# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X
|  | : |  |
| *In re* | : | Chapter 11 |
|  | : |  |
| Nortel Networks Inc., *et al.*,[1] | : | Case No. 09-10138 (KG) |
|  | : |  |
| Debtors. | : | Joint Administration Pending |
|  | : |  |
---------------------------------------------------------X

## DECLARATION OF JOHN DOOLITTLE, VICE PRESIDENT OF NORTEL NETWORKS INC. IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, John Doolittle, do hereby declare as follows:

1.      I am Vice President of Nortel Networks Inc. ("NNI"), a corporation organized under the laws of Delaware.  I also serve as a Vice President of the other above-captioned debtors (collectively with NNI, the "Debtors" or the "U.S. Debtors") in these cases filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[2]  I am generally familiar with the day-to-day operations of the Debtors and their affairs, books and records.

2.      On the date hereof (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  The Debtors are operating their businesses and managing

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).

their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

       3.      The Debtors are all direct or indirect subsidiaries of Nortel Networks

Corporation ("NNC"), a corporation organized under the laws of Canada.  I also serve as the

Treasurer of NNC.  Concurrently with these chapter 11 cases, NNC, Nortel Networks Limited

("NNL") and other affiliated Canadian corporations (collectively, the "Canadian Debtors")[3] are

seeking insolvency protection under the Companies' Creditors Arrangement Act (the "Canadian

Proceedings") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian

Court").  A proposal will be presented to the Canadian Court that Ernst & Young Inc. be

appointed to serve as the monitor (the "Monitor") and foreign representative of the Canadian

Debtors, and the Monitor is currently seeking recognition of the Canadian Proceedings in this

Court under chapter 15 of the Bankruptcy Code.  Additionally, certain of Nortel's European

subsidiaries will make consequential filings for creditor protection.  Together, the Debtors, the

Canadian Debtors and certain of their non-debtor affiliates operate an integrated, multinational

business, providing networking and communications technology and services to customers in the

United States, Canada and around the world.  Attached as Schedule 1 is a chart summarizing the

Debtors' corporate organization.

       4.      To minimize the adverse effects of filing for bankruptcy protection on

their businesses, the Debtors have requested various types of "first day" relief (collectively, the

"First Day Motions").  The First Day Motions seek relief intended to allow the Debtors to

perform and meet those obligations necessary to fulfill their duties as debtors-in-possession.  I

---

[3]      The Canadian Debtors include:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

am familiar with the contents of each First Day Motion (including the exhibits thereto), and

believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to

operate in chapter 11 with minimum disruption or loss of productivity or value, (b) constitutes a

critical element in achieving a successful reorganization of the Debtors, and (c) best serves the

Debtors' estates and creditors' interests.

5.    I submit this declaration in support of the First Day Motions and pursuant

to 28 U.S.C. § 1746.  Except as otherwise indicated, all facts set forth in this declaration are

based upon my personal knowledge, information supplied to me by other members of the

Debtors' management and professionals or learned from my review of relevant documents or

upon my opinion based upon my experience and knowledge of the Debtors' operations and

financial condition.  If I were called upon to testify, I could and would testify competently to the

facts set forth herein.  I am authorized to submit this declaration.

6.    Part I of this declaration describes the Debtors' businesses, their capital

structure and the circumstances surrounding the commencement of these chapter 11 cases.  Part

II summarizes the relief requested in each First Day Motion and the facts supporting those

requests.

# I

## BACKGROUND

### Nortel's History

7.    The name Nortel is known throughout the world for leadership in the

networking and communications industries.  With over 110 years of experience, the Nortel

Companies (as defined below) work closely with their service provider and enterprise customers

3

in the United States, Canada, Central and Latin America, Europe, the Middle East and Africa, and Asia to deliver them cutting edge hardware and software solutions and related services.

8.      The Nortel Companies trace their heritage to 1895 when the Bell Telephone Company of Canada founded the Northern Electric and Manufacturing Company Limited ("Northern Electric") as an equipment provider for Canada's telephone system. Over the following century, Northern Electric grew into Northern Telecom and eventually Nortel, gaining a well-deserved reputation for innovation and creativity through the development of ground-breaking technology -- including many industry firsts -- in such fundamental technologies as digital, optical, wireless, internet protocol, voice-over internet protocol, broadband, multimedia, and ethernet. Through substantial research and development ("R&D") initiatives and external R&D partnerships, the Nortel Companies continue to invest in the development of next-generation technologies to deliver value to their customers around the world.

9.      From the mid-1980s to 2000, the Nortel Companies expanded substantially, helping to lead the telecommunications boom, moving from the development and manufacturing of traditional landline phone technology and equipment into the wireless and digital age. From its Canadian base, North American operations were expanded into the United States with the establishment of production and R&D facilities, resulting in an increase in the number of U.S.-based employees and the creation of a large customer base in the U.S. At the same time, the Nortel Companies moved aggressively into Europe, Asia, Africa and Latin America, becoming a truly global enterprise.

10.      In 1998, the name Nortel Networks was first officially adopted in recognition of the continuing transformation of the companies' business. In 2000, BCE Inc., the

4

parent company of Bell Canada, spun-off substantially all of its shareholdings in Nortel through

a statutory reorganization transaction, with the result that NNC became the ultimate parent entity

of the Nortel Companies, and NNL became its principal Canadian operating subsidiary.  NNC

and its predecessors have been a public company in Canada for many decades, listed on the

Toronto Stock Exchange, and became a public company in the United States in 1975, listed on

the New York Stock Exchange.  Notwithstanding the fact that NNC and NNL are non-U.S.

companies, they nevertheless report on the same basis as U.S. domestic companies because

neither NNC nor NNL meets all the requirements of a "foreign private issuer" pursuant to Rule

3b-4 under the U.S. Securities Exchange Act of 1934, as amended.

### The Dot Com Bust and Nortel's Restatements

11.    At its peak in 2000, the Nortel Companies reported approximately $30

billion of annual revenue, employed nearly 93,000 employees, and had a market capitalization

(for NNC) of over $250 billion.  With the burst of the high-tech bubble in early 2001 and the

resulting significant downturn in both the telecommunications industry and the economic

environment, the Nortel Companies began to face an increasingly difficult competitive

environment.  After a long period of expansion, the capital expenditure levels of many customers

began to decrease substantially in 2001.  Also, R&D costs continued to expand during 2001 as

the Nortel Companies and its competitors scrambled to predict and adjust to the rapidly changing

technological landscape.

12.    Since 2001, the Nortel Companies have taken a wide range of steps to

right-size their businesses, increase efficiency, cut costs and focus on building on their

substantial franchise in potentially high-growth and high-margin areas.  Among the most

significant steps taken have been a series of restructurings as principally announced in 2001,

2004, 2006, 2007 and 2008 that have reduced the number of worldwide employees from more than 90,000 to about 30,000.  These restructurings have included (a) the outsourcing of nearly all manufacturing and production to a number of key suppliers, including, most importantly, Flextronics Telecom Systems Ltd. and its affiliates; (b) the substantial consolidation of key R&D expertise in Canada and China; (c) decisions to dispose of or exit certain non-core businesses, such as the sale of Nortel's United Mobile Technology System business unit; (d) the creation and/or expansion of joint venture relationships (such as with LG Electronics, Inc. of Korea and Guandong-Nortel Telecommunications Equipment Company Limited of China); (e) establishing alliances with various large organizations; (f) real estate optimizations, including the sale of the Company's former headquarters in Brampton, Ontario, Canada; and (g) the continued reorientation of the Nortel Companies from a traditional supplier of telecommunications equipment to a global leader in cutting edge networking hardware and software solutions.

13.    At the same time, the Nortel Companies worked tirelessly to meet the challenges presented in the aftermath of the tech bust and, beginning in 2003, to address the significant issues that arose when a number of accounting irregularities came to light.  These irregularities, which primarily involved practices relating to the improper booking of revenue and establishment and release of accrued liabilities, led to regulatory, civil and criminal investigations, and the discovery of certain material weaknesses in internal control over financial reporting ultimately resulted in four successive restatements of the consolidated financial statements of the Nortel Companies for the fiscal years 2000 through 2005 and certain interim periods, the termination of a number of high-ranking executives for cause, the replacement of the then-incumbent CEO, CFO and Controller and the senior finance management team, and a complete revamping of control processes.  The restatements also triggered substantial

6

shareholder litigation in Canada and the United States, all of which was settled in 2006 for cash of $575 million and NNC common shares valued at $1.6 billion. Since 2005, Nortel has established a new senior executive leadership team with key external hires and internal promotions, entered into settlements with the Ontario Securities Commission and the U.S. Securities and Exchange Commission and confirmed that it is not the subject of the ongoing criminal investigations. In addition, Nortel remediated its material weaknesses and returned to timely financial reporting.

### The Chapter 11, CCAA and European Filings

14.    The Nortel Companies operate in a highly competitive environment. The networking solutions industry is characterized both by industry rationalization as well as consolidation. By way of example, two of Nortel's largest competitors, Lucent Technologies Inc. and Alcatel, merged in 2006 and two of its largest customers, Verizon Wireless and Alltel Corporation, merged in 2008. Simply put, the competition for market share is fierce, and the cost of rapid technological development is steep.

15.    In recent years, the operating costs of the Nortel Companies have generally exceeded revenues, resulting in negative cash flow. A number of factors have contributed to these results, including competitive pressures, an inability to reduce operating expenses fast enough, the incurrence of costs related to restructuring efforts, significant competitor and customer consolidation, customers cutting back on capital expenditures and deferring new investments and the poor state of the global economy. These difficulties have increased materially in recent months as global economic conditions have dramatically worsened. The Nortel Companies are experiencing significant pressure on their businesses and facing a deterioration of their cash and liquidity, globally as well as on a regional basis, as

7

customers across all businesses delay and reduce their capital expenditures. In particular, the

extreme volatility in the global markets has hampered the ability to accurately forecast future

revenue and cash position.

16.     After Nortel announced in 2004 the need to restate prior period financial

results, Standard & Poor's Corporation ("Standard & Poor's") and Moody's Investors Service,

Inc. ("Moody's") reduced the Nortel credit ratings to below investment-grade. As a result, the

Nortel Companies were unable to access the commercial paper market and were limited in their

access to the capital markets. For several years, the Nortel Companies were only able to raise

high yield/convertible debt and did not have any revolving credit or other bank lines.

17.     Current market conditions have further restricted Nortel's ability to access

the capital markets, which has been compounded by recent actions taken by rating agencies with

respect to its credit ratings. In September 2008, Standard & Poor's revised its outlook on Nortel

from positive to stable, and Moody's revised its outlook on Nortel from stable to negative. In

November 2008, Standard and Poor's changed its outlook to negative. In December 2008,

Moody's issued a downgrade of Nortel's corporate family rating from B3 to Caa2. The actions

of the rating agencies also jeopardize the ongoing relationship between the Nortel Companies

and Export Development Canada ("EDC," Canada's federal export credit agency, which

provides financing support to Canadian exporters). EDC provides a support facility that

backstops certain letters of credit and performance bonds and the recent Moody's downgrade

gives EDC a right to suspend additional support under the facility. A 30-day waiver was granted

by EDC on December 15, 2008. On January 18, 2009, EDC and Nortel entered into a

subsequent agreement for 30 days that provides Nortel access to a maximum of up to $30 million

of additional support under the facility during this period, to allow EDC and Nortel to work

together to see if a longer term arrangement, acceptable to both parties, can be reached.  The

agreement is subject to the condition that any support granted by EDC post-filing under the EDC

Support Facility, as it may be amended from time to time, is secured by a second charge over all

the assets of the Canadian Debtors, subject only to the Administrative Charge (other than the

Carling Facility, where the charge will be a third ranking charge).  The potential termination of

the EDC Support Facility would be very damaging to the Debtors' businesses.

18.    In November 2008, Nortel announced a new operating model that will

consolidate executive and management personnel across the global organization and transition

the company to vertically-integrated business units.  In addition, Nortel announced a further

restructuring plan which provides for a net reduction in global workforce of approximately 1,300

positions as well as additional cost cutting measures.  The November workforce reduction was

the second of the year, with total 2008 announced job reductions of 3,500.

19.    It has become increasingly clear that the struggle to reduce operating costs

during a time of decreased customer spending and massive global economic uncertainty has put

substantial pressure on Nortel's liquidity position globally, and in particular in North America.

With no current access to the capital markets, the prospects of the capital markets opening up in

the near term being very dim, substantial interest carrying costs on over $4 billion of unsecured

public debt, and significant pension plan liabilities that are expected to increase in a very

substantial and material manner principally due to the adverse conditions in the financial markets

globally, it has become imperative for the Nortel Companies to protect their current cash

positions.

20.    Against this background, Nortel has been assessing its projected liquidity

position, particularly taking into account its highly leveraged debt position, downgraded credit

ratings and significant practical limitations given its existing high cost structure on accessing the

cash position of Nortel Companies in certain regions. After exploring all possible alternatives,

Nortel has concluded that, in the absence of seeking creditor protection, in later portions of this

year there is a significant risk it would have insufficient cash resources on a regional basis and

would likely be unable to remedy this deficit position through third-party financing. Nortel has

further determined that a number of factors relating to its high cost structure liabilities raise

serious impediments to its ability to continue operations absent a fundamental financial and

business restructuring that can most effectively and quickly be achieved within the framework of

bankruptcy and insolvency proceedings in multiple jurisdictions. As a consequence, Nortel has

determined that it will not make payment of its regularly scheduled interest due January 15, 2009

on its outstanding public debt and will seek creditor protection under the respective restructuring

regimes of Canada, the United States and certain EMEA subsidiaries.

21.    Therefore, in light of the foregoing, on January 14, 2009, NNI, NNCC,

Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Architel Systems (U.S.)

Corporation, Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks

Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel

Networks HPOCS Inc., Nortel Networks International Inc., Northern Telecom International Inc.

and Nortel Networks Cable Solutions Inc. filed voluntary petitions for relief under chapter 11 of

the Bankruptcy Code with this Court. Also, on January 14, the Canadian Debtors will

commence the Canadian Proceedings and it is anticipated that certain of Nortel's European

subsidiaries will make consequential filings for creditor protection (collectively, the "EMEA

Debtors"). Pursuant to section 18.6 of the CCAA, NNI will also bring an application before the

Canadian Court for recognition of the automatic stay imposed by the filing of the U.S. Debtors'

10

bankruptcy petitions.  Applications will be made to this Court under chapter 15 of the

Bankruptcy Code for recognition of the Canadian Proceedings as foreign main proceedings by

Ernst & Young Inc. as foreign representative for the Canadian Debtors.

