## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------X
                                                          :
*In re*                                                   :    Chapter 11
                                                          :
Nortel Networks Inc., *et al.*,[1]                        :    Case No. 09-10138 (KG)
                                                          :
                                    Debtors.              :    Joint Administration Pending
                                                          :
----------------------------------------------------------X

**DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 345, 363(c)(1),
364(a) AND 503(b)(1):  (A) APPROVING THE CONTINUED USE OF THE CASH
MANAGEMENT SYSTEM, BANK ACCOUNTS AND BUSINESS FORMS;
(B) PERMITTING CONTINUED INTERCOMPANY TRANSACTIONS,
GRANTING ADMINISTRATIVE PRIORITY STATUS TO POSTPETITION
INTERCOMPANY CLAIMS AND PRESERVING AND PERMITTING
THE EXERCISE OF INTERCOMPANY SETOFF RIGHTS; (C) AUTHORIZING
BANKS TO HONOR CERTAIN TRANSFERS AND CHARGE
CERTAIN FEES AND OTHER AMOUNTS; AND (D) WAIVING
THE REQUIREMENTS OF 11 U.S.C. SECTION 345(b) ON AN INTERIM BASIS**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of

an order substantially in the form attached hereto as Exhibit A, (a) approving the continued use

of the Cash Management System, Bank Accounts and Business Forms (each as defined below);

(b) permitting continued Intercompany Transactions (as defined below), granting administrative

priority status to postpetition Intercompany Claims (as defined below), and preserving and

permitting the exercise of intercompany setoff rights; (c) authorizing banks to honor certain

---

[1]         The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc.
(9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera
Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel
Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.)
Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and
Nortel Networks Cable Solutions Inc. (0567).

transfers and charge certain fees and other amounts; (d) waiving the requirements of 11 U.S.C. section 345(b) on an interim basis; and granting them such other and further relief as the Court deems just and proper.  In support of this Motion, the Debtors rely on the Declaration of John Doolittle in Support of First Day Motions and Applications (the "First Day Declaration").  In further support of this Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 345, 363(c)(1), 364(a) and 503(b)(1) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

## Background

**A.    Introduction**

3.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or official committee of unsecured creditors has been appointed in the Debtors' cases.

5.      On the date hereof, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[2] will file an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors will continue to manage their properties and operate their businesses under the supervision of the Canadian Court. Ernst & Young Inc., as foreign representative for the Canadian Debtors, will file petitions for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. Certain of Nortel's European subsidiaries will make consequential filings for creditor protection.

6.      Simultaneously with the filing of this Motion, the Debtors have sought an order of joint administration pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that would provide for the joint administration of these cases and for consolidation for procedural purposes only.

**B.      Debtors' Corporate Structure and Businesses**

**Nortel's History**

7.      The name Nortel is known throughout the world for leadership in the networking and communications industries. With over 110 years of experience, the Nortel Companies (as defined below) work closely with their service provider and enterprise customers in the United States, Canada, Central and Latin America, Europe, the Middle East and Africa, and Asia to deliver them cutting edge hardware and software solutions and related services.

8.      The Nortel Companies trace their heritage to 1895 when the Bell Telephone Company of Canada founded the Northern Electric and Manufacturing Company Limited ("Northern Electric") as an equipment provider for Canada's telephone system. Over the

---

[2]      The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

following century, Northern Electric grew into Northern Telecom and eventually Nortel, gaining

a well-deserved reputation for innovation and creativity through the development of ground-

breaking technology -- including many industry firsts -- in such fundamental technologies as

digital, optical, wireless, internet protocol, voice-over internet protocol, broadband, multimedia,

and ethernet.  Through substantial research and development ("R&D") initiatives and external

R&D partnerships, the Nortel Companies continue to invest in the development of next-

generation technologies to deliver value to their customers around the world.

9.      From the mid-1980s to 2000, the Nortel Companies expanded substantially,

helping to lead the telecommunications boom, moving from the development and manufacturing

of traditional landline phone technology and equipment into the wireless and digital age. From

its Canadian base, North American operations were expanded into the United States with the

establishment of production and R&D facilities, resulting in an increase in the number of U.S.-

based employees and the creation of a large customer base in the U.S.  At the same time, the

Nortel Companies moved aggressively into Europe, Asia, Africa and Latin America, becoming a

truly global enterprise.

10.     In 1998, the name Nortel Networks was first officially adopted in recognition of

the continuing transformation of the companies' business.  In 2000, BCE Inc., the parent

company of Bell Canada, spun-off substantially all of its shareholdings in Nortel through a

statutory reorganization transaction, with the result that NNC became the ultimate parent entity

of the Nortel Companies, and NNL became its principal Canadian operating subsidiary.  NNC

and its predecessors have been a public company in Canada for many decades, listed on the

Toronto Stock Exchange, and became a public company in the United States in 1975, listed on

the New York Stock Exchange.  Notwithstanding the fact that NNC and NNL are non-U.S.

companies, they nevertheless report on the same basis as U.S. domestic companies because

neither NNC nor NNL meets all the requirements of a "foreign private issuer" pursuant to Rule

3b-4 under the U.S. Securities Exchange Act of 1934, as amended.

**The Dot Com Bust and Nortel's Restatements**

11.     At its peak in 2000, the Nortel Companies reported approximately $30 billion of

annual revenue, employed nearly 93,000 employees, and had a market capitalization (for NNC)

of over $250 billion.  With the burst of the high-tech bubble in early 2001 and the resulting

significant downturn in both the telecommunications industry and the economic environment, the

Nortel Companies began to face an increasingly difficult competitive environment.  After a long

period of expansion, the capital expenditure levels of many customers began to decrease

substantially in 2001.  Also, R&D costs continued to expand during 2001 as the Nortel

Companies and its competitors scrambled to predict and adjust to the rapidly changing

technological landscape.

12.     Since 2001, the Nortel Companies have taken a wide range of steps to right-size

their businesses, increase efficiency, cut costs and focus on building on their substantial

franchise in potentially high-growth and high-margin areas.  Among the most significant steps

taken have been a series of restructurings as principally announced in 2001, 2004, 2006, 2007

and 2008 that have reduced the number of worldwide employees from more than 90,000 to about

30,000.  These restructurings have included (a) the outsourcing of nearly all manufacturing and

production to a number of key suppliers, including, most importantly, Flextronics Telecom

Systems Ltd. and its affiliates; (b) the substantial consolidation of key R&D expertise in Canada

and China; (c) decisions to dispose of or exit certain non-core businesses, such as the sale of

Nortel's United Mobile Technology System business unit; (d) the creation and/or expansion of

joint venture relationships (such as with LG Electronics, Inc. of Korea and Guandong-Nortel

Telecommunications Equipment Company Limited of China); (e) establishing alliances with various large organizations; (f) real estate optimizations, including the sale of the Company's former headquarters in Brampton, Ontario, Canada; and (g) the continued reorientation of the Nortel Companies from a traditional supplier of telecommunications equipment to a global leader in cutting edge networking hardware and software solutions.

13.   At the same time, the Nortel Companies worked tirelessly to meet the challenges presented in the aftermath of the tech bust and, beginning in 2003, to address the significant issues that arose when a number of accounting irregularities came to light.  These irregularities, which primarily involved practices relating to the improper booking of revenue and establishment and release of accrued liabilities, led to regulatory, civil and criminal investigations, and the discovery of certain material weaknesses in internal control over financial reporting ultimately resulted in four successive restatements of the consolidated financial statements of the Nortel Companies for the fiscal years 2000 through 2005 and certain interim periods, the termination of a number of high-ranking executives for cause, the replacement of the then-incumbent CEO, CFO and Controller and the senior finance management team, and a complete revamping of control processes.  The restatements also triggered substantial shareholder litigation in Canada and the United States, all of which was settled in 2006 for cash of $575 million and NNC common shares valued at $1.6 billion.  Since 2005, Nortel has established a new senior executive leadership team with key external hires and internal promotions, entered into settlements with the Ontario Securities Commission and the U.S. Securities and Exchange Commission and confirmed that it is not the subject of the ongoing criminal investigations.  In addition, Nortel remediated its material weaknesses and returned to timely financial reporting.

**The Chapter 11, CCAA and European Filings**

14.     The Nortel Companies operate in a highly competitive environment.  The networking solutions industry is characterized both by industry rationalization as well as consolidation.  By way of example, two of Nortel's largest competitors, Lucent Technologies Inc. and Alcatel, merged in 2006 and two of its largest customers, Verizon Wireless and Alltel Corporation, merged in 2008.  Simply put, the competition for market share is fierce, and the cost of rapid technological development is steep.

