## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
                         :

*In re*                          :        Chapter 11

Nortel Networks Inc., *et al.*,[1]      :        Case No. 09-10138 (KG)

               Debtors.      :        Joint Administration Pending
                         :
-------------------------------------------------------X

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO PAY CERTAIN PREPETITION (I) WAGES, SALARIES AND OTHER COMPENSATION, (II) REIMBURSABLE EXPENSES, AND (III) MEDICAL, RETIREMENT AND SIMILAR BENEFITS

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a), 363(b), 507(a)(4), 507(a)(5), 541, 1107(c), 1108 and 1129 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003(b) and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing, but not directing, the Debtors to (a) pay prepetition claims and obligations related to employee wages, salaries and benefits described herein; (b) reimburse employees for unpaid expenses incurred prepetition; and (c) continue the wage, salary and benefit plans for employees, or to change their plans or policies regarding wages, salaries, benefits, and/or reimbursable expenses, in the ordinary course of business, without obtaining further approval of the Court; and granting them such other and further relief

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).

as the Court deems just and proper.  In support of this Motion, the Debtors rely on the

Declaration of John Doolittle in Support of First Day Motions and Applications (the "First Day

Declaration").  In further support of this Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 363(b),

507(a)(4), 507(a)(5), 541(b)(7), 541(d), 1107(c), 1108 and 1129 of the Bankruptcy Code.

## Background

### A.      Introduction

3.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for

relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee,

examiner or official committee of unsecured creditors has been appointed in the Debtors' cases.

5.      On date hereof, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[2] will file an application with the

Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors

Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

"Canadian Proceedings"). The Canadian Debtors will continue to manage their properties and operate their businesses under the supervision of the Canadian Court. Ernst & Young Inc., as foreign representative for the Canadian Debtors, will file petitions for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. Certain of Nortel's European subsidiaries will make consequential filings for creditor protection.

6.       Simultaneously with the filing of this Motion, the Debtors have sought an order of joint administration pursuant to Rule 1015(b) of the Bankruptcy Rules that would provide for the joint administration of these cases and for consolidation for procedural purposes only.

**B.       Events Leading to the Chapter 11 Cases**

**Nortel's History**

7.       The name Nortel is known throughout the world for leadership in the networking and communications industries. With over 110 years of experience, the Nortel Companies (as defined below) work closely with their service provider and enterprise customers in the United States, Canada, Central and Latin America, Europe, the Middle East and Africa, and Asia to deliver them cutting edge hardware and software solutions and related services.

8.       The Nortel Companies trace their heritage to 1895 when the Bell Telephone Company of Canada founded the Northern Electric and Manufacturing Company Limited ("Northern Electric") as an equipment provider for Canada's telephone system. Over the following century, Northern Electric grew into Northern Telecom and eventually Nortel, gaining a well-deserved reputation for innovation and creativity through the development of ground-breaking technology -- including many industry firsts -- in such fundamental technologies as digital, optical, wireless, internet protocol, voice-over internet protocol, broadband, multimedia, and ethernet. Through substantial research and development ("R&D") initiatives and external

3

R&D partnerships, the Nortel Companies continue to invest in the development of next-generation technologies to deliver value to their customers around the world.

9.      From the mid-1980s to 2000, the Nortel Companies expanded substantially, helping to lead the telecommunications boom, moving from the development and manufacturing of traditional landline phone technology and equipment into the wireless and digital age. From its Canadian base, North American operations were expanded into the United States with the establishment of production and R&D facilities, resulting in an increase in the number of U.S.-based employees and the creation of a large customer base in the U.S.  At the same time, the Nortel Companies moved aggressively into Europe, Asia, Africa and Latin America, becoming a truly global enterprise.

10.     In 1998, the name Nortel Networks was first officially adopted in recognition of the continuing transformation of the companies' business.  In 2000, BCE Inc., the parent company of Bell Canada, spun-off substantially all of its shareholdings in Nortel through a statutory reorganization transaction, with the result that NNC became the ultimate parent entity of the Nortel Companies, and NNL became its principal Canadian operating subsidiary.  NNC and its predecessors have been a public company in Canada for many decades, listed on the Toronto Stock Exchange, and became a public company in the United States in 1975, listed on the New York Stock Exchange.  Notwithstanding the fact that NNC and NNL are non-U.S. companies, they nevertheless report on the same basis as U.S. domestic companies because neither NNC nor NNL meets all the requirements of a "foreign private issuer" pursuant to Rule 3b-4 under the U.S. Securities Exchange Act of 1934, as amended.

**The Dot Com Bust and Nortel's Restatements**

11.     At its peak in 2000, the Nortel Companies reported approximately $30 billion of annual revenue, employed nearly 93,000 employees, and had a market capitalization (for NNC) of over $250 billion.  With the burst of the high-tech bubble in early 2001 and the resulting significant downturn in both the telecommunications industry and the economic environment, the Nortel Companies began to face an increasingly difficult competitive environment.  After a long period of expansion, the capital expenditure levels of many customers began to decrease substantially in 2001.  Also, R&D costs continued to expand during 2001 as the Nortel Companies and its competitors scrambled to predict and adjust to the rapidly changing technological landscape.

12.     Since 2001, the Nortel Companies have taken a wide range of steps to right-size their businesses, increase efficiency, cut costs and focus on building on their substantial franchise in potentially high-growth and high-margin areas.  Among the most significant steps taken have been a series of restructurings as principally announced in 2001, 2004, 2006, 2007 and 2008 that have reduced the number of worldwide employees from more than 90,000 to about 30,000.  These restructurings have included (a) the outsourcing of nearly all manufacturing and production to a number of key suppliers, including, most importantly, Flextronics Telecom Systems Ltd. and its affiliates; (b) the substantial consolidation of key R&D expertise in Canada and China; (c) decisions to dispose of or exit certain non-core businesses, such as the sale of Nortel's United Mobile Technology System business unit; (d) the creation and/or expansion of joint venture relationships (such as with LG Electronics, Inc. of Korea and Guandong-Nortel Telecommunications Equipment Company Limited of China); (e) establishing alliances with various large organizations; (f) real estate optimizations, including the sale of the Company's

former headquarters in Brampton, Ontario, Canada; and (g) the continued reorientation of the

Nortel Companies from a traditional supplier of telecommunications equipment to a global

leader in cutting edge networking hardware and software solutions.

13.     At the same time, the Nortel Companies worked tirelessly to meet the challenges

presented in the aftermath of the tech bust and, beginning in 2003, to address the significant

issues that arose when a number of accounting irregularities came to light.  These irregularities,

which primarily involved practices relating to the improper booking of revenue and

establishment and release of accrued liabilities, led to regulatory, civil and criminal

investigations, and the discovery of certain material weaknesses in internal control over financial

reporting ultimately resulted in four successive restatements of the consolidated financial

statements of the Nortel Companies for the fiscal years 2000 through 2005 and certain interim

periods, the termination of a number of high-ranking executives for cause, the replacement of the

then-incumbent CEO, CFO and Controller and the senior finance management team, and a

complete revamping of control processes.  The restatements also triggered substantial

shareholder litigation in Canada and the United States, all of which was settled in 2006 for cash

of $575 million and NNC common shares valued at $1.6 billion.  Since 2005, Nortel has

established a new senior executive leadership team with key external hires and internal

promotions, entered into settlements with the Ontario Securities Commission and the U.S.

Securities and Exchange Commission and confirmed that it is not the subject of the ongoing

criminal investigations.  In addition, Nortel remediated its material weaknesses and returned to

timely financial reporting.

**The Chapter 11, CCAA and European Filings**

14.    The Nortel Companies operate in a highly competitive environment. The networking solutions industry is characterized both by industry rationalization as well as consolidation. By way of example, two of Nortel's largest competitors, Lucent Technologies Inc. and Alcatel, merged in 2006 and two of its largest customers, Verizon Wireless and Alltel Corporation, merged in 2008. Simply put, the competition for market share is fierce, and the cost of rapid technological development is steep.

15.    In recent years, the operating costs of the Nortel Companies have generally exceeded revenues, resulting in negative cash flow. A number of factors have contributed to these results, including competitive pressures, an inability to reduce operating expenses fast enough, the incurrence of costs related to restructuring efforts, significant competitor and customer consolidation, customers cutting back on capital expenditures and deferring new investments and the poor state of the global economy. These difficulties have increased materially in recent months as global economic conditions have dramatically worsened. The Nortel Companies are experiencing significant pressure on their businesses and facing a deterioration of their cash and liquidity, globally as well as on a regional basis, as customers across all businesses delay and reduce their capital expenditures. In particular, the extreme volatility in the global markets has hampered the ability to accurately forecast future revenue and cash position.

16.    After Nortel announced in 2004 the need to restate prior period financial results, Standard & Poor's Corporation ("Standard & Poor's") and Moody's Investors Service, Inc. ("Moody's") reduced the Nortel credit ratings to below investment-grade. As a result, the Nortel Companies were unable to access the commercial paper market and were limited in their access

7

to the capital markets. For several years, the Nortel Companies were only able to raise high yield/convertible debt and did not have any revolving credit or other bank lines.

