## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
:
*In re*                                              :     Chapter 11
:
Nortel Networks Inc., *et al.*,[1]                   :     Case No. 09-10138 (KG)
:
                  Debtors.    :     Joint Administration Pending
:
-------------------------------------------------------X

### DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO (I) HONOR PREPETITION OBLIGATIONS TO THEIR CUSTOMERS AND (II) CONTINUE CUSTOMER PROGRAMS

Nortel Networks Inc. ("NNI") and its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 1015(b), 6003(b) and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (a) authorizing the Debtors, in their sole discretion, to honor and perform prepetition obligations to their customers (the "Customer Obligations"); (b) continue their customer programs in the ordinary course of business and (c) granting related relief. In support of this Motion, the Debtors rely on the Declaration of John Doolittle in Support of First Day Motions and Applications (the "First Day Declaration"). In further support of this Motion, the Debtors respectfully represent as follows:

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of

the Debtors' chapter 11 cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections §§ 105(a) and

363(b) of chapter 11 of title 11 of the Bankruptcy Code.

## Background

### A.      Introduction

3.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for

relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee,

examiner or official committee of unsecured creditors has been appointed in the Debtors' cases.

5.      On the date hereof, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[2] will file an application with the

Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors

Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the

"Canadian Proceedings"). The Canadian Debtors will continue to manage their properties and

operate their businesses under the supervision of the Canadian Court. Ernst & Young Inc., as

foreign representative for the Canadian Debtors, will file petitions for recognition of the

---

[2]      The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

Certain of Nortel's European subsidiaries will make consequential filings for creditor protection.

6.      Simultaneously with the filing of this Motion, the Debtors have sought an order of

joint administration pursuant to Rule 1015(b) of the Bankruptcy Rules that would provide for the

joint administration of these cases and for consolidation for procedural purposes only.

**B.      Debtors' Corporate Structure and Businesses**

7.      A description of the Debtors' corporate structure and businesses and the events

leading to the chapter 11 cases are set forth in the First Day Declaration.[3]

<u>**Facts Relevant to this Motion**</u>

**A.      Nortel's Customer Services**

8.      In the ordinary course of their businesses, the Debtors provide

telecommunications and networking equipment, capacity and capability to private and public

service providers and corporate customers around the world.  As a whole, Nortel, including the

Debtors and their affiliates, count among their customers 85% of the world's top revenue-

generating wireless operators globally.  In addition, Nortel has designed, installed and launched

hundreds of wired and wireless networks in over 50 countries and continues to provide a wide

range of network management services to hundreds of customers around the world.

9.      The Debtors' telecommunications solutions include a comprehensive spectrum of

networking products and services, from initial infrastructure engineering, planning and

deployment to the sale of hardware and software products and services designed to reduce

complexity, improve efficiency and increase productivity for a diverse base of customers and

end-users (collectively, the "<u>Customers</u>").  The Customers rely on the Debtors for an array of

---

[3]      Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

mission critical services related their networks, including maintenance and technical support,

repair and spares management,[4] network managed services, network hosting services,

applications services and related engineering, marketing, sales, supply, licensing and installation.

10.    In carrying out these activities, the Debtors rely on numerous suppliers, vendors,

partners and strategic relationships, including numerous contract manufacturers responsible for

the manufacturing of Nortel hardware and technology, the crafting and creation of solutions and

the various materials necessary for the Debtors to provide their offerings to the Customers.  In

addition, the Debtors have established strategic partnerships with a number of industry leaders

that are critical in providing the technology and operations capability that the Debtors need to

carry on their businesses and ensure that the Customers' networks continue to operate.

