# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------X
                                                 :
In re                                            :    Chapter 11
                                                 :
Nortel Networks Inc., et al.,[1]                 :    Case No. 09-10138 (KG)
                                                 :
                    Debtors.                     :    Joint Administration Pending
                                                 :
-------------------------------------------------X
```

## DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b)(1) OF THE BANKRUPTCY CODE FOR AN ORDER AUTHORIZING THE DEBTORS TO PAY PREPETITION COMMON CARRIER CHARGES AND WAREHOUSE FEES

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a) and 363(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003(b) and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing the Debtors, to pay undisputed prepetiton Common Carrier Charges (as defined below) and Warehouse Fees (as defined below) in their sole discretion; (ii) authorizing and directing the banks and other financial institutions to receive, process, honor and pay checks presented for payment and electronic payment requests relating to the foregoing; and (iii) granting them such other and further relief as the Court deems just and proper.  In support of this Motion, the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).

Debtors rely on the Declaration of John Doolittle in Support of First Day Motions and Applications. In further support of this Motion, the Debtors respectfully represent as follows:

### Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 363(b)(1) of the Bankruptcy Code and Rules 6003(b) and 6004(h) of the Bankruptcy Rules.

### Background

**A.      Introduction**

3.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed in the Debtors' cases.

5.      On the date hereof, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] will file an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors will continue to manage their properties and

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

operate their businesses under the supervision of the Canadian Court. Ernst & Young Inc., as foreign representative for the Canadian Debtors, will file petitions for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. Certain of Nortel's European subsidiaries will make consequential filings for creditor protection.

6.      Simultaneously with the filing of this Motion, the Debtors have sought an order of joint administration pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that would provide for the joint administration of these cases and for consolidation for procedural purposes only.

**B.      Debtors' Corporate Structure and Business**

7.      A description of the Debtors' corporate structure and businesses and the events leading to the chapter 11 cases are set forth in the First Day Declaration.[3]

## Relief Requested

8.      By this Motion, the Debtors seek entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code and Bankruptcy Rules 6003(b) and 6004(h), (i) authorizing the Debtors to pay undisputed prepetiton Common Carrier Charges (as defined below) and Warehouse Fees (as defined below) in their sole discretion; and (ii) authorizing and directing the banks and other financial institutions to receive, process, honor and pay checks presented for payment and electronic payment requests relating to the foregoing; and (iii) granting them such other and further relief as the Court deems just and proper.

---

[3]      Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

**<u>Facts Relevant to this Motion</u>**

9.      In the ordinary course of their businesses, the Debtors provide
telecommunications and networking equipment, capacity and capability to both service provider
and enterprise customers around the world.  The networking solutions that the Debtors provide
include hardware and software products and services designed to reduce complexity, improve
efficiency and increase productivity for a diverse base of customers.

**A.      The Common Carrier Charges**

10.      To expedite the delivery of the Debtors' telecommunication and networking
hardware and software products to their customers and distributors across North America, the
Debtors employ PowerTrack as a third-party freight audit and payment manager in the ordinary
course of business.  PowerTrack audits and arranges for pass-through payment of freight
invoices.  PowerTrack reduces costs by eliminating paper invoices, auditing each invoice to
reduce payment errors, avoiding late fees and balance due invoices, and improving security to
eradicate fraud opportunities.  While PowerTrack charges the Debtors a fee for its services, the
fee is more than offset by the savings gained.

11.      Maintaining the Debtors' businesses requires the coordinated efforts of a variety
of third party common carriers (collectively, the "<u>Common Carriers</u>") who transport the Debtors'
telecommunications and networking products via truck, rail, ship and air.  In addition to delivery
charges, the Debtors' customs fees are also paid initially by the Common Carriers.  The
Common Carriers invoice the Debtors for their delivery fees and customs charges and send the
invoice to PowerTrack.  After auditing the Common Carriers' invoices, PowerTrack will,
weekly, invoice the Debtors and the Debtors will submit payments for (a) the amounts to be paid
to the Common Carriers and (b) PowerTrack's servicing fee (collectively, the "<u>Common Carrier</u>
<u>Charges</u>").  PowerTrack holds the funds for five (5) days and then issues payments to the

4

Common Carriers.  In sum, the Debtors effectuate payments to the Common Carriers through

PowerTrack, thus the Common Carriers are not paid unless PowerTrack is paid.  The delay

between the shipment of the Debtors' products and the Debtors' payment for that shipment

varies depending on each Common Carrier's payment terms.

12.     While the amount the Debtors pay to PowerTrack fluctuates, the average weekly

amount paid over the last two months was approximately $1.3 million.  The estimated value of

the goods in transit on the Petition Date is approximately $25 million.  As of the Petition Date,

the Debtors estimate that they owe PowerTrack and the Common Carriers paid through

PowerTrack approximately $2.5 million, which, absent the commencement of these chapter 11

cases, would be paid over the course of the next few weeks, depending on the terms of the

Debtors' contract with each individual Common Carrier.

