**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------X
                             :

*In re*                           :      Chapter 11
                             :

Nortel Networks Inc., *et al.*,[1]      :      Case No. 09-10138 (KG)
                             :

               Debtors.       :      Joint Administration Pending
                             :

                             :
------------------------------------------------------------X

**DEBTORS' MOTION UNDER 11 U.S.C. §§ 105, 362 and 541 FOR AN INTERIM ORDER**
**ESTABLISHING NOTIFICATION PROCEDURES AND APPROVING**
**RESTRICTIONS ON CERTAIN TRANSFERS OF THE**
**DEBTORS' PARENTS' EQUITY SECURITIES**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an interim order substantially in the form attached hereto as Exhibit C, establishing notification procedures and approving restrictions on certain transfers of the Debtors' parents' equity securities, and granting the Debtors such other and further relief as the Court deems just and proper. In support of this Motion, the Debtors rely on the Declaration of John Doolittle in Support of First Day Motions and Applications (the "First Day Declaration"). In further support of this Motion, the Debtors respectfully represent as follows:

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are: NNI (6332), Nortel Networks Capital Corporation ("NNCC") (9620), Alteon Websystems, Inc. (9769), Alteon Websystems International, Inc. (5596), XROS, Inc. (4181), Sonoma Systems (2073), QTERA Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation. (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 362(a) and

541 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

## Background

### A.      Introduction

3.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for

relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee,

examiner or official committee of unsecured creditors has been appointed in the Debtors' cases.

5.      On January 14, 2009, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with its affiliates, including the Debtors, "Nortel"), and certain of their Canadian

affiliates (collectively, the "Canadian Debtors")[2] commenced a proceeding before the Ontario

Superior Court of Justice (Commercial List) (the "Canadian Court") for a plan of compromise or

arrangement (the "Canadian Proceedings") under the Canadian Companies' Creditors

Arrangement Act (the "CCAA").  On January 14, 2009, Ernst & Young Inc. as foreign

representative filed petitions for recognition of the Canadian Proceedings as foreign main

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

proceedings under chapter 15 of the Bankruptcy Code. Certain of Nortel's European subsidiaries will make consequential filings for creditor protection.

6.     Simultaneously with the filing of this Motion, the Debtors have sought an order of joint administration pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that would provide for the joint administration of these cases and for consolidation for procedural purposes only.

**B.     Debtors' Corporate Structure and Business**

7.     A description of the Debtors' corporate structure and businesses and the events leading to the chapter 11 cases are set forth in the First Day Declaration.[3]

**Relief Requested**

8.     By this motion (the "Motion"), the Debtors seek to enforce the automatic stay by implementing court-ordered procedures (the "Procedures") designed to protect the Debtors' estates against inadvertent stay violations and the possible loss of valuable tax benefits that could flow therefrom. Pursuant to sections 105, 362 and 541 of the Bankruptcy Code, the Debtors request authorization (i) to establish and implement restrictions and notification requirements regarding the Tax Ownership (as defined in paragraph 16(d)(12) below), and certain transfers, of NNC Common Stock and NNL Preferred Stock (as such terms are defined in paragraphs 16(d)(7) and (8) below and collectively, "Stock")[4] and (ii) to notify holders of Stock of the restrictions and notification requirements. The Debtors also seek approval of the form of notice

---

[3]     Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

[4]     The common shares of NNC are publicly traded on the New York Stock Exchange and the Toronto Stock Exchange ("TSX"). NNL's Cumulative Redeemable Class A Preferred Shares Series 5 and Non-cumulative Redeemable Class A Preferred Shares Series 7 are publicly traded on the TSX. NNL is a direct operating subsidiary of NNC.

attached hereto as Exhibit B, which will notify holders of Stock whose actions could adversely affect the Debtors' tax assets that the Procedures have been established by order of this Court.

## The Debtors' Net Operating Loss and Tax Credit Carryforwards

9.     The Debtors estimate that, as of September 30, 2008, Debtors and their subsidiaries had net operating losses ("NOLs") for U.S. federal income tax purposes of at least $1.6 billion, at least $500 million of unused excess general business and foreign tax credits, in addition to other amounts that potentially could be subject to certain statutory limitations described below (the "Tax Attributes").  Because the Internal Revenue Code permits corporations to carry forward NOLs and tax credits to offset future income and reduce future tax liabilities, these Tax Attributes are valuable assets of the Debtors' estates.  *See* I.R.C. §§ 39, 172, 904(c).  Based on a combined federal and state corporate income tax rate of 39%, Debtors' Tax Attributes could yield future tax savings to the Debtors of at least $1.1 billion.  The availability of these tax savings may prove crucial to the financial health of the Debtors and may be critical in the formulation of any plan of reorganization.

