IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
:
In re                                                        :   Chapter 11
:
Nortel Networks Inc., et al.,[1]                             :   Case No. 09-10138 (KG)
:
               Debtors.       :   Jointly Administered
:
------------------------------------------------------------x

## DEBTORS' MOTION FOR ENTRY OF AN ORDER
## AUTHORIZING PAYMENT OF PREPETITION OBLIGATIONS
## TO CERTAIN FOREIGN VENDORS

Nortel Networks Inc. ("NNI") and its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 1015(b), 6003(b) and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (a) authorizing the Debtors, in their sole discretion, to honor and perform prepetition obligations to certain foreign vendors; (b) granting related relief. In support of this Motion, the Debtors rely on the First Day Declaration and the Declaration of Erica Brennan attached to this Motion. In further support of this Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of the Debtors' chapter 11 cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections §§ 105(a) and 363(b) of chapter 11 of title 11 of the Bankruptcy Code.

## Background

**A.      Introduction**

3.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed in the Debtors' cases.

5.      These cases are being jointly administered and consolidated for procedural purposes only.

6.      On January 14, 2009, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their

---

[2]      The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

2

businesses under the supervision of the Canadian Court. Ernst & Young Inc., as foreign representative for the Canadian Debtors, filed petitions for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. Certain of Nortel's European subsidiaries also made filings for creditor protection.

**B.    Debtors' Corporate Structure and Businesses**

7.    A description of the Debtors' corporate structure and businesses and the events leading to the chapter 11 cases are set forth in the First Day Declaration.[3]

### Facts Relevant to the Motion

8.    In the ordinary course of their businesses, the Debtors maintain branch offices dedicated to sales and distribution in, among other cities, Cairo, Egypt (the "Cairo Office"); Dubai, United Arab Emirates (the "Dubai Office"); and Tunis, Tunisia (the "Tunis Office," and together with the Cairo Office and the Dubai Office, the "Foreign Offices"). There are a total of 74 NNI employees of located in the Foreign Offices, including seven employees in the Cairo Office, 63 employees in the Dubai Office and four employees in the Tunis Office.

9.    In conducting their operations, the Foreign Offices incur obligations to various third-party vendors (the "Foreign Vendors"), some of which have prepetition claims outstanding against the Debtors (the "Foreign Vendor Claims"). The Foreign Vendor Claims are for various obligations including, but not limited to:

      a.    Utility payments;

      b.    Rent payments;

      c.    Tax obligations;

      d.    Courier services;

---

[3]    Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

3

      e.      Information Technology support;

      f.      Independent contractor services; and

      g.      Accounting services.[4]

10.    The Debtors estimate that there remains outstanding, as of the Petition Date, approximately $892,000 in Foreign Vendor Claims.[5] In addition, there may be an additional approximately $1,500,000 checks that were previously issued but might not have cleared to date, including approximately $1 million in payments to local taxing authorities. Some local banks also may have honored some of these checks notwithstanding the commencement of the cases. Based on the information available to the Debtors at this time, these amounts include amounts owed to the Cairo Office, the Dubai Office and the Tunis Office.[6]

### Relief Requested

11.    By this Motion, the Debtors seek entry of an order (a) authorizing but not directing the Debtors to pay, in their sole discretion and in the ordinary course of business, as and when due, the Foreign Vendor Claims to the Foreign Vendors including, without limitation, claims for goods and services provided to the Debtors, as well as import or tax obligations, and (b) authorizing their banks to receive, process, honor, and pay checks or electronic transfers used by the Debtors to pay prepetition obligations to Foreign Vendors.

---

[4] To the extent that the Debtors owe the employees in the Foreign Offices prepetition wages and benefits, these costs are accounted for in the "Debtors' Motion For Entry of an Order Authorizing, But Not Directing, Debtors to Pay Certain Prepetition (i) Wages, Salaries and Other Compensation, (ii) Reimbursable Expenses, and (iii) Retirement and Similar Benefits" filed on January 14, 2009, which was granted by the Court on January 15, 2009.

