IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------X
                                                            :
*In re*                                                     :    Chapter 11
                                                            :
Nortel Networks Inc., *et al.*,[1]                          :    Case No. 09-10138 (KG)
                                                            :
                                    Debtors.                :    Jointly Administered
                                                            :
------------------------------------------------------------X

## **DECLARATION OF ERICA BRENNAN**

I, Erica Brennan, do hereby declare as follows:

1.  I am Financial Controller of EMEA Outsourced Entities of Nortel Networks UK responsible for the Foreign Offices (as defined below). Part of my responsibilities and duties are to manage the accounting and financial records of the Foreign Offices and for authorizing payments on the Foreign Offices' accounts payable.

2.  I submit this declaration in support of the Debtors' Motion for Entry of an Order Authorizing Payment of Prepetition Obligations To Certain Foreign Vendors. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals or learned from my review of relevant documents or upon my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).

3. In the ordinary course of its business, NNI maintains branch offices dedicated to sales and distribution in, among other cities, Cairo, Egypt (the "Cairo Office"); Dubai, United Arab Emirates (the "Dubai Office"); and Tunis, Tunisia (the "Tunis Office," and together with the Cairo Office and the Dubai Office, the "Foreign Offices"). There are a total of 74 NNI employees located in the Foreign Offices, including seven employees in the Cairo Office, 64 employees in the Dubai Office and three employees in the Tunis Office.

4. In conducting their operations, the Foreign Offices incur obligations to various third-party vendors (the "Foreign Vendors"), some of which have prepetition claims outstanding against the Debtors (the "Foreign Vendor Claims"). The Foreign Vendor Claims are for various obligations including, but not limited to:

    a. Utility payments;

    b. Rent payments;

    c. Tax obligations;

    d. Courier services;

    e. Information Technology support;

    f. Independent contractor services; and

    g. Accounting services.[2]

5. According to the information on our accounts payable ledgers there remains outstanding, as of the Petition Date, approximately $892,000 in Foreign Vendor

---

[2] To the extent that the Debtors owe the employees in the Foreign Offices prepetition wages and benefits, these costs are accounted for in the "Debtors' Motion For Entry of an Order Authorizing, But Not Directing, Debtors to Pay Certain Prepetition (i) Wages, Salaries and Other Compensation, (ii) Reimbursable Expenses, and (iii) Retirement and Similar Benefits" filed on January 14, 2009, which was granted by the Court on January 15, 2009.

Claims.[3]  In addition, there may be an additional approximately $1,500,000 in checks that were previously issued that might not have cleared to date, including approximately $1,000,000 in payment to local taxing authorities. Some local banks also may have honored some of these checks not withstanding the commencement of the cases. Based on the information available to the Debtors at this time, these amounts include amounts owed by the Cairo Office, the Dubai Office and the Tunis Office.

6.      By the Motion, the Debtors seek entry of an order (a) authorizing but not directing the Debtors to pay, in their sole discretion and in the ordinary course of business, as and when due, the Foreign Vendor Claims to the Foreign Vendors including, without limitation, claims for goods and services provided to the Debtors, as well as import or tax obligations, and (b) authorizing their banks to receive, process, honor, and pay checks or electronic transfers used by the Debtors to pay prepetition obligations to Foreign Vendors.  I believe that the relief requested in the Motion is necessary and appropriate and in the best interests of the Debtors' estates, creditors and other parties in interest.

7.      I believe that it is critical that the Debtors be permitted in their discretion to honor their prepetition Foreign Vendor Claims and pay any prepetition amounts related thereto without disruption.  While the automatic stay generally prevents counterparties from terminating the provision of goods and services based on prepetition defaults, foreign counterparties are not always either aware of or willing to respect such restrictions, and it can be both unduly time-consuming and costly to enforce the automatic stay against such counterparties, particularly where relatively small claims amounts are involved.  If the Foreign

---

[3]      There may be other payments owed to other foreign vendors of which the Debtors may become aware.  By the Motion, the Debtors seek to make payments to other foreign vendors as the Debtors deem necessary, to the extent they are within the $3 million cap requested by the Motion, and request that such can be deemed to be Foreign Vendors Claims, in the Debtors' discretion, for purposes of this Motion.

3

Vendor Claims are not paid, I understand that the Foreign Vendors may take precipitous action against the Debtors based upon an erroneous belief that they are not subject to the jurisdiction of this Court and, thus, not subject to the automatic stay provisions of 11 U.S.C. § 362(a). Indeed, I have been advised that some or all of the jurisdictions in which the Foreign Offices are located may not recognize the automatic stay provisions of 11 U.S.C. § 362(a), and thus it is effectively unenforceable as against the Foreign Vendors. I understand that the Foreign Vendors could, among other things, attempt to sue in a foreign court and obtain a judgment against the Debtors to collect prepetition amounts owed to them. I also understand that they could immediately seek to attach or seize the Debtors' foreign assets even prior to obtaining a judgment. In addition, I have been advised that foreign governmental authorities might seize the Debtors' assets in such countries or seek civil penalties against the Debtors. More importantly, I am concerned that the Debtors' foreign suppliers could refuse to do business with the Debtors. I believe that the impact of such events on the operations in the Foreign Offices would be catastrophic.

8. Indeed, if the Foreign Vendors fail to ship goods or refuse to do business with the Debtors because of a failure to pay the Foreign Vendor Claims, or if foreign governmental entities seize goods from sole-source suppliers because of a failure to pay the Foreign Vendor Claims owing to such entities, I believe that the Debtors' operations in the foreign offices would quickly be significantly curtailed, which could dilute stakeholder recoveries.

9. I am concerned that if the Debtors are not allowed to pay some or all of the Foreign Vendor Claims, the Foreign Vendors are likely to stop shipping goods or providing services to the Debtors on a timely basis, and foreign governmental and other

entities may take action to seize assets of the Debtors or refuse to release shipments of goods to the Debtors. Irrespective of the accuracy of any Foreign Vendor's belief that the automatic stay does not apply to these actions, I believe that the consequences of such actions would be monumental and irreparable. The operations of the Foreign Offices rely almost wholly on the services of the Foreign Vendors, and therefore the Foreign Offices would be forced to shut down the Debtors would be forced to discontinue any operations including sales operations in their respective countries, if the Foreign Vendors were to take such actions. Not only would such an eventuality drastically affect the Debtors' revenues, cash flows, and profitability, but it could also potentially lead to the Debtors' customers asserting sizeable damage claims against the Debtors' estates to the detriment of the Debtors' other creditors. Accordingly, the amount of the Foreign Vendor Claims is small in comparison to the likely damage to the Debtors' businesses if such payments are not made.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 15, 2009

*Erica Brennan*
ERICA BRENNAN

6