IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

**NOTICE OF ENDORSEMENT OF INITIAL APPLICATION BY THE
ONTARIO COURT IN THE CANADIAN PROCEEDINGS**

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Alteon Websystems, Inc. (9769); Alteon Websystems International, Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); and Nortel Networks Cable Solutions Inc. (0567).

**PLEASE TAKE NOTICE** that on January 14, 2009, the Honorable Mr. Justice Morawetz of the Ontario Superior Court of Justice (Commercial List) (the "**Ontario Court**") issued an Endorsement of the Initial Application dated January 14, 2009 (the "**Endorsement**") filed in the proceedings for the Canadian Nortel Group[2] under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Court. A copy of the Endorsement is annexed hereto as Exhibit A.

Dated: Wilmington, Delaware
   January 22, 2009

            ALLEN & OVERY LLP

            Ken Coleman
            Lisa Kraidin
            1221 Avenue of the Americas
            New York, New York 10020
            Telephone (212) 610-6300
            Facsimile (212) 610-6399
            Ken.Coleman@allenovery.com
            Lisa.Kraidin@allenovery.com

                -and-

            BUCHANAN INGERSOLL & ROONEY

            By: /s/ Mary F. Caloway
            Mary F. Caloway (No. 3059)
            Peter J. Duhig (No. 4024)
            The Brandywine Building
            1000 West Street, Suite 1410
            Wilmington, Delaware 19801
            Telephone (302) 552-4209
            Facsimile (302) 552-4295
            Mary.Caloway@bipc.com

            *Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Nortel Group*

---

[2] The Canadian Nortel Group, which are affiliates of the above-captioned debtors, consists of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation.

# Exhibit A

COURT FILE NO.: 09-CL-7950
DATE: 20090114

**SUPERIOR COURT OF JUSTICE – ONTARIO**
**(COMMERCIAL LIST)**

| | |
|---|---|
| RE: | IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED |
| | AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION (Applicants) |
| | APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED |
| BEFORE: | MORAWETZ J. |
| COUNSEL: | Derrick Tay, Mario Forte and Jennifer Stam for Nortel Networks Corporation, et al |
| | Edmond Lamek and Aubrey Kauffman, for Export Development Canada |
| | Michael Barrack and Rachelle Moncur, for Flextronics Corporation |
| | Edward A. Sellers, for the Directors of Nortel Networks Corporation and Nortel Networks Limited |
| | Jay Carfagnini, for Ernst & Young Inc., Monitor |
| HEARD & RELEASED: | JANUARY 14, 2009 |

**ENDORSEMENT**

[1] Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks International Corporation ("NNIC"), Nortel Networks Global Corporation ("NNGC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Technology

Corporation ("NNTC") bring this application under the *Companies' Creditors Arrangement Act* ("*CCAA*").

[2]    NNC is a Canadian corporation and is the direct or indirect parent of 143 subsidiaries including the other applicants. NNC, NNL, NNIC, NNGC and NNTC are referred to as the "Applicants".

[3]    In addition, NNC is party to eight joint ventures operating worldwide. References to "Nortel" or the "Nortel Companies" are references to the global enterprise as a whole. References to a "Nortel Company" are references to a single entity within the Nortel Companies.

[4]    NNC's and NNL's principal executive offices are in Toronto, Ontario. NNTC's principal executive offices are in Ottawa, Ontario. NNL also has offices in Montreal and Ottawa with sales and support offices throughout Western and Central Canada, Quebec and Atlantic Canada. NNIC and NNGC have their registered offices in Toronto, Ontario, but apparently have no operations.

