IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

IN RE:                              : Chapter 11
                                    :
NORTEL NETWORKS, INC., et al,       : Case No. 09-10138 (KG)
                                    :
                Debtor              : Wilmington, Delaware
                                    : January 15, 2009
                                    : 11:19 o'clock a.m.
. . . . . . . . . . . . . . . . :

HEARING
BEFORE THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

- - -

APPEARANCES:

For the Debtors:        JAMES L. BROMLEY, ESQUIRE
                        LISA M. SCHWEITZER, ESQUIRE
                        JANE KIM, ESQUIRE
                        CRAIG B. BROD, ESQUIRE
                        Cleary Gottlieb Steen
                        & Hamilton LLP
                        One Liberty Plaza
                        New York, NY  10006
                           - and -
                        DEREK C. ABBOTT, ESQUIRE
                        THOMAS F. DRISCOLL, III, ESQUIRE
                        ANN C. CORDO, ESQUIRE
                        Morris, Nichols, Arsht & Tunnell LLP
                        1201 North Market Street, 18th Floor
                        P.O. Box 1347
                        Wilmington, DE  19899-1347

For the Trustee:        PATRICK TINKER, ESQUIRE
                        U.S. Department of Justice
                        Office of the United States Trustee
                        J. Caleb Boggs Federal Building
                        844 King Street, Suite 2207
                        Wilmington, DE  19801

For Certain             ANDREW M. LEBLANC, ESQUIRE
Bondholders:            ROBERT E. WINTER, ESQUIRE
                        Milbank, Tweed, Hadley & McCoy LLP
                        1850 K Street, NW
                        Suite 1100
                        Washington, DC  20006

2

APPEARANCES:  (Continued)

For EDC:                ANDREW D. SHAFFER, ESQUIRE
                        Mayer Brown LLP
                        1675 Broadway
                        New York, NY  10019-5820
                                 - and -
                        MICHAEL W. YURKEWICZ, ESQUIRE
                        Klehr Harrison Harvey Branzburg
                        & Ellers
                        919 Market Street
                        Wilmington, DE  19801-3062

For Westcon:            CHRISTOPHER A. WARD, ESQUIRE
                        Polsinelli Shalton Flanigan
                        Suelthaus PC
                        222 Delaware Avenue
                        Suite 1101
                        Wilmington, DE  19801

For Ernst & Young:      KEN COLEMAN, ESQUIRE
                        Allen & Overy LLP
                        1221 Avenue of the Americas
                        New York, NY  10020
                                 - and -
                        PETER J. DUHIG, ESQUIRE
                        Buchanan Ingersoll & Rooney PC
                        The Brandywine Building
                        1000 West Street, Suite 1410
                        Wilmington, DE  19801-1054

For ENH:                KATHRYN COLMAN, ESQUIRE
                        Gibson, Dunn & Crutcher LLP
                        200 Park Avenue
                        New York, NY  10166-0193

                                        - - -

Audio Operator:         Brandon McCarthy

Transcribed by:         Paula L. Curran, CET

          (Proceedings recorded by For The Record Gold digital
sound recording; transcript provided by AAERT-certified
transcriber.)

1          (The following occurred in open court at 11:19

2     o'clock a.m.)

3               THE CLERK:  Please rise.

4               THE COURT:  Good morning, everyone, please be

5     seated.  Mr. Abbott, good morning.

6               MR. ABBOTT:  Good morning, your Honor, how are you

7     this morning?

8               THE COURT:  Very well, thank you.

9               MR. ABBOTT:  Well, we appreciate a little time, your

10    Honor.  As with any case this large, there continue to be a

11    couple of small, moving parts.

12              THE COURT:  Certainly.

13              MR. ABBOTT:  We used the time to good measure with

14    Mr. Tinker from the U.S. Trustee's Office.  Perhaps the first

15    order of business, your Honor, would be to introduce some of

16    the team, if I may?

17              THE COURT:  Yes, please, that would be nice.

18              MR. ABBOTT:  Seated at counsel table, your Honor,

19    are the three principal lawyers from Cleary Gottlieb, Jim

20    Bromley, Lisa Schweitzer and Jane Kim.

21              THE COURT:  Welcome.

22              MR. ABBOTT:  Your Honor, in the first row is Mr.

23    John Doolittle, whose declaration I'm sure you've read --

24              THE COURT:  Yes.

25              MR. ABBOTT:  -- from the company.

4

```
1              THE COURT:  Mr. Doolittle, welcome to you, sir.

2              MR. ABBOTT:  And we've brought him to Wilmington on

3   this nice, comfortable day.  We're trying to keep him

4   acclimated, he's from Toronto, your Honor.

5              THE COURT:  Yes.

6              MR. ABBOTT:  And the cold weather is good for those

7   folks.

8              THE COURT:  Absolutely.

9              MR. ABBOTT:  Your Honor, we're prepared to present

10  all of these motions, to the extent necessary, but your

11  Honor, obviously, many of them are fairly routine.

12             THE COURT:  Yes.

13             MR. ABBOTT:  And I don't know if the Court wanted to

14  indicate which motions it wanted a presentation on or wanted

15  us to run through them all.  We're at your pleasure, your

16  Honor.

17             THE COURT:  I think, unless people have concerns or

18  comments to make, certainly Items -- I'm going by the agenda

19  -- 1, 2, 3, 4 and 13 were certainly, in my mind, routine.

20  And I don't know whether there have been any discussions with

21  the Office of the United States Trustee that require some

22  comment.

23             MR. ABBOTT:  Your Honor, there have been a handful

24  and those were emerging as we walked into the courtroom, so

25  there are a couple of things.  But we'll try to run through
```

1  the non-routine ones at first, I think, your Honor.  And

2  incidentally, we have moved on the docket, for the admission

3  pro hoc of my colleagues from Cleary, but I'd certainly move

4  them today for the hearing, if the Court hasn't got those

5  orders yet, which makes sense.

6           THE COURT:  I think we've signed them, but to the

7  extent we haven't, you are certainly admitted and welcome and

8  thank you.

9           MR. ABBOTT:  All right, and I think we'll start,

10 your Honor, if it pleases the Court, with a presentation by

11 Mr. Bromley, sort of --

12          THE COURT:  The background?

13          MR. ABBOTT:  -- the bit picture overview, if we

14 could.

15          THE COURT:  Yes.

16          MR. ABBOTT:  I think that will be helpful for the

17 Court, your Honor.

18          THE COURT:  That would be wonderful.  Thank you, Mr.

19 Abbott.  It's a solemn day, but I think, hopefully, a hopeful

20 day for these debtors.  Someone is talking on the phone and

21 I'm hearing what they're saying.  So, you might want to be on

22 mute.  I thought it was an echo, for a minute, Mr. Bromley.

23          MR. BROMLEY:  Your Honor, may I grab that easel

24 which we're probably going to need here in a minute?

25          THE COURT:  Yes, absolutely.  I've read the papers

1    very carefully.  They're an excellent set of papers, Mr.

2    Bromley and I'm prepared and hope you are, as well.

3              MR. BROMLEY:  Thank you very much, your Honor.  We

4    appreciate you making time for us today.

5              THE COURT:  Yes.

6              MR. BROMLEY:  These cases are challenging cases in a

7    lot of ways.  They present issues that have a lot of

8    different dynamics and they're difficult factually.  They're

9    challenging legally and emotionally.  I think it's important

10   to keep in mind that while we're sitting here in Wilmington,

11   Delaware, that Nortel and the Nortel companies are an

12   institution.  They're an institution, a Canadian institution

13   in particular, over 115 years old.  The equivalent of Bell

14   Labs and Western Electric, as we grew up learning about the

15   phone company.

16             THE COURT:  Yes.

17             MR. BROMLEY:  Technology innovators for over 115

18   years.  Current employers of nearly 30,000 employees around

19   the world, including 9,000 in the United States.  They are a

20   leader in technologies that we all deal with on a daily

21   basis, any time we use a phone system, pick up a telephone, a

22   wireless call, we've a voicemail, send an e-mail, use

23   something known as voice-over-internet protocol, we're using,

24   most likely, Nortel technology.  It's all around us and I

25   suspect it's being used right now to broadcast my voice.

1          It is certainly not a happy day that we find

2    ourselves here in front of you, your Honor.  But it is

3    certainly with a lot of hope that we appear.  Nortel has

4    faced a lot of challenges over the years, particularly over

5    the past eight years, as it's dealt with the dot-com bust,

6    certain investigations and most recently, with the credit

7    crisis and the general downturn in the economy.

8          Nortel is also what, I think, you could as a classic

9    multi-national.  It's an organization that is everywhere.

10   It's simply not here in the United States.  It's not in

11   Canada.  It's not in Europe or Asia.  It's in all of those

12   places and all of those places, at once.  It's in all of

13   those places, at once, every day.  For every transaction it

14   enters into, every piece of service it delivers, every piece

15   of support it supplies, it relies on the international

16   network that is in place.  The system of companies and the

17   system of payments and the system of orders and the system of

18   production.

19         In may ways, it's also a virtual business.  It

20   doesn't own its manufacturing facilities anymore.  It out

21   sources.  And indeed, it is an out source provider to other

22   companies.  It's part of the devolution of the vertically

23   integrated business.

24         So, when we're talking about this case today, your

25   Honor and when we're before you in the coming weeks and

1  months, we're always going to have to remember that that

2  framework is what characterizes Nortel.  Many cross-border

3  cases have a center and a tail, so to speak.  And in this

4  situation, I think it's fair to say that we have multiple

5  centers that are very important.  They're important to each

6  other and they're important to the creditors, but they're

7  also important to the continuation of the enterprise and the

8  maximization of value of the enterprise, however that may

9  occur.

10         And before I go into a little bit of detail, more

11  detail, with respect to the business, I think it's important

12  to start the story with what happened yesterday.  Because I

13  think the explanation of what happened yesterday will help

14  the Court understand a little bit of the planning that went

15  into this and the care and concern that was the foremost

16  concern to the management of the business, in terms of making

17  sure that this worldwide enterprise would be brought into

18  insolvency proceedings in a safe manner.  A manner that would

19  allow the employees and the value to be preserved in the best

20  way possible.  And as I said, your Honor, that is very

21  difficult when you're dealing with an enterprise that

22  operates everywhere at once, in so many jurisdiction.

23         So, if I could, I'd like to just tell you a little

24  bit of what happened yesterday.

25         THE COURT:  Please.

1          MR. BROMLEY:  At 7:30 a.m., we received a phone call

2   from Toronto and we were ready, after having already received

3   indications from the board of directors, that the

4   commencement of the proceedings here in the United States

5   could begin.  We needed to pick that time because we wanted

6   it to be at the most quiet time, in terms of markets around

7   the world.  We wanted the commencement to begin prior to the

8   market open in Toronto and New York and it's important to

9   also note that Nortel trades fully in both jurisdiction.

10          THE COURT:  Yes.

11          MR. BROMLEY:  It is a full filer under the U.S.

12   Securities Code.  At 8:30, a press release was made

13   indicating that the filings had taken place here in the

14   United States.  And indicating, as well, that proceedings

15   under the Canadian Company Creditors Arrangement Act, the

16   CCAA would begin.  Now, the CCAA, which is well known to most

17   U.S. Bankruptcy lawyers, is a little different than ours, a

18   little shorter.  But the one thing it doesn't provide for is

19   an automatic stay.  Our automatic stay happens immediately

20   upon the filing, as you know, your Honor.  And in Canada, an

21   application needs to be made.  The judge needs to hear the

22   presentations and then enter an order.  And the order

23   contains virtually identical type relief to the automatic

24   stay under 362(a), but nevertheless, a court hearing has to

25   take place and an order has to be entered, finding that the

1   relief is justified.

2           So, around 10:00 a.m., that began in Toronto.

3   Meanwhile, in Europe, meetings with certain worker's councils

4   and certain jurisdictions, which were required under local

5   law, also commenced.  And other preparations in the European

6   companies, which I'll refer to as EMEA, Europe, Middle East

7   and Africa.

8           THE COURT:  Yes.

9           MR. BROMLEY:  That's the abbreviation we use.

10          THE COURT:  Yes, I've seen that.

11          MR. BROMLEY:  Preparation began in multiple

12  jurisdiction across Europe for the commencement of

13  proceedings.

14          At around 1:00 p.m., the Canadian Court issued the

15  order and so, the CCAA proceedings in Canada were officially

16  commenced.  The stay was put in place and Justice Morowitz

17  (ph) recognized these proceedings as foreign proceedings

18  under the Canadian equivalent of Chapter 15, which is known

19  as 18.6 of the CCAA.  The Canadian order did a lot of things,

20  as well, providing particular protection that I'll explain in

21  a little more detail in a moment, about inter-company

22  transfers and the like.  The Court also approved a protocol,

23  which we will be seeking approval for here today.  So, part

24  one was taken care of.  We got into Canada, we got the relief

25  we needed and now we had to turn our attention to Europe.

1              At about 3:00 p.m. U.S. time, eastern time, I should

2       say, I'm sorry, about 1:00 p.m., at the time right after the

3       Canadian order was granted, a hearing was commenced before

4       Justice Blackburn in the High Court in London, seeking

5       admission into administration for 18 companies in the EMEA

6       group of Nortel companies.

7              A hearing then commenced before Justice Blackburn

8       and took, at least, two, maybe three hours.  This hearing

9       resulted in the granting of administration.  But I should

10      take a moment to explain a little bit about what occurs

11      there.  We're not talking simply about a United Kingdom

12      company, your Honor, we were talking about companies that

13      were spread out all over the European union.  And there's a

14      phrase that is used and I'll call it the center of main

15      interests, which I'm sure you're familiar with.

16              THE COURT:  Yes.

17              MR. BROMLEY:  Or COMI.

18              THE COURT:  Yes.

19              MR. BROMLEY:  It was very essential that a fulsome

20      and complete factual presentation be made to the justice of

21      the High Court, in order for him to find that the center of

22      main interests of the European union companies within the

23      EMEA group were located in the United Kingdom.  And why is

24      that important, your Honor?  It's important that in order for

25      the coordination of these international proceedings to take

1    place, we would like to have as few judges, so to speak, no

2    offense --

3            THE COURT:  None taken.

4            MR. BROMLEY:  -- as possible to talk together to

5    help make this all hang together.  And so what we have done

6    in Europe, is sought COMI recognition for European companies

7    that are no incorporated within the United Kingdom.  And

8    after a fulsome hearing and review of the evidence, Justice

9    Blackburn granted that with respect to 18 companies.  It's

10   very important, your Honor, because among the companies that

11   COMI was determined to exist, were the French, German and

12   Irish companies within the EMEA group.  These entities are

13   important entities for a number of different reasons.  Not

14   least of which is that they are centers of certain R&D,

15   owners of certain intellectual property and the generators of

16   substantial revenue with major European telephonic carriers,

17   such as Deutsche Telecom or Orange in France.

18           So, when that order was granted, it was a very good

19   thing, your Honor.  It was a good thing because now we have a

20   single Court to coordinate with.  We are not going to deal

21   with multiple jurisdictions in the European union and the

22   availability of COMI in the United Kingdom means that we

23   absolutely maximize the ability to reorganize.  Or if

24   necessary, to sell assets.  Because, of course, you can

25   imagine that if we needed to try to sell assets in a

1    devolving situation in multiple jurisdictions, value would be

2    lost almost immediately.

3            THE COURT:  Yes.

4            MR. BROMLEY:  So, an enormous amount of care and

5    attention went into trying to make sure that we were able to

6    obtain the COMI findings and so, we are very happy to do

7    that.  And so, by about 8:00 p.m. last night, your Honor, we

8    were sure that we had had that.  We also had, your Honor,

9    last night, filed by the monitor, Ernst & Young is the

10   monitor in the Canadian proceedings, Chapter 15 petitions.

11   In those Chapter 15 petitions there will be certain relief

12   sought today by counsel for the monitor, Allen & Overy.  And

13   so, along about 8:00 o'clock last night, we had finished a

14   long day of things in multiple jurisdictions, leaving only

15   this hearing to complete the loop.

16           So, the goal here, your Honor, is to bring this

17   enormous organization around the world in for a safe landing,

18   to maintain the status quo and to attempt to maximize value.

19   It's something that is kind of taken as a given when we're

20   dealing with a solely domestic organization.  And many of the

21   things that we'll have to talk about in these proceedings

22   will be complicated by the fact that they're multiple

23   jurisdictions, but we are confident that there are means to

24   make sure that the three jurisdictions will work together.

25   That the interests are aligned and that business will be able

1    to continue to operate, albeit, with certain restrictions.

