## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X

*In re*

Nortel Networks Inc., *et al.,*[1]

                     Debtors.

-------------------------------------------------------X

:
:
:
:
:
:
:

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

Hearing date: Feb. 5, 2009 at 10:00 a.m. (ET) (requested)
Objections due: Feb 3, 2009 at 4:00 p.m. (ET) (requested)

## DEBTORS' SUPPLEMENTAL MOTION FOR ENTRY OF AN ORDER CLARIFYING RELIEF GRANTED PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE AUTHORIZING DEBTORS TO HONOR PREPETITION OBLIGATIONS TO THEIR CUSTOMERS [D.I. 49]

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of a supplemental order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") clarifying the Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code Authorizing Debtors to Honor Prepetition Obligations to Their Customers [D.I. 49] by specifically authorizing, but not directing, the Debtors to honor their prepetition obligations to their customers (the "Customer Obligations") in accordance with the terms of existing customer contracts, to continue their customer programs in the ordinary course of business and granting them such other and further

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

relief as the Court deems just and proper.  In support of this Motion, the Debtors rely on the

Declaration of John Doolittle in Support of First Day Motions and Applications (the "Doolittle

Declaration") as well as the Declaration of Pamela Hehn Schroeder, dated as of January 29,

2009, and submitted in support hereof.  In further support of this Motion, the Debtors

respectfully represent as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections §§ 105(a) and

363(b) of chapter 11 of the Bankruptcy Code.

## Background

**A.      Introduction**

3.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario

Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court. Ernst & Young Inc., as foreign representative for the Canadian Debtors, has filed petitions in this Court for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. In addition, at 8 p.m. on January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European affiliates into administration under the control of individuals from Ernst & Young LLC (collectively, the "EMEA Debtors").[3]

6.     On January 15, 2009, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that provided for the joint administration of these cases and for consolidation for procedural purposes only.

7.     On January 21, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I. 142]. No trustee or examiner has been appointed in the Debtors' cases.

---

[3]     The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

**B.**     **Debtors' Corporate Structure and Businesses**

8.      A description of the Debtors' corporate structure and businesses and the events leading to the chapter 11 cases are set forth in the Doolittle Declaration.

**C.**     **The Customer Obligations Motion**

9.      On January 14, 2009, the Debtors filed the Debtors' Motion for Entry of an Order Authorizing, But Not Directing, Debtors to (I) Honor Prepetition Obligations to Their Customers and (II) Continue Customer Programs [D.I. 12] (the "Customer Obligations Motion").[4]  The Debtors incorporate the Customer Obligations Motion in this Motion by reference as if set forth herein in its entirety.  On January 15, 2009, the court entered the Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code Authorizing Debtors to Honor Prepetition Obligations to Their Customers [D.I. 49] (the "Customer Obligations Order").  Among other things, paragraph 2 of the Customer Obligations Order provides as follows:  "The Debtors are authorized to honor and perform, in their sole discretion, all Customer Obligations, including through the Customer Programs."  Customer Obligations Order at ¶ 2.

10.      During the first-day hearing, the Court recognized that the Customer Obligations Motion is meant to cover all ordinary course customer programs ("I certainly understand the nature of the Motion and also what the debtors are trying to accomplish here and it clearly is critical to the ongoing efforts to, hopefully, reorganize this company, and to maintain it in the meantime.  That it be able to honor, on an ongoing basis, the ordinary course programs that it has in place.").  Hearing Tr. 102:20 – 103:1, Jan. 15, 2009.

---

[4]      Capitalized terms used but not defined herein have the meanings ascribed to them in the Customer Obligations Motion.

**Facts Relevant to this Motion**

11.    The Customer Obligations Order granted the Debtors broad relief to honor

prepetition obligations to customers and continue programs designed for the benefit of

customers.  During the first-day hearing on the Customer Obligations Motion, the Court further

clarified that the relief granted therein encompasses all ordinary course customer programs.

Notwithstanding the broad relief granted in the Customer Obligations Order, the Debtors

understand that the specific enumeration of some, but not all, customer programs in the

Customer Obligations Motion has raised concerns with certain customers about the scope of the

Debtors' authority to honor prepetition Customer Obligations.  For this reason, the Debtors seek

clarification of the relief specified in the Customer Obligations Order to include all of their

ordinary course customer obligations, programs and similar arrangements ("All Customer

Programs"); programs which are aligned with standard industry practices.  It is important to note

that the majority of the programs and dollar values listed below do not represent cash costs to the

Debtors or the Canadian Debtors; rather, such obligations are honored predominantly through the

outlay of goods and/or services.

