## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------X
                                                          :
*In re*                                                   :     Chapter 11
                                                          :
Nortel Networks Inc., *et al.*                            :     Case No. 09- 10138 (KG)
                                                          :
                            Debtors.                      :     Jointly Administered
                                                          :
-------------------------------------------------------------------X     **RE: D.I. 166**


**DECLARATION OF PAMELA HEHN SCHROEDER, FINANCE LEADER, NORTH AMERICA CARRIER SALES OF NORTEL NETWORKS INC., IN SUPPORT OF DEBTORS' SUPPLEMENTAL MOTION FOR ENTRY OF AN ORDER CLARIFYING RELIEF GRANTED PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE AUTHORIZING DEBTORS TO HONOR PREPETITION OBLIGATIONS TO THEIR CUSTOMERS [D.I. 49]**


I, Pamela Hehn Schroeder, do hereby declare as follows:

1.      I am the Finance Leader, North America Carrier Sales of Nortel Networks

Inc. ("NNI" and, together with the other above-captioned debtors, the "Debtors" or the "U.S.

Debtors").[1]

2.      I submit this declaration in support of the Debtors' Supplemental Motion

for Entry of an Order Clarifying Relief Granted Pursuant to Sections 105(a) and 363(b) of the

Bankruptcy Code Authorizing Debtors to Honor Prepetition Obligations to Their Customers (the

"Motion").[2]  Except as otherwise indicated, all facts set forth in this declaration are based upon

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]      Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

my personal knowledge, information supplied to me by other members of the Debtors'

management and professionals or learned from my review of relevant documents or upon my

opinion based upon my experience and knowledge of the Debtors' operations and financial

condition. If I were called upon to testify, I could and would testify competently to the facts set

forth herein. I am authorized to submit this declaration.

       3.     I am generally familiar with the day-to-day operations of the Debtors and

am responsible for monitoring the financial impacts of the Debtors' relationships with their

largest customers. Since the commencement of these chapter 11 proceedings on January 14,

2009, I have been informed of numerous conversations with customers concerning the terms and

conditions of their current and going forward relationships with the Debtors. Various customers

have requested information on how the filing of these chapter 11 cases affects their transactions

with the Debtors, including specifically confirmation that the Order Pursuant to Sections 105(a)

and 363(b) of the Bankruptcy Code Authorizing Debtors to Honor Prepetition Obligations to

Their Customers [D.I. 49] (the "Customer Obligations Order") covers All Customer Programs

(as defined in the Motion). In the ordinary course of their businesses, the Debtors had

outstanding prepetition obligations in varying amounts under All Customer Programs.

          a.    Customer Credits Arrangements. A Customer Credit Arrangement is a program through which a customer accrues credits (the "Customer Credits") either up-front, upon signing of a contract, or at an agreed upon percentage of its annual purchases with Nortel (the "annual spend"). Once accrued, a customer may apply Customer Credits towards future purchases of Nortel products and services under the terms of its agreement. Customer Credits Arrangements ensure that the Debtors will continue to be an attractive supplier for key customers over the terms of their agreements and create an incentive for those customers to continue purchasing goods and services from Nortel during the chapter 11 cases and otherwise. The Debtors estimate that honoring Customer Credits issued through 12/31/2008 will cost the Debtors and the Canadian Debtors approximately $82 million. This figure should be considered in

comparison with the annual spend by the relevant North American carrier customer base of $3.49 billion.

b.    <u>Training Credits</u>.  The products and systems Nortel provides to its customers incorporate complex technologies.  As such, Nortel sells training programs alongside its products in order to educate customers on their features and instruct them as to their proper uses.  The training, which is provided either by Nortel directly or through third-party providers, eases the pressure on Nortel's support and services obligations and builds loyalty with existing customers.  From time to time, Nortel grants Training Credits to customers to help those customers shoulder training costs (the "<u>Training Credits</u>").  The Debtors estimate that honoring Training Credits issued in connection with the carrier business through 12/31/2008 will cost the Debtors and the Canadian Debtors approximately $14 million.  The Debtors have also issued Training Credits in connection with the enterprise business.

