## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X

*In re*

Nortel Networks Inc., *et al.*,[1]

                Debtors.

-------------------------------------------------------X

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

**Hearing date: Feb. 5, 2009 at 10:00am (ET) (requested)**
**Objections due: Feb. 4, 2009 at 4:00pm (ET) (requested)**

## DEBTORS' MOTION FOR ENTRY OF AN ORDER
## SUPPLEMENTING CERTAIN OF THE FIRST DAY ORDERS

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of an order substantially in the form attached hereto as Exhibit A (the "Supplemental Order"), pursuant to sections 105(a), 345, 363(b)(1), 363(c)(1), 364(a), 503(b)(1), 507(a)(4) and 507(a)(5) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003(b) and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") supplementing certain of the Debtors' first day orders. In support of the Motion, the Debtors rely on the Declaration of John Doolittle in Support of First Day Motions and Applications (the "First Day Declaration") [D.I. 3]. In further support of the Motion, the Debtors respectfully represent as follows:

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

## I. Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections105(a), 345,

363(b)(1), 363(c)(1), 364(a), 503(b)(1), 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

## II. Background

**A.      Introduction**

3.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario

Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement

Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian

Proceedings"). The Canadian Debtors continue to manage their properties and operate their

businesses under the supervision of the Canadian Court. Ernst & Young Inc., as foreign

representative for the Canadian Debtors, has filed petitions in this Court for recognition of the

Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11

proceedings as a foreign proceeding under section 18.6 of the CCAA. In addition, at 8 p.m.

(London time) on January 14, 2009, the High Court of Justice in England placed nineteen of

Nortel's European affiliates into administration under the control of individuals from Ernst &

Young LLC (collectively, the "EMEA Debtors").[3]

6.    On January 15, 2009, this Court entered an order of joint administration pursuant

to Rule 1015(b) of the Bankruptcy Rules that provided for the joint administration of these cases

and for consolidation for procedural purposes only.

7.    On January 26, 2009, the Office of the United States Trustee (the "U.S. Trustee")

appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section

1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142]. No trustee or examiner has been appointed

in the Debtors' cases.

**B.    Debtors' Corporate Structure and Business**

8.    A description of the Debtors' corporate structure and businesses and the events

leading to the chapter 11 cases are set forth in the First Day Declaration.

### III. The First Day Relief

**A.    The Common Carrier and Warehouse Motion**

9.    On January 14, 2009, the Debtors filed their Motion for Entry of an Order

Authorizing Debtors to Pay Prepetition Common Carrier Charges and Warehouse Fees [D.I. 14]

---

[3]    The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A.,
Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel
Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks
B.V., Nortel Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH,
Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks
Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

(the "Common Carrier and Warehouse Motion").[4] On January 15, 2009, the Court entered the Order Authorizing Debtors to Pay Prepetition Common Carrier Charges and Warehouse Fees [D.I. 50] (the "Common Carrier and Warehouse Order"). The Debtors incorporate the Common Carrier and Warehouse Motion herein by reference as if set forth in its entirety by reference.

10.　Paragraph 2 of the Common Carrier and Warehouse Order provides as follows:

> The Debtors are authorized to honor and pay, in their sole discretion, all undisputed prepetition Common Carrier Charges and Warehouse Fees consistent with their customary practices in the ordinary course of business, including:
>
> a.　The Common Carrier Charges in an amount not to exceed $3.5 million; and
>
> b.　The Warehouse Fees in an amount not to exceed $5 million.

Common Carrier and Warehouse Order at ¶ 2.

11.　While the Debtors' first day estimates of Common Carrier Charges and Warehouse Fees were based on the best information then available, the size of the Debtors' supply chain required a post-filing reassessment of the goods actually in transit on the Petition Date. Since the entry of the Common Carrier and Warehouse Order, the Debtors have received additional invoices from carriers and warehouse facilities and have been informed of certain additional invoices to be received shortly that relate to the prepetition period. The Debtors believe that the aggregate amount of prepetition Common Carrier Chargers, including amounts previously authorized to be paid, is approximately $16 million, or $12.5 million more than the original estimate of $3.5 million, and that the aggregate amount of prepetition Warehouse Fees,

---

[4]　Capitalized terms used but not defined in Sections III.A., IV.A. and V.A. have the meanings ascribed to them in the Common Carrier and Warehouse Motion.

including amounts previously authorized to be paid, is approximately $5.5 million, or $500,000 more than original estimate of $5 million.

