UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
_____
                              )
In re:                        ) Chapter 11
                              )
NORTEL NETWORKS INC., et al., ) Case No. 09-10138 (KG)
                              ) Jointly Administered
                              )
             Debtors.         )
                              ) Re:  Docket Nos. 8 & 46
                              ) Objection Due: 2/4/09 at 4:00 p.m.
                              ) Hearing Date: 2/5/09 at 10:00 a.m.
_____)
```

OBJECTION OF CERTAIN UTILITY COMPANIES TO MOTION PURSUANT TO
SECTIONS 105(a) AND 366 OF THE BANKRUPTCY CODE FOR INTERIM AND
FINAL ORDERS (I) RESTRAINING UTILITY COMPANIES FROM DISCONTINUING,
ALTERING OR REFUSING SERVICE, (II) DEEMING UTILITY COMPANIES
ADEQUATELY ASSURED OF FUTURE PERFORMANCE AND (III) ESTABLISHING
PROCEDURES FOR DETERMINING REQUESTS FOR ADDITIONAL ASSURANCE

Duke Energy Carolinas, LLC ("Duke"), Long Island Lighting
Company d/b/a LIPA ("LIPA"), KeySpan Gas East Corporation d/b/a
National Grid ("KGE"), Colonial Gas Company d/b/a National Grid
("Colonial"), Massachusetts Electric Company d/b/a National Grid
("MEC"), and The Commonwealth Edison Company ("ComEd")
(collectively, the "Utilities"), by counsel, hereby object to the
*Motion Pursuant To Sections 105(a) And 366 Of The Bankruptcy Code
For Interim And Final Orders (I) Restraining Utility Companies
From Discontinuing, Altering Or Refusing Service, (II) Deeming
Utility Companies Adequately Assured Of Future Performance And
(III) Establishing Procedures For Determining Requests For
Additional Assurance* (the "Utility Motion"), and set forth the
following:

SL1 900259v1/000000.00000

## **Introduction**

Section 366(c)(2) of the Bankruptcy Code requires a Chapter 11 debtor to provide utilities with adequate assurance of payment that is satisfactory to the utility within 30 days of the Petition Date.  If a debtor believes the **amount** of the utility's request pursuant to Section 366(c)(2) needs to be modified, the debtor, pursuant to Section 366(c)(3), can file a motion seeking to modify the **amount** of the utility's request.

In this case, the Debtors filed the Utility Motion at the outset of the case seeking to determine adequate assurance of payment satisfactory to the Debtors.  Specifically, the Debtors seek to establish adequate assurance of payment in the form of a newly created segregated interest-bearing account that would contain a deposit equal to two weeks of utility services, calculated as a historical average over the past fifty-two (52) weeks, except for those utilities that: (a) agree to a lesser amount; (b) already hold a deposit equal to or greater than two (2) weeks of utility service; and (c) are not being paid in advance (the "Escrow Account").  Neither this Court nor the Debtors, however, have the authority to establish the **form** of adequate assurance of payment or require a utility to waive its rights under Section 366(c) to seek additional security later in the case.  At best, the Debtors, after notice and a hearing, can

2

only seek to modify the amount of the Utilities' adequate assurance of payment requests pursuant to Section 366(c)(3).

The Utilities are requesting adequate assurance of payment from the Debtors in the form of cash deposits. The Utilities, therefore, are not interested in a two-week deposit, especially a deposit that is held by another entity. Moreover, as more fully explained herein, the Debtors' proposed Escrow Account is not in compliance with Section 366(c) and is an otherwise unreliable form of adequate assurance of future payment. Accordingly, the Utilities request that the Court deny the Utility Motion.

## Procedural Facts

1.    On January 14, 2009 (the "Petition Date"), Nortel Networks Inc. ("NNI")[1] and certain of its United States affiliates (collectively, the "Debtors") commenced their cases under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") that are now pending with this Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

2.    The Debtors' cases are being jointly administered.

---

[1]    NNI is the principal U.S. operating subsidiary of the Nortel Companies and is a direct subsidiary of NNL.

3

## The Utility Motion

3.    The Debtors are seeking authority from the Court to provide adequate assurance in a form and in the amount that is satisfactory to the Debtors – a position clearly in violation of the express provisions of Section 366(c)(2).

4.    In addition and despite their statutory obligation under Section 366 to provide all of their utilities with adequate assurance of payment, the Debtors limit their offer of the Escrow Account only to certain of their utilities that satisfy Debtors' arbitrary criteria – namely, to utilities that do not already hold a deposit equal to or greater than two (2) weeks of utility service and are not being paid in advance.  Utility Motion at ¶ 15.  As Duke held a prepetition deposit greater than two (2) weeks of utility service, the Debtors are not offering Duke anything in the Utility Motion.  Pursuant to Section 366(c)(4) Duke has offset its prepetition deposit of $218,615, plus interest of $84,531.13, against the Debtors' prepetition debt, leaving a balance of $102,750.80.

