## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Foreign Applicants in Foreign Proceedings. | Jointly Administered |

### NOTICE OF FILING OF FIRST REPORT OF THE MONITOR OF THE
### CANADIAN NORTEL COMPANIES IN THE CANADIAN PROCEEDINGS

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Alteon Websystems, Inc. (9769); Alteon Websystems International, Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); and Nortel Networks Cable Solutions Inc. (0567).

**PLEASE TAKE NOTICE** that on February 9, 2009, Ernst & Young Inc., the monitor and foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation (collectively, the "**Canadian Nortel Group**"), in proceedings under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**Canadian Proceedings**"), pending before the Ontario Superior Court of Justice (Commercial List), by its undersigned counsel, filed, in the above-captioned cases, a copy of the First Report of the Monitor (the "**First Report**"), dated February 5, 2009. A copy of the First Report is annexed hereto as Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that a copy of the First Report is also available on the Monitor's website, www.ey.com/ca/nortel or upon request to the Monitor's counsel.

Dated: New York, New York
February 9, 2009

ALLEN & OVERY LLP

Ken Coleman
Lisa Kraidin
1221 Avenue of the Americas
New York, New York 10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
ken.coleman@allenovery.com
lisa.kraidin@allenovery.com

-and-

BUCHANAN INGERSOLL & ROONEY

By: /s/ Mary F. Caloway
Mary F. Caloway (No. 3059)
Peter J. Duhig (No. 4124)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
Telephone (302) 552-4200
Facsimile (302) 552-4295
mary.caloway@bipc.com

Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian Nortel
Group

**EXHIBIT A**

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE** *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, **R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION (the "Applicants")**

**FIRST REPORT OF THE MONITOR**
**DATED FEBRUARY 5, 2009**

**INTRODUCTION**

1.  On January 14, 2009, Nortel Networks Corporation ("NNC" and collectively with all
    its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel
    Networks Technology Corporation ("NNTC"), Nortel Networks International
    Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") filed for
    and obtained protection under the *Companies' Creditors Arrangement Act*
    ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009
    (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the
    Applicants (the "Monitor") in the CCAA proceeding. The Initial Order provided for
    a stay of proceedings through to February 12, 2009.

**PURPOSE**

2.  The purpose of this first report of the Monitor (the "First Report") is to provide this
    Honourable Court with an update in respect of the following:

a) Commencement of insolvency proceedings;

b) Stabilization of operations;

c) Consolidated cash position and liquidity as at January 30, 2009;

d) Financial performance and cash flow projections;

e) Export Development Canada facility;

f) Carling Facility;

g) Cost saving initiatives;

h) Preparation of business plan and restructuring plan;

i) Annual Incentive Plan ("AIP") and Global Sales Incentive Plan ("SIP");

j) Request for approval of the Patent Award and Incentive Program;

k) Clarification of D&O Trust amount as presented in the Doolittle Affidavit;

l) Relief from the holding of Nortel's annual shareholders meetings; and

m) Request for an extension of the stay of proceedings.

**TERMS OF REFERENCE**

3. In preparing this Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company, and discussions with management of Nortel. EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Report.

2

4. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

5. Capitalized terms not defined in this Report are as defined in the Affidavit of John Doolittle (the "Doolittle Affidavit") sworn on January 14, 2009, or the report of the proposed Monitor dated January 14, 2009 (the "Pre-Filing Report").

**GENERAL BACKGROUND**

6. Nortel is fundamentally a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

7. Nortel conducts its global business through three reportable business unit segments, Carrier Networks ("CN"), Enterprise Solutions ("ES") and Metro Ethernet Networks ("MEN"). The revenue and assets of each of the business units is distributed among the multiple Nortel legal entities and joint ventures around the world.

**COMMENCEMENT OF INSOLVENCY PROCEEDINGS**

8. On January 14, 2009, Nortel commenced insolvency proceedings in Canada, the U.S., the U.K and several other countries in Europe, the Middle East and Africa ("EMEA"). These proceedings are described in more detail below.

9. Nortel entities located in Asia Pacific, Asia Central ("APAC") and in the Central America and Latin America ("CALA") regions continue to operate in the normal course and are not subject to insolvency proceedings.

### CCAA Proceedings

10. On January 14, 2009 (the "Filing Date"), this Court, issued an order at the request of the Applicants which, among other things, declared that the Applicants are debtor companies to which the CCAA applies and granted certain relief to the Applicants while they prepare one or more plans of arrangement pursuant to the CCAA.

11. The Initial Order granted the Monitor authority to apply for recognition of the CCAA proceedings with respect to the Applicants as "Foreign Main Proceedings" in the United Sates pursuant to Chapter 15 of *United States Bankruptcy Code* (the "Code"). The Monitor filed petitions under Chapter 15 on January 14, 2009 and the hearing of the petitions is scheduled for February 27, 2009 in the United States Bankruptcy Court, District of Delaware (the "U.S. Court").

12. Pursuant to the Initial Order, the Monitor completed its mailing of a notice of the CCAA proceedings within ten business days of the entry of the Initial Order. This mailing was sent to all known potential creditors except those to which the Applicants owed less than $5,000 as of the Filing Date as well as other potential stakeholders.

13. The Monitor has made various materials relating to the proceedings available on its website at www.ey.com/ca/nortel. In particular, the Doolittle Affidavit, the Initial Order, the Pre-Filing Report, both English and French versions of the notice of the Initial Order and of the Chapter 15 hearing which was mailed to potential creditors and stakeholders as described above, as well as the service list have all been posted on its website.

14. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's ("Epiq") website where materials relating to the voluntary proceedings under Chapter 11 of the Code ("Chapter 11") are posted. The Monitor intends to promptly post Canadian court orders, motion material and its own reports on this website throughout these proceedings.

4

15. The Monitor has also established a toll free hotline number (1-866-942-7177) to allow creditors and other interested parties in Canada and the U.S. to contact the Monitor to obtain additional information concerning the CCAA proceedings. As of the date of this Report, the Monitor has received over 1,500 calls. The Monitor continues to respond to these inquires in a timely manner.

