## EXHIBIT A

This **OEM PURCHASE AND SALE AGREEMENT**, including exhibits, (**Agreement**) is entered into on ~~JANUARY~~ _b 2o t_ (**Effective Date**) among **Nortel Networks Limited**, a Canadian corporation with offices located at 8200 Dixie Road, Suite 100, Brampton, ON L6T 4P6 (**Nortel Networks**)

and

**Excelight Communications, Inc**, a Delaware corporation with offices located at 4021 Stirrup Creek Drive Suite 200, Durham NC 27703, and Sumitomo Electric Ind., Ltd., a Japanese corporation with offices located at 1, Tayacho, Sakaeku, Yokohama 244-8588 Japan, (together, **Seller**).

**Definitions:**

*Acceptance* will have the meaning set out in Exhibit E.

*Affiliate* means one or more of the following (a) a Manufacturing Licensee; (b) a Joint Venture; or (c) an entity of which Nortel Networks Corporation directly or indirectly owns between 20% and 50% of the voting securities or other control mechanism.

*Blanket Purchase Order* means an internal Nortel Networks mechanism issued for Products to support the Demand-Pull Program or SMI Program. Blanket Purchase Orders (i) do not indicate a Delivery Date, (ii) may be issued by Nortel Networks or a purchasing Subsidiary or an Affiliate under the Demand-Pull Program or SMI Program, and (iii) are non-binding except to the extent Releases or SMI Triggers are subsequently issued for specific quantities of the Products.

*Changes and Change Order* will have the meaning set out in Article 5 of this Agreement.

*Confidential Information* means information disclosed by Nortel Networks or Seller to the other party that is designated at the time of disclosure as confidential (or like designation) is disclosed in circumstances of confidence, or would be understood by Nortel Networks and Seller, exercising reasonable business judgment, to be confidential.

*Delivery Date* means the P.O. or Release date for delivering to the FCA delivery location or Seller's dock, at Nortel Networks' option.

*Demand-Pull Program* means the Product ordering mechanism set out in Exhibit C2 hereto.

*Development Document* means the document signed by the parties with respect to the development of any product which may become a Product under this Agreement.

*Epidemic Failure* occurs when a Product (whether in the installed base or in stock at Nortel Networks, Affiliate, Subsidiary, a customer and/or other third party) has experienced one or more of the same type of failure in excess of the FIT rate as specified in the applicable Specifications for the Product, and such failure materially affects Product functionality.

*Failures in Time (FIT)* means number of failures in one billion hours of device operation.

*Forecast* shall mean Nortel Networks' projected Product requirement as set out in Exhibit C1 or Exhibit C2.

*Free Carrier* and *FCA* means *freight carrier alongside*, as set out under the International Chamber of Commerce document, *INCOTERMS 2000*.

*Field-Replaceable Unit (FRU)* means replacement Product, parts, sub-assemblies, circuit cards, modules and other electronic and mechanical assemblies that may be replaced at an end-user location.

*Infringement Claim Liabilities* will have the meaning set out in Section 18.1 of this Agreement.

*Joint Venture* means a business enterprise with a limited scope and duration between Nortel Networks and a third party.

*Manufacturing Licensee* means a third party that has a written agreement with Nortel Networks allowing the third party to (a) manufacture or integrate products and/or (b) lease, sell, sublicense or distribute products, using Nortel Networks' or the licensee's brand name.

*Nortel Networks Corporation* means the parent and ultimate holding company of Nortel Networks Limited.

*Prices* means the prices and rates for the Products and services set out in Exhibits A and D.

*Product* means Seller's products listed in Exhibit A, including hardware. *Product* includes related Product Documentation. In the event that Nortel Networks purchases a Seller's product but such product is not listed on Exhibit A, such product will be deemed to be a "Product" under this Agreement until the parties amend Exhibit A to include such product.

*Product Documentation* will have the meaning set out in Article 15 of this Agreement.

*Product Liabilities* will have the meaning set out in Section 18.1 of this Agreement.

*Product Warranty Period* will have the meaning set out in Section 11.1 of this Agreement.

*Proprietary Items* has the meaning set out in Section 6.5 of this Agreement.

*Purchase Order or P.O.* means any order issued by Nortel Networks or a purchasing Subsidiary or an Affiliate under this Agreement for the purchase of Products or Repair Services.

*Release* means a written or verbal communication (confirmed in writing within 2 days), requesting a Delivery Date for a quantity of Products or Repair Services under a Blanket Purchase Order.

***Repair Period*** means a period of 10 business days for repair or replacement by Seller of a Product that doesn't conform to the Specifications. The Repair Period will commence on the date that Seller receives the defective Product from Nortel Networks at a location designated in advance in writing by Seller. However, if the quantity of Product returned by Nortel Networks can be demonstrated by Seller to consume a significant capacity to repair or replace, the Seller shall have the right to make a written request to Nortel Networks for time in addition to the Repair Period in which to make the repair or return. Nortel Networks will not unreasonably withhold its consent to the additional time.

***Repair Services*** means repair and technical assistance services described in Article 12 and Exhibit D, Section 3 of this Agreement.

***Share Allocations*** means those share allocation percentages listed in Exhibit A, as such share allocation percentages may be revised pursuant to Sections 8.3.2 and 9.7.

***Sole Source Supplier*** will have the meaning in subsection 6.3.1.

***Specifications*** means the most current controlling document, for Products, listed at Exhibit A and maintained by Nortel Networks in its "Product and Component Enterprise System database (known as "PACES"), the certifications outlined at Exhibit B (Part I), Acceptance test specifications and specifications for installation and testing in the field. If a version of the applicable controlling document is different in Exhibit A and in PACES, the most current version will apply. If no specification is listed at Exhibit A, the controlling document maintained in PACES will apply or as both parties agree in writing. Specifications will be deemed to include, without limitation, Nortel Networks' quality and reliability target metrics (such metrics to include, without limitation, Mean Time Between Failure ("**MTBF**"), Return Rate ("**RR**") and Supplier Product Quality Level ("**SPQL**")).

***Standard Product*** means those Products indicated in Exhibit A with an "S" or "N+" in column titled "Standard-Non-Standard Product".

***Subsidiary*** means an entity that directly or indirectly (a) controls or is controlled by Nortel Networks Corporation by fifty percent (50%) or more of the voting stock, shares or voting power, or (b) is under common control with Seller or Nortel Networks Corporation by more than fifty percent (50%) of the voting stock, shares or voting power of the entity and Seller or Nortel Networks Corporation.

***Tax*** means foreign, federal, state, provincial, local (e.g., sales, use, excise VAT, GST or PST) and all other taxes arising from the sale of the Productss, except withholding taxes.

***Uneconomical To Repair (UTR)*** means that a Product (a) is beyond repair due to physical damage; (b) cannot be changed, modified, or upgraded from the current release to the next release acceptable to Nortel Networks; (c) repair is characterized as "no fault found" for the third consecutive time; or, (d) has already been through the repair process three (3) times; or, (e) has exceeded the limit placed on the number of repairs a Product may undergo, as mutually agreed in writing by the parties.

## 1. Scope

1.1 In addition to Nortel Networks' purchasing under this Agreement, Nortel Networks may notify Seller in writing that the Subsidiary or Affiliate named in the notice may purchase under this Agreement. This Agreement will apply to all purchases of Products by the named Subsidiaries and Affiliates, as if each were "Nortel Networks." Each purchase by a Subsidiary or Affiliate will create contractual rights and obligations under this Agreement solely between the purchasing Subsidiary or Affiliate and Seller. In the event that the terms of this Agreement conflict directly or indirectly, with the terms of any agreements between Seller and Subsidiary or Affiliate, the terms and conditions of such agreement between Seller and Subsidiaries and Affiliates shall control, except that with respect to the following provisions, the Subsidiary or Affiliate will have the option to have one or more of the following listed provision(s) control: Subsections 4.1 and 4.2 (Conformance or Rejection of Products), Subsections 6.1 through 6.3 (Certification, Quality Control and Reliability Requirements, and Sole Source/Critical Supply), Subsections 8.2 and 8.3 (re: Delivery), Subsections 9.1.1, 9.2 and 9.3 (re: Price), Section 11 (Warranties), Section 12 (Repair Services), Section 13 (Discontinued Product), Section 14 (Technical Support), Section 15 (Documentation), Section 16 (Confidential Information), Section 17 (Hazardous Materials), Section 18 (Indemnity), Section 19 (Damages and Limitations), Section 20 (Insurance), and Section 23 (General).

Notwithstanding the foregoing, Nortel Networks shall have the right to pursue all rights under this Agreement directly, on its own behalf and on behalf of and in lieu of Affiliates and/or Subsidiaries, even if the related purchase(s) was by Affiliates and/or Subsidiaries. In no event will Nortel Networks' pursuance of rights on behalf of or in lieu of Affiliates and/or Subsidiaries increase the rights which would otherwise be available to the Affiliate and/or Subsidiary acting on its own behalf.

1.2 If Nortel Networks requests and subject to the provisions of Exhibit E, Seller will customize the Product to Nortel Networks' specifications. The parties will amend this Agreement to include as "Product" the customized Product, Price and new Specifications.

1.3  Seller will notify Nortel Networks about a new Seller product within 7 days of Seller's authorizing its general release.

1.4  Subject to Section 3.1, either party may research, develop, manufacture or market products or systems similar to the Products.

1.5  On a quarterly basis or as otherwise mutually agreed during the Term of this Agreement, senior management from each party will meet at a mutually agreeable time and place, for a business review.

**2.  Term** – This Agreement will take effect on the Effective Date and continue in effect unless a party gives 60 days advance termination notice to the other party (**Term**).

2.1  *Termination and Continuation of Rights* – The termination right in this Article 2 is in addition to, and not in lieu of, any other rights of the terminating party at law or under this Agreement.

2.1.1  If Seller terminates this Agreement, (a) Seller's obligations to Nortel Networks' customers and end user customers will continue after termination of this Agreement, and (b) Nortel Networks will be allowed (i) to obtain support and maintenance from Seller for paid-for Products, and (ii) Seller shall provide the support and maintenance to Nortel Networks' customers and their end-user customers.  Seller will provide Nortel Networks with sufficient training for Nortel Networks to carry out the post-termination support and maintenance. Nortel Networks shall prepay Seller for any such services performed after termination hereunder (unless Seller is required to perform such services at no cost under Section 11 hereof) at such rate or rates as determined by Seller in its sole and reasonable discretion.

2.1.2  If either party terminates this Agreement, Nortel Networks may issue a Purchase Order any time during the 180-day period after the date of termination, provided such Purchase Order must be followed by payment in full as per payment terms in Section 9 and Nortel Networks must take delivery of the Products ordered within 365 days of the date of termination. Subject to the foregoing, Seller will accept all Purchase Orders issued during the 180 day period following termination. Notwithstanding the foregoing, Seller does not have an obligation to accept Purchase Orders if Seller terminates the Agreement with cause unless Nortel Networks prepays for the Purchase Order.

2.1.3  Nortel Networks may terminate this Agreement and/or any Purchase Order, SMI Trigger or Release, in whole or in part, upon written notice to Seller, in the event another party acquires a controlling interest in Seller (controlling not necessarily requiring greater than 50%) or a majority equity participation in Seller, without a prior written guarantee from such party to Nortel Networks that such party will continue to abide by the terms of this Agreement.

2.1.4  All obligations and liabilities stated to or intended to survive the termination of the Agreement will be effective after termination.

**3.  Rights**

3.1  The Specifications provided to Seller are owned by and are Confidential Information of Nortel Networks, and shall be used by Seller only in conjunction with or for the purposes contemplated under this Agreement.

3.2  Seller grants to Nortel Networks the non-exclusive, worldwide rights to (i) distribute, sell and resell the Products and (ii) sublicense the rights in 3.2 (i) and to end-users, distributors and subcontractors in order to carry out Nortel Networks' rights in part 3.2 (i).

**4.  Conformance or Rejection of Products**

4.1  Products will be deemed to have successfully achieved conformance with the applicable Purchase Order, SMI Trigger or Release unless Nortel Networks gives Seller notice of rejection within 60 business days after delivery.  If delivery is at Nortel Networks' customer's installation site, the 60 days will run from the earlier of (a) successful completion of installation and testing of the Products, or (b) 30 business days after delivery to Nortel Networks' customer's site.

4.2  If Products do not conform to the related P.O., SMI Trigger or Release, Nortel Networks may give Seller a detailed notice describing the nonconformity and without further obligation (a) reject all or part of the Products, (b) cancel all or part of the Purchase Order, and (c) return all or part of the Products at Seller's expense for a full refund of the purchase Price. Conformance of Products or Nortel Networks' payment for all or part of the P.O., SMI Trigger or Release will not be a waiver of Nortel Networks' right to reject such Products ordered.

4.3  *Return of Products* – Nortel Networks will have the right to return any and all unused Products to Seller upon agreement to pay a restocking or return fee as follows:

   i)      where (a) Product is Standard Product indicated with "s" in Exhibit A (and therefore does not require any rework), and (b) Seller has the ability to resell the Product in a reasonable period of time (in no event less than six (6) months), then the parties will negotiate a charge which will not exceed a 10% restocking fee will be applied;

   ii)     where (a) Product is Standard Product indicated with "n+" in Exhibit A (and therefore requires some level of rework to make it ready for resale), and (b) Seller has the ability to resell the Product a reasonable period of time (in no event less than six (6) months), then the parties will negotiate a charge which will not exceed a 20% restocking fee will be applied;

   iii)    where Product does not fall within part i) or ii) above, the parties will negotiate a return charge which will not exceed 50% of the original price paid to Seller and which is based on the parties' intention that the return charge (a) reflect only incremental or direct costs incurred to build and deliver the Product and (b) compensate Seller for taking back and destroying such Product.

   iv)    Return for all Products shall be limited to:

       a.    During any calendar quarter, twenty percent (20%) of the previous quarter's revenue value for all Products, provided that the revenue value will be calculated including Products purchased by Nortel Networks, Subsidiaries and Affiliates;

       b.    During any calendar quarter, no more than US$250,000.00 worth of Product (calculated at Price) per calendar quarter, notwithstanding part iv) a., above;

       c.    Within one hundred and twenty (120) days from date of shipment by Seller.

For i) through iii), Nortel Networks will return Product FCA Seller's manufacturing location.

4.3.1  If Nortel Networks returns Products to Seller in accordance with Section 4.3, and if Nortel Networks has already paid Seller for the Products, Nortel Networks will have the right to request in writing that Seller issue a credit memo to Nortel Networks' for the amount paid; or, (b) within 60 days of Nortel Networks' written request remit the amount paid by Nortel Networks. Seller will comply with Nortel Networks' request.  However, if Nortel Networks has not paid the Seller, then any invoice sent by Seller for the Products will be cancelled by the Seller.

**5.**  **Changes** – Seller will notify Nortel Networks of all proposed changes, including without limitation those that affect processes, form, fit, function, performance, reliability or Prices of Products (**Changes**).  Seller must not make Changes without Nortel Networks written approval, subject to Section 1.1 of Exhibit F (**Change Order**).  The process for making a Change Order involving processes, form, fit, function, reliability or performance is set out in Exhibit F.  If Seller implements a Change without a Change Order, Nortel Networks will have no obligations with respect to the changed Product.  If requested by Nortel Networks, Seller uses commercially reasonable efforts to make the unchanged Product available for purchase until the changed Product has been successfully phased into Nortel Networks' production, including that such changed Product has successfully completed Acceptance.

