```
                  IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE DISTRICT OF DELAWARE


IN RE:                        )    Case No. 09-10138-KG
                              )    (Jointly Administered)
                              )
NORTEL NETWORKS INC., et al., )    Chapter 11
                              )
                              )    Courtroom 3
                              )    824 Market Street
          Debtors.           )    Wilmington, Delaware
                              )
                              )    February 5, 2009
                              )    10:34 a.m.



                    TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE KEVIN GROSS
                 UNITED STATES BANKRUPTCY JUDGE



APPEARANCES:

For Debtors:               Morris Nichols Arsht & Tunnell LLP
                           BY: THOMAS F. DRISCOLL, III, ESQ.
                               JANE KIM, ESQ.
                           1201 North Market Street
                           Wilmington, DE  19801
                           (302) 658-9200

                           Cleary Gottlieb Steen & Hamilton
                           LLP
                           BY: JAMES L. BROMLEY, ESQ.
                               CRAIG BROD, ESQ.
                           One Liberty Plaza
                           New York, NY  10006
                           (212) 225-2000

For U.S. Trustee:          Office of the United States Trustee
                           BY: PATRICK TINKER, ESQ.
                           844 N. King Street, Room 2207
                           Lockbox #35
                           Wilmington, DE  19899-0035
                           (302) 573-6491

ECRO:                      JENNIFER PASIERB

Transcription Service:     DIAZ DATA SERVICES
                           331 Schuylkill Street
                           Harrisburg, Pennsylvania 17110
                           (717) 233-6664


Proceedings recorded by electronic sound recording;
transcript produced by transcription service
```

```
 1   APPEARANCES:
     (Continued)
 2
     For Committee:               Akin Gump Strauss Hauer & Feld
 3                                LLP
                                  BY: FRED S. HODARA, ESQ.
 4                                    RYAN C. JACOBS, ESQ.
                                  One Bryant Park
 5                                New York, NY  10036
                                  (212) 872-1000
 6
     Official Committee of        Richards, Layton & Finger,
 7   Unsecured Creditors of       P.A.
     Nortel Networks Inc., et al.: BY: CHRISTOPHER M. SAMIS, ESQ.
 8                                920 N. King Street
                                  One Rodney Square
 9                                Wilmington, DE  19801
                                  (302) 651-7700
10
     For Verizon Communications,  Smith, Katzenstein & Furlow
11   Inc.:                        LLP
                                  BY: KATHLEEN M. MILLER, ESQ.
12                                The Corporate Plaza
                                  800 Delaware Avenue, Ste. 1000
13                                P.O. Box 410
                                  Wilmington, DE  19899
14                                (302) 652-8400

15   Foreign Representative:
     Allen & Overy LLP            Buchanan Ingersoll & Rooney PC
16   Ernst & Young                BY: MARY CALOWAY, ESQ.
                                      LISA KRANDIN, ESQ.
17                                1000 West Street, Suite 1410
                                  Wilmington, DE  19801
18
     TELEPHONIC APPEARANCE:
19
     For FlexTronics:             Curtis, Mallet-Prevost, Colt &
20                                Mosle LLP
                                  BY: JAMES DREW, ESQ.
21                                101 Park Avenue
                                  New York, NY  10178-0061
22
     For Credit Swiss:            Credit Suisse First Boston
23                                BY: BRYAN M. SIMPSON, ESQ.

24   For Tata Consulting Services: Kelley Drye & Warren, LLP
                                  BY: HOWARD S. STEEL, ESQ.
25                                101 Park Avenue
                                  New York, NY  10178
```

```
 1   APPEARANCES:
     (Continued)
 2
     For Verizon Communications,    Arnall, Golden & Gregory, LLP
 3   Inc.:                          BY: DARRYL LADDIN, ESQ.
                                    171 17th Street, Suite 2100
 4                                  Atlanta, GA  30363

 5   For Silver Lake:               Ropes & Gray LLP
                                    BY: MARK BANE, ESQ.
 6   For Silver Lake, et al.:       BY: ANNELLESE H. PAK, ESQ.
                                    1211 Avenue of the Americas
 7                                  New York, NY  10036

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   WILMINGTON, DELAWARE, THURS., FEBRUARY 5, 2009, 10:10 A.M.

2          THE COURT:  Good morning, everyone.  Please be

3   seated, and thank you.  Welcome.  We have appropriate

4   Canadian weather here this morning.  And I'd also just like

5   to comment that we have two distinguished visitors from

6   Japan this morning, Mr. Kamichi [ph] and Mr. Kazutashi [ph].

7   Welcome to you both.  Good morning.

8        Good morning, Mr. Driscoll.

9          MR. DRISCOLL:  Good morning, Your Honor.  For the

10  record, Tom Driscoll from Morris, Nichols, Arsht & Tunnell

11  on behalf of the Debtors.  With me at counsel table today is

12  James Bromley, Jane Kim, and Craig Brod from Cleary

13  Gottlieb.

14          THE COURT:  Welcome back.

15          MR. DRISCOLL:  Your Honor, I'd like to start

16  things off by thanking you for entering orders in the

17  matters for which we had submitted CNOs.

18          THE COURT:  Yes.

19          MR. DRISCOLL:  Particularly, there are tension

20  applications from Morris, Nichols, & Cleary.  Thank you.

21          THE COURT:  It's a relief, I'm sure.

22          MR. DRISCOLL:  I -- yes, it certainly is, Your

23  Honor.

24        One other matter before I turn things over to Mr.

25  Bromley, on the agenda, there's actually a typo.  We have a

1  stray number eight.  It's falling in the middle of the page.

2          THE COURT:  We noticed.

3          MR. DRISCOLL:  I believe your chambers had

4  contacted us this morning right about the same time as I

5  noticed myself.

6          THE COURT:  Okay.

7          MR. DRISCOLL:  So, that number, I guess, we can

8  just skip today.

9          THE COURT:  Okay.

10          MR. DRISCOLL:  But if we can turn things over to

11  Mr. Bromley.

12          THE COURT:  Thank you very much, Mr. Driscoll.

13          MR. DRISCOLL:  Thank you, Your Honor.

14          THE COURT:  Good morning, Mr. Bromley.

15          MR. BROMLEY:  Good morning, Your Honor.  James

16  Bromley, Cleary Gottlieb on behalf of the Debtors.  Thank

17  you, Your Honor, for having us this morning.

18      I thought I would start off with a little bit of a

19  summary of where we've been, since this is our first omnibus

20  hearing --

21          THE COURT:  Yes.

22          MR. BROMLEY:  -- and to welcome some of our new

23  participants to these proceedings.

