**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

----------------------------------------------------------X
                                                          :
*In re*                                                   :    Chapter 11
                                                          :
Nortel Networks Inc., *et al.*,[1]                        :    Case No. 09-10138 (KG)
                                                          :
                                      Debtors.            :    Jointly Administered
                                                          :
                                                          :    **Hearing date: March 5, 2009 at 10:00 a.m. (E.T.)**
                                                          :    **Objections due:  Feb. 26, 2009 at 4:00 p.m. (E.T.))**
----------------------------------------------------------X

**APPLICATION FOR AN ORDER AUTHORIZING EMPLOYMENT AND RETENTION
OF LAZARD FRÈRES & CO. LLC *NUNC PRO TUNC* TO THE PETITION DATE AS
FINANCIAL ADVISOR AND INVESTMENT BANKER FOR THE DEBTORS AND
DEBTORS IN POSSESSION**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors"), hereby move this Court (the "Application") for the entry

of an order substantially in the form attached hereto as Exhibit B, pursuant to sections 327(a) and

328(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Bankruptcy Rules"), (i) authorizing the employment and retention of

Lazard Frères & Co. LLC ("Lazard") as financial advisor and investment banker to the Debtors

*nunc pro tunc* to the Petition Date, (ii) approving the terms and conditions under which Lazard

will be retained and compensated and (iii) granting related relief.  In support of the Application,

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc.
(9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera
Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel
Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.)
Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and
Nortel Networks Cable Solutions Inc. (0567).  Addresses for the Debtors can be found in the Debtors' petitions,
which are available at http://chapter11.epiqsystems.com/nortel.

the Debtors rely on the Declaration of Frank A. Savage (the "Savage Declaration"), attached

hereto as Exhibit A.  In further support of this Application, the Debtors respectfully represent as

follows:

### Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 327(a) and 328(a)

of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2014 and 2016 and Local

Bankruptcy Rule 2014-1.

### Background

**A.      Introduction**

3.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel" or the "Company"), and

certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application

with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies'

Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

(collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court. Ernst & Young Inc., as foreign representative for the Canadian Debtors, has filed petitions in this Court for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. In addition, at 8 p.m. on January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European affiliates into administration under the control of individuals from Ernst & Young LLC (collectively, the "EMEA Debtors").[3]

6.    On January 15, 2009, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that provided for the joint administration of these cases and for consolidation for procedural purposes only.

7.    On January 26, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code (D.I.s 141, 142). No trustee or examiner has been appointed in the Debtors' cases.

---

[3]    The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

**B.    Debtors' Corporate Structure and Business**

8.    A description of the Debtors' corporate structure and business and the events

leading to the chapter 11 cases are set forth in the Declaration of John Doolittle in Support of

First Day Motions and Applications (the "First Day Declaration").

**Relief Requested**

9.    By this Application, the Debtors seek entry of an order pursuant to sections 327(a)

and 328(a) of the Bankruptcy Code, Rule 2014 of the Bankruptcy Rules and Rule 2014-1 of the

Local Bankruptcy Rules (i) authorizing the employment and retention of Lazard as financial

advisor and investment banker to the Debtors *nunc pro tunc* to the Petition Date, (ii) approving

the terms and conditions under which Lazard will be retained and compensated at the expense of

the Debtors' estates, as contained in that certain letter agreement, dated as of January 13, 2009

(the "Engagement Agreement"), and the related indemnification agreement (the "Indemnification

Agreement", and together with the Engagement Agreement, the "Agreement") and (iii) granting

related relief.  A copy of the Engagement Agreement is attached hereto as Exhibit C, and a copy

of the Indemnification Agreement is attached hereto as Exhibit D.[4]

**Basis for Relief**

10.    Under section 327 of the Bankruptcy Code, a debtor-in-possession may employ

one or more professionals that do not hold or represent an interest adverse to the estate and that

are disinterested persons to assist the debtor-in-possession in carrying out its duties under the

Bankruptcy Code.  11 U.S.C. § 327(a).

---

[4]    The summary of the Agreement in this Application is solely for the benefit of the Court and parties in interest.  To the extent that the summary and the terms of the Agreement are inconsistent, the terms of the Agreement shall control.  Capitalized terms not defined in this Application shall have the meanings given them in the Engagement Agreement.

