## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X

In re                                              :     Chapter 11
                                      :
Nortel Networks Inc., <u>et al.</u>,[1]           :     Case No. 09-10138 (KG)
                                      :
               Debtors.        :     Jointly Administered
                                      :
                                      :     **Hearing date: February 27, 2009 at 11:00 a.m. (requested)**
                                      :     **Objections due: February 26, 2009 at 12:00 noon (requested)**
                                      :

-------------------------------------------------------X

### DEBTORS' MOTION FOR ORDERS (I) AUTHORIZING AND APPROVING (A) PURCHASE AGREEMENT, (B) BIDDING PROCEDURES, (C) BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (D) NOTICE PROCEDURES, (E) ASSUMPTION AND ASSIGNMENT PROCEDURES, (F) FILING OF CERTAIN SCHEDULES UNDER SEAL AND (G) DATE FOR THE SALE HEARING, AND (II) AUTHORIZING AND APPROVING (A) SALE OF CERTAIN NON-CORE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND (B) ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS

Nortel Networks Inc. ("NNI") and certain of its affiliates, including Alteon WebSystems,

Inc. and Alteon WebSystems International, Inc., as debtors and debtors in possession

(collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of orders

pursuant to sections 105, 107(b)(1), 363 and 365 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 6004, 6006, 9014 and 9018 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

Rules"), (i) (a) approving that certain Asset Purchase Agreement ("Purchase Agreement"), among NNI, Nortel Networks Limited ("NNL"), the EMEA Sellers (as such term is defined in the Purchase Agreement and, together with NNI and NNL, the "Sellers") and in the case of the EMEA Sellers, the joint administrators of the EMEA Sellers, A. R. Bloom, S. Harris, A. M. Hudson and C. Hill of Ernst & Young LLP (other than Nortel Networks (Ireland) Limited, for which D. Hughes and A. Bloom serve as joint administrators) (the "Joint Administrators"), and Radware Ltd. (the "Purchaser"), dated as of February 19, 2009, a copy of which is attached hereto as Exhibit A as a "stalking-horse" purchase agreement; (b) approving the bidding procedures (as appended to the Purchase Agreement (the "Bidding Procedures")) for the sale of certain of Sellers' enterprise "Layer 4-7" business (the "Purchased Assets") and certain related U.S. contracts (the "Assumed Contracts," and together with the Purchased Assets, the "Assets") pursuant to the Purchase Agreement, or to the Successful Bidder (as defined below) in accordance with the Bidding Procedures; (c) approving the terms and conditions for payment of the Break-Up Fee and Expense Reimbursement (each as defined below), including granting administrative expense status under sections 503(b) and 507(a) of the Bankruptcy Code to the Break-Up Fee, Expense Reimbursement, and any other amounts to be paid by Debtors to Purchaser under the Purchase Agreement; (d) approving the form and manner of sale notices (the "Notice Procedures"); (e) approving the procedures (the "Assignment Procedures") for the assumption and assignment of the Assumed Contracts; (f) authorizing Debtors to file certain schedules under seal and (g) setting the time, date, and place of a hearing to consider the sale and assumption and assignment (the "Sale Hearing"); (ii) authorizing and approving (a) the sale of the Purchased Assets, free and clear of all liens, claims, encumbrances and other interests, except as set forth in the Purchase Agreement (collectively, "Liens and Claims"), to the Purchaser

2

pursuant to the Purchase Agreement, or to another qualified bidder submitting a higher or

otherwise better offer (the "Successful Bidder") in accordance with the Bidding Procedures; and

(b) the assumption and assignment of the Assumed Contracts, free of all Liens and Claims; and

(iii) granting them such other and further relief as the Court deems just and proper.  In support of

this Motion, the Debtors rely on the Declaration of Hyacinth DeAlmeida (the "DeAlmeida

Declaration"), attached hereto as Exhibit B.  In further support of this Motion, the Debtors

respectfully represent as follows:

## Jurisdiction

1.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.       The statutory bases for the relief requested herein are sections 105, 107(b)(1), 363

and 365 of the Bankruptcy Code.

## Background

### A.       Introduction

3.       On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code.

4.       The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.       On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC," and together with NNL, NNI and their affiliates, including the Debtors,

"Nortel"), NNI's direct corporate parent NNL (NNI, NNL and NNC, and their affiliates,

including the Debtors, "Nortel") and certain of their Canadian affiliates (collectively, the

3

"Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the

"Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"),

seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian

Debtors continue to manage their properties and operate their businesses under the supervision of

the Canadian Court. Ernst & Young Inc., as foreign representative for the Canadian Debtors (the

"Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as

foreign main proceedings under chapter 15 of the Bankruptcy Code. On January 14, 2009, the

Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign

proceeding under section 18.6 of the CCAA. In addition, on January 14, 2009, the High Court of

Justice in England (the "UK Court") placed nineteen of Nortel's European affiliates into

administration under the control of the Joint Administrators (collectively, the "EMEA

Debtors").[3]

6.       On January 15, 2009, this Court entered an order of joint administration pursuant

to Rule 1015(b) of the Bankruptcy Rules that provided for the joint administration of these cases

and for consolidation for procedural purposes only.

7.       On January 26, 2009, the Office of the United States Trustee (the "U.S. Trustee")

appointed an Official Committee of Unsecured Creditors (the "Official Committee") pursuant to

section 1102(a)(1) of the Bankruptcy Code (D.I.s 141, 142). An ad hoc group of bondholders

holding claims against certain of the Debtors and certain of the Canadian Debtors has also been

---

[2]       The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[3]       The EMEA Debtors include the following entities: NNUK, Nortel Networks S.A., Nortel Networks
(Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania
SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Nortel
Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks,
s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o.
and Nortel Networks International Finance & Holding B.V.

4

organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

**B.      Debtors' Corporate Structure and Business**

8.      A description of the Debtors' corporate structure and business and the events leading to the chapter 11 cases are set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications.

9.      The Assets consist of certain assets of Debtors' enterprise "Layer 4-7" business (the "Velocity Business"), which includes the current generation Nortel Application Switch (NAS) released in 2003, the Nortel Application Accelerator (NAA) released in 2007, and the next-generation datacenter Virtual Service Switches (VSS), which was launched at N+I (Interop) 2008 and was planned to be generally available in Q4 2008.

<u>**Relief Requested**</u>

10.      By this Motion, the Debtors seek orders: (i)(a) approving the Purchase Agreement as a "stalking-horse" purchase agreement, (b) approving the Bidding Procedures, (c) approving the Break-Up Fee and Expense Reimbursement, including granting administrative expense status to the Break-Up Fee and Expense Reimbursement, (d) approving the Notice Procedures, (e) approving the Assignment Procedures, (f) setting the time, date, and place of the Sale Hearing and (g) authorizing Debtor to file certain schedules under seal (substantially in the form attached hereto as Exhibit C (the "Sale Procedures Order")); (ii) authorizing and approving (a) the sale of the Purchased Assets, free and clear of all Liens and Claims, to Purchaser pursuant to the Purchase Agreement or to the Successful Bidder in accordance with the Bidding Procedures, and (b) the assumption and assignment of the Assumed Contracts (such order, substantially in the form attached hereto as Exhibit D (the "Sale Order")); and (iii) granting them such other and further relief as the Court deems just and proper.

