## Exhibit A

**Asset Purchase Agreement**

EXECUTION VERSION

ASSET PURCHASE AGREEMENT

by and among

NORTEL NETWORKS INC.,

NORTEL NETWORKS LIMITED,

and

the EMEA SELLERS (as set out in Exhibit A)

as Sellers

A. R. BLOOM, S. HARRIS, A. M. HUDSON AND C. HILL,
AND A.R. BLOOM AND D. HUGHES, as Joint Administrators

and

RADWARE LTD.,

as Buyer

Dated as of February 19, 2009

6734482

## TABLE OF CONTENTS

Page

**ARTICLE I.** DEFINITIONS.................................................................3
    1.1    Certain Definitions....................................................3
    1.2    Certain Additional Definitions..............................13
    1.3    Accounting Terms...................................................15
    1.4    Monetary Terms.....................................................15
**ARTICLE II.** PURCHASE OF ASSETS AND ASSUMPTION OF LIABILITIES................15
    2.1    Sale and Transfer of Assets....................................15
    2.2    Excluded Assets......................................................17
    2.3    Assumed Liabilities.................................................19
    2.4    Liabilities Not Assumed.........................................19
    2.5    Further Assurances.................................................20
    2.6    Buyer Entities.........................................................21
    2.7    Cure Costs; Adequate Assurance; No Rejection. ...............21
    2.8    Canadian Acknowledgement ................................21
    2.9    Seller Entities; UK and EMEA Assets....................21
    2.10   Acknowledgement of Termination of Exploitation Rights...............22
    2.11   Cessation of Status as a Seller Entity....................22
**ARTICLE III.** PURCHASE PRICE ........................................23
    3.1    Purchase Price.........................................................23
    3.2    Allocations; Taxes...................................................24
    3.3    Allocation of Taxes.................................................25
**ARTICLE IV.** CLOSING.........................................................25
    4.1    Closing....................................................................25
    4.2    Seller Closing Deliveries.......................................25
    4.3    Buyer Closing Deliveries.......................................26
    4.4    Delivery of the Acquired Assets............................26
    4.5    Location of Prior IP; Post-Closing Identified Intellectual Property and
           Prior IP...................................................................27
    4.6    Korea Purchase Agreement....................................27
**ARTICLE V.** REPRESENTATIONS AND WARRANTIES OF SELLERS ...............27
    5.1    Organization, Power, Standing ..............................27
    5.2    Due Authorization..................................................28
    5.3    No Conflicts............................................................28
    5.4    Consents and Approvals ........................................28
    5.5    Financial Information.............................................29
    5.6    Tangible Personal Property; Inventory...................30
    5.7    Contracts.................................................................30
    5.8    Intellectual Property...............................................31
    5.9    Litigation................................................................33
    5.10   Compliance with Laws; Governmental Authorizations...............33
    5.11   Nortel Employee Plans. ........................................34
    5.12   Employee Matters. ................................................34
    5.13   Absence of Certain Changes..................................35

i

5.14    Customers and Suppliers.................................................................36
5.15    Valid Transfers.............................................................................36
5.16    Real Property ...............................................................................36
5.17    Brokers........................................................................................36
5.18    No Other Representations or Warranties ........................................36
**ARTICLE VI. REPRESENTATIONS AND WARRANTIES OF BUYER** ...........................37
6.1    Organization, Power ......................................................................37
6.2    Due Authorization.........................................................................37
6.3    No Conflict; Third-Party Consents .................................................37
6.4    Consents and Approvals ................................................................37
6.5    Litigation.....................................................................................38
6.6    Sufficient Funds ...........................................................................38
6.7    Brokers........................................................................................38
6.8    Buyer Employee Plans...................................................................38
6.9    Labor Matters...............................................................................38
6.10    Adequate Assurance of Future Performance ....................................38
6.11    Acknowledgement of Section 5.5(c)................................................38
**ARTICLE VII. PRE-CLOSING COVENANTS** ............................................................38
7.1    Commercially Reasonable Efforts ..................................................38
7.2    Regulatory and Other Approvals; Notification.................................39
7.3    Conduct of Business .....................................................................39
7.4    Examinations and Investigations ...................................................40
7.5    Bulk Sales ...................................................................................41
7.6    Publicity ......................................................................................41
7.7    New Contracts; Disclosure Schedules. ...........................................41
7.8    Confidentiality .............................................................................41
7.9    Notifications of the Transactions ...................................................42
7.10    New Exclusive Service Contracts; Multi-Year Exclusive Service
       Contracts. ....................................................................................42
7.11    Israeli Withholding Tax Exemption Application and Approval...........43
7.12    Subcontractors.............................................................................44
7.13    Nonassignable Contracts................................................................44
7.14    U.S. Bankruptcy Actions ...............................................................44
7.15    U.S. Bidding Procedures Order ......................................................45
7.16    U.S. Sale Order............................................................................45
7.17    Consultation; Notification..............................................................47
7.18    Canadian Bankruptcy Actions .......................................................47
7.19    Sale Process Order .......................................................................47
7.20    Approval and Vesting Order ...........................................................47
7.21    Consultation; Notification...............................................................48
7.22    Conflict Between this Agreement and the Biddng Procedures Order .............48
7.23    Notice of Cure Costs.....................................................................48
**ARTICLE VIII. CONDITIONS PRECEDENT TO CLOSING**...........................................49
8.1    Conditions Precedent to the Obligations of Buyer ............................49
8.2    Conditions Precedent to the Obligations of Sellers ...........................50
**ARTICLE IX. ONGOING COVENANTS** ......................................................................52

| | | |
|---|---|---|
| 9.1 | Tax Matters. | 52 |
| 9.2 | Record Retention | 53 |
| 9.3 | Use of Names. | 54 |
| 9.4 | Further Information. | 54 |
| 9.5 | Mistaken Payments | 55 |
| 9.6 | Sellers Vendor Contracts | 55 |
| 9.7 | Manufacturer Warranties | 55 |
| 9.8 | Business Contracts | 56 |
| 9.9 | Destruction of Materials not Related to the Business | 56 |
| 9.10 | Return of Products | 56 |
| 9.11 | Redirection of Customers | 57 |
| 9.12 | Business Tangible Property Containing Third Party Software | 57 |
| 9.13 | Cooperation Regarding Financial Statements; Provision of Additional Information | 57 |
| 9.14 | Confidentiality. | 58 |
| 9.15 | Delivery of Audited Financial Statements | 59 |
| 9.16 | Employee Related Agreements | 60 |
| 9.17 | Co-operation with Respect to Transferring Employees | 60 |
| 9.18 | Protection of Personal Data | 60 |
| 9.19 | Non-Solicitation of Employees by Buyer | 61 |
| 9.20 | Non-Solicitation of Transferring Employees by Sellers | 61 |
| **ARTICLE X.** | **TERMINATION OF AGREEMENT** | 61 |
| 10.1 | Termination | 61 |
| 10.2 | Break-Up Fee and Expense Reimbursement. | 62 |
| 10.3 | Effect of Termination | 63 |
| **ARTICLE XI.** | **MISCELLANEOUS** | 63 |
| 11.1 | Expenses | 63 |
| 11.2 | Governing Law | 63 |
| 11.3 | Jurisdiction; Service of Process | 64 |
| 11.4 | Waiver of Jury Trial | 64 |
| 11.5 | Attorneys' Fees | 64 |
| 11.6 | Waiver | 64 |
| 11.7 | Notices | 65 |
| 11.8 | Assignment | 66 |
| 11.9 | No Third-Party Beneficiaries | 66 |
| 11.10 | Amendments | 66 |
| 11.11 | Interpretation; Exhibits and Schedules | 66 |
| 11.12 | Entire Agreement; Construction. | 67 |
| 11.13 | Specific Performance | 67 |
| 11.14 | Severability. | 67 |
| 11.15 | Mutual Drafting | 67 |
| 11.16 | Counterparts | 67 |
| 11.17 | Survival | 67 |
| 11.18 | Limitation on Losses | 68 |

## LIST OF EXHIBITS AND ANNEXES

| | |
|---|---|
| Exhibit A | Sellers |
| Exhibit B | Products |
| Exhibit C | Master Purchase Agreement |
| Exhibit D | IP License Agreement |
| Exhibit E | Trademark License Agreement |
| Exhibit F | Transition Services Agreement |
| Exhibit G | Contract Manufacturer Inventory Agreement |
| Exhibit H | Patent Assignment Agreement |
| Exhibit I | Trademark Assignment Agreement |
| Exhibit J | Interim Product Purchase Agreement |
| Exhibit K-1 | Assignment and Assumption Agreement |
| Exhibit K-2 | Assignment and Assumption Agreement (EMEA Sellers) |
| Exhibit L-1 | Bill of Sale |
| Exhibit L-2 | Bill of Sale (EMEA Sellers) |
| Exhibit M | Sellers Closing Certificate |
| Exhibit N | Buyer Closing Certificate |
| Exhibit O | Additional Employee Related Provisions |
| Exhibit P | EMEA Seller Provisions |
| | |
| Annex 1 | U.S. Bidding Procedures |

## LIST OF SCHEDULES

| | |
|---|---|
| 1.1(a) | Business Material Adverse Effects |
| 1.1(b) | Accounting Methodologies, Policies and Principles |
| 1.1(c) | Predecessor Products |
| 2.1(a)(i) | Business Tangible Property |
| 2.1(a)(ii) | Restricted Software |
| 2.1(c) | Business Contracts |
| 2.1(d) | Business IP |
| 3.2 | Asset Allocation Schedule |
| 5.1 | Organization; Power; Standing |
| 5.4 | Seller Consents and Approvals |
| 5.5(a) | GAAP Value of Business Tangible Property, Inventory and Warranty Reserve |
| 5.5(b) | Pro Forma Financial Statements of the Historical Velocity Business |
| 5.5(c) | Accounting Assumptions |
| 5.6(a) | Exceptions to Title/Good Operating Condition (Business Tangible Property) |
| 5.6(b) | Inventory |
| 5.7 | Exceptions to Business Contracts |
| 5.8(a) | Notifications of Adverse Claims |
| 5.8(b) | Infringement |
| 5.8(c) | Infringing Uses |

| | |
|---|---|
| 5.8(e) | Protection of IP |
| 5.8(f) | Exceptions to Title |
| 5.8(g)(ii) | Drop Dead Devices |
| 5.8(g)(iii) | Open Source |
| 5.8(h) | Actions Before USPTO |
| 5.8(i) | Third Party Items |
| 5.9 | Litigation |
| 5.10 | Compliance with Laws; Governmental Authorizations |
| 5.11 | Nortel Employee Plans |
| 5.12(a) | Data Elements of Business Employees |
| 5.12(b) | Employment Laws and Orders |
| 5.12(c) | Work Rules and Collective Bargaining Agreements |
| 5.12(d) | Notices from Labor Authorities |
| 5.12(e) | Workers' Compensation Laws |
| 5.13 | Recent Changes |
| 5.14 | Seller Customers and Suppliers |
| 6.8 | Buyer Employee Plans |
| 8.1(d) | Required Sellers Consents and Approvals |
| 8.1(g) | Delivery of Certain Items at Closing |
| 8.2(d) | Required Buyer Consents |
| P(1)(a) | EMEA Tangible Property |
| P(1)(c) | EMEA Business Contracts |

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of February 19, 2009, by and among NORTEL NETWORKS INC., a Delaware corporation ("NNI"), NORTEL NETWORKS LIMITED, a Canadian corporation ("NNL" and together with NNI, the "Main Sellers"), the entities listed on Exhibit A hereto under the heading "EMEA Sellers" (the "EMEA Sellers" and together with NNI and NNL, the "Sellers") and in the case of the EMEA Sellers, the joint administrators of the EMEA Sellers, A. R. Bloom, S. Harris, A. M. Hudson and C. Hill of Ernst & Young LLP (other than Nortel Networks (Ireland) Limited, for which David Hughes and Alan Bloom serve as joint administrators) (the "Joint Administrators"), and RADWARE LTD., a company registered in accordance with the laws of Israel ("Buyer").

## RECITALS

A.     Sellers and certain of their Affiliates listed on Exhibit A hereto are engaged in the development, production, sales, service and support of the hardware and software products listed on Exhibit B hereto (for the sake of clarity, which products include a load balancing functionality) (the "Products"), which activities are known as the enterprise "Layer 4-7", "Alteon load balancer" or "Alteon Application Accelerator" business of Sellers and such Affiliates (collectively, the "Business").

B.     On January 14, 2009 (the "Petition Date"), NNL and the other entities listed under the heading "Canadian Debtors" on Exhibit A hereto filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "CCAA") (the cases commenced by such application, the "CCAA Cases") and were granted such protection pursuant to an order issued by the Canadian Court on the same date.

C.     On the Petition Date, NNI and the other entities listed under the heading "U.S. Debtors" on Exhibit A hereto filed voluntary petitions and certain orders for relief (the "Chapter 11 Cases") pursuant to Title 11 of the United States Code (the "U.S. Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Delaware (the "U.S. Bankruptcy Court").

D.     On the Petition Date, the EMEA Sellers filed applications with the English High Court of Justice (the "English Court" and, together with the U.S. Bankruptcy Court and the Canadian Court, the "Bankruptcy Courts") pursuant to the Insolvency Act of 1986, as amended (the "Insolvency Act") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "EMEA Cases"), and the English Court appointed Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP as joint administrators of the EMEA Sellers (other than Nortel Networks (Ireland) Limited, for which David Hughes and Alan Bloom serve as joint administrators of Nortel Networks (Ireland) Limited) (the "Joint Administrators") under the Insolvency Act.

