use their, respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws, to consummate and make effective the Transactions as promptly as practicable. From the date hereof through the Closing Date, Sellers will keep Buyer reasonably informed of the amount of Specified Inventory. Without limitation of Sellers' obligations pursuant to Section 7.17 or Section 7.21, this Section 7.1 does not cover any of the matters set forth in Sections 7.14, 7.15 or 7.16.

       7.2    Regulatory and Other Approvals; Notification. Without limitation of Section 7.1, each party hereby agrees to, and Sellers agree to cause the other Transferring Parties to, use their commercially reasonable efforts to (x) obtain as promptly as practicable all Governmental Authorizations, make all filings with and to give all notices to Governmental or Regulatory Bodies and obtain all consents from third parties required of such parties or their Affiliates to consummate the Transactions (other than counterparties to any Business Contracts and those Contracts not assigned to Buyer which are the subject of the Master Purchase Agreement), (y) provide such other information and communications to such Governmental or Regulatory Bodies and third parties as such Governmental or Regulatory Bodies and third parties may reasonably request in connection therewith, and (z) cooperate with each other as promptly as practicable in connection with the foregoing. Each party will, and Sellers will cause the other Transferring Parties to, provide prompt notification to the other parties when any such consent, approval, action, filing or notice referred to in clause (x) above is obtained, taken, made or given, as applicable, and will advise the other parties of any communications from any Governmental or Regulatory Body regarding any of the Transactions. If any party or Affiliate thereof receives a request for additional information or documentary material from any such Governmental or Regulatory Body with respect to the Transactions, then such party will use commercially reasonable efforts to make, or cause to be made, as soon as reasonably practicable and after consultation with the other party, an appropriate response in compliance with such request. Between the date hereof and the Closing Date, NNI shall promptly notify Buyer, and Buyer shall promptly notify NNI, of any litigation, arbitration or administrative proceeding pending or, to their knowledge, threatened in writing against Sellers or their Affiliates or Buyer or its Affiliates, as the case may be, which challenges the consummation of Transactions or the performance by the parties of their obligations under the Transaction Documents; provided, that no Seller shall be obligated under Section 7.2 to provide Buyer with notice of any publicly available filing in any Bankruptcy Proceeding or any document described in the first sentence of Section 7.16. Without limitation of Sellers' obligations pursuant to Section 7.17 or Section 7.21, this Section 7.1 does not cover any of the matters set forth in Sections 7.14, 7.15 or 7.16.

       7.3    Conduct of Business. From the date hereof through the Closing Date, except as may be required in connection with or as a result of the Bankruptcy Proceedings, Sellers will, and will cause their Affiliates to, operate the Business only in the ordinary course of business consistent with past practice. Sellers will, and will cause their Affiliates to, use commercially reasonable efforts, except as may be required in connection with or as a result of the Bankruptcy Proceedings, to: (i) preserve and protect the Acquired Assets and the business organization of the Business; (ii) keep available the services of Business Employees; (iii) cause all transactions between Sellers and third parties relating to the Business to take place on arm's length terms; (iv) comply, in all material respects, with all Laws and Orders applicable to the Business; and (v)

preserve their current relationships with the customers, suppliers, licensors, licensees, contractors, vendors, distributors and others having business dealings with respect to the Business. Without limiting the generality of the foregoing, from the date hereof through the Closing Date, except as may be required in connection with or as a result of the Bankruptcy Proceedings, Sellers shall not, and shall not permit their Affiliates to, without the prior written consent of Buyer (other than with respect to Section 7.3(g), for which Buyer shall have no right of prior written consent):

    (a) sell, lease, encumber, transfer or dispose of any assets or rights which would be included in the Acquired Assets or the Licensed IP, unless in the ordinary course of business consistent with past practice;

    (b) purchase additional Inventory exclusively relating to the Business unless contractually obligated to do so or to replenish a specific type of Inventory exclusively relating to the Business for which it is necessary to fill orders;

    (c) enter into, adopt, amend, modify or terminate any employee benefit plan, program or arrangement with respect to Business Employees in a manner materially more favorable to the Business Employees, increase in any manner the compensation or benefits of any Business Employee or pay any benefit not required by any existing employee benefit plan, or enter into any Contract to do any of the foregoing, except for normal or periodic increases in compensation, or changes in employee benefit plans that are in the ordinary course of the Business consistent with past practice;

    (d) amend, modify or terminate any Business Contract, except in the ordinary course of business consistent with past practice;

    (e) (i) sell, assign, transfer, abandon or fail to maintain, (ii) except in the ordinary course of business consistent with past practice, license or sublicense, or (iii) except in the ordinary course of business consistent with past practice, enter into, amend or terminate any Contract with respect to, any Business Intellectual Property;

    (f) waive any material rights relating to any of the Acquired Assets or Assumed Liabilities;

    (g) modify any pricing or discount terms with respect to the Products or services of the Business other than in the ordinary course of business consistent with past practice; or

    (h) take any action that would prevent or delay Sellers or their Affiliates from licensing the Licensed IP to Buyer or its Affiliates at the Closing.

   7.4 Examinations and Investigations.  At any time prior to the Closing Date, Buyer shall be entitled, through its employees and representatives, to enter upon and make such reasonable investigation of the assets, properties, business and operations of the Transferring Parties to the extent they relate exclusively to the Business, and such examination of the books and records, financial condition and operations of the Business as Buyer may reasonably request.

Any such investigation and examination shall be coordinated through a point of contact designated by NNI and conducted at reasonable times during normal business hours upon reasonable prior notice to NNI and under reasonable circumstances; <u>provided</u>, that such investigation shall not unreasonably interfere with the business operations of any Seller Entity or the sale of the Business pursuant to the U.S. Bidding Procedures Order (including with respect to any Seller Entity's provision of access to other potential bidders in connection with the sale of the Business).

7.5    <u>Bulk Sales</u>.  The parties hereto hereby waive compliance with the provisions of any applicable bulk sales laws, including Article 6 of the Uniform Commercial Code as it may be in effect in any applicable jurisdiction ("<u>Bulk Sales Laws</u>").

7.6    <u>Publicity</u>.  Each party shall be entitled to issue or make a press release regarding the Transactions in the form previously agreed to by the parties (the "<u>Press Release</u>") or any other press release or announcement required by any Law, Order or the rules of a stock exchange; <u>provided</u>, that the party required to make the release or announcement (other than the Press Release) shall, to the extent reasonably practicable, allow the other parties (in the case of a press release or announcement to be made by Buyer, Buyer shall allow NNI) reasonable time to comment on such release or announcement in advance of such issuance; <u>provided</u>, <u>further</u>, that each party shall be permitted to comply with applicable SEC filing requirements and any other securities law requirements applicable to such party with respect to this Agreement and the other Transaction Documents without consultation with any other party.  The Main Sellers and Buyer shall cooperate with each other to issue a joint press release regarding the Transactions following the Closing.

7.7    <u>New Contracts; Disclosure Schedules</u>.

(a)    Between the date hereof and the Closing Date, any Seller or its Affiliates shall, in the ordinary course of business, be entitled to enter into New Exclusive Service Contracts, without the need to obtain the consent thereto from Buyer.  Other than with respect to New Exclusive Service Contracts and Contracts described in <u>Section 2.1(c)(iii)</u>, Sellers shall not, and shall not permit their Affiliates to, without the prior written consent of Buyer, enter into any new Contract between the date hereof and Closing that will be assigned to Buyer at the Closing.  In the event Buyer consents to the entry of any such new Contract, Sellers shall prior to the Closing provide an executed copy of such Contract to Buyer.

(b)    Sellers shall be entitled to submit to Buyer, from time to time between the date hereof and the Closing Date, written updates to the Schedules referenced in <u>Article V</u> (including on the Sellers Closing Certificate) disclosing any events or developments that occurred or any information learned between the date of this Agreement and the Closing Date; <u>provided</u>, that neither such updated Schedules nor any such disclosures on the Sellers Closing Certificate shall operate to in any way modify or cure any breach of the representations and warranties made by Sellers in <u>Article V</u>, including for purposes of meeting the Closing condition set forth in <u>Section 8.1(a)</u>.

7.8    <u>Confidentiality</u>.  The parties acknowledge and agree that the Confidentiality Agreement remains in full force and effect and that information provided by any Seller or its

Affiliates to Buyer or its Affiliates in connection with the Transactions (as well as any information regarding the existence, status or termination of the Transactions) is subject to the terms of and shall be treated in accordance with the Confidentiality Agreement. If this Agreement is terminated prior to the Closing, the Confidentiality Agreement shall remain in full force and effect in accordance with its terms. If the Closing occurs (a) the Confidentiality Agreement shall terminate effective as of the Closing and (b) the confidentiality provisions set forth in Section 9.14 shall apply with respect to Sellers' and Buyer's additional confidentiality obligations following the Closing. For the sake of clarity, neither this Section 7.8 nor the Confidentiality Agreement shall be construed to limit or prohibit the issuance of the Press Release or third party communications in connection with the assignment of the Business Contracts.

7.9    Notifications of the Transactions. As soon as reasonably practicable following the execution of this Agreement, Sellers shall send a notification to each counterparty to a Business Contract, pursuant to forms previously agreed with Buyer, notifying such counterparties of the pendency of the Transactions and, with respect to any Assumed and Assigned Contract, requesting the counterparty thereto to notify Sellers of any outstanding Cure Costs.

7.10    New Exclusive Service Contracts; Multi-Year Exclusive Service Contracts.

(a)    With respect to New Exclusive Service Contracts, Sellers shall, and shall cause each other Seller Entity to, remit to Buyer at the Closing (by wire transfer of immediately available funds to an account designated by Buyer at least three (3) days in advance of the Closing) all amounts paid to any Seller or Seller Entity by the counterparties with respect to any such New Exclusive Service Contract less (in the case of a New Exclusive Service Contract that has been in effect for at least one week prior to the Closing Date) a proportional amount of the moneys paid to any Seller or Seller Entity by the counterparty to such New Exclusive Service Contract prior to the Closing Date (based on the proportion of the period of the New Exclusive Service Contract that occurs between the commencement date thereof and the Closing Date to the entire period of such New Exclusive Service Contract). In the case of a New Exclusive Service Contract that has been in effect for at least one week prior to the Closing Date for which Buyer or any Affiliate of Buyer receives payment therefor following the Closing, Buyer shall promptly pay to the applicable Seller or the applicable Seller Entity (by wire transfer of immediately available funds to an account designated by such Seller or Seller Entity) a proportional amount of the moneys paid to Buyer or its Affiliates by the counterparty to such New Exclusive Service Contract after the Closing Date (based on the proportion of the period of the New Exclusive Service Contract that occurs between the commencement date thereof and the Closing Date to the entire period of such New Exclusive Service Contract).

(b)    With respect to Multi-Year Exclusive Service Contracts, Sellers shall, and shall cause each other Seller Entity to, remit to Buyer at the Closing (by wire transfer of immediately available funds to an account designated by Buyer at least three (3) days in advance of the Closing) all amounts paid to any Seller or Seller Entity by the counterparties with respect to any such Multi-Year Exclusive Service Contract less a proportional amount of the moneys paid to any Seller or Seller Entity by the counterparty to such Multi-Year Exclusive Service

Contract between the date hereof and the Closing Date with respect to Post Signing Periods (based on the proportion of the Post Signing Period that falls between the date hereof and the Closing Date to the overall Post Signing Period). In the case of a Multi-Year Exclusive Service Contract for which payment was due for Post Signing Periods for which Buyer or any Affiliate of Buyer receives payment therefor following the Closing, Buyer shall promptly pay to the applicable Seller or the applicable Seller Entity (by wire transfer of immediately available funds to an account designated by such Seller or Seller Entity) a proportional amount of such moneys with respect to Post Signing Periods (based on the proportion of the Post Signing Period that falls between the date hereof and the Closing Date to the overall Post Signing Period).

(c)     Three (3) Business Days prior to the Closing Date, NNI and NNL shall deliver to Buyer a certificate listing (x) all New Exclusive Service Contracts and all Multi-Year Exclusive Service Contracts entered into prior to such date, (y) the amounts received by Sellers and the Seller Entities (if any) from third parties in connection with such New Exclusive Service Contracts and Multi-Year Exclusive Service Contracts entered into prior to such date, and (z) the amounts (if any) which have been retained by Sellers and the Seller Entities in connection with such New Exclusive Service Contracts and Multi-Year Exclusive Service Contracts pursuant to Sections 7.10(a) and (b). In the event of any changes with respect to the matters set forth in such certificate between the date thereof and Closing, NNI and NNL shall deliver an update to such certificate as promptly as practicable following Closing, and promptly pay (but in no event prior to the Closing) to Buyer any additional amounts received by Sellers or the Seller Entities between the date of the original certificate and the Closing Date or amounts otherwise excluded from the original certificate but received by a Seller Entity between the date hereof and the Closing Date that are payable to Buyer pursuant to Sections 7.10(a) and/or 7.10(b), subject to Sections 7.10(a) and 7.10(b).

