Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")

**SECOND REPORT OF THE MONITOR**
**DATED FEBRUARY 25, 2009**

**INTRODUCTION**

1.      On January 14, 2009, Nortel Networks Corporation ("NNC" and collectively with all its
        subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel
        Networks Technology Corporation ("NNTC"), Nortel Networks International
        Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") filed for and
        obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA").
        Pursuant to the Order of this Honourable Court dated January 14, 2009 which was
        amended as reflected in the Amended and Restated Initial Order dated February 20, 2009
        (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the
        Applicants (the "Monitor") in the CCAA proceeding.

**PURPOSE**

2.      The purpose of this Second Report of the Monitor ("Second Report") is to provide
        information regarding the Applicants' motion seeking approval of a sale of Nortel's

- 2 -

"Layer 4-7" application delivery business , (the "Layer 4-7 Business") and to provide the Monitor's support thereof.

**TERMS OF REFERENCE**

3.    In preparing this Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company, and discussions with management of Nortel.  EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Report.

4.    Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

5.    Capitalized terms not defined in this Report are as defined in the Affidavit of John Doolittle (the "Doolittle Affidavit") sworn on January 14, 2009, the report of the proposed Monitor dated January 14, 2009 (the "Pre-Filing Report") or the first report of the Monitor dated February 5, 2009 (the "First Report").

**GENERAL BACKGROUND**

6.    Nortel is fundamentally a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

7.    Nortel conducts its global business through three reportable business unit segments: Carrier Networks ("CN"), Enterprise Solutions ("ES") and Metro Ethernet Networks ("MEN").  The revenues and assets of each of the business units are distributed among the various Nortel legal entities and joint ventures around the world.

- 3 -

## COMMENCEMENT OF INSOLVENCY PROCEEDINGS

8.    On January 14, 2009, Nortel commenced insolvency proceedings in Canada, the U.S., the U.K and several other countries in Europe, the Middle East and Africa ("EMEA") as set out below.

9.    On January 14, 2009 (the "Filing Date"), this Court issued an order at the request of the Applicants which, among other things, declared that the Applicants are debtor companies to which the CCAA applies and granted certain relief to the Applicants while they prepare one or more plans of arrangement pursuant to the CCAA.

10.   The Initial Order granted the Monitor authority to apply for recognition of the CCAA proceedings with respect to the Applicants as "Foreign Main Proceedings" in the United States pursuant to Chapter 15 of United States Bankruptcy Code (the "Code").    The Monitor filed petitions under Chapter 15 on January 14, 2009, and the hearing of the petitions is scheduled for February 27, 2009, in the United States Bankruptcy Court, District of Delaware (the "U.S. Court").

11.   On January 14, 2009, Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries (the "U.S. Debtors") filed voluntary petitions under Chapter 11 of the Code in the U.S. Court. The U.S. Debtors' cases have been assigned to Judge Kevin Gross.

12.   On January 14, 2009, Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Filed Entities") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court").    The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Filed Entities, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed.    The U.K. Administration Orders provided a stay of the EMEA Filed Entities' creditors which, subject to further order of the U.K. Court, remains in effect during the Administration.

13.   The various Administrators of the EMEA Filed Entities have continued to operate the business since the date of the U.K. Administration Orders and interact with the

- 4 -

Applicants and U.S. Debtors in accordance with the Group Supplier Protocol Agreements (each a "GSPA") as approved in the Initial Order and the Order of this Honourable Court dated February 10, 2009.

14.     On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders").

15.     The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further order of the Israeli Court, remains in effect during the Administration.

16.     Nortel entities located in Asia Pacific, Asia Central (collectively "APAC") and in the Central America and Latin America ("CALA") regions continue to operate in the normal course and are not subject to insolvency proceedings.

## THE LAYER 4-7 BUSINESS

### *Background*

17.     The Layer 4-7 Business is part of Nortel's ES business unit.  The Layer 4-7 Business is not operated through a dedicated legal entity or stand-alone division.  Generally, Nortel has one legal entity in each country in which it operates and sales of all Nortel products in that country are made through the single legal entity.  A more detailed description of this structure is set out in the Pre-Filing Report.

18.     The Layer 4-7 Business sells certain application delivery products, primarily the Nortel Application Switch and Nortel Application Accelerator products.  The Nortel Application Switch is a product designed to improve application availability, performance and security through load balancing and acceleration of network traffic giving IT managers greater control over their networks.  The Nortel Application Accelerator is designed to reduce server and bandwidth needs and improve the responsiveness of web-based applications thereby reducing overall network costs.

- 5 -

19.     Until recently, Nortel was working on the next generation product for the Layer 4-7 Business called the Virtual Service Switch ("VSS") which was planned to be made available in the fourth quarter of 2008. At the present time, the completion of the VSS development has been halted pending the outcome of the sale process described below.

20.     The Applicants have an interest in the intellectual property upon which the Layer 4-7 Business products are based. Generally speaking the owner of intellectual property in the Nortel group licenses the intellectual property in question to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis.

21.     The Layer 4-7 Business currently employs people providing the equivalent of approximately 104 full time positions, primarily in the areas of research & development, technical support, contract administration and sales engineering. In addition, it utilizes the equivalent of approximately 16 full time positions in other Nortel functional areas and approximately 23 contract employees. The majority of the employees are located in the United States, India, Canada and Japan with a few employees located in Australia, France, Finland, the United Kingdom and Germany. Generally, these individuals are employed by the Nortel legal entity established in the country in which they work.

22.     The Layer 4-7 Business has an installed base of more than 1,000 customers. Product and service revenue in 2008 was approximately $50 million. Sales to customers are generally made by the local Nortel legal entity in the country in which the customer is located.

*Initial Sale Process*

23.     In mid-2008, Nortel management determined that the Company should pursue a sale of the Layer 4-7 Business. This decision was made as a result of Nortel desiring to focus its investments in its core competencies and driving differentiation across enterprise networking solutions, laying the foundation for higher-end integrated applications and an end-to-end unified communication solution.

24.     The Monitor has been advised that, as early as June, 2008, the Company began to contact potential investors regarding the Layer 4-7 Business which led to an initial sale process

- 6 -

being commenced by the Company.   The outcome of this initial sale process was as follows.

