# EXHIBIT A

NORTEL NETWORKS INC., et al.

BIDDING PROCEDURES

By order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale (the "Sale") of the Assets (as defined below) of Nortel Networks Inc. and certain of its subsidiaries and affiliates, debtors and debtors-in-possession (collectively, the "Debtors" or "Sellers") as set forth in the Agreement (as defined below), including Nortel Networks Limited (the "Canadian Seller") and Nortel Networks UK Limited (the "UK Seller").

On February 19, 2009, the Sellers executed that certain Asset Purchase Agreement (the "Agreement") with Radware Ltd. (together with any of its designees, the "Buyer"). The Debtors have determined that the transaction contemplated by the Agreement and the ancillary agreements discussed therein should be subject to competitive bidding as set forth herein, approval by the Bankruptcy Court pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), compliance with the terms of an order of the Ontario Superior Court of Justice (the "Ontario Court") dated January 14, 2008 (the "CCAA Order") or, alternatively, approval of the Ontario Court, and certain other closing conditions as set forth in the Agreement.

On February 20, 2009, the Debtors filed a Motion for Orders (I) Authorizing and Approving (A) the Bidding Procedures, (B) the Break-up Fee and Expense Reimbursement Cap, (C) the Form and Manner of Sale Notices and (D) a Date for the Sale Hearing, and (II) (A) Authorizing and Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims and Encumbrances, (B) Authorizing and Approving the Assumption and Assignment of Certain Prepetition Executory Contracts and (C) Granting Related Relief (the "Sale Motion").

Bidding Process

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's and, if required, the Ontario Court's approval thereof (collectively, the "Bidding Process"). The Debtors intend to consult with, among others, their advisors and counsel for the Official Committee of Unsecured Creditors in the chapter 11 cases of Nortel Networks Inc., et al. (Case No. 09-10138) involving the U.S. Debtors (the "Creditors' Committee"), Ernst & Young Inc., in its capacity as the Ontario Court-appointed Monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor") and Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP, in their capacities as the joint administrators of certain Debtors' companies incorporated in the Europe, Middle East and Africa region appointed by the English High Court of Justice in connection with the proceedings under the Insolvency

Act 1986 (such individuals collectively, the "Administrator") throughout the Bidding Process. In the event that the Debtors and any party disagree as to the interpretation or application of these Bidding Procedures, except with respect to the application of the terms of the CCAA Order or any requirement for approval by the Ontario Court or the Monitor, the Bankruptcy Court will have jurisdiction to hear and resolve such dispute. For greater certainty, the Bidding Process shall not govern any disagreements among the Debtors.

## Assets To Be Sold

The Debtors are offering for sale, in one or more transactions, certain of the Debtors' assets pertaining to the product lines described in the Agreement and related schedules and in an information memorandum made available by the Debtors to the Buyer and to be made available to other prospective purchasers that have executed a confidentiality agreement with the Debtors (the "Assets").

## "As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except, with respect to the Buyer, to the extent set forth in the Agreement or, with respect to a Successful Bidder (as defined below), to the extent set forth in the relevant purchase agreement of such Successful Bidder approved by the Bankruptcy Court and the Ontario Court.

## Free Of Any And All Claims And Interests

All of the Sellers' right, title, and interest in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests"), such Claims and Interests to attach to the net proceeds of the sale of such Assets, except, with respect to the Buyer, to the extent otherwise set forth in the Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant purchase agreement of such Successful Bidder.

## Participation Requirements

Unless otherwise ordered by the Bankruptcy Court and accepted by the Monitor, for cause shown, or as otherwise determined by the Sellers, in order to participate in the Bidding Process, each person (a "Potential Bidder"), other than the Buyer, must deliver (unless previously delivered) to counsel to the Sellers, the Creditors' Committee and the Monitor at the addresses provided below:

(a) an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers;

(b) current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements of the equity holders of the Potential Bidder who will

guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their financial advisors, in consultation with the Creditors' Committee and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate a purchase of the Assets; and

(c) a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including assumed liabilities and the other obligations to be performed or assumed by the Potential Bidder, as described below in paragraph (h) under the heading "Qualified Bid"); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals and (v) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Agreement; provided, that in order to be a Qualified Bid (as defined below) the terms and conditions of such proposal shall not be in the aggregate materially less favorable to Sellers than those set forth in the Agreement.

