## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------X

| | |
|---|---|
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

**Hearing date for order attached in Exhibit A:**
**March 5, 2009 at 10:00 a.m. ET (requested)**
**Objections due for order attached in Exhibit A:**
**March 4, 2009 at 12:00 p.m. ET (requested)**

**Hearing date for order attached in Exhibit B:**
**March 20, 2009 at 11:00 a.m. ET**
**Objections due for order attached in Exhibit B:**
**March 13, 2009 at 4:00 p.m. ET**

-----------------------------------------------------X

### DEBTORS' MOTION FOR AN ORDER SEEKING APPROVAL OF
### KEY EMPLOYEE RETENTION PLAN AND KEY EXECUTIVE INCENTIVE PLAN,
### AND CERTAIN OTHER RELATED RELIEF

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of

two orders substantially in the form attached hereto as Exhibit A (the "First Order") and Exhibit

B (the "Second Order"), authorizing the Debtors to implement certain key employee incentive

and retention plans, as well as to make retention payments to certain non-insider employees, who

are not covered by the employee incentive and retention plans; and granting them such other and

further relief as the Court deems just and proper.  In support of this Motion, the Debtors rely on

---

[1]	The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

the Declaration of John Dempsey (the "Dempsey Declaration"), a Principal in the firm of Mercer

(US) Inc. ("Mercer"), submitted herewith. The Debtors have engaged in extensive discussions

regarding the relief requested in this Motion and related relief being sought from the Canadian

Court (as defined below) with the monitor appointed by the Canadian Court, Ernst & Young, Inc.

(the "Monitor") and with the Official Committee of Unsecured Creditors appointed in these

cases (the "Committee"). The Monitor supports the relief as does the Committee (in the case of

the Committee as discussed in more detail in paragraph 16 below). In further support of this

Motion, the Debtors respectfully represent as follows:

### Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 363(b) and

503(c)(3) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

### Background

3.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

2

Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario

Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement

Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian

Proceedings"). The Canadian Debtors continue to manage their properties and operate their

businesses under the supervision of the Canadian Court. On February 27, 2009, this Court

granted petitions recognizing the Canadian Proceedings as foreign main proceedings under

chapter 15 of the Bankruptcy Code. On January 14, 2009, the Canadian Court entered an order

recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the

CCAA. In addition, at 8 p.m. on January 14, 2009, the High Court of Justice in England placed

nineteen of Nortel's European affiliates into administration (the "UK Proceedings") under the

control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators").

6.      On January 15, 2009, this Court entered an order of joint administration pursuant

to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure that provided for the joint

administration of these cases and for consolidation for procedural purposes only.

7.      On January 26, 2009, the Office of the United States Trustee appointed the

Committee pursuant to section 1102(a)(1) of the Bankruptcy Code (D.I.s 141, 142). An ad hoc

group of bondholders holding claims against certain of the Debtors and certain of the Canadian

Debtors has also been organized (the "Bondholder Group"). No trustee or examiner has been

appointed in the Debtors' cases.

8.      A description of the Debtors' corporate structure and business and the events

leading to the chapter 11 cases are set forth in the Declaration of John Doolittle in Support of

First Day Motions and Applications.

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

## Relief Requested

9.     By this Motion, the Debtors seek the entry of two orders: (1) (i) authorizing the

Debtors to implement the KERP (as defined below) with respect to certain non-insider

employees of the Debtors and the KEIP (as defined below) with respect to all executives who are

not members of the SLT (as defined below), and (ii) authorizing the Debtors to make retention

payments to certain non-insider employees, who are not covered by the employee incentive and

retention plans; and (2) authorizing the Debtors to implement the KEIP with respect to members

of the SLT.

## Facts Relevant to this Motion

10.     Nortel delivers cutting edge hardware and software solutions and related services

in a highly competitive environment.  In order to thrive in such a technically complex and highly

competitive industry, it is necessary for Nortel to retain the highly-skilled and well-trained

members of its workforce.  Notwithstanding the current economic conditions, Nortel's key

employees are highly sought after by Nortel's competitors.  If these key employees resign, the

Debtors' operations will be impaired significantly and the Debtors' plans to maximize the value

of the Debtors' estate will be hampered severely.

