IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------X

*In re*

Nortel Networks Inc., *et al.*,[1]

                Debtors.

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

------------------------------------------------------------X

**DECLARATION OF JOHN DEMPSEY IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER SEEKING APPROVAL OF KEY EMPLOYEE RETENTION PLAN AND KEY EXECUTIVE INCENTIVE PLAN, AND CERTAIN OTHER RELATED RELIEF**

I, John Dempsey, declare under penalty of perjury as follows:

1. I am a Principal of Mercer (US) Inc. ("Mercer"). Mercer is a global leader in advising companies on management and employee incentive compensation programs.

2. I have been consulting for over 20 years, advising corporations undergoing major financial transitions including reorganizations, initial public offerings, leveraged buyouts and other acquisitions in matters relating to employment, employee benefits and executive compensation. I design employment agreements, change of control agreements, annual and multi-year incentive programs and retention programs. I joined Mercer in 1985 following my

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

graduation from Yale University where I obtained a Bachelor of Arts degree. In 1992, I obtained a Master Degree in Business Administration (MBA) from The Ohio State University.

3. I have advised clients on compensation matters within the chapter 11 context, including Owens Corning, Kaiser Aluminum, Solutia, Oglebay Norton, Citation Corporation, Intermet Corporation, Venture Industries, Alterra, EaglePitcher, Allied Holdings, Dana Corporation, Mesaba Aviation and FLAG Telecom. I have also advised clients on such matters in connection with non-chapter 11 corporate restructurings, including Barrick Gold, Manulife, CareMark Rx, Archipelago and Sky Financial. I have provided expert testimony representing the debtor in the following chapter 11 cases: Owens Corning, Citation Corporation, Intermet Corporation, Venture Industries and Allied Holdings.

4. I make this declaration in support of the Debtors' Motion For An Order Seeking Approval of Key Employee Retention Plan and Key Executive Incentive Plan, and Certain Other Related Relief (the "Motion").[2]

5. I am aware of the facts and circumstances relating to the Motion, and unless otherwise stated herein, I have personal knowledge of the facts set forth herein.

6. Mercer has been engaged as Nortel's executive compensation consultant since 1998. In particular, in December 2008, Nortel requested that Mercer assist Nortel in creating a fair and market-competitive compensation structure for Nortel's key employees, which balances rewarding employees for achieving the challenging milestones necessary to emerge from bankruptcy, with the inherent insecurity that comes with operating a company under protection.

7. During the initial stages of our engagement, it became clear to me that Nortel was in the midst of a fragile restructuring situation. Given the harsh economic conditions, the

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

2

company faces an uncertain future, and the goal of restructuring Nortel into a leaner and more focused organization will require a motivated workforce. In my experience, it is during this type of process that I have found employees are most likely to either terminate their employment voluntarily, in pursuit of more secure positions with more stable organizations, or become so preoccupied with concerns of their future that they can lose the ability to focus on the tasks at hand. The damage that could be done to the Debtors as a result of employees either departing or losing focus on their jobs demonstrates the need to provide supplemental motivation, which can incent employees to achieve goals that will maximize the value of the Debtor's estate.

8. Nortel's management, together with Mercer, decided to divide the incentive program into two components: (a) a retention plan intended to encourage Nortel's key non-insider employees to remain with the company through a difficult, and potentially lengthy, transition period (the "Key Employee Retention Plan"), and (b) an incentive plan designed to compensate Nortel's key executives for achieving crucial milestones as part of the chapter 11 process (the "Key Executive Incentive Plan," and together with the Key Employee Retention Plan, the "Plans"). Both Plans were designed to compensate the participating employees at a level that is competitive with the total compensation paid by comparable companies in chapter 11 proceedings.

9. In designing the Plans, I assessed the reasonableness of the Plans with respect to (1) the maximum cost of the Plans, (2) employee eligibility to participate in the Plans, (3) individual award levels, (4) performance goals and relative weighting of such goals and (5) market competitiveness of resulting total compensation levels for participating employees. Additionally, I designed the Key Executive Incentive Plan to comply with the 2005 amendments to the United States Bankruptcy Code, which mandate that supplemental compensation for

3

corporate insiders be subject to performance-based achievements ("pay-for-performance") as opposed to simply requiring the insider to remain with the company through a fixed date ("pay-to-stay").

