**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

**NOTICE OF FILING OF FOURTH REPORT OF THE MONITOR OF THE
CANADIAN NORTEL COMPANIES IN THE CANADIAN PROCEEDINGS**

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Alteon Websystems, Inc. (9769); Alteon Websystems International, Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); and Nortel Networks Cable Solutions Inc. (0567).

**PLEASE TAKE NOTICE** that on March 4, 2009, Ernst & Young Inc., the monitor and foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation (collectively, the **"Canadian Nortel Group"**), in proceedings under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the **"Canadian Proceedings"**), pending before the Ontario Superior Court of Justice (Commercial List), by its undersigned counsel, filed, in the above-captioned cases, a copy of the Fourth Report of the Monitor (the **"Fourth Report"**), dated March 2, 2009. A copy of the Fourth Report is annexed hereto as Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Fourth Report is also available on the Monitor's website, www.ey.com/ca/nortel or upon request to the Monitor's counsel.

Dated: New York, New York
          March 4, 2009

ALLEN & OVERY LLP

Ken Coleman
Lisa Kraidin
1221 Avenue of the Americas
New York, New York 10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
ken.coleman@allenovery.com
lisa.kraidin@allenovery.com

-and-

BUCHANAN INGERSOLL & ROONEY

By: /s/ Mary F. Caloway
Mary F. Caloway (No. 3059)
Peter J. Duhig (No. 4124)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
Telephone (302) 552-4200
Facsimile (302) 552-4295
mary.caloway@bipc.com

Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian Nortel
Group

**<u>EXHIBIT A</u>**

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION (the "Applicants")**

**FOURTH REPORT OF THE MONITOR**
**DATED MARCH 2, 2009**

**INTRODUCTION**

1. On January 14, 2009, Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009 (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceeding. The Initial Order was amended as reflected in the Amended and Restated Initial Order dated February 10, 2009 (the "Amended and Restated Initial Order").

**PURPOSE**

2. The purpose of this fourth report of the Monitor (the "Fourth Report") is to provide this Honourable Court with information in connection with the following:

    a) Key Employee Incentive Plan;

    b) Key Employee Retention Plan; and

    c) Calgary Retention Plan.

**TERMS OF REFERENCE**

3. In preparing this Fourth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, the financial information prepared by the Company, and discussions with management of Nortel. The Monitor has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Fourth Report.

4. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

5. Capitalized terms not defined in this Fourth Report are as defined in the Doolittle Affidavit, the Pre-Filing Report or previous reports of the Monitor.

**KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN**

6. Nortel is fundamentally a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

2

7. The commitment and retention of key employees will be essential to the execution of a restructuring of Nortel and the completion of a plan of arrangement.

8. The Applicants are requesting approval of the following proposed key employee incentive plans (together the "Plans"):

   a) A key employee incentive plan ("KEIP") with respect to certain executives of the Senior Leadership Team ("SLTs") (subject to the below), and the Executive Leadership Team ("ELTs") as well as two other officers of the U.S. Debtors that are not members of the SLT or ELT; and

   b) Key employee retention plan ("KERP") for certain other key employees.

9. These Plans have been developed to incent those employees who are (i) absolutely key to the success of the restructuring and (ii) to remain with the Applicants and U.S. Debtors through to the completion of the Canadian and U.S. proceedings.

10. The Plans, as they relate to the employees of the Applicants, require approval by this Honourable Court and as they relate to employees of the U.S. Debtors by the U.S. Court. The U.S. Debtors' motion in this regard is returnable March 5, 2009.

11. Based on discussions with the Unsecured Creditors Committee ("UCC") in the Chapter 11 proceedings, the UCC's support of the KEIP for the SLTs in the U.S. is conditional upon the delivery to the UCC of Nortel's 2009 financial projections (the "2009 Projections"). Therefore, in order to maintain consistency between Canada and the U.S., at this time the Applicants have only brought a motion requesting approval of the KEIP, excluding the SLTs, and approval of the KERP. The Applicants have advised the Monitor they intend to request approval of the KEIP for the SLTs on or about March 20, 2009.

12. The Monitor has also prepared and provided to this Honourable Court a confidential report dated March 2, 2009 (the "Confidential Report") as a supplement to this Fourth Report in order to provide additional detailed information regarding the Plans. Given

3

the sensitive nature of the detailed information related to the Plans and participating employees, the Monitor recommends that this Confidential Report be sealed by this Honourable Court.

*Methodology in Developing and Purpose of the Plans*

13. The Company consulted with Mercer (US) Inc. ("Mercer"), its compensation consultant, to develop the Plans. The Monitor has attached to its Confidential Report, a document prepared by Mercer (the "Mercer Report") that outlines the proposed Plans and provides comparisons to certain market data.

