## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------X
                                                      :
In re                                                 :      Chapter 11
                                                      :
Nortel Networks Inc., et al.,¹                        :      Case No. 09-10138 (KG)
                                                      :
                              Debtors.                :      Jointly Administered
                                                      :
                                                      :      Hearing date:  Apr. 9, 2009 at 9:00am (ET)
                                                      :      Objections due: Apr. 2, 2009 at 4:00pm (ET)
                                                      :
------------------------------------------------------X
```

## DEBTORS' MOTION FOR AN ORDER
## PURSUANT TO SECTIONS 105 AND 363 OF
## THE BANKRUPTCY CODE AUTHORIZING BUT NOT
## DIRECTING THE PAYMENT OF CERTAIN PREPETITION
## OBLIGATIONS UNDER THEIR RETIREMENT INCOME PLAN

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing but not directing the Debtors to pay certain prepetition obligations under their retirement income plan; and granting them such other and further relief as the Court deems just and proper. In support of this Motion, the Debtors respectfully represent as follows:

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code.

## Background

### A.      Introduction

3.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court. Ernst & Young Inc., as foreign representative for the Canadian Debtors, has filed petitions in this Court for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

---

[2]      The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA.  In addition, at 8 p.m. on January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Administrator").

6.    On January 15, 2009, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that provided for the joint administration of these cases and for consolidation for procedural purposes only.

7.    On January 26, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

**B.    Debtors' Corporate Structure and Business**

8.    A description of the Debtors' corporate structure and business and the events leading to the chapter 11 cases are set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications (the "First Day Declaration").[4]

---

[3]    The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.
[4]    Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

**Relief Requested**

9.      By this Motion, the Debtors seek an order pursuant to sections 105(a) and 363(b)

of the Bankruptcy Code authorizing them, in their discretion, to make certain payments related to

pension obligations (described herein) and to continue to exercise their business judgment in

determining whether to make payments in respect of such obligations as they may arise during

the course of these chapter 11 cases.

**Facts Relevant to this Motion**

10.      As set forth in the declaration of Johannus Poos, Director of Global Pensions for

NNL (the "Poos Declaration") submitted herewith, since prior to the Petition Date, certain of the

Debtors, including NNI, and certain of their non-debtor affiliates, (collectively, the "Plan

Sponsors"), have maintained a qualified defined benefit pension plan in the United States (the

"Retirement Income Plan" or the "Plan"), which is funded by the Plan Sponsors.  The Retirement

Income Plan is governed by the Employee Retirement Income Security Act of 1974, as amended

("ERISA"), the Internal Revenue Code of 1986, as amended (the "Tax Code"), and regulations

of the Pension Benefit Guaranty Corporation (the "PBGC").  Effective January 1, 2008, the Plan

Sponsors amended their Retirement Income Plan to freeze future benefit accruals under the Plan.

As a result, Plan participants do not accrue additional pension benefits under the Plan based on

future service or compensation.  Instead, the Plan benefits relate to, and have accrued entirely

from, the past service of the Plan participants.

11.      The Debtors estimate that, as of December 31, 2008, the Retirement Income Plan

had approximately 23,000 participants and had assets worth approximately $828 million.

12.      Under relevant provisions of ERISA and the Tax Code, a plan sponsor is required

to make minimum funding contributions to its defined benefit pension plans each year.  29

U.S.C. § 1082; 26 U.S.C. § 412.  Although section 412(a) of the Tax Code and section 302 of

4

ERISA prescribe minimum funding rules for pension plans, there are limits on how much a plan sponsor can contribute to a pension plan, including limits on deductibility under section 404 of the Tax Code. See 26 U.S.C. § 404. Because of the interplay among these statutory provisions and the performance of plan-related investments, in addition to many other factors, defined benefit pension plans are not always funded to a level that would permit immediate termination without the need for further contributions. In the case of the Retirement Income Plan, the current estimated Plan deficit for funding purposes is approximately $375 million. In addition, the Plan Sponsors are required to make approximately $14.8 million in minimum funding contributions during the 2009 Plan year, of which approximately $8.6 million remains to be paid during the 2009 calendar year.[5] On February 26, 2009, the Plan Sponsors paid a bi-annual premium of $783,938 to the PBGC, which the Debtors believe was a postpetition administrative obligation and with respect to which the Debtors consulted with the Committee prior to payment.

