IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------X
:
In re                                                          : Chapter 11
:
Nortel Networks Inc., et al.,[1]                               : Case No. 09-10138 (KG)
:
                     Debtors.                                  : Jointly Administered
:
:
---------------------------------------------------------------X

## DECLARATION OF JOHANNUS POOS IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AUTHORIZING THE PAYMENT OF CERTAIN PREPETITION OBLIGATIONS UNDER THEIR RETIREMENT INCOME PLAN

I, Johannus Poos, declare under penalty of perjury as follows:

1.  I am Director of Global Pensions for Nortel Networks Limited, a Canadian affiliate of Nortel Networks Inc. ("NNI" and, together with the other above-captioned debtors, the "Debtors" or the "U.S. Debtors.")

2.  I submit this declaration in support of the Debtors' Motion for Entry of an Order Pursuant to Sections 105 and 363 of the Bankruptcy Code Authorizing the Payment of Certain Prepetition Obligations Under Their Retirement Income Plan (the "Motion")[2]. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

information supplied to me by other members of the Debtors' management and professionals or learned from my review of relevant documents or upon my opinion based on my experience and knowledge of the Debtors' operations and financial condition. I am authorized to submit this declaration.

3. I am generally responsible for the maintenance and administration of the pension plans of NNI and certain of its affiliates. Specifically, since prior to the Petition Date, I have overseen the maintenance and funding of a qualified defined benefit pension plan in the United States (the "Retirement Income Plan" or the "Plan") by certain of the Debtors, including NNI, and certain of their non-debtor affiliates (collectively, the "Plan Sponsors"). I understand that the Retirement Income Plan is governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), the Internal Revenue Code of 1986, as amended (the "Tax Code"), and regulations of the Pension Benefit Guaranty Corporation (the "PBGC"). Effective January 1, 2008, I understand, based on my general familiarity with the Plan, that the Plan Sponsors amended their Retirement Income Plan to freeze future benefit accruals under the Plan. As a result, Plan participants do not accrue additional pension benefits under the Plan based on future service or compensation. Instead, the Plan benefits relate to, and have accrued entirely from, the past service of the Plan participants.

4. To the best of my knowledge, based on my general familiarity with the Plan, as of December 31, 2008, the Retirement Income Plan had approximately 23,000 participants and had assets worth approximately $828 million.

5. Moreover, I understand that because of the interplay among the various applicable statutory provisions and the performance of plan-related investments, in addition to many other factors, defined benefit pension plans are not always funded to a level that would permit

immediate termination without the need for further contributions. In the case of the Retirement Income Plan, I understand based on internal calculations that the current estimated Plan deficit for funding purposes is approximately $375 million.

6.  Additionally, the Plan Sponsors have estimated that they are required to make approximately $14.8 million in minimum funding contributions during the 2009 Plan year, of which approximately $8.6 million remains to be paid during the 2009 calendar year.[3] This estimate is subject to change over time and as a result of changes in circumstances or the availability of further information. On February 26, 2009, the Plan Sponsors made a payment of a bi-annual premium of $783,938 to the PBGC.

7.  It is my understanding based on information supplied by the Plan's actuary that on April 15, 2009 a minimum funding contribution of $1.2 million will come due (the "April Funding Contribution), and on July 15, 2009 a minimum funding contribution of $3.7 million will come due (the "July Funding Contribution," and together with the April Funding Contribution, the "Minimum Funding Contributions" or the "Contributions"). In light of the freezing of future benefit accruals as of January 1, 2008, it is my understanding and belief that the Minimum Funding Contributions represent payments that amortize the cost of liabilities accrued prior to the Petition Date and, as such, that the Minimum Funding Contributions constitute prepetition obligations of these estates.

8.  The Debtors have determined that, at this early stage of the Debtors' reorganization proceedings, it is prudent to continue to maintain the Retirement Income Plan in accordance with the terms and applicable law, including through the payment of the Minimum Funding Contributions, as failure to make the payment at this time could result in significant costs for the Debtors and their estates.

---

[3]  The Debtors are setting forth their current estimates, which are subject to change.

9. I understand that the costs of a failure to make the Minimum Funding Contributions can potentially include: (i) the imposition of a lien on any non-Debtor members of the Plan's controlled group for the full amount of the each unpaid Contribution, plus interest; (ii) the imposition of excise taxes on the Plan Sponsors and members of the Plan's controlled group on a joint and several basis; and/or (iii) the termination of the Plan by the PBGC.

10. If the Debtors pay the Minimum Funding Contributions, the Debtors may avoid an excise tax and a lien from being imposed on the Debtors' estates and the termination of the Plan based on non-payment of the Minimum Funding Contributions. Paying the Contributions at this time will provide the Debtors the necessary flexibility at this early stage in their reorganization proceedings to explore and pursue all options with respect to the Plan and with respect to the development of a plan of reorganization. In addition, payment at this time will lessen the likelihood of the PBGC taking potentially adverse action, such as initiating an involuntary termination proceeding or attempting to enforce its rights as a creditor in the bankruptcy.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: Toronto, Canada
       March 23, 2009

_____
Johannus Poos
Director of Global Pensions, Nortel Networks Ltd.