1              IN THE UNITED STATES BANKRUPTCY COURT

2                  FOR THE DISTRICT OF DELAWARE

3    IN RE:                        :
                                   :
4    NORTEL NETWORKS, INC. et al., : Chapter 11
                                   :
5         Debtors.                 : Case No. 09-10138-KG
     . . . . . . . . . . . . . . .

6                        Wilmington, Delaware
7                        Friday, March 20, 2009
                              11:34 a.m.
8
                      TRANSCRIPT OF OMNIBUS HEARING
9                  BEFORE THE HONORABLE KEVIN GROSS
                   UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtors:            Thomas F. Driscoll, III, Esquire
12                               Morris, Nichols, Arsht & Tunnell, LLP

13                               James L. Bromley, Esquire
                                 Jane Kim, Esquire
14                               Cleary, Gottlieb, Steen & Hamilton

15   For the Committee:          David H. Botter, Esquire
                                 Ryan C. Jacobs, Esquire
16                               Akin, Gump, Strauss, Hauer &Feld, LLP

17                               Christopher M. Samis, Esquire
                                 Richards, Layton & Finger, P.A.
18
     For E&Y:                    Lisa Kraidin, Esquire
19                               Allen & Overy, LLP

20   For Johnson Controls:       Christopher Peer, Esquire
     Inc.                        Hahn, Loeser & Parks, LLP
21
     For Johnson Controls:       Benjamin Wilson Keenan, Esquire
22   Inc. & Prudential Ins.      Ashby & Geddes, P.A.

23   For UBS Realty:             Leslie C. Heilman, Esquire
     Investors, LLC &            Ballard, Spahr, Andrews & Ingersoll
24   Prudential Ins. Co.

25

2

| | | |
|---|---|---|
| 1 | For Gores & Siemens: | Kevin Collins, Esquire |
| 2 | | Bifferato, Gentilotti, Biden & Balick, LLC |
| 3 | | Kathryn A. Coleman, Esquire |
| 4 | | Gibson, Dunn & Crutcher, LLP |
| 5 | For Lazard Frères & Co.: | Thomas A. Labuda, Jr., Esquire Sonnenschein, Nath & Rosenthal, LLP |
| 6 | For the United States: Trustee | Patrick Tinker, Esquire U.S. Trustee's Office |
| 7 | | |
| 8 | VIA TELEPHONE: | |
| 9 | For the Debtors: | Gordon A. Davies Nortel Networks, Inc. |
| 10 | | Tracy C. McGilley |
| 11 | | Tracy McGilley, Client |
| 12 | For FlexTonics: | James V. Drew, Esquire Curtis, Maller-Prevost, Colt & Mosle |
| 13 | | |
| 14 | For Verizon: | Darryl Scott Laddin, Esquire Arnall, Golden & Gregory, LLP |
| 15 | For Prudential Ins. Co.: | Robert H. McKirgan, Esquire Lewis & Roca, LLP |
| 16 | | |
| 17 | For Silver Lake Capital: | Anneliese H. Pak, Esquire Ropes & Gray, LLP |
| 18 | For Gores & Siemens: | Eric Fromme, Esquire Gibson, Dunn & Crutcher, LLP |
| 19 | | |
| 20 | Court Recorder: | Leslie Murin U.S. Bankruptcy Court-Delaware |
| 21 | | |
| 22 | Transcribing Firm: | Perfect Pages Transcription, Inc. 22 Washington Avenue Edgewater Park, NJ 08010 |
| 23 | | (609) 877-4254 |
| 24 | Proceedings recorded by electronic sound recording; transcript produced by transcription service. | |
| 25 | | |

3

INDEX

|  | Direct | Cross | Re-Direct | Re-Cross | Further Redirect |
|---|---|---|---|---|---|

Witnesses For Debtors:

Dempsey                    21
(Via proffer)

4

1          THE CLERK:  Please rise.

2          THE COURT:  Good morning, everyone.  Please be

3     seated.  Thank you.  And thank you for your patience.  I

4     apologize.  We try to operate right on time but sometimes

5     things kind of interfere with that.

6          MR. DRISCOLL:  Good morning, Your Honor.

7          THE COURT:  Mr. Driscoll, good morning.

8          MR. DRISCOLL:  Good morning, Your Honor.  For the

9     record, Tom Driscoll from Morris, Nichols, Arsht and Tunnell.

10    With me in the courtroom today at counsel table is James

11    Bromley and Jane Kim from Cleary, Gottlieb.

12         THE COURT:  It's good to see you both again.

13         MR. DRISCOLL:  And I thank Your Honor for seeing us

14    this morning.  With your okay, we'll turn things over to Ms.

