**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

**NOTICE OF FILING OF FIFTH REPORT OF THE MONITOR OF THE
CANADIAN NORTEL COMPANIES IN THE CANADIAN PROCEEDINGS**

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Alteon Websystems, Inc. (9769); Alteon Websystems International, Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); and Nortel Networks Cable Solutions Inc. (0567).

**PLEASE TAKE NOTICE** that on March 30, 2009, Ernst & Young Inc., the monitor and foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation (collectively, the "**Canadian Nortel Group**"), in proceedings under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**Canadian Proceedings**"), pending before the Ontario Superior Court of Justice (Commercial List), by its undersigned counsel, filed, in the above-captioned cases, a copy of the Fifth Report of the Monitor (the "**Fifth Report**"), dated March 26, 2009.  A copy of the Fifth Report is annexed hereto as Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Fifth Report is also available on the Monitor's website, www.ey.com/ca/nortel or upon request to the Monitor's counsel.

Dated: New York, New York
      March 30, 2009

ALLEN & OVERY LLP

Ken Coleman
Lisa Kraidin
1221 Avenue of the Americas
New York, New York  10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
ken.coleman@allenovery.com
lisa.kraidin@allenovery.com

-and-

BUCHANAN INGERSOLL & ROONEY

By: /s/ Mary F. Caloway
Mary F. Caloway (No. 3059)
Peter J. Duhig (No. 4124)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
Telephone (302) 552-4200
Facsimile (302) 552-4295
mary.caloway@bipc.com

Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian Nortel
Group

**EXHIBIT A**

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION (the "Applicants")**

**FIFTH REPORT OF THE MONITOR**
**DATED MARCH 26, 2009**

**INTRODUCTION**

1.  On January 14, 2009, Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009 which was amended as reflected in the Amended and Restated Initial Order dated February 20, 2009 (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceeding.

**PURPOSE**

2.  The purpose of this Fifth Report of the Monitor (the "Fifth Report") is to provide information regarding the Applicants' motion seeking approval of a sale of Nortel's

- 2 -

"Layer 4-7" application delivery business, (the "Layer 4-7 Business") to Radware Ltd. ("Radware") and to provide the Monitor's support thereof.

**TERMS OF REFERENCE**

3.      In preparing this Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company, and discussions with management of Nortel.  EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Report.

4.      Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

5.      Capitalized terms not defined in this Report are as defined in the affidavit of John Doolittle sworn January 14, 2009, the Report of EYI in its capacity as proposed monitor dated January 14, 2009 or the previous Reports of the Monitor.

**BACKGROUND**

6.      In the Second Report, the Monitor noted that in mid-2008, Nortel management determined that the Company should pursue a sale of the Layer 4-7 Business.  The Second Report set out the process conducted by the Company both prior to and immediately after its CCAA filing to identify potential purchasers and to negotiate a definitive agreement for the sale of the business. As noted, this process resulted in NNL, Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries (the "U.S. Debtors"), Nortel Networks UK Limited ("NNUK"), certain of its subsidiaries located in EMEA and the administrators of those EMEA entities (the "EMEA Entities"), (collectively, the "Sellers") entering into an Asset Purchase Agreement (the "Purchase Agreement") with Radware Ltd. ("Radware") outlining the terms of the Company's sale of the assets and certain associated liabilities of the Layer 4-7 Business to Radware.  The Purchase Agreement (without Exhibits or Schedules) is attached as Exhibit "A" to the Affidavit of George Riedel sworn March 26, 2009 (the "Riedel Affidavit").

- 3 -

7.    The aggregate purchase price under the Purchase Agreement is $17,650,000 in cash, with purchase price adjustments that may increase or decrease the purchase price based on the variance of Targeted Inventory Value, Warranty Target Amount and Business Tangible Property Value (all as defined in the Purchase Agreement) to their respective actual values as determined three business days prior to the closing date.  The assets to be transferred by the Applicants and the U.S. Debtors under the Purchase Agreement are to be transferred free and clear of all liens, claims and encumbrances of any kind other than permitted liens and those expressly assumed by Radware under the Purchase Agreement. Accordingly, the Applicants are seeking an order of this Honourable Court vesting in Radware all of the Applicants' right, title and interest in the Acquired Assets as defined in the Purchase Agreements.

8.    Other key terms of the Purchase Agreement are outlined in the Second Report.

**BIDDING PROCEDURES AND AUCTION PROCESS**

9.    The Second Report also noted that as certain of the U.S. Debtors are parties to the Purchase Agreement and given the desire to maximize value for the benefit of stakeholders in relation to the assets which are the subject of the Purchase Agreement, Nortel determined and agreed with Radware that the Purchase Agreement would be subject to higher or better offers being obtained pursuant to a sale process under section 363 of the United States Bankruptcy Code and that the Purchase Agreement would serve as a "stalking horse" bid pursuant to that process.

10.   The proposed bidding procedures were attached as Appendix "A" (the "Bidding Procedures") to the Second Report.  The Bidding Procedures were approved by the U.S. Bankruptcy Court and by this Honourable Court on February 27, 2009 (a copy of which is attached as Exhibit "C" to the Riedel Affidavit).  The Bidding Procedures, as further detailed in the Second Report, provided that all bids must be received by the Sellers no later than March 19, 2009.

