**EXHIBIT 2**

*EXECUTION VERSION*

## AMENDED AND RESTATED REVOLVING LOAN AGREEMENT

THIS **AMENDED AND RESTATED** REVOLVING LOAN AGREEMENT (~~the~~**this** "**Agreement**") is entered into as of ~~15 January~~**March 27,** 2009, by and between NORTEL NETWORKS INC., a company incorporated in Delaware with its registered office at The Corporation Trust Company Corporation, Trust Center, 1209 Orange Street, Wilmington, Delaware, USA 19801 (the "**Lender**"), NORTEL NETWORKS LIMITED, a company incorporated in Canada, with executive offices at 195 The West Mall, Toronto, Ontario, Canada, M9C 5K1 (the "**Borrower**") and NORTEL NETWORKS TECHNOLOGY CORPORATION, a Nova Scotia Unlimited Liability Company, with executives offices at 195 The West Mall, Toronto, Ontario, Canada, M9C 5K1 (~~the~~"**NNTC**"), **Nortel Networks Corporation ("NNC"), a company incorporated in Canada, Nortel Networks Global Corporation ("NNGC"), a company incorporated in Canada, and Nortel Networks International Corporation ("NNIC"), a company incorporated in Canada (NNTC, NNC, NNGC and NNIC collectively called the "Guarantors", and individually, a** "**Guarantor**").

WHEREAS, on January 14, 2009, (i) the Borrower and the ~~Guarantor~~**Guarantors** filed an application for creditor protection under the Canadian Companies' Creditors Arrangement Act (the "**CCAA**") to facilitate a comprehensive business and financial restructuring (the "**Canadian Proceeding**") and (ii) the Lender, a wholly owned subsidiary of the Borrower, filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code (the "**U.S. Proceeding**");

WHEREAS, (i) each of the Borrower and the ~~Guarantor~~**Guarantors** is continuing to operate its business and manage its respective properties under the supervision of Ernst & Young Inc. of Canada, as court-appointed Monitor pursuant to the Canadian Proceeding and (ii) the Lender is continuing to operate its business and manage its properties as debtor in possession under Chapter 11 of the U.S. Bankruptcy Code;

WHEREAS, the Lender desires to make periodic loan advances to the Borrower of up to U.S.$200,000,000 to support on-going working capital funding for general corporate purposes;

WHEREAS, ~~the Guarantor, a~~**NNC, the parent of the Borrower, and the other Guarantors,** wholly owned ~~subsidiary~~**subsidiaries** of the Borrower, will **each** realize substantial benefits from guaranteeing the obligations of the Borrower under this Agreement and, in consideration for such benefits, is willing to guaranty such obligations; ~~and~~

WHEREAS, **(i)** each of the Borrower and ~~the Guarantor~~**NNTC** has agreed to secure its respective obligations to the Lender hereunder ~~(i)~~ with charges, for the benefit of the Lender, on the respective rights, title and interest of the Borrower and ~~the Guarantor~~**NNTC** in and to the research and development headquarters in Ottawa, Ontario as more fully described in the appraisal report prepared by Juteau Johnson Comba Inc. and dated January ~~2008~~**30, 2009** (the "**Carling Facility**"), the charge by the Borrower being a charge as lessee of the applicable portion of the Carling Facility leased by the Borrower (the "**NNL Charge**") and the charge by ~~the Guarantor~~**NNTC** being a charge by ~~the Guarantor~~**NNTC** as owner of the applicable portion of the Carling Facility owned by the Guarantor (the "**NNTC Charge**", and together with the

[New York #1996496 v~~13~~**18**]

NNL Charge, being collectively referred to as the "**Carling Charges**"), which Carling Charges (x) shall rank subordinate only to the ~~Administrative~~**Administration** Charge (as defined, and up to the amount specified, in the Canadian Order) and such other permitted encumbrances as may currently exist on the title to the Carling Facility and (y) may not be otherwise primed without the written consent of the Lender and authorization by the United States Bankruptcy Court for the District of Delaware, and (ii) ~~to the extent that the proceeds realized from the Carling Charges are insufficient to satisfy the Borrower's and the Guarantor's obligations hereunder, with the Intercompany Charge (as defined below), all as more fully provided herein and in the Canadian Order (as defined below).~~<u>each of the Borrower and the Guarantors has agreed to secure its respective obligations hereunder with charges, for the benefit of the Lender, on the respective rights, title and interest of the Borrower and each of the Guarantors in and to the "Property" (as that term is defined in the Canadian Order) (the "NNI Loan Charge") which NNI Loan Charge (x) shall rank subordinate only to (i) the Administration Charge (as defined, and up to the amount specified, in the Canadian Order), (ii) the Carling Charges, (iii) the EDC Charge (as defined, and up to the amount specified, in the Canadian Order) and (iv) the Directors' Charge (as defined, and up to the amount specified, in the Canadian Order) and (y) may not be otherwise primed without prior consent of the Lender and the Official Committee of Unsecured Creditors of Nortel Networks Inc. et al. (which consent shall not be unreasonably withheld) or a further order of the Canadian Bankruptcy Court; and</u>

