**EXHIBIT A**

Court File No. 09-CL-7950

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")**

**EIGHTH REPORT OF THE MONITOR
DATED APRIL 24, 2009**

**INTRODUCTION**

1.  On January 14, 2009, Nortel Networks Corporation ("NNC" and collectively with all
    its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel
    Networks Technology Corporation ("NNTC"), Nortel Networks International
    Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") filed for
    and obtained protection under the *Companies' Creditors Arrangement Act*
    ("CCAA").  Pursuant to the Order of this Honourable Court dated January 14, 2009
    and as amended and restated on April 7, 2009 (the "Second Amended and Restated
    Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the
    Applicants (the "Monitor") in the CCAA proceeding.  The stay of proceedings was
    extended to May 1, 2009 by this Honourable Court in its Order dated February 10,
    2009.

2. Nortel concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the U.S. Court on January 14, 2009, for Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries (the "U.S. Debtors").

3. Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Filed Entities") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court") on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Filed Entities, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed.

4. On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

**PURPOSE**

5. The purpose of this eighth report of the Monitor (the "Eighth Report") is to provide this Honourable Court with an update in respect of the following:

    a) operations update;

    b) other insolvency proceedings update;

    c) cash position, performance and cash flow forecast;

    d) progress on restructuring initiatives;

2

e) Group Supplier Protocol Arrangements;

f) Export Development Canada Facility;

g) NNI Loan;

h) stakeholder matters;

i) motions for the appointment of representative counsel and payment motions; and

j) request for an extension to the stay of proceedings.

## TERMS OF REFERENCE

6. In preparing this Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company, and discussions with management of Nortel. EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Report.

7. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

8. Capitalized terms not defined in this Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report or previous Reports of the Monitor.

## GENERAL BACKGROUND

9. Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and

3

maintained from its R&D activities, its customers and other significant contracts and agreements.

10. Nortel conducts its global business through three reportable business unit segments, Carrier Networks ("CN"), Enterprise Solutions ("ES") and Metro Ethernet Networks ("MEN"). The revenue and assets of each of the business units is distributed among the multiple Nortel legal entities and joint ventures around the world.

11. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

**OPERATIONS UPDATE**

12. Nortel has continued to engage with its existing customer base to maintain delivery of products and services and to minimize interruptions as a result of the insolvency proceedings and to resolve any interruptions in a timely manner. New sales opportunities continue to be explored and Nortel remains active in developing business cases and responding to proposals for new business.

13. At the beginning of the proceedings, Nortel established a senior procurement team, along with appropriate advisors, to promptly address supplier issues and concerns as they arose to ensure ongoing supply of goods and services and minimize any disruption in the Applicants' global supply chain. This procedure continues to function effectively and any supply chain issues are being dealt with on a timely basis.

14. As detailed in the Pre-Filing Report, NNL entered into an amending agreement with its largest supplier, Flextronics (the "Flextronics Amending Agreement"), to ensure ongoing supply of goods and services on a post filing basis. The Monitor understands that since entering in to the Flextronics Amending Agreement, the Applicants and Flextronics

continue to discuss various aspects of the Flextronics Amending Agreement and other matters relating to this relationship.

**OTHER INSOLVENCY PROCEEDINGS UPDATE**

*U.K. Administration*

15. The U.K. Administrators held creditor meetings for each of the EMEA Filed Entities between mid and late March.  The purpose of the creditor meetings was to appoint creditor committees where appropriate and to approve the U.K. Administrators' plan of conduct for the post filing period.  The U.K. Administrators' plans of conduct were approved in all instances and creditor committees were appointed in the majority of estates.

16. The U.K. Administrators have continued to operate the businesses and are evaluating the Company's restructuring opportunities in a collaborative manner with Company management, the Monitor and other significant stakeholder representatives, including the *Ad Hoc* Bondholder Committee and the UCC (together the "Committees").

*Chapter 11 Proceedings*

17. The following is a summary of the court orders that have been issued and the financial information that has been filed in the U.S. Chapter 11 proceedings since the last update provided in the Monitor's First Report.

18. On February 23, 2009, the U.S. Debtors obtained an order authorizing the Rejection of certain non-residential real property leases.

19. On February 27, 2009, the U.S. Debtors obtained an order approving the sales procedures for the sale of the Layer 4-7 Business to Radware.

20. On March 5, 2009, the U.S. Debtors obtained an order

    a) Authorizing the KERP and KEIP with respect to non-senior leadership team executives; and

    b) Further extending the U.S. Debtors' deadline for filing schedules of assets and liabilities and statements of financial affairs.

