UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          )
                                )   Chapter 11
                                )
                                )   Case No. 09-10138(KG)
NORTEL NETWORKS, INC.,          )
                                )
            Debtors.            )   Jointly Administered
                                )
                                )   March 26, 2009
                                )   12:06 p.m.


TRANSCRIPT OF BANKRUPTCY MOTION HEARING
BEFORE THE HONORABLE KEVIN GROSS
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

<u>For the Creditor</u>:
Counsel for Committee of
Unsecured Creditors          KENNETH A. DAVIS, ESQUIRE
                             Akin, Gump, Strauss, Hauer &
                             Feld, LLP
                             One Bryant Park
                             New York, NY 10036
                             Tel: (212) 872 1212
                             Fax: (212) 872 1002

                             DREW G. SLOAN, ESQUIRE
                             Richards, Layton & Finger, P.A.
                             920 N. King Street
                             One Rodney Square
                             Wilmington, DE 19801
                             Tel: (302) 651-7845
                             Fax: (302) 651-7705

Radware                      DANIEL M. EGGERMAN, ESQUIRE
                             Kramer, Levin, Naftalis & Frankel,
                             LLP
                             1177 Avenue of the Americas
                             New York, New York 10036
                             Tel:  (212) 715-9495
                             Fax:  (212) 715-8000

<u>APPEARANCES</u> (Continued):

<u>Counsel for Creditor</u>:

| | |
|---|---|
| Verizon<br>(via telephone) | FRANK N. WHITE, ESQUIRE<br>Arnall, Golden & Gregory, LLP<br>171 17 Street, NW, Suite 2100<br>Atlanta, Georgia 30363-1031<br>Tel: (404) 873-8744<br>Fax: (404) 873-8745 |
| FlexTronics<br>(via telephone) | JAMES V. DREW, ESQUIRE<br>Curtis, Mallet-Prevost, Colt,<br>Mosle, LLP<br>101 Park Avenue<br>New York, New York 10178-0061<br>Tel: (212) 696-6000<br>Fax: (212) 697-1559 |
| Silver Lake Capital<br>(via telephone) | ANNELIESE H. PAK, ESQUIRE<br>Ropes & Gray, LLP<br>One International Place<br>Boston, Massachusetts 02110-2624<br>Tel: (617) 951-7000<br>Fax: (617) 951-7050 |

<u>For the Debtor</u>:

| | |
|---|---|
| | THOMAS F. DRISCOLL, III, ESQUIRE<br>Morris, Nichols, Arsht & Tunnell<br>LLP<br>1201 North Market Street, 18th Flr<br>P.O. Box 1347<br>Wilmington, DE 19899-1347<br>Tel: (302) 658-9200<br>Fax: (302) 425-4664 |
| | LISA M. SCHWEITZER, ESQUIRE<br>Cleary, Gottlieb, Steen &<br>Hamilton, LLP<br>One Liberty Plaza<br>New York, NY 10006<br>Tel: (212)225-2000<br>Fax: (212) 225-3999 |

APPEARANCES (Continued):

| | |
|---|---|
| Monitor Appointed in<br>Canadian Proceeding/<br>Counsel for<br>Canadian Monitor | LISA KRAIDIN, ESQUIRE<br>Allen & Overy, LLP<br>1221 Avenue of the Americas,<br>20th Floor<br>New York, New York  10020<br>Tel:  (212) 610-6300 |
| Canadian Monitor | MARY F. CALOWAY, ESQUIRE<br>Buchanan, Ingersoll & Rooney<br>The Brandywine Building<br>1000 West Street, Suite 1410<br>Wilmington, Delaware  19801-1054<br>Tel:  (302) 552-4209<br>Fax:  (302) 552-4295 |

Interested Party

| | |
|---|---|
| | KEVIN G. COLLINS, ESQUIRE |
| Gores & Siemens | Bifferato Attorneys at Law<br>800 N. King Street<br>P.O. Box 2165<br>Wilmington, Delaware 19899-2165<br>Tel:  (302) 225-7600<br>Fax:  (302) 254-5383 |
| | ERIC D. WATERS, ESQUIRE<br>Gibson, Dunn & Crutcher<br>200 Park Avenue<br>New York, New York  10166-0193<br>Tel:  (212) 351-5368<br>Fax:  (212) 351-6368 |
| Gores & Siemens<br>(via telephone) | ERIC J. FROMME, ESQUIRE<br>Gibson, Dunn & Crutcher<br>3161 Michelson Drive<br>Irvine, California  92612-4412<br>Tel:  (949) 451-3850<br>Fax:  (949) 475-4760 |
| (via telephone) | KATHRYN A. COLEMAN, ESQUIRE<br>Gibson, Dunn & Crutcher<br>200 Park Avenue<br>New York, New York  10166-0193<br>Tel:  (212) 351-3889<br>Fax:  (212) 351-5332 |

