**EXHIBIT D**

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Security Agreement") dated as of August 15, 2008, is made between CROSSROADS WIRELESS, INC., a Delaware corporation ("Crossroads"), CROSSROAD WIRELESS HOLDING, LLC a Delaware corporation ("Purchasing Entity") and Nortel Networks Inc., a    Delaware corporation, ("Nortel").

### RECITALS

WHEREAS, Crossroads is in the process of acquiring all or substantially all of the assets Brookings Municipal Utilities ("BMU") utilizes in the business of providing PCS wireless communication services; and

WHEREAS, Crossroads wholly owned subsidiary, Crossroads Wireless Holding, LLC ("Purchasing Entity") has issued purchase orders to Nortel for the wireless products and services;

WHEREAS, Purchasing Entity and Nortel entered into a Purchase and License Agreement ("PLA") effective June 30, 2008 for the purchase and/or licensing for Nortel's products and services;

WHEREAS, Purchasing Entity's purchase orders exceed its current credit limit as established by Nortel and in as much as Crossroads has agreed to grant Nortel a perfected lien on and security interest in certain of Crossroads assets and properties, all pursuant to the terms of this Security Agreement;

NOW THEREFORE, for and in consideration of the covenants and provisions set forth herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **CERTAIN DEFINITIONS.** Unless otherwise defined herein and if defined in the UCC *then*, (a) if the definition given to such term in this Security Agreement conflicts with the definition given to such term in the UCC, this Security Agreement definition shall control to the extent legally allowable. As used herein, the following terms have the meanings indicated:

"*Collateral*" shall collectively mean (i) the FCC Licenses, and (ii) any and all proceeds from the sale, assignment, transfer, or other disposition of the FCC Licenses, including any partitioning, disaggregation, or leasing of any spectrum for which Crossroads is authorized under the FCC Licenses regardless of the form of such proceeds, tangible or intangible, and regardless of the identity of the purchaser, assignee, transferee or entity otherwise acquiring the FCC Licenses or any rights to use the spectrum authorized thereunder.

EXHIBIT

B

"*FCC*" means the United States Federal Communications Commission or any successor agency.

"*FCC Licenses*" means the licenses issued by the Federal Communications Commission described in Schedule A attached hereto., together with any replacements or substitutions .

"*Obligation*" means the punctual payment of all invoices for Orders issued for Phase I and performance by Purchasing Entity of all of its indebtedness, liabilities, and obligations under the PLA. for the purchase and/or licensing of Nortel's wireless products and services, Crossroads guarantee of Purchasing Entity's payment obligation for such Order and any interest, penalties, fees, costs and expenses to the extent provided for hereunder or under the PLA.

"*Phase I*" means purchase orders ("Orders") issued by Purchasing Entity to Nortel for the HLR migration and EVDO Rev A to the existing 44 BTS located at the Brookings, SD switch

"*Security Interest*" means the security interest granted under *Paragraph 2* hereof.

"*UCC*" means the Uniform Commercial Code as enacted in the Delaware;

2.    **GRANT OF SECURITY INTEREST.** In order to secure the payment and performance of the Obligation, Crossroads hereby transfers, conveys, assigns, pledges and grants a continuing and unconditional security interest in and to the Collateral to Nortel, and its successors and assigns, under this Security Agreement, which shall continue uninterrupted according to the terms of this Security Agreement.

3.    **REPRESENTATIONS AND WARRANTIES.** Crossroads represents, warrants and agrees that:

a.    Crossroads has and shall have good and marketable title to all the Collateral, wherever and whenever acquired, free and clear of any lien, and Crossroads has not filed, nor is there on record, a financing statement under the UCC (or similar statement or instrument of registration under the law of any jurisdiction) covering any Collateral;

b.    Crossroads has the requisite corporate power and authority and legal right to grant the Security Interest in the Collateral to Nortel as provided herein.

