**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

--------------------------------------------------------X

|  |  |  |
|---|---|---|
| *In re* | : | Chapter 11 |
|  | : |  |
| Nortel Networks Inc., *et al.*,[1] | : | Case No. 09-10138 (KG) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |
|  | : | **Hearing date: June 11, 2009 2:00 PM (ET)** |
|  | : | **Objections due: June 4, 2009 4:00 PM (ET)** |

--------------------------------------------------------X

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO FILE UNDER SEAL CERTAIN PORTIONS OF THE SETTLEMENT DOCUMENTS BY AND AMONG (I) NORTEL NETWORKS LIMITED, (II) FLEXTRONICS TELECOM SYSTEMS LTD. AND (III) FLEXTRONICS CORPORATION

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, authorizing the Debtors to file under seal certain portions of a settlement agreement and a side letter to that agreement (the "Settlement Documents") by and among (i) Nortel Networks Limited ("NNL"), (ii) Flextronics Telecom Systems Ltd. ("FTS"), and (iii) Flextronics Corporation (together with FTS and their affiliates, "Flextronics"); and granting them such other and further relief as the Court deems just and proper.  In support of this Motion, the Debtors rely on the Declaration of Joseph Flanagan

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

(the "Flanagan Declaration"), attached hereto as Exhibit B.  In further support of the Motion, the

Debtors respectfully represent as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are section 107(b) of chapter 11

of title 11 of the United States Code (the "Bankruptcy Code"), Rule 9018 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9018-1 of the Local Rules for the

United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Background

**A.      Introduction**

3.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario

Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement

Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court. Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. In addition, at 8 p.m. (London time) on January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators").

6.     On January 15, 2009, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that provided for the joint administration of these cases and for consolidation for procedural purposes only.

7.     On January 26, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code (D.I.s 141, 142). An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been

---

[3]     The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

**B.    Debtors' Corporate Structure and Business**

8.    A description of the Debtors' corporate structure and business and the events leading to the chapter 11 cases are set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications (the "First Day Declaration").[4]

<strong>Relief Requested</strong>

9.    By this Motion, the Debtors seek an order pursuant to section 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule 9018-1 authorizing the Debtors to file under seal certain portions of the Settlement Documents.

<strong>Facts Relevant to this Motion</strong>

**A.    The Relationship Between Nortel and Flextronics**

10.    In 2006, Nortel completed the transition to an outsourcing model whereby it transferred substantially all of its hardware manufacturing and related activities, including certain product integration, testing, repair operations, supply chain management, third party logistics and design assets.  As part of this plan, in 2004 NNL entered into an asset purchase agreement with FTS for the sale of the bulk of Nortel's remaining manufacturing facilities and related inventory.

11.    Since 2004, Nortel and Flextronics have engaged in a complex, wide-ranging contract manufacturing relationship whereby Flextronics, pursuant to specifications supplied by Nortel, purchases materials and components, assembles those materials and components into higher-level components and finished goods, and stores and delivers such finished components and goods to Nortel based on Nortel's forecasts and demands.

---

[4]    Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

12.     Flextronics is by far Nortel's largest supplier.  As the Debtors informed this Court at the January 15, 2009 first day hearing in the chapter 11 proceedings, Flextronics is responsible for the supply of approximately 70% of Nortel's hardware products.  See Hearing Tr. 17:22-25, Jan. 15, 2009, the relevant portions of which are attached hereto as Exhibit C.  In addition, Flextronics provides a significant portion of the logistics and repair services required in connection with those products.  Indeed, as the Debtors explained to the Court, Flextronics is, in many respects, "the critical vendor" of Nortel.  Id. at 18:6.

13.     The contract manufacturing relationship between Flextronics and Nortel is governed by a number of agreements entered into by various Flextronics and Nortel entities.  On September 30, 2003, NNL and Solectron Corporation ("Solectron") entered into the Master Contract Manufacturing Services Agreement (the "2003 MCMSA").  Subsequently, Flextronics acquired Solectron in 2007.  Additionally, on June 29, 2004, in connection with FTS' purchase of the bulk of Nortel's manufacturing facilities, NNL and FTS entered into the Amended and Restated Master Contract Manufacturing Services Agreement (the "2004 MCMSA" and collectively with the 2003 MCMSA, the "MCMSAs").

