Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION (the "Applicants")**

**TENTH REPORT OF THE MONITOR**
**DATED MAY 22, 2009**

**INTRODUCTION**

1.  On January 14, 2009, Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceeding. The stay of proceedings was extended to July 30, 2009, by this Honourable Court in its Order dated April 28, 2009.

**PURPOSE**

2.  The purpose of this tenth report of the Monitor (the "Tenth Report") is to address the Company's motion with respect to:

a)   seeking this Honourable Court's advice and direction in the determination of an appropriate transfer ratio (the "Transfer Ratio"), as defined in the *Pensions Benefits Act*, R.S.O. 1990, c. P.8 (the "PBA") and the regulations thereto (the "Regulations"); and

b)   applying the Transfer Ratio, without filing  updated actuarial reports with the Superintendent of Financial Services Commission of Ontario (the "Superintendent"), to the beneficiaries' requests  for commuted value transfer payments from the Nortel Networks Negotiated Pension Plan (the "Negotiated Plan") and the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (the "Non-Negotiated Plan" and, with the Negotiated Plan, the "Plans").

**TERMS OF REFERENCE**

3.  In preparing this Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company, various actuarial estimates prepared by Mercer Human Resource Consulting ("Mercer"), and discussions with management of Nortel and the Financial Services Commission of Ontario ("FSCO").  EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Tenth Report.

4.  Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

5.  Capitalized terms not defined in this Report are as defined in the Affidavit of John Doolittle sworn on May 20, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report or previous Reports of the Monitor.

## GENERAL BACKGROUND

6. Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

## DEFINED BENEFIT PENSION PLANS

7. NNL has two Canadian defined benefit pension plans registered in Ontario. The Negotiated Plan covers all unionized employees and former unionized employees of participating bargaining units of NNL while the Non-Negotiated Plan covers all managerial and other non-unionized employees and former employees of NNL and its wholly owned subsidiary, NNTC. The Negotiated Plan and the Non-Negotiated Plan are both sponsored and administered by NNL.

8. Oversight of the Plans is provided by NNL's Pension Investment Committee, the Pension Fund Policy Committee and the Retirement Planning Committee (the "Pension Committees"), which advise NNL's Board of Directors Pension Fund Policy Committee on pension matters.

9. As disclosed in the affidavit of Lewis Lockhart sworn April 8, 2009, filed by the Company in connection with the representation order motions (the "Lockhart Affidavit"), there are 12,818 beneficiaries of the Non-Negotiated Plan of which 5,603 are already receiving monthly pension benefits. There are 8,221 beneficiaries of the Negotiated Plan of which 6,165 are already receiving monthly pension benefits. Some of these beneficiaries are beneficiaries of both Plans due to the various positions they have held throughout their tenure at Nortel.

**STATUS OF PENSION PLANS BASED ON LAST FILED ACTUARIAL VALUATION REPORTS**

10. The last actuarial valuation reports with respect to the Plans, were filed by NNL with the Superintendent in September 2007 for the period ending December 31, 2006 (the "2006 Valuations"). According to the PBA and the Regulations, the next triennial actuarial valuation reports for the Plans are not required to be filed until September 2010 for the period ending December 31, 2009.

11. The 2006 Valuations reported a solvency deficit of approximately $98 million for the Non-Negotiated Plan, and a solvency surplus of approximately $51 million for the Negotiated Plan.    The Negotiated Plan surplus was subsequently reduced to approximately $7 million due to plan enhancements for its members.

12. The Plans' current Transfer Ratios (the percentage of a beneficiary's commuted value which may be transferred from the plan) and NNL's funding requirements for current service and special deficit funding are determined by the most recent filed actuarial reports.    NNL's required contributions and the respective Transfer Ratios for the Plans are based upon the 2006 Valuations and are to be applied until the next actuarial valuation reports for the Plans are filed.

13. The PBA generally requires that pension plan deficits be funded over a period of time.    The Non-Negotiated Plan's deficit, based on the 2006 Valuations, requires NNL to contribute approximately $22 million in special payments annually.

14. As a result of the Negotiated Plan's solvency surplus, based on the 2006 Valuations as revised for the subsequent plan enhancements noted above and changes to pension regulations, NNL is currently required to make annual special payments of less than $100,000 which is being set off against existing credit balances.

15. The PBA and the Regulations require that, with some exceptions, commuted values be transferred to a member at a reduced percentage or Transfer Ratio when a plan has a deficit.

16. Prior to the Applicants' filing under the CCAA on January 14, 2009, NNL used Transfer Ratios of 1.0 (100% of commuted value) for the Plans.

