# EXHIBIT A

Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION (the "Applicants")

TWELFTH REPORT OF THE MONITOR
DATED MAY 28, 2009

## INTRODUCTION

1. On January 14, 2009, Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceeding.

## PURPOSE

2. The purpose of this Twelfth Report of the Monitor (the "Twelfth Report") is to provide support for the Company's motion with respect to approval to conduct a sales process (the

"Sales Process") to market its interest in LG-Nortel Co. Ltd. (the "Joint Venture") and the Company's related engagement of Goldman, Sachs & Co ("Goldman") as its financial advisor.

## TERMS OF REFERENCE

3. In preparing this Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Twelfth Report.

4. Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

5. Capitalized terms not defined in this Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report or previous Reports of the Monitor.

## GENERAL BACKGROUND

6. Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

2

## LG-NORTEL CO. LTD

7. The Joint Venture is a South Korean company incorporated in 2005 further to a joint venture agreement (the "JVA") dated August 17, 2005 between NNL and LG Electronics Inc. ("LGE").

8. NNL owns 50% plus one of the outstanding common shares of the Joint Venture. LGE owns the balance of the outstanding common shares.

9. NNL and LGE entered into the JVA as a means to combine Nortel's Korean wireline, wireless and enterprise distribution businesses with LGE's telecommunications infrastructure and enterprise equipment businesses.

10. Currently, the Joint Venture business includes two business segments: Carrier Networks and Enterprise Solutions. The Joint Venture business is South Korea's leading wireless equipment provider and one of the leading wireline, optical and enterprise equipment providers. It also conducts significant research and development, particularly in the areas of next generation wireless technology solutions. The Joint Venture is headquartered in Seoul, South Korea and has approximately 1,300 employees.

11. Shortly after the commencement of NNL's CCAA proceedings, NNL and LGE engaged in discussions regarding the impact of the CCAA proceedings on the Joint Venture. As a result of these discussions, NNL determined that it should explore the possible divesture of its interest in the Joint Venture.

12. After further discussions, NNL and LGE determined that a sale process designed to consider the respective interests of both shareholders and flexible enough to preserve the option for LGE to choose to add, or not to add, its interest in the Joint Venture to the sales transaction was appropriate. Accordingly, NNL and LGE, with the assistance of the Monitor, negotiated and entered into the LG-Nortel Joint Venture Sales Process Protocol Agreement dated May 27, 2009 (the "Protocol"). A copy of the Protocol is attached at Appendix A.

**THE PROTOCOL**

13. The Protocol is based on the following key principles:

- Value maximization for NNL, LGE and the Joint Venture;

- Protection of Joint Venture customer interests;

- Protection of Joint Venture employee interests; and

- Recognition that time is of the essence.

14. The key terms of the Protocol include the following:

- The Monitor will supervise, facilitate and oversee the Sales Process;

- NNL and the Monitor together shall lead the sales efforts with LGE participating as it deems necessary. Negotiations with potential buyers will be led by NNL and Goldman in conjunction with the Monitor, with LGE participating as it so desires. Negotiations with potential buyers with respect to any required amendments to the JVA, or with respect to any new joint venture agreement that may be required, will be led by LGE;

- Shares of the Joint Venture will be made available for sale with bids for a greater percentage of shares viewed more favourably;

- If a buyer desires LGE to remain as a partner in the Joint Venture, LGE is willing to consider that structure, under appropriate terms as determined by LGE;

- Nortel with the concurrence of the Monitor reserves the right to reject any or all of the final bids received. LGE reserves the right to reject any or all of the final bids received

- NNL, in consultation with LGE and the Monitor, has engaged a) Goldman to act as financial advisor; b) Kim & Chang, a South Korean law firm, to act as legal counsel;

4

c) KPMG to assist in financial statement preparation and due diligence support; and d) Ernst & Young LLP to prepare a sell-side diligence report; and

- NNL will pay the fees of the advisors set out above, subject to reimbursement from LGE for its proportionate share of such fees in the event that all or part of LGE's interest in the Joint Venture is sold as a part of the Sale Process.

15. The Sale Process contemplates the following steps to be undertaken:

- NNL, LGE and the Monitor, with input from Goldman, will jointly agree on a list of potential buyers to be contacted. The parties will attempt to ensure the list is robust enough to ensure a competitive process.

- Goldman will contact all of the potential buyers on the list and provide them with a "Teaser Memorandum" and non-disclosure agreement ("NDA").

