# EXHIBIT A

EXHIBIT A

Court File No.: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | MONDAY, THE 1st |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF JUNE, 2009 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**ORDER**
(Nortel-LGE Joint Venture Sale Process Order)

**THIS MOTION**, made by Nortel Networks Corporation, Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for the relief set out in the Applicants' notice of motion dated May 27, 2009 was heard this day at 330 University Avenue, Toronto, Ontario.

DOCSTOR: 1694404\7

- 2 -

**ON READING** the affidavit of George Riedel sworn May 27, 2009 (the "Riedel Affidavit") and the Twelfth report of Ernst & Young Inc. dated May 28, 2009 (the "Twelfth Report") in its capacity as monitor (the "Monitor") and on hearing submissions of counsel for the Applicants, the Monitor and those other parties present, no one appearing for any other person on the service list, although served as appears from the Affidavit of Service of Katie Legree sworn May 28, 2009, filed.

1.   **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the Twelfth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.   **THIS COURT ORDERS** NNL be and is hereby authorized to sell its interest (the "NNL JV Interest") in its joint venture (the "Joint Venture") with LG Electronics Inc. ("LGE") in accordance with the Sale Process (defined below).

3.   **THIS COURT ORDERS** that the sale protocol agreement ("Protocol") described in the Riedel Affidavit, the Twelfth Report and attached as Schedule "A" hereto and the sale process described therein for the potential sale of some or all of: (i) the NNL JV Interest; (ii) LGE's joint venture interest; and/or (iii) the assets of the Joint Venture (collectively, the "Interests"), is hereby approved and the parties thereto are hereby authorized and directed to perform each of their obligations thereunder.

4.   **THIS COURT ORDERS AND DECLARES** that in connection with any information related to the Sale Process provided to advisors and other stakeholders, including the Stakeholders (as defined in the Sale Protocol) and each of their respective financial and legal

advisors, such advisors and stakeholders owe the same duty of confidentiality to LGE, *mutatis mutandis,* as they do to the Applicants and any of their affiliates.

5.     **THIS COURT ORDERS** that NNL is authorized to engage Goldman, Sachs & Co. ("Goldman") in accordance with the engagement letter dated as of May 27, 2009 (the "Engagement Letter") attached as Exhibit "B" to the Riedel Affidavit on its behalf, for the conduct of the Sale Process and the Engagement Letter be and is hereby approved.

6.     **THIS COURT ORDERS** that Goldman shall be entitled to the benefit of and are hereby granted a charge (the "Goldman Charge") on the proceeds of the NNL JV Interest (including (a) any dividend to any of the Applicants from the Joint Venture as a result of a sale and (b) any other distributions from the Joint Venture to any of the Applicants to secure unreimbursed expenses that may be owing to Goldman at the time of such distribution (except expenses described in Annex A to the Engagement Letter) (the "Proceeds"), as security for the full amount of its fees and expenses payable under the Engagement Letter (the "Fees and Expenses") but, for greater certainty, excluding any amounts or obligations under Annex A to the Engagement Letter. The Goldman Charge shall constitute a first priority charge on the Proceeds, ranking *pari passu* with the Administration Charge and shall, without limitation, have priority over all of the other Charges including those set out in the Initial Order (as amended and restated) of this Court made on January 14, 2009 and the Applicants are directed to cause NNL to pay the Fees and Expenses payable under the Engagement Letter forthwith when due. Notwithstanding any other provision herein, none of the provisions of this paragraph 6 shall apply to LGE or LGE's Interest in the Joint Venture.

7.     **THIS COURT ORDERS** that, in the conduct of its obligations under the Engagement Letter, save for any liability or obligation to the extent arising out of the gross negligence or

- 4 -

willful misconduct of Goldman in performing its services under the Engagement Letter, Goldman, its affiliates, partners, officers, directors, employees, agents, advisors and controlling persons shall have no liability to any person including (a) to potential purchasers who participate in the Sale Process; (b) to the Joint Venture or the Applicants; (c) to LGE and its shareholders but only to the extent provided in an exculpation letter dated as of May 27, 2009 executed between LGE and Goldman; or (d) any creditors or shareholders of the Applicants.

8.   **THIS COURT ORDERS** that the confidential appendix to the Twelfth Report be and are hereby sealed pending further Order of the Court.

9.   **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom, the Republic of Korea or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

10.   **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

JUN 0 1 2009

PER / PAR: TV

DOCSTOR: 1694404\7

## SCHEDULE "A" – SALE PROTOCOL

**Attached.**

## LG-NORTEL JOINT VENTURE SALE PROCESS PROTOCOL AGREEMENT

**RECITALS:**

Whereas:

A. LG Electronics Inc., of Korea ("LGE"), and Nortel Networks Limited, of Canada ("Nortel"), are parties to a joint venture agreement dated August 17, 2005 (the "JVA").

