**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------X

*In re*                                                    :          Chapter 11

                                                           :

Nortel Networks Inc., *et al.,*[1]                         :          Case No. 09-10138 (KG)

                                                           :

                              Debtors.                     :          Jointly Administered

                                                           :

                                                           :          Hearing date: June 29, 2009 at a time to be determined.
                                                           :          Objections due: June 22, 2009 at 4 :00 P.M. (ET)

-------------------------------------------------------X

**MOTION PURSUANT TO 11 U.S.C. § 105(A), § 363,**
**§ 503 AND FED. R. BANKR. P. 9019 FOR AN ORDER**
**(A) APPROVING THE INTERIM FUNDING AND**
**SETTLEMENT AGREEMENT, AND (B) GRANTING RELATED RELIEF**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "US Debtors"), hereby move this Court (the "Motion"), for the

entry of an order substantially in the form attached hereto as Exhibit A, approving the Interim

Funding and Settlement Agreement dated as of June 9, 2009 (the "Agreement"),[2] attached hereto

as Exhibit B, by and among the US Debtors, the Canadian Debtors (as defined below) including

Nortel Networks Limited ("NNL"), the EMEA Debtors (as defined below) excluding Nortel

Networks S.A. (all together, the "Parties"), and for purposes of Section 17 of the Agreement

only, Ernst & Young LLP as administrator of the EMEA Debtors other than Nortel Networks

---

[1]      The US Debtors in these chapter 11 cases, along with the last four digits of each US Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).  Addresses for the US Debtors can be found in the US Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]      The description of the Agreement set forth herein is for informational purposes only.  In the event of any discrepancy between the description and the terms of the Agreement, the terms of the Agreement shall govern.

(Ireland) Limited (the "UK Administrator") and Ernst & Young Chartered Accountants on behalf of Nortel Networks (Ireland) Limited ("NNIR") only (the "NNIR Administrator," and together with the UK Administrator, the "Joint Administrators"); and granting them such other and further relief as the Court deems just and proper.  In support of this Motion, the US Debtors respectfully represent as follows:

### Jurisdiction

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory bases for the relief requested herein are sections 105(a) and 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Background

**A.    Introduction**

3.    On January 14, 2009 (the "Petition Date"), the US Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.    The US Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.    Also on the Petition Date, the US Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent NNL (together with NNC and their affiliates, including the US Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] filed an application with the Ontario Superior Court of

---

[3]       The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation ("NNTC"), Nortel Networks Global Corporation and Nortel Networks International Corporation.

Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the

"CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The

Canadian Debtors continue to manage their properties and operate their businesses under the

supervision of the Canadian Court. In addition, Ernst & Young, Inc. (the "Monitor") has been

appointed by the Canadian Court to monitor the Canadian Debtors while the Canadian

Proceedings are pending. On February 27, 2009, this Court entered an order recognizing the

Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

Also, on January 14, 2009, the Canadian Court entered an order recognizing these chapter 11

proceedings as a foreign proceeding under section 18.6 of the CCAA. In addition, at 8 p.m. on

January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European

affiliates into administration under the control of individuals from Ernst & Young LLC

(collectively, the "EMEA Debtors")[4] into administration under the control of individuals from

Ernst & Young LLC (collectively, the "EMEA Proceedings," and together with these

proceedings and the Canadian Proceedings, the "Insolvency Proceedings"). On May 28, 2009,

the Commercial Court of Versailles, France (Docket No. 2009P00492), ordered the

commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which

consist of liquidation proceedings during which NNSA will continue to operate as a going

concern for an initial period of three months. In accordance with the European Union's Council

Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings remain

the main proceedings in respect of NNSA. On June 8, 2009, the UK Administrator filed a

---

[4]    The EMEA Debtors include the following entities: Nortel Networks UK Limited ("NNUK"), Nortel
Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks
Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel
Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria)
GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel
Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

petition with this Court under chapter 15 of the Bankruptcy Code seeking orders recognizing the EMEA Proceedings as they relate to NNUK as foreign main proceedings.

