## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ X

| | |
|---|---|
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

: **Hearing date:** June 29, 2009 at 9:00 AM (ET) (proposed)
: **Objections due:** June 26, 2009 at 12:00 PM (ET) (proposed)

------------------------------------------------------------X

**DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING DEBTORS' ENTRY INTO THE ASSET SALE AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES, (C) AUTHORIZING AND APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (D) APPROVING THE NOTICE PROCEDURES, (E) APPROVING THE ASSUMPTION AND ASSIGNMENT PROCEDURES, (F) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL AND (G) SETTING A DATE FOR THE SALE HEARING, AND (II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF DEBTORS' CDMA AND LTE BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND (C) THE ASSUMPTION AND SUBLEASE OF CERTAIN LEASES**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of orders pursuant to sections 105, 107(b)(1), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 9018-1 of the Local

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems, Inc. (9769), Nortel Altsystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules") (i) (a) approving the Debtors' entry into that certain

Asset Sale Agreement dated as of June 19, 2009 among NNI, Nortel Networks International Inc.

("NNII"), Nortel Networks Limited ("NNL"), Nortel Networks Corporation ("NNC") and certain

of their affiliates as sellers (the "Sellers") and Nokia Siemens Networks B.V. as purchaser

(together with its designees, "Nokia Siemens Networks" or the "Purchaser") for the sale of

certain CDMA and LTE assets as described therein (the "Assets") as a "stalking-horse" purchase

agreement (as appended hereto as Exhibit A, the "Agreement"), (b) authorizing and approving

the bidding procedures (as appended to the Bidding Procedures Order (as defined herein) as

Exhibit 1, the "Bidding Procedures"), (c) authorizing and approving the terms and conditions of

the Break-Up Fee and Expense Reimbursement (as defined below), including granting

administrative expense status to the Break-Up Fee and Expense Reimbursement (together, the

"Bid Protections") to be paid by the Sellers to the Purchaser, (d) approving the form and manner

of sale notices (the "Notice Procedures"), (e) approving the procedures as set forth below for the

assumption and assignment of certain executory contracts and the assumption and sublease of

certain real estate leases (the "Assumption and Assignment Procedures"), (f) authorizing the

Debtors to file certain documents under seal, and (g) setting the time, date and place of a hearing

to consider the sale and the assumption and assignment of the Assumed Agreements (the "Sale

Hearing") and (ii) authorizing and approving (a) the sale of the Debtors' right, title and interest

in the Assets (the "Purchased Assets"), free and clear of all Liens, Claims, and Interests (each as

described below), pursuant to section 363 of the Bankruptcy Code, except as set forth in the

Agreement and (b) the assumption and assignment of certain executory contracts and the

assumption and sublease of certain real estate leases pursuant to section 365 of the Bankruptcy

Code; and (iii) granting them such other and further relief as the Court deems just and proper.  In support of the Motion, the Debtors rely on the declaration of George Riedel (the "Riedel Declaration"), attached hereto as Exhibit B.  In further support of this Motion, the Debtors respectfully represent as follows:

**Jurisdiction**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 107(b)(1), 363 and 365 of the Bankruptcy Code, Rules 6004, 6006, 9014 and 9018 of the Bankruptcy Rules, and Rules 6004-1 and 9018-1 of the Local Rules.

**Background**

**A.      Introduction**

1.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      Also on the Petition Date, the Debtors' ultimate corporate parent NNC, NNI's direct corporate parent NNL (together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court. Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. In addition, at 8 p.m. (London time) on January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA will continue to operate as a going concern for an initial period of three months. In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings remain the main proceedings in respect of NNSA.

4.    On January 15, 2009, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Bankruptcy Rules that provided for the joint administration of these cases

---

[3]    The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

and for consolidation for procedural purposes only [D.I. 36].

5.      On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142]. An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group"). No trustee or examiner has been appointed in the Debtors' cases.

**B.      Debtors' Corporate Structure and Business**

6.      A description of the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3].

7.      The Debtors and their affiliates previously sold certain non-core assets related to their enterprise "Layer 4-7" business to Radware Ltd. The sale, which was approved by this Court on March 26, 2009 [D.I. 539] and by the Canadian Court on March 30, 2009, closed on March 31, 2009.

**C.      The CDMA and LTE Assets**

8.      Nortel's Carrier Network business ("Carrier") offers wireline and wireless networks that help service providers and cable operators supply mobile voice, data and multimedia communications services to individuals and enterprises using cellular telephones, personal digital assistants, laptops, soft-clients, and other wireless computing and communications devices. The Carrier portfolio includes 2G/3G mobility networking solutions based on Code Division Multiple Access ("CDMA"), and its research and development efforts have included innovative technologies focused in the areas of 4G broadband wireless, including Long Term Evolution ("LTE"), an evolving networking standard for which Nortel has completed

early trials with customers.

9.      As described in the Riedel Declaration, the business environment in which the Debtors operate their Carrier business is highly competitive.  While Nortel ranked second globally in CDMA revenues in 2008 according to the Dell'Oro Group and has benefited from customer network upgrades to 3G technology like CDMA2000 1x and CDMA EV-DO Rev A, and it is clear that significant value exists in the CDMA and LTE aspects of the Carrier business, the full value of these assets cannot be realized by attempting to operate it through the process of restructuring.  The Carrier technology is evolving over time and the Carrier business requires investments of R&D and capital to realize the most value from the business and its customer relationships.  Nortel has concluded that such value is best maximized through the sale of the CDMA and LTE assets to a buyer who can leverage off of its own existing customer relationships and the acquired customer relationships, as well as investments in technology in order to develop the next generation of products and services.

**D.      The Market for the CDMA and LTE Assets**

10.      As discussed in the Riedel Declaration, Nortel has from time to time over the last several years explored the possibility of divesting its CDMA and LTE assets.  While none of the contemplated transactions ever came to fruition, the myriad negotiations gave Nortel's management a clear concept of the potential market for the Carrier assets, as well as the assets' value to the major market participants.  In addition to the Purchaser, Nortel's primary market competitors in the CDMA and LTE business include Ericsson, Alcatel-Lucent, Motorola, Huawei and ZTE.

11.      Prior to the Petition Date, Nortel engaged in discussions with various of its market competitors regarding the potential sale of the Carrier business.  Since the Petition Date, Nortel resumed discussions with Nokia Siemens Networks.  The Debtors and their investment banker,

Lazard Frères & Co., also began seeking prospective purchasers both within the Debtors' industry and among potential strategic investment entities.  Prior to signing the Agreement, the Debtors contacted their significant strategic competitors in the Carrier business, and engaged in extensive negotiations with one other strategic competitor regarding the terms of a potential transaction.

12.      The Sellers believe, based on their long-term consideration of potential transactions involving the Carrier business and after re-canvassing the marketplace since the commencement of these Chapter 11 cases, that the proposed transaction with the Purchaser represents the highest and best proposal available for the CDMA and LTE assets, subject to the receipt of a better bid through the auction process contemplated in this Motion.

### Relief Requested

13.      By this Motion, the Debtors seek orders:  (i)(a) authorizing the Debtors' to enter into the Agreement and take other such steps as are necessary to consummate the Transaction, (b) authorizing and approving the Bidding Procedures, (c) authorizing and approving the Bid Protections, (d) approving the Notice Procedures, (e) approving the Assignment Procedures, (f) authorizing the Debtors to file certain documents under seal and (g) setting the time, date, and place of the Sale Hearing (such order, substantially in the form attached hereto as Exhibit C, the "Bidding Procedures Order"); and (ii) authorizing and approving (a) the sale of the Purchased Assets, free and clear of all Liens, Claims and Interests, (b) the assumption and assignment of certain contracts, and (c) the assumption and sublease of certain leases (such order, substantially in the form attached hereto as Exhibit D, the "Sale Order"); and (iii) granting them such other and further relief as the Court deems just and proper.

E.    **The Asset Sale Agreement**[4]

14.    After extensive arm's length, good faith negotiations among the Sellers and the

Purchaser and their respective advisors, the Debtors have determined that the Agreement

represents the best opportunity for the Debtors to maximize the value of their assets and serve as

a basis for conducting an auction to seek higher and/or better offers.  The Agreement[5]

contemplates the sale of the Assets, subject to higher and/or better bids, on the following

material terms:

- Purchase Price.  At the Closing, the Purchaser will pay to the Sellers an estimated purchase price of six-hundred-fifty million dollars ($650,000,000), subject to certain adjustments based on net working capital, including net inventory, CIP receivables, contractual liabilities, royalty liabilities, warranty provisions, and accrued vacation amounts as of the Closing.

