UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Nortel Networks Inc., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br><br>(Jointly Administered)<br><br>Ref. Docket No. 931 |

**LIMITED OBJECTION OF MATLINPATTERSON GLOBAL ADVISERS LLC TO DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING DEBTORS' ENTRY INTO THE ASSET SALE AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES, (C) AUTHORIZING AND APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (D) APPROVING THE NOTICE PROCEDURES, (E) APPROVING THE ASSUMPTION AND ASSIGNMENT PROCEDURES, (F) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL AND (G) SETTING A DATE FOR THE SALE HEARING, AND (II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF DEBTORS' CDMA AND LTE BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND (C) THE ASSUMPTION AND SUBLEASE OF CERTAIN LEASES**

MatlinPatterson Global Advisers LLC ("MP"), as investment advisor with authority to act on behalf of its managed funds MatlinPatterson Global Opportunities Partners III L.P. and MatlinPatterson Global Opportunities Partners (Cayman) III L.P., by and through its undersigned counsel, submits this limited objection (the "Limited Objection") to the Debtors' Motion for Orders (I)(A) Authorizing Debtors' Entry into the Asset Sale Agreement (the "Sale Agreement"), (B) Authorizing and Approving the Bidding Procedures (the "Bidding Procedures"), (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of Debtors' CDMA and LTE Business Free and Clear of All Liens, Claims and Encumbrances, (B) the Assumption and Assignment of

NEWYORK\43222.3

Certain Contracts and (C) the Assumption and Sublease of Certain Leases (Docket No. 931) (the "Sale Motion").[1] In support of this Limited Objection, MP respectfully states as follows:

## PRELIMINARY STATEMENT

1. By approving the instant Sale Motion, this Court will do more than just approve bidding procedures; it will seal Nortel's fate by limiting the rights of current creditors (and other prospective bidders) to propose options less drastic than a wholesale liquidation of one of the world's telecommunications giants. The significance of that should not be overlooked and dictates that all parties should seek to preserve basic restructuring options, moving with caution rather than haste.

2. MP, a significant bondholder and creditor of the Debtors, is not trying to upend the Debtors' sales process. It has no objection to the sale process if (i) the Bidding Procedures make clear that the Debtors can consider all offers in their sales process, including restructuring offers predicated on a chapter 11 plan and (ii) the timeline for the process is extended for an additional 15 days to provide creditors, including MP, as well as other prospective bidders and interested parties, with sufficient time to diligence these assets and/or formulate competing proposals. MP's requested changes will make the Debtors' auction process more fair and open, which, in turn, will inure to the benefit of all creditors (and other constituents) who, at the end of the day, will be assured, after ample investigation, that they have allowed the historic heart of this business to be sold for the highest and best price or restructured in the most advantageous manner. It is generally understood that the assets to be sold by the Sale Motion are not themselves "wasting assets." Indeed, overall, it appears as if the Debtors are accumulating, not hemorrhaging cash, with $2.7 billion of cash as of June 6, 2009.[2] Accordingly, there is no

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sale Motion.
[2] See Fifteenth Report of the Monitor, dated June 25, 2009, ¶ 13 (attached hereto as Exhibit A).

justification for a sale process which permits a mere **22** days from approval of the Bidding Procedures for competing bids to come in and **3** days for creditors to review and consider such bids, and there can be no justification to restrict creditors who already have a vested interest in the business from considering other restructuring options that may be materially superior to the current proposal.

3. Moreover, the Debtors' proposed Bidding Procedures go too far by undermining the fundamental right of creditors to reorganize and retain core elements of a going concern (and any attendant upside) in return for equitizing their debt and/or contributing new capital. The Debtors have proposed a sale of their businesses as the best way to maximize value in these cases. While, ultimately, the Debtors may well be right, there is no way creditors can (or should be forced to) make that determination today. It may be that MP and other creditors will support the proposed sale after the Auction is completed. Until then, the right of creditors to elect to keep the Nortel business and run it for their own benefit *if they choose to* should be preserved. MP believes other creditors may feel similarly or, certainly, should be given the option to consider proposals that MP and other creditors may proffer.

