**EXHIBIT A**

Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")

FIFTEENTH REPORT OF THE MONITOR
DATED JUNE 25, 2009

## INTRODUCTION

1.  On January 14, 2009, Nortel Networks Corporation ("NNC" and collectively with all
    its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel
    Networks Technology Corporation ("NNTC"), Nortel Networks International
    Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC")
    (collectively the "Applicants") filed for and obtained protection under the
    *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this
    Honourable Court dated January 14, 2009, as amended and restated (the "Initial
    Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants
    (the "Monitor") in the CCAA proceeding. The stay of proceedings was extended to
    July 30, 2009, by this Honourable Court in its Order dated April 28, 2009.

2.  Nortel concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy
    Code (the "Code") in the U.S. Court on January 14, 2009, for Nortel Networks Inc.
    ("NNI") and certain of its U.S. subsidiaries (the "U.S. Debtors").

3. Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court") on January 15, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "U.K. Administrators").

4. On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

5. Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court for NNSA.

**PURPOSE**

6. The purpose of this Fifteenth report of the Monitor (the "Fifteenth Report") is to provide this Honourable Court with an update in respect of the following:

   a) Nortel's consolidated cash position and liquidity as at June 6, 2009;

   b) actual receipts and disbursements from April 12, 2009 to June 6, 2009;

c) background and current status of GSPA and other intercompany transactions;

d) the Interim Funding and Settlement Agreement among the Applicants, U.S. Debtors and EMEA Debtors;

e) cash flow forecast for the period June 7, 2009 to September 30, 2009;

f) amendments to Export Development Canada ("EDC") Facility and EDC Charge;

g) update on other insolvency proceedings; and

h) update on Nortel's restructuring efforts.

**TERMS OF REFERENCE**

7. In preparing this Fifteenth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company, and discussions with management of Nortel. EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Fifteenth Report.

8. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

9. Capitalized terms not defined in this Fifteenth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report or previous Reports of the Monitor.

**GENERAL BACKGROUND**

10. Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the

3

globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

11. Nortel conducts its global business through four reportable business unit segments, Carrier Networks ("CN"), Enterprise Solutions ("ES"), Metro Ethernet Networks ("MEN") and LG Nortel Co. Ltd. ("LGN"). The revenue and assets of each of the business units, except for LGN, is distributed among the multiple Nortel legal entities and joint ventures around the world.

12. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

4

## CONSOLIDATED CASH POSITION AND LIQUIDITY AS AT JUNE 6, 2009

13. At June 6, 2009, Nortel's estimated consolidated cash balance was approximately $2.7 billion. Nortel's consolidated cash balance is held globally in various Nortel entities and joint ventures. The following is an overview of Nortel's consolidated cash position as at June 6, 2009:

| Region | Gross Cash | Restricted | Unavailable Cash - JVs and Other Items (see below) | Available Cash |
|---|---|---|---|---|
| NNL | 142 | (29) | (5) | 108 |
| Other Canada | 46 | (29) | - | 19 |
| NNI | 775 | (19) | - | 756 |
| NNI - Reserve MMF (ST/LT) | 25 | - | (25) | - |
| NGS | 45 | - | (45) | - |
| Other US | 2 | - | - | 2 |
| North America | 1,037 | (77) | (75) | 885 |
| NN UK Limited | 332 | (26) | - | 306 |
| Other EMEA Filed Entities | 398 | (2) | - | 396 |
| JV - Netas | 66 | - | (66) | - |
| EMEA non-filed entities | 24 | - | - | 24 |
| UK/Europe | 820 | (28) | (66) | 726 |
| Greater China | 197 | (4) | - | 193 |
| Other ASIA PAC (excl JVs) | 189 | - | - | 189 |
| LG Nortel | 293 | - | (293) | - |
| Other JVs | 33 | - | (33) | - |
| ASIA | 712 | (4) | (326) | 382 |
| CALA | 97 | - | - | 97 |
| Total Treasury Cash | 2,666 | (109) | (467) | 2,090 |

14. As at June 6, 2009, North America had cash available for operations and post–filing inter-company settlements of approximately $885 million compared to a gross cash position of approximately $1 billion. Of this amount, approximately $127 million is held by Canadian entities and approximately $758 million is held by U.S. entities.

5

15. None of the Applicants' Restricted Cash and Unavailable Cash is readily available to them. Restricted Cash relates primarily to: (i) $17 million of cash collateral posted by Nortel with respect to non-EDC performance bond and letter of credit facilities, (ii) $10 million related to cash collateral required to issue EDC performance bonds in exotic foreign currencies, (iii) $10 million held in escrow to the benefit of the insurer related to the Global Class Action, (iv) $8 million held for the benefit of the Health and Welfare Trust (the "H&WT"), and (v) $11 million held in the D&O Trust as described in the Pre-Filing Report. Unavailable Cash consists of $5 million initially deposited with financial institutions for future potential letter of credit requirements. Nortel is currently working with the financial institutions to have these funds released.

16. NNI's Restricted Cash includes the proceeds from the sale of the Layer 4-7 Business of $18 million being held in escrow by JP Morgan until an agreement is reached regarding allocation of these proceeds to various Nortel legal entities, including NNL. NNI's Unavailable Cash as at June 6, 2009 includes $25 million related to the Money Market Reserve Primary Fund (the "MMF"). Since filing, an amount of $40 million has been received from the MMF and another $6 million is expected to be received before the end of 2009.

17. NGS, a U.S. non-debtor entity, has cash of approximately $45 million for use in its own operations and for settlement of inter-company transactions.

18. The U.K. Administrators had cash available for operations and post-filing inter-company settlements for NNUK and the other EMEA Debtors, of approximately $702 million. The EMEA non-filed entities have available cash of approximately $24 million which is expected to be used primarily to fund their in-country operations and inter-company settlements. At present, this cash is considered unavailable to provide funding elsewhere in the Nortel group.

6

19. NETAS, a joint venture in which Nortel owns a 53% interest, has approximately $66 million of cash of which $35 million represents Nortel's proportionate share. Nortel believes these funds will continue to be used to fund NETAS's operations and will be difficult to repatriate as approval of the other joint venture partners would be required.

20. Nortel entities in the APAC region have approximately $382 million of cash available for operations and inter-company settlements. As a result of the regulatory regime in the People's Republic of China, the funds in Greater China of approximately $193 million are generally only available to fund operations within China and inter-company settlements. LGN and other joint ventures Nortel participates in, hold approximately $326 million of cash of which $167 million represents Nortel's proportional share. Repatriation of these funds requires approval of the respective joint venture partners.

21. Nortel's CALA region entities have approximately $97 million of cash generally available to fund their in-country operations and inter-company settlements. At present, this cash is considered unavailable to provide funding to other Nortel entities.

**ACTUAL RECEIPTS AND DISBURSEMENTS FROM APRIL 12, 2009 TO JUNE 6, 2009**

22. The Applicants' actual consolidated net cash outflow for the period from April 12 to June 6, 2009, was $76.6 million. A summary of the actual receipts and disbursements as compared to the forecast filed with the Eighth Report of the Monitor dated April 24, 2009 is attached at Appendix A.

23. Actual net cash outflow exceeded the forecast by $46.5 million. Significant items contributing to the variance were as follows:

   a) a positive permanent variance of $41.7 million with respect to the collection of accounts receivable due to a combination of the following factors:

7

     i. a positive permanent variance of $37 million due to higher than expected billings and the corresponding favourable impact on collections, including receipts from Hitachi related to the LTE licensing agreement for a KDDI project in Japan; and

     ii. a positive permanent variance of approximately $5.0 million due to the strengthening of the Canadian dollar versus the U.S. dollar by approximately 14 percent over the period;

b) a negative permanent variance of $4.8 million in other receipts primarily as the result of a projected release of $5.0 million from unused bonding facilities that did not occur. Due to increased volatility in the currency markets this projected collateral release was instead utilized to provide additional collateral for performance bonds issued in exotic currencies. Accordingly, Unavailable Cash decreased and Restricted Cash increased as discussed in paragraph 24 and 25;

c) a negative net timing variance of inter-company receipts and disbursements of approximately $84.4 million primarily as a result of a negative timing variance of $79.0 million as projected transfer pricing payments from NNI were not made pending conclusion of negotiations regarding an interim funding arrangement;

d) a negative permanent variance relating to payroll of $9.6 million due to the following:

     i. a negative permanent variance as reductions in the workforce tracked behind the assumptions used in the forecast; and

     ii. a negative permanent variance relating to an appreciation in the Canadian dollar resulted in higher payroll costs in U.S. dollar terms;

8

e) a positive permanent variance of $12.9 million as inventory disbursements were lower than projected due to reductions in the purchase volumes for certain product lines; and

f) a negative permanent variance of $4.4 million in Non-Inventory Purchases primarily as a result of the strengthening of the Canadian dollar relative to the U.S. dollar.

24. Unavailable Cash decreased by approximately $0.9 million primarily as a result of the $5.9 million that was re-classified from Unavailable Cash to Restricted Cash due to increased collateral requirements on performance bonds issued in exotic currencies. This was partially offset by the projected release of $5.0 million from unused bonding facilities to Available Cash that did not occur as discussed in paragraph 23(b) above.

25. Restricted Cash increased by $12.1 million primarily as a result of the following:

a) $5.9 million related to the additional collateral needed on the performance bonds issued in exotic currencies as described in paragraph 24 above;

b) $4.2 million increase in the balance of the H&WT; and

c) the balance of the increase was due to an appreciation in the Canadian dollar relative to the U.S. dollar which had a positive impact on the Canadian dollar denominated Restricted Cash balances.

26. Post-filing, the Applicants have not advanced any loans to other non-Applicant Nortel entities.

## BACKGROUND AND CURRENT STATUS OF GSPA AND OTHER INTERCOMPANY TRANSACTIONS

27. As previously discussed in the Pre-Filing Report and the Monitor's First and Eighth Reports, Nortel conducts its business through global business units resulting in a high

degree of interdependence among the various legal entities in different countries around the world.

