**EXHIBIT C**

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION (the "Applicants")**

**FOURTEENTH REPORT OF THE MONITOR**
**DATED JUNE 23, 2009**

**INTRODUCTION**

1.   On January 14, 2009, Nortel Networks Corporation ("NNC" and collectively with all its
     subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel
     Networks Technology Corporation ("NNTC"), Nortel Networks International
     Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") filed for and
     obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA").
     Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and
     restated (the "Initial Order"). Ernst & Young Inc. ("EYI") was appointed as the Monitor
     of the Applicants (the "Monitor") in the CCAA proceeding. The stay of proceedings was
     extended to July 30, 2009, by this Honourable Court in its Order dated April 28, 2009.

2.   Nortel concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy
     Code (the "Code") in the U.S. Court on January 14, 2009, for Nortel Networks Inc.
     ("NNI") and certain of its U.S. subsidiaries (the "U.S. Debtors").

3.    Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Filed Entities") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court") on January 15, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Filed Entities, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "U.K. Administrators").

4.    On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

5.    On May 28, 2009, the Commercial Court of Versailles, France ordered the commencement of secondary insolvency proceeding in respect of, Nortel Networks SA ("NNSA"). These secondary insolvency proceedings commenced within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court for NNSA.

**PURPOSE**

6.    The purpose of this Fourteenth Report of the Monitor (the "Fourteenth Report") is to provide this Honourable Court with information regarding the Applicants' motion seeking approval of:

- an agreement amongst NNC, NNL and NNI and certain of their affiliates (the "Sellers") and Nokia Siemens Networks B.V. ("Nokia Siemens" or the

"Purchaser") in respect of the sale of certain CDMA and LTE assets as a "stalking horse" agreement;

- the Bidding Procedures (as defined below);

- authorizing and approving the terms and conditions of the Break-Up Fee and Expense Reimbursement (as defined below); and

- to provide the Monitor's support thereof.

## TERMS OF REFERENCE

7.    In preparing this Fourteenth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company, and discussions with management of Nortel. EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Fourteenth Report.

8.    Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

9.    Capitalized terms not defined in this Fourteenth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Report of the proposed Monitor dated January 14, 2009 (the "Pre-Filing Report"), previous Reports of the Monitor, or in the Sale Agreement (as defined below).

## GENERAL BACKGROUND

10.    Nortel is fundamentally a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived

and maintained from its R&D activities, its customers and other significant contracts and agreements.

11.     Nortel conducts its global business through four reportable business unit segments: Carrier Networks ("CN"), Enterprise Solutions ("ES"), Metro Ethernet Networks ("MEN") and LG-Nortel Co. Ltd.  The revenues and assets of each of the business units are distributed among the various Nortel legal entities and joint ventures around the world.


## THE CDMA BUSINESS AND LTE BUSINESS

### Background

12.     Nortel operates various lines of business within the CN business unit, which include the CDMA Business and the LTE Business (as defined in the Sale Agreement), (collectively, the "Business").

13.     The CN business unit is not operated through a dedicated legal entity or a stand-alone division.  Generally, Nortel has one legal entity in each country in which it operates and sales of all Nortel products in that country are made through the single legal entity.  A more detailed description of this structure is set out in the Pre-Filing Report.

14.     CN offers wireline and wireless networks that help service providers and cable operators supply mobile voice, data and multimedia communications services to individuals and enterprises using cellular telephones, personal digital assistants, laptops, soft-clients, and other wireless computing and communications devices.  The CN portfolio includes 2G/3G mobility networking solutions based on Code Division Multiple Access ("CDMA"), and Nortel's research and development efforts have included innovative technologies focused in the areas of 4G broadband wireless, including Long Term Evolution ("LTE"), an evolving networking standard for which Nortel has completed early trials with customers. Subsequent to the commencement of insolvency proceedings, Nortel learned that it was not being selected for commercial opportunities by potential

key lead customers despite having positive trial results with several of these customers. As a result, Nortel's plans to offer end-to-end LTE commercial solutions were suspended.

