## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS INC., et al., [1] | ) | Case No. 09-10138 (KG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | Re: Docket No. 931 |
| | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING DEBTORS' ENTRY
INTO THE ASSET SALE AGREEMENT, (B) AUTHORIZING AND APPROVING
THE BIDDING PROCEDURES, (C) AUTHORIZING AND APPROVING
A BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (D) APPROVING
THE NOTICE PROCEDURES, (E) APPROVING THE ASSUMPTION
AND ASSIGNMENT PROCEDURES, (F) AUTHORIZING THE FILING OF
CERTAIN DOCUMENTS UNDER SEAL, AND (G) SETTING A DATE FOR THE
SALE HEARING, AND (II) AUTHORIZING AND APPROVING (A) THE SALE
OF CERTAIN ASSETS OF DEBTORS' CDMA AND LTE BUSINESS FREE
AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES,
(B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS,
AND (C) THE ASSUMPTION AND SUBLEASE OF CERTAIN LEASES**

The Official Committee of Unsecured Creditors (the "Committee") of Nortel Networks

Inc., et al. (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this

objection (the "Objection") to certain portions of the relief requested in the Debtors' Motion for

Orders (i)(a) Authorizing Debtors' Entry Into the Asset Sale Agreement, (b) Authorizing and

Approving the Bidding Procedures, (c) Authorizing and Approving a Break-Up Fee and Expense

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems, Inc.
(9769), Nortel Altsystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation
(0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks
Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826),
Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable
Solutions Inc. (0567).

Reimbursement, (d) Approving the Notice Procedures, (e) Approving the Assumption and

Assignment Procedures, (f) Authorizing the Filing of Certain Documents Under Seal, and (g)

Setting a Date for the Sale Hearing, and (ii) Authorizing and Approving (a) the Sale of Certain

Assets of Debtors' CDMA and LTE Business Free and Clear of All Liens, Claims and

Encumbrances, (b) the Assumption and Assignment of Certain Contracts, and (c) the Assumption

and Sublease of Certain Leases (the "Motion"), as more particularly described below.  In support

of its Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      Although generally supportive of the Debtors' efforts to maximize the value of

certain Assets[2] through their entry into a stalking horse purchase agreement for the sale of their

CDMA and LTE businesses, and the auction process that will be conducted for such Assets, the

Committee believes that certain aspects of the bidding procedures proposed by the Debtors in the

Motion are flawed and must be remedied before they can be approved by this Court:

a) **Matching Right.**  The bidding procedures allow the Debtors' stalking horse purchaser to submit subsequent bids at auction without meeting the Debtors' specified $5 million minimum bid increment for each round of bidding.  In fact, the stalking horse purchaser is not required to satisfy any minimum bid increment at all, and will automatically be deemed the winner in the event its bid is not "materially different" from the otherwise highest bid.

b) **Early Notice of Qualified Bids to Stalking Horse.**  The bidding procedures and the sale agreement guarantee that the stalking horse, alone, will receive advance copies of other Qualified Bids, which will, among other things, allow the stalking horse to strategize regarding such bids in advance of the auction.

c) **The Stalking Horse Is Not Required to Make a Deposit.**  The bidding procedures and the sale agreement unfairly discriminate by requiring that other bidders, but not the stalking horse, provide significant good faith deposits with their bids.

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion or the Bidding Procedures, as applicable.

2

d) **Due Diligence Access**. Although the Committee is confident that the Debtors will work expeditiously with parties previously engaged in due diligence, the bidding procedures unfairly prohibit such parties from continuing their diligence until such time as the bidding procedures are approved, and those parties are formally deemed Qualified Bidders by the Debtors.

e) **Payment of Break Up Fee in Absence of Alternative Transaction.** The Motion and accompanying order request authority to provide the stalking horse with a break up fee and expense reimbursement under a variety of circumstances that do not involve the closing of an alternative transaction that would provide a real benefit to the Debtors' estates and creditors.

f) **Waiver of Key Requirements of Qualified Bid.** The bidding procedures allow the Debtors to waive certain key components of Qualified Bids without the consent of the Committee, the Bondholder Group and the Monitor, including the requirement that a bidder (i) provide written evidence of a firm financing commitment, (ii) not include any conditions related to the outcome of unperformed due diligence by the bidder and/or obtaining financing, (iii) satisfy minimum incremental bid thresholds, and (iv) provide a Good Faith Deposit

2.      These elements of the bidding procedures run contrary to the goal of an auction run under the auspices of a bankruptcy court: to have a fair and open auction designed to maximize proceeds to the debtor's estate.

