## EXHIBIT A

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**
**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**MOTION RECORD**
**Nokia Siemens Networks B.V. Bidding Procedures**
**(returnable June 29, 2009)**

June 23, 2009

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario  M5J 2Z4

Derrick Tay LSUC#: 21152A
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

Mario Forte  LSUC#: 27293F
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

# INDEX

DOCSTOR: 1680120\1

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

## INDEX

| TAB | DOCUMENT | PAGE |
|-----|----------|------|
| 1. | Notice of Motion returnable June 29, 2009 | 1 |
| 2. | Affidavit of George Riedel, sworn June 23, 2009 | 24 |
| 3. | Draft Order | 37 |

**TAB 1**

Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**NOTICE OF MOTION**
**(returnable June 29, 2009)**

Nortel Networks Corporation, Nortel Networks Limited ("NNL"), Nortel Networks
Technology Corporation, Nortel Networks International Corporation and Nortel Networks
Global Corporation (collectively, the "Applicants") will make a motion to Justice Morawetz of
the Commercial List court on Monday, June 29, 2009 at a time to be advised at **393 University
Avenue**, Toronto, Ontario.

PROPOSED METHOD OF HEARING: The motion is to be heard:

| | |
|---|---|
| ☐ | in writing under subrule 37.12.1(1) because it is on consent or unopposed or made without notice; |
| ☐ | in writing as an opposed motion under subrule 37.12.1(4); |
| ☒ | orally. |

THE MOTION IS FOR AN ORDER:

(a)     Abridging the time for service of the Notice of Motion and Motion Record in respect of
this motion and dispensing with further service thereof;

- 2 -

(b)     Approving the bidding procedures (the "Bidding Procedures") described in the affidavit
of George Riedel sworn June 23, 2009 (the "Riedel Affidavit") and the fourteenth report
(the "Fourteenth Report") of Ernst & Young Inc., in its capacity as monitor (the
"Monitor"), subject to approval of the Bidding Procedures by the United States
Bankruptcy Court for the District of Delaware in the Chapter 11 Proceedings of the
Chapter 11 Debtors and authorizing the Applicants to conduct the sale process and
auction contemplated therein;

(c)     Approving the asset sale agreement dated as of June 19, 2009 (the "Sale Agreement")
among Nokia Siemens Networks B.V. ("Nokia Siemens Networks" or the "Purchaser"),
as buyer, and NNC, NNL, Nortel Networks, Inc. ("NNI"), and certain of their affiliates,
as vendors (collectively the "Sellers") in the form attached as Appendix "A" to the
Fourteenth Report and approving and accepting the Sale Agreement for the purposes of
conducting the "stalking horse" bidding process in accordance with the Bidding
Procedures including, without limitation the Break-Up Fee and the Expense
Reimbursement (as both terms are defined in the Sale Agreement);

(d)     Sealing confidential Appendix "B" to the Fourteenth Report containing the schedules
and exhibits to the Sale Agreement pending further Order of this Court; and

(e)     Such further and other relief as counsel may request and this Honourable Court deem
just.

THE GROUNDS FOR THE MOTION ARE:

**BACKGROUND**

(a)     On January 14, 2009 (the "Filing Date"), this Honourable Court made an Initial Order
granting the CCAA stay of proceedings against the Applicants and appointing Ernst &
Young Inc. as Monitor in the CCAA proceedings;

(b)     Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including NNI, made
voluntary filings under Chapter 11 of the United States Bankruptcy Code (the "Code").
On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4)

of the CCAA recognizing the Chapter 11 cases in the U.S. as "foreign proceedings" in Canada and giving effect to the automatic stay under the Code in Canada;

(c)     Additionally, on January 15, 2009, Nortel Networks UK Limited and certain subsidiaries of the Nortel group incorporated in the Europe Middle East and Africa region each obtained an administration order from the English High Court of Justice under the Insolvency Act 1986;

(d)     References to "Nortel" herein shall be to the global enterprise as a whole;

## THE BIDDING PROCEDURES AND SALE AGREEMENT

(e)     Nortel's Carrier Networks business ("Carrier") offers wireline and wireless networks that help service providers and cable operators supply mobile voice, data and multimedia communications services to individuals and enterprises using cellular telephones, personal digital assistants, laptops, soft-clients and other wireless computing and communications devices;

(f)     The Carrier portfolio includes 2G/3G mobility networking solutions based on Code Division Multiple Access ("CDMA"), and its research and development ("R&D") efforts have included innovative technologies focused in the areas of 4G broadband wireless services including Long Term Evolution ("LTE"), an evolving networking standard for which Nortel has completed early trials with customers;

(g)     The business environment in which Nortel operates its Carrier business is highly competitive;

(h)     While it is clear that significant value exists in the CDMA and LTE aspects of the Carrier business, the full value of these assets cannot be realized by attempting to operate it through the process of restructuring;

(i)     The Carrier technology is evolving over time and the Carrier business requires investments of R&D and capital to realize the most value from the business and its customer relationships;

- 4 -

(j)    Nortel believes that a sale of this business at this time is in the best interests of the company and its stakeholders;

(k)    Nortel has from time to time over the last several years explored the possibility of divesting the Business;

(l)    While no transaction was ultimately completed pre-filing, the process provided Nortel's management with a view of the potential market for the Business, as well as the value of the Business to the major market participants;

(m)    Prior to the Filing Date, Nortel engaged in discussions with various of its market competitors regarding the potential sale of the Carrier business and has since resumed discussions with Nokia Siemens Networks as well as certain of its other market competitors;

(n)    The parties have now negotiated and entered into the Sale Agreement for the sale of certain of Nortel's LTE and CDMA assets (the "Assets");

(o)    The terms and conditions of the Sale Agreement, and the agreements to be entered into in connection with the closing of the transactions contemplated in the Sale Agreement are described in further detail in the Riedel Affidavit and the Fourteenth Report;

(p)    In connection with having entered into the Sale Agreement subject to court approvals, Nortel will conduct an auction process for the sale of the Assets to ensure that the Sellers receive the maximum value for the Assets and the Sellers and the Sale Agreement have agreed that the Sale agreement is subject to higher or better offers;

(q)    It is anticipated that in the next month, Nortel, with the assistance of the Monitor, will conduct an expedited sale process and follow the Bidding Procedures with a view to ultimately conducting an auction amongst Qualified Bidders (as described below);

(r)    An agreed upon set of Bidding Procedures have been developed, which provide for a process through which an interested party may become a "Qualified Bidder";

(s)     Bids from Qualified Bidders must be submitted no later than 4:00 pm (ET) on July 21, 2009. The auction is scheduled to take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York City at 9:30 am (ET) on July 24, 2009;

(t)     In the circumstances, the proposed process presents the best way to maximize the value of recovery for the Assets;

(u)     The Sale Agreement was negotiated subject to extensive arm's length negotiations and represents a fair and reasonable price for the Assets;

(v)     The potential purchase price that could be realized through a sale of the Assets is likely to decline over time if the Assets remain unsold;

(w)     While it is clear that the Assets have significant value, the full value of the Assets may not be realized if a sale is not consummated expeditiously;

(x)     Confidential Appendix "B" to the Fourteenth Report contains sensitive competitive and, in some instances, personal information;

(y)     Sealing Confidential Appendix "B" is appropriate in the circumstances.

**MISCELLANEOUS**

(z)     The provisions of the CCAA; and

(aa)     Such further and other grounds as counsel may advise and this Honourable Court permit.

THE FOLLOWING DOCUMENTARY EVIDENCE will be used at the hearing of the motion:

(a)     The Riedel Affidavit;

(b)     The Fourteenth Report; and

(c)     Such further and other relief as counsel may request and this Honourable Court deem just.

- 6 -

June 23, 2009

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4  CANADA

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930
Lawyers for the Applicants

TO:        Attached Service List

Court File No.  09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

### SERVICE LIST

TO:      **OGILVY RENAULT LLP**
Royal Bank Plaza, South Tower
200 Bay Street, Suite 3800
Toronto, Ontario M5J 2Z4

Derrick Tay
Mario Forte
Jennifer Stam

Email:    dtay@ogilvyrenault.com
mforte@ogilvyrenault.com
jstam@ogilvyrenault.com

Tel:     416.216.4000
Fax:    416.216.3930

Lawyers for the Applicants

DOCSTOR: 1600901\1

- 2 -

8

TO:    **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, ON  M5K 1J7

Murray McDonald
Brent Beekenkamp

Email:    nortel.monitor@ca.ey.com

Tel:    416.943.3016
Fax:    416.943.3300

AND
TO:    **GOODMANS LLP**
250 Yonge Street
Suite 2400
Toronto, ON  M5B 2M6

Jay Carfagnini
Joseph Pasquariello
Chris Armstrong

Email:    jcarfagnini@goodmans.ca
jpasquariello@goodmans.ca
carmstrong@goodmans.ca

Tel:    416.597.4107
Fax:    416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND
TO:    **OSLER HOSKIN AND HARCOURT
LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, ON  M5X 1B8

Lyndon Barnes
Rupert Chartrand
Edward Sellers
Adam Hirsh

Email:    lbarnes@osler.com
rchartrand@osler.com
esellers@osler.com
ahirsh@osler.com

