**EXHIBIT B**

**EXECUTION VERSION**

**ASSET SALE AGREEMENT**

BY AND AMONG

**NORTEL NETWORKS CORPORATION**

**NORTEL NETWORKS LIMITED**

**NORTEL NETWORKS INC.**

AND

**THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS**

AND

**NOKIA SIEMENS NETWORKS B.V.**

**DATED AS OF JUNE 19, 2009**

**TABLE OF CONTENTS**

                                                                      **Page**

ARTICLE I INTERPRETATION ................................................................. 2

Section 1.1.        Definitions................................................................. 2

Section 1.2.        Interpretation............................................................ 26

1.2.1.        Gender and Number ............................................... 26

1.2.2.        Certain Phrases and Calculation of Time.................... 26

1.2.3.        Headings, etc. ....................................................... 26

1.2.4.        Currency................................................................ 26

1.2.5.        Statutory References ............................................. 26

ARTICLE II PURCHASE AND SALE OF ASSETS........................................ 2726

Section 2.1.        Purchase and Sale. ................................................. 2726

2.1.1.        Assets .................................................................. 2726

2.1.2.        Excluded Assets .................................................... 2827

2.1.3.        Assumed Liabilities ................................................ 29

2.1.4.        Excluded Liabilities ................................................ 3130

2.1.5.        Assumption and/or Assignment or Rejection of 365
              Contracts. ........................................................... 3231

2.1.6.        Assignment of Non-365 Contracts............................ 33

2.1.7.        Cure Costs; Adequate Assurance; Efforts................... 34

2.1.8.        Local Sale Agreements ......................................... 3635

2.1.9.        EMEA Debtors....................................................... 36

2.1.10.       Non-Assignable Assets ......................................... 36

Section 2.2.        Purchase Price; Adjustment. .................................... 36

2.2.1.        Purchase Price...................................................... 36

2.2.2.        Estimated Purchase Price. ..................................... 3736

2.2.3.        Purchase Price Adjustment; Closing Statement;
              Dispute Resolution................................................. 3837

2.2.4.        Working Capital Escrow.......................................... 39

Section 2.3.        Closing. ................................................................ 4039

2.3.1.        Closing Date......................................................... 4039

2.3.2.        Closing Actions and Deliveries ................................ 40

## TABLE OF CONTENTS

**Page**

Section 2.4.          Designated Purchaser(s)................................................... 41~~41~~**40**

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** . 42~~41~~**41**

~~SECTION~~**Section** 3.1. .................................................Organization and Corporate Power.42~~41~~**41**

Section 3.2.          Authorization; Binding Effect; No Breach. ................................. 42

Section 3.3.          Financing............................................................................ 43

Section 3.4.          Adequate Assurance of Future Performance ............................... 43

Section 3.5.          Purchaser's Acknowledgments; Exclusivity of
                     Representations and Warranties................................................. 43

Section 3.6.          Brokers ....................................................................... 44~~44~~**43**

Section 3.7.          Absence of Certain Business Practices .................................... 44~~44~~**43**

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS** ........ 45~~44~~**44**

Section 4.1.          Organization and Corporate Power.......................................... 45~~44~~**44**

Section 4.2.          Authorization; Binding Effect; No Breach. ................................. 45

Section 4.3.          Title to Tangible Assets ....................................................... 46~~45~~**45**

Section 4.4.          Material Contracts.............................................................. 46

Section 4.5.          Intellectual Property............................................................ 47

Section 4.6.          Litigation................................................................... 49~~48~~**48**

Section 4.7.          Financial Statements. ......................................................... 49

Section 4.8.          Compliance with Laws; Consents............................................ 50~~49~~**49**

Section 4.9.          Real Property.. .................................................................. 50

Section 4.10.        Environmental Matters......................................................... 52

Section 4.11.        Labor and Employee Benefits Matters. ................................... 53~~53~~**52**

Section 4.12.        Brokers ..................................................................... 55~~55~~**54**

Section 4.13.        Tax Liens ................................................................... 55~~55~~**54**

Section 4.14.        Valid Transfers............................................................. 55~~55~~**54**

Section 4.15.        Investment Canada Act ................................................... 55~~55~~**54**

Section 4.16.        Interdependency Schedule .................................................... 55

Section 4.17.        EMEA Debtors unrelated to Business or Assets..................... 56~~56~~**55**

Section 4.18.        Sellers' Acknowledgment; Exclusivity of Representations
                     and Warranties ........................................................... 56~~56~~**55**

**TABLE OF CONTENTS**

<u>Page</u>

Section 4.19.        Absence of Certain Business Practices .................................. ~~56~~**55**

**ARTICLE V COVENANTS AND OTHER AGREEMENTS** .......................................... ~~56~~**55**

Section 5.1.        U.S. Bankruptcy Actions ............................................... ~~56~~**55**

Section 5.2.        Canadian Bankruptcy Actions. ............................................... ~~58~~**57**

    5.2.1.        Canadian Sales Process Order ............................................... ~~58~~**57**

    5.2.2.        Canadian Approval and Vesting Order. ............................... ~~58~~**57**

    5.2.3.        Additional Requests ............................................... ~~58~~**57**

    5.2.4.        Withdrawal, Cancellation or Rejection .............................. ~~59~~**58**

Section 5.3.        Consultation; Notification. ............................................... ~~59~~**58**

Section 5.4.        Pre-Closing Cooperation. ............................................... ~~60~~**59**

Section 5.5.        Antitrust and Other Regulatory Approvals. ........................... ~~61~~**59**

Section 5.6.        Pre-Closing Access to Information. ...................................... ~~64~~**63**

Section 5.7.        Public Announcements ............................................... ~~64~~**63**

Section 5.8.        Post-Closing Cooperation ............................................... ~~65~~**64**

Section 5.9.        Conduct of Business ............................................... ~~65~~**64**

Section 5.10.        Transaction Expenses. ............................................... ~~67~~**66**

Section 5.11.        Confidentiality ............................................... ~~67~~**66**

Section 5.12.        Disclosure Schedules and Certain Information. ..................... ~~67~~**66**

Section 5.13.        Certain Payments or Instruments Received from Third
                     Parties. ............................................... ~~68~~**66**

Section 5.14.        Non-Assignable Contracts. ............................................... ~~68~~**67**

Section 5.15.        Inbound License Agreements ............................................... ~~69~~**68**

Section 5.16.        Bundled Contracts. ............................................... ~~69~~**68**

Section 5.17.        Post-Closing Assistance for Litigation. ............................... ~~71~~**69**

Section 5.18.        Delivery of Assets. ............................................... ~~71~~**70**

Section 5.19.        Termination of Overhead and Shared Services .................. ~~72~~**70**

Section 5.20.        Insurance Matters. ............................................... ~~72~~**71**

Section 5.21.        Deposits, Guarantees and Other Credit Support of the
                     Business ............................................... ~~73~~**71**

Section 5.22.        Use of Trademarks ............................................... ~~73~~**72**

Section 5.23.        Sellers' Accessible Information; Cooperation. ................. ~~73~~**72**

## TABLE OF CONTENTS

**Page**

Section 5.24.    Maintenance of Books and Records. ....................................... ~~74~~72

Section 5.25.    Ancillary Agreements. ....................................................... ~~75~~73

Section 5.26.    Subleases.......................................................................... ~~75~~73

Section 5.27.    Direct Leases.................................................................... ~~75~~74

Section 5.28.    Licenses........................................................................... ~~75~~74

Section 5.29.    Hazardous Materials at the Carling Property......................... ~~76~~74

Section 5.30.    Transition Services Agreement............................................ ~~76~~75

Section 5.31.    Set-off ............................................................................. ~~78~~77

**ARTICLE VI TAX MATTERS**................................................................. ~~79~~77

Section 6.1.    Transfer Taxes. ................................................................. ~~79~~77

Section 6.2.    Tax Characterization of Payments Under This Agreement ..... ~~80~~78

Section 6.3.    Apportionment of Taxes. .................................................... ~~80~~79

Section 6.4.    Withholding Taxes.............................................................. ~~81~~79

Section 6.5.    Records. ........................................................................... ~~81~~80

Section 6.6.    Tax Returns....................................................................... ~~83~~81

Section 6.7.    Allocation of Purchase Price............................................... ~~84~~82

**ARTICLE VII EMPLOYMENT MATTERS** ............................................... ~~85~~83

Section 7.1.    Employment Terms............................................................. ~~85~~83

Section 7.2.    Employee Benefits. ............................................................ ~~86~~84

Section 7.3.    Other Employee Covenants. ................................................ ~~87~~86

Section 7.4.    Excluded Employee Liabilities ............................................ ~~89~~87

Section 7.5.    Sole Benefit of Sellers and Purchaser .................................. ~~90~~88

**ARTICLE VIII CONDITIONS TO THE CLOSING** ................................... ~~90~~88

Section 8.1.    Conditions to Each Party's Obligation ................................. ~~90~~88

Section 8.2.    Conditions to Sellers' Obligation ........................................ ~~91~~89

Section 8.3.    Conditions to Purchaser's Obligation ................................... ~~91~~89

**ARTICLE IX TERMINATION** ................................................................ ~~92~~90

Section 9.1.    Termination....................................................................... ~~92~~90

Section 9.2.    Termination Payments. ...................................................... ~~93~~91

# TABLE OF CONTENTS

**Page**

Section 9.3.        Effects of Termination .............................................................. 94~~92~~

**ARTICLE X MISCELLANEOUS** ........................................................................ 94~~93~~

Section 10.1.       No Survival of Representations and Warranties or
                    Covenants.......................................................................... 94~~93~~

Section 10.2.       Remedies............................................................................. 95~~93~~

Section 10.3.       No Third Party Beneficiaries ................................................ 95~~93~~

Section 10.4.       Consent to Amendments; Waivers.......................................... 95~~93~~

Section 10.5.       Successors and Assigns......................................................... 95~~93~~

Section 10.6.       Governing Law; Submission to Jurisdiction; Waiver of
                    Jury Trial............................................................................ 95~~94~~

Section 10.7.       Notices ............................................................................... 97~~95~~

Section 10.8.       Exhibits; Sellers Disclosure Schedule. .................................. 99~~97~~

Section 10.9.       Counterparts ....................................................................... 99~~97~~

Section 10.10.      No Presumption; Mutual Drafting .......................................... 99~~97~~

Section 10.11.      Severability ........................................................................ 99~~97~~

Section 10.12.      Entire Agreement ................................................................ 100~~98~~

Section 10.13.      Availability of Equitable Relief............................................. 100~~98~~

Section 10.14.      Bulk Sales Laws.................................................................. 100~~98~~

Section 10.15.      Main Sellers as Representatives of Other Sellers. ................. 100~~98~~

Section 10.16.      Execution by Other Sellers .................................................. 101~~99~~

Section 10.17.      Obligations of the Sellers..................................................... 101~~99~~

Section 10.18.      Limitation on Losses............................................................ 101~~99~~

# EXHIBITS

Exhibit A – Other Sellers

Exhibit B – Canadian Debtors; U.S. Debtors; EMEA Debtors; Non-Debtor Sellers

Exhibit C – Adjusted Net Working Capital Statement

Exhibit D – Calculation Principles

Exhibit E – CDMA Supply Agreement

Exhibit F – Flextronics Back-to-Back Agreement Term Sheet

Exhibit G – Escrow Agreement

Exhibit H – GDNT ~~Agreement~~**Agreements** Term Sheet

Exhibit I – Intellectual Property License Agreement

Exhibit J – China Asset Sale Agreement

Exhibit K – Transferring Employee Agreement

Exhibit L – Manufacturing and Supply Regarding Dual Use Platforms Agreement

Exhibit M – Nortel Accounting Principles

Exhibit N – Specified Permitted Encumbrances

Exhibit O – Real Estate Agreements Term Sheet

Exhibit P – Trademark License Agreement

Exhibit Q – Transition Services Agreement

Exhibit R – Software License and Development Agreement for Common Material Platform Software

Exhibit S – Knowledge of the Sellers

Exhibit 2.4 – Designated Purchasers

Exhibit 5.1 – Form of U.S. Bidding Procedures Order and U.S. Sale Order

Exhibit 5.2.1 – Form of Canadian Sales Process Order Motion and Canadian Sales Process Order

Exhibit 5.2.2 – Form of Canadian Approval and Vesting Order

# ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of June 19, 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the Affiliates (as defined below) of the Main Sellers listed in Exhibit A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**") and Nokia Siemens Networks B.V., a corporation organized under the laws of the Netherlands (the "**Purchaser**").

