UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          )  Case No. 09-10138(KG)
                                )  (JOINTLY ADMINISTERED)
                                )  Chapter 11
NORTEL NETWORKS, INC.,          )
*et al.,*                       )  Courtroom 3
                                )  824 Market Street
                    Debtors.    )  Wilmington, Delaware 19801
                                )
                                )  June 29, 2009
                                )  9:15 A.M.


TRANSCRIPT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING
DEBTOR TO MAKE CERTAIN TRANSFERS AND PROVIDE FINANCIAL SUPPORT
 TO THEIR NONDEBTOR SUBSIDIARIES. MOTION FOR AN INTERIM ORDER
(A) APPROVING INTERIM FUNDING AND SETTLEMENT AGREEMENT AND (B)
    GRANTING RELATED RELIEF. DEBTORS' MOTION FOR ORDER (A)
  AUTHORIZING DEBTORS' ENTRY INTO THE ASSET SALE AGREEMENT (B)
AUTHORIZING AND APPROVING BIDDING PROCEDURES (C) AUTHORIZING
   AND APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT (D)
   APPROVING NOTICE PROCEDURES (E) APPROVING ASSUMPTION AND
    ASSIGNMENT PROCEDURES (F) AUTHORIZING FILING OF CERTAIN
DOCUMENTS UNDER SEAL (G) SETTING DATE FOR SALE HEARING. MOTION
 FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO ENTER
INTO ONE OR MORE LETTER OF CREDIT AND BONDING FACILITIES (II)
  GRANTING RELATED RELIEF PURSUANT TO SECTIONS 105, 361, 362,
             363, AND 364 OF THE BANKRUPTCY CODE.
             BEFORE HONORABLE KEVIN GROSS
             UNITED STATES BANKRUPTCY JUDGE


ECRO:                    LESLIE MURIN

TRANSCRIPTION SERVICE:   TRANSCRIPTS PLUS, INC.
                         435 Riverview Circle
                         New Hope, Pennsylvania 18938
                         Telephone:  215-862-1115
                         Facsimile: 215-862-6639
                         e-mail CourtTranscripts@aol.com


 Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

APPEARANCES:

For the Debtors:                 Morris Nichols Arsht & Tunnell, LLP
                                 By:  ANNIE CORDO, ESQ.
                                 1201 North Market Street
                                 P.O. Box 1347
                                 Wilmington, Delaware 19899-1347

                                 Cleary Gottlieb Steen & Hamilton LLP
                                 By:  LISA M. SCHWEITZER, ESQ.
                                      JANE KIM, ESQ.
                                      JIM BROMLEY, ESQ.
                                 One Liberty Plaza
                                 New York, NY 10006

                                 Curtis Mallett-Prevost Colt & Mosle
                                 By:  JAMES DREW, ESQ.
                                      STEVEN REISMAN, ESQ.
                                 101 Park Avenue
                                 New York, New York 10178-0061

For FlexTronics:                 Ashby & Geddes
                                 By:  BEN KEENAN, ESQ.
                                 222 Delaware Avenue, 17th Floor
                                 Wilmington, Delaware 19801

For the Committee:               Richards Layton & Finger, PA
                                 By:  CHRIS SAMIS, ESQ.
                                 One Rodney Square, P.O. Box 551
                                 Wilmington, Delaware 19899

                                 Akin, Gump, Strauss, Hauer & Feld, LLP
                                 By:  FRED HODARA, ESQ.
                                      JOSH STURM, ESQ.
                                 590 Madison Avenue
                                 New York, NY 10022-2524

For NKS:                         Skadden Arps Slate Meagher & Flom
                                 By:  ANTHONY CLARK, ESQ.
                                 One Rodney Square, P.O. Box 636
                                 Wilmington, Delaware 19899-0636

Appearances:
(Continued)

```
The U.S. Trustee:          United States Department of Justice
                           Office of the U.S. Trustee
                           By:  PATRICK TINKER, ESQ.
                           844 King Street
                           Wilmington, Delaware 19899

For Ernst & Young as       Buchanan Ingersoll & Rooney PC
Monitor:                   By:  MARY CALOWAY, ESQ.
                           The Brandywine Building
                           1000 West Street, Suite 1410
                           Wilmington, Delaware 19801

                           Allen & Overy LLP
                           By:  KEN COLEMAN, ESQ.
                                ANDREW DOVE, ESQ.
                           1221 Avenue of the Americas
                           New York, New York 10020

For MatlinPatterson        Cozen O'Connor
Global Advisers LLC:       By:  MARK FELGER, ESQ.
                           Chase Manhattan Centre
                           1201 North Market Street, Suite 1400
                           Wilmington, Delaware 19801

                           Bracewell & Giuliani, LLP
                           By:  JENNIFER FELDSHER, ESQ.
                           1177 Avenue of Americas
                           New York, New York

For Bondholder Group:      Pachulski Stang Ziehl & Jones
                           By:  CURTIS HEHN, ESQ.
                           919 North Market Street, 16th Floor
                           Post Office Box 8705
                           Wilmington, Delaware 19899-8705

                           Milbank, Tweed, Hadley & McCloy LLP
                           By:  THOMAS KRELLER, ESQ.
                           1 Chase Manhattan Plaza
                           New York, New York 10005-1413

For UBS:                   Ballard Spahr Andrews & Ingersoll
                           By:  DAVID POLLACK, EQ.
                           919 North Market Street, 12th Floor
                           Wilmington, Delaware 19801
```

4

Appearances:
(Continued)

For Pension Benefit          Pension Benefit Guaranty Corporation
Guaranty Corporation:        By:  VICENTE MURRELL, ESQ.
                             Office of the Chief Counsel
                             1200 K Street, N.W.
                             Washington, D.C. 20005-4026

For Automotive Rentals,      Archer & Greiner
Inc.:                        By:  JENNIFER STORY, ESQ.
                             300 Delaware Avenue
                             Suite 1370
                             Wilmington, Delaware 19801

For Joint Administrators     Young Conaway Stargatt & Taylor, LLP
for Nortel, et al:           By:  ED HARRON, ESQ.
                             The Brandywine Building
                             1000 West Street, 17th Floor
                             Wilmington, Delaware 19899-0391


**CANADIAN TELEPHONE PARTICIPANTS:   SEE FOLLOWING PAGE**

SUPERIOR COURT OF JUSTICE     COURT FILE NO: 09-7950-00CL

DATE: Jue 29, 2009

SHORT TITLE   NORTEL NETWORKS CORPORATION

J. Carfagnini + J. Pasquarello
for EY as Monitor
(T) 416-593-7216
(F) 416-879-1234

## COUNSEL SLIP

| COUNSEL FOR PLAINTIFF (S) | COUNSEL FOR DEFENDANT (S) |
|---|---|

**COUNSEL FOR PLAINTIFF (S)**

Derrick Tay
Jennifer Stam
for Nortel Networks Corporation, etal
416-216-2327 (ph.)
416-216-3930 (f)

YNDON BARNES
FDAM HIRSH
o/ARD OF DIRECTORS OF NNI/NNC
HONE: 416-862-6679
AX: 416-862-6635

**COUNSEL FOR DEFENDANT (S)**

M. Starnino for Superintendent of Financial Services
as administrator of PBGF
T 416-640-4431
F 416-646-4301

S. Philpott for Former Employees.
T 416-595-2104
F 416-204-2882

K Zych for Informal Nortel Noteholder Group
T - 416 777 5738
PHONE: Pamela Huff / Craig Thorburn
FAX: for Matlin Patterson
Tel: 416-863-2958 / Fax 416-863-2653

Ward, David for UK Pension Protection Fund   416-860-6566 (F)
869-8960 (Ph)

Leanne Williams for Flextronics (416) 304-1616
(416) 304-1313 (F)

Alex MacFarlane for the Official Committee (416)-863-2388
Unsecured Creditors   416-863-4592 (F)

ARTHUR O. JACQUES & TOM MCRAE
for FELSKE & SYLVAIN (defacto
continuing Employees Comm.
416 214-5213
416 214 5413 (Fax)

Robin B. Schwill   P: 416.863.5502
Matthew P. Gottlieb   P: 416.863.5516
Counsel to     F: 416.863.0871
Nodel Networks UK Limited.

A Kaufman for Export Development Canada
(416) 862-3538 (416) 364-7813

D. Ullmann for Verizon Communication
Inc.
416-369-4148   46 X64-9223

G. Benchetrit for IBM
Tel - 416-218-1141   Fax 416-218-1841

INDEX

| WITNESSES FOR THE DEBTORS: | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| GEORGE RIEDEL | | | | | |
| By Ms. Schweitzer | 74 | | 119 | | |
| By Mr. Hodara | | 110 | | | |
| By Ms. Feldsher | | 112 | | 122 | |
| By Mr. Clark | | 118 | | | |
| | | | | | |
| MICHAEL MURRAY | | | | | |
| By Ms. Schweitzer | 125 | | | | |
| By Ms. Feldsher | | 138 | | | |

**PLEASE NOTE: WITNESSES' MICROPHONE HAD AN ECHO/REVERBERATION THROUGHOUT ENTIRE EXAMINATION**

6

1           MR. BROMLEY:  Thank you for having us this morning.

2  While we're trying to work out some of the problems here --

3           THE COURT:  I apologize.

4           MR. BROMLEY:  And, again, the last time I was here, I

5  offered a Nortel Enterprise Solutions person could come by.

6           THE COURT:  We should have.

7                    (Laughter)

8           MR. BROMLEY:  And it seems you still need them.  Your

9  Honor, we could do a couple of the U.S. only uncontested

10 matters.

11          THE COURT:  Sure, let's do that.

12          MR. BROMLEY:  To try to be as efficient as possible.

13          THE COURT:  Absolutely.  I got the certification

14 regarding the protocol stipulation.  I did sign that order this

15 morning.

16          MR. BROMLEY:  Okay.  Very good, Your Honor.

17          THE COURT:  So, that is not something you have to

18 address.

19          MR. BROMLEY:  Okay.  Terrific.  We will mention it

20 briefly as we talk about the interim funding --

21          THE COURT:  Good.

22          MR. BROMLEY:  -- and settlement agreement, but that's

23 very good.  Thank you very much, Your Honor.

24          THE COURT:  You bet.

25          MR. BROMLEY:  So, if we could just take a look at the

1 | agenda letter --

2 |          THE COURT:  Yes.

3 |          MR. BROMLEY:  -- and try to knock a few of these off.

4 | And I would -- we have -- the main addition to the agenda

5 | letter, Your Honor, is a matter that is a U.S. only matter,

6 | which we've added, which is the motion to approve a compromise

7 | under Rule 9019 by and among the debtors and Crossroads

8 | Wireless, Inc. and Crosswords Holding.

9 |          THE COURT:  Yes.

10 |          MR. BROMLEY:  And we moved that from Friday to today.

11 |          THE COURT:  Right.

12 |          MR. BROMLEY:  So, I think it would be worthwhile if

13 | we could maybe start with Crossroads.

14 |          THE COURT:  That would be fine.

15 |          MR. BROMLEY:  Okay.

16 |          THE COURT:  Good morning.

17 |          MS. KIM:  Good morning, Your Honor.

18 |          THE COURT:  Good morning.

19 |          MS. KIM:  The motion for an order approving the

20 | compromise of a controversy under Rule 9019 between the debtors

21 | and Crossroads Wireless, Inc. relates to a sale by Nortel to

22 | Crossroads of certain equipment for which Crossroads has never

23 | paid.  Crossroads is a Chapter 11 debtor in the Western

24 | District of Oklahoma that's in the process of liquidation.

25 |          At the same time, Nortel holds an unperfected

1 security interest in certain of Crossroads' Spectrum licenses.

2 And so this motion and the stipulation that the debtors are

3 asking Your Honor to approve seeks to resolve issues relating

4 to the unperfected security interest and the equipment.

5           The agreement that Nortel and Crossroads have reached

6 is that Crossroads would transfer to Nortel all rights, title,

7 and interest to the equipment free and clear of all liens and

8 encumbrances, and relinquish any claims that Crossroads may

9 have against Nortel.

10           And in exchange, Nortel would release its security

11 interest in the Spectrum licenses, and any other claims that

12 Nortel may have against Crossroads.  And this is in the

13 debtors' -- the debtors would submit that this is in their

14 interest because Crossroads is in Chapter 11 and is in the

15 process of liquidating.  And the debtors believe that this

16 settlement maximizes the value that they would receive with

17 respect to their claims against Crossroads.

18           In addition, Nortel has a potential buyer for the

19 equipment.  So, this would allow the equipment to be

20 transferred over to Nortel free and clear so that Nortel would

21 be able to maximize its value of the assets by selling those.

22           We have Dan Carrigan, who is counsel to NNI, who was

23 involved in negotiating the settlement, he's a partner at

24 McKenna Long, if Your Honor has any questions for Mr. Carrigan.

25           Otherwise, there are a couple of small revisions to

1  the stipulation that we made in order to resolve the --

2          (Interruption by Video Conference Recording)

3          MS. KIM:  That's only a little bit ironic.

4                          (Laughter)

5          THE COURT:  How about that.

6          MS. KIM:  The revisions to the stipulation resolve

7  the objection that was filed --

8          THE COURT:  Yes.

9          MS. KIM:  -- by Brookings Municipal Utilities.  The

10 revised stipulation clarifies that Nortel is responsible for

11 removing and transporting the equipment at Nortel's expense,

12 and explicitly resolves the Brookings Municipal Utilities'

13 objection, which was withdrawn in this Court.

14         THE COURT:  Right.

15         MS. KIM:  So, unless Your Honor has questions for Mr.

16 Carrigan, we would request that Your Honor approve the

17 stipulation.

18         And we will -- we can either hand up the revised

19 stipulation and the order now, or we can wait until --

20         THE COURT:  Why don't we do it now?

21         MS. KIM:  Sure.

22         THE COURT:  Because certainly I was prepared to grant

23 the settlement under Rule 9019.  If -- you can approach, Ms.

24 Kim.

25         MS. KIM:  May we approach?

1        THE COURT:  Certainly.  And this clearly makes it

2   better in resolving the objection, and it certainly meets the

3   standards that we apply under Rule 9019.  It's fair,

4   reasonable, in the best interest of the debtors' estate, and I

5   am satisfied that it is the result of vigorous arm's length

6   negotiations between the parties.  And for those reasons, I

7   would grant the motion.

8        MS. KIM:  Thank you, Your Honor.

9        Could I ask if Mr. Carrigan can be excused?

10        THE COURT:  He may.

11        MS. KIM:  Thank you.

12        THE COURT:  Yes.  Mr. Carrigan, you may be excused.

13  Thank you.

14        MS. MURIN:  Your Honor, I'd like to test the sound.

15        THE COURT:  Okay.

16                    (System test)

17        MS. MURIN:  Thank you, Your Honor.

18        THE COURT:  They can hear us?

19        MS. MURIN:  We'll have to -- we're still working on

20  it.

21        THE COURT:  Okay.  All right.  So, we may as well

22  continue with what we're doing, Ms. Kim.

23        MS. KIM:  Thank you, Your Honor.  The first item on

24  the agenda is the debtors' motion for entry of an order

25  authorizing the debtors to make certain transfers and provide

1 financial support to their nondebtor subsidiaries.  The debtors

2 request in this motion for authorization to make certain

3 transfers and provide financial support to their nondebtor

4 subsidiaries in accordance with procedures that are laid out in

5 the motion.  Specifically the debtors request authorization to

6 make loans on a secured or secured basis, and equity infusions

7 to their nondebtor subsidiaries in the debtors' business

8 judgment, which loan and capital infusions would not exceed $2

9 million.

10          And prior to making any loan or capital contribution,

11 that would result --

12          (Interruption by Video Conference Recording)

13          MS. KIM:  Prior to making any loan or capital

14 contribution that would result in outstanding post petition

15 financial support in excess of $100,000, the debtors would give

16 the Committee's counsel, as well as -- and this is part of a

17 revision that we've agreed to make -- the U.S. Trustee and the

18 bondholders five business days' notice with respect to those

19 contributions or loans.

20          THE COURT:  Justice Morowitz would like to speak with

21 me.

22          MS. KIM:  Oh.

23          THE COURT:  So, if you'll excuse me for a moment.

24          MS. KIM:  Certainly, Your Honor.

25               (Recess 9:24 A.M./Reconvene 9:29 A.M.)

1          THE COURT:  Thank you, everyone.  Please be seated.

2    Ms. Kim, let's see if we can finish.  Thank you for your

3    indulgence, everyone.  I do apologize.  And it looks like we've

4    got them up.  Whether they can hear us or not is another

5    matter.

6          MS. MURIN:  We're still working on that, Your Honor.

7          THE COURT:  Okay.

8          MS. KIM:  Thank you, Your Honor.  And actually it

9    occurred to me that I had neglected to introduce myself to the

10   Court and for the Court Reporter.  So, Jane Kim on behalf of

11   the debtors from Cleary Gottlieb Steen & Hamilton.  I

12   apologize.

13         As I was saying, we -- in connection with the

14   debtors' nondebtor subsidiary funding motion, John Doolittle,

15   who's the Vice President of NNI, and the Treasurer of NNL, is

16   available to testify today.  I would proffer his testimony,

17   unless Your Honor or anyone else would like to cross examine

18   him.

19         THE COURT:  Does anyone wish to cross examine?  Does

20   the Committee have any position?  Good morning, Mr. Hodara.

21         MR. HODARA:  Good morning, Your Honor.  The Committee

22   is supportive of the relief requested.

23         THE COURT:  Okay.  All right.  Well, I certainly find

24   that it is acceptable under the Code.  And obviously necessary

25   for the continued operation of the debtors' business.  I will

1 be pleased to grant the -- to sign the order.

2        MS. KIM:  Thank you, Your Honor.  And as I mentioned

3 earlier, there are a few revisions to the order --

4        THE COURT:  Yes.

5        MS. KIM:  -- which I would hand up, and I'll just

6 quickly summarize them.  We received informal comments from the

7 U.S. Trustee.  And as a result of those conversations with the

8 U.S. Trustee, we have agreed to add additional language to the

9 order that would say that the debtors will file with the Court

10 a notice that discloses the amount, nature, and recipient of

11 the proposed financial support.  That the debtors will provide

12 the Committee, and as I mentioned, the U.S. Trustee and the

13 bondholders five business days prior written notice of the

14 proposed disbursement.  And that in addition to notifying the

15 Committee, we would also notify the U.S. Trustee and the

16 bondholders with -- excuse me.  If we -- if they file a written

17 objection, if the bondholders and the U.S. Trustee, in addition

18 to the Committee, file an objection, then the Court -- then we

19 would seek relief from the Court with respect to that

20 objection.

21        THE COURT:  That's fine.  Thank you.

22        MS. KIM:  May I approach?

23        THE COURT:  You may.

24     (Video conference participants join in proceeding)

25        THE COURT:  We've got them.  Ms. Kim, I think we

1  should move on to the joint business at this point.

2           FEMALE SPEAKER:  Your Honor, we'll move on.  Just for

3  your introduction, this is Derrick Tay from Ogilvy Renault for

4  the debtor who's talking.

5           THE COURT:  Oh, thank you.  Thank you.

6                     (Pause)

7           MR. TAY:  And the reason I wanted to do this is

8  because, as you know, there is a real question these days about

9  what is the proper test that one should be applying in terms of

10 dealing with this question of whether you can use the CCAA to

11 sell all or substantially all your business or to sell your

12 business before there's a plan outside of the context of a

13 plan.  And I assume you have a copy of my --

14          MR. JUSTICE MOROWITZ:  Yes, the one -- this is the

15 (indiscernible - siren sounding).

16          MR. TAY:  Yes.

17          MR. JUSTICE MOROWITZ:  I do.

18          MR. TAY:  Okay.  So, in summary, what I would submit

19 to you, Your Honor, is that there is no question that there is

20 authority for the courts under the CCAA to authorize sales of

21 businesses without there having to be first a plan or in the

22 context of a plan.  And the case that has raised this question

23 is, as you know, the B.C. case of <u>Cliffs Over Maple Bay</u>, and I

24 will take you to it.  But I will suggest to you that even

25 there, the question is not a question of can a court do it, but

1  should a court do it.

2          And in essence, my submission to you is the question

3  that was considered by <u>Cliffs Over Maple Bay</u> is not the right

4  question.  And, in fact, detracts from the real issue.

5          So, it's not helpful to ask can the CCAA be used to

6  sell all the assets outside the context of a plan.

7          The real question is what are the principles that the

8  Court should apply in deciding whether it should allow the sale

9  of assets outside of the context of a plan.  And I would submit

10 to you that if you use that approach, and the principles that

11 I'm about to suggest, then that encompasses all of the case

12 that have been dealt with in this area and allows the Court the

13 requisite flexibility that it needs to come to the right

14 decision in the right circumstances without some kind of

15 arbitrary rule that it's -- you know, as to whether or not you

16 can do it outside of the context of a plan.

17         And the principles that I would suggest that the

18 Court be guided by is set out in Paragraph 20 of my factum.

19         And these are general questions that I believe, if a

20 court looks at and asks these questions, the answer will be

21 self evidence in most cases.  So, is the sale transaction

22 warranted at this time?  Will a sale benefit the whole economic

23 community?  Do any of the debtors' creditors have a bona fide

24 reason to object to the sale of the business?  And lastly, is

25 there a viable alternative?

1        And those are the questions that I submit are the

2   ones that the Court should address.  And I would suggest to

3   Your Honor, as well, that, you know, reasons along these lines

4   would be very helpful for the restructuring community at large

5   because I think it will bring some measure of consistency

6   across the country, and also accommodates the types of concerns

7   that were raised in the Cliffs Over Maple Bay case.

8        Clearly -- and I won't take you through this because

9   you are very familiar with the law.  There is judicial

10  discretion under the CCAA to do this.  The courts have always

11  taken a broad and remedial approach to the interpretation of

12  the act.  The courts have also been very clear about the

13  purpose of the CCAA, I'm referring now to Paragraph 28 of my

14  factum.

15       It is beyond controversy that the CCAA is flexible

16  remedial legislation that should be liberally construed in a

17  manner consistent with its purpose and the intention of

18  Parliament.  And in Paragraph 29, the courts have also

19  discussed what those intentions are.  And it's to address the

20  social evils that would follow the forced liquidation of

21  insolvent companies.

22       In Paragraph 30, I take you to the cases that -- to

23  the authorities that identify the fact that the preservation of

24  the debtors' business as a going concern has been specifically

25  identified as a key objective of the CCAA.

1          And in Paragraph 31, the fact that the courts have

2    repeatedly noted that the purpose of the CCAA is to preserve

3    the benefit of a going concern business for all stakeholders on

4    the whole economic community.

5          This approach has also been recognized in the Alberta

6    Courts in Paragraph 32, there is an overarching policy concern

7    favoring the possibility of a going concern solution and the

8    potential of a long-term upside value for broad constituency of

9    stakeholders.  So, I think that it's clear law across the

10   country that the CCAA should be read in a broad and purpose of

11   manner.  That there is clear authority that what the Parliament

12   and what the courts have been concerned about is preserving the

13   ongoing value of a business to maximize recoveries for all

14   stakeholders.

15         Then in -- starting with Paragraph 35, I've taken you

16   through -- I'm taking you through the various jurisdictions --

17   the issue of the Court's jurisdiction to approve a sale in the

18   various provinces.  Very clear in Ontario, repeatedly

19   recognized by this Court that it has jurisdiction under the

20   CCAA to approve asset sales in the absence of a plan

21   arrangement where such sale is in the best interest of

22   stakeholders generally.  This principle has been upheld by the

23   Court of Appeal in the Consumers Packaging case referred to in

24   Paragraph 37 where the Court of Appeals basically said the sale

25   is a going, allows the preservation of the business, albeit

1    under new ownership, and is, therefore, consistent for the

2    purposes of the CCAA.

3         And goes further on today we cannot refrain from

4    commenting that Farley J.'s decision to approve the bid is

5    consistent with previous decisions in Ontario and elsewhere

6    that have emphasized the broad remedial purpose and flexibility

7    of the CCAA and have approved the sale and disposition of

8    assets during CCAA proceedings prior to the formal plan being

9    tendered.

10        Similarly in <u>Canadian Red Cross</u>, Justice Blair said I

11   cannot accept the submission that the Court has no jurisdiction

12   to make the order so.  The source of the authority is twofold.

13   And first he refers to the words in Section 11, and secondly,

14   to the inherent jurisdiction of the Court.

15        Paragraph 39, I referred to the <u>Eaton</u> case where,

16   again, Justice Farley explained all this and said, "I have no

17   doubt that Blair J.'s conclusion in Canadian Red Cross, that in

18   the CCAA proceedings, a judge has the authority to approve the

19   sale of assets, in essence, outside direct involvement of a

20   plan context.

21        And there's ample authority, and I won't go through

22   each of them, they're pretty clear.  In Ontario, this issue has

23   been dealt head on numerous times, and the Courts have been

24   exceedingly consistent in this purpose of approach to arrive at

25   the right conclusion.

1          In other jurisdictions, you will see that courts in

2    Quebec, Manitoba, and Alberta have similarly recognized the

3    Court's jurisdiction to approve a sale of assets during the

4    course of a CCAA proceeding.

5          Recent case, <u>Winnipeg Motor Express, Inc.</u>, where the

6    court said no plan of arrangement has been prepared, or was

7    even contemplated.  The court relied on the fact that the sale

8    was in keeping with the objectives of CCAA and found that there

9    was no jurisdictional impediment in granting the order sought.

10         It goes on to say I consider those objectives to be

11   both more fundamental and broader than the title of the

12   statute, and this is a direct reference to the <u>Cliffs Over</u>

13   <u>Maple Bay</u> case where the B.C. court simply referred to the

14   title of the act.  And says, and goes beyond the circumstances

15   of a formal plan of arrangement.

16         So, now we come to the case of <u>Cliffs Over Maple Bay</u>

17   and the question was raised there as to whether the court

18   should, and I use the word very advisedly, "should" rather than

19   "can,: should authorize the sale of substantially all of a

20   debtor's assets where the debtor's plan will simply propose

21   that the net proceeds from the sale be distributed to the

22   creditors.

23         But the facts there are that the court was faced with

24   a debtor that no active business, but who was trying to use the

25   CCAA basically to stave off its secured creditor indefinitely.

1          The case didn't involve any kind of sale transaction.

2    But in <u>Obida</u> (phonetic), the Court of Appeal questioned whether

3    a court should authorize a sale under the CCAA without

4    requiring the matter to be voted upon by the creditors.

5          And in posing the question, they adopted this very

6    narrow view of the purpose of the CCAA, relying solely on the

7    name of the act for guidance and ignoring the well developed

8    jurisprudence that the object of the CCAA is to allow companies

9    to reorganize and to preserve the business as a going concern.

10         And in Paragraph 41 of my factum, and this is also

11   important, the Court of Appeal never raised the issue of can

12   the court do this.  It's not a question of jurisdiction, rather

13   it focused on whether the Court should grant the requested

14   relief.

15         And so I would suggest that, you know, the question

16   that they pose is not the question that we want as being the

17   question to be answered.  But if you go back to the four

18   principles that I annunciated, you will find that the court --

19   this court, that court, any court would have been able to deal

20   with that fact situation quite easily by saying that, you know,

21   this process is being used to unfairly prejudice the secured

22   creditor where there's no real business purpose, no benefit to

23   be had by doing it.

24         And so I would suggest and submit that we do not need

25   to ask ourselves the question that the Court of Appeal in the

1  B.C. court asked.  But rather we should ask the question of

2  what other principles that any court, any court should apply in

3  determining whether or not to allow a sale of assets in a CCAA

4  outside of a plan context, or for any -- you know, for that

5  matter, any sale under the CCAA.

6          And to conclude, I would, again, suggest that the

7  right questions to ask are is the sale transaction warranted at

8  this time?  Will it benefit the whole economic community?  Do

9  any of the creditors have a bona fide reason to object to a

10  sale of the business?  And lastly, is there a better viable

11  alternative?

12          And I suggest that a broad purpose of approach

13  suggested by these questions would serve as a much better guide

14  for all courts in deciding this particular issue.

15          Those are my submissions.

16          MR. JUSTICE MOROWITZ:  Thank you.  Is there any other

17  counsel wishing to address on this point?  Mr. Barnes?

18          MR. BURNS:  I'd like to object on the comments of Mr.

19  Tay very, very briefly.  And I think that, once again, going

20  back to basic principles.  One of the overarching objectives of

21  the CCAA is to preserve the debtor's business as a going

22  concern for the benefit of all the stakeholders.

23          And this objective could be achieved regardless of

24  whether the business is continued as a going concern under the

25  debtors' control or under new ownership.

1          And as Mr. Tay took you through the case, except for

2 that one exception in B.C. Canadian courts have exercised their

3 jurisdiction to approve the sale of assets even in the absence

4 of a plan of arrangement or a compromise in creditors' vote.

5          And really it comes down, as Mr. Tay says, he gleaned

6 from the cases what the appropriate factors are.  And there's a

7 four-prong test which he took you through and concluded with.

8 And I suggest to you that this case, one, the evidence

9 satisfies all of those criteria, and that is the appropriate

10 test.

11          Those are the submissions.

12          MR. JUSTICE MOROWITZ:  Thank you.  So, at least Mr.

13 Tay covered that preliminary issue.

14          Does the equipment work?  Madam Register, is there

15 any update from the technical side of life?  I see my

16 counterpart, Judge Gross, on the screen.  He actually moved.

17                         (Laughter)

18          THE COURT:  Oh, Mr. Justice Morowitz, good morning.

19          MR. JUSTICE MOROWITZ:  Are we ready to go?

20          THE COURT:  I'm having difficulty hearing.

21          MR. JUSTICE MOROWITZ:  You've confirmed with Delaware

22 that they're ready to go.  Because I keep seeing there's

23 somebody behind Judge Gross.

24          Judge Gross, can you hear me?

25          THE COURT:  Now I can, yes.

 1          MR. JUSTICE MOROWITZ:  All right.  We're just doing a

 2  volume adjustment here.

 3                        (Pause)

 4          MR. JUSTICE MOROWITZ:  Good morning, Judge Gross.

 5          THE COURT:  Good morning, Mr. Justice Morowitz.

 6          MR. JUSTICE MOROWITZ:  Counsel in both Delaware and

 7  Toronto, you can assume that under the provisions of the

 8  protocol, Judge Gross and I have had a preliminary discussion

 9  to deal with procedural matters.  We're going to divide the

10  proceedings today into two parts.  The first part is going to

11  deal with the interim funding agreement, and that is the Ovalby

12  (phonetic) motion that I have here and supplementary motion

13  record, and I assume that similar materials are before Judge

14  Gross.

15          THE COURT:  Yes.

16          MR. JUSTICE MOROWITZ:  That is going to proceed first

17  with dealing with the matters in the CCAA Court, and then in

18  dealing with the matters in the U.S. Bankruptcy Court.  At the

19  conclusion of argument, my expectation is that Judge Gross and

20  I will take a short recess to review that matter.  And there

21  will also be prior to the recess any update with respect to the

22  second part, which would be the Nokia transaction and the

23  status of the objection.

24          Now, regarding the procedures for that part of the

25  proceedings today, the objections were filed in the Chapter 11

1  court in Delaware.  Judge Gross will be considering those

2  objections.  And then we'll deal with the motion and its

3  substance in the CCAA Court.

4           THE COURT:  Yes.

5           MR. JUSTICE MOROWITZ:  I would also like just to

6  review a timing issue that some of you in the Toronto Court are

7  aware that I am scheduled to hear another matter involving

8  another judge in Delaware at 11:30.  We are investigating three

9  possibilities, because we know that this hearing is not going

10 to be concluded by 11:30, and we'll keep you updated.  But one

11 of those possibilities is there will be another judge in the

12 CCAA Court dealing with that matter.  The other two

13 possibilities will be either some flexibility with the 11:30

14 judge, or perhaps some flexibility in this matter.

15          But the priority is to start the Nortel matters, to

16 hear them until they are complete.

17          Judge Gross, do you have anything to add by way of

18 preliminary?

19          THE COURT:  Mr. Justice Morowitz, I think you've

20 stated the procedure perfectly well.  And I am prepared to

21 proceed as you have suggested.

22          MR. JUSTICE MOROWITZ:  Thank you, Judge Gross.  Mr.

23 Tay, you may commence your first presentation.  I do have

24 before me the motion record, which is, today we'll call Interim

25 Funding Agreement, and the supplementary motion record.  And I

1  also have the 14th and 15th reports of the money.

2            MR. TAY:  Thank you, Your Honor.  Good morning, Judge

3  Gross.

4            THE COURT:  Good morning.

5            MR. TAY:  As you have stated, Your Honor, we plan to

6  deal with the interim funding agreement and the cross border

7  protocol that is a condition precedent to the interim funding

8  agreement.

9            Before I deal with that, though, my counterpart in

10 the U.S., Mr. Bromley, would simply like to make some opening

11 statements in terms of what's being done in the U.S.  And in

12 the spirit of cross border cooperation, I will yield the floor

13 to him before I continue.

14            THE COURT:  Thank you.  Mr. Bromley?

15            MR. BROMLEY:  Thank you, Your Honor.  And thank you,

16 Mr. Justice Morowitz.  It's a pleasure to be before both of

17 you.

18            As both of you know, we filed a number of cases in a

19 number of jurisdictions on January 14th.  We filed five debtors

20 in Canada, we filed 15 debtors in the United States, and 19

21 debtors in the United Kingdom.

22            And since those filings took place on January 14th,

23 there have been two secondary proceedings commenced:  One in

24 Israel, and more recently, one in France.

25            I think it's fair to say from the very start these

1  proceedings have been characterized by complexity,

2  international challenges, and cooperation amongst all of the

3  various interested parties.  And, indeed, the two matters that

4  we have before you today are of substantial interest and

5  importance.  Not just, I think, to the Nortel enterprises, but

6  also to the cross border functioning of them and the insolvency

7  regimes.  What we're trying to do today is to address some of

8  the inconsistencies that exist amongst our sister

9  jurisdictions.

10         First, with respect to the funding of different

11  entities within a corporate group, and next with respect to the

12  sale of assets on a worldwide basis in a manner that allows the

13  maximization of value notwithstanding certain inconsistencies

14  between the different jurisdictions but also taking into

15  account the common heritage that they all share.  The focus

16  that we've had very the very beginning of these cases has been

17  on cooperation and transparency with our creditor

18  consistencies, with the monitor in Canada, and with the

19  administrator in the United Kingdom.

20         There has been an excessive amount of cooperation, if

21  you will, an enormous amount of meetings, information provided

22  across borders, attempts to forestall having to clog the courts

23  of any jurisdiction with any disputes.  And, indeed, the

24  interim funding and settlement agreement is probably the

25  hallmark of that exercise.

1           And I think it's important to recognize what we're

2  dealing with with Nortel.  As we discussed in the very

3  beginning of these cases, Nortel is an integrated global

4  enterprise.  And if anything, the exercise that we have gone

5  through both with respect to funding and proposed asset sales,

6  and the asset sale that we have before you today, has driven

7  that point home.  The businesses themselves are integrated

8  across jurisdictions, the finances, the technology, the

9  research and development, the personnel.  They are integrated

10  across North America, South America, Africa, Asia, the Middle

11  East, and Europe.  And it's not surprising that that's the case

12  in light of an enterprise that has 110 year history of

13  technology and innovation.

14           What we're dealing with is a company that has three

15  main business units:  the carrier business, which is largely

16  the subject of the Narnia transaction, as we call it, the sale

17  to Nokia Siemens, and I apologize ahead of time if we segue at

18  times into our code names.  But we've gotten to the point where

19  it's hard to separate them.  There's the Metro Ethernet Group,

20  the optical division.  And the enterprise division.

21           These businesses are operated in various countries

22  around the world in single companies.  It's not as if there's a

23  carrier company, and an M-E-N company, and an enterprise

24  company in the United States.  There's one.  It's Nortel

25  Networks, Incorporated.  And similarly the case in Canada with

1 Nortel Networks Limited.  And that repeats itself throughout

2 the organization around the world.

3       That operational integration has created challenges

4 that we've worked hard to try to resolve.  Challenges with

5 respect to finances, supply chain, and the like.

6       And that bring us to the two matters that we have

7 before you today.  The first, the interim funding and

8 settlement agreement relates to intercompany funding.  It takes

9 into account the fact that as a global enterprise focused on

10 profit generation, for many years, the Nortel group has used a

11 particular type of program to allocate profits and losses and

12 costs amongst the various entities within the Nortel structure.

13 It was an exercise that was focused on profit maximization, tax

14 minimization, and the movement of people and resources around

15 the world to help advance those goals.  I think it's easy to

16 say that that type of system works very well in an integrated

17 global enterprise when that enterprise is doing well.

18       But when it is facing difficulties, as we are facing

19 here with Nortel, it creates a problem and a set of issues, and

20 a set of issues that has been difficult, I think, for all of us

21 on the professional side to get our heads around.  I think it's

22 fair to say that things work well on the up escalator, and not

23 as well on the down escalator, but we've been working very hard

24 to try to solve those problems.

25       And it's by no means to say that the system, known as

1 Transfer Pricing, was perfect.  I think there have been issues

2 and audits and concerns about transfer pricing, but it is an

3 accepted international standard.  It is something that the

4 Nortel group has been using for over 10 years.

5          So, while it was imperfect, it was the best thing

6 that was available.  And it was functioning.

7          It was also a system that was based on forecasts.

8 Forecast to future performance and then truing up after the

9 fact.  In a sense, that fundamental element of the system

10 created a problem once the companies entered into insolvency

11 proceedings.  And so once we found ourselves in the post filing

12 or post petition period, the smooth flow of funds throughout

13 the Nortel enterprise began to slow down.  And in particular,

14 there were concerns and legitimate concerns raised by various

15 creditor constituencies, particularly in the U.S., as well as

16 with respect to the administrator in the Amia countries.

17          And so while the transfer pricing system, which was

18 really the life blood of, in particular N&L, the Canadian

19 operating company, remained an open issue.

20          The funding essentially ground to a halt as parties

21 began to analyze their rights and remedies whether or not, in

22 light of the progress of the case and the potential for asset

23 sales, the continued use of the transfer pricing regime, and

24 particularly its reliance on forecasts continued to make sense.

25          We also had to look very carefully about the impact

1  of transfer pricing with respect to past years, and tax audits,

2  and plans that had been made and implemented over a long period

3  of time.

4         And so about the March time frame, we began a series

5  of conversations.  Conversations with the official Committee in

6  the United States, the bondholder committee, the monitor and

7  the administrator, as well as the U.S. and Canadian debtors.

8  And we began a series of in depth meetings.  Some of those

9  meetings were cordial, some of them were a little frustrating,

10 others were almost confrontational at times.  But I think it's

11 a testament to the efforts of all of the professionals involved

12 that we were able to move past that and get to an agreement, an

13 agreement that allows essentially for the funding of the

14 Canadian estate through and including the end of the third

15 quarter of 2009, it allows for a process to be put in place to

16 hopefully avoid the need to come back to these two courts, as

17 well as to the High Court in London, to decide how to split up

18 the proceeds of any asset sales.

19        It resolves concerns that had been expressed about

20 potential litigation, threats of discovery, and it is not a

21 perfect document, much like the system we had going forward.

22 But I think it's fair to say that it is the result of heavy and

23 intense good faith negotiations.  An exercise that was

24 undertaken in an area where we had no rules to operate in.  An

25 international context that provides challenges and that too

1  many times would have provided the easy way out of folks going

2  back to their corners and arguing about things.

3          But everyone kept an eye on the idea of value

4  maximization which, notwithstanding the fact that our systems

5  may differ in some ways, I think each one of our insolvency

6  regimes focus on providing an opportunity to maximize value for

7  our stakeholders, for our creditors, for our employees.  And it

8  is in that spirit that the interim funding agreement was

9  negotiated.

10         In simple terms, what we have been able to accomplish

11 is providing a mechanic for providing $157 million of cash that

12 will be provided by the U.S. estate, NNI, Nortel Networks,

13 Incorporated, to Nortel Networks Limited.  It will be paid on a

14 monthly basis, and monthly installments, and it will be paid

15 through and including September 30th.

16         From the U.S. creditors' perspective and the U.S.

17 estate's perspective, built into the system and the agreement

18 is protection against the risk of overpayment.  So, that if

19 there is overpayment between the amounts of 26 and $30 million,

20 there would be a charge created under the Canadian order.  And

21 there's a system that will be agreed to amongst the parties to

22 figure out whether or not there has, indeed, been any

23 overpayment.  And the rights of all parties with respect to

24 that is reserved.

25         What we have here, as well, is a recognition by the

32

1   U.S. estates and by the U.S. creditors that there has been a

2   post petition benefit, an administrative benefit received by

3   the U.S. estates under Sections 503 and 507 of the Bankruptcy

4   Code.

5           It's also important to note that this is a tri party

6   agreement.  It brings into the system the administrator from

7   the United Kingdom, Mr. Bloom and his colleagues.  And that was

8   a very important element of this agreement because there was a

9   legitimate concern expressed by the U.S. creditors and felt by

10  the U.S. estates of the risk that amounts could be paid, absent

11  an agreement, by the UK administrator that might be seen as

12  insufficient or somehow having to be repeated.  We were

13  concerned, in sum, about the risk of double payment.

14          And so what we have is an agreement with the UK

15  administrator that the amount of $96 million or so, a little

16  bit more, is the full and final amount that the UK

17  administrator and those estates would be entitled to under the

18  transfer pricing regime or any other method of administrative

19  expense recapture for the nine-month period, from January 1 to

20  September 30th.

21          Of that, $76 million approximately will be recaptured

22  through, in a sense, a netting amongst the EMEA entities

23  themselves.  So, it doesn't include any issues relating to

24  North America.

25          There will be an additional $20 million that would be

33

1  paid by NNL, the Canadian estate, to the UK after certain

2  thresholds are met in connection with asset sales.

3          The agreement also deals with some of the issues that

4  we have to address looking forward.  Recognizing, as we were

5  negotiating this, that the likelihood of substantial asset

6  sales for the debtors' businesses would be occurring in the

7  very near term.  And it is just a coincidence that we happen to

8  be here today with that first major asset sale.

9          The agreement also envisions a process by which

10  proceeds relating to asset sales will be divvied up, a term

11  that we've been using in our negotiations as the black box.

12  Proceeds will go into a black box, the parties and all

13  interested parties that have interest in those funds will have

14  the right to make submissions according to a protocol that we

15  were in the process of drafting.

16          That protocol, where we have distributed drafts of

17  that and are in the process of discussing, is envisioned to be

18  something that would require very little participation or

19  intervention or bother by these two courts.  The view being

20  that once we have a fair and reasonable and independent body

21  deciding the allocation, that we would simply come to both of

22  these courts for confirmation that those amounts are

23  appropriate, and that due process would be available to all

24  parties who are interested in the allocation of those

25  resources.

1          And that would involve, as well, not just the sale of

2   assets, but the extinguishment of licenses and, again, that is

3   an important issue here.  The intellectual property of the

4   Nortel enterprises held largely in Canada, I would say the vast

5   majority held in Canada at NNL, and flows through the rest of

6   the Nortel enterprise through royalty free licenses.  And the

7   termination of those licenses under the agreements will provide

8   the opportunity for value to be provided to the various

9   entities throughout the Nortel world.  And our allocation

10  protocol, which we are in the middle of negotiating, would help

11  us accomplish both the allocation of proceeds relating to asset

12  sales, as well as the allocation of proceeds relating to

13  license relinquishment.

14          I should note while we're at the point of allocation,

15  the U.S. Trustee has made a request for a clarification, which

16  we've added to the order.  The clarification that this order,

17  in and of itself, does not approve either here or in Ontario

18  for the allocation of any particular proceeds.  But rather sets

19  the stage for the parties to come back to these courts with a

20  protocol for approval.  And it is the intention of all of the

21  interested parties, the core parties, as we refer to them in

22  the agreement, to come back to both of these courts for

23  approval of that allocation protocol.

24          And so we have added a paragraph in the U.S. order,

25  and I want to make it clear to Mr. Justice Morowitz, as well,

1 that it is certainly the intention of all of the core parties

2 that there would also be a companion order issued out of the

3 Ontario Court, as well, before any allocation protocol would be

4 agreed.

5          There are a couple of conditions, Your Honors, to the

6 approval:

7          First, we need both of these courts to enter an

8 order.  And we hope that that will be accomplished today.

9          Second, we needed to agree to certain amendments to

10 the cross border protocol between the United States and Canada.

11 And we engaged in good faith negotiations through the course of

12 last week to do so.  And as one might expect, we reached an

13 agreement at about 9:30 on Friday night, and were able to sign

14 the agreement on that part.

15          One thing I would note is at the time, there were

16 certain representations made in connection with the official

17 Committee and providing information to the official Committee.

18 I was asked prior to the hearing from the bondholder group to

19 clarify that we would be providing equivalent notice to them

20 under those agreements, and we agree to do that.

21          In many respects, the amendments to the cross border

22 protocol are clarifications as to what types of matters would

23 require joint hearings of this sort.  And we have been able to

24 do that, and I think listed 17 or 18 separate matters which we

25 agree are matters of such import that we would come back to

1  both courts and seek relief, if necessary.

2         There was also an agreement that we reached with the

3  Creditors' Committee expressing some concerns about certain

4  material transactions that might be taken by the Canadian

5  debtors.  And in coordination with the monitor, we reached an

6  agreement with the Committee on that front.  It's not embodied

7  in the letter -- I mean in the actual interim funding and

8  settlement agreement, but we do have a letter to that effect.

9  And that, as I said, was agreeable to the debtors, as well as

10 to the monitor.

11        The final condition was an order of direction by the

12 UK court authorizing the UK administrator to take certain

13 actions in connection -- maybe not -- "authorizing" is the

14 wrong term.  Maybe allowing is the right term.  And that order

15 was entered by the high court last week.  And so we have

16 satisfied that condition.

17        And so with the approval of this order by the

18 Bankruptcy Court here in Delaware, and the Ontario court, as

19 well as the approval of the cross border protocol, we will have

20 satisfied all of the conditions to the interim funding and

21 settlement agreement.  And we would anticipate that the funding

22 mechanic would start immediately.

23        As I said,  Your Honor, we did accommodate a comment

24 that had been made by the Office of the U.S. Trustee.  And we

25 believe with that addition to the order relating to the fact

1 that we will come back for approval of any allocation

2 procedures, that we have addressed all of the objections, if

3 you will, that had been raised.

4        In addition, Your Honor, we have two witnesses in

5 court who we have available for testimony, as well as proffer,

6 who would be able to provide the background, if the courts so

7 desire, with respect to the facts and circumstances.  Both

8 justifying the funding needs in Canada, the means by which the

9 numbers were calculated that are embodied within the interim

10 funding agreement, and the prospects for the continued

11 operation of the business and -- in light of these funding

12 arrangements, and that would be Mr. Paul Karr, who is an

13 officer of both NNI and NNL, as well as a director of NNI.  And

14 Mr. Doolittle, who you've seen before, the treasurer of Nortel,

15 both in the U.S. and in Canada.  And I am happy to provide a

16 proffer for both of those gentlemen, if necessary.  I'm also

17 happy to put them on the stand, if anyone has any comments.

18        So, I think on that -- at that point, Your Honor, I

19 have finished the presentation with respect to the interim

20 funding agreement.

21        We will make a couple of other comments with respect

22 to the Nokia Siemens transaction, but I think it might be

23 worthwhile at this point for others, if they have anything to

24 say both here, in Delaware, and in Toronto with respect to the

25 interim funding agreement to do so.  And if there are any

38

1  concerns, we can address them.  And if there's a need to put

2  the witnesses on, we're willing to do so.

3          THE COURT:  All right.  Thank you, Mr. Bromley.

4          Shall we hear from Mr. Hodara for the Committee?  Mr.

5  Hodara, good morning.

6          MR. HODARA:  Good morning.  Thank you, Your Honor.

7  And good morning, Mr. Justice Morowitz.

8          MR. JUSTICE MOROWITZ:  Good morning, Mr. Hodara.

9          MR. HODARA:  Good morning.  The official Creditors'

10 Committee is fully supportive of the interim funding agreement.

11 And I think that Mr. Bromley has done a very fine job in

12 explaining not only the terms of the agreement, but the issues

13 and the considerations of the parties in the various

14 jurisdictions that went into this complex agreement.

15         In supporting the agreement, Your Honor, a couple of

16 items are worthy of note.  Because I think that they could be

17 referred to in future proceedings before these two courts, and

18 because they were of such substance in the discussions amongst

19 the parties.  In particular, Mr. Bromley referred to the

20 history of the transfer pricing agreement amongst the various

21 Nortel entities.  A system that, as Mr. Bromley indicated, has

22 been the subject of various permutations, questions, and

23 involvement of tax authorities in a number of jurisdictions.

24         Two of the provisions in the interim funding

25 agreement that are of utmost importance to the Creditors'

1  Committee are Section 10, which is titled Scope of this

2  Agreement.  And in that provision, it says, among other things,

3  that, "This agreement is not and shall not be deemed to be an

4  acknowledgment by any party of the assumption, ratification,

5  adoption, or rejection of the transfer pricing agreement."  The

6  same with respect to allocation of proceeds.

7       And then Section 20 of the agreement, which is title

8  Reservation -- I'm sorry.  The last bullet of Section 20 is

9  titled Reservation of Rights.  And that provision, among other

10 things, says, "Nothing in the agreement shall constitute an

11 amendment, modification or waiver of rights of any party under

12 any other agreement," and now I'm skipping through the

13 paragraph so I don't have to quote the whole thing, "including

14 the transfer pricing agreements, including the right to object

15 to the propriety of any payments made under or in connection

16 with the transfer pricing agreements, or any offset arising

17 therefrom, or otherwise."  And the provision goes on to state

18 other very important aspects of the reservation.

19      But I do want to stop at that point in the paragraph

20 on the phrase "or any offset arising therefrom, or otherwise"

21 because that's an important provision as it relates to a

22 comment that Mr. Bromley correctly made.  That the Creditors'

23 Committee has acknowledged that there have been benefits to the

24 United States entities on an administrative basis.  And that is

25 the fundamental purpose of the agreement to permit funding or

1  payments to occur at this time from the United States.

2         But it's also recognized here by the parties that

3  there could be offset rights that could implicate the

4  entitlement of the U.S. estates to offset amounts that could

5  have been owing.  And so it was fundamental to the EMEA estates

6  and to the Canadian debtors that it be recognized that

7  notwithstanding those potential offset rights that the

8  agreement to pay an additional $157 million at this time,

9  that's in addition to the 30 million that was paid at the

10  outset of these cases, is without right of setoff, other than

11  with respect to the mechanism that Mr. Bromley described.  And

12  yet there could be rights of setoff, and those will be relevant

13  or could be relevant in the future as the rest of the issues

14  between these estates are worked through.

15         And so, Your Honor, with those specific reservations

16  of rights, the Committee does fully support this intercompany,

17  interim funding agreement.

18         THE COURT:  Thank you, Mr. Hodara.  Anyone else?

19         MR. JUSTICE MOROWITZ:  We have Mr. Tay in Toronto,

20  and then I believe the monitor, either Mr. Carfagnini or Mr.

21  Pasquariello will be addressing.

22         THE COURT:  Why don't we give the Toronto attorney --

23         MR. TAY:  Thank you.  Thank you.  When I handed it to

24  Mr. Bromley for opening statements, I hadn't realized that he

25  was going to do his presentation.  So, he saved me a lot of

1  trouble in terms of my own presentation on the interim funding

2  agreement.

3          The -- from the Canadian's perspective, the Canadian

4  estate's perspective, Your Honors, we're in some ways the ham

5  in the sandwich.  In good times, what happened was Canada would

6  be funding a lot of the expenses up front, doing a lot of the

7  R&D, paying a lot of the overheads.  And then as part of this

8  transfer pricing arrangement that you've heard so much about,

9  would be compensated largely by the U.S. for having incurred

10  all those expenses, and that's how things happened.

11          And so on the date of the filing, we found ourselves

12  at a point in time where we were at the stage where we had

13  expended these monies.  But because of the filings, there was

14  an interruption in the collection of the monies from the other

15  estates in terms of the cost that Canada was bearing for the

16  rest of the Nortel empire.

17          From the Canadian estate's perspective, it was clear

18  to the companies, the Canadian companies, and to the monitors,

19  the court officer, recognizing that there are discrete Canadian

20  creditors while there are overlap creditors for the

21  bondholders, there are also discrete Canadian creditors whose

22  rights had to be protected in the same way that the U.C.C. is

23  trying to protect the rights of the discrete U.S. creditors and

24  the administrator in the EMEA regions are trying to protect the

25  rights of the people in their jurisdictions.

42

1          And so what became clear from the Canadian

2   perspective is that it was not appropriate that, as I used the

3   phrase before, Your Honor, here before that Canada should not

4   be burning its furniture to keep the rest of the empire warm.

5   And so the complex negotiations that Mr. Bromley referred to

6   was entered into because Canada was fast running out of money.

7   And at the time of the filing, we were short of money because

8   of the stage in the cycle.  But because we know that I would be

9   filing in these different jurisdictions, we did not feel that

10  it was appropriate to try and repatriate any of that money

11  prior to the filing.

12          And as a result, Canada was left, in essence,

13  underfunded while the bulk of the cash in the Nortel empire was

14  in the U.S., in the EMEA regions, and in the rest of the world.

15  And so it became extremely clear that we needed to solve this

16  problem.  And as Mr. Bromley has outlined to you after a huge

17  amount of effort on everybody's part, on the one hand, trying

18  to -- everyone recognizing that if you don't keep Canada alive,

19  there is no Nortel to speak about because it's one integrated

20  business.

21          And on the other hand, each of the fiduciaries in the

22  different estates make sure that they were not overpaying or

23  prejudicing their own discrete set of creditors for the benefit

24  of the other estates.

25          And so it's this difficult dynamic tension that give

1  rise to many of the issues that issues that we had incoming to

2  this agreement.  By having come to this agreement, we have

3  solved the funding problem for a short time.

4          As you've heard, this interim funding provides

5  funding just til the end of Q-3 in Canada.  And we'll have to

6  figure out what we do for periods after that.

7          But having said that, I think it's a great

8  achievement on the part of all the people involved in the

9  various estates to come to this agreement.  And there are -- I

10 won't belabor the points that have already been covered.  But

11 there are a couple of Canadian implications to this, Mr.

12 Justice Morowitz, that I need to bring your attention to.

13         And that is that you've heard out of the 157 million

14 that's being paid --

15         (Audio interrupted - Technical Difficulties)

16         MR. HARRON:  Excuse me, Your Honor.  While we're down

17 with technical difficulties.

18         THE COURT:  Yes, Mr. Harron.  Good morning.

19         MR. HARRON:  Good morning, Your Honor.  I received an

20 e-mail from several of the parties that were on the phone.

21 They cannot hear when those in Canada speak.  I don't know if

22 we can --

23         MS. MURIN:  I'm sorry?

24         MR. HARRON:  I've been informed by a party on the

25 phone that they can't hear when the Canadians speak.

1          MR. TAY:  ... (recording commences with the

2    following) ... that it will, in fact, be a repayment by the

3    Canadian estate of such amount.  And that -- so, this

4    contingent payment, I'm sorry, is secured by a charge, a new

5    charge to be created in the Canadian order which charge will

6    rank with where the EDC charge is right now.  And so that's

7    just -- I just wanted to draw that to your attention.

8    Similarly, part of this deal requires that in -- if certain

9    circumstances are achieved, that there will be a payment from

10   the Canadian estate to the EMEA estates of two $10 million

11   tranches.  And this is a recognition of the fact that

12   traditionally under the transfer pricing arrangements, that

13   Canada would be the one collecting these payments, and then

14   allocating them to the various so-called main companies or

15   profit centers as they were intended to be, including the UK.

16        And so there's a recognition here that as a final

17   settlement, there would be a payment of two $10 million

18   tranches to the EMEA regions.  And, again, it's going to come

19   from asset sales, and it's going to be subject to ensuring that

20   the Canadian estate has sufficient liquidity to pay those

21   payments.  They're very complex provisions, I won't get into

22   them.  But suffice it to say that if those events are

23   triggered, and Canada will be paying a total of $20 million to

24   the EMEA estates in total settlement under this agreement, and

25   to secure that, there will be a shortfall charge in favor of

1  NNUK, which will rank with the intercompany -- existing

2  intercompany charge, which is the last charge there is in the

3  various court charges that you've created, Justice Morowitz.

4          And then I simply want to emphasize again, because

5  that point has been raised a number of the Canadian creditors,

6  that nothing in this agreement is intended to deal with the

7  allocation of funds.  That we will be working on some kind of

8  protocol that will absolutely have to be brought back to this

9  Court for approval when we arrive at an agreement as to a

10  protocol to deal with the allocation of funds.

11          And so all the Canadian creditors will have an

12  opportunity to examine that, and to make submissions as

13  necessary.

14          Those are my submissions in terms of the interim

15  funding agreement.

16          The cross border protocol, you mentioned that you had

17  a number of materials.  I just wanted to make sure that you

18  have the supplementary report.

19          MR. JUSTICE MOROWITZ:  Yeah, I have the Supplementary

20  15th and --

21          MR. TAY:  So, as long as you have that --

22          MR. JUSTICE MOROWITZ:  -- the three that have been

23  through the blackline Schedule A.

24          MR. TAY:  Yeah.  Right.  And so, you know, we have no

25  objections to those changes, obviously.  And the monitor -- we

46

1  will hear from the monitor.  I think we're all in accord with

2  the changes to the cross border protocol, and we would ask that

3  Your Honor approve those changes in part, because it's a

4  condition precedent to the effectiveness of the interim funding

5  agreement.

6            So, those are my submissions on that issue, unless

7  either judges have any questions.

8            MR. JUSTICE MOROWITZ:  Thank you, Mr. Tay.  Judge

9  Gross, do you have any further questions of Mr. Tay?

10           THE COURT:  I do not.  Thank you.  I know that we

11 have --

12           MR. JUSTICE MOROWITZ:  Okay.  The next would be --

13           THE COURT:  We may have others who wish to be heard

14 here, I don't know about in Canada.

15           MR. JUSTICE MOROWITZ:  We have counsel to the monitor

16 who wishes to address.

17           And I also -- I think it's Mr. Gottlieb on behalf of

18 the joint administrators from the UK.

19           THE COURT:  All right.

20           MR. JUSTICE MOROWITZ:  So, we'll take them in that

21 order.  Mr. Pasquariello first, and then followed by Mr.

22 Gottlieb.

23           MR. PASQUARIELLO:  Good morning, Judge Gross.

24           THE COURT:  Good morning.

25           MR. PASQUARIELLO:  Good morning, Mr. Justice

1 | Morowitz.

2 | On behalf of Ernst & Young as the monitor.  The

3 | monitor supports the interim funding settlement agreement and

4 | would echo the observations already made by the various counsel

5 | that the agreement is the result of great cooperation among the

6 | debtors and the stakeholders, and the culmination of lengthy

7 | and complicated set of negotiations.

8 | In respect of the CCAA applicants, the funding

9 | settlement agreement is quite important.  As outlined in the

10 | monitor's 15th report, and in particular the cash flow forecast

11 | attaches Appendix B thereto, the cash flow forecast for the

12 | subject period indicates that the applicants will experience a

13 | negative cash flow of 23 million during the period to September

14 | 30, 2009.  And that includes the 86 million of proceeds from

15 | the Westwind sale, which Justice Morowitz will recall, was the

16 | Calvary property sale for which approval was obtained some time

17 | ago, and also the $157 million of anticipated payments from NNI

18 | under the settlement agreement.

19 | Exclusive of those items, the negative forecast would

20 | result in a cash flow of approximately 266 million to September

21 | 30th.  And, therefore, obviously the settlement agreement

22 | provides the necessary funding in order for the CCAA applicants

23 | to have adequate resources to fund their operations through to

24 | September 30th, 2009.

25 | As Mr. Tay has alluded to, further negotiations will

48

1  be required for funding passed September 30th.  But the interim

2  funding settlement agreement, I would submit, is a great step

3  to moving the case forward.  And we fully anticipate that the

4  parties will be responsible and flexible in providing a further

5  mechanic, if required, to achieve ongoing funding for the

6  benefit of all stakeholders, both north and south of the

7  border, in the future.

8          For these reasons, the monitor recommends approval of

9  the settlement agreement.  And also recommends the approval of

10  the amendments to the initial order, which Mr. Tay has taken

11  the Court through in Canada for the creation of the -- both the

12  interim funding charge and the shortfall charge, which flow

13  from the settlement agreement as being reasonable in the

14  circumstances.

15          With respect to the amendments to the cross border

16  protocol, the monitor concurs that those amendments will

17  enhance the communication and cooperation between the

18  respective courts, while confirming their independence.  And,

19  therefore, in that respect, the monitor also recommends that

20  those proposed amendments to the protocol be approved by both

21  this Court and the U.S. Bankruptcy Court.

22          Those are my submissions on behalf of the monitor,

23  unless either Judge Gross or Your Honor has any questions.

24          MR. JUSTICE MOROWITZ:  Thank you, Mr. Pasquariello.

25  I have no questions.

1          Judge Gross, do you have any?

2          THE COURT:  Nor do I.  Thank you.

3          MR. PASQUARIELLO:  And I'll just note to the extent

4    Your Honor may have any questions specifically of the monitor,

5    Ernst & Young, both Mr. Murray McDonald and Mr. Brad

6    Beconcamper (phonetic) are present in the Ontario Court.

7          THE COURT:  Excellent.  Thank you.

8          MR. PASQUARIELLO:  Thank you.

9          THE COURT:  Thank you.

10          MR. JUSTICE MOROWITZ:  Mr. Gottlieb?

11          MR. GOTTLIEB:  Thank you, Your Honor, and Judge

12    Gross.  We're counsel to the joint administrators in the UK.

13          Just two brief points:

14          One, the joint administrator supports the motion by

15    the applicants today.  And respectfully requests that the order

16    be granted.

17          And second point, although it's not relevant to the

18    approval of the agreement today, the joint administrator takes

19    certain issue with a statement made in Mr. Doolittle's

20    affidavit at Paragraph 17.  I would just like to state for the

21    record that it reserves its rights with respect to that, and

22    that deals with the IP, the ownership of the IP and IP rights.

23          And, Your Honor, we filed in this Court an

24    affirmation of Stephen John Harris.  And the reservation of

25    that right is set out in Paragraph 14 of the affirmation of Mr.

1  Harris.

2         And subject to any questions, Your Honor or Judge

3  Gross, those are our submissions.

4         MR. JUSTICE MOROWITZ:  Thank you, Mr. Gottlieb.  I

5  have no questions.

6         Judge Gross?

7         THE COURT:  No questions from here either.  Thank

8  you.

9         MR. GOTTLIEB:  Thank you.

10        MR. JUSTICE MOROWITZ:  Thank you.  Is there anybody

11 else in the Toronto Court that wishes to address this motion?

12                    (No audible response heard)

13        THE COURT:  All right.  I do have someone here who

14 would like to be heard.

15        MR. JUSTICE MOROWITZ:  Judge Gross, I think the only

16 other open point, I think, that Mr. Bromley had referenced was

17 whether we wanted to hear any live evidence.  I will leave

18 that, Judge Gross, to your discretion.  It will not be required

19 in the Toronto Court.

20        THE COURT:  All right.  Thank you very much, Mr.

21 Justice Morowitz.

22        Yes?

23        MR. KRELLER:  Good morning, Your Honor.  Good

24 morning, Mr. Justice Morowitz.

25            Tom Kreller of Milbank, Tweed, Hadley & McCloy

1 appearing on behalf of the ad hoc bondholder group.

2           MR. JUSTICE MOROWITZ:  Good morning.

3           MR. KRELLER:  Your Honor, I'll be brief.  We filed a

4 statement in support of the motion for approval of the interim

5 funding agreement.

6           THE COURT:  Yes.

7           MR. KRELLER:  Mr. Bromley, and Mr. Hodara, Mr. Tay,

8 and others have, I think, accurately summarized the relevant

9 terms of agreement.  I certainly would echo the statement that

10 it's fraught with complexities that I think the parties worked

11 very hard to resolve.  I think hearing everyone talk about how

12 complex it is, it's probably the first time we've all agreed on

13 anything, at least the first go around, in this process.

14           Your Honor, the agreement, I think, reflects a

15 careful balancing act that the parties have all engaged in in

16 trying to find a resolution to a difficult funding situation

17 while, at the same time, reserving rights in the future, and

18 trying to put processes in place to deal with a number of

19 difficult and important issues in the case surrounding the

20 transfer pricing regime, intercompany claims and relationships,

21 interjurisdictional relationships, allocation of proceeds, all

22 the things you've heard about.

23           The bondholders, as creditors, both here in the U.S.

24 and also in the Canadian cases, may be uniquely sensitive to

25 some of those complexities.  We view the interim funding

52

1  agreement as a carefully crafted and ultimately pragmatic

2  resolution to a near term problem, and hopefully the first step

3  in a process where we can resolve these other difficult issues

4  with the same kind of consensus we were ultimately able to

5  gather.

6          For those reasons, the bondholder group fully

7  supports approval of the interim funding agreement.

8          THE COURT:  All right.  Thank you, Mr. Kreller.

9          MR. KRELLER:  Thank you, Your Honor.

10         THE COURT:  Anyone else?  Mr. Harron, good morning.

11         MR. HARRON:  Good morning, Your Honor.  And good

12  morning, Justice Morowitz.

13         For the record, Ed Harron on behalf of the joint

14  administrators for the Nortel Network, UK Limited entity.

15         Your Honor, I rise only to make one point of

16  clarification.  Similar to the point raised by my colleague in

17  the Canadian court, the administrators take issue with some of

18  the statements made in Paragraph 14 of the approval motion that

19  was filed in this Court.

20         Your Honor, just for the record, the administrators

21  state that the interim funding settlement agreement does not

22  affect -- and the administrators reserve all rights in respect

23  of both the allocation and sale proceeds, consistent with what

24  Mr. Bromley already represented to the Court, but also with

25  respect to the ownership interest of intellectual property

53

1  rights.

2            THE COURT:  Okay.

3            MR. HARRON:  Thank you, Your Honor.

4            THE COURT:  Thank you, Mr. Harron.  Anyone else here

5  in the United States?

6                  (No audible response heard)

7            THE COURT:  No one else.  All right.  Mr. Bromley,

8  did you wish to make any final comments?  I take it that the

9  reservation of rights relating to Mr. Harron's concerns about

10  the allocation and ownership of the intellectual property do

11  not impact the settlement?

12            MR. BROMLEY:  No, Your Honor.  The agreement itself

13  actually has a very specific provision that deals with the

14  treatment of intellectual property and licenses relating

15  thereto.  The -- I think it's fair to say that the statements

16  that have been made, both in the motion papers here and in Mr.

17  Doolittle's affidavit or declaration are statements of the

18  company's position with respect to those.

19            THE COURT:  Yes.

20            MR. BROMLEY:  We believe they are the correct

21  position.  But we recognize that all parties have reserved

22  their rights on that, and certainly there's nothing intended by

23  this application or the orders to compromise any rights in that

24  regard.

25            THE COURT:  Very well.  Thank you.

1        As far as evidence is concerned, I agree with Mr.

2 Justice Morowitz that I think our record is sufficient at this

3 point based upon the declarations, as well as what has

4 transpired in this case to date.  I don't think I need the

5 proffers.  I'm prepared really at this point, subject to any

6 final comments or additional comments you may have to adjourn,

7 and speak with Mr. Justice Morowitz, and come back, and we

8 would state your ruling on the record.

9        MR. BROMLEY:  That would be fine, Your Honor.  I

10 certainly have nothing further other than I can give you the

11 marked copy of the order so that you can have that in front of

12 you when you speak to Mr. Justice Morowitz.

13        THE COURT:  That would be helpful.  Thank you, Mr.

14 Bromley.

15        MR. BROMLEY:  May I approach?

16        THE COURT:  Yes, of course.

17        MR. BROMLEY:  Thank you.

18        MR. JUSTICE MOROWITZ:  And at this end, Judge Gross,

19 thank you.  And, Ms. Stam, do you have any copies of the draft

20 order?  And, Mr. Tay, is there anything further that you wish

21 to --

22        MR. TAY:  I have nothing to add, Your Honor.

23        MR. JUSTICE MOROWITZ:  Thank you.

24        THE COURT:  All right.

25        MS. STAM:  Your Honor, there are two --

1          THE COURT:  Excuse me.

2          MS. STAM:  There's --

3          MR. JUSTICE MOROWITZ:  Ms. Stam just has a few

4  comments, Judge Gross, before we break.

5          MS. STAM:  Your Honor, just so that you're aware, we

6  only added two draft orders.  One is the third amended

7  (indiscernible - feedback) although there are still additional

8  changes that Mr. Tay will make further (indiscernible -

9  feedback) on, but it involves the --

10          MS. MURIN:  If counsel would please step to the

11  microphone.

12          MS. STAM:  And the second is the draft order

13  approving the interim funding agreement itself.  Both with one

14  exception that Mr. Tay will go over when he discusses the

15  initial order later, are in the form that were filed with the

16  motion materials.

17          MR. JUSTICE MOROWITZ:  Okay.  The Court in Delaware,

18  would you like Ms. Stam to repeat the first part of her

19  presentation?

20          THE COURT:  Yes, please.  We missed the very first

21  part.

22          MS. STAM:  I apologize, Judge Gross.  I was --

23  indicated that we were handing up two draft orders:  One was

24  the third amended and receipted initial order in Canada dealing

25  with the creation of the two charges contemplated under the

1 interim funding agreement, but which also had additional

2 changes that Mr. Tay will provide submissions on later.  As

3 well as a second order of the interim funding approval order,

4 both substantially in the same form that were filed with

5 materials.

6          THE COURT:  Thank you.

7          MR. JUSTICE MOROWITZ:  Mr. Tay, do you intend to make

8 those submissions now or part of the second motion.

9          MR. TAY:  No, after.  As a part of the Canadian

10 process.

11          MR. JUSTICE MOROWITZ:  Okay.  Thank you.  Judge

12 Gross, do you think it's an appropriate time now to take an

13 adjournment.  This time --

14          THE COURT:  Yes.

15          MR. JUSTICE MOROWITZ:  -- will be somewhat uncertain,

16 but we'll relay that back to the court as soon as we have a

17 better idea.

18          THE COURT:  Thank you, Mr. Justice Morowitz.

19          MR. JUSTICE MOROWITZ:  Thank you.

20          THE COURT:  We'll take a recess now.

21          (Recess 10:38 A.M./Reconvene 10:54 A.M.)

22          THE COURT:  Please be seated, everyone.  Thank you so

23 much.  I will defer to my esteemed colleague in Canada, Justice

24 Morowitz.

25          MR. JUSTICE MOROWITZ:  Thank you, Judge Gross.  I

1  think just by way of housekeeping, an update on the other

2  matter, the Eddie Bauer matter at 11:30, that matter will be

3  deferred pending the completion of this hearing, and

4  arrangements have been made with Judge Walrath accordingly.

5          On the first motion this morning, this, I think, is

6  where you'll see some divergence of practice between the

7  Ontario courts and the Delaware court.  The record in Ontario

8  has been endorsed as follows:

9  ]          The motion is granted.  The order has been signed in

10  the form requested, brief reasons will follow.

11          And now over to Judge Gross for the disposition in

12  Delaware.

13          THE COURT:  Well, I am also prepared to grant the

14  motion, of course.  Because it is clear that the operations of

15  these companies are extremely integrated.  And the last thing

16  that the debtors can afford is to have any piece of that

17  integrated operation, that consolidated operation fail.  And

18  there is a benefit to all.  The -- just hearing and reading the

19  proposed settlement makes it clear that even after a two-day

20  trial, which had originally been scheduled, it would have been

21  very difficult for this Court to have arrived at an allocation

22  process as fair as these parties have here in this settlement.

23          And it certainly meets the requirements of Section

24  105(a) and 363(b), as well as Rule 9019.  It is in the best

25  interest of the debtors' estate.  And I am certainly most

1  satisfied with the fairness of the settlement and will approve

2  it.

3          MR. JUSTICE MOROWITZ:  Thank you, Judge Gross.  Well,

4  that concludes the first motion.

5          THE COURT:  And I do have the order here.  And I will

6  sign it.

7          And now we're moving to a more contested matter, I

8  take it.

9          MR. JUSTICE MOROWITZ:  Judge Gross, this is the Nokia

10 Siemens Network B.V. bidding procedures motion.

11         THE COURT:  That is correct.

12         MR. JUSTICE MOROWITZ:  And as I outlined at the

13 outset of the hearing today, objections, I understand, have

14 been filed in the -- in your Court.   And I think the

15 appropriate place to hear those objections first is from the

16 Delaware court.  And then we will deal with the presentations

17 in the CCAA.

18         THE COURT:  Yes, sir.  Thank you, Justice Morowitz.

19 Mr. Bromley?

20         MR. BROMLEY:  Thank you, Your Honor.  Thank you, Mr.

21 Justice Morowitz.  And thank you for the entry of the order on

22 the interim funding agreement.

23         We're now turning our attention to the transaction

24 that the debtors have entered into with Nokia Siemens Networks

25 for the sale of a substantial portion of the debtors' carrier

1  business.  If I can just do a little housekeeping at this

2  point.  The way we would proceed is I'd make some introductory

3  remarks with respect to the transaction and what it is intended

4  to accomplish and the relief we will be seeking.

5          Then my partner, Lisa Schweitzer, will take us

6  through the witnesses.  We will then deal with the objections,

7  to the extent they continue to exist.

8          We do have, I think, a reason to put witnesses on in

9  connection with our affirmative case.  And so we would ask for

10 the Court's indulgence in doing so.

11         THE COURT:  Of course.

12         MR. BROMLEY:  Thank you very much, Your Honor.

13         So, the transaction that we're here today to consider

14 is a transaction to sell material assets of the debtors, both

15 in the United States and in Canada, and elsewhere, but

16 primarily in the United States and Canada, related to the

17 carrier business.  The carrier business, as we described

18 earlier, is one of the three main lines of business that Nortel

19 is engaged in.  And, indeed, the carrier business is named that

20 because the largest customers of this business are carriers.

21 They are the telephone companies of the world for those who

22 still remember that terminology, the Verizons, the Sprints, and

23 the like.  And Nortel has been one of the largest providers of

24 the infrastructure relating to these wireless networks.

25         And in particular, there are two technologies that

1 we're talking about the CDMA, which stands for code division

2 multiple access, a 3G technology, and LTE, which is long-term

3 evolution technology.

4        This motion and this hearing is a seminal decision in

5 these cases.  When the entry of the agreement was announced a

6 week ago this past Friday, it was accompanied by a press

7 release that indicated a couple of things:

8        Not only was this transaction being announced, but

9 also that Nortel had taken a decision to engage in discussions

10 with respect to the sale of other material assets, as well as

11 to begin the process of delisting its stock on the Toronto

12 stock exchange.

13       These are very gut wrenching decisions that have been

14 made by a very proud company.  But nevertheless, they are the

15 right decisions in the view of the company and its stakeholders

16 to be taken at this time.

17       Nortel operates in a very competitive environment. A

18 competitive environment where scale and financial resources are

19 paramount.  And, unfortunately, the development of technology

20 and competition, combined with the financial crisis that

21 emerged and exploded over the past nine months, has conspired

22 against Nortel and leads us to this situation where we are

23 doing our best in a very difficult environment.

24       In particular, the process by which we've reached the

25 decision to sell the CDMA and LTE businesses to Nokia Siemens

1   pursuant to an auction process has been highlighted by the

2   themes that were established in the first motion, which is the

3   complexity of the business and the international

4   interconnectedness of it all.

5          These are complicated assets.  They are being offered

6   for sale in the context of an evolving process.  It's not as if

7   every other competitor in this space has exactly the same

8   needs.  And, therefore, what we're talking about in terms of

9   trying to market these specialized assets, not just these, but

10  any others that the company has, is trying to find the right

11  mix.  The right mix of assets and buyer.  And we are, I think,

12  faced with a process that most would agree is complex.

13         In particular, the intellectual property footprint of

14  Nortel is overlapping.  And so there are certain aspects of the

15  business that have to be sold, certain other aspects of the

16  business that are retained and licensed, and certain elements

17  of transactions that have to be matched, if you will, almost

18  like a Lego set, with other transactions that are being

19  considered.

20         As a result of these challenges, we have engaged in a

21  highly consultative process.  We have had over the past several

22  weeks in our offices in New York probably at any given time 20

23  or 30 representatives of various constituencies, whether it be

24  purchasers, the Official Creditors' Committee, the monitor, the

25  administrator from the UK, their financial and legal advisors,

62

1  the bondholders, it has been a revolving door of participants

2  in these processes.

3        So, it is an exercise that I think has yielded the

4  best result at this point with respect to the CDMA business.

5  It is a transaction that we would be seeking under the U.S.

6  Bankruptcy Code approval under Section 363, in particular,

7  363(f) of the Bankruptcy Code, for the sale of certain hard

8  assets, for the sale of intellectual property rights.  Under

9  Section 365, as well, for the assumption and assignment of

10  certain leases, subleasing of certain elements.  We are looking

11  at a transaction that we believe will maintain the jobs of well

12  over 2,000 individuals.  We're looking at an intellectual

13  property license which will allow this business and these

14  assets to be sold, but also to maximize the possibility that as

15  we engage in further transactions, that we will be able to

16  maximize the value of those remaining assets.

17        It also involved something that does tie back into

18  our earlier discussion, which is something that is known as

19  transition services.  These businesses are so integrated that

20  there's going to be a fairly long lived residual responsibility

21  for the debtors, both the U.S. debtors and the Canadian

22  debtors, to provide transition services to the buyers, to allow

23  the buyers to be able to take the assets, integrate them into

24  their own systems, and transition over.

25        So, what we are looking at in the context of this

63

1  transaction, and any competing bids, is a transaction that has

2  several steps.  It has a transaction where we are looking on an

3  admittedly somewhat expedited time frame, but we think one

4  which is eminently justified under the circumstances, to try to

5  get to a closing -- an auction, and then a closing if the

6  current bidder prevails as the successful bidder by the end of

7  July, or the very beginning of August.  And there are reasons

8  for that, which we will go into.

9       We would then at that point also have, as I said, a

10  transition services arrangement for up to two years where the

11  U.S. and Canadian debtors will be establishing a team of people

12  in both jurisdiction and, indeed, around the world to provide

13  the support to be able to move the business out of the

14  integrated Nortel enterprise and into either the Nokia Siemens

15  or the successful bidder's enterprise.

16       The bidding procedures that we've proposed and

17  negotiated with Nokia Siemens are both typical and atypical.

18  They are attempting to balance certainty, the certainty of this

19  transaction, a bird in the hand, if you will, with the

20  flexibility to consider other transactions.  And the time line

21  to allow those transactions to come to fruition and be

22  proposed.

23       The bidding procedures create a certain number of

24  frameworks, frameworks which we believe are important.

25  Important so that as this process goes forward, we are able to

64

1 look at things as much as possible on an apples to apples

2 basis.

3        There are requirements built into the bidding

4 procedures that must be met in order for one to become a

5 proposed bidder.  Now, what does that mean?  Well, these

6 conditions are signing a confidentiality agreement,

7 demonstrating the financial wherewithal to undertake the

8 transaction, and to give an indication of interest of the type

9 of assets, nonbinding, but the type of assets and the scope

10 that the potential bidder would be looking for.

11        Now, why do we have restrictions on becoming a

12 proposed bidder?  Well, the process that we've gone through to

13 this point has been a very elaborate process.  And the

14 witnesses will describe that to you, particularly Mr. George

15 Riedel who is the chief strategy officer at Nortel, and Mr.

16 Michael Murray, our investment banker from Lazard.

17        They will tell you that in the context of this

18 exercise, 28 separate potential buyers were contacted, seven

19 have signed nondisclosure agreements.  And when we came down to

20 it, there were two active bidders involved in this process.

21        They will tell you that there are a limited number of

22 potential acquirers of these assets, given the technology, the

23 requirements, the fact that the scale and global reach that is

24 required in order to take these assets and pay the full value

25 for them is really possessed by a very limited number of

1  potential purchasers.

2         And that shouldn't been seen as disqualifying this

3  process by any stretch.  We have seen, unfortunately, in the

4  financial crisis a number of transactions that have been driven

5  by very few potential acquirers, whether that be the Lehman

6  Brothers or the Chrysler situation, or the General Motors

7  situation, which will be held -- where there's a sale hearing

8  scheduled to begin tomorrow.  The unfortunate result of such

9  large entities suffering in insolvency proceedings is that the

10  potential acquirers in the universe is necessarily narrow.  And

11  I think here we are lucky that we have had a full process with

12  respect to the CDMA and LTE assets, as you will hear from our

13  witnesses.

14         We also have requirements in the bidding procedures

15  that must be met in order for a party to become a qualified

16  bidder, and for the proposal that they put on the table to

17  become a qualified bid.

18         Again, we believe that there's an appropriate balance

19  struck here between certainty and flexibility.  We need,

20  indeed, require that there be deadlines for bids being

21  submitted, that diligence be conducted and completed.  That the

22  details of the transactions that are being proposed be

23  identified so that we can collectively, with our stakeholders,

24  analyze the pros and cons of those transactions.

25         We need to know that if someone is coming to us with

66

1 a proposal, that it's a proposal that can be financed.  And,

2 indeed, is financed.

3         It is a, I think in the scheme of things, a set of

4 requirements which are reasonable and appropriate.  But yet are

5 balanced with the flexibility to allow us to take multiple

6 bids, and aggregate them together so that we could have

7 multiple bidders show up, each bidding on the package of

8 assets.  And we could look at the bids as a collective

9 exercise.

10         Also because these assets are unique in the way that

11 they interact with each other, and will interact with the

12 bidders, it is possible that other bids could come up that may

13 not be exactly the same in terms of the asset package.  And we

14 have reserved the rights to look at those bids, as well.

15         It's hard to prejudge that process because until we

16 have a particular transaction on the table, we really don't

17 know what we are going to be able to compare.  But I can assure

18 you that what we have set forth in the process is a

19 consultative process that will make sure that we are talking on

20 a real time basis with the monitor, with the Creditors'

21 Committee, with the bondholders, and with the administrator.

22         As has been the practice in this jurisdiction and

23 others, the transaction also involves a break-up fee and an

24 expense reimbursement.  The break-up fee of $19.5 million, and

25 an expense reimbursement of a maximum of $3 million, for a

1  total of $22.5 million.

2          We believe that this set of buyer protections is

3  appropriate, and consistent with the market practice, both in

4  the District of Delaware, the Third Circuit, and the Second

5  Circuit in the Southern District of New York.

6          We believe that the evidence will show that the

7  process that has been brought to the Court today is a process

8  that has been benefitted by the presence of this bidder.  And,

9  indeed, there is another bidder that we have been talking to,

10 as well, and we believe the presence of both of them in the

11 process has helped make the value that will be obtained here as

12 high as possible.  And, indeed, while we are here today to

13 approve the bidding protections for Nokia Siemens, I think that

14 it's fair to say the debtors have no greater desire than to see

15 an active and vigorous bidding process for these assets so that

16 the dollars that we can obtain for our stakeholders will be

17 maximized.

18         We wish all of the bidders good luck and deep

19 pockets.

20         THE COURT:  Yes.

21         MR. BROMLEY:  The schedule that we're proposing here,

22 Your Honor, is a somewhat aggressive one.  And there have been

23 some concerns raised about that, and I think it's worthwhile to

24 pause a moment to talk about it.

25         We're here today, it is the 29th of June.  We're

1  looking for an objection deadline of July 17th, a bid deadline

2  of July 21st, a requirement that the debtors give adequate

3  assurances of future performance for assumed contracts and

4  leases by July 23rd, and an auction by July 24th.

5         We would then have a supplemental objection deadline,

6  to the extent that there are any changes as a result of the

7  auction, and a sale hearing on July 28th.

8         So, if we look at the 29th to the 28th, it's not

9  quite a month.  And I know that there have been some concerns

10 raised about that.

11        I think that you'll hear from Mr. Murray and Mr.

12 Riedel that the exercise that the debtors have engaged in over

13 the past several months has given comfort, both to the debtors

14 and to their constituents who have been involved in this

15 process.  The comfort that we are looking at a process that is

16 appropriate under the circumstances.  These assets are not the

17 prototypical melting ice cube that you hear in so many cases.

18 But they are assets that are deteriorating over time.

19        The CDMA assets that we're talking about are assets

20 that relate to the 3G network that the -- and the largest

21 customer we have is Verizon in that business.  And so while

22 Verizon is certainly out there saying "Do you hear me now," and

23 the world's largest 3G network, you can be rest assured that

24 they are actively working on the next generation network.

25        And so when you're looking at the 3G technology that

1  we are putting up for sale now, there is a limited life span

2  for that technology.

3          In addition, the long-term evolution technology that

4  is also a part of this transaction is the next generation

5  technology.  And it is very difficult for Nortel to be putting

6  those assets up for sale because they believe it is good, very

7  good, indeed, probably the best technology.

8          But what we have here is an inability to finance

9  that, a lack of scale, and a lack of financial resources.

10          That particular package of assets, however, is going

11  into testing for certain of the major carriers at the end of

12  this year.  And so our purchaser has made it clear that they

13  want a very expedited auction schedule so that if they are the

14  winning bidder, they will be able to take those particular

15  assets and plug them into their testing schedule so that they

16  will be best positioned to make proposals with respect to the

17  next generation.

18          And we believe that if we miss that cycle in selling

19  these assets, that we could find ourselves having a much less

20  valuable asset.

21          And so for that reason, Your Honor, and for others

22  that Mr. Riedel and Mr. Murray will give when they testify, we

23  do believe that the sale process, while expedited, is

24  appropriate in these circumstances.

25          The exercise that the debtors have been going through

1  over the past several months is one that has created an awful

2  lot of interest in the technology marketplace.  The assets that

3  we have are valuable assets, and the -- a testament to the

4  inventiveness of everyone who's worked at Nortel for so long.

5  We believe that the sale of these assets at this time is

6  appropriate.  It's not a particularly happy day for those who

7  have worked so hard to accomplish what Nortel has.  But

8  nevertheless, we believe at this point in time, it is the best

9  and highest uses for these assets to put them up for sale.

10          You will hear some questions raised, I think, perhaps

11  about why isn't it possible that these assets would form the

12  basis for a plan of reorganization.  And they are appropriate

13  questions to be asked.

14          You will hear from Mr. Riedel and Mr. Murray that

15  extensive efforts have been made to talk with our customers to

16  find out whether or not there would be an appropriate and long

17  lived business plan on a standalone basis that would allow

18  Nortel to use these technology assets to reorganize.  And I

19  think that what you will hear -- as a matter of fact, I know

20  what you will hear is that unfortunately, the customers are

21  looking for providers of this type of technology who are able

22  to provide a long-term commitment, who are going to be there

23  for a decade or more in order to develop and maintain, and

24  support all of these assets.

25          And so when the customers are of a concern that the

1 business on a standalone basis does not have the resources to

2 support it, they will go elsewhere.  They will go and buy,

3 arguably in theory or product, as long as they know they can

4 get it fixed over the long-term.  And I think that is sort of

5 the crux of the difficult choices that we're making here.  The

6 global footprint that our potential purchaser here presents is

7 one that fits with the requirements of those customers,

8 generally speaking.  And we believe there are several others

9 out there that have a similar footprint, and we hope that they

10 all come with loads of money to the auction.  But we have come

11 to the conclusion that it is not, at this point, possible with

12 respect to these particular assets to form a plan of

13 reorganization.  And I think the witnesses will make that clear

14 in their testimony.

15          So, as a result, Your Honor, what we're doing here

16 today is, as I said, a bitter sweet situation.  The debtors are

17 very proud of the assets that they've developed, the technology

18 that they've worked so hard on.  And the exercise that we're

19 going through is one of trying to marry a couple of different

20 things.  The right package of assets, the right purchasers, the

21 right point in time in order to maximize value.  There's lots

22 of other value that the debtors continue to have, and active

23 exercises are in place to make sure that value maximization is

24 going to take place with respect to all of those assets, as

25 well.

72

1          And, as I said, Your Honor, there is the requirement

2   that the Nortel entities remain supporting these businesses for

3   a fairly long period of time under the transition services

4   agreement.

5          So, in sum, that is the overall view of the

6   transaction that we're talking about here.  It is, again,

7   complex and complicated, lots of acronyms, and ultimately a

8   little bit tricky to negotiate and pull off.  But I have to say

9   that I think that the exercise that has gone on here has been

10  vigorous, and we certainly hope that the auction process that

11  we've put in place will yield proposals that will substantially

12  increase the bid that's on the table.  And we think that the

13  process is flexible enough to accommodate that.

14         So, with that as the overview, we would like to move

15  to put on our witnesses.

16         THE COURT:  Yes, please.  Thank you, Mr. Bromley.

17  Ms. Schweitzer?  Good morning.

18         MR. JUSTICE MOROWITZ:  Judge Gross, I'll just let you

19  know we are at somewhat of a disadvantage in the Toronto court

20  because we are not getting video of anybody with the exception

21  of you.

22         THE COURT:  Oh, that's terrible to look here.

23         MR. JUSTICE MOROWITZ:  I know they're trying to work

24  on it.  You're looking much better than you did a half an hour

25  ago.

73

1                        (Laughter)

2            THE COURT:  Oh, good.  I think I'm rallying here.

3            MR. JUSTICE MOROWITZ:  Good.  But hopefully we'll get

4   some improvement so that we can see both counsel and the

5   witness.

6            THE COURT:  Particularly with the witness.  I don't

7   know.  Is there a way to move the camera to the witness?  Okay.

8            MS. SCHWEITZER:  Your Honor, Lisa Schweitzer from

9   Cleary Gottlieb for the debtors.

10           THE COURT:  Yes, Ms. Schweitzer.

11           MS. SCHWEITZER:  Good morning.

12           THE COURT:  Good morning.

13           MS. SCHWEITZER:  I'm pleased to say we're still in

14  the morning.

15           THE COURT:  Yes.

16           MS. SCHWEITZER:  We have two witnesses that we'd like

17  to call today:

18           The first witness is Mr. George Riedel, who's the

19  chief strategy officer at Nortel.

20           And the second witness is Michael Murray, who's a

21  managing director at Lazard, an outside advisor to the debtors.

22           THE COURT:  Okay.

23           MS. SCHWEITZER:  So, if it would please the Court,

24  I'd call Mr. Riedel to the stand first.

25           THE COURT:  Yes, thank you.  Mr. Riedel?  If you will

1 just remain standing, and will stand while you're sworn.

2          CLERK:  Please raise your right hand, place your left

3 hand on the Bible.

4              GEORGE RIEDEL, DEBTORS' WITNESS, SWORN

5          CLERK:  Please state and spell your name for the

6 record.

7          THE WITNESS:  George Riedel, R-I-E-D-E-L.

8          THE COURT:  Justice Morowitz, are you seeing the

9 witness in Canada?

10          MR. JUSTICE MOROWITZ:  No, we're not.  Apparently my

11 register has indicated that that function would have to be

12 controlled from your courtroom.  It's a question of the cameras

13 being available and pointed --

14          MS. MURIN:  I do have the camera on the witness, I

15 can see on my monitor.  I don't know why he's not seeing it.

16          THE COURT:  All right.

17          MR. JUSTICE MOROWITZ:  Well, we'll listen very

18 carefully.

19          THE COURT:  All right.  Thank you, Justice Morowitz.

20          MS. SCHWEITZER:  George, speak loudly because they

21 can't read lips today, so --

22                    DIRECT EXAMINATION

23 BY MS. SCHWEITZER:

24 Q    Mr. Riedel, could you state your position at Nortel?

25 A    Yes.  I'm George Riedel, I'm the chief strategy officer at

1  Nortel.

2  Q    And how long have you worked at Nortel?

3  A    About three and a half years, joined in February of '06.

4  Q    When you say you're the chief strategy officer at Nortel,

5  which Nortel entities are you employed by?

6  A    NNL and NNI.

7  Q    NNI or NNC?

8  A    NNC.

9  Q    Okay.  And what are your job responsibilities as chief

10  strategy officer?

11  A    I have five:  I look after corporate strategy, M&A,

12  business development, and strategic partnerships.  In addition,

13  we have a small incubation fund that we invest in new

14  businesses.

15  Q    Prior to February, 2006, where were you employed?

16  A    I was at Juniper Networks in a similar role.

17  Q    How --

18  A    VP of M&A and strategy.

19  Q    How long did you work at Juniper?

20  A    Three years.

21  Q    And what were your responsibilities there?

22  A    Again, corporate strategy, business development, and M&A.

23  Q    Okay.  Can you describe generally at Nortel, Juniper, and

24  more generally, what your experience has been with M&A

25  transactions?

1  A    Let me take it in two stages, Nortel first.  We've been

2  involved in both small acquisitions and divestitures.  The

3  largest divestiture would have been the 3G UMTS business to

4  Alcatel-Lucent in December of '06.

5        Prior to that at Juniper Networks, we had about nine

6  different acquisitions over a period of three years that I led.

7  The total value of those acquisitions would have been in the

8  billions of dollars.

9  Q    Can you give -- explain for us your general educational

10 background?

11 A    I have a B.S. in mechanical engineering from the

12 University of Virginia, and an MBA from Harvard University.

13        I then spent 15 years with Mackenzie and Company,

14 various strategy roles in both North America and in Asia.

15 Q    Thank you.  You're generally familiar with the sale of

16 assets to NSN that's being proposed today.

17 A    Yes, I am.

18 Q    What was your involvement in the process of negotiating

19 that sale agreement?

20 A    I led the business negotiations for that sale agreement.

21 Q    Before we go into the specifics of the sale agreement, I'd

22 like to talk generally about the CDMA and LTE business, and how

23 that fits into the Nortel enterprise.  Can you first just

24 describe the Nortel enterprise and the different divisions

25 within Nortel?

1  A     Think of it as a journey.  Nortel, as Mr. Bromley

2  mentioned, was an integrated entity that had both an enterprise

3  services and a carrier services.  Within the carrier business,

4  we have several different lines of business.  We have a

5  wireless business, CDMA and GSM are the two global standards

6  that that revolves around.  There's a carrier VoIP business

7  which sells voice technologies to large carrier customers.

8  Those are the two carrier businesses.

9          In addition, there's the optical business, which

10 sells Ethernet and optical transport technologies.  Those are

11 the bulk of the carrier assets in the company.  They represent

12 probably about 80 percent of the total revenue of the company.

13         In addition, there's the enterprise business, which

14 sells voice, data, and other applications to enterprise

15 customers.

16         And lastly, we have a joint venture interest in

17 Korea.  LG-Nortel, where we have a 50 plus one percent interest

18 in an operating with LG in Korea.

19 Q    When you talk about a carrier business and an enterprise

20 business, how does that overlay with the corporate structure of

21 Nortel and the different corporate entities?

22 A     Right.  The corporate entities have a responsibility for a

23 range of things.  There is a set of corporate functions,

24 finance, HR, strategy, operations and the like that are

25 matrixed to these some of these lines of business.  And so what

1 we've gone through is a process over time to disaggregate

2 these.   These businesses were once shared or shared functions,

3 whether it's in the global operations, whether it's in platform

4 development, whether it was in finance.   And as we launched the

5 plan late last year to create standalone businesses starting in

6 November, we've effectively tried to, if you will, carve up

7 these businesses so that they could be standalone entities

8 available for sale.

9         So, what that means is taking a sales function or an

10 operation function, mapping the people and the resources into

11 that line of business so that you could, in fact, present a

12 standalone entity to a prospective buyer.

13 Q   When you say "standalone entity," are you referring just

14 to a business that you can identify assets, and employees, and

15 contracts?   Or are you referring to that you actually took one

16 corporate entity and made it into two corporate entities?

17 A   No, it's the former.   I want to be very clear.   These are

18 global businesses, they cut across the entities that we operate

19 in.   The difference is now what used to be a matrixed,

20 interdependent set of organizational elements are now organized

21 differently.

22 Q   Okay.   So, for example, that you've referred to the

23 carrier business, and you've said within the carrier business,

24 there are these different sublines of the carrier business,

25 where it's the voice over Internet, protocol business, the LTE,

1   and the CDMA, and GSM, are those -- you've now disaggregated

2   those such that they could be sold separately?

3   A    That is correct.

4   Q    And when you say "disaggregated," are they completely

5   separate?  Or are there relationships that still exist between

6   the businesses?

7   A    There are still interdependencies on three fronts:

8        There are platform interdependencies where common

9   hardware elements are still shared across multiple businesses.

10       There are still operational supply chain

11  interdependencies.

12       And there are still some finance system

13  interdependencies to cut our costs.  We've tired to apportion

14  the costs and the activities as best we can, but there is still

15  some sharing of those different elements of costs.

16  Q    And can you just describe for us who don't live and

17  breathe the technology -- the telephone companies every day,

18  what is the CDMA business and the LTE business?

19  A    Let's start with the market.  CDMA stands for code

20  division multiple access, it's a way for multiplexing different

21  channel (indiscernible - feedback interference).  Effectively

22  it's wireless technology.  So, it's infrastructure we sell to

23  the major carriers, Sprint, Verizon as classic examples.  That

24  they run mobile services on, whether they're voice services or

25  data services.  So, we'll put in switching, we'll put in access

1  gear, we'll put in services to implement that that they run

2  their networks on.  It's not a consumer related service, it's

3  an enterprise, it's a corporate service sold to large mobile

4  carriers.  That's a business that is in decline.  The market

5  itself is (indiscernible - feedback interference) forecast

6  dropping somewhere between eight and 10 percent.  Our business

7  is declining more rapidly, in part because of the economy, in

8  part because of the filing.  But it's a business in decline.

9  It's a business that represents probably 18 to 20 percent of

10 the total wireless world.  GSM being the larger stand -- or GSM

11 and UMTS being the largest standing.  CDMA is a relatively

12 small piece of the total wireless spend, it's a market about $9

13 billion and change out of the total global spend of about 50.

14        It's in decline.  It's profitable.  It has a long

15 tail on the voice side.  The customers will continue to use

16 this technology for their voice services for quite some time,

17 particularly North America.

18        However, outside of North America, many of the

19 customers have moved to these other technologies.  GSM or wide

20 band CDMA as an example, which has been part of the reason why

21 this is a business that's been in decline for quite some time

22 for us.

23        Think of it as a legacy set of technologies that has

24 a long life in terms of the use in today's world being

25 transitioned to LTE.  LTE stands for long-term evolution.  It's

1  a more efficient higher bandwidth technology that Verizon,

2  Vodafone, China Mobile and others have helped shape the global

3  standards on.  It's a substantial investment to develop LTE

4  technology.  We have been spending upwards of $200 million a

5  year in R&D on our own to develop that technology.  And it is,

6  I think, now finally seen as the consistent view where the most

7  of the wireless carriers want to take their next generation

8  networks.

9  Q    You had said that you have corporate clients, not

10 individual customers.  Someone like you or I wouldn't be a

11 customer of CDMA or LTE.

12 A    That's correct.  We'd be a user of a phone service, but we

13 wouldn't buy the equipment.

14 Q    So, it's the large telephone companies are your customers.

15 And when you say that this CDMA business is the declining

16 business, LTE is next generation, that's what people have

17 previously referred to as this 3G, third generation is the CDMA

18 and 4G is the LTE generation?

19 A    Just one clarification.  CDMA actually has a 2G element

20 and 3G element.  Not to go into techno babble, but there are

21 both 2G and 3G elements in the CDMA product line.  But LTE is,

22 in fact, the fourth generation.

23 Q    Okay.  And can you explain how Nortel or another

24 competitor would get a new customer contract and develop

25 customer relationships?

Riedel - Direct                                82

1  A    Most of these large carriers go through lengthy trial

2  periods.  They go through different phases or stages.  They'll

3  start with lab trials, they'll go through technical trials,

4  field deployment trials.  They'll pick a short list of vendors

5  they want to bid with, and then over the next five, 10 years,

6  they'll deploy the networks associated by that.

7           In the instance of LTE, these trials have been

8  underway, certainly in North America.  Again, they're

9  coordinated with Vodafone and Verizon, trying to decide which

10 vendor they want to work with for the next decade for deploying

11 this technology.  Think of it as a -- roughly a two-year cycle

12 to go through the trials.  Two years, maybe two and a half

13 years.  And then an eight- to 10-year deployment.

14 Q    And where are we in the cycle of the 4G technology?

15 A    In North America, we're way into the commercial trials

16 now.  Perhaps the most seminal event occurred in February this

17 year when Verizon announced its decisions around the vendors it

18 wanted to deploy this LTE technology.  If I could go back a

19 bit, there were six vendors originally that were in the various

20 trials.  Three working with Vodafone in the European landscape,

21 three working with Verizon here in North America.  Of those

22 six, Verizon announced in February they were going to pick two

23 to go forward with.

24           The go forward means to start to deploy commercial

25 services in 2010.  And so they're on a very aggressive schedule

1  to finish, what they call, Phase 4 trials in order to get

2  commercial deployments in 2010 for a large part of their North

3  America footprint using the spectrum that they've invested in.

4         In addition, they're working with vice vendors and

5  ecosystem vendors to bring in the new services and handset

6  devices to the table so that when the infrastructure's

7  deployed, they actually have devices that can take advantage of

8  that.

9         So, it's a very aggressive schedule.  They're

10 probably leading the world in terms of the commercial

11 deployment in these technologies.

12        Followed right behind is other North American

13 vendors.  There's -- AT&T is also aggressively trying to roll

14 out LTE technology in a slightly shifted time frame, maybe it

15 will be 2010, perhaps 2011.  But it's a very significant

16 investment, and time, and energy and a commitment of capital

17 which would roll into the billions of dollars for these

18 companies over the next several years.

19 Q    And you've mentioned U.S. customers.  Can you describe the

20 global footprint or use of this technology, and also where

21 Nortel is present in the market?

22 A    It is used globally.  The majority of the business for us

23 in North America.  We have large customers in Canada, in the

24 U.S. certainly.  We also have some customers in Mexico, China,

25 parts of Eastern Europe, and the like.  But probably 80 to 85

1  percent of our business is in North America.

2  Q    You also spoke to the need to invest substantial amounts

3  of capital in the LTE technology to be able to compete in this

4  race to get to the next generation.  Can you speak to Nortel's

5  ability to commit that type of capital to the next generation?

6  A    One of our challenges, we're either Number 6 or Number 7,

7  depending on the league table you use, telecom equipment

8  provider.  So, sale in the R&D capacity is an important

9  challenge for us.

10        We have been spending near abouts $200 million a year

11  on LTE development.  We think we've built some fascinating

12  technology, the customers have given us very strong remarks on

13  that.

14        However, the combination of a limited balance sheet

15  and concerns about the ability to continue to sustain that

16  investment over the next, let's say, decade has basically given

17  significant pause on the parts of our trial customers who

18  effectively would say, love your technology, but we're

19  concerned about your economic viability to continue to sustain

20  that.  Therefore, we're going to choose other people.  And,

21  unfortunately for us, we will win the technology prize, but not

22  the commercial businesses.

23  Q    I'd like to go a little more into the decision to divest

24  the CDMA and LTE business before -- I'd like to just venture

25  off to a footnote for one second.  Which is that you've openly

1  discussed some of Nortel's customers in this space.  Is it --

2  would you describe the customer relationship as very open or

3  public?  Or is there a lot of confidentiality around the

4  contracts being entered into, and your customer relationships?

5  A    It's a bit of both.  We have a very good dialogue with our

6  customers, they're very transparent to us in terms of feedback.

7  But the contracts are, in fact, confidential in terms of --

8  under the terms that we've entered into them.

9  Q    And Nortel considers those to be sensitive commercial

10  information to the company?

11  A    That's correct.

12  Q    So, let's turn to the divestiture and the decision to

13  divest.  Can you describe generally Nortel's view and strategic

14  thinking around this business, starting with about two years

15  prior to the bankruptcy, and into the bankruptcy?

16  A    If you go back 18, 24 months, one of our challenges as we

17  looked down the road was substantial investment with uncertain

18  return, and it was driven by three factors.  We knew the dollar

19  value that we were going to have to spend in these 4G

20  technologies.  We knew what the competitors were spending.  The

21  ballpark number was in the neighborhood of 150 to $250 million.

22        The challenge was getting the return on that

23  investment, and it came from three reasons:

24        One is the global footprint required.  Again, we're

25  largely a North American player.  We haven't the strong

Riedel - Direct                                    86

1  position that other large vendors have in Europe and Asia.  So,

2  our ability to recoup that investment without that footnote was

3  a difficult one.

4       Secondly was timing.  There was uncertainty about

5  these technologies would actually deploy, and how much of that

6  burn you have to continue to bear with some uncertain knowledge

7  of when the revenue would flow.

8       And then third was the customer feedback we gotten

9  which was, again, strong technology, concerned about your

10  balance sheet, concerned about your viability.  You, Nortel,

11  should be working with others to partner to help bridge that

12  gap.  Because you have strong install base assets, you have

13  strong support in terms of what you do for our networks.  But

14  we need you to work with others who have that kind of global

15  scale, who have that kind of ability to leverage the

16  technologies you develop more effectively.  And that began the

17  journey of discussions.  A journey of discussions which started

18  in earnest in the middle of '08 where we had a series of

19  discussions with -- again, go back to the six or so vendors

20  that Verizon and Vodafone focused on.  Each one of them we had

21  discussions with on their interest in partnering.  Partnering

22  is a euphuism, I'll granting you.  But the idea is there's some

23  form of consolidating transaction that would make sense.  The

24  specific nature of that was always unique to the conversation.

25       But was there an opportunity for us to combine our

1  footprint, our technology, and the other parties' interest to

2  build a stronger global scale player that would serve the

3  interest of customer respect.

4  Q    You made reference to your customers' encouraging you to

5  work with others or having their own vendors.  Are you

6  referring to strategic competitors of Nortel?

7  A    That's correct.

8  Q    And who are the major strategic competitors in this space?

9  A    Normally you think of six folks.  You think of Ericsson,

10 Nokia Siemens, Alcatel-Lucent, Motorola, Huawei, and ZT, and

11 us.

12 Q    And when you think of -- that -- looking into a potential

13 transaction, did your customers give you feedback on -- that it

14 had to be or they preferred any interest in strategic versus

15 financial investors to partner with?

16 A    The customers that we spoke with -- and, again, these are

17 largest North America customers, were quite direct.  That they

18 were very concerned about the ability of a partner who did not

19 have global scale, who could not help provide the long-term

20 support, both retain talent and deliver on the R&D end, which

21 was important to them, that a strategic vendor could only do.

22 Said differently, a financial buyer or a financial sponsor

23 would have challenges in their eyes to meet that same test.

24 How do I get global scale, how do I retain the talent, how do I

25 continue to support these networks long-term.  And it was their

1  confidence or comfort level that drove that decision to work

2  more closely with strategics.

3  Q    Just for the record, when you're referring to R&D, you're

4  talking about research and development?

5  A    That's correct.

6  Q    Have you, from time-to-time, gotten interest from other

7  parties in either merging, acquiring, or forming other

8  relationships on the CDMA and LTE business?

9  A    We have.  We've had a number of conversations, some

10  developed into meaningful dialogue, some were short and quick

11  where the combination of lack of desire or fit on the other

12  party's interest didn't develop into a more meaningful

13  conversation.  But for those that did, they understand the

14  business.  They've looked hard at it, in terms of the economics

15  and the technology transition, and customer base.  And I think

16  they're well equipped to assess the value of the asset.

17  Q    Can you give some of the reasons why strategic bidders

18  might not be interested in the business?  Or why it might be

19  more interesting to other strategic bidders?

20  A    Generally it would fit into two -- one or two categories.

21  Either they have their own financial constraint and concerns

22  that are impacting their ability to make big investments, big

23  decisions.  Or they've already gotten, if you will, the green

24  light from some of them, the major customers from a trial win.

25  So, if you've gotten from Verizon or Vodafone a indication that

1  you're already going to be a winner in some of these LTE

2  deployments, your appetite, your desire to spend more money to

3  acquire an asset is limited.

4         The third perhaps item is to gain trust.  If we know

5  we have a significant share in the North America CDMA market,

6  there are other players who have even a greater share.  I think

7  they would be concerned about whether that combination would,

8  in fact, pass muster on any trust issues.

9  Q    You've given us some color as to your strategic -- the

10 Nortel strategic thinking around the CDMA and LTE space prior

11 to the creditor protection filings in the U.S., Canada and

12 Europe.  Obviously none of those discussions or explorations

13 led to transaction because you still own the assets.  Can you

14 now turn to what the strategic thinking around the assets has

15 been since the bankruptcy and restructuring filings?

16 A    We ended up looking at two paths.  One was to continue to

17 go deeper into a couple of these strategic partners or

18 strategic competitor conversations.  Again, mindful of the

19 feedback we were getting for our large customers to see if that

20 made sense.

21        In addition, we did some analysis to decide could we,

22 on a standalone basis, develop a plan that made sense to our

23 customers.

24        Let me take the second one first.  The CDMA does have

25 a long tail, it's a profitable business.  We can see cash flows

1 that will be extending out to the many, many years in the mid

2 teens.   The challenge was the rate of decline that we were

3 seeing in that business.   Historically that business has been

4 dropping eight to 10 percent.   It's down 35, 37 percent this

5 year.   We are seeing attrition in that business, in our key

6 customer roles.   We basically had a financial model that looked

7 possibly interesting, but needed the affirmative support of our

8 customers.

9          And so we went to several of our largest customers

10 and said if we were to build this standalone plan, would you

11 support it.   And, again, they have grave concerns.   Grave

12 concerns about retaining talent, grave concerns about

13 continuing to stay in the high level investment they require.

14 And, therefore, were basically saying to us we will derisk our

15 plan if that's what you do.   We have other alternatives, other

16 options, and you, at your own peril, go down that path.   We'd

17 much rather you go back to the two or three vendors that we're

18 trying to work with you on to find a global answer to this

19 industry scale challenge and go back and, with vigor, revisit

20 the conversations you've had with these strategic vendors.

21 Which is principally where we focused on, which, hence, led to

22 the transaction we announced on the 19th.

23 Q    Okay.  Can you discuss how the transaction with Nokia

24 Siemens Networks evolved?  Where did you start?  What was the

25 timing?

1 A    If you go back in time, we actually had our first

2 conversation with Nokia in April of '06 about this, before it

3 became know Nokia Siemens.  Then they obviously did that

4 merger, it took them a lot of time and energy.  Continues to be

5 an important activity to finish that integration.  In earnest,

6 we regained or rejoined these conversations in October of '08

7 where we sat down with senior management of Nokia Siemens about

8 putting the two businesses together.  That had a set of ups and

9 downs in discussions.  Then after the filing, it took on a

10 focused effort around when could we sit down and do something

11 that met the schedule of a major customer.

12        Part of the challenge here was -- I go back to

13 February 14th when Verizon announced their decisions for LTE

14 vendors.  We knew we were not going to be selected.  I think

15 Nokia Siemens had a hope that they would be selected on their

16 own.  It turns out they were not.

17        And as a result, the urgency for Nokia Siemens and

18 for us to address this solution to find a way to put a

19 partnership together that would meet the time line that

20 certainly Verizon and others were driving to get the deployment

21 of LTE networks.

22        So, since then, the focus has been on negotiating a

23 term sheet and exploring other options with other potential

24 bidders.  Nokia Siemens was clearly the most interested and

25 most engaged in that process.

1 Q    When you say February 14th was the monumental date, is it

2 -- everyone's now missed that window of opportunity?  Or it's

3 just important to keep staying on track?

4 A    No, there were two that were given an opportunity to start

5 the trials.  I think what Verizon said is that we would perhaps

6 consider a third, either because we wanted to have a chance to

7 see other options, or because derisking our two selections.

8 But there's a real premium on capturing the right footprint,

9 whether you call them the NFL cities or whether you call them -

10 - whatever you want.  But the volume associated with the

11 certain deployment is important.  So, getting, in a timely

12 fashion, a solution that Verizon could deploy into North

13 America is of paramount importance to Nokia Siemens.

14         As you may know, Nokia Siemens has had a strategic

15 challenge for building its business in North America.  Over the

16 next decade, while they've made some progress, I think they

17 would really admit that that remains one of their strategic

18 gaps, how do I become more relevant in North America.

19         If LTE is the next decade of relevance in North

20 America, without Verizon, without AT&T as part of that, that's

21 hard to see how that would work.

22 Q    And would other strategic bidders share that same interest

23 in getting in now versus waiting on the longer horizon?

24 A    You'd have to put it in two buckets.  If you were already

25 in one of those two who were selected as LTE trial vendors,

1  your interest is probably somewhat diminished.  If you are not,

2  then your interest will be how do I become part of that

3  solution.

4  Q    That would be an industry reason why it would be important

5  to pursue a sale at this time.  Are there other reasons unique

6  to Nortel, or as a result of this bankruptcy filing, that

7  caused this to be the right time --

8  A    Yes.

9  Q    -- to sell the assets?

10 A    Two reasons.  One was attrition.  The talent that we have

11 developed to serve and develop these products is quite special,

12 quite unique.  Historically our attrition rate is run in the

13 mid single digits, six, seven percent.  Post filing, now it's

14 in the mid double digits, 20, 25 percent.  And so you've got a

15 very talented workforce seen by the customers, which is

16 particularly important to any future, and attrition rates of

17 double digits, that's a significant concern in terms of the

18 value of that asset.

19         And secondly is customer support.  Our customer

20 support metrics has never been better.  The post filing

21 performance of this team is terrific.  But, again, another

22 attrition risk that as time goes on, the ability to retain

23 those people can continue to have them focus, but the uncertain

24 future is quite high.  So, attrition in either the R&D side or

25 on the customer support side are huge risks for both us and for

1  our customers.

2  Q    We've, throughout this discussion, been talking about

3  selling CDMA and LTE assets and how you broke apart Nortel's

4  business into these different business segments.  Is that a

5  clean boundaries to that such that every potential bidder is

6  going to look and say here's my pile of CDMA and LTE assets,

7  and we all agree what is in that pile, and what should be in

8  that pile, and what would be useful to us as bidders on these

9  assets?

10  A    Oh, if it were true.

11                        (Laughter)

12  A    The harsh reality is that for every one of these

13  conversations each of these perspective buyers has a set of

14  facts and circumstances that influence what they actually want

15  in the scope.  And so part of the journey is which customers,

16  which contracts, which platforms, which geography do you

17  actually fit in the scope.  And hence the need to have

18  flexibility to respond to the buyer side of the equation to

19  tailor a solution.

20            We set out a construct that we thought made sense

21  based on the logical buyer communities.  But, frankly, have

22  seen in every one of our dialogues, whether it's in this

23  particular asset or others, the need to tailor that solution

24  for the facts and circumstances of the buyer.

25  Q    Can you give a little color around that in terms of the

1  CDMA and LTE assets of how they interface with your other

2  business divisions and things that on the periphery might be

3  interesting to someone or necessary as part of a bid?

4  A    Sure.  Let me take a couple of examples to illustrate

5  that.  As I mentioned earlier, we have platform into entities

6  to cut across some of our businesses.  We have a hardware

7  platform that effectively runs the elements of the CDMA

8  business and the elements of GSM business, it's called the GE

9  core for our large North American customers.  A buyer could

10  quite well say I have a common platform, that I have a scale

11  advantages across all of these technologies and a common custom

12  base in North America, I might be interested in adding an

13  element of the GSM business to the bid, if you will, into what

14  I'd be looking for.  Similarly, we have a technology called

15  passport to just switching businesses that effectively cuts

16  across a number of our businesses, which is not in scope as an

17  asset sale here, but others have suggested an interest in

18  deciding whether that should be a scope.  So, those are two

19  platform examples of where folks would say I'd like the

20  flexibility because of what I'm interested in to add or modify

21  the scope of what I see here.

22  Q    Okay.  Has anyone expressed interest to date in buying

23  only the U.S. debtors' assets alone?

24  A    No, they haven't.  These are global businesses.  And the

25  combination of the IP, the platform, the customer support, the

1  sale that exists outside of North America.  Nobody has said I'm

2  only interested in North America.

3  Q    I'd like to turn a little bit to the bidding procedures

4  and the actual sale transaction that we're seeking to start a

5  process on today.  Are you generally familiar with the bidding

6  procedures that have been submitted to the Court for approval

7  today?

8  A    Yes, I am.

9  Q    And those bidding procedures provide for effectively a 22-

10 day window for bidders to put in qualified bids.  Do you have a

11 view as to whether that's a sufficient time to maximize the

12 value of the assets?  The value that can be obtained off of

13 these assets?

14 A    I do.  I think if you go back to the journey we've been on

15 in terms of having a dialogue with the leading industry

16 competitors who would be certainly representative of the

17 limited subset who have the most strategic rationale for doing

18 this, the value maximizing rationale.  They're familiar with

19 the assets, they understand the business, they know their

20 customers, they would be readily in the position, have either

21 already looked at it or quickly could look at it and decide in

22 that time frame to act.  I think if you broaden that circle and

23 say what about the rest of the buyer community being

24 interested, the business is 80 percent North America, the

25 contracts are few, there's a handful of customers that you need

1 to sort of understand the revenue around.  That, too, is a

2 manageable task.  Is it aggressive?  Yes, but it's a manageable

3 task.

4 Q    Has an electronic data room been set up already?

5 A    It has.  An electronic data room has all the core

6 documents, all the history of the financials, all the ancillary

7 documents, and the like.  So, yes, all of that material is

8 readily available.

9 Q    And have other parties, other than Nokia Siemens Networks

10 already signed confidentiality agreements?

11 A    There have been, yes.  As a total of before -- seven total

12 have signed.

13 Q    And have other people, other than Nokia Siemens Networks,

14 been given access to the electronic data room already?

15 A    They have.

16 Q    How did you select the 22-day or 25-day or 27-day,

17 whatever we're going to call it, auction period, depending what

18 we're measuring off of?

19 A    Two things drove this.  I go back to the customer first.

20 They're on a very rapid deployment schedule.  And for Nokia

21 Siemens, that meant particularly a road map for integrating our

22 technologies into their platforms.  That was a key concern to

23 them.  That unless they could see a path forward to leveraging

24 LTE technologies into that road map quickly, the value

25 associated would just diminish.

1         Secondly, they were quite clear to us about the

2 financial implications of slipping months in the schedule.  The

3 CDMA business is profitable.  It kind of cash flow generated,

4 it was tens of millions of dollars a month, and they were quite

5 strong and clear that a delay in closing this transaction would

6 result in a reduction in purchase price.  And so a combination

7 of customer argument and a value diminution argument, their

8 interest and ours, was to find a solution that was manageable

9 to meet those constraints, but also fair to others who were

10 interested.

11 Q    When you say Nokia Siemens Networks expressed a view that

12 this business was throwing off cash, so another month closed,

13 another month that they missed cash coming in, did you get the

14 feeling that that -- or did they express any view as to whether

15 that would be a dollar for dollar reduction?  That you wait one

16 more month, that's 20 million less in their pockets, or 20

17 million less in your pocket?

18 A    There were two discussions.  There was an absolute

19 discussion and a formulaic discussion.  Both of them led to the

20 same conclusion.  Yes, you would see a dollar for dollar

21 reduction in the purchase price.

22 Q    And no more than that?

23 A    No more.

24 Q    That there'd be no secondary damages?  And do you think

25 that their interest would have declined, or that you would have

1  lost other value to the transaction?  Or were they perfectly

2  willing to hold out their bid for a longer -- a longer period?

3  A    I think -- again, I go back to their indication of the

4  customer and the financial, and from the attrition side, their

5  interest and the value of that asset to them would decline over

6  time quickly.

7  Q    And you had said that you were one of the primary

8  negotiators of the asset sale agreement, or the senior M&A

9  person on the transaction.

10 A    That's correct.

11 Q    And can you describe or give us all a flavor for how the

12 negotiations played out once you decided to engage with Nokia

13 Siemens to pursue an asset sale agreement?

14 A    Sure.  Think about this as having two tracks.  It was a

15 fairly vigorous set of discussions that took place in Cleary's

16 office for two and a half weeks in New York through a

17 combination of topics, whether it was on the main agreement,

18 whether it was on the ancillary agreements, whether it was on

19 schedules, the business aspects.  So, a fairly robust

20 discussion on all of those fronts.

21        The second track was briefing our constituents in the

22 process, real times or discussions with the Creditors'

23 Committee, the ad hoc bondholders, the UKA and the like about

24 where we were in the journey and what the issues were so that

25 they could understand this and other choices they had in front

1  of them.

2  Q    When you say the Creditors' Committee, you're referring to

3  the official Creditors' Committee appointed --

4  A    Yes, I am.

5  Q    -- in this case?

6  A    Correct.

7  Q    And the Bondholder Committee is the ad hoc committee of

8  bondholders that's been involved in these proceedings and in

9  Canada?

10 A    That's correct.  And UKA refers to the United Kingdom

11 Administrator or the Administrator appointed in the EMEA

12 jurisdictions?

13 A    Correct.  And I'd be remiss if I didn't mention the

14 monitor in Canada, too.  Sorry about that, Murray.

15 Q    Especially when he's on the camera, he would be horribly

16 offended if we forgot about Murray.

17       And without going into painful levels of detail, can

18 you give a flavor for the level of assets in the CDMA space and

19 LTE space that are involved in the Nokia Siemens bid?  Are they

20 taking everything?  Are they leaving some stuff behind?

21 A    Right.  So, they are not taking everything.  Let me do it

22 in two buckets.  Let me do CDMA and LTE.

23       CDMA, they are taking largely the North American

24 businesses, a set of assets in China, Mexico, and parts of

25 Latin America.  And that probably represents, in the aggregate,

1  85 to 87 percent of the CDMA business.

2          On the LTE side, they are taking several hundred

3  people in Canada in our development organization.  But not any

4  intellectual property associated with the patents, if you will,

5  around the LTE business.

6  Q    There's reference in the asset sale agreement to bundled

7  contracts and other non-assignable contracts.  Can you explain

8  what a bundled contract is?

9  A    Sure.  Go back to the fact that Nortel is or has operated

10 as an integrated entity.  Many of our suppliers are in multiple

11 lines of businesses, whether they're on the IT side, whether

12 they're on the operational side or the like.  So, a bundled

13 contract for us is a supplier who we work with (indiscernible -

14 feedback interference) or enterprise, or wireless, and the

15 like.  And, therefore, our ability to assign that contract is,

16 frankly, nonexistent.  We need to have that contract to

17 continue perform business.

18 Q    And the headline price for the sale and asset sale

19 agreement is 650 million.

20 A    Um-hum.

21 Q    But it's subject to certain adjustments.

22 A    Correct.

23 Q    Can you walk through in general what that adjustment is?

24 A    There's some small adjustments.  There's a small asset in

25 China, it's a fixed value of two and a half million dollars.

1  Perhaps the more relevant adjustment is around working capital.

2  There were elements of the working capital that we were

3  transferring across as part of this transaction, not all

4  elements, but some elements.

5        And so the adjustments would flow from what you

6  estimated the balance sheet to look like at different stages in

7  time.   We had a view on the year end number.  We had a view on

8  the Q-1 number.  We have a view on what Q-2 will look like.

9  But in aggregate, there will be a true up of those adjustments

10 at the end of -- at a close.

11        I don't expect that adjustment to be material.  The

12 variances that we've seen in our working capital over each of

13 those different snapshots, year end, Q-1, Q-2 range in the tens

14 of millions of dollars.  It's quite possible there could be a

15 positive adjustment.  There could be a small negative

16 adjustment.  It wouldn't be material.

17 Q    In connection with the asset sale agreement, there's also

18 a contemplation that Nortel and NSN would enter into a series

19 of ancillary agreements.  Can you, just to the highest level,

20 explain the nature of those ancillary agreements and why

21 they're important to the transaction?

22 A    Probably two stand out the most:  transition services

23 agreement, or a TSA.  A set of services, again, supply chain,

24 IT, financial services, that any buyer is going to need to be

25 able to move from our system to their system, up to a period of

1  two years.  And so we've mapped out a schedule and a set of

2  services with them they would require and a cost to deliver

3  that.

4         The second ancillary agreement would be the IPLA, the

5  intellectual property licensing agreement.  In this, you

6  basically convey three things.  There are a set of patents that

7  will be assigned to the buyer, CDMA related patents.  There are

8  some licenses that are also going with that business for a

9  field of use.  And so part of what the IPLA does is describe

10 which patents to what licenses to what field it is.

11 Q    Are there any agreements around employees?

12 A    There is.  There's another agreement to basically help

13 facilitate the transition of some employees, I believe referred

14 to as the loaned employee agreement or transfer employee

15 agreement where for a period of time, not less than six months,

16 we would provide a set of services to help facilitate the

17 transition of those employees on to the Nokia Siemens' payroll

18 systems.

19 Q    And those ancillary agreements to date haven't been

20 publicly filed.  Would they be made available to any other

21 potential bidders?

22 A    Correct.  If you sign the NDA, they're -- would be

23 available through the electronic data room.

24 Q    Nortel obviously has decided to pursue or to select Nokia

25 Siemens Networks as the stalking horse bidder and to provide

Riedel - Direct                                     104

1  them certain bidding protections, rather than to just hold

2  assets up for auction without a stalking horse bidder.  Can you

3  describe, based on your experience and M&A deals generally and

4  particularly in your experience in working with Nortel and

5  Nortel in this market why you decided to pursue an auction with

6  a stalking horse bidder?

7  A    Sure.  It gets a value risk.  A value risk is the person

8  who wants to be that stalking horse, and value in creating some

9  tension in the dynamics of the bid.  These buyers are spending

10 resources, they're extending reputation, they're spending a lot

11 of time and energy, there's a high opportunity cost.  They,

12 rightfully so, expect some level of protection as they put, if

13 you will, their foot forward to be a stalking horse.  It's

14 customary to have a model of the world where both expenses and

15 some break fee are part of that protection package.

16       In this particular situation, particularly around

17 post filing, the risks, I think, are even greater where the

18 concern about what am I getting, how do I get comfort on it,

19 are there issues that are unique to the post filing requirement

20 that I need to be mindful of.  And so it was our experience

21 through arm's length discussions with Nokia Siemens that the

22 model that we ended up negotiating, the break fee and the

23 expense reimbursements, was good practice for them and for us

24 to protect their interest and our interest.

25       I'd add to that the notion that it also helped bring

1  others to the table.  And that others to the table helped

2  create value for the creditors, the bondholders, the monitor,

3  and the like.

4          What we were able to observe in the process was a

5  significant change in the dynamics of the negotiations, i.e.,

6  tension gets induced into that negotiation as a result of this.

7  Q    I'd like to just respond to two of those points or ask you

8  follow-up questions.  First, you had referenced that there were

9  negotiations around the break fee and the bidding -- the

10 expense reimbursement.  Can you describe a little bit of what

11 the bid ask was or how you wound up on the protections that you

12 agreed to?

13 A    The bid ask sort of dealt with two topics.  The

14 circumstance under which the break fee was going to be paid was

15 primarily the bigger debate.  When, and how, and under what

16 circumstances.  It's not the amount itself.  I think we arrived

17 fairly easily to a number that made sense to both of the

18 parties.

19         On the expense reimbursement, there was a bit more

20 bid ask spread between what they wanted and we thought was

21 reasonable.   There was more arm wrestling around what would

22 make sense.  So, less so on break fee, more so on the expense

23 reimbursement.

24 Q    And expense reimbursement wound up, we agree -- you agreed

25 to three million -- or a cap up to $3 million --

1  A    Correct.

2  Q    -- in expense reimbursement.  But Nokia Siemens Network,

3  in fact, had asked for more than that?

4  A    That's correct.

5  Q    And how much had they asked for?

6  A    We talked about percentages.  The bid ask spread was -- it

7  started at one to five percent of expenses, we narrowed it down

8  $3 million to a cap.

9  Q    And then in terms of the break-up fee, you said that Nokia

10 Siemens Networks had asked for payment of a break-up fee in

11 more circumstances that you ultimately agreed to?

12 A    Correct.

13 Q    What was their initial ask with respect to the break-up

14 fee?

15 A    It was largely around timing as to when they would get

16 paid if there was a break-up fee, whether it was emergence of

17 an alternate bidder or other circumstances that create an

18 obligation on our part.

19 Q    Now, the size of the break-up fee is tied to -- it's a

20 flat number --

21 A    Correct.

22 Q    -- and you agreed to $19.5 million, and you've referred to

23 it as a three percent break-up fee.  Do you think it would be a

24 material different percentage of the final adjusted purchase

25 price for these assets?

Riedel - Direct                                107

1  A    No, I don't.  In the course of the discussions we went

2  through, there were gives and takes, back and forth around

3  adjustments.  But at the end of the day, where we ended up,

4  this would not be a material change.

5  Q    You testified to the fact of why Nokia Siemens Networks

6  would want a break-up fee or might even demand or require a

7  break-up and other bidding protections as part of their

8  willingness to play.  Where there -- what are the reasons that

9  it's important, in addition to the fact that you get them

10  willing to play, are there other reasons to Nortel that it's

11  important to have a stalking horse bidder or to engage someone

12  and be willing to pay these protections to them?

13  A    It's my experience that it enforces a discipline in the

14  auction process.  You have a benchmark, you have a forcing

15  function to shoot for.  And it creates better bid dynamics on

16  the other parties' part.  We saw this in the last week of our

17  negotiations with Nokia Siemens, we were having that desire to,

18  if you will, own that stalking horse position, it became a

19  particularly important variable in the calculus of these other

20  parties.  And so value then shifted hands in terms of those

21  discussions, and became better for our various stakeholders as

22  a result.

23  Q    When you -- you were making reference to other parties

24  that are -- their behavior was changed as a result of this

25  Nokia Siemens Networks pushing forward with a bid, are there

1  other potential bidders whose behavior changed as a result of

2  Nokia Siemens Networks pushing forward?

3  A    I'm sorry, could you repeat that again?

4  Q    Were there other potential bidders or strategic

5  competitors that changed their behavior once they heard that

6  Nokia Siemens Networks was prepared to --

7  A    Yes.

8  Q    And then what -- without going into confidential

9  discussions, can you give us some general flavor for what those

10  changes were?

11  A    It was a set of changes around both price and terms that

12  effectively put an interesting alternative on the table that

13  effectively became useful, as comparing that versus Nokia

14  Siemens' bid.

15  Q    And those price and terms weren't offered until you had

16  revealed to that bidder that Nokia Siemens Networks was out

17  there and --

18  A    We didn't reveal who it was.  We just said there was

19  another party that was well down the track, both in terms of

20  certainty and value.  That they had to up their bid.

21  Q    And do you think that there would have been different and

22  customer reaction if Nortel had announced the sale without a

23  stalking horse bidder?

24  A    I do.  Part of the experience here is dealing with

25  uncertainty, uncertainty for an employee, uncertainty for a

1   customer, in a very difficult economic environment.  So, having

2   some sense of closure, even though there's a process still to

3   run, I want to acknowledge obviously the auction's still in

4   front of us, but having at least a stake in the ground, which

5   then sets in motion a time frame, has been hugely positive in

6   terms of the feedback from customers and employees.

7   Q    So, stepping back and realizing this is a negotiated

8   process then, do you have an overall view as to the

9   reasonableness of the bidding protections being afforded to

10  Nokia Siemens Networks?

11  A    I think they are very reasonable.  They're customary.

12  They're arrived at through arm's length negotiations.  I'm

13  quite comfortable where we're at on them.

14          MS. SCHWEITZER:  I have no further questions for the

15  witness.

16          THE COURT:  All right, Ms. Schweitzer.  Thank you.

17  Does anyone wish to cross examine?  Mr. Hodara?

18          MR. HODARA:  Thank you, Your Honor.  And before I do,

19  because, again, of the peculiarity of the procedural

20  arrangements, is it appropriate to inquire if Mr. Justice

21  Morowitz has questions for the witness?  Or shall I commence my

22  cross examination?

23          MR. JUSTICE MOROWITZ:  Mr. Hodara, you may commence

24  your cross examination.  I can also advise that we do now have

25  video of the witness.

1          THE COURT:  Oh, good.  All right.

2          MR. HODARA:  Good.  I'm glad to hear it's only of the

3  witness.

4          MR. JUSTICE MOROWITZ:  We've lost you, Judge Gross,

5  we do have the witness.

6          MR. HODARA:  Good.

7          THE COURT:  It's a relief.

8          MR. HODARA:  And, Your Honor and Mr. Justice

9  Morowitz, this will be very brief.

10                    CROSS EXAMINATION

11  BY MR. HODARA:

12  Q    Mr. Riedel, you are the chief strategy officer of Nortel,

13  is that correct?

14  A    Correct.

15  Q    During Mr. Bromley's opening comments, he made a comment

16  regarding strategy which I understood to say that part of the

17  sale process in considerations of the company of whether to

18  ultimately sell these assets and other assets is to conclude

19  the right mix of assets to include in any of the sales, did I

20  understand that strategy correctly?

21  A    Yes, you did.

22  Q    Is it fair to say that it would be appropriate or

23  beneficial in connection with the sale of Nortel's CDMA and LTE

24  assets that such sale might or might not include the specific

25  group of assets that have been included in the stalking horse

1  asset purchase agreement or asset sale agreement, and that in

2  so concluding, the estate might benefit from including these

3  specific assets, or some other mix of related assets?

4  A    Yes, I would conclude that the estate would benefit from

5  having the flexibility to deal with additional scope changes to

6  maximize value.

7  Q    Thank you, Mr. Riedel.  Is it your understanding that the

8  intent and the importance of Footnote 2 to the bidding

9  procedures goes to this issue?

10         MR. HODARA:  And that Footnote 2 for the parties who

11  are listening to this question says, "The debtors may entertain

12  bids through the bidding procedures for other assets besides

13  the assets, whether related to or unrelated to the CDMA and LTE

14  businesses."

15  A    That is correct.  That's the intent.

16  Q    One last question, Mr. Riedel.  Is there any preference or

17  prejudice of any kind that you're aware of on the part of any

18  of the Nortel entities or persons involved in the sale process

19  in favor of Nokia Siemens that would in any way favor them over

20  any other ultimate qualified bidder for these assets?

21  A    I'm not aware of any.

22         MR. HODARA:  Thank you.

23         THE COURT:  Good afternoon.

24         MS. FELDSHER:  Good afternoon, Your Honor.  I was

25  just checking my cell.

1          THE COURT:  Yes.

2          MS. FELDSHER:  Jennifer Feldsher from Bracewell &

3   Giuliani on behalf of MatlinPatterson Global Advisors, LLC, a

4   significant bondholder in these cases, Your Honor, just to

5   preface my later remarks.

6          THE COURT:  Thank you.

7                          CROSS EXAMINATION

8   BY MS. FELDSHER:

9   Q    Good morning -- good afternoon, Mr. Riedel.  I apologize.

10  Mr. Riedel, I, too, shall try to be brief.  I'll just ask a

11  couple of questions on what you testified to a few minutes ago.

12         Mr. Riedel, you testified that customers wanted to

13  see Nortel with more money and a stronger balance sheet, is

14  that correct?

15  A    What I said was that a greater balance sheet and a greater

16  ability to give them confidence that they could fund the next

17  generation investment, yes.

18  Q    Correct.  So, were Nortel to have more money and a

19  stronger balance sheet, that would be viewed favorably by your

20  customers, correct?

21  A    Necessary, but not sufficient.  Part of our challenge is

22  footprint and the ability to have global scale to recoup that

23  investment.  And so what effectively they said to us in a

24  number of different ways is, yes, if you had a better balance

25  sheet, that would be nice.  But, frankly, unless I see a global

1  footprint, you're still going to be subscale.

2  Q    Fair enough.  What if you had a financial backer that

3  provided you with a stronger balance sheet and more money who

4  partnered with a strategic, was that ever discussed with any of

5  your customers?

6  A    It was.  The key was to strategic.  We had a number of

7  conversations about if the financial sponsor, or some other

8  entity stepped up to bring the balance sheet, would that be

9  helpful.  And the answer was only in the context of having a

10 strategic integration.

11 Q    But there's nothing that prevents the financial --

12 A    Correct.

13 Q    -- backer from partnering with the strategic --

14 A    That's correct.

15 Q    -- correct?

16 A    That's correct.

17 Q    Also, just a related note, but it might be obviously

18 obvious.  There's nothing that prevents a financial player

19 partnering with a strategic through a Chapter 11 process as

20 opposed to a straight sale, correct?

21 A    That's correct.

22 Q    Thank you, Mr. Riedel.  You also testified that customers

23 were concerned that with a financial party coming in here, you

24 know, just a pure financial.  Just to clarify, the concern that

25 you expressed, that related to a financial player coming in as

1  a buyer for these particular assets as opposed to Nokia

2  Siemens, which is a strategic player, correct?

3  A    That's correct.

4  Q    Did any of your customers object to a financial party

5  coming in as a sponsor for a Chapter 11 plan specifically?

6  A    I'm sorry.  Could you say that again, please?

7  Q    I apologize.  Did any of your customers object to a

8  financial sponsor coming in to sponsor a Chapter 11 plan

9  specifically?

10 A    No.

11 Q    Was that option discussed with any of your customers?

12 A    It was discussed in the context of a standalone CDMA plan.

13 If we were to have a standalone CDMA plan that had some

14 independent status in terms of -- not aligning strategic, how

15 would you -- forget whether it was sponsored by a private firm,

16 or a bond firm, or somebody else, it was only in that context.

17 Q    Correct.  But just to clarify, when you were speaking of a

18 standalone, it was Nortel as it existed at that time that you

19 were discussing it, correct?

20 A    Not necessarily.  We were amenable to a range of different

21 options if that business were to be spun off separately, that

22 was also an option we explored with a couple of our customers.

23 Q    Did you have any financial backer at the time, or

24 financial party, waiting in the winds that your customers would

25 have considered at that point?

1  A    No specific names.

2  Q    Now, you also testified that the business is down -- I

3  believe you said 37 percent since the commencement of these

4  cases.  Isn't it correct, Mr. Riedel, that a big portion of

5  that is because of delayed purchases and not lost customers?

6  A    Actually, no.  The Q-1 and Q-2 are ahead of the plan

7  relative to where we thought we had budgeted this business.  I

8  think part of the big challenge is customers in the aggregate

9  are spending less than they had planned for this year, in part,

10 due to the economy and in part due to our circumstances.

11 Q    But have you lost any material customers through the --

12 since the --

13 A    No, we have not.

14 Q    -- filing of the Chapter 11 cases?  You have not.  And do

15 you have any sense if the process were delayed a short two

16 weeks if you would lose any significant customers?

17 A    I don't think a two-week delay would cause a loss of a

18 significant customer, no.

19 Q    Thank you, Mr. Riedel.  Now, just a few more questions.  I

20 thank you for your indulgence.

21       You testified that Nokia Siemens has spent about a

22 decade trying to make in roads into the U.S. market, is that

23 correct?

24 A    That's correct.

25 Q    Again, is it your sense that if this process were delayed

1  a mere two weeks, that they would forego a decade's worth of

2  efforts here?

3  A    Hardly.

4  Q    I -- clearly that was a little bit of a loaded question.

5                        (Laughter)

6  Q    You also testified, Mr. Riedel, that most strategics could

7  look at these assets quickly.  But that's not the case with

8  financial players like MatlinPatterson, correct?

9  A    They would need more time, yes.

10 Q    Correct.  And not only would they need more time, but if

11 they were looking at not just the CDMA/LTE businesses, but

12 rather at the enterprise as it wholly exists, that would take

13 even more time, correct?

14 A    I'm sorry.  A clarifying question:  You say "the

15 enterprise," meaning --

16 Q    All of Nortel.

17 A    All of them.

18 Q    Your carrier --

19 A    Sure.

20 Q    -- your enterprise business, and any --

21 A    Yes.

22 Q    -- of your other assets --

23 A    Correct.

24 Q    -- that haven't been sold.  That would require more time,

25 correct?

1  A    Correct.

2  Q    In addition, and just to go back to your prior testimony,

3  did you speak to any of the strategic parties that were

4  involved in your initial shop process about possibly partnering

5  with a financial player?

6  A    Yes, we did.

7  Q    Any specific financial player?

8  A    We had a number of names that we had socialized with

9  various folks.  There was limited interest from the strategics

10 that we had talked to about bringing in financial sponsors.

11 Q    So, were MatlinPatterson Global Advisors to propose a

12 particular Chapter -- you know, to speak to the debtors about

13 proposing a particular Chapter 11 plan, they would need

14 significant time to negotiate with the strategics, correct?

15 A    I think you'd need time to negotiate with the strategics,

16 and I think you'd need time to get comfortable with talking

17 with the customers, too.

18        MS. FELDSHER:  Thank you, Mr. Riedel.  I agree with

19 both of those statements, and I'm fairly certain 22 days

20 probably wouldn't be enough time.

21        Thank you, Your Honor.

22        THE COURT:  Thank you, Ms. Feldsher.  Anyone else?

23        MS. MURIN:  We most likely lost the connection again,

24 but it should be -- it keeps coming up and down, but if you

25 want to wait just one moment.

1            THE COURT:  We'll wait a moment.  Let's wait one

2   moment.  Mr. Clark?

3            MR. CLARK:  Thank you.

4            THE COURT:  Good afternoon.  Why don't we wait just

5   one moment?

6            MS. MURIN:  It's coming back up.

7            THE COURT:  There you are.

8            MR. JUSTICE MOROWITZ:  Judge Gross, I think we're

9   back on.  But if there was any explosive testimony in the next

10  90 seconds, we missed it.

11                          (Laughter)

12           THE COURT:  I didn't notice when you dropped off,

13  Justice Morowitz.  But I think the explosive examination is

14  about to come from Mr. Clark.

15           MR. CLARK:  I was going to tell you the same thing,

16  Mr. Justice Morowitz.

17           I don't have very many questions.  Tony Clark of

18  Skadden Arps.  I'm here on behalf of Nokia Siemens, the

19  purchaser.  I just want to follow-up on some of the questions

20  from the bondholders' counsel.

21           MS. FELDSHER:  MatlinPatterson.

22           MR. CLARK:  Oh, MatlinPatterson.  Your questions

23  didn't bother me a bit, Mr. Hodara.

24                          (Laughter)

25                      CROSS EXAMINATION

1  BY MR. CLARK:

2  Q    The last lawyer up here made the point -- or asked you,

3  and you agreed, that a two-week delay, in your opinion,

4  probably wouldn't result in the loss of any significant

5  customers, is that correct?

6  A    Correct.

7  Q    But the longer it takes to close on the transaction, the

8  less of the CDMA's business revenues a buyer will ultimately

9  acquire, isn't that also correct?

10 A    Correct.

11 Q    And you said, did you not, that those revenues run to the

12 tens of millions of dollars a month?

13 A    The cash flow, not the revenues.  The cash flow one would

14 avoid on a month's slip is in the neighborhood of $30 million.

15        MR. CLARK:  Thank you very much.  No further

16 questions.  Thank you, Your Honor.

17        THE COURT:  Thank you, Mr. Clark.  Ms. Schweitzer,

18 anything in follow-up?

19        MS. SCHWEITZER:  Yes, I have a few redirects, please.

20                    REDIRECT EXAMINATION

21 BY MS. SCHWEITZER:

22 Q    Has Nortel come to the point where they've ruled out the

23 possibility that a financial bidder could bid such that they're

24 no longer willing to entertain such bids?

25 A    Not at all.

1  Q    And, in fact, has Nortel contacted any financial bidders

2  throughout this process to see if there was interest?

3  A    Quite a number, both before filing and after filing.

4  Q    You were asked questions regarding customer interest in

5  seeing Nortel reorganize around a plan, whether a standalone

6  plan or partnered with different financial strategic buyers.

7  Do you have an understanding as to whether a plan of

8  reorganization for Nortel's U.S. debtors could be confirmed by

9  year end?

10 A    I think it would be difficult at the extreme.  I go back

11 to the fundamental challenges that we've stared at to try and

12 do that, and it comes back to support from the customers,

13 attrition of talent, and loss of opportunity in terms of next

14 generation business.  And I think at least to this scope of

15 businesses, I don't see those fundamentally changing, i.e., it

16 doesn't get better, it gets worst.

17 Q    Has Nortel made an announcement with respect to strategic

18 plans for other divisions?

19 A    We have.  Two kinds of announcements.  We did announce our

20 intention to sell our interest in our LG Nortel joint venture

21 about a month ago.  And obviously on the 19th, we did indicate

22 that our intention was to -- given we were in accelerated

23 stages of discussions with other buyers for other assets, that

24 that, in fact, be our base plan is to sell the assets to the

25 highest bidders.

1  Q    And have you received, both before and after that time,

2  expressions of interest from potential acquirers for other

3  parts of the business?

4  A    We have.

5  Q    And Nortel's considering all options available to it at

6  this point?

7  A    Correct.

8  Q    Is it Nortel's intention to run all the sale processes

9  through these particular bidding procedures or not?

10 A    I'm sorry.  Say that again?

11 Q    Is it Nortel's -- in this Footnote 2 referenced to the

12 fact that you'd be willing to entertain the bids for non -- or

13 enter into bids that have non-LTE and CDMA assets involved with

14 them, is it your intention in putting forward these bidding

15 procedures that you would be effectively running their entire

16 auction process for your intention -- every Nortel business

17 through this auction today?

18 A    Yes.

19 Q    So, that if some -- are you looking right now for bids

20 for, let's say, Enterprise, and LG, and all these other things

21 through this particular bidding procedures?

22 A    Not through this particular bidding procedure.

23 Q    Okay.  And so what are these bidding procedures designed

24 to do?

25 A    Give flexibility to the buyer to allow them to adjust the

                         Riedel - Redirect/Recross                    122

1  scope of maximize value of the estate.

2  Q    And when you say "scope," you're talking around the CDMA

3  and LTE business specifically?

4  A    Correct.

5            MS. SCHWEITZER:  No further questions.

6            MS. FELDSHER:  Your Honor?

7            THE COURT:  Yes, Ms. Feldsher.

8            MS. FELDSHER:  Brief recross, unless somebody else --

9            THE COURT:  All right.

10           MS. FELDSHER:  Thank you, Your Honor.

11                        RECROSS EXAMINATION

12 BY MS. FELDSHER:

13 Q    Mr. Riedel, I just have one question.  You testified just

14 a moment ago that you -- through the bidding process, you and

15 the company are willing to entertain bids for a Chapter 11

16 plan, in addition to just a straight 363 sale, correct?

17 A    Correct.

18 Q    Is it your understanding that the current -- the bid

19 procedures, as proposed and filed with the Court, would permit

20 somebody to make a Chapter 11 plan proposal?

21 A    Yes.

22 Q    And for that proposal to be considered a qualified one?

23 A    I'd yield to our legal interpretation of the definition of

24 qualifying.

25           MS. FELDSHER:  Your Honor, actually if I may ask --

1  Q    I'm asking you your business decision.  You're considering

2  the proposals.

3  A    Yes.

4  Q    Is it your --

5  A    From a business perspective, yes.

6          MS. FELDSHER:  Okay.  Thank you very much.

7          THE COURT:  Thank you, Ms. Feldsher.  Well, I think

8  we have a considerable amount of time left here, and we still

9  have Justice Morowitz and Judge Walrath's Eddie Bauer matter.

10  Would it be appropriate for us to break in order to take that

11  now?  Those folks have been waiting quite a while already.

12          MR. JUSTICE MOROWITZ:  If it fits Judge Walrath's

13  schedule, that's fine with me.

14          MS. SCHWEITZER:  We're happy to entertain whatever

15  works for both of Your Honors.

16          THE COURT:  All right.  I think we should adjourn

17  this.  I don't know how long the Eddie Bauer matter is going to

18  take, but I had the impression probably not long, maybe an

19  hour.

20          MR. JUSTICE MOROWITZ:  I have some common counsel in

21  the room here.  Is there anybody here on Eddie Bauer that could

22  give a time estimate?

23          UNIDENTIFIED ATTORNEY:  I think probably an hour and

24  a half, Your Honor.

25          MR. JUSTICE MOROWITZ:  Boy, that's longer than what

124

1  was originally forecast.  They're now saying one and a half

2  hours.

3          THE COURT:  One and a half.

4          MR. JUSTICE MOROWITZ:  I think what I'm going to try

5  and do is find a colleague who might be prepared to volunteer.

6          THE COURT:  Okay.  And then we'll proceed with this

7  matter, in other words?

8          MR. JUSTICE MOROWITZ:  Well, perhaps we should take a

9  short break now, Judge Gross?

10         THE COURT:  Yes, let's take -- I'm thinking perhaps a

11  15-minute break.

12         MR. JUSTICE MOROWITZ:  All right.  We'll take a 15-

13  minute break, and I'll try to find a colleague.  Thank you.

14             (Recess 12:26 P.M./Reconvene 1:11 P.M.)

15         THE COURT:  Justice Morowitz, I think you've found a

16  replacement in the other case, is that correct?

17         MR. JUSTICE MOROWITZ:  I have found a replacement.  I

18  have an IOU list that's very long at the moment.

19         THE COURT:  All right.

20         MR. JUSTICE MOROWITZ:  But it's going forth, and

21  we're back, ready to go on this one.

22         THE COURT:  Ms. Schweitzer, are you prepared with

23  your second witness?

24         MS. SCHWEITZER:  Yes, I am, Your Honor.  Just to let

25  you know where we're going is that we have this witness, which

1  I expect to be a relatively short witness.

2              THE COURT:  Okay.

3              MS. SCHWEITZER:  And then after that, there is a

4  limited number of objections that have been filed.  Some of

5  them I think we can clear out as reservation of rights.  And

6  then there's two or three substantive objections that we can

7  take in turn, and then the end is near.

8              THE COURT:  Okay.

9              MS. SCHWEITZER:  Before that, we'll call Mike Murray,

10 who's the managing director from Lazard.

11             THE COURT:  All right.  Mr. Murray.  Thank you.  If

12 you'll stand while you're being sworn, sir.

13             CLERK:  Place your left hand on the Bible.

14               MICHAEL MURRAY, DEBTORS' WITNESS, SWORN

15             CLERK:  Please state and spell your name for the

16 record.

17             THE WITNESS:  Michael Murray, M-U-R-R-A-Y.

18             CLERK:  Thank you.

19                       DIRECT EXAMINATION

20 BY MS. SCHWEITZER:

21 Q    Mr. Murray, can you please tell us where you work and what

22 your job title is?

23 A    I'm a partner with Lazard, a managing director.

24 Q    And what are your job responsibilities at Lazard?

25 A    I am one of two senior partners in the firm that covers

                                    Murray - Direct                          126

1 | the technology industry.

2 | Q    How long have you worked at Lazard?

3 | A    I joined in the fall of 2007

4 | Q    What did you do before you were working at Lazard?

5 | A    I was co-head of technology investment banking for

6 | Deutsche Bank.

7 | Q    How long did you work in that position at Deutsche Bank?

8 | A    I was five years as group head, I had been at the firm for

9 | 13 years.

10 | Q    Can you briefly describe your educational background?

11 | A    I have a Harvard MBA and a Brown BA.

12 | Q    When was Lazard initially retained by the debtors?

13 | A    We -- we became restructuring advisor at the time of the

14 | filing in January.  We had been working with the company for

15 | some time prior to that.

16 | Q    And what has Lazard's role been in the bankruptcy filings

17 | and the related insolvency cases?

18 | A    Restructuring advisor on all matters, and my particular

19 | role is advising on the M&A side of the issues across the

20 | businesses.

21 | Q    And do you -- you mentioned Lazard versus you.  Do you

22 | work with a team of personnel at Lazard?

23 | A    We have a very large team on the Nortel case,

24 | approximately 25 professionals.  In particular, I work very

25 | closely with the vice chairman and co-head of our restructuring

1  practice, Terry Savage.

2  Q    And who at Lazard was involved in the development of the

3  asset purchase agreement in the CDMA and LTE space?

4  A    That was me.

5  Q    And did you consult with others in your group during that?

6  A    Yes.  Yes.

7  Q    Can you let us know your experience with distressed asset

8  sales, and particularly in telecom space?

9  A    Again, I've covered technology since the early '90's.

10 I've worked on, I'd say, at least 50 transactions in the space

11 over those years.  So, of course, I've been involved in some

12 distressed asset sales, but my space has been typified by

13 distress until fairly recently.  But I had sold -- and have

14 worked across from a number of the largest players in the

15 industry, including Cisco, Motorola, Alcatel-Lucent, and

16 others.

17 Q    Mr. Riedel, when he testified earlier, described that

18 Nortel went through a process of -- after the bankruptcy filing

19 of determining whether it was viable to pursue a standalone

20 plan, or whether it was a better decision to sell the assets.

21 Did you have any role in that decision?

22 A    We were quite involved in that, in that decision making

23 end analysis, I should say, including multiple presentations

24 before the Board and discussions with all of the business unit

25 managers with regard to their plans.

1  Q    And without giving away confidential discussions with the

2  company, did you have a view or conclusions based on your own

3  experience in consulting with other experienced folks at Lazard

4  as to whether a standalone plan or an asset sale was

5  preferable?

6  A    I did.  And I am in agreement with George's conclusions

7  and the company's conclusions that the standalone plan, in our

8  opinion and analysis, resulted in lower potential values versus

9  the ability to sell the assets today.

10 Q    Do you have a view on the affect of the bankruptcy on

11 operation of the company, in particular in the CDMA/LTE space?

12 A    I think it's affecting Nortel across its business units.

13 I think the decline in CDMA/LTE that we're witnessing this year

14 has been more radical than perhaps it otherwise might have

15 been, it's declining more rapidly than the overall market.  And

16 I think that's somewhat related to the company's financial

17 situation.

18 Q    Mr. Riedel also testified regarding his and the company's

19 views on whether now is the right time to sell the assets once

20 the decision to sell had been made.  Do you have a view, based

21 on your experience, as to whether his conclusions have merit?

22 A    Yeah.  I do find it compelling that decisions are being

23 made by major customers today with regard to their LTE strategy

24 and vendor choice, which leads me to believe that time is of

25 the essence.

1  Q    And once the company made the decision to pursue asset

2  sales, what did Lazard do to further that process?

3  A    We immediately staffed teams on the various business units

4  and began the process of outreach to the potential buyers of

5  each of them.

6           In this case in particular, we -- as Jim alluded to,

7  we contacted nearly 30 potential counterparties, including both

8  financials and strategics on all -- in all major markets.

9  Q    And then of those nearly 30 that you contacted, how many

10  of them proceeded to what we called the next steps in the

11  process?

12  A    Seven signed NDAs, four started, I would say, real

13  diligence or analysis of information, two in particular emerged

14  as motivated parties.

15  Q    Beyond the 28 parties that you contacted, do you think

16  that there are other obvious choices for partnering or for

17  acquiring the business that you would feel needed to be

18  contacted in addition?

19  A    No, I feel that we've been comprehensive.

20  Q    And what do you base that conclusion on?

21  A    My experience in the industry.  And I also would point

22  out, as George said, I regard the current processes really as

23  the culmination of 18 months to two years of work that's been

24  undertaken by the company in terms of exploring potential

25  options for the business.

1  Q    Mr. Riedel also had given testimony regarding the
2  likelihood that a strategic buyer or financial buyer would be
3  either well suited, better suited or better acceptable to
4  customers as an acquirer.  Do you have a view with respect to
5  the difference between strategic and financial bidders in this
6  process?
7  A    We have certainly heard that the large customers would
8  prefer a strategic buyer.  In fact, they've been quite specific
9  as to what kind of company, and which company in particular
10 they would -- which companies in particular they would prefer
11 as a buyer.
12 Q    Now, have you ruled out the possibility that a financial
13 buyer could be a successful bidder in this process?
14 A    No, we have not.
15 Q    What do you think their main obstacles would be?
16 A    I think that customer reaction would probably be at the
17 top of my list.  I think that that would be negative relative
18 to the perception of a strategic buyer.  And, again, this
19 business has a highly concentrated revenue base, customer base,
20 over 30 percent of its revenue, one major player.  So, that's
21 one.
22        Two, it's a difficult business to leverage because it
23 is in decline.  That being said, it is losing cash flow.
24        So, from a financial buyer's perspective, you could
25 put some limited leverage on it, but I don't think it would be

1   significant.

2           And George alluded to global scale.  I do -- I share

3   the view that that is a significant issue for this business.

4   Q    When you --

5   A    It's significantly smaller than the major competitors in

6   this market.  It's, I think, difficult for it to compete on a

7   global basis.

8   Q    When you say global scale being a significant issue, what

9   are you talking about?

10  A    Just breadth of resources around them, low revenue base,

11  customer base, and different geographies.

12  Q    You're saying the global scale of Nortel's business today?

13  A    Specifically CDMA/LTE, yes.  It's largely a North American

14  footprint today.

15  Q    And are you aware generally of the timing process set

16  forth in the bidding procedures that are proposed today?

17  A    Yes.

18  Q    And the bidding procedures proposed approximately or

19  exactly a 22-day period for potential bidders to submit bids,

20  are you aware of that?

21  A    I am.

22  Q    Do you have a view as to whether that's sufficient time to

23  bring in the highest and best bids for this asset?

24  A    I think it is.  Again, I view this as the culmination of

25  almost two years of work that's been undertaken to identify

1  potential counterparties in of the assets.  I think that those

2  that are prepared and able to bid are very knowledgeable of the

3  business.  That the data room is very well populated, I think

4  the information is there for those qualified bidders to see and

5  reach conclusions quickly.

6  Q    And are you generally familiar with the terms of the asset

7  sale agreement between Nokia Siemens Networks and Nortel?

8  A    Yes.

9  Q    What was your role in that negotiation process of that

10 agreement?

11 A    I worked very closely with George and the team on

12 negotiating that.

13 Q    Can you generally describe for us how those negotiations

14 went?

15 A    I would describe them as a four-month period of time with

16 several starts and stops.  I would describe them as, at times,

17 contentious, almost always vigorous.  And, you know, with the

18 culmination of approximately a two-week sprint that happened in

19 the past month with regard to finalizing the definitive

20 agreement.  We were also able, I would point out to, in my

21 opinion, significantly increase the value of the original offer

22 which came over in March.

23 Q    What parties were involved in the negotiations, to your

24 knowledge?

25 A    Well, certainly on our side it was George and his team at

1  Lazard, our representatives, Cleary on their side, it was

2  Citibank as advisor.  They also had M&A professionals from the

3  parent company of Nokia involved, as well as legal

4  representation from the parent company.

5  Q    Do you have a view as to whether the discussion -- the

6  negotiations were conducted at arm's length?

7  A    I certainly believe that to be the case.

8  Q    Do you have an opinion as to whether Nortel had special

9  preference for Nokia Siemens Networks over any other potential

10 bidders?

11 A    I don't believe that, no.

12 Q    Are you familiar with the purchase price adjustments

13 involved in the calculation of the final purchase price under

14 the ASA?

15 A    Yes.

16 Q    Can you describe that purchase price adjustment for us

17 very briefly?

18 A    The primary purchase price adjustment relates to the

19 delivery of working capital.  This was a negotiated point.  We

20 were quite successful, in my opinion, of lowering the peg or

21 target level to a level that we're extremely comfortable in

22 achieving.  I do not perceive there to be downside risk in

23 price as a result of that purchase price adjustment.

24 Q    When you say you don't perceive there to be downside risk,

25 you're saying that you expect the price to wind up flat or

1  maybe higher --

2  A    Yes.

3  Q    -- in the end?

4  A    I do.

5  Q    Do you have an opinion as to the reasonableness of the

6  value being offered by Nokia Siemens in their stalking horse

7  bid?

8  A    I consider it to be reasonable and fair.  Both in

9  comparison to standalone companies business capabilities,

10  producing cash flow, as well as in comparison to other bids

11  that we may or may not receive.

12  Q    Mr. Riedel had testified that he viewed that the

13  opportunity to realize value off of these assets would decline

14  over time.  Do you share his view that this is a wasting asset,

15  the CDMA and LTE business?

16  A    I do.  The revenues are clearly declining, that's seen in

17  the projections.  The cash flow, as well, is declining.  I

18  think most importantly, though, the company has an inability to

19  sustain the R&D required over the very long period of time to

20  effectively complete in the next generation technologies.

21  Q    Do you have any view as to whether you would characterize

22  this as a fire sale of assets?

23  A    I don't believe it to be.

24  Q    Why not?

25  A    Again, I think that we've had a very vigorous set of

1 negotiations with a very qualified buyer over extended

2 periods of time.  I think we've successfully moved the price up

3 and have reached a very reasonable and fair price for this

4 asset.

5 Q    Are you familiar with the bidding protections being

6 afforded to NSN in this transaction, and specifically with the

7 break-up fee and expense reimbursement provisions?

8 A    Yes, I am.

9 Q    And specifically there's a 19 and a half million dollar

10 break-up fee being offered and a cap of a $3 million expense

11 reimbursement, was there negotiation around these numbers and

12 the conditions in which they would be paid?

13 A    Yes, all of those were negotiated.  With regard to the

14 break-up fee, the 19 plus million is approximately three

15 percent of the in-line purchase price, which is in line with

16 precedent.  Very much in line with precedent.

17        We also negotiated the circumstances under which it

18 would be triggered.  Their original position was simply -- we

19 basically negotiated an alternative bidder had to be

20 identified.  That was not in the original position on their

21 side.

22        With regard to the expenses, there was a bid ask

23 spread of approximately one to five percent, in that range.  We

24 ended up at 3 million which, in my opinion, was a reasonable

25 outcome for our side.

1  Q    When you say that you determined that the three percent is

2  within market, what do you base your opinion on?

3  A    We track break-up fee levels very closely, as you might

4  imagine.  I recent reviewed a database that, I think, recent

5  transactions.  The average across those deals is 2.9 percent.

6  Q    Is there a financing out in this deal?

7  A    No.

8  Q    Do you have an expectation as to whether NSN has

9  sufficient capital lined up that they're able to close this

10 deal?

11 A    I believe that they do.  They recently completed a

12 refinancing of their bank facility, and they have very well

13 financed parent companies.

14 Q    In your mind, what kind of value is contributed to this

15 process and the debtors' ability to realize value off of their

16 assets through designating NSN as a stalking horse?

17 A    I'm sorry.  Could you repeat that?

18 Q    What's your view as to the value added to Nortel and the

19 value that it can receive off of this transaction by

20 designating NSN as the stalking horse?

21 A    I think it has brought value to the process, both through

22 NSN's involvement in the negotiations to date, but also the

23 announcement of the stalking horse bidder.  It gives other

24 potential creditors something to shoot at, it sets a baseline

25 value.  I think it's really healthy with regard to competitive

1  tension for our auction process.

2  Q    Has -- are you aware of customer reactions to the

3  announcement of the deal?

4  A    To a degree.  I believe they've been positive.

5  Q    Do you think there would have been additional risk to

6  auctioning this process if a stalking horse had not been

7  selected?

8  A    I think that -- yes.  I think that there would have been

9  potentially negative impact on a number of areas, including

10 employees where we have, as George mentioned, in suffering

11 elevated levels of attrition.  I think that having a stated

12 buyer, which is a very well known player in the industry, sets,

13 in my opinion, a level of stability for the business that

14 otherwise would have been at potential risk.

15 Q    So, taking the bidding process and the transaction as a

16 whole, are you reasonably comfortable this is in the best

17 interest of the company to pursue this course of action at this

18 time?

19 A    I am.

20            MS. SCHWEITZER:  No further questions.

21            THE COURT:  All right, Ms. Schweitzer.  Thank you.

22 Mr. Hodara?

23            MR. HODARA:  No questions, Your Honor.

24            THE COURT:  All right.  Ms. Feldsher?

25            MS. FELDSHER:  Thank you, Your Honor.

1                          CROSS EXAMINATION

2  BY MS. FELDSHER:

3  Q     Good afternoon, Mr. Murray.  Jennifer Feldsher again from

4  Bracewell & Giuliani.

5          Mr. Murray, you testified that you feel that you have

6  been comprehensive in identifying bidders for these assets, is

7  that correct?

8  A     That's correct.

9  Q     How many of the bidders did you identify were current

10 bondholders of Nortel?

11 A     I would say the ones that we contacted on the financial

12 buyer's side, none of them, to my knowledge.

13 Q     I'm sorry.  Could you say that?  None?

14 A     None.

15 Q     How many were pure financial bidders?

16 A     Of the 28 or so, eight are pure financial players.

17 Q     Okay.  And of the eight -- or of the 28, let's say, how

18 many were financial bidders and strategic partnerships?

19 A     There were a number of potential partnerships that had

20 been discussed along the way.  There was no specific financial

21 MPE firm partnership that was expressly set out with a bid in

22 mind.

23 Q     So, none.

24 A     Yes.

25 Q     Also, you testified that of the main obstacles you see to

1  a financial player coming in and bidding for this asset is

2  customer reaction, which I think you said was --

3  A    Yes.

4  Q    -- one of the major ones.  And I'm just going to ask you

5  the same question that I asked Mr. Riedel.  Would a combination

6  of a financial player to bolster Nortel's balance sheet, along

7  with a strategic, help to assuage that customer reaction, in

8  your opinion?

9  A    I would say we're not averse to -- we don't rule anything

10 out in terms of a potential counterparty here.  So, yes.

11 Q    Thank you.  Also, with respect to the 22 days, you

12 testified, you know, that there is between today and the day

13 that bids are due, assuming that they -- you know, there's some

14 ruling today on the issue.

15 A    Right.

16 Q    You testified that anybody who is able and prepared to

17 bid, I believe were your exact words, would be able to under

18 that time frame.

19 A    I believe that to be true, yes.

20 Q    Do you believe -- are you familiar with MatlinPatterson

21 Global Advisors and their funds generally?

22 A    I am not, only with regard to this matter.

23 Q    Okay.  If I told you that MatlinPatterson was a large

24 private equity firm in New York, would you believe that a firm

25 like that could be prepared and able to bid for these assets?

1  A    I would say to the extent they understand the space, and

2  have gotten to know the company during the course of what has

3  been a very highly publicized process and procedure, yes, I

4  think they could be prepared to move that quickly.

5  Q    But isn't the diligence process supposed to be about

6  potential bidders and other outside parties getting familiar

7  with the space?  Isn't that the exact purpose of a due

8  diligence process?

9  A    Which is why we have an electronic data room that is

10 incredibly well populated with the information required to get

11 somebody intelligent about the business.

12 Q    In 22 days?

13 A    I think it's possible.

14 Q    Okay.  Would it be -- would you still think it was

15 possible if I told you -- and I'm going to represent to you --

16 that MatlinPatterson signed a confidentiality agreement last

17 Friday, but still doesn't have access to significant parts of

18 the data room?

19 A    I still think it's possible.

20 Q    Would you change your opinion if I represented to you that

21 -- actually -- excuse me.  Let me back up a second.  If you

22 were to sign an agreement for any of the other -- not you

23 personally.  But if Nortel was able to sign an agreement for

24 its other businesses, for example, the enterprise business, in

25 your opinion, would it be more likely than not that that

1  agreement would also contain a no shop provision in it until

2  the Court could rule on approval of bid procedures?

3  A    I do believe it more likely than not, yes.

4  Q    So, there is no assurance that even in the 22-day process

5  that you've laid out that there wouldn't be a period by which

6  MatlinPatterson or any other bidders wouldn't have access to

7  significant portions of your well populated data room?

8  A    You mean outside of CDMA and LTE?

9  Q    Correct.

10  A    That's true.

11  Q    Thank you.  You also testified that this is not a fire

12  sale, you don't believe that this is a fire sale.  And your

13  basis for that was that you negotiated extensively with the

14  buyer and successfully moved the price up.

15  A    Yes.

16  Q    And I obviously have no way to know otherwise, but I will

17  take you at your word.

18  A    Thank you.

19  Q    And I know the reputation certainly precedes you.  That

20  being said, would you not agree that in a real robust,

21  competitive process, that that price could go up?

22  A    I think that we've had a real competitive, robust process.

23  Q    So, then the auction is the fait accompli, you're not even

24  holding out hope for any better bids --

25  A    I very much am holding out hope.  I think we may see a

1  higher price result, and I think the auction process as

2  designed is sufficient to achieve that.

3  Q     Sufficient in that only those that have been involved thus

4  far would be able to come in and bid?

5  A     Now, again, as I said, I believe that we have structured

6  the information and the process such that even someone starting

7  from a standing start can get there in time.

8  Q     Unless they didn't have access to the data room?

9  A     Which is true --

10  Q     Which could be the case.  Right, which could be the case.

11  One final question, it's just something I asked Mr. Riedel, as

12  well.  Is it your -- you're familiar with the bid procedures

13  that the debtors are proposing be approved here?

14  A     Yes.

15  Q     Do you believe under those bid procedures that

16  MatlinPatterson, or any other bidder, could come in and propose

17  a Chapter 11 plan under those procedures?

18  A     I do believe from a business perspective, yes, I believe

19  they could do that.

20            MS. FELDSHER:  Thank you.

21            THE COURT:  Any redirect?

22            MS. SCHWEITZER:  No further questions, Your Honor.

23            THE COURT:  All right.  Anyone else?

24                 (No audible response heard)

25            THE COURT:  Thank you, Mr. Murray.  You may step

143

1  down, sir.

2          MS. SCHWEITZER:  Your Honor, for the record, Lisa

3  Schweitzer.

4          I think that we've closed our evidentiary portion,

5  unless there's anyone else that wants to put on contrary

6  evidence.  I would turn to the objections that have been

7  filed.

8          THE COURT:  All right.

9          MS. SCHWEITZER:  So, there's been a handful of

10 objections and requests for clarifications and reservation of

11 rights in different forms.  What I would propose to do is take

12 some of the low hanging fruit and address that.  And then we

13 can give the more substantive some time.  And then we can --

14 NSN also wants to be heard on the different objections that

15 have been filed.  So, we'll -- the debtors and NSN will address

16 them after the objectors have had a chance to speak.

17         THE COURT:  Okay.

18         MS. SCHWEITZER:  So, to start with what I hope are

19 the more low hanging fruit, I may be able to be criticized for

20 my characterization, is the first that there was an informal

21 comment received from the Ontario government, which is a

22 representative for the pension in Ontario, the equivalent of

23 our PBGC type of representative.  And they just wanted

24 clarifying language added into the bidding procedures.  It

25 appears that in all of our efforts to conform everything, we

1  left out a reference to the fact that the Canadian court, as

2  well as the U.S. court, would have to approve the final sale

3  transaction which, of course, everyone's intended.  And we'll

4  modify the bidding procedures to account for that one

5  inadvertent slip.

6          THE COURT:  Very well.

7          MS. SCHWEITZER:  The second thing is there's a

8  property in Alpharetta, Georgia, and their landlord had

9  approached us informally regarding questions whether their

10 lease would be assumed and assigned, or assumed and sublet, or

11 subject to the sale transaction.

12          And in connection with that, the landlord had asked

13 for an extension of their time to object to the sale.  As you

14 may know, there's a two-step process that you object to the

15 contracts to the stalking horse bid, then you get a

16 supplemental objection deadline.  They've asked that they just

17 be allowed to file one objection, that they don't have to split

18 it, except for with respect to cure.  They'll respect the

19 original objection deadline with respect to cure, but all other

20 objections would be at the supplemental objection period.  And

21 we're fine with that.

22          THE COURT:  Okay.

23          MS. SCHWEITZER:  The next objection that was filed,

24 it was a limited objection, reservation of rights was filed by

25 FlexTronics.  FlexTronics, as you are probably well aware based

1  on prior motion practice before this Court, is a substantial

2  supplier to the debtors across their lines of business,

3  including with respect to CDMA, LTE, and they're one of the

4  holders of these referenced bundled contracts.

5          THE COURT:  Yes.

6          MS. SCHWEITZER:  So, FlexTronics had raised two

7  different points with -- first of all, it was more in the

8  nature of a reservation of rights with respect to the

9  substantive treatment of their contracts through the sale

10  process.  And I'd be happy for them to talk, if they feel the

11  need.  But we viewed that as more of substantive sale

12  objections, rather than procedural issues for today.

13          The second issue they had raised is that to the

14  extent that we intended to assume and assign the Flex contract

15  as part of this sale, that they wanted notice of that

16  assumption and assignment by July 1st, rather than by July 7th

17  wherein all other notices would be sent out.

18          Quite frankly, of course, we're going to work to get

19  notices out as soon as possible.  But as the objection reveals,

20  we have told Flex that there isn't currently any intention to

21  assume and assign the contract.  But I'm happy to say that for

22  everyone to be able to sleep at night if we were to change our

23  mind, then we'll change our mind before July 1st.  So, that

24  should hopefully address their objections and concerns.  But

25  I'll allow them speak if they'd like.

1        I'm getting the high sign that I've actually

2   characterized it properly.

3        THE COURT:  Okay.

4        MS. SCHWEITZER:  So -- and then I think there are

5   three more substantive objections:  The Pension Benefit

6   Guaranty Corporation, which I might characterize as a

7   reservation of rights.  But I feel that it's worthy of letting

8   them -- to have opportunity to speak on the record.

9        And then there's an objection by MatlinPatterson, and

10  by the Creditors' Committee, and I know that the U.S. Trustee

11  has expressed some willingness to join or support some of the

12  issues raised in the Creditors' Committee objection.  So, I

13  propose to turn over the podium to the objectors at this time

14  and allow them to proceed forward.

15       THE COURT:  Okay.  Very well.  Who would like to be

16  heard first?  Mr. Hodara?

17       MR. HODARA:  Thank you, Your Honor and Mr. Justice

18  Morowitz.  Fred Hodara of Akin, Gump, Strauss, Hauer & Feld for

19  the Official Committee of Unsecured Creditors.

20       Your Honor, this is a limited objection of the

21  Creditors' Committee.  The Committee is strongly supportive of

22  what we understand through the testimony today and the

23  statements of counsel to be the chosen strategy of the Nortel

24  entities.  That is a strategy to engage in managed sales of

25  each of the asset groups of the company, and to engage in those

147

1  asset sales on a flexible basis.

2        The first of those sales, of course, is the one that

3  is before the Court today with respect to its bid procedures,

4  and that's the sale of the CDMA and LTE assets.  And so, again,

5  the Creditors' Committee is supportive of that approach, and it

6  comes to that support after more than four solid months of in-

7  depth analysis and review of the various options that are

8  before the company and their creditors.  Those options, of

9  course, included a potential standalone plan of reorganization

10 for these entities.  Those options included the potential of a

11 combination of a standalone plan of reorganization for certain

12 of the business groups or assets, and then sales of other -- of

13 the assets.  But it appears to the Committee, based on this

14 period of analysis, that the sale of all of the asset groups is

15 the right approach.

16       And so when we come today to the proposed bidding

17 procedures, we think that it is all the more important, and

18 perhaps more important than usual in looking at these kinds of

19 sale and bid procedures to make sure that we all, all of us

20 here in court today, our colleagues in Canada, are getting the

21 sale and bid procedures right.  Because these will be, if not

22 the template, certainly the model that the parties who are

23 looking at other assets of the company will review, and will

24 use as a starting point as the sale and bid procedures in the

25 forthcoming asset sales.

1          And so that's why we've identified six specific areas

2    of the bid procedures that we believe are problematic and

3    deserve the serious consideration of both this Court and the

4    Court in Canada.

5          We've laid out those six specific items in summary on

6    Pages 2 and 3 of our objection.  And they're not necessarily in

7    the order of importance.  I'm not sure exactly why we did it

8    that way.  But I will identify, as I go through, the nature of

9    each of the six and which of them we think are, in fact, the

10   most important.

11         The first one, the so-called matching right, is one

12   of the six that we think is of a critical nature.  It's not

13   unusual in bid procedures that there is a requirement that a

14   competing bidder, that is a bidder who's seeking to overbid the

15   stalking horse, reach a certain prescribed additional amount in

16   its bid in order for the bid to be recognized as a qualifying

17   bid.  But what -- and that is what the debtor has done in the

18   first portion of the procedures here.

19         But then what the bid procedures provide is that all

20   the stalking horse need do is match that bid, or substantially

21   match it.  Which we take to mean bid a dollar more, Canadian or

22   U.S. is unclear.

23         And so we think that it's essential that the same

24   obligations pertain to both the stalking horse bidder and any

25   other bidders that make a qualifying bid in the process.  We

149

1  think otherwise, there will be a slanting of the playing field

2  of an inappropriate nature toward the stalking horse.

3         The second area that we find objectionable is the

4  early notice of qualifying alternative bids to the stalking

5  horse.  As we read the procedures, as soon as an additional

6  qualifying bid is received, or I think the way to say it is as

7  soon as a bid is received that the debtor qualifies, that bid

8  must be turned over to the stalking horse.

9         In our experience, what's more common, and we think

10  more common because in keeping with the procedures here in

11  Delaware, and I can't speak to the procedures in Ontario, but I

12  suspect they would be similar, it's important that in dealing

13  with the competitive bids, they be handled in a careful manner

14  by the debtor to be vetted with Mr. Murray from Lazard, in this

15  case with the monitor, in this case with the Creditors'

16  Committee and the Ad Hoc Bondholders' Committee, and that the

17  bid not be prematurely shown to the stalking horse before it

18  can be vetted.

19         So, we have no problem with the bid ultimately being

20  shown to the stalking horse.  And in converse, as the stalking

21  horse, if it comes to pass, makes an additional bid, for that

22  bid to be shown to the other qualifying bidders.  But that

23  should all be done in a methodical process after the creditors,

24  the monitor, the debtors, of course, have had an opportunity to

25  properly vet the bid.

1          The next objection that we have to the bid procedures

2  is that the stalking horse is not required to have made a

3  deposit with its bid while the competing bidders will have to

4  make a deposit.

5          Now, we don't question the financial wherewithal of

6  Nokia Siemens.  But we do think, again, in order to keep the

7  playing field level, that if a deposit is going to be required

8  of alternative bidders, and we think one should be, that it

9  should also be required in a similar amount from the stalking

10 horse.

11         The fourth area of objection, due diligence access,

12 was actually the topic of some of the discussion on cross

13 examination from one of the other parties.  And we have been

14 assured, subsequent to filing our objection, that, in fact, the

15 data room is open and will be open to competing bidders.  So,

16 we believe based on the statements of Mr. Riedel today, and of

17 the debtors in speaking with us about this item, that this is

18 no longer an area of concern for the Creditors' Committee.

19         Obviously if there are diligence problems, bidders

20 have not been shy to come to the Creditors' Committee in the

21 past.  But typically, especially with this debtor, it has not

22 seemed to be a problem, and we don't expect it to be now.

23         The next item, I would emphasize, again, is one of

24 the more important of our objections.  And that is the terms on

25 which the debtors will be caused to pay a break-up fee in the

1  absence of an alternative transaction.  And there are several

2  instances under these procedures in which even absent a

3  successful alternative transaction, the break-up fee of a

4  considerable amount of cash would have to be paid.

5        So, for instance, the fee would have to be paid upon

6  enter into an alternative transaction even if that transaction

7  does not close.  And as we understand, for instance, the

8  O'Brien Energy ruling of the Third Circuit, and other cases

9  that have followed it, there needs to be a commensurate benefit

10 to the estate before the cash can be paid out in the form of

11 the break-up fee.

12       And we think that there needs to be the closing of

13 that alternative transaction before Nokia Siemens, as stalking

14 horse, would be entitled to receive the payment.

15       That's not to say that Nokia Siemens wouldn't be

16 entitled to be compensated in some manner for what it has done,

17 and that, in our view, is what the expense reimbursement of a

18 considerable -- several millions of dollars is in the bid

19 procedures to accomplish.  Of course, the hope would be the

20 alternative transaction would close.  Once that happens, we

21 have no objection to the amount and the payment of the break-up

22 fee that's proposed in these bid procedures.

23       Similarly, if NSN terminates the sale agreement to a

24 purported material breach by the debtors, which results in the

25 failure to satisfy any closing conditions, the break-up fee

1  would be required to be paid.  Again, we think expense

2  reimbursement satisfies that instance.

3        There are two others like this.  If the debtors

4  announce that they're going to liquidate the CDMA/LTE

5  businesses rather than sell them, and there are certain

6  scenarios where that could come to pass if, for any reason, the

7  process dragged out or otherwise, if that happens, again,

8  expense reimbursement should satisfy the stalking horse rather

9  than the payment of the $19 million in the way of a break-up

10  fee.

11        And then finally, if the debtors terminate because of

12  any of these very tight deadlines that we've heard about,

13  tight, but we think doable.  But if they're forced to terminate

14  because of missing those deadlines, that should not result in

15  payment of the break-up fee.

16        The final specific area of objection that the

17  Committee has is the potential for waiver of certain key

18  requirements of a qualified bid by the debtor -- by the debtors

19  without consultation or consent of the Creditors' Committee and

20  the bondholder group.  And just to make sure there's no

21  confusion, as I had myself when Mr. Clark made his comments

22  before.  The bondholder group, as we've generally referred to

23  in this case as the Ad Hoc Bondholder Group represented by the

24  Milbank firm, and not MatlinPatterson.  And so we think that it

25  is appropriate in keeping with the flexibility concepts that

153

1  we've talked about today that the ability to modify the --

2  certain of the key requirements.  But that needs to be done in

3  consultation with the consent of the other critical parties

4  that have taken part throughout this process.  So, those are

5  the specific areas of the bid procedures with which we have

6  concern and make objection.

7          The final comment that I'll make is with respect to

8  the scope of assets that is being sold here.  And just to

9  reiterate the point that was discussed between myself and Mr.

10  Riedel during his examination, Footnote 2 of the bid

11  procedures, we think, says it all, and says it appropriately.

12  And to be clear, it says, "The debtors' may entertain bids

13  through the bidding procedures for other assets besides the"

14  Capital A "Assets, whether related or unrelated to the CDMA and

15  LTE businesses."

16          So, if the debtors determine that it makes sense over

17  the course of this process to drop certain assets out of the,

18  capital A, Assets or to put certain other assets in, whatever

19  those assets might be, if they believe that makes sense, then

20  it's our understanding that that's within the scope of the

21  intention of these procedures.  And we think that's not only

22  appropriate but critical.

23          THE COURT:  All right.

24          MR. HODARA:  Thank you, Your Honor.

25          THE COURT:  Thank you, Mr. Hodara.  Mr. Tinker, good

1 afternoon.

2          MR. TINKER:  Good afternoon, Your Honors.  Patrick

3 Tinker for the United States Trustee.

4          Your Honor, my comments will be brief.  The United

5 States Trustee does support the arguments raised by the

6 Official Committee.

7          I don't have anything to add to that -- to those

8 arguments.  I would note that we did have other concerns that

9 debtors' counsel has addressed through the direct examination.

10          I do have the concerns raised by Creditors'

11 Committee.  Your Honor, last week I understand that Your Honor

12 indicated that you would allow us to raise these objections

13 informally --

14          THE COURT:  Yes.

15          MR. TINKER:  -- and I appreciate that.

16          THE COURT:  Yes.

17          MR. TINKER:  I think, Your Honor, to put it very

18 simply:  Our view is that a break-up fee and an expense

19 reimbursement is often times allowed because it can help you to

20 get to a good competitive auction.  And our concerns here today

21 are that some of the provisions in the bid procedures motion,

22 to the extent that they don't allow for an even playing field,

23 they are contrary to those goals.

24          And so, Your Honor, we are not objecting to a break-

25 up fee or expense reimbursement, per se.  We're simply

1 objecting to certain items as identified by the Committee.

2          THE COURT:  All right.

3          MR. TINKER:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          MR. TINKER:  Your Honor, if I may be excused, I

6 actually have another sale hearing in five minutes.

7          THE COURT:  You certainly may, Mr. Tinker.

8          MR. TINKER:  Thank you, Judge.

9          THE COURT:  You bet.  Ms. Feldsher?

10          MS. FELDSHER:  Good afternoon again, Your Honor.

11 This is -- and Mr. Justice Morowitz.  This is Jennifer Feldsher

12 from Bracewell & Giuliani on behalf of MatlinPatterson Global

13 Advisors.

14          Your Honor, as you've heard earlier, MatlinPatterson

15 is a significant creditor in these cases.  It holds

16 approximately, if not more, than 10 percent of the total

17 outstanding bond debt of all of Nortel.

18          Your Honor, we stand before you unfortunately outside

19 of the process at this time, but we're not trying to upend the

20 process.  And I think that is critical to note.  We are not

21 trying to derail the debtors' sale process.  We are not opposed

22 to the debtors' sale process.

23          What we have asked here is for an opportunity to have

24 an open and full sales process.  My client, MatlinPatterson,

25 believes on the current information that it has that it can,

156

1 and will, propose a plan that will deliver more value to the

2 debtors' creditors.

3       That being said, again, it wants the process to go

4 forward.  We may very well be before this Court at the sale

5 hearing singing Kumbaya instead of Don't Stop Believing by

6 Foreigner.  But, you know, we're not there yet.  And all we're

7 asking for this Court and the Court in Toronto to do is allow

8 that process to be as fair and as open as possible.

9       To that end, we were heartened today to hear from Mr.

10 Riedel and Mr. Murray that they believe the current bid

11 procedures contemplate that a Chapter 11 plan could be filed.

12 And that that plan could serve as a qualified bid, albeit both

13 qualified their statements by saying they believe that to be

14 true on the business end.

15      We would obviously ask, and we have proposed language

16 which was appended to our response, that the debtors confirm

17 that that is, indeed, the legal case.  And that that language

18 be added just in order to preserve MatlinPatterson's, but also

19 any other creditors' ability here to propose a Chapter 11 plan.

20 And that plan -- Your Honor, just to be clear, we would propose

21 be subject to the same rigorous standards as all other bids in

22 this case.  And we're not changing any standards for it, just

23 rather that a Chapter 11 plan, rather than a 363 sale, could

24 serve as a qualified bid.

25      And just to highlight the point, Your Honor, the

1  reason there's some ambiguity is that in the bid procedures,

2  they require, as part of being a qualified bid, that a bidder

3  submit a sale -- the word "sale" is in there -- a sale

4  proposal.  And also that that proposal be on terms similar to

5  the current Nokia Siemens transaction.  Obviously that language

6  would not work.  So, we have proposed -- and, Your Honor, it's

7  very limited -- the addition of language that says very clearly

8  that it can also be by a Chapter 11 plan.  We believe that is

9  the right of all creditors here.  We believe there's been no

10 showing by the debtors that a potential transaction that would

11 involve a Chapter 11 plan should not -- should, at this point,

12 be foreclosed.

13         In addition, Your Honor, we stand before you asking

14 for a very, very short extension of the process.  This Court

15 has heard from Mr. Riedel, and we appreciate his candor, saying

16 anybody who has, up to this date, been outside of this process

17 would have a hard time in 22 days coming up with a fully vetted

18 bid for these assets.

19         And just to highlight the point, Mr. Bromley and

20 several of the other attorneys here, but I'm just going to cite

21 Mr. Bromley and, you know, imitation is the sincerest form of

22 flattery here.  Mr. Bromley started his remarks today by

23 saying, "This case has been about complexity and international

24 challenges."  Those were his words.

25         As an outsider, I hear those words, as do my clients.

1 And that says time, just need time to get the right transaction

2 here that maximizes value for all of the creditors.  That may

3 very well be the current transaction, maybe in a slightly

4 modified form.  But you need time to get the right one because

5 there is still value, we believe, to be achieved here, Your

6 Honor.

7 And so as late as yesterday, very late in the

8 evening, Your Honor, we were -- myself, MatlinPatterson

9 principals, as well as MatlinPatterson's financial advisors,

10 had very late conference calls yesterday, as well as throughout

11 this process since we heard about the sale.  We had originally

12 wanted to ask for an additional 60-day process because we do

13 think in a case of this complexity and size that that would be

14 fair and reasonable in these circumstances.

15 But in consultation with the debtors, and mindful to,

16 again, not upend this process, and in consultation with our own

17 advisors, we came forward with the bare minimum, 15 days.  Your

18 Honor, there is a impending holiday in the U.S. that will be

19 coming up, 22 days is not really 22 days.  You will lose people

20 for the July 4th holiday.  So, we asked for a bare two-week

21 extension, and really just to give people back what they're

22 going to lose because of the holiday.

23 For MatlinPatterson to propose a transaction here,

24 they will need to complete their due diligence, but they will

25 also need to speak to other creditors, to speak to strategic

1  parties, as Your Honor has heard from the testimony here.  We

2  are not challenging the debtors' reasoning in these cases or

3  the good faith judgment of the debtors that their customers

4  prefer a strategic.  All we're saying is give us a chance to

5  get there.  We might come in here and -- we might come to the

6  auction hand-in-hand with a strategic and provide the financial

7  backbone and strengthen the balance sheet or have a proposal to

8  do that.  All we ask is for the ability to try.

9        Now, Your Honor, Mr. Bromley mentioned, and I think

10 it's apt to highlight, that the 22 days is not so shocking in

11 light of transactions like Lehman, or Chrysler, I believe he

12 referred to G.M., although that -- the jury's still out on that

13 one.

14       Your Honor, one, I think it's a tough situation to be

15 in to argue that most 363 sales should proceed in accordance

16 with very extenuating cases of Lehman or Chrysler.  The entire

17 financial market does not hang in the balance of this

18 transaction, although I appreciate that it is significant to

19 the players that are here.  And I just want to make mention of

20 the fact that this is precisely not Lehman or Chrysler.

21       This company has not lost money since it has been in

22 Chapter 11.  In fact, by the most recent monitor's report, this

23 company has actually accumulated money.  It has consolidated

24 cash of $2.7 billion.  Asking for a short two-week extension,

25 an extension that Mr. Riedel testified likely will not cause

1  any harm to the business here, is, I don't think too much to

2  ask in order to ensure that bidders have enough time to

3  complete due diligence.

4        And while we've heard testimony from Mr. Riedel and

5  Mr. Murray that there is a runoff of this business because it's

6  a technology business.  New technologies come along all the

7  time, and we understand that.

8        The fact that it's running off business at this point

9  that is in a runoff period, at least as to the CDMA assets, may

10 be important to a strategic, but it might not be important to a

11 financial player.  The financial player can still achieve value

12 with those constraints.  And I think that's important to note.

13 That this is not -- the fact that the business is running off,

14 you know, its valuable technology will not prejudice a later

15 bid by a financial player here.

16       Your Honor, another point that I just wanted to

17 address is why now?  You know, why we waited until now to make

18 ourselves clear.  And I think that's worth a mention here.

19 Until a week ago, or slightly over a week ago when the debtors

20 filed the instant sale motion, we were under the information

21 that the debtors were considering all of their options.  In

22 fact, the debtors have publicly stated to this Court on

23 numerous occasions from the transcripts that I've been able to

24 review that they didn't know at the beginning of this case

25 which way this case would go.  And that they were going to

161

1  consider all of their options.

2          It was only when a little over a week ago, I believe

3  it was a week from Friday, the debtors filed their sale motion

4  that it became evident to MatlinPatterson, and I'm sure to

5  other players, that the debtors' current intention is not to

6  reorganize, but rather to sell off its assets in one off asset

7  sales.  And the reason I can say that, Your Honor, is because

8  what they're seeking to sell in this particular motion is the

9  historical heart of the Nortel business.  And I say that so

10  that that point is not overlooked.

11          There is no restructuring, Your Honor, once these

12  assets are sold.  There is no way to unscramble that egg.

13          And as a result, we believe that that dictates

14  caution, not haste, again, within the confines of the debtors'

15  business.  We are not asking for an extended additional period,

16  but rather a short one.  And we think that that is justified

17  given the severity and the significance of the transactions

18  that are being requested here today.

19          So, in short, Your Honor, just to sum up, we're

20  asking for two things:

21          The first is that the bid procedures be amended to

22  reflect what we have heard today.  Namely that a Chapter 11

23  plan can be proposed and would constitute a qualified bid, so

24  long as it met the other requirements in the bid procedures.

25  We're asking for a short 15-day extension of the process to

162

1  permit those bidders, like MatlinPatterson, who were outside of

2  this process up until now to be able to do their diligence and

3  propose an auction.

4          I find it wholly disheartening to hear from the

5  debtors or their professionals that they believe they've done

6  all that can be done here by their negotiations prior to coming

7  to this Court.  That is not a jab at the, you know, monumental

8  efforts they have undertaken.  To the contrary, we have no

9  qualms with what the debtors have done to date, and take them

10  at their word, and believe they've done a superior job.  But we

11  do believe that the whole process of 363 is you get to have

12  your stalking horse bid, then you get an auction process and

13  you come back at the end of that auction process when the

14  parties can tell the Court -- these Courts actually that we had

15  a fulsome, fair process, everybody could participate, and we

16  now know we have the best bid.  The current process would not

17  capture that because it would foreclose, and we've heard

18  testimony today, anybody who is outside of this process from

19  meaningfully participating in it.

20          We don't believe that is justified.  We don't believe

21  that is reasonable.  We don't believe that's the best way to

22  get to the most value here.  And, therefore, again, I close

23  with the Foreigner song, we have not stopped believing, my

24  client has not stopped believing.  We ask this Court to just

25  give us an opportunity to see if there is more value here to be

1  achieved.

2          Thank you, Your Honor.

3          THE COURT:  Would MatlinPatterson be prepared to

4  guarantee a minimum of $650 million?

5          MS. FELDSHER:  Excuse me, Your Honor.  Could you

6  repeat that?

7          THE COURT:  Would your client be willing to guarantee

8  a minimum of $650 million?

9          MS. FELDSHER:  I am -- I have been authorized to say

10 in open court that on the basis and the information that

11 MatlinPatterson has today, it believes that it is highly likely

12 it will submit a bid of more value to creditors than the

13 current $650 million bid on the table.  No qualifications in

14 that.

15         THE COURT:  So, it would be willing to guarantee the

16 $650 million for the extension of 22 days?

17         MS. FELDSHER:  I don't know if -- I don't know what

18 you mean by a guarantee.

19         THE COURT:  If --

20         MS. FELDSHER:  It's not proposing to put in a cash

21 bid.  It's proposing to reorganize this business, and the

22 business is made up of more than just this -- the carrier

23 business.  As you've heard, Your Honor, it's also made up of an

24 enterprise business and other assets --

25         THE COURT:  Right.

1          MS. FELDSHER:  -- that are worth something, as well.

2    I can tell you that they are contemplating, and certainly would

3    like a bid on their own investment that will achieve value for

4    all creditors here well in excess of this bid.

5          THE COURT:  All right.  Thank you.

6          MS. FELDSHER:  Thank you, Your Honor.

7          THE COURT:  Thank you, Ms. Feldsher.  Good afternoon.

8          MR. MURRELL:  Good afternoon, Your Honor.  Vicente

9    Matias Murrell on behalf of Pension Benefit Guaranty

10   Corporation.

11         THE COURT:  Yes, sir.

12         MR. MURRELL:  And, good afternoon --

13         THE COURT:  Welcome.

14         MR. MURRELL:  -- Mr. Justice Morowitz.

15         Your Honor, PBGC is not philosophically opposed to

16   the sale of assets.  And it also appreciates that, you know,

17   the debtors are going to have to come back in front of Your

18   Honor for an allocation of the proceeds from the sale.

19         However, Your Honor, there's a fundamental problem

20   with the proposed bidding procedures and proposed sale order,

21   and that is that, Your Honor, the debtors are asking Your Honor

22   to approve the sale of assets that are not the property of the

23   debtors.  And, Your Honor, there's a long line of cases which,

24   you know, we cited in our brief in which many courts, including

25   this one, and most of the cases I cite, Your Honor, are

1  primarily from here.  And, Your Honor, I also would add to that

2  the Winstar case which, through oversight, was left out of the

3  brief.  That in which courts have held that in 363 sales,

4  nondebtor assets cannot be sold.  And the way these bidding

5  procedures are currently structured, Your Honor, you know,

6  nondebtor assets clearly are being sold.

7          A sale of nondebtor assets could end up with a

8  situation where state laws regarding, you know, fraudulent

9  transfers are, you know, are brought into play, as well as

10  possibly ERISA, you know, evasion of liability, you know,

11  facets.  And also the Code itself because if these entities go

12  bankrupt later on, these nondebtor entities go bankrupt which,

13  given the circumstances, Your Honor, and the fact that, you

14  know, where the business is going, could very well happen.  You

15  could have a situation with these current nonbankrupt debtors

16  than having to pursue the debtors or bringing actions for the

17  sale of assets that to them and essentially it would leave them

18  -- you know, and certainly that's what would happen because

19  what's being proposed would certainly leave them insolvent or,

20  at the very least, you know, marginally capitalized.

21          We think, Your Honor, that a solution for this would

22  be for the assets to be sold, you know, in a separate

23  agreement, Your Honor.  Not the way it's currently structured.

24          We don't think this is too burdensome, Your Honor, to

25  the debtors.  Right now, Your Honor, you will note that, I

166

1  believe, two Chinese subsidiaries or affiliates of the debtors,

2  Your Honor, are being sold in a separate agreement.  And, you

3  know, it doesn't take that much to carve out these non -- you

4  know, to carve out these non -- you know, these nondebtor

5  entities.  And certainly, as well, along with that the Court

6  should -- and we would ask that the Courts, since this -- since

7  nondebtors cannot be in front of the Court, that the nondebtors

8  be carved -- that the Court not issue any order, you know, free

9  -- you know, selling the nondebtor assets free and clear.

10 Because, Your Honor, that would just be an end run around

11 ERISA's joint and several liability that Congress has seen fit

12 to give PBGC and the Nortel Pension Plan, which has sponsored

13 or -- which is either sponsored by the debtors or which are --

14 to which the debtors are responsible for as members of its

15 control group.

16        PBGC would also ask, along with that, Your Honor,

17 that the bidding procedures be altered such that whoever is

18 taking the -- whoever is taking the assets be given the

19 opportunity to take plan assets, as well -- plan assets and

20 plan liabilities.  And that the debtor should then give a --

21 you know, should give a dollar-for-dollar credit for how much

22 is being -- for how much in plan liabilities and assets are

23 being assumed.

24        Your Honor, I would note that unlike any other

25 creditor in this -- in these cases, that PBGC -- reducing

1  PBGC's claim has a material affect on the amount of the -- on

2  the amount of recovery for the creditors in this case.  Because

3  unlike any other creditor, you know, assuming that, you know,

4  their claims are valued at whatever -- at the face value that

5  -- which they've been put in, even if it's sold, Your Honor, it

6  would take -- you know, they don't -- they still have that --

7  they still have that claim against the estate.  If somebody

8  assumes pension plan liabilities and assets, it would -- you

9  know, our claims are reduced by that amount.

10         And certainly, Your Honor, considering PBGC's joint

11 and several liability here, it would have a material affect on

12 the estates.

13         If there are no questions, thank you, Your Honor.

14         THE COURT:  Thank you.  Thank you.  Ms. Schweitzer,

15 are you going to respond to the objections?

16         MS. SCHWEITZER:  Yes, Your Honor.

17         If it is okay with you, I'd like to take them in

18 reverse order.

19         THE COURT:  Okay.

20         MS. SCHWEITZER:  To touch first on the PBGC concerns.

21 We understand the PBGC concerns.  We understand the PBGC

22 concerns.  We view these as issues that definitely need to be

23 dealt with at the time of the sale hearing and in selecting the

24 highest and best offer at the auction process.

25         I'd like to address a couple of the points in that we

168

1  agree that absolutely every buyer should have the opportunity

2  to take pension liabilities.  We'd love nothing more than for a

3  buyer to take all of the pension liabilities, and we certainly

4  would never stand in the way of an offer that considered any of

5  that.  And certainly we'd absolutely give buyers credit for the

6  assumption of PBGC liabilities, as with any liabilities.  And

7  the bidding procedures now make clear that assumed liabilities

8  are one of the factors that go into taking the highest and best

9  offer at the end of the process.

10           On the second point that he raised that with respect

11  to the proposed sale order, somehow asserting that we're trying

12  to get a free and clear 363(f) finding for nondebtor assets.

13           THE COURT:  Yes.

14           MS. SCHWEITZER:  This order could have been written

15  by a rabbi, or certainly interpreted by a rabbi, maybe.  It's

16  very complex, we've got a lot of defined terms.  But we were

17  trying, at least, to be very careful.  And I think we succeeded

18  in being very careful in making a distinction between assets,

19  the global collective assets being sold versus the purchased

20  assets which, you know, the term we picked, meaning the portion

21  of the assets relating to the U.S. debtors.  That the U.S.

22  debtors, as opposed to the global Nortel enterprise they've

23  conveying, we define as purchased assets.  And when you look at

24  Paragraph 21 of the sale order, it makes reference to the free

25  and clear findings, and elsewhere in the order, to be rapped up

1  in the purchased assets.  But certainly we've got almost a

2  month to go through and fine tooth comb this, and we're happy

3  to accept all comments on the sale order in the due course.

4         THE COURT:  Okay.

5         MS. SCHWEITZER:  On the proposal that we asked buyers

6  to offer separate agreements for the sale of nondebtor assets

7  and to change the bidding procedure requirements, I think, once

8  again, the enemy of the good might be the perfect here in that

9  we would love to have perfect process where we can do every

10 allocation, and not just for nondebtor assets but between U.S.

11 and Canada and any other jurisdiction.  We would absolutely

12 love to do that today and to be able to sell these as

13 disaggregated assets, and we'd love all this.

14        The fact is, as Mr. Riedel testified, that 80, 90

15 plus percent of the assets come from the North American

16 entities, come from the U.S. debtors and the Canadian debts.

17 And certainly in the NSN bid, it's relatively -- I don't want

18 to say de minimis, because I don't want to prejudice

19 allocation.  But in the grand scheme of things, it's not a

20 substantial portion.  And in some instances, it might be the

21 conveyance of employees or the conveyance of customer contracts

22 and the like such that the time and effort for a buyer might

23 just reject the offer that they're going to sign a separate

24 sale agreement.

25        As in NSN, there was a decision for various reasons

1  to make a separate sale agreement for China, but not for other

2  regions where there are smaller buckets of assets being

3  conveyed, sometimes maybe on the level of 10,000 or $100,000.

4  Again, not to put anything on the record that's prejudicial to

5  anyone on allocation, but just to give you an idea of the

6  flavor, could range from one or two contracts, all the way up

7  to a huge chunk of business.  And we recognize that these are

8  showings we're going to have to make later, issues we're going

9  to need to address at the time of the sale and getting anything

10 approved.  But for right now, we think that the bidding

11 procedures provide the flexibility that we need, and we're

12 aware that we have to approach bidders about addressing those

13 concerns.

14         With respect to MatlinPatterson's objection, I guess

15 maybe, again, we're in the world of the enemy of the good is

16 the perfect in that MatlinPatterson seems very sincerely

17 interested, and very active, and very willing to commit

18 themselves to this process, and to try and figure out the best

19 way for us to reorganized.  And we're enthusiastic to hear that

20 they're not trying to derail our sales process, and they really

21 hope and they expect that they'll be able to achieve a plan or

22 propose a plan that has more value to the debtors than the

23 current sale process.  And all we can say is I really hope

24 they're right.  I mean everyone in this room hopes they're

25 right.  So, maybe NSN, no, but everyone else in the room hopes

1  they're right.

2          And so the fact is is that up to this point, the

3  debtors, as the testimony came in, has spent a lot of time and

4  a lot of energy, and have had -- and unvariably large amounts

5  of advisors lined up across jurisdictions all over the world,

6  including counsel to the debtor, they have financial advisors,

7  and they have a monitor in Canada, they have administrators in

8  the UK, they have local insolvency proceedings filed in Europe,

9  they have nondebtors that need their own advice, and the

10  businesses are integrated in such a way that every decision,

11  particularly with respect to a plan of reorganization, has to

12  be vetted up and down that chain to make sure that you don't

13  just pick the best assets, or convey the best assets, or solve

14  for the high class problems.  That there are serious concerns

15  and, you know, when you work through a plan of reorganization

16  and that you can propose a plan that works for the whole

17  business.

18          Right now, the debtors, after a lot of talk and a lot

19  of consultation, and work with the Creditors' Committee in the

20  U.S., and an ad hoc bondholder committee that was formed at the

21  start of the case, that several bondholder participants who

22  have been actively involved in discussions, and actively able

23  to access diligence of the company, that with all those

24  professionals and people thinking very hard, and having a

25  common interest, we have reached the point where we said that

1 now is the time to sell.  And if we can get another plan

2 process in the next month, that's great.  But we can't wait for

3 that plan process.  And I'll let NSN address two weeks versus

4 three weeks versus whatever weeks, but from the debtors'

5 perspective, it's not just a matter about extending bidding

6 deadlines, it's about realizing the fact that we've made this

7 decision based on the information available to us, and our --

8 what we thought we had to do that we're committed to a sale

9 process.  And we're willing to entertain anything, but we can't

10 lose the sale process and the value that we're able to achieve

11 off of that in that hope.

12         That said, we have fiduciary duties.  We're

13 absolutely willing to entertain any bid that walks in the door

14 with or without the sale process.  I know folks have also

15 focused on this Footnote 2 of what assets are in or out, and I

16 think the answer on that, as Mr. Riedel said, is that the

17 process right now is focused on the CDMA/LTE business.

18 Different bidders might define that scope broadly, they might

19 define that scope narrowly, they might say they need more,

20 less, all of it, other assets.  We're here to start with the

21 CDMA/LTE business.  We're going to entertain the bids that come

22 in.  And with that footnote in general, we want to make sure

23 that we can maximize value and that we have the flexibility and

24 the optionality that enables us to maximize value on the time

25 lines proposed here and in other processes that are going on in

1 the parallel -- in the same time.

2        And I think that Your Honor did the cross examination

3 that I'm not allowed to do, and wouldn't do anyway maybe of the

4 asking of, you know, is this money for real.  And I think that,

5 you know, again, I hope it is.  I don't mean to doubt that it

6 is.  But I think that we do have to acknowledge then the

7 circumstance that even in that most unconditional statements,

8 it's the same that in the end, we realize that when we've

9 gotten under the tent, and we've gotten through the exercise,

10 they might, in fact, be singing Kumbaya and they might, in

11 fact, realize that we've all reached the same decision.

12        So, you know, I guess there's nothing more to address

13 on that.  The requests are rather small, and I'll leave NSN to

14 address -- you know, they're discreet in the bidding process.

15 I'll leave NSN's counsel to address, you know, this is their

16 bidding process.  I am proposing their process forward.  And

17 whether it's two weeks, that's one issue.  Whether it's a plan

18 that can come in, that's one issue.  But what we'll really have

19 to do is not lose sight from the debtors' perspective of doing

20 anything that will derail a willingness of an eager bidder to

21 show up and stay through the process.

22        Finally with respect to the objections of the

23 Committee that were seconded by the United States Trustee, I

24 think that we, once again, are in violent agreement that these

25 are precedential procedures.  And that, you know, of course, we

1  did our best.  Then we do recognize that any procedures

2  approved here would affect further auctions in the same way

3  that the Radware sale that took place early on in the case for

4  $16 million has now become, you know, the focus of attention

5  for a lot of people in saying that that somehow created

6  precedential effect, and we get that.

7            But on the other hand, we're not in a hypothetical.

8  We're not in a bubble.  These were heavily negotiated

9  procedures, and they're complex, and they deal with different

10 jurisdictions, and with sensitivities all around the world to

11 answer to the needs of the monitor and the Canadian company to

12 show before their court, to keep enough flexibility in the

13 process for the debtor.  But also we feel that we have made a

14 very concerted effort to not only involve the Creditors'

15 Committee and the Bondholder Committee in this process, but to

16 actively and seriously consider their views, and to take them

17 into account in reaching the right conclusion because, after

18 all, we're doing this in order to maximize value for the

19 stakeholders of the company.  And we've tried in every way

20 possible to include them and consider them.  And with respect

21 to their key bidding requirements, even though they point those

22 out as things that they would like to be locked in time, what

23 the bidding procedures provide is for the different elements to

24 make someone a qualified bidder, including the ones that they

25 spotlight, which is that qualified bidders can't have financing

1  outs.  So, they have to have committed financing.  They don't

2  have diligence outs.  And conditions like that which, of

3  course, the debtors want.  And no one should be under the

4  impression that the debtors are going to ever waive that

5  lightly, and the Creditors' Committee want.

6         With all those key requirements, what the bidding

7  procedures provide is qualified bidders should plan to show up

8  with all of those requirements satisfied.  And the debtors, in

9  consultation with the Creditors' Committee, the bondholders,

10  and the monitor can make a decision in special circumstances to

11  waive those elements.

12         But there's -- no one in this courtroom should be

13  under the impression that the debtors would waive those lightly

14  or just that they're somehow vaporous.  We intend to hold

15  everyone to those standards and we intend, if we were to waive

16  them, to consult with the Committee.  So, we're not really

17  fighting about anything other than disagreement, whether the

18  Committee gets consultation rights or consent rights to that

19  process.  And where we come down on that is that we do have to

20  finalize -- we have to have a smaller universe of people that

21  make decisions in the end, that can make decisions in real

22  time, and we think our interests are aligned enough and that

23  the debtors should be allowed to have some control of the

24  process such that consent right -- that consultation rights are

25  satisfactory and the Committee, on that particular issue,

176

1  doesn't need consent rights for the waiver of those key bidding

2  requirements.

3          To go through the other bidding procedure elements

4  that Mr. Hodara raised.  I think, you know, again, I stand in

5  front of you as debtor counsel, and I'd love to say that the

6  purchaser has gotten no special provisions, that they don't

7  have any matching rights, and that they're going to pay all the

8  break-up -- the deposits, and they're never going to get paid a

9  break-up fee.  That's not the world we live in.  It's not the

10  practice in debtor cases.  And certainly that, you know, it's

11  always a give and take of negotiating of whether -- how many

12  rights a purchaser is going to get compared to other people.

13          We, the debtors, don't feel that these processes that

14  the Committee has spotlighted unduly shill bids, or that they

15  give the purchaser a strategic advantage in the process.  With

16  5 million -- to pick them down in the list, with respect to the

17  $5 million bid increment, other bidders would be required to

18  make the bidding in $5 million increments.  The purchaser would

19  be -- have the right to match.  But, again, the debtors, in

20  their discretion and consultation with all the right people,

21  have the right to alter the bidding increment such that if we

22  thought that there was an injustice being done, we could

23  address that, and we do keep that flexibility.

24          Also, with respect to the sticker price that we're

25  starting with, a $5 million bid increment is quite low, and

1  that was a negotiated number.  So, that the relative prejudice

2  is quite small compared to the size of the headline price that

3  we're talking about.

4        The second point on the early notification of

5  qualified bidders.  That all bidders would get copies of the

6  starting bid at auction.  Every bidder is going to know when we

7  get to the auction what the starting bid is that that have to

8  shoot against.  And the purchaser insisted in also getting

9  copies of all qualified bids, which would be people able to

10 participate in the auction, but they wouldn't be the starting

11 bid.  They wouldn't be the effective auction stalking horse.

12       And to Mr. Hodara's concern that he didn't want to

13 make it a situation where the purchaser was getting that bid

14 before it had been vetted by the Committee, there is -- I

15 acknowledge the bidding timing is tight, but there is a 24-hour

16 process.  And that the -- that we, the debtors, in

17 consultation, again, with the Committee and everyone else, have

18 to first make a determination that a bid does, in fact, qualify

19 as a qualified bid in order to get them in the door.

20       So, on balance, you know, it's just a factor that got

21 in there.  I'll let NSN explain to you the importance of these

22 different factors but we don't, as debtors, view it as so

23 highly prejudicial or shilling of the bidding process, or that

24 it would be detrimental to our process to let NSN see that.

25       On the lack of a good faith for the stalking horse

1  bidder.  I can tell you we asked.  I can tell you we asked over

2  and over and over again.  And I can tell you the entire

3  discussion around the good faith deposit by any bidder was a

4  contentious discussion on all sides of the table because there

5  are different issues, and different jurisdictions, and between

6  the seller and the buyer.

7        But, quite frankly, this is a point where it's just

8  not a level playing field.  It's just not.  The stalking horse

9  comes in and they take the position that they're going to hold

10 their bid open and that they're going to tell everyone their

11 homework through making public their asset purchase agreement.

12 And so that's where they're at risk.  And, in fact, maybe

13 they've put more at risk than a five percent good faith

14 deposit.

15       So, again, we negotiated.  But we don't view that as

16 really that it's something necessary to be required in order to

17 level the playing field because they've got enough skin in the

18 game to make sure that they're committed to this, and that

19 they're at risk, as well.

20       And finally on the payment of the break-up fee for --

21 in the absence of an alternative transaction.  I think that,

22 again, to start with, that this was, as you heard testimony

23 today, this was a highly negotiated provision.  And, of course,

24 the buyer wanted a break-up fee every single time that this

25 deal wouldn't go through.  We said, we never want to pay your

1 break-up fee, and we worked, and went back and forth.

2          But when you step back, the break-up fee here

3 basically gets paid when we decide we no longer want this

4 process.  If we're in this process, and we're seeking to get

5 this bid confirmed, we don't owe that break-up fee.

6          But if we decide that we don't want this process, or

7 we breach our sale agreement.  And when I say "we don't want

8 our process," it's because we've gotten an alternative

9 transaction actually approved by the courts, not just saw, but

10 we actually have gotten the alternative transaction approved in

11 U.S. and Canada, that's when the break-up fee would be paid by

12 the debtors.

13          If we fail to miss milestones in the case by getting

14 orders entered in time, and we, the debtors, decide to

15 terminate the asset purchase agreement as a result, then we

16 have to pay the break-up fee.  If we say, look, we're totally

17 willing to press on and you, purchaser, may not be, then they

18 might get expenses, but they're not going to get their break-up

19 fee.

20          So, basically the negotiation was that if we are the

21 ones that are walking away, either through a breach, through

22 pursuing another sale, or just walking away from the process

23 generally, that's when we owe the fee.

24          And as you heard, the number is, you know, in the

25 scheme of things from people who don't want to pay money, it

180

1  is, you know because who wants to pay money, that three percent

2  isn't the highest number that's -- you know, it's in the range

3  of reasonableness, and we really negotiated back to the point

4  of saying that we felt we could commit to the process and that

5  we were willing to put money at risk if we changed our mind and

6  we wanted to walk away.

7      So, I think that's where we're at as far as

8  addressing the Committee's concerns.  But I do want NSN to be

9  able to speak because I know they had an interest in addressing

10  some of these concerns, as well.

11      THE COURT:  All right.  Thank you.

12      MR. JUSTICE MOROWITZ:  Judge Gross, just before we

13  continue, the court's been sitting now for a considerable

14  length of time.  I would expect that some people in the

15  audience may like a five-minute comfort break, if nothing else.

16      THE COURT:  I think that's fine, Justice Morowitz.

17  Why don't we take a 10-minute break?  It will give Mr. Clark a

18  chance to get his thoughts together even more.  We'll be back

19  in 10 minutes.

20      MR. CLARK:  I might talk longer if I've got longer to

21  think about it, Your Honor.  Thank you.

22          (Recess 2:30 P.M./Reconvene 2:42 P.M.)

23      THE COURT:  Mr. Clark.

24      MR. CLARK:  Good afternoon, Your Honors.

25      THE COURT:  Good afternoon.

1          MR. CLARK:  Thank you for your time and your patience

2    here.  I'm going to say something that is almost never true

3    when it comes out of a lawyer's mouth, and I'm going to try to

4    make it true today.  I will be brief.

5          THE COURT:  Okay.

6          MR. CLARK:  Let's see if I succeed at that.

7          Your Honor, many of the objections that have been

8    made we simply don't take a position on one way or the other.

9    Either they're the debtors' issues or they become moot, or

10   they're really something for the sale hearing.  I'm just going

11   to focus on the few that we do really care about.

12         One objection we actually strongly agree with.  It

13   was an objection that the U.S. Trustee had communicated over

14   the weekend in their informal e-mail to the parties, but didn't

15   mention it here today, and that was an objection to Footnote 2

16   in the bid procedures.  The footnote that says that the debtors

17   can consider bids for assets other than those included in our

18   bid at the auction.

19         Now, Your Honor, that's plainly okay if what we're

20   talking about are nonmaterial assets.  If somebody else comes

21   in and wants to buy the same business as we're buying, but they

22   want to pick up a couple, three small dollar contracts that,

23   for some reason, we're not interested in, that's obviously

24   fine.  But if the debtors want to take bids on -- and sell

25   other material assets, hundreds of millions of dollars worth of

1   assets, then those should be done pursuant to separate

2   procedures with respect -- with appropriate due diligence and a

3   separate auction so that all bidders, including my client,

4   Nokia Siemens, can know what assets they're bidding for and at

5   what stalking horse price.  That's the only thing, I think,

6   that makes sense here.

7           With respect to the few objections that we really do

8   strongly care about, Your Honor, these are objections that are

9   frankly flatly inconsistent with the deal we negotiated with

10  the debtors.

11          First of all, there's the objection to the Committee

12  with respect to a deposit.  The fact that competing bidders

13  have to put up a five percent deposit, five percent of their

14  bid as a deposit.  But that Nokia Siemens doesn't have to do

15  that.

16          The purpose of a deposit, Your Honor -- well, one

17  purpose is to make sure that you've got the financial

18  wherewithal to do a bid.  But Mr. Hodara has already conceded

19  that we have that.  So, that's not the purpose to be served

20  here.

21          The other purpose is so that for such a substantial

22  deposit is to show that the bidder is a bona fide bidder.  And

23  Nokia Siemens has already done that by expending a substantial

24  amount of time, energy, and money doing diligence and

25  negotiating the stalking horse transaction that's here before

1  the Court now.  The bird in the hand.

2          And so, in effect, we've already put up our deposit.

3  And that's why the playing field is level if others who want to

4  come in and compete are required to put up a deposit on their

5  bid, to show that they have the same bona fides that we do, and

6  that they're really here, just as we are.

7          Secondly, Your Honor, there are -- the Committee's

8  objection to the triggers for payment of our break-up fee.

9  They say that should only be payable in the event that an

10  alternative transaction is selected and, indeed, goes to

11  closing.  And that's when the break-up fee should be paid, only

12  when and if that occurs.

13          Well, respectfully that's not our deal.  If the

14  debtors breach their contract with us, as they can do, we are

15  in bankruptcy, this is a 363 auction, but if they breach their

16  contract with us by opting for another path, whether it's

17  another transaction, a 363 sale, or a reorganization plan, or

18  something else, Nokia Siemens is not particularly interested in

19  taking the risk of one of those alternatives actually closing.

20  And that is why we negotiated for what we did in terms of when

21  our break-up fee would become payable.

22          Third, Your Honor, MatlinPatterson objects and says

23  that this auction should be delayed to give other potential

24  bidders more time to decide whether or not they ought to bid

25  here.  And one of the things they say -- or the factual

184

1  premises for that position is that it's really -- these are not

2  wasting assets.  So, there's no big deal to delay it just by a

3  couple of weeks, which Ms. Feldsher said -- and I wrote this

4  one down because I wasn't very good at math either, so I'm not

5  going to throw too many stones here.  But she said they want a

6  two-week extension simply to make up for the time that's going

7  to be lost because of the July 4th holiday.  The last I looked

8  at my calendar, we get one day.  And it's actually not even

9  July 4th, it's July 3rd.  So, two weeks is a little bit longer

10 than that.

11       And she also says that a delay may not be important

12 to a financial bidder.  Well, okay, fine.  But it is very

13 important to Nokia Siemens, which is the only bidder here.  It

14 is the only bird in the hand.

15       We very much disagree, Your Honor, with the asserted

16 factual basis for that objection.  That is these are not

17 wasting assets.

18       As Your Honor has heard from the testimony today, the

19 assets have been on the market for months.  In fact, even

20 before the Chapter 11 filing in January of this year, the

21 witness has testified that they had had discussions with us,

22 and presumably with others about potential transactions

23 involving these assets.

24       So, those folks out there in the world who are

25 interested in this kind of business have known for a long, long

1  time that these assets are available to purchase, or for some

2  kind of a strategic transaction if they're interested in doing

3  it.

4       Now, each of the two asset groups that we're talking

5  about here are, indeed, Your Honor, wasting assets.  The

6  proverbial melting ice cube, if you will, but for different

7  reasons.  What we're talking about are the two technologies

8  that we are purchasing:  The CDMA and the LTE.

9       With respect to the CDMA, Your Honor, this is the

10  current technology, the third generation, 3G technology.  But

11  it is, as the witnesses have indicated, it is dated.  It

12  becomes incrementally obsolete each and every day as newer, and

13  faster, and better technologies get closer and closer to the

14  marketplace.  So, it has a finite life span during which it can

15  earn money for the owner.

16       And each day that passes before Nokia Siemens owns

17  that business results in an irretrievable loss of earnings and

18  a diminution in the value of the assets to us.

19       Moreover, Your Honor, any delay in getting these

20  assets sold to a viable purchaser -- and they're -- I think

21  you've heard this from the witnesses, as well.  There are

22  really only two or three viable strategic purchasers for these

23  assets in the entire world, and we're one of them.  But every

24  day that these assets are delayed in getting sold to one of

25  those viable purchasers increases the risk of a loss of

186

1  customers which, of course, would result in a loss of value to

2  the purchaser.  And that simply -- we heard people say do you

3  think that if this thing is delayed for just two weeks that

4  you'll lose substantial customers?  And they said, well,

5  probably not.  Well, with all due respect, that's a risk that

6  Nokia Siemens doesn't want to take.  We want these assets.  We

7  want them at the price that we've agreed to pay.  And we're

8  willing to go to an auction and listen to others who want to

9  pay more, and maybe we'll pay more if there is an auction.  But

10 we want a closing, and we want a closing soon, and we want a

11 closing soon, quickly, so that we get the value, the benefit of

12 the bargain that we've tried to strike.   Now, with respect to

13 -- that's the CDMA assets.

14          With respect to the LTE assets, this is the new

15 fourth generation technology that's expected to replace CDMA at

16 some point.  So, it's the future of the business that we're

17 acquiring here.

18          The problem with this business, Your Honor, and as

19 the Court heard, what we're really acquiring is the right to

20 employ approximately 700 people who are working on that

21 technology today.  That's the asset, those employees.

22          And the problem with that asset, as Your Honor heard,

23 is employee attrition.  I think the testimony was that prior to

24 the Chapter 11 filing, the attrition rate for these debtors was

25 something in the range on an annual basis of six to seven

187

1  percent.  But that since the Chapter 11 filing, that number has

2  shot up to 25 to 30 percent now.

3          Now, these key -- and these are key employees, Your

4  Honor, who are nervous obviously about working for an employer

5  in bankruptcy, and some of them, 25 to 30 percent apparently,

6  are electing to leave to join other competing employers.  These

7  are very valuable workers to us, and the more of them that the

8  debtors lose while waiting to sell the business to us, the less

9  valuable that business will be to us.  And so delay is a

10  significant, significant issue for us, Your Honor.

11          So, we cannot agree to the modification suggested by

12  these objections to our break-up fee rights, the timing of the

13  auction process, the competing bidder requirements.  But in

14  order to try and forge some kind of a compromise for Your Honor

15  here to get the auction procedures approved today, we can and

16  will agree to the following modifications to the bid procedures

17  that we negotiated, Your Honor:

18          First of all, we certainly can live with a provision

19  that says, "All qualified bidders will get copies of all bids

20  in advance of the auction."  We think that -- and not just us.

21  We think that transparency in that respect will help the

22  process go more smoothly.  So, we're willing to have everybody

23  who is a true qualified bidder get the same information and be

24  able to use it.

25          Secondly, we have no problem with the bid procedures

1 being amended to expressly state that a plan transaction can be

2 included in the definition of an alternative transaction here.

3         Third, Your Honor, it's fine from our perspective if

4 the bid procedures are clarified to make it express and

5 explicitly clear that the pension treatment could be considered

6 by the debtors and the constituents in assessing the relative

7 value of bids, and to require bidders to say in their bid

8 whether or not they are assuming pension liabilities.  With

9 respect to Nokia Siemens, we are not assuming those

10 liabilities.

11         And fourth and finally, Your Honor, we are prepared,

12 if it gets the order for these procedures entered today, we are

13 prepared to give up our right to simply match a competing bid.

14 We'll step into the same position as all other bidders whatever

15 the incremental -- required incremental bid is.  If it's, you

16 know, $5 million, that's what we'll have to do.  If it's

17 modified by the debtors at the auction to something else, we'll

18 have to live by the same increment to make it a new bid, as

19 anybody else.

20         Your Honor, with those changes, I think we've got a

21 set of procedures.  And, frankly, given what I've heard the

22 Committee say and the debtors say, I'm thinking maybe we should

23 be applying for some kind of substantial contribution payment

24 here because we've created the template that's going to, you

25 know, guide these cases for the rest of the asset sales.  And

1  you're very welcome.  You're very welcome.

2                      (Laughter)

3          MR. CLARK:  Your Honor, if the Court has any

4  questions, I'd be happy to address them.

5          THE COURT:  I don't.

6          MR. CLARK:  Thank you very much.

7          THE COURT:  Thank you very much, Mr. Clark.  Anyone

8  else?

9          MR. MURRELL:  Your Honor, Vicente Matias Murrell

10 again --

11         THE COURT:  Yes.

12         MR. MURRELL:  -- on behalf of the Pension Benefit

13 Guaranty Corporation, as well as Mr. Justice Morowitz.

14         Your Honor, just a clarification of something that

15 Ms. Schweitzer said.  Just in case, so there is no

16 misunderstanding, PBGC's objections are only related to the

17 domestic nondebtors, nothing else.  Which is in accordance with

18 the case law, as well.

19         THE COURT:  Thank you.

20         MR. MURRELL:  Thank you, Your Honor.

21         THE COURT:  Thank you.  Oh, Ms. Caloway, why don't I

22 hear from you first?  I haven't heard from you today.

23         MS. CALOWAY:  Thank you, Your Honor.

24         And, Your Honor, Mary Caloway on behalf of Ernst &

25 Young as monitor.

1           THE COURT:  Yes.

2           MS. CALOWAY:  Your Honor, I just wanted to briefly

3  clarify for the record that notwithstanding the fact that in

4  both its objection and its counsel's comments earlier today by

5  MatlinPatterson of taking a couple of statements out of context

6  of the monitor's 14th report, a full reading of the 14th

7  report, and I just wanted to make it clear on the record, that

8  the monitor supports the sale process that is being proffered

9  to Your Honor here today by the debtors and as modified on the

10 record just now by buyer's counsel.  And we didn't want any

11 individual sentences removed from that report to give anyone

12 the misimpression.  And so that it's clear, the monitor does

13 support the process.

14          Thank you.

15          THE COURT:  Thank you very much, Ms. Caloway.  Thank

16 you.

17          Ms. Feldsher, yes?

18          MS. FELDSHER:  Your Honor, while I was glad to cede

19 the podium to Ms. Caloway, I hope that you haven't grown bored

20 of me yet.

21          THE COURT:  No.

22          MS. FELDSHER:  Your Honor, I, too, in the spirit of

23 Nokia's counsel will be brief.

24          The first is we've heard a lot today about the fact

25 that this technology has a finite life span.  It's -- you know,

1  it is technology, yes.  It has a finite life span.

2          That being said, Verizon came out recently -- and you

3  heard a lot about February -- but came out recently and

4  indicated its desire for this platform.  That is a game

5  changer.  It is a game changer for the debtors.  All of their

6  work that they've done in advance with strategic bidders while

7  valiant and fruitful to this point, and I'm not disparaging the

8  Nokia bid.  In fact, I suppose I need to send flowers, you

9  know, somewhat soon.

10          And, again, we're not disparaging the bid that's on

11 the table.  We're saying the game changed just recently.  And,

12 therefore, there are additional parties, including my own

13 clients, who have become interested here in these assets.  In

14 fact, in the entire business.

15          And so our short delay -- and look, Your Honor, it's

16 15 days, I mean, that we're asking for here.  It's designed

17 solely to get those parties, the ones that weren't picked up in

18 the previous efforts of the debtors, to come in and to bid here

19 so that we get the best value.  Obviously Nokia Siemens doesn't

20 want that.  There's nothing wrong with their position, it just

21 is not the best one for this estate.  And I understand the

22 debtors' position is that they need to go forward with the bird

23 in the hand, and to do their darndest to get it approved.  I

24 appreciate that, that's why we've fall on the mercy of the

25 Court.  Because at the end of the day, this Court will have to

1  be satisfied by the debtors and everybody else that it has

2  achieved the best value for these assets.  And all we're saying

3  is the current process would not get us there.

4         Now, again, we heard the loss of customers.  I just

5  highlight the testimony of Mr. Riedel.  This is a business that

6  has not lost a single customer since it filed for bankruptcy.

7  This is not the typical example where a debtor says, you know,

8  we've lost tons and tons of customers that have a lot of

9  options.

10        Nortel's customers do not have options.  They cannot

11 migrate off of this platform easily or quickly.  Nobody will go

12 anywhere in two weeks' time.  While I can't guarantee that, I

13 understand -- I think given the testimony that they've gone

14 nowhere for the last six months leads one to believe that an

15 additional two weeks will be okay, and Mr. Riedel's testimony

16 who is the business person here, corroborates that.  He does

17 not believe there will be a loss of any material customers.

18        And that is the same for the employee matters.  So,

19 Your Honor, just in closing, we're asking for two weeks.  I

20 understand that, you know, July 4th is only one day.  Although

21 those of us with children can stand before you and say, no, it

22 really is a week, and everybody goes away.  We're just trying

23 to get a fair shake, Your Honor.  And that's all we're asking

24 for.

25        Thank you.

1          THE COURT:  Thank you.  Anyone else?  Mr. Bromley?

2          MR. BROMLEY:  Your Honor, hopefully I'll be the last

3  one speaking today, other than the --

4          THE COURT:  It depends what you say.

5          MR. BROMLEY:  -- other than you.

6                        (Laughter)

7          MR. BROMLEY:  I'll try to keep that in mind.

8          THE COURT:  Yes.

9          MR. BROMLEY:  Your Honor, we started out earlier

10 today, much earlier today, talking about this being a seminal

11 event in the course of these cases.  And I believe that nothing

12 that we have seen today in the course of the hearing has

13 demonstrated that to be untrue.  Indeed, I think it's

14 emphasized how important a day it is.

15         We're here to approve the bidding procedures for our

16 first major asset sale.  We have had ample testimony explaining

17 why the process needs to proceed on the time line that we've

18 set forth.  Why this bidder has reasons, good reasons, business

19 justifications for insisting on the time line that it insists

20 on.

21         And while I understand that MatlinPatterson is a well

22 known investment vehicle, and they have certainly a lot of

23 experience in the distressed area, I would note that there's a

24 thin line between being a bona fide bidder and being an

25 irresponsible tease.  We're here with very heavy things that a

1  lot of people have thought about for many, many months.  And

2  not just months, but years.  So, we're not talking about adding

3  two weeks onto a 22-day process.  We're talking about adding

4  two weeks onto a two-year process.  A process that has been an

5  exhaustive process.  A process that's been a very public

6  process.  A process that would have allowed MatlinPatterson at

7  any point in time to have walked forward and said we own bonds

8  or we're buying bonds, and we'd like to be involved.  And

9  they've never done that.  But they're here today at the last

10 minute saying "please delay everything."

11         If they come back in a couple of weeks with a lot of

12 money and a signed agreement, then we might have something to

13 talk about.  But right now, we're talking about a hope and a

14 prayer as opposed to a signed agreement that these estates can

15 enforce against a credible worldwide entity.

16         And so we would say that while it's all well and good

17 to talk about just getting a little bit more time, and a little

18 bit more hope, we need a little bit more on the table in order

19 to try to justify that leap.

20         So, Your Honor, we've had a lot of argument and a lot

21 of objections.  And I think most of them have been resolved,

22 and we certainly appreciate Mr. Clark's efforts.

23         I would note, however, that there's one point that

24 Mr. Clark gave which I think is more -- easy for him rather

25 than for us, which is the idea that we would be providing

1 qualified bidders copies of all bids.  I would want to note

2 that it does -- the provision is in there, not particularly to

3 benefit the purchaser as much as it is to benefit the estates

4 and their constituencies in trying to have time to analyze the

5 bids.  Because what we're talking about is a relatively small

6 delay.

7        Now, if you look at the bidding procedures, what

8 we're talking about is providing to the Committee, the

9 bondholder group, the monitor, and the purchaser qualified bids

10 at such time that a bid is deemed to be a qualified bid, but no

11 later than two business days prior to the auction.  So, what

12 does that mean?  The bids don't come in until the very last

13 day.  And so two business days prior to the auction, we're

14 going to have to provide all qualified bids that we've -- all

15 bids that we've determined to be qualified to anyone who

16 submitted a qualified bid.  We were comfortable providing it to

17 the purchaser.

18        But if we have a robust and multifaceted auction, it

19 could be complicated if we have to provide those qualified bids

20 to multiple parties.  Because just a couple of paragraphs

21 later, what we're -- we are currently obligated to do is to

22 provide the starting bid to everyone.

23        So, the idea that -- say we get five bids, and that

24 is admittedly aspirational, five qualified bids, yes, right

25 now, the way this system is set up, the purchaser would have a

1 chance to take a look at them.

2        The purchaser, however, has now walked away from its

3 matching right.  We would, within a matter of hours, another

4 day or so, have to make a decision as to which of those

5 qualified bids is the starting bid.  And then we would provide

6 that starting bid to everyone who is a qualified bidder.  And

7 then everyone would know what they're shooting at.

8        So, I fear that if we had five bids, all of which are

9 a little bit apples and oranges, and we send them out to

10 everybody, what we will have is the debtors', and the

11 committees' and the various constituencies and their advisors

12 responding to five separate bidders all saying what can I do to

13 improve it, rather than that group getting together, as they

14 are intended to get together, and decide which is the best bid

15 and then take that best bid and show it to everyone else.

16        So, we actually think the system works well.  We

17 appreciate Mr. Clark's efforts to accommodate.  But we would

18 rather it remain as written.

19        Even given the fact that Mr. Clark would still

20 benefit from getting it early.  But, again, having removed the

21 matching right, we think that that's relatively insignificant

22 at this point.

23        So, in conclusion, Your Honor, we'd like to ask that

24 the applications be granted.  That the debtors' request for the

25 bidding procedures to be approved.  That the provisions in the

1  order relating to the notices that we are -- would be obligated

2  to provide be approved, including the publication, both in the

3  Globe and mail, and in the Wall Street Journal, in setting the

4  sale hearing for the 28th of July.

5          We believe that the record amply supports all of the

6  relief requested.  And we would ask for that order to be

7  entered as soon as possible.

8          THE COURT:  Thank you.

9          MR. BROMLEY:  Thank you, Your Honor.

10         THE COURT:  Thank you, Mr. Bromley.

11         Well, I am going to approve the bid procedures with

12  the modifications that Mr. Clark suggested, except for the

13  modification relating to providing the qualified bids in

14  advance.  I do think that would be problematic.  I know that we

15  have a Committee in this case, which has been extremely helpful

16  and cooperative.  But I think that in these circumstances, my

17  philosophy basically is if I have what I view to be a bona fide

18  purchaser, am I prepared to place at risk that offer for what

19  might be or could be or hopefully will be higher and better

20  bids?  But those higher and better bids are still available to

21  be made at the auction.  We don't lose that opportunity by

22  granting these procedures, and that's all they are is bidding

23  procedures.  And I'm sensitive to the fact that 22 days is not

24  a lot of time, but I think it is sufficient time under these

25  circumstances in a case that has been pending for quite some

1  time.  And it is a relatively narrow field of potential

2  purchasers.  And that, of course, also has some significance in

3  my decision to approve these bidding procedures.

4           I think that the PBGC's objections go to the sale.

5  We'll see what happens at the sale, and those will be of

6  concern to me at the sale hearing.

7           I also think that as far as MatlinPatterson is

8  concerned, I am concerned that they be afforded great

9  cooperation from the debtors in having access to all of the

10 information.  And I would want the debtors to really be very,

11 very forthcoming with information provided to them so that

12 there is no delay in their ability to put together a potential

13 plan.

14          But I do think that a $650 million bid -- I will say

15 this.  Some of it I think is perhaps -- forgive me, Mr. Clark

16 -- but a little bit cheeky on behalf of your client in not

17 making a deposit.  You know, I don't know that I would like to

18 sit down and play poker at a table where somebody says, well, I

19 don't have to put in an ante because, you know, I'm providing

20 the sandwiches tonight, or whatever.

21                         (Laughter)

22          THE COURT:  But I don't know, I think that in this

23 particular case, that is going to have such minimal negative

24 impact, if any negative impact upon a transaction of this

25 magnitude with such sophisticated players, if you will, that I

1   just don't think that it really does shill the bidding at all.

2   And I appreciate the other allowances from Nokia Siemens, and I

3   think those will be helpful in at least creating an atmosphere

4   were parties think that they'll be given a fair shot at this

5   auction.  And that, of course, is the most important thing.

6           So, having said that, I will approve the bidding

7   procedures.  There may be a little bit of tweaking that needs

8   to be done, I recognize, Mr. Bromley, in an order.  You could

9   either interlineate it or however you propose, but I do think

10  that the objections will be overruled under these facts --

11  under the facts presented.

12          MS. SCHWEITZER:  Your Honor --

13          THE COURT:  Ms. Schweitzer?

14          MS. SCHWEITZER:  -- Lisa Schweitzer.  There's just --

15  you're right, I think that there's very minor interlineation of

16  the order itself.  I think it's just to acknowledge that

17  objections have been filed, they're being overruled.  And that

18  the final form of the bidding procedure order will be attached

19  to that order.  The bidding procedures attached to that order,

20  as opposed to attached to the motion.

21          THE COURT:  Okay.  Okay.

22          MS. SCHWEITZER:  They're very minor clean-up changes,

23  but, of course, we'll give you a blackline and make it

24  available to the constituencies and objectors, so that they see

25  what's being submitted.

1            THE COURT:  Excellent.

2            MS. SCHWEITZER:  There is another housekeeping point

3  that got lost in the --

4            THE COURT:  Let me just interrupt.

5            MS. SCHWEITZER:  Go ahead.

6            THE COURT:  I want to say just one thing, too.  With

7  regard to Footnote 2, you know, I do have concern that this --

8  we basically know what assets are being purchased.  There could

9  be a little tweaking.  But if all of a sudden this sale

10 transaction changes in any material fashion, so I think that

11 the debtor ought to be careful that it not change much at all.

12 But if there's any material change, I would not approve that

13 because that would create a situation in which people are going

14 to be bidding on different -- not only perhaps making different

15 bids, but making different bids on different assets.  And that

16 could create a tremendous, I think, problem.

17            MS. SCHWEITZER:  Right.  No, everyone understands

18 that their concern is to show highest and best in the assets

19 presented.  And I think our view is that we cross that bridge

20 when we see it because we have to deal with what would

21 effectively be a private sale, and we'd have to make a separate

22 showing around that.  So, I think everyone understands your

23 concerns and appreciates it.

24            THE COURT:  Okay.

25            MS. SCHWEITZER:  And that's helpful guidance for

1  everyone to have.

2           There's one other ministerial point in that the asset

3  purchase --

4           THE COURT:  Mr. Hodara, yes?

5           MR. HODARA:  I'm sorry to interrupt.  But before we

6  get to another point, on the point of Footnote 2, if I may,

7  Your Honor.

8           THE COURT:  Yes.

9           MR. HODARA:  I think the reason that the parties have

10 harped on that point so much is because it's our belief, based

11 on, as Mr. Bromley indicated, not 22 days of shopping the

12 asset, but literally weeks and months of talking with

13 interested buyers that there may, in fact, be a bona fide bid

14 in the wings that includes assets other than the specific

15 assets within the four corners of the current agreement.  And

16 if our goal here is to make sure that we maximize value for the

17 estate, I think the testimony has been clear that this is a

18 flexible process by design.  So, I would ask Your Honor to

19 either reconsider that point, or perhaps do as you have done

20 many times in the past and permit us to come back to court over

21 the course of this short 22-day period if, in fact, there is an

22 alternative bid that is making sense to parties -- by parties,

23 I mean the debtor, the monitor, and the committees -- and seek

24 the Court's permission at that time, if appropriate, or

25 clarification at that time as to whether the competing bid is

202

1  one that can be entertained.

2          THE COURT:  I think Mr. Clark would like to address

3  that.

4          MR. CLARK:  Your Honor's prior comments were

5  brilliant, insightful, shouldn't be changed on syllable.  And

6  if something happens at the auction, Your Honor, that people

7  think that Your Honor ought to consider at that time, they can

8  come in and ask Your Honor to consider it at that time.

9          But right now, what we have, and what we ought to

10  have are clear bid procedures for a clear set of assets that

11  are being sold with a floor of $650 million that my client is

12  providing based on procedures we agreed to.  And we didn't

13  agree to procedures that said, oh, yeah, you can tack on 400,

14  $300 million of other assets that's got nothing to do with our

15  bid, and use that to compete against us.

16          Thank you, Your Honor.

17          THE COURT:  I am concerned with a moving target, and

18  the harm and the mischief that result from it.  And I would say

19  that, first of all, I'm readily accessible.  If that happens,

20  as Mr. Hodara indicated, I would like to hear about it in

21  advance.  And it may have -- we may find ourselves in a

22  situation -- well, I don't know.  I'm concerned.  I don't like

23  to approve bidding procedures where I don't know necessarily

24  what assets are involved in the sale.

25          MR. BROMLEY:  Well, I think, Your Honor, it's very

1 | clear that we're selling the CDMA and LTE assets.

2 |         THE COURT:  Right.

3 |         MR. BROMLEY:  The question is if someone comes to us

4 | with a proposal, like MatlinPatterson, that says I want to

5 | propose a plan of reorganization for all of Nortel --

6 |         THE COURT:  And that language has been conceded.

7 |         MR. BROMLEY:  That language has been added in.

8 |         THE COURT:  Yes.

9 |         MR. BROMLEY:  That can be an alternative transaction.

10 | That would be an alternative transaction that would generate a

11 | payment of the break-up fee and the expense reimbursement.

12 |         THE COURT:  Correct.

13 |         MR. BROMLEY:  That would be a different package of

14 | assets than the one that is the subject of the Nokia Siemens

15 | proposal.

16 |         I don't think that Footnote 2 -- I think we're

17 | getting a little mixed up about it, and I do agree it's a bit

18 | of a moving target.  I think fundamentally what we're talking

19 | about is that if there is another material transaction that is

20 | available to be proposed, and someone comes to the debtors with

21 | that, that the debtors will have to take a look at it.

22 |         Now, I think it's a fiduciary duty issue.  If someone

23 | came to us tomorrow and said we have $5 billion and we want to

24 | buy all of the business, we would say to Mr. Clark, here's your

25 | expense reimbursement and break-up fee, and thank you very

1  much.

2          If someone came in with a deal that was $1 more than

3  Mr. Clark's clients, we would say, in all likelihood, no, thank

4  you very much, and we'll go with Mr. Clark's client.

5          There's a lot of distance between that extra dollar

6  and the $5 billion deal.  And I think all we're looking for is

7  to have the flexibility that when somebody comes to us with a

8  proposal, that we can listen to it.  And I don't think that the

9  bidding procedures say that that's not possible.  It may mean

10  that the -- that we need to come back to both courts for

11  guidance, and I think that would be the appropriate thing to

12  do.

13          But it's definitely the debtors' view that the best

14  thing that we can have is an apples to apples comparison.

15          THE COURT:  Sure.

16          MR. BROMLEY:  And we'd certainly encourage anyone

17  who's out there looking at the LTE and CDMA assets to view it

18  in that fashion.  But it is also important to recognize that it

19  may be that others feel they can't do that.  And if we're to

20  have a true auction and a true fiduciary duty here, we need to

21  be able to look at whatever anyone delivers.  And the process

22  provides -- doesn't mean that it's a qualified bid, and it

23  doesn't mean that we are going to go forward on this bidding

24  procedure.  But it means that we have to be able to take a

25  look at it.  We can't simply close our eyes to it.

1         That said, you know, if someone's bidding on the CDMA

2  and LTE assets, we want to know exactly what they want, how

3  they want to pay for it, what they're going to do with it, and

4  when they intend to close on it so that we can compare it on

5  the best basis possible to the proposal that's been put on the

6  table.

7         I think you've heard that the business is

8  sufficiently malleable in some respects with respect to

9  different purchasers that we just want to have flexibility on

10 that.  And the protections that Mr. Clark's client has with the

11 break-up fee and the expense reimbursement, and that is

12 appropriate and fair, and we very much believe that it should

13 be approved and is justified in this circumstance.

14        And believe me, nothing that -- the debtors will do

15 nothing in a cavalier manner.  We'll do everything that we have

16 to do in a consultative basis, and the way that we've done it

17 to date.  And we take all of the obligations that we have under

18 the agreement, and to both courts, and to all of our

19 constituencies very seriously.

20        So, I hope that we're not trying to legislate for the

21 hypothetical.  We have a sale transaction.  We want to proceed

22 with it.  We want people to bid against it.  But we have

23 somebody here saying they want to put a plan together, that's a

24 different transaction.  That's an alternative transaction.

25        If somebody else shows up and says they want to buy

1 all of it, and then some, I think we have to be able to come

2 back to the courts and say this has landed in our lap, what

3 should we do.

4          THE COURT:  Yes, and I do appreciate that.  And

5 obviously, this Court is very concerned about maximizing value.

6          But just so you understand my primary concern, it is

7 -- you know, an auction is presumably the best test of value

8 for the estate.  And if somebody comes in at the last moment

9 with purchasing additional assets where other parties were not

10 also bidding on those other assets, it becomes very difficult

11 for a court to say yes, you know, that's been market tested and

12 I think that's a fair price.  That's part of my concern.

13          MR. BROMLEY:  And it's definitely part of the

14 debtors' concern, as well, Your Honor.  And if anyone is out

15 there considering doing just that, I think they need to take

16 that into very serious consideration.  Because unless there's a

17 fair market test for the assets that are being sold, then we do

18 believe that the courts are going to have to take into account

19 the lack of that market test.

20          THE COURT:  Right.

21          MR. BROMLEY:  And so by no means would we be looking

22 to do anything out of the ordinary in that respect.  So, that

23 is a -- if somebody wanted to come in with a proposal that was

24 in that fashion, the -- with respect to specific assets that

25 had not been tested, they better be sure about it, and they

1 better be sure that they're putting up money that is sufficient

2 to make that issue go away.  And I doubt that people are out

3 there ready to do that.  We'll see.

4          THE COURT:  I doubt it, too.

5          MR. BROMLEY:  We'll see.  But the point of view is we

6 are selling the CDMA and LTE assets.  The transaction is an

7 important transaction.  We believe that we should follow

8 through with it, and we will, subject to the ability of other

9 parties to come and make bids.

10          It's hard to sit here today and say, you know, well,

11 what if this or what if that.  We really don't have anything in

12 front of us to make a decision.

13          And I don't think that bidding procedures are ever

14 designed to prevent anyone from looking at what people throw at

15 you, so to speak.

16          THE COURT:  Understood.

17          MR. BROMLEY:  And so -- but by that same token, we

18 have 10 pages of requirements of showing up, and financial

19 wherewithal, and conditions, and what people have to put on a

20 piece of paper in order for it to be considered.

21          The fact is is that these processes are fairly fluid.

22 And many times, we have people taking somewhat cavalier

23 approaches to indications of interest.  And, you know, for

24 better, for worst, I think our M&A team and our investment

25 advisors have gotten pretty good at snipping those out.  So,

208

1 you know, we want hard and fast, clear cut, achievable

2 transactions.  And it is in that spirit that we've approached

3 this one.

4           THE COURT:  All right.  Thank you, Mr. Bromley.  Mr.

5 Clark?

6           MR. CLARK:  Your Honor, in view of the Court's

7 comments, I just want to make sure we all understand what the

8 record should be when these bid procedures go out there.

9           As I understood what Your Honor said, Footnote 2

10 comes out.  And that's what I'm asking.  Either it should come

11 out, Your Honor, or it should say "nonmaterial assets" to make

12 it clear that people are not being invited to come in here and,

13 as I say, bid on material assets that are not subject to the

14 stalking horse bid at this point.

15           THE COURT:  Well, let me say this, and I don't know

16 if this addresses it, but if there were material changes in

17 what was being auctioned, I think that the process would have

18 to start over.

19           MR. CLARK:  Thank you very much, Your Honor.

20           THE COURT:  That's what I think.  I do want to make

21 that clear.  I don't want to see a situation in which somebody

22 is suddenly throwing in the kitchen sink and there hasn't been

23 bidding on that kitchen sink.  I don't know what qualified bids

24 mean in that situation anymore, and we have a different

25 auction, and we start over.

1          MR. CLARK:  Understood, Your Honor.  Thank you.

2          THE COURT:  And if that's what parties want to do,

3   and if they think that there is that much better a transaction

4   out there than is on the table at the moment, then we'll start

5   over.

6          I mean one thing that concerns me, I don't know if

7   there is a party out there right now that is making or

8   expressing an interest.  And I'm not asking.  But I'll just

9   tell you what I think.  That is expressing a much different bid

10  for a lot more money.  And if that's the case, then we

11  shouldn't proceed down this path.  I think that's what I'm

12  saying.  I don't want to see us all of a sudden going in a

13  completely different direction here.  If that is what is being

14  contemplated by this debtor and the Committee, and I don't

15  blame you, but let's not go forward with these bidding

16  procedures then.

17         My whole principle in approving them today is a bird

18  in the hand.  And if you've got the bird in the hand, but

19  you've got another one under the table, then I'm not happy.

20         MR. BROMLEY:  Well, Your Honor, we certainly have a

21  bird in the hand.

22         THE COURT:  Okay.

23         MR. BROMLEY:  And we want a lot of other birds flying

24  in the door, and that's what we're trying to balance.  And we

25  do agree --

1            THE COURT:  I understand.

2            MR. BROMLEY:  -- this is very difficult.  Could I

3    just ask for two minutes with Mr. Hodara?

4            THE COURT:  Absolutely.  Would you like me to step

5    out and give you five minutes?

6            MR. BROMLEY:  I really think it would only be two

7    minutes.

8            THE COURT:  Okay.  Ms. Caloway?

9            MS. CALOWAY:  Your Honor, I'll use this two minutes

10   to address a housekeeping matter --

11           THE COURT:  Yes.

12           MS. CALOWAY:  -- on the Chapter 15 side.  And I would

13   just request Your Honor's approval, as I anticipate that

14   tonight or tomorrow, depending on when we get copies of the

15   signed orders from the Canadian court, we will be filing

16   motions in the Chapter 15 here to enforce those orders.

17           THE COURT:  Yes.

18           MS. CALOWAY:  And since we don't have omnibus hearing

19   dates, and if we get it filed tonight or very early tomorrow, I

20   think we could get -- satisfy the notice requirements without

21   the need for a motion to shorten notice for the next omnibus

22   hearing in these cases, which I think is the 17th.

23           THE COURT:  That would be fine.

24           MS. CALOWAY:  So, I would like to just be able to put

25   the motions to enforce the Canadian orders on for a hearing on

211

1  the 17th.

2          THE COURT:  Absolutely.  Something ministerial of

3  that nature, yes.

4          MS. CALOWAY:  Thank you, Your Honor.

5          THE COURT:  You're welcome.  Justice Morowitz, now I

6  can hear you, sir.

7          MR. JUSTICE MOROWITZ:  Good.  I was just going to

8  address yourself briefly, and then Ms. Caloway, that I don't

9  think the Canadian court has quite pronounced on it yet.  I

10 think a five-minute recess would be in order.

11         MS. CALOWAY:  I apologize for that, Your Honor, I was

12 being maybe overly optimistic and anticipating what I should

13 not have anticipated on the record.

14         THE COURT:  Well, let's just say that within a

15 reasonable time, yes, we will certainly allow that on a

16 shortened basis.

17         MS. CALOWAY:  Thank you.

18         THE COURT:  Yes.

19                         (Pause)

20         THE COURT:  Ms. Kim?

21         MS. KIM:  Your Honor, we have one other motion.

22         THE COURT:  We do.

23         MS. KIM:  And I don't know if now is an opportune

24 time.

25         THE COURT:  Yes.

212

1            MS. KIM:  I didn't want to have --

2            THE COURT:  As long as the Committee is not opposing

3  it.

4            MS. KIM:  The Committee is not opposing it.

5            THE COURT:  Okay.

6            MS. KIM:  Although maybe I might -- I might ask one

7  of my colleagues to just jump out and let them know that we are

8  presenting this motion.

9            THE COURT:  Okay.

10                         (Pause)

11            CANADIAN REGISTRAR:  Can you hear me, Judge Gross?

12            THE COURT:  Yes, now I can hear you.

13            CANADIAN REGISTRAR:  I'm sorry.  This is the

14  Registrar of the Courtroom 807.

15            THE COURT:  Yes.

16            CANADIAN REGISTRAR:  His Honor was addressing you,

17  and was saying that a five-minute recess, so he's not in court.

18            THE COURT:  Oh, I missed that.

19            CANADIAN REGISTRAR:  We're just in a five-minute

20  recess.

21            THE COURT:  Okay.  Thank you.

22            CANADIAN REGISTRAR:  All right?

23            THE COURT:  Thank you.  Thank you.

24            CANADIAN REGISTRAR:  You're welcome.

25            THE COURT:  So, we should take, I guess, a couple of

1  more minutes, all right, while Justice Morowitz is off the

2  bench.  Oh, no, this only pertains to our action, right?

3            MS. KIM:  Yes, exactly.

4            THE COURT:  Okay.

5            MS. KIM:  Exactly.  It's not a joint hearing issue.

6            THE COURT:  Good.

7            MS. KIM:  This is for -- this is the debtors' motion

8  for a final order authorizing the debtors to be able to enter

9  into one or more letter of credit, or bonding facilities.

10           THE COURT:  Yes.  Yes.

11           MS. KIM:  And if Your Honor may recall, Mr. Bromley

12  at the last hearing --

13           THE COURT:  I entered the interim order on that.

14  Exactly.

15           MS. KIM:  Exactly.  We received -- there was a couple

16  of developments since you entered that interim order.  First,

17  the debtors have been engaged in substantive negotiations with

18  two financial institutions, and hopefully are close to being

19  able to enter into letter of credit facilities with those two

20  financial institutions and have been in consultation with the

21  various constituents, the Committee, and the U.S. Trustee, and

22  we expect to, as those progress, to be able to give them notice

23  of the facilities once we've actually finalized them or are

24  close to finalizing them.

25           THE COURT:  Okay.

1          MS. KIM:  The other thing is that we did receive some

2   comments -- informal comments from the U.S. Trustee and have

3   incorporated them into the revised order that I would hand up

4   to Your Honor, if Your Honor is going to approve this -- the

5   order.

6          THE COURT:  Excuse me one moment.  Justice is

7   calling.

8                        (Pause)

9          THE COURT:  Thank you.  Please be seated.  And I

10  think that Justice Morowitz may have a few comments, as well.

11         Justice Morowitz?

12         MR. JUSTICE MOROWITZ:  Thank you, Judge Gross.

13         Mr. Tay, is there anything you wish to add to what

14  has already transpired down in Delaware?

15         MR. TAY:  Thank you, Your Honors.  In the break that

16  we've had, I've had a chance to consult with counsel around the

17  room.  And clearly no one feels the need to add to anything

18  that has been said from a argumentation perspective, or from

19  the factual perspective.

20         The -- what we're interested in obviously is that we

21  need consistent bid procedures being approved in both

22  jurisdictions.  We were hoping that as -- in allowing the U.S.

23  proceedings to proceed first, that we get clarification, which

24  we have gotten, and we're very thankful to Judge Gross for

25  that.

1         And my job here right now is to submit to you, Mr.

2  Justice Morowitz, that you have the jurisdiction and the

3  ability to come to the same conclusion.  And I would refer you

4  to -- and you don't need to turn to it, but the Sound Air

5  decision, which I'm sure you're familiar with.  And although

6  that was done in the context of a receivership, I would submit

7  that the principles that were annunciated in that case should

8  equally apply to this fact situation.

9         And I'll simply take you through the four principles

10 very quickly.  And although this was, as I've said, in the

11 context of a receiver, says it should consider -- the court

12 should consider whether the receiver has made a sufficient

13 effort to get the best price, and has not acted improvidently.

14        The second test is it should consider the interest of

15 all parties.

16        Thirdly, it should consider the efficacy and

17 integrity of the process by which offers are obtained.

18        And lastly, it should consider whether there has been

19 unfairness in the working out of the process.

20        I think we've all seen in the proceedings today, and

21 in the evidence that was given today, that there clearly has

22 been due process.  There has been an ability for all of us who

23 have wanted to participate to participate.  And I believe, and

24 I submit to you, Your Honor, that under the Canadian law, that

25 we fall squarely within these principles.

216

1         And that I would submit to you that we should adopt

2    the same finding as has been found in the U.S. proceedings.

3         Those are my submissions.  Thank you.

4         MR. JUSTICE MOROWITZ:  Thank you.  Anybody else have

5    anything to add?  Mr. Pasquariello?

6         MR. PASQUARIELLO:  Good afternoon, Judge Gross.

7         THE COURT:  Good afternoon.

8         MR. PASQUARIELLO:  Your Honor.  The monitor has filed

9    its 14th report in relation to the Nokia Siemens sale agreement

10   and the related bid procedures.  And the monitor has reviewed

11   the efforts of the applicants to divest itself of the CDMA and

12   LTE businesses.  It is of the view that the applicants are

13   acting in good faith to maximize value for the benefit of the

14   stakeholders.

15        The monitor, therefore, recommends the approval of

16   the Nokia Siemens sale agreement as the stalking horse bid and

17   approval of the bidding procedures described therein.

18        If I may, Your Honor, clarify one point as it relates

19   to the bid procedures, and I'd ask you to turn to them.  And

20   they can be found in the 14th report as Tab C.  And in

21   particular, Your Honor, on Page 2 under the heading of Bidding

22   Process.

23        MR. JUSTICE MOROWITZ:  Yes?

24        MR. PASQUARIELLO:  To avoid any confusion, the last

25   sentence speaks to dealing with disagreements or

217

1  interpretations of the bidding procedures, and has the

2  jurisdiction of the Bankruptcy Court which is to be the U.S.

3  Court, to deal with and resolve those disputes, except with

4  respect to the application or the terms of any Canadian order.

5  We wanted it to be abundantly clear to the parties that --

6  especially given the joint hearing here today, that we view

7  that -- the monitor views that as being somewhat moot.  And

8  that to the extent that there are any issues with respect to

9  these bidding procedures, it is the expectation certainly of

10  the monitor, and I believe of the other parties, that like it

11  or not, we'll be back before both courts to deal with the

12  matter.

13        MR. JUSTICE MOROWITZ:  Thank you.  Mr. Pasquariello,

14  in light of the fact that Nortel is embarking on a series of

15  363, or asset, sales, and absent any type of plan of

16  arrangements coming forth, it very much looks like there's no

17  continuing business.  Does that require any enhanced oversight

18  by the monitor of these circumstances?

19        MR. PASQUARIELLO:  Your Honor, the monitor has been

20  extensively involved.  So, I don't want to suggest that it

21  hasn't by answering in the affirmative that additional -- an

22  additional oversight is required.  The monitor has been working

23  very closely with the company, both in respect of operational

24  matters, and in its efforts vis-a-vis sale divestiture.

25        So, I think the answer to the question is given the

1 extensive involvement in this particular case of the monitor,

2 we would expect that it would be status quo in terms of the

3 involvement of continuing at what is, in my respectful

4 submission, a very high level and degree of touch point as

5 between the monitor and the CCAA applicants.

6           MR. JUSTICE MOROWITZ:  Thank you.

7           MR. PASQUARIELLO:  Thank you.

8           MR. JUSTICE MOROWITZ:  Anything further?

9                (No audible response heard)

10           MR. JUSTICE MOROWITZ:  Judge Gross, thank you very

11 much for your attention for this matter today.

12           As far as the Canadian decision, prior to the joint

13 hearing commencing this morning, Mr. Tay made submissions with

14 respect to the law that I will address, and some brief reasons

15 that will come forward hopefully later this week.  An order

16 will go approving the motion in the form requested.

17           I will add some observations.  I just gave some of

18 them.  That in view of the fact that in all likelihood, absent

19 a plan of arrangement forthcoming, the going forward business

20 of Nortel is somewhat questionable.

21           I do believe that this does require significant

22 creditor involvement and oversight.  With respect to the

23 request of the Committee, the UCC in 1, Sub F, waiver of key

24 requirements of qualified bid, it is my intention in the

25 endorsement to make mention that I do have an expectation that

1  there will be advance disclosure of any of the items listed in

2  Sub F to the monitor.

3          I will also add that our Court does not readily

4  embrace courthouse auctions.  That is not what is happening in

5  this situation.  It's an auction at the Cleary firm, then to be

6  brought before a Court.  But it is, I think, in the interest of

7  all parties to avoid chaotic situations.

8          Judge Gross has made mention of the fact that his

9  Court is open, as is this Court.

10         So, to the extent that there are matters that do

11 require attention on a timely basis, it is certainly my

12 expectation that they will be coming to the Court, and I

13 believe I don't have to put words in Judge Gross's mouth, but

14 he expects the same thing.  That the opportunity here is -- the

15 objective is clearly to the maximize value of the assets.  It

16 is being done on a very expedited time frame.

17         July 4th, will take people out of action, as will

18 July 1st in Canada.  So, there's an awful lot of work to be

19 done in a short period of time.  And to the extent it needs

20 adjustment, we expect that that will come back before us.

21         Judge Gross, I do not have anything further to add.

22 I'll turn it back to you.

23         THE COURT:  Thank you, Justice Morowitz.  Mr.

24 Bromley?

25         MR. BROMLEY:  Thank you, Your Honor.  I just wanted

220

1  to follow-up on Footnote 2.

2          We have consulted with the company and with our

3  creditor constituencies, both from the Official Committee and

4  the bondholder group.  And we have agreed that we should delete

5  Footnote 2.

6          THE COURT:  Okay.

7          MR. BROMLEY:  In light of Your Honor's statements

8  that if something substantial comes in, and we have to come

9  back to see you, we will do that.

10          THE COURT:  And you're welcome to do so.

11          MR. BROMLEY:  Thank you very much, Your Honor.

12          THE COURT:  Thank you.  Mr. Clark?

13          MR. CLARK:  Your Honor, my hearing -- everything's

14  falling apart on me.  I couldn't hear what Mr. Bromley just

15  said.  Footnote 2 has been deleted?

16          THE COURT:  Yes, Mr. Clark.

17          MR. CLARK:  Thank you, Your Honor.  That's what I

18  thought.

19          THE COURT:  I think you heard it, but you just wanted

20  to hear it another time.

21                          (Laughter)

22          THE COURT:  Ms. Schweitzer?

23          MS. SCHWEITZER:  I aspire to do housekeeping here,

24  Your Honor.

25          THE COURT:  All right.

1          MS. SCHWEITZER:  So, just in the nature of

2   housekeeping:

3          First of all, that we will have orders submitted to

4   you this afternoon, but we are -- in the interest of moving

5   this along, have marked it up and have blacklines here.  So,

6   I'd invite everyone in the courtroom to -- anyone who wants to

7   look at them, but just so we don't have to do e-mail

8   distributions and all that.

9          THE COURT:  Absolutely.  We want to get this on the

10  docket.

11         MS. SCHWEITZER:  Second thing is that in the last

12  week, people have had a chance to read through the asset

13  purchase agreement and found clean up changes to it.

14         THE COURT:  Yes.

15         MS. SCHWEITZER:  So, that -- they're not particularly

16  material changes, but we'd like everyone to be bidding off of a

17  cleaned up version, if all is the same.  So, I have a copy, if

18  you'd like me to hand it up to you.  We have 20 or so copies

19  for everyone else.  I'll file them.  If you want it now, I'm

20  happy to give it to you now just so you see the nature of the

21  changes.

22         THE COURT:  That will be fine.

23         MS. SCHWEITZER:  We'll formally file it, and then

24  we'll attach the revised version to the bidding procedure

25  order --

222

1          THE COURT:  Okay.

2          MS. SCHWEITZER:  -- just so we have a cleaner copy

3 for everyone to work off of.

4          MS. SCHWEITZER:  May I approach?

5          THE COURT:  Yes, please, Ms. Schweitzer.  Thank you.

6          MR. JUSTICE MOROWITZ:  Judge Gross, at this end, I

7 think it would be -- now is the time to terminate the joint

8 hearing.  There will be some clean up of the order up here, as

9 well.

10          THE COURT:  Yes, Justice Morowitz.  It's been an

11 honor to serve with you here today, sir.  And a good evening to

12 you.

13          MR. JUSTICE MOROWITZ:  Okay.  Mr. Tay will be framing

14 an order up for signature very shortly.

15          THE COURT:  Very well.

16          MR. JUSTICE MOROWITZ:  Thank you, Judge Gross.

17          THE COURT:  Thank you.  Good evening, Canada.

18          Ms. Kim, are we going to finish now?

19          MS. KIM:  I certainly hope so.  I have the unenviable

20 task of closing today's very long day.  And, thank you, Your

21 Honor, for indulging us.

22          THE COURT:  Certainly.

23          MS. KIM:  So, as I was mentioning -- for the record,

24 Jane Kim from Cleary Gottlieb Steen & Hamilton on behalf of the

25 debtors.

223

1           As I was mentioning, with respect to the debtors'
2  motion for a final order authorizing entry into some -- one or
3  more LC or bonding facilities --
4           THE COURT:  Correct.
5           MS. KIM:  -- we've received some informal comments
6  from the U.S. Trustee, and we also received some comments from
7  the financial institutions with which we are negotiating and
8  have made a few revisions to the proposed order as a -- in
9  response to those comments.
10          Mr. Tinker isn't here today, but he did -- this
11 afternoon, but he did represent to me earlier this morning that
12 he did not have any objections to the proposed revised order.
13 And I'll just quickly explain what those comments -- those
14 revisions are:
15          First, that the -- that the debtors will be expressly
16 and immediately authorized and empowered to negotiate and enter
17 LC and bonding facilities without obtaining Court approval.
18 But notice requirements will be in place -- five-day notice
19 requirements will be in place to the U.S. Trustee and the
20 Official Committee for fees over $50,000, and entry into a
21 facility or bond over $500,000, and two-day notice for bonds
22 over $200,000.
23          THE COURT:  Okay.
24          MS. KIM:  Second, there is a provision -- the
25 provision that requires funds to be kept in a segregated

1  account have been deleted because of the notice requirements to

2  the U.S. Trustee and the Committee.  I think we'll all have to

3  get satisfaction among ourselves that not keeping the funds in

4  a segregated account will still give us comfort that our

5  interests are -- and the cash collateral is being protected.

6           THE COURT:  Okay.

7           MS. KIM:  But that gives us some flexibility in terms

8  of negotiating with the financial institutions.

9           THE COURT:  Yes.

10          MS. KIM:  Third, there was an inadvertent admission

11 of the 364(e) protections that were in the interim order, but

12 were not in the final order giving the financial institutions

13 or sureties that entered into these facilities with us 364(e)

14 protection.  So, --

15          THE COURT:  So, you've put those back in?

16          MS. KIM:  And so we've put those back in.  And the

17 final -- I'm sorry, there are two more additions.

18          Any reimbursement obligation or any other obligation

19 made under the final order shall be governed by the final

20 order.

21          And the automatic stay -- the order provides that the

22 automatic stay will be amended as necessary to effectuate the

23 terms, rights, benefits, privileges, and provision of the final

24 order, and any facility.

25          THE COURT:  All right.

225

1          MS. KIM:  So, I think those are just self

2    explanatory, except for the segregation requirements.

3          THE COURT:  Absolutely.

4          MS. KIM:  And as I mentioned, we have a revised

5    order.  So, I am happy to hand it up --

6          THE COURT:  Very well.

7          MS. KIM:  -- if Your Honor --

8          THE COURT:  Please approach, and I will look at it

9    and enter it.

10          MS. KIM:  Thank you very much.  And I should have

11   mentioned.  Mr. John Doolittle is also here as a witness for

12   the LC facility motion, if Your Honor had any questions.  But I

13   take it from your comments that you do not.

14          THE COURT:  I don't.

15          MS. KIM:  Thank you, Your Honor.  May I approach?

16          THE COURT:  Please.  Thank you, Ms. Kim.  Thank you.

17          MS. KIM:  Your Honor, it's been a long day.  So, I

18   just wanted to remind you that in case things got lost in the

19   shuffle, at this point, we should have handed up to you three

20   revised orders.

21          THE COURT:  Yes.

22          MS. KIM:  And the -- actually four revised orders

23   because the interim funding agreement order was -- so, four

24   revised orders.

25          THE COURT:  Including the one you just gave me?

226

1          MS. KIM:  Including the one that I just handed up to

2  you.

3          THE COURT:  Yes.  The other three I think have

4  already made it down to the Clerk's Office.

5          MS. KIM:  Thank you very much, Your Honor.

6          THE COURT:  This one will, as well.  And now I'll

7  have the bidding procedures, of course.  And I'll be looking

8  for those right after the hearing, or shortly, or how do you

9  propose to do this?

10          MS. SCHWEITZER:  What we can do is have them sent to

11  your chambers.  We'll have them electronically sent over.

12  We'll caucus with anyone in the hall, they should be

13  nonobjectionable and --

14          THE COURT:  Good.

15          MS. SCHWEITZER:  -- then head back to counsel's

16  office and get them out.

17          THE COURT:  Excellent.

18          MS. SCHWEITZER:  Great.

19          THE COURT:  That will be fine.

20          MS. SCHWEITZER:  Thank you so much.

21          THE COURT:  Very well.  Thank you, Counsel.  Anything

22  further?

23          MS. SCHWEITZER:  No.

24          THE COURT:  All right.  It's been a good day.  A hard

25  day, but a good day.  And I wish you all a good holiday that's

227

1  upcoming and we'll stand in recess.

2           MS. SCHWEITZER:  Thank you, Your Honor.

3           THE COURT:  Thank you.

4       (Whereupon, at 3:50 P.M. the hearing was adjourned.)

5

6                          CERTIFICATE

7

8       I certify that the foregoing is a correct transcript from

9  the electronic sound recording of the proceedings in the

10 above-entitled matter.

11

12

13  _/s/  *Karen Hartmann*____AAERT CET**D0475   Date:  July 7, 2009

14 TRANSCRIPTS PLUS, INC.

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1-** 204:2
**$10-** 44:10,17
**$100,000-** 11:15
170:3
**$157-** 31:11 40:8
47:17
**$16-** 174:4
**$19-** 152:9
**$19.5-** 66:24
106:22
**$2-** 11:8
**$2.7-** 159:24
**$20-** 32:25 44:23
**$200-** 81:4 84:10
**$200,000-** 223:22
**$22.5-** 67:1
**$250-** 85:21
**$3-** 66:25 105:25
106:8 135:10
**$30-** 31:19 119:14
**$300-** 202:14
**$5-** 176:17,18,25
188:16 203:23
204:6
**$50,000-** 223:20
**$500,000-** 223:21
**$650-**
163:4,8,13,16
198:14 202:11
**$76-** 32:21
**$9-** 80:12
**$96-** 32:15

**&**

**&-** 12:11 47:2
49:5 50:25 112:2
138:4 146:18
155:12 189:24
222:24

**'**

**'06-** 75:3 76:4
91:2
**'08-** 86:18 91:6
**'90'S-** 127:9

**/**

**/S/-** 227:13

**1**

**1-** 32:19 218:23
**10-** 29:4 39:1
80:6 82:5 90:4
155:16 180:19
207:18
**10,000-** 170:3
**105A-** 57:24
**10:38-** 56:21
**10:54-** 56:21
**10-MINUTE-** 180:17
**10YEAR-** 82:13
**11-** 7:23 8:14
18:13 23:25
113:19 114:5,8
115:14 117:13
122:15,20 142:17
156:11,19,23

157:8,11 159:22
161:22 184:20
186:24 187:1
**110-** 27:12
**11:30-** 24:8,10,13
57:2
**12:26-** 124:14
**13-** 126:9
**14-** 49:25 52:18
**14TH-** 25:1,19,22
91:13 92:1 190:6
216:9,20
**15-** 25:20 76:13
124:12 158:17
191:16 210:12,16
**150-** 85:21
**157-** 43:13
**15DAY-** 161:25
**15-MINUTE-** 124:11
**15TH-** 25:1 45:20
47:10
**17-** 35:24 49:20
211:1
**17TH-** 68:1 210:22
**18-** 35:24 80:9
85:16 129:23
**19-** 25:20
135:9,14
**19TH-** 90:22
120:21
**1:11-** 124:14
**1ST-** 145:16,23
219:18

**2**

**2-** 111:8,10
121:11 148:6
153:10 172:15
181:15 200:7
201:6 203:16
208:9 216:21
220:1,5,15
**2,000-** 62:12
**2.9-** 136:5
**20-** 15:18 39:7,8
61:22 80:9 93:14
98:16 221:18
**2006-** 75:15
**2007-** 126:3
**2009-** 30:15
47:14,24 227:13
**2010-** 82:25
83:2,15
**2011-** 83:15
**21-** 168:24
**21ST-** 68:2
**22-** 96:9 117:19
139:11 140:12
157:17 158:19
159:10 163:16
197:23 201:11
**22DAY-** 97:16
131:19 141:4
194:3 201:21
**23-** 47:13
**23RD-** 68:4
**24-** 85:16
**24HOUR-** 177:15
**24TH-** 68:4

**25-** 93:14 126:24
187:2,5
**25DAY-** 97:16
**26-** 31:19
**266-** 47:20
**27DAY-** 97:16
**28-** 16:13 64:18
129:15 138:16,17
**28TH-** 68:7,8
197:4
**29-** 16:18
**29TH-** 67:25 68:8
**2:30-** 180:22
**2:42-** 180:22
**2G-** 81:19,21

**3**

**3-** 135:24 148:6
**30-** 16:22 40:9
47:14 61:23
129:7,9 130:20
187:2,5
**30TH-** 31:15 32:20
47:21,24 48:1
**31-** 17:1
**32-** 17:6
**35-** 17:15 90:4
**363-** 62:6 122:16
156:23 159:15
162:11 165:3
183:15,17 217:15
**363B-** 57:24
**363F-** 62:7 168:12
**364E-** 224:11,13
**365-** 62:9
**37-** 17:24 90:4
115:3
**39-** 18:15
**3:50-** 227:4
**3G-** 60:2
68:20,23,25 76:3
81:17,20,21
185:10
**3RD-** 184:9

**4**

**4-** 83:1
**400-** 202:13
**41-** 20:10
**4G-** 81:18 82:14
85:19
**4TH-** 158:20
184:7,9 192:20
219:17

**5**

**5-** 176:16
**50-** 77:17 80:13
127:10
**503-** 32:3
**507-** 32:3

**6**

**6-** 84:6
**60DAY-** 158:12
**650-** 101:19

**7**

**7-** 84:6 227:13

**700-** 186:20
**7TH-** 145:16

**8**

**80-** 77:12 83:25
96:24 169:14
**807-** 212:14
**85-** 83:25 101:1
**86-** 47:14
**87-** 101:1

**9**

**90-** 118:10 169:14
**9019-** 7:7,20 9:23
10:3 57:24
**9:24-** 11:25
**9:29-** 11:25
**9:30-** 35:13

**A**

**ABILITY-** 84:5,15
86:2,15 87:18
88:22 93:22
101:15 112:16,22
128:9 136:15
153:1 156:19
159:8 198:12
207:8 215:3,22
**ABLE-** 8:21 20:19
30:12 31:10
35:13,23 37:6
52:4 62:15,23
63:13,25 66:17
69:14 70:21 84:3
102:25 105:4
132:2,20 136:9
139:16,17,25
140:23 142:4
143:19 145:22
160:23 162:2
169:12 170:21
171:22 172:10
177:9 18
**ABOUTS-** 84:10
**ABSENCE-** 17:20
22:3 151:1 178:21
**ABSENT-** 32:10
151:2 217:15
218:18
**ABSOLUTE-** 98:18
**ABSOLUTELY-** 6:13
45:8 168:1,5
169:11 172:13
210:4 211:2 221:9
225:3
**ABUNDANTLY-** 217:5
**ACCELERATED-**
120:22
**ACCEPT-** 18:11
169:3
**ACCEPTABLE-** 12:24
130:3
**ACCEPTED-** 29:3
**ACCESS-** 60:2
79:20,25 97:14
140:17 141:6
142:8 150:11
171:23 198:9
**ACCESSIBLE-**

202:19
**ACCOMMODATE-**
36:23 72:13
196:17
**ACCOMMODATES-**
16:6
**ACCOMPANIED-** 60:6
**ACCOMPLI-** 141:23
**ACCOMPLISH-** 31:10
34:11 59:4 70:7
151:19
**ACCOMPLISHED-**
35:8
**ACCORD-** 46:1
**ACCORDANCE-** 11:4
159:15 189:17
**ACCORDING-** 33:14
**ACCORDINGLY-** 57:4
**ACCOUNT-** 26:15
28:9 144:4 147:17
206:18 224:1,4
**ACCUMULATED-**
159:23
**ACCURATELY-** 51:8
**ACHIEVABLE-** 208:1
**ACHIEVE-** 48:5
142:2 160:11
164:3 170:21
172:10
**ACHIEVED-** 21:23
44:9 158:5 163:1
192:2
**ACHIEVEMENT-** 43:8
**ACHIEVING-** 133:22
**ACKNOWLEDGE-**
109:3 173:6
177:15 199:16
**ACKNOWLEDGED-**
39:23
**ACKNOWLEDGMENT-**
39:4
**ACQUIRE-** 89:3
119:9
**ACQUIRER-** 130:4
**ACQUIRERS-** 64:22
65:5,10 121:2
**ACQUIRING-** 88:7
129:17 186:17,19
**ACQUISITIONS-**
76:2,6,7
**ACRONYMS-** 72:7
**ACROSS-** 16:6 17:9
26:22 27:8,10
78:18 79:9
95:6,11,16 102:3
126:19 127:14
128:12 136:5
145:2 171:5
**ACT-** 16:12 19:14
20:7 51:15 96:22
**ACTED-** 215:13
**ACTING-** 216:13
**ACTION-** 137:17
213:2 219:17
**ACTIONS-** 36:13
165:16
**ACTIVE-** 19:24
64:20 67:15 71:22
170:17

ACTIVELY- 68:24
171:22 174:16
ACTIVITIES- 79:14
ACTIVITY- 91:5
ACTUAL- 36:7 96:4
AD- 51:1 99:23
100:7 149:16
152:23 171:20
ADD- 13:8 24:17
54:22 95:20
104:25 154:7
165:1 214:13,17
216:5 218:17
219:3,21
ADDED- 7:6
34:16,24 55:6
136:18 143:24
156:18 203:7
ADDING- 95:12
194:2,3
ADDITION- 7:4
8:18 13:14,17
36:25 37:4 40:9
69:3 75:12
77:9,13 83:4
89:21 107:9 117:2
122:16 129:18
157:7,13
ADDITIONAL- 13:8
32:25 40:8 54:6
55:7 56:1 111:5
137:5 148:15
149:5,21 158:12
161:15 191:12
192:15 206:9
217:21,22
ADDITIONS- 224:17
ADDRESS- 6:18
16:2,19 21:17
26:7 33:4 38:1
46:16 50:11 91:18
143:12,15 145:24
160:17 167:25
170:9 172:3
173:12,14,15
176:23 189:4
202:2 210:10
211:8 218:14
ADDRESSED- 37:2
154:9
ADDRESSES- 208:16
ADDRESSING- 40:21
170:12 180:8,9
212:16
ADEQUATE- 47:23
68:2
ADJOURN- 54:6
123:16
ADJOURNED- 227:11
ADJOURNMENT-
56:13
ADJUST- 121:25
ADJUSTED- 106:24
ADJUSTMENT- 23:2
101:23
102:1,11,15,16
133:16,18,23
219:20
ADJUSTMENTS-

101:21,24 102:5,9
107:3 133:12
ADMINISTRATIVE-
32:2,18 39:24
ADMINISTRATOR-
26:19 29:16 30:7
32:6,11,15,17
36:12 41:24
49:14,18 61:25
66:21 100:11
ADMINISTRATORS-
46:18 49:12
52:14,17,20,22
171:7
ADMISSION- 224:10
ADMIT- 92:17
ADMITTEDLY- 63:3
195:24
ADOPT- 216:1
ADOPTED- 20:5
ADOPTION- 39:5
ADVANCE- 28:15
187:20 191:6
197:14 202:21
219:1
ADVANTAGE- 83:7
176:15
ADVANTAGES- 95:11
ADVICE- 171:9
ADVISE- 109:24
ADVISEDLY- 19:18
ADVISING- 126:19
ADVISOR- 73:21
126:13,18 133:2
ADVISORS- 61:25
112:3 117:11
139:21 155:13
158:9,17 171:5,6
196:11 207:25
AFFECT- 52:22
128:10 167:1,11
174:2
AFFECTING- 128:12
AFFIDAVIT- 49:20
53:17
AFFILIATES- 166:1
AFFIRMATION-
49:24,25
AFFORD- 57:16
AFFORDED- 109:9
135:6 198:8
AFRICA- 27:10
AFTERNOON-
111:23,24 112:9
118:4 138:3
154:1,2 155:10
164:7,8,12
180:24,25 216:6,7
221:4 223:11
AGAINST-
8:9,12,17 31:18
60:22 167:7 177:8
194:15 202:15
205:22
AGENDA- 7:1,4
10:24
AGGREGATE- 66:6
100:25 102:9
115:8

AGGRESSIVE- 67:22
82:25 83:9 97:2
AGGRESSIVELY-
83:13
AGREE- 35:9,20,25
54:1 61:12 94:7
105:24 117:18
141:20 168:1
181:12 187:11,16
202:13 203:17
209:25
AGREEABLE- 36:9
AGREED- 11:17
13:8 31:21 35:4
51:12 105:12,24
106:11,22 119:3
186:7 202:12
220:4
AGREEMENT- 6:22
8:5 23:11 24:25
25:6,8 26:24 28:8
30:12,13 31:8,17
32:6,8,11,14
33:3,9 34:22
35:13,14
36:2,6,8,21
38:10,12,14,15,20
,25
39:2,3,5,7,10,12,
25
37:10,20,25
40:8,17 41:2
43:2,9 44:24
45:6,9,15 46:5
47:
AGREEMENTS- 34:7
35:20 39:14,16
64:19 97:10 99:18
102:19,20
103:11,19 169:6
AHEAD- 27:17
115:6 200:5
AIR- 215:4
AKIN- 146:18
ALBEIT- 17:25
156:12
ALBERTA- 17:5
19:2
ALCATEL-LUCENT-
76:4 87:10 127:15
ALIGNED- 175:22
ALIGNING- 114:14
ALIVE- 42:18
ALLOCATE- 28:11
ALLOCATING- 44:14
ALLOCATION-
34:9,11,12,14,18,
23
33:21,24 35:3
37:1 39:6 45:7,10
51:21 52:23 53:10
57:21 164:18
169:10,19 170:5
ALLOW- 8:19 15:8
20:8 21:3
62:13,22 63:21
66:5 70:17 121:25
145:25 146:14
154:12,22 156:7

211:15
ALLOWANCES- 199:2
ALLOWED- 144:17
154:19 173:3
175:23 194:6
ALLOWING- 36:14
214:22
ALLOWS- 15:12
17:25 26:12
30:13,15
ALLUDED- 47:25
129:6 131:2
ALONE- 95:23
ALPHARETTA- 144:8
ALTER- 176:21
ALTERED- 166:17
ALTERNATE- 106:17
ALTERNATIVE-
15:25 21:11
108:12 135:19
149:4 150:8
151:1,3,6,13,20
178:21 179:8,10
183:10 188:2
201:22 203:9,10
205:24
ALTERNATIVES-
90:15 183:19
AM/RECONVENE-
11:25 56:21
AMBIGUITY- 157:1
AMENABLE- 114:20
AMENDED- 55:6,24
161:21 188:1
224:22
AMENDMENT- 39:11
AMENDMENTS-
35:9,21
48:10,15,16,20
AMERICA- 27:10
32:24 76:14
80:17,18
82:8,15,21
83:3,23 84:1
87:17 89:5
92:13,15,18,20
95:12 96:1,2,24
100:25
AMERICAN- 83:12
85:25 95:9 100:23
131:13 169:15
AMIA- 29:16
AMONG- 7:7 39:2,9
47:5 224:3
AMONGST- 26:2,8
28:12 31:21 32:22
38:18,20
AMOUNT- 13:10
26:20,21 32:15,16
42:17 44:3 105:16
123:8 148:15
150:9 151:4,21
167:1,2,9 182:24
AMOUNTS- 31:19
32:10 33:22 40:4
84:2 171:4
AMPLE- 18:21
193:16
AMPLY- 197:5

ANALYSIS- 89:21
127:23 128:8
129:13 147:7,14
ANALYZE- 29:21
65:24 195:4
ANCILLARY- 97:6
99:18 102:19,20
103:4,19
ANNOUNCE- 120:19
152:4
ANNOUNCED- 60:5,8
82:17,22 90:22
91:13 108:22
ANNOUNCEMENT-
120:17 136:23
137:3
ANNOUNCEMENTS-
120:19
ANNUAL- 186:25
ANNUNCIATED-
20:18 215:7
ANSWER- 15:20
90:18 113:9
172:16 174:11
217:25
ANSWERED- 20:17
ANSWERING- 217:21
ANTE- 198:19
ANTICIPATE- 36:21
48:3 210:13
ANTICIPATED-
47:17 211:13
ANTICIPATING-
211:12
ANYMORE- 208:24
ANYWAY- 173:3
ANYWHERE- 192:12
APOLOGIZE- 6:3
12:3,12 27:17
55:22 112:9 114:7
211:11
APPARENTLY- 74:10
187:5
APPEAL- 17:23
20:2,11,25
APPEALS- 17:24
APPEARING- 51:1
APPEARS- 143:25
147:13
APPENDED- 156:16
APPENDIX- 47:11
APPETITE- 89:2
APPLES- 64:1
196:9 204:14
APPLICANTS-
47:8,12,22 49:15
216:11,12 218:5
APPLICATION-
53:23 217:4
APPLICATIONS-
77:14 196:24
APPLY- 10:3 15:8
21:2 215:8
APPLYING- 14:9
188:23
APPOINTED-
100:3,11
APPORTION- 79:13
APPRECIATE-

154:15 157:15
159:18 191:24
194:22 196:17
199:2 206:4
APPRECIATES-
164:16 200:23
APPROACH- 9:23,25
13:22 15:10 16:11
17:5 18:24 21:12
54:15 147:5,15
170:12 222:4
225:8,15
APPROACHED- 144:9
208:2
APPROACHES-
207:23
APPROPRIATE-
22:6,9 33:23
42:2,10 56:12
58:15 65:18 66:4
67:3 68:16 69:24
70:6,12,16 109:20
110:22 123:10
152:25 153:22
182:2 201:24
204:11 205:12
APPROPRIATELY-
153:11
APPROVAL-
34:20,23 35:6
36:17,19 37:1
45:9 47:16 48:8,9
49:18 51:4
52:7,18 56:3 62:6
96:6 141:2 210:13
216:15,17 223:17
APPROVE- 7:6 8:3
9:16 17:17,20
18:4,18 19:3 22:3
34:17 46:3 58:1
67:13 144:2
164:22 193:15
197:11 198:3
199:6 200:12
202:23 214:4
APPROVED- 18:7
48:20 142:13
170:10 174:2
179:9,10 187:15
191:23 196:25
197:2 205:13
214:21
APPROVING- 7:9
55:13 209:17
218:16
APPROXIMATELY-
32:21 47:20
126:24 131:18
132:18 135:14,23
155:16 186:20
APRIL- 91:2
APT- 159:10
ARBITRARY- 15:15
AREA- 15:12 30:24
149:3 150:11,18
152:16 193:23
AREAS- 137:9
148:1 153:5
ARGUABLY- 71:3

ARGUE- 159:15
ARGUING- 31:2
ARGUMENT- 23:19
98:7 194:20
ARGUMENTATION-
214:18
ARGUMENTS-
154:5,8
ARISING- 39:16,20
ARM- 105:21
ARM'S- 10:5
104:21 109:12
133:6
ARPS- 118:18
ARRANGEMENT-
17:21 19:6,15
22:4 41:8 63:10
218:19
ARRANGEMENTS-
37:12 44:12 57:4
109:20 217:16
ARRIVE- 18:24
45:9
ARRIVED- 57:21
105:16 109:12
ASA- 133:14
ASIA- 27:10 76:14
86:1
ASPECTS- 39:18
61:14,15 99:19
ASPIRATIONAL-
195:24
ASPIRE- 220:23
ASSERTED- 184:15
ASSERTING- 168:11
ASSESS- 88:16
ASSESSING- 188:6
ASSET- 17:20
27:5,6 29:22
30:18 33:2,5,8,10
34:11 44:19 66:13
69:20 88:16 89:3
93:18 94:23 95:17
99:5,8,13
101:6,18,24
102:17 111:1
127:3,7,12 128:4
129:1 131:23
132:6 134:14
135:4 139:1
146:25
147:1,14,25 1
ASSETS- 8:21
15:6,9 18:8,19
19:3,20 21:3 22:3
26:12 34:2 59:14
60:10 61:5,9,11
62:8,14,16,23
64:9,22,24 65:12
66:8,10 67:15
68:16,18,19
70:2,3,5,9,11,18,
24
69:6,10,15,19
71:12,17,20,24
76:16 77:11 78:14
86:12
ASSIGN- 101:15
145:14,21

ASSIGNED- 103:7
144:10
ASSIGNMENT- 62:9
145:16
ASSOCIATED- 82:6
92:10 97:25 101:4
ASSUAGE- 139:7
ASSUME- 14:13
23:7,13 145:14,21
ASSUMED- 68:3
144:10 166:23
168:7
ASSUMES- 167:8
ASSUMING- 139:13
167:3 188:8,9
ASSUMPTION- 39:4
62:9 145:16 168:6
ASSURANCE- 141:4
ASSURANCES- 68:3
ASSURE- 66:17
ASSURED- 68:23
150:14
AT&T- 83:13 92:20
ATMOSPHERE- 199:3
ATTACH- 221:24
ATTACHED-
199:18,19,20
ATTACHES- 47:11
ATTEMPTING- 63:18
ATTEMPTS- 26:22
ATTENTION- 43:12
44:7 58:23 174:4
218:11 219:11
ATTORNEY- 40:22
123:23
ATTORNEYS- 157:20
ATTRITION- 90:5
93:10,12,16,22,24
99:4 120:13
137:11 186:23,24
ATYPICAL- 63:17
AUCTION- 61:1
63:5 68:4,7 69:13
71:10 72:10 97:17
104:2,5 107:14
121:16,17 137:1
141:23 142:1
154:20 159:6
162:3,12,13
167:24
177:6,7,10,11
181:18 182:3
183:15,23 186:8,9
187:13,15,20
188:17
195:11,13,18
197:2
AUCTION'S- 109:3
AUCTIONED- 208:17
AUCTIONING- 137:6
AUCTIONS- 174:2
219:4
AUDIENCE- 180:15
AUDIO- 43:15
AUDITS- 29:2 30:1
AUGUST- 63:7
AUTHORITIES-
16:23 38:23
AUTHORITY- 14:20

17:11 18:12,18,21
AUTHORIZATION-
11:2,5
AUTHORIZE- 14:20
19:19 20:3
AUTHORIZED- 163:9
223:16
AUTHORIZING-
10:25 36:12,13
213:8 223:2
AUTOMATIC-
224:21,22
AVAILABLE- 12:16
29:6 33:23 37:5
74:13 78:8 97:8
103:20,23 121:5
172:7 185:1
197:20 199:24
203:20
AVERAGE- 136:5
AVERSE- 139:3
AVOID- 30:16
119:14 216:24
219:7
AWARE- 24:7 55:5
111:17,21
131:15,20 137:2
144:25 170:12
AWFUL- 70:1
219:18

B
BA- 126:11
BABBLE- 81:20
BACK- 20:17 21:20
30:16 31:2
34:19,22 35:25
37:1 45:8 54:7
56:16 62:17 82:18
85:16 86:19
90:17,19 91:1,12
96:14 97:19 99:3
101:9 107:2 109:7
117:2 118:6,9
120:10,12 124:21
140:21 158:21
162:13 164:17
179:1,
BACKBONE- 159:7
BACKER- 113:2,13
114:23
BACKGROUND- 37:6
76:10 126:10
BALANCE- 63:18
65:18 84:14 86:10
102:6
112:13,15,19,24
113:3,8 139:6
159:7,17 177:20
209:24
BALANCED- 66:5
BALANCING- 51:15
BALLPARK- 85:21
BAND- 80:20
BANDWIDTH- 81:1
BANK- 126:6,7
136:12
BANKER- 64:16
BANKING- 126:5

BANKRUPT- 165:12
BANKRUPTCY- 23:18
32:3 36:18 48:21
62:6,7 85:15
89:15 93:6 126:16
127:18 128:10
183:15 187:5
192:6 217:2
BARE- 158:17,20
BARGAIN- 186:12
BARNES- 21:17
BASE- 86:12 88:15
95:12 120:24
129:20 130:19
131:10,11 136:2
BASED- 29:7 54:3
94:21 104:3
128:2,20 144:25
147:13 150:16
172:7 201:10
202:12
BASELINE- 136:24
BASIC- 21:20
BASIS- 11:6 26:12
31:14 39:24 64:2
66:20 70:12,17
71:1 89:22 131:7
141:13 147:1
163:10 184:16
186:25 205:5,16
211:16 219:11
BAUER- 57:2
123:9,17,21
BAY- 14:23 15:3
16:7 19:13,16
21:1 22:2
BEAR- 86:6
BEARING- 41:15
BECAME- 42:1,15
91:3 107:18,21
108:13 126:13
161:4
BECOME- 64:4
65:15,17 92:18
93:2 174:4 181:9
183:21 191:13
BECOMES- 185:12
206:10
BECOMING- 64:11
BECONCAMPER- 49:6
BEGAN- 29:13,21
30:4,8 86:16
129:4
BEGINNING- 26:16
27:3 63:7 160:24
BEHAVIOR- 107:24
108:1,5
BEHIND- 22:23
83:12 100:20
BELABOR- 43:10
BELIEF- 201:10
BELIEVES- 155:25
163:11
BELIEVING- 156:5
162:23,24
BENCH- 213:2
BENCHMARK- 107:14
BENEFICIAL-

110:23
**BENEFIT-** 15:22
17:3 20:22
21:8,22 32:2
42:23 48:6 57:18
111:2,4 146:5
151:9 164:9
186:11 189:12
195:3 196:20
216:13
**BENEFITS-** 39:23
224:23
**BENEFITTED-** 67:8
**BET-** 6:24 155:9
**BETWEEN-** 7:20
10:6 26:14 31:19
35:10 40:14 48:17
57:6 65:19 79:5
80:6 105:20 130:5
132:7 139:12
153:9 168:18
169:10 178:5
193:24 204:5
218:5
**BIBLE-** 74:3
125:13
**BID-** 18:4 65:17
68:1 72:12 82:5
95:3,13 99:2
100:19 104:9
105:11,13,20
106:6 107:15,25
108:14,20 119:23
122:18 132:2
134:7 135:22
138:21 139:17,25
141:2 142:4,12,15
144:15
148:2,13,16,17,19
,
**BIDDER-** 63:6
64:5,10,12 65:16
67:8,9 69:14 94:5
103:25 104:2,6
106:17 107:11
108:16,23 111:20
119:23 130:13
135:19 136:23
142:16 148:14,24
157:2 173:20
174:24 177:6
178:1,3 182:22
184:12,13
187:13,23
193:18,2
**BIDDER'S-** 63:15
**BIDDERS-** 64:20
66:7,12 67:18
88:17,19 91:24
92:22 94:8 96:10
103:21 108:1,4
120:1,25 130:5
131:19 132:4
133:10
138:6,9,15,18
140:6 141:6
148:25 149:22
150:3,8,15,19
160:2 162:1

170:12 172:18
174:25 175:7
176:1
**BIDDING-** 58:10
63:16,23 64:3
65:14 66:7
67:13,15 96:3,5,9
104:1 105:9 107:7
109:9 111:8,12
121:9,14,21,22,23
122:14 131:16,18
135:5 137:15
139:1 143:24
144:4 147:16
153:13 164:20
165:4 166:17
168:7 169:7 170:1
**BIDS-** 63:1 65:20
66:6,8,12,14
96:10 111:12
119:24
121:12,13,19
122:15 131:19,23
134:10 139:13
141:24 149:4,13
153:12 156:21
172:21 176:14
177:9 181:17,24
195:1,5,9,12,14,1
5,19,23,24
187:19 188:7
196:5,8 197
**BIG-** 88:22
115:4,8 184:2
**BILLION-** 80:13
159:24 203:23
204:6
**BILLIONS-** 76:8
83:17
**BIRD-** 63:19 183:1
184:14 191:22
209:17,18,21
**BIRDS-** 209:23
**BIT-** 9:3 32:16
72:8 82:19 85:5
96:3 105:10,19
116:4 118:23
184:9 194:17,18
196:9 198:16
199:7 203:17
**BITTER-** 71:16
**BLACK-** 33:11,12
**BLACKLINE-** 45:23
199:23
**BLACKLINES-** 221:5
**BLAIR-** 18:10,17
**BLAME-** 209:15
**BLOOD-** 29:18
**BLOOM-** 32:7
**BOARD-** 127:24
**BODY-** 33:20
**BOLSTER-** 139:6
**BONA-** 15:23 21:9
182:22 183:5
193:24 197:17
201:13
**BOND-** 114:16
155:17 223:21
**BONDHOLDER-** 30:6

35:18 51:1 52:6
100:7 112:4
152:20,22,23
171:20,21 174:15
195:9 220:4
**BONDHOLDERS-**
11:18 13:13,16,17
41:21 51:23 62:1
66:21 99:23 100:8
105:2 138:10
175:9
**BONDHOLDERS'-**
118:20 149:16
**BONDING-** 213:9
223:3,17
**BONDS-** 194:7,8
223:21
**BORDER-** 25:6,12
26:6 35:10,21
36:19 45:16 46:2
48:7,15
**BORDERS-** 26:22
**BORED-** 190:19
**BOTH-** 19:11 23:6
25:16,18 27:5
33:21 34:11,22
35:7 36:1
37:7,13,15,16,24
48:6,11,20 49:5
51:23 52:23 53:16
55:13 56:4 59:14
62:21 63:12,17
67:3,10 68:13
73:4 76:2,14 77:2
81:21 85:5 87:20
93:25 98:19
104:14
**BOTHER-** 33:19
118:23
**BOUNDARIES-** 94:5
**BOX-** 33:11,12
**BOY-** 123:25
**BRACEWELL-** 112:2
138:4 155:12
**BRAD-** 49:5
**BREACH-** 151:24
179:7,21
183:14,15
**BREADTH-** 131:10
**BREAK-** 55:4
104:15,22
105:9,14,22
123:10
124:9,11,13
154:24 180:15,17
214:15
106:9,10,13,16,19
,23
**BREAKUP-** 66:23,24
107:6,7
135:7,10,14 136:3
150:25
151:3,11,21,25
152:9,15 154:18
179:1,2,5,11,16,1
8
176:8,9 178:20,24
183:8,11,21
187:12 203:11,25

205:11
**BREATHE-** 79:17
**BRIDGE-** 86:11
200:19
**BRIEF-** 49:13 51:3
57:10 110:9
112:10 122:8
154:4 164:24
165:3 181:4
190:23 218:14
**BRIEFING-** 99:21
**BRILLIANT-** 202:5
**BRINGS-** 32:6
**BROAD-** 16:11
17:8,10 18:6
21:12
**BROADEN-** 96:22
**BROADER-** 19:11
**BROADLY-** 172:18
**BROKE-** 94:3
6:1,4,8,12,16,19,
22,25
**BROMLEY-**
7:3,10,12,15
25:10,14,15
38:3,11,19,21
39:22 40:11,24
42:5,16 50:16
51:7 52:24
53:7,12,20
54:9,14,15,17
58:19,20 59:12
67:21 72:16 77:1
157:19,21,22
159:9
193:1,2,5,7,9
197:9,10
**BROMLEY'S-** 110:15
**BROOKINGS-** 9:9,12
**BROTHERS-** 65:6
**BROUGHT-** 45:8
67:7 136:21 165:9
219:6
**BROWN-** 126:11
**BS-** 76:11
**BUBBLE-** 174:8
**BUCKETS-** 92:24
100:22 170:2
**BUDGETED-** 115:7
**BUILD-** 87:2 90:10
**BUILDING-** 92:15
**BUILT-** 31:17 64:3
84:11
**BULK-** 42:13 77:11
**BULLET-** 39:8
**BUNDLED-**
101:6,8,12 145:4
**BURDENSOME-**
165:24
**BURN-** 86:6
**BURNING-** 42:4
**BURNS-** 21:18
**BUSINESS-** 11:7,18
12:25 13:13
14:1,11,12 15:24
16:24 17:3,13,25
19:24 20:9,22
21:10,21,24 27:15
37:11 42:20

59:1,17,18,19,20
61:3,15,16
62:4,13 63:13
68:21 70:17 71:1
75:12,22
77:3,4,5,6,9,13,1
9,20,2
**BUSINESSES-** 14:21
27:7,21 33:6
60:25 62:19 72:2
75:14 77:8
78:2,5,7,18
79:6,9 84:22 91:8
95:6,15,16,24
100:24 101:11
111:14 116:11
120:15 126:20
140:24 152:5
153:15 171:10
216:12
**BUY-** 71:2 81:13
181:21 203:24
205:25
**BUYER-** 8:18 61:11
67:2 78:12 87:22
94:18,21,24 95:9
96:23 102:24
103:7 114:1 119:8
121:25
130:2,8,11,13,18
135:1 137:12
141:14 168:1,3
169:22 178:6,24
**BUYER'S-** 130:24
138:12 190:10
**BUYERS-** 62:22,23
64:18 94:13 104:9
120:6,23 129:4
168:5 169:5
201:13
**BUYING-** 95:22
181:21 194:8
**BV-** 58:10

─────────
C
─────────
**CALCULATED-** 37:9
**CALCULATION-**
133:13
**CALCULUS-** 107:19
**CALENDAR-** 184:8
**CALL-** 24:24 27:16
73:17,24 83:1
92:9 97:17 125:9
**CALLED-** 95:8,14
129:10
**CALLING-** 214:7
**CALLS-** 158:10
**CALOWAY-**
189:21,23,24
190:2,15,19
210:8,9,12,18,24
211:4,8,11,17
**CALVARY-** 47:16
**CAMERA-** 37:3
74:14 100:15
**CAMERAS-** 74:12
**CAN-** 9:18,19,23
10:9,18 12:2,4
14:10,25 15:5,16

19:19 20:11
22:24,25 23:7
38:1 43:22 52:3
54:10,11 57:16
59:1 65:23
66:1,17 67:16
68:23 71:3 73:4
74:15 75:23
76:9,23 78:14
79:14,16 81:23
83:7,19 84:4
85:13
CAN'T- 43:25
74:21 149:11
172:2,9 174:25
192:12 204:19,25
CANADA- 25:20
26:18 27:25
34:4,5 35:10
37:8,15 41:5,15
42:3,6,12,18
43:5,21 44:13,23
46:14 48:11 55:24
56:23 59:15,16
74:9 83:23 89:11
100:9,14 101:3
147:20 148:4
169:11 171:7
179:11 219:18
222:17
CANADIAN-
18:10,17 22:2
29:18 30:7,14
31:20 33:1 36:4
40:6
41:3,17,18,19,21
42:1 43:11
44:3,5,10,20
45:5,11 51:24
52:17 56:9 62:21
63:11 144:1
148:21 169:16
174:11 210:15,25
212:11,13,16,19,2
2,24
211:9 215:24 2
CANADIAN'S- 41:3
CANADIANS- 43:25
CANDOR- 157:15
CANNOT- 18:3,11
43:21 165:4 166:7
187:11 192:10
CAP- 105:25 106:8
135:10
CAPABILITIES-
134:9
CAPACITY- 84:8
CAPITAL-
11:8,10,13 83:16
84:3,5 102:1,2,12
133:19 136:9
153:14,18
CAPITALIZED-
165:20
CAPTURE- 162:17
CAPTURING- 92:8
CARE- 181:11
182:8
CAREFUL- 51:15

149:13 168:17,18
200:11
CAREFULLY- 29:25
52:1 74:18
CARFAGNINI- 40:20
CARRIER- 27:15,23
58:25 59:17,19
77:3,6,7,8,11,19
78:23,24 116:18
163:22
CARRIERS- 59:20
69:11 79:23 80:4
81:7 82:1
CARRIGAN- 8:22,24
9:16 10:9,12
CARVE- 78:6
166:3,4
CARVED- 166:8
CASE- 14:22,23
15:11 16:7 17:23
18:15 19:5,13,16
20:1 22:1,8
27:11,25 29:22
48:3 51:19 54:4
59:9 100:5 116:7
124:16 126:23
129:6 133:7
142:10 149:15
152:23 156:17,22
157:23 158:13
160:24,25 165:2
167:2 171:
CASES- 15:21
16:22 22:6 25:18
26:16 27:3 40:10
51:24 60:5 68:17
112:4 115:4,14
126:17 151:8
155:15 159:2,16
164:23,25 166:25
176:10 188:25
193:11 210:22
CASH- 31:11 42:13
47:10,11,13,20
89:25 98:3,12,13
119:13 130:23
134:10,17
151:4,10 159:24
163:20 224:5
CATEGORIES- 88:20
CAUCUS- 226:12
CAUSE- 115:17
159:25
CAUSED- 93:7
150:25
CAUTION- 161:14
CAVALIER- 205:15
207:22
CCAA- 14:10,20
15:5
16:10,13,15,25
17:2,10,20
18:2,7,8,18
19:4,8,25
20:3,6,8
21:3,5,21 23:17
24:3,12 47:8,22
58:17 218:5
CDMA- 60:1,25

62:4 65:12 68:19
76:22 77:5
79:1,18,19
80:11,20
81:11,15,17,19,21
84:24 88:8
89:5,10,24 94:3,6
95:1,7 98:3
100:18,22,23
101:1 103:7
110:23 111:13
114:12,13 121:13
122:2 127:3
134:15 141:8 145:
CDMA'S- 119:8
CDMA/LTE- 116:11
128:11,13 131:13
152:4 172:17,21
CEDE- 190:18
CELL- 111:25
CENTERS- 44:15
CERTAIN- 7:22 8:1
10:25 11:2 26:13
33:1 35:9,16
36:3,12 44:8
49:19 61:14,15,16
62:7,10 63:23
69:11 92:11
101:21 104:1
117:19 147:11
148:15 152:5,17
153:2,17,18 155:1
CERTAINLY- 9:22
10:1,2 11:24
12:23 35:1 51:9
53:22 54:10
57:23,25 68:22
72:10 82:8 83:24
91:20 96:16 130:7
132:25 133:7
141:19 147:22
155:7 164:2
165:18,19 166:5
167:10 168:3,5,15
169:1,17 176:10
187:18 193:22 1
CERTAINTY- 63:18
65:19 108:20
CERTIFICATE-
227:6
CERTIFICATION-
6:13
CERTIFY- 227:8
CET**D0475-
227:13
CHAIN- 28:5 79:10
102:23 171:12
CHAIRMAN- 126:25
CHALLENGE- 84:9
85:22 90:2,19
91:12 92:15
112:21 115:8
CHALLENGES- 26:2
28:3,4 30:25
61:20 84:6 85:16
87:23 120:11
157:24
CHALLENGING-
159:2

CHAMBERS- 226:11
CHANCE- 92:6
143:16 159:4
180:18 196:1
214:16 221:12
CHANGE- 80:13
105:5 107:4
140:20 145:22,23
169:7 200:11,12
CHANGED- 107:24
108:1,5 180:5
191:11 202:5
CHANGER- 191:5
CHANGES- 45:25
46:2,3 55:8 56:2
68:6 108:10,11
111:5 188:20
199:22 200:10
208:16
221:13,16,21
CHANGING- 120:15
156:22
CHANNEL- 79:21
CHAOTIC- 219:7
CHAPTER- 7:23
8:14 23:25 113:19
114:5,8 115:14
117:12,13
122:15,20 142:17
156:11,19,23
157:8,11 159:22
161:22 184:20
186:24 187:1
210:12,16
CHARACTERIZATION-
143:20
CHARACTERIZE-
134:21 146:6
CHARACTERIZED-
26:1 146:2
CHARGE- 31:20
44:4,5,6,25 45:2
48:12
CHARGES- 45:3
55:25
CHECKING- 111:25
CHEEKY- 198:16
CHIEF- 64:15
73:19 74:25
75:4,9 110:12
CHILDREN- 192:21
CHINA- 81:2 83:24
100:24 101:25
170:1
CHINESE- 166:1
CHOICE- 128:24
CHOICES- 71:5
99:25 129:16
CHOOSE- 84:20
CHOSEN- 146:23
CHRYSLER- 65:6
159:11,16,20
CHUNK- 170:7
CIRCLE- 96:22
CIRCUIT- 67:4,5
151:8
CIRCUMSTANCE-
105:14 173:7
205:13

CIRCUMSTANCES-
15:14 19:14 37:7
44:9 48:14 63:4
68:16 69:24
94:14,24 105:16
106:11,17 115:10
135:17 158:14
165:13 175:10
197:16,25 217:18
CISCO- 127:15
CITE- 157:20
164:25
CITED- 164:24
CITIBANK- 133:2
CITIES- 92:9
CLAIM- 167:1,7
CLAIMS- 8:8,11,17
51:20 167:4,9
CLARIFICATION-
34:15,16 52:16
81:19 189:14
201:25 214:23
CLARIFICATIONS-
35:22 143:10
CLARIFIED- 188:4
CLARIFIES- 9:10
CLARIFY- 35:19
113:24 114:17
190:3 216:18
CLARIFYING-
116:14 143:24
118:2,3,14,15,17,
22
CLARK-
119:1,15,17
152:21
180:17,20,23,24
181:1,6 189:3,6,7
194:24 196:19
197:12 198:15
202:2,4 203:24
208:5,6,19 209:1
220:12,13,16,17
CLARK'S- 194:22
196:17 204:3,4
205:10
CLASS- 171:14
CLASSIC- 79:23
CLEAN- 94:5
221:13 222:8
CLEANED- 221:17
CLEANER- 222:2
CLEANUP- 199:22
CLEAR- 8:7,20
16:12 17:9,11,18
18:22 34:25 41:17
42:1,15 57:14,19
69:12 71:13 78:17
98:1,5 125:5
153:12 156:20
160:18 166:9
168:7,12,25 188:5
190:7,12,22 201:17
202:10 203:1
208:1,12,21 217:5
CLEARLY- 10:1
16:8 91:24 116:4
134:16 157:7
165:6 214:17

215:21 219:15
CLEARY- 12:11
73:9 133:1 219:5
222:24
CLEARY'S- 99:15
CLERK- 74:2,5
125:13,15,18
CLERK'S- 226:4
CLIENTS- 81:9
157:25 191:13
204:3
CLIFFS- 14:23
15:3 16:7
19:12,16
CLOG- 26:22
CLOSE- 102:10
119:7 136:9
151:7,20 162:22
204:25 205:4
213:18,24
CLOSED- 98:12
143:4
CLOSELY- 88:2
126:25 132:11
136:3 217:23
CLOSER- 185:13
CLOSING- 63:5
98:5 151:12,25
183:11,19
186:10,11 192:19
222:20
CLOSURE- 109:2
CODE- 12:24 27:18
32:4 60:1 62:6,7
79:19 165:11
CO-HEAD- 126:5,25
COINCIDENCE- 33:7
COLLATERAL- 224:5
COLLEAGUE- 52:16
56:23 124:5,13
COLLEAGUES- 32:7
147:20 212:7
COLLECTING- 44:13
COLLECTION- 41:14
COLLECTIVE- 66:8
168:19
COLLECTIVELY-
65:23
COLOR- 89:9 94:25
COMB- 169:2
COMBINATION-
84:14 88:11 89:7
95:25 98:6 99:17
139:5 147:11
COMBINE- 86:25
COMBINED- 60:20
COME- 6:5 15:13
19:16 30:16 33:21
34:19,22 35:25
37:1 43:2,9 44:18
54:7 63:21 66:12
71:10 118:14
119:22 142:4,16
147:16 150:20
152:6 159:5 160:6
162:13 164:17
169:15,16 172:21
173:18 175:19
183:4 191:18 194

COMES- 22:5
120:12 147:6
149:21 178:9
181:3,20 203:3,20
204:7 206:8
208:10 220:8
COMFORT- 68:13,15
88:1 104:18
180:15 224:4
COMFORTABLE-
109:13 117:16
133:21 137:16
195:16
COMING- 65:25
98:13 113:23,25
114:5,8 117:24
118:6 139:1
157:17 158:19
162:6 217:16
219:12
COMMENCE- 24:23
109:21,23
COMMENCED- 25:23
COMMENCEMENT-
115:3
COMMENCES- 44:1
COMMENCING-
218:13
COMMENSURATE-
151:9
COMMENT- 36:23
39:22 110:15
143:21 153:7
COMMENTING- 18:4
COMMENTS- 13:6
21:18 37:17,21
53:8 54:6 55:4
110:15 152:21
154:4 169:3 190:4
202:4 208:7
214:2,10
223:5,6,9,13
225:13
COMMERCIAL-
82:15,24 83:2,10
84:22 85:9
COMMIT- 84:5
170:17 180:4
COMMITMENT- 70:22
83:16
COMMITTED- 172:8
175:1 178:18
COMMITTEE-
12:20,21
13:12,15,18
30:5,6 35:17
36:3,6 38:4,10
39:1,23 40:16
61:24 66:21 99:23
100:2,3,7
146:10,12,19,21
147:5,13 149:16
150:18,20
152:17,19
154:6,11 155:1
171:19,20 173:23
174:15
175:5,9,16,18,25
1

COMMITTEE'S-
11:16 180:8 183:7
COMMITTEES-
201:23
COMMITTEES'-
196:11
COMMON- 26:15
79:8 95:10,11
123:20 149:9,10
171:25
COMMUNICATED-
181:13
COMMUNICATION-
48:17
COMMUNITIES-
94:21
COMMUNITY- 15:23
16:4 17:4 21:8
96:23
COMPANIES- 16:21
20:8 27:22 29:10
41:18 44:14 57:15
59:21 79:17 81:14
83:18 130:10
134:9 136:13
COMPANION- 35:2
COMPANY-
27:14,23,24 29:19
60:14,15 61:10
76:13 77:11,12
85:10 110:17
122:15 126:14
128:2,11 129:1,24
130:9 133:3,4
134:18 137:17
140:2 146:25
147:8,23
159:21,23 171:23
174:11,19 217:23
220:2
COMPANY'S- 53:18
128:7,16,18
COMPARE- 66:17
205:4
COMPARED- 176:12
177:2
COMPARING- 108:13
COMPARISON-
134:9,10 204:14
COMPELLING-
128:22
COMPENSATED- 41:9
151:16
COMPETE- 84:3
131:6 183:4
202:15
COMPETING- 63:1
148:14 150:3,15
182:12 187:6,13
188:13 201:25
COMPETITION-
60:20
COMPETITIVE-
60:17,18 136:25
141:21,22 149:13
154:20
COMPETITOR- 61:7
81:24 89:18
COMPETITORS-

85:20 87:6,8
96:16 108:5 131:5
COMPLETE- 24:16
134:20 158:24
160:3
COMPLETED- 65:21
136:11
COMPLETELY- 79:4
209:13
COMPLETION- 57:3
COMPLEX- 38:14
42:5 44:21 51:12
61:12 72:7 168:16
174:9
COMPLEXITIES-
51:10,25
COMPLEXITY- 26:1
61:3 157:23
158:13
COMPLICATED- 47:7
61:5 72:7 195:19
COMPREHENSIVE-
129:19 138:6
COMPROMISE-
7:6,20 22:4 53:23
187:14
CONCEDED- 182:18
203:6
CONCENTRATED-
130:19
CONCEPTS- 152:25
CONCERN- 16:24
17:3,6,7 20:9
21:22,24 32:9
70:25 93:17 97:22
104:18 113:24
150:18 153:6
177:12 198:6
200:7,18
206:6,12,14
CONCERNED- 17:12
32:13 54:1 84:19
86:9,10 87:18
89:7 113:23 198:8
202:17,22 206:5
CONCERNS- 16:6
29:2,14 30:19
36:3 38:1 53:9
67:23 68:9 84:15
88:21 90:11,12
145:24
154:8,10,20
167:20,21,22
170:13 171:14
180:8,10 200:23
209:6
CONCERTED- 174:14
CONCLUDE- 21:6
110:18 111:4
CONCLUDED- 22:7
24:10
CONCLUDES- 58:4
CONCLUDING- 111:2
CONCLUSION-
18:17,25 23:19
71:11 98:20
129:20 174:17
196:23 215:3
CONCLUSIONS-

128:2,6,7,21
132:5
CONCURS- 48:16
CONDITION- 25:7
36:11,16 46:4
CONDITIONS- 35:5
36:20 64:6 135:12
151:25 175:2
207:19
CONDUCTED- 65:21
133:6
CONFERENCE- 9:2
11:12 13:24
158:10
CONFIDENCE- 88:1
112:16
CONFIDENTIAL-
85:7 108:8 128:1
CONFIDENTIALITY-
64:6 85:3 97:10
140:16
CONFINES- 161:14
CONFIRM- 156:16
CONFIRMATION-
33:22
CONFIRMED- 22:21
120:8 179:5
CONFIRMING- 48:18
CONFORM- 143:25
CONFRONTATIONAL-
30:10
CONFUSION- 152:21
216:24
CONGRESS- 166:11
CONNECTION- 12:13
33:2 35:16 36:13
39:15 59:9 102:17
110:23 117:23
144:12
CONS- 65:24
CONSENSUS- 52:4
CONSENT- 152:19
153:3 175:18,24
176:1
CONSIDER- 19:10
59:13 63:20 92:6
134:8 161:1
174:16,20 181:17
215:11,12,14,16,1
8
CONSIDERABLE-
123:8 151:4,18
180:13
CONSIDERATION-
148:3 206:16
CONSIDERATIONS-
38:13 110:17
CONSIDERED- 15:3
61:19 114:25
122:22 168:4
188:5 207:20
CONSIDERING- 24:1
121:5 123:1
160:21 167:10
206:15
CONSIDERS- 85:9
CONSISTENCIES-
26:18
CONSISTENCY- 16:5

CONSISTENT- 16:17
18:1,5,24 52:23
67:3 81:6 214:21
CONSOLIDATED-
57:17 159:23
CONSOLIDATING-
86:23
CONSPIRED- 60:21
CONSTITUENCIES-
29:15 61:23 195:4
196:11 199:24
205:19 220:3
CONSTITUENCY-
17:8
CONSTITUENTS-
68:14 99:21 188:6
213:21
CONSTITUTE- 39:10
161:23
CONSTRAINT- 88:21
CONSTRAINTS- 98:9
160:12
CONSTRUCT- 94:20
CONSTRUED- 16:16
CONSULT- 127:5
175:16 214:16
CONSULTATION-
152:19 153:3
158:15,16 171:19
175:9,18,24
176:20 177:17
213:20
CONSULTATIVE-
61:21 66:19
205:16
CONSULTED- 220:2
CONSULTING- 128:3
CONSUMER- 80:2
CONSUMERS- 17:23
CONTACTED- 64:18
120:1
129:7,9,15,18
138:11
CONTAIN- 141:1
CONTEMPLATE-
156:11
CONTEMPLATED-
19:7 55:25 209:14
CONTEMPLATING-
164:2
CONTEMPLATION-
102:18
CONTENTIOUS-
132:17 178:4
CONTESTED- 58:7
CONTEXT- 14:12,22
15:6,9,16 18:20
21:4 30:25 61:6
62:25 64:17 113:9
114:12,16 190:5
215:6,11
CONTINGENT- 44:4
CONTINUE- 10:22
25:13 59:7 71:22
80:15 84:15,19
86:6 87:25 89:16
93:23 101:17
180:13
CONTINUED- 12:25

21:24 29:23,24
37:10
CONTINUES- 91:4
CONTINUING- 90:13
217:17 218:3
CONTRACT- 81:24
101:8,13,15,16
145:14,21
183:14,16
CONTRACTS- 68:3
78:15 85:4,7
94:16 96:25 101:7
144:15 145:4,9
169:21 170:6
181:22
CONTRARY- 143:5
154:23 162:8
CONTRIBUTED-
136:14
CONTRIBUTION-
11:10,14 188:23
CONTRIBUTIONS-
11:19
CONTROL- 21:25
166:15 175:23
CONTROLLED- 74:12
CONTROVERSY- 7:20
16:15
CONVERSATION-
86:24 88:13 91:2
CONVERSATIONS-
13:7 30:5 88:9
89:18 90:20 91:6
94:13 113:7
CONVERSE- 149:20
CONVEY- 103:6
171:13
CONVEYANCE-
169:21
CONVEYED- 170:3
CONVEYING- 168:23
COOPERATION-
25:12 26:2,17,20
47:5 48:17 198:9
COOPERATIVE-
197:16
COORDINATED- 82:9
COORDINATION-
36:5
COPIES- 54:19
177:5,9 187:19
195:1 210:14
221:18
COPY- 14:13 54:11
221:17 222:2
CORDIAL- 30:9
CORE- 34:21 35:1
95:9 97:5
CORNERS- 31:2
201:15
CORPORATE- 26:11
75:11,22
77:20,21,22,23
78:16 80:3 81:9
CORPORATION-
146:6 164:10
189:13
CORRECT- 53:20
58:11 79:3 81:12

85:11 87:7 88:5
99:10 100:6,10,13
101:22 103:22
106:1,4,12,21
110:13,14 111:15
113:12,14,15,16,2
0,21
112:14,18,20
114:2,3,17,19
115:4,23,24
116:8,10,13,23,25
117:1,14
119:5,6,9,
CORRECTLY- 39:22
110:20
CORROBORATES-
192:16
COST- 41:15 103:2
104:11
COSTS- 28:12
79:13,14,15
COULDN'T- 220:14
COUNSEL- 8:22
11:16 21:17 23:6
46:15 47:4 49:12
55:10 73:4 118:20
123:20 146:23
154:9 171:6
173:15 176:5
190:10,23 214:16
226:21
COUNSEL'S- 190:4
226:15
COUNTERPART-
22:16 25:9
COUNTERPARTIES-
129:7 132:1
COUNTERPARTY-
139:10
COUNTRIES- 27:21
29:16
COUNTRY- 16:6
17:10
COUPLE- 6:9 8:25
35:5 37:21 38:15
43:11 60:7 71:19
89:17 95:4 112:11
114:22 167:25
181:22 184:3
190:5 194:11
195:20 212:25
213:15
COURSE- 19:4
35:11 54:16 57:14
59:11 107:1
127:11 137:17
140:2 144:3
145:18 147:2,9
149:24 151:19
153:17 169:3
173:25 175:3
178:23 186:1
193:11,12 198:2
199:5,23 201:21
226:7
COURT'S- 17:17
19:3 59:10 180:13
201:24 208:6
COURTHOUSE- 219:4

COURTROOM- 74:12
175:12 212:14
221:6
COURTS- 14:20
16:10,12,18
17:1,6,12 18:23
19:1 21:14 22:2
26:22 30:16
33:19,22 34:19,22
35:7 36:1 37:6
38:17 48:18 57:7
162:14 164:24
165:3 166:6 179:9
204:10 205:18
206:2,18 217:11
COVERED- 22:13
43:10 127:9
COVERS- 125:25
CRAFTED- 52:1
CREATE- 63:23
78:5 105:2 106:17
200:13,16
CREATED- 28:3
29:10 31:20 44:5
45:3 70:1 174:5
188:24
CREATES- 28:19
107:15
CREATING- 104:8
199:3
CREATION- 48:11
55:25
CREDIBLE- 194:15
CREDIT- 166:21
168:5 213:9,19
CREDITOR- 19:25
20:22 26:17 29:15
89:11 155:15
166:25 167:3
218:22 220:3
CREDITORS- 15:23
19:22 20:4 21:9
31:7 32:1,9
41:20,21,23 42:23
45:5,11 51:23
105:2 136:24
146:19 147:8
149:23 156:2
157:9 158:2,25
163:12 164:4
167:2
CREDITORS'- 22:4
31:16 36:3
38:9,25 39:22
61:24 66:20 99:22
100:2,3
146:10,12,21
147:5 149:15
150:18,20 152:19
154:10 156:19
171:19 174:14
175:5,9
CRISIS- 60:20
65:4
CRITERIA- 22:9
CRITICAL- 148:12
153:3,22 155:20
CRITICIZED-
143:19

CROSS- 12:17,19
18:10,17 25:6,12
26:6 35:10,21
36:19 45:16 46:2
48:15
109:17,22,24
110:10 112:7
118:25 138:1
150:12 173:2
200:19
CROSSROADS-
7:7,13,21,22,23
8:5,6,8,12,14,17
CROSSROADS'- 8:1
CROSSWORDS- 7:8
CRUX- 71:5
CUBE- 68:17 185:6
CULMINATION- 47:6
129:23 131:24
132:18
CURE- 144:18,19
CURRENT- 63:6
122:18 129:22
138:9 155:25
156:10 157:5
158:3 161:5
162:16 163:13
165:15 170:23
185:10 192:3
201:15
CURRENTLY- 145:20
165:5,23 195:21
CUSTOM- 95:11
CUSTOMARY- 104:14
109:11
CUSTOMER- 68:21
81:11,24,25
85:2,4 86:8 87:3
88:15 90:6 91:11
93:19,25 95:25
97:19 98:7 99:4
108:22 109:1
115:18 120:4
130:16,19 131:11
137:2 139:2,7
169:21 192:6
CUSTOMERS- 59:20
70:15,20,25 71:7
77:7,15 80:15,19
81:10,14
83:19,23,24
84:12,17 85:1,6
87:13,16,17 88:24
89:19,23 90:8,9
93:15 94:1,15
95:9 96:20,25
109:6 112:12,20
113:5,22
114:4,7,11,22,24
115:5,8,11,16
117:1
CUSTOMERS'- 87:4
95:6 208:1
CUT- 78:18 79:13
95:6 208:1
CUTS- 95:15
CYCLE- 42:8 69:18
82:11,14

D

DAMAGES- 98:24
DAN- 8:22
DARNDEST- 191:23
DATA- 77:14 79:25
97:4,5,14 103:23
132:3 140:9,18
141:7 142:8
150:15
DATABASE- 136:4
DATE- 41:11 54:4
92:1 95:22 103:19
136:22 157:16
162:9 205:17
227:13
DATED- 185:11
DATES- 210:19
DAY- 70:6 79:17
96:10 107:3
139:12 184:8
185:12,16,24
191:25 192:20
193:14 195:13
196:4 222:20
225:17 226:24,25
DAYS- 13:13 14:8
117:19 139:11
140:12 157:17
158:17,19 159:10
163:16 191:16
195:11,13 197:23
201:11
DAYS'- 11:18
DE- 169:18
DEADLINE- 68:1,5
144:16,19
DEADLINES- 65:20
152:12,14 172:6
DEAL- 20:19
23:9,11 24:2
25:6,9 44:8
45:6,10 51:18
58:16 59:6 111:5
136:6,10 137:3
174:9 178:25
182:9 183:13
184:2 200:20
204:2,6 217:3,11
DEALING- 14:10
23:17,18 24:12
27:2,14 55:24
108:24 149:12
216:25
DEALS- 33:3 49:22
53:13 104:3 136:5
DEALT- 15:12
18:23 105:13
167:23
DEBATE- 105:15
DEBT- 155:17
DEBTOR- 7:23 14:4
19:24 148:17
149:7,14 150:21
152:18 166:20
171:6 174:13
176:5,10 192:7
200:11 201:23
209:14

DEBTOR'S- 19:20
21:21
DEBTORS- 7:7,20
8:2,13,15 10:25
11:1,5,15 12:11
13:9,11
25:19,20,21 30:7
36:5,9 40:6 47:6
57:16 58:24 59:14
62:21,22 63:11
67:14 68:2,12,13
69:25 71:16,22
73:9,21 111:11
117:12 120:8
126:12 142:13
143:15 145:2
DEBTORS'- 8:13
10:4,24 11:7
12:14,25 15:23
16:24 21:25 33:6
57:25 58:25 74:4
95:23 125:14
136:15 153:12
154:9 155:21,22
156:2 159:2
161:5,14 172:4
173:19 181:9
191:22 196:10,24
204:13 206:14
213:7 223:1
DEBTS- 169:16
DECADE- 70:23
82:10 84:16
92:16,19 115:22
DECADE'S- 116:1
DECEMBER- 76:4
DECIDE- 30:17
82:9 89:21 96:21
179:3,6,14 183:24
196:14
DECIDED- 99:12
103:24 104:5
DECIDING- 15:8
21:14 33:21 95:18
DECISION- 15:14
18:4 60:4,9,25
84:23 85:12 88:1
123:1
127:20,21,22
128:20 129:1
169:25 171:10
172:7 173:11
175:10 196:4
198:3 207:12
215:5 218:12
DECISIONS- 18:5
60:13,15 82:17
88:23 91:13
128:22 175:21
DECLARATION-
53:17
DECLARATIONS-
54:3
DECLINE-
80:4,8,14,21 90:2
99:5 128:13
130:23 134:13
DECLINED- 98:25
DECLINING- 80:7

81:15 128:15
134:16,17
DEEMED- 39:3
195:10
DEEP- 67:18
DEEPER- 89:17
DEFER- 56:23
DEFERRED- 57:3
DEFINE- 168:23
172:18,19
DEFINED- 168:16
DEFINITELY-
167:22 204:13
206:13
DEFINITION-
122:23 188:2
DEFINITIVE-
132:19
DEGREE- 137:4
218:4
DELAWARE- 22:21
23:6 24:1,8 36:18
37:24 55:17
57:7,12 58:16
67:4 149:11
214:14
DELAY- 98:5
115:17 119:3
184:2,11 185:19
187:9 191:15
194:10 195:6
198:12
DELAYED-
115:5,15,25
183:23 185:24
186:3
DELETE- 220:4
DELETED- 220:15
224:1
DELISTING- 60:11
DELIVER- 87:20
103:2 156:1
DELIVERS- 204:21
DELIVERY- 133:19
DEMAND- 107:6
DEMONSTRATED-
193:13
DEMONSTRATING-
64:7
DEPENDING- 84:7
97:17 210:14
DEPENDS- 193:4
DEPLOY-
82:6,18,24 86:5
92:12
DEPLOYED- 83:7
DEPLOYING- 82:10
DEPLOYMENT-
82:4,13 83:11
91:20 92:11 97:20
DEPLOYMENTS- 83:2
89:2
DEPOSIT-
150:3,4,7
182:12,13,14,16,2
2
178:3,14 183:2,4
198:17
DEPOSITS- 176:8

DEPTH- 30:8 147:7
DERAIL- 155:21
170:20 173:20
DERISK- 90:14
DERISKING- 92:7
DERRICK- 14:3
DESCRIBE- 64:14
75:23 76:24 79:16
83:19 85:2,13
99:11 103:9 104:3
105:10 126:10
132:13,15,16
133:16
DESCRIBED- 40:11
59:17 127:17
216:17
DESERVE- 148:3
DESIGN- 201:18
DESIGNATING-
136:16,20
DESIGNED- 121:23
142:2 191:16
207:14
DESIRE- 37:7
67:14 88:11 89:2
107:17 191:4
DETAIL- 100:17
DETAILS- 65:22
DETERIORATING-
68:18
DETERMINATION-
177:18
DETERMINE- 153:16
DETERMINED- 136:1
195:15
DETERMINING- 21:3
127:19
DETRACTS- 15:4
DETRIMENTAL-
177:24
DEUTSCHE- 126:6,7
DEVELOP- 70:23
81:3,5,24 86:16
88:12 89:22 93:11
DEVELOPED- 20:7
71:17 88:10 93:11
DEVELOPMENT- 27:9
60:19 75:12,22
78:4 84:11 88:4
101:3 127:2
DEVELOPMENTS-
213:16
DEVICES- 83:6,7
88:10 96:15
DIALOGUE- 85:5
DIALOGUES- 94:22
DICTATES- 161:13
DIDN'T- 20:1
88:12 100:13
108:18 118:12,23
142:8 160:24
177:12 181:14
190:10 202:12
212:1
DIFFER- 31:5
DIFFERENCE- 78:19
130:5
DIFFERENT-
26:10,14 42:9,22

71:19 76:6,24
77:4,21 78:24
79:15,20 82:2
94:4 102:6,13
106:24 108:21
112:24 114:20
120:6 131:11
143:11,14 145:7
172:18 174:9,23
177:22 178:5
185:6 200:14,15
203:13 205:9,24
208:24 20
DIFFERENTLY-
78:21 87:22
DIFFICULT- 28:20
42:25 51:16,19
52:3 57:21 60:23
69:5 71:5 86:3
109:1 120:10
130:22 131:6
206:10 210:2
DIFFICULTIES-
28:18 43:15,17
DIFFICULTY- 22:20
DIGITS-
93:13,14,17
DILIGENCE- 65:21
129:13 140:5,8
150:11,19 158:24
160:3 162:2
171:23 175:2
182:2,24
DIMINISH- 97:25
DIMINISHED- 93:1
DIMINUTION- 98:7
185:18
DIRECTION- 36:11
209:13
DIRECTOR- 37:13
73:21 125:10,23
DISADVANTAGE-
72:19
DISAGGREGATE-
78:1
DISAGGREGATED-
79:1,4 169:13
DISAGREE- 184:15
DISAGREEMENT-
175:17
DISAGREEMENTS-
216:25
DISBURSEMENT-
13:14
DISCIPLINE-
107:13
DISCLOSES- 13:10
DISCLOSURE- 219:1
DISCOVERY- 30:20
DISCREET- 173:14
DISCRETE-
41:19,21,23 42:23
DISCRETION- 16:10
50:18 176:20
DISCUSS- 90:23
DISCUSSED- 16:19
27:2 85:1 113:4
114:11,12 138:20
153:9

DISCUSSES- 55:14
DISCUSSING- 33:17
114:19
DISCUSSION- 23:8
62:18 94:2 98:19
99:20 133:5
150:12 178:3,4
DISCUSSIONS-
38:18 60:9
86:17,19,21 89:12
91:9 98:18
99:15,22 104:21
107:1,21 108:9
120:23 127:24
128:1 171:22
184:21
DISHEARTENING-
162:4
DISPARAGING-
191:7,10
DISPOSITION- 18:7
57:11
DISPUTES- 26:23
217:3
DISQUALIFYING-
65:2
DISTANCE- 204:5
DISTINCTION-
168:18
DISTRESS- 127:13
DISTRESSED-
127:7,12 193:23
DISTRIBUTED-
19:21 33:16
DISTRIBUTIONS-
221:8
DISTRICT- 7:24
67:4,5
DIVERGENCE- 57:6
DIVEST- 84:23
85:13 216:11
DIVESTITURE- 76:3
85:12 217:24
DIVESTITURES-
76:2
DIVIDE- 23:9
DIVISION- 27:20
60:1 79:20
DIVISIONS- 76:24
95:2 120:18
DIVVIED- 33:10
DOABLE- 152:13
DOCKET- 221:10
DOCUMENT- 30:21
DOCUMENTS- 97:6,7
DOESN'T- 32:23
120:16 140:17
166:3 176:1
182:14 186:6
191:19 204:22,23
DOLLAR- 85:18
98:15,20 135:9
148:21 166:21
181:22 204:5
DOLLARS- 67:16
76:8 83:17 98:4
101:25 102:14

119:12 151:18
181:25
DOMESTIC- 189:17
DOOLITTLE- 12:14
37:14 225:11
DOOLITTLE'S-
49:19 53:17
DOOR- 62:1 172:13
177:19 209:24
DOUBLE- 32:13
93:14,17
DOUBT- 18:17
173:5 207:2,4
DOWNS- 91:9
DOWNSIDE-
133:22,24
DRAFT- 54:19
55:6,12,23
DRAFTING- 33:15
DRAFTS- 33:16
DRAGGED- 152:7
DRAW- 44:7
DRIVEN- 27:6 65:4
85:18
DRIVING- 91:20
DROP- 153:17
DROPPED- 118:12
DROPPING- 80:6
90:4
DROVE- 88:1 97:19
DUE- 33:23 115:10
139:13 140:7
150:11 158:24
160:3 169:3 182:2
186:5 215:22
DUTIES- 172:12
DUTY- 203:22
204:20
DYNAMIC- 42:25
DYNAMICS- 104:9
105:5 107:15

———————
E
———————

EACH- 18:22 31:5
42:21 66:7,11
86:20 94:13
102:12 129:5
146:25 148:9
185:4,12,16
EAGER- 173:20
EARLIER- 13:3
59:18 62:18 95:5
127:17 155:14
190:4 193:9,10
223:11
EARLY- 127:9
149:4 174:3 177:4
196:20 210:19
EARN- 185:15
EARNEST- 86:18
91:5
EARNINGS- 185:17
EASILY- 20:20
105:17 192:11
EAST- 27:11
EASTERN- 83:25
EASY- 28:15 31:1
194:24
EATON- 18:15

ECHO- 47:4 51:9
ECONOMIC- 15:22
17:4 21:8 84:19
109:1
ECONOMICS- 88:14
ECONOMY- 80:7
115:10
ECOSYSTEM- 83:5
ED- 52:13
EDC- 44:6
EDDIE- 57:2
123:9,17,21
EDUCATIONAL- 76:9
126:10
EFFECT- 36:8
174:6 183:2
EFFECTIVE- 177:11
EFFECTIVELY- 78:6
79:21 84:18 86:16
95:7,15 96:9
108:12,13 112:23
121:15 134:20
200:21
EFFECTIVENESS-
46:4
EFFECTUATE-
224:22
EFFICACY- 215:16
EFFICIENT- 6:12
81:1
EFFORT- 42:17
91:10 169:22
174:14 215:13
EFFORTS- 30:11
70:15 116:2
143:25 162:8
191:18 194:22
196:17 216:11
217:24
EGG- 161:12
EIGHT- 80:6 82:13
90:4 138:16,17
ELABORATE- 64:13
ELECTING- 187:6
ELECTRONIC-
97:4,5,14 103:23
140:9 227:9
ELECTRONICALLY-
226:11
ELEMENT- 29:9
32:8 81:19,20
95:13
ELEMENTS- 61:16
62:10 78:20
79:9,15 81:21
95:7,8 102:2,4
174:23 175:11
176:3
ELEVATED- 137:11
ELSEWHERE- 18:5
59:15 71:2 168:25
EMAIL- 43:20
181:14 221:7
EMBARKING- 217:14
EMBODIED- 36:6
37:9
EMBRACE- 219:4
EMEA- 32:22 40:5
41:24 42:14

44:10,18,24
100:11
EMERGED- 60:21
129:13
EMERGENCE- 106:16
EMINENTLY- 63:4
EMPHASIZE- 45:4
150:23
EMPHASIZED- 18:6
193:14
EMPIRE- 41:16
42:4,13
EMPLOY- 186:20
EMPLOYED- 75:5,15
EMPLOYEE- 103:14
108:25 186:23
192:18
EMPLOYEES- 31:7
78:14
103:11,13,17
109:6 137:10
169:21 186:21
187:3
EMPLOYER- 187:4
EMPLOYERS- 187:6
EMPOWERED- 223:16
ENABLES- 172:24
ENCOMPASSES-
15:11
ENCOURAGE- 204:16
ENCOURAGING- 87:4
ENCUMBRANCES- 8:8
ENDORSED- 57:8
ENDORSEMENT-
218:25
ENEMY- 169:8
170:15
ENERGY- 83:16
91:4 104:11 151:8
171:4 182:24
ENFORCE- 194:15
210:16,25
ENFORCES- 107:13
ENGAGE- 60:9
62:15 99:12
107:11 146:24,25
ENGAGED- 35:11
51:15 59:19 61:20
68:12 91:25
213:17
ENGINEERING-
76:11
ENHANCE- 48:17
ENHANCED- 217:17
ENORMOUS- 26:21
ENSURE- 160:2
ENSURING- 44:19
ENTER- 35:7
102:18 121:13
151:6 213:8,19
223:16 225:9
ENTERED- 29:10
36:15 42:6 58:24
85:4,8 179:14
188:12 197:7
213:13,16 224:13
ENTERPRISE- 6:5
27:4,12,20,23
28:9,17 29:13

34:6 63:14,15
76:23,24
77:2,13,14,19
80:3 101:14
116:12,15,20
121:20 140:24
163:24 168:22
ENTERPRISES- 26:5
34:4
ENTERTAIN- 111:11
119:24 121:12
122:15 123:14
153:12
172:9,13,21
ENTERTAINED-
202:1
ENTHUSIASTIC-
170:19
ENTIRE- 121:15
159:16 178:2
185:23 191:14
ENTITIES- 26:11
28:12 32:22 34:9
38:21 39:24 65:9
72:2 75:5
77:21,22
78:7,16,18 95:5
111:18 146:24
147:10 165:11,12
166:5 169:16
ENTITLED- 32:17
151:14,16
ENTITLEMENT- 40:4
ENTITY- 52:14
77:2 78:12,13,16
101:10 113:8
194:15
ENTRY- 10:24
58:21 60:5
223:2,20
ENVIRONMENT-
60:17,18,23 109:1
ENVISIONED- 33:17
ENVISIONS- 33:9
EQUALLY- 215:8
EQUATION- 94:18
EQUIPMENT- 7:22
8:4,7,19 9:11
22:14 81:13 84:7
EQUIPPED- 88:16
EQUITY- 11:6
139:24
EQUIVALENT- 35:19
143:22
ERICSSON- 87:9
ERISA- 165:10
ERISA'S- 166:11
ERNST- 47:2 49:5
189:24
ESCALATOR-
28:22,23
ESPECIALLY-
100:15 150:21
217:6
ESSENCE- 15:2
18:19 42:12
128:25
ESSENTIAL- 148:23
ESSENTIALLY-

29:20 30:13 165:17
ESTABLISHED- 61:2
ESTABLISHING- 63:11
ESTATE- 10:4 30:14 31:12 33:1 44:3,10,20 57:25 111:2,4 122:1 151:10 167:7 191:21 201:17 206:8
ESTATE'S- 31:17 41:4,17
ESTATES- 32:1,3,10,17 40:4,5,14 41:15 42:22,24 43:9 44:10,24 167:12 194:14 195:3
ESTEEMED- 56:23
ESTIMATE- 123:22
ESTIMATED- 102:6
ETHERNET- 27:19 77:10
EUPHUISM- 86:22
EUROPE- 27:11 83:25 86:1 89:12 171:8
EUROPEAN- 82:20
EVASION- 165:10
EVENING- 158:8 222:11,17
EVENTS- 44:22
EVERYBODY- 162:15 187:22 192:1,22 196:10
EVERYBODY'S- 42:17
EVERYONE- 12:1,3 31:3 42:18 51:11 56:22 70:4 145:22 170:24,25 175:15 177:17 178:10 195:22 196:6,7,15 200:17,22 201:1 221:6,16,19 222:3
EVERYONE'S- 92:2 144:3
EVERYTHING- 100:20,21 143:25 194:10 205:15
EVERYTHING'S- 220:13
EVIDENCE- 15:21 22:8 50:17 54:1 67:6 143:6 215:21
EVIDENT- 161:4
EVIDENTIARY- 143:4
EVILS- 16:20
EVOLUTION- 60:3 69:3 80:25
EVOLVED- 90:24
EVOLVING- 61:6
EXACT- 139:17 140:7
EXACTLY- 61:7 66:13 131:19

148:7 205:2 213:3,5,14,15
EXAMINATION- 74:22 109:22,24 110:10 112:7 118:13,25 119:20 122:11 125:19 138:1 150:13 153:10 154:9 173:2
EXAMINE- 12:17,19 45:12 109:17
EXAMPLE- 78:22 80:20 140:24 192:7
EXAMPLES- 79:23 95:4,19
EXCEED- 11:8
EXCEEDINGLY- 18:24
EXCELLENT- 49:7 200:1 226:17
EXCEPT- 22:1 144:18 197:12 217:3 225:2
EXCEPTION- 22:2 55:14 72:20
EXCESS- 11:15 164:4
EXCESSIVE- 26:20
EXCHANGE- 8:10 60:12
EXCLUSIVE- 47:19
EXCUSE- 11:23 13:16 43:16 55:1 140:21 163:5 214:6
EXCUSED- 10:9,12 155:5
EXERCISE- 26:25 27:4 28:13 30:23 62:3 64:18 66:9 68:12 69:25 71:18 72:9 173:9
EXERCISED- 22:2
EXERCISES- 71:23
EXHAUSTIVE- 194:5
EXISTED- 114:18
EXISTING- 45:1
EXISTS- 96:1 116:12
EXPECT- 35:12 102:11 104:12 125:1 133:25 150:22 170:21 180:14 213:22 218:2 219:20
EXPECTATION- 23:19 136:8 217:9 218:25 219:12
EXPECTED- 186:15
EXPECTS- 219:14
EXPEDITED- 63:3 69:13,23 219:16
EXPENDED- 41:13
EXPENDING- 182:23
EXPENSE- 9:11 32:19 66:24,25 104:23

105:10,19,22,24 106:2 135:7,10 151:17 152:1,8 154:18,25 203:11,25 205:11
EXPENSES- 41:6,10 104:14 106:7 135:22 179:18
EXPERIENCE- 47:12 75:24 104:3,4,20 107:13 108:24 127:7 128:3,21 129:21 149:9 193:23
EXPERIENCED- 128:3
EXPLAIN- 76:9 81:23 101:7 102:20 177:21 223:13
EXPLAINED- 18:16
EXPLAINING- 38:12 193:16
EXPLANATORY- 225:2
EXPLICITLY- 9:12 188:5
EXPLODED- 60:21
EXPLORATIONS- 89:12
EXPLORED- 114:22
EXPLORING- 91:23 129:24
EXPLOSIVE- 118:9,13
EXPRESS- 19:5 98:14 188:4
EXPRESSED- 30:19 32:9 95:22 98:11 113:25 146:11
EXPRESSING- 36:3 209:8,9
EXPRESSIONS- 121:2
EXPRESSLY- 138:21 188:1 223:15
EXTENDED- 135:1 161:15
EXTENDING- 90:1 104:10 172:5
EXTENSION- 144:13 157:14 158:21 159:24,25 161:25 163:16 184:6
EXTENSIVE- 70:15 218:1
EXTENSIVELY- 141:13 217:20
EXTENT- 49:3 59:7 68:6 140:1 145:14 154:22 217:8 219:10,19
EXTENUATING- 159:16
EXTINGUISHMENT- 34:2
EXTRA- 204:5
EXTREME- 120:10
EYE- 31:3

EYES- 87:23 204:25

F

FACE- 167:4
FACED- 19:23 61:12
FACETS- 165:11
FACILITATE- 103:13,16
FACILITIES- 213:9,19,23 223:3,17 224:13
FACILITY- 136:12 223:21 224:24 225:12
FACING- 28:18
FACTORS- 22:6 85:18 168:8 177:22
FACTUAL- 183:25 184:16 214:19
FACTUM- 15:18 16:14 20:10
FAIL- 57:17 179:13
FAILURE- 151:25
FAIR- 10:3 25:25 28:22 30:22 33:20 53:15 57:22 67:14 98:9 110:22 113:2 134:8 135:3 156:8 158:14 162:15 192:23 199:4 205:12 206:12,17
FAIRLY- 62:20 72:3 99:15,19 105:17 117:19 127:13 207:21
FAIRNESS- 58:1
FAIT- 141:23
FAITH- 30:23 35:11 159:3 177:25 178:3,13 216:13
FALL- 126:3 191:24 215:25
FALLING- 220:14
FAR- 54:1 142:4 180:7 198:7 218:12
FARLEY- 18:4,16
FASCINATING- 84:11
FASHION- 92:12 200:10 204:18 206:24
FAST- 42:6 208:1
FASTER- 185:13
FAVOR- 44:25 111:19
FAVORABLY- 112:19
FAVORING- 17:7
FEAR- 196:8
FEBRUARY- 75:3,15 82:16,22 91:13 92:1 191:3
FEE- 66:23,24 104:15,22

106:9,10,14,16,19 ,23
105:9,14,22 107:6 135:7,10,14 136:3 150:25
151:3,5,11,22,25 152:10,15 154:18,25 176:9 179:1,2,5,11,16,1 9,23
178:20,24 183:8,11,21 187:12 203:11,25 205:11
FEEDBACK- 55:7,9 79:21 80:5 85:6 86:8 87:13 89:19 101:14 109:6
FEEL- 42:9 129:17,19 138:5 145:10 146:7 174:13 176:13 204:19
FEELING- 98:14
FEELS- 214:17
FEES- 223:20
FELD- 146:18
FELDSHER- 111:24 112:2,8 117:18,22 122:6,7,8,10,12,2 5
118:21 123:6,7 137:24,25 138:2,3 142:20
155:9,10,11 163:5,9,17,20 164:1,6,7 184:3 190:17,18,22
FELT- 32:9 180:4
FEMALE- 14:2
FIDE- 15:23 21:9 182:22 193:24 197:17 201:13
FIDES- 183:5
FIDUCIARIES- 42:21
FIDUCIARY- 172:12 203:22 204:20
FIELD- 82:4 103:9,10 149:1 150:7 154:22 178:8,17 183:3 198:1
FIGHTING- 175:17
FIGURE- 31:22 43:6 170:18
FILE- 13:9,16,18 144:17 221:19,23 25:18,19,20 49:23 51:3 52:19 55:15 56:4 58:14 103:20 122:19 125:4 143:7,15 144:23,24 156:11 160:20 161:3 171:8 192:6 199:17 210:19 216:8

FILING- 29:11
41:11 42:7,9,11
80:8 91:9
93:6,13,20
104:17,19 115:14
120:3 126:14
127:18 150:14
184:20 186:24
187:1 210:15
FILINGS- 25:22
41:13 89:11,15
126:16
FINAL- 32:16
36:11 44:16 53:8
54:6 106:24
133:13 142:11
144:2 152:16
153:7 199:18
213:8 223:2
224:12,17,19,23
FINALIZE- 175:20
FINALIZED- 213:23
FINALIZING-
132:19 213:24
FINALLY- 81:6
152:11 173:22
178:20 188:11
FINANCE- 69:8
77:24 78:4 79:12
FINANCED- 66:1,2
136:13
FINANCES- 27:8
28:5
FINANCIAL-
11:1,3,15 13:11
60:18,20 61:25
64:7 65:4 69:9
87:15,22 88:21
90:6 98:2 99:4
113:2,7,11,18,23,
24,25
102:24
114:4,8,23,24
116:8 117:5,7,10
119:23 120:1,6
128:16
138:11,15,16,18,2
0
130:2,5,12,24
139:1,6
FINANCIALS- 97:6
129:8
FINANCING- 136:6
174:25 175:1
FIND- 12:23 20:18
51:16 61:10 69:19
70:16 90:18 91:18
98:8 124:5,13
128:22 149:3
162:4 202:21
FINDING- 168:12
216:2
FINDINGS- 168:25
FINE- 7:14 13:21
38:11 54:9 123:13
144:21 169:2
180:16 181:24
184:12 188:3
210:23 221:22

226:19
FINITE- 185:14
190:25 191:1
FIRE- 134:22
141:11,12
FIRM- 114:15,16
125:25 126:8
138:21 139:24
152:24 219:5
FIRST- 10:23
14:21 18:13
23:10,16 24:23
26:10 28:7 33:8
35:7 46:21
51:12,13 52:2
55:18,20 57:5
58:4,15 61:2
73:18,24 76:1,23
89:24 91:1 97:19
105:8 143:20
145:7 146:16
147:2 148:11,18
161:21 167:20
177:18 18
FIVE- 11:18 13:13
25:19 75:11 82:5
106:7 126:8
135:23 155:6
178:13 182:13
195:23,24
196:8,12 210:5
FIVE-DAY- 223:18
FIVE-MINUTE-
180:15 211:10
212:17,19
FIXED- 71:4
101:25
FLAT- 106:20
133:25
FLATLY- 182:9
FLATTERY- 157:22
FLAVOR- 99:11
100:18 108:9
170:6
FLEX- 145:14,20
FLEXIBILITY-
15:13 18:6
24:13,14 63:20
65:19 66:5 94:18
95:20 111:5
121:25 152:25
170:11 172:23
174:12 176:23
204:7 205:9 224:7
FLEXIBLE- 16:15
48:4 72:13 147:1
201:18
FLEXTRONICS-
144:25 145:6
FLOOR- 25:12
202:11
FLOW- 29:12
47:10,11,13,20
48:12 86:7 98:3
102:5 119:13
130:23 134:10,17
FLOWERS- 191:8
FLOWS- 34:5 89:25
FLUID- 207:21

FLYING- 209:23
FOCUS- 26:15 31:6
91:22 93:23 174:4
181:11
FOCUSED- 20:13
28:9,13 86:20
90:21 91:10
172:15,17
FOLKS- 31:1 87:9
95:19 117:9
123:11 128:3
172:14 184:24
FOLLOW- 16:20
57:10 207:7
FOLLOWED- 46:21
83:12 151:9
FOLLOWING- 44:2
187:16
FOLLOWS- 57:8
FOLLOW-UP- 105:8
118:19 119:18
220:1
FOOT- 104:13
FOOTNOTE- 84:25
86:2 111:8,10
121:11 153:10
172:15,22
181:15,16 200:7
201:6 203:16
208:9 220:1,5,15
FOOTPRINT- 61:13
71:6,9 83:3,20
85:24 87:1 92:8
112:22 113:1
131:14
FORCED- 16:20
152:13
FORCING- 107:14
FORECAST- 29:8
47:10,11,19 80:5
124:1
FORECASTS-
29:7,24
FORECLOSE- 162:17
FORECLOSED-
157:12
FOREGO- 116:1
FOREGOING- 227:8
FOREIGNER- 156:6
162:23
FORESTALL- 26:22
FORGE- 187:14
FORGET- 114:15
FORGIVE- 198:15
FORGOT- 100:16
FORM- 55:15 56:4
57:10 70:11 71:12
86:23 151:10
157:21 158:4
199:18 218:16
FORMAL- 18:8
19:15
FORMALLY- 221:23
FORMED- 171:20
FORMER- 78:17
FORMING- 88:7
FORMS- 143:11
FORMULAIC- 98:19
FORTH- 66:18

107:2 124:20
131:16 179:1
193:18 217:16
FORTHCOMING-
147:25 198:11
218:19
FORWARD- 30:21
33:4 48:3 63:25
82:23,24 97:23
104:13 107:25
108:2 121:14
146:14 156:4
158:17 173:16
191:22 194:7
204:23 209:15
218:15,19
FOUND- 19:8 29:11
41:11 124:15,17
216:2,20 221:13
FOUR- 20:17
129:12 147:6
201:15 215:9
225:22,23
FOUR-MONTH-132:15
FOUR-PRONG- 22:7
FOURTH- 81:22
150:11 186:15
188:11
FRAME- 30:4 63:3
83:14 96:22 109:5
139:18 219:16
FRAMEWORKS- 63:24
FRAMING- 222:13
FRANCE- 25:24
FRANKLY- 94:21
101:16 112:25
145:18 178:7
182:9 188:21
FRAUDULENT- 165:8
FRAUGHT- 51:10
FRED- 146:18
FREE- 8:7,20 34:6
166:8,9 168:12,24
FRIDAY- 7:10
35:13 60:6 140:17
161:3
FRONT- 36:6 41:6
54:11 99:25 109:4
164:17 166:7
176:5 207:12
FRONTS- 79:7
99:20
FRUIT- 143:12,19
FRUITFUL- 191:7
FRUITION- 63:21
FRUSTRATING- 30:9
FULL- 32:16 64:24
65:11 155:24
190:6
FULLY- 38:10
40:16 48:3 52:6
157:17
FULSOME- 162:15
FUNCTION- 74:11
78:9,10 107:15
FUNCTIONING- 26:6
29:6
FUNCTIONS- 77:23
78:2

FUND- 47:23 75:13
112:16
FUNDAMENTAL-
19:11 29:9 39:25
40:5 120:11
164:19
FUNDAMENTALLY-
120:15 203:18
FUNDING- 6:20
12:14 23:11 24:25
25:6,7 26:10,24
27:5 28:7,8 29:20
30:13 31:8
36:7,20,21
37:8,10,11,20,25
38:10,24 39:25
40:17 41:1,6
43:3,4,5 45:15
46:4 47:3,8,22
48:1,2,5,12
51:5,16,25
52:7,21 55:13
56:1,3 58
FUNDS- 29:12
33:13 45:7,10
139:21 223:25
224:3
FURNITURE- 42:4
FURTHER- 18:3
46:9 47:25 48:4
54:10,20 55:8
62:15 109:14
119:15 122:5
129:2 137:20
142:22 174:2
218:8 219:21
226:22
FUTURE- 29:8
38:17 40:13 48:7
51:17 68:3
93:16,24 186:16

G

GAIN- 89:4
GAME- 178:18
191:4,5,11
GAP- 86:12
GAPS- 92:18
GAVE- 194:24
218:17 225:25
GE- 95:8
GEAR- 80:1
GENERAL- 15:19
65:6 76:9 101:23
108:9 172:22
GENERALLY- 17:22
71:8 75:23,24
76:15,22 85:13
88:20 96:5 104:3
131:15 126:6,13
139:21 152:22
179:23
GENERATE- 203:10
GENERATED- 98:3
GENERATION- 28:10
68:24 69:4,17
81:7,16,17,18,22
84:4,5 112:17
120:14 134:20

185:10 186:15
GENTLEMEN- 37:16
GEOGRAPHIES-
131:11
GEOGRAPHY- 94:16
GEORGE- 64:14
73:18
74:4,7,20,25
129:22 131:2
132:11,25 137:10
GEORGE'S- 128:6
GEORGIA- 144:8
GET- 28:21 30:12
44:21 63:5 71:4
73:3 81:24 83:1
84:4 87:24 91:20
98:13 104:18
106:15 107:9
117:16 120:16
140:10 142:7
144:15 145:18
154:20 158:1,4
159:5
162:11,12,22
168:12 172:1
174:6 176:8,12
177:5,7,19
GETS- 104:7 105:6
120:16 175:18
179:3 188:12
GIULIANI- 112:3
138:4 155:12
GIVE- 11:15 40:22
42:25 54:10 64:8
68:2 69:22 76:9
87:13 88:17 94:25
99:11 100:18
108:9 112:16
121:25 123:22
143:13 158:21
159:4 162:25
166:12,20,21
168:5 170:5
176:11,15 180:17
183:23 188:13
190:11 199:23
GIVEN- 61:22
64:22 68:13
84:12,16 89:9
92:4 97:14 120:22
130:1 161:17
165:13 166:18
188:21 192:13
196:19 199:4
215:21 217:6,25
GIVES- 107:2
136:23 224:7
GLAD- 110:2
190:18
GLEANED- 22:5
GLOBAL- 27:3
28:9,17 64:23
71:6 77:5 78:3,18
80:13 81:2 83:20
85:24 86:14
87:2,19,24 90:18
95:24 112:3,22,25
117:11
131:2,7,8,12

139:21 155:12
168:19,22
GLOBALLY- 83:22
GLOBE- 197:3
GM- 159:12
GO- 18:21 20:17
22:19,22 33:12
51:13 55:14 63:8
82:1,2,3,12,18,23
,24
71:2 76:21 81:20
82:23 85:16 86:19
89:17 90:16,17,19
91:1,12 96:14
97:19 99:3 101:9
117:2 120:10
124:21 141:21
148:8 156:3
160:25 165:1
GOAL- 201:16
GOALS- 28:15
154:23
GOING- 16:24
17:3,7,25 20:9
21:19,21,24
23:9,10,16 24:9
30:21 31:1 40:25
44:18,19 62:20
66:17 69:10,25
70:22 71:19,24
82:22 84:20 85:19
89:1 91:14 94:6
97:17 100:17
102:24 103:8
105:14 108:8
113:1 118:15 123
GONE- 27:4 64:12
72:9 78:1 192:13
GOOD- 6:16,21,23
7:16,17,18
12:20,21 22:18
23:4,5 25:2,4
30:23 35:11
38:5,6,7,8,9 41:5
43:18,19
46:23,24,25 50:23
51:2 52:10,11
67:18 69:6,7
72:17
73:2,3,11,12 85:5
104:23 110:1,2,6
111:23,24 112:9
118:4 13
GOT- 6:13 12:4
13:25 93:14
168:16 169:1
177:20 178:17
180:20 182:17
188:20 200:3
202:14 209:18,19
225:18
GOTTLIEB- 12:11
46:17,22 49:10,11
50:4,9 73:9
222:24
GOVERNED- 224:19
GOVERNMENT-
143:21
GRAND- 169:19

GRANT- 9:22 10:7
13:1 20:13 57:13
GRANTED- 49:16
57:9 196:24
GRANTING- 19:9
86:22 197:22
GRAVE- 90:11,12
GREATER- 67:14
89:6 104:17
112:15
GREEN- 88:23
GROSS-
22:16,23,24
23:4,8,14,19
24:1,17,22 25:3
46:9,23 48:23
49:1,12
50:3,6,15,18
54:18 55:4,22
56:12,25 57:11
58:3,9 72:18
110:4 118:8 124:9
180:12 212:11
214:12,24 216:6
218:10 219:8,21
222:6,16
GROSS'S- 219:13
GROUND- 29:20
109:4
GROUP- 26:11
27:19 28:10 29:4
35:18 51:1 52:6
110:25 126:8
127:5
152:20,22,23
166:15 195:9
196:13 220:4
GROUPS- 146:25
147:12,14 185:4
GROWN- 190:19
GSM- 77:5 79:1
80:10,19 95:8,13
GUARANTEE-
163:4,7,15,18
192:12
GUARANTY- 146:6
164:9 189:13
GUESS- 170:14
173:12 212:25
GUIDANCE- 20:7
200:25 204:11
GUIDE- 21:13
188:25
GUIDED- 15:18
GUMP- 146:18
GUT- 60:13

H
HADLEY- 50:25
HADN'T- 40:24
HALF- 72:24 75:3
82:12 99:16
101:25 123:24
124:1,3 135:9
HALL- 226:12
HALLMARK- 26:25
HALT- 29:20
HAM- 41:4
HAMILTON- 12:11

222:24
HAND- 9:18 13:5
42:17,21 63:19
74:2,3 125:13
174:7 183:1
184:14 191:23
209:18,21 214:3
221:18 225:5
HANDED- 40:23
225:19 226:1
HANDFUL- 96:25
143:9
HAND-IN-HAND-
159:6
HANDLED- 149:13
HANDS- 107:20
HANDSET- 83:5
HANG- 159:17
HANGING-
143:12,19
HAPPEN- 33:7
165:14,18
HAPPENED- 41:5,10
132:18
HAPPENING- 219:4
HAPPENS- 151:20
152:7 198:5
202:6,19
HAPPY- 37:15,17
70:6 123:14
145:10,21 169:2
189:4 209:19
221:20 225:5
HARD- 27:19
28:4,23 51:11
62:7 66:15 70:7
71:18 88:14 92:21
157:17 171:24
207:10 208:1
226:24
HARDWARE- 79:9
95:6
HARM- 160:1
202:18
HARPED- 201:10
HARRIS- 49:24
50:1
HARRON-
43:16,18,19,24
52:10,11,13
53:3,4
HARRON'S- 53:9
HARSH- 94:12
HARVARD- 76:12
126:11
HASN'T- 208:22
217:21
HASTE- 161:14
HAUER- 146:18
HAVEN'T- 85:25
95:24 103:19
116:24 189:22
190:19
HE'S- 8:23 74:15
100:15 212:17
HEAD- 18:23 126:8
226:15
HEADING- 216:21
HEADLINE- 101:18
177:2

HEALTHY- 136:25
HEAR- 10:18 12:4
22:24 24:7,16
38:4 43:21,25
46:1 50:17 58:15
65:12 68:11,17,22
70:10,14,19,20
110:2 156:9
157:25 162:4
170:19 189:22
202:20 211:6
212:11,12
220:14,20
HEARD- 41:8
43:4,13 46:13
50:12,14 51:22
53:6 108:5 130:7
142:24 143:14
146:16 152:12
155:14 157:15
158:11 159:1
160:4 161:22
162:17 163:23
178:22 179:24
184:18 185:21
186:2,19,22
188:21 189:22
190:24 191:3
HEARING- 22:20
24:9 35:18 51:11
57:3,18 58:13
60:4 65:7 68:7
155:6 156:5
167:23 181:10
193:12 197:4
198:6
210:18,22,25
213:5,12 217:6
218:13 220:13
222:8 226:8 227:4
HEARINGS- 35:23
HEART- 161:9
HEARTENED- 156:9
HEAVILY- 174:8
HEAVY- 30:22
193:25
HELD- 34:4,5 65:7
165:3
HELP- 28:15 34:10
86:11 87:19
103:12,16 139:7
154:19 187:21
HELPED- 67:11
81:2 104:25 105:1
HELPFUL- 15:5
16:4 54:13 113:9
197:15 199:3
200:25
HENCE- 90:21
94:17
HERE'S- 94:6
203:24
HERITAGE- 26:15
HIGH- 30:17 36:15
67:12 90:13 93:24
104:11 146:1
171:14 218:4
HIGHER- 81:1
134:1 142:1

197:19,20
**HIGHEST-** 70:9
102:19 120:25
131:23 167:24
168:8 180:2
200:18
**HIGHLIGHT-** 156:25
157:19 159:10
192:5
**HIGHLIGHTED-** 61:1
**HIGHLY-** 61:21
130:19 140:3
163:11 177:23
178:23
**HISTORICAL-** 161:9
**HISTORICALLY-**
90:3 93:12
**HISTORY-** 27:12
38:20 97:6
**HOC-** 51:1 99:23
100:7 149:16
152:23 171:20
**HODARA-** 12:20,21
38:4,5,6,8,9
40:18 51:7
109:17,18,23
110:2,6,8,11
111:10,22 118:23
137:22,23
146:16,17,18
153:24,25 176:4
182:18 201:4,5,9
202:20 210:3
**HODARA'S-** 177:12
**HOLD-** 99:2 104:1
175:14 178:9
**HOLDERS-** 145:4
**HOLDING-** 7:8
141:24,25
**HOLDS-** 7:25
155:15
**HOLIDAY-**
158:18,20,22
184:7 226:25
**HOME-** 27:7
**HOMEWORK-** 178:11
**HONOR'S-** 202:4
210:13 220:7
**HONORS-** 35:5 41:4
123:15 154:2
180:24 214:15
**HOPE-** 35:8 71:9
72:10 91:15
141:24,25 143:18
151:19 170:21,23
172:11 173:5
190:19 194:13,18
205:20 222:19
**HOPEFULLY-** 30:16
52:2 73:3 145:24
193:2 197:19
213:18 218:15
**HOPES-** 170:24,25
**HOPING-** 214:22
**HORIZON-** 92:23
**HORRIBLY-** 100:15
**HORSE-** 103:25
104:2,6,8,13
107:11,18 108:23

110:25 134:6
136:16,20,23
137:6 144:15
149:2,5,8,17,20,2
1
148:15,20,24
150:2,10 151:14
152:8 162:12
177:11,25 178:8
182:5,25 208:14
216:16
**HOUR-** 72:24
123:19,23
**HOURS-** 124:2
196:3
**HOUSEKEEPING-**
57:1 59:1 200:2
210:10 220:23
221:2
**HR-** 77:24
**HUAWEI-** 87:10
**HUGE-** 42:16 93:25
170:7
**HUGELY-** 109:5
**HUNDRED-** 101:2
**HUNDREDS-** 181:25
**HYPOTHETICAL-**
174:7 205:21

--------
I
--------

**ICE-** 68:17 185:6
**IDEA-** 31:3 56:17
86:22 170:5
194:25 195:23
**IDENTIFIED-** 16:25
65:23 135:20
148:1 155:1
**IDENTIFY-** 16:23
78:14 131:25
138:9 148:8
**IDENTIFYING-**
138:6
**IE-** 105:5 120:15
**IGNORING-** 20:7
**ILLUSTRATE-** 95:4
**IMAGINE-** 136:4
**IMITATION-** 157:21
**IMMEDIATELY-**
36:22 129:3
223:16
**IMPACT-** 29:25
53:11 137:9
198:24
**IMPACTING-** 88:22
**IMPEDIMENT-** 19:9
**IMPENDING-** 158:18
**IMPERFECT-** 29:5
**IMPLEMENT-** 80:1
**IMPLEMENTED-** 30:2
**IMPLICATE-** 40:3
**IMPLICATIONS-**
43:11 98:2
**IMPORT-** 35:25
**IMPORTANCE-** 26:5
38:25 92:13 111:8
148:7 177:21
**IMPORTANT-** 20:11
27:1 32:5,8 34:3
39:18,21 47:9

51:19 63:24,25
84:8 87:21 91:5
92:3,11 93:4,16
102:21
107:9,11,19
147:17,18 148:10
149:12 150:24
160:10,12
184:11,13 193:14
199:5 204:18
207:7
**IMPORTANTLY-**
134:18
**IMPRESSION-**
123:18 175:4,13
**IMPROVE-** 196:13
**IMPROVEMENT-** 73:4
**IMPROVIDENTLY-**
215:13
**INABILITY-** 69:8
134:18
**INADVERTENT-**
144:5 224:10
**INAPPROPRIATE-**
149:2
**INC-** 7:8,21 19:5
227:14
**INCOMING-** 43:1
**INCONSISTENCIES-**
26:8,13
**INCONSISTENT-**
182:9
**INCORPORATED-**
27:25 31:13 214:3
**INCREASE-** 72:12
132:21
**INCREASES-** 185:25
**INCREDIBLY-**
140:10
**INCREMENT-**
176:17,21,25
188:18
**INCREMENTAL-**
188:15
**INCREMENTALLY-**
185:12
**INCREMENTS-**
176:18
**INCUBATION-** 75:13
**INCURRED-** 41:9
**INDEED-** 26:3,23
31:22 59:19 63:12
65:20 66:2
67:9,12 69:7
156:17 183:10
185:5 193:13
**INDEFINITELY-**
19:25
**INDEPENDENCE-**
48:18
**INDEPENDENT-**
33:20 114:14
**INDICATED-** 38:21
55:23 60:7 74:11
154:12 185:11
191:4 201:11
202:20
**INDICATES-** 47:12
**INDICATION-** 64:8

88:25 99:3
**INDICATIONS-**
207:23
**INDISCERNIBLE-**
14:15 55:7,8
79:21 80:5 101:13
**INDIVIDUAL-** 81:10
190:11
**INDIVIDUALS-**
62:12
**INDUCED-** 105:6
**INDULGENCE-** 12:3
59:10 115:20
**INDULGING-** 222:21
**INDUSTRY-** 90:19
93:4 96:15 126:1
127:15 129:21
137:12
**INFLUENCE-** 94:14
**INFORMAL-** 13:6
143:20 181:14
214:2 223:5
**INFORMALLY-** 144:9
154:13
**INFORMATION-**
26:21 35:17 85:10
129:13 132:4
140:10 142:6
155:25 160:20
163:10 172:7
187:23 198:10,11
**INFORMED-** 43:24
**INFRASTRUCTURE-**
59:24 79:22
**INFRASTRUCTURE'S-**
83:6
**INFUSIONS-** 11:6,8
**INHERENT-** 18:14
**INITIAL-** 48:10
55:15,24 106:13
117:4
**INITIALLY-** 126:12
**INJUSTICE-** 176:22
**INLINE-** 135:15
**INNOVATION-** 27:13
**INQUIRE-** 109:20
**INSIGHTFUL-** 202:5
**INSIGNIFICANT-**
196:21
**INSISTED-** 177:8
**INSISTING-** 193:19
**INSISTS-** 193:19
**INSOLVENCY-** 26:6
29:10 31:5 65:9
126:17 171:8
**INSOLVENT-** 16:21
165:19
**INSTALL-** 86:12
**INSTALLMENTS-**
31:14
**INSTANCE-** 82:7
151:5,7 152:2
**INSTANCES-** 151:2
169:20
**INSTANT-** 160:20
**INSTEAD-** 156:5
**INSTITUTIONS-**
213:18,20 223:7
224:8,12

**INSUFFICIENT-**
32:12
**INTEGRATE-** 62:23
**INTEGRATED-**
27:3,7,9 28:16
42:19 57:15,17
62:19 63:14 77:2
101:10 171:10
**INTEGRATING-**
97:21
**INTEGRATION-** 28:3
91:5 113:10
**INTEGRITY-** 215:17
**INTELLECTUAL-**
34:3 52:25
53:10,14 61:13
62:8,12 101:4
103:5
**INTELLIGENT-**
140:11
**INTEND-** 56:7
175:14,15 205:4
**INTENDED-** 44:15
45:6 53:22 59:3
144:3 145:14
196:14
**INTENSE-** 30:23
**INTENT-** 111:8,15
**INTENTION-** 16:17
34:20 35:1
120:20,22
121:8,14,16
145:20 153:21
161:5 218:24
**INTENTIONS-** 16:19
**INTERACT-** 66:11
**INTERCOMPANY-**
28:8 40:16 45:1,2
51:20
**INTERCONNECTED
NESS-** 61:4
**INTERDEPENDENCIES
-** 79:7,8,11,13
**INTERDEPENDENT-**
78:20
**INTEREST-**
8:1,4,7,11,14
10:4 17:21 26:4
33:13 52:25 57:25
64:8 70:2
77:16,17 86:21
87:1,3,14 88:6,12
92:22 93:1,2
95:17,22 98:8,25
99:5 104:24 117:9
120:2,4,20 121:2
137:17,17 171:25
180:9 207:23
209:8 215:14 219:
23
**INTERESTED-** 26:3
33:13,24 34:21
88:18 91:24
95:12,20 96:2,24
98:10 170:17
181:23 183:18
184:25 185:2
191:13 201:13
214:20

INTERESTING-
88:19 90:7 95:3
108:12
INTERESTS- 175:22
224:5

INTERFACE- 95:1

INTERFERENCE-
79:21 80:5 101:14

INTERIM- 6:20
23:11 24:24
25:6,7 26:24 28:7
31:8 36:7,20
37:9,19,25
38:10,24 40:17
41:1 43:4 45:14
46:4 47:3 48:1,12
51:4,25 52:7,21
55:13 56:1,3
58:22 213:13,16
224:11 225:23
INTERJURISDIC-
TIONAL -51:21

INTERLINEATE-
199:9
INTERLINEATION-
199:15
INTERNATIONAL-
26:2 29:3 30:25
61:3 157:23
INTERNET- 78:25
INTERPRETATION-
16:11 122:23
INTERPRETATIONS-
217:1
INTERPRETED-
168:15
INTERRUPT- 200:4
201:5
INTERRUPTED-
43:15
INTERRUPTION- 9:2
11:12 41:14
INTERVENTION-
33:19
INTRODUCE- 12:9
INTRODUCTION-
14:3
INTRODUCTORY-
59:2
INVENTIVENESS-
70:4
INVEST- 75:13
84:2
INVESTED- 83:3
INVESTIGATING-
24:8
INVESTMENT- 64:16

81:3 83:16 84:16
85:17,23 86:2
90:13 112:17,23
126:5 164:3
193:22 207:24
INVESTMENTS-
88:22
INVESTORS- 87:15
INVITE- 221:6
INVITED- 208:12
INVOLVE- 20:1
34:1 157:11
174:14
INVOLVEMENT-
18:19 38:23 76:18
136:22 218:1,3,22
INVOLVES- 55:9
66:23
IOU- 124:18
IP- 49:22 95:25
IPLA- 103:4,9
IRONIC- 9:3
IRRESPONSIBLE-
193:25
IRRETRIEVABLE-
185:17
ISN'T- 70:11
115:4 119:9
140:5,7 145:20
180:2 223:10
ISRAEL- 25:24
ISSUE- 15:4 17:17
18:22 20:11 21:14
22:13 24:6 29:19
34:3 46:6 49:19
52:17 111:9
131:3,8 139:14
145:13 166:8
173:17,18 175:25
187:10 203:22
207:2 213:5
ISSUED- 35:2
ISSUES- 8:3
28:19,20 29:1
32:23 33:3 38:12
40:13 43:1 51:19
52:3 89:8 99:24
104:19 126:19
145:12 146:12
167:22 170:8
178:5 181:9 217:8
IT'S- 10:3
15:5,15 16:19
17:19 20:12
25:16,25
27:1,11,19,22,24
28:15,21,25
30:10,22 32:5
36:6 40:2
42:19,25 43:7
44:18,19 46:3,17
49:17 51:10,12
53:15 56:12 61:6
66:1,15 67:14,23
68:8 70:6 74:12
78:3,17,25 7
ITEM- 10:23 89:4
150:17,23
ITEMS- 38:16

47:19 148:5 155:1
219:1

───── J ─────

J'S- 18:4,17
JAB- 162:7
JANE- 12:10
222:24
JANUARY- 25:19,22
32:19 126:14
184:20
JENNIFER- 112:2
138:3 155:11
JIM- 129:6
JOB- 38:11 75:9
125:22,24 162:10
215:1
JOBS- 62:11
JOHN- 12:14 49:24
225:11
JOIN- 13:24
146:11 187:6
JOINED- 75:3
126:3
JOINT- 14:1 35:23
46:18 49:12,14,18
52:13 77:16
120:20 166:11
167:10 213:5
217:6 218:12
222:7
JOURNAL- 197:3
JOURNEY- 77:1
86:17 94:15 96:14
99:24
JUDGE- 18:18
22:16,23,24
24:1,8,11,14,17,2
2
23:4,8,13,19 25:2
46:8,23 48:23
49:1,11
50:2,6,15,18
54:18 55:4,22
56:11,25 57:4,11
58:3,9 72:18
110:4 118:8
123:9,12 124:9
155:8 180:12
212:11 214:12,24
216:6 218
JUDGES- 46:7
JUDGMENT- 11:8
159:3
JUDICIAL- 16:9
JULY- 63:7
68:1,2,4,7
145:16,23 158:20
184:7,9 192:20
197:4 219:17,18
227:13
JUMP- 212:7
JUNE- 67:25
JUNIPER-
75:16,19,23 76:5
JURISDICTION-
17:17,19 18:11,14
19:3 20:12 22:3
26:23 63:12 66:22

169:11 215:2
217:2
JURISDICTIONAL-
19:9
JURISDICTIONS-
17:16 19:1 25:19
26:9,14 27:8
38:14,23 41:25
42:9 100:12 171:5
174:10 178:5
214:22
JURISPRUDENCE-
20:8
JURY'S- 159:12
JUSTICE- 11:20
14:14,17 18:10,16
21:16
22:12,18,19,21
23:1,4,5,6,16
24:5,19,22 25:16
34:25 38:7,8
40:19 43:12
45:3,19,22
46:8,12,15,20,25
47:15 48:24 49:10
50:4,10,15,21,24
51:2 52:12
54:2,7,12,18,23
55:3,17 5
JUSTIFICATIONS-
193:19
JUSTIFIED- 63:4
161:16 162:20
205:13
JUSTIFY- 194:19
JUSTIFYING- 37:8

───── K ─────

KARR- 37:12
KEEPING- 19:8
149:10 152:25
224:3
KEEPS- 117:24
KEY- 16:25 90:5
97:22 113:6
152:17 153:2
174:21 175:6
176:1 187:3
218:23
9:3,6,9,15,21,24,
25
KIM- 7:17,19
10:8,11,22,23
11:13,22,24
12:2,8,10
13:2,5,22,25
211:20,21,23
212:1,4,6
213:3,5,7,11,15
214:1
222:18,19,23,24
223:5,24
225:1,4,7,10,15,1
6,17,22
224:7,10,16
226:1,5
KINDS- 120:19
147:18
KINGDOM- 25:21

26:19 32:7 100:10
KITCHEN-
208:22,23
KNOCK- 7:3
KNOWLEDGE- 86:6
132:24 138:12
KNOWLEDGEABLE-
132:2
KNOWN- 28:25
62:18 137:12
184:25 193:22
KOREA- 77:17,18
KRELLER- 50:23,25
51:3,7 52:8,9
KUMBAYA- 156:5
173:10

───── L ─────

LAB- 82:3
LACK- 69:9 88:11
177:25 206:19
LAID- 11:4 141:5
148:5
LANDED- 206:2
LANDLORD-
144:8,12
LANDSCAPE- 82:20
LANGUAGE- 13:8
143:24 156:15,17
157:5,7 203:6,7
LAP- 206:2
LARGE- 16:4 65:9
77:7 80:3 81:14
82:1 83:2,23 86:1
89:19 95:9 126:23
130:7 139:23
171:4
LARGELY- 27:15
34:4 41:9 85:25
100:23 106:15
131:13
LARGER- 80:10
LARGEST- 59:20,23
68:20,23 76:3
80:11 87:17 90:9
127:14
LASTLY- 15:24
21:10 77:16
215:18
LATE- 78:5
158:7,10
LATER- 55:15 56:2
112:5 160:14
165:12 170:8
195:11,21 218:15
LATIN- 100:25
LAUGHTER- 6:7 9:4
22:17 73:1 94:11
116:5 118:11,24
189:2 193:6
198:21 220:21
LAUNCHED- 78:4
LAWYER- 119:2
LAWYER'S- 181:3
LAZARD- 64:16
73:21
125:10,23,24
126:2,4,12,21,22
127:2 128:3 129:2

133:1 149:14
LAZARD'S- 126:16
LC- 223:3,17
225:12
LEADING- 83:10
96:15
LEADS- 60:22
128:24 192:14
LEAGUE- 84:7
LEAP- 194:19
LEASE- 144:10
LEASES- 62:10
68:4
LEAVE- 50:17
165:17,19
173:13,15 187:6
LEAVING- 100:20
LED- 76:6,20
89:13 90:21 98:19
LEFT- 42:12 74:2
123:8 125:13
144:1 165:2
LEGACY- 80:23
LEGAL- 61:25
122:23 133:3
156:17
LEGISLATE- 205:20
LEGISLATION-
16:16
LEGITIMATE- 29:14
32:9
LEGO- 61:18
LEHMAN- 65:5
159:11,16,20
LENGTH- 10:5
104:21 109:12
133:6 180:14
LENGTHY- 47:6
82:1
LET'S- 6:11 12:2
79:19 84:16 85:12
118:1 121:20
124:10 138:17
181:6 209:15
211:14
LETTER- 7:1,5
36:7,8 213:9,19
LETTING- 146:7
LEVEL- 88:1 90:13
100:18 102:19
104:12 133:21
137:13 150:7
170:3 178:8,17
183:3 218:4
LEVELS- 100:17
136:3 137:11
LEVERAGE- 86:15
130:22,25
LEVERAGING- 97:23
LG- 77:18 120:20
121:20
LGNORTEL- 77:17
LIABILITIES-
166:20,22 167:8
168:2,3,6,7
188:8,10
LIABILITY- 165:10
166:11 167:11
LIBERALLY- 16:16

LICENSE- 34:13
62:13
LICENSED- 61:16
LICENSES- 8:1,11
34:2,6,7 53:14
103:8,10
LICENSING- 103:5
LIENS- 8:7
LIGHT- 27:12
29:22 37:11 88:24
159:11 217:14
220:7
LIGHTLY- 175:5,13
LIKELIHOOD- 33:5
130:2 204:3
218:18
LIMITED- 28:1
31:13 52:14
64:21,25 69:1
84:14 89:3 96:17
117:9 125:4
130:25 144:24
146:20 157:7
LINE- 63:20 78:11
81:21 91:19
135:15,16 164:23
193:17,19,24
LINED- 136:9
171:5
LINES- 16:3 59:18
77:4,25 101:11
145:2 172:25
LIPS- 74:21
LIQUIDATE- 152:4
LIQUIDATING- 8:15
LIQUIDATION- 7:24
16:20
LIQUIDITY- 44:20
LISA- 59:5 73:8
143:2 199:14
LIST- 82:4 124:18
130:17 176:16
LISTED- 35:24
219:1
LISTENING- 111:11
LITERALLY- 201:12
LITIGATION- 30:20
LIVED- 62:20
70:17
LLC- 112:3
LOADED- 116:4
LOADS- 71:10
LOAN- 11:8,10,13
LOANED- 103:14
LOANS- 11:6,19
LOCAL- 171:8
LOCKED- 174:22
LOGICAL- 94:21
LONDON- 30:17
LONG- 8:24 30:2
45:21 62:20
70:4,16 71:3 72:3
75:2,19 80:14,24
89:25 123:17,18
124:18 126:2,7
134:19 161:24
164:23 184:25
212:2 222:20
225:17

LONGER- 92:23
99:2 119:7,24
123:25 150:18
179:3 180:20
184:9
LONG-TERM- 17:8
60:2 69:3 70:22
71:4 80:25
87:19,25
LOOK- 6:25 29:25
64:1 66:8,14 68:8
72:22 75:11 94:6
96:21 102:6,8
116:7 168:23
179:16 191:15
195:7 196:1
203:21 204:21,25
221:7 225:8
LOOKED- 85:17
88:14 90:6 96:21
184:7
LOOKING- 33:4
62:10,12,25 63:2
64:10 68:1,15,25
70:21 72:24 87:12
89:16 95:14
116:11 121:19
147:18,23
204:6,17 206:21
207:14 226:7
LOSE- 115:16
158:19,22 172:10
173:19 186:4
187:8 197:21
LOSING- 130:23
LOSS- 115:17
119:4 120:13
185:17,25 186:1
192:4,17
LOSSES- 28:11
LOST- 99:1 110:4
115:5,11 117:23
159:21 184:7
192:6,8 200:3
225:18
LOT- 40:25 41:6,7
70:2 85:3 91:4
104:10 168:16
171:3,4,18 174:5
190:24 191:3
192:8 193:22
194:1,11,20
197:24 204:5
209:10,23 219:18
LOTS- 71:21 72:7
LOUDLY- 74:20
LOVE- 84:18 168:2
169:9,12,13 176:5
LOW- 131:10
143:12,19 176:25
LOWER- 128:8
LOWERING- 133:20
LTE- 60:2,25
65:12 76:22 78:25
79:18 80:25
81:3,11,16,18,21
82:7,18 83:14
84:3,11,24 88:8
89:1,10 91:13,21

92:19,25 94:3,6
95:1 97:24
100:19,22 101:2,5
110:23 111:13
122:3 127:3
128:23 134:15
141:8 145:3 1
LUCK- 67:18
LUCKY- 65:11

_____

M

M&A-
75:11,18,22,24
99:8 104:3 126:19
133:2 207:24
MACKENZIE- 76:13
MADAM- 22:14
MAGNITUDE- 198:25
MAIL- 197:3
MAIN- 7:4 27:15
44:14 59:18 99:17
130:15 138:25
MAINTAIN- 62:11
70:23
MAJOR- 33:8 69:11
79:23 87:8 88:24
91:11 128:23
129:8 130:20
131:5 139:4
193:16
MAJORITY- 34:5
83:22
MAKING- 11:10,13
71:5 107:23
127:22 168:18
178:11 198:17
200:14,15 201:22
209:7
MALLEABLE- 205:8
MANAGEABLE- 97:2
98:8
MANAGED- 146:24
MANAGEMENT- 91:7
MANAGERS- 127:25
MANAGING- 73:21
125:10,23
MANITOBA- 19:2
MANNER- 16:17
17:11 26:12
149:13 151:16
205:15
MANY- 28:10 31:1
35:21 43:1 68:17
80:18 90:11 101:10
118:17 129:9
138:9,15,18
164:24 176:11
181:7 184:5 194:1
201:20 207:22
MAP- 97:21,24
MAPLE- 14:23 15:3
16:7 19:13,16
MAPPED- 103:1
MAPPING- 78:10
MARCH- 30:4
132:22
MARGINALLY-
165:20
MARKED- 54:11

221:5
MARKET- 61:9 67:3
79:19 80:4,12
83:21 89:5 104:5
115:22 128:15
131:6 136:2
159:17 184:19
206:11,17,19
MARKETPLACE- 70:2
185:14
MARKETS- 129:8
MARRY- 71:19
MARY- 189:24
MATCH- 148:20,21
176:19 188:13
MATCHED- 61:17
MATCHING- 148:11
176:7 196:3,21
MATERIAL- 36:4
59:14 60:10 97:7
102:11,16 106:24
107:4 115:11
151:24 167:1,11
181:25 192:17
200:10,12 203:19
208:13,16 221:16
MATERIALS- 23:13
45:17 55:16 56:5
MATH- 184:4
MATIAS- 164:9
189:9
MATLINPATTERSON-
112:3 116:8
117:11 118:21,22
139:20,23 140:16
141:6 142:16
146:9 152:24
155:12,14,24
158:8,23 161:4
162:1 163:3,11
170:16 183:22
190:5 193:21
194:6 198:7 203:4

MATLINPATTERSON'S
156:18 158:9
170:14

MATRIXED- 77:25
78:19

MATTER- 7:5 12:5
20:4 21:5 23:20
24:7,12,14 57:2
58:7 70:19
123:9,17 124:7
139:22 172:5
196:3 210:10
217:12 218:11
227:10
MATTERS- 6:10
23:9,17,18 24:15
26:3 28:6
35:22,24,25
126:18 192:18
217:24 219:10
MAXIMIZATION-
26:13 28:13 31:4
71:23

MAXIMIZE- 8:21
17:13 31:6
62:14,16 71:21
96:11 111:6 122:1
172:23,24 174:18
201:16 216:13
219:15
MAXIMIZED- 67:17
MAXIMIZES- 8:16
158:2
MAXIMIZING- 96:18
206:5
MAXIMUM- 66:25
MBA- 76:12 126:11
MCCLOY- 50:25
MCDONALD- 49:5
MCKENNA- 8:24
MEANINGFUL-
88:10,12
MEANINGFULLY-
162:19
MEANS- 28:25 37:8
78:9 82:24 204:24
206:21
MEANT- 97:21
MEASURE- 16:5
MEASURING- 97:18
MECHANIC- 31:11
36:22 48:5
MECHANICAL- 76:11
MECHANISM- 40:11
MEET- 87:23 91:19
98:9
MEETINGS- 26:21
30:8,9
MEETS- 10:2 57:23
MELTING- 68:17
185:6
MEMBERS- 166:14
MEN- 27:23
MENTIONING-
222:23 223:1
MERCY- 191:24
MERE- 116:1
MERGER- 91:4
MERGING- 88:7
MERIT- 128:21
MET- 33:2 64:4
65:15 91:11
161:24
METHOD- 32:18
METHODICAL-
149:23
METRICS- 93:20
METRO- 27:19
MEXICO- 83:24
100:24
MICHAEL- 64:16
73:20 125:14,17
MICROPHONE- 55:11
MIGRATE- 192:11
MIKE- 125:9
MILBANK- 50:25
152:24
MILESTONES-
179:13
MILLION- 11:9

31:11,19
32:15,21,25
40:8,9 43:13
44:10,17,23
47:13,14,17,20
66:24,25 67:1
81:4 84:10 85:21
98:16,17
101:19,25 105:25
106:8,22 119:14
135:9,10,14,24
152:9
163:4,8,13,16
174:4
176:16,17,18,25
188:
MILLIONS- 98:4
102:14 119:12
151:18 181:25
MINDFUL- 89:18
104:20 158:15
MINIMAL- 198:23
MINIMIS- 169:18
MINIMIZATION-
28:14
MINIMUM- 158:17
163:4,8
MINISTERIAL-
201:2 211:2
MINOR- 199:15,22
MISCHIEF- 202:18
MISIMPRESSION-
190:12
MISS- 69:18
179:13
MISSED- 55:20
92:2 98:13 118:10
212:18
MISSING- 152:14
MISUNDERSTANDING-
189:16
MIX- 61:11 110:19
111:3
MIXED- 203:17
MOBILE- 79:24
80:3 81:2
MODEL- 90:6
104:14,22 147:22
MODIFICATION-
39:11 187:11
197:13
MODIFICATIONS-
187:16 197:12
MODIFIED- 158:4
188:17 190:9
MODIFY- 95:20
144:4 153:1
MONEY- 25:1
42:6,7,10 71:10
89:2 112:13,18
113:3 159:21,23
173:4 179:25
180:1,5 182:24
185:15 194:12
207:1 209:10
MONIES- 41:13,14
MONITOR- 26:18
30:6 36:5,10
40:20 45:25

46:1,15 47:2,3
48:8,16,19,22
49:4 61:24 66:20
74:15 100:14
105:2 149:15,24
171:7 174:11
175:10 189:25
190:8,12 195:9
201:23
216:8,10,15
217:7,10,18,19,22
218:1,5 219:2
MONITOR'S- 47:10
159:22 190:6
MONITORS- 41:18
MONTH- 68:9
98:4,12,13,16
119:12 120:21
132:19 169:2
172:2
MONTH'S- 119:14
MONTHLY- 31:14
MONTHS- 60:21
68:13 70:1 85:16
98:2 103:15
129:23 147:6
184:19 192:14
194:1,2 201:12
MONUMENTAL- 92:1
162:7
MOOT- 181:9 217:7
MOREOVER- 185:19
MORNING- 6:1,15
7:16,17,18
12:20,21 22:18
23:4,5 25:2,4
38:5,6,7,8,9
43:18,19
46:23,24,25
50:23,24 51:2
52:10,11,12 57:5
72:17 73:11,12,14
112:9 218:13
223:11
MOROWITZ- 11:20
14:14,17 21:16
22:12,18,19,21
23:1,4,5,6,16
24:5,19,22 25:16
34:25 38:7,8
40:19 43:12
45:3,19,22
46:8,12,15,20
47:1,15 48:24
49:10
50:4,10,15,21,24
51:2 52:12
54:2,7,12,18,23
55:3,17
56:7,11,15,
MOTION- 7:6,19
8:2 10:7,24
11:2,5 12:14
23:12 24:2,24,25
49:14 50:11 51:4
52:18 53:16 55:16
56:8 57:5,9,14
58:4,10 60:4 61:2
109:5 145:1

154:21 160:20
161:3,8 199:20
210:21 211:21
212:8 213:7
218:16 223:2 225
MOTIONS-
210:16,25
MOTIVATED- 129:14
MOTOR- 19:5
MOTOROLA- 87:10
127:15
MOTORS- 65:6
MOUTH- 181:3
219:13
MOVE- 14:1,2
30:12 63:13 72:14
73:7 102:25 140:4
MOVED- 7:10 22:16
80:19 135:2
141:14
MOVEMENT- 28:14
MOVING- 48:3 58:7
202:17 203:18
221:4
MPE- 138:21
MUCH- 6:23 21:13
30:21 41:8 50:20
56:23 59:12 64:1
69:19 72:24 86:5
90:17 106:5
119:15 123:6
135:16 141:25
160:1 166:3,21,22
184:15 189:6,7
190:15 193:10
195:3 200:11
201:10 204:1,4
205:12 208:19
209:3,9 21
MULTIFACETED-
195:18
MULTIPLE- 60:2
66:5,7 79:9,20
101:10 127:23
195:20
MULTIPLEXING-
79:20
MUNICIPAL- 9:9,12
MURIN-
10:14,17,19 12:6
43:23 55:10 74:14
117:23 118:6
MURRAY- 49:5
64:16 68:11 69:22
70:14 73:20
100:14,16
125:9,11,14,17,21
138:3,5 142:25
149:14 156:10
160:5
MURRELL-
164:8,9,12,14
189:9,12,20
MUSTER- 89:8

N

N&L- 29:18
NAMED- 59:19
NAMES- 27:18

115:1 117:8
NARNIA- 27:16
NARROW- 20:6
65:10 198:1
NARROWED- 106:7
NARROWLY- 172:19
NDA- 103:22
NDAS- 129:12
NEAR- 33:7 52:2
84:10 125:7
NECESSARILY-
65:10 114:20
148:6 202:23
NECESSARY- 12:24
36:1 37:16 45:13
47:22 95:3 112:21
178:16 224:22
NEEDED- 35:9
42:15 90:7 129:17
NEGATIVE-
47:13,19 102:15
130:17 137:9
198:23,24
NEGLECTED- 12:9
NEGOTIATE- 72:8
117:14,15 223:16
NEGOTIATED- 31:9
63:17 109:7
133:19
135:13,17,19
141:13 174:8
177:1 178:15,23
183:3 182:9
183:20 187:17
NEGOTIATING- 8:23
33:5 34:10 76:18
91:22 104:22
132:12 176:11
182:25 223:7
224:8
NEGOTIATION-
105:6 132:9
135:11 179:20
NEGOTIATIONS-
10:6 30:23 33:11
35:11 42:5
47:7,25 76:20
99:12 105:5,9
107:17 109:12
132:13,23 133:6
135:1 136:22
162:6 213:17
NEGOTIATORS- 99:8
NEIGHBORHOOD-
85:21 119:14
NERVOUS- 187:4
NET- 19:21
NETTING- 32:22
NETWORK- 52:14
58:10 68:20,23,24
106:2
NETWORKS- 27:25
28:1 31:12,13
58:24 59:24 75:16
76:5 80:2 81:8
82:6 86:13 87:25
90:24 91:21
97:9,13 98:11
103:25 106:10

107:5,25
108:2,6,16 109:10
132:7 133:9
**NEVER-** 7:22 20:11
93:20 168:4 176:8
178:25 181:2
194:9
**NEVERTHELESS-**
60:14 70:8
**NEW-** 18:1 21:25
44:4 61:22 67:5
75:13 81:24 83:5
99:16 139:24
160:6 186:14
188:18
**NEWER-** 185:12
**NFL-** 92:9
**NICE-** 112:25
**NIGHT-** 35:13
145:22
**NINE-** 60:21 76:5
**NINE-MONTH-** 32:19
**NNC-** 75:7,8
**NNI-** 8:22 12:15
31:12 37:13 47:17
75:6,7
**NNL-** 12:15 33:1
34:5 37:13 75:6
**NNUK-** 45:1
**NOBODY-** 96:1
192:11
**NOKIA-** 23:22
27:17 37:22
58:9,24 60:25
63:14,17 67:13
87:10 90:23
91:2,3,7,15,17,24
92:13,14
97:9,13,20 98:11
99:12 100:19
103:17,24 104:21
106:2,9
107:5,17,25
108:2,6,13,16
109:10 111:19
114:1 115:21
118:18
**NOKIA'S-** 190:23
**NON-** 121:12
166:3,4
**NON-ASSIGNABLE-**
101:7
**NONBANKRUPT-**
165:15
**NONBINDING-** 64:9
**NONDEBTOR-**
11:1,3,7 12:14
165:4,6,7,12
166:4,9 168:12
169:6,10
**NONDEBTORS-** 166:7
171:9 189:17
**NONDISCLOSURE-**
64:19
**NONEXISTENT-**
101:16
**NONLTE-** 121:13
**NONMATERIAL-**
181:20 208:11

**NONOBJECTIONABLE-**
226:13
**NOR-** 49:2
**NORMALLY-** 87:9
**NORTEL-** 6:5
8:5,6,9,10,12,18,
20
7:21,25 9:10
24:15 26:5
27:2,3,24
28:1,10,12,19
29:4,13 31:12,13
34:4,6,9 37:14
38:21 41:16
42:13,19 52:14
59:18,23
60:9,17,22 61:14
63:14 64:15 69:5
70:4,7,18 72:2
73:19 74:24
**NORTEL'S-** 9:11
84:4 85:1,13 94:3
110:23 120:8
121:5,8,11 131:12
139:6 192:10
**NORTH-** 27:10
32:24 48:6 76:14
80:17,18
82:8,15,21
83:2,12,23 84:1
85:25 87:17 89:5
92:12,15,18,19
95:9,12 96:1,2,24
100:23 131:13
169:15
**NOTE-** 32:5 34:14
35:15 38:16 49:3
113:17 154:8
155:20 160:12
165:25 166:24
193:23 194:23
195:1
**NOTED-** 17:2
**NOTICE-** 11:18
13:10,13 35:19
118:12 145:15
149:4 210:20,21
213:22 223:18,21
224:1
**NOTICES-**
145:17,19 197:1
**NOTIFICATION-**
177:4
**NOTIFY-** 13:15
**NOTIFYING-** 13:14
**NOTION-** 104:25
**NOTWITHSTANDING-**
26:13 31:4 40:7
190:3
**NOVEMBER-** 78:6
**NSN-** 76:16 102:18
135:6 136:8,16,20
143:14,15 151:23
169:17,25 170:25
172:3 173:13
177:21,24 180:8
**NSN'S-** 136:22
173:15
**NUMBERS-** 37:9

135:11
**NUMEROUS-** 18:23
160:23

O

**O'BRIEN-** 151:8
**OBIDA-** 20:2
**OBJECT-** 15:24
20:8 21:9,18
39:14 114:4,7
144:13,14
**OBJECTING-** 154:24
155:1
**OBJECTION-** 9:7,13
10:2 13:17,18,20
144:16,17,19,20,2
3,24
23:23 68:1,5
145:19
146:9,12,20 148:6
150:1,11,14
151:21 152:16
153:6 170:14
181:12,13,15
182:11 183:8
184:16 190:4
**OBJECTIONABLE-**
149:3
**OBJECTIONS-** 23:25
24:2 37:2 45:25
58:13,15 59:6
125:4,6
143:6,10,14
144:20 145:12,24
146:5 150:24
154:12 167:15
173:22 181:7
182:7,8 187:12
189:16 194:21
198:4 199:10,17
223:12
**OBJECTIVE-** 16:25
21:23 219:15
**OBJECTIVES-**
19:8,10 21:20
**OBJECTORS-** 143:16
146:13 199:24
**OBJECTS-** 183:22
**OBLIGATED-** 195:21
197:1
**OBLIGATION-**
106:18 224:18
**OBLIGATIONS-**
148:24 205:17
**OBSERVATIONS-**
47:4 218:17
**OBSERVE-** 105:4
**OBSOLETE-** 185:12
**OBSTACLES-** 130:15
138:25
**OBTAIN-** 67:16
**OBTAINED-** 47:16
67:11 96:12
215:17
**OBTAINING-** 223:17
**OBVIOUS-** 113:18
129:16
**OBVIOUSLY-** 12:24
45:25 47:21 89:12

91:3 103:24 109:3
113:17 120:21
141:16 150:19
156:15 157:5
181:23 187:4
191:19 206:5
214:20
**OCCASIONS-** 160:23
**OCCUR-** 40:1
**OCCURRED-** 12:9
82:16
**OCCURRING-** 33:6
**OCCURS-** 183:12
**OCTOBER-** 91:6
**OFFENDED-** 100:16
**OFFER-** 132:21
167:24 168:4,9
169:6,23 197:18
**OFFERED-** 6:5 61:5
108:15 134:6
135:10
**OFFERS-** 215:17
**OFFICE-** 36:24
99:16 226:4,16
**OFFICER-** 37:13
41:19 64:15 73:19
74:25 75:4,10
110:12
**OFFICES-** 61:22
**OFFICIAL-** 30:5
35:16,17 38:9
61:24 100:3
146:19 154:6
220:3 223:20
**OFFSET-** 39:16,20
40:3,4,7
**OFTEN-** 154:19
**OGILVY-** 14:3
**OKLAHOMA-** 7:24
**OMNIBUS-**
210:18,21
**ONE-** 14:9,14
21:20 22:2,8
24:10 25:23,24
27:24 31:5
35:12,15 42:17,19
44:13 49:14 52:15
53:7 55:6,13,23
59:18,23 63:3
64:4 67:22 70:1
71:7,19 77:17
78:15 81:19
84:6,25 85:16,24
86:3,20 88:20
89:16,24 92:17
139:4 174:24
179:21 191:17
**ONGOING-** 17:13
48:5
**ONTARIO-** 17:18
18:5,22 34:17
35:3 36:18 49:6
57:7 143:21,22
149:11
**OPEN-** 29:19 50:16
85:2 150:15
155:24 156:8
163:10 178:10

219:9
**OPENING-** 25:10
40:24 110:15
**OPENLY-** 84:25
**OPERATE-** 30:24
78:18
**OPERATED-** 27:21
101:9
**OPERATES-** 60:17
**OPERATING-** 29:19
77:18
**OPERATION-** 12:25
37:11 57:17 78:10
128:11
**OPERATIONAL-** 28:3
79:10 101:12
217:23
**OPERATIONS-** 47:23
57:14 77:24 78:3
**OPINION-** 119:3
128:8 132:21
133:8,20 134:5
135:24 136:2
137:13 139:8
140:20,25
**OPPORTUNE-** 211:23
**OPPORTUNITY-** 31:6
34:8 45:12 86:25
92:2,4 104:11
120:13 134:13
146:8 149:24
155:23 162:25
166:19 168:1
197:21 219:14
**OPPOSED-** 113:20
114:1 155:21
164:15 168:22
194:14 199:20
**OPPOSING-** 212:2,4
**OPTICAL-** 27:20
77:9,10
**OPTIMISTIC-**
211:12
**OPTING-** 183:16
**OPTION-** 114:11,22
**OPTIONALITY-**
172:24
**OPTIONS-** 90:16
91:23 92:7 114:21
121:5 129:25
147:7,8,10 160:21
161:1 192:9,10
**ORANGES-** 196:9
**ORDER-** 6:14 7:19
9:1,19 10:24
13:1,3,9 18:12
19:9 31:20
34:16,24 35:2,8
36:11,14,17,25
44:5 46:21 47:22
48:10 49:15
54:11,20
55:12,15,24 56:3
57:9 58:5,21
64:4,24 65:15
70:23 71:21 83:1
123:10 148:7,16
150:6
**ORDERS-** 53:23

55:6,23 179:14
210:15,16,25
221:3
225:20,22,24
ORDINARY- 206:22
ORGANIZATION-
28:2 101:3
ORGANIZATIONAL-
78:20
ORGANIZED- 78:20
ORIGINAL- 132:21
135:18,20 144:19
ORIGINALLY- 57:20
82:19 124:1
158:11
OTHERWISE- 8:25
39:17,20 128:14
137:14 141:16
149:1 152:7
OURS- 98:8
OURSELVES- 20:25
29:11 41:11 69:19
160:18 202:21
224:3
OUTCOME- 135:25
OUTLINED- 42:16
47:9 58:12
OUTREACH- 129:4
OUTS- 175:1,2
OUTSET- 40:10
58:13
OUTSIDER- 157:25
OUTSTANDING-
11:14 155:17
OVALBY- 23:11
OVERALL- 72:5
109:8 128:15
OVERARCHING- 17:6
21:20
OVERBID- 148:14
OVERHEADS- 41:7
OVERLAP- 41:20
OVERLAPPING-
61:14
OVERLAY- 77:20
OVERLOOKED-
161:10
OVERLY- 211:12
OVERPAYING- 42:22
OVERPAYMENT-
31:18,19,23
OVERRULED-
199:10,17
OVERSIGHT- 165:2
217:17,22 218:22
OVERVIEW- 72:14
OWE- 179:5,23
OWING- 40:5
OWN- 41:1 42:23
62:24 81:5 87:5
88:21 89:13 90:16
91:16 107:18
128:2 158:16
164:3 171:9
191:12 194:7
OWNER- 185:15
OWNERSHIP- 18:1
21:25 49:22 52:25
53:10

OWNS- 185:12

P

PACKAGE- 66:7,13
69:10 71:20
104:15 203:13
PACKAGING- 17:23
PAID- 7:23
31:13,14 32:10
33:1 40:9 43:14
105:14 106:16
135:12 151:4,5,10
152:1 176:8
179:3,11 183:11
PAINFUL- 100:17
PAPERS- 53:16
PARALLEL- 173:1
PARAMOUNT- 60:19
92:13
PARENT- 133:3,4
136:13
PARLIAMENT- 16:18
17:11
PARTICIPANTS-
13:24 62:1 171:21
PARTICIPATE-
162:15 177:10
215:23
PARTICIPATING-
162:19
PARTICIPATION-
33:18
PARTICULAR- 21:14
28:11 29:13,18
34:18 38:19 47:10
59:25 60:24 61:13
62:6 66:16
69:10,14 71:12
94:23 104:16
114:1 117:12,13
121:9,21,22
126:18,24 128:11
129:6,13 130:9,10
161:8 175:25
198:23 216:21
218:1
PARTICULARLY-
29:15,24 64:14
70:6 73:6 80:17
93:16 97:21
104:4,16 107:19
127:8 171:11
183:18 195:2
221:15
PARTIES- 10:6
26:3 29:20
31:21,23
33:12,13,24
34:19,21 35:1
38:13,19 40:2
43:20 48:4
51:10,15 53:21
57:22 88:7 97:9
105:18 107:20,23
111:10 117:3
129:14,15 132:23
140:6 147:22
150:13 153:3
159:1 162:14

181:14
PARTIES'- 87:1
107:16
PARTNER- 8:23
59:5 86:11
87:15,18 125:23
PARTNERED- 113:4
120:6
PARTNERING- 86:21
113:13,19 117:4
129:16
PARTNERS- 89:17
125:25
PARTNERSHIP-
91:19 138:21
PARTNERSHIPS-
75:12 138:18,19
PARTS- 23:10
83:25 84:17
100:24 121:3
140:17
PARTY- 32:5
39:4,11 43:24
65:15 108:19
113:23 114:4,24
209:7
PARTY'S- 88:12
PASQUARIELLO-
40:21 46:21,23,25
48:24 49:3,8
216:5,6,8,24
217:13,19 218:7
PASS- 89:8 149:21
152:6
PASSED- 48:1
PASSES- 185:16
PASSPORT- 95:15
PAST- 30:1,12
60:6,21 61:21
68:13 70:1 132:19
150:21 201:20
PATENTS- 101:4
103:6,7,10
PATH- 90:16 97:23
183:16 209:11
PATHS- 89:16
PATIENCE- 181:1
PATRICK- 154:2
PAUL- 37:12
PAUSE- 14:6 23:3
67:24 84:17
211:19 212:10
214:8
PAY- 40:8 44:20
64:24 107:12
150:25 176:7
178:25 179:16,25
180:1 186:7,9
205:3
PAYABLE- 183:9,21
PAYING- 41:7
44:23
PAYMENT- 32:13
44:4,9,17 106:10
151:14,21
152:9,15 178:20
183:8 188:23
203:11
PAYMENTS- 39:15

40:1 44:13,21
47:17
PAYROLL- 103:17
PBGC- 143:23
164:15
166:12,16,25
167:20,21 168:6
PBGC'S- 167:1,10
189:16 198:4
PECULIARITY-
109:19
PEG- 133:20
PENDING- 57:3
197:25
PENSION- 143:22
146:5 164:9
166:12 167:8
168:2,3 188:5,8
189:12
PEOPLE- 28:14
41:25 43:8 63:11
78:10 81:16 84:20
93:23 97:13 101:3
158:19,21 171:24
174:5 175:20
176:12,20 177:9
179:25 180:14
186:2,20 194:1
200:13 202:6
205:22
207:2,14,19,22
208:12 219:17
221:12
PERCEIVE-
133:22,24
PERCENT- 77:12,17
80:6,9 84:1 90:4
93:13,14 96:24
101:1 106:7,23
115:3 130:20
135:15,23 136:1,5
155:16 169:15
178:13 180:1
182:13 187:1,2,5
PERCENTAGE-
106:24
PERCENTAGES-
106:6
PERCEPTION-
130:18
PERFECT- 29:1
30:21 169:8,9
170:16
PERFECTLY- 24:20
99:1
PERFORM- 101:17
PERFORMANCE- 29:8
68:3 93:21
PERHAPS- 24:14
70:10 82:16 83:15
89:4 92:5 102:1
124:8,10 128:14
147:18 198:15
200:14 201:19
PERIL- 90:16
PERIOD- 29:12
30:2 32:19
47:12,13 72:3
76:6 97:17 99:2

102:25 103:15
131:19 132:15
134:19 141:5
144:20 147:14
160:9 161:15
201:21 219:19
PERIODS- 43:6
82:2 135:2
PERIPHERY- 95:2
PERMISSION-
201:24
PERMIT- 39:25
122:19 162:1
201:20
PERMUTATIONS-
38:22
PERSON- 6:5 99:9
104:7 192:16
PERSONALLY-
140:23
PERSONNEL- 27:9
126:22
PERSONS- 111:18
PERSPECTIVE-
31:16,17
41:3,4,17 42:2
94:13 123:5
130:24 142:18
172:5 173:19
188:3 214:18,19
PETITION- 11:14
29:12 32:2
PHASE- 83:1
PHASES- 82:2
PHILOSOPHICALLY-
164:15
PHILOSOPHY-
197:17
PHONE- 43:20,25
81:12
PHRASE- 39:20
42:3
PICK- 82:4,22
171:13 176:16
181:22
PICKED- 168:20
191:17
PIECE- 57:16
80:12 207:20
PILE- 94:6,7,8
PLACE- 25:22
30:15 51:18 58:15
71:23,24 72:11
74:2 99:15 125:13
174:3 197:18
223:18,19
PLAINLY- 181:19
PLAN-
14:12,13,21,22
15:6,9,16 17:20
18:8,20
19:6,15,20 21:4
22:4 25:5
70:12,17 71:12
78:5 89:22
90:10,15
114:5,8,12,13
115:6 117:13
120:5,6,7,24

122:16,20 127:20
128:4,7 142:17
156:1,11,12,19,20
,2
**PLANNED-** 115:9
**PLANS-** 30:2
120:18 127:25
**PLATFORM-** 78:3
79:8
95:5,7,10,19,25
191:4 192:11
**PLATFORMS-** 94:16
97:22
**PLAY-** 107:8,10
165:9 198:18
**PLAYED-** 99:12
**PLAYER-** 85:25
87:2 113:18,25
114:2 117:5,7
130:20 137:12
139:1,6 160:11,15
**PLAYERS-** 89:6
116:8 127:14
138:16 159:19
161:5 198:25
**PLAYING-** 149:1
150:7 154:22
178:8,17 183:3
**PLEASED-** 13:1
73:13
**PLEASURE-** 25:16
**PLUG-** 69:15
**PM-** 124:14 180:22
227:4
**PM/RECONVENE-**
124:14 180:22
**POCKET-** 98:17
**POCKETS-** 67:19
98:16
**PODIUM-** 146:13
190:19
**POINTED-** 74:13
**POINTS-** 43:10
49:13 105:7 145:7
167:25
**POKER-** 198:18
**POLICY-** 17:6
**POPULATED-** 132:3
140:10 141:7
**PORTION-** 58:25
115:4 143:4
148:18 168:20
169:20
**PORTIONS-** 141:7
**POSE-** 20:16
**POSING-** 20:5
**POSITION-** 12:20
53:18,21 74:24
86:1 96:20 107:18
126:7 135:18,20
178:9 181:8 184:1
188:14 191:20,22
**POSITIONED-** 69:16
**POSITIVE-** 102:15
109:5 137:4
**POSSESSED-** 64:25
**POSSIBILITIES-**
24:9,11,13
**POSSIBILITY-** 17:7

62:14 119:23
130:12
**POST-** 11:14
29:11,12 32:2
93:13,20
104:17,19
**POTENTIAL-** 8:18
17:8 29:22 30:20
40:7 64:10,18,22
65:1,5,10 71:6
87:12 91:23 94:5
103:21 108:1,4
121:2 128:8
129:4,7,24 131:19
132:1 133:9
136:24 137:14
138:19 139:10
140:6 147:9,10
152:17 157:10
183:23 184:22 1
**POTENTIALLY-**
137:9
**PRACTICE-** 57:6
66:22 67:3 104:23
127:1 145:1
176:10
**PRAGMATIC-** 52:1
**PRAYER-** 194:14
**PRECEDENT-** 25:7
46:4 135:16
**PRECEDENTIAL-**
173:25 174:6
**PRECEDES-** 141:19
**PRECISELY-** 159:20
**PREFACE-** 112:5
**PREFER-** 130:8,10
159:4
**PREFERABLE-** 128:5
**PREFERENCE-**
111:16 133:9
**PREFERRED-** 87:14
**PREJUDGE-** 66:15
**PREJUDICE-** 20:21
111:17 160:14
169:18 177:1
**PREJUDICIAL-**
170:4 177:23
**PREJUDICING-**
42:23
**PRELIMINARY-**
22:13 23:8 24:18
**PREMATURELY-**
149:17
**PREMISES-** 184:1
**PREMIUM-** 92:8
**PREPARED-** 9:22
19:6 24:20 54:5
57:13 108:6
124:5,22 132:2
139:16,25 140:4
163:3 188:11,13
197:18
**PRESCRIBED-**
148:15
**PRESENCE-** 67:8,10
**PRESENT-** 49:6
78:11 83:21
**PRESENTATION-**
24:23 37:19 40:25

41:1 55:19
**PRESENTATIONS-**
58:16 127:23
**PRESENTED-** 199:11
200:19
**PRESENTING-** 212:8
**PRESENTS-** 71:6
**PRESERVATION-**
16:23 17:25
**PRESERVE-** 17:2
20:9 21:21 156:18
**PRESERVING-** 17:12
**PRESIDENT-** 12:15
**PRESS-** 60:6
179:17
**PRESUMABLY-**
184:22 206:7
**PREVAILS-** 63:6
**PREVENT-** 207:14
**PREVENTS-**
113:11,18
**PREVIOUS-** 18:5
191:18
**PREVIOUSLY-** 81:17
**PRICE-** 98:6,21
101:18 106:25
133:12,13,16,18,2
3,25
108:11,15
135:2,3,15
141:14,21 142:1
176:24 177:2
182:5 186:7
206:12 215:13
**PRICING-**
29:1,2,17,23 30:1
32:18 38:20
39:5,14,16 41:8
44:12 51:20
**PRIMARILY-** 59:16
105:15 165:1
**PRINCIPALLY-**
90:21
**PRINCIPALS-** 158:9
**PRINCIPLE-** 17:22
209:17
**PRINCIPLES-**
15:7,10,17 20:18
21:2,20
215:7,9,25
**PRIOR-** 11:10,13
13:13 18:8 23:21
35:18 42:11 75:15
76:5 85:15 89:10
117:2 126:15
145:1 162:6
186:23 195:11,13
202:4 218:12
**PRIORITY-** 24:15
**PRIVATE-** 114:15
139:24 200:21
**PRIVILEGES-**
224:23
**PRIZE-** 84:21
**PROBABLY-** 26:24
51:12 61:22 69:7
77:12 80:9
83:10,25 93:1
100:25 102:22

117:20 119:4
123:18,23 130:16
144:25 186:5
**PROBLEM-** 28:19
29:10 42:16 43:3
52:2 149:19
150:22 164:19
186:18,22 187:25
200:16
**PROBLEMATIC-**
148:2 197:14
**PROBLEMS-** 6:2
28:24 150:19
171:14
**PROCEDURAL-** 23:9
109:19 145:12
**PROCEDURE-** 24:20
121:22 140:3
169:7 176:3
199:18 204:24
221:24
**PROCEDURES-** 11:4
23:24 37:2 58:10
63:16,23 64:4
65:14 96:3,6,9
111:9,12
121:9,15,21,23
122:19 131:16,18
141:2
142:12,15,17
143:24 144:4
147:3,17,19,21,24
148:2,13,18,19
149:5,10,11 150:1
151:2,19,22
153:5,11,13,2
**PROCEED-** 23:16
24:21 59:2 124:6
146:14 159:15
193:17 205:21
209:11 214:23
**PROCEEDED-** 129:10
**PROCEEDINGS-**
18:8,18 23:10,25
25:23 26:1 29:11
38:17 65:9 100:8
171:8 214:23
215:20 216:2
227:9
**PROCEEDS-** 19:21
30:18 33:10,12
34:11,12,18 39:6
47:14 51:21 52:23
164:18
**PROCESS-** 7:24
8:15 20:21 30:15
33:9,15,17,23
51:13 52:3 56:10
57:22 60:11,24
61:1,6,12,21
63:25 64:12,13,20
65:3,11
66:15,18,19
67:7,11,15 68:15
69:23 72:10,13
76:18 78:1 91:25
96:5 99:22 105:4
107:14 109:2,8
**PROCESSES-** 51:18

62:2 121:8 129:22
172:25 176:13
207:21
**PRODUCING-** 134:10
**PRODUCT-** 71:3
81:21
**PRODUCTS-** 93:11
**PROFESSIONAL-**
28:21
**PROFESSIONALS-**
30:11 126:24
133:2 162:5
171:24
**PROFFER-** 12:16
37:5,16
**PROFFERED-** 190:8
**PROFFERS-** 54:5
**PROFIT-** 28:10,13
44:15
**PROFITABLE-** 80:14
89:25 98:3
**PROFITS-** 28:11
**PROGRAM-** 28:11
**PROGRESS-** 29:22
92:16 213:22
**PROJECTIONS-**
134:17
**PRONOUNCED-** 211:9
**PROPER-** 14:9
**PROPERLY-** 146:2
149:25
**PROPERTY-** 34:3
47:16 52:25
53:10,14 61:13
62:8,13 101:4
103:5 144:8
164:22
**PROPOSAL-** 65:16
66:1 122:20,22
157:4 159:7 169:5
203:4,15 204:8
205:5 206:23
**PROPOSALS-** 69:16
72:11 123:2
**PROPOSE-** 19:20
117:11 142:16
143:11 146:13
156:1,19,20
158:23 162:3
170:22 171:16
199:9 203:5 226:9
**PROPOSED-**
13:11,14 27:5
48:20 57:19
63:16,22 64:5,12
65:22 76:14
122:19 131:16,18
147:16 151:22
156:15 157:6
161:23 164:20
165:19 168:11
172:25 203:20
223:8,12
**PROPOSING-** 67:21
117:13 142:13
163:20,21 173:16
**PROPRIETY-** 39:15
**PROS-** 65:24
**PROSPECTIVE-**

78:12
PROSPECTS- 37:10
PROTECT- 41:23,24
104:24
PROTECTED- 41:22
224:5
PROTECTION- 31:18
89:11 104:12,15
224:14
PROTECTIONS-
67:2,13 104:1
105:11 107:7,12
109:9 135:5
205:10 224:11
PROTOCOL- 6:14
23:8 25:7
33:14,16
34:10,20,23
35:3,10,22 36:19
45:8,10,16 46:2
48:16,20 78:25
PROTOTYPICAL-
68:17
PROUD- 60:14
71:17
PROVERBIAL- 185:6
PROVIDE- 10:25
11:3 13:11 34:7
37:6,15 56:2
62:22 63:12 70:22
87:19 96:9
103:16,25 148:19
159:6 170:11
174:23 175:7
195:14,19,22
196:5 197:2
PROVIDED- 26:21
31:1,12 34:8
113:3 198:11
PROVIDER- 84:8
PROVIDERS- 59:23
70:21
PROVIDES- 30:25
43:4 47:22 204:22
224:21
PROVIDING-
31:6,11 35:17,19
43:4 194:25
195:8,16 197:13
198:19 202:12
PROVINCES- 17:18
PROVISION-
39:2,9,17,21
53:13 141:1
178:23 187:18
195:2 223:24,25
224:23
PROVISIONS- 23:7
38:24 44:21 135:7
154:21 176:6
196:25
PUBLIC- 85:3
178:11 194:5
PUBLICATION-
197:2
PUBLICIZED- 140:3
PUBLICLY- 103:20
160:22
PULL- 72:8

PURCHASE- 98:6,21
106:24 111:1
133:12,13,16,18,2
3
127:3 135:15
178:11 179:15
185:1 201:3
221:13
PURCHASED-
168:19,23 169:1
200:8
PURCHASER- 69:12
71:6 118:19
176:6,12,15,18
177:8,13 179:17
185:20 186:2
195:3,9,17,25
196:2 197:18
PURCHASERS- 61:24
65:1 71:20
185:22,25 198:2
205:9
PURCHASES- 115:5
PURCHASING- 185:8
206:9
PURE- 113:24
138:15,16
PURPORTED- 151:24
PURPOSE- 16:13,17
17:2,10 18:6,24
20:6,22 21:12
39:25 140:7
182:16,17,19,21
PURPOSES- 18:2
PURSUANT- 61:1
182:1
PURSUE- 93:5
99:13 103:24
104:5 127:19
129:1 137:17
165:16
PURSUING- 179:22
PUSHING- 107:25
108:2
PUTTING- 69:1,5
91:8 121:14 207:1

_____

Q

Q1- 102:8,13
115:6
Q2- 102:8,13
115:6
Q3- 43:5
QUALIFICATIONS-
163:13
QUALIFIED-
65:15,17 96:10
111:20 122:22
132:4 135:1
152:18
156:12,13,24
157:2 161:23
174:24,25 175:7
177:5,9,19
195:1,9,10,14,15,
16,19,24
187:19,23 196:5,6
197:13 204:22
208:23 218:24

QUALIFIES- 149:7
QUALIFY- 177:18
QUALIFYING-
122:24 148:16,25
149:4,6,22
QUALMS- 162:9
QUARTER- 30:15
QUEBEC- 19:2
QUESTIONABLE-
218:20
QUESTIONED- 20:2
QUESTIONS- 8:24
9:15 15:19,20
16:1 21:7,13
38:22 46:7,9
48:23,25 49:4
50:2,5,7 70:10,13
105:8 109:14,21
112:11 115:19
118:17,19,22
119:16 120:14
122:5 137:20,23
142:22 144:9
167:13 189:4
225:12
QUICK- 88:10
QUICKLY- 13:6
96:21 97:24 99:6
116:7 132:5 140:4
186:11 192:11
215:10 223:13
QUO- 218:2
QUOTE- 39:13

_____

R

R&D- 41:7 81:5
84:8 87:20 88:3
93:24 134:19
RABBI- 168:15
RACE- 84:4
RADICAL- 128:14
RADWARE- 174:3
RAISE- 74:2
154:12
RAISED- 14:22
16:7 19:17 20:11
29:14 37:3 45:5
52:16 67:23 68:10
70:10 145:6,13
146:12 154:5,10
168:10 176:4
RALLYING- 73:2
RANGE- 77:23
102:13 114:20
135:23 170:6
180:2 186:25
RANK- 44:6 45:1
RAPID- 97:20
RAPIDLY- 80:7
128:15
RAPPED- 168:25
RATE- 90:2 93:12
186:24
RATES- 93:16
RATHER- 19:18
20:12 21:1 34:18
90:17 104:1
116:12 145:12,16
152:5,8 156:23

161:6,16 173:13
194:24 196:13,18
RATIFICATION-
39:4
RATIONALE-
96:17,18
REACH- 64:23
132:5 148:15
REACHED- 8:5
35:12 36:2,5
60:24 135:3
171:25 173:11
REACHING- 174:17
REACTION- 108:22
130:16 139:2,7
REACTIONS- 137:2
READILY- 96:20
97:8 202:19 219:3
READING- 57:18
190:6
READY- 22:19,22
124:21 207:3
REALITY- 94:12
REALIZE- 134:13
136:15 173:8,11
REALIZED- 40:24
REALIZING- 109:7
172:6
REASON- 14:7
15:24 21:9 59:8
69:21 80:20 93:4
152:6 157:1 161:7
181:23 201:9
REASONABLE- 10:4
33:20 48:13 66:4
105:21 109:11
134:8 135:3,24
158:14 162:21
211:15
REASONABLENESS-
109:9 134:5 180:3
REASONABLY-
137:16
REASONING- 159:2
REASONS- 10:6
16:3 48:8 52:6
57:10 63:7 85:23
88:17 93:5,10
107:8,10 169:25
185:7 193:18
218:14
RECAPTURE- 32:19
RECAPTURED- 32:21
RECEIPTED- 55:24
RECEIVE- 8:16
134:11 136:19
151:14 214:1
RECEIVED- 13:6
32:2 43:19 121:1
143:21 149:6,7
213:15 223:5,6
RECEIVER-
215:11,12
RECEIVERSHIP-
215:6
RECENT- 19:5
136:4 159:22
RECENTLY- 25:24
127:13 136:11

191:2,3,11
RECIPIENT- 13:10
RECOGNITION-
31:25 44:11,16
RECOGNIZE- 27:1
53:21 170:7 174:1
199:8 204:18
RECOGNIZED-
17:5,19 19:2
40:2,6 148:16
RECOGNIZING- 33:4
41:19 42:18
RECOMMENDS-
48:8,9,19 216:15
RECONSIDER-
201:19
RECORDING- 9:2
11:12 44:1 227:9
RECOUP- 86:2
112:22
RECOVERIES- 17:13
RECOVERY- 167:2
RECROSS- 122:8,11
RED- 18:10,17
REDIRECT- 119:20
142:21
REDIRECTS- 119:19
REDUCED- 167:9
REDUCING- 166:25
REDUCTION-
98:6,15,21
REFERENCED- 50:16
105:8 121:11
145:4
REFERRED- 17:23
18:15 19:13
38:17,19 42:5
78:22 81:17
103:13 106:22
152:22 159:12
REFERRING- 16:13
78:13,15 87:6
88:3 100:2
REFERS- 18:13
100:10
REFINANCING-
136:12
REFLECT- 161:22
REFLECTS- 51:14
REFRAIN- 18:3
REGAINED- 91:6
REGARDLESS- 21:23
REGIME- 29:23
32:18 51:20
REGIMES- 26:7
31:6
REGIONS- 41:24
42:14 44:18 170:2
REGISTER- 22:14
74:11
212:11,13,14,16,1
9,22,24
REIMBURSEMENT-
66:24,25
105:10,19,23,24
106:2 135:7,11
151:17 152:2,8
154:19,25
203:11,25 205:11

224:18
**REIMBURSEMENTS-**
104:23
**REITERATE-** 153:9
**REJECT-** 169:23
**REJECTION-** 39:5
**REJOINED-** 91:6
**RELATE-** 68:20
**RELATION-** 216:9
**RELATIONSHIP-**
85:2
**RELATIONSHIPS-**
51:20,21 79:5
81:25 85:4 88:8
**RELATIVE-** 115:7
130:17 177:1
188:6
**RELATIVELY-** 80:11
125:1 169:17
195:5 196:21
198:1
**RELAY-** 56:16
**RELEASE-** 8:10
60:7
**RELEVANCE-** 92:19
**RELIANCE-** 29:24
**RELIED-** 19:7
**RELIEF-** 12:22
13:19 20:14 36:1
59:4 110:7 197:6
**RELINQUISH-** 8:8
**RELINQUISHMENT-**
34:13
**RELYING-** 20:6
**REMAIN-** 72:2 74:1
196:18
**REMAINED-** 29:19
**REMAINING-** 62:16
**REMAINS-** 92:17
**REMARKS-** 59:3
84:12 112:5
157:22
**REMEDIAL-**
16:11,16 18:6
**REMEDIES-** 29:21
**REMIND-** 225:18
**REMISS-** 100:13
**REMOVED-** 190:11
196:20
**REMOVING-** 9:11
**RENAULT-** 14:3
**REORGANIZATION-**
70:12 71:13 120:8
147:9,11
171:11,15 183:17
203:5
**REORGANIZE-** 20:9
70:18 120:5 161:6
163:21
**REORGANIZED-**
170:19
**REPATRIATE-** 42:10
**REPAYMENT-** 44:2
**REPEATED-** 32:12
**REPEATEDLY-**
17:2,18
**REPEATS-** 28:1
**REPLACE-** 186:15
**REPLACEMENT-**

124:16,17
**REPORT-** 45:18
47:10 159:22
190:6,7,11
216:9,20
**REPORTER-** 12:10
**REPORTS-** 25:1
**REPRESENTATION-**
133:4
**REPRESENTATIONS-**
35:16
**REPRESENTATIVE-**
96:16 143:22,23
**REPRESENTATIVES-**
61:23 133:1
**REPRESENTED-**
52:24 140:20
152:23
**REPUTATION-**
104:10 141:19
**REQUEST-** 9:16
11:2,5 34:15
196:24 210:13
218:23
**REQUESTED-** 12:22
20:13 57:10
161:18 197:6
218:16
**REQUESTS-** 49:15
143:10 173:13
**REQUIRE-** 33:18
35:23 65:20 90:13
103:2 107:6
116:24 157:2
188:7 217:17
218:21 219:11
**REQUIRED-** 48:1,5
50:18 64:24 85:24
134:19 140:10
150:2,7,9 152:1
176:17 178:16
183:4 188:15
217:22
**REQUIREMENT-** 68:2
72:1 104:19
148:13
**REQUIREMENTS-**
57:23 64:3,23
65:14 66:4 71:7
152:18 153:2
161:24 169:7
174:21 175:6,8
176:2 187:13
207:18 210:20
218:24 223:18,19
224:1 225:2
**REQUIRES-** 44:8
223:25
**REQUIRING-** 20:4
**REQUISITE-** 15:13
**RESEARCH-** 27:9
88:4
**RESERVATION-**
39:8,9,18 49:24
53:9 125:5 143:10
144:24 145:8
146:7
**RESERVATIONS-**
40:15

**RESERVE-** 52:22
**RESERVES-** 49:21
**RESERVING-** 51:17
**RESIDUAL-** 62:20
**RESOLUTION-** 51:16
52:2
**RESOLVE-** 8:3
9:1,6 28:4 51:11
52:3 217:3
**RESOLVED-** 194:21
**RESOLVES-** 9:12
30:19
**RESOLVING-** 10:2
**RESOURCES-** 28:14
33:25 47:23 60:18
69:9 71:1 78:10
104:10 131:10
**RESPECT-** 8:17
11:18 13:19 23:21
26:10,11 27:5
28:5 29:16 30:1
31:23
37:7,19,21,24
39:6 40:11 47:8
48:15,19 49:21
52:22,25 53:18
59:3 60:10 62:4
65:12 69:16
71:12,24 87:3
106:13 120:17
130:4 139:11
144:18,19 14
**RESPECTFUL-** 218:3
**RESPECTFULLY-**
49:15 183:13
**RESPECTIVE-** 48:18
**RESPECTS-** 35:21
205:8
**RESPOND-** 94:18
105:7 167:15
**RESPONDING-**
196:12
**RESPONSE-** 50:12
53:6 142:24
156:16 218:9
223:9
**RESPONSIBILITIES-**
75:9,21 125:24
**RESPONSIBILITY-**
62:20 77:22
**RESPONSIBLE-** 9:10
48:4 166:14
**RESTRICTIONS-**
64:11
**RESTRUCTURING-**
16:4 89:15
126:13,18,25
161:11
**RESULT-** 10:5
11:11,14 13:7
30:22 42:12
47:5,20 61:20
62:4 65:8 68:6
71:15 91:17 93:6
98:6 105:6
107:22,24 108:1
119:4 133:23
142:1 152:14
161:13 179:15

186:1 202:18
**RESULTED-** 128:8
**RESULTS-** 151:24
185:17
**RETAIN-** 87:20,24
93:22
**RETAINED-** 61:16
126:12
**RETAINING-** 90:12
**RETURN-** 85:18,22
**REVEAL-** 108:18
**REVEALED-** 108:16
**REVEALS-** 145:19
**REVENUE-** 77:12
86:7 97:1
130:19,20 131:10
**REVENUES-**
119:8,11,13
134:16
**REVERSE-** 167:18
**REVIEWED-** 136:4
216:10
**REVISED-** 9:10,18
214:3 221:24
223:12
225:4,20,22,24
**REVISION-** 11:17
**REVISIONS-** 8:25
9:6 13:3 223:8,14
**REVISIT-** 90:19
**REVOLVES-** 77:6
**REVOLVING-** 62:1
**RIEDEL-** 64:15
68:12 69:22 70:14
73:18,24,25
74:4,7,24,25
110:12 111:7,16
112:9,10,12
113:22 115:4,19
116:6 117:18
122:13 127:17
128:18 130:1
134:12 139:5
142:11 150:16
153:10 156:10
157:15 159:25
160:4 169:14
**RIEDEL'S-** 192:15
**RIGHTFULLY-**
104:12
**RIGHTS-** 8:6 29:21
31:23 39:9,11
40:3,7,12,16
41:22,23,25
49:21,22 51:17
52:22
53:1,9,22,23 62:8
66:14 125:5
143:11 144:24
145:8 146:7
175:18,24
176:1,7,12 187:12
224:23
**RIGOROUS-** 156:21
**RISE-** 43:1 52:15
**RISK-** 31:18
32:10,13 93:22
104:7 133:22,24
137:5,14

178:12,13,19
180:5 183:19
185:25 186:5
197:18
**RISKS-** 93:25
104:17
**ROAD-** 85:17
97:21,24
**ROADS-** 115:22
**ROBUST-** 99:19
141:20,22 195:18
**ROLE-** 75:16
126:16,19 127:21
132:9
**ROLES-** 76:14 90:6
**ROLL-** 83:13,17
**ROOM-** 97:4,5,14
103:23 123:21
132:3 140:9,18
141:7 142:8
150:15 170:24,25
214:17
**ROYALTY-** 34:6
**RULE-** 7:7,20 9:23
10:3 15:15 57:24
139:9 141:2
**RULED-** 119:22
130:12
**RULES-** 30:24
**RULING-** 54:8
139:14 151:8
**RUN-** 79:24 80:1
93:12 109:3
119:11 121:8
166:10
**RUNNING-** 42:6
121:15 160:8,13
**RUNOFF-** 160:5,9
**RUNS-** 95:7

_____
            S
_____
**SALE-** 7:12
15:8,21,22,24
17:17,21,24
18:7,19
19:3,7,19,21
20:1,3
21:3,5,7,10 22:3
26:12 27:6,16
33:8 34:1
47:15,16 52:23
58:25 60:10 61:6
62:7,8 65:7 68:7
69:1,6,23 70:5,9
76:15,19,20,21
78:8 84:8 93:5
95:1
**SALES-** 14:20
17:20 27:5 29:23
30:18 33:2,6,10
34:12 44:19 78:9
110:19 127:8,12
129:2 146:24
147:1,2,12,25
155:24 159:15
161:7 165:3
170:20 188:25
217:15
**SANDWICH-** 41:5

SANDWICHES- 198:20
SAT- 91:7
SATISFACTION- 224:3
SATISFACTORY- 175:25
SATISFIED- 10:5 36:16,20 58:1 175:8 192:1
SATISFIES- 22:9 152:2
SATISFY- 151:25 152:8 210:20
SAVAGE- 127:1
SAVED- 40:25
SAW- 107:16 179:9
SCALE- 60:18 64:23 69:9 86:15 87:2,19,24 90:19 95:10 112:22 131:2,8,12
SCENARIOS- 152:6
SCHEDULE- 45:23 67:21 69:13,15 82:25 83:9 91:11 97:20 98:2 103:1 123:13
SCHEDULED- 24:7 57:20 65:8
SCHEDULES- 99:19
SCHEME- 66:3 169:19 179:25
SCHWEITZER- 59:5 73:8,10,11,13,16,23 72:17 74:20,23 109:14,16 119:17,19,21 122:5 123:14 124:22,24 125:3,9,20 137:20,21 142:22 143:2,3,9,18 144:7,23 145:6 146:4 167:14,16,20 168:14 169:5 189:15 199:12,13,14,22 200
SCOPE- 39:1 64:9 94:15,17 95:16,18,21 111:5 120:14 122:1,2 153:8,20 172:18,19
SCREEN- 22:16
SEATED- 12:1 56:22 214:9
SECOND- 23:22 35:9 49:17 55:12 56:3,8 67:4 73:20 84:25 89:24 99:21 103:4 124:23 140:21 144:7 145:13 149:3 168:10 177:4 215:14 221:11

223:24
SECONDARY- 25:23 98:24
SECONDED- 173:23
SECONDLY- 18:13 86:4 93:19 98:1 183:7 187:25
SECONDS- 118:10
SECTIONS- 32:3
SECURE- 44:25
SECURED- 11:6 19:25 20:21 44:4
SECURITY- 8:1,4,10
SEE- 12:2 19:1 22:15 57:6 67:14 73:4 74:15 89:19,25 92:7,21 95:21 97:23 98:20 112:13,25 120:2,15 132:4 138:25 141:25 162:25 177:24 181:6 198:5 199:24 200:20 207:3,5 208:21 209:12 220:9 221:20
SEEING- 22:22 74:8,15 90:3,5 120:5
SEEK- 13:19 36:1 201:23
SEEKING- 59:4 62:5 96:4 148:14 161:8 179:4
SEEKS- 8:3
SEEN- 32:11 37:14 65:2,3 81:6 93:15 94:22 102:12 134:16 166:11 193:12 215:20
SEGMENTS- 94:4
SEGREGATED- 223:25 224:4
SEGREGATION- 225:2
SEGUE- 27:17
SELECT- 97:16 103:24
SELECTED- 91:14,15 92:25 137:7 183:10
SELECTING- 167:23
SELECTIONS- 92:7
SELF- 15:21 225:1
SELL- 14:11 15:6 59:14 60:25 79:22 93:9 110:18 120:20,24 127:20 128:9,19,20 152:5 161:6,8 169:12 172:1 181:24 187:8
SELLER- 178:6
SELLING- 8:21 69:18 94:3 166:9 203:1 207:6
SELLS- 77:7,10,14

SEMINAL- 60:4 82:16 193:10
SENIOR- 91:7 99:8 125:25
SENSITIVE- 51:24 85:9 197:23
SENSITIVITIES- 174:10
SENT- 145:17 226:10,11
SENTENCE- 216:25
SENTENCES- 190:11
SEPARATE- 27:19 35:24 64:18 79:5 165:22 166:2 169:6,23 170:1 182:1,3 196:12 200:21
SEPARATELY- 79:2 114:21
SEPTEMBER- 31:15 32:20 47:13,20,24 48:1
SERIES- 30:4,8 86:18 102:18 217:14
SERIOUS- 148:3 171:14 206:16
SERIOUSLY- 174:16 205:19
SERVE- 21:13 87:2 93:11 156:12,24 222:11
SERVED- 182:19
SERVICE- 80:2,3 81:12
SERVICES- 62:19,22 63:10 72:3 77:3 79:24,25 80:1,16 82:25 83:5 102:22,23,24 103:2,16
SET- 15:18 28:19,20 42:23 47:7 49:25 61:18 66:3,18 67:2 77:23 78:20 80:23 91:8 94:13,20 97:4 99:15 100:24 102:23 103:1,6,16 108:11 131:15 134:25 138:21 188:21 193:18 195:25 202:10
SETOFF- 40:10,12
SETS- 34:18 109:5 136:24 137:12
SETTING- 197:3
SETTLEMENT- 6:22 8:16,23 9:23 26:24 28:8 36:8,21 44:17,24 47:3,9,18,21 48:2,9,13 52:21 53:11 57:19,22 58:1
SEVEN- 64:18 93:13 97:11

129:12 186:25
SEVERAL- 43:20 61:21 63:2 68:13 70:1 71:8 77:4 83:18 90:9 101:2 132:16 151:1,18 157:20 166:11 167:11 171:21
SEVERITY- 161:17
SHAKE- 192:23
SHALL- 38:4 39:3,10 109:21 112:10 224:19
SHAPE- 81:2
SHARE- 26:15 89:5,6 92:22 131:2 134:14
SHARED- 78:2 79:9
SHARING- 79:15
SHEET- 84:14 86:10 91:23 102:6 112:13,15,19,25 113:3,8 139:6 159:7
SHIFTED- 83:14 107:20
SHILL- 176:14 199:1
SHILLING- 177:23
SHOCKING- 159:10
SHOOT- 107:15 136:24 177:8
SHOOTING- 196:7
SHOP- 117:4 141:1
SHOPPING- 201:11
SHORTEN- 210:21
SHORTENED- 211:16
SHORTFALL- 44:25 48:12
SHORTLY- 222:14 226:8
SHOT- 187:2 199:4
SHOULDN'T- 65:2 202:5 209:11
SHOW- 66:7 67:6 173:21 174:12 175:7 182:22 183:5 196:15 200:18
SHOWING- 157:10 200:22 207:18
SHOWINGS- 170:8
SHOWN- 149:17,20,22
SHOWS- 205:25
SHUFFLE- 225:19
SHY- 150:20
SIDE- 22:15 28:21 80:15 93:24,25 94:18 99:4 101:2,11,12 126:19 132:25 133:1 135:21,25 138:12 210:12
SIDES- 178:4
SIEMENS- 27:17 37:22 58:10,24 60:25 63:14,17 67:13 87:10 90:24

91:3,7,15,17,24 92:13,14 97:9,13,21 98:11 99:13 100:19 103:25 104:21 106:2,10 107:5,17,25 108:2,6,16 109:10 111:19 114:2 115:21 118:18 132:7 133:9
SIEMENS'- 103:17 108:14
SIGHT- 173:19
SIGN- 6:14 13:1 35:13 58:6 103:22 140:22,23 146:1 169:23
SIGNATURE- 222:14
SIGNED- 57:9 64:19 97:10,12 129:12 140:16 194:12,14 210:15
SIGNIFICANCE- 161:17 198:2
SIGNIFICANT- 83:15 84:17 89:5 93:17 105:5 112:4 115:16,18 117:14 119:4 131:1,3,8 140:17 141:7 155:15 159:18 187:10 218:21
SIGNIFICANTLY- 131:5 132:21
SIGNING- 64:6
SIMILAR- 23:13 52:16 71:9 75:16 149:12 150:9 157:4
SIMILARLY- 18:10 19:2 27:25 44:8 95:14 151:23
SIMPLE- 31:10
SIMPLY- 19:13,20 25:10 33:21 45:4 135:18 154:18,25 181:8 184:6 186:2 188:13 204:25 215:9
SINCERELY- 170:16
SINCEREST- 157:21
SINGING- 156:5 173:10
SINGLE- 27:22 93:13 178:24 192:6
SINK- 208:22,23
SIREN- 14:15
SISTER- 26:8
SIT- 91:10 198:18 207:10
SITTING- 180:13
SITUATION- 20:20 51:16 60:22 65:6,7 71:16 104:16 128:17 159:14 165:8,15 177:13 200:13

202:22 208:21,24
215:8 219:5
SITUATIONS- 219:7
SIX- 82:19,22
86:19 87:9 93:13
103:15
148:1,5,9,12
186:25 192:14
SIZE- 106:19
158:13 177:2
SKADDEN- 118:18
SKIN- 178:17
SKIPPING- 39:12
SLANTING- 149:1
SLEEP- 145:22
SLIGHTLY- 83:14
158:3 160:19
SLIP- 119:14
144:5
SLIPPING- 98:2
SLOW- 29:13
SMALL- 8:25 75:13
76:2 80:12 101:24
102:15 173:13
177:2 181:22
195:5
SMALLER- 131:5
170:2 175:20
SMOOTH- 29:12
SMOOTHLY- 187:22
SNAPSHOTS- 102:13
SNIPPING- 207:25
CO-CALLED- 44:14
148:11
SOCIAL- 16:20
SOCIALIZED- 117:8
SOLD- 61:15 62:14
79:2 80:3 116:24
127:13 153:8
161:12 165:4,6,22
166:2 167:5
168:19 185:20,24
202:11 206:17
SOLELY- 20:6
191:17
SOLID- 147:6
SOLUTION- 17:7
91:18 92:12 93:3
94:19,23 98:8
165:21
SOLUTIONS- 6:5
SOLVE- 28:24
42:15 171:13
SOLVED- 43:3
SOMEONE'S- 205:1
SOMEWHAT- 56:15
63:3 67:22 72:19
93:1 128:16 191:9
207:22 217:7
218:20
SONG- 162:23
SOPHISTICATED-
198:25
SOUGHT- 19:9
SOUND- 10:14
215:4 227:9
SOUNDING- 14:15
SOURCE- 18:12
SOUTH- 27:10 48:6

SOUTHERN- 67:5
SPACE- 61:7 85:1
87:8 89:10
100:18,19
127:3,8,10,12
128:11 140:1,7
SPAN- 69:1 185:14
190:25 191:1
SPEAKER- 14:2
SPEAKS- 216:25
SPECIAL- 93:11
133:8 175:10
176:6
SPECIALIZED- 61:9
SPECIFIC- 40:15
53:13 86:24
110:24 111:3
115:1 117:7 130:8
138:20 148:1,5
152:16 153:5
201:14 206:24
SPECIFICALLY-
11:5 16:24 49:4
114:5,9 122:3
131:13 135:6,9
SPECIFICS- 76:21
SPECTRUM- 8:1,11
83:3
SPELL- 74:5
125:15
SPEND- 80:12,13
85:19 89:2
SPENDING- 81:4
84:10 85:20
104:9,10 115:9
SPENT- 76:13
115:21 171:3
SPIRIT- 25:12
31:8 190:22 208:2
SPLIT- 30:17
144:17
SPONSOR- 87:22
113:7 114:5,8
SPONSORED- 114:15
166:12,13
SPONSORS- 117:10
SPOTLIGHT- 174:25
SPOTLIGHTED-
176:14
SPREAD- 105:20
106:6 135:23
SPRINT- 79:23
132:18
SPRINTS- 59:22
SPUN- 114:21
SQUARELY- 215:25
STABILITY- 137:13
STAFFED- 129:3
STAGE- 34:19
41:12 42:8
STAGES- 76:1 82:2
102:6 120:23
STAKE- 109:4
STAKEHOLDERS-
17:3,9,14,22
21:22 31:7 47:6
48:6 60:15 65:23
67:16 107:21
174:19 216:14

STALKING- 103:25
104:2,6,8,13
107:11,18 108:23
110:25 134:6
136:16,20,23
137:6 144:15
148:15,20,24
149:2,4,8,17,20
150:2,9 151:13
152:8 162:12
177:11,25 178:8
182:5,25 208:14
216:16
STAM- 54:19,25
55:2,3,5,12,18,22
STAND- 37:17
73:24 74:1 80:10
102:22 125:12
155:18 157:13
168:4 176:4
192:21 227:1
STANDALONE- 70:17
71:1 78:5,7,12,13
89:22 90:10
114:12,13,18
120:5 127:19
128:4,7 134:9
147:9,11
STANDARD- 29:3
STANDARDS- 10:3
77:5 81:3
156:21,22 175:15
STANDING- 74:1
80:11 142:7
STANDS- 60:1
79:19 80:25
STARED- 120:11
START- 7:13 24:15
25:25 36:22 79:19
82:3,24 90:24
92:4 96:4 142:7
143:18 171:21
172:20 178:22
208:18,25 209:4
STARTED- 86:17
106:7 129:12
157:22 193:9
STARTING- 17:15
78:5 85:14 142:6
147:24 176:25
177:6,7,10 195:22
196:5,6
STARTS- 132:16
STATE- 39:17
49:20 52:21 54:8
74:5,24 125:15
165:8 188:1
STATEMENT- 49:19
51:4,9
STATEMENTS- 25:11
40:24 52:18
53:15,17 117:19
146:23 150:16
156:13 173:7
190:5 220:7
STATUS- 23:23
114:14 218:2
STATUTE- 19:12
STAVE- 19:25

STAY- 90:13
173:21 224:21,22
STAYING- 92:3
STEEN- 12:11
222:24
STEP- 48:2 52:2
55:10 142:25
179:2 188:14
210:4
STEPHEN- 49:24
STEPPED- 113:8
STEPPING- 109:7
STEPS- 63:2
129:10
STICKER- 176:24
STIPULATION- 6:14
8:2
9:1,6,10,17,19
STOCK- 60:11,12
STONES- 184:5
STOP- 39:19 156:5
STOPPED-
162:23,24
STOPS- 132:16
STRAIGHT- 113:20
122:16
STRATEGIC- 75:12
85:13
87:6,8,14,21
88:17,19
89:9,10,14,17,18
90:20 92:14,17,22
96:17 108:4
113:4,6,10,13,19
114:2,14 117:3
120:6,17
130:2,5,8,18
138:18 139:7
158:25 159:4,6
160:10 176:15
185:2,22 191:6
STRATEGICS- 88:2
116:6 117:9,14,15
129:8
STRATEGY- 64:15
73:19 74:25
75:4,10,11,18,22
76:14 77:24
110:12,16,20
128:23 146:23,24
STRAUSS- 146:18
STREET- 197:3
STRENGTHEN- 159:7
STRETCH- 65:3
STRIKE- 186:12
STRONG- 84:12
85:25 86:9,12,13
98:5
STRONGER- 87:2
112:13,19 113:3
STRONGLY- 146:21
181:12 182:8
STRUCK- 65:19
STRUCTURE- 28:12
77:20
STRUCTURED- 142:5
165:5,23
SUB- 218:23 219:2
SUBLEASING- 62:10

SUBLET- 144:10
SUBLINES- 78:24
SUBMISSION- 15:2
18:11 218:4
SUBMISSIONS-
21:15 22:11 33:14
45:12,14 46:6
48:22 50:3 56:2,8
216:3 218:13
SUBMITTED- 65:21
96:6 195:16
199:25 221:3
SUBSCALE- 113:1
SUBSEQUENT-
150:14
SUBSET- 96:17
SUBSIDIARIES-
11:1,4,7 166:1
SUBSIDIARY- 12:14
SUBSTANCE- 24:3
38:18
SUBSTANTIAL- 26:4
33:5 58:25 81:3
84:2 85:17 145:1
169:20 182:21,23
186:4 188:23
220:8
SUBSTANTIALLY-
14:11 19:19 56:4
72:11 148:20
SUBSTANTIVE-
125:6 143:13
145:9,11 146:5
213:17
SUCCEED- 181:6
SUCCEEDED- 168:17
SUCCESSFUL-
63:6,15 130:13
133:20 151:3
SUCCESSFULLY-
135:2 141:14
SUDDEN- 200:9
209:12
SUDDENLY- 208:22
SUFFERING- 65:9
137:10
SUFFICE- 44:22
SUFFICIENT- 44:20
54:2 96:11 112:21
131:22 136:9
142:2,3 197:24
207:1 215:12
SUFFICIENTLY-
205:8
SUGGESTED- 21:13
24:21 95:17
187:11 197:12
SUITED- 130:3
SUM- 32:13 72:5
161:19
SUMMARIZE- 13:6
SUMMARIZED- 51:8
SUMMARY- 14:18
148:5
SUPERIOR- 162:10
SUPPLEMENTAL-
68:5 144:16,20
SUPPLEMENTARY-
23:12 24:25

45:18,19
SUPPLIER- 101:13
145:2
SUPPLIERS- 101:10
SUPPLY- 28:5
79:10 102:23
SUPPORT-
11:1,3,15 13:11
40:16 51:4 63:13
70:24 71:2 86:13
87:20,25 90:7,11
93:19,20,25 95:25
120:12 146:11
147:6 154:5
190:13
SUPPORTING- 38:15
72:2
SUPPORTIVE- 12:22
38:10 146:21
147:5
SUPPORTS- 47:3
49:14 52:7 190:8
197:5
SUPPOSE- 191:8
SUPPOSED- 140:5
SURETIES- 224:13
SURPRISING- 27:11
SURROUNDING-
51:19
SUSPECT- 149:12
SUSTAIN- 84:15,19
134:19
SWEET- 71:16
SWITCHING- 79:25
95:15
SWORN- 74:1,4
125:12,14
SYLLABLE- 202:5
SYSTEM- 10:16
28:16,25
29:7,9,17 30:21
31:17,21 32:6
38:21 79:12
102:25 195:25
196:16
SYSTEMS- 31:4
62:24 103:18

T

TAB- 216:20
TABLE- 65:16
66:16 72:12 83:6
84:7 105:1 108:12
163:13 178:4
191:11 194:18
198:18 205:6
209:4,19
TACK- 202:13
TAIL- 80:15 89:25
TAILOR- 94:19,23
TAKING- 17:16
26:14 78:9
100:20,21,23
101:2 137:15
166:18 168:8
183:19 190:5
207:22
TALENT- 87:20,24
90:12 93:10

120:13
TALENTED- 93:15
TARGET- 133:21
202:17 203:18
TASK- 97:2,3
222:20
TAX- 28:13 30:1
38:23
TAY- 14:3,7,16,18
21:19 22:1,5,13
24:23 25:2,5
40:19,23 44:1
45:21,24 46:8,9
47:25 48:10 51:7
54:20,22 55:8,14
56:2,7,9
214:13,15 218:13
222:13
TEAM- 63:11 93:21
126:22,23
132:11,25 207:24
TEAMS- 129:3
TEASE- 193:25
TECHNICAL- 22:15
43:15,17 82:3
TECHNO- 81:20
TECHNOLOGIES-
59:25 77:7,10
80:19,23 83:11
85:20 86:5,16
95:11 97:22,24
134:20 160:6
185:7,13
TECHNOLOGY-
27:8,13 60:2,3,19
64:22 68:25
69:2,3,5,7
70:2,18,21 71:17
79:17,22 80:16
81:1,4,5
82:11,14,18
83:14,20
84:3,12,18,21
86:9 87:1 88:15
95:14 126:1,5
127:9 160:6,14
185:10 186:15,21
190:25 191:1
TEENS- 90:2
TELECOM- 84:7
127:8
TELEPHONE- 59:21
79:17 81:14
TEMPLATE- 147:22
188:24
TENDERED- 18:9
TENS- 98:4 102:13
119:12
TENSION- 42:25
104:9 105:6 137:1
TENT- 173:9
TERM- 33:7,10
36:14 52:2 91:23
168:20
TERMINATE-
152:11,13 179:15
222:7
TERMINATES-
151:23

TERMINATION- 34:7
TERMINOLOGY-
59:22
TERMS- 14:9 25:11
31:10 38:12
41:1,15 45:14
51:9 61:8 66:13
80:24 83:10
85:6,7,8 86:13
88:14 93:17 94:25
96:15 106:9
107:20
108:11,15,19
109:6 114:14
120:13 129:24
132:6 139:10
150:24 157:4
168:16 183:20 217
TERRIBLE- 72:22
TERRIFIC- 6:19
93:21
TERRY- 127:1
TEST- 10:14,16
14:9 22:7,10
87:23 206:7,17,19
215:14
TESTAMENT- 30:11
70:3
TESTED- 206:11,25
TESTIMONY- 12:16
37:5 71:14 117:2
118:9 130:1
146:22 159:1
160:4 162:18
171:3 178:22
184:18 186:23
192:5,13,15
193:16 201:17
TESTING- 69:11,15
THANKFUL- 214:24
THEMES- 61:2
THEORY- 71:3
THERE'D- 98:24
THEREFORE- 18:1
47:21 48:19 61:8
84:20 90:14
101:15 162:22
191:12 216:15
THEREFROM-
39:17,20
THEREIN- 216:17
THERETO- 47:11
53:15
THEY'D- 145:25
THEY'LL-
82:2,3,4,6 144:18
170:21 199:4
THIN- 193:24
THIRD- 30:14
55:6,24 67:4
81:17 86:8 89:4
92:6 151:8 183:22
185:10 188:3
224:10
THIRDLY- 215:16
THREATS- 30:20
THREE- 24:8 27:14
45:22 59:18
75:3,20 76:6 79:7

82:20,21 85:18,23
90:17 103:6
105:25 106:23
125:6 135:14
136:1 146:5 172:4
180:1 181:22
185:22 225:19
226:3
THRESHOLDS- 33:2
THROW- 184:5
207:14
THROWING- 98:12
208:22
THUS- 142:3
TIE- 62:17
TIED- 106:19
TIGHT- 152:12,13
177:15
TIL- 43:5
TIME- 6:4 7:25
15:22 21:8 27:17
30:3,4 35:15
40:1,8 41:12 42:7
43:3 47:16
51:12,17 56:12,13
60:16 61:22
63:3,20 66:20
68:18 70:5,8
71:21 72:3 78:1
80:16,21 83:14,16
91:1,4,19
93:5,7,22
96:11,22 99:6
102:7 1
TIMELY- 92:11
219:11
TIMES- 18:23
27:18 30:10 31:1
41:5 99:22 132:16
154:19 201:20
207:22
TIME-TO-TIME-
88:6
TIMING- 24:6 86:4
90:25 106:15
131:15 177:15
187:12
TINKER- 153:25
154:2,3,15,17
155:3,5,7,8
223:10
TIRED- 79:13
TITLE- 8:6
19:11,14 39:7
125:22
TITLED- 39:1,9
TODAY- 7:10 12:16
18:3 23:10,25
24:24 26:4,7 27:6
28:7 33:8 35:8
49:15,18 58:13
59:13 67:7,12,25
71:16 73:17 74:21
76:16 96:5,7
121:17 128:9,23
131:12,14,16
139:12,14 145:12
146:22
147:3,16,20
150:16 153:1 1

TODAY'S- 80:24
222:20
TOGETHER- 66:6
91:8,19 180:18
196:13,14 198:12
205:23
TOKEN- 207:17
TOM- 50:25
TOMORROW- 65:8
203:23 210:14,19
TONIGHT- 198:20
210:14,19
TONS- 192:8
TONY- 118:17
TOOK- 22:1,7
25:22 78:15
91:4,9 99:15
174:3
TOOTH- 169:2
TOP- 130:17
TOPIC- 150:12
TOPICS- 99:17
105:13
TORONTO- 23:7
24:6 37:24
40:19,22 50:11,19
60:11 72:19 156:7
TOTAL- 44:23,24
67:1 76:7 77:12
80:10,12,13 97:11
155:16
TOUCH- 167:20
218:4
TOUGH- 159:14
TOWARD- 149:2
TRACK- 92:3 99:21
108:19 136:3
TRACKS- 99:14
TRADITIONALLY-
44:12
TRANCHES-
44:11,18
TRANSACTION-
15:21 20:1 21:7
23:22 27:16 37:22
58:23 59:3,13,14
60:8 62:5,11
63:1,2,19 64:8
66:16,23 69:4
72:6 86:23 87:13
89:13 90:22,23
96:4 98:5 99:1,9
102:3,21 119:7
135:6 136:19
137:15 144:3,11
151:1,3,6,13,2
TRANSACTIONS-
36:4 61:17,18
62:15 63:20,21
65:4,22,24 75:25
127:10 136:5
159:11 161:17
184:22 208:2
TRANSCRIPT- 227:8
TRANSCRIPTS-
160:23 227:14
TRANSFER- 8:6
29:1,2,17,23 30:1
32:18 38:20

39:5,14,16 41:8
44:12 51:20
103:14
TRANSFERRED- 8:20
TRANSFERRING-
102:3
TRANSFERS- 10:25
11:3 165:9
TRANSITION-
62:19,22,24 63:10
72:3 88:15 102:22
103:13,17
TRANSITIONED-
80:25
TRANSPARENCY-
26:17 187:21
TRANSPARENT- 85:6
TRANSPIRED- 54:4
214:14
TRANSPORT- 77:10
TRANSPORTING-
9:11
TREASURER- 12:15
37:14
TREATMENT- 53:14
145:9 188:5
TREMENDOUS-
200:16
TRI- 32:5
TRIAL- 57:20 82:1
84:17 88:24 92:25
TRIALS-
82:3,4,7,12,15,20
83:1 92:5
TRICKY- 72:8
TRIED- 78:6
174:19 186:12
TRIGGERED- 44:23
135:18
TRIGGERS- 183:8
TROUBLE- 41:1
TRUING- 29:8
TRUST- 89:4,8
TRUSTEE- 11:17
13:7,8,12,15,17
34:15 36:24
146:10 154:3,5
173:23 181:13
213:21 214:2
223:6,19 224:2
TSA- 102:23
TURN- 85:12 89:14
96:3 125:7 143:6
146:13 215:4
216:19 219:22
TURNED- 149:8
TURNING- 58:23
TURNS- 91:16
TWEAKING- 199:7
200:9
TWEED- 50:25
TWO- 23:10 24:12
25:23 26:3 28:6
30:16 33:19 37:4
38:17,24 44:10,17
49:13 54:25
55:6,23,25 59:25
63:10 64:20 73:16
76:1 77:5,8 78:16

82:12,22 85:14
88:20 89:16 90:17
91:8 92:4,7,24,25
93:10 95:18 97:19
98:
TWO-DAY- 57:19
223:21
TWOFOLD- 18:12
TWO-STEP- 144:14
TWO-WEEK- 115:17
119:3 132:18
158:20 159:24
184:6
TWO-YEAR- 82:11
194:4
TYPES- 16:6 35:22
TYPICAL- 63:17
192:7
TYPICALLY- 150:21
TYPIFIED- 127:12

U

UCC- 41:22 218:23
UK- 32:11,14,16
33:1 36:12 44:15
46:18 49:12 52:14
61:25 171:8
UKA- 99:23 100:10
ULTIMATE- 111:20
ULTIMATELY-
52:1,4 72:7
106:11 110:18
119:8 149:19
UMTS- 76:3 80:11
UNCERTAIN- 56:15
85:17 86:6 93:23
UNCERTAINTY- 86:4
108:25
UNCLEAR- 148:22
UNCONDITIONAL-
173:7
UNCONTESTED- 6:9
UNDERFUNDED-
42:13
UNDERSTANDING-
111:7 120:7
122:18 153:20
UNDERSTANDS-
200:17,22
UNDERSTOOD-
110:16 207:16
208:9 209:1
UNDERTAKE- 64:7
UNDERTAKEN- 30:24
129:24 131:25
162:8
UNDERWAY- 82:8
UNDULY- 176:14
UNENVIABLE-
222:19
UNFAIRLY- 20:21
UNFAIRNESS-
215:19
UNFORTUNATE- 65:8
UNFORTUNATELY-
60:19 65:3 70:20
84:21 155:18
UNIDENTIFIED-
123:23

UNIQUE- 66:10
86:24 93:5,12
104:19
UNIQUELY- 51:24
UNIT- 127:24
UNITED- 25:20,21
26:19 27:24 30:6
32:7 35:10 39:24
40:1 53:5
59:15,16 100:10
154:3,4 173:23
UNITS- 27:15
128:12 129:3
UNIVERSE- 65:10
175:20
UNIVERSITY- 76:12
UNLESS- 9:15
12:17 46:6 48:23
97:23 112:25
122:8 142:8 143:5
206:16
UNLIKE- 166:24
167:3
UNPERFECTED- 7:25
8:4
UNRELATED- 111:13
153:14
UNSCRAMBLE-
161:12
UNSECURED- 146:19
UNTRUE- 193:13
UNUSUAL- 148:13
UNVARIABLY- 171:4
UPCOMING- 227:1
UPDATE- 22:15
23:21 57:1
UPDATED- 24:10
UPEND- 155:19
158:16
UPHELD- 17:22
UPS- 91:8
UPSIDE- 17:8
UPWARDS- 81:4
URGENCY- 91:17
USED- 15:5 20:21
28:10 42:2 78:19
83:22
USEFUL- 94:8
108:13
USER- 81:12
USES- 70:9
USING- 29:4 33:11
83:3
UTILITIES- 9:9
UTILITIES'- 9:12
UTMOST- 38:25

V

VALIANT- 191:7
VALUABLE- 69:20
70:3 160:14
187:7,9
VALUE- 8:16,21
17:8,13 26:13
31:3,6 34:8 62:16
64:24 67:11
71:21,22,23 76:7
85:19 88:16 93:18
96:12,18 97:24

98:7 99:1,5
101:25 104:7,8
105:2 107:20
108:20 111:6
122:1 132:21
136:14,15,18,19,2
1,25
134:6,13 1
VALUED- 167:4
VALUES- 128:8
VAPOROUS- 175:14
VARIABLE- 107:19
VARIANCES- 102:12
VARIOUS- 17:16,18
26:3 27:21 28:12
29:14 34:8
38:13,20,22 43:9
44:14 45:3 47:4
61:23 76:14 82:19
107:21 117:9
129:3 147:7
169:25 196:11
213:21
VAST- 34:4
VEHICLE- 193:22
VENDOR- 82:10
87:21 128:24
VENDORS-
82:4,17,19
83:4,5,13 86:1,19
87:5 90:17,20
91:14 92:25
VENTURE- 77:16
84:24 120:20
VERIZON- 68:21,22
79:23 81:1
82:9,17,21,22
86:20 88:25
91:13,20
92:5,12,20 191:2
VERIZONS- 59:22
VERSION-
221:17,24
VERSUS- 87:14
92:23 108:13
126:21 128:8
168:19 172:3,4
VET- 149:25
VETTED- 149:14,18
157:17 171:12
177:14
VIABILITY- 84:19
86:10
VIABLE- 15:25
21:10 127:19
185:20,22,25
VICE- 12:15 83:4
126:25
VICENTE- 164:8
189:9
VIDEO- 9:2 11:12
13:24 72:20
109:25
VIEW- 20:6 33:19
51:25 60:15 72:5
81:6 85:13 96:11
98:11,14 102:7,8
109:8 128:2,10,20
130:4 131:3,22,24

133:5 134:14,21
136:18 151:17
154:18 167:22
177:22 178:15
197:17 200:19
204:13,17 207:5
208:6 216:12 2
VIEWED- 112:19
134:12 145:11
138:19
174:16 217:7
VIGOR- 90:19
VIGOROUS- 10:5
67:15 72:10 99:15
132:17 134:25
VIOLENT- 173:24
VIRGINIA- 76:12
VIS-A-VIS- 217:24
VODAFONE- 81:2
82:9,20 86:20
88:25
VOICE- 77:7,14
78:25 79:24
80:15,16
VOIP- 77:6
VOLUME- 23:2
92:10
VOLUNTEER- 124:5
VOTE- 22:4
VOTED- 20:4
VP- 75:18

W

WAIT- 9:19 98:15
117:25 118:1,4
172:2
WAITED- 160:17
WAITING- 92:23
114:24 123:11
187:8
WAIVER- 39:11
152:17 176:1
218:23
WALK- 101:23
180:6
WALKED- 194:7
196:2
WALKING-
179:21,22
WALKS- 172:13
WALL- 197:3
WALRATH- 57:4
WALRATH'S-
123:9,12
WANTS- 104:8
143:5,14 156:3
180:1 181:21
221:6
WARM- 42:4
WARRANTED- 15:22
21:7
WASN'T- 184:4
WASTING- 134:14
184:2,17 185:5
WAYS- 31:5 41:4
112:24
WE'RE- 6:2
10:19,22 12:6
23:1,9 26:7

27:1,14 34:14
38:2 41:4 43:16
46:1 49:12
58:7,23 59:13
60:1 61:8 62:12
67:21,25 68:19
71:5,15,18 72:6
73:13 74:10 82:15
84:6,18,20 85:24
90:17 96:4
97:17,18 109:13
118:8
**WEEK-** 35:12 36:15
60:6 107:16
154:11 160:19
161:2,3 192:22
218:15 221:12
**WEEKEND-** 181:14
**WEEKS-** 61:22
99:16 115:16
116:1 172:3,4
173:17 184:3,9
186:3 192:15,19
194:3,4,11 201:12
**WEEKS'-** 192:12
**WELCOME-** 164:13
189:1 211:5
212:24 220:10
**WEREN'T-** 108:15
191:17
**WESTERN-** 7:23
**WESTWIND-** 47:15
**WHEREIN-** 145:17
**WHEREUPON-** 227:4
**WHEREWITHAL-** 64:7
150:5 182:18
207:19
**WHO'S-** 12:15 14:4
70:4 73:18,20
125:10 148:14
204:17
**WHOLE-** 15:22 17:4
21:8 39:13 137:16
162:11 171:16
209:17
**WHOLLY-** 116:12
162:4
**WIDE-** 80:19
**WILL-** 6:19 9:18
12:25 13:9,11
14:24 15:20,22
16:5 19:1,20
20:18 21:8
23:20,21
24:1,11,13 25:12
26:21
31:12,13,14,21
32:21,25
33:10,12,13 34:7
35:8 36:19
37:1,3,21
40:12,21
44:2,5,9,23,25
45:1,7,8,11 46:1
47
**WILLING-** 38:2
99:2 107:10,12
119:24 121:12
122:15 163:7,15

170:17 172:9,13
179:17 180:5
186:8 187:22
**WILLINGNESS-**
107:8 146:11
173:20
**WIN-** 84:21 88:24
**WIND-** 133:25
**WINDOW-** 92:2
96:10
**WINDS-** 114:24
**WINGS-** 201:14
**WINNER-** 89:1
**WINNING-** 69:14
**WINNIPEG-** 19:5
**WINSTAR-** 165:2
**WIRELESS-** 7:8,21
59:24 77:5 79:22
80:10,12 81:7
101:14
**WISH-** 12:19 46:13
53:8 54:20 67:18
109:17 214:13
226:25
**WISHES-** 46:16
50:11
**WISHING-** 21:17
**WITHDRAWN-** 9:13
**WITNESS-**
73:5,6,7,18,20
74:4,7,9,14
109:15,21,25
110:3,5 124:23,25
125:1,14,17
184:21 225:11
**WITNESSES-** 37:4
38:2 59:6,8 64:14
65:13 71:13 72:15
73:16 185:11,21
**WITNESSING-**
128:13
**WON'T-** 16:8 18:21
43:10 44:21
**WORD-** 19:18
141:17 157:3
162:10
**WORDS-** 18:13
124:7 139:17
157:24,25 219:13
**WORK-** 6:2 22:14
28:22 72:23 75:19
82:10 86:14 87:5
88:1 90:18 92:21
101:13 125:21
126:7,22,24
129:23 131:25
145:18 157:6
171:15,19 191:6
219:18 222:3
**WORKED-** 28:4
40:14 51:10
70:4,7 71:18 75:2
126:2 127:10,14
132:11 179:1
**WORKERS-** 187:7
**WORKFORCE-** 93:15
**WORKING-** 10:19
12:6 28:23 45:7
68:24 82:20,21

83:4 86:11
102:1,2,12 104:4
126:4,14 133:19
186:20 187:4
215:19 217:22
**WORKS-** 28:16
123:15 171:16
196:16
**WORLD-** 27:22
28:2,15 34:9
42:14 59:21 63:12
80:10,24 83:10
104:14 170:15
171:5 174:10
176:9 184:24
185:23
**WORLD'S-** 68:23
**WORLDWIDE-** 26:12
194:15
**WORST-** 120:16
207:24
**WORTH-** 116:1
160:18 164:1
181:25
**WORTHWHILE-** 7:12
37:23 67:23
**WORTHY-** 38:16
146:7
**WOULDN'T-**
81:10,13 102:16
117:20 119:4
141:5,6 151:15
173:3 177:10,11
178:25
**WOUND-** 105:11,24
**WRENCHING-** 60:13
**WRESTLING-** 105:21
**WRITTEN-** 13:13,16
168:14 196:18
**WROTE-** 184:3

Y

**YEAR-** 27:12 69:12
78:5 81:5 82:17
84:10 90:5
102:7,13 115:9
120:9 128:13
184:20
**YEARS-** 28:10 29:4
30:1 63:10
75:3,20 76:6,13
82:5,12,13 83:18
85:14 90:1 103:1
126:8,9 127:11
129:23 131:25
194:2
**YESTERDAY-**
158:7,10
**YIELD-** 25:12
72:11 122:23
**YIELDED-** 62:3
**YORK-** 61:22 67:5
99:16 139:24
**YOU'D-** 92:24
117:15,16 121:12
221:18
**YOU'LL-** 11:23
57:6 68:11 125:12
186:4

**YOU'RE-** 55:5
68:25 72:24 74:1
75:4 76:15 88:3
89:1 100:2 111:17
113:1 122:2 123:1
125:12 131:12
133:25 141:23
142:12 189:1
199:15 211:5
212:24 215:5
220:10
**YOU'VE-** 22:21
24:19 37:14 41:8
43:4,13 45:3
51:22 78:22,23
79:1 83:19 84:25
88:25 89:9 90:20
93:14 106:22
124:15 141:5
155:14 163:23
182:17 185:21
205:7 209:18,19
224:15
**YOUNG-** 47:2 49:5
189:25

Z

**ZT-** 87:10