**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS INC., et al.,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |
| | **RE: Docket No. 931** |

**OBJECTION BY OSS NOKALVA, INC., TO DEBTORS' MOTION FOR
ORDERS (I)(A) AUTHORIZING DEBTORS' ENTRY INTO THE ASSET SALE
AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING
PROCEDURES, (C) AUTHORIZING AND APPROVING A BREAK-UP FEE
AND EXPENSE REIMBURSEMENT, (D) APPROVING THE NOTICE
PROCEDURES, (E) APPROVING THE ASSUMPTION AND ASSIGNMENT
PROCEDURES, (F) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS
UNDER SEAL AND (G) SETTING A DATE FOR THE SALE HEARING, AND
(II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS
OF DEBTORS' CDMA AND LTE BUSINESS FREE AND CLEAR OF ALL
LIENS, CLAIMS AND ENCUMBRANCES, (B) ASSUMPTION AND
ASSIGNMENT OF CERTAIN CONTRACTS AND (C) THE ASSUMPTION AND
SUBLEASE OF CERTAIN LEASES**

OSS Nokalva, Inc., the successor in interest to Open Systems Solutions, Inc.

("OSS"), by and through its undersigned counsel, by way of objection to Debtors' Motion

for Orders (I)(A) Authorizing Debtors' Entry into the Asset Sale Agreement, (B)

Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a

Break-Up Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems, Inc. (9769), Nortel Altsystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Atera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

Approving the Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of Debtors' CDMA and LTE Business Free and Clear of All Liens, Claims and Encumbrances, (B) the Assumption and Assignment of Certain Contracts and (C) the Assumption and Sublease of Certain Leases [Docket No. 931] (the "Motion"), respectfully states and represents as follows:

## PRELIMINARY STATEMENT

1.      OSS is a party with Debtor Nortel Networks Inc. ("NNI" or "Debtor") to a certain "Nortel Networks/OSS Corporate-Wide Software License Agreement" (the "OSS Agreement").[2] Pursuant to the OSS Agreement, OSS non-exclusively licenses to NNI OSS software, including, without limitation, source code generated by NNI through use of certain of the OSS software (collectively, the "OSS Software").

2.      Whether by design or inadvertence, nothing in the Motion, the stalking horse purchase agreement (the "Agreement"), the Notice Procedures, and/or the Assumption and Assignment Procedures, remotely identifies OSS, the OSS Agreement or the OSS Software as integral parts of the sale of the Purchased Assets to Nokia Siemens Networks ("NSN" or "Purchaser") or other Higher Bidder.  OSS submits, however, the OSS Software is an integral part of the NNI Assets being proposed for sale to NSN.

3.      Despite that fact, OSS has received no notice, formal or otherwise, that NNI intends to assume and assign the OSS Agreement to NSN or other Higher Bidder for

---

[2] Capitalized terms have the meaning ascribed to them in the Motion or OSS Agreement, unless the meaning is otherwise clear from the context of their usage.

the Purchased Assets. OSS learned of the pending sale of the Purchased Assets by mere happenstance.[3]

4.      OSS does not consent to the assignment of the OSS Agreement or transfer of the OSS Software to NSN, and reserves the right to deny its consent to an assignment or transfer to a yet-unknown Higher Bidder for the Purchased Assets, as permitted by the OSS Agreement and applicable non-bankruptcy law.

5.      Accordingly, OSS respectfully requests that the Court deny approval of the Agreement and Sale of the Purchased Assets, as presently configured.

## BACKGROUND

6.      NNI and OSS entered into the OSS Agreement as of the 25th day of June, 1999. Pursuant to the OSS Agreement, NNI was granted a non-exclusive license to use the OSS Software. A copy of the OSS Agreement is annexed hereto as Exhibit A.

7.      The OSS Software includes software tools, libraries and code that Nortel uses to develop certain products, which products Nortel sells to end users. Nortel has used many copies of the OSS Software since the inception of the OSS Agreement.

8.      The OSS Software is OSS' main asset. Most of OSS' business consists of licensing the OSS Software to entities and receiving fees for such licenses.

9.      NNI's proposed transfer of the OSS Software to a third party for valuable consideration to NNI would deprive OSS of its license fees and risk, potentially, such third party having the continued use of the OSS Software without having to pay fees to OSS.

