IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X

In re                          :      Chapter 11

Nortel Networks Inc., *et al.*,[1]    :      Case No. 09-10138 (KG)

             Debtors.      :      Jointly Administered

                          :

                          :      **Hearing date: August 4, 2009 at 9:00 AM (ET) (proposed)**
                          :      **Objections due: July 28, 2009 at 4:00 PM (ET) (proposed)**

-------------------------------------------------------X

**DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING DEBTORS' ENTRY INTO
THE ASSET AND SHARE SALE AGREEMENT, (B) AUTHORIZING AND
APPROVING THE BIDDING PROCEDURES, (C) AUTHORIZING AND APPROVING
A BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (D) APPROVING THE
NOTICE PROCEDURES, (E) APPROVING THE ASSUMPTION AND
ASSIGNMENT PROCEDURES, (F) AUTHORIZING THE FILING OF CERTAIN
DOCUMENTS UNDER SEAL, AND (G) SETTING A DATE FOR
THE SALE HEARING, AND (II) AUTHORIZING AND APPROVING
(A) THE SALE OF CERTAIN ASSETS OF, AND EQUITY INTERESTS IN,
DEBTORS' ENTERPRISE SOLUTIONS BUSINESS, (B) THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES
AND (C) THE ASSUMPTION AND SUBLEASE OF CERTAIN LEASES**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of

orders pursuant to sections 105, 107(b)(1), 363 and 365 of chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9014 and 9018 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 9018-1 of the

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules") (i)(a) authorizing the Debtors' entry into that certain

Asset and Share Sale Agreement dated as of July 20, 2009 among Nortel Networks Corporation

("NNC"), Nortel Networks Limited ("NNL"), NNI and certain other entities identified therein as

Sellers (the "North American Sellers"), certain other entities defined therein as EMEA Sellers

(the "EMEA Sellers" and, together with the North American Sellers, the "Sellers") and Avaya

Inc. as purchaser (together with its designees, "Avaya" or the "Purchaser") for the sale of inter

alia certain assets (including the stock of certain subsidiaries of the Debtors) of the Debtors'

Enterprise Solutions Business (as defined below) as described therein as a "stalking-horse"

purchase agreement (as appended hereto as Exhibit A, the "Agreement"), (b) authorizing and

approving the bidding procedures (as appended to the Bidding Procedures Order (as defined

below), the "Bidding Procedures") for the sale of substantially all of the assets (including the

stock of certain subsidiaries of the Debtors) of the Enterprise Solutions Business (as defined

below) of Nortel (collectively, the "Assets"), (c) authorizing and approving the terms and

conditions of the Break-Up Fee and Expense Reimbursement (each as defined below), (d)

approving the form and manner of sale notices (the "Notice Procedures"), (e) approving the

procedures as set forth below for the assumption and assignment of certain contracts and leases

and the assumption and sublease of certain leases (the "Assignment Procedures"), (f) authorizing

the Debtors to file certain documents under seal, and (g) setting the time, date and place of a

hearing (the "Sale Hearing") to consider the sale of certain assets and equity interests relating to

the Debtors' Enterprise Solutions Business (the "Sale Transaction") and the assumption and

assignment, or assumption and sublease, as the case may be, of certain pre-petition executory

contracts and unexpired leases of the Debtors; (ii) authorizing and approving (a) the sale of

2

certain assets (including the stock of certain subsidiaries of the Debtors) of the Debtors'

Enterprise Solutions Business, (b) the assumption and assignment of certain contracts and leases

pursuant to section 365 of the Bankruptcy Code, and (c) the assumption of certain real estate

leases pursuant to section 365 of the Bankruptcy Code, where a portion of the leased property

shall be subleased to the Purchaser in accordance with the terms and conditions of such lease;

and (iii) granting them such other relief as the Court deems just and proper.  In support of the

Motion, the Debtors rely on the declaration of George Riedel (the "Declaration"), attached hereto

as Exhibit B.  In further support of the Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 107(b)(1), 363

and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9014 and 9018 of the Bankruptcy

Rules, and Rules 6004-1 and 9018-1 of the Local Rules.

## Background

**A.      Introduction**

3.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code, except for Nortel Networks (CALA) Inc.

("NN CALA"), which filed its voluntary petition for relief under chapter 11 of the Bankruptcy

Code on July 14, 2009.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.    Also on the Petition Date, the Debtors' ultimate corporate parent NNC, NNI's direct corporate parent NNL (together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court. Ernst & Young Inc., as court-appointed monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. In addition, at 8:00 p.m. (London time) on January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Administrators"). On May 28, 2009, at the request of the Administrators, the Commercial Court of Versailles, France (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel

---

[2]    The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[3]    The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA will continue to operate as a going concern for an initial period of three months.  In accordance with the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA.  On June 8, 2009, Nortel Networks UK Limited ("NNUK") filed petitions in this Court for recognition of the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.  On June 26, 2009, the Court entered an order recognizing the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

6.      On January 15, 2009, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Bankruptcy Rules that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].  On July 17, 2009, this Court entered a further order of joint administration that provided for the joint administration of NN CALA's case with the pre-existing cases of its Debtor-affiliates [D.I. 1098].

7.      On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

**B.      Debtors' Corporate Structure and Business**

8.      A description of the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3].

9.     The Debtors and their affiliates previously sold certain non-core assets related to

their enterprise "Layer 4-7" business to Radware Ltd.  The sale, which was approved by this

Court on March 26, 2009 [D.I. 539] and by the Canadian Court on March 30, 2009, closed on

March 31, 2009.

10.     In addition, the Debtors and certain of their affiliates are in the process of selling

certain assets related to their Carrier Networks ("Carrier") business segment.  The assets

involved in the sale relate to Carrier's 2G/3G mobility networking solutions based on Code

Division Multiple Access (CDMA), and its 4G broadband wireless technology including Long

Term Evolution (LTE), an evolving networking standard for which Nortel has completed early

trials with customers.  On June 19, 2009, the Debtors and their affiliates signed a stalking-horse

asset sale agreement with Nokia Siemens Networks B.V. and filed with this Court Debtors'

Motion for Orders (I)(A) Authorizing Debtors' Entry into the Asset Sale Agreement, (B)

Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up

Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E) Approving the

Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents under

Seal, and (G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the

Sale of Certain Assets of Debtors' CDMA and LTE Business Free and Clear of All Liens,

Claims and Encumbrances, (B) the Assumption and Assignment of Certain Contracts and (C) the

Assumption and Sublease of Certain Leases [D.I. 931], as well as a motion requesting shortened

notice for the bidding procedures hearing associated with that motion.  This Court granted the

motion to shorten notice on June 22, 2009, and a hearing to consider the bidding procedures and

other related relief was held on June 29, 2009.  An order was entered scheduling a public auction

for July 24, 2009 at 9:30 a.m., and a hearing to confirm the final sale for July 28, 2009 at 2:00

p.m.

**C.    Nortel's Enterprise Solutions Business**

11.    Nortel's Enterprise Solutions business unit provides solutions for addressing the

communication needs of large and small businesses globally across a wide variety of industries

and governmental agencies by building new networks and transforming existing networks into

more cost-effective, packet-based networks supporting data, voice and multimedia

communications (the "Enterprise Solutions Business"). In particular, the Enterprise Solutions

Business specializes in providing solutions that allow its customers to integrate and remove

barriers between voice, email, conferencing, video and instant messaging technologies.

12.    Nortel's Enterprise Solutions Business has a global presence with operations and

customers in the United States, Canada, Central and Latin America, Europe, the Middle East,

Africa, and Asia. The Enterprise Solutions Business, including Nortel Government Solutions

Inc., has approximately 7,900 employees, who are located in various locations worldwide.

13.    The environment in which Nortel's Enterprise Solutions Business operates is

highly competitive. About ten years ago, the enterprise solutions industry was comprised of two

kinds of vendors: voice- or data-centric. Voice-focused vendors included Nortel, Avaya,

Siemens and Alcatel, while data-focused vendors included Cisco, 3Com and HP ProCurve. Due

to the convergence of data and voice networking technologies, however, competition in the

global enterprise solutions industry has intensified. Nortel and other telephony-focused vendors

no longer dominate the enterprise solutions market, as data networking-focused vendors (e.g.,

Cisco) have taken steps to improve their strategic position. In order to compete in this industry,

Nortel must continue to make significant investments in research and development and in

building its sales and marketing infrastructure. Simply put, the competition for market share is

fierce, the cost of rapid technological development is steep and therefore the value of scale is substantial in this business.

**D.      Development of a Sale Strategy for the Enterprise Solutions Business**

14.     Until 2008, Nortel's Enterprise Solutions Business was integrated with its other businesses, including its Carrier business. In the summer of 2008, as part of its overall restructuring efforts, Nortel began the separation of the Enterprise Solutions Business into an independent business, an effort that is continuing.

15.     In late 2008, Nortel began to explore the potential sale of the Enterprise Solutions Business. In connection with those efforts, Nortel approached eight parties, including one financial investor and seven strategic buyers. Nortel received six expressions of interest, and three of the interested parties participated in management presentations and due diligence sessions, resulting in the receipt of two non-binding proposals.

16.     The commencement of creditor protection proceedings in the United States, Canada and the United Kingdom temporarily interrupted Nortel's exploration of the potential sale of the Enterprise Solutions Business. After evaluating various potential strategic options for its reorganization, Nortel – in consultation with its advisors, the Committee, the Monitor and the Administrators – determined it is in the best interests of the company to divest its Enterprise Solutions Business in the near term to maximize the value that can be realized from the Assets.

17.     In furtherance of exploring such a sale, in early March 2009, Nortel and its financial advisor engaged in a robust marketing effort, pursuant to which they contacted potential bidders for the Enterprise Solutions Business, including all of the parties that had indicated interest in acquiring the Assets and with whom active discussions took place prior to the filing, and a number of new parties (together, the "Prospective Bidders"). The Prospective Bidders were invited by Nortel to commence (or recommence) their due diligence efforts and were

provided access to key information regarding the Enterprise Solutions Business. Shortly thereafter, the Prospective Bidders carrying out due diligence were invited to attend in-person information sessions with the management of the Enterprise Solutions Business. Nortel (including the Debtors) subsequently invited the Prospective Bidders to submit definitive proposals to acquire the Enterprise Solutions Business.

18.    During the course of this process, the field of Prospective Bidders was narrowed to three prospective stalking horse bidders (the "Bidders") who submitted definitive proposals to acquire the Enterprise Solutions Business. Nortel engaged in further discussions with each of the three Bidders in parallel, and evaluated their bids in light of a number of criteria, such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by each Bidder, the claims likely to be created by such bid in relation to other bids, the counterparties to such transactions, the proposed transaction documentation or terms, the effect of the sale on the value of the ongoing businesses of Nortel (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the sale (including any regulatory approvals required to close the transactions), the assets included or excluded from the bid, the estimated number of in-scope employees to be offered post-closing employment by the Bidder and any proposed measures associated with their continued employment, the transition services required from Nortel post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction. Based upon this evaluation, it was ultimately decided that the Purchaser's bid offered the most advantageous terms and best value.

### Relief Requested

19.    By this Motion, the Debtors seek orders: (i)(a) authorizing the Debtors' entry into the Agreement, (b) authorizing and approving the Bidding Procedures, (c) authorizing and

approving the terms and conditions of the Break-Up Fee and Expense Reimbursement (as

defined below), (d) approving the Notice Procedures, (e) approving the Assignment Procedures,

(f) authorizing the Debtors to file certain documents under seal, and (g) setting the time, date,

and place of the Sale Hearing (such order, substantially in the form attached hereto as Exhibit C,

the "Bidding Procedures Order"); and (ii) authorizing and approving (a) the sale of the Debtors'

rights, title and interests in the Assets (the "Debtors' Assets"), (b) the assumption and assignment

of certain contracts and leases and (c) the assumption and sublease of certain leases (such order,

substantially in the form attached hereto as Exhibit D, the "Sale Order"); and (iii) granting them

such other relief as the Court deems just and proper.

