**Exhibit B**

**Declaration of George Riedel**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------X
: 
*In re* : Chapter 11
:
Nortel Networks Inc., *et al.*,[1] : Case No. 09-10138 (KG)
:
                    Debtors. : Jointly Administered
:
:
------------------------------------------------------------X

**DECLARATION OF GEORGE RIEDEL IN SUPPORT OF DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING DEBTORS' ENTRY INTO THE ASSET AND SHARE SALE AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES, (C) AUTHORIZING AND APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (D) APPROVING THE NOTICE PROCEDURES, (E) APPROVING THE ASSUMPTION AND ASSIGNMENT PROCEDURES, (F) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL, AND (G) SETTING A DATE FOR THE SALE HEARING, AND (II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF, AND EQUITY INTERESTS IN, DEBTORS' ENTERPRISE SOLUTIONS BUSINESS, (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES AND (C) THE ASSUMPTION AND SUBLEASE OF CERTAIN LEASES**

I, George Riedel, declare under penalty of perjury as follows:

1. I am Chief Strategy Officer of Nortel Networks Corporation ("NNC") and Nortel Networks Limited ("NNL"), direct corporate parent of Nortel Networks, Inc. ("NNI" and, together with the other above-captioned debtors, the "Debtors" or the "U.S. Debtors" and,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

together with NNL and NNC and their other affiliates, "Nortel"). I have held these positions since February 2006.

2. I submit this declaration in support of the Debtors' motion (the "Motion")[2] for orders (i)(a) approving the Debtors' entry into that certain Asset and Share Sale Agreement dated as of July 20, 2009 among NNC, NNL, NNI and certain other entities identified therein as Sellers (the "North American Sellers"), certain entities defined therein as EMEA Sellers (the "EMEA Sellers") and Avaya Inc. as purchaser (together with its designees, "Avaya" or the "Purchaser") for the sale of inter alia certain assets (including the stock of certain subsidiaries of the Debtors) of the Debtors' Enterprise Solutions Business (as defined below) as described therein as a "stalking-horse" purchase agreement (as appended to the Motion as Exhibit A, the "Agreement"), (b) authorizing and approving the bidding procedures (as appended to the Bidding Procedures Order (as defined below), the "Bidding Procedures") for the sale of substantially all of the assets (including the stock of certain subsidiaries) of the Enterprise Solutions Business (as defined below) of Nortel (collectively, the "Assets"), (c) authorizing and approving the terms and conditions of the Break-Up Fee and Expense Reimbursement (each as defined in the Motion), (d) approving the form and manner of sale notices (the "Notice Procedures"), (e) approving the procedures as set forth below for the assumption and assignment of certain contracts and leases and the assumption and sublease of certain leases (the "Assignment Procedures"), (f) authorizing the Debtors to file certain documents under seal, and (g) setting the time, date and place of a hearing (the "Sale Hearing") to consider the sale of certain assets and equity interests relating to the Debtors' Enterprise Solutions Business (the "Sale Transaction") and the assumption and assignment, or assumption and sublease, as the case

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

2

may be, of certain pre-petition executory contracts and unexpired leases of the Debtors, and (ii) authorizing and approving (a) the sale of certain assets (including the stock of certain subsidiaries of the Debtors) of the Debtors' Enterprise Solutions Business, (b) the assumption and assignment of certain contracts and leases pursuant to section 365 of the Bankruptcy Code, and (c) the assumption certain real estate leases pursuant to section 365 of the Bankruptcy Code, where a portion of the leased property shall be subleased to the Purchaser in accordance with the terms and conditions of such lease; and (iii) granting them such other relief as the Court deems just and proper. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals, or learned from my review of relevant documents or upon my opinion based on my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this declaration.

3. For several months preceding the commencement of these chapter 11 proceedings on January 14, 2009, I participated in or was informed of Nortel's intention and plan to sell substantially all of the assets of Nortel's Enterprise Solutions Business. Such Assets have since become the subject of the Agreement, and the EMEA Agreement among the EMEA Sellers and the Purchaser, dated as of July 20, 2009.

4. Nortel's Enterprise Solutions business unit provides solutions for addressing the communication needs of large and small businesses globally across a wide variety of industries and Government agencies by building new networks and transforming existing networks into more cost-effective, packet-based networks supporting data, voice and multimedia communications (the "<u>Enterprise Solutions Business</u>"). In particular, the Enterprise Solutions

Business specializes in providing solutions that allow its customers to integrate and remove barriers between voice, email, conferencing, video and instant messaging technologies.

5. Nortel's Enterprise Solutions Business has a global presence with operations and customers in the United States, Canada, Central and Latin America, Europe, the Middle East, Africa, and Asia. The Enterprise Solutions Business, including Nortel Government Solutions Inc., has approximately 7,900 employees, who are located in various locations worldwide.

