## Exhibit C

**Proposed Form of Bidding Procedures Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

----------------------------------------------------------X
                                        :
*In re*                                 :    Chapter 11
                                        :
Nortel Networks Inc., *et al.*,[1]      :    Case No. 09-10138 (KG)
                                        :
                        Debtors.        :    Jointly Administered
                                        :
                                        :
                                        :
----------------------------------------------------------X

**ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363 AND 365
(A) AUTHORIZING DEBTORS' ENTRY INTO THE ASSET AND SHARE SALE
AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING
PROCEDURES, (C) AUTHORIZING AND APPROVING A BREAK-UP FEE
AND EXPENSE REIMBURSEMENT, (D) APPROVING THE NOTICE
PROCEDURES, (E) APPROVING THE ASSUMPTION AND ASSIGNMENT
PROCEDURES, (F) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS
UNDER SEAL, AND (G) SETTING A DATE FOR THE SALE HEARING**

Upon the motion, dated July 20, 2009, of Nortel Networks Inc. ("NNI") and certain of its

affiliates, as debtors and debtors in possession (collectively, the "Debtors") for orders pursuant to

sections 105, 107(b)(1), 363 and 365 of chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 6004, 6006, 9014 and 9018 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 9018-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules"), as more fully described in the Motion, (I)(A)

Authorizing Debtors' Entry into the Asset and Share Sale Agreement, (B) Authorizing and

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

Approving the Bidding Procedures,[2] (C) Authorizing and Approving a Break-Up Fee and

Expense Reimbursement, (D) Approving the Notice Procedures, (E) Approving the Assumption

and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under Seal, and

(G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of

Certain Assets of, and Equity Interests in, Debtors' Enterprise Solutions Business, (B) the

Assumption and Assignment of Certain Contracts and Leases and (C) the Assumption and

Sublease of Certain Leases [D.I. [●]] (the "Motion"); and the Court having reviewed the Motion;

and the Court having determined that the relief requested in the Motion is in the best interests of

the Debtors, their estates, their creditors and other parties in interest; and it appearing that proper

and adequate notice of the Motion has been given and that no other or further notice is necessary;

and a hearing having been held on [August 4], 2009 (the "Hearing"); and upon the evidence

adduced at, the arguments of counsel at, and the entire record of the Hearing; and after due

deliberation thereon; [and the objections filed having been considered;] and good and sufficient

cause appearing therefore, it is hereby

**FOUND AND DETERMINED THAT:**

A.     The court has jurisdiction over the Motion pursuant to 28 U.S.C. § 157 and 1334, and this

       matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue of these cases

       and the Motion in this district is proper under 28 U.S.C. § 1408 and 1409.

B.     The statutory and legal predicates for the relief requested in the Motion are Bankruptcy

       Code sections 105, 107(b)(1), 363 and 365, Bankruptcy Rules 6004, 6006, 9014 and

       9018, and Local Rules 6004-1 and 9018-1.  Pursuant to Bankruptcy Rule 7052, findings

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.

C.  Good and sufficient notice of the relief granted by this Order has been given and no further notice is required.  A reasonable opportunity to object or be heard regarding the relief granted by this Order (including, without limitation, with respect to the proposed Bidding Procedures and Bid Protections, as defined below) has been afforded to those parties entitled to notice pursuant to Local Rule 2002-1(b).

D.  The Debtors' proposed sale notice, substantially in the form attached to the Motion as Exhibit E (the "Sale Notice"), and the Debtors' proposed publication notice, substantially in the form attached to the Motion as Exhibit F (the "Publication Notice"), are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Auction and the Sale Hearing, and no other or further notice is required.

E.  The Bidding Procedures, substantially in the form attached hereto as Exhibit 1, are fair, reasonable and appropriate, and are designed to maximize recovery with respect to the sale of the Assets.

F.  The Debtors have demonstrated compelling and sound business justifications for authorizing the sale of the Debtors' Assets, entry into the Asset and Share Sale Agreement (the "Agreement") as a "stalking horse" sale agreement and the payment of the Bid Protections (as defined below) under the circumstances, timing, and procedures set forth herein, in the Motion and in the Agreement.

G.  Entry into the Agreement with Avaya Inc. (the "Purchaser"), a copy of which is attached to the Motion as Exhibit A, as a "stalking-horse" sale agreement is in the best interest of

3

the Debtors and the Debtors' estates and creditors.  The Agreement, along with the EMEA Agreement, will enable the Debtors to secure an adequate floor for the Auction and will provide a clear benefit to the Debtors' estates.

**H.**    The Break-up Fee and Expense Reimbursement (each as defined below) are fair and reasonable, and provide a benefit to the Debtors' estates and creditors.

**I.**    The Debtors' payment of the Bid Protections is, to the extent due and owed by the Debtors under Section 9.2 of the Agreement, under the conditions set forth in, and in accordance with the terms of, the Agreement, the Motion and this Order, (a) an actual and necessary cost of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtors' estates and creditors and all parties in interest herein, (c) reasonable and appropriate, and (d) necessary to ensure that the Purchaser will continue to pursue the proposed Agreement to undertake the sale of the Debtors' Assets.

**J.**    The entry of this Order is in the best interests of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and it is therefore

**ORDERED, ADJUDGED AND DECREED THAT:**

1.    Those portions of the Motion seeking approval of the Debtors' entry into the Agreement, the Bidding Procedures, the Bid Protections, the Notice Procedures, the Assignment Procedures, authorizing the Debtors to file certain documents under seal, and setting the time, date and place of the Sale Hearing are GRANTED.

2.    Except as expressly provided herein, nothing herein shall be construed as a determination of the rights of any party in interest in these chapter 11 cases.

4

## The Bidding Procedures

3.      The Bidding Procedures attached hereto as <u>Exhibit 1</u> are hereby APPROVED.

Subject to the approval of the Bidding Procedures by the Ontario Superior Court of Justice in the

Canadian Proceedings regarding the Canadian Debtors, the Debtors are hereby authorized to

conduct a sale by auction of the Assets pursuant to the Bidding Procedures and the terms of this

Order.

4.      The Purchaser shall be deemed a Qualified Bidder pursuant to the Bidding

Procedures for all purposes.

5.      The Bidding Procedures shall apply to Qualified Bidders, the conduct of the sale

of the Assets and the Auction.

## The Assignment Procedures

6.      The Assignment Procedures attached hereto as <u>Exhibit 2</u> are hereby authorized,

approved and made part of this Order as if fully set forth herein.

7.      The Court recognizes that the identities of the Customer Contract Counterparties

(as defined in the Motion) and any affidavits of service that identify such parties constitute

confidential commercial information, and therefore authorizes that any lists disclosing the

identities of the Customer Contract Counterparties and affidavits to be filed in connection with

the Motion and the procedures approved herein may be filed under seal.

