IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------x
: **Chapter 11**
**In re** :
: **Case No. 09-10138 (KG)**
**NORTEL NETWORKS INC.,** *et al.,* :
: **(Jointly Administered)**
Debtors. : Hearing Date: July 28, 2009 at 1:00 p.m. (ET)
: Objection Deadline: July 22, 2009 (by agreement)
---------------------------------------------------x Related to Docket Nos. 931 and 969

### OBJECTION OF FLEXTRONICS CORPORATION AND FLEXTRONICS TELECOM SYSTEMS LTD TO DEBTORS' MOTION FOR ORDERS (I) (A) AUTHORIZING DEBTORS' ENTRY INTO THE ASSET SALE AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES, (C) AUTHORIZING AND APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (D) APPROVING THE NOTICE PROCEDURES, (E) APPROVING THE ASSUMPTION AND ASSIGNMENT PROCEDURES, (F) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL AND (G) SETTING A DATE FOR THE SALE HEARING, AND (II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF DEBTORS' CDMA AND LTE BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND (C) THE ASSUMPTION AND SUBLEASE OF CERTAIN LEASES

Flextronics Corporation and Flextronics Telecom Systems Ltd, on behalf of themselves and certain of their affiliates (collectively, "Flextronics"), by and through their undersigned counsel, hereby file this objection (the "Objection") and the supporting Declaration of Simon Robins in Support of the Objection, filed contemporaneous herewith, each with respect to the Debtors' Motion For Orders (i) (A) Authorizing Debtors' Entry Into The Asset Sale Agreement, (B) Authorizing And Approving The Bidding Procedures, (C) Authorizing And Approving A Break-Up Fee And Expense Reimbursement, (D) Approving The Notice Procedures, (E) Approving The Assumption And Assignment Procedures, (F) Authorizing The Filing Of Certain Documents Under Seal And (G) Setting A Date For The Sale Hearing, And (ii) Authorizing And Approving (A) The Sale Of Certain Assets Of Debtors' CDMA and LTE

6154710

Business Free And Clear Of All Liens, Claims And Encumbrances, (B) The Assumption And Assignment Of Certain Contracts And (C) The Assumption And Sublease Of Certain Leases, dated June 19, 2009 [Docket No. 931] (the "<u>Sale Motion</u>"),[1] and respectfully represent as follows:

### Preliminary Statement

As stated in Flextronics' prior limited objection and reservation of rights filed in connection with the Sale Motion [Docket No. 969], Flextronics is generally supportive, at least in concept, of the proposed sale of the CDMA and LTE assets which are the subject of the Sale Motion. However, Flextronics does not support the proposed treatment of its executory contracts in the proposed sale, and the transfer of CDMA-related equipment in its possession free and clear of its interests.

The Sale Motion contemplates, among other things, that Flextronics is to remain obligated to perform under its existing agreements related to the CDMA business post-closing, without those agreements being assumed and assigned in accordance with Section 365 of the Bankruptcy Code or applicable Canadian law. The Sale Motion instead proposes that Nortel will enter into a "back-to-back" arrangement with Nokia Siemens whereby Nortel would pass through its rights and remedies under the Flextronics agreements to Nokia Siemens. Essentially, Nortel will stand as a conduit between Flextronics and Nokia Siemens, <u>despite</u> having sold the assets relating to the CDMA business and <u>despite</u> the fact that Nokia Siemens will be directing the operation of that business. The Sale Motion cites absolutely no legal or factual precedent for this back-to-back arrangement, which in essence is an assignment of the benefit of the Flextronics agreements to Nokia Siemens without the corresponding burdens, in violation of the Bankruptcy Code and general principles of equity and fairness.

---

[1] Capitalized terms used but not defined herein shall have the meaning assigned to them in the Sale Motion.

Flextronics objects to this "end-run" around Nortel's legal and contractual restrictions on assignment. Nortel should not be permitted, by this contrived back-to-back, agreement, to avoid Flextronics' right to require (i) assumption of the corresponding burdens of Flextronics' agreements, (ii) cure of existing defaults under the agreements, and (iii) adequate assurance of future performance under the agreements. Flextronics further objects to the transfer of CDMA-related equipment in its possession free and clear of its interests.

