Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION (the "Applicants")**

**SIXTEENTH REPORT OF THE MONITOR**
**DATED JULY 24, 2009**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceeding. The stay of proceedings was extended to July 30, 2009, by this Honourable Court in its Order dated April 28, 2009.

2.    Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the U.S. Court on January 14, 2009.

3.    Nortel Networks (CALA) Inc. ("NCI") (together with NNI and certain of its subsidiaries filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

4.    Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court") on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "U.K. Administrators").

5.    On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

6.    Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court.

**PURPOSE**

7.  The purpose of this Sixteenth report of the Monitor (the "Sixteenth Report") is to report on the following matters:

    a)  consolidated cash position and liquidity as at July 11, 2009;

    b)  actual receipts and disbursements from June 7, 2009 to July 11, 2009;

    c)  cash flow forecast for the period from July 12, 2009 to October 31, 2009;

    d)  current status of the Group Supplier Protocol Agreement ("GSPA");

    e)  the Applicants' request for an Order approving a process whereby the Applicants will call for certain claims of their creditors and establish a bar date by which such claims must be filed;

    f)  representative counsel matters;

    g)  the establishment of an application process for hardship payments relating to Canadian resident former employees;

    h)  status of foreign proceedings;

    i)  the Applicants' progress on restructuring; and

    j)  the Applicants' request for an extension of the stay of proceedings to October 30, 2009.

**TERMS OF REFERENCE**

8.  In preparing this Sixteenth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel.  EYI has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Sixteenth Report.

9.  Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

10. Capitalized terms not defined in this Sixteenth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor and the Claims Procedure Order (as herein defined).

**GENERAL BACKGROUND**

11. Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

12. As at June 30, 2009, Nortel conducts its global business through four reportable business unit segments, Carrier Networks ("CN"), Enterprise Solutions ("ES"), Metro Ethernet Networks ("MEN") and LG Nortel Co. Ltd. ("LGN").  The revenue and assets of each of the business units, except for LGN, is distributed among the multiple Nortel legal entities and joint ventures around the world.

4

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

**CONSOLIDATED CASH POSITION AND LIQUIDITY AS AT JULY 11, 2009**

14. At July 11, 2009, Nortel's estimated consolidated cash balance was approximately $2.7 billion. Nortel's consolidated cash balance is held globally in various Nortel entities and joint ventures. The following is an overview of Nortel's consolidated cash position as at July 11, 2009:

| Region | Gross Cash | Restricted | Unavailable Cash and JV's | Available Cash |
|---|---|---|---|---|
| NNL | 222 | (35) | (6) | 181 |
| Other Canada | 45 | (24) | - | 21 |
| | | | | |
| NNI | 698 | (19) | - | 679 |
| NNI - Reserve MMF (ST/LT) | 25 | - | (25) | - |
| NGS | 51 | - | (51) | - |
| Other US | 2 | - | - | 2 |
| **North America** | 1,043 | (78) | (82) | 883 |
| | | | | |
| NN UK Limited | 330 | (27) | - | 303 |
| Other EMEA Filed Entities | 429 | (4) | - | 425 |
| JV - Netas | 66 | - | (66) | - |
| EMEA non-filed entities | 26 | - | - | 26 |
| **UK/Europe** | 851 | (31) | (66) | 754 |
| | | | | |
| Greater China | 199 | (2) | - | 197 |
| Other ASIA PAC (excl JVs) | 195 | - | - | 195 |
| LG Nortel | 275 | - | (275) | - |
| Other JVs | 36 | - | (36) | - |
| **ASIA** | 705 | (2) | (311) | 392 |
| | | | | |
| NN CALA Inc. | 59 | - | - | 59 |
| CALA non-filed entities | 52 | - | - | 52 |
| **CALA** | 111 | - | - | 111 |
| | | | | |
| **Total Treasury Cash** | **2,710** | **(111)** | **(459)** | **2,140** |

15.  As at July 11, 2009, North America had cash available for operations and post–filing inter-company settlements of approximately $883 million compared to a gross cash position of approximately $1 billion.  Of this amount, approximately $202 million is held by Canadian entities and approximately $681 million is held by U.S. entities.

16.  None of the Applicants' Restricted Cash and Unavailable Cash is readily available to them.  Restricted Cash relates primarily to: (i) $17 million of cash collateral posted by Nortel with respect to non-EDC performance bonds and letter of credit facilities, (ii) $7 million of cash collateral posted with EDC for post filing performance bonds, (iii) $10 million related to cash collateral required to issue EDC performance bonds in exotic foreign currencies, (iv) $10 million held in escrow to the benefit of the insurer related to the Global Class Action, (v) $4 million held for the benefit of the Health and Welfare Trust (the "H&WT"), (vi) $1 million held in escrow in respect of a certain real estate lease, and (vi) $10 million held in the D&O Trust as described in the Pre-Filing Report. Unavailable Cash consists of $6 million deposited with financial institutions for future potential letter of credit or performance bonding requirements.  Nortel is currently working with the financial institutions to have these unavailable funds released.

17.  NNI's Restricted Cash includes the proceeds from the sale of the Layer 4-7 Business of $18 million being held in escrow by JP Morgan until an agreement is reached regarding allocation of these proceeds to various Nortel legal entities, including NNL.  NNI's Unavailable Cash as at July 11, 2009 includes $25 million related to the Money Market Reserve Primary Fund (the "MMF").  Since filing, an amount of $40 million has been received from the MMF and a further $6 million is expected to be received before the end of 2009.

18.  NGS, a U.S. non-debtor entity, had cash of approximately $51 million for use in its own operations and for settlement of inter-company transactions.

19. The U.K. Administrators had cash available for operations and post–filing inter-company settlements for NNUK and the other EMEA Debtors, of approximately $728 million. The EMEA non-filed entities had available cash of approximately $26 million which is expected to be used primarily to fund their in-country operations and inter-company settlements.

20. NETAS, a joint venture in which Nortel owns a 53% interest, has approximately $66 million of cash of which $35 million represents Nortel's proportionate share. Nortel believes these funds will continue to be used to fund NETAS's operations and repatriation of these funds requires approval of the respective joint venture partners.

21. Nortel entities in the APAC region have approximately $392 million of cash available for operations and inter-company settlements.   As a result of the regulatory regime in the People's Republic of China, the funds in Greater China of approximately $197 million are generally only available to fund operations within China and inter-company settlements.   LGN and other joint ventures Nortel participates in, hold approximately $311 million of cash of which $159 million represents Nortel's proportional share.   Repatriation of these funds requires approval of the respective joint venture partners.

22. As at July 11, 2009 NCI's available cash was $59 million.  On July 14, 2009 NCI, a U.S. domiciled entity, filed a voluntary petition under Chapter 11 of the Code in the U.S. Court. Pursuant to the First Day Orders NCI's cash is available for its operations and post–filing inter-company settlements. NCI's cash as of the date of filing was $56 million. NCI's cash is not available, except under circumstances specified in the First Day Orders to fund its non-debtor subsidiaries in the CALA region.

23. The CALA non-filed entities have approximately $52 million of cash generally available to fund their in-country operations and inter-company settlements.

**ACTUAL RECEIPTS AND DISBURSEMENTS FROM JUNE 7, 2009 TO JULY 11, 2009**

24. The Applicants' actual consolidated net cash inflow for the period from June 7 to July 11, 2009, was $79.2 million. A summary of the actual receipts and disbursements as compared to the forecast filed with the Fifteenth Report of the Monitor dated April 24, 2009 (the "Fifteenth Report Forecast") is attached as Appendix A.

25. Actual net cash inflow exceeded the forecast by $34.3 million. Significant items contributing to the positive variance were as follows:

   a) a positive permanent variance of $17.3 million with respect to the collection of accounts receivable due to the following:

      i. a positive permanent variance of $5.7 million as a result of a receipt from a Vietnamese customer not originally forecast;

      ii. a positive permanent variance of $2.6 million as a result of higher than forecast collections from contract manufacturers; and

      iii. the balance of the increase of $9.0 million related to higher than expected trade billings thereby creating a corresponding favourable impact on collections;

   b) a positive timing variance relating to net inter-company receipts and disbursements of approximately $9.9 million primarily as a result of an inventory receipt from NNI of $12.0 million received in the week ended July 4 that was forecast to be received in the third week of July;

c)   a positive timing variance in payroll of $1.6 million primarily due to payments clearing the bank later than forecast;

d)   A positive variance in benefits of $3.6 million as a result of the following:

    i.   $1.0 million positive timing variance related to a reforecast of certain remittances to the end of July; and

    ii.   $2.6 million positive permanent variance as a result of a refinement to the amount of employer's portion of employee related costs;

e)   a positive timing variance of $5.0 million primarily relating to a $3.6 million payment to Flextronics in respect of excess and obsolete inventory that has been reforecast from June 2009 to August 2009;

f)   a negative timing variance of $4.3 million relating to non-inventory purchases as a result of higher than forecast number of vendor invoices being processed at quarter end; and

g)   a positive timing variance of $1.2 million relating to restructuring costs as certain professional fees are anticipated to settle later than originally forecast.

