## EXHIBIT A

Court File No. 09-CL-7950

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**SEVENTEENTH REPORT OF THE MONITOR
DATED JULY 27, 2009**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited
    ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks
    International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC")
    (collectively, the "Applicants") filed for and obtained protection under the *Companies'
    Creditors Arrangement Act* ("CCAA").  Pursuant to the Order of this Honourable Court
    dated January 14, 2009, as amended and restated (the "Initial Order"),  Ernst & Young Inc.
    ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA
    proceeding.  The stay of proceedings was extended to July 30, 2009, by this Honourable
    Court in its Order dated April 28, 2009.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed
    voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the U.S.
    Court on January 14, 2009.  Nortel Networks (CALA) Inc. ("NCI") (together with NNI and

certain of its subsidiaries filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009. As required by U.S. law, an official unsecured creditors committee ("UCC") was established in January, 2009. In addition, an ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as those in the U.S. (the "Bondholder Group").

3.    Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court") on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "U.K. Administrators").

4.    On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

5.    Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court.

**PURPOSE**

6.    The purpose of this Seventeenth Report of the Monitor (the "Seventeenth Report") is to provide information regarding the Applicants' motion seeking approval of a sale of certain of Nortel's CDMA and LTE Access assets (the "Business") pursuant to an asset sale agreement dated July 24, 2009 (the "Successful Bid") between NNC, NNI and NNL and certain of their affiliates (the "Sellers") and Telefonaktiebolaget LM Ericsson (publ) ("Ericsson" or the "Purchaser") and to provide the Monitor's support thereof.

**TERMS OF REFERENCE**

7.    In preparing this Seventeenth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company, and discussions with management of Nortel.  EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Seventeenth Report.

8.    Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

9.    Capitalized terms not defined in this Seventeenth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor, the Successful Bid or the Bidding Procedures.

**GENERAL BACKGROUND**

10.  In the Fourteenth Report, the Monitor noted that prior to commencing insolvency proceedings, Nortel management determined that the Company should explore the possibility of divesting its CDMA and LTE Access assets.  The Fourteenth Report provided

3

a description of the CDMA and LTE Access assets and set out the process conducted by the Company both prior to and immediately after its CCAA filing to identify potential purchasers and to negotiate a definitive agreement for the sale of the business. As noted, the Monitor was present in certain discussions held with two potential buyers including the discussions that resulted in NNC, NNL, NNI and certain of their affiliates, (collectively, the "Sellers") entering into an asset sale agreement dated June 19, 2009 (the "Nokia Agreement") with Nokia Siemens Networks B.V. ("Nokia Siemens") outlining the terms of the Company's sale of the assets and certain associated liabilities of the CDMA Business and LTE Business to Nokia Siemens. The Nokia Agreement is attached as Appendix "A" to the Fourteenth Report.

11. The Fourteenth Report also noted that as certain of the U.S. Debtors are parties to the Nokia Agreement and given the desire to maximize value for the benefit of stakeholders in relation to the assets which are the subject of the Nokia Agreement, Nortel determined and agreed with Nokia Siemens that the Nokia Agreement would be subject to higher or better offers being obtained pursuant to a section 363 type sale process subject to the approval of both this Honourable Court and the U.S. Court and that the Nokia Agreement would serve as a stalking horse bid pursuant to that process.

12. The Bidding Procedures to be employed in connection with the sale process were approved by the U.S. Court on June 30, 2009 and by this Honourable Court on June 29, 2009. A copy of the Bidding Procedures is attached at Appendix "A". The Bidding Procedures provided that all bids were to be received by the Sellers not later than July 21, 2009 at 4:00 p.m. ET giving interested parties 22 days to conduct due diligence and submit a bid. Such bids had to be accompanied by a Good Faith Deposit in the amount of 5% of the proposed Purchase Price. The Bidding Procedures also provided that the Auction would be held on July 24, 2009 at 9:30 a.m. ET.

4

**BIDDING PROCEDURES AND AUCTION PROCESS**

13. Subsequent to this Honourable Court's approval of the Bidding Procedures, two potential buyers submitted non-binding letters of intent. These parties were MPAM Wireless, Inc. ("MPAM") and Ericsson. MPAM's letter of intent was received on July 1, 2009, and Ericsson's letter of intent was received on July 9, 2009. After consultation with the Monitor, the UCC and the Bondholder Group, both of these potential buyers were deemed Qualified Bidders pursuant to the Bidding Procedures. In addition, Nokia Siemens was deemed a Qualified Bidder.

14. On July 15, 2009, one additional party submitted a non-binding letter of intent and requested that such party be deemed a Qualified Bidder. Upon receiving this request, the Company provided such party with a form of non-disclosure agreement ("NDA") substantially in the same form as that previously executed by Nokia Siemens. This party declined to execute the NDA and accordingly, was not deemed a Qualified Bidder. Each of the Monitor, the UCC and the Bondholder Group were consulted in connection with the request of such party to be considered a Qualified Bidder.

15. No other parties expressed interest in the Business pursuant to the Bidding Procedures.

16. The Monitor is of the view that any party that wanted to bid for the Business and complied with the Bidding Procedures was permitted to do so.

17. In the period up to July 21, 2009, Ericsson and MPAM: a) were given access to the confidential data room; b) accessed the data room; c) engaged legal counsel and other advisors; d) participated in meetings and other discussions with management of Nortel; d) held discussions with key customers and suppliers which were co-ordinated through Nortel; e) met with representatives of the Monitor, the UCC and/ or the Bondholder Group; and f) prepared marked up versions of the Nokia Agreement as well as various ancillary agreements.

18. During this period, the Monitor was kept apprised of all activity conducted between Nortel and the potential buyers. In addition, the Monitor participated in conference calls and meetings with the potential buyers, both with Nortel and independently. The Monitor conducted its own independent review and analysis of materials submitted by the potential buyers.

19. On July 21, 2009, prior to the bid deadline, both Ericsson and MPAM submitted bids. In accordance with the Bidding Procedures, both parties submitted Good Faith Deposits. These Good Faith Deposits are currently being held in a sole purpose bank account with Citibank N.A. The Ericsson and MPAM bids were reviewed by the Sellers and the Monitor in detail. Copies of the Ericsson and MPAM bids were also provided to representatives of the UCC and the Bondholder Group for their review. All of these parties concurred that the bids as submitted met the requirements of a Qualified Bid pursuant to the Bidding Procedures. In accordance with the Bidding Procedures, the Nokia Siemens bid was deemed to be a Qualified Bid.

20. On July 22, 2009, in accordance with the Bidding Procedures, copies of both the MPAM bid and the Ericsson bid were provided to Nokia Siemens. MPAM and Ericsson were both notified that three Qualified Bids had been received.

21. After consultation with the Monitor and representatives of the UCC and the Bondholder Group, the Sellers determined that the highest or otherwise best offer amongst the three bids was the bid submitted by Ericsson. Accordingly, on July 22, 2009, the three Qualified Bidders were informed that the Ericsson bid had been selected as the Starting Bid pursuant to the Bidding Procedures. Copies of the Ericsson bid were distributed to Nokia Siemens and MPAM.

22. The auction commenced on July 24, 2009 at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York. In attendance at the auction were representatives of the Sellers, the Monitor, each of the three Qualified Bidders, the UCC and the Bondholder Group. Also in attendance were representatives of certain creditors and other interested parties admitted at the discretion of the Sellers.

6

23. Pursuant to the Bidding Procedures, the Sellers required that bids in the first round were to provide net value to the estate of at least $5 million over the Starting Bid after taking into account any required payment of the Break-Up Fee and Expense Reimbursement. The Sellers also required that bids be submitted in writing. The Sellers then adjourned the auction to allow the Qualified Bidders time to prepare written bids. Once all written bids were received by the Sellers and the Sellers had consulted with the Monitor, the UCC and the Bondholder Group, the auction was re-convened and the Sellers announced the Leading Bid. The Sellers then asked for a second round of bidding.

24. In the second round, the Sellers exercised their discretion pursuant to the Bidding Procedures, following consultation with the Monitor and representatives of the UCC and the Bondholder Group, and increased the incremental net value threshold to $25 million. Once again, the auction was adjourned to allow the Qualified Bidders time to prepare written bids.

25. The auction continued in a similar fashion for a third, fourth and fifth round of bidding. After the fourth round of bidding, MPAM indicated that it would not submit an additional bid. After the Leading Bid in the fifth round was announced, the Sellers commenced a sixth round of bidding. For the sixth round, the Sellers, following consultation with the Monitor and representatives of the UCC and the Bondholder Group, required that the Qualified Bidders submit verbal bids. A verbal bid was immediately submitted by Ericsson and was deemed by the Sellers to be the Leading Bid in that round.

26. The Sellers then called for a seventh round of bidding. After a brief period of adjournment upon the request of one of the Qualified Bidders, during which the Seller consulted with the Monitor and representatives of the UCC and the Bondholder Group, Nokia Siemens indicated that it would not submit an additional bid. Accordingly, the Sellers determined that the Ericsson bid submitted in the sixth round should be declared the Successful Bid and that the Nokia Siemens bid submitted in the fifth round should be the Alternate Bid, which determinations were made in accordance with consultations with the Monitor and

representatives of the UCC and the Bondholder Group held during the seventh round adjournment.

27.  The auction was then adjourned again, solely to permit the completion of documentation between the Sellers and Ericsson relating to the Successful Bid.  At approximately 11:00 pm ET on July 24, 2009, the documentation was finalized and signature pages were exchanged.  At that point, the auction was concluded.

**THE SUCCESSFUL BID**

28.  A copy of the Successful Bid is attached as Appendix "B".  A copy of the Successful Bid blacklined against the Nokia Agreement is attached as Appendix "C".  A copy of the exhibits and schedules to the Successful Bid are attached as confidential Appendix "D" hereto.  As these exhibits and schedules contain sensitive competitive information as well as personal information with respect to employees, the Monitor requests that confidential Appendix "D" to this Seventeenth Report be sealed by this Honourable Court.

29.  Ericsson, the Purchaser under the Successful Bid provides telecommunications and related services to mobile and fixed and network operators in over 175 countries globally.  Its headquarters are located in Stockholm, Sweden.

30.  The terms and conditions of the Successful Bid are substantially the same as the Nokia Agreement described in the Fourteenth Report.  The significant differences between the Nokia Agreement and the Successful Bid are as follows:

- The Purchase Price has been increased from $650 million to $1.13 billion plus the obligation of the Purchaser to pay, perform and discharge the Assumed Liabilities.  The Purchaser has made a Good Faith Deposit of $36,500,000 that will be applied toward the Purchase Price at Closing;

- The Purchased Assets (as defined in the Fourteenth Report) also include all rights of the Sellers as at Closing with respect to Avoidance Actions;

- At Closing, the Sellers shall assign to the Purchaser certain claims under casualty insurance policies covering Purchased Assets with respect to which a casualty has occurred after signing but prior to Closing;

- The Termination Date has been extended to September 30, 2009 or in the event that closing has not occurred solely because regulatory approvals have not yet been obtained, October 31, 2009 (as opposed to August 31, 2009 and September 30, 2009 respectively per the Nokia Agreement); and

- The provisions in the Nokia Agreement with respect to the Break-Up Fee and Expense Reimbursement have been deleted.

