License, Direct Lease or Sublease (as the case may be): (i) an acknowledgement that the Purchaser or a Designated Purchaser did not cause or contribute to, and shall not be liable or responsible for, the currently or formerly existing Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property prior to or at the commencement of the License, Direct Lease or Sublease (as the case may be); (ii) an indemnity by the relevant Seller in favor of the Purchaser and any Designated Purchaser for (A) any Liabilities, including any Order, arising (directly or indirectly) out of or relating to any currently or formerly existing Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property prior to or at the commencement of the License, Direct Lease or Sublease (as the case may be) with respect to the Carling Property and (B) if and to the extent caused by Sellers, any Liabilities, including any Order, arising (directly or indirectly) out of or relating to any Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property; and (iii) an indemnity by the relevant Purchaser in favor of Sellers for, if and to the extent caused by the Purchaser, any Liabilities, if and to the extent caused by Purchaser, including any Order, arising (directly or indirectly) out of or relating to any Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property after the commencement of the License, Direct Lease or Sublease (as the case may be) with respect to the Carling Property.

Section 5.30. Transition Services Agreement

(a) The Parties acknowledge that Schedule 1 attached to the form of Transition Services Agreement contained in Exhibit Q (the "**General Scope of Included Services**") reflects the general scope of services anticipated by the Parties to be provided pursuant to the Transition Services Agreement, but may not be sufficiently refined to define all such services in detail. Accordingly, the Parties agree that, from and after the execution of this Agreement, they will negotiate in good faith to refine the description of the services included within the General Scope of Included Services so as to provide sufficient operational detail (as mutually agreed or as determined by arbitration in accordance with clause (d), the "**Included Services**"). The Parties agree that Included Services will be finally determined by such negotiation or by arbitration in accordance with this Section 5.30; provided that the Included Services will be consistent with, and will omit any services not reasonably within the service description categories contained in the General Scope of Included Services. The Parties further agree that such negotiation and arbitration will be subject to the following general limitations and conditions (the "**Scope Guidelines**"): (i) if and to the extent that employees of any Seller or Provider are Transferring Employees under this Agreement, then the human tasks formerly undertaken by such Transferring Employees will no longer be required to be provided under the Transition Services Agreement (but equipment, licenses and other resources not transferred shall, in accordance with the terms of the Transition Services Agreement, continue to be made available as necessary to perform such tasks under the Transition Services Agreement as contemplated by this Section 5.30), and (ii) the Included Services will be limited to those reasonably necessary to carry on the Business after the Closing in a manner consistent with the operation of the Business during the twelve month period prior to the Closing Date (and will be limited to services provided internally by the applicable Seller, or sourced from a third party by the applicable Seller, during such period).

(b)    If, between the time of execution of this Agreement and Closing, Purchaser identifies services not reasonably within the service description categories contained in the General Scope of Included Services which are reasonably advisable in order to assist with the orderly transition of the Business to Purchaser and which are consistent with the Scope Guidelines, then the Parties agree that such additional services (defined in operational detail as described herein) will be provided under the Transition Services Agreement, and the Parties will negotiate in good faith and use reasonable efforts expeditiously to refine such additional services in operational (as mutually agreed or as determined by arbitration in accordance with clause (d), the "**Type 1 Extra Services**"). If, between the time of the execution of this Agreement and Closing, Purchaser identifies services not described within the General Scope of Included Services which are reasonably necessary to carry on the Business and which are not consistent with the Scope Guidelines, but which can reasonably be provided by the applicable Seller without hiring new employees and without materially changing or burdening the operations of such Seller, then the Parties agree that such additional services (defined in operational detail as described herein) will be provided under the Transition Services Agreement, and the Parties will negotiate in good faith and use reasonable efforts expeditiously to define such additional services in operational detail (as mutually agreed or as determined by arbitration in accordance with clause (h), "**Type 2 Extra Services**," together with Type 1 Extra Services, the "**Extra Services**").

(c)    It is the expectation of the Parties that the Included Services and any Extra Services will be specified in accordance with the mechanisms described in Sections 5.30(a) and 5.30(b) prior to the Closing. However, notwithstanding anything to the contrary in this Agreement, finalization and mutual approval of the Included Services and the Extra Services shall not be a condition to, or delay, the Closing, or permit any Party to rescind or terminate this Agreement. In the event the Included Services and any Extra Services have not been finalized and mutually approved by the Closing Date, then the following will apply: (i) at Closing, the applicable parties will execute and deliver the Transition Services Agreement in the form of Exhibit Q, (ii) the Parties will continue to use good faith efforts after the Closing to finalize the Included Services and any Extra Services (subject to, and in accordance with, the terms of this Section), (iii) pending such finalization, the Sellers will (a) provide Included Services (subject to the Scope Guidelines), and any Extra Services as are not in dispute in accordance with the pricing and other provisions of the Transition Services Agreement and (b) use reasonable efforts, with the cooperation of Purchaser, to provide such other services, subject to the Scope Guidelines, as may be reasonably requested by Purchaser on an interim basis reasonably to support the Business in a manner materially consistent with the operation of the Business during the twelve months prior to the Closing Date (any such services provided to be in accordance with the pricing and other provisions of the Transition Services Agreement).

(d)    If the Parties have not finalized the Included Services or the Extra Services forty-five (45) days after the Closing Date, then any affected Party shall have the right but not the obligation to submit the associated disagreements to binding arbitration for resolution, which arbitration proceeding will be initiated by notice delivered by such Party (the "**Complaining Party**") to the applicable counterparty, which notice shall specify the name of a person who shall serve as such Complaining Party's arbitrator. Within ten (10) business days of receipt of such notice, the applicable counterparty (the "**Responding Party**") shall notify the Complaining Party of such Responding Party's choice of a person to act as an arbitrator (if such Responding Party

does not so notify the Complaining Party, then the arbitration shall be conducted by the Complaining Party's arbitrator alone). If two arbitrators are so selected, they will attempt to resolve the matter within thirty (30) days, failing which they shall jointly appoint a third arbitrator, who shall be unaffiliated with any of the Parties (a "**Qualified Arbitrator**"), to serve as arbitrator. (If the two arbitrators are unable jointly to appoint a third arbitrator, such third arbitrator, who must be a Qualified Arbitrator, shall be appointed either by the American Arbitration Association or upon application to the Supreme Court for the State of New York sitting in New York County). Any arbitration hereunder shall be conducted in the English language by such three arbitrators (except as expressly provided above), and shall take place in New York City in accordance with the Expedited Procedures of the Commercial Arbitration Rules of the American Arbitration Association. In rendering a decision, the arbitrators shall abide by the provisions of this Agreement and the Transition Services Agreement (and in particular, the arbitrators shall be engaged and directed by the Parties to define the Included Services and any Extra Services in operational detail in accordance with the requirements of Sections 5.30(a) and (b)). The decision of a majority of the arbitrators shall be in writing, shall be final and conclusive on the Parties, and counterpart copies thereof shall be delivered to all of the Parties not later than sixty (60) days of initiation of the date of the submission of the associated disagreements to binding arbitration for resolution. Judgment may be had on the decision of the arbitrators so rendered in any court of competent jurisdiction. The Purchaser shall bear the fees and expenses of the arbitrator it designates, the applicable Seller shall bear the fees and expenses of the arbitrator it designates, and the Purchaser and the applicable Seller shall equally share the fees and expenses of the third arbitrator.

(e)    The Sellers and Purchaser shall respectively use all commercially reasonable efforts, and take all reasonable steps, to obtain the consents and approvals listed in Section 5.30(e) of the Sellers Disclosure Schedule, which such consents and approvals are required to enable the Providers to perform the Included Services in accordance with the Transition Services Agreement. The costs for obtaining such third-party consents will be shared equally by Purchaser and the applicable Seller; provided, that to the extent the aggregate of such costs exceeds $8 million, the Sellers shall bear all of such excess. The Parties will reasonably cooperate to mitigate such costs.

Section 5.31. Casualty.

At Closing the Sellers shall assign to the Purchaser, and the Purchaser shall be entitled to receive the benefits of, any and all claims and proceeds the Sellers may have with respect to any casualty insurance policies with respect to any Assets which related to a casualty occurring after the date of this Agreement but prior to the Closing, and the Purchaser shall have the right to proceed against any insurance company to recover any such items and will have the right prior to the Closing to participate in all negotiations and discussions regarding the adjustment and settlement of any insurance claims with respect to any property or group of properties having a value in excess of $500,000. The Sellers shall promptly after learning of same notify Purchaser in writing of the occurrence of any casualty or similar event with respect to any of the Assets.

Section 5.32.  <u>Set-Off.</u>

The Parties agree that in addition to any other remedy available, (i) the Purchaser and any Designated Purchaser will have the right, at any time and from time to time, with reasonable prior notice, to set-off any payment obligation (whether matured or unmatured) owed by a Seller to the Purchaser or any Designated Purchaser, as applicable, that arises under any Ancillary Agreement (other than the Transition Services Agreement and the Real Estate Agreements) against any payment obligation owed by the Purchaser (or any Designated Purchaser) under the same or any other Ancillary Agreement (other than the Transition Services Agreement and the Real Estate Agreements) to the same Seller, and (ii) any Seller will have the right, at any time and from time to time, with reasonable prior notice, to set-off any payment obligation (whether matured or unmatured) owed by the Purchaser or any Designated Purchaser, as applicable, to the Seller that arises under any Ancillary Agreement (other than the Transition Services Agreement and the Real Estate Agreements) against any payment obligation owed by the same Seller under the same or any other Ancillary Agreement (other than the Transition Services Agreement and the Real Estate Agreements) to the Purchaser or any Designated Purchaser.  Any such set-off will automatically satisfy and discharge the relevant obligation of the respective Persons; provided that, if an obligation exceeds the amount of the related set-off, such obligation will be novated and replaced by an obligation to pay the applicable Person only such excess.  The currency of one obligation shall be converted into another currency at the then-current exchange rate prescribed by Section 1.2.4.  Each Seller or Purchaser (or Designated Purchaser) that is a party to an Ancillary Agreement shall be jointly and severally liable with each other Seller or Purchaser (or Designated Purchaser), respectively, that is a party to an Ancillary Agreement.

Section 5.33.  <u>Good Faith Deposit.</u>

Subject to the U.S. Bidding Procedures Order, Sellers shall hold the Good Faith Deposit in escrow in a non-interest-bearing account maintained by the Sellers and the Good Faith Deposit shall not become property of the Sellers' bankruptcy estates.  Subject to the U.S. Bidding Procedures Order, the Sellers shall retain the Good Faith Deposit until the earlier to occur of (a) the Closing or (b) the termination of this Agreement.  At the Closing, the Purchaser will be entitled to a credit for the amount of the Good Faith Deposit against the Purchase Price.  Upon the termination of this Agreement, the Sellers shall return the Good Faith Deposit to Purchaser in not less than three (3) Business Days, free and clear of any claim, counterclaim, offset, recoupment lien or encumbrance; <u>provided</u>, that in the case of termination pursuant to Section 9.1(e), the Good Faith Deposit shall become the property of the Main Sellers.

Section 5.34.  <u>Certain Counterparty Objections.</u>

Purchaser will use its reasonable efforts to resolve prior to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order the objections of Airvana, Inc., iStar CTL North Glenville - Richardson LLC, Sprint and Flextronics filed with the U.S. Bankruptcy Court on or prior to July 24, 2009 and will be responsible for all amounts payable to such objectors in order to accomplish the resolution of such objections; <u>provided</u>, that (i) any such Cure Cost paid by Purchaser must be related solely to the Business, (ii) as to the Sprint objection, Sellers shall be responsible for any attorneys fees and expenses incurred by Sprint and arising

before the Closing Date and Purchaser shall be responsible for all other indemnification obligations to Sprint related to the Business due after the Closing Date and (iii) Sellers shall use commercially reasonable efforts to provide Purchaser with a copy of the cross license agreement between Sellers and Lucent Technologies.

## ARTICLE VI

## TAX MATTERS

Section 6.1.    Transfer Taxes.

