**"Licensed Real Estate Leases"** has the meaning set forth in Section 2.1.5(b[396]c[397]).

**"Lien"** means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance on real property, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, lease or conditional sale arrangement.

**"Local Sale Agreements"** has the meaning set forth in Section 2.1.8.

**"Losses"** means all losses, damages, Liabilities, deficiencies, interest, awards, judgments, fines, penalties and reasonable and documented out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements and the costs of litigation, including reasonable amount paid in investigation, defense or settlement of an Action).

**"LTE Access Products"** has the meaning specified in the definition of Business.

**"LTE Business"** has the meaning set forth in the definition of Business.

**"LTE-Related Patents"** means any and all Patents related to 3GPP Long-Term Evolution products and services (including Patents related to the LTE Business).

**"LTE Transferring Employees"** means the Employees listed on Section 1.1(g) of the Sellers Disclosure Schedule who become Transferring Employees.

**"Main Sellers"** has the meaning set forth in the preamble to this Agreement.

**"Manufacturing and Supply Regarding Dual Use Platforms Agreement"** means the agreement between the relevant Sellers (or their Affiliates), on the one hand, and the Purchaser and/or a Designated Purchaser, on the other hand, to be executed on or before the Closing in the form attached hereto as Exhibit L.

**"Material Adverse Effect"** means any circumstance, state of fact, event, change or effect (each an **"Effect"**) that, individually or in the aggregate with all other Effects, (a) is or could reasonably be materially adverse to the business, operations, assets, liabilities, results of operations or financial condition of the Business, taken as a whole (or, solely for purposes of the representations and warranties in Section 4.11 or for purposes of Section 8.3(a)(i) as applied to the representations and warranties in Section 4.5 and Section 4.11, either of the CDMA Business or the LTE Business), or (b) prevents or could reasonably be expected to prevent the ability of the Sellers to perform their obligations under this Agreement or the timely consummation of the transactions contemplated by this Agreement, but excluding, for purposes of clauses (a) and (b), (i) Effects resulting from changes in general economic conditions in the United States or Canada, (ii) Effects arising from the execution or delivery of this Agreement or the Transactions or the public announcement thereof, (iii) Effects that result from any action required to be taken pursuant to this Agreement or any action taken pursuant to the written request or with the prior written consent of the Purchaser, (iv) Effects relating to the industries and markets in which the Business operates, (v) Effects relating to changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (vi) Effects relating to or including the

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                17                    **Error! Unknown document
                                                                           property name.**

attrition of customers prior to the Closing Date, or (vii) Effects relating to the pendency of the Bankruptcy Proceedings and any action approved by, or motion made before, the Bankruptcy Courts; it being understood that the failure of the Business to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect; provided, that, with respect to clauses (i), (iv), and (v),[398] any such Effect shall be included to the extent such Effect has a materially disproportionate effect on the Business, taken as a whole (or, solely for purposes of the representations and warranties in Section 4.11 or for purposes of Section 8.3(a)(i) as applied to the representations and warranties in Section 4.5 and Section 4.11, either of the CDMA Business or the LTE Business), as compared to other industry participants.

"**Material Contracts**" has the meaning set forth in Section 4.4.[399]4.4(a).[400]

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**Net Inventory Value**" means, as of any given date, the amount of the Owned Net Inventory, net of applicable provisions, determined in accordance with the Calculation Principles.

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNTC**" has the meaning set forth in Section 6.5(b).

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.14(a).

"**Non-Assigned Contract**" means a Non-Assignable Contract as to which all applicable Consents to assignment have not been granted prior to the Closing Date.

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

"**Non-Solicitation Period**" means the twelve (12) month period immediately following the Closing Date.

"**Non-365 Contract[401]Contracts[402]**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Contract List**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Licensed Real Estate Leases**" has the meaning set forth in Section 2.1.6(c).

"**Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Non-365 Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.6(b).

18

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Unaudited Financial Statements, as set forth in Exhibit M hereto.

"Notice Parties" has the meaning set forth in Section 5.1(b).[403]

"**NSN Agreement**" means the Asset Sale Agreement, dated as of June 19, 2009, among the Sellers and Nokia Siemens Networks B.V.. [404]

"**OAM Systems**" means operations, administration and maintenance systems.

"**Open Source Software**" means Software that is made available under a license agreement that (i) conditions use, modification or distribution of any Software program, or any Software derived from such Software program or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software), (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software or (iii) is made available under any software license listed at the website http://www.opensource.org/licenses/alphabetical as of Closing.

"**Ordinary Course**" means the ordinary course of each of the Businesses through the date hereof consistent with each of their recent past practice since the filing of the Bankruptcy Proceedings, as such practice may be modified from time to time to the extent necessary to reflect the Bankruptcy Proceedings.

"**Outbound License Agreements**" has the meaning set forth in Section 4.5(f).

"**Other Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Overhead and Shared Services**" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services or provided to both (i) the Business and (ii) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, Tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software and other Intellectual Property necessary for or used in connection therewith, including the Licensed Applications (as defined in the Transition Services Agreement).

"**Owned Equipment**" means Equipment owned by the Sellers that is (i) held or used exclusively by the LTE Transferring Employees or (ii) held or used predominantly in

connection with the CDMA Business, in each case including the items listed in Section 1.1(h) of the Sellers Disclosure Schedule, and excluding in all cases any Owned Net Inventory and any Intellectual Property.

"**Owned Net Inventory**" means (i) Inventory owned by any of the Sellers that is held or used predominantly in connection with the Business, including any such Inventory which is owned by the Sellers but remains in the possession or control of a contract manufacturer or another Third Party, and (ii) the other Inventory listed in Section 1.1(i) of the Sellers Disclosure Schedule, all as reflected on Sellers' general ledger as of the Closing Date an estimate of which will be provided to the Purchaser at least three days prior to Closing.

"**Partial Allocation**" has the meaning set forth in Section 6.7(b).

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patent Cross Licenses**" means all Contracts between the Sellers or their Affiliates (other than the EMEA Debtors and their respective Subsidiaries) and a Third Party under which the Sellers or such Affiliates, as applicable, both (i) grant a license under patents and patent applications owned by (or licensed to) them, and (ii) receive from the counter-party a license under patents and patent applications owned by (or licensed to) such counter-party (but other than inbound or outbound license agreements where the only grant back from the licensee is under improvements on the licensed Intellectual Property).

"**Patents**" means all national (including without limitation the United States and Canada) and multinational patents and utility models (petty patents) as well as all applications and provisional applications for any of the foregoing, and further including without limitation all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, and all rights therein provided by multinational treaties or conventions.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings,[405] and for which adequate reserves have been established to the extent required by GAAP, and which, during the pendency of any such contest, will not result in a forfeiture or otherwise reasonably be expected to result in a forfeiture of any of the Assets[406], other than Liens that may be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue; (iii) zoning, entitlement, building and land use regulations, customary covenants, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted provided that same are complied with in all material respects; and (iv) minor title defects or irregularities which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Pre-Closing Taxable Period**" means any Taxable period ending on or prior to the Closing Date.

"**Primary Party**" means (i) each of the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Products**" means the CDMA Products and the LTE Access Products.

"**Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan or agreement, termination or retirement indemnity plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, early or ill health retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferring Employees pursuant to this Agreement.

"<u>**Qualcomm Cross-License**" means that certain Patent Cross-License Agreement, dated December 27, 2006, by and between Qualcomm Incorporated and NNL.</u>[407]

"**Qualified Arbitrator**" has the meaning set forth in Section 5.30(d).

"**Qualified Expenditures**" has the meaning set forth in Section 6.5(b).

"**Real Estate Agreements**" means the leases, sub-leases or license agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or prior to the Closing, in accordance with and as provided by the Real Estate Agreements Term Sheet.

Error! Unknown document property name.Error! Unknown document property name.Error! Unknown document property

21

Error! Unknown document property name.

"**Real Estate Agreements Term Sheet**" means the Real Estate Agreements Term Sheet attached hereto as Exhibit O.

"**Real Estate Lease**" means a Seller Contract that is a lease, sublease, license or other agreement for use and occupancy of real property including all amendments, extensions and renewals thereof and is an Assigned Contract, an Assumed and Subleased Real Estate Lease, a Non-365 Subleased Real Estate Lease, a Licensed Real Estate Lease or a Non-365 Licensed Real Estate Lease.

"**Records Custodian**" means Deloitte & Touche LLP or in case such firm is unable to carry out its duties for whatever reason, such other auditing firm of international reputation that is acceptable to each of Purchaser and Sellers, each acting reasonably.

"**Regulatory Approvals**" means (i) the Antitrust Approvals; (ii) the CFIUS Approval; (iii) any Consent of any ~~Governmental~~[408]Government[409] Entity required to be obtained under the Investment Canada Act (other than the ICA Approval); and (iv) if subsection 448(1) of the Budget Implementation Act, ~~2009,~~[410]2009 (Canada),[411] comes into force on or before the Closing Date, the ICA Approval.

"**Release**" when used in conjunction with Hazardous Materials, means any spilling, leaking, pumping, emitting, emptying, pouring, discharging, depositing, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers or other receptacles containing Hazardous Materials) into the environment.

"**Representatives**" means as to any Person, the attorneys, accountants, financing sources, consultants, financial advisors and other representatives and agents of such Person.

"**Respective Affiliates**" has the meaning set forth in Section 10.15(c).

"**Responding Party**" has the meaning set forth in Section 5.30(d).

"**Restricted Technical Records**" means the Livelink database or any other similar database containing only[412]all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their ~~2007~~[413]2002[414] and subsequent ~~Tax~~[415]taxation[416] years.

"**Royalty Liability Amount**" means, as of any given date, the amount of the royalty liabilities determined in accordance with the Calculation Principles.

"**Scope Guidelines**" has the meaning set forth in Section 5.30(a).

"**Security Deposits**" has the meaning set forth in Section 5.21.

"**Seller Consents**" has the meaning set forth in Section 2.1.1(i).

"**Seller Contracts**" means those Contracts of a Seller that (i) relate predominantly to the Business; (ii) are Material Contracts; or (iii) are otherwise material to the operation of the Business and not commercially available to the Purchaser.[417]

"**Seller Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings,[418] and for which adequate reserves have been established to the extent required by GAAP, ~~and which, during the pendency of any such contest, will not result in a forfeiture or otherwise reasonably be expected to result in a forfeiture of any of the Assets~~[419], other than Liens that may be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue; (iii) Liens arising hereunder or under any Assigned Contracts incurred as a result of the assignment hereunder; (iv) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (v) any other Liens set forth on Exhibit N; ~~and~~[420] (vi) zoning, entitlement, building and land use regulations, customary covenants, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted provided that same are complied with in all material respects; and (vii) minor title defects or irregularities which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted.

