Section 6.5.    Records .[1026]

(a)      Notwithstanding the provisions of Section 5.23 or Section 5.24, but subject to the provisions of Section 5.6, (i) after the Closing Date, the Purchaser and the Designated Purchasers, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets, the Assumed Liabilities, or the Business for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Assets, the Assumed Liabilities or the Business for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow Representatives of the other party access to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be necessary or convenient. The obligation to cooperate pursuant to this Section 6.5 shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

(b)      On or prior to Closing, the Sellers shall cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for ten (10) years in accordance with an escrow agreement between the Purchaser, the Sellers and the Records Custodian, in form satisfactory to the Purchaser and the Main Sellers. The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by Tax advisors of any purchaser ("**Tax Credit Purchaser**") of the scientific research and experimental development tax credits of the Sellers under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser. The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or Nortel Networks Technology Corporation ("**NNTC**") as qualified expenditures on scientific research and experimental development for purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**"),

(c)      The Purchaser shall use reasonable efforts to make available to the relevant Tax Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Tax Authority of the characterization of expenditures by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser.

(d)      The Purchaser shall have no obligation to provide any access under this provision unless the Seller (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                87                Error! Unknown document
                                                                                      property name.

with the foregoing provisions, including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

(e)    At the request of the Purchaser, the Sellers shall provide reasonable access to records and employees of the Sellers to assist the Purchaser in claiming any future scientific research and experimental development Tax credits for Qualified Expenditures.

(f)    The Sellers shall have no obligation to provide any access under this provision unless the Purchaser pays all of the Sellers' reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to employees of the Sellers (based on the total compensation of the employee at the time access is provided).

Section 6.6.   Tax Returns .[1027]

(a)    The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets or the Business, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("**Transfer Tax Returns**") described below in Section 6.6(b)). Such Tax Returns shall be true, correct and complete in all material respects. Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) Sellers as and when required by Law.

(b)    Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated herein or in respect of the execution of any other Transaction Document shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws. Any Transfer Tax Returns prepared by the Sellers pursuant to this Section 6.6(b) shall be made available to the Purchaser at least ten (10) Business Days before such Tax Returns are due to be filed. The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.6(b) at least five (5) Business Days before such Transfer Tax becomes due and payable.

(c)    The Purchaser or a Designated Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets or the Business for all Straddle Periods. Such Tax Returns shall be true, correct and complete in all material respects. All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Purchaser or a Designated Purchaser as and when required by Law.

(d)    The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.6(b)) prepared by the Purchaser or a Designated Purchaser for any Straddle Period before any such Tax Return is filed. The Purchaser shall submit a draft of any such Tax Return to the Main Sellers at least thirty (30) days before the date such Tax Return is required to be filed with the relevant Tax Authority. The Main Sellers shall have ten (10) days after the date of receipt thereof to submit to the Purchaser,

Error! Unknown document property name.Error! Unknown document property name.Error! Unknown document property

88

Error! Unknown document property name.

in writing, the Main Sellers' written comments with respect to such Tax Return. The Purchaser shall notify the Main Sellers within five (5) days after receipt of such comments of (a) the extent, if any, to which the Purchaser accepts such comments and will file such Tax Return in accordance therewith and (b) the extent, if any, to which the Purchaser rejects such comments. To the extent the Purchaser rejects the comments of the Main Sellers, the Purchaser and the Main Sellers promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within five (5) days, the Parties immediately shall appoint an Independent Auditor to determine the correct manner for reporting the items that are in dispute and shall provide to the Independent Auditor all relevant information. The Independent Auditor shall have ten (10) days to submit its determination, which shall be binding upon the Parties, and the Purchaser shall file such Tax Return in accordance therewith. Notwithstanding the preceding sentence, if the Independent Auditor shall not have submitted its determination on or before the date such Tax Return is required to be filed with the relevant Tax Authority (giving effect to any valid extensions), the Purchaser shall file its original draft of such Tax Return and shall, upon receiving the Independent Auditor'[1028,1029]s later determination and to the extent permitted under applicable Law, promptly file an amended return in accordance therewith. The fees and expenses of the Independent Auditor shall be paid by the Party whose position is deemed to be least correct by the Independent Auditor.

(e) Notwithstanding any contrary provision in this ~~Article~~[1030]ARTICLE[1031] VI, each Seller shall pay to the Purchaser the amount of its liability for Taxes shown to be due on any Tax Return for a Straddle Period at least three (3) Business Days prior to the due date thereof, giving effect to valid extensions; provided, however, that (i) if such Seller and the Purchaser are unable to agree as to the amount of such liability prior to such due date, such Seller shall pay to the Purchaser such amount as it in good faith believes that it owes, and (ii) to the extent the Independent Auditor determines that the amount of such liability is greater than the amount actually paid to the Purchaser prior to such due date, such Seller shall pay to the Purchaser such excess within three (3) Business Days after receiving the Independent Auditor'[1032,1033]s determination.

(f) Notwithstanding any contrary provision in this ~~Article~~[1034]ARTICLE[1035] VI, the Sellers shall not be entitled to any Tax-related information, including any Tax Return, that includes assets or operations of the Purchaser or any of its Affiliates in addition to the Assets; provided[1036], however, that the Purchaser shall provide the Sellers with a copy of a pro forma Tax Return relating solely to the Assets for any Straddle Period.

Section□6.7. Allocation of Purchase Price .[1037]

(a) ~~The~~[1038]Except as otherwise required by applicable Law, the[1039] Parties shall (i) allocate to the tangible Assets a ~~proportion~~[1040]portion[1041] of the Purchase Price equal to the net book value of such Assets as of the Closing Date, and (ii) allocate to the intangible Assets the balance of the Purchase Price.

