- 4 -

**MANITOBA**

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF THE
PROVINCE OF MANITOBA AS REPRESENTED
BY THE MINISTER OF FINANCE**

101-401 York Ave.
Winnipeg, Manitoba  R3C 0P8

- 5 -

**NOVA SCOTIA**

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF NOVA SCOTIA AS
REPRESENTED BY THE MINISTER OF
FINANCE**

Doug Moodie

P.O. Box 187
1723 Hollis St.
Halifax, Nova Scotia  B3J 2N3

- 6 -

**SASKATCHEWAN**

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF SASKATCHEWAN AS
REPRESENTED BY THE MINISTER OF
FINANCE**

2350 Albert Street
Regina, Saskatchewan  S4P 4A6

- 7 -

**ONTARIO**

AND
TO:

**ONTARIO MINISTRY OF FINANCE**
Legal Services Branch
6th Floor
33 King Street West
Oshawa, Ontario
L1H 8H5

Kevin O'Hara

Email:  kevin.ohara@ontario.ca
Tel:      (905) 433-6934
Fax:     (905) 436-4510

- 8 -

**QUEBEC**

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF QUEBEC AS
REPRESENTED BY THE MINISTER OF
FINANCE**

12 Rue Saint-Louis
Québec, Québec  G1R 5L3

- 9 -

**FEDERAL**

AND
TO:

**CANADA REVENUE AGENCY**
c/o Department of Justice
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario  M5X 1K6

Diane Winters
Nancy Arnold

Email: diane.winters@justice.gc.ca
Tel:    416.973.3172
Fax:    416.973.0810

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**NOTICE OF MOTION**
**(Returnable July 28, 2009)**

Ogilvy Renault LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P. O. Box 84
Toronto, Ontario M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 1756101\1

TAB # 2

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF GEORGE RIEDEL**
**(sworn July 25, 2009)**

I, George Riedel, of the city of Boston in the State of Massachusetts, MAKE OATH
AND SAY:

1.       I am the Chief Strategy Officer of Nortel Networks Corporation ("NNC") and Nortel
Networks Limited ("NNL") and have held those positions since February, 2006. As such, I have
personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where I do
not possess personal knowledge, I have stated the source of my information and, in all such
cases, believe it to be true.

2.       I swear this Affidavit in support of the motion to approve, among other things, the
transactions contemplated by the asset sale agreement dated as of July 24, 2009 (the "Sale
Agreement") among NNC, NNL and Nortel Networks Inc. ("NNI") and certain of their affiliates,
as vendors (the "Sellers"), and Telefonaktiebolaget L M Ericsson (publ), as purchaser (the
"Purchaser"), in respect of the sale of certain of its assets relating to Nortel's CDMA and LTE
business (as such terms are defined and described in further detail below) (the "Business"). A
copy of the Sale Agreement (without exhibits or schedules) will be attached as an appendix to
the seventeenth report (the "Seventeenth Report") of the Monitor (as defined below) to be filed

- 2 -

in connection with this motion. References to "Nortel" herein are references to the global enterprise as a whole.

## BACKGROUND

3.      On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court and Ernst & Young Inc. was appointed as monitor (the "Monitor") in the CCAA proceedings.

4.      Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "Chapter 11 Debtors"), made voluntary filings in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

5.      Additionally, on January 15, 2009, Nortel Networks UK Limited and certain subsidiaries of the Nortel group incorporated in Europe, the Middle East or Africa each obtained an administration order for the appointment of administrators from the English High Court of Justice under the Insolvency Act 1986.

6.      On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

7.      On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA will continue to operate as a going concern for an initial period of three months. In accordance with the European Union's Counsel Regulation, the English law proceedings remain the main proceedings in respect of NNSA.

- 3 -

8.      Lastly, on June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK under Chapter 15 of the Code.  On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

9.      On July 15, 2009, Nortel Networks (CALA) Inc. made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

10.     Further details regarding the background to these proceedings are set out in the affidavit of John Doolittle sworn January 14, 2009 (the "Initial Order Affidavit") previously filed in these proceedings as well as my affidavit sworn June 23, 2009 (the "June 23 Affidavit") and are therefore not repeated herein.

11.     Capitalized terms used herein and not otherwise defined shall have the meaning given to them in my June 23 Affidavit or the Sale Agreement as applicable.

**THE TRANSACTION**

*The Business*

12.     My June 23 Affidavit and the Initial Order Affidavit both included a detailed description of Nortel's Carrier Networks business ("Carrier") which includes 2G/3G mobility networking solutions based on Code Division Multiple Access ("CDMA"), and its research and development ("R&D") efforts have included innovative technologies focused in the areas of 4G broadband wireless services including Long Term Evolution ("LTE"), an evolving networking standard for which Nortel has completed early trials with customers.

*The Stalking Horse Agreement*

13.     Pursuant to an Order of this Court made on June 30, 2009 (the "Bidding Procedures Order"), approving a stalking horse agreement dated as of June 19, 2009 (the "Stalking Horse Agreement") among Nokia Siemens Networks B.V. ("Nokia Siemens Networks"), as buyer and the Sellers as well as certain bidding procedures ("Bidding Procedures") for a sales process for the Business.  A copy of the Bidding Procedures Order will be attached as an appendix to the Seventeenth Report.  A similar order was made by the U.S. Court on the same day.

- 4 -

14.    The Stalking Horse Agreement was described in detail in the June 23 Affidavit and the Fourteenth Report. Briefly, the Stalking Horse Agreement provided for the following:

a)    A purchase price of US$650,000,000, subject to certain adjustments based on net working capital, including net inventory, construction-in-process receivables, contractual liabilities, royalty liabilities, warranty provisions, and accrued vacation amounts as of the Closing;

b)    The payment of a break up fee of US$19,500,000 and an expense reimbursement of up to US$3,000,000; and

c)    A commitment to take at least 2,500 Nortel employees worldwide.

