continuing for a period not to exceed two (2) years. The fees to be paid by the
Purchasers to the Sellers for these services shall be set out in the Transition
Services Agreement.

- Intellectual Property License Agreement. NNL and Nokia Siemens Networks OY
  ("NSNOY"), an affiliate of the Purchaser will enter into an intellectual property
  license agreement ("IPLA") pursuant to which (i) NNL will license to the
  NSNOY and its affiliates certain intellectual property necessary for the
  manufacture of the products and the provision of services, and (ii) NNL and its
  affiliates will receive a license back from the Purchaser to all intellectual property
  included in the Purchased Assets for use in the Company's other businesses. The
  IPLA will remain in force for so long as any intellectual property rights licensed
  thereunder continue to exist. In addition, NNL and the Purchaser will enter into a
  Transitional Trademark License Agreement allowing the Purchaser and its
  affiliates to, among other things, utilize the "Nortel" trademark and logo in its
  sales of the Products for a transitional period after closing.

- Transferring Employee Agreement. Nortel and the Purchaser will enter into an
  agreement under which certain employees of Nortel and its affiliates will be
  seconded to the Purchaser to perform services for the Purchaser for a 90-day
  period beginning on the Closing Date. The Transferring Employees will remain
  on the payroll of the applicable Seller and will continue to participate in the Seller
  pension and benefit plans. Any expenses for these Transferring Employees will
  be absorbed by the Purchaser.

- CDMA Supply Agreement. The Sellers and NSNOY will enter into a CDMA
  Supply agreement pursuant to which the Purchaser will undertake to supply the
  Sellers with CDMA Products and related support services in order to enable the
  Sellers to continue to service certain contracts not assigned pursuant to the Sale
  Agreement ("Excluded Contracts"). In addition, the agreement provides that the
  Sellers will not enter into any new, or renew any existing, customer contracts
  related to the Business (including the Excluded Contracts).

- <u>Trademark Licence Agreement.</u> NNL and the Purchaser will enter into a license agreement permitting the Purchaser to license from Nortel certain trademarks for a transitional period following the Closing.

- <u>Escrow Agreement.</u> NNC, NNL, NNI, the Purchaser and a third party escrow agent will enter into an escrow agreement with respect to the Working Capital Escrow Amount.

- <u>Real Estate Agreements.</u> The Sellers and the Purchaser will enter into certain real estate agreements with respect to the post Closing lease, sublease or license by the Purchaser of certain owned and leased properties of the Sellers.

- <u>GDNT Agreement.</u> NNL, the Purchaser and Guangdong-Nortel Telecommunications Switching Equipment Limited shall enter into certain manufacturing and development agreements with respect to the Business.

- <u>China Asset Sale Agreement.</u> Nortel Networks (China) Limited ("Nortel China") and Nokia Siemens Networks Technology (Beijing) Co., Ltd. ("NSN Tech") shall enter into a local asset sale agreement to sell Nortel China's right, title and interest in and to the assets located in China relating to the CDMA Business.

- <u>Manufacturing and Supply Agreement Regarding Dual Platforms.</u> NNI and NSNOY shall enter into a master purchase agreement with respect to the purchase from NNI of certain post Closing products and services

41.  <u>Closing Conditions:</u> The obligation of the Purchaser to close the sale is subject to the satisfaction of the following conditions: (i) Sellers' representations and warranties are true and correct, except as would not result in a Material Adverse Effect, (ii) the performance in all material respects of all material covenants, obligations and agreements required to be performed by the Sellers on or before the Closing, (iii) bankruptcy court and all other regulatory approvals; and (iv) with respect to Bundled Contracts which accounted for in aggregate at least $1.5 billion or no less than 75% of the sales revenue related to the CDMA Business in fiscal year 2008, the Sellers shall have or will have

prior to or at the Closing entered into new contracts with the counterparties, which will be Assigned Contracts.

42.    Additional Termination Rights:  In addition to the Termination Rights of the Purchaser that would give rise to the payment of the Break-Up Fee and the Expense Reimbursement as outlined above, either the Purchaser or the Sellers may terminate the Sale Agreement if the Closing does not take place by August 31, 2009, or as extended per the Sale Agreement, without triggering the requirement to pay the Break-Up Fee or the Expense Reimbursement.