## Corporate Structure

22.     The Nortel Companies consist of NNC, the ultimate parent company;

NNL, NNC's principal Canadian operating subsidiary; NNI, a Delaware corporation and the

principal U.S. operating subsidiary (and a direct subsidiary of NNL); NNCC, a Delaware

corporation and a finance company with public debt; and over 140 affiliates around the world

(together, the "Nortel Companies").  NNC's most significant assets consist of its investments in

its direct and indirect subsidiaries.  NNC and NNL are both incorporated under the Canada

Business Corporations Act (the "CBCA").  As set forth in NNC's 2008 third quarter report, NNC

has, as of September 30, 2008, consolidated assets of approximately $11.6 billion and

consolidated liabilities of approximately $11.8 billion.

23.     The Nortel Companies' U.S. businesses are primarily conducted through

NNI, which is the direct or indirect parent of a majority of the U.S. Nortel Companies, including

U.S. Debtors.  NNCC is a financing company with few assets and has no operations of its own.

As of September 30, 2008, NNI had assets of approximately $9 billion and liabilities of

approximately $3.2 billion, which liabilities do not include liabilities relating to NNI's guarantee

of some or all of the Nortel Companies' approximately $4.2 billion of unsecured public debt.

Each of NNC, NNL, NNI and NNCC is an issuer and/or guarantor of some or all of the Nortel

Companies' approximately $4.2 billion of unsecured public debt.

24.     In addition to the Debtors, Nortel has other U.S. subsidiaries, most of

which either have no material assets or business in the U.S. or are in the process of being wound-

down.  Several entities, particularly Nortel Government Solutions Incorporated ("NGS") and

Nortel Networks (CALA) Inc., have material operations and are not part of these proceedings.

None of these other U.S. subsidiaries has commenced chapter 11 proceedings at this time.

25.     The Nortel Companies also include NNL's and NNC's active subsidiaries

located in Europe, the Middle East and Africa (collectively, the "EMEA Entities").  The majority

of the EMEA Entities are subsidiaries of Nortel Networks UK Limited ("NN UK), with the

exception of (a) Nortel Networks SA ("NN France"), which is jointly owned by NNL and Nortel

International Finance & Holding BV ("NNIF"), and Nortel Networks France SAS ("NN France

SAS"), which is a subsidiary of NN France; and (b) Nortel Networks (Ireland) Limited ("NN

Ireland"), which is a wholly owned subsidiary of NNL for fiscal reasons.  NN UK is the largest

business of the EMEA Entities and is the headquarters for the EMEA region.

### Nortel's Business

*Global Integrated Business Model*

26.     The Nortel Companies' businesses are highly complex and global in

nature.  As set forth in more detail below, the U.S. Debtors, the Canadian Debtors, the EMEA

Debtors and their debtor and non-debtor affiliates employ a global integrated business model.  In

particular:

- The main operating subsidiaries around the world operate in each of Nortel's four main business segments.

- Nortel has substantially outsourced its manufacturing, relying on contract manufacturers with affiliates across the world to supply the Nortel Companies globally.

- The Nortel Companies employ a complex internal purchasing system where sales orders are placed at the local, in-country level, and internal purchase orders are routed to one of four purchasing hubs (located in four separate countries), which entities place orders with suppliers around the world.

- The Nortel Companies use a complex transfer pricing model, periodically submitted to global taxing authorities for approval, to allocate costs and revenues throughout the global enterprise and ensure the proper allocation of tax payments among relevant jurisdictions.

- Nortel's integrated business model is financed through a complex intercompany cash management system that itself is integrated with Nortel's sales, purchasing, supply and distribution networks.

- Nortel employees around the world share responsibility for the R&D, sales and operations of the global enterprise.

### Nortel's Business Segments

27.     As of December 31, 2008, the Nortel Companies had four main business segments – (1) Carrier Networks ("Carrier"); (2) Enterprise Solutions ("Enterprise"); (3) Metro Ethernet Networks ("MEN"); and (4) Global Services.

28.     **Carrier**.  The Carrier segment provides wireless networking solutions that enable service providers and cable operators to supply mobile voice, data and multimedia communications services to individuals and enterprises using mobile telephones, personal digital assistants, and other wireless computing and communications devices.

29.     **Enterprise**.  The Enterprise segment provides communication solutions that are used to build new networks and transform existing communications networks into more cost effective, packet-based networks supporting data, voice and multimedia communications.

30.     **MEN**.  The MEN segment provides optical networking and carrier grade Ethernet data networking solutions to make the carrier and large enterprise customers' networks more scalable and reliable for the high-speed delivery of diverse multimedia communications services.

31.     **Global Services**.  The Global Services segment provides a broad range of services and solutions supporting the entire lifecycle of multi-vendor, multi-technology networks

for enterprises and carriers worldwide seeking to reduce costs, improve efficiency and performance and capitalize on new revenue opportunities.

32.    With certain exceptions, the business segments are not segregated by legal entities but are operated across various legal entities.  One such exception is NGS, which has been reported historically under "Other" in Nortel's business segments.

33.    On January 1, 2009, Nortel implemented a new operating model, which decentralized several of its corporate functions and transitioned to vertically-integrated business units to give greater financial and operational control to the business units and reduce duplication.  Enterprise customers are now served by the Enterprise business unit, which is responsible for product and portfolio development, R&D, marketing and sales, partner and channel management, strategic business development and associated functions.  Service provider customers are served by two business units with full responsibility for all product, services, applications, portfolio, business and market development, marketing and R&D functions: Carrier and MEN.  A dedicated global carrier sales organization supports both business units.The Global Services and Global Operations organizations will be decentralized and transitioned to the business units by April 1, 2009 to ensure there is no impact to customer service.  Beginning January 1, 2009, Nortel includes services revenue in the respective financial results for Enterprise, Carrier and MEN.

34.    The Global Services and Global Operations organizations will be decentralized and transitioned to the business units by April 1, 2009 to ensure there is no impact to customer service.  Beginning January 1, 2009, Nortel includes services revenue in the respective financial results for Enterprise, Carrier and MEN.

14

35.     Historically, the various business segments have been reported across the following geographic regions for financial reporting purposes: United States, Europe, Middle East and Africa, Canada, Asia and Central and Latin America.

**Global Supply Chain**

36.     The Nortel Companies rely on numerous suppliers, including contract manufacturers responsible for the manufacturing of Nortel hardware and the various materials necessary for the Debtors to provide their solutions to customers and end-users. The Nortel Companies employ a complex internal purchasing system for their hardware and software products. When a sales order is placed with a regional Nortel distribution entity, an internal purchase order is generated and automatically routed through one of four purchasing hub entities, depending on the business segment and the geographical region involved. Purchasing hub entities manage key supplier relationships and act as funneling points for orders from Nortel's sale entities all around the world.

37.     The four purchasing hubs are NNL, NNI, NN UK and NN France. Approximately two-thirds of all Nortel purchasing activity flows through the North American purchasing hubs, NNL and NNI. NNI acts as the purchaser for Enterprise Data products for all of the Americas and Asia as well as certain other worldwide products.

38.     The respective purchasing hub entity contracts directly with equipment and design manufacturers to facilitate the ultimate product delivery to the customer. Following shipping of the product, the purchasing hub entity pays the manufacturer and the distribution entity books an intercompany payable to the purchasing hub entity. The payable equals the amount paid by the purchasing hub entity to the supplier plus a small margin. The manufacturer may be paid prior to the internal payment of the resulting receivable. Intercompany obligations

15

are settled monthly through cash payments or setoffs, to the extent available, and are carried

forward in certain circumstances as a net receivable.

***Transfer Pricing and Cash Management***

39.     Once a customer's hardware needs have been manufactured, Nortel

provides installation, network integration and support services (collectively, "Deployment

Services").  In keeping with the integrated, co-dependent nature of the Nortel Companies,

Deployment Services are managed regionally and cover all product lines.  For example, there are

two divisions responsible for Deployment Services in North America.

40.     Given the integrated basis on which the Nortel Companies operate, certain

of the Nortel Companies have reached agreements and engaged in certain practices to properly

allocate profits and costs across the various affiliates.  The key profit driver of Nortel's business

is the development and maintenance of intellectual property, and the Nortel Companies utilize a

residual profit sharing methodology (the "RPSM") that is designed to reflect that certain Nortel

affiliates, designated as profit sharing entities, are the source of the research and development

that has created Nortel's global technology footprint.  The RPSM is a transfer pricing

methodology designed to allocate profit or loss based on each relevant Nortel Company's

relative share of certain R&D costs.  Transfer pricing methodologies have been recognized by

the Organization for Economic Co-operation and Development (the "OECD") and U.S. and

Canadian taxing authorities as mechanisms to fairly allocate costs and profits for fully integrated

multinational corporations such as Nortel and to ensure the proper allocation of tax payments

among interested jurisdictions.  Transfers and payments dictated by the RPSM are governed by

practices agreed to by the relevant Nortel Companies, including as memorialized in a master

R&D agreement, as it has been amended from time to time.  Nortel's RPSM practices are meant

16

to comply with tax regulations, and NNI and NNL from time to time seek approval of their bilateral Advance Pricing Agreement application permitting such practices from taxing authorities, including the Internal Revenue Service and the Canada Revenue Agency.

41.    In addition, from time to time, as part of the management of Nortel's cash needs on a global basis, certain Nortel affiliates, including NNI and NNCC, have funded intercompany loans and capital contributions to other Nortel Companies on an as-needed basis to fund working capital in the ordinary course of business. The source and terms of such intercompany loans are typically memorialized through notes or other loan documentation.

42.    The Debtors' and their Canadian parents' interests are united in their integrated, co-dependent business relationship. As a result, the Debtors' ability to reorganize is dependent on (a) the reorganization of the jointly operated Nortel businesses in Canada and the U.S. and/or (b) the sale of one or more Nortel business segments that are located in both Canada and the U.S. The U.S. Debtors and the Canadian Debtors therefore have committed to engage in a joint and harmonious approach to their restructuring in both jurisdictions, to the expected benefit of their collective stakeholders. Such cooperation and coordination will be required, for example, in any sale of a cross-border business segment by a Canadian parent, which could involve the sale of assets and the assignment of material contracts currently employed by U.S. Debtors and the transfer of employees relevant to U.S. operations. Such overlapping assets and obligations of the U.S. Debtors and Canadian Debtors similarly will be relevant in the development of a reorganization plan for any and all of the Debtors, even outside of an asset sale context. The U.S. Debtors and Canadian Debtors will also seek to coordinate as needed any such actions with the Nortel Companies subject to previously described proceedings in the Europe.

17

## II

## FIRST DAY MOTIONS

43.     To minimize the adverse effects on their businesses of seeking protection

under chapter 11, the Debtors have requested various types of relief in the following First Day

Motions, all of which are being filed concurrently with this declaration.  For the reasons

discussed below, I believe that the relief requested in each of the First Day Motions is necessary

and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-

interest.

## PROCEDURAL MOTIONS

A.      MOTION FOR AN ORDER PURSUANT TO RULE 1015(B) OF THE FEDERAL
        RULES OF BANKRUPTCY PROCEDURE DIRECTING THE JOINT
        ADMINISTRATION OF THEIR CHAPTER 11 CASES ("JOINT ADMINISTRATION
        MOTION")

44.     As described above, all of the Debtors are direct or indirect subsidiaries of

NNC.  Together with the Canadian Debtors and other affiliated entities, the Debtors operate an

integrated, multinational business, providing networking and communications technology and

services to customers in the United States, Canada and around the world.  Accordingly, the

Debtors have sought entry of an order directing the joint administration of their chapter 11 cases.

45.     I believe that joint administration will eliminate the need for duplicative

notices, applications and orders, thereby allowing the Debtors to avoid the time and expense that

otherwise would be required to separately administer individual cases.  The rights of creditors

will not be adversely affected because this Joint Administration Motion requests only

administrative, and not substantive, consolidation of the Debtors' cases.  In fact, all creditors will

benefit from the reduced costs that will result from the joint administration of these cases.

Finally, I believe joint administration will simplify supervision of the administrative aspects of

these chapter 11 cases by this Court and the Office of the United States Trustee for the District of

Delaware (the "U.S. Trustee").

B.    MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11
      U.S.C. § 521 EXTENDING THE DEBTORS' DEADLINE TO FILE SCHEDULES OF
      ASSETS AND LIABILITIES AND STATEMENT OF FINANCIAL AFFAIRS
      ("EXTENSION OF TIME MOTION")

            46.    By the Extension of Time Motion, the Debtors seek the entry of an Order,

extending the time within which the Debtors must file their Schedules and Statements.

            47.    I believe that "cause" exists to extend the Debtors' time to file the

Schedules and Statements.  Given the size and complexity of the Debtors' business, I understand

that a significant amount of information must be accumulated, reviewed and analyzed to properly

prepare the Schedules and Statements.  From the Petition Date forward, the Debtors will be

consumed with a multitude of critical administrative and business decisions arising in

conjunction with the commencement of these chapter 11 cases.  While the Debtors have initiated

the major task of assembling the data necessary for the Schedules and Statements, they will not

be able to complete this undertaking prior to the Original Deadline.

            48.    At present, the Debtors estimate that an extension from the Original

Deadline of an additional thirty days, through and including March 16, 2009, should provide

sufficient time to assemble and verify information and prepare the Schedules and Statements,

without prejudice to the Debtors' right to seek further extensions if necessary.

C.    MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER APPROVING
      CROSS-BORDER COURT-TO-COURT PROTOCOL ("CROSS-BORDER
      PROTOCOL MOTION")

            49.    By the Cross-Border Protocol Motion, the Debtors are requesting the

Court to enter an Order approving the cross-border court-to-court protocol attached to the

Motion (the "Protocol").

50.     As described more fully above, the Debtors operate their businesses and manage their assets on a global integrated basis with the Canadian Debtors. Consequently, I believe it is essential that the companies are able to coordinate these chapter 11 cases and the Canadian Proceedings (collectively, the "Insolvency Proceedings") in a coordinated fashion so as to maximize the value of each of their estates. The Debtors and the Canadian Debtors therefore seek approval of a protocol that will provide this Court and the Canadian Court with a framework for the coordination of the administration of the Insolvency Proceedings on matters of concern to both Courts. The Protocol proposes to establish general administrative procedures to govern and facilitate the administration of cross-border matters among the Debtors and the Canadian Debtors and the Insolvency Proceedings, and to permit the effectuation of cooperative principles such as comity as appropriate, while also ensuring that this Court and the Canadian Court maintain their independent jurisdiction over other aspects of their respective Proceedings.

51.     Among the issues addressed by the proposed Protocol are:

   a.     The purpose and goals of the Insolvency Proceedings;

   b.     Maintaining comity and independence between the U.S. and Canadian Courts;

   c.     Promoting coordination and cooperation between the U.S. and Canadian Courts; and

   d.     Other issues related to the Insolvency Proceedings.

52.     In order to facilitate the efficient and effective administration of cross-border issues that may arise from time to time in the Insolvency Proceedings, I believe that it is necessary and appropriate to set out and have this Court and the Canadian Court adopt and approve a set of administrative and procedural guidelines for dealing with such cross-border

20

issues. The proposed administrative and procedural guidelines are set forth in the Protocol

attached to the Cross-Border Protocol Motion.