15.     In recent years, the operating costs of the Nortel Companies have generally exceeded revenues, resulting in negative cash flow.  A number of factors have contributed to these results, including competitive pressures, an inability to reduce operating expenses fast enough, the incurrence of costs related to restructuring efforts, significant competitor and customer consolidation, customers cutting back on capital expenditures and deferring new investments and the poor state of the global economy.  These difficulties have increased materially in recent months as global economic conditions have dramatically worsened.  The Nortel Companies are experiencing significant pressure on their businesses and facing a deterioration of their cash and liquidity, globally as well as on a regional basis, as customers across all businesses delay and reduce their capital expenditures.  In particular, the extreme volatility in the global markets has hampered the ability to accurately forecast future revenue and cash position.

16.     After Nortel announced in 2004 the need to restate prior period financial results, Standard & Poor's Corporation ("Standard & Poor's") and Moody's Investors Service, Inc. ("Moody's") reduced the Nortel credit ratings to below investment-grade.  As a result, the Nortel Companies were unable to access the commercial paper market and were limited in their access

to the capital markets.  For several years, the Nortel Companies were only able to raise high

yield/convertible debt and did not have any revolving credit or other bank lines.

17.    Current market conditions have further restricted Nortel's ability to access the

capital markets, which has been compounded by recent actions taken by rating agencies with

respect to its credit ratings.  In September 2008, Standard & Poor's revised its outlook on Nortel

from positive to stable, and Moody's revised its outlook on Nortel from stable to negative.  In

November 2008, Standard and Poor's changed its outlook to negative.  In December 2008,

Moody's issued a downgrade of Nortel's corporate family rating from B3 to Caa2.  The actions

of the rating agencies also jeopardize the ongoing relationship between the Nortel Companies

and Export Development Canada ("EDC," Canada's federal export credit agency, which

provides financing support to Canadian exporters).  EDC provides a support facility that

backstops certain letters of credit and performance bonds and the recent Moody's downgrade

gives EDC a right to suspend additional support under the facility.  On January 13, 2009, EDC

and Nortel entered into a subsequent agreement for 30 days that provides Nortel access to a

maximum of up to $30 million of additional support under the facility during this period, to

allow EDC and Nortel to work together to see if a longer term arrangement, acceptable to both

parties, can be reached.  The agreement is subject to the condition that any support granted by

EDC post-filing under the EDC Support Facility, as it may be amended from time to time, is

secured by a second charge over all the assets of the Canadian Debtors, subject only to the

Administrative Charge (other than the Carling Facility, where the charge will be a third ranking

charge).  The potential termination of the EDC Support Facility would be very damaging to the

Debtors' businesses.

18.     In November 2008, Nortel announced a new operating model that will consolidate executive and management personnel across the global organization and transition the company to vertically-integrated business units.  In addition, Nortel announced a further restructuring plan which provides for a net reduction in global workforce of approximately 1,300 positions as well as additional cost cutting measures.  The November workforce reduction was the second of the year, with total 2008 announced job reductions of 3,500.

19.     It has become increasingly clear that the struggle to reduce operating costs during a time of decreased customer spending and massive global economic uncertainty has put substantial pressure on Nortel's liquidity position globally, and in particular in North America. With no current access to the capital markets, the prospects of the capital markets opening up in the near term being very dim, substantial interest carrying costs on over $4 billion of unsecured public debt, and significant pension plan liabilities that are expected to increase in a very substantial and material manner principally due to the adverse conditions in the financial markets globally, it has become imperative for the Nortel Companies to protect their current cash positions.

20.     Against this background, Nortel has been assessing its projected liquidity position, particularly taking into account its highly leveraged debt position, downgraded credit ratings and significant practical limitations given its existing high cost structure on accessing the cash position of Nortel Companies in certain regions.  After exploring all possible alternatives, Nortel has concluded that, in the absence of seeking creditor protection, in later portions of this year there is a significant risk it would have insufficient cash resources on a regional basis and would likely be unable to remedy this deficit position through third-party financing.  Nortel has further determined that a number of factors relating to its high cost structure raise serious

impediments to its ability to continue operations absent a fundamental financial and business restructuring that can most effectively and quickly be achieved within the framework of bankruptcy and insolvency proceedings in multiple jurisdictions. As a consequence, Nortel has determined that it will not make payment of its regularly scheduled interest due January 15, 2009 on its outstanding public debt and will seek creditor protection under the respective restructuring regimes of Canada, the United States and certain EMEA subsidiaries.

21.    Therefore, in light of the foregoing, on January 14, 2009, NNI, NNCC, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Architel Systems (U.S.) Corporation, Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc. filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court. Also, on January 14, the Canadian Debtors will commence the Canadian Proceedings and it is anticipated that certain of Nortel's European subsidiaries will make consequential filings for creditor protection (collectively, the "EMEA Debtors"). Pursuant to section 18.6 of the CCAA, NNI will also bring an application before the Canadian Court for recognition of the automatic stay imposed by the filing of the U.S. Debtors' bankruptcy petitions. Applications will be made to this Court under chapter 15 of the Bankruptcy Code for recognition of the Canadian Proceedings as foreign main proceedings by Ernst & Young Inc. as foreign representative for the Canadian Debtors.

**Corporate Structure**

22.    The Nortel Companies consist of NNC, the ultimate parent company; NNL, NNC's principal Canadian operating subsidiary; NNI, a Delaware corporation and the principal U.S. operating subsidiary (and a direct subsidiary of NNL); NNCC, a Delaware corporation and

a finance company with public debt; and over 140 affiliates around the world (together, the "Nortel Companies"). NNC's most significant assets consist of its investments in its direct and indirect subsidiaries. NNC and NNL are both incorporated under the Canada Business Corporations Act (the "CBCA"). As set forth in NNC's 2008 third quarter report, NNC has, as of September 30, 2008, consolidated assets of approximately $11.6 billion and consolidated liabilities of approximately $11.8 billion.

23.    The Nortel Companies' U.S. businesses are primarily conducted through NNI, which is the direct or indirect parent of a majority of the U.S. Nortel Companies, including U.S. Debtors. NNCC is a financing company with few assets and has no operations of its own. As of September 30, 2008, NNI had assets of approximately $9 billion and liabilities of approximately $3.2 billion, which liabilities do not include liabilities relating to NNI's guarantee of some or all of the Nortel Companies' approximately $4.2 billion of unsecured public debt. Each of NNC, NNL, NNI and NNCC is an issuer and/or guarantor of some or all of the Nortel Companies' approximately $4.2 billion of unsecured public debt.

24.    In addition to the Debtors, Nortel has other U.S. subsidiaries, most of which either have no material assets or business in the U.S. or are in the process of being wound-down. Several entities, particularly Nortel Government Solutions Incorporated ("NGS") and Nortel Networks (CALA) Inc., have material operations and are not part of these proceedings. None of these other U.S. subsidiaries has commenced chapter 11 proceedings at this time.

25.    The Nortel Companies also include NNL's and NNC's active subsidiaries located in Europe, the Middle East and Africa (collectively, the "EMEA Entities"). The majority of the EMEA Entities are subsidiaries of Nortel Networks UK Limited ("NN UK), with the exception of (a) Nortel Networks SA ("NN France"), which is jointly owned by NNL and Nortel

11

International Finance & Holding BV ("NNIF"), and Nortel Networks France SAS ("NN France

SAS"), which is a subsidiary of NN France; and (b) Nortel Networks (Ireland) Limited ("NN

Ireland"), which is a wholly owned subsidiary of NNL for fiscal reasons.  NN UK is the largest

business of the EMEA Entities and is the headquarters for the EMEA region.

### Nortel's Business

#### *Global Integrated Business Model*

26.    The Nortel Companies' businesses are highly complex and global in nature.  As

set forth in more detail below, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and

their debtor and non-debtor affiliates employ a global integrated business model.  In particular:

- The main operating subsidiaries around the world operate in each of Nortel's four main business segments.

- Nortel has substantially outsourced its manufacturing, relying on contract manufacturers with affiliates across the world to supply the Nortel Companies globally.

- The Nortel Companies employ a complex internal purchasing system where sales orders are placed at the local, in-country level, and internal purchase orders are routed to one of four purchasing hubs (located in four separate countries), which entities place orders with suppliers around the world.

- The Nortel Companies use a complex transfer pricing model, periodically submitted to global taxing authorities for approval, to allocate costs and revenues throughout the global enterprise and ensure the proper allocation of tax payments among relevant jurisdictions.

- Nortel's integrated business model is financed through a complex intercompany cash management system that itself is integrated with Nortel's sales, purchasing, supply and distribution networks.

- Nortel employees around the world share responsibility for the R&D, sales and operations of the global enterprise.