17.    Current market conditions have further restricted Nortel's ability to access the capital markets, which has been compounded by recent actions taken by rating agencies with respect to its credit ratings. In September 2008, Standard & Poor's revised its outlook on Nortel from positive to stable, and Moody's revised its outlook on Nortel from stable to negative. In November 2008, Standard and Poor's changed its outlook to negative. In December 2008, Moody's issued a downgrade of Nortel's corporate family rating from B3 to Caa2. The actions of the rating agencies also jeopardize the ongoing relationship between the Nortel Companies and Export Development Canada ("EDC," Canada's federal export credit agency, which provides financing support to Canadian exporters). EDC provides a support facility that backstops certain letters of credit and performance bonds and the recent Moody's downgrade gives EDC a right to suspend additional support under the facility. A 30-day waiver was granted by EDC on December 15, 2008. On January 13, 2009, EDC and Nortel entered into a subsequent agreement for 30 days that provides Nortel access to a maximum of up to $30 million of additional support under the facility during this period, to allow EDC and Nortel to work together to see if a longer term arrangement, acceptable to both parties, can be reached. The agreement is subject to the condition that any support granted by EDC post-filing under the EDC Support Facility, as it may be amended from time to time, is secured by a second charge over all the assets of the Canadian Debtors, subject only to the Administrative Charge (other than the Carling Facility, where the charge will be a third ranking charge). The potential termination of the EDC Support Facility would be very damaging to the Debtors' businesses.

18.     In November 2008, Nortel announced a new operating model that will consolidate

executive and management personnel across the global organization and transition the company

to vertically-integrated business units.  In addition, Nortel announced a further restructuring plan

which provides for a net reduction in global workforce of approximately 1,300 positions as well

as additional cost cutting measures.  The November workforce reduction was the second of the

year, with total 2008 announced job reductions of 3,500.

19.     It has become increasingly clear that the struggle to reduce operating costs during

a time of decreased customer spending and massive global economic uncertainty has put

substantial pressure on Nortel's liquidity position globally, and in particular in North America.

With no current access to the capital markets, the prospects of the capital markets opening up in

the near term being very dim, substantial interest carrying costs on over $4 billion of unsecured

public debt, and significant pension plan liabilities that are expected to increase in a very

substantial and material manner principally due to the adverse conditions in the financial markets

globally, it has become imperative for the Nortel Companies to protect their current cash

positions.

20.     Against this background, Nortel has been assessing its projected liquidity

position, particularly taking into account its highly leveraged debt position, downgraded credit

ratings and significant practical limitations given its existing high cost structure on accessing the

cash position of Nortel Companies in certain regions. After exploring all possible alternatives,

Nortel has concluded that, in the absence of seeking creditor protection, in later portions of this

year there is a significant risk it would have insufficient cash resources on a regional basis and

would likely be unable to remedy this deficit position through third-party financing.  Nortel has

further determined that a number of factors relating to its high cost structure raise serious

impediments to its ability to continue operations absent a fundamental financial and business restructuring that can most effectively and quickly be achieved within the framework of bankruptcy and insolvency proceedings in multiple jurisdictions. As a consequence, Nortel has determined that it will not make payment of its regularly scheduled interest due January 15, 2009 on its outstanding public debt and will seek creditor protection under the respective restructuring regimes of Canada, the United States and certain EMEA subsidiaries.

21.     Therefore, in light of the foregoing, on January 14, 2009, NNI, NNCC, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Architel Systems (U.S.) Corporation, Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc. filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court. Also, on January 14, the Canadian Debtors will commence the Canadian Proceedings and it is anticipated that certain of Nortel's European subsidiaries will make consequential filings for creditor protection (collectively, the "EMEA Debtors"). Pursuant to section 18.6 of the CCAA, NNI will also bring an application before the Canadian Court for recognition of the automatic stay imposed by the filing of the U.S. Debtors' bankruptcy petitions. Applications will be made to this Court under chapter 15 of the Bankruptcy Code for recognition of the Canadian Proceedings as foreign main proceedings by Ernst & Young Inc. as foreign representative for the Canadian Debtors.

**Corporate Structure**

22.     The Nortel Companies consist of NNC, the ultimate parent company; NNL, NNC's principal Canadian operating subsidiary; NNI, a Delaware corporation and the principal

U.S. operating subsidiary (and a direct subsidiary of NNL); NNCC, a Delaware corporation and

a finance company with public debt; and over 140 affiliates around the world (together, the

"Nortel Companies").  NNC's most significant assets consist of its investments in its direct and

indirect subsidiaries.  NNC and NNL are both incorporated under the Canada Business

Corporations Act (the "CBCA").  As set forth in NNC's 2008 third quarter report, NNC has, as

of September 30, 2008, consolidated assets of approximately $11.6 billion and consolidated

liabilities of approximately $11.8 billion.

23.     The Nortel Companies' U.S. businesses are primarily conducted through NNI,

which is the direct or indirect parent of a majority of the U.S. Nortel Companies, including U.S.

Debtors.  NNCC is a financing company with few assets and has no operations of its own.  As of

September 30, 2008, NNI had assets of approximately $9 billion and liabilities of approximately

$3.2 billion, which liabilities do not include liabilities relating to NNI's guarantee of some or all

of the Nortel Companies' approximately $4.2 billion of unsecured public debt.  Each of NNC,

NNL, NNI and NNCC is an issuer and/or guarantor of some or all of the Nortel Companies'

approximately $4.2 billion of unsecured public debt.

24.     In addition to the Debtors, Nortel has other U.S. subsidiaries, most of which either

have no material assets or business in the U.S. or are in the process of being wound-down.

Several entities, particularly Nortel Government Solutions Incorporated ("NGS") and Nortel

Networks (CALA) Inc., have material operations and are not part of these proceedings.  None of

these other U.S. subsidiaries has commenced chapter 11 proceedings at this time.

25.     The Nortel Companies also include NNL's and NNC's active subsidiaries located

in Europe, the Middle East and Africa (collectively, the "EMEA Entities").  The majority of the

EMEA Entities are subsidiaries of Nortel Networks UK Limited ("NN UK), with the exception

of (a) Nortel Networks SA ("NN France"), which is jointly owned by NNL and Nortel International Finance & Holding BV ("NNIF"), and Nortel Networks France SAS ("NN France SAS"), which is a subsidiary of NN France; and (b) Nortel Networks (Ireland) Limited ("NN Ireland"), which is a wholly owned subsidiary of NNL for fiscal reasons.  NN UK is the largest business of the EMEA Entities and is the headquarters for the EMEA region.

### Nortel's Business

#### *Global Integrated Business Model*

26.    The Nortel Companies' businesses are highly complex and global in nature.  As set forth in more detail below, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and their debtor and non-debtor affiliates employ a global integrated business model.  In particular:

- The main operating subsidiaries around the world operate in each of Nortel's four main business segments.

- Nortel has substantially outsourced its manufacturing, relying on contract manufacturers with affiliates across the world to supply the Nortel Companies globally.

- The Nortel Companies employ a complex internal purchasing system where sales orders are placed at the local, in-country level, and internal purchase orders are routed to one of four purchasing hubs (located in four separate countries), which entities place orders with suppliers around the world.

- The Nortel Companies use a complex transfer pricing model, periodically submitted to global taxing authorities for approval, to allocate costs and revenues throughout the global enterprise and ensure the proper allocation of tax payments among relevant jurisdictions.

- Nortel's integrated business model is financed through a complex intercompany cash management system that itself is integrated with Nortel's sales, purchasing, supply and distribution networks.

- Nortel employees around the world share responsibility for the R&D, sales and operations of the global enterprise.

#### *Nortel's Business Segments*

27.     As of December 31, 2008, the Nortel Companies had four main business segments -- (1) Carrier Networks ("Carrier"); (2) Enterprise Solutions ("Enterprise"); (3) Metro Ethernet Networks ("MEN"); and (4) Global Services.

28.     **Carrier**.  The Carrier segment provides wireless networking solutions that enable service providers and cable operators to supply mobile voice, data and multimedia communications services to individuals and enterprises using mobile telephones, personal digital assistants, and other wireless computing and communications devices.

29.     **Enterprise**.  The Enterprise segment provides communication solutions that are used to build new networks and transform existing communications networks into more cost effective, packet-based networks supporting data, voice and multimedia communications.

30.     **MEN**.  The MEN segment provides optical networking and carrier grade Ethernet data networking solutions to make the carrier and large enterprise customers' networks more scalable and reliable for the high-speed delivery of diverse multimedia communications services.

31.     **Global Services**.  The Global Services segment provides a broad range of services and solutions supporting the entire lifecycle of multi-vendor, multi-technology networks for enterprises and carriers worldwide seeking to reduce costs, improve efficiency and performance and capitalize on new revenue opportunities.

32.     With certain exceptions, the business segments are not segregated by legal entities but are operated across various legal entities.  One such exception is NGS, which has been reported historically under "Other" in Nortel's business segments.

33.     On January 1, 2009, Nortel implemented a new operating model, which decentralized several of its corporate functions and transitioned to vertically-integrated business units to give greater financial and operational control to the business units and reduce

duplication.  Enterprise customers are now served by the Enterprise business unit, which is responsible for product and portfolio development, R&D, marketing and sales, partner and channel management, strategic business development and associated functions.  Service provider customers are served by two business units with full responsibility for all product, services, applications, portfolio, business and market development, marketing and R&D functions: Carrier and MEN.  A dedicated global carrier sales organization supports both business units

34.    The Global Services and Global Operations organizations will be decentralized and transitioned to the business units by April 1, 2009 to ensure there is no impact to customer service.  Beginning January 1, 2009, Nortel includes services revenue in the respective financial results for Enterprise, Carrier and MEN.