11.    The Debtors maintain numerous customer programs (the "Customer Programs")

that are critical to their past and future success and that they wish to continue postpetition.  The

Customer Programs are aimed at the Debtors' product and services distribution network which

includes accredited resellers, distributors, value-added dealers and other strategic partners

engaged in the sales and marketing of the Debtors' products and services to end-users.  The total

cost to the Debtors and the Canadian Debtors of carrying out the Customer Programs in 2008

was approximately $249 million.  Among these Customer Programs are:

> a.    Volume Incentive Discount Program (the "VID Program"):  The
> VID Program provides discounts to accredited resellers and strategic
> partners who act as resellers of the Debtors' products and services.  The
> VID Program discount amount is based on an individual reseller's or
> partner's revenue performance in the previous year.  Maintaining the VID
> Program is critical to ensuring that the Debtors' most successful partners
> remain loyal to the Debtors through this difficult time by providing them
> with the rewards for past performance that they have been promised.  The

---

[4]    "Spares management" is a term of art that refers to an end-to-end service offering that includes a number of
functions such as spare parts inventory management (warehousing of the parts), associated logistics (collection of
defective parts and delivery of replacements) and installation of replacement parts into the network.

Debtors estimate that maintaining the VID Program in 2008 cost the
Debtors and the Canadian Debtors approximately $116 million;

b.      Marketing Efforts (the "Marketing Programs"):  The Marketing
Programs include efforts undertaken by the Debtors themselves and in
conjunction with accredited resellers and strategic partners to advertise,
promote and demonstrate the benefits of the Debtors' products and
services to their end-user customers.  The Marketing Programs involve a
series of offers, incentives, discounts, rebates, communications, and
training to partners acting as resellers, distributors as well as end-user
customers.  The Marketing Programs are primarily designed to expand the
Nortel customer base and increase sales.  Continuation of the Marketing
Programs is essential if the Debtors are to remain competitive in the global
marketplace.  The Debtors estimate that maintaining the Marketing
Programs in 2008 cost the Debtors and the Canadian Debtors
approximately $83 million;

c.      Cooperative Partner Programs (the "Partner Programs"):  The
Partner Programs provide cash incentives to the Debtors' most valued
accredited resellers and strategic partners for their undertaking ongoing
efforts to support, market and sell the Debtors' products and services
alongside their own on the Debtors' behalf.  The Debtors have developed
three tiers of accredited resellers and partners as determined by volume
performance, portfolio breadth and service commitment:  Advantage
Partners, Premium Advantage Partners and Elite Advantage Partners.
Participants in the Partner Programs include some of the most
recognizable and powerful names in the telecommunications and
networking industry including IBM, Dell, Verizon and Bell Canada,
among others.  Without the continued support of these partners, the
Debtors' ability to restructure their businesses will be severely hindered.
The Debtors estimate that maintaining the Partner Programs in 2008 cost
the Debtors and the Canadian Debtors approximately $12 million; and

d.      Value-Added Dealers Program (the "VAD Program"):  The VAD
Program provides discounts and rebates to the most valued and successful
accredited distributors and dealers of Nortel products.  The VAD Program
includes a series of up-front discounts and back-end rebates based on the
achievement of performance metrics as well as discounts for early
payment.  The continuation of the VAD Program will ensure that the
Debtors' products and services reach end-customers and are delivered,
implemented and maintained in an orderly and efficient manner.  The
Debtors estimate that maintaining the VAD Program in 2008 cost the
Debtors and the Canadian Debtors approximately $38 million.

**B.    Nortel's Supply Chain**[5]

12.    Nortel's supply chain configuration for hardware consists of three key supply chain steps:  (a) contract manufacturers or electronics manufacturing service providers, which provide final assembly and value-add for test, configuration and total end-to-end supply chain management; (b) OEM Tier II Suppliers, which supply products that may be embedded into Nortel's final product or sold "bundled" with such product; and (c) Tier II Component Suppliers, which provide piece parts for Nortel's hardware products.

13.    Since 2006, Nortel has outsourced substantially all of its hardware manufacturing and related activities, including certain product integration, testing, repair operations, supply chain management, third party logistics operations and design assets.  Flextronics Telecom Systems Ltd. (together with its affiliates and subsidiaries, "Flextronics") is currently Nortel's single largest supplier.  For 2008, Nortel estimates that Flextronics will have supplied approximately 75% of Nortel's products and provided logistics and maintenance with those products.