13.     The Debtors are concerned that, pursuant to applicable state law, if the Common

Carrier Charges are not paid by the Debtors, the Common Carriers may have possessory liens

against the goods in their possession absent payments of the Common Carrier Charges and may

refuse to deliver the goods.  Additionally, pursuant to section 363(b)(3) of the Bankruptcy Code,

the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy

Code, is expressly excluded from the automatic stay.  11 U.S.C. § 362(b)(3).  Section

546(b)(1)(A) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession's

avoidance powers "are subject to any generally applicable law that . . . permits perfection of an

interest in property to be effective against an entity that acquires rights in such property before

the date of perfection."  11 U.S.C. § 546(b)(1)(A).  Accordingly, the Common Carriers,

notwithstanding the automatic stay imposed by section 362(a) of the Bankruptcy Code, may

(i) be entitled to assert and perfect liens against the Debtors' property, which would entitle them

to payment ahead of other general unsecured creditors and (ii) hold the property subject to the asserted liens pending payment, to the direct detriment of the Debtors, their estates, customers and other parties in interest.  In contrast, prompt and continued payment of the Common Carrier Charges promotes the uninterrupted flow of goods and the smooth continuation of the Debtors' businesses.

14.    Further, section 9-333(b) of the Uniform Commercial Code (the "UCC") grants to creditors, such as Common Carriers holding possessory liens, a priority in payment over consensual lien creditors.  Thus, under the Bankruptcy Code, as secured creditors, the Common Carriers are entitled to receive payment in full for the Common Carrier Charges pursuant to any confirmed plan(s) of reorganization in these chapter 11 cases.  Consequently, payment of such charges and fees gives the Common Carriers no more than that to which they are already entitled.  On the other hand, absent payment of the amounts owed, goods having an approximate aggregate value in excess of $25 million would likely to be retained by the Common Carriers as security for payment of approximately $2.5 million in outstanding prepetition Common Carrier claims.

15.    The Debtors also request that PowerTrack, pursuant to its contractual obligations, continue to arrange for the pass-through payment of the Debtors' freight invoices, and be directed to make such payments to the respective Common Carriers and prohibited from holding, using or setting off such payments for their own benefit.

16.    Alternatively, the Debtors request authorization to, in their sole discretion, to make payments directly to the Common Carries should the need arise.

**B.    Warehouse Fees**

17.    The Debtors also utilize a number of third party warehouse facilities (collectively, the "Warehouse Facilities") for the purpose of storing products prior to the point of sale.  The

Warehouse Facilities are located in Oklahoma, Texas, New Jersey, New York, Connecticut, Delaware, Maryland, North Carolina, Virginia, Illinois, Wisconsin, Georgia, California, Tennessee and Florida.

18.    The Debtors pay storage costs (the "Warehouse Fees") directly to the Warehouse Facilitates in exchange for their services. While the amount the Debtors pay in Warehouse Fees fluctuates, the average weekly amount paid over the last two months was approximately $500,000. The estimated value of the products currently being stored in the Warehouse Facilities as of the Petition Date is approximately $168 million. As of the Petition Date, the Debtors estimate that they owe Warehouse Fees of approximately $4 million, which, absent the commencement of these chapter 11 cases, would be paid over the course of the next few weeks, depending on the terms of the Debtors' contract with each individual Warehouse Facility.

19.    As is the case with the Common Carrier Charges, the Debtors are concerned that, pursuant to applicable state law, if the Warehouse Fees are not paid by the Debtors, the Warehouse Facilities may have possessory liens in the goods in their possession absent payments of the Warehouse Fees and may refuse to deliver the goods. As detailed above, pursuant to section 363(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay. Accordingly, the Warehouse Facilitates, notwithstanding the automatic stay, may (i) be entitled to assert and perfect liens against the Debtors' property, which would entitle them to payment ahead of other general unsecured creditors and (ii) hold the property subject to the asserted liens pending payment, to the direct detriment of the Debtors, their estates and other parties in interest. In contrast, prompt and continued payment of the Warehouse Fees promotes the uninterrupted flow of goods and the smooth continuation of the Debtors' businesses.

20.     The Debtors are similarly concerned that pursuant to section 9-333(b) of the

UCC, and as detailed above, the Warehouse Facilities have a priority in payment over consensual

lien creditors.  Thus, under the Bankruptcy Code, as secured creditors, the Warehouse Facilities

are entitled to receive payment in full for the Warehouse Fees pursuant to any confirmed plan(s)

of reorganization in these chapter 11 cases.  Consequently, payment of the Warehouse Fees gives

the Warehouse Facilities no more than that to which they are already entitled.  On the other hand,

absent payment of the amounts owed, goods having an approximate aggregate value in excess of

$168 million would likely to be retained by the Warehouse Facilities as security for payment of

approximately $4 million in outstanding prepetition Warehouse Fees.