10.     For the reasons discussed below, and consistent with the automatic stay, the Debtors seek the authority to enforce the stay to preclude certain transfers of Stock, and to monitor and possibly object to other changes in the ownership of Stock.  Specifically, trading of Stock could adversely affect the Debtors' future ability to utilize their Tax Attributes described above if too many 5% or greater blocks of equity securities are created through purchases, sales or issuances, or too many shares are added to or sold from such blocks, such that, together with the previous trading by 5-percent shareholders during the preceding three year period, a section 382 ownership change is triggered prior to the consummation, and outside the context, of a confirmed chapter 11 plan.

4

11.     The ability of the Debtors to use their Tax Attributes is subject to certain statutory limitations.  One limitation is contained in section 382 of the Internal Revenue Code ("section 382"), which, in the case of a corporation that undergoes a change of ownership, limits that corporation's ability to use its NOLs and certain other tax attributes to offset future income.  For purposes of section 382, a change of ownership occurs when the percentage of a company's equity held by one or more "5-percent shareholders" (as defined in section 382 and the Treasury regulations promulgated thereunder) increases by more than fifty percentage points over the lowest percentage of stock owned by those shareholders at any time during a three-year rolling period.  For example, if a 10% shareholder purchased additional Stock and became a 61% shareholder, the percentage of stock owned by 5-percent shareholders would have increased by 51 percentage points, thereby causing an "ownership change."[5]  *See also* I.R.C. § 383 (extending section 382 to tax credits).

12.     A section 382 ownership change generally results in an annual limitation on the amount of NOLs and certain other tax attributes that can be utilized to offset future income.  Subject to a number of potentially applicable adjustments, this limitation is generally equal to the product of (1) the equity value of the debtor immediately before the change in ownership multiplied by (2) a long-term tax-exempt rate prescribed by the U.S. Treasury (5.49% for the month of January 2009).  If Debtors were to undergo an ownership change at a time prior to reorganization, the resulting annual limitation could result in a substantial portion of their Tax Attributes expiring unutilized.

---

[5]     The rules of determining ownership of stock for these purposes are complicated, and in some cases the rules aggregate holdings of members of the public.  *See* Treas. Reg. § 1.382-2T(j)(3)(i).  For example, if a 61% shareholder sold stock to the public such that his or her percentage ownership in the corporation were reduced to 5%, the public group that purchased the stock would be treated as a single shareholder owning 56% of the stock.

13.    By contrast, the limitations imposed by section 382 in the context of a change of ownership that occurs pursuant to a confirmed chapter 11 or similar plan are significantly more relaxed, particularly where the plan involves the retention or receipt of at least 50% of the stock of the reorganized debtor by shareholders or "qualified creditors." *See* I.R.C. § 382(l)(5), (6). Accordingly, the Debtors' ability to take advantage of the special relief provided by the Internal Revenue Code, as described below, would be severely limited if the Debtors experience an ownership change before the confirmation of a chapter 11 or similar plan.  Paragraph 14 below discusses the special rule under section 382(l)(5) of the Internal Revenue Code ("section 382(l)(5)") that would apply if NNC and NNL shareholders and "qualified creditors" of the Debtors beneficially own (as determined in accordance with applicable rules under section 382 and the Treasury regulations promulgated thereunder) stock, pursuant to a plan of reorganization or arrangement ordered or approved by the court, constituting at least 50% of the total combined value and voting power of equity interests in the Debtors immediately after the ownership change.  Paragraph 15 below discusses the special rule under section 382(l)(6) of the Internal Revenue Code ("section 382(l)(6)") that would apply if the Debtors do not satisfy the eligibility requirements of section 382(l)(5) or elect out of that provision.