[5] There may be other payments owed to other foreign vendors of which the Debtors may become aware. By the Motion, the Debtors seek to make payments to other foreign vendors as the Debtors deem necessary, to the extent they are within the $3 million cap requested by the Motion, and request that such can be deemed to be Foreign Vendors Claims, in the Debtors' discretion, for purposes of this Motion.

[6] To the extent that the Debtors owe the employees in the Foreign Offices prepetition wages and benefits, these costs are accounted for in the "Debtors' Motion For Entry of an Order Authorizing, But Not Directing, Debtors to Pay Certain Prepetition (i) Wages, Salaries and Other Compensation, (ii) Reimbursable Expenses, and (iii) Retirement and Similar Benefits" filed on January 14, 2009, which was granted by the Court on January 15, 2009.

12. It is critical that the Debtors be permitted in their discretion to honor their prepetition Foreign Vendor Claims and pay any prepetition amounts related thereto without disruption. While the automatic stay generally prevents counterparties from terminating the provision of goods and services based on prepetition defaults, foreign counterparties are not always either aware of or willing to respect such restrictions, and it can be both unduly time-consuming and costly to enforce the automatic stay against such counterparties, particularly where relatively small claims amounts are involved. If the Foreign Vendor Claims are not paid, the Foreign Vendors may take precipitous action against the Debtors based upon an erroneous belief that they are not subject to the jurisdiction of this Court and, thus, not subject to the automatic stay provisions of 11 U.S.C. § 362(a). Indeed, some or all of the jurisdictions in which the Foreign Offices are located may not recognize the automatic stay provisions of 11 U.S.C. § 362(a), and thus it is effectively unenforceable as against the Foreign Vendors. The Foreign Vendors could, among other things, attempt to sue in a foreign court and obtain a judgment against the Debtors to collect prepetition amounts owed to them. They could immediately seek to attach or seize the Debtors' foreign assets even prior to obtaining a judgment. In addition, foreign governmental authorities might seize the Debtors' assets in such countries. The foreign governmental entities could also seek civil penalties against the Debtors. More importantly, the Debtors' foreign suppliers could refuse to do business with the Debtors. The impact of such events on the operations in the Foreign Offices would be catastrophic.

13. Indeed, if the Foreign Vendors fail to ship goods or refuse to do business with the Debtors because of a failure to pay the Foreign Vendor Claims, or if foreign governmental entities seize goods from sole-source suppliers because of a failure to pay the

Foreign Vendor Claims owing to such entities, the Debtors' operations in the foreign offices would quickly be significantly curtailed, which could dilute stakeholder recoveries.

14. The Debtors therefore believe that it is in the best interests of their estates and creditors to satisfy the Foreign Vendors Claims. Indeed, some of the Foreign Vendor Claims may be priority claims under section 507(a)(8) of the Bankruptcy Code. Regardless of the possible application of section 507(a)(8), however, the risks associated with non-payment of Foreign Vendors justify the payment of the Foreign Vendor Claims in the ordinary course of business.

15. Accordingly, the Debtors request that the Court grant the Debtors the authority, in their sole discretion, to honor the prepetition obligations to the Foreign Vendors and pay any prepetition amounts associated therewith.

## Basis for Relief

### A. The Relief Requested Is Supported by Section 105(a) of the Bankruptcy Code and the "Doctrine of Necessity"

16. The Debtors submit that the relief requested is reasonable and necessary under the circumstances and justified by applicable law. Section 363(b)(1) of the Bankruptcy Code provides that, after notice and a hearing, the trustee "may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). The Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may permit pre-plan payments of prepetition obligations when essential to the continued operation of the debtor's business. Specifically, this Court may use its

power under section 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").

17. The "doctrine of necessity" or the "necessity of payment" rule originated in railway cases and was first articulated by the United States Supreme Court in Miltenberger v. Logansport, C. & S. W. R. Co., 106 U.S. 286 (1882). The doctrine was expanded to non-railroad debtors in the mid-century. See Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in hotel reorganization case, that the court was not "helpless" to apply the rule to supply creditors of non-railroad debtors where alternative was cessation of operations).