[5]    The Applicants seek protection under the *CCAA* to facilitate the re-organization of the Nortel Companies for the benefit of all creditors. In addition, certain of NNC's direct and indirect U.S. subsidiaries have filed voluntary petitions (the "Chapter 11 proceedings") pursuant to Chapter 11 of the United States Bankruptcy Code (the "Code"), and the directors of certain of NNL's active subsidiaries in Europe, Middle East and Africa (collectively referred to as the "ENEA Entities") and ("ENEA"), are expected to apply to the English court for administration orders for each of the ENEA Entities and (the "Administration Proceedings") pursuant to the *Insolvency Act* 1986 ("IA86"). The Applicants are also seeking this court's authorization to apply for recognition of the *CCAA* proceedings as "foreign main proceedings" under Chapter 15 of the Code. Counsel has also indicated that Nortel Networks Inc. ("NNI") and the other scheduled Chapter 11 applicants are making an application to this court pursuant to s.18.6 of the *CCAA* to recognize the Chapter 11 proceedings as "foreign proceedings" in Canada and to give effect to the stay thereunder.

[6]    The name Nortel is known throughout the world for leadership in the networking and communication industries, delivering cutting-edge hardware and software solutions and related services.

[7]    In his affidavit filed in support of this application, Mr. John Doolittle, Treasurer of NNC and NNL stated that at their peak in 2000, the Nortel companies generated approximately $30 billion of annual revenue, employed nearly 93,000 employees and had a market capitalization of over U.S. $250 billion. He also stated that with the burst of the high-tech bubble in early 2001 and the resulting significant downturn in both the telecommunications industry and the economic environment, the Nortel companies began to face an increasingly difficult competitive environment.

[8]    A number of steps have been taken to restructure the affairs of Nortel since 2001, but as Mr. Doolittle explains in his affidavit these measures have not provided adequate relief from the significant pressures Nortel is experiencing. The Applicants are of the view that the action which presents the greatest potential for the survival and recovery of Nortel is a comprehensive

business and financial restructuring which can only be accomplished through a *CCAA* process coordinated with the Chapter 11 proceedings and the Administration Proceedings.

[9]   The Canadian corporate structure, the U.S. corporate structure and the European corporate structure are detailed in the affidavit of Mr. Doolittle as is the Applicants' capital structure.

[10]   As at January 9, 2009, Nortel's debt structure consisted of the following unsecured obligations:

Nortel Networks Corporation

- $575 million, 1.75 percent convertible notes due 2012
- $575 million, 2.125 percent convertible notes due 2014

Nortel Networks Limited and Nortel Networks Inc.

- $1 billion Libor + 4.25 percent senior notes due 2011
- $550 million, 10.125 percent senior notes due 2013
- $1.125 billion, 10.75 percent senior notes due 2016
- $200 million, 6.875 percent senior notes due 2023 (no NNI guarantee)

Nortel Networks Capital Corporation

- $150 million, 7.875 percent senior notes due 2026
- Notes do not carry NNI guarantee but are fully and unconditionally guaranteed by NNL

[11]   Mr. Doolittle also stated that the operation of the Nortel business is a highly complex integrated structure designed to accommodate the global nature of their business and, although many of Nortel's primary contractual external relationships with vendors are through NNL, products are ordered, delivered and paid for pursuant to internal sub-agreements with vendors and Nortel regional entities.

[12]   As a result of the complex structure, Mr. Doolittle states that there are frequent inter-company receivables arising among the operating subsidiaries and, occasionally, when such receivables are not settled on a short timeframe, such receivables may be converted into an inter-company loan. These loans are typically repaid in the normal course.

[13]   Further, as a result of the inter-connectivity of the Nortel Companies, Nortel employs a complex arrangement to deal with cash management and inter-company payments and the allocation of revenues, and costs among the Nortel Companies. By way of summary, Mr.

Page: 4

Doolittle noted that the Applicants have a total of 39 Canadian $ and U.S. $ bank accounts, which are maintained on an entity-by-entity basis.

[14] Again, according to Mr. Doolittle, the Nortel business is highly integrated with several key Nortel Companies acting as purchasing hubs for Nortel Companies around the world which results in high levels of inter-company receivables and payables, which necessitate the complex transfer pricing and inter-company settling methods employed by Nortel.

[15] Mr. Doolittle goes on to explain that the inter-company sales and receivables system is highly complex and essential for the ongoing fulfillment of customer orders.