2    But in the ordinary course, continuing to serve its customers

3    and supplier worldwide, continuing to provide support to its

4    employees and providing an opportunity both for

5    reorganization or if necessary, the sale of assets in certain

6    circumstances.

7            So, that's kind of what happened yesterday and

8    pardon me if I went on for a bit long, but it was a bit of an

9    exciting day, in a wonky sort of order way.

10           THE COURT:  Yes.

11           MR. BROMLEY:  So, what that means, your Honor, is

12   what we're now here for, is to deal with sort of our

13   traditional Chapter 11 things.  And I think it would be

14   worthwhile for me -- oh, and there are two other things I

15   wanted to mention.  Just prior to the filing, we were able to

16   accomplish two very important things.  And this will be

17   mentioned later as I describe the company, but there's an

18   organization in Canada known as Expert Development Canada,

19   EDC.

20           THE COURT:  Yes, yes.

21           MR. BROMLEY:  And they are like an export/import

22   support facility of the government.  They provide certain

23   backstop with respect to customer obligations and I mean,

24   Nortel obligations to customers.  And it's very important to

25   have that, because if you think about the way -- what Nortel

1     sells, they sell very expensive things that have to be

2     installed and maintained over very long periods of time.  And

3     so, in order to make sure that the customer is going to be

4     confident, there is often bonding that has to go into it to

5     make sure that service is going to be provided and

6     continuation during the life of the contract.

7               It's also important for a number of jurisdictions,

8     because when you think about what Nortel sells and you have

9     to think about who it sells it to, phone companies and

10    carrier companies, some of which, in many parts of the world

11    are government entities.  And by law, they require the

12    posting of these bonds in order for the contracts to be

13    granted.

14              So, the EDC facility has been in place for a long

15    period of time.  It's unsecured.  There's approximately $200

16    million, a little less, $186 million of exposure and unless I

17    specifically say dollars, your Honor, I should say everything

18    I refer to will be U.S. dollars.

19              THE COURT:  Okay.

20              MR. BROMLEY:  Unless I specifically say Canadian.

21              THE COURT:  That will be helpful.

22              MR. BROMLEY:  And Nortel has reported on that basis

23    for awhile.  So, there will be times I'll say Canadian, but

24    for now, it's U.S. dollars.  And the exposure of EDC, as I

25    said, is pre-petition exposure of about $186 million, it is

1    unsecured.  The facility with EDC, however, was due to expire

2    today and in light of the exigent circumstances, the folks at

3    EDC and the management team in Toronto were able to negotiate

4    a new facility, a short term facility and the hope is

5    certainly that that will be available and expanded in the

6    future.  But, for right now, a facility of $30 million and

7    that facility will be secured by a junior lien or a charge,

8    as it's called in Canada and that charge was granted in favor

9    of EDC to the extent of $30 million yesterday in the Canadian

10   order.

11         I should note, your Honor, that the pre-petition

12   exposure of EDC of $186 million is an exposure where the

13   direct obligation is the Canadian operating business, NNL,

14   Nortel Networks Limited and the U.S. business, Nortel

15   Networks, Incorporated, guarantees that obligation.

16         THE COURT:  Okay.

17         MR. BROMLEY:  And that will be a theme that you'll

18   see repeated as we go through the way the business is put

19   together and the financing is put together and the customers

20   are served and the suppliers are contracted with.  There's a

21   consistent and continual overlap between the companies.

22   Which, I think, actually helps as we go through this process.

23         The second issue, your Honor, that was announced

24   just prior to yesterday's hearing in Canada, was an agreement

25   with the single largest supplier of Nortel.  A company that

1   we all refer to shorthand, as Flex.

2          THE COURT:  Okay.

3          MR. BROMLEY:  But it's Flextronics.  They are a

4   Singapore-based entity with operations all around the world

5   and in very shorthand terms, your Honor, Nortel sold its

6   manufacturing facilities to Flex several years ago and

7   Flextronics has been contracting back and supplying the

8   hardware that Nortel sells.

9          And the arrangement that was put in place and

10  negotiated into the wee hours of the morning yesterday, is an

11  agreement that amends certain other agreements.  And the

12  agreements that they amend are Canadian agreements.  They are

13  agreements between Nortel Networks Limited and certain

14  Canadian Flextronics entities.  And the arrangement is for

15  the purchase of certain inventory that Nortel did not

16  arguably have the obligation to buy in the amount of $120

17  million and those amounts would be payable in four tranches

18  over the period between now and the middle of April.  That

19  arrangement was approved by the court yesterday in Toronto.

20          THE COURT:  Okay.

21          MR. BROMLEY:  And the first payment was made

22  yesterday of $25 million.  That is extraordinarily important,

23  your Honor, because Flextronics represents approximately 70

24  percent of the out-sourced production with respect to Nortel

25  hardware.

1           So, it is important to note that we may be back for

2    come critical vendor relief and just to give you fair

3    warning.  We don't have a motion yet, but we have a lot of

4    phone calls asking for one.  But we really couldn't take any

5    steps in that regard, your Honor, until we dealt with

6    Flextronics, which in many respects, is the critical vendor.

7    So, we're very happy that we were able to come to that

8    arrangement and while it is a Canadian contract, the way the

9    system works within the Nortel empire is that contracts,

10   purchase orders may be entered into by the U.S. entities that

11   incorporate all of the terms of the Canadian contract for

12   delivery of goods and services or actually, just goods out of

13   Flextronics to U.S. customers of the U.S. entities.

14           THE COURT:  Okay.

15           MR. BROMLEY:  So, without that ability under the --

16   the amendment under the Canadian contracts, then none of

17   those purchase orders would be able to be entered by the U.S.

18   entities and there would be no supply.  So, it's again, yet

19   another sign of the co-dependency, so to speak, of all of

20   these organizations.

21           Your Honor, if I may, it would be worthwhile, I

22   think, to take a little bit of time and talk to you a little

23   bit about what Nortel does.  Because that is important and

24   I've mentioned a little bit of it already.  But it is a

25   technology company.  It invents things and develops things,

```
1    markets it and sells it and then services it.  Now, it
2    doesn't manufacture it anymore, by and large.  And the way
3    the organization is structured takes into account all of
4    these aspects.  In terms of what it sells, I think it's
5    important to recognize, too, that there are three main
6    components.  There's hardware, the actual piece of equipment.
7    There's software, how it works and is integrated into the
8    systems and there are services and support and services and
9    support are very important.  It's like how the car dealers
10   make money off of fixing your muffler when you bring it back.
11             THE COURT:  Right.
12             MR. BROMLEY:  So, these three things are integrated
13   into almost every transaction that Nortel enters.  You're not
14   going to buy a telephone system if you are going to not get
15   the software that runs it and the people who know how to fix
16   it.  And that type of organization is present in all of the
17   various legal jurisdictions.
18             In the United States, there are 9,000 employees and
19   we give the figure in the pleadings of 30,000.  That's really
20   24,000 that were employed specifically by Nortel.  There's
21   another 6,000 that are employed by joint ventures, in which
22   Nortel is a joint venture partner.
23             THE COURT:  Okay.
24             MR. BROMLEY:  And there are two major joint
25   ventures.  One in Korea with LG Electronics and two in China.
```

1    Those joint ventures are -- the parties to those joint

2    ventures are Canadian entities.  Of the 9,000 employees in

3    the United States, they do a lot of different things.  They

4    do R&D, research and development, sales and servicing,

5    operations, support, it's a real broad band.

6        By comparison, Canada has about 6,000 employees.  If

7    you had to look at where the larger concentrations were, you

8    will find that there's more R&D that takes place in Canada

9    than in any other jurisdiction.  Indeed, there is a very

10   large research campus outside of the Capital of Ottowa, which

11   I'll talk to about in a minute, because it forms a collateral

12   package that helps give comfort to you, hopefully and to the

13   U.S. creditors, in terms of how some of the inner-company

14   financing is going to take place.

15       Of the employees in the United States, your Honor,

16   you have about 1,800 in the United States that are engaged in

17   research and development, in a number of locations around the

18   country.  Approximately, 1,400 are engaged in sales and

19   nearly 4,000 are engaged in services and operations.   Now,

20   what is operations?  Service, as you know, I think most of us

21   can figure out what that means, going out and making sure

22   that the stuff we've sold is continuing to work.  Operations

23   has to do with the procurement facilitation of the

24   manufacturing and support.  Because you have to understand,

25   too, as well, that you're not simply going in and buying

1    something off the shelf.  If Verizon Wireless network is

2    supported by Nortel, it is a customized system and so, you

3    have to make sure that we have a whole group of people who

4    are coordinating with our suppliers to make sure that

5    everything is manufactured according to spec.

6          There's other overhead with respect to legal and

7    treasury and the like.  Most of that, however, is located in

8    Canada.  We do have elements of that, as well, in the United

9    States.  And it's worthwhile to note that the vast majority

10   of the intellectual property of the Nortel companies is owned

11   by Nortel Networks Limited, the Canadian company.  And so,

12   how we have a little bit more co-dependency here is that the

13   countries around the world that sell and market and support

14   Nortel products are licensed intellectual property out of

15   Canada and there's a compensation system that's put in place

16   that makes sure that the revenues are allocated appropriately

17   amongst the different businesses.

18         There are three businesses that Nortel engages in

19   mainly.  The first is the carrier business.  The carrier

20   business is the business with respect to the telecom

21   companies, the wireless communications and the like.  That is

22   the largest proportion of revenue of the business.  And that

23   is the part of the business that you see sort of most -- it's

24   most apparent, it's the Verizons and the Alltels and the

25   Sprints of the world who are using this.

1          The second is the Metro Ethernet business or MEN.

2    That is more of the cutting edge internet type of work and a

3    real growth area and opportunity.

4          The enterprise business is the third part of the

5    business.  Enterprise Solutions, as it's called, is a package

6    of a product and services, where you go in and you provide

7    consulting advice and help develop solutions, that deal not

8    only with Nortel technologies, but also integrate

9    technologies from other intellectual property providers.

10         THE COURT:  A fourth was mentioned in the papers, I

11   think, global services, as I recall.

12         MR. BROMLEY:  Yes, global services was separate and

13   supported each of them and now they're taking essentially,

14   the services business that supports MEN and merging it into

15   MEN.

16         THE COURT:  Okay.

17         MR. BROMLEY:  The services business that supports

18   carrier and the like.  So, it's just sort of redefining it,

19   but it's not a separate business unit.  And that was -- that

20   changeover was occurring on January 1.

21         THE COURT:  Okay.  And as I understand it, each of

22   these business segments operate across each of the legal

23   entities?

24         MR. BROMLEY:  Yes.

25         THE COURT:  Okay.

1          MR. BROMLEY:  I was going to mention, your Honor,

2    that in a moment, it's important to think, too, about each of

3    these businesses have different characteristics.  The carrier

4    business and the MEN business are businesses that enter into

5    big contracts with relatively few customers, that require

6    performance over long periods of time.  These are contracts

7    that are absolutely essential to the customers.  They go to

8    the absolute core of what those customers are doing.  Imagine

9    if you didn't have the computer systems or the phone systems,

10   in any large organization, things would collapse and collapse

11   rapidly.  So, they are enormous investments.

12          They are also investments that are predicated very

13   much on confidence. Confidence that the technology is going

14   to continue to be there.  The software will continue to be

15   there.  The support will continue to be there.  And so, you

16   know, in terms of bringing the companies in, in the way that

17   we have, it's really important for our customer base to

18   recognize that the company is brought in as a whole.

19          THE COURT:  Of course.

20          MR. BROMLEY:  The enterprise business is a little

21   different.  They're smaller contracts with a larger number of

22   companies.  So, and that is, you know, just by the nature of

23   this solution-driven business that it has.

24          As you mentioned, your Honor, these businesses are

25   in multiple jurisdictions and each one of the jurisdictions,

1     they -- the three businesses essentially operate out of the

2     same business -- out of the same legal entity.   So, it's not

3     as if there is a carrier company in the United States and a

4     MEN company and an Enterprise company.   They all operate out

5     of NNI, which is the U.S. operating company and that's the

6     same around the world.

7            So, it might be worthwhile, having set forth the

8     business, to talk a little bit about the way the production

9     takes place.

10            THE COURT:   Okay.

11            MR. BROMLEY:   The production is outsourced, as I

12     mentioned.   Flextronics is the largest, but there are plenty

13     of others, as well.   And that production has implications in

14     a couple of different ways.   So, for instance, Flextronics

15     has a factory in Guadelahara, Mexico.   There may be multiple

16     contracts with the Guadelahara, Mexico facility that come out

17     of Nortel Networks, Incorporated, the U.S. entity.   Those

18     contracts would incorporate the terms of the master agreement

19     that exists between Flextronics, Canada and Nortel Networks

20     Limited.   And it may be that the goods and services being

21     produced by that Guadelahara factory, the goods, actually,

22     are going to be shipped to France or Germany or Morocco or

23     Spain or some other country, because the United States

24     organization operates as a distributor, so to speak.

25            They are the ones who take orders.   There are

1  several of these hubs.  And take the product and move it out

2  throughout the world.  The U.S. entity, NNI, the Canadian

3  entity, NNL, the German entity, the French entity, the UK

4  entity and the Irish entity are those businesses.  They are

5  the ones who take the orders in, move them out in an

6  economically rational and tax efficient basis and the goods

7  are then produced remotely and shipped directly to the

8  customer.

9            THE COURT:  Okay.

10           MR. BROMLEY:  That does a couple of things.  It

11  means that your Honor is not likely to see an awful lot of

12  reclamation claims, because things actually aren't shipped to

13  Nortel, per se.  They're actually produced at the remote

14  location by the third party manufacturer and shipped directly

15  to the customer.

16           As you might imagine, when you have a structure

17  that's put in place like that, it does put pressure on, sort

18  of, the legal regimes that we're all looking at.  And that's

19  why, again, it was very important for us to do what we've

20  done.  Because, frankly, if you didn't have the ability to

21  use the intellectual property from Canada, if you didn't have

22  the ability to access the large customer base in the United

23  States, the two would collapse.  Without the technology and

24  the intellectual property and the R&D, the United States

25  would have nothing to sell.  And without the United States to

1    sell and generate revenue, the intellectual property and the

2    R&D wouldn't generate money.  So, that's why part of what

3    we're talking about, your Honor, is the way funds transfer

4    and move around the organization.

5            So, the long-term viability of these companies are

6    inter-dependent on each other and particularly within North

7    America.  Indeed, you know, it's very typical within Nortel

8    to not even refer to the United States and Canada, it's

9    usually just a reference to North America, because of the

10   inter-connectedness between the two.

11           Your Honor, with respect to the way that company's

12   organized, it also reflects, I think, quite a bit on the way

13   the creditor constituencies are situated.  I can give you an

14   example and I already have, actually, with EDC.  Because the

15   EDC bonds that are issued, performance bonds, most of them,

16   actually, are being issued for contracts that lie outside

17   North America.  Because those are where the requirements for

18   bonds are most -- are most needed.  There's a certain

19   population within the United States and there's an even

20   smaller population within Canada, but the largest numbers are

21   outside.  So, what you have there is basically, the U.S. and

22   Canadian operating companies procuring these performance

23   bonds from EDC, guaranteeing those obligations, if they're

24   ever called and making sure that you can generate the sales

25   around the world.  Because, after all, your Honor, there are

1    only a certain number of telephone companies.  Less and less

2    these days.

3              THE COURT:  That's right.

4              MR. BROMLEY:  And so, you need to be able to go

5    around the world to sell them.  And with the confluence of

6    the technology converging around the world, it's more and

7    more possible to sell in multiple jurisdictions.

8              So, EDC is an example, but the biggest example are

9    the bonds.  Because the bonds actually provide a little bit

10   of framework here.  We're sitting here, your Honor, without

11   any secured debt before you and you're not going to see that

12   much these days.

13             THE COURT:  No.

14             MR. BROMLEY:  And certainly, that's a good thing as

15   a bankruptcy lawyer.  The bonds are about four and half

16   billion dollars worth of bonds, denominated in U.S. dollars.

17   And they have been issued or guaranteed by four entities.

18   Nortel Networks Corporation, the parent company, the publicly

19   traded parent company and a holding company in Canada.

20   Nortel Networks Limited, the operating company in Canada.

21   Nortel Networks, Incorporated, the operating company here in

22   the United States and Nortel Networks Capital Corporation, a

23   special purpose financing vehicle.

24             So, what that means is you essentially have joint

25   and several liability for four and a half billion dollars of

1   public debt across North America, both in the United States

2   and in Canada.  So, a lot of the issues that kind of go into

3   the mix, when you're talking about company versus company

4   issues and allocations, frankly, your Honor, are going to

5   come out in the wash in a case like this, where the creditor

6   body sits very firmly across both jurisdictions.