> a.    Customer Credits Arrangements.  A Customer Credit Arrangement
> is a program through which a customer accrues credits (the "Customer
> Credits") either up-front, upon signing of a contract, or at an agreed upon
> percentage of its annual purchases with Nortel (the "annual spend").  Once
> accrued, a customer may apply Customer Credits towards future purchases
> of Nortel products and services under the terms of its agreement.
> Customer Credits Arrangements ensure that the Debtors will continue to
> be an attractive supplier for key customers over the terms of their
> agreements and create an incentive for those customers to continue
> purchasing goods and services from Nortel during the chapter 11 cases
> and otherwise.  The Debtors estimate that honoring Customer Credits
> issued through 12/31/2008 will cost the Debtors and the Canadian Debtors
> approximately $82 million.  This figure should be considered in
> comparison with the annual spend by the relevant North American carrier
> customer base of $3.49 billion.

5

b.     <u>Training Credits</u>.  The products and systems Nortel provides to its customers incorporate complex technologies.  As such, Nortel sells training programs alongside its products in order to educate customers on their features and instruct them as to their proper uses.  The training, which is provided either by Nortel directly or through third-party providers, eases the pressure on Nortel's support and services obligations and builds loyalty with existing customers.  From time to time, Nortel grants Training Credits to customers to help those customers shoulder training costs (the "<u>Training Credits</u>").  The Debtors estimate that honoring Training Credits issued in connection with the carrier business through 12/31/2008 will cost the Debtors and the Canadian Debtors approximately $14 million.  The Debtors have also issued Training Credits in connection with the enterprise business.

c.     <u>Trade-in Credits</u>.  Certain carrier and enterprise customers have contractual rights to trade in products utilizing old technologies when Nortel releases products that utilize newer technologies (the "<u>Trade-in Credits</u>").  In order to create an incentive for existing customers to take advantage of new Nortel products, from time to time Nortel has offered those customers Trade-in Credits to help facilitate the transition from older to newer technologies.

d.     <u>Performance Compensation Payments and Liquidated Damages</u>.  Performance Compensation Payments and Liquidated Damages (collectively, "<u>Compensation Payments</u>") are payments typically made in the form of Customer Credits, though occasionally made in cash, to customers in the event that Nortel does not meet certain milestones, delivery dates or performance standards.  Building Compensation Payments into large customer contracts is an industry standard practice that provides comfort to customers in the event that system outages occur or new technologies cannot be rolled out on time.  Honoring amounts due in prepetition Compensation Payments is a vital step towards maintaining critical customer relationships during the chapter 11 cases.  The Debtors estimate that honoring Compensation Payments accrued in connection with the carrier business through 12/31/2008 will cost the Debtors and the Canadian Debtors approximately $18 million.  As with the cost associated with the Customer Credit Arrangements, this figure should also be considered in comparison with the $3.49 billion annual spend by the North American carrier customer base.  Additionally, it should be noted that some portion of the figure would be booked as revenue in the event that the estimated amount is greater than the amount actually paid to customers.  The Debtors have also incurred Compensation Payments in connection with the enterprise business.

e.     <u>Free Trial Equipment and Services</u>.  In accordance with standard industry practices, Nortel grants certain customers the right to receive free services, lab or trial equipment, or other hardware and software products

prior to their widespread commercial release in order to accommodate in-house customer testing requirements and for other business development purposes. Customers earn such benefits up-front upon the signing of a contract, in exchange for signing a contract with a minimum purchase commitment or upon a negotiated factor of annual spend. The Debtors estimate that honoring such benefits granted in connection with the carrier business through 12/31/2008 will cost the Debtors and the Canadian Debtors approximately $9 million. The Debtors have also issued similar benefits in connection with the enterprise business.

      f.      <u>Advanced Billing</u>. From time to time, certain Nortel customers pay portions of their contracts in advance. For example, under such an arrangement, a customer may pay for all of Nortel's service obligations at the start of a year. Various customers have paid Nortel for certain services and products prepetition, and it is critical for the maintenance of customer relationships that Nortel continue to perform its obligations under these agreements.

      g.      <u>Co-marketing Agreements</u>. Co-marketing Agreements are agreements between the Debtors and certain customers (the "<u>Marketing Customers</u>") under which the Debtors make funds available to the Marketing Customers to use in their efforts to stimulate demand for the Debtor's products through advertising and promoting to the Marketing Customers' subscribers. Honoring such obligations to Marketing Customers is another step towards maintaining critical customer relationships during the chapter 11 cases. The Debtors estimate that honoring obligations under Co-marketing Agreements accrued in connection with the carrier business through 12/31/2008 will cost the Debtors and the Canadian Debtors approximately $3 million. The Debtors have also entered into similar agreements in connection with the enterprise business.

      h.      <u>Return Rights</u>. Certain customers have contractual rights to return certain products for cash based on defined contingencies. The Debtors estimate that honoring such benefits granted in connection with the carrier business through 12/31/2008 will cost the Debtors and the Canadian Debtors slightly more than $1 million. The Debtors have also issued such rights in connection with the enterprise business.