c.    <u>Trade-in Credits</u>.  Certain carrier and enterprise customers have contractual rights to trade in products utilizing old technologies when Nortel releases products that utilize newer technologies (the "<u>Trade-in Credits</u>").  In order to create an incentive for existing customers to take advantage of new Nortel products, from time to time Nortel has offered those customers Trade-in Credits to help facilitate the transition from older to newer technologies.

d.    <u>Performance Compensation Payments and Liquidated Damages</u>.  Performance Compensation Payments and Liquidated Damages (collectively, "<u>Compensation Payments</u>") are payments typically made in the form of Customer Credits, though occasionally made in cash, to customers in the event that Nortel does not meet certain milestones, delivery dates or performance standards.  Building Compensation Payments into large customer contracts is an industry standard practice that provides comfort to customers in the event that system outages occur or new technologies cannot be rolled out on time.  Honoring amounts due in prepetition Compensation Payments is a vital step towards maintaining critical customer relationships during the chapter 11 cases.  The Debtors estimate that honoring Compensation Payments accrued in connection with the carrier business through 12/31/2008 will cost the Debtors and the Canadian Debtors approximately $18 million.  As with the cost associated with the Customer Credit Arrangements, this figure should also be considered in comparison with the $3.49 billion annual spend by the North American carrier customer base.  Additionally, it should be noted that some portion of the figure would be booked as revenue in the event that the estimated amount is greater than the amount actually paid to customers.  The Debtors have also incurred Compensation Payments in connection with the enterprise business.

e.    <u>Free Trial Equipment and Services</u>.  In accordance with standard industry practices, Nortel grants certain customers the right to receive free services, lab or trial equipment, or other hardware and software products prior to their widespread commercial release in order to accommodate in-house customer testing requirements and for other business development purposes.  Customers earn such benefits up-front upon the signing of a contract, in exchange for signing a contract with a minimum purchase commitment or upon a negotiated factor of annual spend.  The Debtors estimate that honoring such benefits granted in connection with the carrier business through 12/31/2008 will cost the Debtors and the Canadian Debtors approximately $9 million. The Debtors have also issued similar benefits in connection with the enterprise business.

f.    <u>Advanced Billing</u>.  From time to time, certain Nortel customers pay portions of their contracts in advance.  For example, under such an arrangement, a customer may pay for all of Nortel's service obligations at the start of a year.  Various customers have paid Nortel for certain services and products prepetition, and it is critical for the maintenance of customer relationships that Nortel continue to perform its obligations under these agreements.

g.    <u>Co-marketing Agreements</u>.  Co-marketing Agreements are agreements between the Debtors and certain customers (the "<u>Marketing Customers</u>") under which the Debtors make funds available to the Marketing Customers to use in their efforts to stimulate demand for the Debtor's products through advertising and promoting to the Marketing Customers' subscribers.  Honoring such obligations to Marketing Customers is another step towards maintaining critical customer relationships during the chapter 11 cases.  The Debtors estimate that honoring obligations under Co-marketing Agreements accrued in connection with the carrier business through 12/31/2008 will cost the Debtors and the Canadian Debtors approximately $3 million.  The Debtors have also entered into similar agreements in connection with the enterprise business.

h.    <u>Return Rights</u>.  Certain customers have contractual rights to return certain products for cash based on defined contingencies.  The Debtors estimate that honoring such benefits granted in connection with the carrier business through 12/31/2008 will cost the Debtors and the Canadian Debtors slightly more than $1 million. The Debtors have also issued such rights in connection with the enterprise business.

4.    I believe that maintaining All Customer Programs and honoring amounts incurred during the prepetition period incurred thereunder is essential to maintaining customer loyalty and building on existing customer relationships.  A supplemental order from the Court

4

clarifying that the relief granted in the Customer Obligations Order allows for the continuation of All Customer Programs through the Petition Date in an uninterrupted fashion will enhance greatly the Debtors' ability to maintain key customer relationships during these chapter 11 cases.

5.      Accordingly, given the high level of importance placed upon All Customer Programs and Customer Credits Arrangements in particular, the clarification requested in the Motion is a significant step towards providing the necessary comfort to customers so that they will continue doing business with the Debtors in the ordinary course.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 29, 2009

Pamela Hehn Schroeder
Finance Leader, North America Carrier Sales

4