**B.    The Employee Wage Motion**

12.    On January 14, 2009, the Debtors filed the Debtors' Motion for Entry of an Order Authorizing, But Not Directing, Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Reimbursable Expenses, and (III) Medical, Retirement and Similar Benefits [D.I. 10] (the "Employee Wage Motion").[5]  On January 15, 2009, the Court entered the Order Authorizing, but not Directing, Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Reimbursable Expenses, and (III) Medical, Retirement and Similar Benefits [D.I. 59] (the "Employee Wage Order").  The Debtors incorporate the Employee Wage Motion herein by reference as if set forth in its entirety.  On January 23, 2009, the Court entered a Supplemental Order Authorizing, but Not Directing, Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Reimbursable Expenses, and (III) Medical, Retirement and Similar Benefits [D.I. 98] (the "Supplemental Employee Wage Order").

13.    Since the entry of the Employee Wage Order, certain additional obligations to Employees, including some arguably incurred prepetition, though all incurred in the ordinary course, have come to light.  The Debtors believe it essential to remove any question of the ability to honor such obligations in the postpetition period in order to maintain employee morale in this difficult environment.

*Sales Incentive Plan*

14.    In the Employee Wage Motion, the Debtors sought permission to pay up to $15 million in connection with the Sales Incentive Plan (as defined in the Employee Wage Motion).

---

[5]    Capitalized terms used but not defined in Sections III.B., IV.B. and V.B. have the meanings ascribed to them in the Employee Wage Motion.

Since the entry of the Employee Wage Order, as payments due under the Sales Incentive Plan have been processed, certain additional outstanding prepetition amounts under the Sales Incentive Plan have come to light. The Debtors believe that the aggregate amount of prepetition payments under the Sales Incentive Plan, including amounts previously authorized to be paid, is approximately $19 million, or $4 million more than the original estimate of $15 million.

***Intellectual Property Bonuses***

15.     In the ordinary course of business, Nortel administers the "Nortel Intellectual Property Rights Award and Recognition Plan" (the "IP Rights Award Plan"), under which the Debtors provide monetary rewards to Employees for the creation, protection and exploitation of certain intellectual property, including patents, on behalf of the Debtors. In a technology company such as Nortel, the use of such programs is commonplace. The IP Rights Award Plan was not discussed in the Employee Wage Motion.

16.     There are two types of monetary awards under the IP Rights Award Plan, including:

> a.  Fixed Monetary Awards:  A non-discretionary, fixed monetary award in the amount of $13,500 payable to each inventor (up to a maximum of three inventors) on the first filing of a patent application, and a further non-discretionary fixed monetary award in the amount of $350 per inventor payable upon the grant of the first patent for the invention. In addition, cumulative issuance awards will be paid to an Employee-inventor for the issuance of the fifth, tenth and every additional multiple of five patents issued to be paid on an annual basis. The amounts for such cumulative awards are as follows:
>
> > (i)     Fifth Patent:  $1,250
> >
> > (ii)    Tenth Patent:  $2,500
> >
> > (iii)   15th Patent:  $3,750
> >
> > (iv)    20th and each subsequent patent:  $5,000

6

b. <u>Discretionary Awards</u>:  Additionally, from time to time, an Employee may be determined to be entitled to a discretionary, cumulative monetary award for meritorious contributions to invention disclosures, patent applications, granted patents, copyrights, registered trademarks, trade secrets, industrial designs and documented, unique proprietary know-how of competitive or commercial value.  Such discretionary awards are typically determined following the end of a given year by an appropriate group or committee within Nortel.

17.    The Debtors estimate that the total cost to the Debtors to administer the IP Rights Award Plan in 2009 will be approximately $202,000, including approximately $180,000 in fixed monetary awards and approximately $22,000 in cumulative and discretionary awards.  Since the entry of the Employee Wage Order, the Debtors have determined that, as of the Petition Date, there remained outstanding approximately $40,900 associated with the IP Rights Award Plan, including $19,650 in outstanding fixed monetary awards owed to approximately 40 Employees and approximately $21,250 in outstanding cumulative and discretionary awards for 2008, which will be determined during the first quarter of 2009.  The payments due under the IP Rights Award Plan for prepetition periods, if paid, may lead to certain Employees receiving more than $10,950 in wages and salaries.

***Recognition Awards***

18.    In the ordinary course of business, the Debtors provide certain, limited rewards to the Employees in the form of additional compensation in special recognition for their efforts on behalf of Nortel (the "<u>Recognition Awards</u>").  The Recognition Awards provided to Employees take the form of small gift certificates that can be redeemed for gifts in varying amounts through a website operated by Globoforce Limited ("<u>Globoforce</u>"), a third-party vendor (the "<u>Globoforce Certificates</u>").  Under an agreement between NNL and Globoforce, Nortel issues Globoforce Certificates to its Employees in its discretion and is subsequently invoiced by Globoforce on a monthly basis for the face value of all Globoforce Certificates issued plus additional

administrative fees. The Debtors ultimately bear the cost of both the Globoforce Certificates and administrative fees for the Recognition Awards provided to the Debtors' Employees.