5.    Debtors further contend that the Escrow Account along with Debtors' purported ability to pay for all post-petition invoices in the ordinary course of business constitutes adequate assurance of payment.  Utility Motion at ¶ 17.  Section 366(c)(3)(B)(iii), however, specifically provides that in making

4

a determination under Section 366, a court may not consider the availability of an administrative expense priority.

6.    Moreover, the Debtors seek permission from the Court to reduce the amount of available funds within the Escrow Account held on behalf of a particular utility upon Debtors' termination of post-petition utility service.  Utility Motion at ¶ 15.  Thus, the Debtors are seeking return of the two-week deposits prior to Debtors' payment in full of final bills for post-petition utility charges.

7.    In support of the Utility Motion, the Debtors state, *inter alia*, that:

A.    over the past twelve (12) months, the Debtors have paid an average of $2,113,278 per month to its utility providers. Utility Motion at ¶ 12; and,

B.    prior to the Petition Date, the Debtors made timely payments to their utility providers each month without exception.  Utility Motion at ¶ 12.  Section 366(c)(3)(B)(ii), however, specifically provides that "the payment by the debtor of charges for utility service in a timely manner before the date of the filing of the petition" is no longer to be considered in making a determination under Section 366(c).  Moreover, it is interesting that even though the Debtors claim to have timely paid their pre-petition invoices, they owed the Utilities the following amounts as of the Petition Date:

5

   i.  Duke – $200,395.33 (Fortunately, this potential loss was covered by the prepetition security Duke maintained on the Debtors' accounts);

   ii. LIPA – $80,000 (Significantly more than its 2 month deposit request of $49,175);

   iii. KGE – $4,131.64 (nearly the same amount of its 2 month deposit request of $4,500);

   iv.  Colonial – $3,043.48 (nearly the same amount of its 2 month deposit request of $3,375);

   v.   MEC – $126,758.26.

  8.   Additionally, the Debtors rely upon unpublished decisions in support of the Utility Motion.  Utility Motion at ¶ 27.  The Debtors, however, do not address the merits or the facts of those cases to explain why, if at all, the adequate assurance of payment decisions in those cases are relevant to this case. Also, the Debtors fail to explain why the facts of this case justify modifying the amount of the Utilities' deposit requests set forth herein.  It has always been and continues to be the standard that once the Court is in the position to make a determination of adequate assurance of payment, it is a decision that the Court is to make based upon the facts of the case before it.

  9.   Finally, throughout the Utility Motion, and as more

6

fully discussed herein, the Debtors seek to avoid the procedural and substantive requirements of Section 366 and to impose upon the Utilities various burdensome procedures that are either not authorized by Section 366 or are contrary to its specific provisions.

10.   On January 15, 2009, the Court held an *ex parte* hearing on the Utility Motion and thereafter entered the *Interim Order (I) Restraining Utility Companies From Discontinuing, Altering Or Refusing Service, (II) Deeming Utility Companies Adequately Assured Of Future Performance, And (III) Establishing Procedures For Determining Adequate Assurance Of Payment* (the "Interim Utility Order").

11.   Under the Interim Utility Order, the Court, *inter alia*, granted the Utility Motion on an interim basis and set an objection deadline to the Utility Motion of February 4, 2009, at 4:00 p.m. and a Final Hearing on the Utility Motion of February 5, 2009, at 10:00 a.m.

## Facts Regarding the Debtors

12.   Debtors manufacture, sell and distribute hardware and software and related technologies for the networking and communications industries.   *Declaration Of John Doolittle, Vice President Of Nortel Networks Inc. In Support Of Chapter 11 Petitions And First Day Motions* at ¶ 7 (hereinafter "Doolittle

7

Dec. at ¶ ___").

13.   The Debtors are all direct or indirect subsidiaries of Nortel Networks Corporation ("NNC"), a corporation organized under the laws of Canada.  Concurrently with the Debtors' Bankruptcy Cases, NNC, Nortel Networks Limited ("NNL") and certain other Canadian affiliates (collectively, the "Canadian Debtors") are seeking insolvency protection under the Companies' Creditors Arrangement Act (the "Canadian Proceedings") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court").