**Chapter 11 Proceedings**

16. On January 14, 2009, Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries (the "U.S. Debtors") filed voluntary petitions under Chapter 11 of the Code in the U.S. Court. The U.S. Debtors' cases have been assigned to Judge Kevin Gross. The U.S. Debtors are as follows:

| Nortel Networks, Inc. | Xros, Inc. | Qtera Corporation |
|---|---|---|
| Alteon WebSystems International, Inc. | Sonoma Systems | CoreTek, Inc. |
| Nortel Networks Applications Management Solutions Inc. | Alteon WebSystems, Inc. | Nortel Networks Optical Components Inc. |
| Nortel Networks Capital Corporation | Nortel Networks HPOCS Inc. | Architel Systems (U.S.) Corporation |
| Nortel Networks International Inc. | Northern Telecom International Inc. | Nortel Networks Cable Solutions Inc |

17. The filing of voluntary petitions by the U.S. Debtors initiated an automatic stay which remains in effect during the pendency of the proceedings under the Code, subject to the orders of the U.S. Court.

18. On January 14, 2009, the U.S. Debtors filed a motion in Canada requesting the U.S. Proceedings be recognized as a "foreign proceeding" for purposes of Section 18.6 of the CCAA. This motion was granted and an Order was issued recognizing the stay of proceedings granted to the U.S. Debtors in the U.S. Proceedings and ordering that such stay shall be in full force and effect in Canada.

19. On January 15, 2009, the U.S. Court granted various "first day" motions and entered "first day" orders on a number of important and urgent matters (the "First Day

5

Orders" and together with subsequent U.S Court orders, the "U.S. Orders"), including:

a) an Order authorizing the U.S. Debtors to continue to pay and honour certain pre-petition claims for wages, salaries, employee benefits and other compensation withholdings and deductions and reimbursable expenses and to continue to provide employee benefits in the ordinary course of business;

b) an Interim Order authorizing the U.S. Debtors to continue to use existing cash management systems and bank accounts with some exceptions as set out later in this First Report (and setting a final hearing for these matters on February 19, 2009). The Interim Order also authorized:

   i. NNI to continue the settlement of pre-filing intercompany trade transactions between the Applicants and NNI. NNI reserves its right of set-off for inter-company trade amounts as against the pre-filing loan from NNI to NNL (the "Existing NNI Revolver"). In return, the Canadian Court authorized the Applicants to secure any amounts owing by NNL to NNI under the Existing NNI Revolver (approximately $295 million as at January 13, 2009) by way of an Inter-company Charge.

   ii. NNI to provide an initial post filing inter-company loan (the "NNI Loan") of up to $75 million to the Applicants. This interim loan is secured by the Carling Facility Charge, and is discussed in more detail later in this report.

c) an Order authorizing payment of certain essential pre-petition shipping and warehousing charges including for goods in transit;

6

d) an Order authorizing the U.S. Debtors to honour certain pre-petition obligations to customers and to otherwise continue in the ordinary course of business with their customer programs and practices;

e) an Interim Order determining adequate assurance of payment for future utility services (and setting a final hearing for these matters on February 5, 2009);

f) an Order authorizing the U.S. Debtors to continue insurance coverage entered into pre-petition and to enter into new insurance policies post-petition;

g) an Order authorizing the U.S. Debtors to remit and pay certain taxes and fees;

h) an Interim Order establishing the notification procedures and approving restrictions on certain transfers of the U.S. Debtors parents' equity securities (and setting a final hearing for these matters on February 5, 2009); and

i) an Order approving the cross-border court-to-court protocol that was approved by this Honourable Court on January 14, 2009.

20. On January 16, 2009, the U.S. Court granted an Order authorizing the U.S. Debtors to pay pre-petition obligations owing to certain foreign vendors transacting with NNI's foreign branch offices.

21. On January 22, 2009, the U.S. trustee convened a meeting of the larger unsecured creditors of the U.S. Debtors to form the unsecured creditors committee (the "UCC"). The following creditors are currently appointed to the UCC:

a) The Bank of New York Mellon;

b) Flextronics Corporation;

c) Airvana, Inc.; and

d) Pension Benefit Guaranty Corporation.

22. The UCC has retained Akin, Gump, Strauss, Hauer & Feld LLP as U.S. legal counsel and Fraser Milner Casgrain as Canadian legal counsel. The Monitor understands that Jeffries & Company, Inc. and Capstone Advisory Group LLC are the UCC's financial advisors.

23. The bondholders have organized themselves and formed an *Ad Hoc* Bondholders Committee. They have retained Milbank, Tweed, Hadley & McCloy LLP as U.S. legal counsel, Bennett Jones LLP as Canadian legal counsel and FTI as their financial advisors.

24. On January 23, 2009, the U.S. Debtors presented and were granted an Order amending the employee wage order to authorize an increase of the pre-petition cap on 401K contributions from $0.7 million to $1.5 million and authorizing the U.S. Debtors to pay for goods and services received post-petition for which there were pre-petition purchase orders issued and to correct certain omissions in the schedule of bank accounts attached to the cash management motion.

25. On February 4, 2009 the following Orders were granted:

   a) an Order extending the deadline to file certain schedules and a statement of financial affairs to March 16, 2009;

   b) an Order approving the retention applications of Cleary Gottlieb Steen & Hamilton LLP and Morris, Nicholls, Arsht & Tunnell LLP as counsel to the U.S. Debtors; and

   c) an Order establishing procedures for interim compensation of fees and reimbursement of expenses for professionals and official committee members.