**6.**  **Certification, Quality Control and Supply Management Requirements**

6.1  *Certification* – Seller will be certified under ISO 9001 (or the most current successor standard)(**Standard**).  On receiving notice of Standard non-compliance, Seller will notify Nortel Networks about the details of the non-conformance and the plan (e.g., timelines and goals) submitted to the ISO registrars to comply with the Standard.  Upon notification by Nortel to Seller, Seller will provide a plan to achieve TL9000 compliance and certification within 365 days after notification. Seller's investigation may result in determining that TL9000 may not be pursued, in which case Nortel Networks will have the right to reduce or remove Share Allocation or otherwise take steps to reduce business with Seller.

6.1.1  Seller will obtain the certifications specified in Exhibit B, Part I.

6.2  *Quality Control and Reliability Requirements*

6.2.1  All Products delivered by Seller must comply with the Specifications.

6.2.2  Seller will test and inspect Products prior to shipment, using testing and inspection procedures approved in writing by Nortel Networks.  Seller will keep detailed inspection records and make them available to Nortel Networks upon request.

6.2.3  Nortel Networks may, from time to time, request that Seller provides detailed Unit Failure Analysis and Component Failure Analysis reports.  On a regular basis, Seller to provide reports covering:

        i) fit rates by product family – based on field returns, and

        ii) return rates (returns from Nortel Networks) based on Field Returns, Factory Returns and "Other" Returns.

In addition, Seller agrees to use reasonable commercial efforts to provide any requested reports made in writing by Nortel.

6.2.4   With respect to Products or Seller's similar products, within 7 days of discovery Seller will notify Nortel Networks of a (a) defect in design or manufacturing, (b) malfunction, (c) failure to conform to the Specifications or applicable specifications, and (d) being used in combination with other product(s) or services, causing or having the potential to cause a disruption in related end-user services. Seller will remedy (a) through (c) and (d) (to the extent the use is not contrary to the design Specifications) under the warranties set out Article 11.

6.2.5   Seller will re-qualify all Products, at a minimum of every two (2) years or as specified in the supporting Nortel Procurement Specifications (NPS), General Specification or referenced Telcordia specification. Any failures occurring during this re-qualification will be reported to Nortel Networks within seven (7) days. Qualification Reports will be submitted to Nortel Networks at the completion of re-qualification.

6.2.6   Seller will notify Nortel Networks, within seven (7) days, when a similar or identical product sold to other Seller customers shows higher rates of failures than specified by Nortel Networks for the similar or identical Product.

6.3   *Sole Source/Critical Supply* – Seller agrees to provide Seller's suppliers of sole source/critical components and materials used in Products (**Sole Source Supplier**) upon request by Nortel Networks. Nortel Networks will notify Seller if Nortel Networks does not approve of a Sole Source Supplier.

6.4   *Inspection Rights* – Nortel Networks may inspect Seller's facilities, processes or Products and may inspect Seller's third party suppliers facilities, processes or Products together with Seller based on acceptance of the third party, in both situations during the facilities' regular business hours (including without limitation that Nortel Networks may perform a quality assurance inspection of Seller's manufacturing or Seller's third party suppliers'). Nortel Networks will give reasonable advance notice of any inspection. However, Nortel Networks must give at least 15 days advance notice to inspect a manufacturing facility. At its expense, Seller will provide whatever is reasonably required by Nortel Networks to perform its inspection. Seller will use commercially reasonable efforts to have Seller's third party suppliers accept an inspection by Nortel Networks.

6.5   *Proprietary Items*

6.5.1   Nortel Networks has suppliers that manufacture components or supply materials based on Nortel Networks' proprietary specifications (**Proprietary Items**). As needed, Seller will buy Proprietary Items from Nortel Networks' suppliers or Nortel Networks. Seller's purchase of Proprietary Items will not relieve it from its obligations under Articles 4 and 5 of this Agreement. The Change Order requirements set out in Article 5 of this Agreement will also apply to Proprietary Items. Seller will use Nortel Networks' standard written agreement to purchase Proprietary Items from Nortel Networks.

6.5.2   Seller must not re-sell Proprietary Items or components or materials made using Nortel Networks' proprietary information to third parties.

6.6   *Second Source License*

6.6.1   Subject to the provisions contained in this Section 6.6, Seller hereby grants to Nortel Networks a royalty free, worldwide license ("License") covering:

(a)   the non-exclusive right to use, the I.P. Rights (as described in Section 6.6.5) and the Product Technical Information to manufacture or have manufactured the Products; and/or

(b)   the non-exclusive right to use, and to sublicense the use to one or more subcontractors of, the I.P. rights and Product Technical Information to maintain, support and repair the Product; and

(c)   the right to, directly or indirectly, sell and support the Products including those modified hereunder.

The License will include the rights in each subparagraph (a) through (c) above, only if and to the extent that Nortel Networks actually requires the exercise of such rights, at that time, to meet its obligations to its customers.

The License will terminate ninety (90) days after Nortel Networks receives written notice from Seller to Nortel Networks, supported by conclusive evidence, that Seller is willing and able to provide the Products or services obtained by Nortel Networks through its exercise of the License and has in effect resumed supplying Products and services. Seller acknowledges that Nortel Networks may have expended considerable effort and monies to establish its own manufacturing capacity or obtain the required capacity from a third party manufacturer and agrees that the License granted hereunder shall, in the event of termination of such License pursuant to the preceding sentence, remain in effect for a reasonable period of time to allow Nortel Networks to wind down its operations or meet contractual obligations entered into with a third party manufacturer in order to establish or maintain the required capacity.

6.6.2  A License shall solely be obtained by Nortel Networks hereunder,

    (a)    subject to the terms and conditions contained in this Section 6.6, and

    (b)    upon the occurrence of any one of the conditions described in Section 6.6.3; and

    (c)    upon written notice to Seller of Nortel Networks' intention to exercise the License granted under Section 6.6 .
If Nortel Networks uses a subcontractor to implement its have-made rights hereunder, that subcontractor will be selected by Nortel Networks subject to the prior written consent of Seller, which consent shall not be unreasonably withheld or delayed.  The license rights shall include the right to communicate relevant portion of the Product Technical Information to subcontractors for the purpose of the exercise of the have-made rights granted to Nortel Networks herein provided, however, that the recipients of the Product Technical Information be advised by Nortel Networks at the time, or before such communication, that proprietary information is being communicated and that such information is to be kept confidential and not used except as permitted hereunder and such recipients shall enter into a non-disclosure agreement with Nortel Networks.

6.6.3  The following shall be the conditions in order for Nortel Networks to have access to the Product Technical Information and to exercise the License granted hereunder:

    (a)    the institution by Seller of insolvency, receivership or bankruptcy proceedings or any other material proceedings for the settlement of its debts, including, without limitation, a reorganization, a compromise, an arrangement or assignment for the benefit of its creditors; or the institution of such proceedings against Seller, in the event any of the foregoing has not been settled, terminated or dismissed, as the case may be, in Seller's favor within twenty (20) calendar days after the commencement of any of the foregoing; or

    (b)    Seller's dissolution or ceasing to do business in the normal course; or

    (c)    if a new owner of Seller refuses, in writing, to honor the material terms of this Agreement related to the manufacture, delivery or support of the Products for Nortel; or

    (d)    Seller ceasing to manufacture, sell, deliver or support any one of the Products in a manner that breaches Seller's obligations hereunder to continue such manufacture, sale, delivery or support, and Seller fails to cure such breach within thirty (30) days of written notice of the breach from Nortel; or

    (e)    Seller is in material breach of the development, Acceptance, supply, repair, or warranty provisions of the Agreement with respect to a Product, and Seller fails to remedy such breach within sixty (60) days of written notice of such breach, and either:  (i) Seller either has failed to provide Nortel Networks an acceptable corrective action plan; or (ii) Nortel Networks reasonably concludes that Nortel Networks can obtain the Products or services more quickly and/or reliably by exercise of the License than by allowing Seller to implement its corrective action plan.

6.6.4  During the period of six (6) months immediately following the effective date of the License, Seller shall make available to Nortel Networks, reasonable technical assistance to facilitate the exercise of the rights granted under the License. Seller shall be paid, in return for such services and visits, standard fees based on reasonable rates which Seller establishes from time to time for such services and visits for the location from which the assistance is being provided, plus reasonable travel and living expenses incurred by Seller personnel for such visits. Such fees shall be preapproved by Nortel Networks and paid to Seller by Nortel Networks within sixty (60) calendar days of receipt of invoice, provided that Seller will provide to Nortel Networks receipts upon request.

6.6.5  The License granted under Section 6.6 shall include, to the extent set out in this Section, the worldwide non-exclusive license under all copyrights, rights to create derivative works, trade secrets, mask works, patents and any related and/or other intellectual property rights (collectively called "**I.P. Rights**") of Seller related to the Products and Product Technical Information, existing as of the effective date of the License or issued or granted or acquired during the term of this License. All patent licenses herein granted shall commence on the effective date of the License or when letters patent are issued or granted if subsequent hereto, and provided this License is not terminated pursuant to this Agreement, shall continue for the shortest of the entire term of the respective patent rights under which they are granted or are in force, or for that part of such terms for which Seller has the right to grant such licenses, or the duration of the License.

6.6.6  For the purpose of this Section 6.6, "**Product Technical Information**" means that technical information necessary for the manufacture and support of Product, including without limitation, all design, technical, manufacturing information (including manufacturing processes, drawings and specifications including circuit schematics) of assemblies, sub-assemblies and parts, sole source and other components and ASICs (including the part number, name and location of the supplier), associated test requirements, lists of associated manufacturing tools and test equipment, repair and maintenance specifications and test procedures and source code for applicable firmware.

6.7 *M/WBE-DVBE Involvement* – – Seller will comply with the M/WBE-DVBE requirements set out at Exhibit M or other reports as mutually agreed between the parties.

## 7.  Ordering

7.1 Nortel Networks may use the Seller Managed Inventory (SMI) program set out in Exhibit C1 or the Demand-Pull Program set out in Exhibit C2. Nortel Networks will use Blanket Purchase Orders, Releases, discrete Purchase Orders and SMI Triggers (as defined in Exhibit C1) to purchase under this Agreement. At its discretion Nortel Networks may issue Blanket Purchase Orders, Releases, Purchase Orders and SMI Triggers by electronic data interchange (EDI) (in a manner which will be communicated to Seller by Nortel Networks) or by other electronic means  (e.g., fax, html or web ordering).

7.2 Blanket Purchase Order, Release, P.O. or SMI Triggers terms and conditions will be for administrative purposes only and invalid to the extent they conflict with this Agreement.

7.3 Seller acknowledges and agrees that the Forecasts and Blanket Purchase Orders are issued for convenience only, and Nortel Networks' issuance of a Forecast and/or Blanket Purchase Order is not a purchase of Products or commitment to purchase any quantity of the Products identified in the Forecast and/or Blanket Purchase Order.  Seller will only ship or deliver Products to Nortel Networks under a Blanket Purchase Order in response to Releases issued under the Blanket Purchase Order.  Nortel Networks is only committed to purchase Products to the extent described in Exhibit C2 (Demand Pull Program) or as set out in the Share Allocations. The purchase of Products by Nortel Networks, Subsidiaries, and Affiliates will count towards such Exhibit C1 and Exhibit C2 commitments.

7.4 Seller will accept Blanket Purchase Orders, Releases, P.O.s and SMI Triggers, if the orders, Releases or SMI Triggers comply with this Agreement.  Seller will acknowledge acceptance of the orders, Releases and SMI Triggers in writing in a form agreed by the parties (e.g., e-mail, fax web or html response) within 2 days of its receipt of the order, Release or SMI Trigger.  At its convenience Nortel Networks or the purchasing Subsidiary or Affiliate may cancel any part of a Blanket Purchase Order, or Release. To cancel a discrete P.O., Nortel Networks must give cancellation notice to Seller fourteen (14) days prior to Delivery Date. The parties acknowledge that they may agree to negotiate different time periods for cancellations for non-Standard Product.

## 8.  Delivery

8.1 *Demand-Pull Lead Times* – The lead times for Products ordered under the Demand-Pull Program and Supplier Managed Inventory Program will be as set out in Exhibit C1 and Exhibit C2, respectively.

8.2*Packaging* – Seller will package the Products as described in Part II of Exhibit B.  In addition Nortel Networks may reasonably request in writing modifications to the packaging (e.g., change the size and external markings). Seller will package all FRU components provided as replacements under Exhibit D as a single unit.  FRU packages will meet all ASTI Type I requirements for domestic shipments and ASTI Type II requirements for international shipments.

8.3*Delivery Delay* – Seller understands the importance of supplying Products on time as required by Nortel Networks.  Seller will notify Nortel Networks of any anticipated Delayed Delivery. If approved in writing by Nortel Networks, Seller will, (a) make a partial shipment, or (b) at Seller's expense substitute products until the delayed Products are delivered or implement another type of workaround at its expense.  Nortel Networks may cancel the affected Release, SMI Trigger or Purchase Order (a) if a Delayed Delivery (defined at Subsection 8.3.2) occurs, or (b) if Nortel Networks' customer ("Customer") cancels an order as a result of a delay.  Nortel Networks will have no liability for the cancellation and the cancellation will not affect Nortel Networks' other remedies under this Agreement.

    8.3.1*Additional Remedies* – In addition to Nortel Networks' other remedies under this Agreement, if a Delayed Delivery (defined at Subsection 8.3.2) occurs, Nortel Networks may:

        a)  purchase substitute product from a third party in order to fulfill the Customer order(s) affected by the Delayed Delivery notwithstanding any other provision of this Agreement; and/or

        b)  require Seller to pay to Nortel Networks the following:

            i.  the price differential between the higher price paid or payable by Nortel Networks for substitute product purchased from a third party and the price of the Products affected by the Delayed Delivery; and

            ii.  Nortel Networks' lost revenue due to Nortel Networks' inability to fulfill the affected Customer order(s) or Customer canceling order(s) as a result of the Delayed Delivery.

       iii.  Nortel Networks' customer penalty due to Nortel Networks' inability to fulfill the affected Customer order(s) or Customer Canceling order(s) as a result of the Delayed Delivery.

8.3.2   *Effect on Allocation* – In the event of a Delivery Default as described below, the following terms and conditions shall apply:

      "**Delayed Delivery**" shall be any instance where Seller fails to make a shipment that:

        a) for a Product ordered under the Demand-Pull Program, contains the total quantity of Products in a Release and conforms to the Delivery Date of such Products in accordance with Section 3 of Exhibit C2, or

        b) for Product ordered under the SMI program, contains the total quantity of Products in a SMI Trigger and conforms to the delivery times set out in Exhibit C1, and such failure is due to Seller's failure to maintain the required Safety Stock at the Hub, or

        c) for a Product ordered other than under a discrete Purchase Order, is in compliance with the mutually agreed-upon quantities and Delivery Date under the Purchase Order.