24      As you know, Your Honor, we filed for Chapter 11 in

25  January, on the 14th, and commenced proceedings as well in

1  the United Kingdom and in Canada on the same day.  We had

2  our first hearing on the 15th, the next day.  So, it's been

3  three weeks since we've first come to your court, and I

4  think it's worthwhile to give you a little bit of an update.

5         THE COURT:  That would be helpful.  Thank you,

6  Mr. Bromley.

7         MR. BROMLEY:  Since the filing, I think things

8  have gone quite well, overall.  The business has stabilized.

9  Relationships with suppliers and customers, we believe, are

10  in good order, considering the circumstances that the

11  company finds itself in.  that's not to say we haven't had a

12  large number of conversations with suppliers and customers,

13  many of which have been spirited at times, as you might

14  imagine, but overall, I think that the company's working

15  quite well both with suppliers and customers, and that --

16  those relationships, we believe, have stabilized.  That's

17  not to say that we may not need to come back and ask for

18  your intervention at times, but at the moment, I think, Your

19  Honor, we're quite good in that regard.  And one of the

20  matters that's on today does help clarify certain issues

21  with respect to our customers, and that will certainly go a

22  long way on that front.

23      In terms of the process that the Chapter 11

24  proceedings and, indeed, the other proceedings around the

25  world impose on us, we have been spending a lot of time,

1  over the past couple of weeks, working to establish

2  relationships, working relationships with the various

3  interested parties.  As you know, Your Honor, an official

4  committee was appointed on the 22nd --

5              THE COURT:  Yes.

6              MR. BROMLEY:  -- and Mr. Hodara and Mr. Jacobs'

7  firm have --

8              THE COURT:  Good morning.

9              MR. BROMLEY:  -- been selected as proposed

10  counsel.  We have met with them twice: once on a lawyer's

11  basis; and then yesterday, we were all up in Toronto for a

12  very large meeting where we had the financial advisors, the

13  proposed financial advisors, receive a presentation from

14  management.

15      We also have reached out to the ad hoc committee of

16  bondholders, who appeared on the First Day at Terminal Bank

17  Tweed, and we have engaged them as well.  They were invited

18  to that meeting yesterday in Toronto, so we'd have

19  confidentiality arrangements in place with the ad hoc

20  committee as well as the official committee.  And we hope

21  that they feel as good about the meeting that we had

22  yesterday as we did, which is to open the lines of

23  communication and help provide all of us with a transparent

24  opportunity to understand the issues the business faces and

25  to make sure that we're all working together to solve those

1 issues.

2      At that meeting as well, we established a number of

3 working groups to deal with specific issues, and we

4 anticipate that those working groups will be getting

5 together, starting next week, to try and make sure that we

6 have resolution on as many issues as possible.  It is

7 certainly our goal, Your Honor, to try to deal with as many

8 of the issues and controversies that we may have outside of

9 your presence so that we don't need to burden you with

10 anything other than the most important issues.

11      That leads me to a couple of points, Your Honor.  One

12 thing that we have adjourned from the hearing today, which

13 was a big subject discussed on the First Day, is the Cash

14 Management Motion.

15           THE COURT:  Yes.

16           MR. BROMLEY:  That was approved, as you recall,

17 Your Honor, on an interim basis with respect to the $75

18 million -- well $200 million post-petition loan that we've

19 proposed between the North American entities from NNI,

20 Nortel Networks, Incorporated, the U.S.-operating company,

21 to Nortel Networks, Limited, the Canadian-operating company.

22 It was approved on an interim basis for $75 million of the

23 200 million and a limitation on the use of that 75 so that

24 none of the money would go outside of the North American

25 entities.  And indeed, Your Honor, I can report that of the

1   75 million that was available, the entire amount has been

2   drawn down by NNL and that none of those funds have been

3   used for any funding of entities outside of North America.

4                  THE COURT:  Okay.

5                  MR. BROMLEY:  With respect to the general

6   operation of the business under the Cash Management Motion,

7   that has continued, and so there is trading between North

8   America and Europe as well as between the United States and

9   Canada.  The -- among other things we did mention on the

10  First Day, Your Honor, that there was a resolution of issues

11  with respect to FlexTronics, the largest --

12                 THE COURT:  Yes.

13                 MR. BROMLEY:  -- supplier, and that had been

14  approved by the court in Canada with respect to FlexTronics

15  that that relationship continues to remain stable.  The

16  funds that were -- have been paid to FlexTronics so far, I

17  think there's 75 million of the 120 million of which I think

18  40 million has been allocated to the United States and been

19  paid by the United States.

20      The other issue, Your Honor -- so I think with respect

21  to cash management, where we are is the Committee does have

22  some issues that they've raised with us, issues that we

23  believe are informational and certainly legitimate, given

24  the fact that the Committee's been appointed relatively

25  recently.  The cash position in Canada is stable, and so, on

1  that basis, Your Honor, we have agreed to adjourn the

2  hearing from today's date to the next Omnibus Hearing date,

3  which is the 19th.  And in between today and the 19th, it is

4  our hope that we'll be able to sit down both with the

5  official committee and the ad hoc committee and resolve any

6  issues that they may have.

7          THE COURT:  Okay.  And in a case of this size and

8  importance, the fact that I really have not been called upon

9  often to entertain any matters of an urgent nature, I think,

10  is a testament to counsels' hard work and cooperation with

11  one another.

12          MR. BROMLEY:  Thank you, Your Honor.  We're

13  certainly going to continue in that vein.

14      We will have a hearing in Canada before the 19th.

15  There's one scheduled for the 10th.  And that is the

16  extension of the stay.  As you may recall, Your Honor, we

17  did mention that under the CCAA, the stay is not automatic

18  and is meted out in small bites, and so the first period is

19  a 30-day period.  And the next hearing is on the 10th, and

20  there will be a request, at that point, to extend it for

21  another three months.

22          THE COURT:  Okay.

23          MR. BROMLEY:  And so that hearing will be held on

24  the 10th.

25      Another issue, Your Honor, that we will be bringing

1  before you, and we have discussed with the Committee as

2  well, is the -- a proposal of a key employee incentive plan.

3  We do not have anything ready to file yet, but we will, with

4  Your Honor's permission, file something that we hope for

5  hearing on the omnibus date of the 5th of March, we believe.