4

11.     Section 328 of the Bankruptcy Code provides, in pertinent part, that under section 327 of the Bankruptcy Code a professional may be employed "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a).

12.     Bankruptcy Rule 2014 requires that an application for retention of a professional person include:

> [S]pecific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014(a).    Local Rule 2014-1 further requires that "[a]ny entity seeking approval of employment of a professional person pursuant to 11 U.S.C. § 327 . . . shall file with the Court a motion, a supporting affidavit or verified statement of the professional person and a proposed order for approval." Del. Bankr. L.R. 2014-1(a).

13.     By this Application, the Debtors request that the Court approve the employment and compensation arrangements described in the Agreement pursuant to section 328(a) of the Bankruptcy Code. The employment arrangements contained in the Engagement Agreement are beneficial to the Debtors' estates and the compensation arrangements provide certainty and proper inducement for Lazard to act expeditiously and prudently with respect to the matters for which it will be employed.    Similar fee arrangements in other large chapter 11 cases have routinely been approved and implemented by this Court.    See, e.g., In re Tropicana Entm't, LLC, Case No. 08-10856 (KJC) (Bankr. D. Del. May 30, 2008); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. Jan. 17, 2006); In re Foamex Int'l Inc., Case No. 05-12685 (PJW)

(Bankr. D. Del. Oct. 17, 2005).   Additionally, indemnification arrangements similar to the one

provided for pursuant to the Indemnification Agreement have been approved and implemented in

other large chapter 11 cases by courts in this district.  See, e.g., In re Tropicana Entm't, LLC,

Case No. 08-10856 (KJC) (Bankr. D. Del. May 30, 2008); In re New Century TRS Holdings,

Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. Apr. 26, 2007); In re Foamex Int'l Inc., Case No.

05-12685 (PJW) (Bankr. D. Del. Oct. 17, 2005).

14.     The Debtors also request approval of the employment of Lazard *nunc pro tunc* to

the Petition Date.  Such relief is warranted by the extraordinary circumstances presented by these

cases.  The Third Circuit has identified "time pressure to begin service" and absence of prejudice

as factors favoring *nunc pro tunc* retention.  See In re Arkansas Co., 798 F.2d 645, 650 (3d Cir.

1986); see also In re Indian River Homes, Inc., 108 B.R. 46, 52 (D. Del. 1989), appeal dismissed,

909 F.2d 1476 (3d Cir. 1990).   The complexity, intense activity and speed that have

characterized these cases have necessitated that the Debtors, Lazard and the Debtors' other

professionals focus their immediate attention on time-sensitive matters and promptly devote

substantial resources to the affairs of the Debtors pending submission and approval of this

Application.

## Selection of Lazard

15.     Prior to the commencement of these cases, NNC and its controlled subsidiaries

engaged Lazard as financial advisor and investment banker to assist with the evaluation of

strategic alternatives and to render investment banking and financial advisory services to the

Company, including providing advice to the Company's Board of Directors.

16.     An experienced investment bank and financial advisor such as Lazard fulfills a

critical need that complements the services offered by the Debtors' other restructuring

professionals in these cases. The Debtors believe they require the services of a capable and experienced investment banking and financial advisory firm such as Lazard because, among other reasons, Lazard's resources and capabilities, together with its prepetition experience advising the Debtors, are crucial to the Debtors' success in these chapter 11 cases.

17.    The Debtors and NNC and its other controlled subsidiaries chose Lazard to act as their financial advisor and investment banker postpetition because Lazard has a long-standing financial advisory relationship with the Debtors and NNC and its other controlled subsidiaries. In particular, during Lazard's most recent engagement by the Debtors and NNC and its other controlled subsidiaries, pursuant to the Agreement, Lazard has gained substantial knowledge of the Company's current financial and operational condition, which knowledge may help the Company and Lazard expedite execution of potential transactions.[5] Moreover, Lazard has extensive experience and excellent reputation in providing financial advisory and investment banking services in complex chapter 11 cases. As a result, the Debtors believe that Lazard is well qualified to perform these services and represent the Debtors' interests in their chapter 11 cases. Denial of the relief requested by the Debtors in this Application would deprive the Debtors of the assistance of uniquely qualified advisors. Furthermore, it would unjustly disadvantage the Debtors and all parties in interest, as the Debtors would be forced to engage new investment bankers who lack Lazard's extensive knowledge of the Debtors.