5

11.    The Debtors, together with their non-debtor affiliates, conduct operations globally, with customers in the United States, Canada, Central and Latin America, Europe, the Middle East and Africa, and Asia.  As set forth in the declaration of Hyacinth DeAlmeida, the environment in which they operate is highly competitive.  The networking solutions industry is undergoing both industry rationalization and consolidation.  By way of example, two of Nortel's largest competitors, Lucent Technologies Inc. and Alcatel, merged in 2006, and two of its largest customers, Verizon Wireless and Alltel Corporation, merged in 2008.  Simply put, the competition for market share is fierce, and the cost of rapid technological development is steep.

12.    Nortel is experiencing significant pressure on its businesses and facing competing demands on its cash resources, globally as well as on a regional basis, as customers across all businesses delay and reduce capital expenditures.  As a result, Nortel has to make difficult decisions in respect of the funding of product development across many product lines and businesses.

13.    Even before filing for creditor protection, it had become clear that in order to reduce operating costs during a time of decreased customer spending and global economic uncertainty, Nortel would need to divest certain non-core businesses and assets in order to conserve liquidity and consolidate its position with respect to its remaining businesses.  Nortel has reviewed its product lines and businesses, and identified the Assets as candidates for divestiture.  While the Assets are valuable, the cost of R&D required to maintain a competitive position within the markets they serve would be prohibitive.  The Assets comprise a small component of the Debtors' Enterprise Solutions business, and are not core to that business or to Nortel's overall business structure.  Accordingly, Nortel had begun the process of marketing the Assets for sale before the decision was made to file for creditor protection.

6

14.    On September 19, 2008, Nortel management approved a plan to sell the Assets. During the prepetition period, Nortel approached seventeen parties, including twelve financial investors and three strategic buyers.  An information memorandum was provided to all fifteen interested parties, and meetings and/or calls were held with each.  Three expressions of interest were received, and non-binding term sheets were received from two parties, both of which were subsequently negotiated and signed.  Purchaser was chosen as the lead bidder primarily due to its financially superior offer.  By the time of filing, Sellers had negotiated the material aspects of a deal with Purchaser and were very close to entering into a transaction with them.

15.    The commencement of creditor protection proceedings in the United States, Canada and the United Kingdom forced Sellers to forego the pre-filing deal it had negotiated with Purchaser, and to reopen the bidding process for the Assets.  To that end, Sellers have again approached the fifteen initial parties and initiated contact with an additional fifteen potential buyers.

16.    Once this Court has approved the Bidding Procedures and Purchase Agreement, those documents will be submitted to the Canadian Court for approval pursuant to this Court's order approving a cross-border protocol.  The final sale and assignment of the Assets will also be submitted for approval by the Canadian Court.  With respect to those assets owned by the EMEA Debtors, the Joint Administrators have the power and authority to sell the assets without seeking a separate order from the UK Court.

17.    As set forth in the DeAlmeida Declaration, the potential purchase price for the Assets has fallen in the postpetition period and is likely to continue to decline.  Entry of the Sale Procedures Order and the expeditious sale of the Assets are important to increasing the value of these estates and of Nortel on a worldwide basis, and, in turn, to maximizing recoveries for the

[New York #2010792 v5]

creditors of these estates. The Debtors have consulted extensively with the Official Committee

about the relief sought in this Motion and understand that the Official Committee is supportive of

the timing of this sale process. The Debtors therefore have filed a motion to shorten, requesting

approval of the Sale Procedures Order no later than February 27, 2009. The Debtors request that

approval of other aspects of this Motion be heard at the Sale Hearing and that the Court hold the

Sale Hearing on March 25, 2009, or as soon thereafter as counsel may be heard.

## A.    The Purchase Agreement[4]

18.    After extensive arm's-length, good faith negotiations among the parties and their

respective advisors, Sellers and Purchaser executed the Purchase Agreement, pursuant to which

they have agreed, among other things, on the following:[5]

- Consideration. At the closing, Purchaser shall pay to Sellers a purchase price (the "Purchase Price") of seventeen million six hundred fifty thousand dollars ($17,650,000). In addition, Purchaser has agreed to perform certain warranty obligations of Sellers related to products previously sold by Sellers in connection with the Business, as described below under the heading Master Purchase Agreement. The Purchase Price is subject to adjustment based on the value as of the closing of the Business Inventory, the Business Tangible Property and the warranty obligations Purchaser has agreed to assume.

- Purchased Assets. The assets to be acquired by the Purchaser include, among other things, (i) certain fixed assets used in the Business, (ii) all inventory related to the Products, (iii) service contracts related exclusively to the servicing of the Products, and (iv) certain intellectual property used in the Products. Certain of the Purchased Assets are being sold to Purchaser by the Sellers other than the Debtors. In particular, the intellectual property is property of NNL.

- Assumed Liabilities. The liabilities to be assumed include, among other things, (i) post-closing liabilities under the Business Contracts, (ii) liabilities relating to the post-closing employment of the employees being transferred in connection with the transaction, and (iii) the payment of half of the transfer

---

[4]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Purchase Agreement.

[5]    To the extent that there are any inconsistencies between the summary description of the Purchase Agreement contained herein and the terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement control.

8

taxes, with the other half being paid by Sellers.

- <u>Sale Free and Clear</u>. That portion of the Assets to be transferred by the U.S. Debtors and the Canadian Debtors are to be transferred free and clear of all mortgages, liens, security interests, charges, easements, leases, subleases, covenants, rights of way, options, claims, restrictions or encumbrances of any kind, other than those expressly assumed by the Purchaser in the Purchase Agreement, and free and clear of all Excluded Liabilities.

- <u>Ancillary Agreements</u>. Pursuant to the Purchase Agreement, at or prior to the closing, Sellers and the Purchaser will enter into, among others, the following ancillary agreements:

  - <u>Transition Services Agreement</u>. At the closing, NNL and Purchaser will enter into an agreement under which NNL and its affiliates will agree to provide to Purchaser certain knowledge transfer and related services, commencing at the closing and continuing for a period not to exceed six (6) months.

  - <u>Intellectual Property License Agreements</u>. At the closing, NNL and the Purchaser will enter into an intellectual property license agreement (the "<u>IPLA</u>") pursuant to which (i) NNL will license to the Purchaser and its affiliates certain intellectual property necessary for the manufacture of the Products, and (ii) NNL and its affiliates will receive a license back to all intellectual property included in the Purchased Assets for use in their other product lines. The IPLA will remain in force for so long as any intellectual property rights licensed thereunder continue to exist. Also at the closing, NNL and the Purchaser will enter into a license agreement allowing the Purchaser and its affiliates to utilize the "Nortel" trademark and logo in its sales of the Products for a period of one year from closing.