E.     Each Seller has agreed to, and to cause its Affiliates to, transfer to Buyer, and Buyer has agreed to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and subject to the entry of the Approval and Vesting Order, the Acquired Assets and the Assumed Liabilities (each as defined below) (in the case of EMEA Sellers, the EMEA Acquired Assets (as defined in Exhibit P) and the EMEA

Assumed Liabilities (as defined in Exhibit P)) from such Seller or such Affiliates, upon the terms and conditions hereinafter set forth, in return for (x) a cash payment by Buyer to the Escrow Agent on behalf of Sellers and their Affiliates and (y) Buyer's agreement to assume and perform certain warranty-related obligations of Sellers and their Affiliates with respect to certain products sold by Sellers and their Affiliates prior to the Closing, pursuant to a Master Purchase and Sale Agreement (the "Master Purchase Agreement"), substantially in the form attached hereto as Exhibit C.

F.    The parties acknowledge and agree that the purchase by Buyer and the other Buyer Entities of the Acquired Assets and the EMEA Acquired Assets (and the license of the Licensed IP) and the assumption by Buyer and the other Buyer Entities of the Assumed Liabilities and the EMEA Assumed Liabilities are being made at arms length and in good faith and without intent to hinder, delay or defraud creditors of Sellers and their Affiliates, and each Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisitions by Buyer and the other Buyer Entities of the Acquired Assets and the EMEA Acquired Assets (and the license of the Licensed IP) and the assumption by Buyer and the other Buyer Entities of the Assumed Liabilities and the EMEA Assumed Liabilities, as set forth hereunder.  This Agreement and the other Transaction Documents by and among the Seller Entities and the Buyer Entities are integral and non-severable parts of the same transaction.

G.    In addition, at the Closing, Buyer and certain Sellers will enter into (i) an IP Licensing Agreement (the "IP License Agreement"), substantially in the form attached hereto as Exhibit D, (ii) a Trademark License Agreement (the "Trademark License Agreement"), substantially in the form attached hereto as Exhibit E, (iii) a Transition Services Agreement (the "Transition Services Agreement"), substantially in the form attached hereto as Exhibit F, (iv) a Contract Manufacturer Inventory Agreement (the "Contract Manufacturer Inventory Agreement"), substantially in the form attached hereto as Exhibit G, (v) a Patent Assignment Agreement (the "Patent Assignment Agreement"), substantially in the form attached hereto as Exhibit H, (vi) a Trademark Assignment Agreement (the "Trademark Assignment Agreement"), substantially in the form of Exhibit I and (vii) an Interim Product Purchase Agreement (the "Interim Product Purchase Agreement"), substantially in the form attached hereto as Exhibit J.

H.    The parties agree that the only obligations and liabilities of the EMEA Sellers and the Joint Administrators shall be with respect to the matters set out in Exhibit P, but that the EMEA Sellers and the Joint Administrators shall enjoy the benefit of the rights granted to the Sellers in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

2

## ARTICLE I.
## DEFINITIONS

1.1    Certain Definitions.  As used in this Agreement, the following terms have the following meanings unless the context otherwise requires (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Accounts Receivable" means (a) all trade accounts receivable and other rights to payment from customers of any Seller or its Affiliates, whether or not arising out of the Business, (b) all other accounts or notes receivable of any Seller or its Affiliates, whether or not arising out of the Business and (c) any claim, remedy or other right related to any of the foregoing.

"Action or Proceeding" means any action, suit, claim (provided that, for purposes of this definition and as this definition is used in this Agreement, "claim" shall be limited to matters involving (x) infringement of Intellectual Property Rights or Intellectual Property Assets and (y) Business Employees), proceeding or arbitration by any Person, or any investigation or audit by any Governmental or Regulatory Body.

"Affiliate" means with respect to any Person, any other Person controlling, controlled by or under common control with such first Person.  The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.  In the case of any Seller, "Affiliates" of such Seller shall not include any joint venture to which NNL or any Affiliate thereof is party and that is structured as a legal entity unless NNL or its Affiliates owns 75% or more of the voting equity of such joint venture.

"Alternative Transaction" means the sale, transfer or other disposition, by means of asset sale, merger, stock sale or otherwise, directly or indirectly, of all or substantially all of (i) the Business or (ii) collectively the Acquired Assets and the EMEA Acquired Assets, in a transaction or a series of transactions with one or more Persons other than Buyer and/or its Affiliates; provided, that an Alternative Transaction does not include: (a) the retention of the Business by any or all Seller Entities (or their successor entities emerging from the Bankruptcy Proceedings) under a stand-alone plan of reorganization approved by the U.S. Bankruptcy Court or any plan or arrangement approved by the Canadian Court, or (b) the sale, transfer or other disposition, directly or indirectly, of any portion of the Business, the Acquired Assets or the EMEA Acquired Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any Seller Entity.

"Assignment and Assumption Agreement" means an assignment and assumption agreement in substantially the form attached hereto as Exhibit K-1 (in the case of all Seller Entities other than the EMEA Sellers) and Exhibit K-2 (in the case of the EMEA Sellers).

3

"Assumed and Assigned Contract" means a Business Contract that can be assumed and assigned pursuant to Section 365 of the U.S. Bankruptcy Code.  For the sake of clarity, no New Exclusive Service Contract shall be deemed to be an Assumed and Assigned Contract.

"Bankruptcy Proceedings" means the Chapter 11 Cases, the CCAA Cases and the EMEA Cases and, in each case, any proceedings thereunder.

"Bill of Sale" means a bill of sale in substantially the form attached hereto as Exhibit L-1 (in the case of all Seller Entities other than the EMEA Sellers) and Exhibit L-2 (in the case of the EMEA Sellers).

"Business" has the meaning set forth in the Recitals; provided, that the Business for all purposes excludes all financial, accounting, IT, operations (including supply and support), administrative, corporate and all other back office and/or similar shared operations and functions of any Seller and its Affiliates that support or are utilized by the "Layer 4-7", "Alteon load balancer" or "Alteon Application Accelerator" business; provided, further, that except as expressly provided herein, with respect to Tangible Property, references to the Business shall only refer to the Business Tangible Property.  References to the Business as operated by Buyer and its Affiliates after the Closing shall mean the business and operations of Buyer and its Affiliates with respect to, utilizing or based upon the Acquired Assets, the Assumed Liabilities, the EMEA Acquired Assets, the EMEA Assumed Liabilities, the Radware Products (as defined in the IP License Agreement) and/or the Licensed Intellectual Property (as defined in the IP License Agreement) after the Closing.

"Business Confidential Information" means all Confidential Information that relates exclusively to the Business, the Products, the Acquired Assets, the Assumed Liabilities, the EMEA Acquired Assets or the EMEA Assumed Liabilities, whether (a) disclosed prior to or after the Closing Date to Buyer or (b) disclosed after the Closing Date to any Seller and/or its Affiliates pursuant to any post-Closing covenants provided under this Agreement.

"Business Day" means a day other than a Saturday or a Sunday or other day on which commercial banks in New York are authorized or required by Law to close.

"Business Employee" means an individual listed on Schedule 5.12(a) who is an employee of a Seller or an Affiliate of a Seller and who provides services to a Seller or such Affiliate in connection with the Business.

"Business Material Adverse Effect" means any circumstance, change or effect (any such item, an "Effect") that is materially adverse to the business, operations, assets, liabilities, results of operations or financial condition of the Business, taken as a whole, or that prevents or could reasonably be expected to prevent the timely consummation of the Transactions by Sellers and their Affiliates, but excluding (i) Effects resulting from changes in the United States or general economic conditions, except to the extent such Effects disproportionately affect the Business taken as a whole, (ii) Effects arising out of the execution or delivery of this Agreement or the Transactions or the public announcement thereof, (iii) Effects that result from any action required to be taken pursuant to this Agreement or any action taken pursuant to the written request or with the prior written consent of Buyer, (iv) Effects arising out of the pendency of any

Bankruptcy Proceeding and any action approved by, or motion made before, any Bankruptcy Court, (v) Effects arising out of the attrition of customers or other deterioration of the Business prior to the Closing Date or (vi) Effects arising out of the matters set forth in Schedule 1.1(a).

"Business Tangible Property Value" means the book value, net of reserves, of the Business Tangible Property and the EMEA Business Tangible  Property calculated consistent with GAAP.

"Buyer Employee Plan" means any currently active/open pension plan, supplemental pension plan, profit sharing plan, savings plan, retirement savings plan, bonus plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, employee benefit plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, relocation plan, family support plan, retirement plan, medical, hospitalization or life insurance plan, disability plan, sick leave plan, redundancy or severance plan, retention agreement, death benefit plan, compensation arrangement, including any base salary arrangement, overtime policy, on-call policy or call-in policy, or any other plan, program, arrangement, policy or practice that is maintained or otherwise contributed to, or required to be contributed to, by or on behalf of Buyer or its Affiliates with respect to employees of Buyer or its Affiliates in the United States, Japan and/or India.

"Buyer Entity" means Buyer and all Affiliates of Buyer that will take title to any Acquired Asset or EMEA Acquired Asset, assume any Assumed Liability or EMEA Assumed Liability, employ any Transferring Employee as a result of the Transactions, or enter into any Transaction Document.

"Buyer Material Adverse Effect" means any circumstance, change or effect that is materially adverse to the ability of Buyer to perform its obligations under this Agreement and the Transaction Documents or on the ability of Buyer to consummate the Transactions.

"Canadian Business Tangible Property" means Business Tangible Property located in Canada.

"Canadian Business Inventory" means Business Inventory located in Canada.

"Canadian Court" means the Ontario Superior Court of Justice.

"Canadian Debtors" means the Seller Entities listed under the heading "Canadian Debtors" in Exhibit A.

"Claim" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" means non-public, proprietary or confidential information that is labeled as such or should reasonably be understood by the recipient to be confidential, and includes trade secrets, research and development, methods of operations, analytical processes, software, source codes, inventions, databases, other technology, designs and other Intellectual

Property Assets, consulting techniques, processes, formulae, methods and methodologies for analyzing data, information concerning finances, investments, projections, profits, strategies, pricing, costs, products, services, service providers, vendors, customers' identities and needs, employees, partners, investors, personnel, compensation, recruiting, training, advertising, sales, marketing, promotions, government and regulatory activities and approvals, in whatever form or media, of the disclosing party and/or any third party that has disclosed or provided any of same to the disclosing party on a confidential basis; provided, that Confidential Information shall not include any information that is (i) lawfully in the public domain prior to its disclosure, or lawfully becomes publicly available other than through a breach of this Agreement or any other confidentiality obligation on behalf of any third party, (ii) disclosed to the recipient by a third party provided such third party, or any other party from whom such third party receives such information, is not in breach of any confidentiality obligation in respect of such information, (iii) developed by such recipient without use of Confidential Information, as evidenced by its business records or (iv) without obligation of confidentiality was rightfully known by the recipient prior to disclosure, as evidenced by its business records.

"Confidentiality Agreement" means that certain Nondisclosure and Confidentiality Agreement dated December 2, 2008, by and between NNI and Buyer.

"Contracts" means all executory contracts, agreements, subcontracts, indentures, notes, bonds, loans, instruments, leases, mortgages, franchises, licenses, purchase orders, sale orders, proposals, bids, understandings or commitments, whether written or oral, that are legally binding.

"CSWL" means California Software Laboratories.

"Cure Cost" means with respect to any Assumed and Assigned Contract, any amounts required by Section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under such Assumed and Assigned Contract and to pay any actual or pecuniary losses that have resulted from such defaults under such Assumed and Assigned Contract.

"EMEA" means the Europe, Middle East and Africa region.

"Employment Transfer Date" means the first Business Day following the Closing Date or, in cases where the terms of this Agreement provides for a later employment date, the date on which a Transferring Employee becomes employed with Buyer or an Affiliate of Buyer pursuant to this Agreement.

"Escrow Agent" means the Person designated as the escrow agent by Sellers pursuant to Section 3.1(a).

"Exclusive Service Contract" means a Contract between a Seller or any Affiliate of a Seller and a customer of the Business that provides exclusively for the servicing of Products.

"Final Order" means an order of any Bankruptcy Court or other court of competent jurisdiction (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial

6

has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 ("Rule 9024") or Federal Rule of Civil Procedure 60 ("Rule 60") shall not cause an order not to be deemed a "Final Order" unless, in the case of a Rule 9024 motion, such motion shall be filed within ten (10) days of the entry of the order at issue or, in the case of a Rule 60 motion, such motion shall be filed within thirty (30) days of the entering of the order at issue.

"GAAP" means United States generally accepted accounting principles, as in effect on the date of this Agreement, consistent with the accounting policies, methodologies and principles of NNI set forth on Schedule 1.1(b).

"Governmental Authorization" means any consent, license, registration, authorization, approval, franchise or permit issued, granted, given or otherwise made available by or under the authority of any Governmental or Regulatory Body or pursuant to any Law.

"Governmental or Regulatory Body" means any court, tribunal, arbitrator or government, whether federal, state, county, local or foreign, or any subdivision, agency, authority, department, commission, board, bureau, official or instrumentality thereof.

"Historical Velocity Business" means the enterprise "Layer 4-7", "Alteon load balancer" or "Alteon Application Accelerator" business of Sellers and their Affiliates as conducted in 2007 and 2008. The Historical Velocity Business does not include numerous assets and liabilities of Sellers and their Affiliates that may be utilized in connection with and/or relate to their Layer 4-7, Alteon load balancer or Alteon Application Accelerator business but are also utilized in connection with and/or relate to other businesses of Sellers and their Affiliates. Sellers and their Affiliates have not historically separately defined, or reported the financial or other results of, the Historical Velocity Business, and Sellers have made good faith estimations as to the scope of the Historical Velocity Business. For the sake of clarity, the Business and the Historical Velocity Business consist of the same product lines (including the VSS Products).

"Income Taxes" means all foreign or U.S. federal, state, local or municipal net income, alternative or add-on minimum, gross income, adjusted gross income, profits or excess profits, gross receipts or similar taxes (including withholding taxes), and any interest, penalties and additions attributable to such taxes.