(d)     In the event that following the Closing any Seller or any other Seller Entity receives any payment in respect of a New Exclusive Service Contract or a Multi-Year Exclusive Service Contract, Sellers shall, and shall cause each other Seller Entity to, promptly pay to Buyer (by wire transfer of immediately available funds to an account designated by Buyer) a proportional amount of the moneys paid to Sellers or any other Seller Entity by the counterparty to such New Exclusive Service Contract or Multi-Year Exclusive Service Contract after the Closing Date (based on the proportion of the period of the New Exclusive Service Contract or Multi-Year Exclusive Service Contract that occurs between the commencement date thereof and the Closing Date to the entire period of such New Exclusive Service Contract or a Multi-Year Exclusive Service Contract).

(e)     With respect to the New Exclusive Service Contracts and/or Multi-Year Exclusive Service Contracts that are assigned to Buyer or another Buyer Entity hereunder, in the event that the customer under such New Exclusive Service Contracts and/or Multi-Year Exclusive Service Contracts fails to make the required payments due thereunder within the time period for payment thereunder plus a period of thirty (30) days, nothing in this Agreement shall prevent Buyer from terminating such Contracts.

7.11    Israeli Withholding Tax Exemption Application and Approval. Prior to the date hereof, Buyer has filed an application with the Israel Tax Authority (the "ITA") requesting a

43

complete exemption of the Transactions from all applicable Israeli withholding Tax Laws (the "Israeli Withholding Tax Exemption Application"), which Israeli Withholding Tax Exemption Application shall correctly describe the Transactions in all material respects. Buyer shall use its commercially reasonable efforts to obtain approval of the Israeli Withholding Tax Exemption Application as promptly as practicable. Buyer shall promptly notify NNI of all requests for additional information or documentary material or otherwise from the ITA that Buyer receives with respect to the Israeli Withholding Tax Exemption Application, and consult with NNI with respect to any response thereto. Buyer shall promptly notify NNI upon obtaining the approval of the Israeli Withholding Tax Exemption Application. All Buyer's expenses (including legal or tax advisory fees) with respect to the filing and receipt of approval of the Israeli Withholding Tax Exemption Application shall be borne solely by Buyer. NNI shall notify Buyer of any adjustment to the allocation of the Purchase Price among the Seller Entities required by any Bankruptcy Court, or other Governmental or Regulatory Body of competent jurisdiction, and Buyer shall promptly update the Israeli Withholding Tax Exemption Application so that such application correctly describes the Transactions, as so modified, in all material respects.

7.12    Subcontractors. Between the date hereof and the Closing Date, NNI shall, or shall cause Nortel India to, retain at its sole cost and expense, twenty (20) CSWL subcontractors (the "Retained Subcontractors") through NNI's or Nortel India's agreement with CSWL. On the Closing Date, NNI or Nortel India, as applicable, shall terminate the engagement of the Retained Subcontractors and permit Buyer or its Affiliates to engage the services of the Retained Subcontractors directly with CSWL following the Closing. The individuals who are Retained Subcontractors shall be separately agreed between the parties.

7.13    Nonassignable Contracts. In the event any Business Contract cannot be assigned (whether pursuant to Section 365 of the U.S. Bankruptcy Code or, if inapplicable, then pursuant to other applicable Laws or the terms of such Contract), then as of the Closing, this Agreement, to the extent permitted by Law and the terms of such Business Contract, shall constitute a full and equitable assignment by the applicable Transferring Party to Buyer of all of the applicable Transferring Party's right, title and interest in and to, and all of the applicable Transferring Party's Liabilities under, such Business Contract, and Buyer shall be deemed the applicable Transferring Party's agent for purpose of completing, fulfilling and discharging all of the applicable Transferring Party's Liabilities thereunder. The parties shall take all necessary steps and actions to provide Buyer with the benefits of such Business Contract, and to relieve the applicable Transferring Party of the performance and other obligations thereunder (to the extent that such would have constituted "Assumed Liabilities" had such Business Contract been assigned to Buyer hereunder), including entry into subcontracts for the performance thereof. For the purposes of this Agreement (including the previous sentence and all representations and warranties of Sellers contained herein), the relevant Seller Entity shall be deemed to have obtained all required consents in respect of the assignment of any Business Contract if, and to the extent that, pursuant to the U.S. Sale Order, such Seller Entity is authorized to assume and assign to Buyer such Business Contract pursuant to Section 365 of the U.S. Bankruptcy Code and any applicable Cure Cost has been satisfied as provided in Section 2.7.

7.14    U.S. Bankruptcy Actions. On the timetables set forth below, Sellers shall cause the U.S. Debtors to (a) file with the U.S. Bankruptcy Court one or more motions and proposed

44

orders covering the U.S. Debtors, each in form and substance reasonably satisfactory to Buyer, as set forth below, (b) cause the U.S. Debtors to notify, as required by the U.S. Bankruptcy Code and the U.S. Bankruptcy Rules, all parties entitled to notice of such motions and orders (including all relevant Taxing Authorities), as modified by orders in respect of notice which may be issued at any time and from time to time by the U.S. Bankruptcy Court, and such additional parties as Buyer may request, and (c) subject to the provisions of this Agreement, use commercially reasonable efforts to obtain U.S. Bankruptcy Court approval of such orders without any stay, modification, reversal or amendment adverse or unacceptable to Buyer.

7.15    U.S. Bidding Procedures Order.  As promptly as possible, but in no event later than February 20, 2009, Sellers shall cause the U.S. Debtors to file with the U.S. Bankruptcy Court a motion (the "U.S. Bidding Procedures Motion") and a proposed order (the "U.S. Bidding Procedures Order") with related U.S. bidding procedures in the form of Annex 1 seeking approval of a process for the sale of the Business, as set forth below.  Sellers shall cause the U.S. Debtors to use commercially reasonable efforts to cause the U.S. Bankruptcy Court to (a) schedule a hearing to consider the U.S. Bidding Procedures Motion as soon as possible and (b) enter the U.S. Bidding Procedures Order by February 27, 2009.

7.16    U.S. Sale Order.

(a)    As promptly as possible, but in no event later than February 20, 2009, Sellers shall cause the U.S. Debtors to file with the U.S. Bankruptcy Court one or more motions (collectively, the "U.S. Sale Motion") and proposed orders (collectively, the "U.S. Sale Order") seeking the approval of the U.S. Bankruptcy Court pursuant to Sections 105, 363, 365 and (to the extent applicable) 1146 of the U.S. Bankruptcy Code of the transfers of the Acquired Assets to Buyer and the assumption by the U.S. Debtors and assignment to Buyer of the Assumed and Assigned Contracts, as specified below.

(b)    The U.S. Sale Order shall contain the following provisions (it being understood that certain of such provisions must constitute findings of fact or conclusions of Law to be made by the U.S. Bankruptcy Court as part of the U.S. Sale Order):

(i)    the transfers of the Acquired Assets and the assignment of the Assumed and Assigned Contracts by the U.S. Debtors to Buyer in accordance with this Agreement (A) are or will be legal, valid and effective transfers of such Acquired Assets and assignment of such Assumed and Assigned Contracts, as the case may be, (B) vest or will vest Buyer with all right, title and interest of the U.S. Debtors in and to the Acquired Assets pursuant to section 363(f) of the U.S. Bankruptcy Code free and clear of any and all Liens (other than Permitted Liens and Liens created by Buyer) and Claims whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise, including any Claims held by any of the U.S. Debtors' or their Affiliates' creditors, vendors, suppliers, employees or lessors, and any other Person (collectively, the "Claimants"), and that none of Buyer or its Affiliates shall be liable in any way (as assignee, successor entity or otherwise) for any Claims that any of the Claimants or any other third party may have against the U.S. Debtors, their Affiliates or the Business, or under any such Assumed and Assigned Contract, other than Claims on the account of Assumed Liabilities, and (C) constitute transfers for reasonably equivalent value and fair

45

consideration under the U.S. Bankruptcy Code, the Laws of the States of New York and Delaware and all other applicable State Laws, including those relating to fraudulent conveyance and fraudulent transfers;

(ii)    all amounts to be paid by the U.S. Debtors to Buyer or to be borne by any U.S. Debtors pursuant to this Agreement and each of the other Transaction Documents shall constitute administrative expenses under Sections 503(b) and 507(a)(1) of the U.S. Bankruptcy Code, and shall be immediately payable if and when any U.S. Debtors' obligation to pay or bear such amount may arise under this Agreement without any further order of the U.S. Bankruptcy Court;

(iii)    the U.S. Bankruptcy Court retains exclusive jurisdiction to interpret, construe and enforce the provisions of, and to resolve any and all disputes that may arise under or in connection with the assumption and/or assignment of any Business Contracts under this Agreement and the U.S. Sale Order, in all respects, and further to hear and determine any and all disputes among Sellers, Sellers' Affiliates, Buyer or its Affiliates, as the case may be, and any non-Sellers party thereto that may arise under or in connection with (A) the assumption and/or assignment of any Assumed and Assigned Contract or (B) the Assumed Liabilities or Excluded Liabilities;

(iv)    the provisions of the U.S. Sale Order are nonseverable and mutually dependent;

(v)    the Transactions and the U.S. Sale Order are undertaken by Sellers and Buyer at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the U.S. Bankruptcy Code, and such parties are entitled to the protections of Section 363(m) of the U.S. Bankruptcy Code;

(vi)    a determination that approval of this Agreement and the U.S. Sale Order, and consummation of the Transactions, are in the best interests of the U.S. Debtors, their creditors and estates;

(vii)    a determination that the terms and conditions of this Agreement and the Transactions, including the transfer of the relevant Acquired Assets free and clear of any and all Liens (other than Permitted Liens) and Claims, are fair and reasonable;

(viii)    the U.S. Debtors may assign and transfer to Buyer all of the U.S. Debtors' right, title and interest (including common law rights) to all of their intangible property included in the Acquired Assets they each own, including the Assumed and Assigned Contracts to which they are a party, subject to their obtaining deemed consents to the extent required by applicable Law;

(ix)    provides that any stay of orders authorizing the use, sale or lease of property, or the assignment of an executory Contract or unexpired lease as provided for in Bankruptcy Rules 6004(g) or 6006(d) shall not apply to the U.S. Sale Order and that the U.S. Sale Order is immediately effective and enforceable;

(x)    provides that neither Buyer nor its Affiliates shall assume Liabilities of any U.S. Debtors or their Affiliates other than the Assumed Liabilities; and

(xi)    approves the U.S. Debtors' assumption and assignment to Buyer of the Assumed and Assigned Contracts pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code.

7.17    Consultation; Notification.  Buyer and the U.S. Debtors shall cooperate with filing and prosecuting the U.S. Bidding Procedures Motion and the U.S. Sale Motion, and obtaining entry of the U.S. Bidding Procedures Order and the U.S. Sale Order, and the U.S. Debtors shall deliver to Buyer prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for Buyer and its counsel to review and comment, copies of all proposed pleadings, motions, objections, responses to objections, notices, statements schedules, applications, reports and other material papers to be filed by the U.S. Debtors in connection with such motions, relief requested therein and any challenges thereto.  If the U.S. Sale Order or any other order of the U.S. Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, reargument or stay shall be filed with respect thereto), the U.S. Debtors agree to take all commercially reasonable steps, and use commercially reasonable efforts, to defend against such appeal, petition or motion, and Buyer agrees to reasonably cooperate in such efforts.  Each of the parties hereby agrees to use commercially reasonable efforts to obtain an expedited resolution of such appeal; provided, however, that nothing herein shall preclude the parties from consummating the transactions contemplated hereby if the U.S. Sale Order shall have been entered and have not been stayed and Buyer, in its reasonable judgment, has waived in writing the requirement that such U.S. Sale Order be a Final Order, in which event Buyer shall be able to assert the benefits of Section 363(m) of the U.S. Bankruptcy Code and, as a consequence of which, such appeal shall become moot.

7.18    Canadian Bankruptcy Actions.  On the timetables set forth below, Sellers shall cause the Canadian Debtors to (a) file with the Canadian Court one or more motions and proposed orders covering the Canadian Debtors, as set forth below, (b) cause the Canadian Debtors to notify, as required by the CCAA and any orders of the Canadian Court made in the Bankruptcy Proceedings, all parties entitled to notice of such motions and orders, as modified by orders in respect of notice which may be issued at any time and from time to time by the Canadian Court, and (c) subject to the provisions of this Agreement, use commercially reasonable efforts to obtain Canadian Court approval of such orders without any stay, modification, reversal or amendment.

7.19    Sale Process Order.  As promptly as possible, but in no event later than the date on which the U.S. Bidding Procedures Order is granted, Sellers shall cause the Canadian Debtors to file with the Canadian Court a motion (the "Sale Process Order Motion") and a proposed order (the "Sale Process Order") seeking approval of a process for the sale of the Business.