- Eight parties were initially contacted in connection with this process and each of the parties were provided with an information memorandum and meetings and/or calls were held with each.

- Two expressions of interest were received and ultimately one term sheet was submitted.

- The Company entered into an exclusivity arrangement with the party that submitted the term sheet and proceeded to try to negotiate a definitive agreement; however, despite several extensions of the exclusivity period, a definitive agreement was not finalized.

- Following an unsolicited inquiry from a party representing Radware Ltd. ("Radware"), discussions began with Radware in early December, 2008, and resulted in a term sheet being agreed to between Nortel and Radware in mid-December, 2008.   Negotiations with respect to a definitive agreement commenced.

- While negotiations with Radware were ongoing, Nortel received a revised proposal from the party it had previously entered into an exclusivity arrangement with.  However, Nortel's assessment of the proposal was that it was inferior to the Radware term sheet.  As a result, Nortel management continued its negotiations with Radware.

- Ultimately, prior to the Filing Date, the Company had contacted fifteen parties, including twelve financial investors and three strategic buyers.   Information memoranda were provided to each and meetings were held with each of the parties.

- 7 -

- As at the Filing Date, Nortel and Radware had settled substantially all of the terms of a definitive agreement and were very close to being in a position to sign the agreement.

25. Given the filing of insolvency proceedings, the Company determined that the sale of the Layer 4-7 Business would have to be on modified terms, including selling the subject assets on an "as is, where is basis".

26. As a result of the filing of insolvency proceedings, Nortel became concerned about the ability of the Layer 4-7 Business to attract customers and generate ongoing revenue. As outlined in the Affidavit of George Riedel sworn February 24, 2009 in support of the within motion (the "Riedel Affidavit") the potential purchase price for the subject assets has fallen. Therefore, the Company decided that any sale process would need to be carried out on an expedited basis. Accordingly, the Company recommenced negotiations with Radware to attempt to reach a modified definitive agreement.

## THE RADWARE AGREEMENT

27. On February19, 2009 NNL, NNI, NNUK and certain of the EMEA entities (collectively, the "Sellers") and the administrators of those EMEA entities entered into an Asset Purchase Agreement with Radware (the "Purchase Agreement") outlining the terms of the Company's sale of the assets and associated liabilities of the Layer 4-7 Business to Radware. The Purchase Agreement (without Exhibits or Schedules) is attached as Exhibit "A" to the Riedel Affidavit.

28. Radware is a global integrated applications delivery solutions vendor. It offers business-critical applications for more than 6,000 enterprises and carriers worldwide. Radware was founded in 1997 and went public in 1999 and is traded on the NASDAQ Exchange. The company has a worldwide presence with 550 employees with primary offices in Tel Aviv and New Jersey.

29. The key terms of the Purchase Agreement are outlined in the paragraphs that follow.

30. The aggregate purchase price under the Purchase Agreement is $17,650,000 in cash, with purchase price adjustments that may increase or decrease the purchase price based on the

- 8 -

variance of Targeted Inventory Value, Warranty Target Amount and Business Tangible Property Value (all as defined in the Purchase Agreement) to their respective actual values as determined three business days prior to the closing date.

31.    Radware will purchase the following assets (the "Purchased Assets") from the Sellers under the Purchase Agreement:

- certain fixed assets associated with the Layer 4-7 Business as specifically set out in the Purchase Agreement;

- all inventory owned by Nortel exclusively relating to the Layer 4-7 Business;

- all exclusive service contracts with customers with respect to the maintenance of Layer 4-7 products;

- all intellectual property exclusively associated with the Layer 4-7 Business; and

- the financial records, documents, customers list and sale records exclusively relating to the Layer 4-7 Business.

32.    Radware will assume the following liabilities from the Sellers under the Purchase Agreement:

- all liabilities of Nortel in connection with the customer contracts to be assigned to Radware, other than the liability: (a) for cure costs required to assign such contracts which are subject to section 365 of the Code (the "Cure Costs") and (b) arising as a result of a breach, default or wrongful failure on the part of any Seller or its affiliates to perform any covenant or obligation under such contract required to be performed by it prior to closing;

- all liabilities relating to the post-closing employment of employees transferred to Radware;

- the payment of certain transfer taxes; and

- 9 -

- obligations to perform under all exclusive and certain obligations to perform under non-exclusive (ie. those contracts bundled with non-Layer 4-7 Business that are being retained by Nortel) service contracts.

33.    In addition to transferring the Purchased Assets, the Sellers have the following responsibilities and obligations pursuant to the Purchase Agreement:

- to pay all Cure Costs associated with the assignment of the assumed customer contracts; subject to the provision that should such cure costs exceed $1 million, NNL and NNI shall have the right to terminate the Purchase Agreement unless Radware agrees to pay such Cure Costs in excess of $1 million. Nortel does not anticipate having to pay any Cure Costs; and

- to pay 50% of certain transfer taxes, if any, assessed against Radware in connection with the transaction.

34.    The Purchase Agreement contemplates that Radware will make offers of employment to approximately 43 employees of the Layer 4-7 Business in Japan, India, Australia, U.K. and Germany on terms and conditions no less favourable than the terms of their current employment with Nortel in effect prior to closing and with offers to certain employees in the U.S. of at least 100% of their salary and benefits and no less favourable than Radware provides to its U.S. employees. The 11 Canadian employees of the Layer 4-7 Business will not be transferred to Radware.

35.    The Purchase Agreement provides that, in effect, the EMEA parties shall only have liability to Radware with respect to the transfer of certain assets to Radware and certain other matters related to the EMEA region.

36.    In the event that (i) Sellers enter into a binding definitive agreement regarding an Alternative Transaction (described below) for the sale of the Assets or (ii) if the Sellers exercise their right to terminate the Purchase Agreement in the event that Cure Costs exceed a specified amount (described above) and Radware elects not to pay the excess Cure Costs, or (iii) Radware terminates the Purchase Agreement due to a material breach by the Sellers, the Purchase Agreement provides that the Sellers shall pay a break fee of

- 10 -

$650,000 (the "Break Fee") and an expense reimbursement of up to $400,000 (the "Expense Reimbursement") to Radware. The Monitor understands that Nortel and its advisors are of the view that the Break Fee and Expense Reimbursement are reasonable.