A Potential Bidder that delivers the documents described above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Sale and perform after the completion of the Sale, if selected as a Successful Bidder, and that the Sellers determine in their sole discretion, after consultation with their counsel and financial advisors, the Creditors' Committee and the Monitor is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Creditors' Committee and the Monitor, and will notify both the Potential Bidder and Buyer, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin to conduct due diligence with respect to the Assets as provided in the following paragraph.

### Due Diligence

The Sellers may in their discretion, and subject to competitive and other business concerns, afford each Qualified Bidder such due diligence access to the Assets as the Sellers deem appropriate, after consultation with their counsel and financial advisors, the Creditors' Committee, and the Monitor. Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their sole discretion, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. Any additional due diligence will not continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that

multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. In any event, Buyer shall be provided access to all material due diligence materials provided to Qualified Bidders that were not previously made available to Buyer. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders who make an acceptable preliminary proposal. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Agreement with any Successful Bidder.

### Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to: counsel to the Sellers (James L. Bromley, Esq., Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006); the Creditors' Committee (Stephen Kuhn, Esq. and Kenneth A. Davis, Esq., Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036); the Monitor (Ken Coleman, Esq., Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY 10020) and Buyer (Ernest S. Wechsler, Esq., Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036); so as to be received not later than noon (Eastern) on March 19, 2009 (the "Bid Deadline"). The Sellers may extend the Bid Deadline once or successively, but they are not obligated to do so; provided, however, that for any such extension beyond five (5) days the Sellers shall have obtained the written consent of the Buyer, which consent will not be unreasonably withheld. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders of such extension.

### Qualified Bid

A bid submitted pursuant to the previous paragraph will be considered a Qualified Bid only if the bid complies with all of the following (a "Qualified Bid"):

(a)  it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or upon alternative terms and conditions that the Sellers determine, after consultation with the Creditors' Committee and the Monitor, are no less favorable than the terms and conditions of the Agreement;

(b)  it includes a letter stating that the bidder's offer is irrevocable until (i) the date of the selection of the Successful Bidder (as defined below) and, (ii) if such bidder is selected as the Alternate Bidder (as defined below), the Alternate Bid Expiration Date (as defined below);

(c)  it includes a duly authorized and executed asset purchase agreement, including the purchase price for the Assets (the "Purchase Price"), together with all exhibits and schedules thereto, the Transition Services Agreement, the IP License Agreement, the Interim Product Purchase Agreement, the Master Purchase Agreement, the Patent Assignment Agreement, the Trademark License Agreement, the Contract

Manufacturing Inventory Agreement and the other ancillary agreements described in the Agreement with all exhibits and schedules thereto, as well as copies of such materials marked to show those amendments and modifications to the Agreement proposed by a prospective bidder (a "Marked Agreement") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed Sale Order of the Bankruptcy Court and the Ontario Court;

(d) it is not conditioned on the outcome of unperformed due diligence by the bidder;

(e) it is not conditioned on obtaining financing and includes written evidence of a commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Creditors' Committee and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreement;

(f) it identifies with particularity each and every executory contract and unexpired lease, the assumption and assignment of which is a condition to closing;

(g) it fully discloses the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(h) it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with its financial advisors, the Creditors' Committee and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid that constitutes part of the same offer for the Assets, is greater than or equal to the sum of (i) the Base Purchase Price (as defined in the Agreement) (making appropriate adjustments for any proposed changes to the Target Inventory Value, Warranty Target Amount and Target Business Tangible Property Value (each as defined in the Agreement)) plus (ii) the Assumed Liabilities (as defined in the Agreement) plus (iii) the value of the performance of the warranty and service-related obligations of the Sellers for which Buyer has agreed to assume responsibility (as set forth in the Master Purchase Agreement) less (iv) the amount of transfer taxes to be paid by the Sellers under the Agreement plus (v) the value of the assumed obligation to purchase returned products and excess inventory (as set forth in the Agreement) plus (vi) the savings to Sellers resulting from Buyer's obligations with respect to employment of certain of Sellers' employees pursuant to the Agreement plus (vii) the value of those component parts purchased by the Sellers pursuant to Exhibit C to the Interim Product Purchase Agreement plus (viii) the amount of the Break-Up Fee (as defined below) plus (ix) the Expense Reimbursement Cap (as defined below) plus (x) $500,000 (or such other increment as the Sellers, in consultation with their financial advisors, the Creditors' Committee and the Monitor determine to be appropriate);

(i) it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Assets

prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j) it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreement;

(k) it is accompanied with a good faith deposit (the "Good Faith Deposit") in the form of a wire transfer, certified check or such other form acceptable to the Sellers payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to $2,500,000; and

(l) it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Creditors' Committee and the Monitor, to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids; provided, that Sellers, in evaluating such bids, may not waive compliance with the requirements in items (d), (e) and (k) above.