11.     Unfortunately, as a result of the global economic crisis and the particular financial

pressures facing Nortel, a number of difficult, but necessary, steps have been taken with respect

to employees that are necessary to maximize the likelihood of Nortel's long-term survival and to

maximize recoveries for all stakeholders.  Most recently, on February 25, 2009, Nortel

announced plans to implement a workforce reduction plan providing for the termination of

4

employment of an additional 3,200 employees over the course of 2009.[3]  Also, a determination

was made that payments and benefits previously paid by Nortel upon involuntary termination of

employment of the Debtors' employees would no longer be made on a current basis, instead

giving rise to claims in the appropriate jurisdiction.  Lastly, on February 27, 2009, Nortel

obtained an order (the "Equity Order") in the Canadian Proceedings terminating certain Nortel

equity plans.[4]  Historically, awards under such equity plans had comprised a significant portion

of the total compensation of employees at Nortel and a key source of long-term incentives for

such employees.

12.     While Nortel believes that these actions were necessary for its continued

economic viability, it also recognizes that these actions have further lowered its employees'

flagging morale.  In light of the Nortel's financial difficulties, employees are justifiably

concerned about involuntary termination of employment where in most cases severance pay and

other post-employment benefits must be pursued through the claims process.  In addition,

employee attrition will most likely result in increased workload for many, if not all, of the

remaining employees.  Because of Nortel's reorganization proceedings around the world, the

Debtors' employees currently face a number of unique challenges and demands on their time and

expertise.  Therefore, while performing all of their normal duties, they are working in their

respective business areas to help the Debtors effectuate a successful reorganization.

**B.      Participating Employees in the Plans.**

13.     Given all of these concerns and the immense importance of its employees to the

continued viability of Nortel's business, the Debtors, together with the Canadian Debtors,

---

[3]      This figure does not include restructuring actions previously announced in 2008, namely plans to shift
approximately 200 positions from higher-cost to lower-cost locations and approximately 1,800 workforce reductions
that have not yet taken place.

[4]      The plans terminated as a result of the Equity Order are the NNC 2005 Stock Incentive Plan, the NNC 1986
Stock Option Plan, the NNC 2000 Stock Option Plan and certain equity plans assumed in prior acquisitions.

developed an incentive program in coordination with Mercer, Nortel's compensation consultant, for employees other than those domiciled in Europe, Middle East and Africa (the "Eligible Employees"). The program consists of an incentive plan for Nortel's key senior executives (the "Key Executive Incentive Plan" or "KEIP") and a retention plan for Nortel's key non-insider employees[5] (the "Key Employee Retention Plan" or "KERP," and together with the KEIP, the "Plans"). Any retention arrangements in Europe, Middle East and Africa will be structured based on market practice in the region and will be designed and approved by the UK Joint Administrators.

14. Each Eligible Employee chosen to participate in one of the Plans was selected through a careful evaluation process based on the following criteria: (a) whether such Eligible Employee's role is critical to accomplish a successful reorganization of the Debtors; (b) the cost and the likelihood of finding a suitable replacement for such Eligible Employee; and (c) the latest performance review of such Eligible Employee. In evaluating the first criterion (role criticality), positions were identified that were critical to driving Nortel's strategic objectives. Five key factors in this identification process were: (1) identifying positions that were central to the operations of business units that would be retained; (2) identifying positions critical to product development; (3) identifying positions important in client relationship management; (4) identifying those employees with critical leadership roles required to stabilize the Debtors, and (5) identifying positions that were restructuring-focused (e.g., positions in the finance and legal departments) . In evaluating the second criterion (replacement cost), focus was placed on identifying those positions for which the external talent market reflects extremely short supply,

---

[5]    Five non-executive employees of NNI, who serve as directors or officers of other Debtors, will be covered by NNI's KERP. These individuals receive no compensation from the Debtors as to which they serve as officers or directors and serve in these positions in connection with their employment by NNI, Nortel's main operating entity in the United States.

or very high demand, as well as roles with steep learning curves or where highly specialized knowledge is required. After engaging in the evaluations described in the preceding paragraph, participants for the Plans were selected whose positions had both a high role criticality and a high replacement cost. Additionally, as a final screening criteria, only those participants who received a "Successful / Most Effective" rating on their most recent performance review were eligible to participate in the plans. Based on these criteria, 5.1% of the Eligible Employees of Nortel were selected to participate in the Plans. In the case of the Debtors, 5.6% of the Eligible Employees employed by the Debtors were selected to participate in the Plans.