10. As part of my assessment, a major goal was to identify those participants who would be included in the Plans. This was accomplished by advising Nortel that the selection process should evaluate whether such participant's role was critical to accomplish a successful reorganization of the Debtors, measure the cost and the likelihood of finding a suitable replacement for such participant, and consider the latest performance review of such participant. In evaluating the first criterion (role criticality), management identified those positions that were critical to driving Nortel's strategic objectives. Five key factors in this identification process were: (1) identifying positions that were central to the operations of business units that would be retained; (2) identifying positions critical to product development; (3) identifying positions important in client relationship management; (4) identifying those employees with critical leadership roles required to stabilize the Debtors, and (5) identifying positions that were restructuring-focused (e.g., positions in the finance and legal departments); In evaluating the second criterion (replacement cost), management singled out those positions within the company for which the external talent market reflects extremely short supply, or very high demand, as well as roles with steep learning curves or where highly specialized knowledge is required. After engaging in the evaluations described in the preceding paragraph, management selected participants for the Plans whose positions had both a high role criticality and a high replacement cost. Additionally, as a final screening criteria, only those participants who received a "Most Effective" (the highest possible performance rating), or were among the top performers who

received a "Successful" rating on their most recent performance review were eligible to participate in the plans.

11. In determining the appropriate number of employees eligible, maximum program cost, and the size of awards to be granted, I reviewed Key Employee Incentive Plans that had been approved by bankruptcy courts in a number of recent chapter 11 cases. The companies for which these plans were approved reflect entities both inside and outside the technology sector as well as companies facing multi-jurisdictional issues, including SemGroup LLP, Quebecor World, Delphi Corporation, Dura Automotive, and Calpine Corporation.

12. I advised Nortel management to select participants that would result in a population of employees totaling approximately 5% of the aggregate Nortel population, as this amount was well within the range of competitive market practice. Nortel has a population of professional employees that, as a percentage of total employees, is higher than typical manufacturing corporations, and the unique nature of the corporation necessitated including a significant number of these professionals in the Plans. Also, a determination was made that payments and benefits previously paid by Nortel upon involuntary termination of employment would no longer be made on a current basis, instead giving rise to claims in the appropriate jurisdiction. This reinforced the standpoint that it was necessary to increase the total participating employees.

13. Ultimately, management selected approximately 92 executives of Nortel (53 employed by the Debtors) to participate in the Executive Incentive Plan – eight members of the Senior Leadership Team ("SLT"), five of which are employed by the Debtors; 82 members of the Executive Leadership Team ("ELT"), 46 of which are employed by the Debtors; and two other officers of the Debtors. The Key Executive Incentive Plan does not cover all members of

the ELT who might be eligible to participate. 880 key non-insider employees were also selected to participate in the Key Employee Retention Plan (446 of the Debtors), all of whom have a Job Complexity Indicator ("JCI") of at least 4 on a scale of 1-6 (6 being the most complex and 1 being the least complex). Approximately 972 employees (499 of the Debtors) chosen to participate in the Plans represent approximately 5.1% of the population of full-time and part-time employees that will remain at Nortel following the completion of the North American cost-reduction plan, excluding employees in the Europe, Middle East, and Africa region ("EMEA").

14. Assuming all milestones are achieved, the maximum cost of the Key Executive Incentive Program would be approximately $23 million (approximately $14.6 million to be funded by the Debtors), while the maximum cost of the Key Employee Retention Plan would be approximately $22 million (approximately $12.5 million to be funded by the Debtors). The aggregate cost of the combined programs reflects approximately 0.55% of Nortel's revenue in fiscal year 2007, attributable to regions outside EMEA. Mercer's benchmarking showed that this cost was within the range of competitive market practice.

15. The award levels set under the KEIP and KERP were designed in order to provide key employees compensation competitive with organizations in similar industries that are in similar circumstances. My analysis of the market data revealed that Nortel's key employees, if left without any supplemental compensation, would be paid well below the 50th percentile of the market. I reviewed the award levels across Nortel's employee levels that were approved by the court under the plans of the comparable companies, and found that the proposed award sizes fall within the same range as the average offered in the chapter 11 cases I reviewed.