14. The purpose of the Plans is to motivate key employees and encourage them to remain with Nortel during the restructuring period. It also replaces additional compensation previously earned by the executives and other eligible employees under long-term incentive programs, (including its equity based compensation plans which now have no economic value and were terminated by Order of this Honourable Court on February 27, 2009), in order to bring employee 2009 compensation levels closer to market competitive levels.

15. The Plans include employees of Nortel (including two expatriates from the UK whose salary is paid for by the Applicants and work for the benefit of the Applicants), the U.S., Central and Latin America and Asia, but excludes employees of EMEA Filed Entities. Any retention arrangements in the EMEA region will be structured based on market practice in the region and will be designed and approved by the U.K. Administrators.

16. A list of 972 key employees or approximately 5% of the total number of Nortel's global workforce employees (excluding employees of the EMEA Filed Entities and the joint ventures), including 5.6% of eligible employees of the Applicants, was established by the Company's senior management based on the following factors:

4

a) The criticality of the individual's role in driving the strategic objectives of the Company whether focused on the restructuring, critical leadership roles required to stabilize the organization, or central to operations of business units that would be retained, including product development and client relationship management;

b) The difficulty or costly "replacement" process required to replace the role either due to the external market for the individual's skills, the steep learning curve where no strong succession plan is in place or where highly specialized knowledge in technical or functional areas is required for success; and

c) The individuals must also have a high performance ranking as of their latest performance review to be eligible to participate.

*Key Terms and Projected Cost of the Plans*

*KEIP*

17. The KEIP is intended to cover certain SLT and ELT employees, as well as two other officers of the U.S. Debtors who are not members of the SLT or ELT, totalling approximately 92 participants, domiciled in North America and Asia, of which 29 are employed by the Applicants.

18. The total potential dollar value to be paid out under the KEIP is approximately $23 million, of which $6.8 million is allocated to the Canadian Applicants. Details of the KEIP related to Canadian participants are provided in the Monitor's Confidential Report.

19. Significant terms of the KEIP include the following:

a) The awards will vest based on the achievement of three milestones:

   i. Achieve North American objectives as measured by the cost reduction plan ("First Milestone") (25% of payout);

5

    ii. Achievement of certain parameters, which have been disclosed to the Monitor, the UCC and the advisors to the Ad Hoc Committee of Bondholders, that will result in a leaner and more focused organization ("Second Milestone") (25% of payout). Further details are provided in the Confidential Report; and

    iii. Court approved confirmation of a plan or plans of restructuring and/or arrangement in the Canadian proceedings and a plan of reorganization in the U.S. proceedings ("Third Milestone" and collectively the "Milestones") (50% of payout);

b) The respective employers are responsible for making all payments within 30 days of the vesting date of an award.

c) The KEIP has the following termination provisions:

    i. If an individual leaves voluntarily or employment is terminated (including death or disability) prior to the achievement of a milestone, other than in connection with a divestiture, the individual will not receive a payout of any unvested awards at time of termination;

    ii. An individual whose employment is terminated as a result of an organizational re-sizing that follows and is related to a divestiture, or receives, with Nortel's consent, an opportunity to be employed by a buyer and agrees to continue employment with the buyer, will continue to have a right to any unvested awards. These unvested awards will vest automatically and payment of them will be accelerated on the closing date of the sale transaction. Employees who receive an offer and do not agree to continue employment with a buyer would forfeit all rights to any unvested awards;

6

iii.  If an individual is on a leave of absence on the date of the achievement
      of a milestone, the individual will not receive a payment with respect to
      the specific milestone;

iv.  All participants will be required to forfeit their rights to participate in
     Nortel's Change in Control plan; and

v.   The KEIP will expire on July 14, 2010 and all rights to unvested
     awards will lapse.

*KERP*

20. The KERP is intended to cover certain non-executive employees globally, excluding
    those in the EMEA Filed Entities. In total there are 880 participants, of which 294 are
    employed by the Canadian Applicants.

21. The total potential dollar value to be paid out under the KERP is approximately $22
    million, of which $6.2 million is allocated to the Canadian Applicants.  Details of the
    KERP related to Canadian participants are provided in the Monitor's Confidential
    Report.

22. Significant terms of the KERP include the following:

    a)  The awards will vest in three tranches:

        i.   The first payout of 25% of the total award will vest upon the earlier of
             June 30, 2009 or the achievement of the First Milestone;

        ii.  The second payout of 25% will vest upon the earlier of  December 31,
             2009 or the achievement of the Second Milestone; and

        iii. The remaining 50% of the award will vest upon the earlier of June 30,
             2010 or the achievement of the Third Milestone.