13.    On April 15, 2009 a minimum funding contribution of $1.2 million will come due (the "April Funding Contribution), and on July 15, 2009 a minimum funding contribution of $3.7 million will come due (the "July Funding Contribution," and together with the April Funding Contribution, the "Minimum Funding Contributions" or the "Contributions"). In light of the freezing of future benefit accruals as of January 1, 2008, the Debtors believe that the Minimum Funding Contributions represent payments that amortize the cost of liabilities accrued prior to the Petition Date and, as such, that the Minimum Funding Contributions constitute prepetition obligations of these estates. Therefore, the Debtors believe that section 363 of the Bankruptcy Code requires this Court's authorization to pay the Minimum Funding Contributions.

14.    At this time, the Debtors believe that it is prudent to continue to maintain the Retirement Income Plan in accordance with the terms and applicable law, as the costs associated

---

[5]    The Debtors are setting forth their current estimates, which are subject to change.

with the failure to do so are likely to result in even higher expenses for the Debtors and their

estates.  Accordingly, by this Motion, the Debtors request that they be authorized, but not

obligated, to pay the full amount of the Minimum Funding Contributions.[6]

### A.    **Statutory Lien**

15.    For a variety of sound business reasons, the Debtors believe that it is appropriate

to pay the Minimum Funding Contributions.  For example, if the Plan Sponsors fail to pay the

Minimum Funding Contributions, a statutory lien arises automatically, giving the PBGC the right

to impose such lien on any non-Debtor members of the Plan's controlled group for the full

amount of the each unpaid Contribution, plus interest, so long as such Contribution exceeds $1

million, as each Contribution does in this case.  26 U.S.C. § 430(k); 29 U.S.C. 1083(k).  Though

the Debtor-members of the controlled group would be protected against the imposition of such a

lien on account of the section 362 automatic stay in bankruptcy, non-debtor members of the

Plan's controlled group would be subject to the lien on account of the joint and several liability

imposed by ERISA.

### B.    **Excise Tax**

16.    Moreover, the failure of the Plan Sponsors to make the Minimum Funding

Contributions may result in the imposition of excise taxes under the Tax Code, for which the

Plan Sponsors and members of the Plan's controlled group, including non-debtors, are

potentially exposed to a joint and several liability.  See 26 U.S.C. § 4971(a).  The Debtors

estimate that the excise tax associated with a failure to pay the Minimum Funding Contributions

would be $120,000, plus interest, for the April Funding Contribution and $370,000, plus interest,

for the July Funding Contribution.  Additionally, if the Minimum Funding Contributions remain

---

[6]    The Debtors reserve their rights with respect to any future obligations that may become due and owing in
the future with respect to the Retirement Income Plan, and in seeking this relief the Debtors do not waive their rights
on any defenses they have with respect to any such future obligations.

unpaid at the end of the taxable year, an additional, non-deductible excise tax in the amount of

100% of the unpaid Contributions can be imposed on the Plan Sponsors and members of the

controlled group.  See 26 U.S.C. § 4971(b)(1).  On the other hand, by timely making the

Minimum Funding Contributions, the Debtors' estates will avoid the imposition of the excise

tax.

      17.     It is true that the Debtors are protected from the immediate payment of the excise

tax in full, both by the automatic stay and applicable law that would treat the excise tax not as a

priority claim but, at best, as a general unsecured claim.  See United States v. Reorganized CF &

I Fabricators of Utah, Inc., 518 U.S. 213, 226 (1996) (holding that an excise tax imposed by the

IRS under 29 U.S.C. § 4971 was a penalty and not an excise tax for Bankruptcy Code purposes

and thus not entitled to priority status as an excise tax).  Nevertheless, following emergence from

bankruptcy, the excise tax would become due and payable in full, unless the Retirement Income

Plan was terminated prior to emergence.  The Debtors are in the early stages of these

reorganization cases and have not made any final decisions regarding the continuation of the

Plan.  Moreover, as certain members of the Plan's controlled group are not debtors in these

chapter 11 cases, these entities would not be protected by the automatic stay and would be

obligated to pay the excise tax on a current basis.