15    Kim.

16         THE COURT:  Yes, that's fine.  Thank you.

17         MR. DRISCOLL:  Thank you.

18         THE COURT:  Good morning, Ms. Kim.

19         MS. KIM:  Good morning, Your Honor.  For the record,

20    Jane Kim from Cleary, Gottlieb, Steen, and Hamilton on behalf

21    of the Debtors.  This -- we have a number of items on the

22    agenda that have been resolved or adjourned, so I'm just going

23    to go one by one through the items on --

24         THE COURT:  That would be fine.

25         MS. KIM:  -- the agenda.

5

1          MS. KIM:  Hopefully these -- this hearing is not too
2     long.  Items one through four have been adjourned to later
3     hearings.
4          THE COURT:  Yes.
5          MS. KIM:  Items five through eight, Certificates of
6     No Objections were filed, and Your Honor entered orders
7     granting motions and applications.
8          THE COURT:  Yes.
9          MS. KIM:  So thank you, Your Honor.  Item nine is the
10    application to employee Lazard Frères, and actually, Mr.
11    Bromley is going to handle that --
12         THE COURT:  Okay.
13         MS. KIM:  -- motion -- or application.
14         THE COURT:  All right.  Thank you, Ms. Kim.  Mr.
15    Bromley, it's good to see you again.
16         MR. BROMLEY:  Thank you, Your Honor.  Good to see you
17    as well.  And thank you for having us this morning.  The matter
18    on -- with respect to the Debtors' financial advisors is the
19    retention of Lazard Frères, and this matter has been adjourned
20    to today's date that we may try to accomplish certain open
21    issues and try to solve them and we have, I believe, solved
22    them to the satisfaction of both the U.S. Trustee's Office and
23    the Official Creditors' Committee as well.
24         THE COURT:  Okay.
25         MR. BROMLEY:  If I can explain a little bit, Your

6

1  Honor, about the background, the -- I think the largest issue

2  that we had faced, with respect to the Official Committee, was

3  the fact that the Debtors' group of companies, the Nortel

4  Companies, had retained two investment bankers just prior to

5  the filing, the Lazard Frères firm and Credit Suisse firm.

6          THE COURT:  Yes.

7          MR. BROMLEY:  And the Credit Suisse firm had been

8  retained solely in Canada by Nortel Networks, Limited and

9  Lazard Frères was being retained jointly by Nortel Networks,

10  Corporation, the Canadian parent, as well as, Nortel Networks,

11  Incorporated, the U.S. operating company.  And the Committee

12  expressed concern that there might be duplication of effort in

13  connection with the retention of both firms.  After discussions

14  with the Committee and discussions internally within Nortel,

15  the decision was made to proceed with Lazard, and that if there

16  is any work that is going to be done in respect of the matters

17  that are set forth in the Lazard Retention Agreement, they will

18  be done solely by Lazard and not by Credit Suisse.  There is a

19  possibility that Credit Suisse may have one or two discrete

20  assignments in the Canadian context alone, but that has not

21  been determined at this point in time, and we intend to consult

22  with the Committee, as we have done in the past, if anything

23  changes in that regard.

24      So what we -- where we are, Your Honor, is we have Lazard

25  handling the matters that are the traditional restructuring

7

1   matters, as well as any potential M&A matters that come up in

2   the course of these proceedings.  The -- I think that's the

3   major issue, and we've resolved that.

4        There were also some comments that the Committee had, in

5   particular with respect to the way that the compensation flowed

6   through the Lazard Retention Agreement, primarily, with respect

7   to the crediting of certain interim fees that might be earned,

8   with respect to the final fee, the restructuring fee.  And I

9   think we have satisfied the Committee and indeed, we -- Lazard

10  has simply taken the comments of the Committee and said they're

11  fine, and we've incorporate them into the agreement.  We have

12  provided a copy of the agreement, as amended, to the U.S.

13  Trustee's Office, and I believe that the U.S. Trustee's Office

14  is in agreement as well that it's acceptable.

15       There is one thing I would like to note, Your Honor, that

16  we set forth in the application, but I would like it just to be

17  clear on the record, that there had been certain amounts that

18  had been paid to Lazard prior to -- that were supposed to have

19  been paid prior to the petition date, but actually were paid

20  after the petition date.  A total of $575,000 had been paid by

21  NNI to Lazard comprised of a monthly fee of $250,000, a sort of

22  start up fee of $250,000, and a $75,000 expense retainer.

23            THE COURT:  Right.

24            MR. BROMLEY:  And so the way that we -- and the way

25  it was supposed to work was that it was supposed to come out of

8

1  NNL, the Canadian Entity, not NNI but, indeed, it came out of

2  NNI.  So what has been done is Lazard is going to hold those

3  funds received from NNI and credit them against the fees that

4  they would earn as the case goes forward in the United States,

5  and the 575 that they were supposed to receive from NNL has

6  been paid from NNL.  So sort of it's been, in a sense,

7  corrected, and rather than simply give the 575 back and then

8  have to receive it, again, they'll keep it and obviously only

9  apply it once Your Honor approves the applications.

10          THE COURT:  Okay.

11          MR. BROMLEY:  Okay?

12          THE COURT:  Yes.

13          MR. BROMLEY:  So that -- that is the Lazard

14  situation.  I think we've resolved that, you know, to the

15  satisfaction both to the Committee and the U.S. Trustee's

16  Office.

17          THE COURT:  And I see a lot of nodding going on at

18  the table where the Committee and the Office of the United

19  States Trustee counsel are sitting so unless anyone wishes to

20  be heard, I am certainly satisfied and prepared to grant the

21  application.

22          MR. BROMLEY:  Thank you, Your Honor.

23          THE COURT:  All right, hearing no one, that's what

24  we'll -- oh.

25          UNIDENTIFIED SPEAKER:  I apologize.  (Indiscernible)

1  next motion.

2          THE COURT:  Okay.  Very well.

3      (Laughter.)