11.   In connection with the Bidding Procedures, the Monitor is advised by the Company that:

- 4 -

- it contacted 38 potentially interested parties to assess the interest of these parties in acquiring the Layer 4-7 Business;

- sixteen (16) of these parties attended, in person or by teleconference, a preliminary due diligence session held by the Company in Santa Clara, California;

- two (2) potential buyers submitted non-binding letters of intent and were deemed "Qualified Bidders" pursuant to the Bidding Procedures.  These two Qualified Bidders were given access to the confidential data room, accessed the data room and discussions were held with these parties;

- on March 17, 2009, both Qualified Bidders advised that they would not be submitting a bid for the Layer 4-7 Business.

12.  As no bids were received by the deadline of March 19, 2009, no auction was held. Accordingly, the Company has determined that it should proceed to closing of the transaction with Radware as contemplated by the Purchase Agreement.

13.  The Monitor is advised that a hearing has been scheduled before the U.S. Bankruptcy Court on March 26, 2009 for approval of the Purchase Agreement and that subject to the approval of the U.S. Bankruptcy Court and of this Honourable Court, that closing is anticipated to occur on or about March 31, 2009.

**ALLOCATION OF PROCEEDS OF SALE AMONGST NORTEL ENTITIES**

14.  As noted in the Second Report, the Layer 4-7 Business is not operated through a dedicated legal entity or stand-alone division.  For example, the Applicants have an interest in intellectual property of the Layer 4-7 Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from the Purchase Agreement amongst the various Nortel entities in the various jurisdictions is complex. As a result, the Sellers have agreed that the proceeds of sale stemming from the Purchase Agreement will be held in escrow until such time as an allocation is agreed upon.

- 5 -

15. The Applicants, the U.S. Debtors and the Administrators of the EMEA entities have agreed that J.P. Morgan Chase & Co. will act as the Escrow Agent. A draft of an escrow agreement (the "Escrow Agreement") amongst the parties is attached at Appendix "A". The Monitor is advised that the parties intend to finalize and execute the Escrow Agreement prior to March 30, 2009, the date set for the hearing of the approval of the Purchase Agreement by this Honourable Court.

16. The key terms of the Escrow Agreement are as follows:

- Upon closing, the Company will direct Radware to deposit the sale proceeds pursuant to the Purchase Agreement in an escrow account (the "Escrow Account") to be established by the Escrow Agent.

- Funds will be released from the Escrow Account by the Escrow Agent as follows:

  o To satisfy any liability of the Escrow Agent for the payment of taxes in respect of income derived from the investment of funds held in the Escrow Account;

  o In the event that the bankruptcy / insolvency proceedings in both Canada and the U.S. are ongoing, pursuant to orders of both the U.S. Bankruptcy Court for the District of Delaware and the Ontario Superior Court of Justice, provided such orders are not inconsistent;

  o In the event that the bankruptcy / insolvency proceedings have been terminated in one jurisdiction, pursuant to an order of the court in the jurisdiction in which insolvency proceedings are still ongoing;

  o In the event that the bankruptcy / insolvency proceedings have been terminated in both jurisdictions, pursuant to an order of the federal court in the Southern District of New York and the state courts of the State of New York, county of Manhattan (the "New York Courts") or pursuant to the written direction of a number of the Sellers holding more than 90% of the Voting Interest as set out in the Escrow Agreement. The Monitor notes

- 6 -

that the draft Escrow Agreement does not currently contain the Voting Interest percentages by Nortel legal entity. However, the Monitor has been advised by counsel to the Applicants that the Voting Interest to be allocated to NNL will be no less than 10% and as a result, any direction pursuant to this provision will require the agreement of NNL; and

o   In respect of monies, other than the Purchase Price (as defined in the Purchase Agreement) which are deposited into the Escrow Account and which in the opinion of any one of the Sellers are payments intended to be in respect of VAT (meaning value added tax imposed in any member state of the European Union) or transfer taxes, upon the written request of that particular Seller, provided that if any other Seller is objecting to the release of such funds, the Escrow Agent shall not release the funds without an order from the New York Courts.

- All requests for the release of funds, other than to satisfy any tax obligations of the Escrow Agent, may only be made by the designated Authorized Representatives of the Sellers as set out in the Escrow Agreement.

- The Escrow Agent shall be indemnified by the Sellers, other than the Administrators of the EMEA Entities, for any liability it may incur in respect of its actions other than if determined to be as a result of gross negligence or wilful misconduct.

- The Escrow Agent shall be paid a fee of U.S.$3,000 for its services. In addition, the Escrow Agent shall be reimbursed for all out-of-pocket costs and expenses, including legal costs, incurred in the performance of its duties.

- The Escrow Agent may resign at any time upon 30 days prior written notice.

- The Escrow Agreement is governed by New York law. All disputes under the Escrow Agreement, other than in respect of the release of funds as specifically set out above, will be subject to the exclusive jurisdiction of the New York Courts.

- 7 -

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

17.    Based upon discussions with management of the Company, the Monitor is of the view that the Company's efforts to market the Layer 4-7 Business were conducted in good faith to maximize value. Despite having contacted a number of potential purchasers, there has been limited interest in the Layer 4-7 Business and ultimately, no bids other than the Radware bid were submitted pursuant to the Bidding Procedures. Accordingly, the Purchase Agreement represents the best transaction available. The Monitor therefore recommends that his Honourable Court approve the Applicants' motion authorizing the Applicants to complete the Radware transaction and vesting all of the Applicants' right, title and interest in the Acquired Assets to Radware.

18.    The Monitor is also of the view that the allocation of proceeds amongst the Sellers is complex and requires a significant amount of further analysis before any determination can be made. Accordingly, the Monitor supports the Applicants' request for approval of this Honourable Court to place the proceeds from the closing of the Radware transaction in escrow. This will allow the Sellers time to complete a detailed analysis and engage in discussions with respect to the appropriate method of allocation. Once this process has been completed, the Monitor expects that the Applicants will return before this Honourable Court to seek approval of the allocation and release of the funds from escrow.