<u>**WHEREAS**, the parties desire to amend and restate the revolving loan agreement, dated as of January 15, 2009, entered into by and between the Lender, the Borrower and NNTC (the "Original Loan Agreement").</u>

NOW, THEREFORE, in consideration of the foregoing and the obligations described herein and other good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

## ARTICLE I– DEFINITIONS

**Section 1.1    Defined Terms**:  As used in this Agreement, the following terms have the following meanings:

"**Advance**" means any amount advanced by the Lender to the Borrower pursuant to Section 2.2;

"**Agreement**" means this <u>**amended and restated**</u> revolving loan agreement between the parties hereto, including each Funding Report, as the same may be amended or supplemented in writing from time to time;

"**Banking Day**" means any day (other than a Saturday or Sunday) on which the banks are open for business in the United States and Canada;

"**Canadian Bankruptcy Court**" means the Ontario Superior Court of Justice (Commercial List);

"**Canadian Order**" means that certain **second amended and restated** initial order of the Canadian Bankruptcy Court in form and substance reasonably satisfactory to the Lender approving, **among other things,** the extension of Advances under this Agreement, the ~~Carling~~**NNI** Charges as described herein ~~and the Intercompany Charge~~, as to which no stay has been entered and which has not been reversed, modified, vacated or overturned;

"**Canadian Proceeding**" has the meaning set forth for such term in the Recitals of this Agreement;

"**Carling Charges**" has the meaning set forth for such term in the Recitals of this Agreement;

"**Carling Facility**" has the meaning set forth for such term in the Recitals of this Agreement;

"**CCAA**" has the meaning set forth for such term in the Recitals of this Agreement;

"**Consent**" has the meaning set forth for such term in Section 5.1 hereof;

"**Dollar**" and "**U.S.$**" mean lawful money of the United States;

"**Effective Date**" has the meaning set forth for such term in Section 2.5 hereof;

"**Enforcement Costs" has the meaning set forth for such term in Section 7.3 hereof.**

"**Event of Default**" has the meaning set forth for such term in Section 7.1 hereof;

"**Final U.S. Order**" means an order of the U.S. Bankruptcy Court in the U.S. Proceeding after a final hearing under U.S. Bankruptcy Rule 4001 approving this Agreement and authorizing the extension of up to $200,000,000 of Advances in accordance with this Agreement, and as to which no stay has been entered and which has not been reversed, modified, vacated or overturned;

"**Funding Report**" means a schedule maintained by the Lender substantially in the form attached as Exhibit A hereto reflecting all Advances made under this Agreement and for each such Advance, each Interest Period applicable thereto and the amount of interest payable on capitalized interest at the end of each Interest Period;

"**Guaranteed Obligations**" means (i) the payment of all principal and interest (including, without limitation, capitalized interest ~~and~~**,** post-petition interest) on the Advances and all other amounts payable by the Borrower in connection with the Advances under this Agreement **and Enforcement Costs**, and (ii) the performance of all obligations of the Borrower and the ~~Guarantor~~**Guarantors** under this Agreement **and the other Loan Documents to which the Borrower and/or any one or more of the Guarantors are party**;

"**Guarantor**" and "**Guarantors**" has the meaning set forth for such term in the introductory paragraph to this Agreement;

3

"~~Intercompany~~**Inter-company Charge**" has the meaning set forth for such term in the Canadian Order;

"**Interest Period**" means 1, 2, 3 or 6 months or as otherwise agreed between the parties, in each case as indicated on the Funding Report with respect to each such Advance; provided that if any Interest Period would otherwise end on a day that is not a Banking Day, such Interest Period shall be extended to the next day that is a Banking Day;

"**Interest Rate**" means 10% per annum;

"**Lender**" has the meaning set forth for such term in the Recitals of this Agreement;

"**Loan Documents**" **means this Agreement and any other documents, instruments, certificates or notices delivered in connection herewith from time to time including without limitation any mortgages, charges or other security agreements delivered by any one or more of the Borrower or the Guarantors in favor of the Lender;**

"**Maximum Facility Amount**" means:

(i)  prior to the later of (x) the receipt of the Consent and (y) the entry of the Final U.S. Order, U.S.$75,000,000; and

(ii) thereafter, U.S.$200,000,000, subject to reduction as provided in Section 2.3 hereof;