21. On March 20, 2009, the U.S. Debtors obtained an order

    a) Authorizing the KEIP with respect to the senior leadership team executives; and

    b) Approving the procedures for the rejection of executory contracts and unexpired leases.

22. On March 26, 2009, the U.S. Debtors obtained an order confirming and approving the sale of the Layer 4-7 Business to Radware.

23. On April 9, 2009, the U.S. Debtors obtained an order

    a) Authorizing payment of certain prepetition pension obligations (minimum funding contributions);

    b) Approving the omnibus settlement procedures to resolve certain claims and controversies; and

    c) Establishing uniform procedures regarding Section 503(b) (9) claims.

24. On April 13, 2009, the U.S. Debtors filed its Debtor-in-Possession Monthly Operating Report for the period January 14, 2009 to February 28, 2009.

25. On April 20, 2009, the U.S. Debtors filed Statements of Financial Affairs for NNI, Nortel Networks Capital Corp., Alteon Websystems Inc. and Nortel Networks Int'l Inc. In addition, the U.S. Debtors filed Schedules of Assets and Liabilities and Statements of Financial Affairs for certain other dormant Chapter 11 entities.

*Chapter 15 Proceedings*

26. On February 27, 2009, the U.S. Court entered an order pursuant to Chapter 15 of the Code recognizing the Applicants' CCAA proceedings as a "foreign main proceeding" and enforcing the terms of the amended and restated initial order (and any amendments or extensions thereto) of the Ontario Court dated February 10, 2009 in the U.S. (the "First Amended and Restated Initial Order"). The Monitor has also filed with the U.S. Court and served on required parties motions to enforce this Honourable Court's bidding procedures order dated February 27, 2009 and the approval and vesting order dated March 30, 2009 in relation to the sale of Nortel's Layer 4-7 Business. The U.S. Bankruptcy Court entered orders enforcing each order in the U.S. on March 5, 2009 and April 9, 2009, respectively. The Monitor has also filed with the U.S. Bankruptcy Court and served on required parties notices of each of its reports to this Honourable Court and subsequent amendments to the Initial Order. The Monitor has also filed and served these notices in the chapter 11 cases for the U.S. Debtors.

**CONSOLIDATED CASH POSITION AND LIQUIDITY AS AT APRIL 11, 2009**

27. At April 11, 2009, Nortel's estimated consolidated cash balance was approximately $2.6 billion. Nortel's consolidated cash balance is held globally in various Nortel entities and joint ventures. The following is an overview of Nortel's consolidated cash position as at April 11, 2009:

7

| Region | Gross Cash | Restricted | JV's and Other Items (see below) | Available Cash |
|---|---|---|---|---|
| NNL | 220 | (23) | (11) | 186 |
| Other Canada | 35 | (23) | - | 12 |
| | | | | |
| NNI | 679 | (20) | - | 659 |
| NNI - Reserve MMF (ST/LT) | 41 | - | (41) | - |
| NGS | 48 | - | (48) | - |
| Other US | 2 | - | - | 2 |
| **North America** | 1,025 | (66) | (100) | 859 |
| | | | | |
| NN UK Limited | 298 | (23) | - | 275 |
| Other EMEA Filed Entities | 406 | (3) | - | 403 |
| JV - Netas | 67 | - | (67) | - |
| EMEA non-filed entities | 22 | - | - | 22 |
| **UK/Europe** | 793 | (26) | (67) | 700 |
| | | | | |
| Greater China | 213 | (2) | - | 211 |
| Other ASIA PAC (excl JVs) | 189 | - | - | 189 |
| LG Nortel | 237 | - | (237) | - |
| Other JVs | 27 | - | (27) | - |
| **ASIA** | 666 | (2) | (264) | 400 |
| | | | | |
| **Cala** | 89 | - | - | 89 |
| | | | | |
| **Total Treasury Cash** | **2,573** | **(94)** | **(431)** | **2,048** |

28. As at April 11, 2009, North America had cash available for operations of approximately $859 million. Of this amount, approximately $198 million is held by Canadian entities and approximately $661 million is held by U.S. entities.

29. None of the Applicants' Restricted Cash and Unavailable Cash is readily available to them. Restricted Cash relates primarily to: (i) $17 million of cash collateral posted by Nortel with respect to non-EDC performance bond and letter of credit facilities, (ii) $4 million related to cash collateral required to issue EDC performance bonds in exotic foreign currencies, (iii) $10 million held in escrow to the benefit of the insurer

8

related to the Global Class Action, (iv) $4 million belonging to the Health and Welfare Trust (the "H&WT"), (v) $10 million held in the D&O Trust as described in the Pre-filing Report. Unavailable Cash consists of $11 million deposited with financial institutions for future potential letter of credit requirements.