<u>APPEARANCES</u> (Continued):

```
U.S. Trustee              T. PATRICK TINKER, ESQUIRE
                          Office of the U.S. Trustee
                          844 King Street, Suite 2207
                          Lockbox 35
                          Wilmington, Delaware  19801-3519
                          Tel:  (302) 573-6491
                          Fax:  (302) 573-6497


Audio Operator:           Leslie Murin, ECR Operator


Transcribed By:           DIANA DOMAN TRANSCRIBING
                          P.O. BOX 129
                          Gibbsboro, NJ  08026-129
                          TEL:  (856) 435-7172
                          FAX:  (856) 435-7124
                          E-MAIL: dianadoman@comcast.net
```

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

I N D E X

Page

ARGUMENT BY:

Mr. Thomas F. Driscoll, III          6

Ms. Lisa M. Schweitzer               7,25

Ms. Lisa Kradin                      23

THE COURT

Decision                             27

1           THE CLERK:  Please rise.

2           THE COURT:  Good afternoon, everyone.  Please be

3     seated.  Thank you.  Mr. Driscoll, good afternoon.

4           MR. DRISCOLL:  Good afternoon, Your Honor.  For the

5     record, Tom Driscoll, from Morris, Nichols, Arsht & Tunnell

6     on behalf of the debtors.

7           THE COURT:  Yes, sir.

8           MR. DRISCOLL:  Your Honor, late last night, we had

9     filed an amended agenda.  I had --

10          THE COURT:  Yes, you did and I saw that and I

11    appreciate it.

12          MR. DRISCOLL:  Okay.  Great.  I just wanted to make

13    sure that it made its way to chambers, Your Honor.

14          THE COURT:  It did.

15          MR. DRISCOLL:  Obviously, that first agenda item,

16    there was CNO filed and we thank Your Honor for entering the

17    order on that.

18          THE COURT:  Yes.

19          MR. DRISCOLL:  So, the only matter going forward

20    today is the second agenda item, which is the sale motion.

21          THE COURT:  Okay.

22          MR. DRISCOLL:  I will turn things over to Lisa

23    Schweitzer from Cleary, Gottlieb.

24          THE COURT:  Thank you.

25          MR. DRISCOLL:  Thank you, Your Honor.

1          THE COURT:  Ms. Schweitzer, good to see you again.

2          MS. SCHWEITZER:  To you as well, Your Honor.  Thank

3     you for entertaining the motion today.

4          THE COURT:  Sure.  We are here, as Mr. Driscoll

5     said, to seek final approval of the sale of certain assets,

6     known as the velocity assets to Radware.  That -- that, as

7     the Court is aware, you had approved bidding procedures

8     previously and this is the final sale hearing.  And, also,

9     the amended agenda indicates that there is only one objection

10    to the sale that was filed.

11         THE COURT:  Yes.

12         MS. SCHWEITZER:  And that was with -- for Verizon

13    with respect to the assignment of eight contracts for which

14    it was notified.  And we're adjourning the hearing solely

15    with respect to the assignment of the -- those eight

16    contracts until the April 9th hearing.

17         THE COURT:  Yes.

18         MS. SCHWEITZER:  So, what we're going forward with

19    today is a final hearing on everything except for assignment

20    of eight contracts.

21         THE COURT:  Okay.

22         MS. SCHWEITZER:  And as far as I know, that that's

23    going to be an uncontesting hearing today, but we're here to

24    make our proffer and do the homework so that you're

25    comfortable in approving the transaction.

1              THE COURT:  We'll make a good record.

2              MS. SCHWEITZER:  Absolutely.  And, so, as the Court

3     is aware that the assets being sold are what are referred to

4     as the Layer 4 through 7, business assets of enterprise

5     business of Nortel.  And this is actually a sale of worldwide

6     assets, as the Court's aware, that the -- Nortel is in

7     various proceedings.  Certain affiliates are in

8     administrational proceedings in front of the UK courts.