c.    Crossroads has paid when due all taxes, fees, assessments and other charges now or hereafter imposed upon the Collateral except for any tax, fee, assessment or other charge the validity of which is being contested in good faith by appropriate proceedings and which may not result in any material

2

impairment of the lien of Nortel on such Collateral and, except for any tax, fee, assessment or other charges assessed subsequent to Nortel's foreclosure on such Collateral pursuant to this Security Agreement;

d.      as a result of the execution and delivery of this Security Agreement and the filing of any financing statements or other documents necessary to assure, preserve and perfect the security interest created hereby, Nortel shall have a valid, perfected, enforceable lien on, and a continuing first priority security interest in, the Collateral, enforceable and superior as such as against creditors and purchasers, and there are no other liens or security interests in all or any portion of the Collateral, whether senior or junior to the interests created hereunder;

e.      none of the Collateral is held by a third party as assignee, trustee, bailee, consignee or in any similar capacity.

All representations, warranties and agreements of Crossroads contained in this Security Agreement shall survive the execution, delivery and performance of this Security Agreement until the termination of this Security Agreement pursuant to Section 13 hereof.

4.      **COVENANTS.** Crossroads hereby covenants to and agrees with Nortel that so long as this Security Agreement shall remain in effect or the Obligation shall remain unpaid or unperformed:

a.      Crossroads shall promptly give written notice to Nortel of any levy or attachment, execution or other process against any of the Collateral;

b.      Crossroads at its sole cost and expense shall take any and all actions reasonably necessary or desirable to defend the Collateral against the claims and demands of all persons other than Nortel and to defend the security interest of Nortel in the Collateral and the priority thereof against any adverse lien, security interest, or claim of any nature;

c.      Nortel, or any of its agents, shall have the right to call at Crossroads place or places of business during normal business hours at intervals to be determined by Nortel and without hindrance or delay after notice to Crossroads, to inspect, audit, verify, check and make extracts from the books, records, journals, orders, receipts, correspondence and other data relating to the Collateral.

d.      Without the prior written consent of Nortel or except as otherwise permitted by this Security Agreement, Crossroads will not (1) pledge, assign or grant a security interest in any of the Collateral to anyone except Nortel, (2) suffer any lien or encumbrance to exist with to, or permit any lien or encumbrance to attach to any of the Collateral, (3) permit any levy to be made on any of the Collateral or (4) permit any financing statement (except any financing statements

3

for the benefit of Nortel as secured party) to be on file with respect to any Collateral.

e. Crossroads shall pay and discharge when due all taxes, levies and other charges on the Collateral, unless such tax, levy or other charge is being contested in good faith and with respect to which adequate reserves as determined in good faith by Crossroads have been established and are being maintained and unless such tax, levy or other charge is assessed subsequent to Nortel's foreclosure on such Collateral pursuant to this Security Agreement.

5. **EVENTS OF DEFAULT**. The following shall constitute *"Events of Default"* hereunder:

a. Failure of Purchasing Entity or Crossroads to perform the Obligation as and when due, which breach or failure to perform shall not have been cured within thirty (30) days after the earlier to occur of (i) receipt of written notice thereof from Nortel or (ii) knowledge of the breach by Crossroad; or

b. In the event Crossroads or Purchasing Entity goes into receivership or insolvency proceedings, is the object of the institution of voluntary or involuntary proceedings in bankruptcy, liquidation, is dissolved or ceases doing business, or has a substantial part of its assets seized...