14.     Under the MCMSAs, NNL and certain of its subsidiaries, including NNI, have also entered into "Virtual Systems House Agreements" (the "VSHAs") with Flextronics.  The VSHAs authorize the Nortel entity party to the VSHA to issue purchase orders to Flextronics and outline the responsibilities of the parties with respect to individual Flextronics manufacturing sites and particular Nortel products.  For example, each VSHA may contain terms and conditions unique to each Flextronics manufacturing site, such as a list of products manufactured at the site, support teams and the specific reporting requirements for the site.  Additionally, each Nortel entity and Flextronics entity that enters into a VSHA becomes a party to the MCMSA with

regard to the products covered by the VSHA and the VSHAs are incorporated by reference into the relevant MCMSA.

15.     In connection with the 2003 MCMSA, NNI entered into three prepetition VSHAs for the supply of specific products: a VSHA dated August 2, 2004 between NNI and Solectron USA, Inc. (the "Columbia VSHA"); a VSHA dated November 11, 2005 between NNI and Solectron USA, Inc. (the "Charlotte VSHA"); and a VSHA dated March 31, 2006 between NNI and Solectron Manufactura de Mexico (the "Mexico VSHA" and together with the Columbia VSHA and the Charlotte VSHA, the "NNI VSHAs"). The 2003 MCMSA governs NNI's issuance of purchase orders under the NNI VSHAs and the fulfillment of these purchase orders by Flextronics. Since the Petition Date, NNI has continued to issue purchase orders to Flextronics in accordance with prior practice pursuant to the terms of the 2003 MCMSA and the NNI VSHAs.

**B.     The Amending Agreement**

16.     Just prior to the Petition Date, in anticipation of the filing and in recognition of the extreme importance of Flextronics' continued performance during the chapter 11, CCAA and EMEA proceedings, Nortel entered into negotiations with Flextronics to ensure ongoing supply during the postpetition period. On January 13, 2009, NNL, FTS and Flextronics Corporation entered into an amending agreement (the "Amending Agreement") that amends various Flextronics agreements, including the MCMSAs.

17.     Pursuant to the Amending Agreement, Flextronics agreed to continue to supply products to Nortel. In exchange, NNL agreed to purchase certain Flextronics inventory in the total amount of $120 million payable in four installments between January 14, 2009 and July 1,

2009.[5]  Additionally, NNL agreed to submit purchase orders on a quarterly basis for certain other inventory and to pay on a weekly basis for goods supplied during the immediately previous week.  To date, Nortel has paid $100 million of the $120 million owed under the Amending Agreement in accordance with the schedule set forth in that document, in addition to making payments on the goods and services Flextronics provides in the ordinary course.

18.    On January 14, 2009, in its Initial Order in the Canadian Proceedings, the Canadian Court approved the Amending Agreement and authorized and directed NNL to comply with its obligations thereunder.  Initial Order at ¶ 48.

19.    NNI has reimbursed NNL for certain inventory purchased from Flextronics under the Amending Agreement.  Nortel allocates the cost of inventory purchases among the four Nortel entities that serve as transaction control centers ("TCCs"),[6] which are used to coordinate Nortel's global purchasing and supply chain.  Under this system, Nortel determines the product line for which inventory will be used.  Then, the cost of the inventory is allocated between Nortel entities based on the historical mix of purchases by product line that each TCC made in 2008.  As a result of this purchasing system, costs related to the provision of goods and services are settled in the ordinary course through inter-company receivables and payables between the Nortel entities that serve as TCCs.  Of the $100 million that NNL has paid Flextronics under the Amending Agreement thus far, $57.75 million has been allocated to NNI and reimbursed by NNI to NNL.