17. Subsequent to January 14, 2009, the Monitor has been advised that the Pension Committees revisited the Plans' Transfer Ratios in light of the Plans' deficits and the number of transfers requested by beneficiaries and made the decision to decrease the Transfer Ratios from 1.0 to the Transfer Ratios indicated in the 2006 Valuations (being 0.86 for the Non-Negotiated Plan and 0.85 for the Negotiated Plan). The 2006 Valuation for the Negotiated Plan indicated a Transfer Ratio of 0.89; however, the subsequent plan enhancements decreased the Transfer Ratio to 0.85.

**STATUS OF PENSION PLANS BASED ON UPDATED ACTUARIAL ESTIMATES**

18. Since the 2006 Valuations were filed, the global stock markets have fallen significantly and, as a result, the Monitor understands that the asset values in the Plans have decreased significantly. NNL has expressed concern with the significant fluctuations in the value of the Plans' assets. Given NNL's current situation and the current economic environment, NNL believed it was prudent to have Mercer prepare an updated actuarial estimate for the Plans even though NNL is not required to file an actuarial valuation report at this time.

19. The updated actuarial estimate prepared by Mercer in April 2009 (the "2009 Actuarial Estimate) estimates the Transfer Ratios to be approximately 0.69 for the Plans. The revised estimated Transfer Ratios are approximately 16 and 17 percentage points lower than the existing Transfer Ratios for the Negotiated Plan and the Non-Negotiated Plan, respectively.

**NNL'S PROPOSED PLAN OF ACTION**

20. The Monitor has been advised that the Pension Committees, after considering possible alternative actions, believe it would be prudent to reduce the Transfer Ratios to the 0.69 estimate in order to treat all members equitably.

21. NNL's proposed plan of action is to reduce the Transfer Ratio used in calculating interim commuted value payments for members requesting to transfer out of the Negotiated Plan and the Non-Negotiated Plan.

22. Notwithstanding that an actuarial valuation has not been filed with FSCO reflecting the updated valuation data, the Pension Committees believe using Transfer Ratios of 0.69 for both the Negotiated Plan and Non-Negotiated Plan interim commuted value transfer payments, as estimated in the 2009 Actuarial Estimate, balances the interests of members desiring to transfer their commuted value with the interests of active and deferred members and retirees.

23. The Monitor and NNL have engaged FSCO in a discussion with respect to its increasing pension deficit and the Transfer Ratios. After deliberations and discussions with FSCO, NNL has applied to obtain direction and instruction from this Honourable Court to establish reduced Transfer Ratios of 0.69 for the Plans for the purpose of making interim commuted value payments.

**POTENTIAL IMPACT OF FILING UPDATED VALUATION**

24. NNL is also seeking the approval of this Honourable Court to allow NNL to reduce the Transfer Ratio without being required to file an actuarial valuation report with FSCO before its current filing requirement of September 2010.

25. As previously noted, the next triennial actuarial valuation reports for the Plans are not required to be filed until September 2010. Filing an actuarial valuation report, whether at the required date or earlier, results in the determination of revised funding requirements and Transfer Ratios.  If the actuarial valuation report reflects an increase in a pension plan's deficit, it would trigger an increase in the amount of special deficit funding payments required under the PBA and the Regulations.

26. The potential increase in required funding by NNL would add to the significant financial pressure the Applicants find themselves under.  The Applicants' April 12 Cash Flow Forecast filed with the Eighth Report includes approximately $1.8 million of monthly special deficit funding payments. The current cash resources of the Applicants are not sufficient to fund increased special payments.

27. In a letter from FSCO to NNL dated May 12, 2009, FSCO indicated its support of NNL's determination to reduce the Transfer Ratio and that it would not oppose NNL's court application with respect to the proposed reduction in the Transfer Ratio notwithstanding the fact that NNL will not be filing with the Superintendent an updated actuarial valuation report with respect to the Plans.

**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

28. NNL has proposed an approach to balance the fluctuation in the Plans' deficits with the rights and interests of the various beneficiaries of the Plans.  NNL is proposing a reduction in the Transfer Ratio (to 0.69) based on the 2009 Actuarial Estimate for calculating the interim commuted value transfer payments for the Plans without filing updated actuarial valuation reports for the Plans with the Superintendent.

29. The Monitor has reviewed Mercer's 2009 Actuarial Estimate and has had discussions with NNL and FSCO regarding the foregoing. Taking into consideration the current economic environment, FSCO's support of NNL's proposed course of action, and NNL's current forecast of cash resources, the Monitor is of the view that NNL's proposed reduction in the Transfer Ratios without filing updated actuarial valuation reports is reasonable and reflects efforts by NNL to minimize potential inequities among the Plans' beneficiaries within the constraints of NNL's cash resources. Accordingly, the Monitor recommends that the motion by the Applicants be approved by this Honourable Court.

All of which is respectfully submitted this 22nd day of May 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**


Per:


Murray A. McDonald
President

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al*.

Court File No:  09-CL-7950

---

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**TENTH REPORT OF THE MONITOR**
**DATED MAY 22, 2009**

---

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada  M5B 2M6

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.