- Interested parties that execute the NDA will receive a more detailed offering memorandum and access to a limited electronic data room;

- Based on the above, interested parties will be asked to submit a non-binding bid by a specified deadline. Currently, NNL expects that this deadline will be in July, 2009, however it may be subject to change.

- NNL, LGE and the Monitor will evaluate the preliminary bids based on the ability of the potential buyers to complete due diligence on a timely basis as well as on the buyer selection criteria set out in the Protocol. Based on this evaluation, a limited number of these bidders will be invited to continue to the second phase of the Sales Process;

- Bidders invited to continue to the second phase will be provided with a management presentation and access to an expanded electronic data room, as well as a draft purchase and sale agreement and other key ancillary agreements;

- A deadline will be established for bidders to provide a revised bid along with their mark-up of the purchase and sale agreement and related documents; and

5

- NNL, LGE and the Monitor will review the bids and select one or more parties with which to negotiate a definitive agreement, such agreement to be conditional upon this Honourable Court's approval.

## ENGAGEMENT OF GOLDMAN

16. As set out above, NNL has engaged Goldman to act as financial advisor in connection with the Sale Process pursuant to an engagement letter dated May 27, 2009 (the "Goldman Engagement Letter"). A redacted copy of the Goldman Engagement Letter is attached at Appendix B. An unredacted copy of the Goldman Engagement Letter will be provided to this Honourable Court for its review. The redactions made are in connection with the relationship between the aggregate consideration paid in connection with the transaction and the calculation of the fee payable to Goldman. It is the Monitor's view that the redactions are necessary as such sensitive information could have a detrimental impact on the bids submitted pursuant to the Sales Process.

17. The key terms of the Goldman Engagement Letter are as follows:

   a) Goldman will be paid a fee for its services calculated on the basis of the aggregate consideration paid in connection with a Sales Process transaction. If there is no such transaction, there will be no such fee payable;

   b) Goldman will be entitled to reimbursement of its reasonable expenses regardless of whether a Sales Process transaction is completed;

   c) NNL shall provide an unsecured indemnity to Goldman for any legal and other expenses or any losses, claim damages or liabilities incurred in connection with the performance of its services pursuant to the Goldman Engagement Letter;

   d) Goldman shall be granted a court-ordered charge, ranking *pari passu* with the Administration Charge, on the proceeds of sale of any of NNL's interest in the Joint Venture or, any distributions of proceeds from the Joint Venture to NNL, in connection with a transaction resulting from the Sales Process as security for its fees

6

and expenses other than those amounts arising in connection with the indemnity described above;

e) The Goldman Engagement Letter is conditional upon this Honourable Court issuing an order (the "Goldman Claims Bar Order") declaring that save and except for any liability or obligation arising out of the gross negligence or wilful misconduct of Goldman in performing its services pursuant to the Goldman Engagement Letter, Goldman, along with its affiliates, partners, directors, employees, agents and controlling persons shall have no liability to any person including a) potential purchasers who participate in the Sales Process; b) the Joint Venture or the Applicants; c) LGE and its shareholders but only to the extent provided in an exculpation letter dated as of May 27, 2009 as between LGE and Goldman; or d) any creditors or shareholders of the Applicants;

f) NNL or the Monitor will seek recognition of the Goldman Claims Bar Order as described above, in the United States of America pursuant to Chapter 15 of the U.S. Bankruptcy Code and in the Republic of Korea pursuant to its insolvency laws and will make reasonable best efforts to obtain such recognition; and

g) NNL shall require any potential purchaser that wishes to participate in the sales transaction to acknowledge in writing that Goldman shall not have any liability to such bidder and that it is bound by the provisions of the Goldman Claims Bar Order.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

18. The Sales Process described above and set out in the Protocol are designed to provide a commercially reasonable approach for NNL and LGE to work together with a view to permitting NNL to attempt to maximize value for its interest in the Joint Venture. The Monitor will have an extensive role in the Sales Process.

19. The Goldman Engagement Letter was agreed upon after extensive negotiation between Goldman and NNL and while it requires certain protections to be provided to Goldman by

7

this Honourable Court, the Monitor is of the view that such protections are reasonable in the circumstances.

20. Accordingly, the Monitor recommends that the Applicants' motion for approval of the Sales Process and the Goldman Engagement Letter be approved by this Honourable Court.

All of which is respectfully submitted this 28th day of May 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

8

# APPENDIX A