B. The JVA governs a joint venture ("JV") which has carried on a technology business from Korea.

C. The business of the JV is profitable and is a valuable asset of LGE and Nortel.

D. Nortel filed for protection with the Ontario Superior Court of Justice (the "Ontario Court") pursuant to, among other things, the *Companies' Creditors Arrangement Act* ("CCAA") on January 14, 2009, as part of a series of international insolvency proceedings by Nortel and other members of Nortel's group of companies.

E. Among other things, pursuant to the CCAA proceedings, Ernst & Young Inc. (the "Monitor") has been appointed as the Monitor of Nortel.

F. Each of LGE and Nortel have an interest in the JV.

G. LGE and Nortel have had extensive discussions about the situation facing the JV and the options that are realistically available to the parties in the circumstances. Those discussions have included careful consideration of the following five options, each in accordance with the JVA:

(i) continuing to operate the JV in its current form;

(ii) LGE buying Nortel's stake in the JV;

(iii) Nortel buying LGE's stake in the JV;

(iv) soliciting a third party to buy some or all of Nortel's stake and/or LGE's stake; and

(v) liquidating the JV.

H. Under the circumstances, LGE and Nortel wish to pursue a process designed to realize the maximum possible value for the JV on a consensual basis.

I. Accordingly, the sale process set out herein which has been agreed upon represents a flexible, commercially reasonable approach to realizing on such maximum value.

J. In particular, the sale process is designed to preserve the possibility of certain broad options with consideration of the respective interests of the parties.

K. Accordingly, among other things, the sale process preserves LGE's rights to approve any sale transaction with respect to the JV.

3490540.1

L. The sales process also preserves LGE's right to choose to add, or not to add, its interest in the JV to any sales transaction.

M. The sale process is also designed to reflect certain fundamental concerns which respect the fact that, among other things, the JV does not belong exclusively to Nortel, provided however that: (i) the Monitor shall play a critical role in the sale process at all stages; and (ii) any final sale transaction shall be subject to the approval of the Ontario Court on the recommendation of the Monitor.

For good and valuable consideration, the receipt and adequacy of which is acknowledged by each of LGE and Nortel, the parties agree as follows:

## ARTICLE 1 - INTRODUCTION

1.0 The recitals are true and accurate in all respects.

1.1 In order to ensure that the sale process successfully identifies the best possible buyer(s), among other things:

(a) Nortel and the Monitor shall lead the sales efforts with LGE participation as LGE deems necessary.

(b) Each of Nortel and LGE shall devote all time and attention necessary to pursue the sale process in a timely manner. Without limitation, each of Nortel and LGE and/or their respective advisors shall be entitled to participate in any meetings with the Financial Advisor, Accounting Advisors (defined below), Legal Counsel, and any other professional advisors who may be retained as part of the Sale Process (including all meetings necessary to finalize the sales documentation in form satisfactory to LGE and Nortel).

## ARTICLE 2 - KEY SALE PRINCIPLES

2.0. The following are the key principles of the sale process:

(a) value maximization for Nortel, LGE and the JV;

(b) protection of JV customer interests;

(c) protection of JV employee interests; and

(d) time is of the essence.

## ARTICLE 3 - OTHER SALE CONSIDERATIONS

3.0. The following are other considerations of the sale process:

(a) Shares in the JV are available for sale with bids for higher stake amounts viewed more favourably.

3490540.1

(b) If a buyer desires LGE as a partner in the JV, LGE is willing to consider that structure, under appropriate terms as determined by LGE.

## ARTICLE 4 - SUPERVISION AND REPORTING

4.0 Subject to the over-riding provisions of this agreement:

(a) The Monitor will supervise, facilitate and oversee the process undertaken by Nortel and LGE and their respective advisors, all in accordance with the full terms of this agreement (the "Sale Process") to find a buyer for the interest(s) in the JV. Subject to, and in accordance with this agreement, LGE is to be kept informed on all material aspects throughout the Sale Process and work in conjunction with Nortel, as may be required.

(b) Ontario Court approval for the sale process will be obtained prior to its commencement. Subject to Section 12.1, Nortel and LGE shall agree on the terms of the motion materials and other public communications, including press releases, with respect to this sale process.

(c) At the conclusion of the Process, Nortel will bring forward a motion seeking final approval of the ultimate proposed transaction. The Monitor will provide a report to the Ontario Court including a detailed summary as to how the Process was conducted, information with respect to the resulting transaction and the Monitor's recommendation with respect to that transaction.