6. On January 15, 2009, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Bankruptcy Rules that provided for the joint administration of these cases and for consolidation for procedural purposes only. [D.I. 36].

7. On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142]. An ad hoc committee of bondholders holding claims against certain of the US Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Committee"). No trustee or examiner has been appointed in the US Debtors' cases.

**B.      Corporate Structure and Business**

8. A description of the corporate structure and business of Nortel and the US Debtors and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").[5]

**Relief Requested**

9. By this Motion, the US Debtors seek an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (a) approving the terms and conditions of the Agreement, and (b) granting related relief.

---

[5]      Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

**Facts**

**A. History**

10.     As described in the First Day Declaration, the Nortel entities operate on an integrated basis across multiple jurisdictions.  Nortel's business is based on the development, licensing and maintenance of intellectual property and the marketing of products and services based on that intellectual property.  Certain Nortel affiliates, including NNL, NNI, NNUK, NNIR and NNSA (collectively, the "Main Nortel Companies"), are or have been the primary source of the research and development that has created Nortel's global technology footprint, the benefits of which are shared worldwide across multiple corporate entities.  These five Nortel entities also provide service and support on an ongoing basis to Nortel customers in their respective jurisdictions, as well as certain overhead and institutional support to Nortel entities and customers outside of their jurisdictions.  Certain other Nortel Group companies function primarily as sales operations, acting as intermediaries between the Main Nortel Companies and customers in jurisdictions not served by the Main Nortel Companies, and, in certain circumstances, providing ongoing service and support in their local jurisdictions.

11.     In light of the foregoing, certain Nortel entities, including the Main Nortel Companies, have entered into a number of agreements and have been engaged in certain practices designed both to allow Nortel to operate on a global basis and to allocate profits and losses, and certain costs, across the corporate entities within the Nortel Group.  These agreements include certain distribution agreements between one or more Nortel Group entities (the "Distribution Agreements"), and the Master R&D Agreement, dated as of December 22, 2004 among NNL, NNI, NNUK, NNIR, NNSA and other affiliates (as amended from time to time, the "Master R&D Agreement," and together with the Distribution Agreements, the "Transfer Pricing Agreements").  In addition, two group supplier protocol agreements, one

5

between NNL and the Joint Administrators on behalf of the EMEA Debtors, and the other

between NNI and the Joint Administrators on behalf of the EMEA Debtors, have been entered in

respect of the inter-company trading of goods and services after the Petition Date (together, and

as amended from time to time, the "GSPAs").

12.    The Nortel Group has used "transfer pricing" to allocate profits and losses, and

certain costs, among the various Nortel Group companies.  Transfer pricing is an accepted

method for such allocation, used widely by multinational enterprises similar in structure and

geographic scope to Nortel.  Transfer pricing principles similar to those used by Nortel have

been accepted by most of the world's largest economies and are monitored by the Organization

for Economic Co-operation and Development ("OECD"), an international non-profit

organization headquartered in Paris, France, with 30 member states (including the United States,

Canada, the United Kingdom and France).

13.    In the case of Nortel, the Master R&D Agreement is the governing document

pursuant to which the Nortel Group implemented its transfer pricing regime using the residual

profit split methodology (the "Nortel Transfer Pricing Regime").  Among other things, the Nortel

Transfer Pricing Regime was designed to determine the arm's length allocation due to each of

the parties for their share of the profits and losses arising from "Research and Development

Activity," as that term is defined in the Master R&D Agreement.  In general terms, the Nortel

Transfer Pricing Regime historically sought to allocate residual profits and losses among the

Main Nortel Companies based on the proportionate share of Research and Development Activity

conducted by or on behalf of, such affiliates.  Among other things, the Nortel Transfer Pricing

Regime typically requires that profits and losses, and certain costs, be allocated among such

affiliates during a calendar year under the Transfer Pricing Agreements (the "Transfer Pricing

Payments") and that a true-up allocation is determined after the actual results for the year are known.