- Certain Fees.  In certain circumstances the Sellers may be required to pay to the Purchaser a break-up fee and an expense reimbursement.  See section D for more details on these obligations.

- Assets.  The assets to be acquired by the Purchaser include, among other things, certain (i) inventory and supplies, (ii) equipment, (iii) real estate subleases, (iv) contracts, (v) accounts receivable, (vi) CIP receivables, (vii) rights under warranties, representations and guarantees by suppliers, manufacturers and third parties, (viii) business information, (x) intellectual property, (xi) governmental consents and (xii) certain other rights against third parties relating to the foregoing.  The assets to be acquired by the Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable, bank account balances and petty cash, certain assets and rights relating to the pre-closing period, and security deposits.

- Assumed Liabilities.  The liabilities to be assumed by the Purchaser include, among others, (i) liabilities arising after the Closing Date to the extent related to the Business or the operations or ownership thereof after the closing, (ii) liabilities arising from assigned contracts, (iii) certain liabilities relating to transferred intellectual property, (iv) certain tax liabilities, (v) certain warranty liabilities, (vi) certain liabilities related to employees and employee benefit plans and under employment laws, (vii) liabilities

---

[4]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement.  To the extent that there are inconsistencies between the summary description of the Agreement contained herein and the terms and conditions of the Agreement, the terms and conditions of the Agreement control.

[5]    A separate asset sale agreement, the China Asset Sale Agreement (as defined in the Agreement), is being executed for the conveyance of certain assets by relevant Affiliates of the Sellers to the Purchaser.

related to the obligations to repurchase inventory under certain contract manufacturing agreements, and (viii) liabilities related to net working capital adjustments.

- <u>Sale Free and Clear</u>.  The assets to be transferred by the Debtors will be transferred free and clear of all Liens, Claims and Interests, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the Agreement.

- <u>Ancillary Agreements</u>.  Pursuant to the Agreement, at or prior to the closing, Sellers and the Purchaser will enter into, among others, the following ancillary agreements:

  - <u>Transition Services Agreement</u>.  At the closing, NNL, NNC, NNI, NNII and Purchaser will enter into an agreement under which NNL, NNC and NNI and their affiliates (including NNII) will agree to provide to Purchaser and its affiliates certain information technology, business transition and related services, commencing at the Closing and continuing for a period not to exceed two (2) years.

  - <u>Intellectual Property License Agreement</u>.  At the closing, NNL and the Purchaser will enter into an intellectual property license agreement (the "<u>IPLA</u>") pursuant to which (i) NNL will license to the Purchaser and its affiliates certain intellectual property necessary for the manufacture of the products and the provision of services, and (ii) NNL and its affiliates will receive a license back to all intellectual property included in the Purchased Assets for use in their other businesses.  The IPLA will remain in force for so long as any intellectual property rights licensed thereunder continue to exist.  Also at the closing, NNL and the Purchaser will enter into a license agreement allowing the Purchaser and its affiliates to utilize the "Nortel" trademark and logo in its sales of the Products for a limited period after closing.

  - <u>Loaned Employee Agreement</u>.  At the Closing, Nortel and the Purchaser will enter into an agreement under which certain employees of Nortel and its affiliates will be seconded to the Purchaser to perform services for the Purchaser for a 90-day period beginning on the Closing Date.  Nortel will continue to pay all employment costs in respect of the Loaned Employees that relate to the period of the Loaned Employee Agreement, and the Purchaser will provide for the payment of, or if not paid pursuant to the pre-funding mechanism in the Loaned Employee Agreement, promptly reimburse Nortel for, all such employment costs.

  - <u>CDMA Supply Agreement</u>.  At the Closing, the Sellers and the Purchaser or Designated Purchaser will enter into a CDMA Supply agreement pursuant to which the Purchaser will undertake to supply the Sellers with CDMA Products and related support services in order to enable the Sellers to continue to service certain contracts not assigned pursuant to the Agreement ("<u>Excluded Contracts</u>"). In addition, the agreement imposes certain restrictions on competing activities on both parties; in particular, it provides that Sellers will not enter into any new, or renew any existing, customer contracts related to the Business (including the

Excluded Contracts) and that Purchaser will not enter into contracts with any of the parties to the Excluded Contracts until satisfaction of certain obligations to Sellers.

- <u>Closing Conditions</u>:  In addition to certain other customary closing conditions, including conditions relating to bankruptcy court approvals, the obligation of the Purchaser to close the sale is subject to the satisfaction of the following conditions: (i) the accuracy of the Sellers' representations and warranties, except as would not result in a Material Adverse Effect, and (ii) the performance in all material respects of all material covenants, obligations and agreements required to be performed by the Sellers on or before the Closing.

- <u>Ongoing Covenants and Restrictions</u>:  In addition to certain other customary post-closing obligations such as information-sharing and redirection of customers and payments, the Sellers have agreed to:  (i) cooperate with the Purchaser in relation to arrangements regarding non-assignable contracts and bundled contracts during an agreed period after the closing and (ii) sublease certain real estate to the Purchaser.

- <u>Post-Closing Access to Books and Records</u>.  For seven (7) years after the Closing (or such longer period as may be required under applicable law), the Purchaser must preserve pre-closing records. After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable advance notice and during regular business hours, the Purchaser shall, and/or shall cause the Person holding such records to provide the Sellers or their representatives reasonable access to such records and permit the Sellers or their representatives to make copies of such records, in each case at no cost to the Sellers or their representatives (other than for reasonable out-of-pocket expenses).  The Agreement contains further provisions related to tax records and information.

- <u>Status of Payments</u>.  All amounts required to be paid or borne by the Debtors shall constitute administrative expenses under section 503(b) of the Bankruptcy Code.

15.    In addition, in order to facilitate consummation of the Agreement, the Debtors will enter into an agreement or agreements terminating certain Licenses and rights granted by NNL to the Debtors that relate to the Assets (the "<u>Appropriate License Termination</u>"), pursuant to the terms of the Interim Funding and Settlement Agreement subject to approval of this Court of the Debtors' Motion Pursuant to 11 U.S.C. § 105 (a), § 363, § 503 and Fed. R. Bankr. P. 9019 for an Order (a) Approving the Interim Funding and Settlement, and (b) Granting Related Relief [D.I. 874] (the "<u>Interim Funding Motion</u>")

**F.      The Bidding Procedures**

16.      In order to ensure that the Sellers receive the maximum value for the Assets, the

Agreement is subject to higher or better offers, and, as such, the Agreement will serve as the

"stalking-horse" bid for the Assets.  The Assets may be sold in a single sale to a single purchaser

or in parts to several purchasers.[6]

17.      The key provisions of the Bidding Procedures to be employed with respect to the

proposed sale of certain assets and assumption of certain liabilities as set forth in the Agreement

are as follows:

a.  Bid Deadline.  A Qualified Bidder that desires to make a bid will deliver written copies of its
bid to the following parties (collectively, the "Notice Parties"):  (i) Nortel Networks Limited
and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Gordon A. Davies, Esq., Chief
Legal Officer, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905)
863-8386; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L.
Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006,
Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn:
Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay
Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors:
Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY
10020, Facsimile: (212) 332-1748; (v) counsel to the Committee: Akin Gump Strauss Hauer
& Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis,
One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vi) financial
advisor to the Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment
Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (vii)
counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland
Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-
5735; and (viii) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young
Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-
3300; so as to be received not later than July 21, 2009 at 4:00 p.m. (ET) by the Sellers (the
"Bid Deadline").  The Sellers, after consultation with the Committee, the Bondholder Group
and the Monitor, may extend the Bid Deadline once or successively, but they are not
obligated to do so; provided, however, that for any such extension beyond ten (10) Business
Days, the Sellers shall have obtained the prior written consent of the Purchaser, the
Committee, the Bondholder Group and the Monitor, which consent will not be unreasonably
withheld.  If the Sellers extend the Bid Deadline, they will promptly notify all Qualified

---

[6]      The Debtors also may entertain bids through the Bidding Procedures for other assets besides the Assets that
are the subject of the Agreement, whether related or unrelated to the CDMA and LTE businesses.