4. Alternatively, if the Bidding Procedures are not modified, MP requests that the Court temporarily delay any ruling on the Bidding Procedures for a short time to enable the Debtors' major creditor constituencies to consider whether the sales process proposed by the Debtors is the best path to maximizing value at all.

## BACKGROUND

5. On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. The Nortel companies consist of (a) Nortel Networks Corporation, a Canadian corporation ("NNC"), the ultimate parent company; (b) Nortel Networks Limited, NNC's principal Canadian operating subsidiary ("NNL"); (c) Nortel Networks Inc., a Delaware corporation and the principal U.S. operating subsidiary ("NNI"); and (d) Nortel Networks Capital Corporation, a Delaware corporation and a finance company with public debt. As of September 30, 2008, NNC had consolidated assets of $11.6 billion and consolidated liabilities of approximately $11.8 billion. As of the same date, NNI had assets of $9 billion and liabilities of approximately $3.2 billion, excluding liabilities relating to NNI's guarantee of some or all of the Nortel companies' approximately $4.2 billion of unsecured public debt.

7. Among other debt, Nortel had $4.175 billion of bond debt outstanding, in the aggregate, as of December 31, 2008. MP holds approximately $400 million in principal amount of the total aggregate bond debt.

8. Succinctly put, Nortel is a telecommunications conglomerate with a highly technical and complicated corporate structure and product line. In his "first day" affidavit in respect of the Debtors, John Doolittle, Nortel's Vice President, aptly stated, "[t]he operation of the Nortel Companies' business is a highly complex integrated structure designed to accommodate the global nature of their business." Doolittle Affidavit at ¶ 71. As a result, at the outset of these cases, the Debtors told this Court that they needed time to consider all of their restructuring alternatives.

9. On June 19, 2009, the Debtors filed the Sale Motion seeking, among other things, authorization to enter into an asset purchase agreement with Nokia Siemens Networks B.V. ("Nokia Siemens") for the sale of Nortel's Code Division Multiple Access ("CDMA") and Long Term Evolution ("LTE") businesses for a purchase price of $650 million, less various purchase-

price adjustments, pursuant to the Bidding Procedures. The CDMA and LTE businesses comprise key components of Nortel's profitable Carrier Division, represent nearly a quarter of Nortel's total revenue and a major portion of Nortel's total profitability. Whereas any chapter 11 plan would necessarily reorganize around these businesses, the Sale Motion makes clear that the Debtors have instead decided to use these chapter 11 cases to liquidate their assets through discrete 363 asset sales. No information is provided in the Sale Motion explaining the Debtors' determination that this sale is better than a chapter 11 plan and, to date, MP has not had the opportunity to assess or review any evidence to support any such conclusion. Indeed, the Debtors have been making money in these chapter 11 cases, not losing it. That is no small feat in this depressed economic market and signals that Nortel's core businesses and platforms are strong, may have a future and certainly deserve more consideration and the benefit of the doubt.

10. Simultaneously with the Sale Motion, the Debtors sought an expedited hearing for approval of the Bidding Procedures. Among other things, the Bidding Procedures provide:

(a) July 21, 2009 as the deadline for the submission of competing bids – 22 days from the targeted approval date of the procedures;

(b) July 24, 2009 (i.e., 3 days after the bid deadline) as the date for any auction, if competing, Qualified Bids are submitted,

(c) that to be a Qualified Bid, a competing bid must be on terms and conditions substantially similar to the Sale Agreement (without specific reference to competing restructuring alternatives).

**ARGUMENT**

11. The paramount goal of any proposed auction process is to maximize the proceeds received by the estate. See e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997). While courts typically defer to the debtor's business judgment in reviewing proposed § 363 transactions, a sale of the Debtors' principal assets compels a heightened scrutiny of the

debtor's decision-making process. In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc., 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987).