28. A significant factor relating to this interdependence is the transfer pricing methodology employed by the Nortel entities pursuant to:

   a) the Master Research and Development Agreement entered into on December 22, 2004 and as subsequently amended (the "Master R&D Agreement"), which incorporates a transfer pricing arrangement; and

   b) certain distribution agreements between one or more Nortel entities (the "Distribution Agreements" and together with the Master R&D Agreement, the "TPA").

29. Nortel has, for a number of years, used the TPA as a methodology for allocating profits and losses, and certain costs among the relevant entities that incur significant R&D cost and corporate sales, marketing and administrative costs on behalf of the Nortel entities globally. This group of companies is referred to as the residual profit share ("RPS") entities.

30. The RPS entities include:

   a) in Canada: NNL;

   b) in the U.S.: NNI; and

   c) in EMEA: NNUK, Nortel Networks (Ireland) Limited ("NNIR") and NNSA.

31. A number of the remaining members of the Nortel group are referred to as Limited Risk Entities ("LREs") that operate under the Distribution Agreements.

10

*Transfer Pricing Arrangement*

32. The Master R&D Agreement and Distribution Agreements provide for the sharing of intellectual property rights and the related benefits thereto through the following methodology:

*Initial Mark-up on Inventory*

a) inventory is purchased centrally from third party suppliers by one of four designated transaction control centres ("TCC") and then is invoiced to the LREs with a mark-up on cost. At the end of each quarter, after the operating profit for each legal entity is calculated, routine returns are calculated for both the LREs and the RPS entities.

*LREs*

b) the LREs distribute products and provide services to customers, pursuant to Distribution Agreements, in return for a small consistent profit margin on sales. These entities have a limited amount of risk and do not participate significantly in R&D activities.

*RPS*

c) the RPS entities calculate a normal return as a profit margin on sales and "cost plus" on sales, marketing, general administration and operating costs incurred. In addition to this return, the RPS entities participate in the redistribution of profits or losses from the rest of the group, in part, to compensate them for corporate costs and research and development expenses incurred on behalf of the Nortel Group globally.

11

*Payments under the TPA*

33. Amounts owing pursuant to the TPA are calculated and recorded in the relevant Nortel entities' accounting records.

34. NNL's proportionate share of global revenues and customer base is significantly smaller than the proportionate share of the global corporate and R&D costs incurred in Canada. As a result, NNL has historically been a net recipient of significant funding under the TPA.

35. Since the Filing Date, the TPA calculations for the fourth quarter of 2008 and the first quarter of 2009 have been completed; however, payments have not been made by the Non-Filed Entities, EMEA Debtors or U.S. Debtors apart from a $30 million payment made by NNI to NNL in January 2009 (the "January Payment").

*Current Status of GSPA and Other Intercompany Transactions*

36. Since the Filing Date, Nortel entities have continued to purchase goods and services from one another on a basis consistent with the operation of the business prior to these proceedings. Post-filing transactions between the U.S. Debtors and the Applicants are pursuant to court orders entered in the Canadian Proceedings (e.g. the Initial Order) and the U.S. proceedings and/or in accordance with the Code (together the "Trading Orders"). Trade between the EMEA Debtors and the Applicants is pursuant to the Nortel Group Supplier Protocol Agreement ("GSPA"). The GSPA has been continually extended by the parties, substantially in the same form as the initial GSPA, since the Filing Date. The current GSPA expires on July 9, 2009.

37. The purpose of the Trading Orders and GSPA is to ensure that goods and services purchased after the Filing Date are paid in full without any set off, deduction, withholding, counter-claim or payment netting with respect to amounts owed by the parties prior to the Filing Date. In addition, the Trading Orders and GSPA set out the requirement for the Applicants to secure any unpaid amount owing for post-filing

12

purchases to the U.S. Debtors or EMEA Debtors by way of a charge on the assets of the Applicants (the "Inter-Company Charge").

38. The Inter-Company Charge, as described in the Initial Order, is for the purpose of securing payment of all post-filing inter-company loans and other transactions between the Applicants and the U.S. Debtors and the EMEA Debtors. The Inter-Company Charge ranks sixth behind the Administration Charge.

39. On June 17, 2009, the NNSA Administrator acceded to the sixth and seventh extensions of the GSPA.

40. The Applicants are seeking Court approval of the fifth, sixth and seventh extensions of the GSPA. The seventh extension of the GSPA expires on July 9, 2009.

*Applicants' Cash Needs*

41. The Applicants continue to incur significant R&D and corporate costs on behalf of all Nortel entitles around the world. These expenses are incurred by the Applicants in order to preserve the enterprise value of Nortel's businesses and coordinate the global restructuring for the benefit of all stakeholders. With the exception of the January Payment, the Applicants have not received compensation from Nortel entities since the Filing Date to help fund these expenses.

42. The Applicants' cash flow forecast for the period June 7, 2009 to September 30, 2009 (respectively, the "June 7 Forecast" and the "Forecast Period") is attached as Appendix B to this Fifteenth Report. The June 7 Forecast indicates the Applicants will experience a negative cash flow of $23 million during the Forecast Period, including net sale proceeds of approximately $86 million from the sale of lands and buildings located in Calgary, Alberta ("Westwinds") that was previously approved by this Honourable Court and receipts on account of NNI Interim Obligations (as defined later in this Fifteenth Report) from NNI of $157 million. Excluding these items, the

Applicants are forecast to incur a negative cash flow for the Forecast Period of approximately $266 million.

43. It is the Monitor's continuing view that receipt by NNL of $157 million on account of NNI Interim Obligations and asset sales proceeds of $86 million from the Westwinds sale are necessary in order for the Applicants to have adequate resources to fund operations through the forecast period ended September 30, 2009. Further negotiations between NNL and the U.S. Debtors will be necessary in order to address NNL liquidity needs for periods subsequent to September 30, 2009.

44. The Applicants, U.S. Debtors, and certain of the EMEA entities, through their U.K. Administrators, have recently negotiated an agreement, (the "Interim Funding and Settlement Agreement" or "IFSA") to address the Applicants' liquidity requirements to September 30, 2009 and settle various purported economic and legal rights and obligations between them pursuant to the TPA. A summary of certain terms of the agreement is outlined in the following section entitled "Interim Funding and Settlement Agreement" and a copy of the IFSA is attached as Appendix C to this report.

45. The Applicants and U.S Debtors are seeking approval of the IFSA at a joint hearing of this Honourable Court and the U.S. Bankruptcy Court.

## INTERIM FUNDING AND SETTLEMENT AGREEMENT

46. The IFSA represents the successful culmination of a lengthy and complicated set of negotiations between the Applicants, U.S. Debtors, EMEA Debtors, Monitor, U.K. Administrators, UCC and *Ad Hoc* Bondholders' Committee in addressing certain issues, including:

    a) forecast liquidity requirements of the Applicants;

b) enabling NNI, on behalf of itself and the other U.S. Debtors, to settle any claims of NNL corporate overhead and R&D costs, whether pursuant to the TPA or otherwise, incurred by NNL on behalf of the U.S. Debtors during the period from the Filing Date through and including September 30, 2009 (respectively, the "Canada/U.S. Interim Period" and the "NNI Interim Obligations");

c) enabling the EMEA Debtors to settle among themselves, and with the Canadian and U.S. Debtors, amounts payable and anticipated to become payable as TPA payments, for the period from the Filing Date to December 31, 2009 (the "EMEA Interim Period");

d) providing for the termination of intellectual property licenses and rights granted by NNL to the U.S. and EMEA Debtors pursuant to the provisions of the Master R&D Agreement for purposes of facilitating specified potential asset sales; and

e) to further facilitate potential asset sales, by agreeing that the execution of definitive documentation with a purchaser by each of the Debtors shall not be conditioned upon the Debtors reaching an agreement with respect to the allocation of the proceeds from such a sale.

47. The significant terms of the agreement include the following:

*NNI Funding and Settlement*

a) NNI shall pay to NNL $157 million (the "Total Payment") payable in five equal instalments of $31.4 million. The sum of the Total Payment and the January Payment, being $187 million, is intended to be full and final settlement of any and all NNI Interim Obligations;

b) the Total Payment is subject to the following limitations/conditions:

15

i.   the first $131 million of the Total Payment shall be paid on an indefeasible and permanent basis;

ii.  if it is determined that the NNI Interim Obligations are less than $187 million, then the amount by which the NNI Interim Obligations are less than $187 million, to a maximum of $26 million, shall be repaid by NNL to NNI on October 30, 2009 (the "Contingent Payment") with interest thereon as provided for in the IFSA;

iii. The Contingent Payment and interest, if any, arising thereon is to be secured by a charge (the "Excess Funding Charge") on the assets of the Applicants that ranks *pari passu* with the EDC Charge, or in the event the EDC Charge is extinguished the Excess Interim Funding Charge shall be a second ranking charge in the CCAA proceedings; and

iv.  to the extent that NNL actually receives TPA payments from the Nortel entities which are not party to the IFSA in excess of the funds forecast to be received from these entities during the Canada/US Interim Period, and it is determined the amount of the NNI Interim Obligation is less than $161 million, NNL shall pay NNI a *pro rata* amount of these excess receipts, to a maximum of $30 million;

c)  The Total Payment is to be used for working capital and other purposes as reflected in the Applicants' rolling 13-week cash flow forecasts. To the extent NNL seeks to use the funds from the Total Payment for other purposes, NNL must first obtain the consent for such use from NNI, UCC, and the *Ad Hoc* Bondholders' Committee. In addition to providing these parties the 13-week cash flow forecasts on a weekly basis, NNL must provide a cash flow schedule showing payments for the preceding monthly period and the use of proceeds from the Total Payment, no later than the tenth day following the last