15.   The CDMA Business is the business segment through which the Sellers, individually, jointly or in collaboration with or pursuant to contracts with third parties, design, develop, process components, indirectly manufacture through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers the prior versions (if currently supported), current versions and versions under development of the following products: CDMA BTS, CDMA BSC/eBSC, CDMA DO-RNC, CDMA MSC/MTX, CDMA HLR, CDMA Media Gateway, CDMA Gateway controller, CDMA Billing Manager, SS7 Signaling Gateway Software and certain associated OAM Software Systems and provide certain services related to CDMA (the "CDMA Business").

16.   The LTE Business is the business through which the Sellers, individually, jointly or in collaboration with or pursuant to contracts with third parties, design, develop, process components, indirectly manufacture through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers the prior versions (if currently supported), current versions and versions under development of the following LTE Access products: eNodeB (including UDM and URM) and associated Element Management Systems (the "LTE Business").

17.   CN is Nortel's largest business unit and represents approximately 41% of Nortel's 2008 revenue.  Revenues from CDMA comprised over 21% of Nortel's 2008 Revenue.

18.   The Applicants also have an interest in the intellectual property upon which the CDMA products are based.  Generally speaking, the owner of intellectual property in the Nortel group, which in most cases is NNL, licenses the intellectual property in question for sale to customers in the other geographies, to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis.

19.   The Business currently employs approximately 3,100 people (approximately 500 in Canada) in the CDMA Business and approximately 1,000 people (approximately 500 in Canada) in the LTE Business.

20.    The CN technology requires significant investments of research and development and
       capital to continue to realize the most value from the business and its customer
       relationships. Nortel has concluded that such value is best maximized through the sale of
       the CDMA and LTE businesses to a buyer who can leverage its own existing customer
       relationships and the acquired customer relationships, as well as continue to make the
       necessary investments in technology in order to develop the next generation of products
       and services.

*Initial Sale Process*

21.    Prior to commencing insolvency proceedings, as discussed in the Affidavit of George
       Riedel dated June 23, 2009, Nortel began to explore the possibility of divesting its
       CDMA and LTE assets.  While no binding agreements were entered into, these
       discussions provided Nortel's management with a strong assessment of the market for
       these assets as well as the value of the assets to its major market competitors.

22.    Subsequent to the commencement of insolvency proceedings, Nortel with the assistance
       of Lazard Frères & Co. recommenced efforts to seek a prospective purchaser for the
       CDMA Business and the LTE Business.  In connection with this process, Nortel
       contacted certain of its strategic competitors and ultimately entered into extensive
       negotiations with Nokia Siemens and one other primary competitor.  These negotiations
       culminated in Nortel entering into an agreement with Nokia Siemens as described below.

## THE NOKIA SIEMENS AGREEMENT

23.    On June 19, 2009, the Sellers entered into an Asset Sale Agreement (the "Sale
       Agreement") with Nokia Siemens outlining the terms of the Sellers' sale of certain assets
       and liabilities of the CDMA Business in North America, the CDMA research and
       development assets in China as well as certain LTE assets and liabilities in Canada and
       the United States to Nokia Siemens. The Sale Agreement (without Exhibits or
       Schedules) is attached as Appendix "A". A copy of the exhibits and schedules to the Sale
       Agreement are attached as confidential Appendix "B" hereto. As these exhibits and
       schedules contain sensitive competitive information as well as personal information with

~ 6 ~

respect to employees, the Monitor requests that confidential Appendix "B" to this Fourteenth Report be sealed by this Honourable Court.

24.    Nokia Siemens provides global telecommunications services including a complete portfolio of mobile, fixed and converged network technology, as well as professional services including consultancy and systems integration, deployment, maintenance and managed services. It is one of the largest telecommunications hardware, software and professional services companies in the world. Operating in 150 countries, its headquarters are in Espoo, Finland. Nokia Siemens is a joint venture between Nokia Corporation and Siemens AG.

25.    The key terms of the Sale Agreement are outlined in the paragraphs that follow.

26.    Assets. The assets of the Business being sold are as follows (collectively the "Purchased Assets"):

- the Owned Net Inventory as of the Closing Date;

- the CIP (Construction-In-Process) Receivables as of the Closing Date;

- the Owned Equipment as of the Closing Date;

- the Assigned Contracts in force as of the Closing Date;

- the Assigned Accounts Receivable;

- Real Estate sub-leases;

- the Business Information existing as of the Closing Date;

- the Assigned Intellectual Property as of the Closing Date, subject to any and all licenses granted under such Intellectual Property prior to the Closing Date, together with all claims against Third Parties for infringement, misappropriation or other violation of any Law with respect to any of the Assigned Intellectual Property, whether for any past, present or future infringement, misappropriation or other violation;

- all rights as of the Closing under all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Assets; and

- to the extent assignable under applicable Law, all Consents of Government Entities exclusively pertaining to the Business.