3.      Here, certain aspects of the bidding procedures serve to stifle, rather than encourage active bidding at auction. Critically, (a) disadvantaging prospective bidders by providing them with less information regarding competing bids than the stalking horse, (b) requiring bidders other than the stalking horse to provide deposits, (c) prohibiting other parties already performing due diligence from continuing such diligence until the bid procedures are approved and they are formally deemed qualified bidders, and (d) requiring subsequent bidders to leapfrog the stalking horse's matching rights at each round of bidding, creates a non-level playing field and will retard active participation in this auction of one of the Debtors' and their stakeholders' most valuable assets. Such discrimination will in all likelihood result in an auction that will not maximize value for the benefit of the Debtors' estates. Thus, the playing field needs to be reset by the Court.

3

4.     Moreover, aspects of the bidding procedures, sale order and motion must be more carefully focused on safeguarding – or working to maximize – value to the Debtors' estates. The Debtors should not be entitled to, for instance, unilaterally accept "bids" that contain no financing commitment, contain no deposits, or that contain a due diligence out. Expending estate resources to conduct an auction that may result in a winning bid that never closes, for failure to obtain financing, is not consistent with the Debtors' duties to maximize value for their estates. Similarly, the Debtors should not be permitted to provide the stalking horse with a break up fee and expense reimbursement in the absence of the closing of an alternative transaction that actually generates value for the Debtors' estates. See ASA Section 9.1 (allowing break up fees for failure to timely obtain certain court orders or for the breach of representations and warranties). Consistent with binding precedent in this Circuit, such payments must only be provided to the stalking horse if the payments can be offset by a corresponding benefit to the estate, such as the closing of an alternative transaction. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999). Because the payment of the break up fee and expense reimbursement proposed in the Motion and sale agreement, in such instances, do not meet this standard, they cannot be approved.

## BACKGROUND

5.     On January 14, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On January 15, 2009, the Court entered an order jointly administering these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

6.     On January 14, 2009, the Debtors' ultimate corporate parent, Nortel Networks Corporation, together with Nortel Networks Limited and certain of their Canadian affiliates

4

commenced a proceeding before the Ontario Superior Court of Justice (the "Canadian Court")

for a plan of compromise or arrangement under the Canadian Companies' Creditors

Arrangement Act.  The Canadian Debtors continue to operate their businesses and manage their

properties under the supervision of the Canadian Court.

      7.      On January 14, 2009, the High Court of Justice in England placed nineteen of the

Debtors' European affiliates into administration under the control of individuals from Ernst &

Young LLC.

      8.      Since the Petition Date, the Debtors continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

      9.      On January 22, 2009, pursuant to section 1102 of the Bankruptcy Code, the

United States Trustee for the District of Delaware appointed the Committee.[3]

      10.      Pursuant to the Motion, the Debtors seek, among other things, the entry of an

order (i) establishing bidding procedures (the "Bidding Procedures") to govern the sale of the

Assets, and (ii) approving (a) a break-up fee of $19.5 million (the "Break-Up Fee"), and (b) an

expense reimbursement of up to a maximum of $3 million (the "Expense Reimbursement").

Also on June 19, 2009, the Sellers and the Purchaser executed an asset sale agreement (the

"ASA"), pursuant to which the Buyer agreed to purchase the Assets (the "Sale").  More

specifically, the Sellers propose to sell the Assets to the Purchaser for cash consideration of $650

million, subject to certain purchase price adjustments.

---

[3] The Committee currently consists of the following five entities: Airvana, Inc., Flextronics Corporation (Chairperson); Law Debenture Trust Company of New York, as indenture trustee; Pension Benefit Guaranty Corp.; and The Bank of New York Mellon, as indenture trustee.

11.     The Purchaser's offer to purchase the Assets will be subject to higher and better offers, if any, received during an auction process (the "Auction") to be conducted in accordance with the Bidding Procedures.  Notwithstanding the requirement that Qualified Bids and each successive bid be made in $5 million increments, however, the Purchaser is specifically exempted from such requirement and will be deemed the highest and best even if it is not "materially different" from the preceding Leading Bid.  See Bidding Procedures at 11.  Finally, the Purchaser, in contrast to other Qualified Bidders, is given the right to receive copies of each Qualified Bid as soon as reasonably practicable after such bid is deemed a Qualified Bid.