Tel:    416.362.2111
Fax:    416.862.6666

Lawyers for the Boards of Directors of
Nortel Networks Corporation and Nortel
Networks Limited

AND
TO:    **FASKEN MARTINEAU DUMOULIN LLP**
66 Wellington Street West
Toronto Dominion Bank Tower
P.O. Box 20, Suite 4200
Toronto, ON  M5K 1N6

Donald E. Milner
Aubrey Kauffman
Edmond Lamek
Jon Levin

Email:    dmilner@fasken.com
akauffman@fasken.com
elamek@fasken.com
jlevin@fasken.com

Tel:    416.868.3538
Fax:    416.364.7813

Lawyers for Export Development Canada

- 3 -

AND TO: **EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, ON K1A 1K3

Jennifer Sullivan

Email: jsullivan@edc.ca

Tel: 613.597.8651
Fax: 613.598.3113

AND TO: **McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email: john.stringer@mcinnescooper.com
stephen.kingston@mcinnescooper.com

Tel: 902.425.6500
Fax: 902.425.6350

Lawyers for Convergys EMEA Limited

AND TO: **CAW-CANADA**
Legal Department
205 Placer Court
Toronto, ON M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email: barry.wadsworth@caw.ca
lewis.gottheil@caw.ca

Tel.: 416.495.3776
Fax: 416.495.3786

Lawyers for all active and retired Nortel
employees represented by the CAW-Canada

AND TO: **THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific Tower
Toronto, ON M5K 1K7

Robert I. Thornton
Michael Barrack
Rachelle Moncur
Leanne M. Williams

Email: rthornton@tgf.ca
mbarrack@tgf.ca
rmoncur@tgf.ca
lwilliams@tgf.ca

Tel: 416.304.1616
Fax: 416.304.1313

Lawyers for Flextronics Telecom Systems Ltd.

AND TO: **MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON M5H 3S1

Jeffrey Carhart
Margaret Sims

Email: jcarhart@millerthomson.com
msims@millerthomson.com

Tel: 416.595.8615/8577
Fax: 416.595.8695

Lawyers for Toronto-Dominion Bank

AND TO: **BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC V7X 1S8

R. Hoops Harrison

Email: hharrison@boughton.ca

Tel: 604.687.6789
Fax: 604.683.5317

Lawyers for Tonko Realty Advisors (BC) Ltd.

DOCSTOR: 1600901\1

AND TO:

**BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, ON  M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email:   mmacnaughton@blgcanada.com
Tel:     416. 367.6646
Fax:     416. 682.2837

Email:   rjaipargas@blgcanada.com
Tel:     416.367.6266
Fax:     416.361.7067

Email:   srappos@blgcanada.com
Tel:     416.367.6033
Fax:     416.361.7306

Lawyers for Bell Canada

AND TO:

**SISKINDS LLP**
680 Waterloo Street
London, ON  N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein

Email:   ray.leach@siskinds.com
         dimitri.lascaris@siskinds.com
         monique.radlein@siskinds.com

Tel:     519.672.2121
Fax:     519.672.6065

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare

AND TO:

**LANG MICHNER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

Leslie A. Wittlin
John Contini
Aaron Rousseau

Email:   lwittlin@langmichener.ca
Tel:     416.307.4087
Fax:     416.304.3855

Email    jcontini@langmichener.ca
Tel:     416.307.4148
Fax:     416.304.3767

Email    arousseau@langmichener.ca
Tel:     416.307.4081
Fax:     416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON  M5X 1A4

Kevin Zych
S. Richard Orzy
Robert W. Staley
Gavin Finlayson

Email:   zychk@bennettjones.com
Tel:     416.777.5738
Fax:     416.863.1716

Email:   orzyr@bennettjones.com
Tel:     416.777.5737
Fax:     416.863.1716

Email:   staleyr@bennettjones.com
Tel:     416.777.4857
Fax:     416.863.1716

Email:   finlaysong@bennettjones.com
Tel:     416.777.5762
Fax:     416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

- 5 -

*11*

| | | | | |
|---|---|---|---|---|
| AND<br>TO: | **KOSKIE MINSKY**<br>20 Queen Street West<br>Suite 900<br>Toronto, ON  M5H 3R3 | | AND<br>TO: | **MILLER THOMSON LLP**<br>Scotia Plaza<br>40 King Street West, Suite 5800<br>P.O. Box 1011<br>Toronto, ON  M5H 3S1 |

AND
TO:

**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, ON  M5H 3R3

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon

Email:  mzigler@kmlaw.ca
Tel:    416.595.2090
Fax:    416.204.2877

Email:  sphilpott@kmlaw.ca
Tel:    416.595.2104
Fax:    416.204.2882

Email:  dyiokaris@kmlaw.ca
Tel:    416.595.2130
Fax:    416.204.2810

Email:  amckinnon@kmlaw.ca
Tel:    416.595.2150
Fax:    416.204.2874

Lawyers for the Former Employees of Nortel

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:  jcarhart@millerthomson.com
Tel:    416.595.8615
Fax:    416.595.8695

Email   msims@millerthomson.com
Tel:    416.595.8577
Fax:    416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

Email:  jcarhart@millerthomson.com
Tel:    416.595.8615
Fax:    416.595.8695

Email:  msims@millerthomson.com
Tel:    416.595.8577
Fax:    416.595.8695

Email:  jmklotz@millerthomson.com
Tel:    416.595.4373
Fax:    416.595.8695

Lawyers for LG Electronics Inc.

AND
TO:

**LG ELECTRONICS INC.**
11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongdeungpo-gu
Seoul 150-721, Korea

Joseph Kim

Email:  joseph.kim@lge.com

Tel:    +82.2.3777.3171
Fax:    +82.2.3777.5345

- 6 -

*12*

| | |
|---|---|
| AND TO: | **CHAITONS LLP**<br>185 Sheppard Avenue West<br>Toronto, ON  M2N 1M9 |

Harvey G. Chaiton

Email:    harvey@chaitons.com

Tel:      416.218.1129
Fax:      416.218.1849

Lawyers for IBM Canada Limited

AND TO:    **FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, ON  M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder

Email:    Shayne.kukulowicz@fmc-law.com
          Alex.macfarlane@fmc-law.com
          Michael.wunder@fmc-law.com

Tel:      416.863.4511
Fax:      416.863.4592

Canadian Lawyers for the Official Committee of Unsecured Creditors

AND TO:    **PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, ON  M5H 3E5

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:    ken.rosenberg@paliareroland.com
Tel:      416.646.4304
Fax:      416.646.4301

Email:    max.starnino@paliareroland.com
Tel:      416.646.7431
Fax:      416.646.4301

Email:    lily.harmer@paliareroland.com
Tel:      416.646.4326
Fax:      416.646.4301

Email:    tina.lie@paliareroland.com
Tel:      416.646.4332
Fax:      416.646.4301

Lawyers for the Superintendent of Financial Services as Administrator of the Pension Benefits Guarantee Fund

AND TO:    **GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

E. Patrick Shea

Email:    patrick.shea@gowlings.com

Tel:      416.369.7399
Fax:      416.862.7661

Lawyers for Westcon Group

| | | | | |
|---|---|---|---|---|
| AND<br>TO: | **MINDEN GROSS LLP**<br>145 King Street West, Suite 2200<br>Toronto, ON  M5H 4G2 | | AND<br>TO: | **AIRD & BERLIS**<br>Brookfield Place<br>181 Bay Street, Suite 1800<br>Toronto, ON  M5J 2T9 |

Raymond M. Slattery
David T. Ullmann

Email:  rslattery@mindengross.com
        dullmann@mindengross.com
Tel:    416.369.4149
Fax:    416.864.9223

Lawyers for Verizon Communications Inc.

Harry Fogul
Peter K. Czegledy

Email:  hfogul@airdberlis.com
Tel:    416.865.7773
Fax:    416.863.1515

Email:  pczegledy@airdberlis.com
Tel:    416.865.7749
Fax:    416.863.1515

Lawyers for Microsoft Corporation

AND
TO:     **GARDINER ROBERTS LLP**
        Suite 3100, Scotia Plaza
        40 King Street West
        Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:  jwigley@gardiner-roberts.com
Tel:    416.865.6655
Fax:    416.865.6636

Email:  vdare@gardiner-roberts.com
Tel:    416.865.6641
Fax:    416.865.6636

Lawyers for Andrew, LLC

AND
TO:     **AIRD & BERLIS LLP**
        Barristers & Solicitors
        Brookfield Place, P.O. Box 754
        181 Bay Street, Suite 1800
        Toronto, ON  M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email:  renglish@airdberlis.com
        smitra@airdberlis.com

Tel:    416.863.1500
Fax:    416.863.1515

Lawyers for Tata Consultancy Services Limited
and Tata America International Corporation

AND
TO:     **AIRD & BERLIS LLP**
        Barristers & Solicitors
        Brookfield Place, P.O. Box 754
        181 Bay Street, Suite 1800
        Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:    416.865.7726
Fax:    416.863.1515

Email:  iaversa@airdberlis.com
Tel:    416.865.3082
Fax:    416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND
TO:     **ALEXANDER HOLBURN BEAUDIN &
        LANG LLP**
        Barristers and Solicitors
        700 West Georgia Street
        Suite 2700
        Vancouver, British Columbia  V7Y 1B8

Sharon M. Urquhart

Email:  surquhart@ahbl.ca
Tel:    604.484.1757
Fax:    604.484.1957

Lawyers for Algo Communication Products Ltd.