## W I T N E S S E T H :

WHEREAS, the Sellers beneficially own and operate the Business (as defined below);

WHEREAS, on January 14, 2009 (the "**Petition Date**"), NNC, NNL and the Other Sellers listed in part 1 of Exhibit B hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and was extended by further order of the Canadian Court on February 10, 2009 and April 28, 2009, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit B hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) having commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the Other Sellers listed in part 3 of Exhibit B hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers, if any) of the Assets (as defined below), the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities (as defined below) are being

made at arms' length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates;

WHEREAS, the Purchaser (and each of the Designated Purchasers, where applicable) intends to purchase only those Assets relating to the Sellers' CDMA Business in North America and CDMA research and development in China, as well as certain LTE Assets in Canada; and

WHEREAS, in addition, as of the Closing, the Purchaser (or Affiliates of the Purchaser) and certain Sellers (or Affiliates of the Sellers) will enter into the following ancillary agreements, (i) the Transition Services Agreement, (ii) the Intellectual Property License Agreement, (iii) the Trademark License Agreement, (iv) the Escrow Agreement, (v) the Transferring Employee Agreement, (vi) the Real Estate Agreements, (vii) the Manufacturing and Supply Agreement Regarding Dual Platforms, (viii) Flextronics Back-to-Back Agreement, (ix) the CDMA Supply Agreement, (x) the China Asset Sale Agreement, (xi) the Software License and Development Agreement for Common Material Platform Software, and (xii) the GDNT ~~Agreement~~**Agreements** (the foregoing, collectively, the "**Ancillary Agreements**"), and any arrangements as may be required pursuant to Section 5.16.

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I

## INTERPRETATION

Section 1.1.  Definitions.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accounting Arbitrator**" has the meaning set forth in Section 2.2.3(c).

"**Accrued Vacation Amount**" means the amount of compensation, including the employer's portion of any associated payroll ~~taxes~~**Taxes**, with respect to the accrued and unused vacation days that is accrued on the account of a Transferring Employee from his or her respective employer as of the Closing Date to be calculated in accordance with the Calculation Principles.

"**Action**" means any litigation, action, suit, charge, binding arbitration, Tax audit or investigation or other legal, administrative, regulatory or judicial proceeding.

"**Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(c).

"**Adjusted Net Working Capital Statement**" means the statement of certain specified asset and liability accounts and certain accounting principles, methodologies and

policies used in the determination of such accounts, consistent with the Calculation Principles, a *pro forma* version of which (as of March 31, 2009) is provided in Exhibit C hereto.

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person.

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Alternative Transaction**" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangement or other similar transaction, of all or a substantial portion of the Business, or all or a substantial portion of the Assets, in each case, in a transaction or series of transactions with a Successful Bidder (as such term has been defined in Exhibit 5.1, which may include multiple bidders whose bids are combined) other than the Purchaser and/or its Affiliates.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Annual Audited Financial Statements**" has the meaning set forth in Section 4.7(a).

"**Antitrust Approvals**" means the HSR Approval and the Competition Act Approval.

"**Antitrust Laws**" means the Competition Act, the HSR Act, and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Accounts Receivable**" means North American trade accounts receivable that are current and not in dispute relating to the Specified CDMA Contracts, in the aggregate amount of $5,000,000, net of any allowance for doubtful accounts computed in accordance with the Nortel Accounting Principles consistent with historical practice.

"**Assigned Contracts**" means (i) the Assumed and Assigned Contracts, and (ii) the Designated Non-365 Contracts.

"**Assigned Intellectual Property**" means (i) the Assigned Patents, (ii) the Assigned Trademarks, (iii) the Intellectual Property (other than Patents and Trademarks) in the Software (including previous versions and versions in development) predominantly used in the

CDMA Products and in the Software predominantly used in the LTE Access Products, respectively, in each case, as listed in Section 1.1(a) of the Sellers Disclosure Schedule, and (iv) any other Intellectual Property (other than Patents or Trademarks) owned as of the Closing Date by any of the Sellers that is predominantly used in the Business with such predominant use to be determined, if applicable, in accordance with guidelines and principles, if any, that the Sellers and the Purchaser may from time to time agree in writing prior to Closing.

"**Assigned Patents**" means the Patents predominantly used in the CDMA Business as of Closing and owned as of the Closing Date by any of the Sellers as set forth in Section 1.1(b) of the Sellers Disclosure Schedule.

"**Assigned Trademarks**" means the Trademarks predominantly used in the Business as of the Closing and owned as of the Closing Date by any of the Sellers, as set forth in Section 1.1(c) of the Sellers Disclosure Schedule.

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(d).

"**Assumed and Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.5(b).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Auction**" has the meaning set forth in the Bidding Procedures.

"**Balance Sheet Date**" has the meaning set forth in Section 4.7 **4.7(b).**

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court or any other court before which Bankruptcy Proceedings are held.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings concerning any of the Sellers that are held from time to time.

"**Bidding Procedures**" means the procedures to be employed with respect to the proposed sale of the Assets and the assumption of the Assumed Liabilities to be approved by the U.S. Bankruptcy Court and the Canadian Court pursuant to the U.S. Bidding Procedures Order and the Canadian Sales Process Order, respectively.

"**Break-Up Fee**" has the meaning set forth in Section 9.2(a).

"**Bundled Contracts**" has the meaning set forth in Section 5.16.

"**Business**" means, collectively, the following businesses to the extent operated by the Sellers as of the Closing, consisting of:

(i)    the business segment through which the Sellers, individually, jointly or in collaboration with or pursuant to contracts with Third Parties:  (a) design, develop, process components, indirectly manufacture through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers the prior versions (if currently supported), current versions and versions under development of the following products:  CDMA BTS, CDMA BSC/eBSC, CDMA DO-RNC, CDMA MSC/MTX, CDMA HLR, CDMA Media Gateway, CDMA Gateway controller, CDMA Billing Manager, SS7 Signaling Gateway Software and associated OAM Software Systems as listed in Section 1.1(d) of the Sellers Disclosure Schedule (collectively, the "**CDMA Products**") and (b) provide the CDMA Services (clauses (a) and (b), collectively, the "**CDMA Business**"); and

(ii)    the business through which the Sellers, individually, jointly or in collaboration with or pursuant to contracts with Third Parties, design, develop, process components, indirectly manufacture through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers the prior versions (if currently supported), current versions and versions under development of the following LTE Access products:  eNodeB (including UDM and URM) and associated Element Management Systems (EMS) (collectively, the "**LTE Access Products**" and the activities described in this clause (ii) are the "**LTE Business**"),

but excluding, in each of clauses (i) and (ii) above: (A) any Excluded Asset; (B) Overhead and Shared Services (other than Transferred Overhead and Shared Services); and (C) any products and/or services provided by businesses or business segments of any Seller other than those specified in clauses (i) and (ii) above, including for the avoidance of doubt, the Excluded Products and Services.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, and (iii) Frankfurt, Germany.

"**Business Information**" means all books, records, files, research and development log books, ledgers, documentation, sales literature or similar documents in the possession or under control of the Sellers and to the extent that such information relates to the Business, including policies and procedures, Owned Equipment manuals and materials and procurement documentation; provided, that, to the extent any of the foregoing is also used in any business or business segment of any Seller other than the Business, then such portion of the Business Information as used in such business or business segment of any Seller other than the Business shall be segregated and shall not form part of Business Information, provided further that, where such segregation shall be impracticable, Business Information shall be limited to copies of the foregoing.  Business Information shall not include any Employee Records.

"**Business Registered IP**" has the meaning set forth in Section 4.5(b).

"**Calculation Principles**" means the Nortel Accounting Principles, applied in a manner consistent with historical practices, to the extent applicable to the determination of the Net Inventory Value, the CIP Receivables Amount, the Contractual Liabilities Amount, the Royalty Liability Amount, the Warranty Provision Amount, the Accrued Vacation Amount, and the Adjusted Net Working Capital as set forth in Exhibit D and in the Adjusted Net Working Capital Statement.

"**Calgary Retention Plan**" means the retention plan developed for certain Westwinds Facility employees substantially approved by the Canadian Court on March 6, 2009, with such further approvals as may be obtained from the Canadian Court from time to time.

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.2.

"**Canadian Court**" means the Ontario Superior Court of Justice.

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Sales Process Order**" has the meaning set forth in Section 5.2.1.

"**Canadian Sales Process Order Motion**" has the meaning set forth in Section 5.2.1.

"**Carling Property**" means the property municipally known as 3500 Carling Avenue, Nepean, Ontario.

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**CDMA Business**" has the meaning set forth in the definition of Business.

"**CDMA Contracts**" means those Contracts of a Seller pursuant to which a Seller or Sellers provide CDMA Products and/or CDMA Services to carriers or other customers of the CDMA Business.

"**CDMA Products**" has the meaning set forth in the definition of Business.

"**CDMA Services**" mean, collectively, the following services, solely in relation to CDMA Products, that the Sellers, individually, jointly or in collaboration with or pursuant to contracts with Third Parties, market, distribute and sell globally to carriers: (i) network implementation services, consisting of the configuration, planning, installation and integration of a network migration, upgrade or green-field deployment into a new or existing network, including design and deploy services, audit and optimization services, and operations support

system services; (ii) network managed services, consisting of the provision of on-site skilled resources to provide operational support, technician support, staff augmentation, on-the-job training, product specialist consulting, core network optimization, software loading service, and transport network service; and (iii) network support services, including technical support, technical account manager service, network prime engineer service, emergency recovery services, online support , technical support for special projects, repair services, managed spares service, Third Party products spares, management service, corrective content management, network discovery services, engineering helpdesk, network configuration, and software release services; but expressly excludes the Sellers' network operations centre.

"**CDMA Supply Agreement**" means the agreement between the Purchaser and/or any Designated Purchasers and the relevant Sellers, to be executed as of the Closing in substantially the form attached hereto as Exhibit E.

"**CFIUS**" means the Committee on Foreign Investment in the United States.

"**CFIUS Approval**" means that the Parties shall have received a written notification issued by CFIUS that it has concluded a review of any notification voluntarily provided pursuant to the Exon-Florio Amendment of the Defense Production Act of 1950, as amended, and Section 5.5(f) hereof and determined not to conduct an investigation or, if an investigation is deemed to be required, notification that the U.S. government will not take action to prevent the transactions contemplated by this Agreement from being consummated.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**China Asset Sale Agreement**" means the agreement between the Purchaser and/or any Designated Purchasers and the relevant Affiliates of the Sellers to be executed as soon as practicable after the date hereof in substantially the form attached hereto as Exhibit J.

"**China Assets**" means the Assets related to the CDMA Business to be sold pursuant to the China Asset Sale Agreement.

"**CIP Receivables**" means, as of a given date, amounts classified in Construction-in-Process accounts in a manner consistent with the Calculation Principles.

"**CIP Receivables Amount**" means, as of any given date, the amount of CIP Receivables of the Business, determined in accordance with the Calculation Principles.

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 2.3.1.

"**Closing Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.3(a).

"**Closing CIP Receivables Amount**" has the meaning set forth in Section 2.2.3(a).

"**Closing Contractual Liabilities Amount**" has the meaning set forth in Section 2.2.3(a).

"**Closing Date**" has the meaning set forth in Section 2.3.1.

"**Closing Employee Adjustment Amount**" has the meaning set forth in Section 2.2.3(a).

"**Closing Net Inventory Value**" has the meaning set forth in Section 2.2.3(a).

"**Closing Royalty Liability Amount**" has the meaning set forth in Section 2.2.3(a).

"**Closing Statement**" has the meaning set forth in Section 2.2.3(a).

"**Closing Warranty Provision Amount**" has the meaning set forth in Section 2.2.3(a).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Seller or any of its Affiliates has entered into with any union, works council or collective bargaining agent with respect to terms and conditions of employment of the employees of such Seller or its Affiliates.

"**Commissioner**" means the Commissioner of Competition appointed under the Competition Act or any person duly authorized to exercise the powers and perform the duties of the Commissioner of Competition.

"**Competition Act**" means the Competition Act (Canada), as amended, and includes the regulations promulgated thereunder.

"**Competition Act Approval**" means that: (i) the applicable waiting period has expired or been terminated pursuant to Section 123 of the Competition Act; (ii) the Commissioner or his/her authorized representative shall have provided the Purchaser with a waiver from complying with Part IX of the Competition Act pursuant to Section 113(c) of the Competition Act and the Commissioner or his/her authorized representative shall have advised the Purchaser in writing that the Commissioner does not intend to make an application under Section 92 of the Competition Act with respect to the transactions contemplated by this Agreement, and neither the Commissioner nor any of his/her authorized representatives shall have rescinded or amended such advice; or (iii) the Commissioner shall have issued an advance

ruling certificate pursuant to Section 102 of the Competition Act in respect of the transactions contemplated by this Agreement.

"**Complaining Party**" has the meaning set forth in Section 5.30(d).

"**Confidentiality Agreement**" means the confidentiality agreement among the Purchaser, the Sellers listed therein and the Joint Administrators dated May 9, 2009, as amended.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by, or notice to (including the expiry of any related notice or waiting period), any Government Entity or other Third Party.

"**Contract**" means any written binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.

"**Contractual Liabilities Amount**" means, as of any given date, the amount of contractual liabilities of the Business determined in accordance with the Calculation Principles.