---

[3] On or about July 16, 2009, OSS first received formal notice of the proposed Sale from the Bankruptcy Court.

10.    In addition, OSS has concerns if the OSS Software were to be provided to a competitor of OSS.  Presently, it is impossible to know if the ultimate Higher Bidder at Auction for the Purchased Assets is a competitor of OSS or, arguably, may hold interests adverse to those of OSS.

11.    Furthermore, there is a distinct risk that the OSS Software may be transferred to a third party, with which OSS might not agree to contract for various business reasons.  Those reasons include, without limitation, such party's use of the OSS Software in a manner that could adversely affect OSS' ownership and intellectual property rights.  For example, if the transferee were to distribute the OSS Software in source code form to third parties, which is prohibited by the OSS Agreement, this would seriously affect OSS' business.  OSS would have to proceed with costly and time-consuming litigation to prevent further damage to its rights.

12.    The OSS Agreement also authorizes NNI to use OSS' trademarks in connection with marketing and distributing of the OSS Software or those NNI products that incorporate any of the OSS Software.  A transfer of that right to a third party purchaser - - not approved by OSS - - greatly impairs the value and usefulness of the OSS trademarks.

13.    Pursuant to Section 12.4 of the OSS Agreement, NNI's duties and rights under the OSS Agreement with respect to the OSS Software "may not be sold, assigned, sublicensed or otherwise transferred by NNI, in whole or in part, without the prior written consent of OSS."

14.    In addition, pursuant to Sections 10.1 and 10.2 of the OSS Agreement, any source code provided by OSS, and source code produced by the use of the OSS Software,

are confidential information of OSS and cannot be disclosed by NNI to third parties.

Thus, absent OSS' consent, OSS is greatly concerned that NNI already has breached this

provision of the OSS Agreement in its negotiations with NSN.

15.     Finally, Paragraph 14 of the Motion provides in pertinent part:

> "■     Intellectual Property License Agreement.     At the
> closing, NNL and the Purchaser will enter into an intellectual
> property license agreement (the "IPLA") pursuant to which
> (i) NNL will license to the Purchaser and its affiliates certain
> intellectual property necessary for the manufacture of the
> products and the provision of services, and (ii) NNL and its
> affiliates will receive a license back to all intellectual
> property included in the Purchased Assets for use in their
> other businesses.  The IPLA will remain in force for so long
> as any intellectual property rights licensed thereunder
> continue to exist.     Also at the closing, NNL and the
> Purchaser will enter into a license agreement allowing the
> Purchaser and its affiliates to utilize the "Nortel" trademark
> and logo in its sales of the Products for a limited period after
> closing."

Notwithstanding NNI's purported transfer of the OSS Software, NNI retains in Paragraph

14 all license privileges and benefits as though no assignment had been made.  That is

unacceptable to OSS.

16.     Moreover, the unfettered right of NNI to further license the Purchaser's

"affiliates" - - with or without OSS' consent - - deprives OSS of valuable license fees and

control over the use of the OSS Software to enhance its' business opportunities.  NNI

does not have that right under the OSS Agreement.

## LEGAL BASIS FOR OBJECTION

17.     Pursuant to 11 U.S.C. § 365(a) and (f) of the Bankruptcy Code, the trustee,

subject to the court's approval, may assume or assign any executory contract or unexpired

lease of the debtor. The license for the OSS Software, which NNI proposes to assume and

assign, is an executory contract excluded from the reach of § 365(a) and (f) by the exception in 11 U.S.C. § 365(c)(1). Under § 365(c) (1),

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if-
>
> (1) (a) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
>> (b) such party does not consent to such assumption or assignment . . .

18.     The 3rd Circuit adheres to the definition under <u>Countryman</u> of an executory contact as a contract in which "the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." <u>See</u> <u>In re Access Beyond Tech., Inc.</u>, 237 B.R. 32, 43 (Bankr. D. Del. 1999) (quoting Countryman, <u>Executory Contracts in Bankruptcy: Part I</u>, 57 Minn. L. Rev. 439, 460 (1973)) (citing <u>Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.</u>, 872 F.2d 36, 39 (3d Cir. 1989)).