**E.    The Purchase Agreements**

20.    After extensive arm's-length, good faith negotiations among the Sellers and the

Purchaser and their respective advisors, the parties have agreed, among other things, to convey

the Assets and assign the Designated Agreements (as defined below) to the Purchaser in

accordance with the terms and conditions of the Purchase Agreements (as defined below),

subject to the approval of the transaction in a number of the jurisdictions in which the Sellers are

subject to creditor protection proceedings.  The Sellers and the Purchaser have entered into two

separate purchase agreements for the sale of the Assets: (a) the Agreement and (b) that certain

Asset Sale Agreement Relating to the Sale and Purchase of the EMEA Assets among the EMEA

Sellers and the Purchaser, dated as of July 20, 2009 (the "EMEA Agreement" and together with

the Agreement, the "Purchase Agreements").  A copy of the Agreement is attached hereto as

Exhibit A.  The Debtors have determined that the Purchase Agreements represent the best

opportunity for the Debtors to maximize the value of their assets and serve as a basis for

conducting an auction to seek higher and/or better offers. The Purchase Agreements contemplate the sale of the Assets, subject to higher and/or better bids, on the following material terms:[45]

- <u>Purchase Price</u>. At the closing, the Purchaser will pay an amount of $475 million to the Sellers, adjusted based on estimates of, <u>inter alia</u>, inventory and amounts relating to accrued and unused vacations of the employees of the Business, and working capital and net debt of the subsidiaries of the Debtors included in the transaction. These adjustments will not take into account (and therefore the purchase price will not be reduced by) approximately $28 million of liabilities of one of the transferred Companies under a certain lease. After the closing, a further adjustment payment will be made based on differences between the estimated and final amounts of the various adjustments. In addition, depending on the difference between the unaudited 2008 standard margin of the Business communicated to the Purchaser and the audited number subsequently calculated, the purchase price may also be reduced by an amount equal to the Adjustment Payment. The purchase price may also be reduced if the assets of any Seller under the EMEA Agreement are excluded in certain circumstances. Lastly, the purchase price has been effectively reduced by a further $10 million by means of a reduction in the aggregate price to be paid by the Purchaser to the Sellers for services under the Transition Services Agreement. The purchase price adjustments are set forth in the Agreement.

- <u>Certain Fees</u>.

  - <u>Fees Payable by the Sellers</u>.

    - In certain circumstances the Sellers may be required to pay to the Purchaser a break-up fee and/or an expense reimbursement. For more details, please refer to Section G below.

  - <u>Fees Payable by the Purchaser</u>.

    - Upon the termination of the Agreement by the Purchaser before the earlier of (i) the 60th day after the date of the Agreement and (ii) the Bid Deadline (as defined in the Bidding Procedures Order), the Purchaser may be required to pay a cash fee of $100 million (the

---

[4]     The Debtors are not parties to the EMEA Agreement and therefore this Motion does not discuss the terms and conditions of the EMEA Agreement.

[5]     Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement. To the extent that there are inconsistencies between the description of the provisions of the Agreement contained in this Motion and the terms and conditions of the Agreement, the terms and conditions of the Agreement shall control.

"Reverse Termination Fee") to the Sellers. The Reverse Termination Fee may also be payable by the Purchaser upon termination of the Agreement in certain other circumstances, generally involving a failure to obtain antitrust approvals, or certain material intentional uncured breaches by the Purchaser of its representations, warranties, agreements or covenants resulting in a failure to satisfy conditions to the Sellers' obligation to close under the Agreement or the EMEA Agreement, in each case unless:

- the Sellers are in intentional breach of the Agreement or the EMEA Agreement in any material respect which breach:

  - would result in a failure of the conditions to the Purchaser's obligations to close under the Agreement or the EMEA Agreement, and

  - is not cured in the period permitted by the Agreement or EMEA Agreement, or

- the conditions to the Purchaser's obligations to close under the Agreement cannot be satisfied on or before 365 days after the date of the Agreement.

- The Purchaser could also be required to pay a Delay Fee that accrues at a rate of $97,600 per day[6] from the 150th day after the date of the Agreement, if the regulatory approvals are then still pending and the other conditions to Closing are otherwise satisfied, until all regulatory approvals have been obtained or the Agreement is terminated.

- Good Faith Deposit. The Purchaser has delivered to an escrow agent $100 million as a Good Faith Deposit, to be applied against the purchase price, the Reverse Termination Fee, or damages payable by the Purchaser.

- Other Escrow Amounts. The following portions of the purchase price will be placed in escrow at closing:

  - $30 million as security for any payments required upon the final determination of the adjustments to the purchase price,

  - $25 million as security for certain obligations of NNC, NNL and NNI (the "Main Sellers") in relation to the post-closing delivery of certain financial statements and engagement of KPMG in relation thereto,

---

[6]    This is equivalent to 7.5% annual interest on the Base Purchase Price.

- certain amounts as security for payments by Sellers of accrued and unused vacation days for certain transferred employees, and for certain severance and carrying costs incurred with respect to redundancy of transferring employees in certain EMEA jurisdictions, and

- an amount as security for certain French tax obligations.

- <u>Assets and Shares to be Transferred</u>. At the closing, the North American Sellers will transfer, subject to certain exceptions, their rights, title and interests in the Assets. In addition, the Purchaser will acquire all equity interests owned by NNI in Nortel Government Solutions Incorporated and DiamondWare, Ltd. The Purchaser, however, will not acquire any cash or cash equivalents and accounts receivable of the North American Sellers, security deposits provided by the North American Sellers to their contractual counterparties, any assets owned by NN Turkey, the LGN Joint Venture, Uni-Nortel or certain other foreign subsidiaries of NNL or NNI that the Purchaser can elect after signing not to purchase (without adjustments to the purchase price) or, in the case of certain foreign subsidiaries in bankruptcy proceedings that elect not to participate in the transaction (with appropriate adjustments to the purchase price), or any shares owned by the North American Sellers in any entity (including joint ventures) other than the shares of Nortel Government Solutions Incorporated and DiamondWare, Ltd.

- <u>Assumed Liabilities</u>. The liabilities to be assumed by the Purchaser include, among others, (i) liabilities arising after the Closing Date to the extent related to the Acquired Business or the operations or ownership thereof after the closing, (ii) certain liabilities arising from assigned contracts, (iii) certain liabilities relating to intellectual property, (iv) certain tax liabilities, (v) certain liabilities related to employees and employee benefit plans and under employment laws, (vi) certain liabilities relating to certain executory supply purchase orders, and (vii) certain liabilities relating to bids made by any Seller or a contractor team or joint venture in which a Seller is participating, which are capable of acceptance after closing.

- <u>Limitation on Successor Liability</u>. The Agreement requires the entry of a sale order by this Court, containing, among other provisions, a provision regarding limitations on successor liability. In summary, this provision seeks to transfer the Debtors' rights, title and interests in the Assets free and clear of any claims based on theories of successor liability. For more detail, please refer to paragraph Q of the proposed order, which has been attached to this Motion as <u>Exhibit C</u>.

- <u>Sale Free and Clear</u>. The Agreement requires assets to be transferred by the Debtors free and clear of all Interests (as defined below). For more detail, please refer to Section K of this Motion.

- Ancillary Agreements.  Pursuant to the Agreement, on or before the closing, the Purchaser, certain Sellers (or affiliates of Sellers) and certain EMEA Sellers will enter into a number of ancillary agreements dealing with, <u>inter alia</u>, provision of transition services to the Purchaser, licensing of intellectual property, and secondment of certain employees.  In addition, the Main Sellers, the applicable EMEA Sellers and the Purchaser will use reasonable best efforts to negotiate certain contracts in good faith among themselves and/or with third parties, including contract manufacturers, the LGN Joint Venture and Uni-Nortel.

- Closing Conditions:  The obligation of each party to close the Transactions is subject to a number of conditions.  The obligation of the Purchaser to close the Transactions is subject to, among other things, the satisfaction of the following conditions:

  - the accuracy of the Sellers' representations and warranties, except as would not result in a Material Adverse Effect,

  - the performance in all material respects of all material covenants, obligations and agreements required to be performed by the Sellers on or before the closing (except the covenant to deliver certain financial information must be fully performed by the Sellers and the breach of this covenant is not subject to a materiality qualifier),

  - the receipt of all antitrust approvals in a number of jurisdictions, including the United States, Canada and the European Union, and an approval under the Investment Canada Act,

  - the Sale Order and the Canadian Approval and Vesting Order shall have been entered without material modification, unless the Purchaser expressly consented to such modification, which consent shall not be unreasonably withheld and shall not have been stayed, amended or, in certain circumstances, appealed as of the Closing Date,

  - certain termination and similar events have not occurred with respect to the Nortel Networks Retirement Income Plan, unless the Pension Benefit Guaranty Corporation shall have waived its claims against the Purchaser or any of its Affiliates (including the Companies) in relation to any potential liabilities and, if applicable, any lien shall have been released by the Pension Benefit Guaranty Corporation (and the North American Sellers have acknowledged that the Purchaser is entitled to the benefit of this closing condition with respect to the Complaint For Pension Plan Termination dated July 16, 2009 filed by the PBGC in the U.S. District Court for the Middle District of Tennessee (Nashville Division) and the PBGC Notice of Determination addressed to the Retirement Plan Committee of Nortel Networks Retirement Income

14

Plan and any related plan termination or actual or potential Claim, Lien or liability), and

- there can be no pending Action by the UK Pensions Regulator, the PPF, or the Pension Trustees against the Companies (meaning, among other things, the issuance of a warning notice or determination notice in respect of the imposition of a contribution notice or a financial support direction on either of the companies).

In addition, the Purchaser's obligation to close under the Agreement is conditioned upon satisfaction of all conditions to the closing under the EMEA Agreement.

- Termination Rights: The Agreement may be terminated prior to the Closing in a number of instances, including, among others:

  - by the Purchaser and the Main Sellers (as defined below) if the Bidding Procedures Order, Sale Order or certain Canadian approvals have not been entered within a specified period,

  - by the Purchaser at any time until the earlier of (i) the sixtieth (60th) day after the date of the Agreement and (ii) the Bid Deadline (as defined in the Bidding Procedures Order), provided that the Reverse Termination Fee is paid to the Sellers in accordance with the Agreement, and

  - by the Purchaser, if the Adjusted Audited Standard Margin of the Business in 2008 is less than ninety percent (90%) of the Unaudited Standard Margin. (The Unaudited Standard Margin is $1,383.5 million. The Adjusted Audited Standard Margin will be calculated based on audited financial information.)

- Closing Deadlines: If the closing has not taken place within 270 days from the date of the Agreement, the Main Sellers may terminate the agreement. If the closing has not taken place within 365 days from the date of the Agreement, the Purchaser may terminate the agreement.

- Ongoing Covenants and Restrictions: In addition to certain other customary post-closing obligations such as sharing of information and redirection of customers and payments, the Sellers have agreed to, among other things: (i) cooperate with the Purchaser in relation to arrangements regarding non-assignable contracts and bundled contracts during an agreed period after the closing, (ii) sublease certain real estate to the Purchaser, (iii) assume certain non-compete obligations in favor of the Purchaser and (iv) perform certain transition services for the Purchaser.

- <u>Other Significant Provisions</u>:

  - <u>Taxes</u>. The Sellers will bear all taxes relating to the Assets or the Business for all tax periods or portions thereof ending on or before the closing, and the Purchaser will bear all taxes for all tax periods or portions thereof beginning after the closing. The taxes for any straddle period will be apportioned between the Sellers and the Purchaser based on the portion of the period ending on and including the closing date and the portion beginning after the closing date, respectively. The Purchaser will bear all transfer taxes in connection with the Agreement, the transactions contemplated by the Agreement, or the other Transaction Documents. In the event of any withholding taxes applicable to the Purchase Price or the Reverse Termination Fee paid by the Purchaser, the Purchaser will deduct such amount from the payment. The Purchaser is not obliged to compensate the Sellers in respect of the withheld amount. The Purchaser also has the right to make (or direct the Sellers to make) certain tax elections, provided that the Purchaser indemnifies the Sellers for any increased tax liability of the Sellers caused by the elections for a specified period.