6. The environment in which Nortel's Enterprise Solutions Business operates is highly competitive. About ten years ago, the enterprise solutions industry was comprised of two kinds of vendors: voice- or data-centric. Voice-focused vendors included Nortel, Avaya, Siemens and Alcatel, while data-focused vendors included Cisco, 3Com and HP ProCurve. Due to the convergence of data and voice networking technologies, however, competition in the global enterprise solutions industry has intensified. Nortel and other telephony-focused vendors no longer dominate the enterprise solutions market, as data networking-focused vendors (e.g., Cisco) have taken steps to improve their strategic position. In order to compete in this industry, Nortel must continue to make significant investments in research and development and in building its sales and marketing infrastructure. Simply put, the competition for market share is fierce, the cost of rapid technological development is steep and therefore the value of scale is substantial in this business.

7. While Nortel believes significant value exists in its Enterprise Solutions Business, Nortel is experiencing significant pressure on its businesses and facing customer demands on its cash resources, globally as well as on a regional basis. As a result, Nortel has to make difficult decisions in respect of product development across many product lines and businesses.

8. In late 2008, Nortel began to explore the potential sale of the Enterprise Solutions Business. In connection with those efforts, Nortel approached eight parties, including one financial investor and seven strategic buyers. Nortel received six expressions of interest, and three of the interested parties participated in management presentations and due diligence sessions, resulting in the receipt of two non-binding proposals.

9. The commencement of creditor protection proceedings in the United States, Canada and the United Kingdom temporarily interrupted Nortel's exploration of the potential sale of the Enterprise Solutions Business. After evaluating various potential strategic options for its reorganization, Nortel – in consultation with its advisors, the Committee, the Monitor and the Administrators – determined it is in the best interests of the company to divest its Enterprise Solutions Business in the near term to maximize the value that can be realized from the Assets.

10. In furtherance of exploring such a sale, in early March 2009, Nortel and its financial advisor engaged in a robust marketing effort, pursuant to which they contacted potential bidders for the Enterprise Solutions Business, including all of the parties that had indicated interest in acquiring the Assets and with whom active discussions took place prior to the filing, and a number of new parties (together, the "Prospective Bidders"). The Prospective Bidders were invited by Nortel to commence (or recommence) their due diligence efforts and were provided access to key information regarding the Enterprise Solutions Business. Shortly thereafter, the Prospective Bidders carrying out due diligence were invited to attend in-person information sessions with the management of the Enterprise Solutions Business. Nortel (including the Debtors) subsequently invited the Prospective Bidders to submit definitive proposals to acquire the Enterprise Solutions Business.

11. During the course of this process, the field of Prospective Bidders was narrowed to three prospective stalking horse bidders (the "Bidders") who submitted definitive proposals to acquire the Enterprise Solutions Business. Nortel engaged in further discussions with each of the three Bidders in parallel, and evaluated their bids in light of a number of criteria, such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by each Bidder, the claims likely to be created by such bid in relation to other bids, the counterparties to such transactions, the proposed transaction documentation or terms, the effect of the sale on the value of the ongoing businesses of Nortel (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the sale (including any regulatory approvals required to close the transactions), the assets included or excluded from the bid, the estimated number of in-scope employees to be offered post-closing employment by the Bidder and any proposed measures associated with their continued employment, the transition services required from Nortel post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction. Based upon this evaluation, it was ultimately decided that the Purchaser's bid offered the most advantageous terms and best value for Nortel as a whole and the Debtors in particular.

12. Some of the most valuable assets involved in the proposed transaction are the established relationships that the Debtors maintain with thousands of customers with whom it has entered into the contracts at issue in the Motion, in addition to other contracts related to the Assets but not at issue in the Motion. These contracts are valuable not only in terms of current revenue streams, but also for the potential they represent for future sales, as technology advances and equipment comes due for replacement.

13. I believe, based on the Debtors' long-term consideration of potential transactions involving the Enterprise Solutions Business and after re-canvassing the marketplace since the commencement of these chapter 11 cases, that the proposed transaction with the Purchaser represents the highest and best proposal available for the Assets, subject to the receipt of a better bid through the auction process contemplated in the Motion.

14. The potential purchase price that could be realized through a sale of the Assets is likely to decline over time if the Assets remain unsold. While it is clear that the Assets have significant value, the full value of the Assets may not be realized if a sale is not consummated quickly.

15. As part of the Motion, the Debtors seek authority to file certain notices identifying their Customer Contracts under seal. A significant aspect of the value of the Enterprise Solutions Business and the Assets is the established relationships the Debtors maintain with hundreds of customers with whom they have entered into the contracts at issue in the Motion, in addition to other contracts related to the Assets but not at issue in the Motion. These Customer Contracts are of critical value not only to any prospective purchaser of the Customer Contracts but also to the Debtors' other businesses.

16. If a list of counterparties to the Debtors' Customer Contracts were to be made publicly available, I believe that the value of the Assets would decline further, and as a result, the Purchaser may become less likely to consummate the transaction.

17. In addition, publicizing such a list would disclose confidential proprietary information enabling competitors of the Debtors to solicit such customers for the sale of competing products and services, which would be detrimental to the preservation of the value of the Debtors' estates.

18. Accordingly, I believe the best interests of the Debtors and their creditors require that the sale of the Assets and contracts be completed as expeditiously as possible, and that the Court approve procedures by which the sale can be carried out without publicly divulging the names of the counterparties to the Customer Contracts.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: July 20, 2009
New York, NY

_____
George Riedel

8