8.      The Debtors shall provide unredacted lists of Designated Customer Contracts and

affidavits of service that identify the Debtors' customers to the Clerk's Office of the United

States Bankruptcy Court for the District of Delaware in a prominently marked envelope with a

cover sheet attached containing (i) the caption, (ii) the docket number of the Motion, (iii) the

docket number of this Order, (iv) the title of the list of Designated Customer Contracts and

affidavits of service that identify the Debtors' customers and (v) the legend "DOCUMENTS TO BE KEPT UNDER SEAL" in bold print.

9.      Recognizing that providing individual notice to each Customer Contract Counterparty and each Lease Counterparty will ensure that such parties will receive adequate notice, the Court hereby waives the requirements of Bankruptcy Rule 6006(f)(6).

10.     To facilitate the assumption and assignment of the Designated Agreements, the anti-assignment provisions of the Designated Agreements, if any, are hereby deemed unenforceable pursuant to section 365(f) of the Bankruptcy Code.

11.     Pursuant to Bankruptcy Rule 6006(f)(6), the Court hereby authorizes the Debtors to file one or more omnibus notices, pursuant to the Assignment Procedures, incorporating all the Executory Contracts and unexpired leases to be either assumed and assigned or assumed and subleased.

**Break-Up Fee and Expense Reimbursement**

12.     To the extent due and owed by the Debtors under Section 9.2 of the Agreement, the Debtors are authorized to pay to the Purchaser:  (i) two-thirds (2/3) of an amount in cash equaling $14.25 million minus one-half of any Expense Reimbursement (as defined below) paid by the Sellers (the "Break-Up Fee") and (ii) two-thirds (2/3) of an amount in cash equal to the total amount of all reasonable and documented fees, costs and expenses incurred by the Purchaser in connection with the preparation, execution and performance of the Agreement and the transactions contemplated thereby, including all filing and notification fees, and all fees and expenses of the Purchaser's representatives (the "Expense Reimbursement, and together with the Break-Up Fee, the "Bid Protections"), provided that the Expense Reimbursement will be capped at $9.5 million.

13.     The Debtors' obligation to pay the Break-Up Fee and Expense Reimbursement, under the conditions set forth in, and in accordance with the terms of, Section 9.2 of the Agreement, shall survive termination of the Agreement and shall constitute an administrative expense of the Debtors under section 503(b) of the Bankruptcy Code.

14.     Except as provided in Section 5.36 of the Agreement, the Break-Up Fee and/or the Expense Reimbursement, if payable, will be the sole and exclusive remedy of the Purchaser as a result of the failure of the transactions contemplated by the Purchase Agreements to be consummated, or in respect of any Liabilities arising under, or relating to, the Purchase Agreements or the transactions contemplated thereby prior to the Closing, including as a result of an intentional breach of the Purchase Agreements prior to the Closing.

15.     Under no circumstances shall any party to the Agreement be liable for punitive damages (including multiple damages assessed as a punitive measure) or special damages arising out of, or in connection with, the Agreement or the transactions contemplated thereby or any breach or alleged breach of any of the terms thereof or of the EMEA Agreement or any other Transaction Document (as defined in the Agreement), including damages alleged as a result of tortious conduct, or for specific performance of the obligations it is to perform thereunder at or prior to the Closing nor shall any Nortel Party (as defined in the Agreement) be liable for tortious interference with the Purchaser's rights under the Agreement nor shall any Avaya Party (as defined in the Agreement) be liable for tortious interference with the Sellers' rights under the Agreement.

## The Notice Procedures

16.     The notices, in substantially the same forms as annexed to the Motion as Exhibits E (Form of Sale Notice), F (Form of Publication Notice), G (Form of Initial Customer Notice), H (Form of Final Customer Notice), I (Form of Lease Notice), J (Form of Initial Omnibus Notice)

7

and K (Form of Final Omnibus Notice) are sufficient to provide effective notice to all interested parties of the Bidding Procedures, the Auction, the Sale Hearing and the Assignment Procedures, pursuant to Bankruptcy Rules 2002(a)(2), 6004 and 6006, and are hereby approved.

17.    Immediately after entry of this Order (or as soon thereafter as reasonably practicable) the Debtors (or their agent) shall serve the Sale Notice, in substantially the form attached as Exhibit E to the Motion, by first-class mail upon (i) the U.S. Trustee, (ii) counsel to the Purchaser, (iii) counsel to the Committee, (iv) counsel to the Bondholder Group, (v) all entities known to have a claim, lien, interest or encumbrance against the Debtors' interest in the Assets, the Shares, the Assumed and Assigned Contracts and the Assumed and Subleased Real Estate Leases, (vi) all counterparties to the Assumed and Assigned Contracts and Assumed and Subleased Real Estate Leases, (vii) the Monitor, (viii) the Administrators, (ix) the Internal Revenue Service and applicable federal and state taxing authorities, (x) the Securities and Exchange Commission, (xi) the Pension Benefit Guaranty Corporation and all regulatory authorities of the Sellers' pension plans in Canada and the United Kingdom, (xii) the attorneys general for all states in which the Assets are located, (xiii) the EPA and relevant state environmental protection agencies, (xiv) the Department of Labor and similar state labor or employment agencies, (xv) the United States Department of Justice, (xvi) each of the entities that had received an invitation from the Sellers to acquire or had expressed an interest in acquiring the Assets (which shall be filed under seal), and (xvii) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002.

18.    The Court recognizes that the identities of the entities that received an invitation from the Sellers to acquire, or that previously expressed an interest in acquiring, the Assets and affidavits of service that identify such parties, constitute confidential commercial information,

8

and therefore authorizes that any such affidavits to be filed in connection with the Motion may be filed under seal in accordance with the procedures set forth above for lists and affidavits of service that identify the Debtors' customers.

19.     As soon as reasonably practicable after entry of this Order and the Canadian Sales Process Order, but in any event no more than three (3) business days after the entry of such orders, the Sellers (including the Debtors) shall publish notice of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing, substantially in the form attached to the Motion as Exhibit F, in The Wall Street Journal (National Edition), The Globe & Mail (National Edition) and The Financial Times (International Edition).

20.     As the Purchaser designates the Designated Customer Contracts to be assumed by the relevant Debtor and assigned to the Purchaser as of the Closing Date, the Debtors will, from time to time, serve an Initial Customer Notice on each Customer Contract Counterparty by first class mail.  The Debtors will also send a Final Customer Notice to each Customer Contract Counterparty by first class mail.  The Debtors will file under seal with the Court and deliver a full, alphabetized list of Customer Contract Counterparties, along with an affidavit or declaration confirming that each of the Initial Customer Notice and the Final Customer Notice have been sent to each Customer Contract Counterparty, to (i) counsel to the Purchaser, (ii) the U.S. Trustee, (iii) the Monitor, (iv) counsel to the Committee and (v) counsel to the Bondholder Group.