Flextronics has attempted to work with Nortel to resolve its objections to the Sale Motion in the few weeks since approval of the sale procedures, but unfortunately has been unable to resolve its issues. Indeed Nortel has been unwilling or unable to share with Flextronics copies of the proposed "back to back" agreement with Nokia Siemens, even in draft form. Without the proposed "back to back" agreement, Flextronics cannot properly evaluate how the Nokia Siemens sale will prejudice its rights. It is likely, however, that the proposed back-to-back arrangement will be prejudicial to Flextronics in a number of ways. For example, once it acquires the CDMA assets, Nokia Siemens will necessarily control purchasing and supply forecasts for the purchase of finished goods from Flextronics in the coming year. Flextronics needs these forecasts as a basis to issue orders to third party suppliers and to otherwise manage Nortel's supply chain. In the event that such forecasts prove to be inaccurate (which is often the case), Flextronics must be assured that it will be fully protected from any resulting damages or claims it has on a dollar for dollar basis. Neither Nortel nor Nokia Siemens has provided any adequate assurance to Flextronics in this regard. For this and the other reasons set forth herein, the Sale Motion should be denied.

## The Flextronics-Nortel Agreements

1.      Flextronics' business relationship with Nortel is complex and multi-leveled. The relationship is primarily governed by two separate master contract manufacturing and service agreements, as follows: (1) the Amended and Restated Master Contract Manufacturing Services Agreement, dated as of June 29, 2004, between Nortel Networks Limited ("NNL") and Flextronics Telecom Systems Ltd. (the "Flextronics MCMSA"); and (2) the Master Contract Manufacturing Services Agreement, dated as of September 30, 2003, between NNL and Flextronics Corporation (f/k/a Solectron Corporation) (the "SLR MCMSA" and together with the Flextronics MCMSA, the "MCMSAs"). Each of the MCMSAs has several subagreements incorporated by reference thereunder, including certain "virtual systems house" agreements (VSHAs), among other agreements.

2.      Flextronics' business with Nortel as it relates to the CDMA business is governed by both the SLR MCMSA and the Flextronics MCMSA, and certain subagreements, including the Virtual Systems House Agreement, dated August 2, 2004, between NNL and Flextronics Corporation (f/k/a Solectron Corporation) (the "CDMA VSHA"). Flextronics also conducts certain business with Nortel related to the CDMA business without a formal VSHA, but on commercial terms consistent with the MCMSAs.

3.      The MCMSAs have been amended from time to time to resolve various issues that have arisen between the parties, including pursuant to (i) a memorandum of understanding dated October 13, 2006 (the "MOU"), (ii) an Amending Agreement, dated as of January 13, 2009 (the "Amending Agreement") and (iii) a Settlement Agreement (the "Settlement Agreement") and related Side Letter (the "Side Letter"), each dated as of May 22, 2009.

4.   The Amending Agreement, Settlement Agreement and Side Letter have been approved by the Ontario Superior Court of Justice in Nortel's proceedings under the Companies' Creditors Arrangement Act (the "CCAA Proceedings"), and the Settlement Agreement and Side Letter have been approved by this Court in Nortel's chapter 11 cases.

5.   The Settlement Agreement provides, as relevant here, that "the termination of the SLR MCMSA, pursuant to the termination notice delivered by Flextronics dated January 12, 2009, shall be effective on December 12, 2009 . . . . Notwithstanding the termination of the SLR MCMSA, the parties agree that Flextronics shall continue to perform all operations under the [CDMA VSHA], in accordance with the terms and conditions of the SLR MCMSA as if not terminated on December 12, 2009; it being understood that the CDMA VSHA may be terminated in accordance with the terms of the SLR MCMSA; provided, however, any notice to that effect may not be given by Flextronics before December 13, 2009." Settlement Agreement, § 4.

6.   Thus, the SLR MCMSA is scheduled to terminate on December 12, 2009, with the exception of the CDMA business. The Flextronics MCMSA remains in effect and no termination notices have been given thereunder. Nortel has not moved to assume or reject either of the MCMSAs to date.

7.   The MCMSAs, as amended, with subagreements, establish a complex manufacturing relationship by which, in essence, Nortel has "outsourced" its hardware design, manufacturing and supply functions to Flextronics. In very general terms, pursuant to the agreements, Nortel issues 12-month nonbinding "forecasts" of orders for goods and services expected to be placed by Nortel in the coming year. Flextronics uses these as a basis to place orders for materials from third parties and to otherwise manage its manufacturing process to

meet Nortel's expected demand. Nortel places monthly orders for finished goods to Flextronics, which, following acceptance by Flextronics, obligate Flextronics to ship goods in accordance with the accepted purchase orders.