26. Available Cash was impacted by a negative permanent variance of $4.8 million as a result of an unfavourable foreign exchange translation on Canadian dollar denominated cash balances due to the depreciation of the Canadian dollar relative to the U.S. dollar.

27. Unavailable Cash increased by approximately $1.0 million as a portion of the cash collateral posted for non-EDC performance bonds was re-classified from Restricted Cash to Unavailable Cash as a result of decreased collateral requirements relating to the maturity of certain of the underlying bonds.

28.  Restricted Cash decreased by $6.0 million primarily as a result of the following:

    a)  $1.0 million decrease related to the reduced collateral needed on non-EDC performance bonds;

    b)  $4.1 million decrease in the balance of the H&WT; and

    c)  the remaining decrease of $0.9 million is related to the depreciation of the Canadian dollar relative to the U.S. dollar thereby negatively impacting the Canadian dollar denominated Restricted Cash balances.

29.  Since January 14, 2009, the Applicants have not advanced any loans to other non-Applicant Nortel entities.

30.  As reported in the Monitor's Fifteenth Report, EDC and NNL have entered into the EDC Support Agreements (as defined in the Initial Order). In connection with the EDC Support Agreements, NNL agreed to post cash collateral of $7 million with EDC to support outstanding performance bonds issued by EDC on behalf of NNL. In return, EDC agreed to release a charge that had been granted to it under the Initial Order and to allow NNL to access certain proceeds from the sale of the Westwinds facility that had been deposited in a special account. Pursuant to the Endorsement of the Honourable Mr. Justice Morawetz dated June 29, 2009, the above arrangement was to be effective upon the filing of a Monitor's Certificate confirming that EDC had advised the Monitor that it was in receipt of the cash collateral. The Monitor's Certificate was delivered to this Honourable Court on June 30, 2009.

**CASH FLOW FORECAST FOR THE PERIOD JULY 12, 2009 TO OCTOBER 31, 2009**

31.  Nortel, with the assistance of the Monitor, has prepared an updated 19-week cash flow forecast for the period July 12 to October 31, 2009 (respectively, the "July 12 Forecast" and the "Forecast Period").  A copy of the July 12 Forecast is attached as Appendix B.

32.  The July 12 Forecast indicates the Applicants will have total receipts of $385 million, including $94 million pursuant to the IFSA, and total disbursements of $465 million resulting in a net cash outflow of $80 million.

33.  During the Forecast Period it is assumed NNL does not make any additional post filing draws on the NNI Loan beyond the $75 million drawn prior to February 1, 2009.

34.  At July 11, 2009, the Applicants have Available Cash balances of approximately $202 million excluding Restricted Cash and Unavailable Cash of approximately $65 million.

35.  The significant assumptions used in preparing the July 12 Forecast include the following:

   a)  the impact of the sale of the CDMA business and LTE Access assets business with an assumed closing date of August 31, 2009 has been reflected in the July 12 Forecast.  Proceeds of sale are assumed to be held in escrow pending allocation and are not included in the Forecast Period.  No other potential business unit divestiture transactions are assumed to close within the Forecast Period;

11

b) accounts receivable collections have been estimated by the Applicants' collection group based on revenue forecasts and historic customer collection experience;

c) payments from the U.S. Debtors totalling $94 million pursuant to the Interim Funding and Settlement Agreement dated June 9, 2009 (the "IFSA") have been reflected in the July 12 Forecast. Transfer pricing or similar payments ("TPA Payments") from non-filed entities have not been included in the forecast, however, discussions with the non-filed entities are on-going with respect to TPA Payments for 2009;

d) payroll disbursements include:

    i.   payments under the Key Employee Retention and Incentive Plans; and

    ii.   payment of the Annual Incentive Plan amounts earned related to the second quarter of 2009;

e) all disbursements are made assuming suppliers' pre-filing amounts are stayed and post-filing amounts are paid on significantly reduced credit terms as a result of the CCAA proceedings;

f) inventory purchases include payments to Flextronics as provided for pursuant to the Amending Agreement dated January 13, 2009, and the Settlement Agreement and Side Letter dated May 22, 2009 as approved by this Honourable Court;

g) inter-company trade accounts for post-filing transactions continue to settle on a cash basis between the Applicants, U.S. Debtors, EMEA Debtors and the other Nortel entities. Inter-company pre-filing loans between the Applicants and all other Nortel filed and non-filed entities are stayed;

h) severance payments are stayed during the Forecast Period;

    i)   pension funding payments are made for both current and special service payments based upon existing requirements with respect to the registered defined benefit and defined contribution plans. Funding for non-registered pension or other retirement plans is stayed;

    j)   funding in the ordinary course for the H&WT is included; and

    k)   all interest payments relating to the Company's pre-filing indebtedness are stayed. Interest with respect to the post filing NNI Loan has been included.

36.   The Applicants continue to incur significant R&D and corporate costs on behalf of all Nortel entities around the world. These expenses are incurred by the Applicants in order to preserve the enterprise value of Nortel's businesses and coordinate the global restructuring for the benefit of all stakeholders.

37.   The July 12 Forecast indicates the Applicants will experience a negative cash flow of approximately $77 million during the Forecast Period including receipts totalling $94 million pursuant to the IFSA.

38.   It is the Monitor's view that NNL has adequate resources to fund operations through the Forecast Period. Further arrangements between NNL and the U.S. Debtors will be necessary in order to address NNL liquidity needs for periods subsequent to September 30, 2009 as the IFSA provides funding through this date.

**CURRENT STATUS OF GSPA**

39.   Since the Filing Date, Nortel entities have continued to purchase goods and services from one another on a basis consistent with the operation of the business prior to these proceedings. Post-filing transactions between the U.S. Debtors and the Applicants are pursuant to court orders entered in the Canadian Proceedings (e.g. the Initial Order) and the U.S. proceedings and/or in accordance with the Code (together, the "Trading Orders"). Trade between the EMEA Debtors and the

Applicants is pursuant to the GSPA. The GSPA has continued to be extended by the parties, substantially in the same form as the initial GSPA.

40.    The purpose of the Trading Orders and GSPA is to ensure that goods and services purchased after the Filing Date are paid in full without any set off, deduction, withholding, counter-claim or payment netting with respect to amounts owed by the parties prior to the Filing Date.  In addition, the Trading Orders and GSPA set out the requirement for the Applicants to secure any unpaid amount owing for post-filing purchases to the U.S. Debtors or EMEA Debtors by way of a charge on the assets of the Applicants (the Inter-Company Charge).

41.    The Applicants are seeking Court approval of the eighth extension of the GSPA. The eighth extension of the GSPA expires on September 9, 2009. The Monitor supports the extension of the GSPA.

## CLAIMS PROCESS

*General*

42.    The Applicants, in conjunction with the Monitor, have prepared a draft claims procedure order ("Claims Procedure Order"), which the Applicants are seeking to have approved by this Honourable Court.

43.    The purpose of the proposed claims process set out in the Claims Procedure Order is to allow creditors of the Applicants to formally file certain Claims (as defined in the Claims Procedure Order) against each Applicant as at the Filing Date ("Pre-Filing Claims") and Claims arising against each Applicant on or after the Filing Date relating to the restructuring, termination, repudiation or disclaiming of any contract, lease or other agreement or obligation (a "Restructuring Claim").