- The Purchaser has agreed to assume certain liabilities relating to CDMA Products and CDMA Services supplied to Verizon, whether arising before or after Closing.

- Certain set-off rights of the Purchaser pursuant to the Transition Services Agreement and the Real Estate Agreement have been limited.

- The Purchaser has agreed to use reasonable efforts to resolve certain counterparty objections and will be responsible for certain amounts that may be required to be paid to resolve such objections.

**BREAK-UP FEE AND EXPENSE REIMBURSEMENT**

31. As set out in the Fourteenth Report, the Nokia Agreement provided for payment of the Break-Up Fee of $19.5 million and the Expense Reimbursement to a maximum of $3 million, upon termination of the Nokia Agreement in several instances including upon the entry of an order by the U.S. Court and this Honourable Court approving an Alternative Transaction as defined in the Nokia Agreement. As a result, if this Honourable Court and the U.S. Court approves the Successful Bid, the Company is of the view that the Break-Up Fee and Expense Reimbursement will become payable on the terms set out in the Nokia Agreement. In accordance with this Honourable Court's order of June 29, 2009, the

9

Company intends to make such payment. It is currently contemplated that 50% of the amount will be funded by NNL and 50% by NNI. The respective estates would then be reimbursed for these amounts on the Closing Date from the funds received on account of the Purchase Price prior to those proceeds being deposited into the escrow account as described below.

## APPROVAL AND VESTING ORDER AND OTHER CLOSING CONDITIONS

32. The assets to be transferred by the Applicants and the U.S. Debtors pursuant to the Successful Bid are to be transferred free and clear of all liens, claims and encumbrances of any kind other than permitted liens and those expressly assumed by Ericsson pursuant to the Successful Bid. Accordingly, the Applicants are seeking an order of this Honourable Court vesting in Ericsson all of the Applicants' right, title and interest in the Purchased Assets as defined in the Successful Bid. The Monitor understands that no leased assets are being conveyed as part of this transaction. Nevertheless, the Monitor understands that notice has been or will be provided to all personal property security registrants out of an abundance of caution.

33. The Monitor notes that at the request of the Purchaser, the approval and vesting order specifically approves the intellectual property license agreement and trademark license agreement (collectively, the "IP Licenses") entered into between NNL and the Purchaser in connection with the Successful Bid. A copy of the IP Licenses is included in confidential Appendix "D" hereto.

34. The Monitor understands that a joint hearing has been scheduled before the U.S. Bankruptcy Court and this Honourable Court on July 28, 2009 for approval of the Successful Bid and that subject to the approval of both Courts, that closing is anticipated to occur in September, 2009.

**THE ALTERNATE BID**

35.  The Bidding Procedures provide that the Sellers may, at their election, seek approval of the next highest or otherwise best offer (after the Successful Bid) as the Alternate Bid.  If closing of the transactions contemplated by the Successful Bid fails to occur for any reason, the Sellers would be authorized, but not directed, to proceed to effect a sale pursuant to the terms of the Alternate Bid without further approval of the U.S. Bankruptcy Court or this Honourable Court.

36.  The Sellers, in consultation with the Monitor, the UCC and the Bondholders have determined that a bid submitted by Nokia Siemens in the fifth round of bidding with a Purchase Price of $1,032,500,000 is the next highest and best offer and therefore have deemed such bid to be the Alternate Bid.  The Alternate Bid is substantially in the same form as the Nokia Agreement, save for the increased Purchase Price.  Accordingly, the Company is seeking this Honourable Court's approval of the Alternate Bid pursuant to the Bidding Procedures.  The Monitor notes that the Company is not seeking an approval and vesting order in connection with the Alternate Bid and therefore, understands that should closing of the transaction contemplated by the Successful Bid fail to occur, the Company would return before this Honourable Court prior to taking steps to close a transaction pursuant to the Alternate Bid.

**ALLOCATION OF SALES PROCEEDS**

37.  As noted in the Fourteenth Report, the CDMA Business and the LTE Business are not operated through a dedicated legal entity or stand-alone division.  The Applicants have an interest in intellectual property of the CDMA Business and the LTE Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis.  Therefore, the task of allocating the sale proceeds stemming from the Successful Bid amongst the various Nortel entities in the various jurisdictions is complex.

11

38. As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through their U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation.

39. As of the current date, no agreement has been reached regarding the allocation of any sales proceeds. Accordingly, the Selling Debtors have determined that the proceeds shall be deposited in an escrow account. The Applicants and the U.S. Debtors are currently in discussions with a major financial institution with respect to having this institution act as escrow agent.

40. In addition, the terms of a protocol with respect to the resolution of disputes in connection with the allocation of proceeds are still under discussion between the Applicants, the U.S. Debtors, the U.K. Administrators, the Monitor, the UCC and the Bondholder Group. Accordingly, the Monitor expects that the Company will return before this Honourable Court prior to closing of the transaction contemplated by the Successful Bid to seek approval of the escrow agreement and a protocol for resolving disputes regarding the allocation of sale proceeds.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

41. The Monitor is of the view that the Company's efforts to market the CDMA Business and the LTE Business were comprehensive and conducted in accordance with the Bidding Procedures and is further of the view that the Section 363 type auction process provided a mechanism to fully determine the market value of these assets. The Monitor is satisfied that the Purchase Price for the Purchased Assets constitutes fair consideration for such assets. As a result, the Monitor is of the view that the Successful Bid represents the best transaction for the sale of these assets. The Monitor therefore recommends that this Honourable Court approve the Applicants' motion authorizing the Applicants to complete the transaction contemplated by the Successful Bid and vesting all of the Applicants' right, title and interest in the Purchased Assets to Ericsson.

All of which is respectfully submitted this 27th day of July, 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

13

**APPENDIX "A"**

**[ATTACHED]**

## SCHEDULE "A"

### BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities as set forth in the Agreement (as defined below) with respect to the Purchaser, or, as set forth in the relevant sale agreement with respect to a Successful Bidder (as defined below). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement (as defined below).

On June 19, 2009, Nortel Networks Inc. and certain of its U.S. subsidiaries that are debtors and debtors-in-possession (collectively, the "U.S. Debtors") as well as Nortel Networks Limited and certain other affiliates of the U.S. Debtors that have commenced proceedings under the Canadian Companies' Creditors Arrangement Act (the "Canadian Debtors"), and certain non-debtor affiliates of the U.S. Debtors and the Canadian Debtors (together with the U.S. Debtors and the Canadian Debtors, the "Sellers") executed that certain Asset Sale Agreement (the "Agreement") with Nokia Siemens Networks B.V. (together with any of its designees, the "Purchaser").

The Sellers have determined that: (A) the transactions contemplated by the Agreement and the ancillary agreements discussed therein with respect to the Purchaser, or, as set forth in the relevant sale agreement or standalone plan of reorganization and ancillary agreements with respect to a Successful Bidder (collectively, the "Transaction") should be subject to competitive bidding as set forth herein; (B) the transfer of the U.S. Debtors' rights, title and interests in and to the Assets (as defined below) should be subject to approval by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"); (C) the transfer of the rights, title and interests of the Canadian Debtors (as such term is defined in the Agreement) in and to the Assets should be subject to approval by the Ontario Superior Court of Justice (the "Canadian Court"); and (D) the Transaction shall be subject to approval by such other applicable court(s) as the Sellers, in consultation with the Committee (as defined below), the Bondholder Group (as defined below) and the Monitor (as defined below), may determine are necessary or appropriate and certain other closing conditions as set forth in the Agreement.

On June 19, 2009, the U.S. Debtors filed a Motion for Orders (I)(A) Authorizing Debtors' Entry into the Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of Debtors' CDMA and LTE Business Free and Clear of All Liens, Claims and Encumbrances, (B) The Assumption and Assignment of Certain Contracts and (C) the Assumption and Sublease of Certain Leases (the "Sale Motion").

- 5 -

On [●], 2009, the Bankruptcy Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Bidding Procedures Order").

On June 23, 2009, the Canadian Debtors filed a motion with the Canadian Court seeking an order for approval of (I) execution and delivery of the Agreement by the Canadian Debtors, (II) payment of the Break-Up Fee and Expense Reimbursement in the circumstances provided for in the Agreement, and (III) a process for the Sale of the Canadian Debtors' rights, title and interests in and to the Assets (as defined below).

On [●], 2009, the Canadian Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Canadian Sales Process Order").

Bidding Process

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's and the Canadian Court's and, if required, such other applicable courts' approval thereof (collectively, the "Bidding Process"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., *et al.* (Case No. 09-10138) involving the U.S. Debtors (the "Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor"), and their respective advisors throughout the Bidding Process. In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, except with respect to the application of the terms of any order of the Canadian Court or any requirement for approval by the Canadian Court or the Monitor, the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.[1]

Assets To Be Sold

The Sellers are offering for sale, in one or more transactions, certain of the Sellers' assets pertaining to the business segments described in the Agreement (to the extent that such assets are not subsequently excluded from the Sale in accordance with the terms of the Agreement) with respect to the Purchaser, or, as set forth in the relevant sale or restructuring agreement with respect to a Successful Bidder, and related schedules and in an information memorandum made available by the Sellers to the Purchaser and other potential bidders, which will also be made

---

[1]    For the avoidance of doubt, this Bidding Process shall not govern any disagreements among the Sellers.

available to other prospective purchasers that have executed a confidentiality agreement with the Sellers (the "Assets").

"As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except, with respect to the Purchaser, to the extent set forth in the Agreement or, with respect to a Successful Bidder (as defined below), to the extent set forth in the relevant sale agreement of such Successful Bidder.

Free Of Any And All Claims And Interests

All of the rights, title and interests of the U.S. Debtors and the Canadian Debtors in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests") to the extent permitted by sections 363 and 365 of the Bankruptcy Code and other applicable law, such Claims and Interests to attach to the net proceeds of the sale of such Assets (without prejudice to any claims or causes of action regarding the priority, validity or enforceability thereof), except, with respect to the Purchaser, to the extent otherwise set forth in the Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant sale or restructuring (if applicable) agreement of such Successful Bidder with the U.S. Debtors and the Canadian Debtors.