(a)    The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. The Purchaser shall (on behalf of itself and the Designated Purchasers) promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the execution of any other Transaction Document; provided, that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller or any Subsidiary, Affiliate, Representative or agent thereof, such Transfer Taxes shall be paid by the Purchaser to such Seller, Subsidiary, Affiliate, Representative or agent, as applicable, at the Closing or thereafter, as requested of or by the applicable Seller. For the avoidance of doubt, the Purchaser shall remain liable in respect of any Transfer Taxes regardless of the date that the Assets are removed from the premises of a Seller or any Seller's supplier. All other Closing expenses will be paid by the Party incurring such expenses. Upon request from a Seller, the Purchaser shall provide to such Seller an original receipt (or such other evidence as shall be reasonably satisfactory to such Seller) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1(a).

(b)    If the Purchaser or any Designated Purchaser wishes to claim any exemption relating to, or a reduced rate of, or make an election with the effect of reducing, Transfer Taxes, in connection with this Agreement or the transactions contemplated herein, or in connection with the execution of any other Transaction Document, the Purchaser or any Designated Purchaser, as the case may be, shall be solely responsible for ensuring that such exemption, reduction or election applies and, in that regard, shall provide the Sellers prior to Closing with its permit number, GST, VAT or other similar registration numbers and/or any appropriate certificate of exemption and/or other document or evidence to support the claimed entitlement to such exemption or reduction by the Purchaser or such Designated Purchaser, as the case may be. All Parties shall make reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduction.

(c)    Provided that, in the opinion of the relevant Purchaser or Designated Purchaser, acting reasonably, the sale qualifies for such an election, the Purchaser and the relevant Designated Purchasers shall jointly execute with the applicable Seller(s) an election under section 167(1) of Part IX of the Excise Tax Act (Canada) and any equivalent election provided under provincial Laws, in the forms prescribed for such purposes, such that the sale of the Assets will take place without payment of any GST. The Purchaser or the relevant Designated Purchaser, as the case may be, shall file within the prescribed filing period all forms

supporting such election with the relevant Tax Authority, together with its Tax Returns for the applicable reporting periods during which the sale of the Assets contemplated herein occurs and shall provide the Seller with a copy of such filed election. The Purchaser shall indemnify and hold the Sellers harmless with respect to any Tax, interest or penalties assessed against the Sellers as a result of making such election or the Purchaser's or Designated Purchaser's failure to timely file such an election.

Section 6.2.    Tax Characterization of Payments Under This Agreement.

The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than payment of the Estimated Purchase Price and any interest payments) as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

Section 6.3.    Apportionment of Taxes.

(a)    Except as otherwise provided in this ARTICLE VI, (i) the Sellers shall, and shall cause the other Sellers (to the extent such Sellers are their Subsidiaries), as the case may be, to bear all Taxes of any kind relating to the Assets or the conduct or operation of the Business for all Tax periods or portions thereof ending on or before the Closing Date and (ii) the Purchaser shall and shall cause the Designated Purchasers to bear all Taxes relating to the Assets or the conduct or operation of the Business for all Tax periods or portions thereof beginning after the Closing Date.

(b)    For purposes of this Agreement, any Taxes for a **"Straddle Period"** (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of the period beginning after the Closing Date, respectively. The amount of Taxes shall be allocated between portions of a Straddle Period in the following manner: (i) in the case of a Tax imposed in respect of property (excluding, for the avoidance of doubt, any income Tax) and that applies ratably to a Straddle Period, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of sales, value-added and similar transaction-based Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be allocated to the portion of the Straddle Period in which the relevant transaction occurred.

Section 6.4.    Withholding Taxes.

The Purchaser and the Designated Purchasers shall be entitled to deduct and withhold from the Purchase Price such amounts as the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold under the Code, or any provision of state, local or foreign Tax Law, with respect to the making of such payment. To the extent such amounts are so withheld by the Purchaser or a Designated Purchaser, as the case may be, such

withheld amounts shall be treated for all purposes of this Agreement and the Ancillary Agreements as having been paid to the relevant Seller in respect of whom such deduction and withholding was made by such Purchaser or Designated Purchaser. None of the Parties is aware of any obligation to deduct and withhold any amounts from the Purchase Price under the Code, or any provision of state, local or foreign Tax Law, with respect to the making of such payment. If any of the Parties learns of any such obligation on or prior to the Closing Date, then (i) in the case of a Seller, such Seller shall promptly provide reasonable notice of such obligation to the Purchaser, and (ii) in the case of the Purchaser, the Purchaser shall promptly provide reasonable notice of such obligation to the Sellers. In the event that a Tax withholding obligation arises with respect to payment of the Purchase Price, the Parties shall cooperate in good faith to minimize the amounts that the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold.

Section 6.5.    Records.

(a)    Notwithstanding the provisions of Section 5.23 or Section 5.24, but subject to the provisions of Section 5.6, (i) after the Closing Date, the Purchaser and the Designated Purchasers, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets, the Assumed Liabilities, or the Business for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Assets, the Assumed Liabilities or the Business for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow Representatives of the other party access to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be necessary or convenient. The obligation to cooperate pursuant to this Section 6.5 shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

(b)    On or prior to Closing, the Sellers shall cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for ten (10) years in accordance with an escrow agreement between the Purchaser, the Sellers and the Records Custodian, in form satisfactory to the Purchaser and the Main Sellers. The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by Tax advisors of any purchaser ("**Tax Credit Purchaser**") of the scientific research and experimental development tax credits of the Sellers under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser. The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or Nortel Networks Technology Corporation ("**NNTC**") as qualified expenditures on scientific research and experimental development for

82

purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**").

(c)     The Purchaser shall use reasonable efforts to make available to the relevant Tax Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Tax Authority of the characterization of expenditures by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser.

(d)     The Purchaser shall have no obligation to provide any access under this provision unless the Seller (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

(e)     At the request of the Purchaser, the Sellers shall provide reasonable access to records and employees of the Sellers to assist the Purchaser in claiming any future scientific research and experimental development Tax credits for Qualified Expenditures.

(f)     The Sellers shall have no obligation to provide any access under this provision unless the Purchaser pays all of the Sellers' reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to employees of the Sellers (based on the total compensation of the employee at the time access is provided).

Section 6.6.    Tax Returns.

(a)     The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets or the Business, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("**Transfer Tax Returns**") described below in Section 6.6(b)). Such Tax Returns shall be true, correct and complete in all material respects. Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) Sellers as and when required by Law.

(b)     Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated herein or in respect of the execution of any other Transaction Document shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws. Any Transfer Tax Returns prepared by the Sellers pursuant to this Section 6.6(b) shall be made available to the Purchaser at least ten (10) Business Days before such Tax Returns are due to be filed. The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.6(b) at least five (5) Business Days before such Transfer Tax becomes due and payable.

83

(c)    The Purchaser or a Designated Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets or the Business for all Straddle Periods. Such Tax Returns shall be true, correct and complete in all material respects. All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Purchaser or a Designated Purchaser as and when required by Law.

(d)    The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.6(b)) prepared by the Purchaser or a Designated Purchaser for any Straddle Period before any such Tax Return is filed. The Purchaser shall submit a draft of any such Tax Return to the Main Sellers at least thirty (30) days before the date such Tax Return is required to be filed with the relevant Tax Authority. The Main Sellers shall have ten (10) days after the date of receipt thereof to submit to the Purchaser, in writing, the Main Sellers' written comments with respect to such Tax Return. The Purchaser shall notify the Main Sellers within five (5) days after receipt of such comments of (a) the extent, if any, to which the Purchaser accepts such comments and will file such Tax Return in accordance therewith and (b) the extent, if any, to which the Purchaser rejects such comments. To the extent the Purchaser rejects the comments of the Main Sellers, the Purchaser and the Main Sellers promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within five (5) days, the Parties immediately shall appoint an Independent Auditor to determine the correct manner for reporting the items that are in dispute and shall provide to the Independent Auditor all relevant information. The Independent Auditor shall have ten (10) days to submit its determination, which shall be binding upon the Parties, and the Purchaser shall file such Tax Return in accordance therewith. Notwithstanding the preceding sentence, if the Independent Auditor shall not have submitted its determination on or before the date such Tax Return is required to be filed with the relevant Tax Authority (giving effect to any valid extensions), the Purchaser shall file its original draft of such Tax Return and shall, upon receiving the Independent Auditor's later determination and to the extent permitted under applicable Law, promptly file an amended return in accordance therewith. The fees and expenses of the Independent Auditor shall be paid by the Party whose position is deemed to be least correct by the Independent Auditor.

(e)    Notwithstanding any contrary provision in this ARTICLE VI, each Seller shall pay to the Purchaser the amount of its liability for Taxes shown to be due on any Tax Return for a Straddle Period at least three (3) Business Days prior to the due date thereof, giving effect to valid extensions; provided, however, that (i) if such Seller and the Purchaser are unable to agree as to the amount of such liability prior to such due date, such Seller shall pay to the Purchaser such amount as it in good faith believes that it owes, and (ii) to the extent the Independent Auditor determines that the amount of such liability is greater than the amount actually paid to the Purchaser prior to such due date, such Seller shall pay to the Purchaser such excess within three (3) Business Days after receiving the Independent Auditor's determination.

(f)    Notwithstanding any contrary provision in this ARTICLE VI, the Sellers shall not be entitled to any Tax-related information, including any Tax Return, that includes assets or operations of the Purchaser or any of its Affiliates in addition to the Assets; provided, however, that the Purchaser shall provide the Sellers with a copy of a pro forma Tax Return relating solely to the Assets for any Straddle Period.

Section 6.7.    Allocation of Purchase Price.

(a)    Except as otherwise required by applicable Law, the Parties shall (i) allocate to the tangible Assets a portion of the Purchase Price equal to the net book value of such Assets as of the Closing Date, and (ii) allocate to the intangible Assets the balance of the Purchase Price.

(b)    To the extent necessary to file Transfer Tax Returns, the Parties shall negotiate in good faith to determine an allocation of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities) among the Assets in accordance with the principles of Section 1060 of the Code and the Treasury regulations promulgated thereunder and other applicable Tax Laws, which allocation shall be subject to the principles of Section 6.7(a) (such allocation, a "**Partial Allocation**"). If the Parties do not reach agreement on a Partial Allocation after negotiating in good faith, the Partial Allocation shall be submitted to the Independent Auditor, which shall prepare a final Partial Allocation; provided, however, that if a different Partial Allocation is required by a Government Entity (including as a result of the Bankruptcy Proceedings), then the Partial Allocation shall be modified as necessary to be consistent with the required allocation but in all cases shall be subject to the principles of Section 6.7(a). Notwithstanding the preceding sentence, if the Parties have not reached agreement on the Partial Allocation and the Independent Auditor has not submitted its determination on or before the date that a Transfer Tax Return is required to be filed with the relevant Tax Authority (giving effect to any valid extensions) pursuant to Section 6.6(b), then such Tax Return shall be timely filed in the manner that the Party with primary responsibility for filing such return reasonably determines and shall, upon receiving the Independent Auditor's later determination and to the extent permitted under applicable Law, promptly file an amended return in accordance therewith. The Parties agree (i) to be bound by the final Partial Allocation accepted by the Parties or prepared by the Independent Auditor (as modified to be consistent with the allocation required by a Government Entity, as described above), as applicable, and (ii) to act in accordance with the allocations contained in such final Partial Allocation for all purposes relating to Transfer Taxes, including the preparation, filing and audit of any Transfer Tax Returns.

## ARTICLE VII

### EMPLOYMENT MATTERS

Section 7.1.    Employment Terms.

(a)    Immediately following the completion of the Auction, but in any event prior to Closing (or otherwise in accordance with applicable Law), the Purchaser shall, or shall cause a Designated Purchaser to, extend a written offer of employment to the Employees as set forth on Section 7.1 of the Sellers Disclosure Schedule, such offer being contingent (x) in each case, in the discretion of the Purchaser, on such Employee passing a background check and, if such Employee is located in the United States, drug screening, in all cases, to the extent permitted and consistent with applicable Law and (y) in the case of Inactive Employees, upon

their return to active status (other than Employees set forth on Section 7.1 of the Sellers Disclosure Schedule whose employment transfers automatically by operation of Law to the Purchaser or a Designated Purchaser. The Sellers shall have the right to review any offer of employment made pursuant to this Section 7.1 prior to it being sent to any Employee. Such offer of employment shall provide for an employee consideration period of at least one week, or such longer period as required by applicable Law. Such offers (and, with respect to Employees whose employment transfers by operation of Law, such continued employment) shall be consistent with the requirements of applicable Law and on terms and conditions no less favorable, in the aggregate, than those the Employees currently have, but subject to certain adjustments to conform to the Purchaser's standard employment policies where legally possible. The Sellers shall provide the Purchaser or a Designated Purchaser with such additional information as the Purchaser may reasonably require in order to comply with its obligations under this ARTICLE VII. Notwithstanding anything to the contrary contained herein, as a condition to the transfer of employment (except as prohibited by applicable Law) the Purchaser or Designated Purchaser may require Employees to provide evidence they are legally permitted to be employed by the Purchaser or a Designated Purchaser, as required by applicable Law. Any Employee who accepts such offer of employment and commences employment with the Purchaser or a Designated Purchaser, and any Employees whose employment transfers by operation of Law, shall be deemed to be a Transferring Employee for all purposes of this Agreement, effective as of the Employee Transfer Date.