"**Seller Employee Plan**" means (i) any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement including any employee agreement other than immaterial employment agreements, profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan or agreement, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy under which the Sellers or any of their Subsidiaries or Affiliates have any Liabilities, or[421] that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates with respect to Employees, or former employees of the Business, or pursuant to which payments are made, or benefits are provided to, or an entitlement to payments or benefits may arise with respect to any Employees or former employees of the Business (or any spouses, dependants or beneficiaries of any such individuals)[422] and (ii) any other employee benefit plan with respect to which the Purchaser or any of its Affiliates could have any Liability as a result of the Sellers or any of their Subsidiaries or Affiliates maintaining such plan prior to the Closing Date.

Error! Unknown document property name,Error! Unknown document property name,Error! Unknown document property

23

Error! Unknown document property name.

"**Seller Insurance Policies**" means all current or previous insurance policies of the Sellers and their Affiliates, including all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, contaminated products insurance policies and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing.

"**Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Software**" means any and all (i) computer programs, in source code or object code, (ii) computerized databases and compilations, and (iii) documentation, compilation tools, development tools and support tools associated with (i) and/or (ii).

"**Specified CDMA Contracts**" has the meaning set forth in Section 8.3(e$^{423}$d$^{424}$).

"**Straddle Period**" has the meaning set forth in Section 6.3(b).

"**Subleases**" has the meaning set forth in Section 5.26.

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity, including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, gross receipts, sales, use, ad valorem, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto, and (b) any obligation to pay Taxes of a Third Party, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian, United Kingdom or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

"$^{425}$**Tax Credit Purchaser**" has the meaning set forth in Section 6.5(b).

"**Tax Returns**" means all returns, reports (including elections, declarations, disclosures, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes, including any amendments thereto.

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                24                Error! Unknown document
property name.

"**Termination Date**" has the meaning set forth in Section 9.1(e[426]b[427])(iv[428]ii[429]).

"**Third Party**" means any Person that is neither a Party nor an Affiliate of a Party.

"**365 ~~Contract~~[430]Contracts[431]**" has the meaning set forth in Section 2.1.5(a)(i).

"**365 Contract List**" has the meaning set forth in Section 2.1.5(a)(i).

"**365 Real Estate Lease List**" has the meaning set forth in Section 2.1.5(a)(ii).

"**365 Real Estate Leases**" has the meaning set forth in Section 2.1.5(a)(ii).

"**Title IV Plan**" has the meaning set forth in Section 4.11(i[432]j[433]).

"**Trademarks**" means all trademarks, service marks, trade dress, logos, trade names, corporate names, business names, domain names, whether or not registered, together with all goodwill associated therewith and including all common law rights, and registrations, applications for registration and renewals thereof, including all marks registered in the United States Patent and Trademark Office, the trademark offices of the states and territories of the United States of America, and the trademark offices of other nations throughout the world (including the Canadian Intellectual Property Office), and all rights therein provided by multinational treaties or conventions.

"**Trademark License Agreement**" means the trademark license agreement between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, in respect of certain Trademarks used in ~~respect of the Products and/or CDMA Services~~[434]the Business[435] to be entered into on or before the Closing in the form attached hereto as Exhibit P.

"**Transaction Documents**" means this Agreement, the Ancillary Agreements and all other ancillary agreements to be entered into, or documentation delivered by, any Party and/or any Designated Purchaser pursuant to this Agreement or any Local Sale Agreement.

"**Transfer Taxes**" means all goods and services, sales, excise, use, transfer, gross receipts, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees and notarial fees), together with interest, penalties and additional amounts imposed with respect thereto.

"**Transfer Tax Returns**" has the meaning set forth in Section 6.6(a).

"**Transferring Employee Agreement**" means the agreement between Sellers, on the one hand, and the Purchaser, on the other hand, to be executed as of the Closing in substantially the form attached hereto as Exhibit K.

"**Transferring Employee**" means (i) Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in

Error! Unknown document property name.Error! Unknown document property name.Error! Unknown document property

Error! Unknown document property name.

accordance with the terms of Section 7.1, and (ii) those Employees whose employment transfers by operation of Law.

"**Transferred Employee Plan**" means the (i) Accrued Vacation Amount, or (ii) any Seller Employee Plan that is (or the Liabilities of which are) transferred by operation of Law to the Purchaser or a Designated Purchaser (or to a Purchaser Employee Plan, as the case may be).

"**Transferred Overhead and Shared Services**" means Overhead and Shared Services to be provided to or in support of the Business post-Closing by Transferring Employees.

"**Transition Services Agreement**" means an agreement between the relevant Sellers (or their Affiliates), on the one hand, and the Purchaser and/or any Designated Purchaser, on the other hand, to be executed on or prior to the Closing Date, in the form attached hereto as Exhibit Q.

"**Treasury Regulations**" means the regulations promulgated under the Code.

"**Type 1 Extra Services**" has the meaning set forth in Section 5.30(b).

"**Type 2 Extra Services**" has the meaning set forth in Section 5.30(b).

"**Unaudited Financial Statements**" has the meaning set forth in Section 4.7(b).

"**Unexpired Leases**" means Leases that constitute "unexpired leases" for the purposes of Section 365 of the U.S. Bankruptcy Code.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**U.S. Bidding Procedures and Sale Motion**" ~~has the meaning set forth in Section 5.1(a[436]~~means the motion filed June 19, 2009 by the Sellers who are U.S. Debtors for orders authorizing and approving, among other things, the entry into the NSN Agreement and the Bidding Procedures (as defined therein[437]).

"**U.S. Bidding Procedures Order**" ~~has the meaning set forth in Section 5.1(a[438]~~means the order entered June 30, 2009 authorizing and approving, among other things, the entry into the NSN Agreement by the Sellers who are U.S. Debtors and the Bidding Procedures (as defined in the U.S. Bidding Procedures and Sale Motion[439]).

"**U.S. Debtor Contract**" means any Seller Contract to which a U.S. Debtor is a party.

"**U.S. Debtors**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Sale Order**" has the meaning set forth in Section 5.1(a).

"**Verizon**" has the meaning set forth in Section 5.16(a).[440]

"**Visa Employees**" means Employees who are identified as having a visa or permit in Section 4.11(b) of the Sellers Disclosure Schedule and whose employment with Purchaser or a Designated Purchaser cannot commence until the required visa or permit for a transfer of employment to Purchaser or a Designated Purchaser with respect to such Employee is obtained. An Employee shall be a Visa Employee for purposes hereof only if such Employee receives and accepts an employment offer from Purchaser as provided in Section 7.1 and has an Employee Transfer Date that occurs within twelve (12) months following the Closing Date.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act or any similar Law requiring notice to employees in the event of a plant closing or mass layoff.

"**Warranty Provision Amount**" means, as of any given date, the amount of the warranty provision of the Business determined in accordance with the Calculation Principles.

"**Wholly-Owned Subsidiary**" means any Subsidiary all of the capital stock or capital which is held directly or indirectly by the Purchaser, except for any capital stock which is held by a director of such Subsidiary as required by applicable Laws.

"**Working Capital Escrow Amount**" means an amount in immediately available funds equal to $20,000,000.

Section 1.2.   Interpretation.[441]

1.2.1.   Gender and Number.[442]

[443]Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2.   Certain Phrases and Calculation of Time.[444]

[445]In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding", and (iv) in determining whether an asset is "exclusively" used in connection with the Business, incidental, de minimis uses outside the Business shall not be considered. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                 27                 **Error! Unknown document
property name.**

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

### 1.2.3.  Headings, etc.

The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

### 1.2.4.  Currency.[446]

[447]All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency. All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency. All payments required under this Agreement shall be paid in United States currency in immediately available funds, unless otherwise specifically indicated herein. Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the *Wall Street Journal* newspaper for the day in question.

### 1.2.5.  ~~Statutory References~~[448]Miscellaneous.[449]

[450]Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

## ARTICLE☐II

## PURCHASE AND SALE OF ASSETS

Section☐2.1.  Purchase and Sale.[451]

### 2.1.1.  Assets.[452]

[453]Subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, purchase or accept assignment and assume from the relevant Sellers (including legal title, equitable title and risk of loss), and each Seller shall transfer or assign to the Purchaser or the relevant Designated Purchasers, all of such Seller's right, title and interest in and to the assets predominantly used or held for use in the conduct of the Business ~~including the following assets~~ [454](such assets, excluding the Excluded Assets, the "**Assets**") (x) in the case of Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens and Claims (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to and to the extent provided by Sections 363 and 365 of the U.S. Bankruptcy Code, (y) in the case of Assets that are transferred or assigned by the Canadian Debtors, free and clear of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any

28

of their Affiliates) pursuant to the Canadian Approval and Vesting Order, when granted, and (z) in the case of Assets that are transferred or assigned by the Non-Debtor Sellers, free and clear of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates). The Assets described above include[455]:

(a)    the Owned Net Inventory as of the Closing Date;

(b)    the CIP Receivables as of the Closing Date;

(c)    the Owned Equipment as of the Closing Date;

(d)    the Assigned Contracts in force as of the Closing Date;

(e)    the Assigned Accounts Receivable;

(f)    the Business Information existing as of the Closing Date, subject to 2.1.2(i);

(g)    the Assigned Intellectual Property as of the Closing Date, subject to any and all licenses granted under such Intellectual Property prior to the Closing Date, together with all claims against Third Parties for infringement, misappropriation or other violation of any Law with respect to any of the Assigned Intellectual Property, whether for any past, present or future infringement, misappropriation or other violation;

(h)    all rights as of the Closing (i)[456] under all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Assets, and (ii) with respect to the Acquired Actions[457]; and

(i)    to the extent assignable under applicable Law, all Consents of Government Entities exclusively pertaining to the Business (the "**Seller Consents**").