(b) To the extent necessary to file Transfer Tax Returns, the Parties shall negotiate in good faith to determine an allocation of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities) among the Assets in accordance with the principles of Section 1060 of the Code and the Treasury

regulations promulgated thereunder and other applicable Tax Laws, which allocation shall be subject to the principles of Section 6.7(a) (such allocation, a **"Partial Allocation"**). If the Parties do not reach agreement on a Partial Allocation after negotiating in good faith, the Partial Allocation shall be submitted to the Independent Auditor, which shall prepare a final Partial Allocation; provided, however, that if a different Partial Allocation is required by a Government Entity (including as a result of the Bankruptcy Proceedings), then the Partial Allocation shall be modified as necessary to be consistent with the required allocation but in all cases shall be subject to the principles of Section 6.7(a). Notwithstanding the preceding sentence, if the Parties have not reached agreement on the Partial Allocation and the Independent Auditor has not submitted its determination on or before the date that a Transfer Tax Return is required to be filed with the relevant Tax Authority (giving effect to any valid extensions) pursuant to Section 6.6(b), then such Tax Return shall be timely filed in the manner that the Party with primary responsibility for filing such return reasonably determines and shall, upon receiving the Independent Auditor's later determination and to the extent permitted under applicable Law, promptly file an amended return in accordance therewith. The Parties agree (i) to be bound by the final Partial Allocation accepted by the Parties or prepared by the Independent Auditor (as modified to be consistent with the allocation required by a Government Entity, as described above), as applicable, and (ii) to act in accordance with the allocations contained in such final Partial Allocation for all purposes relating to Transfer Taxes, including the preparation, filing and audit of any Transfer Tax Returns.[1042]

## ARTICLE VII

## EMPLOYMENT MATTERS

Section 7.1.  Employment Terms.[1043]

(a)    Immediately following the completion of the Auction, but in any event prior to Closing (or otherwise in accordance with applicable Law), the Purchaser shall, or shall cause a Designated Purchaser to, extend a written offer of employment to the Employees as set forth on Section 7.1 of the Sellers Disclosure Schedule, such offer being contingent (x) in each case, in the discretion of the Purchaser, on such Employee passing a background check and, if such Employee is located in the United States, drug screening, in all cases, to the extent permitted and consistent with applicable Law and (y) in the case of Inactive Employees, upon their return to active status (other than Employees set forth on Section 7.1 of the Sellers Disclosure Schedule whose employment transfers automatically by operation of Law to the Purchaser or a Designated Purchaser)[1044]. The Sellers shall have the right to review any offer of employment made pursuant to this Section 7.1 prior to it being sent to any Employee. Such offer of employment shall provide for an employee consideration period of at least one week, or such longer period as required by applicable Law. Such offers (and, with respect to Employees whose employment transfers by operation of Law, such continued employment) shall be consistent with the requirements of applicable Law and on terms and conditions no less favorable, in the aggregate, than those the Employees currently have, but subject to certain adjustments to conform to the Purchaser's standard employment policies where legally possible. The Sellers shall provide the Purchaser or a Designated Purchaser with such additional information as the

Purchaser may reasonably require in order to comply with its obligations under this ARTICLE VII. Notwithstanding anything to the contrary contained herein, as a condition to the transfer of employment (except as prohibited by applicable Law) the Purchaser or Designated Purchaser may require Employees to provide evidence they are legally permitted to be employed by the Purchaser or a Designated Purchaser, as required by applicable Law. Any Employee who accepts such offer of employment and commences employment with the Purchaser or a Designated Purchaser, and any Employees whose employment transfers by operation of Law, shall be deemed to be a Transferring Employee for all purposes of this Agreement, effective as of the Employee Transfer Date, which for Employees whose employment transfers by operation of Law shall be the Closing Date[1045].

(b)    For the twelve (12) month period following the Closing Date (or for such shorter period as a Transferring Employee remains employed by Purchaser or a Designated Purchaser), such Transferring Employee, subject to applicable Law, shall be employed on terms and conditions of employment not materially less favorable, in the aggregate, than the terms and conditions of employment provided to such Employees immediately prior to the Closing, subject, following the Employee Transfer Date, to certain adjustments to conform to the Purchaser's standard employment policies where legally possible; provided[1046], however[1047]that, subject to the terms of the Transferring Employee Agreement, neither this Section 7.1 nor Section 7.2 restricts the right of the Sellers, the Purchaser or a Designated Purchaser to terminate the employment of any Transferring Employee after the Closing; , provided[1048], further[1049]that, following the Employee Transfer Date, , except as provided in Section 7.2(c), [1050]nothing shall prohibit the Purchaser or any Designated Purchaser from amending or terminating, in whole or in part, any Purchaser Employee Plan or from [1051]making changes to such terms and conditions of employment that are generally applicable and broadly based across the Purchaser's or Designated Purchaser's employee population; and provided, further, that for purposes of clarity the Purchaser shall not be required to offer in any offer made pursuant to this ARTICLE VII any (i) equity, (ii) retiree medical or other retiree welfare arrangement or (iii) defined benefit pension plan, in each case, unless required by applicable Law[1052].

(c)    The Purchaser or a Designated Purchaser shall use reasonable efforts from the date hereof until the expiration of the Transferring Employee Agreement with respect to Visa Employees to obtain, at its cost, such visas or permits as are required for it to employ Visa Employees.

Section☐7.2.    Employee Benefits.[1053]

(a)    The Purchaser or a Designated Purchaser shall, and shall cause its relevant Affiliates to, recognize the service date of each Transferring Employee as set out in the Employee Information for all purposes other than benefit accrual under any defined benefit plan and except as would result in a duplication of benefits.