*The Sale and Bid Process*

15.    In accordance with the Bid Procedures, upon the entry of the Bidding Procedures Order, Nortel went into a twenty two (22) day "go shop" period pursuant to which prospective bidders were entitled to follow certain procedures in order to qualify as "Qualified Bidders" and submit "Qualified Bids" no later than 4:00 p.m. (ET) on July 21, 2009 (the "Bid Deadline").

16.    By the Bid Deadline, Nortel had received three (3) bids, including the Stalking Horse Agreement, all of which were subsequently allowed as "Qualified Bids"). In addition to Nokia Siemens Networks, both MPAM Wireless, Inc. ("MatlinPatterson") and the Purchaser submitted Qualified Bids.

17.    As contemplated by the Bidding Procedures, an auction was held at the offices of Cleary Gottlieb Steen & Hamilton LLP on July 24, 2009. The auction concluded on July 24, 2009 and the Purchaser was selected as the successful bidder.

18.    I am aware that the Seventeenth Report will contain a more detailed summary of the auction and the variations from the Stalking Horse Agreement as a result of the bid and auction process. The final purchase price for the Assets is US$1.130 billion subject to similar adjustments as were contained in the Stalking Horse Agreement. Pursuant to the Sale Agreement, the Purchaser has committed to make employment offers to at least 2,500 Nortel employees worldwide.

- 5 -

19.     As part of the transaction, NNL will enter into an intellectual property license agreement and trademark license agreement with the Purchaser (or such other entity designated by it) (the "IP Licenses") pursuant to which NNL will license certain intellectual property to the Purchaser. The Purchaser has requested approval of the IP Licenses as part of the approval and vesting order.

20.     I believe that the process undertaken the by the Applicants, the Chapter 11 Debtors and their advisors, including with input from the official committee of unsecured creditors of NNI and the ad hoc bondholders committee, was in compliance with the Bidding Procedures and that maximum value for the Assets has been achieved.

21.     I also note that the assets to be sold as part of this transaction do not include any of the intellectual property licensed to Hitachi Communication Technologies Ltd., which license agreement was approved by Order of this Court on June 1, 2009.

22.     The Sale Agreement is conditional upon the approval of both the U.S. Court and this Court and I am aware that a joint hearing between the two (2) courts has been scheduled for July 28, 2009.

*Alternate Bidder*

23.     The Bidding Procedures contemplated the approval of one or more "Alternate Bids" in the event that the transaction with the Purchaser does not close. At the auction, Nokia Siemens Networks was chosen as the alternative bidder with a bid on substantially similar terms contained in the Sale Agreement, with a purchase price of US$1,032,500,000 (the "Alternate Bid"). Further details regarding the Alternate Bid will be set out in the Seventeenth Report.

*Sealing*

24.     I am aware that the Monitor has or will be filing one or more confidential appendices to the Seventeenth Report which, among other thing, will contain the disclosure schedules and exhibits to the Sale Agreement.   These disclosure schedules and exhibits contain sensitive competitive and, in some instances, personal information. I believe sealing this confidential appendix is appropriate in the circumstances.

- 6 -

**CONCLUSION**

25.    The sale process was conducted by Nortel with consultation from its financial advisor, the Monitor and several of its significant stakeholders and in accordance with the Bidding Procedures. The auction resulted in a significantly increased purchase price on terms that are the same or better than those contained in the Stalking Horse Agreement. I believe that the proposed transaction as set out in the Sale Agreement is the best offer available for the Assets and that the Alternate Bid represents the second best offer available for the Assets.

SWORN BEFORE ME at the City of New York, in the State of New York on this 25th day of July, 2009

George Riedel

Commissioner for Taking Affidavits or Notary Public

Jennifer T. Scott
Notary Public, State of New York
No. 01SC6193409
Qualified in New York County
Commission Expires September 15, 2010

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**AFFIDAVIT OF GEORGE RIEDEL**
**(sworn July 25, 2009)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

DOCSTOR: 1736538\2

# TAB # 3

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF GEORGE RIEDEL**
**(sworn June 23, 2009)**

I, George Riedel, of the city of Boston in the State of Massachusetts, MAKE OATH AND SAY:

1.     I am the Chief Strategy Officer of Nortel Networks Corporation ("NNC") and Nortel Networks Limited ("NNL") and have held those positions since February, 2006. As such, I have personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where I do not possess personal knowledge, I have stated the source of my information and, in all such cases, believe it to be true.

2.     I swear this Affidavit in support of the motion to approve, among other things, the bidding procedures and a "stalking horse" asset sale agreement dated as of June 19, 2009 (the "Sale Agreement") among NNC, NNL and Nortel Networks Inc. ("NNI") and certain of their affiliates, as vendors (the "Sellers"), and Nokia Siemens Networks B.V., as purchaser ("Nokia Siemens Networks" or the "Purchaser"), in respect of the sale of certain of its assets relating to Nortel's CDMA and LTE business (as such terms are defined and described in further detail below) (the "Business"). A copy of the Sale Agreement (without exhibits or schedules) is attached as Appendix "A" to the fourteenth report (the "Fourteenth Report") of the Monitor (as

- 2 -

defined below) to be filed in connection with this motion.  References to "Nortel" herein are references to the global enterprise as a whole.

**BACKGROUND**

3.    On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court and Ernst & Young Inc. was appointed as monitor (the "Monitor") in the CCAA proceedings.

4.    Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "Chapter 11 Debtors"), made voluntary filings in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code (the "Code").  On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

5.    Additionally, on January 15, 2009, Nortel Networks UK Limited and certain subsidiaries of the Nortel group incorporated in Europe, the Middle East or Africa each obtained an administration order for the appointment of administrators from the English High Court of Justice under the Insolvency Act 1986.