43.    Ongoing Covenants and Restrictions:  In addition to certain other customary post-closing obligations such as information-sharing and redirection of customers and payments, the Sellers have agreed to: (i) cooperate with the Purchaser in relation to arrangements regarding non-assignable contracts and Bundled Contracts during an agreed period after the Closing and (ii) sublease certain real estate to the Purchaser.

44.    Post-Closing Access to Books and Records.  For three years after the Closing (or such longer period as may be required under applicable law), the Purchaser must preserve pre-closing records. After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable advance notice and during regular business hours, the Purchaser shall, and/or shall cause the Person holding such records to provide the Sellers or their representatives reasonable access to such records and permit the Sellers or their representatives to make copies of such records, in each case at no cost to the Sellers or their representatives (other than for reasonable out-of-pocket expenses). The Sale Agreement contains further provisions related to tax records and information.

**BIDDING PROCEDURES AND AUCTION PROCESS**

45.    Given that certain of the U.S. Debtors are parties to the Sale Agreement and given the desire to maximize value for the benefit of stakeholders in relation to the assets which are the subject of the Sale Agreement, Nortel has determined and has agreed with Nokia Siemens that the Sale Agreement is subject to higher or better offers being obtained pursuant to a sale process under section 363 of the Code and that the Sale Agreement

~ 15 ~

shall serve as a "stalking horse" bid pursuant to that process. The Purchased Assets may be sold in a single sale to a single purchaser or in parts to several purchasers.

46.    The U.S. Debtors have filed a bidding procedures motion with the U.S. Court. A copy of the proposed bidding procedures is attached as Appendix "C" (the "Bidding Procedures").

47.    It is a condition of the Sale Agreement that Nortel shall have filed a motion seeking the approval of the Bidding Procedures by the U.S. Court by the second Business Day after signing the Sale Agreement. The motion was filed with the U.S. Court on June 19, 2009. It is also a condition of the Sale Agreement that Nortel shall have filed a similar motion seeking the approval of the same Bidding Procedures by this Honourable Court by the date that the U.S. Court grants an Order approving the Bidding Procedures. The Order being sought from the U.S. Court in respect of the Bidding Procedures is conditional upon this Honourable Court's approval of the same and the Applicants' motion for approval of the Bidding Procedures by this Honourable Court is likewise conditional on approval by the U.S. Court.

48.    Pursuant to the Sale Agreement, the Sellers who are U.S. Debtors shall use their best efforts to cause the U.S. Court to schedule a hearing to consider the Bidding Procedures and Sale Motion and enter the U.S. Bidding Procedures order as soon as possible.

49.    The Bidding Procedures provide that all bids must be received by the Sellers by no later than July 21, 2009 and that the Sellers will conduct an Auction of the Purchased Assets on July 24, 2009.

50.    It is anticipated that Nortel will ultimately seek a final Sales Order from the U.S. Court on or about July 28, 2009 and an Approval and Vesting Order from this Honourable Court in respect of the Sale Agreement and Purchased Assets on or about July 30, 2009.

51.    The Monitor recognizes the expeditious nature of the proposed sale process. However, the Monitor is advised that given the nature of the Business and the consolidation occurring in the global market, there are likely to be a limited number of parties interested in acquiring the Business. The Monitor is further advised that the Applicants have previously engaged in discussions with certain of these parties and the Monitor has

observed the extensive discussions held to date with Nokia Siemens and one other primary competitor.

52.    Nortel has consulted with, among others, the Official Committee of Unsecured Creditors (the "UCC") and the Bondholder Group regarding the Bidding Procedures and believe that both are supportive of the timing of this sale process.

53.    Given the sale efforts made to date by Nortel, the Monitor supports the sale process outlined herein and more particularly described in the Bidding Procedures.

54.    As described in the relevant motion materials filed with the U.S. Court, the key provisions of the Bidding Procedures are outlined in the paragraphs that follow.

### Bid Deadline

55.    A Qualified Bidder (as defined below) that desires to make a bid will deliver written copies of its bid to: the Sellers, counsel and financial advisors to the Sellers, counsel and financial advisors to the UCC, counsel to the Bondholder Group, and the Monitor; so as to be received not later than 4:00 p.m. (Eastern Time) on July 21, 2009 (the "Bid Deadline"). The Sellers, after consultation with the UCC, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so; provided, however, that for any such extension beyond ten Business Days the Sellers shall have obtained the written consent of the UCC, the Bondholder Group, and the Monitor, which consent will not be unreasonably withheld. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders, including Nokia Siemens, of such extension.