53.    For these and for additional reasons set forth in the Cross-Border Protocol

Motion, I assert that the adoption of the Protocol is in the best interests of the Debtors' estate,

their creditors, and all parties-in-interest.

## PROFESSIONAL RELATED MOTIONS[4]

D.    APPLICATION FOR AN ORDER AUTHORIZING EMPLOYMENT AND
RETENTION OF CLEARY GOTTLIEB STEEN & HAMILTON LLP NUNC PRO
TUNC TO THE PETITION DATE AS COUNSEL FOR THE DEBTORS AND
DEBTORS IN POSSESSION ("CLEARY GOTTLIEB RETENTION MOTION")

54.    For the purposes of these chapter 11 proceedings, the Debtors have

determined that it will be necessary to engage counsel with knowledge and experience in the

areas of bankruptcy, reorganization, litigation, securities law, employee benefits, intellectual

property, mergers and acquisitions, divestitures and corporate governance. Such counsel will

enable the Debtors to carry out their duties in these chapter 11 proceedings and to assist in the

reorganization of their estates. Consequently, by filing the Cleary Gottlieb Retention Motion, the

Debtors seek to retain and employ the law firm of Cleary Gottlieb Steen & Hamilton LLP

("Cleary Gottlieb" or the "Firm") as counsel in all phases of their chapter 11 cases. Subject to

the control and further order of this Court, Cleary Gottlieb will be required to render various

services to the Debtors, including the following professional services:

a.    providing advice to the Debtors with respect to their powers and
duties as debtors in possession in the continued operation of their businesses and
the management of their properties;

b.    taking necessary or appropriate action to protect and preserve the
Debtors' estates, including prosecuting actions on the Debtors' behalf, defending

---

[4]    The Debtors also intend to file an application for retention of their financial advisor, Lazard Frères & Co.
LLC, in the future.

any actions commenced against the Debtors, conducting negotiations concerning litigation or other disputes in which the Debtors are involved, and filing and prosecuting objections to claims filed against the Debtors' estates;

        c.      preparing, on behalf of the Debtors, applications, motions, answers, orders, reports, memoranda of law and other papers in connection with the administration of the Debtors' estates;

        d.      representing the Debtors in negotiations with all other creditors, equity holders, and parties in interest, including governmental agencies and authorities;

        e.      representing the Debtors in negotiations regarding possible dispositions of assets;

        f.      providing advice to the Debtors with respect to the cross-border aspects of Nortel's bankruptcy proceedings;

        g.      negotiating and preparing on behalf of the Debtors one or more plans of reorganization and all related documents; and

        h.      performing other necessary or appropriate legal services in connection with these chapter 11 cases.

55.      I understand that Cleary Gottlieb employs more than 1,000 attorneys and maintains offices for the practice of law at One Liberty Plaza, New York, New York, among other locations. I have also been informed that James L. Bromley of Cleary Gottlieb, a partner who will be engaged in these chapter 11 cases, is a member in good standing of, among others, the Bar of the State of New York and the United States District Court for the Southern District of New York; and that Lisa M. Schweitzer of Cleary Gottlieb, another partner who will be engaged in these chapter 11 cases, is also a member in good standing of, among others, the Bar of the State of New York and the United States District Court for the Southern District of New York. As I will describe in greater detail later in this declaration, the Debtors also seek to retain and employ the law firm of Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols") as their Delaware co-counsel in these chapter 11 proceedings. Cleary Gottlieb and Morris Nichols intend

22

to work cooperatively to provide effective and cost-efficient representation of the Debtors in their reorganization.

56.     Cleary Gottlieb has represented Nortel, a long standing firm client for more than twenty years, regarding a number of matters, including providing general corporate advice and legal services relating to bankruptcy, reorganization, litigation, securities law, employee benefits, intellectual property, mergers and acquisitions, divestitures and corporate governance, as well as regarding the laws of certain non-U.S., non-Canadian jurisdictions.

57.     The Debtors have selected Cleary Gottlieb to serve as their counsel in these chapter 11 proceedings because of the Firm's extensive knowledge of Nortel, including a variety of cross-border aspects of their operations, as well as the Firm's extensive experience and knowledge in the field of business reorganizations under chapter 11 of the Bankruptcy Code and other related matters. I understand that Cleary Gottlieb also has substantial experience representing companies involved in the telecommunications industry. I believe that the Firm is both well qualified and uniquely able to represent them as debtors in possession in these chapter 11 cases in an efficient and timely manner. If the Debtors were required to retain counsel other than Cleary Gottlieb in connection with the prosecution of these chapter 11 cases, I believe that the Debtors, their estates and all parties in interest would be unduly prejudiced by the time and expense necessarily required by such new attorneys to familiarize themselves with the intricacies of the Debtors' businesses, operations and capital structure.

58.     I have been informed that Cleary Gottlieb does not hold or represent any interest adverse to the Debtors or their estates and that Cleary Gottlieb is a "disinterested person" as that phrase is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and I believe Cleary Gottlieb's employment and retention is

necessary and in the best interests of the Debtors and their estates. Except as set forth in the

Cleary Gottlieb Retention Application and the Declaration of James L. Bromley attached thereto,

I understand that the partners, counsel and associates of Cleary Gottlieb have not represented,

and do not have any connection with, the Debtors, their creditors, equity security holders or any

other parties in interest in any matters relating to the Debtors or their estates. I have been

informed that Cleary Gottlieb is currently representing certain of the Debtors' creditors, equity

holders and other parties in interest in matters wholly unrelated to these proceedings. I

understand that Cleary Gottlieb has fully informed the Debtors of its ongoing representation of

these entities, and the Debtors have consented to the Firm's continued representation of these

entities in matters unrelated to these proceedings. I believe that given the size of the Debtors and

the extent of their creditor and interest holder constituencies, it is unlikely that any major law

firm with the expertise necessary for these cases could be found that is not currently representing

some of the Debtors' major creditors or interest holders in unrelated matters. I believe that

Cleary Gottlieb's current and future representation of these entities will not in any way adversely

affect the Firm's representation of the Debtors.

59.     Therefore, I respectfully request that this Court grant the relief requested

in the Cleary Gottlieb Retention Application.

E.     APPLICATION FOR AN ORDER AUTHORIZING EMPLOYMENT AND
       RETENTION OF MORRIS, NICHOLS, ARSHT & TUNNELL LLP NUNC PRO
       TUNC TO THE PETITION DATE AS DELAWARE COUNSEL FOR THE DEBTORS
       AND DEBTORS IN POSSESSION ("MORRIS NICHOLS RETENTION MOTION")

60.     By this Application, the Debtors seek to retain Morris Nichols as

Delaware counsel for the Debtors, nunc pro tunc, to the Petition Date. The Debtors seek to retain

Morris Nichols because of the firm's extensive experience and knowledge in the fields of, inter

alia, Debtors' and creditors' rights, business reorganizations under chapter 11 of the Bankruptcy

24

Code and general corporate law, and because of its expertise, experience and knowledge in practicing before this Court, its proximity to the Court and its ability to respond quickly to emergency hearings and other emergency matters in this Court.

61.     In addition, in connection with their engagement by the Debtors, Morris Nichols has become familiar with the Debtors' business and affairs.  Accordingly, I believe Morris Nichols, in consultation with Cleary Gottlieb, is well qualified to deal effectively with the potential legal issues and problems that may arise in the context of these chapter 11 cases.  I believe that the services of Morris Nichols are necessary to enable the Debtors to execute faithfully their duties as debtors in possession.

F.     APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING THE RETENTION OF EPIQ SYSTEMS AS NOTICE, CLAIMS AND BALLOTING AGENT TO THE DEBTORS ("EPIQ RETENTION MOTION")

62.     I have been informed that the numerous creditors and other parties in interest involved in these chapter 11 cases may impose heavy administrative and other burdens on the Court and the Office of the Clerk of the Court (the "Clerk's Office").  To relieve the Clerk's Office of these burdens, the Debtors seek an order appointing Epiq Bankruptcy Solutions, LLC ("Epiq") as the notice, claims and balloting agent to among other things: prepare and serve required notices in these chapter 11 cases; maintain copies of all proofs of claims filed in these chapter 11 cases and act as balloting agent.  The Debtors selected Epiq because it is one of the nation's leading bankruptcy administrators, and has extensive experience performing these tasks in cases of this size.  I believe that Epiq is well qualified to perform the services contemplated in its retention application.

**MOTIONS RELATED TO DEBTORS' OPERATIONS IN CHAPTER 11**

G.    MOTION FOR AN ORDER PURSUANT TO SECTIONS 345, 363(C)(1), 364(A) AND
        503(B)(1):  (A) APPROVING THE CONTINUED USE OF THE CASH
        MANAGEMENT SYSTEM, BANK ACCOUNTS AND BUSINESS FORMS;
        (B) PERMITTING CONTINUED INTERCOMPANY TRANSACTIONS, GRANTING
        ADMINISTRATIVE PRIORITY STATUS TO POSTPETITION INTERCOMPANY
        CLAIMS AND PRESERVING AND PERMITTING THE EXERCISE OF
        INTERCOMPANY SETOFF RIGHTS; (C) AUTHORIZING BANKS TO HONOR
        CERTAIN TRANSFERS AND CHARGE CERTAIN FEES AND OTHER AMOUNTS;
        AND (D) WAIVING THE REQUIREMENTS OF 11 U.S.C. SECTION 345(B) ON AN
        INTERIM BASIS ("CASH MANAGEMENT MOTION")

        63.    By this Cash Management Motion, the Debtors seek an order of this Court

(a) approving the continued use of the Cash Management System, Bank Accounts and Business

Forms (each as defined below); (b) permitting continued Intercompany Transactions (as defined

below), granting administrative priority status to postpetition Intercompany Claims (as defined

below), and preserving and permitting the exercise of intercompany setoff rights; (c) authorizing

banks to honor certain transfers and charge certain fees and other amounts; and (d) waiving the

requirements of 11 U.S.C. section 345(b) on an interim basis.

        64.    In furtherance of Nortel's integrated global business operations, in the

ordinary course of business the Debtors, the Canadian Debtors and non-debtor affiliates use a

cash management system (the "Cash Management System") to transfer funds between and

among the Debtors, the Canadian Debtors and non-debtor affiliates, to properly allocate costs

and profits, as part of an arm's length transfer pricing policy to comply with tax laws, across all

Nortel entities (the "Nortel Companies") and to manage operations, their cash needs, and the

cash needs of Nortel generally.

Continued Use of the Cash Management System Is Warranted

        65.    The Cash Management System is managed as part of Nortel's integrated

business operations primarily by financial personnel (the "Treasury") shared among the Debtors

26

and the Canadian Debtors in Toronto and is linked to the Nortel Companies' global finance and operations personnel ("Global Treasury").  NNI maintains a series of bank, brokerage and investment accounts to facilitate the movement and investment of cash necessary for its operations.  NNI is also a party to certain transfer pricing and residual profit sharing agreements, and other reconciliation practices with other Nortel affiliates that, as adjusted or amended from time to time, govern the intercompany transfers of funds.  I will discuss the details of the Cash Management System, which is managed on an integrated basis, more fully below.

66.     By filing the Cash Management Motion, the Debtors seek an order authorizing, but not directing, them to continue to use the Cash Management System, subject to certain modifications as discussed below.  In light of the substantial size and complexity of the Debtors' operations, and the interrelationships between the Debtors' operations and those of their affiliates, I believe the maintenance of their current cash management operations is essential for a successful reorganization of their businesses, as well as the preservation and enhancement of the Debtors' respective values as going concerns.  Therefore, I request permission for them to continue, in their own discretion, to employ global cash management procedures that permit the transfer of funds between or among the Debtors and their affiliates periodically in the amounts necessary to continue the operation of their businesses in accordance with the existing Cash Management System.

67.     The Cash Management System has been continuously utilized by the Debtors and constitutes a customary and essential business practice.  The Cash Management System is similar to those commonly employed by multinational corporate enterprises of comparable size and complexity as the Debtors.  The system provides numerous benefits, including the ability to:  (a) control and monitor corporate funds; (b) invest idle cash; (c) ensure

27

cash availability; and (d) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information.

68.    In addition, given the Debtors' corporate and financial structure and the number of affiliated entities participating in the Cash Management System, I believe that it would be difficult and unduly burdensome for the Debtors to establish an entirely new system of accounts and a new cash management system for each separate legal entity. Thus, under the circumstances, maintenance of the Cash Management System not only is essential, but I trust that it is also in the best interests of the Debtors' respective estates and creditors. In addition, I believe preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption of the Cash Management System will (a) facilitate the Debtors' stabilization of their postpetition business operations and (b) assist the Debtors in their reorganization efforts. The Debtors will continue to maintain accurate and current records with respect to all transactions, whether transfers of cash, setoffs or otherwise, so that all transactions can be readily ascertained, traced and recorded properly on applicable intercompany accounts.

69.    If the Debtors are not permitted to continue to utilize the Cash Management System, I believe their operations would be severely, and perhaps irreparably, disrupted. Accordingly, I respectfully request that the Court authorize (but not direct) the Debtors to continue to use the Cash Management System described herein.

70.    In addition, I hereby request authority for the Debtors to open and close bank accounts. I request that the Banks (as defined below) be authorized to honor the Debtors' requests to open or close any bank accounts, provided, however, that any new domestic account is established at a bank insured with the FDIC or the FSLIC and that it is organized under the

laws of the United States or any State therein, or in the case of accounts that may carry a balance exceeding the insurance limitations set thereby, that the bank holding the account has entered into a Uniform Depository Agreement with the U.S. Trustee.

Continued Use of the Bank, Brokerage and Investment Accounts Is Warranted

71.    The Debtors maintain 23 bank, brokerage and investment accounts in the U.S. and two bank accounts abroad.  The movement of funds through these accounts is described below and is illustrated in the chart attached to the Cash Management Motion as Exhibit B, as is described in more detail therein.

72.    Additionally, a chart containing a schedule of the Debtors' prepetition bank, brokerage and investment accounts (the "Bank Accounts") is attached to the Cash Management Motion as Exhibit C.

73.    As set forth in Exhibit C of the Cash Management Motion, within the Cash Management System, the Debtors and their affiliated non-debtors utilize 25 deposit, collection, payment, investment, and brokerage accounts on a regular basis in the ordinary course of their businesses.  To avoid substantial disruption to the normal operation of their businesses and to preserve a "business as usual" atmosphere, as part of their request to maintain the Cash Management System, I hereby request that the Debtors be permitted to continue to use the bank, brokerage, and investment accounts.  I believe allowing these accounts to be maintained with the same account numbers will greatly assist the Debtors in accomplishing a smooth transition to operating in chapter 11.

74.    To protect against the possible inadvertent payment of prepetition claims, the Debtors will immediately advise their banks and financial institutions (collectively, the "Banks") not to honor checks issued prior to the Petition Date, except as otherwise expressly

permitted by an order of the Court and directed by the Debtors. I believe the Debtors have the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments without closing the bank accounts and opening new ones.