*Nortel's Business Segments*

27.    As of December 31, 2008, the Nortel Companies had four main business

segments – (1) Carrier Networks ("Carrier"); (2) Enterprise Solutions ("Enterprise"); (3) Metro

Ethernet Networks ("MEN"); and (4) Global Services.

28.    **Carrier**.  The Carrier segment provides wireless networking solutions that enable

service providers and cable operators to supply mobile voice, data and multimedia

communications services to individuals and enterprises using mobile telephones, personal digital

assistants, and other wireless computing and communications devices.

29.    **Enterprise**.  The Enterprise segment provides communication solutions that are

used to build new networks and transform existing communications networks into more cost

effective, packet-based networks supporting data, voice and multimedia communications.

30.    **MEN**.  The MEN segment provides optical networking and carrier grade Ethernet

data networking solutions to make the carrier and large enterprise customers' networks more

scalable and reliable for the high-speed delivery of diverse multimedia communications services.

31.    **Global Services**.  The Global Services segment provides a broad range of

services and solutions supporting the entire lifecycle of multi-vendor, multi-technology networks

for enterprises and carriers worldwide seeking to reduce costs, improve efficiency and

performance and capitalize on new revenue opportunities.

32.    With certain exceptions, the business segments are not segregated by legal entities

but are operated across various legal entities.  One such exception is NGS, which has been

reported historically under "Other" in Nortel's business segments.

33.    On January 1, 2009, Nortel implemented a new operating model, which

decentralized several of its corporate functions and transitioned to vertically-integrated business

units to give greater financial and operational control to the business units and reduce

13

duplication.  Enterprise customers are now served by the Enterprise business unit, which is responsible for product and portfolio development, R&D, marketing and sales, partner and channel management, strategic business development and associated functions.  Service provider customers are served by two business units with full responsibility for all product, services, applications, portfolio, business and market development, marketing and R&D functions: Carrier and MEN.  A dedicated global carrier sales organization supports both business units.

34.    The Global Services and Global Operations organizations will be decentralized and transitioned to the business units by April 1, 2009 to ensure there is no impact to customer service.  Beginning January 1, 2009, Nortel includes services revenue in the respective financial results for Enterprise, Carrier and MEN.

35.    Historically, the various business segments have been reported across the following geographic regions for financial reporting purposes: United States, Europe, Middle East and Africa, Canada, Asia and Central and Latin America.

### *Global Supply Chain*

36.    The Nortel Companies rely on numerous suppliers, including contract manufacturers responsible for the manufacturing of Nortel hardware and the various materials necessary for the Debtors to provide their solutions to customers and end-users.  The Nortel Companies employ a complex internal purchasing system for their hardware and software products.  When a sales order is placed with a regional Nortel distribution entity, an internal purchase order is generated and automatically routed through one of four purchasing hub entities, depending on the business segment and the geographical region involved.  Purchasing hub entities manage key supplier relationships and act as funneling points for orders from Nortel's sale entities all around the world.

37.     The four purchasing hubs are NNL, NNI, NN UK and NN France. Approximately two-thirds of all Nortel purchasing activity flows through the North American purchasing hubs, NNL and NNI.  NNI acts as the purchaser for Enterprise Data products for all of the Americas and Asia as well as certain other worldwide products.

38.     The respective purchasing hub entity contracts directly with equipment and design manufacturers to facilitate the ultimate product delivery to the customer.  Following shipping of the product, the purchasing hub entity pays the manufacturer and the distribution entity books an intercompany payable to the purchasing hub entity.  The payable equals the amount paid by the purchasing hub entity to the supplier plus a small margin.  The manufacturer may be paid prior to the internal payment of the resulting receivable.  Intercompany obligations are settled monthly through cash payments or setoffs, to the extent available, and are carried forward in certain circumstances as a net receivable.

### Transfer Pricing and Cash Management

39.     Once a customer's hardware needs have been manufactured, Nortel provides installation, network integration and support services (collectively, "Deployment Services").  In keeping with the integrated, co-dependent nature of the Nortel Companies, Deployment Services are managed regionally and cover all product lines.  For example, there are two divisions responsible for Deployment Services in North America.

40.     Given the integrated basis on which the Nortel Companies operate, certain of the Nortel Companies have reached agreements and engaged in certain practices to properly allocate profits and costs across the various affiliates.  The key profit driver of Nortel's business is the development and maintenance of intellectual property, and the Nortel Companies utilize a residual profit sharing methodology (the "RPSM") that is designed to reflect that certain Nortel affiliates, designated as profit sharing entities, are the source of the research and development

that has created Nortel's global technology footprint.  The RPSM is a transfer pricing

methodology designed to allocate profit or loss based on each relevant Nortel Company's

relative share of certain R&D costs.  Transfer pricing methodologies have been recognized by

the Organization for Economic Co-operation and Development (the "OECD") and U.S. and

Canadian taxing authorities as mechanisms to fairly allocate costs and profits for fully integrated

multinational corporations such as Nortel and to ensure the proper allocation of tax payments

among interested jurisdictions.  Transfers and payments dictated by the RPSM are governed by

practices agreed to by the relevant Nortel Companies, including as memorialized in a master

R&D agreement, as it has been amended from time to time.  Nortel's RPSM practices are meant

to comply with tax regulations, and NNI and NNL from time to time seek approval of their

bilateral Advance Pricing Agreement application permitting such practices from taxing

authorities, including the Internal Revenue Service and the Canada Revenue Agency.

      41.     In addition, from time to time, as part of the management of Nortel's cash needs

on a global basis, certain Nortel affiliates, including NNI and NNCC, have funded intercompany

loans and capital contributions to other Nortel Companies on an as-needed basis to fund working

capital in the ordinary course of business.  The source and terms of such intercompany loans are

typically memorialized through notes or other loan documentation.

      42.     The Debtors' and their Canadian parents' interests are united in their integrated,

co-dependent business relationship.  As a result, the Debtors' ability to reorganize is dependent

on (a) the reorganization of the jointly operated Nortel businesses in Canada and the U.S. and/or

(b) the sale of one or more Nortel business segments that are located in both Canada and the U.S.

The U.S. Debtors and the Canadian Debtors therefore have committed to engage in a joint and

harmonious approach to their restructuring in both jurisdictions, to the expected benefit of their

collective stakeholders.  Such cooperation and coordination will be required, for example, in any sale of a cross-border business segment by a Canadian parent, which could involve the sale of assets and the assignment of material contracts currently employed by U.S. Debtors and the transfer of employees relevant to U.S. operations.  Such overlapping assets and obligations of the U.S. Debtors and Canadian Debtors similarly will be relevant in the development of a reorganization plan for any and all of the Debtors, even outside of an asset sale context.  The U.S. Debtors and Canadian Debtors will also seek to coordinate as needed any such actions with the Nortel Companies subject to previously described proceedings in the Europe.

### Relief Requested

43.     By this Motion, the Debtors seek an order of this Court (a) approving the continued use of the Cash Management System, Bank Accounts and Business Forms (each as defined below); (b) permitting continued Intercompany Transactions (as defined below), granting administrative priority status to postpetition Intercompany Claims (as defined below), and preserving and permitting the exercise of intercompany setoff rights; (c) authorizing banks to honor certain transfers and charge certain fees and other amounts; and (d) waiving the requirements of 11 U.S.C. section 345(b) on an interim basis.

### Facts Relevant to this Motion

44.     In furtherance of Nortel's integrated global business operations, in the ordinary course of business the Debtors, the Canadian Debtors and non-debtor affiliates use a cash management system (the "Cash Management System") to transfer funds between and among the Debtors, the Canadian Debtors and non-debtor affiliates, to properly allocate costs and profits, as part of an arm's length transfer pricing policy to comply with tax laws, across the Nortel Companies and to manage operations, their cash needs, and the cash needs of Nortel generally.

45.     The Cash Management System is managed as part of Nortel's integrated business operations primarily by financial personnel (the "Treasury") shared among the Debtors and the Canadian Debtors in Toronto and is linked to the Nortel Companies' global finance and operations personnel ("Global Treasury").  NNI maintains a series of bank, brokerage and investment accounts to facilitate the movement and investment of cash necessary for its operations.  NNI is also a party to certain transfer pricing and residual profit sharing agreements, and other reconciliation practices with other Nortel affiliates that, as adjusted or amended from time to time, govern the intercompany transfers of funds.  The details of the Cash Management System, which is managed on an integrated basis, are discussed more fully below.

A.     **Bank, Brokerage and Investment Accounts**

46.     The Debtors maintain 23 bank, brokerage and investment accounts in the U.S. and two bank accounts abroad.  The movement of funds through these accounts is described below and is illustrated in the chart attached as Exhibit B, which is incorporated herein by reference.