35.    Historically, the various business segments have been reported across the following geographic regions for financial reporting purposes: United States, Europe, Middle East and Africa, Canada, Asia and Central and Latin America.

### Global Supply Chain

36.    The Nortel Companies rely on numerous suppliers, including contract manufacturers responsible for the manufacturing of Nortel hardware and the various materials necessary for the Debtors to provide their solutions to customers and end-users.  The Nortel Companies employ a complex internal purchasing system for their hardware and software products.  When a sales order is placed with a regional Nortel distribution entity, an internal purchase order is generated and automatically routed through one of four purchasing hub entities, depending on the business segment and the geographical region involved.  Purchasing hub entities manage key supplier relationships and act as funneling points for orders from Nortel's sale entities all around the world.

14

37.     The four purchasing hubs are NNL, NNI, NN UK and NN France. Approximately two-thirds of all Nortel purchasing activity flows through the North American purchasing hubs, NNL and NNI.  NNI acts as the purchaser for Enterprise Data products for all of the Americas and Asia as well as certain other worldwide products.

38.     The respective purchasing hub entity contracts directly with equipment and design manufacturers to facilitate the ultimate product delivery to the customer.  Following shipping of the product, the purchasing hub entity pays the manufacturer and the distribution entity books an intercompany payable to the purchasing hub entity.  The payable equals the amount paid by the purchasing hub entity to the supplier plus a small margin.  The manufacturer may be paid prior to the internal payment of the resulting receivable.  Intercompany obligations are settled monthly through cash payments or setoffs, to the extent available, and are carried forward in certain circumstances as a net receivable.

### *Transfer Pricing and Cash Management*

39.     Once a customer's hardware needs have been manufactured, Nortel provides installation, network integration and support services (collectively, "Deployment Services").  In keeping with the integrated, co-dependent nature of the Nortel Companies, Deployment Services are managed regionally and cover all product lines.  For example, there are two divisions responsible for Deployment Services in North America.

40.     Given the integrated basis on which the Nortel Companies operate, certain of the Nortel Companies have reached agreements and engaged in certain practices to properly allocate profits and costs across the various affiliates.  The key profit driver of Nortel's business is the development and maintenance of intellectual property, and the Nortel Companies utilize a residual profit sharing methodology (the "RPSM") that is designed to reflect that certain Nortel

affiliates, designated as profit sharing entities, are the source of the research and development that has created Nortel's global technology footprint. The RPSM is a transfer pricing methodology designed to allocate profit or loss based on each relevant Nortel Company's relative share of certain R&D costs. Transfer pricing methodologies have been recognized by the Organization for Economic Co-operation and Development (the "OECD") and U.S. and Canadian taxing authorities as mechanisms to fairly allocate costs and profits for fully integrated multinational corporations such as Nortel and to ensure the proper allocation of tax payments among interested jurisdictions. Transfers and payments dictated by the RPSM are governed by practices agreed to by the relevant Nortel Companies, including as memorialized in a master R&D agreement, as it has been amended from time to time. Nortel's RPSM practices are meant to comply with tax regulations, and NNI and NNL from time to time seek approval of their bilateral Advance Pricing Agreement application permitting such practices from taxing authorities, including the Internal Revenue Service and the Canada Revenue Agency.

41.    In addition, from time to time, as part of the management of Nortel's cash needs on a global basis, certain Nortel affiliates, including NNI and NNCC, have funded intercompany loans and capital contributions to other Nortel Companies on an as-needed basis to fund working capital in the ordinary course of business. The source and terms of such intercompany loans are typically memorialized through notes or other loan documentation.

42.    The Debtors' and their Canadian parents' interests are united in their integrated, co-dependent business relationship. As a result, the Debtors' ability to reorganize is dependent on (a) the reorganization of the jointly operated Nortel businesses in Canada and the U.S. and/or (b) the sale of one or more Nortel business segments that are located in both Canada and the U.S. The U.S. Debtors and the Canadian Debtors therefore have committed to engage in a joint and

16

harmonious approach to their restructuring in both jurisdictions, to the expected benefit of their collective stakeholders.  Such cooperation and coordination will be required, for example, in any sale of a cross-border business segment by a Canadian parent, which could involve the sale of assets and the assignment of material contracts currently employed by U.S. Debtors and the transfer of employees relevant to U.S. operations.  Such overlapping assets and obligations of the U.S. Debtors and Canadian Debtors similarly will be relevant in the development of a reorganization plan for any and all of the Debtors, even outside of an asset sale context.  The U.S. Debtors and Canadian Debtors will also seek to coordinate as needed any such actions with the Nortel Companies subject to previously described proceedings in the Europe.

### Nortel's Workforce

43.    Due to the financial pressures on the business in recent years, Nortel has been forced to reduce its workforce considerably.  At its peak in 2000, Nortel employed more than 90,000 people, but by January 2009, Nortel's payroll has been reduced to approximately 24,000 employees worldwide (plus 6,000 employed at joint ventures in which Nortel holds interests, or 30,000 total), 8,911 of whom are currently employed by the Debtors in the United States.  On November 10, 2008, as a part of Nortel's informal restructuring efforts, a further global net reduction of 1,300 employees was announced, approximately half of which has been implemented as of the Petition Date.  Though the Nortel workforce is spread throughout the world, Nortel is a global integrated enterprise and its businesses are highly integrated, with employees in the United States working closely every day with employees in Canada, the United Kingdom and other countries throughout the world with responsibilities for Nortel's customers, suppliers, research and development and group operations spread across multiple Nortel Companies.

44.    As of the Petition Date, NNI employs a total of approximately 8,099 full-time salaried employees, 717 full-time hourly employees, 24 part-time salaried employees, and 3 part-time hourly employees (the "NNI Employees"). In addition, Alteon WebSystems, Inc. employs approximately 68 full-time employees in the United States (the "Alteon Employees," and together with the NNI Employees, the "Employees"). The Alteon Employees' compensation is funded through NNI's payroll account, and the Alteon Employees receive the same benefits as the NNI Employees. To supplement their workforce, the Debtors additionally utilize the services of approximately 40 independent contractors.

45.    The Debtors' employee base is made up largely of the following categories of employees:

         a.     Sales Force;

         b.     Research and Development personnel;

         c.     Services and Operations personnel;

         d.     Other Employees; and

         e.     Independent Contractors.

***Nortel's Sales Force***

46.    Nortel has a sales force consisting of over 3,200 sales representatives worldwide (the "Sales Force"), of whom 1,374 are employed by the Debtors in the United States (the "U.S. Sales Employees"). The Sales Force markets and sells products and services to customers located in the United States, Canada, Central and Latin America, Europe, the Middle East, Africa and Asia. Dedicated sales account teams are responsible for certain major service provider customers located near the customers' main purchasing locations. Nortel also maintains centralized marketing, product management and technical support teams dedicated to providing individual product line support to the global sales and support teams.

47.     The U.S. Sales Employees handle all aspects of their sales transactions, from identifying a sales opportunity, to identifying the customer's needs, to constructing a customized Nortel solution that responds to the customer's needs and, finally, to facilitating the delivery of the solution to the customer.

### Nortel's R&D Personnel

48.     The Debtors employ 1,850 R&D employees in the United States, including 1,782 NNI research and development employees as well as all 68 of the Alteon Employees (the "R&D Employees"). The Debtors maintain R&D laboratories in Boston, Massachusetts; Research Triangle Park, North Carolina; Silicon Valley, California; and Dallas, Texas. In addition, the Debtors have a specialty site dedicated to R&D located in Bohemia, New York.

49.     The R&D Employees are involved in the strategic development and introduction of new products to meet market needs and competitive positioning, establish long-term strategy and facilitate technical design. The R&D Employees work closely with Nortel's business leaders around the world to identify next generation technologies, build Nortel's technological roadmap and coordinate the evolution of Nortel's product portfolios and network solutions.

### Nortel's Service and Operations Personnel

50.     The Debtors employ 3,825 service and operations personnel in the United States (the "Service and Operations Employees"). The Service and Operations Employees are spread throughout the United States, but are primarily located in Boston, Research Triangle Park, Silicon Valley and Dallas.

51.     The Debtors' service employees (the "Service Employees") are responsible for the complete lifecycle management of Nortel's U.S. services portfolio. This includes all aspects of service development, retirement, pricing and commercial offering. In addition, the Service

Employees are responsible for the commercial performance of the services portfolio including the achievement of operational performance targets for attachment rates, overall profitability and the contract renewal process for all maintenance and managed services agreements.

52.    The Debtors' global operations employees (the "Operations Employees") are responsible for end-to-end customer support from the time of initial order through deployment. In providing these services, the operations employees serve a critical role in the procurement and management of customer orders, the facilitation of manufacturing services for Nortel's products as well as the installation and providing of ongoing technical support for Nortel's solutions.