**Relief Requested**

14.    By this Motion, the Debtors seek an order authorizing them to honor their prepetition Customer Obligations.  The Debtors do not seek relief at this time with respect to their suppliers because they intend to coordinate an approach with respect to their suppliers in conjunction with the Canadian Proceedings, given the substantial overlap of supplier relationships among the U.S. Debtors and Canadian Debtors.  In the meantime, however, it is critical that the Debtors be permitted to continue to honor their prepetition obligations with respect to the Customers and continue the Customer Programs without disruption.  Most, if not

---

[5]    Although this Motion seeks relief only with respect to Customer Obligations, the Debtors include a description of Nortel's supply chain to provide the Court with an understanding of Nortel's businesses on both the supplier and customer sides.

all, of the Customers have the right to reduce the amount of products purchased from the Debtors pursuant to their supply agreements, which in most cases do not provide for minimum purchase obligations.

15.    As of the Petition Date, some of the Debtors' most valued Customers, who operate complex and important networks that depend on the Debtors' continued support, have outstanding claims against the Debtors for goods and services for which they have already paid. Given the critical nature of the Debtors' continued support required to ensure network operational readiness, failure to honor prepetition obligations to such Customers creates a significant risk to these customer relationships.  Thus, the Debtors anticipate that honoring prepetition obligations to these Customers, including through the Customer Programs, will benefit all creditors because honoring these obligations will allow the Debtors' businesses to avoid the loss of critical Customers, the costs of which far outweigh the costs of honoring these obligations.

16.    Accordingly, the Debtors request that the Court grant the Debtors the authority, in their sole discretion, to honor the prepetition obligations to the Customers and continue the Customer Programs.

### Basis for Relief

**A.    The Relief Requested Is Supported by Section 105(a) of the Bankruptcy Code and the "Doctrine of Necessity"**

17.    As a consequence of the filing of these chapter 11 cases, Customers will be concerned that the goods and/or services ordered and paid for prior to the Petition Date, which will be delivered or provided by the Debtors after the Petition Date, will not be delivered or provided.  Similarly, the Debtors' failure to honor their Customer Obligations, including through the Customer Programs, will severely, and perhaps irreparably, impair the Debtors' customer

relations at a time when the loyalty and support of their Customers is extremely critical. The

failure to deliver goods and services for which the Debtors have already received payment could

effectively destroy the Debtors' relationship with their Customers. This, in turn, will disrupt the

Debtors' businesses by requiring them to establish new customer relationships, which would

reduce the Debtors' revenue in a very difficult economic environment. By contrast, honoring

these prepetition obligations will require a limited and reasonable expenditure of estate funds and

will assist the Debtors in preserving their key customer relationships to the benefit of all

stakeholders.

       18.    The Debtors submit that the relief requested is reasonable and necessary under the

circumstances and justified by applicable law. Section 363(b)(1) of the Bankruptcy Code

provides that, after notice and a hearing, the trustee "may use, sell, or lease, other than in the

ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). The Court may

authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of

the Bankruptcy Code. Section 105(a), which codifies the inherent equitable powers of the

bankruptcy court, empowers the court to "issue any order, process, or judgment that is necessary

or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a)

of the Bankruptcy Code, courts may permit pre-plan payments of prepetition obligations when

essential to the continued operation of the debtor's business. Specifically, this Court may use its

power under section 105(a) to authorize payment of prepetition obligations pursuant to the

"necessity of payment" rule (also referred to as the "doctrine of necessity").

       19.    The "doctrine of necessity" or the "necessity of payment" rule originated in

railway cases and was first articulated by the United States Supreme Court in Miltenberger v.

Logansport, C. & S. W. R. Co., 106 U.S. 286 (1882). The doctrine was expanded to non-railroad

debtors in the mid-century.  See Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in

hotel reorganization case, that the court was not "helpless" to apply the rule to supply creditors

of non-railroad debtors where alternative was cessation of operations).