### Basis For Relief

21.     If the Common Carrier Charges and Warehouse Fees are not paid, the Debtors

believe that the products held by the Common Carriers and Warehouse Facilities may be subject

to possessory liens under applicable law.  The Debtors' businesses are inextricably tied to their

ability to deliver telecommunications and networking equipment to their service provider and

enterprise customers and distributors across North America in a timely manner.  To this end, the

Debtors rely heavily on the Common Carriers and Warehouse Facilities to deliver and store their

products.  At this critical point in the Debtors' business operations, any interruption in the timely

delivery of products resulting from the retention of such goods by the Common Carriers and

Warehouse Facilities would immediately disrupt and irreparably harm the Debtors' businesses,

as well as harm the Debtors' long-term operations.  Moreover, the payment of charges and fees,

which may be subject to possessory liens under applicable law, is merely an issue of timing,

because the Debtors anticipate they will be able to pay their secured creditors in full.  Thus, the

interests of the Debtors and their estates will be best served by an order of this Court allowing

the payment of the Common Carrier Charges and Warehouse Fees.  The Debtors respectfully

submit that the amount of the Common Carrier Charges and Warehouse Fees are modest in

comparison to the value of the Debtors' products held by the Common Carriers and Warehouse

Facilities and the value the Debtors' estates will receive from an uninterrupted supply of goods.

22.     The Debtors submit that the relief requested is reasonable and necessary under the

circumstances and justified by applicable law.  Section 363(b)(1) of the Bankruptcy Code

provides that, after notice and a hearing, the trustee "may use, sell, or lease, other than in the

ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  In addition, the

Court may authorize payment of prepetition claims in appropriate circumstances based on

section 105(a) of the Bankruptcy Code.  Section 105(a), which codifies the inherent equitable

powers of the bankruptcy court, empowers the court to "issue any order, process, or judgment

that is necessary or appropriate to carry out the provisions of this title."  Id. § 105(a).  Under

section 105(a) of the Bankruptcy Code, courts may permit pre-plan payments of prepetition

obligations when essential to the continued operation of the debtor's business.  Specifically, this

Court may use its power under section 105(a) to authorize payment of prepetition obligations

pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").

23.     The "doctrine of necessity" or the "necessity of payment" rule originated in

railway cases and was first articulated by the United States Supreme Court in Miltenberger v.

Logansport, C. & S. W. R. Co., 106 U.S. 286 (1882).  The doctrine was expanded to non-railroad

debtors in the mid-century.  See Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in

hotel reorganization case, that the court was not "helpless" to apply the rule to supply creditors

of non-railroad debtors where alternative was cessation of operations).

24.     The Third Circuit recognized the "necessity of payment" doctrine in In re Lehigh & New England Railway Co., 657 F.2d 570, 581 (3d Cir. 1981).  The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor.  Id. (stating courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); see also In re Penn Cent. Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims . . . have been paid"); In re Just for Feet, Inc., 242 B.R. 821, 824-26 (D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).[4]

25.     Today, the rationale for the necessity of payment rule – the rehabilitation of a debtor in reorganization cases – is "the paramount policy and goal of Chapter 11."  In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); see also Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation" is appropriate); In re Just for Feet, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11

---

[4]     Additionally, the Bankruptcy Code contemplates prepetition payments in some circumstances.  Section 549(a), which deals with postpetition transfers, provides that "the trustee may avoid a transfer of property of the estate . . . that occurs after the commencement of the case . . . that is not authorized . . . by the court."  11 U.S.C. § 549(a).  Thus, by necessary implication, a bankruptcy court may authorize limited postpetition payments to satisfy prepetition obligations.  See In re Isis Foods, Inc., 37 B.R. 334, 336 n.3 (W.D. Mo. 1984) (noting that "proposed transfers [to pay prepetition claims may] be presented in advance to a bankruptcy court for its approval and would thereafter be insulated from attack" under section 549(a); see also 11 U.S.C. § 363(b)(1) (allowing the trustee, after notice and hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate").

reorganization"); In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991)

("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of

reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has

developed . . . where bankruptcy courts permit the payment of certain pre-petition claims,

pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such

payment."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991)

(approving payment of prepetition unsecured claims of tool makers as "necessary to avert a

serious threat to the Chapter 11 process"); Mich. Bureau of Workers' Disability Comp. v.

Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing

payment of prepetition worker's compensation claims on grounds that the fundamental purpose

of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that

will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at

least proportionately"); 3 Collier on Bankruptcy § 105.04[5][a] (15th ed. rev. 2004) (discussing

cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment"

rule to pay prepetition claims immediately).