14.    Under section 382(l)(5), a corporation that has not previously had an ownership change is not subject to the limitations imposed by section 382 with respect to an ownership change resulting from consummation of a chapter 11 or similar plan if the plan provides that the persons or entities who owned the debtor's stock immediately before the relevant ownership change and/or "qualified creditors" of the entity emerge from the reorganization beneficially owning (as a result of their prior ownership of stock or claims that are "qualified indebtedness") at least 50% of the total value and voting power of the debtor's stock immediately after the

6

ownership change. *See* I.R.C. § 382(l)(5)(A). Qualified creditors are, in general, creditors who (i) have held their claims continuously since at least eighteen (18) months before the filing of the bankruptcy petition or (ii) hold claims incurred in the ordinary course of the debtor's business and have held those claims continuously since they were incurred. In addition, under Treas. Reg. § 1.382-9(d)(3), a creditor receiving less than 5% of a debtor's equity immediately after emergence from chapter 11 is treated for these purposes as having owned the relevant creditor claims for at least 18 months, and thus meeting the condition in clause (i) of the previous sentence, *provided however*, that the creditor has not participated in formulating the plan of reorganization in a manner that makes evident to the debtor that such creditor has held claims for less than eighteen (18) months before the filing of the bankruptcy petition. Claims having met the qualifications in the text above are "qualified indebtedness." *See* I.R.C. § 382(l)(5)(E); Treas. Reg. § 1.382-9(d).

15.     Even if the Debtors are ultimately unable to satisfy the requirements of section 382(l)(5) or determine that it is more advantageous to elect not to accept its benefits, it is still in the best interest of the Debtors and their estates to restrict Stock trading that could result in a section 382 ownership change of the Debtors before the confirmation of a chapter 11 or similar plan.[6] In order for the Debtors to qualify for the other section 382 bankruptcy relief provision the favorable valuation rule of section 382(l)(6) an ownership change must occur pursuant to the consummation of a chapter 11 or similar plan. Under section 382(l)(6), if the Debtors experience an ownership change pursuant to a confirmed chapter 11 or similar plan and section 382(l)(5)

---

[6]     As discussed above, if a change of ownership occurred *before* the confirmation of a chapter 11 plan, the appropriate value of the reorganized Debtors' equity for purposes of calculating the limitation under section 382 would be determined immediately before the ownership change. Consequently, the Debtors' ability to use their Tax Attributes could be severely limited. While the severity of an ownership change on the Debtors' ability to utilize their Tax Attributes might be mitigated by other provisions of Section 382, both the law and the facts are unclear in this regard. Accordingly, this Motion proposes restrictions on Stock trading in order to guard against an ownership change and thereby to protect a valuable asset of the Debtors' estates.

does not apply (either because the Debtors elect out of that provision or because its requirements are not satisfied), the appropriate value of the reorganized Debtors' equity for the purposes of calculating the limitation under section 382 (as discussed above in paragraph 12) would reflect the increase in value of the reorganized Debtors' equity resulting from the restructuring of creditor claims in the plan.  Thus, to the extent the value of the reorganized Debtors' equity increases as a result of the reorganization or arrangement (compared to the value of the Debtors' equity prior to the reorganization or arrangement), section 382(l)(6) will provide for a higher annual limitation than would otherwise be obtained under section 382 for an ownership change occurring during the time the Debtors are operating under chapter 11.

### Trading Restrictions and Notification Requirements

16.    In light of the above, the Debtors seek to implement the following trading restrictions and notification requirements:

a.    Notice of Substantial Equityholder Status.  Within thirty (30) days of the later of the Effective Time and the date on which an Entity (as such term is defined for purposes of section 382) becomes a Substantial Equityholder, each Substantial Equityholder shall serve on the Debtors and their attorneys (as per the instructions in the notice) a notice in the form attached hereto as Exhibit A-1 (a "Substantial Equityholder Notice"), setting forth summary information regarding the aggregate amount of each class of Stock of which it has Tax Ownership.

b.    Immediate Restrictions and Procedures for Trading in Stock.  Any Entity (as such term is defined for purposes of section 382) that, after the Effective Time,

(i)    is not a Substantial Equityholder and wishes to purchase or otherwise acquire Tax Ownership of an amount of Stock that would cause the Entity to become a Substantial Equityholder;

(ii)    is a Substantial Equityholder and wishes to purchase or otherwise acquire Tax Ownership of any additional Stock; or