18. The Third Circuit recognized the "necessity of payment" doctrine in In re Lehigh & New England Railway Co., 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. Id. (stating courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); see also In re Penn Cent. Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims . . . have been paid"); In re Just for Feet, Inc., 242 B.R. 821, 824-26 (D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).[7]

---

[7] Additionally, the Bankruptcy Code contemplates prepetition payments in some circumstances. Section 549(a), which deals with postpetition transfers, provides that "the trustee may avoid a transfer of property of the estate . . . that occurs after the commencement of the case . . . that is not authorized . . . by the court." 11 U.S.C. § 549(a). Thus, by necessary implication, a bankruptcy court may authorize limited postpetition payments to satisfy prepetition obligations. See In re Isis Foods, Inc., 37 B.R. 334, 336 n.3 (W.D. Mo. 1984) (noting that "proposed transfers [to pay prepetition claims may] be presented in advance to a bankruptcy court for its approval and would thereafter be insulated from attack" under section 549(a); see also

19. Today, the rationale for the necessity of payment rule -- the rehabilitation of a debtor in reorganization cases -- is "the paramount policy and goal of Chapter 11." In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); see also Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation" is appropriate); In re Just for Feet, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); 3 Collier on Bankruptcy § 105.04[5][a] (15th ed. rev. 2004) (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

---

11 U.S.C. § 363(b)(1) (allowing the trustee, after notice and hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate").

8

20.     Courts also have permitted postpetition payment of prepetition claims pursuant to section 105(a) of the Bankruptcy Code in other situations, such as if nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan. See In re UNR Indus., Inc., 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization); In re Ionosphere Clubs, 98 B.R. at 175-77 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

21.     This flexible approach is particularly critical where a prepetition creditor provides vital goods or services to a debtor that would be unavailable if the Debtor did not satisfy its prepetition obligations. In In re Structurlite Plastics Corp., 86 B.R. 922 (Bankr. S.D. Ohio 1988), the bankruptcy court stated it "may exercise its equity powers under § 105(a) [of the Bankruptcy Code] to authorize payment of pre-petition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" Id. at 931 (citing In re Chateaugay, 80 B.R. at 287). The court explained that "a per se rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." Id. at 932.

22.     This standard is unquestionably met with respect to the Foreign Vendor Claims. As noted above, the Debtors have determined that the Foreign Vendors may take drastic action if the Foreign Vendor Claims are not paid. It is not uncommon for non-U.S. entities to assert that they are not subject to the jurisdiction of a United States bankruptcy court and, as such, not subject to the automatic stay provisions of 11 U.S.C. § 362(a). Although the Debtors vigorously dispute any such contentions, the Foreign Vendors are

likely to stop shipping goods or providing services to the Debtors on a timely basis, and foreign governmental and other entities may take action to seize assets of the Debtors or refuse to release shipments of goods to the Debtors, on the basis of such assertions. Irrespective of the accuracy of any Foreign Vendor's belief that the automatic stay does not apply to these actions, the consequences of such actions would be monumental and irreparable. The operations of the Foreign Offices rely almost wholly on the services of the Foreign Vendors, and therefore the Foreign Offices could be forced to discontinue any operations, including sales operations in their respective countries, if the Foreign Vendors were to take such actions. Therefore, even if the Foreign Vendors' legal arguments are completely without merit, it is unlikely that the Debtors could seek and obtain orders from all the appropriate foreign courts forcing such Foreign Vendors to discontinue the offending activities within the time frame necessary to avoid irreparable harm to the Debtors' businesses – particularly since injunctive relief is not available in all jurisdictions. Not only would such an eventuality drastically affect the Debtors' revenues, cash flows, and profitability, but it could also potentially lead to the Debtors' customers asserting sizeable damage claims against the Debtors' estates to the detriment of the Debtors' other creditors. The Debtors assert that the amount of the Foreign Vendor Claims pales in comparison to the likely damage to the Debtors' businesses and the claims which would be asserted by the Debtors' customers should the relief requested herein not be granted. Not only would the Debtors' other creditors not be harmed by payment of the Foreign Vendor Claims, but such creditors would also in fact benefit from this Courts' empowering the Debtors to make payments to the Foreign Vendors so as to achieve a smooth transition into bankruptcy with

minimal disruption to its operations. In light of these factors, payment of the Foreign Vendor Claims is plainly in the best interests of the Debtors' estates and their creditors.