[16] Accordingly, the Applicants propose to continue their buying and selling arrangements consistent with the transfer pricing model post filing. In anticipating of these insolvency proceedings, the Chapter 11 proceedings in the U.S. and the Administration in England, Mr. Doolittle stated that the Applicants have entered into discussions with NNI in the U.S. and NNUK (the head of ENEA) along with Ernst & Young LLP (UK) as proposed administrator (the "Administrator") and have reached a 30-day agreement with respect to the terms on which these arrangements would continue were proceedings to be commenced in all three jurisdictions.

[17] In addition, the Applicants have critical relationships with two entities.

[18] First, the Applicants rely heavily on Flextronics Telecom Systems Ltd. to supply approximately 75 percent of Nortel's products. In anticipation of this filing, and in recognition of the importance of Flextronics' continuing compliance during the proceedings, Nortel and Flextronics negotiated the terms of an agreement that will ensure ongoing supply upon filing. A copy of the agreement is contained at Exhibit B to the affidavit of Mr. Doolittle. The agreement is subject to Canadian court approval. The Monitor recommends that this court approve this amending agreement.

[19] Second, Export Development Canada ("EDC") provides a support facility to Nortel. Nortel is of the view that this facility is a key component of the ability of Nortel to continue its business. EDC has agreed to provide a 30-day waiver of default and has agreed to provide up to U.S. $30 million of additional support during the 30-day waiver period, to allow EDC and Nortel to work together to see if a longer-term arrangement can be reached. The EDC waiver is subject to the condition that any support granted by EDC post-filing will be secured by a charge on the assets of Nortel (the "EDC Charge"). Nortel is agreeable to the granting of the charge and the Monitor has recommended that the EDC Charge be granted.

[20] Copies of NNC's audited Consolidated Financial Statements for 2007 as well its Unconsolidated Financial Statements for the first three fiscal quarters of 2008 are filed in the Record.

[21] As of September 30, 2008, the Applicants had total current assets of U.S. $21.153 billion and total current liabilities of U.S. $22.355 billion.

[22] The Applicants do not have any senior secured obligations. Other than leased equipment, capital leases, sale lease arrangements related to the real estate properties and certain letters of

credit which are cash collateralized, the remainder of their obligations are apparently unsecured obligations.

[23] Nortel also has significant pension and post-retirement plan liabilities. Mr. Doolittle states that an upcoming valuation will reflect a significant decline in the value of the assets held in Nortel pension plans due to the recent adverse conditions in the financial markets globally. As a result, Nortel anticipates that its pension plan funding requirements in 2009 will increase in a very substantial and material manner.

[24] Mr. Doolittle also states that the Applicants have third-party trade debt of approximately U.S. $160 million. He also indicated that the Applicants are defendants in various legal proceedings for which the Applicants are unable to ascertain the ultimate aggregate amount of liability. Further, the Applicants have other debt of approximately $414 million relating to various contractual commitments.

[25] The Applicants have acknowledged that they are insolvent. In addition to the information referenced above, the Chapter 11 applicants are seeking protection pursuant to Chapter 11 of the Code, which is a default under the high-yield notes. Mr. Doolittle has acknowledged that NNL and NNC do not have sufficient funds to pay any accelerated amounts on the high-yield notes and defaults under the high-yield notes lead to a default under support facility provided by EDC as well as other convertible notes.

[26] Further, Mr. Doolittle acknowledges that the Applicants are cognizant of the significant pension deficits in England (the contributions to which have been guaranteed by NNL) and Canada, which, if accelerated they would not be able to fulfill.

[27] Ernst & Young Inc. ("E&Y") was retained by the Applicants on September 26, 2008 to advise as to the financial status of the Applicants.

[28] E&Y has consented to act as the Monitor (the "Monitor") of the Applicants in the *CCAA* proceedings.

[29] E&Y has filed a report in its capacity as proposed Monitor (the "Report"). The Report provides additional detail as to the current financial status of Nortel and as well it contains the recommendations of the Monitor in respect of the proposed form of *CCAA* order.

[30] The Record filed in support of the application also contains the required cash-flow forecast, which in this case is a 13-week cash-flow forecast that estimates the Applicants' financing requirements.