7           Customers, as well, sit across jurisdictions,

8   because what is happening when you enter into a contract, for

9   instance, because of the way the system is put in place, if a

10  contract comes into Nortel Networks, Incorporated, certain

11  aspects of that contract are going to have to be fulfilled by

12  other parties within the other entities within the Nortel

13  Network.  And so, those contracts basically go out and are

14  sent out throughout the system, so that, if a contract comes

15  into the U.S. and the goods that are going to be produced,

16  have to be produced in Germany, then we've created a bond to

17  Germany on that U.S. contract.  If it's being produced out of

18  Canada, we've created a link there, as well.  And virtually

19  all of the contracts have some element of that.

20          The suppliers, your Honor, are really in the same

21  situation, because as I mentioned with Flextronics, you will

22  see on our top 40 list, they're one of our largest creditors

23  from a U.S. debtor's perspective.  They are also one of the

24  largest creditors from a Canadian debtor's perspective.  So,

25  the identify of creditors is an interesting aspect of this

1    and it's important, because, as I said, your Honor, if

2    there's to be value maximization here, we have to keep the

3    whole thing together.

4            There are three main characteristics, your Honor and

5    then I'm going to stop, if I could.  There are three main

6    characteristics of the way that the, I would say, the

7    business operates, aside from the things that I've already

8    mentioned.  And one I should mention is employees.  There, as

9    I said, are 24,000 employees around the world and it is

10   important to recognize that there are differences in the way

11   that legal regimes require the treatment of employees around

12   the world.  And so, it is very possible, indeed likely, that

13   there will be different types of creditor claims in each of

14   the legal jurisdictions, as is relates to employees.

15           But it's also important to recognize that with

16   respect to employees, within Nortel they work collaboratively

17   on a daily basis across jurisdictions.  And I would say, not

18   just collaboratively, but almost, in my experience in the

19   past several months, seamlessly, so we would be on a phone

20   call, for instance, talking about intellectual property and

21   how it relates to a contract with Verizon, say, and we are

22   dealing with people who are sitting in the UK and people are

23   sitting in the United States and people are sitting in

24   Canada, because they are all responsible for servicing that

25   particular portfolio.

1            It's also important to recognize, as we'll mention

2     in our employee motion, that employee incentives are driven

3     by global results.  So, while everyone has their own personal

4     performance incentive metrics, that are decided on an

5     individual basis every year, there's a substantial component

6     of performance compensation and that deals at a global level.

7     So, you're dealing across enterprise in that respect.

8            The second point, your Honor, is what is really a

9     profit-sharing mechanic that moves the profits to the various

10    legal entities.  And the term of art that's used is transfer

11    pricing.  You know, it's interesting that you can practice

12    Bankruptcy Law for quite awhile and not run into the way that

13    this thing operates.  But there are United Nations guidelines

14    on how transfer pricing is supposed to be put together, the

15    OECD is an international organization that is in place to

16    make sure that transfer pricing is done appropriately across

17    jurisdictions.  And it's really a simple idea.  It's the idea

18    that you want to make sure that when a revenue comes in, that

19    it gets put in the right place.  And so, if you have someone,

20    an entity, that only is a sales entity in a country such as

21    Spain, for instance, if you're selling something, you should

22    get a little bit of the profit.  Who should get more of it?

23    Well, it would depend on who made it, who invented it, who

24    brought it to market, who developed it.  And when all that's

25    being done within a group and some of the entities within

1   that group sit in multiple jurisdictions, there needs to be a

2   mechanic to figure out how that's done.  So, transfer pricing

3   is a way to do that.

4          It's not all that complicated in theory.  It's

5   really made more complicated by the fact that it's a very

6   expansive business in multiple jurisdictions.  But what I

7   found interesting about it is that rather than trust the

8   companies to figure it out, all of the taxing jurisdictions

9   around the world, including ours here in the United States,

10  the Internal Revenue Service have their fingers into this

11  like you wouldn't believe.

12         The way that the transfer pricing systems are put in

13  place involves enormous submissions to the taxing

14  jurisdictions, long, drawn-out audits with respect to whether

15  the right number is used or the wrong number is used and it's

16  all because the taxing jurisdictions are fighting with each

17  other about tax revenue.

18         THE COURT:  Right.

19         MR. BROMLEY:  So, if there's profit to be taxed in

20  the United States, the IRS damn well wants it, your Honor and

21  they want it and they're going to argue with the people who

22  think that they should get it.  And so, what we have is

23  constant communication between the taxing jurisdictions for

24  the multinationals like Nortel.  And in may respects, the

25  company does the best it can and waits for them to fight it

1    out, to figure out where it goes.  So, right now, the company

2    operates under a transfer pricing mechanism that has been

3    reviewed by various taxing jurisdictions.  There's a proposal

4    to amend that a little bit, a proposal that was made months

5    and months and months ago, pursuant to another submission and

6    which is going to be implemented in due course -- in the

7    ordinary course.

8            But all of it is based on the concept that within

9    the allocation of profits, you're supposed to have some proxy

10   for arm's length transactions among companies within a group.

11   So, and the key elements of that are that it's being reviewed

12   and under this, in a sense, the jurisdiction and review of

13   the taxing authorities, which it is and that accurate books

14   and records are being kept, which they are.

15           So, when you're talking about transfer pricing, it

16   sounds really complicated.  It's really all about making sure

17   the profit goes to the right place and the tax man gets the

18   right compensation and ultimately, we're all subject to that.

19           THE COURT:  That's right.  And does it make a

20   difference as far as Nortel is concerned, where that tax

21   falls, based upon different rates?

22           MR. BROMLEY:  Well, it does, it does, your Honor and

23   that's part of the push and pull of that process.  You know,

24   there are lower cost jurisdictions.  There are places where

25   losses sit and we'll talk to you, a little bit, as well,

1   about the NOL trading restrictions order.  And so, the

2   organization of any multi-national is driven by tax

3   considerations to make sure that within the boundaries of the

4   law, that you're able to pay as a little taxes as possible.

5           THE COURT:  Right.

6           MR. BROMLEY:   Something I think every one of us

7   aspires to.  So, there are issues that go to the allocation.

8   There are judgment calls that go into it.  But, again, under

9   this kind of rubric of all of the jurisdictions, at once,

10  talking to each other and talking to Nortel and this is

11  what's happening in all of the multi-nationals around the

12  world.  So, I think, if there's a growth industry, transfer

13  pricing accounting is certainly one of them, in my mind, your

14  Honor.

15          The third element of this is the cash management

16  system and at this point, I may pause, because I don't want

17  to go into seeking specific relief with respect to any of the

18  particular motions, unless your Honor would like to.  But I

19  think, you know, that is kind of --

20          THE COURT:  We have that motion, I'm sure we'll get

21  to it then.

22          MR. BROMLEY:  So, that's, if you will, your Honor,

23  an overview of the Nortel business --

24          THE COURT:  Yes.

25          MR. BROMLEY:  -- around the world.  The process by

1   which we got here.  The legal mechanics that required, you

2   know, us to be here today, rather than yesterday.  It's an

3   architecture that was carefully planned and all with the goal

4   of making sure that we can try to respect to the greatest

5   degree possible, the legal entities.  But also, recognize

6   that with respect to the maximization of value for all the

7   creditors of all those entities, it's absolutely important

8   that, you know, it be kept together.  And when that phone

9   rings and an order is place, it can be shipped and directed

10  and paid and invented and compensated and supported from all

11  of the different parts within the matrix that exists within

12  Nortel.

13              Your Honor, I did bring a chart for you.

14              THE COURT:  Okay.

15              MR. BROMLEY:  I don't think it's -- I'll explain it

16  to you just very briefly, if I could approach.

17              THE COURT:  Please.  Is this the cash management

18  chart or?

19              MR. BROMLEY:  No, your Honor, this is just the

20  organizational --

21              THE COURT:  Oh, okay.

22              MR. BROMLEY:  If I may approach, your Honor?

23              THE COURT:  Yes, thank you.

24              MR. BROMLEY:  We blew it up because --

25              THE COURT:  Oh, okay.

1        MR. BROMLEY:  -- it's hard to read, it's very small.

2        THE COURT:  Yes.  Thank you, Mr. Bromley.

3        MR. BROMLEY:  If I can just point you, your Honor,

4   to there's three colors on the chart.  The yellow companies

5   are the Canadian debtors, they are now subject to the

6   protection of the CCAA and that includes Nortel Networks

7   Corporation, the parent publicly traded company.  Nortel

8   Networks Limited, right underneath it, that is the operating

9   company within Canada and three other entities down below,

10  including Nortel Networks Technology Corporation, which is

11  the owner and fee simple of the Carling facility, which we'll

12  mention in connection with the cash management system.

13       THE COURT:  Yes.

14       MR. BROMLEY:  The pink companies, your Honor, are

15  now yours.  These are the American debtors.  That includes

16  Nortel Networks, Incorporated, the main U.S. operating

17  entity.  In terms of employees, most of them are dormant and

18  have certain reasons why they're here.  The one that isn't

19  and has employees is all the way up at the top right, Altion

20  Web Systems.

21       THE COURT:  Okay.

22       MR. BROMLEY:  They have 68 employees, but all the

23  other employees in the United States are located right here.

24       THE COURT:  Okay.

25       MR. BROMLEY:  The blue companies, your Honor, are

1    the ones that are now in administration in the United

2    Kingdom, subject to COMI findings with respect to the center

3    of main interest being in the United Kingdom, with the main

4    company Nortel Networks U.K. Limited, up here at the top.

5    There are some, as you can see, subsidiaries of the Canadian

6    company, that are in administration, that sit directly below

7    the Canadian operating company and not below the U.K.

8    operating company.  But from an operational perspective, they

9    have always been operated within this EMEA system and that's

10   why COMI determinations were made with respect to these

11   entities.

12             THE COURT:  Okay.

13             MR. BROMLEY:  So, there are a lot of other

14   companies, your Honor, that have not filed.  Many of them,

15   you'll see little asterisks, those are the ones that are

16   inactive.  But there are, down here, two other areas of the

17   world that it's our hope that are stable and do not need any

18   issues addressed and that would be the so-called CALA

19   entities.

20             THE COURT:  Yes.

21             MR. BROMLEY:  C-A-L-A and that is Caribbean and

22   Latin America.  And by virtue of the way certain

23   organizational issues, some of the CALA entities are under

24   the North -- the United States company and most of them are

25   under the Canadian company.  But right now, we think that

1    Latin America should be okay.

2            THE COURT:  Okay.

3            MR. BROMLEY:  And then there are others in Asia,

4    your Honor, that are down lower.  All the Asian entities,

5    except for one, sit below the Canadian parent and that's

6    where the two joint ventures with China and Korea are

7    located.

8            THE COURT:  Okay, thank you.

9            MR. BROMLEY:  And I should mention, your Honor, that

10   there are two other entities.  One is so secret, I can't tell

11   you what it's about -- and I'm just kidding, a little bit.

12   One is called Nortel Government Solutions.  Nortel Government

13   Solutions is a government -- is an entity that solely does

14   contracts with the U.S. Government.  Because it is owned

15   indirectly by a Canadian company, there is a proxy

16   arrangement that circles this company.  That means that

17   visibility into it is very limited because of the Department

18   of Defense security clearances that relate to that business.

19           So, right now, one of the issues that we will be

20   dealing with in cash management as to NGS, is that there are

21   certain payroll functions that operate out of Nortel Networks

22   Incorporated.  So, the payroll for Nortel Government

23   Solutions is made by NNI, but it's reimbursed on a real-time

24   basis by NGS.  So, NGS has no cross to call for any issues

25   that -- required to file.  It is liquid and fully funded.

1    The only issue would be that on a periodic basis, during

2    payroll cycles, Nortel Networks may incorporate it.  May, for

3    a short period of time, fund their payroll and then be

4    reimbursed by NGS.

5              THE COURT:  Okay.

6              MR. BROMLEY:  So, that sits outside.  And then

7    there's another company called Diamondware, where we have

8    similar issues with respect, not to the secrecy issues, but

9    that's an operating company within the United States, but at

10   this point, we don't believe that there's any need to bring

11   that into the proceedings.

12             THE COURT:  There was a reference to Nortel Networks

13   CALA, Inc.?

14             MR. BROMLEY:  Nortel Networks CALA, Inc.

15             THE COURT:  As a non-filer?

16             MR. BROMLEY:  As a non-filer.  That is -- that

17   relates to that Caribbean and Latin America.

18             THE COURT:  Fine, good.

19             MR. BROMLEY:  There are two other things that are

20   mentioned, your Honor, in terms of the corporate chart.

21   There is a company called Nortel Ventures Capital.  That is a

22   financing vehicle.  The way that the technology world works

23   is there are lots of people in places including back rooms

24   and garages and things like that, that invent things.  Like,

25   Steve Jobs and Bill Gates, sometimes, it works out.

1                THE COURT:  Yes.

2                MR. BROMLEY:  And the companies like Nortel provide

3    seed capital to these small organizations.

4                THE COURT:  Okay.

5                MR. BROMLEY:  And so, Nortel Ventures is a company

6    that really is not active other, in the sense that it

7    provides certain financing in relatively small amounts, into

8    existing investments.  So, that is -- there's a company

9    within the group called Nortel India, that sits under the

10   United States.  Right now, we don't see any requirement.  It

11   actually, then relates to another entity that sits under the

12   Canadian companies, that also does business in India.  It's,

13   for the moment, not required to be filed.

14               THE COURT:  Okay.

15               MR. BROMLEY:  So, I think that covers the universe

16   of the filers and non-filers in the U.S.  There are a number

17   of companies that are in the EMEA group that have not filed,

18   that we believe are not required to file, as well.

19               So, that's the kind of overview of the structure.

20   All the information that I've given you on it, your Honor, is

21   included in the declaration of Mr. Doolittle.

22               THE COURT:  Yes.

23               MR. BROMLEY:  And in connection with the hearing, we

24   will ask for the admission of the declaration into evidence,

25   your Honor.

```
 1              THE COURT:  Of course.

 2              MR. BROMLEY:  So, at this point, your Honor, I think

 3    that's the overview and maybe if we could go to the specific

 4    motions or if you have any questions, I'd be happy to address

 5    them.

 6              THE COURT:  No, that was very, very helpful, Mr.

 7    Bromley, thank you.  It was very thorough and clear.  Good

 8    morning, Ms. Schweitzer.

 9              MS. SCHWEITZER:  Good morning, your Honor.  We can

10    and I think probably it would be easiest just so that things

11    don't fall through the cracks, is to just go in order of the

12    agenda letter.

13              THE COURT:  I agree, I agree.

14              MS. SCHWEITZER:  And then we don't have to

15    characterize what's important today and what's housekeeping.

16              THE COURT:  Exactly.

17              MS. SCHWEITZER:  Housekeeping, perhaps, is very

18    exciting news to some other people who have been calling all

19    morning.  So, on the first motion, the motion for seeking

20    joint administration of the cases, I believe you indicated

21    that is a housekeeping type motion.

22              THE COURT:  Yes.

23              MS. SCHWEITZER:  So, I would offer that without

24    further explanation.  The only note is that the United States

25    Trustee asked that we, on the front of every motion, create
```

1    -- indicate the link to the website for the debtors, where

2    they can find the address for all of the debtors.

3              THE COURT:  Okay.

4              MS. SCHWEITZER:  So, we'll do that and we'll agree

5    to that, we can put it in the order or not, but either way,

6    it will be done.

7              THE COURT:  I think it's sufficient that you've

8    represented that you'll do it.

9              MS. SCHWEITZER:  Okay, great.  So, that's the first

10   day motion -- that's Agenda Item Number 1.  Agenda Item

11   Number 2 is, again, the consolidated list of creditors and

12   filing certain notices.  I believe you indicated that you had

13   no further questions.

14             THE COURT:  No further questions and I assume the

15   United States Trustee's Office was fine with that, as well?

16             MS. SCHWEITZER:  That's right.  So, we would submit

17   that.

18             THE COURT:  Yes.

19             MS. SCHWEITZER:  And then the third motion, which is

20   a motion to extend time to file schedules of assets and

21   liabilities and the statements of financial affairs.  The

22   United States Trustee has asked that we present that on

23   notice, which we're happy to do.

24             THE COURT:  Okay.

25             MS. SCHWEITZER:  So, we can do that on the 20th day

1    hearing and then we'll send out a notice of motion for that.

2              Agenda Item Number 4, which is the motion for the

3    retention of Epic Bankruptcy Solutions as the noticing and

4    balloting agent.  Again, I believe you indicated that you

5    were comfortable with the motion accepting it on it's face.