<b><u>Relief Requested</u></b>

      12.      By this Motion, the Debtors seek an order clarifying the Order Pursuant to

Sections 105(a) and 363(b) of the Bankruptcy Code Authorizing Debtors to Honor Prepetition

Obligations to Their Customers [D.I. 49] by specifically authorizing, but not directing, the

Debtors to honor their obligations under All Customer Programs in accordance with their terms and granting them such other and further relief as the Court deems just and proper.

13.     Without this clarification, customers may engage in various protective measures, including withholding payments due to the Debtors and/or seeking alternative suppliers to replace the Debtors.  Indeed, certain customers have already taken certain protective measures. The Debtors anticipate that the requested clarification, and accompanying comfort generated for customers, will benefit all stakeholders because they will ensure the maintenance of Nortel's most critical customer relationships.  The cost of losing critical customers would far outweigh the costs of honoring the Debtors obligations under All Customer Programs.

14.     Additionally, without this clarification, customers may attempt to set off prepetition amounts owed to Nortel against the various credits discussed above.  While the legal merit for such actions and the end result of the litigation that would ensue are uncertain, the costs of that litigation, both in terms of time spent by the Debtors and their professionals and the strain placed on existing businesses relationships, would harm the Debtors' prospects for a successful reorganization.

15.     Accordingly, the Debtors request that the Court clarify that the relief previously granted to the Debtors authorizes the Debtors to honor existing Customer Obligations under the All Customer Programs.

16.     Certain of Nortel's customers or their affiliates also provide services and goods to the Debtors and have asserted claims against the Debtors, and rights of setoff or recoupment in respect of such claims.  While the Debtors are not prepared, at this time, to resolve such claims and assertions of setoff or recoupment rights, the Debtors are willing to agree that any payments by customers to the Debtors will be without prejudice to setoff or recoupment rights, whatever

they may be. In order to give comfort to customers on those issues, the Debtors request that any

order entered in respect of this Motion recognize this reservation of rights.

### Basis for Relief

**A.    The Relief Requested Is Supported by Section 105(a) of the Bankruptcy Code and the "Doctrine of Necessity"**

17.    As a consequence of the filing of these chapter 11 cases, certain customers have

become concerned that the Debtors will not honor certain obligations under their existing

contracts. The Debtors' failure to honor their obligations under All Customer Programs would

severely, and perhaps irreparably, impair the Debtors' customer relations at a time when the

loyalty and support of their Customers is extremely critical. By contrast, honoring such

obligations will require a limited and reasonable expenditure of estate funds and will assist the

Debtors in preserving their key customer relationships to the benefit of all stakeholders.

18.    The Debtors submit that the relief requested is reasonable and necessary under the

circumstances and justified by applicable law. Section 363(b)(1) of the Bankruptcy Code

provides that, after notice and a hearing, the trustee "may use, sell, or lease, other than in the

ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). The Court may

authorize the relief requested herein based on section 105(a) of the Bankruptcy Code.

Section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers

the court to "issue any order, process, or judgment that is necessary or appropriate to carry out

the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code,

courts may permit pre-plan payments of prepetition obligations when essential to the continued

operation of the debtor's business. Specifically, this Court may use its power under

section 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of

payment" rule (also referred to as the "doctrine of necessity").

19.     The "doctrine of necessity" or the "necessity of payment" rule originated in railway cases and was first articulated by the United States Supreme Court in Miltenberger v. Logansport, C. & S. W. R. Co., 106 U.S. 286 (1882). The doctrine was expanded to non-railroad debtors in the mid-century. See Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in hotel reorganization case, that the court was not "helpless" to apply the rule to supply creditors of non-railroad debtors where alternative was cessation of operations).

20.     The Third Circuit recognized the "necessity of payment" doctrine in In re Lehigh & New England Railway Co., 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. Id. (stating courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); see also In re Penn Cent. Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims . . . have been paid"); In re Just for Feet, Inc., 242 B.R. 821, 824-26 (D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).[5]

---

[5]     Additionally, the Bankruptcy Code contemplates prepetition payments in some circumstances. Section 549(a), which deals with postpetition transfers, provides that "the trustee may avoid a transfer of property of the estate . . . that occurs after the commencement of the case . . . that is not authorized . . . by the court." 11 U.S.C. § 549(a). Thus, by necessary implication, a bankruptcy court may authorize limited postpetition payments to satisfy prepetition obligations. See In re Isis Foods, Inc., 37 B.R. 334, 336 n.3 (W.D. Mo. 1984) (noting that "proposed transfers [to pay prepetition claims may] be presented in advance to a bankruptcy court for its approval and would thereafter be insulated from attack" under section 549(a); see also 11 U.S.C. § 363(b)(1) (allowing the trustee, after notice and hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate").