19.     The Debtors estimate that the average monthly cost to the Debtors of providing the Recognition Awards is approximately $37,000. The Debtors believe that, approximately $50,000 in costs associated with the Recognition Awards was owed as of the Petition Date. This includes amounts invoiced to the Debtors that they have yet to pay as well as amounts for Globoforce Certificates issued to Employees prior to the Petition Date but for which the Debtors have yet to receive an invoice.

### Deferred Compensation Remittance

20.     Prior to January 1, 2009, the Debtors suspended the "Nortel Networks U.S. Deferred Compensation Plan" (the "Deferred Compensation Plan"). However, due to an administrative error, amounts were mistakenly withheld from certain Employees' paychecks on January 2, 2009, as if such amounts were employee contributions to the Deferred Compensation Plan (the "Deferred Compensation Amounts"). Because the Deferred Compensation Amounts were withheld in error, the Debtors believe these amounts should be remitted to the Employees to ensure that they are fully compensated with respect to wages, salaries and other compensation to which they are entitled.

21.     The Debtors believe that, as of the Petition Date, approximately $81,500 in Deferred Compensation Amounts were owed to 89 Employees and that such Deferred Compensation Amounts range from approximately $46 to $10,535 for each Employee. The Debtors do not believe that the payment of any of these amounts will result in an Employee

receiving more than the $10,950 cap set in the Employee Wage Order for outstanding prepetition wages and salaries.[6]

### *Tax Equalization Payments*

22.    Paragraph 6 of the Employee Wage Order authorized the Debtors to pay any outstanding prepetition Expat Costs in an amount not to exceed $200,000 and to continue to pay the Expat Costs in accordance with the Debtors' prepetition policies and practices.  The Debtors believe that the outstanding prepetition amounts owed with respect to the Expat Costs will fall well below the $200,000 cap provided in the Employee Wage Order.

23.    However, when calculating the Expat Costs, certain Tax Equalization Payments, described in paragraph 78 of the Employee Wage Motion, were not included.  While the total amount payable in respect of the Tax Equalization Payments discussed will be impossible to determine accurately until the Expats' tax returns are fully prepared, based on a more comprehensive review of the Tax Equalization Payments made by the Debtors in 2008, the Debtors determined that they paid approximately $300,000 in Tax Equalization Payments on behalf of the Employees in 2008 and that the cost of prepetition Tax Equalization Payments to be made in 2009 will not exceed $500,000.  In the event that the cost of the Tax Equalization Payments for 2008 would exceed $500,000, the Debtors will request additional authority from this Court to make such payments.

### C.    The Taxes and Fees Motion

24.    On January 14, 2009, the Debtors filed the Debtors' Motion for an Order Authorizing the Debtors to Remit and Pay Certain Taxes and Fees [D.I. 11] (the "Taxes and Fees

---

[6]    One Employee, who was inactive as of the Petition Date and has been provided notice of terminated, had $37,513.97 erroneously withheld.  Because of the amount at issue, the Debtors do not seek authorization to pay that Employee the amount withheld.

Motion").[7]  On January 15, 2009, the Court entered the Order Authorizing Debtors to Remit and Pay Certain Taxes and Fees [D.I. 48] (the "Taxes and Fees Order").  The Debtors incorporate the Taxes and Fees Motion herein by reference as if set forth in its entirety.

**_Personal Property Taxes_**

25.    Paragraph 2 of Taxes and Fees Order in part provides as follows:

> The Debtors are authorized, but not directed, to remit and pay all undisputed prepetition Taxes and Fees consistent with their customary practices in the ordinary course of business, including . . .
>
> c.  Personal property taxes in an amount not to exceed $1 million.

Taxes and Fees Order at ¶ 2.

26.    Since the entry of the Taxes and Fees Order, as taxes liened against the Debtors' personal property in early January 2009 have been processed, certain additional outstanding prepetition personal property tax liabilities have come to light.  The Debtors believe that the aggregate amount of prepetition personal property taxes, including amounts previously authorized to be paid, is approximately $5.3 million, or $4.3 million above the original estimate of $1 million.

**_Business and Occupation Taxes and Business License Fees_**

27.    Paragraph 20 of the Taxes and Fees Motion in part provides as follows:

> The Debtors' records reflect that they are current with respect to their business and occupation taxes and business license fees.

---

[7]    Capitalized terms used but not defined in Sections III.C., IV.C. and V.C. have the meanings ascribed to them in the Taxes and Fees Motion.

Taxes and Fees Motion at ¶ 20.  Accordingly, the Debtors did not request authority to pay any outstanding prepetition amounts with respect to the business and occupation taxes and business license fees in the Taxes and Fees Order.

28.     Since the entry of the Taxes and Fees Order, as additional invoices have been processed, certain outstanding business and occupation taxes and business license fees that accrued in 2008 but will not come due until later in 2009 have come to light.  The Debtors believe that the aggregate amount of prepetition business and occupation taxes and business license fees is approximately $400,000.