14.   Over the past few years, the Debtors' operating costs have exceeded its revenues, resulting in negative cash flow. Debtors state that the following factors contributed to their liquidity crisis: (a) pressures from competitors; (b) the inability to quickly and efficiently reduce operating expenses; (c) the costs incurred by investigating potential restructuring, significant mergers; (d) consolidations by customers and competitors; (e) customers reducing their capital expenditures; and (f) the generally sagging condition of the global economy. Doolittle Dec. at ¶ 15.

15.   Due to the Debtors' reduced credit ratings in 2004 to below investment grade, the Debtors have been unable to access the commercial paper market and have been severely limited in their access to the capital markets.  As a result and for several

8

years, the Debtors were only able to raise high yield/convertible debt and did not have any revolving credit or other bank lines. Doolittle Dec. at ¶ 16.

16.  By November 2008, rating agencies had downgraded the Debtors' outlook from stable to negative.  The impact of these ratings jeopardized the relationship between the Debtors and Export Development Canada ("EDC").  EDC, Canada's federal export credit agency that provides financing support to Canadian exporters, provides the Debtors with a support facility to backstop certain letters of credit and performance bonds.  The recent rating downgrades provide EDC with the right to terminate the support facility.  On January 18, 2009, the Debtors and EDC entered into an agreement for a thirty-day suspension waiver that provides the Debtors with access of up to $30 million of additional support under the facility.  In addition, the agreement with EDC is subject to the condition that any post-petition support granted under the facility is secured by a second charge over all of the assets of the Canadian debtors. Doolittle Dec. at ¶ 17.

17.  The Debtors' struggle to reduce their operating expenses during a period of decreased customer spending has put substantial pressure on the Debtors' liquidity globally but in particular in North America.  With no current access to the capital markets and the prospect of any immediate access

9

appearing dim, with the Debtors substantial interest costs on over $4 billion of unsecured public debt, and with the Debtors' pension plan liabilities expected to substantially increase in the near future based upon current global economic conditions, the Debtors filed their Bankruptcy Cases in an effort to protect their current cash positions.  Doolittle Dec. at ¶ 19.

18.  Based upon the foregoing, including Debtors' highly leveraged debt position and downgraded credit ratings, Debtors determined that without bankruptcy protection there would be a significant risk of insufficient cash resources on a regional basis during 2009 which the Debtors would be unable to correct through third-party financing.  In addition, Debtors have determined that its high cost liabilities will prevent the Debtors from continuing operations absent a dramatic and fundamental financial and business restructuring achieved through bankruptcy.  Accordingly, Debtors have decided not to make their regularly scheduled interest payment on their outstanding public debt due January 15, 2009.  Doolittle Dec. at ¶ 20.

19.  In addition to NNC, NNL and NNI as described herein, the Debtors' remaining corporate structure is as follows: Nortel Networks Capital Corporation ("NNCC"), a Delaware corporation and a finance company with public debt, and, over 140 additional global affiliates (collectively, the "Nortel Companies").  NNC's most significant assets consist of its investments in its direct

10

and indirect subsidiaries.  As of September 30, 2008, NNC
reported consolidated assets of approximately $11.6 billion and
consolidated liabilities of approximately $11.8 billion.  The
Nortel Companies' businesses in the United States are conducted
primarily through NNI, which is the direct or indirect parent of
most of the U.S. Nortel Companies.  NNCC is a financing company
with few assets and conducts no business operations of its own.
As of September 30, 2008, NNI showed assets of approximately $9
billion and liabilities of approximately $3.2 billion.  NNI's
liabilities, however, do not include NNI's liabilities relating
to its guarantee of some or all of the Nortel Companies'
approximate $4.2 billion of unsecured public debt.  The Nortel
Companies also include NNL's and NNC's active subsidiaries
located in Europe, the Middle East and Africa (collectively, the
"EMEA Entities").  Doolittle Dec. at ¶¶ 22, 23 & 25.

20.   The Nortel Companies employ a global integrated
leveraged business model.  Under this scheme, the Nortel
Companies are financed through a complex intercompany cash
management system that is integrated with the Nortel Companies'
sales, purchasing, supply and distribution networks.  Doolittle
Dec. at ¶ 26.  Through their Bankruptcy Cases, including the
Canadian Proceedings, the Debtors seek to implement a new
operating model, announced by the Nortel Companies in November
2008, that will transition the companies to vertically-integrated

11

business units.  Doolittle Dec. at ¶ 18.

21.  Under the Nortel Companies' integrated business model, certain of the Nortel Companies have reached intercompany agreements and engaged in certain practices to allocate profits and costs across the various affiliates.  For example, as part of the management of cash needs on a global basis, certain of the affiliates have funded intercompany loans and capital contributions to other Nortel Companies on an as-needed basis to fund working capital in the ordinary course of business.  The Debtors and the Canadian parents' interests are united in their integrated and co-dependent leveraged system.  Accordingly, the Debtors state that their ability to reorganize is dependent on (a) the reorganization of the jointly operated Nortel business in Canada and in the United States; and/or, (b) the sale of one or more business segments that are located in both Canada and in the United States.  Doolittle Dec. at ¶¶ 40-42.