26. On February 5, 2009, in addition to certain Interim Orders being heard for final approval, the U.S. Debtors presented the following motions:

8

a) a supplement to the First Day Orders regarding customer obligations in order to clarify that the Order applies to all pre-petition customer obligations and programs including all product credits and volume rebates;

b) a supplement to the First Day Orders to amend the pre-petition caps as set out in the employee wage, tax, foreign vendor, and common carrier/warehousers motions and to clarify the cash management motion with respect to the intercompany treatment of certain payments that NNI makes on behalf of other entities;

c) a motion requesting approval to retain professional advisors in the ordinary course;

d) a motion requesting an extension to file financial information regarding entities in which the U.S. Debtors hold a substantial or controlling interest; and

e) a motion requesting approval of interim fee application procedures.

27. On February 19, 2009 the U.S. Debtors intend to have a final hearing of the interim cash management system order during which they will request an increase in the amount available under the NNI Loan to allow the Applicants to borrow up to $200 million as well as present the following for U.S. Court approval:

a) To reject certain non-residential real estate leases;

b) To sell *de minimis* assets without requiring court approval (similar to paragraph 11 (a) of the Initial Order); and

c) Approval of procedures to deal with reclamation claims.

9

28. Copies of all of the U.S. Orders are posted on the web-site established by Epiq (http://chapter11.epiqsystems.com/nortel).  As indicated earlier in this First Report, a dynamic link to the Epiq web-site was included on the Monitor's website.

**U.K. Administration**

29. On January 14, 2009, Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Filed Entities") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court").  The EMEA Filed Entities are as follows:

| Nortel Networks UK Limited | Nortel Networks International Finance & Holding B.V. | Nortel Networks (Austria) GmbH |
|---|---|---|
| Nortel Networks NV | Nortel Networks S.R.O. | Nortel Networks OY |
| Nortel Networks SA | Nortel Networks France SAS | Nortel GmbH |
| Nortel Networks Engineering Service Kft. | Nortel Networks (Ireland) Limited | Nortel Networks S.p.A. |
| Nortel Networks BV | Nortel Networks Polska Sp. z o.o. | Nortel Networks Portugal, S.A. |
| Nortel Networks Romania Srl | Nortel Networks Slovensko, s.r.o. | Nortel Networks Hispania, S.A. |
| Nortel Networks AB | | |

30. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Filed Entities, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed.  The U.K. Administration Orders provided a stay of the EMEA Filed Entities' creditors which, subject to further orders of the U.K. Court, remains in effect during the Administration.

31. The various Administrators of the EMEA Filed Entities have continued to operate the business since the date of the U.K. Administration Orders and interact with the Applicants and U.S. Debtors in accordance with the Group Supplier Protocol Agreements (each a "GSPA") as approved in the Initial Order.

**Other Formal Insolvency Proceedings**

32. On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders").

33. The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

## STABILIZATION OF OPERATIONS

### Customers

34. Immediately upon the issuance of the Initial Order and the commencement of insolvency proceedings in the U.S. and EMEA, Nortel implemented its communication plan advising its significant customers of the various filings and of Nortel's commitment to continue to meet its customer obligations.

35. Since the Filing Date, Nortel continues to be in regular contact with many of its customers to assure them that all customer programs including volume rebates and customer credit programs will continue and be honoured during the proceedings.

36. Nortel continues to engage with existing and potential customers on new projects and is active in developing business cases and responding to proposals for new business.

37. Nortel continues to work with its customers to manage the operations on a "business as usual" basis.

**Suppliers**

38. Upon commencement of the insolvency proceedings, the Applicants also implemented a communication strategy to contact their major suppliers and advise them of the CCAA, Chapter 11 and U.K. Administration Orders. This strategy included an initial creditor mailing in all jurisdictions, direct verbal communications by global or local procurement personnel, as applicable, and postings to a Nortel website that hosts general creditor information and frequently asked questions.

39. The Applicants, with the assistance of legal counsel, the Monitor and the U.K. Administrators, have implemented procedures to promptly address supplier issues and concerns as they arise to ensure ongoing supply of goods and services and minimize any disruption in the Applicants' global supply chain. These procedures have included, among other things, the establishment of a senior procurement team, along with appropriate advisors, that is accessible around the clock to deal with significant supplier issues and troubleshoot any supply chain disruptions.

40. Pursuant to the Initial Order, U.S. Orders and the U.K. Administration Orders issued under the U.K. Proceedings, the Applicants, the U.S. Debtors and the EMEA Filed Entities are not authorized to make any payments on account of amounts owing to any of their trade creditors as of January 14, 2009 (January 15, 2009 in the U.K.) without approval by the Monitor, the U.K. Administrator or the Court, as applicable.

41. In the U.S., the following Orders have been issued:

    a) an Order authorizing the U.S. Debtors to honour certain pre-petition obligations to customers and to otherwise continue customer programs and practices in the ordinary course of business;

    b) an Order authorizing payment of certain essential pre-petition shipping and warehousing charges, including for goods in transit;

    c) an Order authorizing payment of certain necessary insurance premiums;

    d) an Order authorizing payment of certain foreign vendor expenses relating to NNI's foreign branch offices; and

    e) an Order authorizing the payment of certain pre-petition taxes and fees.

42. The Applicants, with the approval of the Monitor, have made similar payments in Canada in accordance with the terms of the Initial Order.

43. As detailed in the Pre-Filing Report, NNL entered into an amending agreement with its largest supplier, Flextronics, to ensure ongoing supply of goods and services on a post filing basis. The Flextronics Amending Agreement was approved by this Honourable Court as part of the Initial Order and the parties thereto have been operating pursuant to the terms therein during the post-filing period.