      "**Delivery Default**" will be deemed to occur if Seller is unable, within a period of seven (7) calendar days after the agreed-to Delivery Date, to remedy to Nortel Networks' satisfaction a Delayed Delivery.

    Upon the occurrence of a Delivery Default, Nortel Networks may, upon written notice to Seller, remove or reduce Nortel Networks' Share Allocation for the particular Product.

8.4   *Rescheduling Delivery Date* –At no additional charge, Nortel Networks may reschedule each Delivery Date (i) for Blanket P.O.'s, Releases and SMI Triggers, at Nortel Networks' convenience, and (ii) for discrete P.O.s, by giving Seller seven (7) days prior notification from the Delivery Date. Nortel Networks may reschedule the Delivery Date to up to twelve (12) months from the original Delivery Date.

## 9.   Prices, Payments and Share Allocations

9.1   Subject to Section 9.3 and 9.8, the Prices will (a) apply to all purchases under this Agreement, and (b) include shipping FCA Seller's designated plant, and (c) include packing. The Prices will be exclusive of all applicable Taxes. Nortel Networks will not be responsible for any Taxes imposed upon Seller's net income, net worth or gross receipts. Seller will timely remit all the described taxes to the proper taxing authorities. When and where permitted by law, Seller will include applicable taxes as a separate line item on each invoice. If Nortel Networks or a purchasing Subsidiary or Affiliate provides Seller with a tax exemption certificate, Seller will not invoice for the related taxes. Seller will reimburse Nortel Networks to the extent Taxes paid by Nortel Networks are recovered by Seller from the taxing or governmental authority. To the extent that Taxes may only be refunded to Nortel Networks, Seller agrees to cooperate reasonably with Nortel Networks' obtaining a refund or reimbursement of the Taxes.

    9.1.1 The Price for each Product is set forth in Exhibit A. Prices will be reviewed and agreed to on or about every January 1 and July 1 during this Agreement and shall be firm until the following January 1 or July 1, as applicable. Prices and existing Purchase Orders (for which delivery has not been completed) will be adjusted to take into account any price reductions and volume discounts agreed to between the Parties.

9.2   *Low Price* – On an annual basis, the Prices will be the same as Seller's lowest OEM customer price for similar quantities of the same or similar kind of products and Repair Services. For making a comparison with OEM customer purchases Seller will aggregate all purchases made by Nortel Networks, its Subsidiaries and its Affiliates.

9.3   *Price Reductions* – (a) If Seller offers an end-user customer or OEM customer better prices than Nortel Networks, as determined under Section 9.2, Seller must notify Nortel Networks about the more favorable prices. (b) Whether or not Section 9.2 applies, if Seller reduces its list price or increases its price discounts, the Prices will be reduced for Products accordingly.

    9.3.1 If either (a) or (b) occurs, Seller and Nortel Networks will enter into an amendment of Exhibit A of this Agreement to include the more favorable prices for future purchases. Nortel Networks will receive a retroactive refund equal to the total difference between the more favorable prices offered by Seller to the third parties and the higher Prices paid by Nortel Networks for Products purchased under this Agreement.

9.4   *Payment* – Seller will invoice Nortel Networks at the invoicing address indicated on the Purchase Order. Nortel Networks will pay Seller for Products achieving conformance under Article 4 of this Agreement within sixty (60) days of Seller's invoice date.

9.5  All Prices and payments will be in U.S. currency unless otherwise agreed in writing by the parties.

9.6  *Audit* – Using a mutually agreed independent certified professional accounting firms, Nortel Networks or purchasing Subsidiaries or Affiliates may audit Seller's records and accounts to determine whether Seller has complied with Section 9.2 at the expense of Nortel, unless noncompliance is found, in which case such audit will be at the expense of Seller. The audit will be conducted during Seller's normal business hours. No more than one audit will be conducted each calendar quarter. Seller will reasonably cooperate with Nortel Networks and provide Nortel Networks with any financial or business records that contain subject matter relevant to the audit. Seller will keep clear and accurate financial and business records.

9.7  The initial Share Allocation for each Product is as specified in Exhibit A. Share Allocations apply only to Accepted Product. The Share Allocations for each Product will be reviewed and renegotiated every six months, and shall be a binding allocation commitment on Nortel Networks for the six month period following each such review and agreement. Nortel Networks may consider the following criteria in making its decision at such six month review:
    (a)    Seller's ability to achieve pricing for Products and new products which is equal to or less than Nortel Networks' target pricing. (Nortel Networks determines its target pricing based on competitive factors, including, but not limited to pricing);
    (b)    Seller is able to meet Nortel Networks' volume capacity requirements for a particular Product or Product family;
    (c)    Seller has delivered such Product or Product family on a timely basis in accordance with this Agreement as set out in Section 8.3.2;
    (d)    There are no material quality problems or issues with such Product or Product family;
    (e)    NFF Products are more than twenty percent (20%) of the Product RRs.
    9.7.1    In the event that, during any six month period as described in Section 9.7, Seller does not satisfy one or more of the above-listed criteria for a particular Product or Product family, Nortel Networks may lower or eliminate the Share Allocation for such Product or Product family within the committed, current six month period.

**10. Title and Risk of Loss** – Title to (excluding Software title) and risk of loss of the Products will pass to Nortel Networks upon delivery under Article 8 (Delivery). Title to and risk of loss of warranty replacement Products will pass to Nortel Networks on delivery to Nortel Networks' designated destination.

**11.**    **Warranties**

11.1  Seller warrants that for sixty (60) months from the manufacturing date stamped on the Products (**Product Warranty Period**), the Products, as applicable, will be free from defects in materials and workmanship and will conform to the Specifications

11.1.1  Further, Seller warrants for the life of Products that (a) the Products were new and free and clear of all security interest or other lien and other encumbrance when sold; (b) the Products (i) are safe for normal use and non-toxic, (ii) present no abnormal hazards to persons or their environment, and (iii) may be disposed of as normal refuse without special precautions; (c) the Products will function without any material service-affecting errors relating to date data and date-dependent data, (Date related problems will be given Critical Problem resolution priority, as described in Article 14 of this Agreement); (e) Seller (i) owns all of the rights necessary to provide to Nortel Networks the rights as set out in this Agreement, including without limitation that Seller may grant the licenses contained in this Agreement and the grants will not infringe any third party intellectual property rights and (ii) Seller is not aware of any claim or allegation of infringement of intellectual property rights.; and (f) the Products will have no design defects.

11.1.2  If Seller breaches the warranties under this Section 11.1, Seller will provide at its expense, as described in Exhibit H, (a) the Repair Services described in Article 12 within the Repair Period or (b) replacement Product. If Seller does not or cannot provide Repair Services within the Repair Period, Seller will replace the applicable Product. Warranty replacement Product must (a) be functionally equal to or better than the replaced units, (b) be backward compatible, and (c) meet the Specifications.

11.1.3  In addition to Nortel Networks' rights under the Repair Services, Seller must correct warranty breaches under this Section 11.1 within 30 calendar days of notice from Nortel Networks, or Nortel Networks may return the affected Products for a refund.

11.2  *Epidemic Failure Warranty* – If an Epidemic Failure occurs, or if and when Seller becomes aware of the likelihood of an Epidemic Failure occurring in a Product, Seller will use its best efforts to understand, correct and eliminate the Epidemic Failure as soon as possible and shall indemnify Nortel Networks for customer imposed fines, penalties, reasonable losses, reasonable costs, damages, injuries, claims, reasonable expenses or liabilities incurred as a direct result of the Epidemic Failure including reasonable costs and reasonable expenses incurred by Nortel Networks in

implementing repairs, replacement or upgrading of units of the Product subject to the Epidemic Failure (**Covered Products**) or related Products necessitated by the Epidemic Failure. This includes Seller (a) advising Nortel Networks of likelihood of the Epidemic Failure if Seller becomes aware of such a likelihood; (b) cooperating fully with Nortel Networks in all aspects of understanding, correction and elimination of the Epidemic Failure; (c) the performing and disclosing to Nortel Networks at no charge a root cause analysis within four (4) weeks from the date of Seller's first knowledge or notice of the Epidemic Failure; (d) reimbursing for the removal or removing at no charge from the Customer installed base and from Nortel Networks', Affiliates', Subsidiaries', customers' and other third parties' storage locations all Covered Products as soon as possible and in any event within 180 calendar days of Seller's first knowledge or notice of the Epidemic Failure; (e) refunding in full all payments made by Nortel Networks to Seller for Covered Products; (f) canceling at no charge all invoices for the Covered Product; (g) paying to Nortel Networks the amounts similar to those described in Section 8.3 (Delivery Delay) but applicable to the Epidemic Failure; (h) providing a workaround at no charge until a replacement for the Covered Product is available, and (i) complying with the requirements of Exhibit F, Part B (Epidemic Failure Retrofit). In addition, Nortel Networks may (i) cancel all outstanding P.O.s, SMI Triggers, Blanket Purchase Orders and Releases for the Covered Products without penalty or further obligation, and/or (ii) purchase substitute product from a third party in order to meet Customer requirements arising from the Epidemic Failure notwithstanding any other provision of this Agreement.

11.3   *Repair and Replacement Warranty* – Seller warrants that Product warranty repairs and replacements will be free from defects in materials and workmanship and will conform to the Specifications for the longer of (a) the remainder of the Product Warranty Period, or (b) two (2) years from the date of Nortel Networks' receipt of a replacement or repaired Product. Seller warrants out-of-warranty repairs and replacements for 1 year from the date of Nortel Networks' receipt of a replacement or repaired Product. Shipping expenses for repair and replacement will be borne by Seller.

11.4   Seller represents, warrants and covenants that all services provided under this Agreement, including without limitation all services will be provided in a highly professional manner in keeping with industry practice.

11.5   Nortel Networks may contract with third parties to repair or replace defective Product. Seller will reimburse Nortel Networks for all reasonable charges for third party repair and replacement. Nortel Networks will look to the third party to warrant its repair or replacement.

11.6   The remedies in this Article 11 are in addition to the other remedies under this Agreement.

11.7   The warranties in this Article 11 will not cover (a) items normally consumed in operation (e.g., lamps and fuses), and (b) defects caused by mishandling, misuse, neglect or improper testing or repair by Nortel Networks.

11.8   Nortel Networks may pass through to its customers the warranties set out in this Article 11. Seller agrees to fulfill the warranties directly to those customers.

12.  **Repair Services** – If Seller breaches a warranty, at no additional charge it will provide Repair Services to Nortel Networks in accordance with Exhibit H. After the Product Warranty Period, Seller will provide the Repair Services to Nortel Networks during the Repair Period as described in Article 3 of Exhibit D.

13.  **Discontinued Product** – Seller will not discontinue a Product without Nortel Networks' advance written consent. Nortel Networks' consent will be conditioned on Seller's not discontinuing the Products for 18 months from consent, unless the parties agree in writing to a longer period. Seller will accept all SMI Triggers, Releases and Purchase Orders issued during the 18 months. Seller will ensure that its suppliers give Nortel Networks notice of discontinuance under Section 3 of Exhibit H.

14.  **Technical Support** – The parties will perform their respective duties as set forth in Exhibit D and Exhibit I. Seller will provide technical support services during the Product Warranty Period at no additional charge. After the Product Warranty Period, Seller will provide assistance at the rates in Exhibit D. Subject to the applicable Development Document, at no additional charge and at Nortel Networks' option, Seller will provide technical support to Nortel Networks in respect of Products during Acceptance and also during the applicable Product Warranty Period.

15.  **Documentation** – At no charge, Seller will develop Product documentation for Nortel Networks' distribution to customers (Product Documentation). Product Documentation will comply with the Specifications and Nortel Networks' then-current branding and documentation requirements. For marketing purposes Nortel Networks may use, copy, modify and translate

Seller's promotional and end-user materials and Product Documentation. Nortel Networks will keep copyright markings and notices intact.

**16. Confidential Information** –Each party will use reasonable care in holding the other's Confidential Information in confidence and not disclose it to anyone except the party's employees. However, a party may also disclose the Confidential Information to third parties (e.g., Subsidiaries, Affiliates, parent companies and subcontractors) who have a need to know for purposes of carrying out this Agreement and have agreed in writing in advance to be bound by the confidentiality terms substantially similar to those of this Agreement.

16.1   *Exceptions* –Information is not protected if (a) a recipient can demonstrate through written documentation that it was already known; (b) it becomes known or generally available to the public (other than by act of the recipient) after its disclosure; (c) it is disclosed or made available in writing to the recipient by a third party having a bona fide right to do so and without similar confidentiality obligations; (d) it is independently developed by recipient, as demonstrated by its business records; or (e) it is required to be disclosed by subpoena or other process of law. The recipient will notify the disclosing party promptly of a subpoena or other process of law requiring disclosure.

16.2   *Release of Information* –Only with Nortel Networks' prior written consent may Seller (a) advertise, make public statements or publish information concerning this Agreement or a P.O. or the relationship between Nortel Networks and Seller, or (b) use the name or trademark of Nortel Networks with respect to any advertising, promotion, publicity, or representation that Seller may make in connection with Seller's business, services, or product lines. Nortel Networks will consent to such advertisement, publication or use (*Information Release*), if Seller's legal counsel provides Nortel Networks with a written opinion that Seller is required by law to make an Information Release. Seller and Nortel Networks will cooperate to create the language of any Information Release permitted under this Agreement.

**17.   Hazardous Materials**

17.1   As required by law or government regulation, including those set forth in Exhibit J, prior to shipment Seller will notify Nortel Networks about hazardous and toxic materials in Products. Seller will update the lists of hazardous and toxic materials annually. Upon Nortel Networks' request, in addition to the lists and updates, Seller will inform Nortel Networks whether Products contain materials that Nortel Networks may consider hazardous or toxic.

17.2   Product recalls due to Seller's negligence or misconduct related to hazardous or toxic material content or quantity will be at Seller's expense. Nortel Networks will cooperate with Seller to minimize Seller's recall related expenses. If a recall occurs, Seller must provide Nortel Networks with a workaround. The workaround must be Seller's (a) removing the offending hazardous or toxic material and substituting a non-offending material, or (b) removing the prohibited excess of hazardous or toxic material, or (c) substituting a functionally equivalent product that does not contain the offending hazardous or toxic material. Seller will indemnify Nortel Networks and its customers in accordance with Article 18 below for their use, sale or distribution of offending Products. Seller will not be liable for unreasonable costs or fees decided upon and incurred by Nortel Networks in relation to the abovementioned recall.