6  Certainly, in the meantime, we are going to be sitting down

7  and talking with the Committee about that.  one of the

8  issues, we'll just, you know, put it on the table, which we

9  did with the Committee is that because of the three

10 jurisdictions, there are employees in the United Kingdom,

11 for instance, who will be dealt with under U.K. law;

12 employees in Canada dealt with Canadian law; and for our

13 U.S. employees, dealt with U.S. law.  I should say that

14 given our respect for due process and transparency, our

15 process is the longest --

16           THE COURT:  Yes.

17           MR. BROMLEY:  -- lead time, which presents some

18 issues, but nevertheless, Your Honor, we're working through

19 them.  So -- and it is our intention to meet with the

20 Committee's advisors early next week to talk to them about

21 that.  And at the same time, the company is, as we mentioned

22 in our First Day Hearings, going to put in place the annual

23 incentive program, which is part of the normal course

24 incentive -- I mean, compensation program that they've had

25 every year.  And that is what will happen in the ordinary

1  course.

2      That, Your Honor, I think, sort of summarizes where we

3  stand.  We, like I said, have worked hard to try to set up a

4  process that will be as cooperative as possible, and so far,

5  I think that, you know, that has -- the sprit has been

6  reciprocal in terms of the cooperation and conversations

7  that we've had with both the official committee and the ad

8  hoc committee.

9          THE COURT:  Excellent.

10         MR. BROMLEY:  Your Honor, with respect to the

11  calendar, I would like to then just -- if I could, I'm happy

12  to give Mr. Hodara an opportunity to introduce himself to

13  the Court and say anything he would like --

14         THE COURT:  That's right.  I don't think Mr.

15  Hodara spoke at the last hearing.  Mr. Hodara, good to see

16  you again, sir, and welcome.

17         MR. HODARA:  Thank you, Your Honor.  Thank you

18  very much.  And I won't take a lot of the Court's time, but

19  with that offer to step to the podium, I do want to say --

20  reintroduce myself and say --

21         THE COURT:  Yes.

22         MR. HODARA:  -- how pleased we are to be back

23  here on this case.

24      And as long as I'm in that vein, let me say that the

25  meeting in Toronto that Mr. Bromley referred to was, in

1  fact, a very, very constructive meeting.  Management spent a

2  lot of time, obviously, preparing for it and presenting on a

3  huge range of critical issues in the case, and they,

4  themselves, at least four times, used the word transparency,

5  and that's going to be critical --

6            THE COURT:  Sure.

7            MR. HODARA:  -- and they certainly got off on the

8  right foot with respect to that.  And so with that, I'll

9  turn it back so we can move on.

10            THE COURT:  All right.  Thank you, Mr. Hodara.

11            MR. BROMLEY:  Your Honor, I just --

12            THE COURT:  We have plenty of time, Mr. Bromley,

13  so don't feel rushed at all at this hearing.

14            MR. BROMLEY:  Thank you very much, Your Honor.

15  We have a number of matters on, and as I think you've

16  probably heard enough from me for now, I would like to

17  introduce my colleague, who hasn't spoken to you yet, Jane

18  Kim, who's going to handle most of the matters.  There's one

19  thing I'll come back on at the very end.

20            THE COURT:  Okay.

21            MR. BROMLEY:  But if I could turn over the podium

22  to Jane.

23            THE COURT:  It's a pleasure.  Thank you, Mr.

24  Bromley.

25        Ms. Kim, welcome to you, and good morning.

1          MS. KIM:  Good morning, Your Honor.  Jane Kim

2    from Cleary Gottlieb on behalf of the Debtors.

3          Your Honor, the first matter that I would like to

4    present to you is the -- for final approval of the Training

5    Restrictions Motion --

6          THE COURT:  Yes.

7          MS. KIM:  -- which basically seeks final approval

8    of the training restrictions that Your Honor set forth in

9    the Interim Order.  There have been no objections to this

10   Motion.  The notices that were required in the Interim Order

11   were sent out, as part of the procedures set forth in that

12   Interim Order.  And the Debtors would respectfully request

13   that Your Honor grant the Final Order as necessary to

14   protect the Debtors' valuable tax assets.

15         There was no Final Order that was attached to the

16   Motion, so we do have a Final Order, which is essentially

17   the same as the Interim Order but removes references to the

18   Order as being interim and also takes out the notice

19   provisions with respect to the notice of the Interim Order,

20   and so --

21         THE COURT:  Yes.

22         MS. KIM:  -- we have a black line that we will

23   also hand up later.

24         THE COURT:  Okay.  Thank you, Ms. Kim.  Does

25   anyone wish to be heard on this matter?  I -- as I said at

1   the hearing at -- in which I entered the Interim Order, this

2   is clearly necessary and appropriate to protect the tax

3   benefits for the estate, and it's in the best interest of

4   the estate, and I will be pleased to enter the Order.

5           MS. KIM:  Thank you, Your Honor.

6       The second Motion that we'd like to present is the

7   Motion to clarify the customer obligations Order that Your

8   Honor entered after the First Day Hearing.

9           THE COURT:  Yes.

10          MS. KIM:  At the First Day Hearing, Ms.

11  Schweitzer had presented the customer obligations Motion and

12  had made clear that while there were four specific types of

13  programs that were delineated in the Motion, that the

14  Debtors were actually seeking approval for all of the

15  customer pre-petition obligations.  And this Court, through

16  Your Honor's statements at the hearing, made clear that you

17  recognized and understood the scope of the Debtors' request.

18      Since that date, however, some customers of the

19  Debtors have come back to the Debtors and sought comfort

20  with respect to the scope of the Order and the ability of

21  the Debtors to be able to perform and honor its existing

22  obligations and future obligations to their customers, and

23  -- which is why we filed the Motion that is before Your

24  Honor today.

25      Obviously, customers are the lifeblood of the Debtors

1   businesses, and maintaining customer confidence is crucial

2   to be able to support that lifeblood.  And while this

3   Court's statements at the First Day Hearing demonstrated

4   that Your Honor understands and appreciates that importance,

5   we wanted to make sure that the Order clarified that the

6   scope of Your Honor's authorization of the Debtors.  So,

7   recognizing that certain but not all of the customer

8   programs that the Debtors offered to their customers were

9   specifically highlighted in the original Motion, the Debtors

10  believed that it was important to seek an Order that

11  clarified the scope of the Debtors -- of the Court's first

12  Order.

13       The -- it's important to note there -- that the

14  programs that are in that Motion, in the current Motion, are

15  all industry-standard programs and incentives and are

16  offered and are part of most, if not all, of the Debtors'

17  relationships with its significant customers.  So, these are

18  not special programs, one-off programs or a one-off

19  obligation.