---

[5]    In particular, starting in 2005, Lazard provided financial advisory services to NNC's legal counsel in connection with various suits involving NNC, and its controlled subsidiaries, including the class action compliant filed in the U.S. District Court for the Middle District of Tennessee on behalf of participants and beneficiaries of the Nortel Networks Long-Term Investment Plan under the Employee Retirement Income Security Act. In 2006 and 2007, Lazard provided financial advisory services to NNC in connection with the refinancing of NNC's senior notes and a potential transaction with a particular counterparty (along with other alternative transactions). And, in 2008, Lazard acted as a financial advisor to NNC, and its controlled subsidiaries, in connection with evaluating the financial implications of certain potential transactions that NNC, and its controlled subsidiaries, contemplated. In addition, Lazard Capital Markets LLC served as a co-manager in NNC's March 2007 offering of senior unsecured convertible notes.

7

18.     Lazard is an investment banking and financial advisory firm focused on providing investment banking services, financial advice and transaction execution on behalf of its clients. Lazard's broad range of corporate advisory services includes general financial advice, corporate restructurings, domestic and cross-border mergers and acquisitions, divestitures, privatizations, special committee assignments, takeover defenses and strategic partnerships / joint ventures.  In addition, Lazard maintains a presence in capital markets and its affiliate has a significant asset management business.

19.     On January 13, 2009, the Debtors and their ultimate corporate parent NNC and its other controlled subsidiaries engaged Lazard to provide general investment banking and financial advice in connection with the Debtors' and NNC's and its other controlled subsidiaries' attempts to complete a strategic restructuring, reorganization, and/or recapitalization and the Debtors' preparation for the commencement of these chapter 11 cases.

20.     In providing prepetition services to the Debtors in connection with these matters, Lazard's professionals have worked closely with the Company's management and other professionals and have become well acquainted with the Debtors' operations, debt structure, creditors, business and operations and related matters.  Accordingly, Lazard has developed significant relevant experience and expertise regarding the Debtors that will assist it in providing effective and efficient services in these chapter 11 cases.

21.     In addition to Lazard's understanding of the Debtors' financial history, business operations, and the industry in which the Debtors operate, Lazard and its senior professionals have extensive experience in the reorganization and restructuring of troubled companies, both out of court and in chapter 11 proceedings.  Lazard's employees have advised debtors, creditors, equity constituencies and government agencies in many complex financial reorganizations.

Since 1990, these professionals have been involved in over 250 restructurings representing billions of dollars of restructured debt and assets.

22.    The professionals of Lazard have been employed as financial advisors and as investment bankers in a number of troubled company situations, including the chapter 11 cases of In re Tropicana Entertainment, LLC, Case No. 08-10856 (KJC) (Bankr. D. Del. May 30, 2008); In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. Apr. 2, 2007); In re NorthWestern Corp., Case No. 03-12872 (KJC) (Bankr. D. Del. Oct. 10, 2003); In re Metrocall, Inc., Case No. 02-11579 (CGC) (Bankr. D. Del. June 3, 2002); In re Kaiser Aluminum Corp., Case No. 02-10429 (JKF) (Bankr. D. Del. Feb. 12, 2002); In re Hayes Lemmerz International, Inc., Case No. 01-11490 (MFW) (Bankr. D. Del. Dec. 5, 2001); In re Armstrong World Industries, Inc., Case No. 00-04471 (RJN) (Bankr. D. Del. Feb. 6, 2001); In re Movie Gallery, Inc., Case No. 07-33849 (DOT) (Bankr. E.D. Va. Oct. 18, 2007); In re Tower Automotive, Inc., Case No. 05-10578 (ALG) (Bankr. S.D.N.Y. June 15, 2005); In re Parmalat U.S.A. Corp., Case No. 04-11139 (RDD) (Bankr. S.D.N.Y. Apr. 22, 2004); In re THCR/LP Corp., Case No. 04-46898 (JHW) (Bankr. D.N.J. Mar. 17, 2005).