  - <u>Master Purchase Agreement</u>. At the closing, NNL and the Purchaser will enter into a Master Purchase and Sale Agreement pursuant to which the Purchaser will undertake to perform certain warranty obligations of Sellers and their affiliates related to the Products for so long as the warranty periods for such Products are in effect. Additionally, Sellers will have the right to enter into subcontracts pursuant to which Purchaser will provide services to Sellers' customers in connection with certain contractual obligations being retained by Sellers.

- <u>Closing Conditions</u>: In addition to certain other customary closing conditions relating to bankruptcy court approvals and regulatory matters, the obligation of Purchaser to close the Transactions is subject to the satisfaction of the following conditions: (i) the accuracy of the Sellers' representations and warranties, except as would not be reasonably expected to have a material

9

adverse effect, (ii) the performance of and compliance in all material respects with all agreements and obligations required to be performed or complied with by the Sellers prior to the closing, and (iii) the Sellers' execution and delivery of the ancillary agreements.

- _Ongoing Covenants_: In addition to certain other customary post-closing obligations such as information-sharing and redirection of customers, Sellers have agreed to the following: (i) If Purchaser is not able to enforce a warranty claim against the third party supplier of (a) inventory sold to Purchaser pursuant to the Purchase Agreement or (b) products in respect of which Purchaser has agreed to fulfill the warranty obligations of Sellers, Sellers will use commercially reasonable efforts to assist Purchaser in obtaining the benefits of such warranties. (ii) In the event that Purchaser determines that separate financial statements of the Historical Velocity Business are required, Sellers will assist Purchaser with the preparation of such financial statements, or, if Purchaser so notifies Sellers within one month of the closing of the Transactions, Sellers will prepare audited financial statements of the Historical Velocity Business. Purchaser will reimburse Sellers for all out-of-pocket costs incurred in the preparation of or assistance with such financial statements.

- _Bidding Protections_. In the event that (i) Sellers enter into a binding definitive agreement regarding an Alternative Transaction for the sale of the Assets or (ii) Sellers exercise their right to terminate the Purchase Agreement in the event that Cure Costs exceed a specified amount and the Purchaser elects not to pay the excess Cure Costs, or (iii) Purchaser terminates the Purchase Agreement due to a material breach by the Sellers, Sellers will be required to pay to Purchaser a break-up fee of $650,000 (the "Break-Up Fee") plus an expense reimbursement of up to $400,000 (the "Expense Reimbursement").

**B.    The Bidding Procedures**

19.    In order to ensure that the Sellers receive the maximum value for the Assets, the Purchase Agreement is subject to higher or better offers, and, as such, the Purchase Agreement will serve as the "stalking-horse" bid for the Assets. The Assets may be sold in a single sale to a single purchaser or in parts to several purchasers.

20.    The key provisions of the Bidding Procedures are as follows:

- _Bid Deadline_. A Qualified Bidder (as defined below) that desires to make a bid will deliver written copies of its bid to: counsel to the Sellers, the Official Committee, the Monitor and Purchaser, so as to be received not later than noon (Eastern Time) on March 19, 2009 (the "Bid Deadline"). The Sellers may extend the Bid Deadline once or successively, but they are not obligated

10

to do so; provided, however, that for any such extension beyond five (5) days the Sellers must obtain the written consent of the Purchaser, which consent will not be unreasonably withheld. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders of such extension.

- Provisions Governing Qualifications of Bidders. Unless otherwise ordered by the Bankruptcy Court and accepted by the Monitor, for cause shown, or as otherwise determined by the Sellers, in order to participate in the Bidding Process, each person (a "Potential Bidder"), other than the Purchaser, must deliver (unless previously delivered) to counsel to the Sellers, the Official Committee and the Monitor, at the addresses provided in the Bidding Procedures:

    (a) an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers;

    (b) current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their financial advisors, in consultation with the Official Committee and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate a purchase of the Assets; and

    (c) a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including assumed liabilities and the other obligations to be performed or assumed by the Potential Bidder, as described below in paragraph (h) under the heading Provisions Governing Qualified Bids); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; and (v) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Purchase Agreement; provided that, in order to be a Qualified Bid (as defined below) the terms and conditions of such proposal shall not be in the aggregate materially less favorable to Sellers than those set forth in the Purchase Agreement.

A Potential Bidder that delivers the documents described above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the sale and perform after the completion of the sale, if selected as a Successful Bidder,

11

and that the Sellers determine in their sole discretion, after consultation with their counsel and financial advisors, the Official Committee and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the sale will be deemed a "Qualified Bidder."

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Official Committee and the Monitor, and will notify both the Potential Bidder and Purchaser, if such Potential Bidder is a Qualified Bidder.  At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin to conduct due diligence with respect to the Assets as provided in the Bidding Procedures.

- Provisions Governing Qualified Bids.  A bid submitted pursuant to the Bidding Procedures will be considered a Qualified Bid only if the bid complies with all of the following (a "Qualified Bid"):

    (a) it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Purchase Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or alternative terms and conditions that the Sellers determine, after consultation with the Official Committee and the Monitor, is no less favorable than the terms and conditions of the Agreement;

    (b) it includes a letter stating that the bidder's offer is irrevocable until (i) the date of the selection of the Successful Bidder (as defined below) and, (ii) if such bidder is selected as the Alternate Bidder (as defined below), the Alternate Bid Expiration Date (as defined below);

    (c) it includes a duly authorized and executed asset purchase agreement, including the purchase price for the Assets (the "Purchase Price"), together with all exhibits and schedules thereto, the Transition Services Agreement, the IP License Agreement, the Interim Product Purchase Agreement, the Master Purchase Agreement, the Patent Assignment Agreement, the Trademark License Agreement, the Contract Manufacturing Inventory Agreement and the other ancillary agreements described in the Agreement with all exhibits and schedules thereto, as well as copies of such materials marked to show those amendments and modifications to the Agreement proposed by a prospective bidder (a "Marked Agreement") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed Sale Order of the Bankruptcy Court and the Ontario Court;

    (d) it is not conditioned on the outcome of unperformed due diligence by the bidder;

(e) it is not conditioned on obtaining financing and includes written evidence of a commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Official Committee and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreement;

(f) it identifies with particularity each and every contract and unexpired lease, if any, the assumption and assignment of which is a condition to closing;