"India Business Tangible Property" means Business Tangible Property located in India.

"India Business Inventory" means Business Inventory located in India.

"India Employee" means a Business Employee who has a work location in India.

"India Employee Gratuity Accrual" means the amount accrued on the books of Nortel India in respect of an India Transferring Employee's gratuity payment as of such Employee's

Employment Transfer Date, which amounts shall be accrued in accordance with the books and records of Nortel India.

"India Transferring Employee" means an India Employee who accepts an India Employment Offer and becomes employed by Buyer or an Affiliate of Buyer.

"Intellectual Property Assets" means (i) copyrightable works, all registered copyrights, and all applications, registrations and renewals thereof, (ii) Marks and all applications, registrations and renewals thereof, (iii) patents and patent applications, (iv) proprietary documents describing formulations, know-how, confidential business information, trade secrets, and other technical information and technology, (vi) computer software (including data and related documentation) and (vii) tangible embodiments of any of the foregoing in whatever form or medium, but excludes sales literature, promotional literature and any other sales, advertising, marketing or promotional materials of any Seller and/or its Affiliates.

"Intellectual Property Rights" means all past, present, and future rights of the following types, which may exist or be created under the Laws of any jurisdiction in the world: (a) rights associated with works of authorship, including exclusive exploitation rights, copyrights, moral rights, and mask work rights; (b) trademark and trade name rights and similar rights; (c) trade secret rights; (d) patent and industrial property rights; (e) other proprietary rights of every kind and nature; and (f) rights in or relating to registrations, renewals, extensions, combinations, divisions, and reissues of, and applications for, any of the rights referred to in clauses (a) through (e) of this sentence.

"Inventory" means all finished goods and service inventory.

"Inventory Value" means the book value of Inventory that is required to be reflected on a balance sheet prepared consistent with GAAP, net of reserves, as of the Closing Date, determined in a manner consistent with GAAP.

"Japan Employee" means a Business Employee who has a work location in Japan.

"Japan Transferring Employee" means a Japan Employee who accepts a Japan Employment Offer and becomes employed by Buyer or an Affiliate of Buyer.

"Knowledge of Sellers" means and shall be limited to the actual knowledge of any of Mohan Dattatreya, Philippe Michelet, Yuet Lee, Liam Kiely, Aziz Khadbai, Mark Hearn, Bill LaSalle, Larry Barrows, Ken Pecot, Gayle Zajac, Shane Donahoe, Liz Ward, Hyacinth DeAlmeida and/or Kirk Otis.

"Law" means any law, statute, rule, regulation, ordinance or other pronouncement having the effect of law of the United States of America, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental or Regulatory Body.

"Liabilities" means any direct or indirect liability, indebtedness, claim, loss, damage, demand, deficiency, assessment, penalty, obligation or responsibility of any kind or nature, whether fixed or unfixed, choate or inchoate, primary or secondary, liquidated or unliquidated,

8

secured or unsecured, asserted or unasserted, due or to become due, accrued, absolute, known or unknown, contingent or otherwise.

"Licensed IP" means the Intellectual Property Rights of any Seller and/or its Affiliates licensed to Buyer and/or its Affiliates pursuant to the IP License Agreement and/or Trademark License Agreement.

"Lien" means any title defect, mortgage, lien, pledge, charge, security interest, claim, contractual restriction, easement, right-of-way, option, conditional sale or installment contract or other encumbrance of any nature whatsoever.  For the sake of clarity, Assumed Liabilities shall not be "Liens."

"Loss" or "Losses" means any Liability, judgment, settlement, penalty, fine, cost or expense (including reasonable attorneys' fees and disbursements and the costs of litigation, including reasonable amounts paid in investigation, defense or settlement of an Action or Proceeding) of any nature, whether or not arising out of any claims by or on behalf of a third party.

"Marks" means trade names, fictional business names, trade dress rights, registered and unregistered trademarks and service marks and logos, including any Internet domain names and websites, and applications therefor, together with all translations, adaptations, derivations and combinations and like intellectual property rights.

"Monitor" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"Multi-Year Exclusive Service Contract" means an Exclusive Service Contract with a term of more than one (1) year with respect to which the annual renewal thereof falls between the date hereof and the Closing.

"Non-Debtor Nortel  Networks Entities" means the Seller Entities listed under the heading "Non-Debtor Nortel Networks Entities" in Exhibit A.

"Non-Exclusive Confidential Information" means all Confidential Information of any Seller and/or its Affiliates that does not pertain exclusively, but otherwise relates, to the Business, the Products, the Acquired Assets, the EMEA Acquired Assets, the Assumed Liabilities or the EMEA Assumed Liabilities, whether disclosed prior to or after the Closing Date.

"Nortel Employee Plans" mean any currently active/open pension plan, supplemental pension plan, profit sharing plan, savings plan, retirement savings plan, bonus plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, employee benefit plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, relocation plan, family support plan, retirement plan, medical, hospitalization or life insurance plan, disability plan, sick leave plan, redundancy or severance plan, retention agreement, death benefit plan, compensation arrangement, including any base salary arrangement, overtime policy, on-call policy or call—in policy, or any other

plan, program, arrangement, policy or practice that is maintained or otherwise contributed to, or required to be contributed to, by or on behalf of any Seller or its Affiliates with respect to Business Employees in the United States, Japan and/or India.

"Nortel India" means Nortel Technology Excellence Centre PVT Limited, a private company limited by shares organized under the laws of India.

"Notice Recipients" means (a) any person listed in the definition of "Knowledge of Sellers," (b) any elected officer of NNL, and/or (c) any attorney employed in any legal department of any Seller or its Affiliates.

"NNUK" means Nortel Networks UK Limited.

"Order" means any writ, judgment, decree, injunction, award, stipulation or similar order or judicial or administrative decree of any Governmental or Regulatory Body, in each case whether preliminary or final.

"Organizational Documents" means (a) the articles or certificate of incorporation, the bylaws and any shareholders agreement of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and certificate of formation or organization of any limited liability company, (e) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and (f) any amendment to any of the foregoing.

"Permitted Lien" means (a) any Lien for Taxes not yet due or delinquent or being contested in good faith by appropriate proceedings or that may thereafter be paid without penalty, (b) any statutory Lien arising in the ordinary course of business by operation of Law for amounts which are not material and not yet due and payable, (c) any minor imperfection of title or similar Lien that could not reasonably be expected to impact in any material respect the use of the affected assets and (d) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings which Liens are to be discharged at or by the Closing.

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental or Regulatory Body or other entity.

"Predecessor Products" means the products set forth on Schedule 1.1(c).

"Prior Existing IP" means Intellectual Property Assets, other than Business Intellectual Property, that are used in the Predecessor Products, to the extent that such Intellectual Property Assets as of the Closing Date (i) are owned by any Seller and/or its Affiliates and (ii) are not patents, patent applications, domain names and websites, inventions and/or invention disclosures.

"SEC" means the U.S. Securities and Exchange Commission.

"Seller Confidential Information" means all Confidential Information of any Seller and/or its Affiliates other than (x) Business Confidential Information and/or (y) Non-Exclusive Confidential Information, in each case, whether disclosed prior to or after the Closing Date.

"Seller Entity" means each Seller and each Affiliate of a Seller that is a Transferring Party.

"Specified Inventory" means Inventory owned by any Seller or its Affiliates and exclusively relating to the Business that is required to be reflected on a balance sheet prepared consistent with GAAP.

"Tangible Property" means all furniture, fixtures, equipment, computers, office equipment and apparatuses, tools, machinery and supplies.

"Target Business Tangible Property Value" means two hundred fifty thousand dollars ($250,000).

"Target Inventory Value" means two million one hundred thousand dollars ($2,100,000).

"Tax" or "Taxes" (and, with correlative meanings "Taxable" or "Taxing") mean, without limitation and with respect to any Person, (i) all Income Taxes, (ii) all sales, use, ad valorem, transfer, stamp, license, recording, employment (including federal and state income tax withholding, backup withholding, FICA, FUTA, national insurance, social security or other payroll taxes), environmental, excise, severance, stamp, occupation, premium, prohibited transaction, property, VAT, value added, net worth, franchise, or any other taxes, customs, tariffs, imposts, levies, duties, rates, government fees or other like assessments or charges or impositions or withholdings of any kind imposed under any Law, (iii) any interest, penalties, fines and additions attributable to any items listed in clauses (i) and (ii), and (iv) any Liability in respect of any items described in clauses (i), (ii) and/or (iii) payable by reason of contract, assumption, transferee liability, operation of Law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof) or any similar provision under Law or otherwise regardless of whether any amount in respect of them is recoverable from any other Person.

"Tax Return" means any U.S. federal, state, local, provincial and foreign return, declaration, claim for refund, form, statement, report, schedule, information return or similar statement or document, and any amendment thereof (including any related or supporting information or schedule attached thereto) required to be filed with any Taxing Authority in connection with the determination, assessment or collection of any Tax or Taxes.

"Taxing Authority" means any government or subdivision, agency, commission or authority thereof, or any quasi-governmental or private body having jurisdiction over the assessment, determination, collection or other imposition of Taxes.

"Transaction Documents" means (i) this Agreement, (ii) the IP License Agreement, (iii) the Trademark License Agreement, (iv) the Master Purchase Agreement, (v) the Transition Services Agreement, (vi) the Contract Manufacturer Inventory Agreement, (vii) the Patent Assignment Agreement, (viii) the Assignment and Assumption Agreement(s), (ix) the Bill(s) of

11

Sale, (x) Trademark Assignment Agreement, (xi) the Interim Product Purchase Agreement, (xii) the Korea Purchase Agreement, (xiii) the Tripartite Agreement and (xiv) all other agreements, certificates and instruments to be executed by Buyer and/or any Seller Entity at or prior to the Closing pursuant to this Agreement or any of the agreements described in clauses (i) through (xiii) of this definition.

"Transactions" means the transactions contemplated by the Transaction Documents.

"Transferring Employee" means, individually or in the aggregate, as the case may be, an India Transferring Employee, a Japan Transferring Employee, or a U.S. Transferring Employee.

"Transferring Party" means (i) in the case of an Acquired Asset or an EMEA Acquired Asset, the Seller or the Affiliate of a Seller that is the owner of such Acquired Asset or EMEA Acquired Asset (or in the case of a Business Contract or an EMEA Business Contract, a contracting party to such Contract), (ii) in the case of an Assumed Liability or an EMEA Assumed Liability, the Seller and/or the Affiliate(s) of a Seller that have obligations or other Liabilities in respect of such Assumed Liability or EMEA Assumed Liability, (iii) in the case of a Business Employee, the Seller or the Affiliate of a Seller that is the employer of such Business Employee and (iv) in the case of a Transaction Document, the Seller or the Affiliate of a Seller that is party to such Transaction Document.

"Tripartite Agreement" means that certain Tripartite Agreement by and among California Software Company Ltd., CSWL Inc., Buyer, Radware Inc. and NNL to be executed concurrent herewith or following the execution of this Agreement.

"U.S. Bankruptcy Rules" means the U.S. Federal Rules of Bankruptcy Procedure.

"U.S. Business Tangible Property" means Business Tangible Property located in the United States.

"U.S. Business Inventory" means Business Inventory located in the United States.

"U.S. Creditor Committee" means the official committee of unsecured creditors of the U.S. Debtors appointed by the U.S. Bankruptcy Court in the Chapter 11 Cases.

"U.S. Debtors" means the Seller Entities listed under the heading "U.S. Debtors" in Exhibit A.

"U.S. Employee" means a Business Employee who has a work location in the United States.

"U.S. GAAP" means United States generally accepted accounting principles, consistently applied.

"U.S. Transferring Employee" means a U.S. Employee who accepts a U.S. Employment Offer and becomes employed by Buyer or an Affiliate of Buyer.

"VAT" means value added tax imposed in any member state of the European Union pursuant to EC Council Directive 2006/112 on the common system of value added tax (Directive 2006/112) and national legislation implementing or supplemental to that Directive and any other sales or turnover tax of a similar nature imposed in any country that is a member of the European Union, together with all penalties or interest thereon or any tax of a similar nature which may be substituted for or levied in addition to it.

"VSS Products" means the products set forth under the heading "VSS Products" on Exhibit B attached hereto.

"Warranty Reserve" means a reserve, determined in a manner consistent with GAAP, with respect to the warranty obligations that Buyer and its Affiliates have undertaken to perform at no additional cost to any Seller and/or its Affiliates pursuant to the Master Purchase Agreement.

"Warranty Target Amount" means three million one hundred thousand dollars ($3,100,000).