7.20    Approval and Vesting Order.  As promptly as possible, but in no event later than the date on which the U.S. Sale Motion is granted, Sellers shall cause the Canadian Debtors to file with the Canadian Court one or more motions (the "Approval and Vesting Order Motion")

47

seeking an order (the "Approval and Vesting Order") of the Canadian Court approving this Agreement and the transactions contemplated herein, such order to include the following:

(a)     the Transactions are approved, and that this Agreement is commercially reasonable and in the best interests of the Canadian Debtors and their stakeholders (it being recognized that such a determination is a finding of fact or conclusions of Law to be made by the Canadian Court as part of the Approval and Vesting Order);

(b)     the execution of the Agreement by NNL on behalf of all the Canadian Debtors is authorized and approved, and the Canadian Debtors are authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the transactions contemplated in this Agreement and for the conveyance of the Canadian Debtors' right, title and interest in the Acquired Assets to the Buyer;

(c)     all of the Canadian Debtors' right, title and interest in and to the Acquired Assets shall vest absolutely in the Buyer, free and clear of and from any and all Liens (other than Permitted Liens); and

(d)     the sale of the Acquired Assets is exempt from the application of the Bulk Sales Act (Ontario).

7.21    Consultation; Notification.  Buyer and the Canadian Debtors shall cooperate with filing and prosecuting the Sale Process Order Motion and the Approval and Vesting Order Motion, and obtaining entry of the Sale Process Order and the Approval and Vesting Order Motion, and the Canadian Debtors shall deliver to Buyer prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for Buyer and its counsel to review and comment, copies of all proposed pleadings, motions, objections, responses to objections, notices, statements schedules, applications, reports and other material papers to be filed by the Canadian Debtors in connection with such motions, relief requested therein and any challenges thereto.  If the Approval and Vesting Order or any other order of the Canadian Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, reargument or stay shall be filed with respect thereto), the Canadian Debtors agree to take all commercially reasonable steps, and use commercially reasonable efforts, to defend against such appeal, petition or motion, and Buyer agrees to reasonably cooperate in such efforts.  Each of the parties hereby agrees to use commercially reasonable efforts to obtain an expedited resolution of such appeal; provided, however, that nothing herein shall preclude the parties from consummating the transactions contemplated hereby if the Approval and Vesting Order shall have been entered and have not been stayed.

7.22    Conflict Between this Agreement and the Biddng Procedures Order.  Notwithstanding anything to the contrary in this Agreement, (a) in the event of any inconsistency with or conflict between this Agreement and the U.S. Bidding Procedures Order, the U.S. Bidding Procedures Order shall control and (b) in no event shall any Seller's (or its Affiliate's) compliance with the U.S. Bidding Procedures Order constitute a breach of this Agreement.

7.23    Notice of Cure Costs.  The Main Sellers shall promptly notify Buyer in writing if the Main Sellers reasonably believe that the aggregate Cure Costs are likely to exceed

$1,000,000 and offer the Buyer the opportunity to pay all such Cure Costs in excess of $1,000,000. Buyer shall have a period of five (5) Business Days to inform Seller whether it is willing to pay such Cure Costs in excess of $1,000,000 in the aggregate, and provide reasonable assurance thereof.

## ARTICLE VIII.
## CONDITIONS PRECEDENT TO CLOSING

8.1     <u>Conditions Precedent to the Obligations of Buyer</u>. The obligations of Buyer to effect the Transactions, purchase and pay for the Acquired Assets and EMEA Acquired Assets, and assume the Assumed Liabilities and EMEA Assumed Liabilities are subject to the fulfillment on or prior to the Closing of the following conditions, any one or more of which may be waived by Buyer:

(a)     <u>Representations</u>. The representations and warranties of Sellers set forth in <u>Article V</u> shall be true and correct as of the date of this Agreement and as of the Closing Date as if made as of the Closing Date, except (i) for those representations and warranties that address matters only as of a date prior to the execution of this Agreement (which shall be true and correct as of such date, subject to clause (ii) below), and (ii) where the failure of the representations and warranties to be true and correct would not reasonably be expected to result, in the aggregate, in a Business Material Adverse Effect (it being agreed that any materiality or Business Material Adverse Effect qualification in a representation and warranty shall be disregarded in determining whether any such failure would reasonably be expected to result in a Business Material Adverse Effect for purposes of this clause (ii)).

(b)     <u>Covenants</u>. Sellers shall have performed or complied in all material respects with all obligations and covenants required by this Agreement and the other Transaction Documents to be performed or complied with by Sellers at or prior to the Closing, except in each case to the extent that any such non-compliance arises out of a request made by Buyer in writing which expressly waives compliance with a particular covenant.

(c)     <u>Law</u>. No Law, temporary restraining order, preliminary or permanent injunction, cease and desist order or other Order issued by any Governmental or Regulatory Body prohibiting or preventing the purchase and sale contemplated by this Agreement or the consummation of the Transactions to be effected at the Closing shall be in effect.

(d)     <u>Consents and Approvals</u>. All notices, consents and approvals of Governmental or Regulatory Bodies set forth on <u>Schedule 8.1(d)</u> shall have been made or obtained, as applicable.

(e)     <u>Closing Certificate</u>. The Main Sellers shall have delivered to Buyer a certificate, dated the Closing Date, and signed by an authorized officer of each Main Seller, in substantially the form attached hereto as <u>Exhibit M</u> (the "<u>Sellers Closing Certificate</u>"), with respect to the satisfaction of the conditions specified in <u>Section 8.1(a)</u> and <u>Section 8.1(b)</u> and containing and certifying as to the information set forth in <u>Section 3.1(b)</u> and <u>7.10(c)</u>.

(f)     <u>Seller Closing Deliveries</u>. Buyer shall have received:

49

(i)     Bills of Sale (in the applicable form) executed by the applicable Seller Entities covering (i) Business Tangible Property, EMEA Tangible Property, Business Inventory and EMEA Inventory with an aggregate value equal to or exceeding ninety-five percent (95%) of the aggregate value, in U.S. Dollars, of the Tangible Business Property, EMEA Tangible Property, Business Inventory and EMEA Inventory set forth on the certificate delivered by the Main Sellers pursuant to Section 3.1(b) (excluding from such calculation, for the sake of clarity, all EMEA Inventory and EMEA Tangible Property excluded from the sale and purchase hereunder pursuant to the provisions of Section 2(b) of Exhibit P) and (ii) all Business Intellectual Property, Prior IP, EMEA Business Intellectual Property and EMEA Prior IP;

(ii)    Assignment and Assumption Agreements (in the applicable form) executed by the applicable Seller Entities with respect to the United States, Canada and the United Kingdom; and

(iii)   counterpart signature pages executed by the applicable Seller Entities to the IP License Agreement, the Master Purchase Agreement, the Transition Services Agreement, the Trademark License Agreement, the Patent Assignment Agreement, the Contract Manufacturer Inventory Agreement, the Trademark Assignment Agreement and the Interim Product Purchase Agreement.

(g)     Delivery of Certain Items.  NNI shall have delivered to Buyer, in form reasonably acceptable to Buyer, the databases set forth on Schedule 8.1(g).

(h)     Bankruptcy Orders.  Each of the U.S. Bidding Procedures Order, the U.S. Sale Order, the Sale Process Order and the Approval and Vesting Order shall (i) have been entered and (ii) have become Final Orders.

(i)     Export Licenses.  To the extent that any Governmental Authorizations are necessary to assign the Business Intellectual Property to Buyer and/or its Affiliates, Sellers shall have received all such necessary Governmental Authorizations.

8.2     Conditions Precedent to the Obligations of Sellers.  The obligations of Sellers to effect the Transactions and sell and deliver the Acquired Assets to Buyer are subject to the fulfillment on or prior to the Closing of the following conditions, any one or more of which may be waived by the Main Sellers:

(a)     Representations.  The representations and warranties of Buyer set forth in Article VI shall be true and correct as of the date of this Agreement and as of the Closing Date as if made as of the Closing Date, except (i) for those representations and warranties that address matters only as of a date prior to the execution of this Agreement (which shall be true and correct as of such date, subject to clause (ii) below), and (ii) where the failure of the representations and warranties to be true and correct would not reasonably be expected to result, in the aggregate, in a Buyer Material Adverse Effect (it being agreed that any materiality or Buyer Material Adverse Effect qualification in a representation and warranty shall be disregarded in determining whether any such failure would reasonably be expected to result in a Buyer Material Adverse Effect for purposes of this clause (ii)).

50

     (b)    <u>Covenants</u>.  Buyer shall have performed or complied in all material respects with all obligations and covenants required by this Agreement and the other Transaction Documents to be performed or complied with by Buyer at or prior to the Closing, except in each case to the extent that any such non-compliance arises out of a request made by a Seller in writing which expressly waives compliance with a particular covenant.

     (c)    <u>Law</u>.  No Law, temporary restraining order, preliminary or permanent injunction, cease and desist order or other Order issued by any Governmental or Regulatory Body prohibiting or preventing the purchase and sale contemplated by this Agreement or the consummation of the Transactions to be effected at the Closing shall be in effect.

     (d)    <u>Consents and Approvals</u>.  All notices, consents and approvals of Governmental or Regulatory Bodies set forth on <u>Schedule 8.2(d)</u> shall have been made or obtained, as applicable.

     (e)    <u>Closing Certificate</u>.  Buyer shall have delivered to the Main Sellers a certificate, dated the Closing Date, and signed by an authorized officer of Buyer, in substantially the form attached hereto as <u>Exhibit N</u> (the "<u>Buyer Closing Certificate</u>"), with respect to the satisfaction of the conditions specified in the conditions specified in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u>.

     (f)    <u>Buyer Closing Deliveries</u>.  Buyer shall have delivered to the Main Sellers or the Escrow Agent, as the case may be, (i) the Purchase Price as specified in <u>Section 4.3(a)</u> and (ii) executed counterpart signature pages of Buyer (or its Affiliates) to the IP License Agreement, the Master Purchase Agreement, the Transition Services Agreement, the Trademark License Agreement, the Patent Assignment Agreement, the Contract Manufacturer Inventory Agreement, Assignment and Assumption Agreements (solely with respect to the United States, Canada and the United Kingdom), the Trademark Assignment Agreement and the Interim Product Purchase Agreement).

     (g)    <u>Israeli Tax Withholding Exemption</u>.  Buyer shall have obtained and provided the Main Sellers with a copy of the ITA's approval of the Israeli Withholding Tax Exemption Application, which approval shall be final and binding on the ITA.

     (h)    <u>Export Licenses</u>.  To the extent that any Governmental Authorizations are necessary to assign the Business Intellectual Property to Buyer and/or its Affiliates, Sellers shall have received all such necessary Governmental Authorizations.

     (i)    <u>Bankruptcy Orders</u>.  Each of the U.S. Bidding Procedures Order, the U.S. Sale Order, the Sale Process Order and the Approval and Vesting Order shall (i) have been entered and (ii) have become Final Orders.

**ARTICLE IX.**
**ONGOING COVENANTS**

9.1    <u>Tax Matters</u>.

(a)    (i)    All sums payable under this Agreement shall be exclusive of Transfer Taxes (as defined below).  Subject to <u>Section 9.1(a)(iii)</u> and <u>Section 9.1(a)(iv)</u>, Buyer, on the one hand, and Sellers, on the other, shall each be responsible for 50% of all goods and services, sales, use, transfer, documentary, VAT, value added, stamp, recording and similar Taxes incurred in connection with the purchase and sale of the Acquired Assets and EMEA Acquired Assets (for the avoidance of doubt, including interest and penalties but excluding any Income Taxes) ("<u>Transfer Taxes</u>"); <u>provided</u>, that Buyer shall be responsible for 100% of the portion of such Transfer Taxes as to which Buyer and NNI will in good faith determine it is reasonably expected that Buyer will receive a refund, rebate, credit or similar amount (a "<u>Transfer Tax Refund</u>") (where the Transfer Tax in question is VAT or any similarly computed value added tax, on the assumption that Buyer is registered for VAT in the jurisdiction in which the relevant supply of the EMEA Acquired Assets takes place and that Buyer has paid to the EMEA Seller the VAT charged to it by such EMEA Seller in respect of the acquisition of the EMEA Acquired Assets without regard to this <u>Section 9.1(a)(i)</u>).  Buyer (or Sellers or their Affiliates, in the case of Transfer Taxes required to be collected, remitted or paid by Sellers or their Affiliates) shall timely pay or cause to be paid any Transfer Taxes to the applicable Taxing Authority.  Buyer or Sellers or their Affiliates, as applicable, shall reimburse such paying party its share of such Transfer Taxes, if any, as determined pursuant to the foregoing, within seven (7) Business Days of receipt of a reimbursement request from the paying party; <u>provided</u>, that such reimbursement need not be paid prior to three (3) Business Days before such Transfer Tax is required to be paid to the Taxing Authority.  Buyer or Sellers, as applicable, shall promptly provide to the other party sufficient documentation evidencing payment of any Transfer Taxes.  Disputes with respect to the amount of Transfer Taxes due will be referred to an accounting firm jointly selected and engaged by Buyer and NNI for resolution.  The fees of such accounting firm shall be borne by the party who in the opinion of such accounting firm had the position which was more erroneous.