37.  Radware has the right under the Purchase Agreement to terminate the agreement if closing has not occurred prior to the earlier of (i) April 15, 2009 (or May 1, 2009, in certain limited circumstances) or (ii) the 30th day following the U.S. Sale Order becoming a Final Order, provided such failure does not result from a breach by Radware.

38.  As part of the Radware transaction, Nortel and Radware have or will enter into:

- an Assignment of Patents pursuant to which NNL will assign two patents and two patent applications related to the Layer 4-7 Business to Radware;

- an Assignment of Trademarks and Domain Name pursuant to which NNL and one of its subsidiaries will assign certain trademarks and a domain name pertaining to the Layer 4-7 Business to Radware;

- a Trademark License Agreement pursuant to which NNL grants limited rights in the Nortel mark to allow Radware sufficient time to transition the Layer 4-7 Business products to its own marks;

- an Intellectual Property License Agreement pursuant to which Nortel will grant Radware certain rights in respect of certain intellectual property used in the Layer 4-7 Business and Radware will grant Nortel and its affiliates certain rights in respect of certain intellectual property;

- an Interim Product Purchase Agreement pursuant to which Nortel will, if necessary, purchase certain Layer 4-7 Business hardware from a contract manufacturer and resell the same to Radware (with a 5% premium added after a certain period of time has elapsed) until the earlier of such time as Radware enters into an agreement with the contract manufacturer or 12 months from the closing of the transaction. Nortel is responsible for costs associated with chronic failure of any such hardware provided to Radware under the Interim Product Purchase

- 11 -

Agreement, which, the Monitor has been advised, mirrors the obligation of the contract manufacturer to Nortel in respect of such hardware;

- a Contract Manufacturer Inventory Agreement with the contract manufacturer pursuant to which Nortel will purchase remaining excess and obsolete finished goods, work-in-process and materials related to the Layer 4-7 Business from the contract manufacturer that were purchased or manufactured by the contract manufacturer in order to meet Nortel's forecast requirements for the Layer 4-7 Business, to be entered into at the time Radware enters into an agreement with the contract manufacturer, where such contract manufacturer will hold such excess and obsolete inventory on consignment for sale to Radware on behalf of Nortel to satisfy Radware's demands under the new contract;

- a Master Purchase and Sale Agreement which will govern the purchase of Layer 4-7 Business products and services from Radware by NNL post-closing and grant certain non-exclusive IP rights to NNL; and

- a Transition Services Agreement pursuant to which NNL will provide certain ongoing support to Radware (for instance, the continuation of email accounts, cell phones and computer access for transferred employees) for periods ranging from 60 days to six months post-closing depending on the service.

39.  The Purchased Assets to be transferred by the Applicants and the U.S. Debtors under the Purchase Agreement are to be transferred free and clear of all liens, claims and encumbrances of any kind other than permitted liens and those expressly assumed by Radware under the Purchase Agreement.

**BIDDING PROCEDURES AND AUCTION PROCESS**

40.  Given that certain of the U.S. Debtors are parties to the Purchase Agreement and given the desire to maximize value for the benefit of stakeholders in relation to the assets which are the subject of the Purchase Agreement, Nortel has determined and has agreed with Radware that the Purchase Agreement is subject to higher or better offers being obtained under a sale process under section 363 of the Code and that the Purchase Agreement shall

- 12 -

serve as a "stalking horse" bid pursuant to that process. The Layer 4-7 Business assets (the "Assets") may be sold in a single sale to a single purchaser or in parts to several purchasers.

41.     The U.S. Debtors have filed a bidding procedures motion with the U.S. Court. A copy of the proposed bidding procedures is attached as Appendix "A" (the "Bidding Procedures").

42.     It is a condition of the Purchase Agreement that Nortel shall have filed a motion seeking the approval of the Bidding Procedures by the U.S. Court by no later than February 20, 2009 and filed a similar motion seeking the approval of the sales process by this Honourable Court by the date that the U.S. Court grants an Order approving the Bidding Procedures. This condition has been satisfied. The Order being sought from the U.S. Court in respect of the Bidding Procedures is conditional upon this Honourable Court's approval of same and the Applicants' motion for approval of the Bidding Procedures by this Honourable Court is likewise conditional on approval by the U.S. Court.

43.     It is a condition of the Purchase Agreement that the U.S. Court Order approving the Bidding Procedures and the Order of this Honourable Court approving the sale process be obtained prior to March 12, 2009 and not stayed as of such date, failing which Radware shall have the right to terminate the Purchase Agreement.

44.     The Bidding Procedures, as further detailed below, provide that all bids must be received by the Sellers no later than March 19, 2009.

45.     It is anticipated that Nortel will ultimately seek an Approval and Vesting Order from this Honourable Court in respect of the Layer 4-7 Business transaction, and a final sales Order from the U.S. Court in respect of the same, on or about March 25, 2009.

46.     The Monitor recognizes the expeditious nature of the proposed sale process. However, the Monitor has been advised that post-Filing Date, Nortel has re-approached the fifteen parties contacted prior to the Filing Date regarding the opportunity to acquire the Layer 4-7 Business and, given that those parties had previously executed non-disclosure agreements, Nortel has provided those parties with an updated information memorandum.

- 13 -

In addition, post-Filing Date, Nortel has contacted an additional nineteen parties regarding the opportunity to acquire the Layer 4-7 Business and upon executing an appropriate non-disclosure agreement, each of those parties will receive a copy of the updated information memorandum.

47.   The list of thirty-four potential bidders was selected by Nortel and reviewed by its advisors.

48.   These thirty-four potential bidders will be notified by Nortel of the Bidding Procedures.

49.   Nortel has consulted with, among others, the Official Committee of Unsecured Creditors (the "UCC") and the Bondholder Group regarding the Bidding Procedures and believe that both are supportive of the timing of this sale process.

50.   Given the pre-filing sale efforts of Nortel and the post-filing contact made with additional potential bidders described above, the Monitor recommends the approval of the sale process outlined herein and more particularly described in the Bidding Procedures.