Notwithstanding the foregoing, the Buyer will be deemed a Qualified Bidder, and the Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

### Aggregate Bids

Persons who collectively are referred to as a "Qualified Bidder" need not be affiliated persons and need not act in concert with one another, and the Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided, however, that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

### Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder, as described above in paragraph (h) under this heading) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such transactions, the terms and conditions of the ancillary agreements, the effect of the Sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value

of the Sale, the amount of Assets included or excluded from the bid, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their financial and legal advisors, the Creditors' Committee and the Monitor. In determining the net value of a potential Qualified Bid, Sellers will utilize (to the extent quantifiable) the data relating to the items listed in paragraph (h) above that was available to Sellers as of the date such assessment was made with respect to Buyer.

## No Qualified Bids

If the Sellers do not receive any Qualified Bids other than the Agreement received from the Buyer, the Sellers shall report the same to the Bankruptcy Court and the Monitor and subject to requiring and obtaining approvals of the Ontario Court shall proceed with the Sale pursuant to the terms of the Agreement. If approval of the Ontario Court is required, the applicable Seller will as soon as practicable file a motion with such court(s) seeking approval of the Agreement. If the Sellers receive a bid that does not conform to one or more of the requirements specified above, but determine, in their reasonable business judgment, after consultation with the Creditors' Committee and the Monitor, that such bid is to be treated as a Qualified Bid, subject to the conditions set forth in the fourth preceding paragraph (with respect to the restriction on Sellers' ability to waive certain requirements of a Qualified Bid), with a higher value as defined above, then any Qualified Bidder (including the Buyer) shall have the opportunity to submit a bid at the Auction on the same basis, so long as such bid has a value of at least $500,000 (or such other increment as the Sellers, in consultation with their financial advisors, the Creditors' Committee and the Monitor determine to be appropriate) more than the non-conforming bid. The Sellers shall notify the Buyer and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids no later than 48 hours following the expiration of the Bid Deadline.

## Break-Up Fee and Expense Reimbursement

Recognizing the Buyer's expenditure of time, energy, and resources, the Sellers have agreed that if the Buyer is not the Successful Bidder, the Sellers will, in certain circumstances as set forth in the Agreement, pay to the Buyer a break-up fee of $650,000 (the "Break-Up Fee"), and (2) reimburse Buyer for its documented out-of-pocket expenses up to $400,000 (the "Expense Reimbursement Cap"), which amounts shall constitute super priority administrative claim in the Debtors' bankruptcy cases administered under the Bankruptcy Code. The payment of the Break-Up Fee and the reimbursement of Buyer's expenses up to the Expense Reimbursement Cap will be governed by the provisions of the Agreement.

## Auction

If the Sellers receive one or more Qualified Bids in addition to the Agreement, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video, upon notice to all Qualified Bidders who have submitted Qualified Bids, at 9:30 a.m. on March 23, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attention: James L. Bromley, which Auction shall not be canceled or adjourned without the prior consent of the Buyer (except as provided herein), such consent not to be unreasonably withheld. Copies of all Qualified Bids shall be delivered to counsel to the

Creditors' Committee, the Monitor and the Buyer promptly after such time that such bid is deemed a Qualified Bid. The Auction shall run in accordance with the following procedures:

 (a) Only the Sellers, the Buyer, any representative of the Creditors' Committee and the Monitor (and the legal and financial advisors to each of the foregoing), any creditor of the Debtors, and any other Qualified Bidder which has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Buyer and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

 (b) Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

 (c) Prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to participate in the Auction, provided that, in the event a Qualified Bidder elects not to participate in the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and, (ii) if such bidder is selected as the Alternate Bidder (as defined below), the Alternate Bid Expiration Date (as defined below). Prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Creditors' Committee and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to all Qualified Bidders which have informed the Sellers of their intent to participate in the Auction.

 (d) All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as explained below) at the Auction with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided, that all Qualified Bidders wishing to participate in the Auction must participate in person.

 (e) The Sellers, after consultation with their counsel and financial advisors, the Creditors' Committee, and the Monitor may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court or of any other applicable court entered in connection herewith and (ii) disclosed to each Qualified Bidder at the Auction.