15.    The KEIP will cover approximately 92 senior executives of Nortel:  eight members of the Senior Leadership Team ("SLT"), 82 members of the Executive Leadership Team ("ELT") and two other officers of the Debtors, who are not members of the SLT or the ELT.   Of the approximately 92 total participants in the KEIP, approximately 53 are employees of the Debtors, including 5 members of the SLT, 46 members of the ELT and two other officers of the Debtors, who are not members of the SLT or the ELT. Not all members of ELT of Nortel are covered by the KEIP.[6]  For example, 26 US based ELT members are not included in the KEIP.  In addition, it is noteworthy that although Canadian law (unlike U.S. law) does not prohibit executives from being paid retention bonuses that are not tied to any performance goals, Nortel has designed its KEIP to cover all participating executives, including those senior executives that are employees of the Canadian Debtors. The Debtors submit that it is a testament to the solidarity of Nortel's leadership that the senior executives employed by the Canadian Debtors will receive solely incentive payments, rather than retention payments, despite the availability of the latter under Canadian law.

---

[6] Please note that the Chief Executive Officer of NNC is also not a participant in either of the Plans.

16.    Both the Monitor in the Canadian proceedings and the Committee were consulted regarding the Plans and offered an opportunity to review and evaluate them. In fact, the Debtors and the Canadian Debtors provided substantial amounts of background information to the Committee over the two weeks prior to the filing of this motion and numerous conference calls relating to the Plans, their structure, philosophy, metrics, and target payouts were held among the Committee, the Monitor, senior executives of the Debtors and the Canadian Debtors and their respective advisors, including Mercer. Substantial feedback was received from the Monitor and the Committee and certain elements of the Plans were modified as a result of this process. The Debtors and the Canadian Debtors are pleased that the Monitor supports the implementation of the Plans and that the Committee supports the KERP and the KEIP with respect to the plan participants who are not members of the SLT. The Committee also supports the KEIP with respect to the members of the SLT, although such support is conditioned solely on the delivery by Nortel to the Committee of projections for calendar year 2009 prepared by management acting reasonably in accordance with Nortel's ordinary course business practices taking into account the performance of the business in light of current global economic conditions as well as specific competitive challenges facing Nortel. For the avoidance of doubt, the Committee's support is conditioned solely on the delivery of the forgoing projections and is not conditioned on the Committee's approval of such projections. Nortel intends to deliver such projections prior to the court hearing to consider the adoption of the KEIP for the members of the SLT.

17.    Eligible Employees who are not members of SLT, ELT or otherwise insiders of the Debtors will be covered by the KERP, which will include approximately 880 key non-insider employees[7] who have a Job Complexity Indicator ("JCI") of 6 (200 employees), 5 (358

---

[7]    This figure includes five non-executive employees of NNI who are directors and officers of other Debtors, as mentioned above in footnote 5.

employees) or 4 (322 employees). Of the approximately 880 total participants in the KERP, approximately 446 are employees of the Debtors, including 97 employees with a JCI of 6, 190 employees with a JCI of 5 and 159 employees with a JCI of 4. Eligible Employees with a JCI of less than 4 will not be invited to participate in the KERP.

**C.      Key Executive Incentive Plan.**

18.      The KEIP, which has been designed by taking into account the levels of compensation at other comparable companies, is properly tailored to provide incentives to the Debtors' senior executives to maximize the size of the Debtors' estate and guide the Debtors out of bankruptcy as swiftly as possible. Accordingly, the awards under the KEIP will be tied to the achievement of three important milestones: (1) the achievement of North American objectives of Nortel's cost reduction plan ("First Milestone") ; (2) the achievement of certain parameters, which have been disclosed to the Monitor, the Committee and the advisors to the Bondholder Group, that will result in a leaner and more focused organization ("Second Milestone"); and (3) the later of the confirmation of the Debtors' plan of reorganization or the confirmation by the Canadian Court of a plan or plans of restructuring and/or arrangement in Canada ("Third Milestone" and together with the First Milestone and the Second Milestone, the "Milestones"). Under the KEIP, 25% of each incentive award would vest upon achievement of the First Milestone; 25% would vest upon achievement of the Second Milestone; and the remaining 50% would vest upon achievement of the Third Milestone.