16. In terms of targets for the Key Executive Incentive Plan, I suggested that management select milestones that would be indicative of progress being made in the Debtors'

reorganization process. Furthermore, we desired to weigh these targets accordingly, so that each payout under the KEIP would coincide with a crucial step in the Debtors' reorganization. As such, it was decided that payment of incentive awards under the KEIP would be triggered by the achievement of three important milestones: (1) the achievement of North American objectives of Nortel's cost reduction plan ("First Milestone"); (2) the achievement of certain parameters, which have been disclosed to the Monitor, the Committee and the advisors to the Bondholder Group, that will result in a leaner and more focused organization ("Second Milestone"); and (3) the later of the confirmation of the Debtors' plan of reorganization or the confirmation by the Canadian Court of a plan or plans of restructuring and/or arrangement in Canada ("Third Milestone" and together with the First Milestone and the Second Milestone, the "Milestones"). In terms of the timing of payments, 25% of each incentive award would be payable within 30 days of the achievement of the First Milestone, 25% within 30 days of the achievement of the Second Milestone, and 50% within 30 days of the achievement of the Third Milestone, in each case so long as the participant is employed by Nortel at the time of such achievement.[3] Although a significant portion of the participants in the Key Executive Incentive Plan are employees of the Canadian Debtors, I recommended that management consider designing the Key Executive Incentive Plan and its payment triggers to comply in all respects with United States law, as described above in paragraph 7. Ultimately, in light of the circumstances, the decision was made to use a consistent incentive structure in the United States and Canada, rather than an incentive structure in the United States and a separate retention structure in Canada. In my experience, and after reviewing similar incentive plans implemented by companies undergoing reorganization, I

---

[3] Additional vesting and payment details of the Key Executive Incentive Plan are set forth in paragraphs 22 and 24 of the Motion.

believe the Milestones to be among the most commonly used and appropriate metrics in such plans.

17. With regard to the Key Employee Retention Plan, management, together with Mercer, structured payouts to reflect the goals of encouraging the Debtors' key non-executive employees to remain employed by Nortel, to strive for an early and successful completion of critical events in the reorganization and to provide those employees with a level of compensation that is competitive with comparable companies. Consequently, under the Key Employee Retention Plan, 25% of each employee's incentive award would be made on the earlier of June 30, 2009 or the achievement of the First Milestone; 25% of their award upon the earlier of December 31, 2009 or the achievement of the Second Milestone; and the remaining 50% upon the earlier of June 30, 2010 or the achievement of the Third Milestone.[4] I believe that the Key Employee Retention Plan, as structured, not only provides appropriate incentive for the Debtors' key employees to remain with Nortel, but also ensures that they are properly motivated to assist in the Debtors' reorganization process.

18. Nortel delivers cutting edge hardware and software solutions and related services in a highly competitive environment. In order to thrive in such a technically complex and highly competitive industry, it is necessary for Nortel to retain the highly-skilled and well-trained members of its workforce. Notwithstanding the current economic conditions, Nortel's key employees are highly sought after by its competitors. If these key employees resign, the Debtors' operations will be impaired significantly and the Debtors' plans to maximize the value of the Debtors' estate will be hampered severely. It is thus crucial that Nortel be able to pay

---

[4] Additional vesting and payment details of the Key Executive Incentive Plan, refer to paragraphs 23 and 24 of the Motion

these employees at competitive levels, as other companies in similar chapter 11 cases have had the opportunity to do.

19. Given Nortel's revenue of approximately $8.18 billion (as of December, 2007), and 19,148 full-time employees (as of the Petition Date, and excluding the revenues and employees based in EMEA), I believe that the participation level, aggregate cost, compensation levels, and milestones proposed in the Plans are appropriate and necessary to maximize the value of the Debtors' estates. Companies undergoing reorganization are inevitably faced with a number of conflicting demands on their limited financial resources; such companies must endeavor to successfully maintain their business and retain crucial employee talent while simultaneously implementing difficult cost-cutting and significant re-organizational efforts. To that end, my research shows, and I am able to conclude, that for each of the eligible groups of employees under both the Key Executive Incentive Plan and the Key Employee Retention Plan, the resulting compensation is both reasonable and competitive in nature.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: February 27, 2009

_____<br>John Dempsey