7

b) The respective employers are responsible for making all payments within 30 days of the vesting date of an award.

c) The KERP has the following termination provisions:

    i. If an individual leaves voluntarily or employment is terminated with cause, the individual will not receive a payout for any unvested awards at time of termination;

    ii. If an individual's employment is terminated without cause, other than in connection with a divestiture, the individual will receive a payout for all unvested awards at time of termination;

    iii. If an individual's employment is terminated as a result of death or disability or employee is on certain leave of absences at time of vesting of an award, the amount of the award will be determined on a pro rata basis based upon the next nearest instalment or milestone (Nortel, at its option, may accelerate payment of the pro rata award);

    iv. An individual whose employment is terminated as a result of an organizational re-sizing that follows and is related to a divestiture, or receives, with Nortel's consent, an opportunity to be employed by the buyer and agrees to continue employment with the buyer, will continue to have a right to any unvested awards, which will vest automatically and be accelerated on the closing date of the sale transaction. Employees who receive an offer and do not agree to continue employment with a buyer would forfeit all rights to any unvested awards; and

    v. The KERP will expire on July 14, 2010.

8

*Review and Analysis*

23. The following analysis was completed to assess the reasonableness of the proposed Plans:

    a) Nortel obtained independent advice from Mercer for the development of the Plans, including benchmarking total direct compensation levels against industry standards and comparing other key employee incentive plans approved by the courts in recent comparable North American restructurings;

    b) The Company's financial advisor, Lazard Fréres & Co. and the Monitor have been consulted by the Company throughout the development process with respect of the Plans and have provided the Company with appropriate input;

    c) The Monitor has reviewed the final documentation prepared by the Company and Mercer; and

    d) The Monitor, the UCC, the *Ad Hoc* Bondholders Committee, the Company and Mercer participated in teleconference meetings to address concerns of the Company and its various stakeholders.

## CALGARY RETENTION PLAN

24. In July 2008, Nortel made the decision to reduce its wireless research and development activities ("R&D") at Nortel's Westwinds Innovation Centre (the "Westwinds Facility") in Calgary, Alberta and to transfer the residual R&D operations to Nortel's R&D facility in China. This decision was made as part of a larger strategic plan to consolidate its resources into a smaller number of locations and take advantage of lower-cost locations.

25. The decision to discontinue the R&D functions at the Westwinds Facility, which was already below optimal capacity, led to the decision to exit it completely over a 12 month period and to transition the remaining employees from Global Operations and other functional areas primarily to Nortel's Ottawa and Raleigh locations.

9

26. The transition of both the R&D operations to China (including the dismantling and shipping of R&D assets) and the various other functional areas to Ottawa and Raleigh, required the development of a complex transition plan to ensure a smooth transition to preserve critical R&D during the transfer period, to ensure ongoing customer service to significant Carrier business segment customers and to not disrupt relations with certain contract manufacturers (namely Flextronics). In order to retain the key employees required to properly and effectively manage this transition through to its planned conclusion in June 2009, a retention plan (the "Calgary Retention Plan") was put into place.

27. Management has informed the Monitor this project is still important to the overall strategy of Nortel. Therefore, the Applicants are requesting they be authorized to honour the Calgary Retention Plan for the 45 key employees who still remain at the facility in Calgary. None of these employees will participate in the Plans.

28. Pursuant to the Calgary Retention Plan, the eligible employees will receive a bonus payment at their predetermined termination dates or upon completion of the transition which is still estimated to be complete by the end of June 2009. The total cost of the Calgary Retention Plan for the remaining employees is approximately CDN$730,000. Details regarding the calculation of the retention payments for each of the eligible employees are included in the Confidential Report.

**MONITOR'S RECOMMENDATION**

29. The Monitor is of the view that the commitment and retention of the key employees will be essential to the execution of a restructuring of Nortel and the completion of a plan of arrangement.

30. The Monitor has reviewed the details of the Applicants' proposed Plans and Mercer's analysis and believes that the proposed Plans provide reasonable compensation in the current situation.

31. Accordingly, the Monitor recommends this Honourable Court approve the Applicants' Plans, excluding the KEIP for the SLTs, in order to permit the Applicants to motivate their employees and stabilize their workforce by offering competitive compensation to preserve the core expertise, knowledge and experience needed to focus on these restructuring efforts. As previously noted, we understand the Applicants will seek court approval of the KEIP with respect to the SLTs in the near future.

32. The Monitor has reviewed the Calgary Retention Plan with management and understands the Applicants continue to believe that effective management of the completion of this project is important. The compensation it provides to eligible employees is reasonable in the current situation, therefore, the Monitor recommends this Honourable Court authorize the Applicants to honour the previously agreed to payments under this plan.

All of which is respectfully submitted this 2nd day of March 2009.

**ERNST & YOUNG INC.**
**In its capacity as the Monitor of**
**Nortel Networks Corporation** *et al*

Per:

Murray A. McDonald
President

11

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

FOURTH REPORT OF THE MONITOR
DATED MARCH 2, 2009

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada  M5B 2M6

Jay A. Carfagnini (LSUC# 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5691706