**C.**     **Threat of Plan Termination**

      18.     Termination of benefit plans such as the Retirement Income Plan can be either

voluntary, at the request of the plan sponsor, or involuntary at the demand of the PBGC.  See 29

U.S.C. §§ 1341(b)-(c), 1342.  Because the Debtors believe that the Retirement Income Plan is

underfunded on a termination basis, unless the Plan Sponsors were to fund fully the unfunded

benefit liabilities under the Plan in accordance with ERISA, the Plan Sponsors would be unable

to seek a standard termination.  29 U.S.C. § 1341(b)(1)(D).  Although the Plan Sponsors are

currently in the process of determining how much it would cost to fully fund the Retirement Income Plan in the event of a termination, they currently estimate the deficit for funding purposes to be approximately $375 million. Seeking a standard termination of the Plan at this time would result in a significant, immediate cost to the estates, as opposed to the continued maintenance of the Plan. While it is possible for the Plan Sponsors to seek a voluntary "distress termination" pursuant to 29 U.S.C. § 1341(c) and terminate the Plan while underfunded, the provisions regarding such a termination require a showing that each member of the Plan's controlled group satisfy ERISA's requirements for financial distress. 29 U.S.C. § 1341(c)(2)(B). Because certain members of the controlled group are entities that are not debtors in these chapter 11 cases, it is not certain whether the Plan Sponsors could make the requisite showing of financial distress at this time. 29 U.S.C. § 1341(c)(1)(B). In any event, following the termination of the Retirement Income Plan in a "distress termination," the Plan Sponsors and each of the members of the controlled group, including certain non-debtors, would become liable to the PBGC for the unfunded benefit liabilities.

19.    In addition, the failure of the Plan Sponsors to make the Minimum Funding Contributions could lead the PBGC to seek an involuntary termination of the Retirement Income Plan pursuant to 29 U.S.C. § 1342. Pursuant to section 1342, the PBGC may institute involuntary termination proceedings in a United States District Court that the Debtors may not be able to enjoin. ERISA states that the PBGC may take action to terminate a pension plan in district court, which litigation is not subject to the automatic stay in bankruptcy. 29 U.S.C. § 1342(e). An attempt to terminate the Plan on an involuntary basis would cause the Debtors to incur significant litigation costs in defending any such action and, if adversely determined,

8

would cause the Plan Sponsors and each member of the controlled group potentially to become liable on a joint and several basis for the full claim value asserted by the PBGC.

20.     The Debtors submit that, at the present time, the cost of making the Minimum Funding Contributions is significantly lower than the cost of terminating the Retirement Income Plan.  Moreover, if the Plan is maintained, the minimum funding payments become obligations of the reorganized Debtors over time, whereas a standard termination arguably would require the Debtors to cure the underfunding and a distressed termination would lead to an immediate maturation of the claims asserted by the PBGC.

21.     Although the Debtors believe that the PBGC's claims against the Debtors in the event of a termination of the Retirement Income Plan would be general unsecured claims, the Debtors believe that, due to the joint and several nature of claims for unfunded pension liability, the PBGC would attempt to recover against each of the Debtors and certain affiliates, including certain non-debtor affiliates.[7]  Thus, any judgment in favor of the PBGC could result in a diminution of the assets available for distribution to the Debtors' other creditors.

### Basis for Relief

22.     The Debtors seek an order granting the relief sought in this Motion pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course, property of the estate." 11 U.S.C. § 363(b)(1).  To use property outside of the ordinary course of business under section 363(b), a debtor has the burden to establish that it has a sound business justification.  See Dai-Ichi Kangyo Bank, Ltd. V. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999).  When

---

[7]     The Debtors reserve all rights to argue that the PBGC has no right to collect against certain affiliates.

a valid business justification exists, the law vests the debtor's decision to use property out of the

ordinary course of business with a strong presumption that "in making a business decision the

directors of a corporation acted on an informed basis, in good faith and in the honest belief that

the action taken was in the best interests of the company." Smith v. Van Gorkom, 488 A.2d 858,

872 (Del. 1985).

23.    Section 105(a) of the Bankruptcy Code provides, in pertinent part, that "[t]he

court may issue any order, process or judgment that is necessary or appropriate to carry out the

provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Specifically, this Court may use its

power under section 105(a) to authorize payment of prepetition obligations pursuant to the

"necessity of payment" rule (also referred to as the "doctrine of necessity").

24.    The "doctrine of necessity" or the "necessity of payment" rule originated in

railway cases and was first articulated by the United States Supreme Court in Miltenberger v.

Logansport, C. & S. W. R. Co., 106 U.S. 286 (1882). The doctrine was expanded to non-railroad

debtors in the mid-century. See Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in

hotel reorganization case, that the court was not "helpless" to apply the rule to supply creditors

of non-railroad debtors where alternative was cessation of operations).