4          THE COURT:  Very well.  That's fine, thank you.  So I

5  will grant that application.

6          MR. BROMLEY:  Thank you, Your Honor.

7          MS. KIM:  Your Honor, the next item on the agenda is

8  a Motion of Johnson Controls, Inc. to lift the automatic stay

9  and effectuate a setoff of prepetition amounts.  And counsel

10  for Johnson Controls, Inc. is in the courtroom --

11          THE COURT:  Okay.

12          MS. KIM:  -- to present the motion.

13          THE COURT:  Thank you.  Good morning.

14          MR. KEENAN:  Good morning, Your Honor.  May it please

15  the Court, Ben Keenan with Ashby and Geddes --

16          THE COURT:  Yes.

17          MR. KEENAN:  -- on behalf of Johnson Controls.  And

18  with me in court this morning is Mr. Christopher Peer of the

19  law firm of Hahn, Loeser and Parks, and he will be presenting

20  the motion for Johnson Controls.  He has been admitted pro hac

21  vice.  And unless the Court has any questions, I would cede the

22  podium to him.

23          THE COURT:  That is fine.  Thank you.

24          MR. KEENAN:  Thank you.

25          THE COURT:  Thank you, very much.  Mr. Peer, welcome

10

1    to you.

2         MR. PEER:  Thank you, Your Honor.  It's a pleasure to

3    be here.  Good morning.  For the record, Chris Peer with law

4    firm of Hahn, Loeser and Parks for Johnson Controls, Inc.  In

5    general, as the Court knows, Johnson Controls filed their

6    Motion Seeking Relief from the Automatic Stay to Effectuate a

7    Setoff.  Shortly after that Motion was filed, we had some

8    discussions with the Debtors and their counsel, and they

9    articulated to us that there was -- that they had no objection,

10   although they did request that we include an additional line of

11   text in the Order, and we've agreed to that, so the Proposed

12   Order has been amended to add the following last further

13   ordered:  It is further ordered that any and all claims NNI may

14   have relating to the amounts owed to NNI, amounts owed to NNI

15   being a defined term, for nonpayment from JCI are resolved.

16   That language was added at the request of the Debtors.

17        THE COURT:  Okay.

18        MR. PEER:  The only other note that I would like to

19   make is that JCI has very diligently supplemented its Motion

20   with additional information as additional information became

21   available based on the timing of the case being filed and when

22   invoices were flowing from NNI to JCI so that the numbers in

23   the Motion for the amounts owed to NNI have been amended by the

24   second supplement in particular.

25        THE COURT:  Yes.

1    MR. PEER:  With that, Your Honor, if the Court has

2  any questions --

3    THE COURT:  I do not unless anyone wishes to be

4  heard.  And hearing no one, I will grant the motion --

5    MR. PEER:  Thank you.

6    THE COURT:  -- and I will attest to JCI's diligence

7  on this matter so I'm pleased to enter the Order.

8    MR. PEER:  Thank you, Your Honor.  Shall I pass the

9  new order or should we upload on that from --

10    THE COURT:  Why don't you bring the new order up to

11  me?

12    MR. PEER:  May I approach the bench?

13    THE COURT:  Yes, of course, Mr. Peer.

14      (Counsel approaches.)

15    THE COURT:  And I will be -- and that way, I'll sign

16  that off now.  The Debtors probably are going to submit all of

17  their orders to me at the end but this is yours so I will be

18  signing the order and we will get it on the docket today.

19    MR. PEER:  Thank you, Your Honor.  And again, it's

20  nice to be in Delaware.

21    THE COURT:  It's good to have you here, Mr. Peer.

22  Thank you, sir.  All right.

23      (Pause in proceedings.)

24    THE COURT:  Mr. Bromley.

25    MR. BROMLEY:  Thank you, Your Honor.  The next matter

12

1    on the agenda is the conclusion of the hearing with respect to

2    the Debtors' key employee --

3              THE COURT:  Yes.

4              MR. BROMLEY:  -- incentive program, and key executive

5    -- I'm sorry, key executive incentive plan following on on the

6    hearing that we had earlier this month on the 5th.  And if I

7    could, Your Honor, I'll just refresh your recollection a bit in

8    terms of what we did on the 5th, but there are really three

9    things I wanted to talk about, just what we did on the 5th, the

10   agreement that we had reached with the Unsecured Creditors'

11   Committee, and there are certain relatively minor changes that

12   have occurred with respect to some of the dollar amounts that

13   we have discussed with and agreed to with the Creditors'

14   Committee.  And then the final thing, Your Honor, would be

15   proffer of the testimony of John Dempsey of Mercer, who was

16   here and testified quite extensively on the 5th of March.

17             THE COURT:  And as I recall, it was decided that the

18   record from that prior hearing would be incorporated into this

19   hearing; is that correct?

20             MR. BROMLEY:  Yes, Your Honor.  That was -- I was

21   going -- that's the first thing on my note.  Incorporate March

22   5 hearing, it says.

23             THE COURT:  Okay.

24             MR. BROMLEY:  So, Your Honor, I would ask that we

25   incorporate the record and the evidence provided at that

1    hearing into the record for this hearing as well.

2              THE COURT:  Is there any objection to my doing so?

3         (No verbal response.)