All of which is respectfully submitted this 26th day of March 2009.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:

Murray A. McDonald
President

ESCROW AGREEMENT

This Escrow Agreement (the "Agreement") is entered into as of March __, 2009, by and among Nortel Networks Inc., a Delaware corporation ("NNI"), acting on behalf of itself and on behalf of its wholly-owned subsidiary Alteon WebSystems Inc., Nortel Networks Limited, a Canadian corporation ("NNL"), acting on behalf of itself and on behalf of Nortel Networks Technology Corporation and NNL's wholly-owned subsidiaries identified as Non-Debtor Nortel Networks Entities on Exhibit 1 hereto (collectively, the "Non-Debtor Nortel Networks Entities"), those entities listed under the heading EMEA Sellers on the signature pages hereto (collectively, the "Depositors" and each a "Depositor"), and A. R. Bloom, S. Harris, A. M. Hudson and C. Hill of Ernst & Young LLP, in their capacity as the joint administrators of the EMEA Sellers (other than Nortel Networks (Ireland) Limited) and A. R. Bloom and D Hughes in their capacity as the joint administrators of Nortel Networks (Ireland) Limited (the "Joint Administrators"), and JP Morgan Chase Bank, N.A., as escrow agent ("Escrow Agent").

R E C I T A L S

WHEREAS, the parties (other than Escrow Agent) and Radware Ltd. (the "Buyer") have entered into that certain Asset Purchase Agreement, dated as of February 19, 2009, under which, subject to the terms and conditions set forth therein, the Depositors have agreed to sell, and in the case of NNI and NNL, cause certain of their respective affiliates to sell, certain of their assets to the Buyer (the "Purchase Agreement");

WHEREAS, the Purchase Agreement contemplates that the purchase price payable thereunder will be deposited into escrow, with an escrow agent, pending agreement among the Depositors and Joint Administrators as to how such purchase price is to be allocated among the Depositors; and

WHEREAS, the parties desire to enter this Agreement to govern the terms of such escrow arrangement and to appoint Escrow Agent as escrow agent for such purpose in accordance with the terms hereof.

A G R E E M E N T

In consideration of the mutual promises contained herein and for other good and valuable consideration, receipt of which is hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1.    Appointment of Escrow Agent. Depositors and the Joint Administrators hereby jointly nominate, constitute and appoint Escrow Agent as escrow agent to hold the Escrow Funds (as defined below) in the Escrow Account (as defined below) upon the terms and conditions set forth herein. Escrow Agent hereby accepts such appointment and agrees that deposits to, and disbursements from, the Escrow Account, or applicable portions thereof, shall only be made in accordance with the terms and conditions of this Agreement. Escrow Agent hereby represents to each of the Depositors and the Joint Administrators that it has the corporate power and legal authority to execute this Agreement and to perform its obligations hereunder. The Depositors and the Joint Administrators agree that any action specified in this Agreement as to be taken by

the Requisite Depositors (as defined below) shall be binding upon each of the Depositors and the Joint Administrators and Escrow Agent shall be entitled to act and rely upon any action taken by the Requisite Depositors as provided in this Agreement. As used herein, the term "Requisite Depositors" shall mean Depositors whose aggregate voting percentage (as set forth on Exhibit 1 hereto) (with respect to each Depositor, such Depositor's "Voting Percentage") is at least ninety percent (90%).

      2.      Escrow Funds. At the closing of the transactions contemplated by the Purchase Agreement (the "Closing"), Depositors shall instruct the Buyer to deposit the purchase price payable under the Purchase Agreement with Escrow Agent by wire transfer of immediately available funds (the "Escrow Amount") to the Escrow Account. The Depositors shall notify Escrow Agent of the amount of the purchase price payable under the Purchase Agreement at least one Business Day (as defined below) prior to the Closing. Said wire transfer shall be delivered directly to the following account: JP Morgan Chase Bank, ABA #: 021000021, Account Name: Nortel Velocity Escrow Agreement, Account #: 806020871, Attn: Natalie Pesce/Joan King-Francois, Ref: Nortel Velocity Escrow (the "Escrow Account"). The Escrow Amount, plus all interest and other income thereon received by Escrow Agent, less any funds distributed or paid in accordance with this Agreement, are collectively referred to herein as the "Escrow Funds". Escrow Agent shall provide the Depositors and the Joint Administrators with e-mail or other written confirmation of receipt of the Escrow Amount in the Escrow Account. As used herein, the term "Business Day" means a day other than a Saturday or a Sunday or other day on which commercial banks in New York are authorized or required by Law to close.

      3.      Investment of Escrow Funds. During the term of this Escrow Agreement, the Escrow Funds shall be invested in a cash compensation account at Escrow Agent (the "Cash Compensation Account"), segregated apart from the general funds of Escrow Agent. Cash Compensation Accounts have rates of compensation that may vary from time to time based upon market conditions. The parties recognize and agree that the Escrow Agent will not provide supervision, recommendations or advice relating to the investment of the Escrow Funds. Escrow Agent shall not have any liability for any loss sustained as a result of any investment in an investment made pursuant to the terms of this Agreement. Escrow Agent shall have the right to liquidate any investments held in order to provide the funds necessary to make required payments under this Agreement.