"**Net Cash Proceeds**" means, with respect to any sale of all or any portion of the Carling Facility, including the Borrower's leasehold interest therein, by the Borrower or any of its subsidiaries prior to the repayment in full of all Advances and termination of this Agreement, an amount equal to: (i) all cash payments (including any cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by the Borrower or any of its subsidiaries from such sale, minus (ii) any bona fide direct costs incurred in connection with such sale, including (a) income or gains taxes payable by the seller as a result of any gain recognized in connection with such sale and (b) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such sale undertaken by the Borrower or any of its subsidiaries in connection with such sale;

"**NNI Charges**" **means, collectively, the Carling Charges and the NNI Loan Charge and** "**NNI Charge**" **shall mean any one of the Carling Charges or the NNI Loan Charge;**

"**NNI Loan Charge**" **has the meaning set forth for such term in the Recitals of this Agreement.**

"**NNL Charge**" has the meaning set forth for such term in the Recitals of this Agreement;

4

"**NNTC Charge**" has the meaning set forth for such term in the Recitals of this Agreement;

"**Original Loan Agreement**" has the meaning set forth for such term in the Recitals of this Agreement;

"**Original Loan Agreement Security**" has the meaning set forth for such term in Section 9.10 hereof;

"**Term**" has the meaning set forth for such term in Section 2.5 hereof;

"**Termination**" has the meaning set forth for such term in Section 7.2 hereof;

"**U.S. Order**" means that certain order of the U.S. Bankruptcy Court entered on January 15, 2009 approving the extension of up to U.S.$75,000,000 of Advances under this Agreement, as to which no stay has been entered and which has not been reversed, modified, vacated or overturned; and

"**U.S. Proceeding**" has the meaning set forth for such term in the Recitals of this Agreement.

## ARTICLE II– THE FACILITY, FUNDING, REPORTS, TERM

**Section 2.1   The Maximum Facility Amount**: The Lender agrees to make Advances to the Borrower during the Term from time to time in accordance with this Agreement. The outstanding principal amount of all Advances may not exceed the Maximum Facility Amount.

**Section 2.2   Advances**: The Lender shall make the Advances available to the Borrower on any Banking Day upon the Lender's receipt of a written request from the Borrower not later than 10:00 a.m., Toronto time, on the immediately preceding Banking Day (or such shorter notice as shall be agreed to by the Lender for any such Advance), specifying the amount and date of a particular Advance, together with the bank account details to which payment of such Advance shall be made.

**Section 2.3   Reduction in Maximum Facility Amount**:

(a)   At any time and from time to time, the Borrower may, upon notice to the Lender, reduce to zero or reduce in part the Maximum Facility Amount; <u>provided</u> that if, as a result of such reduction, the aggregate principal amount of Advances then outstanding shall exceed the Maximum Facility Amount, the Borrower shall, pursuant to Section 4.3(b), prepay Advances to the extent required to comply with Section 2.1 hereof.

(b)   The then current Maximum Facility Amount shall be reduced on each date on which a prepayment of Advances is required to be made pursuant to Section 4.3, in each case in the amount of such prepayment.

5

**Section 2.4  Funding Report**: A Funding Report shall be prepared by the Lender on the date each Advance is made and shall be updated by the Lender within five (5) days following (i) any changes in the principal amount of any Advance or in the Interest Period applicable to such Advance or (ii) any capitalization of the interest on such Advance. A copy of each Funding Report shall be provided to the Borrower upon request. Each of the Borrower and the Lender hereby acknowledge, confirm and agree that all amounts set out in each Funding Report shall be considered true and correct, and shall be accepted by the Borrower and Lender and become a part of this Agreement, absent manifest error. However, the failure to prepare any Funding Report shall not affect the liability of the Borrower to the Lender in respect of the relevant indebtedness.

**Section 2.5  Term:** This Agreement shall continue in full force and effect from the later of the entry of the Canadian Order and the entry of the U.S. Order (such later date, the "**Effective Date**") until the earliest to occur of (the "**Term**"):

(a)  December 31, 2009, subject to extension until December 31, 2010 at the request of the Borrower and with written consent of the Lender;

(b)  The reduction of the Maximum Facility Amount to zero pursuant to Section 2.3 hereof; and

(c)  The Termination of this Agreement pursuant to Section 7.2(a) hereof.

## ARTICLE III– INTEREST

**Section 3.1  Interest on Advances**:

(a)  The unpaid principal amount of each Advance shall accrue interest from the date such Advance is made until the principal amount of such Advance is repaid in full at a rate equal to the Interest Rate. Interest on each Advance shall be payable, subject to paragraph (b) of this Section 3.1, in arrears on the last day of each Interest Period. Interest on each Advance shall be calculated on the basis of a 365-day year and the actual number of days elapsed.