30. NNI's Restricted Cash includes the proceeds from the sale of the Layer 4-7 Business of $18 million that is being held in escrow by JP Morgan until an agreement is reached regarding allocation of these proceeds to various Nortel legal entities, including NNL.   NNI's Unavailable Cash as at April 11, 2009 includes $41 million dollars related to the Money Market Reserve Primary Fund (the "MMF").   Since filing, an amount of $24 million has been received from the MMF.  A further $16 million was received on April 17, 2009 and another $6 is expected to be received before the end of 2009.

31. NGS, a U.S. non-filed entity, has cash of approximately $48 million for use in its own operations and for settlement of inter-company transactions.

32. The U.K. Administrators had cash available for operations and post–filing inter-company settlements for NNUK and the other EMEA Filed Entities, of approximately $678 million.  The EMEA non-filed entities have available cash of approximately $22 million which is expected to be used primarily to fund their in-country operations and inter-company settlements. Pending further review, this cash is unavailable for funding elsewhere in the Nortel group.

33. NETAS, a joint venture in which Nortel owns a 53% interest, has approximately $67 million of cash of which $36 million represents Nortel's proportionate share.  Nortel believes these funds will continue to be used to fund NETAS's operations and will be difficult to repatriate for other funding purposes as approval of the other joint venture partners would be required.

34. Nortel's entities in the APAC region have approximately $400 million of cash available for operations and inter-company settlements.  As a result of the regulatory

9

regime in the People's Republic of China, the funds in Greater China of approximately $211 million are generally only available to fund operations within China and inter-company settlements. Furthermore, Nortel's LG Nortel Co. Ltd. ("LGN") joint venture and other joint ventures Nortel participates in, hold approximately $264 million of cash of which $136 million represents Nortel's share. Repatriation of these funds requires approval of the respective joint venture partners. In the week ended April 11, 2009, a dividend of approximately $58 million was paid by LGN of which $29 million was received by NNL. The Monitor is not aware of any further anticipated distributions.

35. Nortel's CALA region entities have approximately $89 million of cash generally available to fund their in-country operations and inter-company settlements. Pending further review, this cash is likely unavailable for purposes of funding other Nortel entities.

**ACTUAL RECEIPTS AND DISBURSEMENTS FROM FEBRUARY 1, 2009 TO APRIL 11, 2009**

36. The Applicants' actual consolidated net cash outflow for the period from February 1 to April 11, 2009, was $62 million. A summary of the actual receipts and disbursements as compared to the forecast filed with the First Report of the Monitor dated February 5, 2009 (the "First Report Forecast") is attached at Appendix A.

37. Actual net cash flow exceeded the forecast by $15 million. The significant items contributing to the variance were as follows:

   a) a positive permanent variance of $5.5 million with respect to the collection of accounts receivable due to a combination of higher billings and lower than projected delinquencies;

   b) a positive timing variance of $2.8 million in other receipts primarily as the result of release of collateral from unused bonding facilities was higher than

projected.    This release represents a reduction in Unavailable Cash as discussed in paragraph 38(a);

c)  a negative net variance of inter-company receipts and disbursements of approximately $17.0 million primarily as a result of:

    i.  a negative timing variance of $38.5 million as projected transfer pricing payments were not funded during the period;

    ii.  a negative permanent variance of $16.4 million with respect to inventory receipts from NNI. The product flows from NNL to NNI were lower than projected resulting in negative variances in the net settlements for February and March of $10.0 million and $6.4 million, respectively;

    iii.  $5.1 million negative timing variance in inter-company inventory receipts from Nortel Networks CALA Inc.;

    iv.  $7.9 million negative timing variance in respect of research and development and service chargeback reimbursements to Nortel Networks China and GDNT of $6.2 million and $1.7 million, respectively;

    v.  $29.0 million positive permanent variance related to NNL's share of a dividend distribution from LG Nortel that was not included in the First Report Forecast; and

    vi.  $20.0 million positive permanent variance on inventory receipts related to the reimbursement to NNL for NNI's and NNUK's portion of the costs related to the Flextronics Amending Agreement. There is an offsetting $20 million negative variance in the inventory purchases

11

(see paragraph 37(e)). These variances resulted from the method by which the Flextronics payment was made.

d) a positive payroll variance of $6.5 million due to two factors. First, positive timing variances as reductions in the workforce for the first quarter were implemented ahead of schedule. Second, a depreciation in the CAD dollar of approximately three percent resulted in lower payroll costs in USD terms;

e) a negative inventory purchases variance of $18.9 million of which $20 million related to NNI's and NNUK's share of the Flextronics payment that was paid by NNL and reimbursed via inter-company (see paragraph 37(c)(vi)).

f) a positive permanent variance of $33.3 million as non-inventory disbursements were lower than projected due to the run rate estimates in the First Report Forecast not reflecting the post-filing experience of the Applicants. Refined post-filing run rates for non-inventory disbursements have been reflected in the revised forecast; and

g) a positive timing variance of $3.0 million related to professional fees.