9     Canadian parents and affiliates are in Canadian CCAA

10    proceedings up in Canada and we have the U.S. proceedings.

11    And then there are other affiliates who are not in any

12    insolvency proceedings at this time.

13             THE COURT:  Right.

14             MS. SCHWEITZER:  And this sale relates to condensed

15    assets around the world and we're here today to seek approval

16    of the U.S. side of that.

17             THE COURT:  Good.

18             MS. SCHWEITZER:  And just to remind everyone in the

19    courtroom today, that what we're selling is a business which

20    makes different switches and accelerators and different

21    telephone -- I'm sorry, equipment, computer parts where

22    they're Nortel application switches and application

23    accelerators and virtual service switches which are new next

24    generation technology that was developed by Nortel.

25             And what I'd like to do first is to introduce the

1    Court to the few people who are in the courtroom.  We have

2    Radware's counsel from Kramer, Levin here today.

3              MR. EGGERMANN:  Good morning, Your Honor.

4              THE COURT:  Good morning.

5              MR. EGGERMANN:  Daniel Eggermann.

6              THE COURT:  Or good afternoon and welcome.

7              MR. EGGERMANN:  Good afternoon.  Thank you.

8              MS. SCHWEITZER:  And we also have Mr. Paul

9    Woodruff, who is acting general man -- manager of Alteon,

10   which is also the Velocity business.  This is Mr. Woodruff in

11   the courtroom.

12             THE COURT:  Mr.  Woodruff, --

13             MR. WOODRUFF:  Good afternoon.

14             THE COURT:  -- it's good to see you, sir.  Thank

15   you.

16             MS. SCHWEITZER:  We have pe -- we have people from

17   all over the world, consistent with the global business.  Mr.

18   Woodruff came in from California for this hearing.

19             THE COURT:  Okay.

20             MS. SCHWEITZER:  And Mr. Meir Moshe, who is the

21   Chief Financial Officer of Radware, is also in the courtroom

22   today.

23             THE COURT:  Mr. Moshe, welcome to you, sir.

24             MR. DRISCOLL:  And you have him from across the

25   ocean, so, --

1          THE COURT:  All right.

2          MS. SCHWEITZER:  -- we're good to go here.  What I

3    would propose to do is to walk through the -- the bidding

4    history and, particularly, the auction process.  And given

5    that it's an uncontested hearing, I'd like to offer it as a

6    proffer for Mr. Woodruff, his direct testimony, to -- to do

7    it once.

8          THE COURT:  Okay.

9          MS. SCHWEITZER:  And, then, he is available for

10   cross-examination if anyone were to have that.  So, if I

11   could proceed by way of proffer?

12         THE COURT:  Unless anyone had an objection, that's

13   fine with the Court.

14         MS. SCHWEITZER:  Okay.

15         THE COURT:  Please.

16         MS. SCHWEITZER:  Great.  It sounds like there are

17   no objections.  So, we'll do that.  And Mr. Woodruff, as I

18   said, is acting general manager of the Alteon business at

19   Nortel.  He's employed by NNI, the U.S. debtor.  He has

20   worked for Nortel or entities acquired by Nortel for 15

21   years, subject to an absence last summer.  He returned in

22   October and one of his main tasks was to oversee the sale of

23   the Velocity assets.

24         And prior to the debtor's filing of the bankruptcy

25   proceedings in January of 2009, Nortel had -- was actually

1    very far advanced in its efforts to sell the Velocity

2    business.  And, specifically, Nortel actually started that

3    process in June, 2008.  They started considering whether it

4    would be appropriate to sell the assets.  And as of last

5    September, 2008, management and Nortel had, in fact,

6    authorized and instructed that the -- a solicitation process

7    begin for the sale of the Alteon assets and they approved

8    that September 2008.

9        And at that time, they had an out-of-court auction

10   type process where they solicited potential purchasers, about

11   37 of them, at that time.  They looked for different levels

12   of interest and two bidders did emerge and Radware was

13   selected over the other bidder as the highest and best offer

14   in late 2008, in that November/December period.