6. **REMEDIES UPON DEFAULT**. Upon the occurrence and during the continuation of an Event of Default, after any applicable cure period, and at any time thereafter if Crossroads fails to cure the Event of Default during the applicable cure period, Nortel may (but shall not be required to) take any or all of the following actions simultaneously or in any order which it may choose:

a. Nortel may from time to time take whatever action at law or in equity may appear necessary or desirable in order to collect the monies payable hereunder or secured hereby or to enforce performance and observance of any obligation, agreement or covenant hereunder.

b. Nortel may foreclose its Security Interest in any of the Collateral in any way permitted by law, and Nortel may thereupon, or at any time thereafter, in its sole discretion, without notice or demand (except such notice as may be specifically required by law) and with or without having the Collateral at the time or place of sale, sell or otherwise dispose of the Collateral, or any part thereof, at one or more public or private sales, at any time or place, at such price or prices and upon such terms, either for cash, credit or future delivery, as Nortel may elect. In the exercise of such remedy, Nortel may sell all of the Collateral even though the sales price thereof may be in excess of the amounts remaining unpaid on the Obligation. At any such public sale Nortel may bid for and become the purchaser of all or any part of the Collateral, and such sale or sales may be held without demand of performance, notice of intention to sell, the time or place of sale or any

4

other matter, except for such notice as may be specifically required by law; and the purchaser at any such sale or other disposition shall thereafter hold the Collateral sold absolutely free from any claim or right of Crossroads of whatsoever kind, including any right of redemption of Crossroads, all such rights being hereby expressly waived and released by Crossroads.

c.    Nortel may proceed by a suit or suits at law or in equity to foreclose this Security Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. Crossroads hereby assents to the passage of a decree for the sale of any of the Collateral by any court having jurisdiction. In any action hereunder, Nortel shall be entitled to the appointment of a receiver without notice, to peaceably take possession of all or any portion of the Collateral and to exercise such powers as the court shall confer upon the receiver. Notwithstanding the foregoing, if an Event of Default shall occur and be continuing, Nortel shall be entitled to apply, without notice to Crossroads or Purchasing Entity, any cash or cash items constituting Collateral in its possession to payment of the Obligation in such order and manner as it may elect in its sole discretion.

d.    Nortel shall have the right, in its sole discretion, to apply for and have a receiver appointed by a court of competent jurisdiction in any action taken by Nortel to enforce its rights and remedies hereunder in order to manage, protect and preserve the Collateral and continue the operation of the business of Crossroads and to collect all revenues and profits thereof and apply the same to the payment of all expenses and other charges of such receivership, including but not limited to, the compensation of the receiver, until a sale or other disposition of such Collateral shall be finally made and consummated. Nortel and Crossroads acknowledge and agree that in connection with any exercise by Nortel of its rights hereunder to dispose of or operate under certain of the Collateral, it may be necessary to obtain the prior consent or approval of certain governmental authorities, including the FCC. Upon the exercise by Nortel of any power, right, privilege or remedy pursuant to this Security Agreement which requires any consent or approval of the FCC or any other governmental authority, Crossroads will execute and deliver, or will cause the execution and delivery of, all applications, certificates and other documents which may reasonably be required to obtain such approval or consent. Crossroads shall cooperate in good faith with Nortel and any purchaser of the Collateral in obtaining any such approvals or consents.

e.    Crossroads hereby authorizes and empowers Nortel to sell its interest in the Collateral in accordance with the UCC and any other applicable law. Such Collateral or any interest therein may be sold upon such terms and in as many lots as the person conducting the sale may, in his sole discretion, elect. No readvertisements of any sale shall be required if the sale is adjourned by

5

announcement, at the time or place set therefor, of the date, time or place to which the same is to be adjourned.

      f.    Nortel may take possession of the Collateral (subject to applicable law and obtaining any required consents) pursuant hereto without legal process and without incurring liability to Crossroads therefor for the purpose of exercising its rights hereunder.

      g.    Nortel may exercise any other right or remedy with respect to any of the Collateral given to secured parties under the UCC or other applicable law.

      h.    Any notification required by the UCC shall be deemed reasonably and properly given if mailed, certified or registered mail, postage prepaid, to Crossroads, at least ten (10) days before any sale or disposition of any of the Collateral which is subject to the UCC. Any advertisement of the sale or other disposition of such Collateral shall be deemed to be reasonable if such advertisement is placed in a newspaper of general circulation in or about the location of the chief executive offices or principal place of business of Crossroads or the location of the sale at least once in each of the two (2) calendar weeks immediately preceding the sale.