---

[5]    The payment schedule under the Amending Agreement is as follows: (i) $25 million on January 14, 2009; (ii) $50 million on January 20, 2009; (iii) $25 million on April 1, 2009; and (iv) $20 million on July 1, 2009.

[6]    The four TCCs are NNL, NNI, Nortel Networks UK Limited ("NN UK") and Nortel Networks S.A. ("NN France").

C.    **The Settlement Documents**

20.    Subsequent to the commencement of the CCAA, EMEA and chapter 11 proceedings, certain disputes emerged between Nortel and Flextronics regarding the proper interpretation of the Amending Agreement and certain other matters.  Again recognizing the extreme importance of Flextronics' continued performance during Nortel's restructuring proceedings, Nortel engaged Flextronics in negotiations in order to maintain the relationship and resolve the disputes concerning the Amending Agreement.  Because Flextronics is responsible for approximately 70% of Nortel's products, the Debtors' business would suffer immensely if Flextronics were to cease complying with its obligations to Nortel or if Nortel were required to seek orders from the Courts to compel performance under the MCMSAs, the Amendment Agreement and the VSHAs and the various purchase orders issued under these agreements.

21.    After lengthy negotiations, including extensive discussions with the Committee, the Bondholder Group, the Monitor, and the Joint Administrators,[7] Flextronics and Nortel have resolved the disputes existing between them regarding the proper interpretation of the Amending Agreement.  This resolution is memorialized in the Settlement Documents entered into between Flextronics and Nortel on May 22, 2009.

22.    Specifically, the Settlement Documents resolve (i) whether Nortel's obligations to purchase inventory in accordance with existing plans of record is in addition to, or included within, its obligation to purchase from Flextronics $120 million of inventory as set forth in the Amending Agreement; (ii) whether the termination of the 2003 MCMSA will occur as scheduled on July 12, 2009; (iii) whether Nortel's quarterly E&O purchase orders to Flextronics are to include inventory acquired by Flextronics on or before the effective date of the Amending

---

[7]    Nortel also advised the Ontario Superintendent of Financial Services as Administrator of the Pension Benefits Guarantee Fund of its settlement with Flextronics.

Agreement; (iv) whether, for purposes of determining the due date for Nortel's payments in accordance with the modified weekly credit terms set forth in the Amending Agreement, the date of "delivery" shall mean the date that Flextronics delivers the goods in to the Incoterms location agreed by the parties, or the date that Nortel actually takes possession of goods from the carrier; and (v) certain other disputes that have arisen between the parties, which are addressed in the settlement side letter, including whether performance under the MCMSAs and subsequent agreements constitutes an extension of credit by either party. Both Nortel and Flextronics acknowledge that the Settlement Documents represent the full and final settlement of the disputes listed (i)-(iv) above and all other disputes relating to the interpretation of the Amending Agreement known by both parties as of May 22, 2009.

23. In accordance with past and current practice, a portion of the total amount owed by NNL under the Settlement Documents will be allocated to NNI for NNI's share of costs related to the Settlement Documents. This reimbursement will be calculated under the same system used to allocate costs among Nortel entities under the Amending Agreement, described above in paragraph 19. The Debtors believe that such a reimbursement, made pursuant to Nortel's inter-company accounts payable system, for NNI's portion of the costs relating to the Settlement Documents continues to be in the ordinary course. However, in an abundance of caution the Debtors have filed a motion seeking approval of the Settlement Documents to the extent NNI is responsible for its share of the costs. In support of this motion, the Debtors must file a copy of the Settlement Documents with the Court. Since the public disclosure of certain "commercial information" in the Settlement Documents would severely harm the Debtors and their estates, the Debtors have filed this Motion seeking to file portions of the Settlement Documents under seal.

## Basis for Relief

24.    The relief requested by the Debtors is squarely authorized under the Bankruptcy Code.  Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to issue orders to protect a party's confidential, commercial or proprietary information:

> On request of a party in interest, the bankruptcy court shall . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information . . . .