(d) Nortel's motion materials and the Monitor's report will include a copy of the purchase and sale agreement executed between Nortel, LGE and the buyer as well as any related ancillary agreements, subject to any reasonable confidentiality considerations as may be applicable.

## ARTICLE 5 - STAKEHOLDER REPORTING

5.0 Subject to the over-riding provisions of this agreement:

(a) Subject to subsection 5.0(b) and the balance of the terms of this agreement, Nortel and the Monitor may provide periodic updates, as appropriate, to significant stakeholder groups which have executed confidentiality agreements (the "Stakeholders") including:

  (i) The Unsecured Creditors Committee ("UCC");

  (ii) The Ad-Hoc Bondholders Committee; and

  (iii) The Ontario Government.

(b) Prior to sharing any confidential information related to this Sale Process, Nortel shall require each Stakeholder (other than the Ontario Government and the members of the UCC who shall be bound by the confidentiality provisions of the UCC by-laws) and their

3490540.1

advisors that wish to obtain information related to this process to sign a further confidentiality agreement on substantially the same terms and conditions as previously executed by such Stakeholder, which agreement shall be in favour of LGE.

(c) LGE and/ or its advisors shall be entitled to participate in any calls or meetings with the Stakeholders scheduled in advance which are specifically contemplated to discuss the proposed sale process and any potential sale transaction.

(d) During the periodic updates provided to the Stakeholders, Nortel and the Monitor will respect any potential buyers' desire for confidentiality.

## ARTICLE 6 - SELECTION OF ADVISORS

6.0 Subject to the over-riding provisions of this agreement:

**Financial Advisor**

(a) Nortel, LGE and the Monitor confirm that they have interviewed potential financial advisors including Morgan Stanley, Deutsche Bank and Goldman Sachs and have selected Goldman Sachs as the Financial Advisor.

(b) Nortel, in conjunction with the Monitor, will direct the Financial Advisor, provided that LGE will participate and shall be entitled to provide input into the Sale Process as contemplated in this agreement; without limitation, LGE shall receive regular updates from the Financial Advisor.

(c) Nortel may also seek the input of Lazard, Nortel's overall restructuring advisor, throughout the process, with LGE to be kept informed throughout the Sale Process.

**Legal Counsel**

(d) LGE acknowledges that Nortel has selected Kim & Chang, the JV's current legal counsel, as Legal Counsel to assist on this transaction, subject to the reporting and other terms and obligations of this agreement.

(e) The Legal Counsel will have responsibility for drafting of all purchase and sale related agreements, for review and approval by Ogilvy Renault LLP (counsel to Nortel) and LGE's legal advisor(s).

(f) Nortel, in conjunction with the Monitor, will direct the Legal Counsel, but the Legal Counsel shall be authorized by Nortel to communicate with LGE's legal advisor(s) throughout the Sale Process.

**Accounting**

(g) _Financial Statement Preparation and Diligence Support_ - LGE acknowledges that Nortel has agreed to engage KPMG (the local auditors of the JV), subject to the reporting and other terms and obligations of this agreement.

3490540.1

(h) <u>Sell-side Diligence Book</u> - LGE acknowledges that Nortel has agreed to engage Ernst & Young (Canada and Seoul) (together with KPMG, the "Accounting Advisors") subject to the reporting and other terms and obligations of this agreement.

**Engagement of and Costs related to Advisors**

(i) Subject to subsection 6.0(k), Nortel will engage and pay the fees of all advisors.

(j) If there is no resulting sale of shares or if only Nortel's interest in the JV is sold, LGE will have no responsibility for any fees incurred.

(k) If there is a sale of all or part of LGE's interest in the JV as a result of the sale process contemplated in this agreement, each of Nortel and LGE will pay their respective proportionate shares of amount of the professional fees incurred in order to achieve that sale. Professional fees will include the fees of the Financial Advisor, Legal Counsel and Accounting Advisors along with any other professional advisors who may be retained as part of the process, but, for greater certainty, shall not include the fees of Ogilvy Renault, Miller.Thomson, Lazard or the Monitor and Nortel and LGE shall be required to bear their own costs including the costs of their own legal and related advisors.

The amount that LGE will pay in those circumstances shall be calculated as follows: JV percentage sold by LGE as the numerator and JV percentage sold by both parties as the denominator.

(l) LGE confirms that it has reviewed the engagement letters with the Accounting Advisors, Legal Counsel and the Financial Advisor.