14.     Within the Nortel Group, NNL is the owner of the vast majority of Nortel's intellectual property assets and, in accordance with the Master R&D Agreement, NNL licenses its intellectual property to the Main Nortel Companies on a royalty-free basis.  The Nortel Transfer Pricing Regime, in normal times, is the means by which NNL is compensated for the development and use of its intellectual property by affiliates.  NNI has historically been a net payor under the Nortel Transfer Pricing Regime largely due to the substantial sales revenue generated in the United States when contrasted with its level of Research and Development Activity.  NNL, on the other hand, has historically been a net recipient under the Nortel Transfer Pricing Regime given that NNL generates lower levels of revenue when compared to the high level of corporate overhead and Research and Development Activity incurred in Canada.

15.     As was set forth in the Cash Management Motion filed on the Petition Date, the US Debtors originally intended to reconcile amounts owed under the Master R&D Agreement on a monthly basis in the postpetition period.  However, following commencement of these proceedings, discussions began with various interested parties, including Nortel, the Monitor, the Joint Administrators, the Committee and the Bondholder Committee (the Bondholder Committee, together with the Committee, the "Creditor Groups") concerning continued payments under the Nortel Transfer Pricing Regime within the context of Nortel's worldwide insolvency proceedings.  In particular, issues were raised in light of substantial changes that have occurred and may continue to occur in respect of Nortel's business model given the uncertainties facing Nortel's business.  As a result, only one payment has been made in respect of amounts that could arguably be owed in respect of the Master R&D Agreement – a January 2009 payment

of $30 million by NNI to NNL (the "January Payment").  In addition, the EMEA Debtors have

neither made, nor received, any payments under the Nortel Transfer Pricing Regime since the

Petition Date.  Without the receipt of these payments, NNL is currently facing significant

liquidity pressure – pressure that puts NNL, and thus the entire Nortel Group, at risk.

16.     The importance of NNL to the Nortel Group is self-evident.  First, NNL is both

the historic and actual operational parent of the global Nortel enterprise.  From the Nortel Group

headquarters in Toronto, Canada, NNL provides corporate overhead support to its affiliates

throughout the world.  In particular, a substantial portion of Nortel's legal, finance, strategic,

insurance, procurement, human resources and real estate functions are directed on a group-wide

basis from NNL's Toronto offices.  Second, NNL conducts a disproportionate share of Nortel's

Research and Development Activities (when compared to revenue generation) and operates the

Carling Facility, the largest Nortel R&D facility in the world (NNL's Research and Development

Activities and corporate overhead support, collectively, the "Postpetition Services," and the costs

related thereto, the "Expenses").  Third, as noted above, NNL is the legal owner of nearly all of

the group's intellectual property, which it licenses to its affiliates.

17.     The various interested parties have been discussing possible solutions to NNL's

liquidity issues for over two months.  Among other possible solutions, NNL requested that

payments be made by both NNI and certain of the EMEA Debtors to NNL in respect of the

Postpetition Services and Expenses. The Joint Administrators informed NNL and the Monitor

that the EMEA Debtors are not willing to make such payments to NNL at the present time, but

the Parties, the Monitor and the Joint Administrators, working with the Creditor Groups, have

reached an agreement whereby NNI will make certain payments to NNL in respect of the

Postpetition Services and Expenses provided to NNI (on the basis described below) that should

provide NNL with sufficient liquidity at least through September 30, 2009 (the "Interim Funding Agreement" or the "Agreement").