Bidders (including the Purchaser) and the parties listed above of such extension.

b.  <u>Provisions Governing Qualifications of Bidders</u>.  Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court, for cause shown, or as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), in order to participate in the Bidding Process, each person, other than the Purchaser, who wishes to participate in the Bidding Process (a "<u>Potential Bidder</u>") must deliver to the Notice Parties (as defined below) at the addresses provided below:

      (i)     an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, that shall not be on terms that, in the Sellers' reasonable judgment, are more favorable to the Potential Bidder than the confidentiality agreement executed by the Purchaser and which shall inure to the benefit of any purchaser of the Assets (in the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets and waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transaction it may enter into, to the Notice Parties (as defined below);

      (ii)    current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transaction; and

      (iii)    a preliminary (non-binding) written proposal regarding:  (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder, and any proposed measures associated with their continued employment; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Agreement.

A Potential Bidder that delivers the documents described above, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the

Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence as provided in the following paragraph with respect to the Assets.

c.      Provisions Governing Qualified Bids. A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

        (i)      it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or upon alternative terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholders Committee and the Monitor, are no less favorable than the terms and conditions of the Agreement;

        (ii)      it includes a letter stating that the bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), provided that if such bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, August 31, 2009, and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

        (iii)      it includes a duly authorized and executed Agreement, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, including, to the extent required by the terms and conditions of such bid, the Intellectual Property License Agreement, the Transition Services Agreement, the CDMA Supply Agreement, the Loaned Employee Agreement, the Manufacturing and Supply Regarding Dual Use Platforms Agreement and the Trademark License Agreement (each as defined in the Agreement), the other ancillary agreements as described in the Agreement and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Agreement ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve the Sale by the Bankruptcy Court, the

13

Canadian Court and any other applicable court(s) whose approval may be required, proposed by the bidder;

(iv)    it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(v)    it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

(vi)    it fully discloses the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(vii)    it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Agreement, plus (i) the amount of the Break-Up Fee and Expense Reimbursement (as defined below), plus (ii) U.S.$5,000,000.

(viii)    it includes an acknowledgment and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Agreement (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(ix)    it includes an acknowledgement and representation that the bidder:  (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(x)    it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable

governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(xi)   it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to 5% of the Purchase Price to be dealt with as provided for under "Good Faith Deposit" herein;

(xii)   it contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder and any proposed measures associated with their continued employment;

(xiii)   it includes evidence of the Potential Bidder's ability to comply with section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(xiv)   it contains other information reasonably requested by the Sellers; and

(xv)   it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids, and shall deliver copies of any bids deemed to be Qualified Bids to Purchaser in accordance with section 10.7 of the Agreement as soon as reasonably practicable after such a determination has been made.[7] Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

The Sellers shall notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids promptly following the expiration of the Bid Deadline.

d.   <u>Evaluation of Competing Bids</u>.  A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the

---

[7]   The Debtors may entertain bids through the Bidding Procedures for other assets besides the Assets, whether related or unrelated to the CDMA and LTE Businesses.

relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Transaction (including any regulatory approvals required to close the Transaction), the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

e.      No Qualified Bids.  If the Sellers do not receive any Qualified Bids other than the Agreement received from the Purchaser, the Auction shall be cancelled and the U.S. Debtors shall report the same to the Bankruptcy Court, the Canadian Debtors shall report the same to the Canadian Court and the Monitor and subject to requiring and obtaining approvals of the Bankruptcy Court, the Canadian Court or any other applicable court and satisfaction of the conditions set forth in the Agreement, the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Agreement.  In addition, if no Qualified Bid is received, the U.S. Debtors reserve the right to request that the Bankruptcy Court advance the date of the Sale Hearing (as defined below) and provide notice of such new date to those parties in interest entitled to notice thereof and the Canadian Debtors reserve the right to file a motion with the Canadian Court seeking the approval of the sale of the Canadian Debtors' rights, title and interests in and to the Assets to the Purchaser.  In addition, if approval of any other applicable court is required, the Sellers will as soon as practicable file an appropriate pleading with such court(s) seeking approval of the Transaction.

f.      Auction Process.  If the Sellers receive one or more Qualified Bids in addition to the Agreement, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at 9:30 a.m. (ET) on July 24, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned without the prior written consent of the Purchaser, subject to the terms of the Agreement.  Copies of all Qualified Bids shall be delivered to the Committee, the Bondholder Group, the Monitor and the Purchaser at such time that such bid is deemed a Qualified Bid but no later than two (2) Business Days prior to the Auction.  The Auction shall run in accordance with the following procedures:

(i)      Only the Sellers, the Purchaser, the Committee, the Bondholder Group and the Monitor (and the advisors to each of the foregoing), any creditor of the Sellers and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(ii)     Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(iii)     At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date.  At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction.

(iv)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(v)     The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(vi)     Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below).  Each incremental bid at the Auction shall provide net value to the estate of at least U.S.$5,000,000 over the Starting Bid or the Leading Bid, as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction.  After the first round of bidding and between each

subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers. Notwithstanding the foregoing, the Purchaser shall be entitled to submit a Subsequent Bid without being required to satisfy the aforementioned minimum bid increment requirement.

g.    Selection Of Successful Bid. Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid and evaluate each Qualified Bid as set forth in the section titled "Evaluation of Competing Bids" herein, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), it being understood that the Purchaser is not required to satisfy any minimum bid increment requirement and that if the Sellers determine that a Qualified Bid or Subsequent Bid by the Purchaser and any other Qualified Bid are therefore not materially different, then as between those two offers the Purchaser's offer shall be deemed to be the highest and best offer for purposes of this provision and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by the Canadian Court and any required approvals of any other applicable court(s) with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

h.    Closing with Alternative Backup Bidders. If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is necessary or appropriate, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest

approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval is required. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court. If a Qualified Bid other than the Agreement is selected as the Alternate Bid, the Alternate Bid shall remain open until the earlier of (a) August 15, 2009 or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date"). All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

**G.      Break-Up Fee and Expense Reimbursement**

18.      The Purchaser and its advisors have expended, and likely will continue to expend, considerable time, energy, and resources pursuing the purchase of the Assets and the assumption and assignment of the Assumed Agreements, and have engaged in extended, good faith negotiations. The Agreement is the culmination of these efforts.

19.      In recognition of this expenditure of time, energy, and resources, the Sellers have agreed that if the Purchaser is not the Successful Bidder, the Sellers will, to the extent due under section 9.2 of the Agreement, pay the Purchasers: (i) a fee of nineteen million five-hundred thousand dollars and 00/100 ($19,500,000), which is equal to three percent (3%) of the aggregate Purchase Price (prior to adjustment) set forth in section 2.2.1 of the Agreement (the "Break-Up Fee") and (ii) an amount in cash equal to the total amount of all reasonable and documented fees, costs and expenses incurred by the Purchaser in connection with the preparation, performance and execution of the Agreement and the transactions contemplated thereby,[8] including all filing and notification fees, and all fees and expenses of the Purchaser's Representatives (as defined in

---

[8]      For the avoidance of doubt, the fee and expense structures of Skadden, Arps, Slate, Meagher & Flom LLP shall be deemed reasonable.

the Agreement) in an amount not to exceed three million dollars and 00/100 ($3,000,000) (the "Expense Reimbursement" and, together with the Break-up Fee, the "Bid Protections"), which shall be payable as provided for pursuant to the terms of the Agreement.