12. Bidding procedures, in turn, are supposed to provide a vehicle to enhance the bid process and to ensure that a fair and open sales process is conducted in order to maximize value. See In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair sale designed to maximize value for the estate."); In re Cormier, 382 B.R. 377, 388 (Bankr. W.D. Mich. 2008) (noting that the courts should be mindful to "strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets."). Therefore, it is axiomatic that bidding procedures that fail to promote, enhance and encourage bidding should not be approved. In re S.N.A Nut Co., 186 B.R. 98, 104 (B.R. N.D. Ill. 1995); In re America West Airlines, Inc., 166 B.R. 908, 913 (Bankr. D. Ariz. 1994); In re Integrated Resources, Inc., 147 B.R. 650, 663 (S.D.N.Y. 1992); In re Hupp Industries, Inc., 140 B.R. 191, 196 (Bankr. N.D.Ohio 1992).

13. In this case, the restrictive conditions imposed by the Debtors' Bidding Procedures may prevent, rather than promote, perfectly valid competing proposals. The Bidding Procedures restrict competing bids to only 363 asset sales and contain an overly aggressive and restrictive timeline that renders it virtually impossible for any potential bidders to submit a competing bid. These restrictions serve only to permit Nokia/Siemens to effectively "lock down" these valuable core assets. Accordingly, the Bidding Procedures, as currently proposed, should not be approved. MP's requested changes to the Bidding Procedures are extremely limited and set forth on Exhibit B.

## The Bidding Procedures Improperly Proscribe A
## Competing Bid Predicated on a Chapter 11 Plan

14. The Bidding Procedures, if approved in their current form, would turn bankruptcy norms on their head. Specifically, the Bidding Procedures require that to be a "Qualified Bid" and participate in the Debtors' auction process, bidders must submit only a "sale agreement" on "terms and conditions substantially as set forth in the [Sale] Agreement." Therefore, by its terms, the Bidding Procedures would preclude creditors, the effective "owners" of the Debtors' assets, from suggesting a restructuring agreement to keep their own assets. There is no justification to support this unnecessary restriction.

15. Simply put, in any bankruptcy case in which the Debtors lack the ability to pay creditors in full, creditors have two options – to equitize their claims under a chapter 11 plan, thereby taking and running (and funding, if needed) their business as a going concern, or to sell such assets in a 363 or similar process. These Bidding Procedures fail to pay sufficient attention to the former right. MP learned only 7 days ago that the Debtors intend to sell all of their assets, rather than propose a plan, and that in such process the rights to evaluate individual sales and propose restructuring alternatives may be cut off. Accordingly, it is grossly unfair to require MP to give up its right to operate this business without the benefit of any due diligence or discussion or the ability to propose viable, funded and superior alternatives captured within a restructuring plan.

16. MP has begun preliminary discussions with creditors in these cases, has signed a confidentiality agreement, is commencing due diligence, and is considering supporting a chapter 11 plan, in lieu of the currently proposed sale. Were it to determine to do so, MP should be permitted to submit a restructuring agreement predicated on a chapter 11 plan under the Bidding Procedures. The Debtors are, of course, free to determine, in accordance with the Bidding

Procedures and in consultation with their creditor constituencies, that such an offer is not the "highest and best" offer. But their Bidding Procedures should not prevent the offer out of hand.

**The Sale Timeline is Wholly Inappropriate
For the Sale of a Company of this Size and Complexity**

17.   Similarly, the expedited nature of the sale timeline does not allow adequate time for potential bidders to prepare and submit bids and will have a chilling effect on the bidding process. There are merely 22 days between the Bidding Procedures hearing and the bid deadline! It is unlikely that a bidder can complete due diligence on a company of Nortel's size and in locations throughout the world, meet with management, understand the status of the complicated technology involved, and develop a bid in such a short time (considering not only price, but assets to be included or excluded and the best way to structure such a transaction). To prevent this sale from becoming a fait accompli, the sale process must be extended by at least 15 days. This is especially important given the Bidding Procedures require that bids not contain any due diligence or financing contingencies.