16

day of each month commencing with the month ending June 2009 and ending with the cash flow schedule for September 2009;

d) The sum of the Total Payment and the January Payment ($187 million) constitutes a full and final settlement of the NNI Interim Obligations and represents the maximum payment the U.S. Debtors could owe with respect to the NNI Interim Obligations and the maximum administrative claim that any of the Applicants or EMEA Debtors may have or could assert against the U.S. Debtors in the Chapter 11 Proceedings or any other proceedings with respect to the NNI Interim Obligations; and

e) The Applicants agree to indemnify each U.S. Debtor from and against any and all actions resulting from a claim arising from Transfer Pricing Payments (as defined in the IFSA) in respect of the Canada/US Interim Period;

*EMEA Debtors Payments and Settlement*

f) NNUK is authorized to seek payment for its own account from other EMEA Debtors of TPA payments due or becoming due during the EMEA Interim Period, which would have otherwise been due to or administered by NNL. The EMEA Debtors appoint NNUK as their agent to administer the collection and *pro rata* distribution of the Transfer Pricing Payments received;

g) NNL shall make two payments to NNUK, in the amount of $10 million each (the "Shortfall Payments"), payable out of the proceeds from certain asset sales allocated to and received by NNL. The obligation of NNL to make the Shortfall Payments and the triggering of the Shortfall Charge (as defined below) only occur upon the execution of transaction documents in respect of a "Subject Transaction" (as defined in the IFSA);

17

h) The Shortfall Payments are to be secured by a charge (the "Shortfall Charge") on the Applicants' assets that ranks *pari passu* with the Inter-Company Charge as defined in the Initial Order;

i) The authorization provided to NNUK and the payments to be made to NNUK shall constitute a full and final settlement of any and all TPA amounts payable and that could be payable between the EMEA Debtors inter se and between an EMEA Debtor, on the one hand, and a Canadian Debtor or U.S. Debtor, on the other hand, for the EMEA Interim Period;

j) The timing of any payments which may be made to NNI under the repayment provision described in paragraph 47(b) above, and the payments to be made by NNL to NNUK as described in paragraph 47(f) above, are subject to a review of NNL's liquidity position, as reflected in NNL's then current 13-week cash flow forecast, and Monitor's determination, in its sole judgement, after consultation with either the UCC and the *Ad Hoc* Bondholders' Committee, or the Joint Administrators, respectively, that the making of such payments would not materially and adversely impact the liquidity position of NNL;

*General Settlement Provisions*

k) The U.S. Debtors and EMEA Debtors agree, that in the event of a sale of any material assets of any of the Canadian Debtors or U.S. Debtors, and in consideration of a right to an allocation of a portion of the proceeds from such a sale, they will enter into an agreement providing for the termination of the IP licenses they hold with respect to the IP used in or related to the business or assets being sold. With respect to the EMEA Debtors, the license termination provisions are limited to certain proposed asset sales previously communicated to the Joint Administrators;

18

l)  Each of the Canadian Debtors, U.S. Debtors, and EMEA Debtors agree their execution of definitive documentation with a purchaser of material assets of any of the Debtors (a "Selling Debtor") shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds;

m)  In the absence of an agreement regarding the allocation of any sales proceeds, the Debtors agree that the proceeds shall be deposited in an escrow account, and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers pursuant to the dispute resolution protocol referred to in paragraph 47 (n) below;

n)  The Debtors shall negotiate in good faith and attempt to reach an agreement on a sample form of agreement to effectuate the termination of IP licenses as contemplated in paragraph 47 (k) above, and an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation;

o)  The Interim Funding and Settlement Agreement shall not constitute an amendment, modification or waiver of rights of any party (i) under any other agreement, including, without limitation, the GSPAs and the TPA (except as expressly set forth in Sections 3 and 8 of the IFSA), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the TPA or any offset arising therefrom or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from transfer pricing payments pursuant to the TPA or any offset arising therefrom or otherwise; provided, however, that the Debtors waive any and all rights to object to or otherwise

19

seek to amend or revisit (A) any payments made pursuant to the IFSA, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights under certain provisions of the IFSA against NNL, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL under certain provisions of the IFSA, and (B) the January Payment; and

p) In addition to court approval of the IFSA in both the Canadian Court and the U.S Court, the coming into effect of the IFSA is also conditioned on the following:

    i. Canadian Court and U.S. Court approval of proposed amendments to the Cross-Border Insolvency Protocol; and

    ii. The UK Court giving a direction that the U.K. Administrators be at liberty to enter into this agreement, which direction has since been given.

48. The Applicants have indicated to the Monitor that they are engaged in ongoing discussions with respect to the proposed amendments to the Cross-Border Insolvency Protocol. The Monitor will file a report with respect to the proposed amendments upon completion of the discussions.

## CASH FLOW FORECAST FOR THE PERIOD JUNE 7, 2009 TO SEPTEMBER 30, 2009

49. Nortel, with the assistance of the Monitor, has prepared an updated 17-week cash flow forecast for the period June 7 to September 30, 2009. A copy of the June 7 Forecast is attached as Appendix B.

20

50. The cash flow forecast estimates the Applicants will have total receipts of $713 million and total disbursements of $736 million resulting in a net cash outflow of $23 million.

51. During the forecast period it is assumed NNL does not make any additional draws on the NNI Loan beyond the $75 million drawn prior to February 1, 2009.

52. At June 6, 2009, the Applicants have Available Cash balances of approximately $127 million, which excludes Restricted Cash and Unavailable Cash of approximately $63 million.

53. The Restricted Cash and Unavailable Cash balance increased by $30 million during the week ended June 20, 2009 relating to the receipt of sales proceeds from the Westwinds sale that were set aside pursuant to EDC's request (as described later in this Fifteenth Report).

54. The significant assumptions used in preparing the June 7 Forecast include the following:

    a) accounts receivable collections have been estimated by the Applicants' collection group based on revenue forecasts and historic customer collection experience;

    b) payments from the U.S. Debtors totalling $157 million pursuant to the IFSA have been reflected in the June 7 Forecast. TPA or similar payments from non-filed entities have not been included in the forecast, however, discussions with the non-filed entities are on-going with respect to TPA payments for 2009;

    c) all disbursements are made assuming suppliers' pre-filing amounts are stayed and post-filing amounts are paid on significantly reduced credit terms as a result of the CCAA proceedings;

d) inventory purchases includes payments to Flextronics as provided for pursuant to the amending agreement dated January 13, 2009, and the settlement agreement and the side letter dated May 22, 2009 as approved by this Honourable Court;

e) inter-company trade accounts for post-filing transactions continue to settle on a cash basis between the Applicants, U.S. Debtors, EMEA Debtors and the other Nortel entities. Inter-company pre-filing loans between the Applicants and all other Nortel filed and non-filed entities are stayed;

f) severance payments are stayed during the forecast period;

g) pension funding payments are made for both current and special service payments based upon existing requirements with respect to the registered defined benefit and defined contribution plans. Funding for non-registered pension or other retirement plans is stayed;

h) funding in the ordinary course for the H&WT is included;

i) all interest payments relating to the Company's pre-filing indebtedness are stayed. Interest with respect to the post filing NNI Loan has been included;

j) Restricted Cash of $30 million relating to the sale of Westwinds is released and becomes part of Available Cash and $7 million is paid to EDC pursuant to a cash collateral arrangement addressed later in this Fifteenth Report; and

k) no material asset divestiture transactions close within the forecast period.

## ADMENDMENT TO EDC FACILTY AND EDC CHARGE

55. As outlined in the Monitor's Eighth Report, on April 24, 2009, EDC and NNL signed the Second Amended and Restated Short Term Support Agreement which extended the availability of the EDC Facility until July 30, 2009 in an amount up to $30

22

million. EDC was granted a charge against the Applicants' assets, as provided for in the Initial Order (the "EDC Charge"), in support of this post-filing EDC Facility.

56. As at June 15, 2009, there were approximately $6 million of bonds outstanding under the $30 million post-filing EDC Facility. As well, there are approximately $100 million of pre-filing performance bonds outstanding.

57. On May 15, 2009, at a court hearing for the purpose of approving the sale of Westwinds by NNL, EDC raised concern with respect to the potential erosion of the collateral subject to its security pursuant to the EDC Charge. EDC was specifically concerned regarding the forecast use by the Applicants of the sale proceeds from the Westwinds sale.

58. Pursuant to the endorsement granted by this Honourable Court in approving the Westwinds sale, NNL was to set aside and not use $30 million of the sales proceeds until a mutually acceptable agreement was reached between the Applicants and EDC to address this issue.

59. On June 15, 2009, NNL received the Westwinds net sales proceeds of $86 million and immediately set aside in a separate bank account $30 million (CDN$33 million).

60. As a result of further discussions with EDC, the Applicants have reached an agreement, including a new cash collateral agreement (the "Amended Second Amended and Restated Short Term Support Agreement"). A copy of which is attached as Exhibit G to John Doolittle's Affidavit dated June 22, 2009.

61. The significant revisions to the EDC Facility as contained in the Amended Second Amended and Restated Short Term Support Agreement include the following:

    a) NNL to provide cash collateral to EDC in the amount of approximately $7 million (the "Cash Collateral") relating to outstanding bonds supported by

23

EDC, including any renewal or extensions thereof, issued post petition and all agreed upon fees/expenses of EDC;

b) all future support for the issuance of bonds is at the full discretion of EDC;

c) release of the EDC Charge and allow NNL to access the $30 million of proceeds from the sale of Westwinds, upon Canadian court approval and the posting of the Cash Collateral; and

d) the Cash Collateral related to a bond or any renewal or extension thereof will be released to NNL upon the extinguishment of EDC's obligation under a bond as a result of its cancelation or expiry.

62. Subject to the approval of this Honourable Court of the Amended Second Amended and Restated Short Term Support Agreement, NNL will establish, in conjunction with EDC, the Cash Collateral to support the outstanding bonds issued post-filing.