27. The Purchased Assets to be acquired by the Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable, bank account balances and petty cash, certain assets and rights relating to the pre-closing period, and security deposits.

28. <u>Purchase Price.</u>  The Purchase Price is $650 million plus the obligation of the Purchaser to pay, perform and discharge the Assumed Liabilities.  At the Closing, the Purchaser will pay to the Sellers the Estimated Purchase Price calculated as follows:

- The Purchase Price
  - minus
    - $2.6 million for the China Assets (which assets are to be sold pursuant to the China Asset Sale Agreement);
    - the Estimated Employee Adjustment Amount, if any;
  - plus:
    - the difference which may be positive or negative, equal to the Estimated Adjusted Net Working Capital plus $22 million; provided that if the difference is a positive number greater than $30 million, the difference shall be deemed to be $30 million;
  - minus an amount equal to the Working Capital Escrow Amount of $20 million.

29. The parties will enter into the China Asset Sale Agreement for the sale of the CDMA research and development assets in China with the purchase price to be based upon the book value of the assets.  The China Asset Sale Agreement is discussed below.

30. The Working Capital Escrow Amount will be funded by the Purchaser into an escrow account to be established with an escrow agent.

31. Within 30 days of Closing, the Purchaser shall deliver to the Sellers a statement of the calculation of the final Purchase Price.  The Sellers have 30 days from receipt of this statement to issue a Disagreement Notice.  The Sellers and the Purchaser will negotiate in good faith and any resolution will be final and binding on the parties.

32.   If the parties are unable to resolve the disputes within 30 days of the issuance of the Disagreement Notice, an Independent Auditor shall be appointed as an arbitrator. Within 15 business days from the appointment date, he or she is to issue a written report setting forth the resolution of such disagreement, and such report will be final and binding on the parties.

33.   The escrow agent will make a payment to the Purchaser or Seller as the case may be from the Working Capital Escrow Account upon determination of the Final Purchase Price.

34.   Assumed Liabilities.  The liabilities to be assumed by the Purchaser include:

- all liabilities arising on or after the Closing Date to the extent related to the conduct, operation or ownership of the Business after the Closing Date, including (i) all such liabilities with respect to the ownership, exploitation and operation of the Purchased Assets incurred on or after the Closing Date, and (ii) all such liabilities related to actions or claims brought against the Business arising from events occurring after the Closing Date;

- all liabilities arising from or in connection with the performance of the Assigned Contracts after the Closing Date, or any arrangements entered into regarding contracts not assigned to the Purchaser which contain commercial relationships with other Nortel businesses in addition to the CDMA and LTE businesses (the "Bundled Contracts") after the Closing Date;

- any obligations under any warranty liabilities relating to products and CDMA services which have been supplied under any Assigned Contract but excluding any Cure Costs payable under the Sale Agreement;

- the obligation to post any deposits, bonds or other security in replacement of security posted under any Assigned Contract pursuant to the Sale Agreement;

- all liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Assigned Intellectual Property which the Sellers may have granted or committed to third parties, including liabilities resulting from the

~ 9 ~

assurances, declarations and undertakings made to standard setting bodies that are listed in the Sellers Disclosure Schedule;

- all liabilities for, or related to any obligation for, any Transfer Tax that the Purchaser bears under the Sale Agreement;

- all obligations under any warranty liabilities relating to Products and CDMA Services which have been supplied under any Bundled Contract subcontracted to the Purchaser or any Designated Purchaser under the Sale Agreement;

- except to the extent otherwise expressly set forth in the Sale Agreement, all liabilities related to or arising from any of the following: (i) the Purchaser's or any Designated Purchaser's (or any of their Affiliates') employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of the Transferring Employees arising on or after the Closing Date, (ii) the terms of any offer of employment or notice of continued employment, as applicable, to any Employee who is provided an offer pursuant to the Sale Agreement and (iii) Purchaser's or a Designated Purchaser's failure to offer employment to any employee that constitutes a violation of applicable Law;