12.     Additionally, pursuant to the Bidding Procedures and the ASA, under certain circumstances, the Purchaser will be entitled to the Break-Up Fee in the amount of $19.5 million and the Expense Reimbursement in the amount of up to $3 million in the event the ASA is terminated without the Sellers consummating an Alternative Transaction.  See Bidding Procedures at 9, ASA §§ 9.1 and 9.2(a).

## THE COMMITTEE'S OBJECTION

## I.     The Proposed Bidding Procedures Will Impermissibly Chill Bidding.

13.     The purpose of bidding procedures is to facilitate the fair sale of a debtor's assets through a process that will maximize the value of such assets for the benefit of the debtor's creditors.  See In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997); In re Reading Broadcasting, Inc., 386 B.R. 562, 575 (Bankr. E.D. Pa. 2008) (noting that the purpose of a bankruptcy sale is to obtain the highest and best price for the estate and thus for its creditors); In re E-Z Serve Convenience Stores, Inc., 289 B.R. 45 (Bankr. M.D.N.C. 2003) (denying approval of a sale on the grounds that the auction procedures were "patently unfair and inequitable"); In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").  Courts

6

have consistently held that mechanisms that will have a chilling effect on the bidding process should not be approved.  See In re President Casinos, Inc., 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) (permitting debtor to conduct sale of assets, but declining to approve bidding procedures that could have hampered the bidding process); see also In re APP Plus, Inc., 223 B.R. 870 (Bankr. E.D.N.Y. 1998) (rejecting a proposed topping fee because it found that the stalking horse bidder was adequately protected by a break-up fee).

14.    The Bidding Procedures proposed by the Debtors will not facilitate a fair sale of the Assets and must be modified in order to ensure such a fair sale.  As detailed below, these modifications include eliminating: (i) the waiver for the Purchaser of the requirement that bids submitted at the Auction must be at least $5 million greater than the Leading Bid, and associated protections exclusively benefiting the Purchaser, and (ii) the requirement that the Sellers deliver a copy of each Qualified Bid to the Purchaser as soon as it is deemed a Qualified Bid.  Absent these modifications, the Committee believes that approval of the Bidding Procedures will discourage competing bids, diminishing the likelihood of (a) a competitive Auction and (b) increased unsecured creditor recoveries resulting from the Sale.

A.    **By Providing the Purchaser with a Matching Right, and Associated Preferences, the Bidding Procedures Will Stifle Bidding.**

15.    Pursuant to the proposed Bidding Procedures, the Purchaser is exempted from the minimum $5 million incremental overbid requirement applicable to all other bidders, and, accordingly, the Purchaser will be automatically deemed the winner of the Auction if it submits a bid that is not "materially different" from the leading bid (the "Matching Right").  See Bidding Procedures at 10-11.  In other words, under the Bidding Procedures, a Subsequent Bidder may outbid the Purchaser by $5 million, only to have the Purchaser outbid the Qualified Bid by $1.  In such a scenario, if the Subsequent Bidder does not wish to again raise its bid by yet another $5 million, the Purchaser will automatically be deemed the Successful Bidder, notwithstanding that

7

its bid is not materially higher than that of the Subsequent Bidder. Alternatively, if the Subsequent Bidder wishes to bid again, it may raise its bid by another $5 million, in which case it has effectively been required to increase its bid by a total of $10 million in order to be deemed higher and better than the Purchaser's bid.[4] The proposed Matching Right thus requires a Qualified Bidder to continually raise its own bid each time the Purchaser makes a Matching Bid, while the Purchaser's Matching Bid itself will never actually increase the net value offered for the Assets.

16.     The Matching Right afforded to the Purchaser by the proposed Bidding Procedures will chill bidding on the Assets because it stacks the deck against all Qualified Bidders other than the Purchaser. Indeed, it not only reduces the incentive for other Qualified Bidders to bid at the Auction, it reduces their incentive to even participate in the Auction in the first instance. Why incur the substantial expense involved in performing due diligence on the Assets, obtaining financing, and participating in an auction when the Auction is inherently unfair? In order to establish a fair process, and encourage bidding, the Committee submits that the Matching Right ought to be removed from the Bidding Procedures.

**B.      The Requirement that Qualified Bids Be Given Up Front to the Purchaser Gives the Purchaser an Unfair Advantage.**

17.     The proposed Bidding Procedures and the ASA inappropriately require that as soon as reasonably practicable after the Sellers determine that a bid is a Qualified Bid, they are required to deliver copies of such bid to the Purchaser. See Bidding Procedures at 8, ASA Section 10.7. This requirement could chill the competitive bidding process in at least two ways. First, this requirement provides the Purchaser with an unfair advantage over other Qualified

---

[4] Although the Debtors, in consultation with the Committee, the Bondholder Group and the Monitor, retain the right to modify the $5 million bid increment applicable to all Qualified Bidders other than the stalking horse, they are not required to do so, and likely will not reduce the increment to zero. Accordingly, it is unlikely that this unfair advantage will ever be entirely neutralized.