- 8 -

*14*

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Maurice Fleming

Email:   mfleming@millerthomson.com
Tel:      416.595.8686
Fax:      416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:   bdarlington@davis.ca
Tel:      416.365.3529
Fax:      416.369.5210

Email:   jdavissydor@davis.ca
Tel:      416.941.5397
Fax:      416.365.7886

Lawyers for Brookfield LePage Johnson Controls
Facility Management Services

AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:   andrew.kent@mcmillan.ca
Tel:      416.865.7160
Fax:      416.865.7048

Email:   hilary.clarke@mcmillan.ca
Tel:      416.865.7286
Fax:      416.865.7048

Email:   tushara.weerasooriya@mcmillan.ca
Tel:      416.865.7262
Fax:      416.865.7048

Lawyers for Royal Bank of Canada

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:      416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:      416.863.1515

Lawyers for Perot Systems Corporation

AND TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario M5J 2T3

Lawrence J. Crozier
Adam C. Maerov

Email: lawrence.crozier@mcmillan.ca
Tel: 416.865.7178
Fax: 416.865.7048

Email: adam.maerov@mcmillan.ca
Tel: 416.865.7285
Fax: 416.865.7048

Lawyers for Citibank

AND TO:

**BLANEY McMURTRY LLP**
Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, Ontario M5C 3G5

Domenico Magisano

Email: dmagisano@blaney.com
Tel: 416.593.2996
Fax: 416.593.5437

Lawyers for Expertech Network Installation Inc.

AND TO:

**LANG MICHENER LLP**
Brookfield Place
Suite 2500, 181 Bay Street
P.O. Box 747
Toronto, Ontario M5J 2T7

Leslie Wittlin
Aaron Rousseau

Email: lwittlin@langmichener.ca
Tel: 416.307.4087
Fax: 416.365.1719

Email: arousseau@langmichener.ca
Tel: 416.307.4081
Fax: 416.365.1719

Lawyers for Right Management Inc.

AND TO:

**BLANEY McMURTRY LLP**
2 Queen Street East,
Suite 1500
Toronto, ON M5C 3G5

Deborah S. Grieve

Email: dgrieve@blaney.com
Tel: 416.593.2951
Fax: 416.593.5437

Lawyers for Alvarion Ltd.

AND TO:

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email: jwigley@gardiner-roberts.com
Tel: 416.865.6655
Fax: 416.865.6636

Email: vdare@gardiner-roberts.com
Tel: 416.865.6641
Fax: 416.865.6636

Lawyers for Amphenol Corporation

AND TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario M5J 2T9

Sanjeev P.R. Mitra
Sandra A. Vitorovich

Email: smitra@airdberlis.com
svitorovich@airdberlis.com

Tel: 416.863.1500
Fax: 416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

| | | | |
|---|---|---|---|
| AND<br>TO: | **NELLIGAN O'BRIEN PAYNE LLP**<br>Barristers and Solicitors<br>50 O'Connor Street<br>Suite 1500<br>Ottawa, Ontario K1P 6L2 | AND<br>TO: | **CASSELS BROCK & BLACKWELL LLP**<br>2100 Scotia Plaza<br>40 King Street West<br>Toronto, Ontario M5H 3C2 |

**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario K1P 6L2

Janice B. Payne
Ainslie Benedict
Steven Levitt
Christopher Rootham

Email:   janice.payne@nelligan.ca
ainslie.benedict@nelligan.ca
steven.levitt@nelligan.ca
christopher.rootham@nelligan.ca

Tel:   613.231.8245
Fax:   613.788.3655

Lawyers for the Steering Committee of Recently
Severed Canadian Nortel Employees

**CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, Ontario M5H 3C2

E. Bruce Leonard
Harvey Garman

Email:   bleonard@casselsbrock.com
hgarman@casselsbrock.com

Tel:   416.860.6455
Fax:   416.640.3054

Lawyers for the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

---

AND
TO:

**CALEYWRAY**
Labour/Employment Lawyers
1600-65 Queen Street West
Toronto, Ontario M5H 2M5

Gail E. Misra

Email:   misrag@caleywray.com

Tel:   416.775.4680
Fax:   416.366.3293

Lawyers for the Communication, Energy and
Paperworkers Union of Canada

AND
TO:

**MCFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, Ontario K2P 0A2

Paul K. Lepsoe

Email:   pklepsoe@mcfarlanelaw.com

Tel:   613.233.2679
Fax:   613.233.3774

Lawyers for Iron Mountain Canada Corporation
and Iron Mountain Information Management, Inc.

---

AND
TO:

**CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street, West
Toronto, Ontario M5H 3C2

Lydia Salvi

Email:   lsalvi@casselsbrock.com

Tel:   416.869.5409
Fax:   416.640.3195

Lawyers for Jabil Circuit Inc.

AND
TO:

**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario M5J 2T3

Chris Besant

Email:   chris.besant@bakernet.com

Tel:   416.865.2318
Fax:   416.863.6275

Co-counsel for Jabil Circuit Inc.

- 11 -

*1x*

| | |
|---|---|
| AND TO: | **NELLIGAN O'BRIEN PAYNE LLP**<br>Barristers and Solicitors<br>50 O'Connor Street<br>Suite 1500<br>Ottawa, Ontario  K1P 6L2 |

Janice B. Payne
Steven Levitt
Christopher Rootham

Email:   janice.payne@nelligan.ca
         steven.levitt@nelligan.ca
         christopher.rootham@nelligan.ca

Tel:    613.231.8245
Fax:    613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA
as at January 14, 2009

---

AND
TO:   **COLBY, MONET DEMERS, DELAGE &**
      **CREVIER LLP**
      Tour McGill College
      1501 McGill College Avenue
      Suite 2900
      Montreal, Quebec  H3A 3M8

David J. Dropsy

Email:   ddropsy@colby-monet.com
Tel:    514.284.3663
Fax:    514.284.1961

Lawyers for GFI INC., a division of Thomas &
Betts Manufacturing Inc.

---

AND
TO:   **McCARTHY TETRAULT LLP**
      Suite 5300, Toronto Dominion Bank Tower
      Toronto, Ontario  M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email:   theintzm@mccarthy.ca
Tel:    416.601.7627
Fax:    416.868.0673

Email:   jsirivar@mccarthy.ca
Tel:    416.601.7750
Fax:    416.868.0673

Lawyers for Frank Andrew Dunn

---

AND
TO:   **SCHNEIDER & GAGGINO**
      375 Lakeshore Drive
      Dorval, Quebec  H9S 2A5

Dan Goldstein
Marco Gaggino

Email:   dgoldstein@schneidergaggino.com
         mgaggino@schneidergaggino.com

Tel:    514.631.8787
Fax:    514.631.0220

Lawyers for the Teamsters Quebec Local 1999

---

AND
TO:   **BENNETT JONES LLP**
      1 First Canadian Place
      Suite 3400
      Toronto, Ontario  M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:   ryanbellr@bennettjones.com
         laugesenm@bennettjones.com

Tel:    416.863.1200
Fax:    416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

---

AND
TO:   **EURODATA**
      2574 Sheffield Road
      Ottawa, Ontario  K1B 3V7

Nanci Shore

Email:   nanci@eurodata.ca
Tel:    613.745.0921
Fax:    613.745.1172

- 12 -

18

| | |
|---|---|
| **AND TO:** | **MINDEN GROSS LLP**<br>145 King Street West, Suite 2200<br>Toronto, Ontario M5H 4G2<br><br>Timothy R. Dunn<br><br>Email:  tdunn@mindengross.com<br>Tel:      416.369.4335<br>Fax:     416.864.9223<br><br>Lawyers for 2748355 Canada Inc. | **AND TO:** | **BALDWIN LAW PROFESSIONAL CORPORATION**<br>54 Victoria Avenue<br>Belleville, Ontario K8N 5J2<br><br>Ian W. Brady<br><br>Email:  lbrady@baldwinlaw.ca<br>Tel:      613.771.9991<br>Fax:     613.771.9998<br><br>Lawyers for Sydney Street Properties Corp. |

**AND TO:**  **MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, Ontario M5H 4G2

Timothy R. Dunn

Email:  tdunn@mindengross.com
Tel:      416.369.4335
Fax:     416.864.9223

Lawyers for 2748355 Canada Inc.

**AND TO:**  **BALDWIN LAW PROFESSIONAL CORPORATION**
54 Victoria Avenue
Belleville, Ontario K8N 5J2

Ian W. Brady

Email:  lbrady@baldwinlaw.ca
Tel:      613.771.9991
Fax:     613.771.9998

Lawyers for Sydney Street Properties Corp.

**AND TO:**  **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:  iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Lawyers for Huawei Technologies Co. Ltd.