"**Control**" (together with its correlative meanings, "Controlled by" and "under common Control with") means, in connection with a given Person, the possession, directly or indirectly, or as trustee or executor, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract, credit arrangement or otherwise.

"**Covered Assets and Persons**" means the Business and the assets (including the Assets), tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of the Business.

"**Cross-Border Protocol**" means the certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cure Cost**" means (i) any amounts required by Section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under a 365 Contract or an Assumed and Subleased Real Estate Lease and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract or Assumed and Subleased Real Estate Lease; and (ii) with respect to any Designated Non-365 Contract, any amounts required to cure any defaults and to pay any actual or accrued pecuniary losses under such Seller Contract in respect of the period prior to the Closing Date that are required by the counterparty thereto to be paid in order for such Assigned Contract to be assigned.

"**Designated Non-365 Contracts**" has the meaning set forth in Section 2.1.6(d).

"**Designated Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Designated Purchaser**" has the meaning set forth in Section 2.4.**2.4(a).**

"**Direct Lease Real Estate**" has the meaning set forth in Section 5.27.

"**Direct Leases**" has the meaning set forth in Section 5.27.

"**Disagreement Notice**" has the meaning set forth in Section 2.2.3(b).

"**EMEA Cases**" means the proceedings commenced by the applications filed with the English Court on the Petition Date, pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings.

"**EMEA Debtors**" means the entities listed under the heading "EMEA Debtors" in part 3 of Exhibit B hereto.

"**Employee**" means any employee, as of the date hereof, of the Sellers or their Affiliates (other than the EMEA Debtors or their respective Subsidiaries) who (i) for the twelve months prior to the date hereof (or such shorter time as such employee was employed by the Sellers or such Affiliates) performed services which were all or substantially all related to the Business or (ii) were**was** hired into, transferred into, or assigned to the Business prior to the Closing in the Ordinary Course below Job Complexity Indicator 6 or with the Purchaser's consent and whose services are all or substantially all related to the Business, or whose services are necessary to the operation of the Business**, provided that if the employee is at a Job Complexity Indicator 6 or above, such hire, transfer or assignment is subject to Purchaser's consent in accordance with Section 5.9(l)**.

"**Employee Adjustment Amount**" means, at any given time, the Accrued Vacation Amount.

"**Employee Information**" has the meaning set forth in Section 4.11(b).

"**Employee Records**" means books, records, files, or other documentation with respect to Employees.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferring Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day on which the employment of a Transferring Employee commences with the Purchaser or its Designated Purchaser as provided for in this Agreement and the Transferring Employee Agreement.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environmental Law**" means any applicable Law relating to or regulating (i) the handling, generation, management, Release or remediation of Hazardous Materials; (ii) the

exposure of persons to Hazardous Materials; (iii) occupational health and safety; or (iv) pollution or protection of human health, the environment or natural resources, including the United States Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act and the Toxic Substances Control Act, all as amended, and any requirements of a Government Entity promulgated pursuant to these applicable Laws or any analogous supranational, foreign, state, provincial, territorial, municipal or local Laws.

"**Environmental Permit**" means any Consent required under any Environmental Law for the Business as currently conducted.

"**Equipment**" means tangible property, including all trade fixtures and fixtures, furniture, furnishings, fittings, equipment, apparatus, appliances, test labs, trial equipment and other articles of personal property, including that located at the Direct Lease Real Estate or the demised premises which are (i) the subject of any real property lease included in the Assigned Contracts or (ii) the subject of any Sublease, provided, however, that the term "Equipment" shall not include fixtures other than trade fixtures located at the Direct Lease Real Estate and shall not include any leasehold improvements owned by the head landlord and located at the demised premises which are the subject of any Sublease; and; provided, further, that "Equipment" shall not include (i) any Inventory, (ii) items of tangible property personally assigned to Employees who are not Transferring Employees, or (iii) any Intellectual Property covering, embodied in or connected to any Equipment.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Agreement**" means the Escrow Agreement to be entered into on or prior to Closing substantially in the form attached hereto as Exhibit G.

"**Escrow Agent**" has the meaning ascribed to such term in the Escrow Agreement.

"**Estimated Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(a).

"**Estimated CIP Receivables Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Contractual Liabilities Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Employee Adjustment Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Net Inventory Value**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Royalty Liability Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Warranty Provision Amount**" has the meaning set forth in Section 2.2.2(a).

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.4.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded Non-365 Contract**" has the meaning set forth in Section 2.1.6(e).

"**Excluded Products and Services**" means all products and services provided by businesses or business segments of any Seller other than the Business, including the following products and all associated development and PLM resources:  Evolved Packet Core (including MME, SGW, PGW), XACore and associated peripherals (including LPP, MS/ENET, SPM, DTC, MTM, DRAM IWSPM), ERS8600, Passport and OAM Systems not expressly included in the Products.

"**Excluded 365 Contract**" has the meaning set forth in Section 2.1.5(f).

"**Executory Contract**" means an "executory contract" for the purposes of Section 365 of the U.S. Bankruptcy Code.

"**Expense Reimbursement**" has the meaning set forth in Section 9.2(a).

"**Expense Reimbursement Notice**" has the meaning set forth in Section 9.2(a).

"**Extra Services**" has the meaning set forth in Section 5.30(b).

"**Final Order**" means an order of any Bankruptcy Court or other court of competent jurisdiction (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 ("**Rule 9024**") or Federal Rule of Civil Procedure 60 ("**Rule 60**") shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

"**Final Purchase Price**" has the meaning set forth in Section 2.2.3(a).

"**Flextronics Back-to-Back Agreement**" means the agreement between the relevant Sellers and the Purchaser and/or any Designated Purchasers to be executed on or before Closing based substantially on the term sheet attached hereto as Exhibit F.

"**GAAP**" means the United States generally accepted accounting principles.

"**GDNT** ~~Agreement Term Sheet~~**Agreements**" means the ~~agreement~~**agreements** to be entered into between the relevant Sellers, the Purchaser (**and/**or ~~the relevant~~**any** Designated Purchasers), and Guangdong-Nortel Telecommunications Equipment Co. Ltd., on or prior to the Closing based substantially on the term sheet attached hereto as Exhibit H.

"**General Scope of Included Services**" has the meaning set forth in Section 5.30(a).

"**Government Entity**" means any U.S., Canadian, U.K., supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**GST**" means goods and services ~~tax~~**Tax** payable under Part IX of the Excise Tax Act (Canada).

"**Hazardous Materials**" means any chemical, material, waste, heat, sound, radiation or substance defined by or regulated under any Environmental Law as a hazardous waste, hazardous material, hazardous substance, extremely hazardous waste, restricted hazardous waste, pollutant, contaminant, toxic substance or toxic waste, including without limitation petroleum, petroleum products, asbestos, lead or polychlorinated biphenyls.

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means that the Purchaser shall have received notification from the responsible Minister under the Investment Canada Act that he/she is satisfied or is deemed to be satisfied that the transactions contemplated in this Agreement that are subject to the provisions of the Investment Canada Act are likely to be of net benefit to Canada, on terms and conditions satisfactory to the Purchaser, in its reasonable discretion.

"**Inactive Employees**" means Employees on a Seller-approved leave of absence who are expected to return and actually return to work within the relevant time period set out below. An Employee shall be an Inactive Employee for purposes hereof only if such individual is absent as a result of military service, pregnancy or parental leave, disability leave, medical leave, jury duty or any leave provided under applicable Law and, in the case of leaves provided

under applicable Law, is expected to return to work and actually returns to work in the time permitted for such leave under applicable Law and, for any other leave, is expected to return to work and actually returns to work in accordance with the terms of such leave but not longer than ninety (90) days (or, if such Employee is located in Canada, six (6) months) following the Closing Date.

"**Inbound License Agreements**" has the meaning set forth in Section 4.5(f).

"**Included Services**" has the meaning set forth in Section 5.30(a).

"**Indebtedness**" of any Person means at any date, without duplication, all obligations of such Person to the extent incurred for the Business (i) for indebtedness for borrowed money (including any unpaid principal, premium and accrued and unpaid interest or fees), (ii) for indebtedness evidenced by bonds, debentures, notes or similar instruments, (iii) in respect of leases whether or not capitalized in accordance with the Nortel Accounting Principles under which such Person is the lessee, (iv) in respect of letters of credit issued for the account of such Person (to the extent drawn), (v) in respect of guarantees of the obligations of other Persons of the type referred to in clauses (i) through (iv) above and (vi) any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayment or default under any of the Indebtedness referred to in items (i) and (ii) above.

"**Independent Auditor**" means Grant Thornton LLP or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation that is jointly selected by the Primary Parties.

"**Insolvency Act**" has the meaning set forth in the recitals to this Agreement.

"**Intellectual Property**" means any and all intellectual and industrial property rights, whether protected or arising under the Laws of the United States, Canada or any other jurisdiction, including all intellectual or industrial property rights in any of the following: (i) Trademarks; (ii) Patents, invention disclosures and inventions; (iii) works of authorship (including any registrations or applications for registration of copyrights); (iv) mask works; (v) trade secrets, know-how and confidential information; (vi) *sui generis* data base rights; (vii) industrial designs; and (viii) Software.

"**Intellectual Property License Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit I.

"**Interim Unaudited Financial Statements**" has the meaning set forth in Section 4.7(~~b~~a).

"**Inventory**" means any inventories of raw materials, manufactured and purchased parts, works in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise; <u>provided</u>, that inventory not located within the United States, Canada or Caribbean countries served by United States contracts ("**Caribbean Countries**") shall not be included in

"Inventory", unless it (i) has been manufactured abroad; (ii) is, in the Ordinary Course, destined for shipment to the United States, Canada or Caribbean Countries; (iii) is not older than ninety (90) days, (iv) is the current product release/revision; and (v) is saleable.

"**Investment Canada Act**" means the Investment Canada Act, as amended.

"**Joint Administrators**" means Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes and Alan Bloom serve as joint administrators) as appointed by the English Court under the Insolvency Act.

"**KEIP**" means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in the District of Delaware pursuant to orders entered on March 5, 2009 and March 20, 2009, and approved by the Canadian Court in part on March 6, 2009 and in part on March 20, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**KERP**" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware by an order dated March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase means, with reference to the Sellers, the actual knowledge of those Persons listed on Exhibit S hereto.

"**Latest Lease Rejection Date**" means the latest of (i) August 12, 2009, or (ii) if Sellers (in their sole discretion) request and a landlord under a 365 Real Estate Lease agrees to an extension of the date by which the relevant Seller must elect to either assume or reject such 365 Real Estate Lease to a date following August 12, 2009, then with respect to such 365 Real Estate Lease, the date to which such deadline has been extended by agreement of Sellers and such landlord and (iii) with respect to the Non-365 Real Estate Leases and the Non-365 Licensed Real Estate Leases in each case related to property located in Canada, the date on which the Sellers file a "plan of record" with the Canadian Bankruptcy Court.

"**Law**" means any U.S., Canadian, U.K., foreign, supranational, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, judicial, administrative or other order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**Leased Real Property**" means all real property subject to a Real Estate Lease which is an Assigned Contract, an Assumed and Subleased Real Estate Lease, a Non-365 Subleased Real Estate Lease, a Licensed Real Estate Lease or a Non-365 Licensed Real Estate Lease.

"**Lease(s)**" means all Seller Contracts that are leases, subleases, licenses or other agreements (written or oral), including all amendments, extensions and renewals thereof, pursuant to which real property is held.

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability.

"**License**" has the meaning set forth in Section 5.28.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchasers under the Intellectual Property License Agreement and the Trademark License Agreement.

"**Licensed Real Estate Leases**" has the meaning set forth in Section 2.1.5(b).

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance on real property, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, lease or conditional sale arrangement.

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Losses**" means all losses, damages, Liabilities, deficiencies, interest, awards, judgments, fines, penalties and reasonable and documented out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements and the costs of litigation, including reasonable amount paid in investigation, defense or settlement of an Action).

"**LTE Access Products**" has the meaning specified in the definition of Business.

"**LTE Business**" has the meaning set forth in the definition of Business.

"**LTE-Related Patents**" means any and all Patents related to 3GPP Long-Term Evolution products and services (including Patents related to the LTE Business).

"**LTE Transferring Employees**" means the Employees listed on Section 1.1(g) of the Sellers Disclosure Schedule who become Transferring Employees.

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Manufacturing and Supply Regarding Dual Use Platforms Agreement**" means the agreement between the relevant Sellers (or their Affiliates), on the one hand, and the Purchaser and/or a Designated Purchaser, on the other hand, to be executed on or before the Closing in the form attached hereto as Exhibit L.