19.     This Court has also held that intellectual property licenses, including copyright licenses, are executory contracts within the meaning of 11 U.S.C. § 365(c) under the Countryman definition. <u>See</u> <u>In re Valley Media, Inc.</u>, 279 B.R. 105, 135 (Bankr. D. Del. 2002) (copyright license found to be executory contract); <u>In re Golden Books Family Entm't. Inc.</u>, 269 B.R. 311, 349 (Bankr. D. Del. 2001) ("courts generally

have found intellectual property license to be 'executory' within the meaning of section 365(c) because each party to the license had the material duty of "refraining from suing the other for infringement of any of the [intellectual property] covered by the license")(terms in brackets included in original); Access Beyond Tech., 237 B.R. at 43-44 (patent license agreement found to be executory contract).    Accordingly, the OSS Agreement for the licensing of OSS Software is an executory contract because it provides for the licensing of OSS' intellectual property to NNI.

20.    In accordance with the exception outlined in § 365(c)(1)(a), there is applicable non-bankruptcy law that prohibits the assumption and assignment of non-exclusive intellectual property licenses, like the OSS Agreement.    Under the Copyright Act, 17 U.S.C. § 201(d), the owner of a copyright may transfer, by a license or otherwise, in whole or in part, any of the exclusive rights that inure to the benefit of the copyright holder as defined in 17 U.S.C. § 106.    Those rights under § 106 include the right to make copies of the copyrighted work, prepare derivative works based on the copyrighted work, and distribute copies of the copyrighted work to the public for sale.    Thus, any exercise of these exclusive rights, or any transfers of these rights pursuant to a non-exclusive license, may only be accomplished with the consent of the copyright holder.

21.    The Copyright Act recognizes a distinction between exclusive licenses, which transfer all rights of the copyright owner to the extent of the license to the licensee, and non-exclusive licenses, where all rights remain with the licensor.    See In re Patient Educ. Media, Inc., 210 B.R. 237, 240 (Bankr. S.D.N.Y. 1997) (holding that photographer had granted debtor a nonexclusive license in his copyrighted work, and thus, debtor could not transfer license to purchaser of substantially all of its assets without photographer's

consent. Id. at 243). The owner of an exclusive license receives the rights of exclusive ownership of the copyright and may act without the consent of the copyright owner. See Golden Books, 269 B.R. at 319 (Bankr. D. Del. 2001) (holding that copyright law provides a distinction between treatment of exclusive and non-exclusive licenses to copyright material and that copyright law would not prevent assumption and assignment of work held pursuant to an exclusive license).

22.     However, the holder of a non-exclusive license does not possess all of the rights of exclusive ownership of the copyright, and thus, may not take any action with respect to the copyright, including assignment of its license, without the consent of the copyright owner. See Valley Media, 279 B.R. at 135 ("A non-exclusive license of rights by a copyright owner to another party is not assignable by that party without the permission of the copyright holder under federal copyright law since the license represents only a personal and not a property interest in the copyright); Patient Educ. Media, 210 B.R. at 240 ("non-exclusive license is personal to the transferee . . . and the licensee cannot assign it to a third party without the consent of the copyright owner").

23.     Notably, the OSS Agreement between OSS and NNI expressly provides in § 12.4 that "the OSS Software and OSS Generated Source Code may not be sold, assigned, sublicensed or otherwise transferred by Nortel Networks, in whole or in part, without the prior consent of OSS."

24.     Here, the OSS Agreement with NNI clearly sets forth in the "LICENSE" section, specifically paragraphs 4.1 -4.2, that "[s]ubject to the payment of fees . . . OSS grants Nortel Networks a non-exclusive, worldwide right" to perform various actions outlined in the OSS Agreement with respect to its use of the OSS Software. See OSS

Agreement at 7. Thus, there can be no dispute that all NNI possesses is a non-exclusive license for the use of the OSS Software.