  - <u>Competing Transaction</u>. Except during the period from entry of the Bidding Procedures Order until conclusion of the Auction, the Sellers and their affiliates are restricted from soliciting, engaging in discussions with any person (other than the Purchaser) in relation to, and taking certain other actions in furtherance of, any transaction that is alternative to the Sale Transaction governed by the Purchase Agreements.

  - <u>Liability Limitation</u>. The liability of the Purchaser to the Sellers and their affiliates or related parties for any failure of the transactions contemplated by the Purchase Agreements to be consummated or in respect of any liabilities or obligations arising under, or relating to, the Purchase Agreements or the transactions contemplated thereby prior to the closing, including an intentional breach prior to the closing, is limited to (i) a maximum of $200 million (including the Reverse Termination Fee, if payable) or (ii) a maximum of $100 million in the event that (A) at the time of termination the Standard Margin of the Business for a four fiscal quarter measurement period is less than $640 million, (B) the Purchaser is not in a material Intentional Breach of the Purchase Agreements, or (C) the Purchaser terminates the Agreement within the earlier of (x) the 60th day after the date of the Agreement and (y) the Bid Deadline (as defined in the Bidding Procedures Order) and pays the Reverse Termination Fee. The liability of the Sellers and their affiliates to the Purchaser for pre-closing breaches of the Purchase Agreements is limited to the Break-Up Fee and the Expense Reimbursement, when payable.

  - <u>Additional Financial Information</u>. The Main Sellers will be required to provide before and after closing certain financial statements (included

16

audited financial statements) of the Business that the Purchaser may require for the purpose of, inter alia, (i) an exchange offer for outstanding debt securities to be made by the Purchaser or its affiliates, or (ii) any current reports required to be filed by the Purchaser or its affiliates in connection with the acquisition.

- Transition Services. The parties have agreed to a form of Transition Services Agreement, which sets out the general scope of transition services to be provided by certain Sellers and other entities. The parties have agreed to negotiate in good faith and use reasonable efforts expeditiously to refine the description of Included Services[7] and to agree certain Extra Services. The parties have agreed to an arbitration procedure to resolve any disputes regarding the services to be provided or the amount to be billed for such services.

## F.    The Bidding Procedures

21.     In order to ensure that the Sellers receive the maximum value for the Assets, the Purchase Agreements are subject to higher or better offers, and, as such, the Purchase Agreements will serve as the "stalking-horse" bid for the Assets. The Assets may be sold in a single sale to a single purchaser or in parts to several purchasers.

22.     The key provisions of the Bidding Procedures to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities (the "Sale") as set forth in the Purchase Agreements with respect to the Purchaser or, as set forth in the relevant sale agreements with respect to a Successful Bidder (as defined below) (the transactions contemplated by such agreements and any ancillary agreements discussed therein, collectively, the "Transaction") are as follows:[8]

---

[7]      Included Services will exclude any portion of any service that has at no time on or after April 1, 2009 been provided by any North American Seller or any EMEA Seller (or any Affiliate of any of them) nor provided or procured by any North American Seller or any EMEA Seller (or any Affiliate of any of them) from a third party (the services within the General Scope of Services that have been provided either by such a North American Seller or any EMEA Seller (or any Affiliate of any of them) entity or by a third party at any time on or after April 1, 2009.

[8]      To the extent that there are inconsistencies between the description of the provisions of the Bidding Procedures contained in this Motion and the terms and conditions of the Bidding Procedures set forth in Exhibit 1 to the proposed form of Bidding Procedures Order at Exhibit C to this Motion, the terms and conditions of the Bidding

a.      Bid Deadline.  A Qualified Bidder (as defined below) that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"):  (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn:  Gordon A. Davies, Esq., Chief Legal Officer, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile:  (905) 863-8386; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn:  James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile:  (212) 225-3999; (iii) Canadian Debtors' counsel:  Ogilvy Renault LLP, Attn:  Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile:  (416) 216-3930; (iv) Sellers' financial advisors:  Lazard Frères & Co., Attn:  Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile:  (212) 332-1748; (v) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Attn:  Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile:  (212) 872-1002; (vi) financial advisor to the Committee: Jefferies & Company, Inc., Attn:  General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile:  (212) 284-2280; (vii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn:  Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile:  (212) 822-5735; (viii) the Monitor:  Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile:  (416) 943-3300; (ix) the Administrators:  Ernst & Young LLP, Attn:  Stephen Harris, 1 More Place, London SE1 2AF, United Kingdom, Facsimile:  +44 20 7951 9002; and (x) counsel to the Administrators:  Herbert Smith LLP, Attn:  Stephen Gale, Exchange House, Primrose Street, London, EC2A 2HS, Facsimile:  +44 20 7098 4878; so as to be received not later than September 4, 2009 at 12:00 p.m. (ET) by the Sellers (the "Bid Deadline").

b.      Provisions Governing Qualifications of Bidders.  Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court and accepted by the Administrators, for cause shown or, with regard to paragraphs (ii) and (iii) below, as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), prior to the Bid Deadline, in order to participate in the Bidding Process, each person, other than the Purchaser, who wishes to participate in the Bidding Process (a "Potential Bidder") must deliver to the Notice Parties at the addresses provided above:

---

Procedures set forth in Exhibit 1 to the proposed form of Bidding Procedures Order at Exhibit C to this Motion to shall control.

(i)     an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, that shall not be on terms that, in the Sellers' reasonable judgment, are more favorable to the Potential Bidder than the confidentiality agreement executed by the Purchaser and which shall inure to the benefit of any purchaser of the Assets (in the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets and waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transaction it may enter into, to the Notice Parties);

(ii)    current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transaction; and

(iii)   a preliminary (non-binding) written proposal regarding:  (a) the purchase price range (including liabilities to be assumed by the Potential Bidder); (b) any Assets expected to be excluded or any additional assets desired to be included; (c) the structure and financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (d) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (e) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated

19

with the continued employment of all employees who will become employees of the Qualified Bidder; and (f) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Purchase Agreements.

A Potential Bidder that delivers the documents described above, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence with respect to the Assets.

c.    Provisions Governing Qualified Bids. A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(i)    it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Purchase Agreements, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or upon alternative terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholder Group and the Monitor, are no less favorable than the terms and conditions of the Purchase Agreements;

(ii)    it includes a letter stating that the bidder's offer is irrevocable until the selection of the Successful Bidder (as defined below) and, if applicable, the Alternate Bidder (as defined below), provided that if such bidder is selected as

20

the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (a) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (b) (x) with respect to the Successful Bidder only, 180 days from the later of the Sale Hearing and the entry of the Sale Order and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(iii)    it includes duly authorized and executed Purchase Agreements (as modified by the bidder to reflect the terms and conditions of its bid), including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, including, to the extent required by the terms and conditions of such bid, the Local Sale Agreements, the Real Estate Agreements, the Intellectual Property License Agreement, the Transition Services Agreement, the Trademark License Agreement, the Loaned Employee Agreement (each as defined in the Agreement and each as modified by the bidder to reflect the terms and conditions of its bid), the other ancillary agreements as described in the Purchase Agreements and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Purchase Agreements ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the bidder;

(iv)    it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(v)    it is not conditioned on (i) the outcome of unperformed due diligence by the bidder (and includes an acknowledgement and representation that the bidder has had an opportunity to conduct any and all required due diligence regarding the

Assets prior to making its offer) and/or (ii) obtaining financing;

(vi)    it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(vii)    it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Purchase Agreements, <u>plus</u> (a) the amount of the Break-Up Fee and Expense Reimbursement (each as defined in the Purchase Agreements), <u>plus</u> (b) U.S.$4.75 million.

(viii)    it includes an acknowledgment and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreements (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(ix)    it includes an acknowledgement and representation that the bidder: (a) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; and (b) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (c) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(x)    it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from

22

the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(xi)     it is accompanied by a good faith deposit (each, together with the good faith deposit of the Purchaser, a "Good Faith Deposit") in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to $30 million to be dealt with as provided for under "Good Faith Deposit" herein;

(xii)    it (a) contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction(s)) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment and associated with the employment of all employees who will become employees of the Qualified Bidder, and (b) identifies any pension liabilities and assets related to any employees currently covered under any Nortel registered pension or retirement income plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(xiii)   it includes evidence of the Potential Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(xiv)    it contains other information reasonably requested by the Sellers; and

(xv)     it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids, provided that the Sellers in

23

evaluating such bids, may not waive substantial compliance with any items in paragraphs (ii), (iv), (v), (vi), (ix), (x), (xi), (xii), (xiii), (xiv) and (xv) without the consent of the Purchaser, the Committee, the Bondholder Group and the Monitor, and such consent shall not be unreasonably withheld in connection with any bid that (1) would otherwise fully satisfy the requirements of a Qualified Bid hereunder but for a de minimis failure to comply with paragraphs (ii), (iv), (v), (vi), (ix), (x), (xi), (xii), (xiii), (xiv), or (xv) and (2) such noncompliance is cured within 24 hours of the Bid Deadline.  Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Purchase Agreements will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

The Sellers shall deliver copies of any bids deemed to be Qualified Bids to Purchaser in accordance with section 5.1(c) of the Agreement, and notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids no later than three (3) days following the expiration of the Bid Deadline.

d.     Evaluation of Competing Bids.  A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Transaction (including any regulatory approvals required to close the Transaction), the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction(s)) to be offered post-closing employment by the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment of all employees who will become the employees of the Qualified Bidder, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

e.     No Qualified Bids.  If the Sellers do not receive any Qualified Bids other than the Purchase Agreements received from the Purchaser, the Auction shall be cancelled and the U.S. Debtors shall report the same to the Bankruptcy Court, the Canadian Debtors shall report the same to the

Canadian Court and the Monitor and subject to requiring and obtaining approvals of the Bankruptcy Court, the Canadian Court or any other applicable court and satisfaction of the conditions set forth in the Purchase Agreements, the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Purchase Agreements. In addition, if no Qualified Bid is received, the U.S. Debtors reserve the right to request that the Bankruptcy Court advance the date of the Sale Hearing and provide notice of such new date to those parties in interest entitled to notice thereof and the Canadian Debtors reserve the right to file a motion with the Canadian Court seeking the approval of the sale of the Canadian Debtors' rights, title and interests in and to the Assets to the Purchaser. In addition, if approval of any other applicable court is required, the Sellers will as soon as practicable file an appropriate pleading with such court(s) seeking approval of the Transaction.

f.     Auction Process. If the Sellers receive one or more Qualified Bids in addition to the Purchase Agreements, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at 9:30 a.m. on September 11, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned without the prior written consent of the Purchaser, subject to the terms of the Purchase Agreements and the Bidding Procedures Order. Copies of all Qualified Bids shall be delivered to the Committee, the Bondholder Group, the Monitor, the Administrators and the Purchaser at such time that such bid is deemed a Qualified Bid but no later than two (2) Business Days prior to the Auction. The Auction shall run in accordance with the following procedures:

(i)     Only the Sellers, the Purchaser, the Committee, the Bondholder Group, the Monitor and the Administrators (and the advisors to each of the foregoing), any creditor of the North American Sellers and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(ii)     Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(iii)     At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the

25

Auction; <u>provided</u> that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder (as defined below) at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder, the Alternate Bid Expiration Date (each as defined below). At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "<u>Starting Bid</u>") to the Purchaser and <u>all</u> other Qualified Bidders.