21.     As the Purchaser designates Other Designated Contracts, the Debtors will, from time to time file with the Court one or more Initial Omnibus Notices, and serve each omnibus notice on each Other Contract Counterparty whose Other Designated Contract appears on such

omnibus notice.  The Debtors will also send one or more Final Omnibus Notices to each Other

Contract Counterparty by first class mail.

22.     As the Purchaser designates the Designated Leases, the Debtors will, from time to

time but no later than fifty (50) days following the Signing Date, serve a Lease Notice on each

Lease Counterparty by first class mail.

23.     The Initial Notices, the Final Notices and the Lease Notice, in substantially the

same forms as annexed to the Motion as Exhibits G, H, I, J and K, are sufficient to provide

effective notice pursuant to Bankruptcy Rules 2002(a)(2), 6004(a) and 6006(c) to all

Counterparties of the Debtors' intent to assume and assign the Designated Agreements, and are

hereby approved.

### Objection Procedures

**A.     Objections to Sale**

24.     All objections to the relief requested in the Motion pertaining to approval of the

sale of the Assets, shall file a formal objection that complies with the objection procedures as set

forth in the Motion.  Each objection shall state the legal and factual basis of such objection and

may be orally supplemented at the Sale Hearing.  All objections must also be:  (i) in writing; (ii)

signed by counsel or attested to by the objecting party; (iii) in conformity with the Bankruptcy

Rules and the Local Rules, (iv) filed with the Clerk of the Bankruptcy Court, 824 Market Street,

Wilmington, Delaware 19801 by **4:00 p.m. (ET) on September 4, 2009** (the "General Objection

Deadline"); and (v) served in accordance with the Local Rules so as to be received on or before

the General Objection Deadline by the following:  (a) counsel to the Debtors:  Cleary Gottlieb

Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Fax:  (212) 225-3999

(Attention:  James L. Bromley and Lisa M. Schweitzer) and Morris, Nichols, Arsht & Tunnell

LLP, 1201 North Market Street, Wilmington, Delaware 19801, Fax:  (302) 658-3989 (Attention:

Derek C. Abbott); (b) counsel to the Purchaser: Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, Fax: (646) 728-1662 (Attention: Mark I. Bane, and Anne H. Pak); (c) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Fax: (212) 872-1002 (Attention: Fred S. Hodara, Stephen Kuhn, and Kenneth Davis) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attention: Christopher M. Samis); (d) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy LLP, One Chase Manhattan Plaza, New York, New York 10005, Fax: (212) 822-5735 (Attention: Roland Hlawaty); and (e) the U.S. Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801.

25.    Failure to object to the relief requested in the Motion shall be deemed to be "consent" for purposes of Bankruptcy Code section 363(f).

26.    Supplemental objections to issues arising from and in connection with the Auction and/or the Debtors' selection of a Successful Bidder other than the Purchaser must be filed by **12:00 p.m. (ET) on September 14, 2009**.

27.    The foregoing requirements are collectively referred to herein as the "General Objection Procedures." Only those objections made in compliance with the General Objection Procedures will be considered by the Court at the Sale Hearing. The failure of any objecting person or entity to file its objections by the General Objection Deadline and in accordance with the General Objection Procedures will be a bar to the assertion, at the Sale Hearing or thereafter, of any objection pertaining to the Auction or the Sale Transaction (excluding, however, objections relating to the assumption and assignment of any Designated Agreement, which must be filed in accordance with the Assignment Procedures).

11

**B.      Objections to Assumption and Assignment or Assumption and Sublease**

*Initial Objections*

28.      Any Customer Contract Counterparty or Other Contract Counterparty that wishes to object to any matter set forth in the Initial Notices with regards to the proposed assumption and assignment of a Designated Agreement, including without limitation the adequate assurance of future performance by the Purchaser under the applicable Designated Agreement or the Interim Cure Amount, if any, must file a written objection with the Court no later than ten (10) days following service of the Initial Notice, and serve notice of such objection on (a) counsel to the Debtors, (b) counsel to the Purchaser, (c) counsel to the Committee and (d) counsel to the Bondholder Group, each at the addresses set forth in the Assignment Procedures.

29.      To the extent that any Customer Contract Counterparty or Other Contract Counterparty does not timely serve an objection as set forth above, such Counterparty will be deemed to have (i) consented to the assumption and assignment of the applicable Designated Agreement; (ii) agreed that the Purchaser has provided adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(1)(C); (iii) consented to the Interim Cure Amount, if any; and (iv) agreed that the terms of this Order and the Sale Order shall apply to the assignment, subject only to the resolution of the Tail Cure Amount, if any.

*Final Objections*

30.      Any Customer Contract Counterparty or Other Contract Counterparty that wishes to object to the Tail Cure Amount in the Final Notice must file a Final Cure Objection with the Court no later than ten (10) days following service of the Final Notice, and serve notice of such objection on (a) counsel to the Debtors, (b) counsel to the Purchaser, (c) counsel to the Committee and (d) counsel to the Bondholder Group, each at the addresses set forth in the Assignment Procedures.

31.     To the extent that any Customer Contract Counterparty or Other Contract Counterparty does not timely serve an objection as set forth directly above, such Counterparty will be deemed to have (i) consented to such Tail Cure Amount, if any, and to the assumption and assignment of the Designated Agreement; (ii) agreed that all defaults under the Designated Agreement arising or continuing prior to the effective date of the assignment have been cured such that the Purchaser or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the effective date of the assignment, and from and after the effective date of the assignment, the Designated Agreement shall remain in full force and effect for the benefit of the Purchaser and the Counterparty in accordance with its terms; and (iii) waived any right to terminate the Designated Agreement or designate an early termination date under the applicable Designated Agreement as a result of any default that occurred or was continuing prior to the effective date of the assignment.

***Lease Objections***

32.     Any Lease Counterparty that wishes to object to any matter pertaining to the proposed assumption and assignment or assumption and sublease of a Designated Lease, including without limitation the adequate assurance of future performance by the Purchaser under the applicable Designated Lease or the Cure Amount, if any, then such Lease Counterparty must file a written objection with the Court no later than ten (10) days following service of the Lease Notice, and serve notice of such objection on (a) counsel to the Debtors, (b) counsel to the Purchaser, (c) counsel to the Committee and (d) counsel to the Bondholder Group, each at the addresses set forth in the Assignment Procedures.