8.      Section 26.10 of each of the MCMSAs provides that neither MCMSA nor any license or rights thereunder, in whole or in part, shall be assignable or otherwise transferable whether by merger, operation of law or otherwise, without the prior written consent of the other Party. The MCMSAs do permit Nortel to assign the agreements under certain circumstances to its subsidiaries or a company of which Nortel becomes a subsidiary; or a successor entity which has assumed in writing or by operation of law its obligations under the agreement.

### Treatment of the Flextronics-Nortel Agreements Under the Sale Motion

9.      The Sale Motion seeks authorization for the sale of Nortel's CDMA and LTE business to Nokia Siemens Networks B.V. ("Nokia Siemens"), subject to higher and better offers at an auction, pursuant to the terms of a proposed Asset Sale Agreement, dated as of June 19, 2009, attached as Exhibit A to the Notice of Filing of Revised Asset Sale Agreement, dated June 29, 2009 [Docket No. 1007] (the "Asset Sale Agreement"). The Asset Sale Agreement contemplates several ancillary agreements, including a proposed agreement to be entered into between Nortel and Nokia Siemens in accordance with the terms set out in a term sheet attached to the Asset Sale Agreement as Exhibit F (the "Flextronics Back-to-Back Agreement Term Sheet").

10.     By letter dated June 24, 2009, counsel for Nortel indicated to Flextronics that (i) Nortel does not intend to assume, assign or ratify any of Flextronics' agreements relating to the CDMA or LTE businesses in connection with the Sale Motion and (ii) Nortel intends to enter into an agreement consistent with the Flextronics Back-to-Back Agreement Term Sheet whereby

6154710

Nortel will agree to continue to place orders with Flextronics and otherwise perform under its agreements with Flextronics "for an interim period" until a new master agreement can be negotiated between Nokia Siemens and Flextronics.

11. The Flextronics Back-to-Back Agreement Term Sheet is not attached to the publicly filed Asset Sale Agreement, but a copy has been provided to Flextronics subject to confidentiality restrictions. The Flextronics Back-to-Back Agreement Term Sheet is the only documentation available to Flextronics concerning the back-to-back arrangement. Nortel has ignored Flextronics' requests for documents to explain the back-to-back and its effect on the Flextronics MCMSAs.

## **Objection**

12. The proposed agreement contemplated by the Flextronics Back-to-Back Agreement Term Sheet violates the language and intent of Section 365 of the Bankruptcy Code, as well as applicable Canadian law.[2] The agreement will effectively assign the benefits of the MCMSAs to Nokia Siemens (i) without curing existing defaults under the agreements or providing adequate assurance of future performance under the agreements as required under Section 365 of the Bankruptcy Code, and (ii) by violating applicable law prohibiting assignment of nonexclusive licenses of intellectual property extended by Flextronics to Nortel under the MCMSAs.

---

[2] Nortel Networks Limited is Flextronics' counterparty with respect to the relevant written agreements relating to the CDMA business. Flextronics will be filing a corresponding objection to the Sale Motion in the CCAA Proceedings in accordance with applicable procedure. In any event, Flextronics respectfully submits that the principles under US law set forth in this Objection are authority with respect to the treatment of Flextronics' agreements in the CCAA Proceedings. Moreover, Flextronics does business with certain of the Debtors relating to the CDMA business without a formal written document governing the relationship but where a contractual relationship does exist, making US bankruptcy law applicable to that relationship, and thus this Objection is applicable to those unwritten agreements.

13. Moreover, the Sale Motion seeks sale of certain of Flextronics' equipment free and clear of its interests in such equipment, to which Flextronics objects.

14. For each of these reasons, the Sale Motion's treatment of Flextronics' agreements is improper and the Sale Motion must be denied.

### A. The Back-to Back Arrangement is a De Facto Assignment

15. Under the proposed back-to-back agreement with Nokia Siemens, Nortel would pass through its rights and remedies under the Flextronics agreements to Nokia Siemens, with Nortel to remain in place as a mere conduit between Flextronics and Nokia Siemens. Nortel would maintain the fiction of a direct contractual relationship with Flextronics, even though Nortel will have sold the assets relating to the CDMA business and Nokia Siemens will be directing the operation of the business.