44.  Numerous issues are expected to be encountered with respect to the nature, valuation and jurisdiction of Claims, including but not limited to:

a)  Creditors may be uncertain as against which Applicant or Nortel subsidiary their Claims are against and may choose to file duplicate Claims in both the Canadian and U.S. proceedings;

b)  Creditors may file Claims relating to previously unknown actions or the Creditors' initial valuation of their Claims may differ substantially from the Applicants' previous estimates of such Claims; and

c)  it is anticipated there will be a high volume of trade, contingent, litigation and other unsecured Claims requiring significant time and effort on the part of the Applicants and the Monitor to resolve.

45.  Undertaking a claims process at this time will provide useful information to the Applicants, their stakeholders and the Monitor as to the number, nature and value of Claims against the Applicants.  This will advance the Applicants restructuring efforts, provide essential time for the Claims to be identified and ultimately adjudicated in advance of a plan of compromise and arrangement (the "Plan") being developed and voted on by the Creditors.

46.  The Claims Procedure Order addresses only the setting of a bar date and the calling for proofs of claim for certain types of Claims.  The Applicants will bring further motions before this Honourable Court requesting approval to call for claims not included in the proposed claims procedure and requesting approval of a process to establish a final determination of the Claims filed for purposes of voting on and participating in any distribution pursuant to a Plan.

*Proposed Claims Process*

47. The purpose of the proposed Claims Procedure Order is to establish Pre-Filing Claims and Restructuring Claims against the Applicants and establish Claims against the current or former directors or officers of the Applicants (the "Directors/Officers Claims").

48. Certain Claims will not be required to be proven (the "Excluded Claims") at this stage of the CCAA proceedings pursuant to the claims process. The Applicants propose this be without prejudice to the Applicants' right to seek a further Order to provide for, amongst other things, other Claims to be proven. Excluded Claims at this stage for the purpose of the proposed Claims Procedure Order include:

    a) Claims secured by any of the Charges (as defined in the Claims Procedure Order);

    b) Claims as between any of the Applicants, and as between any of the Applicants and any of the Applicants' direct or indirect subsidiaries or affiliates other than Claims by those joint ventures as defined in the Claims Procedure Order (the "Inter-Company Claims");

    c) Claims of any current or former employee of any of the Applicants for amounts owing to him or her on account of wages, salaries, any other form of compensation (whether sales based, incentive based, deferred, retention based, share-based or otherwise), severance or termination pay, employee benefits (including, but not limited to, medical and similar benefits, disability benefits, relocation or mobility benefits and benefits under employee assistance programs), pension and retirement benefits, vacation pay and employee expenses and the claims of any Director for compensation for acting as a Director including without limitation fees, deferred share-based compensation, benefits and director expenses (collectively "Compensation Claims");

d) Claims for grievances under any collective agreements to which the Applicants, or any of them, are a party; and

e) Claims of any Director and Officer of the Applicants for indemnification and/or contribution arising from such director's or officer's service to any Applicant. .

49. As described in previous Monitor's Reports and motion materials previously presented to this Honorable Court, NNC and NNL each issued and/or guaranteed certain Bonds that are governed by Bondholder Trust Indentures, as defined in the Claims Procedure Order.   The Pre-Filing Claims will include, among other Claims, the Claims of Bondholders and those Bondholders whose Bonds were guaranteed by the Applicants.  The Claims Procedure Order authorizes and directs the Bondholder Trustee to file a claim in respect of all of the Bonds for which such Bondholder Trustee acts, on an aggregate basis for each separate series of Bonds issued under each Bondholder Trust Indenture.  Bondholders are not required to file individual proofs of claim relating solely to the debt evidenced by their Bonds, and the Applicants and the Monitor will disregard any such Proof of Claim filed by any individual Bondholder.  It is the Applicants intention to seek a further Order of this Honourable Court to address the process by which individual Bondholders may vote on a Plan.

*Claims Bar Date*

50. The Applicants propose that any Creditor asserting a:

a) Pre-Filing Claim, be required to file a proof of claim with the Monitor prior to 4:00 pm (prevailing Eastern time) on September 30, 2009 (the "Pre-Filing Claims Bar Date");

b) Restructuring Claim, be required to file a proof of claim with the Monitor prior to 4:00 pm (prevailing Eastern time) on the later of:

    i. September 30, 2009; and

    ii. the date that is 30 days after the date on which the Monitor sends a Proof of Claim Document Package to a Person with respect to a Restructuring Claim ("Restructuring Claim Bar Date"); and

c) Director/Officer Claim, be required to file a proof of claim with the Monitor on the Pre-Filing Claims Bar Date except to the extent the Director/Officer Claim relates to a Restructuring Claim in which case it shall be filed by the Restructuring Claim Bar Date.

(collectively known as the "Claims Bar Date")

51. Any Creditors not filing a Proof of Claim with the Monitor on or before the applicable Claims Bar Date shall:

a) be forever barred from making or enforcing any Claim against the Applicants or the Directors or Officers;

b) not be entitled to vote at any creditors meetings in respect of a Plan or to receive any distribution thereunder; and

c) not be entitled to any further notice in and shall not be entitled to participate as a Creditor in these proceedings.

52. The Monitor believes the Pre-Filing Claims Bar Date and the Restructuring Claims Bar Date are reasonable in that they provide in excess of 60 calendar days from the date of the proposed Claims Procedure Order (or at least 30 days for Creditors with Restructuring Claims arising after August 31, 2009) during which Creditors may

evaluate their Claims against the Applicants and Directors/Officers and submit the necessary Proofs of Claim.

*Notice to Creditors*

53. The Monitor will send a copy of the Notice to Creditors, the Creditors Guide to Completing the Proof of Claim Form and a Proof of Claim form (the "Proof of Claim Document Package") to each Known Creditor by regular mail within 10 days of the making of the Claims Procedure Order. The Monitor is not required to send a Proof of Claim Document Package to Bondholders, Directors or Officers or the current or former employees of any Applicant. A copy of the Proof of Claim Document Package is attached hereto as Appendix C.

54. With respect to Bondholder Claims, the Monitor will send to each of the Bondholder Trustees a Proof of Claim Document Package within 5 days of the making of the Claims Procedure Order.

55. The Monitor will publish a Notice to Creditors prior to August 15, 2009 (to be coordinated with the U.S. Debtors) in the Globe and Mail (National Edition) and The Wall Street Journal (National and Global Editions).

56. The Monitor will post an electronic copy of the Notice to Creditors within five days following the making of the Claims Procedure Order on its website at www.ey.com/ca/nortel.

57. The Monitor will send a Proof of Claim Document Package to each creditor with a Restructuring Claim no later than 10 days following the time the Monitor becomes aware of the Restructuring Claim.

58. In addition, provided that such request is received by the Monitor prior to the applicable Claims Bar Date, the Monitor will send a Proof of Claim Document

Package to any person claiming to be a Creditor as soon as reasonably possible after receipt of such a request from a potential creditor.

59.  In the Monitor's view, the identification of Known Creditors, the mailing of Proof of Claim Document Packages and newspaper advertisements described above will provide sufficient and timely notification to allow Creditors to submit their Proofs of Claim prior the applicable Claims Bar Date.

*U.S. Claims Order and Cross Border Protocol*

60.  As has been described in previous Monitor's reports, Nortel is a highly integrated business with operations spanning various business units that operate around the world. Accordingly, its third party suppliers, business partners and Bondholders have relationships with many different Nortel legal entities and across many of Nortel's business units.

61.  The U.S. Debtors, other than NCI, are concurrently seeking approval from the U.S. Court of a claims procedure order authorizing them to call for claims. We are advised by U.S. legal counsel to Nortel that a hearing has been set for August 4, 2009 for this purpose.

62.  Due to the geographic proximity and the extent of the financial and operational integration between the Applicants and the U.S. Debtors, the CCAA claims process and the Chapter 11 claims process are being coordinated to minimize potential confusion by Creditors of the various Canadian and U.S. estates as to both the appropriate claims process and procedures within that process. Accordingly, in an attempt to avoid confusion amongst the Creditors, the Applicants, in conjunction with the Monitor and the U.S. Debtors, have drafted the Claims Procedure Order and the U.S. Claims Order with a view to coordinating, to the extent possible, the timing and certain other substantive provisions in each order.

63.  These provisions include, amongst other things:

    a)  the timing of and the newspapers in which the Notices to Creditors will be published;

    b)  the timing of mailing the Proof of Claim Packages to the Known Creditors; and

    c)  the establishment of September 30, 2009 as the Pre-Filing Claims Bar Date in Canada and the General Bar Date in the U.S.