Publication Notice

Within five (5) Business Days, or as soon thereafter as is reasonably practicable, after entry of orders by the Bankruptcy Court and the Canadian Court approving these Bidding Procedures, the Sellers shall publish notice of these Bidding Procedures, the time and place of the Auction (as defined below), if required, the time and place of the Sale Hearing (as defined below), and the objection deadline for the Sale Hearing in The Wall Street Journal (National Edition) and The Globe & Mail (National Edition).

Participation Requirements

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court, for cause shown, or as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), in order to participate in the Bidding Process, each person, other than the Purchaser, who wishes to participate in the Bidding Process (a "Potential Bidder") must deliver to the Notice Parties (as defined below) at the addresses provided below:

(a)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, that shall not be on terms that, in the Sellers' reasonable judgment, are more favorable to the Potential Bidder than the confidentiality agreement executed by the Purchaser and which shall inure to the benefit of any

- 7 -

purchaser of the Assets (in the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets and waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transaction it may enter into, to the Notice Parties (as defined below));

(b)    current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transaction; and

(c)    a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder, and any proposed measures associated with their continued employment; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Agreement.

A Potential Bidder that delivers the documents described above, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence as provided in the following paragraph with respect to the Assets.

- 8 -

### Due Diligence

The Sellers may in their reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a confidentiality agreement with the Sellers such due diligence access to materials and information relating to the Assets as the Sellers deem appropriate after consultation with the Committee, the Bondholder Group and the Monitor. Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their reasonable business judgment, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. No additional due diligence for any party other than a Qualified Bidder who has submitted a Qualified Bid will continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. In any event, the Purchaser shall be provided prompt access to all material due diligence materials, management presentations, on-site inspections and other information provided to Qualified Bidders that were not previously made available to the Purchaser. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Agreement or any other definitive sale agreement with any Successful Bidder executed and delivered by Sellers.

### Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Gordon A. Davies, Esq., Chief Legal Officer, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905) 863-8386; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (v) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vi) financial advisor to the Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (vii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; and (viii) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; so as to be received not later than July 21, 2009 at 4:00 p.m. (ET) by the Sellers (the "Bid Deadline"). The Sellers, after consultation with the Committee, the

Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so; provided, however, that for any such extension beyond ten (10) Business Days, the Sellers shall have obtained the prior written consent of the Purchaser, the Committee, the Bondholder Group and the Monitor, which consent will not be unreasonably withheld. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders (including the Purchaser) and the parties listed above of such extension.

Qualified Bid

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(a)  it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or standalone plan of reorganization, or upon alternative terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholders Committee and the Monitor, are no less favorable than the terms and conditions of the Agreement;

(b)  it includes a letter stating that the bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), provided that if such bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, August 31, 2009, and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)  it includes a duly authorized and executed Agreement, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, including, to the extent required by the terms and conditions of such bid, the Intellectual Property License Agreement, the Transition Services Agreement, the CDMA Supply Agreement, the Loaned Employee Agreement, the Manufacturing and Supply Regarding Dual Use Platforms Agreement and the Trademark License Agreement (each as defined in the Agreement), the other ancillary agreements as described in the Agreement and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Agreement ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve the Sale or standalone plan of reorganization by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the bidder;

(d)  it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the

- 10 -

Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(e)  it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

(f)  it fully discloses the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(g)  it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Agreement, plus (i) the amount of the Break-Up Fee and Expense Reimbursement (as defined below), plus (ii) U.S.$5,000,000.

(h)  it includes an acknowledgment and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Agreement (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)  it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)  it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(k)  it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may

- 11 -

determine) in an amount equal to 5% of the Purchase Price to be dealt with as provided for under "Good Faith Deposit" herein;

(l)    it (a) contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder and any proposed measures associated with their continued employment, and (b) identifies any pension liabilities and assets related to any employees currently covered under the Nortel Retirement Income Plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m)    it includes evidence of the Potential Bidder's ability to comply with section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)    it contains other information reasonably requested by the Sellers; and

(o)    it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids, and shall deliver copies of any bids deemed to be Qualified Bids to Purchaser in accordance with section 10.7 of the Agreement as soon as reasonably practicable after such a determination has been made. Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

The Sellers shall notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids promptly following the expiration of the Bid Deadline.

### Aggregate Bids

The Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided, that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

### Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder, including any assumed pension liabilities) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed,

- 12 -

certainty and value of the Transaction (including any regulatory approvals required to close the Transaction), the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

<u>No Qualified Bids</u>

If the Sellers do not receive any Qualified Bids other than the Agreement received from the Purchaser, the Auction shall be cancelled and the U.S. Debtors shall report the same to the Bankruptcy Court, the Canadian Debtors shall report the same to the Canadian Court and the Monitor and subject to requiring and obtaining approvals of the Bankruptcy Court, the Canadian Court or any other applicable court and satisfaction of the conditions set forth in the Agreement, the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Agreement. In addition, if no Qualified Bid is received, the U.S. Debtors reserve the right to request that the Bankruptcy Court advance the date of the Sale Hearing (as defined below) and provide notice of such new date to those parties in interest entitled to notice thereof and the Canadian Debtors reserve the right to file a motion with the Canadian Court seeking the approval of the sale of the Canadian Debtors' rights, title and interests in and to the Assets to the Purchaser. In addition, if approval of any other applicable court is required, the Sellers will as soon as practicable file an appropriate pleading with such court(s) seeking approval of the Transaction.

<u>Break-Up Fee and Expense Reimbursement</u>

Recognizing the value and benefits that Purchaser has provided to the U.S. Debtors and the other Sellers by entering into the Agreement, as well as the Purchaser's expenditure of time, energy and resources, the Sellers have agreed that if the Purchaser is not the Successful Bidder, the Sellers will, in the circumstances as set forth in the Agreement and Bidding Procedures Order, pay to the Purchaser (i) a break-up fee of $19,500,000 (the "<u>Break-Up Fee</u>"), and (ii) reimburse the Purchaser for certain expenses as set forth in the Agreement and Bidding Procedures Order up to $3,000,000 (the "<u>Expense Reimbursement</u>"), which amounts shall constitute administrative expense claims against the U.S. Debtors under section 503(b) of the U.S. Bankruptcy Code, payable in accordance with the terms of the Agreement and the Bidding Procedures Order.

<u>Auction</u>

If the Sellers receive one or more Qualified Bids in addition to the Agreement, the Sellers will conduct an auction (the "<u>Auction</u>") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at <u>9:30 a.m. (ET) on July 24, 2009</u>, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned without the prior written

consent of the Purchaser, subject to the terms of the Agreement. Copies of all Qualified Bids shall be delivered to the Committee, the Bondholder Group, the Monitor and the Purchaser at such time that such bid is deemed a Qualified Bid but no later than two (2) Business Days prior to the Auction. The Auction shall run in accordance with the following procedures:

(a)    Only the Sellers, the Purchaser, the Committee, the Bondholder Group and the Monitor (and the advisors to each of the foregoing), any creditor of the Sellers and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(c)    At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date. At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction.

(d)    All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(e)    The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

- 14 -

(f)      Bidding at the Auction will begin with the Starting Bid and continue, in
one or more rounds of bidding, so long as during each round at least one subsequent bid
is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's
immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in
consultation with their advisors, the Committee, the Bondholder Group and the Monitor
that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than
the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than
the Leading Bid (as defined below). Each incremental bid at the Auction shall provide
net value to the estate of at least U.S.$5,000,000 over the Starting Bid or the Leading Bid,
as the case may be, provided that the Sellers, in consultation with the Committee, the
Bondholder Group and the Monitor, shall retain the right to modify the increment
requirements at the Auction. After the first round of bidding and between each
subsequent round of bidding, the Sellers shall announce the bid or combination of bids
(and the value of such bid(s)) that it believes to be the highest or otherwise better offer
(the "Leading Bid"). A round of bidding will conclude after each participating Qualified
Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the
Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the
value of the consideration provided by Subsequent Bids (including any Subsequent Bid
by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up
Fee and Expense Reimbursement that may be payable to the Purchaser under the
Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and
any additional costs which may be imposed on the Sellers.

<u>Selection Of Successful Bid</u>

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the
Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid and
evaluate each Qualified Bid as set forth in the section titled "Evaluation of Competing Bids"
herein, (b) identify the highest or otherwise best offer or offers for the Assets received at the
Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such
bid, collectively, the "Successful Bidder"), and (c) communicate to the Purchaser and the other
Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below),
if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The
determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the
Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be
final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the
Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the
approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by
the Canadian Court and any required approvals of any other applicable court(s) with such
Successful Bidder (or, under certain circumstances described herein, the Alternate Bid
transaction documents with the Alternate Bidder).

- 15 -

## Sale Hearing

The sale hearing to authorize certain of the Sellers to enter into agreements with respect to the Successful Bid (the "Sale Hearing") will be held, in respect of those Sellers that are U.S. Debtors, before the Honorable Judge Kevin Gross (or any substitute therefor) in the United States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as **July 28, 2009 at 2:00 p.m. (ET)**, and, in respect of those Sellers that are Canadian Debtors, before the Honourable Mr. Justice Geoffrey B. Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto, Ontario, and in any other applicable court(s) whose approval is required, as soon as practicable following the date of the Sale Hearing (or, with respect to the Canadian Court, in a joint hearing with the Bankruptcy Court at the Sale Hearing). The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing. If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Sellers shall proceed as set forth in the "No Qualified Bids" section above. If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is necessary or appropriate, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval is required. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court. If a Qualified Bid other than the Agreement is selected as the Alternate Bid, the Alternate Bid shall remain open until the earlier of (a) August 15, 2009 or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date"). All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

## Good Faith Deposits

The Good Faith Deposit of any Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within five (5) Business Days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within five (5) Business Days of the date of

- 16 -

the selection of the Successful Bidder and the Alternate Bidder. The Good Faith Deposit of the Successful Bidder will be applied in accordance with the terms of the Successful Bid, and will become nonrefundable upon the approval by the Bankruptcy Court and the Canadian Court of the Sale to the Successful Bidder.

## Reservation Of Rights

The Sellers, after consultation with their advisors, the Committee, the Bondholder Group and the Monitor, and their respective advisors, (a) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof; (b) may reject, at any time, any bid (other than the Purchaser's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, any orders of the Canadian Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor; and (c) except as otherwise specifically set forth herein, with respect to instances in which the consent of the Committee, the Bondholder Group and the Monitor is required, may modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets. Notwithstanding any of the foregoing, or anything else contained herein, however, the Sellers may not, without prior written consent of the Committee, the Bondholder Group and the Monitor, which consent may not be unreasonably withheld, (i) extend the deadlines set forth in the Auction procedures for more than ten (10) Business Days, (ii) adjourn the Auction for more than ten (10) Business Days, or (iii) adjourn the Sale Hearing for more than five (5) Business Days if the Auction has concluded.