(b)     For the twelve (12) month period following the Closing Date (or for such shorter period as a Transferring Employee remains employed by Purchaser or a Designated Purchaser), such Transferring Employee, subject to applicable Law, shall be employed on terms and conditions of employment not materially less favorable, in the aggregate, than the terms and conditions of employment provided to such Employees immediately prior to the Closing, subject, following the Employee Transfer Date, to certain adjustments to conform to the Purchaser's standard employment policies where legally possible; provided, however, that, subject to the terms of the Transferring Employee Agreement, neither this Section 7.1 nor Section 7.2 restricts the right of the Sellers, the Purchaser or a Designated Purchaser to terminate the employment of any Transferring Employee after the Closing; provided, further, that, following the Employee Transfer Date, except as provided in Section 7.2(c), nothing shall prohibit the Purchaser or any Designated Purchaser from amending or terminating, in whole or in part, any Purchaser Employee Plan or from making changes to such terms and conditions of employment that are generally applicable and broadly based across the Purchaser's or Designated Purchaser's employee population; and provided, further, that for purposes of clarity the Purchaser shall not be required to offer in any offer made pursuant to this ARTICLE VII any (i) equity, (ii) retiree medical or other retiree welfare arrangement or (iii) defined benefit pension plan, in each case, unless required by applicable Law.

(c)     The Purchaser or a Designated Purchaser shall use reasonable efforts from the date hereof until the expiration of the Transferring Employee Agreement with respect to Visa Employees to obtain, at its cost, such visas or permits as are required for it to employ Visa Employees.

86

Section 7.2.    <u>Employee Benefits.</u>

(a)    The Purchaser or a Designated Purchaser shall, and shall cause its relevant Affiliates to, recognize the service date of each Transferring Employee as set out in the Employee Information for all purposes other than benefit accrual under any defined benefit plan and except as would result in a duplication of benefits.

(b)    Without limiting the generality of the foregoing, the Purchaser shall, or shall cause its relevant Affiliates to, provide the following benefits to Transferring Employees:

(i)    The Sellers shall: (x) with respect to each Transferring Employee located in the United States and Mexico, pay to such Transferring Employee upon his or her Employee Transfer Date the amount of compensation with respect to the unused vacation days that is due and owing to such Transferring Employee, up to his or her Employee Transfer Date; and (y) with respect to each Transferring Employee located in Canada, pay to such Transferring Employee upon his or her Employee Transfer Date the amount of compensation with respect to the accrued and unused vacation days that is due and owing to such Transferring Employee up to his or her Employee Transfer Date (other than the Accrued Vacation Amount accrued and unused by such Transferring Employee in the year in which the Employee Transfer Date occurs); in each case by the date required under applicable Law in exchange for, with respect only to those Transferring Employees located in Canada, an acknowledgement and consent by each such Employee that he or she has received full compensation for such accrued and unused vacation days and has no entitlement to the vacation time associated therewith. Nothing contained in this Section 7.2(b)(i) shall be construed to amend or modify any provision in the Transferring Employee Agreement providing for any payment or transfer of paid vacation days with respect to Transferring Employees' vacation time associated with the period between the Closing Date and the Employee Transfer Date.

(ii)    Section 7.2(b)(ii) of the Sellers Disclosure Schedule sets forth the amount of the Accrued Vacation Amount that is due and owing to each Transferring Employee as of the date hereof and updated by the Sellers as of the Closing Date. The Purchaser shall, or shall cause its relevant Affiliates to, grant each Transferring Employee located in Canada or China paid time off in an amount equal to the accrued unused vacation days for such Transferring Employee that are not paid upon the Employee Transfer Date pursuant to Section 7.2(b)(i)(y). If such Transferring Employee terminates employment with the Purchaser or an Affiliate of Purchaser prior to receiving such paid time off, as described above, the Purchaser shall pay such Transferring Employee an amount equal to any such unused paid time off upon such employment termination.

(iii)    With respect to each Transferring Employee (and their eligible dependents, as applicable), the Purchaser or the relevant Purchaser's Affiliates shall cause the Purchaser Employee Plans to (i) waive any eligibility periods, evidence of insurability or pre-existing condition limitations to the extent such limitations no longer apply to such Transferring Employees under the comparable Seller Employee Plan and (ii) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employees, including with respect to their dependents, under

87

comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Employment Transfer Date occurs; provided, that such employee provides an explanation of benefits or similar documentation of such expenses paid or incurred to the Purchaser or its Affiliates.

(c)     As of the Closing Date, the Purchaser or the Designated Purchaser shall establish or otherwise provide a registered pension plan for Transferring Employees employed in Canada and maintain such plan for a period of at least five (5) years following the Closing Date and each such Transferring Employee's participation shall commence on such Transferring Employee's Employee Transfer Date.

(d)     The Sellers shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Employees that occur on or prior to the Closing Date provided that Purchaser or the Designated Purchaser, as applicable, has satisfied their obligations set out in Section 7.1. Purchaser shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Transferring Employees that occur on or after the Closing Date.

Section 7.3.    Other Employee Covenants.

(a)     After the date hereof, and subject to each Party's disclosure obligations imposed by Law or by Government Entities and each Party's obligations hereunder, neither the Purchaser, the Sellers nor any of their respective Affiliates shall issue any announcement or communication to their respective employees or the Employees, prior to consultation with, and the approval of, the other Party (not to be unreasonably withheld or delayed) with respect to this Agreement or any of the transactions contemplated hereby.  If requested, the Parties shall reasonably cooperate in respect of the development and distribution of any announcement and communication to the employees of the Sellers, including Employees, with respect to this Agreement or any of the transactions contemplated hereby.

(b)     Prior to the Employee Transfer Date (for Transferring Employees) and before and after the Closing Date for all other Employees, the Purchaser undertakes to keep the Employee Information in confidence including taking the following actions:

(i)     the Purchaser shall, and shall cause the Designated Purchasers to, restrict the disclosure of the Employee Information only to such of its employees, agents and advisors as is reasonably necessary for the purposes of complying with its obligations pursuant to this Agreement;

(ii)     the Employee Information shall not be disclosed to any Person other than those set forth in Section 7.3(b)(i) above (including, for the avoidance of doubt, any other employee of the Purchaser or any Designated Purchaser or other Affiliate of the Purchaser) without the consent of the Main Sellers, such consent not to be unreasonably withheld;

(iii)     the Employee Information shall not be used except for the purposes of complying with the obligations of the Purchaser and the Designated

88

Purchasers pursuant to this Agreement and shall be returned to the Sellers or destroyed, at the Sellers' election, if this Agreement is terminated; and

(iv)    the Purchaser shall, and shall cause the Designated Purchasers to, comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

(c)    Within fourteen (14) days following the Employee Transfer Date, except to the extent prohibited by applicable data privacy Laws and subject to consent by such Employee in his or her written offer of employment, or as otherwise required by Law, the Sellers shall provide the Purchaser or the Designated Purchaser with the Employee Records (or a copy thereof).

(d)    During the Non-Solicitation Period, the Sellers shall not, without the advance written consent of Purchaser, either directly or indirectly solicit for employment or hire any Transferring Employee unless the employment of such Transferring Employee is involuntarily terminated without cause by the Purchaser or Designated Purchaser prior to such action by the Sellers (other than any termination in connection with such Transferring Employee seeking employment with Sellers); provided, however, that nothing in this Section 7.3(d) shall prevent the Sellers from (i) employing the Transferring Employees pursuant to the terms of the Transferring Employee Agreement, (ii) conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such Transferring Employees or (iii) hiring such Transferring Employees identified through such employment searches.

(e)    During the Non-Solicitation Period, the Purchaser shall not, and shall cause the Designated Purchasers not to, either directly or indirectly solicit for employment or hire any employee of the Sellers who is not an Employee unless (i) the employment of such employee is involuntarily terminated without cause by the Seller prior to such action by the Purchaser or Designated Purchasers (other than any termination in connection with such employee seeking employment with Purchaser or Designated Purchasers), or (ii) otherwise permitted by the Transition Services Agreement.

(f)    During the Non-Solicitation Period, the Purchaser shall not, and shall cause the Designated Purchasers not to, either directly or indirectly solicit for employment or hire any Employee who has rejected an offer of employment from the Purchaser or a Designated Purchaser, or to whom the Purchaser or a Designated Purchaser did not make an offer of employment pursuant to this Agreement; provided, that this Section 7.3(f) shall not apply if the Purchaser gives the Sellers prior notice of such solicitation or hire and such employee, if applicable, returns to the Sellers any severance payments paid by the Sellers to such employee and, if applicable, releases the Sellers from any right to severance payments.

(g)    During the Non-Solicitation Period, neither Party shall, except as specifically set out in this Agreement or without the other Parties' written consent or as expressly permitted by this Agreement, either directly or indirectly solicit for employment or hire any of the employees with whom the Party has had personal contact, or who became known to the Party in the course of its negotiation of the transactions contemplated hereby; provided that nothing in

89

this Section 7.3(g) shall restrict or preclude the Party, without such consent, from employing any employee Party who (x) contacts such Party directly at his or her own initiative without any direct or indirect solicitation by or encouragement from such party, (y) responds to a mass media solicitation or advertisement consistent with such Party's past practices, as applicable, that is not directed at the employees, or (z) is contacted by a third party executive search firm or employment agency, so long the Party did not provide guidance as to such employee to the third party firm or agency.

Section 7.4.    Excluded Employee Liabilities.

None of the Purchaser or the Designated Purchasers shall assume or be deemed to have assumed any Liabilities of the Sellers or their Affiliates relating to Employees other than the Assumed Liabilities (the "**Excluded Employee Liabilities**"). The Excluded Employee Liabilities shall include, but not be limited to, the following:

(a)    the Sellers' or any of their Affiliates' obligations to contribute to, make payments with respect to or provide benefits under any Seller Employee Plan (including, for the avoidance of doubt, any arrangement that provides severance-type benefits) except with respect to the Transferred Employee Plans;

(b)    any Liability with respect to the KERP, the KEIP, the Calgary Retention Plan or any other Seller retention plan, program or arrangement in effect as of the Closing Date that provides benefits to any Transferring Employee;

(c)    any obligation to provide continuation coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to the Transferring Employees and/or their qualified beneficiaries with respect to a COBRA qualifying event that occurs prior to such Employees' Employee Transfer Date;

(d)    Liabilities resulting from any Action (i) with respect to any Employee relating to his/her employment or termination of employment with any of the Sellers, or (ii) with respect to an applicant with respect to potential employment with any of the Sellers in the Business; and

(e)    any Liabilities relating to the Employees or any former employees employed in the Business by the Sellers (with respect only to such employee's employment with the Sellers), including payments or entitlements that Sellers or any of their Affiliates may owe or have promised to pay to any current or former Employee (whether or not becoming a Transferring Employee prior to or in connection with the Closing, (including any Employee who does not accept an offer of employment with the Purchaser or a Designated Purchaser)), including wages, other remuneration, holiday, bonus, severance pay (statutory or otherwise), commission, post-employment medical or life obligations, pension contributions or benefits, Taxes, ERISA Affiliate Liability, any obligation, liability or expense relating to any employment agreement or contract, any former Collective Labor Agreement, the employment practices of Sellers or any of their Affiliates prior to the Closing Date and any other liability, payment or obligations related to current or former Employees, including any WARN Act Liabilities relating to actions of the Sellers arising on or prior to the Closing Date, any workers compensation, labor,

90

social welfare or similar Law, if any, including any such Liabilities arising out of or resulting from the Closing and/or the consummation of the transactions contemplated by this Agreement, other than any Assumed Liabilities and other than with respect to liabilities incurred after the Closing Date under Purchaser Employee Plans by Transferring Employees who are terminated by Purchaser or a Designated Purchaser after the Closing Date.