2.1.2.    Excluded Assets.[458]

.—[459]Nothing herein shall be deemed to sell, transfer, assign or convey (or require Sellers to do any of the foregoing as to) the following assets to the Purchaser or any Designated Purchaser, and the Sellers shall retain all of their respective rights, title and interests in and to, and the Purchaser and the Designated Purchasers shall have no rights with respect to, the rights, title and interests of the Sellers in and to any of the following assets (collectively, the "**Excluded Assets**"):

(a)    cash and cash equivalents, accounts receivable (including intercompany receivables but excluding Assigned Accounts Receivable), bank account balances and all petty cash of the Sellers;

(b)    any refunds due from, or payments due on, claims with the insurers of any of the Sellers in respect of losses arising prior to the Closing Date (except as provided in Section 5.3.1)[460];

(c)     all rights to Tax refunds, credits or similar benefits relating to the Assets or the Business allocable to a Pre-Closing Taxable Period or to the portion of a Straddle Period ending on and including the Closing Date;

(d)     all claims, causes of action and rights of Sellers or any Subsidiary thereof to the extent relating to any Excluded Liabilities or to any Liabilities for which Sellers are responsible under this Agreement (including rights of set-off, rights to refunds and rights of recoupment from or against any Third Party but excluding any Acquired Actions)[461];

(e)     any security deposits made by or on behalf of the Sellers (including those relating to Assigned Contracts);

(f)     any rights of the Sellers under Assumed and Subleased Real Estate Leases, Excluded 365 Contracts, Bundled Contracts (except as provided for in Section 5.16), Excluded Non-365 Contracts;[462] and Seller Insurance Policies);

(g)     any rights of the Sellers under Non-Assigned Contracts (except as provided for in Section 5.14);

(h)     the minute books, stock ledgers and Tax records of the Sellers;

(i)     (x) any books, records, files, documentation or sales literature other than the Business Information (subject to clauses (y) and (z) of this subsection (i)), (y) any Employee Records other than those required to be delivered to the Purchaser pursuant to ARTICLE VII, and (z) such portion of the Business Information that the Sellers are required by Law (including Laws relating to privacy but subject to any exemption from those Laws included in the Canadian Approval and Vesting Order or the U.S. Sale Order) or by any agreement with a Third Party to retain and/or not to disclose (provided that copies of such information shall be provided to the Purchaser to the extent permitted by applicable Law or such agreement);

(j)     any assets, properties and rights to the extent relating predominantly to the Excluded Products and Services (except in all cases as otherwise provided in any of the Ancillary Agreements);

(k)     except for (i) the Assigned Intellectual Property and (ii) Intellectual Property, to the extent rights are granted thereto pursuant to any Ancillary Agreement, any rights to (A) any Intellectual Property of any of the Sellers (including Sellers' names and the LTE-Related Patents unless constituting Assigned Patents) or any Affiliates of any of the Sellers and (B) Intellectual Property owned by a Third Party, except to the extent licensed under a Contract that is an Assumed and Assigned Contract or a Designated Non-365 Contract;

(l)     all rights of the Sellers under this Agreement and the Transaction Documents;

(m)     all of the rights and claims of the U.S. Debtors available to the U.S. Debtors under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code, and any related claims and actions arising under such Sections by operation of Law or

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    30                    Error! Unknown document
                                                                                                                    property name.

otherwise, including any and all proceeds of the foregoing but excluding the Acquired Actions[463];

        (n)    all records containing personal communications or notes related to the negotiations in connection with the Transaction Documents that were not shared with the Purchaser;

        (o)    all stock or other equity interests in any Person;

        (p)    any assets set forth on Section 2.1.2(p) of the Sellers Disclosure Schedule;

        (q)    any Equipment other than Owned Equipment; and[464]

        (r)    any asset, property or right of Guangdong-Nortel Telecommunications Equipment Co. Ltd. ; and[465]

        (s)    [466]the Excluded Contracts.[467]

2.1.3.  Assumed Liabilities.[468]

    —[469]Subject to the terms of this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, assume and become responsible for, and perform, discharge and pay when due, solely the following Liabilities (the "**Assumed Liabilities**"):

        (a)    all Liabilities arising on or after the Closing Date to the extent related to the conduct, operation or ownership of the Business[470]Assets[471] after the Closing Date, including (i) all such Liabilities with respect to the ownership, exploitation and operation of the Assets incurred on or after the Closing Date, and (ii) all such Liabilities related to Actions or claims brought against the Business[472]Assets[473] arising from events occurring after the Closing Date;

        (b)    all Liabilities arising from or in connection with the performance of the Assigned Contracts after the Closing Date, or any arrangements entered into pursuant to Section 5.16 after the Closing Date;

        (c)    any obligations under any warranty liabilities relating to Products and CDMA Services which have been supplied under any Assigned Contract,[474] but excluding any Cure Costs payable pursuant to Section 2.1.7;

        (d)    the obligation to post any deposits, bonds or other security in replacement of security posted under any Assigned Contract pursuant to Section 5.21 of this Agreement;

        (e)    all Liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Assigned Intellectual Property which the Sellers may have granted or committed to Third Parties, including Liabilities resulting from the assurances, declarations and undertakings made to standard setting bodies that are listed in Section 2.1.3(e) of the Sellers Disclosure Schedule;

        31

      (f)    all Liabilities for, or related to any obligation for, any Tax that the Purchaser or any Designated Purchaser bears under ARTICLE VI;

      (g)    all obligations under any warranty liabilities relating to Products and CDMA Services which have been supplied ~~under any Bundled Contract subcontracted to the~~[475]by[476] Purchaser or any Designated Purchaser under ~~Section 5.16(a)~~[477]any subcontract in respect of a Bundled Contract[478];

      (h)    except to the extent otherwise expressly set forth in ARTICLE VII or the Transferring Employee Agreement[479], all Liabilities related to or arising from any of the following:  (i) the Purchaser's or any Designated Purchaser's (or any of their Affiliates') employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferring Employees arising ~~on or~~[480] after the Closing Date, (ii) the terms of any offer of employment or notice of continued employment, as applicable, to any Employee who is provided an offer pursuant to Section 7.1 of this Agreement and (iii) Purchaser's or a Designated Purchaser's failure to offer employment to any employee that constitutes a violation of applicable Law;

      (i)    all Liabilities arising that relate to or arise from or in connection with any Purchaser Employee Plan;

      (j)    all Liabilities related to Transferring Employees expressly assumed by the Purchaser or a Designated Purchaser as set forth in ARTICLE VII;

      (k)    any obligation to provide continuation coverage pursuant to COBRA or any similar Law under any Purchaser Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to a Transferring Employee and/or their qualified beneficiaries with respect to a qualifying event that occurs on or after such Transferring Employee's Transfer Date;

      (l)    the Accrued Vacation Amount;

      (m)    all Liabilities to the extent[481] reflected in the computation of Adjusted Net Working Capital, including the Contractual Liabilities Amount, the Royalty Liability Amount and the Warranty Provision Amount[482]; and

      (n)    all other Liabilities listed in Section 2.1.3(n) of the Sellers Disclosure Schedule.

2.1.4.  Excluded Liabilities.[483]

      ~~.  Subject to the terms of this Agreement, none~~[484]None[485] of the Purchaser or the Designated Purchasers, as applicable, shall assume or be deemed to have assumed any Liabilities of the Sellers or their Affiliates other than the Assumed Liabilities (collectively, ~~and together with the Excluded Employee Liabilities (as defined in Section 7.4),~~[486]the "**Excluded Liabilities**").  Without limiting the generality of the foregoing, Excluded Liabilities include:

      (a)    all Indebtedness of the Sellers and their Affiliates;

(b)    all Liabilities arising out of the Contracts that are not Assigned Contracts (including Liabilities arising out of that portion of any arrangement entered into pursuant to Section 5.16 for which Sellers are responsible by the terms thereof);

(c)    all accounts payable and trade payables of the Sellers, including intercompany payables;

(d)    all fees or commissions of any brokers, funds or investment banks in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates;

(e)    any Cure Costs payable by the Sellers pursuant to Section 2.1.7;

(f)    (i)[487]any Liabilities (including any Order) to the extent relating to any Hazardous Materials present prior to the Closing Date in, under, at, near or migrating from, to or through the Carling Property; and (ii) any Liabilities arising from or based on events or conditions occurring or existing prior to the Closing Date and connected with, arising out of or relating to (x) the release[488]Release[489] or threatened Release of any Hazardous Materials at any location[490]location[491] currently or formerly owned, operated or used by the Business or at any location to which Hazardous Materials generated, handled, stored or processed by the Business were sent, released or disposed of;[492, 493] or (y) compliance or the alleged non-compliance by the Business with any Environmental Law or Environmental Permit;

(g)    all Liabilities for, or related to any obligation for, any Tax that is not expressly assumed by the Purchaser or any of the Designated Purchasers pursuant to ARTICLE VI (including, for the avoidance of doubt, any income or gross receipts Tax imposed on any of the Sellers);

(h)    Excluded Employee Liabilities; and

(i)    all Liabilities of Sellers arising under this Agreement and the Ancillary Agreements.

2.1.5.    Assumption and/or Assignment or Rejection of 365 Contracts.[494]

(a)    Section 2.1.5(a) of the Sellers Disclosure Schedule sets forth:

(i)    a list (the "**365 Contract List**") of all U.S. Debtor Contracts (other than (a) Leases and (b)[495] licenses of Intellectual Property[496]including[497] Inbound License Agreements[498] that are used, as of the date hereof, exclusively in connection with the Business and which are not[499] Inbound License Agreements[500], but excluding any (a) other[501] licenses of Intellectual Property[502] and (b) Leases[503]) that are Executory Contracts, and were entered into prior to the Petition Date (Contracts that may be included on the 365 Contract List, the "**365 Contracts**") that the Purchaser has elected to have the relevant U.S. Debtor pursuant to Section 365 of the U.S. Bankruptcy Code assume and assign to the Purchaser or a Designated Purchaser at Closing; and

(ii)    a list (the "**365 Real Estate Lease List**") of all Leases of a U.S. Debtor which were entered into prior to the Petition Date and are Unexpired Leases (Leases that may be included on the 365 Real Estate Lease List, the "**365 Real Estate Leases**") that the Purchaser has elected to have the relevant U.S. Debtor pursuant to Section 365 of the U.S. Bankruptcy Code assume and assign to the Purchaser or a Designated Purchaser at Closing, in accordance with, and as provided by, the Real Estate Agreements Term Sheet; provided[504] that[505], subject to the terms of the Real Estate Agreements Term Sheet, the applicable U.S. Debtor shall (i) not be required to assume a 365 Real Estate Lease prior to the Closing Date in connection with an assumption and assignment to Purchaser and (ii) have the right to reject any 365 Real Estate Lease designated for assumption and assignment in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(b)    Section 2.1.5(b) of the Sellers Disclosure Schedule sets forth a list of all 365 Real Estate Leases that the Purchaser has elected to have the relevant U.S. Debtor, pursuant to Section 365 of the U.S. Bankruptcy Code, assume and under which the Purchaser or a Designated Purchaser will enter into a Sublease, to the extent permitted by, and in accordance with, the terms of the related 365 Real Estate Lease and applicable Law (the "**Assumed and Subleased Real Estate Leases**"), at Closing, in accordance with, and as provided by, the Real Estate Agreements Term Sheet; provided that, subject to the terms of the Real Estate Agreements Term Sheet, the applicable U.S. Debtor shall (i) not be required to assume an Assumed and Subleased Real Estate Lease prior to the Closing Date in connection with a Sublease to Purchaser and (ii) have the right to reject any Assumed and Subleased Real Estate Lease designated for Sublease in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(c)    Section 2.1.5(c) of the Sellers Disclosure Schedule sets forth a list of Real Estate Leases, certain of which may be available for the Purchaser to elect to have the relevant Seller enter into a License at Closing with the Purchaser or a Designated Purchaser to the extent permitted by, and in accordance with (i) the terms of the related Real Estate Lease and applicable Law (the 365 Real Estate Leases on such Schedule, the "**Licensed Real Estate Leases**", such Schedule to be supplemented as expressly set forth in the Real Estate Agreements Term Sheet), and (ii) the Real Estate Agreements Term Sheet; provided, that, the applicable U.S. Debtor shall (i) not be required to assume a Licensed Real Estate Lease prior to the Closing Date in connection with a License to Purchaser and (ii) have the right to reject any Licensed Real Estate Lease designated for License in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(d)    The Contracts listed in the 365 Contract List and the 365 Real Estate Leases listed for assumption and assignment by the U.S. Debtors are collectively referred to as the "**Assumed and Assigned Contracts**".