(b)    Without limiting the generality of the foregoing, the Purchaser shall, or shall cause its relevant Affiliates to, provide the following benefits to Transferring Employees:

(i)    The Sellers shall:  (x) with respect to each Transferring Employee located in the United States and Mexico, pay to such Transferring Employee upon his or

her Employee Transfer Date the amount of compensation with respect to the unused vacation days that is due and owing to such Transferring Employee, up to his or her Employee Transfer Date; and (y) with respect to each Transferring Employee located in Canada and China[1054], pay to such Transferring Employee upon his or her Employee Transfer Date the amount of compensation with respect to the accrued and unused vacation days that is due and owing to such Transferring Employee up to his or her Employee Transfer Date (other than the Accrued Vacation Amount accrued and unused by such Transferring Employee in the year in which the Employee Transfer Date occurs); in each case by the date required under applicable Law in exchange for, with respect only to those Transferring Employees located in Canada and China[1055], an acknowledgement and consent by each such Employee that he or she has received full compensation from the Sellers for such accrued and unused vacation days and has no entitlement to the vacation time associated therewith . Nothing contained in this Section 7.2(b)(i) shall be construed to amend or modify any provision in the Transferring Employee Agreement providing for any payment or transfer of paid vacation days with respect to Transferring Employees' vacation time associated with the period between the Closing Date and the Employee Transfer Date.

(ii)    Section 7.2(b)(ii) of the Sellers Disclosure Schedule sets forth the amount of the Accrued Vacation Amount that is due and owing to each Transferring Employee as of the date hereof and updated by the Sellers as of the Closing Date.  The Purchaser shall, or shall cause its relevant Affiliates to, grant each Transferring Employee covered by Section 7.2(b)(i)(y)[1056]located in Canada or China[1057] paid time off in an amount equal to the accrued unused vacation days for such Transferring Employee that are not paid upon the Employee Transfer Date pursuant to Section 7.2(b)(i)(y).  If such Transferring Employee terminates employment with the Purchaser or an Affiliate of Purchaser prior to receiving such paid time off, as described above, the Purchaser shall pay such Transferring Employee an amount equal to any such unused paid time off upon such employment termination.

(iii)    With respect to each Transferring Employee (and their eligible dependents, as applicable), the Purchaser or the relevant Purchaser's Affiliates shall cause the Purchaser Employee Plans to (i) waive any eligibility periods, evidence of insurability or pre-existing condition limitations to the extent such limitations no longer apply to such Transferring Employees under the comparable Seller Employee Plan and (ii) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employees, including with respect to their dependents, under comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Employment Transfer Date occurs; provided[1058], that such employee provides an explanation of benefits or similar documentation of such expenses paid or incurred to the Purchaser or its Affiliates.

(c)    As of the Closing Date, the Purchaser or the Designated Purchaser shall establish or otherwise provide a registered pension plan for Transferring Employees employed in Canada and maintain such plan for a period of at least five (5) years following the Closing Date and each such Transferring Employee's participation shall commence on such Transferring Employee's Employee Transfer Date.

(d)    The Sellers shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Employees that occur on or prior to the Closing Date provided that Purchaser or the Designated Purchaser, as applicable, has satisfied their obligations set out in Section 7.1. Purchaser shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Transferring Employees that occur on or after the Closing Date.

Section□7.3.    Other Employee Covenants.[1059]

(a)    After the date hereof, and subject to each Party's disclosure obligations imposed by Law or by Government Entities and each Party's obligations hereunder, neither the Purchaser, the Sellers nor any of their respective Affiliates shall issue any announcement or communication to their respective employees or the Employees, prior to consultation with, and the approval of, the other Party (not to be unreasonably withheld or delayed) with respect to this Agreement or any of the transactions contemplated hereby. If requested, the Parties shall reasonably cooperate in respect of the development and distribution of any announcement and communication to the employees of the Sellers, including Employees, with respect to this Agreement or any of the transactions contemplated hereby.

(b)    Prior to the Employee Transfer Date (for Transferring Employees) and before and after the Closing Date for all other Employees, the Purchaser undertakes to keep the Employee Information in confidence including taking the following actions:

(i)    the Purchaser shall, and shall cause the Designated Purchasers to, restrict the disclosure of the Employee Information only to such of its employees, agents and advisors as is reasonably necessary for the purposes of complying with its obligations pursuant to this Agreement;

(ii)    the Employee Information shall not be disclosed to any Person other than those set forth in Section 7.3(b)(i) above (including, for the avoidance of doubt, any other employee of the Purchaser or any Designated Purchaser or other Affiliate of the Purchaser) without the consent of the Main Sellers, such consent not to be unreasonably withheld;

(iii)    the Employee Information shall not be used except for the purposes of complying with the obligations of the Purchaser and the Designated Purchasers pursuant to this Agreement and shall be returned to the Sellers or destroyed, at the Sellers' election, if this Agreement is terminated; and

(iv)    the Purchaser shall, and shall cause the Designated Purchasers to, comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

(c)    Within fourteen (14) days following the Employee Transfer Date, except to the extent prohibited by applicable data privacy Laws and subject to consent by such Employee in his or her written offer of employment, or as otherwise required by Law, the Sellers shall provide the Purchaser or the Designated Purchaser with the Employee Records (or a copy thereof).

(d)     During the Non-Solicitation Period, the Sellers shall not, without the advance written consent of Purchaser, either directly or indirectly solicit for employment or hire any Transferring Employee unless the employment of such Transferring Employee is involuntarily terminated without cause by the Purchaser or Designated Purchaser prior to such action by the Sellers (other than any termination in connection with such Transferring Employee seeking employment with Sellers); provided, however, that nothing in this Section 7.3(d) shall prevent the Sellers from (i) employing the Transferring Employees pursuant to the terms of the Transferring Employee Agreement, (ii) conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such Transferring Employees or (iii) hiring such Transferring Employees identified through such employment searches.

(e)     During the Non-Solicitation Period, the Purchaser shall not, and shall cause the Designated Purchasers not to, either directly or indirectly solicit for employment or hire any employee of the Sellers who is not an Employee unless (i) the employment of such employee is involuntarily terminated without cause by the Seller prior to such action by the Purchaser or Designated Purchasers (other than any termination in connection with such employee seeking employment with Purchaser or Designated Purchasers), or (ii) otherwise permitted by the Transition Services Agreement.