6.    On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

7.    On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA will continue to operate as a going concern for an initial period of three months.  In accordance with the European Union's Counsel Regulation, the English law proceedings remain the main proceedings in respect of NNSA.

- 3 -

8.      Lastly, on June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK under Chapter 15 of the Code.

9.      Further details regarding the background to these proceedings are set out in the affidavit of John Doolittle sworn January 14, 2009 (the "Initial Order Affidavit") previously filed in these proceedings and are therefore not repeated herein.

## THE TRANSACTION

*The Business*

10.      As was set out in the Initial Order Affidavit, Nortel's Carrier Networks business ("Carrier") offers wireline and wireless networks that help service providers and cable operators supply mobile voice, data and multimedia communications services to individuals and enterprises using cellular telephones, personal digital assistants, laptops, soft-clients and other wireless computing and communications devices.

11.      The Carrier portfolio includes 2G/3G mobility networking solutions based on Code Division Multiple Access ("CDMA"), and its research and development ("R&D") efforts have included innovative technologies focused in the areas of 4G broadband wireless services including Long Term Evolution ("LTE"), an evolving networking standard for which Nortel has completed early trials with customers.

12.      As was more particularly described in the pre-filing report filed by Ernst & Young Inc., as proposed monitor, the Carrier business is Nortel's largest business, its largest generator of revenue and has been its core business for several years. .The Business focuses on serving primarily telecommunications customers, with Verizon Communications Inc. being the largest customer in North America.

13.      The business environment in which Nortel operates its Carrier business is highly competitive. While it is clear that significant value exists in the CDMA and LTE aspects of the Carrier business, the full value of these assets cannot be realized by attempting to operate it through the process of restructuring. The Carrier technology is evolving over time and the Carrier business requires investments of R&D and capital to realize the most value from the

- 4 -

business and its customer relationships. As described below, Nortel believes that a sale of this business at this time is in the best interests of the company and its stakeholders.

14.     Nortel has concluded that, given its CCAA and Chapter 11 filings, value for the Business is best maximized through the sale of the Business assets to a buyer that can leverage such value off of its own existing customer relationships and the acquired customer relationships, as well as investments in R&D to develop the next generation of CDMA and LTE products and services. In the absence of continued investment, the long-term viability of the Business will be in jeopardy.

15.     As a consequence, Nortel has determined that the Business must be provided with stability and that in order to provide the necessary business certainty, a sale process is necessary at this time.

16.     Nortel has from time to time over the last several years explored the possibility of divesting the Business. While no transaction was ultimately completed pre-filing, the process provided Nortel's management with a view of the potential market for the Business, as well as the value of the Business to the major market participants.

17.     Prior to the Filing Date, Nortel engaged in discussions with various of its market competitors regarding the potential sale of the Carrier business. Since then, Nortel resumed discussions with Nokia Siemens Networks. The Applicants and their investment banker, Lazard Frères & Co., also began seeking prospective purchasers for the Business both among market competition and among potential strategic investment entities. Prior to signing the Sale Agreement, the Applicants contacted certain of their significant market competitors in the Business and engaged in extensive negotiations with one of these competitors regarding the terms of a potential transaction.

*The Sale Agreement*

18.     Capitalized terms used in this section of my Affidavit and not otherwise defined herein shall have the meanings given to them in the Sale Agreement.

- 5 -

19.     The Sale Agreement[1] contemplates the sale of the Assets, subject to higher and/or better bids, on the following material terms:

a) *Purchase Price.*  At the Closing, the Purchaser will pay to the Sellers an estimated purchase price of US$650,000,000, subject to certain adjustments based on net working capital, including net inventory, construction-in-process receivables, contractual liabilities, royalty liabilities, warranty provisions, and accrued vacation amounts as of the Closing.

b) *Certain Fees.*  In certain circumstances the Sellers may be required to pay to the Purchaser a break-up fee and an expense reimbursement, which are discussed in further detail below.

c) *Assets.*  The Assets to be acquired by the Purchaser include, among other things, certain (i) inventory and supplies, (ii) equipment, (iii) real estate subleases, (iv) contracts, (v) accounts receivable, (vi) construction-in-process receivables, (vii) rights under warranties, representations and guarantees by suppliers, manufacturers and third parties, (viii) business information, (x) intellectual property, (xi) governmental consents and (xii) certain other rights against third parties relating to the foregoing. The assets to be acquired by the Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable, bank account balances and petty cash, certain assets and rights relating to the pre-Closing period, and security deposits.

d) *Assumed Liabilities.*  The liabilities to be assumed by the Purchaser include, among others, (i) liabilities arising after the Closing Date to the extent related to the Business or the operations or ownership thereof after the Closing, (ii) liabilities arising from assigned contracts in connection with the performance of such contracts after the Closing Date, (iii) certain liabilities relating to transferred intellectual property, (iv) certain tax liabilities, (v) certain warranty liabilities, (vi) certain liabilities related to employees, their accrued vacation entitlements under employment laws, and (vii) liabilities related to net working capital adjustments.

---

[1]     A separate asset sale agreement, the China Asset Sale Agreement (as defined in the Sale Agreement), is being executed for the conveyance of certain assets by relevant Affiliates of the Sellers to the Purchaser.