### Provisions Governing Qualifications of Bidders

56.    Unless otherwise ordered by the U.S. Court and this Honourable Court, for cause shown, or as otherwise determined by the Sellers, in consultation with the UCC, the Bondholder Group and the Monitor, in order to participate in the bidding process, each person (a "Potential Bidder"), other than Nokia Siemens, must deliver (unless previously delivered) to the Sellers and their advisors, the UCC and its advisors, counsel to the Bondholder Group and the Monitor:

- an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers;

- financial information that will allow the Sellers and their financial advisors, in consultation with the UCC, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate a purchase of the Purchased Assets; and

- a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Purchased Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder, and any proposed measures associated with their employment; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Sale Agreement.

57.     A Potential Bidder that satisfies the above requirements, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the UCC, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction,  will be deemed a "Qualified Bidder".  The determination as to whether a Potential Bidder meets the requirements of a Qualified Bidder will be made as promptly as practicable and the Sellers will so notify the Potential Bidder.  The

Sellers will immediately allow Qualified Bidders to begin to conduct due diligence with respect to the Purchased Assets as provided in the Bidding Procedures.

***Provisions Governing Qualified Bids***

58.  A bid submitted pursuant to the Bidding Procedures will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "Qualified Bid"):

- *the Qualified Bidder offers to purchase the Purchased Assets upon the terms and* conditions substantially as set forth in the Sale Agreement, or pursuant to terms and conditions that the Sellers determine, after consultation with the UCC, the Bondholder Group and the Monitor, are no less favourable than the terms and conditions of the Sale Agreement;

- the bidder's offer is irrevocable until the selection of the Successful Bidder (as defined below) and, if applicable, the Alternate Bidder (as defined below), provided that if such bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, August 31, 2009 and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

- it includes a duly authorized and executed Sale Agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto including to the extent required by such bid, all applicable ancillary agreements as well as copies of such materials marked to show those amendments and modifications to the Sale Agreement, related ancillary agreements  and proposed orders to approve the Sale by the U.S. Court, this Honourable Court and any other applicable court(s) whose approval may be required, as proposed by the Qualified Bidder;

- it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction;

- it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

- it fully discloses the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

- it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the UCC, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Purchased Assets, is greater than or equal to the sum of the value offered under the Sale Agreement, plus (i) the amount of the Break-Up Fee and Expense Reimbursement plus (ii) $5,000,000;

- it includes an acknowledgment and representation with respect to the executory contracts and unexpired leases which the Qualified Bidder proposes to assume or not assume, the Qualified Bidder's proposal for the treatment of related Cure Costs and any executory contract or unexpired lease the assumption and assignment of which is a condition to Closing;

- it includes an acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all required due diligence, has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets, has not relied upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, except as expressly stated in its bid  and is not entitled to any expense reimbursement or break fee in connection with its bid;

- it includes evidence of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body);

- it is accompanied by a good faith deposit in an amount equal to 5% of the Purchase Price;

- it contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder and any proposed measures associated with their continued employment;

- it includes evidence of the Qualified Bidder's ability to comply with Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed to be assigned or subleased to the Potential Bidder;

- it contains other information reasonably requested by the Sellers; and

- it is received by the Bid Deadline.

59.    The Sellers will determine, in their reasonable business judgment, after consultation with the UCC, the Bondholder Group and the Monitor, whether to deem bids for the Purchased Assets that do not conform to one or more of the requirements specified in the Bidding Procedures to be Qualified Bids and shall deliver copies of any bids deemed to be Qualified Bids to the Purchaser as soon as reasonably practicable after such a determination has been made.

60.    Notwithstanding the foregoing, Nokia Siemens will be deemed a Qualified Bidder, and the Sale Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale.

61.    A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such transactions, the proposed revisions to the relevant transaction documents, the effect of the Sale on the value of the ongoing businesses of the Sellers, other factors affecting the speed, certainty and value of the Sale, the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such

transaction, each as determined by the Sellers, in consultation with their advisors, the UCC, the Bondholder Group and the Monitor.