Continued Intercompany Transactions and Related Transactions are Appropriate

75.    The Debtors' Cash Management System is complex, but relies on procedures that constitute ordinary, usual and essential business practices, and are similar to those used by other major corporate enterprises. I understand that the Cash Management System provides significant benefits to the Debtors, including the ability to control corporate funds centrally, invest idle cash, ensure the availability of funds when necessary, and reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information. Furthermore, the use of a centralized cash management system reduces interest expense by enabling the Debtors to utilize all funds within the system rather than relying upon short-term borrowing to fund the Debtors' and their non-debtor subsidiaries' cash requirements. The Debtors also benefit from the use of a coordinated cash management system with their other non-debtor affiliates due to the integration of their businesses on an operational level.

76.    The operation of the Debtors' businesses requires that the Cash Management System continues during the pendency of these chapter 11 cases. Requiring the Debtors to adopt new, segmented cash management systems at this early and critical stage of these cases would be expensive, create unnecessary administrative problems, and be much more disruptive than productive. I believe that such a disruption could have a severe and adverse impact upon the Debtors' ability to reorganize. Moreover, as a practical matter, because of the Debtors' complex corporate and financial structure, it would not be possible to establish a new

system of accounts and a new cash management and disbursement system without substantial additional costs and expenses to the Debtors' bankruptcy estates and a significant disruption of the Debtors' business operations. The Debtors propose to modify certain aspects of the Cash Management System to account for cash management practices commonly employed in chapter 11 cases (such as for the handling of setoffs and intercompany claims). Consequently, I believe that maintenance of the existing Cash Management System (as modified to the extent described herein), including the Debtors' continued ability to transfer funds among themselves and with other non-debtor affiliates as described herein, is not only essential but is in the best interests of all creditors and other parties-in-interest.

77.    The Debtors generate certain intercompany payables and receivables with their subsidiaries and other Nortel affiliates as a result of three primary types of transactions: (1) charges related to the purchase of inventory and the provision of services, (2) the Residual Profit Sharing Methodology ("RPSM") and (3) certain ordinary course intercompany loan agreements.

78.    Inventory Purchases. The Nortel Companies' complex and interconnected global supply chain requires that the companies regularly transact with each other, generating intercompany payables and receivables. From a supply chain perspective, the Nortel Companies can be separated into purchasing hub entities and distribution entities. Distribution entities are the primary Nortel sales and relationship contact points for customers in a geographic area. Distribution entities place orders with purchasing hub entities for products that are delivered to customers either by the purchasing hub entities or third party suppliers. Purchasing hub entities manage key supplier relationships and act as funneling points for orders from distribution entities all around the world.

31

79.    Accounts payable and receivable generated by Nortel and its affiliates in the ordinary course of business based on the purchase of products and the provision of services, and satisfaction of customer orders, are reconciled on a monthly basis. For accounts in which it is available, accounts payable and accounts receivable between the Debtors and their affiliates are calculated and reconciled through Citinetting, Citibank's automated netting software. Intercompany accounts, including the Citinetting reports and manual reconciliation and netting of other accounts, are reviewed by Global Treasury and Nortel affiliates settle such intercompany obligations through cash payments, netting (including multi-party netting in some instances) or setoffs, to the extent available. Payments under this settlement system occur monthly, typically in the third week of each month.

80.    <u>Residual Profit Sharing Methodology</u>. Given the integrated basis on which Nortel operates, certain of the Nortel Companies have reached agreements and engaged in certain practices to properly allocate profits and costs across the various affiliates. The key profit driver of Nortel's business is the development and maintenance of intellectual property, and the RPSM is designed to reflect that certain Nortel affiliates designated as profit sharing entities, including NNL, NNI, Nortel Networks UK Limited, Nortel Networks SA (a French company), and Nortel Networks (Ireland) Limited (collectively, the "<u>Profit Sharing Entities</u>") are the source of the research and development that has created Nortel's global technology footprint. The RPSM is a transfer pricing methodology designed to allocate profit or loss based on each Profit Sharing Entity's relative share of certain research and development and other overhead costs. Transfer pricing methodologies have been recognized by the Organisation for Economic Co-operation and Development (OECD) and U.S. and Canadian taxing authorities as mechanisms to fairly allocate costs and profits for fully integrated multinational corporations such as Nortel and

ensure the proper allocation of tax payments among interested jurisdictions.  Transfers and

payments dictated by the RPSM are governed by practices agreed to by the Profit Sharing

Entities, including as memorialized in a master R&D agreement, as it has been amended from

time to time.[5]  Payment obligations under the RPSM are reconciled quarterly, with NNL acting

as a clearinghouse for such payments.  In the near future, Nortel intends to begin reconciling

such payment obligations on a monthly basis.

   81. <u>Intercompany Loans and Investments</u>.  From time to time, as part of the

management of Nortel's cash needs on a global basis, I am aware that certain Nortel affiliates,

including NNI and NNCC,[6] have funded intercompany loans and capital contributions to other

Nortel Companies on an as-needed basis to fund working capital in the ordinary course of

business.  The source and terms of such intercompany loans are typically memorialized through

notes or other loan documentation.  As part of this practice, NNI and NNL are parties to a $1

billion revolving loan agreement dated March 21, 2008, which permits NNL to borrow funds on

an as-needed basis.  While a substantial loan balance has existed and fluctuated in amount over

time, the intercompany loan balance as of January 13, 2009 owed by NNL to NNI is

approximately $295,982,134.75 (the "<u>NNL Loan Receivable</u>").  The Debtors account for all such

intercompany loans and affiliate transactions in their internal accounting systems.

   82. As I described above, prior to the Petition Date, the Debtors and certain

non-debtor affiliates provided services to, and engaged in intercompany financial transactions

---

[5] Nortel's RPSM practices are meant to comply with tax regulations, and NNI and NNL from time to time seek approval of their bilateral Advance Pricing Agreement application permitting such practices from taxing authorities, including the Internal Revenue Service and the Canada Revenue Agency.  Audits by the taxing authorities are ongoing for the periods 2001 to 2005 that could result in the recharacterization of a material amount of historic transfers that were made in accordance with prior transfer pricing practices.

[6] The only loan that has been made by NNCC is an intercompany loan in the amount of $150,000,000 to NNI, made in connection with the issuance of certain bonds.

with, each other in the ordinary course of their respective businesses (collectively, the "Intercompany Transactions"). These transactions are recorded by each entity as an intercompany obligation. The Debtors seek authorization, but not direction, to continue to enter into Intercompany Transactions in the ordinary course of business.[7]

83.    These Intercompany Transactions reduce the administrative costs incurred by the Debtors and their affiliates and allow for the purchase and supply of essential goods for the operation of the Debtors' businesses. If the Intercompany Transactions were to be discontinued, I believe that the Debtors' Cash Management System and related administrative controls would be disrupted to the detriment of the Debtors, their estates and their affiliates. The Intercompany Transactions are essential to the Debtors' businesses given the integrated nature of the Nortel Companies' operations. I hereby submit that the continuation of the Intercompany Transactions is in the best interests of the Debtors' estates and creditors.

84.    If this Court authorizes the continuation of Intercompany Transactions, at any given time there may be balances due and owing from one Debtor to another, or between the Debtors and other Nortel affiliates. These balances represent extensions of intercompany credit. To ensure that each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors will continue to maintain records of such transfers, including records of all current intercompany receivables and payables. Additionally, I respectfully request that, pursuant to section 364(a) of the Bankruptcy Code, all claims relating to Intercompany Transactions (collectively, the "Intercompany Claims") arising after the Petition

---

[7]    The Debtors engaged in Intercompany Transactions on a regular basis prior to the Petition Date. Such transactions are common for enterprises like the Debtors. The Debtors believe that such transactions are in the ordinary course within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require this Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions.

Date be accorded administrative priority of the kind specified in section 503(b) of the

Bankruptcy Code.

Approval of Intercompany Revolving Loan Agreement

85.    Prior to its filing, in the ordinary course, NNI provided financing to NNL

pursuant to a revolving loan agreement entered as of March 21, 2008, for NNL to draw on an as-

needed basis.  NNI seeks approval to maintain this ordinary course intercompany lending

practice through entry into a new revolving loan agreement with NNI as lender, NNL as

borrower and Nortel Networks Technology Corporation ("NNTC"), NNL's subsidiary, as

guarantor, in the amount of up to USD $200 million (the "NNL Revolver").  A form of the

agreement documenting the NNL Revolver is attached to the Cash Management Motion as

Exhibit D (the "NNL Revolver Agreement").

86.    This facility is expected to benefit both NNI and NNL by maintaining

NNL's ordinary course access to working capital, and thereby avoiding additional fees and

expenses associated with third party financing, particularly given current market conditions.

Given the integrated nature of the Nortel Companies' operations and NNI's reliance on NNL for

certain corporate overhead and research and development functions, as well as intellectual

property licenses, NNI similarly benefits from the advance to the extent it maintains or improves

NNL's reorganization prospects.

87.    Moreover, while NNI and NNL regard this extension of credit as a

continuation of ordinary course business practices, NNTC and NNL itself are willing to pledge

certain assets to secure the NNL Revolver.  In particular, NNL and NNTC are willing to grant,

subject to approval of the Canadian Court and the co-owner of the facility, charges on (i.e. a

security interest in) all of the fee simple interest of NNTC and leasehold interest of NNL

35

respectively in a research and development facility located at 3100 Carling Avenue, Ottawa,

Canada, which was valued at CAN $288,750,000 as of December 21, 2007 in a third party

appraisal (the "Carling Charges"), which charges (a) shall rank subordinate only to the

Administrative Charge sought to be approved by the Canadian Court and such other

encumbrances as may currently exist on the title to the Carling Facility and (b) may not be

otherwise primed without the written consent of NNI and authorization of the Court.  Under the

NNL Revolver, $75 million will be immediately available for borrowing and the remainder is

available upon obtaining the relevant consents to the Carling Charges.  To the extent the

proceeds realized from the Carling Facility are insufficient to satisfy NNL's obligations under

the NNL Revolver, any deficiency shall be deemed an intercompany reimbursement claim

entitled to the security of an intercompany charge (as sought in the Canadian Proceedings) (the

"Intercompany Charge").  The Carling Charges and the Intercompany Charge will secure any

outstanding balance under the NNL Revolver.  I believe that the making of this advance on a

secured basis is a proper and beneficial use of the assets of NNI.

Setoffs and Payments of Intercompany Obligations

88.    The Debtors also seek authorization to preserve their ordinary course

practices in recording and reconciling Intercompany Obligations, including for inventory

purchases, under the RPSM, and with respect to intercompany loans, as modified below.

89.    In light of the commencement of the chapter 11 cases, the Canadian

Proceedings and the expectation that the EMEA Debtors also will seek creditor protection, the

Debtors and their affiliates propose to modify their ordinary course cash management practices

in the following manner.  First, the Debtors intend to settle postpetition transactions with the

Canadian Debtors and the EMEA Debtors on a cash basis rather than through Citinetting.

Second, the Debtors propose to not set off prepetition and postpetition amounts owed between the Debtors on the one hand and the EMEA Debtors on the other hand in the ordinary course, and rather to only set off postpetition obligations.

90.    Third, with respect to the Canadian Debtors, the Debtors seek approval to continue the netting and payment of intercompany obligations in the ordinary course of business consistent with their prior practice, except that the Debtors have agreed to forbear from exercising any right of setoff they may have against the Canadian Debtors until such time as (a) the chapter 11 cases of NNI or NNCC shall been dismissed or converted to cases under chapter 7 of the Bankruptcy Code; (b) an interim or permanent trustee, a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) has been appointed to oversee or operate any of the Debtors in these chapter 11 cases; (c) any Debtor files a motion seeking any of the foregoing relief; (d) a receiver is appointed over all or substantially all of the assets of the Canadian Debtors; or (e) any of NNC, NNL or NNTC are declared bankrupt under the Bankruptcy and Insolvency Act.[8]  In consideration for such forbearance, the Canadian Debtors are seeking to grant NNI an Intercompany Charge in the Canadian Proceedings to secure the payment of the NNL Loan Receivable.

91.    In an abundance of caution, the Debtors further seek authority to enter into written agreements with the Canadian Debtors and the EMEA Debtors as may be necessary or desirable to effectuate the above arrangements.  Accordingly, the Debtors respectfully request express permission to (a) set off mutual prepetition obligations relating to Intercompany

---

[8]    Under Canadian Law, NNI would have the right to set off postpetition obligations owing to NNL against the NNL Loan Receivable.

37

Transactions, (b) in the discretion of the relevant Debtor, to set off mutual postpetition

obligations relating to Intercompany Transactions and (c) to settle and reconcile certain

intercompany transactions with the Canadian Debtors and EMEA Debtors as described above.

Finally, the Debtors request authorization to continue their cash management practices, as

modified above.

Continued Use of Business Forms Is Warranted

92.     In the ordinary course of their businesses, the Debtors use a variety of

checks and other business forms (collectively, and as they may be modified, the "Business

Forms"). To avoid disruption of the Cash Management System and unnecessary expense,

pursuant to Local Rule 2015-2(a), the Debtors request that they be authorized to continue to use

the Business Forms substantially in the forms existing immediately before the Petition Date,

without reference to their status as debtors in possession, provided, however, that once the

Debtors' existing check stock has been used, any future checks ordered by the Debtors will

include the legend "Debtor-in-Possession." In the absence of such relief, I believe the estates

will be required to bear a potentially significant expense, which I respectfully submit is

unwarranted.

Waiver of the Deposit Requirements of Section 345(b) of the Bankruptcy Code on an Interim
Basis Is Warranted

93.     To the extent excess funds are available in the Treasury Account at the

end of each day, Treasury invests those funds through an account with BAS in certain money

market funds, including the Federated Treasury Obligations Fund, the JP Morgan U.S. Money

Market Fund, the Fidelity Treasury Portfolio fund and the Dreyfus Government Cash

Management and Government Prime Cash Management funds (collectively, the "Money Market

38

Funds") on an investment/redemption basis.[9]  In addition, the Debtors currently hold

approximately $65 million in the Reserve Primary Fund, which froze withdrawals in September

2008, and is in the process of winding down.

94.    I understand that investment in the Money Market Funds is consistent with

the Debtors' Investment Guidelines, which were implemented by Nortel to minimize financial

risk through managed counterparty exposure limits and ensure effective diversification and

sufficient liquidity to meet business requirements and maximize returns.  The Investment

Guidelines limit investments to term deposits, certificates of deposit, commercial paper, fixed

and floating rate notes, medium term notes, government or agency securities, auction rate money

market securities, repurchase agreements and money market funds.