47.     The Treasury Account.  NNI maintains the treasury account ("Treasury Account") as the central concentration account in the Cash Management System at Citibank in New York. Generally, on a daily basis, funds from accounts maintained exclusively for the receipt of receivables (the "Dedicated Receipts Accounts") are manually transferred via wire transfer into the Treasury Account.[3]  In turn, the Treasury Account funds disbursement accounts from which disbursements are made to trade creditors (the "Trade Disbursement Accounts") and to or for the benefit of employees (the "Payroll and Employee Benefits Accounts" and the "Benefit Trusts"). The Treasury Account also is used to process intercompany payments, foreign exchange transactions, and certain other third party payments.  To the extent excess funds are available in

---

[3]     Prior to late December 2008, funds from the Dedicated Receipts Accounts were automatically swept into the Treasury Account at the end of each business day.  Similarly, a number of the transfers described below were formerly completed on an automatic basis using zero balance accounts.

the Treasury Account each day, Treasury may decide to invest those funds in Money Market

Funds (as defined below) for investment on an investment/redemption basis in accordance with

Nortel's Cash Investments and Safe Custody Arrangements Procedure (the "Investment

Guidelines"), described in greater detail below.  Prior to the filing, additional funds remaining in

the account at the close of each business day were automatically swept into an overnight offshore

investment account with Citibank (the "Nassau Sweep"), and automatically transferred back to

the Treasury Account at the start of business the following morning.  NNI discontinued this

practice just prior to the filing.  NNI is currently exploring other possible overnight investment

options in lieu of the Nassau Sweep.

48.    Dedicated Receipts Accounts.  NNI maintains four Dedicated Receipts Accounts,

two at Bank of America in Dallas, TX and two at Citibank in New York, NY for the purpose of

collecting customer payments.

49.    Trade Disbursement Accounts.  NNI maintains Trade Disbursement Accounts

with Citibank in Toronto, Ontario, New Castle, DE, and New York, NY for the purpose of

settling accounts payable.  The account maintained at Citibank in Toronto is solely for the

purpose of making disbursements in Canadian dollars.  NNI pays the majority of its payables via

electronic funds transfers ("EFT") on the first and fifteenth of each month.  Additional

disbursements are made on an as-needed basis to pay tax obligations and certain other

specifically excepted payments.  The Trade Disbursement Accounts are funded via manual wire

transfer from the Treasury Account, and disbursements are made via EFT on the appropriate

settlement date.

50.    Payroll and Employee Benefits Accounts.  NNI maintains a central payroll

account (the "Payroll Account") for Nortel's U.S. operations at Bank of America in Atlanta, GA.

NNI also maintains four accounts to facilitate employee benefits programs and expenses at Citibank in New Castle, DE and New York, NY. The Payroll Account is funded via manual transfers from the Treasury Account four days prior to payroll settlement dates, which occur every second Friday.

51.     Benefit Trusts. NNI maintains a VEBA trust account at Bank of America in Chicago, IL and NNI maintains a benefit trust account at Citibank in New York, NY. A third party trustee holds the funds in both accounts for the benefit of Nortel employees.

52.     NNCC Account. NNCC is a special purpose financing vehicle that is an obligor under the $150,000,000 7.875% notes due June 15, 2026. NNCC maintains a bank account at Citibank in New York, NY for the purpose of making semi-annual interest payments on its long-term debt.

53.     Brokerage and Investment Accounts. NNI maintains two brokerage accounts, one with Deutsche Bank in Baltimore, MD and one with Morgan Stanley in New York, NY primarily for the purpose of holding and selling securities that are received via distributions from venture capital funds in which NNI makes strategic investments. Securities are typically sold and converted to cash shortly after they are received. The accounts may from time to time contain relatively small cash balances, but cash generated from the sale of securities is typically transferred to the Treasury Account via manual wire transfer promptly following any sale. NNI maintains an investment account with Banc of America Securities LLC ("BAS") in Boston, MA for the purpose of investing excess cash, as discussed below. NNI also maintains an account at Citibank in New York, NY in connection with its stock option program.

54.     Nortel Networks International Inc. ("NNII") Account. NNII is a dormant entity that maintains an account with Bank of America in the Philippines, containing less than $500.

55.    A chart containing a schedule of the Debtors' prepetition bank, brokerage and investment accounts (the "Bank Accounts") is attached hereto as Exhibit C, and is incorporated herein by reference.

**B.    Intercompany Transactions and Transfers among Debtors and Non-debtor Affiliates**

56.    The Debtors' Cash Management System is complex, but relies on procedures that constitute ordinary, usual and essential business practices, and are similar to those used by other major corporate enterprises. The Cash Management System provides significant benefits to the Debtors, including the ability to control corporate funds centrally, invest idle cash, ensure the availability of funds when necessary, and reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information. Furthermore, the use of a centralized cash management system reduces interest expense by enabling the Debtors to utilize all funds within the system rather than relying upon short-term borrowing to fund the Debtors' and their non-debtor subsidiaries' cash requirements. The Debtors also benefit from the use of a coordinated cash management system with their other non-debtor affiliates due to the integration of their businesses on an operational level.

57.    The operation of the Debtors' businesses requires that the Cash Management System continues during the pendency of these chapter 11 cases. Requiring the Debtors to adopt new, segmented cash management systems at this early and critical stage of these cases would be expensive, create unnecessary administrative problems, and be much more disruptive than productive. Disruption could have a severe and adverse impact upon the Debtors' ability to reorganize. Moreover, as a practical matter, because of the Debtors' complex corporate and financial structure, it would not be possible to establish a new system of accounts and a new cash management and disbursement system without substantial additional costs and expenses to the

Debtors' bankruptcy estates and a significant disruption of the Debtors' business operations. The Debtors propose to modify certain aspects of the Cash Management System to account for cash management practices commonly employed in chapter 11 cases (such as for the handling of setoffs and intercompany claims). Consequently, maintenance of the existing Cash Management System (as modified to the extent described herein), including the Debtors' continued ability to transfer funds among themselves and with other non-debtor affiliates as described herein, is not only essential but is in the best interests of all creditors and other parties-in-interest.

58.     The Debtors generate certain intercompany payables and receivables with their subsidiaries and other Nortel affiliates as a result of three primary types of transactions: (1) charges related to the purchase of inventory and the provision of services, (2) the Residual Profit Sharing Methodology ("RPSM") and (3) certain ordinary course intercompany loan agreements.

59.     Inventory Purchases. The Nortel Companies' complex and interconnected global supply chain requires that the companies regularly transact with each other, generating intercompany payables and receivables. From a supply chain perspective, the Nortel Companies can be separated into purchasing hub entities and distribution entities. Distribution entities are the primary Nortel sales and relationship contact points for customers in a geographic area. Distribution entities place orders with purchasing hub entities for products that are delivered to customers either by the purchasing hub entities or third party suppliers. Purchasing hub entities manage key supplier relationships and act as funneling points for orders from distribution entities all around the world.

60.     Specifically, and by way of example, when a customer places an order with a Nortel distribution affiliate, that entity places a purchase order with a purchasing hub entity, which in turn pays a third party supplier to deliver the product directly to the customer.

Following shipment of the product to the customer, the distribution entity reconciles the shipping receipt with its purchase order to the purchasing hub entity, and books an intercompany payable to the purchasing hub.  The payable equals the amount paid by the purchasing hub entity to the supplier, plus a small margin.  Accounts between distribution entities and purchasing hub entities are typically reviewed and reconciled on a monthly basis, either through the transfer of funds, setoff of obligations between affiliates (when available) or the maintenance of a net receivable, as described in greater detail below.  NNI is a purchasing hub entity that purchases products to fulfill orders generated by it and its distribution affiliates, thereby generating both profits and receivables owed by the affiliates to NNI in the ordinary course of its operations.[4]

61.    Accounts payable and receivable generated by Nortel and its affiliates in the ordinary course of business based on the purchase of products and the provision of services, and satisfaction of customer orders, are reconciled on a monthly basis.  For accounts in which it is available, accounts payable and accounts receivable between the Debtors and their affiliates are calculated and reconciled through Citinetting, Citibank's automated netting software.  Intercompany accounts, including the Citinetting reports and manual reconciliation and netting of other accounts, are reviewed by Global Treasury and Nortel affiliates settle such intercompany obligations through cash payments, netting (including multi-party netting in some instances) or setoffs, to the extent available.  Payments under this settlement system occur monthly, typically in the third week of each month.