### Nortel's Other Employees

53.    Nortel, including the U.S. Debtors, also employs a number of individuals responsible for other operations, including executive officers and employees dedicated to Nortel's treasury, tax, human resources, marketing, legal and finance operations.  Approximately 1,862 of these individuals work for the U.S. Debtors.

### Independent Contractors

54.    To supplement the service requirements for their businesses, the Debtors utilize the services of approximately 40 independent contractors, who are paid under contracts for services directly by the Debtors (the "Independent Contractors").  The Debtors utilize the Independent Contractors for a variety of services for numerous departments, including, but not limited to:  field support, customer relations, order fulfillment, sales support and research and development support.  A number of Independent Contractors have unique technical knowledge and/or skills necessary to provide services to the Debtors, and the Debtors intend to continue to utilize their services in the postpetition period.

55.    As outlined above, the Employees perform a variety of critical functions on behalf of the Debtors.  The Employees' knowledge and understanding of the Debtors' products,

operations, research and development, customer relations and infrastructure are essential to the effective reorganization of the Debtors' businesses. Accordingly, with the commencement of these chapter 11 cases, it is critical for morale and the continued operation of the businesses to ensure that there is no interruption to the payment of wages, salaries and benefits to the Employees. Moreover, due to the high level of integration among the Nortel workforce, it is imperative that, to the extent possible, the Debtors' Employees receive substantially similar treatment as their colleagues in Canada.

56.    By this Motion, the Debtors seek authority to be exercised in the Debtors' sole discretion to pay and honor certain prepetition claims for, among other amounts, wages, salaries and other compensation, federal and state withholding taxes and other amounts withheld (including, garnishments, employees' share of insurance premiums, taxes and 401(k) contributions), reimbursable expenses, health benefits, retirement benefits, insurance benefits, workers' compensation benefits, vacation time and other paid leave, and all other benefits that the Debtors have historically provided in the ordinary course of business (collectively, and as more fully described below, the "Wages and Benefits"), to continue to pay and honor such claims postpetition and to pay all costs incident to the foregoing. The Debtors also seek authority (to be exercised in the Debtors' sole discretion) to continue to reimburse the Employees for various reimbursable expenses. In addition, the Debtors request the right to modify or discontinue any of the Wages and Benefits and the policy related to reimbursable expenses, and to implement new Wages and Benefits in the ordinary course of business during these chapter 11 cases without the need for further Court approval.

### Employee Wage Obligations

57.    For 2008, the Debtors paid approximately $1.305 billion in compensation and benefits to the Employees. These payments were comprised of:

a.   Approximately $898 million in wages and salary to the NNI full-time salary employees, $43.6 million to the full-time NNI hourly employees, $1.7 million to the NNI part-time salaried employees and $180,000 to the NNI part-time hourly employees;

b.   Approximately $8.2 million in wages and salary to the Alteon Employees;

c.   Approximately $3 million in short-term disability benefits through salary continuance;

d.   Approximately $8.1 million in premium payments for overtime hours, on-call hours and undesirable shift hours;

e.   Approximately $108 million in sales commissions to the U.S. Sales Employees;

f.   Approximately $72 million in reimbursable expenses;

g.   Approximately $2 million in expat and tax equalization costs; and

h.   Approximately $160 million in employee benefits, described more fully below.

58.    In the ordinary course of their businesses, the Debtors pay the Employees on a bi-weekly basis on every other Friday. The Employees were paid on Friday, January 2nd for the two-week period from December 22nd to January 4th. The Debtors' next payroll will be paid on Friday, January 16th, for the period from January 5th to January 18th.[3] The Debtors' payroll is generally made by direct deposit through electronic transfer of funds to the Employees. Currently, the Debtors pay approximately $37 million per pay period in wages to the Employees.

59.    Because the last payroll date for most Employees was on January 2nd, as of the Petition Date, certain Employees will not have been paid all of their prepetition wages.[4] Additionally, compensation may be due and owing as of the Petition Date because:

a.   Some discrepancies may exist between the amounts paid and amounts the Employees or others believe should have been paid,

---

[3]    The January 16th payroll includes payments to certain non-active Employees, none of whom exceed the $10,950 administrative priority cap.

[4]    Certain of the Employees were last paid on January 9th, 2009 as part of an interim payroll.

which, upon resolution, may reveal that additional amounts are owed to such Employees;

b.      Some payroll checks issued to the Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date;

c.      The U.S. Sales Employees are paid in arrears by 45 days for sales commissions;

d.      Employees who receive premium pay for overtime hours, on-call hours or undesirable shift hours are paid in arrears by two weeks; and

e.      Variations may occur in the Debtors' various payroll schedules.

The Debtors estimate that there remains outstanding, as of the Petition Date, approximately $26 million in wages and salaries.

60.     In addition to the Employees' basic wages and salary, some Employees are eligible to receive additional income in the form of premium pay ("Premium Pay"). Employees may be entitled to Premium Pay for working overtime hours, for working special shifts, or for being on call outside of scheduled working hours. In 2008, the Debtors paid approximately $8.1 million in Premium Pay to the Employees. The Debtors estimate that there remains outstanding, as of the Petition Date, approximately $1 million in Premium Pay.

61.     The U.S. Sales Employees, in addition to their base salaries, are eligible to receive variable compensation based on achieving revenue, orders or key sales objectives under the "Nortel Global Sales Incentive Compensation Plan" (the "Sales Incentive Plan"). Until January 1, 2009, payments under the Sales Incentive Plan were made on a monthly basis and were paid in arrears by 45 days. Additionally, any earned sales bonus payments under the Sales Incentive Plan were paid in the monthly or quarterly payment cycle in which the sales objectives were met. The Debtors estimate that there remains outstanding, as of the Petition Date, approximately $14

million in payments under the Sales Incentive Plan. The Sales Incentive Plan is an ordinary course of business compensation program that has been in place and implemented for several years. The Debtors intend to renew the Sales Incentive Plan in 2009 based on the alignment of individual quota targets determined on an annual basis in the ordinary course of business.

62.     In addition to base salary, certain Employees are eligible for an annual cash bonus award under the "Nortel Networks Limited Annual Incentive Plan" (the "Annual Incentive Plan"). Bonuses under the Annual Incentive Plan are based on the achievement of pre-established corporate and individual performance objectives for a given calendar year, subject to the discretion of the joint Compensation and Human Resources Committee of the Boards of Directors of NNC and NNL (the "CHRC") and the Board of Directors of NNL. The Annual Incentive Plan is an ordinary course of business compensation program that has been in place and implemented for several years. This type of bonus structure is standard in this industry.

63.     Given that payments under the Annual Incentive Plan are made in the ordinary course of business, the Debtors note that they need not obtain special approval to continue making payments under the Annual Incentive Plan. See In re Dana Corp., 358 B.R. 567, 580-81 (Bankr. S.D.N.Y. 2006). Out of an abundance of caution, however, the Debtors by this Motion seek authority in their sole discretion to pay bonuses under the Annual Incentive Plan for 2008 in the ordinary course of business. Bonuses to be paid under the Annual Incentive Plan for a given year are typically determined in February or March of the following year upon approval of the CHRC and the Board of Directors of NNL. As of the Petition Date, the Debtors are in the process of calculating the achievement of corporate and individual performance objectives under the Annual Incentive Plan for 2008. Those calculations will not be finally determined until sometime after the Petition Date. Based on preliminary estimates and under the current

circumstances, however, the Debtors anticipate that there will be no payments under the Annual Incentive Plan for 2008.

64.    The Debtors intend to continue the Annual Incentive Plan in 2009 based on corporate and individual performance objectives that will be adopted in or around February in the ordinary course of business.  Corporate performance objectives will be developed by management in coordination with its compensation consultant, Mercer Human Resources Consulting, LLC, and subject to the approval of the CHRC and the Board of Directors of NNL.  Individual performance objectives will be determined through an annual employee review process.  The Debtors expect that the performance objectives for the 2009 Annual Incentive Plan will also be reviewed by both the Monitor in the Canadian proceedings and the official creditors committee, once appointed, in these proceedings.

65.    The Debtors are in the process of developing a Key Employee Incentive Plan (the "KEIP") in the course of these chapter 11 proceedings.  The development of the KEIP is essential in order to ensure that the Debtors are able to retain and motivate the employees most critical to the Debtors' ability to successfully reorganize and maximize value for all stakeholders.  The Debtors anticipate that the details of the KEIP will be developed and adopted quickly after the Petition Date by the CHRC and the Boards of Directors of NNC and NNL.  Both the Monitor in the Canadian proceedings and the official creditors committee, once appointed, will be consulted regarding the KEIP and will be offered an opportunity to review and evaluate the KEIP before it is submitted for approval to the CHRC and the Boards of Directors of NNC and NNL.

66.    The Debtors compensate Employees suffering from short-term disability by continuing to pay those Employees salary for the period of the time that they are disabled.  Such

salary continuance is available for disabilities lasting between one and 26 weeks. The Debtors

estimate that the cost of providing short-term disability in 2008 was approximately $3 million.

67.    The Debtors believe that there remain unpaid, as of the Petition Date, wages,

salaries, overtime pay, commissions and other compensation (excluding reimbursable expenses,

vacation pay, severance pay, deferred compensation and incentive bonus pay) earned by the

Employees prior to the Petition Date (the "Unpaid Compensation"). The Debtors estimate that

they owe approximately $41 million in Unpaid Compensation to the Employees.