20.    The Third Circuit recognized the "necessity of payment" doctrine in In re Lehigh

& New England Railway Co., 657 F.2d 570, 581 (3d Cir. 1981).  The Third Circuit held that a

court could authorize the payment of prepetition claims if such payment was essential to the

continued operation of the debtor.  Id. (stating courts may authorize payment of prepetition

claims when there "is the possibility that the creditor will employ an immediate economic

sanction, failing such payment"); see also In re Penn Cent. Transp. Co., 467 F.2d 100, 102 n.1

(3d Cir. 1972) (holding necessity of payment doctrine permits "immediate payment of claims of

creditors where those creditors will not supply services or material essential to the conduct of the

business until their pre-reorganization claims . . . have been paid"); In re Just for Feet, Inc., 242

B.R. 821, 824-26 (D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition

claims that are essential to continued operation of business); In re Columbia Gas Sys., Inc., 171

B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).[6]

21.    Today, the rationale for the necessity of payment rule -- the rehabilitation of a

debtor in reorganization cases -- is "the paramount policy and goal of Chapter 11."  In re

Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); see also Burchinal v. Cent.

Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that

---

[6]      Additionally, the Bankruptcy Code contemplates prepetition payments in some circumstances.  Section
549(a), which deals with postpetition transfers, provides that "the trustee may avoid a transfer of property of the
estate . . . that occurs after the commencement of the case . . . that is not authorized . . . by the court."  11 U.S.C. §
549(a).  Thus, by necessary implication, a bankruptcy court may authorize limited postpetition payments to satisfy
prepetition obligations.  See In re Isis Foods, Inc., 37 B.R. 334, 336 n.3 (W.D. Mo. 1984) (noting that "proposed
transfers [to pay prepetition claims may] be presented in advance to a bankruptcy court for its approval and would
thereafter be insulated from attack" under section 549(a); see also 11 U.S.C. § 363(b)(1) (allowing the trustee, after
notice and hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate").

allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation" is appropriate); In re Just for Feet, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); 3 Collier on Bankruptcy § 105.04[5][a] (15th ed. rev. 2004) (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

22.    Courts also have permitted postpetition payment of prepetition claims pursuant to section 105(a) of the Bankruptcy Code in other situations, such as if nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan. See In re UNR Indus., Inc., 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting debtor to pay prepetition claims of suppliers or employees whose continued

cooperation is essential to the debtors' successful reorganization); In re Ionosphere Clubs, 98

B.R. at 175-77 (finding that section 105 empowers bankruptcy courts to authorize payment of

prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

23.    This flexible approach is particularly critical where a prepetition creditor provides

vital goods or services to a debtor that would be unavailable if the Debtor did not satisfy its

prepetition obligations.  In In re Structurlite Plastics Corp., 86 B.R. 922 (Bankr. S.D. Ohio 1988),

the bankruptcy court stated it "may exercise its equity powers under § 105(a) [of the Bankruptcy

Code] to authorize payment of pre-petition claims where such payment is necessary to 'permit

the greatest likelihood of survival of the debtor and payment of creditors in full or at least

proportionately.'" Id. at 931 (citing In re Chateaugay, 80 B.R. at 287).  The court explained that

"a per se rule proscribing the payment of pre-petition indebtedness may well be too inflexible to

permit the effectuation of the rehabilitative purposes of the Code." Id. at 932.

24.    The Debtors' request for authority to fulfill their prepetition Customer Obligations

and honor their Customer Obligations postpetition has been granted in numerous other chapter

11 cases in this District and elsewhere.  See, e.g., In re Tribune Co., 08-13141 (KJC) (Bankr. D.

Del. Dec. 10, 2008); In re Hilex Poly Co., Case No. 08-10890 (KJC) (Bankr. D. Del. May 7,

2008); In re Linens Holdings Co., Case No. 08-10832 (CSS) (Bankr. D. Del. May 2, 2008); In re

Buffets Holdings, Inc., Case No. 08-10141 (MFW) (Bankr. D. Del. Jan. 23, 2008); In re Remy

Worldwide Holdings, Inc., Case No. 07-11481 (KJC) (Bankr. D. Del. May 23, 2007); In re

Holliston Mills, Inc., Case No. 07-10687 (MFW) (Bankr. D. Del. May 23, 2007); In re Pliant

Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. Jan. 4, 2006); see also In re Bally Total

Fitness of Greater N.Y., Inc., No. 08-14818 (BRL) (Bankr. S.D.N.Y. Dec. 5, 2008); In re Stone

Barn Manhattan, LLC, No. 08-12579 (ALG) (Bankr. S.D.N.Y. July 29, 2008); In re Quebecor

World (USA), Inc., No. 08-10152 (JMP) (Bankr. S.D.N.Y. Jan. 23, 2008).