26.    Courts also have permitted postpetition payment of prepetition claims pursuant to

section 105(a) of the Bankruptcy Code in other situations, such as if nonpayment of a prepetition

obligation would trigger a withholding of goods or services essential to the debtors' business

reorganization plan.  See In re UNR Indus., Inc., 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992)

(permitting debtor to pay prepetition claims of suppliers or employees whose continued

cooperation is essential to the debtors' successful reorganization); In re Ionosphere Clubs, 98

B.R. at 175-77 (finding that section 105 empowers bankruptcy courts to authorize payment of

prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

27.     This flexible approach is particularly critical where a prepetition creditor provides vital goods or services to a debtor that would be unavailable if the Debtor did not satisfy its prepetition obligations.  In re Structurlite Plastics Corp., 86 B.R. 922 (Bankr. S.D. Ohio 1988), the bankruptcy court stated it "may exercise its equity powers under § 105(a) [of the Bankruptcy Code] to authorize payment of pre-petition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" Id. at 931 (citing In re Chateaugay, 80 B.R. at 287).  The court explained that "a per se rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." Id. at 932.  Accordingly, pursuant to section 105(a) of the Bankruptcy Code, this Court is empowered to grant the relief requested herein.

28.     Courts in this District have granted similar relief in other chapter 11 cases with respect to the debtors' common carriers and warehouses.  See, e.g., In re Buffets Holdings, Inc., Case No. 08-10141 (Bankr. D. Del. Feb. 13, 2008) (MFW); In re Holliston Mills, Inc., Case No. 07-10687 (Bankr. D. Del. May 23, 2007) (MFW); In re Adva-Lite, Inc., Case No. 07-10264 (Bankr. D. Del. Mar. 2, 2007) (KJC); In re Meridian Auto. Sys. – Composites Operations, Inc., Case No. 05-11168 (Bankr. D. Del. Apr. 27, 2005) (MFW); In re Ultimate Elecs., Inc., Case No. 05-10104 (Bankr. D. Del. Jan. 13, 2005) (PJW); In re KB Toys, Inc., Case No. 04-10120 (Bankr. D. Del. Jan. 16, 2004) (PWJ).

29.     Nothing contained herein is intended or should be construed as: (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim on any grounds or assert any counterclaims or affirmative defenses; (iii) a promise to pay any claim; (iv) an implication or admission that any particular claim would constitute a

12

Common Carrier Charge or Warehouse Fee; or (v) a request to assume any executory contract or unexpired lease, pursuant to section 365 of the Bankruptcy Code.

30.    The Debtors also request that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment and to honor all electronic payments requests made by the Debtors relating to the foregoing, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date. The Debtors further request that all such banks and financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

31.    Bankruptcy Rule 6003(b) provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition, grant relief regarding . . . a motion to use, lease or otherwise incur an obligations regarding property of the estate, including a motion to pay all or part of a claim that arose before filing of the petition . . . ." As set forth above, the Debtors submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003(b) has been satisfied.

32.    Further, to successfully implement the foregoing, the Debtors request that, pursuant to Bankruptcy Rule 6004(h), the Court direct that the order granting the requested relief be effective immediately upon entry.

33.    Based on the foregoing, the Debtors submit that the relief requested herein is essential, appropriate, and in the best interests of the Debtors' estates and their creditors, and therefore should be granted in these chapter 11 cases.

**Notice**

34.     Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to the (i) Office of the United States Trustee for the District of Delaware; (ii) counsel to the trustee under that certain indenture dated as of July 5, 2006, as supplemented, with respect to the floating rate senior notes due 2011, the 10.125% Senior Notes due 2013, and the 10.75% Senior Notes due 2016; (iii) counsel to the trustee under that certain indenture dated as of February 15, 1996, with respect to the 7.875% Senior Notes due 2026; (iv) counsel to the trustee under that certain indenture dated as of March 28, 2007, with respect to the 1.75% Convertible Senior Notes due 2012 and the 2.125% Convertible Senior Notes due 2014; (v) holders of the forty (40) largest unsecured claims on a consolidated basis against the Debtors; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service; (viii) the United States Department of Justice; and (ix) Powertrack.  In light of the exigencies of the circumstances and the potential harm to the Debtors, their estates, and other parties in interest that will ensue if the relief requested herein is not granted, the Debtors submit that no other notice need be given.

**No Prior Request**

35.     No prior request for the  relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: January 14, 2009
Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (No. 5125)
Lisa M. Schweitzer (No. 1033)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Thomas F. Driscoll III (No. 4703)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Phone: (302) 658-9200
Facsimile: (302) 658-3989

*Proposed Counsel for the Debtors
and Debtors in Possession*

2665168.1

15