> (iii)    is a Substantial Equityholder and wishes to sell or otherwise
> dispose of Tax Ownership of any Stock,

must, prior to the consummation of any such transaction, serve on the
Debtors and their attorneys (as per the instructions in the notice) a notice
in the form attached to this Motion as <u>Exhibit A-2</u>, in the case of a
proposed acquisition of Stock, or <u>Exhibit A-3</u>, in the case of a proposed
disposition of Stock (either such notice, a "<u>Proposed Stock Transaction
Notice</u>").  If no written objection to the proposed transaction is filed with
the Court by the Debtors within ten (10) calendar days following the
receipt of a Proposed Stock Transaction Notice, then the transaction may
proceed.  If a written objection to the proposed transaction is filed by the
Debtors with the Court within such period, then the transaction may not be
consummated unless approved by a final and nonappealable order of the
Court; *provided, however*, that under no circumstances may the Debtors
object to any purchase, sale, or other transfer of Tax Ownership of Stock
by or to any Entity pursuant to a binding contract entered into by that
Entity before the Effective Time.  Further transactions within the scope of
this paragraph 16(b) must be the subject of additional notices as set forth
herein with additional waiting periods.

> c.      <u>Potential Future Restrictions and Procedures for Trading in
> Covered Claims</u>.  The Debtors wish to inform present and future holders
> of Covered Claims that they may seek the imposition of restrictions on
> trading in Covered Claims.

(1) Any Entity that, on or after the Effective Time, has Tax Ownership of
Covered Claims may have an obligation to comply with additional notice
and information requirements, and appropriate sanctions for
noncompliance related thereto, and may, to the extent such Covered
Claims could be converted under a 382(l)(5) Plan into a 5% or greater
block of the stock of the reorganized Debtors (applying the beneficial
ownership rules of section 382 of the Internal Revenue Code and the
Treasury regulations promulgated thereunder), have an obligation to
comply with a Sell Down Order, in both cases pursuant to a subsequent
Debtors' motion and an order by this Court.  All such future procedures,
obligations, requirements and sanctions will be substantially similar to
those established in Sections 3, 4 and 6 of the Model Final NOL Trading
Order.

(2) Any Entity that purchases or otherwise acquires Tax Ownership of
Covered Claims after the Effective Date and that participates in
formulating any Chapter 11 plan of reorganization of or on behalf of the
Debtors (which shall include, without limitation, making any suggestions
or proposals to the Debtors or their advisers with regard to such a plan)
shall not so participate in a manner that makes evident to the Debtors that
any Covered Claims of which such Entity has Tax Ownership are Newly

Traded Covered Claims (the "Participation Restriction"). For this purpose, the Debtors acknowledge and agree that the following activities shall not without more constitute a violation of the Participation Restriction: (i) filing an objection to a proposed disclosure statement or to confirmation of a proposed plan of reorganization; (ii) voting to accept or reject a proposed plan of reorganization; (iii) reviewing or commenting on a proposed business plan; (iv) being a member of a Creditors Committee or an ad hoc committee; (v) providing information to the Debtors' counsel on a confidential basis; or (vi) taking any action required by the Interim Order.

     d.     Definitions. For purposes of this Motion:

(1) "382($l$)(5) Plan" means a plan of reorganization for the Debtors under Chapter 11 pursuant to which there is a reasonable possibility that section 382($l$)(5) of the Internal Revenue Code will be utilized and which provides that transfers of Tax Ownership of the reorganized Debtors', NNC's and NNL's equity will be restricted for not less than two years after the reorganization, in a manner reasonably sufficient to prevent the application of section 382($l$)(5)(D) of the Internal Revenue Code.

(2) "Covered Claims" means any general unsecured claims and the unsecured portion of any partially secured claims against the Debtors that are treated as indebtedness for U.S. federal income tax purposes, including claims incurred in the ordinary course of Debtors' respective businesses, debt securities issued by the Debtors and preferred securities issued by the Debtors that are treated as indebtedness for U.S. federal income tax purposes, but not including any loans or other financial accommodations made to or for the benefit of the Debtors pursuant to debtor-in-possession financing agreements.

(3) "Creditors Committee" means the official committee of unsecured creditors that has been appointed in these cases.

(4) "Effective Time" means the earlier of:

     (i)     two hours after notice of the Interim Order first appears on the Bloomberg newswire service; and

     (ii)     10:00 A.M. Eastern Time on the morning when notice of the Interim Order is first published in The Wall Street Journal.