23.   Bankruptcy courts routinely grant authorization for chapter 11 debtors to pay claims owing to foreign entities against which the automatic stay cannot be readily enforced in the United States and as to which it would be unduly time-consuming and expensive to seek to enforce an order of the bankruptcy court in the creditor's home country. See, e.g., In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005); In re Northwest Airlines Corp., Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sept. 15, 2005); In re US Airways Group, Inc., Case No. 02-83983 (SSM) (Bankr. E.D. Va. Aug. 12, 2002); In re WorldCom, Inc., Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. July 22, 2002 and Aug. 13, 2002); In re Global Crossing Ltd., Case Nos. 02-40187 through 02-40241 (REG) (Bankr. S.D.N.Y. Jan. 28, 2002); In re Kmart Corp., Case No. 02-02474 (SPS) (Bankr. N.D. Ill. Jan. 25, 2002); In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Dec. 4, 2001).

24.   To facilitate the payment of Foreign Vendors and, thus, the avoidance of foreign actions against the Debtors and their assets, the Debtors additionally respectfully request that the banks that provide banking services to the Debtors be authorized and required to (a) honor any checks drawn against their accounts, but not cleared prior to the Petition Date, and (b) complete any fund transfer requests made but not completed prior to the Petition Date. In addition, the Debtors respectfully request authorization to issue postpetition checks and to make postpetition fund transfer requests to replace any prepetition checks and prepetition transfers to Foreign Vendors that may be dishonored by the banks.

25.   Bankruptcy Rule 6003(b) provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the

filing of the petition, grant relief regarding . . . a motion to use, lease or otherwise incur an obligations regarding property of the estate, including a motion to pay all or part of a claim that arose before filing of the petition . . . ." As set forth above, the Debtors submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003(b) has been satisfied.

26.    Nothing contained herein is intended or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds or assert any counterclaims or affirmative defenses; (c) a promise to pay any claim; (d) an implication or admission that any particular claim would constitute a Foreign Vendor Claim; or (e) a request to assume any executory contract or unexpired lease, pursuant to section 365 of the Bankruptcy Code.

27.    For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of the Debtors' estates, their creditors, and all parties-in-interest. The Debtors reserve their right to seek further relief with respect to foreign vendors in the future if further facts and circumstances arose beyond those set forth in the Motion.

### Request for Waiver of Stay

28.    The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." As set forth above, the immediate payment of the Foreign Vendor Claims is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize. Accordingly, the

Debtors submit that ample cause exists to justify a waiver of the ten-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

### Notice

29.     Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to the (i) Office of the United States Trustee for the District of Delaware; (ii) the trustee under that certain indenture dated as of July 5, 2006, as supplemented, with respect to the floating rate senior notes due 2011, the 10.125% Senior Notes due 2013, and the 10.75% Senior Notes due 2016; (iii) the trustee under that certain indenture dated as of February 15, 1996, with respect to the 7.875% Senior Notes due 2026; (iv) the trustee under that certain indenture dated as of March 28, 2007, with respect to the 1.75% Convertible Senior Notes due 2012 and the 2.125% Convertible Senior Notes due 2014; (v) holders of the forty (40) largest unsecured claims on a consolidated basis against the Debtors; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service; and (viii) the United States Department of Justice. In light of the exigencies of the circumstances and the potential harm to the Debtors, their estates, and other parties in interest that will ensue if the relief requested herein is not granted, the Debtors submit that no other notice need be given.

### No Prior Request

30.     No prior request for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (a) grant this Motion and the relief requested herein; (b) enter the proposed order attached hereto; and (c) grant such other and further relief as it deems just and proper.

Dated: January 15, 2009
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley
Lisa M. Schweitzer
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Thomas F. Driscoll III (No. 4703)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Phone: (302) 658-9200
Facsimile: (302) 658-3989

*Proposed Counsel for the Debtors
and Debtors in Possession*

14