[31] The proposed form of order provides for a number of charges and financial thresholds which are described in both the affidavit of Mr. Doolittle and in the Report.

[32] These charges include an Administrative Charge, a Directors' and Officers' Charge, and Inter-Company Charge, and a Carling Facility Charge to support cash loans from NNI to NNL.

Page: 6

[33]  With respect to the Carling Facility Charge, Mr. Doolittle states that, at the present time, most of Nortel's cash in North America is with NNI. NNL requires access to $200 million of that cash to ensure that NNL has access to adequate funding for this process. It is therefore contemplated that as part of its first-day hearings, NNI will seek U.S. Bankruptcy Court approval to advance up to U.S. $200 million on a revolving basis to NNL (the "NNI Loan") which will be secured by the Carling Facility Charge.

[34]  The Applicants have also disclosed that the directors in the past have elected to receive remuneration by way of allocation of share units. The proposed Monitor has been advised by the Applicants that, in the future, all directors will be remunerated by way of cash payments (at current cash-equivalent levels, less $25,000), subject to court approval.

[35]  In its report, the Monitor has recommended that the Applicants be granted the benefit of protection under the *CCAA* and, as well, the Monitor is supportive of the charges and financial thresholds proposed in the draft order. The priority of the various charges is specified in the order.

[36]  Having reviewed the record and having heard submissions, I am satisfied that the Applicants qualify as debtor corporations within the meaning of the *CCAA*.

[37]  The Applicants clearly have obligations in excess of the qualifying limit and have acknowledged that they are insolvent.

[38]  The jurisdiction of this court to receive the *CCAA* application has been established.

[39]  The Applicants seek an initial order under s.11 of the *CCAA*. The required Statement of Projected Cash Flow and the other financial documents required under s.11(2) have been filed. The application was not opposed by any party appearing.

[40]  Counsel to Flextronics, EDC and the Board of Directors all expressed their support for the granting of the requested relief. The Monitor expressed its approval to the requested form of order.

[41]  I am satisfied that it is appropriate that the Applicants be granted protection under the *CCAA* and an order shall issue to that effect, which order also approves the amending agreement with Flextronics and the granting of the EDC Charge. The draft order is based on the Model Order and the modifications as proposed are acceptable.

[42]  Although none of the Applicants have filed for Chapter 11 protection in the United States, and none of the Chapter 11 entities have filed as debtor companies under the *CCAA*, it is recognized that Nortel's operations are connected in many ways such that, in my view, it is desirable to implement a cross-border insolvency protocol. The initial order seeks approval of such a protocol which establishes the basis for communication and cooperation between the Canadian and U.S. courts, while confirming their independence. The form of protocol is acceptable to this court and is, accordingly, approved. However, this cross-border insolvency protocol cannot be implemented without the approval of the U.S. court.

Page: 7

[43] The Applicants have also requested that the Monitor be directed to commence proceedings under Chapter 15 of the Code to have the *CCAA* proceedings recognized as "foreign main proceedings". The effect of the Chapter 15 proceedings would be to give effect to this initial order in the United States. The Applicants anticipate that the Monitor will be appointed as the Applicants' foreign representative in respect of such Chapter 15 proceedings.

[44] The Monitor is of the view that the Applicants should be authorized to seek such recognition. I am in agreement with these submissions and the Monitor is accordingly authorized to seek such recognition under Chapter 15 of the Code.

[45] In considering whether these *CCAA* proceedings should be recognized as "foreign main proceedings", Mr. Doolittle at paragraph 189 of his affidavit provides comprehensive reasons for the basis for his conclusion that the Applicants' centre of main interest ("COMI") is in Toronto, Ontario.

[46] An order shall issue to give effect to the foregoing.

[47] I would like to express my appreciation to all parties involved in this process. It is clear that significant effort was expended by all concerned in the preparation of the materials. The detail contained in the affidavit of Mr. Doolittle as well as the proposed Monitor's report was of great assistance to the court.

_____
MORAWETZ J.

DATE:      January 14, 2009