6              THE COURT:  Exactly.

7              MS. SCHWEITZER:  So, we'll submit that as presented.

8    And then, Number 5 on the agenda item, which is DI-8 is the

9    motion regarding --

10             THE COURT:  Utilities.

11             MS. SCHWEITZER:  -- the utilities motion.  That, I

12   think, it contains relatively standard procedures for how to

13   reconcile these adequate assurances claims.  And there are

14   two different notes on that.  It's first, we've been

15   contacted by Verizon and we agreed with them that we would

16   adjourn the motion with respect to them and we would just

17   present it at the final hearing.

18             THE COURT:  Okay.

19             MS. SCHWEITZER:  So, we've added clarifying language

20   to that effect in the order that we would hand up.

21             THE COURT:  And it is an interim order, so --

22             MS. SCHWEITZER:  Yes, it is.  It's an interim order

23   with respect to everyone, although, certain of the notice

24   procedures would start before the final hearing.

25             THE COURT:  Right.

```
 1              MS. SCHWEITZER:  And then, the United States Trustee
 2    also asked for clarification that if there was a change in
 3    circumstances or a significant post-petition default later
 4    on, that people can come back again.  That, you know, if
 5    there was a complete change in circumstances, they're not
 6    locked into the fact you haven't raised an objection in the
 7    first ten days or 20 days of the case.
 8              THE COURT:  Okay.
 9              MS. SCHWEITZER:  So, we're going to add clarifying
10    language into the order to reflect that comment.
11              THE COURT:  Good.
12              MS. SCHWEITZER:  With that, I mean, I'm happy to go
13    through the procedures more, but I think they're relatively
14    routine.
15              THE COURT:  They are relatively routine and I
16    certainly accept them and we'll grant that motion.
17              MS. SCHWEITZER:  Okay.  Now, that brings up to
18    Agenda Item Number 6 and Mr. Bromley will be handling Items
19    6, 7, so, I would defer back to him and you get to hear about
20    the cash management system, which is a nice segue from where
21    we just left off.
22              THE COURT:  Oh, yes, the cash management system.
23    Thank you, Ms. Schweitzer.  Well, Mr. Bromley, it is
24    involved, that's for sure.
25              MR. BROMLEY:  Yes.
```

1          THE COURT:  And I understand why.

2          MR. BROMLEY:  Well, your Honor, it's involved, but I

3   think it's fair to say that what we -- if there's a theme to

4   it, is what we had attempted to do and I think we have

5   accomplished, is to make sure that the cash management

6   system, which is essential to lubricating the system and

7   keeping the business running, is maintain to the greatest

8   degree possible.  But also, that protections are provided to

9   make sure that the multi-national and multi-jurisdictional

10  nature of this case is respected.

11          So, and if I could step back, your Honor, I think

12  almost everything that we're doing here, if this was a group

13  of companies that operated within the United States and the

14  United States only, we'd be moving on very quickly.

15          THE COURT:  Yes.

16          MR. BROMLEY:  And so, but I would never attempt to

17  say don't worry about it, it's just like the U.S.  So, I

18  think it's important that maybe we walk through it, in a

19  little bit of detail, because we have taken very specific

20  steps to make sure that the issues that are here, that have

21  been raised, have been addressed.

22          And again, we recognize in the importance of

23  maintaining the integrity of the business, we've had to look

24  at basically, the three jurisdictions that interact with each

25  other and converting the pre-filing relationships where

1    everything happened without the need to recognizing the

2    separate jurisdictional elements in the same way.  I mean,

3    clearly, all the books and records have been kept on a very

4    precise basis.  But the question is, what do you do in the

5    post-filing?

6            Now, typically, in a cash management motion of a

7    group of U.S. debtors, you basically freeze the pre-petition

8    amounts.  553 says you can't set off across the petition

9    date, but you can have pre-petition netting and post-petition

10   netting and the pre versus post is frozen.

11           THE COURT:  Right.

12           MR. BROMLEY:  So, moving from that as sort of the

13   baseline, we had to look at two things that are

14   characteristics of the cash management system.  And then the

15   third, which is transfer pricing, which relates into it.  But

16   the first is that in the ordinary course of business, all the

17   business that is being conducted amongst the different Nortel

18   entities, is netted and set off on a regular basis.

19   Sometimes, that has to do with timing issues.  You may have

20   the order that's been placed by the customer payable on 90

21   days and the internal reconciliation payable on 30 days.  And

22   in a sense, that's the extension, by someone in the group, of

23   60 days worth of trade credit to the ultimate customer.

24           THE COURT:  Yes.

25           MR. BROMLEY:  Right.  So, that's a timing issue,

1    however.  But nevertheless, when you're looking at a

2    situation like this, it creates open accounts, so to speak.

3            So, but that's really the ordinary course,

4    purchasing and selling of goods and services around the

5    organization.  And so, when you think about that from the

6    pre-filing basis, in the United States, again, we would say

7    pre versus pre is fine, post versus post is fine and across

8    the petition date, we freeze and we're going to sit back at

9    the end of the case and we just know what the number is and

10   if we need to reconcile things, we will.  But, as we know, in

11   most circumstances, either in a sale or a reorganization, it

12   gets -- it comes out in the wash.

13           So, what's a little different, well, there's another

14   element here.  One is that there's also lending arrangements

15   within the group, actual loans.

16           THE COURT:  Yes.

17           MR. BROMLEY:  And there is a revolving credit

18   facility that exists between, specifically, the United States

19   and Canada.  Now, if you think about the reason why, well --

20   and that pre-petition facility was a facility, you know,

21   drafted and you know, looks exactly like you'd expect the

22   loan facility to look, up to a billion dollars.  And the

23   balance, as we sit here today on the petition date, is $295

24   million in favor of the United States entity, NNI.  Meaning

25   that NNI is owed, at the petition date, $295 million by NNL.

```
 1              In the normal course, what you would do is that
 2   balance would be netted down as transactions take place.
 3   Ordinary course purchasing transactions, they might be set
 4   off against that, but if cash was needed elsewhere in the
 5   system, the balance might just be maintained and you know, to
 6   be set off later.  And then if there are particular cash
 7   needs, at different times, the cash might be moved up.
 8              THE COURT:  Right.
 9              MR. BROMLEY:  And the loan balance would be
10   increased.  Typically, though, the way it works is that over
11   the course of a year, you have transfer pricing adjustments.
12   So, you do all these transactions and you basically do it on
13   the invoice basis and then, you have to sit back,
14   periodically, and allocate the profit.  So, while the U.S. is
15   certainly a part of the system that provides services to
16   other parts of the system, it tends to be, on that basis, a
17   net payor to Canada, because Canada owns the intellectual
18   property, Canada provides the R&D, Canada has the overhead
19   relating to an awful lot of the organizational work,
20   particular things like the U.S. registration requirements and
21   all of the things that are required to be in business in the
22   United States.
23              So, every quarter, you would see the loan balance
24   amount increase and then a transfer pricing payment,
25   substantial, hundreds of millions of dollars would be paid
```

1    and the balance would be brought down.  Is it always brought

2    down to zero?  No.  Has it been brought down to zero?  Yes.

3    So, where we are today, as of the petition date, ordinary

4    course transactions have led that number to be up into the

5    $295 million dollar range.

6            If we were dealing with just the U.S. debtor --

7    group of debtors -- that amount would be frozen.

8            THE COURT:  Right.

9            MR. BROMLEY:  It would be a pre-petition claim.

10   Well, actually, NNI, the U.S. entity, has a benefit here,

11   because there is no prohibition in Canada against setting off

12   pre versus post.  Because, under Canadian Law, there's no new

13   entity created under a CCAA proceeding.  There's no estate --

14           THE COURT:  No estate.

15           MR. BROMLEY:  -- created.  So, there's no

16   pre-petition period and no post-petition period.  There's

17   simply unsecured claims and secured claims.  There's no

18   administrative claim in Canadian Bankruptcy Law, CCAA.  It

19   doesn't exist.  So, here's a situation where we would have

20   the ability, the U.S. entities would have the ability to take

21   cash, that it would otherwise owe in this inter-company

22   system and not pay that cash over to the Canadian entity

23   until that loan balance was paid down.  The problem there is

24   that doesn't work in terms of keeping NNL, the Canadian

25   entity, in business.

1           THE COURT:  Right.

2           MR. BROMLEY:  From a cash perspective, the cash

3   flows are needed and the ordinary course maintenance and

4   management of those loan balances that would never be a

5   problem outside of CCAA and Chapter 11, create a problem.

6   So, we sat down and thought hard about this and what we have

7   created is a lien, a charge, as they call it in Canada.  So,

8   the $295 million loan balance that exists in this

9   inter-company revolver, as of the petition date, is frozen at

10  that amount and it is secured by a charge granted yesterday

11  by the Court in Toronto.  And it's not a senior charge, it's

12  a junior charge.  But what it does, is it makes clear that

13  that charge is going -- and I can go through what it's junior

14  to, but it makes it clear that that charge is a charge that

15  makes that loan balance, at the end of the day, if it's

16  necessary to deal with it, superior to unsecured claims in

17  the Canadian proceeding.

18          So, that was an attempt to try to replicate to the

19  greatest degree possible --

20          THE COURT:  Right.

21          MR. BROMLEY:  -- recognizing, however, that the U.S.

22  entities would have had superior rights because of the quirk

23  of the U.S. Law freezing everything and the Canadian Law not

24  freezing it.

25          So, the cash management system will freeze that

1    amount, create a charge in Canada, it's already created.

2    Post-petition transactions, as it relates to the U.S.

3    entities and the Canadian entities, will occur on a normal

4    course basis --

5              THE COURT:  Right.

6              MR. BROMLEY:  -- with post-petition netting and set

7    off going forward.  And to the extent that there are excess

8    balances, you will have an administrative expense claim in

9    the United States, if it's a Canadian claim into the U.S.

10   And to the extent that there's a U.S. claim into Canada, it

11   will be supported by an inter-company charge.  Again, a

12   security interest, a junior securing interest that makes it

13   superior to unsecured claims.  So, it's our best effort and I

14   think the only thing that can be done under Canadian Law to

15   make sure that it's, because there's no -- you can't, if we

16   simply said we've got a Canadian administrative expense

17   claim, that would say nothing, because there is no such

18   thing.  So, it's a junior lien, a charge, it's superior to

19   all unsecured claims, duplicating, we believe to the greatest

20   degree possible, the exact sort of treatment that you would

21   obtain in a U.S. cash management system.

22             And typically, if you look at the cash management

23   systems included in most of the first day pleadings for U.S.

24   entities, that's exactly what happens.  Admin claims are

25   created to protect the balances as they shift between

1    companies within the same group.  And indeed, the companies

2    within this group, that's what we're suggesting to do.

3    There'll be inter-company claims being created to the extent

4    that they are excess balances.

5              That's how we deal with things between the U.S. and

6    Canada.  Because, what used to be a circle is now a triangle,

7    because there has to be bilateral arrangements.

8              THE COURT:  Yes.

9              MR. BROMLEY:  So, we have to deal with EMEA.  So,

10   what is happening with EMEA?  Well, the -- Ernst & Young has

11   been appointed as the administrator in the UK.

12             THE COURT:  In the UK, as well, okay.

13             MR. BROMLEY:  Well, it's a different, you know, the

14   accounting firms, it's the E&Y LLP, I think is the

15   administrator and E&Y, Inc. is the monitor.

16             THE COURT:  Okay.

17             MR. BROMLEY:  But the administrator in -- the

18   monitor in Canada is, as our Canadian co-counsel says, like a

19   friendly sheriff.  He's there, he's an officer of the court,

20   he is a very sophisticated business person, he knows the

21   company inside and out and is somebody who is there helping

22   to deal with all of the major decisions and reports directly

23   to the court.  And indeed, your Honor, you will hear from the

24   monitor's counsel about the reports that the monitor makes

25   and you will be receiving those reports, as well.

1            THE COURT:  Okay.

2            MR. BROMLEY:  The administrator's a little

3    different, because in Canada, management is not displaced in

4    any way.  The monitor has full access to management, but does

5    not replace management.  In the United Kingdom, the

6    administrator replaces managements.  So, but it does not mean

7    by any stretch, liquidation.  It is a going concern

8    administration and the relations between the EMEA groups, the

9    EMEA companies and North America are, as I've described, very

10   much inter-connected.  And so, the survival of those

11   entities, the maximization of value for the creditors and all

12   those companies, depends on being able to, again, get Nortel

13   intellectual property, get products that are made here in the

14   United States and the like.

15            So, what is created is between the United States and

16   the EMEA entities, is a very simple situation.  Pre-petition

17   amounts, frozen.  No post-petition -- and setting off in the

18   pre-petition amounts to the degree possible between

19   companies, as would be permitted under 553.  No post versus

20   pre, no crossing over the border, so to speak.  So, there's

21   no set offs across the petition date between the U.S. and the

22   EMEA companies.  And in the post-petition basis, trading on a

23   cash basis, essentially, that there's going to be netting of

24   amounts and set off of post-petition as 553 would anticipate

25   you are able to do.  And to the extent that there are claims

 1    that would result, those claims -- claims into the United

 2    States, administrative expense claims, the claims out of the

 3    United States into EMEA, supported by an administrative

 4    expense claim.  They actually have --

 5              THE COURT:  They do.

 6              MR. BROMLEY:  -- they do.

 7              THE COURT:  Okay.

 8              MR. BROMLEY:  So, you have, they call it an

 9    expensive administration and that -- and indeed, one quirk is

10    that the expenses of administration are actually superior to

11    the expenses of the professionals.  It keeps them in line, I

12    guess.  So, that's the way it will be dealt with between the

13    United States and EMEA.

14              Now, I can say that that same relationship, I just

15    described, as it goes between the United States and EMEA,

16    will be duplicated between Canada and EMEA.  So, EMEA, again,

17    they have this issue of meeting the charge, so, the

18    inter-company charge that goes from Canada will, you know,

19    will be given to the EMEA companies, as well, to support any

20    open amounts, you know, on post-petition trading.  In Canada,

21    pre-petition trading, it's exactly the same in Canada,

22    between Canada and EMEA, as I described between the United

23    States and EMEA.

24              THE COURT:  Okay.

25              MR. BROMLEY:  They are mirror-image contracts.

1          THE COURT:  Yes.

2          MR. BROMLEY:  Those arrangements are put in place on

3  an interim basis, right, so that, what you're talking about

4  in Canada, I mean, in EMEA, is going to be relatively short

5  term.  And the hope is that and the expectation is that we're

6  going to turn them into longer term agreements, it's just a

7  matter of the timing issues.  And I should say, as well, one

8  of the issues that relates to Canada, there's a second

9  hearing with respect to the first day order, that comes up in

10  30 days.  But the relief that's granted in the order is

11  certainly granted.

12          But there's another element to the cash management

13  system, your Honor, which is the fact that the existence of

14  the pre-petition revolver between the United States' NNI and

15  Canada's NNL, we're freezing it.  But there is a continued

16  need for funding between the two entities.  And so, how do we

17  deal with that?  Well, in a sense, we're creating an

18  inter-company DIP arrangement, if you will.  NNI, which is

19  cash rich and relatively speaking, because it has the larger

20  customer base and that's where the revenues come in, is going

21  to enter into and we've drafted and it's attached to the

22  pleadings, a revolving credit agreement that up to $200

23  million can be advanced from NNI to NNL.  And -- yes, to NNL

24  -- oh, I'm sorry, NNI to NNL.

25          THE COURT:  Yes.

1           MR. BROMLEY:  And that will be supported by a first

2    priority charge.  That goes to the technology center that I

3    mentioned.  There is a first priority charge on a specific

4    piece of property.  It is a campus, the campus -- the

5    research campus where there are ten large laboratories and a

6    central building outside of Ottowa.  It is a substantial

7    piece of property, the largest research facility in Canada.

8    It is owned by NNTC, Nortel Networks Technology Corporation,

9    which is one of the Canadian debtors.  And NTC is an obligor

10   under the inter-company loan agreement that is proposed.  And

11   there's a charge placed on these, it's called the Carling

12   facility.

13           The only -- there are two wrinkles to that.  First

14   wrinkle is that 99 acres of the land that this facility sits

15   on and that's not by, any means, the majority of it, it's a

16   very large facility, is owned by the Canadian federal

17   government and they have to consent to the granting of the

18   charge.  It is our full expectation that the charge will be

19   consented to by the Canadian government.  It hasn't happened

20   yet and we expect that to take place in two or three weeks.

21           The second wrinkle is that there is, when you look

22   at the motion, there's a reference to an administrative

23   charge.  So, what is that?  Well, it's the professional's

24   carve-out, your Honor.