21.     Today, the rationale for the necessity of payment rule – the rehabilitation of a debtor in reorganization cases – is "the paramount policy and goal of Chapter 11." In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); see also Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation" is appropriate); In re Just for Feet, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); 3 Collier on Bankruptcy § 105.04[5][a] (15th ed. rev. 2004) (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

11

22.     Courts also have permitted postpetition payment of prepetition claims pursuant to section 105(a) of the Bankruptcy Code in other situations, such as if nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan.  See In re UNR Indus., Inc., 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization); In re Ionosphere Clubs, 98 B.R. at 175-77 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

23.     This flexible approach is particularly critical where a prepetition creditor provides vital goods or services to a debtor that would be unavailable if the Debtor did not satisfy its prepetition obligations.  In In re Structurlite Plastics Corp., 86 B.R. 922 (Bankr. S.D. Ohio 1988), the bankruptcy court stated it "may exercise its equity powers under § 105(a) [of the Bankruptcy Code] to authorize payment of pre-petition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" Id. at 931 (citing In re Chateaugay, 80 B.R. at 287).  The court explained that "a per se rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." Id. at 932.

24.     The Debtors' request for authority to honor existing Customer Obligations under All Customer Programs has been granted in numerous other chapter 11 cases in this District and elsewhere.  See, e.g., In re Tribune Co., 08-13141 (KJC) (Bankr. D. Del. Dec. 10, 2008); In re Hilex Poly Co., Case No. 08-10890 (KJC) (Bankr. D. Del. May 7, 2008); In re Linens Holdings Co., Case No. 08-10832 (CSS) (Bankr. D. Del. May 2, 2008); In re Buffets Holdings, Inc., Case No. 08-10141 (MFW) (Bankr. D. Del. Jan. 23, 2008); In re Remy Worldwide Holdings, Inc.,

Case No. 07-11481 (KJC) (Bankr. D. Del. May 23, 2007); In re Holliston Mills, Inc., Case No.

07-10687 (MFW) (Bankr. D. Del. May 23, 2007); In re Pliant Corp., Case No. 06-10001 (MFW)

(Bankr. D. Del. Jan. 4, 2006); see also In re Bally Total Fitness of Greater N.Y., Inc., No. 08-

14818 (BRL) (Bankr. S.D.N.Y. Dec. 5, 2008); In re Stone Barn Manhattan, LLC, No. 08-12579

(ALG) (Bankr. S.D.N.Y. July 29, 2008); In re Quebecor World (USA), Inc., No. 08-10152

(JMP) (Bankr. S.D.N.Y. Jan. 23, 2008).

25.     The Debtors further represent that they anticipate access to sufficient working

capital to pay and/or honor all Customer Obligations, including through All Customer Programs,

in the ordinary course of business.

26.     In addition, by this Motion, the Debtors request that their banks and financial

institutions be authorized and directed, when requested by the Debtors in the Debtors' sole

discretion, to honor and paychecks or requests for funds transfers arising out of the Debtors'

Customer Obligations.  The Debtors represent that these payments can be readily identified as

relating directly to the authorized payment of these obligations, and that, accordingly, payments

for prepetition obligations other than those addressed herein or in another order of this Court will

not be honored inadvertently.

27.     In light of the foregoing, the Debtors respectfully submit that clarifying the

authority to honor All Customer Programs is essential for the Debtors' reorganization and is in

the best interests of the Debtors' estates and creditors.

28.     Nothing contained in this Motion shall constitute a rejection or assumption by the

Debtors, as debtors in possession, of any executory contract or unexpired lease relating to All

Customer Programs or otherwise discussed in this Motion.  As such, the Debtors reserve all of

their rights to assume or reject such agreements in accordance with the applicable provisions of

the Bankruptcy Code. Furthermore, the Debtors reserve the right to contest, on nonbankruptcy grounds or otherwise, any amount claimed to be due by any of the counterparties to the Customer Credits Arrangements.

### Request for Waiver of Stay

29.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." As set forth above, the immediate performance of the Customer Obligations is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the ten-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

### Notice

30.     Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to the (i) Office of the United States Trustee for the District of Delaware; (ii) the Committee; and (iii) the general service list established in these chapter 11 cases. The Debtors submit that under the circumstances no other or further notice is necessary.

### No Prior Request

31.     No prior request for the relief requested herein has been made to this or any other court.

14

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  January 29, 2009
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley
Lisa M. Schweitzer
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Thomas F. Driscoll III (No. 4703)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Phone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Proposed Counsel for the Debtors*
*and Debtors in Possession*