**D.     The Foreign Vendors Motion**

29.     On January 15, 2009, the Debtors filed the Debtors' Motion for Entry of an Order Authorizing Payment of Prepetition Obligations to Certain Foreign Vendors [D.I. 60] (the "Foreign Vendors Motion").[8]  On January 16, 2009, the Court entered the Order Authorizing Payment of Prepetition Obligations to Foreign Vendors [D.I. 71] (the "Foreign Vendors Order").  The Debtors incorporate the Foreign Vendors Motion herein by reference as if set forth in its entirety.

30.     Paragraph 2 of the Foreign Vendors Order provides as follows:

> The Debtors are authorized to honor and pay, in their sole discretion, prepetition Foreign Vendor Claims in an amount not to exceed $3 million.

Foreign Vendors Order at ¶ 2.

31.     Since the entry of the Foreign Vendors Order, as additional invoices received from the Foreign Vendors have been processed, certain additional outstanding prepetition Foreign Vendor Claims have come to light.  These amounts include approximately $200,000 in

---

[8]     Capitalized terms used but not defined in Sections III.D., IV.D. and V.D. have the meanings ascribed to them in the Foreign Vendors Motion.

sales and use taxes owed by the Foreign Offices, which the Debtors believe they are authorized to pay under the Taxes and Fees Order. Out of an abundance of caution, the Debtors request authority to pay those amounts under the Foreign Vendors Order. The Debtors believe that the aggregate amount of prepetition Foreign Vendor Claims, including amounts previously authorized to be paid, is approximately $5.5 million, or $2.5 million more than the original estimate of $3 million.

**E.      The Cash Management Motion**

32.      On January 14, 2009, the Debtors filed the Debtors' Motion for an Order Pursuant to Sections 345, 363(c)(1), 364(a) and 503(b)(1):  (A) Approving the Continued Use of the Cash Management System, Bank Accounts and Business Forms; (B) Permitting Continued Intercompany Transactions, Granting Administrative Priority Status to Postpetition Intercompany Claims and Preserving and Permitting the Exercise of Intercompany Setoff Rights; (C) Authorizing Banks to Honor Certain Transfers and Charge Certain Fees and Other Amounts; and (D) Waiving the Requirements of 11 U.S.C. Section 345(b) on an Interim Basis [D.I. 9] (the "Cash Management Motion").[9]  On January 15, 2009, the Court entered the Order Pursuant to Sections 345, 363(c)(1), 364(a) and 503(b)(1):  (A) Approving the Continued Use of the Cash Management System, Bank Accounts and Business Forms; (B) Permitting Continued Intercompany Transactions, Granting Administrative Priority Status to Postpetition Intercompany Claims and Preserving and Permitting the Exercise of Intercompany Setoff Rights; (C) Authorizing Banks to Honor Certain Transfers and Charge Certain Fees and Other Amounts; and (D) Waiving the Requirements of 11 U.S.C. Section 345(b) on an Interim Basis [D.I. 58]

---

[9]      Capitalized terms used but not defined in Sections III.E., IV.E. and V.E. have the meanings ascribed to them in the Cash Management Motion.

(the "Cash Management Order"). The Debtors incorporate the Cash Management Motion herein by reference as if set forth in its entirety.

33.    Since the Court granted the Cash Management Motion, the Debtors have discovered two areas in need of clarification. First, the schedule of bank accounts attached to the Cash Management Motion as Exhibit C requires minor amendment. In addition to the accounts listed therein, at the time of filing, Nortel Networks Capital Corporation ("NNCC") maintained, and continues to maintain, an investment account with Banc of America Securities LLC ("BAS")[10] in Boston, Massachusetts for the purpose of holding cash used to pay certain guarantee fees to Nortel Networks Limited ("NNL")[11] and NNI maintained, and continues to maintain, an investment account with The Reserve in New York, New York for the purpose of holding approximately $65 million in the Reserve Primary Fund, pending future disbursements. Additionally, at the time of the filing, the Debtors did not maintain one of the Trade Disbursement Accounts described in the Cash Management Motion. A revised schedule of the Debtors' bank accounts, reflecting these changes and the correction of a typographical error in the numbering of NNI's account with BAS, is attached to the Motion as Exhibit B.

34.    Second, in their description of ordinary course intercompany financial transactions (the "Intercompany Transactions"), the Debtors described intercompany payables and receivables as being generated between the Debtors and other Nortel affiliates as a result of three primary types of transactions: (1) charges related to the purchase of inventory and the provision of services; (2) the Residual Profit Sharing Methodology ("RPSM"); and (3) certain ordinary course intercompany loan agreements. Cash Management Motion at ¶ 58. In addition

---

[10]    This investment account currently has a balance of approximately $1.8 million, which is invested in the JP Morgan U.S. Money Market Fund. As described in the Cash Management Motion, NNI also invests in this fund. Cash Management Motion at ¶ 65.