## Cash Management Motion

22.  On the Petition Date, the Debtors filed the *Debtors' Motion For An Order Pursuant To Sections 345, 363(c)(1), 364(a), And 503(b)(1): (A) Approving the Continued Use of the Cash Management System, Bank Accounts and Business Forms; (B) Permitting Continued Intercompany Transactions, Granting Administrative Priority Status to Postpetition Intercompany*

12

*Claims and Preserving and Permitting the Exercise of Intercompany Setoff Rights; (C) Authorizing Banks to Honor Certain Transfer and Charge Certain Fees and Other Amounts; and (D) Waiving the Requirements of 11 U.S.C. Section 345(b) on an Interim Basis* (the "Cash Management Motion").

23.   Under the Cash Management Motion, Debtors seek permission from the Court to continue its use of the Debtors' Cash Management System ("Cash Management System").  Under the Cash Management System, the Nortel Companies transfer funds between and among themselves, including non-debtor affiliates, to allocate costs and profits and to manage their operational and cash needs.  Cash Management Motion at ¶ 44.

24.   The Cash Management System is managed as part of the Nortel Companies integrated business operations primarily by financial personnel (the "Treasury").  NNI maintains a series of bank, brokerage and investment accounts to conduct the transfer of cash necessary to pay for its operations.  NNI is also a party to various Nortel Companies' transfer pricing and residual profit sharing agreements and other internal reconciliation practices which govern the intercompany transfer of funds.  Cash Management Motion at ¶ 45.

25.   NNI maintains the Treasury Account which is the centralized account in the Cash Management System.  As a general matter, on a daily basis, funds from accounts maintained

13

exclusively for deposit of receivables are manually transferred via wire transfer into the Treasury Account.  In turn, the Treasury Account is used to fund disbursements to disbursement accounts that are use to pay trade creditors (the "Trade Disbursement Accounts") and/or employee obligations.  The Treasury Account is also used to fund intercompany payments, foreign exchange transactions, and certain other third party payments.  Cash Management Motion at ¶ 47.

26.  The Trade Disbursement Accounts are used to settle the accounts payable.  Cash Management Motion at ¶ 49.

27.  According to the Debtors, the Cash Management System, *inter alia*, reduces interest expenses by enabling the Debtors to utilize all funds within the system rather than relying upon short-term borrowing to fund the Debtors' and their non-debtor subsidiaries' cash requirements.  Cash Management Motion at ¶ 56.

28.  The Debtors generate intercompany payables and receivables with their subsidiaries and other affiliates through three primary transactions: (a) charges related to the purchase of inventory and payment for services; (b) residual profit sharing; and, (c) intercompany loan agreements.  Cash Management Motion at ¶ 58.

29.  Under the Nortel Companies' leveraged business model, the management of cash needs on a global basis is addressed, *inter alia*, by intercompany loans and capital contributions on an

14

as-needed basis to fund working capital.   In particular, NNI and NNL are parties to a $1 billion revolving pre-petition loan agreement which permits NNL to borrow funds on an as-needed basis.   As of January 13, 2009, the balance owed by NNL to NNI on this intercompany loan is approximately $295,982,134.75 (the "NNL Loan Receivable").   Cash Management Motion at ¶ 63.

30.   Under the Cash Management Motion, the Debtors request permission, in their discretion, to continue the use of global cash management procedures that permit the periodic transfer of funds between or among the Debtors and their affiliates in the amounts necessary to continue the operations of their businesses in accordance with the current Cash Management System.   Cash Management Motion at ¶ 68.

31.   The Debtors request permission from the Court to continue the use of intercompany transfers to fund operational needs of the Nortel Companies.   Further, any balance owed under an intercompany loan represents an internal extension of credit. Accordingly, Debtors request that all claims related to intercompany loans receive administrative expense priority under Section 503(b) of the Bankruptcy Code.   Cash Management Motion at ¶ 78.

32.   Further, concerning the NNL Loan Receivable, NNI seeks permission to enter into a new revolving loan agreement with NNI as lender and NNL as borrower in the amount of up to $200 million

15

the "NNL Revolver Agreement").  Cash Management Motion at ¶ 80.

33.  The purpose of the NNL Revolver Agreement is to maintain the Debtors' Canadian parent's access to working capital while avoiding fees and interest obligations under third party financing.  Cash Management Motion at ¶ 81.