**Cash Management System**

44. Pursuant to the approvals and relief provided by the CCAA Initial Order and the U.S. First Day Orders and in accordance with agreements executed or arrangements made with the Administrators of the EMEA Filed Entities and NN Israel, Nortel has maintained use of its cash management system, minimized disruption to its operations and continued transactions between the various filed and non-filed Nortel entities. To the extent possible, in order to preserve the *status quo* of the cash management system, the following significant agreements and provisions (as more fully described in the Pre-Filing Report and the Doolittle Affidavit) are in effect:

    a) The Transfer Pricing Model which provides the basis for provision of goods and services between Nortel entities and allocates profit or loss based on each relevant Nortel entity's relative share of certain R&D costs incurred by the R&D centres on behalf of Nortel globally and to allow for the sharing of the IP among NNL's subsidiaries.

    b) A Court authorized arrangement between the Applicants and the U.S. Debtors to continue to settle pre-filing inter-company trade obligations. The

13

settlement of pre-filing and post-filing trade obligations is secured in the CCAA proceedings by an Inter-company Charge as approved in the Initial Order and as an administrative expense in the Chapter 11 proceedings. In addition, NNI reserved its right of set-off for inter-company trade amounts against the Existing NNI Revolver and in return NNI was provided with the Inter-company Charge to secure NNL's obligations under the Existing NNI Revolver.

c)  The GSPAs, one between the Applicants and the EMEA Filed Entities and the other between the U.S. Debtors and EMEA Filed Entities, are arrangements between the parties for treatment of post-filing receivables pursuant to the Transfer Pricing Model and prevent set-off of post-filing liabilities against pre-filing obligations. Transactions under the GSPA are secured in the CCAA proceedings by the Inter-company Charge as approved in the Initial Order and as an Administrator expense in the Administration of the EMEA Filed Entities. The GSPA is for an initial term of 30 days from the date of filing. The various parties have agreed to extend the GSPAs until March 15, 2009.

**Employees**

45. The U.S. Debtors obtained an Order authorizing the U.S. Debtors to continue to pay and honour certain pre-petition claims for wages, salaries, commissions, vacation pay, employee benefits and other compensation withholdings and deductions and reimbursable expenses and to continue to generally provide employee benefits in the ordinary course of business. The Initial Order also permits such payments with respect to the employees of the Applicants. In respect of pre-filing amounts for continuing employees, the U.K. Administrator has also indicated to the Monitor that the active employees of the EMEA Filed Entities have also been treated in a manner consistent with the employees of the Applicants and U.S. Debtors.

14

46. The Applicants, U.S. Debtors and EMEA Filed Entities have generally made employee related payments on a "business as usual" basis. A delay was experienced by a number of U.S. employees in receiving their paycheques on January 16, 2009 as a result of actions by third parties that were outside of the U.S. Debtors' control.

47. The Applicants continue to contribute to the registered defined benefit and defined contribution pension plans, in Canada, on account of current service and special deficit funding payments, as applicable. Active and retiree health and medical benefits also continue to be paid. No payments have been made since filing to the non-registered pension plans including the Transitional Retirement Plan, the Retirement Allowance Plan and the Supplementary Executive Retirement Plan.

48. The Nortel Networks Health and Welfare Trust ("H&WT"), as more fully described in the Doolittle Affidavit, is not subject to the CCAA proceedings and continues to operate in the ordinary course. The Sun Life Assurance Company of Canada administers various non-pension benefits through the H&WT. The H&WT provides funding for various non-pension benefits on behalf of current and former Canadian employees of the Applicants. The Applicants continue to fund this trust in accordance with past practice.

15

**CONSOLIDATED CASH POSITION AND LIQUIDITY AS AT JANUARY 30, 2009**

49. At January 30, 2009, Nortel's estimated consolidated cash balance was, approximately $2.4 billion. Nortel's consolidated cash balance is held globally in various Nortel entities and joint ventures. The following is an overview of Nortel's consolidated cash position as at January 30, 2009:

| Region | Gross Cash | Restricted | JV's and Other Items (see below) | Available Cash |
|---|---|---|---|---|
| NNL | 282 | (19) | (23) | 240 |
| Other Canada | 32 | (11) | | 21 |
| | | | | |
| NNI | 466 | | | 466 |
| NNI - Reserve MMF (ST/LT) | 66 | | (66) | - |
| NGS | 44 | | (44) | - |
| Other US | 4 | | | 4 |
| **North America** | **894** | **(30)** | **(133)** | **731** |
| | | | | |
| NN UK Limited | 337 | (23) | - | 314 |
| Other EMEA Filed Entities | 294 | (1) | - | 293 |
| JV - Netas | 72 | | (72) | - |
| EMEA non-filed entities | 22 | | | 22 |
| **UK/Europe** | **725** | **(24)** | **(72)** | **629** |
| | | | | |
| Greater China | 198 | (1) | - | 197 |
| Other ASIA PAC (excl JVs) | 165 | (1) | | 164 |
| LG Nortel | 286 | | (286) | - |
| Other JVs | 51 | | (51) | - |
| **ASIA** | **701** | **(2)** | **(338)** | **361** |
| | | | | |
| Cala | 46 | - | | 46 |
| | | | | |
| **Total Treasury Cash** | **2,366** | **(56)** | **(543)** | **1,767** |

50. As at January 30, 2009, North America had cash available for operations of approximately $731 million. Of this amount, approximately $261 million is held by Canadian entities and approximately $470 million is held by U.S. entities.

51. NGS has cash of approximately $44 million for use in its own operations and for settlement of inter-company transactions. It is expected that a further $66 million from the money market Reserve Primary Fund will become available in the U.S. at

16

some time during 2009, including $21 million expected to be released to NNI in February 2009.

52. The Applicants' restricted and unavailable cash relates primarily to: (i) $33 million of cash collateral posted by Nortel with respect to non-EDC performance bond and letter of credit facilities, (ii) $10 million related to cash collateral required to issue EDC performance bonds in exotic foreign currencies, and (iii) $10 million held in escrow to the benefit of the insurer related to the Global Class Action.

53. The U.K. Administrator had cash available for operations and post–filing inter-company settlements of NNUK and the other EMEA Filed Entities, of approximately $607 million. The EMEA non-filed entities have available cash of approximately $22 million which is expected to be used primarily to fund their in-country operations and and inter-company settlements. Pending further review, this cash is likely unavailable for funding elsewhere in the Nortel group.

54. NETAS, a joint venture in which Nortel owns a 53% interest, has approximately $72 million of cash of which $38 million represents Nortel's proportionate share. Nortel believes these funds will continue to be used to fund NETAS's operations and will be difficult to repatriate for other funding purposes as approval of the other joint venture partners would be required. The Monitor understands there are no current plans for a dividend distribution from the NETAS joint venture.