**18.   Indemnity**

18.1   *Indemnification* –Seller will indemnify and hold harmless Nortel Networks and its Subsidiaries and Affiliates (including their employees, officers and directors) from fines, penalties, losses, costs, damages, injuries, claims, reasonable expenses or liabilities related to (a) injury or death of a person or damage or loss of property during performance of this Agreement, (b) any claim or action brought by a third party to the extent that such claim or action is based on an assertion that Product(s) infringe third party patent, copyright, trademark or other proprietary right(s) (Infringement Claim Liabilities) or (c) Nortel Networks having to pay fines, penalties and/or similar amounts as a direct result of the Seller's breach of this Agreement. The fines, penalties, losses, costs, damages, injuries, claims, expenses or liabilities resulting from Section 18.1(a) through (c) will be known collectively as *Liabilities*. Seller will not be responsible for indemnifying Nortel Networks to the extent the Infringement Claim Liability results from (i) the Product being modified by Nortel Networks without Seller's approval, or used in a manner for which they were not designed, (ii) the Product being used by Nortel Networks or its customers in combination with non-Seller products without Seller's approval, or (iii) unreasonable costs or fees decided upon and incurred by Nortel Networks in relation to Nortel Networks' defense or settlement of Infringement Claim Liabilities

18.2   *Responsibilities of Indemnifying Party* –At its expense Seller will (a) defend against or settle Liabilities and (b) pay related costs and attorneys' fees. Seller will have sole control of the settlement or defense of Liabilities, but Nortel Networks or the indemnified Subsidiary or Affiliate may participate in the defense or settlement at its own expense. However, Seller may not have sole control of settlement or defense of Infringement Claim Liabilities. Seller and Nortel

Networks shall give notice to each other of Infringement Claim Liabilities.   After receiving notice, Nortel Networks may at Seller's expense (a) defend or settle the liability with the consent of Seller, which consent shall not be unreasonably withheld, or (b) reasonably support Seller's defending against the liability.

18.3    *Injunction* – If Nortel Networks is enjoined from using Products due to an Infringement Claim Liability caused by Seller, Seller at its expense must immediately provide Nortel Networks with a workaround.   The workaround will be Seller's (a) obtaining the right for Nortel Networks and its Subsidiaries to use the Product as provided under this Agreement, (b) substituting a functionally equivalent product that does not infringe, or (c) modifying the offending Product so that it no longer infringes.

18.4    In respect of any individual Liability, provided that Nortel Networks receives the indemnification and other remedies outlined above in this Section 18 in respect of such Liability, Nortel Networks will not pursue from Seller any other remedies.

18.5    The obligations under this Article 18 will survive the termination of this Agreement.

## 19.  Damages

19.1  Neither party will be liable for any unforseeable, incidental or consequential damages or for any loss of revenues, loss of profits, loss of goodwill or other forms of economic loss, even if the party or its authorized representative has been advised of the possibility of the type of damages and notwithstanding any failure of the essential purpose of any limited remedy. Notwithstanding any other provision of this Agreement, the foregoing limitation in this Section 19.1 shall not apply to (i) Seller's indemnifying Nortel Networks under Section  11.2, Section 17.2, Section 18.1 or Section 2 of Exhibit K of  this Agreement (except the foregoing limitation in this Section 19.1 will apply to Seller's indemnifying Nortel Networks under Section 18.1(a) for damage or loss of property ), (ii) Seller's infringement of Nortel Networks' intellectual property rights, (iii) Seller's liability under Section 8.3 (Delivery Delay), (iv)  Seller's liability for Epidemic Failure, or (v) breach of Article 16 (Confidential Information).

19.2  Seller's liability under this Agreement shall not exceed the greater of (i) US$10,000,000.00 or (ii) Seller's total revenue under this Agreement from the previous twelve months, such limit to apply in the aggregate for any twelve (12) month period (as described in Section 19.2.2 below) and Seller shall have no continuing or further liability for any amounts in excess of such limitation attributable to such twelve (12) month period.

19.2.1   Notwithstanding any other provision of this Agreement, the foregoing limitation in Section 19.2 will not apply to (i) Seller's infringement of Nortel Networks' intellectual property rights, (ii) breach of Article 16 (Confidential Information), or (iii) Seller's indemnification obligations under Section  11.2, Section 17.2 or Section 18.1 of this Agreement (except that the foregoing limitation in Section 19.2 *will* apply to Seller's indemnification obligations related to (a) Epidemic Failure, (b) unforseeable, incidental or consequential damages or for any loss of revenues, loss of profits, loss of goodwill or other forms of economic loss related to (I) injury or death of a person (except to the extent prophibited by applicable laws) and (II) Infringement Claim Liabilities , and (c) Nortel Networks having to pay fines, penalties and/or similar amounts under Section 18.1(c) unless such fines, penalties and/or similar amounts are otherwise due under Section 17, Section 18.1(a) or Section 18.1(b)).

19.2.2    For purposes of determining the twelve (12) month period for a liability related to:
(i) Delayed Delivery under Section 8.3, the twelve (12) month period shall begin on the date on the Delivery Date for the affected shipment(s);
(ii) Epidemic Failure under Section 11.2, the twelve (12) month period shall begin on the earlier of the date on which either party notifies the other that the Epidemic Failure has occurred or will occur.
(iii) any liability under Section 18, the twelve (12) month period shall begin on the date on which Nortel Networks or its Subsidiaries or Affiliates first incurs a fine, penalty, loss, cost, damage, injury, claim, expense or liability in connection with such liability.

## 20.   Insurance

20.1   During the Term and for 5 years after, Excelight Communications, Inc. ("Excelight") will maintain:

20.1.1    A comprehensive general liability insurance policy that (a) includes third party liability coverage, protecting Nortel Networks and its Subsidiaries and Affiliates from property damage or personal injury caused by Seller, (b) has a minimum combined single limit of 5 million U.S. dollars, (c) provides worldwide coverage, and (d) indicates on its face that it is primary insurance.

20.1.2  Employer's liability insurance with a minimum liability limit of $1,000,000.00.

20.1.3  Workers' compensation, with the statutory requirement for coverage. (When performing Services in the United States, Excelight must carry statutory workers' compensation coverage whether or not state law allows Seller to elect not to carry coverage.)

20.2  The comprehensive general liability and employer's liability policies will name Nortel Networks and its Subsidiaries and Affiliates as additional insured parties. Excelight cannot cancel or change a policy to Nortel Networks' disadvantage or potential disadvantage without at least 30 days advance written notice to Nortel Networks.

20.3  Within 10 days after the Effective Date, Excelight will furnish Nortel Networks with a certificate of insurance and evidence of the required, paid-up coverage. The insurance policy will be in addition to Seller's indemnity under Article 18.

20.4  Nortel Networks may request Excelight to increase its coverage, if Nortel Networks reasonably believes that Excelight's coverage is inadequate. Excelight will comply with the request.

**21. Notices –** Notices will be given in writing by (a) fax or (b) courier service or (c) electronic mail (e-mail). Courier service notice is effective on the earlier of 5 days from being deposited for delivery or the date on the mail or courier receipt. Fax and electronic mail notice is effective when the sender receives confirmation that the fax was sent or electronic mail received. A party will send notice to the following contacts:

**Seller:**       Excelight Communications, Inc.
              4021 Stirrup Creek Drive Suite 200
              Durham, NC
              Attention: Ed Wilson
              FAX:       919-361-1619
              EMAIL :ewilson@excelight.com

**Nortel Networks:**   Nortel Networks Limited        Nortel Networks Limited
              3500 Carling Ave.              2351 Boulevard Alfred-Nobel
              Ottawa, Ontario, K2H 8E9       St. Laurent, Quebec, H4S 2A9
              MS 043/52/F12
              Attention: Law Group—Supply Management   Attention: Leader – Product Supply Management
                                             PHONE:     514-818-8354
                                             FAX:       514-818-3222
                                             EMAIL:     lsaintam@nortelnetworks.com

**22.   Governing Law –** The laws of the State of New York, except for conflict of laws rules, will govern the Agreement. Application of the U.N. Convention on Contracts for the International Sale of Goods is specifically excluded from this Agreement

**23.   General**

23.1  *Severability* – If any provision of this Agreement is determined to be legally unenforceable or invalid, the remaining provisions will continue in effect. The parties will substitute a provision that most closely approximates the economic effect and intent of the invalid provision.

23.2  *Trade Treatment* – Seller will support Products for preferential trade treatment, including without limitation as set forth in Exhibit K.

23.3  *Debarment Certificate* – Seller may be required by law to provide Nortel Networks with a certificate about the Products, based on the then-current version of the form set forth in Exhibit L. Seller and its Products and services will conform to all laws and governmental orders and regulations in effect at the time of shipment of Products or the performance of services.

23.4  *Assignment* – Neither party will assign or transfer this Agreement, or its rights or obligations, without the prior written consent of the other party. However, Nortel Networks may assign or subcontract its rights or obligations under this Agreement to a Subsidiary without Seller's consent or to a person or entity to which Nortel Networks has seceded all or substantially all of its business and assets to which this Agreement relates.

Nortel Networks Agreement No. _____

23.5  *Waiver* –Unless waived and agreed in writing by the parties, no action or inaction by a party under this Agreement will constitute a waiver of a party's (a) rights or obligations under this Agreement, or (b) breach of this Agreement.

23.6  *Independent Contractors* – Under this Agreement Seller is an independent contractor.  This Agreement does not create a joint venture, partnership, principal-agent or employment relationship between Seller and Nortel Networks.

23.7  *Incorporation of Exhibits* –All exhibits attached to this Agreement are also incorporated in this Agreement.

23.8  *English* – This Agreement has been drafted in the English language at the mutual request of the parties hereto.  Les présentes ont été rédigées dans la langue anglaise à la demande mutuelle des parties aux présentes.

23.9  *Entire Agreement* – This Agreement is the entire subject matter agreement of Nortel Networks and Seller and may not be amended except in writing signed by an authorized representative of each party.

23.10 *Order of Precedence* – To the extent conflicting terms exist between this Agreement, the applicable Development Documents, or the terms of any Purchase Order, the order of precedence will be as follows:  1) the applicable Development Document (but only to the extent that such document does not deal with commercial product supply, which is set out in this Agreement); 2) this Agreement, including Exhibits, and any addendum; and then 3) the terms on the Purchase Order.

**Sumitomo Electric Ind., Ltd.**

By: _____
          (Signature)
Name: HISASHI TAKADA , PH.D.
             (Print)
Title: GENERAL MANAGER  PHOTO-ELECTRON
        PRODUCTS DIVISION
Date: FEB. 4 , 2004

**Excelight Communications, Inc.**

By: _____

Name: Kevin J. Green

Title: COO

Date: 2/5/2004

**NORTEL NETWORKS LIMITED**

By: _____
          (Signature)
Name: Luc St. Amour
             (Print)
Title: LEADER - PSM

Date: FEB. 10, 2004

Nortel Networks Agreement No. _____

# EXHIBIT A
## PRICES, DISCOUNTS, SHARE ALLOCATIONS AND DELIVERY

NOTE: INITIAL EXHIBIT A FOR THE FIRST HALF OF 2004 WILL BE COMPLETED BY THE PARTIES AT THE SAME TIME AS THIS AGREEMENT. THEREAFTER, EXHIBIT A TO BE UPDATED ON OR ABOUT EVERY JANUARY 1 AND JULY 1.

Part I:    Product List:        Accepted Products, Prices, Share Allocations and Discounts

The Parties agree that any other products which are ordered by Nortel and delivered by Seller shall be considered "Products" and will be subject to the terms and conditions of this Agreement.

**Product List – Example:**

| Product Family | CPC | Description | Specification | Price at Jan 1 | Price at July 1 | Allocation |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

Part II:   Price Reduction

Seller will use all reasonable efforts to minimize any costs related to the Products.  Savings by Seller will be passed on to Nortel Networks in the form of reduced Prices.

## EXHIBIT B

### CERTIFICATIONS AND PRODUCT MARKING

References to Telcordia or Nortel Networks proprietary telecommunications standards in this Exhibit B will include amendments and replacements of the standards, as they occur from time to time during the Term.

**PART I:**          **CERTIFICATIONS**

*Certification* – Seller will obtain the design certifications listed below for new or modified designs after production release. The Nortel Networks Acceptance Program in Part II of this Exhibit will still apply.  At Seller's expense Nortel Networks and Seller will make joint submissions to the certifying regulatory bodies.  However, Nortel Networks will be responsible for any costs in excess of those for a solo submission.  The parties will notify each other about design changes that might invalidate a certification.  The exposure will be included in the Change Notification process whether or not the changed or modified design will be in a production release.

Seller will obtain the following certifications and any other certifications required by law:

    CEMark
    UK Type Approval
    UL / CSA / EN safety
    FCC parts 15 and 101

**PART II:**     **PRODUCT MARKING**

For Product Family "Transceivers" refer to NPS25303 for Product Marking Requirements.
For all other Product families, refer to specification in effect, or as both parties agree in writing.

## EXHBIIT C1 – SELLER MANAGED INVENTORY (SMI) PROGRAM

1.      DEFINITIONS – For the purposes of the Supplier Managed Inventory Program outlined in this Exhibit, the following definitions will apply:

"**3PL**" shall mean a third party logistics provider with whom the Seller will contract with for the provision of warehousing services for the SMI Products Seller expects to sell to Nortel Networks when Nortel Networks issues a SMI Trigger.

"**SMI Trigger**" shall mean an instruction that is only sent by electronic or other written recorded means issued in accordance with clause 4, below, from Nortel Networks to the 3PL (which 3PL will be acting as the agent for Seller to deliver SMI Products).

"**Electronic Means**" shall mean any form of electronic communication, including e-mail, Electronic Data Interchange ("EDI"), Internet Web based, fax, but excluding telephone.

"**Hub**" shall mean a storage facility or warehouse, owned and/or managed by the 3PL, within close proximity of the system house set out in Attachment 1a, in which the Seller warehouses SMI Products prior to delivery to Nortel Networks.

"**Lead-time**" shall mean the length of the manufacturing process time between the start of a known requirement and the actual delivery of such SMI Products for replenishment as set out in Attachment 1b.

"**Safety Stock**" shall mean the minimum level of SMI Products, as identified in Attachment 1b, which Seller shall maintain in the Hub based upon consumption consistent with Forecast rates.

"**SMI Products**" shall mean the components or products in Attachment 1b, as may be amended from time to time by the prior written agreement of the parties.

"**Agreement**" means the agreement to which this Exhibit is incorporated.

2.      SCOPE OF EXHIBIT

2.1      This Exhibit establishes an additional managed inventory mechanism, for the purchase and sale of products and components pursuant to the Agreement. In the event of a direct conflict between a term in the Agreement and this Exhibit, this Amendment will prevail in regards to the Supplier Managed Inventory Program. With regard to all other terms, the Agreement will prevail.

2.2      In the event a component or product is included in the SMI Products but the component or product is not to be delivered to the Hub, Nortel Networks is not required to operate in accordance with the terms of this Amendment.

3.      FORECASTS, ORDERS

3.1      The Nortel Networks shall provide, through Electronic Means, a weekly Forecast to the Seller of its requirement for the SMI Products for the following fifty-two (52) weeks. The Seller shall advise Nortel Networks if the Seller does not receive a Forecast within seven (7) calendar days of the previous Forecast. Nortel Networks may at any time change its Forecast for SMI Products.

3.2      Nortel Networks will issue on an annual basis, through Electronic Means, Blanket Purchase Order(s) ("BPO") to Seller, against which SMI Triggers will be made. Such Blanket Purchase Orders may contain quantities of SMI Products and a maximum value, but the BPO shall not create a commitment on Nortel Networks to purchase SMI Products. Nortel Networks will review the quantity on the BPO bi-annually and will issue a change order if required.