20       Pamela Haintrader [ph], who is the finance leader for

21  the Debtors' North American Carrier Sales Group, submitted a

22  declaration with the Motion that --

23            THE COURT:  Yes.

24            MS. KIM:  -- describes these programs, and Ms.

25  Haintrader is in Court today, if she is needed to testify.

1           THE COURT:  Okay.

2           MS. KIM:  In addition, in the Motion, the Debtors

3   had given amounts with respect to amounts outstanding as of

4   December 31, 2008 for the carrier business, but it also said

5   that there are -- that some of these programs are also

6   available to customers in the Enterprise business.  And

7   today, I have a certain amount for those programs, as they

8   relate to the Enterprise business as well, if you're -- if

9   that would be helpful to Your Honor.

10           THE COURT:  It would.

11           MS. KIM:  And at the outside, I would just note

12   that, for the most part, these amounts are smaller for the

13   Enterprise business than they are for the Carrier business.

14   And so those that aren't smaller were, for the most part,

15   included in the numbers that were disclosed in the First Day

16   Motion.

17       So, I just have a list here that I'll go through

18   pretty quickly.  The customer credits arrangements --

19           THE COURT:  Yes.

20           MS. KIM:  -- in the Motion, we had talked about

21   that, for the Carrier business, there was $82 million

22   outstanding as of December 31, 2008.  For the Enterprise

23   business, there's about $100,000.  Training credits, which

24   were -- which are essentially credits to allow the

25   customers, employees to be trained in the Debtors' product.

1  There was $14 million for the Carrier business outstanding

2  as of December 31.  There's $1.5 million for the Enterprise

3  business.

4       The performance compensation payments, or liquidated

5  damages, which are essentially payments that are made when

6  there is an outage or some other issue with respect to the

7  -- Nortel's Networks, there was $18 million outstanding as

8  of December 31, 2008 for the Carrier business.  For

9  Enterprise, that's $600,000.

10       Free trial equipment and services that the company

11  offers to customers, there was $9 million for the Carrier

12  business.  For the Enterprise business, there was $2 million

13  outstanding as of December 31.

14       For the co-marketing agreements, and this is one

15  where, for the Enterprise business, the -- there was a

16  number in the First Day Motion that talked about $83 million

17  for marketing efforts, and part of that $83 million is $32.5

18  million for the Enterprise business, and there was $3

19  million disclosed in the clarification Motion for the --

20            THE COURT:  Yes.

21            MS. KIM:  -- Carrier business.

22            THE COURT:  Yes.  Thank you.

23            MS. KIM:  And finally, with respect to return

24  rights, there was $1 million for the Carrier business as of

25  December 31, 2008, and there's $14 million for the

1  Enterprise business, and these are the rights for the

2  customer to be able to return products, for any given

3  reason.

4          THE COURT:  Which as far as size is concerned, is

5  the reverse of the other --

6          MS. KIM:  Exactly, the only one that's the --

7          THE COURT:  -- programs.

8          MS. KIM:  -- reverse of that.

9          THE COURT:  Okay.

10          MS. KIM:  There have been no objections filed

11  with respect to this Motion, and because of the importance

12  of the customer relationships and maintaining customer

13  confidence, the Debtors would respectfully request that Your

14  Honor grant this Clarification Motion.

15          THE COURT:  Thank you, Ms. Kim.  Does anyone wish

16  to be heard?

17          MR. LADDIN:  Your Honor, this is Darryl Laddin on

18  behalf of the authorities of Verizon Communications, Inc.

19          THE COURT:  Yes, Mr. Laddin.  Good morning.

20          MR. LADDIN:  Good morning, Your Honor.  Verizon

21  is a very large customer of the Debtors and supports this

22  Motion.  We were in close contact with the Debtors with

23  respect to this Motion.  We had discussions with them

24  concerning the form of the Order, and they have agreed to

25  make a representation on the record that I would ask that

1  they make, specifically the Proposed Order states that "The

2  Debtors are authorized to honor and perform in their sole

3  discretion all customer obligations, including through all

4  customer programs."  We had asked that the Debtors

5  represent, with respect to Verizon, that they will honor

6  their customer obligations.  And I would ask that the

7  Debtors confirm that on the record, please.

8           THE COURT:  Ms. Miller, I assume you're here on

9  the same concern?

10          MS. MILLER:  Yes, Your Honor.  Mr. Laddin was

11 handling it.

12          THE COURT:  Okay.  Thank you.  Ms. Kim?

13          MS. KIM:  Yes, and the Debtors will confirm that,

14 with respect to Verizon, the Debtors will perform their

15 customer obligations.

16          THE COURT:  Okay.  Thank you.  Mr. Laddin, I

17 assume that's sufficient?

18          MR. LADDIN:  Yes, it is.  Thank you, Your Honor.

19          THE COURT:  Certainly.  Well, I am certainly

20 prepared to approve this Motion.  First of all, I didn't

21 give the Committee an opportunity.  I'm sorry.

22          MR. JACOBS:  Ryan Jacobs, Your Honor.

23          THE COURT:  Mr. Jacobs, welcome back.

24          MR. JACOBS:  Thank you.  The Committee supports

25 the Motion.

1         THE COURT:  Okay.  Thank you.  I think it's clear

2 that it is necessary and appropriate and the best interest

3 of the estate -- of the estates, I should say, to approve

4 this Motion.  These are certainly -- as I'm looking at them

5 and as the affidavit made clear, these are industry-standard

6 programs, the absence of which would place the Debtors at a

7 disadvantage in the industry.  And it is very, very

8 significant and important at this early stage that customers

9 have the confidence in the Debtors going forward, which will

10 make it possible for the Debtors to reorganize.  So I am

11 pleased -- I will be pleased to sign the Order.