## Scope of Services

23.    Pursuant to the Engagement Agreement,[6] Lazard will assist in the evaluation of strategic alternatives and render investment banking and financial advisory services to the Debtors, NNC and their affiliates including the following, as reasonably requested:

a.    reviewing and analyzing, from a financial advisory perspective, the Company's businesses, capital structures and financial information, as well as the business and financial information of any Sale Transaction or Other Transaction counterparty;

---

[6]    The summary of the Agreement in this Application is solely for the benefit of the Court and parties in interest. To the extent that the summary and the terms of the Agreement are inconsistent, the terms of the Agreement shall control. Capitalized terms not defined in this Application shall have the meanings given them in the Engagement Agreement.

b.      evaluating the Company's potential debt capacity in light of its projected cash flows;

c.      assisting in the determination of a capital structure for the Company;

d.      assisting in the valuation analysis of the Company and of any Sale Transaction or Other Transaction counterparty;

e.      advising the Company on tactics and strategies for negotiating with the Stakeholders;

f.      rendering financial advice to the Company and participating in meetings or negotiations with the Stakeholders and/or rating agencies or other appropriate parties in connection with a Restructuring;

g.      advising the Company on the timing, nature, and terms of new securities, other consideration or other inducements to be offered pursuant to a Restructuring;

h.      advising and assisting the Company in evaluating potential Financings, and, subject to Lazard's agreement so to act, and, if requested by Lazard, to execution of appropriate agreements by the Company, contacting potential sources of capital as the Company may designate and assisting the Company in implementing such a Financing;

i.      assisting the Company in identifying and evaluating candidates for a potential Sale Transaction or Other Transaction;

j.      attending meetings of the Company's boards of directors and their committees with respect to matters which Lazard has been engaged to advise the Company; and

k.      providing the Company with other general financial and restructuring advice.

24.     It is necessary that the Debtors employ Lazard to render the foregoing professional services. The Debtors believe that the services will not duplicate the services that other professionals will be providing the Debtors in these cases. Specifically, Lazard will carry out unique functions and will use reasonable efforts to coordinate the Debtors and other professionals retained in these cases to avoid the unnecessary duplication of services.

## Professional Compensation

25.    Lazard's decision to continue with this engagement to advise and assist the Debtors is conditioned upon its ability to be retained in accordance with its customary terms and conditions of employment and compensated for its services and reimbursed for the expenses it incurs in accordance with its customary billing practices.

26.    Lazard intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these chapter 11 cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and any other applicable procedures and orders of the Court and consistent with the proposed compensation set forth in the Engagement Agreement (the "Fee Structure").[7]

27.    In summary, the Fee Structure provides that the Company is obligated to pay the following compensation to Lazard:[8]

a.    A fee of $250,000 for services provided pursuant to this engagement prior to the execution of the Engagement Agreement, which became payable upon execution of the Engagement Agreement.

b.    A monthly fee of $250,000 (the "Monthly Fee"), which became payable upon execution of the Engagement Agreement and becomes payable in advance on the first day of each month thereafter (beginning February 1, 2009) until the earlier of the completion of the Restructuring or the termination of Lazard's engagement pursuant to section 12 of the Engagement Agreement.  One-half of each Monthly Fee that becomes

---

[7]    The summary of the Agreement in this Application is solely for the benefit of the Court and parties in interest.  To the extent that the summary and the terms of the Agreement are inconsistent, the terms of the Agreement shall control.  Capitalized terms not defined in this Application shall have the meanings given them in the Engagement Agreement.

[8]    While the Debtors have agreed to pay these fees and expenses, the Debtors reserve their right to seek contribution or allocation of these fees and expenses with their affiliates as may be appropriate.  Additionally, the $250,000 set forth in subparagraph (a) below, the January 2009 payment in subparagraph (b) below and the expense retainer in subparagraph (h) below have already been paid by the Debtors' Canadian direct parent, NNL (a non-debtor).  Lazard has informed the Debtors that any unused portion of the expense reimbursement paid to it by NNL will be applied to postpetition invoices.

payable on or after July 1, 2009 and is paid thereafter shall be credited against any Restructuring/Breakup Fee payable under the Engagement Agreement.