(g) it fully discloses the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(h) it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with its financial advisors, the Creditors' Committee, and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid that constitutes part of the same offer for the Assets, is greater than or equal to the sum of (i) the Base Purchase Price (as defined in the Purchase Agreement) (making appropriate adjustments for any proposed changes to the Target Inventory Value, Warranty Target Amount and Target Business Tangible Property Value (each as defined in the Purchase Agreement) plus (ii) the Assumed Liabilities (as defined in the Purchase Agreement) plus (iii) the value of the performance of the warranty and service-related obligations of the Sellers for which Purchaser has agreed to assume responsibility (as set forth in the Master Purchase Agreement) less (iv) the amount of transfer taxes to be paid by the Sellers under the Purchase Agreement plus (v) the value of the assumed obligation to purchase returned products and excess inventory (as set forth in the Purchase Agreement) plus (vi) the savings to Sellers resulting from the Purchaser's obligations with respect to employment of certain of Sellers' employees pursuant to the Purchase Agreement plus (vii) the value of those component parts purchased by the Sellers pursuant to Exhibit C to the Interim Product Purchase Agreement plus (viii) the amount of the Break-Up Fee (as defined below) plus (ix) the Expense Reimbursement (as defined below) plus (x) $500,000 (or such other increment as the Sellers, in consultation with their financial advisors, the Official Committee and the Monitor determine to be appropriate);

(i) it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets or the completeness of any information provided in

connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j) it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreement;

(k) it is accompanied with a good faith deposit in the form of a wire transfer, certified check or such other form acceptable to the Sellers payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to $2,500,000; and

(i) it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Official Committee and the Monitor, to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids; provided that Sellers, in evaluating such bids, may not waive compliance with the requirements in items (d), (e) and (k) above.

Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Purchase Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the sale.

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder, as described above in paragraph (h) under this heading) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such transactions, the terms and conditions of the ancillary agreements, the effect of the sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the sale, the amount of Assets included or excluded from the bid, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their financial and legal advisors, the Official Committee and the Monitor.  In determining the net value of a potential Qualified Bid, Sellers will utilize (to the extent quantifiable) the data relating to the items listed in paragraph (h) above that was available to Sellers as of the date such assessment was made with respect to Purchaser.

If the Sellers do not receive any Qualified Bids other than the Purchase Agreement received from the Purchaser, the Sellers shall report the same to

14

the Bankruptcy Court and the Monitor and subject to requiring and obtaining approvals of the Ontario Court shall proceed with the sale pursuant to the terms of the Agreement. If approval of the Ontario Court is required, the applicable Seller will as soon as practicable file a motion with such court(s) seeking approval of the Purchase Agreement. If the Sellers receive a bid that does not conform to one or more of the requirements specified above, but determine, in their reasonable business judgment, after consultation with the Official Committee and the Monitor, that such bid is to be treated as a Qualified Bid, subject to the conditions with respect to the restriction on Sellers' ability to waive certain requirements of a Qualified Bid, with a higher value as defined above, then any Qualified Bidder (including the Purchaser) shall have the opportunity to submit a bid at the Auction on the same basis, so long as such bid has a value of at least $500,000 (or such other increment as the Sellers, in consultation with their financial advisors, the Official Committee and the Monitor determine to be appropriate) more than the non-conforming bid. The Sellers shall notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids no later than one (1) day following the expiration of the Bid Deadline.

- Auction Process. If the Sellers receive one or more Qualified Bids in addition to the Purchase Agreement, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video, upon notice to all Qualified Bidders who have submitted Qualified Bids, at 9:30 a.m. on March 23, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attention: James L. Bromley and Lisa M. Schweitzer, which Auction shall not be canceled or adjourned without the prior consent of the Purchaser (except as provided herein), such consent not to be unreasonably withheld. Copies of all Qualified Bids shall be delivered to the Official Committee, the Monitor and counsel to the Purchaser promptly after such time that such bid is deemed a Qualified Bid.

The Auction shall run in accordance with the following procedures:

(a) Only the Sellers, the Purchaser, any representative of the Official Committee and the Monitor (and the legal and financial advisors to each of the foregoing), any creditor of the Debtors and any other Qualified Bidder which has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b) Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(c) Each Qualified Bidder who has timely submitted a Qualified Bid may participate in the Auction prior thereto, provided that, in the event a Qualified Bidder elects not to participate in the Auction, such Qualified

15

Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bidder at the conclusion of the Auction. Prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Official Committee and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to all Qualified Bidders.

(d) All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as explained below) at the Auction with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to participate in the Auction must participate in person.

(e) The Sellers, after consultation with their counsel and financial advisors, the Official Committee and the Monitor may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court or of any other applicable court entered in connection herewith and (ii) disclosed to each Qualified Bidder at the Auction.

(f) Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their financial advisor, the Official Committee, and the Monitor, that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (defined below). Each incremental bid at the Auction shall have a purchase price of at least $500,000 over the Starting Bid or the Leading Bid, as the case may be; provided, that the Sellers, in consultation with the Official Committee and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid (and the value of such bid) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge and written confirmation of the Leading Bid. For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of

bidding, give effect to the Break-Up Fee and the Expense Reimbursement that may be payable to the Purchaser under the Purchase Agreement as well as any additional liabilities to be assumed by a Qualified Bidder.

(g) If the Sellers do not receive any Qualified Bid other than the Purchaser's Qualified Bid at the Auction, the Sellers shall seek approval of the Purchase Agreement at the Sale Hearing.

- Selection Of Successful Bid.  At the conclusion of the Auction, or as soon thereafter as practicable, the Sellers, in consultation with their counsel and financial advisors, the Official Committee and the Monitor, will (a) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including, among other things, the terms and conditions of the ancillary agreements, the effect of the Sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), the counterparties to such transactions, and other factors affecting the speed, certainty and value of the Sale, (b) identify the highest or otherwise best offer for the Assets received at the Auction (the "Successful Bid(s)" and the bidder making such bid, the "Successful Bidder") and (c) communicate to the Buyer, the Creditors' Committee and the Monitor the identity of the Successful Bidders and the details of the Successful Bid. The determination of the Successful Bid by Sellers, after consultation with the Official Committee, at the conclusion of the Auction, shall be final.

- Closing with Alternative Backup Bidders.  If the Sellers receive additional Qualified Bids at the Auction, then, at the Sale Hearing, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid," and such bidder, the "Alternate Bidder").  The Sellers' presentation to the Bankruptcy Court, and any other applicable court(s) whose approval is required, of the Successful Bid and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of any such bids, which acceptance will only occur upon the latest approval of such bid(s) to be delivered by the Bankruptcy Court at the Sale Hearing and any other applicable court(s) whose approval is required. Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court or any other court.  The Alternate Bid shall remain open until the earlier of (a) sixty (60) days following the entry of the Sale Order or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date").

## C.    Break-Up Fee and Expense Reimbursement

21.    Purchaser and its professionals have expended, and likely will continue to expend,

[New York #2010792 v5]

considerable time, money and energy pursuing the purchase of the Assets and the assumption and assignment of the Assumed Contracts, and have engaged in extended lengthy, good faith negotiations. The Purchase Agreement is the culmination of these efforts.