1.2    Certain Additional Definitions.  As used in this Agreement, the following terms shall have the respective meanings ascribed thereto in the respective Sections of this Agreement set forth opposite each such term below:

| Term | Section |
| --- | --- |
| Acquired Assets | 2.1 |
| After Identified IP | 4.5(b) |
| Agreement | Preamble |
| Approval and Vesting Order | 7.20 |
| Approval and Vesting Order Motion | 7.20 |
| Asset Allocation Schedule | 3.2(a) |
| Assumed Liabilities | 2.3 |
| Audited Financial Statements | 9.15 |
| Audit Notice | 9.15 |
| Bankruptcy Courts | Recital D |
| Base Purchase Price | 3.1(a) |
| Break-Up Fee | 10.2(a) |
| Bulk Sales Laws | 7.5 |
| Business | Recital A |
| Business Contracts | 2.1(c) |
| Business Intellectual Property | 2.1(d) |
| Business Inventory | 2.1(b) |
| Business Tangible Property | 2.1(a) |
| Buyer | Preamble |
| Buyer Closing Certificate | 8.2(e) |
| CCAA | Recital B |
| CCAA Cases | Recital B |
| Chapter 11 Cases | Recital C |
| Claimants | 7.16(b)(i) |

13

| Term | Section |
|---|---|
| Closing | 4.1 |
| Closing Date | 4.1 |
| Contract Manufacturer Inventory Agreement | Recital G |
| Effective Time | 4.1 |
| EMEA Cases | Recital D |
| EMEA Sellers | Preamble |
| Enforceability Exceptions | 5.2 |
| English Court | Recital D |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Expense Reimbursement | 10.2(b) |
| Insolvency Act | Recital D |
| Interim Product Purchase Agreement | Recital G |
| IP License Agreement | Recital G |
| Israeli Tax Withholding Exemption Application | 7.11 |
| ITA | 7.11 |
| Joint Administrators | Preamble |
| Korea Purchase Agreement | 4.6 |
| Main Sellers | Preamble |
| Master Purchase Agreement | Recital E |
| New  Exclusive Service Contracts | 2.1(c) |
| New York Courts | 11.3 |
| NNI | Preamble |
| NNL | Preamble |
| Patent Assignment Agreement | Recital G |
| Petition Date | Recital B |
| Press Release | 7.6 |
| Prior IP | 2.1(e) |
| Products | Recital A |
| Pro Forma Financial Statements | 5.5(b) |
| Purchase Price | 3.1(a) |
| Restricted Software | 2.1(a) |
| Retained Subcontractors | 7.12 |
| Sale Process Order | 7.19 |
| Sale Process Order Motion | 7.19 |
| Sellers | Preamble |
| Sellers Closing Certificate | 8.1(e) |
| Straddle Period | 3.3 |
| Trademark Assignment Agreement | Recital G |
| Trademark License Agreement | Recital G |
| Transfer Taxes | 9.1(a)(i) |
| Transfer Tax Refund | 9.1(a)(i) |
| Transition Services Agreement | Recital G |
| U.S. Bankruptcy Code | Recital C |
| U.S. Bankruptcy Court | Recital C |

14

| Term | Section |
|------|---------|
| U.S. Bidding Procedures Motion | 7.15 |
| U.S. Bidding Procedures Order | 7.15 |
| U.S. Sale Motion | 7.16(a) |
| U.S. Sale Order | 7.16(a) |

1.3    <u>Accounting Terms</u>.  All accounting terms shall have the meaning specified by GAAP unless otherwise specified.

1.4    <u>Monetary Terms</u>.  All references to "Dollars" or "$" shall mean U.S. Dollars unless otherwise specified.

**PURCHASE OF ASSETS AND ASSUMPTION OF LIABILITIES**

2.1    <u>Sale and Transfer of Assets</u>.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, each Seller shall, or in the case of any of the following that is owned by an Affiliate of a Seller, shall cause the applicable Transferring Party to, sell, transfer, assign, convey and deliver to Buyer (or Affiliates of Buyer), and Buyer (or Affiliates of Buyer) shall purchase, acquire and accept from the applicable Transferring Party, all of the Transferring Party's right, title and interest in and to the following properties, rights and assets (but in all cases excluding the Excluded Assets) of such Seller or such Affiliate, as and to the extent existing on the Closing Date (such properties, rights and assets are hereinafter collectively referred to as the "<u>Acquired Assets</u>"), and (x) in the case of Acquired Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens (other than Permitted Liens) and Claims pursuant to Section 363 of the U.S. Bankruptcy Code, (y) in the case of Acquired Assets that are transferred or assigned by Canadian Debtors, free and clear of all Liens (other than Permitted Liens) pursuant to the terms of the Approval and Vesting Order, when granted, and (z) in the case of Acquired Assets that are transferred or assigned by a Non-Debtor Nortel Networks Entity, free and clear of all Liens other than Permitted Liens:

(a)    the Tangible Property set forth on <u>Schedule 2.1(a)(i)</u> (collectively, the "<u>Business Tangible Property</u>"); <u>provided</u>, that with respect to Business Tangible Property containing the software set forth on <u>Schedule 2.1(a)(ii)</u> that is licensed from third parties and cannot be assigned to Buyer absent consent of the licensor thereof (the "<u>Restricted Software</u>"), the physical transfer of such Business Tangible Property from the applicable Transferring Party to Buyer shall occur at the Closing, but legal title to such Business Tangible Property shall not transfer to Buyer until the earlier of the time specified in the Transition Services Agreement or the date of expiration or termination of the Transition Services Agreement;

(b)    all Specified Inventory (whether located at a business facility, in the possession of any contract manufacturer, or at any other location in the supply chain, of any Seller or any of its Affiliates) owned by any Seller or an Affiliate of any Seller (the "<u>Business Inventory</u>");

(c)    (i) the Contracts set forth on <u>Schedule 2.1(c)</u>, (ii) any Exclusive Service Contracts (including any renewals of existing Exclusive Service Contracts) that any Seller or an

15

Affiliate of any Seller enters into with a third party during the period between the date hereof and the Closing (the "New Exclusive Service Contracts"), (iii) any confidentiality or non-disclosure agreements entered into by any Seller or any of its Affiliates in connection with the sale of the Business (other than the Confidentiality Agreement) and (iv) any other Contract, the entry into of which Buyer consents to in accordance with Section 7.7(a) (which additional Contracts shall be set forth on updated Schedule 2.1(c) delivered at Closing) (together with the Contracts listed under clauses (i) and (ii) above, collectively, the "Business Contracts");

(d)      (i) the Intellectual Property Assets owned by any Seller or an Affiliate of any Seller set forth on Schedule 2.1(d) and (ii) to the extent not covered by Section 2.1(d)(i), the Intellectual Property Assets owned by such Seller and/or its Affiliates that are (x) used in Products as of the Closing Date and (y) have never been used in any other commercial products of any Seller and/or its Affiliates (including, for the sake of clarity, the EMEA Sellers), in each case including all Intellectual Property Rights therein and the goodwill associated therewith and all rights to sue for past, present or future infringement and to collect and retain all damages and profits relating to the foregoing (the assets and rights included in clauses (i) and (ii), the "Business Intellectual Property"; for the sake of clarity, no Prior Existing IP shall be deemed to be Business Intellectual Property); provided, that in the case of Intellectual Property Assets and Intellectual Property Rights that constitute patents, patent applications, domain names and websites, inventions and/or invention disclosures, only those patents, patent applications, domain names and websites, inventions and invention disclosures specifically listed on Schedule 2.1(d) shall constitute Business Intellectual Property and be assigned;

(e)      the Prior Existing IP, together with all Intellectual Property Rights therein and the goodwill associated therewith and all rights to sue for past, present or future infringement and to collect and retain all damages and profits relating to the foregoing ("Prior IP"); provided, that, subject to Section 4.5, none of this Section 2.1(e), the assignment of the Prior IP to Buyer or anything else in this Agreement shall obligate any Seller or any of its Affiliates or representatives to (x) create, recreate, improve, prepare, develop or acquire any Intellectual Property Assets or Intellectual Property Rights that would otherwise be, or (y) document, create any physical or electronic embodiment not then existing of, or otherwise put into tangible form, any Prior IP, other than making copies of existing documents or files for delivery to Buyer.

(f)      without prejudice to (x) Section 2.1(d) or 2.1(e) (with respect to the right to sue for past, present or future infringement, and to collect and retain all damages and profits relating to the Business Intellectual Property or the Prior IP in respect of such infringement) and (y) Section 2.1(i), all claims, demands, deposits, causes of action, choses in action, rights of recovery, rights of set-off and rights of recoupment, in each case relating exclusively to the operation of the Business after the Closing by Buyer (other than those related to Excluded Assets);

(g)      all refunds and rebates relating exclusively to the operation of the Business after the Closing by Buyer (other than those excluded pursuant to Section 2.2(e));

(h)      all sales literature, promotional literature and any other sales, advertising, marketing or promotional materials of any Seller or an Affiliate of any Seller that relate exclusively to the Products;

16

(i)    all rights under Business Contracts to the extent that such rights relate to non-competition, confidentiality or non-solicitation obligations, whether relating to periods prior to or following the Closing;

(j)    all rights of any Seller or an Affiliate of any Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating directly to (i) Business Inventory, (ii) Product returns purchased by Buyer after Closing pursuant to Section 9.10, (iii) the Business Tangible Property or (iv) products in respect of which Buyer or its Affiliates are obligated to fulfill warranty obligations pursuant to the Master Purchase Agreement; and

(k)    the information set out in Schedule 5.12(a) and copies of all general and financial records, ledgers, sales invoices, files, books and documents, correspondence and other files and records, including customer lists and sales records, of any Seller or an Affiliate of any Seller pertaining exclusively to the Products or the assets and rights transferred to Buyer pursuant to the above paragraphs (a) through (j) of this Section 2.1 (other than those excluded pursuant to Sections 2.2(i), 2.2(l) and/or 2.2(n)).

Notwithstanding the foregoing, Sellers and their Affiliates may retain and use in appropriate circumstances originals or copies of any Contracts, documents, books and records:  (i) that relate, in whole or in part, to assets other than the Acquired Assets and/or activities of Sellers or any of their Affiliates other than the Business, (ii) that are required to be retained pursuant to any legal requirement or are reasonably necessary, for financial reporting purposes or for Tax purposes or (iii) that otherwise are used in connection with the Excluded Liabilities.

2.2    Excluded Assets.  Notwithstanding anything to the contrary contained in Section 2.1 or elsewhere in this Agreement, all properties, rights and assets of any Seller and/or its Affiliates not expressly described in Section 2.1 (collectively, the "Excluded Assets") are not part of the sale and purchase contemplated hereunder, are excluded from the Acquired Assets and shall remain the property of the applicable Seller and/or its Affiliates, as the case may be, after the Closing.  Without limiting the foregoing, the Excluded Assets include the following:

(a)    all cash and cash equivalents or similar investments, including checking accounts, bank accounts, lock box numbers, marketable securities, commercial paper, certificates of deposit and other bank deposits, and treasury bills;

(b)    all insurance policies and all rights of every nature (including proceeds) under or arising out of such policies;

(c)    all Contracts to which any Seller or any of its Affiliates is a party other than the Business Contracts;

(d)    without prejudice to Buyer's rights pursuant to Section 7.10, all Accounts Receivable;

(e)    subject to (x) Sections 2.1(d), 2.1(e), 2.1(f) and 2.1(g) (with respect to the right to sue for past, present or future infringement, and to collect and retain all damages and

17

profits relating to the Business Intellectual Property and the Prior IP in respect of such infringement) and (y) Section 2.1(i), all claims, demands, deposits, refunds, rebates, causes of action, choses in action, rights of recovery, rights of set-off and rights of recoupment, and all claims for refunds or rebates of Taxes, in any case related to periods (or portions thereof) ending on or prior to the Effective Time, and other governmental charges and the benefit of net operating loss carryforwards, carrybacks or other credits of any Seller and/or any of its Affiliates;

       (f)     all prepaid charges, expenses, sums and fees;

       (g)     all Intellectual Property Assets owned, acquired, developed or licensed by any Seller or any of its Affiliates other than the Business Intellectual Property and the Prior IP;

       (h)     without prejudice to Section 9.13(b), all proprietary or confidential business or technical information, records and policies that relate generally to any Seller and/or its Affiliates and/or are not used exclusively in their operation of the Business, including organization manuals, strategic plans and Tax records and related information;

       (i)     all personnel records relating to the Business Employees other than the information set forth in Section 2.1(k) and other records that any Seller or its Affiliates is required by Law to retain in its possession or is not permitted under Law to provide to Buyer;

       (j)     all rights in connection with, and assets of, any Nortel Employee Plan;

       (k)     all rights of any Seller and/or its Affiliates under this Agreement or any other Transaction Document or in respect of the Transactions;

       (l)     all records prepared in connection with the sale of the Business;

       (m)     without prejudice to Section 9.13(b), all books, records, accounts, ledgers, files, documents, correspondence, studies, reports and other printed or written materials related to any Excluded Assets or Excluded Liabilities;

       (n)     all of the rights and claims of the U.S. Debtors available to the U.S. Debtors under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in Chapter 5 of the U.S. Bankruptcy Code and any other applicable provisions of the U.S. Bankruptcy Code, and any related claims and actions arising under Chapter 5 or such provisions by operation of law or otherwise, including any and all proceeds of the foregoing;

       (o)     all of the rights and claims of Canadian Debtors of whatever kind of nature not expressly included in the Acquired Assets, including any and all proceeds of the foregoing; and

       (p)     all other properties, rights and assets of any Seller and/or its Affiliates that are not used by them exclusively in the operation of the Business.

2.3    Assumed Liabilities.  Subject to the terms and conditions set forth in this Agreement, including Section 2.4, at the Closing, Buyer shall assume and thereafter pay, perform and discharge when due, only the following Liabilities (the "Assumed Liabilities"):

(a)    all Liabilities under or arising from the Business Contracts, other than (i) any Liability for Cure Costs (in the case of Assumed and Assigned Contracts) or (ii) any Liability arising under any Business Contract (other than an Assumed and Assigned Contract) as a result of a breach, default or wrongful failure on the part of any Seller or its Affiliates to perform any covenant or obligation under such Business Contract required to be performed by it prior to the Closing;

(b)    all Liabilities to or in respect of (i) any Transferring Employee, including their employment (or termination of employment) by Buyer, any Buyer Entity or any Affiliate of Buyer, with respect to periods from and after such Transferring Employee's Employment Transfer Date and (ii) any Buyer Employee Plan or future employee benefit plan of Buyer or its Affiliates, including for severance or other obligations to Transferring Employees arising following such Transferring Employees' Employment Transfer Date;

(c)    all Liabilities for or in respect of Taxes (other than Income Taxes) (i) that are the responsibility of Buyer pursuant to Section 9.1 or (ii) in connection with the operation of the Business or in respect of the Acquired Assets with respect to periods (or portions thereof) beginning on or after the Effective Time;

(d)    all Liabilities with respect to defective Product claims and product liability claims and causes of action arising with respect to (i) products shipped or sold by or on behalf of Buyer or its Affiliates from or after the Closing and (ii) Product returns purchased by Buyer pursuant to Section 9.10 (but only to the extent of Buyer's obligation to purchase such Product returns pursuant to Section 9.10); and

(e)    all Liabilities relating to Buyer's and/or its Affiliates' ownership or use of the Acquired Assets, or the conduct or operation of the Business, or the activities of Buyer and/or its Affiliates in connection with the Acquired Assets or the Business after the Closing.