(ii)    Notwithstanding clause (a)(i) above, Buyer shall be responsible for 100% of any Transfer Taxes incurred in connection with the purchase and sale of the Acquired Assets and EMEA Acquired Assets (A) as a result of Buyer's failure to obtain any necessary state sales and use tax permits, timely deliver any necessary resale certificates, or otherwise take any action that would result in an exemption relating to, or a reduced rate of, such Transfer Taxes and (B) for any Transfer Taxes that are interest or penalties, to the extent that the interest or penalties arise in respect of an amount of Transfer Tax that the Buyer is required pursuant to sections  9.1(a) (i) or (iv)  to pay to a Taxing Authority or any Seller or Affiliate of the Seller where the Buyer has failed to pay such Transfer Taxes within the time limits envisaged in Section 9.1(a) (i) or (iv).  Buyer or its Affiliate shall be solely responsible for ensuring that any exemption relating to, or a reduced rate of, Transfer Taxes in connection with the transactions contemplated herein applies and, in that regard, shall, prior to the Closing Date, provide Sellers and/or any of

52

their Affiliates, as the case may be, with its permit number and/or any appropriate certificate of exemption and/or other document or evidence to support the claimed entitlement to such exemption by such party or an Affiliate thereof. NNI will make commercially reasonable efforts to provide Buyer with information requested by Buyer that is necessary for Buyer to obtain permits or certificates exempting any or all of the Transactions in whole or part from Transfer Taxes.

(iii)    Sellers' obligations pursuant to this <u>Section 9.1(a)</u> shall be based on the Asset Allocation Schedule as of the Closing Date. Notwithstanding anything to the contrary in this <u>Section 9.1(a)</u>, in the event that the Asset Allocation Schedule is changed or modified after the Closing Date in accordance with <u>Section 3.2</u>, Buyer (or its Affiliate, as applicable) shall promptly pay directly to the appropriate Taxing Authority or the applicable Seller or Seller's Affiliate (if requested by such Seller or Seller's Affiliate) any Transfer Taxes that may be due as a result of such change or modification.

(iv)    Where a sum is paid pursuant to this Agreement in consideration for any supply (or deemed supply) of goods or services the payor shall, in addition to the consideration payable for such supply, pay an amount equal to the VAT (if any) arising in respect of such supply against the production of a valid VAT invoice. Where and to the extent that the Transfer Taxes described in <u>Section 9.1(a)</u> are VAT, <u>Section 9.1(a)</u> shall apply save that the Buyer shall pay or shall procure that the relevant Affiliate shall pay an amount equal to 100% of such VAT to the Seller or relevant Affiliate against the production of a valid VAT invoice. The Sellers or their Affiliates shall then reimburse the Buyer or its Affiliates, as required, in accordance with <u>Section 9.1(a)(i)</u>.

(b)    If Buyer or any Affiliate of Buyer is required by Law to make any deduction or withholding for any Tax with respect to any consideration payable hereunder, the consideration payable hereunder shall be increased to an amount that, after such deduction or withholding, will result in payment to Sellers or any of their Affiliates of the full amount Sellers or such Affiliates would have received from Buyer had such deduction or withholding not been made. Buyer shall promptly furnish Sellers with such evidence as may be required by the applicable taxing authorities to establish that any such Tax has been paid.

(c)    Sellers and Buyer will each provide the other with such assistance as may reasonably be requested in connection with the preparation of any Tax Return relating to the Business.

9.2    <u>Record Retention</u>. In the event that Buyer or any Seller desires to destroy or otherwise dispose of any of the books and records relating to the Acquired Assets or the Assumed Liabilities in its possession with respect to periods prior to the Closing within one (1) year of the Closing Date, such party shall give Buyer (in the event that it is a Seller that wishes to destroy or dispose of any such books or records) or the Main Sellers (in the event that it is Buyer that wishes to destroy or dispose of any such books or records) twenty (20) Business Days' prior written notice of such intended disposition and by offering to deliver to the other party, at the other party's expense, custody of such books and records as such first party may intend to destroy or dispose of.

53

9.3     Use of Names.

(a)     Except as set forth on Schedule 2.1(d), no interest in any Marks of any Seller or any of its Affiliates is being transferred or assigned (or, except as set forth in the Trademark License Agreement, licensed) to Buyer or any subsidiary of Buyer pursuant to the Transactions.  Except as may be expressly permitted pursuant to the Trademark License Agreement (including, for the sake of clarity, in the case of Products purchased pursuant to Section 9.10), Buyer will, within thirty (30) days following the Closing Date, remove or obliterate all such Marks from the signs, purchase orders, invoices, sales orders, labels, letterheads, shipping documents, business cards and other materials included in the Acquired Assets, and Buyer shall not, and shall not permit its subsidiaries to, put into use after the Closing Date any such materials not in existence on the Closing Date that bear any Mark; provided, that if such materials are used by Buyer or any of its subsidiaries during such thirty (30) day period, Buyer shall, and shall cause its subsidiaries to, conspicuously note thereon that ownership of the Business has transferred to Buyer.  Except to the extent expressly set forth elsewhere in this Agreement or in another Transaction Document, nothing in this Agreement shall give Buyer permission, without the prior written consent of NNI in each instance, to use in advertising, publicity or otherwise the name of any Seller or any of its Affiliates or any Mark owned or used by any Seller or any of its Affiliates.

(b)     Each Seller hereby covenants and agrees (i) that (x) if such Seller has a corporate name containing the Mark "alteon", it will, and (y) such Seller will cause any Affiliate of such Seller (other than another Seller) that has a corporate name containing the Mark "alteon" to, in either case remove "alteon" from such corporate name(s), within thirty (30) days of the Closing Date (in the case of U.S.-organized Sellers and Affiliates) and as soon as reasonably practicable following the Closing (in the case of non-U.S. organized Sellers and Affiliates) through the use of commercially reasonable efforts; and (ii) notwithstanding the period set forth in Section 9.3(b)(i), from and after the Closing, Sellers shall not conduct, and each Seller shall prevent any such Affiliate from conducting, any commercial activity under or in connection with a corporate name containing "alteon."  Buyer hereby grants to each Seller and Affiliate thereof described in the preceding sentence a fully paid up, worldwide, personal, non-transferable and non-assignable, indivisible and non-exclusive right to use the Mark "alteon" as part of its corporate name during the period set forth in the preceding sentence.

9.4     Further Information.

(a)     Following the Closing, Buyer will afford to Sellers, their counsel and their accountants, during normal business hours, reasonable access to the books and records relating to the Business, Acquired Assets or the Assumed Liabilities in its possession with respect to periods after the Closing and the right to make copies and extracts therefrom, to the extent that such access may be reasonably required by the requesting party (i) to facilitate the investigation, litigation and final disposition of any claims that may have been or may be made against any Seller or its Affiliates or (ii) for any other reasonable business purpose.

(b)     Without limiting the generality of Section 9.4(b), following the Closing, Buyer shall (i) provide each Seller with such assistance and cooperation as may be reasonably requested by such Seller and (ii) make available to each Seller and its legal counsel, during

54

normal business hours, any of the Transferring Employees who were involved in, or are otherwise knowledgeable about, pre-Closing matters, including making such Transferring Employees available on a mutually convenient basis to provide information, testimony at depositions, hearings or trials, and such other similar assistance as may be reasonably requested by such Seller.

(c)     The applicable Seller shall reimburse Buyer for reasonable out-of-pocket costs and expenses incurred in assisting such Seller pursuant to this Section 9.4.  Buyer shall not be required by this Section 9.4 to take any action that would unreasonably interfere with the conduct of its business, unreasonably disrupt its normal operations or materially impair a Transferring Employee's ability to perform his or her duties.

9.5     Mistaken Payments.  Following the Closing Date:

(a)     if any Seller or any of its Affiliates receives any payment, refund or other amount that is an Acquired Asset, such Seller shall or shall cause such Affiliate to, within thirty (30) days of becoming or being made aware of such payment, remit, or shall cause to be remitted, such amount to Buyer; and

(b)     if Buyer receives any payment, refund or other amount that is an Excluded Asset, Buyer shall, within thirty (30) days of becoming or being made aware of such payment, remit, or shall cause to be remitted, such amount to the applicable Seller or Affiliate thereof.

9.6     Sellers Vendor Contracts.  Buyer acknowledges and agrees that the supply contracts, software contracts, tooling contracts and other Contracts of any Seller and/or its Affiliates that are not exclusive to the Business are not being assigned to Buyer hereunder. Accordingly, Buyer agrees that it is responsible for directly entering into a Contract with the applicable vendors (including original equipment manufacturers) to obtain parts for, or products included in, or used in connection with producing or selling, the Products that any Seller or its Affiliates currently obtain from third parties pursuant to the supply contracts, software contracts, tooling contracts and other Contracts of any Seller and/or its Affiliates that are not exclusive to the Business.

9.7     Manufacturer Warranties.  If due to lack of contractual privity or similar legal theory, Buyer after the Closing is not able to enforce a warranty claim against the third party supplier, manufacturer or contractor of Business Inventory, Products purchased by Buyer pursuant to Section 9.10, Business Tangible Property and/or products in respect of which Buyer is obligated to fulfill warranty obligations pursuant to the Master Purchase Agreement, Sellers shall, or shall cause their Affiliates to, use commercially reasonable efforts to (x) cause Buyer to be the direct beneficiary of such warranties or (y) if unable to cause Buyer to be the direct beneficiary of such warranties, assist Buyer in obtaining the benefits of such warranties.  If Sellers' or their Affiliates' warranty rights with respect to such Business Inventory, Product purchased by Buyer pursuant to Section 9.10, Business Tangible Property and/or products pursuant to the Contract between Sellers or the applicable Affiliate of Sellers are assignable, Sellers shall take commercially reasonable steps to assign such benefits to Buyer with respect to such Business Inventory, Product purchased by Buyer pursuant to Section 9.10, Business Tangible Property and products, and in the event Sellers are unable to make such assignment,

Sellers shall cause Buyer to receive the benefit of such warranties by assisting Buyer in obtaining the benefits of such warranties. Sellers' obligations under this <u>Section 9.7</u> shall terminate at the end of twelve (12) months following the Closing Date; Sellers shall have no obligations under this <u>Section 9.7</u> in respect of Business Inventory, Products purchased by Buyer pursuant to <u>Section 9.10</u>, Business Tangible Property and/or products in respect of which Buyer is obligated to fulfill warranty obligations pursuant to the Master Purchase Agreement for which the relevant suppliers, manufacturers' or contractors' warranties have terminated or expired or where Sellers or their Affiliates have not purchased such warranties.

    9.8    <u>Business Contracts</u>. Except as expressly provided in <u>Section 7.9</u>, but notwithstanding else anything herein to the contrary, the parties agree that no Seller or Affiliate of any Seller shall have any responsibility to seek or obtain, and there shall be no condition to Closing under <u>Section 8.1</u> with respect to, any consent or approval from any Person with respect to or under any Business Contracts or EMEA Business Contracts, in connection with the assignment of such Contracts to Buyer or with respect to Buyer's performance under certain Contracts not assigned to Buyer which are the subject of the Master Purchase Agreement. Immediately following the Closing, Buyer and the applicable Seller Entity shall send a joint acknowledgement letter to each counterparty to a Business Contract or EMEA Business Contract notifying such counterparty of the consummation of the Transactions and that all requests relating to the Business Contracts thereafter should be directed to Buyer.

    9.9    <u>Destruction of Materials not Related to the Business</u>. Buyer agrees that, within thirty (30) days of the Closing, it will ensure that all information and materials of any Seller and/or its Affiliates that are in the possession of the Transferring Employees but that are not included within the scope of the Acquired Assets or EMEA Acquired Assets are (as directed by Sellers) either destroyed or returned to the applicable Seller or Affiliate thereof, and that no Transferring Employee retains a copy thereof or extract or summary therefrom.

    9.10    <u>Return of Products</u>. In the event that, during the six (6) month period following the Closing, any distributor, reseller or other channel partner of any Seller or its Affiliates returns or seeks to return Products delivered to such distributor, reseller or other channel partner prior to the Closing Date (either to any Seller or its Affiliates or to Buyer) pursuant to the terms of the sales agreement pertaining to such Product or such other Contract as may govern such return, Buyer shall purchase, accept and receive such Products, from such Seller, its Affiliate or the applicable distributor, reseller or other channel partner, as the case may be; <u>provided</u>, that Buyer shall not be obligated to purchase returned Products pursuant to this sentence after such time as Buyer shall have purchased returned Products with a value (as determined in accordance with the next sentence) of seven hundred thousand dollars ($700,000) in the aggregate; <u>provided</u>, <u>further</u>, that Buyer shall only be obligated to purchase returned Products that have originally been shipped by a Seller or its Affiliates to the relevant channel partner within six (6) months of the date on which such Product is returned. Buyer's purchase price for such returned Products (and the value used for determining the amount of Products Buyer is required to purchase pursuant to the preceding sentence) shall be equal to the price that Buyer then pays its relevant contract manufacturer or to the applicable Seller or Affiliate pursuant to the relevant contract manufacturing agreement, as the case may be, for the corresponding Product. Such payment shall be made in cash to the applicable Seller, its Affiliate or the applicable distributor, reseller or

other channel partner, as the case may be, within thirty (30) days of the date on which such Products are received by Buyer or such longer period as may be permitted by the applicable contract.