51.   As described in the relevant motion materials filed with the U.S. Court, the key provisions of the Bidding Procedures are outlined in the paragraphs that follow.

***Bid Deadline***

52.   A Qualified Bidder (as defined below) that desires to make a bid will deliver written copies of its bid to: counsel to the Sellers, the UCC, the Monitor and Radware; so as to be received not later than noon (Eastern Time) on March 19, 2009 (the "Bid Deadline"). The Sellers may extend the Bid Deadline once or successively, but they are not obligated to do so; provided, however, that for any such extension beyond five days the Sellers shall have obtained the written consent of Radware, which consent will not be unreasonably withheld. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders of such extension.

- 14 -

*Provisions Governing Qualifications of Bidders*

53.    Unless otherwise ordered by the U.S. Court and accepted by the Monitor, for cause shown, or as otherwise determined by the Sellers, in order to participate in the bidding process, each person (a "Potential Bidder"), other than Radware, must deliver (unless previously delivered) to counsel to the Sellers, the UCC and the Monitor:

- an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers;

- current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their financial advisors, in consultation with the UCC and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate a purchase of the Assets; and

- a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including assumed liabilities and the other obligations to be performed or assumed by the Potential Bidder, as described in the Bidding Procedures paragraph (h) under the heading Qualified Bid); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; and (v) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Purchase Agreement; provided that, in order to be a Qualified Bid (as defined below) the

- 15 -

terms and conditions of such proposal shall not be in the aggregate materially less favourable to Sellers than those set forth in the Purchase Agreement.

54.     A Potential Bidder that delivers the documents described above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the sale and perform after the completion of the sale, if selected as a Successful Bidder (as defined below), and that the Sellers determine in their sole discretion, after consultation with their counsel and financial advisors, the UCC and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the sale will be deemed a "Qualified Bidder".

55.     As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the UCC and the Monitor, and will notify both the Potential Bidder and Radware, if such Potential Bidder is a Qualified Bidder.  At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin to conduct due diligence with respect to the Assets as provided in the Bidding Procedures.

***Provisions Governing Qualified Bids***

56.     A bid submitted pursuant to the Bidding Procedures will be considered a Qualified Bid only if the bid complies with all of the following (a "Qualified Bid"):

- it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Purchase Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or upon alternative terms and conditions that the Sellers determine, after consultation with the UCC and the Monitor, are no less favourable than the terms and conditions of the Purchase Agreement;

- it includes a letter stating that the bidder's offer is irrevocable until the date of the selection of the Successful Bidder and, if such bidder is selected as the Alternate Bidder (as defined below), the Alternate Bid Expiration Date (as defined below);

- 16 -

- it includes a duly authorized and executed asset purchase agreement, including the purchase price for the Assets (the "Purchase Price"), together with all exhibits and schedules thereto, the Transition Services Agreement, the Intellectual Property License Agreement, the Interim Product Purchase Agreement, the Master Purchase Agreement, the Patent Assignment Agreement, the Trademark License Agreement, the Contract Manufacturing Inventory Agreement and the other ancillary agreements described in the Purchase Agreement with all exhibits and schedules thereto, as well as copies of such materials marked to show those amendments and modifications to the Purchase Agreement proposed by a prospective bidder (a "Marked Agreement") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed sale orders of the U.S. Court and this Honourable Court;

- it is not conditioned on the outcome of unperformed due diligence by the bidder;

- it is not conditioned on obtaining financing and includes written evidence of a commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the UCC and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreement;

- it identifies with particularity each and every contract and unexpired lease, if any, the assumption and assignment of which is a condition to closing;

- it fully discloses the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

- it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with its financial advisors, the UCC, and the Monitor that either individually or, when evaluated in conjunction with any other Qualified Bid that constitutes part of the same offer for the Assets, is greater than or equal to the sum

- 17 -

of (i) the Base Purchase Price (as defined in the Purchase Agreement) (making appropriate adjustments for any proposed changes to the Target Inventory Value, Warranty Target Amount and Target Business Tangible Property Value (each as defined in the Purchase Agreement) plus (ii) the Assumed Liabilities (as defined in the Purchase Agreement) plus (iii) the value of the performance of the warranty and service-related obligations of the Sellers for which Radware has agreed to assume responsibility (as set forth in the Purchase Agreement) less (iv) the amount of transfer taxes to be paid by the Sellers under the Purchase Agreement plus (v) the value of the assumed obligation to purchase returned products and excess inventory (as set forth in the Purchase Agreement) plus (vi) the savings to Sellers resulting from the Radware's obligations with respect to employment of certain of Sellers' employees pursuant to the Purchase Agreement plus (vii) the value of those component parts purchased by the Sellers pursuant to the Contract Manufacturer Inventory Agreement plus (viii) the amount of the Break-Up Fee plus (ix) the Expense Reimbursement plus (x) $500,000 (or such other increment as the Sellers, in consultation with their financial advisors, the UCC and the Monitor determine to be appropriate);

- it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Purchase Agreement or the Marked Agreement or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

- 18 -

- • it includes evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreement;

- • it is accompanied with a good faith deposit in the form of a wire transfer, certified cheque or such other form acceptable to the Sellers payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to $2,500,000; and

- • it is received by the Bid Deadline.

57.    The Sellers will determine, in their reasonable business judgment, after consultation with the UCC and the Monitor, to entertain bids for the Assets that do not conform to one or more of the requirements specified in the Bidding Procedures and deem such bids to be Qualified Bids; provided that Sellers, in evaluating such bids, may not waive compliance with the requirements to be unconditional in relation to due diligence and financing and to be accompanied by the requisite deposit.

58.    Notwithstanding the foregoing, Radware will be deemed a Qualified Bidder, and the Purchase Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the sale.

59.    A Qualified Bid will be valued based upon several factors including, without limitation, items such as the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder, as described in the Bidding Procedures in paragraph (h) under the heading Qualified Bid) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such transactions, the terms and conditions of the ancillary agreements, the effect of the sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the sale, the amount of Assets included or excluded from the bid, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their financial and legal advisors, the UCC and the Monitor.  In determining the net value of a potential Qualified Bid, Sellers will utilize (to the extent quantifiable) the data relating to the items

- 19 -

listed in paragraph (h) under the heading Qualified Bid above that was available to Sellers as of the date such assessment was made with respect to Radware.