 (f) Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their financial advisor, the Creditors' Committee and the Monitor, that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the

8

Leading Bid (defined below). Each incremental bid at the Auction shall have a purchase price of at least $500,000 over the Starting Bid or the Leading Bid, as the case may be; provided, that the Sellers, in consultation with the Creditors' Committee and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid (and the value of such bid) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge and written confirmation of the Leading Bid. For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Buyer), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and the Expense Reimbursement Cap that may be payable to the Buyer under the Agreement as well as any additional liabilities to be assumed by a Qualified Bidder.

(g) If the Sellers do not receive any Qualified Bid other than the Buyer's Qualified Bid at the Auction, the Sellers shall seek approval of the Agreement in the Bankruptcy Court and the Ontario Court on or prior to the date scheduled for the Sale Hearing.

## Selection Of Successful Bid

At the conclusion of the Auction, or as soon thereafter as practicable, the Sellers, in consultation with their counsel and financial advisors, the Creditors' Committee and the Monitor, will (a) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including, among other things, the terms and conditions of the ancillary agreements, the effect of the Sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), the counterparties to such transactions, and other factors affecting the speed, certainty and value of the Sale, (b) identify the highest or otherwise best offer for the Assets received at the Auction (the "Successful Bid" and the bidder making such bid, the "Successful Bidder") and (c) communicate to the Buyer, the Creditors' Committee and the Monitor the identity of the Successful Bidders and the details of the Successful Bid. The determination of the Successful Bid by Sellers, after consultation with the Creditors' Committee and the Monitor, at the conclusion of the Auction, shall be final.

The Sellers will sell the Assets for the highest or otherwise best Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by the Bankruptcy Court and the Ontario Court after the Sale Hearing.

## Sale Hearing

The sale hearing to authorize the Sellers to enter into agreements with respect to the Successful Bid (the "Sale Hearing") will be held before the Honorable Judge Gross in the United States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as March 25, 2009 at 10:30 a.m. (Eastern), and if required by the terms of the CCAA Order before the Honorable Mr. Justice Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto,

Ontario, as soon as practicable following the date of the Sale Hearing. The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing. If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Buyer), the Sellers will report the same to the Bankruptcy Court at the Sale Hearing, to the Monitor, and will proceed with a sale of the Assets to the Buyer following entry of the Sale Order of the Bankruptcy Court and the Ontario Court. If the Sellers do receive additional Qualified Bids, then, at the Sale Hearing, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Sellers' presentation to the Bankruptcy Court, and any other applicable court(s) whose approval is required, of the Successful Bid and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bid(s) to be delivered by the Bankruptcy Court at the Sale Hearing and any other applicable court(s) whose approval is required. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court or any other court. The Alternate Bid shall remain open until the earlier of (a) 60 days following the entry of the Sale Order or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date").

### Return of Good Faith Deposit

The Good Faith Deposit of the Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within three (3) business days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within three (3) business days of the date of the selection of the Successful Bidder and the Alternate Bidder. If a Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Sellers will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit will become property of the Sellers.

### Reservation Of Rights

The Sellers, after consultation with their counsel and financial advisors, the Creditors' Committee and the Monitor, (a) may determine which Qualified Bid, if any, is the highest or otherwise best offer, (b) may reject, at any time, any bid (other than the Buyer's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, the CCAA Order or any other orders applicable to the Sellers, or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in their sole discretion, and (c) may modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets, including, without limitation, (1) extending the deadlines set

forth in the Auction procedures, (2) modifying bidding increments, (3) with the consent of the Successful Bidder or Buyer, as the case may be, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice, (4) withdrawing from the Auction the Assets at any time prior to or during the Auction or (5) canceling the Auction, and rejecting all Qualified Bids if, in the Seller's business judgment, in consultation with its financial advisors, the Creditors' Committee and the Monitor, no such bid is for a fair and adequate price.

Each of the foregoing actions shall be made in consultation with the Creditors' Committee and the Monitor. Notwithstanding the forgoing, (a) the Sellers may not impair or modify the Buyer's rights and obligations under the Agreement or the Buyer's right to credit the Break-Up Fee and the Expense Reimbursement Cap as part of any subsequent bids or (b) in the event the Sellers (i) elect to withdraw from the Auction the Assets, (ii) cancel the Auction, and/or (iii) reject all Qualified Bids, the Sellers shall nonetheless be obligated to request at the Sale Hearing that the Bankruptcy Court approve the Agreement with the Buyer.