19.      Executives participating in the KEIP would be eligible to receive an incentive award equivalent to a percentage of their annual base salaries (ranging from an average award size of 20% to 183% of their annual base salary, depending on the participant's experience and responsibilities; the SLT range would be 100% - 183% and the ELT range would be 48% -

112%[8]).  Assuming that all of the Milestones are accomplished in a timely manner, Nortel

estimates that the aggregate potential payout under the KEIP will be approximately $23 million.

The Debtors submit that their aggregate payouts under the KEIP will not exceed $14.6 million.

**D.    Key Employee Retention Plan.**

20.    The KERP has been tailored to provide incentives to the Debtors' critical

employees to remain with Nortel and to strive for a speedy achievement of the Milestones.

Under the KERP, the incentive awards shall vest as follows:  25% upon the earlier of June 30,

2009 or the achievement of the First Milestone; 25% upon the earlier of December 31, 2009 or

the achievement of the Second Milestone; and 50% upon the earlier of June 30, 2010 or the

achievement of the Third Milestone.

21.    Employees participating in the KERP would be eligible to receive incentive

awards equivalent to a percentage of their annual base salaries ranging from 13% to 44% of their

annual base salary, depending on the participant's experience and responsibilities (26% - 44%

for JCI 6, 20% - 35% for JCI 5, and 13% for JCI 4[9]).  Nortel estimates that the aggregate payout

under the KERP will be approximately $22 million.  The Debtors submit that their aggregate

payouts under the KERP will not exceed  $12.4 million.

**E.    Involuntary Termination; Payment Details.**

22.    Any participant in the KEIP whose employment is involuntarily terminated for

any reason (other than in connection with a divestiture as discussed in paragraph 24 below), or

who resigns or terminates employment due to death or disability will forfeit any incentive awards

that have not vested at the time of such termination ("Unvested Awards").  In addition, any KEIP

---

[8]        With respect to the participants employed by the Debtors, the SLT range of average award size would be
100% - 190% and the ELT range would be 52% - 117%.

[9]        With respect to the participants employed by the Debtors, the range of average award size would be 28% -
45% for JCI 6, 21% - 35% for JCI 5 and the average award size for JCI 4 is 14%.

participant that is on a leave of absence on the date of achievement of any Milestone will forfeit any Unvested Awards related to such Milestone.  Finally, any Eligible Employees who are also participants in the Nortel Networks Corporation Change in Control Plan will be required to waive any entitlement to any claim they may have under that plan before they become eligible to participate in the KEIP.  The KEIP will expire on July 14, 2010, and therefore, all rights to any Unvested Awards under the KEIP will lapse on July 14, 2010.

23.    Any participant in the KERP whose employment is involuntarily terminated (other than in connection with a divestiture as discussed in paragraph 24 below or for cause) will have a right to any Unvested Awards.  Any Unvested Awards will be accelerated upon such involuntary termination and will vest automatically at the time of such termination.  Any KERP participant whose employment is terminated for cause or resigns will forfeit any Unvested Awards.  In the case of death, disability or certain other leave of absences, the KERP participant will retain a pro rata right[10] to the next Unvested Award (but not all Unvested Awards).  In the case of death or certain other circumstances, Nortel may determine that such pro rata award should vest on an accelerated basis.

24.    The participants under the Plans whose employment with Nortel is terminated as a result of a divestiture (including participants who are transferred to or hired by a third-party buyer in connection with a divestiture or any employee whose employment is terminated as a result of organizational re-sizing following and related to a divestiture) will continue to have a right in any Unvested Awards, unless those participants receive, with Nortel's consent, an opportunity to be employed by the buyer and fail to accept the buyer's offer.  Any Unvested

---

[10]    Pro rata calculation will be determined based on the percentage earned from the date of last vested installment / achieved milestone (or January 1, 2009, if no earned installments / milestones have occurred) through next installment vesting date.

Awards will be accelerated on the date of the consummation of the applicable divestiture (the "Closing Date") and will vest automatically on the Closing Date.