25.    The Third Circuit recognized the "necessity of payment" doctrine in In re Lehigh

& New England Railway Co., 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a

court could authorize the payment of prepetition claims if such payment was essential to the

continued operation of the debtor. Id. (stating courts may authorize payment of prepetition

claims when there "is the possibility that the creditor will employ an immediate economic

sanction, failing such payment"); see also In re Penn Cent. Transp. Co., 467 F.2d 100, 102 n.1

(3d Cir. 1972) (holding necessity of payment doctrine permits "immediate payment of claims of

creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims . . . have been paid"); In re Just for Feet, Inc., 242 B.R. 821, 824-26 (D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).[8]

26.    Today, the rationale for the necessity of payment rule -- the rehabilitation of a debtor in reorganization cases -- is "the paramount policy and goal of Chapter 11." In re Ionosphere Clubs, 98 B.R. at 176; see also Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation" is appropriate); In re Just for Feet, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process"); Mich. Bureau of Workers'

---

[8]    Additionally, the Bankruptcy Code contemplates prepetition payments in some circumstances. Section 549(a), which deals with postpetition transfers, provides that "the trustee may avoid a transfer of property of the estate . . . that occurs after the commencement of the case . . . that is not authorized . . . by the court." 11 U.S.C. § 549(a). Thus, by necessary implication, a bankruptcy court may authorize limited postpetition payments to satisfy prepetition obligations. See In re Isis Foods, Inc., 37 B.R. 334, 336 n.3 (W.D. Mo. 1984) (noting that "proposed transfers [to pay prepetition claims may] be presented in advance to a bankruptcy court for its approval and would thereafter be insulated from attack" under section 549(a); see also 11 U.S.C. § 363(b)(1) (allowing the trustee, after notice and hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate").

Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 287 (S.D.N.Y.
1987) (authorizing payment of prepetition worker's compensation claims on grounds that the
fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a
flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment
of creditors in full or at least proportionately"); 3 Collier on Bankruptcy § 105.04[5][a] (15th ed.
rev. 2004) (discussing cases in which courts have relied on the "doctrine of necessity" or the
"necessity of payment" rule to pay prepetition claims immediately).

27.    Courts have authorized debtors to pay minimum funding contributions on their
pension plans related to prepetition amounts.  See, e.g., In re Parmalat USA Corp., Case No. 04-
11139 (RDD) (Bankr. S.D.N.Y. Sept. 14, 2004); 9 Norton Bankr. L. & Prac. 3d § 176:35 (2009)
("Bankruptcy courts have sometimes approved the payment of pension contributions before plan
confirmation . . . .").  Moreover, the leading treatises on bankruptcy recognize that, though
minimum funding contributions relating to labor performed prior to the bankruptcy filing are
prepetition claims, debtors have nevertheless sought and obtained approval to make such
contributions.  See 9 Norton Bankr. L. & Prac. 3d § 176:35 (2009) ("The debtor . . . sometimes
seek[s] bankruptcy court approval to make pension contributions, and bankruptcy courts often
grant their approval."); Collier on Bankruptcy Monograph 1: Employee Benefits and Executive
Compensation in Corporate Bankruptcy § 7 (15th ed. rev. 2009) ("If the plan sponsor wants to
make the minimum required contributions attributable to past service, bankruptcy court approval
to make such contributions should be sought.").

28.    The Debtors submit that making the Minimum Funding Contributions would be a
proper exercise of their business judgment, as it would enable the Debtors to avoid an excise tax
and a lien on the Debtors' estates as well as preserve the Debtors' options as a reorganization

plan is developed.  Additionally, as explained above, payment of the Contributions allows the

Debtors to avoid the high termination costs and ensure that the PBGC will not at this time seek

involuntary termination of the Retirement Income Plan.  Paying the Contributions at this time

will provide the Debtors the necessary flexibility at this early stage in their reorganization

proceedings to explore and pursue all options with respect to the Plan and with respect to the

development of a plan of reorganization.  In addition, payment at this time will lessen the

likelihood of the PBGC taking potentially adverse action, such as initiating an involuntary

termination proceeding or attempting to enforce its rights as a creditor in the bankruptcy.

29.     For the foregoing reasons, the Debtors submit that it is in the best interests of the

Debtors, their estates and their creditors to make the Minimum Funding Contributions at this

time and request that the Court authorize them to do so.

30.     The Debtors consulted the Committee with regard to this Motion prior to its

filing.

### Notice

31.     Notice of the Motion has been given via facsimile, electronic transmission, hand

delivery or overnight mail to the (i) Office of the United States Trustee for the District of

Delaware; (ii) the Committee; (iii) the Bondholder Group; and (iv) the general service list

established in these chapter 11 cases.  The Debtors submit that under the circumstances no other

or further notice is necessary.

### No Prior Request

32.     No prior request for the relief sought herein has been made to this or any other

court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  March 24, 2009
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley
Lisa M. Schweitzer
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

    - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Thomas F. Driscoll III (No. 4703)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*