4              THE COURT:  All right.  Then it is so incorporated,

5    Mr. Bromley.

6              MR. BROMLEY:  Thank you, Your Honor.  As you recall,

7    when we were last here on the 5th, the Debtors had brought a

8    motion seeking relief in two parts.  There was a key employee

9    retention plan and a key executive incentive plan intended to

10   comply with the requirements of Section 503 of the Bankruptcy

11   Code for those employees here in the United States, but also

12   intended to cover and apply equally to the employees of Nortel

13   Networks, Limited in Canada.  So that we would have, as we've

14   attempted throughout the history of Nortel, to have a

15   consolidated and uniform compensation program across the

16   jurisdictions.  As you recall, Your Honor, we did mention, and

17   Mr. Dempsey testified that in Canada, the programs are allowed

18   to be retention plans, and the incentive elements that are

19   required in -- under Section 503 with the respect to insiders

20   are not required there, but nevertheless, the Debtors and their

21   Canadian affiliates have determined that it's appropriate for

22   those individuals who could be considered to be insiders,

23   without having to go into that, whether they are or not, the

24   so-called ELTs and SLTs will all be treated the same under an

25   incentive plan rather than a retention plan, regardless of

1    whether or not they are employees of the Canadian entities or

2    the U.S. entities.

3              THE COURT:  Yes.

4              MR. BROMLEY:  We also discussed at length, Your

5    Honor, the existence of the AIP, the Annual Incentive Program,

6    which is the Debtors' ordinary course compensation program, and

7    then also the terms and conditions of the retention program the

8    KERP and the KEIP.

9         Your Honor, the thing that we left out were the eight most

10   senior employees, --

11             THE COURT:  Yes.

12             MR. BROMLEY:  -- the members of the so-called Senior

13   Leadership Team or the SLT.  Five of those individuals are

14   employees in the United States and three in Canada.  And

15   notably, the CEO of Nortel Networks Corporation is not included

16   in either program.  The -- and the view was, in reaching the

17   conclusion with the Creditors' Committee that it made sense to

18   proceed in two stages, was that the folks who are the most

19   senior people in the company traditionally are those who are

20   the most scrutinized, and in connection with that, the

21   Committee was very insistent that certain information be

22   provided to the Committee prior to this hearing.  And we're

23   pleased to report, Your Honor, that we have done so.  We had a

24   very extensive meeting with the Committee, in person, last week

25   at the offices of Akin, Gump, and we provided a update of that

1    information this week, on time, as we had planned to do.  And

2    we believe that satisfies the requirements of the Committee.

3        The -- also, Your Honor, we have talked about, in the

4    past, with respect to the SLTs, the situation that the company

5    finds itself in and how important it is to make sure that the

6    folks who are in charge of the reorganization process are kept

7    in place, and the cost, in particular, that would be required

8    to replace them.  So -- and I will, in a moment, go through the

9    proffer of the testimony of Mr. Dempsey, as it relates solely

10   with respect to the SLTs.  I would like, Your Honor, however,

11   to mention for a moment that -- the minor changes that have

12   occurred.  Again, these are changes which we have talked to the

13   Committee about and they've -- they have told us they are

14   comfortable with.  Of the eight individuals in the SLT, there

15   have been two individuals whose compensation haven't been

16   adjusted in the time since the hearing on the 5th.  One, in

17   particular, because of the responsibilities that he has had to

18   undertake, additional responsibilities, and I think that it's

19   fair to say that the compensation -- total compensation level

20   with respect to that individual does not even bring him up to

21   the median of the market.  And with another -- with respect to

22   another individual, the calculation of his KEIP bonus has also

23   changed as a result of -- of certain matters that have occurred

24   since the filing of the motion, which the Committee is

25   supportive of.

1     The -- it's important to talk about what that means in

2   terms of dollars.  We had said, Your Honor, that the total

3   amount for the KEIP for the SLTs would go up by about $200,000

4   total as a result --

5           THE COURT:  Yes.

6           MR. BROMLEY:  -- of these changes.  So it's not a

7   material addition, and I believe the Committee is comfortable

8   with that.  It's also worthwhile mentioning, Your Honor, that

9   there had been, as we feared, a number of resignations,

10  notwithstanding the approval of the program on the 5th.  And in

11  connection with that, we have lost a number of individuals who

12  had been entitled to participate in the KERP.  And as a result

13  of that, what we have done is replaced several of those

14  individuals with other individuals.  And a result of several

15  who have left, adjusted their compensation, as well, upward

16  because of -- in recognition of the new responsibilities they

17  have as a result of the resignations.  What the net result is

18  with respect to the KERP, however, is a total decrease in the

19  cost, and so the net -- the net impact, with respect to the

20  KEIP and the KERP is a net decrease in cost, when you take it

21  all into account, of approximately $200,000.

22     And again, Your Honor, we have gone over the names and

23  details with the Creditors' Committee and believe that they are

24  comfortable with those changes.

25          THE COURT:  Okay.

1        MR. BROMLEY:  And I don't know if the Committee would

2   like to just confirm that so we --

3        THE COURT:  Mr. Jacobs.

4        MR. JACOBS:  Good morning.  Your Honor, good morning.

5   Ryan Jacobs of Akin, Gump on --

6        THE COURT:  Good morning.

7        MR. JACOBS:  -- behalf of the Creditors' Committee.

8   We have no objections to the modifications that Mr. Bromley's

9   described.  And also with the receipt of the financial

10  information that the company had promised, we have no objection

11  to the motion.