      4.      Ownership of Escrow Funds; Taxes.

      (a)      The Escrow Funds at all times are and shall be the exclusive property of the Depositors. Interest or other income earned on or with respect to the Escrow Funds shall, as of the end of each calendar year and to the extent required by law, be reported by Escrow Agent on Form 1099 or Form 1042-S as the income of the Depositors or their Affiliates, based upon the disbursement of the Escrow Funds to the Depositors or their Affiliates pursuant to Paragraph 5 if such income was disbursed during such calendar year or, with respect to any Escrow Funds not disbursed during such calendar year, based upon each Depositor's pro rata share of such income, with each Depositor's pro rata share being deemed to be equal to such Depositor's interest allocation percentage as set forth on Exhibit 1. Any other tax returns required to be filed will be prepared and filed by the Depositors with the IRS and any other taxing authority as required by law, including but not limited to any applicable reporting or withholding pursuant to the Foreign

Investment in Real Property Tax Act ("FIRPTA"). Depositors acknowledge and agree that Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable FIRPTA reporting or withholding with respect to the Escrow Funds or any income earned by the Escrow Funds. Depositors further acknowledge and agree that any taxes payable from the income earned on the investment of any sums held in the Escrow Funds shall be paid by Depositors. All proceeds of the Escrow Funds shall be retained in the Escrow Account and reinvested from time to time by Escrow Agent as provided in this Agreement. Escrow Agent shall withhold any taxes required by law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities. Escrow Agent has no ownership interest in the Escrow Funds but is serving solely as escrow holder having only possession thereof. This Paragraph 4 shall survive notwithstanding any termination of this Agreement or the resignation of Escrow Agent. Each Depositor will provide Escrow Agent with the appropriate form W-9 or W-8 either (x) if any of the Escrow Funds are to be disbursed to such Depositor prior to December 31, 2009, as a condition to such Depositor's receipt of such Escrow Funds from Escrow Agent, prior to Escrow Agent making such disbursement hereunder or (y) if none of the Escrow Funds are to be disbursed to such Depositor prior to December 31, 2009, on or before December 31, 2009. If W-8 or W-9 forms, validated by Escrow Agent, have not been provided by all of the Depositors prior to December 31, 2009 the Escrow Agent shall report taxes on a disbursement basis in the year they are disbursed.

        (b)      To the extent that Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Funds, Escrow Agent shall satisfy such liability to the extent possible from the Escrow Funds. The Depositors shall, jointly and severally, indemnify, defend and hold Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against Escrow Agent on or with respect to the Escrow Funds and the investment thereof unless such tax, late payment, interest, penalty or other expense was caused by the gross negligence or willful misconduct of Escrow Agent. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a pro rata basis by the Depositors in accordance with their Interest Allocation Percentages reflected in Exhibit 1 and any Depositor paying in excess of its pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Depositor that has paid less than its pro rata share of such costs either directly to Escrow Agent or by payment to another Depositor pursuant to this sentence. The indemnification provided by this Paragraph 4(b) is in addition to the indemnification provided in Paragraph 9 and shall survive the resignation or removal of Escrow Agent and the termination of this Agreement.

        5.     Distribution of Escrow Funds. Depositors, Joint Administrators and Escrow Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, Escrow Agent shall hold the Escrow Funds and not disburse any amounts from the Escrow Account except in accordance with the following terms and conditions:

        (a)      Escrow Agent shall disburse to any Person (as defined below) all or any portion of the Escrow Funds if and as so instructed by orders of both the U.S. Bankruptcy Court for the District of Delaware (the "US Bankruptcy Court") and any Canadian court before which one or more of the Bankruptcy Cases is pending (each an "Applicable Canadian Court" and, collectively, the "Applicable Canadian Courts"); provided, however, that (i) if the US

Bankruptcy Court or any one or more Applicable Canadian Court shall have entered a final decree closing the Bankruptcy Cases (as defined below) involving the Depositors subject to the jurisdiction of such court(s), then an order of such court(s) shall not be required and (ii) if Escrow Agent receives orders from multiple courts that are inconsistent, Escrow Agent shall take no action until Escrow Agent receives consistent orders from the US Bankruptcy Court and the Applicable Canadian Courts.  The orders referenced in the preceding sentence may be presented to Escrow Agent by an Authorized Representative (as set forth in Paragraph 12) of one or more of the Depositors and accompanied by the written instruction referenced in Paragraph 5(d).  As used herein, (a) the term "Person" means any individual, corporation, partnership, limited partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, governmental or regulatory body or other entity, (b) the term "Bankruptcy Cases" means (1) the voluntary petitions and certain orders for relief pursuant to Title 11 of the United States Code with respect to certain of the Depositors pending before the US Bankruptcy Court and (2) the cases commenced by the application of certain Depositors for protection under the Companies' Creditors Arrangement Act before the Ontario Supreme Court of Justice together with together with any other formal insolvency proceedings commenced in Canada in respect of any Depositor.  If any formal insolvency proceeding is commenced in Canada in respect of any Depositor, the applicable Depositor (or any other Depositor) shall notify Escrow Agent of the commencement of such proceeding.  Until such notification is given, Escrow Agent shall only require an order of the US Bankruptcy Court and an order of the Ontario Supreme Court of Justice as the Depositors hereby inform Escrow Agent that no other formal insolvency proceeding is pending in Canada with respect to any Depositor.

(b)    If the escrow established pursuant to this Agreement is not terminated prior to the entry of final decrees closing the Bankruptcy Cases involving the relevant Depositors, following the entry of such final decrees, Escrow Agent shall disburse to any Person all or any portion of the Escrow Funds if and as so instructed pursuant to (i) a letter of direction executed by the Requisite Depositors or (ii) a final decision of a court of competent jurisdiction (as set forth in Paragraph 20 below), which is either non-appealable or with respect to which the time for appeal has expired without the filing of a timely appeal, directing the distribution of all or such portion of the Escrow Fund as specified in such letter of direction or court order.  Any court order pursuant to the preceding sentence may be presented to Escrow Agent by an Authorized Representative (as set forth in Paragraph 12) of one or more of the Depositors and accompanied by the written instruction referenced in Paragraph 5(d).