(b)  On or before the last day of an Interest Period for an Advance, at the request of the Borrower and at the sole and absolute discretion of the Lender, the interest on such Advance payable on such day may be capitalized and added to the outstanding principal amount of such Advance as of such date. Such capitalization of interest, if any, shall be reflected in the related Funding Reports. The Lender shall provide notice to the Borrower of such capitalization of interest, through delivery of an amended Funding Report or otherwise. All accrued interest on an Advance that is not capitalized shall be paid in full at the end of each Interest Period. For the avoidance of doubt, any such capitalization of interest shall be disregarded in calculating whether the Advances outstanding on any date exceed the Maximum Facility Amount.

## ARTICLE IV– REPAYMENT, PREPAYMENT

**Section 4.1  Repayment**: The outstanding principal amount of all Advances, together with accrued and unpaid interest thereon, as documented in the Funding Report, shall be due and payable by the Borrower to the Lender on the earlier of (i) the last day of the Term and (ii) the Termination of this Agreement.

**Section 4.2  Voluntary Prepayment**: The Borrower may, in its sole and absolute discretion, at any time and from time to time upon notice, make prepayments in any amounts desired, without premium or penalty, of the outstanding principal of any Advance. If more than one Advance is outstanding at the time the Borrower elects to make a prepayment, the Borrower shall be entitled to specify the Advance to which the prepayment will apply. Any such prepayment shall be made together with all accrued and unpaid interest on the principal amount prepaid, including any amount capitalized pursuant to Section 3.1(b) hereof. Amounts prepaid hereunder may be reborrowed during the Term, so long as the total principal amount of Advances borrowed and not yet prepaid does not at any time exceed the Maximum Facility Amount.

**Section 4.3  Mandatory Prepayment**:

(a) No later than the Banking Day following the date of receipt by the Borrower or any of its subsidiaries of any Net Cash Proceeds, the Borrower shall prepay the Advances in an aggregate principal amount equal to the Net Cash Proceeds so received. Any such prepayment of Advances shall result in a permanent reduction of the Maximum Facility Amount in an amount equal to the aggregate principal amount of the Advances prepaid.

(b) If for any reason the aggregate amount of outstanding Advances at any time exceeds the Maximum Facility Amount then in effect, the Borrower shall immediately prepay Advances in an aggregate amount equal to such excess.

## ARTICLE V– REPRESENTATIONS AND WARRANTIES

**Section 5.1  Representations of the Borrower and the** ~~Guarantor~~**Guarantors**: The Borrower and the ~~Guarantor~~**Guarantors**, jointly and severally, represent and warrant to the Lender that:

(a) on the date hereof and on each date of an Advance, each of the Borrower and the ~~Guarantor~~**Guarantors (other than NNTC)** is a corporation duly incorporated and validly existing under the laws of Canada**, and NNTC is an Unlimited Liability Company duly organized and validly existing under the laws of Nova Scotia (Canada)**;

(b) following the entry of, and giving effect to, the Canadian Order, the execution, delivery and performance by each of the Borrower and the ~~Guarantor~~**Guarantors** of this Agreement (i) are within its corporate powers, have been duly authorized by all necessary corporate action, (ii) require no action by or in respect of or filing with any governmental body, agency or official, except for consents or approvals that have been obtained on or prior to ~~the date hereof (it being acknowledged by~~

7

~~the Lender that the NNL Charge will require~~**January 15, 2009 and** the consent of the National Capital Commission (the "**Consent**")~~)~~**, which Consent has been obtained,** and (iii) do not contravene any provision of applicable law or its certificate of incorporation or by-laws or any contractual restriction, order, decree or other instrument binding upon the Borrower or the ~~Guarantor~~**Guarantors**, except, in the case of (ii) and (iii) above, any such action, filing or contravention which would not have a material adverse effect on the Borrower or the ~~Guarantor~~**Guarantors** or on the legality, validity or enforceability of this Agreement~~, the Carling Charges~~ or the ~~Intercompany Charge~~**NNI Charges**;

(c) upon the entry of the Canadian Order, the Advances will be secured by ~~(i)~~ the ~~Carling Charges and (ii) to the extent that the proceeds realized from the Carling Charges are insufficient to satisfy the Borrower's and the Guarantor's obligations hereunder, the Intercompany Charge, and each such charge~~**NNI Charges and each of the NNI Charges** shall have the priority set forth in the Canadian Order; and

(d) the leasehold rights of the Borrower in and to the applicable portion of the Carling Facility and the fee simple rights of ~~the Guarantor~~**NNTC** as the owner of the applicable portion of the Carling Facility, in each case are held free and clear of all liens other than easements, zoning restrictions, rights-of-way, servitudes and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligation and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or ~~the Guarantor~~**NNTC**.