38. Unavailable Cash decreased by approximately $6.4 million primarily as a result of the following:

a) $3.0 million related to the higher than forecasted release of collateral from unused bonding facilities as discussed in paragraph 37 (b) above; and

b) $3.5 million related to amounts that moved from Unavailable Cash to Restricted Cash due to an increase in utilized portion of the RBC letter of credit facility (as discussed in paragraph 39(b) below).

39. Restricted Cash increased by $15.7 million primarily as a result of the following:

12

a) $10.0 million related to the establishment of a D&O Trust amounts put aside prior to filing by the Applicants as discussed in the Monitor's Pre-Filing Report. This amount was not included in Restricted Cash in the First Report Forecast;

b) $3.5 million increase in the utilized portion of the RBC letter of credit facility; and

c) $2.8 million increase in the balance of the H&WT

40. Post-filing, the Applicants have not advanced any loans to other non-Applicant Nortel entities.

## CASH FLOW FORECAST FOR THE PERIOD FROM APRIL 12, 2009 TO JULY 31, 2009

41. Nortel, with the assistance of the Monitor, has prepared an updated 16-week cash flow forecast (the "April 12 Forecast") for the period April 12 to July 31, 2009. A copy of the April 12 Forecast is attached as Appendix B.

42. The cash flow forecast estimates the Applicants will have total receipts of $477 million and total disbursements of $533 million resulting in a net cash outflow of $56 million of Available Cash for the period of April 12, 2009 to July 11, 2009.

43. In the forecast period it is assumed NNL does not make any draws on the NNI Loan beyond the $75 million drawn prior to February 1, 2009 (as described further in this report).

44. At April 11, 2009, the Applicants have Available Cash balances of approximately $198 million, which excludes Restricted Cash and Unavailable Cash of approximately $57 million.

13

45. The significant assumptions used in preparing the April 12 Forecast include the following:

a) accounts receivable collections have been estimated by the Applicants' collection group based on revenue forecasts and historic customer collection experience;

b) TPA (defined below) payments will be received as discussed below;

c) all disbursements are made assuming suppliers' pre-filing amounts are stayed and post-filing amounts are paid on significantly reduced credit terms as a result of the CCAA proceedings;

d) inter-company trade accounts for post filing transactions continue to settle on a cash basis in the normal course between the Applicants, U.S. Debtors, EMEA Filed Entities and the other Nortel entities. Inter-company pre-filing loans between the Applicants and all other Nortel filed and non-filed entities are stayed;

e) severance payments are stayed during the forecast period;

f) pension funding payments are made for both current and special service payments, based upon existing requirements with respect to the registered defined benefit and defined contribution plans. Funding for non-registered pension or other retirement plans is stayed;

g) funding in the ordinary course for the H&WT is included; and

h) all interest payments relating to the Company's pre-filing indebtedness are stayed.

46. As discussed in the Pre-Filing Report, and in the Monitor's First Report, Nortel conducts its business through global business units resulting in a high degree of

14

interdependence among the various legal entities in different countries around the world.

47. A significant feature of this interdependence is the transfer pricing agreement (the "TPA") which provides for the provision of goods and services among various Nortel entities and allocates profit or loss based on each relevant Nortel entity's relative share of corporate overhead costs and research and development.

48. As is discussed in the Affidavit of John Doolittle filed in respect of this Motion, the Applicants continue to fund significant corporate overhead and research and development costs that historically have been funded by the receipt of TPA payments. The receipt of TPA payments by the Applicants is required to fund these ongoing costs during the stay extension and beyond.

49. Since the date of filing under the CCAA, NNI made one payment under the TPA which resulted in funding to the Applicants of $30 million, however, since then, payments under the TPA have been suspended to allow all interested parties time to review the TPA and cost funding issues while representatives of the Applicants, the U.S. Debtors and the EMEA entities discussed the most appropriate means to fund these costs during the restructuring. The Applicants have advised the Monitor that NNI has not formally assumed the TPA in the Chapter 11 proceedings.