15       And part -- for various factors, including the

16   purchase price being paid and the fact that Radware had the

17   ability to pay, which is always an important aspect of

18   closing a sale; and, so, at that time the debtors and

19   Radware -- or Nortel, at the time, and Radware started

20   working on an asset purchase agreement, got very close on an

21   asset purchase agreement and they were one of the many things

22   that were stayed by the bankruptcy process.

23       And even though at that time in January, 2008,

24   Nortel felt that it already had engaged in an extensive

25   process of evaluating whether a sale was appropriate and also

1    its listing bids, they decided in interest of -- there was a

2    Canadian proceeding subject to a monitor,  a U.S. proceeding

3    subject to a 363 showing.  And we felt that it would be

4    appropriate to -- to engage in a short follow-on auction

5    process just to get that last opportunity to shout it out, if

6    someone was out there with a better bid.

7            And, sure enough, we did that and we came in front

8    of the Court in February of 2000 -- on February 27th, and

9    bidding procedures were approved where a showing similar to

10   what I just described was just described was made.  And

11   there's an auction process that, again, potential bidders

12   were solicited.  There was another 38 letters or 37 letters

13   went out, plus Radware was the 38th.  And the same people

14   were approached.

15          The Stalking pur -- Horse purchase agreement had

16   already been signed as of late February.  And of those 37

17   potential bidders that were solicited, there was a

18   preliminary due diligence session where 16 potential bidders

19   participated.  Of those, two potential bidders submitted non-

20   binding letters of intent and be -- thereby became qualified

21   bidders under the bidding procedures.  And they were given

22   access to the data room.  And they were also engaged in

23   follow-up due diligence conversations with the debtors.

24          But neither of those two bidders, the qualified

25   bidders, ultimately submitted a competing bid.  And they

1    informed Nortel, in fact, that they would not want to submit

2    a -- submit a competing bid.  And, therefore, when the

3    deadline passed, of March 19th, for other people to submit

4    qualifying bids, there were no other bids submitted.  We

5    cancelled the auction and here we are today with not only the

6    highest and best offer but the only offer after two full

7    rounds of solicitation.

8              And, so, therefore, the debtors and Alteon

9    generally believe that this is the highest and best sale and

10   appropriate disposition of the assets for the all the reasons

11   ascribed and, obviously, the very thorough solicitation

12   process.  And it's also appropriate to sell the assets at

13   this time because even prior to bankruptcy, the decision was

14   made that it was too costly for the debtors to continue to

15   operate and run this business, Nortel, generally.  And it

16   would be a higher and better value for the company to realize

17   the value through a sale than to continue to operate the

18   company.

19             And so that would conclude my proffer.  If Mr.

20   Woodruff's testimony.  And, of course, as I said before, he's

21   in the courtroom if anyone would wish to cross-examine him.

22   Otherwise, I would put it forward to be accepted by the

23   Court.

24             THE COURT:  Does anyone wish to cross-examine Mr.

25   Woodruff?  All right.  Hearing noone, the -- the proffer is

1    admitted.

2         MS. SCHWEITZER:  Okay.  Thank you, Your Honor.

3         And then, just to refresh Your Honor's

4    recollection, which is -- it's all contained in pa -- papers

5    before the Court, including the asset purchase agreement in

6    the motion, but the purchase price for the assets is $17.6

7    million and it's subject to certain purchase price

8    adjustments for inventory listed at closing and, you know,

9    schedules effects assets and the like.  All is described in

10   the purchase agreement itself.

11        And the -- in accordance with the purchase

12   agreement terms, those schedules are being (sic) in the

13   process of finalized and being delivered so we don't have the

14   final purchase price, but it's all within the range as

15   contemplated by the asset purchase agreement.

16        There is also the -- this is a hearing to obviously

17   approve the U.S. portion of the sale.  And there will be a

18   sale hearing in Canada on March 30th, next Monday, to approve

19   that.  And the parties are aiming to close the sale as of the

20   next day, which would be March 31st.  So, it's all full steam

21   ahead to finalize the documents.

22        In connection with the finalization of the

23   documents, obviously, we have these clean-up steps to be

24   taken and we also -- and the sale order contemplates that

25   the -- the parties can make non-material modifications and

1   amendments and supplements to the deal, as long as that

2   there's no material changes.

3           In the last day, there's been discussion with the

4   Committee just -- and the purchaser.  Everyone wants to be

5   sure that we're clear of what we're -- we're allowed to do

6   and not to do.  So, we put some clarifying language into

7   paragraph 13 of the order and I can hand-up a blackline that

8   will show you the change that's been proposed.