All of Nortel's rights and remedies under this Security Agreement shall be cumulative and not exclusive, and shall be enforceable alternatively, successively or concurrently as Nortel may, in its sole discretion, deem expedient. Nortel shall have no obligation to preserve rights in the Collateral or marshal any of the Collateral for the benefit of any person or entity. The Obligation is a recourse obligation. Accordingly, the exercise of Nortel's remedies hereunder, or any of them, including, without limitation, foreclosure on the Collateral, shall not result in a satisfaction or discharge of the Obligation or otherwise limit Nortel's ability to exercise its other remedies hereunder.

      7.    **APPLICATION OF PROCEEDS.** Any proceeds received from the exercise of any remedy hereunder, after deducting therefrom any and all costs and expenses reasonably incurred in securing possession of any Collateral, in shipping and storing the Collateral, in preparing the Collateral for sale or otherwise dealing with Collateral prior to any sale or other disposition thereof and in connection with the sale or other disposition thereof (including, without limitation, reasonable attorneys' and accountants' fees and brokers' commissions), shall be applied toward the payment of any and all amounts due under or with respect to the Obligation, including interest, and all other costs and expenses reasonably incurred by Nortel in connection with this Security Agreement which are then due and payable, in such order and amounts as Nortel, in its sole discretion, may elect. If such net proceeds should be insufficient to pay the same and a deficiency shall result, Crossroads shall nevertheless remain liable for such deficiency; and if such proceeds should be more than sufficient to pay the same, then in case of a surplus, such surplus shall be accounted for and, if any amounts due under the Obligation remain outstanding, retained by Nortel, who shall hold the same as security for the payment of the Obligation; otherwise, such surplus shall be paid over to

Crossroads or to whomsoever a court of competent jurisdiction shall determine to be entitled thereto.

8. **POWERS OF ATTORNEY.** Crossroads hereby irrevocably appoints Nortel (and any officer or agent of Nortel) as its true and lawful attorney-in-fact, with power of substitution for and in the name of Nortel or otherwise, for the use and benefit of Nortel, effective upon the occurrence and during the continuance of an Event of Default and to the extent not prohibited by applicable law: (i) to receive and give discharges and releases of all or any of the Collateral; (ii) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction, to collect or otherwise realize on all or any part of the Collateral or to enforce any rights in respect thereof; (iii) to notify any obligor of the company with respect to any Collateral to make payment to Nortel; (iv) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating or pertaining to all or any of the Collateral; (v) to take any action for purposes of carrying out of the terms of this Security Agreement; (vi) to enforce all of Crossroads' rights and powers under and pursuant to any and all agreements with respect to the Collateral; and (vii) generally to sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out this Security Agreement, as fully and completely as though Nortel were the absolute owner of the Collateral for all purposes; provided, however, that nothing herein contained shall be construed as requiring or obligating Nortel to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received Nortel, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby, and no action taken by Nortel or omitted to be taken with respect to the Collateral or any part thereof shall give rise to any defense, counterclaim or offset in favor of Crossroads or to any claim or action against Nortel. It is understood and agreed that the power of attorney granted to Nortel for the purposes set forth above in this Section 8 is coupled with an interest and is irrevocable and Crossroads hereby ratifies all actions taken by its attorney-in-fact by virtue hereof. The provisions of this Section 8 shall in no event relieve Crossroads of any of its obligations hereunder with respect to the Collateral or any part thereof or impose any obligation on Nortel to proceed in any particular manner with respect to the Collateral or any part thereof, or in any way limit the exercise by Nortel of any other or further right which it may have on the date of this Security Agreement or hereafter, whether hereunder, by law or otherwise.