11 U.S.C. § 107(b).

25.    Furthermore, Bankruptcy Rule 9018 defines the procedure by which a party may move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court may make any order which justice requires . . . to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018.

26.    This Court has previously described "commercial information" as "information which would result in 'an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'" In re Alterra Healthcare Corp., 353 B.R. 66, 75 (Bankr. D. Del. 2006) (citing In re Orion Pictures Corp., 21 F.3d 24, 27-28 (2d Cir. 1994).  This Court has also noted that "commercial information" may include "the terms of agreements with suppliers." Id. at 76 (citing In re Barney's, Inc., 201 B.R. 703, 709 (Bankr. S.D.N.Y. 1996)).

27.    Since the redacted portions of the Settlement Documents are "commercial information" within the ambit of section 107(b), the Court should enter an order permitting the Debtors to file under seal the redacted portions of the Settlement Documents.  As described above and in Flanagan Declaration, the redacted portions of the Settlement Documents contain sensitive commercial information concerning the relationship between the Debtors and their

largest supplier Flextronics, which since 2004 has acquired substantially all of Nortel's hardware manufacturing and related operations.  The disclosure of this information would unfairly advantage the Debtors' competitors by revealing certain costs and terms associated with Nortel's supply chain and production process.  As this Court has noted before, the expenses associated with a debtor's operations are "commercial and sensitive in nature."  Alterra, 353 B.R. at 76.

28.     Additionally, in In re Orion Pictures Corp., the Second Circuit reviewed a bankruptcy court's order authorizing a debtor to file under seal a licensing agreement by which McDonald's agreed to distribute one of the debtor's products.  21 F.3d at 26.  The Second Circuit upheld the bankruptcy court's decision to file the agreement under seal, explaining that:

> Here, the bankruptcy court properly found, after reviewing the licensing agreement and other relevant material, that disclosing the sealed information, including the overall structure, terms and conditions of the McDonald's Agreement, renders very likely a direct and adverse impairment to [the debtor's] ability to negotiate favorable promotion agreements * * *, thereby giving [the debtor's] competitors an unfair advantage.

Id. at 27-28.  In this case, the redacted portions of the Settlement Documents contain information the release of which would similarly disadvantage the Debtors.  The disclosure of this information would severely impair the ability of the Debtors to negotiate successful agreements with their other suppliers, disrupting the Debtors' ongoing operations during this already difficult period.  If the Debtors' other suppliers knew the precise terms of the settlement with Flextronics, the Debtors would face increased pressure to renegotiate terms with them, further increasing the costs of the Debtors' operations and thereby unfairly advantaging the Debtors' competitors.  Such added expenses would also drain additional resources from the Debtors' estates and reduce the eventual recovery of creditors.  As one bankruptcy court has explained, "the commercial information that is entitled to protection under Code section 107(b) and Bankruptcy Rule 9018

must be viewed from the practical perspective of damage to the estate or its creditors." In re Global Crossing Ltd., 295 B.R. 720, 725 (Bankr. S.D.N.Y. 2003).

29.       Furthermore, by destabilizing the Debtors' relationships with their suppliers, the disclosure of information redacted from the Settlement Documents would disrupt eventual sale transactions the Debtors may undertake. Courts have recognized that filing commercial information under seal is appropriate when its disclosure would reduce the value of the estate by having a "serious and detrimental impact on the prices for which . . . assets could be sold." In re Farmland Industries, 290 B.R. 364, 369 (Bankr. W.D. Mo. 2003); see also In re Global Crossing Ltd., 295 B.R. at 725.

30.       Consequently, this Court should enter an order authorizing the Debtors to file the redacted portions of the Settlement Documents under seal.

### Notice

31.       Notice of the Motion has been given via first class mail to the (i) Office of the United States Trustee for the District of Delaware; (ii) the Committee; and (iii) the general service list established in these chapter 11 cases. The Debtors submit that under the circumstances no other or further notice is necessary.

### No Prior Request

32.       No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: May 22, 2009
Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley
Lisa M. Schweitzer
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*