## ARTICLE 7 - IDENTIFICATION OF POTENTIAL BUYERS

7.0 Subject to the over-riding provisions of this agreement, Nortel, LGE and the Monitor will jointly agree upon a preliminary buyer list with input from the Financial Advisor. The parties will attempt to develop a robust list that helps ensure a competitive process.

## ARTICLE 8 - THE SALE PROCESS

8.0 Subject to the over-riding provisions of this agreement:

**Preparation Phase**

(a) Nortel will work with the JV management team to prepare a "Teaser Memorandum," draft NDA and communications package. The Monitor and LGE shall be entitled to review and provide input into these materials as they shall each deem appropriate. LGE shall approve the form and substance of such documents prior to their circulation, such approval not to be unreasonably withheld or unduly delayed.

**Phase I**

(b) The Financial Advisor will contact all of the parties on the final potential buyer list and provide them with a copy of the Teaser Memorandum and form of NDA, subject to LGE's approval.

(c) Interested parties that execute the NDA will receive an offering memorandum and will receive access to a limited Electronic Data Room. LGE has the right to approve any material modifications to the form of NDA or any other essential documents relating to the sale process.

(d) Based on the above, potential interested buyers will be asked to submit a non-binding bid.

(e) Nortel, LGE and the Monitor will evaluate the preliminary bids based on the ability of the potential buyers to complete due diligence on a timely basis as well as on the buyer selection criteria noted below.

(f) Given that all parties recognize the need to complete a transaction as quickly as possible, the number of parties invited to participate in Phase II of the Sale Process will be limited in number and will be jointly selected by the Monitor, Nortel and LGE.

(g) Nortel and the Monitor will review the preliminary bids and their analysis of the bids with LGE and, thereafter (in conjunction with LGE, as contemplated in this agreement) the Stakeholders prior to finalizing any decisions with respect to which parties will be invited to participate in Phase II.

Phase II

(h) Bidders invited to participate in Phase II will be provided with a management presentation and full Electronic Data Room access. In addition, these buyers will also receive a draft purchase and sale agreement, revised JVA, if required, and other key ancillary agreements.

(i) A deadline will be established for bidders to provide a revised bid along with their mark-up of the purchase and sale agreement and related documents. Revised bids are to be submitted to the Financial Advisor and the Monitor with copies to Nortel and LGE.

(j) Nortel, LGE and the Monitor will review the bids and jointly select one or more parties with which the parties will proceed to negotiate a definitive agreement.

(k) Subject to Section 5(c), Nortel and the Monitor will also go over the bids with the Stakeholders prior to finalizing any decision with respect to selecting one or more parties to negotiate a definitive agreement with.

(l) Negotiations with potential buyers will be led by Nortel and the Financial Advisor in conjunction with the Monitor. Nortel and the Financial Advisor shall keep LGE apprised of the negotiations so that LGE may participate in all negotiations as it so desires.

(m) If the proposed transaction is to result in LGE maintaining some interest in the JV, LGE shall lead negotiations with the potential buyer with respect to any amendments to

3450540.1

the JV agreement, or execution of a new JV agreement, as may be required. Nortel and the Monitor shall be kept apprised of the status of these negotiations.

(n) Once a definitive agreement is executed, the conditional transaction will be publicly announced and Nortel will proceed to seek final approval from the Ontario Court.

**Post-Execution Phase**

(o) To the extent local regulatory approval is required, the buyer will be responsible for obtaining such approval and LGE shall reasonably support or facilitate such approval process.

**General**

(p) In addition to such consent rights as LGE may have above, Nortel agrees to provide copies of all material documents to LGE in advance of such materials being sent to buyers or any other third party(-ies) not a party to this agreement (other than the Financial Advisor, the Accounting Advisor and the Monitor) for LGE's approval (such approval not to be unreasonably withheld or unduly delayed) and to provide to LGE all other materials sent to buyers contemporaneously with such delivery or as soon as reasonably practicable thereafter.

(q) To the extent reasonably practicable in the circumstances, LGE will be included in all communications with the Financial Advisor, Accounting Advisors, Legal Counsel, and any other professional advisors who may be retained as part of the Sale Process, whether in-person, via phone or email. For the avoidance of doubt, LGE should be copied on all emails between such advisors and Nortel, and LGE should be notified in advance (to the extent reasonably possible in the circumstances) whenever there are discussions over the phone or in person between such advisors and Nortel.

(r) The Monitor will be present at all meetings, conference calls and discussions between Nortel, LGE, or the Financial Advisor and potential buyers.