18.    Prior to reaching the Interim Funding Agreement, NNI and NNL provided the Creditor Groups with access to an electronic database of relevant documents to allow the Creditor Groups' experts to conduct due diligence concerning the appropriate amount owed by NNI to NNL, whether for the provision of Postpetition Services and the reimbursement of the related Expenses, or in respect of the Nortel Transfer Pricing Regime.[6]  Furthermore, representatives of the Canadian Debtors, the Monitor, the US Debtors, the Joint Administrators and the Creditor Groups have met multiple times in person and by phone, in Toronto and in New York, to discuss this issue and reach a mutually acceptable compromise.

19.    A precise allocation of the Expenses that NNL incurs and the value of the Postpetition Services it provides on behalf of the other Nortel Group entities would be a time-consuming and difficult endeavor in light of the integrated nature of the Nortel entities.  In addition, any definitive and binding determination regarding the interpretation and applicability of the Nortel Transfer Pricing Regime similarly would be extremely time consuming and potentially contentious.  Rather than pursue such a precise allocation or definitive and binding determination at this time – and in recognition of NNL's near term liquidity needs - the Creditor Groups and the Joint Administrators have agreed with NNI and NNL that, for the purposes of and subject to the terms of the Agreement, an appropriate estimate of the value of the Postpetition Services provided and Expenses incurred by NNL postpetition on behalf of NNI for the period from the Petition Date through September 30, 2009 (the "Canada/US Interim Period"),

---

[6]    It should be noted that given the role of certain taxing authorities in reviewing the Nortel Transfer Pricing Regime, there is limited information with respect to the views of these government authorities regarding the Nortel Transfer Pricing Regime.

is $187 million (which includes the $30 million paid by NNI through the January Payment). Such amount is equal to the amount forecasted by NNL to be owed by NNI under the Master R&D Agreement, and is substantially less than an estimate generated by Nortel of the allocation of costs to NNI on the basis of each entity's revenue generated, which indicated that NNI could be considered responsible for a higher amount in costs incurred by NNL.

**B. Terms of the Interim Funding Agreement**

20. Following lengthy, difficult, and good faith negotiations, on or about June 9, 2009, the Parties entered into the Interim Funding Agreement. The main terms of the Interim Funding Agreement[7] are as follows:

- PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

  - Total Payment: NNI shall pay to NNL a sum total of US$157 million (the "Total Payment"), payable in five equal installments of US$31.4 million in accordance with the schedule attached as Annex C to the Agreement.

    - Permanent Payment: The first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "Permanent Payment").

    - Contingent Payment: If it is determined, pursuant to a process to be agreed upon by NNL, NNI and the Creditor Groups, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof (being the difference between US$187 million and the value of the NNI Interim Obligations so determined) in excess of US$161 million (any such portion, the "Contingent Payment") shall be repaid by NNL to NNI on October 30, 2009.

    - True-up Obligations: NNL agrees to use commercially reasonable efforts to recover from Nortel Group entities, other than the Debtors (collectively, "Other Nortel Group Companies"), Transfer Pricing Payments that are determined to be owed to the Canadian Debtors by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "ONGC Costs"). Solely to the extent that the Canadian

---

[7] Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement, certain of which definitions appear in sections of the Agreement not set forth herein, but in the entire Agreement attached hereto as Exhibit B.

Debtors actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Canadian Debtors' forecast, based on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished to the Parties, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "Excess Recoveries"), and it is also determined, pursuant to the process referred to in Section 1.a.ii of the Agreement, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "Overage Amount"), the Canadian Debtors shall, in addition to any payments made or required to be made in accordance with Section 1.a.ii., pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the US Debtors, in an aggregate amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "Maximum Overage Repayment") within 30 days of the date of determination thereof; *provided, however,* that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditor Groups, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (giving pro forma effect to such payment) prepared by NNL, with assistance from the Monitor, and provided in advance of such decision by the Monitor to the Creditor Groups (the "NNL Liquidity Review Procedures"). The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Canadian Debtors from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full. For the purposes of this Section, "U.S. Pro Rata Excess Recoveries," as of any date of determination shall equal the product of (i) the Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has been paid U.S. Pro Rata Excess Recoveries in accordance with Section 5) and (ii) a fraction (x) the numerator of which shall equal US$161 million minus the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable or paid to the Canadian Debtors by Nortel Group entities (excluding the Canadian Debtors) that are payors for the Canada/US Interim Period (rounded to four decimal points).