20.     Specifically, as set forth in section 9.2 of the Agreement, the Agreement provides for payment of the Break-Up Fee upon termination of the Agreement in the following instances: (a) upon the entry of an order by this Court and the Canadian Court approving an Alternative Transaction; (b) if the Sellers terminate the Agreement because the U.S. Bidding Procedures Order and the Canadian Sales Process Order have not been entered within twelve (12) days from the date of the Agreement; (c) if the Sellers terminate the Agreement because the Auction is not completed within thirty (30) days of the entry of the U.S. Bidding Procedures Order and the Canadian Sales Process Order; (d) if the Sellers terminate the Agreement because the U.S. Sale Order and the Canadian Approval and Vesting Order have not been entered by the respective Courts by July 31, 2009; (e) if any of the Sellers withdraw or seek authority to withdraw the Canadian Approval and Vesting Order Motion or the U.S. Bidding Procedures and Sale Motion, or publicly announce any stand alone plan of reorganization or liquidation (or support any such plan filed by any other Person) in respect of the Business; (f) in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in the Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Section 8.3(a) or Section 8.3(b) thereof, as applicable, and, in each case, which, if capable of being cured, is not cured within ten (10) days from receipt of a written notice from the Purchaser; provided, however, that the right to terminate the Agreement pursuant to Section 9.1(e) thereof shall not be available to the Purchaser where a breach of the Agreement by the Purchaser has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate the

Agreement pursuant to such clause; or (g) in the event the Sellers fail to consummate the Closing in material breach of Section 2.3 of the Agreement, within five (5) Business Days of written demand by the Purchaser to consummate the Closing, and the Expense Reimbursement is payable upon termination of the Agreement pursuant to any of the grounds listed above and/or if the Closing does not take place by August 31, 2009, or if the Closing does not take place because of the condition that certain regulatory approvals be obtained, September 30, 2009.  The timing of the Debtors' obligation to pay the Break-Up Fee and Expense Reimbursement as set forth in section 9.2 of the Agreement.

21.    The Sellers have further agreed that their obligation to pay the Break-Up Fee and Expense Reimbursement pursuant to Section 9.2 of the Agreement shall survive termination of the Agreement, shall constitute an administrative expense claim under section 503(b) of the Bankruptcy Code, and shall be payable within two (2) business days under the terms and conditions of the Agreement and this Order, notwithstanding section 507(a) of the Bankruptcy Code.

## H.    The Notice Procedures

22.    The Debtors propose to give notice, immediately after the entry of the Bidding Procedures Order (or as soon thereafter as reasonably practicable), of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing by sending a notice (the "Sale Notice"), substantially in the form attached to this Motion as Exhibit E, to (i) all entities reasonably known to have expressed an interest in a transaction with respect to the Assets during the past nine (9) months, (ii) all entities reasonably known to have asserted any interest in the Assets, (iii) the attorneys general for all states in which Purchased Assets are located, all federal and state taxing authorities, including (without limitation) the SEC, the EPA, state environmental protection agencies, the IRS, and the

Department of Labor and similar state labor or employment agencies, (iv) all parties entitled to notice pursuant to Local Rule 2002-1(b), (v) all counterparties to the Assumed and Assigned Contracts and the Assumed and Subleased Real Estate Leases, and (vi) all known or potential creditors of the Debtors.

23.     In addition, as soon as practicable after entry of the Bidding Procedures Order and the Canadian Bidding Procedures Order (as defined below), within five (5) business days after entry of such orders (or as soon thereafter as reasonably practicable), the Sellers shall publish notice of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing in The Wall Street Journal (National Edition) and The Globe & Mail (National Edition), substantially in the form attached hereto as Exhibit G (the "Publication Notice").

24.     The Debtors propose to give notice of the Sale to the counterparties under all Assumed Agreements (the "Counterparties") in accordance with section I below.

**I.     The Assumption and Assignment Procedures**

25.     To facilitate and effect the sale of the Debtors' Assets, the Debtors seek authorization to assume certain pre-petition executory contracts (the "Assumed and Assigned Contracts") and unexpired leases (the "Assumed and Subleased Real Estate Leases" and, together with the Assumed and Assigned Contracts, the "Assumed Agreements") of the Debtors related to the Assets, to assign such executory contracts to the Purchaser or the Successful Bidder, and to enter into Subleases (as defined in the Agreement) with the Purchaser or Successful Bidder with respect to such unexpired leases.

26.     Included in the Assumed and Assigned Contracts designated for assumption and assignment to the Purchaser or other Successful Bidder are over one hundred contracts between

the Debtors and their customers (the "Customer Contracts").[9] The identity of the counterparties

to the Customer Contracts (the "Customer Counterparties") constitutes an integral component of

the Assumed Agreements' value.  Access to the list of Customer Counterparties absent

appropriate confidentiality restrictions would entail releasing valuable confidential information

of critical value not only to any prospective purchaser of the Assets but also to the Debtors' other

businesses, many of which share overlapping customer lists.  Thus, publicly releasing the names

of the Customer Counterparties would have an immediate detrimental impact on the value of the

Assets as well as other aspects of the Debtors' business.

27.    In light of the foregoing and the need to coordinate the sale of the Assets, the

Debtors submit the following procedures (the "Assumption and Assignment Procedures") for the

Court's approval:

*Notices*

28.    The Debtors shall, no later than July 7, 2009, serve an individual notice

substantially in the form attached hereto as Exhibit F (the "Assumption Notice") by first class

mail on each Counterparty under each Assumed Agreement (and its attorney, if known) at the

last known address available to the Debtors.  Each Assumption Notice shall set forth the

following information:  (i) the name and address of the Counterparty, (ii) notice of the proposed

effective date of the assignment, (iii) identification of the Assumed Agreement, (iv) the amount,

if any, determined by the Debtors to be necessary to be paid to cure any existing default in

accordance with sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "Cure Amount"),

and (v) a description of the Purchaser and a statement as to the Purchaser's ability to perform the

---

[9]    While Debtors have made an effort to limit the list of Assumed Agreements to include only those contracts to which they are parties, in the event that Debtors later determine that they are not in fact a party to any agreement included on the list of Assumed Agreements, Debtors reserve the right to remove such contract from the list and from the relief requested herein for the Assumed Agreements.

Debtors' obligations under the Assumed Agreements.

29.     For Assumed Agreements other than Customer Contracts, the Debtors shall file with the Court a master notice of assignment of contracts that sets forth:  (i) the name and address of each Counterparty, (ii) notice of the proposed effective date of the assignments, (iii) a description of each Assumed Agreement, and (iv) the Cure Amount, if any.  For Customer Contracts, the Debtors shall file under seal with the Court and deliver to (i) counsel to the Purchaser, (ii) the U.S. Trustee, (iii) counsel to the Monitor, (iv) counsel to the Committee, and (v) counsel to the Bondholder Group, a master notice of assignment of contracts that sets forth: (i) the name and address of each Counterparty, (ii) notice of the proposed effective date of the assignments, (iii) description of the Assumed Agreement, and (iv) the Cure Amount, if any, as well as an affidavit confirming that Assumption Notices have been sent to each.

### Cure Amounts

30.     To the extent necessary to consummate a sale of the Debtors' assets as contemplated by this Motion, the Debtors shall pay the Cure Amounts promptly, but in no event more than twenty (20) days following the resolution of the Cure Amounts in accordance with these procedures.

31.     Any Counterparty will be deemed to have received adequate assurance of future performance as required by section 365 of the Bankruptcy Code if the Debtors, after payment of any Cure Amounts, would no longer have any payment or delivery obligations under the Assumed Agreement.

### Counterparty Objection Procedures

32.     To the extent that any Counterparty wishes to object to any matter pertaining to the proposed assumption and assignment of the Assumed and Assigned Contracts, or the

proposed assumption and sublease of the Assumed and Subleased Real Estate Leases, including

without limitation to the proposed Cure Amount and the adequate assurance of future

performance by the Purchaser under the applicable Assumed Agreement, then such Counterparty

must file a written objection with the Court so that such objection is received by the General

Objection Deadline (as defined below).

### *Requests for Adequate Assurance*

33.    Any Counterparty that wishes to obtain adequate assurance information regarding

bidders other than the Purchaser that will or may participate at the Auction, and to which the

Debtors may ultimately elect, at the conclusion of the Auction, to assume and assign or assume

and sublease the Assumed Agreements, must provide written notice (a "Request for Adequate

Assurance") to counsel to the Debtors by mail, facsimile or hand delivery at Cleary Gottlieb

Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Fax:  (212) 225-3999

(Attention:  Lisa M. Schweitzer) so as to be received on or before the General Objection

Deadline.  All Requests for Adequate Assurance must include an email address and/or facsimile

number to which a response to such request will be sent.

34.    If a Counterparty timely submits a Request for Adequate Assurance, the Debtors

shall supply such Counterparty with any non-confidential information reasonably related to

adequate assurance with respect to such other bidders by email or facsimile delivery on July 23,

2009.  If a bidder other than the Purchaser is the Successful Bidder at the end of the Auction, the

Debtors shall immediately notify all Counterparties that filed a Request for Adequate Assurance

of the name of the Successful Bidder and the Alternate Bidder, if any.