18.   Significantly, extending the sales process for two weeks will harm no one. The Debtors are not a typical debtor that is running of out cash imminently, nor is it believed that the assets to be sold are by themselves "wasting." To the contrary, these Debtors have the financial wherewithal to wait out this market and to achieve greater value for these businesses. The Debtors' cash and cash equivalents increased from $2.4 billion as of December 31, 2008 to $2.7 billion as of June 6, 2009 – an over $220 million net increase. See Fifteenth Report of the Monitor, ¶ 13. Moreover, there is no evidence that they will be worth less if the sales process is extended for 15 days.

19.   The Debtors only stated reason for selling their key businesses in such a rushed manner is that Nokia/Siemens insisted on this timeframe. To be sure, Nokia/Siemens is doing all

it can to get these assets and MP takes no issue with that. However, Nokia/Siemens' desired provisions should not be approved by this Court where, as here, doing so could render the process potentially meaningless. Rather, they should be balanced against the magnitude of the harm that could befall creditors standing to receive a substantially discounted recovery on their claims (or denied the option to reorganize around their assets) should this sale goes forward as proposed. Again, MP is only requesting a short extension of the sales process to get up to speed and permit other like-minded creditors and bidders to do the same. The bidding incentives payable to Nokia/Siemens under the Sale Agreement should more than compensate Nokia/Siemens for the proposed two-week extension.

20. That the effect of the proposed sale process and timeline would chill bidding is evident from the Fourteenth Report of the Monitor, dated June 23, 2009 (a copy of which is attached hereto as <u>Exhibit C</u>) in support of the sale. In that report, the Monitor states, in pertinent part:

> The Monitor recognizes the expeditious nature of the proposed sale process. However, the Monitor is advised that given the nature of the Business and the consolidation occurring in the global market, there are likely to be a limited number of parties interested in acquiring the Business.

Fourteenth Monitor Report of the Monitor, ¶ 51. Taken literally, this report suggests that the Debtors have already determined that Nokia/Siemens will get these assets and have little hope for the auction process to increase value. Unfortunately, if the Debtors are permitted to proceed under the currently proposed timing, they will effectively guarantee that result. More time is needed, and creditors deserve the option to consider reorganizing and retaining these businesses on a slightly extended timeline.

21. In sum, MP is not prepared to give up on its investment in Nortel or in the potential of this company. It believes there may be more value to be achieved here and that other

creditors, properly noticed, will feel the same. All it asks for is a reasonable opportunity to investigate the Debtors' businesses and, if appropriate, the ability for it or other bidders to propose a restructuring transaction predicated on a chapter 11 plan rather than what may be, in effect, an immediate sale. In that way, the Debtors can have a real and fair auction process, conducted within the confines of what (at the end of the day) is a restructuring process under the Bankruptcy Code, that is designed to maximize value in these cases.

[Remainder of Page Intentionally Left Blank]

## CONCLUSION

WHEREFORE, for the reasons stated above, MP respectfully request that this Court (a) enter an order amending the Bidding Procedures to (i) extend the bidding process by 15 days (along with corresponding amendments to the timeline in the Sale Agreement, including under section 9.1(a)(iv)) and (ii) permit MP to submit and the Debtors to consider a competing bid predicated on a chapter 11 plan as a Qualified Bid or, in the alternative, (b) postpone approval of the Bidding Procedures for 30 days to permit MP and the Debtors' major creditor constituencies to further consider this sales process and (c) grant such other and further relief as is just and appropriate.

Date: June 26, 2009

COZEN O'CONNOR

_/s/ Mark E. Felger_
Mark E. Felger (No. 3919)
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000
Facsimile: (302) 295-2013

- and –

BRACEWELL & GIULIANI LLP
Jennifer Feldsher, Esq.
1177 Avenue of the Americas
New York, NY 10036-2714
Telephone: (212) 508-6137
Facsimile: (212) 938-3837

*Attorneys for MatlinPatterson Global Advisers LLC*