63. As contemplated by the Amended Second Amended and Restated Short Term Support Agreement, upon posting the Cash Collateral, the Applicants are seeking approval to take such steps as necessary to terminate the EDC Charge and amend the Initial Order. This will assist in facilitating the establishment of the Excess Interim Funding Charge pursuant to the IFSA.

64. Upon the termination of the EDC Charge, the NNI Loan Charge and Excess Funding Charge would be the second ranking charges after the Administration Charge as provided for in the Initial Order.

65. The Applicants have informed the Monitor that the proposed revisions to the EDC Facility, including the posting of the Cash Collateral and the termination of the EDC Charge, satisfy EDC's concerns with respect to its collateral. Furthermore, the proposed revisions continue to provide Nortel with a bonding facility, subject to EDC approval of individual bonding requests, and provide improved liquidity to the

Applicants by allowing them access to the $30 million currently set aside relating to the Westwinds sale.

## OTHER INSOLVENCY PROCEEDINGS UPDATE

*Secondary Proceeding for Nortel Networks S.A. in France*

66. On May 26, 2009, the Joint Administrators filed a request with the French Commercial Court in Versailles (the "French Court") for secondary proceedings (the "Secondary Proceedings"), or "liquidation with continuity of certain activities," in respect of NNSA.

67. On May 28, 2009, the French Court granted the request for Secondary Proceedings and appointed an NNSA Administrator and an NNSA Liquidator.

68. The NNSA Administrator has been authorized to carry on the business of NNSA for a renewable period of three months.

*Chapter 11 Proceedings*

69. The following is a summary of the court orders that have been issued and the financial information that has been filed in the U.S. Chapter 11 proceedings since the last update provided in the Monitor's Eighth Report.

   a) On April 22, 2009, the U.S. Debtors obtained an order further extending the deadline for filing their Form 26 Reports which describe the status of entities in which NNI, Nortel AltSystems Inc. and Sonoma Systems hold a substantial or controlling interest. The Form 26 Reports were filed on May 11, 2009.

   b) On May 7, 2009, the U.S. Debtors obtained orders:

      i. Further extending the period during which the U.S. Debtors may seek to remove prepetition actions from state court to United States federal court; and

25

ii. Further extending the deadline before which the U.S. Debtors must assume or reject unexpired leases of nonresidential property to August 12, 2009.

c) On May 18, 2009, the U.S. Debtors obtained an order amending the Chapter 11 case caption to reflect the renaming of Alteon WebSystems, Inc. to Nortel Altsystems Inc. and the renaming of Alteon WebSystems International, Inc. to Nortel Altsystems International Inc.

d) On May 19, 2009, the U.S. Debtors filed the Debtor-in-Possession Monthly Operating Report for the period March 1, 2009 to March 31, 2009.

e) On May 20, 2009, the U.S. Debtors obtained orders:

i. Further extending the period during which the U.S. Debtors may file a Chapter 11 plan and solicit acceptances thereof; and

ii. Authorizing the U.S. Debtors to file certain portions of their Schedules of Assets and Liabilities containing customer information under seal, subject to the possible future request of the United States Trustee that such information be unsealed.

f) On May 29, 2009, the U.S. Debtors filed:

i. The Schedules of Assets and Liabilities for NNI, Nortel Networks Capital Corp., Nortel Altsystems Inc. and Nortel Networks International Inc.;

ii. A Form 26 Report describing the status of entities in which NNI holds a limited partnership, non-controlling interest; and

iii. The Debtor-in-Possession Monthly Operating Report for the period April 1, 2009 through May 2, 2009.

g)  On June 11, 2009, the U.S. Debtors obtained orders:

    i.  Approving the settlement agreement and the related side letter entered into between NNL, Flextronics Telecom Systems Ltd. and Flextronics Corporation on May 22, 2009 and authorizing any payments NNI may make to NNL to reimburse NNL for NNI's share of the costs relating to the agreement; and

    ii.  Authorizing the U.S. Debtors to file certain portions of the settlement agreement and the related side letter under seal.

h)  On June 11, 2009, the U.S. Debtors obtained an interim order authorizing NNI, subject to certain conditions, to enter into a letter of credit and bonding facility for the purpose of issuing surety and performance bonds to secure the U.S. Debtors' customer obligations.

*Chapter 15 Proceedings*

70. The following is a summary of the filings in the Chapter 15 proceedings since the last update provided in the Monitor's Eighth Report.

71. The Monitor has continued to file with the U.S. Bankruptcy Court and serve on required parties notices of each of its reports to this Honourable Court.

72. On May 5, 2009 the Monitor filed, with the U.S. Bankruptcy Court, notice of the order of this Honourable Court extending the stay until July 30, 2009. The Monitor also filed a notice of the approval and vesting order dated May 15, 2009 in relation to the sale of Westwinds. Notice of the order approving the license agreement and the non-exclusive license granted by NNL to Hitachi Communications Technologies, Ltd. was filed on June 2, 2009. The Monitor also filed a notice of the order relating to

pension plan commuted value payments dated May 28, 2009. Notice of the order on
pension plan commuted value payments and of the order approving settlement with
Flextronics was also filed on June 9, 2009 and June 15, 2009, respectively. These
notices were all filed and served in the Chapter 15 proceedings and in the Chapter 11
cases for the U.S. Debtors.

73. On June 2, 2009, the Monitor also filed with the U.S. Bankruptcy Court, and served
on required parties, a motion to enforce this Honourable Court's order dated June 1,
2009 authorizing NNL to sell its interest in its joint venture with LG Electronics (the
"LGE Joint Venture Sale Process Order") and the retention of Goldman Sachs & Co.
("Goldman") as financial advisor to NNL in connection with that sale. A hearing in
the U.S. Bankruptcy Court on the Monitor's motion to enforce the LGE Joint Venture
Sale Process Order and the retention of Goldman was heard and the motion granted
on June 11, 2009.

74. On June 8, 2009, the UK Administrator filed a petition with the U.S. Court seeking
orders recognizing the UK administration proceedings as they relate to NNUK as
foreign main proceedings.

**UPDATE ON NORTEL'S RESTRUCTURING EFFORTS**

75. On June 19, 2009, NNC issued a press release announcing that it, NNL and certain of
NNL's subsidiaries, including NNI, had entered into a "stalking horse" asset sale
agreement with Nokia Siemens Networks B.V. for the sale of substantially all of its
CDMA business and LTE Access assets for $650 million. The terms and provisions
of the agreement are more fully addressed in the Monitor's Fourteenth Report.

76. Nortel also announced that it is engaging in discussions with numerous parties for the
sale of its other businesses. If necessary, Nortel will assess other restructuring
alternatives for these businesses if it is unable to maximize value through a sale of
these assets.

77. NNC also announced its intention to apply for a delisting of its common shares and the NNL preferred shares from trading on the Toronto Stock Exchange. The Monitor provided its consent to the request for the delisting of the shares.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

78. The Monitor has assisted and continues to assist the Applicants in their efforts to review their operations and assess a range of restructuring alternatives in consultation with the Applicants' legal and financial advisors. The Monitor believes the Applicants are working diligently and in good faith towards developing a restructuring strategy to address their financial and strategic issues in the context of complex multijurisdictional insolvency proceedings.

79. It is the Monitor's view that based upon the key assumptions used in preparation of the Applicants' June 7 Cash Flow Forecast, including receipt of payments contemplated under the IFSA, that the Applicants will have sufficient cash resources available during the Forecast Period to permit the Applicants to make further progress in its efforts to pursue the sale of its other businesses or develop alternative restructuring strategies, if appropriate, and file a plan of arrangement.

80. For reasons discussed earlier in this Report, the Monitor recommends the IFSA, attached as Appendix C to this Report which is a condition to the taking effect of the IFSA, be approved by this Honourable Court and that the Initial Order be further amended for the creation of the Interim Funding Charge and Shortfall Charge to secure NNL's obligations pursuant to the IFSA.

81. The Monitor supports the Applicants' request to have the fifth, sixth and seventh extensions to the GSPA approved by this Honourable Court.

82. The Monitor supports the Applicants' request to have the modifications to the EDC Facility and the extinguishment of the EDC Charge upon NNL posting the Cash Collateral, as contemplated by the Second Amended and Restated Short Term Support Facility Agreement, approved by this Honourable Court.

All of which is respectfully submitted this 25th day of June, 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

30

# APPENDIX A

Nortel Networks
OCAA Applicant
13-Week Cash Flow Variance
US$ millions

## Weekly Receipts & Disbursements

| | | | |
|---|---|---|---|
| **Receipts** | | | |
| Collection of Accounts Receivable | 78.5 | 120.2 | 41.7 |
| Other Receipts | 10.6 | 6.0 | (4.6) |
| Intercompany Receipts | 57.7 | 27.6 | (30.1) |
| Intercompany Receipts - Interim Funding Arrangement | 79.0 | - | (79.0) |
| NNL/NNI Restructuring Loan Advances | - | - | - |
| **Total Receipts** | 226.1 | 153.8 | (72.2) |
| | | | |
| **Disbursements** | | | |
| Payroll (Gross) | 74.3 | 83.8 | (9.6) |
| Benefits | 16.6 | 17.0 | (0.5) |
| Pension | 3.6 | 3.8 | (0.2) |
| Inventory Purchases | 47.7 | 34.8 | 12.9 |
| Non-Inventory Purchases | 63.0 | 67.4 | (4.4) |
| Intercompany Disbursements | 42.2 | 17.4 | 24.7 |
| Intercompany Disbursements - Interim Funding Arrangement | - | - | - |
| Restructuring Costs | 9.0 | 6.2 | 2.8 |
| NNL/NNI Restructuring Loan Repayments | - | - | - |
| **Total Disbursements** | 256.1 | 230.4 | 25.8 |
| **Net Cash Flow** | (30.1) | (76.6) | (46.5) |
| FX Impact | - | 6.4 | 6.4 |
| **Opening Available Cash Balance** | 197.5 | 197.5 | (0.0) |
| **Closing Available Cash Balance** | 167.5 | 127.3 | (40.1) |
| Unavailable Cash | 6.9 | 6.0 | (0.9) |
| **Total Cash** | 173.4 | 132.3 | (41.0) |
| Restricted Cash | 46.0 | 58.1 | 12.1 |
| **Total Cash + Restricted Cash** | 219.4 | 190.5 | (28.9) |