- all liabilities arising that relate to or arise from or in connection with any Purchaser Employee Plan;

- all liabilities related to Transferring Employees expressly assumed by the Purchaser or a Designated Purchaser as set forth in the Sale Agreement;

- any obligation to provide continuation coverage pursuant to COBRA or any similar Law under any Purchaser Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to Transferring Employees and/or their qualified beneficiaries with respect to a qualifying event that occurs on or after such Transferring Employee Transfer Date;

- the Accrued Vacation Amount;

- all liabilities reflected in the computation of Adjusted Net Working Capital, including the Contractual Liabilities Amount, the Royalty Liability Amount and the Warranty Provision Amount; and

- all other liabilities listed in the Sellers Disclosure Schedule.

35.  Employees – The Purchaser shall extend written offers of employment to at least 2,500 employees in the Business in accordance with the terms of the Sale Agreement. Such offers (and, with respect to Employees whose employment transfers by operation of law, such continued employment) shall be consistent with the requirements of applicable law and on terms and conditions no less favourable, in the aggregate, than those the Employees currently have, but subject to certain adjustments to conform to the Purchaser's standard employment policies where legally possible, and shall provide the employees with a one week consideration period.

36.  Cure Costs – The Sellers are responsible for certain specified Cure Costs required to be paid to effect the assignment of certain contracts to be assumed by the Purchaser.

37.  Sale Free and Clear. The assets to be transferred by the Applicants will be transferred free and clear of all liens, claims and interests, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the Sale Agreement.

38.  No Survival of Representations and Warranties or Covenants:  No representations or warranties, covenants or agreements in the Sale Agreement or in any instrument delivered pursuant to the Sale Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

39.  Certain Fees. The Sale Agreement provides for payment of the Break-Up Fee upon termination of the Sale Agreement in the following instances:  (a) upon the entry of an order by the U.S. Court and the Canadian Court approving an Alternative Transaction; (b) if the Sellers terminate the Sale Agreement because the U.S. Bidding Procedures Order and the Canadian Sales Process Order have not been entered within twelve (12)

~ 11 ~

days from the date of the Sale Agreement; (c) if the Sellers terminate the Sale Agreement because the Auction is not completed within thirty (30) days of the entry of the U.S. Bidding Procedures Order and the Canadian Sales Process Order; (d) if the Sellers terminate the Sale Agreement because the U.S. Sale Order and the Canadian Approval and Vesting Order have not been entered by the respective Courts by July 31, 2009; (e) if any of the Sellers withdraw or seek authority to withdraw the Canadian Approval and Vesting Order Motion or the U.S. Bidding Procedures and Sale Motion, or publicly announce any stand alone plan of reorganization or liquidation (or support any such plan filed by any other Person) in respect of the CDMA and/or LTE businesses; (f) in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in the Sale Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Section 8.3(a) or Section 8.3(b) thereof, as applicable, and, in each case, which, if capable of being cured, is not cured within ten (10) days from receipt of a written notice from Purchaser; provided, however, that the right to terminate the Sale Agreement pursuant to Section 9.1(e) thereof shall not be available to Purchaser where a breach of the Sale Agreement by Purchaser has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate the Sale Agreement pursuant to such clause; or (g) in the event the Sellers fail to consummate the Closing in material breach of Section 2.3 of the Sale Agreement, within five (5) Business Days of written demand by Purchaser to consummate the Closing, and the Expense Reimbursement is payable upon termination of the Sale Agreement pursuant to any of the grounds listed above or if the Closing does not take place by August 31, 2009, or if the Closing does not take place by August 31, 2009 because of the condition that certain regulatory approvals be obtained, if the Closing does not take place by September 30, 2009.

40.    <u>Ancillary Agreements.</u>  Pursuant to the Sale Agreement, at or prior to the Closing, Sellers and the Purchaser will enter into, among others, the following ancillary agreements:

- <u>Transition Services Agreement</u>.  NNL, NNC, NNI and the Purchaser will enter into an agreement under which NNL, NNC and NNI and their affiliates will agree to provide to the Purchaser and its affiliates certain information technology, business transition and related services, commencing at the Closing and

continuing for a period not to exceed two (2) years. The fees to be paid by the Purchasers to the Sellers for these services shall be set out in the Transition Services Agreement.