Bidders prior to the Auction because the Purchaser will have more information about competing Qualified Bids, and more time to prepare counter-offers than any of the other Qualified Bidders. Second, this requirement could prevent the Purchaser's industry competitors from submitting bids to the extent that their bids contain information of a proprietary or confidential nature that these competitors would not want shared with the Purchaser in advance of an Auction. Finally, this requirement impairs the Debtors' ability to review Qualified Bids and consult with the Committee in order to seek to refine or improve the terms of such bids prior to the Auction, which often occurs in these situations. The Committee submits that this requirement should be removed from the Bidding Procedures and the ASA.

## II.     The Break-Up Fee Should Only be Payable Upon Closing of a Competing Transaction.

18.     The proponent of a break-up fee bears a very heavy burden, which cannot be fulfilled by the Debtors in this instance. The allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate. See In re O'Brien Envtl. Energy, Inc., 181 F.3d at 535. Courts have recognized that break-up fees may yield large profits to the recipient at the expense of unpaid unsecured creditors. See In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995). Indeed, as "any money that a bidder receives through a bidding incentive comes out of the pockets of the creditors of the estate . . . there should be a direct relationship between the reimbursement an unsuccessful buyer receives and the benefit to the estate from the unsuccessful buyer's bid." Id. Absent an actual sale of the Assets subject to the pending bid at a price equal to or great than the stalking horse bid, the stalking horse bid will not have provided a benefit to the Debtors' estates. Accordingly, the only circumstance where the Break-Up Fee should be paid in this case is upon the closing of a competing transaction that provides a demonstrable benefit to the Debtors' estates and creditors.

9

19.    The ASA currently provides for the payment of the Break-Up Fee to the

Purchaser upon a variety of inappropriate circumstances that permit the Purchaser to terminate

the ASA, other than the closing of an actual competing transaction including, among others,

termination upon:

> (i) entry of an order by the Court and the Canadian Court approving a transaction
> for the Assets with a Successful Bidder other than the Purchaser, regardless of
> whether such transaction closes, see ASA Section 9.1(b) and 9.2(a);
>
> (ii) (a) orders approving the Bidding Procedures not having been entered by the
> Court and the Canadian Court by July 1, 2009, see ASA Section 9.1(c)(i) and
> 9.2(a), (b) the Auction not having been completed within 30 days of the entry of
> such orders, see ASA Section 9.1(c)(ii) and 9.2(a), or (c) the U.S. Sale Order and
> the Canadian Approval and Vesting Order not having been entered by the Court
> and the Canadian Court by July 31, 2009, see ASA Section 9.1(c)(iii) and 9.2(a);
> or
>
> (iii) a breach by the Sellers of any of the covenants, representations or warranties
> under the ASA such that they are unable to satisfy the closing conditions, even if,
> for example, the reason for such inability to satisfy the closing conditions is the
> result of a flood.

See ASA §§ 9.1(e) and 9.2(a).

20.    The ASA thus provides that the Debtors are obligated to pay the Purchaser the

$19.5 million Break-Up Fee upon events other than the closing of an Alternative Transaction and

thus not from the proceeds of another sale. If no Alternative Transaction closes, or the Break-Up

Fee becomes payable by reason of a condition other than the existence of a prospective

Alternative Transaction, then the Debtors' estates will have received no benefit from the Break-

Up Fee. There simply is no justification for the payment of a break-up fee if, for instance, the

Sale does not occur because of a breach of a representation and warranty or the failure of the

parties to obtain a necessary governmental approval. The Break-Up Fee must only be payable

from and upon consummation of an Alternative Transaction because only at such time will the

benefit of the Break-Up Fee to the Debtors' estates be received. Accordingly, the Committee

10

requests that this Court allow the payment of the Break-Up Fee solely upon the **closing** of a competing transaction.