**AND TO:**  **SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:  arthurjacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email :  thomas.mcrae@shibleyrighton.com
Tel :     416.214.5206
Fax :    416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee

**AND TO:**  **SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:  arthurjacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email :  thomas.mcrae@shibleyrighton.com
Tel :     416.214.5206
Fax :    416.214.5400

Co-Counsel for the Steering Committee of
Nortel Canadian Continuing Employees – Post
CCAA as at January 14, 2009

**AND TO:**  **AETL TESTING, INC.**
130 Chaparral Court, Suite 250
Anaheim, California 92808

Cynthia R. Maher

Email:  cynthia.maher@ntscorp.com
Tel:      714.998.4351
Fax:     714.998.7142

Lawyers for AETL Testing, Inc.

19

| | | | |
|---|---|---|---|
| AND<br>TO: | **LAVERY, DE BILLY, LLP**<br>Barristers & Solicitors<br>Suite 2400, 600 de la Gauchetière West<br>Montreal, Quebec H3B 4L8 | AND<br>TO: | **NATIONAL TECHNICAL SYSTEMS**<br>130 Chaparral Ct., Suite 250<br>Anaheim, California, U.S.A.<br>92808 |

**LAVERY, DE BILLY, LLP**
Barristers & Solicitors
Suite 2400, 600 de la Gauchetière West
Montreal, Quebec H3B 4L8

Jean-Yves Simard

Email : jysimard@lavery.ca
Tel :    514.871.1522
Fax :   514.871.8977

Lawyers for Texas Landlords to Nortel Networks
Inc.

**NATIONAL TECHNICAL SYSTEMS**
130 Chaparral Ct., Suite 250
Anaheim, California, U.S.A.
92808

Cynthia Maher

Email:   cynthia.maher@ntscorp.com
Tel:     714.998.4351

---

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:   bdarlington@davis.ca
Tel:     416.365.3529
Fax:     416.369.5210

Email:   jdavissydor@davis.ca
Tel:     416.941.5397
Fax:     416.365.7886

Lawyers for Computershare Trust Company of
Canada

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

David F.W. Cohen

Email:   david.cohen@gowlings.com

Tel:     416.369.6667
Fax:     416.862.7661

Lawyers for General Electric Canada Equipment
Finance G.P. and GE Capital Canada Leasing
Services Inc.

---

AND
TO:

**DAVIES WARD PHILLIPS & VINEBERG LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:   rschwill@dwpv.com
Tel:     416.863.0900
Fax:     416.863.0871

Email:   mgottlieb@dwpv.com
Tel:     416.863.0900
Fax:     416.863.0871

Lawyers for Nortel Networks UK Limited (In
Administration

AND
TO:

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

E-mail:  tosullivan@counsel-toronto.com
Tel:     416.598.1744
Fax:     416.598.3730

Email:   slaubman@counsel-toronto.com
Tel:     416.598.1744
Fax:     416.598.3730

Lawyers for William A. Owens

- 14 -

20

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:    sgraff@airdberlis.com
Tel:       416.865.7726
Fax:       416.863.1515

Email:    iaversa@airdberlis.com
Tel:       416.865.3082
Fax:       416.863.1515

Lawyers for the Current and Former Employees of
Nortel Networks Inc. who are or were Participants
in the Long-Term Investment Plan Sponsored by
Nortel Networks Inc.

AND
TO:

**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Lydia Salvi

Email:    lydia.salvi@bakernet.com

Tel:       416.865.6944
Fax:       416.863.6275

Lawyers for Wipro Limited

## COURTESY COPIES:

AND
TO:

**LEWIS AND ROCA**
40 North Central Avenue
Phoenix, Arizona
USA 85004-4429

Scott K. Brown

Email:  sbrown@lrlaw.com

Tel:  602.262.5321
Fax:  602.734.3866

Lawyers for The Prudential Insurance
Company of America

AND
TO:

**AKIN GUMP STRAUSS HAUER &**
**FELD LLP**
One Bryant Park
New York, NY  10036

Fred S. Hodara
Ryan C. Jacobs

Email:  fhodara@akingump.com
          rjacobs@akingump.com

Tel:  212.872.1000
Fax:  212.872.1002

U.S. Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**CURTIS, MALLET-PREVOST, COLT &**
**MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061

Steven J. Reisman
James V. Drew

E-mail:  sreisman@curtis.com
          jdrew@curtis.com

Tel:  212.696.6000
Fax:  212-697-1559

Lawyers for Flextronics International

AND
TO:

**MILBANK, TWEED, HADLEY**
**McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY  10005

Dennis F. Dunne
Andrew M. Leblanc
Albert A. Pisa

Email:  DDunne@milbank.com
Tel:  212.530.5770
Fax:  212.530.5219

Email:  ALeblanc@milbank.com
Tel:  212.835.7574
Fax:  212.530.5219

Email:  APisa@milbank.com
Tel:  212.530.5319
Fax:  212.530.5219

U.S. Lawyers for The Informal Nortel
Noteholder Group

- 16 -

22

| | | | |
|---|---|---|---|
| AND TO: | **VEDDER PRICE P.C.** | AND TO: | **BRYAN CAVE LLP** |

<table>
<tr><td>AND<br>TO:</td><td><b>VEDDER PRICE P.C.</b><br>1633 Broadway, 47th Floor<br>New York, New York 10019</td><td>AND<br>TO:</td><td><b>BRYAN CAVE LLP</b><br>161 North Clark Street, Suite 4300<br>Chicago, Illinois 60601</td></tr>
</table>

AND TO:  **VEDDER PRICE P.C.**
1633 Broadway, 47th Floor
New York, New York 10019

Michael L. Schein

Email:  mschein@vedderprice.com

Tel:      212.407.6920
Fax:     212.407.7799

U.S. Lawyers for Telmar Network Technology,
Inc. and Precision Communication Services, Inc.

AND TO:  **MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta  T2P 4H2

Andrew Robertson
Caylee M. Rieger

Email :  andrew.robertson@macleoddixon.com
caylee.rieger@macleoddixon.com

Tel :    403.267.8222
Fax :   403.264.5973

Agent for Nelligan O'Brien Payne LLP, lawyers
for the Steering Committee of Recently Severed
Canadian Nortel Employees and lawyers for the
Steering Committee of Nortel Canadian
Continuing Employees – Post CCAA as at
January 14, 2009

AND TO:  **BRYAN CAVE LLP**
161 North Clark Street, Suite 4300
Chicago, Illinois  60601

Eric S. Prezant

Email:  eric.prezant@bryancave.com
Tel:      312.602.5033
Fax:     312.602.5050

U.S. Lawyers for Tellabs, Inc.

23

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Applicants

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

Proceeding commenced at Toronto

NOTICE OF MOTION
(returnable June 29, 2009)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4
CANADA

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 1717497\1

**TAB 2**

24

Court File No: 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AFFIDAVIT OF GEORGE RIEDEL
(sworn June 23, 2009)

I, George Riedel, of the city of Boston in the State of Massachusetts, MAKE OATH
AND SAY:

1.      I am the Chief Strategy Officer of Nortel Networks Corporation ("NNC") and Nortel
Networks Limited ("NNL") and have held those positions since February, 2006. As such, I have
personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where I do
not possess personal knowledge, I have stated the source of my information and, in all such
cases, believe it to be true.

2.      I swear this Affidavit in support of the motion to approve, among other things, the
bidding procedures and a "stalking horse" asset sale agreement dated as of June 19, 2009 (the
"Sale Agreement") among NNC, NNL and Nortel Networks Inc. ("NNI") and certain of their
affiliates, as vendors (the "Sellers"), and Nokia Siemens Networks B.V., as purchaser ("Nokia
Siemens Networks" or the "Purchaser"), in respect of the sale of certain of its assets relating to
Nortel's CDMA and LTE business (as such terms are defined and described in further detail
below) (the "Business"). A copy of the Sale Agreement (without exhibits or schedules) is
attached as Appendix "A" to the fourteenth report (the "Fourteenth Report") of the Monitor (as

25

- 2 -

defined below) to be filed in connection with this motion.  References to "Nortel" herein are references to the global enterprise as a whole.

**BACKGROUND**

3.     On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court and Ernst & Young Inc. was appointed as monitor (the "Monitor") in the CCAA proceedings.

4.     Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "Chapter 11 Debtors"), made voluntary filings in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code (the "Code").  On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

5.     Additionally, on January 15, 2009, Nortel Networks UK Limited and certain subsidiaries of the Nortel group incorporated in Europe, the Middle East or Africa each obtained an administration order for the appointment of administrators from the English High Court of Justice under the Insolvency Act 1986.

6.     On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

7.     On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA will continue to operate as a going concern for an initial period of three months.  In accordance with the European Union's Counsel Regulation, the English law proceedings remain the main proceedings in respect of NNSA.

26

- 3 -

8.      Lastly, on June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK under Chapter 15 of the Code.

9.      Further details regarding the background to these proceedings are set out in the affidavit of John Doolittle sworn January 14, 2009 (the "Initial Order Affidavit") previously filed in these proceedings and are therefore not repeated herein.