"**Material Adverse Effect**" means any circumstance, state of fact, event, change or effect (each an "**Effect**") that, individually or in the aggregate with all other Effects, (a) is or could reasonably be materially adverse to the business, operations, assets, liabilities, results of operations or financial condition of the Business, taken as a whole (or, solely for purposes of the representations and warranties in Section 4.11 or for purposes of Section 8.3(a)(i) as applied to

the representations and warranties in Section 4.5 and Section 4.11, either of the CDMA Business or the LTE Business), or (b) prevents or could reasonably be expected to prevent the ability of the Sellers to perform their obligations under this Agreement or the timely consummation of the transactions contemplated by this Agreement, but excluding, for purposes of clauses (a) and (b), (i) Effects resulting from changes in general economic conditions in the United States or Canada, (ii) Effects arising from the execution or delivery of this Agreement or the Transactions or the public announcement thereof, (iii) Effects that result from any action required to be taken pursuant to this Agreement or any action taken pursuant to the written request or with the prior written consent of the Purchaser, (iv) Effects relating to the industries and markets in which the Business operates, (v) Effects relating to changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (vi) Effects relating to or including the attrition of customers prior to the Closing Date, or (vii) Effects relating to the pendency of the Bankruptcy Proceedings and any action approved by, or motion made before, the Bankruptcy Courts; it being understood that the failure of the Business to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect; provided, that, with respect to clauses (i), (iv), and (v) any such Effect shall be included to the extent such Effect has a materially disproportionate effect on the Business, taken as a whole (or, solely for purposes of the representations and warranties in Section 4.11 or for purposes of Section 8.3(a)(i) as applied to the representations and warranties in Section 4.5 and Section 4.11, either of the CDMA Business or the LTE Business), as compared to other industry participants.

"**Material Contracts**" has the meaning set forth in Section 4.4.

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**Net Inventory Value**" means, as of any given date, the amount of the Owned Net Inventory, net of applicable provisions, determined in accordance with the Calculation Principles.

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNTC**" has the meaning set forth in Section 6.5(b).

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.14(a).

"**Non-Assigned Contract**" means a Non-Assignable Contract as to which all applicable Consents to assignment have not been granted prior to the Closing Date.

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

"**Non-Solicitation Period**" means the twelve (12) month period immediately following the Closing Date.

"**Non-365 Contract**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Contract List**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Licensed Real Estate Leases**" has the meaning set forth in Section 2.1.6(c).

"**Non-365 Real Estate Leases**" has the meaning set forth in <u>Section </u>2.1.6(a)(ii).

"**Non-365 Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.6(b).

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Unaudited Financial Statements, as set forth in Exhibit M hereto.

"**Notice Parties**" has the meaning set forth in Section 5.1(b).

"**OAM Systems**" means operations, administration and maintenance systems.

"**Open Source Software**" means Software that is made available under a license agreement that (i) conditions use, modification or distribution of any Software program, or any Software derived from such Software program or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software), (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software and~~or~~ (iii) ~~any Software~~is made available under any software license listed at the website http://www.opensource.org/licenses/alphabetical as of Closing.

"**Ordinary Course**" means the ordinary course of each of the Businesses through the date hereof consistent with each of their recent past practice since the filing of the Bankruptcy Proceedings, as such practice may be modified from time to time to the extent necessary to reflect the Bankruptcy Proceedings.

"**Outbound License Agreements**" has the meaning set forth in Section 4.5(f).

"**Other Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Overhead and Shared Services**" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services or provided to both (i) the Business and (ii) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, ~~tax~~**Tax**

services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software and other Intellectual Property necessary for or used in connection therewith, including the Licensed Applications (as defined in the Transition Services Agreement).

"**Owned Equipment**" means Equipment owned by the Sellers that is (i) held or used exclusively by the LTE Transferring Employees or (ii) held or used predominantly in connection with the CDMA Business, in each case including the items listed in Section 1.1(h) of the Sellers Disclosure Schedule, and excluding in all cases any Owned Net Inventory and any Intellectual Property.

"**Owned Net Inventory**" means (i) Inventory owned by any of the Sellers that is held or used predominantly in connection with the Business, including any such Inventory which is owned by the Sellers but remains in the possession or control of a contract manufacturer or another Third Party, and (ii) the other Inventory listed in Section 1.1(i) of the Sellers Disclosure Schedule, all as reflected on Sellers' general ledger as of the Closing Date an estimate of which will be provided to the Purchaser at least three days prior to Closing.

"**Partial Allocation**" has the meaning set forth in Section 6.7(b).

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patent Cross Licenses**" means all Contracts between the Sellers or their Affiliates (other than the EMEA Debtors and their respective Subsidiaries) and a Third Party under which the Sellers or such Affiliates, as applicable, both (i) grant a license under patents and patent applications owned by (or licensed to) them, and (ii) receive from the counter-party a license under patents and patent applications owned by (or licensed to) such counter-party (but other than inbound or outbound license agreements where the only grant back from the licensee is under improvements on the licensed Intellectual Property).

"**Patents**" means all national (including without limitation the United States and Canada) and multinational patents and utility models (petty patents) as well as all applications and provisional applications for any of the foregoing, and further including without limitation all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, and all rights therein provided by multinational treaties or conventions.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings, and for which adequate reserves have been established to the extent required by GAAP, and which, during the pendency of any such contest, will not result in a forfeiture or otherwise reasonably be expected to result in a forfeiture of any of the Assets, other than Liens that may be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii)

mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue; (iii) zoning, entitlement, building and land use regulations, customary covenants, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted provided that same are complied with in all material respects; and (iv) minor title defects or irregularities which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Pre-Closing Taxable Period**" means any Taxable period ending on or prior to the Closing Date.

"**Primary Party**" means (i) each of the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Products**" means the CDMA Products and the LTE Access Products.

"**Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan or agreement, termination or retirement indemnity plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, early or ill health retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferring Employees pursuant to this Agreement.

"**Qualified Arbitrator**" has the meaning set forth in Section 6.5~~5.30~~(b**d**).

"**Qualified Expenditures**" has the meaning set forth in Section 6.5~~5.30~~(d**b**).

"**Real Estate Agreements**" means the leases, sub-leases or license agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or prior to the Closing, in accordance with and as provided by the Real Estate Agreements Term Sheet.

"**Real Estate Agreements Term Sheet**" means the Real Estate **Agreements** Term Sheet attached hereto as Exhibit O.

"**Real Estate Lease**" means a Seller Contract that is a lease, sublease, license or other ~~agreements~~**agreement** for use and occupancy of real property including all amendments, extensions and renewals thereof and is an Assigned Contract, an Assumed and Subleased Real Estate Lease ~~or,~~ a Non-365 Subleased Real Estate Lease**, a Licensed Real Estate Lease or a Non-365 Licensed Real Estate Lease**.

"**Records Custodian**" means Deloitte & Touche LLP or in case such firm is unable to carry out its duties for whatever reason, such other auditing firm of international reputation that is acceptable to each of Purchaser and Sellers, each acting reasonably.

"**Regulatory Approvals**" means (i) the Antitrust Approvals; (ii) the CFIUS Approval; (iii) any Consent of any Governmental Entity required to be obtained under the Investment Canada Act (other than the ICA Approval); and (iv) if subsection 448(1) of the Budget Implementation Act, 2009, comes into force on or before the Closing Date, the ICA Approval.

"**Release**" when used in conjunction with Hazardous Materials, means any spilling, leaking, pumping, emitting, emptying, pouring, discharging, depositing, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers or other receptacles containing Hazardous Materials) into the environment.

"**Representatives**" means as to any Person, the attorneys, accountants, financing sources, consultants, financial advisors and other representatives and agents of such Person.

"**Respective Affiliates**" has the meaning set forth in Section 10.15(c).

"**Responding Party**" has the meaning set forth in Section 5.30(d).

"**Restricted Technical Records**" means the Livelink database or any other similar database containing all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2007 and subsequent ~~taxation~~**Tax** years.

"**Royalty Liability Amount**" means, as of any given date, the amount of the royalty liabilities determined in accordance with the Calculation Principles.

"**Scope Guidelines**" has the meaning set forth in Section 5.30(a).

"**Security Deposits**" has the meaning set forth in Section 5.21.

"**Seller Consents**" has the meaning set forth in Section 2.1.1(i).

"**Seller Contracts**" means those Contracts of a Seller that (i) relate predominantly to the Business; (ii) are Material Contracts; ~~and~~**or** (iii) are otherwise material to the operation of the Business and not commercially available to the Purchaser.

"**Seller Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings, and for which adequate reserves have been established to the extent required by GAAP, and which, during the pendency of any such contest, will not result in a forfeiture or otherwise reasonably be expected to result in a forfeiture of any of the Assets, other than Liens that may be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue; (iii) Liens arising hereunder or under any Assigned Contracts incurred as a result of the assignment hereunder; (iv) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (v) any other Liens set forth on Exhibit N; and (vi) zoning, entitlement, building and land use regulations, customary covenants, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted provided that same are complied with in all material respects; and (vii) minor title defects or irregularities which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted.

"**Seller Employee Plan**" means (i) any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement including any employee agreement other than immaterial employment agreements, profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan or agreement, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates with respect to Employees, and (ii) any other employee benefit plan with respect to which the Purchaser or any of its Affiliates could have any Liability as a result of the Sellers or any of their Subsidiaries or Affiliates maintaining such plan prior to the Closing Date.

"**Seller Insurance Policies**" means all current or previous insurance policies of the Sellers and their Affiliates, including all environmental, directors' and officers' Liability,

fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, contaminated products insurance policies and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing.

"**Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Software**" means any and all (i) computer programs, in source code or object code, (ii) computerized databases and compilations, and (iii) documentation, compilation tools, development tools and support tools associated with (i) and/or (ii).

"**Specified CDMA Contracts**" has the meaning set forth in Section 8.3(c).

"**Straddle Period**" has the meaning set forth in Section 6.3(b).

"**Subleases**" has the meaning set forth in Section 5.26.

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity, including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, gross receipts, sales, use, ad valorem, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto, and (b) any obligation to pay Taxes of a Third Party, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian, United Kingdom or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

"**Tax Credit Purchaser**" has the meaning set forth in Section 6.5(b).

"**Tax Returns**" means all returns, reports (including elections, declarations, disclosures, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes, including any amendments thereto.

"**Termination Date**" has the meaning set forth in Section 9.1(c)(iv).

"**Third Party**" means any Person that is neither a Party nor an Affiliate of a Party.

"**365 Contract**" has the meaning set forth in Section 2.1.5(a)(i).

"**365 Contract List**" has the meaning set forth in Section 2.1.5(a)(i).

"**365 Real Estate Lease List**" has the meaning set forth in Section 2.1.5(a)(ii).

"**365 Real Estate Leases**" has the meaning set forth in Section 2.1.5(a)(ii).

"**Title IV Plan**" has the meaning set forth in Section 4.11(i).

"**Trademarks**" means all trademarks, service marks, trade dress, logos, trade names, corporate names, business names, domain names, whether or not registered, together with all goodwill associated therewith and including all common law rights, and registrations, applications for registration and renewals thereof, including all marks registered in the United States Patent and Trademark Office, the trademark offices of the states and territories of the United States of America, and the trademark offices of other nations throughout the world (including the Canadian Intellectual Property Office), and all rights therein provided by multinational treaties or conventions.

"**Trademark License Agreement**" means the trademark license agreement between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, in respect of certain Trademarks used in respect of the Products and/or CDMA Services to be entered into on or before the Closing in the form attached hereto as Exhibit P.

"**Transaction Documents**" means this Agreement, the Ancillary Agreements and all other ancillary agreements to be entered into, or documentation delivered by, any Party and/or any Designated Purchaser pursuant to this Agreement or any Local Sale Agreement.

"**Transfer Taxes**" means all goods and services, sales, excise, use, transfer, gross receipts, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees and notarial fees), together with interest, penalties and additional amounts imposed with respect thereto.

"**Transfer Tax Returns**" has the meaning set forth in Section 6.6(a).

"**Transferring Employee Agreement**" means the agreement between Sellers, on the one hand, and the Purchaser ~~and/or any Designated Purchasers~~, on the other hand, to be executed as of the Closing in substantially the form attached hereto as Exhibit K.

"**Transferring Employee**" means (i) Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in

accordance with the terms of Section 7.1, and (ii) those Employees whose employment transfers by operation of Law.

"**Transferred Employee Plan**" means the (i) Accrued Vacation Amount, or (ii) any Seller Employee Plan that is (or the Liabilities of which are) transferred by operation of Law to the Purchaser or a Designated Purchaser (or to a Purchaser Employee Plan, as the case may be).

"**Transferred Overhead and Shared Services**" means Overhead and Shared Services to be provided to or in support of the Business post-Closing by Transferring Employees.

"**Transition Services Agreement**" means an agreement between the relevant Sellers (or their Affiliates), on the one hand, and the Purchaser and/or any Designated Purchaser, on the other hand, to be executed on or prior to the Closing Date, in the form attached hereto as Exhibit Q.

"**Treasury Regulations**" means the regulations promulgated under the Code.

"**Type 1 Extra Services**" has the meaning set forth in Section 5.30(b).

"**Type 2 Extra Services**" has the meaning set forth in Section 5.30(b).

"**Unaudited Financial Statements**" has the meaning set forth in Section 4.7(b).