25.    Accordingly, because applicable non-bankruptcy law, here the Copyright Act, prohibits NNI from transferring its non-exclusive license in the OSS Software without the consent of OSS, and such consent is denied, NNI may not assume and assign its non-exclusive license with OSS as part of this bankruptcy proceeding. See In re Sunterra Corp., 361 F.3d 257, 260, 271 (4th Cir. 2004) (debtor not permitted to assume non-exclusive software license under § 365(c)); Patient Educ. Media, 210 B.R. at 243 (relying on case law concerning non-assignability under bankruptcy and federal law of non-exclusive patent licenses to hold that non-exclusive copyright license could not be assigned pursuant to § 365(c) without copyright owner's consent); Access Beyond Tech., 237 B.R. at 47 (non-exclusive patent cross-license agreement cannot be assigned pursuant to § 365(c)); Cf. Golden Books, 269 B.R. at 314 (determination as to whether copyright license is assignable under § 365(c) turns on whether license is exclusive or non-exclusive).

26.    In addition, under trademark law, the registration of a trademark provides the registrant with the exclusive right to use the mark, see 15 U.S.C. § 1057(b) and § 1115, and any person who uses a trademark without the consent of the trademark registrant can be subject to civil suit for infringement. See 15 U.S.C. § 1114.

27.    Trademark law similarly provides that the registrant of a trademark may assign the mark, but such assignment must be by consent, or "by instrument in writing duly executed." See 15 U.S.C. § 1060.

28.     In § 4.8 of the OSS Agreement, OSS also agrees to permit NNI to use its trademarks in connection with marketing and distribution of NNI products provided, however, that NNI properly identifies OSS as the owner of such trademarks and complies with the instructions of OSS regarding the use of the marks.

29.     The courts that have addressed the assumption and assignment of licenses to use trademarks have relied upon cases in the copyright and patent areas to similarly hold that the exception under § 365(c)(1) applies with equal force to prohibit the assignment of trademark licensing agreements. See In re Wellington Vision, Inc., 364 B.R. 129, 136 (S.D. Fla. 2007) (precluding assignment of franchise agreement that provided for right to use trademarks as a license under the Trademark (Lanham) Act and § 365(c) and noting that "a clause against unreasonable withholding of consent is not equivalent to a clause expressly allowing assignment without consent."); In re N.C.P. Marketing Group, Inc., 337 B.R. 230, 237-238 (D. Nev. 2005) (holding that "[b]ecause . . . under applicable trademark law, trademarks are personal and non-assignable without the consent of the licensor, the [owners'] trademark would be unassuamble as part of the bankruptcy estate of NCP without the [owners'] consent.").

30.     Moreover, for § 365(c)(1) to be applicable, not only must non-bankruptcy law prohibit the transfer of the property, but the non-debtor party must withhold its consent. As previously noted, OSS refuses to consent to the assignment of its non-exclusive license with NNI under the present terms of the asset sale. OSS may withhold consent to such assignment, not only under the applicable law discussed above, but pursuant to section 12.4 of the OSS Agreement which provides that "the OSS Software and OSS Generated Source Code may not be sold, assigned, sublicensed or otherwise

transferred by Nortel Networks, in whole or in part, without the prior written consent of OSS."

31.    Although NNI has requested that this Court allow it to assume and assign various agreements, including the OSS Agreement at issue here, pursuant to § 365(a) and (f) of the Bankruptcy Code, such assignments cannot take place where the exceptions to § 365(a) and (f), under § 365(c), are applicable.  Thus, under the OSS Agreement, relevant bankruptcy law, and applicable non-bankruptcy law, the Debtor should not be permitted to transfer its non-exclusive license with OSS without the consent of OSS.

## CONCLUSION

For each of the reasons set forth above, OSS respectfully requests entry of an order denying the sale of the Purchased Assets to NSN or other Higher Bidder.

Dated:  July 17, 2009
        Wilmington, Delaware

                                    **POLSINELLI SHUGHART PC**

                        By:    _____
                                    Christopher A. Ward (No. 3877)
                                    Justin K. Edelson (No. 5002)
                                    222 Delaware Avenue, Suite 1101
                                    Wilmington, Delaware 19801
                                    Telephone: (302) 252-0920
                                    Facsimile: (302) 252-0921

                                    -and-

                                    Robert E. Nies, Esq.
                                    **WOLFF & SAMSON PC**
                                    The Offices at Crystal Lake
                                    One Boland Drive
                                    West Orange, New Jersey 07052
                                    Phone:  (973) 325-1500
                                    Facsimile:  (973) 325-1501

                                    *Counsel for OSS Nokalva, Inc.*