(iv)    All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; <u>provided</u> that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(v)    The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (<u>e.g.</u>, the amount of time allotted to make Subsequent Bids) for conducting the Auction, <u>provided</u> that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(vi)    Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "<u>Subsequent Bid</u>") and (ii) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and

the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least U.S. $2.375 million over the Starting Bid or the Leading Bid, as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the Purchase Agreements as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

g.    Selection Of Successful Bid. Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid that is either the Leading Bid or submitted subsequent to and as an improvement to the submission of the Leading Bid (except in the event that there is no Leading Bid, in which case the Qualified Bids to be considered will be the Starting Bid and any bids submitted subsequent and as an improvement to the Starting Bid) on the basis of financial and contractual terms and the factors relevant to the sale process, including, among other things, the proposed revisions to the transaction documents, the effect of the Sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), the counterparties to such transactions, the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, other factors affecting the speed, certainty and value of the Sale (including any regulatory approvals required to close the Transaction), the Assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers to be offered post-closing employment by the Qualified Bidder (save in

27

jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by the Canadian Court and any required approvals of any other applicable court(s) with such Successful Bidder and approval and execution by the Administrators of the relevant Successful Bid transaction documents with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

h.      Closing with Alternative Backup Bidders. If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Sellers shall proceed as set forth in the "No Qualified Bids" section above. If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is legally required, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval is legally required. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful

28

Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court. The Alternate Bid shall remain open until the earlier of (a) eleven (11) days following the entry of the Sale Order or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date"). All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

      i.    <u>Fiduciary Duties</u>. The entirety of the Bidding Procedures are subject to the rights of the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, to revoke the Bidding Procedures, the Bidding Process or the Auction at any time to satisfy their fiduciary duties or the statutory duties or the legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers, provided that such revocation will result in a breach of the Purchase Agreements entitling the Purchaser to such rights as are set forth in the Purchase Agreements in respect of such breach.

## G.    Break-Up Fee and Expense Reimbursement[9][10]

23.    The Purchaser and its advisors have expended, and likely will continue to expend, considerable time, energy, and resources pursuing the purchase of the Assets and the assumption and assignment of the Designated Agreements (as defined below), and have engaged in extended good faith negotiations. The Purchase Agreements are the culmination of these efforts.

24.    In recognition of this expenditure of time, energy, and resources, the Sellers have agreed that if the Purchaser is not the Successful Bidder, the Sellers will, to the extent due under Section 9.2 of the Agreement, pay to the Purchaser: (i) an aggregate cash fee equal to US $14.25

---

[9]    The Debtors are not parties to the EMEA Agreement and therefore this Motion does not discuss the terms and conditions of the EMEA Agreement.

[10]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement. To the extent that there are inconsistencies between the description of the provisions of the Agreement contained in this Motion and the terms and conditions of the Agreement, the terms and conditions of the Agreement shall control.

million minus one-half of any Expense Reimbursement (as defined below) paid under the Agreement (the "Break-Up Fee") and (ii) an aggregate amount in cash equal to the total amount of all reasonable and documented fees, costs and expenses incurred by the Purchaser in connection with the preparation, execution and performance of the Agreement and the transactions contemplated thereby, including all filing and notification fees, and all fees and expenses of the Purchaser's representatives (the "Expense Reimbursement," and together with the Break-Up Fee, the "Bid Protections"), provided that the Expense Reimbursement will be capped at $9.5 million. The North American Sellers shall pay two-thirds (2/3) and the EMEA Debtors shall pay one-third (1/3) of each of the Break-Up Fee and the Expense Reimbursement. The North American Sellers' and the EMEA Debtors' obligations to pay their respective shares of the Break-Up Fee and the Expense Reimbursement pursuant to Section 9.2 of the Agreement shall be several and not joint (but the obligation of the North American Sellers to pay two-thirds (2/3) of each of the Break-Up Fee and Expense Reimbursement shall be joint and several among the North American Sellers and the obligation of the EMEA Debtors to pay one-third (1/3) of each of the Break-Up Fee and Expense Reimbursement shall be joint and several among the EMEA Debtors).

25.    Specifically, the Agreement provides for payment of the Break-Up Fee if (i) the Purchaser has "clean hands,"[11] (ii) an Alternative Transaction[12] is entered into before, on or

---

[11]    The Purchaser will have "clean hands" for this purpose if it is not in breach of the Agreement or the EMEA Agreement, which breach (i) is an Intentional Breach (defined as an action or omission (including a failure to cure circumstances) that the breaching party knows or reasonably should have known is or would result in a breach of the agreement), (ii) would result in a failure to satisfy any condition to the North American Sellers' obligations to close under the Agreement, and (iii) if capable of being cured, has not been cured within the cure period permitted by the Agreement (ranging from five (5) to twenty (20) days after notice of the breach, but ending upon any earlier termination of the Agreement or the EMEA Agreement by the Purchaser).

[12]    "Alternative Transaction" means (A) any of the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation or other similar transaction, of (i) all or a substantial portion of the Acquired Business, or all of the Assets and the EMEA Assets, or a portion of the Assets

within nine months following the termination of the Agreement in one of the circumstances

contemplated in (iii) below and such Alternative Transaction is eventually consummated (and the

Break-Up Fee will be payable only after such consummation), and (iii) any of the following

occurs:

> a.    Sale Approvals (Purchaser): the Purchaser terminates the Agreement on or prior to the fifth (5th) Business Day after entry of the Sale Order or the Canadian Court's approval because the Sale Order and the Canadian Court's approval are not entered within ten (10) Business Days after conclusion of the Auction in the forms attached to the Agreement without modification that is material and adverse to the Purchaser, unless the Purchaser expressly consented to such modification (such consent not to be unreasonably withheld), and an Alternative Transaction (i) has been proposed or re-proposed to the Main Sellers between the date of the Agreement (the "Signing Date") and such termination and (ii) is entered into within sixty (60) days after such termination;

> b.    Sale Approvals (Sellers): the Main Sellers terminate the Agreement on or prior to the fifth (5th) Business Day after entry of the Sale Order or the Canadian Court's approval because the Sale Order and the Canadian Court's approval are not entered within twenty (20) Business Days after conclusion of the Auction in the forms attached to the Agreement without modification that is material and adverse to the Main

---

and/or the EMEA Assets that constitutes a substantial portion of the Assets and the EMEA Assets considered as a whole, in a transaction or a series of transactions with one or more Persons other than the Purchaser and/or its Affiliates or (ii) all or a portion of the Acquired Business or all or a portion of the Assets or the EMEA Assets in a transaction or series of transactions with one or more Persons other than the Purchaser and/or its Affiliates that results or evolves from a Successful Bid, an Alternate Bid or a Qualified Bid (each as defined in the U.S. Bidding Procedures Order) or (B) the retention by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) of all or substantial portion of the Acquired Business, all of the Assets or the EMEA Assets, or a portion of the Assets and/or the EMEA Assets that constitutes a substantial portion of the Assets and the EMEA Assets considered as a whole, pursuant to a plan of reorganization under Section 1129 of the Bankruptcy Code filed or otherwise sponsored by one or more third-party creditors of the Sellers; provided, however, that an "Alternative Transaction" shall not include: (i) except as specified in clause (B) above, the retention of the Business by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings), (ii) the sale, transfer or other disposition, directly or indirectly, of any portion of the Business or the Assets and the EMEA Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers or the Companies, (iii) the sale, assignment, leasing, expiration, termination or other disposition by the Sellers of any real estate or Real Estate Lease, as applicable, not in violation of this Agreement, in connection with the implementation of the Sellers' global real estate strategy and not as part of a sale of a going concern, or (iv) the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the U.S. Bankruptcy Code. For the purpose of this definition, "substantial portion" means more than forty percent (40%) of the Assets and the EMEA Assets (taken as a whole). Terms used in this definition have the meanings assigned to such terms in the Agreement.

Sellers, unless the Main Sellers expressly consented to such modification (such consent not to be unreasonably withheld), and an Alternative Transaction (i) has been proposed or re-proposed to the Main Sellers between the Signing Date and such termination and (ii) is entered into within sixty (60) days after such termination;

c.    Alternative Transaction:  the Agreement is terminated upon or following the entry of an order by this Court or the Canadian Court approving an Alternative Transaction;

d.    Liquidation of Business:  the Agreement is terminated upon or following the sale, transfer or other disposition, directly or indirectly, of any material portion of the Business (as defined in the Agreement) or the Assets to be purchased under the Agreement (the "North American Assets") (other than as a going concern), in connection with the closure, liquidation or winding up of the Business or any of the North American Sellers, Nortel Government Solutions Incorporated, Integrated Information Technology Corporation, AC Technologies, Inc. or DiamondWare Ltd.;

e.    Material Breach by Sellers:  the Purchaser terminates the Agreement as a result of a material breach by the North American Sellers of their representations, warranties, agreements or covenants set forth in the Agreement, which breach would result in a failure of certain conditions to closing set forth in Section 8.1(a) (*Regulatory Approvals*), 8.1(e) (*Satisfaction of Conditions under EMEA Asset Sale Agreement*), 8.1(f) (*Consummation of Closing under EMEA Asset Sale Agreement*), 8.3(a) (*No Breach of Representations and Warranties*) or 8.3(b) (*No Breach of Covenants*) of the Agreement and:

    (i)    is an action or omission (including a failure to cure circumstances) that the breaching party knows or reasonably should have known is or would result in a breach (an "Intentional Breach"); and

    (ii)    if capable of cure, has not been cured within twenty five (25) days of notice;

f.    Not Successful Bidder:  the Purchaser terminates the Agreement if the Purchaser is not selected as the Successful Bidder at the conclusion of the Auction;

g.    Failure to Close:  the Purchaser terminates the Agreement upon any North American Seller's material breach of its obligations to close the transactions governed by the Agreement, which breach (i) is an Intentional Breach and (ii) is not cured within 25 days of notice;

h.    Competing Transaction:  the Purchaser terminates the Agreement (within 30 days of giving the Sellers a written notice of breach) because,

subsequent to the conclusion of the Auction, there is a material breach by the North American Sellers of their covenant not to solicit or take certain other actions in furtherance of a competing transaction involving all or a substantial part of the business and operations of the Business, which breach (i) is an Intentional Breach and (ii) if capable of being cured, has not been cured within five (5) days of written notice;

i.    <u>Auction</u>: the Purchaser terminates the Agreement, upon written notice to the Main Sellers delivered prior to the entry of the Sale Order, because the Auction does not conclude by the later of (x) the forty-fifth (45th) Business Day after the entry of the Bidding Procedures Order and (y) September 15, 2009;

j.    <u>Revocation or Alteration of the Bidding Procedures or Process</u>: the Purchaser terminates the Agreement, upon written notice to the Main Sellers, because of the revocation or alteration of the Bidding Procedures, the Bidding Process or the Auction pursuant to the last paragraph of the section of the Bidding Procedures titled "Reservation of Rights;" or

k.    <u>Termination of EMEA Agreement</u>: the Agreement is terminated as a result of the termination of the EMEA Agreement in circumstances similar (as applied to the EMEA Agreement) to those listed in paragraphs (c), (d) and (e) above.

26.    The Expense Reimbursement is payable if the Purchaser has "clean hands"[13] and either:

a.    in any of the following instances:

(i)    <u>Bidding Process Approvals</u>:  the Agreement is terminated on or prior to the fifth (5th) Business Day after entry of the Bidding Procedures Order or the Canadian Sales Process Order because the Bidding Procedures Order and the Canadian Sales Process Order have not been entered within thirty (30) days from the date of the Agreement in the form of orders attached to the Agreement, without modification that is material and adverse to the terminating Party, unless such Party expressly consented to such modification (such consent not to be unreasonably withheld);

---

[13]    The Purchaser will have "clean hands" for this purpose if it is not in breach of the Agreement or the EMEA Agreement, which breach (i) is an Intentional Breach, (ii) would result in a failure to satisfy any condition to the North American Sellers' obligations to close under the Agreement or the EMEA Sellers' obligations to close under the EMEA Agreement and (iii) if capable of being cured, has not been cured within the cure period permitted by the Agreement (ranging from five (5) to twenty (20) days after notice of the breach, but ending upon any earlier termination of the Agreement or EMEA Agreement by the Purchaser).