33.     To the extent that any Lease Counterparty does not timely serve an objection as set forth directly above, such Counterparty will be deemed to have (i) consented to the

assumption and assignment or assumption and sublease of the applicable Designated Lease; (ii)

agreed that the Purchaser has provided adequate assurance of future performance within the

meaning of Bankruptcy Code section 365(b)(1)(C); (iii) consented to the Cure Amount, if any;

and (iv) agreed that the terms of this Order and the Sale Order shall apply to the assignment or

sublease.

***Resolution of Objections to Assumption and Assignment or Assumption and Sublease***

34.    Upon filing of an objection by a Counterparty, the Debtors will initiate a meeting

or teleconference with the objecting Counterparty and the Purchaser to consensually resolve any

timely served objection.  If the Debtors, the Purchaser and the Counterparty are unable to

consensually resolve any timely served objection within fifteen (15) days ("Consensual

Resolution Deadline"), the Debtors shall be required to respond to such objection within thirty

(30) days after the Consensual Resolution Deadline.

35.    To the extent that an objection by a Counterparty is not resolved prior to the

Closing Date, the Debtors, in consultation with the Purchaser, may elect to (i) not assume and

assign or assume and sublease such Designated Agreement, (ii) postpone the assumption and

assignment or assumption and sublease of such Designated Agreement until the resolution or

adjudication of such objection or (iii) in the case of a Cure Objection, the relevant party

responsible for payment of the Cure Amount under Section 2.1.7 of the Agreement shall

segregate any disputed Cure Amount pending the resolution or adjudication of any such

objection, in which case the Debtors shall be permitted to assume and assign or assume and

sublease such Designated Agreement as of the Closing Date.  Any Cure Amounts outstanding on

the Closing Date shall be paid to the appropriate Counterparty as a condition subsequent to such

assumption and assignment or assumption and sublease by the relevant party responsible for

payment of the Cure Amount under Section 2.1.7 of the Agreement.

14

## The Sale Hearing

36.     The Sale Hearing shall be held on September 15, 2009 at _____ a.m. (ET) before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801, to consider the issuance and entry of an order, inter alia, approving the sale of the Debtors' rights, title and interests in and to the Assets as set forth in the Agreement.  In accordance with the terms of the Agreement, the Debtors may adjourn the Sale Hearing one or more times without further notice by making an announcement in open court or by the filing of a hearing agenda announcing the adjournment.

## Other Relief Granted

37.     In the event there is a conflict between this Order and the Motion or the Agreement, this Order shall control and govern.

38.     Nothing in this Order, the Agreement or the Motion shall be deemed to or constitute the assumption or assignment of an executory contract or unexpired lease.

39.     The Debtors are authorized and empowered to take such steps, expend such sums of money, and do such other things as may be necessary to implement and effect the terms and requirements established by this Order.

40.     The Debtors are hereby authorized to conduct the Sale (as defined in the Bidding Procedures) without the necessity of complying with any state or local bulk transfer laws or requirements.

41.     Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) the Debtors are not subject to any stay in the implementation, enforcement or

realization of the relief granted in this Order and (iii) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

42.     All objections to the Motion or the relief requested therein (and all reservations of rights included therein), as they pertain to the entry of this Order, are overruled to the extent they have not been withdrawn, waived or otherwise resolved.

43.     The provisions of Bankruptcy Rules 6004(h) and 6006(d) staying the effectiveness of this Order for ten (10) days are hereby waived, and this Order shall be effective immediately upon entry of this Order.

44.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2009
Wilmington, Delaware

        _____
        THE HONORABLE KEVIN GROSS
        UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Bidding Procedures**

BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities (the "Sale") as set forth in the Purchase Agreements (as defined below) with respect to the Purchaser, or, as set forth in the relevant sale agreements with respect to a Successful Bidder (as defined below).  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement (as defined below).

On January 14, 2009, Nortel Networks Inc. and certain of its U.S. subsidiaries that are debtors and debtors-in-possession (collectively, the "U.S. Debtors") as well as Nortel Networks Limited and certain other affiliates of the U.S. Debtors that have commenced proceedings under the Canadian Companies' Creditors Arrangement Act (the "Canadian Debtors"), and certain non-debtor affiliates of the U.S. Debtors and the Canadian Debtors (together with the U.S. Debtors and the Canadian Debtors, the "North American Sellers") executed that certain Asset and Share Sale Agreement (the "Agreement") with Avaya Inc. (together with any of its designees, the "Purchaser").

On January 14, 2009, certain other affiliates of the North American Sellers (the "EMEA Sellers" and together with the North American Sellers, the "Sellers"), certain of which are in administration proceedings in which Alan Bloom, Stephen Harris, Chris Hill, Alan Hudson and David Hughes of Ernst & Young LLP, have been appointed as the joint administrators of those EMEA Sellers by the English High Court of Justice in connection with the proceedings (the "UK Proceedings") under the Insolvency Act 1986 (such individuals collectively, the "Administrators"), and the Administrators executed that certain Asset Sale Agreement relating to the sale and purchase of the EMEA Assets with the Purchaser (the "EMEA Agreement" and together with the Agreement, the "Purchase Agreements").

The Sellers have determined that:  (A) the transactions contemplated by the Purchase Agreements and the ancillary agreements discussed therein with respect to the Purchaser, or, as set forth in the relevant sale agreements and ancillary agreements with respect to a Successful Bidder, (collectively, the "Transaction") should be subject to competitive bidding as set forth herein; (B) the transfer of the U.S. Debtors' rights, title and interests in and to the Assets (as defined below) should be subject to approval by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to Sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"); (C) the transfer of the rights, title and interests of the Canadian Debtors (as such term is defined in the Agreement) in and to the Assets should be subject to approval by the Ontario Superior Court of Justice (the "Canadian Court"); and (D) the Transaction shall be subject to approval by such other applicable court(s) as the Sellers, in consultation with the Committee (as defined below), the Bondholder Group (as defined below) and the Monitor (as defined below), may reasonably determine in good faith is legally required and certain other closing conditions as set forth in the Purchase Agreements.

On July 20, 2009, the U.S. Debtors filed a Motion for Orders (I)(A) Authorizing Debtors' Entry into the Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D) Approving the

Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of, and Equity Interests in, Debtors' Enterprise Solutions Business, (B) the Assumption and Assignment of Certain Contracts and Leases and (C) the Assumption and Sublease of Certain Leases (the "Sale Motion").

On [●], 2009, the Bankruptcy Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Bidding Procedures Order").

On [●], 2009, the Canadian Debtors filed a motion with the Canadian Court seeking an order for approval of (I) execution and delivery of the Agreement by the Canadian Debtors, (II) payment of the Break-Up Fee and Expense Reimbursement in the circumstances provided for in the Agreement, and (III) a process for the Sale of the Canadian Debtors' rights, title and interests in and to the Assets (as defined below).

On [●], 2009, the Canadian Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Canadian Sales Process Order").