16. This back-to-back arrangement is a *de facto* assignment of Flextronics' agreements with Nortel to Nokia Siemens.

17. Bankruptcy courts adhere to the rule that form will not prevail over substance. See M.C. Prods., Inc. v. AT&T (In re M.C. Prods., Inc.), No. 98-56964, 1999 U.S. App. LEXIS 34116 at *9 (9th Cir. Nov. 2, 1999) (upholding a lower courts ruling that "exalted substance over form"); Breeden v. Tricom Bus. Sys., Inc., 244 F.Supp. 2d 5, 14 (N.D.N.Y. 2003) (concluding that bankruptcy's equitable principles are designed to prevent the elevation of form over substance); Ryker v. Current (In re Ryker), 301 B.R. 156, 167 (D.N.J. 2003) (finding that lower courts "rightly exercised their equitable powers to . . . protect the interests of all parties affected" when "refusing to elevate form over substance" and declaring that notice of a foreclosure sale was inadequate, notwithstanding literal compliance with the governing statutes).

18. In categorizing a debtor's relationship, and thus in determining the rights of a debtor's counter-parties, courts uniformly disregard the labels chosen for transactions in favor of

recognizing the legal effect of and factual circumstances surrounding those dealings. See Hall v. Goforth (In re Goforth), 179 F.3d 390, 395 (5th Cir. 1999) (determining that debtor was in fact a guarantor of plaintiff's employment contract though debtor never specifically guaranteed the contract and was not plaintiff's employer); Orix Credit Alliance, Inc. v. Pappas, 946 F.2d 1258, 1261-63 (7th Cir. 1991) (upholding lower court ruling that a lease was "in substance a conditional sale and should be treated as such"); Nova Info. Sys., Inc. v. Premier Operations, Ltd. (In re Premier Operations, Ltd.), 294 B.R. 213, 222 (S.D.N.Y. 2003) (agreeing with bankruptcy court where purported "assignments" were not supported by consideration and that there were no rights to assign, it was correct to look at the substance rather than the form and hold that they did not qualify as true assignments); Baldridge v. Continental Airline Holdings, Inc. (In re Continental Airlines, Inc.), 257 B.R. 658, 663 (Bankr. D. Del. 2000) (holding that a collective bargaining agreement was, in substance, an employment contract). Courts disregard these labels because it is the responsibility of a bankruptcy court determining the rights of a party against a bankruptcy estate to "look through the form to the substance in determining the true nature of the transaction in question." In re Premier Operations, 294 B.R. at 222 (quoting In re Wingspread Corp., 145 B.R. 784, 788 (S.D.N.Y. 1992); see also Pepper v. Litton, 308 U.S. 295, 304 (1939) (stating that the bankruptcy courts have equitable powers which can be invoked to solve a range of problems, including to ensure "that substance will not give way to form").

19.    Indeed, courts have refused to allow parties to circumvent limitations on assignment through "back to back" arrangements similar to the one proposed by Nortel here. See Public Service Commission of Maryland, et al. v. Panda-Brandywine, LP, 375 Md. 185, 825 A.2d 462 (2002).

20. In <u>Panda-Brandywine</u>, in response to the state's mandate that the electric industry restructure itself in order to promote competition, Potomac Electric Power Company ("<u>PEPCO</u>") proposed a restructuring plan that involved the complete divestiture of its electric generating assets and its various PPAs (power purchase agreements). The sale of its PPAs was to be accomplished through auction sales. <u>Id</u>. at 189. As part of PEPCO's plan to auction off its PPAs, the winning bidder was to enter into an Asset Purchase and Sale Agreement (APSA). Because some of the PPAs contained anti-assignment provisions, consent of the supplier would sometimes be required. Recognizing this, PEPCO inserted into the APSAs a provision that provided that in the event consent was not given:

> PEPCO agreed to sell to the buyer all capacity, energy, ancillary services and other benefits under the unassigned PPA and that the buyer would pay to PEPCO all amounts due from PEPCO to the Power Seller.

<u>Id</u>. at 192.

21. The Court held that the provision in the APSA constituted an assignment of rights and obligations under Panda's PPA in contravention of the anti-assignment provision of the PPA, and therefore determined the provision to be invalid and unenforceable.[3] <u>Id</u>. at 203.

22. Similarly here Nortel's proposed "back to back" arrangement with Nokia Siemens is a contravention of applicable legal and equitable principles and must not be authorized by this Court.

---

[3] In determining that the APSA provision constituted an assignment, the Court looked to the effect of the provision itself, in which: "PEPCO irrevocably and unconditionally appointed SEI [the successful bidder] as its exclusive agent for all purposes and to the fullest extend allowed by the PPA. SEI was expressly authorized to take all actions that PEPCO could lawfully take under the PPA, without further approval by PEPCO, including the right to perform all obligations of PEPCO in respect to the PPA, to deal directly with Panda. . ." <u>Id</u>. at 199.