64.  It is also the intention of the Applicants and the U.S. Debtors to seek a cross border claims protocol ("Cross Border Claims Protocol") in the future to deal with the cross border issues that will inevitably arise in the consideration and resolution of Claims.  If approved by this Honourable Court and the U.S. Court, the Cross Border Claims Protocol will supplement the procedures established by each of the Canadian Court and the U.S. Court with respect to the filing and determination of Claims, notably those Claims filed in the wrong jurisdiction and Claims filed against the Applicants and U.S. Debtors.

65.  As noted above, efforts have been made to coordinate and streamline the Canadian and U.S. Claims processes.  However, there are two substantive differences between them, that arise from the differing legal regimes and/or from the differing practices and procedures in the two jurisdictions.

66.  The first difference is with respect to "Compensation Claims" as defined in the Canadian Claims Procedure Order.  In the U.S. Claims Order, all employees (current and former) of the U.S. Debtors must fill out and submit proofs of claims. The Canadian approach, on the other hand, is to exempt Compensation Claims from the current call for claims in Canada.  The Applicants and the Monitor are of the view that this blanket exemption is preferable for the Canadian estates, particularly in view of the fact that in Canada representative counsel for former employees has

been appointed (which is not the case in the United States), and the Applicants, the Monitor and representative counsel for the former employees intend on establishing a claims process that can deal more specifically and more efficiently with these claims. The Applicants have also consulted with their human resources staff and considered operational and messaging issues that would arise from requiring all current and former employees in Canada to file proofs of claim at this time, and it is the Applicants' and Monitor's view the blanket exemption with respect to the Compensation Claims is preferable. As referred to in the affidavit of John Doolittle sworn on July 24, 2009, this blanket exemption approach was not taken in the United States due to issues related to U.S. laws, practice and/or procedure.

67.   The Canadian Claims Procedure Order also exempts all current and former officers and directors from filing indemnity and contribution claims at this time. On the other hand, the U.S. Claims Order exempts only current (as of August 1, 2009) officers and directors from filing such claims. As officers are also employees, an officer's claims for compensation might overlap with his or her claims for indemnity. The Monitor views the Canadian approach as simpler and clearer, particularly in light of difference in treatment of employee claims, since it just leaves all officers and directors (rather than just current officers and directors) outside of the current claims process for all claims based on compensation, indemnity or contribution. The Monitor notes that current and former Canadian officers and directors are a finite number of people, and that it should be manageable to give this finite number of people notice of any subsequent requirement to file such claims, without creating additional delay in the future.

## REPRESENTATIVE COUNSEL MATTERS

68.   On April 21, 2009 CAW-Canada and certain former unionized employees (collectively, the "CAW") as well as representatives of the former employees, including, amongst others, pensioners of the Applicants (collectively, the "Former Employees") sought orders requiring the Applicants to make payments in respect of

amounts claimed owing under, amongst other things, the *Employment Standards Act* (Ontario) and other applicable provincial employment standards legislation, and a collective bargaining agreement.

69. The motions were dismissed in an Endorsement of the Honourable Mr. Justice Morawetz dated June 18, 2009. The CAW and the Former Employees have sought leave to appeal the dismissals.

70. On July 21, 2009 the CAW and the Former Employees each brought a Motion for Directions in Respect of a Motion for Leave to Appeal and a Proposed Appeal to the Court of Appeal for Ontario with respect to the Endorsement of the Honourable Mr. Justice Morawetz dated June 18, 2009. Each Motion for Directions sought, amongst other things, that leave to appeal and appeal be consolidated and heard on August 28, 2009.

71. On July 22, 2009, the Honourable Madame Justice MacFarland of the Ontario Court of Appeal released an Endorsement in respect of the Motions for Directions which provided that the motions for leave to appeal and appeal would not be consolidated, but that leave to appeal (and, if leave to appeal is granted, appeal) would be expedited. The Monitor understands that all materials in connection with the leave to appeal motions are to be served and filed by August 25, 2009.

## ESTABLISHMENT OF AN APPLICATION PROCESS FOR HARDSHIP PAYMENTS

72. On June 18, 2009, this Honourable Court issued an Endorsement directing the Monitor to "determine the feasibility of establishing a process by which certain creditors facing hardship might receive a partial distribution in advance of a general distribution to creditors".

73. The Monitor has worked closely with the Applicants and Koskie Minsky LLP to develop criteria to evaluate applications for hardship payments asserted by

Canadian resident former employees and to establish a process for the submission and review of applications and the payment of accepted claims. The development of the hardship case process considered among other factors:

    a)   timeliness of the application and review process;

    b)   responsiveness to the needs of those facing hardship; and

    c)   the Applicants' responsibility to preserve its liquidity for the benefit of all stakeholders.

74.   A Notice Respecting Hardship Payment Applications, which includes the eligibility requirements and an application form, in the form attached at Appendix D, will be posted on the website of each of the Monitor and the Nortel Retirees and Former Employees Protection Committee (the "NRPC"). The Monitor believes these are channels the former employees frequent for information relating to these proceedings and by posting the notice on these websites the information concerning application process for hardship payments will be readily accessible to potential claimants. While the potential number of claimants is not known, preliminary data indicates it is not expected to be a significant number.

75.   The criteria to evaluate eligibility for payment to those former employees, with a potential claim against the Applicants, who are experiencing hardship as a result of loss of income and loss of medical benefit coverage, have now been established. The criteria and process addressing eligibility are detailed in the Eligibility Requirements and Procedures with Respect to Hardship Payment Applications which are included in the Notice Respecting Hardship Payment Applications and have been designed to be simple and functional.

76. To be eligible, a claimant must:

   a) not have another source of income and either:

      i. be incurring significant unreimbursed medical expenses while in receipt of employment insurance; or

      ii. not be in receipt of employment insurance and be experiencing financial difficulty.

77. The process includes the following steps:

   a) applications are reviewed and are either accepted or rejected by a person designated by the Monitor within 21 days of receipt of a completed claim form;

   b) applications which are rejected will be reviewed by a committee comprised of one representative of the Monitor, one representative of the Company and one representative of the NRPC;

   c) applications that are rejected by the three person review committee outlined above may be appealed to this Honourable Court; and

   d) payment is to take place within seven business days of an application being accepted.

78. To address the Applicants continuing financial pressure and liquidity concerns, the procedure provides:

   a) the maximum amount payable to an individual would be limited to CDN$12,100;

   b) the total amount available for hardship payments is to be capped at CDN$750,000; and

c) the application period would run for a fixed period ending on November 30, 2009.

79. Each hardship payment made shall be considered an advance against any eventual distribution to which a claimant may be entitled under a Plan. While it is premature at this time to determine claims and estimate potential distributions to creditors by the Applicants, it is appropriate to recognize the needs of former employees experiencing extreme hardship. The Monitor recognizes the need to balance these factors and establish an equitable compromise.

80. The Monitor believes the proposed application process for hardship payments and the payment limits proposed achieve that balance.

81. The procedures require that the Monitor report back to this Honourable Court before November 30, 2009 with respect to the processing and administration of hardship applications.

## STATUS OF FOREIGN PROCEEDINGS

### *Chapter 11*

82. The following is a summary of the court orders that have been issued and the financial information that has been filed in the U.S. Chapter 11 proceedings since the last update provided in the Monitor's Fifteenth Report.

83. On June 26, 2009, the U.S. Debtors obtained an order approving a process for the U.S. Debtors to obtain landlords' consent to extensions of the statutory deadlines by which the U.S. Debtors must assume or reject unexpired real property leases.

84. On June 29, 2009, the U.S. Debtors obtained orders:

a) approving the IFSA between the U.S. Debtors, the Canadian Debtors and certain of the EMEA Debtors;

b) approving amendments to the cross-border protocol mutually agreed to by the U.S. Debtors, the Canadian Debtors, the Monitor, the UCC and the *Adhoc Bondholder Committee*; and

c) authorizing the U.S. Debtors, subject to certain conditions, to make loans or equity transfers to their non-debtor subsidiaries in an aggregate amount not to exceed $2 million.

85. On June 29, 2009, the U.S. Debtors obtained a final order authorizing NNI, subject to certain conditions, to enter into one or more letters of credit and bonding facilities, up to $30 million, for the purpose of issuing surety and performance bonds to secure the U.S. Debtors' customer obligations.