Each of the foregoing actions shall be made by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, and their respective advisors. Notwithstanding the foregoing, the Sellers may not, without the prior written consent of the Purchaser, impair or modify (a) the Purchaser's rights and obligations under the Agreement; or (b) the Sellers' obligation to give effect to the Break-Up Fee and the Expense Reimbursement payable to the Purchaser under the Agreement by crediting those amounts to the Purchaser's Qualified Bid and any Subsequent Bid by the Purchaser.

**APPENDIX "B"**

**[ATTACHED]**

EXECUTION COPY

ASSET SALE AGREEMENT

BY AND AMONG

NORTEL NETWORKS CORPORATION

NORTEL NETWORKS LIMITED

NORTEL NETWORKS INC.

AND

THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

AND

TELEFONAKTIEBOLAGET L M ERICSSON (PUBL)

DATED AS OF JULY 24, 2009

# TABLE OF CONTENTS

Page

ARTICLE I INTERPRETATION ................................................................................ 2
Section 1.1.        Definitions................................................................. 2
Section 1.2.        Interpretation............................................................ 26
    1.2.1.          Gender and Number.................................................. 26
    1.2.2.          Certain Phrases and Calculation of Time...................... 27
    1.2.3.          Headings, etc. .......................................................... 27
    1.2.4.          Currency.................................................................. 27
    1.2.5.          Miscellaneous. ......................................................... 27
ARTICLE II PURCHASE AND SALE OF ASSETS.................................................. 28
Section 2.1.        Purchase and Sale. ................................................... 28
    2.1.1.          Assets. .................................................................... 28
    2.1.2.          Excluded Assets........................................................ 29
    2.1.3.          Assumed Liabilities. ................................................. 30
    2.1.4.          Excluded Liabilities. ................................................. 32
    2.1.5.          Assumption and/or Assignment or Rejection of 365
                    Contracts. ................................................................ 33
    2.1.6.          Assignment of Non-365 Contracts................................ 34
    2.1.7.          Cure Costs; Adequate Assurance; Efforts...................... 35
    2.1.8.          Local Sale Agreements. .............................................. 37
    2.1.9.          EMEA Debtors........................................................... 37
    2.1.10.         Non-Assignable Assets. .............................................. 37
Section 2.2.        Purchase Price; Adjustment. ....................................... 38
    2.2.1.          Purchase Price........................................................... 38
    2.2.2.          Estimated Purchase Price............................................ 38
    2.2.3.          Purchase Price Adjustment. ........................................ 39
    2.2.4.          Working Capital Escrow.............................................. 41
Section 2.3.        Closing. ................................................................... 41
    2.3.1.          Closing Date.............................................................. 41
    2.3.2.          Closing Actions and Deliveries. ................................... 41

i

Section 2.4.  Designated Purchaser(s).............................................................. 42

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ..... 43**

SECTION 3.1.  Organization and Corporate Power.............................................. 43

Section 3.2.  Authorization; Binding Effect; No Breach. ................................. 44

Section 3.3.  Financing................................................................................... 44

Section 3.4.  Adequate Assurance of Future Performance. ............................. 45

Section 3.5.  Purchaser's Acknowledgments; Exclusivity of
Representations and Warranties.................................................. 45

Section 3.6.  Brokers...................................................................................... 45

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS ............. 45**

Section 4.1.  Organization and Corporate Power.............................................. 46

Section 4.2.  Authorization; Binding Effect; No Breach. ................................. 46

Section 4.3.  Title to Tangible Assets. .............................................................. 47

Section 4.4.  Material Contracts....................................................................... 47

Section 4.5.  Intellectual Property.................................................................... 48

Section 4.6.  Litigation.................................................................................... 50

Section 4.7.  Financial Statements. .................................................................. 50

Section 4.8.  Compliance with Laws; Consents................................................ 51

Section 4.9.  Real Property. ............................................................................. 51

Section 4.10.  Environmental Matters................................................................ 53

Section 4.11.  Labor and Employee Benefits Matters. ........................................ 54

Section 4.12.  Brokers....................................................................................... 56

Section 4.13.  Tax Liens. ................................................................................... 56

Section 4.14.  Valid Transfers............................................................................ 56

Section 4.15.  Investment Canada Act. ............................................................... 56

Section 4.16.  Interdependency Schedule ........................................................... 56

Section 4.17.  EMEA Debtors unrelated to Business or Assets........................... 56

Section 4.18.  Sellers' Acknowledgment; Exclusivity of Representations
and Warranties. ........................................................................... 57

**ARTICLE V COVENANTS AND OTHER AGREEMENTS............................................ 57**

Section 5.1.  U.S. Bankruptcy Actions. ............................................................ 57

Section 5.2.  Canadian Bankruptcy Actions. .................................................... 57

5.2.1.          Canadian Approval and Vesting Order.......................................... 57

5.2.2.          Additional Requests. ................................................................... 58

Section 5.3.     Consultation; Notification.............................................................. 58

Section 5.4.     Pre-Closing Cooperation................................................................ 59

Section 5.5.     Antitrust and Other Regulatory Approvals. ................................... 60

Section 5.6.     Pre-Closing Access to Information................................................ 63

Section 5.7.     Public Announcements. ................................................................. 64

Section 5.8.     Post-Closing Cooperation. ............................................................ 64

Section 5.9.     Conduct of Business. .................................................................... 64

Section 5.10.    Transaction Expenses.................................................................... 66

Section 5.11.    Confidentiality. ............................................................................. 66

Section 5.12.    Disclosure Schedules and Certain Information............................. 67

Section 5.13.    Certain Payments or Instruments Received from Third
                 Parties.......................................................................................... 67

Section 5.14.    Non-Assignable Contracts. ........................................................... 68

Section 5.15.    Inbound License Agreements. ....................................................... 69

Section 5.16.    Bundled Contracts......................................................................... 69

Section 5.17.    Post-Closing Assistance for Litigation. ........................................ 70

Section 5.18.    Delivery of Assets......................................................................... 71

Section 5.19.    Termination of Overhead and Shared Services. ........................... 71

Section 5.20.    Insurance Matters.......................................................................... 72

Section 5.21.    Deposits, Guarantees and Other Credit Support of the
                 Business. ...................................................................................... 72

Section 5.22.    Use of Trademarks. ....................................................................... 73

Section 5.23.    Sellers' Accessible Information; Cooperation. ............................. 73

Section 5.24.    Maintenance of Books and Records. ............................................ 73

Section 5.25.    Ancillary Agreements. .................................................................. 74

Section 5.26.    Subleases....................................................................................... 75

Section 5.27.    Direct Leases................................................................................. 75

Section 5.28.    Licenses......................................................................................... 75

Section 5.29.    Hazardous Materials at the Carling Property................................ 75

Section 5.30.    Transition Services Agreement...................................................... 76

Section 5.31.    Casualty......................................................................................... 78

iii

Section 5.32.    Set-Off....................................................................................... 79

Section 5.33.    Good Faith Deposit. .................................................................. 79

Section 5.34.    Certain Counterparty Objections. ............................................. 79

**ARTICLE VI TAX MATTERS.............................................................................. 80**

Section 6.1.    Transfer Taxes. ......................................................................... 80

Section 6.2.    Tax Characterization of Payments Under This Agreement. ........ 81

Section 6.3.    Apportionment of Taxes. ........................................................... 81

Section 6.4.    Withholding Taxes..................................................................... 81

Section 6.5.    Records. ..................................................................................... 82

Section 6.6.    Tax Returns................................................................................ 83

Section 6.7.    Allocation of Purchase Price...................................................... 85

**ARTICLE VII EMPLOYMENT MATTERS .......................................................... 85**

Section 7.1.    Employment Terms..................................................................... 85

Section 7.2.    Employee Benefits. .................................................................... 87

Section 7.3.    Other Employee Covenants. ...................................................... 88

Section 7.4.    Excluded Employee Liabilities. ................................................. 90

Section 7.5.    Sole Benefit of Sellers and Purchaser........................................ 91

**ARTICLE VIII CONDITIONS TO THE CLOSING .............................................. 91**

Section 8.1.    Conditions to Each Party's Obligation. ...................................... 91

Section 8.2.    Conditions to Sellers' Obligation............................................... 92

Section 8.3.    Conditions to Purchaser's Obligation. ....................................... 92

**ARTICLE IX TERMINATION ............................................................................... 93**

Section 9.1.    Termination................................................................................. 93

Section 9.2.    Effects of Termination. .............................................................. 94

**ARTICLE X MISCELLANEOUS ........................................................................... 95**

Section 10.1.    No Survival of Representations and Warranties or
Covenants.................................................................................... 95

Section 10.2.    Remedies..................................................................................... 95

Section 10.3.    No Third Party Beneficiaries. .................................................... 95

Section 10.4.    Consent to Amendments; Waivers.............................................. 95

Section 10.5.    Successors and Assigns............................................................... 96

Section 10.6.          Governing Law; Submission to Jurisdiction; Waiver of
                       Jury Trial. .................................................................................... 96
Section 10.7.          Notices. ........................................................................................ 97
Section 10.8.          Exhibits; Sellers Disclosure Schedule. ...................................... 100
Section 10.9.          Counterparts. ............................................................................... 100
Section 10.10.         No Presumption; Mutual Drafting. ............................................. 100
Section 10.11.         Severability. ................................................................................ 100
Section 10.12.         Entire Agreement. ....................................................................... 100
Section 10.13.         Availability of Equitable Relief. ................................................ 101
Section 10.14.         Bulk Sales Laws. ......................................................................... 101
Section 10.15.         Main Sellers as Representatives of Other Sellers. ..................... 101
Section 10.16.         Execution by Other Sellers. ........................................................ 102
Section 10.17.         Obligations of the Sellers. .......................................................... 102
Section 10.18.         Limitation on Losses. .................................................................. 102

v

## EXHIBITS

Exhibit A - Other Sellers

Exhibit B - Canadian Debtors; U.S. Debtors; EMEA Debtors; Non-Debtor Sellers

Exhibit C - Adjusted Net Working Capital Statement

Exhibit D - Calculation Principles

Exhibit E – CDMA Supply Agreement

Exhibit F - Flextronics Back-to-Back Agreement Term Sheet

Exhibit G - Escrow Agreement

Exhibit H - GDNT Agreements Term Sheet

Exhibit I - Intellectual Property License Agreement

Exhibit J - China Asset Sale Agreement

Exhibit K - Transferring Employee Agreement

Exhibit L - Manufacturing and Supply Regarding Dual Use Platforms Agreement

Exhibit M - Nortel Accounting Principles

Exhibit N - Specified Seller Encumbrances

Exhibit O - Real Estate Agreements Term Sheet

Exhibit P - Trademark License Agreement

Exhibit Q - Transition Services Agreement

Exhibit R – Software License and Development Agreement for Common Material Platform Software

Exhibit S - Knowledge of the Sellers

Exhibit 5.1 - Form of U.S. Sale Order

Exhibit 5.2.1 - Form of Canadian Approval and Vesting Order

## ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of July 24, 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the Affiliates (as defined below) of the Main Sellers listed in Exhibit A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**") and Telefonaktiebolaget L M Ericsson (publ), a corporation organized under the laws of Sweden (the "**Purchaser**").