Section 7.5.    Sole Benefit of Sellers and Purchaser.

The terms and provisions of this ARTICLE VII are for the sole benefit of the Sellers and the Purchaser. Nothing contained herein, express or implied (i) shall be construed to establish, amend, or modify any Seller Employee Plan, any Purchaser Employee Plan, or any other benefit plan, program, agreement or arrangement, (ii) shall alter or limit the ability of the Purchaser, the Sellers, or any of their respective Affiliates to amend, modify or terminate any Seller Employee Plan, any Purchaser Employee Plan (other than as provided in Section 7.2(c)), or any other benefit or employment plan, program, agreement or arrangement after the Closing Date, (iii) is intended to confer or shall confer upon any current or former employee any right to employment or continued employment, or constitute or create an employment agreement with any Transferring Employee, or (iv) is intended to confer or shall confer upon any individual or any legal representative of any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees and including collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement.

## ARTICLE VIII

## CONDITIONS TO THE CLOSING

Section 8.1.    Conditions to Each Party's Obligation.

The Parties' obligation to effect, and, as to the Purchaser, to cause the relevant Designated Purchasers to effect, the Closing is subject to the fulfillment (or the express written waiver of the Primary Parties), at or prior to the Closing, of the following conditions:

(a)    *Regulatory Approvals.* All Regulatory Approvals shall have been obtained; provided, however, that any order issued under paragraph 25.4(1)(b) of the Investment Canada Act authorizing the transactions contemplated hereby shall be an order that is on terms and conditions satisfactory to the Purchaser acting reasonably (in acting reasonably, the Purchaser shall agree to all terms and conditions, provided that they do not impair the ability of the Purchaser to operate and derive benefits from the Business in a commercially reasonable manner).

(b)    *No Injunctions or Restraints.* There shall be in effect no Law, order, injunction, decree or judgment of any court or other Government Entity in the U.S., Canada or the United Kingdom prohibiting the consummation of the transactions contemplated hereby, and there shall not be any proceedings pending by any Government Entity in the U.S. or Canada seeking such prohibition.

(c)    *U.S. Sale Order and Canadian Approval and Vesting Order.* The U.S. Sale Order and the Canadian Approval and Vesting Order (i) shall have been entered and not

91

modified, and (ii) shall have become Final Orders, provided, that, this condition under Section 8.1(c)(ii) may be waived by the Purchaser in its sole discretion.

Section 8.2.    <u>Conditions to Sellers' Obligation.</u>

The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or the express written waiver by the Main Sellers), at or prior to the Closing, of each of the following conditions:

(a)    *No Breach of Representations and Warranties.*

(i)    Each of the representations and warranties set forth in ARTICLE III (other than those referred to in clause (ii) below), disregarding all materiality qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that has not had, and would not reasonably be expected to have, a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

(ii)    Each of the representations and warranties set forth in Sections 3.1, 3.2 and 3.3, disregarding all materiality and material adverse effect qualifications contained therein, shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

(b)    *No Breach of Covenants.* The covenants contained in this Agreement to be complied with by the Purchaser or the Designated Purchasers on or before the Closing shall not have been breached in any material respect.

Section 8.3.    <u>Conditions to Purchaser's Obligation.</u>

The Purchaser's obligation to effect, and to cause the relevant Designated Purchasers to effect, the Closing shall be subject to the fulfillment (or the express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a)    *No Breach of Representations and Warranties.*

(i)    Each of the representations and warranties set forth in ARTICLE IV (other than those referred to in clause (ii) below), disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that has not had, and would not reasonably be expected to have, a Material Adverse Effect.

(ii)    Each of the representations and warranties set forth in Sections 4.1, 4.2 and 4.3, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

(b)    *No Breach of Covenants.* The covenants, obligations and agreements contained in this Agreement to be complied with by the Sellers on or before the Closing shall not have been breached in any material respect.

(c)    *Certificates.* The Sellers shall have delivered to the Purchaser duly executed certificates, as set forth in Section 2.3.2(a).

(d)    *Unbundling and Assignment.* With respect to Seller Contracts that accounted, in the aggregate, for at least $1,500,000,000 (or no less than 75%) of the sales revenue related to the CDMA Business in fiscal year 2008 (the "**Specified CDMA Contracts**"), the Sellers shall have (or will prior to or at the Closing) (i) in the case of Assumed and Assigned Contracts, assumed and assigned such Specified CDMA Contracts pursuant to Section 2.1.5, and (ii) in the case of Bundled Contracts other than the Contracts assumed and assigned as required by the foregoing clause (i), amended such Bundled Contracts and entered into new Contracts in accordance with Section 5.16 with the counterparties to such Specified CDMA Contracts and which will be Assigned Contracts.

(e)    *Investment Canada.* The Minister of Industry has not sent to the Purchaser a notice under subsection 25.2(1) of the Investment Canada Act and the Governor in Council has not made an order under subsection 25.3(1) of the Investment Canada Act in relation to the transaction contemplated by this Agreement or, if such a notice has been sent or such an order has been made, the Purchaser has subsequently received (i) a notice under paragraph 25.2(4)(a) of the Investment Canada Act indicating that a review of the transaction on grounds of national security will not be made, (ii) a notice under paragraph 25.3(6)(b) of the Investment Canada Act indicating that no further action will be taken in respect of the transaction or (iii) a copy of an order under paragraph 25.4(1)(b) authorizing the transaction, provided that order is on terms and conditions satisfactory to the Purchaser acting reasonably (in acting reasonably, the Purchaser shall agree to all terms and conditions, <u>provided</u> that they do not impair the ability of the Purchaser to operate and derive benefits from the Business in a commercially reasonable manner).

## ARTICLE IX

## TERMINATION

Section 9.1.    <u>Termination.</u>

This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of the Primary Parties;

(b)    by either the Main Sellers or the Purchaser, upon written notice to the other:

(i)    if the U.S. Sale Order and the Canadian Approval and Vesting Order approving this Agreement and the transactions contemplated hereby have not been entered by the respective Courts by July 31, 2009; or

93

(ii)    if the Closing does not take place by September 30, 2009 (the "**Termination Date**"); provided, that if the Closing does not take place by the Termination Date solely due to the condition set forth in Section 8.1(a) not being fulfilled, the Termination Date shall automatically be extended to October 31, 2009;

provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(b) shall not be available to the Party seeking to terminate if such Party or one of its Affiliates is then in breach of this Agreement and such breach has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to this Section 9.1(b).

(c)    by the Purchaser if any of the Sellers withdraw or seek authority to withdraw the Canadian Approval and Vesting Order Motion or the U.S. Bidding Procedures and Sale Motion, or publicly announce any stand alone plan of reorganization or liquidation (or support any such plan filed by any other Person) in respect of the Business;

(d)    by the Purchaser in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Section 8.1(a), Section 8.3(a) or Section 8.3(b), as applicable, and, in each case, which, if capable of being cured, is not cured within ten (10) days (or such lesser number of days remaining prior to the Termination Date) from receipt of a written notice from the Purchaser; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(d) shall not be available to the Purchaser where a breach of this Agreement by the Purchaser has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to such clause;

(e)    by the Main Sellers in the event of a material breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Section 8.1(a) or Section 8.2 of this Agreement; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(e) shall not be available to the Main Sellers where a breach of this Agreement by any of the Sellers has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to such clause; or

(f)    by the Purchaser in the event the Sellers fail to consummate the Closing in breach of Section 2.3, within five (5) Business Days of written demand by the Purchaser to consummate the Closing.

Section 9.2.    Effects of Termination.

If this Agreement is terminated pursuant to Section 9.1:

(a)    all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of (i) Section 5.7 (Public Announcements), (ii) Section 5.10 (Transaction Expenses), (iii) Section 5.11 (Confidentiality), (iv) Section 5.33 (Good Faith Deposit), with respect to the last sentence thereof, (v) Section 7.3(b) (Other Employee Covenants), (vi) Section 9.1 (Termination), (vii) Section 9.2 (Effects of Termination) and (viii) ARTICLE X (Miscellaneous);

94

provided, that neither the termination of this Agreement nor anything in this Section 9.2 shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof and thereof;

(b)    except as required by applicable Law, the Purchaser shall return to the Sellers or destroy all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; and

(c)    the provisions of the Confidentiality Agreement shall continue in full force and effect.

**ARTICLE X**

**MISCELLANEOUS**

Section 10.1.    No Survival of Representations and Warranties or Covenants.

No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

Section 10.2.    Remedies.

No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

Section 10.3.    No Third Party Beneficiaries.

Except for any acknowledgments, rights, undertakings, representations or warranties expressed to be for the benefit of the EMEA Debtors or the Joint Administrators, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.4.    Consent to Amendments; Waivers.

No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement and the Ancillary Agreements shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.

95

Section 10.5.  <u>Successors and Assigns.</u>

Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Main Sellers in case of an assignment by Purchaser or Purchaser in case of an assignment by any Seller, which consent may be withheld in such party's sole discretion, except for the following assignment which shall not require consent (i) assignment to an Affiliate of a Party (provided (A) that such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Parties and (B) any such assignment by Purchaser complies with Section 2.4 if applicable), (ii) assignment by a U.S. Debtor to a succeeding entity following such U.S. Debtor's emergence from Chapter 11, and (iii) assignment by any of the Canadian Debtors pursuant to any plan of arrangement approved by the Canadian Court, which will not require the consent of the Purchaser.

Section 10.6.  <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.</u>

(a)      Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York applicable to Contracts made and to be performed in that State and without regard to the rules of conflict of laws of any other jurisdiction.

(b)      To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, Action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, <u>provided</u> that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors or the Canadian Debtors may, in accordance with the Cross-Border Protocol, request that the Bankruptcy Court or the Canadian Court, as case may be, to hold a joint hearing of the Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, Action or proceeding, and (b) in the United States District Court for the Southern District of New York or, if that court lacks subject matter jurisdiction, the Supreme Court of the State of New York, County of New York, if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases, and shall not be brought, in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the U.S. Bankruptcy Court, the Canadian Court, in the United States District Court for the Southern District of New York and the Supreme Court of the State of New York, County of New York and the Canadian Court, as applicable, pursuant to the preceding clauses (a) and (b) for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such Action brought in any such court or any claim that any such Action brought in such court has been brought in an inconvenient forum;

(iv) agrees that the mailing of process or other papers in connection with any such Action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)    Section 10.6(b) shall not limit the jurisdiction of the Accounting Arbitrator set forth in Section 2.2.3.1(c) and 5.30, although claims may be asserted in the courts referred to in Section 10.6(b) for purposes of enforcing the jurisdiction and judgments of the Accounting Arbitrator.

(d)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

Section 10.7.  <u>Notices.</u>

All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below, by electronic mail with confirmation to any Party at the address specified below, or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Purchaser to:

Telefonaktiebolaget L M Ericsson (PUBL)
Torshamnsgatan 23
Kista
Stockholm
Sweden
Attention: Per Oscarsson
Attention: Carl Olof Blomqvist
Facsimile: +46-8-18-4085

97

With copies (that shall not constitute notice) to:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York, USA 10019-6064
> Attention: Stephen J. Shimshak
> Attention: Marilyn Sobel
> Facsimile: +1-212-373-3990

> and

> Blake, Cassels & Graydon LLP
> 199 Bay Street
> Suite 2800, Commerce Court West
> Toronto, Ontario, Canada M5L 1A9
> Attention: Richard Corley
> Attention: Susan Grundy
> Facsimile: +1-416-863-26-53

If to the Main Sellers or the Sellers, to:

> Nortel Networks Corporation
> 195 The West Mall Mailstop: T0503006
> Toronto, Ontario, Canada M9C 5K1
> Attention: Gordon A. Davies
>           Chief Legal Officer & Corporate Secretary
> Facsimile: +1-905-863-7386

> Nortel Networks Limited
> 195 The West Mall
> Mailstop: T0503006
> Toronto, Ontario, Canada M9C 5K1
> Attention: Gordon A. Davies
>           Chief Legal Officer & Corporate Secretary
> Facsimile: +1-905-863-7386

> Nortel Networks Inc.
> Legal Department
> 220 Athens Way, Suite 300
> Nashville, Tennessee, USA 37228
> Attention: Lynn C. Egan
>           Assistant Secretary
> Facsimile: +1-615-432-4067

With copies (that shall not constitute notice) to:

    Nortel Networks Limited
    195 The West Mall
    Mailstop: T0505009
    Toronto, Ontario, Canada M9C 5K1
    Attention: Douglas Parker
             Associate General Counsel, Corporate
    Facsimile: +1-905-863-7739

and

    Nortel Networks Inc.
    Legal Department
    220 Athens Way, Suite 300
    Nashville, Tennessee 37228
    USA
    Attention: Robert Fishman
             Senior Counsel
    Facsimile: +1-347-427-3815 & +1-615-432-4067

and

    Cleary Gottlieb Steen & Hamilton LLP
    One Liberty Plaza
    New York, New York, USA 10006
    Attention: Paul J. Shim
    Attention: Daniel S. Sternberg
    Facsimile: +1-212-225-3999

and

    Ogilvy Renault LLP
    200 Bay Street
    Suite 3800, P.O. Box 84
    Royal Bank Plaza, South Tower
    Toronto, Ontario M5J 2Z4
    Canada
    Attention: Michael Lang
    Facsimile: +1-416-216-3930

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the second calendar day after deposit with a reputable overnight courier service, as applicable.