(e)    The U.S. Debtors shall seek the approval of the U.S. Bankruptcy Court to permit (i) the assumption and assignment of the Assumed and Assigned Contracts and (ii) if and to the extent the landlord of the applicable Assumed and Subleased Real Estate Lease and[506] or[507] Licensed Real Estate Lease has consented to the applicable Sublease or License, the

~~Assumption~~[508]assumption[509] of the Assumed and Subleased Real Estate ~~Lease~~[510]Leases[511] and the entry into Subleases in connection therewith,[512] and the assumption of Licensed Real Estate Leases and the entry into Licenses in connection therewith, all of the foregoing as part of the U.S. Sale Order in accordance with Section 5.1.

(f)      Any (x) 365 Contract that the Purchaser has elected not to have assumed and assigned, and (y) 365 Real Estate Lease that the Purchaser has not elected to have assumed and assigned pursuant to Section 2.1.5(a)(ii) or under which the Purchaser has not elected to enter into a Sublease pursuant to Section 2.1.5(b) or a License pursuant to Section 2.1.5(c), shall be referred to as an "**Excluded 365 Contract**" and shall not be an Assigned Contract hereunder.

2.1.6.   <u>Assignment of Non-365 Contracts</u> .[513]

(a)      Section 2.1.6(a) of the Sellers Disclosure Schedule sets forth:

(i)      a list (the "**Non-365 Contract List**") of all the Contracts (~~other than (a) 365 Contracts, (b) Leases and (c)~~[514] ~~licenses of Intellectual Property~~[515] ~~other than~~[516]including[517] Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business<u>, but excluding any (a) other</u>[518] <u>licenses of Intellectual Property</u>[519]<u>, (b) 365 Contracts and (c) Leases</u>[520]) that the Purchaser has elected to have the relevant Seller assign to the Purchaser or a Designated Purchaser at Closing (Contracts that may be included on the Non-365 Contract List, the "**Non-365 Contracts**"); and

(ii)      a list of all the Leases other than 365 Real Estate Leases ("**Non-365 Real Estate Leases**") relating to the Business that the Purchaser has elected to have the relevant Seller assign to the Purchaser or a Designated Purchaser at Closing, in accordance with, and as provided by, the Real Estate Agreements Term Sheet (the "**Designated Non-365 Real Estate Leases**"); <u>provided</u> that, subject to the terms of the Real Estate Agreements Term Sheet, the applicable Seller shall have the right to repudiate any Designated Non-365 Real Estate Lease designated for assignment in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(b)      Section 2.1.6(b) of the Sellers Disclosure Schedule sets forth a list of Non-365 Real Estate Leases (other than the Assumed and Subleased Real Estate Leases) under which the Purchaser has elected to have the relevant Seller enter into a Sublease with the Purchaser or a Designated Purchaser to the extent permitted by, and in accordance with, the terms of the related Non-365 Real Estate Lease and applicable Law (the "**Non-365 Subleased Real Estate Leases**") at Closing, in accordance with, and as provided by, the Real Estate Agreements Term Sheet; <u>provided</u>, that, subject to the terms of the Real Estate Agreements Term Sheet, the applicable Seller shall have the right to repudiate any Non-365 Subleased Real Estate Lease designated for Sublease in the event that the Closing shall not have ~~not~~[521]occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(c)      Section 2.1.5(c) of the Sellers Disclosure Schedule sets forth a list of Real Estate Leases, certain of which may be available for the Purchaser to elect to have the relevant

Seller enter into a License (as defined in Section 5.28) at Closing, with the Purchaser or a Designated Purchaser to the extent permitted by, and in accordance with, (i) the terms of the related Real Estate Lease and applicable Law (the Non-365 Real Estate Leases on such Schedule, the **"Non-365 Licensed Real Estate Leases"**, such Schedule to be supplemented as expressly set forth in the Real Estate Agreements Term Sheet), and (ii) the Real Estate Agreements Term Sheet; provided, that the applicable Seller shall have the right to repudiate any Non-365 Licensed Real Estate Lease designated for License in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(d)    The Contracts listed in the Non-365 Contract List and the Designated Non-365 Real Estate Leases are collectively referred to as the **"Designated Non-365 Contracts"**.

(e)    Any (x) Non-365 Contract that the Purchaser has not elected to have assigned, and (y) any Non-365 Real Estate Lease that the Purchaser has not elected to have assumed and assigned pursuant to Section 2.1.6(a)(ii) or under which the Purchaser has not elected to enter into a Sublease pursuant to Section 2.1.6(b) or a License pursuant to Section 2.1.6(c), shall be referred to as an **"Excluded Non-365 Contract"** and shall not be an Assigned Contract hereunder.

(f)    Subject to Section 2.1.7(e), Section 2.1.10, Section 5.14, the Real Estate Agreements Term Sheet and the receipt of any required Consent, all the Designated Non-365 Contracts in effect as of the Closing shall be assigned to the Purchaser or a Designated Purchaser at the Closing pursuant to Section 2.1.1(d) and Purchaser or a Designated Purchaser shall enter into a Sublease or a License at the Closing pursuant to Section 5.26 or Section 5.28, as applicable, [522] with the relevant Seller under each of the Non-365 Subleased Real Estate Leases and Non-365 Licensed Real Estate Lease[523]Leases[524], as the case may be, in effect as of the Closing.

2.1.7.    Cure Costs; Adequate Assurance; Efforts.[525]

(a)    Except for those Assumed and Assigned Contracts set forth on Section 2.1.7 of the Sellers Disclosure Schedule, to the extent that assumption and assignment of any Assumed and Assigned Contract entails the payment of any Cure Cost, NNI shall, or shall cause the relevant U.S. Debtor to, pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order.

(b)    To the extent that assignment to the Purchaser or a Designated Purchaser of any Designated Non-365 Contract entails the payment of any Cure Cost, the relevant Main Sellers shall, or shall cause the relevant Seller to, pay such amounts directly to such counterparty, and shall offer to do so on or prior to Closing,[526] in a manner agreed between such Main Seller or such relevant Seller, as applicable, and such counterparty or ordered by a court of competent jurisdiction.

(c)    To the extent that the assumption and sublease or license of any Assumed and Subleased Real Estate Leases or Licensed Real Estate Leases entails the payment of any

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property          36          **Error! Unknown document property name.**

Cure Cost, NNI shall, or shall cause the relevant U.S. Debtor to pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order. To the extent that the assignment, sublease or license to the Purchaser or a Designated Purchaser of any Non-365 Real Estate Leases or the Non-365 Subleased Real Estate Leases or Non-365 Licensed Real Estate Leases entails the payment of any amount to any party other than a Seller, the relevant Main Sellers shall, or shall cause the relevant Seller to, pay such amounts directly to such contracting party,[527] and shall offer to do so on or prior to Closing, in a manner agreed between such Main Seller or such relevant Seller, as applicable and such contracting party or ordered by a court of competent jurisdiction.

(d)    Prior to the hearing before the U.S. Bankruptcy Court to approve the assumption and assignment of the Assumed and Assigned Contracts, the Purchaser shall provide, as necessary, adequate assurance of its and the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the Sellers) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code and to the extent required by the U.S. Sale Order.

(e)    Sellers shall use reasonable efforts,[528] both before and after Closing,[529] to obtain all Consents in a form reasonably satisfactory to the Purchaser required to permit the assignment, sublease or license,[530] as applicable, to the Purchaser (or, if specified by the Purchaser, a Designated Purchaser) of the Assigned Contracts in force as of the Closing Date, and the entry into Subleases and Licenses,[531] as applicable, and[532] the Purchaser shall reasonably cooperate with Sellers to the extent necessary to obtain the same; provided, however, that the Sellers shall be under no obligation to seek any such Consent prior to the completion of the Auction or to compromise any right, asset or benefit (including relinquishment of rights in the Retained Field of Use, as defined in the Intellectual Property License Agreement) or to expend any amount or incur any Liability or provide any other consideration in seeking such Consents (other than the payment of Cure Costs pursuant to this Section 2.1.7); provided, further, that Sellers' obligations under this Section 2.1.7 with respect to any Lease shall be subject to Purchaser's obligation to provide the adequate assurances required by the relevant landlord and/or the U.S. Bankruptcy Code as necessary, and, for greater certainty, except as set forth in Section 8.3(e[533]d[534]), the failure to obtain any or all of such Consents shall not in itself entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment to the Purchase Price.

(f)    To the extent that the obtaining of a Consent required pursuant to Section 5.16 with respect to a Specified CDMA Contract entails the payment of any Cure Cost, the Main Sellers shall pay or cause the relevant Seller to pay or otherwise provide for the payment of such Cure Cost prior to the Closing.

2.1.8.  Local Sale Agreements.[535]

—[536]Subject to the terms and conditions hereof, if reasonably requested in writing by the Purchaser to effect the Closing on the terms hereof, the relevant Sellers shall, and the Purchaser shall, and shall cause the relevant Designated Purchasers to, enter into such agreements or instruments, including bills of sale and/or assignment and assumption agreements (the "**Local Sale Agreements**"), providing for (i) the sale, transfer, assignment or other

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property          37                    Error! Unknown document
property name.

conveyance to the Purchaser and relevant Designated Purchasers, in accordance with the requirements of applicable local Law, and (ii) the assumption by the Designated Purchasers of any Assumed Liability that the Purchaser intends to allocate to them.  In the event of a conflict between this Agreement and the Local Sale Agreement, this Agreement shall prevail.