(f)     During the Non-Solicitation Period, the Purchaser shall not, and shall cause the Designated Purchasers not to, either directly or indirectly solicit for employment or hire any Employee who has rejected an offer of employment from the Purchaser or a Designated Purchaser, or to whom the Purchaser or a Designated Purchaser did not make an offer of employment pursuant to this Agreement; provided, that this Section 7.3(f) shall not apply if the Purchaser gives the Sellers prior notice of such solicitation or hire and such employee, if applicable, returns to the Sellers any severance payments paid by the Sellers to such employee ([1060]and, if applicable, releases the Sellers from any right to severance payments)[1061].

(g)     During the Non-Solicitation Period, neither Party shall, except as specifically set out in this Agreement or without the other Parties' written consent or as expressly permitted by this Agreement, either directly or indirectly solicit for employment or hire any of the employees with whom the Party has had personal contact, or who became known to the Party in the course of its negotiation of the transactions contemplated hereby; provided[1062] that nothing in this Section 7.3(g) shall restrict or preclude the Party, without such consent, from employing any employee Party who (x) contacts such Party directly at his or her own initiative without any direct or indirect solicitation by or encouragement from such party, (y) responds to a mass media solicitation or advertisement consistent with such Party's past practices, as applicable, that is not directed at  the employees, or (z) is contacted by a third party executive search firm or employment agency, so long the Party did not provide guidance as to such employee to the third party firm or agency.

~~Section VII.4.~~ [1063]

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    94                    Error! Unknown document
                                                                               property name.

Section☐7.4.  [1064]Excluded Employee Liabilities.[1065]

—[1066]None of the Purchaser or the Designated Purchasers shall assume or be deemed to have assumed any Liabilities of the Sellers or their Affiliates relating to Employees other than the Assumed Liabilities and except as otherwise provided in the Transferring Employee Agreement[1067] (the "**Excluded Employee Liabilities**"). The Excluded Employee Liabilities shall include, but not be limited to, the following:

(a)    the Sellers' or any of their Affiliates' obligations to contribute to, make payments with respect to or provide benefits under any Seller Employee Plan (including, for the avoidance of doubt, any arrangement that provides severance-type benefits) except with respect to the Transferred Employee Plans;

(b)    any Liability with respect to the KERP, the KEIP, the Calgary Retention Plan or any other Seller retention plan, program or arrangement in effect as of the Closing Date that provides benefits to any Transferring Employee;

(c)    any obligation to provide continuation coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to the Transferring Employees and/or their qualified beneficiaries with respect to a COBRA qualifying event that occurs prior to such Employees' Employee Transfer Date; and[1068]

(d)    Liabilities resulting from any Action (i) with respect to any Employee relating to his/her employment or termination of employment with any of the Sellers, or (ii) with respect to an applicant with respect to potential employment with any of the Sellers in the Business.[1069]; and[1070]

Section VII.5.—[1071]

(e)    [1072]any Liabilities relating to the Employees or any former employees employed in the Business by the Sellers (with respect only to such employee's employment with the Sellers), including payments or entitlements that Sellers or any of their Affiliates may owe or have promised to pay to any current or former Employee (whether or not becoming a Transferring Employee prior to or in connection with the Closing, (including any Employee who does not accept an offer of employment with the Purchaser or a Designated Purchaser)), including wages, other remuneration, holiday, bonus, severance pay (statutory or otherwise), commission, post-employment medical or life obligations, pension contributions or benefits, Taxes, ERISA Affiliate Liability, any obligation, liability or expense relating to any employment agreement or contract, any former Collective Labor Agreement, the employment practices of Sellers or any of their Affiliates prior to the Closing Date and any other liability, payment or obligations related to current or former Employees, including any WARN Act Liabilities relating to actions of the Sellers arising on or prior to the Closing Date, any workers compensation, labor, social welfare or similar Law, if any, including any such Liabilities arising out of or resulting from the Closing and/or the consummation of the transactions contemplated by this Agreement, other than any Assumed Liabilities and other than with respect to liabilities incurred after the Closing Date under Purchaser Employee Plans by Transferring Employees who are terminated by Purchaser or a Designated Purchaser after the Closing Date.[1073]

Section☐7.5.  [1074]Sole Benefit of Sellers and Purchaser.[1075]

,—[1076]The terms and provisions of this ARTICLE VII are for the sole benefit of the Sellers and the Purchaser. Nothing contained herein, express or implied (i) shall be construed to establish, amend, or modify any Seller Employee Plan, any Purchaser Employee Plan, or any other benefit plan, program, agreement or arrangement, (ii) shall alter or limit the ability of the Purchaser, the Sellers, or any of their respective Affiliates to amend, modify or terminate any Seller Employee Plan, any Purchaser Employee Plan (other than as provided in Section 7.2(c)), or any other benefit or employment plan, program, agreement or arrangement after the Closing Date, (iii) is intended to confer or shall confer upon any current or former employee any right to employment or continued employment, or constitute or create an employment agreement with any Transferring Employee, or (iv) is intended to confer or shall confer upon any individual or any legal representative of any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees and including collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement.

## ARTICLE☐VIII

## CONDITIONS TO THE CLOSING

Section VIII.1.[1077]

Section☐8.1.  [1078]Conditions to Each Party's Obligation.[1079]

,—[1080]The Parties' obligation to effect, and, as to the Purchaser, to cause the relevant Designated Purchasers to effect, the Closing is subject to the fulfillment (or the express written waiver of the Primary Parties), at or prior to the Closing, of the following conditions:

(a)   *Regulatory Approvals.*  All Regulatory Approvals shall have been obtained; [1081] provided, however, that any order issued under paragraph 25.4(1)(b) of the Investment Canada Act authorizing the transactions contemplated hereby shall be an order that is on terms and conditions satisfactory to the Purchaser acting reasonably (in acting reasonably, the Purchaser shall agree to all terms and conditions, provided that they do not impair the ability of the Purchaser to operate and derive benefits from the Business in a commercially reasonable manner)[1082].