- 6 -

e) *Sale Free and Clear.*  The Assets to be transferred by the Applicants will be transferred free and clear of all Liens, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the Sale Agreement.

f) *Ancillary Agreements.*  Pursuant to the Sale Agreement, at or prior to the Closing, Sellers and the Purchaser will enter into, among others, the following ancillary agreements:

  i.   *Transition Services Agreement.*  At the Closing, NNL, NNC, NNI and the Purchaser will enter into an agreement under which NNL, NNC and NNI and their affiliates will agree to provide to the Purchaser and its affiliates certain information technology, business transition and related services, commencing at the Closing and continuing for a period not to exceed two (2) years.

  ii.  *Intellectual Property License Agreement.*  At the closing, NNL and the Purchaser will enter into an intellectual property license agreement (the "IPLA") pursuant to which (i) NNL will license to the Purchaser and its affiliates certain intellectual property necessary for the manufacture of the products and the provision of services, and (ii) NNL and its affiliates will receive a license back to all intellectual property included in the Assets for use in their other businesses.  The IPLA will remain in force for so long as any intellectual property rights licensed thereunder continue to exist.  Also at the Closing, NNL and the Purchaser will enter into a license agreement allowing the Purchaser and its affiliates to utilize the "Nortel" trademark and logo in its sales of the CDMA Products and the LTE Access Products for a limited period after Closing.

  iii. *Transferring Employee Agreement.*  At the Closing, the Main Sellers and the Purchaser will enter into an agreement under which certain employees of Nortel (the  "Transferring Employees") and its affiliates will be seconded to the Purchaser to perform services for the Purchaser for a 90-day period generally (and 6 months in respect of Canadian Inactive Employees and 12 months in respect of Visa Employees) beginning on the Closing Date, which Nortel has agreed to do while the Purchaser establishes the appropriate human

- 7 -

resources functions or obtains visas, as the case may be. The Transferring Employees will remain on the payroll of the applicable Seller and will continue to participate in the Sellers' pension and benefit plans. The applicable Seller will continue to pay all employment costs in respect of the Transferring Employees that relate to the period of the Employee Agreement, and the Purchaser will provide for the payment of, or if not paid pursuant to the pre-funding mechanism in the Transferring Employee Agreement, promptly reimburse Nortel for, all such employment costs.

iv.   *CDMA Supply Agreement.* At the Closing, the Sellers and the Purchaser or Designated Purchaser will enter into a CDMA Supply Agreement pursuant to which the Purchaser will undertake to supply the Sellers with CDMA Products and related support services in order to enable the Sellers to continue to service certain contracts not assigned pursuant to the Sale Agreement ("Excluded Contracts"). In addition, the agreement, among other things, provides that the Sellers will not enter into any new, or renew any existing, customer contracts related to the Business (including the Excluded Contracts).

g) *Closing Conditions*: In addition to certain other customary closing conditions, including conditions relating to approvals by the U.S. Court and this Honourable Court, the obligation of the Purchaser to close the sale is subject to the satisfaction of the following conditions: (i) the accuracy of the Sellers' representations and warranties, except as would not result in a Material Adverse Effect, and (ii) the performance in all material respects of all covenants, obligations and agreements required to be performed by the Sellers on or before the Closing.

h) *Ongoing Covenants and Restrictions*: In addition to certain other customary post-Closing obligations such as information-sharing and redirection of customers and payments, the Sellers have agreed to: (i) cooperate with the Purchaser in relation to *arrangements regarding non-assignable contracts and bundled contracts during an* agreed period after the Closing, and (ii) license or sublease certain real estate to the Purchaser.

- 8 -

i) *Post-Closing Access to Books and Records.* For three (3) years after the Closing (or such longer period as may be required under applicable law), the Purchaser must preserve pre-Closing records. After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable advance notice and during regular business hours, the Purchaser shall, and/or shall cause the Person holding such records to provide the Sellers or their representatives reasonable access to such records and permit the Sellers or their representatives to make copies of such records, in each case at no cost to the Sellers or their representatives (other than for reasonable out-of-pocket expenses). The Sale Agreement contains further provisions related to tax records and information.

20.     None of the amounts required to be paid or borne by the Applicants under the Sale Agreement or Ancillary Agreements shall be secured by a Charge over the Applicants' assets.

21.     In addition, in order to facilitate consummation of the Sale Agreement, NNL and the Debtors will enter into one or more agreements for the termination of the Debtors intellectual property license interest (the "Appropriate License Termination"), as contemplated by the Interim Funding and Settlement Agreement (which is subject to the approval of this Honourable Court and the U.S. Court on June 29, 2009).

22.     As set out above, the Closing of the sale under the Sale Agreement is conditional upon, among other things, court approval in the U.S. pursuant to Section 363 of the Code and the granting of an approval and vesting order from this Honourable Court. Upon the conclusion of the auction process referred to below, if the Purchaser is the successful bidder, the Chapter 11 Debtors intend to return to the U.S. Court for such approval and the Applicants will also bring a motion for approval before this Honourable Court on or about July 30, 2009.

*Employees*

23.     As part of the transaction contemplated by the Sale Agreement, the Purchaser has committed to offer employment to at least 2,500 Nortel employees world wide.

24.     The Sale Agreement provides that the Purchaser shall be entitled to commence extending offers to employees after the completion of the Auction but prior to Closing subject to the terms and conditions of the Sale Agreement.

- 9 -

*Break up Fee and Expense Reimbursement*

25.    The Purchaser and its advisors have expended, and likely will continue to expend, considerable time, energy, and resources pursuing the purchase of the Assets and the assumption and assignment of the Assigned Contracts, and have engaged in extended, good faith negotiations. The Sale Agreement is the culmination of these efforts.

26.    In recognition of this expenditure of time, energy, and resources, the Sellers have agreed that if the Purchaser is not the Successful Bidder (as defined in the Bidding Procedures described below), the Sellers will, to the extent due under Section 9.2 of the Sale Agreement, pay the Purchasers: (i) a fee of US$19,500,000 (the "Break-Up Fee"), which is equal to three percent (3%) of the aggregate Purchase Price (prior to adjustment) set forth in Section 2.2.1 of the Sale Agreement, and (ii) an amount in cash equal to the total amount of all reasonable and documented fees, costs and expenses incurred by the Purchaser in connection with the preparation, performance and execution of the Sale Agreement and the transactions contemplated thereby, including all filing and notification fees, and all fees and expenses of the Purchaser's Representatives in an amount not to exceed US$3,000,000 (the "Expense Reimbursement" and, together with the Break-up Fee, the "Bid Inducements"), which shall be payable as provided for pursuant to the terms of the Sale Agreement.