62.   If the Sellers do not receive any Qualified Bids other than the Sale Agreement, the Auction shall be cancelled and the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Sale Agreement subject to obtaining any relevant court approvals.

***Auction Process***

63.   If the Sellers receive one or more Qualified Bids in addition to the Sale Agreement, the Sellers will conduct an auction (the "Auction") of the Purchased Assets, upon notice to all Qualified Bidders who have submitted Qualified Bids, on July 24, 2009, which Auction may be cancelled or adjourned without the prior consent of Nokia Siemens, subject to the terms of the Sale Agreement. Copies of all Qualified Bids shall be delivered to the UCC, the Bondholder Group, the Monitor and Nokia Siemens promptly after such time that such bid is deemed a Qualified Bid, but no later than 2 Business Days prior to the Auction.

64.   The Auction shall run in accordance with the following procedures:

  •   Only the Sellers, the Purchaser, the UCC, the Bondholder Group and the Monitor (and the advisors to each of the foregoing), any creditor of the Sellers and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction;

  •   Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale;

  •   At least one Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction and the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the UCC, the Bondholder Group and

~ 22 ~

the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction;

- All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction;

- Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that in the determination of the Sellers, in consultation with their advisors, the UCC, the Bondholder Group and the Monitor, improves upon the Starting Bid or previous Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least $5,000,000, or such amount to be determined by the Sellers, in consultation with the UCC, the Bondholder Group and the Monitor, over the Starting Bid or the Leading Bid. After each round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

*Selection of Successful Bid*

65.    Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the UCC, the Bondholder Group and the Monitor will (a) review each Qualified Bid and evaluate each Qualified Bid, (b) identify the highest or otherwise best offer or offers for the Purchased Assets received at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder making such bid, collectively the "Successful Bidder"), it being understood that the Purchaser is not required to satisfy any minimum bid increment requirement and that if the Sellers determine that a Qualified Bid or

~ 23 ~

Subsequent Bid by the Purchaser and any other Qualified Bid are therefore not materially different, then as between those two offers, the Purchaser's offer shall be deemed to be the highest and best offer for purposes of this provision and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid shall be final subject to approval by the U.S. Court and this Honourable Court.

66.    The Sellers will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the U.S. Court and this Honourable Court.

### *Closing with Alternate Bidders*

67.    If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid. If a Qualified Bid other than the Sale Agreement is selected as the Alternate Bid, then the Alternate Bid shall remain open until the earlier of (a) August 15, 2009 or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date").

### *Court Approval*

68.    The Bidding Procedures and Sale Agreement are being submitted to this Honourable Court and to the U.S. Court for approval. The final sale and assignment of the Purchased

Assets will also be submitted to this Honourable Court and to the U.S. Court for approval.

## ALLOCATION OF PROCEEDS OF SALE AMONGST NORTEL ENTITIES

69.    As previously indicated, the Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the *Business which, in turn, is subject to various intercompany licensing agreements. NNL,* NNI and certain of their affiliates have interests in various customer contracts, receivables and other assets. Therefore, the task of allocating the sale proceeds stemming from the Sale Agreement amongst the various Nortel entities in the various jurisdictions is complex. As a result, the net proceeds of sale stemming from the Sale Agreement will be held in escrow with a party acceptable to the Sellers until such time as an allocation is *agreed upon.*

## OTHER RESTRUCTURING EFFORTS

70.    On June 19, 2009, Nortel announced that it is advancing in its discussions with external parties to sell its other businesses. The company will assess other restructuring alternatives for these businesses in the event it is unable to maximize value through sales. In addition, Nortel announced it would apply to delist its common shares and the NNL preferred shares from trading on the Toronto Stock Exchange.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

71.    The Monitor has reviewed Nortel's efforts to divest its CDMA Business and LTE Business and is of the view that the Company is acting in good faith to maximize value. The Monitor recommends approval of the Sale Agreement as a "stalking horse" bid and approval of the Bidding Procedures as described above. In so doing, the Monitor

considers the potential payment of the Break-Up Fee and Expense Reimbursement to Nokia Siemens as reasonable in the circumstances.