95.    As described above, the Debtors and their non-debtor affiliates invest

excess funds in certain money market funds, including the Money Market Funds. Such

investments are consistent with the Investment Guidelines.  Although I have been advised that

the current investment practices and Investment Guidelines may not strictly comply with the

approved investment guidelines identified in section 345 of the Bankruptcy Code in all cases, I

believe that the Debtors' deposits and investments nevertheless are prudent and designed to yield

the maximum reasonable net return on the funds invested, taking into account the safety of such

deposits and investments.  Accordingly, I respectfully request that the Debtors be authorized to

invest and deposit funds in the Money Market Funds and other similar instruments in accordance

with the Investment Guidelines, including as per their current investment practices,

---

[9]    Each of the Money Market Funds currently maintains both Aaa and AAAm ratings from Moody's and
Standard & Poor's, with the exception of the Dreyfus Government Prime Cash Management and Government Cash
Management funds, which maintain an AAAm rating from Standard & Poor's but are not rated by Moody's.
According to fund disclosure materials, the Money Market funds generally invest most or all of their assets in U.S.
Treasury-related securities, repurchase agreements collateralized by Treasury securities, and/or securities issued or
guaranteed by the U.S. government or its agencies or instrumentalities.

notwithstanding that they may not strictly comply in all respects with the approved investment

guidelines set forth in section 345 of the Bankruptcy Code.   I further request that the applicable

institutions be authorized and directed to accept and hold or invest such funds, at the Debtors'

direction.

96.    I have been advised that, in other chapter 11 cases, courts in this District

have granted requests for approval of continued investment practices in accordance with

investment and deposit guidelines that did not strictly comply with section 345 of the Bankruptcy

Code, the Debtors are large, sophisticated companies with a complex Cash Management System

that provides the Debtors with the ability to transfer funds as and when needed.[10]  In light of

these factors and the safety of the investment vehicles that the Debtors propose to utilize to

invest any excess funds, the Debtors believe that sufficient cause exists under section 345(b) of

the Bankruptcy Code to allow the Debtors to deviate from the investment guidelines set forth in

section 345(b).

## Authorization of (A) Banks to Charge Back Returned Items and (B) Debtors to Pay Bank Fees Is Warranted

97.    Concurrently with the filing of this Motion, the Debtors have filed motions

requesting authority to pay, in their sole discretion and in the ordinary course of their businesses,

certain prepetition obligations to customers, employees, lienholders, taxing authorities and other

entities.  With respect to some of these obligations, prior to the Petition Date, the Debtors issued

checks that have yet to clear the banking system.  In other cases, the Debtors would issue the

relevant checks postpetition on account of such prepetition debt once the Court enters an order

permitting the Debtors to do so.  I understand that the Debtors intend to inform their banks which

---

[10]    The Debtors also are required to maintain accounts in Toronto, Canada and in the Philippines to hold local currency, including for use by the Debtors in the ordinary course of their business operations.

prepetition checks should be honored pursuant to any separate orders of the Court authorizing such payments.

98.     As a result of the foregoing, I request that the Debtors' Banks be authorized to accept and honor all representations from the Debtors as to which checks, drafts or wires should be honored or dishonored consistent with any order(s) of this Court and governing law, whether such checks, drafts or wires are dated prior to, on or subsequent to the Petition Date.  Pursuant to the relief requested in this Motion, I have been advised that the Banks shall not be liable to any party on account of (a) following the Debtors' instructions or representations as to any order of this Court, (b) the honoring of any prepetition check or item in a good faith belief that the Court has authorized such prepetition check or item to be honored or (c) an innocent mistake made despite implementation of reasonable item handling procedures. I believe that such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with the Court's order or otherwise.

99.     Finally, I request authority for the Banks to charge and the Debtors to pay or honor both prepetition and postpetition service and other fees, costs, charges and expenses to which the Banks may be entitled under the terms of and in accordance with their contractual arrangements with the Debtors (collectively, the "Bank Fees").  I also request that the Banks be authorized to charge back returned items to the Bank Accounts in the normal course of business.

100.    I believe this relief to minimize the disruption of the Cash Management System and their Bank Accounts and to assist them in accomplishing a smooth transition to operating in chapter 11.

Strategic Investments

101.    From time to time, NNI and its non-debtor affiliate Nortel Ventures LLC make venture capital investments in small high-tech companies. These investments are made to further expand Nortel's technology portfolio. By this Motion, the Debtors seek authority, in their sole discretion, to satisfy any existing capital calls related to existing investments to protect the value of such investments.

Payroll Administration

102.    In addition to administering its own payroll, NNI administers payroll payments for certain of its non-debtor subsidiaries, including Diamondware, Ltd. and Nortel Networks (CALA) Inc. (the "Payroll Affiliates"). On a regular periodic basis, NNI processes and issues payroll checks for the Payroll Affiliates' employees (the "Affiliate Payroll Processing System"). The payables and receivables generated by this process are currently settled as part of the regular intercompany settlement process. In light of the commencement of NNI's chapter 11 case, the Payroll Affiliates have agreed either to prefund or promptly reimburse disbursements made from the Payroll Account.

103.    I believe that the relief requested in the Cash Management Motion is required to minimize the disruption of the Cash Management System and the Debtors' bank accounts and to assist the Debtors in accomplishing a smooth transition to operating in chapter 11.

H.    MOTION FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO PAY CERTAIN PREPETITION (I) WAGES, SALARIES AND OTHER COMPENSATION, (II) REIMBURSABLE EXPENSES, AND (III) MEDICAL, RETIREMENT AND SIMILAR BENEFITS ("EMPLOYEE WAGE MOTION").

104.    By filing the Employee Wage Motion, the Debtors are requesting that the Court enter an Order: authorizing, but not directing, them to (i) pay prepetition claims and

42

obligations related to employee wages, salaries and benefits described herein; (ii) reimburse

employees for unpaid expenses incurred prepetition; and (iii) continue their wage and benefit

plans for employees, or to change their plans or policies regarding wages, salaries, benefits,

and/or reimbursable expenses, if they deem it necessary and appropriate, without obtaining

further approval of the Court.

105.    The Debtors, collectively with the Canadian Debtors and other affiliated

entities, employ thousands of dedicated and skilled employees in the United States and around

the world.  As of the Petition Date, the Debtors employ a total of approximately of 8,911

employees in the United States.  Of those, NNI employs 8,099 full-time salaried employees, 717

full-time hourly employees, 24 part-time salaried employees, and 3 part-time hourly employees

(the "NNI Employees").  In addition, Alteon WebSystems, Inc. employs approximately 68 full-

time employees in the United States (the "Alteon Employees," and together with the NNI

Employees, the "Employees").  The Alteon Employees' compensation is funded through NNI's

payroll account, and the Alteon Employees receive the same benefits as the NNI Employees. To

supplement their workforce, the Debtors additionally utilize the services of approximately 40

independent contractors.

106.    In order to retain this workforce, the Debtors have incurred a variety of

obligations to its Employees, in the form of wages, salaries and benefits.  A description of these

prepetition employee related obligations and programs is as follows:

Payment of Unpaid Compensation

107.    For 2008, the Debtors paid approximately $1.305 billion in compensation

and benefits to the Employees.  These payments consist of:

> a.    Approximately $898 million in wages and salary to the NNI full-
> time salary employees, $43.6 million to the NNI full-time hourly employees, $1.7

43

million to the NNI part-time salaried employees and $180,000 to the NNI part-time hourly employees;

        b.      Approximately $8.2 million in wages and salary to the Alteon Employees;

        c.      Approximately $3 million in short-term disability benefits through salary continuance;

        d.      Approximately $8.1 million in premium payments for overtime hours, on-call hours and undesirable shift hours;

        e.      Approximately $108 million in sales commissions to the U.S. Sales Employees;

        f.      Approximately $72 million in reimbursable expenses;

        g.      Approximately $2 million in expat costs; and

        h.      Approximately $160 million in employee benefits, described more fully below.

108.    In the ordinary course of their businesses, the Debtors pay the Employees on a bi-weekly basis on every other Friday. The Employees were paid on Friday, January 2nd for the two-week period from December 22nd to January 4th. The Debtors' next payroll will be paid on Friday, January 16th, for the period from January 5th to January 18th.[11] The Debtors' payroll is generally made by direct deposit through electronic transfer of funds to the Employees. Currently, the Debtors pay approximately $37 million per pay period in wages to the Employees.

109.    Because the last payroll date for most Employees was on January 2nd, as of the Petition Date, certain Employees will not have been paid all of their prepetition wages.[12] Additionally, compensation may be due and owing as of the Petition Date because:

---

[11]    The January 16th payroll includes payments to certain non-active Employees, none of whom exceed the $10,950 administrative priority cap.

[12]    Certain of the Employees were last paid on January 9th, 2009 as part of an interim payroll.

a.      Some discrepancies may exist between the amounts paid and amounts the Employees or others believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees;

b.      Some payroll checks issued to the Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date;

c.      The U.S. Sales Employees are paid in arrears by 45 days for sales commissions;

d.      Employees who receive premium pay for overtime hours, on-call hours or undesirable shift hours are paid in arrears by two weeks; and

e.      Variations may occur in the Debtors' various payroll schedules.

The Debtors estimate that there remains outstanding, as of the Petition Date, approximately $26 million in wages and salaries.

110.    In addition to the Employees' basic wages and salary, some Employees are eligible to receive additional income in the form of premium pay ("Premium Pay"). Employees may be entitled to Premium Pay for working overtime hours, for working special shifts, or for being on call outside of scheduled working hours. In 2008, the Debtors paid approximately $8.1 million in Premium Pay to the Employees. The Debtors estimate that there remains outstanding, as of the Petition Date, approximately $1 million in Premium Pay.

111.    The U.S. Sales Employees, in addition to their base salaries, are eligible to receive variable compensation based on achieving revenue, orders or key sales objectives under the "Nortel Global Sales Incentive Compensation Plan" (the "Sales Incentive Plan"). Until January 1, 2009, payments under the Sales Incentive Plan were made on a monthly basis and were paid in arrears by 45 days. Additionally, any earned sales bonus payments under the Sales Incentive Plan were paid in the monthly or quarterly payment cycle in which the sales objectives were met. The Debtors estimate that there remains outstanding, as of the Petition Date,

45

approximately $14 million in payments under the Sales Incentive Plan. The Sales Incentive Plan

is an ordinary course of business compensation program that has been in place and implemented

for several years. The Debtors intend to renew the Sales Incentive Plan in 2009 based on the

alignment of individual quota targets determined on an annual basis in the ordinary course of

business.

112.    In addition to base salary, certain Employees are eligible for an annual

cash bonus award under the "Nortel Networks Limited Annual Incentive Plan" (the "Annual

Incentive Plan"). Bonuses under the Annual Incentive Plan are based on the achievement of pre-

established corporate and individual performance objectives for a given calendar year, subject to

the discretion of the joint Compensation and Human Resources Committee of the Boards of

Directors of NNC and NNL (the "CHRC") and the Board of Directors of NNL. The Annual

Incentive Plan is an ordinary course of business compensation program that has been in place

and implemented for several years. This type of bonus structure is standard in this industry.

113.    Given that payments under the Annual Incentive Plan are made in the

ordinary course of business, the Debtors note that they need not obtain special approval to

continue making payments under the Annual Incentive Plan. See In re Dana Corp., 358 B.R.

567, 580-81 (Bankr. S.D.N.Y. 2006). Out of an abundance of caution, however, the Debtors by

this Motion seek authority in their sole discretion to pay bonuses under the Annual Incentive

Plan for 2008 in the ordinary course of business. Bonuses to be paid under the Annual Incentive

Plan for a given year are typically determined in February or March of the following year upon

approval of the CHRC and the Board of Directors of NNL. As of the Petition Date, the Debtors

are in the process of calculating the achievement of corporate and individual performance

objectives under the Annual Incentive Plan for 2008. Those calculations will not be finally

46

determined until sometime after the Petition Date.  Based on preliminary estimates and under the current circumstances, however, the Debtors anticipate that there will be no payments under the Annual Incentive Plan for 2008.

114.    The Debtors intend to continue the Annual Incentive Plan in 2009 based on corporate and individual performance objectives that will be adopted in or around February in the ordinary course of business.  Corporate performance objectives will be developed by management in coordination with its compensation consultant, Mercer Human Resources Consulting, LLC, and subject to the approval of the CHRC and the Board of Directors of NNL. Individual performance objectives will be determined through an annual employee review process.  The Debtors expect that the performance objectives for the 2009 Annual Incentive Plan will also be reviewed by both the Monitor in the Canadian proceedings and the official creditors committee, once appointed, in these proceedings.

115.    The Debtors are in the process of developing a Key Employee Incentive Plan (the "KEIP") in the course of these chapter 11 proceedings.  The development of the KEIP is essential in order to ensure that the Debtors are able to retain and motivate the employees most critical to the Debtors' ability to successfully reorganize and maximize value for all stakeholders. I have been informed that the Debtors anticipate that the details of the KEIP will be developed and adopted quickly after the Petition Date by the CHRC and the Boards of Directors of NNC and NNL.  I understand that both the Monitor in the Canadian proceedings and the official creditors committee, once appointed, will be consulted regarding the KEIP and will be offered an opportunity to review and evaluate the KEIP before it is submitted for approval to the CHRC and the Boards of Directors of NNC and NNL.

116.    The Debtors compensate Employees suffering from short-term disability by continuing to pay those Employees salary for the period of the time that they are disabled. Such salary continuance is available for disabilities lasting between one and 26 weeks. The Debtors estimate that the cost of providing short-term disability in 2008 was approximately $3 million.

117.    The Debtors believe that there remain unpaid, as of the Petition Date, wages, salaries, overtime pay, commissions and other compensation (excluding reimbursable expenses, vacation pay, severance pay, deferred compensation and incentive bonus pay) earned by the Employees prior to the Petition Date (the "Unpaid Compensation"). The Debtors estimate that they owe approximately $41 million in Unpaid Compensation to the Employees.

118.    I believe that authorizing the Debtors to honor and pay any outstanding unpaid compensation and to continue, during the course of these cases, to pay salary, wages, overtime pay, commissions and other compensation to the Employees in accordance with the Debtors stated policies and in the ordinary course of business is critical to maintaining the Debtors' businesses, as I will describe further below.

Deductions and Withholdings

119.    During each applicable pay period, the Debtors routinely deduct certain amounts from the Employees' paychecks, including, without limitation, garnishments and other pre-tax and after-tax deductions payable to certain of the benefit plans discussed herein, such as an employee's share of health care benefits, insurance premiums, 401(k) contributions, flexible spending account contributions, legally ordered deductions and other miscellaneous deductions (collectively, the "Employee Deductions") and forward those amounts to various third-party

48

recipients. On average, the Debtors have historically deducted approximately $14.8 million from the Employees' paychecks per pay period.

120.    Furthermore, the Debtors are required by law to withhold from the Employees' wages amounts related to federal, state and local income taxes, social security and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state or local taxing authority. In 2008, the Debtors withheld on average approximately $9.6 million from the Employees' paychecks per pay period. The Debtors must then match from their own funds for social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes"). The Payroll Taxes, including those from the Employees and the employer, are approximately $11.2 million per pay period.