62.    <u>Residual Profit Sharing Methodology</u>.  Given the integrated basis on which Nortel operates, certain of the Nortel Companies have reached agreements and engaged in certain

---

[4]    Nortel expects to roll out a new Transaction Cost Centre software system in or around March 2009 that would improve internal controls and result in an increased volume of sales to be generated through NNI rather than NNL.  This upgrade is expected to drive additional revenue through NNI and create concomitant increased transfer pricing adjustment payments to NNL.

practices to properly allocate profits and costs across the various affiliates. The key profit driver

of Nortel's business is the development and maintenance of intellectual property, and the RPSM

is designed to reflect that certain Nortel affiliates designated as profit sharing entities, including

NNL, NNI, Nortel Networks UK Limited, Nortel Networks SA (a French company), and Nortel

Networks (Ireland) Limited (collectively, the "Profit Sharing Entities") are the source of the

research and development that has created Nortel's global technology footprint. The RPSM is a

transfer pricing methodology designed to allocate profit or loss based on each Profit Sharing

Entity's relative share of certain research and development and other overhead costs. Transfer

pricing methodologies have been recognized by the Organisation for Economic Co-operation and

Development (OECD) and U.S. and Canadian taxing authorities as mechanisms to fairly allocate

costs and profits for fully integrated multinational corporations such as Nortel and ensure the

proper allocation of tax payments among interested jurisdictions. Transfers and payments

dictated by the RPSM are governed by practices agreed to by the Profit Sharing Entities,

including as memorialized in a master R&D agreement, as it has been amended from time to

time.[5] Payment obligations under the RPSM are reconciled quarterly, with NNL acting as a

clearinghouse for such payments. In the near future, Nortel intends to begin reconciling such

payment obligations on a monthly basis.

     63.     Intercompany Loans and Investments. From time to time, as part of the

management of Nortel's cash needs on a global basis, certain Nortel affiliates, including NNI and

---

[5]     Nortel's RPSM practices are meant to comply with tax regulations, and NNI and NNL from time to time
seek approval of their bilateral Advance Pricing Agreement application permitting such practices from taxing
authorities, including the Internal Revenue Service and the Canada Revenue Agency. Audits by the taxing
authorities are ongoing for the periods 2001 to 2005 that could result in the recharacterization of a material amount
of historic transfers that were made in accordance with prior transfer pricing practices.

NNCC,[6] have funded intercompany loans and capital contributions to other Nortel Companies on an as-needed basis to fund working capital in the ordinary course of business. The source and terms of such intercompany loans are typically memorialized through notes or other loan documentation. As part of this practice, NNI and NNL are parties to a $1 billion revolving loan agreement dated March 21, 2008, which permits NNL to borrow funds on an as-needed basis. While a substantial loan balance has existed and fluctuated in amount over time, the intercompany loan balance as of January 13, 2009 owed by NNL to NNI is approximately $295,982,134.75 (the "NNL Loan Receivable"). The Debtors account for all such intercompany loans and affiliate transactions in their internal accounting systems.

## C.    Strategic Investments

64.    From time to time, NNI and its non-debtor affiliate Nortel Ventures LLC make venture capital investments in small high-tech companies. These investments are made to further expand Nortel's technology portfolio. By this Motion, the Debtors seek authority, in their sole discretion, to satisfy any existing capital calls related to existing investments to protect the value of such investments.

## D.    Current Investment Practices and Investment Guidelines

65.    To the extent excess funds are available in the Treasury Account at the end of each day, Treasury invests those funds through an account with BAS in certain money market funds, including the Federated Treasury Obligations Fund, the JP Morgan U.S. Money Market Fund, the Fidelity Treasury Portfolio fund and the Dreyfus Government Cash Management and Government Prime Cash Management funds (collectively, the "Money Market Funds") on an

---

[6]    The only loan that has been made by NNCC is an intercompany loan in the amount of $150,000,000 to NNI, made in connection with the issuance of certain bonds.

investment/redemption basis.[7]  In addition, the Debtors currently hold approximately $65 million

in the Reserve Primary Fund, which froze withdrawals in September 2008, and is in the process

of winding down.

66.    Investment in the Money Market Funds is consistent with the Debtors' Investment

Guidelines, which were implemented by Nortel to minimize financial risk through managed

counterparty exposure limits and ensure effective diversification and sufficient liquidity to meet

business requirements and maximize returns.  The Investment Guidelines limit investments to term

deposits, certificates of deposit, commercial paper, fixed and floating rate notes, medium term

notes, government or agency securities, auction rate money market securities, repurchase

agreements and money market funds.

### E.    Payroll Administration

67.    In addition to administering its own payroll, NNI administers payroll payments

for certain of its non-debtor subsidiaries, including Diamondware, Ltd. and Nortel Networks

(CALA) Inc. (the "Payroll Affiliates").  On a regular periodic basis, NNI processes and issues

payroll checks for the Payroll Affiliates' employees (the "Affiliate Payroll Processing System").

The payables and receivables generated by this process are currently settled as part of the regular

intercompany settlement process.  In light of the commencement of NNI's chapter 11 case, the

Payroll Affiliates have agreed either to prefund or promptly reimburse disbursements made from

the Payroll Account.

---

[7]    Each of the Money Market Funds currently maintains both Aaa and AAAm ratings from Moody's and Standard & Poor's, with the exception of the Dreyfus Government Prime Cash Management and Government Cash Management funds, which maintain an AAAm rating from Standard & Poor's but are not rated by Moody's. According to fund disclosure materials, the Money Market funds generally invest most or all of their assets in U.S. Treasury-related securities, repurchase agreements collateralized by Treasury securities, and/or securities issued or guaranteed by the U.S. government or its agencies or instrumentalities.

**Basis for Relief**

A.    **Continued Use of the Cash Management System Is Warranted**

68.    The Debtors hereby seek an order authorizing, but not directing, them to continue

to use the Cash Management System, subject to certain modifications as discussed below.  In

light of the substantial size and complexity of the Debtors' operations, and the interrelationships

between the Debtors' operations and those of their affiliates, the maintenance of their current

cash management operations is essential for a successful reorganization of their businesses, as

well as the preservation and enhancement of the Debtors' respective values as going concerns.

Therefore, the Debtors request permission for them to continue, in their own discretion, to

employ global cash management procedures that permit the transfer of funds between or among

the Debtors and their affiliates periodically in the amounts necessary to continue the operation of

their businesses in accordance with the existing Cash Management System.

69.    The Cash Management System has been continuously utilized by the Debtors and

constitutes a customary and essential business practice.  The Cash Management System is similar

to those commonly employed by multinational corporate enterprises of comparable size and

complexity as the Debtors.  The system provides numerous benefits, including the ability to:  (a)

control and monitor corporate funds; (b) invest idle cash; (c) ensure cash availability; and (d)

reduce administrative expenses by facilitating the movement of funds and the development of

timely and accurate account balance and presentment information.

70.    In addition, given the Debtors' corporate and financial structure and the number

of affiliated entities participating in the Cash Management System, it would be difficult and

unduly burdensome for the Debtors to establish an entirely new system of accounts and a new

cash management system for each separate legal entity.  Thus, under the circumstances,

maintenance of the Cash Management System not only is essential, but also is in the best

interests of the Debtors' respective estates and creditors. In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption of the Cash Management System will (a) facilitate the Debtors' stabilization of their postpetition business operations and (b) assist the Debtors in their reorganization efforts. The Debtors will continue to maintain accurate and current records with respect to all transactions, whether transfers of cash, setoffs or otherwise, so that all transactions can be readily ascertained, traced and recorded properly on applicable intercompany accounts.

71.     If the Debtors are not permitted to continue to utilize the Cash Management System, their operations would be severely, and perhaps irreparably, disrupted. Accordingly, the Debtors respectfully request that the Court authorize (but not direct) the Debtors to continue to use the Cash Management System described herein.

72.     In addition, the Debtors request authority to open and close bank accounts. The Debtors request that the Banks (as defined below) be authorized to honor the Debtors' requests to open or close any bank accounts, provided, however, that any new domestic account is established at a bank insured with the FDIC or the FSLIC and that it is organized under the laws of the United States or any State therein, or in the case of accounts that may carry a balance exceeding the insurance limitations set thereby, that the bank holding the account has entered into a Uniform Depository Agreement with the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee").

73.     Section 363(c)(1) of the Bankruptcy Code authorizes a debtor in possession to use property of the estate "in the ordinary course of business, without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of section 363(c)(1) of the Bankruptcy Code is to provide a debtor in possession with the flexibility to engage in those transactions that make up the bulk of its day-to-

day operations without incurring the excessive monitoring costs that would result from the need

to provide notice of, and obtain approval for, such ordinary course activities. Official Comm. Of

Unsecured Creditors v. Columbia Gas Transmission Corp., 997 F.2d 1039,1061 (3d Cir. 1993)

(holding that a requirement to maintain all accounts separately "would be a huge administrative

burden and economically inefficient"). Within the purview of section 363(c) of the Bankruptcy

Code, a debtor in possession is authorized to continue utilizing its cash management system "in

the ordinary course of business."