68.    By this Motion, the Debtors seek authority in their sole discretion to honor and

pay any outstanding Unpaid Compensation and to continue, during the course of these cases, to

pay salary, wages, overtime pay, commissions and other compensation to the Employees in

accordance with the Debtors' stated policies and in the ordinary course of business.

### Deductions and Withholdings

69.    During each applicable pay period, the Debtors routinely deduct certain amounts

from the Employees' paychecks, including, without limitation, garnishments and other pre-tax

and after-tax deductions payable to certain of the benefit plans discussed herein, such as an

employee's share of health care benefits, insurance premiums, 401(k) contributions, flexible

spending account contributions, legally ordered deductions and other miscellaneous deductions

(collectively, the "Employee Deductions") and forward those amounts to various third-party

recipients. On average, the Debtors have historically deducted approximately $14.8 million from

the Employees' paychecks per pay period.

70.    Furthermore, the Debtors are required by law to withhold from the Employees'

wages amounts related to federal, state and local income taxes, social security and Medicare

taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state or

local taxing authority.  In 2008, the Debtors withheld on average approximately $9.6 million from the Employees' paychecks per pay period.  The Debtors must then match from their own funds for social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes").  The Payroll Taxes, including those from the Employees and the employer, are approximately $11.2 million per pay period.

71.     Due to the commencement of the chapter 11 cases, there may be Employee Deductions from the earnings of the Employees that were not forwarded to the appropriate third party recipients prior to the Petition Date.  Accordingly, the Debtors seek entry of a final order giving them authority, but not direction, to continue to forward these prepetition Employee Deductions to the applicable third party recipients on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

72.     Additionally, due to the commencement of the chapter 11 cases, the Debtors may have withheld but not yet forwarded to the appropriate authority amounts for Payroll Taxes.  As a result, the Debtors seek entry of a final order granting them authority, but not direction, to continue to honor and process the prepetition obligations with respect to Payroll Taxes on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

73.     As discussed more fully herein, the Debtors believe that under section 541(d) the Employee Deductions and Payroll Taxes are not the property of the Debtors' estates and, therefore, such funds are not available for general distribution to a debtor's creditors.

**Expat Costs**

74.      As a global enterprise, from time to time Nortel assigns certain highly-qualified and highly-compensated employees to locations in outside of their home country either temporarily or permanently (the "Global Mobility Program"). The participants in the Global Mobility Program (the "Expats") function as the primary face of Nortel in the world community and are responsible for spearheading Nortel's global efforts. Among the critical functions performed by the Expats are providing the expertise necessary to start up a new operation or deploy new technologies, providing on-site training for exceptional skills, and providing senior management expertise in a location where such needs cannot be met locally. Temporary assignments under the Global Mobility Program are typically for a fixed period of time lasting between 30 days and three years.

75.      Maintaining the Global Mobility Program requires Nortel to incur various costs associated with sending the Expats to their designated locations. NNI bears such costs for Expats who are sent to its operations in the United States. This bundle of costs, whether payable to the Expats or to third parties (the "Expat Costs"), represents some of the costs to Nortel of doing business in these countries and includes paying for such necessities as transportation to the assignment location, housing, utilities, schooling, medical coverage, insurance, immigration and visa costs and tax assistance. While some of the Expat Costs may be classified as imputed income to the Expats, depending on the host country and applicable tax regimes, the Expat Costs are essentially Nortel's operating costs for maintaining a global presence.

76.      For certain of the Expat Costs, Nortel contracts with a third-party supplier, which performs certain obligations on behalf of Nortel and the Expats. For instance, Nortel contracts with Mobility Service International for the purpose of providing international assignment management services, including coordinating various aspects of the temporary relocation of the

28

Expats from their home country to their host country location.  In addition, Nortel contracts with Chamness Relocation Services ("Chamness") for the purpose of assisting the Expats in finding housing and educational services.  Expats also have the option of authorizing Chamness to manage the home rental in the host country and pay the Expats' rents, utilities and other bills on a recurring basis for the duration of the assignment

77.    The Debtors estimate that they owe $100,000 in outstanding Expat Costs as of the Petition Date and that the Debtors will incur approximately $1.85 million in Expat Costs under the Global Mobility Program in 2009.

78.    While the Debtors continue to evaluate their global businesses in these chapter 11 proceedings, it is essential that they receive authority to pay any outstanding prepetition Expat Costs and continue to pay the Expat Costs.  To the extent that the Debtors determine that it is in their best interests to retain the Expats, failure to pay the Expat Costs would not only disrupt the Expats' lives but also jeopardize Nortel's presence in the locations in which the Expats are based.  Moreover, failure to pay the Expat Costs would provide little benefit to the Debtors, because the Debtors are still obligated to reimburse the Expats for their living expenses.  Thus, if the Expats were forced to, for example, seek alternative housing as a result of the Debtors' failure to pay their landlords, the Debtors would be obligated to pay the Expats for any moving costs as well as to reimburse their rents.  In order to continue operating the Global Mobility Program in the interim, therefore, the Debtors seek authority, in their sole discretion, but not direction, to (a) pay any outstanding prepetition Expat Costs, and (b) continue during the course of these cases to pay the Expat Costs in accordance with the Debtors' stated policies and in the ordinary course of business.

79.     In addition, in order to ensure that the Expats do not suffer a financial hardship as a result of the tax consequences of an international assignment, the Debtors make certain tax equalization payments on behalf of the Expats (the "Tax Equalization Payments"). Incurring the costs of the Tax Equalization Payments ensures that the Expats pay no more or less in taxes than they would pay if they worked in their home country. The Debtors estimate that in 2008 the cost of the Tax Equalization Payments to the Debtors was approximately $128,000. By this Motion, the Debtors seek authority in their sole discretion to pay any outstanding Tax Equalization Payments and continue during the course of these cases to pay Tax Equalization Payments in accordance with the Debtors' stated policies and in the ordinary course of business.

### Payment of Reimbursable Expenses

80.     Prior to the Petition Date, and in the ordinary course of business, the Debtors reimbursed the Employees for certain reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment in accordance with Internal Revenue Service ("IRS") regulations (the "Reimbursable Expenses").

81.     A Reimbursable Expense is an expense incurred by an Employee in the performance of his/her duties that is deemed to be necessary to the performance of his/her job, and is reasonable. The Reimbursable Expenses are paid-for expenses such as travel, meals, accommodations, parking, automobile mileage, and other business-related expenses that are paid by the Employees.

82.     A Reimbursable Expense is made to an Employee when an approved expense report is submitted by such Employee to the appropriate accounts payable department and processed.

83.     Certain Employees are permitted to use an American Express credit card provided by the Debtors.  The Employees using such credit cards are billed directly by American Express and are entitled to choose their method of payment for business expenses.  Some Employees choose to pay their business expenses to American Express directly and subsequently prepare an expense report for any Reimbursable Expenses, which, if approved as valid Reimbursable Expenses, are reimbursed by the Debtors.  Other Employees choose to have the Debtors pay American Express on their behalf for their valid Reimbursable Expenses.  Upon the commencement of these chapter 11 proceedings, future reimbursements for Reimbursable Expenses will be made only directly to American Express on behalf of the Employees and not to the Employees.

84.     It is likely that certain Employees have not been reimbursed for Reimbursable Expenses incurred prior to the Petition Date.  In this regard, it is difficult for the Debtors to estimate the amount of Reimbursable Expenses outstanding as of the Petition Date because not all Employees may have submitted expense reports for all accrued expenses.  Nevertheless, it is critical that the Debtors be authorized to reimburse all such expenses when the reports are submitted in order to assure such Employees that they will be reimbursed for their actual out-of-pocket expenses incurred while acting within the scope of their employment.

85.     In 2008, the Debtors paid approximately $6 million in Reimbursable Expenses to the Employees per month.  As of the Petition Date, the Debtors estimate that there remains outstanding approximately $4 to $6 million in Reimbursable Expenses.

86.     The Reimbursable Expenses were all incurred on the Debtors' behalf and with the understanding that they would be reimbursed.  Accordingly, to avoid harming individuals who incurred the Reimbursable Expenses while performing their duties, the Debtors seek authority, in

31

their sole discretion, but not direction, to (a) pay any outstanding prepetition Reimbursable

Expenses, and (b) continue during the course of these cases to pay the Reimbursable Expenses in

accordance with prepetition practices.

**Employee Benefits**

87.    In the ordinary course of business, the Debtors provide the Employees with a

number of benefits, including:  (a) health and dental insurance and other insurance benefits

including life insurance; (b) worker's compensation benefits; (c) vacation pay and other paid

leave; (d) retirement plan and flexible spending accounts; and (e) other non-insured programs

and voluntary insured programs, (collectively, the "Employee Benefits") through employer

sponsored contributory and non-contributory benefit plans and voluntary insurance coverage.  In

2008, the cost to the Debtors of providing all of the Employee Benefits was approximately $160

million.

**A.    Health Care Programs and Insurance Benefits**

88.    In the ordinary course of business, the Debtors offer the Employees and their

families health and dental insurance (the "Health Care Programs").  Approximately 9,890

Employees obtain health care coverage (medical and/or dental) through the Debtors' Health Care

Programs.  These figures include certain Employees on disability and paid leave or otherwise

eligible for salary continuance who are not considered active employees.  Additionally,

approximately 3,000 retired employees obtain medical coverage through the Debtors' Health

Care Programs.