25.    The Debtors further represent that they anticipate access to sufficient working

capital to pay and/or honor all Customer Obligations, including through the Customer Programs,

in the ordinary course of business.

26.    In addition, by this Motion, the Debtors request that their banks and financial

institutions be authorized and directed, when requested by the Debtors in the Debtors' sole

discretion, to honor and paychecks or requests for funds transfers arising out of the Debtors'

Customer Obligations.  The Debtors represent that these payments can be readily identified as

relating directly to the authorized payment of these obligations, and that, accordingly, payments

for prepetition obligations other than those addressed herein or in another order of this Court will

not be honored inadvertently.

27.    In light of the foregoing, the Debtors respectfully submit that obtaining the

authority to honor all Customer Obligations is essential for the Debtors' reorganization and is in

the best interests of the Debtors' estates and creditors.

28.    Nothing contained herein is intended or should be construed as:  (a) an admission

as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute

any claim on any grounds; (c) a promise to pay any claim; (d) an implication or admission that

any particular claim would constitute a Customer Obligation; or (e) a request to assume any

executory contract or unexpired lease, pursuant to section 365 of the Bankruptcy Code.

29.    Bankruptcy Rule 6003(b) provides that "[e]xcept to the extent that relief is

necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the

filing of the petition, grant relief regarding . . . a motion to use, lease or otherwise incur an

obligations regarding property of the estate, including a motion to pay all or part of a claim that

arose before filing of the petition . . . ." As set forth above, the Debtors submit that because the

relief requested in this Motion is necessary to avoid immediate and irreparable harm to the

Debtors for the reasons set forth herein, Bankruptcy Rule 6003(b) has been satisfied.

### Request for Waiver of Stay

30.     The Debtors further seek a waiver of any stay of the effectiveness of the order

approving this Motion.  Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order

authorizing the use, sale, or lease of property other than cash collateral is stayed until the

expiration of 10 days after entry of the order, unless the court orders otherwise." As set forth

above, the immediate performance of the Customer Obligations is essential to prevent potentially

irreparable damage to the Debtors' operations, value and ability to reorganize.  Accordingly, the

Debtors submit that ample cause exists to justify a waiver of the ten-day stay imposed by

Bankruptcy Rule 6004(h), to the extent that it applies.

### Notice

31.     Notice of the Motion has been given via facsimile, electronic transmission, hand

delivery or overnight mail to the (i) Office of the United States Trustee for the District of

Delaware; (ii) the trustee under that certain indenture dated as of July 5, 2006, as supplemented,

with respect to the floating rate senior notes due 2011, the 10.125% Senior Notes due 2013, and

the 10.75% Senior Notes due 2016; (iii) the trustee under that certain indenture dated as of

February 15, 1996, with respect to the 7.875% Senior Notes due 2026; (iv) the trustee under that

certain indenture dated as of March 28, 2007, with respect to the 1.75% Convertible Senior

Notes due 2012 and the 2.125% Convertible Senior Notes due 2014; (v) holders of the forty (40)

largest unsecured claims on a consolidated basis against the Debtors; (vi) the Securities and

Exchange Commission; (vii) the Internal Revenue Service; and (viii) the United States

Department of Justice.  In light of the exigencies of the circumstances and the potential harm to

the Debtors, their estates, and other parties in interest that will ensue if the relief requested herein

is not granted, the Debtors submit that no other notice need be given.

### No Prior Request

32.    No prior request for the relief requested herein has been made to this or any other

court.

WHEREFORE, the Debtors respectfully request that this Court (a) grant this Motion and

the relief requested herein; (b) enter the proposed order attached hereto; and (c) grant such other

and further relief as it deems just and proper.

Dated:  January 14, 2009
        Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (No. 5125)
Lisa M. Schweitzer (No.1033)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Thomas F. Driscoll III (No. 4703)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Phone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Proposed Counsel for the Debtors
and Debtors in Possession*

2665161.1

14