(5) "Model Final NOL Trading Order" means the Model Final NOL Trading Order published in June 2006 by the Bond Market Association and Loan Syndications and Trading Association.

(6) "<u>Newly Traded Covered Claims</u>" means Covered Claims (i) of which an Entity acquired Tax Ownership after the date that was 18 months before the Petition Date; and (ii) that are not "ordinary course" claims, within the meaning of Treasury regulations section 1.382-9(d)(2)(iv), of which the same Entity has always had Tax Ownership.

(7) "<u>NNC Common Stock</u>" means common shares of NNC.

(8) "<u>NNL Preferred Stock</u>" means NNL's Cumulative Redeemable Class A Preferred Shares Series 5 and NNL's Non-cumulative Redeemable Class A Preferred Shares Series 7, and any other series of NNL preferred shares into which they may be converted.

(9) "<u>Sell Down Order</u>" means an order established under procedures and with restrictions substantially similar to those established in sections 3 and 4 of the Model Final NOL Trading Order, authorizing the Debtors to restrict an Entity's transactions in, or require an Entity's sale of, Covered Claims.

(10) "<u>Stock</u>" means NNC Common Stock and NNL Preferred Stock.

(11) "<u>Substantial Equityholder</u>" means an Entity that has Tax Ownership of (i) at least 23,600,000 shares of NNC Common Stock (representing approximately 4.75% of the issued and outstanding shares of NNC Common Stock), or (ii) at least 4.75% of the total number of outstanding shares of either of the following series of NNL Preferred Stock, or any other series of NNL preferred shares into which they may be converted: Cumulative Redeemable Class A Preferred Shares Series 5, and Non-cumulative Redeemable Class A Preferred Shares Series 7.

(12) "<u>Tax Ownership</u>" means beneficial ownership for U.S. federal income tax purposes as determined in accordance with applicable rules under section 382. To the extent provided in those rules, Tax Ownership shall include, but not be limited to, direct and indirect ownership (e.g., a holding company would generally be considered to have Tax Ownership of all Stock or Covered Claims owned by its subsidiaries), ownership by members of a person's family and persons acting in concert and, in certain cases, ownership of an option, warrant, convertible security, or similar interest.

e.      <u>Sanctions for Noncompliance Relating to Stock</u>. Acquisitions and dispositions of Tax Ownership of Stock in violation of the restrictions and procedures set forth in paragraph 16(b) shall be void ab initio, and the sanction for violating paragraph 16(b) shall be reversal of the noncompliant transaction or such other (or additional) measures as the Court may consider appropriate.

11

  f. <u>Discretionary Waiver by Debtors</u>. The Debtors may waive any sanctions, remedies, or notification procedures imposed by the Interim Order on parties other than the Debtors.

### Ample Support Exists for the Proposed Restrictions and Notification Requirements

  17. It is well established that a debtor's NOL is property of its estate that is protected by section 362 of the Bankruptcy Code. The Court of Appeals for the Second Circuit, in its seminal decision <u>Official Committee of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines Inc.)</u>, 928 F.2d 565 (2d Cir. 1991), affirmed the application of the automatic stay and upheld a permanent injunction against a parent corporation's taking a worthless stock deduction for the stock of its debtor subsidiary, because doing so would have adversely affected the subsidiary s ability to use its NOL carryforwards post-bankruptcy. The Second Circuit held that the debtor's NOL carryforwards were property of the estate under the broad language of section 541 of the Bankruptcy Code:

> Including NOL carryforwards as property of a corporate debtor's estate is consistent with Congress' intention to "bring anything of value that the debtors have into the estate." Moreover, "[a] paramount and important goal of Chapter 11 is the rehabilitation of the debtor by offering breathing space and an opportunity to rehabilitate its business and eventually generate revenue." Including the right to a NOL carryforward as property of [the debtor's] bankruptcy estate furthers the purpose of facilitating the reorganization of [the debtor].