25           THE COURT:  Okay.

1              MR. BROMLEY:  In all honesty, that's the way the

2    Canadian system works.  There is a charge for the

3    administration, in this case, $5 million, that is placed on

4    all the assets of companies to secure the payment of the

5    monitor's fees, the counsel fees to the monitor, as well as

6    the professionals to the company.  And so, that's the only

7    thing that sits on top of this inter-company charge.

8              And the Canadian order provides all of this.  Have

9    you --

10             THE COURT:  I received it this morning, yes.

11             MR. BROMLEY:  Okay.  Well, if you'd like to, your

12   Honor, I can actually show you where that is, if you'd like?

13             THE COURT:  Okay, please.

14             MR. BROMLEY:  So, your Honor, if you could take a

15   look at the order and turn first to page 14?

16             THE COURT:  Yes.

17             MR. BROMLEY:  And you'll see just -- you'll see the

18   reference to EDC, that is the -- there is security for the

19   post-filing EDC facility, which is a $30 million charge.  And

20   under that is inter-company loans, paragraph 34.  So, the way

21   this works is that you'll see that to the extent that an

22   applicant, one of the Canadian debtors, receives a

23   post-filing inter-company loan or other transfer, including

24   goods and services from a Chapter 11 entity, which is defined

25   as a beneficiary applicant -- that's the applicant who's

1    received these things -- the U.S. entity, the Chapter 11

2    entity, will get a claim.  And that is called an inter-

3    company reimbursement claim.

4              THE COURT:  Right.

5              MR. BROMLEY:  That's in paragraph 34-A.

6              THE COURT:  Yes.

7              MR. BROMLEY:  And then it says, in 34-B, that all

8    the property of the beneficiary applicant, the Canadian

9    debtors, is hereby charged with a mortgage lien and security

10   interest, the inter-company charge, in favor of each of the

11   protected entities, as security for repayment of the

12   inter-company reimbursement claim, including principal

13   interests and expenses.  So, that's the first level, all

14   right, that deals with the inter-company trading on an

15   ordinary course basis.

16             Paragraph 35 covers the pre-petition revolver, the

17   $295 million.  It says the court orders that the

18   inter-company charge shall also secure all amounts -- any

19   amounts owed by the applicants to any Chapter 11 entity, as

20   of the date of filing under the existing NNI revolver, that's

21   the $295.

22             THE COURT:  Right.

23             MR. BROMLEY:  And all rights that such Chapter 11

24   entity has with respect thereto are preserved.  That last

25   reference is to the set-off rights.

1      Then, if you go on, your Honor, to paragraph 40, you

2   have the -- I'm sorry, paragraph 39 -- for Canada, this is

3   the interim group supplier protocol agreement, that's the

4   very elaborate name for this bilateral arrangement between

5   Canada and EMEA and we'll have the same thing between NNI and

6   EMEA.  That shows that any obligations there under would, to

7   the extent there's a net balance owing to EMEA, is secured by

8   an inter-company charge.

9      The Carling facility charges, paragraphs 40 and 41,

10  deal with the post-petition revolver.

11      THE COURT:  Okay.

12      MR. BROMLEY:  And so, if you look at paragraph --

13      THE COURT:  The $200 million?

14      MR. BROMLEY:  -- the $200 million, yes.  So, if you

15  look at paragraph 41, it says, that the Court orders that as

16  security for NNL's and NNTC's obligations under the NNI loan

17  agreement, upon approval of the NNI loan agreement by the

18  United States Bankruptcy Court, NNI is hereby granted

19  charges, the Carling facility charges, by each of NNL and

20  NNTC, NNL's wholly-owned subsidiary, on all of the fee simple

21  interest of NNTC and the leasehold interest of NNL,

22  respectively in the Carling facility.  And that no equal or

23  higher charge will be granted by the court order, unless

24  consented to by NNI, the U.S. entity, as authorized by the

25  U.S. Bankruptcy Court.

1          So, and then there's other provisions that talk

2     about not having to file mortgages and the like, but your

3     Honor, in very simple terms, that paragraph says it's a first

4     priority lien, subject only to the administration charge and

5     it cannot be primed unless it's consented to by NNI, as

6     authorized by you.

7               THE COURT:  Okay.

8               MR. BROMLEY:  So, that is our, you know, belt and

9     suspenders attempt to make sure that the issues are

10     addressed.

11               THE COURT:  Excellent.

12               MR. BROMLEY:  So, when you look at this, we've taken

13     a lot of care to try to create a structure that preserves the

14     status quo.  In may respects, I think, your Honor, the inter-

15     company claim actually improves itself as going from an

16     unsecured obligation to a secured obligation.

17               THE COURT:  Okay.

18               MR. BROMLEY:  The existence of the post-petition

19     amount lending facility is important for a lot of different

20     reasons.  It's not just important in terms of managing the

21     cash flows and the timing issues that are imbedded into this

22     company's complex system.  It also is important, because, as

23     I said earlier, the company survives and thrives on

24     confidence.  And to the extent that it would be seen in the

25     market place that the funding, that is normally available for

1    NNI to support its product to create and continue to innovate

2    would be, we think, very detrimental, if not fatal to the

3    efforts to reorganize.

4              One thing I should mention, your Honor, we did sit

5    down with the U.S. Trustee yesterday, on the phone and today,

6    just before the hearing.  And we talked about a number of

7    different issues and I spent a lot of time with Mr. Tinker,

8    going through this and it was actually, very helpful to

9    prepare for today, because the issues that he raised were all

10   very good and the questions that he raised were all questions

11   that I would expect that you would have, as well, your Honor.

12             One thing that we have done as a result of the

13   conversations with Mr. Tinker, is to agree to do the

14   following, is what we had asked for in the motion to start,

15   was that the availability under this post-petition facility

16   would be tranched.  The first $75 million would be available

17   immediately and the rest of the $200 would be available as

18   soon as the consent was obtained of the Canadian federal

19   government to the charge on the leasehold.  So, there's a bit

20   of an interim and final element to that, but, if you notice,

21   it doesn't have a final that requires anyone to show up and

22   hear that it's final.  It would have happened automatically,

23   as soon as the consent is granted.

24             So, at Mr. Tinker's request and in light of the

25   importance of the situation and the fact that everyone should

1    understand everything, what we have agreed is that it will be

2    we're asking now for approval of the $75 million on an

3    interim basis and the remainder, we will come back to the

4    Court in, hopefully, around 20 days time after the

5    appointment of a creditor's committee and after we've sat

6    down with the creditors and explained all this to them in a

7    very fulsome manner and answered all their questions.  So

8    that, we've got really on this post-petition arrangement, 75

9    on an interim basis, the remaining 125 on a final basis in

10   three weeks time, two or three weeks time.

11            So, that, we thought was an appropriate

12   accommodation and we're happy to do it.

13            THE COURT:  The $75 million is immediate?

14            MR. BROMLEY:  Yes.

15            THE COURT:  So, that is one of --

16            MR. BROMLEY:  The availability is immediate.

17            THE COURT:  -- the availability, okay.

18            MR. BROMLEY:  Yes.

19            THE COURT:  Okay.

20            MR. BROMLEY:  And I think it's important, as well,

21   your Honor, the way the phrasing in the Canadian order is,

22   the charge on the Carling facility, it takes effect as soon

23   as this Court approves the agreement.

24            THE COURT:  Right.

25            MR. BROMLEY:  So, we would like to have the

1    agreement approved as soon as possible, even if it's just for

2    a relatively small funding amounts, in order to have that

3    charge take effect, as well.

4            THE COURT:  Understood.

5            MR. BROMLEY:  So, your Honor, that's kind of the

6    situation as the cash management motion.  There are other

7    elements of the cash management motion that are very ordinary

8    course with respect to bank accounts.  With the 345(b) issue,

9    we're absolutely cognizant of the issues.  We'll seek

10   approval only on an interim basis with respect to the

11   balances and want to sit down the U.S. Trustee, as soon as

12   possible, to explain where the cash balances are maintained,

13   to make sure that they are either comfortable with the

14   current arrangements or whether we could make some

15   accommodations to change those, as necessary.

16           THE COURT:  Okay.

17           MR. BROMLEY:  I would note that approximately $65

18   million of the company's cash balances are in the primary

19   reserve fund.  But, the good thing is, is that that balance

20   was nearly $300 million in September, when it was frozen.

21   So, it has migrated down substantially as the assets of that

22   fund have liquidated.

23           THE COURT:  Okay.

24           MR. BROMLEY:  And there is a $10 million charge, in

25   a sense, in the U.S. sense, that has been placed on that.

1    So, the amounts that actually do, $75 million, is being

2    carried at $65 million and in light of the fact that there

3    might not be a full recovery.  But in terms of the rest of

4    the balances, they are maintained in a variety of accounts

5    that are invested substantially or primarily in U.S. Treasury

6    securities.  And we'll sit down with the U.S. Trustee's

7    Office to make sure that what's being done is either

8    acceptable or if it's not acceptable, that we'll make

9    accommodations to make it acceptable.

10              THE COURT:  Okay.

11              MR. BROMLEY:  There's the typical issues with

12   respect to the maintenance of the bank accounts and the

13   checks and that sort of thing, those are all completely

14   standard.

15              THE COURT:  Yes.

16              MR. BROMLEY:  And it is --

17              THE COURT:  You run out of forms, you'll put the DIP

18   legend on them.

19              MR. BROMLEY:  Exactly.

20              THE COURT:  Okay.

21              MR. BROMLEY:  So, from that perspective, your Honor,

22   I think I summarized substantially the motion.  The changes

23   of it, I've tried to explain how we've attempted to

24   accommodate what we thought are the most pressing issues.

25   But in sum and substance for the post-petition filing, you've

1  got really good collateral.  I should say it's been appraised

2  -- the last appraisal was at $280 million Canadian and that -

3  - oh, there is one thing I did forget.  To the extent that

4  there's any deficiency under that Carling charge, which we

5  don't think there would be, the deficiency is secured as an

6  inter-company charge. So, that would get the same level

7  charge as is available to secure the pre-petition revolver.

8  So, you've got -- you wouldn't have a deficiency that would

9  fall into an unsecured bucket at the Canadian level.

10          THE COURT:  Are there any other charges against the

11  Carling facility?

12          MR. BROMLEY:  No, the Carling facility is free and

13  clear of leans.

14          THE COURT:  Okay.

15          MR. BROMLEY:  The only one that would be on top,

16  other than things like ordinary course, you know.

17          THE COURT:  Taxes?

18          MR. BROMLEY:  Taxes and you know --

19          THE COURT:  Yes.

20          MR. BROMLEY:  -- mechanic's liens --

21          THE COURT:  Sure.

22          MR. BROMLEY:  -- and things like that.

23          THE COURT:  Sure.

24          MR. BROMLEY:  And as I said, the administration

25  charge of $5 million.  I should mention to your Honor and it

1    would be, I think, helpful to explain, because, at least,

2    when I first read it, it made me ask a few questions.

3    Paragraph 42 of the order, the Canadian order, sets forth the

4    priority of the charges and it says first, the administration

5    charge.  Second, the Carling facility charges and that's the

6    one that would support this $200 million lending facility.

7    Three, the EDC charge, which is for the new availability

8    under the EDC arrangement.

9              THE COURT:  The $30 million.

10             MR. BROMLEY:  And that's $30 million.

11             THE COURT:  Right.

12             MR. BROMLEY:  Fourth, the director's charge.  It's

13   worthwhile stopping there for a second --

14             THE COURT:  Yes.

15             MR. BROMLEY:  -- because, I think, when anyone sees

16   something's going to the directors, what's up with that?  And

17   I think that it's important, again, to step back and

18   recognize that, you know, Canadian Law and U.S. Law differ in

19   certain ways.  But there is a personal liability with respect

20   to directors for employee benefits and wages in certain

21   categories.

22             THE COURT:  Okay.

23             MR. BROMLEY:  So, and the term of art is the

24   statutory liabilities.  So, things like wages, health

25   benefits, vacation pay, the things that we are looking for

1    you to approve with respect to our employees, if they are not

2    paid in Canada, the directors are personally liable.

3              THE COURT:  Okay.

4              MR. BROMLEY:  So, there has been an estimate made of

5    those amounts and this again, relates to -- and the estimate

6    of that amount is $90 million total.  It is worthwhile to

7    note though, that the reason it's an issue more in Canada and

8    it doesn't even come up in the U.S., aside from there's no

9    statutory personal liability, is again, because you're

10   dealing with that kind of risk in a liquidation scenario.

11   Because yesterday's order in Canada makes clear that all of

12   those obligations, to the extent that they were not paid, as

13   of the petition date, they can be paid.

14             THE COURT:  Okay.

15             MR. BROMLEY:  And they have full authority to pay

16   them in the ordinary course.  The only way that they would

17   come up is if the company liquidated.  And if the company

18   liquidated and turned into -- convert its proceeding into one

19   under the Bankruptcy and Insolvency Act in Canada, there is

20   no administrative charge.  There's no administration charge.

21   So, whereas, if we had post-petition employees here and they

22   lost their job, they're unpaid wages at the time of their

23   termination would be an administration expense.  They don't

24   have that in Canada. They would immediately become unsecured

25   creditors and have exposure on a post-petition basis for

```
1    wages and benefits.  And so, the director's charge is the
2    Canadian style of getting and of course, they're obviously
3    very comfortable with it, because it's an employee
4    protection, not a director's protection.
5            THE COURT:  Right.
6            MR. BROMLEY:  So, I just wanted to explain that.
7            THE COURT:  That's helpful, thank you.
8            MR. BROMLEY:  And the fifth is the inter-company
9    charge, so, which is the charge that deals with the ordinary
10   course trading back and forth, as well as the balance under
11   the pre-petition revolving credit facility.
12           THE COURT:  Thank you, Mr. Bromley, thank you.
13           MR. BROMLEY:  So, I think that summarizes it and I'm
14   not sure if you have any questions, your Honor or -- oh, I'm
15   sorry.  And I know that the U.S. Trustee has an interest in,
16   perhaps hearing a little bit of testimony from Mr. Doolittle.
17   I'm not sure that he feels it necessary.  If he does, I would
18   suggest that we take a break, because we didn't before coming
19   in here, have any time to prepare for that.
20           THE COURT:  Okay.  Mr. Tinker, good afternoon.
21           MR. TINKER:  Your Honor, I suspect that I'm going to
22   be satisfied and maybe it could be done by proffer.  But I
23   would suggest that the Court address any other objections
24   that might be coming forth from other people.  But I think
25   that Mr. Bromley and I can deal with that, probably with a
```

1  few minutes as we get towards the conclusion.

2         THE COURT:  Just a few minutes recess or something?

3         MR. TINKER:  At some point during the hearing, yes,

4  Judge.

5         THE COURT:  Okay.  All right, does anyone else wish

6  to be heard?  Ms. Makowski, good afternoon to you.

7         MS. MAKOWSKI:  Good afternoon, your Honor.  Your

8  Honor, as a matter of courtesy, I present my colleagues from

9  the Milbank firm in D.C., Andrew Leblanc and Robert Winter.

10        THE COURT:  Yes.

11        MS. MAKOWSKI:  They both are admitted in good

12  standing in the jurisdiction of Washington, D.C. and I would

13  move their admission for this hearing pro hoc vice, as a

14  courtesy.  Pachulski does not currently represent anyone

15  formally.  This is courtesy for Milbank colleagues.

16        THE COURT:  All right, thank you, Ms. Makowski and

17  certainly, you are admitted.

18        MR. LEBLANC:  Thank you, your Honor.

19        THE COURT:  Good afternoon, good to see you, sir.

20        MR. LEBLANC:  Good afternoon.  Good to see you, too,

21  your Honor.  Andrew Leblanc, Milbank Tweed Hadley and McCoy.

22  Your Honor, we're working with certain of the bondholders of

23  Nortel that were described earlier --

24        THE COURT:  Yes.

25        MR. LEBLANC:  -- the $4.2 billion worth of

1   bondholders.  Your Honor, we think that the change that has

2   been made with respect to making only a portion of this final

3   and a portion of it interim takes great steps towards the

4   direction that we had hoped this would go.  And we spoke with

5   the debtor's counsel before the hearing briefly.  We have the

6   concern, it appears the same concern that the U.S. Trustee

7   has with respect to doing this without an opportunity for

8   notice and an opportunity to be heard for parties that may

9   wish to heard and certainly, the creditor constituencies.

10          As was alluded to earlier by Mr. Bromley, we sit --

11  the group of entities that were working with, sits with

12  claims at this debtor, as well as at the Canadian debtors.

13  And it is somewhat extraordinary to be asking on the first

14  day of the hearing, to extend essentially, to serve as the

15  Debtor in Possession financer for a different debtor entity

16  that isn't subject to this Court's jurisdiction.