[11]    NNL is the guarantor of the $150,000,000 7.875% notes issued by NNCC and due June 15, 2026.

to these broad categories, the Debtors also described how NNI processes and issues payroll

checks for the employees of certain Payroll Affiliates through the Affiliate Payroll Processing

System. Cash Management Motion at ¶ 67. The Debtors wish to supplement these descriptions

with certain other ordinary course Intercompany Transactions that regularly occur.

35.     In addition to the circumstances described above, NNI makes payments for a

variety of goods and services on behalf of other Nortel affiliates for the purpose of administrative

convenience. For example, NNI regularly makes payments to a vendor, which is responsible for

reimbursing expatriate employees for the inherent costs of living abroad. Prior to the filing, NNI

booked such payments as intercompany receivables and settled them with the Nortel entities that

received the benefit of expatriate employees' services through the ordinary course intercompany

settlement process described in the Cash Management Motion. In light of the commencement of

NNI's chapter 11 case, Nortel entities that receive the ultimate benefit of such disbursements

have agreed to either prefund or promptly reimburse NNI for any such disbursements. Similarly,

to the extent other Nortel entities make initial payments for the benefit of the Debtors, the

Debtors will prefund or promptly reimburse such disbursements.

## IV.  Relief Requested

36.     By the Motion, the Debtors seek the entry of an order supplementing certain of

the Debtors' first day orders, as described herein.

### A.     The Common Carrier and Warehouse Fees Order

37.     The Debtors seek to amend paragraph 2 of the Common Carrier and Warehouse

Order as follows:

> The Debtors are authorized to honor and pay, in their sole
> discretion, all undisputed prepetition Common Carrier Charges and
> Warehouse Fees consistent with their customary practices in the
> ordinary course of business, including:

14

a.    The Common Carrier Charges in an amount not to
exceed $16 million; and

b.    The Warehouse Fees in an amount not to exceed
$5.5 million.

(the "Common Carrier and Warehouse Amendment").

## B.    The Employee Wage Order

### *Sales Incentive Plan*

38.    The Debtors seek to amend paragraph 4 of the Employee Wage Order as follows:

The Debtors are authorized, but not directed, to honor and pay any
outstanding prepetition payments under the Sales Incentive Plan in
an amount not to exceed $19 million and to continue, during the
course of these cases, to make payments under the Sales Incentive
Plan to the U.S. Sales Employees in accordance with the Debtors'
stated policies and prepetition practices.

(the "Sales Incentive Plan Amendment").

### *Intellectual Property Awards*

39.    The Debtors seek to amend the Employee Wage Order to include the following

paragraph:

The Debtors are authorized, but not directed, to honor and
pay any outstanding prepetition payments under the IP
Rights Award Plan in an amount not to exceed $80,000 and
to continue, during the course of these cases, to make
payments under the IP Rights Award Plan in accordance
with the Debtors' stated policies and prepetition practices.

(the "Intellectual Property Awards Amendment").

### *Recognition Awards*

40.    The Debtors seek to amend the Employee Wage Order to include the following

paragraph:

The Debtors are authorized, but not directed to honor and
pay any outstanding prepetition Recognition Award

15

> payments in an amount not to exceed $100,000 and to
> continue to provide Recognition Awards during the course
> of these cases in accordance with the Debtors' stated
> policies and prepetition practices.

(the "Recognition Awards Amendment").

**_Deferred Compensation Remittance_**

41.    The Debtors seek to amend the Employee Wage Order to include the following

paragraph:

> The Debtors are authorized, but not directed, to remit the
> Deferred Compensation Amounts to the Employees.

(the "Deferred Compensation Amendment").

**_Tax Equalization Payments_**

42.    The Debtors seek to amend the Employee Wage Order to include the following

paragraph:

> The Debtors are authorized, but not directed, to pay any
> outstanding prepetition Tax Equalization Payments in an
> amount not to exceed $500,000 and to continue, during the
> course of these cases, to pay the Tax Equalization
> Payments in accordance with the Debtors' prepetition
> policies and practices.

(the "Tax Equalization Amendment").

**C.    The Taxes and Fees Order**

43.    The Debtors seek to amend paragraph 2 of the Taxes and Fees Order as follows:

> The Debtors are authorized, but not directed, to remit and pay all
> undisputed prepetition Taxes and Fees consistent with their
> customary practices in the ordinary course of business, including:
>
> a.    Sales and use taxes in an amount not to exceed $6.6
>        million;
>
> b.    Real property taxes in an amount not to exceed $3
>        million;

16

c.   Personal property taxes in an amount not to exceed
$5.3 million; and

d.   Business and occupation taxes, business license fees
and other fees in an amount not to exceed $400,000.