34.  Finally, due to the bankruptcy and/or international insolvency proceedings of the Nortel Companies, the Debtors seek permission from the Court to alter certain practices under the Cash Management System.  In particular, the Debtors shall settle all postpetition transactions with the Canadian Debtors and the EMEA Debtors on a cash basis.  Further, the Debtors propose not to setoff any pre-petition obligations between the Debtors and the EMEA Debtors, only post-petition obligations.  Cash Management Motion at ¶ 89.

35.  As to the Canadian Debtors, the Debtors have agreed to forbear from exercising any right of setoff that the Debtors may have until, *inter alia*, the dismissal or conversion to chapter 7 of the Debtors' Bankruptcy Cases.  Cash Management Motion at ¶ 90.

36.  On January 15, 2009, the Court held a hearing on the Cash Management Motion and thereupon entered an order granting the relief on an interim basis.  The Court has scheduled a final hearing on the Cash Management Motion for February 5, 2009, at 10:00 a.m.

SL1 900259v1/000000.00000

## Facts Concerning the Utilities

37.  Each of the Utilities provided the Debtors with prepetition utility goods and/or services and has continued to provide the Debtors with utility goods and/or services since the Petition Date.

38.  Under the Utilities' billing cycles, the Debtors receive approximately one month of utility goods and/or services before the Utility issues a bill for such charges.  Once a bill is issued, the Debtors have approximately 15 to 30 days to pay the applicable bill.  If the Debtors fail to timely pay the bill, a past due notice is issued and a late fee is subsequently imposed on the account.  If the Debtors fail to pay the bill after the issuance of the past due notice, the Utilities issue a notice that informs the Debtors that they must cure the arrearage within a certain period of time or their service will be disconnected.  Accordingly, under the Utilities' billing cycles, the Debtors could receive at least 2 months of goods and/or services before the utility could cease the supply of goods and/or services based on a post-petition payment default.

39.  In order to avoid the need to bring witnesses and have lengthy testimony regarding the billing cycles of the Utilities, Duke, LIPA, KGE, Colonial, MEC and ComEd request that this Court, pursuant to Rule 201 of the Federal Rules of Evidence, take judicial notice of their billing cycles.  Pursuant to the

SL1 900259v1/000000.00000

foregoing request and based on the voluminous size of the applicable documents, the Utilities are providing the following web site links to the tariffs and/or state laws, regulations and/or ordinances:

Duke –
http://www.ncuc.net/

LIPA –
http://www.lipower.org/pdfs/lipatariff.pdf

KGE –

https://www2.dps.state.ny.us/ETS/search/searchShortcutEffective.cfm?companyID=3569154&serviceType=GAS&psc_num=1

Colonial –

http://www.mass.gov/?pageID=eoeeasubtopic&L=4&L0=Home&L1=Energy%2C+Utilities+%26+Clean+Technologies&L2=Natural+Gas+Industry&L3=Natural+Gas+Tariffs%2C+Applications+and+Forms&sid=Eoeea

MEC –

http://www.nationalgridus.com/masselectric/non_html/rates_tariff.pdf

ComEd –

http://www.exeloncorp.com/ourcompanies/comed/comedbiz/energy_rates/our_rates_and_prices.htm

40.   Subject to a reservation of the Utilities' rights to supplement their post-petition deposit requests if additional accounts belonging to the Debtors are subsequently identified, the Utilities' estimated prepetition debt owed by the Debtors to the Utilities and post-petition deposit requests are as follows:

18

| Utility | No. of Accts. | Est. Pre-Pet. Debt | Dep. Request |
|---------|---------------|--------------------|--------------| 
| Duke | 1 | $200,395.33 | $532,746 (2-months) |
| LIPA | 1 | $80,000.00 | $49,175 (2-months) |
| KGE | 1 | $4,131.64 | $4,500 (2-months) |
| Colonial | 1 | $3,043.48 | $3,375 (2-months) |
| MEC | 1 | $126,758.26 | $315,870 (2-months) |
| ComEd | 1 | $1,400.00 | $6,000 (4-months) |
| | | Total | $911,666.00 |

## Discussion

**A.    THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.**

Sections 366(b) and (c) of the Bankruptcy Code, in pertinent part, provide:

(b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the Debtors, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date.

(c)(1)(A) For purposes of this subsection, the term "assurance of payment" means

  (i) a cash deposit;

  (ii) a letter of credit;

  (iii) a certificate of deposit;

  (iv) a surety bond;

  (v) a prepayment of utility consumption; or

  (vi) another form of security that is mutually agreed upon between the utility and the Debtors or the trustee.