55. Nortel's entities in the APAC region have approximately $361 million of cash available for operations and inter-company settlements. As a result of the regulatory regime in the People's Republic of China, the funds in Greater China are generally only available to funds operations within China. Furthermore, Nortel's LG Nortel Co. Ltd. joint venture and other joint ventures Nortel participates in, hold approximately $337 million of cash of which $175 million represents Nortel's share. Repatriation of these funds requires approval of the respective joint venture partners. The Monitor understands there are no current plans for a distribution from the various

17

joint ventures, except for a possible distribution of $7 million in the first quarter of 2009 from Guangdong-Nortel Telecommunications Company Limited of China.

56. Nortel's CALA region entities have approximately $46 million of cash generally available to fund their in-country operations and inter-company settlements. Pending further review, this cash is likely unavailable for purposes of funding other Nortel entities.

**ACTUAL RECEIPTS AND DISBURSEMENTS FROM JANUARY 11, 2009 TO JANUARY 31, 2009**

57. The Applicants' actual consolidated net cash inflow for the period from January 11 to January 31, 2009, was $104 million. A summary of the actual receipts and disbursements as compared to the forecast filed with the Pre-Filing Report is attached at Appendix A.

58. Actual net cash flow exceeded the forecast by $184 million. The significant items contributing to the variance were as follows:

    a) a positive permanent variance of $29 million of which $35 million related to receipt of a net settlement associated with the termination of various foreign exchange and interest rate derivative contracts;

    b) a positive timing variance as NNL drew down $75 million on the Carling Facility to ensure NNL had adequate liquidity for operations;

    c) a net positive timing variance of inter-company receipts and disbursement of approximately $64 million primarily as a result of:

        i. a $46 million intercompany receipt from NNI for re-imbursement to NNL for NNI's portion of costs related to the Flextronics Amending Agreement. The receipt was originally forecast to be received in the week ending February 21, 2009; and

18

ii. a net positive variance of $18 million related to inter-company settlements, including settlements for the trade of inventory and services;

d) a positive timing variance of $29 million related to inventory and non-inventory purchases primarily as a result of reduced purchases from stop shipments, negotiations with suppliers and delays in receipt of appropriate documentation for processing of post-filing invoices; and

e) a negative timing variance of $20 million related lower than forecast accounts receivable collections.

59. Accordingly, the Applicants expect that a portion of the timing variances will reverse in the future.

60. Post-filing, the Applicants have not advanced any loans to other Nortel entities.

**CASH FLOW FORECAST FOR THE PERIOD FROM FEBRUARY 1, 2009 TO MAY 2, 2009**

61. Nortel, with the assistance of the Monitor, has prepared an updated 13-week cash flow forecast (the "February 1 Forecast") that estimates the Applicants' financing requirements. A copy of the February 1 Forecast is attached as Appendix B.

62. The cash flow forecast estimates the Applicants, will have total receipts of $348 million and total disbursements of $438 million resulting in a net cash outflow of $90 million for the period of February 1, 2009 to May 2, 2009.

63. NNL is not expected to make any draws in addition to the $75 million drawn prior to February 1, 2009 under the NNI Loan (as described later).

19

64. At May 2, 2009, the Applicants are forecast to have available liquidity of approximately $294 million, consisting of cash on hand of $172 million and availability under the NNI Loan, subject to final U.S. Court approval, of $123 million. This liquidity excludes restricted or unavailable cash of approximately $48 million.

65. The primary assumptions used in preparing the February 1 Forecast include the following:

    a) accounts receivable collections have been estimated by the Applicants' collection group based on revenue forecasts and historic customer collection experience;

    b) all disbursements are made assuming suppliers' pre-filing amounts are stayed and post-filing amounts are paid on significantly reduced credit terms as a result of the CCAA proceedings;

    c) inter-company trade accounts for post filing transactions continue to settle on a cash basis in the normal course between the Applicants, U.S. Debtors, EMEA Filed Entities and the other Nortel entities.  As provided for in the Initial Order and the Chapter 11 Cash Management Order, the Applicants and U.S. Debtors continue to settle pre-filing inter-company trade amounts on a cash basis in the normal course   Inter-company pre-filing loans between the Applicants and all other Nortel filed and non-filed entities are stayed;

    d) severance payments are stayed and are considered as unsecured claims;

    e) pension funding is made available for both current and special service payments with respect to the registered defined benefit and defined contribution plans.  Funding for non-registered pension or other retirement plans is stayed;

20

f) funding in the ordinary course for the H&WT is included; and

g) all interest payments relating to the Company's indebtedness are stayed.

## EXPORT DEVELOPMENT CANADA FACILITY

66. On January 13, 2009, EDC provided NNL with a 30 day waiver (the "EDC Waiver") to provide a post-filing facility that allows the Company the ability to issue new performance based bonds or other similar types of securities of up to $30 million (the "EDC Facility"). The facility is secured by a priority charge on the Applicants assets as provided for in the Initial Order.

67. Since the date of filing, the Applicants have had discussions with EDC and potential fronting institutions which issue the performance bonds and to put in place a more permanent performance bonding facility that will adequately support Nortel's needs over the longer term to provide performance bonds and guarantees to its customers to support its sales contracts.

68. Since the EDC Waiver expires February 13, 2009, NNL has requested and expects EDC to grant, prior to the expiry of the EDC Waiver, an extension of the current waiver to permit continued access by NNL to its EDC performance-related support facility. EDC and NNL, along with potential fronting institutions, will continue to work together to see if a longer term arrangement, acceptable to the parties, can be reached.

69. As at February 5, 2009, there have been three Surety bonds with a approximate total value of $0.9 million issued under the $30 million post-filing EDC Facility. With respect to the pre-filing EDC facility, as of February 2, 2009, approximately $164 million of performance bonds were outstanding of which $111 million were issued under the pre-filing committed line and $53 million under the pre-filing uncommitted revolving support line.