3.3      Seller shall meet the following flexibility requirements: Seller will use commercially reasonable efforts to have the capability to increase the Safety Stock level at the Hub by (a) 20% within one (1) month after Nortel Networks' written request for the increase, and (b) 40% within two (2) months after Nortel Networks' written request.

3.4      A Forecast will not create any binding obligations on the part of Nortel Networks.

3.5      Nortel Networks will periodically issue SMI Trigger instructions to the Seller, or 3PL as the agent for the Seller. Seller agrees to sell, and Nortel Networks agrees to buy, the SMI Products described in SMI Triggers.
If at any time the Seller becomes aware that it is unable to meet its commitments under this clause 3 it shall immediately notify Nortel Networks' designated point of contact. Nortel Networks may purchase Products included in the Supplier Managed Inventory Program by issuing a P.O. for the Products under terms of the Agreement rather than the terms of the Supplier Managed Inventory Program. Seller will then issue a transaction to the 3PL so that products ordered by Nortel in the P.O will be delivered to Nortel via the SMI program. The Products purchased under the P.O. will count towards Nortel Networks' purchases of Safety Stock.

3.6      In the event that Nortel Networks issues SMI Trigger(s) which exceed the required Safety Stock due to Nortel Networks exceeding its Forecast, , Seller will replenish the Safety Stock within the applicable Product lead time.

4.      LEAD TIMES

The Seller will immediately advise Nortel Networks in writing of any requested change in the Lead-times for any SMI Products and shall provide to Nortel Networks a monthly update on the Lead-time for all SMI Products.

5.      HUB OPERATION

5.1      The parties will agree upon the Hub and the 3PL which will manage the Hub for the Seller. Nortel Networks may at any time, on reasonable notice to the Seller, change the nominated 3PL. In the event of a 3PL change, the Seller will be responsible for ensuring that stocks of SMI Products and operation of the Hub is transferred to the new 3PL without any loss or disruption in service to Nortel Networks in a time period acceptable to Nortel Networks.

5.2      Upon reasonable notice from Nortel Networks, Seller will conduct a stock check or other similar activity to be undertaken in the Hub and report the results to Nortel Networks.

5.3      Seller will at all times be responsible for the compliance of the 3PL with this Supplier Managed Inventory Program.

6.      DELIVERY AND INVOICING

6.1      The terms of delivery shall be DDP Incoterms 2000 Hub dock within twenty-four (24) hours of 3PL's receipt of SMI Trigger.

6.2      Seller will invoice Nortel Networks for the SMI Products delivered to, and purchased by, Nortel Networks. Unless agreed otherwise in writing by Nortel Networks, the Seller will not issue an invoice before the relevant SMI Products are delivered to Nortel Networks in accordance with this clause.

6.3      Seller will ensure that 3PL is responsible for providing Seller with notification by Electronic Means within twenty-four (24) hours of shipping SMI Products to Nortel Networks.

7.      STOCK LEVELS AND CANCELLATION

7.1      The Seller will maintain stock at a level between the Safety Stock and Maximum Safety Stock level, set out in Attachment 1b, of the SMI Products at the Hub. Safety Stock and Maximum Safety Stock level will be reviewed by Nortel Networks on a quarterly basis and adjusted by Seller if necessary.

7.2      Nortel Networks will not be responsible or liable for any stock stored at Hub in excess of the Maximum Safety Stock level set out in Attachment 1b. Seller agrees to use best commercial efforts to maintain the Safety Stock levels where Forecasts increase inside of the Lead-time. Nortel Networks' will have the unlimited right to increase the Forecast outside of the Lead-time.

7.3      The Seller will ensure that all SMI Products, including Forecasted SMI Products and Maximum Safety Stock held in the Hub, are at the latest engineering level and that Seller and the 3PL use strict "first-in/first-out" management.

7.4      The Seller will notify Nortel Networks of any line item of SMI Products in the Hub that has not witnessed a SMI Trigger in the preceding one hundred and eighty (180) days. Nortel Networks and Seller will agree upon disposition arrangements for such SMI Products, provided that in no event will Nortel Networks' liability exceed the amounts set out in Section 7.7, below.

7.5      In all cases, the Seller shall use best efforts for a period of four (4) weeks commencing on the date of issuance of a change in Forecast to limit the potential liability of Nortel Networks through such means as, but not limited to returning, reworking or re-using SMI Products, diverting SMI Products to other customers of Seller. The Seller will make available, and Nortel Networks has the right to inspect, all materials and process related documentation and information in support of any claim by the Seller.

7.6      **Cancellation** - Nortel Networks may cancel the Supplier Managed Inventory Program in whole or in part by providing Seller with written notice. Such cancellation will be effective immediately, and any current Blanket Purchase Order(s) will be cancelled, subject to Nortel Networks notifying Seller otherwise.

7.7      Disposition of the Maximum Safety Stock level at the Hub due to inactivity described at Section 7.5 of this Exhibit or due to cancellation described at Section 7.6 of this Exhibit will be subject to the following:

a)  Delivery schedule for applicable Maximum Safety Stock will be as agreed by the parties hereto, provided that Nortel Networks will have the right to require delivery in accordance with the time periods set out in this Agreement.

b)  Nortel Networks' total liability under the SMI Program, including without limitation for Seller's stock of finished goods, will not exceed the Maximum Safety Stock level maintained at the Hub according to Attachment 1b.

Nortel Networks Agreement No. _____

   c)   Amount to be paid by Nortel Networks for agreed upon Maximum Safety Stock level will be the stock quantity at the time of the inactivity or the cancellation @Price and which will not exceed the Maximum Safety Stock level @Price.

8.      TITLE AND RISK OF LOSS

Title and risk of loss to a SMI Product shall pass from Seller to Nortel Networks at the time that the SMI Product is delivered to Nortel Networks' carrier from the Hub dock. Seller is responsible for all necessary insurance until title passes to Nortel Networks.

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

## ATTACHMENT 1a TO EXHIBIT C1
## BUYER'S SYSTEM HOUSE LOCATIONS

ST LAURENT SYSTEM HOUSE delivery location is: 7055 Alexander-Fleming, St-Laurent, Quebec, Canada, H4S 2B7; Contact: , Nortel Buyer, currently Pascal Tessier 514-818-8397

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ATTACHMENT 1b TO EXHIBIT C1
## DETAILS OF SMI PRODUCTS

**SELLER:** SELLER NAME

VALID FROM: __/__/__

| SELLER NAME PART NUMBER | CUSTOMER PART NUMBER | ORDER PACK QUANTITY | LEAD TIME | SAFETY STOCK LEVEL (AT HUB) | MAXIMUM SAFETY STOCK LEVEL (AT HUB) |
|---|---|---|---|---|---|
| | | | | | Safety Stock + two (2) weeks actual demand requirements |
| | | | | | |
| | | | | | |
| | | | | | |

Notes to Attachment 1:

Deliveries of SMI Products are only to be made in the Order Pack Quantity specified above or multiples thereof as agreed between Nortel Networks and the Seller.

Nortel Networks Agreement No. _____

## EXHIBIT C2 - DEMAND-PULL PROGRAM

1.   **Demand-Pull Program Forecast** – On the first business day of each week during the Term, Nortel Networks will provide Seller with a 12 month rolling Forecast of its Demand-Pull Program Product requirements. If Seller's stock of components exceeds Seller's requirements for Products purchased by Nortel, Seller will sell the excess to third parties to the extent reasonably possible. Forecasts or Blanket Purchase Orders are not binding on Nortel Networks; Releases against Blanket Purchase Orders are binding on Nortel Networks.

2.   **Target Product Total Stock** – *Target Product Total Stock* or TPTS means the total quantity of goods targeted (**Target Finished Goods**) plus works in progress (**Target WIP**) as agreed between by the parties and set out on Attachment 1 to this Exhibit. The Product run rate and the maximum number of weeks for which Seller will maintain the Target Product Total Stock are included in Attachment 1 to this Exhibit. However, if the Target Finished Goods is inactive for more than one hundred and eighty (180) days, the parties will agree on a reasonable disposition of all or part of the Target Product Total Stock, subject to Section 7 of this Exhibit C2. At the written request of Nortel, Seller will provide a report similar to Attachment 1 at a frequency to be agreed on.

    2.1 *Increase Target Product Total Stock* – Seller will use commercially reasonable efforts to have the capability to increase the then-current Target Product Total Stock by (a) 20% within 1 month after Nortel Networks' written request for the increase, and (b) 40% within 2 months after Nortel Networks' written request.

    2.2 *Depletion of Target Product Total Stock* – In the event that Nortel Networks' and/or Nortel Networks' Subsidiaries' and/or Affiliates' demand for a Product exceeds the Forecast, Nortel Networks may instruct Seller to draw on the Target Product Total Stock. In such a case, if the Target Product Total Stock is reduced, Seller will replenish such Target Product Total Stock with in the applicable Product lead time.

3.   **Delivery** – Demand-Pull Program Products will be shipped FCA, Seller's plant, within 24 hours after Nortel Networks issues the Release(s) to Seller.

4.   **Discrete P.O.'s** – Nortel Networks may purchase Products included in the Demand-Pull Program by issuing a P.O. for the Products under terms of the Agreement rather than the terms of the Demand-Pull Program. The Products purchased under the P.O. will count towards Nortel Networks' purchases of Target Product Total Stock.

5.   **Target Finished Goods Report** – Seller will provide Nortel Networks' designated purchasing department representative with a weekly written report detailing the status of the **Target Finished Goods**.

6.   **Cancellation** – Nortel Networks may cancel the Demand-Pull Program in whole or in part by providing Seller with written notice. Such cancellation will be effective immediately, and any current Blanket Purchase Order(s) and Release(s) will be cancelled, subject to Nortel Networks notifying Seller otherwise. The parties will agree on a reasonable disposition of the Target Product Total Stock, subject to Section 7 of this Exhibit C2.

7.   Disposition of the Target Product Total Stock due to inactivity described at Section 2 of this Exhibit or due to cancellation described at Section 6 of this Exhibit will be subject to the following:

    (a) Delivery schedule for applicable Target Product Total Stock will be as agreed by the parties..

    (b) Nortel Networks' total liability under the Demand-Pull Program, including without limitation for Seller's stock of finished goods and works in progress, will be the quantity maintained by Seller and will not exceed the Target Product Total Stock for the maximum number of weeks indicated in Attachment.

    (c) Amount to be paid by Nortel Networks for agreed upon Target Product Total Stock will be:

        A.  Target Finished Goods @ Price; and

        B.  Target WIP @ nil.

**EXHIBIT C2**

**ATTACHMENT 1**
NOTE: The Parties may mutually agree to a different format.

**WEEK:** _____
–

| CPC NO. | DESCRIPTION | PROJECTED WEEKLY RUN RATE | MAX. WEEKS OF TPTS | TPTS | TARGET FG STK | TARGET WIP | ACTUAL FG STK | ACTUAL WIP | LEAD TIME |
|---------|-------------|---------------------------|--------------------|------|---------------|------------|---------------|------------|-----------|
|         |             |                           |                    |      |               |            |               |            |           |
|         |             |                           |                    |      |               |            |               |            |           |
|         |             |                           |                    |      |               |            |               |            |           |
|         |             |                           |                    |      |               |            |               |            |           |
|         |             |                           |                    |      |               |            |               |            |           |
|         |             |                           |                    |      |               |            |               |            |           |
|         |             |                           |                    |      |               |            |               |            |           |
|         |             |                           |                    |      |               |            |               |            |           |
|         |             |                           |                    |      |               |            |               |            |           |
|         |             |                           |                    |      |               |            |               |            |           |
|         |             |                           |                    |      |               |            |               |            |           |
|         |             |                           |                    |      |               |            |               |            |           |
|         |             |                           |                    |      |               |            |               |            |           |
|         |             |                           |                    |      |               |            |               |            |           |
|         |             |                           |                    |      |               |            |               |            |           |
|         |             |                           |                    |      |               |            |               |            |           |

NORTEL NETWORKS
APPROVAL:                    _____
DATE:_____

SUPPLIER APPROVAL:          _____
DATE:_____

## EXHIBIT D

## REPAIRS AND TECHNICAL ASSISTANCE RATES

1.   **Technical Support Rates –** Seller's rates for providing Technical Support Services for out-of warranty Products will be agreed upon by the Parties.

2.   **FCA Repair Locations**
     FCA Durham, North Carolina

3.   **Out of Warranty Replacement Service and Repairs**

3.1   *Replacement Service* – At Nortel Networks' request, Seller will deliver replacement Products, and for a period of 10 years total, less the Product Warranty period, Seller will (a) make available the out-of-warranty repair and replacement services described in this Exhibit H, and (b) provide functionally equivalent maintenance, replacement and repair parts necessary to maintain the Products, including discontinued Products. after the expiration of the applicable Warranty Period. Nortel Networks will pay freight expenses on the returned Product. Seller will pay the freight expenses for the shipment of replacement Product.

3.2   *No Fault Found* – No charge.

## EXHIBIT E

### ACCEPTANCE PROGRAM

**1.    QUALIFICATION:**
The Seller will complete qualification of the Product based on written notice from Nortel Networks respecting the tests to be performed, the acceptable failure level and the completion schedule ("Qualification Program"). All Product components must have passed Nortel Networks' then standard qualification process.

**2.    VERIFICATION:**
At the same time as the Qualification Program, Nortel Networks will test the Product through Nortel Networks' verification program ("Verification Program") to verify that the Product meets the applicable Specifications.

**3.    ACCEPTANCE:**
"Acceptance" of the product means successful completion of the Acceptance Program.

"Acceptance Program" means the Qualification Program, the Verification Program, and this Section 4, together, in respect of a particular Product.

The following additional provisions apply in respect of Acceptance:

a.    Seller will comply with the schedule for Acceptance.

b.    At no charge or mutually agreed price to Nortel Networks, Seller will provide Nortel Networks with (a) products as required by Nortel Networks for the Acceptance Program, and (b) any reasonable support required by Nortel Networks.

c.    One or more of each new Seller product design and each mechanically different product design will go through an Acceptance Program. Nortel Networks will make reasonable efforts to avoid testing design factors that a Seller product may have in common with previously accepted Products.

d.    In the event Seller is unable to comply to the Specifications, Seller may request in writing to ship such noncompliant Product. If such request is granted it must be signed by the Nortel Networks Design Authority to be valid. If Nortel Networks does approve for such a shipment to take place, Seller will nonetheless remain responsible to provide the same performance and functionality in the Product as set out in the Specifications except to the extent of the non-compliance expressly set out and approved on Seller's request.

e.    If a product fails to meet any portion of the Specifications after development or fails any portion of the Acceptance Program, Nortel Networks will notify Seller and request that Seller identify the problem. Seller will use best efforts to, at its expense and Nortel Networks' request, correct the problem within five (5) days of Nortel Networks' request.

f.    Seller will provide a root cause analysis for a problem identified in the previous subsection within two (2) days from Seller's receipt of Nortel Networks' notice.

g.    Upon Acceptance, Seller will provide Nortel Networks with a written report with the product details, as requested by Nortel Networks (e.g., Product part number and current Product revision level).