12         MS. KIM:  Thank you.  Thank you, Your Honor.

13 Thank you very much.

14     The next Motion that I will be presenting is the

15 2015.3 Extension Motion.  The new Rule 2015.3 and the

16 related Form 26 requires the filing of reports regarding the

17 value, operations, and profitability of entities in which

18 the Debtors hold a substantial or controlling interest --

19         THE COURT:  Yes.

20         MS. KIM:  -- and requires a variety of different

21 forms, including valuation estimates, financial statements,

22 balance sheets, and the like.  The Debtors have been

23 compiling a lot of information for a variety of purposes as

24 a result of the filings in the various jurisdictions, which

25 go beyond the consolidated reporting requirements that

1   Nortel historically has complied with and is intending to

2   continue to comply with.  And especially with respect to

3   these Forms 26, they are -- it is time-consuming to be able

4   to gather this information.  There are about 30 entities

5   that the Debtors right now know that they would need to, if

6   they were required to file these in the timeframe required,

7   to -- they would need to file approximately 30 entities --

8   reports with respect to approximately 30 entities.  And

9   moreover, as discussed in the Motion, with some of these

10  entities, for example, joint ventures that the Debtors have

11  some interest in as well as Nortel Government Solutions.

12       There are additional complications with respect to

13  compiling the type of information that's required in the

14  Form 26.  This -- in particular, with Nortel Government

15  Solutions, NGS, that is held through a proxy agreement,

16  because of the nature of the contracts that NGS has with the

17  Federal Government, and so information may be difficult, if

18  not impossible, to compile.  And therefore, while the

19  Debtors are working through the requirements and determining

20  what it -- they are able to put together, they would

21  respectfully request that we have until April 14 to be able

22  to either file those reports or come back to this Court to

23  seek further relief with respect to modify and waiving or

24  getting further protections.

25            THE COURT:  Okay, Ms. Kim.  Thank you.  Does

1  anyone wish to be heard?

2            MR. JACOBS:  The Committee has no objection to

3  the initial request.

4            THE COURT:  Thank you, Mr. Jacobs.  Mr. Tinker,

5  good morning.

6            MR. TINKER:  Good morning, Your Honor.  The U.S.

7  Trustee has no objection to the Motion.  I will just note

8  that the timing of it, in our view, is good in the sense

9  that the Debtors didn't file it as a First Day Motion,

10 because the obligation to file these documents doesn't arise

11 until five days before the 341 meeting.

12           THE COURT:  Yes.

13           MR. JACOBS:  But on the other hand, they're in

14 advance of five days before the 341 meeting, so it's good.

15 And so we appreciate the timings, and we have no objection

16 to the Motion.

17           THE COURT:  All right.  Thank you, Mr. Tinker.

18 Anyone else?  The Court has -- I have stated, on previous

19 occasions, I certainly appreciate the enormous effort that

20 is required in this case, and these filings clearly are

21 going to be difficult to assemble, and I will approve the

22 Motion.

23           MS. KIM:  Thank you very much, Your Honor.

24           THE COURT:  Grant the Motion.

25           MS. KIM:  The next Motion that I'll be presenting

1   is the Supplemental Motion with respect to some of the First

2   Day Orders that the Court entered.

3            THE COURT:  Yes.

4            MS. KIM:  This Motion relates to some of the

5   Orders that the Court entered on -- after the First Day

6   Hearing that permitted payments of some pre-petition

7   obligations.  Each of those Orders was important to the

8   Debtors' businesses and its efforts to reorganize and go

9   through this process.  The Motions that those Orders relate

10  to are -- the first one is the Common Carriers and

11  Warehousers Motion, which was important, because the payment

12  of those common carrier charges and warehouser fees would

13  prevent the common carriers and warehousers from exercising

14  possessory loans -- liens, excuse me, and was important to

15  prevent the disruption of the Debtors' flow of business --

16  of goods and their business operations.

17       The second Motion was the employee wage motion and the

18  payment -- the intention of that Motion was to be able to

19  pay the employees of the Debtors pre-petition compensation

20  and wages for their employees and their benefits and --

21  which was important to be able to maintain employee morale

22  and prevent those important employees from leaving the

23  Debtors' businesses.

24       The third Motion was the Taxes and Fees Motion, which

25  was important to get approval from the Court to be able to

1    prevent disruption, the imposition of penalties or personal

2    liability on the Debtors' directors and officers.

3        And the last Motion was the Foreign Vendors Motion,

4    which was actually not granted on the First Day, because we

5    didn't file it until after the First Day Hearing but was

6    granted shortly thereafter, I think actually the next day

7    after the First Day Hearing.

8            THE COURT:  That's right.

9            MS. KIM:  And related to the three foreign branch

10   offices that NNI has in Dubai, Cairo, and Tunis and was

11   important to be able to maintain the business operations in

12   those three branch offices.

13       The Debtors gave estimates in those First Day Motions

14   that were based on the best information that was available

15   at the time and caps were set in the Orders, according to

16   those estimates.  And since that day, additional obligations

17   have come to light, in part because of additional invoices

18   that the Debtors have received that relate to pre-petition

19   periods as well as other estimates that the Debtors have

20   been able to gather and obtain based on further invoices

21   that they expect to come in as well as other information.

22       I would -- most of those -- the -- those categories of

23   payment were already disclosed and discussed in the First

24   Day Motions and were part of the First Day Orders that the

25   Court entered.  There -- the only exception would be with

1    respect to the Employee Wage Motion.  There are a number of

2    categories of other compensation that was not -- that were

3    not specifically discussed in the First Day Motion, and I

4    thought it might be helpful just to quickly outlook --

5    outline those.

6              THE COURT:  Yes, please, Ms. Kim.

7              MS. KIM:  So, the sales incentive -- the sales

8    commissions was discussed specifically in the First Day

9    Motion, and the Debtors are only seeking -- are basically

10   seeking just to increase that cap, based on further

11   estimates that they've received since the First Day from $15

12   million to $19 million.  But -- and the categories that were

13   not discussed in the First Day Motion were the IP bonuses

14   and intellectual property bonuses, which are awards that are

15   given to incentivize employees to innovate, and once they

16   have innovated and invented something, to protect their

17   intellectual property by filing patents.

18        There is actually a typo in the Motion for the amounts

19   of those awards.  Page six of the Motion says that the fixed

20   monetary award for the first filing of the patent is

21   $13,500.  There is actually an extra zero there.  It's

22   actually $1,350.

23             THE COURT:  Okay.  Okay.

24             MS. KIM:  There are also -- and the cap that we

25   would request for those bonuses is $80,000.