c.    A fee of $15,000,000, payable upon the consummation or material completion of a Restructuring or a breakup of the Company pursuant to insolvency or bankruptcy proceedings (the "Restructuring/Breakup Fee"). For the avoidance of doubt, it is understood that since the Company has now entered into such proceedings, the Restructuring/Breakup Fee shall be payable at some point during these proceedings, except if, prior to the consummation or material completion of a Restructuring or Breakup:

        i.    Lazard terminates the Engagement Agreement or

        ii.    a receiver is appointed over and liquidates all or substantially all of the assets (as of the date of the Engagement Agreement) of NNL or NNL is declared a "bankrupt" under the Bankruptcy and Insolvency Act (Canada) (other than to facilitate a Restructuring or Breakup) and all or substantially all of the assets (as of the date of the Engagement Agreement) of NNI are liquidated pursuant to chapter 7 of the Bankruptcy Code.

d.    A fee, payable upon consummation of a Financing implemented during or in connection with any insolvency or bankruptcy proceeding (the "Financing Fee"), equal to:

        i.    1% of the aggregate gross proceeds of any senior secured debt Financing; and

        ii.    3% of the aggregate gross proceeds of any other Financing.

e.    A fee, payable upon the consummation of an Other Transaction (whether in connection with the consummation of a Restructuring or otherwise) (an "Other Transaction Fee").  Such fee shall be mutually agreed in good faith between the Company and Lazard, shall appropriately compensate Lazard in light of the magnitude and complexity of the Other Transaction and the fees customarily paid to investment bankers of similar standing for similar transactions and shall be subject to prior Bankruptcy Court approval in connection with a supplemental retention application.

f.    For the avoidance of doubt, in the event there are multiple Financings or Other Transactions, multiple Financing Fees and Other Transaction Fees shall become payable under the Engagement Agreement.  Notwithstanding anything in the Engagement Agreement to the contrary, the crediting of Monthly Fees described in the Engagement Agreement shall only apply if all fees are approved in their entirety by all applicable courts and/or other authorities (if any) and paid in their entirety.

g.     In addition to any fees that may be payable to Lazard and regardless of whether any transaction occurs, the Company shall also promptly reimburse Lazard for all:

      i.     reasonable expenses (including travel and lodging, data processing and communications charges, courier services and other appropriate expenditures); and

      ii.    other reasonable fees and expenses, including expenses of counsel, if any.

h.     The Company has provided Lazard with an expense retainer of $75,000 to be applied by Lazard against the expenses that it has incurred prior to the execution of the Engagement Agreement, has incurred thereafter and will still incur.

28.    The Fee Structure is reasonable and comparable to those generally charged by investment banking and financial advisory firms of similar stature to Lazard and for comparable engagements, both in- and out-of-court.  In determining the Fee Structure to be paid to Lazard and the reasonableness of such compensation, the Company compared Lazard's fee proposal to other proposals received by the Company.  After such comparison, the Debtors believe, as does Lazard, that the Fee Structure is in fact reasonable, market-based and designed to compensate fairly Lazard for its work and to cover fixed and routine overhead expenses.

29.    Lazard's strategic and financial expertise as well as its capital markets knowledge, financing skills, restructuring capabilities and mergers and acquisitions expertise, some or all of which may be required by the Debtors during the term of Lazard's engagement, were all important factors in determining the Fee Structure.  The Debtors believe that the ultimate benefit of Lazard's services hereunder cannot be measured by reference to the number of hours to be expended by Lazard's professionals in the performance of such services.  Indeed, the Company and Lazard have agreed upon a Fee Structure in anticipation that a substantial commitment of professional time and effort will be required of Lazard and its professionals in connection with these chapter 11 cases and in light of the fact that (i) such commitment may foreclose other

13

opportunities for Lazard and (ii) the actual time and commitment required of Lazard and its professionals to perform its services under the Engagement Agreement may vary substantially from week to week and month to month, creating "peak load" issues for Lazard.

30.    Lazard will maintain records in support of any actual, necessary costs and expenses incurred in connection with the rendering of its services in these chapter 11 cases. As Lazard's compensation will be calculated and paid based on certain transaction fees (in addition to certain periodic fees), Lazard requests that it not be required to file time records in accordance with the United States Trustee Guidelines. Notwithstanding that Lazard does not charge for its services on an hourly basis, Lazard will nonetheless maintain records (in summary format) of its services rendered for the Debtors including reasonably detailed descriptions of those services, the approximate time expended in providing those services and the individuals who provided those services, and will present such records to the Court.