22.    In recognition of this expenditure of time, energy, and resources, the Sellers have agreed that if the Purchaser is not the Successful Bidder, the Sellers will, in certain circumstances as set forth in Section 10.2 of the Purchase Agreement, pay to the Purchaser the Break-Up Fee and Expense Reimbursement, which amounts shall constitute superpriority administrative claims in the Debtors' bankruptcy cases.

23.    The payment of the Break-Up Fee and the reimbursement of Purchaser's expenses up to the Expense Reimbursement will be governed by the provisions of the Purchase Agreement.

**D.    The Notice Procedures**

24.    The Debtors propose to give notice, immediately after the entry of the Sale Procedures Order, of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing by sending a notice (the "Notice of Auction and Sale Hearing"), substantially in the form attached to this Motion as Exhibit E, to (i) all taxing authorities or recording offices which have a reasonably known interest in the relief requested, (ii) the U.S. Trustee, (iii) the Monitor, (iv) counsel to the Official Committee, (v) counsel to the Bondholder Group, (vi) all federal, state, and local regulatory authorities with jurisdiction over the Debtors, (vii) all non-debtor parties to relevant contracts or leases, (viii) each of the entities that had received an invitation from the Sellers to acquire or had previously expressed an interest in acquiring the Assets; and (ix) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002.

25.    The notice proposed by the Debtors will specify that objections to the relief

18

requested by this Motion, including objections relating to the assumption or assignment of the Assumed Contracts and the proposed Cure Amounts (as defined below), shall be set forth in writing and specify with particularity the grounds for such objections or other statements of position, and shall be filed and served by the objection deadline set forth in the Sale Procedures Order, on (i) counsel to Debtors, (ii) counsel to the Purchaser, (iii) the U.S. Trustee, (iv) the Monitor, (v) counsel to the Bondholder Group, and (vi) counsel to the Official Committee. The Debtors request that failure to file and serve objections by the deadline set forth in the Sale Procedures Order and in accordance with the foregoing procedure shall be deemed a waiver of such objections and the objecting party shall be forever barred from asserting such objections with respect to the consummation and closing of the sale, including without limitation, any objections to the proposed assumption and assignment of the Assumed Contracts. The notice will further state that any objections filed and served in accordance with the foregoing procedure will be heard by the Court at the Sale Hearing.

**E.      The Assignment Procedures**

26.      The Assumed Contracts consist of a significant number of contracts, under which Nortel is required to provide certain support and customer service. The identity of the counterparties under the Assumed Contracts (the "Counterparties") constitutes an important component of the Assumed Contracts' value. Access to the list of Counterparties absent appropriate confidentiality restrictions would entail releasing valuable confidential information of critical value not only to any prospective purchaser of the Assumed Contracts but also to the Debtors' other businesses, many of which share overlapping customer lists. Thus, publicly releasing the names of the Counterparties would have an immediate detrimental impact on the value of the Debtors' assets.

27.     The Debtors believe that there are no existing defaults under the Assumed

Contracts that will require cure.

28.     In light of the foregoing and the need to expedite the sale of the Assets, the

Debtors submit the following Assignment Procedures for the Court's approval:

a.      The Debtors shall, no more than three (3) business days after entry of the Sale
        Procedures Order, serve an individual notice substantially in the form attached
        hereto as Exhibit F (the "Assumption and Assignment Notice") by first class mail
        on each counterparty under each Assumed Contract (each a "Counterparty") (and
        its attorney, if known) at the last known address available to Debtors.  Each
        Assumption and Assignment Notice shall set forth the following information: (i)
        the name and address of the Counterparty, (ii) notice of the proposed effective
        date of the assignment, (iii) identification of the Assumed Contract, (iv) the
        amount, if any, determined by the Debtors to be necessary to be paid to cure any
        existing default ("Cure Amount"), and (v) a description of Purchaser and a
        statement as to Purchaser's ability to perform Debtors' obligations under the
        Assumed Contracts.  All Assumption and Assignment Notices will be
        accompanied by a copy of the order granting this motion.

b.      To the extent necessary to consummate a sale of the Debtors' assets as
        contemplated by this Motion, the Debtors shall pay the Cure Amounts and
        segregate any disputed cure amounts pending the resolution of any such dispute.[6]

c.      The Debtors shall file under seal with the Court and deliver to (i) counsel to the
        Purchaser, (ii) the U.S. Trustee, (iii) the Monitor, (iv) counsel to the Bondholder
        Group, and (v) counsel to the Official Committee a full, alphabetized list of
        Counterparties in conformance with Rule 6006(f) of the Bankruptcy Rules, along
        with an affidavit confirming that Assumption and Assignment Notices have been
        sent to each.

d.      Any Counterparty will be deemed to have received adequate assurance of future
        performance as required by section 365 of the Bankruptcy Code if the Debtors,
        after payment of any Cure Amounts, would no longer have any payment or
        delivery obligations under the Assumed Contract.

e.      To the extent that any Counterparty wishes to object on the grounds of (i) the
        proposed Cure Amount; (ii) the need to cure a default or early termination event,

---

[6]     Note that Sellers may elect to terminate the Purchase Agreement if the Cure Amounts payable by Sellers
exceed the higher of (x) $1,000,000 in the aggregate and (y) if an auction (as described in the Sales Procedures
Order) occurs and Purchaser makes a subsequent bid with a base cash component greater than the $17,650,000, five
percent (5%) of such base cash component; provided, that all Cure Amounts and other amounts for which Sellers
would otherwise be responsible pursuant to Section 2.3(a) of the Purchase Agreement actually paid by Buyer shall
be excluded from the amount payable by Sellers for these purposes.

including, without limitation, any default or early termination event with respect to the Debtors and each of their respective affiliates, successors and assigns (a "Default") other than a Default relating to the commencement of a case under the Bankruptcy Code by any of the Debtors, or the insolvency or financial condition of any of the Debtors, which Defaults need not be cured prior to assignment; or (iii) the adequate assurance of future performance under the applicable Assumed Contract, then such Counterparty must serve a written notice of objection, so that such objection is <u>actually received</u> no later than **noon on March 18, 2009**, on counsel to the Debtors: Cleary Gottlieb Steen & Hamilton LLP, 1 Liberty Plaza, New York, NY 10006, Fax: (212) 872-1002 (Attention: James L. Bromley and Lisa M. Schweitzer), and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, DE 19801, Fax: (302) 658-3989 (Attention: Derek C. Abbott).  Copies must also be served contemporaneously on (a) counsel to the Purchaser: Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036, Fax: (212) 715-8000 (Attention: Ernest S. Wechsler), (b) counsel to the Official Committee: Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Fax: (212) 872-1002 (Attention:  Fred S. Hodara), and (c) counsel to the Bondholder Group:  Milbank, Tweed, Hadley & McCloy, One Chase Manhattan Plaza, New York, New York 10006, Fax: (212) 822-5735 (Attention:  Roland Hlawaty).  Any such notice must specify the grounds for such objection, including stating the Counterparty's alleged Cure Amount (including, on a transaction by transaction basis, calculations and detail of specific charges and dates, and any other amounts receivable or payable supporting such alleged Cure Amount, and in any event containing no less detail than the calculation of the Cure Amount provided by the Debtors) if the Counterparty disagrees with the Debtors' proposed Cure Amount and any other defaults or termination events the Counterparty alleges must be cured to effect assignment of the Assumed Contract.