2.4    Liabilities Not Assumed.  Notwithstanding anything contained in this Agreement to the contrary, Buyer does not assume or agree or undertake to pay, satisfy, discharge or perform in respect of, and will not be deemed by virtue of the execution and delivery of this Agreement or any Transaction Documents or other document delivered at the Closing pursuant to this Agreement, or as a result of the consummation of the Transactions, to have assumed, or to have agreed to pay, satisfy, discharge or perform in respect of, any Liabilities of any Seller or its Affiliates or of any other Person or in any way relating to the Business other than the Assumed Liabilities, including the following (such Liabilities retained by any Seller and its Affiliates, collectively, the "Excluded Liabilities"):

(a)    all Liabilities to or in respect of (i) any Transferring Employee, including their employment by any Seller Entity or any Affiliate of any Seller, in each case with respect to periods prior to such Transferring Employee's Employment Transfer Date, and (ii) any Nortel Employee Plan or prior employee benefit plan of any Seller or its Affiliates, including for

19

severance or other obligations to Transferring Employees arising prior to such Transferring Employees' Employment Transfer Date or as a result of the consummation of the Transactions;

(b)    except as set forth in <u>Section 2.3(c)</u>, all Liabilities of any Seller or its Affiliates for Taxes, including (i) Taxes that are the responsibility of any Seller pursuant to <u>Section 9.1</u> and (ii) all Taxes arising out of the operations of the Business (including ownership of the Acquired Assets) with respect to transactions occurring prior to or periods (or portions thereof) ending prior to the Effective Time;

(c)    all Liabilities of any Seller or its Affiliates under this Agreement or any other Transaction Document;

(d)    all Liabilities for legal, accounting and audit fees (except as provided in <u>Section 9.15</u>) and any other expenses incurred by any Seller or any of its Affiliates in connection with this Agreement, any other Transaction Document or consummation of the Transactions, including any fees, expenses or other payments incurred or owed by any Seller or any of its Affiliates to any agent, broker, investment banker or other firm or Person retained or employed by any Seller or any of its Affiliates in connection with the Transactions;

(e)    all Liabilities of any Seller or any of its Affiliates, to the extent relating to the Excluded Assets;

(f)    except as provided in <u>Section 2.3(d)</u> and/or as specified in the Master Purchase Agreement, all Liabilities with respect to defective product claims and product liability claims and causes of action arising with respect to Products shipped prior to Closing;

(g)    all Liabilities under or arising from the VSS Products with respect to periods prior to Closing Date, including claims relating to warranty obligations or other Liabilities under or arising from Contracts that have been entered into prior to the Closing Date with respect to VSS Products; <u>provided</u>, that Buyer and the other Buyer Entities shall be responsible for all Liabilities with respect to any implementation of the features or functionality of the VSS Products in whatsoever manner implemented by Buyer or its Affiliates, in accordance with <u>Section 2.3(e)</u>, from and after the Closing;

(h)    all Liabilities relating to any Seller's and/or its Affiliates' ownership or use of the Acquired Assets, or the conduct or operation of the Business, or the activities of any Seller and/or its Affiliates in connection with the Acquired Assets or the Business prior to the Closing, to the extent not an Assumed Liability;

(i)    all Liabilities in respect of any applicable Bulk Sales Laws as a result of the actions contemplated by <u>Section 7.5</u>; and

(j)    all Liabilities relating to any other assets, operations, products, businesses or activities of any Seller and/or its Affiliates that are not part of the Business.

2.5    <u>Further Assurances</u>.  From time to time after the Closing, without additional consideration, Sellers shall, and shall cause the other Transferring Parties to, execute and deliver

such other instruments of transfer and documents related thereto and take such other action as may be necessary or reasonably requested by Buyer in order to more effectively transfer to Buyer, and to place Buyer in possession and control of, the Acquired Assets, or to enable Buyer to exercise and enjoy all rights and benefits of the applicable Transferring Party with respect thereto. Buyer shall take such actions as may be necessary or reasonably requested by any Seller in order to assure Buyer's assumption of the Assumed Liabilities. Without limiting the foregoing, upon reasonable request of Buyer, Sellers shall, and shall cause the other Transferring Parties to, execute, acknowledge and deliver all such further assurances, deeds, assignments, consequences, powers of attorney and other instruments and paper as may be required to sell, transfer, convey, assign and deliver to Buyer all right, title and interest in, to and under the Acquired Assets.

     2.6    <u>Buyer Entities</u>. Buyer agrees that the U.S. Business Tangible Property and U.S. Business Inventory will be purchased by a U.S. organized corporation; the India Business Tangible Property and India Business Inventory will be purchased by an Indian organized entity treated for U.S. tax purposes as a corporation; and all other Acquired Assets will be purchased by Buyer itself.

     2.7    <u>Cure Costs; Adequate Assurance; No Rejection</u>.

     (a)    To the extent that any Assumed and Assigned Contract is subject to a Cure Cost, the applicable Seller shall, or shall cause the applicable Seller Entity to, (x) notify Buyer of the amount of such Cure Cost and (y) within ten Business Days of the determination of such Cure Cost by the U.S. Bankruptcy Court, directly pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code or other applicable Law.

     (b)    Prior to the entry of the U.S. Sale Order, Buyer shall provide adequate assurance of its future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) as reasonably necessary to satisfy Section 365(f)(2)(B) of the U.S. Bankruptcy Code.

     (c)    Except as may be required by the U.S. Bankruptcy Court, NNI shall not, and shall cause the other U.S. Debtors not to, reject any Assumed and Assigned Contract.

     2.8    <u>Canadian Acknowledgement</u>. Buyer acknowledges that the Canadian Sellers are selling their rights, title and interest in the Acquired Assets pursuant to the Approval and Vesting Order.

     2.9    <u>Seller Entities; UK and EMEA Assets</u>.

     (a)    When references are made in this Agreement to Sellers causing their Affiliate(s) or other Seller Entities to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain Affiliates or other Seller Entities, "Sellers" for purposes of such clause shall be deemed to mean NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor and Non-Debtor Nortel Networks Entities (as listed on <u>Exhibit A</u> hereto)).

21

(b)     Notwithstanding anything to the contrary in this Agreement, this Article II shall not apply or govern the sale, assignment, transfer, retention or assumption of assets, rights, properties or Liabilities of or by any EMEA Seller in any manner whatsoever.  The only assets, rights, properties and Liabilities of the EMEA Sellers that are being sold, assigned, transferred and assumed by, the Buyer Entities, and the terms and conditions thereof, and representations with respect thereto, are solely as expressly set forth in Exhibit P.

(c)     Where references are made in this Agreement to Sellers assuming an obligation or liability, making a representation or warranty or being referred to in Article V (except as set forth in Section 5.8(l)), giving an undertaking (to do or not do certain actions) or making an acknowledgement, "Sellers" for the purposes of such reference shall be construed and understood not to include the EMEA Sellers or (for the avoidance of doubt) the Joint Administrators.  The parties agree that the only obligations of the EMEA Sellers under this Agreement shall be as set forth in Exhibit P.  Where references are made in this Agreement to the Sellers taking the benefit of any rights, undertakings, representations or warranties, "Sellers" for the purpose of such reference shall be deemed to include the EMEA Sellers and the Joint Administrators.

(d)     For the sake of clarity, the provisions in Exhibit P have been drafted separately from the provisions in the body of this Agreement to reflect differing market practices in the countries of jurisdiction of the EMEA Sellers.  The provisions contained in the body of this Agreement and the provisions of Exhibit P shall be interpreted independently.

2.10     Acknowledgement of Termination of Exploitation Rights.  Each of NNI (on behalf of itself and the other U.S. Debtors) and NNL (on behalf of itself, the other Canadian Debtors and the Non-Debtor Nortel Networks Entities) hereby acknowledges and irrevocably agrees (a) that any and all of their rights to the Business Intellectual Property, EMEA Business Intellectual Property (as defined in Exhibit P), Prior Existing IP and EMEA Prior Existing IP (as defined in Exhibit P) (including pursuant to any agreement among Sellers and their Affiliates) shall terminate effective as of the Closing Date, except to the extent set forth in the IP License Agreement and (b) to the entry into and the license of the Licensed IP to Buyer pursuant to the IP License Agreement.

2.11     Cessation of Status as a Seller Entity.  In the event that any Person listed on Exhibit A hereto does not, as of the Closing, own any assets, properties or rights that constitute Acquired Assets or Assumed Liabilities, such Person shall not be a Seller Entity for any purpose hereunder and there shall be no Closing deliveries (under Section 4.2) or the Closing conditions (as set forth in Section 8.1) with respect to such Person.  At least three (3) Business Days prior to the Closing Date, the Main Sellers shall certify Buyer in writing if there are any Persons to which this Section 2.11 will pertain.

## ARTICLE III.
## PURCHASE PRICE

3.1    Purchase Price.

(a)    The aggregate consideration for the Acquired Assets and the EMEA Acquired Assets (the "Purchase Price") shall be an amount equal to the sum of (i) seventeen million six hundred fifty thousand dollars ($17,650,000) (the "Base Purchase Price"), plus or minus (ii) the amount by which the Inventory Value of the Specified Inventory is greater or less than the Target Inventory Value (on a dollar-for-dollar basis) (provided, that in no event shall Buyer be required to purchase Specified Inventory with an Inventory Value greater than three million dollars ($3,000,000) in the aggregate or otherwise pay more than three million dollars ($3,000,000) in the aggregate in respect of the Specified Inventory), plus or minus (iii) the amount by which the Warranty Reserve is greater or less than the Warranty Target Amount (on a dollar-for-dollar basis) plus or minus (iv) the amount by which the Business Tangible Property Value is greater or less than the Target Business Tangible Property Value (on a dollar-for-dollar basis).  At least three (3) Business Days prior to the Closing, the Main Sellers and NNUK shall notify Buyer in writing of the identity of the Escrow Agent.  At the Closing, Buyer shall pay the full amount of the Purchase Price to the Escrow Agent to hold such amounts on behalf of the Seller Entities pending an agreed allocation of the Purchase Price among Sellers in cash by wire transfer of immediately available funds to the bank account that the Escrow Agent has designated in writing at least three (3) Business Days prior to the Closing, and such Escrow Agent shall collect such funds on behalf of the Seller Entities.  For the avoidance of doubt, the Escrow Agent shall hold such funds on behalf of the Seller Entities only, and Buyer shall have no recourse to such funds held by the Escrow Agent in respect of any claim against any Seller or Affiliate thereof.  Notwithstanding anything in this Agreement to the contrary, Sellers shall have the right to provide Buyer, at least three (3) Business Days prior to the Closing, with a written notice executed by all Sellers instructing that Buyer pay the Purchase Price directly to Sellers and to the bank accounts to which such payments should be made (in the proportions specified in such written notice), and in such case (i) Buyer shall pay the Purchase Price directly to Sellers as specified in such notice and (ii) all references to Escrow Agent hereunder shall be disregarded.

(b)    Three (3) Business Days prior to the Closing Date, NNI and NNL shall deliver to Buyer a written certificate of a duly authorized officer of NNI and NNL, setting forth as of such date (i) an updated Schedule 5.6(b) (as set forth in the last sentence of Section 5.6(b)), and (ii) their good faith determination of the Inventory Value of the Specified Inventory, the Business Tangible Property Value, the Warranty Reserve and the amount payable to Buyer pursuant to Section 7.10, together with reasonable supporting detail therefor.  Buyer shall be entitled to review such certificate, and in connection therewith, Sellers shall, and shall cause their Affiliates to, at no cost to Buyer, provide Buyer with access at all reasonable times upon the prior written request of Buyer to any records reasonably related to the New Exclusive Service Contracts, the Multi-Year Exclusive Service Contracts, the Warranty Reserve, the Business Tangible Property Value and the Inventory Value of the Specified Inventory.  Unless the parties agree to make any change to the foregoing prior to the Closing, the amounts set forth on such certificate shall be the amounts therefore used for purposes of the amount payable by Buyer pursuant to Section 3.1(a).

23

(c)     For all purposes of this Section 3.1, (i) the Inventory Value of the Specified Inventory shall be calculated taking into account, and the certificate delivered by NNI and NNL pursuant to Section 3.1(b) shall include, both Business Inventory and EMEA Inventory, (ii) the Warranty Reserve shall be calculated taking into account, and the certificate delivered by NNI and NNL pursuant to Section 3.1(b) shall include, the Warranty Reserve applicable to all Sellers (including the EMEA Sellers) and (iii) the Business Tangible Property Value shall be calculated taking into account, and the certificate delivered by NNI and NNL pursuant to Section 3.1(b) shall include, the Business Tangible Property and the EMEA Tangible Property.  For the sake of clarity, any EMEA Inventory or EMEA Tangible Property excluded from the sale and purchase hereunder pursuant to the provisions of Section 2(b) of Exhibit P shall result in a reduction in the Inventory Value of the Specified Inventory or in the Business Tangible Property Value equal to the book value, net of reserves, of the excluded EMEA Inventory or EMEA Tangible Property.