9.11    Redirection of Customers.  Following the Closing, in the event a customer of the Business contacts a Seller or its Affiliates (by telephone, electronic mail, written correspondence or otherwise) regarding the provision of services under a Business Contract, such Seller shall, and shall cause its Affiliates to, use commercially reasonable efforts to promptly redirect or otherwise forward such customer and communication to Buyer's technical support services.

9.12    Business Tangible Property Containing Third Party Software.  In the event of a termination or expiration of the Transition Services Agreement, or the occurrence of the date specified in the Transition Services Agreement for the transfer of legal title to such Business Tangible Property to Buyer, with respect to Business Tangible Property containing Restricted Software, Buyer hereby agrees (i) to obtain any necessary licenses to any such software and (ii) until Buyer has obtained such licenses, not to use any such Business Tangible Property in any manner that could cause any Seller or its Affiliates to be in breach of any obligation to the licensor of such Restricted Software.

9.13    Cooperation Regarding Financial Statements; Provision of Additional Information.

(a)    For a period of three (3) months following the Closing Date, in the event separate financial statements with respect to the Business for periods from and after January 1, 2007 but prior to the Closing Date are deemed to be necessary by Buyer's accountants or required under applicable securities Laws or other reporting requirements, the Main Sellers agree that they shall, upon the reasonable request of Buyer, (i) assist and cooperate with Buyer in the production of such separate financial statements and (ii) permit Buyer and Buyer's accountants, agents and representatives to have reasonable access, in accordance with Section 9.4(a) (*mutatis mutandis*), to the books and records pertaining to the Business during periods from and after January 1, 2007 but prior to the Closing which have been retained by Sellers and their Affiliates. Buyer's rights under this Section 9.13(a) are in addition to its rights pursuant to Section 9.15.

(b)    For a period of three (3) months following the Closing Date, Sellers shall, and shall cause their Affiliates to, at all reasonable times upon the prior written request of Buyer, provide Buyer with access to the information, records, files, books and documents reasonably related to the Business, the Products, the Acquired Assets or the Assumed Liabilities which are retained by Sellers or their Affiliates at Closing and not transferred to Buyer pursuant to Section 2.1, to the extent necessary for Buyer to operate the Business following the Closing (without duplication of Section 9.13(a)); provided, that the applicable Seller or Affiliate shall be entitled to redact those portions of such materials that in no way relate to the Business, the Products, the Acquired Assets or the Assumed Liabilities; and provided, further, that no Seller or Affiliate thereof shall be required to provide Buyer with any of the foregoing or access thereto to the extent not permitted pursuant to the terms of applicable Law or applicable contractual obligations of any Seller or its Affiliates.  Any information, records, files, documents and/or Contracts that any Seller or Affiliate thereof provides to Buyer (or provides Buyer access to)

pursuant to this Section 9.13(b) shall constitute Seller Confidential Information and be subject to the provisions of Section 9.14.

(c)     Buyer shall reimburse each Seller and its Affiliates for all reasonable out-of-pocket costs and expenses incurred by such Seller and its Affiliates in assisting Buyer pursuant to this Section 9.13.  Neither any Seller nor its Affiliates shall be required by this Section 9.13 to take any action or provide Buyer or its accountants, agents or representatives with access to records, if such would unreasonably interfere with the conduct of its business or unreasonably disrupt the normal operations of such Seller or its Affiliates.

9.14    Confidentiality.

(a)     Each Seller shall, and shall cause its Affiliates to, keep confidential in accordance with such Seller's standards for protecting its own confidential information, and shall not use or disclose to any other Person (other than its Affiliates and its and their officers, directors, employees, agents and representatives), any Business Confidential Information, except as permitted by this Agreement.  Each Seller shall only disclose Business Confidential Information to its or its Affiliates' officers, directors, employees, agents, auditors, lenders, consultants and other representatives who are legally bound by a confidentiality obligation to a Seller or its Affiliates no less protective of the Business Confidential Information than that contained in this Section 9.14 and who have a bona fide need to access the Business Confidential Information consistent with Sellers' rights under this Agreement.

(b)     Each Seller shall, and shall cause its Affiliates to, keep confidential in accordance with such Seller's standards for protecting its own confidential information, any Non-Exclusive Confidential Information; provided, that nothing in this Agreement shall prevent or limit in any way whatsoever the right of a Seller or its Affiliates to utilize or disclose the Non-Exclusive Confidential Information, without need to obtain consent therefor from Buyer, or otherwise impose obligations on such Seller or its Affiliates in respect of Non-Exclusive Confidential Information other than what such Seller or its Affiliates would otherwise undertake for Seller Confidential Information.

(c)     Buyer shall, and shall cause its Affiliates to, keep confidential in accordance with Buyer's standards for protecting its own confidential information, and shall not use or disclose to any other Person (other than its Affiliates and its and their officers, directors, employees, agents and representatives), any Seller Confidential Information, except as permitted by this Agreement.  Buyer shall only disclose Seller Confidential Information to its or its Affiliates' officers, directors, employees, agents, auditors, lenders, consultants and other representatives who are legally bound by a confidentiality obligation to Buyer or its Affiliates no less protective of the Seller Confidential Information than that contained in this Section 9.14 and who have a bona fide need to access the Seller Confidential Information consistent with Buyer's rights under this Agreement.

(d)     Notwithstanding anything to the contrary in this Section, any party may disclose Confidential Information:

(i)      if and to the extent such Confidential Information is required by subpoena or Order to be disclosed;

(ii)      to a Governmental or Regulatory Body;

(iii)      pursuant to any Bankruptcy Proceeding;

(iv)      to the extent such disclosure is otherwise required by applicable Law or requirement of any stock exchange on which the shares or stock of the Person in question are listed;

(v)      in connection with a party's exercise and enforcement of any rights or remedies provided under this Agreement; or

(vi)      to the extent such disclosure is required for financial or tax reporting purposes of the applicable party or its Affiliates.

(e)      If any Person is requested or required (by subpoena, court order or similar process) to disclose any Confidential Information as provided in Section 9.14(d)(i), or intends to disclose any Confidential Information as provided in Section 9.14(d)(iii), the Person from which the disclosure is sought or who intends to make such disclosure shall (i) provide the other parties with prompt written notice of such request or requirement and (ii) make reasonable efforts to cooperate with the applicable party so that such party may seek a protective order or other appropriate remedy or protection.  If such protective order or other remedy or protection is not obtained, or the applicable party waives compliance with the provisions of this Agreement, the Person from which the disclosure is sought shall use reasonable efforts to disclose only that portion of the Confidential Information that is legally requested or required to be disclosed.

(f)      Nothing in this Section 9.14 shall prevent Sellers or their Affiliates from disclosing either Business Confidential Information or Non-Exclusive Confidential Information to other prospective purchasers of the Business that have executed a confidentiality agreement with a Seller or an Affiliate thereof.

9.15      Delivery of Audited Financial Statements.  Within six (6) months of the Closing Date, Buyer may, in its sole discretion, deliver written notice to the Main Sellers (the "Audit Notice") requiring Sellers to use their commercially reasonable efforts to cause to be prepared and delivered to Buyer audited statements of the balance sheet of the Historical Velocity Business, as of December 31, 2008 and December 31, 2007, and related audited statements of income and cash flows of the Historical Velocity Business for the fiscal years ended December 31, 2008 and December 31, 2007, together with notes thereon and the reports thereon of KPMG LLP, Sellers' independent certified public accountants (collectively, the "Audited Financial Statements").  The Audited Financial Statements shall be prepared utilizing the same financial allocations, judgments and assumptions as are noted in the Pro Forma Financial Statements and accompanying notes and/or Schedules 5.5(b) or 5.5(c).  Further, it is understood and agreed that (i) the Audited Financial Statements will be prepared in accordance with carve-out accounting guidelines as promulgated by the SEC and that are consistent with U.S. GAAP, (ii) such carve-out accounting guidelines have not been applied to the Pro Forma Financial Statements, and (iii)

any differences between the Pro Forma Financial Statements and the Audited Financial Statements arising out of or related to the application of such carve-out accounting guidelines to the Audited Financial Statements and/or any modifications that would have been made to the Pro Forma Financial Statements had such carve-out accounting principles been utilized therefor (including as a result of corporate and other allocations, such as goodwill and other intangibles) shall not be the basis for any claim against any Seller by Buyer or any of its Affiliates.  Buyer shall provide Sellers with all necessary and appropriate cooperation with respect to Sellers' preparation of the Audited Financial Statements.  Following Buyer's request for preparation and audit of the Audited Financial Statements, Sellers shall (i) promptly engage independent experts to prepare and audit the Audited Financial Statements, (ii) promptly respond to requests for information from such independent experts and (iii) keep Buyer reasonably informed regarding the status of the preparation and audit the Audited Financial Statements.  Buyer shall promptly reimburse Sellers for all documented third-party costs and expenses incurred by Sellers in the preparation and audit of the Audited Financial Statements.  No Seller shall be required by this Section 9.15 to take any action that would unreasonably interfere with the conduct of its business or unreasonably disrupt its normal operations.

9.16    Employee Related Agreements.  Exhibit O sets forth certain agreements of the parties with respect to employment matters.

9.17    Co-operation with Respect to Transferring Employees.  Buyer and the applicable Seller Entity shall cooperate from and after the approval of the U.S. Sale Order and the Approval and Vesting Order with each other (and shall cause their respective Affiliates to cooperate with the others and their Affiliates): (a) with respect to Employment Offers and in implementing the transition of coverage of Transferring Employees from the Nortel Employee Plans to Buyer Employee Plans and (b) to provide for an orderly transition of the Transferring Employees to Buyer or its Affiliates, as applicable, and to minimize the disruption to the respective businesses of any Seller and its Affiliates and Buyer and its Affiliates resulting from the Transactions; provided, that in no event shall Buyer or its Affiliates or its or their representatives contact in any way any Business Employee with respect to any employment offer or otherwise prior to the later of (x) the approval of the Approval and Vesting Order and (y) the approval of the U.S. Sale Order, except as expressly authorized in writing by the Main Sellers  prior to such contact. All such contacts by Buyer or its Affiliates shall be in accordance with applicable Law.

9.18    Protection of Personal Data.  With respect to the data relating to Business Employees set forth in the Schedules, including any revisions thereto, Buyer undertakes that such personal data shall be held in confidence and that:

(a)    Buyer shall restrict the disclosure of such personal data to such of their employees, agents and advisors as is reasonably necessary to give effect to the Transactions;

(b)    except as permitted pursuant to Section 9.18(a), personal data shall not be disclosed to any Person (including, for the avoidance of doubt, any other employee of Buyer) without the consent of NNI, such consent not unreasonably to be withheld; and

(c)    personal data shall be returned to the applicable Seller or destroyed if this Agreement is terminated.  Disclosure shall only be made in accordance with applicable Law.

60

9.19    <u>Non-Solicitation of Employees by Buyer</u>.  Prior to the end of the twelve (12) months following the execution of this Agreement, Buyer shall not, and shall cause its Affiliates to not, except with NNI's prior written consent, solicit for employment or hire: (i) any Business Employee who does not accept an offer of employment with Buyer or an Affiliate of Buyer or (ii) any other employee of any Seller or its Affiliates with whom Buyer or its Affiliates have had direct contact in connection with the preparation, negotiation and execution of this Agreement and/or the other Transaction Documents; provided, that Buyer and/or its Affiliates shall not be prohibited from soliciting or hiring any person described in this <u>Section 9.19</u> (x) pursuant to a general mass solicitation of employment not specifically directed toward employees of any Seller and/or its Affiliates or (y) who has been terminated by any Seller or its Affiliates.

9.20    <u>Non-Solicitation of Transferring Employees by Sellers</u>.  Prior to the end of the twelve (12) months following the execution of this Agreement, Sellers shall not, and shall cause their Affiliates not to, except with Buyer's prior written consent, solicit for employment or hire (i) any Transferring Employees or (ii) any employee of Buyer or its Affiliates with whom any Seller or its Affiliates has come into direct contact in connection with the preparation, negotiation and execution of this Agreement and/or the other Transaction Documents; provided, that Sellers and/or their Affiliates shall not be prohibited from soliciting or hiring any person described in this <u>Section 9.20</u> (x) pursuant to a general mass solicitation of employment not specifically directed toward employees of Buyer and/or its Affiliates or (y) who has been terminated by Buyer or its Affiliates.