60.    If the Sellers do not receive any Qualified Bids other than the Purchase Agreement received from Radware, the Sellers shall report the same to the U.S. Court and the Monitor and subject to requiring and obtaining approvals of this Honourable Court, shall proceed with the sale pursuant to the terms of the Purchase Agreement. If approval of this Honourable Court is required, the applicable Seller will as soon as practicable file a motion with such court(s) seeking approval of the Purchase Agreement. If the Sellers receive a bid that does not conform to one or more of the requirements specified above, but determine, in their reasonable business judgment, after consultation with the UCC and the Monitor, that such bid is to be treated as a Qualified Bid, subject to the conditions with respect to the restriction on Sellers' ability to waive certain requirements of a Qualified Bid, with a higher value as defined above, then any Qualified Bidder (including Radware) shall have the opportunity to submit a bid at the Auction on the same basis, so long as such bid has a value of at least $500,000 (or such other increment as the Sellers, in consultation with their financial advisors, the UCC and the Monitor determine to be appropriate) more than the non-conforming bid. The Sellers shall notify Radware and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids no later than one (1) day following the expiration of the Bid Deadline.

*Auction Process*

61.    If the Sellers receive one or more Qualified Bids in addition to the Purchase Agreement, the Sellers will conduct an auction (the "Auction") of the Assets, upon notice to all Qualified Bidders who have submitted Qualified Bids, on March 23, 2009, which Auction shall not be cancelled or adjourned without the prior consent of Radware (except as provided herein), such consent not to be unreasonably withheld. Copies of all Qualified Bids shall be delivered to the UCC, the Monitor and counsel to Radware promptly after such time that such bid is deemed a Qualified Bid.

62.    The Auction shall run in accordance with the following procedures:

- 20 -

- only the Sellers, Radware, any representative of the UCC and the Monitor (and the legal and financial advisors to each of the foregoing), any creditor of the U.S. Debtors, and any other Qualified Bidder which has timely submitted a Qualified Bid, shall attend the Auction in person, and only Radware and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction;

- each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

- prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to participate in the Auction, provided that, in the event a Qualified Bidder elects not to participate in the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bidder at the conclusion of the Auction and if such bidder is selected as the Alternate Bidder (as defined below), the Alternate Bid Expiration Date (as defined below).  Prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the UCC and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to all Qualified Bidders which have informed the Sellers of their intent to participate in the Auction;

- all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as explained below) at the Auction with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to participate in the Auction must participate in person;

- the Sellers, after consultation with their counsel and financial advisors, the UCC and the Monitor may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules

- 21 -

are (i) not inconsistent with the Bidding Procedures, the Code, or any order of the U.S. Court or of any other applicable court entered in connection herewith and (ii) disclosed to each Qualified Bidder at the Auction;

- bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their financial advisor, the UCC, and the Monitor, that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (defined below). Each incremental bid at the Auction shall have a purchase price of at least $500,000 over the Starting Bid or the Leading Bid, as the case may be; provided, that the Sellers, in consultation with the UCC and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid (and the value of such bid) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge and written confirmation of the Leading Bid. For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by Radware), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and the Expense Reimbursement that may be payable to Radware under the Purchase Agreement as well as any additional liabilities to be assumed by a Qualified Bidder; and

- if the Sellers do not receive any Qualified Bid other than Radware's Qualified Bid at the Auction, the Sellers shall seek approval of the Purchase Agreement before the U.S. Court and this Honourable Court on or prior to the date scheduled for the sale hearing in the U.S. Court authorizing the Sellers to enter into agreements with respect to the Successful Bid (as defined below).

- 22 -

*Selection Of Successful Bid*

63.    At the conclusion of the Auction, or as soon thereafter as practicable, the Sellers, in consultation with their counsel and financial advisors, the UCC and the Monitor, will (a) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including, among other things, the terms and conditions of the ancillary agreements, the effect of the sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), the counterparties to such transactions, and other factors affecting the speed, certainty and value of the sale, (b) identify the highest or otherwise best offer for the Assets received at the Auction (the "Successful Bid" and the bidder making such bid, the "Successful Bidder") and (c) communicate to Radware, the UCC and the Monitor the identity of the Successful Bidders and the details of the Successful Bid.  The determination of the Successful Bid by Sellers, after consultation with the UCC and the Monitor, at the conclusion of the Auction, shall be final.

*Closing with Alternative Backup Bidders*

64.    If the Sellers receive additional Qualified Bids at the Auction, then, at the sale hearing before the U.S. Court and, if required, this Honourable Court, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid," and such bidder, the "Alternate Bidder").  The Sellers' presentation to the U.S. Court, and any other applicable court(s) whose approval is required, of the Successful Bid and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of any such bids, which acceptance will only occur upon the latest approval of such bid(s) to be delivered by the U.S. Court at the Sale Hearing and any other applicable court(s) whose approval is required.  Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the U.S. Court or any other court. The Alternate Bid shall remain open until the earlier of (a) sixty (60) days following the entry of the sale Order by the U.S. Court and this

- 23 -

Honourable Court or (b) the consummation of the sale to the Successful Bidder (the "Alternate Bid Expiration Date").

***Court Approval***

65.    The Bidding Procedures and Purchase Agreement are being submitted to this Honourable Court and to the U.S. Court for approval pursuant to the cross-border protocol. The final sale and assignment of the Purchased Assets will also be submitted to this Honourable Court and to the U.S. Court for approval. With respect to those assets owned by the EMEA Filed Entities, the Joint Administrators have the power and authority to sell the assets without seeking a separate order from the U.K. Court.

## ALLOCATION OF PROCEEDS OF SALE AMONGST NORTEL ENTITIES

66.    As previously indicated, the Layer 4-7 Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the Layer 4-7 Business which, in turn, is subject to various intercompany licensing agreements. Therefore, the task of allocating the sale proceeds stemming from the Purchase Agreement amongst the various Nortel entities in the various jurisdictions is complex. As a result, the proceeds of sale stemming from the Purchase Agreement will be held in escrow with a party acceptable to the Sellers until such time as an allocation is agreed upon.