25.      Under the Plans, each participating Debtor will be responsible for any payments due to its participating Eligible Employees. All payments under the Plans will be made within 30 days of the relevant vesting date, subject to applicable laws and regulations.

**F.      Authorization to Make Non-Insider Retention Payments.**

26.      In addition to the payments under the Plans, the Debtors seek authorization to assume certain obligations they incurred prepetition to make retention payments to certain employees ("Prepetition Awards").  There are approximately 37 employees to whom, either to give special recognition to such employee or because of a specific project or acquisition in which such employee was involved, the Debtors promised during the prepetition period to make certain payments on a certain date after the Petition Date subject to satisfaction of certain conditions. Such payments, which range from $6,750 to $145,000 per employee, total approximately $1.2 million, and become due and payable at various times between January 2009 and July 2011. None of these employees are officers or directors of the Debtors and none are covered by the Plans.  As the Debtors evaluate these employees and determine whether these employees are valuable to the estate, the Debtors may determine in their business judgment to make such payments, and accordingly request authorization by this Motion to do so.  Moreover, from time to time, the Debtors may, in the ordinary course and based on the exercise of their business judgment, determine that it is necessary to offer limited retention payments to certain non-insider employees because of their value to the estate ("Postpetition Awards" and together with

Prepetition Awards, the "Non-Insider Retention Payments"). Nortel estimates that the

Postpetition Awards shall not exceed $3 million.[11]

27.    In order to compensate employees for their extraordinary effort and to help ensure

that the value of the Debtors' estates is maximized, the Debtors hereby move the Court to

approve the KEIP and the KERP and request authorization to make Non-Insider Retention

Payments.

### Basis for Relief

28.    The Debtors seek authority pursuant to sections 363(b) and 503(c)(3) of the

Bankruptcy Code to implement the Plans and to make Non-Insider Retention Payments.

**G.    Implementation of the Key Executive Incentive Plan and the Key Employee
Retention Plan, and the Non-Insider Retention Payments Satisfies the Standards of
Section 363(b) of the Bankruptcy Code.**

29.    Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Use of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a "sound business purpose" for it.  See In re Lionel Corp.,

722 F. 2d 1063, 1071 (2d Cir. 1983) ("[t]he rule we adopt requires that a judge determining a

363(b) application expressly find from the evidence presented before him a good business reason

---

[11]  In addition, as described in paragraph 62 of the Debtors' first day motion for authorization to pay certain
prepetition wages, salaries and other compensation and other related relief (the "First Day Employees Motion"),
certain employees are eligible for cash awards under the "Nortel Networks Limited Annual Incentive Plan" (the
"AIP").  The AIP is an ordinary course of business compensation program, see In re Dana Corp., 358 B.R. 567, 580-
81 (Bankr. S.D.N.Y. 2006), has been in place for several years and is standard in Debtors' industry.  The Debtors
will continue the AIP in 2009, with quarterly performance targets and payments, and beyond.  The performance
metrics for the first and second quarter of 2009 are:  (1) revenue performance; (2) levels of cash and cash
equivalents; and (3) operational performance. The Debtors have consulted with the Committee with respect to the
target payouts and performance metrics relating to the 2009 AIP and will continue to do so for the duration of these
proceedings.

to grant the application."); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. Del. 1991).

30.     Once the debtor articulates a valid business justification for a particular form of relief, the Court reviews the debtor's request under the "business judgment rule." The business judgment rule "is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985).

31.     The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. See In re Martin, 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999).

32.     The Debtors believe that approval of the Plans and the Non-Insider Retention Payments will accomplish an important business purpose by assisting the Debtors in maximizing the value of the estate for all of its stakeholders. The awards under both the KEIP and the KERP, and the Non-Insider Retention Payments are appropriate to properly compensate and motivate the Debtors' key employees, including key executives, to assist the Debtors in successfully navigating through the Debtors' chapter 11 proceedings, which are proceeding in parallel with the proceedings. Furthermore, the aggregate potential level of compensation to be paid pursuant to the Plans is appropriate, as it represents approximately one-half of 1% of the Debtors' annual revenue for 2007, and less than 3% of the Debtors' total estimated compensation costs for 2009.