12       THE COURT:  All right.  Thank you --

13       MR. JACOBS:  Thank you.

14       THE COURT:  -- Mr. Jacobs.  Mr. Tinker.  Good

15  morning, sir.

16       MR. TINKER:  Good morning, Your Honor.  The United

17  States Trustee doesn't have anything additional to add today.

18  Your Honor will recall that on March 5th, we did have an

19  expensive evidentiary record with testimony as well as --

20  testimony on cross, by myself.

21       THE COURT:  Yes, sir.

22       MR. TINKER:  I would note that my cross did address,

23  at that time, bonuses and amounts that were being proposed for

24  the individuals that are the subject of today's hearing, and

25  there was testimony regarding the bonuses and how much and how

18

1    it related and the manner in which Mercer and the Debtor

2    evaluated those bonuses and how much was appropriate and that

3    sort of thing.  So I think that the record was set back then.

4    I don't have anything additional to add today.  The proffer, I

5    think, today is consistent with the record from last -- well,

6    from two weeks ago, the last hearing.  The two changes that Mr.

7    Bromley noted, those are not changes that I have an objection

8    to.

9              THE COURT:  Okay.

10             MR. TINKER:  So to the extent that there is a change

11   in the facts, that is not a basis for any objection on my part

12   at all.  So, Your Honor, what I would do is I would state on

13   the record one exception, the -- at the hearing last time, I

14   had raised concern about the expedited nature of the hearing.

15             THE COURT:  Yes.

16             MR. TINKER:  And I understand that the Court granted

17   the motion for that hearing.  It was held on an emergency

18   basis.  That, of course, is not true today.  And Mr. Bromley

19   has been very cooperative in getting the information to me.  I

20   very much appreciate that.  So that is not a concern I would

21   have today at all.

22             THE COURT:  Thank you, very much, Mr. Tinker.

23             MR. TINKER:  And I appreciate the additional time

24   that we've had and the cooperation of Debtors' counsel in

25   getting that information to us.  It's very helpful.

1          THE COURT:  All right.  And certainly your --

2          MR. TINKER:  Thank you, Your Honor.

3          THE COURT:  -- thorough cross-examination at the last

4    hearing even under the shortened circumstances is part of this

5    record here today.

6          MR. TINKER:  Thank you, Your Honor.

7          THE COURT:  Thank you, Mr. Tinker.

8          MR. BROMLEY:  Your Honor, I -- if I could then

9    proceed to the proffer just so that we have a complete record.

10   Oh, and I should note, Your Honor, as well, that we have

11   received two submissions --

12         THE COURT:  Yes.

13         MR. BROMLEY:  -- in response to the motion today.

14   One, a pro se filing that was filed by a former employee, and

15   another, which is a letter to the Court by another former

16   employee.  The Debtors recognize the difficulties that the

17   employees are facing.

18         THE COURT:  Yes.

19         MR. BROMLEY:  And it is -- it is a difficulty that we

20   are seeing throughout the organization and -- but with all due

21   respect, Your Honor, we do think that the (inaudible) provided

22   on the record on the 5th applies here as well, which is that

23   the best that can be done for the employees and the former

24   employees, at this point, is to work as hard as possible and as

25   effectively as possible to maximize the values that are here.

1   And to the extent that individuals have claims rather than
2   current payment with respect to certain employment obligations,
3   including severance, the way to maximize the recoveries on
4   those claims is to make sure that the people who are in place
5   and best suited to maximize the value through whatever means
6   possible, whether it be reorganization or sale of certain
7   assets or businesses, that they be paid appropriately to do
8   that.  So I think the answer to those responses, Your Honor, is
9   we -- the company is very upset and concerned, but it is
10  limited in its ability to address those concerns because the
11  concerns really are based on frustration and anger with respect
12  to the failure to pay and their recognition as Creditors within
13  the proceeding.  And the fact that they're individuals and
14  they're suffering individually is certainly difficult but we,
15  Your Honor, do believe that the best interest of Creditors,
16  generally, is satisfied in terms of proceeding on this basis.
17          THE COURT:  Thank you, Mr. Bromley.  And I think my
18  comments at the last hearing along those same lines of concern
19  for former employees certainly is as true here today as it was
20  then and unlike -- well, I'll save additional comments until
21  the end.
22          MR. BROMLEY:  Okay.  Thank you, Your Honor.  Your
23  Honor, we have present in the courtroom today, Mr. John Dempsey
24  of Mercer, and if called to testify Mr. Dempsey would testify
25  as follows:

Dempsey - Direct (proffered)

1    With respect to the KEIP program, the SLTs, the eight

2  individuals, like the program related to the ELTs, it is

3  comprised of four -- of, sorry, three separate incentive

4  points, milestones that must be achieved in order for payments

5  to be earned.

6    The first, Your Honor, relates to the achievement of

7  certain cost reductions, and that was described in detail at

8  the first hearing and those same -- that same milestone applies

9  here, and Mr. Dempsey would so testify.