(c)    The Depositors and the Joint Administrators understand and agree that no payments or reimbursements made pursuant to Section 9.1 of the Purchase Agreement in respect of VAT or Transfer Taxes shall constitute any part of the Escrow Amount or the Escrow Fund, or shall be required to be paid by the Buyer into the Escrow Account.  In the event, however, that Buyer or its affiliates make any payments with respect to VAT or Transfer Taxes that are payable to or intended for the benefit of one or more Depositors pursuant to Section 9.1 of the Purchase Agreement but which are deposited into the Escrow Account (any such payment, "Misdirected Tax Payment"), then the applicable Depositor(s) shall have the right to request the release of such Misdirected Tax Payment by providing Escrow Agent with a letter of direction executed by an authorized representative of such Depositor directing the release of such Misdirected Tax Payment.  The requesting Depositor(s) shall (A) send a copy of such letter of

direction to each of the other Depositors and the Joint Administrators at the same time as such letter is sent to Escrow Agent and (B) attach thereto (i) supporting documentation evidencing the amount of VAT or Transfer Taxes payable (it being understood that Escrow Agent shall have no responsibility for verifying the accuracy or sufficiency of such supporting documentation) and (ii) a certification of an authorized representative of such Depositor that the amount requested by such Depositor represents amounts deposited into escrow that are payable to or intended for the benefit of such Depositor by the Buyer or its affiliates with respect to VAT or Transfer Taxes pursuant to Section 9.1 of the Purchase Agreement. Escrow Agent shall, within ten (10) days of receipt of such letter of direction disburse to such Depositor the amounts requested therein; provided, however, that if Escrow Agent receives a notice of objection from one or more of the Depositors prior to making such disbursement, Escrow Agent shall not make such disbursement until Escrow Agent either (x) receives an order of a court of competent jurisdiction (as provided in Paragraph 20) instructing it to make such distribution or (y) the objecting Depositor(s) provide written notice to Escrow Agent withdrawing such objection. Subject to the proviso to the preceding sentence, Escrow Agent shall be entitled to act upon any such written letter of direction even if not countersigned by one or more of the other Depositors. For the sake of clarity, there shall, pursuant to this Paragraph 5(c), be no releases of any portion of the $_____ purchase price (as specified in Section 3.1(a) of the Purchase Agreement) deposited into the Escrow Account at the Closing or earnings thereon.

As used herein, (i) the term "VAT" means value added tax imposed in any member state of the European Union pursuant to EC Council Directive 2006/112 on the common system of value added tax (Directive 2006/112) and national legislation implementing or supplemental to that Directive and any other sales or turnover tax of a similar nature imposed in any country that is a member of the European Union, together with all penalties or interest thereon or any tax of a similar nature which may be substituted for or levied in addition to it and (ii) the term "Transfer Taxes" means all goods and services, sales, use, transfer, documentary, VAT, value added, stamp, recording and similar taxes incurred in connection with the purchase and sale of the assets sold pursuant to the Purchase Agreement (for the avoidance of doubt, including interest and penalties but excluding any income taxes).

(d)    Escrow Agent shall have no responsibility or obligation for investigating or determining the validity or sufficiency of any matter asserted in a letter of direction or of any pending claim for entitlement to release of funds from the Escrow Account. Escrow Agent shall have the right to withhold an amount equal to the amount due and owing to Escrow Agent, plus any reasonable costs and expenses incurred by Escrow Agent in accordance with the terms of this Agreement in connection with the termination of the Escrow Account and each of the Depositors hereby agrees to indemnify and hold harmless each other Depositor for its allocation of such amount in an amount proportionate to the distributions such Depositor has received from the Escrow Account prior to such termination.

The Authorized Representative of the Depositor(s) presenting court order(s) to Escrow Agent pursuant to Paragraph 5(a) or Paragraph 5(b) shall provide, along with such court order(s), a written instruction informing Escrow Agent of the action to be taken by Escrow Agent on account of such court order(s), as Escrow Agent shall not be required to interpret any court orders independently of such written instruction. None of the Depositors shall issue a written instruction which fails to comply with the terms of the applicable court order(s) and the

Depositors shall provide a copy of such written instruction to each of the other Depositors and the Joint Administrators.

Any request for a distribution pursuant to this Paragraph 5 shall be accompanied by a completed Schedule A with respect to the Depositors participating in such distribution, unless a completed Schedule A with respect to such Depositor has previously been provided to Escrow Agent (in which case the Schedule A to be provided to Escrow Agent need only contain the requisite information with respect to Depositors as to whom no previous Schedule A has been provided to Escrow Agent. The Depositors shall comply with any request from another Depositor for information necessary for inclusion in Schedule A.

6.    Termination of Escrow Account. Escrow Agent shall hold the Escrow Amount in the Escrow Account until all such amounts have been distributed in accordance with Paragraph 5 hereof. If, at any time, the Escrow Amount shall equal zero, then the Escrow Account and this Agreement (except for any provisions which expressly survive the termination of this Agreement, including Paragraph 9 and Paragraph 10) shall terminate at such time.