**Section 5.2    Representations of the Lender:** The Lender represents and warrants to the Borrower that:

(a) on the date hereof and on each date of an Advance, the Lender is a corporation duly formed and validly existing under the laws of the State of Delaware; and

(b) following the entry of, and giving effect to, the U.S. Order, the execution, delivery and performance by the Lender of this Agreement (i) are within its corporate powers, have been duly authorized by all necessary corporate action, (ii) require no action by or in respect of or filing with any governmental body, agency or official and (iii) do not contravene any provision of applicable law or its certificate of incorporation or by-laws or any contractual restriction, order, decree or other instrument binding upon the Lender, except, in the case of (ii) and (iii) above, any such action, filing or contravention which would not have a material adverse effect on the Lender.

## ARTICLE VI– COVENANTS

**Section 6.1    Material Adverse Change:** During the period in which any Advances are outstanding, the Borrower shall notify the Lender of (x) any sale, transfer, lease or other disposition of all or any part of the Carling Facility and (y) any material adverse change in the

8

[New York #1996496 v~~13~~**18**]

business, financial position or results of operations of the Borrower or the ~~Guarantor~~**Guarantors**, within ten (10) Banking Days after any director or officer of the Borrower obtains actual knowledge of such material adverse change. Notwithstanding the foregoing, nothing contained in this Agreement shall prevent the Borrower or the ~~Guarantor~~**Guarantors** from (i) amalgamating, merging or consolidating with or into any related party, affiliate or subsidiary or (ii) selling, transferring, leasing or otherwise disposing of all or any part of the Carling Facility; provided that the Net Cash Proceeds of such sale are applied in accordance with Section 4.3 to prepay the Advances.

**Section 6.2  Grant of Security; Further Assurances:**

(a) To induce the Lender to make the Advances and to supplement the Canadian Order**, and** without in any way diminishing or limiting the effect of the Canadian Order or the security ~~interest, pledge and lien granted thereunder~~**interests, pledges and liens granted thereunder, including without limitation the Inter-Company Charge which secures amounts now owing and which may hereafter become owing to the Lender by one or more of the Borrower or Guarantors other than for the Advances,**:

  (i) The Borrower hereby grants to the Lender, for itself, as security for the full and prompt payment when due of the Advances **and interest** under this Agreement **and the Enforcement Costs**, continuing security interests consisting of (x) the NNL Charge and (y) ~~to the extent that the proceeds realized from the Carling Charges are insufficient to satisfy the obligations of the Borrower and the Guarantor hereunder, the Intercompany~~**the NNI Loan** Charge; and

  (ii) ~~The Guarantor~~**NNTC** hereby grants to the Lender, for itself, as security for the full and prompt payment when due of the Advances **and interest** under this Agreement **and the Enforcement Costs**, continuing security interests consisting of (x) the NNTC Charge and (y) ~~to the extent that the proceeds realized from the Carling Charges are insufficient to satisfy the obligations of the Borrower and the Guarantor hereunder, the Intercompany Charge.~~ **the NNI Loan Charge; and**

  **(iii) Each Guarantor other than NNTC hereby grants to the Lender, for itself, as security for the full and prompt payment when due of the Advances and interest under this Agreement and the Enforcement Costs, continuing security interests consisting of the NNI Loan Charge.**

(b) At any time or from time to time upon the request of the Lender, each of the Borrower and the ~~Guarantor~~**Guarantors** agrees, jointly and severally, at its expense, to promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Lender may reasonably request in order to effect fully the purposes of this Agreement, the Canadian Order, the U.S. Order and the Final U.S. Order, as the case may be. In furtherance and not in limitation

9

[New York #1996496 v~~13~~**18**]

of the foregoing, each of the Borrower and the ~~Guarantor~~**Guarantors** agrees, jointly and severally, to use its best efforts to ~~obtain the Consent and~~ take such other actions, including filings, as the Lender may reasonably request from time to time to ensure that the Borrower's and the ~~Guarantor's~~**Guarantors'** obligations hereunder are secured by the security interests described in paragraph (a) of this Section 6.2 and keep such security interests free of other charges except for charges permitted by the Canadian Order or such other encumbrances as may currently exist on the title to the Carling Facility.