50. The Applicants, NNI, one of the U.S. Debtors, and certain of the EMEA entities, through their U.K. Administrators, have recently come to a framework agreement which will, in principle, result in net TPA payments to the Applicants from NNI and the forebearance by NNUK of the enforcement of its purported right to receive certain payments under the TPA which will result in net TPA payments to the Applicants from NNI for the nine month period ending September 30, 2009 in the amount of approximately $157 million. This equates to six monthly payments of approximately $26.2 million during the second and third quarters. For purposes of the April 12 Forecast it is assumed that $105 million of TPA payments will be

15

received on the following schedule: (i) week ending May 30, 2009 - $52 million (representing April and May payments); (ii) week ending June 6, 2009 - $27 million; and (iii) week ending July 4, 2009 - $26 million.   This agreement is being documented and once approved by the U.K. Administrators and the relevant boards of directors, the Applicants and NNI intend to apply to this Honourable Court and the U.S. Bankruptcy Court for a joint hearing to approve the agreement.   In the meantime, the parties are providing further information and cooperating with the various stakeholders, and in particular, with representatives for the Committees in advance of the proposed approval hearing.   While the Applicants and Monitor are hopeful that the Committees will support the approval of the agreement, no assurances can be given at this time.

51. In the Monitor's view, receipt of the assumed TPA payments, together with other asset sale proceeds of approximately $75 million, are necessary in order for the Applicants to have adequate cash resources to fund operations for the proposed stay period.

**PROGRESS ON RESTRUCTURING INITIATIVES**

52. The Applicant's continue to diligently pursue the restructuring of their global operations with the assistance of their financial advisor and input from the Monitor in consultation with the stakeholders.   Nortel has made progress with several initiatives that will generate cost reductions to decrease the Company's cash burn, undertaken a comprehensive operational and strategic review of its business units and legal entities around the world and prepared a financial outlook for 2009 which has been presented to and discussed with the major stakeholder groups of the various estates.

53. The various cost reduction initiatives include the following:

   a) On February 25, 2009 the first phase of global workforce reductions was announced;

16

b) Nortel is currently conducting a comprehensive review of its real estate needs and preparing a comprehensive real estate strategy and restructuring plan;

c) Since the date of filing, Nortel's restructuring efforts in North America have resulted in the repudiation of five real estate leases in Canada which will result in annual savings of approximately $2 million in operating costs, and the rejection of six real estate leases in the United States which will result in annual savings of approximately $11.5 million. The Applicants continue to evaluate their real estate portfolio.

d) The Applicants are also reviewing various other contracts in conjunction with its operational restructuring.

54. The Applicants continue to review various restructuring alternatives in conjunction with its advisors, the Monitor, the Administrators and the Committees.

**GROUP SUPPLIER PROTOCOL ARRANGEMENTS**

55. In order to continue to conduct business in the ordinary course with EMEA entities post-filing and post-administration, the Applicants and the U.S. Debtors entered into separate Group Supplier Protocol Agreements ("GSPA") with the U.K. Administrators. The GSPAs contemplate an arrangement for post-filing receivables and prevents the set-off of post filing liabilities against pre-filing obligations. The first GSPA, including the provision that NNL's obligations pursuant to the first extension of GSPA be secured by the Inter-company Charge, was approved by this Honourable Court on February 10, 2009.

56. The U.K. Administrators have continued to operate the business since the date of the U.K. Administration Orders and interact with the Applicants and U.S. Debtors in accordance with the GSPAs. The GSPAs have been extended by the parties, substantially in the form of the initial GSPAs for a second, third and fourth time, since the original expiry date of February 10, 2009. The GSPAs were extended on

17

April 21, 2009 pursuant to a deed (the "Fourth Extension Deed") until May 5, 2009. The extension of the GSPAs has contributed to the stabilization of the interconnected businesses of Nortel.

57. The Applicants are requesting this Honourable Court retroactively approve the subsequent extensions of the GSPA by the Applicants.

**EXPORT DEVELOPMENT CANADA FACILITY**

58. On February 10, 2009, EDC and NNL signed the Amended and Restated Short Term Support Agreement which extended the availability of the EDC Facility until May 1, 2009. This post-filing EDC Facility of up to $30 million is secured by a priority charge on the Applicants' assets as provided for in the Second Amended and Restated Initial Order (the "EDC Charge"). As a result of ongoing discussions, EDC has since agreed to both extend the Amended and Restated Short Term Support Agreement to July 30, 2009 and amend its terms. The amended agreement clarifies that the EDC Charge does not apply to bonds issued post filing as the result of the renewal of a bond issued pre-filing except for the renewal of a bond issued pre-filing that was completed during the period from January 14, 2009 to April 14, 2009. The EDC Charge applies to all other new bonds issued post-filing.