9           THE COURT:  Yes, please, Ms. Schweitzer.  Thank

10  you.  Thank you.  Paragraph 13 is the --

11          MS. SCHWEITZER:  Right.

12          THE COURT:  -- change?

13          MS. SCHWEITZER:  This is the clean, so you'll see

14  it on the blackline.

15          THE COURT:  Okay.  Thanks.  Thank you.

16      (Pause)

17          THE COURT:  All right.

18          MS. SCHWEITZER:  Are you ready?

19          THE COURT:  Yes.

20          MS. SCHWEITZER:  So, Your Honor, I've handed you

21  the clean and black line of the revised proposed order and as

22  it shows in the black line, the changes is simply to make

23  clear that the debtor and the purchaser can make effectively

24  non-material changes to the documents which will either be

25  generally non-material changes or that don't materially

1    change the economic substance of the transaction where the

2    clarification is that anything less than two percent of the

3    purchase price, which is a defined term in the purchase

4    agreement, would not constitute a material change to the

5    economic substance of the deal.  So, we don't think that

6    really changes the order so much as puts a sharpened

7    objective test on what we're all talking about, that we can

8    do de minimis changes.

9              THE COURT:  I think that is helpful.

10             MS. SCHWEITZER:  Okay.

11             THE COURT:  Having had some recent experience

12   which -- which created an issue, I think that it's a -- it's

13   a good -- I think it's a very good idea to have some kind of

14   a defined term, if you will, for making changes.

15             MS. SCHWEITZER:  Right.  That's right.  And, just

16   to be clear, that's obviously in addition to the -- the

17   purchase price adjustments within the asset purchase

18   agreement.

19             THE COURT:  Right.

20             MS. SCHWEITZER:  But this is solely so we can get

21   these things done and not bother your Court with things that

22   everyone agrees are de minimis in consideration of the

23   larger deal.  And, of course, there are copies available for

24   anyone else in the courtroom.  But I believe noone's asked

25   for them.

1          And so that is where we're at with the purchase

2    price and the -- the asset purchase agreement.  Also, as part

3    of the sale, we're seeking to assume and assign certain

4    executory contracts.  And as this is a global deal, there are

5    many contracts being assigned worldwide.  But in the U.S.,

6    they're assigning service contracts where Velocity or the

7    debtors would sell from time to time different -- these

8    different parts and equipment.

9          And in connection with those sales, usually done by

10   separate purchase orders, stand alone agreements, they would

11   sell a service contract to service and maintain the warranty

12   that equipment and, obviously, as more fully described in

13   each of the individual contracts.  But these are pretty

14   standard form contracts that they're signing over where the

15   debtor has obligation to provide the services and the

16   counter-party has the obligation to pay either up-front or on

17   a quarterly or annual basis.  The contracts are usually for a

18   year or two and I believe a lot of this was explained to you

19   at the prior hearing.

20         There are also a handful of confidentiality

21   agreements that were entered into in connection with the sale

22   that the purchaser wanted to have assigned over to it

23   because, obviously, they want the -- the right to enforce the

24   confidentiality provisions and protect the assets that

25   they're buying.

1          And, in accordance with the bidding procedures that

2     Your Honor approved, notice was sent to each of the counter-

3     parties.  And in that notice, there is a -- a description of

4     the contract that counter-party that's being assigned and

5     there's also in that notice a description about Radware and a

6     showing that we assert would be sufficient under -- for

7     adequate protection purposes, that describes Radware and

8     gives accs -- a link that would give access to Radware's

9     publically filed FCC filings.  They, in fact, just filed a

10    20-F yesterday and have a prior 20-F been filed and they also

11    have unaudited financial statements on file -- available on

12    their website.  And we gave counter-parties an opportunity to

13    access that information and, obviously, to object to the

14    assignment of their contracts.

15         There are about 50 -- 50 counter-parties that

16    received such assignment notices for, again, U.S. executory

17    contracts.  And of those, some had multiple contracts.  So

18    it's over 100 contracts are going over, but it's 50 counter-

19    parties.  And then none of those counter-parties -- a couple

20    of them made inquiries.  We gave them further information.