9. **COLLECTIONS.** Upon the occurrence and during the continuance of an Event of Default, Nortel may, in its sole discretion, in its name or in the name of Crossroads, or otherwise, (a) demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for, or make any compromise or settlement deemed desirable with respect to any of the Collateral, but shall be under no obligation to do so, or (b) extend the time of payment, arrange for payment in installments, or otherwise modify the term of, or release, any of the Collateral, without thereby incurring responsibility to, or discharging or otherwise affecting any liability of, Crossroads, other than to discharge Crossroads in so doing with

7

respect to liabilities of Crossroads to the extent that the liabilities are paid or repaid. Nortel may make such payments and take such actions as Nortel, in its sole discretion, deem necessary to protect its security interest in the Collateral or the value thereof, and Nortel is hereby unconditionally and irrevocably authorized (without limiting the general nature of the authority hereinabove conferred) to pay, purchase, contest or compromise any liens which in the judgment of Nortel appear to be equal to, prior to or superior to its security interest in the Collateral.

10.     **EXPENSES.** Crossroads shall pay, when due, any and all reasonable fees, taxes or (other than taxes based on the income of Nortel) other charges imposed in connection with the granting of the security interests hereunder including, without limitation, any fees imposed in connection with recordation of instruments necessary or desirable in order to reflect, effectuate or release such security interests.

11.     **NOTICES.** All notices or other communications hereunder shall be in writing and shall be deemed to have been duly given or made (i) upon delivery if delivered personally (by courier service or otherwise), as evidenced by written receipt or other written proof of delivery (which may be a printout of the tracking information of a courier service that made such delivery), or (ii) upon confirmation of dispatch if sent by facsimile transmission (which confirmation shall be sufficient if shown by evidence produced by the facsimile machine used for such transmission), in each case to the respective parties to their addresses set forth below, or in accordance with any subsequent written direction delivered in accordance with this section from the recipient party to the sending party:

    If to Crossroads
    Mr. Thomas F. Riley, Jr., President
    CROSSROADS WIRELESS, INC.
    5 N. McCormick
    Oklahoma City, OK 73127

    If to Nortel
    Nortel Networks Corporation:
    Trevor Jones, Director Finance & Credit
    195 The West Mall
    Toronto, Ontario M9C5K1
    MS: T0506007

12.     **ASSIGNABILITY AND PARTIES IN INTEREST.** This Security Agreement shall not be assignable by Crossroads without the written consent of Nortel. This Security Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

8

13. **TERMINATION.** This Security Agreement shall terminate and the Security Interest shall be released upon irrevocable payment and performance in full of the Obligation.

14. **CERTAIN WAIVERS; CROSSROADS NOT DISCHARGED.** Crossroads expressly and irrevocably waives (to the extent permitted by applicable law) presentment, demand of payment and protest of nonpayment in respect of its Obligation under this Security Agreement. The obligations and duties of Crossroads hereunder are irrevocable, absolute, and unconditional and shall not be discharged, impaired or otherwise affected by (a) the failure of Nortel to assert any claim or demand or to enforce any right or remedy against Crossroads or any waiver, consent, extension, indulgence or other action or inaction in respect thereof, (b) any extension or renewal of any part of the Obligation, (c) any rescission, waiver, amendment or modification of any of the terms or provisions of this Security Agreement, (d) the release of any liens on or security interests in any part of the Collateral or the release, sale or exchange of or failure to foreclose against any security held by or for the benefit of Nortel for payment or performance of the Obligation, (e) the bankruptcy, insolvency or reorganization of Crossroads or any grantee or any other persons, (f) the invalidity or unenforceability of this Security Agreement, (g) any change, restructuring or termination of the corporate structure or existence of Crossroads or any grantee or any restructuring or refinancing of all or any portion of the Obligation, or (h) any other event which under law would discharge the obligations of a surety.

15. **TRANSFER OF COLLATERAL OR SECURITY INTEREST.** Nortel may transfer to any other person all or any part of the Collateral, which may be in Nortel's possession after the occurrence and during the continuance of an Event of Default. Nortel may, at any time, assign all or any portion of its rights as Nortel hereunder to its parent company or any affiliate of Nortel, upon notice to Crossroads, but without any requirement for consent or approval by or from Crossroads, and any such assignment shall be valid and binding upon Crossroads.