(s) During the process, LGE and Nortel will retain current rights under the Joint Venture Agreement each of them may currently have but each commits to act in good faith, and acknowledges that this process shall be without prejudice, will not impact nor will any of the information gathered in this process be used by, either party except for the purposes set out herein, including without limitation, as a basis for determination or argument in the context of any other dealings or negotiations between them.

### ARTICLE 9 - BUYER SELECTION

9.0 Subject to the over-riding provisions of this agreement:

(a) Nortel, with the concurrence of the Monitor, reserves the right to reject any or all of the final bids received. LGE reserves the right to reject any or all of the final bids received.

(b) Final bids will be evaluated by Nortel, LGE and the Monitor.

3490540.1

(c) Both Nortel and LGE agree that in the course of their respective evaluation of bids, they will each consider relevant factors, which may include the following:

(i) Technology

- Ability to resolve issues relating to installed ALU UMTS base stations, including continued servicing, via access to supply agreements, alliances and licenses (LTE, etc.)
- Buyer's technology value proposition and credible plan for the JV to access future technology/product (especially LTE)

(ii) Bid

- Valuation
- Portion of Nortel and LGE's current share interest to be purchased
- Ability of the buyer to fund the investment
- Form of Purchase Agreement close to the form provided to potential buyers

(iii) Other

- Management/cultural fit with LGE, including Asia experience (assuming LGE remains in JV)
- Strength of future vision: Not to result in negative perceptions from customers, employees and stakeholders (e.g., widespread layoffs due to restructuring)
- Lock-up period
- No put option
- Closing risk / timing

(iv) Nortel, LGE and the Monitor have agreed that the importance of any of the individual factors set out above will be determined in the context of evaluating actual bids.

## ARTICLE 10 – REQUIRED CLOSING CONDITIONS

10.0 Subject to the over-riding provisions of this agreement:

(a) Ontario Court approval will be required before any definitive agreement can become binding.

(b) As necessary, buyer(s) must enter into a new Joint Venture Agreement with LGE.

3490540.1

(c) LG Corp. approval to be obtained if the buyer will continue to retain the LG brand.

(d) Key technology and/or licensing agreements will be entered into, as required.

## ARTICLE 11 – MILESTONES

11.0 Subject to the over-riding provisions of this agreement, the parties anticipate that the process will follow the following stages:

(a) Nortel / LGE / Monitor Agreement on Process

(b) Ontario Court Approval of Process

(c) Potential buyers Contacted

(d) Preliminary Non-Binding Deadline

(e) Selection of Bidders to Move to Phase II

(f) Phase II Due Diligence Period

(g) Final Bids Due

(h) Final Bids Evaluated & Selection Made

(i) Negotiations re Definitive Agreement

(j) Execution of Definitive Agreement

(k) Ontario Court Approval of Agreement

(l) Closing of Transaction

## ARTICLE 12 – GENERAL

12.0 This agreement contains the entire agreement between the parties hereto with respect to the Sale Process described herein and supersedes and cancels all prior discussions and / or agreements, including, but not limited to, all proposals, representations, written or oral, with respect thereto, provided however, that none of the parties' rights under the JVA shall be affected by this agreement, and provided that this agreement may be amended only by further written agreement executed by the parties.

12.1 The parties agree that they shall work cooperatively to respond to any media or regulatory inquiries made of either one or both of them. Unless time constraints make it impossible to do so, the parties agree to consult with each other before making any response, oral or written, to any media or regulatory inquiries in order to ensure the delivery of a single accurate response to any such inquiry.

3490540.1

12.2 This Agreement shall be governed by the laws of New York. Subject to the CCAA proceedings, the parties agree to resolve any disputes arising out of this agreement in accordance with the JVA.

Dated this 27th day of May, 2009.

NORTEL NETWORKS LIMITED

Per: _____
Name: Paui Binning
Title: CFO

Per: _____
Name: GORDON DAVIES
Title: CHIEF LEGAL OFFICER +
CORPORATE SECRETARY

3490540.1

LG ELECTRONICS INC.

Per: _____
Name:
Title:

Per: _____
Name: DAVID S. KIM
Title: VICE PRESIDENT, STRATEGY + BUSINESS DEVELOPMENT

3491162.1

Acknowledged and agreed to this 27th day of May, 2009

        **ERNST & YOUNG INC.,** in its role as the Monitor in Nortel's CCAA proceedings and not in its personal capacity

Per: _Sharon Hamilton_
    Name: Sharon Hamilton
    Title: Senior Vice-President

Per: _____
    Name:
    Title:

3490540.1

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**ORDER**
**(Nortel-LG Joint Venture Sale Process Order)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

DOCSTOR: 1694404\7