- Excess Funding Charge:  NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Canadian Debtors (the "Excess Funding Charge"), which charge shall be granted by order of the Canadian Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "EDC Charge"); *provided, however,* that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-

11

ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in the Canadian Proceedings. For the purposes of this provision, the terms "Administration Charge," "Carling Facility" and "Carling Facility Charges" shall have the same meaning as ascribed to each such term in the initial order granted by the Canadian Court on the Filing Date in the Canadian Proceedings (the "Canadian Initial Order"). Simple interest shall be payable on the Contingent Payment at the time of repayment at a rate of 10% per annum and shall accrue from the date of NNL's receipt of the Contingent Payment to, but not including, the date of repayment. Upon payment in full of the Contingent Payment and any accrued interest thereon, the Excess Funding Charge shall be automatically extinguished.

- Use of Funds: NNL has informed the other Parties that NNL intends to use the funds from the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (as defined below) (the "Permitted Uses"). To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI and the Creditor Groups.

- Settlement: The sum of the Total Payment and the January Payment (being US$187 million) represents (A) the maximum payment that the US Debtors may or could owe in respect of the NNI Interim Obligations (as defined in the Agreement), (B) the maximum administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceedings with respect to the NNI Interim Obligations, whether pursuant to Sections 503 and 507 of the Bankruptcy Code or otherwise, and (C) constitutes a full and final settlement of any and all NNI Interim Obligations. Each of NNL and the other Canadian Debtors hereby agrees to indemnify, defend and hold harmless each US Debtor from and against any and all actions, claims, costs, and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

- PART B – EMEA SELF-FUNDING; SETTLEMENT MATTERS

  - Shortfall Payment: Subject to the terms of the Agreement, NNL shall pay to NNUK the sum of US$10 million (the "First Shortfall Payment"), such amount to be paid out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account certain adjustments) exceeds the amount previously communicated to the

12

Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor and the Creditor Groups) and such communication having been counter-signed by the Joint Administrators (such sale, a "<u>Material Asset Sale</u>"); *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (as set forth in the Agreement)  Subject to the terms of the Agreement, NNL shall pay to NNUK the sum of US$10 million (the "<u>Second Shortfall Payment</u>" and together with the First Shortfall Payment, the "<u>Shortfall Payments</u>"), such amount to be paid out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL; *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures.

- <u>Shortfall Charge</u>:  NNL's obligation to make the Shortfall Payments shall be secured by a charge against all of the assets of the Canadian Debtors (the "<u>Shortfall Charge</u>"), which charge shall be granted by order of the Canadian Court and shall at all times rank *pari passu* with the Inter-company Charge (as defined in the Canadian Initial Order.  Without prejudice to the foregoing sentence, NNUK consents to any current or future charges that have been, or may be granted to the US Debtors in connection with any future funding provided by the US Debtors to the Canadian Debtors may, or could be senior to the Shortfall Charge, and consents to such charges being senior to the Shortfall Charge.

- <u>Settlement</u>:  Except with respect to the obligation of NNL to make the Shortfall Payments, the Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Debtors *inter se,* and (ii) an EMEA Debtor, on the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof within the EMEA Interim Period including, without limitation, any subsequent determination by any revenue authority with respect to the EMEA Interim Period giving rise to any subsequent liability to taxation of any Party hereto.  Upon payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically extinguished.  It is expressly understood that Part B of the Agreement is intended to constitute a full and final settlement of all of the matters between the US and Canadian Debtors, on the one hand, and the EMEA Debtors, on the other hand, set forth in Part B of the Agreement whether arising during, or related to, the EMEA Interim Period.