35.    If the Purchaser is not the Successful Bidder at the Auction and if a Counterparty

does not timely submit a Request for Adequate Assurance and does not timely object to adequate

assurance of future performance by bidders other than Purchaser on or before the General

Objection Deadline, the Court may enter an order forever barring such Counterparty from

objecting to adequate assurance of future performance. Any party that has submitted a Request

for Adequate Assurance shall have until July 27, 2009 at 4 p.m. (ET) to file an objection to

adequate assurance of future performance by any Successful Bidder or Alternate Bidder that is

not the Purchaser.

### Service of Objections

36.     All Counterparty objections must be served in accordance with the General

Objection Procedures (as defined below) and must specify the grounds for such objection,

including stating the Counterparty's alleged Cure Amount (including, on a transaction by

transaction basis, calculations and detail of specific charges and dates, and any other amounts

receivable or payable supporting such alleged Cure Amount) if the Counterparty disagrees with

the Debtors' proposed Cure Amount and any other defaults or termination events the

Counterparty alleges must be cured to effect assignment of the Assumed and Assigned Contract.

37.     To the extent that any Counterparty does not timely serve an objection as set forth

above, such Counterparty will be (i) deemed to have consented to such Cure Amounts, if any,

and to the assumption and assignment or assumption and sublease of the applicable Assumed

Contract; (ii) bound to such corresponding Cure Amount, if any; (iii) deemed to have agreed that

the Purchaser or any Successful Bidder has provided adequate assurance of future performance

within the meaning of Bankruptcy Code section 365(b)(1)(C); (iv) deemed to have agreed that all

defaults under the Assumed and Assigned Contracts arising or continuing prior to the effective

date of the assignment have been cured as a result or precondition of the assignment, such that

the Purchaser or any Successful Bidder or the Debtors shall have no liability or obligation with

respect to any default occurring or continuing prior to the assignment, and from and after the

date of the assignment the Assumed Contract shall remain in full force and effect for the benefit

of the Purchaser or any Successful Bidder and the Counterparty in accordance with its terms; (v)

to have waived any right to terminate the Assumed Contract or designate an early termination

date under the applicable Assumed Contract as a result of any default that occurred and/or was

continuing prior to the assignment date; and (vi) to have agreed that the terms of the Sale Order

shall apply to the assumption and assignment or assumption and sublease of the applicable

Assumed Agreement.

### *Reservation of Rights*

38.    The Debtors' assumption and assignment of the Assumed and Assigned Contracts

is subject to Court approval and consummation of the sale of the Assets to the Purchaser or other

Successful Bidder.  Accordingly, the Debtors shall be deemed to have assumed each of the

Assumed and Assigned Contracts as of the date of and effective only upon the closing date of the

Agreement or a similar agreement entered into between the Sellers and any Successful Bidder,

and absent such closing, the Assumed and Assigned Contracts shall be deemed neither assumed

nor assigned and shall in all respects be subject to subsequent assumption or rejection by the

Debtors under the Bankruptcy Code.

39.    The Debtors' assumption of the Assumed and Subleased Real Estate Leases is

subject to Court approval, consummation of the sale of the Assets to the Purchaser or other

Successful Bidder, and the Debtors' entry into a Sublease pursuant to section 5.26 of the

Agreement or a similar provision in an agreement entered into between the Sellers and any

Successful Bidder.  Accordingly, the Debtors shall be deemed to have assumed each of the

Assumed and Subleased Real Estate Leases as of the date of and effective only upon the later of

the closing date of the Agreement or a similar agreement entered into between the Sellers and any Successful Bidder or execution of the relevant Sublease, and absent such closing and sublease, the Assumed and Subleased Real Estate Leases shall not be deemed assumed and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.

40.     The Purchaser shall have no rights in and to a particular Assumed Agreement until such time as the particular Assumed Agreement is assumed and assigned in accordance with the procedures set forth herein.

41.     In the event that the Purchaser is not the Successful Bidder at the Auction, the Debtors reserve the right to modify the Assumption and Assignment Procedures, subject to approval of this Court.

42.     Regardless of whether any objection with respect to adequate assurance has been received from a Counterparty, prior to the entry of the Sale Order, the Purchaser or any bidder other than the Purchaser that is the Successful Bidder at the Auction shall provide such adequate assurance of its future performance under the Assumed and Assigned Contracts for the benefit of the parties thereto (other than the Debtors) as reasonably necessary to satisfy section 365(f)(2)(B) of the Bankruptcy Code.  Except as set forth in the Purchase Agreement, the Purchaser has not agreed to pay, shall not be required to assume, and shall have no liability or obligation with respect to, any liability or obligation, direct or indirect, absolute or contingent, of the Debtors, including any liabilities or obligations associated with the Assumed and Assigned Contracts arising on or before closing under the Purchase Agreement.

43.     The same Assumption and Assignment Procedures will be used for each of the Assumed Agreements.  Bankruptcy Rule 6006(e) allows for the sale of multiple contracts in one

motion upon authorization of the Court.  The Debtors therefore request that the Court grant

authorization to file an omnibus motion pursuant to Bankruptcy Rule 6006(f)(6).

44.     To facilitate the assumption and assignment of the Assumed Agreements, the

Debtors further request that the Court find the anti-assignment provisions of the Assumed

Agreements, if any, to be unenforceable under section 365(f) of the Bankruptcy Code.[10]

## J.     Objections

45.     All objections to the relief requested in the Motion must be:  (a) in writing; (b)

signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy

Rules and the Local Rules, (d) filed with the Clerk of the Bankruptcy Court, 824 Market Street,

Wilmington, Delaware 19801 by no later than **4 p.m. (ET) on July 17, 2009** (the "General

Objection Deadline"), or other applicable deadline as indicated in this Motion; and (e) served in

accordance with the Local Rules so as to be received on or before the Objection Deadline by the

following (collectively, the "Objection Notice Parties"):  (a) counsel to the Debtors:  Cleary

Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Fax:  (212)

225-3999 (Attention:  James L. Bromley and Lisa M. Schweitzer) and Morris, Nichols, Arsht &

Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801, Fax:  (302) 658-3989

(Attention:  Derek C. Abbott); (b) counsel to the Purchaser:  Skadden, Arps, Slate, Meagher &

Flom LLP & Affiliates, Four Times Square, New York, New York 10036, Fax:  (212) 735-2000

(Attention: N. Lynn Hiestand), (c) counsel to the Committee:  Akin Gump Strauss Hauer & Feld

---

[10]     Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "Nothwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

LLP, One Bryant Park, New York, New York 10036, Fax: (212) 872-1002 (Attention: Fred S. Hodara, Stephen Kuhn and Kenneth Davis) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attention: Christopher M. Samis), and (d) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, One Chase Manhattan Plaza, New York, New York 10006, Fax: (212) 822-5735 (Attention: Roland Hlawaty) (these procedures collectively referred to as the "General Objection Procedures").

46.     Each objection shall state the legal and factual basis of such objection and may be orally supplemented at the Hearing.

47.     If the Purchaser is not the Successful Bidder at the Auction, objections to issues arising from and in connection with the Auction and/or the Debtors' selection of a Successful Bid made by a Successful Bidder other than the Purchaser must be filed by **July 27, 2009 at 4:00 p.m. (ET)** in accordance with the General Objection Procedures.

48.     Only those objections made in compliance with the General Objection Procedures will be considered by the Court at the Sale Hearing. The failure of any objecting person or entity to file its objections by the General Objection Deadline and in accordance with the General Objection Procedures will be a bar to the assertion, at the Sale Hearing or thereafter, of any objection (including to the sale of Assets and assumption and assignment of Assumed and Assigned Contracts free and clear of Liens, Claims and Interests), and shall be deemed to be "consent" for purposes of Bankruptcy Code section 363(f).