APPENDIX B

Receipts
Collection of Accounts Receivable
Other Receipts
Intercompany Receipts
Intercompany Receipts – Interim Funding Arrangement
NNL/NNI Restructuring Loan Advances

Total Receipts

Disbursements
Payroll (Gross)
Benefits
Payroll
Inventory Purchases
Non-Inventory Purchases
Intercompany Disbursements
Intercompany Disbursements – Interim Funding Arrangement
Restructuring Costs
NNL/NNI Restructuring Loan Repayments

Total Disbursements

Net Cash Flow
FX Impact

Opening Available Cash Balance
Closing Available Cash Balance

Unavailable Cash
Total Cash

Restricted Cash
Total Cash + Restricted Cash

APPENDIX C

EXECUTION VERSION

INTERIM FUNDING AND SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto, and the Joint Administrators (as defined below) and the entities set forth in Schedule 3 attached hereto (the "EMEA Debtors"). The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Section 17 and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein (including, without limitation, the EMEA Debtors), as the "Nortel Group"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, "CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date, NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "Bankruptcy Code," and the "US Proceedings"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "Transfer Pricing Payments") to other Nortel Group entities pursuant to a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements, where "Transfer Pricing Agreements" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the

related understandings contained in, the documents listed in Annex A hereto, the "Master R&D Agreement") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in Annex B hereto and any other agreements similar to the agreements listed in Annex B hereto (as amended, supplemented or otherwise modified, the "Distribution Agreements"); and

WHEREAS, notwithstanding a US$30 million payment made by NNI to NNL in January, 2009 (the "January Payment"), certain members of the Nortel Group, including, in particular, NNL, have liquidity constraints; and

WHEREAS, it should be noted that no other payments similar to the January Payment have been made between or among the Nortel Group entities since the Filing Date; and

WHEREAS, each of the Parties hereto has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which, *inter alia*: (i) NNI, on behalf of itself and the other US Debtors, shall settle any claims of NNL for corporate overhead and research and development costs, whether pursuant to Transfer Pricing Agreements or otherwise, incurred by NNL for the benefit of the US Debtors which NNL has asserted or could assert (without admission by the US Debtors and subject to Section 20 of this Agreement) would have been reimbursed to NNL through Transfer Pricing Payments payable by the US Debtors to the Canadian Debtors during, or with respect to, the period after the Filing Date through and including September 30, 2009 (respectively, the "Canada/US Interim Period" and the "NNI Interim Obligations") and (ii) the EMEA Debtors shall among themselves and as between one or more EMEA Debtors, on the one hand, and one or more Canadian Debtors and/or US Debtors, on the other hand, settle amounts payable and anticipated to become payable as Transfer Pricing Payments as provided for herein for the period from the Filing Date to December 31, 2009 (the "EMEA Interim Period"), in all cases subject to the terms of this Agreement; and

WHEREAS, the Parties hereto intend this Agreement to constitute a full and final settlement of all matters set forth in this Agreement, whether arising during or related to the Canada/US Interim Period or the EMEA Interim Period, as applicable; and

WHEREAS, the Parties intend to continue to meet their respective obligations to make the monthly payments in respect of the inter-company trading of goods and services by Nortel Group entities (the "Inter-Company Trading Payments") pursuant to and during the effectiveness of the group supplier protocol agreements approved in the applicable Proceedings from time to time (the "GSPAs") or pursuant to and in accordance with court orders entered in the Canadian Proceedings and the US Proceedings ("Trading Orders"); and

WHEREAS, the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "Creditors' Committee") and the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "Bondholders' Committee") have each agreed to support this Agreement.

2

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

1. Funding.

    a. NNI shall pay to NNL a sum total of US$157 million (the "Total Payment"), payable in five equal installments of US$31.4 million in accordance with the schedule attached as Annex C hereto, subject to the following limitations:

        i. the first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "Permanent Payment"); and

        ii. if it is determined, pursuant to a process to be agreed upon by NNL, NNI, the Creditors' Committee and the Bondholders' Committee, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof (being the difference between US$187 million and the value of the NNI Interim Obligations so determined) in excess of US$161 million (any such portion, the "Contingent Payment") shall be repaid by NNL to NNI on October 30, 2009.

    b. NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Canadian Debtors (the "Excess Funding Charge"), which charge shall be granted by order of the Canadian Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "EDC Charge"); *provided, however,* that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in the Canadian Proceedings. For the purposes of this provision, the terms "Administration Charge," "Carling Facility" and "Carling Facility Charges" shall have the same meaning as ascribed to each such term in the initial order granted by the Canadian Court on the Filing Date in the Canadian Proceedings, as amended and restated from time to time (the "Canadian Initial Order").

    c. Simple interest shall be payable on the Contingent Payment at the time of repayment at a rate of 10% per annum and shall accrue from the date of NNL's receipt of the Contingent Payment to, but not including, the date of repayment.

    d. Upon payment in full of the Contingent Payment and any accrued interest thereon, the Excess Funding Charge shall be automatically extinguished.

3

2. <u>Use of Funds; Reporting</u>.

    a.  NNL has informed NNI, the Creditors' Committee and the Bondholders' Committee, that NNL intends to use the funds from the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (as defined below) (the "<u>Permitted Uses</u>"). To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI, the Creditors' Committee and the Bondholders' Committee.

    b.  NNL and NNI shall continue to provide to the Creditors' Committee and the Bondholders' Committee, on a weekly basis, (i) rolling 13-week cash flow forecasts (each, a "<u>13 Week CF Forecast</u>"), and (ii) reports on actual weekly cash flow results. NNL further agrees to provide, to the extent not already provided in accordance with the foregoing sentence, each of NNI, the Creditors' Committee and the Bondholders' Committee with a cash flow schedule showing payments for the preceding monthly period and the use of proceeds from the Total Payment to the extent received by NNL, such schedule to be provided no later than the tenth day following the last day of each month commencing with the cash flow schedule for June 2009 and ending with the cash flow schedule for September 2009.

3. <u>Maximum Payment; Full and Final Settlement</u>. The sum of the Total Payment and the January Payment (being US$187 million) represents (A) the maximum payment that the US Debtors may or could owe in respect of the NNI Interim Obligations, (B) the maximum administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceedings with respect to the NNI Interim Obligations, whether pursuant to Sections 503 and 507 of the Bankruptcy Code or otherwise, and (C) constitutes a full and final settlement of any and all NNI Interim Obligations. Each of NNL and the other Canadian Debtors hereby agrees to indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

4. <u>Settlement of Motions.</u> It is expressly understood that Part A of this Agreement is intended to constitute a full and final settlement of all of the matters set forth in Part A of this Agreement whether arising during, or related to, the Canada/US Interim Period, including, without limitation, any funding motions of the Canadian Debtors and the US Debtors scheduled to be heard by the Canadian Court and the US Court on June 29 and 30, 2009 or such later date or dates as might be agreed or ordered.

4

5. <u>True-up Obligations.</u> NNL agrees to use commercially reasonable efforts to recover from Nortel Group entities, other than the Debtors (collectively, "<u>Other Nortel Group Companies</u>"), Transfer Pricing Payments that are determined to be owed to the Canadian Debtors by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "<u>ONGC Costs</u>"). Solely to the extent that the Canadian Debtors actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Canadian Debtors' forecast, based on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished to the Parties, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "<u>Excess Recoveries</u>"), and it is also determined, pursuant to the process referred to in Section 1.a.ii above, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "<u>Overage Amount</u>"), the Canadian Debtors shall, in addition to any payments made or required to be made in accordance with Section 1.a.ii. above, pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the US Debtors, in an aggregate amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "<u>Maximum Overage Repayment</u>") within 30 days of the date of determination thereof; *provided, however,* that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditors' Committee and the Bondholders' Committee, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (giving pro forma effect to such payment) prepared by NNL, with assistance from the Monitor, and provided in advance of such decision by the Monitor to the Creditors' Committee and the Bondholders' Committee (the "<u>NNL Liquidity Review Procedures</u>"). The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Canadian Debtors from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full. For the purposes of this Section, "<u>U.S. Pro Rata Excess Recoveries</u>," as of any date of determination shall equal the product of (i) the Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has been paid U.S. Pro Rata Excess Recoveries in accordance with this Section 5) and (ii) a fraction (x) of which shall equal US$161 million <u>minus</u> the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable or paid to the Canadian Debtors by Nortel Group entities (excluding the Canadian Debtors) that are payors for the Canada/US Interim Period (rounded to four decimal points).