- <u>Intellectual Property License Agreement</u>. NNL and Nokia Siemens Networks OY ("NSNOY"), an affiliate of the Purchaser will enter into an intellectual property license agreement ("IPLA") pursuant to which (i) NNL will license to the NSNOY and its affiliates certain intellectual property necessary for the manufacture of the products and the provision of services, and (ii) NNL and its affiliates will receive a license back from the Purchaser to all intellectual property included in the Purchased Assets for use in the Company's other businesses. The IPLA will remain in force for so long as any intellectual property rights licensed thereunder continue to exist. In addition, NNL and the Purchaser will enter into a Transitional Trademark License Agreement allowing the Purchaser and its affiliates to, among other things, utilize the "Nortel" trademark and logo in its sales of the Products for a transitional period after closing.

- <u>Transferring Employee Agreement</u>. Nortel and the Purchaser will enter into an agreement under which certain employees of Nortel and its affiliates will be seconded to the Purchaser to perform services for the Purchaser for a 90-day period beginning on the Closing Date. The Transferring Employees will remain on the payroll of the applicable Seller and will continue to participate in the Seller pension and benefit plans. Any expenses for these Transferring Employees will be absorbed by the Purchaser.

- <u>CDMA Supply Agreement</u>. The Sellers and NSNOY will enter into a CDMA Supply agreement pursuant to which the Purchaser will undertake to supply the Sellers with CDMA Products and related support services in order to enable the Sellers to continue to service certain contracts not assigned pursuant to the Sale Agreement ("<u>Excluded Contracts</u>"). In addition, the agreement provides that the Sellers will not enter into any new, or renew any existing, customer contracts related to the Business (including the Excluded Contracts).

- <u>Trademark Licence Agreement.</u> NNL and the Purchaser will enter into a license agreement permitting the Purchaser to license from Nortel certain trademarks for a transitional period following the Closing.

- <u>Escrow Agreement.</u> NNC, NNL, NNI, the Purchaser and a third party escrow agent will enter into an escrow agreement with respect to the Working Capital Escrow Amount.

- <u>Real Estate Agreements.</u> The Sellers and the Purchaser will enter into certain real estate agreements with respect to the post Closing lease, sublease or license by the Purchaser of certain owned and leased properties of the Sellers.

- <u>GDNT Agreement.</u> NNL, the Purchaser and Guangdong-Nortel Telecommunications Switching Equipment Limited shall enter into certain manufacturing and development agreements with respect to the Business.

- <u>China Asset Sale Agreement.</u> Nortel Networks (China) Limited ("Nortel China") and Nokia Siemens Networks Technology (Beijing) Co., Ltd. ("NSN Tech") shall enter into a local asset sale agreement to sell Nortel China's right, title and interest in and to the assets located in China relating to the CDMA Business.

- <u>Manufacturing and Supply Agreement Regarding Dual Platforms.</u> NNI and NSNOY shall enter into a master purchase agreement with respect to the purchase from NNI of certain post Closing products and services

41.    <u>Closing Conditions:</u> The obligation of the Purchaser to close the sale is subject to the satisfaction of the following conditions: (i) Sellers' representations and warranties are true and correct, except as would not result in a Material Adverse Effect, (ii) the performance in all material respects of all material covenants, obligations and agreements required to be performed by the Sellers on or before the Closing, (iii) bankruptcy court and all other regulatory approvals; and (iv) with respect to Bundled Contracts which accounted for in aggregate at least $1.5 billion or no less than 75% of the sales revenue related to the CDMA Business in fiscal year 2008, the Sellers shall have or will have

prior to or at the Closing entered into new contracts with the counterparties, which will be Assigned Contracts.

42.    <u>Additional Termination Rights:</u>  In addition to the Termination Rights of the Purchaser that would give rise to the payment of the Break-Up Fee and the Expense Reimbursement as outlined above, either the Purchaser or the Sellers may terminate the Sale Agreement if the Closing does not take place by August 31, 2009, or as extended per the Sale Agreement, without triggering the requirement to pay the Break-Up Fee or the Expense Reimbursement.

43.    <u>Ongoing Covenants and Restrictions:</u>  In addition to certain other customary post-closing obligations such as information-sharing and redirection of customers and payments, the Sellers have agreed to: (i) cooperate with the Purchaser in relation to arrangements regarding non-assignable contracts and Bundled Contracts during an agreed period after the Closing and (ii) sublease certain real estate to the Purchaser.