### III.    The Bidding Procedures and the ASA Require Additional Critical Modifications.

21.    In addition to the inappropriate provisions discussed above, it is critical that the following additional provisions of the ASA and Bidding Procedures be modified or clarified as a condition to this Court's approval of the ASA and Bidding Procedures:[5]

- **Waivability of Key Qualified Bid Requirements**. The Sellers should not have the ability to waive the following key Qualified Bid requirements without the consent of the Committee, the Bondholder Group and the Monitor: (i) written evidence of a firm financing commitment, (ii) the absence of any conditions related to the outcome of unperformed due diligence by the bidder and/or obtaining financing, (iii) the incremental value of a Subsequent Bid meeting the minimum thresholds, and (iv) the requirement that bids be accompanied by a Good Faith Deposit (collectively, the "Key Bid Requirements"). The Sellers have a duty to maximize the value of their estate for the benefit of their creditors. In re Martin, 91 F.3d 389, 394 (3d Cir. 1996) ("[I]t is the trustee's duty to ... the creditor to realize from the estate all that is possible for distribution among the creditors." (citing 4 Collier on Bankruptcy ¶ 704.01 (15th ed. 1993)). As the net value of the Debtors' Assets may erode over time, it is critical that the Auction produce a Successful Bid with a reliable likelihood of a timely closing. Allowing, for instance, the Debtors to unilaterally allow bidders to insert a due diligence condition or a financing contingency, would be to allow them to agree to a potentially illusory sale agreement. Any reason for granting such waivers must be compelling. Accordingly, the Committee submits that the Sellers should not be permitted to waive the Key Bid Requirements without obtaining consent from the Debtors' main stakeholders, the Committee, the Bondholder Group and the Monitor.

- **Good Faith Deposit**. While the Bidding Procedures require that all Qualified Bids be accompanied by a Good Faith Deposit of 5% of the Purchase Price, neither the ASA nor the Bidding Procedures require the Purchaser to provide any deposit whatsoever. A deposit (i) provides the Sellers with critical assurance that the Purchaser is committed to, and has a stake in, the success of the Sale, and (ii) provides the Sellers with direct access to a source of recovery from the Purchaser in the event the Purchaser breaches the ASA. Requiring Qualified Bidders, but

---

[5] The Creditors' Committee reserves the right to raise any and all appropriate objections to the Sale at the Sale Hearing, including, without limitation, the Debtors' failure to modify the ASA to address the Committee's concerns.

not the Purchaser, to provide deposits will create unfair discrimination, chill bidding, and compromise the Debtors' ability to maximize value for the benefit of the Debtors' estates and creditors.

- **Due Diligence Access**. Although the proposed Bidding Procedures provide that, following the approval of the Bidding Procedures, and "[a]t the same time that the Sellers notify [a] Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence...with respect to the Assets", the procedures do not clearly discuss what happens before such notification. In other words, between (a) the execution of the ASA with the Purchaser and (b) the notification of a Potential Bidder that it is a Qualified Bidder, any parties already conducting due diligence on the Assets are not clearly entitled to continue such diligence. Given the extremely compressed time period to conduct diligence and submit bids under the proposed Bidding Procedures, it is critical that prospective bidders that have signed confidentiality agreements with the Debtors be given continuous and unfettered access to all necessary due diligence materials. Prohibiting access during this period will only suppress bidding and/or the value offered in any affected bids.

## IV.    Reservation of Rights With Respect to Escrow of Purchase Proceeds.

22.    The Committee believes that, in accordance with that certain Interim Funding and Settlement Agreement, dated June 9, 2009 (the "IFA"), all proceeds of the Sale must be deposited into an Escrow Account for the benefit of the Sellers (the "Escrow Account"). The order approving the sale contemplated in the Debtors' Motion must require that proceeds in the Escrow Account be distributed only upon (a) an agreement of all of the Sellers, the Committee, the Bondholder Group and the Monitor as to the distribution of such proceeds or (b) in the event those parties fail to reach agreement, determination in accordance with the terms of the IFA. The proposed sale order appended to the Motion does not contain such a requirement. Therefore, the Committee requests that any sale order approved by this Court must be amended accordingly. The Committee reserves all of its rights with respect to the proper allocation of proceeds received by the Sellers in respect of the Assets until an Allocation Determination becomes final.

12

## CONCLUSION

23.     For all of the foregoing reasons, the Committee respectfully requests that the

Court (i) deny approval of the Bidding Procedures absent the modifications thereof as outlined

herein, (ii) deny approval of the ASA absent the modification thereof as outlined herein, and

(iii) grant such other and further relief as this Court deems just, proper and equitable.

Dated: June 26, 2009          Respectfully submitted,
       New York, New York

By: _____

Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
Tel.:  (302) 651-7700

-and-

Fred S. Hodara (*pro hac vice*)
David H. Botter (*pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY  10036
Tel.:  (212) 872-1000

Co-counsel to the Committee

13