## THE TRANSACTION

*The Business*

10.      As was set out in the Initial Order Affidavit, Nortel's Carrier Networks business ("Carrier") offers wireline and wireless networks that help service providers and cable operators supply mobile voice, data and multimedia communications services to individuals and enterprises using cellular telephones, personal digital assistants, laptops, soft-clients and other wireless computing and communications devices.

11.      The Carrier portfolio includes 2G/3G mobility networking solutions based on Code Division Multiple Access ("CDMA"), and its research and development ("R&D") efforts have included innovative technologies focused in the areas of 4G broadband wireless services including Long Term Evolution ("LTE"), an evolving networking standard for which Nortel has completed early trials with customers.

12.      As was more particularly described in the pre-filing report filed by Ernst & Young Inc., as proposed monitor, the Carrier business is Nortel's largest business, its largest generator of revenue and has been its core business for several years. ,The Business focuses on serving primarily telecommunications customers, with Verizon Communications Inc. being the largest customer in North America.

13.      The business environment in which Nortel operates its Carrier business is highly competitive. While it is clear that significant value exists in the CDMA and LTE aspects of the Carrier business, the full value of these assets cannot be realized by attempting to operate it through the process of restructuring. The Carrier technology is evolving over time and the Carrier business requires investments of R&D and capital to realize the most value from the

27

- 4 -

business and its customer relationships. As described below, Nortel believes that a sale of this business at this time is in the best interests of the company and its stakeholders.

14.      Nortel has concluded that, given its CCAA and Chapter 11 filings, value for the Business is best maximized through the sale of the Business assets to a buyer that can leverage such value off of its own existing customer relationships and the acquired customer relationships, as well as investments in R&D to develop the next generation of CDMA and LTE products and services. In the absence of continued investment, the long-term viability of the Business will be in jeopardy.

15.      As a consequence, Nortel has determined that the Business must be provided with stability and that in order to provide the necessary business certainty, a sale process is necessary at this time.

16.      Nortel has from time to time over the last several years explored the possibility of divesting the Business. While no transaction was ultimately completed pre-filing, the process provided Nortel's management with a view of the potential market for the Business, as well as the value of the Business to the major market participants.

17.      Prior to the Filing Date, Nortel engaged in discussions with various of its market competitors regarding the potential sale of the Carrier business.  Since then, Nortel resumed discussions with Nokia Siemens Networks. The Applicants and their investment banker, Lazard Frères & Co., also began seeking prospective purchasers for the Business both among market competition and among potential strategic investment entities. Prior to signing the Sale Agreement, the Applicants contacted certain of their significant market competitors in the Business and engaged in extensive negotiations with one of these competitors regarding the terms of a potential transaction.

*The Sale Agreement*

18.      Capitalized terms used in this section of my Affidavit and not otherwise defined herein shall have the meanings given to them in the Sale Agreement.

DOCSTOR. 1716009\5

28

- 5 -

19.    The Sale Agreement[1] contemplates the sale of the Assets, subject to higher and/or better bids, on the following material terms:

a)  *Purchase Price.*  At the Closing, the Purchaser will pay to the Sellers an estimated purchase price of US$650,000,000, subject to certain adjustments based on net working capital, including net inventory, construction-in-process receivables, contractual liabilities, royalty liabilities, warranty provisions, and accrued vacation amounts as of the Closing.

b)  *Certain Fees.*  In certain circumstances the Sellers may be required to pay to the Purchaser a break-up fee and an expense reimbursement, which are discussed in further detail below.

c)  *Assets.*  The Assets to be acquired by the Purchaser include, among other things, certain (i) inventory and supplies, (ii) equipment, (iii) real estate subleases, (iv) contracts, (v) accounts receivable, (vi) construction-in-process receivables, (vii) rights under warranties, representations and guarantees by suppliers, manufacturers and third parties, (viii) business information, (x) intellectual property, (xi) governmental consents and (xii) certain other rights against third parties relating to the foregoing. The assets to be acquired by the Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable, bank account balances and petty cash, certain assets and rights relating to the pre-Closing period, and security deposits.

d)  *Assumed Liabilities.*  The liabilities to be assumed by the Purchaser include, among others, (i) liabilities arising after the Closing Date to the extent related to the Business or the operations or ownership thereof after the Closing, (ii) liabilities arising from assigned contracts in connection with the performance of such contracts after the Closing Date, (iii) certain liabilities relating to transferred intellectual property, (iv) certain tax liabilities, (v) certain warranty liabilities, (vi) certain liabilities related to employees, their accrued vacation entitlements under employment laws, and (vii) liabilities related to net working capital adjustments.

---

[1]    A separate asset sale agreement, the China Asset Sale Agreement (as defined in the Sale Agreement), is being executed for the conveyance of certain assets by relevant Affiliates of the Sellers to the Purchaser.

29

- 6 -

e) *Sale Free and Clear*. The Assets to be transferred by the Applicants will be transferred free and clear of all Liens, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the Sale Agreement.

f) *Ancillary Agreements*. Pursuant to the Sale Agreement, at or prior to the Closing, Sellers and the Purchaser will enter into, among others, the following ancillary agreements:

   i.   *Transition Services Agreement*. At the Closing, NNL, NNC, NNI and the Purchaser will enter into an agreement under which NNL, NNC and NNI and their affiliates will agree to provide to the Purchaser and its affiliates certain information technology, business transition and related services, commencing at the Closing and continuing for a period not to exceed two (2) years.

   ii.  *Intellectual Property License Agreement*. At the closing, NNL and the Purchaser will enter into an intellectual property license agreement (the "IPLA") pursuant to which (i) NNL will license to the Purchaser and its affiliates certain intellectual property necessary for the manufacture of the products and the provision of services, and (ii) NNL and its affiliates will receive a license back to all intellectual property included in the Assets for use in their other businesses. The IPLA will remain in force for so long as any intellectual property rights licensed thereunder continue to exist. Also at the Closing, NNL and the Purchaser will enter into a license agreement allowing the Purchaser and its affiliates to utilize the "Nortel" trademark and logo in its sales of the CDMA Products and the LTE Access Products for a limited period after Closing.

   iii. *Transferring Employee Agreement* At the Closing, the Main Sellers and the Purchaser will enter into an agreement under which certain employees of Nortel (the "Transferring Employees") and its affiliates will be seconded to the Purchaser to perform services for the Purchaser for a 90-day period generally (and 6 months in respect of Canadian Inactive Employees and 12 months in respect of Visa Employees) beginning on the Closing Date, which Nortel has agreed to do while the Purchaser establishes the appropriate human

- 7 -

resources functions or obtains visas, as the case may be. The Transferring Employees will remain on the payroll of the applicable Seller and will continue to participate in the Sellers' pension and benefit plans. The applicable Seller will continue to pay all employment costs in respect of the Transferring Employees that relate to the period of the Employee Agreement, and the Purchaser will provide for the payment of, or if not paid pursuant to the pre-funding mechanism in the Transferring Employee Agreement, promptly reimburse Nortel for, all such employment costs.

iv.    *CDMA Supply Agreement.* At the Closing, the Sellers and the Purchaser or Designated Purchaser will enter into a CDMA Supply Agreement pursuant to which the Purchaser will undertake to supply the Sellers with CDMA Products and related support services in order to enable the Sellers to continue to service certain contracts not assigned pursuant to the Sale Agreement ("Excluded Contracts"). In addition, the agreement, among other things, provides that the Sellers will not enter into any new, or renew any existing, customer contracts related to the Business (including the Excluded Contracts).

g) *Closing Conditions*: In addition to certain other customary closing conditions, including conditions relating to approvals by the U.S. Court and this Honourable Court, the obligation of the Purchaser to close the sale is subject to the satisfaction of the following conditions: (i) the accuracy of the Sellers' representations and warranties, except as would not result in a Material Adverse Effect, and (ii) the performance in all material respects of all covenants, obligations and agreements required to be performed by the Sellers on or before the Closing.

h) *Ongoing Covenants and Restrictions*: In addition to certain other customary post-Closing obligations such as information-sharing and redirection of customers and payments, the Sellers have agreed to: (i) cooperate with the Purchaser in relation to arrangements regarding non-assignable contracts and bundled contracts during an agreed period after the Closing, and (ii) license or sublease certain real estate to the Purchaser.

31

- 8 -

   i) *Post-Closing Access to Books and Records.* For three (3) years after the Closing (or such longer period as may be required under applicable law), the Purchaser must preserve pre-Closing records. After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable advance notice and during regular business hours, the Purchaser shall, and/or shall cause the Person holding such records to provide the Sellers or their representatives reasonable access to such records and permit the Sellers or their representatives to make copies of such records, in each case at no cost to the Sellers or their representatives (other than for reasonable out-of-pocket expenses). The Sale Agreement contains further provisions related to tax records and information.

20.    None of the amounts required to be paid or borne by the Applicants under the Sale Agreement or Ancillary Agreements shall be secured by a Charge over the Applicants' assets.

21.    In addition, in order to facilitate consummation of the Sale Agreement, NNL and the Debtors will enter into one or more agreements for the termination of the Debtors intellectual property license interest (the "Appropriate License Termination"), as contemplated by the Interim Funding and Settlement Agreement (which is subject to the approval of this Honourable Court and the U.S. Court on June 29, 2009).