"**Unexpired Leases**" means Leases that constitute "unexpired leases" for the purposes of Section 365 of the U.S. Bankruptcy Code.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**U.S. Bidding Procedures and Sale Motion**" has the meaning set forth in Section 5.1(a).

"**U.S. Bidding Procedures Order**" has the meaning set forth in Section 5.1(a).

"**U.S. Debtor Contract**" means any Seller Contract to which a U.S. Debtor is a party.

"**U.S. Debtors**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Sale Order**" has the meaning set forth in Section 5.1(a).

"**Visa Employees**" means Employees who are identified as having a visa or permit in Section 4.11(b) of the Sellers Disclosure Schedule and whose employment with Purchaser or a Designated Purchaser cannot commence until the required visa or permit for a transfer of employment to Purchaser or a Designated Purchaser with respect to such Employee is obtained.  An Employee shall be a Visa Employee for purposes hereof only if such Employee receives and accepts an employment offer from Purchaser as provided in Section 7.1 and has an Employee Transfer Date that occurs within twelve (12) months following the Closing Date.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act or any similar Law requiring notice to employees in the event of a plant closing or mass layoff.

"**Warranty Provision Amount**" means, as of any given date, the amount of the warranty provision of the Business determined in accordance with the Calculation Principles.

"**Wholly-Owned Subsidiary**" means any Subsidiary all of the capital stock or capital which is held directly or indirectly by the Purchaser, except for any capital stock which is held by a director of such Subsidiary as required by applicable Laws.

"**Working Capital Escrow Amount**" means an amount in immediately available funds equal to $20,000,000.

Section 1.2.    Interpretation.

1.2.1.    Gender and Number.  Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2.    Certain Phrases and Calculation of Time.  In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding", and (iv) in determining whether an asset is "exclusively" used in connection with the Business, incidental, de minimis uses outside the Business shall not be considered.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

1.2.3.    Headings, etc.  The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

1.2.4.    <u>Currency</u>. All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency. All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency. All payments required under this Agreement shall be paid in United States currency in immediately available funds, unless otherwise specifically indicated herein. Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the *Wall Street Journal* newspaper for the day in question.

1.2.5.    <u>Statutory References</u>. Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

Section 2.1.  <u>Purchase and Sale</u>.

2.1.1.    <u>Assets</u>. Subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, purchase or accept assignment and assume from the relevant Sellers (including legal title, equitable title and risk of loss), and each Seller shall transfer or assign to the Purchaser or the relevant Designated Purchasers, all of such Seller's right, title and interest in and to the assets predominantly used or held for use in the conduct of the Business including the following assets (such assets, excluding the Excluded Assets, the "**Assets**") (x) in the case of Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens and Claims (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to and to the extent provided by Sections 363 and 365 of the U.S. Bankruptcy Code, (y) in the case of Assets that are transferred or assigned by the Canadian Debtors, free and clear of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to the Canadian Approval and Vesting Order, when granted, and (z) in the case of Assets that are transferred or assigned by the Non-Debtor Sellers, free and clear of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates):

(a)    the Owned Net Inventory as of the Closing Date;

(b)    the CIP Receivables as of the Closing Date;

(c)    the Owned Equipment as of the Closing Date;

(d)    the Assigned Contracts in force as of the Closing Date;

(e)    the Assigned Accounts Receivable;

(f)       the Business Information existing as of the Closing Date, subject to 2.1.2(i);

(g)       the Assigned Intellectual Property as of the Closing Date, subject to any and all licenses granted under such Intellectual Property prior to the Closing Date, together with all claims against Third Parties for infringement, misappropriation or other violation of any Law with respect to any of the Assigned Intellectual Property, whether for any past, present or future infringement, misappropriation or other violation;

(h)       all rights as of the Closing under all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Assets; and

(i)       to the extent assignable under applicable Law, all Consents of Government Entities exclusively pertaining to the Business (the "**Seller Consents**").

2.1.2.    Excluded Assets.  Nothing herein shall be deemed to sell, transfer, assign or convey (or require Sellers to do any of the foregoing as to) the following assets to the Purchaser or any Designated Purchaser, and the Sellers shall retain all of their respective rights, title and interests in and to, and the Purchaser and the Designated Purchasers shall have no rights with respect to, the rights, title and interests of the Sellers in and to any of the following assets (collectively, the "**Excluded Assets**"):

(a)       cash and cash equivalents, accounts receivable (including intercompany receivables but excluding Assigned Accounts Receivable), bank account balances and all petty cash of the Sellers;

(b)       any refunds due from, or payments due on, claims with the insurers of any of the Sellers in respect of losses arising prior to the Closing Date;

(c)       all rights to Tax refunds, credits or similar benefits relating to the Assets or the Business allocable to a Pre-Closing Taxable Period or to the portion of a Straddle Period ending on and including the Closing Date;

(d)       all claims, causes of action and rights of Sellers or any Subsidiary thereof to the extent relating to any Excluded Liabilities or to any Liabilities for which Sellers are responsible under this Agreement (including rights of set-off, rights to refunds and rights of recoupment from or against any Third Party;

(e)       any security deposits made by or on behalf of the Sellers (including those relating to Assigned Contracts);

(f)       any rights of the Sellers under Assumed and Subleased Real Estate Leases, Excluded 365 Contracts, Bundled Contracts (except as provided for in Section 5.16), Excluded Non-365 Contracts, and Seller Insurance Policies);

(g)    any rights of the Sellers under Non-Assigned Contracts (except as provided for in Section 5.14);

(h)    the minute books, stock ledgers and Tax records of the Sellers;

(i)    (i<u>x</u>) any books, records, files, documentation or sales literature other than the Business Information (subject to ~~clause (iii~~<u>clauses (y) and (z)</u> of this subsection (i)), (ii<u>y</u>) any Employee Records other than those required to be delivered to the Purchaser pursuant to ARTICLE VII, and (iii<u>z</u>) such portion of the Business Information that the Sellers are required by Law (including Laws relating to privacy but subject to any exemption from those Laws included in the Canadian Approval and Vesting Order or the U.S. Sale Order) or by any agreement with a Third Party to retain and/or not to disclose (<u>provided</u> that copies of such information shall be provided to the Purchaser to the extent permitted by applicable Law or such agreement);

(j)    any assets, properties and rights to the extent relating predominantly to the Excluded Products and Services (except in all cases as otherwise provided in any of the Ancillary Agreements);

(k)    except for (i) the Assigned Intellectual Property and (ii) Intellectual Property, to the extent rights are granted thereto pursuant to any Ancillary Agreement, any rights to (A) any Intellectual Property of any of the Sellers (including Sellers' names and the LTE-Related Patents unless constituting Assigned Patents) or any Affiliates of any of the Sellers and (B) Intellectual Property owned by a Third Party, except to the extent licensed under a Contract that is an Assumed and Assigned Contract or a Designated Non-365 Contract;

(l)    all rights of the Sellers under this Agreement and the Transaction Documents;

(m)    all of the rights and claims of the U.S. Debtors available to the U.S. Debtors under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code, and any related claims and actions arising under such Sections by operation of Law or otherwise, including any and all proceeds of the foregoing;

(n)    all records containing personal communications or notes related to the negotiations in connection with the Transaction Documents that were not shared with the Purchaser;

(o)    all stock or other equity interests in any Person;

(p)    any assets set forth on Section 2.1.2(p) of the Sellers Disclosure Schedule;

(q)    any Equipment other than Owned Equipment; and

(r)      any asset, property or right of Guangdong-Nortel Telecommunications Equipment Co. Ltd.

2.1.3.      Assumed Liabilities.  Subject to the terms of this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, assume and become responsible for, and perform, discharge and pay when due, solely the following Liabilities (the "**Assumed Liabilities**"):

(a)      all Liabilities arising on or after the Closing Date to the extent related to the conduct, operation or ownership of the Business after the Closing Date, including (i) all such Liabilities with respect to the ownership, exploitation and operation of the Assets incurred on or after the Closing Date, and (ii) all such Liabilities related to Actions or claims brought against the Business arising from events occurring after the Closing Date;

(b)      all Liabilities arising from or in connection with the performance of the Assigned Contracts after the Closing Date, or any arrangements entered into pursuant to Section 5.16 after the Closing Date;

(c)      any obligations under any warranty liabilities relating to Products and CDMA Services which have been supplied under any Assigned Contract but excluding any Cure Costs payable pursuant to Section 2.1.7;

(d)      the obligation to post any deposits, bonds or other security in replacement of security posted under any Assigned Contract pursuant to Section 5.21 of this Agreement;

(e)      all Liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Assigned Intellectual Property which the Sellers may have granted or committed to Third Parties, including Liabilities resulting from the assurances, declarations and undertakings made to standard setting bodies that are listed in Section 2.1.3(e) of the Sellers Disclosure Schedule;

(f)      all Liabilities for, or related to any obligation for, any Tax that the Purchaser or any Designated Purchaser bears under ARTICLE VI;

(g)      all obligations under any warranty liabilities relating to Products and CDMA Services which have been supplied under any Bundled Contract subcontracted to the Purchaser or any Designated Purchaser under Section 5.16(a);

(h)      except to the extent otherwise expressly set forth in ARTICLE VII, all Liabilities related to or arising from any of the following:  (i) the Purchaser's or any Designated Purchaser's (or any of their Affiliates') employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferring Employees arising on or after the Closing Date, (ii) the terms of any offer of employment or notice of continued employment, as applicable, to any Employee who is provided an offer pursuant to Section 7.1 of this Agreement and (iii) Purchaser's or a Designated Purchaser's failure to offer employment to any employee that constitutes a violation of applicable Law;

(i)        all Liabilities arising that relate to or arise from or in connection with any Purchaser Employee Plan;

(j)        all Liabilities related to Transferring Employees expressly assumed by the Purchaser or a Designated Purchaser as set forth in ARTICLE VII;

(k)        any obligation to provide continuation coverage pursuant to COBRA or any similar Law under any Purchaser Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to a Transferring Employee and/or their qualified beneficiaries with respect to a qualifying event that occurs on or after such Transferring Employee's Transfer Date;

(l)        the Accrued Vacation Amount;

(m)        all Liabilities reflected in the computation of Adjusted Net Working Capital, including the Contractual Liabilities Amount, the Royalty Liability Amount and the Warranty Provision Amount); and

(n)        all other Liabilities listed in Section 2.1.3(n) of the Sellers Disclosure Schedule.

2.1.4.        Excluded Liabilities.  Subject to the terms of this Agreement, none of the Purchaser or the Designated Purchasers, as applicable, shall assume or be deemed to have assumed any Liabilities of the Sellers or their Affiliates other than the Assumed Liabilities (collectively, and together with the Excluded Employee Liabilities (as defined in Section 7.4), the "**Excluded Liabilities**").  Without limiting the generality of the foregoing, Excluded Liabilities include:

(a)        all Indebtedness of the Sellers and their Affiliates;

(b)        all Liabilities arising out of the Contracts that are not Assigned Contracts (including Liabilities arising out of that portion of any arrangement entered into pursuant to Section 5.16 for which Sellers are responsible by the terms thereof);

(c)        all accounts payable and trade payables of the Sellers, including intercompany payables;

(d)        all fees or commissions of any brokers, funds or investment banks in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates;

(e)        any Cure Costs payable by the Sellers pursuant to Section 2.1.7;

(f)        (i) any Liabilities (including any Order) to the extent relating to any Hazardous Materials present prior to the Closing Date in, under, at, near or migrating from, to or through the Carling Property; and (ii) any Liabilities arising from or based on events or

conditions occurring or existing prior to the Closing Date and connected with, arising out of or relating to (x) the release or threatened Release of any Hazardous Materials at any location currently or formerly owned, operated or used by the Business or at any location to which Hazardous Materials generated, handled, stored or processed by the Business were sent, released or disposed of; or (y) compliance or the alleged non-compliance by the Business with any Environmental Law or Environmental Permit;

(g)      all Liabilities for, or related to any obligation for, any Tax that is not expressly assumed by the Purchaser or any of the  Designated Purchasers pursuant to ARTICLE VI (including, for the avoidance of doubt, any income or gross receipts Tax imposed on any of the Sellers);

(h)      Excluded Employee Liabilities; and

(i)      all Liabilities of Sellers arising under this Agreement and the Ancillary Agreements.