(ii)     <u>Sale Approvals</u>:  the Agreement is terminated on or prior to the fifth (5th) Business Day after entry of the Sale Order or the Canadian Approval and Vesting Order because the Sale Order and the Canadian Approval and Vesting Order are not entered within ten (10) Business Days if terminated by the Purchaser or twenty (20) Business Days if terminated by the Main Sellers after the conclusion of the Auction in the form of orders attached to the Agreement, without modification that is material and adverse to the terminating Party, unless such Party expressly consented to such modification (such consent not to be unreasonably withheld);

(iii)    <u>Alternative Transaction</u>:  the Agreement is terminated upon or following the entry of an order by this Court or the Canadian Court approving an Alternative Transaction;

(iv)    <u>Termination of EMEA Agreement</u>:  the Agreement is terminated as a result of a termination of the EMEA Agreement in accordance with its terms in circumstances similar (as applied to the EMEA Agreement) to those listed in paragraphs (i) through (iii) above and paragraphs (v) through (xiii) below;

(v)     <u>Liquidation of Business</u>:  the Agreement is terminated upon or following the sale, transfer or other disposition, directly or indirectly, of any material portion of the Business or the North American Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the North American Sellers or Nortel Government Solutions Incorporated, Integrated Information Technology Corporation, AC Technologies, Inc. or DiamondWare Ltd.;

(vi)    <u>Long-Stop Date</u>:  the Main Sellers terminate the Agreement because the Closing (as defined in the Agreement) does not take place on or prior to the date that is 270 days from the date of the Agreement, or the Purchaser terminates the Agreement because the Closing does not take place on or prior to the date that is 365 days from the Signing Date;

(vii)   <u>Material Breach by Sellers</u>:  the Purchaser terminates the Agreement, upon written notice to the Main Sellers, as a result of a material breach by the North American Sellers of their representations, warranties, agreements or covenants set forth in the Agreement, which breach, if capable of cure, has not been cured within 25 days of written notice

34

from the Purchaser, and which breach would result in a failure of certain conditions to closing set forth in Section 8.1(a) (*Regulatory Approvals*), 8.1(e) (*Satisfaction of Conditions under EMEA Asset Sale Agreement*), 8.1(f) (*Consummation of Closing under EMEA Asset Sale Agreement*), 8.2(a) (*No Breach of Representations and Warranties*) or 8.2(b) (*No Breach of Covenants*) of the Agreement;

(viii)    <u>Not Successful Bidder</u>:  the Purchaser terminates the Agreement because the Purchaser is not selected as the Successful Bidder at the conclusion of the Auction;

(ix)    <u>Auction</u>:  the Purchaser terminates the Agreement, upon written notice to the Main Sellers delivered prior to entry of the Sale Order, because the Auction does not conclude by the later of (x) the forty-fifth (45th) Business Days after the entry of the Bidding Procedures Order and (y) September 15, 2009;

(x)    <u>Failure to Close</u>:  the Purchaser terminates the Agreement upon any North American Seller's material breach of its obligations to close the transactions governed by the Agreement, which breach is not cured within twenty-five (25) days of written notice from the Purchaser;

(xi)    <u>Competing Transaction</u>:  the Purchaser terminates the Agreement (within 30 days of giving the Sellers a written notice of breach) because, (A) on or subsequent to the Signing Date and prior to entry of the Bidding Procedures Order or (B) subsequent to the conclusion of the Auction, there is a material breach by the North American Sellers of their covenant not to solicit or take certain other actions in furtherance of a competing transaction involving all or a substantial portion of the Business, which breach, if capable of being cured, has not been cured within five (5) days of written notice (provided that with respect to a breach occurring in the period contemplated by clause (A), no termination notice shall be given by the Purchaser after the entry of the Bidding Procedures Order); or

(xii)    <u>Standard Margin Deficiency</u>:  the Purchaser terminates the Agreement, upon written notice to the Main Sellers delivered within fifteen (15) days of delivery to the Purchaser of the Audited Financial Statements for fiscal year 2008, because the Adjusted Audited Standard Margin (as defined in the Agreement, and calculated based on the

audited financial statements) for the Business in 2008 is less than 90% of the Unaudited Standard Margin (which is $1,383.5 million); or

(xiii)   Revocation or Alteration of the Bidding Procedures or Process: the Purchaser terminates the Agreement, upon written notice to the Main Sellers, because of the revocation or alteration of the Bidding Procedures, the Bidding Process or the Auction pursuant to the last paragraph of the section of the Bidding Procedures titled "Reservation of Rights;"

b.    the Agreement is terminated on the grounds set forth in (a) above or any other ground permitted by the Agreement and, prior to such termination, the North American Sellers publicly announce:

(i)    the retention of the Business by all or some of the Sellers (or their successor entities) under a stand-alone plan of reorganization approved by this Court or any plan of arrangement approved by the Canadian Court; or

(ii)   that any portion of the Business or the North American Assets and the EMEA Assets will be sold, transferred or otherwise dispose, directly or indirectly, in connection with the closure, liquidation or winding up of the Business or any of the North American Sellers, the EMEA Sellers, Nortel Government Solutions Incorporated, Integrated Information Technology Corporation, AC Technologies, Inc. or DiamondWare Ltd.

The Expense Reimbursement is not payable if the Agreement is terminated by the Main Sellers because the Closing does not take place on or prior to the date that is 270 days from the date of the Agreement, or by the Purchaser because the Closing does not take place on or prior to 365 days from the date of the Agreement, in each case if:

(x) the condition to Closing relating to certain antitrust approvals and approvals under the Investment Canada Act has not been satisfied, and

(y) certain other conditions to the Purchaser's obligations to close under the Agreement have been satisfied, other than any failure to satisfy them as a result of a failure to obtain any mandatory antitrust approvals or a breach by the

36

Purchaser which breach (A) is an Intentional Breach and (B) if capable of being cured, has not been cured within the cure period permitted by the Agreement.[14]

27.    The Sellers have further agreed that their obligation to pay the Break-Up Fee and Expense Reimbursement shall survive termination of the Purchase Agreements, and that the portion of the Break-Up Fee and Expense Reimbursement to be paid by the Debtors shall constitute an administrative expense of the Debtors under sections 503(b) or 507(b) of the Bankruptcy Code.

## H.    The Notice Procedures

28.    The Debtors propose to give notice, immediately after the entry of the Bidding Procedures Order (or as soon thereafter as reasonably practicable), of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing by sending a notice (the "Sale Notice"), substantially in the form attached to this Motion as Exhibit E, to (i) the U.S. Trustee, (ii) counsel to the Purchaser, (iii) counsel to the Committee, (iv) counsel to the Bondholder Group, (v) all entities known to have a claim, lien, interest or encumbrance against the Assets, the Shares, the Assumed and Assigned Contracts and the Assumed and Subleased Real Estate Leases, (vi) all counterparties to the Assumed and Assigned Contracts and Assumed and Subleased Real Estate Leases, (vii) the Monitor, (viii) the Administrators, (ix) the Internal Revenue Service and applicable federal and state taxing authorities, (x) the Department of Justice, (xi) the Pension Benefit Guaranty Corporation and all regulatory authorities of the North American Sellers' pension plans in Canada and the United Kingdom, (xii) each of the entities that had received an invitation from the North American Sellers to acquire or had expressed an interest in acquiring the Assets (which

---

[14]    This cure period ranges from five (5) to twenty (20) days after notice of the breach, but ends upon any earlier termination of the Agreement or EMEA Agreement by the Purchaser.

shall be filed under seal), and (xiii) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002.

29.      In addition, as soon as practicable after entry of the Bidding Procedures Order and the Canadian Bidding Procedures Order (as defined below), but in any event no more than three (3) business days after entry of such orders, the North American Sellers shall publish notice of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing in The Wall Street Journal (National Edition), The Globe & Mail (National Edition), and The Financial Times (International Edition), substantially in the form attached hereto as Exhibit F (the "Publication Notice").

## I.      The Assignment Procedures

30.      To facilitate and effect the sale of the Debtors' Assets, the Debtors seek authorization to assume certain pre-petition executory contracts and unexpired leases of the Debtors exclusively related to the Enterprise Solutions Business (together, the "Enterprise Agreements") and assign or sublease, as the case may be, such agreements to the Purchaser or the Successful Bidder.

31.      The Debtors estimate that the universe of Enterprise Agreements is quite large and may well run into the thousands.  Given the large number of Enterprise Agreements, the parties have not finalized the list of the Enterprise Agreements that are to be assumed by the relevant Debtor and assigned or subleased to the Purchaser as of the Closing Date (as defined in the Agreement) or, in certain cases, after the Closing Date.  Accordingly, the Agreement allows the Purchaser to designate certain of the Enterprise Agreements that will be assigned or subleased to the Purchaser until the applicable Contract Designation Date (as defined in the Agreement), which date may, for a number of Enterprise Agreements, well be after the date of

the Sale Hearing.  This process will allow for the designation of Enterprise Agreements from the Signing Date until after the Closing Date, if necessary.

32.    This transaction will require certain antitrust approvals, including HSR Approval, Competition Act Approval and other Mandatory Antitrust Approvals (each as defined in the Agreement, and collectively, the "Antitrust Approvals").  During the period that the parties are awaiting the Antitrust Approvals and the satisfaction of other conditions set forth in Article VIII of the Agreement, the Debtors and the Purchaser propose to finalize the list of Debtors' Enterprise Agreements that are to be assumed by the relevant Debtor and assigned or subleased to the Purchaser as of the Closing Date (the "Designated Agreements") in accordance with the procedures described below.

33.    In light of the foregoing and the need to coordinate the sale of the Debtors' Assets, the Debtors submit the following procedures (the "Assignment Procedures") for the Court's approval:[15]

        a.    The process for designating Enterprise Agreements for assumption and assignment (or, in the case of certain real estate leases, assumption and sublease in accordance with the terms and conditions of such lease), and the deadline by which such designation must occur, shall be in accordance with Section 2.1.5 of the Agreement.

        b.    For the purposes of these Assignment Procedures, the Designated Agreements are divided into three separate categories:  (A) Designated Agreements in which one or more counterparties is a customer of the relevant Debtor(s) (including Designated SI/SP Contracts) (the "Designated Customer Contracts"); (B) Designated Agreements that are unexpired leases (the "Designated Leases"); and (C) Designated Agreements that are neither Designated Customer Contracts nor Designated Leases (the "Other Designated Contracts").

---

[15]    To the extent that there are inconsistencies between the description of the provisions of the Assignment Procedures contained in this Motion and the terms and conditions of the Assignment Procedures set forth in Exhibit 2 to the proposed form of Bidding Procedures Order at Exhibit C to this Motion, the terms and conditions of the Assignment Procedures set forth in Exhibit 2 to the proposed form of Bidding Procedures Order at Exhibit C to this Motion to shall control.

**NOTICES**

***Designated Customer Contracts – Initial Notices***

c.     After entry of the Bidding Procedures Order, during the Initial Notice Period (as defined below), the Debtors shall serve an individual notice substantially in the form attached hereto as <u>Exhibit G</u> (the "<u>Initial Customer Notice</u>") by first class mail on each counterparty to a Designated Customer Contract (a "<u>Customer Contract Counterparty</u>") (and its attorney, if such attorney has filed a notice of appearance in these chapter 11 proceedings) at the last known address available to the Debtors, where "<u>Initial Notice Period</u>" means the period from the date of entry of the Bidding Procedures Order until fifteen (15) days prior to the Closing Date.

d.     Each Initial Customer Notice shall set forth the following information: (i) the name and address of the Customer Contract Counterparty, (ii) identification of the Designated Customer Contracts, (iii) a description of the Purchaser and a statement as to the Purchaser's ability to perform the Debtors' obligations under the Designated Customer Contracts and (iv) any Cure Amount (as defined below) under each relevant Designated Customer Contract that has resulted from defaults occurring prior to or on the date that is thirty (30) days prior to the date of service of the Initial Customer Notice (the "<u>Interim Cure Amount</u>"), where "<u>Cure Amount</u>" means, with respect to an agreement, any amount required by section 365(b)(1) and Bankruptcy Rule 6006(f) to pay for any actual pecuniary losses that have resulted from any defaults by the relevant Debtor under such agreement.

e.     The Debtors shall file under seal with the Court and deliver a full, alphabetized list of Customer Contract Counterparties, along with an affidavit or declaration confirming that an Initial Customer Notice and a Final Customer Notice (as defined below) have been sent to each Customer Contract Counterparty, to (i) counsel to the Purchaser, (ii) the U.S. Trustee, (iii) the Monitor, (iv) counsel to the Committee and (v) counsel to the Bondholder Group.