Bidding Process

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's and the Canadian Court's and, if required, such other applicable courts' approval thereof (collectively, the "Bidding Process"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., et al. (Case No. 09-10138) involving the U.S. Debtors (the "Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor"), the Administrators in connection with the UK Proceedings, and their respective advisors throughout the Bidding Process. In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, the Bankruptcy Court and the Canadian Court will have jurisdiction to hear and resolve such dispute.[1]

---

[1] For the avoidance of doubt, this Bidding Process shall not govern any disagreements among the Sellers.

<u>Assets To Be Sold</u>

The Sellers are offering for sale, in one or more transactions, certain of the Sellers' assets (including the stock of certain subsidiaries of the Sellers) pertaining to the business segments described in the Purchase Agreements with respect to the Purchaser, or, as set forth in the relevant sale agreements with respect to a Successful Bidder, and related schedules and in an information memorandum made available by the Sellers to the Purchaser and other potential bidders, which will also be made available to other prospective purchasers that have executed a confidentiality agreement with the Sellers (the "<u>Assets</u>").

<u>"As Is, Where Is"</u>

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except, with respect to the Purchaser, to the extent set forth in the Purchase Agreements or, with respect to a Successful Bidder (as defined below), to the extent set forth in the relevant sale agreements of such Successful Bidder.  In addition, in the case of the EMEA Sellers, the sale of whatever rights, title and interests that such EMEA Seller may have (if any) in and to the Assets will be on an "as-is" basis and will be without any representations or warranties.

<u>Free Of Any And All Claims And Interests</u>

All of the rights, title and interests of the U.S. Debtors and the Canadian Debtors in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "<u>Claims and Interests</u>") pursuant to sections 363 and 365 of the Bankruptcy Code, such Claims and Interests to attach to the net proceeds of the sale of such Assets (without prejudice to any claims or causes of action regarding the priority, validity or enforceability thereof), except, with respect to the Purchaser, to the extent otherwise set forth in the Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant sale agreement of such Successful Bidder with the U.S. Debtors and the Canadian Debtors.

<u>Publication Notice</u>

As soon as reasonably practicable after entry of orders by the Bankruptcy Court and the Canadian Court approving these Bidding Procedures, but in any event no more than three (3) Business Days after the entry of such orders, the Sellers shall publish notice of these Bidding Procedures, the time and place of the Auction (as defined below), if required, the time and place of the Sale Hearing (as defined below), and the objection deadline for the Sale Hearing in <u>The Wall Street Journal</u> (National Edition), <u>The Globe & Mail</u> (National Edition) and <u>The Financial Times</u> (International Edition).

<u>Participation Requirements</u>

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court and accepted by the Administrators, for cause shown or, with regard to paragraphs (b) and (c) below, as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder

3

Group and the Monitor), prior to the Bid Deadline (as defined below), in order to participate in the Bidding Process, each person, other than the Purchaser, who wishes to participate in the Bidding Process (a "Potential Bidder") must deliver to the Notice Parties (as defined below) at the addresses provided below:

> (a)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, that shall not be on terms that, in the Sellers' reasonable judgment, are more favorable to the Potential Bidder than the confidentiality agreement executed by the Purchaser and which shall inure to the benefit of any purchaser of the Assets (in the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets and waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transaction it may enter into, to the Notice Parties (as defined below));

> (b)    current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transaction; and

> (c)    a preliminary (non-binding) written proposal regarding:  (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Purchase Agreements.

A Potential Bidder that delivers the documents described above, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine

4

in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence as provided in the following paragraph with respect to the Assets.

Due Diligence

The Sellers may in their reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a confidentiality agreement with the Sellers such due diligence access to materials and information relating to the Assets as the Sellers deem appropriate after consultation with the Committee, the Bondholder Group and the Monitor. Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their reasonable business judgment, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. No additional due diligence for any party other than a Qualified Bidder who has submitted a Qualified Bid will continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. In any event, the Purchaser shall be provided prompt access to all material due diligence materials, management presentations, on site inspections and other information provided to Qualified Bidders that were not previously made available to the Purchaser. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Purchase Agreements or any other definitive sale agreements with any Successful Bidder executed and delivered by Sellers.

Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Gordon A. Davies, Esq., Chief Legal Officer, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905) 863-8386; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam,

5

Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (v) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vi) financial advisor to the Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (vii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; (viii) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; (ix) the Administrators: Ernst & Young LLP, Attn: Stephen Harris, 1 More Place, London SE1 2AF, United Kingdom, Facsimile +44 20 7951 9002; and (x) counsel to the Administrators: Herbert Smith LLP, Attn: Stephen Gale, Exchange House, Primrose Street, London, EC2A 2HS, Facsimile: +44 20 7098 4878; so as to be received not later than September 4, 2009 at 12:00 pm (Eastern) by the Sellers (the "Bid Deadline").

Qualified Bid

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(a)     it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Purchase Agreements, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or upon alternative terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholders Committee and the Monitor, are no less favorable than the terms and conditions of the Purchase Agreements;

(b)     it includes a letter stating that the bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), provided that if such bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, 180 days from the later of the Sale Hearing and the entry of the Sale Order and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)     it includes duly authorized and executed Purchase Agreements (as modified by the bidder to reflect the terms and conditions of its bid), including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, including, to the extent required by the terms and conditions of such bid, the Local Sale Agreements, the Real Estate Agreements, the Intellectual Property License Agreement, the Transition Services Agreement, the Trademark License Agreement, the Loaned Employee Agreement (each as defined in the Agreement and each as modified by the bidder to reflect the terms and conditions of its

6

bid), the other ancillary agreements as described in the Purchase Agreements and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Purchase Agreements ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the bidder;

(d)     it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(e)     it is not conditioned on (i) the outcome of unperformed due diligence by the bidder (and includes an acknowledgement and representation that the bidder has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer) and/or (ii) obtaining financing;

(f)     it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(g)     it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Purchase Agreements, plus (i) the amount of the Break-Up Fee and Expense Reimbursement (each as defined in the Purchase Agreements), plus (ii) U.S. $4.75 million.