> B. **Nortel Cannot Assume and Assign its Agreements with Flextronics Without Curing Existing Defaults and Providing Adequate Assurance of Future Performance Under Section 365(b) of the Bankruptcy Code**

23. Section 365 of the Bankruptcy Code allows the debtor-in-possession to "maximize the value of the debtor's estate" by assuming executory contracts or unexpired leases that "benefit the estate" and rejecting those that do not. Cinicola v. Scharffenberger, 248 F.3d 110, 119 (3d Cir. 2001) (quotations omitted).

24. Pursuant to Section 365(b) of the Bankruptcy Code, a debtor may not assume an executory contract or unexpired lease unless the debtor (a) cures all defaults or provides adequate assurance that it will promptly cure all defaults, (b) compensates, or provide adequate assurance that it will compensate, the other party to the contract for any actual pecuniary loss resulting from the default, and (c) provides the nondebtor party to the contract with adequate assurance of future performance. 11 U.S.C. § 365(b).

25. "Congress' intent in imposing these conditions on the ability of the debtor to assume the contract was 'to insure that the contracting parties receive the full benefit of their bargain if they are forced to continue performance.'" Ionosphere, 85 F.3d at 999 (quoting In re Superior Toy & Mfg. Co., 78 F.3d 1169, 1174 (7th Cir. 1996). "If the [debtor in possession] is to assume a contract or lease, the court will have to insure that the [debtor in possession's] performance under the contract or lease gives the other contracting party the full benefit of his bargain." S. Rep. No. 95-989, at 59 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5845; H.R. Rep. No. 95-595, at 348 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6304-05.

26. The statutory requirement of "adequate assurance of future performance by the assignee" affords "needed protection to the non-debtor party because the assignment relieves the trustee and the bankruptcy estate from liability for breaches arising after the assignment." In re Fleming Cos., 499 F.3d 300, 304 (3d Cir. 2007); Cinicola, 248 F.3d at 120; 11 U.S.C. § 365(k).

27. The phrase "adequate assurance of future performance" is not defined in the Bankruptcy Code. The United States Court of Appeals for the Third Circuit has noted, however, that the Bankruptcy Code adopted the phrase from Uniform Commercial Code § 2-609(1), which provides that "when reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of future performance . . . ." Cinicola, 248 F.3d at 120 n.10 (quoting UCC § 2-609(1)).

28. Here, assumption of the MCMSAs and related agreements relevant to the CDMA business would require a payment to Flextronics of not less than $16 million,[4] consisting primarily of unpaid accounts receivable for unpaid deliveries and ordinary course contractual claims.

29. These amounts must be paid in order for Nortel's rights under its agreements with Nortel to be assigned. Indeed, Flextronics respectfully submits that if the proposed "back to back" arrangement is an acceptable substitute for assumption and assignment of contracts, then no debtor ever need cure defaults under an executory contract. Instead, where cure costs are a concern, all a debtor must do is enter into a similar arrangement with the buyer and maintain the estate as a conduit between its counterparty and the purchaser for the duration of the agreement.

30. As to adequate assurance, Nortel has provided absolutely none. Indeed Nortel proposes that it remain as Flextronics' counterparty under the agreements, apparently leaving Flextronics no recourse to Nokia Siemens despite its expected control over the forecasting and ordering functions under the agreements. This proposed three-way relationship adds significant complexity to an already complex relationship, and is likely to prejudice Flextronics with respect to Nortel's future performance for several reasons.

---

[4] The amount of Flextronics' cure claim is an estimate, and is subject to change based upon a review of the supporting detail related thereto, including copies of invoices and purchase orders relating to the CDMA business.

31. First, payments to Flextronics are likely to be delayed in the event that Nortel has disputes related to payments due from Nokia Siemens. When such inevitable disputes arise, Nortel is likely to reduce payments to Flextronics accordingly, leaving Flextronics no recourse to Nokia Siemens, and thus no remedy other than withholding performance from Nortel, which is an extreme remedy not suitable for resolving ordinary course disputes. (Robins Decl. at para. 8).

32. As one example of the types of possible disputes, under the MCMSAs, as amended by the Amending Agreement and Settlement Agreement and Side Letter, Flextronics presents claims for excess inventory to Nortel on a quarterly basis. These claims are subject to a review process. Determining what is excess inventory will necessarily implicate Nokia Siemens' forecasts of expected demand. Further, Nokia Siemens may be liable to Nortel for certain items under the terms of the Asset Sale Agreement and ancillary agreements (including the "back to back" agreement). Flextronics believes it is likely that Nortel will hold back payment of claims to Flextronics as a result of (i) claims Nortel may have against Nokia Siemens, or (ii) difficulties in calculating or determining amounts due to Flextronics because of differing interpretations of the Amending Agreement and Settlement Agreement and Side Letter. (Robins Decl. at para. 9).