86. On June 30, 2009, the U.S. Debtors obtained an order approving the bidding and sale procedures for the sale by the U.S. Debtors of certain CDMA and LTE assets of the Carrier Networks business and certain break-up fee protections for Nokia Siemens Networks, B.V. as the stalking horse bidder.

87. On June 30, 2009, the U.S. Debtors filed the Debtor-in-Possession Monthly Operating Report for the period May 3, 2009 through May 30, 2009.

88. On July 14, 2009, NCI filed a Chapter 11 petition. On July 17, 2009, the U.S. Debtors obtained orders:

a) directing the joint administration of the Chapter 11 case of NCI with the U.S. Debtors' main Chapter 11 proceedings;

b) authorizing numerous orders previously entered in the U.S. Debtors' main Chapter 11 proceedings govern NCI prospectively in its Chapter 11 proceeding; and

c) authorizing NCI to be afforded the protections of the automatic stay applicable in Chapter 11 proceedings under section 362 of the Code.

89. The Applicants' will seek Chapter 18.6(4) recognition of the orders relating to the NCI Chapter 11 filing from this Honourable Court.

90. On July 15, 2009, the U.S. Debtors, other than NCI, filed a motion to establish September 30, 2009 as the bar date for certain claims in the Chapter 11 cases.

91. On July 17, 2009, the Pension Benefit Guarantee Corporation filed a complaint in the U.S. District Court for the Middle District of Tennessee seeking the termination of NNI's defined benefit pension plan.

*Chapter 15*

92. The following is a summary of the court orders that have been issued and the financial information that has been filed in the U.S. Chapter 15 proceedings since the last update provided in the Monitor's Fifteenth Report.

93. The Monitor has continued to file with the U.S. Court and serve on required parties notices of each of its reports to this Honourable Court.

94. On June 30, 2009, the Monitor filed, with the U.S. Court, and served on required parties' motions to enforce the orders of this Honourable Court approving the IFSA and the bidding procedures in connection with the sale of certain assets relating to Nortel's CDMA and LTE business. The U.S. Court entered orders approving both of these motions on July 16, 2009.

95. Notice of the Third Amended and Restated Initial Order of this Honourable Court was filed with the U.S. Court on July 10, 2009.

96. On July 15, 2009, the Monitor entered into a stipulation with the plaintiffs who filed a class action complaint in the U.S. District Court for the Southern District of New York for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and of Rule 10b-5 promulgated there under by the U.S. Securities and Exchange Commission against Mike Zafirovski and Pavi Binning. The stipulation

permits the limited modification of paragraph 19 of the Initial Order, as given effect in the Recognition Order of the U.S. Court, for the sole purpose of allowing any member of the purported class in the class action litigation to move the District Court for selection of lead plaintiff in the litigation. The U.S. Bankruptcy court entered an order approving the Stipulation on July 16, 2009.

*France*

97. NNSA is subject to secondary insolvency proceedings and is under the direction of the NNSA Liquidator and NNSA Administrator.

98. France NNSA is party to the eighth extension of the GSPA and acceded to the IFSA.

*Israel*

99. The Israeli court established a claims bar date of July 26, 2009 for filing of claims against Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communication Holdings (1997) Limited. The Applicants have prepared and filed their claims in these proceedings.

## PROGESS ON RESTRUCTURING

*CDMA Business and LTE Access Assets Sale*

100. As discussed in the Fourteenth Report, NNC, NNL and certain of NNL's subsidiaries, including NNI entered into a "stalking horse" asset sale agreement dated June 19, 2009 with Nokia Siemens Networks B.V. ("Nokia Siemens") for the sale of substantially all of its CDMA Business and LTE Access Assets for $650 million.

101. The Bidding Procedures described in the Fourteenth Report were approved by this Honourable Court and by the U.S. Court on June 29, 2009.

102. The Bidding Procedures provided all bids must be received by the Sellers not later than July 21, 2009 and the Sellers will conduct an Auction of the Purchased Assets on July 24, 2009 to determine the successful purchaser.

103. It is anticipated Nortel will ultimately seek a final Sales Order from the U.S. Court and an Approval and Vesting Order from this Honourable Court on or about July 28, 2009 by way of a video conference joint hearing pursuant to the Cross-Border Insolvency Protocol approved by both the Canadian Court and the U.S. Court. A detailed report with respect to the outcome of the bidding process, auction and these motions will be filed separately.

*Enterprise Solutions Sale*

104. On July 20, 2009, Nortel announced that NNL, NNI and certain of its other subsidiaries had entered into an asset and share sale agreement with Avaya Inc. ("Avaya") for its North American, CALA and APAC enterprise solutions business as well as the shares of Nortel Government Solutions Incorporated and DiamondWare, Ltd. At the same time NNUK, through the U.K. Administrator, entered into an asset sale agreement with Avaya for the EMEA portion of its enterprise solutions business.

105. These agreements include the planned sale of substantially all of the assets of the enterprise solutions business globally for a purchase price of US$475 million.

106. It is anticipated Nortel will seek approval of the Bidding Procedures with respect to the Avaya asset and share sale agreement on or about August 4, 2009 before this Honourable Court. A detailed report in respect of these motions will be filed separately.

107. Nortel continues to advance its discussions with interested parties for its other businesses. In parallel with these sales discussions, the company continues to assess

other restructuring alternatives for these businesses in the event it is unable to maximize value through sales.

108. These announced business divestitures are a significant milestone in the Applicants' progress towards developing a Plan. The Applicants are continuing to assess alternatives for remaining businesses and undertake other restructuring activities that will contribute to the development of a Plan.

## REQUEST FOR AN EXTENSION TO THE STAY OF PROCEEDINGS

109. Pursuant to the Order of this Honourable Court dated April 28, 2009, the stay extension granted expires on July 30, 2009. The Applicants are seeking an extension of the Stay Period for a period of 93 days, until and including October 30, 2009.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

110. The Monitor has assisted and continues to assist the Applicants in their efforts to review their operations and assess a range of restructuring alternatives in consultation with the Applicants' legal and financial advisors. The Monitor believes the Applicants are working diligently and in good faith and continue to progress to development of a Plan.

111. The Monitor supports the Applicants' request to have the eighth extension to the GSPA approved by this Honourable Court.

112. The Monitor supports the Applicants request for approval of the application process for hardship payments.

113. The Monitor recommends this Honourable Court approve the Claims Procedure Order on the terms and conditions substantially in the form as submitted by the Applicants because a determination of claims on a timely basis will allow the Applicants to develop a Plan using information obtained in the Claims Procedure.

114. It is the Monitor's view, based upon the key assumptions used in preparation of the Applicants' July 12 Cash Flow Forecast, the Applicants will have sufficient cash resources available during the Forecast Period to permit the Applicants to make further progress in its efforts to pursue the sale of its other businesses or develop alternative restructuring strategies, if appropriate, and file a Plan.

115. For the reasons outlined in this report, the Monitor supports the Applicants' request for an extension of the stay to October 30, 2009.

All of which is respectfully submitted this 24th day of July, 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

APPENDIX A

### Nortel Networks - July 12, 2009
### CCAA Applicants
### Forecast Cash Flow - Variances
USD (Millions)

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 07-Jun-09 | 07-Jun-09 | 07-Jun-09 |
| End of period | 11-Jul-09 | 11-Jul-09 | 11-Jul-09 |

## 1 . Receipts & Disbursements

| | Forecast | Actuals | Variances |
|---|---|---|---|
| **Receipts** | | | |
| Collection of Accounts Receivable | 49.3 | 66.6 | 17.3 |
| Other Receipts | 86.2 | 86.2 | - |
| Intercompany Receipts | 117.4 | 110.4 | (7.0) |
| Intercompany Receipts - Interim Funding Arrangement | 62.8 | 62.8 | - |
| NNL/NNI Restructuring Loan Advances | - | - | - |
| **Total Receipts** | 315.7 | 326.0 | 10.3 |
| **Disbursements** | | | |
| Payroll (Gross) | 52.3 | 50.7 | 1.6 |
| Benefits | 9.6 | 6.0 | 3.6 |
| Pension | 2.0 | 2.0 | - |
| Inventory Purchases | 67.6 | 62.6 | 5.0 |
| Non-Inventory Purchases | 39.3 | 43.6 | (4.3) |
| Intercompany Disbursements | 93.7 | 76.8 | 16.9 |
| Intercompany Disbursements - Interim Funding Arrangement | - | - | - |
| Restructuring Costs | 6.3 | 5.1 | 1.2 |
| NNL/NNI Restructuring Loan Repayments | - | - | - |
| **Total Disbursements** | 270.8 | 246.8 | 24.0 |
| **Net Cash Flow** | 44.9 | 79.2 | 34.3 |
| FX Impact | - | (4.8) | (4.8) |
| **Opening Available Cash Balance** | 127.3 | 127.3 | (0.0) |
| **Closing Available Cash Balance** | 172.2 | 201.7 | 29.5 |
| Unavailable Cash | 5.0 | 6.0 | 1.0 |
| **Total Cash** | 177.2 | 207.7 | 30.5 |
| Restricted Cash | 65.1 | 59.1 | (6.0) |
| **Total Cash + Restricted Cash** | 242.3 | 266.8 | 24.5 |