## W I T N E S S E T H:

WHEREAS, the Sellers beneficially own and operate the Business (as defined below);

WHEREAS, on January 14, 2009 (the "**Petition Date**"), NNC, NNL and the Other Sellers listed in part 1 of Exhibit B hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and was extended by further order of the Canadian Court on February 10, 2009 and April 28, 2009, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit B hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) having commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the Other Sellers listed in part 4 of Exhibit B hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers, if any) of the Assets (as defined below), the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities (as defined below) are being

1

made at arms' length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates;

WHEREAS, the Purchaser (and each of the Designated Purchasers, where applicable) intends to purchase only those Assets relating to the Sellers' CDMA Business in North America and CDMA research and development in China, as well as certain LTE Assets in Canada;

WHEREAS, in accordance with the U.S. Bidding Procedures Order, Purchaser has delivered to Sellers a good faith deposit in the amount of thirty-six million five hundred thousand dollars ($36,500,000)(the "**Good Faith Deposit**"); and

WHEREAS, in addition, as of the Closing, the Purchaser (or Affiliates of the Purchaser) and certain Sellers (or Affiliates of the Sellers) will enter into the following ancillary agreements, (i) the Transition Services Agreement, (ii) the Intellectual Property License Agreement, (iii) the Trademark License Agreement, (iv) the Escrow Agreement, (v) the Transferring Employee Agreement, (vi) the Real Estate Agreements, (vii) the Manufacturing and Supply Regarding Dual Use Platforms Agreement, (viii) Flextronics Back-to-Back Agreement, (ix) the CDMA Supply Agreement, (x) the China Asset Sale Agreement, (xi) a Software License and Development Agreement for Common Material Platform Software, and (xii) the GDNT Agreements (the foregoing, collectively, the "**Ancillary Agreements**"), and any arrangements as may be required pursuant to Section 5.16.

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I

## INTERPRETATION

Section 1.1.    Definitions.

Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accounting Arbitrator**" has the meaning set forth in Section 2.2.3.1(c).

"**Accrued Vacation Amount**" means the amount of compensation, including the employer's portion of any associated payroll Taxes, with respect to the accrued and unused vacation days that is accrued on the account of a Transferring Employee from his or her respective employer as of the Closing Date, to be calculated in accordance with the Calculation Principles.

"**Action**" means any litigation, action, suit, charge, binding arbitration, Tax audit or investigation or other legal, administrative, regulatory or judicial proceeding.

2

"**Acquired Actions**" means any avoidance actions as used under Section 547 or 548 of the Bankruptcy Code or the equivalent provisions under other applicable Laws that the Sellers have against any counterparty to an Assumed and Assigned Contract arising out of or relating to the Assigned Contracts that are actually assigned to the Purchaser or a Designated Purchaser hereunder.

"**Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(c).

"**Adjusted Net Working Capital Statement**" means the statement of certain specified asset and liability accounts and certain accounting principles, methodologies and policies used in the determination of such accounts, consistent with the Calculation Principles, a pro forma version of which (as of March 31, 2009) is provided in Exhibit C hereto.

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person.

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Annual Audited Financial Statements**" has the meaning set forth in Section 4.7(a).

"**Antitrust Approvals**" means the HSR Approval and the Competition Act Approval.

"**Antitrust Laws**" means the Competition Act, the HSR Act, and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Accounts Receivable**" means North American trade accounts receivable that are current and not in dispute relating to the Specified CDMA Contracts, in the aggregate amount of $5,000,000, net of any allowance for doubtful accounts computed in accordance with the Nortel Accounting Principles consistent with historical practice.

"**Assigned Contracts**" means (i) the Assumed and Assigned Contracts, and (ii) the Designated Non-365 Contracts.

3

"**Assigned Intellectual Property**" means (i) the Assigned Patents, (ii) the Assigned Trademarks, (iii) the Intellectual Property (other than Patents and Trademarks) in the Software (including previous versions and versions in development) predominantly used in the CDMA Products and in the Software predominantly used in the LTE Access Products, respectively, in each case, as listed in Section 1.1(a) of the Sellers Disclosure Schedule, and (iv) any other Intellectual Property (other than Patents or Trademarks) owned as of the Closing Date by any of the Sellers that is predominantly used in the Business with such predominant use to be determined, if applicable, in accordance with guidelines and principles, if any, that the Sellers and the Purchaser may from time to time agree in writing prior to Closing.

"**Assigned Patents**" means the Patents predominantly used in the CDMA Business as of Closing and owned as of the Closing Date by any of the Sellers as set forth in Section 1.1(b) of the Sellers Disclosure Schedule.

"**Assigned Trademarks**" means the Trademarks predominantly used in the Business as of the Closing and owned as of the Closing Date by any of the Sellers, as set forth in Section 1.1(c) of the Sellers Disclosure Schedule.

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(d).

"**Assumed and Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.5(b).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Auction**" has the meaning set forth in the Bidding Procedures (as defined in the U.S. Bidding Procedures and Sale Motion).

"**Balance Sheet Date**" has the meaning set forth in Section 4.7(b).

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court or any other court before which Bankruptcy Proceedings are held.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings concerning any of the Sellers that are held from time to time.

"**Bundled Contracts**" has the meaning set forth in Section 5.16.

"**Business**" means, collectively, the following businesses consisting of:

4

(i) the business segment through which the Sellers, individually, jointly or in collaboration with or pursuant to contracts with Third Parties: (a) design, develop, process components, indirectly manufacture through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers the prior versions (if currently supported), current versions and versions under development of the following products: CDMA BTS, CDMA BSC/eBSC, CDMA DO-RNC, CDMA MSC/MTX, CDMA HLR, CDMA Media Gateway, CDMA Gateway controller, CDMA Billing Manager, SS7 Signaling Gateway Software and associated OAM Software Systems as listed in Section 1.1(d) of the Sellers Disclosure Schedule (collectively, the "**CDMA Products**") and (b) provide the CDMA Services (clauses (a) and (b) collectively, the "**CDMA Business**"); and

(ii) the business through which the Sellers, individually, jointly or in collaboration with or pursuant to contracts with Third Parties, design, develop, process components, indirectly manufacture through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers the prior versions (if currently supported), current versions and versions under development of the following LTE Access products: eNodeB (including UDM and URM) and associated Element Management Systems (EMS) (collectively, the "**LTE Access Products**" and the activities described in this clause (ii) are the "**LTE Business**"),

but excluding, in each of clauses (i) and (ii) above: (A) any Excluded Asset; (B) Overhead and Shared Services (other than Transferred Overhead and Shared Services); and (C) any products and/or services provided by businesses or business segments of any Seller other than those specified in clauses (i) or (ii) above, including for the avoidance of doubt, the Excluded Products and Services.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, and (iii) Stockholm, Sweden.

"**Business Information**" means all books, records, files, research and development log books, ledgers, documentation, sales literature or similar documents in the possession or under control of the Sellers and to the extent that such information relates to the Business, including policies and procedures, Owned Equipment manuals and materials and procurement documentation; provided, that, to the extent any of the foregoing is also used in any business or business segment of any Seller other than the Business, then such portion of the Business Information as used in such business or business segment of any Seller other than the Business shall be segregated and shall not form part of Business Information, provided further that, where such segregation shall be impracticable, Business Information shall be limited to copies of the foregoing. Business Information shall not include any Employee Records.

"**Business Registered IP**" has the meaning set forth in Section 4.5(b).

"**Calculation Principles**" means the Nortel Accounting Principles, applied in a manner consistent with historical practices, to the extent applicable to the determination of the Net Inventory Value, the CIP Receivables Amount, the Contractual Liabilities Amount, the Royalty Liability Amount, the Warranty Provision Amount, the Accrued Vacation Amount and

the Adjusted Net Working Capital as set forth in Exhibit D and in the Adjusted Net Working Capital Statement.

"**Calgary Retention Plan**" means the retention plan developed for certain Westwinds Facility employees substantially approved by the Canadian Court on March 6, 2009, with such further approvals as may be obtained from the Canadian Court from time to time.

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.1.

"**Canadian Court**" means the Ontario Superior Court of Justice.

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Sales Process Order**" means the order entered on June 29, 2009 approving the items described in the Canadian Sales Process Order Motion.

"**Canadian Sales Process Order Motion**" means the motion filed by the Canadian Debtors on June 23, 2009 with the Canadian Court seeking an order for approval of, among other things, a process of the sale of the Canadian Debtors' rights, title and interests in and to the "Assets" (as defined therein).

"**Carling Property**" means the property municipally known as 3500 Carling Avenue, Nepean, Ontario.

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**CDMA Business**" has the meaning set forth in the definition of Business.

"**CDMA Contracts**" means those Contracts of a Seller pursuant to which a Seller or Sellers provide CDMA Products and/or CDMA Services to carriers or other customers of the CDMA Business.

"**CDMA Products**" has the meaning set forth in the definition of Business.

"**CDMA Services**" mean, collectively, the following services, solely in relation to CDMA Products, that the Sellers, individually, jointly or in collaboration with or pursuant to contracts with Third Parties, market, distribute and sell globally to carriers: (i) network implementation services, consisting of the configuration, planning, installation and integration of a network migration, upgrade or green-field deployment into a new or existing network, including design and deploy services, audit and optimization services, and operations support system services; (ii) network managed services, consisting of the provision of on-site skilled resources to provide operational support, technician support, staff augmentation, on-the-job

6

training, product specialist consulting, core network optimization, software loading service, and transport network service; and (iii) network support services, including technical support, technical account manager service, network prime engineer service, emergency recovery services, online support , technical support for special projects, repair services, managed spares service, Third Party products spares, management service, corrective content management, network discovery services, engineering helpdesk, network configuration, and software release services; but expressly excludes the Sellers' network operations centre.

"**CDMA Supply Agreement**" means the agreement between the Purchaser and/or any Designated Purchasers and the relevant Sellers, to be executed as of the Closing in substantially the form attached hereto as Exhibit E.

"**CFIUS**" means the Committee on Foreign Investment in the United States.