99

Section 10.8.   Exhibits; Sellers Disclosure Schedule.

(a)     The Sellers Disclosure Schedule and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)     The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

Section 10.9.   Counterparts.

The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterparty of this Agreement

Section 10.10. No Presumption; Mutual Drafting.

The parties hereto are sophisticated and have been represented by lawyers who have carefully negotiated the provisions hereof.  As a consequence, the parties do not intend that the presumptions of any Laws relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement and therefore waive the effects of such Laws.

Section 10.11. Severability.

If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

Section 10.12. Entire Agreement.

This Agreement, the other Transaction Documents and the Confidentiality Agreement set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the other Transaction Documents and

100

the Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated. In the event of any irreconcilable conflict between this Agreement and any of the other Transaction Documents or the Confidentiality Agreement, the provisions of this Agreement shall prevail, regardless of the fact that certain other Transaction Documents, such as the Local Sale Agreements (if any), may be subject to different governing Laws.

Section 10.13. Availability of Equitable Relief.

The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, calculation of which the Parties agree would be uncertain and difficult to ascertain, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches.

Section 10.14. Bulk Sales Laws.

Subject to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, each Party waives compliance by the other Party with any applicable bulk sales Law.

Section 10.15. Main Sellers as Representatives of Other Sellers.

(a)    For all purposes of this Agreement:

(i)    each Other Seller listed in Section 10.15(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNC as its representative;

(ii)    each Other Seller listed in Section 10.15(a)(ii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNL as its representative; and

(iii)    each Other Seller listed in Section 10.15(a)(iii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNI as its representative.

(b)    Pursuant to Section 10.15(a), each of NNC, NNL and NNI shall expressly have the power to, in the name and on behalf of each of its Respective Affiliates (as defined below), (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

(c)    For the purposes of this Agreement, **"Respective Affiliates"** means: (i) with respect to NNC, each Other Seller listed in Section 10.15(a)(i) of the Sellers Disclosure Schedule; (ii) with respect to NNL, each Other Seller listed in Section 10.15(a)(ii) of the Sellers Disclosure Schedule, and (iii) with respect to NNI, all the other U.S. Debtors and each Other Seller listed in Section 10.15(a)(iii) of the Sellers Disclosure Schedule, but in all cases other than any EMEA Debtors or their respective Subsidiaries.

(d)    Each Respective Affiliate shall indemnify the Main Seller that acts as representative of such Respective Affiliate pursuant to this Section 10.15(d) for, and hold it harmless against, any loss, liability or expense, including reasonable attorneys' fees, incurred by such Main Seller without gross negligence, bad faith or willful misconduct, for serving in the capacity of representative of such Respective Affiliate hereunder.

Section 10.16. Execution by Other Sellers.

The Purchaser hereby acknowledges that the Other Sellers are not executing this Agreement as of the date hereof. This Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers have done so. Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall cause each Other Seller to execute a counterpart to this Agreement no later than the day prior to the Closing Date, agreeing to be bound as a Seller under this Agreement and authorizing NNC, NNL or NNI, as applicable, to act as its representative under Section 10.15 hereof.

Section 10.17. Obligations of the Sellers.

When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor other than NNC and a Non-Debtor Seller) and Affiliates of any Sellers shall in no event include any EMEA Debtors or their respective Subsidiaries.

Section 10.18. Limitation on Losses.

Except as provided in Section 5.32 or except in the case of a Liability arising from a cash payment obligation due to a party in respect of which the party seeking set-off has received a final judgment in an Action or Proceeding in accordance with Section 10.6, no party shall be entitled to set-off any Liabilities or Losses under this Agreement against any amounts due to such party under any other agreement with the other parties or any Affiliate thereof. In no event shall any party be responsible or liable for any Losses that are consequential, in the nature of lost profits, diminution in the value of property, special or punitive or otherwise not actual damages.

**[Remainder of this page intentionally left blank. Signature page follows.]**

102

IN WITNESS WHEREOF, the Parties have duly executed this Asset Sale Agreement as of the date first written above.

Telefonaktiebolaget L M Ericsson (publ)

By: _____
    Name: Per Oscarsson
    Title: Head of Mergers & Acquisitions

By: _____
    Name: Carl Olof Blomqvist
    Title: Senior Vice President & General
                                    Counsel

Nortel Networks Corporation

By: _____
    Name: Gordon Davies
    Title: Chief Legal Officer & Corporate
                                    Secretary

By: _____
    Name: George Riedel
    Title: Chief Strategy Officer

Nortel Networks Limited

By: _____
    Name: Gordon Davies
    Title: Chief Legal Officer & Corporate
                                    Secretary

By: _____
    Name: George Riedel
    Title: Chief Strategy Officer

Nortel Networks Inc.

By: _____
    Name: Gordon Davies
    Title: Chief Legal Officer

# APPENDIX "C"

## [ATTACHED]

ASSET SALE AGREEMENT

BY AND AMONG

NORTEL NETWORKS CORPORATION

NORTEL NETWORKS LIMITED

NORTEL NETWORKS INC.

AND

THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

AND

~~NOKIA SIEMENS NETWORKS B.V.~~[1]

TELEFONAKTIEBOLAGET L M ERICSSON (PUBL)[2]

DATED AS OF ~~JUNE 19,~~[3] JULY 24,[4] 2009

# TABLE OF CONTENTS

Page[5]

**ARTICLE I INTERPRETATION** ................................................................................ 2

Section 1.1.          Definitions.................................................................................. 2

Section 1.2.          Interpretation............................................................................. 26

   1.2.1.          Gender and Number.[6]............................................................. 26

   1.2.2.          Certain Phrases and Calculation of Time 26[7].................... 27[8]

   1.2.3.          Headings, etc........................................................... 26[9] 27[10]

   1.2.4.          Currency 26[11]............................................................... 27[12]

   ~~1.2.5.~~          ~~Statutory References~~ ...................................................... 26[13]

   1.2.5.          Miscellaneous ............................................................... 27[14]

**ARTICLE II PURCHASE AND SALE OF ASSETS**................................... 26[15] 28[16]

Section 2.1.          Purchase and Sale. ...................................................... 26[17] 28[18]

   2.1.1.          Assets 26[19]..................................................................... 28[20]

   2.1.2.          Excluded Assets 27[21].................................................... 29[22]

   2.1.3.          Assumed Liabilities 29[23]............................................... 30[24]

   2.1.4.          Excluded Liabilities 30[25].............................................. 32[26]

   2.1.5.          Assumption and/or Assignment or Rejection of 365 Contracts. ............................................................... 31[27] 33[28]

   2.1.6.          Assignment of Non-365 Contracts.................. 33[29] 34[30]

   2.1.7.          Cure Costs; Adequate Assurance; Efforts.......... 34[31] 35[32]

   2.1.8.          Local Sale Agreements 35[33]........................................ 37[34]

   2.1.9.          EMEA Debtors 36[35]...................................................... 37[36]

   2.1.10.         Non-Assignable Assets 36[37]........................................ 37[38]

Section 2.2.          Purchase Price; Adjustment. .......................... 36[39] 38[40]

   2.2.1.          Purchase Price 36[41]..................................................... 38[42]

   2.2.2.          Estimated Purchase Price........................... 36[43] 38[44]

   2.2.3.          Purchase Price Adjustment; ~~Closing Statement; Dispute Resolution~~....................................... 37[45], 39[46]

   2.2.4.          Working Capital Escrow..................................... 39[47] 41[48]

Section 2.3.          Closing. ....................................................... 39[49] 41[50]

   2.3.1.          Closing Date 39[51].......................................................... 41[52]

Error! Unknown document property name.

2.3.2.              Closing Actions and Deliveries 40[53] ..................................... 41[54]

Section 2.4.        Designated Purchaser(s)................................................... 40[55]42[56]

## ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER 41[57]43[58]

Section[59]SECTION[60] 3.1.[61] ................................................................O[62]rganization

Section 3.2.        Authorization; Binding Effect; No Breach. ........................ 42[65]44[66]

Section 3.3.        Financing 43[67] ....................................................... 44[68]

Section 3.4.        Adequate Assurance of Future Performance 43[69] ................. 45[70]

Section 3.5.        Purchaser's Acknowledgments; Exclusivity of
                    Representations and Warranties 43[71] ............................ 45[72]

Section 3.6.        Brokers 43[73] .......................................................... 45[74]

Section 3.7.        Absence of Certain Business Practices ............................ 43[75]

## ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS ... 44[76]45[77]

Section 4.1.        Organization and Corporate Power................................... 44[78]46[79]

Section 4.2.        Authorization; Binding Effect; No Breach. ........................ 45[80]46[81]

Section 4.3.        Title to Tangible Assets 45[82] ....................................... 47[83]

Section 4.4.        Material Contracts..................................................... 46[84]47[85]

Section 4.5.        Intellectual Property.................................................. 47[86]48[87]

Section 4.6.        Litigation 48[88] ..................................................... 50[89]

Section 4.7.        Financial Statements. ................................................. 49[90]50[91]

Section 4.8.        Compliance with Laws; Consents..................................... 49[92]51[93]

Section 4.9.        Real Property. ......................................................... 50[94] 51[95]

Section 4.10.       Environmental Matters................................................. 52[96]53[97]

Section 4.11.       Labor and Employee Benefits Matters. .............................. 52[98]54[99]

Section 4.12.       Brokers 54[100] ...................................................... 56[101]

Section 4.13.       Tax Liens 54[102] ..................................................... 56[103]

Section 4.14.       Valid Transfers 54[104] ............................................... 56[105]

Section 4.15.       Investment Canada Act 54[106] ........................................ 56[107]

Section 4.16.       Interdependency Schedule ............................................ 55[108]56[109]

Section 4.17.       EMEA Debtors unrelated to Business or Assets 55[110] .............. 56[111]

Section 4.18.       Sellers' Acknowledgment; Exclusivity of Representations
                    and Warranties 55[112] ............................................... 57[113]

Section 4.19.       Absence of Certain Business Practices ............................. 55[114]

Error! Unknown document property          ii          Error! Unknown document
name.Error! Unknown document property                  property name.
name.Error! Unknown document property

ARTICLE V COVENANTS AND OTHER AGREEMENTS................................. ~~55~~[115]<u>57</u>[116]

Section 5.1.     U.S. Bankruptcy Actions ~~55~~[117] ................................................. <u>57</u>[118]

Section 5.2.     Canadian Bankruptcy Actions. ......................................... 57

    5.2.1.     Canadian ~~Sales Process Order~~ .......................................... ~~57~~[119]

    ~~5.2.2.~~     ~~Canadian~~ [120]Approval and Vesting Order .................... 57

    ~~5.2.3.~~[121] <u>5.2.2.</u>[122] ..............................................Additional Requests ~~57~~[123]

    ~~5.2.4.~~     ~~Withdrawal, Cancellation or Rejection~~[124] [125] ................ 58

Section 5.3.     Consultation; Notification .................................................. 58

Section 5.4.     Pre-Closing Cooperation ..................................................... 59

Section 5.5.     Antitrust and Other Regulatory Approvals. ..................... ~~59~~[126]<u>60</u>[127]

Section 5.6.     Pre-Closing Access to Information. .................................. 63