### 2.1.9.  EMEA Debtors.[537]

﹘[538]None of the EMEA Debtors or the Joint Administrators shall assume, or be deemed to assume, any Liability whatsoever under this Agreement and nothing in this Agreement shall apply to, or govern, the sale, assignment, transfer, retention or assumption of assets, rights, properties or Liabilities of, or by, any EMEA Debtors or the Joint Administrators in any manner whatsoever.  Neither the Purchaser nor any Designated Purchaser shall be entitled to make any claim under this Agreement, or assert any right hereunder, against any Person other than the Sellers.

### 2.1.10. Non-Assignable Assets.[539]

﹘[540]Notwithstanding anything in this Agreement to the contrary, if a Consent of a Third Party (including a Government Entity) has not been obtained on or prior to Closing, then, unless such Consent is subsequently obtained, this Agreement shall not constitute an agreement to sell, transfer or assign, directly or indirectly, any Asset or any obligation or benefit arising thereunder if an attempted direct or indirect sale, transfer, lease, sublease or assignment thereof, without such Consent, would constitute a breach, default, violation or other contravention of the rights of such Third Party or would be ineffective with respect to any party to a Contract concerning such Asset; provided, however, that the Sellers shall use their reasonable efforts to cooperate with the Purchaser in connection with any commercially reasonable arrangement to provide the Purchaser the same interest, benefits and rights with respect to such Asset as the applicable Seller had immediately prior to the Closing; provided, further, that unless requested by the Purchaser or a Designated Purchaser, the Purchaser shall not have any interest, benefits or rights with respect to the China Assets prior to the closing under the China Asset Sale Agreement[541].  For greater certainty, except as set forth in Section 8.3(e[542]d[543]), failure to obtain any such Consent shall not entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment of the Purchase Price.

### Section☐2.2.  Purchase Price; Adjustment.[544]

### 2.2.1.  Purchase Price.[545]

﹘[546]Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the sale of the Assets pursuant to the terms hereof, and of the rights granted by certain Sellers under the Intellectual Property License Agreement and the Trademark License Agreement, the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers, shall (x) assume and become obligated to pay, perform and discharge, when due, the Assumed Liabilities and (y) pay to the Sellers an amount of cash (the "**Purchase Price**") equal to ~~six~~[547]one billion one.[548]hundred ~~fifty~~[549] thirty[550] million dollars

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    38                    Error! Unknown document
property name.

(\$~~650,000,000~~[551] <u>1,130,000,000</u>[552]) as adjusted pursuant to Section ~~2.2.3, so adjusted, the Final~~
~~Purchase Price.~~[553] <u>2.2.3.</u>[554]

### 2.2.2.  <u>Estimated Purchase Price.</u>[555]

(a)    For purposes of determining the amount of cash to be paid as the
Estimated Purchase Price by the Purchaser to the Sellers at the Closing pursuant to Section
2.3.2(b), at least three (3) Business Days prior to the Closing Date, the Main Sellers shall deliver
to the Purchaser a statement prepared in good faith in accordance with the Calculation Principles
(in all cases without double-counting of Cure Costs) and the terms hereof setting forth (i) the
estimated Net Inventory Value as of the Closing (the "**Estimated Net Inventory Value**"), (ii)
the estimated amount of the CIP Receivables Amount as of the Closing (the "**Estimated CIP
Receivables Amount**"), (iii) the estimated Contractual Liabilities Amount as of the Closing (the
"**Estimated Contractual Liabilities Amount**"), (iv) an estimate of the Royalty Liability
Amount as of the Closing (the "**Estimated Royalty Liability Amount**"), (v) an estimate of the
Warranty Provision Amount as of the Closing (the "**Estimated Warranty Provision Amount**"),
(vi) an estimate of the Adjusted Net Working Capital (the "**Estimated Adjusted Net Working
Capital**") which shall be in the form of and shall use the line items as set out in the Adjusted Net
Working Capital Statement, (vii) an estimate of the Employee Adjustment Amount as of the
Closing (the "**Estimated Employee Adjustment Amount**") and (viii) the Estimated Purchase
Price.

(b)    As used in this Agreement, "**Estimated Purchase Price**" means an
amount equal to:

(i)    ~~the Purchase Price; minus~~[556] <u>one billion one hundred thirty million
dollars (\$1,130,000,000); minus</u>[557]

(ii)    \$2,600,000 for the China Assets; plus[558]

(iii)    an amount, which may be positive or negative, equal to the
Estimated Adjusted Net Working Capital plus[559] \$22,000,000; minus[560]

(iv)    the Estimated Employee Adjustment Amount (if any);

provided[561], however[562] that if the ~~difference~~[563], <u>amount</u>[564] calculated in clause (iii) is a positive
number greater than \$30,000,000, then ~~the difference~~[565] <u>such amount</u>[566] shall be deemed to be
\$30,000,000 for purposes of calculating the Estimated Purchase Price.

(c)    As used in this Agreement and as set forth in the attached Adjusted Net
Working Capital Statement in Exhibit C, the "**Adjusted Net Working Capital**" means an
amount equal to

(i)    the Net Inventory Value; <u>plus</u>

(ii)    the CIP Receivables Amount; ~~plus~~[567] <u>minus</u>[568]

(iii)    the Contractual Liabilities Amount; <u>minus</u>

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    39                    Error! Unknown document
property name.

(iv)     the Royalty Liability Amount; minus

(v)     the Warranty Provision Amount.

2.2.3.     [569]Purchase Price Adjustment[570],[571]

2.2.3.1 ~~II.2.3.~~[572]~~Purchase Price Adjustment~~[573]~~;~~[574]Closing Statement; Dispute Resolution.[575]

(a)     As promptly as practicable (and in any event within thirty (30) days after the Closing), the Purchaser shall deliver to the Main Sellers a written statement (the "**Closing Statement**") that shall contain the Purchaser's final calculation of (i) the Net Inventory Value as of the Closing (the "**Closing Net Inventory Value**"), (ii) the CIP Receivables Amount as of the Closing (the "**Closing CIP Receivables Amount**"), (iii) the Contractual Liabilities Amount as of the Closing (the "**Closing Contractual Liabilities Amount**"), (iv) the Royalty Liability Amount as of the Closing (the "**Closing Royalty Liability Amount**"), (v) the Warranty Provision as of the Closing (the "**Closing Warranty Provision Amount**"), (vi) the Adjusted Net Working Capital as of the Closing (the "**Closing Adjusted Net Working Capital**"),[576] which shall be in the form of and shall use the line items as set out in the Adjusted Net Working Capital Statement,[577] (vii) the Employee Adjustment Amount as of the Closing (the ~~"~~[578],[579]**Closing Employee Adjustment Amount**~~"~~[580]~~"~~[581]) and (viii) the final Purchase Price based on the foregoing, which shall be equal to ~~the Purchase Price; plus (A~~[582]one billion one hundred thirty million dollars ($1,130,000,000); minus (A) $2,600,000 for the China Assets; plus (B[583]~~)~~ an amount, which may be positive or negative, equal to the Closing Adjusted Net Working Capital (calculated without double-counting Cure Costs) plus $22,000,000; minus (~~B~~[584]C[585]) the Closing Employee Adjustment Amount; provided, however, that if the amount calculated in clause (~~A~~[586]B[587]) is a positive number greater than $30,000,000, then ~~the difference~~[588]such amount[589] shall be deemed to be $30,000,000 for purposes of calculating the Purchase Price (the Purchase Price, so adjusted as provided in this Section ~~2.2.3.~~[590]2.2.3.1[591](a), the "**Final Purchase Price**"). The Closing Statement shall be prepared in accordance with the Calculation Principles and the terms hereof.

(b)     If the Main Sellers disagree with the determination of the Closing Statement, the Main Sellers shall notify the Purchaser of such disagreement within thirty (30) days after delivery of the Closing Statement (such notice, the "**Disagreement Notice**"). The Disagreement Notice shall set forth, in reasonable detail, any disagreement with, and any requested adjustment to, the Closing Statement. If the Main Sellers fail to deliver the Disagreement Notice by the end of such thirty (30) day period, the Main Sellers shall be deemed to have accepted as final the Closing Statement delivered by the Purchaser. Matters included in the calculations in the Closing Statement to which the Main Sellers do not object in the Disagreement Notice shall be deemed accepted by the Main Sellers and shall not be subject to further dispute or review. Throughout the periods during which the Closing Statement is being prepared and any disputes that may arise under this Section 2.2.3 are being resolved, the Purchaser shall, promptly upon request, provide the Main Sellers and their accountants access to the books, records and personnel of the Business and all documents, schedules and workpapers used by the Purchaser in the preparation of the Closing Statement or that are otherwise reasonably necessary for the Main Sellers and their accountants to review the Closing Statement

(provided that nothing herein shall require the Purchaser to disclose any information to the Main Sellers if such information disclosure would jeopardize any attorney-client or legal privilege or contravene any applicable Law, fiduciary duty or agreement, it being understood, that Purchaser and the Designated Purchasers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Main Sellers or their Representatives to occur without so jeopardizing privilege or contravening such Law, duty or agreement). The Main Sellers and the Purchaser shall negotiate in good faith to resolve any disagreement with respect to the Closing Statement, and any resolution agreed to in writing by the Main Sellers and the Purchaser shall be final and binding upon the Parties.

(c)     If the Main Sellers and the Purchaser are unable to resolve any disagreement as contemplated by Section 2.2.3[592]2.2.3.1[593](b) within thirty (30) days after delivery of a Disagreement Notice by the Main Sellers, the Independent Auditor shall serve as arbitrator (the "**Accounting Arbitrator**") to resolve such disagreement. The Primary Parties shall instruct the Accounting Arbitrator to consider only those items and amounts set forth in the Closing Statement as to which the Primary Parties have not resolved their disagreement and to conduct such hearings as it considers necessary to resolve such disagreement. The Primary Parties shall use their reasonable efforts to cause the Accounting Arbitrator to deliver to the Primary Parties, as promptly as practicable (and in no event later than fifteen (15) days after its appointment), a written report setting forth the resolution of any such disagreement determined in accordance with the terms of this Agreement. Such report and the Closing Statement, as adjusted thereby, shall be final and binding upon the Sellers, the Purchaser and the Designated Purchaser. In the event the Accounting Arbitrator concludes that the Purchaser was correct as to a majority (by dollar amount) of the disputed items, then the Sellers shall pay the Accounting Arbitrator's fees, costs and expenses. In the event the Accounting Arbitrator concludes that the Main Sellers were correct as to a majority (by dollar amount) of the disputed items, then the Purchaser shall pay the Accounting Arbitrator's fees, costs and expenses.