(b)   *No Injunctions or Restraints.*  There shall be in effect no Law, order, injunction, decree or judgment of any court or other Government Entity in the U.S., Canada or the United Kingdom prohibiting the consummation of the transactions contemplated hereby, and there shall not be any proceedings pending by any Governmental[1083] Government[1084] Entity in the U.S. or Canada seeking such prohibition.

(c)   *U.S. Bidding Procedures Order and Canadian Sales Process Order.* The U.S. Bidding Procedures Order and the Canadian Sales Process Order shall have been entered and shall not have been stayed as of the Closing Date.[1085]

(c)   (d) [1086]*U.S. Sale Order and Canadian Approval and Vesting Order.*  The U.S. Sale Order and the Canadian Approval and Vesting Order (i) shall have been entered and

not modified[1087], and (ii) shall have become Final Orders, provided, that, this condition under Section 8.1(d[1088]e[1089])(ii) may be waived by the Purchaser in its sole discretion.

~~Section VIII.2.~~[1090]

Section☐8.2.  [1091]Conditions to Sellers' Obligation.[1092]

—[1093]The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or the express written waiver by the Main Sellers), at or prior to the Closing, of each of the following conditions:

    (a)    *No Breach of Representations and Warranties.*

    (i)    Each of the representations and warranties set forth in ARTICLE III (other than those referred to in clause (ii) below), disregarding all materiality qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that has not had, and would not reasonably be expected to have, a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

    (ii)    Each of the representations and warranties set forth in Sections 3.1, 3.2 and 3.3, disregarding all materiality and material adverse effect qualifications contained therein, shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

    (b)    *No Breach of Covenants.*  The covenants contained in this Agreement to be complied with by the Purchaser or the Designated Purchasers on or before the Closing shall not have been breached in any material respect.

~~Section VIII.3.~~[1094]

Section☐8.3.  [1095]Conditions to Purchaser's Obligation.[1096]

—[1097]The Purchaser's obligation to effect, and to cause the relevant Designated Purchasers to effect, the Closing shall be subject to the fulfillment (or the express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

    (a)    *No Breach of Representations and Warranties.*

    (i)    Each of the representations and warranties set forth in ARTICLE IV (other than those referred to in clause (ii) below), disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that has not had, and would not reasonably be expected to have, a Material Adverse Effect.

(ii)     Each of the representations and warranties set forth in Sections 4.1, 4.2,[1098]4.2[1099] and 4.3, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

(b)     *No Breach of Covenants.*  The covenants, obligations and agreements contained in this Agreement to be complied with by the Sellers on or before the Closing shall not have been breached in any material respect.

(c)     [1100]*Certificates.  The Sellers shall have delivered to the Purchaser duly executed certificates, as set forth in Section 2.3.2(a).*[1101]

(d)     (e)[1102]*Unbundling and Assignment.*  With respect to Bundled[1103]Seller[1104] Contracts that accounted, in the aggregate, for at least $1,500,000,000 (or no less than 75%) of the sales revenue related to the CDMA Business in fiscal year 2008 (the **"Specified CDMA Contracts"**), the Sellers shall have (or will prior to the[1105]or at the Closing) (i) in the case of Assumed and Assigned Contracts, assumed and assigned such[1106] Specified CDMA Contracts pursuant to[1107] Section 2.1.5, and (ii) in the case of Bundled Contracts other than the Contracts assumed and assigned as required by the foregoing clause (i), amended such Bundled Contracts and[1108]entered into new Contracts;[1109] in accordance with Section 5.16[1110] with the counterparties to[1111]such Specified CDMA Contracts and[1112] which will be Assigned Contracts;[1113] with the counterparties to[1114]the[1115] Specified CDMA Contracts pursuant to[1116] Section 5.16(a)[1117].

(e)     (d)[1118]*Investment Canada.*[1119]  The Minister of Industry has not sent to the Purchaser a notice under subsection 25.2(1) of the Investment Canada Act and the Governor in Council has not made an order under subsection 25.3(1) of the Investment Canada Act in relation to the transaction contemplated by this Agreement or, if such a notice has been sent or such an order has been made, the Purchaser has subsequently received (i) a notice under paragraph 25.2(4)(a) of the Investment Canada Act indicating that a review of the transaction on grounds of national security will not be made, (ii) a notice under paragraph 25.3(6)(b) of the Investment Canada Act indicating that no further action will be taken in respect of the transaction or (iii) a copy of an order under paragraph 25.4(1)(b) authorizing the transaction, provided that order is on terms and conditions satisfactory to the Purchaser in its sole discretion[1120]acting reasonably (in acting reasonably, the Purchaser shall agree to all terms and conditions, provided that they do not impair the ability of the Purchaser to operate and derive benefits from the Business in a commercially reasonable manner)[1121].

# ARTICLE□IX

# TERMINATION

Section IX.1.  [1122]Termination[1123]

Section 9.1.  [1124]Termination.[1125]

—[1126]This Agreement may be terminated at any time prior to the Closing:

(a)  by mutual written consent of the Primary Parties;

(b)  [1127]~~by either the Main Sellers or the Purchaser, upon written notice to the other upon the entry of an order by the U.S. Bankruptcy Court and the Canadian Court approving an Alternative Transaction;~~[1128]

(b)  ~~(e)~~[1129]by either the Main Sellers or the Purchaser, upon written notice to the other:

(i)  if the U.S. ~~Bidding Procedures Order and the Canadian Sales Process Order have not been entered within twelve (12) days from the date of this Agreement;~~[1130]

~~(ii)    if the Auction is not completed within thirty (30) days of the entry of the U.S. Bidding Procedures Order and the Canadian Sales Process Order;~~[1131]

~~(iii)    if the U.S.~~[1132]Sale Order and the Canadian Approval and Vesting Order <u>approving this Agreement and the transactions contemplated hereby</u>[1133]have not been entered by the respective Courts by July 31, 2009; <u>or</u>[1134]

(ii)  ~~(iv)~~[1135]if the Closing does not take place by ~~August 31,~~[1136]<u>September 30,</u>[1137] 2009 (the "**Termination Date**")[1138]; provided, that if the Closing does not take place by the Termination Date solely due to the condition set forth in Section 8.1(a) not being fulfilled, the Termination Date shall automatically be extended to ~~September 30,~~[1139]<u>October 31,</u>[1140] 2009;

provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(e[1141]<u>b</u>[1142]) shall not be available to the Party seeking to terminate if such Party <u>or one of its Affiliates</u>[1143] is then in breach of this Agreement and such breach has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to this Section 9.1(e[1144]<u>b</u>[1145]).