27.    Specifically, as set forth in Section 9.2 of the Sale Agreement, the Sale Agreement provides for payment of the Break-Up Fee upon termination of the Sale Agreement in the following instances:

    a) upon the entry of an order by this Honourable Court and the U.S. Court approving an Alternative Transaction;

    b) if the Sellers terminate the Sale Agreement because the U.S. Bidding Procedures Order and the Canadian Sales Process Order have not been entered within twelve (12) days from the date of the Sale Agreement;

    c) if the Sellers terminate the Sale Agreement because the Auction is not completed within thirty (30) days of the entry of the U.S. Bidding Procedures Order and the Canadian Sales Process Order;

- 10 -

d) if the Sellers terminate the Sale Agreement because the U.S. Sale Order and the Canadian Approval and Vesting Order have not been entered by the respective Courts by July 31, 2009;

e) if the Purchaser terminates the Sale Agreement because any of the Sellers withdraw or seek authority to withdraw the Canadian Approval and Vesting Order Motion or the U.S. Bidding Procedures and Sale Motion, or publicly announce any stand alone plan of reorganization or liquidation (or support any such plan filed by any other Person) in respect of the Business;

f) if the Purchaser terminates the Sale Agreement in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in the Sale Agreement, which breach would result in a failure to satisfy the conditions to Closing described in paragraphs 18(g)(i) and (ii) above, as applicable, and, in each case, which, if capable of being cured, is not cured within ten (10) days from receipt of a written notice from the Purchaser; provided, however, that the Purchaser's right to terminate the Sale Agreement in these circumstances will not be available where a breach of the Sale Agreement by the Purchaser has been the cause of, or has resulted in, the event or condition giving rise to such right to terminate; or

g) if the Purchaser terminates the Sale Agreement in the event the Sellers fail to consummate the Closing in material breach of Section 2.3 of the Sale Agreement which speaks to the time of Closing and Closing deliverables, within five (5) Business Days of written demand by the Purchaser to consummate the Closing.

28.    The Expense Reimbursement is payable upon termination of the Sale Agreement pursuant to any of the grounds listed above if the Closing does not take place by August 31, 2009, or if the Closing does not take place because of the condition that certain regulatory approvals be obtained, by September 30, 2009.

*The Sale and Bid Process*

29.    *In connection with having entered into the Sale Agreement and subject to approvals by the U.S. Court and this Honourable Court, Nortel will conduct an auction process for the sale of the Assets to ensure that the Sellers receive the maximum value for the Assets and the Sellers and the Purchaser have agreed that the Sale Agreement is subject to higher or better offers. It is*

- 11 -

anticipated that in the next month, Nortel will conduct an expedited sale process and follow the bid procedures referred to below with a view to the ultimate conduct of an auction.

30.     An agreed upon set of bidding procedures (the "Bidding Procedures") have been developed, which provide for a process through which an interested party may become a "Qualified Bidder".  Bids from Qualified Bidders must be submitted no later than **4:00 p.m. (ET) on July 21, 2009**.  The auction is scheduled to take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York City at 9:30 **a.m. (ET) on July 24, 2009**.

31.     I am aware that the Fourteenth Report will outline the proposed sale process and the Bidding Procedures in more detail.  I have reviewed the Bidding Procedures and the Bid Inducements and believe them to be fair in the circumstances.

*Sealing*

32.     I am aware that the Monitor has or will be filing a confidential appendix to the Fourteenth Report which contains the disclosure schedules and exhibits to the Sale Agreement.  These disclosure schedules and exhibits contain sensitive competitive and, in some instances, personal information. I believe sealing this confidential appendix is appropriate in the circumstances.

**CONCLUSION**

33.     On June 19, 2009, Nortel announced that it was advancing in its discussions with external parties to sell its other businesses in addition to the Business.

34.     This decision followed extensive discussions and consultation with outside advisors and stakeholders, which discussions have been taking place since the inception of the proceedings. This process has taken months of hard work by Nortel and its advisors.

35.     Although all restructuring alternatives were considered, management's exercise of its business judgment has concluded that given the impact of the filings on the businesses including deterioration in sales and an inability to maintain spending on R&D (for instance), conducting specific sales processes of Nortel's various businesses on a "going concern" basis at this time provides the greatest chance to maximize the value of its operations to preserve as many jobs as possible and continue businesses in Canada and the U.S.

36.     I believe that this proposed process for the sale of the CDMA and LTE businesses

- 12 -

pursuant to an auction process is the best way to preserve the Business as a going concern and to maximize value and preserve jobs for the Applicants' employees. I further believe that exploration of the sale of the other businesses as a going concern through this process will provide the greatest chances for further value maximization and job preservation.

37.     Based on the Applicants' previous consideration of potential transactions involving the Carrier business and after re-canvassing the marketplace since the commencement of these proceedings, I believe that the proposed transaction with the Purchaser represents the highest and best proposal available for the Business, subject to the receipt of a better bid through the auction process contemplated in this motion.

38.     The potential purchase price that could be realized through a sale of the Assets is likely to decline over time if the Assets remain unsold. While it is clear that the Assets have significant value, the full value of the Assets may not be realized if a sale is not consummated expeditiously.

39.     The Sale Agreement requires an expeditious sale process and provides the Purchaser the right to terminate the Agreement if certain milestones in the sale process are not timely met. For these reasons, the expeditious sale of the Assets is critical to the maximization of the value of the Applicants' assets and, in turn, to a recovery for the Applicants' estates.