72. For the reasons described in Paragraph 23, the Monitor recommends that confidential Appendix "B" to this Fourteenth Report be sealed by this Honourable Court.

All of which is respectfully submitted this 23rd day of June 2009.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:

Murray A. McDonald
President

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**FOURTEENTH REPORT OF THE MONITOR**
**DATED JUNE 23, 2009**

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada M5B 2M6

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5726149

# TAB # 5

Court File No.: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | MONDAY, THE 29th |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF JUNE, 2009 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
**R.S.C. 1985, c. C-36, AS AMENDED**

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**ORDER**
(Nokia Siemens Networks B.V. Bidding Procedures Order)

**THIS MOTION**, made by Nortel Networks Corporation ("NNC"), Nortel Networks
Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global
Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for
the relief set out in the Applicants' notice of motion dated June 23, 2009 was heard this day at
330 University Avenue, Toronto, Ontario.

**ON READING** the affidavit of George Riedel sworn June 23, 2009 (the "Riedel
Affidavit") and the fourteenth report of Ernst & Young Inc. dated June 23, 2009 (the "Fourteenth
Report") in its capacity as monitor (the "Monitor") and on hearing submissions of counsel for the
Applicants, the Monitor and those other parties present, no one appearing for any other person on

-2-

the service list, although served as appears from the Affidavit of Service of Katie Legree sworn June 24, 2009, filed.

1.      **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the Fourteenth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Riedel Affidavit.

3.      **THIS COURT ORDERS** that the bidding procedures (the "Bidding Procedures") described in the Riedel Affidavit, the Fourteenth Report and attached as Schedule "A" hereto are hereby approved and, subject to approval of the Bidding Procedures in substantially the same form by the United States Bankruptcy Court for the District of Delaware in the Chapter 11 Proceedings of the Chapter 11 Debtors, the Applicants shall be authorized to conduct the sale process and auction (the "Stalking Horse Process") contemplated therein.

4.      **THIS COURT ORDERS** that the asset sale agreement dated as of June 19, 2009 (the "Stalking Horse APA") among Nokia Siemens Networks B.V., as buyer, and NNC, NNL and Nortel Networks Inc., as vendors, in the form attached as Appendix "A" to the Fourteenth Report be and is hereby approved and accepted for the purposes of conducting the Stalking Horse Process including, without limitation, the Break-Up Fee and the Expense Reimbursement.

5.      **THIS COURT ORDERS** that Confidential Appendix "B" to the Fourteenth Report be and is hereby sealed pending further order of this Court.

6.      **THIS COURT ORDERS** that in connection with the Stalking Horse APA and the Stalking Horse Process and pursuant to clause 7(3)(c) of the Canada *Personal Information Protection and Electronic Documents Act*, the Applicants shall disclose personal information of identifiable individuals to prospective purchasers or bidders for the Business and to their advisors, but only to the extent desirable or required to negotiate and attempt to complete one or more sales of the Business (each, a "Sale"). Each prospective purchaser or bidder to whom such personal information is disclosed shall maintain and protect the privacy of such information and

- 3 -

limit the use of such information to its evaluation of the Sale, and if it does not complete a Sale, shall (i) return all such information to the Applicants; (ii) destroy all such information; or (iii) in the case of such information that is electronically stored, destroy all such information to the extent it is reasonably practical to do so.  The purchaser of the Business shall be entitled to continue to use the personal information provided to it, and related to the Business, in a manner which is in all material respects identical to the prior use of such information by the Applicants, and shall (i) return all other personal information to the Applicants; (ii) ensure that all other personal information is destroyed; or (iii) in the case of all other personal information that is electronically stored, destroy all such other personal information to the extent it is reasonably practical to do so.

7.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

8.    **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

JUN 3 0 2009

PER / PAR: TJ

## SCHEDULE "A"

### BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities as set forth in the Agreement (as defined below) with respect to the Purchaser, or, as set forth in the relevant sale agreement with respect to a Successful Bidder (as defined below). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement (as defined below).

On June 19, 2009, Nortel Networks Inc. and certain of its U.S. subsidiaries that are debtors and debtors-in-possession (collectively, the "U.S. Debtors") as well as Nortel Networks Limited and certain other affiliates of the U.S. Debtors that have commenced proceedings under the Canadian Companies' Creditors Arrangement Act (the "Canadian Debtors"), and certain non-debtor affiliates of the U.S. Debtors and the Canadian Debtors (together with the U.S. Debtors and the Canadian Debtors, the "Sellers") executed that certain Asset Sale Agreement (the "Agreement") with Nokia Siemens Networks B.V. (together with any of its designees, the "Purchaser").