121.    Due to the commencement of the chapter 11 cases, there may be Employee Deductions from the earnings of the Employees that were not forwarded to the appropriate third party recipients prior to the Petition Date. Additionally, due to the commencement of the chapter 11 cases, the Debtors may have withheld but not yet forwarded to the appropriate authority amounts for Payroll Taxes.

Expat Costs

122.    As a global enterprise, from time to time Nortel assigns certain highly-qualified and highly-compensated employees to locations in outside of their home country either temporarily or permanently (the "Global Mobility Program"). The participants in the Global Mobility Program (the "Expats") function as the primary face of Nortel in the world community and are responsible for spearheading Nortel's global efforts. Among the critical functions

49

performed by the Expats are providing the expertise necessary to start up a new operation or deploy new technologies, providing on-site training for exceptional skills, and providing senior management expertise in a location where such needs cannot be met locally. Temporary assignments under the Global Mobility Program are typically for a fixed period of time lasting between 30 days and three years.

123.    Maintaining the Global Mobility Program requires Nortel to incur various costs associated with sending the Expats to their designated locations. NNI bears such costs for Expats who are sent to its operations in the United States. This bundle of costs, whether payable to the Expats or to third parties (the "Expat Costs"), represents some of the costs to Nortel of doing business in these countries and includes paying for such necessities as transportation to the assignment location, housing, utilities, schooling, medical coverage, insurance, immigration and visa costs and tax assistance. While some of the Expat Costs may be classified as imputed income to the Expats, depending on the host country and applicable tax regimes, the Expat Costs are essentially Nortel's operating costs for maintaining a global presence.

124.    For certain of the Expat Costs, Nortel contracts with a third-party supplier, which performs certain obligations on behalf of Nortel and the Expats. For instance, Nortel contracts with Mobility Service International for the purpose of providing international assignment management services, including coordinating various aspects of the temporary relocation of the Expats from their home country to their host country location. In addition, Nortel contracts with Chamness Relocation Services ("Chamness") for the purpose of assisting the Expats in finding housing and educational services. Expats also have the option of authorizing Chamness to manage the home rental in the host country and pay the Expats' rents, utilities and other bills on a recurring basis for the duration of the assignment.

125.   The Debtors estimate that they owe $100,000 in outstanding Expat Costs as of the Petition Date and that the Debtors will incur approximately $1.85 million in Expat Costs under the Global Mobility Program in 2009.

126.   While the Debtors continue to evaluate their global businesses in these chapter 11 proceedings, I believe that it is essential that they receive authority to pay any outstanding prepetition Expat Costs and continue to pay the Expat Costs.  To the extent that the Debtors determine that it is in their best interests to retain the Expats, my understanding is that failure to pay the Expat Costs would not only disrupt the Expats' lives but also jeopardize Nortel's presence in the locations in which the Expats are based.  Moreover, failure to pay the Expat Costs would provide little benefit to the Debtors, because the Debtors are still obligated to reimburse the Expats for their living expenses.  Thus, if the Expats were forced to, for example, seek alternative housing as a result of the Debtors' failure to pay their landlords, the Debtors would be obligated to pay the Expats for any moving costs as well as to reimburse their rents.  In order to continue operating the Global Mobility Program in the interim, therefore, the Debtors seek authority in the Employee Wage Motion, in their sole discretion, but not direction, to (a) pay any outstanding prepetition Expat Costs, and (b) continue during the course of these cases to pay the Expat Costs in accordance with the Debtors' stated policies and in the ordinary course of business.

127.   In addition, in order to ensure that the Expats do not suffer a financial hardship as a result of the tax consequences of an international assignment, the Debtors make certain tax equalization payments on behalf of the Expats (the "Tax Equalization Payments").  Incurring the costs of the Tax Equalization Payments ensures that the Expats pay no more or less

51

in taxes than they would pay if they worked in their home country.  The Debtors estimate that in

2008 the cost of the Tax Equalization Payments to the Debtors was approximately $128,000.

Payment of Reimbursable Expenses

128.    Prior to the Petition Date, and in the ordinary course of business, the

Debtors reimbursed the Employees for certain reasonable and customary expenses incurred on

behalf of the Debtors in the scope of their employment in accordance with Internal Revenue

Code ("IRS") regulations (the "Reimbursable Expenses").

129.    A Reimbursable Expense is an expense incurred by an Employee in the

performance of his/her duties that is deemed to be necessary to the performance of his/her job,

and is reasonable.  The Reimbursable Expenses are paid-for expenses such as travel, meals,

accommodations, parking, automobile mileage, and other business-related expenses that are paid

by the Employees.

130.    A Reimbursable Expense is made to an Employee when an approved

expense report is submitted by such Employee to the appropriate accounts payable department

and is processed.

131.    Certain Employees are permitted to use an American Express credit card

provided by the Debtors.  The Employees using such credit cards are billed directly by American

Express and are entitled to choose their method of payment for business expenses.  Some

Employees choose to pay their business expenses to American Express directly and subsequently

prepare an expense report for any Reimbursable Expenses, which, if approved as valid

Reimbursable Expenses, are reimbursed by the Debtors.  Other Employees choose to have the

Debtors pay American Express on their behalf for their valid Reimbursable Expenses.  Upon the

commencement of these chapter 11 proceedings, I understand that future reimbursements for

Reimbursable Expenses will be made only directly to American Express on behalf of the Employees and not to the Employees.

132.    It is likely that certain Employees have not been reimbursed for Reimbursable Expenses incurred prior to the Petition Date. In this regard, I understand that it is difficult for the Debtors to estimate the amount of Reimbursable Expenses outstanding as of the Petition Date because not all Employees may have submitted expense reports for all accrued expenses. Nevertheless, I believe that it is critical that the Debtors be authorized to reimburse all such expenses when the reports are submitted in order to assure such Employees that they will be reimbursed for their actual out-of-pocket expenses incurred while acting within the scope of their employment.

133.    In 2008, the Debtors paid approximately $6 million in Reimbursable Expenses to the Employees per month. As of the Petition Date, the Debtors estimate that there remains outstanding approximately $4 to $6 million in Reimbursable Expenses.

Employee Benefits

134.    In the ordinary course of business, the Debtors provide the Employees with a number of benefits, including: (a) health and dental insurance and other insurance benefits including life insurance; (b) worker's compensation benefits; (c) vacation pay and other paid leave; (d) retirement plan and flexible spending accounts; and (e) other non-insured programs and voluntary insured programs, (collectively, the "Employee Benefits") through employer sponsored contributory and non-contributory benefit plans and voluntary insurance coverage. In 2008, the cost to the Debtors of providing all of the Employee Benefits was approximately $160 million.

Health Care Programs & Insurance Benefits

135.    In the ordinary course of business, the Debtors offer the Employees and

their families health and dental insurance (the "Health Care Programs").  Approximately 9,890

Employees obtain health care coverage (medical and/or dental) through the Debtors' Health Care

Programs.  These figures include certain Employees on disability and paid leave or otherwise

eligible for salary continuance who are not considered active employees.  Additionally,

approximately 3,000 retired employees obtain medical coverage through the Debtors' Health

Care Programs.

136.    The Debtors maintain self-insured medical and dental plans that are

administered through CIGNA (medical and dental) and Blue Cross Blue Shield (medical only).

The Employees contribute a portion of their salaries to premium payments for the health and

dental insurance plans, and the Debtors pay the costs for all administrative claims and ancillary

costs of the health plan and dental plan.  In addition, the Debtors pay fees to CIGNA and Blue

Cross Blue Shield to administer the claims.

137.    The Debtors also provide several other types of insurance to the

Employees and their dependents, including life insurance, dependent life insurance, accidental

death and dismemberment insurance, business travel accident insurance and long-term disability

insurance (collectively, the "Insurance Benefit Programs").

138.    The costs associated with the Debtors' Health Care and Insurance Benefit

Programs are paid through the Debtors' Voluntary Employee Beneficiary Association plan (the

"VEBA Trust").  The VEBA Trust is a qualified, tax-exempt plan the purpose of which is to

provide a funding vehicle for the Debtors' Health Care and Insurance Benefit Programs.  The

Debtors manage the operation and administration of the VEBA Trust in conjunction with the

trustee, Bank of America.  The VEBA Trust is open to all participants in the Debtors' Health

Care Programs.  Both the Debtors and the participating Employees make contributions to the

VEBA Trust, the proceeds of which are used to make claim and benefit payments on behalf of

the participating Employees.  On a biweekly basis, the Debtors place approximately $5 million

into the VEBA Trust to cover all claims and expenses associated with the Employees' Health

Care and Insurance Benefits Programs.  The Employees' contributions are handled through

deductions from their paychecks.  The annual cost to the Debtors to fund and administer the

VEBA Trust is approximately $130 million.

### Workers' Compensation

139.    Under the laws of the various states in which the Debtors operate, the

Debtors are required to maintain workers' compensation liability insurance and to provide

employees with workers' compensation coverage for claims arising from or related to their

employment with the Debtors.  The Debtors provide workers' compensation benefits (the

"Private Workers' Compensation Benefits") to their Employees, except for those employed in

jurisdictions (the "Publicly Insured States") that require workers' compensation liability

insurance to be maintained through the state, through a workers' compensation insurance policy

issued by Travelers (the "Workers' Compensation Policy").  The term of the Workers'

Compensation Policy is from May 15, 2008 to May 15, 2009.

140.    The Debtors provide workers' compensation benefits (the "Public

Workers' Compensation Benefits," and together with the Private Workers' Compensation

Benefits, the "Workers' Compensation Programs") to their Employees working in the Publicly

Insured States through policies provided directly from those states (collectively, the "Public

Workers' Compensation Policies," and together with the Private Workers' Compensation Policy, the "Workers' Compensation Policies").

141.    For the 2008 renewals, the Debtors expect to pay approximately, but no more than, $882,000 in premiums for their Workers' Compensation Policies, of which approximately $546,000 has been paid as of Petition Date.

142.    I understand that failure to maintain workers' compensation insurance in the various states in which the Debtors conduct business could result in the institution of administrative or legal proceedings and material fines against the Debtors and their officers and directors.

### Vacation, Sick and Other Paid Leave

143.    The Debtors provide vacation time to the Employees as a paid time-off benefit ("Vacation Obligations"). The Employees are entitled to take a minimum of three weeks and a maximum of five weeks vacation per year. Vacation time begins accruing on the date of employment and can be used immediately. Employees are entitled to carry forward up to one year of unused vacation time to the following year, except for those Employees located in California, who are entitled under state law to carry forward up to two years of unused vacation time.

144.    As of the Petition Date, the Debtors estimate that they have approximately 1.1 million hours and $67 million in unpaid Vacation Obligations for the Employees that accrued prior to the Petition Date (collectively, the "Unpaid Vacation"). By the Employee Wage Motion, the Debtors seek authority in their sole discretion to (a) allow the Employees to take vacation time in the ordinary course of business on a going forward basis (and thus reducing any liability

relating thereto); and (b) to the extent applicable, pay Unpaid Vacation upon termination or retirement in accordance with prior practice.

145.    I believe that the continuation of the Vacation Obligations in accordance with prior practice is essential to maintaining morale during this difficult time.  Further, the Vacation Obligations are provided to all Employees and are a benefit that Employees have come to depend on.  Thus, I believe that continuation of the Vacation Obligations is necessary under the circumstances and should be authorized by this Motion.

146.    Under company policy, Employees are entitled to take up to 10 sick days per year ("Sick Leave Obligations").  In addition, Employees are paid for 12 holidays per year ("Holiday Obligations").  Employees are also entitled to up to three days bereavement leave per calendar year for use in the event of a death of an immediate family member ("Bereavement Obligations").  Employees are also entitled to take a leave of absence in certain situations ("Leave of Absence Obligations" and, together with the Sick Leave Obligations, Holiday Obligations and Bereavement Obligations, the "Leave Obligations").  Employees may take up to 12 weeks of unpaid[13] leave per year for family care.  Employees may take up to five years of military leave, the first two years of which the Debtors will compensate the Employee up to his/her full salary.  Employees may take up to one year of unpaid personal leave.  In other situations, Employees may qualify for a paid leave of absence for medical reasons.

401(k) Retirement Plan

147.    Employees are eligible to participate in the 401(k) retirement plan (the "401(k) Plan"), which is a 401(k) savings plan pursuant to the Internal Revenue Code ("IRC").

_____

[13]    Except in those states that mandate by law that family leave be paid in part.

57

Employees may elect to contribute up to the annual IRS limits on contributions and eligible compensation.

148.    Under the 401(k) Plan, Employees become eligible to contribute immediately upon employment with the Debtors.  Employees may contribute between 1% and 50% of their pay on a pre-tax basis up to the IRS limits.  The Debtors automatically contribute 2% of Employees' pay and additionally provide a matching contribution on pre-tax amounts equal to 50% of the first 6% of an Employee's eligible pay.  In 2008, the Debtors contributed approximately $29 million in matching contributions to the 401(k) Plan.

149.    As of the Petition Date, the Debtors estimate that there is approximately $630,000 in outstanding matching contributions to the 401(k) Plan that the Debtors have yet to pay.[14]

### Flexible Spending Accounts

150.    The Debtors offer Employees the ability to contribute a portion of their compensation into flexible spending accounts on a pre-tax basis under IRC section 125 for health and dependent care expenses (the "Health Care FSA" and the "Dependent Care FSA," respectively, and collectively, the "FSAs").  The Health Care FSA allows Employees to contribute up to $5,200 per year to pay for non-reimbursed health care expenses that the IRS would consider deductible medical expenses.  The Dependent Care FSA allows Employees to contribute up to $5,000 per year for day care expenses for a child or qualified adult dependent. The Debtors estimate that approximately 4,200 Employees have elected to contribute funds to either the Health Care FSA or the Dependent Care FSA.

---

[14]    The Debtors also other maintain retirement plans in addition the 401(k) Plan.  However, the Debtors do not ask the Court to provide relief with respect to these retirement plans at this time.

151.    The FSAs are administered by a third party administrator, WageWorks,

Inc. ("WageWorks").  On a bi-weekly basis, the Debtors wire the Employees' selected

contribution amounts into a special employee deposit holding account.  On a weekly basis, the

Debtors wire money to an account maintained by WageWorks to reimburse WageWorks for

claims paid to Employees for the previous week.  The Debtors estimate that the cost to

administer the FSAs in 2008 was approximately $300,000, which is offset by savings to the

Debtors from FICA taxes that are not paid on section 125 employee contributions and amounts

forfeited by Employees in the FSAs.

Additional Employee Benefits

152.    In the ordinary course of business, the Debtors provide the following

additional Employee Benefits (the "Additional Employee Benefits").  Specifically:

a.    Adoption Costs:  The Debtors provide up to $5,000 per Employee
for adoption costs.

b.    Employee Assistance Program: The Debtors provide free
counseling and referral information to Employees, up to 8 visits per year.

c.    Health & Fitness Centers:  At some locations, the Debtors provide
on-site access to health centers and fitness centers.

d.    Travel Well Program:  The Debtors provide pre-departure health
and security information for Employees traveling for business purposes and
provide expert assistance with health and security emergencies during
international travel whether for business or pleasure.