74.     Further, the continued postpetition use of cash management systems also has been

approved as a routine matter in other chapter 11 cases in this District. See, e.g., In re Hilex Poly

Co., No. 08-10890 (KJC) (Bankr. D. Del. May 7, 2008); In re Delta Mills, Inc., No. 06-11144

(CSS) (Bankr. D. Del. Oct. 13, 2006); In re Global Home Prods., LLC, No. 06-10340 (KG)

(Bankr. D. Del. Apr. 11, 2006); In re Premium Papers HoldCo, LLC, No. 06-10269 (CSS)

(Bankr. D. Del. Mar. 23, 2006); In re Lovesac Corp., No. 06-10080 (CSS) (Bankr. D. Del. Feb.

1, 2006); In re Nellson Nutraceutical Inc., No. 06-10072 (CSS) (Bankr. D. Del. Jan. 31, 2006); In

re Nobex Corp., No. 05-20050 (CSS) (Bankr. D. Del. Dec. 6, 2005); In re Glass Group, Inc., No.

05-10532 (KG) (Bankr. D. Del. Mar. 2, 2005); In re Astropower Inc., No. 04-10322 (MFW)

(Bankr. D. Del. Feb. 3, 2004); In re Rouge Indus., Inc., No. 03-13272 (MFW) (Bankr. D. Del.

Oct. 27, 2003); In re Orion Ref., Inc., No. 03-11483 (MFW) (Bankr. D. Del. May 15, 2003).

75.     The Debtors respectfully submit that, under the circumstances, the maintenance of

the Cash Management System in substantially the same form as it existed prior to the Petition

Date is in the best interests of the Debtors' estates and their creditors. Preserving a "business as

usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated

with any material changes to the Cash Management System will facilitate the stabilization of the

Debtors' postpetition business operations and assist the Debtors in their reorganization efforts. Accordingly, the Debtors seek authority under section 363(c)(1) of the Bankruptcy Code to continue the collection, disbursement and investment of cash pursuant to the Cash Management System, as described above, and subject to the modifications described below.

**B.    Continued Intercompany Transactions and Related Transactions are Appropriate**

        1.    Continued Use of Intercompany Transfers

    76.    As described above, prior to the Petition Date, the Debtors and certain non-debtor affiliates provided services to, and engaged in intercompany financial transactions with, each other in the ordinary course of their respective businesses (collectively, the "Intercompany Transactions"). These transactions are recorded by each entity as an intercompany obligation. The Debtors seek authorization, but not direction, to continue to enter into Intercompany Transactions in the ordinary course of business.[8]

    77.    These Intercompany Transactions reduce the administrative costs incurred by the Debtors and their affiliates and allow for the purchase and supply of essential goods for the operation of the Debtors' businesses. If the Intercompany Transactions were to be discontinued, the Debtors' Cash Management System and related administrative controls would be disrupted to the detriment of the Debtors, their estates and their affiliates. The Intercompany Transactions are essential to the Debtors' businesses given the integrated nature of the Nortel Companies' operations. The Debtors thus submit that the continuation of the Intercompany Transactions is in the best interests of the Debtors' estates and creditors.

---

[8]    The Debtors engaged in Intercompany Transactions on a regular basis prior to the Petition Date. Such transactions are common for enterprises like the Debtors. The Debtors believe that such transactions are in the ordinary course within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require this Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions.

78.    If this Court authorizes the continuation of Intercompany Transactions, at any given time there may be balances due and owing from one Debtor to another, or between the Debtors and other Nortel affiliates.  These balances represent extensions of intercompany credit. To ensure that each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors will continue to maintain records of such transfers, including records of all current intercompany receivables and payables.  Additionally, the Debtors respectfully request that, pursuant to section 364(a) of the Bankruptcy Code, all claims relating to Intercompany Transactions (collectively, the "Intercompany Claims") arising after the Petition Date be accorded administrative priority of the kind specified in section 503(b) of the Bankruptcy Code.

79.    Administrative priority treatment for postpetition Intercompany Claims, as requested here, has been granted in other chapter 11 cases in this District.  See, e.g., In re Tropicana Entm't, LLC, Case No. 08-10856 (KJC) (Bankr. D. Del. May 6, 2008); In re Pope & Talbot. Inc., Case No. 07-11738 (CSS) (Bankr. D. Del. Dec. 7, 2007); In re Dura Auto. Sys., Case No. 06-11202 (KJC) (Bankr. D. Del. Nov. 21, 2006); In re Pliant Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. Jan. 4, 2006); In re FLYi, Inc. Case No. 05-20011 (MFW) (Bankr. D. Del. Nov. 8, 2005); In re Federal-Mogul Global. Inc., Case No. 01-10578 (Bankr. D. Del. Oct. 4, 2001); In re NationsRent, Inc., Case No. 01-11628 (Bankr. D. Del. Dec. 18, 2001).

2.    Approval of Intercompany Revolving Loan Agreement

80.    Prior to its filing, in the ordinary course, NNI provided financing to NNL pursuant to a revolving loan agreement entered as of March 21, 2008, for NNL to draw on an as-needed basis.  NNI seeks approval to maintain this ordinary course intercompany lending practice through entry into a new revolving loan agreement with NNI as lender, NNL as

borrower and Nortel Networks Technology Corporation ("NNTC"), NNL's subsidiary, as

guarantor, in the amount of up to USD $200 million (the "NNL Revolver").  A form of the

agreement documenting the NNL Revolver is attached hereto as Exhibit D (the "NNL Revolver

Agreement").[9]

81.    This facility is expected to benefit both NNI and NNL by maintaining NNL's

ordinary course access to working capital, and thereby avoiding additional fees and expenses

associated with third party financing, particularly given current market conditions.  Given the

integrated nature of the Nortel Companies' operations and NNI's reliance on NNL for certain

corporate overhead and research and development functions, as well as intellectual property

licenses, NNI similarly benefits from the facility to the extent it maintains or improves NNL's

reorganization prospects.

82.    Moreover, while NNI and NNL regard this extension of credit as a continuation of

ordinary course business practices, NNTC and NNL itself are willing to pledge certain assets to

secure the NNL Revolver.  In particular, NNL and NNTC are willing to grant, subject to the

approval of the Canadian Court and, with respect to the interest of NNL, the consent of the

owner of the land leased by NNL, charges on (i.e. a security interest in) all of the fee simple

interest of NNTC and leasehold interest of NNL respectively in a research and development

facility located at 3100 Carling Avenue, Ottawa, Canada, which was valued at CAN

$288,750,000 as of December 21, 2007 in a third party appraisal (the "Carling Charges"), which

charges shall (a) rank subordinate only to the Administrative Charge sought to be approved by

the Canadian Court and such other encumbrances as may currently exist on the title to the

Carling Facility and (b) may not be otherwise primed without the written consent of NNI and

---

[9]    The description of the NNL Revolver set forth herein is for informational purposes only.  In the event of
any discrepancy between the description and the terms of the NNL Revolver, the terms of the NNL Revolver shall
govern.

authorization of this court.  Under the NNL Revolver, $75 million will be immediately available

for borrowing upon approval of the Canadian Court and this Court, and the remainder is

available upon obtaining the consent to the Carling Charges.  To the extent the proceeds realized

from the Carling Facility are insufficient to satisfy NNL's obligations under the NNL Revolver,

any deficiency shall be deemed an intercompany reimbursement claim entitled to the security of

an intercompany charge (as sought in the Canadian Proceedings) (the "Intercompany Charge").

The Carling Charges and the Intercompany Charge will secure any outstanding balance under the

NNL Revolver.

       83.     It is NNI's judgment that the making of this advance on a secured basis is a

proper and beneficial use of its assets under section 363(c) of the Bankruptcy Code, consistent

with its prior ordinary course business practices (or alternatively under section 363(b)(1) of the

Bankruptcy Code).  In re Nellson Nutraceutical, Inc., 369 B.R. 787, 797 (Bankr. D. Del. 2007)

("[I]f the Court determines that a transaction is in the ordinary course of a debtor's business, the

Court will not entertain an objection to the transaction, provided that the conduct involves a

business judgment made in good faith upon a reasonable basis and within the scope of authority

under the Bankruptcy Code."); In re Roth American, Inc., 975 F.2d 949, 952 (3d Cir. 1992)

("The framework of section 363 is designed to allow a trustee (or debtor-in-possession) the

flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court

oversight, while protecting creditors by giving them an opportunity to be heard when

transactions are not ordinary.").