89.    The Debtors maintain self-insured medical and dental plans that are administered

through CIGNA (medical and dental) and Blue Cross Blue Shield (medical only).  The

Employees contribute a portion of their salaries to premium payments for the health and dental

insurance plans, and the Debtors pay the costs for all administrative claims and ancillary costs of the health plan and dental plan. In addition, the Debtors pay fees to CIGNA and Blue Cross Blue Shield to administer the claims.

90.     The Debtors also provide several other types of insurance to the Employees and their dependents, including life insurance, dependent life insurance, accidental death and dismemberment insurance, business travel accident insurance and long-term disability insurance (collectively, the "Insurance Benefit Programs").

91.     The costs associated with the Debtors' Health Care and Insurance Benefit Programs are paid through the Debtors' Voluntary Employee Beneficiary Association plan (the "VEBA Trust"). The VEBA Trust is a qualified, tax-exempt plan the purpose of which is to provide a funding vehicle for the Debtors' Health Care and Insurance Benefit Programs. The Debtors manage the operation and administration of the VEBA Trust in conjunction with the trustee, Bank of America. The VEBA Trust is open to all participants in the Debtors' Health Care Programs. Both the Debtors and the participating Employees make contributions to the VEBA Trust, the proceeds of which are used to make claim and benefit payments on behalf of the participating Employees. On a biweekly basis, the Debtors place approximately $5 million into the VEBA Trust to cover all claims and expenses associated with the Employees' Health Care and Insurance Benefits Programs. The Employees' contributions are handled through deductions from their paychecks. The annual cost to the Debtors to fund and administer the VEBA Trust is approximately $130 million.

92.     By this Motion, the Debtors seek authority in their sole discretion to continue their Health Care Programs, Insurance Benefit Programs and the VEBA Trust in the ordinary

course of business and pay any prepetition amounts related thereto, including those claims incurred before the Petition Date but reported after the Petition Date.

**B.    Workers' Compensation**

93.     Under the laws of the various states in which the Debtors operate, the Debtors are required to maintain workers' compensation liability insurance and to provide employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors.  The Debtors provide workers' compensation benefits (the "Private Workers' Compensation Benefits") to their Employees, except for those employed in jurisdictions (the "Publicly Insured States") that require workers' compensation liability insurance to be maintained through the state, through a workers' compensation insurance policy issued by Travelers (the "Workers' Compensation Policy").  The term of the Workers' Compensation Policy is from May 15, 2008 to May 15, 2009.

94.     The Debtors provide workers' compensation benefits (the "Public Workers' Compensation Benefits," and together with the Private Workers' Compensation Benefits, the "Workers' Compensation Programs") to their Employees working in the Publicly Insured States through policies provided directly from those states (collectively, the "Public Workers' Compensation Policies," and together with the Private Workers' Compensation Policy, the "Workers' Compensation Policies").

95.     For the 2008 renewals, the Debtors expect to pay approximately, but no more than, $882,000 in premiums for their Workers' Compensation Policies, of which approximately $546,000 has been paid as of Petition Date.

96.     Failure to maintain workers' compensation insurance in the various states in which the Debtors conduct business could result in the institution of administrative or legal proceedings and material fines against the Debtors and their officers and directors.  By this

Motion, therefore, the Debtors seek a final order giving them authority, but not direction, to maintain the Workers' Compensation Programs in the ordinary course of business, and pay any prepetition amounts related thereto.

**C.     Vacation, Sick and Other Paid Leave**

97.     The Debtors provide vacation time to the Employees as a paid time-off benefit ("Vacation Obligations"). The Employees are entitled to take a minimum of three (3) weeks and a maximum of five (5) weeks vacation per year. Vacation time begins accruing on the date of employment and can be used immediately. Employees are entitled to carry forward up to one year of unused vacation time to the following year, except for those Employees located in California, who are entitled under state law to carry forward up to two years of unused vacation time.

98.     As of the Petition Date, the Debtors estimate that they have approximately 1.1 million hours and $67 million in unpaid Vacation Obligations for the Employees that accrued prior to the Petition Date (collectively, the "Unpaid Vacation"). By this Motion, the Debtors seek authority in their sole discretion to: (a) allow the Employees to take vacation time in the ordinary course of business on a going forward basis (and thus reducing any liability relating thereto); and (b) to the extent applicable, pay Unpaid Vacation upon termination or retirement in accordance with prior practice.

99.     The Debtors assert that the continuation of the Vacation Obligations in accordance with prior practice is essential to maintaining morale during this difficult time. Further, the Vacation Obligations are provided to all Employees and are a benefit that Employees have come to depend on. Thus, the Debtors believe that continuation of the Vacation Obligations is necessary under the circumstances and should be authorized by this Motion.

100.    Under company policy, Employees are entitled to take up to 10 sick days per year ("Sick Leave Obligations").  In addition, Employees are paid for 12 holidays per year ("Holiday Obligations").  Employees are also entitled to up to three days bereavement leave per calendar year for use in the event of a death of an immediate family member ("Bereavement Obligations").  Employees are also entitled to take a leave of absence in certain situations ("Leave of Absence Obligations" and, together with the Sick Leave Obligations, Holiday Obligations and Bereavement Obligations, the "Leave Obligations").  Employees may take up to 12 weeks of unpaid[5] leave per year for family care.  Employees may take up to five years of military leave, the first two years of which the Debtors will compensate the Employee up to his/her full salary.  Employees may take up to one year of unpaid personal leave.  In other situations, Employees may qualify for a paid leave of absence for medical reasons.

101.    By this Motion, the Debtors seek a final order giving them authority, but not direction, to honor their Leave Obligations in the ordinary course of business, and to honor and pay any prepetition and postpetition amounts relating thereto.

**D.    Retirement Plan and Flexible Spending Accounts**

*401(k) Retirement Plan*

102.    Employees are eligible to participate in the 401(k) retirement plan (the "401(k) Plan"), which is a 401(k) savings plan pursuant to the Internal Revenue Code ("IRC").  Employees may elect to contribute up to the annual IRS limits on contributions and eligible compensation.

103.    Under the 401(k) Plan, Employees become eligible to contribute immediately upon employment with the Debtors.  Employees may contribute between 1% and 50% of their

---

[5]    Except in those states that mandate by law that family leave be paid in part.

pay on a pre-tax basis up to the IRS limits. The Debtors automatically contribute 2% of

Employees' pay and additionally provide a matching contribution on pre-tax amounts equal to

50% of the first 6% of an Employee's eligible pay. In 2008, the Debtors contributed

approximately $29 million in contributions to the 401(k) Plan. As of the Petition Date, the

Debtors estimate that there is approximately $630,000 in outstanding matching contributions to

the 401(k) Plan that the Debtors have yet to pay.

104.    By this Motion, the Debtors seek authority in their sole discretion to maintain the

401(k) Plan and to make any payments attributable to the 401(k) Plan, including any that accrued

prepetition in the ordinary course of business.[6]

*Flexible Spending Accounts*

105.    The Debtors offer Employees the ability to contribute a portion of their

compensation into flexible spending accounts on a pre-tax basis under IRC section 125 for health

and dependent care expenses (the "Health Care FSA" and the "Dependent Care FSA,"

respectively, and, collectively, the "FSAs"). The Health Care FSA allows Employees to

contribute up to $5,200 per year to pay for non-reimbursed health care expenses that the IRS

would consider deductible medical expenses. The Dependent Care FSA allows Employees to

contribute up to $5,000 per year for day care expenses for a child or qualified adult dependent.

The Debtors estimate that approximately 4,200 Employees have elected to contribute funds to

either the Health Care FSA or the Dependent Care FSA.

106.    The FSAs are administered by a third party administrator, WageWorks, Inc.

("WageWorks"). On a bi-weekly basis, the Debtors wire the Employees' selected contribution

amounts into a special employee deposit holding account. On a weekly basis, the Debtors wire

---

[6]     The Debtors also maintain other retirement plans in addition the 401(k) Plan. However, the Debtors do not
ask the Court to provide relief with respect to those other retirement plans at this time.

money to an account maintained by WageWorks to reimburse WageWorks for claims paid to

Employees for the previous week. The Debtors estimate that the cost to administer the FSAs in

2008 was approximately $300,000, which is offset by savings to the Debtors from FICA taxes

that are not paid on section 125 employee contributions and amounts forfeited by Employees in

the FSAs.

107.    By this Motion, the Debtors seek authority in their sole discretion to continue the

FSAs and make any payments attributable to the FSAs, including any that accrued prepetition in

the ordinary course of business.

**E.    Additional Employee Benefits**

108.    In the ordinary course of business, the Debtors provide the following additional

Employee Benefits (the "Additional Employee Benefits"). Specifically:

- Adoption Costs: The Debtors provide up to $5,000 per Employee for adoption costs.

- Employee Assistance Program: The Debtors provide free counseling and referral information to Employees, up to 8 visits per year.

- Health & Fitness Centers: At some locations, the Debtors provide on-site access to health centers and fitness centers.

- Travel Well Program: The Debtors provide pre-departure health and security information for Employees traveling for business purposes and provide expert assistance with health and security emergencies during international travel whether for business or pleasure.