<u>Id.</u> at 573 (citations omitted); <u>see also</u> <u>Gibson v. United States (In re Russell)</u>, 927 F.2d 413, 417 (8th Cir. 1991) (stating that the "right to carry forward the [debtor's] NOLs" was a "property interest" of the estate); <u>Nisselson v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.)</u>, 222 B.R. 417, 424 (Bankr. S.D.N.Y. 1998) ("It is beyond peradventure that NOL carrybacks and carryovers are property of the estate of the loss corporation that generated them."); <u>In re Delta Air Lines, Inc.</u>, Ch. 11 Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. 2005) (finding that tax credit carryforwards were property of the debtors' estates and approving

12

notification procedures and restrictions on certain transfers of claims against and interests in the

debtors to protect, among other things, $346 million in non-NOL tax credits).  In *Prudential*

*Lines*, the Second Circuit held that the parent corporation's attempt to claim a worthless stock

deduction in stock of its debtor subsidiary would effectively eliminate the value of the debtor's

NOL carryforwards and thus would be an act to exercise control over estate property in violation

of the automatic stay under section 362 of the Bankruptcy Code.

18.    Section 362(a) of the Bankruptcy Code operates as a stay of, among other things,

"any act to obtain possession of property of the estate or of property from the estate or to

exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  Accordingly, "where a non-

debtor's action with respect to an interest that is intertwined with that of a bankrupt debtor would

have the legal effect of diminishing or eliminating property of the bankrupt estate, such action is

barred by the automatic stay."  Prudential Lines, 928 F.2d at 574 (quoting 48th St. Steakhouse v.

Rockefeller Group, Inc. (In re 48th St. Steakhouse, Inc.), 835 F.2d 427, 431 (2d Cir. 1987)).  The

Second Circuit therefore opined that, "despite the fact that the [parent corporation's] action is not

directed specifically at [the debtor subsidiary], it is barred by the automatic stay as an attempt to

exercise control over property of the estate."  *Id.*

19.    The Second Circuit also held that the permanent injunction was supported by the

court's equitable powers pursuant to section 105(a) of the Bankruptcy Code, and refused to

disturb the bankruptcy court's finding that elimination of the debtor's ability to apply its NOL to

offset income on future tax returns would impede its reorganization.  *Id.*

20.    Similarly, in In re Phar-Mor, Inc., 152 B.R. 924 (Bankr. N.D. Ohio 1993), chapter

11 debtors moved to prohibit any transfer of the debtors' stock that could have triggered the

section 382 limitation.  The court held that the NOL qualified as property of the estate, and

issued an injunctive order to protect those assets and enforce the automatic stay. Significantly, the court granted the relief requested even though the stockholders did not state any intent to sell their stock and even though the debtors did not show that a sale was pending that would trigger the section 382 change in ownership. *See id.* at 927. The court observed that "[w]hat is certain is that the *NOL has a potential value, as yet undetermined*, which will be of benefit to creditors and will assist [d]ebtors in their reorganization process. This asset is entitled to protection while [d]ebtors move forward toward reorganization." *Id.* (emphasis added). The court also concluded that, because the debtors were seeking to enforce the stay, they did not have to meet the more stringent requirements for a grant of preliminary injunctive relief:

> The requirements for enforcing an automatic stay under 11 U.S.C. § 362(a)(3) do not involve such factors as lack of an adequate remedy at law, or irreparable injury, or loss and a likelihood of success on the merits. The key elements for a stay . . . are the existence of property of the estate and the enjoining of all efforts by others to obtain possession or control of property of the estate.

Id. at 926 (quoting In re Golden Distribs., Inc., 122 B.R. 15, 19 (Bankr. S.D.N.Y. 1990)).

21.     Numerous courts in this and other districts have either prohibited or otherwise restricted equity and/or claims trading to protect a debtor against the possible loss of its NOL carryovers with restrictions and procedures substantially similar to those proposed in this Motion. See, e.g., In re VeraSun Energy Corp., Ch. 11 Case No. 08-12606 (Bankr. D. Del. Nov. 6, 2008) (restricting acquisitions and dispositions of debtor stock for investors holding such stock above a certain threshold, and establishing notification procedures and trading restrictions for certain acquisitions of claims); In re Dana Corp., Ch. 11 Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. 2006) (approving notification and sell-down procedures); In re Northwest Airlines Corp., Ch. 11 Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. 2005) (approving notification procedures and restrictions on certain transfers of claims against and equity interests in the

debtors on an interim basis); In re Delta Air Lines, Inc., Ch. 11 Case No. 05-17923 (PCB)

(Bankr. S.D.N.Y. 2005) (approving notification procedures and restrictions on certain transfers

of claims against and equity interests in the debtors); In re Metrocall, Inc., Ch. 11 Case No 02-

11579 (Bankr. D. Del. 2002) (debtor provided 5 business days notice to object to proposed

transfers of stock that would result in the transferee holding 5% or more of the debtor's stock or

a reduction in the ownership interest of an existing 5% or greater shareholder); In re WorldCom,

Inc., Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. Mar. 5, 2003) (restricting acquisitions of stock

above a certain threshold and establishing notification requirements for certain acquisitions of

claims); In re Williams Commc'ns Group, Inc., Case No. 02-11957 (BRL) (Bankr. S.D.N.Y. Jul.