17          And your Honor, the biggest concern we have is

18  simply that the lack of availability of information given

19  that this is the first day of the hearing and although $75

20  million may not seem like a significant amount, it certainly

21  is a meaningful amount as it relates to the unsecured

22  creditor pool of this -- potentially relates to the unsecured

23  creditor pool of this debtor.  And so, it isn't clear to us,

24  certainly, from the materials that have been submitted both

25  here in the United States and in Canada, that any sort of

1    interim DIP financing is necessary for the Canadian entities.

2    And what our understanding and this is based on the public

3    information that we saw from the Canadian entities and I

4    think your Honor could probably take this as a proffer, if

5    the debtor's would so submit.

6            In the examiner, I'm sorry, the monitor's report in

7    Canada, we understand that there sits on the balance sheet of

8    Canada, approximately, $176 million and I don't know if

9    that's U.S. dollars or Canadian dollars.  I presume it's

10   Canadian, if the monitor is reporting it.  But it's unclear

11   to us that there's a need for additional liquidity within the

12   Canadian entities during this very short 20-day period.

13           And your Honor, our objection to the proposal is

14   that even the $75 million on an interim basis, we have

15   concerns with that amount of money being made available to

16   Canada without the protections of an opportunity to be heard

17   notice and what you would typically expect to see in a

18   request for DIP financing, a budget, how that money is going

19   to be used, what the purposes of it are.

20           And your Honor, one other issue.  I don't know if

21   this has been addressed between the Trustee and the debtor's

22   counsel.  There is a carve-out of an amount that can be used

23   to pay to non-debtors and that amount is five percent of the

24   facility or $10 million.  It's not clear to us, based upon

25   the very recent change to the proposal, that only $75 million

1    be extended if that carve-out is going to similarly be

2    reduced to five percent of the interim facility or $3.75

3    million or if the intent would be that they have $10 million

4    available to advance to non-debtor entities.  We certainly

5    would like to see that number as limited as possible, because

6    of the obvious consequences of those types of extensions,

7    particularly, if it's an extension by the Canadian debtor,

8    who is not subject to this Court's jurisdiction, to a

9    non-debtor affiliate located anywhere throughout the world.

10           So, your Honor, those are the two points that we

11   have.  We think, you know, we appreciate the debtor's efforts

12   to try to protect everybody in the creditor capacities.  But

13   we think that there isn't the need for the rush to this --

14   even this $75 million on a limited basis.  We simply haven't

15   seen it and we think the liquidity is their absence, I'm

16   showing that it really is necessary to be extended on the

17   first day of this case.

18           THE COURT:  Thank you, Mr. Leblanc.

19           MR. LEBLANC:  Thank you, your Honor.

20           THE COURT:  Thank you.  Would anyone else like to be

21   heard?  Mr. Tinker?

22           MR. TINKER:  Your Honor, my reference earlier to

23   getting some additional information, during a break, that

24   actually is in connection with the second point raised by

25   counsel.

1          THE COURT:  The need for the cash, you mean?

2          MR. TINKER:  The non-debtor --

3          THE COURT:  Oh, the non-debtor, okay.

4          MR. TINKER:  -- moneys to non-debtors and how that

5    balances out and that sort of thing.

6          THE COURT:  Well, I think we ought to proceed in an

7    organized fashion here, rather than jump ahead and leave

8    these issues to the end.  Would it be helpful to have a short

9    recess to give counsel an opportunity to talk and then it

10   sounds like absent a resolution, we ought to have, at least,

11   some testimony or at least, a proffer as to these two issues

12   that have been raised by the bondholders.

13         MR. BROMLEY:  Your Honor, we're perfectly happy to

14   take a few minute recess and chat.  Obviously, we recognized

15   before coming in that we were asking for something that

16   wasn't typical.  We do have, in our hands, though, an order

17   from the Canadian Court --

18         THE COURT:  That's right.

19         MR. BROMLEY:  -- granting a first priority lien on a

20   very substantial piece of property.

21         THE COURT:  Exactly.

22         MR. BROMLEY:  And that was sort of the main

23   intention.  Again, what we're talking about here is a

24   confidence issue.

25         THE COURT:  I agree.

1          MR. BROMLEY:  And I am actually very confident that

2   committee counsel, once appointed and bondholder counsel will

3   be fully supportive of these efforts and think that it's the

4   best way for them to maximize their returns.  I understand

5   their concerns, though.  So, I think it might be worthwhile

6   for us to first talk with counsel to see if there's anything

7   we can do to make them comfortable and if not, we'll be

8   prepared to proceed with a proffer or testimony.

9          THE COURT:  Okay.  All right, then why don't we take

10  a recess and when you're ready to proceed, you can just let

11  us know.

12         MR. BROMLEY:  Good, thank you, your Honor.

13         THE COURT:  Thank you, Mr. Bromley.  We stand in

14  recess.  Thank you.

15         (Court in recess 12:52 to 1:41 o'clock p.m.)

16         THE CLERK:  Please rise.

17         THE COURT:  Thank you, everyone, please be seated.

18  Mr. Bromley?

19         MR. BROMLEY:  Thank you, your Honor.  I apologize

20  for the delay.

21         THE COURT:  No, sir.

22         MR. BROMLEY:  As soon as you put lawyers and numbers

23  in a room, you're in trouble.

24         THE COURT:  That's why I hate to go back into the

25  office.  I get tied up on something.  Yes?

1    MR. BROMLEY:  Your Honor, we were able to talk a bit

2    outside and I think that there is a couple of things that we

3    can clarify that will be helpful and I think the agreed way

4    to proceed was for me to make a proffer with respect to Mr.

5    Doolittle on certain things.

6            THE COURT:  Okay.

7            MR. BROMLEY:  So, why don't I first deal with the --

8    there was a comment raised at the very end which correctly

9    noted that in the relief we were seeking the ability to have

10   ten percent, I mean, $10 million to five percent, $10 million

11   of the 200, that would be allowed to be used for non-debtors.

12           THE COURT:  Correct.

13           MR. BROMLEY:  And non-Canadian debtors.  And we have

14   confirmed that there's no immediate pressing need for that

15   and so, while we still wish to have that relief granted, we

16   will agree to move that off to the final hearing.

17           THE COURT:  Wonderful.

18           MR. BROMLEY:  With respect to the question of need,

19   your Honor?

20           THE COURT:  Yes.

21           MR. BROMLEY:  In the courtroom today is Mr. John

22   Doolittle.  Mr. Doolittle is the treasurer of Nortel

23   Networks, Limited.  He's also a vice president of Nortel

24   Networks Incorporated.  He is responsible for a wide array of

25   financial -- has a wide array of financial responsibilities

1   for the debtors, as well as the other Nortel entities around

2   the world.  He has a team of people that work for him and at

3   his direction and he has a working knowledge of the books and

4   records and the financial balances of the companies,

5   including the debtors and the Canadian debtors.

6           Your Honor, if Mr. Doolittle was called, he would

7   testify, I believe, as follows and I would offer the

8   following as a proffer and he is available for

9   cross-examination.

10          THE COURT:  Okay.

11          MR. BROMLEY:  Your Honor, as of the close yesterday,

12  the cash balances and the Canadian entity were $157 million

13  U.S.  Of that $157 million, $30 million is restricted,

14  leaving $127 million and restricted according to the

15  financial statements as they prepare them in the ordinary

16  course.  There are certain things that they simply can't

17  touch.  So, your Honor, we're down to about a balance of

18  $127.  That may, to some people, seem like a lot of money for

19  an organization of this size, it is not.  Particularly for

20  the business that it engages in.  And particularly, when you

21  take into account the following facts.

22          Mr. Doolittle will testify that the pre-petition

23  revolver, which is now frozen, as discussed earlier --

24          THE COURT:  Yes.

25          MR. BROMLEY:  -- was used on a daily basis, that

1  funds were paid down and advanced, in order to help manage

2  the daily cash flows for the entire Nortel group.

3        Not having availability to that revolver requires

4  that the entire organization change the way it deals with

5  funding.  And so, the lack of availability of a revolver is a

6  problem for operations.  It decreases flexibility and

7  increases the need to perfectly match inflows and outflows,

8  which is difficult in a business of this size.

9        He may also testify that in the next week, a payment

10  of $50 million is due under this agreement with Flextronics.

11  So, while the current cash balance in Canada is $127, it

12  could be decreased if that Flex payment is made without

13  corresponding increases in revenues.

14        He would also testify that the funds that would be

15  available under the revolver, the $75 million, in his view,

16  would be essential to having the flexibility to manage cash

17  balances over the next three weeks before final approval.

18  And important to stabilize the business and to instill

19  confidence in the business for customers, suppliers and

20  employees and the like.

21        He would also testify, if called, that looking at

22  the January 1, 2009 numbers, as they exist on trade between

23  simply NNI and NNL, that is stayed now, as a result of the

24  automatic stay.  But there's a net amount that would be due

25  from NNI, settling trade, inter-company trade, a net amount

1    due of $133 million.  So, from a cash flow perspective, your

2    Honor, as a result of the filings here and in Canada, $133

3    million in cash that was expected to flow from the United

4    States into Canada from NNI to NNL, who has now been stayed

5    and will not be received.  And thereby further compromises

6    the cash position of the Canadian entities and magnifies the

7    need for the funding that is being sought in connection with

8    the post-petition revolver.

9            As a result, your Honor, I think he would say that,

10   if called, that it is essential that it be approved on the

11   first day and on the interim basis and I would ask that the

12   Court do so.  So, your Honor, that would conclude the proffer

13   and we're happy to put Mr. Doolittle on the stand if anyone

14   wishes to cross-examine him.

15           THE COURT:  Thank you, Mr. Bromley.  All right, does

16   anyone wish to cross-examine?  Mr. Tinker?

17           MR. TINKER:  Your Honor, if I could have one moment?

18           THE COURT:  Yes.

19           (Pause.)

20           MR. BROMLEY:  One other thing, your Honor and I

21   apologize.  There had been questions raised, as well, in our

22   sidebar as to payments out of the system other than in

23   respect of the settlement of trade payables to affiliates

24   that are non-debtors and in terms of the interim period.  As

25   I stand here today, your Honor, we are unaware of any cash

1    outflows other than in connection with the settlement, the

2    trade arrangements between the debtors and non-debtors.

3              THE COURT:  Thank you for that addition, Mr.

4    Bromley.  Mr. Duhig, good afternoon.

5              MR. DUHIG:  Good afternoon, your Honor.  Peter Duhig

6    of Buchanan Ingersoll and Rooney on behalf of Ernst & Young,

7    Inc., the Court-appointed monitor and foreign representative

8    of Nortel Networks Corporation and certain of its

9    subsidiaries.  I have here with me today, Ken Coleman from

10   the Allen & Overy firm.  Your Honor has entered his order or

11   the order admitting him pro hoc vice.

12             THE COURT:  Yes, thank you, Mr. Duhig.  Mr. Coleman,

13   welcome to you, sir.

14             MR. COLEMAN:  Thank you very much, your Honor, I'll

15   be very, very brief.  We are on a little later today --

16             THE COURT:  Yes.

17             MR. COLEMAN:  -- in connection with the Chapter 15

18   petitions.  I just wanted to clarify something for the record

19   and I appreciate that people are trying to digest a large

20   number of documents in connection with this case and doing a

21   masterful job at that, I might add.  It was a statement made

22   just before the break about the monitor's report.  Your

23   Honor, that document is attached to an affidavit by me, filed

24   in connection with the Chapter 15 cases and it's Exhibit B to

25   my affidavit.

1           THE COURT:  Yes.

2           MR. COLEMAN:  I just wanted to point out, your

3    Honor, that the financial data is what it is in that report.

4    Mr. Bromley's proffer of testimony, I think, clarifies that

5    number.  But I think the important information from the

6    monitor's point of view that I would like to clarify for your

7    Honor, is at paragraph 126 of the monitor's report, which is

8    on page 37.  Where the monitor and we'll explain this in more

9    detail later this afternoon, who is an officer of the court.

10   The monitor is not a party, has no advocacy role in these

11   proceedings.  The monitor has expressed an opinion to the

12   Ontario Court that this financing, which is defined as the

13   NNI loan, in that paragraph.

14           THE COURT:  Okay.

15           MR. COLEMAN:   Which is the very loan that we're

16   talking about, in the monitor's opinion, is necessary,

17   together with the other financial accommodations made through

18   that initial order that Mr. Bromley described.  It is

19   necessary for the liquidity of the Nortel business and I

20   would just like the record to reflect that the monitor has

21   expressed that view.  And on the basis of that view, the

22   Canadian court has approved the charge.

23           THE COURT:  Right.

24           MR. COLEMAN: To that extent, to support repayment of

25   that loan.

1          THE COURT:  Thank you, Mr. Colman.

2          MR. COLEMAN:  Thank you.

3          THE COURT:  Thank you, that's helpful.  Mr. Leblanc?

4          MR. LEBLANC:  Andrew Leblanc, Milbank and Tweed,

5    your Honor, no desire for cross-examination.  And your Honor,

6    we do appreciate the debtor's concession with respect to the

7    transfers out of $10 million.  And with that, we have nothing

8    further to say with respect to our objection.  Thank you.

9          THE COURT:  All right, thank you, sir.  Well, I am

10   prepared to approve the motion.  I recognize that it is a

11   very complex cash management system, but it is, obviously,

12   essential.  Much of it is ordinary course, with certain

13   adjustments to take into consideration the bankruptcy

14   filings.  I find that the Canadian entity does require the

15   loan under the DIP, if you will, the DIP formula and as

16   approved by the Canadian Court and I'm satisfied with the

17   proffer, which I admit and accept into evidence, that there

18   is the necessity and that the protections are in place.  As

19   far as the investment guidelines are concerned, I find that,

20   certainly, on a present basis, those should be waived and I

21   am satisfied, certainly, that counsel will work with the

22   Office of the United States Trustee going forward to resolve

23   those and obviously, we're talking about all of this on an

24   interim basis.  It is, as I said, a very complex matter and I

25   think very well formulated by the company.  Under the

1   circumstances, it is important on the first day basis, to

2   provide confidence to the creditors, to the customers, to the

3   suppliers.  And on that basis, I am prepared to approve the

4   order -- to sign the order.

5          MR. BROMLEY:  Thank you very much, your Honor.

6          THE COURT:  Yes.

7          MR. BROMLEY:  We'll have to make some changes to

8   accommodate the issues that we've addressed on the record and

9   we will do that promptly and submit an order.

10         THE COURT:  Understood.  Thank you, Mr. Bromley.

11  I guess we ought to, at least, talk right now about our next

12  hearing and just to sort of get that replaced.  And we're

13  talking about roughly 20 days, is that right?

14         MR. BROMLEY:  Yes, your Honor.  Would you mind if I

15  looked at my calendar -- on my Blackberry?

16         THE COURT:  No, go ahead.

17         MR. BROMLEY:  Thank you, your Honor.

18         THE COURT:  That would take us to about the 4th or

19  so of February?

20         MR. BROMLEY:  Yes, your Honor.

21         THE COURT:  Could we stretch it out to the 5th,

22  would that be satisfactory?  How does that look on your

23  schedule?  I have a lot of time that day.

24         MR. BROMLEY:  Well, I'd say I have a dentist

25  appointment, so I will --

```
 1              THE COURT:  Oh, you --

 2              MR. BROMLEY:  -- I will gladly waive that.

 3              THE COURT:  I'll give you a note.  Either that, we

 4   could it the 6th, as well.

 5              MR. BROMLEY:  No, no, no, I'm fine.

 6              THE COURT:  All right, then why don't we start at

 7   10:00 o'clock, if that's all right?  I don't know, as far as

 8   travel arrangements are concerned, we could start a little

 9   bit later, if it would be more convenient for the parties?

10              MR. BROMLEY:  A.M. is fine, your Honor.

11              THE COURT:  Okay.

12              MR. BROMLEY:  And would that be, your Honor, for all

13   the things that we're talking about today?

14              THE COURT:  Yes, as well as other matters that might

15   arise.

16              MR. ABBOTT:  In addition, your Honor, there are a

17   couple of retention applications in the things that went out

18   or they go out on notice?

19              THE COURT:  You bet.

20              MR. ABBOTT:  Thank you, your Honor.

21              THE COURT:  And I know that other matters may arise

22   and obviously, you can seek a hearing on those, if and when

23   they're necessary.

24              MR. ABBOTT:  Thank you, your Honor.

25              THE COURT:  Also for that date, I meant, because I
```

1     do have the bulk of the day.