(the "Taxes and Fees Amendment").

**D.    The Foreign Vendors Order**

44.    The Debtors seek to amend paragraph 2 of the Foreign Vendors Order as follows:

The Debtors are authorized to honor and pay, in their sole
discretion, prepetition Foreign Vendor Claims in an amount
not to exceed $5.5 million.

(the "Foreign Vendors Amendment").

**E.    Cash Management Order**

45.    The Debtors seek to amend the Cash Management Order so that it grants the Cash

Management Motion as supplemented by the additional facts described herein.

## V. Basis for Relief Requested

46.    As discussed more thoroughly in the first day motions, section 105(a) of the

Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order, process or

judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

In addition, Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to use

property of the estate other than in the ordinary course of business after notice and a hearing.

Courts have applied section 105(a) of the Bankruptcy Code in authorizing debtors to pay

prepetition costs to the extent it is necessary to preserve a debtor's business.  Further, as

discussed in the first day motions, this Court may use its power under section 105(a) to authorize

payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to

as the "doctrine of necessity").

17

47.    This Court has already granted much of the relief requested herein.  By the Motion, the Debtors are seeking authority to continue to pay those types of prepetition obligations previously authorized by the Court, albeit at higher amounts because of additional invoices received and other information gathered since the Petition Date.

**A.    Sufficient Cause Exists for the Court to Amend the Common Carrier and Warehouse Order**

48.    As discussed more fully in the Common Carrier and Warehouse Motion, the payment of the additional Common Carrier Charges and Warehouse Fees is necessary for continued delivery and storage of the Debtors' goods, and, by entry of the Common Carrier and Warehouse Order, the Common Carriers and Warehouse Facilities have been led to believe that these obligations would be satisfied.  The Debtors believe that the relief sought in the Motion with respect to Common Carriers and Warehouse Facilities is necessary to prevent a disruption of the Debtors' ability to continue their business operations and to satisfy obligations to customers.

49.    If the Debtors fail to honor their prepetition obligations to Common Carriers, the Common Carriers may be entitled to assert and perfect liens against the Debtors' property, which would entitle them to payment ahead of other general unsecured creditors.  In addition, the Common Carriers may hold the property subject to the asserted liens pending payment, to the direct detriment of the Debtors, their estates, customers and other parties in interest.  In contrast, prompt and continued payment of the Common Carrier Charges promotes the uninterrupted flow of goods and the smooth continuation of the Debtors' businesses.  The Debtors' Common Carriers believe that, pursuant to the Common Carrier and Warehouse Order, the Debtors have the authority to pay the prepetition Common Carrier Charges.  The Motion merely seeks to confirm the Common Carriers' belief.

50.     Similarly, if the Debtors fail to honor their prepetition obligations to the
Warehouse Facilities, the Warehouse Facilities may refuse to deliver the Debtors' goods
currently in their possession and similarly may be entitled to assert and perfect liens against the
Debtors' property.  In addition, the Warehouse Facilities may hold the property subject to the
asserted liens pending payment, to the direct detriment of the Debtors, their estates, customers
and other parties in interest.  In contrast, prompt and continued payment of the Warehouse Fees
promotes the uninterrupted flow of goods and the smooth continuation of the Debtors'
businesses.

51.     The Debtors' ability to meet their obligations to Common Carriers and
Warehouse Facilities in the ordinary course is in the best interests of the Debtors' estates and
creditors.  Given the above stated change in facts, ample cause exists to amend the Common
Carrier and Warehouse Order and raise the cap on outstanding Common Carrier Charges from
$3.5 million to $16 million.  Similarly ample cause exists to raise the cap on outstanding
Warehouse Fees and from $5 million to $5.5 million.

**B.      Sufficient Cause Exists for the Court to Amend the Employee Wage Order**

52.     As discussed more fully in the Employee Wage Motion, with the commencement
of these chapter 11 cases, it is critical for morale and the continued operation of the Debtors'
businesses to ensure that there is no interruption to the payment of wages, salaries and benefits to
the Debtors' Employees.  By entry of the Employee Wage Order, the Employees have been led
to believe that any outstanding prepetition obligations related to ordinary course wages, salaries
and benefit programs would be satisfied.  The Debtors believe that the relief sought in the
Motion with respect to Employees is necessary to prevent certain Employees from seeking
alternative employment opportunities and a resulting disruption of the Debtors' ability to
continue their business operations.

53.     With respect to the Sales Incentive Plan Amendment, the Debtors believe that

payment of the additional prepetition Sales Incentive Plan payments is necessary to continue to

operate with minimal disruption and incentivize their sales force, which is vital to the Debtors'

revenue generation and who have critical relationships with customers.  Moreover, by entry of

the Employee Wage Order, the U.S. Sales Employees have been led to believe that they would

be compensated for sales commissions earned prior to the Petition Date, and the intention of the

Debtors in seeking entry of the Employee Wage Order was to permit payment of all sales

commissions.