  (B) For purposes of this subsection an

SL1 900259v1/000000.00000

administrative expense priority shall not constitute an assurance of payment,

   (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the Debtors or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;

   (3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

   (B) In making a determination under this paragraph whether an assurance of payment is adequate, the court may not consider

        (i) the absence of security before the date of the filing of the petition;

        (ii) the payment by the Debtors of charges for utility service in a timely manner before the date of the filing of the petition; or

        (iii) the availability of an administrative expense priority.

   (4) Notwithstanding any other provision of law, with respect to a case subject to this subsection, a utility may recover or set off against a security deposit provided to the utility by the Debtors before the date of the filing of the petition without notice or order of the court.

11 U.S.C. §366.

   As set forth by the United States Supreme Court, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534,

SL1 900259v1/000000.00000

124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford*
*Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1,
6, 120 S. Ct., 1942, 147 L. Ed. 2d 1 (2000)).  *Rogers v. Laurain*
*(In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997)("Statutes . .
. must be read in a 'straightforward' and 'commonsense'
manner.").  A plain reading of Section 366(c)(2) makes clear that
a debtor is required to provide adequate assurance of payment
satisfactory to its utilities on or within thirty (30) days of
the filing of the petition (In this case, February 13, 2009).  If
a debtor believes the amount of the utility's request needs to be
modified, then the debtor can file a motion under Section
366(c)(3) requesting the court to modify the amount of the
utility's request (the "Modification Motion").  In this case, the
Debtors have not filed a Modification Motion and they completely
ignored the Utilities' adequate assurance requests.  The Debtors
filed the Utility Motion to improperly shift the focus of their
obligations under Section 366(c) from modifying the amount of the
Utilities' adequate assurance request to establishing the form
and amount of adequate assurance of payment acceptable to the
Debtors - the Escrow Account. Accordingly, because the Debtors
are not properly before this Court seeking to modify the amount
of the Utilities' requests, this Court should deny the Utility
Motion as to the Utilities.

Moreover, the Utilities are prejudiced by the Debtors'

21

failure to file a Modification Motion in accordance with the requirements of Section 366(c)(3) because the Debtors have not provided the Utilities with any pleading that sets forth the evidentiary or legal basis upon which they are relying to modify the amount of the Utilities adequate assurance of payment requests. Specifically, the Debtors have not presented this Court with any evidence as to: (1) Why the Court should modify the amount of the Utilities' adequate assurance of payment requests; (2) What, if any, prejudice the Debtors would suffer by paying the two-month deposits requested by the Utilities, especially if:

     i.   the Debtors can fund the operations of their Canadian parent, NNL, through the NNL Revolver Agreement;

     ii.   the Debtors can afford to deprive themselves of certain working capital by forbearing their rights to setoff under the Cash Management System;

     iii. the Debtors can afford to provide their professionals with pre-petition retainers in the amounts of $1.25 million and $300,000;[2] and,

---

[2]    *See Application For An Order Authorizing Employment And Retention Of Cleary Gottlieb Steen & Hamilton LLP Nunc Pro Tunc To The Petition Date As Counsel For The Debtors And Debtors In Possession* at ¶ 26 indicating payment of a $1.25 million pre-petition retainer; and, *Debtors' Application For Entry Of An Order Pursuant To 11 U.S.C. §§ 327(a) And 1107(b), Fed. R. Bankr. P. 2014 And 2016, And Del. Bankr. L.R. 2014-1 And 2016-1 Authorizing Retention And Employment Of Morris, Nichols, Arsht & Tunnell LLP As Delaware And General Bankruptcy Counsel For The Debtors, Nunc Pro Tunc To The Petition Date* at ¶ 21 indicating payment of a $300,000 pre-petition retainer. [Docket Nos. 24 & 75].

SL1 900259v1/000000.00000

iv. the Debtors can afford to pay pre-petition claims of certain creditors, including utility obligations, totaling between approximately $7,392,000 and $8.9 million;[3] (3) What, if any, prejudice the Debtors would suffer by paying the Utilities in advance or paying the Utilities a one-month deposit and requiring the Debtors to pay the Utilities' post-petition invoices within 5 days of receipt; (4) Whether or not the Debtors could provide the Utilities with letters of credit or surety bonds as adequate assurance of payment and the applicable costs of obtaining the letters of credit or surety bonds; and, (5) The trade terms the Debtors have with their other post-petition vendors. Accordingly, the Court should not permit the Debtors to proceed to a hearing without complying with the requirements of Section 366(c)(3) by filing a Modification Motion. *See In re Viking Offshore (USA), Inc.*, 2008 WL 782449 at *3 (Bankr. S.D. Tex. Mar. 20, 2008) ("The relief requested by Debtors would reverse the burden, by making an advance determination that the proposed assurance was adequate. . . . the court lacks the power to reverse the statutory framework for

---

[3]    *See Debtors' Motion Pursuant To Sections 105(a) And 363(b)(1) Of The Bankruptcy Code For An Order Authorizing The Debtors To Pay Prepetition Common Carrier Charges And Warehouse Fees* at ¶¶ 12 & 18 wherein Debtors seek permission to pay pre-petition debts to common carriers totaling $2.5 million and warehouse obligations totaling $4 million; and, *Debtors' Motion For Entry Of An Order Authorizing Payment Of Prepetition Obligations To Certain Foreign Vendors* at ¶ 10 wherein Debtors seek permission to pay foreign vendor claims, including utility expenses, totaling $892,000, and to permit the uninterrupted payment of an additional $1.5 million in uncleared payments as of the Petition Date. [Docket Nos. 14 & 60].