**CARLING FACILITY**

70. To ensure that the Applicants have sufficient cash resources available to them, NNI agreed, subject to U.S. Court approval, to provide a post filing inter-company loan of up to $200 million (the "NNI Loan") secured by the Carling Facility Charge as approved in the Initial Order.   The NNI Loan bears interest at 10% and pursuant to terms for use of proceeds, the Applicants cannot advance more than $10 million to its subsidiaries that are not Applicants or debtors in the Chapter 11 proceedings.

71. On January 15, 2009, as part of the Chapter 11 First Day Orders, NNI was granted approval of the NNI Loan for an interim amount of $75 million and terms for use of proceeds provided that the Applicants cannot advance any funds to its subsidiaries that are not Applicants or U.S. Debtors.  As previously indicated, as of January 30, 2009, NNL has drawn $75 million on the NNI Loan.

72. The Applicants have informed the Monitor that NNI intends to seek approval on February 19, 2009 for the remaining portion, $125 million, of the originally proposed $200 million inter-company facility and to broaden the terms for the use of proceeds to those originally agreed to between the Applicants and NNI.

**COST SAVING INITIATIVES**

73. Nortel has commenced several initiatives to generate cost reductions to decrease the Company's cash burn.  Although a comprehensive restructuring plan is still at a preliminary stage, Nortel believes these initiatives are essential to reducing costs and preserving existing cash resources. These initiatives include, the following:

    a)   a detailed plan for a reduction of its global workforce;

    b)   a review of real estate and other property leases;

    c)   a review of information system equipment leases, contracts and licenses;

d)  a review of other direct and indirect supplier and customer contracts; and

e)  a detailed plan to reduce Nortel's discretionary spend.

74. On January 30, 2009, Nortel delivered lease repudiation notices to the lessor of its
    two Challenger aircraft.  In addition, notice of repudiation of the related aircraft
    operating, maintenance and supplies contract was sent to the service provider.  It is
    estimated that repudiation of the aircraft lease and related service contracts will result
    in monthly cost savings of approximately $1 million.

75. Nortel has also commenced a process to assess the strategic and economic value of its
    many subsidiaries.  Due to the complexity and interdependency of the Nortel
    operational and corporate structure, Nortel anticipates it will take some time for the
    assessment to be completed.

*WiMax*

76. In June 2008, Nortel entered into a joint strategic agreement with Alvarion for the
    development and sale of the WiMax 16e technology and products (the "WiMax
    Agreement").  Under the WiMax Agreement Nortel provided significant funding to
    Alvarion for on-going R&D and in return Nortel obtained rights to market and sell
    WiMax 16e technology and products.

77. As part of its on-going strategic review process, Nortel determined that, given
    WiMax's sales growth was slower than forecast and significant on-going investment
    was required in both R&D and marketing, Nortel would exit the WiMax Agreement
    in an effort to preserve its cash resources.

78. On January 29, 2009, Nortel and Alvarion announced that they would be ending the
    WiMax Agreement.  Nortel sent a notice of repudiation on January 29, 2009.

79. Nortel has approached Alvarion and will reach out to its customers to discuss an effective way to transition customers to Alvarion. In addition, other alternatives are being considered, such as repudiation or rejection where appropriate and feasible.

**PREPARATION OF BUSINESS PLAN AND RESTRUCTURING PLAN**

80. The Applicants are in the process of preparing a business plan with the advice and assistance of their financial advisors, Lazard, and input from the Monitor. Management expects the preparation of the business plan will take several weeks before it will be ready for discussion with stakeholder groups. The business plan will reflect the Applicants expectation of future operating performance for 2009 taking into consideration the current economic environment and CCAA, Chapter 11 and various Administration processes.

81. The Applicants also continue efforts toward development of a comprehensive restructuring plan. As was described in the Pre-Filing Report, given the complex multi-jurisdictional nature of this restructuring, the shape and direction of the Nortel restructuring will take some time to develop. It requires a thorough strategic review of Nortel's assets and operations as well as input from Nortel's various stakeholder groups. Completion of the business plans and support of the business plans by the stakeholder groups is an important part in developing Nortel's overall restructuring plan.

**ANNUAL INCENTIVE PLAN AND GLOBAL SALES INCENTIVE PLAN**

82. As set out in the Doolittle Affidavit filed with this Honourable Court on January 14, 2009, Nortel intends to continue with its AIP for non-sales employees and SIP for its sales force in 2009.

24

**REQUEST FOR APPROVAL OF THE PATENT AWARDS AND INCENTIVE PROGRAM**

83. Nortel has a global Patent Award and Incentive Program ("PAIP") whereby cash bonuses are awarded to an employee who invents new intellectual property. This program is a critical aspect of protecting Nortel's R&D investments as it provides critical financial and recognition incentives to R&D professionals within the organization for ensuring that Nortel's innovations are properly protected.

84. Part of a cash award is paid upon the preparation of patent applications with the residual paid upon the issuance of a patent registration, all of which is paid in arrears.

85. The Applicants intend to continue to award cash bonuses under the PAIP in 2009 and to honour pre-petition amounts already earned by employees.

86. The total projected annual expense for the 2009 PAIP is approximately $1.0 million of which approximately $0.8 million is estimated to be paid by the Applicants. In addition, outstanding pre-petition amounts, globally, are approximately $0.4 million, of which approximately $0.3 million is in respect of the Applicants.

**CLARIFICATION OF D&O TRUST AMOUNT IN AFFIDAVIT**

87. The Doolittle Affidavit, incorrectly indicated a directors and officers' trust ("D&O Trust") was established in the amount of CDN$11,941,440 million. The actual amount of the D&O Trust was approximately CDN$11.9 million.