## EXHIBIT F

### CHANGES AND RETROFIT

**PART A.    CHANGES**

1.        The supplier shall notify Nortel Networks of any changes that impact the form, fit or function, or have the potential to impact reliability of a product after it has been initially qualified. The Product Change Notice (PCN) shall be submitted to Nortel Networks at least 90 days prior to initial shipment of modified product. Notification shall be via an email drop box at pcns4nt@nortelnetworks.com. As an objective, the relevant Nortel Supplier Relations Prime and Component Engineer should also be notified. The wording of a PCN cannot over ride existing NPS requirements. Changes that cause product to no longer comply with existing NPS requirements require a new part number to be assigned. This amounts to a product discontinuation / substitution and should be addressed using the Product Discontinuation procedure instead.

Notifiable changes include the following:

> a) Changes that impact form, fit or function;
> b) Changes that impact or have the potential to impact reliability;
> c) Changes in assembly or test manufacturing location;
> d) Changes to materials or subcomponents;
> e) Changes to firmware;
> f) Changes in manufacturing process or technology. (Note that even minor changes in performance could trigger effects in Nortel systems that may not be addressed explicitly in the specification. Where doubt exists a PCN should be issued.)

Minor changes in process, materials or subcomponents, that clearly neither impact nor have the potential to impact, form, fit, function or reliability, do not require notification.

The PCN should include, as a minimum, the following:

> a) PCN title and identification number;
> b) Detailed description of and reason for the proposed change;
> c) Supplier part number(s) affected;
> d) Manufacturing location(s) and products (lines) affected;
> e) Nortel Networks product identification number(s) affected (objective);
> f) Means of distinguishing changed and unchanged product. This may be a date code, date code range, release number, etc.;
> g) Engineering and/or qualification test data sufficient to demonstrate that the changed product will continue to meet the original specified requirements;
> h) Estimated implementation date and first shipment date of changed product;
> i) Estimated last order and shipment dates for unchanged product;
> j) Supplier contact for questions.

1.1      If Nortel Networks has not responded to a Change Notice within 60 days of receipt, Seller may implement the Change.

1.2      Within 5 days of receipt of Nortel Networks' request for further justification for a Change, Seller will respond in writing with additional evidence or rely on the information included in the Change Notice. If Nortel Networks disagrees with the evidence given, the parties will have 30 days from the date of the Change Notice to resolve the disagreement. If not resolved at the end of the 30 days, Nortel Networks' reasonable resolution of the disagreement will be the final resolution.

2.        Within 7 business days of Acceptance of a changed Product, Seller will update the Acceptance report described in Exhibit E.

2A.      At any time Seller updates a Product to a new release, the Product will be stamped with a serial number that it clearly identifies the new release and distinguishes it from previous releases of the Product.

**PART B.          EPIDEMIC FAILURE RETROFIT**

**3.**     The Epidemic Failure retrofit remedies outlined in this Part will be (i) in addition to any other remedies at law or under the Agreement (including without limitation those set out at Section 11.2), and (ii) at no charge regardless of whether the Product is within or outside of the applicable Product Warranty Period.

3.1     Seller will make Class A or AC changes required by Telcordia GR-209 (i.e., re-design and retrofit) to eliminate Product defects. Seller will install the Class A or AC change at no charge in all installed and stocked Products through the retrofit program, whether such installation or stock is at Nortel Networks, Affiliate, Subsidiary or a customer or other third party. Seller will implement the retrofit in no more than 180 days from the date of Seller's first knowledge or notice of the defects.

3.2     Seller will provide Class A seed stock units at Seller's expense in order to complete the retrofit in the 180 days. The number of seed stock units required will be calculated as follows:

Seed Stock Units = Material Cycle Time (Weeks)* x Retrofit Rate**

* Material Cycle Time = 8 Weeks

$$**\text{Retrofit Rate} = \frac{\text{Number of units to be retrofitted}}{\text{Change Completion Date} - \text{Implementation Date}}$$

Upon completion of the retrofit, Nortel Networks will have no obligation whatsoever to purchase any of the Seed Stock Units. Furthermore, Nortel Networks may return Seed Stock Units to Seller, and Seller shall treat such Seed Stock Units as Product removed from the field during the retrofit (i.e., bad units).

3.3     On Seller's request, Nortel Networks will give Seller Nortel Networks' (a) Product Engineering Code, (b) Product release number, and (c) CLEI Product code for each retrofitted Product. On Nortel Networks' request, the information will be stamped on the Products.

**ATTACHMENT 1**
**to Exhibit F**

Change Notification
(Example)

| 1. SUPPLIER INFORMATION: | 2. PRODUCT CHANGE NOTICE: |
| | 1997xxxx |
| | ISSUE: 01 |

3. ISSUE DATE:    4. PRODUCT IDENTIFICATION:
    | MAJOR SYSTEM:
    | SUB SYSTEM :
    | HWARE: ?  FWARE: ?  SWARE: ?  PLUGIN: ?

5. NEW PROD   RLSE |7. NEW CLEI CODE |6. OLD PROD   RLSE |8. OLD CLEI CODE
  NTxxxxxx   tbd |  tbd     |  NTxxxxxx       xx  |  xxxxxxxxx

9. ASSOCIATED PRODUCTS OR CHANGES AFFECTED:

10. DRAWING NUMBER:              |11. CHANGE CLASSIFICATION:
  ADxxxxxx                      |  A/AC/B.......

12. CLASSIFICATION SUBSTANTIATION:

13. REASON FOR CHANGE:

14. DESCRIPTION OF CHANGE:

  VERIFICATION PROCEDURES:

  BACKOUT PROCEDURES:

15. EFFECT OF CHANGE INCLUDING IMPACT ON RELIABILITY:
Enhanced features and easier installability.
SAFETY HAZARD: ?  FIRE HAZARD : ?  SRVC AFFCTG: ?  TRANS AFFCTG: ?
MNTNCE AFFCTG: ?  RELIA AFFCTG: ?  POWR AFFCTG: ?  TRAF  AFFCTG: ?

16. MATERIAL AFFECTED:

17. DOCUMENTATION AFFECTED:

18. IMPLEMENTATION DATE:        |19. CHANGE COMPLETION DATE:
  MM/DD/YY                      |  N/A

20. MODIFICATION LOCATION:
  N/A
  TRIALED: N (Field Lab Na)

21. INSTALLATION HOURS AND MATERIAL COST:
   HOURS: N/A
   COST : N/A

22. LOCATION AND QUANTITY OF EQUIPMENT:
   N/A

23. ATTACHMENTS:
   None

24. COMMENTS:

**EXHIBIT G – MONTHLY REPORTS – INTENTIONALLY DELETED**

Nortel Networks Agreement No. _____

## EXHIBIT H - WARRANTY AND POST WARRANTY SUPPORT

References to Telcordia or Nortel Networks proprietary telecommunications standards in this Exhibit H will include amendments and replacements of the standards, as they occur from time to time during the Term.

## 1.    REPAIR PROCEDURE

1.1    Seller will give Nortel Networks a return material authorization (RMA) number within twenty-four (24) hours of receipt of Nortel Networks' notice of a repair requirement and will notify Nortel Networks about the FCA repair location to which Nortel Networks will ship defective Products.  Nortel Networks will mark the return shipping package with the RMA number.  The parties will agree in writing on a procedure for return of Products for repair.

1.2    Nortel Networks will ship RMA Products to Seller, freight prepaid and reasonably insured.  Nortel Networks will prepare export documentation, showing Nortel Networks' ownership of the RMA Products and complying with the free trade requirements in Section 23.2 (Free Trade Agreement - Procedures) of the Agreement.  The following information with Products returned to Seller for Repair Services:
   (a)    Nortel Networks' name and complete address;
   (b)    quantities and model numbers of Products being delivered for repair;
   (c)    the nature of the defect or failure, if known;
   (d)    Purchase Order number under which repairs are to be made, if Product is no longer under warranty;
   (e)    name(s) and telephone number(s) of Nortel Networks' point of contact concerning the Repair Services requested;
   (f)    ship-to address or Nortel Networks' location for return of repaired or replacement Products; and,
   (g)    whether or not returned Products are under warranty.

1.3    Seller will date stamp each repaired and returned Product with the repair date and type of repair "pre fix" as per Telcordia GR-209 and the Specifications. Product repaired by Seller will be stamped as per Telcordia GR-78-CORE at a readily visible location on the unit.

1.4    On receipt of notice of a repair requirement, Seller will notify Nortel Networks about (a) its point of contact for the Repair Service requested, and (b) any special packing for Product returns.

1.5    Seller's invoice to Nortel Networks for out-of-warranty repairs will contain:
   (a)    Nortel Networks' PO number for the Repair Services;
   (b)    a detailed description of and justification for the Repair Services;
   (c)    the quantities and model numbers of Products repaired and associated repair charges;
   (d)    the applicable sales or excise taxes;
   (e)    the total amount payable; and,
   (f)    the address to which payment should be made.

1.6    Seller will deliver repaired Products and replacements to Nortel Networks' designated location, freight prepaid and reasonably insured.  Seller will prepare export documentation, showing Nortel Networks' ownership of the RMA Products and complying with Free Trade Agreement requirements.

## 2.    REPAIR AND REPLACEMENT SERVICES

2.1    *Product Repair Service Process* – Seller will:
   (a)    ship repaired Products freight and insurance prepaid;
   (b)    track any defective Product by its unique serial number throughout the repair process;
   (c)    repair and update the Products to the minimum field baseline;
   (d)    at Nortel Networks' option, return the same Product shipped by Nortel Networks for repair.  If the returned Product's serial number has changed, Seller will put the following on repair tag originally provided by Nortel Networks: (i) old serial number, (ii) new serial number and (iii) reason(s) for change; and,
   (e)    complete the Same-for-Same process within 10 calendar days of having received the defective Product.

2.2   *Fast Cycle Failure Analysis* – At Nortel Networks' request and Seller's expense, Seller will perform a Fast Cycle Failure Analysis (FCFA) on failed, installed Products. Seller will issue a separate RMA number for each Product returned for an FCFA. As part of the FCFA, Seller will:

    (a)   perform a detailed root cause analysis of the problem, using the engineering tools required to find the cause of the failure (e.g., Environment Stress Screening [ESS]);

    (b)   track any defective Product by its serial number throughout the repair process;

    (c)   repair and update the Products to the minimum field baseline;

    (d)   at Nortel Networks' option, return the same Products shipped by Nortel Networks for repair. If the returned Product's serial number has changed, Seller will put the following on repair tag originally provided by Nortel Networks and in the FCFA report: (i) old serial number, (ii) new serial number and (iii) reason(s) for change. Seller will not upgrade or repair Products going through an FCFA until the Products successfully complete the FCFA test cycle.

    (e)   at Nortel Networks' option, return repaired Products with a written report, documenting all FCFA findings;

    (f)   complete the FCFA process within 7 days after receiving the defective Products;

    (g)   notify Nortel Networks about the return shipping information (e.g., the date shipped, carrier, waybill number); and,

    (h)   change the Products to eliminate Product deficiencies found during the FCFA.

2.3   *DOA/ELF Products* – Products that become defective within the first 120 days of use by Nortel Networks' customer will be referred to as *Dead On Arrival* (DOA) or *Early Life Failure* (ELF). Nortel Networks will immediately notify the Seller of a DOA/ELF Product. Nortel Networks will return the DOA/ELF Products to Seller with the RMA documentation. At Nortel Networks' option, Seller will provide Nortel Networks with a (a) full refund of the purchase Price for the affected Products, (b) credit in the amount of the purchase Price for the affected Products. Nortel may, at its option, issue a Purchase Order, SMI Trigger or Release for replacement Product, in which case, Seller will fulfil such Purchase Order, SMI Trigger or Release. At its expense Seller will perform a root cause analysis on returned DOA/ELF Products. The root cause analysis will consist of functional tests and ESS.

    2.3.1   After testing, Seller will repair, re-furbish, upgrade (to the latest version or release) and stamp (with the repair date) the Products to Nortel Networks. Such DOA/ELF Products will be considered new Products. Within 30 days of Nortel Networks' notice, Seller will do a root cause analysis and implement a plan of correction if the rate of failure of a DOA/ELF Product exceeds twenty percent (20%) of the Product's return rate (RR) defined in the Specifications. Seller will update Nortel Networks in writing with the findings of the root cause analysis as well as with the corrective plan of action.

2.4   *No Fault Found*

2.4.1   Seller will return the Products to Nortel Networks, using Nortel Networks' chosen carrier. Seller will take no more than 10 calendar days from the later of its receipt of Nortel Networks' PO or the returned Products to test the Products and return them to Nortel Networks.

2.4.2   If NFF Products (as defined in Section 4 of this Exhibit) are more than twenty percent (20%) of the Product RRs as defined in the Specifications, Seller will (a) perform a root cause analysis, and (b) implement a plan to correct the NFF occurrences within 30 days of reaching the 20% level. Seller will include the analysis results and the plan in the Monthly Report described in Subsection 6.2.3 of the Agreement.

2.5   *Reimburse Expenses* – If the actual Product RRs (i..e., repair and returns) are higher than twice the mean time between failure criteria for the Product, as set out in the Specifications, Seller will reimburse Nortel Networks for Nortel Networks' actual, documented costs resulting from the increase in Product RRs.

2.6   *Uneconomical To Repair* – The Seller will promptly notify Nortel Networks of any returned Product that is UTR in the opinion of the Seller. However, a Product will only be UTR if Nortel Networks and Seller agree in writing that it is UTR. Seller will return UTR Products to Nortel Networks at the expense of the party that agrees to cover the cost of the return in the written agreement characterizing the Product as UTR.

## 3.    LONG TERM SUPPORT

3.1   For 10 years after the termination of the Agreement, Seller will (a) make available the out-of-warranty repair and replacement services described in this Exhibit H, and (b) provide functionally equivalent maintenance, replacement and repair parts necessary to maintain the Products, including discontinued Products.

3.2     Seller will promptly notify Nortel Networks upon Seller's receipt of a supply discontinuance notices from suppliers of any sole source/critical components incorporated into the Products. Seller will make reasonable efforts to obtain an eighteen (18) month discontinuance notice from its suppliers. After Seller's receipt of notice, Seller and Nortel Networks will agree on the number of discontinued components Seller will buy in its last buy opportunity.

## 4.     RETURN RATE

4.1     Returns consist of three components:
   1.   Field returns (units deployed in the field and carrying live traffic)
   2.   Factory returns (units returned for out-of-spec performance prior to deployment carrying live traffic, excluding No Fault Found (NFF)). The NFF designation for any returned unit must be mutually agreed by the Parties.
   3.   Other returns (units returned for out-of-spec performance not Seller-caused, including, but not limited to damaged connectors or pigtails and damage due to shipping)

4.2     This section will only be used to evaluate "Factory returns" of Mature Products. Mature Products are defined as Products that Seller has shipped more than 500 units or that have been in production for more than six months. Unforeseen problems, i.e. power fluctuations, will not be included in this calculation. Both Parties must agree that a failure mode is "Unforeseen" and will work together to determine a screen, resolution and timeline for implementation.