1        The next category is a category of recognition awards,
2   which are basically small, monetary awards in the form of
3   gift certificates that the employees will -- that employees
4   receive for special value that they have given to the
5   company, and they are -- these are administered through a
6   third-party vendor, called Global Force.  And the employees
7   basically go to -- once they receive the gift certificate,
8   can go to the Global Force website and redeem gifts based on
9   those certificates.  Some of those certificates have not yet
10  been redeemed by the employees, and some have been redeemed
11  by the employees but have not yet been paid for by the
12  Debtors, so we would request a cap of $100,000 for that --
13  for those recognition awards.
14       The next category is based on some mistaken
15  withdrawals that were made from employees' paychecks at the
16  beginning of January.  There was a deferred compensation
17  plan that was in place that was suspended for 2009, and in
18  -- and before it was suspended, every paycheck, employees
19  who were participants in that plan, would have a portion of
20  their plan, according to their election, withheld from that
21  -- from their paychecks and put into that plan.  That plan
22  was suspended, as I said, in January of 2009, but through --
23  due to an administrative error, withdrawals were still made
24  from those employees' paychecks, and the -- because those
25  otherwise would have been wages and compensation that the

1    employees were entitled to, and because, with the exception

2    of one employee, who I'll discuss shortly, every other

3    employee, for the term of those wages and salaries that were

4    mistakenly withheld, would not put anybody over the $10,950

5    cap with respect to wages and salaries.  We believe that it

6    would be appropriate and necessary to return those monies to

7    the employees.  The one employee whose amounts would take

8    that employee over $10,950 is an inactive employee, who was

9    inactive as of -- before the date of the filing, and because

10   of the amount that would be owed otherwise to her, we are

11   not requesting that the Debtors be authorized to pay that

12   amount.

13        And the final category is something that was touched

14   upon in the First Day Motion, which is the tax equalization

15   payments, but were not specifically authorized in the

16   employee wage order that was entered on the First Day.  The

17   tax equalization payments are basically part of the

18   company's expat program in -- when the company sends expats

19   abroad, they -- in order to make sure that they are not

20   penalized in terms of the taxes that they have to file

21   because of their foreign assignment, the company promises

22   to, essentially, make them whole for any additional taxes

23   that they have to pay because of the higher tax rate, for

24   example, in the foreign country.  The -- because those

25   payments are not easily calculable until taxes are actually

1    -- tax returns are actually filed and taxes are actually

2    due, we -- what we did was, based on historical information

3    and the taxes that were paid in 2007, made an estimate that

4    $500,000 for the year 2008 outstanding tax payments would be

5    enough to cover the tax equalization payments that are owed

6    to employees for the pre-petition periods.  If that isn't

7    enough, then the Debtors will need to come back to the Court

8    to seek further relief.

9              THE COURT:  Certainly.

10             MS. KIM:  And on a related note, with respect to

11   the Taxes and Fees Motion, we specifically have asked for

12   increases in the caps for personal property taxes and

13   business and occupation taxes.  What we haven't asked for is

14   corporate income tax-related payments, and the reason for

15   that, again, is that those amounts are not calculable at

16   this time for the year 2008, and so the Debtors may need to

17   come back to the Court to seek approval to pay those amounts

18   once they are able to calculate what's due.  And

19   particularly with respect to the foreign branch offices,

20   payments of those amounts are going to be -- may very well

21   be critical.

22        The only other category of information that was in the

23   Supplemental Motion is with respect to the Cash Management

24   Motion, which is not to seek to amend any caps or pay any

25   pre-petition amounts, but we needed to include something to

1    correct and further disclose a few issues.  The first was to

2    the bank account schedule that was included with the First

3    Day Cash Management Motion had a typographical error with

4    respect to one of the Bank of America accounts, so we needed

5    to correct that.  In addition, there was an investment

6    account that was inadvertently omitted from that bank

7    account schedule as well as one account that is no longer

8    being used by the Debtors and was not used as of the filing

9    date.  So, we have a corrected schedule that we included

10   with the Supplemental Motion.

11        And in addition, the Debtors want to disclose some

12   further intercompany transactions that the Debtors enter

13   into the -- while there were a number of specific types of

14   intercompany transactions that were disclosed in the First

15   Day Cash Management Motion, what wasn't specifically

16   discussed, and so we thought it was worth pointing out in

17   the Supplemental Motion, was that NNI, for administrative

18   convenience, sometimes makes payments on behalf of the

19   Global Nortel Enterprise.  For example, with respect to the

20   expat program that I was discussing just a moment ago, they

21   make payments for -- to third-party vendors that support the

22   entire global expat program.  And historically, the way that

23   this has been dealt with on an intercompany basis has been

24   that payables were booked to intercompany -- the various

25   other Nortel entities that were receiving the benefit of

1   these payments, and then, on a periodic basis, those

2   intercompany payables would be settled.  Going forward

3   because -- as a result of the filing, the entities -- the

4   other non-Debtor entities have agreed to either fund or pre-

5   fund or promptly reimburse for -- NNI for any payments that

6   it makes on their behalf.

7        We have Paul Carr [ph] here who is an officer of the

8   Debtors and the controller for Nortel Networks, who is able

9   to testify, if needed, as to the necessity for -- to -- for

10  the Debtors to be able to make these payments.

11            THE COURT:  Well, I think, as far as I'm

12  concerned, your statements on the record, which are

13  supported by the First Day Affidavit with these adjustments,

14  is sufficient, unless anyone in the courtroom wishes to

15  cross-examine Mr. Carr.  Okay.  And does anyone else wish to

16  be heard on argument on the Motion?  Well, again, this is a

17  Supplemental Motion.  It's an extension of the First Day

18  Hearing.  It's obvious that there was a tremendous amount of

19  work to be done on the -- before the First Day, and these

20  sorts of clarifications, adjustments, supplements are

21  appropriate.  They're necessary, clearly.  All of them are

22  significant, and certainly, the company, the Court finds,

23  would suffer immediate and irreparable harm were the Court

24  not to grant the relief requested.  I'm most impressed with

25  the detail and the amount of attention being paid to all of

1   this, very specific information.  And I'll be pleased to

2   grant the Motion and enter the Order.

3           MS. KIM:  Thank you, Your Honor.

4           THE COURT:  Thank you, Ms. Kim.

5           MS. KIM:  The last Motion that I'd like to

6   present before I cede the podium back to Mr. Bromley is the

7   Utilities Motion.  At the outset, I'd like to note that two

8   objections were filed --

9           THE COURT:  Yes.

10          MS. KIM:  -- to this Motion: one by the Public

11  Service Company of North Carolina, and one was a joint

12  objection filed by certain other utility companies.  I

13  believe that both of those objections have been resolved.