31.    Given the numerous issues which Lazard may be required to address in the performance of its services hereunder, Lazard's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Lazard's services for engagements of this nature, the Debtors believe that the Fee Structure described above is reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.

### Indemnification, Contribution and Reimbursement Provisions

32.    The Debtors have also agreed, among other things, to indemnify, make certain contributions to and reimburse Lazard and certain related persons and entities in accordance with the indemnification provisions set forth in the Indemnification Agreement.

33.    The indemnification, contribution and reimbursement provisions reflected in the Indemnification Agreement are customary and reasonable terms of compensation for financial

advisors and investment bankers such as Lazard for proceedings both out of court and in chapter 11. The terms of the Indemnification Agreement and the Engagement Agreement were fully negotiated between the Company and Lazard at arm's-length and the Debtors respectfully submit that the Indemnification Agreement and the Engagement Agreement are reasonable and in the best interests of the Debtors, their estates and their creditors.

34.     Accordingly, as part of this Application, the Debtors request that the Court approve the Indemnification Agreement.

### Lazard's Disinterestedness

35.     To the best of the Debtors' knowledge, information and belief, and based and in reliance upon Lazard's review of its electronic database and the Savage Declaration: (i) Lazard is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code and referenced by section 328(c) of the Bankruptcy Code and (ii) Lazard holds no interest materially adverse to the Debtors, their creditors and shareholders for the matters for which Lazard is to be employed. As disclosed in the Savage Declaration, Lazard has represented and may continue to represent various creditors and other parties in interest in these cases, but only in matters unrelated to the Debtors or these cases.

36.     Additionally, as detailed above and in the Savage Declaration, prior to the commencement of these cases, Lazard advised the Debtors and their affiliates, including their Canadian parents, regarding various restructuring and other matters. Because the Debtors' and their Canadian parents' interests are united in their integrated, co-dependent business relationship, the Debtors' ability to successfully reorganize is dependent on the reorganization of the jointly operated Nortel businesses in Canada and in the U.S. in a strategic transaction, on a

stand alone basis, and/or through the sale of one of more Nortel business segments that are located in both Canada and the U.S. As a result, the Debtors and their Canadian parents desire to have Lazard continue to provide advice to all of them pursuant to the Engagement Agreement regarding issues that affect their joint interests and their respective reorganization efforts in order to facilitate a joint and harmonious approach to the Company's restructuring in both jurisdictions. Both the Debtors and their Canadian parents, therefore, are parties to the Agreement as the services thereunder may benefit the Debtors, their Canadian parents and/or their affiliates.

37. The Debtors did not make any payments to Lazard during the 90 day period prior to the Petition Date.[9] Shortly after the Petition Date, however, the Debtors wired $575,000 to Lazard pursuant to the Engagement Agreement. This amount was invoiced to the Company prior to the Petition Date, but was not received until January 20, 2009. Lazard therefore proposes that this $575,000 be held by Lazard and be applied to Lazard's postpetition fees and/or expenses as and when any such fees and/or expenses are approved by the Court in accordance with any applicable fee application procedures utilized in these cases. This will ensure that that this postpetition wire is applied only against postpetition fees and/or expenses approved by the Court. Lazard further states that, notwithstanding anything to the contrary in the Engagement Agreement, to the extent any other fees or expense reimbursement remained due from the Debtors as of the Petition Date, if any, Lazard has agreed to waive any claim for any such fees and expenses as against the Debtors.

---

[9]     Lazard did receive a payment of $645,985.69 from the Debtors' Canadian indirect parent, NNC, a non-debtor, on November 17, 2008. The Debtors' Canadian direct parent, NNL, also a non-debtor, paid Lazard $575,000.00 on February 12, 2009 in connection with amounts invoiced to the Company prior to the commencement of the Company's insolvency proceedings.

### Notice

38.     Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to the (i) Office of the United States Trustee for the District of Delaware; (ii) the Committee; and (iii) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

### No Prior Request

39.     No prior request for the relief sought herein has been made to this or any other court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Application and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: February 13, 2009
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley
Lisa M. Schweitzer
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

      - and -

MORRIS NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Thomas F. Driscoll III (No. 4703)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*