f.    To the extent that any Counterparty does not timely serve an objection as set forth above, such Counterparty will be deemed (i) to have consented to such Cure Amounts, if any, and to the assumption and assignment of the Assumed Contract; (ii) to have agreed that the Purchaser has provided adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(1)(C); (iii) to have agreed that all Defaults under the Assumed Contracts arising or continuing prior to the assignment have been cured as a result or precondition of the assignment, such that the Purchaser or the Debtors shall have no liability or obligation with respect to any Default occurring or continuing prior to the assignment, and from and after the date of the assignment the Assumed Contract shall remain in full force and effect for the benefit of the Purchaser and the Counterparty in accordance with its terms; (iv) to have waived any right to terminate the Assumed Contract or designate an early termination date under the applicable Assumed Contract as a result of any Default that occurred and/or was continuing prior to the assignment date; and (v) to have agreed that the terms of the Sale Order shall apply to the assignment.

21

g.  Upon receipt of an objection from a Counterparty, Debtors shall immediately initiate a meeting or teleconference with the objecting Counterparty. If the Debtors and the Counterparty are unable to consensually resolve any timely served objection before 5 p.m. on March 20, 2009, then (i) either party may seek the intervention of the Court to settle the dispute by filing a formal objection no later than March 20, 2009, (ii) if the dispute relates solely to the amount of the Cure Amount, at the time of the assignment, Debtors may pay to the Counterparty any undisputed portion of the proposed Cure Amount and place any disputed portion into a segregated interest-bearing account such that, upon any resolution by the Court of the Cure Amount dispute, or agreement between the Debtors and the Counterparty, the Counterparty will be entitled to payment from the segregated account of any disputed portion and interest earned thereon to which the Court finds, or the Debtors and Counterparty agree, it is entitled, and/or (iii) Debtors may elect not to assume the relevant Assumed Contract and instead reject it, subject to the limitations set forth in the Purchase Agreement.

h.  Prior to the entry of the Sale Order, Purchaser or Successful Bidder shall provide adequate assurance of its future performance under each Assumed Contract to the parties thereto (other than the Debtors), as reasonably necessary to satisfy section 365(f)(2)(B) of the Bankruptcy Code. Any Cure Amounts still outstanding at the time of closing shall be paid to the appropriate Counterparty as a condition subsequent to assumption and assignment. Except as set forth in the Purchase Agreement, Purchaser has not agreed to pay, shall not be required to assume, and shall have no liability or obligation with respect to, any liability or obligation, direct or indirect, absolute or contingent, of Sellers, including any liabilities or obligations associated with the Assumed Contracts arising on or before closing.

29.  The Assumed Contracts are largely similar in their terms, and therefore it is appropriate to treat them together. Bankruptcy Rule 6006(e) allows for the sale of multiple contracts in one motion upon authorization of the Court. The Debtors therefore request that the Court grant authorization to file an omnibus motion pursuant to Bankruptcy Rule 6006(f)(6).

30.  To facilitate the assumption and assignment of the Assumed Contracts, the Debtors further request that the Court find the anti-assignment provisions of the Assumed Contracts, if any, to be unenforceable under section 365(f) of the Bankruptcy Code.[7]

---

[7]  Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease…" 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or

22

**E.**     **Request to Set a Date for the Sale Hearing**

31.     The Debtors intend to present the Successful Bid for approval by the Court

pursuant to the provisions of sections 105, 363, and 365 of the Bankruptcy Code at the Sale

Hearing to be scheduled by the Court and currently proposed as **March 25, 2009 at 10:30 a.m.**

**(Eastern Time).**  The Debtors shall be deemed to have accepted a bid only when the bid has

been approved by the Court at the Sale Hearing.  Upon the failure to consummate a sale of the

Assets after the Sale Hearing because of the occurrence of a breach or default under the terms of

the Successful Bid, the next highest or otherwise best Alternate Bid, if any, as disclosed at the

Sale Hearing, shall be deemed the Successful Bid without further order of the Court, and the

parties shall be authorized to consummate the transaction contemplated by the Alternate Bid.

**Basis for Relief**

**F.**     **The Bidding Procedures Are Appropriate Under the Circumstances**

32.     A debtor may sell, after notice and a hearing, its assets outside the ordinary course

of business.  11 U.S.C. § 363.  Generally, to obtain approval of a proposed sale of assets, a

debtor must demonstrate that the "proffered purchase price is the highest and best offer" under

the circumstances of the case.  See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food

Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a

primary objective of the Code [is] to enhance the value of the estate at hand); In re Integrated

Res., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law

that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest

overall benefit possible for the estate.") (quoting Cello Bay Co. v. Champion Int'l Corn. (In re

Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

---

a right or obligation under such contract or lease on account of an assignment of such contract or lease, such
contract, lease, right, or obligation may not be terminated or modified under such provision because of the
assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

23

33.     The implementation of competitive bidding procedures to facilitate the sale of a

debtor's assets outside of the ordinary course of a debtor's business is routinely approved by

bankruptcy courts as a means of ensuring that such sale will generate the highest and best return

for a debtor's estate.  The Debtors submit that the foregoing Bidding Procedures and the

opportunity for competitive bidding embodied therein are reasonable and designed to maximize

the value of the Debtors' assets and should, therefore, be approved by this Court.

34.     The Debtors believe that a prompt sale process is the best way to maximize the

value of the estate's assets for the benefit of their estates, creditors and other stakeholders.  In

recognition of the fact that the value of the Assets likely diminish every day, the Purchase

Agreement explicitly contains a provision whereby Purchaser may elect to terminate its

obligations under the Purchase Agreement if the Sale has not closed by April 15, 2009 (or has

not been finally approved by the Court by May 1, 2009).

35.     Accordingly, the Debtors have concluded that:  (a) a prompt sale of the Assets is

the best way to maximize value for these estates, and (b) the proposed Bidding Procedures

described herein are the most effective method of obtaining the highest and best offer for the

Assets.

**G.    Provision for Bid Protection in the Form of a Break-Up Fee and Expense
        Reimbursement Has Become a Recognized and Necessary Practice**

36.     The Debtors have formulated a bidding process that the Debtors believe will

induce prospective competing bidders to expend the time, energy and resources necessary to

submit an Initial Bid, and which the Debtors believe is fair and reasonable in view of the assets

to be sold.  The Bidding Procedures and, in particular, the proposed Break-Up Fee and Expense

Reimbursement, are reasonable and supported by applicable case law.