3.2     Allocations; Taxes.

(a)     The Purchase Price paid by Buyer hereunder shall be allocated in accordance with Schedule 3.2 (the "Asset Allocation Schedule"), which applies the residual allocation method under Code Section 1060 and the regulations thereunder.  For the avoidance of doubt, the amounts allocated to the Business Tangible Property, EMEA Tangible Property, Business Inventory and EMEA Inventory (both on the initial Schedule 3.2 and any modification thereto) shall be the relevant Seller Entity's net book value for such assets, as determined by such Seller Entity consistent with GAAP.  In the event of (i) a change or correction to the Acquired Assets or EMEA Acquired Assets, (ii) a final determination of the Purchase Price pursuant to Section 3.1 or (iii) any adjustment to the allocation of the Purchase Price among Sellers required by any Bankruptcy Court or other Governmental or Regulatory Body of competent jurisdiction, Schedule 3.2 shall be modified in a manner consistent with such change or correction and the principles set forth above and on Schedule 3.2; provided, that any change to Schedule 3.2 in the circumstances described in clause (i) or (ii) of this Section 3.2(a) shall be agreed between the Main Sellers and Buyer, but no consent of Buyer shall be necessary for a modification of Schedule 3.2 in the circumstances set forth in clause (iii) of this Section 3.2(a).  In the event any EMEA Inventory or EMEA Tangible Property is excluded from the sale and purchase hereunder pursuant to the provisions of Section 2(b) of Exhibit P, the amounts allocated on Schedule 3.2 to the applicable EMEA Seller(s) in respect of inventory and/or fixed assets shall be reduced by an amount equal to the book value, net of reserves, of the excluded EMEA Inventory or EMEA Tangible Property, as the case may be.

(b)     Each of the parties hereto shall not, and shall not permit any of its Affiliates to, take a position (except as required pursuant to any Order) on any Tax Return, or before any Taxing Authority or in any judicial proceeding to the extent Tax issues are raised, that is in any way inconsistent with the allocation of the consideration among the Acquired Assets and/or EMEA Acquired Assets determined in accordance with Section 3.2(a).

(c)     Each of the parties hereto and any Affiliate of any such party may determine in its discretion how it should treat the Assumed Liabilities for Tax purposes in any

24

relevant jurisdiction and shall not be bound by the position taken by any other party or Affiliate thereof with respect thereto in such jurisdiction or any other jurisdiction.

3.3    Allocation of Taxes.  In order to apportion appropriately any Taxes (other than Income Taxes and Taxes subject to Section 9.1) relating to a period beginning on or before and ending after the Effective Time ("Straddle Period"), the portion of any such Taxes that are allocable to the period beginning after the Effective Time shall be: (A) in the case of ad valorem Taxes and other Taxes that are imposed on a periodic basis (and not based on invoices, receipts, sales or payments), deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of calendar days in the Straddle Period after the Closing Date and the denominator of which is the number of calendar days in the entire relevant Straddle Period, and (B) in the case of Taxes imposed in connection with any sale or other transfer or assignment of property (personal, tangible or intangible), deemed equal to the amount that would be payable if the taxable year or period ended and the books closed immediately prior to the Effective Time.

**ARTICLE IV.**
**CLOSING**

4.1    Closing.  The closing hereunder (the "Closing") shall take place at 10:00 a.m., local time, at the offices of Crowell & Moring LLP, 1001 Pennsylvania Avenue, N.W., Washington, D.C.  20004, on the third Business Day after satisfaction or waiver of all of the conditions set forth in Article VIII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other date or at such other place or time as the parties may mutually agree upon (such date of the Closing is hereinafter referred to as the "Closing Date").  The Closing will be deemed effective at 11:59 p.m. in Washington, D.C. on the Closing Date (the "Effective Time").

4.2    Seller Closing Deliveries.  At the Closing, the Main Sellers (for themselves and all other Seller Entities) shall deliver to Buyer each of the following:

(a)    Bill(s) of Sale, each executed by the applicable Seller Entity (in the applicable form);

(b)    Counterpart signature pages, executed by the applicable Seller Entities, to the IP License Agreement, the Master Purchase Agreement, the Transition Services Agreement, the Trademark License Agreement, the Patent Assignment Agreement, the Contract Manufacturer Inventory Agreement, the Assignment and Assumption Agreement(s) (in the applicable form), the Trademark Assignment Agreement and the Interim Product Purchase Agreement;

(c)    The Sellers Closing Certificate, executed by the Main Sellers;

(d)    An updated Schedule 2.1(c), Schedule 5.5(a) (if applicable) and Schedule 5.12(a) (if applicable); and

(e)    Any amounts payable to Buyer pursuant to Section 7.10.

25

4.3     Buyer Closing Deliveries.  At the Closing, Buyer (for itself and all other Buyer Entities) shall deliver each of the following:

(a)     The Purchase Price to the Escrow Agent to hold such amounts on behalf of the Seller Entities pending an agreed allocation of the Purchase Price among them;

(b)     To the Main Sellers, counterpart signature pages executed by Buyer (or its Affiliates) to the IP License Agreement, the Master Purchase Agreement, the Transition Services Agreement, the Trademark License Agreement, the Patent Assignment Agreement, the Contract Manufacturer Inventory Agreement, the Assignment and Assumption Agreement(s), the Trademark Assignment Agreement and the Interim Product Purchase Agreement; and

(c)     To the Main Sellers, the executed Buyer Closing Certificate.

4.4     Delivery of the Acquired Assets.

(a)     Tangible Assets.  Within fourteen (14) days after the Closing Date, Sellers shall, or shall cause the other applicable Seller Entities to, at its or their cost and expense, de-install, disassemble, pack and crate the tangible Acquired Assets for shipping by Buyer, and notify Buyer no less than three (3) Business Days in advance that such tangible Acquired Assets will be ready for shipment by Buyer.  Buyer shall, within two (2) Business Days of the date in which such Acquired Assets are ready for shipping by Buyer, transport or cause to be promptly transported, at its cost and expense, such Acquired Assets to such facility or location of Buyer or its Affiliates as Buyer shall elect.  All risk of loss and damage with respect to the Acquired Assets shall pass from the applicable Seller or Seller Entity to Buyer on the earlier of (x) Buyer or its Affiliates or their representatives taking delivery of such Acquired Assets and (y) two (2) Business Days after such Acquired Assets are ready for shipping to Buyer.

(b)     Intellectual Property and Documentation.  The delivery of the tangible or electronic copies of the Business Intellectual Property and the other documentation set forth in Section 2.1(k) shall be accomplished at or following the Closing in the manner set forth in the Transition Services Agreement and/or delivered at Closing pursuant to Section 8.1(g); provided, that neither any Seller nor any of its Affiliates or representatives shall have any obligation to (x) create, recreate, improve, prepare, develop or acquire any of the foregoing or (y) document, create any physical or electronic embodiment of, or otherwise put into tangible form, any of the foregoing, other than making copies of existing documents or files for delivery to Buyer.

(c)     Other Assets.  If after the deliveries provided for in Section 4.4(a) or 4.4(b) have taken place, and other than in the case of any Intellectual Property Assets or Intellectual Property Rights identified by Buyer after the Closing (which are covered by Section 4.5), if any Seller Entity or Buyer Entity, as the case may be, shall have in its possession any asset or right which Buyer and NNI agree should have been delivered to Buyer or retained by such Seller Entity, as applicable, except in the case of patents, patent applications, inventions or invention disclosures (unless expressly set forth on Schedule 2.1(d)), Sellers or Buyer shall, or shall cause their respective Affiliates, as the case may be, to promptly deliver such asset or right to the other party.

4.5     <u>Location of Prior IP; Post-Closing Identified Intellectual Property and Prior IP</u>.

(a)     Following the Closing, each Seller shall, and shall cause its Affiliates who are not Sellers to, use commercially reasonable efforts to locate existing tangible written and/or electronic embodiments of Prior IP.

(b)     In the event that Buyer believes that any Seller has not transferred to Buyer or its Affiliates any Intellectual Property Assets or Intellectual Property Rights (other than patents, patent applications, inventions or invention disclosures, unless expressly set forth on <u>Schedule 2.1(d)</u>) that constitute Business Intellectual Property or Prior IP ("<u>After Identified IP</u>"), Buyer shall be entitled to give NNI written notice thereof, describing in reasonable detail the After Identified IP.  If the After Identified IP constitutes Business Intellectual Property or Prior IP and such After Identified IP is as of such time owned by a Seller or its Affiliates, Sellers shall cause all right and title to such After Identified IP to be promptly transferred and assigned to Buyer or its Affiliates without further consideration and deliver to Buyer or its Affiliates tangible or electronic embodiments of such After Identified IP; <u>provided</u>, that neither any Seller nor any of its Affiliates or representatives shall have any obligation to (x) create, recreate, improve, prepare, develop or acquire any After Identified IP or (y) document, create any physical or electronic embodiment of, or otherwise put into tangible form, any After Identified IP, other than making copies of existing documents or files for delivery to Buyer.

4.6     <u>Korea Purchase Agreement</u>.  The parties shall use their commercially reasonable efforts to enable Buyer, as promptly as is reasonably practicable following the date hereof, to enter into an agreement with LG Nortel Co. Ltd. (the "<u>Korea Purchase Agreement</u>") pursuant to which LG Nortel Co. Ltd. will distribute Products following the Closing.

**ARTICLE V.**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

Sellers represent and warrant to Buyer that the statements contained in this <u>Article V</u> are true and correct as of the date hereof, except as set forth in the Schedules referenced in this <u>Article V</u>.  The disclosures in any such Schedule shall qualify other sections and subsections in this <u>Article V</u> to the extent it is readily apparent on its face that such disclosure is applicable to such other sections and subsections.  The inclusion of any information in a Schedule (or any update thereto) shall not be deemed to be an admission or acknowledgment, in and of itself, that such information is required by the terms hereof to be disclosed, is material to the Business, has resulted in or would result in a Business Material Adverse Effect, or is outside the ordinary course of business.

5.1     <u>Organization, Power, Standing</u>.  Except as set forth on <u>Schedule 5.1</u>: (i) Each Seller Entity is duly organized, validly existing and in good standing under the Laws of the state or foreign jurisdiction in which it is organized.  (ii) The Seller Entities have all requisite corporate power and authority to own, operate or lease the Acquired Assets and the Licensed IP and to conduct the Business as it has been and is currently being conducted.  (iii) The Seller Entities have all requisite corporate power and authority to execute and deliver this Agreement and to enter into the Transaction Documents to which each is or will be a party, as the case may

27

be, and to consummate the Transactions. (iv) The Seller Entities are duly authorized to conduct business and are in good standing in each jurisdiction where such authorization is required to conduct the Business as currently conducted.

5.2    Due Authorization. Except as set forth on Schedule 5.4: (i) The execution and delivery by each Seller Entity of the Transaction Documents to which such Seller Entity is or will be a party and the performance of such Seller Entity's respective obligations thereunder have been duly and validly authorized by all necessary corporate action, and no other corporate or other action on the part of any of the Seller Entities is necessary to authorize the execution and delivery of this Agreement and the other Transaction Documents to which such Seller Entity is or is proposed to be a party or the consummation of the Transactions. (ii) This Agreement has been, and each of the other Transaction Documents, when executed, will be, duly executed and delivered by the applicable Seller Entity, and this Agreement constitutes, and each of the other Transaction Documents when so executed shall constitute, the legal, valid and binding obligations of the Seller Entity or Seller Entities party thereto, as applicable, enforceable against each such Seller Entity in accordance with their respective terms, except as such enforcement may be limited by (A) bankruptcy, insolvency, reorganization, moratorium and other Laws of general application affecting the rights and remedies of creditors, and (B) general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law) (the "Enforceability Exceptions"). (iii) Each Seller has all necessary right and power to agree, on behalf of the other Seller Entities, to the transfer of the Acquired Assets owned by such Seller Entity and to the transfer of the Assumed Liabilities to which such Seller Entity is subject. No Seller Entity is a joint venture in which NNL or its Affiliates own less than 75% of the voting equity of such joint venture.

5.3    No Conflicts. Except as set forth on Schedule 5.4, the execution and delivery of this Agreement do not, and of the other Transaction Documents do not or will not, and the consummation of the Transactions will not, (a) violate or conflict with the provisions of the Organizational Documents of the Seller Entities, (b) result in the imposition of any Lien upon any of the Acquired Assets or cause the acceleration or material modification of any obligation under, create in any party the right to terminate, constitute a default or breach of, or violate or conflict with the terms, conditions or provisions of any Business Contract (other than an Exclusive Services Contract and those Contracts not assigned to Buyer which are the subject of the Master Purchase Agreement, in each case as to which no representation or warranty is made) or any credit or loan agreements, indentures, finance related agreements or any other material Contract to which any of the Acquired Assets or Assumed Liabilities are subject, or (c) result in a breach or violation by the Seller Entities of any of the terms, conditions or provisions of any Law, Order or Governmental Authorization.

5.4    Consents and Approvals. Except as set forth on Schedule 5.4 or as may be required under or in respect of any Business Contract and those Contracts not assigned to Buyer which are the subject of the Master Purchase Agreement (in each case as to which no such representation or warranty is made), no consent, waiver, approval, authorization, order or permit of, or declaration, filing or registration with, or notification to, any Governmental or Regulatory Body or other Person is required to be made or obtained by any Seller Entity in connection with the execution and delivery of this Agreement or any other Transaction Document to which such

28

Seller Entity is or will be a party, the performance by such Seller Entity of its obligations hereunder or thereunder, the consummation by such Seller Entity of the Transactions, the transfer by such Seller Entity of its respective Acquired Assets and Assumed Liabilities, or the licensing by such Seller Entity of the Licensed IP.

5.5    Financial Information.

(a)    Schedule 5.5(a) sets forth, consistent with GAAP, as of the date set forth on Schedule 5.5(a), of (i) the net book value of the Business Tangible Property, (ii) the net book value of the Specified Inventory set forth in Schedule 5.6(b) and (iii) a reserve with respect to the warranty obligations of the type that Buyer and its Affiliates will undertake to perform following the Closing pursuant to the Master Purchase Agreement (as if the Closing had occurred on the date set forth on Schedule 5.5(a)).  In the event of any change to such Business Tangible Property, Specified Inventory (as and to the extent provided in Section 5.6(b)) or warranty reserves between the date of this Agreement and the Closing Date, Sellers shall provide Buyer with an updated version of Schedule 5.5(a) prior to the Closing.