**ARTICLE X.**
**<u>TERMINATION OF AGREEMENT</u>**

10.1    <u>Termination</u>.  This Agreement may be terminated prior to the Closing as follows:

(a)    By the mutual written consent of the Main Sellers and Buyer;

(b)    By Buyer by giving written notice to the Main Sellers in the event Sellers are in material breach of this Agreement or any other Transaction Document and such breach, (i) individually or in combination with any other such breach, would cause the conditions set forth in <u>Section 8.1</u> not to be satisfied and (ii) is not cured within thirty (30) days following delivery by Buyer to Sellers of written notice of such breach;

(c)    By the Main Sellers by giving written notice to Buyer in the event Buyer is in material breach of this Agreement or any other Transaction Document and such breach, (i) individually or in combination with any other such breach, would cause the conditions set forth in <u>Section 8.2</u> not to be satisfied and (ii) is not cured within thirty (30) days following delivery by the Main Sellers to Buyer of written notice of such breach;

(d)    By Buyer, on or after March 12, 2009, if either the U.S. Bidding Procedures Order or the Sale Process Order has not been entered on or prior to such date or has been entered but stayed as of such date;

(e)    By Buyer by giving written notice to the Main Sellers if the Closing shall not have occurred on or prior to the earlier of (i) April 15, 2009 or (ii) the thirtieth (30th) day

following the U.S. Sale Order becoming a Final Order by reason of the failure of any condition precedent under Section 8.1; provided, that the right to terminate this Agreement under this subsection (e) shall not be available to Buyer if such failure results exclusively or primarily from a breach by Buyer of one or more representations, warranties, covenants or agreements of Buyer contained in this Agreement or any other Transaction Document; and provided, further, that if all of the conditions to Closing set forth in Section 8.1 have been satisfied, other than (x) those conditions that are to be satisfied at the Closing and (y) the condition set forth in Section 8.1(h) as a result of the failure of any of the U.S. Bidding Procedures Order, the U.S. Sale Order, the Sale Process Order and/or the Approval and Vesting Order to become a Final Order on or before April 15, 2009, then the reference to "April 15, 2009" in clause (i) of this Section 10.1(e) shall be replaced by a reference to "May 1, 2009";

(f)    By the Main Sellers by giving written notice to Buyer if the Closing shall not have occurred on or prior to the earlier of (i) May 15, 2009 or (ii) thirtieth (30th) day following the U.S. Sale Order becoming a Final Order by reason of the failure of any condition precedent under Section 8.2; provided, that the right to terminate this Agreement under this subsection (f) shall not be available to Sellers if such failure results exclusively or primarily from a breach by Sellers of one or more representations, warranties, covenants or agreements of Sellers contained in this Agreement or any other Transaction Document;

(g)    By the Main Sellers or Buyer if Sellers enter into a binding definitive agreement with respect to an Alternative Transaction; or

(h)    By the Main Sellers by giving written notice to Buyer if the Cure Costs payable by Sellers (excluding any Cure Costs that Buyer has agreed to pay pursuant to Section 7.23) exceed the higher of (x) $1,000,000 in the aggregate and (y) if an Auction (as defined in the U.S. Bidding Procedures Order) occurs and Buyer makes a subsequent bid with a base cash component (excluding any adjustment such as are set forth in clauses (ii) through (iv) of Section 3.1(a)) greater than the Base Purchase Price, five percent (5%) of such base cash component; provided, that the Main Sellers shall not be permitted to exercise their termination right under this Section 10.1(h) until they have complied with Section 7.23 and given Buyer the five (5) Business Day response period referred to in Section 7.23.

10.2    Break-Up Fee and Expense Reimbursement.

(a)    In the event that this Agreement is terminated pursuant to Section 10.1(b), 10.1(g) or 10.1(h), Sellers shall pay to Buyer by wire transfer of immediately available funds, within five (5) Business Days after such termination, a break-up fee (the "Break-Up Fee") equal to $650,000; provided, that no Break-Up Fee shall be payable in respect of a termination of this Agreement pursuant to Section 10.1(b) unless (i) the breach in question is of a material provision of this Agreement and (ii) such breach is still existing on the later of (x) April 15, 2009 and (y) the thirtieth (30th) day following delivery by Buyer to Sellers of written notice of such breach.

(b)    In the event that this Agreement is terminated pursuant to Section 10.1(b), 10.1(g) or 10.1(h), Sellers shall pay to Buyer by wire transfer of immediately available funds, within five (5) Business Days after such termination, a cash amount equal to Buyer's reasonable

and documented out-of-pocket fees and expenses incurred in connection with the Transactions, up to a maximum of $400,000 (the "Expense Reimbursement").

(c)    The Break-Up Fee and/or the Expense Reimbursement, if payable in accordance with this Section 10.2, will be the sole and exclusive remedy of Buyer, whether at Law or in equity, in the event that Closing has not occurred or does not occur for any reason whatsoever, without regard to whether Buyer elects to terminate this Agreement pursuant to this Article X; provided, that if the Closing occurs, the Break-Up Fee and/or the Expense Reimbursement will not be payable and will not be the sole and exclusive remedy of Buyer hereunder.  For the avoidance of doubt, both the Break-Up Fee and the Expense Reimbursement will be payable to Buyer in the event that this Agreement is terminated pursuant to Section 10.1(b) (if payable thereunder), 10.1(g) or 10.1(h).

(d)    Sellers' obligation to pay the Break-Up Fee and the Expense Reimbursement pursuant to this Section 10.2 shall survive termination of this Agreement and shall constitute an administrative expense of Sellers under Section 364(c)(1) of the U.S. Bankruptcy Code with priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the U.S. Bankruptcy Code.

(e)    Notwithstanding anything to the contrary herein, Sellers' obligation to pay the Break-Up Fee and the Expense Reimbursement pursuant to this Section 10.2 is expressly subject to entry of the U.S. Bidding Procedures Order.

10.3    Effect of Termination.  In the event of termination of this Agreement as permitted by Section 10.1, this Agreement shall become void and of no further force and effect, except for the following provisions, which shall remain in full force and effect:  (a) Section 7.8 relating to confidentiality, (b) Sections 9.19, 9.20(ii) and 10.2, (c) this Section 10.3 and (d) Article XI. Nothing in this Section 10.3 shall be deemed to release any party from any Liability for any breach by such party of the terms and provisions of this Agreement or to impair the right of any party to compel specific performance by any other party of its obligations under this Agreement; provided, (i) except in the case of a breach of Section 9.14, no injunctive relief, specific performance or other type of relief specified in Section 11.13 may be obtained under this Agreement against any Seller Entity and (ii) this sentence shall not apply to Sellers or their Affiliates.

**ARTICLE XI.**
**MISCELLANEOUS**

11.1    Expenses.  Whether or not the Transactions are consummated, and except as otherwise provided in this Agreement, each party to this Agreement will bear its respective fees, costs and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the Transactions (including legal, accounting and other professional fees).

11.2    Governing Law.  The interpretation of this Agreement, and any questions, claims, disputes, remedies, Action or Proceeding arising from or related to this Agreement, and any

63

relief or remedies sought by any party hereunder, shall be governed exclusively by the Laws of the State of New York, without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

11.3    Jurisdiction; Service of Process.  To the fullest extent permitted by applicable Law, each party hereto (a) agrees that any claim, Action or Proceeding by such party seeking any relief whatsoever arising out of, or in connection with, this Agreement, the other Transaction Documents or the Transactions shall be brought only in (i) the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, and (ii) in the federal courts in the Southern District of New York and the state courts of the State of New York, County of Manhattan (collectively, the "New York Courts"), if brought after entry of such final decree closing the Chapter 11 Cases, and shall not be brought, in each case, in any other State or Federal court in the United States of America or any court in any other country, (b) agrees to submit to the exclusive jurisdiction of the U.S. Bankruptcy Court or the New York Courts, as applicable pursuant to the preceding clauses (a)(i) and (ii), for purposes of all Actions or Proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby, (c) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such Action or Proceeding brought in such a court or any claim that any such Action or Proceeding brought in such a court has been brought in an inconvenient forum, (d) agrees that mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 11.7 shall be valid and sufficient service thereof, and (e) agrees that a final judgment in any such Action or Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

11.4    Waiver of Jury Trial.  THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT BETWEEN OR AMONG THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY AND THAT ANY ACTION OR PROCEEDING WHATSOEVER BETWEEN OR AMONG THEM RELATING TO THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

11.5    Attorneys' Fees.  If any action, suit, arbitration or other proceeding for the enforcement of this Agreement is brought with respect to or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions hereof, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that proceeding, in addition to any other relief to which it may be entitled.

11.6    Waiver.  Neither any failure nor any delay by any party in exercising any right, power or privilege under this Agreement or any of the other Transaction Documents will operate

as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by applicable Law, (a) no claim or right arising out of this Agreement or any of the other Transaction Documents can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other parties; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of that party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or any of the other Transaction Documents.

11.7    Notices.  All notices or other communications required or permitted to be given hereunder shall be in writing and shall be deemed given to a party when (a) delivered by hand, (b) three (3) Business Days after delivery by a nationally recognized overnight courier service (costs prepaid), or (c) sent by facsimile (confirmed in writing by mail promptly thereafter dispatched), in each case to the following:

if to Buyer, to:

Radware Ltd.
22 Raoul Wallenberg Street
Tel Aviv 69710
Israel
Attention:  Roy Zisapel
Tel: +972-3-7668610
Fax: +972-3-7668982

with a copy to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attention:  Ernest S. Wechsler
Tel: (212) 715-9100
Fax: (212) 715-8000

if to any Seller or Seller Entity, to:

Nortel Networks Inc.
c/o Nortel Networks Limited
195 The West Mall
Toronto, Ontario M9C 5K1
Attention: Douglas M. Parker, Esq., Associate General Counsel -
Corporate
Tel: (905) 863-2564
Fax: (905) 863-7739

65

with a copy to:

Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
Attention: James R. Stuart, III, Esq.
Tel : (202) 624-2865
Fax : (202) 628-5116

Notices to any Seller Entity may be delivered to NNI on behalf of such Seller Entity. Any party hereto may change its contact information for notices and other communications hereunder by notice to the other party hereto.

11.8    Assignment. This Agreement and the rights and obligations hereunder shall not be assignable or transferable by any party (including, by operation of Law or in connection with a merger or sale of substantially all the assets, stock or membership interests of such party) without the prior written consent of the other parties (which, in the case of an assignment following the Closing, shall not be unreasonably withheld) except for (a) assignment by a U.S. Debtor to a succeeding entity following such U.S. Debtor's emergence from Chapter 11 or (b) assignment by any of the Canadian Debtors pursuant to any plan of arrangement approved by a Bankruptcy Court, which will not require the consent of the Buyer. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon and inure to the benefit of the permitted assigns of the parties. Buyer hereby consents to the assignment by any Canadian Debtor or any U.S. Debtor of rights and obligations under any of the Transaction Documents in the circumstances set forth in (a) or (b) of the immediately preceding sentence.

11.9    No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any Person, other than the parties hereto and such assigns, any legal or equitable rights, remedy or claim hereunder.

11.10    Amendments. No amendment to this Agreement shall be effective unless it shall be in writing and signed by all of the parties hereto.

11.11    Interpretation; Exhibits and Schedules. The headings contained in this Agreement, in any exhibit, annex or Schedule and in the table of contents to this Agreement, are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Except when the context otherwise requires, references to Sections, Articles, Exhibits, Annexes or Schedules refer to Sections, Articles, Exhibits, Annexes or Schedules of this Agreement. All Exhibits, Annexes and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized term used in any Schedule, Annex or Exhibit, but not otherwise defined therein, shall have the meaning ascribed to such term in this Agreement. Whenever used in this Agreement, a singular number shall include the plural and a plural the singular. Pronouns of one gender shall include all genders. The words "hereof," "herein," and terms of similar import shall refer to this entire Agreement. Unless the context clearly requires otherwise, the use of the terms

66

"including," "included," "such as," or terms of similar meaning, shall not be construed to imply the exclusion of any other particular elements and shall be deemed to be followed by the words "without limitation." Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

11.12   Entire Agreement; Construction. This Agreement and the Transaction Documents contain the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior oral and written agreements and understandings relating to such subject matter, including that certain Term Sheet, dated December 13, 2008, between Buyer and NNI. In the event of any inconsistency or conflict between the terms of this Agreement and any other Transaction Document, the terms of this Agreement shall prevail over the terms of the other Transaction Document.

11.13   Specific Performance. Each party acknowledges and agrees that the other party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each party agrees that the other parties may be entitled to an injunction or injunctions (without the posting of any bond) to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the parties and the matter. Except in the case of a breach of Section 9.14, but otherwise notwithstanding anything to the contrary in this Agreement, no injunctive relief, specific performance or other type of relief specified in this Section 11.13 may be obtained under this Agreement against any Seller Entity.

11.14   Severability. If any provision of this Agreement or the application of any such provision to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

11.15   Mutual Drafting. The parties hereto are sophisticated and have been represented by lawyers who have carefully negotiated the provisions hereof. As a consequence, the parties do not intend that the presumptions of any Laws relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement and therefore waive the effects of such Laws.

11.16   Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other party.

11.17   Survival. The representations, warranties, undertakings, agreements and covenants in this Agreement and/or in any instrument delivered pursuant to this Agreement shall terminate on the Closing Date; provided, that undertakings, agreements and covenants contained in this Agreement and/or the other Transaction Documents that continue in effect or are applicable to or relate to periods, matters or events following the Closing shall survive the

67

Closing and shall continue in full force and effect until performed or satisfied or for so long as such are applicable in accordance with their terms.

      11.18  <u>Limitation on Losses</u>.