- 24 -

**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

67.    The Monitor has reviewed Nortel's efforts to divest its Layer 4-7 Business and is of the view that the Company is acting in good faith to maximize value.    The Monitor recommends approval of the Purchase Agreement as a "stalking horse" bid in the Auction process.    In so doing, the Monitor considers the potential payment of the Break Fee and Expense Reimbursement as reasonable in the circumstances.

All of which is respectfully submitted this 25th day of February 2009.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:

Murray A. McDonald
President

## APPENDIX "A"

## [ATTACHED]

NORTEL NETWORKS INC., et al.

BIDDING PROCEDURES

By order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale (the "Sale") of the Assets (as defined below) of Nortel Networks Inc. and certain of its subsidiaries and affiliates, debtors and debtors-in-possession (collectively, the "Debtors" or "Sellers") as set forth in the Agreement (as defined below), including Nortel Networks Limited (the "Canadian Seller") and Nortel Networks UK Limited (the "UK Seller").

On [●], 2009, the Sellers executed that certain Asset Purchase Agreement (the "Agreement") with Radware Ltd. (together with any of its designees, the "Buyer"). The Debtors have determined that the transaction contemplated by the Agreement and the ancillary agreements discussed therein should be subject to competitive bidding as set forth herein, approval by the Bankruptcy Court pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), compliance with the terms of an order of the Ontario Superior Court of Justice (the "Ontario Court") dated January 14, 2008 (the "CCAA Order") or, alternatively, approval of the Ontario Court, and certain other closing conditions as set forth in the Agreement.

On [●], 2009, the Debtors filed a Motion for Orders (I) Authorizing and Approving (A) the Bidding Procedures, (B) the Break-up Fee and Expense Reimbursement Cap, (C) the Form and Manner of Sale Notices and (D) a Date for the Sale Hearing, and (II) (A) Authorizing and Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims and Encumbrances, (B) Authorizing and Approving the Assumption and Assignment of Certain Prepetition Executory Contracts and (C) Granting Related Relief (the "Sale Motion").

Bidding Process

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's and, if required, the Ontario Court's approval thereof (collectively, the "Bidding Process"). The Debtors intend to consult with, among others, their advisors and counsel for the Official Committee of Unsecured Creditors in the chapter 11 cases of Nortel Networks Inc., et al. (Case No. 09-10138) involving the U.S. Debtors (the "Creditors' Committee"), Ernst & Young Inc., in its capacity as the Ontario Court-appointed Monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor") and Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP, in their capacities as the joint administrators of certain Debtors' companies incorporated in the Europe, Middle East and Africa region appointed by the English High Court of Justice in connection with the proceedings under the Insolvency Act 1986 (such individuals collectively, the "Administrator") throughout the Bidding Process. In

the event that the Debtors and any party disagree as to the interpretation or application of these Bidding Procedures, except with respect to the application of the terms of the CCAA Order or any requirement for approval by the Ontario Court or the Monitor, the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.  For greater certainty, the Bidding Process shall not govern any disagreements among the Debtors.

Assets To Be Sold

The Debtors are offering for sale, in one or more transactions, certain of the Debtors' assets pertaining to the product lines described in the Agreement and related schedules and in an information memorandum made available by the Debtors to the Buyer and to be made available to other prospective purchasers that have executed a confidentiality agreement with the Debtors (the "Assets").

"As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except, with respect to the Buyer, to the extent set forth in the Agreement or, with respect to a Successful Bidder (as defined below), to the extent set forth in the relevant purchase agreement of such Successful Bidder approved by the Bankruptcy Court and the Ontario Court.

Free Of Any And All Claims And Interests

All of the Sellers' right, title, and interest in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests"), such Claims and Interests to attach to the net proceeds of the sale of such Assets, except, with respect to the Buyer, to the extent otherwise set forth in the Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant purchase agreement of such Successful Bidder.

Participation Requirements

Unless otherwise ordered by the Bankruptcy Court and accepted by the Monitor, for cause shown, or as otherwise determined by the Sellers, in order to participate in the Bidding Process, each person (a "Potential Bidder"), other than the Buyer, must deliver (unless previously delivered) to counsel to the Sellers, the Creditors' Committee and the Monitor at the addresses provided below:

(a)     an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers;

(b)     current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial

2

disclosure and credit-quality support or enhancement that will allow the Sellers and their financial advisors, in consultation with the Creditors' Committee and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate a purchase of the Assets; and

      (c)    a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including assumed liabilities and the other obligations to be performed or assumed by the Potential Bidder, as described below in paragraph (h) under the heading "Qualified Bid"); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals and (v) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Agreement; provided, that in order to be a Qualified Bid (as defined below) the terms and conditions of such proposal shall not be in the aggregate materially less favorable to Sellers than those set forth in the Agreement.

A Potential Bidder that delivers the documents described above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Sale and perform after the completion of the Sale, if selected as a Successful Bidder, and that the Sellers determine in their sole discretion, after consultation with their counsel and financial advisors, the Creditors' Committee and the Monitor is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Creditors' Committee and the Monitor, and will notify both the Potential Bidder and Buyer, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin to conduct due diligence with respect to the Assets as provided in the following paragraph.

<u>Due Diligence</u>

The Sellers may in their discretion, and subject to competitive and other business concerns, afford each Qualified Bidder such due diligence access to the Assets as the Sellers deem appropriate, after consultation with their counsel and financial advisors, the Creditors' Committee, and the Monitor. Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their sole discretion, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. Any additional due diligence will not continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or

simultaneous attendance at management presentations or site inspections. In any event, Buyer shall be provided access to all material due diligence materials provided to Qualified Bidders that were not previously made available to Buyer. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders who make an acceptable preliminary proposal. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Agreement with any Successful Bidder.

Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to: counsel to the Sellers (James L. Bromley, Esq., Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006); the Creditors' Committee (Stephen Kuhn, Esq. and Kenneth A. Davis, Esq., Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036); the Monitor (Ken Coleman, Esq., Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY 10020) and Buyer (Ernest S. Wechsler, Esq., Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036; so as to be received not later than noon (Eastern) on March 19, 2009 (the "Bid Deadline"). The Sellers may extend the Bid Deadline once or successively, but they are not obligated to do so; provided, however, that for any such extension beyond five (5) days the Sellers shall have obtained the written consent of the Buyer, which consent will not be unreasonably withheld. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders of such extension.