14

**H.**    **The Key Executive Incentive Plan Complies with Section 503(c) of the Bankruptcy Code.**

33.    The KEIP also complies with section 503(c) of the Bankruptcy Code.  Section 503(c) restricts transfers or payments by debtors for retention or severance, or to the extent that such payments are outside of the ordinary course and not justified by the facts and circumstances.

34.    Sections 503(c)(1) and (c)(2) of the Bankruptcy Code are inapplicable to these circumstances.  Section 503(c)(1) of the Bankruptcy Code limits payments to "insiders" to the extent such payments are made "for the purpose of inducing such person to remain with the debtor's business."  11 U.S.C. § 503(c)(1).  Section 503(c)(2) of the Bankruptcy Code places restrictions on "severance payment[s]" to "insider[s]."  11 U.S.C. § 503(c)(2).  Neither section 503(c)(1) nor 503(c)(2) of the Bankruptcy Code applies here because the KEIP does not include retention payments or severance payments.

35.    To the extent applicable, the KEIP satisfies the requirements of section 503(c)(3) of the Bankruptcy Code.  Section 503(c)(3) of the Bankruptcy Code prohibits "transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case."  11 U.S.C. § 503(c)(3).  The Debtors submit that the KEIP is justified by the "facts and circumstances" of this case and thus satisfies the applicable standards of section 503(c)(3) of the Bankruptcy Code.

36.    The standard for approval under the "facts and circumstances" test of section 503(c)(3) is similar to the business judgment standard for approval under section 363(b)(1) of the Bankruptcy Code. See, e.g., In re Nobex Corp., No. 05-20050 (MFW), 2006 WL 4063024, at *3 (Bankr. D. Del. Jan. 19, 2006) (section 503(c)(3) standard is that of the business judgment of the debtor); see also In re Dana Corp., 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006) ("Dana II")

(acknowledging the sound business judgment test as the standard of review for key employee incentive programs); In re Silicon Graphics, Inc., Case No. 06-10977 (BRL) (Bankr. S.D.N.Y. July 27, 2006) (approving employee incentive plan under business judgment standard pursuant to section 363 of the Bankruptcy Code); In re Movie Gallery, Inc., Case No. 07-33849 (DOT) (Bankr. E.D. Va. Feb. 29, 2008) (approving the debtor's key employee incentive plan under sections 363(b) and 503(c)(3)).

37.     Courts have examined certain factors to determine if incentive-based compensation programs are appropriate under section 503(c)(3). Among some of the factors on which courts have focused are:

        (a)     whether the plan is calculated to achieve the desired performance;

        (b)     whether the cost of the plan is reasonable within the context of the debtor's assets, liabilities, and earnings potential;

        (c)     whether the scope of the plan is fair and reasonable;

        (d)     whether the plan is consistent with industry standards;

        (e)     whether the debtor engaged in due diligence related to the need for the plan, the employees that needed to be incentivized, and what types of plans are generally applicable in a particular industry; and

        (f)     whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.

See, e.g., In re Global Home Prods., LLC, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (citing Dana II, 358 B.R. at 576-77).  Courts will balance the foregoing factors; a debtor need not satisfy every factor to demonstrate that its proposed compensation structure should be approved.  See, e.g., Global Home Prods., 369 B.R. at 786 (holding that the debtors' performance-based compensation structure was a proper exercise of the debtors' business judgment even though, for instance, the debtors did not use a benefits consultant to structure the program).

38.     The incentive awards are tied to the achievement of specific performance results that directly relate to the Debtors' goal of maximizing the value of the Debtors' estate for the benefit of all stakeholders.  The KEIP is narrowly tailored to provide incentives to the senior executives to achieve the Debtors' crucial goal of seeking the confirmation of a plan of reorganization, as well as reducing costs and assisting Nortel in becoming a leaner and more focused organization.  The KEIP awards are payable to participants only in the event that (i) the relevant Milestone is achieved, and (ii) the participant is an employee of the Debtors on the dates such Milestone except for certain exceptions as set forth in paragraphs 22 and 24 of this Motion. Given Nortel's revenue of approximately $8.18 billion (as of December, 2007) and 19,148 full-time employees (as of the Petition Date, and excluding the revenues and employees based in EMEA), the Debtors submit that the maximum cost of the KEIP of $14.4 million is reasonable on its face.  As set forth in greater detail in the Dempsey Declaration, KEIP is consistent with industry standards and was designed by Nortel's management, along with Mercer (US) Inc. (an independent compensation consulting firm), after closely studying similar plans in high-tech industries and similar companies in circumstances similar to Nortel.  The Debtors, therefore, respectfully submit that the KEIP satisfies all or nearly all of the factors considered by courts in approving such incentive schemes.