10    With respect to the second milestone, Your Honor, we did

11  talk somewhat about that as well, at the hearing on the 5th,

12  and you will recall there were certain confidentiality concerns

13  with respect to that second milestone.  Those confidentiality

14  concerns continue --

15         THE COURT:  Yes.

16         MR. BROMLEY:  -- and --

17         THE COURT:  And I have -- by the way, I do have the

18  document that was prepared by Mercer.  I've kept it safely in

19  my desk drawer but I have it here today, and I certainly recall

20  that evidence.

21         MR. BROMLEY:  Thank you, Your Honor.  And Mr. Dempsey

22  would testify that the second milestone for 25 percent of the

23  award is tied to the achievement of that second milestone.  And

24  Mr. Dempsey would testify that for the SLTs, like the ELTs, the

25  third milestone and 50 percent of the award are dependent on

Dempsey - Direct (proffered)

1    the confirmation of plans of reorganization and arrangement in

2    the United States and Canada.

3         Mr. Dempsey would also testify, if called, that of the

4    eight members of the SLT that participate in the KEIP, five are

5    employees of the U.S. Debtors, that the total cost of the KEIP,

6    with the respect to the SLTs, is approximately 7.3 million, 5

7    million of which is attributable to the U.S. Debtors, and that

8    the average award level, assuming that all three of the

9    milestones is approximately $900,000.  The compensation for the

10   SLTs, Mr. Dempsey would testify, is below the 50th percentile

11   of the market in terms of compensation and -- which is taken

12   into account when developing the KEIP and the importance of

13   retaining these individuals.  The -- indeed, Mr. Dempsey would

14   testify that in 2008, the compensation was approximately 20

15   percent of the 50th percentile, and that for 2009, assuming

16   that the full amount of the KEIP is earned, that it would be

17   brought to 76 percent of the 50th percentile, so it's still

18   below the 50th percentile.

19        The -- Mr. Dempsey would also testify, as he did in the

20   earlier hearing, that when preparing the KEIP program for the

21   SLTs, that he reviewed the programs that had been put in place

22   in respect to a number of other Debtors, including SemGroup,

23   Quebecor World, Delpi, Dura Automotive and Calpine.  And that

24   with respect to the KEIP participation level, comparing it to

25   those companies, Nortel is slightly below the average.

23

Dempsey - Direct (proffered)

1      The -- Mr. Dempsey would also testify, if called, that the
2  overall cost of the KEIP, which is not just with respect to the
3  SLTs, but the ELTs as well, is slightly higher than with
4  respect to the comparables, but taking into account the high
5  level of professional expertise of these Debtors, he believes
6  that it is appropriate in these circumstances.
7      The -- Mr. Dempsey would also testify, if called, that the
8  metrics that he employed with the company in preparing these
9  programs were appropriate and reasonable in terms of market
10 practice.
11     Mr. Dempsey would also testify, if called, that in
12 developing the KEIP with respect to the SLTs, that it was
13 calculated to achieve the desired performance of maximizing the
14 value of the Debtors in the States, that -- in his view, that
15 the KEIP is reasonable with respect to the SLTs, particularly
16 in the context of other similarly situated companies, and in
17 light of Nortel's circumstances.
18     Mr. Dempsey would also testify that the terms and scope of
19 the KEIP are reasonable and fair in light of the achievement of
20 the companies goals, and in particular, would note that the CEO
21 is not included in the KEIP as we had mentioned earlier.
22     Mr. Dempsey would also testify that the KEIP is consistent
23 with industry standards with respect to the SLTs.  And the
24 metrics are common in terms of the similar programs for SLTs.
25 Mr. Dempsey would also testify that Nortel engaged in an

Dempsey - Direct (proffered)

1    appropriate amount of due diligence in investigating the need

2    for the plan, analyzing which employees should be included,

3    comparing the plan with others implemented by similar

4    companies, and consulting with the constituencies that are

5    interested in this, including with respect to the Official

6    Committee of Unsecured Creditors.

7         Mr. Dempsey would also testify, if called, that the KEIP

8    with respect to the SLTs, while having retentive aspects, is

9    primarily incentive based, and that it is intended to motivate

10   these executives to help the organization achieve the important

11   goals of maximizing value.

12        Overall, Mr. Dempsey would testify, if called, that he

13   believes that the KEIP, as it relates to the SLT, is reasonable

14   and appropriate under the facts and circumstances of these

15   proceedings.  I would also note, Your Honor, that in the first

16   hearing on the 5th, that Mr. Dempsey was qualified as an expert

17   with respect to executive compensation matters, particularly --

18             THE COURT:  Yes.

19             MR. BROMLEY:  -- as it relates to Chapter 11 Debtors.

20   And that would conclude the proffer.  And we would be happy to

21   put Mr. Dempsey on the stand for any cross-examination if

22   anybody would like to do so.

23             THE COURT:  All right, Mr. Bromley.  Thank you for

24   that.  Does anyone wish to cross-examine Mr. Dempsey?

25        (No verbal response.)

1          THE COURT:  All right.  The proffer is admitted.

2          MR. BROMLEY:  Thank you very much, Your Honor.

3          THE COURT:  Thank you.

4          MR. BROMLEY:  And I'm happy to address any questions

5    you may have.

6          THE COURT:  I don't have any.  I thought we really

7    covered these issues at the last hearing to a large extent.  I

8    realize that there are, perhaps -- well, we've carved out the

9    -- primarily, I think, to provide additional time to the

10   Committee to formulate its views and so I don't have questions

11   for you, but I thank you.