7.    Method of Payment. Any payments to be made hereunder shall be made by wire transfer in immediately available funds to the account of such party designated on Schedule A annexed hereto (collectively, the "Standing Settlement Instructions"). Any Depositor shall have the right, from time to time, to provide written notice to Escrow Agent and the other Depositors updating its Standing Settlement Instructions, and Escrow Agent shall thereafter use such revised Standing Settlement Instructions for purposes of any subsequent distributions to such Depositor pursuant to Paragraph 5 until such Standing Settlement Instructions have been further updated pursuant to this Paragraph 7.

The Depositors and Joint Administrators acknowledge that Escrow Agent may rely upon all identifying information set forth in the Standing Settlement Instructions. Escrow Agent and the Depositors agree that such Standing Settlement Instructions shall be effective as the funds transfer instructions of the Depositors, without requiring a verifying callback, whether or not authorized, if Escrow Agent has previously authenticated such Standing Settlement Instructions with respect to such Depositor. The parties acknowledge that such Standing Settlement Instructions are a security procedure and are commercially reasonable.

8.    Monthly Reports. Escrow Agent shall provide monthly account statements to the Depositors and Joint Administrators with respect to the Escrow Account.

9.    Liability of Escrow Agent. Escrow Agent's sole liability hereunder shall be to hold and invest the Escrow Amount and any moneys or other properties received with respect thereto, to make payments and distributions therefrom in accordance with the terms of this Agreement, and otherwise to discharge its obligations hereunder. Escrow Agent shall not be liable for any act performed in good faith or in reliance on any document, instrument or statement believed by it to be genuine and delivered in accordance with the terms hereof. Escrow Agent may act upon any notice, certificate, instrument, request, paper or other document believed by it to be genuine or to have been made, sent, signed, prescribed or presented by the proper person or persons. It shall be under no obligation to institute or defend any action, suit or legal proceeding in connection herewith, or to take any other action likely to involve it in

expense unless first indemnified to its satisfaction by the party or parties who desire that it undertake such action. Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through agents or attorneys (and shall be liable only for the careful selection of any such agent or attorney) and may consult with counsel, accountants and other skilled persons to be selected and retained by it. Escrow Agent shall not be liable for anything done, suffered or omitted by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons. Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction (as set forth in Paragraph 20 below) determines that Escrow Agent's gross negligence or willful misconduct was the cause of any loss to any Depositor or any of the Joint Administrators. In the event that Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise pursuant to Paragraph 5 or otherwise by a final order or judgment of a court of competent jurisdiction (as set forth in Paragraph 20 below).

        Anything in this Agreement to the contrary notwithstanding, in no event shall Escrow Agent be liable for special, indirect or consequential loss or damage or any kind whatsoever (including but not limited to lost profits), even if Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

        If any dispute should arise with respect to the payment or ownership or right of possession of the Escrow Amount, or any part thereof, at any time, that cannot be settled under other provisions hereof, Escrow Agent is authorized to retain in its possession, without liability to anyone, all or any part of the Escrow Amount, as applicable, or the proceeds from any sale thereof until such dispute shall have been settled either by mutual agreement between the parties concerned or until otherwise ordered by a court order of a court of competent jurisdiction (as set forth in Paragraph 20 below).

        The Depositors shall, jointly and severally, indemnify and hold harmless Escrow Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the "Indemnitees") from all losses, costs, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, and expenses (including, without limitation, the reasonable fees and expenses of outside counsel) (collectively "Losses") arising out of or in connection with (a) Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement by Escrow Agent of any of its rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except in the case of any Indemnitee to the extent that such Losses are finally adjudicated by a court of competent jurisdiction (as set forth in Paragraph 20 below) to have been caused by the gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or directions, whether joint or singular, from the parties, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof. The parties hereto acknowledge that the foregoing indemnities shall survive the resignation, replacement or removal of Escrow Agent or the termination of this Agreement. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a pro rata basis by the Depositors in accordance with their Interest Allocation Percentages reflected in Exhibit 1 and

any Depositor paying in excess of its pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Depositor that has paid less than its pro rata share of such costs either directly to Escrow Agent or by payment to another Depositor pursuant to this sentence.

The duties and responsibilities of Escrow Agent hereunder shall be determined solely by the express provisions of this Agreement, which shall be deemed purely ministerial in nature, and no other or further duties or responsibilities shall be implied. Escrow Agent shall not have any liability under, nor duty to inquire into, the terms and provisions of any agreement or instructions, including the Purchase Agreement, other than outlined in this Agreement, nor shall Escrow Agent be required to determine if any person or entity has complied with any such agreements, nor shall any additional obligations of Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. In the event of any conflict between the terms and provisions of this Agreement, those of the Purchase Agreement, any schedule or exhibit attached to the Agreement, or any other agreement among Depositors and the Joint Administrators, or any of them, the terms and conditions of this Agreement shall control.

10.    Compensation of Escrow Agent. The Depositors agree to pay Escrow Agent a one-time fee in the amount of $3,000 on the date hereof as full compensation for its services hereunder; provided, however, that the Depositors further agrees to reimburse Escrow Agent all reasonable out-of-pocket costs and out-of-pocket expenses, including reasonable attorneys' fees, suffered or incurred by Escrow Agent in connection with the performance of its duties and obligations hereunder, including but not limited to any suit in interpleader brought by Escrow Agent (which shall be brought only in a court of competent jurisdiction (as set forth in Paragraph 20)).