(c)     Subject to those charges and encumbrances referred to in the Recitals hereto, **(i)** without prior consent of the Lender as authorized by the United States Bankruptcy Court for the District of Delaware, neither the Borrower nor ~~the Guarantor~~**NNTC** may grant any charge on the Carling Facility that is equal to or higher than the Carling Charges~~.~~ **and (ii) without prior consent of the Lender and the Official Committee of Unsecured Creditors of Nortel Networks Inc. et al. (which consent shall not be unreasonably withheld) or a further order of the Canadian Bankruptcy Court, none of the Borrower or the Guarantors may grant any lien, charge, encumbrance or security interest on the Property that is equal to or higher than the NNI Loan Charge.**

**Section 6.3   Use of Proceeds:** The Borrower will use the proceeds of each Advance to support on-going working capital funding for general corporate purposes, pay ordinary operating costs and expenses of the Borrower during the Term, including to provide cash advances to its direct and ~~direct~~**indirect** subsidiaries; provided that (i) prior to the entry of the Final U.S. Order, such proceeds may be advanced to the Borrower for use by the Borrower or its affiliates that are applicants in the Canadian Proceeding, and (ii) thereafter, subject to obtaining an authorization in the Final U.S. Order, such proceeds may be used up to an aggregate amount of U.S.$ 10,000,000 to provide cash advances to subsidiaries that are not debtors in the Canadian Proceeding or the U.S. Proceeding.

## ARTICLE VII– EVENTS OF DEFAULTS AND REMEDIES

**Section 7.1   Events of Default:** Each of the following events shall constitute an "**Event of Default**" hereunder:

(a)     any principal due with respect to any Advance made hereunder, or any interest payable hereunder, shall not be paid within five (5) Banking Days of the due date thereof (unless such failure is cured and this provision waived by the Lender);

(b)     the Borrower shall take any corporate action to convert, or the Borrower or the Monitor shall file a petition to convert, the Canadian Proceeding, or the Canadian Bankruptcy Court shall order the conversion of the Canadian Proceeding, into a proceeding for the liquidation of the Borrower and its assets under the Bankruptcy and Insolvency Act, or such other statute or proceeding for the purpose of the liquidation of assets;

(c) any of the Borrower's or ~~the~~__any__ Guarantor's representations and warranties set forth in Article V hereof shall prove to be incorrect and, if capable of remedy, shall not be remedied within 30 days after notice thereof shall be given from the Lender to the Borrower; or

(d) the Borrower or ~~the~~__any__ Guarantor shall fail to observe any of its covenants and agreements set forth herein and such failure shall not be remedied within 30 days after notice thereof shall be given from the Lender to the Borrower.

**Section 7.2   Remedies upon Event of Default:**  If any Event of Default occurs and is continuing, the Lender may take any or all of the following actions without further order of, or application to, the Canadian Bankruptcy Court:

(a) terminate the commitment of the Lender to make any Advances (a "**Termination**"), upon notice to the Borrower, whereupon such commitment shall be immediately terminated;

(b) declare the unpaid principal amount of all outstanding Advances, all interest accrued and unpaid thereon and all other amounts owing or payable hereunder to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(c) exercise all rights and remedies available to it hereunder and in respect of the Carling Charges and, subject to the Canadian Order, the ~~Intercompany~~__NNI Loan__ Charge, and exercise all rights and remedies available to it under the Canadian Order or applicable law__; and for greater certainty, the Lender shall not be required to have exhausted its remedies under the Carling Charges prior to realizing on or being entitled to proceeds from the NNI Loan Charge__.

11

<u>Section 7.3    Enforcement Costs:  The Borrower and each Guarantor covenant and agree, jointly and severally, to pay to the Lender all reasonable costs, fees and expenses incurred by the Lender (including without limitation legal fees and disbursements) in connection with the enforcement of the Lender's rights and remedies under Section 7.2 (c) with respect to the NNI Charges (collectively, the "Enforcement Costs"), and for greater certainty, the Enforcement Costs are and shall be secured by the NNI Charges.</u>

### ARTICLE VIII– THE GUARANTY

**Section 8.1    The Guaranty:**    ~~The~~**Each** Guarantor unconditionally guarantees, as a primary obligor and not merely as a surety, the due and punctual payment and performance of the Guaranteed Obligations.  ~~The~~**Each** Guarantor further agrees that the Guaranteed Obligations may be extended, renewed or amended, in whole or in part, without notice to or further assent from ~~the~~**such** Guarantor, and that ~~the~~**such** Guarantor will remain bound upon its guaranty notwithstanding any extension, renewal or amendment of any Guaranteed Obligation.  ~~The~~**Each** Guarantor waives presentment to, demand of payment from and protest to the Borrower of any of the Guaranteed Obligations, and also waives notice of acceptance of its guaranty and notice of protest for nonpayment.  This guaranty is a continuing guaranty and shall be binding on each of the ~~Guarantor~~**Guarantors** and its **respective** successors and assigns.