59. As at April 17, 2009, there were approximately $4 million of bonds outstanding under the $30 million post-filing EDC Facility. As well, there are approximately $141 million of pre-filing performance bonds outstanding.

60. The Applicants continue to have ongoing discussions with EDC and potential fronting institutions which issue the performance bonds to put in place a more permanent performance bonding facility that will adequately support Nortel's needs over the longer term to provide performance bonds and guarantees to its customers to support its sales contracts.

18

## NNI LOAN

61. On April 7, 2009 this Honourable Court approved an amended and restated loan agreement dated as of March 27, 2009 (the "Amended NNI Loan Agreement") between NNI, as lender, NNL as borrower and NNC and the other Applicants as guarantors. At the motion for approval the UCC enumerated several reservations of rights. At the request of this Honourable Court, the Monitor has summarized below in paragraph 65 those reservations as conveyed by counsel for the UCC. The Monitor has also summarized the related issues arising therefrom.

62. In its Pre-Filing Report, the Monitor noted the Applicants sought approval of a loan agreement between NNI, as lender, NNL, as borrower and NNTC, as guarantor (the "Original NNI Loan Agreement") to provide for post filing advances (the "Advances") up to $200 million. Any Advances would be secured by the Carling Facility Charges (as defined in the Second Amended and Restated Initial Order and as more fully described in the Monitor's Pre-Filing Report and First Report).

63. As part of the first day orders that were granted in the Chapter 11 proceedings, NNI was granted approval to advance up to $75 million pursuant to the Original NNI Loan Agreement. Approval for NNI to advance any further amounts under the Original NNI Loan Agreement was adjourned and has not been heard by the U.S. Court as of the date of this Eighth Report.

64. As outlined in the Monitor's Sixth Report, the Amended NNI Loan Agreement and corresponding changes reflected in the Second Amended and Restated Initial Order, among other things, expands the scope of the guarantee to include NNC, NNIC and NNGC (in addition to NNTC), retains the Carling Facility Charge and adds a new NNI Loan Charge which ranks ahead of the Inter-company Charge but after the Directors' Charge. No enforcement action can be taken pursuant to the NNI Loan Charge without prior order of this Honourable Court. Furthermore, NNI is not

19

required to exhaust all of its remedies under the Carling Facility Charge prior to exercising its rights under the NNI Loan Charge.

65. In the CCAA proceedings, the UCC agreed to the Amended NNI Loan Agreement and the consequential amendments to the Second Amended and Restated Initial Order; however, at the motion reserved its rights on a number of matters.  As requested by The Honourable Mr. Justice Morawetz, the following summarizes those reservations of rights as communicated to the Monitor by legal counsel to the UCC:

a) Priority of the NNI Loan Charge – As it applies to any additional amounts that may be loaned under the Amended NNI Loan Agreement, the UCC's position is that the NNI Loan Charge should rank *pari passu* with the EDC Charge.  The UCC also reserved its right that if further funds are advanced it would claim that the first $75 million advanced to date should also be afforded the same priority charge as any additional amounts which may be advanced by NNI to NNL.

b) Modifications to loan agreements – To the extent any additional amounts are required to be loaned under the Amended NNI Loan Agreement, the UCC's position is that the agreement should be amended to include typical DIP lender protections including reporting requirements, covenants on use of proceeds, etc.

c) Adequacy of collateral and priority of charge for post-petition inter-company advances – To the extent the UCC determines the collateral under the Inter-company Charge, to secure the post-petition inter-company advances, is inadequate, or is being diluted by reason of the collateral being limited to NNL's assets rather than the property and assets of all the Applicants, the UCC reserves the right to request the Inter-company Charge be expanded to include the property and assets of all the Applicants.  The UCC further reserves its right to request the NNI Loan Charge should potentially be used to

20

secure those amounts advanced by [NNI] (sic) or another of the U.S. Debtors
instead of being granted protection under the lower ranking Inter-company
Charge.

d) Charge granted to NNL over the assets of NNTC – in respect of the Inter-
company Charge also securing advances by NNL to NNTC, the UCC reserves
its right to revisit this charge to assure itself the inclusion of that charge in the
Inter-company Charge would not be dilutive of NNI's charge thereunder.