21         The only objection that was filed was the Verizon

22    objection to the eight contracts and it's -- when I use

23    Verizon, I'm using the colloquial term of all the affiliates

24    of Verizon Communications.  But they're different Verizon

25    entities, but the -- Verizon filed an objection and wanted

1    further information with respect to the assignment of its

2    contracts.

3           And we've worked cooperatively as we're required to

4    do under the bidding procedures to try and resolve that

5    objection.  We're still in discussions and providing more

6    information and trying to see if we can address their

7    concerns and provide sufficient information.

8           So, the thought was to take those eight contracts,

9    put them to the side, get approval of the sale for everything

10   except for the assignment of the eight contracts, and that

11   would be heard on April 9th.  And I believe Verizon's counsel

12   is on the phone today, also.  So they're aware of what's

13   happening.

14          And with respect to the assignment, the Debtors

15   obviously have -- the issue of making a showing of cure as

16   indicated in each of the notices, the Debtors assert that

17   there is no financial cure required for these contracts

18   because the Debtors aren't paying money.  We're not aware,

19   obviously, of breaches in our performance of the contracts.

20   And there's no obligation to pay money as opposed to provide

21   services.  The Debtor is the recipient of the services.  And

22   so, each of the -- the notices sent to counter-parties

23   indicate a zero cure; again, no objections to that.

24          The other showing, obviously, the Debtors need to

25   make with respect to assignment of contracts is Radware's

1    adequate -- giving everyone adequate assurances of Radware's

2    ability to perform in the future as required under 365 of the

3    Bankruptcy Code.  As I said, that we have given parties that

4    information, what we thought was sufficient.

5              But, we also have Mr. Meir Moshe who is the Chief

6    Financial Officer of Radware, who's in the courtroom today,

7    who is available to testify.  And, again, I would like to

8    just in the interest of expedience and because we don't have

9    objections to offer his testimony by way of proffer and,

10   obviously, he's available for cross-examination if anyone

11   would like.

12             THE COURT:  Does anyone object to a -- to a proffer

13   here?

14        (No audible objection).

15             THE COURT:  All right.  You may proceed --

16             MS. SCHWEITZER:  Okay.

17             THE COURT:  -- by proffer.  Thank you, Ms.

18   Schweitzer.

19             MS. SCHWEITZER:  Sure.  Thank you, Your Honor.  So,

20   Mr. Moshe is the Chief Financial Officer of Radware.  He has

21   worked for Radware for ten years.

22             Radware, itself, was established in 1997 and is an

23   industry player.  And, so, they're familiar with the

24   business.  They're familiar with the types of customers and

25   the types of goods and services that would be provided by

1    that -- Alteon or the Block C business they're acquiring.

2    And Radware, in fact, has facilities, itself, worldwide.  It

3    has facilities in Canada, in the United States, all across

4    Europe, in the U.K., France, Germany and a list that would --

5    it's very long, a very large footprint in Europe.

6         They also have facilities in Asia, including

7    without limitations, in Japan, Korea, Hong Kong, Taiwan and,

8    again, several other entities, and footprint in Australia.

9    So, they're truly a global enterprise.  They have over 500

10   employees enter -- worldwide.

11        And, as I said, they are in the same business,

12   generally, as -- as the debtors --   they're -- with respect

13   to the assets being sold, which made them a natural -- a -- a

14   natural purchaser twice, shall we say, in the process.

15        Radware also, in our mind has -- there's no doubt

16   of their financial ability to perform on the contracts in

17   that they currently have over $134 million in cash and their

18   sales in 2008 were $95 million in sales, including $35

19   million related to services that they're providing.

20        So, again, a similar footprint to other players in

21   the industry and to the business that they're acquiring.  And

22   they, in fact, have relationships with some of the customers

23   who they're taking over their contracts and going to be doing

24   business with in the future.

25        So, for all those reasons, we think they have the

1    financial ability to perform.  They have the know-how to

2    perform and they certainly have the commitment to perform on

3    these contracts in the future.  And, particularly, where

4    these are short contracts, small dollar value, relatively

5    speaking, and for short periods of time.  We think that that

6    showing has been met and we assume everyone agrees in that

7    there are no objections.

8         So, that would conclude the proffer for Mr. Moshe,

9    subject to anyone's right to cross-examine him.

10        THE COURT:  Does anyone wish to cross-examine Mr.

11   Moshe?

12       (No audible response).

13        THE COURT:  No?  All right.  Then we will admit the

14   proffer.