16. **INDEMNITY; REIMBURSEMENT OF NORTEL.** Crossroads agrees to indemnify, defend and hold Nortel harmless from and against any and all claims, demands, losses, judgments and liabilities (including but not limited to, liabilities for penalties) of any nature, and to reimburse Nortel for all reasonable costs and expenses, including but not limited to attorneys' fees and expenses, arising from this Security Agreement or the exercise of any right or remedy granted to Nortel hereunder, except to the extent such claims arise out of Nortel's gross negligence and willful misconduct. In no event shall Nortel be liable for any matter or thing in connection with this Security Agreement other than to account for moneys actually received by Nortel in accordance with the terms hereof. All indemnities contained in this Section 16 and elsewhere in this Security Agreement shall survive the expiration or earlier termination of this Security Agreement.

17. **NO LIABILITY FOR COLLATERAL.** Beyond the exercise of reasonable care in the custody of any Collateral in its possession, Nortel shall not, under

9

any circumstance or in any event whatsoever, have any liability for any part of the Collateral, nor shall Nortel have any liability for any error or omission or delivery of any kind incurred in the good faith settlement, collection or payment of any of the Collateral or any monies received in payment therefor or for any damages resulting therefrom, nor shall this Security Agreement impose upon Nortel any obligation to perform any obligation with respect to the Collateral. The costs of collection, notification and enforcement, including but not limited to, attorneys' fees and out-of-pocket expenses, shall be borne solely by Crossroads, whether the same are incurred by Crossroads or Nortel.

18.  **GOVERNING LAW.** This Security Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Delaware, without regard to its conflict of laws principles, except to the extent that the perfection and the effect of perfection or nonperfection of any security interests created hereby is governed by the laws of a jurisdiction other than the State of Delaware.

19.  **COMPLETE AGREEMENT.** This Security Agreement and the PLA contain the entire agreement between the parties hereto with respect to the transactions contemplated herein and, except as provided herein, supersede all previous oral and written and all contemporaneous oral negotiations, commitments, writings and understandings.

20.  **AMENDMENTS AND WAIVERS.** This Security Agreement may be amended only by a writing signed by Crossroads and Nortel. No delay or omission on the part of any party hereto in exercising any right hereunder shall operate as a waiver of such right or any other right hereunder or operate to constrain the rights of any other parties hereunder. No waiver of any one right shall operate as a waiver of any subsequent right.

21.  **INTERPRETATION.** The headings contained in this Security Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Security Agreement.

22.  **COUNTERPARTS.** This Security Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which when taken together shall constitute but one contract, and shall become effective when copies hereof which, when taken together, bear the signatures of each of the parties hereto shall be delivered or mailed to Nortel.

23.  **SEVERABILITY.** If any provision of this Security Agreement shall be held to be invalid, illegal or unenforceable in any material respect, such provision shall be replaced with a provision which is as close as possible in effect to such invalid, illegal or unenforceable provision, and still be valid, legal and enforceable, and the validity, legality and enforceability of the remainder of this Security Agreement shall not in any way be affected or impaired thereby, unless the parties otherwise so provide.

10

24. **WAIVER OF JURY TRIAL.**

EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS SECURITY AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE. EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS SECURITY AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS SECURITY AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 24.

25. **FURTHER ASSURANCES.** Crossroads agrees, from time to time, at its expense, to do such further things, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents and take all such actions as Nortel may from time to time, reasonably request for the better assuring and preserving of the security interests and rights and remedies created hereby, including, without limitation, the execution and delivery of such financing statements or continuation statements, and amendments thereto, as may be necessary or desirable, or as Nortel may request in order to perfect and preserve the security interests granted hereby. Crossroads hereby authorizes Nortel or its agent to file such financing statements and/or such continuation statements and amendments thereto, relating to all or any part of the Collateral without its signature, where permitted by law. A carbon, photographic or other reproduction of this Security Agreement or any financing statement covering the collateral granted hereby or any part thereof shall be sufficient as a financing statement where permitted by law.