- <u>PART C – PROVISIONS OF GENERAL APPLICATION</u>

  - <u>Intellectual Property Licenses</u>:  Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination (as defined below) with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "<u>IP Licenses</u>") for the purpose of facilitating, and in consideration

13

of a right to an allocation to such Debtors of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "Asset Sale"); *provided, however,* that (x) in the case of the US Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditor Groups (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the project name of the referenced proposed transaction or/and the description of the scope of assets, businesses and technologies covered by such Asset Sales have been previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor and the Creditor Groups) and such communication having been by the Joint Administrators.

- Sale Transactions: Each Debtor hereby agrees that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or consummation of any sale of, material assets of any of the Debtors to which such Debtor (a "Selling Debtor") is proposed to be a party (each, a "Sale Transaction") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction. Pending the distribution of the Sale Proceeds, the entire amount of the Sale Proceeds (less certain costs) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all Selling Debtors, in each case acting reasonably (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors. As soon as reasonably practicable following the execution of this Agreement, the Parties shall negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation. The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Protocol, failing which the Protocol shall apply to determine the allocation of the relevant Sale Proceeds. No Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the other Parties to this Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally, and it is expressly acknowledged by all Debtors that, in relation to any Sale

14

Transaction, (A) neither any matter in the course of negotiation with any prospective purchaser, nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such Sale Transaction and sharing of transaction costs relating to such Sale Transaction between the Selling Debtors shall constitute items regarding allocation of Sale Proceeds from such Sale Transaction. For the purposes of Sections 11.c. and 12.a. through 12.f. (inclusive) of the Agreement, the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditor Groups in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditor Groups acting in good faith; and

- <u>Effectiveness</u>: No provision of the Agreement (other than as set forth in Section 13.f. of the Agreement) shall be effective until the satisfaction of the following conditions: (A) each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "<u>North American Court Condition</u>"), (B) the UK Court giving a direction (the "<u>UK Court's Directions</u>") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "<u>UK Court Condition</u>" and, together with the North American Court Condition, the "<u>Court Approval Condition</u>"); *provided, however,* the Joint Administrators may at their election waive the UK Court Condition, and (C) the Canadian Court and the US Court approving amendments to the cross-border protocol previously approved by the US Court and the Canadian Court (as may be in effect from time to time, the "<u>Cross-Border Protocol</u>") that are mutually satisfactory to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Monitor, the Creditor Groups (the "<u>Cross-Border Protocol Condition</u>", and together with the Court Approval Condition, the "<u>Conditions</u>").

- <u>Creditor Group Support</u>: Written confirmation has been received from the Creditors' Committee confirming that the members of the Creditors' Committee, after thorough review and due deliberation of the Agreement, have voted, in compliance with the by-laws of the Creditors' Committee, in favor of supporting this Agreement and have granted permission to their advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement. Written confirmation has been received from the counsel to the Bondholders' Committee confirming that the Bondholders' Committee has granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of the Agreement.

- <u>Reservation of Rights</u>: Nothing in the Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 8 of the Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety

of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to this Agreement, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights under the Agreement against NNL, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL under certain provisions of the Agreement, and (B) the January Payment. The use of the term Transfer Pricing Payment (or any similar term) or reference to the Master R&D Agreement (or similar agreement) in the Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any entity of the transfer pricing regime or the Master R&D Agreement.

### Basis for Relief

21. The relief requested herein is authorized by sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105.

22. Section 363(b) of the Bankruptcy Code permits a debtor to use property of the estate outside of the ordinary course of business after notice and a hearing. 11 U.S.C. § 363. Section 363 applies when an agreement involves the disposition of the estate's assets in such a way that it ventures beyond an ordinary course transaction. Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996).

23. The use or transfer of estate property under this provision must be supported by a sound business purpose. The Committee of Equity Security Holders v. Lionel Corporation (In re Lionel Corporation), 722 F.2d 1063, 1070-71 (2d Cir. 1983); Travelers Casualty and Surety Company v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008); In re Decora Industries, Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del.