**K.     Sale Free and Clear of All Liens, Claims and Interests**

49.     The Debtors have agreed to sell and transfer the Debtors' right, title and interest in the assets, free and clear of any and all interests pursuant to section 363 of the Bankruptcy Code to the maximum extent allowed by section 363 of the Bankruptcy Code (other than with respect to Assumed Liabilities and Permitted Encumbrances), including (without limitation) all

30

liens, including any lien (statutory or otherwise), mortgage, pledge, security interest, charge,

right of first refusal, hypothecation, encumbrance on real property, easement, encroachment,

right-of-way, restrictive covenant on real property, real property license, lease or conditional sale

arrangement (collectively, the "Liens"), rights or causes of action (whether in law or in equity),

obligations, demands, restrictions, interests and matters of any kind or nature whatsoever,

whether arising prior to or subsequent to the commencement of these cases, and whether

imposed by agreement, understanding, law, equity or otherwise (collectively, the "Claims"), and

debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or

unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable,

known or unknown, including those arising under any Law or Action and those arising under any

Contract or otherwise, including any Tax liability (collectively, the "Liabilities" and together

with the Liens, the "Interests") (in each case other than Assumed Liabilities and Permitted

Encumbrances), with such Interests to attach to the sale proceeds in the same validity, extent and

priority as immediately prior to the sale transactions, subject to any rights, claims and defenses

of the Debtors and other parties in interest.

50.     The Debtors seek a finding by the Court that upon the Closing, and except as

otherwise expressly provided in the Agreement, the Purchaser shall not be liable for any Claims

against, and Liabilities and obligations of, the Debtors or any of the Debtors' predecessors or

affiliates.  The Debtors further seek a finding by the Court that as of the Closing, subject to the

provisions of this Order, the Purchaser shall succeed to the entirety of the Debtors' rights and

obligations in the Assumed and Assigned Contracts first arising and attributable to the time

period occurring on or after the Closing and shall have all rights thereunder.

51.     The Debtors further request that (i) all defaults (monetary and non-monetary) under the Assumed Agreements through the Closing shall be deemed cured, (ii) no other amounts will be owed by the Debtors, their estates or the Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period prior to Closing, (iii) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or the Purchaser that any additional amounts are due or defaults exist under the Assumed Agreements that arose or accrued, or relate to or are attributable to the period prior to the Closing.

**L.     Assumption and Assignment or Sublease of the Assumed Agreements**

52.     Pursuant to Section 365(f) of the Bankruptcy Code, the Debtors seek authorization and approval:  (a) to assume and assign the Assumed and Assigned Contracts to the Purchaser notwithstanding any provision to the contrary in the Assumed and Assigned Contracts, or in applicable non-bankruptcy law, that prohibits, restricts, or conditions the assignment, and (b) assume the Assumed and Subleased Real Estate Leases and sublease the Assumed and Subleased Real Estate Leases to the Purchaser, notwithstanding any provision to the contrary in the Assumed and Subleased Real Estate Leases, or in applicable non-bankruptcy law, that prohibits, restricts, or conditions the Debtors' right to sublease.

53.     Upon assumption of the Assumed and Assigned Contracts by the Debtors and assignment to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order.

**M.     Request to Set a Date for the Sale Hearing**

54.     The Debtors intend to present the Successful Bid and the Alternate Bid, if any, for approval by the Court pursuant to the provisions of sections 105, 363 and 365 of the Bankruptcy

Code at the Sale Hearing to be scheduled by the Court and currently proposed as **July 28, 2009 at 2 p.m. (ET)**. The Debtors shall be deemed to have accepted a bid only when the Court has approved the bid at the Sale Hearing. Upon the failure to consummate a sale of the Assets after the Sale Hearing because of the occurrence of a breach or default under the terms of the Successful Bid, the next highest or otherwise best Alternate Bid, if any, as disclosed at the Sale Hearing, shall be deemed the Successful Bid without further order of the Court, and the parties shall be authorized to consummate the transaction contemplated by the Alternate Bid.

**N.    Canadian Proceedings**

55.    Once this Court approves the Bidding Procedures and the Agreement, those documents will be submitted to the Canadian Court for approval (the "Canadian Bidding Procedures Order"). The final sale and assignment of the Assets and Assumed Agreements also will be submitted for approval by the Canadian Court.

**Basis for Relief**

**A.    Sale of the Assets Is a Product of the Debtors' Reasonable Business Judgment**

56.    Section 363(b)(1) of the Bankruptcy Code provides: "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Section 105(a) of the Bankruptcy Code provides in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

57.    Virtually all courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession. See In re Abbotts Dairies of Pa., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124

B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be

considered by a court in determining whether there is a sound business purpose for an asset sale:

"the proportionate value of the asset to the estate as a whole; the amount of elapsed time since

the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the

amount of proceeds to be obtained from the sale versus appraised values of the property; and

whether the asset is decreasing or increasing in value"); In re Stroud Ford, Inc., 164 B.R. 730,

732 (Bankr. M.D. Pa 1993); Titusville Country Club v. Pennbank (In re Titusville Country

Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Industrial Valley Refrigeration & Air

Conditioning Supplies Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); In re Lionel Corp., 722 F.2d

1063 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re

Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82

B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a

section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is

a good business reason for completing the sale and the transaction is in good faith").

58.    The "sound business reason" test requires a trustee or debtor-in-possession to

establish four elements:  (1) that a sound business purpose justifies the sale of assets outside the

ordinary course of business; (2) that accurate and reasonable notice has been provided to

interested persons; (3) that the trustee or the debtor-in-possession has obtained a fair and

reasonable price; and (4) good faith.  In re Titusville Country Club, 128 B.R. at 399; In re

Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R.

at 335-36; see also Stephens Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.[11]

---

[11]    Lionel's "sound business purpose test" replaces an older rule that held that sales of substantially all of a debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i.e. when the assets to be sold were "wasting" or perishable.  Lionel, 722 F.2d at 1071.

59. Additionally, prior to and after enactment of the Bankruptcy Code, courts have permitted a proposed sale of all or substantially all assets of a trustee outside the ordinary course of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See In re Abbotts Dairies of Pa., Inc., 788 F.2d at 143; In re Lionel Corp., 722 F.2d at 1063 (passim).

60. The proposed procedures for the sale of the Debtors' Assets meet the "sound business reason" test. First, sound business purposes justify the sale. The Debtors believe that a prompt sale of the Assets conducted pursuant to the Bidding Procedures presents the best opportunity to realize the maximum value of the Assets for distribution to the Debtors' estates and their creditors. The Debtors further believe that the benefit to their creditors will be adversely affected absent an immediate sale. See In re Lionel Corp., 722 F.2d at 1071 (of factors for court to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").

61. The proposed procedures for the sale of the Assets also meet the other factors of the "sound business reason" test. As part of this Motion, the Debtors have sought to establish procedures for notice to creditors and other prospective bidders. Under the circumstances of this case, the Debtors submit that the notice period proposed satisfies the requirements of the Bankruptcy Rules, see Bankruptcy Rule 2002, and provides sufficient time for parties in interest to submit objections to the proposed sale and for bidders to formulate and submit competing proposals.

62. Finally, the proposed procedures for the sale of the Assets, which require the Debtors to consult with the Committee and the Monitor throughout the process, satisfy the good

faith requirement of <u>Abbotts Dairies</u>.  The Debtors submit that the results of the Auction will be the product of good faith, arm's length negotiations with respect to the price and other terms of the sale of the Assets between the Debtors and highest and best bidder at the conclusion of the Auction.

63.    As set forth above, the Debtors have demonstrated compelling and sound business justifications for authorizing the sale of the Assets, entry into the Agreement (as defined herein) as a "stalking horse" sale agreement and the payment of the Bid Protections under the circumstances, timing, and procedures set forth herein and in the Motion.  The sale of the Assets pursuant to the Bidding Procedures will afford the Debtors' estates an opportunity to maximize the recoveries to creditors.  Accordingly, the Debtors request that the Court approve the proposed procedures for sale of the Assets to the highest or otherwise best bidder at the Auction and approve the sale presented to the Court at the Sale Hearing and authorize the Debtors to take such other steps as are necessary to consummate the Transaction, including with respect to the Appropriate License Terminations as described above.[12]

## B.    The Bidding Procedures Are Appropriate Under the Circumstances

64.    A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business.  11 U.S.C. § 363.  Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case.  <u>See, e.g.</u>, <u>Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)</u>, 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand); <u>In re Integrated</u>

---

[12] For purposes of approving the Appropriate Licenes Termination, the Debtors incorporate the arguments set forth in the Interim Final Motion in support thereof.