<u>PART B – EMEA SELF-FUNDING; SETTLEMENT MATTERS</u>

6. <u>Administration; Funding.</u>

    a. NNUK is hereby irrevocably authorized to seek payment for its own account from other EMEA Debtors of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the EMEA Interim Period which would otherwise be made to or administered by NNL, in consideration of the full and final settlement set out in Section 8 below. Each of the EMEA Debtors hereby appoints NNUK as its agent

(without liability, including as to failure of any EMEA Debtor to make any Transfer Pricing Payment) to administer the collection and pro rata distribution of the Transfer Pricing Payments received, solely with respect to the EMEA Interim Period, as detailed on Annex D hereto. Each of the EMEA Debtors agrees that the payments set out in Annex D shall be made to NNUK in cleared funds and without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof, except as otherwise agreed between any EMEA Debtor and NNUK. To the extent that any EMEA Debtor breaches any obligation to make its Transfer Pricing Payment with respect to the EMEA Interim Period, only NNUK and none of NNL, NNI or any of their other affiliates shall have any claim against such defaulting EMEA Debtor for such payment and no EMEA Debtor shall have any claim against NNL, NNI or any of their affiliates (other than such EMEA Debtor) for such payment.

b.  Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "First Shortfall Payment"), such amount to be paid out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets entered into subsequent to the date hereof where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account all purchase price adjustments, taxes and other transaction costs, and excluding the amount of any holdback or escrow for indemnification or otherwise) exceeds the amount previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators (such sale, a "Material Asset Sale"); provided, however, that some or all of such payment shall be subject to NNL Liquidity Review Procedures (in this case, however, the NNL Liquidity Review Procedures shall provide the UK Administrator with the same information and consultation rights as provided to the Creditors' Committee and the Bondholders' Committee under the procedures set forth in Section 5 of this Agreement and shall give pro forma effect to such payment and take into account any payments actually received by NNL in connection with such Material Asset Sale).

c.  Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "Second Shortfall Payment" and together with the First Shortfall Payment, the "Shortfall Payments"), such amount to be paid out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL; provided, however, that some or all of such payment shall be subject to NNL Liquidity Review Procedures (modified as set forth in Section 6.b. above).

d.  The unpaid balance of the Shortfall Payments, if any, shall be carried forward and shall be paid in full or in part to NNUK on the earlier of the date or dates that, (i) in the reasonable and sole judgment of the Monitor, upon consultation with the Creditors' Committee and the Bondholders' Committee, after the

6

application of the NNL Liquidity Review Procedures (giving pro forma effect to such payment) such payment would not materially and adversely impact the liquidity position of NNL, and (ii) sale proceeds are allocated to, and actually received by, NNL from one or more subsequent Material Asset Sales, subject to the NNL Liquidity Review Procedures (giving pro forma effect to such payment and taking into account the payments actually received by NNL in connection with such Material Asset Sales), until paid in full. The obligation relating to the Shortfall Payments shall be an obligation of NNL only and of no other entity within the Nortel Group. Until the Shortfall Payments have been fully paid, NNL shall (i) promptly notify NNUK of the signing and closing of any Material Asset Sale, (ii) provide material information regarding such Material Asset Sale as may be reasonably requested by the UK Administrator, and (iii) upon actual receipt of sale proceeds from such Material Asset Sale, NNL shall promptly inform NNUK of the calculation and allocation of the sale proceeds from such Material Asset Sale to NNL. For the avoidance of doubt, any Shortfall Payments relating to any Material Asset Sale shall not be used as any basis for claiming that the purchase price allocation to NNUK in respect of such Material Asset Sale has been satisfied in whole or in part, and the Shortfall Payments shall not be excluded from the total amount of sale proceeds available for allocation to the relevant parties to such Material Asset Sale.

e.  NNL's obligation to make the Shortfall Payments shall be secured by a charge against all of the assets of the Canadian Debtors (the "Shortfall Charge"), which charge shall be granted by order of the Canadian Court and shall at all times rank *pari passu* with the Inter-company Charge (as defined in the Canadian Initial Order and as modified from time to time, including without limitation any modifications relating to the priority of such charge). Without prejudice to the previous sentence, NNUK hereby acknowledges that any current or future charges that have been, or may be, granted to the US Debtors in connection with any funding provided by the US Debtors to the Canadian Debtors may, or could, be senior to the Shortfall Charge, and consents to such charges being senior to the Shortfall Charge.

f.  The Canadian Debtors and the EMEA Debtors hereby confirm that the Shortfall Payments resulted from arm's length negotiations among such Parties.

g.  In the event of any breach of Section 12.a. in connection with the Subject Transaction by any EMEA Debtor, NNL's obligation to make any Shortfall Payments shall be automatically forfeited, and the Shortfall Payments shall not be payable pursuant to Sections 6.b. and 6.c. of this Agreement under any circumstances. In addition, in such circumstances the Shortfall Charge shall be automatically extinguished.

h.  The Canadian Debtors and the EMEA Debtors hereby confirm that the calculation of the payments set forth in Annex D resulted from arm's length negotiations among such Parties and are based on principles to fairly allocate profits and costs among the EMEA Debtors.

7

7.  Covenants.

    a.  [left intentionally blank].

    b.  In respect of NNSA, the EMEA Debtors shall use commercially reasonable efforts to obtain (i) within 30 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to all provisions of this Agreement applicable to an EMEA Debtor, other than Sections 11.a., 11.b. and 12 of this Agreement, and (ii) within 45 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to Sections 11.a., 11.b. and 12 as applicable to an EMEA Debtor. The EMEA Debtors hereby agree to provide copies of such letters, upon receipt, to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Creditors' Committee and the Bondholders' Committee.

8.  Maximum Payment; Full and Final Settlement. Except with respect to the obligation of NNL to make the Shortfall Payments as herein provided, this Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Debtors *inter se*, and (ii) an EMEA Debtor, on the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof within the EMEA Interim Period including, without limitation, any subsequent determination by any revenue authority with respect to the EMEA Interim Period giving rise to any subsequent liability to taxation of any Party hereto. Upon payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically extinguished.

9.  Settlement of Claims Between the US/Canadian Debtors and the EMEA Debtors. It is expressly understood that Part B of this Agreement is intended to constitute a full and final settlement of all of the matters between the US and Canadian Debtors, on the one hand, and the EMEA Debtors, on the other hand, set forth in Part B of this Agreement whether arising during, or related to, the EMEA Interim Period.

PART C -- PROVISIONS OF GENERAL APPLICATION

10.  Scope of this Agreement. The Parties hereto agree that:

    a.  this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group; and

    b.  this Agreement shall not have any effect on any claims as to amounts owed or purported to be owed to or by any Party, either: (i) prior to the Filing Date, or (ii)

8

after the Canada/US Interim Period or the EMEA Interim Period, as applicable; *provided, however,* the Parties agree, except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense; and

c.   this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement in respect of any period prior to or after the Canada/US Interim Period or the EMEA Interim Period, as applicable, or allocation of any sale proceeds, or any ownership of intellectual property; and

d.   each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

e.   this Agreement is without prejudice to any provision of the Master R&D Agreement, except full and final settlement in relation to Transfer Pricing Payments with respect to the Canada/US Interim Period or the EMEA Interim Period, as applicable, as set out herein; and

f.   this Agreement is without prejudice to any Party's claims relating to Inter-Company Trading Payments, whether pursuant to the GSPAs or the Trading Orders; *provided, however,* that upon satisfaction of the Conditions, it is expressly understood and agreed that the GSPAs do not require, and shall be deemed not to have required, any Party to make Transfer Pricing Payments.

11. Relinquishment of Intellectual Property Licenses.

a.   Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination (as defined below) with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "IP Licenses") for the purpose of facilitating, and in consideration of a right to an allocation, to be determined in accordance with this Section 11, to such Debtors of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "Asset Sale"); *provided, however,* that (x) in the case of the US Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditors' Committee and the Bondholders' Committee (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the project name of the referenced proposed transaction or/and the description of the scope of assets, businesses and technologies covered by such Asset Sales have been previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators.

9

b. For the purposes of this Agreement, the term "Appropriate License Termination" means an agreement to be entered into between NNL, the US Debtors and the EMEA Debtors, providing, effective as of the date of closing of each Asset Sale, (i) for the termination of the IP Licenses (including the right to sublicense) with respect only to any intellectual property used in or related to the businesses or assets being sold in that Asset Sale (the "Transaction IP"); (ii) for the grant by NNL or for the procurement by NNL of the grant by the relevant purchaser of the Transaction IP, as applicable, of a non-exclusive license or sublicense, as applicable, to the EMEA Debtors permitting each such EMEA Debtor to use the Transaction IP to the extent necessary for such Debtor to continue, for the purposes of winding-down its business, the use of such Transaction IP (except for any Transaction IP that is used exclusively in or relates exclusively to the businesses or assets which are the subject of that Asset Sale), as such Transaction IP is being used by such Debtor as of the date of closing of such Asset Sale and only in connection with the types of products and services sold or provided by such Debtor as of that date, including to perform such Debtor's obligations under any customer contract or end user contract that is in existence as of the date of closing of such Asset Sale and is not assigned to the purchaser in such Asset Sale, solely as such contract and such obligations are in effect as of that date (the "Existing Customer Contract"), with the right to sublicense the Transaction IP to such customers (but not to any person or entity which is not a customer of such Debtor as of the date of closing of such Asset Sale) to the extent required under the applicable Existing Customer Contract; (iii) that the foregoing non-exclusive license shall terminate on the date of termination of the applicable Existing Customer Contract (except to the extent that such license remains in effect with respect to the performance of any other Existing Customer Contracts), it being understood that the term of the Existing Customer Contract shall not be extended or renewed beyond its scheduled expiry date except to the extent any automatic extension rights are in effect at the date of closing of such Asset Sale that may be exercised solely at the option of the other party to the relevant Existing Customer Contract without the consent of the Debtor party to such Contract; *provided, however,* that in the event of such automatic extension such Debtor shall be required to seek to terminate the Existing Customer Contract as soon as possible in accordance with the terms of such Existing Customer Contract; and (iv) that the Appropriate License Termination shall not affect the ownership rights that such Debtors and NNL may have to any intellectual property. For the avoidance of doubt, the Appropriate License Termination will not be deemed to be or result in an expiry or termination of the Master R&D Agreement.

c. The Parties hereby agree that, within a reasonable period of the date hereof, the Debtors shall negotiate in good faith and attempt to reach agreement on a timely basis on a sample form agreement to effectuate an Appropriate License Termination, such form to include more specific details as to the scope of "used in or related to", as used in clause (i) of the definition of the term "Appropriate License Termination." In addition, the Parties hereby agree that such sample form agreement shall have additional provisions that the Parties deem appropriate and customary for such license termination agreements.