44.    <u>Post-Closing Access to Books and Records</u>.  For three years after the Closing (or such longer period as may be required under applicable law), the Purchaser must preserve pre-closing records. After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable advance notice and during regular business hours, the Purchaser shall, and/or shall cause the Person holding such records to provide the Sellers or their representatives reasonable access to such records and permit the Sellers or their representatives to make copies of such records, in each case at no cost to the Sellers or their representatives (other than for reasonable out-of-pocket expenses).  The Sale Agreement contains further provisions related to tax records and information.

**BIDDING PROCEDURES AND AUCTION PROCESS**

45.    Given that certain of the U.S. Debtors are parties to the Sale Agreement and given the desire to maximize value for the benefit of stakeholders in relation to the assets which are the subject of the Sale Agreement, Nortel has determined and has agreed with Nokia Siemens that the Sale Agreement is subject to higher or better offers being obtained pursuant to a sale process under section 363 of the Code and that the Sale Agreement

~ 15 ~

shall serve as a "stalking horse" bid pursuant to that process. The Purchased Assets may be sold in a single sale to a single purchaser or in parts to several purchasers.

46.  The U.S. Debtors have filed a bidding procedures motion with the U.S. Court. A copy of the proposed bidding procedures is attached as Appendix "C" (the "Bidding Procedures").

47.  It is a condition of the Sale Agreement that Nortel shall have filed a motion seeking the approval of the Bidding Procedures by the U.S. Court by the second Business Day after signing the Sale Agreement. The motion was filed with the U.S. Court on June 19, 2009. It is also a condition of the Sale Agreement that Nortel shall have filed a similar motion seeking the approval of the same Bidding Procedures by this Honourable Court by the date that the U.S. Court grants an Order approving the Bidding Procedures. The Order being sought from the U.S. Court in respect of the Bidding Procedures is conditional upon this Honourable Court's approval of the same and the Applicants' motion for approval of the Bidding Procedures by this Honourable Court is likewise conditional on approval by the U.S. Court.

48.  Pursuant to the Sale Agreement, the Sellers who are U.S. Debtors shall use their best efforts to cause the U.S. Court to schedule a hearing to consider the Bidding Procedures and Sale Motion and enter the U.S. Bidding Procedures order as soon as possible.

49.  The Bidding Procedures provide that all bids must be received by the Sellers by no later than July 21, 2009 and that the Sellers will conduct an Auction of the Purchased Assets on July 24, 2009.

50.  It is anticipated that Nortel will ultimately seek a final Sales Order from the U.S. Court on or about July 28, 2009 and an Approval and Vesting Order from this Honourable Court in respect of the Sale Agreement and Purchased Assets on or about July 30, 2009.

51.  The Monitor recognizes the expeditious nature of the proposed sale process. However, the Monitor is advised that given the nature of the Business and the consolidation occurring in the global market, there are likely to be a limited number of parties interested in acquiring the Business. The Monitor is further advised that the Applicants have previously engaged in discussions with certain of these parties and the Monitor has

observed the extensive discussions held to date with Nokia Siemens and one other primary competitor.

52.  Nortel has consulted with, among others, the Official Committee of Unsecured Creditors (the "UCC") and the Bondholder Group regarding the Bidding Procedures and believe that both are supportive of the timing of this sale process.

53.  Given the sale efforts made to date by Nortel, the Monitor supports the sale process outlined herein and more particularly described in the Bidding Procedures.

54.  As described in the relevant motion materials filed with the U.S. Court, the key provisions of the Bidding Procedures are outlined in the paragraphs that follow.

### Bid Deadline

55.  A Qualified Bidder (as defined below) that desires to make a bid will deliver written copies of its bid to:  the Sellers, counsel and financial advisors to the Sellers, counsel and financial advisors to the UCC, counsel to the Bondholder Group, and the Monitor; so as to be received not later than 4:00 p.m. (Eastern Time) on July 21, 2009 (the "Bid Deadline").  The Sellers, after consultation with the UCC, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so; provided, however, that for any such extension beyond ten Business Days the Sellers shall have obtained the written consent of the UCC, the Bondholder Group, and the Monitor, which consent will not be unreasonably withheld.  If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders, including Nokia Siemens, of such extension.