22.    As set out above, the Closing of the sale under the Sale Agreement is conditional upon, among other things, court approval in the U.S. pursuant to Section 363 of the Code and the granting of an approval and vesting order from this Honourable Court. Upon the conclusion of the auction process referred to below, if the Purchaser is the successful bidder, the Chapter 11 Debtors intend to return to the U.S. Court for such approval and the Applicants will also bring a motion for approval before this Honourable Court on or about July 30, 2009.

*Employees*

23.    As part of the transaction contemplated by the Sale Agreement, the Purchaser has committed to offer employment to at least 2,500 Nortel employees world wide.

24.    The Sale Agreement provides that the Purchaser shall be entitled to commence extending offers to employees after the completion of the Auction but prior to Closing subject to the terms and conditions of the Sale Agreement.

32

- 9 -

*Break up Fee and Expense Reimbursement*

25.    The Purchaser and its advisors have expended, and likely will continue to expend, considerable time, energy, and resources pursuing the purchase of the Assets and the assumption and assignment of the Assigned Contracts, and have engaged in extended, good faith negotiations. The Sale Agreement is the culmination of these efforts.

26.    In recognition of this expenditure of time, energy, and resources, the Sellers have agreed that if the Purchaser is not the Successful Bidder (as defined in the Bidding Procedures described below), the Sellers will, to the extent due under Section 9.2 of the Sale Agreement, pay the Purchasers:  (i) a fee of US$19,500,000 (the "Break-Up Fee"), which is equal to three percent (3%) of the aggregate Purchase Price (prior to adjustment) set forth in Section 2.2.1 of the Sale Agreement, and (ii) an amount in cash equal to the total amount of all reasonable and documented fees, costs and expenses incurred by the Purchaser in connection with the preparation, performance and execution of the Sale Agreement and the transactions contemplated thereby, including all filing and notification fees, and all fees and expenses of the Purchaser's Representatives in an amount not to exceed US$3,000,000 (the "Expense Reimbursement" and, together with the Break-up Fee, the "Bid Inducements"), which shall be payable as provided for pursuant to the terms of the Sale Agreement.

27.    Specifically, as set forth in Section 9.2 of the Sale Agreement, the Sale Agreement provides for payment of the Break-Up Fee upon termination of the Sale Agreement in the following instances:

a)  upon the entry of an order by this Honourable Court and the U.S. Court approving an Alternative Transaction;

b)  if the Sellers terminate the Sale Agreement because the U.S. Bidding Procedures Order and the Canadian Sales Process Order have not been entered within twelve (12) days from the date of the Sale Agreement;

c)  if the Sellers terminate the Sale Agreement because the Auction is not completed within thirty (30) days of the entry of the U.S. Bidding Procedures Order and the Canadian Sales Process Order;

33

- 10 -

d) if the Sellers terminate the Sale Agreement because the U.S. Sale Order and the Canadian Approval and Vesting Order have not been entered by the respective Courts by July 31, 2009;

e) if the Purchaser terminates the Sale Agreement because any of the Sellers withdraw or seek authority to withdraw the Canadian Approval and Vesting Order Motion or the U.S. Bidding Procedures and Sale Motion, or publicly announce any stand alone plan of reorganization or liquidation (or support any such plan filed by any other Person) in respect of the Business;

f) if the Purchaser terminates the Sale Agreement in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in the Sale Agreement, which breach would result in a failure to satisfy the conditions to Closing described in paragraphs 18(g)(i) and (ii) above, as applicable, and, in each case, which, if capable of being cured, is not cured within ten (10) days from receipt of a written notice from the Purchaser; provided, however, that the Purchaser's right to terminate the Sale Agreement in these circumstances will not be available where a breach of the Sale Agreement by the Purchaser has been the cause of, or has resulted in, the event or condition giving rise to such right to terminate; or

g) if the Purchaser terminates the Sale Agreement in the event the Sellers fail to consummate the Closing in material breach of Section 2.3 of the Sale Agreement which speaks to the time of Closing and Closing deliverables, within five (5) Business Days of written demand by the Purchaser to consummate the Closing.

28.    The Expense Reimbursement is payable upon termination of the Sale Agreement pursuant to any of the grounds listed above if the Closing does not take place by August 31, 2009, or if the Closing does not take place because of the condition that certain regulatory approvals be obtained, by September 30, 2009.

*The Sale and Bid Process*

29.    In connection with having entered into the Sale Agreement and subject to approvals by the U.S. Court and this Honourable Court, Nortel will conduct an auction process for the sale of the Assets to ensure that the Sellers receive the maximum value for the Assets and the Sellers and the Purchaser have agreed that the Sale Agreement is subject to higher or better offers. It is

34

- 11 -

anticipated that in the next month, Nortel will conduct an expedited sale process and follow the bid procedures referred to below with a view to the ultimate conduct of an auction.

30.     An agreed upon set of bidding procedures (the "Bidding Procedures") have been developed, which provide for a process through which an interested party may become a "Qualified Bidder". Bids from Qualified Bidders must be submitted no later than 4:00 p.m. (ET) on July 21, 2009. The auction is scheduled to take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York City at 9:30 a.m. (ET) on July 24, 2009.

31.     I am aware that the Fourteenth Report will outline the proposed sale process and the Bidding Procedures in more detail. I have reviewed the Bidding Procedures and the Bid Inducements and believe them to be fair in the circumstances.

*Sealing*

32.     I am aware that the Monitor has or will be filing a confidential appendix to the Fourteenth Report which contains the disclosure schedules and exhibits to the Sale Agreement. These disclosure schedules and exhibits contain sensitive competitive and, in some instances, personal information. I believe sealing this confidential appendix is appropriate in the circumstances.

**CONCLUSION**

33.     On June 19, 2009, Nortel announced that it was advancing in its discussions with external parties to sell its other businesses in addition to the Business.

34.     This decision followed extensive discussions and consultation with outside advisors and stakeholders, which discussions have been taking place since the inception of the proceedings. This process has taken months of hard work by Nortel and its advisors.

35.     Although all restructuring alternatives were considered, management's exercise of its business judgment has concluded that given the impact of the filings on the businesses including deterioration in sales and an inability to maintain spending on R&D (for instance), conducting specific sales processes of Nortel's various businesses on a "going concern" basis at this time provides the greatest chance to maximize the value of its operations to preserve as many jobs as possible and continue businesses in Canada and the U.S.

36.     I believe that this proposed process for the sale of the CDMA and LTE businesses

35

- 12 -

pursuant to an auction process is the best way to preserve the Business as a going concern and to maximize value and preserve jobs for the Applicants' employees. I further believe that exploration of the sale of the other businesses as a going concern through this process will provide the greatest chances for further value maximization and job preservation.

37.    Based on the Applicants' previous consideration of potential transactions involving the Carrier business and after re-canvassing the marketplace since the commencement of these proceedings, I believe that the proposed transaction with the Purchaser represents the highest and best proposal available for the Business, subject to the receipt of a better bid through the auction process contemplated in this motion.

38.    The potential purchase price that could be realized through a sale of the Assets is likely to decline over time if the Assets remain unsold. While it is clear that the Assets have significant value, the full value of the Assets may not be realized if a sale is not consummated expeditiously.

39.    The Sale Agreement requires an expeditious sale process and provides the Purchaser the right to terminate the Agreement if certain milestones in the sale process are not timely met. For these reasons, the expeditious sale of the Assets is critical to the maximization of the value of the Applicants' assets and, in turn, to a recovery for the Applicants' estates.

SWORN BEFORE ME at the City of
New York, in the State of New York on
this 23rd day of June, 2009.

_____
Commissioner for Taking Affidavits or
Notary Public

PETER O'KEEFE
Notary Public, State of New York
No.01OK6148766
Qualified in Richmond County
Certificate Filed in New York County
Commission Expires May 22, 2010

_____
George Riedel

DOCSTOR: 171600915

36

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**AFFIDAVIT OF GEORGE RIEDEL**
(sworn June 23, 2009)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

**TAB 3**

*3ꟾ*

Court File No.: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | MONDAY, THE 29th |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF JUNE, 2009 |

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**ORDER**
(Nokia Siemens Networks B.V. Bidding Procedures Order)

**THIS MOTION**, made by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for the relief set out in the Applicants' notice of motion dated June 23, 2009 was heard this day at 330 University Avenue, Toronto, Ontario.

**ON READING** the affidavit of George Riedel sworn June 23, 2009 (the "Riedel Affidavit") and the fourteenth report of Ernst & Young Inc. dated June 23, 2009 (the "Fourteenth Report") in its capacity as monitor (the "Monitor") and on hearing submissions of counsel for the Applicants, the Monitor and those other parties present, no one appearing for any other person on



- 2 -

the service list, although served as appears from the Affidavit of Service of ■ sworn ■, 2009, filed.

1.    **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the Fourteenth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.    **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Riedel Affidavit.

3.    **THIS COURT ORDERS** that the bidding procedures (the "Bidding Procedures") described in the Riedel Affidavit, the Fourteenth Report and attached as Schedule "A" hereto are hereby approved and, subject to approval of the Bidding Procedures in substantially the same form by the United States Bankruptcy Court for the District of Delaware in the Chapter 11 Proceedings of the Chapter 11 Debtors, the Applicants shall be authorized to conduct the sale process and auction (the "Stalking Horse Process") contemplated therein.