2.1.5.      <u>Assumption and/or Assignment or Rejection of 365 Contracts.</u>

(a)      Section 2.1.5(a) of the Sellers Disclosure Schedule sets forth:

(i)      a list (the "**365 Contract List**") of all U.S. Debtor Contracts (other than (a) Leases and (b) licenses of Intellectual Property that are used, as of the date hereof, exclusively in connection with the Business and which are not Inbound License Agreements) that are Executory Contracts, and were entered into prior to the Petition Date (Contracts that may be included on the 365 Contract List, the "**365 Contracts**") that the Purchaser has elected to have the relevant U.S. Debtor pursuant to Section 365 of the U.S. Bankruptcy Code assume and assign to the Purchaser or a Designated Purchaser at Closing; and

(ii)      a list (the "**365 Real Estate Lease List**") of all Leases of a U.S. Debtor which were entered into prior to the Petition Date and are Unexpired Leases (Leases that may be included on the 365 Real Estate Lease List, the "**365 Real Estate Leases**") that the Purchaser has elected to have the relevant U.S. Debtor pursuant to Section 365 of the U.S. Bankruptcy Code assume and assign to the Purchaser or a Designated Purchaser at Closing, in accordance with, and as provided by, the Real Estate Agreements Term Sheet; provided, subject to the terms of the Real Estate Agreement**Agreements** Term ~~Sheet~~**Sheet**, the applicable U.S. Debtor shall (i) not be required to assume a 365 Real Estate Lease prior to the Closing Date in connection with an assumption and assignment to Purchaser and (ii) have the right to reject any 365 Real Estate Lease designated for assumption and assignment in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(b)      Section 2.1.5(b) of the Sellers Disclosure Schedule sets forth a list of all 365 Real Estate Leases that the Purchaser has elected to have the relevant U.S. Debtor, pursuant to Section 365 of the U.S. Bankruptcy Code, assume and under which the Purchaser or a

Designated Purchaser will enter into a Sublease, to the extent permitted by, and in accordance with, the terms of the related 365 Real Estate Lease and applicable Law (the "**Assumed and Subleased Real Estate Leases**"), at Closing, in accordance with, and as provided by, the Real Estate Agreements Term Sheet; <u>provided</u> that, subject to the terms of the Real Estate ~~Agreement~~**Agreements** Term Sheet, the applicable U.S. Debtor shall (i) not be required to assume an Assumed and Subleased Real Estate Lease prior to the Closing Date in connection with a Sublease to Purchaser and (ii) have the right to reject any Assumed and Subleased Real Estate Lease designated for Sublease in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(c)     Section 2.1.5(c) of the Sellers Disclosure Schedule sets forth a list of Real Estate Leases, certain of which may be available for the Purchaser to elect to have the relevant Seller enter into a License at Closing with the Purchaser or a Designated Purchaser to the extent permitted by, and in accordance with (i) the terms of the related Real Estate Lease and applicable Law (the 365 Real Estate Leases on such Schedule, the "**Licensed Real Estate Leases**", such Schedule to be supplemented as expressly set forth in the Real Estate Agreements Term Sheet), and (ii) the Real Estate Agreements Term Sheet; <u>provided</u>, that, the applicable U.S. Debtor shall (i) not be required to assume a Licensed Real Estate Lease prior to the Closing Date in connection with a License to Purchaser and (ii) have the right to reject any Licensed Real Estate Lease designated for License in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(d)     The Contracts listed in the 365 Contract List and the 365 Real Estate Leases listed for assumption and assignment by the U.S. Debtors are collectively referred to as the "**Assumed and Assigned Contracts**".

(e)     The U.S. Debtors shall seek the approval of the U.S. Bankruptcy Court to permit (i) the assumption and assignment of the Assumed and Assigned Contracts and (ii) if and to the extent the landlord of the applicable Assumed and Subleased Real Estate Lease and Licensed Real Estate Lease has consented to the applicable Sublease or License, the Assumption of the Assumed and Subleased Real Estate Lease and the entry into Subleases in connection therewith and the assumption of Licensed Real Estate Leases and the entry into Licenses in connection therewith, all of the foregoing as part of the U.S. Sale Order in accordance with Section 5.1.

(f)     Any (x) 365 Contract that the Purchaser has elected not to have assumed and assigned, and (y) 365 Real Estate Lease that the Purchaser has not elected to have assumed and assigned pursuant to Section 2.1.5(a)(ii) or under which the Purchaser has not elected to enter into a Sublease pursuant to Section 2.1.5(b) or a License pursuant to Section 2.1.5(~~b~~<u>c</u>), shall be referred to as an "**Excluded 365 Contract**" and shall not be an Assigned Contract hereunder.

2.1.6.    Assignment of Non-365 Contracts.

(a)    Section 2.1.6(a) of the Sellers Disclosure Schedule sets forth:

(i)    a list (the "**Non-365 Contract List**") of all the Contracts (other than (a) 365 Contracts, (b) Leases and (c) licenses of Intellectual Property other than Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business) that the Purchaser has elected to have the relevant Seller assign to the Purchaser or a Designated Purchaser at Closing (Contracts that may be included on the Non-365 Contract List, the "**Non-365 Contracts**"); and

(ii)    a list of all the Leases other than 365 Real Estate Leases ("**Non-365 Real Estate Leases**") relating to the Business that the Purchaser has elected to have the relevant Seller assign to the Purchaser or a Designated Purchaser at Closing, ~~at Closing,~~ in accordance with, and as provided by, the Real Estate Agreements Term Sheet (the "**Designated Non-365 Real Estate Leases**"); provided that**, subject to the terms of the Real Estate Agreements Term Sheet,** the applicable Seller shall have the right to repudiate any Designated Non-365 Real Estate Lease designated for assignment in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(b)    Section 2.1.6(b) of the Sellers Disclosure Schedule sets forth a list of Non-365 Real Estate Leases (other than the Assumed and Subleased Real Estate Leases) under which the Purchaser has elected to have the relevant Seller enter into a Sublease with the Purchaser or a Designated Purchaser to the extent permitted by, and in accordance with, the terms of the related Non-365 Real Estate Lease and applicable Law (the "**Non-365 Subleased Real Estate Leases**") at Closing, in accordance with, and as provided by, the Real Estate Agreements Term Sheet; provided, that**, subject to the terms of the Real Estate Agreements Term Sheet,** the applicable Seller shall have the right to repudiate any Non-365 Subleased Real Estate Lease designated for Sublease in the event that the Closing shall not have not occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(c)    Section ~~2.1.6~~**2.1.5**(c) of the Sellers Disclosure Schedule sets forth a list of Real Estate Leases, certain of which may be available for the Purchaser to elect to have the relevant Seller enter into a License (as defined in Section 5.28) at Closing, with the Purchaser or a Designated Purchaser to the extent permitted by, and in accordance with, (i) the terms of the related Real Estate Lease and applicable Law (the Non-365 Real Estate Leases on such Schedule, the "**Non-365 Licensed Real Estate Leases**", such Schedule to be supplemented as expressly set forth in the Real Estate Agreements Term Sheet), and (ii) the Real Estate Agreements Term Sheet; provided, that the applicable Seller shall have the right to repudiate any Non-365 Licensed Real Estate Lease designated for License in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(d)    The Contracts listed in the Non-365 Contract List and the Designated Non-365 Real Estate Leases are collectively referred to as the "**Designated Non-365 Contracts**".

(e)        Any (x) Non-365 Contract that the Purchaser has not elected to have assigned, and (y) any Non-365 Real Estate Lease that the Purchaser has not elected to have assumed and assigned pursuant to Section 2.1.6(a)(ii) or under which the Purchaser has not elected to enter into a Sublease pursuant to Section 2.1.6(b) or a License pursuant to Section 2.1.6(c), shall be referred to as an "**Excluded Non-365 Contract**" and shall not be an Assigned Contract hereunder.

(f)        Subject to Section 2.1.7(e), Section 2.1.10,  Section 5.14, the Real Estate Agreements Term Sheet and the receipt of any required Consent, all the Designated Non-365 Contracts in effect as of the Closing shall be assigned to the Purchaser or a Designated Purchaser at the Closing pursuant to Section 2.1.1(d) and Purchaser or a Designated Purchaser shall enter into a Sublease or a License at the Closing pursuant to Section 5.26 with the relevant Seller under each of the Non-365 Subleased Real Estate Leases and Non-365 Licensed Real Estate Lease, as the case may be, in effect as of the Closing.

2.1.7.        Cure Costs; Adequate Assurance; Efforts.

(a)        Except for those Assumed and Assigned Contracts set forth on Section 2.1.7 of the Sellers Disclosure Schedule, to the extent that assumption and assignment of any Assumed and Assigned Contract entails the payment of any Cure Cost, NNI shall, or shall cause the relevant U.S. Debtor to, pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order.

(b)        To the extent that assignment to the Purchaser or a Designated Purchaser of any Designated Non-365 Contract entails the payment of any Cure Cost, the relevant Main Sellers shall, or shall cause the relevant Seller to, pay such amounts directly to such counterparty, and shall offer to do so on or prior to Closing in a manner agreed between such Main Seller or such relevant Seller, as applicable, and such counterparty or ordered by a court of competent jurisdiction.

(c)        To the extent that the assumption and sublease or license of any Assumed and Subleased Real Estate Leases or Licensed Real Estate Leases entails the payment of any Cure Cost, NNI shall, or shall cause the relevant U.S. Debtor to pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order.  To the extent that the assignment, sublease or license to the Purchaser or a Designated Purchaser of any Non-365 Real Estate Leases or the Non-365 Subleased Real Estate Leases or Non-365 Licensed Real Estate Leases entails the payment of any amount to any party other than a Seller, the relevant Main Sellers shall, or shall cause the relevant Seller to, pay such amounts directly to such contracting party, and shall offer to do so on or prior to Closing, in a manner agreed between such Main Seller or such relevant Seller, as applicable and such contracting party or ordered by a court of competent jurisdiction.

(d)        Prior to the hearing before the U.S. Bankruptcy Court to approve the assumption and assignment of the Assumed and Assigned Contracts, the Purchaser shall provide, as necessary, adequate assurance of its and the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the

Sellers) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code and to the extent required by the U.S. Sale Order.

(e)    Sellers shall use reasonable efforts both before and after Closing to obtain all Consents in a form reasonably satisfactory to the Purchaser required to permit the assignment, sublease or license as applicable, to the Purchaser (or, if specified by the Purchaser, a Designated Purchaser) of the Assigned Contracts in force as of the Closing Date, and the entry into Subleases **and Licenses** as applicable, the Purchaser shall reasonably cooperate with Sellers to the extent necessary to obtain the same; provided, however, that the Sellers shall be under no obligation to seek any such Consent prior to the completion of the Auction or to compromise any right, asset or benefit (including relinquishment of rights in the Retained Field of Use, as defined in the Intellectual Property License Agreement) or to expend any amount or incur any Liability or provide any other consideration in seeking such Consents (other than the payment of Cure Costs pursuant to this Section 2.1.7); provided, further, that Sellers' obligations under this Section 2.1.7 with respect to any Lease shall be subject to Purchaser's obligation to provide the adequate assurances required by the relevant landlord and/or the U.S. Bankruptcy Code as necessary, and, for greater certainty, except as set forth in Section 8.3(c), the failure to obtain any or all of such Consents shall not in itself entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment to the Purchase Price.

(f)    To the extent that the obtaining of a Consent required pursuant to Section 5.16 with respect to a Specified CDMA Contract entails the payment of any Cure Cost, the Main Sellers shall pay or cause the relevant Seller to pay or otherwise provide for the payment of such Cure Cost prior to the Closing.

2.1.8.    Local Sale Agreements.  Subject to the terms and conditions hereof, if reasonably requested in writing by the Purchaser to effect the Closing on the terms hereof, the relevant Sellers shall, and the Purchaser shall, and shall cause the relevant Designated Purchasers to, enter into such agreements or instruments, including bills of sale and/or assignment and assumption agreements (the "**Local Sale Agreements**"), providing for (i) the sale, transfer, assignment or other conveyance to the Purchaser and relevant Designated Purchasers, in accordance with the requirements of applicable local Law, and (ii) the assumption by the Designated Purchasers of any Assumed Liability that the Purchaser intends to allocate to them. In the event of a conflict between this Agreement and the Local Sale Agreement, this Agreement shall prevail.

2.1.9.    EMEA Debtors.  None of the EMEA Debtors or the Joint Administrators shall assume, or be deemed to assume, any Liability whatsoever under this Agreement and nothing in this Agreement shall apply to, or govern, the sale, assignment, transfer, retention or assumption of assets, rights, properties or Liabilities of, or by, any EMEA Debtors or the Joint Administrators in any manner whatsoever.  Neither the Purchaser nor any Designated Purchaser shall be entitled to make any claim under this Agreement, or assert any right hereunder, against any Person other than the Sellers.

2.1.10.    Non-Assignable Assets.  Notwithstanding anything in this Agreement to the contrary, if a Consent of a Third Party (including a Government Entity) has not been obtained on

or prior to Closing, then, unless such Consent is subsequently obtained, this Agreement shall not constitute an agreement to sell, transfer or assign, directly or indirectly, any Asset or any obligation or benefit arising thereunder if an attempted direct or indirect sale, transfer, lease, sublease or assignment thereof, without such Consent, would constitute a breach, default, violation or other contravention of the rights of such Third Party or would be ineffective with respect to any party to a Contract concerning such Asset.  For greater certainty, except as set forth in Section 8.3(c), failure to obtain any such Consent shall not entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment of the Purchase Price.

       Section 2.2.    Purchase Price; Adjustment.