***Designated Customer Contracts – Final Notices***

f.     The Debtors shall, no later than fifteen (15) days prior to the Closing Date, serve an individual notice substantially in the form attached hereto as <u>Exhibit H</u> (the "<u>Final Customer Notice</u>") by first class mail on each Customer Contract Counterparty (and its attorney, if such attorney has filed a notice of appearance in these chapter 11 proceedings) at the last known address available to the Debtors. Each Final Customer Notice shall set forth the following information:  (i) the name and address of the Counterparty, (ii) notice of the proposed effective date of the assignment,

(iii) identification of the Designated Customer Contracts and (iv) any Tail Cure Amount for each relevant Designated Customer Contract, where "Tail Cure Amount" means, with respect to an agreement, the Cure Amount that is due under such agreement as a result of defaults occurring after the date set forth in the Initial Notice and until the Closing Date.

### Designated Leases – Notices

g.    Within fifty (50) days from the Signing Date, the Debtors shall serve an individual notice substantially in the form attached hereto as Exhibit I (the "Lease Notice") by first class mail on each counterparty to a Designated Lease (a "Lease Counterparty") (and its attorney, if such attorney has filed a notice of appearance in these chapter 11 proceedings) at the last known address available to the Debtors.

h.    Each Lease Notice shall set forth the following information:  (i) the name and address of the Lease Counterparty, (ii) identification of the Designated Leases, (iii) a description of the Purchaser and a statement as to the Purchaser's ability to perform the Debtors' obligations under the Designated Leases and (iv) any Cure Amount under each relevant Designated Lease.

i.    The Debtors shall file with the Court a full, alphabetized list of Lease Counterparties, along with an affidavit or declaration confirming that a Lease Notice has been sent to each Lease Counterparty.

### Other Designated Contracts – Initial Omnibus Notices

j.    After entry of the Bidding Procedures Order, the Debtors shall, during the Initial Notice Period, file with the Court one or more omnibus notices, each covering no greater than 100 Other Designated Contracts, substantially in the form attached hereto as Exhibit J (the "Initial Omnibus Notice" and together with the Initial Customer Notice, the "Initial Notice"), and serve each omnibus notice on each Counterparty to an Other Designated Contract (an "Other Contract Counterparty," and together with a Customer Contract Counterparty and a Lease Counterparty, a "Counterparty") whose Other Designated Contract appears on such omnibus notice.  The Initial Omnibus Notices will provide inter alia Interim Cure Amounts.

### Other Designated Contracts – Final Omnibus Notices

k.    The Debtors shall, no later than fifteen (15) days prior to the Closing Date, also file with the Court one or more omnibus notices, each covering no greater than 100 Other Designated Contracts, substantially in the form attached hereto as Exhibit K ("Final Omnibus Notice" and together with the Final Customer Notice, the "Final Notice"), and serve each omnibus notice on each Other Contract Counterparty whose Other

Designated Contract appears on such omnibus notice.  The Final Omnibus
Notices will provide inter alia Tail Cure Amounts.

## OBJECTION PROCEDURES

### Initial Objections

l.       To the extent that any Customer Contract Counterparty or Other
Contract Counterparty wishes to object to any matter pertaining to the
proposed assumption and assignment of a Designated Customer Contract
or an Other Designated Contract, including without limitation the adequate
assurance of future performance by the Purchaser under the applicable
Designated Agreement or the Interim Cure Amount, if any, ("Initial Cure
Objection"), then such Counterparty must file a written objection with the
Court no later than ten (10) days following service of the Initial Notice,
and serve notice of such objection on counsel to the Debtors:  Cleary
Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York
10006, Fax:  (212) 225-3999 (Attention:  James L. Bromley and Lisa M.
Schweitzer) and Morris, Nichols, Arsht & Tunnell LLP, 1201 North
Market Street, Wilmington, Delaware 19801, Fax:  (302) 658-3989
(Attention:  Derek C. Abbott).  Copies also must be served
contemporaneously on (a) counsel to the Purchaser:  Ropes & Gray LLP,
1211 Avenue of the Americas, New York, New York 10036, Fax:  (646)
728-1662 (Attention:  Mark I. Bane and Anne H. Pak), (b) counsel to the
Committee:  Akin Gump Strauss Hauer & Feld LLP, One Bryant Park,
New York, New York 10036, Fax:  (212) 872-1002 (Attention:  Fred S.
Hodara, Stephen Kuhn and Kenneth Davis) and Richards, Layton &
Finger, P.A., One Rodney Square, 920 North King Street, Wilmington,
Delaware 19801 (Attention:  Christopher M. Samis), and (c) counsel to the
Bondholder Group:  Milbank, Tweed, Hadley & McCloy, One Chase
Manhattan Plaza, New York, New York 10006, Fax:  (212) 822-5735
(Attention:  Roland Hlawaty).

m.       To the extent that any Customer Contract Counterparty or Other
Contract Counterparty does not timely serve an objection as set forth
above, such Counterparty will be deemed to have (i) consented to the
assumption and assignment of the applicable Designated Agreement; (ii)
agreed that the Purchaser has provided adequate assurance of future
performance within the meaning of Bankruptcy Code section
365(b)(1)(C); (iii) consented to the Interim Cure Amount, if any; and (iv)
agreed that the terms of the Bidding Procedures Order and the Sale Order
shall apply to the assignment, subject **SOLELY** to the resolution of the
Tail Cure Amount, if any.

### Final Objections

n.    To the extent that any Customer Contract Counterparty or Other Contract Counterparty wishes to object to the Tail Cure Amount in the Final Notice, then such Counterparty must file a written objection with the Court ("Final Cure Objection" and together with the Initial Cure Objection and the Lease Cure Objection (as defined below), the "Cure Objection") no later than ten (10) days following service of the Final Notice, and serve notice of such objection on (a) counsel to the Debtors, (b) counsel to the Purchaser, (c) counsel to the Committee and (d) counsel to the Bondholder Group, each at the address set forth above.

o.    To the extent that any Counterparty does not timely serve an objection as set forth directly above, such Counterparty will be deemed to have (i) consented to such Tail Cure Amount, if any, and to the assumption and assignment of the Designated Agreement; (ii) agreed that all defaults under the Designated Agreement arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Purchaser or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the effective date of the assignment, the Designated Agreement shall remain in full force and effect for the benefit of the Purchaser and the Counterparty in accordance with its terms; and (iii) waived any right to terminate the Designated Agreement or designate an early termination date under the applicable Designated Agreement as a result of any default that occurred or was continuing prior to the effective date of the assignment.

### *Lease Objections*

p.    To the extent that any Lease Counterparty wishes to object to any matter pertaining to the proposed assumption and assignment or assumption and sublease of a Designated Lease, including without limitation the adequate assurance of future performance by the Purchaser under the applicable Designated Lease or the Cure Amount, ("Lease Cure Objection"), then such Lease Counterparty must file a written objection with the Court no later than ten (10) days following service of the Lease Notice, and serve notice of such objection on (a) counsel to the Debtors, (b) counsel to the Purchaser, (c) counsel to the Committee and (d) counsel to the Bondholder Group, each at the address set forth above.

q.    To the extent that any Lease Counterparty does not timely serve an objection as set forth above, such Lease Counterparty will be deemed to have (i) consented to the assumption and assignment or assumption and sublease of the applicable Designated Lease; (ii) agreed that the Purchaser has provided adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(1)(C); (iii) consented to the Cure Amount, if any; and (iv) agreed that the terms of the Bidding

Procedures Order and Sale Order shall apply to the assignment or sublease.

## RESOLUTION OF OBJECTIONS

r.      Upon filing of an objection by a Counterparty, the Debtors will initiate a meeting or teleconference with the objecting Counterparty and the Purchaser to consensually resolve any timely served objection.  If the Debtors, the Purchaser and the Counterparty are unable to consensually resolve any timely served objection within fifteen (15) days ("Consensual Resolution Deadline"), the Debtors shall be required to respond to such objection within thirty (30) days after the Consensual Resolution Deadline.

s.      To the extent that an objection by a Counterparty is not resolved prior to the Closing Date, the Debtors, in consultation with the Purchaser, may elect to (i) not assume and assign or assume and sublease such Designated Agreement, (ii) postpone the assumption and assignment or assumption and sublease of such Designated Agreement until the resolution or adjudication of such objection, or (iii) in the case of a Cure Objection, the relevant party responsible for payment of the Cure Amount under Section 2.1.7 of the Agreement[16] shall segregate any disputed Cure Amount pending the resolution or adjudication of any such objection, in which case the Debtors shall be permitted to assume and assign or assume and sublease such Designated Agreement as of the Closing Date.  Any Cure Amounts outstanding on the Closing Date shall be paid to the appropriate Counterparty as a condition subsequent to such assumption and assignment or assumption and sublease by the relevant party responsible for payment of the Cure Amount under Section 2.1.7 of the Agreement.

## RESERVATION OF RIGHTS

t.      The Debtors' decision to assume and assign or assume and sublease the Designated Agreements is subject to Court approval and consummation of the sale of the Enterprise Solutions Business to the Purchaser.  Accordingly, the Debtors shall be deemed to have assumed and assigned or assumed and subleased those Designated Agreements ultimately identified under the Agreement as of and effective only upon the Closing Date.  Absent a closing that includes such Designated

---

[16]      In summary, this Section provides that (i) the Debtors shall pay all Cure Amounts relating to Designated Customer Contracts, (ii) the Purchaser shall pay all Cure Amounts relating to Other Designated Contracts and Designated Leases that are to be assumed and assigned, and (iii) each of the Purchaser and the Debtors shall pay a pro-rata share of all Cure Amounts relating to Designated Leases that are to be assumed and subleased.

Agreements, each of the Designated Agreements shall be deemed neither assumed nor assigned/subleased and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.

u.      The Purchaser shall have no rights in and to a particular Designated Agreement until such time as the particular Designated Agreement is assumed and assigned or assumed and subleased in accordance with the procedures set forth herein.

v.      The Debtors reserve the right to combine any Initial Notice with the corresponding Final Notice in appropriate circumstances.

w.      In the event that the Purchaser is not a Successful Bidder at the Auction, the Debtors reserve the right to modify the Assignment Procedures, subject to approval of this Court.

x.      To the extent required by applicable law, the Debtors reserve the right to file one or more motions to assume and assign or assume and sublease any unexpired leases of the Debtors.

34.      To facilitate the assumption and assignment of the Designated Agreements, the Debtors further request that the Court find the anti-assignment provisions of the Designated Agreements, if any, to be unenforceable under section 365(f) of the Bankruptcy Code.[17]

**J.      Request to Set a Date for the Sale Hearing**

35.      The Debtors intend to present the Successful Bid and the Alternate Bid, if any, for approval by the Court pursuant to the provisions of sections 105, 363 and 365 of the Bankruptcy Code at the Sale Hearing to be scheduled by the Court and currently proposed as September 15, 2009 at 9:00 a.m. (ET).  The Debtors shall be deemed to have accepted a bid only when the

---

[17]      Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease…" 11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

Court has approved the bid at the Sale Hearing.  Upon the failure to consummate a sale of the

Assets after the Sale Hearing because of the occurrence of a breach or default under the terms of

the Successful Bid, the next highest or otherwise best Alternate Bid, if any, as disclosed at the

Sale Hearing, shall be deemed the Successful Bid without further order of the Court, and the

parties shall be authorized to consummate the transaction contemplated by the Alternate Bid.