(h)     it includes an acknowledgment and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreements (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)     it includes an acknowledgement and representation that the bidder:  (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; and (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the

7

completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (iii) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)       it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(k)       it is accompanied by a good faith deposit (each, together with the good faith deposit of the Purchaser, a "Good Faith Deposit") in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to $30 million to be dealt with as provided for under "Good Faith Deposit" herein;

(l)       it (a) contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction(s)) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment and associated with the employment of all employees who will become employees of the Qualified Bidder, and (b) identifies any pension liabilities and assets related to any employees currently covered under any Nortel registered pension or retirement income plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m)       it includes evidence of the Potential Bidder's ability to comply with Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)       it contains other information reasonably requested by the Sellers; and

(o)       it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids, provided that the Sellers in evaluating such bids, may not waive substantial compliance with any items in paragraphs (b), (d), (e), (f), (i), (j), (k), (l), (m), (n), and (o) without the consent of the Purchaser, the Committee, the Bondholder Group and the Monitor, and such consent shall not be unreasonably withheld in connection with any bid that (1) would otherwise fully satisfy the requirements of a Qualified Bid hereunder but for a de minimis failure to comply with paragraphs (b), (d), (e), (f), (i), (j), (k), (l), (m), (n), or (o) and (2) such noncompliance is

cured within 24 hours of the Bid Deadline. Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Purchase Agreements will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction and the Sale.

The Sellers shall deliver copies of any bids deemed to be Qualified Bids to Purchaser in accordance with section 5.1(c) of the Agreement, and notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids no later than three (3) days following the expiration of the Bid Deadline.

Aggregate Bids

The Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Transaction (including any regulatory approvals required to close the Transaction), the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction(s)) to be offered post-closing employment by the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment of all employees who will become the employees of the Qualified Bidder, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

No Qualified Bids

If the Sellers do not receive any Qualified Bids other than the Purchase Agreements received from the Purchaser, the Auction shall be cancelled and the U.S. Debtors shall report the same to the Bankruptcy Court, the Canadian Debtors shall report the same to the Canadian Court and the Monitor and subject to requiring and obtaining approvals of the Bankruptcy Court, the Canadian Court or any other applicable court and satisfaction of the conditions set forth in the Purchase Agreements, the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Purchase Agreements. In addition, if no Qualified Bid is received, the U.S. Debtors reserve the right to request that the Bankruptcy Court advance the date of the Sale Hearing (as defined below) and provide notice of such new date to those parties in interest entitled to notice thereof and the Canadian Debtors reserve the right to file a motion with the Canadian Court seeking the approval of the sale of the Canadian Debtors' rights, title

9

and interests in and to the Assets to the Purchaser. In addition, if approval of any other applicable court is required, the Sellers will as soon as practicable file an appropriate pleading with such court(s) seeking approval of the Transaction.

<u>Break-Up Fee and Expense Reimbursement</u>

Recognizing the value and benefits that Purchaser has provided to the U.S. Debtors and the other Sellers by entering into the Purchase Agreements, as well as the Purchaser's expenditure of time, energy and resources, the Sellers have agreed that the Purchaser is entitled to a Break-Up Fee and Expense Reimbursement in amounts and under the circumstances set forth in the Purchase Agreements and as set forth in the Bidding Procedures Order and the Canadian Sales Process Order.

<u>Auction</u>

If the Sellers receive one or more Qualified Bids in addition to the Purchase Agreements, the Sellers will conduct an auction (the "<u>Auction</u>") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at 9:30 a.m. on September 11, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned without the prior written consent of the Purchaser, subject to the terms of the Purchase Agreements and the Bidding Procedures Order. Copies of all Qualified Bids shall be delivered to the Committee, the Bondholder Group, the Monitor, the Administrators and the Purchaser at such time that such bid is deemed a Qualified Bid but no later than two (2) Business Days prior to the Auction. The Auction shall run in accordance with the following procedures:

(a)     Only the Sellers, the Purchaser, the Committee, the Bondholder Group, the Monitor and the Administrators (and the advisors to each of the foregoing), any creditor of the North American Sellers and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)     Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(c)     At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; <u>provided</u> that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date. At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor,

is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders.

(d)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(e)     The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(f)     Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least U.S. $2.375 million over the Starting Bid or the Leading Bid, as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the Purchase Agreements as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

## Selection Of Successful Bid

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid that is either the Leading Bid or submitted subsequent to and as an improvement to the submission of the Leading Bid (except in the event that there is no Leading Bid, in which case the Qualified Bids to be considered will be the Starting Bid and any bids submitted subsequent and as an improvement to the Starting Bid) on the basis of financial and contractual terms and the factors relevant to the sale process, including, among other things, the proposed revisions to the transaction documents, the effect of the Sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), the counterparties to such transactions, the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, other factors affecting the speed, certainty and value of the Sale (including any regulatory approvals required to close the Transaction), the Assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers to be offered post-closing employment by the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such bids, collectively, the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by the Canadian Court and any required approvals of any other applicable court(s) with such Successful Bidder and approval and execution by the Administrators of the relevant Successful Bid transaction documents with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

## Sale Hearing

The sale hearing to authorize certain of the Sellers to enter into agreements with respect to the Successful Bid (the "Sale Hearing") will be held, in respect of those Sellers that are U.S. Debtors, before the Honorable Judge Kevin Gross (or any substitute therefor) in the United States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as September 15, 2009 at 9 a.m. (Eastern), and, in respect of those Sellers that are Canadian Debtors, before the Honourable Mr.

Justice Geoffrey B. Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto, Ontario, and in any other applicable court(s) whose approval is required, as soon as practicable following the date of the Sale Hearing (or, with respect to the Canadian Court, in a joint hearing with the Bankruptcy Court at the Sale Hearing).  The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing.  If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Sellers shall proceed as set forth in the "No Qualified Bids" section above.  If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder").  The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is legally required, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval is legally required.  Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court.  The Alternate Bid shall remain open until the earlier of (a) eleven (11) days following the entry of the Sale Order or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date").  All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

<u>Good Faith Deposits</u>

The Good Faith Deposit of any Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within five (5) Business Days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid.  The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within five (5) Business Days of the date of the selection of the Successful Bidder and the Alternate Bidder.  The Good Faith Deposit of the Successful Bidder will be applied in accordance with the terms of the Successful Bid, and, except in the case of the Purchaser, where the Purchaser's Good Faith Deposit shall be governed by the terms and conditions of the Purchase Agreements, will become nonrefundable upon the approval by the Bankruptcy Court and the Canadian Court of the Sale to the Successful Bidder.

<u>Reservation Of Rights</u>

The Sellers, after consultation with their advisors, the Committee, the Bondholder Group and the Monitor, and their respective advisors, (a) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof, except that a Qualified Bid not selected as a Starting Bid or Leading Bid cannot subsequently be determined to be higher or better than the Starting Bid or Leading Bid, as applicable; and (b) may reject, at any time, any bid (other than the Purchaser's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, any orders of the Canadian Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, or (iv) contrary to the statutory duties or legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers.

Notwithstanding any of the foregoing, or anything else contained herein, however, the Sellers may not, without prior written consent of the Committee, the Bondholder Group and the Monitor, which consent may not be unreasonably withheld, (i) extend the deadlines set forth in the Auction procedures for more than three (3) Business Days, (ii) adjourn the Auction for more than three (3) Business Days, or (iii) adjourn the Sale Hearing for more than three (3) Business Days if the Auction has concluded.