33. Second, following the sale to Nokia Siemens, Flextronics will likely receive certain purchase orders from Nortel some portion of which is related to Nokia Siemens and some portion of which is not. In the event that issues arise with respect to those orders, there may be confusion or uncertainty as to which of Nortel and Nokia Siemens is the proper party to address those issues, and which party is properly liable for claims by Flextronics related thereto. In addition, certain equipment in Flextronics' possession may be sold to Nokia Siemens if the Sale Motion is granted. Some of this equipment may be used in connection with other aspects of Nortel's business (e.g., to satisfy warranty or return obligations). This would leave Flextronics

subject to competing claims of Nortel and Nokia Siemens with respect to capacity of the equipment, or even possibly left unable to satisfy other contractual obligations to Nortel in the event that Nokia Siemens seeks to take possession of the equipment. (Robins Decl. at para. 10).

34. Further complications arise because Flextronics has in many cases paid Nortel for such equipment, and regularly charges back to Nortel in the ordinary course of business for depreciation and other amounts. While my understanding is that Nortel is current on these obligations (although Flextronics reserves all rights in that regard), the transfer of the equipment to Nokia Siemens should in no way impact Nortel's obligations to continue making such ordinary course payments. (Robins Decl. at para. 12).

35. The concerns listed here are illustrative of the types of adequate assurance concerns that Flextronics has. This list may not be comprehensive, and Flextronics reserves the right to raise other or additional adequate assurance concerns once it has had the opportunity to review the "back to back" agreement between Nortel and Nokia Siemens.

### C. Flextronics' Does Not Consent to Sale of Testing and Other Equipment to Nokia Siemens Free and Clear of Flextronics' Interests

36. Finally, Flextronics is in possession of various pieces of testing and other equipment related to the CDMA business. This equipment is used in various aspects of the Flextronics-Nortel relationship, including both Flextronics' so-called "Class A" obligations (i.e., the production and sale of new equipment) and so-called "Class B" obligations (i.e., warranty, return and repair obligations), each in connection with both CDMA and other lines of business with Nortel. My understanding is that Nokia Siemens is proposing to purchase only the Class A line of business, while leaving behind the Class B business with Nortel. Such a split of the Class A and B business lines will likely present difficulties for Flextronics in prioritizing and allocating resources among the Class A and B businesses and other non-CDMA businesses, and there will

6154710

likely be conflicting demands from Nortel and Nokia Siemens and uncertainty about which entity is truly in control. Further, in the event that Nokia Siemens seeks to take possession of such equipment or otherwise limit Flextronics' use of the equipment, Flextronics' ability to satisfy its obligations may be prejudiced. In the event that Nokia Siemens seeks to take possession of such equipment or otherwise limit Flextronics' use of the equipment, Flextronics' ability to satisfy its obligations to Nokia Siemens may be prejudiced. (Robins Decl. at para. 11).

37. To the extent that the Sale Motion seeks an order transferring any equipment in Flextronics' possession free and clear of Flextronics' interest in such equipment, Flextronics hereby objects, and hereby requests adequate protection of its interests pursuant to Section 363(e) of the Bankruptcy Code, which may be provided in the form of an escrow reserve to cover added costs or damages to Flextronics arising from these issues.

*[Remainder of page intentionally left blank.]*

**WHEREFORE,** Flextronics respectfully request that the Court deny the Sale Motion for the reasons set forth above and grant such other and further relief as the Court deems just and proper.

Dated: July 22, 2009

Steven J. Reisman, Esq.
Turner P. Smith, Esq.
James V. Drew, Esq.
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178-0061
Telephone: 212-696-6000
Facsimile: 212-697-1559
sreisman@curtis.com
jdrew@curtis.com

*Counsel to Flextronics Corporation and Flextronics Telecom Systems Ltd*

-and-

ASHBY & GEDDES, P.A.

_____
William P. Bowden (I.D. #2553)
Amanda M. Winfree (I.D. # 4615)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
Telephone: 302-654-1888
Facsimile: 302-654-2067
wbowden@ashby-geddes.com

*Delaware Counsel to Flextronics Corporation and Flextronics Telecom Systems Ltd*

6154710