**Nortel Networks – Jul 12, 2009**
**CCAA Applicants**
**Forecast Cash Flow**
(USD Millions)

**1. Receipts & Disbursements**

| | Jul 2009 (12-Jul/18-Jul) | Jul 2009 (19-Jul/25-Jul) | Total (12-Jul-09 / 31-Oct-09) |
|---|---|---|---|
| **Receipts** | | | |
| Collection of Accounts Receivable | 5.4 | 4.3 | 180.7 |
| Other Receipts | 3.0 | 2.0 | 15.8 |
| Intercompany Receipts | - | 24.7 | 83.9 |
| Intercompany Receipts – Interim Funding Arrangement | - | - | 94.2 |
| NNL/NNI Restructuring Loan Advances | - | - | - |
| **Total Receipts** | **8.4** | **31.0** | **384.6** |
| **Disbursements** | | | |
| Payroll (Gross) | 14.6 | 6.1 | 145.1 |
| Benefits | 2.1 | 0.5 | 29.6 |
| Pension | - | 1.9 | 7.7 |
| Inventory Purchases | 2.1 | 1.6 | 60.0 |
| Non-Inventory Purchases | 7.5 | 6.4 | 120.2 |
| Intercompany Disbursements | - | 22.2 | 83.9 |
| Intercompany Disbursements – Interim Funding Arrangement | - | - | - |
| Restructuring Costs | 2.2 | 1.0 | 18.5 |
| NNL/NNI Restructuring Loan Repayments | - | - | - |
| **Total Disbursements** | **28.4** | **38.8** | **464.9** |
| **Net Cash Flow** | (20.0) | (8.8) | (80.3) |
| Opening Available Cash Balance | 201.6 | 181.6 | 201.6 |
| Closing Available Cash Balance | 181.6 | 172.7 | 121.3 |
| Unavailable Cash | 3.0 | 1.0 | 1.0 |
| **Total Cash** | **184.6** | **173.7** | **122.3** |
| Restricted Cash | 59.1 | 57.1 | 57.1 |
| **Total Cash + Restricted Cash** | **240.8** | **230.8** | **179.4** |

**APPENDIX C**

File No. 09-CL-7950

**SCHEDULE "A"**

---

**NOTICE TO CREDITORS**
**of NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**
(hereinafter referred to as the "Debtors")

---

**RE:    NOTICE OF CLAIMS PROCEDURE FOR THE DEBTORS PURSUANT TO THE**
*COMPANIES' CREDITORS ARRANGEMENT ACT* **(the "CCAA")**

**PLEASE TAKE NOTICE** that this notice is being published pursuant to an Order of the Superior Court of Justice of Ontario made July 30, 2009 (the "Order").  Pursuant to the Order, Proof of Claim packages will be sent to creditors by mail, on or before August 15, 2009, if those creditors are known to the Debtors, and if the Debtors have a current address.  Creditors may also obtain the Order and a Proof of Claim package from the website of Ernst & Young Inc., Court-appointed monitor of the Debtors, at "www.ey.com/ca/nortel", or by contacting the Monitor by telephone (1-416-943-4439 or 1-866-942-7177) or by fax (1-416-943-2808).

Proofs of Claim must be submitted to the Monitor for any claim against any Debtor, whether unliquidated, contingent or otherwise, or a claim against any current or former officer or director of the Debtors, or any of them, in each case where the claim (i) arose prior to January 14, 2009, or (ii) arose on or after January 14, 2009 as a result of the restructuring, termination, repudiation or disclaimer of any lease, contract, or other agreement or obligation.  Please consult the Proof of Claim package for more details.

**Completed Proofs of Claim must be received by the Monitor by 4:00 p.m. (prevailing Eastern Time) on the applicable Claims Bar Date, as set out in the Order.  The Claims Bar Date for most claims is SEPTEMBER 30, 2009.  It is your responsibility to ensure that the Monitor receives your Proof of Claim by the applicable Claims Bar Date.**

**Certain Creditors are exempted from the requirement to file a Proof of Claim.  Among those creditors who do not need to file a Proof of Claim are (i) current or former employees of the Debtors, for amounts owing to him or her in his or her capacity as a current or former employee of any of the Debtors, and (ii) individual bondholders in respect of Claims relating solely to the debt evidenced by their bonds.  Please consult the Claims Procedure Order made on July 30, 2009 for details with respect to these and other exemptions.**

**PLEASE NOTE that these procedures apply ONLY to claims filed against the Debtors in the CCAA proceedings. Several of the Debtors' affiliates are subject to creditor protection proceedings in other jurisdictions, including in the United States.  Separate proceedings and deadlines have been or will be established in those cases for the filing of claims. With respect to the U.S. proceedings, a general bar date of September 30, 2009 at 4:00 p.m.**

- 2 -

(prevailing Eastern Time) has been established by the U.S. Court.  If you believe you have claims against the U.S. Debtors, any such claims must be filed in, and only in, the U.S. proceedings with the U.S. Debtors' claims agent.  A list of the U.S. Debtors and procedures for filing such claims in the U.S. Proceedings can be found by going to the following internet link:  www.chapter11.epiqsystems.com/nortel.

**CLAIMS WHICH ARE NOT RECEIVED BY THE APPLICABLE CLAIMS BAR DATE WILL BE BARRED AND EXTINGUISHED FOREVER.**

**DATED** at Toronto this ● day of ●, 2009.

**CANADIAN CCAA Proof of Claim**    **re Nortel Networks Corporation and others**

**❶    Name of Debtor (the "Debtor")**
Debtor:

**❷    Original Creditor Identification (the "Creditor")**

| Legal Name of Creditor | | | Name of Contact |
|---|---|---|---|
| Address | | | Phone # |
| | | | Fax # |
| City | Prov / State | Postal/Zip code | e-mail |

**❸    Assignee, if claim has been assigned**

| Full Legal Name of Assignee | | | Name of Contact |
|---|---|---|---|
| Address | | | Phone # |
| | | | Fax # |
| City | Prov / State | Postal/Zip code | e-mail |

**❹    Amount of Claim**

The Debtor / Officer(s) / Director(s) was/were and still is/are indebted to the Creditor as follows:

*Claims will be recorded as "Unsecured" unless the "Secured" box is checked*    *(Check only if applicable)*

If you are making a claim against an Officer or Director check the box below, and list the Officer(s) and Director(s) against whom you assert your claim

| Currency | Original Currency Amount | Secured | S. 136 Priority | Restructuring | |
|---|---|---|---|---|---|
| | | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | |

**❺    Documentation**

Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim.

**❻    Certification**

I hereby certify that:
- I am the Creditor, or authorized Representative of the Creditor.
- I have knowledge of all the circumstances connected with this Claim.
- The Creditor asserts this claim against the Debtor; and the Officer(s) and Director(s) as indicated above.
- Complete documentation in support of this claim is attached.

This space reserved for use by the Monitor

| Signature | Name |
|---|---|
| | Title |
| Dated at | Signed at |

**❼    Filing of Claim**

**This Proof of Claim must be received by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on <u>SEPTEMBER 30, 2009</u>, by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission at the following address:**

Ernst & Young Inc.
222 Bay St., P.O. Box 251
Toronto-Dominion Centre
Toronto, ON  M5K 1J7
CANADA
Attention: Nortel Claims

Fax: 416-943-2808
Tel: 1-866-942-7177 or 416-943-4439
e-mail: nortel.monitor@ca.ey.com

An electronically fillable version of this form is available at www.ey.com/ca/nortel

## SCHEDULE "C"

## CREDITOR GUIDE TO COMPLETING THE PROOF OF CLAIM FORM

This Guide has been prepared to assist Creditors in filling out the Proof of Claim form with respect to the Debtors listed in Section 1, below.  If you have any additional questions regarding completion of the Proof of Claim form, please consult the Monitor's website at www.ey.com/ca/nortel  or contact the Monitor, whose contact information is shown below.