"**CFIUS Approval**" means that the Parties shall have received a written notification issued by CFIUS that it has concluded a review of any notification voluntarily provided pursuant to the Exon-Florio Amendment of the Defense Production Act of 1950, as amended and Section 5.5(f) hereof and determined not to conduct an investigation or, if an investigation is deemed to be required, notification that the U.S. government will not take action to prevent the transactions contemplated by this Agreement from being consummated.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**China Asset Sale Agreement**" means the agreement between the Purchaser and/or any Designated Purchasers and the relevant Affiliates of the Sellers to be executed as soon as practicable after the date hereof in substantially the form attached hereto as Exhibit J.

"**China Assets**" means the Assets related to the CDMA Business to be sold pursuant to the China Asset Sale Agreement.

"**CIP Receivables**" means, as of a given date, amounts classified in Construction-in-Process accounts in a manner consistent with the Calculation Principles.

"**CIP Receivables Amount**" means, as of any given date, the amount of CIP Receivables of the Business, determined in accordance with the Calculation Principles.

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 2.3.1.

"**Closing Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing CIP Receivables Amount**" has the meaning set forth in Section 2.2.3.1(a).

7

"**Closing Contractual Liabilities Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Date**" has the meaning set forth in Section 2.3.1.

"**Closing Employee Adjustment Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Net Inventory Value**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Royalty Liability Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Statement**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Warranty Provision Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Seller or any of its Affiliates has entered into with any union, works council or collective bargaining agent with respect to terms and conditions of employment of the employees of such Seller or its Affiliates.

"**Commissioner**" means the Commissioner of Competition appointed under the Competition Act or any person duly authorized to exercise the powers and perform the duties of the Commissioner of Competition.

"**Competition Act**" means the Competition Act (Canada), as amended, and includes the regulations promulgated thereunder.

"**Competition Act Approval**" means that: (i) the applicable waiting period has expired or been terminated pursuant to Section 123 of the Competition Act; (ii) the Commissioner or his/her authorized representative shall have provided the Purchaser with a waiver from complying with Part IX of the Competition Act pursuant to Section 113(c) of the Competition Act and in either case the Commissioner or his/her authorized representative shall have advised the Purchaser in writing that the Commissioner does not intend to make an application under Section 92 of the Competition Act with respect to the transactions contemplated by this Agreement, and neither the Commissioner nor any of his/her authorized representatives shall have rescinded or amended such advice; or (iii) the Commissioner shall have issued an advance ruling certificate pursuant to Section 102 of the Competition Act in respect of the transactions contemplated by this Agreement.

"**Complaining Party**" has the meaning set forth in Section 5.30(d).

8

"**Confidentiality Agreement**" means the confidentiality agreement among the Purchaser, the Sellers listed therein and the Joint Administrators dated March 30, 2009, as amended.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by, or notice to (including the expiry of any related notice or waiting period), any Government Entity or other Third Party.

"**Contract**" means any written binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.

"**Contractual Liabilities Amount**" means, as of any given date, the amount of contractual liabilities of the Business determined in accordance with the Calculation Principles.

"**Control**" (together with its correlative meanings, "Controlled by" and "under common Control with") means, in connection with a given Person, the possession, directly or indirectly, or as trustee or executor, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract, credit arrangement or otherwise.

"**Covered Assets and Persons**" means the Business and the assets (including the Assets), tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of the Business.

"**Cross-Border Protocol**" means the certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cure Cost**" means (i) any amounts required by Section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under a 365 Contract or an Assumed and Subleased Real Estate Lease and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract or Assumed and Subleased Real Estate Lease; and (ii) with respect to any Designated Non-365 Contract, any amounts required to cure any defaults and to pay any actual or accrued pecuniary losses under such Seller Contract in respect of the period prior to the Closing Date that are required by the counterparty thereto to be paid in order for such Assigned Contract to be assigned.

"**Designated Non-365 Contracts**" has the meaning set forth in Section 2.1.6(d).

"**Designated Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Designated Purchaser**" has the meaning set forth in Section 2.4(a).

9

"**Direct Lease Real Estate**" has the meaning set forth in Section 5.27.

"**Direct Lease**" has the meaning set forth in Section 5.27.

"**Disagreement Notice**" has the meaning set forth in Section 2.2.3.1(b).

"**EMEA Cases**" means the proceedings commenced by the applications filed with the English Court on the Petition Date, pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings.

"**EMEA Debtors**" means the entities listed under the heading "EMEA Debtors" in part 3 of Exhibit B hereto.

"**Employee**" means any employee, as of the date hereof, of the Sellers or their Affiliates (other than the EMEA Debtors or their respective Subsidiaries) who (i) for the twelve months prior to the date hereof (or such shorter time as such employee was employed by the Sellers or such Affiliates) performed services which were all or substantially all related to the Business or (ii) was hired into, transferred into, or assigned to the Business prior to the Closing in the Ordinary Course and whose services are all or substantially all related to the Business, or (iii) whose services are necessary to the operation of the Business, provided that if the employee is at a Job Complexity Indicator 6 or above, such hire, transfer or assignment is subject to Purchaser's consent in accordance with Section 5.9(l).

"**Employee Adjustment Amount**" means, at any given time, the Accrued Vacation Amount.

"**Employee Information**" has the meaning set forth in Section 4.11(b).

"**Employee Records**" means books, records, files, or other documentation with respect to Employees.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferring Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day on which the employment of a Transferring Employee commences with the Purchaser or its Designated Purchaser as provided for in this Agreement and the Transferring Employee Agreement.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environmental Law**" means any applicable Law relating to or regulating (i) the handling, generation, management, Release or remediation of Hazardous Materials; (ii) the exposure of persons to Hazardous Materials; (iii) occupational health and safety; or (iv) pollution or protection of human health, the environment or natural resources, including the United States Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act and the Toxic Substances Control Act, all as amended, and any requirements of a Government Entity promulgated

10

pursuant to these applicable Laws or any analogous supranational, foreign, state, provincial, territorial, municipal or local Laws.

"**Environmental Permit**" means any Consent required under any Environmental Law for the Business as currently conducted.

"**Equipment**" means tangible property, including all trade fixtures and fixtures, furniture, furnishings, fittings, equipment, apparatus, appliances, test labs, trial equipment and other articles of personal property, including that located at the Direct Lease Real Estate or the demised premises which are (i) the subject of any real property lease included in the Assigned Contracts or (ii) the subject of any Sublease; provided, however, that the term "Equipment" shall not include fixtures other than trade fixtures located at the Direct Lease Real Estate and shall not include any leasehold improvements owned by the head landlord and located at the demised premises which are the subject of any Sublease; and provided, further, that "Equipment" shall not include (i) any Inventory, (ii) items of tangible property personally assigned to Employees who are not Transferring Employees, or (iii) any Intellectual Property covering, embodied in or connected to any Equipment.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate Liability**" means any obligation, liability, or expense of any Seller which arises under or relates to any Seller Employee Plan that is subject to Title IV of ERISA, Section 302 of ERISA, Section 412 of the Code, COBRA or any other statute or regulation that imposes liability on a so-called "controlled group" basis with or without reference to any provision of Section 414 of the Code or Section 4001 of ERISA, including by reason of any Seller's affiliation with any of its ERISA Affiliates or the Purchaser being deemed a successor to any ERISA Affiliate of any Seller.

"**Escrow Agreement**" means the Escrow Agreement to be entered into on or prior to Closing substantially in the form attached hereto as Exhibit G.

"**Escrow Agent**" has the meaning ascribed to such term in the Escrow Agreement.

"**Estimated Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(a).

"**Estimated CIP Receivables Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Contractual Liabilities Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Employee Adjustment Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Net Inventory Value**" has the meaning set forth in Section 2.2.2(a).

11

"**Estimated Purchase Price**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Royalty Liability Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Warranty Provision Amount**" has the meaning set forth in Section 2.2.2(a).

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Contracts**" means any Contract that is not assigned to the Purchaser under this Agreement. For the avoidance of doubt, Excluded Contracts shall include the Excluded 365 Contracts, the Excluded Non-365 Contracts, any underlying Contract between a Third Party and a Seller that is subleased or licensed to the Purchaser or a Designated Purchaser pursuant to this Agreement, the Qualcomm Cross-License, and Addendum No. 9 to the OEM iPlanet Software Products (Binary) Exhibit to the Global Account Agreement Master Terms between Sun Microsystems, Inc. and NNI, Binary License and Redistribution Agreement for Java 2 Standard Edition dated October 5, 2006.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.4.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded Non-365 Contract**" has the meaning set forth in Section 2.1.6(e).

"**Excluded Products and Services**" means all products and services provided by businesses or business segments of any Seller other than the Business, including the following products and all associated development and PLM resources: Evolved Packet Core (including MME, SGW, PGW), XACore and associated peripherals (including LPP, MS/ENET, SPM, DTC, MTM, DRAM IWSPM), ERS8600, Passport and OAM Systems not expressly included in the Products.

"**Excluded 365 Contract**" has the meaning set forth in Section 2.1.5(f).

"**Executory Contract**" means an "executory contract" for the purposes of Section 365 of the U.S. Bankruptcy Code.

"**Extra Services**" has the meaning set forth in Section 5.30(b).

"**Final Order**" means an order of any Bankruptcy Court or other court of competent jurisdiction (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of

12

Bankruptcy Procedure 9024 ("**Rule 9024**") or Federal Rule of Civil Procedure 60 ("**Rule 60**") shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

"**Final Purchase Price**" has the meaning set forth in Section 2.2.3.1(a).

"**Flextronics Back-to-Back Agreement**" means the agreement between the relevant Sellers and the Purchaser and/or any Designated Purchasers to be executed on or before Closing based substantially on the term sheet attached hereto as Exhibit F.

"**GAAP**" means the United States generally accepted accounting principles.

"**GDNT Agreements**" means the agreements to be entered into between the relevant Sellers, the Purchaser (and/or any Designated Purchasers), and Guangdong-Nortel Telecommunications Equipment Co. Ltd., on or prior to the Closing based substantially on the term sheet attached hereto as Exhibit H.

"**General Scope of Included Services**" has the meaning set forth in Section 5.30(a).

"**Good Faith Deposit**" has the meaning set forth in the recitals.

"**Government Entity**" means any U.S., Canadian, U.K. and any other applicable supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**GST**" means goods and services Tax payable under Part IX of the Excise Tax Act (Canada).

"**Hazardous Materials**" means any chemical, material, waste, heat, sound, radiation or substance defined by or regulated under any Environmental Law as a hazardous waste, hazardous material, hazardous substance, extremely hazardous waste, restricted hazardous waste, pollutant, contaminant, toxic substance or toxic waste, including without limitation petroleum, petroleum products, asbestos, lead or polychlorinated biphenyls.

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means that the Purchaser shall have received notification from the responsible Minister under the Investment Canada Act that he/she is satisfied or is deemed to be satisfied that the transactions contemplated in this Agreement that are subject to the

13

provisions of the Investment Canada Act are likely to be of net benefit to Canada, on terms and conditions satisfactory to the Purchaser, in its reasonable discretion.