Section 5.7.     Public Announcements ~~63~~[128] ......................................... <u>64</u>[129]

Section 5.8.     Post-Closing Cooperation. .............................................. 64

Section 5.9.     Conduct of Business.[131] ................................................. 64

Section 5.10.     Transaction Expenses.[132] ................................................ 66

Section 5.11.     Confidentiality.[133] ......................................................... 66

Section 5.12.     Disclosure Schedules and Certain Information ............... ~~66~~[134]<u>67</u>[135]

Section 5.13.     Certain Payments or Instruments Received from Third Parties ~~66~~[136] ................................................................. <u>67</u>[137]

Section 5.14.     Non-Assignable Contracts. ............................................ ~~67~~[138]<u>68</u>[139]

Section 5.15.     Inbound License Agreements ~~68~~[140] ............................... <u>69</u>[141]

Section 5.16.     Bundled Contracts ........................................................... ~~68~~[142]<u>69</u>[143]

Section 5.17.     Post-Closing Assistance for Litigation. ........................... ~~69~~[144]<u>70</u>[145]

Section 5.18.     Delivery of Assets. ........................................................ ~~70~~[146]<u>71</u>[147]

Section 5.19.     Termination of Overhead and Shared Services ~~70~~[148] ......... <u>71</u>[149]

Section 5.20.     Insurance Matters ............................................................ ~~71~~[150]<u>72</u>[151]

Section 5.21.     Deposits, Guarantees and Other Credit Support of the Business ~~71~~[152] ............................................................... <u>72</u>[153]

Section 5.22.     Use of Trademarks ~~72~~[154] ............................................... <u>73</u>[155]

Section 5.23.     Sellers' Accessible Information; Cooperation. ................ ~~72~~[156]<u>73</u>[157]

Section 5.24.     Maintenance of Books and Records. ............................... ~~72~~[158]<u>73</u>[159]

Section 5.25.     Ancillary Agreements. .................................................... ~~73~~[160]<u>74</u>[161]

Section 5.26.     Subleases. ........................................................................ ~~73~~[162]<u>75</u>[163]

Error! Unknown document
name.Error! Unknown document property
name.Error! Unknown document property

iii

Error! Unknown document
property name.

| Section 5.27. | Direct Leases ~~74[164]~~ | 75[165] |
| Section 5.28. | Licenses ~~74[166]~~ | 75[167] |
| Section 5.29. | Hazardous Materials at the Carling Property ~~74[168]~~ | 75[169] |
| Section 5.30. | Transition Services Agreement | ~~75[170]~~ 76[171] |
| Section 5.31. | Casualty | 78[172] |
| Section 5.32. | [173]Set-off | ~~77[174]~~Off 79[1: |
| Section 5.33. | Good Faith Deposit | 79[176] |
| Section 5.34. | Certain Counterparty Objections | 79[177] |

**ARTICLE VI TAX MATTERS** ........................... ~~77[178]~~80[179]

| Section 6.1. | Transfer Taxes. | ~~77[180]~~80[181] |
| Section 6.2. | Tax Characterization of Payments Under This Agreement ~~78[182]~~ | 81[183] |
| Section 6.3. | Apportionment of Taxes. | ~~79[184]~~81[185] |
| Section 6.4. | Withholding Taxes ~~79[186]~~ | 81[187] |
| Section 6.5. | Records. | 80[188]82[189] |
| Section 6.6. | Tax Returns. | 81[190]83[191] |
| Section 6.7. | Allocation of Purchase Price | 82[192]85[193] |

**ARTICLE VII EMPLOYMENT MATTERS** ..................... 83[194]85[195]

| Section 7.1. | Employment Terms ~~83[196]~~ | 85[197] |
| Section 7.2. | Employee Benefits. | 84[198]87[199] |
| Section 7.3. | Other Employee Covenants. | 86[200]88[201] |
| Section 7.4. | Excluded Employee Liabilities ~~87[202]~~ | 90[203] |
| Section 7.5. | Sole Benefit of Sellers and Purchaser ~~88[204]~~ | 91[205] |

**ARTICLE VIII CONDITIONS TO THE CLOSING** ........... 88[206]91[207]

| Section 8.1. | Conditions to Each Party's Obligation ~~88[208]~~ | 91[209] |
| Section 8.2. | Conditions to Sellers' Obligation ~~89[210]~~ | 92[211] |
| Section 8.3. | Conditions to Purchaser's Obligation ~~89[212]~~ | 92[213] |

**ARTICLE IX TERMINATION** ........................... 90[214]93[215]

| Section 9.1. | Termination ~~90[216]~~ | 93[217] |
| Section 9.2. | ~~Termination Payments.~~ | 91[218] |
| ~~Section 9.3.~~ | [219]Effects of Termination ~~92[220]~~ | 94[221] |

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

iv

Error! Unknown document
property name.

**ARTICLE X MISCELLANEOUS** ................................................................ 93[222]95[223]

Section 10.1.    No Survival of Representations and Warranties or
                 Covenants-93[224] ................................................................ 95[225]

Section 10.2.    Remedies-93[226] ................................................................ 95[227]

Section 10.3.    No Third Party Beneficiaries-93[228] ................................ 95[229]

Section 10.4.    Consent to Amendments; Waivers-93[230] ........................ 95[231]

Section 10.5.    Successors and Assigns-93[232] ........................................ 96[233]

Section 10.6.    Governing Law; Submission to Jurisdiction; Waiver of
                 Jury Trial. ................................................... 94[234]96[235]

Section 10.7.    Notices-95[236] .................................................................. 97[237]

Section 10.8.    Exhibits; Sellers Disclosure Schedule. ..................... 97[238]100[239]

Section 10.9.    Counterparts-97[240] ........................................................ 100[241]

Section 10.10.   No Presumption; Mutual Drafting-97[242] ...................... 100[243]

Section 10.11.   Severability-97[244] .......................................................... 100[245]

Section 10.12.   Entire Agreement-98[246] ................................................ 100[247]

Section 10.13.   Availability of Equitable Relief-98[248] .......................... 101[249]

Section 10.14.   Bulk Sales Laws-98[250] .................................................. 101[251]

Section 10.15.   Main Sellers as Representatives of Other Sellers. ......... 98[252]101[253]

Section 10.16.   Execution by Other Sellers-99[254] ................................ 102[255]

Section 10.17.   Obligations of the Sellers-99[256] .................................. 102[257]

Section 10.18.   Limitation on Losses-99[258] ............................................ 102[259]

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    v                    Error! Unknown document
                                                                                property name.

[260]**EXHIBITS**

Exhibit A –[261],[262] Other Sellers

Exhibit B –[263],[264] Canadian Debtors; U.S. Debtors; EMEA Debtors; Non-Debtor Sellers

Exhibit C –[265],[266] Adjusted Net Working Capital Statement

Exhibit D –[267],[268] Calculation Principles

Exhibit E – CDMA Supply Agreement

Exhibit F –[269],[270] Flextronics Back-to-Back Agreement Term Sheet

Exhibit G –[271],[272] Escrow Agreement

Exhibit H –[273],[274] GDNT Agreements Term Sheet

Exhibit I –[275],[276] Intellectual Property License Agreement

Exhibit J –[277],[278] China Asset Sale Agreement

Exhibit K –[279],[280] Transferring Employee Agreement

Exhibit L –[281],[282] Manufacturing and Supply Regarding Dual Use Platforms Agreement

Exhibit M –[283],[284] Nortel Accounting Principles

Exhibit N –[285],[286] Specified ~~Permitted~~[287]<u>Seller</u>[288] Encumbrances

Exhibit O –[289],[290] Real Estate Agreements Term Sheet

Exhibit P –[291],[292] Trademark License Agreement

Exhibit Q –[293],[294] Transition Services Agreement

Exhibit R – Software License and Development Agreement for Common Material Platform Software

Exhibit S –[295],[296] Knowledge of the Sellers

Exhibit ~~2.4  Designated Purchasers~~[297]~~Exhibit~~[298]5.1 –[299],[300] Form of ~~U.S. Bidding Procedures Order and~~[301] U.S. Sale Order

Exhibit 5.2.1 –~~Form of Canadian Sales Process Order Motion and Canadian Sales Process Order~~[302]~~Exhibit 5.2.2~~ –[303],[304] Form of Canadian Approval and Vesting Order

## ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of ~~June 19,~~[305]July 24,[306] 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the Affiliates (as defined below) of the Main Sellers listed in Exhibit A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**") and ~~Nokia Siemens Networks B.V.~~[307] Telefonaktiebolaget L M Ericsson (publ)[308], a corporation organized under the laws of ~~the Netherlands~~[309]Sweden[310] (the "**Purchaser**").

<u>W I T N E S S E T H :</u>

WHEREAS, the Sellers beneficially own and operate the Business (as defined below);

WHEREAS, on January 14, 2009 (the "**Petition Date**"), NNC, NNL and the Other Sellers listed in part 1 of Exhibit B hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and was extended by further order of the Canadian Court on February 10, 2009 and April 28, 2009, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit B hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) having commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the Other Sellers listed in part 3[311]4[312] of Exhibit B hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers, if any) of the Assets (as defined below), the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the

Error! Unknown document property name.Error! Unknown document property name. Error! Unknown document property

1

Error! Unknown document property name.

Purchaser and the Designated Purchasers of the Assumed Liabilities (as defined below) are being made at arms' length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates;

WHEREAS, the Purchaser (and each of the Designated Purchasers, where applicable) intends to purchase only those Assets relating to the Sellers' CDMA Business in North America and CDMA research and development in China, as well as certain LTE Assets in Canada;

WHEREAS, in accordance with the U.S. Bidding Procedures Order, Purchaser has delivered to Sellers a good faith deposit in the amount of thirty-six million five hundred thousand dollars ($36,500,000)(the "**Good Faith Deposit**");[313] and

WHEREAS, in addition, as of the Closing, the Purchaser (or Affiliates of the Purchaser) and certain Sellers (or Affiliates of the Sellers) will enter into the following ancillary agreements, (i) the Transition Services Agreement, (ii) the Intellectual Property License Agreement, (iii) the Trademark License Agreement, (iv) the Escrow Agreement, (v) the Transferring Employee Agreement, (vi) the Real Estate Agreements, (vii) the Manufacturing and Supply ~~Agreement~~[314]Regarding Dual Use[315]Platforms ~~Agreement~~[316], (viii) Flextronics Back-to-Back Agreement, (ix) the CDMA Supply Agreement, (x) the China Asset Sale Agreement, (xi) ~~the~~[317]a[318] Software License and Development Agreement for Common Material Platform Software, and (xii) the GDNT Agreements (the foregoing, collectively, the "**Ancillary Agreements**"), and any arrangements as may be required pursuant to Section 5.16.

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I

## INTERPRETATION

~~Section 1.1.~~[319]~~Definitions~~[320]

Section 1.1. [321]Definitions[322,323]

—[324]Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accounting Arbitrator**" has the meaning set forth in Section ~~2.2.3~~[325]2.2.3.1[326](c).

"**Accrued Vacation Amount**" means the amount of compensation, including the employer's portion of any associated payroll Taxes, with respect to the accrued and unused vacation days that is accrued on the account of a Transferring Employee from his or her

2

respective employer as of the Closing Date,[327] to be calculated in accordance with the Calculation Principles.

"**Action**" means any litigation, action, suit, charge, binding arbitration, Tax audit or investigation or other legal, administrative, regulatory or judicial proceeding.

"**Acquired Actions**" means any avoidance actions as used under Section 547 or 548 of the Bankruptcy Code or the equivalent provisions under other applicable Laws that the Sellers have against any counterparty to an Assumed and Assigned Contract arising out of or relating to the Assigned Contracts that are actually assigned to the Purchaser or a Designated Purchaser hereunder.[328]

"**Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(c).

"**Adjusted Net Working Capital Statement**" means the statement of certain specified asset and liability accounts and certain accounting principles, methodologies and policies used in the determination of such accounts, consistent with the Calculation Principles, a pro forma[329] version of which (as of March 31, 2009) is provided in Exhibit C hereto.

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person.

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"~~**Alternative Transaction**~~" ~~means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangement or other similar transaction, of all or a substantial portion of the Business, or all or a substantial portion of the Assets, in each case, in a transaction or series of transactions with a Successful Bidder (as such term has been defined in Exhibit 5.1, which may include multiple bidders whose bids are combined) other than the Purchaser and/or its Affiliates.~~[330]

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Annual Audited Financial Statements**" has the meaning set forth in Section 4.7(a).