### 2.2.3.2 [594]Purchase Price Adjustment.[595]

2.2.3.1.[596] Purchase Price Adjustment.[597] If (i) the Final Purchase Price, as finally determined in accordance with this Section 2.2.3, is less than the Estimated Purchase Price, (A) the parties agree to cause the Escrow Agent to pay to the Purchaser the lesser of (x) the excess of the Estimated Purchase Price over the Final Purchase Price, or (y) the Working Capital Escrow Amount, and (B) the Sellers shall pay the amount of any such excess not to be paid by the Escrow Agent pursuant to the preceding clause (A), provided that in the event that the excess of the Estimated Purchase Price over the Final Purchase Price is less than the Working Capital Escrow Amount, the Parties agree to cause the Escrow Agent to pay to the Sellers the balance, and (ii) if the Final Purchase Price, as finally determined in accordance with this Section 2.2.3, exceeds the Estimated Purchase Price, Purchaser shall pay to Sellers the amount by which the Final Purchase Price exceeds the Estimated Purchase Price and the Escrow Agent shall pay the full Working Capital Escrow Amount to the Sellers, in either case by wire transfer of immediately available U.S. dollar funds to an account designated by the party receiving payment, within (3) three Business Days after the final determination of the Final Purchase Price, plus interest on such amount, accrued from the Closing Date to the date of such payment in accordance with the terms of the Escrow Agreement.

2.2.4.  <u>Working Capital Escrow.</u>[598]

(a)     At or prior to the Closing, each of the Main Sellers and the Purchaser shall enter into the Escrow Agreement with the Escrow Agent in the form of Exhibit G.

(b)     Each of the Main Sellers and the Purchaser hereby undertake to promptly execute and deliver to the Escrow Agent, in accordance with the formalities set forth in the Escrow Agreement, instructions to pay to the Sellers or the Purchaser, as applicable, funds from the escrow account established pursuant to the Escrow Agreement any time that such Person becomes entitled to such payment from the ~~Escrow Account~~[599]escrow account[600] pursuant to Section ~~2.2.3.1.~~[601]2.2.3.2.[602]

Section 2.3.  <u>Closing.</u>[603]

2.3.1.  <u>Closing Date.</u>[604]

—[605]The completion of the purchase and sale of the Assets and the assumption of the Assumed Liabilities (the **"Closing"**) shall take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York, commencing at 10:00 a.m. local time on ~~the earliest of (i) July 31, 2009, subject to the waiver or fulfillment of the conditions set forth under ARTICLE VIII (other than conditions to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions), (ii) on~~[606](i)[607] the date which is five (5) Business Days after the day upon which all of the conditions set forth under ARTICLE VIII (other than conditions to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions) have been satisfied,[608] or,[609] if permissible, waived by the Main Sellers and/or the Purchaser (as applicable), ~~and~~[610]or[611] (~~iii~~[612]ii[613]) on such other place, date and time as shall be mutually agreed upon in writing by the Purchaser and the Main Sellers (the day on which the Closing takes place being the **"Closing Date"**).

2.3.2.  <u>Closing Actions and Deliveries.</u>[614]

—[615]At the Closing, the Sellers and the Purchaser shall, and the Purchaser shall cause the Designated Purchasers to, enter into (i) the Ancillary Agreements to which it is contemplated that they will be parties, to the extent such agreements have not yet been entered into (except as otherwise provided in the Real Estate Agreements Term Sheet), and (ii) instruments of assignment and assumption effecting the transfer of the Assets and the Assigned Intellectual Property from the Sellers to the Purchaser or the Designated Purchaser(s), as applicable;

(a)     [616]At the Closing, each Seller[617] shall deliver to the Purchaser[618],[619]

(i)     ~~(a)~~[620]At the Closing the Sellers[621] shall deliver to the Purchaser[622], [623](x) in the case of a Seller that is a "United States person" within the meaning of Section 7701 of the Code and applicable Treasury Regulations, a duly executed certificate of non-foreign status in accordance with Section 1445 of the Code and applicable Treasury Regulations, or (y) in the case of a Seller that is not a "United States person" within the meaning of Section 7701 of the Code and applicable Treasury Regulations, a duly executed certificate certifying that none of the Assets transferred or

assigned to the Purchaser or a Designated Purchaser pursuant to this Agreement by such Seller constitute a "United States real property interest" within the meaning of Section 1445 of the Code and applicable Treasury Regulations; and[624]

        (ii)    [625](x) a duly executed certificate certifying that such Seller is not a non-resident of Canada for purposes of section 116 of the *Income Tax Act* (Canada), or (y) in the case of a Seller that is a non-resident of Canada for purposes of section 116 of the *Income Tax Act* (Canada), a duly executed certificate certifying that the Assets transferred or assigned to the Purchaser pursuant to this Agreement by such Seller do not include any taxable Canadian property as defined in the *Income Tax Act* (Canada), of such non-resident Seller.[626]

    (b)    At the Closing, the Purchaser shall deliver or cause to be delivered:

        (i)    to the Sellers, an amount equal to the Estimated Purchase Price;[627] (less the Good Faith Deposit, pursuant to Section 5.33)[628] less[629] the Working Capital Escrow Amount, by wire transfer in immediately available funds to an account or accounts designated by the Main Sellers in a written notice to the Purchaser at least two (2) Business Days prior to the Closing Date;

        (ii)    to the Escrow Agent, an amount equal to the Working Capital Escrow Amount; and

        (iii)    to the Main Sellers, a duly executed certificate of an executive officer of the Purchaser certifying the fulfillment of the conditions set forth in Section 8.2.

    (c)    At the Closing, NNI shall deliver or cause to be delivered:

        (i)    an updated Section 4.11(b) of the Sellers Disclosure Schedule (if applicable), dated as of a date no earlier than three (3) days prior to the Closing; and

        (ii)    a duly executed certificate of an executive officer of NNI certifying the fulfillment of the conditions set forth in Section 8.3.

    (d)    At the Closing, each Party shall deliver, or cause to be delivered, to the other any other documents reasonably requested by such other Party in order to effect, or evidence the consummation of, the transactions contemplated herein.

Section□2.4.   Designated Purchaser(s).[630]

    (a)    The Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.4, one or more ~~Wholly-Owned Subsidiaries~~[631]Affiliates of the Purchaser[632] to (i) purchase specified Assets (including specified Assigned Contracts), (ii) assume specified Assumed Liabilities, and/or (iii) employ specified Transferring Employees on and after the Employee Transfer Date (any Subsidiary of the Purchaser that shall be properly designated by the Purchaser in accordance with this clause, a "**Designated Purchaser**");[633],[634] it being understood and agreed[635], however[636], that[637] any such

    43    

right of the Purchaser to designate a Designated Purchaser is conditioned upon (x) such Designated Purchaser being able to perform the applicable covenants under Section 2.1.7 and ARTICLE VII and demonstrate satisfaction of the applicable requirements of Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance, with respect to the Assumed and Assigned Contracts and (y) any such designation not creating any Liability (including any Liability relating to Taxes) for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the relevant Assets, assumed the relevant specified Liabilities and/or employed the relevant specified Transferring Employees. No such designation shall relieve the Purchaser of any of its obligations hereunder. Any breach hereof by a Designated Purchaser shall be deemed a breach by Purchaser. The Purchaser and each Designated Purchaser shall be jointly and severally liable for any obligations assumed by any of them hereunder. ~~In furtherance of its rights under this Section 2.4 the Purchaser has designated the Person(s) listed on Exhibit 2.4 as the Designated Purchaser(s) hereunder.~~[638]

(b)      The <u>above designation shall be made by the</u>[639]Purchaser by way of a written notice to be delivered to the Sellers as soon as reasonably practicable after the date hereof and in no event later than the fifteenth (15th[640]) day prior to the Closing Date, ~~(i) may amend Exhibit 2.4, provided, that such amended Exhibit 2.4~~[641]<u>which written notice</u>[642] shall contain appropriate information about the Designated Purchaser(s) ~~listed on such amended Exhibit 2.4; and (ii)~~[643]<u>and</u>[644] shall indicate which Assets, Assumed Liabilities and Transferring Employees the Purchaser intends ~~the~~[645]<u>such</u>[646] Designated Purchaser(s) to purchase, assume and/or employ, as applicable, hereunder.

(c)      The Purchaser shall deliver to the Sellers ~~as soon as reasonably practicable after the date hereof and in no event later than the fifteenth (15th) day prior to the Closing Date~~[647]<u>with the written notice provided in Section 2.4(b),</u>[648] a signed counterpart to this Agreement in a form acceptable to the Main Sellers, signed by such Designated Purchaser(s), agreeing to be bound by the terms of this Agreement and authorizing the Purchaser to act as such Designated Purchaser(s)' agent for all purposes hereunder.

# ARTICLE□III

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Sellers as follows:

Section□3.1.  <u>Organization and Corporate Power.</u>[649]

(a)      The Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of ~~the Netherlands~~[650]<u>Sweden</u>[651]. Each of the Purchaser and the Designated Purchasers has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and (ii) to own, lease and operate its assets and to carry on its business as it is now being conducted.

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    44                    Error! Unknown document
property name.

(b)       Each of Purchaser and the Designated Purchasers is duly qualified or licensed to own or lease and operate its properties and assets (including the Assets), and is in good standing, in each jurisdiction in which its ownership of assets or operation of business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not materially hinder, delay or impair the Purchaser's or any such Designated Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is or will become a party.

Section 3.2.   Authorization; Binding Effect; No Breach.[652]

(a)       The execution, delivery and performance of each Transaction Document to which the Purchaser or any of the Designated Purchasers is a party have been duly authorized by the Purchaser and the relevant Designated Purchasers, as applicable.  This Agreement has been duly executed and delivered by the Purchaser, and the other Transaction Documents to which the Purchaser or any Designated Purchaser is, or on the Closing Date will become, a party have been or will be duly executed and delivered by the Purchaser and each Designated Purchaser party thereto.  Assuming due authorization, execution and delivery by the relevant Sellers, each Transaction Document to which the Purchaser or any Designated Purchaser is a party constitutes, or upon execution thereof will constitute, a valid and binding obligation of the Purchaser or such Designated Purchaser, as applicable, enforceable against such Person in accordance with its respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b)       The execution, delivery and performance by each of the Purchaser and the Designated Purchasers of the Transaction Documents to which the Purchaser or such Designated Purchaser is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, or require any Consent (other than the Regulatory Approvals) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the Purchaser or the relevant Designated Purchaser, (ii) any material ~~contract~~[653]Contract[654] to which the Purchaser or the relevant Designated Purchaser is a party or to which any of its assets is subject or (iii) any Laws to which the Purchaser, the relevant Designated Purchaser, or any of their assets is subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that have not materially hindered, delayed or impaired, and would not reasonably be expected to, individually or in the aggregate, materially hinder, delay or impair, the performance by the Purchaser or the Designated Purchasers of any of their obligations under the Transaction Documents.