(c)  ~~(d)~~[1146]by the Purchaser if any of the Sellers withdraw or seek authority to withdraw the Canadian Approval and Vesting Order Motion or the U.S. Bidding Procedures and Sale Motion, or publicly announce any stand alone plan of reorganization or liquidation (or support any such plan filed by any other Person) in respect of the Business;

(d)  ~~(e)~~[1147]by the Purchaser in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Section 8.1(a), Section 8.3(a) or Section 8.3(b), as applicable, and, in each case, which, if capable of being cured, is not cured within ten (10) days <u>(or such lesser number of days remaining prior to the Termination Date)</u>[1148]from receipt of a written notice from the Purchaser; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(e[1149]<u>d</u>[1150]) shall

not be available to the Purchaser where a breach of this Agreement by the Purchaser has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to such clause; ~~or~~ [1151]

(e) ~~(f)~~ [1152]by the Main Sellers in the event of a material breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Section 8.1(a) or Section 8.2 of this Agreement; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(f [1153]~~g~~ [1154]) shall not be available to the Main Sellers where a breach of this Agreement by ~~the~~ [1155] any of the Sellers has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to such clause; or

(f) ~~(g)~~ [1156]by the Purchaser in the event the Sellers fail to consummate the Closing in breach of Section 2.3, within five (5) Business Days of written demand by the Purchaser to consummate the Closing.

Section IX.2. ~~[1157]Termination Payments.~~ [1158]

~~(a)~~ [1159]~~In the event that this Agreement is terminated pursuant to Section 9.1(b), by the Main Sellers pursuant to Section 9.1(e) (other than Section 9.1(e)(iv)) or by the Purchaser pursuant to Section 9.1(d), Section 9.1(e) or Section 9.1(g), then the Sellers shall pay to the Purchaser in immediately available funds within two (2) Business Days following such termination, a cash fee of $19,500,000 (the "Break-Up Fee"). In addition, in the event this Agreement is terminated pursuant to Section 9.1 (other than Section 9.1(a) or Section 9.1(f)), the Sellers shall pay to the Purchaser an amount in cash equal to the total amount of all reasonable and documented fees, costs and expenses incurred by the Purchaser in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all filing and notification fees, and all fees and expenses of the Purchaser's Representatives in an amount not to exceed $3,000,000 (the "Expense Reimbursement"). The Sellers acknowledge and agree that the Expense Reimbursement is a reasonable amount given the size and complexity of the transactions contemplated by this Agreement. The Expense Reimbursement shall be paid by wire transfer or other means acceptable to the Purchaser not later than two (2) Business Days following the receipt by the Main Sellers of a written notice from the Purchaser describing the fees and expenses which constitute the Expense Reimbursement in reasonable detail (the "Expense Reimbursement Notice").~~ [1160]

~~(b)    The Sellers' obligation to pay the Break-Up Fee and the Expense Reimbursement pursuant to this Section 9.2 shall survive termination of this Agreement and shall to the extent owed by the U.S. Debtors, constitute administrative expense claims against the U.S. Debtors under Section 503(b) of the U.S. Bankruptcy Code.~~ [1161]

~~(c)    Notwithstanding anything to the contrary herein, the Sellers' obligation to pay the Break-Up Fee pursuant to this Section 9.2 is expressly subject to entry of the US Bidding Procedures Order and Canadian Sales Process Order.~~ [1162]

Section IX.3. ~~[1163]Effects of Termination~~ [1164]

Section☐9.2.   [1165]Effects of Termination.[1166]

‒[1167]If this Agreement is terminated pursuant to Section 9.1:

(a)    all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of (i) Section 5.7 (Public Announcements), (ii) Section 5.10 (Transaction Expenses), (iii) Section 5.11 (Confidentiality), (iv) Section 5.33 (Good Faith Deposit), with respect to the last sentence thereof, (v) Section [1168]7.3(b) (Other Employee Covenants), (v[1169]vi[1170]) Section 9.1 (Termination), (vi) Section 9.2 (Termination Payments), ([1171]vii) Section 9.3[1172]9.2[1173] (Effects of Termination) and (viii) ARTICLE X (Miscellaneous); provided, that neither the termination of this Agreement nor anything in this Section 9.3[1174]9.2[1175] shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof and thereof;

(b)    except as required by applicable Law, the Purchaser shall return to the Sellers or destroy all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; and

(c)    the provisions of the Confidentiality Agreement shall continue in full force and effect.

## ARTICLE ☐ X

## MISCELLANEOUS

Section X.1. ‒[1176]

Section☐10.1.  [1177]No Survival of Representations and Warranties or Covenants.[1178]

‒[1179]No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

Section X.2. ‒[1180]Remedies[1181]

Section☐10.2.  [1182]Remedies.[1183]

‒[1184]No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

Section X.3. ‒[1185]

Section☐10.3. [1186]No Third Party Beneficiaries.[1187]

̶ [1188]Except for any acknowledgments, rights, undertakings, representations or warranties expressed to be for the benefit of the EMEA Debtors or the Joint Administrators, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

~~Section X.4.~~    [1189]

Section☐10.4. [1190]Consent to Amendments; Waivers.[1191]

̶ [1192]No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement and the Ancillary Agreements shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.