SWORN BEFORE ME at the City of
New York, in the State of New York on
this 23rd day of June, 2009.

_____
Commissioner for Taking Affidavits or
Notary Public

PETER O'KEEFE
Notary Public, State of New York
No.01OK6146765
Qualified in Richmond County
Certificate Filed In New York County
Commission Expires May 22, 2010

_____
George Riedel

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**AFFIDAVIT OF GEORGE RIEDEL**
(sworn June 23, 2009)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

# TAB # 4

Court File No. 09-CL-7950

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")**

**FOURTEENTH REPORT OF THE MONITOR
DATED JUNE 23, 2009**

**INTRODUCTION**

1.     On January 14, 2009, Nortel Networks Corporation ("NNC" and collectively with all its
       subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel
       Networks Technology Corporation ("NNTC"), Nortel Networks International
       Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") filed for and
       obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA").
       Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and
       restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor
       of the Applicants (the "Monitor") in the CCAA proceeding. The stay of proceedings was
       extended to July 30, 2009, by this Honourable Court in its Order dated April 28, 2009.

2.     Nortel concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy
       Code (the "Code") in the U.S. Court on January 14, 2009, for Nortel Networks Inc.
       ("NNI") and certain of its U.S. subsidiaries (the "U.S. Debtors").

3.  Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Filed Entities") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court") on January 15, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Filed Entities, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "U.K. Administrators").

4.  On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

5.  On May 28, 2009, the Commercial Court of Versailles, France ordered the commencement of secondary insolvency proceeding in respect of, Nortel Networks SA ("NNSA"). These secondary insolvency proceedings commenced within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court for NNSA.

**PURPOSE**

6.  The purpose of this Fourteenth Report of the Monitor (the "Fourteenth Report") is to provide this Honourable Court with information regarding the Applicants' motion seeking approval of:

    •   an agreement amongst NNC, NNL and NNI and certain of their affiliates (the "Sellers") and Nokia Siemens Networks B.V. ("Nokia Siemens" or the

~ 2 ~

"Purchaser") in respect of the sale of certain CDMA and LTE assets as a "stalking horse" agreement;

- the Bidding Procedures (as defined below);

- authorizing and approving the terms and conditions of the Break-Up Fee and Expense Reimbursement (as defined below); and

- to provide the Monitor's support thereof.

**TERMS OF REFERENCE**

7.    In preparing this Fourteenth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company, and discussions with management of Nortel. EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Fourteenth Report.

8.    Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

9.    Capitalized terms not defined in this Fourteenth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Report of the proposed Monitor dated January 14, 2009 (the "Pre-Filing Report"), previous Reports of the Monitor, or in the Sale Agreement (as defined below).

**GENERAL BACKGROUND**

10.    Nortel is fundamentally a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived

~ 3 ~

and maintained from its R&D activities, its customers and other significant contracts and agreements.

11.   Nortel conducts its global business through four reportable business unit segments: Carrier Networks ("CN"), Enterprise Solutions ("ES"), Metro Ethernet Networks ("MEN") and LG-Nortel Co. Ltd.  The revenues and assets of each of the business units are distributed among the various Nortel legal entities and joint ventures around the world.

**THE CDMA BUSINESS AND LTE BUSINESS**

*Background*

12.   Nortel operates various lines of business within the CN business unit, which include the CDMA Business and the LTE Business (as defined in the Sale Agreement), (collectively, the "Business").

13.   The CN business unit is not operated through a dedicated legal entity or a stand-alone division.  Generally, Nortel has one legal entity in each country in which it operates and sales of all Nortel products in that country are made through the single legal entity.  A more detailed description of this structure is set out in the Pre-Filing Report.

14.   CN offers wireline and wireless networks that help service providers and cable operators supply mobile voice, data and multimedia communications services to individuals and enterprises using cellular telephones, personal digital assistants, laptops, soft-clients, and other wireless computing and communications devices.  The CN portfolio includes 2G/3G mobility networking solutions based on Code Division Multiple Access ("CDMA"), and Nortel's research and development efforts have included innovative technologies focused in the areas of 4G broadband wireless, including Long Term Evolution ("LTE"), an evolving networking standard for which Nortel has completed early trials with customers. Subsequent to the commencement of insolvency proceedings, Nortel learned that it was not being selected for commercial opportunities by potential

key lead customers despite having positive trial results with several of these customers. As a result, Nortel's plans to offer end-to-end LTE commercial solutions were suspended.

15.    The CDMA Business is the business segment through which the Sellers, individually, jointly or in collaboration with or pursuant to contracts with third parties, design, develop, process components, indirectly manufacture through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers the prior versions (if currently supported), current versions and versions under development of the following products: CDMA BTS, CDMA BSC/eBSC, CDMA DO-RNC, CDMA MSC/MTX, CDMA HLR, CDMA Media Gateway, CDMA Gateway controller, CDMA Billing Manager, SS7 Signaling Gateway Software and certain associated OAM Software Systems and provide certain services related to CDMA (the "CDMA Business").

16.    The LTE Business is the business through which the Sellers, individually, jointly or in collaboration with or pursuant to contracts with third parties, design, develop, process components, indirectly manufacture through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers the prior versions (if currently supported), current versions and versions under development of the following LTE Access products: eNodeB (including UDM and URM) and associated Element Management Systems (the "LTE Business").

17.    CN is Nortel's largest business unit and represents approximately 41% of Nortel's 2008 revenue. Revenues from CDMA comprised over 21% of Nortel's 2008 Revenue.

18.    The Applicants also have an interest in the intellectual property upon which the CDMA products are based. Generally speaking, the owner of intellectual property in the Nortel group, which in most cases is NNL, licenses the intellectual property in question for sale to customers in the other geographies, to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis.