The Sellers have determined that:  (A) the transactions contemplated by the Agreement and the ancillary agreements discussed therein with respect to the Purchaser, or, as set forth in the relevant sale agreement or standalone plan of reorganization and ancillary agreements with respect to a Successful Bidder (collectively, the "Transaction") should be subject to competitive bidding as set forth herein; (B) the transfer of the U.S. Debtors' rights, title and interests in and to the Assets (as defined below) should be subject to approval by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"); (C) the transfer of the rights, title and interests of the Canadian Debtors (as such term is defined in the Agreement) in and to the Assets should be subject to approval by the Ontario Superior Court of Justice (the "Canadian Court"); and (D) the Transaction shall be subject to approval by such other applicable court(s) as the Sellers, in consultation with the Committee (as defined below), the Bondholder Group (as defined below) and the Monitor (as defined below), may determine are necessary or appropriate and certain other closing conditions as set forth in the Agreement.

On June 19, 2009, the U.S. Debtors filed a Motion for Orders (I)(A) Authorizing Debtors' Entry into the Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of Debtors' CDMA and LTE Business Free and Clear of All Liens, Claims and Encumbrances, (B) The Assumption and Assignment of Certain Contracts and (C) the Assumption and Sublease of Certain Leases (the "Sale Motion").

- 5 -

On [●], 2009, the Bankruptcy Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Bidding Procedures Order").

On June 23, 2009, the Canadian Debtors filed a motion with the Canadian Court seeking an order for approval of (I) execution and delivery of the Agreement by the Canadian Debtors, (II) payment of the Break-Up Fee and Expense Reimbursement in the circumstances provided for in the Agreement, and (III) a process for the Sale of the Canadian Debtors' rights, title and interests in and to the Assets (as defined below).

On [●], 2009, the Canadian Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Canadian Sales Process Order").

Bidding Process

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's and the Canadian Court's and, if required, such other applicable courts' approval thereof (collectively, the "Bidding Process"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., *et al.* (Case No. 09-10138) involving the U.S. Debtors (the "Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor"), and their respective advisors throughout the Bidding Process. In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, except with respect to the application of the terms of any order of the Canadian Court or any requirement for approval by the Canadian Court or the Monitor, the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.[1]

Assets To Be Sold

The Sellers are offering for sale, in one or more transactions, certain of the Sellers' assets pertaining to the business segments described in the Agreement (to the extent that such assets are not subsequently excluded from the Sale in accordance with the terms of the Agreement) with respect to the Purchaser, or, as set forth in the relevant sale or restructuring agreement with respect to a Successful Bidder, and related schedules and in an information memorandum made available by the Sellers to the Purchaser and other potential bidders, which will also be made

---

[1]     For the avoidance of doubt, this Bidding Process shall not govern any disagreements among the Sellers.

- 6 -

available to other prospective purchasers that have executed a confidentiality agreement with the Sellers (the "Assets").

### "As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except, with respect to the Purchaser, to the extent set forth in the Agreement or, with respect to a Successful Bidder (as defined below), to the extent set forth in the relevant sale agreement of such Successful Bidder.

### Free Of Any And All Claims And Interests

All of the rights, title and interests of the U.S. Debtors and the Canadian Debtors in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests") to the extent permitted by sections 363 and 365 of the Bankruptcy Code and other applicable law, such Claims and Interests to attach to the net proceeds of the sale of such Assets (without prejudice to any claims or causes of action regarding the priority, validity or enforceability thereof), except, with respect to the Purchaser, to the extent otherwise set forth in the Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant sale or restructuring (if applicable) agreement of such Successful Bidder with the U.S. Debtors and the Canadian Debtors.

### Publication Notice

Within five (5) Business Days, or as soon thereafter as is reasonably practicable, after entry of orders by the Bankruptcy Court and the Canadian Court approving these Bidding Procedures, the Sellers shall publish notice of these Bidding Procedures, the time and place of the Auction (as defined below); if required, the time and place of the Sale Hearing (as defined below), and the objection deadline for the Sale Hearing in The Wall Street Journal (National Edition) and The Globe & Mail (National Edition).