153.    By filing the Employee Wage Motion, the Debtors seek authority, to be

exercised at their sole discretion, to pay and honor the prepetition obligations I have described

above, including wages, salaries and other compensation, federal and state withholding taxes and

other amounts withheld (including garnishments, employees' share of insurance premiums, taxes

and 401(k) contributions), reimbursable expenses, expat costs, health and insurance benefits,

workers' compensation benefits, retirement benefits, vacation time and other paid leave, and all

other benefits that the Debtors have historically provided in the ordinary course of business and

to continue to pay and honor such claims postpetition and to pay all costs incident to the

foregoing.  In addition, the Debtors request the right to modify or discontinue any of the wages

and benefits and their policy related to reimbursable expenses, and to implement new wages and

benefits in the ordinary course of business during these chapter 11 cases without the need for

further approval by this Court.

154.    I believe that granting the relief requested in the Employee Wage Motion

is essential for the Debtors' reorganization, as it will allow the Debtors to continue to operate

with minimal disruption and enable them to stabilize their businesses.  A lapse in the payment of

wages and benefits would distract the Debtors' Employees from the Debtors' reorganization by

reducing employee morale, by raising questions as to the viability of the Debtors as a going

concern, and by imposing significant financial hardships on the Debtors' Employees and their

families.  I am also concerned that these financial hardships would result in the loss of many

crucial Employees, who could seek employment with the Debtors' competitors.  Such a loss of

key personnel at this crucial time would undoubtedly slow the Debtors' reorganization, and

moreover, necessitate expensive recruitment and training of replacements for these employees, if

replacements could be recruited at all.  Given these severe potential problems, I am confident

that if this Court failed to grant the relief requested in the Employee Wage Motion, the Debtors

would be irreparably harmed.

155.    Furthermore, I have been advised that this Court could not confirm any

plan of reorganization proposed by the Debtors if the Debtors had not first completed payment of

wages and benefits to their Employees, to the extent that such payments do not exceed $10,950.

I also understand that if the Debtors had not paid payroll taxes and other deductions from Employees' wages to the appropriate authorities, and that if they had not made the contributions required by law to their Employees' retirement plan, that a plan of confirmation could also not be confirmed.  As a result, I do not believe that payment of these obligations now will be detrimental to the Debtors' creditors and ask this Court to grant the relief requested in the Employee Wage Motion.

I.    MOTION PURSUANT TO SECTIONS 105(A), 363(B), 507(A)(8), AND 541 OF THE BANKRUPTCY CODE FOR AN ORDER AUTHORIZING THE DEBTORS TO REMIT AND PAY CERTAIN TAXES AND FEES ("TAX AND FEE MOTION")

156.    In the ordinary course of their businesses, the Debtors incur sales, use, income/franchise, real and personal property, business and occupation and other similar taxes, collect sales taxes from their customers and charge fees for licenses and other similar charges and assessments on behalf of various taxing, licensing and regulatory authorities and pay fees to such authorities for licenses required to conduct the Debtors' businesses.

157.    For example, between January and October 2008, the Debtors paid approximately $2.8 million on average each month in sales and use taxes, and estimate that as of the Petition Date, they still owe approximately $5.6 million in sales and use taxes incurred prior to seeking protection under chapter 11.  Additionally, in 2008, the Debtors accrued approximately $2 million in property taxes, roughly half of which remain to be paid as of the Petition Date.

158.    In addition, in 2008 the Debtors accrued approximately $3.5 million in income/franchise taxes in certain U.S. jurisdictions, based on the income tax base, the capital employed in the Debtors' businesses, the Debtors' assets and/or a variety of other factors.

Payment of the income/franchise taxes allows the Debtors to continue operating their businesses in such states.  The income/franchise taxes are typically paid on a quarterly or annual basis.

159.    In 2008, the Debtors accrued approximately $3.5 million in real property taxes. As of the Petition Date, the Debtors estimate that they owe approximately $2.36 million with respect to the 2008 real property taxes incurred prior to the Petition Date.  These accrued amounts would, absent the commencement of these chapter 11 proceedings, generally be paid in the first quarter of 2009.

160.    In 2008, the Debtors accrued approximately $2 million in personal property taxes.  As of the Petition Date, the Debtors estimate that they owe approximately $1 million with respect to the 2008 personal property taxes incurred prior to the Petition Date. These accrued amounts would, absent the commencement of these chapter 11 proceedings, generally be paid in the first quarter of 2009.

161.    In 2008, the Debtors incurred approximately $580,000 in business and occupation taxes and business license fees in certain jurisdictions.  I believe that the Debtors are current with respect to their business and occupation taxes and business license fees.

162.    The Debtors are also required to obtain construction, telecommunication and engineering contractor licenses and pay the applicable authorities corresponding flat fees in certain jurisdictions.  Typically, these contractor license fees are paid on a biannual, annual or biennial basis, depending on the jurisdiction.  I believe that the Debtors are current with respect to their contractor license fees.

163.    The Debtors are subject to certain audit investigations and may be subject to further audit investigations over the course of these chapter 11 proceedings that may result in additional amounts owed in prepetition taxes and/or fees to certain authorities.

164.     By filing the Tax and Fee Motion, the Debtors request that the Court allow them to remit and pay the sales, use, income/franchise, real and personal property, business and occupation taxes, and other similar taxes as the Debtors deem necessary, as well as fees for licenses, and other similar charges and assessments as described above.  I fear that if this Court does not authorize the Debtors to pay these taxes and fees, the Debtors' taxing authorities could take a range of actions that could have wide-ranging negative effects on the Debtors' operations. I understand that the Debtors' officers and directors might face personal liability for unpaid taxes or that the taxing authorities could seek to impose liens on the Debtors' assets or to suspend their operations.  I am also concerned that the Debtors could face audits, which would divert their attention away from the reorganization process.

165.     Moreover, I understand that many of the Debtors' outstanding tax liabilities are for trust fund taxes that the Debtors have collected and hold in trust for the benefit of the authorities and are therefore not a part of the Debtors' estate.  I also understand that, to the extent that debtors' taxes are not trust fund taxes, courts have regularly authorized debtors to pay such taxes so as to facilitate the reorganization process and thereby enhance the value of debtors' estates.  Finally, I also understand that payment of some of the Debtors' prepetition taxes and fees is a prerequisite to any confirmation of a potential chapter 11 plan, and as such I believe there is no reason to delay these inevitable payments.  Consequently, I ask the Court to grant the relief requested in the Tax and Fee Motion, including granting such relief on an interim basis pending entry of a final order.

J.    MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO
      (A) CONTINUE INSURANCE COVERAGE ENTERED INTO PREPETITION, AND
      (B) ENTER INTO NEW INSURANCE POLICIES ("INSURANCE MOTION")

166.    By the Insurance Motion, the Debtors are requesting that the Court enter

an Order: authorizing them to (a) continue their insurance policies uninterrupted and pay any

prepetition amounts related to such policies to the extent that the Debtors determine, in their

discretion, that such payment is necessary or appropriate; and (b) enter into new insurance

policies through renewal of their insurance policies or purchase of new policies in the ordinary

course of their businesses.

167.    Pursuant to the diverse regulations, laws and contracts that govern their

commercial activities, the Debtors hold third-party insurance policies with a number of insurance

carriers and are required to pay premiums to maintain these policies (the "Insurance Policies").

The Debtors estimate that, for the 2008 renewals, the total premiums to be paid by the Debtors

on the Insurance Policies was approximately $938,863 in the aggregate, of which approximately

$292,000 will be paid postpetition as payments come due in the ordinary course of business.  I

understand that the Debtors have made all premium payments on the Insurance Policies that

came due prior to the Petition Date.

168.    The Debtors' Insurance Policies can be grouped into two categories:  First,

NNI maintains insurance policies to provide coverage for workers' compensation claims brought

by employees injured on the job in the United States.  For the 2008 renewals, the total cost of

premiums for the Workers' Compensation Policies is $882,004, of which $819,754 was

structured to be paid over 12 monthly installments, starting in May 2008, and the remainder

structured to be paid in accordance with the terms of individual state policies.  The majority of

these policies will expire on May 15, 2009, and, as of the Petition Date, there remains to be paid

approximately and no more than $274,000 on the workers' compensation policies for the 2008 renewals.  The Debtors also incur other expenses related to these policies, including a quarterly payment of $35,350 to reimburse NNL for the costs of maintaining letters of credit to cover potential workers' compensation liability.  They also make monthly payments to insurance companies to cover expenses and settlements related to outstanding claims, which totaled $784,653 in 2008.

169.    Second, NNI also maintains an Insurance Policy to cover liability arising from the use of company-owned or leased automobiles in the United States.  For the 2008 renewal, the total cost of premiums for the Debtors' auto liability policy is $56,859, which was structured to be paid over 12 monthly installments beginning in May 2008.  The Debtors estimate that, as of the Petition Date, there remains to be paid approximately and no more than $19,000 on the auto liability policy for the 2008 renewal.  In addition, the Debtors paid an additional $435,378 in claims-related expenses for this policy.  These expenses include payments to the Debtors' primary automobile vendor, Automotive Rental Inc. ("ARI"), for the repair cost and any incidental costs for damaged automobiles leased to the Debtors pursuant to an agreement between the Debtors and ARI.  The Debtors are contractually liable for insuring against the cost of repairs to the leased automobiles damaged in accidents.  Rather than purchasing insurance, the Debtors engaged ARI to manage the repairs of the damaged automobiles.  The ongoing payment of these claims-related expenses postpetition will ensure that the Debtors continue to have access to vehicles which are very important to the Debtors' business operations throughout the reorganization period.[15]

---

[15]    I have been informed that the Guidelines of the Office of the United States Trustee for the District of Delaware require the Debtors to maintain certain insurance coverage throughout their chapter 11 proceedings that is more extensive than I have described above.  Although the Debtors themselves do not maintain all of the categories

170.    The Debtors have also retained an insurance broker – Willis of Tennessee, Inc. – to assist with the procurement and negotiation of the policies described above. In 2008, the Debtors paid a total of $60,000 in fees to Willis. As of the Petition Date, I understand that all broker fees for services rendered by Willis before the Petition Date have been paid in full.

171.    In addition to the Insurance Policies funded directly by the NNI, NNC maintains a number of third-party insurance policies on behalf of all of its subsidiaries, including the Debtors (the "Nortel Insurance Policies"). The Nortel Insurance Policies are in NNC's name, and the premiums for these policies are paid by NNL. The Nortel Insurance Policies cover all of NNC's subsidiaries generally, and none of the subsidiaries receive specific coverage under the Nortel Insurance Policies.

172.    The Nortel Insurance Policies are maintained for the following types of insurance: Errors and Omissions, Fiduciary Liability, Auto Liability, Comprehensive General Liability, Directors' and Officers' Liability, Property, Boiler and Machinery, Transit Floater, Crime, Employment Practices Liability and Special Accident Insurance. Most of these types of insurance are required to be maintained either by law or by contracts entered into by Nortel or its subsidiaries, including NNI.

173.    The Debtors do not fund the Nortel Insurance Policies and therefore are not seeking relief from this Court with respect to the Nortel Insurance Policies, which the Debtors understand will continue in the ordinary course during the reorganization period through the Canadian Proceedings.

---

of insurance coverage listed in the U.S. Trustee Guidelines, their corporate parent does maintain such coverage and funds it on the Debtors' behalf.

174.    I believe that the Insurance Policies are essential to the ongoing operation of the Debtors' businesses. I have been advised that the Debtors do not believe that Court approval is necessary to permit them to maintain their existing Insurance Policies. Out of an abundance of caution, however, the Debtors by the Insurance Motion seek authorization from this Court to pay prepetition amounts, if any, necessary to maintain insurance coverage currently in effect and to continue and renew these policies or purchase new policies in the ordinary course of running their businesses, to the extent that the Debtors determine that doing so would be in the best interest of the Debtors and their estates.

175.    I believe that maintaining and renewing the Debtors' insurance coverage is crucial to their reorganization, as it is required by law and is imperative to the protection and preservation of the Debtors' assets. Without the authority requested in the Insurance Motion, I am concerned that the Debtors might lose their coverage, or incur considerable cash expenditures to obtain other replacement coverage, either of which would hamper a successful reorganization. Moreover, I understand that failure to maintain the Debtors' insurance coverage could lead to dismissal or conversion of their chapter 11 cases. As a result, I request that this Court grant the relief requested in the Insurance Motion.

K.    MOTION PURSUANT TO SECTIONS 105(A) AND 363(B) OF THE BANKRUPTCY CODE, FOR AN ORDER AUTHORIZING DEBTORS TO HONOR PREPETITION OBLIGATIONS TO THEIR CUSTOMERS ("CUSTOMER OBLIGATIONS MOTION")

176.    By the Customer Obligations Motion, the Debtors are requesting that the Court enter an Order: authorizing them, in their sole discretion, to (i) honor and perform prepetition obligations to their customers (the "Customer Obligations"); and (ii) continue their customer programs in the ordinary course of business.

177.    As I have described in greater detail above, the Debtors provide networking and communications technology and services to customers in the United States, Canada and around the world.  As a whole, Nortel, including the Debtors and their affiliates, count among their customers 85% of the world's top revenue-generating wireless operators globally.  In addition, Nortel has designed, installed and launched hundreds of wired and wireless networks in over 50 countries and continues to provide a wide range of network management services to hundreds of customers around the world.

178.    The Debtors' telecommunications solutions include a comprehensive spectrum of networking products and services, from initial infrastructure engineering, planning and deployment to the sale of hardware and software products and services designed to reduce complexity, improve efficiency and increase productivity for a diverse base of customers and end-users (collectively, the "Customers").  The Customers rely on the Debtors for an array of mission critical services related to their networks, including maintenance and technical support, repair and spares management,[16] network managed services, network hosting services, applications services and related engineering, marketing, sales, supply, licensing and installation.

179.    The Debtors maintain numerous customer programs (the "Customer Programs") that are critical to their past and future success and that they wish to continue postpetition.  The Customer Programs are aimed at the Debtors' product and services distribution network which includes accredited resellers, distributors, value-added dealers and other strategic partners engaged in the sales and marketing of the Debtors' products and services to end-users.

---

[16]    "Spares management" is a term of art that refers to an end-to-end service offering that includes a number of functions such as spare parts inventory management (warehousing of the parts), associated logistics (collection of defective parts and delivery of replacements) and installation of replacement parts into the network.