       3.     Setoffs and Payments of Intercompany Obligations

       84.     The Debtors also seek authorization to preserve their ordinary course practices in

recording and reconciling Intercompany Obligations, including for inventory purchases, under

the RPSM, and with respect to intercompany loans, as modified below.

85.     As described above, prior to the commencement of the chapter 11 cases, the

Debtors and their affiliates typically settled intercompany payments in the ordinary course either

through the payment of funds, setoffs, or the maintenance of accounts receivable.  The Debtors

seek authorization to maintain their existing practices, including through the setoff and netting of

mutual obligations.  Setoffs and netting generally are authorized in chapter 11 cases.

86.     Section 553(a) of the Bankruptcy Code provides that:

> Except as otherwise provided in this section and in sections 362
> and 363 of this title, this title does not affect any right of a creditor
> to offset a mutual debt owing by such creditor to the debtor that
> arose before the commencement of the case under this title against
> a claim of such creditor against the debtor that arose before the
> commencement of the case. . . .

11 U.S.C. § 553(a).

87.     A creditor need only establish two elements before a setoff may be asserted:

mutuality and timing.  See Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co.

(In re The Bennett Funding Group, Inc.), 212 B.R. 206, 212 (B.A.P. 2d Cir. 1997); see also In re

Verco Indus., 704 F.2d 1134, 1139 (9th Cir. 1983); In re Lundell Farms, 86 B.R. 582, 584

(Bankr. W.D. Wis. 1988).  Although courts have not uniformly defined the elements of

mutuality, most courts require the following elements:  that the debts are (a) owed between the

same parties and (b) in the same right or capacity.  See 5 COLLIER ON BANKRUPTCY ¶

553.03[3][a] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006); Lubman v. Sovran

Bank, N.A. (In re A & B Homes, Ltd.), 98 B.R. 243, 248 (Bankr. E.D. Va. 1989).  Timing

requires that both claims arise prepetition.  See Packaging Indus. Group, Inc. v. Dennison Mfg.

Co. (In re Sentinel Prods. Corp.), 192 B.R. 41, 45 (N.D.N.Y. 1996) ("[T]he offset debts must be

mutual, prepetition debts."); Scherling v. Hellman Elec. Corp. (In re Westchester Structures,

Inc.), 181 B.R. 730, 739 (Bankr. S.D.N.Y. 1995) ("Courts have interpreted debts in the same

right to mean that a 'pre-petition debt cannot offset a post-petition debt.'") (citation omitted).

88.     As described above, from time to time certain intercompany obligations are set

off against each other.  The Cash Management System and related controls allow the Debtors to

track all obligations owing between related entities and thereby ensures that setoffs of

Intercompany Claims will meet both the mutuality and timing requirements of section 553 of the

Bankruptcy Code.

89.     Furthermore, in light of the commencement of the chapter 11 cases and the

Canadian Proceedings, and the expectation that the EMEA Debtors also will seek creditor

protection, the Debtors and their affiliates propose to modify their ordinary course cash

management practices in the following manner.  First, the Debtors intend to settle postpetition

transactions with the Canadian Debtors and the EMEA Debtors on a cash basis rather than

through Citinetting.  Second, the Debtors propose to not set off prepetition and postpetition

amounts owed between the Debtors on the one hand and the EMEA Debtors on the other hand in

the ordinary course, and rather to only set off postpetition obligations between the two debtor

groups pursuant to agreement between the parties, as it may be amended from time to time.  The

Debtors initially intend to enter into an interim 30-day protocol agreement with the EMEA

Debtors that governs such setoff rights.

90.     Third, with respect to the Canadian Debtors, the Debtors seek approval to

continue the netting and payment of intercompany obligations in the ordinary course of business

consistent with their prior practice, except that the Debtors have agreed to forbear from

exercising any right of setoff they may have against the Canadian Debtors until such time as (a)

the chapter 11 cases of NNI or NNCC shall been dismissed or converted to cases under chapter 7

of the Bankruptcy Code; (b) an interim or permanent trustee, a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) has been appointed to oversee or operate any of the Debtors in these chapter 11 cases; (c) any Debtor files a motion seeking any of the foregoing relief; (d) a receiver is appointed over all or substantially all of the assets of the Canadian Debtors; or (e) any of NNC, NNL or NNTC are declared bankrupt under the Bankruptcy and Insolvency Act.[10]  In consideration for such forbearance, the Canadian Debtors are seeking to grant NNI an Intercompany Charge in the Canadian Proceedings to secure the payment of the NNL Revolver. In an abundance of caution, the Debtors further seek authority to enter into written agreements with the Canadian Debtors and the EMEA Debtors as may be necessary or desirable to effectuate the above arrangements.

91.    Accordingly, the Debtors respectfully request express permission to (a) set off mutual prepetition obligations relating to Intercompany Transactions, (b) in the discretion of the relevant Debtor, to set off mutual postpetition obligations relating to Intercompany Transactions and (c) to settle and reconcile certain intercompany transactions with the Canadian Debtors and EMEA Debtors as described above.  Finally, the Debtors request authorization to continue their cash management practices, as modified above.

## C.    Continued Use of the Bank, Brokerage and Investment Accounts Is Warranted

92.    As set forth in Exhibit C, within the Cash Management System, the Debtors and their affiliated non-debtors utilize 25 deposit, collection, payment, investment, and brokerage accounts on a regular basis in the ordinary course of their businesses.  To avoid substantial disruption to the normal operation of their businesses and to preserve a "business as usual"

[10]    Under Canadian Law, NNI would have the right to set off postpetition obligations owing to NNL against the NNL Loan Receivable.

36

atmosphere, as part of their request to maintain the Cash Management System, the Debtors hereby request that they be permitted to continue to use the bank, brokerage, and investment accounts. Allowing these accounts to be maintained with the same account numbers will greatly assist the Debtors in accomplishing a smooth transition to operating in chapter 11.

93.    To protect against the possible inadvertent payment of prepetition claims, the Debtors will immediately advise their banks and financial institutions (collectively, the "Banks") not to honor checks issued prior to the Petition Date, except as otherwise expressly permitted by an order of the Court and directed by the Debtors. The Debtors, moreover, have the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments without closing the bank accounts and opening new ones.

94.    Authority to continue the use of existing bank accounts has been granted in other chapter 11 cases in this District. See, e.g., In re Hilex Poly Co., LLC, Case No. 08-10890 (KJC) (Bankr. D. Del. May 7, 2008); In re Sharper Image Corp., Case No. 08-10322 (KG) (Bankr. D. Del. Feb. 20, 2008); In re Lillian Vernon Corp., Case No. 08-10323 (BLS) (Bankr. D. Del. Feb. 21, 2008); In re Buffets Holdings, Inc., Case No. 08-10141 (MFW) (Bankr. D. Del. Jan. 23, 2008); In re Delta Fin. Corp., Case No. 07-11880 (CSS) (Bankr. D. Del. Dec. 19, 2007); Am. Home Mortgage Holdings, Inc., Case No. 07-11047 (CSS) (Bankr. D. Del. Aug. 7, 2007); In re Pliant Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. Jan. 4, 2006); In re Maxide Acquisitions, Inc., Case No. 05-10429 (MFW) (Bankr. D. Del. Feb. 15, 2005); In re Ultimate Electronics, Inc., Case No. 05-10104 (PJW) (Bankr. D. Del. Jan. 13, 2005).

## D.    Continued Use of Business Forms Is Warranted

95.    In the ordinary course of their businesses, the Debtors use a variety of checks and other business forms (collectively, and as they may be modified, the "Business Forms"). To avoid disruption of the Cash Management System and unnecessary expense, pursuant to Local

Rule 2015-2(a), the Debtors request that they be authorized to continue to use the Business

Forms substantially in the forms existing immediately before the Petition Date, without reference

to their status as debtors in possession, provided, however, that once the Debtors' existing check

stock has been used, any future checks ordered by the Debtors will include the legend "Debtor-

in-Possession." In the absence of such relief, the estates will be required to bear a potentially

significant expense, which the Debtors respectfully submit is unwarranted.

96.    Authority to continue the use of business forms without alteration has been

granted in numerous other chapter 11 cases in this District. See, e.g., In re Delta Mills, Inc., No.

06-11144 (CSS) (Bankr. D. Del. Oct. 13, 2006); In re Global Home Prods., LLC, No. 06-10340

(KG) (Bankr. D. Del. Apr. 11, 2006); In re Premium Papers HoldCo, LLC, No. 06-10269 (CSS)

(Bankr. D. Del. Mar. 23, 2006); In re Nellson Nutraceutical Inc., No. 06-10072 (PJW) (Bankr. D.