109.    By this Motion, the Debtors seek authority, in their sole discretion to continue to

provide the Additional Employee Benefits in accordance with prior policy, and to make any

payments due and owing under the Additional Employee Benefits, including any that accrued

prepetition.

## Relief Requested

110.    By this Motion, the Debtors seek authority in their sole discretion, to: (a) pay prepetition claims and obligations related to the employee Wages and Benefits described herein; (b) reimburse employees for unpaid expenses incurred prepetition; and (c) continue their Wage and Benefit plans for Employees or change their plans or policies regarding wages, salaries, benefits and/or reimbursable expenses, if they deem it necessary and appropriate, without obtaining further approval of the Court; and granting them such other and further relief as the Court deems just and proper.

## Basis for Relief

**A.      Sufficient Cause Exists for the Court to Authorize the Debtors to Honor Wage and Benefit Obligations**

111.    The Debtors seek an order granting the relief sought in this Motion pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."   In addition, Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing.  Courts have applied section 105(a) of the Bankruptcy Code in authorizing debtors to pay prepetition wages, salaries and benefits to the extent it is necessary to preserve a debtor's business.  See, e.g., Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 287 (S.D.N.Y. 1987) (affirming a bankruptcy court order authorizing the debtor to pay prepetition wages, salaries and various employee benefits); In re Ionosphere Clubs, Inc., 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989) (authorizing debtor to pay employee's prepetition wages, salaries, business expense claims and benefits).  Specifically, this Court may use its power under

section 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").

112.    The "doctrine of necessity" or the "necessity of payment" rule originated in railway cases and was first articulated by the United States Supreme Court in Miltenberger v. Logansport, C. & S. W. R. Co., 106 U.S. 286 (1882). The doctrine was expanded to non-railroad debtors in the mid-century. See Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in hotel reorganization case, that the court was not "helpless" to apply the rule to supply creditors of non-railroad debtors where alternative was cessation of operations).

113.    The Third Circuit recognized the "necessity of payment" doctrine in In re Lehigh & New England Railway Co., 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. Id. (stating courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); see also In re Penn Cent. Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims . . . have been paid"); In re Just for Feet, Inc., 242 B.R. 821, 824-26 (D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).[7]

---

[7]    Additionally, the Bankruptcy Code contemplates prepetition payments in some circumstances. Section 549(a), which deals with postpetition transfers, provides that "the trustee may avoid a transfer of property of the estate . . . that occurs after the commencement of the case . . . that is not authorized . . . by the court." 11 U.S.C. § 549(a). Thus, by necessary implication, a bankruptcy court may authorize limited postpetition payments to satisfy prepetition obligations. See In re Isis Foods, Inc., 37 B.R. 334, 336 n.3 (W.D. Mo. 1984) (noting that "proposed transfers [to pay prepetition claims may] be presented in advance to a bankruptcy court for its approval and would

114.    Today, the rationale for the necessity of payment rule -- the rehabilitation of a

debtor in reorganization cases -- is "the paramount policy and goal of Chapter 11." In re

Ionosphere Clubs, 98 B.R. at 176; see also Burchinal v. Cent. Wash. Bank (In re Adams Apple,

Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of

pre-petition debts when necessary for rehabilitation" is appropriate); In re Just for Feet, 242 B.R.

at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the

survival of the debtor during the chapter 11 reorganization"); In re Quality Interiors, Inc., 127

B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition

claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy

Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment

of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to

reorganize without such payment."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr.

S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as

"necessary to avert a serious threat to the Chapter 11 process"); Mich. Bureau of Workers'

Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 287 (S.D.N.Y.

1987) (authorizing payment of prepetition worker's compensation claims on grounds that the

fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a

flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment

of creditors in full or at least proportionately"); 3 Collier on Bankruptcy § 105.04[5][a] (15th ed.

rev. 2004) (discussing cases in which courts have relied on the "doctrine of necessity" or the

"necessity of payment" rule to pay prepetition claims immediately).

---

thereafter be insulated from attack" under section 549(a); see also 11 U.S.C. § 363(b)(1) (allowing the trustee, after
notice and hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate").

115.    Courts also have permitted postpetition payment of prepetition claims pursuant to

section 105(a) of the Bankruptcy Code in other situations, such as if nonpayment of a prepetition

obligation would trigger a withholding of goods or services essential to the debtors' business

reorganization plan.  See In re UNR Indus., Inc., 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992)

(permitting debtor to pay prepetition claims of suppliers or employees whose continued

cooperation is essential to the debtors' successful reorganization); In re Ionosphere Clubs, 98

B.R. at 175-77 (finding that section 105 empowers bankruptcy courts to authorize payment of

prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

116.    This flexible approach is particularly critical where a prepetition creditor provides

vital goods or services to a debtor that would be unavailable if the Debtor did not satisfy its

prepetition obligations.  In In re Structurlite Plastics Corp., 86 B.R. 922 (Bankr. S.D. Ohio 1988),

the bankruptcy court stated it "may exercise its equity powers under § 105(a) [of the Bankruptcy

Code] to authorize payment of pre-petition claims where such payment is necessary to 'permit

the greatest likelihood of survival of the debtor and payment of creditors in full or at least

proportionately.'" Id. at 931 (citing In re Chateaugay, 80 B.R. at 287).  The court explained that

"a per se rule proscribing the payment of pre-petition indebtedness may well be too inflexible to

permit the effectuation of the rehabilitative purposes of the Code." Id. at 932.

117.    This Court and others have routinely authorized debtors to pay the prepetition

claims of employees for wages, salaries, expenses and benefits on the grounds that the payment

of such claims was necessary to effectuate a successful reorganization of a debtor's business.

See, e.g., In re Hilex Poly Co., Case No. 08-10890 (KJC) (Bankr. D. Del. May 7, 2008); In re

Lillian Vernon Corp., Case No. 08-10323 (BLS) (Bankr. D. Del. Feb. 21, 2008); In re Sharper

Image Corp., Case No. 08-10322 (KG) (Bankr. D. Del. Feb. 21, 2008); In re Buffets Holdings,

42

Inc., Case No. 08-10141 (MFW) (Bankr. D. Del. Jan. 23, 2008); In re Dura Auto. Sys., Inc., Case

No. 06-11202 (KJC) (Bankr. D. Del. Nov. 21, 2006); see also In re Bally Total Fitness of Greater

N.Y., Inc., Case No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 1, 2007); In re Dana Corp., Case

No. 06-10354 (BRL) (Bankr. S.D.N.Y. Mar. 3, 2006); In re Calpine Corp., Case No. 05-60200

(BRL) (Bankr. S.D.N.Y. Dec. 21, 2005); In re Delphi Corp., Case No. 05-44481 (RDD) (Bankr.

S.D.N.Y. Oct. 13, 2005).

118.    The "fundamental purpose of reorganization is to prevent the debtor from going

into liquidation, with an attendant loss of jobs . . . ." NLRB v. Bildisco & Bildisco, 465 U.S.

513, 528 (1984).  Payment of the amounts requested in the Motion and granting the Debtors

authority, in their discretion, to continue or change their wage and benefit plans as they deem

necessary during the course of these cases is in the interest of all parties.  Such relief will allow

the Debtors to continue to operate with minimal disruption and enable them to stabilize their

business, thereby bolstering the Debtors' ability to reorganize and avoid liquidation of the estate.

See In re Lehigh & New England Ry., 657 F.2d at 581.

119.    Additionally, the Debtors believe that to the extent they do not exceed the

statutory maximum of $10,950 per employee,[8] the Wages and Benefits to be paid pursuant to this

Motion are entitled to priority status under sections 507(a)(4) and 507(a)(5) of the Bankruptcy

Code.  Under section 507(a)(4) of the Bankruptcy Code, each Employee may be granted a

priority claim for:

> allowed unsecured claims, but only to the extent of $10,950 for each individual or
> corporation, as the case may be, earned within 180 days before the date of the
> filing of the petition or the date of cessation of the debtor's business, whichever
> occurs first, for --

---

[8]    The Debtors believe that there are certain of the U.S. Sales Employees who have Unpaid Compensation
exceeding $10,950 because their unpaid amounts under the Sales Incentive Plan were not entirely calculable as of
the Petition Date.  In addition, certain Employee may have claims exceeding $10,950 as a result of Reimbursable
Expenses incurred but not yet processed and paid.

> (A)     wages, salaries or commissions, including vacation, severance, and sick leave pay earned by an individual; or
>
> (B)     sales commissions earned by an individual or by a corporation with only 1 employee, acting as an independent contractor in the sale of goods or services for the debtor in the ordinary course of the debtor's business if, and only if, during the 12 months preceding that date, at least 75 percent of the amount that the individual or corporation earned by acting as an independent contractor in the sale of goods or services was earned from the debtor.