24, 2002) (establishing notification and objection procedures for proposed transfers of unsecured

claims); In re Ames Dep't Stores, Inc., Case No. 01-42217 (REG) (Bankr. S.D.N.Y. Aug. 21,

2001) (enjoining trading of certain senior notes and common stock, and establishing notice and

hearing procedures for certain acquisitions of general unsecured claims); In re Casual Male

Corp., Case No. 01-41404 (REG) (Bankr. S.D.N.Y. May 18, 2001) (same); In re UAL

Corporation, Case No. 02-B-48191 (ERW) (Bankr. E.D. Ill. Feb. 21, 2003) (establishing

notification procedures for certain transfers of claims or equity securities); In re US Airways

Group, Inc., Case No. 02-83984 (SSM) (Bankr. E.D. Va. Oct. 2, 2002) (establishing notification

and hearing procedures for trading in claims or equity securities). But see In re UAL Corp., 412

F.3d 775 (7th Cir. 2005) (disapproving in dicta the bankruptcy court's reliance on sections

105(a) and 362(a)(3) to enforce automatic stay restricting equity trading that could jeopardize

debtor's ability to use NOL).

      22.     In short, it is well-settled by courts in this and other circuits that section 362(a)(3)

stays actions that could adversely affect a debtor's NOL carryforwards.

## The Proposed Restrictions and Notice Procedures are Necessary and in the Best Interests of Debtors, Their Estates, and Creditors

23.     The proposed restrictions and notice procedures are necessary to protect the Debtors' Tax Attributes, which are valuable assets of the Debtors' estates. The Debtors' ability to meet the requirements of the tax laws to protect their Tax Attributes may be seriously jeopardized unless procedures are established immediately to ensure that certain trading in Stock is either precluded or closely monitored. However, the Debtors recognize that some trading in Stock may not pose a serious risk to the Tax Attributes, and thus it preserves the ability to waive, in writing, in appropriate circumstances, any and all restrictions, stays, and notification procedures contained in this Motion.

24.     The relief requested herein is tailored as narrowly as is reasonable to permit certain Stock trading to continue, subject only to Rule 3001(e) of the Federal Rules of Bankruptcy Procedure and applicable securities, corporate and other laws. The Debtors seek only to enforce the provisions of the automatic stay in connection with certain types of Stock trading that pose a serious risk under the ownership change tests and to monitor other types of trading that potentially pose a serious risk. The proposed restrictions on trading are crucial because once an interest is transferred; the transaction might not be reversible for tax purposes, though it should be null and void under section 362 of the Bankruptcy Code. The relief requested is, therefore, critical to prevent what may be an irrevocable loss of the Debtors' Tax Attributes.

## The Interim Approval Should Be Granted

25.     The Debtors seek the relief requested in this Motion in the form of the interim order (the "Interim Order") attached hereto. Within five (5) business days of the entry of the Interim Order, the Debtors shall (i) submit a notice of the entry of this Interim Order

(substantially in the form attached hereto as Exhibit B) for publication on the Bloomberg newswire service, The Depository Trust Company Legal Notice System (also known as LENS) and in The Wall Street Journal; (ii) post such notice together with a copy of this Interim Order on the Case Information Website, as described in the notice, for posting of documents in the Debtors' cases; and (iii) serve such notice on (a) the Office of the United States Trustee for the District of Delaware, (b) those creditors holding the thirty largest unsecured claims against the Debtors' estates, (c) the Internal Revenue Service, and (d) with respect to those Covered Claims (as defined in paragraph 16(d)(2) above) or Stock registered with an indenture trustee, owner trustee or transfer agent, including the Toronto, Ontario office of Computershare Trust Company of Canada (collectively, "Register Agents"), to such Register Agents.  Upon receipt of such notice, if requested by the Debtors, any Register Agent shall send such notice to all holders of the Covered Claims and Stock registered with such Register Agent; provided, however, that, if any Register Agent provides the Debtors with the name and addresses of all holders of the Covered Claims or Stock registered with such Register Agent, the Debtors shall deliver such notice to such holders at the Debtors' expense; and provided, further, that, neither any indenture trustee nor the Debtors shall be required to serve such notice on the Depositary Trust Company.