2              MR. BROMLEY:  Your Honor, if I may, I was ready to

3     move on to the next item on the agenda, but there is one

4     thing that has come up, which I would like to -- that has to

5     do with dates and let me explain the situation.

6              THE COURT:  Yes.

7              MR. BROMLEY:  We would like to be able to come on an

8     emergency basis before you, as soon as tomorrow, on a very

9     limited matter.  NNI has three representative offices in the

10    Middle East.  One in Tunisia, one in Egypt and one in Abu

11    Dhabi or Dubai, it's in Dubai.  Apparently, they don't

12    recognize the automatic stay in those jurisdictions and there

13    is a pressing need to make a hole on the pre-filing leasehold

14    obligations and other related office obligations, in a sense,

15    a foreign vendors motion.  The total amount for those three

16    offices is less than a million dollars.  We think it's about

17    $800,000.  We apologize, your Honor, for not having had that

18    on our radar until such a late time.

19             THE COURT:  There's a lot going on, Mr. Bromley, no

20    apology necessary.  So, you're looking for some time

21    tomorrow?

22             MR. BROMLEY:  If we could, just on that limited

23    issue, your Honor.

24             THE COURT:  Sure.  I could hear you at -- I'm trying

25    to remember if something came off.  Let me get back to you

1    just as to the time, but absolutely, we will schedule that

2    for tomorrow and I'm going to check --

3              MR. BROMLEY:  Okay.

4              THE COURT:  -- with chambers.  Why don't we, I hate

5    to impose this, 9:00 o'clock?  Is 9:00 o'clock doable?

6              MR. BROMLEY:  Yes, it is, your Honor.

7              THE COURT:  All right.

8              MR. BROMLEY:  I mean, we'll be filing the motion

9    this afternoon.

10             THE COURT:  Okay.  And I understand the need and

11   I'll hear you at 9:00.

12             MR. BROMLEY:  I appreciate it.  Your Honor, if I

13   could move on the Item Number 7.

14             THE COURT:  Yes.

15             MR. BROMLEY:  This is always a hot topic of the

16   first day hearings, your Honor, the employee motion.

17             THE COURT:  Yes.

18             MR. BROMLEY:  Your Honor, it's, in many respects, a

19   very standard wages motion, employee wages motion.  Although,

20   by virtue of our cross-border circumstances, the top

21   executives of the company are compensated out of the Canadian

22   entities.

23             THE COURT:  Okay.

24             MR. BROMLEY:  So, we're not here today looking for

25   the things that usually are the hot button items of paying

1    things to the CEO or the like.  What we are looking for, your

2    Honor, is a fairly broad array of specific relief, but we

3    believe it is all perfectly fitting within the established

4    frameworks that we've seen in other first day orders.

5              I have gone into a lot of detail already, your

6    Honor, in terms of the way the company is organized.  But it

7    has a little bit of an impact, as well, with respect to the

8    way the employees are compensated.  So, if I may, your Honor,

9    there's a summary in the motion, so, I can tell you a little

10   bit, just to give you the size of the company.

11             In 2008, almost a billion -- just over a

12   billion-three in U.S. dollars were paid compensation to the

13   9,000 employees.  The vast majority of that going in the form

14   of wages and salary to full time employees, with the rest of

15   it going to sales commissions, premium payments and the like.

16   The differences that we see in this situation here, is in

17   addition to pre-petition wages, which have not been paid.

18   There are a number of other things that relate to current pay

19   for certain types of individuals.  That includes premium pay,

20   over-time pay, if you will and the sales commissions, because

21   we have a very large group of sales people. And then there is

22   something known as the annual incentive plan and I talked to

23   the U.S. Trustee about this and I think we can comfort on

24   that front.

25             So, just focusing on the employee wage obligations,

1    the debtors are paid on a bi-weekly basis.  The last pay

2    period was Friday, February 2nd, and there is a payroll to be

3    paid on Friday, the 16th, at the end of this week, for the

4    period from January 5th, which was a Monday, to January 18th.

5    There's approximately $37 million in pay and wages made

6    during each pay period and we would seek authority to make

7    those payments.  There are some catch-up payments in any pay

8    cycle and therefore, you may have situations where, for

9    particular employees, there are reimbursement amounts and the

10   like that are included in their paychecks.

11         With respect to the overtime people, the premium

12   pay, we believe that the amount that remains outstanding with

13   respect to that, is a million dollars.  With respect to sales

14   employees and again, you know, we do have a large group of

15   sales employees, they are paid according to a sales incentive

16   plan.  They are paid in arrears and by 45 days.  And they're

17   also paid on a monthly basis.  The amounts that remain

18   outstanding, we believe, with respect to the sales incentive

19   program, are approximately $14 million.

20         The annual incentive plan is referred to in

21   paragraph 61 of the motion.

22         THE COURT:  Yes.

23         MR. BROMLEY:  And the annual incentive plan is the

24   means by which incentive compensation is paid to the

25   employees with respect to both their personal performance and

1   with respect to the performance of the organization, as a

2   whole.  The annual incentive plan covers a wide range of well

3   over 15,000 employees and the determination of those payments

4   is not made until February.  We are not seeking any

5   authorization today, to pay any amounts under the annual

6   incentive plan.  And indeed, we think that based on where

7   things stand today and the performance of the business, it is

8   unlikely that payments will be -- we will seek authorization

9   to make payments under the annual incentive plan.

10          However, we will be adopting a new annual incentive

11  plan, not as a KEIP plan, not as a Key Employee Incentive

12  Plan, but as an ordinary course, year to year, incentive plan

13  and we will be adopting that in the ordinary course in the

14  February and March time frame.

15          So, your Honor, I did mention the KEIP concept.  It

16  is absolutely essential that we keep our employees in place,

17  that we incentivize them to work through this very difficult

18  time and that we set appropriate parameters within the scope

19  of the law.  So, right now, the company is in the process of

20  developing a program to present both to the creditors and the

21  Court.  This is more of a heads-up that it will be coming,

22  not that we have it ready.  But we will be looking for the

23  creditors committee to be ready and able to engage on that,

24  as soon as they are appointed.

25          Your Honor, with respect to the -- if I can just

1  summarize, I think where we are in terms of unpaid

2  compensation, I think it's in the neighborhood of $40 million

3  premium pay or overtime of a million sales compensation of,

4  I'm sorry, the unpaid compensation total is $14.  Wages and

5  salaries of $26, sales commissions of $14, premium pay of $1.

6         We are also seeking authorization to the extent we

7  need, your Honor, which we don't believe we need, but we say

8  it all the time anyway, to make all the payments that relate

9  to trust fund and withholding and the like, Social Security,

10 unemployment taxes, all of the trust fund taxes which are

11 withheld from any paycheck.  We withhold them in the ordinary

12 course and would be planning on making those payments, as

13 well, in connection with the payments of the salary and other

14 wages.

15         Beyond that, your Honor, this is a global

16 enterprise, as I said.  That means that there are ex-patriots

17 who are working around the world, paid on the payroll of NNI,

18 who are resident in various foreign countries, either

19 servicing, selling or developing and those ex-pats are doing

20 so in order to be -- in order to help build the business and

21 grow it around the world.  There is approximately $100,000, a

22 very deminimus amount relating to costs and the like relating

23 to ex-pats and there's the likelihood that runs at about $2

24 million a year, but we are looking for the authorization to

25 pay the $100,000 that's outstanding.

1        Your Honor, we also have reimbursable expenses.

2        THE COURT:  Yes.

3        MR. BROMLEY:  And these are things that range from

4   travel, meals, accommodations and the like, other business

5   related relationships, including things that are paid on

6   their American Express card and the like.  The overall amount

7   of reimbursable expenses for which we seek authorization is

8   approximately $4 to $6 million.  That number is still in

9   flux, a little bit, as the actual bills come in.  And there's

10  also, your Honor, the request to make contributions to the

11  401K plans.  The amounts that we're talking about, again, are

12  relatively small of $630,000.

13        The question has been raised, your Honor, as to how

14  this relates to the priority cap.  We believe that on the

15  basis of wages, simply wages, that we don't have anyone who

16  is over the cap.  We do think that there are several people

17  that might be over the cap with respect to the sales

18  incentive commissions that they received, in light of the

19  fact that they are paid 45 days in arrears on a monthly

20  basis, they tend to be lumpier.  We believe, your Honor, to

21  the extent that those individuals are entitled to receive

22  those payments, notwithstanding the cap, we would seek

23  authorization to pay it.  They are not individuals at the top

24  of the house, so to speak --

25        THE COURT:  Right.

1          MR. BROMLEY:  -- they are the sales force out in the

2    field and we believe essential to both maintaining and

3    continuing our customer relationships.

4          (Pause.)

5          MR. BROMLEY:  Your Honor, I'm being informed that

6    with respect to the reimbursable expenses, actually, the $4

7    to $6 million, we're actually agreeing to a cap with respect

8    to that.  So, there will be people, at least, on an interim

9    basis, who may be exposed on the reimbursable expenses and we

10   certainly reserve our right to come back with respect to

11   that.

12         THE COURT:  Okay.

13         MR. BROMLEY:  Your Honor, we also are seeking, to

14   the extent necessary, authorization to continue to perform

15   with respect to our wide range of health and medical

16   benefits.  And they include things including health and

17   dental insurance, worker's compensation, vacation pay and

18   leave programs, retirement pay and flexible spending accounts

19   -- retirement plans and flexible spending accounts and

20   certain other voluntary programs.  There are, as you might

21   imagine with a company of this size, a large number of

22   things.  There is a voluntary employee beneficiary

23   association plan.  A Viva trust, so to speak, that helps pay

24   for certain of the healthcare benefits.  We seek to make --

25   continue to be able to make contributions to that, to the

1    extent that we need any authorization to do it, we believe

2    it's an ordinary course exercise.

3           We want to pay to the extent there are unpaid

4    worker's comp premiums for the pre-petition period, the

5    ability to do that.  With respect to vacation, sick and other

6    paid leave, the debtors are going to maintain the programs

7    going forward and ask that the vacation accrual process be

8    allowed to continue.  That people be allowed to take accrued

9    vacation and to the extent that there are terminations, that

10   we be allowed to pay out on vacation pay in accordance with

11   prior practice.

12          There are certain other programs, as I mentioned,

13   there's a 401K plan.  There's a flexible spending account

14   program.  There is the flexible spending account program also

15   is administered by a third party administrator.  So, not only

16   would we like to continue to -- like authority to the extent

17   that there are any pre-petition obligations relating to

18   employees on the flexible spending side of things, also to

19   pay the fees and expenses of the administrator of that

20   program.

21          In addition, your Honor, we have a limited universe

22   of additional employee benefits.  Adoption costs, there's an

23   employee assistance program with respect to free counseling.

24   Health and fitness centers and a travel well program. These

25   are all things which are less easy to quantify in terms of

1    particular dollar amounts.  There are benefits that are

2    available to the wide range of employees and we would, your

3    Honor, to the extent that there are any pre-petition

4    obligations relating to that, simply seek authorization to

5    continue them into the post-petition period.  I think that

6    summarizes it, your Honor.

7            THE COURT:  Thank you, Mr. Bromley.  Anyone else

8    wish to be heard?  Well, certainly this falls within the

9    necessity -- oh, I'm sorry, Mr. Leblanc.

10           MR. LEBLANC:  I apologize.

11           THE COURT:  I'm too quick.

12           MR. LEBLANC:  I apologize.  Your Honor, the one

13   issue I just want to make sure is clear.  Paragraph 120 of

14   the request seeks authority to pay any amount of wages in

15   excess of the $10,950 cap.  I understand that they don't

16   believe that there is anybody, but the authority would still

17   be there to the extent that there isn't and we would just

18   ask, on an interim basis, that that authority not extend with

19   respect to wages.  Sales commissions, we understand.  But

20   that that authority be limited with respect to wages on the

21   interim basis and to the extent that there is somebody here,

22   in the U.S., one of these debtors that requires those wages,

23   that that be done at a final hearing and not on the first day

24   motion.

25           THE COURT:  Mr. Bromley, any position on that

1    request?

2              MR. BROMLEY:  Your Honor, a point of clarification.

3    The -- because I was actually trying to answer the question

4    as I was listening to it.  But the way I understand it is

5    that the concern is that we're talking about wages.

6              THE COURT:  Just the wages.

7              MR. BROMLEY:  Just the wages.  So, we have, where

8    they're taking it to the sales commission, it can go over

9    that.  The other issue is that there are certain reimbursable

10   expenses that might take it over it, as well.

11             THE COURT:  And I don't think that was the concern

12   of Mr. Leblanc, either.

13             MR. LEBLANC:  It was not, your Honor.

14             THE COURT:  Okay.  It was not, he's confirmed.

15             MR. BROMLEY:  Okay, I hope that clarifies it, your

16   Honor.

17             THE COURT:  And does that create an issue for the

18   debtors?  The cap?

19             MR. BROMLEY:  We're willing to cap the wages.

20             THE COURT:  Okay, and on an interim basis.

21             MR. BROMLEY:  On an interim basis.

22             THE COURT:  Yes.

23             MR. BROMLEY:  We don't believe that there's anyone

24   whose wages take them over the $10,950 cap.

25             THE COURT:  Okay.

1           MR. BROMLEY:  So, we don't believe doing snow to the

2    Canadians.

3           THE COURT:  Yes.

4           MR. LEBLANC:  That's fine, your Honor.

5           THE COURT:  All right.  Well, clearly, this falls

6    within the necessity of payment provisions of Rule 1, of

7    Section 105, under Rule 6003.  I certainly am prepared to

8    make the finding that were the relief sought, to be denied,

9    it would create immediate irreparable harm to the debtors.

10   That the employees are, certainly, a critical cog in the

11   corporate machine and their welfare is essential to the

12   reorganization efforts here.  And under these circumstances,

13   I will grant the motion and enter the order as it will be

14   modified, I take it?

15          MR. BROMLEY:  Yes, we will make those modifications,

16   your Honor.

17          THE COURT:  All right.

18          MR. BROMLEY:  Thank you very much.

19          THE COURT:  You know it.

20          MR. BROMLEY:  Now, I'll turn over the podium to Ms.

21   Schweitzer for a while.

22          THE COURT:  Okay.

23          MS. SCHWEITZER:  Now, good afternoon, your Honor.

24          THE COURT:  Yes, it is.

25          MS. SCHWEITZER:  We still have a few on our

1   schedule, but I think we're moving closer to housekeeping,

2   hopefully and just to give you and maybe some hungry stomachs

3   in this room, guidance, that I don't believe that there's any

4   objections that have been expressed with respect to the

5   remaining relief from people in the courtroom.  Not that

6   everyone shouldn't get an opportunity to speak up, but we'll

7   go through them in turn, but just so you can get a sense of

8   where we're at.

9           I believe the next matter that we're on is Agenda

10  Number 8, which is the motion for the payment of certain

11  taxes and fees that relate to the pre-petition period.  And

12  this is DI-11.  This is again, a pretty standard motion where

13  we're seeking relief to pay sales and use taxes and some

14  franchise taxes and other taxes set forth in the motion.  We

15  don't know the total amount that will come in, but the motion

16  sets forth the dollar amount to date.  I'm happy to go

17  through it in more detail, but the numbers are in the motion

18  themselves.

19          THE COURT:  The numbers are in the motion and I

20  think the basis for the relief being sought is contained in

21  the declaration of Mr. Doolittle, which by the way, I should

22  admit into evidence, at this point.

23          MS. SCHWEITZER:  Thank you, your Honor.

24          THE COURT:  Just to make it clear that it's part of

25  our record.  And unless anyone wishes to be heard on this

1    issue, I am prepared to enter the order on the basis that

2    it's necessary and again, under Rule 6003, it requires -- the

3    debtors require this relief to avoid immediate and

4    irreparable harm.

5            MS. SCHWEITZER:  It looks like no one wants to be

6    heard, so, thank you, your Honor.

7            THE COURT:  Yes.

8            MS. SCHWEITZER:  The next item on the agenda is Item

9    Number 9, which is the motion for the continuing preservation

10   of the existing customer programs and other customer

11   obligations.

12           THE COURT:  Yes.

13           MS. SCHWEITZER:  And in the motion itself, was set

14   forth four, I believe four different programs that are in

15   place now.  Specifically, the volume incentive discount

16   program or VID program, which provides discounts to retailers

17   and strategic partners who resell the debtor's products and

18   services.  And that's tied to the revenue performance in a

19   particular year, so, obviously, they're giving a discount

20   this year, based on prior performance and I think we gave you

21   the 2008 costs for that as about $116 million.  And notably,

22   in this motion, these programs included aggregate for the

23   debtor and Canadian debtor, when you see these numbers

24   they're in U.S. dollars, but we haven't broken it down to the

25   U.S. debtors and quite frankly, it's hard to break it down to

1    pre versus post, because these are ongoing programs.  So,

2    without taking positions, we're here to just get comfort that

3    we're allowed to maintain these in the ordinary course.