54.     With respect to the Intellectual Property Rights Amendment, the Debtors believe

that the IP Rights Award Plan reflects the importance Nortel has assigned to intellectual property

rights as a key tool in enhancing its competitive position and that the Employees have come to

rely on this program.  In addition to providing an incentive for the Employees to innovate in the

course of performing their duties, the limited and reasonable expenditures associated with the IP

Rights Award Plan incentivize the Employees to protect those innovations that they do develop.

Certain of the Employees have come to rely upon the IP Rights Award Plan and have undertaken

substantial efforts with the expectation that the amounts promised under the plan would be paid.

Accordingly, the Debtors believe that it is critical that they honor any unpaid, prepetition

amounts awarded under the IP Rights Award Plan and continue the IP Rights Award Plan in the

ordinary course of business.

55.     With respect to the Recognition Awards Amendment, the Debtors believe that in

this difficult time it is essential that they be permitted to continue their practice of providing

limited awards in recognition of the exceptional and outstanding work of their Employees.  In

addition, in order to maintain Employee morale and ensure a measure of trust between the

Debtors and their Employees, the Debtors believe that they should be permitted to honor the

obligations incurred prepetition with respect to the Recognition Awards. If the Debtors fail to

honor their obligations by paying prepetition amounts related to Globoforce Certificates issued

prepetition, there is a risk that Globoforce will deny the Employees the ability to redeem the

Globoforce Certificates already earned. The Debtors believe that it would be unfair for the

Employees to suffer on account of the Debtors' failure to honor their prepetition Recognition

Awards obligations.

56.     With respect to the Deferred Compensation Amendment, the Deferred

Compensation Amounts were withheld in error based on an administrative mistake that treated

the Deferred Compensation Plan as continuing in 2009. Accordingly, the Debtors believe that it

would be patently unfair to deny to these Employees the earnings withheld in error to which they

were entitled prior to the filing. As noted above, none of the remittances sought to be paid by the

Debtors results in an Employee exceeding the $10,950 administrative priority cap for

outstanding prepetition wages and salaries under sections 507(a)(4) and 507(a)(5) of the

Bankruptcy Code

57.     With respect to the Tax Equalization Amendment, the Debtors believe that

payment of the Tax Equalization Payments is necessary to ensure that the Expats do not suffer a

financial hardship as a result of the tax consequences of an international assignment. These

payments ensure that an Expat transferred as part of the Global Mobility Program pays no more

or less in taxes than he or she would pay working in his or her home country, and therefore is not

worse off as a result of his or her international assignment.

58.     Given the above stated changes in facts and the criticality of the additional

obligations to Employees described herein, ample cause exists to amend the Employee Wage

Order and authorize the prepetition payment of obligations related to the Sales Incentive Plan, IP Rights Award Plan, the Recognition Awards, the Deferred Compensation Amounts and the Tax Equalization Payments.

**C.      Sufficient Cause Exists for the Court to Amend the Taxes and Fees Order**

59.      As described more fully in the Taxes and Fees Order, the payment of the additional Taxes and Fees is necessary to ensure that the Authorities to whom such additional Taxes and Fees are owed do not take actions that could have a wide-ranging and adverse effect on the Debtors' operations as a whole.  By the Taxes and Fees Order, the Authorities have been led to believe that any outstanding prepetition Taxes and Fees would be paid.

60.      The Debtors' failure to pay the Taxes and Fees in a timely manner could have a material adverse impact on the Debtors' business operations in several ways: (i) the Authorities may initiate audits of the Debtors, which would divert unnecessarily their attention away from the reorganization process; (ii) the Authorities may attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay, or pursue other remedies that will harm the estates; and (iii) certain directors and officers might be subject to personal liability, which would likely distract those key employees from their duties related to the Debtors' restructuring.  In addition, unpaid taxes may result in penalties, accrual of interest, or both.

61.      In all cases, the Debtors' failure to pay the Taxes and Fees could have a material adverse impact on their ability to operate their businesses in the ordinary course.  In the ordinary course, the Debtors provide telecommunications and networking equipment, capacity and capability to both service provider and enterprise customers across multiple taxing jurisdictions, and any disputes that could impact their ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole.

62.    The Debtors' ability to timely pay the Taxes and Fees owed to the Authorities in the ordinary course is in the best interests of the Debtors' estates and creditors. Give the above stated change in facts, ample cause exists to raise the cap on undisputed prepetition personal property taxes from $1 million to $5.3 million.  In addition, ample cause exists to authorize the Debtors to pay undisputed prepetition business and occupation taxes and business license fees in an amount not to exceed $400,000.