23

provision of adequate assurance of payment.").

> **1.    The Debtors' Proposed Escrow Account Does Not Provide the Utilities With Adequate Assurance of Payment.**

The Escrow Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

(i)     This Court only has authority under Section 366(c)(3) to modify the <u>amount</u> of the Utilities' deposit requests.  Neither the Debtors nor this Court have the authority to establish the <u>form</u> of adequate assurance of payment, i.e., the creation of an escrow account as opposed to adequate assurance in the form of cash deposits that the Utilities are requesting from the Debtors.

(ii)    The Debtors' proposed Delinquency Notice procedure, as set forth in the Utility Motion, describing the Utilities' access to the Escrow Account imposes undue burdens upon Utilities and improperly interferes with the Utilities state-law mandated billing cycles and is contrary to the provisions of 28 U.S.C. Section 959(b). Moreover, as the Utilities bill monthly in arrears, any request upon the Escrow Account for a delinquency would exceed the amount that could be paid. Further, Section 366 does not provide any relief for the Debtors to avoid termination of post-petition service due to non-payment.  Such relief represents an injunction that the Debtors may only pursue through the filing of an adversary proceeding in accordance with Rule 7001 of the Federal Rules of Bankruptcy Procedure.

(iii)   The Debtors' ability to continually fund the Escrow Account throughout the Debtors' Bankruptcy Cases is not clearly stated in the Utility Motion.

(iv)    The Utilities bill monthly in arrears so any request upon the Escrow Account will be, at a minimum, for monthly bills.  Accordingly, the Escrow Account that would merely contain the estimated cost of two weeks

24

of the Debtors' monthly utility charges would be undercapitalized from the outset.

(v)    The Escrow Account may be reduced by the Debtors' termination of a particular account which essentially operates as a refund to the Debtors of the proposed two-week deposit prior to the utility's issuance and receipt of payment of a final post-petition bill.

Accordingly, the Court should not approve the Escrow Account as adequate assurance to the Debtors' utility providers on a final basis because the Escrow Account is not the **form** of adequate assurance requested by the Utilities herein and because it is an otherwise unreliable form of adequate assurance.

> **2.    The Utility Motion Should Be Denied As To the Utilities Because the Debtors Have Not Set Forth Any Basis For Modifying the Utilities' Requested Deposits.**

As set forth above, in the Utility Motion the Debtors fail to address why this Court should modify the Utilities' requests for adequate assurance of payment.  Under Section 366(c)(3), the Debtors have the burden of proof as to whether the Utilities' adequate assurance of payment requests should be modified.  *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof).  The Debtors, however, offer the Court no evidence nor factually supported documentation to explain how or why the amount of the Utilities' adequate assurance requests should be modified.  Indeed, the

25

Debtors never even address the matter in the Utility Motion because Debtors failed to: (1) contact their Utilities concerning their adequate assurance requests; and (2) make any attempt to determine whether the Utilities' requests for adequate assurance needed to be modified.  Accordingly, the Court should deny the relief requested by Debtors in the Utility Motion and require the Debtors to comply with the requirements of Section 366(c) with respect to the Utilities.  *See In re Lucre, Inc.*, 333 B.R. 151, 154 (Bankr. W.D. Mich. 2005) (holding that the right of a debtor or trustee to seek modification of a utility's deposit request "arises only after the adequate assurance payment has been agreed upon by the parties.").