**RELIEF FROM HOLDING SHAREHOLDERS MEETING**

88. Each of NNC and NNL is required to call annual meetings of its shareholders as a result of their incorporation under the *Canada Business Corporations Act*. NNC's last annual meeting was held on May 7, 2008. Since May 2000, when NNC became the ultimate parent company of NNL, NNL has not been required to hold its own annual meetings. However, as a result of the suspension of the declaration and

25

payment of dividends on NNL's outstanding preferred shares announced in November 2008, NNL is now required to call an annual meeting no later than June 30, 2009.

89. NNC and NNL are each requesting that the court grant them relief from holding these AGM meetings. The annual meeting would be a distraction to both management and other company resources at a time when they are required to be focused on stabilizing and restructuring the business for the benefit of all stakeholders. In addition, there are significant costs associated with holding an annual meeting, including additional costs for mailing, premises/technical support, transportation/accommodation and security.

90. Through information provided as part of the CCAA proceedings, combined with the Applicants' intention to comply with applicable securities regulatory filings, various financial and other information relating to the Company will be readily available to the shareholders and the general public.

**REQUEST FOR AN EXTENSION TO THE STAY OF PROCEEDINGS**

91. Pursuant to the Initial Order, the initial 30 day stay period (the "Stay Period") expires on February 13, 2009. The Applicants are seeking an extension of the Stay Period for a period of 90 days, until and including May 1, 2009.

**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

92. The Monitor has assisted and continues to assist the Applicants in their efforts to stabilize operations. The Monitor believes that the Applicants are acting diligently and in good faith.

93. In an effort to continue to develop and protect Nortel's intellectual property, the Monitor recommends approval of the request for the Applicants to continue their PAIP in 2009 and to honour pre-petition amounts already earned by employees.

94. To maintain management's focus on the restructuring and stabilization of the Company for the benefit of all stakeholders and to preserve the Applicants' cash resources, the Monitor recommends approval of the Applicants' request for relief from calling and holding annual meetings for both NNC and NNL.

95. It is the Monitor's view based upon the Applicants' 13 week cash flow forecast that the Applicants appear to have sufficient available cash resources during the requested Stay Period and that an extension of the Stay Period will permit the Applicants to make further progress towards the ultimate goal of developing a restructuring strategy and filing a plan of arrangement. Accordingly, the Monitor recommends the stay of proceedings be extended to May 1, 2009.

All of which is respectfully submitted this 5th day of February 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**


Per:


Murray A. McDonald
President

27

Appendix A

**Nortel Networks**
**CCAA Applicants**
**Variance Actual to Forecast**
USD (Millions)

|  | Forecast | | | | Actual | | | | Variances | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start of period<br>End of period | 11-Jan-09<br>17-Jan-09 | 18-Jan-09<br>24-Jan-09 | 25-Jan-09<br>31-Jan-09 | Total | 11-Jan-09<br>17-Jan-09 | 18-Jan-09<br>24-Jan-09 | 25-Jan-09<br>31-Jan-09 | Total | 11-Jan-09<br>17-Jan-09 | 18-Jan-09<br>24-Jan-09 | 25-Jan-09<br>31-Jan-09 | Total |
| **1. Receipts & Disbursements** | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | |
| Collection of Accounts Receivable | 3.2 | 18.6 | 65.6 | 86.4 | 7.3 | 4.5 | 53.7 | 65.5 | 4.1 | (12.1) | (11.9) | (19.9) |
| Other Receipts | 2.6 | 2.3 | 0.4 | 5.3 | 0.0 | - | 34.5 | 34.5 | (2.6) | (2.3) | 34.0 | 29.2 |
| Intercompany Receipts | 15.0 | 67.2 | - | 82.2 | 18.6 | 30.4 | 45.8 | 94.7 | 3.8 | (36.8) | 45.8 | 12.5 |
| NNL/NN Restructuring Loan Advances | - | - | - | - | - | - | 75.0 | 75.0 | - | - | 75.0 | 75.0 |
| **Total Receipts** | 20.8 | 88.1 | 66.0 | 172.9 | 26.0 | 34.8 | 208.9 | 269.7 | 5.2 | (51.3) | 142.9 | 96.8 |
| **Disbursements** | | | | | | | | | | | | |
| Payroll (Gross) | 24.2 | - | 23.6 | 47.8 | 23.3 | 0.5 | 20.4 | 44.2 | 0.8 | (0.5) | 3.2 | 3.5 |
| Benefits | 2.7 | - | 2.7 | 5.4 | 2.0 | - | 4.6 | 6.7 | 0.6 | - | (1.9) | (1.3) |
| Pension | - | 1.9 | - | 1.9 | - | 0.5 | - | 0.5 | - | 1.5 | - | 1.5 |
| Inventory Purchases | 34.7 | 51.3 | 4.4 | 80.4 | 25.0 | 50.0 | - | 75.0 | 9.7 | 1.3 | 4.4 | 15.4 |
| Non-Inventory Purchases | 14.2 | 13.1 | 13.8 | 41.1 | 17.2 | 0.9 | 9.3 | 27.4 | (3.0) | 12.2 | 4.6 | 13.7 |
| Intercompany Disbursements | - | 62.3 | - | 62.3 | 11.1 | - | - | 11.0 | (11.1) | 62.4 | - | 51.2 |
| Professional Fees | 1.4 | 1.2 | 1.2 | 3.8 | 0.5 | - | - | 0.5 | 0.9 | 1.2 | 1.2 | 3.3 |
| Restructuring Costs | - | - | - | - | - | - | - | - | - | - | - | - |
| NNL/NN Restructuring Loan Repayments | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Disbursements** | 77.1 | 129.8 | 45.8 | 252.7 | 79.2 | 51.8 | 34.3 | 165.3 | (2.0) | 78.0 | 11.5 | 67.4 |
| **Net Cash Flow** | (56.4) | (43.7) | 20.2 | (79.8) | (53.2) | (17.0) | 174.6 | 104.4 | 3.1 | 26.7 | 154.4 | 184.2 |
| **Opening Cash Balance** | 210.3 | 154.0 | 110.3 | 210.3 | 210.3 | 157.1 | 140.2 | 210.3 | - | 3.1 | 29.8 | - |
| **Closing Cash Balance** | 154.0 | 110.3 | 130.5 | 130.5 | 157.1 | 140.2 | 314.7 | 314.7 | 3.1 | 29.8 | 184.2 | 184.2 |

APPENDIX B

**Nortel Networks - Feb 1, 2009**
**CCAA Applicants**
**Forecast Cash Flow**
USD (Millions)
**1. Receipts & Disbursements**

Month groupings: Feb 2009 (weeks ending 7-Feb to 28-Feb), Mar 2009 (weeks ending 7-Mar to 31-Mar), Apr 2009 (weeks ending 4-Apr to 30-Apr).