Return rate by CPC = "Returns"/ "Shipments", where:

Returns = # of Factory returned units shipped during a specific month
Shipments = total # of units shipped during the same month

Seller will track this ratio on a monthly basis. Seller has committed to a return rate of 1.2% for all Mature Products.

For any unforeseen problems (i.e. power fluctuation), both Parties agree to work together to come up with a solution and screen.

## 5.     RETEST

*Retest* means inspect, retest, relabel, and repackage the Product in order to recertify the Product as complying with Specification. The parties will agree in writing on a procedure for retest of Products.

5.1     Seller agrees to take back Product, identified in Exhibit A at the column titled "Retest Eligible" for the purpose of Retest. Nortel Networks shall obtain an RMA Number from Seller for all qualifying returns for Retest. All Products must be less than nine (9) months from delivery date. Credit will be issued for the Products at the percentage of Price as listed in Appendix A under the column titled "Retest Eligible". Seller will give Nortel Networks a return material authorization ("RMA") number within twenty-four (24) hours of receipt of Nortel Networks' notice of a Retest requirement and will notify Nortel Networks about the Retest location to which Nortel Networks will ship Products. Nortel Networks will mark the return shipping package with the RMA number.

5.2     Nortel Networks will ship Products to Seller, freight prepaid for Retest. Nortel Networks will prepare export documentation. The following information will be included with Products returned to Seller:
   (a)     Nortel Networks' name and complete address;
   (b)     quantities and model numbers of Products being delivered for Retest; and
   (c)     a statement that the Product is being returned for Retest.

5.3     Seller will deliver Retested Products DDP, Incoterms 2000 for Products on SMI, or FCA delivery location or Seller's dock, at Nortel Networks' option, for Product covered by a non-cancellable purchase order as covered underSection 5.4 below.

5.4     For any Products returned to Seller for Retest, Nortel Networks will issue a non-cancellable purchase order for the Price of the Product or, if Product is covered by SMI, then the Product shall be returned to the Hub and will be included as part of the Maximum Safety Stock Level defined in Exhibit C1. If a material fault is found and the Product is within the warranty period applicable to repaired Product (as set out in Section 11.3 of the Agreement), the Product will be repaired or replaced under warranty and either (i) returned on the Purchase order at the same Price which the Product was

returned to Seller or (ii) to the Hub and Seller will credit Nortel Networks with the difference in Price and the value which the Product was returned to Seller.

## EXHIBIT I

## TECHNICAL ASSISTANCE

1.    **Technical Support** – During the Term and for 10 years after the termination of the Agreement, Seller will make available to Nortel Networks the technical support services described in this Exhibit.

1.1    Definitions – As used in this Schedule, unless otherwise defined:

"Critical Problem(s)" means any condition in a Product that renders the service or operation of the Product wholly unusable or inoperative and is due to non-conformance of the Product with its Specification or design defect. Critical Problem includes, but is not limited to, loss of all transaction processing capability, significant reduction in capacity or traffic handling capability, any loss of safety or emergency capability, loss of the ability to perform automatic system reconfiguration, inability to restart a processor or the system, loss of billing capability, corruption of billing or system databases that requires service affecting corrective actions, loss of access to maintenance or recovery operations, or loss of the system's ability to provide any required Critical Problem or Major Problem notification.

"Major Problem(s)" means any condition in a Product that interferes with the ability of the Product to provide routine service or operation at all times due to non-conformance of the Product with its Specifications or design defect. Major Problem includes, but is not limited to, any reduction in capacity or traffic, any loss of functional visibility or diagnostic capability, any loss of routine administrative activity, any significant degradation of the system's ability to provide maintenance or recovery operations, any significant degradation of the system's ability to provide any required Critical Problem or Major Problem notification, any significant increase in system related trouble reports by Nortel Networks' customer, and any corruption of the system billing databases that does not result in service affecting corrective actions.

"Minor Problem(s)" means any condition in a Product that is not a Critical or Major Problem, but is a condition that affects the service or operation of a Product and is due to non-conformance of the Product with its Specifications or a design defect. Without limiting the generality of the foregoing, Minor Problems shall include any defects or inaccuracies in the Product Documentation.

"Permanent Solution(s)" means a resolution to a Problem that, (a) causes the Product to conform with its Specifications, and (b) restores the service and operation of a Product without any loss of functionality.

"Problem" means a Critical Problem, Major Problem or Minor Problem.

"Technical Support Services" means those Seller technical support services described in this Exhibit.

"Work-Around(s)" means a temporary resolution that restores the service and operation of a Product without any loss of functionality.

1.2    Technical Support Services – Seller must make available and provide to Nortel Networks those Technical Support Services necessary to ensure (a) the continued operation of the Product, (b) that the Product contains no design defects and that it remains in compliance with its Specifications (c) the Specifications remain complete and accurate, and (d) the Product remains free of Problems. Nortel Networks will provide the first line of support to its customers

1.3    Priority Levels For Technical Support Services– Nortel Networks will categorize Problems and Seller will provide Technical Support Services according to the definitions in Section 1.1 above and the priority levels set forth in this Section 1.3.

Critical Problems: Seller must work continuously, and must use all reasonable commercial efforts, until a Work-Around or a Permanent Solution is successfully implemented. If a Permanent Solution is successfully implemented, but the Permanent Solution cannot be deployed in a Product operating in the Nortel Networks' customer's network without affecting service or operation, Seller will provide Nortel Networks with a Work-Around. Seller agrees to provide a Work-Around or Permanent Solution (subject to the restrictions described in the preceding sentence) within 5 calendar days of a Critical Problem being reported to Seller by Nortel Networks. If a Work-Around is successfully implemented, a Critical Problem shall be reclassified to a Major Problem.

1.3.2    Major Problems: Seller must work continuously and must use all reasonable commercial efforts, until a Work-Around or Permanent Solution is successfully implemented. If a Permanent Solution is successfully implemented, but the Permanent Solution cannot be deployed in a Product operating in Nortel Networks' customer's network without affecting service or operation, Seller will provide North with a Work-Around. Seller agrees to provide a Work-Around or Permanent Solution (subject to the restrictions described in the preceding sentence) within 14 calendar days of a Major Problem being reported to Seller by Nortel Networks.

1.3.3    Minor Problems: Seller must use all reasonable commercial efforts to provide a Work-Around or Permanent Solution. If a Permanent Solution is successfully implemented, but the Permanent Solution cannot be deployed in a Product operating in Nortel Networks' customer's network without affecting service or operation, Seller must provide Nortel Networks with a Work-Around. Seller agrees to provide a Work-Around or a Permanent Solution (subject to the restrictions described in the preceding sentence) within 30 calendar days of a Minor Problem being reported to Seller by Nortel Networks.

1.3.4    Seller's failure to reproduce a Problem on a Seller-specified reference machine will not prejudice or impact the attention that Seller gives to such Problem.

1.4    Delivery of Work-Arounds and Permanent Solutions

1.4.1    Permanent Solutions: Seller agrees to deliver a Permanent Solution to Nortel Networks as soon as reasonably possible. The patch will be provided within the times described in Section 1.3 above. If such a patch cannot be provided, Seller will provide a Work-Around within the times described in Section 1.3.

1.4.2    Work-Arounds: A Work-Around must be capable of being deployed, without interruption of service or operation, in a Product operating in Nortel Networks' customers' locations and/or businesses.

1.5    Service Level Objective – The parties acknowledge the potentially idiosyncratic nature of any Problem in the Deliverables. While the response times in Section 1.3 constitute targeted goals of the Technical Support Services to be provided by Seller to Nortel Networks, the parties agree that Seller will use all reasonable commercial efforts to attempt to resolve any Problems within the target times specified in Section 1.3 (for the relevant priority level) ninety-five percent (95%) of the time. Seller's meeting the targeted times less than one hundred percent (100%) of the time, but at least ninety-five percent (95%) of the time will not constitute a failure by Seller to perform a material provision of the Agreement.

1.6    Problem Reporting – For each request by Nortel Networks for Technical Support Services from Seller, Nortel Networks will provide Seller with a description ("Problem Report") of the Problem encountered and, where possible, will include a description of how to repeat the condition which brought about the Problem. Nortel Networks will include the priority level, determined to be applicable in its sole discretion, in each Problem Report. Seller will identify each outstanding issue relating to a Problem Report with a unique "Case Number" for tracking purposes. Seller will communicate Case Numbers the Seller production manager responsible for the described Product within twenty-four (24) hours of Seller's receipt of the Problem Report.

1.7    Communications – Seller will provide unlimited telephone support to Nortel Networks on issues relating to Products, between the hours of 8:30 a.m. and 5:30 p.m. Eastern Standard Time, seven (7) days a week. Seller will staff its telephone support service with qualified technical representatives with a detailed working knowledge of the Products. The parties may augment these communications with the use of facsimile transmission and secure electronic mail.

1.7.1    Seller will provide Nortel Networks with continuous access to all of Seller's problem tracking databases ("Problem Databases") for Products. Seller will update the Problem Databases as new hardware become available and commercially feasible. Seller will staff the Problem Databases with trained, qualified technical personnel and, subject to reasonable allowance for hardware downtime, the Product Database must be accessible 24 hours per day, 7 days per week, 365 days per year. Seller will also provide Nortel Networks with access to any other mechanisms (such as World Wide Web sites) through which Seller communicates with its customers or provides support for Products.

1.7.2    Seller will be responsible for establishing and operating the Problem Databases except that Nortel Networks will be responsible for the local service and access charges associated with Problem Database use.

1.7.3    The Parties shall use reasonable efforts to establish security measures for the electronic exchange of Problem Reports and other information.

1.8      Information – Once a month during the Term Seller will provide Nortel Networks with a report, listing the following information: all known bugs, errors, or defects in the Product, and the classification of each; any resolutions or fixes; and any available Work–Arounds.

1.8.1     Upon Nortel Networks' request, Seller will provide a "Status Report" on any Problem logged for Nortel Networks; provided that Nortel Networks identifies the particular Problem by the Case Number assigned to it by Seller.  For Problems that have been resolved, the Status Report will include the Case Number, the closing resolution for the Problem, the expected date that a Permanent Solution will be released, and a description of any known Work–Around. For Problems that have not yet been resolved, the Status Report shall include the Case Number, a Problem resolution plan, and a description of any known Work–Around.  Each Problem logged for Nortel Networks will remain open until closure notification is received from Seller and accepted by Nortel Networks.

1.9      On-site Technical Service – If Nortel Networks requests the on-site presence of a qualified Seller technical support representative at a Nortel Networks location or customer site to diagnose and resolve a Problem, Seller will make reasonable efforts to have a qualified technical representative available at the location or site within the shortest time reasonably possible; provided that Nortel Networks reimburses Seller for reasonable travel and living expenses in accordance with Nortel Networks travel plan guidelines.

1.10      Termination – Nortel Networks may cancel Technical Support for Products upon 60 days prior written notice to Seller. Upon receipt of Nortel Networks' notice, Seller will continue to provide Technical Support for the Products until the termination date specified in the notice.  Nortel Networks will be entitled to receive from Seller a refund of, or other credit for, the remainder of the applicable (annual or otherwise) Technical Support fee.  The amount of any refund or credit shall be equal to the Technical Support fee for the portion of the year from the termination date to the end of that Technical Support year.

## EXHIBIT J

### HAZARDOUS MATERIALS REGULATIONS

Seller will notify Nortel Networks about the hazardous and toxic materials, as required by the regulations promulgated under all applicable laws, rules and regulations of any applicable governmental entity including, without limitation, the following U.S. laws:

The Toxic Substances Control Act, Resource Conservation and Recovery Act of 1976, Hazardous Materials Transportation Act, Occupational Safety and Health Act of 1970, Comprehensive Environmental Response, Compensation and Liability Act of 1980, Consumer Product Safety Act, Radiation Control for Health and Safety Act of 1968, Clean Air Act, and Clean Water Act.

## EXHIBIT K

### FREE TRADE AGREEMENTS AND CERTIFICATES OF ORIGIN

1.  **Trade Agreement** - Seller will perform all administrative actions necessary to qualify Products for preferential treatment under the rules of any trade treaty related to the Products (e.g., the North American Free Trade Agreement [NAFTA]).

2.  **Exporter's Certificate of Origin** - If a Product is governed by a trade agreement, Seller will (a) prepare and distribute the exporter's certificate of origin (Exporter's Certificate of Origin) and answer questionnaires concerning the certificate; (b) reasonably assist Nortel Networks in resolving Product eligibility issues; and, (c) indemnify Nortel Networks under the Agreement against liabilities resulting from Nortel Networks' Exporter's Certificate of Origin being deemed invalid by the governing export authority.

2.1  *Per Shipment* - If an Exporter's Certificate of Origin is prepared for each shipment, Seller will (a) retain the original Exporter's Certificate of Origin (b) attach a copy of the Exporter's Certificate of Origin to the customs/shipping documents for qualifying Products, and (c) mark the customs/shipping documents with: *Copy of the Exporter's Certificate of Origin attached.*

2.2  *Blanket Certificate of Origin* - If a blanket Exporter's Certificate of Origin is prepared, Seller will  (a) retain the original Exporter's Certificate of Origin (b) mark the customs/shipping documents for the qualifying Product with: *Copy of blanket Exporter's Certificate of Origin on file at Nortel Networks' customs offices in Milton, Ontario (Canada) and in Tonawanda, NY (USA),* and (c) mail copies of the blanket Exporter's Certificate of Origin to the following offices:

Canada:                                                    USA:

Nortel Networks Corporation                                Nortel Networks Inc.
8200 Dixie Road                                            55 Pineview Drive
Brampton, Ontario L6V 2M6                                  Suite A
Canada                                                     Amherst, New York
Attention:  MS 036-MT102                                   USA

Nortel Networks Agreement No. _____

**EXHIBIT L**

**DEBARMENT CERTIFICATE**

**(S A M P L E)**

CERTIFICATION REGARDING DEBARMENT, SUSPENSION, INELIGIBILITY AND VOLUNTARY EXCLUSION – LOWER TIER COVERED TRANSACTIONS

This certification is required by the regulations implementing Executive Order 12549, Debarment and Suspension, 7 CFR Part 3017, Section 3017.510, Participants' responsibilities. The regulations were published as Part IV of the January 30, 1989, Federal Register (pages 4722-4733).

(BEFORE COMPLETING CERTIFICATION, READ INSTRUCTIONS ON REVERSE)

(1)    The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participation in this transaction by any Federal department or agency.

(2)    Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

_____

Organization Name                                                PR/Award Number or Project Name


_____

Name and Title of Authorized Representative


_____

Signature                                                        Date

Instructions For Certification

1.    By signing and submitting this form, the prospective lower tier participant is providing the certification set out on the reverse side in accordance with these instructions.

2.    The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

3.    The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

4.    The terms "covered transaction", "debarred", "suspended", "ineligible", "lower tier covered transaction", "participant", "person", "primary covered transaction", "principal", "proposal", and "voluntarily excluded", as used in this clause, have the meanings set out in the Definitions and Coverage sections of rules implementing Executive Order 12549. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations.