14  There was a slight delay in terms of getting signatures, but

15  we had -- on the basis of providing some additional

16  assurance that the utility companies that were objecting

17  found satisfactory, I believe that those have been

18  consensually resolved.

19          THE COURT:  Okay.

20          MS. KIM:  Your Honor entered an Interim Order

21  setting up procedures by which the Debtors could set up an

22  account that would hold two weeks' deposits for all of the

23  utility companies and also a process by which utilities

24  could seek further assurances from the Debtors.  And since

25  that date, the Debtors have received a number of requests

1   from the various utility companies for additional assurance,

2   which the Debtors are in the process of resolving.  The

3   Final Order has been revised slightly to reflect the

4   resolution of the two objections that I just mentioned and

5   to also reflect certain comments by the Creditors' Committee

6   so that the Order now incorporates an opportunity for the

7   Debtors -- for the -- excuse me, for the Committee to get

8   notice and have an opportunity to object with respect to

9   some of the steps in the processes set forth in the

10  Utilities Motion.

11          THE COURT:  That's certainly appropriate.

12          MS. KIM:  And also, as to Verizon alone, we are

13  adjourning the Motion to the 19th, which is the next Omnibus

14  Hearing.

15          THE COURT:  Okay.

16          MS. KIM:  And that's also reflected in the Final

17  Order.

18          THE COURT:  Excellent.

19          MR. JACOBS:  And with those amendments to the

20  Order, we have no objection.

21          THE COURT:  Oh, fine, Mr. Jacobs.  Thank you.

22  Did you want to describe the resolutions with the objecting

23  parties, or is there a black line that I might just review?

24          MS. KIM:  Sure, there's --

25          THE COURT:  Whichever you prefer.

1          MS. KIM:  Yes, we have a -- there is a -- the

2   Public Service Company of North Carolina had requested

3   additional assurance from the company with -- in the form of

4   a direct deposit, so it's -- we are -- we actually have with

5   us a Withdrawal of Objection that we would present to the

6   Court, and --

7          THE COURT:  Okay.

8          MS. KIM:  -- as a stipulation asking the Court to

9   so order that withdrawal.  And the utility companies

10  similarly have requested some additional assurance in the

11  form of cash deposits that we have also agreed to --

12         THE COURT:  And --

13         MS. KIM:  -- and so that settlement agreement is

14  being consensually --

15         THE COURT:  Okay.

16         MS. KIM:  -- entered into.

17         THE COURT:  Okay.

18         MS. KIM:  And so, we do have a black line of the

19  Final Order against the one that had been proposed, so we

20  will submit that as well when we hand up the various orders.

21         THE COURT:  Okay.  Thank you, Ms. Kim.  Anyone

22  else?  Well, I know that the Utility Motions sometimes

23  create some controversy.  I did grant the relief in the --

24  on the First Day of the case, and I note that we're here

25  very shortly thereafter.  So, there has to be a mechanism

1  whereby Debtors are not unduly, if you will, harmed right at

2  the outset of a case and by holding these hearings promptly,

3  and also by availing parties of hearings when requested and

4  when necessary, I think that the Court, and here the

5  Debtors, certainly satisfy the spirit and the intent of

6  Section 366.  And since there -- the objections have been

7  withdrawn, I think it's sufficient simply to say that this

8  is certainly an appropriate and necessary relief for the

9  Debtors, and in their best interests and as well

10 accommodates the utilities who are clearly important

11 creditors of the Debtors estates.  And with that, I will be

12 pleased to grant the Motion and enter the Order on a final

13 basis.

14           MS. KIM:  Thank you very much, Your Honor.  And

15 with that, I will cede the podium back to Mr. Bromley.

16           THE COURT:  Thank you for your good work, Ms.

17 Kim.

18           MS. KIM:  Thank you.

19           THE COURT:  Mr. Bromley?

20           MR. BROMLEY:  Thank you, Your Honor.  I return to

21 stand before you on behalf of the entire legal community,

22 the Ordinary Course of Professionals Motion --

23           THE COURT:  Yes.  Yes.

24           MR. BROMLEY:  -- because I believe the entire

25 legal community is at -- represented on the exhibit.

1              THE COURT:  It looked like it.

2              MR. BROMLEY:  Your Honor, we have a very large

3    organization here, as you've heard --

4              THE COURT:  Yes.

5              MR. BROMLEY:  -- and the Ordinary Course of

6    Professionals Motion is sometimes a bigger problem in the --

7    in larger cases.  We have filed a Motion, which had a list

8    attached.  We have worked hard to drill down on that list to

9    make sure that the appropriate firms are on it, and we've

10   worked hard with Mr. Tinker and his office to make sure that

11   the U.S. Trustee is satisfied with the process and the

12   membership of the exhibit.

13        Just very briefly, Your Honor, let me describe the

14   process.  It's some -- one that I'm sure you're familiar

15   with.

16             THE COURT:  Yes.

17             MR. BROMLEY:  There's a monthly cap and an annual

18   cap, and the requirement of a filing of a declaration under

19   Rule 2014.  So, everyone on the Ordinary Course of

20   Professionals list will file a 2014 statement.  The monthly

21   cap is $50,000.  The annual cap is $500,000.

22             THE COURT:  Right.

23             MR. BROMLEY:  To the extent that the cap is

24   exceeded, then any of the members of the list will have the

25   pleasure of submitting a request for reimbursement under 30

1   -- 330 and 331.

2       We have, on videoconference, Douglas Parker, a member

3   of the legal team at Nortel, who is available to discuss the

4   nature and substance of the work that these professionals do

5   for the firm, but we have received no objections, having

6   worked through the issues with Mr. Tinker, and unless anyone

7   would like to have Mr. Parker cross-examined, we would stand

8   on the record.

9           THE COURT:  And that certainly is sufficient for

10  me, absent anyone's request for cross-examination.  Does the

11  Committee wish to be heard with respect to this Motion?

12          MR. JACOBS:  We have no objection.

13          THE COURT:  Okay, Mr. Jacobs.  Mr. Tinker?

14          MR. TINKER:  Your Honor, Debtors' counsel has

15  accurately represented that we've had fairly extensive

16  discussions regarding the list.  The list that would be

17  attached to the Order, it has been revised a couple of

18  times.

19          THE COURT:  Okay.

20          MR. TINKER:  Mr. Bromley referred to a $500,000

21  annual cap.