37.     The use of bid protections such as these has become an established practice in

24

chapter 11 asset sales involving the sale of significant assets because such bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process. Historically, bankruptcy courts have approved bidding incentives similar to the bid protections solely by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (holding that bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); In re Marrose Corp., Nos. 89 B 12171-12179 (CB), 1992 WL 33848 at *5 (Bankr. S.D.N.Y. 1992) ("[bidding incentives] are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"). See also In re Integrated Resources, 147 B.R. 650, 657-58 (S.D.N.Y. 1992).

38.     The Third Circuit Court of Appeals has clarified the standard for determining the appropriateness of bidding incentives in the bankruptcy context. In Calpine Corp. v. O'Brien Envtl Energy, Inc. (In re O'Brien Envtl Energy, Inc.), 181 F. 3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives such as the Break-Up Fee must provide benefit to a debtor's estate. Id. at 533.

39.     The O'Brien opinion identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have

25

been made and without which bidding would have been limited." Id. at 537. Second, where the availability of bidding incentives induced a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

40.    The bid protections proposed by Debtors are consistent with the "business judgment rule" and satisfy the Third Circuit's "administrative expense" standard. At the inception of the marketing process, potential purchasers will be provided with the Purchase Agreement and will be afforded an opportunity to submit their own adaptation of that agreement, marked to show changes necessary to consummate a sale which must be acceptable to the Debtors. Under the "administrative expense" standard enunciated in O'Brien, as well as the "sound business judgment" standard followed in other jurisdictions, the bid protections proposed by the Debtor, including the Break-Up Fee, should be approved as fair and reasonable. The proposed bid protections are reasonable and generally consistent with the range of bidding protection typically approved by bankruptcy courts in this district. See, e.g., In re Rouge Industries, Inc., Case No. 03-13272 (Bankr. D. Del. Dec. 3, 2003); In re Ameriserve Food Distrib., Inc., Case No. 00-00358 (Bankr. D. Del. Jan 31, 2000) (court approved break up fee of 3.6% or $4 million in connection with a $110 million sale of assets); In re Fruit of the Loom, Inc., Case No. 99-04497 (Bankr. D. Del. Dec. 29, 1999) (court approved break-up fee of 3.0%, or $25 million in connection with a $835 million sale of business); In re Worldwide Direct, Inc., Case No. 99-108 (Bankr. D. Del. Feb. 26, 1999) (approving break-up fee of 3.1% of the proposed purchase price); In re Montgomery Ward Holding Corp., et al., Case No. 97-1409 (Bankr. D. Del. June 15, 1998) (court approved break-up fee of 2.7% or $3 million in connection

26

with $100 million sale of real estate); In re Medlab, Inc., Case No. 97-1893 (Bankr. D. Del. April 28, 1999) (court approved break-up fee of 3.12% or $250,000 in connection with $8 million sale transaction).

41.    Therefore, because the procedures and incentives included in the sale, including the proposed Break-Up Fee, are fair and reasonable, are reasonably calculated to produce the best and highest offers for the Assets and thereby confer actual benefits upon the estates herein, and are within the range of incentives customarily approved by courts, such procedures should be approved in these chapter 11 cases.

**H.    Sale of the Assets Is a Product of the Debtors' Reasonable Business Judgment**

42.    Section 363(b)(1) of the Bankruptcy Code provides: "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

43.    Virtually all courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession.  See In re Abbotts Dairies of Pa., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and

27

whether the asset is decreasing or increasing in value"); In re Stroud Ford, Inc., 164 B.R. 730,

732 (Bankr. M.D. Pa 1993); Titusville Country Club v. Pennbank (In re Titusville Country

Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Industrial Valley Refrigeration & Air

Conditioning Supplies Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); In re Lionel Corp., 722 F.2d

1063 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re

Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82

B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a

section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is

a good business reason for completing the sale and the transaction is in good faith").

44.     The "sound business reason" test requires a trustee or debtor-in-possession to

establish four elements:  (1) that a sound business purpose justifies the sale of assets outside the

ordinary course of business; (2) that accurate and reasonable notice has been provided to

interested persons; (3) that the trustee has obtained a fair and reasonable price; and (4) good

faith.  In re Titusville Country Club, 128 B.R. at 399; In re Sovereign Estates, Ltd., 104 B.R.

702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R. at 335-36; see also Stephens

Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.[8]

45.     Additionally, prior to and after enactment of the Bankruptcy Code, courts have

permitted a proposed sale of all or substantially all assets of a trustee outside the ordinary course

of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or

interest holders.  See In re Abbotts Dairies of Pa., Inc., 788 F.2d at 143; In re Lionel Corp., 722

F.2d 1063 (passim).

---

[8]     Lionel's "sound business purpose test" replaces an older rule that held that sales of substantially all of a
debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i.e. when
the assets to be sold were "wasting" or perishable.  Lionel, 722 F.2d at 1071.

46.    The proposed procedures for the sale of the Debtors' assets meet the "sound business reason" test. First, sound business purposes justify the sales. The Debtors believe that a prompt sale of the Assets conducted pursuant to the Bidding Procedures presents the best opportunity to realize the maximum value of the estate's assets for distribution to the estate and its creditors. The Debtors further believe that the net benefit to their creditors may be adversely affected absent an immediate sale, as a result of the ever-diminishing value of the assets. See In re Lionel Corp., 722 F.2d at 1071 (of factors for court to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").

47.    The proposed procedures for the sale of the Assets also meet the other factors of the "sound business reason" test. As part of this Motion, the Debtors have sought to establish procedures for notice to creditors and other prospective bidders. Under the circumstances of this case, the Debtors submit that the notice period proposed satisfies the requirements of the Bankruptcy Rules, see Bankruptcy Rule 2002, and provides sufficient time for parties in interest to submit objections to the proposed sale and for bidders to formulate and submit competing proposals.

48.    Finally, the proposed procedures for sales of the Debtors' assets satisfy the good faith requirement of Abbotts Dairies. The Debtors submit that the results of the Auction will be the product of good faith, arm's length negotiations with respect to the price and other terms of the sale of the Assets between the Debtors and highest and best bidder at the conclusion of the Auction.

49.    As set forth above, the Debtors have determined, in the exercise of their sound business judgment, that the sale of the Assets to the highest and best bidder at the Auction may

29

be appropriate and in the best interests of their estate and creditors.  The sale of the Assets

pursuant to the Bidding Procedures will afford the Debtors' estates an opportunity to maximize

the recoveries to creditors.  Accordingly, the Debtors request that the Court approve the proposed

procedures for sale of the Assets to the highest or otherwise best bidder at the Auction and

approve the sale presented to the Court at the Sale Hearing.