(b)    Schedule 5.5(b) contains a true and complete copy of the unaudited, pro forma balance sheets of the Historical Velocity Business, as of December 31, 2007 and as of December 31, 2008 and related unaudited, pro forma statements of income of the Historical Velocity Business for the fiscal years ended December 31, 2007 and December 31, 2008 (the "Pro Forma Financial Statements").  Subject to the limitations, qualifications and exceptions set forth in Section 5.5(c), Schedule 5.5(b) and/or Section 9.15 (as the case may be), the Pro Forma Financial Statements (x) have been prepared specifically by Sellers for this Agreement from the books and records of Sellers and their Affiliates, which are maintained in accordance with GAAP (except that carve-out accounting guidelines as outlined by the SEC have not been utilized, and except for the absence of footnotes and other disclosures required by U.S. GAAP), and (y) fairly present in all material respects the financial condition and results of operations of the Historical Velocity Business as of the respective dates thereof and for the periods covered thereby.

(c)    The Business, the Acquired Assets and the Assumed Liabilities constitute only a limited subset of the Historical Velocity Business and of the assets and liabilities presented in the Pro Forma Financial Statements.  Likewise, the Historical Velocity Business and the Pro Forma Financial Statements include assets and liabilities not included within the Acquired Assets or the Assumed Liabilities.  Accordingly, the Pro Forma Financial Statements cannot be viewed as fairly presenting the Business, the Acquired Assets or the Assumed Liabilities to the extent that the Pro Forma Financial Statements include assets and liabilities not included within the Acquired Assets or Assumed Liabilities.  Neither the Historical Velocity Business nor the Business has operated as a separate "stand-alone" entity, nor have Sellers or their Affiliates previously maintained separate financial statements for the Historical Velocity Business or the Business.  As a consequence, (i) in order to prepare the Pro Forma Financial Statements, it has been necessary for Sellers to make numerous subjective judgments regarding financial allocations, and Sellers have summarized those judgments that Sellers believe are material in the Pro Forma Financial Statements in Schedule 5.5(c); and (ii) the Pro Forma Financial Statements do not present financial conditions or results of operations that would have

occurred if either the Historical Velocity Business or the Business had been operated by Sellers and their Affiliates as a "stand-alone" entity.  In addition, in order to present the Pro Forma Financial Statements, it has also been necessary for Sellers to make various assumptions regarding the basis of their presentation, and Schedule 5.5(c) summarizes such assumptions that Sellers believe are material.

5.6     Tangible Personal Property; Inventory.

(a)     Except as set forth in Schedule 5.6(a):  (i)  The applicable Seller or another Seller Entity has exclusive legal and valid title to all of the Business Tangible Property and the Business Inventory, free and clear of all Liens other than Permitted Liens.  (ii)  Upon consummation of the Transactions, Buyer will have acquired good and marketable title in and to, the Business Tangible Property and the Business Inventory, (x) in the case of Acquired Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens (other than Permitted Liens) and Claims pursuant to Section 363 of the U.S. Bankruptcy Code, (y) in the case of Acquired Assets that are transferred or assigned by Canadian Debtors, free and clear of all Liens (other than Permitted Liens) pursuant to the terms of the Approval and Vesting Order, when granted, and (z) in the case of Acquired Assets that are transferred or assigned by a Non-Debtor Nortel Networks Entity, free and clear of all Liens other than Permitted Liens.  (iii)  All Business Tangible Property is in good condition, ordinary wear and tear excepted, and is in adequate operating condition for the purposes for which it is used by the Seller Entities in the Business.  (iv)  All Business Inventory has been created or acquired in the ordinary course of business consistent with past practice.

(b)     Schedule 5.6(b) sets forth a true and complete list of all Specified Inventory (whether located at a business facility, in the possession of any contract manufacturer, or at any other location in the supply chain of any Seller or any of its Affiliates, but other than EMEA Business Inventory), setting forth the location, aging, net book value and serial number of each item of Inventory (aging and serial number, in the case of finished goods Inventory other than service Inventory (for service Inventory, the aging and serial number thereof will be provided as soon as practicable following the Closing)) as of the date set forth on such Schedule.  Pursuant to Section 3.1(b), three (3) Business Days prior to the Closing Date, Sellers shall deliver to Buyer an update of Schedule 5.6(b) as of the most recent date practicable.

5.7     Contracts.  Except as set forth on Schedule 5.7:

(a)     As of the date hereof, Sellers have made available to Buyer true, correct and complete copies of all of the Business Contracts in effect as of the date of this Agreement.  As of the date hereof, each Business Contract in effect as of the date of this Agreement is legal, valid, binding and enforceable against the Seller Entity party thereto, and to the Knowledge of Sellers, against each other party thereto, and is in full force and effect (in each case, subject to the Enforceability Exceptions and the Bankruptcy Proceedings).

(b)     As of the Closing, Sellers will have made available to Buyer true, correct and complete copies of all of the Business Contracts in effect as of the date of the Closing.  As of the date of the Closing, each Business Contract in effect will be as of such date legal, valid, binding and enforceable against the Seller Entity party thereto, and to the Knowledge of Sellers,

30

against each other party thereto, will be in full force and effect (in each case, subject to the Enforceability Exceptions and the Bankruptcy Proceedings) and will continue to be legal, valid, binding, enforceable and in full force and effect following assignment of such Business Contract at Closing (excluding any failure of any such Business Contract (other than an Assumed and Assigned Contract) to be legal, valid, binding, enforceable or in full force and effect as a result of the failure to obtain the consent of the counterparty to such Business Contract to such assignment).

(c)     No Seller (or any Affiliate of any Seller) has been notified in writing that it is in breach or default under any Business Contract, and to the Knowledge of Sellers, no other party to any Business Contract is in breach or default thereof, nor has any Seller or Affiliate thereof been notified in writing of such other party's intention to terminate any Business Contract.

(d)     The Business Contracts do not contain (i) any non-competition, non-solicitation or similar agreements or arrangements or (ii) any "earn-out" or similar agreements or arrangements.

(e)     No Affiliate of a Seller (other than a Seller Entity) is a party to the Business Contracts.

(f)     Neither the Business Contracts nor those Contracts not being assigned to Buyer which are the subject of the Master Purchase Agreement are classified contracts requiring contractor employees to have access to classified information during contract performance.  All services relating to the Business currently being provided by Sellers or their Affiliates to United States governmental agencies under the foregoing Contracts are being provided indirectly by Sellers or their Affiliates through a prime contractor or upper tier contractor and not directly by Sellers or their Affiliates.

5.8     Intellectual Property.

(a)     Except as set forth on Schedule 5.8(a), (x) between January 1, 2007 and the Closing Date, and (y) to the Knowledge of Sellers, between January 1, 2003 and January 1, 2007, neither Sellers nor their Affiliates have received written notice that any Person, other than a Seller, claims any ownership interest in any of the Business Intellectual Property.

(b)     Except as set forth on Schedule 5.8(b):  To the Knowledge of Sellers, the Products, the processes performed by the Products and/or the use of the Products (including, for the sake of clarity, the Business Intellectual Property and the Licensed IP as used in the Products as of the Closing Date) do not infringe upon the Intellectual Property Rights of any other Person. (x) Between January 1, 2007 and the Closing Date, neither Sellers nor their Affiliates have received, and (y) between January 1, 2003 and January 1, 2007 no Notice Recipient has directly been sent, or indirectly actually received, any written notice specifically alleging that the Products, the processes performed by the Products and/or the use of the Products (including, for the sake of clarity, the Business Intellectual Property and the Licensed IP as used in the Products as of the Closing Date) infringe upon the Intellectual Property Rights of any other Person.  (x) Between January 1, 2007 and the Closing Date, neither Sellers nor their Affiliates have received,

31

and (y) between January 1, 2003 and January 1, 2007 no Notice Recipient has directly been sent, or indirectly actually received, from a third party a written offer to grant Sellers or their Affiliates a license on the basis that the Products (including, for the sake of clarity, the Business Intellectual Property and the Licensed IP as used in the Products as of the Closing Date) infringe any Intellectual Property Rights of such third party.

(c)     Except as set forth on Schedule 5.8(c), to the Knowledge of Sellers, no Person is infringing upon any Business Intellectual Property. Sellers have not brought any Action or Proceeding (x) between January 1, 2007 and the Closing Date, and (y) to the Knowledge of Sellers, between January 1, 2003 and January 1, 2007, alleging that any Person is infringing upon any Business Intellectual Property.

(d)     There are no Orders to which Sellers or their Affiliates are party that: (i) restrict the rights of the Seller Entities to use any of the Business Intellectual Property or the Licensed IP (as used in the Products as of the Closing Date) or (ii) permit third parties to use the Business Intellectual Property.

(e)     Except as set forth on Schedule 5.8(e), Sellers and their Affiliates have taken commercially reasonable and customary steps to maintain their proprietary rights in the Business Intellectual Property, and to preserve the secrecy and confidentiality of all Business Intellectual Property that constitute confidential or proprietary information, and/or trade secrets. Without limiting the foregoing, (i) Sellers and their Affiliates have a policy requiring all employees of Sellers and Affiliates of Sellers with access to confidential or proprietary information, and/or trade secrets included in the Business Intellectual Property to execute a proprietary information, confidentiality and assignment agreement with the applicable Seller or Affiliate of a Seller. No representations or warranties with respect to non-infringement or non-infringing uses of the Business Intellectual Property are made in this Section 5.8(e); the only representations and warranties of Sellers made with respect to non-infringement and non-infringing uses are set forth in Sections 5.8(b) and (c), respectively.

(f)     Except as set forth on Schedule 5.8(f): (i) As of the Closing Date, good and valid title to the Business Intellectual Property is held solely and exclusively by the Seller Entities, free and clear of any Liens (other than Permitted Liens and licenses granted prior to the date hereof with respect to the Business Intellectual Property). (ii) The Seller Entities are the sole owners of the Licensed IP or otherwise have the rights necessary to grant the licenses granted in the IP License Agreement and the Trademark License Agreement. No representations or warranties with respect to non-infringement of the Business Intellectual Property are made in this Section 5.8(f); the only representations and warranties of Sellers made with respect to non-infringement are set forth in Section 5.8(b).

(g)     No software included in the Business Intellectual Property contains: (i) to the Knowledge of Sellers, any virus, trojan horse, worm, or other software routines or hardware components designed to permit unauthorized access or to disable, erase, or otherwise harm any computer, system or software; (ii) to the Knowledge of Sellers, except as set forth on Schedule 5.8(g)(ii), any back door, time bomb, drop dead device, or other software routine designed to disable a computer program automatically with the passage of time or under the positive control of a person other than an authorized licensee or owner of a copy of the program or the right and

32

title in and to the software; or (iii) except as set forth on Schedule 5.8(g)(iii), any "open source" code, shareware, or other software that is made generally available to the public without requiring payment of fees or royalties or that does or may require disclosure or licensing of any software owned or used by Buyer.

(h)    Except as set forth on Schedule 5.8(h), Sellers and their Affiliates have taken all reasonable actions before, and paid all necessary fees in, the United States Patent and Trademark Office to maintain all patents, trademarks, and applications therefor in the Business Intellectual Property.

(i)    Schedule 5.8(i) sets forth a true and complete list of all (i) third party software, including Restricted Software, (ii) third party software development tools, and (iii) licenses of Intellectual Property Rights from third parties, other than pursuant to cross-licenses, in each case that are currently licensed to Sellers or their Affiliates pursuant to a written contract and that are currently used in the Products or in connection with the Business.

(j)    As of the Closing Date, between (x) the Business Intellectual Property being assigned to Buyer hereunder and (y) the licenses granted to Buyer pursuant to the IP License Agreement and the other Transaction Documents, except for items (if any) specified hereunder or in the IP License Agreement as not being licensed to Buyer, Sellers and their Affiliates have either assigned hereunder or licensed thereunder to Buyer all of the Intellectual Property Assets and Intellectual Property Rights owned by Sellers and their Affiliates that are used in the Products or in the conduct of the Business as of the Closing Date.

(k)    To the Knowledge of Sellers, neither Sellers nor any Affiliate of Sellers have assigned any Prior IP to any third party.

(l)    The EMEA Sellers hold no right, title or interest in any Business Intellectual Property or Prior IP other than the right to exploit such Business Intellectual Property and/or Prior IP pursuant to an intercompany agreement among the Seller Entities and their Affiliates, assuming, for purposes of this Section 5.8(l), that the term "Sellers" contained in Sections 2.1(d) and 2.1(e) were deemed not to exclude the EMEA Sellers from such term.

5.9    Litigation. Except as set forth on Schedule 5.9: (a) no material Action or Proceeding is or has been pending or, to the Knowledge of Sellers, threatened in writing, during the five (5) years immediately preceding the date of this Agreement that directly affects any of the Acquired Assets, the Assumed Liabilities, the Business or the Products; (b) there is no material Order or settlement to which Sellers or their Affiliates are subject that directly affects or restricts the ownership or use of the Acquired Assets, the Assumed Liabilities, the Business or the Products; and (c) no Action or Proceeding is pending against the Seller Entities, or to the Knowledge of Sellers, threatened against the Seller Entities in writing, that questions the validity of this Agreement or the other Transaction Documents or any action taken or to be taken by the Seller Entities in connection with this Agreement or any other Transaction Documents.