      (a)    Except in the case of a Liability arising from a cash payment obligation due to a party in respect of which the party seeking set-off has received a final judgment in an Action or Proceeding in accordance with <u>Section 11.3</u> and <u>11.4</u>, no party shall be entitled to set-off any Liabilities or Losses hereunder against any amounts due to such party under any other agreement with the other parties or any affiliate thereof.

      (b)    In no event shall any party be responsible or liable for any Losses that are consequential, in the nature of lost profits, diminution in the value of property, special or punitive or otherwise not actual damages.

      (c)    No Seller Entity shall have any Liability with respect to any Business Tangible Property, EMEA Tangible Property, Business Inventory or EMEA Business Inventory for any amount in excess of the value thereof as set forth on <u>Schedule 2.1(a)(i)</u>, <u>Schedule P(1)(a)</u> or <u>Schedule 5.6(b)</u> (as updated in accordance with <u>Section 3.1</u>) (including in the case of any asset with a net book value of zero dollars ($0)), as set forth on the applicable schedule.

[Signature Page Follows on Next Page]

68

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have duly executed this Agreement on the date first above written.

NORTEL NETWORKS INC.

By: _____

Name:  Hyacinth DeAlmeida
Title:  Leader, Corporate Business Development

NORTEL NETWORKS LIMITED

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

NORTEL NETWORKS UK LIMITED (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____
Name:
Title:

NORTEL NETWORKS N.V. (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____
Name:
Title:

Counterpart Signature Page
Asset Purchase Agreement

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have duly executed this Agreement on the date first above written.


NORTEL NETWORKS INC.


By:_____
    Name:  Hyacinth DeAlmeida
    Title:  Leader, Corporate Business Development


NORTEL NETWORKS LIMITED


By:_____
    Name:  Gordon A. Davies
    Title:  Chief Legal Officer
            and Corporate Secretary

By:_____
    Name:
    Title:  Tracy S.J. Connelly McGilley
            Assistant Secretary


NORTEL NETWORKS UK LIMITED (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)


_____
Name:
Title:


NORTEL NETWORKS N.V. (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)


_____
Name:
Title:


Counterpart Signature Page
Asset Purchase Agreement

PAGE 2/9 * RCVD AT 19/02/2009 20:59:51 [GMT Standard Time] * SVR:LNDFX01/10 * DNIS:4673 * CSID:33 1 39 07 46 47 * DURATION (mm-ss):01-26

NORTEL NETWORKS S.A. (in administration) by Kerry Trigg acting as authorised representative for C. Hill as Joint Administrator (acting as agent and without personal liability) under an authorisation dated 15 January 2009

Name: STEVE SANDERSON
Title: SENIOR EXECUTIVE

NORTEL NETWORKS FRANCE S.A.S. (in administration) by Kerry Trigg acting as authorised representative for C. Hill as Joint Administrator (acting as agent and without personal liability) under an authorisation dated 15 January 2009

Name: STEVE SANDERSON
Title: SENIOR EXECUTIVE

NORTEL NETWORKS (AUSTRIA) GMBH (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

Name:
Title:

NORTEL NETWORKS, S.R.O. (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

Name:
Title:

NORTEL NETWORKS AB - DENMARK BRANCH (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

Name:
Title:

Counterpart Signature Page
Asset Purchase Agreement

NORTEL NETWORKS B.V. (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____

Name:
Title:

NORTEL GERMANY GMBH & CO KG (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____

Name:
Title:

NORTEL NETWORKS (IRELAND) LIMITED (in administration) by D. Hughes as Joint Administrator (acting as agent and without personal liability)

_____

Name: DAVID HUGHES
Title: JOINT ADMINISTRATOR
WITNESS: Niall J Cooney
        Niall J Cooney
        AUTHORISED REPRESENTATION
        OF ADMINISTRATION

NORTEL NETWORKS S.P.A. (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____

Name:
Title:

NORTEL NETWORKS POLSKA SP. Z O.O. (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____

Name:
Title:

Counterpart Signature Page
Asset Purchase Agreement

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have duly executed this Agreement on the date first above written.

NORTEL NETWORKS INC.

Name:  Hyacinth DeAlmeida
Title:  Leader, Corporate Business Development

NORTEL NETWORKS LIMITED

Name:
Title:

Name:
Title:

NORTEL NETWORKS UK LIMITED (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

Name:  C. HILL
Title:  JOINT ADMINISTRATOR          WITNESSED  BY  *S. FREEMANTLE*

NORTEL NETWORKS N.V. (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

Name:  C. HILL
Title:  JOINT ADMINISTRATOR          WITNESSED  BY  *S. FREEMANTLE*

Counterpart Signature Page
Asset Purchase Agreement

NORTEL NETWORKS S.A. (in administration) by Kerry Trigg acting
as authorised representative for C. Hill as Joint Administrator (acting as
agent and without personal liability) under an authorisation dated 15
January 2009

Name:
Title:

NORTEL NETWORKS FRANCE S.A.S. (in administration) by Kerry
Trigg acting as authorised representative for C. Hill as Joint Administrator
(acting as agent and without personal liability) under an authorisation
dated 15 January 2009

Name:
Title:

NORTEL NETWORKS (AUSTRIA) GMBH (in administration) by C.
Hill as Joint Administrator (acting as agent and without personal liability)

Name: C. HILL
Title: JOINT ADMINISTRATOR

WITNESSED BY
S. FREEMANTLE

NORTEL NETWORKS, S.R.O. (in administration) by C. Hill as Joint
Administrator (acting as agent and without personal liability)

Name: C. HILL
Title: JOINT ADMINISTRATOR

WITNESSED BY
S. FREEMANTLE

NORTEL NETWORKS AB - DENMARK BRANCH (in administration)
by C. Hill as Joint Administrator (acting as agent and without personal
liability)

Name: C. HILL
Title: JOINT ADMINISTRATOR

WITNESSED BY
S. FREEMANTLE

Counterpart Signature Page
Asset Purchase Agreement

NORTEL NETWORKS B.V. (in administration) by C. Hill as Joint
Administrator (acting as agent and without personal liability)

Name: C. HILL
Title: JOINT ADMINISTRATOR

WITNESSED BY _____
S. FREEMANTLE

NORTEL GERMANY GMBH & CO KG (in administration) by C. Hill as
Joint Administrator (acting as agent and without personal liability)

Name: C. HILL
Title: JOINT ADMINISTRATOR

WITNESSED BY _____
S. FREEMANTLE

NORTEL NETWORKS (IRELAND) LIMITED (in administration) by D.
Hughes as Joint Administrator (acting as agent and without personal
liability)

Name:
Title:

NORTEL NETWORKS S.P.A. (in administration) by C. Hill as Joint
Administrator (acting as agent and without personal liability)

Name: C. HILL
Title: JOINT ADMINISTRATOR

WITNESSED BY _____
S. FREEMANTLE

NORTEL NETWORKS POLSKA SP. Z O.O. (in administration) by C.
Hill as Joint Administrator (acting as agent and without personal liability)

Name: C. HILL
Title: JOINT ADMINISTRATOR

Counterpart Signature Page
Asset Purchase Agreement

WITNESSED BY _____
S. FREEMANTLE

NORTEL NETWORKS PORTUGAL S.A. (in administration) by C. Hill
as Joint Administrator (acting as agent and without personal liability)

Name: *C. HILL*
Title: *JOINT ADMINISTRATOR*

WITNESSED BY *S. FREEMANTLE*

NORTEL NETWORKS ROMANIA SRL (in administration) by C. Hill as
Joint Administrator (acting as agent and without personal liability)

Name: *C. HILL*
Title: *JOINT ADMINISTRATOR*

WITNESSED BY *S. FREEMANTLE*

C. HILL, in his own capacity and on behalf of the Joint Administrators
without personal liability and solely for the benefit of the provisions of
this Agreement expressed to be conferred on or given to the Joint
Administrators:

Name: *C. HILL*
Title: *JOINT ADMINISTRATOR*

WITNESSED BY *S. FREEMANTLE*

RADWARE LTD.

Name:
Title:

Counterpart Signature Page
Asset Purchase Agreement

De    19/02/2009 17:17:33  2 / 4

NORTEL NETWORKS PORTUGAL S.A. (in administration) by C. Hill
as Joint Administrator (acting as agent and without personal liability)

---

Name:
Title:

NORTEL NETWORKS ROMANIA SRL (in administration) by C. Hill as
Joint Administrator (acting as agent and without personal liability)

---

Name:
Title:

C. HILL, in his own capacity and on behalf of the Joint Administrators
without personal liability and solely for the benefit of the provisions of
this Agreement expressed to be conferred on or given to the Joint
Administrators:

---

Name:
Title:

RADWARE LTD.

Roy  Zisapel

Name:  Roy Zisapel
Title:   Chief Executive Officer and President

Counterpart Signature Page
Asset Purchase Agreement

## **ANNEX 1**

### U.S. Bidding Procedures

NORTEL NETWORKS INC., et al.

BIDDING PROCEDURES

By order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale (the "Sale") of the Assets (as defined below) of Nortel Networks Inc. and certain of its subsidiaries and affiliates, debtors and debtors-in-possession (collectively, the "Debtors" or "Sellers") as set forth in the Agreement (as defined below), including Nortel Networks Limited (the "Canadian Seller") and Nortel Networks UK Limited (the "UK Seller").

On [●], 2009, the Sellers executed that certain Asset Purchase Agreement (the "Agreement") with Radware Ltd. (together with any of its designees, the "Buyer"). The Debtors have determined that the transaction contemplated by the Agreement and the ancillary agreements discussed therein should be subject to competitive bidding as set forth herein, approval by the Bankruptcy Court pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), compliance with the terms of an order of the Ontario Superior Court of Justice (the "Ontario Court") dated January 14, 2008 (the "CCAA Order") or, alternatively, approval of the Ontario Court, and certain other closing conditions as set forth in the Agreement.

On [●], 2009, the Debtors filed a Motion for Orders (I) Authorizing and Approving (A) the Bidding Procedures, (B) the Break-up Fee and Expense Reimbursement Cap, (C) the Form and Manner of Sale Notices and (D) a Date for the Sale Hearing, and (II) (A) Authorizing and Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims and Encumbrances, (B) Authorizing and Approving the Assumption and Assignment of Certain Prepetition Executory Contracts and (C) Granting Related Relief (the "Sale Motion").

Bidding Process

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's and, if required, the Ontario Court's approval thereof (collectively, the "Bidding Process"). The Debtors intend to consult with, among others, their advisors and counsel for the Official Committee of Unsecured Creditors in the chapter 11 cases of Nortel Networks Inc., et al. (Case No. 09-10138) involving the U.S. Debtors (the "Creditors' Committee"), Ernst & Young Inc., in its capacity as the Ontario Court-appointed Monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor") and Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP, in their capacities as the joint administrators of certain Debtors' companies incorporated in the Europe, Middle East and Africa region appointed by the English High Court of Justice in connection with the proceedings under the Insolvency Act 1986 (such individuals collectively, the "Administrator") throughout the Bidding Process. In

the event that the Debtors and any party disagree as to the interpretation or application of these Bidding Procedures, except with respect to the application of the terms of the CCAA Order or any requirement for approval by the Ontario Court or the Monitor, the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.  For greater certainty, the Bidding Process shall not govern any disagreements among the Debtors.

Assets To Be Sold

The Debtors are offering for sale, in one or more transactions, certain of the Debtors' assets pertaining to the product lines described in the Agreement and related schedules and in an information memorandum made available by the Debtors to the Buyer and to be made available to other prospective purchasers that have executed a confidentiality agreement with the Debtors (the "Assets").

"As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except, with respect to the Buyer, to the extent set forth in the Agreement or, with respect to a Successful Bidder (as defined below), to the extent set forth in the relevant purchase agreement of such Successful Bidder approved by the Bankruptcy Court and the Ontario Court.

Free Of Any And All Claims And Interests

All of the Sellers' right, title, and interest in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests"), such Claims and Interests to attach to the net proceeds of the sale of such Assets, except, with respect to the Buyer, to the extent otherwise set forth in the Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant purchase agreement of such Successful Bidder.

Participation Requirements

Unless otherwise ordered by the Bankruptcy Court and accepted by the Monitor, for cause shown, or as otherwise determined by the Sellers, in order to participate in the Bidding Process, each person (a "Potential Bidder"), other than the Buyer, must deliver (unless previously delivered) to counsel to the Sellers, the Creditors' Committee and the Monitor at the addresses provided below:

> (a)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers;

> (b)    current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial

2

disclosure and credit-quality support or enhancement that will allow the Sellers and their financial advisors, in consultation with the Creditors' Committee and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate a purchase of the Assets; and

(c)    a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including assumed liabilities and the other obligations to be performed or assumed by the Potential Bidder, as described below in paragraph (h) under the heading "Qualified Bid"); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals and (v) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Agreement; provided, that in order to be a Qualified Bid (as defined below) the terms and conditions of such proposal shall not be in the aggregate materially less favorable to Sellers than those set forth in the Agreement.

A Potential Bidder that delivers the documents described above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Sale and perform after the completion of the Sale, if selected as a Successful Bidder, and that the Sellers determine in their sole discretion, after consultation with their counsel and financial advisors, the Creditors' Committee and the Monitor is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Creditors' Committee and the Monitor, and will notify both the Potential Bidder and Buyer, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin to conduct due diligence with respect to the Assets as provided in the following paragraph.