Qualified Bid

A bid submitted pursuant to the previous paragraph will be considered a Qualified Bid only if the bid complies with all of the following (a "Qualified Bid"):

     (a)    it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or upon alternative terms and conditions that the Sellers determine, after consultation with the Creditors' Committee and the Monitor, are no less favorable than the terms and conditions of the Agreement;

     (b)    it includes a letter stating that the bidder's offer is irrevocable until (i) the date of the selection of the Successful Bidder (as defined below) and, (ii) if such bidder is selected as the Alternate Bidder (as defined below), the Alternate Bid Expiration Date (as defined below);

     (c)    it includes a duly authorized and executed asset purchase agreement, including the purchase price for the Assets (the "Purchase Price"), together with all exhibits and schedules thereto, the Transition Services Agreement, the IP License Agreement, the Interim Product Purchase Agreement, the Master Purchase Agreement, the Patent Assignment Agreement, the Trademark License Agreement, the Contract Manufacturing Inventory Agreement and the other ancillary agreements described in the

4

Agreement with all exhibits and schedules thereto, as well as copies of such materials marked to show those amendments and modifications to the Agreement proposed by a prospective bidder (a "Marked Agreement") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed Sale Order of the Bankruptcy Court and the Ontario Court;

(d)    it is not conditioned on the outcome of unperformed due diligence by the bidder;

(e)    it is not conditioned on obtaining financing and includes written evidence of a commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Creditors' Committee and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreement;

(f)    it identifies with particularity each and every executory contract and unexpired lease, the assumption and assignment of which is a condition to closing;

(g)    it fully discloses the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(h)    it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with its financial advisors, the Creditors' Committee and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid that constitutes part of the same offer for the Assets, is greater than or equal to the sum of (i) the Base Purchase Price (as defined in the Agreement) (making appropriate adjustments for any proposed changes to the Target Inventory Value, Warranty Target Amount and Target Business Tangible Property Value (each as defined in the Agreement)) plus (ii) the Assumed Liabilities (as defined in the Agreement) plus (iii) the value of the performance of the warranty and service-related obligations of the Sellers for which Buyer has agreed to assume responsibility (as set forth in the Master Purchase Agreement) less (iv) the amount of transfer taxes to be paid by the Sellers under the Agreement plus (v) the value of the assumed obligation to purchase returned products and excess inventory (as set forth in the Agreement) plus (vi) the savings to Sellers resulting from Buyer's obligations with respect to employment of certain of Sellers' employees pursuant to the Agreement plus (vii) the value of those component parts purchased by the Sellers pursuant to Exhibit C to the Interim Product Purchase Agreement plus (viii) the amount of the Break-Up Fee (as defined below) plus (ix) the Expense Reimbursement Cap (as defined below) plus (x) $500,000 (or such other increment as the Sellers, in consultation with their financial advisors, the Creditors' Committee and the Monitor determine to be appropriate);

(i)    it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review,

5

investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)      it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreement;

(k)      it is accompanied with a good faith deposit (the "Good Faith Deposit") in the form of a wire transfer, certified check or such other form acceptable to the Sellers payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to $2,500,000; and

(l)      it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Creditors' Committee and the Monitor, to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids; provided, that Sellers, in evaluating such bids, may not waive compliance with the requirements in items (d), (e) and (k) above.

Notwithstanding the foregoing, the Buyer will be deemed a Qualified Bidder, and the Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

### Aggregate Bids

Persons who collectively are referred to as a "Qualified Bidder" need not be affiliated persons and need not act in concert with one another, and the Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided, however, that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

### Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder, as described above in paragraph (h) under this heading) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such transactions, the terms and conditions of the ancillary agreements, the effect of the Sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Sale, the amount of Assets included or excluded from the bid, and the likelihood and

timing of consummating such transaction, each as determined by the Sellers, in consultation with their financial and legal advisors, the Creditors' Committee and the Monitor. In determining the net value of a potential Qualified Bid, Sellers will utilize (to the extent quantifiable) the data relating to the items listed in paragraph (h) above that was available to Sellers as of the date such assessment was made with respect to Buyer.

### No Qualified Bids

If the Sellers do not receive any Qualified Bids other than the Agreement received from the Buyer, the Sellers shall report the same to the Bankruptcy Court and the Monitor and subject to requiring and obtaining approvals of the Ontario Court shall proceed with the Sale pursuant to the terms of the Agreement. If approval of the Ontario Court is required, the applicable Seller will as soon as practicable file a motion with such court(s) seeking approval of the Agreement. If the Sellers receive a bid that does not conform to one or more of the requirements specified above, but determine, in their reasonable business judgment, after consultation with the Creditors' Committee and the Monitor, that such bid is to be treated as a Qualified Bid, subject to the conditions set forth in the fourth preceding paragraph (with respect to the restriction on Sellers' ability to waive certain requirements of a Qualified Bid), with a higher value as defined above, then any Qualified Bidder (including the Buyer) shall have the opportunity to submit a bid at the Auction on the same basis, so long as such bid has a value of at least $500,000 (or such other increment as the Sellers, in consultation with their financial advisors, the Creditors' Committee and the Monitor determine to be appropriate) more than the non-conforming bid. The Sellers shall notify the Buyer and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids no later than 48 hours following the expiration of the Bid Deadline.

### Break-Up Fee and Expense Reimbursement

Recognizing the Buyer's expenditure of time, energy, and resources, the Sellers have agreed that if the Buyer is not the Successful Bidder, the Sellers will, in certain circumstances as set forth in the Agreement, pay to the Buyer a break-up fee of $650,000 (the "Break-Up Fee"), and (2) reimburse Buyer for its documented out-of-pocket expenses up to $400,000 (the "Expense Reimbursement Cap"), which amounts shall constitute super priority administrative claim in the Debtors' bankruptcy cases administered under the Bankruptcy Code. The payment of the Break-Up Fee and the reimbursement of Buyer's expenses up to the Expense Reimbursement Cap will be governed by the provisions of the Agreement.