39.     To the extent that the KEIP has some retentive aspects, the retentive aspects do not change the fundamental characteristic of the incentive awards, which is to reward the eligible employees for enhancing and preserving the value of the Debtors' estate.  See Global Home Prods., 369 B.R. at 785 ("The entire analysis changes if a [] plan is not *primarily* motivated to retain personnel or is not in the nature of severance") (emphasis added); In re Nellson Nutraceutical, Inc., 369 B.R. 787, 802 (Bankr. D. Del. 2007) ("[A]lthough the modification of

the [] bonus program has some retentive effect, it is for the primary purpose of motivating [the] employees and, thus, the limitations of section 503(c)(1) are not applicable."); Dana II, 358 B.R at 571 ("[M]erely because a plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing in nature"). Since payments under the KEIP are being made principally to encourage and motivate the participating executives to achieve the Milestones, and not simply to induce such employees to remain with the Company, these payments are appropriate, even with respect to those certain employees participating in the KEIP who may qualify as "insiders."

40.    While the predominate focus of sections 503(c)(1) and (c)(2) of the Bankruptcy Code is with respect to payments made to retain "insiders" of a debtor, section 503(c) of the Bankruptcy Code was never intended to prevent a chapter 11 debtor from reasonably compensating employees, including "insiders," for their contribution to such debtor's reorganization successes or for its successful efforts pursuant to an incentive plan — precisely the Debtors' goal here in structuring the KEIP. Accordingly, sections 503(c)(3) and 363(b), rather than section 503(c)(1) and section 503(c)(2), govern the Debtors' request to implement the KEIP. The transfers and payments proposed herein under the KEIP are justified by the facts and circumstances in these cases, and therefore meet the standard of section 503(c)(3).

41.    Finally, the KEIP is consistent with employee incentive plans approved in other chapter 11 cases. See, e.g., In re Sharper Image Corp., No. 08-10322 (KG) (June 26, 2008) (approving incentive plan to employees and senior management for performance related to a wind-down process); In re American Home Mortgage Holdings, Inc., No. 07-11-047 (CJS) (Nov. 28, 2007) (approving incentive plan to senior management for, among other things, performance related to wind-down process); In re New Century TRS Holdings, Inc., et al., No. 07-10416

18

(KJC) (May 25, 2007) (approving sale-related incentive plan to senior management and retention and incentive pay to certain nonmanagement employees); In re Global Home Products, LLC, et al., No. 06-10340 (JG) (May 30, 2006) (order authorizing payment of a one-time incentive bonus to certain management employees upon the closing of the going-concern sale); In re Nobex Corp., No. 05-20050 (MFW) (Jan. 19, 2006) (approving sale-based incentive compensation where plan participants' sale efforts would extend beyond their ordinary duties).

42.     For the foregoing reasons, the Debtors believe that approval of the KEIP is appropriate and in the best interests of the Debtors, their bankruptcy estate and all parties in interest, and that the incentives proposed in the KEIP are reasonable and necessary to motivate their critical employees to maximize the value of the Debtors' estate.

## I.     The Key Employee Retention Plan Complies with Section 503(c) of the Bankruptcy Code

43.     The relevant inquiry with respect to non-insiders covered under the KERP is whether the plan falls within the ordinary course of business or alternately complies with the standard imposed by section 503(c)(3) of the Bankruptcy Code.  As noted above in paragraph 26, the Debtors have promised to make retention payments to certain non-insider employees prior to the Petition Date.  Therefore, the practice of making retention payments is, arguably, within the ordinary course of Debtors' business.  In addition, the Debtors submit that the implementation of the KERP is supported by the facts and circumstances of these cases and constitutes a sound exercise of the Debtors' business judgment for the reasons set forth below, and therefore complies with Section 503(c) of the Bankruptcy Code.