12         MR. BROMLEY:  And I think one thing to add, Your

13   Honor, we would note, I believe, that the Committee's had the

14   opportunity to meet nearly everyone of the SLTs over the past

15   couple of weeks.  So that was one of the intentions of also

16   having time to -- between the two hearings.

17         THE COURT:  Excellent.  Thank you, Mr. Bromley.

18         MR. BROMLEY:  Thank you, Your Honor.

19         THE COURT:  Does anyone wish to be heard in argument?

20      (No verbal response.)

21         THE COURT:  All right.  Well, you know, I -- first of

22   all, I do recognize that the former employees are fairing

23   poorly, and as I said at the last hearing, if we could do

24   anything on these bonuses to be of assistance to former

25   employees, it would be one thing, but we can't.  And as a

1    practical matter, as Debtors' counsel has indicated, these --

2    this program hopefully will maximize their recovery to the

3    extent that they are Creditors of these Debtors, and that's

4    significant.  And I have to note, you know, the bonus --

5    bonuses are, as we all know, very much in the news this past

6    week, and just thinking about the differences between this

7    situation and the situation in the news, I think it points out

8    why this program is appropriate.

9        First of all, the entities' money is being used to pay

10   these programs, to fund these programs, is in full support of

11   them, and we have a Committee who has carefully reviewed all of

12   the information available, and it is to be commended for that,

13   and they're also in agreement.  I am satisfied, as I was for

14   the ELTs, that the Senior Leadership team and the eight members

15   who are the subject of this Motion are being incentivized here.

16   This is not a retention program, other than the fact that every

17   incentive program does have, at least, some retention aspect,

18   but this one is vastly incentive based.  And accordingly, I

19   think under Section 503, it is appropriate for the Court to

20   take cognizance of and place great weight upon the fact that

21   interested entities, in particular the Debtor, have exercised

22   their judgment in determining that the program and the

23   incentives and the amounts are appropriate, and we also have as

24   the very helpful, expert testimony of Mr. Dempsey, and the work

25   that he, too, performed in support -- in review, I should say,

27

1    of these programs, and the fact that they are certainly within

2    market, if not even to a large extent below market.  We also, I

3    think, just heard today that the Debtors have lost some key

4    employees, and the Court has to be mindful of the fact that

5    these key employees are essential to a successful

6    reorganization.

7         And for all of those reasons, I am prepared to grant the

8    motion.  I do grant the motion, and I will enter the order.  I

9    think there was a minor change you mentioned, Mr. Bromley, or

10   maybe not -- I may not have -- that was included in the order.

11             MR. BROMLEY:  Your Honor, what we have done --

12             THE COURT:  As to amount -- well, I guess we're not

13   specifying the amounts in the order in any event.

14             MR. BROMLEY:  Well, there was an amount noted in the

15   prior order --

16             THE COURT:  Yes.

17             MR. BROMLEY:  -- of a total for the KEIP.

18             THE COURT:  Total.

19             MR. BROMLEY:  And so what we've done is adjusted it

20   upward by $200,000.

21             THE COURT:  Yes.

22             MR. BROMLEY:  And we do -- we have made a couple of

23   other changes to the order just in terms of incorporating the

24   prior record.

25             THE COURT:  Right.

1    MR. BROMLEY:  And we're happy to let everyone take a
2    look at that before we submit it to -- it's only a page -- two
3    pages long.
4    THE COURT:  All right.  That will be fine and by the
5    time -- it shouldn't take the Committee too long then.  So I
6    will sign that order -- assuming that the Committee doesn't
7    have any concerns.
8    MR. BROMLEY:  Thank you, Your Honor.  Maybe what we
9    could do is move on to the --
10    THE COURT:  Yes.  I suggest -- Yes.
11    MR. BROMLEY:  -- the rejection procedures and then
12    the Committee can have --
13    THE COURT:  That's very fine.  Let's do that.  Ms.
14    Kim, your back.
15    MS. KIM:  Yes, I am.  The last item on the agenda is
16    the Motion to Approve Rejection Procedures.  And the Debtors
17    submit that in light of the vast number of executory contracts
18    and unexpired leases that it has, that it needs -- it is
19    necessary to use the procedures that are outlined in the Motion
20    to streamline their efforts to reject unexpired leases and
21    executory contracts that it deems necessary in its business
22    judgment to reject.  There were three objections that were
23    filed by some landlords --
24    THE COURT:  Yes.
25    MS. KIM:  -- for some nonresidential real property

1    leases, and we have worked with those -- the objectors, the

2    landlords, and have resolved those objections by making certain

3    changes to the proposed order, and I'd like to just outline

4    those changes for Your Honor.

5              THE COURT:  All right.  Thank you, Ms. Kim.

6              MS. KIM:  The first change would be to include names

7    and addresses of the noticed parties in the Rejection Notice

8    that the Debtors serve so that the recipients of those

9    Rejection Notices know who to serve objections on.

10             THE COURT:  Okay.

11             MS. KIM:  The next change would be for real property

12   leases, there was a concern by the landlords that until the

13   expiration of the ten-day notice period, that they would not be

14   in control of the property even if the Debtors had

15   unequivocally surrendered and given over the keys, and so what

16   we have changed the proposed order to would -- is to have the

17   date of the intended Rejection for real property leases be no

18   earlier than the expiration of that ten-day notice period.