11.    Resignation or Removal of Escrow Agent. Escrow Agent may resign as such following the giving of thirty (30) days' prior written notice to the other parties hereto and upon selection of a successor escrow agent pursuant to the provisions of this Agreement. Similarly, Escrow Agent may be removed and replaced following the giving of thirty (30) days' prior written notice to Escrow Agent by the Requisite Depositors and the Joint Administrators. In either event Escrow Agent shall then deliver the balance of the Escrow Amount then in its possession to a successor escrow agent as shall be appointed by the Requisite Depositors and the Joint Administrators as evidenced by a written notice filed with Escrow Agent, with a copy to each of the Depositors.

If the Requisite Depositors and Joint Administrators are unable to agree upon a successor or shall have failed to appoint a successor prior to the expiration of thirty (30) days following the date of notice of resignation or removal, the then-acting escrow agent may petition any court of competent jurisdiction (as set forth in Paragraph 20 below) for the appointment of a successor escrow agent or otherwise appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

Upon acknowledgement by any successor escrow agent of the receipt of the then-remaining balance of the Escrow Amount the then-acting escrow agent shall be fully released and relieved of all duties, responsibilities and obligations under this Agreement.

Any corporation into which Escrow Agent in its individual capacity may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which Escrow Agent in its individual capacity shall be a party, or any corporation to which substantially all the corporate trust business of Escrow Agent in its individual capacity may be transferred, shall be Escrow Agent under this Agreement without further act.

12.    Notices.  All notices and other communications provided for herein shall be in writing and shall be deemed to have been duly given when delivered personally or sent by telex or telecopy, one (1) Business Day after being sent via a nationally recognized courier service for next Business Day delivery or seven (7) Business Days after being mailed by registered or certified mail, return receipt requested, postage prepaid, in each case, addressed to the addressee at its address last furnished to the sender in writing by the addressee for the purpose of receiving notices under this Agreement, or, unless and until such address shall have been so furnished, addressed to the addressee as set forth in Schedule B hereto.

In the event wire transfer instructions are given (other than in writing at the time of execution of this Agreement), whether in writing, by telecopier or otherwise, Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule C hereto (each an "Authorized Representative" of the applicable Depositor), and Escrow Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated.  The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by Escrow Agent, it being understood that each Depositor shall have the right to replace its Authorized Representative from time to time by providing written notice to Escrow Agent or by providing a copy of a court order of a court of competent jurisdiction (as provided in Paragraph 20) to Escrow Agent designating a successor Authorized Representative.  The parties to this Agreement acknowledge that such security procedure is commercially reasonable.

13.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall constitute one and the same agreement.  Facsimile copies may be deemed originals for the purpose of this Agreement.

14.    Paragraph Headings.  The paragraph headings of this Agreement are for convenience of reference only and shall not be deemed to limit or affect any of the provisions hereof.

15.    Amendments; No Waivers.

(a)    Any provision of this Agreement may be waived or amended if, and only if, such amendment or waiver is in writing and is signed by the Requisite Depositors, Joint Administrators and Escrow Agent and, if prior to the entry of a final decree closing the all of the Bankruptcy Cases, such amendment or waiver is approved by both the U.S. Bankruptcy Court and the Applicable Canadian Courts; provided, however, that (i) court approval shall not be required of any applicable court (whether the US Bankruptcy Court or any Applicable Canadian Court) if a final decree closing the Bankruptcy Cases pending before such court shall have been

entered by such court and (ii) court approval shall not be required of any court if final decrees terminating all Bankruptcy Cases shall have been entered by the US Bankruptcy Court and all Applicable Canadian Courts.

        (b)     No failure by any party hereto to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement, or to exercise any right or remedy consequent upon a breach hereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition hereof.

    16.    Entire Agreement; No Third Party Beneficiaries.  This Agreement (including any exhibits, schedules and amendments hereto) and (solely with respect to the Depositors and the Joint Administrators) the Side Agreement, dated as of February 19, 2009 by and among the Depositors and the Joint Administrators, (a) constitutes the entire Agreement and understandings of the parties hereto and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and (b) is not intended to confer upon any other Person any rights or remedies hereunder.  For the avoidance of doubt, the Depositors and Joint Administrators agree that the escrow arrangements set forth herein are in lieu of the escrow arrangements provided for in the Side Agreement.

    17.    Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of the State of New York (without regard to the choice of law provisions thereof).

    18.    Account Opening Information.  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.  When an account is opened, Escrow Agent will ask for information that will allow it to identify relevant parties.

    19.    Severability.  If it is determined by a court of competent jurisdiction (as set forth in Paragraph 20 below) that any provision of this Agreement is invalid or unenforceable under applicable law, such provision shall be ineffective only to the extent of such invalidity or enforceability, without invalidating the remainder of this Agreement.

    20.    JURISDICTION.  EACH PARTY HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, SUBJECT TO PROVISIONS IN THIS AGREEMENT THAT REQUIRE APPROVAL OF ANY APPLICABLE CANADIAN COURT, THE EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE RULES OF (I) THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, IF BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING CERTAIN OF THE DEPOSITORS PENDING BEFORE SUCH COURT, AND (II) THE FEDERAL COURTS IN THE SOUTHERN DISTRICT OF NEW YORK AND THE STATE COURTS OF THE STATE OF NEW YORK, COUNTY OF MANHATTAN (COLLECTIVELY, THE "NEW YORK COURTS"), IF BROUGHT AFTER ENTRY OF SUCH FINAL DECREE CLOSING SUCH BANKRUPTCY CASES, WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND AGREES TO BE BOUND BY ANY