**Section 8.2    No Limitations:**

(a)    The obligations of the ~~Guarantor~~**Guarantors** hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise.  Without limiting the generality of the foregoing, the Guaranteed Obligations of the ~~Guarantor~~**Guarantors** hereunder shall not be discharged or impaired or otherwise affected by (i) the failure of the Lender to assert any claim or demand or to enforce any right or remedy hereunder against the Borrower; (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any agreement related hereto; (iii) the release of any security held by the Lender as security for any Guaranteed Obligation; (iv) any default, failure or delay, willful or otherwise, in the performance of its Guaranteed Obligations; or (v) any other act or omission that may or might in any manner or to any extent vary the risk of the Borrower or the ~~Guarantor~~**Guarantors** or otherwise operate as a discharge of the Borrower or the ~~Guarantor~~**Guarantors** as a matter of law or equity (other than the indefeasible payment in full in cash of all of the Guaranteed Obligations).

(b)    To the fullest extent permitted by applicable law, ~~the~~**each** Guarantor waives any defense based on or arising out of any defense of the Borrower or the unenforceability of its Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower (other than the indefeasible payment in full in cash of all its Guaranteed Obligations).

12

[New York #1996496 v~~13~~**18**]

**Section 8.3   Reinstatement:** ~~The~~**Each** Guarantor agrees that its guaranty hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of the Guaranteed Obligations is rescinded or must otherwise be restored by the Lender upon the bankruptcy or reorganization of the Borrower or the ~~Guarantor~~**Guarantors** or otherwise.

~~Section 8.4   Agreement to Pay; Subrogation:~~

**Section 8.4**   ~~(a)~~ **Agreement to Pay; Subrogation:** In furtherance of the foregoing and not in limitation of any other right that the Lender may have at law or in equity against the ~~Guarantor~~**Guarantors** by virtue hereof, upon the failure of the Borrower to pay any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, ~~the~~**each** Guarantor hereby promises to and will forthwith pay, or cause to be paid, to the Lender in cash the amount of such unpaid Guaranteed Obligation. Upon payment by ~~the~~**a** Guarantor of any sums to the Lender as provided above, (i) in addition to all such rights of indemnity and subordination as ~~the~~**such** Guarantor may have under applicable law (but subject to clause (ii) of this sentence), the Borrower shall indemnify ~~the~~**such** Guarantor for the full amount of such payment and ~~the~~**such** Guarantor shall be subrogated to the rights of the Lender to the extent of such payment and (ii) notwithstanding any provision of this Agreement to the contrary, all rights of ~~the~~**such** Guarantor under clause (i) of this sentence and all other rights of indemnity, contribution or subrogation under applicable law or otherwise shall be fully subordinated to the indefeasible payment in full in cash of the Guaranteed Obligations and no failure on the part of the Borrower or ~~the~~**any** Guarantor to make the payments required by clause (i) of this sentence (or any other payments required under applicable law or otherwise) shall in any respect limit the obligations and liabilities of ~~the~~**any** Guarantor with respect to its obligations hereunder, and ~~the~~**each** Guarantor shall remain liable for the full amount of its obligations hereunder.

> ~~(b)   The obligations of the Guarantor under this Agreement shall be limited to an aggregate amount equal to the largest amount that would not render the guaranty granted by the Guarantor hereunder subject to avoidance under Section 548 of the United States Bankruptcy Code or any comparable provisions of applicable law.~~

**Section 8.5   Information:** ~~The~~**Each** Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations, as applicable, and the nature, scope and extent of the risks that ~~the~~**such** Guarantor assumes and incurs hereunder, and agrees that the Lender will not have any duty to advise ~~the~~**such** Guarantor of information known to it regarding such circumstances or risks.

**ARTICLE IX– GENERAL PROVISIONS**

13

[New York #1996496 v~~13~~**18**]

**Section 9.1  Allocation of Payments**: Payments made by the Borrower on account of any Advance hereunder will be applied first on account of interest and then on account of principal due hereunder for the Advance to which such payment applies. All payments by the Borrower and the Guarantor hereunder shall be made without set-off, defense or counterclaim.

**Section 9.2  Amendments to this Agreement**: This Agreement may be amended only by written agreement signed by ~~both parties~~<u>the Lender, the Borrower and the Guarantors</u>.

**Section 9.3  Waiver**: The Lender may waive in writing any breach by the Borrower of any of the provisions contained in this Agreement or any default by the Borrower in the observance or performance of any covenant or condition required to be observed or performed by the Borrower under this Agreement; <u>provided</u> that no act or omission by the Lender with regard to any such breach or default by the Borrower will be taken in any manner whatsoever to affect any subsequent breach or default or the rights resulting therefrom.