66. The Monitor has been advised by other stakeholders that they do not accept the views
of the UCC in relation to the Amended NNI Loan Agreement and the Second
Amended and Restated Initial Order. The Monitor notes the foregoing views of the
UCC could have a potential negative effect on other stakeholders and in particular
those stakeholders which have been granted Court ordered charges and relied upon
them.

**STAKEHOLDER MATTERS**

67. Since the February 10, 2009 stay extension hearing Nortel's management and the
Monitor have reached out to certain of the Applicant's major stakeholders. The
Monitor's First Report noted the formation of an *Ad Hoc* Bondholder Committee and
that committee's engagement of counsel and advisors. Nortel's management and the
Monitor have met with the *Ad Hoc* Bondholder Committee and its advisors to update
them on the status of the restructuring and share any information with them that has
been shared with other major stakeholders.

**MOTIONS FOR THE APPOINTMENT OF REPRESENTATION COUNSEL AND
PAYMENT MOTIONS**

68. On April 20, 2009, this Honourable Court heard motions by four parties for the
appointment of representative counsel for unionized, non-unionized, active and
severed employees and retirees. In addition, on April 21, 2009, this Honourable

21

Court heard motions by the CAW-Canada and representatives of certain former employees seeking the recommencement of certain payments by the Applicants. No Orders have been issued in respect of these motions at the date of this eighth report.

## REQUEST FOR AN EXTENSION TO THE STAY OF PROCEEDINGS

69. Pursuant to the Order of this Honourable Court dated February 10, 2009, the stay extension granted expires on May 1, 2009. The Applicants are seeking an extension of the Stay Period for a period of 90 days, until and including July 30, 2009.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

70. The Monitor has assisted and continues to assist the Applicants in their efforts to review its operations and assess a range of restructuring alternatives in consultation with the Applicants' legal and financial advisors. The Monitor believes that the Applicants are working diligently and in good faith towards developing a restructuring strategy to address its financial and strategic issues in the context of a complex multijurisdictional set of insolvency proceedings.

71. The Monitor supports the Applicants' request to have the second, third and fourth extensions to the GSPA and the extension of and modification to the Amended and Restated Short Term Support Facility Agreement with EDC approved by this Honourable Court.

72. In the Monitor's view the restructuring of Nortel will require significant additional time to formulate an agreed upon restructuring strategy in conjunction with the Monitor, the U.K. Administrator and the Committees and implement same. The extension of the stay of proceedings to July 30, 2009 is necessary for the restructuring strategy and plan to be fully developed.

73. It is the Monitor's view that based upon the key assumptions used in preparation of the Applicants' 16 week cash flow forecast that the Applicants would have sufficient

available cash resources during the requested Stay Period and that an extension of the Stay Period will permit the Applicants to make further progress developing a restructuring strategy and filing a plan of arrangement. Accordingly, the Monitor recommends the stay of proceedings be extended to July 30, 2009.

All of which is respectfully submitted this 24 day of April 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

23

APPENDIX A



| Receipts / Disbursements | | | |
|---|---|---|---|
| **Receipts** | | | |
| Collection of Accounts Receivable | 111.2 | 116.7 | 5.5 |
| Other Receipts | 28.4 | 31.2 | 2.8 |
| Intercompany Receipts | 84.4 | 119.8 | 35.4 |
| Intercompany Receipts - Transfer Pricing | 38.5 | - | (38.5) |
| **Total Receipts** | 262.5 | 267.7 | 5.2 |
| **Disbursements** | | | |
| Payroll (Gross) | 104.3 | 97.8 | 6.5 |
| Benefits | 18.9 | 19.1 | (0.2) |
| Pension | 3.8 | 3.5 | 0.3 |
| Inventory Purchases | 74.6 | 93.5 | (18.9) |
| Non-Inventory Purchases | 108.8 | 75.5 | 33.3 |
| Intercompany Disbursements | 18.5 | 32.4 | (13.9) |
| Restructuring Costs | 10.8 | 7.9 | 2.9 |
| **Total Disbursements** | 339.7 | 329.7 | 10.0 |
| **Net Cash Flow** | (77.2) | (62.0) | 15.2 |
| FX Impact | - | (1.8) | (1.8) |
| **Opening Available Cash Balance** | 261.3 | 261.3 | - |
| **Closing Available Cash Balance** | 184.1 | 197.5 | 13.4 |
| Unavailable Cash | 17.3 | 10.9 | (6.4) |
| **Total Cash** | 201.4 | 208.4 | 7.0 |
| Restricted Cash | 30.3 | 46.0 | 15.7 |
| **Total Cash + Restricted Cash** | 231.7 | 254.4 | 22.7 |