15        MS. SCHWEITZER:  Thank you, Your Honor.

16        So, I -- the other thing I will do is point you to

17   the Sale Order that I handed up and paragraph 23 of the Sale

18   Order which there's language added just to make clear that

19   the motion is being adjourned, the eight contracts are

20   identified by Nortel contract numbers.  And those are the

21   Verizon contracts, again, using that term colloquially, that

22   are being held over to the April 9th hearing.

23        THE COURT:  All right.

24        MS. SCHWEITZER:  Okay?

25        THE COURT:  Yes.

1              MS. SCHWEITZER:  And those are the only two

2     changes, as you'll see from the black line in the proposed

3     order compared to the order previously filed.  And, with

4     that, I would ask Your Honor if you have further questions

5     about the sale that we would assert that there's showing

6     under Section 363 and 365 for the assignment of contracts has

7     been met.  And we respectfully request that you approve the

8     sale as it's being presented to you today.

9              THE COURT:  All right, Ms. Schweitzer, thank you,

10    very much.  Does anyone else wish to be heard?  And I

11    understand --

12             MS. KRAIDIN:  Judge, --

13             THE COURT:  -- yes, Ms. Kraidin.

14             MS. KRAIDIN:  -- good morning.

15             THE COURT:  Please, come forward.  Good morning.

16    Good afternoon.  I'm sorry.

17             MS. KRAIDIN:  Good afternoon, Your Honor.

18             THE COURT:  And you're hear to tell me about the

19    Canadian proceedings.

20             MS. KRAIDIN:  I -- just briefly, because Ms.

21    Schweitzer's already done a very good job as -- Lisa Kraidin,

22    for the record, from Allen and Ovry on behalf of Ernst &

23    Young, as the monitor of the Canadian Nortel entities.

24             As, Your mi -- as Your Honor will remember, we have

25    previously filed on behalf of the monitor the second

1    monitor's report in both the Chapter 15 and Chapter 11 cases

2    in connection with the bid procedures motions in which the

3    monitor expressed its support for the sale procedures and,

4    obviously, the -- the sale process that had been undertaken

5    prior to the commencement of the insolvency proceedings for

6    Nortel.

7          The monitor intends to file either today or perhaps

8    tomorrow another report that will be filed in both of these

9    cases in support of the motion that will be brought in the

10   Canadian proceedings on Monday to approve the sale there.  We

11   will, of course, file that report in both the Chapter 11 and

12   Chapter 15 cases.

13         So, all I -- I wanted to just say that the monitor

14   does believe that the companies marketing effort was

15   conducted in good faith and supports the sale to Radner (sic)

16   as being the best transaction available under the

17   circumstances.  As Ms. Schweitzer said, the Canadian hearing

18   to approve the sale is on for March 30th.  And as Your Honor

19   would probably expect, we will subsequently being -- bringing

20   a motion in Chapter 15 to enforce the Canadian Sale Order.

21         THE COURT:  yes.

22         MS. KRAIDIN:  We would, you know, -- and -- and the

23   reason for that, obviously, is to provide some finality to

24   all key constituencies in both jurisdictions with respect to

25   the sale.  We do think that that requires some expediency, so

1     we will be seeking to do that on shortened time.  With Your

2     Honor's approval, we would like to bring that motion for a

3     hearing at the next omnibus date in the Chapter 11, which I

4     believe is April 9th.

5              THE COURT:  That is certainly acceptable.

6              MS. KRAIDIN:  Okay.

7              THE COURT:  Yes.

8              MS. KRAIDIN:  Thank you, Your Honor.

9              THE COURT:  Sure.

10             MS. KRAIDIN:  So, we will be bringing that motion

11    on Monday once the order from the Canadian Court is

12    entered.

13             THE COURT:  And I assume that the procedure is much

14    the same in Canada and are there any objections at this point

15    to -- to the sale?

16             MS. KRAIDIN:  None that I'm aware of.  I don't --

17             THE COURT:  All right.

18             MS. KRAIDIN:  -- no.

19             THE COURT:  Very fine.  Thank you, Ms. Kraidin.

20             MS. KRAIDIN:  Thank you very much.

21             THE COURT:  And thank you very much.

22             MS. SCHWEITZER:  Your Honor, there's one other

23    thing I would just point -- just -- so, if you see us come

24    back to the Court in the future, you don't think anything's

25    gone awry, which is that, as indicated in the Asset Purchase

1    Agreement, because this is a -- a sale involving various

2    jurisdictions and various debtors, the Asset Purchase

3    Agreement proposes that the es -- the proceeds are going to

4    be pain in escrow.