26. **FCC MATTERS.** Notwithstanding anything herein which may be construed to the contrary, no action shall be taken by Nortel with respect to the FCC Licenses unless and until all requirements of applicable law, including any required approval under the Communications Act of 1934, as amended by the Telecom Act of 1996, and as it may be further amended, requiring the notice to or consent or approval of such action by, the FCC or any governmental or other authority, have been satisfied. Crossroads agrees, after the occurrence and during the continuation of an Event of Default, to take any actions that Nortel may request in order to enable Nortel to obtain and enjoy the full rights and benefits granted to Nortel under this Security Agreement. Without limiting the generality of the foregoing, Crossroads shall upon the occurrence and during the continuation of an Event of Default, at Crossroads' sole cost and expense, assist in obtaining all approvals of the FCC or any other relevant governmental authority

11

which are then required by law for or in connection with any action or transaction contemplated by this Security Agreement or Article 9 of the UCC and, at Nortel's request, prepare, sign and file with the FCC or such other governmental authority the assignor's or transferor's portion of any application or applications for consent to the assignment of the FCC Licenses or transfer of control thereof necessary or appropriate under the FCC's or such authority's rules for approval of any such sale or transfer or of the exercise of any of Nortel's remedies under this Security Agreement. The parties acknowledge their intent that, upon the occurrence and during the continuation of an Event of Default, Nortel shall receive, to the fullest extent permitted by Applicable Law, all rights necessary or desirable to obtain, use or sell the Collateral, and to exercise all remedies available to it under this Security Agreement, the UCC as in effect in any applicable jurisdiction, or other applicable law. Nortel shall have the right, in connection with the issuance of any order for relief in a bankruptcy proceeding, to petition the bankruptcy court for the transfer of control or assignment of the FCC Licenses to a receiver, trustee, transferee or similar official or to any purchaser of the Collateral pursuant to any public or private sale, foreclosure or other exercise of remedies available to Nortel, all as permitted by applicable law.

**IN WITNESS WHEREOF**, Crossroads, Purchasing Entity and Nortel have executed this Security Agreement as of the date and year written above.

CROSSROADS::
CROSSROADS WIRELESS, INC.

By: _Tom Riley_

THOMAS F. RILEY, JR.
President
Date: 2/13/09

PURCHASING ENTITY::
CROSSROADS WIRELESS HOLDING, LLC.

By: _Tom Riley_

Date: 2/13/09

NORTEL
NORTEL NETWORKS INC.

By: _____

Date: _____

12

## SCHEDULE A

### FCC Licenses

| MTA | BTA | Name | Block | MHZ | Pops. | Mhz/Pops |
|-----|-----|------|-------|-----|-------|----------|
| 19 | 90 | Columbia, MO | C | 10 | 222,312 | 2,223,120 |
| Amount Paid: $750,000 | | | | | | |
| | 220 | Joplin | C5 | 10 | 254,355 | 2,543,550 |
| | 349 | Pittsburgh | C3-5 | 30 | 90,833 | 2,724,990 |
| 34 | | | | | | |
| Amount Paid: $1,215,000 | | | | | | |
| 41 | 4 | Ada, OK | C,D, F | 30 | 55,190 | 1,655,700 |
| Amount Paid: $412,500 | | | | | | |

13

# iLien Coverpage

Date Printed: 8/5/2008

Debtor:
CROSSROADS WIRELESS HOLDING, LLC
5 North McCormick
Oklahoma City, OK  73127

REF1: 4320032847
REF2: CROSSROADS WIRELESS HOLDING, LLC
iLien File #: 31416734
Order Confirmation #: 15232863

UserID: 146949
Number of Collateral Pages Attached: 0

Transaction Type: Original
Jurisdiction: DE, Secretary of State



EXHIBIT

C