16

May 20, 2002); The Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re

Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson

Ry. Co., 124 B.R. 169, 176 (D. Del. 1991). A court determining whether a sound business

purpose justifies the transaction "should consider all salient factors pertaining to the proceeding

and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders,

alike." In re Montgomery Ward, 242 B.R. at 153-54 (quoting In re Lionel, 722 F.2d at 1071). In

addition, a Debtor must show that the transaction has been proposed in good faith, that adequate

and reasonable notice has been provided, and that it is receiving fair and reasonable value in

exchange. See In re Decora Industries, Inc., 2002 WL 32332749, at *2; In re Delaware &

Hudson Ry. Co., 124 B.R. at 176.

24.  Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee and

after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr.

P. 9019.  Under this authority, the Third Circuit has emphasized that "[c]ompromises are favored

in bankruptcy." Martin, 91 F.3d at 393 (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed.

1993)).  In addition, the District of Delaware has recognized that the approval of a proposed

compromise and settlement is committed to the sound discretion of the bankruptcy court. See In

re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

25.  Before approving a settlement under Bankruptcy Rule 9019, a court must determine

whether "the compromise is fair, reasonable, and in the interest of the estate." In re Marvel

Entertainment Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211

B.R. 798, 801 (D. Del. 1997)).  Basic to the process of evaluating proposed settlements is "the

need to compare the terms of the compromise with the likely rewards of litigation." Protective

Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414,

424-25 (1968). The court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in a range of reasonableness." Travelers, 2008 WL 821088, at *5 (citing Matter of Jasmine, Ltd., 258 B.R. 119 (D.N.J. 2000); Coram, 315 B.R. at 330; Pennsylvania Truck Lines, 150 B.R. at 598. The court need not be convinced that the settlement is the best possible compromise in order to approve it. Coram, 315 B.R. at 330.

26. The Third Circuit has set out four criteria for a bankruptcy court to consider when evaluating a settlement proposal (the "Martin Factors"): "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Martin, 91 F.3d at 393.

27. The US Debtors respectfully submit that the Agreement meets each of the requirements under section 363 and Bankruptcy Rule 9019. The Agreement is proposed as a good faith means to reimburse NNL for actual costs incurred on behalf of NNI during the postpetition period while, at the same time, recognizing that assertions have been made that the Nortel Transfer Pricing Regime should no longer apply in light of the current uncertainties relating to Nortel's business. With these positions in mind, good faith negotiations took place with the intention of avoiding the potential cost and delay of litigation relating to the funding of NNL. It was determined by NNI, NNL and the Creditor Groups that a consensual resolution is in the best interest of the creditors (including those, such as the bondholders, with claims both in the United States and Canada) and the US Debtors' estates. The reimbursement of NNL for the Postpetition Services and Expenses provides NNL with the necessary funding in order for NNL to operate during the Canada/US Interim Period, which will allow the US Debtors the continued uninterrupted use of NNL's intellectual property, and maximize the likelihood of a successful

18

resolution of these cases and that NNL will provide the Postpetition Services and pay the

Expenses on the US Debtors' behalf in the future.

28. In addition, section 503(b) of the Bankruptcy Code provides administrative expense

status for "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. §

503(b)(1)(A).  Courts generally require that an administrative expense arise from a postpetition

transaction with the debtor that provided a benefit to the debtor in the operation of its business.

Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl Energy, Inc.), 181 F.3d 527,

532-33 (3d Cir. 1999); In re Women First Healthcare, Inc., 332 B.R. 115, 121 (Bankr. D. Del.

2005).  These administrative expenses, in turn, are entitled to a second priority status pursuant to

section 507(a)(2) of the Bankruptcy Code.  11 U.S.C. § 507(a)(2).