Res., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law

that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest

overall benefit possible for the estate.") (quoting Cello Bay Co. v. Champion Int'l Corn. (In re

Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

65.    The implementation of competitive bidding procedures to facilitate the sale of a

debtor's assets outside of the ordinary course of a debtor's business is routinely approved by

bankruptcy courts as a means of ensuring that such sale will generate the highest and best return

for a debtor's estate.  The Debtors submit that the opportunity for competitive bidding embodied

in the Bidding Procedures will generate the highest or otherwise best offer for the Assets and

therefore is designed to maximize the value of the Assets.

66.    The Debtors believe that a prompt sale process is the best way to maximize the

value of the Debtors' Assets for the benefit of their estates, creditors and other stakeholders.

Accordingly, the Debtors have concluded that:  (a) a prompt sale of the Assets is the best way to

maximize value for these estates, and (b) the proposed Bidding Procedures described herein are

fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale

of the Assets.

**C.     Provision for Bid Protection in the Form of a Break-Up Fee and Expense Reimbursement Has Become a Recognized and Necessary Practice**

67.    The Debtors have formulated a bidding process that the Debtors believe will

induce prospective competing bidders to expend the time, energy and resources necessary to

submit a bid, and which the Debtors believe is fair and reasonable and provide a benefit to the

Debtors' estates and creditors.  The Bidding Procedures and, in particular, the proposed Break-

Up Fee and Expense Reimbursement, are reasonable and supported by applicable case law.

68.    The use of bid protections such as these has become an established practice in

chapter 11 asset sales involving the sale of significant assets because such bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process. Historically, bankruptcy courts have approved bidding incentives (including bid protections) solely by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. See, e.g., In re 995 Fifth Ave. Assocs., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (holding that bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); In re Marrose Corp., Nos. 89 B 12171-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) ("[bidding incentives] are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"). See also In re Integrated Res., 147 B.R. 650, 657-58 (S.D.N.Y. 1992).

69.     The Third Circuit Court of Appeals has clarified the standard for determining the appropriateness of bidding incentives in the bankruptcy context. In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F. 3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives such as the Break-Up Fee must provide benefit to a debtor's estate. Id. at 533.

70.     The O'Brien opinion identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have

been made and without which bidding would have been limited." Id. at 537. Second, where the

availability of bidding incentives induced a bidder to research the value of the debtor and submit

a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may

have provided a benefit to the estate by increasing the likelihood that the price at which the

debtor is sold will reflect its true worth." Id.

71.    The bid protections proposed by the Debtors are consistent with the "business

judgment rule" and satisfy the Third Circuit's "administrative expense" standard. At the

inception of the marketing process, potential purchasers will be provided with the Agreement

and will be afforded an opportunity to submit their own adaptation of that agreement, marked to

show changes necessary to consummate a sale which must be acceptable to the Debtors. Under

the "administrative expense" standard enunciated in O'Brien, as well as the "sound business

judgment" standard followed in other jurisdictions, the bid protections proposed by the Debtors,

including the Break-Up Fee and the Expense Reimbursement, should be approved as fair and

reasonable. The proposed bid protections are reasonable and generally consistent with the range

of bidding protections typically approved by bankruptcy courts in this district. See, e.g., In re

Rouge Indus., Inc., Case No. 03-13272 (Bankr. D. Del. Dec. 3, 2003); In re Ameriserve Food

Distrib., Inc., Case No. 00-00358 (Bankr. D. Del. Jan 31, 2000) (court approved break up fee of

3.6% or $4 million in connection with a $110 million sale of assets); In re Fruit of the Loom,

Inc., Case No. 99-04497 (Bankr. D. Del. Dec. 29, 1999) (court approved break-up fee of 3.0%,

or $25 million in connection with a $835 million sale of business); In re Worldwide Direct, Inc.,

Case No. 99-108 (Bankr. D. Del. Feb. 26, 1999) (approving break-up fee of 3.1% of the

proposed purchase price); In re Montgomery Ward Holding Corp., et al., Case No. 97-1409

(Bankr. D. Del. June 15, 1998) (court approved break-up fee of 2.7% or $3 million in connection

with $100 million sale of real estate); In re Medlab, Inc., Case No. 97-1893 (Bankr. D. Del. Apr.

28, 1999) (court approved break-up fee of 3.12% or $250,000 in connection with $8 million sale

transaction).

72.     Therefore, the Debtors' payment of the Bid Protections under the conditions set

forth in the Motion and this Order is (a) an actual and necessary cost of preserving the Debtors'

estates, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit

to the Debtors' estates and creditors and all parties in interest herein, (c) reasonable and

appropriate, and (d) necessary to ensure that the Purchaser will continue to pursue the proposed

Agreement to undertake the sale of the Assets, and therefore constitute administrative expenses

with priority pursuant to Bankruptcy Code sections 503(b).

**D.     The Purchaser Should be Granted the Protection of Bankruptcy Code Section 363(m)**

73.     As will be set forth in further detail at the Sale Hearing, the Debtors also maintain

that the Purchaser is entitled to the protections afforded by Bankruptcy Code section 363(m).

74.     Specifically, Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

75.     While the Bankruptcy Code does not define "good faith", the Third Circuit in In

re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other

bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); see generally Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.), Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); see also In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)); In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

76.    As the Debtors will demonstrate at the Sale Hearing, over the last months and weeks, the Debtors have spent a considerable amount of time and resources negotiating the Agreement at arm's length, with give and take on both sides. Under the circumstances, this Court should find that the Purchaser is entitled to all of the protections of Bankruptcy Code section 363(m).

**E.    The Agreement is Not the Subject of Collusive Bidding Under Bankruptcy Code Section 363(n)**

77.    As set forth above, the Debtors have been negotiating with the Purchaser at arm's length and in good faith regarding the Sale of the Assets. Moreover, the Debtors do not believe that any such Sale will be the result of collusion or other bad faith between bidders or that the sale price under the Agreement has been or will be controlled by an agreement between potential or actual bidders within the meaning of Bankruptcy Code section 363(n).

78.    As will be set forth in further detail at the Sale Hearing, the Agreement with the Purchaser has been negotiated, proposed, and entered into by the Debtors and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors

41

nor the Purchaser have engaged in any conduct that would cause or permit the Agreement to be

avoided under Bankruptcy Code section 363(n).

**E.      Privacy Ombudsman**

79.      Under section 363(b)(1) of the Bankruptcy Code, if the sale of a consumer

customer list containing personal information relating to individual persons is inconsistent with

the Debtors consumer privacy policy, section 332 governs the appointment of a consumer

privacy ombudsman.  11 U.S.C. § 363(b)(1).  Here, none of the Debtors' customers that are

subject to the sale of the Assets are individuals, and the Debtors do not have a consumer privacy

policy, so section 363(b)(1) does not apply, and a consumer privacy ombudsman is not required.

**F.      Sale of the Assets Should Be Free and Clear of Liens, Claims and Interests**

80.      Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to

sell and transfer the Debtors' right, interest and title in the Assets to the Purchaser or Successful

Bidder free and clear of all Liens, Claims and Interests, except as set forth in the Agreement,

with such Liens, Claims, and Interests to attach to the proceeds of the sale of the Assets, subject

to any rights and defenses of the Debtors and other parties in interest with respect thereto.

Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this
> section free and clear of any interest in such property of an entity
> other than the estate, only if –
>
> (1)      applicable nonbankruptcy law permits sale of such property
> free and clear of such interest;
>
> (2)      such entity consents;
>
> (3)      such interest is a lien and the price at which such property
> is to be sold is greater than the aggregate value of all liens on such
> property;
>
> (4)      such interest is in bona fide dispute; or

> (5)    such entity could be compelled, in a legal or equitable
> proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section

363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the

requirements is met).

81.    With respect to each creditor asserting an Interest, one or more of the standards

set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied.  Those holders of Interests who

did not object or who withdrew their objections to the Sale or the Motion are deemed to have

consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2).  Those holders of

Interests who did object fall within one or more of the other subsections of Bankruptcy Code

Section 363(f).