10

d. Where any Debtor enters into any Appropriate License Termination in accordance with the provisions of this Section 11, such Debtor shall be deemed to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds, for the purposes of Sections 12.b. and 12.d., and Sections 12.b. and 12.d. shall apply accordingly.

12. Entry into Sale Transactions.

a. Each Debtor hereby agrees that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or closing of any sale of, material assets of any of the Debtors to which such Debtor (a "Selling Debtor") is proposed to be a party (each, a "Sale Transaction") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.

b. Pending the distribution of the Sale Proceeds as described in the second sentence of this Section 12.b., the entire amount of the Sale Proceeds (less applicable transfer or value-added taxes and, to the extent agreed by the Selling Debtors, transaction costs) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all Selling Debtors, in each case acting reasonably (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

c. Without derogating from the obligations provided in Section 12.a., the Debtors shall, as soon as reasonably practicable following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.

d. The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol, failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds.

11

e.  Notwithstanding any other provision of this Section 12, (i) no Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the other Parties to this Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally, and (ii) it is expressly acknowledged by all Debtors that, in relation to any Sale Transaction, neither (A) any matter in the course of negotiation with any prospective purchaser, nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such Sale Transaction (which include severance and other restructuring costs of each Selling Debtor) and sharing of transaction costs relating to such Sale Transaction (which include break fees and indemnification escrow accounts) between the Selling Debtors shall constitute a breach of Section 12.a. of this Agreement.

f.  Nothing in this Section 12 shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to seek its entitlement to Sale Proceeds from any Sale Transaction.

g.  For the purposes of Sections 11.c. and 12.a. through 12.f. (inclusive):

  i.  the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditors' Committee and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditors' Committee and the Bondholders' Committee acting in good faith; and

  ii.  the Canadian Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the Canadian Debtors is required, the Canadian Debtors shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Canadian Debtors shall require the prior consent of the Bondholders' Committee acting in good faith and the Monitor.

13. Effectiveness.

  a.  No provision of this Agreement (other than as set forth in Section 13.f. of this Agreement) shall be effective until the satisfaction of the following conditions: (A) each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "North American Court Condition"), (B) the UK Court giving a direction (the "UK Court's Directions") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "UK Court Condition" and, together with the North American Court Condition, the "Court Approval Condition"); provided, however, the Joint Administrators may at their election waive the UK Court Condition, and (C) the

12

Canadian Court and the US Court approving amendments to the cross-border protocol previously approved by the US Court and the Canadian Court (as may be in effect from time to time, the "Cross-Border Protocol") that are mutually satisfactory to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Monitor, the Creditors' Committee and the Bondholders' Committee (the "Cross-Border Protocol Condition", and together with the Court Approval Condition, the "Conditions").

b.  Upon satisfaction of each of the Conditions, all provisions of this Agreement, other than Sections 6.b., 6.c., 6.d., 6.e. and 6.f. of this Agreement, shall be effective as of the date of the satisfaction of the last Condition. Upon execution of the transaction documents relating to the Subject Transaction, Sections 6.b., 6.d., 6.e. and 6.f. of this Agreement shall be effective (except that the term "Shortfall Payments" as used in Sections 6.d., 6.e. and 6.f. shall mean only the First Shortfall Payment until Section 6.c. shall become effective). Upon agreement among the various sellers under the Subject Transaction and the Creditors' Committee and the Bondholders' Committee with regards to (A) the allocation of sale proceeds from the Subject Transaction or (B) the binding procedure for the allocation of sale proceeds from the Subject Transaction, Section 6.c. of this Agreement shall be effective. For the purposes of this Agreement, "Subject Transaction" means the first sale of any material assets of any one or more of the Debtors of each of (i) the Canadian Debtors, (ii) the US Debtors and (iii) the EMEA Debtors (excluding, for the avoidance of doubt, any sale where the involvement of the EMEA Debtors is solely limited to Appropriate License Terminations).

c.  Notwithstanding any of the foregoing, if (i) (x) the UK Court Condition is neither satisfied nor waived by the Joint Administrators in accordance with the terms of Section 13.a. and (y) the Canadian Court and the US Court approve this Agreement, and (ii) the Cross-Border Protocol Condition is fully satisfied, then Part A of this Agreement and those provisions of Part C applicable to Part A shall be effective with regards to the Canadian Debtors and the US Debtors.

d.  Each Party hereto shall:

    i.   use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

    ii.  keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

    iii. use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in

13

any Court related to the satisfaction of the Conditions; *provided, however,* that no Canadian Debtor or US Debtor shall have any obligation to facilitate the participation by the Joint Administrators or the EMEA Debtors in any proceedings related to the satisfaction of the Cross-Border Protocol Condition; and *provided further* that the foregoing proviso shall not constitute an amendment, modification or waiver of rights of the Joint Administrators and the EMEA Debtors to participate in any court proceedings where they would be entitled to otherwise participate.

e. If the Joint Administrators elect to seek the UK Court's Directions, then the EMEA Debtors shall (A) use commercially reasonable efforts to obtain the UK Court's Directions as soon as possible, taking into account the availability of the UK Court, (B) keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the efforts to obtain UK Court's Directions and provide such other information regarding the efforts to obtain UK Court's Directions as reasonably requested by other Parties, and (C) use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in the UK Court related to the UK Court's Directions.

f. Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 7.b., 11.e., 12.c., 12.g., 13.d, 13.e., 13.f.,15 – 19, and 21 – 23.

14. Term. This Agreement shall expire on December 31, 2009 (the "Expiration Date"). Upon termination, the Parties' rights and obligations, except in respect of the obligations under Sections 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 14, 15, 16, 17, 20, 21 and 22 of this Agreement (but only to the extent that these provisions were effective in accordance with Section 13 of this Agreement prior to the Expiration Date) shall cease immediately but without prejudice to the rights and obligations of the Parties existing before termination.

15. Amendments. This Agreement may be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all Parties, and approved by the Creditors' Committee and the Bondholders' Committee, which amendments, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement or gave directions in respect of this Agreement (in the case of the UK Court). For the purpose of this Section 15, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

16. Governing Law and Jurisdiction.

a. This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; *provided, however,* that Section 17 shall be governed exclusively by English law.

14

b. To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however,* that any claim, action or proceeding set forth in Section 17 of this Agreement shall be brought exclusively in the English courts.

17. No Personal Liability of the Joint Administrators.

a. The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

b. The Joint Administrators are a Party to this Agreement: (i) as agents of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of certain other Parties to this Agreement.

c. Notwithstanding anything in Section 16, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtors) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

15

18. Creditors' Committee and Bondholders' Committee Support.

    a.  Written confirmation has been received from the Creditors' Committee confirming that the members of the Creditors' Committee, after thorough review and due deliberation of this Agreement, have voted, in compliance with the by-laws of the Creditors' Committee, in favor of supporting this Agreement and have granted permission to their advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

    b.  Written confirmation has been received from the counsel to the Bondholders' Committee confirming that the Bondholders' Committee has granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

19. Representations and Warranties.

    a.  Subject to satisfaction of the Court Approval Condition, each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

        i.  it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

        ii.  the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

        iii.  this Agreement has been duly executed by it and constitutes its legal, valid and binding obligations.

    b.  Other than entities in or related to the regions of Asia / Pacific, Central and South America, NNSA and Nortel Networks A.G., each Party hereby severally represents and warrants to each other Party that, to the best of such Party's knowledge based on due and reasonable inquiry, including of NNL, it is not party to any Transfer Pricing Agreement with any other Nortel Group entity other than as set forth in this Agreement.

20. Reservation of Rights. Nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 8 of this Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the

16

Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to this Agreement, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights against NNL pursuant to Sections 1.a.ii. and 5 of this Agreement, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL pursuant to Section 6 of this Agreement, and (B) the January Payment. The use of the term Transfer Pricing Payment (or any similar term) or reference to the Transfer Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements.

21. Counterparts. This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

22. Severability. In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

23. Several Obligations. Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

24. Defunct Distributors' Covenant. Each of the Debtors hereby covenants that such Debtor is not currently a party to, and shall not enter, into any arrangement pursuant to which any Transfer Pricing Payments may become payable to or by the following entities: Nortel Networks OY, Nortel Networks AB, or Nortel Networks Shannon Limited.

17

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of this 9th day of June, 2009.

NORTEL NETWORKS CORPORATION

By _____
Name: Paviter S. Binning
Title:  Executive Vice-President,
Chief Financial Officer and Chief
Restructuring Officer

By _____
Name: Tracy S. J. Connelly McGilley
Title:   Assistant Secretary


NORTEL NETWORKS LIMITED

By _____
Name: Paviter S. Binning
Title:  Executive Vice-President,
Chief Financial Officer and Chief
Restructuring Officer

By _____
Name: Tracy S. J. Connelly McGilley
Title:  Assistant Secretary


NORTEL NETWORKS GLOBAL
CORPORATION

By _____
Name: Paviter S. Binning
Title:  Director

By: _____
Tracy S. J. Connelly McGilley
Assistant Secretary

Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By _____
    Name: Paviter S. Binning
    Title: Director

By _____
    Tracy S. J. Connelly McGilley
    Assistant Secretary


NORTEL NETWORKS TECHNOLOGY
CORPORATION

By _____
    Name: Paviter S. Binning
    Title: Director

By: _____
    Name: Tracy S. J. Connelly McGilley
    Title:  Assistant Secretary


Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS INC.

By _____
Name: John Doolittle
Title: Vice President


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
Name: John Doolittle
Title: Vice President


CORETEK, INC.

By _____
Name: John Doolittle
Title: Vice President


NORTEL ALTSYSTEMS, INC.