### Provisions Governing Qualifications of Bidders

56.  Unless otherwise ordered by the U.S. Court and this Honourable Court, for cause shown, or as otherwise determined by the Sellers, in consultation with the UCC, the Bondholder Group and the Monitor, in order to participate in the bidding process, each person (a "Potential Bidder"), other than Nokia Siemens, must deliver (unless previously delivered) to the Sellers and their advisors, the UCC and its advisors, counsel to the Bondholder Group and the Monitor:

~ 17 ~

- an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers;

- financial information that will allow the Sellers and their financial advisors, in consultation with the UCC, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate a purchase of the Purchased Assets; and

- a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Purchased Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder, and any proposed measures associated with their employment; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Sale Agreement.

57.    A Potential Bidder that satisfies the above requirements, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the UCC, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction, will be deemed a "Qualified Bidder". The determination as to whether a Potential Bidder meets the requirements of a Qualified Bidder will be made as promptly as practicable and the Sellers will so notify the Potential Bidder. The

Sellers will immediately allow Qualified Bidders to begin to conduct due diligence with respect to the Purchased Assets as provided in the Bidding Procedures.

***Provisions Governing Qualified Bids***

58.    A bid submitted pursuant to the Bidding Procedures will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "Qualified Bid"):

- the Qualified Bidder offers to purchase the Purchased Assets upon the terms and conditions substantially as set forth in the Sale Agreement, or pursuant to terms and conditions that the Sellers determine, after consultation with the UCC, the Bondholder Group and the Monitor, are no less favourable than the terms and conditions of the Sale Agreement;

- the bidder's offer is irrevocable until the selection of the Successful Bidder (as defined below) and, if applicable, the Alternate Bidder (as defined below), provided that if such bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, August 31, 2009 and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

- it includes a duly authorized and executed Sale Agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto including to the extent required by such bid, all applicable ancillary agreements as well as copies of such materials marked to show those amendments and modifications to the Sale Agreement, related ancillary agreements and proposed orders to approve the Sale by the U.S. Court, this Honourable Court and any other applicable court(s) whose approval may be required, as proposed by the Qualified Bidder;

- it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction;

- it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

- it fully discloses the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

- it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the UCC, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Purchased Assets, is greater than or equal to the sum of the value offered under the Sale Agreement, plus (i) the amount of the Break-Up Fee and Expense Reimbursement plus (ii) $5,000,000;

- it includes an acknowledgment and representation with respect to the executory contracts and unexpired leases which the Qualified Bidder proposes to assume or not assume, the Qualified Bidder's proposal for the treatment of related Cure Costs and any executory contract or unexpired lease the assumption and assignment of which is a condition to Closing;

- it includes an acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all required due diligence, has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets, has not relied upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, except as expressly stated in its bid  and is not entitled to any expense reimbursement or break fee in connection with its bid;

- it includes evidence of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body);

- it is accompanied by a good faith deposit in an amount equal to 5% of the Purchase Price;

- it contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder and any proposed measures associated with their continued employment;

- it includes evidence of the Qualified Bidder's ability to comply with Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed to be assigned or subleased to the Potential Bidder;

- it contains other information reasonably requested by the Sellers; and

- it is received by the Bid Deadline.

59.   The Sellers will determine, in their reasonable business judgment, after consultation with the UCC, the Bondholder Group and the Monitor, whether to deem bids for the Purchased Assets that do not conform to one or more of the requirements specified in the Bidding Procedures to be Qualified Bids and shall deliver copies of any bids deemed to be Qualified Bids to the Purchaser as soon as reasonably practicable after such a determination has been made.

60.   Notwithstanding the foregoing, Nokia Siemens will be deemed a Qualified Bidder, and the Sale Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale.

61.   A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such transactions, the proposed revisions to the relevant transaction documents, the effect of the Sale on the value of the ongoing businesses of the Sellers, other factors affecting the speed, certainty and value of the Sale, the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such

transaction, each as determined by the Sellers, in consultation with their advisors, the UCC, the Bondholder Group and the Monitor.

62. If the Sellers do not receive any Qualified Bids other than the Sale Agreement, the Auction shall be cancelled and the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Sale Agreement subject to obtaining any relevant court approvals.