4.    **THIS COURT ORDERS** that the asset sale agreement dated as of June 19, 2009 (the "Stalking Horse APA") among Nokia Siemens Networks B.V., as buyer, and NNC, NNL and Nortel Networks Inc., as vendors, in the form attached as Appendix "A" to the Fourteenth Report be and is hereby approved and accepted for the purposes of conducting the Stalking Horse Process including, without limitation, the Break-Up Fee and the Expense Reimbursement.

5.    **THIS COURT ORDERS** that Confidential Appendix "B" to the Fourteenth Report be and is hereby sealed pending further order of this Court.

6.    **THIS COURT ORDERS** that in connection with the Stalking Horse APA and the Stalking Horse Process and pursuant to clause 7(3)(c) of the Canada *Personal Information Protection and Electronic Documents Act*, the Applicants shall disclose personal information of identifiable individuals to prospective purchasers or bidders for the Business and to their advisors, but only to the extent desirable or required to negotiate and attempt to complete one or more sales of the Business (each, a "Sale"). Each prospective purchaser or bidder to whom such personal information is disclosed shall maintain and protect the privacy of such information and

- 3 -

limit the use of such information to its evaluation of the Sale, and if it does not complete a Sale, shall (i) return all such information to the Applicants; (ii) destroy all such information; or (iii) in the case of such information that is electronically stored, destroy all such information to the extent it is reasonably practical to do so. The purchaser of the Business shall be entitled to continue to use the personal information provided to it, and related to the Business, in a manner which is in all material respects identical to the prior use of such information by the Applicants, and shall (i) return all other personal information to the Applicants; (ii) ensure that all other personal information is destroyed; or (iii) in the case of all other personal information that is electronically stored, destroy all such other personal information to the extent it is reasonably practical to do so.

7.      **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

8.      **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

40

**SCHEDULE "A"**
(Bidding Procedures)

41

BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities as set forth in the Agreement (as defined below) with respect to the Purchaser, or, as set forth in the relevant sale agreement with respect to a Successful Bidder (as defined below).  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement (as defined below).

On [●], 2009, Nortel Networks Inc. and certain of its U.S. subsidiaries that are debtors and debtors-in-possession (collectively, the "U.S. Debtors") as well as Nortel Networks Limited and certain other affiliates of the U.S. Debtors that have commenced proceedings under the Canadian Companies' Creditors Arrangement Act (the "Canadian Debtors"), and certain non-debtor affiliates of the U.S. Debtors and the Canadian Debtors (together with the U.S. Debtors and the Canadian Debtors, the "Sellers") executed that certain Asset Sale Agreement (the "Agreement") with Nokia Siemens Networks B.V. (together with any of its designees, the "Purchaser").

The Sellers have determined that:  (A) the transactions contemplated by the Agreement and the ancillary agreements discussed therein with respect to the Purchaser, or, as set forth in the relevant sale agreement and ancillary agreements with respect to a Successful Bidder (collectively, the "Transaction") should be subject to competitive bidding as set forth herein; (B) the transfer of the U.S. Debtors' rights, title and interests in and to the Assets (as defined below) should be subject to approval by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"); (C) the transfer of the rights, title and interests of the Canadian Debtors (as such term is defined in the Agreement) in and to the Assets should be subject to approval by the Ontario Superior Court of Justice (the "Canadian Court"); and (D) the Transaction shall be subject to approval by such other applicable court(s) as the Sellers, in consultation with the Committee (as defined below), the Bondholder Group (as defined below) and the Monitor (as defined below), may determine are necessary or appropriate and certain other closing conditions as set forth in the Agreement.

On June 19, 2009, the U.S. Debtors filed a Motion for Orders (I)(A) Authorizing Debtors' Entry into the Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of Debtors' CDMA and LTE Business Free and Clear of All Liens, Claims and Encumbrances, (B) The Assumption and Assignment of Certain Contracts and (C) the Assumption and Sublease of Certain Leases (the "Sale Motion").

On [●], 2009, the Bankruptcy Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Bidding Procedures Order").

42

On [●], 2009, the Canadian Debtors filed a motion with the Canadian Court seeking an order for approval of (I) execution and delivery of the Agreement by the Canadian Debtors, (II) payment of the Break-Up Fee and Expense Reimbursement in the circumstances provided for in the Agreement, and (III) a process for the Sale of the Canadian Debtors' rights, title and interests in and to the Assets (as defined below).

On [●], 2009, the Canadian Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Canadian Sales Process Order").

Bidding Process

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's and the Canadian Court's and, if required, such other applicable courts' approval thereof (collectively, the "Bidding Process"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., *et al.* (Case No. 09-10138) involving the U.S. Debtors (the "Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor"), and their respective advisors throughout the Bidding Process. In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, except with respect to the application of the terms of any order of the Canadian Court or any requirement for approval by the Canadian Court or the Monitor, the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.[1]

Assets To Be Sold

The Sellers are offering for sale, in one or more transactions, certain of the Sellers' assets pertaining to the business segments described in the Agreement (to the extent that such assets are not subsequently excluded from the Sale in accordance with the terms of the Agreement) with respect to the Purchaser, or, as set forth in the relevant sale agreement with respect to a Successful Bidder, and related schedules and in an information memorandum made available by the Sellers to the Purchaser and other potential bidders, which will also be made available to other prospective purchasers that have executed a confidentiality agreement with the Sellers (the "Assets").

"As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or

---

[1]     For the avoidance of doubt, this Bidding Process shall not govern any disagreements among the Sellers.

2

43

estates, except, with respect to the Purchaser, to the extent set forth in the Agreement or, with respect to a Successful Bidder (as defined below), to the extent set forth in the relevant sale agreement of such Successful Bidder.

### Free Of Any And All Claims And Interests

All of the rights, title and interests of the U.S. Debtors and the Canadian Debtors in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests") to the extent permitted by sections 363 and 365 of the Bankruptcy Code and other applicable law, such Claims and Interests to attach to the net proceeds of the sale of such Assets (without prejudice to any claims or causes of action regarding the priority, validity or enforceability thereof), except, with respect to the Purchaser, to the extent otherwise set forth in the Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant sale agreement of such Successful Bidder with the U.S. Debtors and the Canadian Debtors.

### Publication Notice

Within five (5) Business Days, or as soon thereafter as is reasonably practicable, after entry of orders by the Bankruptcy Court and the Canadian Court approving these Bidding Procedures, the Sellers shall publish notice of these Bidding Procedures, the time and place of the Auction (as defined below), if required, the time and place of the Sale Hearing (as defined below), and the objection deadline for the Sale Hearing in The Wall Street Journal (National Edition) and The Globe & Mail (National Edition).

### Participation Requirements

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court, for cause shown, or as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), in order to participate in the Bidding Process, each person, other than the Purchaser, who wishes to participate in the Bidding Process (a "Potential Bidder") must deliver to the Notice Parties (as defined below) at the addresses provided below:

(a)     an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, that shall not be on terms that, in the Sellers' reasonable judgment, are more favorable to the Potential Bidder than the confidentiality agreement executed by the Purchaser and which shall inure to the benefit of any purchaser of the Assets (in the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets and waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transaction it may enter into, to the Notice Parties (as defined below));

3

44

(b)    current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transaction; and

(c)    a preliminary (non-binding) written proposal regarding:  (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder, and any proposed measures associated with their continued employment; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Agreement.

A Potential Bidder that delivers the documents described above, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence as provided in the following paragraph with respect to the Assets.

<u>Due Diligence</u>

The Sellers may in their reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a confidentiality agreement with the Sellers such due diligence access to materials and information relating to the Assets as the Sellers deem appropriate after consultation with the Committee, the Bondholder Group and the Monitor.  Due diligence access may include management presentations as may be scheduled by the Sellers,

access to electronic data rooms, on site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their reasonable business judgment, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. No additional due diligence for any party other than a Qualified Bidder who has submitted a Qualified Bid will continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. In any event, the Purchaser shall be provided prompt access to all material due diligence materials, management presentations, on-site inspections and other information provided to Qualified Bidders that were not previously made available to the Purchaser. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Agreement or any other definitive sale agreement with any Successful Bidder executed and delivered by Sellers.

Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Gordon A. Davies, Esq., Chief Legal Officer, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905) 863-8386; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (v) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vi) financial advisor to the Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (vii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; and (viii) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; so as to be received not later than July 21, 2009 at 4:00 p.m. (ET) by the Sellers (the "Bid Deadline"). The Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so; provided, however, that for any such extension beyond ten (10) Business Days, the Sellers shall have obtained the prior written consent of the Purchaser, the Committee, the Bondholder Group and the Monitor, which consent will not be unreasonably withheld. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders (including the Purchaser) and the parties listed above of such extension.