    2.2.1.    Purchase Price.  Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the sale of the Assets pursuant to the terms hereof, and of the rights granted by certain Sellers under the Intellectual Property License Agreement and the Trademark License Agreement, the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers, shall (x) assume and become obligated to pay, perform and discharge, when due, the Assumed Liabilities and (y) pay to the Sellers an amount of cash (the "**Purchase Price**") equal to six-hundred-fifty million dollars ($650,000,000) as adjusted pursuant to Section 2.2.3, so adjusted, the Final Purchase Price.

    2.2.2.    Estimated Purchase Price.

       (a)    For purposes of determining the amount of cash to be paid as the Estimated Purchase Price by the Purchaser to the Sellers at the Closing pursuant to Section 2.3.2(b), at least three (3) Business Days prior to the Closing Date, the Main Sellers shall deliver to the Purchaser a statement prepared in good faith in accordance with the Calculation Principles (in all cases without double-counting of Cure Costs) and the terms hereof setting forth (i) the estimated Net Inventory Value as of the Closing (the "**Estimated Net Inventory Value**"), (ii) the estimated amount of the CIP Receivables Amount as of the Closing (the "**Estimated CIP Receivables Amount**"), (iii) the estimated Contractual Liabilities Amount as of the Closing (the "**Estimated Contractual Liabilities Amount**"), (iv) an estimate of the Royalty Liability Amount as of the Closing (the "**Estimated Royalty Liability Amount**"), (v) an estimate of the Warranty Provision Amount as of the Closing (the "**Estimated Warranty Provision Amount**"), (vi) an estimate of the Adjusted Net Working Capital (the "**Estimated Adjusted Net Working Capital**") which shall be in the form of and shall use the line items as set out in the Adjusted Net Working Capital Statement, (vii) an estimate of the Employee Adjustment Amount as of the Closing (the "**Estimated Employee Adjustment Amount**") and (viii) the Estimated Purchase Price.

       (b)    As used in this Agreement, "**Estimated Purchase Price**" means an amount equal to:

       (i)    the Purchase Price; minus

       (ii)    $2,600,000 for the China Assets; plus

(iii)        an amount, which may be positive or negative, equal to the Estimated Adjusted Net Working Capital plus $22,000,000; minus

(iv)        the Estimated Employee Adjustment Amount (if any);

provided, however, that if the difference calculated in clause (iii) is a positive number greater than $30,000,000, then the difference shall be deemed to be $30,000,000 for purposes of calculating the Estimated Purchase Price.

(c)        As used in this Agreement and as set forth in the attached Adjusted Net Working Capital Statement in Exhibit C, the "**Adjusted Net Working Capital**" means an amount equal to

(i)        the Net Inventory Value; plus

(ii)        the CIP Receivables Amount; plus

(iii)        the Contractual Liabilities Amount; minus

(iv)        the Royalty Liability Amount; minus

(v)        the Warranty Provision Amount.

2.2.3.     Purchase Price Adjustment; Closing Statement; Dispute Resolution.

(a)        As promptly as practicable (and in any event within thirty (30) days after the Closing), the Purchaser shall deliver to the Main Sellers a written statement (the "**Closing Statement**") that shall contain the Purchaser's final calculation of (i) the Net Inventory Value as of the Closing (the "**Closing Net Inventory Value**"), (ii) the CIP Receivables Amount as of the Closing (the "**Closing CIP Receivables Amount**"), (iii) the Contractual Liabilities Amount as of the Closing (the "**Closing Contractual Liabilities Amount**"), (iv) the Royalty Liability Amount as of the Closing (the "**Closing Royalty Liability Amount**"), (v) the Warranty Provision as of the Closing (the "**Closing Warranty Provision Amount**"), (vi) the Adjusted Net Working Capital as of the Closing (the "**Closing Adjusted Net Working Capital**") which shall be in the form of and shall use the line items as set out in the Adjusted Net Working Capital Statement (vii) the Employee Adjustment Amount as of the Closing (the "**Closing Employee Adjustment Amount**") and (viii) the final Purchase Price based on the foregoing, which shall be equal to the Purchase Price; plus (A) an amount, which may be positive or negative, equal to the Closing Adjusted Net Working Capital (calculated without double-counting Cure Costs) plus $22,000,000; minus (B) the Closing Employee Adjustment Amount; provided, however, that if the amount calculated in clause (A) is a positive number greater than $30,000,000, then the difference shall be deemed to be $30,000,000 for purposes of calculating the Purchase Price (the Purchase Price, so adjusted as provided in this Section 2.2.3.(a), the "**Final Purchase Price**"). The Closing Statement shall be prepared in accordance with the Calculation Principles and the terms hereof.

(b)      If the Main Sellers disagree with the determination of the Closing Statement, the Main Sellers shall notify the Purchaser of such disagreement within thirty (30) days after delivery of the Closing Statement (such notice, the "**Disagreement Notice**"). The Disagreement Notice shall set forth, in reasonable detail, any disagreement with, and any requested adjustment to, the Closing Statement. If the Main Sellers fail to deliver the Disagreement Notice by the end of such thirty (30) day period, the Main Sellers shall be deemed to have accepted as final the Closing Statement delivered by the Purchaser. Matters included in the calculations in the Closing Statement to which the Main Sellers do not object in the Disagreement Notice shall be deemed accepted by the Main Sellers and shall not be subject to further dispute or review. Throughout the periods during which the Closing Statement is being prepared and any disputes that may arise under this Section 2.2.3 are being resolved, the Purchaser shall, promptly upon request, provide the Main Sellers and their accountants access to the books, records and personnel of the Business and all documents, schedules and workpapers used by the Purchaser in the preparation of the Closing Statement or that are otherwise reasonably necessary for the Main Sellers and their accountants to review the Closing Statement (provided that nothing herein shall require the Purchaser to disclose any information to the Main Sellers if such information disclosure would jeopardize any attorney-client or legal privilege or contravene any applicable Law, fiduciary duty or agreement, it being understood, that Purchaser and the Designated Purchasers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Main Sellers or their Representatives to occur without so jeopardizing privilege or contravening such Law, duty or agreement). The Main Sellers and the Purchaser shall negotiate in good faith to resolve any disagreement with respect to the Closing Statement, and any resolution agreed to in writing by the Main Sellers and the Purchaser shall be final and binding upon the Parties.

(c)      If the Main Sellers and the Purchaser are unable to resolve any disagreement as contemplated by Section 2.2.3(b) within thirty (30) days after delivery of a Disagreement Notice by the Main Sellers, the Independent Auditor shall serve as arbitrator (the "**Accounting Arbitrator**") to resolve such disagreement. The Primary Parties shall instruct the Accounting Arbitrator to consider only those items and amounts set forth in the Closing Statement as to which the Primary Parties have not resolved their disagreement and to conduct such hearings as it considers necessary to resolve such disagreement. The Primary Parties shall use their reasonable efforts to cause the Accounting Arbitrator to deliver to the Primary Parties, as promptly as practicable (and in no event later than fifteen (15) days after its appointment), a written report setting forth the resolution of any such disagreement determined in accordance with the terms of this Agreement. Such report and the Closing Statement, as adjusted thereby, shall be final and binding upon the Sellers, the Purchaser and the Designated Purchaser. In the event the Accounting Arbitrator concludes that the Purchaser was correct as to a majority (by dollar amount) of the disputed items, then the Sellers shall pay the Accounting Arbitrator's fees, costs and expenses. In the event the Accounting Arbitrator concludes that the Main Sellers were correct as to a majority (by dollar amount) of the disputed items, then the Purchaser shall pay the Accounting Arbitrator's fees, costs and expenses.

2.2.3.1.  Purchase Price Adjustment.  If (i) the Final Purchase Price, as finally determined in accordance with this Section 2.2.3, is less than the Estimated Purchase Price, (A) the parties agree to cause the Escrow Agent to pay to the Purchaser the lesser of (x) the excess of the

Estimated Purchase Price over the Final Purchase Price, or (y) the Working Capital Escrow Amount, and (B) the Sellers shall pay the amount of any such excess not to be paid by the Escrow Agent pursuant to the preceding clause (A), provided that in the event that the excess of the Estimated Purchase Price over the Final Purchase Price is less than the Working Capital Escrow Amount, the Parties agree to cause the Escrow Agent to pay to the Sellers the balance, and (ii) if the Final Purchase Price, as finally determined in accordance with this Section 2.2.3, exceeds the Estimated Purchase Price, Purchaser shall pay to Sellers the amount by which the Final Purchase Price exceeds the Estimated Purchase Price and the Escrow Agent shall pay the full Working Capital Escrow Amount to the Sellers, in either case by wire transfer of immediately available U.S. dollar funds to an account designated by the party receiving payment, within (3) three Business Days after the final determination of the Final Purchase Price, plus interest on such amount, accrued from the Closing Date to the date of such payment in accordance with the terms of the Escrow Agreement.

 2.2.4. <u>Working Capital Escrow</u>.

  (a) At or prior to the Closing, each of the Main Sellers and the Purchaser shall enter into the Escrow Agreement with the Escrow Agent in the form of Exhibit G.

  (b) Each of the Main Sellers and the Purchaser hereby undertake to promptly execute and deliver to the Escrow Agent, in accordance with the formalities set forth in the Escrow Agreement, instructions to pay to the Sellers or the Purchaser, as applicable, funds from the escrow account established pursuant to the Escrow Agreement any time that such Person becomes entitled to such payment from the Escrow Account pursuant to Section 2.2.3.1.

 Section 2.3. <u>Closing</u>.

 2.3.1. <u>Closing Date</u>.  The completion of the purchase and sale of the Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York, commencing at 10:00 a.m. local time on the earliest of (i) July 31, 2009, subject to the waiver or fulfillment of the conditions set forth under ARTICLE VIII (other than conditions to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions), (ii) on the date which is five (5) Business Days after the day upon which all of the conditions set forth under ARTICLE VIII (other than conditions to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions) have been satisfied or, if permissible, waived by the Main Sellers and/or the Purchaser (as applicable), and (iii) on such other place, date and time as shall be mutually agreed upon in writing by the Purchaser and the Main Sellers (the day on which the Closing takes place being the "**Closing Date**").

 2.3.2. <u>Closing Actions and Deliveries</u>.  At the Closing, the Sellers and the Purchaser shall, and the Purchaser shall cause the Designated Purchasers to, enter into (i) the Ancillary Agreements to which it is contemplated that they will be parties, to the extent such agreements have not yet been entered into (except as otherwise provided in the Real Estate Agreements Term Sheet), and (ii) instruments of assignment and assumption effecting the transfer of the Assets and the Assigned Intellectual Property from the Sellers to the Purchaser or the Designated Purchaser(s), as applicable;

<u>**40**</u>

(a)        At the Closing the Sellers shall deliver to the Purchaser, (x) in the case of a Seller that is a "United States person" within the meaning of Section 7701 of the Code and applicable Treasury Regulations, a duly executed certificate of non-foreign status in accordance with Section 1445 of the Code and applicable Treasury Regulations, or (y) in the case of a Seller that is not a "United States person" within the meaning of Section 7701 of the Code and applicable Treasury Regulations, a duly executed certificate certifying that none of the Assets transferred or assigned to the Purchaser or a Designated Purchaser pursuant to this Agreement by such Seller constitute a "United States real property interest" within the meaning of Section 1445 of the Code and applicable Treasury Regulations;

(b)        At the Closing, the Purchaser shall deliver or cause to be delivered:

(i)        to the Sellers, an amount equal to the Estimated Purchase Price, less the Working Capital Escrow Amount, by wire transfer in immediately available funds to an account or accounts designated by the Main Sellers in a written notice to the Purchaser at least two (2) Business Days prior to the Closing Date;

(ii)        to the Escrow Agent, an amount equal to the Working Capital Escrow Amount; and

(iii)        to the Main Sellers, a duly executed certificate of an executive officer of the Purchaser certifying the fulfillment of the conditions set forth in Section 8.2.

(c)        At the Closing, NNI shall deliver or cause to be delivered:

(i)        an updated Section 4.11(b) of the Sellers Disclosure Schedule (if applicable), dated as of a date no earlier than three (3) days prior to the Closing; and

(ii)        a duly executed certificate of an executive officer of NNI certifying the fulfillment of the conditions set forth in Section 8.3.

(d)        At the Closing, each Party shall deliver, or cause to be delivered, to the other any other documents reasonably requested by such other Party in order to effect, or evidence the consummation of, the transactions contemplated herein.

Section 2.4.        Designated Purchaser(s).

(a)        The Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.4, one or more Wholly-Owned Subsidiaries to (i) purchase specified Assets (including specified Assigned Contracts), (ii) assume specified Assumed Liabilities, and/or (iii) employ specified Transferring Employees on and after the Employee Transfer Date (any Subsidiary of the Purchaser that shall be properly designated by the Purchaser in accordance with this clause, a "**Designated Purchaser**"), it being understood and agreed, however, that any such right of the Purchaser to designate a Designated Purchaser is conditioned upon (x) such Designated Purchaser being able to perform the applicable covenants under Section 2.1.7 and ARTICLE VII and demonstrate satisfaction of the

applicable requirements of Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance, with respect to the Assumed and Assigned Contracts and (y) any such designation not creating any Liability (including any Liability relating to Taxes) for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the relevant Assets, assumed the relevant specified Liabilities and/or employed the relevant specified Transferring Employees.  No such designation shall relieve the Purchaser of any of its obligations hereunder.  Any breach hereof by a Designated Purchaser shall be deemed a breach by Purchaser.  The Purchaser and each Designated Purchaser shall be jointly and severally liable for any obligations assumed by any of them hereunder.  In furtherance of its rights under this Section 2.4 the Purchaser has designated the Person(s) listed on Exhibit 2.4 as the Designated Purchaser(s) hereunder.

(b)     The Purchaser by way of a written notice to be delivered to the Sellers as soon as reasonably practicable after the date hereof and in no event later than the fifteenth (15th) day prior to the Closing Date, (i) may amend Exhibit 2.4, provided, that such amended Exhibit 2.4 shall contain appropriate information about the Designated Purchaser(s) listed on such amended Exhibit 2.4; and (ii) shall indicate which Assets, Assumed Liabilities and Transferring Employees the Purchaser intends the Designated Purchaser(s) to purchase, assume and/or employ, as applicable, hereunder.

(c)     The Purchaser shall deliver to the Sellers as soon as reasonably practicable after the date hereof and in no event later than the fifteenth (15th) day prior to the Closing Date a signed counterpart to this Agreement in a form acceptable to the Main Sellers, signed by such Designated Purchaser(s), agreeing to be bound by the terms of this Agreement and authorizing the Purchaser to act as such Designated Purchaser(s)' agent for all purposes hereunder.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Sellers as follows:

Section 3.1.    Organization and Corporate Power.

(a)     The Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the Netherlands.  Each of the Purchaser and the Designated Purchasers has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and (ii) to own, lease and operate its assets and to carry on its business as it is now being conducted.

(b)     Each of Purchaser and the Designated Purchasers is duly qualified or licensed to own or lease and operate its properties and assets (including the Assets), and is in good standing, in each jurisdiction in which its ownership of assets or operation of business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not materially hinder, delay or impair the Purchaser's or any such Designated

42

Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is or will become a party.

Section 3.2.    Authorization; Binding Effect; No Breach.

(a)    The execution, delivery and performance of each Transaction Document to which the Purchaser or any of the Designated Purchasers is a party have been duly authorized by the Purchaser and the relevant Designated Purchasers, as applicable.  This Agreement has been duly executed and delivered by the Purchaser, and the other Transaction Documents to which the Purchaser or any Designated Purchaser is, or on the Closing Date will become, a party have been or will be duly executed and delivered by the Purchaser and each Designated Purchaser party thereto.  Assuming due authorization, execution and delivery by the relevant Sellers, each Transaction Document to which the Purchaser or any Designated Purchaser is a party constitutes, or upon execution thereof will constitute, a valid and binding obligation of the Purchaser or such Designated Purchaser, as applicable, enforceable against such Person in accordance with its respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b)    The execution, delivery and performance by each of the Purchaser and the Designated Purchasers of the Transaction Documents to which the Purchaser or such Designated Purchaser is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, or require any Consent (other than the Regulatory Approvals) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the Purchaser or the relevant Designated Purchaser, (ii) any material contract to which the Purchaser or the relevant Designated Purchaser is a party or to which any of its assets is subject or (iii) any Laws to which the Purchaser, the relevant Designated Purchaser, or any of their assets is subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that have not materially hindered, delayed or impaired, and would not reasonably be expected to, individually or in the aggregate, materially hinder, delay or impair, the performance by the Purchaser or the Designated Purchasers of any of their obligations under the Transaction Documents.

Section 3.3.    Financing.  The Purchaser has, as of the date hereof, and will have as of the Closing (i) sufficient funds available for purposes of funding the transactions contemplated herein and paying any other amount due hereunder or in respect hereof and (ii) the resources and capabilities (financial or otherwise) to perform its obligations hereunder.  The Purchaser has not, as of the date hereof, and will not have as of the Closing, incurred any obligation, commitment, restriction or liability of any kind, which would materially impair or adversely affect such resources and capabilities.  Notwithstanding anything to the contrary herein, the Purchaser's

obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person.

Section 3.4.    Adequate Assurance of Future Performance.  To the extent required by any Bankruptcy Laws or other Laws, the Purchaser will be able to provide, at Closing or on such earlier date as is designated by the U.S. Bankruptcy Court, adequate assurance of its and/or the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Assumed and Assigned Contract, except as otherwise provided in the Real Estate Agreements Term Sheet.

Section 3.5.    Purchaser's Acknowledgments; Exclusivity of Representations and Warranties.  The Purchaser acknowledges and agrees that (i) except for the representations and warranties expressly set forth herein or in any Ancillary Agreement, the Purchaser has not relied on any representation or warranty from the Sellers or any Affiliate of the Sellers or any employee, officer, director, accountant, financial, legal or other Representative of the Sellers or its Affiliates in determining whether to enter into this Agreement; (ii) except for the representations and warranties expressly set forth herein or in any Ancillary Agreement, none of the Sellers or any employee, officer, director, accountant, financial, legal or other Representative of the Sellers or any Affiliate of the Sellers has made any representation or warranty, express or implied, as to the Business (or the value or future thereof) or the Assets (including any implied representation or warranty as to the condition, merchantability, suitability or fitness for a particular purpose of any of the Assets, including under the International Convention on Contracts for the Sale of Goods (Geneva Convention) and any other applicable sale of goods Laws), the Assumed Liabilities, or any Affiliate of any such Person or the accuracy or completeness of any information regarding any of the foregoing that the Sellers or any other Person furnished or made available to the Purchaser and its Representatives (including any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials).

Section 3.6.    Brokers.  Except for fees and commissions that will be paid by the Purchaser, no broker, finder or investment banker is entitled to any brokerage, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates.

Section 3.7.    Absence of Certain Business Practices.  During the two (2) years prior to the date hereof, neither the Purchaser, its respective Subsidiaries or, to the knowledge of the Purchaser, any of its officers, employees or agents or any other Person authorized to act, and acting, on behalf of the Purchaser or its Subsidiaries has, directly or indirectly (i) given, offered, solicited or agreed to give, offer or solicit any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment, regardless of form and whether in money, property or services, to any customer, supplier, governmental employee or other Person who is or may be in a position to help or hinder the Purchaser or its Subsidiaries in connection with the development, marketing, use, sale or acceptance of products or services of the Purchaser or its Subsidiaries (or

to assist the Purchaser or its Subsidiaries in connection with any actual or proposed transaction relating to the products and services of the Purchaser or its Subsidiaries) in violation of law; (ii) used any corporate funds or, to the knowledge of the Purchaser, any personal funds for unlawful contributions, gifts, entertainment, or other unlawful expenses relating to political activity; (iii) made any unlawful payment to domestic government officials or employees, or to domestic political parties or campaigns, from corporate funds; (iv) violated any provision of the Foreign Corrupt Practices Act of 1977, as amended; (v) established or maintained any unlawful or unrecorded fund of corporate monies or other assets; or (vi) made any false or fictitious entry on the books or records of the Purchaser relating to any such payments.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except (a) for disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably apparent on its face from the Sellers Disclosure Schedule that such disclosure is applicable, (b) as expressly contemplated by this Agreement or (c) to the extent relating to the Excluded Assets or the Excluded Liabilities, each of the Main Sellers jointly and severally represents and warrants to the Purchaser as set forth in this ARTICLE IV:

Section 4.1.    <u>Organization and Corporate Power</u>.

(a)    Each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is organized. Subject to entry of the U.S. Bidding Procedures Order and the U.S. Sale Order in the case of the U.S. Debtors and the Canadian Sales Process Order and Canadian Approval and Vesting Order in the case of the Canadian Debtors and receipt of other Consents from the U.S. Bankruptcy Court and the Canadian Court in connection with the transactions contemplated hereby and in the other Transaction Documents (collectively, the "**Bankruptcy Consents**"), each of the Sellers has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and (ii) own, lease and operate its assets, including the Assets, as applicable, and to carry on the Business as it is now being conducted.

(b)    Each of the Sellers is duly qualified or licensed to do business and to own, lease and operate its properties and assets, including the Assets, and to carry on the Business as it is currently being conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or to be so licensed and is in good standing in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or be so licensed, except to the extent that the failure to be so qualified, licensed or in good standing would not, individually or in the aggregate, materially hinder, delay or impair the performance by the Sellers of any of their obligations under the Transaction Documents.

Section 4.2.    <u>Authorization; Binding Effect; No Breach.</u>

(a)    Subject to the receipt of the Bankruptcy Consents (i) the execution, delivery and performance by each Seller of the Transaction Documents to which such Seller is, or at the Closing will be, a party has been duly authorized by such Seller, (ii) this Agreement has been duly executed and delivered by the Main Sellers, and the other Transaction Documents to which the Main Sellers are, or on the Closing Date will become, parties have been or will be executed and delivered by the Main Sellers thereto; and (iii) the execution, delivery and performance by each Other Seller of the Transaction Documents to which such Seller will be a party will have been duly authorized by such Other Seller by the time such Other Seller executes this Agreement. Subject to receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser and the Designated Purchasers parties thereto, the Transaction Documents to which any Seller is or will be a party, will constitute, a legal, valid and binding obligation of such Seller, enforceable against such Person in accordance with its respective terms, subject to (in the case of Non-Debtor Sellers) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b)    Subject to receipt of the Bankruptcy Consents (where applicable), the Regulatory Approvals, and the receipt of Consents in connection with the Assigned Contracts, any Subleases, Licenses and any other Consents expressly provided for herein, the execution, delivery and performance by each Seller of the Transaction Documents to which such Seller is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, or result in the creation or imposition of any Lien upon any of the Assets, or require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the relevant Sellers, (ii) any material contract to which the relevant Seller is a party or to which any of its or their assets are subject, (iii) any order of any Government Entity applicable to any Seller or by which any of their respective properties or Assets are bound or (iv) any Laws to which any of the Sellers, or any of the Assets are subject, except, in the case of (ii), (iii), and (iv) above, for such defaults, violations and notifications that would not, individually or in the aggregate, materially hinder, delay or impair the performance by the Sellers of any of their obligations under the Transaction Documents.

Section 4.3.    <u>Title to Tangible Assets.</u> Except for Seller Encumbrances, the Owned Net Inventory and the Owned Equipment is owned beneficially by one or more of the Sellers, free and clear of all Liens (except Seller Encumbrances), and such Sellers have good and marketable title thereto.

Section 4.4.    <u>Material Contracts.</u>

(a)    Section 4.4(a) of the Sellers Disclosure Schedule sets forth, as of the date hereof, a list of every Seller Contract (but excluding (a) all licenses of Intellectual Property,

all of which are addressed in Section 4.5 below and (b) all Real Estate Leases, all of which are addressed by Section 4.9 below) in each case other than purchase orders and invoices and any third-party or intercompany agreements related to Overhead and Shared Services, that:

    (i)  in the most recent fiscal year of the Main Sellers resulted in, or is reasonably expected by its terms in the future to result in, (A) the payment of more than $2,000,000 per annum in the aggregate or (B) the receipt by the Business of more than $2,000,000 per annum in the aggregate, except any contracts referred to in any other subsection;

    (ii)  materially restricts the Business from engaging in any business activity anywhere in the world;

    (iii)  is a material joint venture, partnership or alliance Contract;

    (iv)  is a research and development Contract involving consideration or expenditures in excess of $2,000,000 per annum;

    (v)  is a manufacturing or supply Contract involving (A) the purchase of CDMA Products for the Business, or (B) the LTE Business;

    (vi)  contains (i) any non-competition, non-solicitation or similar agreements or arrangements or (ii) any "earn-out" or similar agreements or arrangements; or

    (vii)  is a classified contract requiring contractor employees to have access to classified information during contract performance

    (all the above, collectively, the "**Material Contracts**").

    (b)  The Sellers have made available to the Purchaser true, correct and complete copies of all of the Seller Contracts. Each Seller Contract is legal, valid, binding and enforceable against the Seller party thereto and, to the Knowledge of Seller, each other party thereto and is in full force and effect (in each case, subject to the Bankruptcy Proceedings and subject to applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law).

    (c)  As of the date hereof, except as disclosed in Section 4.4(c) of the Sellers Disclosure Schedule, the Sellers (or any Affiliate of the Sellers) have not been notified in writing that any of them is in breach or default under any Seller Contract, and, to the Knowledge of Seller, no other party to any Seller Contract is in breach or default thereof, nor have the Sellers or any of their respective Affiliates been notified in writing of such other party's intention to terminate any Seller Contract.

    (d)  Since January 14, 2009, the Sellers (or any Affiliate of the Sellers) have not received written notification that any of the customers or suppliers party to the Seller