**K.    Sale Free and Clear of Liens and Claims**

36.    The Debtors have agreed that the conveyance of the Debtors' interest in the

Assets, the Shares, the Assumed and Assigned Contracts and the Assumed and Subleased Real

Estate Leases (the Debtors' interest in such property, the "Transferred Property") in accordance

with the Agreement and Ancillary Agreements will be a legal, valid, and effective transfer of

such Transferred Property, and, to the fullest extent permitted by sections 105, 363(f) and 365 of

the Bankruptcy Code, or other applicable law, vests or will vest the Purchaser with all right, title,

and interest of the Debtors in and to the Transferred Property free and clear of all liens, claims

(as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities,

demands, guarantees, options, rights, restrictions, contractual commitments, rights of first

refusal, rights of setoff, or interests of any kind or nature that have been, are or could be asserted

against the Debtors whether known or unknown, legal or equitable, matured or unmatured,

contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising

prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by

agreement, understanding, law, equity or otherwise (collectively, the "Interests"), including, but

not limited to, (i) those that purport to give to any party a right or option to effect a setoff against

or any forfeiture, modification or termination of the Debtors' interests in the Transferred

Property, or any similar rights, (ii) all Excluded Liabilities, including without limitation, any

liability relating to or arising from any Seller Employee Plans of the Debtors (the "Debtor

Employee Plans"), except as provided in the Agreement, or any tax liability of the Debtors

arising under or out of, in connection with, or in any way relating to the cancellation of debt, (iii)

those arising under all mortgages, deeds of trust, security interests, conditional sale or other title

retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal

or charges of any kind or nature, if any, including, but not limited to, any restriction on the use,

voting, transfer, receipt of income or other exercise of any attributes of ownership, and (iv) those

arising in connection with any agreements, acts, or failures to act, of any of the Debtors or any of

the Debtors' predecessors, affiliates, or representatives including, but not limited to, Interests

arising under any bulk-transfer laws, doctrines of successor liability or similar theories.

Notwithstanding anything else to the contrary set forth in this Motion, the term "Interests" shall

not include any Permitted Encumbrances (as defined below), any Assumed Liabilities (as

defined in the Agreement) and any Liens created by or through the Purchaser or any of its

Affiliates or any license that covers intellectual property included within the Transferred

Property, where "Permitted Encumbrances" shall have the same meaning as set forth in the

Agreement but excluding clauses (i), (ii) and (iv) of such definition.

**L.      Assumption and Assignment or Sublease of the Designated Agreements**

37.      Pursuant to section 365(f) of the Bankruptcy Code, the Debtors seek authorization

and approval to assume and assign or assume and sublease, as the case may be, the Designated

Agreements to the Purchaser notwithstanding any provision to the contrary in the Designated

Agreements, or in applicable non-bankruptcy law, that prohibits, restricts, or conditions the

Debtors' right to assign or sublease.

38.      Upon assumption of the Assumed and Assigned Contracts by the Debtors and

assignment or sublease to the Purchaser, the Designated Agreements shall be deemed valid and

binding, in full force and effect for the benefit of the Purchaser in accordance with their

respective terms, subject to the provisions of the Sale Order.

**M.      Canadian and UK Proceedings**

39.      Once this Court approves the Bidding Procedures and the Agreement, those

documents will be submitted to the Canadian Court for approval (the "Canadian Bidding

Procedures Order"). The final sale and assignment of the Assets also will be submitted for

approval by the Canadian Court. With respect to the Assets owned by the EMEA Debtors, the

Administrators have the power and authority to sell such assets pursuant to the EMEA

Agreement without seeking a separate order from the UK Court.

<strong><u>Basis for Relief</u></strong>

**N.      Sale of the Assets Is a Product of the Debtors' Reasonable Business Judgment**

40.      Section 363(b)(1) of the Bankruptcy Code provides: "[t]he Trustee, after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate." Section 105(a) of the Bankruptcy Code provides in relevant part: "The Court may

issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of this title."

41.      Virtually all courts have held that approval of a proposed sale of assets of a debtor

under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to

the confirmation of a plan of reorganization is appropriate if a court finds that the transaction

represents a reasonable business judgment on the part of the trustee or debtor-in-possession. See

In re Abbotts Dairies of Pa., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124

B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be

considered by a court in determining whether there is a sound business purpose for an asset sale:

"the proportionate value of the asset to the estate as a whole; the amount of elapsed time since

48

the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"); In re Stroud Ford, Inc., 164 B.R. 730, 732 (Bankr. M.D. Pa 1993); Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

42.    The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements:  (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee or the debtor-in-possession has obtained a fair and reasonable price; and (4) good faith.  In re Titusville Country Club, 128 B.R. at 399; In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R. at 335-36; see also Stephens Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.[18]

43.    Additionally, prior to and after enactment of the Bankruptcy Code, courts have permitted a proposed sale of all or substantially all assets of a trustee outside the ordinary course

_____

[18]    Lionel's "sound business purpose test" replaces an older rule that held that sales of substantially all of a debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i.e. when the assets to be sold were "wasting" or perishable.  Lionel, 722 F.2d at 1071.

of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See In re Abbotts Dairies of Pa., Inc., 788 F.2d at 143; In re Lionel Corp., 722 F.2d at 1063 (passim).

44.     The proposed procedures for the sale of the Debtors' interests in the Assets meet the "sound business reason" test. First, sound business purposes justify the sale. The Debtors believe that a prompt sale of the Assets conducted pursuant to the Bidding Procedures presents the best opportunity to realize the maximum value of the Assets for distribution to the Sellers, including the Debtors' estates and their creditors. The Debtors further believe that the benefit to their creditors will be adversely affected absent an immediate sale. See In re Lionel Corp., 722 F.2d at 1071 (of factors for court to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").

45.     The proposed procedures for the sale of the Assets also meet the other factors of the "sound business reason" test. As part of this Motion, the Debtors have sought to establish procedures for notice to creditors and other prospective bidders. Under the circumstances of this case, the Debtors submit that the notice period proposed satisfies the requirements of the Bankruptcy Rules, see Bankruptcy Rule 2002, and provides sufficient time for parties in interest to submit objections to the proposed sale and for bidders to formulate and submit competing proposals.

46.     Finally, the proposed procedures for the sale of the Debtors' Assets, which require the Debtors to consult with the Committee, the Bondholder Group and the Monitor throughout the process, satisfy the good faith requirement of Abbotts Dairies. The Debtors submit that the results of the Auction will be the product of good faith, arm's length negotiations with respect to

the price and other terms of the sale of the Assets between the Sellers (including the Debtors) and highest and best bidder at the conclusion of the Auction.

47.    As set forth above, the Debtors have demonstrated compelling and sound business justifications for authorizing the sale of the Assets, entry into the Agreement as a "stalking-horse" sale agreement and the payment of the Bid Protections under the circumstances, timing, and procedures set forth in the Agreement.  The sale of the Assets pursuant to the Bidding Procedures will afford the Debtors' estates an opportunity to maximize the recoveries to creditors.  Accordingly, the Debtors request that the Court approve the proposed procedures for sale of the Assets to the highest or otherwise best bidder at the Auction and approve the sale presented to the Court at the Sale Hearing and authorize the Debtors to take such other steps as are necessary to consummate the Sale Transaction.

**O.    The Bidding Procedures Are Appropriate Under the Circumstances**

48.    A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business.  11 U.S.C. § 363.  Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case.  See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand); In re Integrated Res., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

49.    The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by

bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate. The Debtors submit that the opportunity for competitive bidding embodied in the Bidding Procedures will generate the highest or otherwise best offer for the Assets and therefore is designed to maximize the value of the Assets.

50.    The Debtors believe that a prompt sale process is the best way to maximize the value of the Debtors' Assets for the benefit of their estates, creditors and other stakeholders. Accordingly, the Debtors have concluded that: (a) a prompt sale of the Assets is the best way to maximize value for these estates, and (b) the proposed Bidding Procedures described herein are fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale of the Assets.

**P.    Provision for Bid Protections in the Form of a Break-Up Fee and Expense Reimbursement Has Become a Recognized and Necessary Practice**

51.    The Debtors have formulated a bidding process that the Debtors believe will induce prospective competing bidders to expend the time, energy and resources necessary to submit a bid, and which the Debtors believe is fair and reasonable and provides a benefit to the Debtors' estates and creditors. The Bidding Procedures and, in particular, the proposed Break-Up Fee and Expense Reimbursement, are reasonable and supported by applicable case law.

52.    The use of bid protections such as these has become an established practice in chapter 11 asset sales involving the sale of significant assets because such bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process. Historically, bankruptcy courts have approved bidding incentives (including bid protections) solely by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the

exercise of honest judgment. See, e.g., In re 995 Fifth Ave. Assocs., 96 B.R. 24, 28 (Bankr.

S.D.N.Y. 1992) (holding that bidding incentives may "be legitimately necessary to convince a

'white knight' to enter the bidding by providing some form of compensation for the risks it is

undertaking") (citation omitted); In re Marrose Corp., Nos. 89 B 12171-12179 (CB), 1992 WL

33848, at *5 (Bankr. S.D.N.Y. 1992) ("[bidding incentives] are meant to compensate the

potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable

offers"). See also In re Integrated Res., 147 B.R. 650, 657-58 (S.D.N.Y. 1992).

53.    The Third Circuit Court of Appeals has clarified the standard for determining the

appropriateness of bidding incentives in the bankruptcy context. In Calpine Corp. v. O'Brien

Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F. 3d 527 (3d Cir. 1999), the Third

Circuit held that even though bidding incentives are measured against a business judgment

standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b)

of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding

incentives such as the Break-Up Fee must provide benefit to a debtor's estate. Id. at 533.

54.    The O'Brien opinion identified at least two instances in which bidding incentives

may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee

promoted more competitive bidding, such as by inducing a bid that otherwise would not have

been made and without which bidding would have been limited." Id. at 537. Second, where the

availability of bidding incentives induced a bidder to research the value of the debtor and submit

a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may

have provided a benefit to the estate by increasing the likelihood that the price at which the

debtor is sold will reflect its true worth." Id.

55.     The bid protections proposed by the Debtors are consistent with the "business judgment rule" and satisfy the Third Circuit's "administrative expense" standard.  At the inception of the marketing process, potential purchasers will be provided with the Purchase Agreements and will be afforded an opportunity to submit their own adaptation of those agreements, marked to show changes necessary to consummate a sale which must be acceptable to the Debtors.  Under the "administrative expense" standard enunciated in O'Brien, as well as the "sound business judgment" standard followed in other jurisdictions, the bid protections proposed by the Debtors, including the Break-Up Fee and the Expense Reimbursement, should be approved as fair and reasonable.  The proposed bid protections are reasonable and generally consistent with the range of bidding protections typically approved by bankruptcy courts in this district.  See, e.g., In re Rouge Indus., Inc., Case No. 03-13272 (Bankr. D. Del. Dec. 3, 2003); In re Ameriserve Food Distrib., Inc., Case No. 00-00358 (Bankr. D. Del. Jan 31, 2000) (court approved break up fee of 3.6% or $4 million in connection with a $110 million sale of assets); In re Fruit of the Loom, Inc., Case No. 99-04497 (Bankr. D. Del. Dec. 29, 1999) (court approved break-up fee of 3.0%, or $25 million in connection with a $835 million sale of business); In re Worldwide Direct, Inc., Case No. 99-108 (Bankr. D. Del. Feb. 26, 1999) (approving break-up fee of 3.1% of the proposed purchase price); In re Montgomery Ward Holding Corp., et al., Case No. 97-1409 (Bankr. D. Del. June 15, 1998) (court approved break-up fee of 2.7% or $3 million in connection with $100 million sale of real estate); In re Medlab, Inc., Case No. 97-1893 (Bankr. D. Del. Apr. 28, 1999) (court approved break-up fee of 3.12% or $250,000 in connection with $8 million sale transaction).

56.     Therefore, the Debtors' payment of that portion of the Bid Protections to be paid by the Debtors under the conditions set forth in the Agreement is (a) an actual and necessary cost

of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code,

(b) of substantial benefit to the Debtors' estates and creditors and all parties in interest herein, (c)

reasonable and appropriate, and (d) necessary to ensure that the Purchaser will continue to

pursue the proposed Purchase Agreements to undertake the sale of the Assets, and therefore

constitute administrative expenses with priority pursuant to Bankruptcy Code sections 503(b) or

507(b).

**Q.     The Purchaser Should be Granted the Protection of Bankruptcy Code Section 363(m)**

57.     As will be set forth in further detail at the Sale Hearing, the Debtors also maintain

that the Purchaser is entitled to the protections afforded by Bankruptcy Code section 363(m).

58.     Specifically, Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

59.     While the Bankruptcy Code does not define "good faith", the Third Circuit in <u>In re Abbotts Dairies of Pennsylvania, Inc.</u>, 788 F.2d 143 (3d Cir. 1986) has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); <u>see generally</u> <u>Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.)</u>, Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding

that party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take

grossly unfair advantage of other bidders"); see also In re Sasson Jeans, Inc., 90 B.R. 608, 610

(S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)); In re

Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case,

concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting In re

Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

60.     As the Debtors will demonstrate at the Sale Hearing, over the last months, the

Debtors have spent a considerable amount of time and resources negotiating the Agreement at

arm's length, with give and take on both sides.  Under the circumstances, this Court should find

that the Purchaser is entitled to all of the protections of Bankruptcy Code section 363(m).

**R.    Privacy Ombudsman**

61.     Under section 363(b)(1) of the Bankruptcy Code, if the sale of a consumer

customer list containing personal information relating to individual persons is inconsistent with

the Debtors consumer privacy policy, section 332 governs the appointment of a consumer

privacy ombudsman.  11 U.S.C. § 363(b)(1).  Here, none of the Debtors' customers that are

subject to the sale of the Debtors' Assets are individuals, and the Debtors do not have a

consumer privacy policy, so section 363(b)(1) does not apply, and a consumer privacy

ombudsman is not required.

**S.    Sale of the Debtors' Assets Should Be Free and Clear of Liens and Claims**

62.     Pursuant to, and to the fullest extent permitted by, section 363(f) of the

Bankruptcy Code, the Debtors seek authority to sell and transfer the Debtors' right, interest and

title in the Assets to the Purchaser or Successful Bidder free and clear of all liens, claims,

encumbrances and other interests, except as set forth in the Agreement, with such liens, claims,

encumbrances and other interests to attach to the proceeds of the sale of the Debtors' Assets,

subject to any rights and defenses of the Debtors and other parties in interest with respect thereto.

Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). See also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the requirements is met).

      63.    With respect to each creditor asserting an Interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied. Those holders of Interests who do not object or who withdraw their objections to the Sale or the Motion will be deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2). Those holders of Interests who do object fall within one or more of the other subsections of Bankruptcy Code section 363(f).

      64.    A sale free and clear of Interests is necessary to maximize the value of the Debtors' Assets. The Purchaser would not have entered into the Agreement and would not consummate the Sale Transaction if the sale of the Debtors' Assets to the Purchaser was not free and clear of all Interests, or if the Purchaser would, or in the future could, be liable for any such

Interests. A sale of the Debtors' Assets other than one free and clear of all Interests would yield

substantially less value for the Debtors' estates, with less certainty than the Sale Transaction.

Therefore, the Sale Transaction contemplated by the Agreement is in the best interests of the

Debtors, their estates and creditors, and all other parties in interest. A sale free and clear of

Interests is particularly appropriate under the circumstances because any Interest in, to or against

the Debtors' right, interest and title in the Assets that exists immediately prior to the closing of

any sales will attach to the sale proceeds allocated to the Debtors with the same validity, priority,

force and effect as it had at such time, subject to the rights and defenses of the Debtors or any

party in interest. The Debtors submit that holders of Interests, if any, will be adequately

protected by the availability of the proceeds of the sale to satisfy their Interests.

**T.     Notice of the Proposed Sale Is Reasonable Under the Circumstances**

65.     The Debtors submit that the Sale Notice as set forth above, along with the

Publication Notice in The Wall Street Journal (National Edition), The Globe & Mail (National

Edition), and The Financial Times (International Edition), is reasonable and appropriate and will

be adequate to ensure that all interested parties have the opportunity to bid for the Assets, and/or

to object to the proposed sale of the Debtors' Assets.

**U.     The Assumption and Assignment or Assumption and Sublease of the Designated
        Agreements Should Be Authorized**

66.     Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval,

may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C.

§ 365(a). Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an

executory contract of a debtor. This subsection provides:

> (b) (1)     If there has been a default in an executory
> contract or unexpired lease of the debtor, the trustee may not
> assume such contract or lease unless, at the time of assumption of
> such contract or lease, the trustee -

> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default;

> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

> (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).  Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if --

> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

67.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

68.    Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from

debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

69.     To the extent any defaults exist under any Designated Agreement, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment or assumption and sublease.  If necessary, the Debtors will submit facts prior to or at the Sale Hearing to show the financial credibility of the Purchaser or Successful Bidder and willingness and ability to perform under the Designated Agreements.  The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Purchaser to provide adequate assurance of future performance under the Designated Agreements, as required under section 365(b)(1)(C) of the Bankruptcy Code.

70.     In addition, the Debtors submit that it is an exercise of their sound business judgment to assume and assign or assume and sublease, as the case may be, the Designated Agreements to the Purchaser in connection with the consummation of the Sale Transaction, and (i) the assumption and assignment of Assumed and Assigned Contracts and (ii) the assumption of the Assumed and Subleased Real Estate Leases and the sublease of the same to the Purchaser are in the best interests of the Debtors, their estates, their creditors, and all parties in interest.  The Assumed and Assigned Contracts being assigned to the Purchaser and Assumed and Subleased Real Estate Leases being assumed by the Debtors and subleased to the Purchaser are an integral part of the Debtors' Assets being acquired by the Purchaser, and accordingly, such assumption, and assignment of Assumed and Assigned Contracts and such assumption and sublease of the Assumed and Subleased Real Estate Leases are reasonable and enhance the value of the Debtors' estates.  The Court should therefore authorize the Debtors to (i) assume and assign the Assumed

and Assigned Contracts and (ii) assume the Assumed and Subleased Real Estate Leases and

sublease a portion of each such Assumed and Subleased Real Estate Lease in accordance with

the terms of such lease.

**V.    Information Regarding the Debtors' Customers And Certain Parties Interested In Purchasing The Debtors' Assets Is Confidential Commercial Information and Should Be Filed Under Seal**

71.    The Debtors propose to file the lists of Designated Customer Contracts to be

assumed and assigned under seal and to serve individualized notices of the assignment to the

relevant Counterparties.  The Debtors also propose to file those portions of the relevant

certificates of service under seal that contain information regarding each of the entities that had

received an invitation from the Sellers to acquire or had previously expressed an interest in

acquiring the Assets.

72.    The relief requested by the Debtors is authorized under the Bankruptcy Code.

Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to issue

orders to protect a party's confidential, commercial or proprietary information:

> On request of a party in interest, the bankruptcy court shall . . .
> protect an entity with respect to a trade secret or confidential
> research, development, or commercial information . . . .

11 U.S.C. § 107(b).

73.    Furthermore, Bankruptcy Rule 9018 defines the procedure by which a party may

move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court
> may make any order which justice requires . . . to protect the estate
> or any entity in respect of a trade secret or other confidential
> research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018.

74.     This Court has defined "commercial information" in the context of section 107(b) as follows:

> Commercial information is information which would result in 'an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'

In re Alterra Healthcare Corp., 353 B.R. 66, 75-76 (Bankr. D. Del. 2006) (citing In re Orion Pictures Corp., 21 F.3d 24, 27-28 (2d Cir. 1994)).  This Court has also explained that section 107(b)'s exception to usual public disclosure mandated by section 107(a) is "intended to avoid 'affording an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'"  In re MUMA Services Inc., 279 B.R. 478, 484 (Bankr. D. Del. 2002) (citing In re Itel Corp., 17 B.R. 942, 944 (B.A.P. 9th Cir. 1982)).

75.     Since information related to the Designated Customer Contracts is "commercial information" within the ambit of section 107, the Court should enter an order permitting the Debtors to file under seal all confidential information related to the Designated Customer Contracts.

76.     The identities of Customer Contract Counterparties constitute confidential commercial information because they represent a significant aspect of the value of the Enterprise Solutions Business and the Debtors' Assets.  Access to the list of Customer Contract Counterparties absent appropriate confidentiality restrictions would entail releasing confidential information of critical value not only to any prospective purchaser of the Designated Customer Contracts but also to the Debtors' other businesses.  Therefore, it is critical to the preservation of the value of the Debtors' estate that the Court allow for this confidential information to be filed under seal.

77.     The identities of each of the entities that had received an invitation from the Sellers to acquire or had previously expressed an interest in acquiring the Assets also falls within

section 107(b) of the Bankruptcy Code.  In order to fall within section 107(b) of the Bankruptcy

Code, the information to be sealed must be "confidential" and "commercial."  See In re Orion

Pictures Corp., 21 F.3d 24, 27 (2d Cir. 1994).  The identities of potential bidders for the Nortel's

Enterprise Solutions Business clearly satisfies both of these requirements.  In addition, it also

safeguards against any attempts of collusion by potential buyers of the Nortel's Enterprise

Solutions Business. As such, the Debtors respectfully submit that the Court permit the Debtors to

file their certificate of service listing the names and addresses of such parties under seal.

**W.  Waiver of Bankruptcy Rule 6006(f)(6) with Respect To The Designated Customer Contracts**

78.     Bankruptcy Rule 6006(f)(6) requires that an omnibus motion to reject, assume

or assign multiple executory contracts or unexpired leases "be limited to no more than 100

executory contracts or unexpired leases."  With regards to the Designated Customer Contracts

and the Designated Leases, the Debtors request that the Court waive the provision in

Bankruptcy Rule 6006(f)(6) limiting the number of executory contracts and unexpired leases

that may be incorporated into one omnibus motion.  Rule 6006(f)(6) seeks "to help the other

parties to the contracts locate their information in the midst of the omnibus motion."  10 Collier

on Bankruptcy ¶ 6006.05 (15th ed. 1999).  Because the Debtors propose to send an individual

notice to each Counterparty to the Designated Customer Contracts and the Designated Leases,

the purpose of the rule will be satisfied without needlessly filing multiple motions with the

Court.

**X.  Waiver of Automatic Ten-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)**

79.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all

orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are

automatically stayed for ten days after entry of the order.  Similarly, under Bankruptcy Rule

6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or

unexpired leases are automatically stayed for ten days after entry of the order.  The purpose of

Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to

request a stay pending appeal before the order can be implemented.  <u>See</u> Advisory Committee

Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

80.    Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee

Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day

stay period, commentators agree that the 10-day stay period should be eliminated to allow a sale

or other transaction to close immediately where there has been no objection to the procedure.

<u>See</u> <u>generally</u> 10 <u>Collier on Bankruptcy</u> ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection

is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay

may be reduced to the amount of time necessary to file such appeal.  <u>Id.</u>

81.    Because of the potentially diminishing value of the Assets, the Debtors need the

flexibility to close this sale promptly after all closing conditions have been met or waived.

While the Purchaser likely will not be able to close within 10 days of entry of the Sale Order, it

is quite possible that another bidder may condition its bid on the ability to close promptly.  Thus,

in an excess of caution, the Debtors submit that waiver of any applicable stays is appropriate in

this circumstance.

### <u>Notice</u>

82.    Notice of the Motion has been given via facsimile, electronic transmission, hand

delivery or overnight mail to (i) counsel to the Purchaser; (ii) the U.S. Trustee; (iii) the Monitor;

(iv) counsel to the Committee; (v) counsel to the Bondholder Group; (vi) the Department of

Justice; and (vii) the general service list established in these chapter 11 cases pursuant to

Bankruptcy Rule 2002.  The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

83.    No prior request for the relief sought herein has been made to this or any other court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Debtors respectfully request that this Court (i) grant this

Motion and the relief requested herein; (ii) enter the proposed orders attached hereto; and

(iii) grant such other relief as it deems just and proper.

Dated:  July 20, 2009
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (No. 5125)
Lisa M. Schweitzer (No. 1033)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*