For the purposes of these Bidding Procedures and all matters relating to them, the Administrators are acting only as agents for and on behalf of the EMEA Sellers that are controlled by the Administrators pursuant to the UK Proceedings and without personal liability. Notwithstanding the foregoing and subject to the following paragraph, the Sellers may not, without the prior written consent of the Purchaser, impair or modify the Purchaser's rights and obligations under the Purchase Agreements or the Purchaser's right to credit the Break-Up Fee and the Expense Reimbursement as part of any subsequent bids (except as specifically set forth herein).

The entirety of the Bidding Procedures are subject to the rights of the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, to revoke these Bidding Procedures, the Bidding Process or the Auction at any time to satisfy their fiduciary duties or the statutory duties or the legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers, <u>provided</u> that such revocation will result in a breach of the Purchase Agreements entitling the Purchaser to such rights as are set forth in the Purchase Agreements in respect of such breach.

**Exhibit 2**

**Assignment Procedures**

## ASSIGNMENT PROCEDURES

### I.    CONTRACT DESIGNATION PROCESS

The process for designating Enterprise Agreements for assumption and assignment (or, in the case of certain real estate leases, assumption and sublease in accordance with the terms and conditions of such lease), and the deadline by which such designation must occur, shall be in accordance with Section 2.1.5 of the Agreement.

For the purposes of these Assignment Procedures, the Designated Agreements are divided into three separate categories:  (A) Designated Agreements in which one or more counterparties is a customer of the relevant Debtor(s) (including Designated SI/SP Contracts) (the "Designated Customer Contracts"); (B) Designated Agreements that are unexpired leases (the "Designated Leases"); and (C) Designated Agreements that are neither Designated Customer Contracts nor Designated Leases (the "Other Designated Contracts").

### II.    NOTICES

#### *Designated Customer Contracts – Initial Notices*

After entry of the Bidding Procedures Order, during the Initial Notice Period (as defined below), the Debtors shall serve an individual notice substantially in the form attached to the Motion as Exhibit G (the "Initial Customer Notice") by first class mail on each counterparty to a Designated Customer Contract (a "Customer Contract Counterparty") (and its attorney, if such attorney has filed a notice of appearance in these chapter 11 proceedings) at the last known address available to the Debtors, where "Initial Notice Period" means the period from the date of entry of the Bidding Procedures Order until fifteen (15) days prior to the Closing Date.

Each Initial Customer Notice shall set forth the following information:  (i) the name and address of the Customer Contract Counterparty, (ii) identification of the Designated Customer Contracts, (iii) a description of the Purchaser and a statement as to the Purchaser's ability to perform the Debtors' obligations under the Designated Customer Contracts and (iv) any Cure Amount (as defined below) under each relevant Designated Customer Contract that has resulted from defaults occurring prior to or on the date that is thirty (30) days prior to the date of service of the Initial Customer Notice (the "Interim Cure Amount"), where "Cure Amount" means, with respect to an agreement, any amount required by section 365(b)(1) and Bankruptcy Rule 6006(f) to pay for any actual pecuniary losses that have resulted from any defaults by the relevant Debtor under such agreement.

The Debtors shall file under seal with the Court and deliver a full, alphabetized list of Customer Contract Counterparties, along with an affidavit or declaration confirming that an Initial Customer Notice and a Final Customer Notice (as defined below) have been sent to each Customer Contract Counterparty, to (i) counsel to the Purchaser, (ii) the U.S. Trustee, (iii) the Monitor, (iv) counsel to the Committee and (v) counsel to the Bondholder Group.

***Designated Customer Contracts – Final Notices***

The Debtors shall, no later than fifteen (15) days prior to the Closing Date, serve an individual notice substantially in the form attached hereto as <u>Exhibit H</u> (the "<u>Final Customer Notice</u>") by first class mail on each Customer Contract Counterparty (and its attorney, if such attorney has filed a notice of appearance in these chapter 11 proceedings) at the last known address available to the Debtors. Each Final Customer Notice shall set forth the following information: (i) the name and address of the Counterparty, (ii) notice of the proposed effective date of the assignment, (iii) identification of the Designated Customer Contracts and (iv) any Tail Cure Amount for each relevant Designated Customer Contract, where "<u>Tail Cure Amount</u>" means, with respect to an agreement, the Cure Amount that is due under such agreement as a result of defaults occurring after the date set forth in the Initial Notice and until the Closing Date.

***Designated Leases – Notices***

Within fifty (50) days from the Signing Date, the Debtors shall serve an individual notice substantially in the form attached to the Motion as <u>Exhibit I</u> (the "<u>Lease Notice</u>") by first class mail on each counterparty to a Designated Lease (a "<u>Lease Counterparty</u>") (and its attorney, if such attorney has filed a notice of appearance in these chapter 11 proceedings) at the last known address available to the Debtors.

Each Lease Notice shall set forth the following information: (i) the name and address of the Lease Counterparty, (ii) identification of the Designated Leases, (iii) a description of the Purchaser and a statement as to the Purchaser's ability to perform the Debtors' obligations under the Designated Leases and (iv) any Cure Amount under each relevant Designated Lease.

The Debtors shall file with the Court a full, alphabetized list of Lease Counterparties, along with an affidavit or declaration confirming that a Lease Notice has been sent to each Lease Counterparty.

***Other Designated Contracts – Initial Omnibus Notices***

After entry of the Bidding Procedures Order, the Debtors shall, during the Initial Notice Period, file with the Court one or more omnibus notices, each covering no greater than 100 Other Designated Contracts, substantially in the form attached hereto as <u>Exhibit J</u> (the "<u>Initial Omnibus Notice</u>" and together with the Initial Customer Notice, the "<u>Initial Notice</u>"), and serve each omnibus notice on each Counterparty to an Other Designated Contract (an "<u>Other Contract Counterparty</u>," and together with a Customer Contract Counterparty and a Lease Counterparty, a "<u>Counterparty</u>") whose Other Designated Contract appears on such omnibus notice. The Initial Omnibus Notices will provide <u>inter alia</u> Interim Cure Amounts.

***Other Designated Contracts – Final Omnibus Notices***

The Debtors shall, no later than fifteen (15) days prior to the Closing Date, also file with the Court one or more omnibus notices, each covering no greater than 100 Other Designated Contracts, substantially in the form attached hereto as <u>Exhibit K</u> ("<u>Final Omnibus Notice</u>" and together with the Final Customer Notice, the "<u>Final Notice</u>"), and serve each omnibus notice on

2

each Other Contract Counterparty whose Other Designated Contract appears on such omnibus notice. The Final Omnibus Notices will provide inter alia Tail Cure Amounts.

## III.   OBJECTION PROCEDURES

### Initial Objections

To the extent that any Customer Contract Counterparty or Other Contract Counterparty wishes to object to any matter pertaining to the proposed assumption and assignment of a Designated Customer Contract or an Other Designated Contract, including without limitation the adequate assurance of future performance by the Purchaser under the applicable Designated Agreement or the Interim Cure Amount, if any, ("Initial Cure Objection"), then such Counterparty must file a written objection with the Court no later than ten (10) days following service of the Initial Notice, and serve notice of such objection on counsel to the Debtors: Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Fax: (212) 225-3999 (Attention: James L. Bromley and Lisa M. Schweitzer) and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801, Fax: (302) 658-3989 (Attention: Derek C. Abbott). Copies also must be served contemporaneously on (a) counsel to the Purchaser: Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, Fax: (646) 728-1662 (Attention: Mark I. Bane and Anne H. Pak), (b) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Fax: (212) 872-1002 (Attention: Fred S. Hodara, Stephen Kuhn and Kenneth Davis) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attention: Christopher M. Samis), and (c) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, One Chase Manhattan Plaza, New York, New York 10006, Fax: (212) 822-5735 (Attention: Roland Hlawaty).

To the extent that any Customer Contract Counterparty or Other Contract Counterparty does not timely serve an objection as set forth above, such Counterparty will be deemed to have (i) consented to the assumption and assignment of the applicable Designated Agreement; (ii) agreed that the Purchaser has provided adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(1)(C); (iii) consented to the Interim Cure Amount, if any; and (iv) agreed that the terms of the Bidding Procedures Order and the Sale Order shall apply to the assignment, subject **SOLELY** to the resolution of the Tail Cure Amount, if any.

### Final Objections

To the extent that any Customer Contract Counterparty or Other Contract Counterparty wishes to object to the Tail Cure Amount in the Final Notice, then such Counterparty must file a written objection with the Court ("Final Cure Objection" and together with the Initial Cure Objection and the Lease Cure Objection (as defined below), the "Cure Objection") no later than ten (10) days following service of the Final Notice, and serve notice of such objection on (a) counsel to the Debtors, (b) counsel to the Purchaser, (c) counsel to the Committee and (d) counsel to the Bondholder Group, each at the address set forth above.

To the extent that any Counterparty does not timely serve an objection as set forth directly above, such Counterparty will be deemed to have (i) consented to such Tail Cure

3

Amount, if any, and to the assumption and assignment of the Designated Agreement; (ii) agreed that all defaults under the Designated Agreement arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Purchaser or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the effective date of the assignment, the Designated Agreement shall remain in full force and effect for the benefit of the Purchaser and the Counterparty in accordance with its terms; and (iii) waived any right to terminate the Designated Agreement or designate an early termination date under the applicable Designated Agreement as a result of any default that occurred or was continuing prior to the effective date of the assignment.

### *Lease Objections*

To the extent that any Lease Counterparty wishes to object to any matter pertaining to the proposed assumption and assignment or assumption and sublease of a Designated Lease, including without limitation the adequate assurance of future performance by the Purchaser under the applicable Designated Lease or the Cure Amount, ("Lease Cure Objection"), then such Lease Counterparty must file a written objection with the Court no later than ten (10) days following service of the Lease Notice, and serve notice of such objection on (a) counsel to the Debtors, (b) counsel to the Purchaser, (c) counsel to the Committee and (d) counsel to the Bondholder Group, each at the address set forth above.

To the extent that any Lease Counterparty does not timely serve an objection as set forth above, such Lease Counterparty will be deemed to have (i) consented to the assumption and assignment or assumption and sublease of the applicable Designated Lease; (ii) agreed that the Purchaser has provided adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(1)(C); (iii) consented to the Cure Amount, if any; and (iv) agreed that the terms of the Bidding Procedures Order and Sale Order shall apply to the assignment or sublease.

## IV.    RESOLUTION OF OBJECTIONS

Upon filing of an objection by a Counterparty, the Debtors will initiate a meeting or teleconference with the objecting Counterparty and the Purchaser to consensually resolve any timely served objection.  If the Debtors, the Purchaser and the Counterparty are unable to consensually resolve any timely served objection within fifteen (15) days ("Consensual Resolution Deadline"), the Debtors shall be required to respond to such objection within thirty (30) days after the Consensual Resolution Deadline.

To the extent that an objection by a Counterparty is not resolved prior to the Closing Date, the Debtors, in consultation with the Purchaser, may elect to (i) not assume and assign or assume and sublease such Designated Agreement, (ii) postpone the assumption and assignment or assumption and sublease of such Designated Agreement until the resolution or adjudication of such objection, or (iii) in the case of a Cure Objection, the relevant party responsible for payment

of the Cure Amount under Section 2.1.7 of the Agreement[1] shall segregate any disputed Cure Amount pending the resolution or adjudication of any such objection, in which case the Debtors shall be permitted to assume and assign or assume and sublease such Designated Agreement as of the Closing Date.  Any Cure Amounts outstanding on the Closing Date shall be paid to the appropriate Counterparty as a condition subsequent to such assumption and assignment or assumption and sublease by the relevant party responsible for payment of the Cure Amount under Section 2.1.7 of the Agreement.

## V.      RESERVATION OF RIGHTS

The Debtors' decision to assume and assign or assume and sublease the Designated Agreements is subject to Court approval and consummation of the sale of the Enterprise Solutions Business to the Purchaser.  Accordingly, the Debtors shall be deemed to have assumed and assigned or assumed and subleased those Designated Agreements ultimately identified under the Agreement as of and effective only upon the Closing Date.  Absent a closing that includes such Designated Agreements, each of the Designated Agreements shall be deemed neither assumed nor assigned/subleased and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.

The Purchaser shall have no rights in and to a particular Designated Agreement until such time as the particular Designated Agreement is assumed and assigned or assumed and subleased in accordance with the procedures set forth herein.

The Debtors reserve the right to combine any Initial Notice with the corresponding Final Notice in appropriate circumstances.

In the event that the Purchaser is not a Successful Bidder at the Auction, the Debtors reserve the right to modify the Assignment Procedures, subject to approval of this Court.

To the extent required by applicable law, the Debtors reserve the right to file one or more motions to assume and assign or assume and sublease any unexpired leases of the Debtors.

---

[1]      In summary, this Section provides that (i) the Debtors shall pay all Cure Amounts relating to Designated Customer Contracts, (ii) the Purchaser shall pay all Cure Amounts relating to Other Designated Contracts and Designated Leases that are to be assumed and assigned, and (iii) each of the Purchaser and the Debtors shall pay a pro-rata share of all Cure Amounts relating to Designated Leases that are to be assumed and subleased.