Additional copies of the Proof of Claim form may be found at the Monitor's website address noted above.

Please note that this is a guide only, and that in the event of any inconsistency between the terms of this guide and the terms of the Claims Procedure Order made on July 30, 2009, the terms of the Claims Procedure Order will govern.

**Section 1 – Name of Debtor:**
- A separate Proof of Claim form must be filed for each Debtor against whom a claim is being asserted.
- The following is a list of Debtor companies against whom a claim may be asserted in this claims process:
  - Nortel Networks Corporation
  - Nortel Networks Limited
  - Nortel Networks Global Corporation
  - Nortel Networks International Corporation
  - Nortel Networks Technology Corporation.
- Please note that these procedures apply ONLY to claims filed against the five Debtor companies listed above.  Several of the Debtors' affiliates are subject to creditor protection proceedings in other jurisdictions, including in the United States.  Separate proceedings and deadlines have been or will be established in those cases for the filing of claims.  With respect to the U.S. proceedings, a general bar date of September 30, 2009 at 4:00 p.m. (prevailing Eastern Time) has been established by the U.S. Court.  If you believe you have claims against the U.S. Debtors,[1] any such claims must be filed in, and only in, the U.S. proceedings with the U.S. Debtors' claims agent.  Procedures for filing such claims in the U.S. Proceedings can be found by going to the following internet link: www.chapter11.epiqsystems.com/nortel.

---

[1] The U.S. Debtors are: Nortel Networks Inc.; Nortel Networks Capital Corporation; Nortel Altsystems Inc.; Nortel Altsystems International Inc.; Xros Inc.; Sonoma Systems; Qtera Corporation; CoreTek, Inc.; Nortel Networks Applications Management Solutions Inc.; Nortel Networks Optical Components Inc.; Nortel Networks HPOCS Inc.; Nortel Networks (CALA) Inc.; Architel Systems (U.S.) Corporation; Nortel Networks International Inc.; Northern Telecom International Inc.; and Nortel Networks Cable Solutions Inc.

- 2 -

**Section 2 – Original Creditor**
- A separate Proof of Claim form must be filed by each legal entity or person asserting a claim against a Debtor listed in Section 1.
- The Creditor shall include any and all Claims it asserts against a single Debtor in a single Proof of Claim[2].
- The full legal name of the Creditor must be provided.
- If the Creditor operates under a different name, or names, please indicate this in a separate schedule in the supporting documentation.
- If the Claim has been assigned or transferred to another party, Section 3 must also be completed.
- Unless the Claim is assigned or transferred, all future correspondence, notices, etc. regarding the Claim will be directed to the address and contact indicated in this section.
- Certain Creditors are exempted from the requirement to file a Proof of Claim. Among those creditors who do not need to file a Proof of Claim are (i) current or former employees of the Debtors, for amounts owing to him or her in his or her capacity as a current or former employee of any of the Debtors, and (ii) individual bondholders in respect of Claims relating solely to the debt evidenced by their bonds. Please consult the Claims Procedure Order made on July 30, 2009 for details with respect to these and other exemptions.

**Section 3 – Assignee**
- If the Creditor has assigned or otherwise transferred its Claim, then Section 3 must be completed.
- The full legal name of the Assignee must be provided.
- If the Assignee operates under a different name, or names, please indicate this in a separate schedule in the supporting documentation.
- If the Monitor is satisfied that an assignment or transfer has occurred, all future correspondence, notices, etc. regarding the Claim will be directed to the Assignee at the address and contact indicated in this section.

**Section 4 – Amount of Claim of Creditor against Debtor**
- Indicate the amount the Debtor / Officer(s) or Director(s) was, and still is indebted to the Creditor

*Currency, Original Currency Amount*
- The amount of the Claim must be provided in the currency in which it arose.
- Indicate the appropriate currency in the Currency column.
- If the Claim is denominated in multiple currencies, use a separate line to indicate the Claim amount in each such currency. If there are insufficient lines to record these amounts, attach a separate schedule indicating the required information.

---

[2] Paragraph 10 of the Claims Procedure Order made on [DATE] provides that: "THIS COURT ORDERS that each Creditor shall include any and all Claims it asserts against an Applicant in a single Proof of Claim, provided however that where a Creditor has taken an assignment or transfer of a Claim after the Filing Date, that Creditor shall file a separate Proof of Claim for each such assigned or transferred Claim."

- 3 -

- Claims denominated in a currency other than Canadian dollars will be converted into Canadian dollars by the Monitor using the exchange rates set out in Appendix A.

*Secured*
- Check the Secured box ONLY if the Claim recorded on that line is secured. Do not check this box if your Claim is unsecured
- If the value of the collateral securing your Claim is less than the amount of your Claim, enter the shortfall portion on a separate line as an unsecured claim
- Evidence supporting the security you hold must be submitted with the Proof of Claim form. Provide full particulars of the nature of the security, including the date on which the security was given and the value you attribute to the collateral securing your Claim. Attach a copy of all related security documents.

*S. 136 Priority*
- Check this box ONLY if the amount of your Claim has a right to priority pursuant to Section 136 of the Bankruptcy and Insolvency Act (Canada) (the "BIA") or would be entitled to claim such a priority if this Proof of Claim were being filed in accordance the provisions of the BIA.
- If a priority claim is being asserted, please provide details as to the nature of the claim being asserted, and the basis for priority on which you rely.

*Restructuring*
- Check this box ONLY if the amount of the Claim against the Debtor arose out of the restructuring, termination, repudiation or disclaimer of a lease, contract, or other agreement or obligation on or after January 14, 2009.

*Officers and Directors*
- Check this box only if the Claim you are making is also being asserted against a current or former officer or director of the Debtor.
- You must identify the individual officer(s) or director(s) against whom you are asserting the Claim.

## Section 5 – Documentation
- Attach to the claim form all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim[3], and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the debtor or any officer or director to the Creditor and estimated value of such security, and particulars of any restructuring claim.

## Section 6 – Certification
- The person signing the Proof of Claim form should

---

[3] If the guarantor is another of the Debtors listed in Section 1, or one of the U.S. Debtors, a Proof of Claim against that Debtor or U.S. Debtor, as the case may be, must also be filed in these Canadian Proceedings or (in the case of U.S. Debtors) in the U.S. proceedings.

- 4 -

     o  Be the Creditor, or authorized Representative of the Creditor.
     o  Have knowledge of all the circumstances connected with this Claim.
- By signing and submitting the Proof of Claim, the Creditor is asserting the claim against the Debtor and / or the indicated officer(s) or director(s)

### Section 7 – Filing of Claim

- This Proof of Claim **must be received** by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on SEPTEMBER 30, 2009. Proofs of Claim should be send by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission to the following address:

     Ernst & Young Inc.
     Court-appointed Monitor of Nortel Networks Corporation & others
     222 Bay Street, Suite 1600
     Toronto, Ontario
     Canada M5K 1J7
     Attention:    Nortel Claims

     Telephone:    1-866.942-7177  or  416-943-4439
     E-mail:       Nortel.monitor@ca.ey.com
     Fax:          416-943-2808

**Failure to file your Proof of Claim so that it is received by the Monitor by 4:00 p.m., on the Claims Bar Date of September 30, 2009 will result in your claim being barred and you will be prevented from making or enforcing a Claim against the Debtor or any current or former officer or director of any of the Debtors. In addition, you shall not be entitled to further notice in and shall not be entitled to participate as a creditor in these proceedings.**

- 5 -

Appendix A

Currency conversion factors
Source: Reuters, January 14, 2009

This Appendix is for
information only. You are
to make your claim in the
currency in which it arose.
The Monitor will calculate
all currency conversions.

| | | CAD per unit of Currency |
|---|---|---|
| CAD | Canadian Dollar | 1 |
| USD | United States Dollar | 1.22025 |
| EUR | Euro | 1.6170753 |
| GBP | United Kingdom: Pnd Ster | 1.77741615 |
| JPY | Japan: Yen | 0.01362647 |

| | | | | | |
|---|---|---|---|---|---|
| AED | United Arab Emir.: Dirham | 0.33221709 | LTL | Lithuanian Litas | 0.46830925 |
| ARS | Argentine Peso | 0.35410621 | LVL | Latvian Lats | 2.29456567 |
| AUD | Australian Dollar | 0.82275356 | MAD | Moroccan Dirham | 0.14500201 |
| BBD | Barbados Dollar | 0.61319095 | MXN | Mexican Peso | 0.08842392 |
| BDT | Bangladeshi Taka | 0.01772331 | MYR | Malaysian Ringgit | 0.34156754 |
| BGN | Bulgaria: New Lev | 0.82683968 | NGN | Nigerian Naira | 0.00816494 |
| BOB | Bolivian Boliviano | 0.17345416 | NOK | Norwegian Krone | 0.17167276 |
| BRL | Brazilian Real | 0.52726527 | NZD | New Zealand Dollar | 0.6711375 |
| CHF | Swiss Franc | 1.09468915 | OMR | Oman: Rial Omani | 3.16980987 |
| CLP | Chilean Peso | 0.0019827 | PAB | Panama: Balb0A | 1.22025 |
| CNY | China: Yuan Renminbi | 0.17854268 | PEN | Peru: Nuevo Sol | 0.3889243 |
| COP | Colombian Peso | 0.00054867 | PGK | Papua New Guinea Kina | 0.4671117 |
| CRC | Costa Rican Colon | 0.00219273 | PHP | Philippine Peso | 0.02592415 |
| CZK | Czech Koruna | 0.06004872 | PKR | Pakistan Rupee | 0.015414 |
| DKK | Danish Krone | 0.21701242 | PLN | Poland: Zloty | 0.39077386 |
| DOP | Dominican Peso | 0.03444601 | PYG | Paraguay: Guarani | 0.0002498 |
| DZD | Algerian Dinar | 0.01682672 | QAR | Qatar: Qatari Rial | 0.33516446 |
| EEK | Estonian Kroon | 0.10334226 | RON | New Romania Leu | 0.37703348 |
| EGP | Egyptian Pound | 0.22086973 | RUB | Russian Ruble | 0.03847246 |
| FJD | Fiji Dollar | 0.67418812 | SAR | Saudi Arabia: Saudi Riyal | 0.32539566 |
| GTQ | Guatemala: Quetzal | 0.15495238 | SEK | Swedish Krona | 0.14788041 |
| HKD | Hong Kong Dollar | 0.15732068 | SGD | Singapore Dollar | 0.82052921 |
| HUF | Hungary: Forint | 0.00583154 | THB | Thailand: Baht | 0.03495417 |
| IDR | Indonesia: Rupiah | 0.00010991 | TND | Tunisian Dinar | 0.89144172 |
| ILS | Israel: Shekel | 0.31449742 | TRY | New Turkish Lira | 0.76914592 |
| INR | Indian Rupee | 0.02499872 | TTD | Trinidad & Tobago Dollar | 0.19524 |
| ISK | Iceland Krona | 0.00966994 | UAH | Ukraine: Hryvnia | 0.13945714 |
| JMD | Jamaican Dollar | 0.01515838 | UYU | Uruguay: Peso | 0.05016444 |
| JOD | Jordanian Dinar | 1.72084329 | VEF | Bolivar Fuerte | 0.56827178 |
| KPW | North Korean Won | 0.00853023 | VND | Vietnam: Dong | 0.00006981 |
| KRW | Republic Of Korea: Won | 0.00090543 | XCD | East Caribbean Dollar | 0.4587406 |
| KWD | Kuwaiti Dinar | 4.28157891 | ZAR | South Africa: Rand | 0.12249969 |
| LBP | Lebanese Pound | 0.00080945 | ZMK | Zambia: Kwacha | 0.00024601 |
| LKR | Sri Lanka Rupee | 0.01072276 | | | |

**APPENDIX D**

Court File No.  09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**NOTICE RESPECTING HARDSHIP PAYMENT APPLICATIONS**

On ●, 2009, the Honourable Mr. Justice Morawetz approved a process for former employees of Nortel who are experiencing financial hardship to apply for immediate payment on account of their future distributions.  The eligibility requirements and application that have been approved by the Court are attached.

Please note that you do not have to be represented by counsel to apply.  If you have questions, you may call ● (E&Y) or ● (K.M.).

**Eligibility Requirements and Procedure with Respect to Hardship Payment Applications**

1. **Eligibility** – A former employee would be eligible for hardship payments if he or she is resident in Canada and has no available source of income, being all monies receivable by the former employee including, without limitation, employment income such as wages, salary or bonuses, consulting income, or pension or disability payments or income replacement payments ("Income"), or Income of a spouse, as of the date of the application and has no reasonable expectation of being in receipt of Income during the Application Period (referred to below) and:

   a. The former employee is unable to work due to illness or is incurring costs in excess of 25% of his or her EI payments as a result of treatment for illness or healthcare costs, or as a result of the illness of a family member who is dependent on the former employee for support; or

   b. During the Application Period the former employee is not receiving a Nortel pension or employment insurance (EI) as a result of ineligibility for EI or exhaustion of EI benefits, and demonstrates some other significant hardship in dealing with financial obligations.

2. **Application Process** – Notice of the application process will be posted on the Monitor's website and the website of the Nortel Retiree Protection Committee (NRPC) in a form approved by the Court. An applicant would be required to complete an application form (to be approved by the Court) to be submitted to a person designated by the Monitor. The person so designated would be expected to deal with completed applications within 14 to 21 days and to make an initial determination to approve or reject the application. The first payment will proceed within seven business days subject to the payment parameters set out below. If not approved, the application is to be reviewed by an informal committee and the applicant will be given the right to be heard by the committee. The committee will be composed of one company appointee, one appointee of the Monitor and one appointee chosen by the NRPC, who will be compensated for his time on an hourly basis. A further appeal may be brought to the Court or an officer of the Court designated by the presiding judge, costs to be determined by the Court on the application.

3. **Payment Parameters** – Any successful applicant may be approved for a maximum payment of up to 8 weeks salary based on a maximum weekly salary of up to $1,200 per week payable in monthly instalments. The hardship committee will also have discretion to approve additional amounts in cases of medical and other emergencies in an amount up to $2,500.

4. **Application Period** – From the date of court approval to November 30, 2009.

5. **Miscellaneous**

   a. Hardship Payments are advances against distributions on claims, and will be deducted from any payments on claims that may be allowed in the ultimate claims process in these proceedings.

   b. The Monitor shall report to the Court on or before November 30, 2009 with respect to the processing and administration of hardship payment applications.

   c. The aggregate maximum amount available for hardship payments on applications approved during the Application Period is $750,000.

Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE ***COMPANIES' CREDITORS ARRANGEMENT ACT***,
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION FOR HARDSHIP PAYMENTS**

**Applicant Information**

1. Name:

2. Address:

3. Telephone Number(s):

4. Email Address:

5. Nortel Global Identification Number:

**Nortel Employment Information**

1. Date Started Nortel Employment:

2. Date Left Nortel Employment:

3. Gross Monthly Pay:          $

4. Nortel Canadian Entity
   Which Employed You

5. Severance Received          $

6. Date Eligible to Receive
   Nortel Pension

- 2 -

Name: _____

**Current Sources of Income**

1.  Employment Insurance:  (a) Amount: _____

                        (b) Actual/Expected
                              End Date: _____

                        (c) If NO EI or EI terminated, reason:

                            _____

2.  Other Sources of Income
    (including income of a spouse
    living with the Applicant):  (a) _____

                             (b) _____

                             (c) _____

**Personal Circumstances Requiring Hardship Payment**

(a) Medical expenses for self or dependant (including nature of expense, amount, whether can be reimbursed from another source):

_____

_____

_____

_____

(b) Other reason for immediate or urgent need for funds:

_____

_____

_____

_____

I certify the contents hereof to be true.

_____        _____
Witness                             Signature

Submit this form
by fax to: _____
by e-mail to: _____
by mail to: _____

5726149

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.
C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION *et al.*

Court File No: 09-CL-7950

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**SIXTEENTH REPORT OF THE MONITOR**
**DATED JULY 24, 2009**

---

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada  M5B 2M6

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.