"**Inactive Employees**" means Employees on a Seller-approved leave of absence who are expected to return and actually return to work within the relevant time period set out below. An Employee shall be an Inactive Employee for purposes hereof only if such individual is absent as a result of military service, pregnancy or parental leave, disability leave, medical leave, jury duty or any leave provided under applicable Law and, in the case of leaves provided under applicable Law, is expected to return to work and actually returns to work in the time permitted for such leave under applicable Law and, for any other leave, is expected to return to work and actually returns to work in accordance with the terms of such leave but not longer than ninety (90) days (or, if such Employee is located in Canada, six (6) months) following the Closing Date.

"**Inbound License Agreements**" has the meaning set forth in Section 4.5(f).

"**Included Services**" has the meaning set forth in Section 5.30(a).

"**Indebtedness**" of any Person means at any date, without duplication, all obligations of such Person to the extent incurred for the Business (i) for indebtedness for borrowed money (including any unpaid principal, premium and accrued and unpaid interest or fees), (ii) for indebtedness evidenced by bonds, debentures, notes or similar instruments, (iii) in respect of leases whether or not capitalized in accordance with the Nortel Accounting Principles under which such Person is the lessee, (iv) in respect of letters of credit issued for the account of such Person (to the extent drawn), (v) in respect of guarantees of the obligations of other Persons of the type referred to in clauses (i) through (iv) above and (vi) any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayment or default under any of the Indebtedness referred to in items (i) and (ii) above.

"**Independent Auditor**" means Grant Thornton LLP or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation that is jointly selected by the Primary Parties.

"**Insolvency Act**" has the meaning set forth in the definition of EMEA Cases.

"**Intellectual Property**" means any and all intellectual and industrial property rights, whether protected or arising under the Laws of the United States, Canada or any other jurisdiction, including all intellectual or industrial property rights in any of the following: (i) Trademarks; (ii) Patents, invention disclosures and inventions; (iii) works of authorship (including any registrations or applications for registration of copyrights); (iv) mask works; (v) trade secrets, know-how and confidential information; (vi) *sui generis* data base rights; (vii) industrial designs; and (viii) Software.

"**Intellectual Property License Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit I.

"**Interim Unaudited Financial Statements**" has the meaning set forth in Section 4.7(a).

"**Inventory**" means any inventories of raw materials, manufactured and purchased parts, works in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise; provided, that inventory not located within the United States, Canada or Caribbean countries served by United States contracts ("**Caribbean Countries**") shall not be included in "Inventory", unless it (i) has been manufactured abroad; (ii) is, in the Ordinary Course, destined for shipment to the United States, Canada or Caribbean Countries; (iii) is not older than ninety (90) days; (iv) is the current product release/revision; and (v) is saleable.

"**Investment Canada Act**" means the Investment Canada Act.

"**Joint Administrators**" means Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes and Alan Bloom serve as joint administrators) as appointed by the English Court under the Insolvency Act.

"**KEIP**" means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in the District of Delaware pursuant to orders entered on March 5, 2009 and March 20, 2009, and approved by the Canadian Court in part on March 6, 2009 and in part on March 20, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**KERP**" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware by an order dated March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase means, with reference to the Sellers, the actual knowledge of those Persons listed on Exhibit S hereto.

"**Latest Lease Rejection Date**" means the latest of (i) August 12, 2009, or (ii) if Sellers (in their sole discretion) request and a landlord under a 365 Real Estate Lease agrees to an extension of the date by which the relevant Seller must elect to either assume or reject such 365 Real Estate Lease to a date following August 12, 2009, then with respect to such 365 Real Estate Lease, the date to which such deadline has been extended by agreement of Sellers and such landlord and (iii) with respect to the Non-365 Real Estate Leases and the Non-365 Licensed Real Estate Leases in each case related to property located in Canada, the date on which the Sellers file a "plan of record" with the Canadian Bankruptcy Court.

"**Law**" means any U.S., Canadian, U.K. and any other applicable foreign, supranational, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, judicial, administrative or other order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

15

"**Leased Real Property**" means all real property subject to a Real Estate Lease which is an Assigned Contract, an Assumed and Subleased Real Estate Lease, a Non-365 Subleased Real Estate Lease, a Licensed Real Estate Lease or a Non-365 Licensed Real Estate Lease.

"**Lease(s)**" means all Seller Contracts that are leases, subleases, licenses or other agreements (written or oral), including all amendments, extensions and renewals thereof, pursuant to which real property is held.

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability.

"**License**" has the meaning set forth in Section 5.28.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchasers under the Intellectual Property License Agreement and the Trademark License Agreement.

"**Licensed Real Estate Leases**" has the meaning set forth in Section 2.1.5(c).

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance on real property, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, lease or conditional sale arrangement.

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Losses**" means all losses, damages, Liabilities, deficiencies, interest, awards, judgments, fines, penalties and reasonable and documented out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements and the costs of litigation, including reasonable amount paid in investigation, defense or settlement of an Action).

"**LTE Access Products**" has the meaning specified in the definition of Business.

"**LTE Business**" has the meaning set forth in the definition of Business.

"**LTE-Related Patents**" means any and all Patents related to 3GPP Long-Term Evolution products and services (including Patents related to the LTE Business).

"**LTE Transferring Employees**" means the Employees listed on Section 1.1(g) of the Sellers Disclosure Schedule who become Transferring Employees.

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Manufacturing and Supply Regarding Dual Use Platforms Agreement**" means the agreement between the relevant Sellers (or their Affiliates), on the one hand, and the

Purchaser and/or a Designated Purchaser, on the other hand, to be executed on or before the Closing in the form attached hereto as Exhibit L.

"**Material Adverse Effect**" means any circumstance, state of fact, event, change or effect (each an "**Effect**") that, individually or in the aggregate with all other Effects, (a) is or could reasonably be materially adverse to the business, operations, assets, liabilities, results of operations or financial condition of the Business, taken as a whole (or, solely for purposes of the representations and warranties in Section 4.11 or for purposes of Section 8.3(a)(i) as applied to the representations and warranties in Section 4.5 and Section 4.11, either of the CDMA Business or the LTE Business), or (b) prevents or could reasonably be expected to prevent the ability of the Sellers to perform their obligations under this Agreement or the timely consummation of the transactions contemplated by this Agreement, but excluding, for purposes of clauses (a) and (b), (i) Effects resulting from changes in general economic conditions in the United States or Canada, (ii) Effects arising from the execution or delivery of this Agreement or the Transactions or the public announcement thereof, (iii) Effects that result from any action required to be taken pursuant to this Agreement or any action taken pursuant to the written request or with the prior written consent of the Purchaser, (iv) Effects relating to the industries and markets in which the Business operates, (v) Effects relating to changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (vi) Effects relating to or including the attrition of customers prior to the Closing Date, or (vii) Effects relating to the pendency of the Bankruptcy Proceedings and any action approved by, or motion made before, the Bankruptcy Courts; it being understood that the failure of the Business to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect; provided, that, with respect to clauses (i), (iv), and (v), any such Effect shall be included to the extent such Effect has a materially disproportionate effect on the Business, taken as a whole (or, solely for purposes of the representations and warranties in Section 4.11 or for purposes of Section 8.3(a)(i) as applied to the representations and warranties in Section 4.5 and Section 4.11, either of the CDMA Business or the LTE Business), as compared to other industry participants.

"**Material Contracts**" has the meaning set forth in Section 4.4(a).

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**Net Inventory Value**" means, as of any given date, the amount of the Owned Net Inventory, net of applicable provisions, determined in accordance with the Calculation Principles.

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNTC**" has the meaning set forth in Section 6.5(b).

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.14(a).

17

"**Non-Assigned Contract**" means a Non-Assignable Contract as to which all applicable Consents to assignment have not been granted prior to the Closing Date.

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

"**Non-Solicitation Period**" means the twelve (12) month period immediately following the Closing Date.

"**Non-365 Contracts**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Contract List**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Licensed Real Estate Leases**" has the meaning set forth in Section 2.1.6(c).

"**Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Non-365 Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.6(b).

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Unaudited Financial Statements, as set forth in Exhibit M hereto.

"**NSN Agreement**" means the Asset Sale Agreement, dated as of June 19, 2009, among the Sellers and Nokia Siemens Networks BV.

"**OAM Systems**" means operations, administration and maintenance systems.

"**Open Source Software**" means Software that is made available under a license agreement that (i) conditions use, modification or distribution of any Software program, or any Software derived from such Software program or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software), (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software or (iii) is made available under any software license listed at the website http://www.opensource.org/licenses/alphabetical as of Closing.

"**Ordinary Course**" means the ordinary course of each of the Businesses through the date hereof consistent with each of their recent past practice since the filing of the Bankruptcy Proceedings, as such practice may be modified from time to time to the extent necessary to reflect the Bankruptcy Proceedings.

"**Outbound License Agreements**" has the meaning set forth in Section 4.5(f).

"**Other Sellers**" has the meaning set forth in the preamble to this Agreement.

18

"**Overhead and Shared Services**" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services or provided to both (i) the Business and (ii) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, Tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software and other Intellectual Property necessary for or used in connection therewith, including the Licensed Applications (as defined in the Transition Services Agreement).

"**Owned Equipment**" means Equipment owned by the Sellers that is (i) held or used exclusively by the LTE Transferring Employees or (ii) held or used predominantly in connection with the CDMA Business, in each case including the items listed in Section 1.1(h) of the Sellers Disclosure Schedule, and excluding in all cases any Owned Net Inventory and any Intellectual Property.

"**Owned Net Inventory**" means (i) Inventory owned by any of the Sellers that is held or used predominantly in connection with the Business, including any such Inventory which is owned by the Sellers but remains in the possession or control of a contract manufacturer or another Third Party, and (ii) the other Inventory listed in Section 1.1(i) of the Sellers Disclosure Schedule, all as reflected on Sellers' general ledger as of the Closing Date an estimate of which will be provided to the Purchaser at least three days prior to Closing.

"**Partial Allocation**" has the meaning set forth in Section 6.7(b).

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patent Cross Licenses**" means all Contracts between the Sellers or their Affiliates (other than the EMEA Debtors and their respective Subsidiaries) and a Third Party under which the Sellers or such Affiliates, as applicable, both (i) grant a license under patents and patent applications owned by (or licensed to) them, and (ii) receive from the counter-party a license under patents and patent applications owned by (or licensed to) such counter-party (but other than inbound or outbound license agreements where the only grant back from the licensee is under improvements on the licensed Intellectual Property).

"**Patents**" means all national (including without limitation the United States and Canada) and multinational patents and utility models (petty patents) as well as all applications and provisional applications for any of the foregoing, and further including without limitation all

19

reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, and all rights therein provided by multinational treaties or conventions.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP, other than Liens that may be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue; (iii) zoning, entitlement, building and land use regulations, customary covenants, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted provided that same are complied with in all material respects; and (iv) minor title defects or irregularities which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Pre-Closing Taxable Period**" means any Taxable period ending on or prior to the Closing Date.

"**Primary Party**" means (i) each of the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Products**" means the CDMA Products and the LTE Access Products.

"**Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan or agreement, termination or retirement indemnity plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, early or ill health retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or

20

policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferring Employees pursuant to this Agreement.

"**Qualcomm Cross-License**" means that certain Patent Cross-License Agreement, dated December 27, 2006, by and between Qualcomm Incorporated and NNL.

"**Qualified Arbitrator**" has the meaning set forth in Section 5.30(d).

"**Qualified Expenditures**" has the meaning set forth in Section 6.5(b).

"**Real Estate Agreements**" means the leases, sub-leases or license agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or prior to the Closing, in accordance with and as provided by the Real Estate Agreements Term Sheet.

"**Real Estate Agreements Term Sheet**" means the Real Estate Agreements Term Sheet attached hereto as Exhibit O.

"**Real Estate Lease**" means a Seller Contract that is a lease, sublease, license or other agreement for use and occupancy of real property including all amendments, extensions and renewals thereof and is an Assigned Contract, an Assumed and Subleased Real Estate Lease, a Non-365 Subleased Real Estate Lease, a Licensed Real Estate Lease or a Non-365 Licensed Real Estate Lease.

"**Records Custodian**" means Deloitte & Touche LLP or in case such firm is unable to carry out its duties for whatever reason, such other auditing firm of international reputation that is acceptable to each of Purchaser and Sellers, each acting reasonably.

"**Regulatory Approvals**" means (i) the Antitrust Approvals; (ii) the CFIUS Approval; (iii) any Consent of any Government Entity required to be obtained under the Investment Canada Act (other than the ICA Approval); and (iv) if subsection 448(1) of the Budget Implementation Act, 2009 (Canada), comes into force on or before the Closing Date, the ICA Approval.

"**Release**" when used in conjunction with Hazardous Materials, means any spilling, leaking, pumping, emitting, emptying, pouring, discharging, depositing, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers or other receptacles containing Hazardous Materials) into the environment.

"**Representatives**" means as to any Person, the attorneys, accountants, financing sources, consultants, financial advisors and other representatives and agents of such Person.

"**Respective Affiliates**" has the meaning set forth in Section 10.15(c).

"**Responding Party**" has the meaning set forth in Section 5.30(d).

21

"**Restricted Technical Records**" means the Livelink database or any other similar database containing only all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2002 and subsequent taxation years.

"**Royalty Liability Amount**" means, as of any given date, the amount of the royalty liabilities determined in accordance with the Calculation Principles.

"**Scope Guidelines**" has the meaning set forth in Section 5.30(a).

"**Security Deposits**" has the meaning set forth in Section 5.21.

"**Seller Consents**" has the meaning set forth in Section 2.1.1(i).

"**Seller Contracts**" means those Contracts of a Seller that (i) relate predominantly to the Business; (ii) are Material Contracts; or (iii) are otherwise material to the operation of the Business and not commercially available to the Purchaser.

"**Seller Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP, other than Liens that may be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue; (iii) Liens arising hereunder or under any Assigned Contracts incurred as a result of the assignment hereunder; (iv) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (v) any other Liens set forth on Exhibit N; (vi) zoning, entitlement, building and land use regulations, customary covenants, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted provided that same are complied with in all material respects; and (vii) minor title defects or irregularities which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted.

"**Seller Employee Plan**" means (i) any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement including any employee agreement other than immaterial employment agreements, profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan or agreement, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death

22

benefit plan, or any other similar plan, program, arrangement or policy under which the Sellers or any of their Subsidiaries or Affiliates have any Liabilities, or that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates with respect to Employees, or former employees of the Business, or pursuant to which payments are made, or benefits are provided to, or an entitlement to payments or benefits may arise with respect to any Employees or former employees of the Business (or any spouses, dependants or beneficiaries of any such individuals) and (ii) any other employee benefit plan with respect to which the Purchaser or any of its Affiliates could have any Liability as a result of the Sellers or any of their Subsidiaries or Affiliates maintaining such plan prior to the Closing Date.

"**Seller Insurance Policies**" means all current or previous insurance policies of the Sellers and their Affiliates, including all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, contaminated products insurance policies and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing.

"**Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Software**" means any and all (i) computer programs, in source code or object code, (ii) computerized databases and compilations, and (iii) documentation, compilation tools, development tools and support tools associated with (i) and/or (ii).

"**Specified CDMA Contracts**" has the meaning set forth in Section 8.3(d).

"**Straddle Period**" has the meaning set forth in Section 6.3(b).

"**Subleases**" has the meaning set forth in Section 5.26.

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity, including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, gross receipts, sales, use, ad valorem, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto, and (b) any obligation to pay Taxes of a Third Party, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise.

23

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian, United Kingdom or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

"**Tax Credit Purchaser**" has the meaning set forth in Section 6.5(b).

"**Tax Returns**" means all returns, reports (including elections, declarations, disclosures, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes, including any amendments thereto.

"**Termination Date**" has the meaning set forth in Section 9.1(b)(ii).

"**Third Party**" means any Person that is neither a Party nor an Affiliate of a Party.

"**365 Contracts**" has the meaning set forth in Section 2.1.5(a)(i).

"**365 Contract List**" has the meaning set forth in Section 2.1.5(a)(i).

"**365 Real Estate Lease List**" has the meaning set forth in Section 2.1.5(a)(ii).

"**365 Real Estate Leases**" has the meaning set forth in Section 2.1.5(a)(ii).

"**Title IV Plan**" has the meaning set forth in Section 4.11(j).

"**Trademarks**" means all trademarks, service marks, trade dress, logos, trade names, corporate names, business names, domain names, whether or not registered, together with all goodwill associated therewith and including all common law rights, and registrations, applications for registration and renewals thereof, including all marks registered in the United States Patent and Trademark Office, the trademark offices of the states and territories of the United States of America, and the trademark offices of other nations throughout the world (including the Canadian Intellectual Property Office), and all rights therein provided by multinational treaties or conventions.

"**Trademark License Agreement**" means the trademark license agreement between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, in respect of certain Trademarks used in the Business to be entered into on or before the Closing in the form attached hereto as Exhibit P.

"**Transaction Documents**" means this Agreement, the Ancillary Agreements and all other ancillary agreements to be entered into, or documentation delivered by, any Party and/or any Designated Purchaser pursuant to this Agreement or any Local Sale Agreement.

"**Transfer Taxes**" means all goods and services, sales, excise, use, transfer, gross receipts, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property

24

transfer Taxes and conveyance and recording fees and notarial fees), together with interest, penalties and additional amounts imposed with respect thereto.

"**Transfer Tax Returns**" has the meaning set forth in Section 6.6(a).

"**Transferring Employee Agreement**" means the agreement between Sellers, on the one hand, and the Purchaser, on the other hand, to be executed as of the Closing in substantially the form attached hereto as Exhibit K.

"**Transferring Employee**" means (i) Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1, and (ii) those Employees whose employment transfers by operation of Law.

"**Transferred Employee Plan**" means the (i) Accrued Vacation Amount, or (ii) any Seller Employee Plan that is (or the Liabilities of which are) transferred by operation of Law to the Purchaser or a Designated Purchaser (or to a Purchaser Employee Plan, as the case may be).

"**Transferred Overhead and Shared Services**" means Overhead and Shared Services to be provided to or in support of the Business post-Closing by Transferring Employees.

"**Transition Services Agreement**" means an agreement between the relevant Sellers (or their Affiliates), on the one hand, and the Purchaser and/or any Designated Purchaser, on the other hand, to be executed on or prior to the Closing Date, in the form attached hereto as Exhibit Q.

"**Treasury Regulations**" means the regulations promulgated under the Code.

"**Type 1 Extra Services**" has the meaning set forth in Section 5.30(b).

"**Type 2 Extra Services**" has the meaning set forth in Section 5.30(b).

"**Unaudited Financial Statements**" has the meaning set forth in Section 4.7(b).

"**Unexpired Leases**" means Leases that constitute "unexpired leases" for the purposes of Section 365 of the U.S. Bankruptcy Code.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

25

"**U.S. Bidding Procedures and Sale Motion**" means the motion filed June 19, 2009 by the Sellers who are U.S. Debtors for orders authorizing and approving, among other things, the entry into the NSN Agreement and the Bidding Procedures (as defined therein).

"**U.S. Bidding Procedures Order**" means the order entered June 30, 2009 authorizing and approving, among other things, the entry into the NSN Agreement by the Sellers who are U.S. Debtors and the Bidding Procedures (as defined in the U.S. Bidding Procedures and Sale Motion).

"**U.S. Debtor Contract**" means any Seller Contract to which a U.S. Debtor is a party.

"**U.S. Debtors**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Sale Order**" has the meaning set forth in Section 5.1(a).

"**Verizon**" has the meaning set forth in Section 5.16(a).

"**Visa Employees**" means Employees who are identified as having a visa or permit in Section 4.11(b) of the Sellers Disclosure Schedule and whose employment with Purchaser or a Designated Purchaser cannot commence until the required visa or permit for a transfer of employment to Purchaser or a Designated Purchaser with respect to such Employee is obtained. An Employee shall be a Visa Employee for purposes hereof only if such Employee receives and accepts an employment offer from Purchaser as provided in Section 7.1 and has an Employee Transfer Date that occurs within twelve (12) months following the Closing Date.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act or any similar Law requiring notice to employees in the event of a plant closing or mass layoff.

"**Warranty Provision Amount**" means, as of any given date, the amount of the warranty provision of the Business determined in accordance with the Calculation Principles.

"**Wholly-Owned Subsidiary**" means any Subsidiary all of the capital stock or capital which is held directly or indirectly by the Purchaser, except for any capital stock which is held by a director of such Subsidiary as required by applicable Laws.

"**Working Capital Escrow Amount**" means an amount in immediately available funds equal to $20,000,000.

Section 1.2.    Interpretation.

1.2.1.    Gender and Number.

Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

26

### 1.2.2.  Certain Phrases and Calculation of Time.

In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding", and (iv) in determining whether an asset is "exclusively" used in connection with the Business, incidental, de minimis uses outside the Business shall not be considered. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

### 1.2.3.  Headings, etc.

The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

### 1.2.4.  Currency.

All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency. All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency. All payments required under this Agreement shall be paid in United States currency in immediately available funds, unless otherwise specifically indicated herein. Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the *Wall Street Journal* newspaper for the day in question.

### 1.2.5.  Miscellaneous.

Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

27