"**Antitrust Approvals**" means the HSR Approval and the Competition Act Approval.

"**Antitrust Laws**" means the Competition Act, the HSR Act, and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any

other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Accounts Receivable**" means North American trade accounts receivable that are current and not in dispute relating to the Specified CDMA Contracts, in the aggregate amount of $5,000,000, net of any allowance for doubtful accounts computed in accordance with the Nortel Accounting Principles consistent with historical practice.

"**Assigned Contracts**" means (i) the Assumed and Assigned Contracts, and (ii) the Designated Non-365 Contracts.

"**Assigned Intellectual Property**" means (i) the Assigned Patents, (ii) the Assigned Trademarks, (iii) the Intellectual Property (other than Patents and Trademarks) in the Software (including previous versions and versions in development) predominantly used in the CDMA Products and in the Software predominantly used in the LTE Access Products, respectively, in each case, as listed in Section 1.1(a) of the Sellers Disclosure Schedule, and (iv) any other Intellectual Property (other than Patents or Trademarks) owned as of the Closing Date by any of the Sellers that is predominantly used in the Business with such predominant use to be determined, if applicable, in accordance with guidelines and principles, if any, that the Sellers and the Purchaser may from time to time agree in writing prior to Closing.

"**Assigned Patents**" means the Patents predominantly used in the CDMA Business as of Closing and owned as of the Closing Date by any of the Sellers as set forth in Section 1.1(b) of the Sellers Disclosure Schedule.

"**Assigned Trademarks**" means the Trademarks predominantly used in the Business as of the Closing and owned as of the Closing Date by any of the Sellers, as set forth in Section 1.1(c) of the Sellers Disclosure Schedule.

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(d).

"**Assumed and Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.5(b).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Auction**" has the meaning set forth in the Bidding Procedures (as defined in the U.S. Bidding Procedures and Sale Motion)[331].

"**Balance Sheet Date**" has the meaning set forth in Section 4.7(b).

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court or any other court before which Bankruptcy Proceedings are held.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings concerning any of the Sellers that are held from time to time.

"~~Bidding Procedures~~" ~~means the procedures to be employed with respect to the proposed sale of the Assets and the assumption of the Assumed Liabilities to be approved by the U.S. Bankruptcy Court and the Canadian Court pursuant to the U.S. Bidding Procedures Order and the Canadian Sales Process Order, respectively.~~[332]

"~~Break-Up Fee~~" ~~has the meaning set forth in Section 9.2(a).~~[333]

"**Bundled Contracts**" has the meaning set forth in Section 5.16.

"**Business**" means, collectively, the following businesses ~~to the extent operated by the Sellers as of the Closing,~~[334] consisting of:

(i)     the business segment through which the Sellers, individually, jointly or in collaboration with or pursuant to contracts with Third Parties:  (a) design, develop, process components, indirectly manufacture through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers the prior versions (if currently supported), current versions and versions under development of the following products:  CDMA BTS, CDMA BSC/eBSC, CDMA DO-RNC, CDMA MSC/MTX, CDMA HLR, CDMA Media Gateway, CDMA Gateway controller, CDMA Billing Manager, SS7 Signaling Gateway Software and associated OAM Software Systems as listed in Section 1.1(d) of the Sellers Disclosure Schedule (collectively, the "**CDMA Products**") and (b) provide the CDMA Services (clauses (a) and (b),[335] collectively, the "**CDMA Business**"); and

(ii)     the business through which the Sellers, individually, jointly or in collaboration with or pursuant to contracts with Third Parties, design, develop, process components, indirectly manufacture through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers the prior versions (if currently supported), current versions and versions under development of the following LTE Access products:  eNodeB (including UDM and URM) and associated Element Management Systems (EMS) (collectively, the "**LTE Access Products**" and the activities described in this clause (ii) are the "**LTE Business**"),

but excluding, in each of clauses (i) and (ii) above: (A) any Excluded Asset; (B) Overhead and Shared Services (other than Transferred Overhead and Shared Services); and (C) any products and/or services provided by businesses or business segments of any Seller other than those specified in clauses (i) ~~and~~[336] or[337] (ii) above, including for the avoidance of doubt, the Excluded Products and Services.

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    5                    **Error! Unknown document
property name.**

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, and (iii) ~~Frankfurt, Germany~~[338]Stockholm, Sweden[339].

"**Business Information**" means all books, records, files, research and development log books, ledgers, documentation, sales literature or similar documents in the possession or under control of the Sellers and to the extent that such information relates to the Business, including policies and procedures, Owned Equipment manuals and materials and procurement documentation; provided, that, to the extent any of the foregoing is also used in any business or business segment of any Seller other than the Business, then such portion of the Business Information as used in such business or business segment of any Seller other than the Business shall be segregated and shall not form part of Business Information, provided further that, where such segregation shall be impracticable, Business Information shall be limited to copies of the foregoing. Business Information shall not include any Employee Records.

"**Business Registered IP**" has the meaning set forth in Section 4.5(b).

"**Calculation Principles**" means the Nortel Accounting Principles, applied in a manner consistent with historical practices, to the extent applicable to the determination of the Net Inventory Value, the CIP Receivables Amount, the Contractual Liabilities Amount, the Royalty Liability Amount, the Warranty Provision Amount, the Accrued Vacation Amount,[340] and the Adjusted Net Working Capital as set forth in Exhibit D and in the Adjusted Net Working Capital Statement.

"**Calgary Retention Plan**" means the retention plan developed for certain Westwinds Facility employees substantially approved by the Canadian Court on March 6, 2009, with such further approvals as may be obtained from the Canadian Court from time to time.

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section ~~5.2.2.~~[341]5.2.1.[342]

"**Canadian Court**" means the Ontario Superior Court of Justice.

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Sales Process Order**" ~~has the meaning set forth in Section 5.2.1.~~[343]:[344]means the order entered on June 29, 2009 approving the items described in the [345]Canadian Sales Process Order Motion[346]" ~~has the meaning set forth in Section 5.2.1.~~[347][348]

"**Canadian Sales Process Order Motion**" means the motion filed by the Canadian Debtors on June 23, 2009 with the Canadian Court seeking an order for approval of, among other things, a process of the sale of the Canadian Debtors' rights, title and interests in and to the "Assets" (as defined therein).[349]

"**Carling Property**" means the property municipally known as 3500 Carling Avenue, Nepean, Ontario.

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**CDMA Business**" has the meaning set forth in the definition of Business.

"**CDMA Contracts**" means those Contracts of a Seller pursuant to which a Seller or Sellers provide CDMA Products and/or CDMA Services to carriers or other customers of the CDMA Business.

"**CDMA Products**" has the meaning set forth in the definition of Business.

"**CDMA Services**" mean, collectively, the following services, solely in relation to CDMA Products, that the Sellers, individually, jointly or in collaboration with or pursuant to contracts with Third Parties, market, distribute and sell globally to carriers:  (i) network implementation services, consisting of the configuration, planning, installation and integration of a network migration, upgrade or green-field deployment into a new or existing network, including design and deploy services, audit and optimization services, and operations support system services; (ii) network managed services, consisting of the provision of on-site skilled resources to provide operational support, technician support, staff augmentation, on-the-job training, product specialist consulting, core network optimization, software loading service, and transport network service; and (iii) network support services, including technical support, technical account manager service, network prime engineer service, emergency recovery services, online support , technical support for special projects, repair services, managed spares service, Third Party products spares, management service, corrective content management, network discovery services, engineering helpdesk, network configuration, and software release services; but expressly excludes the Sellers' network operations centre.

"**CDMA Supply Agreement**" means the agreement between the Purchaser and/or any Designated Purchasers and the relevant Sellers, to be executed as of the Closing in substantially the form attached hereto as Exhibit E.

"**CFIUS**" means the Committee on Foreign Investment in the United States.

"**CFIUS Approval**" means that the Parties shall have received a written notification issued by CFIUS that it has concluded a review of any notification voluntarily provided pursuant to the Exon-Florio Amendment of the Defense Production Act of 1950, as amended,[350] and Section 5.5(f) hereof and determined not to conduct an investigation or, if an investigation is deemed to be required, notification that the U.S. government will not take action to prevent the transactions contemplated by this Agreement from being consummated.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"China Asset Sale Agreement" means the agreement between the Purchaser and/or any Designated Purchasers and the relevant Affiliates of the Sellers to be executed as soon as practicable after the date hereof in substantially the form attached hereto as Exhibit J.

"[351]China Assets" [352]means the Assets related to the CDMA Business to be sold pursuant to the China Asset Sale Agreement.

"CIP Receivables" means, as of a given date, amounts classified in Construction-in-Process accounts in a manner consistent with the Calculation Principles.

"CIP Receivables Amount" means, as of any given date, the amount of CIP Receivables of the Business, determined in accordance with the Calculation Principles.

"Claim" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.3.1.

"Closing Adjusted Net Working Capital" has the meaning set forth in Section 2.2.3[353]2.2.3.1[354](a).

"Closing CIP Receivables Amount" has the meaning set forth in Section 2.2.3[355]2.2.3.1[356](a).

"Closing Contractual Liabilities Amount" has the meaning set forth in Section 2.2.3[357]2.2.3.1[358](a).

"Closing Date" has the meaning set forth in Section 2.3.1.

"Closing Employee Adjustment Amount" has the meaning set forth in Section 2.2.3[359]2.2.3.1[360](a).

"Closing Net Inventory Value" has the meaning set forth in Section 2.2.3[361]2.2.3.1[362](a).

"Closing Royalty Liability Amount" has the meaning set forth in Section 2.2.3[363]2.2.3.1[364](a).

"Closing Statement" has the meaning set forth in Section 2.2.3[365]2.2.3.1[366](a).

"Closing Warranty Provision Amount" has the meaning set forth in Section 2.2.3[367]2.2.3.1[368](a).

"COBRA" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Seller or any of its Affiliates has entered into with any union, works council or collective bargaining agent with respect to terms and conditions of employment of the employees of such Seller or its Affiliates.

"**Commissioner**" means the Commissioner of Competition appointed under the Competition Act or any person duly authorized to exercise the powers and perform the duties of the Commissioner of Competition.

"**Competition Act**" means the Competition Act (Canada), as amended, and includes the regulations promulgated thereunder.

"**Competition Act Approval**" means that: (i) the applicable waiting period has expired or been terminated pursuant to Section 123 of the Competition Act; (ii) the Commissioner or his/her authorized representative shall have provided the Purchaser with a waiver from complying with Part IX of the Competition Act pursuant to Section 113(c) of the Competition Act and in either case [369] the Commissioner or his/her authorized representative shall have advised the Purchaser in writing that the Commissioner does not intend to make an application under Section 92 of the Competition Act with respect to the transactions contemplated by this Agreement, and neither the Commissioner nor any of his/her authorized representatives shall have rescinded or amended such advice; or (iii) the Commissioner shall have issued an advance ruling certificate pursuant to Section 102 of the Competition Act in respect of the transactions contemplated by this Agreement.

"**Complaining Party**" has the meaning set forth in Section 5.30(d).

"**Confidentiality Agreement**" means the confidentiality agreement among the Purchaser, the Sellers listed therein and the Joint Administrators dated May 9,[370]March 30,[371] 2009, as amended.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by, or notice to (including the expiry of any related notice or waiting period), any Government Entity or other Third Party.

"**Contract**" means any written binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.

"**Contractual Liabilities Amount**" means, as of any given date, the amount of contractual liabilities of the Business determined in accordance with the Calculation Principles.

"**Control**" (together with its correlative meanings, "Controlled by" and "under common Control with") means, in connection with a given Person, the possession, directly or indirectly, or as trustee or executor, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract, credit arrangement or otherwise.

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

9

Error! Unknown document
property name.

"**Covered Assets and Persons**" means the Business and the assets (including the Assets), tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of the Business.

"**Cross-Border Protocol**" means the certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cure Cost**" means (i) any amounts required by Section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under a 365 Contract or an Assumed and Subleased Real Estate Lease and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract or Assumed and Subleased Real Estate Lease; and (ii) with respect to any Designated Non-365 Contract, any amounts required to cure any defaults and to pay any actual or accrued pecuniary losses under such Seller Contract in respect of the period prior to the Closing Date that are required by the counterparty thereto to be paid in order for such Assigned Contract to be assigned.

"**Designated Non-365 Contracts**" has the meaning set forth in Section 2.1.6(d).

"**Designated Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Designated Purchaser**" has the meaning set forth in Section 2.4(a).

"**Direct Lease Real Estate**" has the meaning set forth in Section 5.27.

"**Direct ~~Leases~~[372]Lease[373]**" has the meaning set forth in Section 5.27.

"**Disagreement Notice**" has the meaning set forth in Section ~~2.2.3~~[374]2.2.3.1[375](b).

"**EMEA Cases**" means the proceedings commenced by the applications filed with the English Court on the Petition Date, pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings.

"**EMEA Debtors**" means the entities listed under the heading "EMEA Debtors" in part 3 of Exhibit B hereto.

"**Employee**" means any employee, as of the date hereof, of the Sellers or their Affiliates (other than the EMEA Debtors or their respective Subsidiaries) who (i) for the twelve months prior to the date hereof (or such shorter time as such employee was employed by the Sellers or such Affiliates) performed services which were all or substantially all related to the Business or (ii) was hired into, transferred into, or assigned to the Business prior to the Closing in the Ordinary Course and whose services are all or substantially all related to the Business, or (iii)[376]whose services are necessary to the operation of the Business, provided that if the

employee is at a Job Complexity Indicator 6 or above, such hire, transfer or assignment is subject to Purchaser's consent in accordance with Section 5.9(l).

"**Employee Adjustment Amount**" means, at any given time, the Accrued Vacation Amount.

"**Employee Information**" has the meaning set forth in Section 4.11(b).

"**Employee Records**" means books, records, files, or other documentation with respect to Employees.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferring Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day on which the employment of a Transferring Employee commences with the Purchaser or its Designated Purchaser as provided for in this Agreement and the Transferring Employee Agreement.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environmental Law**" means any applicable Law relating to or regulating (i) the handling, generation, management, Release or remediation of Hazardous Materials; (ii) the exposure of persons to Hazardous Materials; (iii) occupational health and safety; or (iv) pollution or protection of human health, the environment or natural resources, including the United States Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act and the Toxic Substances Control Act, all as amended, and any requirements of a Government Entity promulgated pursuant to these applicable Laws or any analogous supranational, foreign, state, provincial, territorial, municipal or local Laws.

"**Environmental Permit**" means any Consent required under any Environmental Law for the Business as currently conducted.

"**Equipment**" means tangible property, including all trade fixtures and fixtures, furniture, furnishings, fittings, equipment, apparatus, appliances, test labs, trial equipment and other articles of personal property, including that located at the Direct Lease Real Estate or the demised premises which are (i) the subject of any real property lease included in the Assigned Contracts or (ii) the subject of any Sublease;[377],[378] provided, however, that the term "Equipment" shall not include fixtures other than trade fixtures located at the Direct Lease Real Estate and shall not include any leasehold improvements owned by the head landlord and located at the demised premises which are the subject of any Sublease; and;[379] provided, further, that "Equipment" shall not include (i) any Inventory, (ii) items of tangible property personally assigned to Employees who are not Transferring Employees, or (iii) any Intellectual Property covering, embodied in or connected to any Equipment.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    11                         Error! Unknown document
                                                                                      property name.

"**ERISA Affiliate Liability**" means any obligation, liability, or expense of any Seller which arises under or relates to any Seller Employee Plan that is subject to Title IV of ERISA, Section 302 of ERISA, Section 412 of the Code, COBRA or any other statute or regulation that imposes liability on a so-called "controlled group" basis with or without reference to any provision of Section 414 of the Code or Section 4001 of ERISA, including by reason of any Seller's affiliation with any of its ERISA Affiliates or the Purchaser being deemed a successor to any ERISA Affiliate of any Seller.[380]

"**Escrow Agreement**" means the Escrow Agreement to be entered into on or prior to Closing substantially in the form attached hereto as Exhibit G.

"**Escrow Agent**" has the meaning ascribed to such term in the Escrow Agreement.

"**Estimated Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(a).

"**Estimated CIP Receivables Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Contractual Liabilities Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Employee Adjustment Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Net Inventory Value**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Royalty Liability Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Warranty Provision Amount**" has the meaning set forth in Section 2.2.2(a).

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Contracts**" means any Contract that is not assigned to the Purchaser under this Agreement. For the avoidance of doubt, Excluded Contracts shall include the Excluded 365 Contracts, the Excluded Non-365 Contracts, any underlying Contract between a Third Party and a Seller that is subleased or licensed to the Purchaser or a Designated Purchaser pursuant to this Agreement, the Qualcomm Cross-License, and Addendum No. 9 to the OEM iPlanet Software Products (Binary) Exhibit to the Global Account Agreement Master Terms between Sun Microsystems, Inc. and NNI, Binary License and Redistribution Agreement for Java 2 Standard Edition dated October 5, 2006.[381]

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.4.

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    12                    Error! Unknown document
                                                                                property name.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded Non-365 Contract**" has the meaning set forth in Section 2.1.6(e).

"**Excluded Products and Services**" means all products and services provided by businesses or business segments of any Seller other than the Business, including the following products and all associated development and PLM resources: Evolved Packet Core (including MME, SGW, PGW), XACore and associated peripherals (including LPP, MS/ENET, SPM, DTC, MTM, DRAM IWSPM), ERS8600, Passport and OAM Systems not expressly included in the Products.

"**Excluded 365 Contract**" has the meaning set forth in Section 2.1.5(f).

"**Executory Contract**" means an "executory contract" for the purposes of Section 365 of the U.S. Bankruptcy Code.

"~~**Expense Reimbursement**~~" ~~has the meaning set forth in Section 9.2(a).~~[382]

"~~**Expense Reimbursement Notice**~~" ~~has the meaning set forth in Section 9.2(a).~~[383]

"**Extra Services**" has the meaning set forth in Section 5.30(b).

"**Final Order**" means an order of any Bankruptcy Court or other court of competent jurisdiction (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 ("**Rule 9024**") or Federal Rule of Civil Procedure 60 ("**Rule 60**") shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

"**Final Purchase Price**" has the meaning set forth in Section ~~2.2.3~~[384]2.2.3.1[385](a).

"**Flextronics Back-to-Back Agreement**" means the agreement between the relevant Sellers and the Purchaser and/or any Designated Purchasers to be executed on or before Closing based substantially on the term sheet attached hereto as Exhibit F.

"**GAAP**" means the United States generally accepted accounting principles.

"**GDNT Agreements**" means the agreements to be entered into between the relevant Sellers, the Purchaser (and/or any Designated Purchasers), and Guangdong-Nortel Telecommunications Equipment Co. Ltd., on or prior to the Closing based substantially on the term sheet attached hereto as Exhibit H.

"**General Scope of Included Services**" has the meaning set forth in Section 5.30(a).

"Good Faith Deposit" has the meaning set forth in the recitals.[386]

"**Government Entity**" means any U.S., Canadian, U.K.,[387] and any other applicable[388] supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**GST**" means goods and services Tax payable under Part IX of the Excise Tax Act (Canada).

"**Hazardous Materials**" means any chemical, material, waste, heat, sound, radiation or substance defined by or regulated under any Environmental Law as a hazardous waste, hazardous material, hazardous substance, extremely hazardous waste, restricted hazardous waste, pollutant, contaminant, toxic substance or toxic waste, including without limitation petroleum, petroleum products, asbestos, lead or polychlorinated biphenyls.

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means that the Purchaser shall have received notification from the responsible Minister under the Investment Canada Act that he/she is satisfied or is deemed to be satisfied that the transactions contemplated in this Agreement that are subject to the provisions of the Investment Canada Act are likely to be of net benefit to Canada, on terms and conditions satisfactory to the Purchaser, in its reasonable discretion.

"**Inactive Employees**" means Employees on a Seller-approved leave of absence who are expected to return and actually return to work within the relevant time period set out below.  An Employee shall be an Inactive Employee for purposes hereof only if such individual is absent as a result of military service, pregnancy or parental leave, disability leave, medical leave, jury duty or any leave provided under applicable Law and, in the case of leaves provided under applicable Law, is expected to return to work and actually returns to work in the time permitted for such leave under applicable Law and, for any other leave, is expected to return to work and actually returns to work in accordance with the terms of such leave but not longer than ninety (90) days (or, if such Employee is located in Canada, six (6) months) following the Closing Date.

" **Inbound License Agreements**" has the meaning set forth in Section 4.5(f).

"**Included Services**" has the meaning set forth in Section 5.30(a).

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property
14
Error! Unknown document
property name.

"**Indebtedness**" of any Person means at any date, without duplication, all obligations of such Person to the extent incurred for the Business (i) for indebtedness for borrowed money (including any unpaid principal, premium and accrued and unpaid interest or fees), (ii) for indebtedness evidenced by bonds, debentures, notes or similar instruments, (iii) in respect of leases whether or not capitalized in accordance with the Nortel Accounting Principles under which such Person is the lessee, (iv) in respect of letters of credit issued for the account of such Person (to the extent drawn), (v) in respect of guarantees of the obligations of other Persons of the type referred to in clauses (i) through (iv) above and (vi) any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayment or default under any of the Indebtedness referred to in items (i) and (ii) above.

"**Independent Auditor**" means Grant Thornton LLP or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation that is jointly selected by the Primary Parties.

"**Insolvency Act**" has the meaning set forth in the ~~recitals to this Agreement~~[389] definition of EMEA Cases[390].

"**Intellectual Property**" means any and all intellectual and industrial property rights, whether protected or arising under the Laws of the United States, Canada or any other jurisdiction, including all intellectual or industrial property rights in any of the following: (i) Trademarks; (ii) Patents, invention disclosures and inventions; (iii) works of authorship (including any registrations or applications for registration of copyrights); (iv) mask works; (v) trade secrets, know-how and confidential information; (vi) *sui generis* data base rights; (vii) industrial designs; and (viii) Software.

"**Intellectual Property License Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit I.

"**Interim Unaudited Financial Statements**" has the meaning set forth in Section 4.7(a).

"**Inventory**" means any inventories of raw materials, manufactured and purchased parts, works in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise; provided, that inventory not located within the United States, Canada or Caribbean countries served by United States contracts ("**Caribbean Countries**")[391] shall not be included in "Inventory", unless it (i) has been manufactured abroad; (ii) is, in the Ordinary Course, destined for shipment to the United States, Canada or Caribbean Countries; (iii) is not older than ninety (90) days,[392,393] (iv) is the current product release/revision; and (v) is saleable.

"**Investment Canada Act**" means the Investment Canada Act.

"**Joint Administrators**" means Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes and Alan Bloom serve as joint administrators) as appointed by the English Court under the Insolvency Act.

"**KEIP**" means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in the District of Delaware pursuant to orders entered on March 5, 2009 and March 20, 2009, and approved by the Canadian Court in part on March 6, 2009 and in part on March 20, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**KERP**" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware by an order dated March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase means, with reference to the Sellers, the actual knowledge of those Persons listed on Exhibit S hereto.

"**Latest Lease Rejection Date**" means the latest of (i) August 12, 2009, or (ii) if Sellers (in their sole discretion) request and a landlord under a 365 Real Estate Lease agrees to an extension of the date by which the relevant Seller must elect to either assume or reject such 365 Real Estate Lease to a date following August 12, 2009, then with respect to such 365 Real Estate Lease, the date to which such deadline has been extended by agreement of Sellers and such landlord and (iii) with respect to the Non-365 Real Estate Leases and the Non-365 Licensed Real Estate Leases in each case related to property located in Canada, the date on which the Sellers file a "plan of record" with the Canadian Bankruptcy Court.

"**Law**" means any U.S., Canadian, U.K.,[394] and any other applicable[395] foreign, supranational, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, judicial, administrative or other order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**Leased Real Property**" means all real property subject to a Real Estate Lease which is an Assigned Contract, an Assumed and Subleased Real Estate Lease, a Non-365 Subleased Real Estate Lease, a Licensed Real Estate Lease or a Non-365 Licensed Real Estate Lease.

"**Lease(s)**" means all Seller Contracts that are leases, subleases, licenses or other agreements (written or oral), including all amendments, extensions and renewals thereof, pursuant to which real property is held.

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability.

"**License**" has the meaning set forth in Section 5.28.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchasers under the Intellectual Property License Agreement and the Trademark License Agreement.