~~Section III.3.~~ [655]~~Financing~~[656]

Section 3.3.  [657]Financing.[658]

—[659]The Purchaser has, as of the date hereof, and will have as of the Closing (i) sufficient funds available for purposes of funding the transactions contemplated herein and paying any other amount due hereunder or in respect hereof and (ii) the resources and capabilities (financial or otherwise) to perform its obligations hereunder.  The Purchaser has not, as of the date hereof, and will not have as of the Closing, incurred any obligation, commitment, restriction or liability of any kind, which would materially impair or adversely affect such resources and capabilities.  Notwithstanding anything to the contrary herein, the Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person.

~~Section III.4.~~ [660]

Section 3.4.  [661]Adequate Assurance of Future Performance.[662]

—[663]To the extent required by any Bankruptcy Laws or other Laws, the Purchaser will be able to provide, at Closing or on such earlier date as is designated by the U.S. Bankruptcy Court, adequate assurance of its and/or the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Assumed and Assigned Contract, except as otherwise provided in the Real Estate Agreements Term Sheet.

~~Section III.5.~~ [664]

Section 3.5.  [665]Purchaser's Acknowledgments; Exclusivity of Representations and Warranties.[666]

—[667]The Purchaser acknowledges and agrees that (i) except for the representations and warranties expressly set forth herein or in any Ancillary Agreement, the Purchaser has not relied on any representation or warranty from the Sellers or any Affiliate of the Sellers or any employee, officer, director, accountant, financial, legal or other Representative of the Sellers or its Affiliates in determining whether to enter into this Agreement; (ii) except for the representations and warranties expressly set forth herein or in any Ancillary Agreement, none of the Sellers or any employee, officer, director, accountant, financial, legal or other Representative of the Sellers or any Affiliate of the Sellers has made any representation or warranty, express or implied, as to the Business (or the value or future thereof) or the Assets (including any implied representation or warranty as to the condition, merchantability, suitability or fitness for a particular purpose of any of the Assets, including under the International Convention on Contracts for the Sale of Goods (Geneva Convention) and any other applicable sale of goods Laws), the Assumed Liabilities, or any Affiliate of any such Person or the accuracy or completeness of any information regarding any of the foregoing that the Sellers or any other Person furnished or made available to the Purchaser and its Representatives (including any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials).

~~Section III.6.~~ [668]~~Brokers~~[669]

Section 3.6.   [670]Brokers.[671]

—[672]Except for fees and commissions that will be paid by the Purchaser, no broker, finder or investment banker is entitled to any brokerage, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates.

Section III.7.  [673]~~Absence of Certain Business Practices~~[674]—~~During the two (2) years prior to the date hereof, neither the Purchaser, its respective Subsidiaries or, to the knowledge of the Purchaser, any of its officers, employees or agents or any other Person authorized to act, and acting, on behalf of the Purchaser or its Subsidiaries has, directly or indirectly (i) given, offered, solicited or agreed to give, offer or solicit any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment, regardless of form and whether in money, property or services, to any customer, supplier, governmental employee or other Person who is or may be in a position to help or hinder the Purchaser or its Subsidiaries in connection with the development, marketing, use, sale or acceptance of products or services of the Purchaser or its Subsidiaries (or to assist the Purchaser or its Subsidiaries in connection with any actual or proposed transaction relating to the products and services of the Purchaser or its Subsidiaries) in violation of law; (ii) used any corporate funds or, to the knowledge of the Purchaser, any personal funds for unlawful contributions, gifts, entertainment, or other unlawful expenses relating to political activity; (iii) made any unlawful payment to domestic government officials or employees, or to domestic political parties or campaigns, from corporate funds; (iv) violated any provision of the Foreign Corrupt Practices Act of 1977, as amended; (v) established or maintained any unlawful or unrecorded fund of corporate monies or other assets; or (vi) made any false or fictitious entry on the books or records of the Purchaser relating to any such payments.~~[675]

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except (a) for disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably apparent on its face from the Sellers Disclosure Schedule that such disclosure is applicable, (b) as expressly contemplated by this Agreement or (c) to the extent relating to the Excluded Assets or the Excluded Liabilities, each of the Main Sellers jointly and severally represents and warrants to the Purchaser as set forth in this ARTICLE IV:

Section 4.1.   Organization and Corporate Power.[676]

(a)       Each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is organized.  Subject to entry of the U.S. ~~Bidding Procedures Order and the U.S.~~[677]Sale Order in the case of the U.S. Debtors and the Canadian ~~Sales Process Order and Canadian~~[678]Approval and Vesting Order in the case of the Canadian Debtors and receipt of other Consents from the U.S. Bankruptcy Court and the Canadian Court in connection with the transactions contemplated hereby and in the other Transaction Documents

(collectively, the "**Bankruptcy Consents**"), each of the Sellers has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and (ii) own, lease and operate its assets, including the Assets, as applicable, and to carry on the Business as it is now being conducted.

(b)     Each of the Sellers is duly qualified or licensed to do business and to own, lease and operate its properties and assets, including the Assets, and to carry on the Business as it is currently being conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or to be so licensed and is in good standing in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or be licensed, except to the extent that the failure to be so qualified, licensed or in good standing would not, individually or in the aggregate, materially hinder, delay or impair the performance by the Sellers of any of their obligations under the Transaction Documents.

Section 4.2.   Authorization; Binding Effect; No Breach.[679]

(a)     Subject to the receipt of the Bankruptcy Consents (i) the execution, delivery and performance by each Seller of the Transaction Documents to which such Seller is, or at the Closing will be, a party has been duly authorized by such Seller, (ii) this Agreement has been duly executed and delivered by the Main Sellers, and the other Transaction Documents to which the Main Sellers are, or on the Closing Date will become, parties have been or will be executed and delivered by the Main Sellers thereto; and (iii) the execution, delivery and performance by each Other Seller of the Transaction Documents to which such Seller will be a party will have been duly authorized by such Other Seller by the time such Other Seller executes this Agreement. Subject to receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser and the Designated Purchasers parties thereto, the Transaction Documents to which any Seller is or will be a party, will constitute, a legal, valid and binding obligation of such Seller, enforceable against such Person in accordance with its respective terms, subject to (in the case of Non-Debtor Sellers) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b)     Subject to receipt of the Bankruptcy Consents (where applicable), the Regulatory Approvals, and the receipt of Consents in connection with the Assigned Contracts, any Subleases, Licenses and any other Consents expressly provided for herein, the execution, delivery and performance by each Seller of the Transaction Documents to which such Seller is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, or result in the creation or imposition of any Lien upon any of the Assets, or require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the relevant Sellers, (ii) any material ~~contract~~[680]Contract[681] to which the relevant Seller is a party or to which any of its or

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

48

Error! Unknown document
property name.

their assets are subject, (iii) any order of any Government Entity applicable to any Seller or by which any of their respective properties or Assets are bound or (iv) any Laws to which any of the Sellers, or any of the Assets are subject, except, in the case of (ii), (iii), and (iv) above, for such defaults, violations and notifications that would not, individually or in the aggregate, materially hinder, delay or impair the performance by the Sellers of any of their obligations under the Transaction Documents.

Section 4.3.  <u>Title to Tangible Assets.</u>[682]  Except for Seller Encumbrances, the Owned Net Inventory and the Owned Equipment is owned beneficially by one or more of the Sellers, free and clear of all Liens (except Seller Encumbrances), and such Sellers have good and marketable title thereto.

Section 4.4.  <u>Material Contracts</u> .[683]

(a)    Section 4.4(a) of the Sellers Disclosure Schedule sets forth, as of the date hereof, a list of every Seller Contract (but excluding (a) all licenses of Intellectual Property, all of which are addressed in Section 4.5 below and (b) all Real Estate Leases, all of which are addressed by Section 4.9 below) in each case other than purchase orders and invoices and any third-party or intercompany agreements related to Overhead and Shared Services, that:

(i)    in the most recent fiscal year of the Main Sellers resulted in, or is reasonably expected by its terms in the future to result in, (A) the payment of more than $2,000,000 per annum in the aggregate or (B) the receipt by the Business of more than $2,000,000 per annum in the aggregate, except any ~~contracts~~[684]Contracts[685] referred to in any other subsection;

(ii)    materially restricts the Business from engaging in any business activity anywhere in the world;

(iii)    is a material joint venture, partnership or alliance Contract;

(iv)    is a research and development Contract involving consideration or expenditures in excess of $2,000,000 per annum;

(v)    is a manufacturing or supply Contract involving (A) the purchase of CDMA Products for the Business, or (B) the LTE Business;

(vi)    contains (i) any non-competition, non-solicitation or similar agreements or arrangements or (ii) any "earn-out" or similar agreements or arrangements; or

(vii)    is a classified ~~contract~~[686]Contract[687] requiring contractor employees to have access to classified information during contract performance

(all the above, collectively, the "**Material Contracts**").

(b)     The Sellers have made available to the Purchaser true, correct and complete copies of all of the Seller Contracts. Each Seller Contract is legal, valid, binding and enforceable against the Seller party thereto and, to the Knowledge of Seller, each other party thereto and is in full force and effect (in each case, subject to the Bankruptcy Proceedings and subject to applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law).

(c)     As of the date hereof, except as disclosed in Section 4.4(c) of the Sellers Disclosure Schedule, the Sellers (or any Affiliate of the Sellers) have not been notified in writing that any of them is in breach or default under any Seller Contract, and, to the Knowledge of Seller, no other party to any Seller Contract is in breach or default thereof, nor have the Sellers or any of their respective Affiliates been notified in writing of such other party's intention to terminate any Seller Contract.

(d)     Since January 14, 2009, the Sellers (or any Affiliate of the Sellers) have not received written notification that any of the customers or suppliers party to the Seller Contracts set forth on Section 4.4(d[688]a[689]) of the Sellers Disclosure Schedule intends to materially reduce the level of Products it purchases from the Business subsequent to Closing or materially reduce the level of supplies it provides to the Business subsequent to Closing, as applicable.

Section☐4.5.   Intellectual Property.[690]

(a)     The Assigned Intellectual Property, the Licensed Intellectual Property and the Intellectual Property licensed to the Sellers and/or their Affiliates under the Inbound License Agreements and the Patent Cross Licenses include all the material Intellectual Property that, as of the date hereof, is used in connection with the conduct and operation of the Business, except with respect to any Intellectual Property included in Overhead and Shared Services.

(b)     A list of all the Assigned Intellectual Property registered in the name of the Sellers is set forth in Section 4.5(b) of the Sellers Disclosure Schedule (such listed Intellectual Property, the **"Business Registered IP"**). To the Knowledge of the Sellers, the Business Registered IP is subsisting and in full force and effect. The foregoing will not be construed as a warranty that any Patent or Trademark will issue or be registered based on any application pending as of the Closing.

(c)     The Assigned Intellectual Property is not subject to any Liens other than Seller Encumbrances and licenses entered into prior to Closing. The Sellers own all right, title and interest in and to each such item of Assigned Intellectual Property.

(d)     Except as set forth in Section 4.5(d) of the Sellers Disclosure Schedule, to the Knowledge of the Sellers, no Seller has received any written assertions during the two (2) years prior to the date hereof that (i) any Seller's operations of the Business, including such Seller's use, performance, licensing, copying, distribution, sale, offer for sale, lease, manufacture, having made, importation, or any other exploitation of the Products sold by the Business or of the CDMA Services rendered by the Business infringes, misappropriates or

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    50                    **Error! Unknown document
property name.**

violates any Intellectual Property right of any Third Party; or (ii) the use or exploitation of any of the Assigned Intellectual Property infringes or violates any Intellectual Property of or was misappropriated from a Third Party.

(e)    To the Knowledge of the Sellers, as of the date hereof, there has been no assertion or claim made in writing to Sellers during the two (2) years prior to the date hereof asserting invalidity, misuse or unenforceability of any Assigned Intellectual Property or challenging the Sellers' right to use, right to transfer, or ownership of the Assigned Intellectual Property.

(f)    Section 4.5(f)(i) of the Sellers Disclosure Schedule sets forth a list of Patent Cross Licenses, indicating for each Patent Cross License, the title and the parties thereto, except to the extent a Patent Cross License prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to reasonably obtain, in which case such Patent Cross License has been omitted from Section 4.5(f)(i) of the Sellers Disclosure Schedule.  Section 4.5(f)(ii) of the Sellers Disclosure Schedule sets forth a list of all material Contracts granting to the Sellers or any of their Affiliates any license under or to any Intellectual Property owned by a Third Party that is, as of the date hereof, incorporated in or used in connection with the design, development, testing, manufacturing, sale, distribution, support or servicing of any products and services within the Business (collectively, the **"Inbound License Agreements"**), indicating for each Inbound License Agreement, the title and the parties thereto, except to the extent an Inbound License Agreement prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to reasonably obtain, in which case such agreement has been omitted from Section 4.5(f)(ii) of the Sellers Disclosure Schedule, but the number of such Inbound License Agreements that have been omitted is set out in Section 4.5(f)(ii) of the Sellers Disclosure Schedule and the Sellers shall use reasonable efforts to provide such other information as reasonably requested by the Purchaser regarding such Inbound License Agreements, the disclosure of which does not breach such prohibition.  Section 4.5(f)(iii) of the Sellers Disclosure Schedule sets forth a list of all material Contracts (other than Patent Cross Licenses) under which the Sellers grant a license to a Third Party under Assigned Patents where the predominant purpose of the Contract is the grant of a Patent license (collectively, the **"Outbound License Agreements"**), indicating for each Outbound License Agreement the title and the parties thereto, except to the extent an Outbound License Agreement prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to reasonably obtain, in which case such agreement has been omitted from Section 4.5(f)(iii) of the Sellers Disclosure Schedule, but the number of such Outbound License Agreements that have been omitted is set out in Section 4.5(f)(iii) of the Sellers Disclosure Schedule and the Sellers shall use reasonable efforts to provide such other information as reasonably requested by the Purchaser regarding such Outbound License Agreements, the disclosure of which does not breach such prohibition.

(g)    To the Knowledge of the Sellers, Section 4.5(g) of the Sellers Disclosure Schedule sets forth a list of any Open Source Software incorporated into any of the Products and, whenever possible, describes (i) the specific Open Source Software used; (ii) the specific Open Source Software version; (iii) the licensor(s) of the specific Open Source Software; and (iv) the Products or portions thereof into which such Open Source Software is incorporated.

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                51                    Error! Unknown document
                                                                              property name.

(h)    Notwithstanding any provision herein to the contrary, this Section 4.5 consists of the sole representation and warranty in this Agreement regarding non-infringement, non-violation and non-misappropriation of Intellectual Property.

Section IV.6.  [691]Litigation[692]

Section☐4.6.  [693]Litigation.[694]

.—[695]As of the date hereof, except for the Bankruptcy Proceedings and except as set forth in Section 4.6 of the Sellers Disclosure Schedule, there is no material Action pending or, to the Knowledge of the Sellers, threatened, against, involving or affecting the Business or the Assets. As of the date hereof, except for Orders and settlements entered in connection with the Bankruptcy Proceedings, there is no Order or settlement to which Sellers are subject that directly and materially affects or restricts the ownership of the Assets, Assumed Liabilities or the Business, and no Action is pending or, to the Knowledge of Sellers, threatened against the Sellers that questions the validity of this Agreement or the Transaction Documents or any action taken or to be taken by the Sellers in connection with this Agreement or the Transaction Documents.

Section☐4.7.    Financial Statements .[696]

(a)    Section 4.7(a) of the Sellers Disclosure Schedule sets forth (i) the audited consolidated balance sheets of NNC as of December 31, 2007 and 2008, and the related consolidated statements of operations, stockholders' deficit and cash flows for the year ended December 31, 2008 (the "**Annual Audited Financial Statements**"), and (ii) the unaudited consolidated balance sheet of NNC has of March 31, 2009, and the related consolidated statements of operations and cash flows for the three-month period then ended (the "**Interim Unaudited Financial Statements**"). The Interim Unaudited Financial Statements were prepared in accordance with Nortel Accounting Principles applied in a manner consistent with historical practices (subject to normal year-end adjustments, the effect of which are not material in nature individually or in the aggregate, and except for the omission of certain footnotes and other presentation items required by GAAP) consistently applied and maintained throughout the periods indicated, and fairly present in all material respects the financial position, results of operations and cash flows of NNC as of the date thereof and for the periods covered thereby.

(b)    Section 4.7(b) of the Sellers Disclosure Schedule sets forth the unaudited management statements of assets and liabilities of the Business as of December 31, 2008 (the "**Balance Sheet Date**") and the related unaudited management statements of income of the Business for the one- (1-) year period ended on the Balance Sheet Date (together, the "**Unaudited Financial Statements**"). Except as set forth in the Unaudited Financial Statements, such Unaudited Financial Statements were prepared based on the financial books and records maintained by the Sellers for the Business on the basis of the Nortel Accounting Principles and fairly presents in all material respects the selected balance sheet accounts and income statements set forth therein for the Business, in each case as of the dates and for the periods presented therein. The Unaudited Financial Statements (a) have been prepared in accordance with the Nortel Accounting Principles, (b) include estimated costs that do not necessarily represent the costs that were actually allocated to the Business for the relevant periods (or that the Business

Error! Unknown document property name.Error! Unknown document property name.Error! Unknown document property

52

Error! Unknown document property name.

will incur after the Closing) (c) reflect the estimated historical operation of the Business for the periods specified therein and (d) do not represent the balance sheet accounts or the income statements that would have occurred if the Business had been operated by the Sellers as a "stand alone" entity.

Section□4.8.   Compliance with Laws; Consents.[697]

(a)    No Seller is in material violation of any Laws applicable to the Business, the Leased Real Property, the Direct Lease Real Estate or the Assets, and none of the Sellers has received any written notice or written claims from any Government Entity within the twelve (12) months preceding the date hereof relating to any material non-compliance of the Business, the Leased Real Property, the Direct Lease Real Estate or the Assets with any applicable Law nor are there, based on the Knowledge of the Sellers, any such notice or claims threatened or pending, except where such notices or claims would not, individually or in the aggregate, materially hinder, delay or impair the performance by the Sellers of any of their obligations under the Transaction Documents.

(b)    (i) all[698]All[699] the Consents of Government Entities necessary for, or otherwise material to, the conduct of the Business as conducted on the date hereof, have been duly obtained and are in full force and effect and (ii) the relevant Sellers are in compliance with all material terms of each of such Consents, in each case except for such violations as would not have, individually or in the aggregate, a Material Adverse Effect.  None of the Sellers has received any written notice or written claims from any Government Entity relating to any material non-compliance of the Business, the Leased Real Property, the Direct Lease Real Estate or the Assets with such Consents nor are there, based on the Knowledge of the Sellers, any such notice or claims threatened or pending, except where such claims would not, individually or in the aggregate, materially hinder, delay or impair the performance by the Sellers of any of their obligations under the Transaction Documents.

Section□4.9.   Real Property.[700]

(a)    Section 4.9(a) of the Sellers Disclosure Schedule sets forth the address of each parcel of Leased Real Property, and a list of all Real Estate Leases, Licensed Real Estate Leases or[701]and[702] Non-365 Licensed Real Estate Leases that will be leased, subleased or licenses[703]licensed[704] for each such parcel of Leased Real Property, each of which Lease is legal, valid, binding, enforceable in accordance with its terms and in full force and effect.  The Sellers have made available to Purchaser a true and complete copy of each such Real Estate Lease, Licensed Real Estate Lease or[705]and[706] Non-365 Licensed Real Estate Lease.  Each of the Real Estate Leases is a valid and existing leasehold interest of the applicable Seller free of Liens created by Sellers (other than Seller Encumbrances or as otherwise provided in the Real Estate Agreements Term Sheet) and is a binding obligation of the applicable Seller.  To the Knowledge of the Sellers, no party is in material default under any Real Estate Lease, and no event has occurred and is continuing that constitutes or, with notice or the passage of time, or both, would constitute a material default under any such Real Estate Lease, Licensed Real Estate Lease or Non-365 Licensed Real Estate Lease.  A schedule will be provided to Purchaser promptly after signing, but in no event later than fifteen (15) days after the date hereof, including with respect to the Real Estate Leases,[707] other than the Licensed Real Estate Leases and the Non-365 Licensed

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

53