~~Section X.5.~~    [1193]~~Successors and Assigns~~[1194]

Section☐10.5. [1195]Successors and Assigns.[1196]

̶ [1197]Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Main Sellers in case of an assignment by Purchaser or Purchaser in case of an assignment by any Seller, which consent may be withheld in such party's sole discretion, except for the following assignment which shall not require consent (i) assignment to an Affiliate of a Party (provided (A) that such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Parties and (B) any such assignment by Purchaser complies with Section 2.4 if applicable), (ii) assignment by a U.S. Debtor to a succeeding entity following such U.S. Debtor's emergence from Chapter 11, and (iii) assignment by any of the Canadian Debtors pursuant to any plan of arrangement approved by the Canadian Court, which will not require the consent of the Purchaser.

Section☐10.6. Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.[1198]

(a)    Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York applicable to ~~contracts~~[1199]Contracts[1200] made and to be performed in that State and without regard to the rules of conflict of laws of any other jurisdiction.

(b)    To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, ~~action~~[1201]Action[1202], proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby

shall be brought only in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, provided that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors or the Canadian Debtors may, in accordance with the Cross-Border Protocol, request that the Bankruptcy Court or the Canadian Court, as case may be, to hold a joint hearing of the Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, ~~action~~[1203]Action[1204] or proceeding, and (b) in the United States District Court for the Southern District of New York or, if that court lacks subject matter jurisdiction, the Supreme Court of the State of New York, County of New York, if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases, and shall not be brought, in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the U.S. Bankruptcy Court, the Canadian Court, in the United States District Court for the Southern District of New York and the Supreme Court of the State of New York, County of New York and the Canadian Court, as applicable, pursuant to the preceding clauses (a) and (b) for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such Action brought in any such court or any claim that any such Action brought in such court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such Action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)    Section 10.6(b) shall not limit the jurisdiction of the Accounting Arbitrator set forth in ~~Sections 2.2.3(c), 2.2.3~~[1205]Section 2.2.3.1[1206](c) and 5.30, although claims may be asserted in the courts referred to in Section 10.6(b) for purposes of enforcing the jurisdiction and judgments of the Accounting Arbitrator.

(d)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

~~Section X.7.~~[1207]Notices[1208]

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property          103          Error! Unknown document
property name.

Section☐10.7. [1209]Notices. [1210]

.—[1211]All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below, by electronic mail with confirmation to any Party at the address specified below, or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Purchaser to:

Nokia Siemens Networks B.V.
Karaportti 3
FI-02610 Espoo
Finland
Attention: Kirsi Kormi
Facsimile: +35-871-802-8037[1212]

Telefonaktiebolaget L M Ericsson (PUBL)
Torshamnsgatan 23
Kista
Stockholm
Sweden
Attention: Per Oscarsson
Attention: Carl Olof Blomqvist
Facsimile: +46-8-18-4085[1213]

With copies (that shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom (UK) LLP
40 Bank Street
Canary Wharf
London, England E14 5DS
Attention: N. Lynn Hiestand, Michal Berkner
Facsimile: +44 207 519 7000[1214]

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York, USA 10019-6064
Attention: Stephen J. Shimshak
Attention: Marilyn Sobel
Facsimile: +1-212-373-3990[1215]

and

~~Torys~~[1216]Blake, Cassels & Graydon[1217] LLP[1218]
~~79 Wellington~~[1219]199 Bay[1220] Street ~~West,~~[1221]
[1222]Suite ~~3000~~
~~Box 270, TD Centre~~[1223]2800, Commerce Court West[1224]
Toronto, Ontario, ~~M5K 1N2~~[1225]Canada M5L 1A9[1226]
Attention: ~~Sharon C. Geraghty~~[1227] Richard Corley
Attention: Susan Grundy[1228]
Facsimile: +1-416-~~865-7380~~[1229]863-26-53[1230]

If to the Main Sellers or the Sellers, to:

Nortel Networks Corporation
[1231]195 The West Mall Mailstop: T0503006
[1232]Toronto, Ontario, Canada  M9C 5K1
Attention:     Gordon A. Davies
        [1233]Chief Legal Officer & Corporate Secretary
Facsimile:     +1-905-863-7386

Nortel Networks Limited
[1234]195 The West Mall
[1235]Mailstop: T0503006
[1236]Toronto, Ontario, Canada  M9C 5K1
Attention:     Gordon A. Davies
        [1237]Chief Legal Officer & Corporate Secretary
Facsimile:     +1-905-863-7386

Nortel Networks Inc.
[1238]Legal Department
[1239]220 Athens Way, Suite 300
[1240]Nashville, Tennessee, USA  37228
Attention:     Lynn C. Egan
            Assistant Secretary
[1241]Facsimile: +1-615-432-4067

With copies (that shall not constitute notice) to:

Nortel Networks Limited[1242]
[1243]195 The West Mall
[1244]Mailstop: T0505009
[1245]Toronto, ~~ON~~ [1246]Ontario, Canada [1247]M9C 5K1~~Canada~~[1248]
Attention:[1249]  ~~Attn:~~  [1250]Douglas Parker
    [1251]Associate General Counsel, Corporate
[1252]Facsimile: +1-905-863-7739

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                105                Error! Unknown document
                                                                        property name.

and

Nortel Networks Inc.
[1253]Legal Department
[1254]220 Athens Way, Suite 300
[1255]Nashville, ~~TN~~ [1256]Tennessee, [1257]37228
USA
[1258]Attention:  Robert Fishman
            Senior Counsel
[1259]Facsimile:  +1-347-427-3815 & +1-615-432-4067

and

Cleary Gottlieb Steen & Hamilton LLP[1260]
One Liberty Plaza
New York, ~~NY~~[1261]New York, USA[1262] 10006
~~United States~~[1263]
Attention:  Paul J. Shim, [1264]
Attention:  [1265]Daniel S. Sternberg
Facsimile:  +1-212-225-3999

and

Ogilvy Renault LLP[1266]
[1267]200 Bay Street
[1268]Suite 3800, P.O. Box 84
[1269]Royal Bank Plaza, South Tower
[1270]Toronto, Ontario M5J 2Z4
[1271]Canada
[1272]Attention:  Michael Lang
[1273]Facsimile:  +1-416-216-3930

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the second calendar day after deposit with a reputable overnight courier service, as applicable.

Section 10.8. Exhibits; Sellers Disclosure Schedule .[1274]

(a)    The Sellers Disclosure Schedule and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)    The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

~~Section X.9.~~ [1275]Counterparts[1276]

Section☐10.9. [1277]Counterparts. [1278]

.—[1279]The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterparty of this Agreement

Section X.10.—[1280]

Section☐10.10.      [1281]No Presumption; Mutual Drafting. [1282]

.—[1283]The parties hereto are sophisticated and have been represented by lawyers who have carefully negotiated the provisions hereof.  As a consequence, the parties do not intend that the presumptions of any Laws relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement and therefore waive the effects of such Laws.

Section X.11.—[1284]Severability[1285]

Section☐10.11.      [1286]Severability. [1287]

.—[1288]If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

Section X.12.—[1289]

Section☐10.12.      [1290]Entire Agreement. [1291]

.—[1292]This Agreement, the other Transaction Documents and the Confidentiality Agreement set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the other Transaction Documents and the Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated.  In the event of any irreconcilable conflict between this Agreement and any of the other Transaction Documents or the Confidentiality Agreement, the provisions of this Agreement shall prevail, regardless of the

fact that certain other Transaction Documents, such as the Local Sale Agreements (if any), may be subject to different governing Laws.

~~Section X.13.~~ [1293]

Section☐ 10.13.        [1294]Availability of Equitable Relief. [1295]

—[1296]The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, calculation of which the Parties agree would be uncertain and difficult to ascertain, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches.

~~Section X.14.~~ [1297]~~Bulk Sales Laws~~[1298]

Section☐ 10.14.        [1299]Bulk Sales Laws. [1300]

—[1301]Subject to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, each Party waives compliance by the other Party with any applicable bulk sales Law.

Section☐ 10.15.        Main Sellers as Representatives of Other Sellers. [1302]

(a)        For all purposes of this Agreement:

(i)        each Other Seller listed in Section 10.15(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNC as its representative;

(ii)        each Other Seller listed in Section 10.15(a)(ii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNL as its representative; and

(iii)        each Other Seller listed in Section 10.15(a)(iii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNI as its representative.

(b)        Pursuant to Section 10.15(a), each of NNC, NNL and NNI shall expressly have the power to, in the name and on behalf of each of its Respective Affiliates (as defined below), (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

(c)        For the purposes of this Agreement, **"Respective Affiliates"** means: (i) with respect to NNC, each Other Seller listed in Section 10.15(a)(i) of the Sellers Disclosure Schedule; (ii) with respect to NNL, each Other Seller listed in Section 10.15(a)(ii) of the Sellers Disclosure Schedule, and (iii) with respect to NNI, all the other U.S. Debtors and each Other Seller listed in Section 10.15(a)(iii) of the Sellers Disclosure Schedule, but in all cases other than any EMEA Debtors or their respective Subsidiaries.

(d)      Each Respective Affiliate shall indemnify the Main Seller that acts as representative of such Respective Affiliate pursuant to this Section 10.15(d) for, and hold it harmless against, any loss, liability or expense, including reasonable attorneys' fees, incurred by such Main Seller without gross negligence, bad faith or willful misconduct, for serving in the capacity of representative of such Respective Affiliate hereunder.

~~Section X.16.~~ [1303]

Section☐10.16.        [1304]Execution by Other Sellers,[1305]

—[1306]The Purchaser hereby acknowledges that the Other Sellers are not executing this Agreement as of the date hereof. This Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers have done so. Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall cause each Other Seller to execute a counterpart to this Agreement no later than the day prior to the Closing Date, agreeing to be bound as a Seller under this Agreement and authorizing NNC, NNL or NNI, as applicable, to act as its representative under Section 10.15 hereof.

~~Section X.17.~~ [1307]

Section☐10.17.        [1308]Obligations of the Sellers,[1309]

—[1310]When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor other than NNC and a Non-Debtor Seller) and Affiliates of any Sellers shall in no event include any EMEA Debtors or their respective Subsidiaries.

~~Section X.18.~~ [1311]~~Limitation on Losses~~[1312]

Section☐10.18.        [1313]Limitation on Losses.[1314]

—[1315]Except as provided in Section ~~5.31~~[1316]5.32[1317] or except in the case of a Liability arising from a cash payment obligation due to a party in respect of which the party seeking set-off has received a final judgment in an Action or Proceeding in accordance with Section 10.6, no party shall be entitled to set-off any Liabilities or Losses under this Agreement against any amounts due to such party under any other agreement with the other parties or any Affiliate thereof. In no event shall any party be responsible or liable for any Losses that are consequential, in the nature of lost profits, diminution in the value of property, special or punitive or otherwise not actual damages.

[Remainder of this page intentionally left blank.  Signature page follows.]

IN WITNESS WHEREOF, the Parties have duly executed this Asset Sale Agreement as of the date first written above.

~~Nokia Siemens Networks B.V.~~[1318]

Telefonaktiebolaget L M Ericsson (publ)[1319]

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Nortel Networks Corporation

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Nortel Networks Limited

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Error! Unknown document property name.Error! Unknown document property name.Error! Unknown document property

Error! Unknown document property name.

Nortel Networks Inc.

By:_____
      Name:
      Title:

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

111

Error! Unknown document
property name.

# APPENDIX "D"

## [CONFIDENTIAL]

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**SEVENTEENTH REPORT OF THE MONITOR**
**DATED JULY 27, 2009**

---

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada  M5B 2M6

Jay A. Carfagnini (LSUC# 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5726149