19.    The Business currently employs approximately 3,100 people (approximately 500 in Canada) in the CDMA Business and approximately 1,000 people (approximately 500 in Canada) in the LTE Business.

20.     The CN technology requires significant investments of research and development and capital to continue to realize the most value from the business and its customer relationships. Nortel has concluded that such value is best maximized through the sale of the CDMA and LTE businesses to a buyer who can leverage its own existing customer relationships and the acquired customer relationships, as well as continue to make the necessary investments in technology in order to develop the next generation of products and services.

***Initial Sale Process***

21.     Prior to commencing insolvency proceedings, as discussed in the Affidavit of George Riedel dated June 23, 2009, Nortel began to explore the possibility of divesting its CDMA and LTE assets. While no binding agreements were entered into, these discussions provided Nortel's management with a strong assessment of the market for these assets as well as the value of the assets to its major market competitors.

22.     Subsequent to the commencement of insolvency proceedings, Nortel with the assistance of Lazard Frères & Co. recommenced efforts to seek a prospective purchaser for the CDMA Business and the LTE Business. In connection with this process, Nortel contacted certain of its strategic competitors and ultimately entered into extensive negotiations with Nokia Siemens and one other primary competitor. These negotiations culminated in Nortel entering into an agreement with Nokia Siemens as described below.

**THE NOKIA SIEMENS AGREEMENT**

23.     On June 19, 2009, the Sellers entered into an Asset Sale Agreement (the "Sale Agreement") with Nokia Siemens outlining the terms of the Sellers' sale of certain assets and liabilities of the CDMA Business in North America, the CDMA research and development assets in China as well as certain LTE assets and liabilities in Canada and the United States to Nokia Siemens. The Sale Agreement (without Exhibits or Schedules) is attached as Appendix "A". A copy of the exhibits and schedules to the Sale Agreement are attached as confidential Appendix "B" hereto. As these exhibits and schedules contain sensitive competitive information as well as personal information with

respect to employees, the Monitor requests that confidential Appendix "B" to this Fourteenth Report be sealed by this Honourable Court.

24.    Nokia Siemens provides global telecommunications services including a complete portfolio of mobile, fixed and converged network technology, as well as professional services including consultancy and systems integration, deployment, maintenance and managed services. It is one of the largest telecommunications hardware, software and professional services companies in the world. Operating in 150 countries, its headquarters are in Espoo, Finland. Nokia Siemens is a joint venture between Nokia Corporation and Siemens AG.

25.    The key terms of the Sale Agreement are outlined in the paragraphs that follow.

26.    Assets. The assets of the Business being sold are as follows (collectively the "Purchased Assets"):

- the Owned Net Inventory as of the Closing Date;

- the CIP (Construction-In-Process) Receivables as of the Closing Date;

- the Owned Equipment as of the Closing Date;

- the Assigned Contracts in force as of the Closing Date;

- the Assigned Accounts Receivable;

- Real Estate sub-leases;

- the Business Information existing as of the Closing Date;

- the Assigned Intellectual Property as of the Closing Date, subject to any and all licenses granted under such Intellectual Property prior to the Closing Date, together with all claims against Third Parties for infringement, misappropriation or other violation of any Law with respect to any of the Assigned Intellectual Property, whether for any past, present or future infringement, misappropriation or other violation;

~ 7 ~

- all rights as of the Closing under all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Assets; and

- to the extent assignable under applicable Law, all Consents of Government Entities exclusively pertaining to the Business.

27.    The Purchased Assets to be acquired by the Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable, bank account balances and petty cash, certain assets and rights relating to the pre-closing period, and security deposits.

28.    Purchase Price.  The Purchase Price is $650 million plus the obligation of the Purchaser to pay, perform and discharge the Assumed Liabilities.  At the Closing, the Purchaser will pay to the Sellers the Estimated Purchase Price calculated as follows:

- The Purchase Price
    - o  minus
        - $2.6 million for the China Assets (which assets are to be sold pursuant to the China Asset Sale Agreement);
        - the Estimated Employee Adjustment Amount, if any;
    - o  plus:
        - the difference which may be positive or negative, equal to the Estimated Adjusted Net Working Capital plus $22 million; provided that if the difference is a positive number greater than $30 million, the difference shall be deemed to be $30 million;
    - o  minus an amount equal to the Working Capital Escrow Amount of $20 million.

29.    The parties will enter into the China Asset Sale Agreement for the sale of the CDMA research and development assets in China with the purchase price to be based upon the book value of the assets.  The China Asset Sale Agreement is discussed below.

30.    The Working Capital Escrow Amount will be funded by the Purchaser into an escrow account to be established with an escrow agent.

31.    Within 30 days of Closing, the Purchaser shall deliver to the Sellers a statement of the calculation of the final Purchase Price.  The Sellers have 30 days from receipt of this statement to issue a Disagreement Notice.  The Sellers and the Purchaser will negotiate in good faith and any resolution will be final and binding on the parties.

32.    If the parties are unable to resolve the disputes within 30 days of the issuance of the Disagreement Notice, an Independent Auditor shall be appointed as an arbitrator. Within 15 business days from the appointment date, he or she is to issue a written report setting forth the resolution of such disagreement, and such report will be final and binding on the parties.

33.    The escrow agent will make a payment to the Purchaser or Seller as the case may be from the Working Capital Escrow Account upon determination of the Final Purchase Price.

34.    <u>Assumed Liabilities</u>. The liabilities to be assumed by the Purchaser include:

- all liabilities arising on or after the Closing Date to the extent related to the conduct, operation or ownership of the Business after the Closing Date, including (i) all such liabilities with respect to the ownership, exploitation and operation of the Purchased Assets incurred on or after the Closing Date, and (ii) all such liabilities related to actions or claims brought against the Business arising from events occurring after the Closing Date;

- all liabilities arising from or in connection with the performance of the Assigned Contracts after the Closing Date, or any arrangements entered into regarding contracts not assigned to the Purchaser which contain commercial relationships with other Nortel businesses in addition to the CDMA and LTE businesses (the "Bundled Contracts") after the Closing Date;

- any obligations under any warranty liabilities relating to products and CDMA services which have been supplied under any Assigned Contract but excluding any Cure Costs payable under the Sale Agreement;

- the obligation to post any deposits, bonds or other security in replacement of security posted under any Assigned Contract pursuant to the Sale Agreement;

- all liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Assigned Intellectual Property which the Sellers may have granted or committed to third parties, including liabilities resulting from the

~ 9 ~

assurances, declarations and undertakings made to standard setting bodies that are listed in the Sellers Disclosure Schedule;

- all liabilities for, or related to any obligation for, any Transfer Tax that the Purchaser bears under the Sale Agreement;

- all obligations under any warranty liabilities relating to Products and CDMA Services which have been supplied under any Bundled Contract subcontracted to the Purchaser or any Designated Purchaser under the Sale Agreement;

- except to the extent otherwise expressly set forth in the Sale Agreement, all liabilities related to or arising from any of the following; (i) the Purchaser's or any Designated Purchaser's (or any of their Affiliates') employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of the Transferring Employees arising on or after the Closing Date, (ii) the terms of any offer of employment or notice of continued employment, as applicable, to any Employee who is provided an offer pursuant to the Sale Agreement and (iii) Purchaser's or a Designated Purchaser's failure to offer employment to any employee that constitutes a violation of applicable Law;

- all liabilities arising that relate to or arise from or in connection with any Purchaser Employee Plan;

- all liabilities related to Transferring Employees expressly assumed by the Purchaser or a Designated Purchaser as set forth in the Sale Agreement;

- any obligation to provide continuation coverage pursuant to COBRA or any similar Law under any Purchaser Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to Transferring Employees and/or their qualified beneficiaries with respect to a qualifying event that occurs on or after such Transferring Employee Transfer Date;

- the Accrued Vacation Amount;

- all liabilities reflected in the computation of Adjusted Net Working Capital, including the Contractual Liabilities Amount, the Royalty Liability Amount and the Warranty Provision Amount; and

- all other liabilities listed in the Sellers Disclosure Schedule.

35. <u>Employees</u> – The Purchaser shall extend written offers of employment to at least 2,500 employees in the Business in accordance with the terms of the Sale Agreement. Such offers (and, with respect to Employees whose employment transfers by operation of law, such continued employment) shall be consistent with the requirements of applicable law and on terms and conditions no less favourable, in the aggregate, than those the Employees currently have, but subject to certain adjustments to conform to the Purchaser's standard employment policies where legally possible, and shall provide the employees with a one week consideration period.

36. *<u>Cure Costs</u> – The Sellers are responsible for certain specified Cure Costs required to be paid to effect the assignment of certain contracts to be assumed by the Purchaser.*

37. <u>Sale Free and Clear</u>. The assets to be transferred by the Applicants will be transferred free and clear of all liens, claims and interests, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the Sale Agreement.

38. <u>No Survival of Representations and Warranties or Covenants:</u> No representations or warranties, covenants or agreements in the Sale Agreement or in any instrument delivered pursuant to the Sale Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

39. <u>Certain Fees</u>. The Sale Agreement provides for payment of the Break-Up Fee upon termination of the Sale Agreement in the following instances: (a) upon the entry of an order by the U.S. Court and the Canadian Court approving an Alternative Transaction; (b) if the Sellers terminate the Sale Agreement because the U.S. Bidding Procedures Order and the Canadian Sales Process Order have not been entered within twelve (12)

days from the date of the Sale Agreement; (c) if the Sellers terminate the Sale Agreement because the Auction is not completed within thirty (30) days of the entry of the U.S. Bidding Procedures Order and the Canadian Sales Process Order; (d) if the Sellers terminate the Sale Agreement because the U.S. Sale Order and the Canadian Approval and Vesting Order have not been entered by the respective Courts by July 31, 2009; (e) if any of the Sellers withdraw or seek authority to withdraw the Canadian Approval and Vesting Order Motion or the U.S. Bidding Procedures and Sale Motion, or publicly announce any stand alone plan of reorganization or liquidation (or support any such plan filed by any other Person) in respect of the CDMA and/or LTE businesses; (f) in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in the Sale Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Section 8.3(a) or Section 8.3(b) thereof, as applicable, and, in each case, which, if capable of being cured, is not cured within ten (10) days from receipt of a written notice from Purchaser; provided, however, that the right to terminate the Sale Agreement pursuant to Section 9.1(e) thereof shall not be available to Purchaser where a breach of the Sale Agreement by Purchaser has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate the Sale Agreement pursuant to such clause; or (g) in the event the Sellers fail to consummate the Closing in material breach of Section 2.3 of the Sale Agreement, within five (5) Business Days of written demand by Purchaser to consummate the Closing, and the Expense Reimbursement is payable upon termination of the Sale Agreement pursuant to any of the grounds listed above or if the Closing does not take place by August 31, 2009, or if the Closing does not take place by August 31, 2009 because of the condition that certain regulatory approvals be obtained, if the Closing does not take place by September 30, 2009.

40.   Ancillary Agreements.   Pursuant to the Sale Agreement, at or prior to the Closing, Sellers and the Purchaser will enter into, among others, the following ancillary agreements:

- Transition Services Agreement. NNL, NNC, NNI and the Purchaser will enter into an agreement under which NNL, NNC and NNI and their affiliates will agree to provide to the Purchaser and its affiliates certain information technology, business transition and related services, commencing at the Closing and

~ 12 ~