### Participation Requirements

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court, for cause shown, or as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), in order to participate in the Bidding Process, each person, other than the Purchaser, who wishes to participate in the Bidding Process (a "Potential Bidder") must deliver to the Notice Parties (as defined below) at the addresses provided below:

     (a)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, that shall not be on terms that, in the Sellers' reasonable judgment, are more favorable to the Potential Bidder than the confidentiality agreement executed by the Purchaser and which shall inure to the benefit of any

- 7 -

purchaser of the Assets (in the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets and waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transaction it may enter into, to the Notice Parties (as defined below));

      (b)    current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transaction; and

      (c)    a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder, and any proposed measures associated with their continued employment; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Agreement.

A Potential Bidder that delivers the documents described above, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence as provided in the following paragraph with respect to the Assets.

- 8 -

## Due Diligence

The Sellers may in their reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a confidentiality agreement with the Sellers such due diligence access to materials and information relating to the Assets as the Sellers deem appropriate after consultation with the Committee, the Bondholder Group and the Monitor. Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their reasonable business judgment, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. No additional due diligence for any party other than a Qualified Bidder who has submitted a Qualified Bid will continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. In any event, the Purchaser shall be provided prompt access to all material due diligence materials, management presentations, on-site inspections and other information provided to Qualified Bidders that were not previously made available to the Purchaser. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Agreement or any other definitive sale agreement with any Successful Bidder executed and delivered by Sellers.

## Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Gordon A. Davies, Esq., Chief Legal Officer, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905) 863-8386; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (v) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vi) financial advisor to the Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (vii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; and (viii) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; so as to be received not later than **July 21, 2009 at 4:00 p.m. (ET)** by the Sellers (the "Bid Deadline"). The Sellers, after consultation with the Committee, the

- 9 -

Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so; provided, however, that for any such extension beyond ten (10) Business Days, the Sellers shall have obtained the prior written consent of the Purchaser, the Committee, the Bondholder Group and the Monitor, which consent will not be unreasonably withheld. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders (including the Purchaser) and the parties listed above of such extension.

<u>Qualified Bid</u>

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "<u>Qualified Bid</u>"):

(a)  it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or standalone plan of reorganization, or upon alternative terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholders Committee and the Monitor, are no less favorable than the terms and conditions of the Agreement;

(b)  it includes a letter stating that the bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), provided that if such bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, August 31, 2009, and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)  it includes a duly authorized and executed Agreement, including the purchase price for the Assets expressed in U.S. Dollars (the "<u>Purchase Price</u>"), together with all exhibits and schedules thereto, including, to the extent required by the terms and conditions of such bid, the Intellectual Property License Agreement, the Transition Services Agreement, the CDMA Supply Agreement, the Loaned Employee Agreement, the Manufacturing and Supply Regarding Dual Use Platforms Agreement and the Trademark License Agreement (each as defined in the Agreement), the other ancillary agreements as described in the Agreement and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Agreement ("<u>Marked Agreements</u>") and such ancillary agreements (the "<u>Marked Ancillary Agreements</u>") and the proposed orders to approve the Sale or standalone plan of reorganization by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the bidder;

(d)  it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the

- 10 -

Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(e)  it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

(f)  it fully discloses the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(g)  it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Agreement, plus (i) the amount of the Break-Up Fee and Expense Reimbursement (as defined below), plus (ii) U.S.$5,000,000.

(h)  it includes an acknowledgment and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Agreement (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)  it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)  it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(k)  it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may

- 11 -

determine) in an amount equal to 5% of the Purchase Price to be dealt with as provided for under "Good Faith Deposit" herein;

(l)    it (a) contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder and any proposed measures associated with their continued employment, and (b) identifies any pension liabilities and assets related to any employees currently covered under the Nortel Retirement Income Plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m)    it includes evidence of the Potential Bidder's ability to comply with section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)    it contains other information reasonably requested by the Sellers; and

(o)    it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids, and shall deliver copies of any bids deemed to be Qualified Bids to Purchaser in accordance with section 10.7 of the Agreement as soon as reasonably practicable after such a determination has been made. Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

The Sellers shall notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids promptly following the expiration of the Bid Deadline.

### Aggregate Bids

The Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided, that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

### Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder, including any assumed pension liabilities) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed,

- 12 -

certainty and value of the Transaction (including any regulatory approvals required to close the Transaction), the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

## No Qualified Bids

If the Sellers do not receive any Qualified Bids other than the Agreement received from the Purchaser, the Auction shall be cancelled and the U.S. Debtors shall report the same to the Bankruptcy Court, the Canadian Debtors shall report the same to the Canadian Court and the Monitor and subject to requiring and obtaining approvals of the Bankruptcy Court, the Canadian Court or any other applicable court and satisfaction of the conditions set forth in the Agreement, the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Agreement. In addition, if no Qualified Bid is received, the U.S. Debtors reserve the right to request that the Bankruptcy Court advance the date of the Sale Hearing (as defined below) and provide notice of such new date to those parties in interest entitled to notice thereof and the Canadian Debtors reserve the right to file a motion with the Canadian Court seeking the approval of the sale of the Canadian Debtors' rights, title and interests in and to the Assets to the Purchaser. In addition, if approval of any other applicable court is required, the Sellers will as soon as practicable file an appropriate pleading with such court(s) seeking approval of the Transaction.

## Break-Up Fee and Expense Reimbursement

Recognizing the value and benefits that Purchaser has provided to the U.S. Debtors and the other Sellers by entering into the Agreement, as well as the Purchaser's expenditure of time, energy and resources, the Sellers have agreed that if the Purchaser is not the Successful Bidder, the Sellers will, in the circumstances as set forth in the Agreement and Bidding Procedures Order, pay to the Purchaser (i) a break-up fee of $19,500,000 (the "Break-Up Fee"), and (ii) reimburse the Purchaser for certain expenses as set forth in the Agreement and Bidding Procedures Order up to $3,000,000 (the "Expense Reimbursement"), which amounts shall constitute administrative expense claims against the U.S. Debtors under section 503(b) of the U.S. Bankruptcy Code, payable in accordance with the terms of the Agreement and the Bidding Procedures Order.

## Auction

If the Sellers receive one or more Qualified Bids in addition to the Agreement, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at **9:30 a.m. (ET) on July 24, 2009**, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned without the prior written

- 13 -

consent of the Purchaser, subject to the terms of the Agreement. Copies of all Qualified Bids shall be delivered to the Committee, the Bondholder Group, the Monitor and the Purchaser at such time that such bid is deemed a Qualified Bid but no later than two (2) Business Days prior to the Auction. The Auction shall run in accordance with the following procedures:

(a)     Only the Sellers, the Purchaser, the Committee, the Bondholder Group and the Monitor (and the advisors to each of the foregoing), any creditor of the Sellers and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)     Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(c)     At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date. At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction.

(d)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(e)     The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

- 14 -

(f)     Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least U.S.$5,000,000 over the Starting Bid or the Leading Bid, as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

## Selection Of Successful Bid

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid and evaluate each Qualified Bid as set forth in the section titled "Evaluation of Competing Bids" herein, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by the Canadian Court and any required approvals of any other applicable court(s) with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

- 15 -

### Sale Hearing

The sale hearing to authorize certain of the Sellers to enter into agreements with respect to the Successful Bid (the "Sale Hearing") will be held, in respect of those Sellers that are U.S. Debtors, before the Honorable Judge Kevin Gross (or any substitute therefor) in the United States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as July 28, 2009 at 2:00 p.m. (ET), and, in respect of those Sellers that are Canadian Debtors, before the Honourable Mr. Justice Geoffrey B. Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto, Ontario, and in any other applicable court(s) whose approval is required, as soon as practicable following the date of the Sale Hearing (or, with respect to the Canadian Court, in a joint hearing with the Bankruptcy Court at the Sale Hearing). The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing. If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Sellers shall proceed as set forth in the "No Qualified Bids" section above. If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is necessary or appropriate, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval is required. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court. If a Qualified Bid other than the Agreement is selected as the Alternate Bid, the Alternate Bid shall remain open until the earlier of (a) August 15, 2009 or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date"). All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

### Good Faith Deposits

The Good Faith Deposit of any Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within five (5) Business Days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within five (5) Business Days of the date of