The total cost to the Debtors and the Canadian Debtors of carrying out the Customer Programs in

2008 was approximately $249 million.  Among these Customer Programs are:

       a.     Volume Incentive Discount Program (the "VID Program"):  The VID Program provides discounts to accredited resellers and strategic partners who act as resellers of the Debtors' products and services.  The VID Program discount amount is based on an individual reseller's or partner's revenue performance in the previous year.  Maintaining the VID Program is critical to ensuring that the Debtors' most successful partners remain loyal to the Debtors through this difficult time by providing them with the rewards for past performance that they have been promised.  The Debtors estimate that maintaining the VID Program in 2008 cost the Debtors and the Canadian Debtors approximately $116 million;

       b.     Marketing Efforts (the "Marketing Programs"):  The Marketing Programs include efforts undertaken by the Debtors themselves and in conjunction with accredited resellers and strategic partners to advertise, promote and demonstrate the benefits of the Debtors' products and services to their end-user customers.  The Marketing Programs involve a series of offers, incentives, discounts, rebates, communications, and training to partners acting as resellers, distributors as well as end-user customers.  The Marketing Programs are primarily designed to expand the Nortel customer base and increase sales.  Continuation of the Marketing Programs is essential if the Debtors are to remain competitive in the global marketplace.  The Debtors estimate that maintaining the Marketing Programs in 2008 cost the Debtors and the Canadian Debtors approximately $83 million;

       c.     Cooperative Partner Programs (the "Partner Programs"):  The Partner Programs provide cash incentives to the Debtors' most valued accredited resellers and strategic partners for their undertaking ongoing efforts to support, market and sell the Debtors' products and services alongside their own on the Debtors' behalf.  The Debtors have developed three tiers of accredited resellers and partners as determined by volume performance, portfolio breadth and service commitment: Advantage Partners, Premium Advantage Partners and Elite Advantage Partners.  Participants in the Partner Programs include some of the most recognizable and powerful names in the telecommunications and networking industry including IBM, Dell, Verizon and Bell Canada, among others.  Without the continued support of these partners, the Debtors' ability to restructure their businesses will be severely hindered.  The Debtors estimate that maintaining the Partner Programs in 2008 cost the Debtors and the Canadian Debtors approximately $12 million and

       d.     Value-Added Dealers Program (the "VAD Program"):  The VAD Program provides discounts and rebates to the most valued and successful accredited distributors and dealers of Nortel products.  The VAD Program includes a series of up-front discounts and back-end rebates based on the

achievement of performance metrics as well as discounts for early payment. The continuation of the VAD Program will ensure that the Debtors' products and services reach end-customers and are delivered, implemented and maintained in an orderly and efficient manner. The Debtors estimate that maintaining the VAD Program in 2008 cost the Debtors and the Canadian Debtors approximately $38 million.

180.    By the Customers Obligations Motion, the Debtors request that this Court allow them to honor obligations to their customers that arose before the Debtors sought relief under chapter 11, including through the Customer Programs. As of the Petition Date, I understand that some of the Debtors' most valued Customers, who operate complex and important networks reliant on Debtors' continued support, have outstanding claims against the Debtors for goods and services for which they have already paid. Given the critical nature of the Debtors' continued support required to ensure network operational readiness, I believe that failure to honor prepetition obligations to such Customers creates a significant risk that such customer relationships will be effectively destroyed. I am confident that honoring prepetition obligations to these Customers, including through the Customer Programs, will benefit all creditors because honoring these obligations will allow the Debtors' businesses to avoid the loss of critical Customers, the costs of which far outweigh the costs of honoring these obligations.

181.    For these and for the other reasons set forth in the Motion, I believe that the relief requested is in the best interest of the Debtors' estates, their creditors and other parties-in-interest in these cases.

70

L.    MOTION PURSUANT TO SECTIONS 105(A) AND 363(B)(1) OF THE
      BANKRUPTCY CODE FOR AN ORDER AUTHORIZING THE DEBTORS TO PAY
      PREPETITION COMMON CARRIER CHARGES AND WAREHOUSE FEES
      ("SHIPPERS AND WAREHOUSERS MOTION").

          182.    In the ordinary course of providing telecommunications and networking

equipment to their customers, the Debtors employ a variety of third party common carriers to

transport their products and warehouse facilities to store them prior to sale.

          183.    To facilitate their payments to common carriers, the Debtors employ

PowerTrack, a third-party freight payment manager, to audit and arrange for pass-through

payment of freight invoices.  While PowerTrack charges the Debtors a fee for its services, I

believe this fee is more than offset by the savings gained from eliminating paper invoices,

avoiding late fees and other benefits.  Over the last two months, the Debtors have paid

PowerTrack an average weekly amount of approximately $1.3 million per week.  As of the

Petition Date, the estimated value of the Debtors' goods in transit is approximately $25 million,

and the Debtors owe PowerTrack and the Common Carriers approximately $2.5 million, which

absent the commencement of these Chapter 11 cases, would be paid over the course of the next

few weeks.

          184.    The Debtors also utilize a number of third party warehouse facilities

(collectively, the "Warehouse Facilities") for the purpose of storing products prior to the point of

sale.  The Warehouse Facilities are located in Oklahoma, Texas, New Jersey, New York,

Connecticut, Delaware, Maryland, North Carolina, Virginia, Illinois, Wisconsin, Georgia,

California, Tennessee and Florida.

          185.    The Debtors pay storage costs (the "Warehouse Fees") directly to the

Warehouse Facilitates in exchange for their services.  While the amount the Debtors pay in

Warehouse Fees fluctuates, the average weekly amount paid over the last two months was

71

approximately $500,000. The estimated value of the products currently being stored in the

Warehouse Facilities as of the Petition Date is approximately $168 million. As of the Petition

Date, the Debtors estimate that they owe Warehouse Fees of approximately $4 million, which

absent the commencement of these Chapter 11 cases, would be paid over the course of the next

few weeks, depending on the terms of the Debtors' contract with each individual Warehouse

Facility.

  186. I understand that if the Debtors do not pay common carriers and

warehouse facilities for their services, these entities may be able to refuse to deliver goods in

their possession or to assert possessory liens in them, notwithstanding the automatic stay

imposed by this Court. I am concerned that such actions would seriously disrupt the Debtors'

operations, which are inextricably tied to the Debtors' ability to timely deliver

telecommunications and networking equipment to their customers across North America. The

Debtors rely heavily on their regular common carriers and warehouse facilities to deliver and

store their products. To avoid this potential disruption, the Debtors have submitted the Shippers

and Warehousers Motion to this Court, requesting authorization to pay its prepetition common

carrier and warehouse fees. I believe granting this relief will be to the benefit of the Debtors,

their estates and their creditors because the amount of the fees due to common carriers and

warehouse facilities are modest in comparison to the value of the Debtors' products held by these

entities and the value the Debtors' estates will receive from an uninterrupted supply of goods. I

also understand that courts have regularly granted such relief under their power to authorize

postpetition payment of prepetition obligations where necessary to preserve or enhance the value

of a debtor's estate for the benefit of all creditors. Accordingly, I request that this Court grant

72

the relief requested in the Shippers and Warehousers Motion, including granting such relief on

an interim basis pending entry of a final order.

M.   MOTION PURSUANT TO SECTIONS 105(A) AND 366 OF THE BANKRUPTCY
      CODE FOR INTERIM AND FINAL ORDERS (I) RESTRAINING UTILITY
      COMPANIES FROM DISCONTINUING, ALTERING OR REFUSING SERVICE,
      (II) DEEMING UTILITY COMPANIES ADEQUATELY ASSURED OF FUTURE
      PERFORMANCE AND (III) ESTABLISHING PROCEDURES FOR DETERMINING
      REQUESTS FOR ADDITIONAL ASSURANCE ("UTILITY MOTION").

187.   The Debtors obtain various products such as gas, water, electricity, sewer,

telephone, Internet and other essential services from a multitude of utility companies or utility

company divisions (collectively, the "Utility Companies"), including, but not limited to, those

listed on Exhibit A attached to the Utility Motion.  Over the past twelve months, the Debtors

have paid an average of $2,113,278 per month to the Utility Companies

188.   The Debtors directly manage their payments to Utility Companies

providing telecommunications services without the assistance of any third parties.  However, to

facilitate their payments to Utility Companies providing electric, gas, water and sewage services,

the Debtors have employed Johnson Controls Inc. ("JCI"), which in turn has subcontracted with

National Information Solutions Cooperative  ("NISC") to arrange for the pass-through payment

of the Debtors' utility invoices.  Although the Debtors incur fees for these services, I believe

these costs are outweighed by the benefits gained from streamlined payments and simplified

tracking and analysis of the Debtors' utility usage and rates.  Pursuant to their contractual

obligations, JCI and NISC will continue to manage the pass-through payment of the Debtors'

electric, gas, water and sewage utility invoices after the Petition Date and make payments to the

respective Utility Companies on behalf of the Debtors.  By the Utility Motion, the Debtors are

seeking an order barring JCI and NISC from holding, using or setting off such payments for their

own benefit.  In addition, the Debtors seek a finding from the Court that failure by the Debtors to

pay prepetition claims to Utility Companies, through JCI or otherwise, shall not give JCI or

NISC any postpetition claims for such unpaid amounts.

189.    I have been advised that Section 366 of the Bankruptcy Code prevents

utility companies from discontinuing, altering or refusing service to a debtor during the first 30

days of a chapter 11 case.  However, after such 30-day period, I understand that a utility

company may terminate its services if a debtor has not furnished it with adequate assurance of

payment.

190.    By the Utility Motion, the Debtors request that this Court approve the

Debtors' proposed offer of adequate assurance and related procedures and prohibit the Utility

Companies from altering, refusing or discontinuing services to the Debtors on the basis of the

commencement of these cases, on account of any unpaid invoice for service provided prior to the

Petition Date or on account of any perceived inadequacy of the Debtors' proposed adequate

assurance.  The Debtors propose, within twenty (20) business days of the Petition Date, to place

a deposit (the "Adequate Assurance Deposit") equal to the aggregate approximate cost of two (2)

weeks of utility services, calculated as a historical average over the past twelve (12) months, into

an interest-bearing, newly created segregated account ("Utility Deposit Account"), except to the

extent that (i) a Utility Company agrees to a lesser amount, (ii) a Utility Company already holds

a deposit equal to or greater than two (2) weeks of utility services, or (iii) a Utility Company is

not currently paid in advance for its services.  On the basis of the Debtors' current estimates,

$1,056,639 will be paid into the Utility Deposit Account within twenty (20) days of the Petition

Date.  The Adequate Assurance Deposit shall be maintained with a minimum balance equal to

the aggregate approximate cost of two (2) weeks of utility services, which may be adjusted by

74

the Debtors to account for the termination of utility services by the Debtors or other arrangements with respect to adequate assurance of payment reached with a Utility Company.

191.    Furthermore, the Debtors propose that to the extent the Debtors become delinquent with respect to a Utility Company's account, such Utility Company may file a notice of delinquency (the "Delinquency Notice") with the Court and serve such notice on (a) the Debtors, (b) counsel to the Debtors, (c) counsel to the official committee of unsecured creditors, when one is appointed, and (d) the U.S. Trustee. If the Debtors have not cured such delinquency or none of the noticed parties have objected to the Delinquency Notice within ten (10) days of the receipt of the Delinquency Notice, then the Debtors shall remit to such Utility Company from the Adequate Assurance Deposit the lesser of (i) the amount allocated to the Adequate Assurance Deposit for such Utility Company's account and (ii) the amount of postpetition charges claimed as delinquent in the Delinquency Notice. In addition to the measures I have just described, the Debtors have also proposed other procedures that allow Utility Companies to request additional adequate assurance or to opt out of the procedures proposed by the Debtors. These procedures are described in greater detail in the Debtors' Utility Motion.

192.    I fear that if the Utility Companies are permitted to terminate services, the Debtors will be forced to cease operations, resulting in a severe disruption, loss of revenue and profits, and potentially the destruction of their businesses. Such disruption and loss would at a minimum cause substantial harm to the Debtors' efforts to expeditiously restructure their business affairs and would be detrimental to the estates and the Debtors' creditors. Accordingly, I believe it is essential that the Utility Companies continue to provide their services without interruption and that this Court grant the relief requested in the Utility Motion, including granting such relief on an interim basis pending entry of a final order.

N.  DEBTORS' MOTION UNDER 11 U.S.C. §§ 105, 362 AND 541 FOR AN INTERIM
ORDER ESTABLISHING NOTIFICATION PROCEDURES AND APPROVING
RESTRICTIONS ON CERTAIN TRANSFERS OF THE DEBTORS' PARENTS'
EQUITY SECURITIES ("NOL TRADING MOTION")

193.    The Debtors estimate that, as of September 30, 2008, the Debtors and their

subsidiaries had net operating losses ("NOLs") for U.S. federal income tax purposes of at least

$1.6 billion, at least $500 million of unused excess general business and foreign tax credits, in

addition to other amounts that potentially could be subject to certain statutory limitations

described below (the "Tax Attributes").  Because the Internal Revenue Code permits

corporations to carry forward NOLs and tax credits to offset future income and reduce future tax

liabilities, these Tax Attributes are valuable assets of the Debtors' estates.  Based on a combined

federal and state corporate income tax rate of 39%, Debtors' Tax Attributes could yield future

tax savings to the Debtors of at least $1.1 billion.  I believe the availability of these tax savings

may prove crucial to the financial health of the Debtors and may be critical in the formulation of

any plan of reorganization.

194.    I understand that trading in equity interests in NNC and NNL could

subject the Debtors' ability to use their Tax Attributes to statutory limitations under the U.S.

Internal Revenue Code, which could result in the Debtors' inability to use a substantial portion of

these Tax Attributes.

195.    By the NOL Trading Motion, the Debtors request authorization to

establish and implement restrictions and notification requirements regarding the ownership and

certain transfers of equity interests in the Debtors' direct and indirect parent corporations, and to

notify holders of such equity interests of such restrictions and requirements.  I believe that the

Debtors' ability to meet the requirements of the tax laws to protect these Tax Attributes may be

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 14, 2009

_____
John Doolittle
Vice President for each of the Debtors and
Debtors-in-Possession

Schedule 1:  Nortel Corporate Structure Chart



[1]      Debtors that are direct subsidiaries of NNC include:  Alteon Websystems, Inc., CoreTek, Inc., Sonoma Systems and Xros, Inc.  Architel Systems (U.S.) Corporation is a direct subsidiary of a non-debtor subsidiary of NNC.  Nortel Networks Applications Management Solutions Inc. is 88.62% owned by NNC, and 11.38% owned by NNI.  Alteon Websystems International, Inc. is a direct subsidiary of Alteon Websystems Inc.
[2]      In addition to Nortel Networks Capital Corporation, the following debtors are also direct subsidiaries of NNI:  Nortel Networks Cable Solutions Inc., Nortel Networks International Inc., Northern Telecom International Inc. and Qtera Corporation.  Also, Nortel Networks Optical Components Inc. is 99.93% owned by NNI, and 0.07% owned by NNL.  In addition, Nortel Networks HPOCS Inc. is the direct subsidiary of Nortel Networks Optical Components Inc.