Del. Jan. 31, 2006); In re Astropower Inc., No. 04-10322 (MFW) (Bankr. D. Del. Feb. 3, 2004);

In re Thaxton Group, Inc., No. 03-13182 (PJW) (Bankr. D. Del. Oct. 22, 2003); In re Orion Ref.,

Inc., No. 03-11483 (MFW) (Bankr. D. Del. May 15, 2003).

**E.    Waiver of the Deposit Requirements of Section 345(b) of the Bankruptcy Code on an Interim Basis Is Warranted**

97.    As described above, the Debtors and their non-debtor affiliates invest excess

funds in certain money market funds, including the Money Market Funds. Such investments are

consistent with the Investment Guidelines. Although the current investment practices and

Investment Guidelines may not strictly comply with the approved investment guidelines

identified in section 345 of the Bankruptcy Code in all cases, the Debtors' deposits and

investments nevertheless are prudent and designed to yield the maximum reasonable net return

on the funds invested, taking into account the safety of such deposits and investments.

Accordingly, the Debtors respectfully request authority to invest and deposit funds in the Money

Market Funds and other similar instruments in accordance with the Investment Guidelines, including as per their current investment practices, notwithstanding that they may not strictly comply in all respects with the approved investment guidelines set forth in section 345 of the Bankruptcy Code. The Debtors further request that the applicable institutions be authorized and directed to accept and hold or invest such funds, at the Debtors' direction.

98.     Pursuant to section 345(b) of the Bankruptcy Code, any deposit or other investment made by a debtor, except those insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States, must be secured by either a bond in favor of the United States that is secured by the undertaking of a corporate surety approved by the U.S. Trustee for the relevant district or the deposit of securities of the kind specified in 31 U.S.C. § 9303. Section 345(b) of the Bankruptcy Code provides further, however, that a bankruptcy court may allow the use of alternatives to these approved investment guidelines "for cause." 11 U.S.C. § 345(b); see also In re Serv. Merch. Co., 240 B.R. 894, 896-97 (Bankr. M.D. Tenn. 1999) (concluding that "cause" existed in that case because the debtors were "large, sophisticated [companies] with a complex cash management system" that had the ability to shift money as needed to ensure the safety of their funds and that the failure to waive §345(b)'s requirements "would 'needlessly handcuff' these debtors' reorganization efforts.")

99.     As in other chapter 11 cases in which courts in this District have granted requests for approval of continued investment practices in accordance with investment and deposit guidelines that did not strictly comply with section 345 of the Bankruptcy Code, the Debtors are large, sophisticated companies with a complex Cash Management System that provides the

Debtors with the ability to transfer funds as and when needed.[11] In light of these factors and the safety of the investment vehicles that the Debtors propose to utilize to invest any excess funds, the Debtors believe that sufficient cause exists under section 345(b) of the Bankruptcy Code to allow the Debtors to deviate from the investment guidelines set forth in section 345(b).

100.    Courts in this District routinely have granted requests for approval of the continued use of investment and deposit guidelines that did not strictly comply with section 345 of the Bankruptcy Code, but that, as here, nevertheless were safe and prudent. See, e.g., In re Sharper Image Corp., Case No. 08-10322 (KG) (Bankr. D. Del. Feb. 20, 2008); In re Lillian Vernon Corp., Case No. 08-10323 (BLS) (Bankr. D. Del. Feb. 21, 2008); In re Buffets Holdings. Inc., Case No. 08-10141 (MFW) (Bankr. D. Del. Jan. 23, 2008); In re Delta Fin. Corp., Case No. 07-11880 (CSS) (Bankr. D. Del. Dec.19, 2007); Am. Home Mortgage Holdings, Inc., Case No. 07-11047 (CSS) (Bankr. D. Del. Aug. 7, 2007); In re Pliant Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. Jan. 4, 2006); In re Ultimate Electronics, Inc., Case No. 05-10104 (PJW) (Bankr. D. Del. Jan. 20, 2005).

**F.    Authorization of (A) Banks to Charge Back Returned Items and (B) Debtors to Pay Bank Fees Is Warranted**

101.    Concurrently with the filing of this Motion, the Debtors have filed motions requesting authority to pay, in their sole discretion and in the ordinary course of their businesses, certain prepetition obligations to customers, employees, lienholders, taxing authorities and other entities. With respect to some of these obligations, prior to the Petition Date, the Debtors issued checks that have yet to clear the banking system. In other cases, the Debtors would issue the relevant checks postpetition on account of such prepetition debt once the Court enters an order

---

[11]    The Debtors also are required to maintain accounts in Toronto, Canada and in the Philippines to hold local currency, including for use by the Debtors in the ordinary course of their business operations.

permitting the Debtors to do so. The Debtors intend to inform their banks which prepetition

checks should be honored pursuant to any separate orders of the Court authorizing such

payments.

102.    As a result of the foregoing, the Debtors request that their Banks be authorized to

accept and honor all representations from the Debtors as to which checks, drafts or wires should

be honored or dishonored consistent with any order(s) of this Court and governing law, whether

such checks, drafts or wires are dated prior to, on or subsequent to the Petition Date. Pursuant to

the relief requested in this Motion, the Banks shall not be liable to any party on account of (a)

following the Debtors' instructions or representations as to any order of this Court, (b) the

honoring of any prepetition check or item in a good faith belief that the Court has authorized

such prepetition check or item to be honored or (c) an innocent mistake made despite

implementation of reasonable item handling procedures. Such relief is reasonable and

appropriate because the Banks are not in a position to independently verify or audit whether a

particular item may be paid in accordance with the Court's order or otherwise.

103.    Finally, the Debtors request authority for the Banks to charge and the Debtors to

pay or honor both prepetition and postpetition service and other fees, costs, charges and expenses

to which the Banks may be entitled under the terms of and in accordance with their contractual

arrangements with the Debtors (collectively, the "Bank Fees"). The Debtors also request that the

Banks be authorized to charge back returned items to the Bank Accounts in the normal course of

business.

104.    The Debtors require this relief to minimize the disruption of the Cash

Management System and their Bank Accounts and to assist them in accomplishing a smooth

transition to operating in chapter 11. Authority for debtors to pay bank fees and banks to charge

back returned items has been routinely granted in other chapter 11 cases in this District. See, e.g.,
In re Linens Holding Co., No. 08-10832 (CSS) (Bankr. D. Del. May 2, 2008) ("Linens Order");
In re Lillian Vernon Corp., No. 08-10323 (BLS) (Bankr. D. Del. Feb. 21, 2008); In re Sharper
Image Corp., No. 08-10322 (KG) (Bankr. D. Del. Feb. 20, 2008).

105.    Nothing in this Motion should be construed as:  (a) an admission as to the validity
or priority of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any
claims or assert any counterclaims or affirmative defenses; or (c) an approval or assumption of
any agreement, contract or lease, pursuant to section 365 of the Bankruptcy Code.

### Request for Waiver of Stay

106.    In addition, by this Motion, the Debtors seek a waiver of any stay of the
effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Bankruptcy
Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is
stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."
As set forth above, the immediate continued use of the Cash Management System, Bank
Accounts and Business Forms is essential to prevent potentially irreparable damage to the
Debtors' operations, value, and ability to reorganize.  Accordingly, the Debtors submit that
ample cause exists to justify a waiver of the ten-day stay imposed by Bankruptcy Rule 6004(h),
to the extent that it applies.

### Notice

107.    Notice of the Motion has been given via facsimile, electronic transmission, hand
delivery or overnight mail to the (i) Office of the United States Trustee for the District of
Delaware; (ii) the trustee under that certain indenture dated as of July 5, 2006, as supplemented,
with respect to the Floating Rate Senior Notes due 2011, the 10.125% Senior Notes due 2013,
and the 10.75% Senior Notes due 2016; (iii) the trustee under that certain indenture dated as of

February 15, 1996, with respect to the 7.875% Senior Notes due 2026; (iv) the trustee under that

certain indenture dated as of March 28, 2007, with respect to the 1.75% Convertible Senior

Notes due 2012 and the 2.125% Convertible Senior Notes due 2014; (v) holders of the forty (40)

largest unsecured claims on a consolidated basis against the Debtors; (vi) the Securities and

Exchange Commission; (vii) the Internal Revenue Service; and (viii) the United States

Department of Justice.  In light of the exigencies of the circumstances and the potential harm to

the Debtors, their estates, and other parties in interest that will ensue if the relief requested herein

is not granted, the Debtors submit that no other notice need be given.

### No Prior Request

108.    No prior request for the relief requested herein has been made to this or any other

court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  January 14, 2009
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (No. 5125)
Lisa M. Schweitzer (No. 1033)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Thomas F. Driscoll III (No. 4703)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Proposed Counsel for the Debtors
and Debtors in Possession*

2665148.2