11 U.S.C. § 507(a)(4).  Likewise under section 507(a)(5) of the Bankruptcy Code, each

Employee may be granted a priority claim for:

> contributions to an employee benefit plan --
>
> (A)     arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
>
> (B)     for each such plan, to the extent of --
>
>> (i)     the number of employees covered by each such plan multiplied by $10,950; less
>>
>> (ii)    the aggregate amount paid to such employees under paragraph (4) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

11 U.S.C. § 507(a)(5).  Thus, the Debtors would likely have to pay these claims in full to exit

from chapter 11 through a confirmed plan of reorganization in any event.  See 11 U.S.C. §

1129(a)(9)(B) (requiring the payment of certain allowed unsecured claims for wages, salaries

and commissions and certain allowed unsecured claims for contributions to an employee benefit

plan).  Therefore, to the extent they constitute priority claims, allowing the Debtors to pay these

claims now would actually only affect the timing, and not the amount, of the payment of

employee claims.

120.   Notwithstanding the $10,950 limitation placed upon such priority claims, the

Debtors, for the foregoing reasons, should be permitted to pay all Unpaid Compensation,

including that which may be in excess of the priority amount, if any, and hereby requests

authority to pay such amounts in the ordinary course of the Debtors' businesses.

121.   As part of the relief requested herein, the Debtors seek authority to pay to the

appropriate entities the Employee Deductions and Payroll Taxes.  These amounts principally

represent Employee earnings that governments, Employees and judicial authorities have

designated for deduction from Employees' paychecks.  The Debtors believe that such amounts

are not property of the Debtors' estates under section 541 of the Bankruptcy Code, and,

therefore, such funds are not available for general distribution to a debtor's creditors.  See 11

U.S.C. § 541(b)(7) (2007) (amounts withheld from employee paychecks by employer for

contribution to employee benefit plan are not property of the estate).

122.   Section 541(d) of the Bankruptcy Code provides the "[p]roperty in which the

debtor holds, as of the commencement of the case, only legal title and not an equitable interest"

becomes property of the debtor's estate only to the extent of the debtor's legal title therein.  11

U.S.C. § 541(d) (2007).  It is well established in this District that "property a debtor holds in trust

for another is not property of the estate" within the meaning of section 541 of the Bankruptcy

Code.  See Golden v. The Guardian (In re Lenox Healthcare, Inc.), 343 B.R. 96, 100 (Bankr. D.

Del. 2006); see also In re Columbia Gas Sys., Inc., 997 F.2d 1039, 1059 (3d Cir. 1993)

(concluding that property which a debtor holds in trust – either express or constructive – for

another does not become property of the estate when the debtor files for bankruptcy, and stating

that "Congress clearly intended the exclusion created by section 541(d) to include not only funds

held in express trust, but also funds held in constructive trust."); EBS Pension L.L.C. v. Edison Bros. Stores, Inc. (In re Edison Bros., Inc.), 243 B.R. 231 (Bankr. D. Del. 2000) (same).

123.    More specifically, it is well established under section 541(d) of the Bankruptcy Code that taxes collected on behalf of taxing authorities are not property of the estate. See Beiger v. I.R.S., 496 U.S. 53, 67 (1990) (holding that taxes such as excise taxes, FICA taxes and withholding taxes are property held by the debtor in trust for another and, as such, do not constitute property of the estate); City of Farrell v. Sharon Steel Corp. (In re Sharon Steel Corp.), 41 F.3d 92, 98-103 (3d Cir. 1994) (finding that funds withheld from employees' paychecks may be subject to a trust, and thus are not property of a debtor's estate, even where such funds were commingled with the debtor's other property). Accordingly, such funds are not available for general distribution to a debtor's creditors.

124.    Moreover, the Debtors and their officers are required by federal or state laws to make certain tax payments that have been withheld from their Employees' paychecks. 26 U.S.C. §§ 6672 and 7501(a) (2007); see also Sharon Steel Corp., 41 F.3d at 95-97 (state law requiring debtor to withhold city income tax from its employees' wages created trust relationship between debtor and city for payment of withheld income taxes); DuCharmes & Co., Inc. v. Michigan (In re DuCharmes & Co.), 852 F.2d 194, 196 (6th Cir. 1988) (noting individual officers of a company may be held personally liable for failure to pay trust fund taxes).

**B.    Irreparable Harm Would Occur if Immediate Relief is not Granted**

125.    Bankruptcy Rule 6003 provides in pertinent part that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition, grant relief regarding the following: . . . (b) . . . a motion to pay all or part of a claim that arose before the filing of the petition." Fed. R. Bankr. P. 6003(b).

126.     Employees are important in any business.  However, in an organization such as Nortel, a global technology business driven by cutting edge R&D, sophisticated service and support and long-term customer and supplier relationships, employees are, in many cases, irreplaceable.  Indeed, the Debtors believe that, without the requested relief, certain Employees would seek alternative employment opportunities, including with the Debtors' competitors.  Such a development would have an immediate and substantial impact on the Debtors' workforce, hindering the Debtors' ability to meet their ongoing customer obligations and likely diminishing stakeholder confidence in the Debtors' ability to successfully reorganize.  The loss of valuable Employees and resulting recruitment of new employees that would be necessary to find replacements would be distracting and costly at this critical time as the Debtors stabilize operations and formulate a comprehensive plan to maximize value for all stakeholders.  Further, if the Debtors lose valuable Employees, they will incur recruiting expenses in locating replacement employees if, under the Debtors' circumstances, replacement employees could be recruited at all.

127.     This Court and others have recognized that the potential loss of critical employees, the lapse in benefit coverage and the financial hardship imposed on employees that would certainly result if relief requested by this Motion were not granted poses a threat of immediate and irreparable harm to the debtor's business.  See, e.g., In re Tribune Co., No. 08-13141 (KJC) (Bankr. D. Del. Dec. 10, 2008); In re Lillian Vernon Corp., Case No. 08-10323 (BLS) (Bankr. D. Del. Feb. 21, 2008); In re Answer Fin., Inc., Case No. 08-10140 (MFW) (Bankr. D. Del. Jan. 23, 2008); In re Sharper Image Corp., Case No. 08-10322 (KG) (Bankr. D. Del. Feb. 20, 2008); In re Buffets Holdings, Inc., Case No. 08-10141 (MFW) (Bankr. D. Del.

Jan. 23, 2008); In re Quebecor World (USA) Inc., Case No. 08-10152 (JMP) (Bankr. S.D.N.Y.

Jan. 23, 2008 (interim order), Mar. 24, 2008) (final order)).

128.    In light of the foregoing, the Debtors respectfully submit that obtaining the

authority to pay prepetition claims and obligations related to the employee Wages and Benefits is

essential for the Debtors' reorganization and is in the best interests of the Debtors' estates and

their creditors.

129.    In addition, by this Motion, the Debtors request that their banks and financial

institutions be authorized and directed, when requested by the Debtors in the Debtors' sole

discretion, to honor and pay checks or requests for funds transfers arising out of the prepetition

claims and obligations related to the employee Wages and Benefits.  The Debtors represent that

these payments can be readily identified as relating directly to the authorized payment of these

obligations, and that, accordingly, payments for prepetition obligations other than those

addressed herein or in another order of this Court will not be honored inadvertently.

130.    Nothing contained herein is intended or should be construed as:  (a) an admission

as to the validity or priority of any claim against the Debtors; (b) a waiver of the Debtors' rights

to dispute any claims or assert any counterclaims or affirmative defenses; (c) a promise to pay

any claim; (d) an implication or admission that any particular claim would constitute a claim or

obligation related to the employee Wages and Benefits; or (e) an approval or assumption of any

agreement, contract or lease, pursuant to section 365 of the Bankruptcy Code.

## Request for Waiver of Stay

131.    The Debtors further seek a waiver of any stay of the effectiveness of the order

approving this Motion.  Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order

authorizing the use, sale, or lease of property other than cash collateral is stayed until the

expiration of 10 days after entry of the order, unless the court orders otherwise." As set forth

above, the immediate performance of the obligations related to the Employees' Wages and Benefits is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the ten-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## Notice

132.    Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to the (i) Office of the United States Trustee for the District of Delaware; (ii) the trustee under that certain indenture dated as of July 5, 2006, as supplemented, with respect to the floating rate senior notes due 2011, the 10.125% Senior Notes due 2013, and the 10.75% Senior Notes due 2016; (iii) the trustee under that certain indenture dated as of February 15, 1996, with respect to the 7.875% Senior Notes due 2026; (iv) the trustee under that certain indenture dated as of March 28, 2007, with respect to the 1.75% Convertible Senior Notes due 2012 and the 2.125% Convertible Senior Notes due 2014; (v) holders of the forty (40) largest unsecured claims on a consolidated basis against the Debtors; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service; and (viii) the United States Department of Justice. In light of the exigencies of the circumstances and the potential harm to the Debtors, their estates, and other parties in interest that will ensue if the relief requested herein is not granted, the Debtors submit that no other notice need be given.

## No Prior Request

133.    No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit A, authorizing, but not directing, the Debtors to (a) pay prepetition claims and obligations related to employee Wages and Benefits described herein; (b) reimburse Employees for unpaid expenses incurred prepetition; and (c) continue their Wage and Benefit plans for Employees or to change their plans or policies regarding wages, salaries, benefits, and/or reimbursable expenses in the ordinary course of business without obtaining further approval of the Court; and granting them such other and further relief as the Court deems just and proper.

Dated: January 14, 2009
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (No. 5125)
Lisa M. Schweitzer (No. 1033)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Thomas F. Driscoll III (No. 4703)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Phone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Proposed Counsel for the Debtors
and Debtors in Possession*