26.    The deadline to file an objection ("Objection") to the Motion shall be 4:00 p.m. (prevailing Eastern Time) on the date that is 20 days after the Petition Date (the "Objection Deadline").  An Objection shall be considered timely if it is (i) filed with the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 3d Floor, Wilmington, DE 19801, and (ii) actually received by (a) Nortel Networks Inc., 220 Athens Way, Suite 300, Nashville, TN 37226 (Attn: Lynn C. Egan, Esq.); (b) Cleary Gottlieb Steen & Hamilton LLP, attorneys for Debtors, One Liberty Plaza, New York, NY 10006 (Attn: James L. Bromley, Esq.);

(c) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, P.O. Box 1347, Wilmington, DE 19899-1347 (att'n: Derek C. Abbott, Esq.); and (d) Office of the United States Trustee for the District of Delaware.

27.    Unless otherwise ordered by the Court, a reply to an Objection may be filed with the Court and served on or before 12:00 p.m. (prevailing Eastern Time) on the day that is at least two (2) business days before the date of the applicable hearing.

28.    If no Objections are timely filed and served, as set forth herein, Debtors shall, on or after the Objection Deadline, submit to the Court a final order granting the relief requested herein, which order shall be submitted and may be entered with no further notice or opportunity to be heard afforded to any party. If an Objection is timely filed, a hearing will be held at the U.S. Bankruptcy Court for the District of Delaware, 824 North Market Street, 3d Floor, Wilmington, DE 19801, at a date and time to be established by the Court.

29.    Until the Court enters a final order, any acquisition or disposition of Tax Ownership of Stock after the Petition Date in violation of the Procedures set forth above shall be null and void *ab initio* as an act in violation of the automatic stay prescribed by section 362 of the Bankruptcy Code and pursuant to this Court's equitable power prescribed in section 105(a) of the Bankruptcy Code.

30.    The foregoing notice procedures satisfy due process and the strictures of Bankruptcy Rule 9014 by providing the counterparties with a notice and an opportunity to object and be heard at a hearing. See, e.g., Harada v. DBL Liquidating Trust (In re Drexel Burnham Lambert Group, Inc.), 160 B.R. 729, 733 (S.D.N.Y. 1993) (indicating that opportunity to present objections satisfies due process); Flynn v. Eley (In re Colo. Mountain Cellars, Inc.), 226 B.R. 244, 246 (D. Colo. 1998) (noting that hearing is not required to satisfy Bankruptcy Rule 9014).

Furthermore, the proposed notice procedures protect the due process rights of the parties in interest without unnecessarily exposing the Debtors' estates to unwarranted administrative expenses.

31.     The Debtors believe that the above measures constitute a sufficient and cost-effective way of providing notice of the Procedures described above.

## Notice

32.     Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to the (i) Office of the United States Trustee for the District of Delaware; (ii) the trustee under that certain indenture dated as of July 5, 2006, as supplemented, with respect to the Floating Rate Senior Notes due 2011, the 10.125% Senior Notes due 2013, and the 10.75% Senior Notes due 2016; (iii) the trustee under that certain indenture dated as of February 15, 1996, with respect to the 7.875% Senior Notes due 2026; (iv) the trustee under that certain indenture dated as of March 28, 2007, with respect to the 1.75% Convertible Senior Notes due 2012 and the 2.125% Convertible Senior Notes due 2014; (v) holders of the thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service; (viii) the United States Department of Justice and (ix) the Toronto, Ontario office of Computershare Trust Company of Canada.  In light of the exigencies of the circumstances and the potential harm to the Debtors, their estates, and other parties in interest that will ensue if the relief requested herein is not granted, the Debtors submit that no other notice need be given.

## No Prior Request

33.     No prior request for the relief sought herein has been made to this or any other court.

19

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  January 14, 2009
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (No. 5125)
Lisa M. Schweitzer (No. 1033)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS NICHOLS, ARSHT & TUNNELL LLP


Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Thomas F. Driscoll III (No. 4703)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Proposed Counsel for the Debtors
and Debtors in Possession*