4          The second program are the marketing programs which

5    are just different incentive programs, discount rebate

6    programs and the like.  They, again, are offered to resellers

7    and distributors and are meant to incentivize people to

8    purchase our products and do business with us.  And the cost

9    that we attributed to that, again, for the U.S. and Canadian

10   debtors combined, in 2008, was $83 million.

11          THE COURT:  Yes.

12          MS. SCHWEITZER:  The third program that's set forth

13   is a bundle of cooperative partner programs, which are

14   different cash incentives that are given to resellers and

15   strategic partners, again, for marketing support and further

16   use for our products and services.  And they're tied, again,

17   to volume performance, portfolio and service commitments, so

18   future commitments and prior work.  And these are the users

19   of the -- to recognize the names set forth in the motion, are

20   the IBMs, Verizon sells of the world, different customers are

21   out in the field.  And again, the 2008 costs for the U.S. and

22   Canadian debtors combined was $12 million last year.

23          The fourth customer program that's outlined in the

24   motion is a value-added dealers' program or VAD program and

25   that's where discounts and rebates are given to different

1    distributors and dealers, again, of Nortel products.  And

2    these are, the rebates could either be up-front rebates or

3    back-end rebates based on performance.  And the dollar amount

4    attributed to those, again, in 2008 is $38 million.

5           The one further point we wanted to clarify in the

6    motion is that it's reading a little bit more broadly in that

7    we're seeking relief to pay, in fact, by customer obligations

8    and not merely these four programs and we've gotten some

9    questions as to what we're looking to pay.  What we're not

10   looking to pay or not looking to do through this motion, is

11   to satisfy long-term disputes or use this as a process for

12   9019 type relief.

13          What we were hoping to capture within this and

14   again, we could sit and analyze it under the law, is it's

15   pre, post or unique, the relief for its ordinary course, is

16   that various internal rebates in accounting and just the

17   netting of bills along the way that we're getting calls of,

18   you know, this product didn't go and I need to credit them on

19   the bill, can I credit them.  This one was broken.  So, it's

20   really the quite ordinary course reconciliation that is the

21   bankruptcy rule imposes this are a special distinction that

22   every single person calling Nortel today is not imposing on

23   them and wants to make sure that they are able to clear out

24   their bills in the ordinary course, without further relief.

25   So, that is the secondary customer obligations that we are

1    hoping to have a comfort order we can continue to honor

2    those.

3            THE COURT:  Thank you, Ms. Schweitzer, anyone else?

4    Mr. Leblanc?

5            MR. LEBLANC:  Your Honor, just briefly.  And the

6    comments, I think, the clarification, this is an issue that

7    we raised in the side session we had.

8            THE COURT:  Okay.

9            MR. LEBLANC:  And just one point of clarification,

10    that the request and this is in paragraph 11 of the motion,

11    is for customer programs and then it says among those

12    customer programs are the four that are delineated there,

13    that Ms. Schweitzer just went through.  I think it's very

14    clear that those are the only customer programs that are at

15    issue in the motion and the definition notwithstanding, those

16    are the four that are being requested and in the amounts that

17    are requested.

18            And then the second issue, your Honor, is the

19    customer obligation and I think the colloquy just made that

20    clear.  The concern we had was that, to the extent that a

21    person or party was a customer in addition to being, for

22    example, a vendor, a supplier, then customer obligation, it

23    was an undefined term without any cap with respect to it.

24    And we just want to make clear that the intent here is to

25    satisfy the customer obligation portion of it and they're

1    deminimus, as has been suggested.  And not using this to

2    shoehorn in some vendor, critical vendor type of request and

3    I don't think that's at all suggested and that was the

4    clarification that we requested and I think we're satisfied

5    with what's been said, as long as it can be confirmed that

6    the customer programs that are at issue are those four that

7    are delineated in the motion.

8              THE COURT:  Okay, thank you, Mr. Leblanc.

9              MR. LEBLANC:  Thank you, your Honor.

10             MS. SCHWEITZER:  I'm sorry, your Honor.

11             THE COURT:  Take your time.

12             (Pause.)

13             MS. SCHWEITZER:  Apologies, your Honor.

14             THE COURT:  Not a problem.

15             MS. SCHWEITZER:  We learn something every minute we

16   stand here.

17             THE COURT:  Well, yes, it's involved, that's for

18   sure.

19             MS. SCHWEITZER:  What I'm being told and learning

20   very quickly is that in the ordinary course, there are

21   certainly customers and vendors, but in the ordinary course

22   practices of the company, that there are these larger

23   contracts in which a case a customer might be a vendor also.

24   And so, may have a contractual right to net or set-off along

25   the way.

1          THE COURT:  Yes.

2          MS. SCHWEITZER:  So, we would be looking to preserve

3    whatever, again, not non-ordinary course set-offs, not just

4    aggressive bankruptcy type moves, but just the ordinary

5    course practices with these customers, as we're being

6    informed that some of them are seeking that comfort already

7    and seeking that clarification that effectively, their

8    contractual arrangement is going to pass through unabated.

9    So, I don't know if that satisfies Mr. Leblanc's concerns,

10   but that is my understanding, is that it is a little hard to

11   parse out these different obligations, because of the way

12   they're presented to the company.

13         THE COURT:  And what is most clear is that it's in

14   the ordinary course?

15         MS. SCHWEITZER:  Absolutely, these are -- we are

16   talking about just maintaining the ordinary course

17   relationships.

18         THE COURT:  Yes.

19         MS. SCHWEITZER:  And not going outside of that.

20         THE COURT:  Okay.  Mr. Leblanc, is that helpful?

21         MR. LEBLANC:  It is helpful, your Honor, although,

22   it's difficult because there isn't a proposed cap and you'll

23   recall, for example, in the Internet case --

24         THE COURT:  Yes.

25         MR. LEBLANC:  -- the issue of set-off between

1   customers and vendors was obviously a significant issue.  And

2   so, I think, you know, we've stated our position.  We'd like

3   to see there be a cap on the quantum of customer obligations

4   that would be paid or satisfied, but you know, we understand,

5   your Honor, that this is a fast-moving train and we're just

6   trying to get understanding or comfort with respect to these

7   issues.  And it is concerning when we hear that there may be

8   vendors, who are also customers, who are offsetting certain

9   things and there's no insight into what the quantum is.  But

10   you know, we also recognize the need to get this done, your

11   Honor.

12         THE COURT:  Yes.

13         MS. SCHWEITZER:  And I would point out, to address

14   that concern, is the relief requested is only for the

15   debtors, in their sole discretion, to honor these different

16   obligations.  So that, if there was a significant concern,

17   certainly the debtors aren't suggesting that they are waiving

18   their right to contest different disputes or set-offs.

19         THE COURT:  I don't know that that will exactly make

20   Mr. Leblanc totally comfortable, but I think I certainly

21   understand the nature of the motion and also what the debtors

22   are trying to accomplish here and it clearly is critical to

23   the ongoing efforts to, hopefully, reorganize this company

24   and to maintain it in the meantime.  That it be able to

25   honor, on an ongoing basis, the ordinary course programs that

1   it has in place.  And I am satisfied that the relief is

2   appropriate, in the best interest of the debtors, necessary

3   and again, satisfies the requirements of Rule 6003.  So, I am

4   going to approve the motion and I'll enter the order.  I

5   don't think that there are any adjustments that are

6   necessary.

7            MS. SCHWEITZER:  No, your Honor.

8            THE COURT:  So, I will be pleased to enter the

9   order.

10           MS. SCHWEITZER:  Thank you, your Honor.  The next

11  item on the agenda is the Item Number 10, which is the motion

12  for authority to pay certain common carrier charges and

13  warehouse fees.

14           THE COURT:  Yes.

15           MS. SCHWEITZER:  I think we're moving down in terms

16  of magnitude and ordinary course motions.  So, I'll rest on

17  the motion, unless you have further questions.

18           THE COURT:  I did not and I don't -- does anyone

19  wish to be heard?  All right, here again, clearly this is

20  necessary and appropriate and in the best interest of the

21  debtors and satisfies Rule 6003 and I will approve the --

22  I'll grant the motion and enter the order.

23           MS. SCHWEITZER:  Thank you, your Honor.  The next

24  item on the agenda is the Item Number 11, which is for a

25  motion to honor -- continue insurance coverage and continue

1  to enter into new insurance policies in the ordinary course.

2  And again, just to point out for the motion, as detailed in

3  the motion, what we're seeking approval for are the payment

4  of existing policies and to renew policies for worker's comp

5  and auto policies.  And then there is a related cost of

6  referencing these Automotive Rental, Inc. costs, which are

7  equivalent to insurance, so we just pay them out of pocket.

8  But the same type of thing, a collision insurance type of

9  payment.  And then, finally, there are broker fees.  Just so

10  you know and I'm sure you've read the motion and are

11  thoroughly versed in it, but just to state it for the record,

12  as well, is that it's not that the debtors don't have other

13  insurance, it's just group insurance maintained at the parent

14  level.  So, the Canadian parent is the one paying those fees

15  in the ordinary course.  But, there's a reference to that and

16  terms just so the U.S. Trustee has satisfaction on that

17  point, as well.

18            THE COURT:  Okay.

19            MS. SCHWEITZER:  What we're seeking authority for is

20  the insurance that's enumerated in the motion.

21            THE COURT:  Exactly.  Does anyone wish to be heard?

22  Well, here again, I know that it is necessary to maintain

23  insurance coverage and this is clearly an ordinary course

24  relief that's being sought.  And it's necessary and

25  appropriate and again, satisfies Rule 6003 and I'll grant the

1    motion.

2              MS. SCHWEITZER:  Thank you, your Honor.  The next

3    motion is Item Number 12, which is the motion for declaratory

4    order to be entered enforcing the automatic stay and I think

5    you've already heard from Mr. Bromley that we might need it

6    in places such as Egypt and Mumbai, possibly --

7              THE COURT:  Yes, yes.

8              MS. SCHWEITZER:  -- quickly.  So, the motion is

9    really, as you'll see, the order just simply restates the

10   terms of automatic stay, enables us to wave an order, instead

11   of the Bankruptcy Code, in front of people's faces.  So, it's

12   more forceful and less heavy when you throw it out there.

13             THE COURT:  Absolutely.

14             MS. SCHWEITZER:  We request authority to have that

15   entered, as well.

16             THE COURT:  Does anyone wish to be heard?  You know,

17   I don't consider this really a comfort order, as is sometimes

18   referred to.  This is really a necessary order to be entered

19   because of the global nature of the debtor's businesses and

20   the unfamiliarity of many with our Bankruptcy Code and

21   process and law and I'll be pleased to enter this order.

22             MS. SCHWEITZER:  Thank you, your Honor.  Moving

23   down, Agenda Item Number 13, which was the order regarding

24   the -- or the motion regarding the establishment of

25   compensation fees procedures.

1          THE COURT:  I didn't have any concerns with this, I

2    don't know if anyone else raised any.

3          MS. SCHWEITZER:  I believe the U.S. Trustee asked us

4    to have this presented on, but it's in a hearing or -- yes,

5    so that we would be willing to do that.

6          THE COURT:  Okay, all right.

7          MS. SCHWEITZER:  To put up for the 20 day hearing.

8          THE COURT:  Okay.

9          MS. SCHWEITZER:  The next item is Agenda Item Number

10   14, which is the motion for entry of an order approving a

11   cross-border, court-to-court protocol to enable us to give

12   you some relief today, as well, since we're asking for all

13   these things for us.  And this is a motion that the cross-

14   border protocol is, to be clear, is presented between the

15   Canadian court and the U.S. court, so the Canadian debtors

16   and U.S. debtors.  We haven't discussed the need yet.  Maybe

17   there will be in the future, whether we need something

18   separate for the European -- the UK court.  But for right

19   now, we wanted an order in place in the first stages,

20   enabling communication between the Court and a venue and a

21   procedure for getting cross-border issues teed up.  It saves

22   for another day, the larger questions on substantive claims

23   and asset sales and plans and all that.

24          THE COURT:  Yes.

25          MS. SCHWEITZER:  So, we thought that this would

1    facilitate the coordination between the courts and the notice

2    and everything that goes along with that.  So, the protocol,

3    in fact, also is presented is very similar to the ones

4    entered in <u>Poke</u> (ph) and <u>Talbot</u> and <u>Calfine</u> (ph), so we were

5    not inventing new law here, but we do request that it be

6    entered today.

7            THE COURT:  And I believe the Canadian court

8    approved a similar protocol yesterday, if I'm not mistaken.

9            MS. SCHWEITZER:  Actually, it's identical protocol,

10   correct.

11           THE COURT:  Yes.  And I'm pleased to grant this

12   motion.  You know, as I understand it, we have an unarmed

13   border and I'm going to try to maintain good relations with

14   Canada, so, I'll be pleased to enter the order.

15           MS. SCHWEITZER:  They've got mounted police, so,

16   that's always good when we're nice to them, right?

17           THE COURT:  Yes.

18           MS. SCHWEITZER:  I'm being asked for emergency

19   relief, which is that if we could excuse our witness, who's

20   in the courtroom, John Doolittle, so that he is able to catch

21   a plane back to Canada?

22           THE COURT:  Yes, indeed.  Mr. Doolittle, you are

23   excused.

24           MR. DOOLITTLE:  Thank you very much.

25           THE COURT:  Thank you, thank you for attending.

1           MR. DOOLITTLE:  Thank you very much.

2           MS. SCHWEITZER:  Finally, there is one thing.  I

3    think the Agenda Item Number 15 was an interim order, what

4    we've called the NOL order.

5           THE COURT:  Yes.

6           MS. SCHWEITZER:  Which is for procedures and

7    restrictions on certain transfers of equities.  I believe,

8    it's been a long day here, but I believe you said in the

9    beginning, that you consider this a relatively standard order

10   and that you didn't need further explanation of?

11          THE COURT:  Well, I didn't mean to include it in the

12   standard orders.  I've read it, clearly I understand the

13   significance, the necessity, but I do want to give anyone an

14   opportunity to be heard on it, as well.  But seeing no one

15   rising, I -- it's clear to me that these NOL -- the NOL and

16   other tax credits, if you will, are property of the estate

17   and are critical to the debtor's reorganization efforts and

18   to the confirmability of a plan, hopefully, later down the

19   road.  And the relief sought is appropriate and necessary and

20   I will grant the motion.

21          MS. SCHWEITZER:  Thank you, your Honor.  So, I think

22   that ends our calendar for today.  Some orders, I understand,

23   were handed up to your chambers during the break.

24          THE COURT:  Yes.

25          MS. SCHWEITZER:  And those --

1        THE COURT:  We wanted to get a few on the docket

2   right away, particularly, the joint administration.

3        MS. SCHWEITZER:  Yes, we absolutely appreciate that

4   and the rest of them, we can hand up.  I think the one that

5   we needed to just add some language to was the cash

6   management, but the rest of them should be in the shape, the

7   same way that they were presented, along with the motion.

8        THE COURT:  All right, well, take your time with

9   them and when they're ready, we will -- they'll bring them

10  into chambers for me.

11       MS. SCHWEITZER:  Okay.

12       THE COURT:  And I know we're on for tomorrow

13  morning.

14       MS. SCHWEITZER:  Yes.

15       THE COURT:  And I appreciate counsel's excellent

16  documents and presentation and hopefully, we will be

17  successful here.

18       MS. SCHWEITZER:  Absolutely.  We really appreciate

19  you taking the time to address this for us today.

20       THE COURT:  It's a pleasure.  Thank you, counsel,

21  we'll stand in recess until tomorrow morning at 9:00.

22       MS. SCHWEITZER:  Thank you.

23       THE COURT:  Good day, everyone.

24       MR. ABBOTT:  One quick question?

25       THE COURT:  Yes.

1          MR. ABBOTT:  Given that we've scheduled that hearing

2     in the morning, I presume we can dispense with a motion to

3     shorten that emergency motion for tomorrow morning?

4          THE COURT:  Yes.

5          MR. ABBOTT:  Thank you, your Honor.

6          THE COURT:  I think that will make life easier.

7          MR. ABBOTT:  It will, your Honor.

8          (Proceeding adjourned 2:31 o'clock p.m.)

9                              *  *  *

<u>CERTIFICATION</u>

I hereby certify that the foregoing is a correct

transcript from the electronic sound recording of the

proceedings in the above-entitled matter.


Geraldine C. Laws, CET          Dated 1/26/09
Laws Transcription Service