**D.    Sufficient Cause Exists for the Court to Amend the Foreign Vendors Order**

63.    As described more fully in the Foreign Vendor Motion, the payment of the additional Foreign Vendor Claims is necessary to ensure that the Foreign Vendors continue to ship goods and do business with the Debtors, and, by entry of the Foreign Vendors Order, the Foreign Vendors have been led to believe that these obligations would be satisfied.  The Debtors believe that the relief sought in the Motion with respect to the Foreign Vendors is necessary to prevent a disruption of the Debtors' ability to continue their business operations in the Foreign Offices.

64.    If the Debtors fail to honor their prepetition obligations to the Foreign Vendors, the Foreign Vendors may take precipitous action against the Debtors based on an erroneous belief that they are not subject to the jurisdiction of this Court and, thus, not subject to the automatic stay provisions of 11 U.S.C. § 362(a).  Such action, including obtaining a judgment in foreign court or seizing the Debtors' foreign assets, would significantly curtail the Debtors' operations in the Foreign Offices, which could dilute stakeholders' recoveries.  The Foreign Vendors believe that pursuant to the Foreign Vendors Order the Debtors have the authority to pay the prepetition Foreign Vendor Claims.  The Motion merely seeks to confirm the Foreign Vendors' belief.

65.    The Debtors' ability to pay the Foreign Vendor Claims is plainly in the best interests of the Debtors' estates and creditors. Given the above stated change in facts, ample cause exists to amend the Foreign Vendors Order and raise the cap on outstanding Foreign Vendors Claims from $3 million to $5.5 million.

**E.    Relief Granted in the Cash Management Motion Remains Justified on the Basis of Additional Information**

66.    As described more fully in the Cash Management Motion, the Cash Management System has been continuously utilized by the Debtors and constitutes a customary and essential business practice. The Cash Management System provides numerous benefits, including the ability to: (a) control and monitor corporate funds; (b) invest idle cash; (c) ensure cash availability; and (d) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. The relief granted in the Cash Management Motion remains justified on the basis of additional information described above.

67.    Section 363(c)(1) of the Bankruptcy Code authorizes a debtor in possession to use property of the estate "in the ordinary course of business, without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of section 363(c)(1) of the Bankruptcy Code is to provide a debtor in possession with the flexibility to engage in those transactions that make up the bulk of its day-to-day operations without incurring the excessive monitoring costs that would result from the need to provide notice of, and obtain approval for, such ordinary course activities. Official Comm. Of Unsecured Creditors v. Columbia Gas Transmission Corp., 997 F.2d 1039,1061 (3d Cir. 1993) (holding that a requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient").

68.     Also as more thoroughly discussed in the Cash Management Motion, Intercompany Transactions reduce the administrative costs incurred by the Debtors and their affiliates.  If the Intercompany Transactions were to be discontinued, the Debtors' Cash Management System and related administrative controls would be disrupted to the detriment of the Debtors, their estates and their affiliates.  The Intercompany Transactions are essential to the Debtors' businesses given the integrated nature of the Nortel Companies' operations.

69.     Such transactions are common for enterprises like Nortel, and the Debtors continue to believe that such transactions are in the ordinary course within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require this Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions, given the additional facts described above.

**F.     Irreparable Harm Would Occur if Immediate Relief is not Granted**

70.     As discussed more thoroughly in the first day motions, Bankruptcy Rule 6003 provides in pertinent part that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition, grant relief regarding the following: . . . (b) . . . a motion to pay all or part of a claim that arose before the filing of the petition." Fed. R. Bankr. P. 6003(b).

71.     This Court granted this relief with regards to the outstanding prepetition costs in the first day orders, and for the reasons described therein, the Debtors believe that the relief is appropriate with regards to the amendments requested in this Motion.

72.     Nothing contained herein is intended or should be construed as: (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim on any grounds or assert any counterclaims or affirmative defenses; (iii) a promise to pay any claim; (iv) an implication or admission that any particular claim would constitute a

25

Common Carrier Charge or Warehouse Fee, Employee Wage Obligation, Taxes or Fees Claim, or Foreign Vendor Claim; or (v) a request to assume any executory contract or unexpired lease, pursuant to section 365 of the Bankruptcy Code.

## VI. **Request for Waiver of Stay**

73.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving the Motion.  Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." As set forth above, the immediate performance of the obligations related to the Amendment is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the ten-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## VII. **Notice**

74.     Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to the (i) Office of the United States Trustee for the District of Delaware; (ii) the Committee; and (iii) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

## VIII. **No Prior Request**

75.     No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

26

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: January 30, 2009       CLEARY GOTTLIEB STEEN & HAMILTON LLP
      Wilmington, Delaware

James L. Bromley
Lisa M. Schweitzer
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Thomas F. Driscoll III (No. 4703)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Phone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Proposed Counsel for the Debtors
and Debtors in Possession*