> **B.  THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), that held that an administrative expense, without more, could constitute adequate assurance of payment in certain cases.  Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as:

> (i) a cash deposit;
> (ii) a letter of credit;
> (iii) a certificate of deposit;
> (iv) a surety bond;

26

(v) a prepayment of utility consumption; or

(vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

A determination of adequate assurance is within the court's discretion, and is made on a case-by-case basis, subject to the new requirements of Section 366(c). *See In re Utica Floor Maintenance, Inc.*, 25 B.R. 1010, 1016 (Bankr. N.D.N.Y. 1982); *In re Cunha*, 1 B.R. 330, 332-33 (Bankr. E.D. Va. 1979). Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990). The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor." *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed." *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985). Based on the Debtors' anticipated utility consumption, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of bills is approximately two (2) months. Accordingly,

27

the deposits requested by the Utilities are reasonable. *See In re Stagecoach*, 1 B.R. at 735-36 (holding that a two month deposit is appropriate where the debtor could receive sixty (60) days of service before termination of services because of the utilities' billing cycle.); *see also In the Matter of Robmac, Inc.*, 8 B.R. 1, 3-4 (Bankr. N.D. Ga. 1979).

As set forth above, the Utilities' adequate assurance requests are based on the Utilities' billing exposure created by their respective state law tariffs and/or regulations (the "Tariffs"). Therefore, the deposit amounts that the Utilities are seeking are the amounts that the applicable public service commissions, which are neutral third-party entities, permit the Utilities to request from their customers. Although the Utilities recognize that this Court is not bound by the Tariffs, the Tariffs are extremely relevant information of a determination made by an independent entity on the appropriate amount of adequate assurance that should be paid to the Utilities.

In contrast, the Debtors do not provide an objective, much less an evidentiary, basis for their proposed adequate assurance in the form of an Escrow Account. Moreover, it appears that Debtors' counsel believes that it is imperative to secure the payment of their fees through sizeable retainers. If people with first-hand knowledge of the Debtors' current and future financial condition believe they need to obtain this security to have their

28

bills paid, it would appear that post-petition vendors, such as the Utilities, should also receive adequate assurance of payment.

If the Debtors want to continue to receive the Utilities' generous trade terms established by the Tariffs (i.e. bills issued monthly in arrears with due dates 15 to 30 days thereafter), they need to provide the Utilities with more security than a segregated account purportedly containing a 2 week deposit.  The Debtors are not asking their counsel to provide unsecured post-petition service and, as described herein, have filed several motions seeking Court approval to provide special treatment to other post-petition vendors, such as the payment of the prepetition claims of common carriers, warehouse obligations and foreign vendors.  Moreover, although the Debtors state in paragraph 10 of the Utility Motion that "[i]t is essential that the Utility Companies continue to provide their services without interruption," they did not include the Utilities in any motion authority to pay certain pre-petition claims and are for some unexplained reason trying to avoid providing the Utilities with any meaningful adequate assurance of payment in exchange for the generous post-petition trade terms provided by the Utilities.

Finally, as evidenced by the Cash Management Motion, the Debtors are seeking permission to continue their leveraged business model and thereby fund their Canadian parents' working

29

capital needs – all at the expense of the Debtors' creditors including the Utilities.  By filing their Bankruptcy Cases, the Debtors submitted themselves to the jurisdiction of this Court and the statutory obligations imposed upon a debtor seeking relief under the Bankruptcy Code through the filing of a plenary case.  Accordingly, Debtors must be required by this Court to properly provide the Utilities with adequate assurance of payment under Section 366 before being permitted to send monies to Canada and fund the operations of their non-U.S. parent.

Accordingly, not only have the Debtors failed to satisfy their statutory burden under Section 366 as to why the Requests should be modified, but Debtors have also failed to demonstrate why their alternative adequate assurance of payment proposal in the form of the Escrow Account should be accepted by the Utilities and approved by the Court.  Hence, for all of the foregoing reasons the Court should deny the Utility Motion and require the Debtors to immediately pay the Utilities the adequate assurance deposit amounts requested herein.

30

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1.    Denying the Utility Motion as to the Utilities;

2.    Awarding the Utilities post-petition adequate assurance of payment requested herein; and

3.    Providing such other and further relief as the Court deems equitable, just and appropriate.

Dated:  February 2, 2009

STEVENS & LEE, P.C.

_/s/ John D. Demmy_
John D. Demmy (DE Bar No. 2802)
1105 North Market Street, 7th Floor
Wilmington, Delaware 19801
Phone:    (302) 425-3308
Fax:      (610) 371-8515
E-mail:   jdd@stevenslee.com

and

Russell R. Johnson III, Esq.
John M. Merritt, Esq.
Law Offices of Russell R. Johnson III
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Phone: (804) 749-8861

*Co-Counsel for Duke Energy Carolinas, LLC, Long Island Lighting Company d/b/a LIPA, KeySpan Gas East Corporation d/b/a National Grid, Colonial Gas Company d/b/a National Grid, Massachusetts Electric Company d/b/a National Grid, and The Commonwealth Edison Company*

31