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start of period | 1-Feb-09 | 8-Feb-09 | 15-Feb-09 | 22-Feb-09 | 1-Mar-09 | 8-Mar-09 | 15-Mar-09 | 22-Mar-09 | 29-Mar-09 | 1-Apr-09 | 5-Apr-09 | 12-Apr-09 | 19-Apr-09 | 26-Apr-09 | 1-May-09 | 1-Feb-09 |
| End of period | 7-Feb-09 | 14-Feb-09 | 21-Feb-09 | 28-Feb-09 | 7-Mar-09 | 14-Mar-09 | 21-Mar-09 | 28-Mar-09 | 31-Mar-09 | 4-Apr-09 | 11-Apr-09 | 18-Apr-09 | 25-Apr-09 | 30-Apr-09 | 2-May-09 | 2-May-09 |
| **Receipts** | | | | | | | | | | | | | | | | |
| Collection of Accounts Receivable | 4.0 | 6.2 | 9.6 | 37.3 | 3.6 | 14.0 | 7.2 | 21.8 | 10.9 | 3.6 | 13.3 | 7.2 | 16.8 | 15.9 | 3.6 | 154.7 |
| Other Receipts | 0.4 | 27.4 | - | 0.4 | - | - | - | 0.2 | - | - | - | - | - | 0.2 | - | 28.7 |
| Intercompany Receipts | 4.1 | 15.0 | 39.9 | 1.7 | - | 1.3 | 41.3 | 18.3 | - | - | 1.3 | 24.2 | 17.3 | - | - | 164.3 |
| NNL/NNI Restructuring Loan Advances | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | 8.5 | 48.6 | 49.5 | 39.4 | 3.6 | 4.8 | 48.5 | 40.3 | 10.9 | 3.6 | 4.8 | 31.4 | 34.0 | 16.1 | 3.9 | 347.7 |
| **Disbursements** | | | | | | | | | | | | | | | | |
| Payroll (Gross) | 6.8 | 14.8 | 6.8 | 14.4 | 6.8 | 14.0 | 6.8 | 13.7 | - | 6.8 | 13.3 | 6.8 | 13.2 | - | - | 124.2 |
| Benefits | 1.7 | 1.0 | 1.7 | 3.0 | 1.7 | 1.0 | 1.7 | 1.0 | 3.2 | 1.7 | 1.0 | 1.7 | 1.0 | 1.0 | - | 21.7 |
| Pension | - | - | - | 1.9 | - | - | 1.9 | 1.9 | - | - | - | 1.8 | 1.8 | - | - | 5.7 |
| Inventory Purchases | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | - | 7.2 | 7.0 | 7.0 | 7.0 | 7.0 | - | 95.8 |
| Non-Inventory Purchases | 11.4 | 11.4 | 11.5 | 11.5 | 11.3 | 11.6 | 11.4 | 11.5 | - | 8.8 | 8.6 | 8.6 | 8.6 | 8.3 | - | 143.0 |
| Intercompany Disbursements | - | 11.0 | - | - | - | 7.5 | - | - | - | 14.6 | - | - | - | - | - | 33.0 |
| Professional Fees | 1.2 | 1.0 | 1.2 | 1.0 | 1.2 | 1.0 | 1.2 | 1.0 | - | 1.2 | - | 1.0 | 1.2 | 1.2 | - | 14.2 |
| NNL/NNI Restructuring Loan Repayments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Disbursements** | 28.1 | 35.3 | 39.1 | 38.9 | 28.1 | 34.7 | 35.6 | 36.1 | 3.2 | 29.6 | 30.9 | 39.9 | 32.7 | 15.6 | 9.8 | 437.5 |
| **Net Cash Flow** | (19.6) | 13.3 | 10.5 | 0.6 | (24.5) | (29.9) | 12.9 | 4.2 | 7.7 | (26.1) | (26.3) | (8.5) | 1.3 | 0.5 | (5.9) | (89.9) |
| Opening Available Cash Balance | 261.3 | 241.7 | 255.0 | 265.5 | 266.1 | 241.6 | 211.7 | 224.6 | 228.8 | 236.5 | 210.4 | 184.1 | 175.6 | 176.9 | 177.4 | 261.3 |
| Closing Available Cash Balance | 241.7 | 255.0 | 265.5 | 266.1 | 241.6 | 211.7 | 224.6 | 228.8 | 236.5 | 210.4 | 184.1 | 175.6 | 176.9 | 177.4 | 171.5 | 171.5 |
| **Restricted Cash and Other Cash Deposits** | | | | | | | | | | | | | | | | |
| Restricted Cash | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 |
| Cash Deposits | 22.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 |
| Total Restricted Cash and Other Cash Deposits | 52.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 |
| **Total Cash** | 294.3 | 302.7 | 313.1 | 313.7 | 289.2 | 259.4 | 272.3 | 276.4 | 284.1 | 258.0 | 231.8 | 223.3 | 224.6 | 225.0 | 219.1 | 219.1 |
| Facility Size | | | | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 |
| Less Utilized Facility | | | | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) |
| Available Facility | | | | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 |
| **Closing Cash + Available Facility** | 294.3 | 302.7 | 313.1 | 438.7 | 414.2 | 384.4 | 397.3 | 401.4 | 409.1 | 383.0 | 356.8 | 348.3 | 349.6 | 350.0 | 344.1 | 344.1 |

2/6/2009  1:49 PM