5.    The prospective lower tier participant agrees by submitting this form that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

6.    The prospective lower tier participant further agrees by submitting this form that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – Lower Tier Covered Transactions", without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions.

7.    A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that it is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant may decide the method and frequency by which it determines the eligibility of its principals. Each participant may, but is not required to, check the Non-procurement List.

8.    Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of a participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

9.    Except for transactions authorized under paragraph 5 of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

Nortel Networks Agreement No. _____

## EXHIBIT M – MWBE INVOLVEMENT

## DIVERSITY SUPPLIER PROGRAM PARTICIPATION PLANS AND REPORTS

**A.  M/WBE-DVBE PARTICIPATION PLANS AND REPORTS**

To the extent of any subcontracting by Seller, Seller shall strive to meet Nortel Networks' goals for the participation of M/WBE and DVBE firms (as defined below) as follows: 5% annual MBE participation; 5% total annual WBE and/or DVBE participation.  These goals shall apply to Nortel Networks' annual expenditures with Seller for Products and services.

Seller shall complete for each Product line Seller's completed plan outlining its M/WBE-DVBE goals and specific and detailed plans to achieve Nortel Networks' goals with respect to each such Product line ("Participation Plan").  A non-binding example of a Participation Plan is attached within this Exhibit below. Seller will submit an updated Participation Plan to be verified by Nortel Networks with the regular QBR. Seller will submit M/WBE-DVBE Results Reports quarterly within thirty (30) days following the close of each quarter, using the form attached hereto and incorporated herein below.  Participation Plans and Results Reports will be submitted to Nortel Networks' designated representative.

**B.  CANCELLATION**

Seller agrees that: (i) Seller will provide accurate results reports and immediately notify Nortel Networks of a disqualifying change in the MBE/WBE/DVBE status of Seller or any subcontractor utilized by Seller; (ii) Seller will strive to comply in good faith with any MBE/WBE/DVBE utilization goals established pursuant to a Participation Plan; (iii) Seller's will cooperate in any investigation conducted by Nortel Networks, or by Nortel Networks' agent, to determine Seller's compliance with this section.

**C.  DEFINITIONS**

1.   **"Minority and Women Business Enterprises (MBEs/WBEs)"** means businesses are certified as MBEs/WBEs by a certifying agency recognized by Nortel Networks that satisfy the following requirements. MBEs/WBEs must be at least 51% owned by a minority individual or group or by one or more women (for publicly-held businesses, at least 51% of the stock must be owned by one or more of those individuals), and the MBEs/WBEs' management and daily business operations must be controlled by one or more of those individuals, and these individuals must be either U.S. citizens or legal aliens with permanent residence status. For the purpose of this definition, minority group members include male or female Asian Americans, Black Americans, Filipino Americans, Hispanic Americans, Native Americans (i.e., American Indians, Eskimos, Aleuts and Native Hawaiians), Polynesian Americans, and multi-ethnic (i.e., any combination of MBEs and WBEs where no one specific group has a 51% ownership and control of the business, but when aggregated, the ownership and control combination meets or exceeds the 51% rule).  "Control" in this context means exercising the power to make policy decisions.  "Operate" in this context means actively involved in the day-to-day management of the business and not merely acting as officers or directors.

2.     **"Disabled Veteran Business Enterprises (DVBEs)"** means a business concern certified as a DVBE by a certifying agency recognized by Nortel Networks that satisfy the requirements below that satisfy the following requirements:  (1) a sole proprietorship at least 51% owned by one or more disabled veterans; or (2) a publicly-owned business in which at least 51% of the stock is owned by one or more disabled veterans; or (3) a subsidiary which is wholly owned by a parent corporation, but only if at least 51% of the voting stock of the parent corporation is owned by one or more disabled veterans; or (4) a joint venture in which at least 51% of the joint venture's management and control and earnings are held by one or more disabled veterans.  In each case, the management and control of the daily business operations must be by one or more disabled veterans.  A disabled veteran is a veteran of the military, naval or air service of the United States with a service-connected disability. "Management and control" in this context means exercising the power to make policy decisions and actively involved in the day-to-day management of the business and not merely acting as officers or directors.

**D.  CHARGES**

If the parties mutually agree to use a Diversity Supplier to provide a portion of the Material or Services on a job, and such Diversity Supplier contracts with Seller to engineer and/or install a portion of such job, Seller agrees that Nortel Networks shall be charged only one (1) engineering and/or installation start-up fee as applicable.

*********************************

**M/WBE-DVBE Forms**

Nortel Networks Agreement No. _____

PRIME SUPPLIER
MBE/WBE/DVBE PARTICIPATION PLAN

PRIME SUPPLIER NAME: _____
ADDRESS: ____
TELEPHONE NUMBER: _____

DESCRIBE GOODS OR SERVICES BEING PROVIDED UNDER THIS AGREEMENT:
_____

DESCRIBE YOUR M/WBE-DVBE OR SUPPLIER DIVERSITY PROGRAM AND THE PERSONNEL DEDICATED TO THAT PROGRAM:
_____
_____
_____

*THE FOLLOWING, TOGETHER WITH ANY ATTACHMENTS IS SUBMITTED AS AN MBE/WBE/DVBE PARTICIPATION PLAN.*

1.    **GOALS**

    A.    **WHAT ARE YOUR MBE/WBE/DVBE PARTICIPATION GOALS?**

MINORITY BUSINESS ENTERPRISES (MBEs)    _____%
WOMEN BUSINESS ENTERPRISES (WBEs)    _____%
DISABLED VETERANS BUSINESS    _____%
ENTERPRISES (DVBEs)

    **B.    WHAT IS THE ESTIMATED ANNUAL VALUE OF THIS CONTRACT WITH NORTEL NETWORKS?** _____
*Note: Indicate dollar award(s) as it applies to this contract .*

C.    **WHAT ARE THE DOLLAR AMOUNTS OF YOUR PROJECTED MBE/WBE/DVBE PURCHASES?**

MINORITY BUSINESS ENTERPRISES (MBEs)    _____
WOMEN BUSINESS ENTERPRISES (WBEs)    _____
DISABLED VETERANS BUSINESS    _____
ENTERPRISES (DVBEs)

**\*SEE MBE/WBE/DVBE CANCELLATION CLAUSE IN AGREEMENT FOR DEFINITIONS OF MBE, WBE, AND DVBE\***

2.    **LIST THE PRINCIPAL GOODS AND/OR SERVICES TO BE SUBCONTRACTED TO MBE/WBE/DVBEs OR DELIVERED THROUGH MBE/WBE/DVBE VALUE ADDED RESELLERS.**
_____
_____
_____

DETAILED PLAN FOR USE OF M/WBEs-DVBEs AS SUBCONTRACTORS, DISTRIBUTORS, VALUE ADDED RESELLERS

**For every product and service you intend to use, provide the following information:**
**(Attach additional sheets if necessary)**

Nortel Networks Agreement No. _____

| Company name | Classification (MBE/WBE/DVBE) | Products/Services to be provided | $ Value | Date to Begin |
|---|---|---|---|---|
|  |  |  |  |  |

| Product Family | CPC | Engcode | Supplier part number | Specification | Standard-Non-Standard Product | Second Source License | Retest Eligible | 1H04 Price | 1H04 Allocation | 2H04 | 1H05 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Budgetary Pricing | |
| Discrete TX/RX | A0886171 | A0886171 | SDT8008-TC-QN | NPS25268 +SDT8008-TC-QN | s | y | 80% | $140.00 | 100% | $129.00 | $125.00 |
| Discrete TX/RX | A0864598 | A0864598 | SDT8028-TC-QN | NPS25268 +SDT8028-TC-QN | s | y | 80% | $98.00 | 100% | $87.00 | $85.00 |
| Discrete TX/RX | A0880468 | A0880468 | SDT8490-RC-QN | NPS25268 +SDT8490-RC-QN | s | y | 80% | $120.00 | 100% | $105.00 | $100.00 |
| Discrete TX/RX | A0864537 | A0864537 | SDT8408-RC-QN | NPS25268 +SDT8408-RC-QN | s | y | 80% | $120.00 | 100% | $105.00 | $100.00 |
| Transceiver | A0893592 | A0893592 | SCM6392-GL-DN | NPS25303 | n+ | y | 80% | $285.00 | 100% | $248.00 | $243.00 |
| Transceiver | A0832710 | QFTR0045-2A | SCM6328-GL-CN | NPS25303 | s | y | 80% | $160.00 | 100% | $142.00 | $142.00 |
| Transceiver | A0898467 | A0898467 | SCM6296-GL-ZN | NPS25303 | n+ | y | 80% | $57.50 | 50% | $57.50 | $55.00 |
| Transceiver | A0894020 | A0894020 | SCM7302-XC-WN | NPS25303 | n+ | y | 80% | $112.50 | 100% | $110.00 | $105.00 |
| Transceiver | A0996323 | A0996323 | SCM6392-GL-DW | NPS25303 | n+ | y | 80% | $302.50 | 100% | $270.00 | $265.00 |
| Transceiver | A0996311 | A0996311 | SCM6393-GL-DW | NPS25303 | n+ | y | 80% | $165.00 | 0% | $57.50 | $55.00 |
| Transceiver | A0505981 | NTTP02CD | SCP6801-N1-AWE | NPS25303-1 | n+ | y | 80% | $65.00 | 100% | $65.00 | $60.00 |
| Transceiver | A0505989 | NTTP02ED | SCP6811-N1-AWE | NPS25303-1 | n+ | y | 80% | $100.00 | 100% | $95.00 | $88.00 |
| Transceiver | A0513256 | NTTP01CF | SCP6844-N1-AUE | NPS25303-1 | n+ | y | 80% | $75.00 | 100% | $70.00 | $65.00 |
| Transceiver | A0513270 | NTTP02FF | SCP6861-N1-AUE | NPS25303-1 | n+ | y | 80% | $196.00 | 100% | $190.00 | $190.00 |
| Transceiver | A0513282 | NTTP03CF | SCP6808-N1-AUE | NPS25303-1 | n+ | y | 80% | $250.00 | 40% | $240.00 | $220.00 |
| Transceiver | A0513300 | NTTP03FF | SCP6878-N1-AUE | NPS25303-1 | n+ | y | 80% | $695.00 | 100% | $635.00 | $600.00 |
| Transceiver | A0513318 | NTTP04CF | SCP6802-N2-AUE | NPS25303-1 | n+ | y | 80% | $77.50 | 40% | $75.00 | $70.00 |
| Transceiver | A0520829 | NTTP05FF | SCP6862-N1-AUE | NPS25303-1 | n+ | y | 80% | $230.00 | 100% | $230.00 | $228.00 |
| Transceiver | A0538264 | A0538264 | SCM6628-GL-ZWA | NPS25303 | n+ | y | 80% | $83.00 | 60% | $80.00 | $78.00 |
| Transceiver | A0538265 | A0538265 | SCM6628A-GL-ZWA | NPS25303 | n+ | y | 80% | $206.00 | 100% | $200.00 | $190.00 |
| Transceiver | A0538272 | A0538272 | SCM6828D-GL-ZWA | NPS25303 | n+ | y | 80% | $486.00 | 100% | $450.00 | $428.00 |
| Transceiver | A0538273 | A0538273 | SCM6202-GL-ZWA | NPS25303 | s | y | 80% | $75.00 | 100% | $70.00 | $67.00 |
| Transceiver | A0538290 | A0538290 | SCM6286-GL-ZWA | NPS25303 | n+ | y | 80% | $89.00 | 60% | $85.00 | $83.00 |
| Transceiver | A0538291 | A0538291 | SCM6287-GL-ZWA | NPS25303 | n+ | y | 80% | $68.00 | 60% | $65.00 | $63.00 |

**Control Log:**
Approved by:
(Sales & SRM)    ExceLight         Nortel
Date approved:    *Feb 10, 04*        *Feb 10/04*
Media format:    *Paper*          *Paper*

| Product Family | CPC | Engcode | Supplier part number | Specification | Standard-Non-Standard Product | Second Source License | Retest Eligible | 1H04 Price | 1H04 Allocation | 2H04 | 1H05 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Parts Requiring Acceptance: Allocation will be Determined and Effective upon Acceptance.** | | | | | | | | | | |
| Transceiver | A0825377 | | SCM6102-XL-W (GL-DW) | NPS25303 | s | y | 80% | $90.00 | 100% | $80.00 | $78.00 |
| Transceiver | A0513252 | NTTP01AF | SCP6954-N2-CUE | NPS25303-1 | n+ | y | 80% | $35.00 | 0% | $35.00 | $30.00 |
| Transceiver | A0513262 | NTTP02BF | SCP6821-N1-AUE | NPS25303-1 | n+ | y | 80% | $65.00 | 0% | $65.00 | $60.00 |
| Transceiver | A0513264 | NTTP02CF | SCP6801-N1-AUE | NPS25303-1 | n+ | y | 80% | $65.00 | 0% | $65.00 | $60.00 |
| Transceiver | A0513268 | NTTP02EF | SCP6811-N1-AUE | NPS25303-1 | n+ | y | 80% | $100.00 | 0% | $95.00 | $88.00 |
| Transceiver | A0513276 | NTTP03BF | SCP6828-N1-AUE | NPS25303-1 | n+ | y | 80% | $141.00 | 0% | $130.00 | $125.00 |
| Transceiver | A0520805 | NTTP05BF | SCP6822-N1-AUE | NPS25303-1 | n+ | y | 80% | $139.00 | 0% | $139.00 | $130.00 |
| Transceiver | A0520842 | NTTP51AA | WILL ADVISE | NPS25303-1 | | | | $43.00 | 0% | $0.00 | $35.00 |
| Transceiver | A0520849 | NTTP51BD | WILL ADVISE | NPS25303-1 | | | | $88.00 | 0% | $0.00 | $75.00 |
| Transceiver | A0536621 | | SCM6201-JL-DN | NPS25303+TS-S00D006G rev May, 2002 | s | | 80% | $54.00 | 0% | $50.00 | $50.00 |
| Transceiver | A0536825 | 215917-A | WILL ADVISE | TBD | | | | $70.00 | 0% | $70.00 | $70.00 |
| Transceiver | A0642414 | | SDM7101-XC | NPS25303 + NPS25268-67 | s | y | 80% | $66.00 | 0% | $63.00 | $63.00 |
| Transceiver | A0768001 | | SCM7101-XC-W | NPS25303 + TS-S98D003A rev May 1998 | s | | 80% | $70.00 | 0% | $67.00 | $67.00 |
| Transceiver | A0793311 | | SDM7112-XC | NPS25303 + TS-S98D044A rev Mar/99 | s | | 80% | $122.00 | 0% | $113.00 | $113.00 |
| Transceiver | A0854404 | | SCM6101-GL-CW | NPS25303 | s | y | 80% | $85.00 | 0% | $82.00 | $80.00 |
| Transceiver | A0859254 | | SDM 7104-XC | NPS25303 | s | y | 80% | $76.00 | 0% | $72.00 | $65.00 |

In the event that the parties have not included a Product in the Second Source License column, then Nortel Networks will have the right to so designate the Products upon verbal notice to Seller, and such notice will be valid until the parties agree otherwise in writing in an updated version of Exhibit A.