22          THE COURT:  Yes.

23          MR. TINKER:  There's actually two tiers in the

24  file list, and 500- would be as to a couple of the

25  professionals, and there's a lower cap, a lower annual cap

1  as to the remainder, and so that's why we have the two

2  different tiers, really to reflect the annual cap part of

3  it.

4            THE COURT:  Of course.

5            MR. TINKER:  And we have reviewed the list, and a

6  number of the professionals had been deleted, as they target

7  in on the ones who are actually going to be used.  And the

8  services had been described as well in an individual kind of

9  way, which I think is useful.  So, we appreciate very much

10 the cooperation of Debtors' counsel in working through all

11 of that.

12           THE COURT:  And I know, likewise, they are

13 grateful to the -- to your office, Mr. Tinker.  And it's

14 clear that this is a necessary and appropriate Motion.  The

15 relief requested is in the best interest of the estate here.

16 There has to be a mechanism to pay ordinary course

17 professionals, and I think that the cap is a reasonable cap,

18 or the caps, I should say.  And I'm satisfied, of course,

19 that the Debtors won't be paying more than they need to or

20 pay anyone who doesn't deserve being paid.  And there's

21 always availability of some Court oversight if any party has

22 a concern or wishes to bring a matter to the Court's

23 attention.

24      So, I'm pleased and prepared to grant the Motion and

25 sign the Order.

1              MR. BROMLEY:  Thank you, Your Honor.

2         There's one other matter, Your Honor, if we could.  We

3  have in the Court, as well, counsel for the monitor --

4              THE COURT:  Yes.

5              MR. BROMLEY:  -- the Allen & Overy firm --

6              THE COURT:  Yes.

7              MR. BROMLEY:  -- and we would like to ask your

8  indulgence so that we could get a summary of the monitor's

9  -- of work over the past month.

10              THE COURT:  That would be helpful.  Thank you

11  very much, Mr. Bromley.

12         Ms. Caloway, good morning.

13              MS. CALOWAY:  Good morning, Your Honor.  Mary

14  Caloway, Buchanan, Ingersoll & Rooney on behalf of Ernst &

15  Young, the monitor and foreign representative for the

16  Canadian Nortel Group.  With me is my co-counsel, Lisa

17  Krandin of the Allen & Overy Firm, who I believe was here

18  before you on the First Day.

19              THE COURT:  Yes.

20              MS. CALOWAY:  And Ms. Krandin would like to give

21  the Court a brief summary of the monitor's activities since

22  the filing of this in the Canadian cases.

23              THE COURT:  That would be much appreciated.

24  Thank you, Ms. Caloway.

25         Ms. Krandin, welcome back.

1           MS. KRANDIN:  Good morning, Your Honor.  Lisa

2   Krandin from Allen & Overy on behalf of Ernst & Young.

3           As Your Honor is aware, we also have Chapter 15 cases

4   -- related Chapter 15 cases pending before Your Honor.  And

5   I thought I'd start out by saying that since the

6   commencement of the cases, both in Canada and the U.S., the

7   monitor has proceeded with providing notice to both

8   proceedings, although we did discover earlier this week with

9   Ernst & Young that certain parties to U.S. litigation had

10  accidently been left off the service list.  So, what we did

11  was contact your chambers and adjourned the hearing out one

12  week in order to make sure --

13          THE COURT:  Okay.

14          MS. KRANDIN:  -- everybody receives notice.  So,

15  the new hearing date, in case Your Honor is not aware, is

16  now February 27 at 2:00 p.m., and we'd move the objection

17  deadline up one week.

18          THE COURT:  Very well.  Good.

19          MS. KRANDIN:  The monitor has been diligently

20  working with the company in its restructuring efforts and

21  also, of course, reporting to the Canadian Court.  The next

22  hearing, I apologize, Your Honor, I -- my train was delayed,

23  so I'm not sure what Debtors' counsel has related to you

24  about the Canadian hearing.  The next Canadian hearing is on

25  the 10th.

1                THE COURT:  Yes.

2                MS. KRANDIN:  Right.  And during that hearing --

3                THE COURT:  That's partly to extend the automatic

4    stay.

5                MS. KRANDIN:  That is correct, through May 1.

6    the monitor intends to file, in the Canadian cases, another

7    report, I believe tomorrow, that will include a cash flow

8    chart, providing that -- showing -- indicating that the

9    company has sufficient funds to take it through the

10   extension date of May 1.

11       In addition, the company will be seeking, just as it

12   has here, to continue its patent program, and the monitor

13   supports the company's efforts in doing that.  In addition,

14   the Canadian companies are required to hold shareholder

15   meetings.  Obviously, holding a shareholder meeting at this

16   point will be nothing more than a disruption, and the

17   company feels that any information that would've been

18   provided will obviously be made available through the

19   Canadian documents as well as through any securities

20   regulation filings.  So, the monitor also supports the

21   company's efforts to be relieved of its obligations to hold

22   those meetings.

23       That's all I have for today, Your Honor.  We will,

24   obviously, be back before you in just a few weeks.

25                THE COURT:  Okay.  It's much appreciate and

1  helpful, obviously.  And I believe you filed these reports

2  with our Court, is that right?

3           MS. KRANDIN:  I'm sorry.  Yes.  We will be -- we

4  will file the reports both in the Chapter 15 and the Chapter

5  11, so they will be --

6           THE COURT:  Good.

7           MS. KRANDIN:  -- made available to everybody.

8           THE COURT:  Excellent.  Thank you very much, Ms.

9  Krandin.  Good to see you again.

10          MS. KRANDIN:  You, too.

11          THE COURT:  Anything else, Mr. Bromley?

12          MR. BROMLEY:  I believe with that, Your Honor,

13  we're all finished on our side.

14          THE COURT:  Well, I appreciate everyone's

15  cooperation and hard work in making this what was a

16  relatively simple hearing, I think.  And I know they won't

17  all be this simple, but whatever can be resolved, it's

18  always good that they -- when it is resolved.

19      So with that, we can stand in recess, and I appreciate

20

21

22

23

24

25

1  everyone's participation, and a good day to all.

2  (Proceedings adjourned at 11:01 a.m.)

3

4           I certify that the foregoing is a correct

5  transcript from the electronic sound recording of the

6  proceedings in the above-entitled matter.

7

8
_____        ___11 February 2009___
9  Shelley M. Kohr                                    Date
   Transcriber
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25