## I.    Privacy Ombudsman

50.    Under section 363(b)(1) of the Bankruptcy Code, if the sale of a consumer

customer list containing personal information relating to individual persons is inconsistent with

the Debtors consumer privacy policy, section 332 governs the appointment of a consumer

privacy ombudsman.  11 U.S.C. § 332(b)(1).  Here, none of Debtors' customers are individuals,

and Debtors do not have a consumer privacy policy, so section 363(b)(1) does not apply, and a

consumer privacy ombudsman is not required.

## J.    Sale of the Assets Should Be Free and Clear of Liens and Claims

51.    Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to

sell and transfer the Assets to the Purchaser or Successful Bidder free and clear of all Liens and

Claims, with such Liens and Claims to attach to the proceeds of the sale of the Assets, subject to

any rights and defenses of the Debtor and other parties in interest with respect thereto.  Section

363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this
> section free and clear of any interest in such property of an entity
> other than the estate, only if –
>
> (1)     applicable nonbankruptcy law permits sale of such property
> free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property
> is to be sold is greater than the aggregate value of all liens on such

30

property;

    (4)    such interest is in bona fide dispute; or

    (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the requirements is met).

    52.    A sale free and clear of Liens and Claims is necessary to maximize the value of the Assets.  A sale subject to Liens and Claims would result in a lower purchase price and be of substantially less benefit to the Debtors' estate.  A sale free and clear of Liens and Claims is particularly appropriate under the circumstances because any Lien or Claim in, to or against the Debtors' assets that exists immediately prior to the closing of any sales will attach to the sale proceeds with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in interest.  The Debtors submit that holders of Liens and Claims, if any, will be adequately protected by the availability of the proceeds of the sale to satisfy their Liens and Claims.  Thus, the proposed sale satisfies sections 363(f) of the Bankruptcy Code.  Moreover, any holder of a Lien or Claim that receives notice of the sale and which fails to object to the sale of the Assets free and clear of Liens and Claims should be deemed to consent to the sale, thereby complying with section 363(f)(2) of the Bankruptcy Code.

**K.**    **Notice of the Proposed Sale Is Reasonable Under the Circumstances**

    53.    In order to receive the highest and best price in return for the Assets, the Debtors have filed this Motion on an expedited basis and are seeking to conduct the Auction and hold the

31

Sale Hearing on an accelerated track. In order to yield the greatest possible return for the benefit

of creditors and to cut off potential administrative expenses, the Debtors believe that an

expedited auction and sale process is warranted and necessary.

54.     Accordingly, the Debtors submit that the notice to be provided is reasonable and

appropriate and will be adequate to ensure that all interested parties have the opportunity to bid

for the Assets, and/or to object to the proposed sale of the Assets.

**L.      The Assumption and Assignment of the Assumed Contracts Should Be Authorized**

55.     Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of
> the debtor only if --
>
>> (A)     the trustee assumes such contract or lease in
>> accordance with the provisions of this section; and
>>
>> (B)     adequate assurance of future performance by
>> the assignee of such contract or lease is provided, whether
>> or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2). Under Bankruptcy Code section 365(a), a debtor, "subject to the court's

approval, may assume or reject any executory contract or unexpired lease of the debtor." 11

U.S.C. § 365(a). Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for

assuming an executory contract of a debtor. This subsection provides:

> (b) (1)     If there has been a default in an executory
> contract or unexpired lease of the debtor, the trustee may not
> assume such contract or lease unless, at the time of assumption of
> such contract or lease, the trustee -
>
>> (A)     cures, or provides adequate assurance that
>> the trustee will promptly cure, such default;
>>
>> (B)     compensates, or provides adequate
>> assurance that the trustee will promptly compensate, a party
>> other than the debtor to such contract or lease, for any
>> actual pecuniary loss to such party resulting from such
>> default; and

32

>            (C)      provides adequate assurance of future
> performance under such contract or lease.

11 U.S.C. § 365(b)(1).

56.      The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

57.      Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

58.      To the extent any defaults exist under any Assumed Contract, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment. If necessary, the Debtors will submit facts prior to or at the Sale Hearing to show the financial credibility of the Purchaser or Successful Bidder and willingness and ability to perform under the Assumed Contracts. The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Purchaser to provide adequate assurance of future performance under the Assumed Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code. The Court should therefore authorize the Debtors to assume and assign the

[New York #2010792 v5]

Assumed Contracts as set forth herein.

**M.    Information Regarding Debtors' Customers Is Confidential Commercial Information and Should Be Filed Under Seal**

59.    Under section 107(b) of the Bankruptcy Code the Court may, where necessary to protect an entity with respect to a trade secret or other confidential information, allow for such information to be filed under seal. 11 U.S.C. § 107(b)(1).  Courts have found that a list of creditors and counterparties can constitute confidential commercial information, especially where such a list is an important asset of the debtor's. See, e.g., In re Frontier Group, 256 B.R. 771 (Bankr. E.D. Tenn. 2000).

60.    The list of Counterparties to the Assumed Contracts constitutes confidential commercial information because it represents a significant aspect of the value of the Assets, and because making the list public would be detrimental not only to the value of the Assets, but also to the value of the Debtors' other assets.  Therefore, it is critical to the preservation of the value of the Debtors' estate that the Court allow for this confidential information to be filed under seal.

**N.    Waiver of Automatic Ten-Day Stay Under Bankruptcy Rules 6004(g) and 6006(d)**

61.    Pursuant to Bankruptcy Rule 6004(g), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for ten days after entry of the order.  Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for ten days after entry of the order.  The purpose of Bankruptcy Rules 6004(g) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(g); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

62.    Although Bankruptcy Rules 6004(g) and 6006(d) and the Advisory Committee

34

Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day

stay period, Collier on Bankruptcy suggests that the 10-day stay period should be eliminated to

allow a sale or other transaction to close immediately where there has been no objection to the

procedure. 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999). Furthermore, Collier on

Bankruptcy provides that if an objection is filed and overruled, and the objecting party informs

the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file

such appeal. Id.

63.     Pursuant to the Purchase Agreement, and because of the potential diminishing

value of the Assets, the Debtors must close this sale promptly after all closing conditions have

been met or waived. Thus, waiver of any applicable stays is appropriate in this circumstance.

## Notice

64.     Notice of the Motion has been given via facsimile, electronic transmission, hand

delivery or overnight mail to (i) counsel to the Purchaser, (ii) the U.S. Trustee; (iii) the Monitor;

(iv) counsel to the Official Committee; (v) counsel to the Bondholders Group; and (vi) the

general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002. The

Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

65.     No prior request for the relief sought herein has been made to this or any other

court.

[New York #2010792 v5]

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: February 20, 2009
Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (No. 5125)
Lisa M. Schweitzer (No.1033)
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Thomas F. Driscoll III (No. 4703)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*

[New York #2010792 v5]