5.10    Compliance with Laws; Governmental Authorizations. Except as set forth on Schedule 5.10, Sellers and their Affiliates are in compliance in all material respects with all Laws, Orders and settlements applicable to the conduct of the Business and the operation thereof,

33

including compliance in all material respects with the Foreign Corrupt Practices Act of 1977, as amended. Sellers and their Affiliates possess all Governmental Authorizations necessary for the lawful conduct of the Business as presently conducted. To the Knowledge of Sellers, Schedule 5.10 sets forth a complete and accurate list of all Governmental Authorizations that are currently held by Sellers or their Affiliates and that directly relate to the Products themselves and not to any other aspect of the Business, and all such Governmental Authorizations are valid and in full force and effect. Sellers and their Affiliates are in compliance in all material respects with such Governmental Authorizations.

5.11   Nortel Employee Plans. Schedule 5.11 contains a complete and accurate list of all Nortel Employee Plans. Sellers have provided Buyer with a copy of each Nortel Employee Plan and an accurate, written, side-by-side summary of each Nortel Employee Plan. Subject to the Bankruptcy Proceedings, the Nortel Employee Plans are administered in all material respects in accordance with their terms and applicable Laws and Orders and Sellers and their Affiliates are in compliance with their obligations in all material respects with respect to each Nortel Employee Plan. Sellers and their Affiliates maintain and perform under the Nortel Employee Plans in material compliance with all applicable Laws and Orders. No Nortel Employee Plan is a multiemployer plan within the meaning of Section 3(37) of the Employee Retirement Income Security Act of 1974, as amended, and neither Sellers nor any of their Affiliates have incurred any unpaid withdrawal liability and no facts exist that would likely give rise to the assessment of any withdrawal liability.

5.12   Employee Matters.

(a)     Concurrent with the execution of this Agreement, Sellers are delivering to Buyer a chart (hereinafter referred to as Schedule 5.12(a), but which is not included in the Disclosure Schedules), which sets forth the following data elements, as of the date of this Agreement, with respect to each Business Employee: (i) name, (ii) home address including municipality, state/province and country, (iii) work location, (iv) continuous service date, (v) job title, (vi) JCI (Job Complexity Indicator), (vii) annual base salary (in local currency), (viii) target incentive compensation, (ix) any other compensation or allowances, including pay premium, ex-patriate provisions, reimbursement and relocation, (x) current vacation entitlement in days, (xi) teleworker status, (xii) whether such Business Employee is on a leave of absence approved by Seller or its Affiliates under a Nortel Employee Plan or as required by Law, along with the type of leave and expected date of return to work, if known, (xiii) India Employee Gratuity Accrual, in the case of India Employees, (xiv) such Business Employee's accrued and unused vacation days, and (xv) whether a background investigation has been performed with respect to such Business Employee. Sellers shall deliver an updated copy of Schedule 5.12(a) to Buyer immediately prior to the Closing, which updated table shall be accurate and complete as of the Closing Date.

(b)     Except as set forth in Schedule 5.12(b), Sellers and their Affiliates are in compliance in all material respects with all applicable Laws and Orders (including any legal obligation to engage in affirmative action) relating to employment practices, terms and conditions of employment, and the employment, of the Business Employees, including all such Laws and Orders relating to wages, hours, withholding, collective bargaining, employment

34

discrimination, immigration, disability, civil rights, fair labor standards, occupational safety and health, workers' compensation, pay equity and wrongful discharge. Sellers and their Affiliates have timely prepared and filed all appropriate reports and other filings required by any relevant Governmental or Regulatory Authority with respect to the Business Employees. None of Sellers or their Affiliates is engaged in any unfair labor practice with respect to any Business Employees.

(c)     Except as set forth in Schedule 5.12(c), (i) neither Sellers nor any of their Affiliates are party to or bound by any work rules and/or collective bargaining agreement that applies to the terms and conditions of employment of any Business Employee or has any obligation to negotiate any such collective bargaining agreement; (ii) there are no trade unions or labor organizations asserting employment rights that would affect any Business Employee and there is no representation claim or petition regarding Business Employees pending before the United States National Labor Relations Board or any similar foreign, state or local labor agency of which Sellers or their Affiliates have been notified in writing and, to the Knowledge of Sellers, no question concerning representation has been raised or threatened in writing respecting Business Employees; (iii) there is no indication that the Business Employees desire to be covered by a collective bargaining agreement; and (iv) to the Knowledge of Sellers, no trade union or labor organization is planning or attempting to organize any of the Business Employees. No strike, slowdown or work stoppage has occurred or, to the Knowledge of Sellers, been threatened with respect to Business Employees, nor has any such strike, slowdown or work stoppage occurred or been threatened within three (3) years prior to the date hereof.

(d)     Except as set forth in Schedule 5.12(d), no notice has been received by Sellers or their Affiliates of any complaint claiming that any of Sellers or their Affiliates has violated any applicable employment standards, human rights or other labor legislation or any complaints or proceedings of any kind involving Business Employees or, to the Knowledge of Sellers, threatened to be filed against the Acquired Assets, the Assumed Liabilities or the Business before any federal, state, local or foreign Governmental or Regulatory Body or labor relations board, including the National Labor Relations Board and the Equal Employment Opportunity Commission. No notice has been received by Sellers or their Affiliates of the intent of any federal, state, local or foreign Governmental or Regulatory Body responsible for the enforcement of labor or employment Laws to conduct an investigation of Sellers or their Affiliates, and, to the Knowledge of Sellers, no such investigation is in progress, in each case, with respect to the Business Employees.

(e)     Except as set forth in Schedule 5.12(e), (i) there are no outstanding assessments, penalties, fines, levies, charges, surcharges or other amounts due or owing by Sellers or their Affiliates pursuant to any applicable worker's compensation Laws or Orders in respect of the Business Employees; and (ii) to the Knowledge of Sellers, there is no audit currently being performed by a Governmental or Regulatory Body pursuant to any applicable workers' compensation Law with respect to the Business Employees.

5.13    Absence of Certain Changes. Except as set forth in Schedule 5.13, since November 31, 2008, (a) the Seller Entities have operated the Business in the ordinary course of business consistent with past practice, (b) neither Sellers nor their Affiliates have taken, or

agreed to take, any of the actions set forth in Section 7.3, and (c) there has been no material damage to or loss or theft of any of the Acquired Assets (whether or not covered by insurance).

5.14     Customers and Suppliers.  Schedule 5.14 sets forth a complete and accurate list of (a) all Persons that are direct customers of Sellers or their Affiliates that represent five percent (5%) or more of the aggregate revenues of the Seller Entities taken as a whole for sales of Products for the fiscal years ended December 31, 2007 and December 31, 2008 and (b) all Persons that are suppliers of Sellers or their Affiliates that represent five percent (5%) or more of the aggregate revenues of the Seller Entities taken as a whole for sales of Products for the fiscal years ended December 31, 2007 and December 31, 2008.  Except as set forth in Schedule 5.14, no Seller Entity or any of their Affiliates has received any written notice within the past twelve (12) months that any of the customers or suppliers set forth on Schedule 5.14 intends to materially reduce the level of Products it purchases from the Business subsequent to Closing or materially reduce the level of supplies it provides to the Business subsequent to Closing, as applicable.

5.15     Valid Transfers.  The transfer of Acquired Assets and the license of the Licensed IP by the Seller Entities to the Buyer Entities pursuant to the Transaction Documents has been and will be made at arms length and in good faith and without intent to hinder, delay or defraud creditors of Sellers or their Affiliates, and Sellers acknowledge that they and the other Seller Entities have received fair consideration and reasonably equivalent value for the purchases by the Buyer Entities of the Acquired Assets, the licenses of the Licensed IP to the Buyer Entities and the assumption by the Buyer Entities of the Assumed Liabilities hereunder and under the other Transaction Documents.

5.16     Real Property.  No real property, whether owned or leased by Sellers or their Affiliates, is included in the Acquired Assets or the Assumed Liabilities.

5.17     Brokers.  Neither Sellers nor any of their Affiliates has agreed or become obligated to pay, or has taken any action that might result in any Person claiming to be entitled to receive, any brokerage commission, finder's fee or similar commission or fee in connection with any of the Transactions.

5.18     No Other Representations or Warranties.  It is the explicit intent of the parties, and the parties hereby agree, that none of Sellers or any of their Affiliates or representatives has made or is making any representation or warranty whatsoever, express or implied, written or oral, including any representation as to the physical condition or value of any of the Acquired Assets or the future profitability or future earnings of the Business, except those representations and warranties expressly contained in this Agreement and the other Transaction Documents. Except as set forth in Section 5.8(k), none of Sellers or any of their Affiliates or representatives has made or is making any representation or warranty whatsoever with respect to the Prior IP, and all such Prior IP is being assigned and transferred to Buyer on an "AS IS, WHERE IS" basis.

36

## ARTICLE VI.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this <u>Article VI</u> are true and correct as of the date hereof.

6.1    <u>Organization, Power</u>. Each Buyer Entity is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization. Each Buyer Entity has all requisite corporate power and authority to conduct its business as it has been and is currently being conducted. Each Buyer Entity has all requisite corporate power and authority to execute and deliver this Agreement and to enter into the Transaction Documents to which it is or will be a party and to consummate the Transactions.

6.2    <u>Due Authorization</u>. The execution and delivery by the Buyer Entities of the Transaction Documents and the performance by the Buyer Entities of their obligations thereunder have been duly and validly authorized by all necessary corporate action, and no other corporate or other action on the part of any Buyer Entity is necessary to authorize the execution and delivery of this Agreement and the other Transaction Documents to which any Buyer Entity is or is proposed to be a party or the consummation of the Transactions. This Agreement has been, and each of the other Transaction Documents, when executed, will be, duly executed and delivered by the applicable Buyer Entity, and this Agreement constitutes, and each of the other Transaction Documents when so executed shall constitute, the legal, valid and binding obligations of each of the Buyer Entities, enforceable against each of the Buyer Entities in accordance with their respective terms, except as such enforcement may be limited by Enforceability Exceptions. Buyer has all necessary right and power to agree, on behalf of the other Buyer Entities, to the purchase of the Acquired Assets to be purchased by such Buyer Entities and to the assumption of the Assumed Liabilities to which such Buyer Entities will assume.

6.3    <u>No Conflict; Third-Party Consents</u>. The execution and delivery of this Agreement do not, and of the other Transaction Documents do not or will not, and the consummation of the Transactions will not, (i) violate or conflict with the provisions of the Organizational Documents of any of the Buyer Entities, (ii) result in the imposition of any Lien upon any of the properties or assets of any of the Buyer Entities, cause the acceleration or material modification of any obligation under, create in any party the right to terminate, constitute a default or breach of, or violate or conflict with the terms, conditions or provisions of any Contract to which any Buyer Entity is a party or by which its assets are bound or (iii) result in a breach or violation by any Buyer Entity of any of the terms, conditions or provisions of any Law, Order or Governmental Authorization.

6.4    <u>Consents and Approvals</u>. No consent, waiver, approval, authorization, order or permit of, or declaration, filing or registration with, or notification to, any Governmental or Regulatory Body or other Person is required to be made or obtained by any Buyer Entity in connection with its execution and delivery of this Agreement or any other Transaction Document to which it is or will be a party, the performance by any Buyer Entity of its obligations hereunder or thereunder, or the consummation by any Buyer Entity of the Transactions.

37

6.5    Litigation.  No Action or Proceeding is or has been pending or, to the knowledge of Buyer, threatened in writing, against Buyer that, if adversely determined, would reasonably be expected to adversely affect or restrict the ability of Buyer to consummate the Transactions. There is no Order to which Buyer is subject that would reasonably be expected to adversely affect or restrict the ability of Buyer to consummate the Transactions.

6.6    Sufficient Funds.  Buyer possesses sufficient funds to consummate the Transactions and affirms that it is not a condition to Buyer's obligations to complete the Transactions that Buyer obtain financing for or related to any of the Transactions.

6.7    Brokers.  Except for Oppenheimer & Co., Inc., whose fees and expenses are the sole responsibility of Buyer, Buyer has not agreed or become obligated to pay, or has taken any action that might result in any Person claiming to be entitled to receive, any brokerage commission, finder's fee or similar commission or fee in connection with any of the Transactions.

6.8    Buyer Employee Plans.  Schedule 6.8 contains a complete and accurate list of all Buyer Employee Plans in effect as of the date hereof in which Transferring Employees will participate.  The Buyer Employee Plans are administered in all material respects in accordance with their terms and Buyer and Buyer's Affiliates are in compliance with their obligations in all material respects with respect to the Buyer Employee Plans.  Buyer and Buyer's Affiliates maintain and perform under the Buyer Employee Plans in material compliance with all applicable Laws.

6.9    Labor Matters.  Neither Buyer nor any Buyer Affiliate is a party to or bound by any collective bargaining agreement that will apply to the terms and conditions of employment of any Transferring Employee, and there are no trade unions or labor organizations asserting representational rights that would affect any Transferring Employee.

6.10    Adequate Assurance of Future Performance.  Buyer will be able to provide, at or prior to Closing, adequate assurance of its future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors), as reasonably necessary to satisfy the requirements of Section 365(f)(2)(B) of the U.S. Bankruptcy Code.  Buyer acknowledges and agrees that, if it becomes necessary to provide a Contract counterparty with additional assurances to satisfy Buyer's obligations under the applicable Contract, Buyer shall perform all actions and bear all such costs and expenses as may be reasonably necessary or advisable in connection with their obligations under such Contract without recourse to any Seller.

6.11    Acknowledgement of Section 5.5(c).  Buyer acknowledges and agrees that Sellers representations and warranties in Section 5.5 are subject to the limitations and qualifications set forth in Section 5.5(c) and Schedule 5.5(c).

## ARTICLE VII.
## PRE-CLOSING COVENANTS

7.1    Commercially Reasonable Efforts.  Subject to the terms and conditions herein provided, each party agrees to use its, and Sellers agree to cause the other Transferring Parties to

38