<u>Due Diligence</u>

The Sellers may in their discretion, and subject to competitive and other business concerns, afford each Qualified Bidder such due diligence access to the Assets as the Sellers deem appropriate, after consultation with their counsel and financial advisors, the Creditors' Committee, and the Monitor. Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their sole discretion, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. Any additional due diligence will not continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or

simultaneous attendance at management presentations or site inspections. In any event, Buyer shall be provided access to all material due diligence materials provided to Qualified Bidders that were not previously made available to Buyer. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders who make an acceptable preliminary proposal. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Agreement with any Successful Bidder.

Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to: counsel to the Sellers (James L. Bromley, Esq., Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006); the Creditors' Committee (Stephen Kuhn, Esq. and Kenneth A. Davis, Esq., Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036); the Monitor (Ken Coleman, Esq., Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY 10020) and Buyer (Ernest S. Wechsler, Esq., Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036); so as to be received not later than noon (Eastern) on March 19, 2009 (the "Bid Deadline"). The Sellers may extend the Bid Deadline once or successively, but they are not obligated to do so; provided, however, that for any such extension beyond five (5) days the Sellers shall have obtained the written consent of the Buyer, which consent will not be unreasonably withheld. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders of such extension.

Qualified Bid

A bid submitted pursuant to the previous paragraph will be considered a Qualified Bid only if the bid complies with all of the following (a "Qualified Bid"):

(a)    it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or upon alternative terms and conditions that the Sellers determine, after consultation with the Creditors' Committee and the Monitor, are no less favorable than the terms and conditions of the Agreement;

(b)    it includes a letter stating that the bidder's offer is irrevocable until (i) the date of the selection of the Successful Bidder (as defined below) and, (ii) if such bidder is selected as the Alternate Bidder (as defined below), the Alternate Bid Expiration Date (as defined below);

(c)    it includes a duly authorized and executed asset purchase agreement, including the purchase price for the Assets (the "Purchase Price"), together with all exhibits and schedules thereto, the Transition Services Agreement, the IP License Agreement, the Interim Product Purchase Agreement, the Master Purchase Agreement, the Patent Assignment Agreement, the Trademark License Agreement, the Contract Manufacturing Inventory Agreement and the other ancillary agreements described in the

4

Agreement with all exhibits and schedules thereto, as well as copies of such materials marked to show those amendments and modifications to the Agreement proposed by a prospective bidder (a "Marked Agreement") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed Sale Order of the Bankruptcy Court and the Ontario Court;

(d)     it is not conditioned on the outcome of unperformed due diligence by the bidder;

(e)     it is not conditioned on obtaining financing and includes written evidence of a commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Creditors' Committee and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreement;

(f)     it identifies with particularity each and every executory contract and unexpired lease, the assumption and assignment of which is a condition to closing;

(g)     it fully discloses the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(h)     it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with its financial advisors, the Creditors' Committee and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid that constitutes part of the same offer for the Assets, is greater than or equal to the sum of (i) the Base Purchase Price (as defined in the Agreement) (making appropriate adjustments for any proposed changes to the Target Inventory Value, Warranty Target Amount and Target Business Tangible Property Value (each as defined in the Agreement)) plus (ii) the Assumed Liabilities (as defined in the Agreement) plus (iii) the value of the performance of the warranty and service-related obligations of the Sellers for which Buyer has agreed to assume responsibility (as set forth in the Master Purchase Agreement) less (iv) the amount of transfer taxes to be paid by the Sellers under the Agreement plus (v) the value of the assumed obligation to purchase returned products and excess inventory (as set forth in the Agreement) plus (vi) the savings to Sellers resulting from Buyer's obligations with respect to employment of certain of Sellers' employees pursuant to the Agreement plus (vii) the value of those component parts purchased by the Sellers pursuant to Exhibit C to the Interim Product Purchase Agreement plus (viii) the amount of the Break-Up Fee (as defined below) plus (ix) the Expense Reimbursement Cap (as defined below) plus (x) $500,000 (or such other increment as the Sellers, in consultation with their financial advisors, the Creditors' Committee and the Monitor determine to be appropriate);

(i)     it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review,

5

investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)     it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreement;

(k)     it is accompanied with a good faith deposit (the "Good Faith Deposit") in the form of a wire transfer, certified check or such other form acceptable to the Sellers payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to $2,500,000; and

(l)     it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Creditors' Committee and the Monitor, to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids; provided, that Sellers, in evaluating such bids, may not waive compliance with the requirements in items (d), (e) and (k) above.

Notwithstanding the foregoing, the Buyer will be deemed a Qualified Bidder, and the Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

<u>Aggregate Bids</u>

Persons who collectively are referred to as a "Qualified Bidder" need not be affiliated persons and need not act in concert with one another, and the Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided, however, that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

<u>Evaluation of Competing Bids</u>

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder, as described above in paragraph (h) under this heading) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such transactions, the terms and conditions of the ancillary agreements, the effect of the Sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Sale, the amount of Assets included or excluded from the bid, and the likelihood and

6

timing of consummating such transaction, each as determined by the Sellers, in consultation with their financial and legal advisors, the Creditors' Committee and the Monitor. In determining the net value of a potential Qualified Bid, Sellers will utilize (to the extent quantifiable) the data relating to the items listed in paragraph (h) above that was available to Sellers as of the date such assessment was made with respect to Buyer.

No Qualified Bids

If the Sellers do not receive any Qualified Bids other than the Agreement received from the Buyer, the Sellers shall report the same to the Bankruptcy Court and the Monitor and subject to requiring and obtaining approvals of the Ontario Court shall proceed with the Sale pursuant to the terms of the Agreement. If approval of the Ontario Court is required, the applicable Seller will as soon as practicable file a motion with such court(s) seeking approval of the Agreement. If the Sellers receive a bid that does not conform to one or more of the requirements specified above, but determine, in their reasonable business judgment, after consultation with the Creditors' Committee and the Monitor, that such bid is to be treated as a Qualified Bid, subject to the conditions set forth in the fourth preceding paragraph (with respect to the restriction on Sellers' ability to waive certain requirements of a Qualified Bid), with a higher value as defined above, then any Qualified Bidder (including the Buyer) shall have the opportunity to submit a bid at the Auction on the same basis, so long as such bid has a value of at least $500,000 (or such other increment as the Sellers, in consultation with their financial advisors, the Creditors' Committee and the Monitor determine to be appropriate) more than the non-conforming bid. The Sellers shall notify the Buyer and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids no later than 48 hours following the expiration of the Bid Deadline.

Break-Up Fee and Expense Reimbursement

Recognizing the Buyer's expenditure of time, energy, and resources, the Sellers have agreed that if the Buyer is not the Successful Bidder, the Sellers will, in certain circumstances as set forth in the Agreement, pay to the Buyer a break-up fee of $650,000 (the "Break-Up Fee"), and (2) reimburse Buyer for its documented out-of-pocket expenses up to $400,000 (the "Expense Reimbursement Cap"), which amounts shall constitute super priority administrative claim in the Debtors' bankruptcy cases administered under the Bankruptcy Code. The payment of the Break-Up Fee and the reimbursement of Buyer's expenses up to the Expense Reimbursement Cap will be governed by the provisions of the Agreement.

Auction

If the Sellers receive one or more Qualified Bids in addition to the Agreement, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video, upon notice to all Qualified Bidders who have submitted Qualified Bids, at 9:30 a.m. on March 23, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attention: James L. Bromley, which Auction shall not be canceled or adjourned without the prior consent of the Buyer (except as provided herein), such consent not to be unreasonably withheld. Copies of all Qualified Bids shall be delivered to counsel to the

Creditors' Committee, the Monitor and the Buyer promptly after such time that such bid is deemed a Qualified Bid.  The Auction shall run in accordance with the following procedures:

(a)     Only the Sellers, the Buyer, any representative of the Creditors' Committee and the Monitor (and the legal and financial advisors to each of the foregoing), any creditor of the Debtors, and any other Qualified Bidder which has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Buyer and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)     Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(c)     Prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to participate in the Auction, provided that, in the event a Qualified Bidder elects not to participate in the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and, (ii) if such bidder is selected as the Alternate Bidder (as defined below), the Alternate Bid Expiration Date (as defined below).  Prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Creditors' Committee and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to all Qualified Bidders which have informed the Sellers of their intent to participate in the Auction.

(d)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as explained below) at the Auction with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided, that all Qualified Bidders wishing to participate in the Auction must participate in person.

(e)     The Sellers, after consultation with their counsel and financial advisors, the Creditors' Committee, and the Monitor may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court or of any other applicable court entered in connection herewith and (ii) disclosed to each Qualified Bidder at the Auction.

(f)     Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their financial advisor, the Creditors' Committee and the Monitor, that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the

8

Leading Bid (defined below). Each incremental bid at the Auction shall have a purchase price of at least $500,000 over the Starting Bid or the Leading Bid, as the case may be; provided, that the Sellers, in consultation with the Creditors' Committee and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid (and the value of such bid) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge and written confirmation of the Leading Bid. For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Buyer), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and the Expense Reimbursement Cap that may be payable to the Buyer under the Agreement as well as any additional liabilities to be assumed by a Qualified Bidder.

(g)    If the Sellers do not receive any Qualified Bid other than the Buyer's Qualified Bid at the Auction, the Sellers shall seek approval of the Agreement in the Bankruptcy Court and the Ontario Court on or prior to the date scheduled for the Sale Hearing.

<u>Selection Of Successful Bid</u>

At the conclusion of the Auction, or as soon thereafter as practicable, the Sellers, in consultation with their counsel and financial advisors, the Creditors' Committee and the Monitor, will (a) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including, among other things, the terms and conditions of the ancillary agreements, the effect of the Sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), the counterparties to such transactions, and other factors affecting the speed, certainty and value of the Sale, (b) identify the highest or otherwise best offer for the Assets received at the Auction (the "Successful Bid" and the bidder making such bid, the "Successful Bidder") and (c) communicate to the Buyer, the Creditors' Committee and the Monitor the identity of the Successful Bidders and the details of the Successful Bid. The determination of the Successful Bid by Sellers, after consultation with the Creditors' Committee and the Monitor, at the conclusion of the Auction, shall be final.

The Sellers will sell the Assets for the highest or otherwise best Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by the Bankruptcy Court and the Ontario Court after the Sale Hearing.

<u>Sale Hearing</u>

The sale hearing to authorize the Sellers to enter into agreements with respect to the Successful Bid (the "Sale Hearing") will be held before the Honorable Judge Gross in the United States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as March 25, 2009 at 10:30 a.m. (Eastern), and if required by the terms of the CCAA Order before the Honorable Mr. Justice Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto,

9

Ontario, as soon as practicable following the date of the Sale Hearing. The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing. If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Buyer), the Sellers will report the same to the Bankruptcy Court at the Sale Hearing, to the Monitor, and will proceed with a sale of the Assets to the Buyer following entry of the Sale Order of the Bankruptcy Court and the Ontario Court. If the Sellers do receive additional Qualified Bids, then, at the Sale Hearing, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Sellers' presentation to the Bankruptcy Court, and any other applicable court(s) whose approval is required, of the Successful Bid and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bid(s) to be delivered by the Bankruptcy Court at the Sale Hearing and any other applicable court(s) whose approval is required. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court or any other court. The Alternate Bid shall remain open until the earlier of (a) 60 days following the entry of the Sale Order or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date").

Return of Good Faith Deposit

The Good Faith Deposit of the Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within three (3) business days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within three (3) business days of the date of the selection of the Successful Bidder and the Alternate Bidder. If a Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Sellers will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit will become property of the Sellers.

Reservation Of Rights

The Sellers, after consultation with their counsel and financial advisors, the Creditors' Committee and the Monitor, (a) may determine which Qualified Bid, if any, is the highest or otherwise best offer, (b) may reject, at any time, any bid (other than the Buyer's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, the CCAA Order or any other orders applicable to the Sellers, or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in their sole discretion, and (c) may modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets, including, without limitation, (1) extending the deadlines set

10

forth in the Auction procedures, (2) modifying bidding increments, (3) with the consent of the Successful Bidder or Buyer, as the case may be, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice, (4) withdrawing from the Auction the Assets at any time prior to or during the Auction or (5) canceling the Auction, and rejecting all Qualified Bids if, in the Seller's business judgment, in consultation with its financial advisors, the Creditors' Committee and the Monitor, no such bid is for a fair and adequate price.

Each of the foregoing actions shall be made in consultation with the Creditors' Committee and the Monitor. Notwithstanding the forgoing, (a) the Sellers may not impair or modify the Buyer's rights and obligations under the Agreement or the Buyer's right to credit the Break-Up Fee and the Expense Reimbursement Cap as part of any subsequent bids or (b) in the event the Sellers (i) elect to withdraw from the Auction the Assets, (ii) cancel the Auction, and/or (iii) reject all Qualified Bids, the Sellers shall nonetheless be obligated to request at the Sale Hearing that the Bankruptcy Court approve the Agreement with the Buyer.