### Auction

If the Sellers receive one or more Qualified Bids in addition to the Agreement, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video, upon notice to all Qualified Bidders who have submitted Qualified Bids, at 9:30 a.m. on March 23, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attention: James L. Bromley, which Auction shall not be canceled or adjourned without the prior consent of the Buyer (except as provided herein), such consent not to be unreasonably withheld. Copies of all Qualified Bids shall be delivered to counsel to the

Creditors' Committee, the Monitor and the Buyer promptly after such time that such bid is deemed a Qualified Bid. The Auction shall run in accordance with the following procedures:

(a)    Only the Sellers, the Buyer, any representative of the Creditors' Committee and the Monitor (and the legal and financial advisors to each of the foregoing), any creditor of the Debtors, and any other Qualified Bidder which has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Buyer and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(c)    Prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to participate in the Auction, provided that, in the event a Qualified Bidder elects not to participate in the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and, (ii) if such bidder is selected as the Alternate Bidder (as defined below), the Alternate Bid Expiration Date (as defined below). Prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Creditors' Committee and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to all Qualified Bidders which have informed the Sellers of their intent to participate in the Auction.

(d)    All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as explained below) at the Auction with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided, that all Qualified Bidders wishing to participate in the Auction must participate in person.

(e)    The Sellers, after consultation with their counsel and financial advisors, the Creditors' Committee, and the Monitor may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court or of any other applicable court entered in connection herewith and (ii) disclosed to each Qualified Bidder at the Auction.

(f)    Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their financial advisor, the Creditors' Committee and the Monitor, that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the

8

Leading Bid (defined below). Each incremental bid at the Auction shall have a purchase price of at least $500,000 over the Starting Bid or the Leading Bid, as the case may be; provided, that the Sellers, in consultation with the Creditors' Committee and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid (and the value of such bid) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge and written confirmation of the Leading Bid. For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Buyer), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and the Expense Reimbursement Cap that may be payable to the Buyer under the Agreement as well as any additional liabilities to be assumed by a Qualified Bidder.

(g)    If the Sellers do not receive any Qualified Bid other than the Buyer's Qualified Bid at the Auction, the Sellers shall seek approval of the Agreement in the Bankruptcy Court and the Ontario Court on or prior to the date scheduled for the Sale Hearing.

<u>Selection Of Successful Bid</u>

At the conclusion of the Auction, or as soon thereafter as practicable, the Sellers, in consultation with their counsel and financial advisors, the Creditors' Committee and the Monitor, will (a) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including, among other things, the terms and conditions of the ancillary agreements, the effect of the Sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), the counterparties to such transactions, and other factors affecting the speed, certainty and value of the Sale, (b) identify the highest or otherwise best offer for the Assets received at the Auction (the "Successful Bid" and the bidder making such bid, the "Successful Bidder") and (c) communicate to the Buyer, the Creditors' Committee and the Monitor the identity of the Successful Bidders and the details of the Successful Bid. The determination of the Successful Bid by Sellers, after consultation with the Creditors' Committee and the Monitor, at the conclusion of the Auction, shall be final.

The Sellers will sell the Assets for the highest or otherwise best Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by the Bankruptcy Court and the Ontario Court after the Sale Hearing.

<u>Sale Hearing</u>

The sale hearing to authorize the Sellers to enter into agreements with respect to the Successful Bid (the "Sale Hearing") will be held before the Honorable Judge Gross in the United States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as March 25, 2009 at 10:30 a.m. (Eastern), and if required by the terms of the CCAA Order before the Honorable Mr. Justice Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto,

9

Ontario, as soon as practicable following the date of the Sale Hearing. The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing. If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Buyer), the Sellers will report the same to the Bankruptcy Court at the Sale Hearing, to the Monitor, and will proceed with a sale of the Assets to the Buyer following entry of the Sale Order of the Bankruptcy Court and the Ontario Court. If the Sellers do receive additional Qualified Bids, then, at the Sale Hearing, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Sellers' presentation to the Bankruptcy Court, and any other applicable court(s) whose approval is required, of the Successful Bid and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bid(s) to be delivered by the Bankruptcy Court at the Sale Hearing and any other applicable court(s) whose approval is required. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court or any other court. The Alternate Bid shall remain open until the earlier of (a) 60 days following the entry of the Sale Order or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date").

Return of Good Faith Deposit

The Good Faith Deposit of the Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within three (3) business days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within three (3) business days of the date of the selection of the Successful Bidder and the Alternate Bidder. If a Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Sellers will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit will become property of the Sellers.

Reservation Of Rights

The Sellers, after consultation with their counsel and financial advisors, the Creditors' Committee and the Monitor, (a) may determine which Qualified Bid, if any, is the highest or otherwise best offer, (b) may reject, at any time, any bid (other than the Buyer's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, the CCAA Order or any other orders applicable to the Sellers, or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in their sole discretion, and (c) may modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets, including, without limitation, (1) extending the deadlines set

10

forth in the Auction procedures, (2) modifying bidding increments, (3) with the consent of the Successful Bidder or Buyer, as the case may be, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice, (4) withdrawing from the Auction the Assets at any time prior to or during the Auction or (5) canceling the Auction, and rejecting all Qualified Bids if, in the Seller's business judgment, in consultation with its financial advisors, the Creditors' Committee and the Monitor, no such bid is for a fair and adequate price.

Each of the foregoing actions shall be made in consultation with the Creditors' Committee and the Monitor. Notwithstanding the forgoing, (a) the Sellers may not impair or modify the Buyer's rights and obligations under the Agreement or the Buyer's right to credit the Break-Up Fee and the Expense Reimbursement Cap as part of any subsequent bids or (b) in the event the Sellers (i) elect to withdraw from the Auction the Assets, (ii) cancel the Auction, and/or (iii) reject all Qualified Bids, the Sellers shall nonetheless be obligated to request at the Sale Hearing that the Bankruptcy Court approve the Agreement with the Buyer.

Court File No:  09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

*ONTARIO*
## SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

Proceeding commenced at Toronto

## SECOND REPORT OF THE MONITOR
## DATED FEBRUARY 25, 2009

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada  M5B 2M6

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

15690196