44.     Given the fragile nature of the Debtors' current restructuring, the Debtors are concerned that its key employees may seek to pursue secure long-term employment opportunities with more stable employers, which will hamper the Debtors' ability to manage through this

difficult transition period. The KERP is aimed at retaining these key employees by providing

them with a degree of job security and preventing attrition of key employees before the Debtors

have attained a confirmed plan of reorganization. The Debtors believe that the benefits provided

under the KERP will create a meaningful level of stability, morale and motivation in the

workplace and allow the Debtors' key employees to not only continue to effectively manage the

Debtors' business, but also maximize the value of the Debtors' estate.

45.      Furthermore, if the Debtors were to experience significant attrition among its key

employee ranks, the Debtors would be forced to fill positions with temporary employees who

would lack the experience and knowledge base possessed by the key employees covered by the

KERP. Without that experience and knowledge, temporary employees would hinder the

Debtors' operations and goal of maximizing the value of the Debtors' estate. Training new

employees would also be a significant drain on the resources of the Debtors and its employees.

46.      Sections 503(c)(1) and (c)(2) of the Bankruptcy Code are inapplicable to Non-

Insider Retention Payments. Section 503(c)(1) of the Bankruptcy Code limits payments to

"insiders" to the extent such payments are made "for the purpose of inducing such person to

remain with the debtor's business." 11 U.S.C. § 503(c)(1). Section 503(c)(2) of the Bankruptcy

Code places restrictions on "severance payment[s]" to "insider[s]." 11 U.S.C. § 503(c)(2).

Neither section 503(c)(1) nor 503(c)(2) of the Bankruptcy Code applies here because only non-

insider key employees are covered by the KERP. Sections 503(c)(1) and 503(c)(2) do not bar

retention payments to non-insider employees. See In re Calpine Corp., Case No. 05-60200

(BRL), Hr'g Tr., at 84 (Bankr. S.D.N.Y. Apr. 26, 2006. See also Douglas Deutsch & David

Lemay, BAPCPA: Review and Analysis of Business Bankruptcy Provisions After One Year,

Pratt's J. Bankr. L. January/February 2007 (citing In re Refco, Inc., Case No. 05-60006 (RDD)

(Bankr. S.D.N.Y. Jan. 17, 2006)), MaryJo Bellew & Edith K. Altice, Tackle §503(c) by Structuring a "MIP", 27-3 Am. Bankr. Inst. J. 34, 78 (2008).

47.    The scope of the KERP is appropriate, as the plan applies only to those key non-insider employees of the Debtors that are necessary to conduct the Debtors' operations and assist the Debtors in successfully navigating the chapter 11 process.  Moreover, the Debtors submit that the overall cost of the KERP is reasonable in light of the size of the Debtors' business and the salaries of those individuals being compensated under the KERP.

**J.    Non-Insider Retention Payments Fall Within the Ordinary Course Exception and Comply with Section 503(c) of the Bankruptcy Code**

48.    The relevant inquiry with respect to the Non-Insider Retention Payments is whether such payments fall within the ordinary course of business or alternately comply with the standard imposed by section 503(c)(3) of the Bankruptcy Code.  As noted above in paragraph 26, the Debtors have promised to make retention payments to certain non-insider employees prior to the Petition Date.  Therefore, the practice of making retention payments is, arguably, within the ordinary course of Debtors' business, and accordingly, the Non-Insider Retention Payments fall within the ordinary course exception.

49.    In addition, the Debtors submit that the Non-Insider Retention Payments are supported by the facts and circumstances of these cases and constitute a sound exercise of the Debtors' business judgment for the reasons set forth in paragraphs 44 and 45 above, and therefore comply with Section 503(c) of the Bankruptcy Code.

50.    The scope of the Non-Insider Retention Payments is appropriate, as the payments are made only to those key non-insider employees of the Debtors that are necessary to conduct the Debtors' operations and assist the Debtors in successfully navigating the chapter 11 process, and the costs of the Non-Insider Retention Payments are reasonable.

21

### Notice

51.     Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to the (i) Office of the United States Trustee for the District of Delaware; (ii) the Committee; (iii) counsel to the Bondholder Group, and (iv) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

### No Prior Request

52.     No prior request for the relief sought herein has been made to this or any other court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  February 27, 2009
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley
Lisa M. Schweitzer
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

    - and -

MORRIS NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Thomas F. Driscoll III (No. 4703)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*