19        The next change was just a clarification that the order is

20   not meant to modify the 210-day period under Section 365(d)(4)

21   --

22             THE COURT:  Certainly.

23             MS. KIM:  -- for real estate -- for nonresidential

24   real estate property leases.

25        The next changes were to say that the surrender of keys

30

1    and the removal of any personal property not abandoned by the

2    Debtors would all be -- would all take place prior to -- on or

3    before the proposed rejection date.

4            THE COURT:  Yes.

5            MS. KIM:  The -- in order to be able to unequivocally

6    surrender those properties.

7        The next change was, for real property leases, if a

8    noticed party, other than the landlord, files an objection that

9    ultimately is overruled by Your Honor, the rejection would be

10   affective on the later of the proposed rejection date, a date

11   that the parties agree to or a date provide by court order.

12   And again, that was intended to respond to concerns by the

13   landlords that they would not be in control of the property if

14   someone who had a claim on personal property that was left at

15   the premises had an objection to that, and Your Honor has

16   resolved that objection.

17       Nevertheless, Debtors reserve the right to seek that

18   rejection should it become effective earlier in the case of

19   such objections are ultimately overruled, and the Debtors also

20   reserve the right to seek a determination of property use and

21   occupancy charges that are accrued during that period be --

22   while that objection is being resolved, and to argue that

23   they're not liable for that installment of rent as post-

24   petition administrative expenses.  So this -- that's just a

25   reservation of rights.

1    The next change was to clarify that or -- and to have this

2  order deemed that personal property abandoned would be

3  abandoned free and clear of claims in trusted and encumbrances,

4  and the landlord would then be able to retain or dispose of

5  such abandoned property, assuming that the Debtors follow the

6  procedures that are outlined in the order.

7            THE COURT:  Okay.

8            MS. KIM:  The next change was to state that the order

9  would not constitute a finding of fact or an adjudication with

10 respect to non-debtor parties' rights -- contractual rights

11 arising from the expiration or termination of a lease or

12 agreement.

13   And finally, because the real property leases are now --

14 would only be rejected on the later -- no earlier than the

15 expiration of the ten-day rejection period, we put in a

16 reservation of right for the Debtors to be able to file a

17 separate motion if they do decide that they need to have a

18 retroactive rejection.

19   Those were the only changes.  I believe that, at least,

20 some counsel for some of the objecting landlords are here, and

21 I believe that this resolved their objections but --

22            THE COURT:  All right.  If any objecting landlords

23 wish to be heard, you may come forward, of course.  Ms.

24 Heilman.  I saw your hand in this resolution, Ms. Heilman.

25            MS. HEILMAN:  Thank you, Your Honor.  Leslie Heilman,

1  Ballard, Spahr, Andrews and Ingersoll.  For the record, I

2  represent UBS Realty Investors, LLC and the Prudential

3  Insurance Company --

4          THE COURT:  Yes.

5          MS. HEILMAN:  -- with respect -- there is two

6  Prudentials appearing before Your Honor this morning.  We are

7  with respect to the Sawgrass Corporate Park in Sunrise,

8  Florida.  Your Honor, I do commend the Debtors.  They have --

9  we worked very long and hard at a resolution of this order, and

10 we do believe it is acceptable to the objecting landlords, and

11 at -- in light of that, we will withdraw our objection.

12         THE COURT:  All right. Ms. --

13         MS. HEILMAN:  Thank you.

14         THE COURT:  -- Heilman, thank you very much.  I think

15 that -- I commend all parties for working together, and

16 certainly the resolutions are understandable and reasonable,

17 and I think will certainly make matters easier later.  So with

18 that resolution, I am prepared to grant the motion.  I think it

19 is -- certainly is very, very necessary in this case given the

20 number of contracting parties and contracts.  The fact that we

21 had only a few objections I think speaks loudly in support of

22 the motion itself, and I, therefore, will grant the motion.

23         MS. KIM:  Thank you, Your Honor.  We have blacklines

24 reflecting those changes and clean copies of --

25         THE COURT:  Good.

1          MS. KIM:  -- the revised order so --

2          THE COURT:  Thank you.

3          MS. KIM:  -- we will submit after the hearing is

4    over.

5          THE COURT:  Okay, Ms. Kim.  Thank you so much.

6          MS. KIM:  And that concludes the agenda.

7          THE COURT:  And did we have any problem of the

8    Proposed Order on the key employee incentive program?

9          MR. BOTTER:  Your Honor, the Order was fine.  There

10   was -- appeared to be a mathematics mistake, but we've cleared

11   that up.

12         THE COURT:  All right.  Excellent.  Thank you, Mr.

13   Botter.  Well, if there's nothing further, I will sign the

14   orders after the hearing.  We'll get them on the docket today,

15   of course, and I thank counsel for being so well prepared and

16   making a very, very fine presentation.  And with that, we stand

17   in recess.  And I wish all a good weekend.

18         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

19         THE COURT:  Good day.

20         UNIDENTIFIED SPEAKER:  Thank you, Judge.

21      (Court adjourned at 12:15.)

34

1                       CERTIFICATE

2          I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter.

5

6     /s/ April J. Foga                    March 30, 2009
     April J. Foga, CET, CCR, CRCR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25