JUDGMENT RENDERED THEREBY ARISING UNDER OR OUT OF IN RESPECT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY RELATED DOCUMENT OR OBLIGATION. EXCEPT AS PROVIDED IN THE FOREGOING NO PARTY HERETO SHALL INITIATE ANY LEGAL PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF OR IN CONNECTION WITH THIS AGREEMENT IN ANY OTHER STATE OR FEDERAL COURT IN THE UNITED STATES OF AMERICA OR ANY COURT IN ANY OTHER COUNTRY. EACH PARTY FURTHER IRREVOCABLY DESIGNATES AND APPOINTS THE INDIVIDUAL IDENTIFIED IN OR PURSUANT TO PARAGRAPH 12 HEREOF (OR, IN THE CASE THAT A SUCCESSOR PERSON IS APPOINTED AS AUTHORIZED REPRESENTATIVE PURSUANT TO PARAGRAPH 12, SUCH SUCCESSOR PERSON) TO RECEIVE NOTICES ON ITS BEHALF, AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH ACTION BEFORE ANY BODY, SUCH SERVICE BEING HEREBY ACKNOWLEDGED TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF ANY SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO EACH PARTY AT ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12; PROVIDED THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF THE SERVICE OF SUCH PROCESS. IF ANY AGENT SO APPOINTED REFUSES TO ACCEPT SERVICE, THE DESIGNATING PARTY HEREBY AGREES THAT SERVICE OF PROCESS SUFFICIENT FOR PERSONAL JURISDICTION IN ANY ACTION AGAINST IT IN THE APPLICABLE JURISDICTION MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12. EACH PARTY HEREBY ACKNOWLEDGES THAT SUCH SERVICE SHALL BE EFFECTIVE AND BINDING IN EVERY RESPECT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY TO BRING ANY ACTION OR PROCEEDING AGAINST THE OTHER PARTY IN ANY OTHER JURISDICTION.

21. <u>Interpretation</u>. As used in this Agreement (including all exhibits, schedules and amendments hereto), the masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires. References to Paragraphs and Articles refer to sections and articles of this Agreement, unless the context otherwise requires. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder," and words of like import, unless the context requires otherwise, refer to this Agreement. The captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

22. <u>Termination</u>. This Agreement shall terminate upon the termination of the Escrow Account in accordance with <u>Paragraph 6</u> hereof.

23. <u>Compliance with Court Orders</u>. In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court of competent jurisdiction (as set forth in <u>Paragraph 20</u>), or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is

advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

     24.    <u>Force Majeure</u>.  In the event that any party or Escrow Agent is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other cause reasonably beyond its control, Escrow Agent shall not be liable for damages to the other parties for any damages resulting from such failure to perform otherwise from such causes.  Performance under this Agreement shall resume when Escrow Agent is able to perform substantially.

*[Remainder of Page Intentionally Left Blank]*

<u>**Appendix "A"**</u>

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS INC., on behalf of itself and Alteon WebSystems Inc.

_____

Name:  Hyacinth DeAlmeida
Title:  Leader, Corporate Business Development

NORTEL NETWORKS LIMITED, on behalf of itself, Nortel Networks Technology Corporation and the Non-Debtor Nortel Networks Entities

_____

Name:
Title:

_____

Name:
Title:

**EMEA SELLERS**

NORTEL NETWORKS UK LIMITED (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____

Name:
Title:

NORTEL NETWORKS N.V. (in administration) by
C. Hill as Joint Administrator (acting as agent and
without personal liability)

_____

Name:
Title:


NORTEL NETWORKS S.A. (in administration) by
Kerry Trigg acting as authorised representative for
C. Hill as Joint Administrator (acting as agent and
without personal liability) under an authorisation
dated 15 January 2009

_____

Name:
Title:


NORTEL NETWORKS FRANCE S.A.S. (in
administration) by Kerry Trigg acting as authorised
representative for C. Hill as Joint Administrator
(acting as agent and without personal liability)
under an authorisation dated 15 January 2009

_____

Name:  Kenny Trigg
Title:    Authorized Representative


NORTEL NETWORKS (AUSTRIA) GMBH (in
administration) by C. Hill as Joint Administrator
(acting as agent and without personal liability)

_____

Name:
Title:

NORTEL NETWORKS, S.R.O. (in administration)
by C. Hill as Joint Administrator (acting as agent
and without personal liability)

_____

Name:
Title:

NORTEL NETWORKS AB – DENMARK
BRANCH (in administration) by C. Hill as Joint
Administrator (acting as agent and without personal
liability)

_____

Name:
Title:

NORTEL NETWORKS B.V. (in administration) by
C. Hill as Joint Administrator (acting as agent and
without personal liability)

_____

Name:
Title:

NORTEL GERMANY GMBH & CO KG (in
administration) by C. Hill as Joint Administrator
(acting as agent and without personal liability)

_____

Name:
Title:

NORTEL NETWORKS (IRELAND) LIMITED (in administration) by D. Hughes as Joint Administrator (acting as agent and without personal liability)

_____

Name:
Title:

NORTEL NETWORKS S.P.A. (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____

Name:
Title:

NORTEL NETWORKS POLSKA SP. Z O.O. (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____

Name:
Title:

NORTEL NETWORKS PORTUGAL S.A. (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____

Name:
Title:

NORTEL NETWORKS ROMANIA SRL (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____

Name:
Title:

**JOINT ADMINISTRATORS**

C. HILL, in his own capacity and on behalf of the Joint Administrators without personal liability and solely for the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators:

_____

Name:
Title:

**ESCROW AGENT**

JP MORGAN CHASE BANK, N.A., as Escrow Agent

By: _____
Name:  Natalie B. Pesce
Title:    Vice President

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**FIFTH REPORT OF THE MONITOR**
**DATED MARCH 26, 2009**

---

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada M5B 2M6

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5691706