**Section 9.4  Notices**: Any request, notice or demand made or given in connection with this Agreement must be in writing and delivered to the relevant party at its address or facsimile number set forth below, or any other address or facsimile number that a party may direct by notice hereunder:

| | |
|---|---|
| if to the Borrower: | Nortel Networks Limited<br>195 The West Mall,<br>Toronto, Ontario,<br>Canada<br>M9C SKI<br>Attention: Treasury Manager |
| if to ~~the~~<u>any</u> Guarantor | <u>c/o </u>Nortel Networks Technology Corporation<br>195 The West Mall,<br>Toronto, Ontario,<br>Canada<br>M9C 5K1<br>Attention: Secretary |
| if to the Lender: | Nortel Networks Inc.<br>220 Athens Way, Suite 300<br>MS 438/03/01<br>Nashville, Tennessee USA 37228<br>Attention: Legal Department |

**Section 9.5  Assignment of Agreement**: All of the covenants, stipulations, promises and agreements in this Agreement shall bind the parties' respective successors and permitted assigns, whether so expressed or not; <u>provided</u> that ~~neither~~<u>no</u> party may, without the prior written consent of the other, assign any rights, powers, duties, or obligations under this Agreement.

14

[New York #1996496 v~~13~~<u>18</u>]

**Section 9.6  Headings**: The headings of this Agreement are included for convenience of reference only and do not constitute a part of this Agreement for any other purpose.

**Section 9.7  Governing Law**: This Agreement and all other documents and instruments referred to will be construed in accordance with and governed by the internal laws of the State of New York.

**Section 9.8  Severability**: If any term or provision of this Agreement shall be determined to be invalid or unenforceable in any situation in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remaining terms and provisions hereof.

**Section 9.9  Counterparts**: This Agreement may be executed in counterparts and each of such counterparts when taken together shall constitute one and the same agreement. Any counterpart of this Agreement may be executed by fax or other direct electronic transmission and any such counterpart executed in such manner shall be deemed to be an original hereof.

**Section 9.10 Restatement**: This Agreement supersedes and replaces Original Loan Agreement. The "Advances" (as that term is defined in the Original Loan Agreement) in existence immediately prior to the execution and delivery of this Agreement shall continue in full force and effect and shall constitute Advances under this Agreement. Without in any way limiting the amendments to the Original Loan Agreement effected by this Agreement and the terms of the Canadian Order (specifically including (i) the granting of the "Charges" (as that term is defined in the Canadian Order) thereunder and the fact that such Charges in favor of NNI may secure loans and advances by NNI to the Borrower and/or the Guarantors in addition to the Advances hereunder and (ii) the priority of such Charges set out in the Canadian Order), each of the Borrower and the Guarantors acknowledges and agrees that all liens, charges and encumbrances (collectively, the "Original Loan Agreement Security") delivered by it to the Lender prior to the date of this Agreement are valid and enforceable in accordance with their terms, continue in full force any effect and in the case of the Borrower, secure all of the Advances, and in the case of the Guarantors, secure payment and performance of the Guaranteed Obligations, and any reference in any such Original Loan Agreement Security to the Original Loan Agreement shall be deemed to refer to this Agreement (as it may hereafter be amended or restated from time to time). The amendments to the Original Loan Agreement contained in this Agreement shall be of no force or effect until such time as the following conditions precedent have been satisfied: (a) the Canadian Order shall have been issued; and (b) an order of the U.S. Bankruptcy Court in the U.S. Proceeding approving this Agreement shall have been issued and entered, and as to which no stay has been entered and which has not been reversed, modified, vacated or overturned.

[Reminder of Page Intentionally Left Blank]

15

[New York #1996496 v~~13~~18]

16

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized persons as of the Effective Date:

**NORTEL NETWORKS LIMITED**

By: _____
Name: _____
Date: _____
Title: _____


By: _____
Name: _____
Date: _____
Title: _____


**NORTEL NETWORKS INC.**

By: _____
Name: _____
Date: _____
Title: _____


**NORTEL NETWORKS TECHNOLOGY CORPORATION**

By: _____
Name: _____
Date: _____
Title: _____


By: _____
Name: _____
Date: _____
Title: _____

**NORTEL NETWORKS CORPORATION**

**By:** _____
**Name:** _____
**Date:** _____
**Title:** _____


**By:** _____
**Name:** _____
**Date:** _____
**Title:** _____


**NORTEL NETWORKS GLOBAL CORPORATION**

**By:** _____
**Name:** _____
**Date:** _____
**Title:** _____


**By:** _____
**Name:** _____
**Date:** _____
**Title:** _____


**NORTEL NETWORKS INTERNATIONAL CORPORATION**

**By:** _____
**Name:** _____
**Date:** _____
**Title:** _____


**By:** _____
**Name:** _____
**Date:** _____
**Title:** _____

[Signature Page to Amended and Restated Revolving Loan Agreement]