APPENDIX B

| | | | | | | | | | | | | | Total |
|---|--:|--:|--:|--:|--:|--:|--:|--:|--:|--:|--:|--:|--:|
| **Receipts** | | | | | | | | | | | | | |
| Collection of Accounts Receivable | 7.7 | 0.5 | 3.4 | 6.1 | 9.2 | 15.3 | 3.2 | 6.5 | 9.7 | 3.7 | 8.0 | 12.1 | 158.5 |
| Other Receipts | 10.6 | - | 10.6 | - | 0.0 | 0.2 | - | 75.8 | 0.0 | - | - | - | 86.5 |
| Intercompany Receipts | 0.1 | 28.7 | - | - | - | 27.1 | - | - | 21.9 | - | - | - | 126.8 |
| Intercompany Receipts - Transfer Pricing | - | - | - | - | - | 52.0 | - | - | - | - | - | 25.4 | 105.0 |
| NNL/NNI Restructuring Loan Advances | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | 7.8 | 29.2 | 13.9 | 6.1 | 9.2 | 94.6 | 3.2 | 82.2 | 31.6 | 3.7 | 8.0 | 37.4 | 476.9 |
| **Disbursements** | | | | | | | | | | | | | |
| Payroll (Gross) | 10.6 | 14.8 | 16.4 | - | 16.4 | 0.1 | 6.6 | 27.2 | 7.3 | 6.7 | 10.7 | 6.5 | 158.4 |
| Benefits | 2.1 | 1.0 | 2.7 | - | 2.7 | 2.7 | 1.7 | 1.0 | 1.8 | 1.7 | 1.0 | 1.7 | 32.4 |
| Pension | - | 1.8 | - | - | - | 1.8 | - | - | 1.8 | - | - | 1.8 | 7.1 |
| Inventory Purchases | 3.3 | 5.8 | 6.0 | 6.0 | 7.5 | 6.0 | 6.0 | 6.0 | 6.0 | 4.3 | 4.3 | 4.3 | 107.4 |
| Non-Inventory Purchases | 4.6 | 6.7 | 7.9 | 11.9 | 8.7 | 8.7 | 8.6 | 8.6 | 8.9 | 6.3 | 6.2 | 7.6 | 121.7 |
| Intercompany Disbursements | 0.2 | 22.2 | - | - | 2.2 | 17.6 | - | - | 21.4 | - | - | 22.2 | 89.4 |
| Restructuring Costs | 1.1 | 1.0 | 1.0 | 1.1 | 1.0 | 1.0 | 1.0 | 1.1 | 1.0 | 1.0 | 1.2 | 1.0 | 16.1 |
| **Total Disbursements** | 22.0 | 53.3 | 33.9 | 19.0 | 38.4 | 37.7 | 23.9 | 44.0 | 48.0 | 19.9 | 23.5 | 45.0 | 533.4 |
| **Net Cash Flow** | (14.2) | (24.1) | (20.0) | (12.9) | (29.2) | 56.9 | (20.7) | 38.3 | (16.5) | (16.2) | (15.5) | (7.6) | (56.6) |
| Opening Available Cash Balance | 197.5 | 183.4 | 175.7 | 155.7 | 142.8 | 113.6 | 167.5 | 146.8 | 185.0 | 189.2 | 173.0 | 167.5 | 197.5 |
| Closing Available Cash Balance | 183.4 | 159.3 | 155.7 | 142.8 | 113.6 | 170.5 | 146.8 | 185.0 | 168.6 | 173.0 | 157.5 | 148.9 | 141.0 |
| Unavailable Cash | 10.9 | 10.8 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 5.8 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 |
| Total Cash | 194.3 | 170.2 | 161.6 | 148.7 | 119.5 | 176.4 | 152.7 | 190.8 | 174.5 | 178.8 | 163.4 | 155.8 | 146.9 |
| Restricted Cash | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 |
| Total Cash + Restricted Cash | 240.3 | 216.2 | 207.7 | 194.7 | 165.5 | 222.5 | 198.7 | 237.0 | 220.5 | 224.9 | 209.4 | 201.8 | 192.9 |
| Facility Size | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 |
| Less Utilized Facility | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) |
| Available Facility | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Closing Cash + Restricted Cash + Available Facility | 240.3 | 216.2 | 207.7 | 194.7 | 165.5 | 222.5 | 198.7 | 237.0 | 220.5 | 224.9 | 209.4 | 201.8 | 192.9 |

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**EIGHTH REPORT OF THE MONITOR DATED APRIL 24, 2009**

---

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada  M5B 2M6

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5710934