5            I believe JP Morgan is going to be the Escrow

6    Agent, but they're working on finalizing that.  And that all

7    parties are involved in finalizing that Escrow Agreement,

8    that a Credit Committee has also been kept in the loop on the

9    conversations and had its comments on the Agreements.

10           But, we will come back with Escrow Agreement,

11   likely, we'll contemplate that the -- we're going to be back

12   in front of Your Honor in some future time, to prove the

13   final allocation of the proceeds.

14           THE COURT:  Okay.

15           MS. SCHWEITZER:  So, that 17.6, subject to purchase

16   adjustments, is the aggregate worldwide purchase price for

17   the assets, and the U.S. portion will be some portion of

18   that, I would not want to throw out numbers for fear of being

19   quoted on them forever, but the parties will work on that

20   after the closing of the sale.  So, --

21           THE COURT:  All right.

22           MS. SCHWEITZER:  -- we will be back one day, but

23   hopefully with a -- a consensual allocation.

24           THE COURT:  Excellent.

25           MS. SCHWEITZER:  Okay.

The Court - Decision                                      Page 27

1           THE COURT:  All right, Ms. Schweitzer, thank you.

2    Well, I -- I hear no objections and -- and no comments from

3    other counsel and as I've noted, the Committee has indicated

4    its support for the motion and, clearly, the Court takes

5    great comfort in the fact that there have in effect been two

6    marketings of -- of these assets and that the process has

7    been an active one with -- with really a -- a very strong

8    effort at marketing.

9           And I am certainly pleased to make the findings

10   that are necessary here as to the good faith, the -- the

11   eq -- appropriate exercise of the debtor's business judgment

12   in the first place, and that the process was a -- a fair --

13   fair one and that the price achieved is a -- is -- is a fair

14   and reasonable price particularly as tested in the market.

15          And I, accordingly, am -- am prepared to grant the

16   motion and to enter the order and also to include in that

17   order the provision that is there waiving the -- the stay

18   period, recognizing that there is a -- a need to close

19   promptly.  And that this will enable the debtors to do so

20   on -- within -- within the stay period that other --

21   otherwise would be a problem as far as enabling the debtor to

22   close.

23          And I also, of course, do take comfort in the fact

24   that there is yet another Court that will be reviewing this

25   and -- and presumably approving it as well.  And, so, for all

1    of those reasons, I am pleased to -- to grant this motion and

2    to enter the order.

3            MS. SCHWEITZER:  Thank you, Your Honor.  And,

4    with that, I believe that we are done for today.  We had a

5    short --

6            THE COURT:  I'm --

7            MS. SCHWEITZER:  -- agenda.

8            THE COURT:  It was short.  I'm going to sign the

9    orders and let me just say that if -- if any issues arise

10   with respect to the closing, I'm certainly available at --

11   on -- on short notice and the parties just need to -- to

12   alert us that -- that there is the need to be heard.

13           MS. SCHWEITZER:  We appreciate that, Your Honor.

14   We'll -- we hope they'll all go smoothly.  But, we do

15   appreciate your availability.

16           THE COURT:  Sometimes just knowing that a Judge

17   is available at a moment's notice, promotes, you know, an --

18   a -- a smooth closing of -- of transactions such as this.

19           MS. SCHWEITZER:  Not just one, but two, Judge, it's

20   an  administrator.  So, --

21           THE COURT:  That's right.  All right, Counsel.  If

22   there's nothing further, then we'll stand in recess and I

23   will see everyone back here on April the 9th.

24           MS. SCHWEITZER:  Thank you, Your Honor.

25           THE COURT:  Thank you and good day to all.

1        MS. KRAIDIN:  You, too.  Thank you.

2

3                    *   *   *   *   *

4

5                C E R T I F I C A T I O N

6

7     I, Lisa A. Wilson, hereby certify that the foregoing is

8  a correct transcript of the record of proceeding on March 26,

9  2009, in the above-entitled matter.

10

11

12

13                          _____

14                          LISA A. WILSON

15

16

17

18

19

20

21

22

23

24

25