29. The Agreement is supported by a sound business purpose because it permits NNI to

reimburse NNL for its share of the Postpetition Services and Expenses satisfying the standard set

forth in Section 503(b), while including terms protecting the US Debtors in the event of an

overpayment and capping the maximum liability to the US Debtors.  NNL has provided

postpetition benefits to the US Debtors by allowing them to continue to sell products

incorporating its intellectual property, and by providing Postpetition Services and paying the

Expenses on their behalf pursuant to past practices.

30. The Agreement is further necessary to preserve the US Debtors' estate, because if

NNI does not pay NNL the amounts provided for in the Interim Funding Agreement, NNL faces

a potential funding crisis that would seriously harm the entities' interconnected global business

operations and substantially decrease the value of the US Debtors' estates.  Such a crisis could

also complicate the US Debtors' continued use of NNL's intellectual property.  If NNL were to

stop sharing costs with NNI, it is also likely estate resources would be wasted duplicating efforts

and trying to separate out overhead between the intertwined affiliates.  Moreover, if at any point

NNL is unable to demonstrate to the Canadian Court that it has sufficient funds, it would be at

risk of losing the protection of the CCAA stay imposed by the Initial Order, as extended from

time to time.  Termination or expiration of the CCAA stay protecting the Canadian Debtors

would likely result in a rapid deterioration of Nortel's Canadian assets and could have a

significant negative impact on the US Debtors.  Further advances from NNI to NNL under the

$200 million inter-company revolving loan facility that was put in place by the US Debtors at the

time of bankruptcy filings are not acceptable to the Monitor overseeing the Canadian

Proceedings as they would ignore those Postpetition Services and Expenses incurred by NNL on

behalf of NNI and, in any event, are insufficient to address the expected operational cash outflow

of NNL during the Canada/US Interim Period.

31. Furthermore, the US Debtors have received, and will continue to receive, fair value in

exchange for their performance under the Interim Funding Agreement, including use of

intellectual property owned by NNL that is crucial to the US Debtors' business, the benefit of

Research and Development Activity performed by NNL, and the payment of certain overhead

costs, which are necessary to its operations.  As such, the Interim Funding Agreement is fair and

its terms are reasonable.  As mentioned above, NNL undertook a cost study to ascertain the

extent of costs incurred by NNL for the benefit of the Nortel Group.  Using revenue as a basis for

cost allocation, the study concluded that NNL would be owed a higher amount from NNI for the

Postpetition Services and Expenses, though this figure would be disputed by the Creditor

Groups.

32. If the Interim Funding Agreement were not approved, NNL may have no choice but

to pursue legal action to recover amounts claimed to be owing, whether in respect of the

Postpetition Services, the Expenses or under the Transfer Pricing Agreements, and NNL may have no choice but to also seek recovery of the value of the Postpetition Services it provided and the Expenses it paid on the US Debtors' behalf as an administrative expense. Any such lawsuit is likely to be complicated and drawn out given the factual nature of the dispute and the interconnected workings of the businesses, and will drain resources from the US Debtors' estates and detract attention from other important matters facing the US Debtors' estates.

33. Accordingly, the US Debtors submit that approval of the Interim Funding Agreement has a valid business purpose, including the payment of an administrative expense obligation owing to NNL for the provision of those actual and necessary Postpetition Services and the payment of related Expenses for the benefit of the US Debtors' estates, and the terms are fair and reasonable. The Agreement has been proposed in good faith upon reasonable and adequate notice, and is in the best interest of the US Debtors' estates, creditors and other stakeholders and should, therefore, be approved by the Court.

## Notice

34. Notice of the Motion has been given via first class mail to the (i) U.S. Trustee; (ii) the Committee; (iii) the Bondholder Committee; (iv) the Joint Administrators, and (v) the general service list established in these chapter 11 cases. The US Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

35. No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the US Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  June 9, 2009
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (No. 5125)
Lisa M. Schweitzer (No. 1033)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*