82.    A sale free and clear of Liens, Claims and Interests is necessary to maximize the

value of the Assets.  The Purchaser would not have entered into the Agreement and would not

consummate the Transaction if the sale of the Purchased Assets to the Purchaser was not free and

clear of all Interests (as defined herein), or if the Purchaser would, or in the future could, be

liable for any of such Interest.  A sale of the Purchased Assets other than one free and clear of all

Interests would yield substantially less value for the Debtors' estates, with less certainty than the

Transaction.  Therefore, the Transaction contemplated by the Agreement is in the best interests

of the Debtors, their estates and creditors, and all other parties in interest.  A sale free and clear

of Liens, Claims and Interests is particularly appropriate under the circumstances because any

lien or claim in, to or against the Debtors' right, interest and title in the Assets that exists

immediately prior to the closing of any sales will attach to the sale proceeds allocated to the

Debtors with the same validity, priority, force and effect as it had at such time, subject to the

rights and defenses of the Debtors or any party in interest.  The Debtors submit that holders of

Liens, Claims and Interests, if any, will be adequately protected by the availability of the
proceeds of the sale to satisfy their Liens, Claims and Interests.

**G.      Notice of the Proposed Sale Is Reasonable Under the Circumstances**

83.      The Debtors submit that the Sale Notice as set forth above, along with the

Publication Notice in The Wall Street Journal (National Edition) and The Globe & Mail

(National Edition), is appropriate and reasonably calculated to provide all interested parties with

timely and proper notice of the Bidding Procedures, the Auction (if necessary) and the Sale

Hearing.

**H.      The Assumption and Assignment of the Assumed Agreements Should Be
         Authorized**

84.      Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval,

may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C.

§ 365(a).  Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an

executory contract of a debtor.  This subsection provides:

>           (b) (1)      If there has been a default in an executory
> contract or unexpired lease of the debtor, the trustee may not
> assume such contract or lease unless, at the time of assumption of
> such contract or lease, the trustee -
>
>           (A)      cures, or provides adequate assurance that
> the trustee will promptly cure, such default . . . ;
>
>           (B)      compensates, or provides adequate
> assurance that the trustee will promptly compensate, a party
> other than the debtor to such contract or lease, for any
> actual pecuniary loss to such party resulting from such
> default; and
>
>           (C)      provides adequate assurance of future
> performance under such contract or lease.

11 U.S.C. § 365(b)(1).  Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part,

that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if --
>
> > (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
> >
> > (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

85.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

86.    Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

87.    To the extent any defaults exist under any Assumed Agreement, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment.  If necessary, the Debtors will submit facts prior to or at the Sale Hearing to show the financial credibility of the Purchaser or Successful Bidder and willingness and ability to perform under the Assumed Agreements. The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if

necessary, challenge the ability of the Purchaser to provide adequate assurance of future

performance under the Assumed Agreements, as required under section 365(b)(1)(C) of the

Bankruptcy Code.

88.     In addition, the Debtors submit that it is an exercise of their sound business

judgment to assume and assign the Assumed and Assigned Contracts to the Purchaser and to

assume the Assumed and Subleased Real Estate Leases and sublease the same to the Purchaser in

connection with the consummation of the Sale, and (i) the assumption, assignment, and sale of

Assumed and Assigned Contracts and (ii) the assumption of the Assumed and Subleased Real

Estate leases and the Sublease of the same to the Purchaser are in the best interests of the

Debtors, their estates, their creditors, and all parties in interest.  The Assumed and Assigned

Contracts being assigned to the Purchaser and Assumed and Subleased Real Estate Leases being

assumed by the Debtors and subleased to the Purchaser are an integral part of the Purchased

Assets being purchased by the Purchaser, and accordingly, such assumption, assignment, and

sale of Assumed and Assigned Contracts and such assumption and Sublease of the Assumed and

Subleased Real Estate Leases are reasonable and enhance the value of the Debtors' estates.  The

Court should therefore authorize the Debtors to assume and assign the Assumed and Assigned

Contracts and assume and sublease the Assumed and Subleased Real Estate Leases as set forth

herein.

**I.      Information Regarding the Debtors' Customers Is Confidential Commercial
Information and Should Be Filed Under Seal**

89.     The Debtors propose to file the lists of Customer Contracts to be assumed and

assigned under seal and to serve individualized notices of the assignment to the relevant

Counterparties.

90.     The relief requested by the Debtors is squarely authorized under the Bankruptcy

Code.  Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to

issue orders to protect a party's confidential, commercial or proprietary information:

> On request of a party in interest, the bankruptcy court shall . . .
> protect an entity with respect to a trade secret or confidential
> research, development, or commercial information. . . .

11 U.S.C. § 107(b).

91.    Furthermore, Bankruptcy Rule 9018 defines the procedure by which a party may

move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court
> may make any order which justice requires . . . to protect the estate
> or any entity in respect of a trade secret or other confidential
> research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018.

92.    This Court has defined "commercial information" in the context of section 107(b)

as follows:

> Commercial information is information which would result in 'an
> unfair advantage to competitors by providing them information as
> to the commercial operations of the debtor.'

In re Alterra Healthcare Corp., 353 B.R. 66, 75-76 (Bankr. D. Del. 2006) (citing In re Orion

Pictures Corp., 21 F.3d 24, 27-28 (2d Cir. 1994)).  This Court has also explained that section

107(b)'s exception to usual public disclosure mandated by section 107(a) is "intended to avoid

'affording an unfair advantage to competitors by providing them information as to the

commercial operations of the debtor.'"  In re MUMA Services Inc., 279 B.R. 478, 484 (Bankr.

D. Del. 2002) (citing In re Itel Corp., 17 B.R. 942, 944 (B.A.P. 9th Cir. 1982)).

93.    Since information related to the Customer Contracts is "commercial information"

within the ambit of section 107, the Court should enter an order permitting the Debtors to file

under seal all confidential information related to the Customer Contracts.

94.    The identities of Customer Counterparties constitute confidential commercial information because they represent a significant aspect of the value of the Business and the Assets. Access to the list of Customer Counterparties absent appropriate confidentiality restrictions would entail releasing confidential information of critical value not only to any prospective purchaser of the Customer Contracts but also to the Debtors' other businesses. Therefore, it is critical to the preservation of the value of the Debtors' estate that the Court allow for this confidential information to be filed under seal.

95.    As such, the Debtors respectfully submit that the Court should permit the Debtors to file their certificate of service listing the names and addresses of such parties under seal.

**J.    Waiver of Bankruptcy Rule 6006(f)(6) with Respect to the Assumed Agreements**

96.    Bankruptcy Rule 6006(f)(6) requires that an omnibus motion to reject, assume or assign multiple executory contracts or unexpired leases "be limited to no more than 100 executory contracts or unexpired leases." With regards to the Assumed Agreements, the Debtors request that the Court waive the provision in Bankruptcy Rule 6006(f)(6) limiting the number of executory contracts and unexpired leases that may be incorporated into one omnibus motion. Rule 6006(f)(6) seeks "to help the other parties to the contracts locate their information in the midst of the omnibus motion." 10 Collier on Bankruptcy ¶ 6006.05 (15th ed. 1999). Because the Debtors propose to send an individual notice to each Counterparty, the purpose of the rule will be satisfied without needlessly filing multiple motions with the Court.

**K.    Waiver of Automatic Ten-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)**

97.    Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for ten days after entry of the order. Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or

unexpired leases are automatically stayed for ten days after entry of the order.  The purpose of

Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to

request a stay pending appeal before the order can be implemented.  See Advisory Committee

Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

98.     Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee

Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day

stay period, commentators agree that the 10-day stay period should be eliminated to allow a sale

or other transaction to close immediately where there has been no objection to the procedure.

See generally 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection

is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay

may be reduced to the amount of time necessary to file such appeal.  Id.

99.     Pursuant to the Agreement, and because of the potentially diminishing value of

the Assets, the Debtors must close this sale promptly after all closing conditions have been met

or waived.  Thus, waiver of any applicable stays is appropriate in this circumstance.

## Notice

100.    Notice of the Motion has been given via first-class mail, facsimile, electronic

transmission, hand delivery or overnight mail to (i) counsel to the Purchaser; (ii) the U.S.

Trustee; (iii) the Monitor; (iv) counsel to the Committee; (v) counsel to the Bondholder Group;

and (vi) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule

2002.  The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

101.    No prior request for the relief sought herein has been made to this or any other

court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed orders attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: June 19 , 2009
Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley
Lisa M. Schweitzer
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*