By _____
Name: John Doolittle
Title: Vice President


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
Name: John Doolittle
Title: Vice President


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
Name: John Doolittle
Title: Vice President


Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
Name: John Doolittle
Title: Vice President


NORTEL NETWORKS CAPITAL
CORPORATION

By _____
Name: John Doolittle
Title: Vice President


NORTEL NETWORKS HPOCS INC.

By _____
Name: John Doolittle
Title: Vice President


NORTEL NETWORKS INTERNATIONAL
INC.

By _____
Name: John Doolittle
Title: Vice President


NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
Name: John Doolittle
Title: Vice President


NORTHERN TELECOM
INTERNATIONAL INC.

By _____
Name: John Doolittle
Title: Vice President


Signature page to Interim Funding
and Settlement Agreement

QTERA CORPORATION

By _____
Name: John Doolittle
Title:  Vice President

SONOMA SYSTEMS

By _____
Name: John Doolittle
Title:  Vice President

XROS, INC.

By _____
Name: John Doolittle
Title:  Vice President

Signed by ALAN BLOOM on behalf of each
of the Joint Administrators of each of the
EMEA Debtors over which they have been
appointed, without personal liability as
provided in Section 17 of this Agreement
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to each
of the Joint Administrators

By _____

Name: _____
Title: _____

in the presence of: _____

Witness Signature _____

Name:
Address:

SIGNED for and on behalf of NORTEL            )
NETWORKS UK LIMITED (IN                       )     ALAN BLOOM
ADMINISTRATION)                               )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature _____

Name:
Address:

SIGNED for and on behalf of NORTEL        )
NETWORKS (IRELAND) LIMITED                )    ALAN BLOOM
(IN ADMINISTRATION)                       )
by ALAN BLOOM as Joint Administrator      )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL        )
NETWORKS NV (IN                           )    ALAN BLOOM
ADMINISTRATION)                           )
by ALAN BLOOM as Joint Administrator      )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL        )
NETWORKS SPA (IN                          )
ADMINISTRATION)                           )    ALAN BLOOM
by ALAN BLOOM as Joint Administrator      )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

10-06-2009    01:03    FRÅN-RADISSON SAS STRAND HOTEL    +46    T-141  P.004/009  F-787

SIGNED for and on behalf of NORTEL
NETWORKS BV (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)    ALAN BLOOM

Witness signature

Name: _Helen Macaughton_
Address: _; more London Place_
_London SE )._

SIGNED for and on behalf of NORTEL
NETWORKS POLSKA SP Z.O.O. (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)    ALAN BLOOM

Witness signature

Name: _Helen Macaughton_
Address: _; more London Place_
_London SE )_

SIGNED for and on behalf of NORTEL
NETWORKS HISPANIA SA (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)    ALAN BLOOM

Witness signature

Name: _Helen Macaughton_

10-06-2009   01:09    FRAN-RADISSON SAS STRAND HOTEL                445                    T-141   P.005/009   F-797

Address: *[handwritten]*

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS (AUSTRIA) GMBH (IN**        }    **ALAN BLOOM**   *[signature]*
**ADMINISTRATION)**                    }
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature  *[signature]*

Name: *[handwritten]*
Address: *[handwritten]*


**SIGNED** for and on behalf of **NORTEL**
**NETWORKS SRO (IN**                   }    **ALAN BLOOM**   *[signature]*
**ADMINISTRATION)**                    }
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature  *[signature]*

Name: *[handwritten]*
Address: *[handwritten]*

10-06-2009  01:03    FRAN-RADISSON SAS STRAND HOTEL              +46                  Y-141   P.006/009   F-797

SIGNED for and on behalf of NORTEL      )
NETWORKS ENGINEERING              )        ALAN BLOOM
SERVICES KFT (IN                          )
ADMINISTRATION)                           )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL      )
NETWORKS PORTUGAL SA (IN               )        ALAN BLOOM
ADMINISTRATION)                           )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL      )
NETWORKS SLOVENSKO SRO (IN            )        ALAN BLOOM
ADMINISTRATION)                           )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: *Helen Macinnugston*
Address: *1 More London Place*
*London SE1.*

**SIGNED** for and on behalf of **NORTEL** }
**NETWORKS ROMANIA SRL (IN**      }   **ALAN BLOOM**
**ADMINISTRATION)**              }
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature *HK Macinnph*

Name: *Helen Macinnugston*
Address: *1 More London Place*
*London SE1.*

.SIGNED for and on behalf of **NORTEL** }
**GMBH (IN ADMINISTRATION)**    }   **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator }
(acting as agent and without personal
liability) in the presence of:

Witness signature *HK Macinnoll*

Name: *Helen Macinnugston*
Address: *1 More London Place*
*London SE1.*

SIGNED for and on behalf of NORTEL
NETWORKS OY (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

}
}
}
}    ALAN BLOOM

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL
NETWORKS AB (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

}
}
}
}    ALAN BLOOM

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL
NETWORKS INTERNATIONAL
FINANCE AND HOLDING BV (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

}
}
}
}    ALAN BLOOM

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL          )
NETWORKS FRANCE S.A.S. (IN                  )    ALAN BLOOM
ADMINISTRATION)                             )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

Schedule 1

Canadian Debtors

Nortel Networks Corporation
Nortel Networks Limited
Nortel Networks Global Corporation
Nortel Networks International Corporation
Nortel Networks Technology Corporation

Schedule 2

US Debtors

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

**Schedule 3**

**EMEA Debtors**

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

Annex A

**Amendments to and Related Understandings Regarding**
**Master Research and Development Agreement**
**dated as of December 22, 2004 ("Master R&D Agreement")**

1. Undated Addendum to Master R&D Agreement executed between October 2005 and June 2006.

2. Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of the Share and Asset Sale Agreement between NNL and Alcatel-Lucent).

3. Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006.

4. Third Addendum to Master R&D Agreement with an effective date of January 1, 2006.

5. Fourth Addendum to Master R&D Agreement with an effective date of December 31, 2008.

6. Letter of acknowledgment dated January 14, 2009 from NNL to the Directors of NNUK, NNSA and NNIR and the UK Administrator.

7. Release in Connection with Master R&D Agreement dated 1 January 2009.

8. Memorandum of Understanding in Connection with Master R&D Agreement, undated with an effective date of 1 January 2006.

A-1

Annex B

## Distribution Agreements

| Party | Date |
|---|---|
| Nortel Networks Limited ("NNL") and Nortel Networks N.V. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks S.p.A. | undated, effective as of 1 January 2002 (plus undated and unsigned Addendum, effective as of 1 January 2003) |
| NNL and Nortel Networks B.V. | dated 22 December 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Polska Sp. z. o. o. | undated, effective as of 1 January 2001 (letter of amendment executed in November 2003, effective as of 1 January 2001 plus Addendum executed in August 2005, effective as of 1 January 2003) |
| NNL and Nortel Networks Hispania, S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks (Austria) GmbH | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks, s.r.o. | dated 15 April 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Engineering Services Kft | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Portugal S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Slovensko, s.r.o. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Romania SRL | executed 22 January 2004, effective 1 January 2003 |
| NNL and Nortel Networks AG | undated, effective 1 January 2001 |

B-1

Annex C

**Funding Schedule**

Payments pursuant to Section 1.a. of this Agreement shall be paid in the following amounts and on the following dates (if the Conditions (other than the UK Court's Directions) are not satisfied by the payment dates set forth below, each such payment date shall be automatically postponed to one (1) business day after the date of satisfaction of such Conditions):

| | |
|---|---|
| June 10, 2009 | US$31,400,000.00 |
| June 15, 2009 | US$31,400,000.00 |
| July 31, 2009 | US$31,400,000.00 |
| August 31, 2009 | US$31,400,000.00 |
| September 30, 2009 | US$31,400,000.00 |
| TOTAL | US$157,000,000.00 |

C-1

Annex D

Intra-EMEA Transfer Pricing Settlement Amounts

| EMEA Debtor | Amount payable US$m |
|---|---|
| [Nortel Networks S.A.][1] | [(4.80)] |
| Nortel Networks (Ireland) Limited | (20.84) |
| [Nortel Networks AG][1] | [(4.08)] |
| Nortel Networks Hispania SA | (1.72) |
| Nortel Networks Slovensko s.r.o | (0.52) |
| Nortel Networks Romania SRL | (0.19) |
| Nortel Networks Portugal S.A. | (1.50) |
| Nortel Networks Polska S.p.z.o.o | (8.22) |
| Nortel Networks B.V. | (17.99) |
| Nortel Networks S.p.A. | (2.73) |
| Nortel Networks Engineering Services Kft | (1.92) |
| Nortel Networks s.r.o | (2.79) |
| Nortel Networks N.V. | (6.43) |
| Nortel Networks Austria GmbH | (2.35) |

---

[1] To the extent it becomes a Party hereto.

D-1

| EMEA Debtor | Amount receivable US$m |
|---|---|
| Nortel Networks UK Limited | [4.80 (Nortel Networks S.A.)] [1] |
| | 20.84 (Nortel Networks (Ireland) Limited) |
| | [4.08 (Nortel Networks AG)] [1] |
| | 1.72 (Nortel Networks Hispania SA) |
| | 0.52 (Nortel Networks Slovensko s.r.o) |
| | 0.19 (Nortel Networks Romania SRL) |
| | 1.50 (Nortel Networks Portugal S.A.) |
| | 8.22 (Nortel Networks Polska S.p.z.o.o) |
| | 17.99 (Nortel Networks B.V.) |
| | 2.73 (Nortel Networks S.p.A.) |
| | 1.92 (Nortel Networks Engineering Services Kft) |
| | 2.79 (Nortel Networks s.r.o) |
| | 6.43 (Nortel Networks N.V.) |
| | 2.35 (Nortel Networks Austria GmbH) |

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**FIFTEENTH REPORT OF THE MONITOR**
**DATED JUNE 25, 2009**

---

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada M5B 2M6

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5726505