***Auction Process***

63. If the Sellers receive one or more Qualified Bids in addition to the Sale Agreement, the Sellers will conduct an auction (the "Auction") of the Purchased Assets, upon notice to all Qualified Bidders who have submitted Qualified Bids, on July 24, 2009, which Auction may be cancelled or adjourned without the prior consent of Nokia Siemens, subject to the terms of the Sale Agreement. Copies of all Qualified Bids shall be delivered to the UCC, the Bondholder Group, the Monitor and Nokia Siemens promptly after such time that such bid is deemed a Qualified Bid, but no later than 2 Business Days prior to the Auction.

64. The Auction shall run in accordance with the following procedures:

- Only the Sellers, the Purchaser, the UCC, the Bondholder Group and the Monitor (and the advisors to each of the foregoing), any creditor of the Sellers and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction;

- Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale;

- At least one Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction and the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the UCC, the Bondholder Group and

the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction;

- All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction;

- Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that in the determination of the Sellers, in consultation with their advisors, the UCC, the Bondholder Group and the Monitor, improves upon the Starting Bid or previous Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least $5,000,000, or such amount to be determined by the Sellers, in consultation with the UCC, the Bondholder Group and the Monitor, over the Starting Bid or the Leading Bid. After each round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

*Selection of Successful Bid*

65.    Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the UCC, the Bondholder Group and the Monitor will (a) review each Qualified Bid and evaluate each Qualified Bid, (b) identify the highest or otherwise best offer or offers for the Purchased Assets received at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder making such bid, collectively the "Successful Bidder"), it being understood that the Purchaser is not required to satisfy any minimum bid increment requirement and that if the Sellers determine that a Qualified Bid or

~ 23 ~

Subsequent Bid by the Purchaser and any other Qualified Bid are therefore not materially different, then as between those two offers, the Purchaser's offer shall be deemed to be the highest and best offer for purposes of this provision and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid shall be final subject to approval by the U.S. Court and this Honourable Court.

66.     The Sellers will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the U.S. Court and this Honourable Court.

### Closing with Alternate Bidders

67.     If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid. If a Qualified Bid other than the Sale Agreement is selected as the Alternate Bid, then the Alternate Bid shall remain open until the earlier of (a) August 15, 2009 or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date").

### Court Approval

68.     The Bidding Procedures and Sale Agreement are being submitted to this Honourable Court and to the U.S. Court for approval. The final sale and assignment of the Purchased

Assets will also be submitted to this Honourable Court and to the U.S. Court for approval.

## ALLOCATION OF PROCEEDS OF SALE AMONGST NORTEL ENTITIES

69.    As previously indicated, the Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the Business which, in turn, is subject to various intercompany licensing agreements. NNL, NNI and certain of their affiliates have interests in various customer contracts, receivables and other assets. Therefore, the task of allocating the sale proceeds stemming from the Sale Agreement amongst the various Nortel entities in the various jurisdictions is complex. As a result, the net proceeds of sale stemming from the Sale Agreement will be held in escrow with a party acceptable to the Sellers until such time as an allocation is agreed upon.

## OTHER RESTRUCTURING EFFORTS

70.    On June 19, 2009, Nortel announced that it is advancing in its discussions with external parties to sell its other businesses. The company will assess other restructuring alternatives for these businesses in the event it is unable to maximize value through sales. In addition, Nortel announced it would apply to delist its common shares and the NNL preferred shares from trading on the Toronto Stock Exchange.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

71.    The Monitor has reviewed Nortel's efforts to divest its CDMA Business and LTE Business and is of the view that the Company is acting in good faith to maximize value. The Monitor recommends approval of the Sale Agreement as a "stalking horse" bid and approval of the Bidding Procedures as described above. In so doing, the Monitor

considers the potential payment of the Break-Up Fee and Expense Reimbursement to Nokia Siemens as reasonable in the circumstances.

72.    For the reasons described in Paragraph 23, the Monitor recommends that confidential Appendix "B" to this Fourteenth Report be sealed by this Honourable Court.

All of which is respectfully submitted this 23rd day of June 2009.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:

Murray A. McDonald
President

~ 26 ~

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**FOURTEENTH REPORT OF THE MONITOR**
**DATED JUNE 23, 2009**

---

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada  M5B 2M6

Jay A. Carfagnini (LSUC# 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5726149