46

## Qualified Bid

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(a)     it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or upon alternative terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholders Committee and the Monitor, are no less favorable than the terms and conditions of the Agreement;

(b)     it includes a letter stating that the bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), provided that if such bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, August 31, 2009, and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)     it includes a duly authorized and executed Agreement, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, including, to the extent required by the terms and conditions of such bid, the Intellectual Property License Agreement, the Transition Services Agreement, the CDMA Supply Agreement, the Loaned Employee Agreement, the Manufacturing and Supply Regarding Dual Use Platforms Agreement and the Trademark License Agreement (each as defined in the Agreement), the other ancillary agreements as described in the Agreement and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Agreement ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the bidder;

(d)     it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(e)     it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

47

(f)      it fully discloses the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(g)      it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Agreement, plus (i) the amount of the Break-Up Fee and Expense Reimbursement (as defined below), plus (ii) U.S.$5,000,000.

(h)      it includes an acknowledgment and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Agreement (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)      it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)      it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(k)      it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to 5% of the Purchase Price to be dealt with as provided for under "Good Faith Deposit" herein;

(l)      it contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder and any proposed measures associated with their continued employment;

7

48

(m)    it includes evidence of the Potential Bidder's ability to comply with section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)    it contains other information reasonably requested by the Sellers; and

(o)    it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids, and shall deliver copies of any bids deemed to be Qualified Bids to Purchaser in accordance with section 10.7 of the Agreement as soon as reasonably practicable after such a determination has been made.[2] Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

The Sellers shall notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids promptly following the expiration of the Bid Deadline.

<u>Aggregate Bids</u>

The Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; <u>provided</u>, that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

<u>Evaluation of Competing Bids</u>

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Transaction (including any regulatory approvals required to close the Transaction), the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

---

[2]    The Debtors may entertain bids through the Bidding Procedures for other assets besides the Assets, whether related or unrelated to the CDMA and LTE Businesses.

49

### No Qualified Bids

If the Sellers do not receive any Qualified Bids other than the Agreement received from the Purchaser, the Auction shall be cancelled and the U.S. Debtors shall report the same to the Bankruptcy Court, the Canadian Debtors shall report the same to the Canadian Court and the Monitor and subject to requiring and obtaining approvals of the Bankruptcy Court, the Canadian Court or any other applicable court and satisfaction of the conditions set forth in the Agreement, the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Agreement. In addition, if no Qualified Bid is received, the U.S. Debtors reserve the right to request that the Bankruptcy Court advance the date of the Sale Hearing (as defined below) and provide notice of such new date to those parties in interest entitled to notice thereof and the Canadian Debtors reserve the right to file a motion with the Canadian Court seeking the approval of the sale of the Canadian Debtors' rights, title and interests in and to the Assets to the Purchaser. In addition, if approval of any other applicable court is required, the Sellers will as soon as practicable file an appropriate pleading with such court(s) seeking approval of the Transaction.

### Break-Up Fee and Expense Reimbursement

Recognizing the value and benefits that Purchaser has provided to the U.S. Debtors and the other Sellers by entering into the Agreement, as well as the Purchaser's expenditure of time, energy and resources, the Sellers have agreed that if the Purchaser is not the Successful Bidder, the Sellers will, in the circumstances as set forth in the Agreement and Bidding Procedures Order, pay to the Purchaser (i) a break-up fee of $19,500,000 (the "Break-Up Fee"), and (ii) reimburse the Purchaser for certain expenses as set forth in the Agreement and Bidding Procedures Order up to $3,000,000 (the "Expense Reimbursement"), which amounts shall constitute administrative expense claims against the U.S. Debtors under section 503(b) of the U.S. Bankruptcy Code, payable in accordance with the terms of the Agreement and the Bidding Procedures Order.

### Auction

If the Sellers receive one or more Qualified Bids in addition to the Agreement, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at **9:30 a.m. (ET) on July 24, 2009**, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned without the prior written consent of the Purchaser, subject to the terms of the Agreement. Copies of all Qualified Bids shall be delivered to the Committee, the Bondholder Group, the Monitor and the Purchaser at such time that such bid is deemed a Qualified Bid but no later than two (2) Business Days prior to the Auction. The Auction shall run in accordance with the following procedures:

(a)    Only the Sellers, the Purchaser, the Committee, the Bondholder Group and the Monitor (and the advisors to each of the foregoing), any creditor of the Sellers and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the



Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)     Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(c)     At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date. At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction.

(d)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(e)     The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(f)     Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least U.S.$5,000,000 over the Starting Bid or the Leading Bid,

10

51

as the case may be, <u>provided</u> that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "<u>Leading Bid</u>"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers. Notwithstanding the foregoing, the Purchaser shall be entitled to submit a Subsequent Bid without being required to satisfy the aforementioned minimum bid increment requirement.

Selection Of Successful Bid

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid and evaluate each Qualified Bid as set forth in the section titled "Evaluation of Competing Bids" herein, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such bids, collectively the "<u>Successful Bid</u>" and the bidder(s) making such bid, collectively, the "<u>Successful Bidder</u>"), it being understood that the Purchaser is not required to satisfy any minimum bid increment requirement and that if the Sellers determine that a Qualified Bid or Subsequent Bid by the Purchaser and any other Qualified Bid are therefore not materially different, then as between those two offers the Purchaser's offer shall be deemed to be the highest and best offer for purposes of this provision and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by the Canadian Court and any required approvals of any other applicable court(s) with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

Sale Hearing

The sale hearing to authorize certain of the Sellers to enter into agreements with respect to the Successful Bid (the "<u>Sale Hearing</u>") will be held, in respect of those Sellers that are U.S. Debtors, before the Honorable Judge Kevin Gross (or any substitute therefor) in the United States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a

11

date to be scheduled by the court and currently proposed as **July 28, 2009 at 2:00 p.m. (ET)**, and, in respect of those Sellers that are Canadian Debtors, before the Honourable Mr. Justice Geoffrey B. Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto, Ontario, and in any other applicable court(s) whose approval is required, as soon as practicable following the date of the Sale Hearing (or, with respect to the Canadian Court, in a joint hearing with the Bankruptcy Court at the Sale Hearing).  The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing.  If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Sellers shall proceed as set forth in the "No Qualified Bids" section above.  If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder").  The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is necessary or appropriate, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval is required.  Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court.  If a Qualified Bid other than the Agreement is selected as the Alternate Bid, the Alternate Bid shall remain open until the earlier of (a) August 15, 2009 or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date").  All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

*53*

## Good Faith Deposits

The Good Faith Deposit of any Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within five (5) Business Days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within five (5) Business Days of the date of the selection of the Successful Bidder and the Alternate Bidder. The Good Faith Deposit of the Successful Bidder will be applied in accordance with the terms of the Successful Bid, and will become nonrefundable upon the approval by the Bankruptcy Court and the Canadian Court of the Sale to the Successful Bidder.

## Reservation Of Rights

The Sellers, after consultation with their advisors, the Committee, the Bondholder Group and the Monitor, and their respective advisors, (a) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof; (b) may reject, at any time, any bid (other than the Purchaser's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, any orders of the Canadian Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor; and (c) except as otherwise specifically set forth herein, with respect to instances in which the consent of the Committee, the Bondholder Group and the Monitor is required, may modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets. Notwithstanding any of the foregoing, or anything else contained herein, however, the Sellers may not, without prior written consent of the Committee, the Bondholder Group and the Monitor, which consent may not be unreasonably withheld, (i) extend the deadlines set forth in the Auction procedures for more than ten (10) Business Days, (ii) adjourn the Auction for more than ten (10) Business Days, or (iii) adjourn the Sale Hearing for more than five (5) Business Days if the Auction has concluded.

Each of the foregoing actions shall be made by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, and their respective advisors. Notwithstanding the foregoing, the Sellers may not, without the prior written consent of the Purchaser, impair or modify (a) the Purchaser's rights and obligations under the Agreement; (b) the Purchaser's right to submit a Subsequent Bid without complying with any minimum bid increment; or (c) the Sellers' obligation to give effect to the Break-Up Fee and the Expense Reimbursement payable to the Purchaser under the Agreement by crediting those amounts to the Purchaser's Qualified Bid and any Subsequent Bid by the Purchaser.

13

54

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

| | |
|---|---|
| | *ONTARIO*<br>SUPERIOR COURT OF JUSTICE<br>(COMMERCIAL LIST)<br><br>Proceeding commenced at Toronto |
| | **ORDER**<br>(Nokia Siemens Networks B.V.<br>Bidding Procedures) |
| | **OGILVY RENAULT LLP**<br>Suite 3800<br>Royal Bank Plaza, South Tower<br>200 Bay Street<br>P.O. Box 84<br>Toronto, Ontario  M5J 2Z4, Canada<br><br>**Derrick Tay LSUC#: 21152A**<br>Tel: (416) 216-4832<br>Email: dtay@ogilvyrenault.com<br><br>**Mario Forte LSUC#: 27293F**<br>Tel: (416) 216-4870<br>Email: mforte@ogilvyrenault.com<br><br>**Jennifer Stam LSUC #46735J**<br>Tel: (416) 216-2327<br>Email: jstam@ogilvyrenault.com<br>Fax: (416) 216-3930<br>Lawyers for the Applicants |

DOCSTOR: 1712669\3

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**MOTION RECORD**
**Nokia Siemens Networks B.V. Bidding Procedures**
**(returnable June 29, 2009)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants