## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*, [1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

## NOTICE PURSUANT TO SECTION 12(d) OF THE CROSS-BORDER PROTOCOL OF ADDITIONAL CASE AUTHORITY SUBMITTED IN SUPPORT OF THE MOTION RECORD AND FACTUM OF APPLICANTS FILED IN CANADIAN PROCEEDINGS FOR APPROVAL OF ASSET SALE TO TELEFONAKTIEBOLAGET L M ERICSSON

**PLEASE TAKE NOTICE** that pursuant to section 12(d) of the Cross-Border Protocol approved in the above-captioned cases (Docket No. 18), on July 28, 2009, Ernst & Young Inc., the Monitor and foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation (the "**Canadian Nortel Group**"), in proceedings under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Proceedings**"), by its undersigned counsel, filed in the above-captioned cases notice of additional case authority submitted in the Canadian Proceedings in support of the motion record and factum of the Canadian Nortel Group for approval of asset sale to Telefonaktiebolaget L M Ericsson (Publ). A joint hearing is scheduled to be held in the Canadian Proceedings and the above-captioned cases on July 28, 2009. Copies of the additional case authority is annexed hereto as Exhibit A.

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

**PLEASE TAKE FURTHER NOTICE** that copies of the additional case authority is also available on the Monitor's website, www.ey.com/ca/nortel or upon request to the Monitor's counsel.

Dated: Wilmington, Delaware
July 28, 2009

ALLEN & OVERY LLP

Ken Coleman
Lisa Kraidin
1221 Avenue of the Americas
New York, New York  10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
ken.coleman@allenovery.com
lisa.kraidin@allenovery.com

-and-

BUCHANAN INGERSOLL & ROONEY

By: /s/ Mary F. Caloway
Mary F. Caloway (No. 3059)
Peter J. Duhig (No. 4124)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
Telephone (302) 552-4200
Facsimile (302) 552-4295
mary.caloway@bipc.com

Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian Nortel
Group

## EXHIBIT A

*Indexed as:*
# Skyepharma PLC v. Hyal Pharmaceutical Corp.

**Between
Skyepharma PLC, plaintiff, and
Hyal Pharmaceutical Corporation, defendant**

[2000] O.J. No. 467

47 O.R. (3d) 234

130 O.A.C. 273

15 C.B.R. (4th) 298

95 A.C.W.S. (3d) 90

Docket Nos. M24061 and C33086

Ontario Court of Appeal
Toronto, Ontario

**Carthy, Goudge and O'Connor JJ.A.**

Heard: December 21, 1999.
Judgment: February 18, 2000.

(33 paras.)

On appeal from the order of Farley J. dated October 24, 1999.

**Counsel:**

James W.E. Doris, for Skyepharma PLC.
Alan H. Mark, for Bioglan Pharma PLC appellant/respondent on the motion.
Joseph M. Steiner and Steven G. Golick, for Price Waterhouse Coopers Inc. the court-appointed receiver
of Hyal Pharmaceutical Corporation, respondent/applicant on the motion.

---

The judgment of the Court was delivered by

**1    O'CONNOR J.A.:--** This is a motion to quash an appeal from the order of Farley J. made on
October 24, 1999. By his order, Farley J. approved the sale of the assets of Hyal Pharmaceutical
Corporation by the court-appointed receiver of Hyal to Skyepharma PLC. Bioglan Pharma PLC, a

disappointed would be purchaser of those assets has appealed, asking this court to set aside the sale approval order and to direct that there be a new sale process.

**2**    The receiver moves to quash the appeal on the ground that Bioglan, as a potential purchaser, did not have any rights that were finally determined by the sale approval order. Accordingly, the receiver contends, this court does not have jurisdiction to hear the appeal.

BACKGROUND

**3**    Skyepharma, the largest creditor of Hyal, moved for the appointment of Pricewaterhouse Coopers Inc. as the receiver and manager of all of the assets of Hyal. On August 16, 1999, Molloy J. granted the order which included provisions authorizing the receiver to take the necessary steps to liquidate and realize upon the assets, to sell the assets (with court approval for transactions exceeding $100,000) and to hold the proceeds of any sales pending further order of the court.

**4**    On August 26, 1999, Cameron J. made an order approving the process proposed by the receiver for soliciting, receiving and considering expressions of interest and offers to purchase the assets of Hyal.

**5**    The receiver reported to the court on September 27, 1999 and set out the results of the sale process. The receiver sought the court's approval to enter into exclusive negotiations with two parties which had made offers, Skyepharma and Cangene Corporation. The receiver indicated that it had also received an offer from Bioglan and explained why, in its view, the best realisation was likely to result from negotiations with Skyepharma and Cangene.

**6**    In its report, the receiver pointed out the importance of attempting to finalize the sale of the assets at an early date. The interest and damages on the secured and unsecured debt of Hyal were increasing in the amount of approximately $70,000 a week. Professional fees and operational costs were also adding to the aggregate debt of the company.

**7**    On September 28, 1999 Farley J. ordered that the receiver negotiate exclusively with Skyepharma and Cangene until October 6, in an attempt to conclude a transaction that was acceptable to the receiver and that realised the superior value inherent in the offers made by Skyepharma and Cangene.[1] The court also directed that no party would be entitled to retract, withdraw, vary or counteract any outstanding offer prior to October 29, 1999 and that, if the receiver was unable to reach agreement with Skyepharma or Cangene, then it would have the discretion to negotiate with other parties.

**8**    On October 13, the receiver reported to the court on the results of the negotiations with Skyepharma and Cangene. The parties had been unable to structure the transaction to take advantage of Hyal's tax loss positions. Nevertheless, the receiver recommended approval for an agreement to sell the assets of Hyal to Skyepharma. In its report, the receiver pointed out that the agreement it was recommending did not necessarily maximize the realisation for the assets but that it did minimize the risk of not closing and also the risk of liabilities increasing in the interim period up to closing, which risks arose from the provisions and timeframes contained in other offers. The receiver said that these risks were not immaterial.

**9**    At the same time that the receiver filed its report it brought a motion for approval of the agreement with Skyepharma. The motion was heard by Farley J. on October 20, 1999. Counsel for Skyepharma, Cangene and Bioglan appeared and were permitted to make submissions. Skyepharma, which was both a creditor of Hyal and the purchaser under the agreement for which approval was being sought, supported the motion. Cangene and Bioglan, which in addition to being unsuccessful prospective purchasers, were also creditors of the company, opposed the motion.

**10**   It is apparent that the motions judge heard the submissions of Cangene and Bioglan in their capacities as creditors of Hyal and not in their role as unsuccessful bidders for the assets being sold. In his endorsement made on October 24 he said:

> Unsuccessful bidders have no standing to challenge a receiver's motion to approve the sale to another candidate. They have no legal or proprietary right as technically they are not affected by the order. They have no interest in the fundamental question of whether the court's approval is in the best interests of the parties directly involved.

The motions judge continued by saying that he would "take into account the objections of Bioglan and Cangene as they have shoehorned into the approval motion". This latter comment, as it applied to Bioglan, appears to refer to the fact that Bioglan only became a creditor after the receiver was appointed and then only by acquiring a small debt of Hyal in the amount of $40,000.

**10a**   The motions judge approved the agreement for the sale of the assets to Skyepharma. In his endorsement, he noted that the assets involved were "unusual" and that the process to sell these assets was complex. He attached significant weight to the recommendation of the receiver who, he pointed out, had the expertise to deal with matters of this nature. The motions judge noted that the receiver's primary concern was to protect the interests of the creditors of Hyal. He recognized the advantages of avoiding risks that may result from the delay or uncertainty inherent in offers containing conditional provisions. The certainty and timeliness of the Skyepharma agreement were important factors in both the recommendation of the receiver and in the reasons of the court for approving the sale.

**10b**   The motions judge said that "at first blush", it appeared that the receiver had conducted itself appropriately throughout the sale process. He reviewed the specific complaints of Cangene and Bioglan and concluded that, although the process was not perfect (my words), there was no impediment to approving the sale to Skyepharma.

**10c**   This court was advised by counsel that the transaction closed immediately after the order approving the sale was made.

**10d**   Bioglan has filed a notice of appeal seeking to set aside the approval order and asking that this court direct that the assets of Hyal be sold pursuant to a court-supervised judicial sale or, alternatively, that the receiver be required to reopen the bidding relating to the sale. The notice of appeal does not set out any specific grounds of appeal. It states only that the motions judge erred in approving the sale agreement.

**10e**   In argument, counsel for Bioglan said that there are two grounds of appeal. First, the receiver misinterpreted the order of September 28, 1999 and should have negotiated further with the non-exclusive bidders, including Bioglan, once it determined that a transaction based on the tax benefits of Hyal's tax loss position could not be structured. Second, the motions judge erred in holding that Bioglan had a full opportunity to participate in the process and was the author of its own misfortune by using a "low balling strategy."

ANALYSIS

**10f**   The receiver moves to quash the appeal on the ground that this court does not have jurisdiction.

**10g**   Section 6(1)(b) of the Courts of Justice Act provides for a right of appeal to this court from a final order of a judge of the Superior Court of Justice. A final order is one that finally disposes of the rights of the parties: Halbert v. Netherlands Investment Company, [1945] S.C.R. 329.

**10h**    The issue raised by the motion is whether Bioglan had a right that was finally disposed of by the sale approval order. Bioglan submits that there are four separate ways by which it acquired the necessary right. The first is one of general application that would apply to all unsuccessful prospective purchasers in court supervised sales. The other three arise from the specific circumstances of this case.

**10i**    First, Bioglan submits that because it made an offer to buy the assets of Hyal, it acquired a right that entitled it to participate in the sale approval motion and to oppose the order sought by the receiver. This right, Bioglan maintains, was finally disposed of by the order approving the sale to Skyepharma.

**10j**    A similar issue was considered by Anderson J. in Crown Trust v. Rosenberg (1986), 60 O.R. (2d) 87, 22 C.P.C. (2d) 131, 67 C.B.R. (N.S.) 320 (note), 39 D.L.R. (4th) 526 (H.C.J.). In that case, a receiver brought a motion to approve the sale of certain properties. On the return of the motion, Larco Enterprises, a prospective purchaser whose offer was not being recommended for approval by the receiver, moved to intervene as an added party under rule 13.01 of the Rules of Civil Procedure. The relevant portion of that rule, at the time, read as follows:

> 13.01(1) Where a person who is not a party to a proceeding claims,
>
> > (a)    an interest in the subject matter of the proceeding;
> > (b)    that he or she may be adversely affected by a judgment in the proceeding;
>
> > ...
>
> the person may move for leave to intervene as an added party.[2]

[Paragraph numbers 10a-10j were originally numbered 1-10. Since paragraph numbers 1-10 were already used in this document, Quicklaw re-numbered the paragraphs.]

**11**    Anderson J. concluded that "the proceeding" referred to in rule 13.01 only included an action or an application. The motion for approval of the sale by the receiver was neither. He therefore dismissed Larco's motion. He continued, however, and held that even if the proceeding was one to which the rule applied, Larco did not satisfy the criteria in it because it did not have an interest in the subject-matter of the sale approval motion nor did it have any legal or proprietary right that would be adversely affected by the court's order approving the sale.

**12**    I adopt both his reasoning and his conclusion. At p. 118, he said:

> The motion brought by Clarkson to approve the sales is one upon which the fundamental question for consideration is whether that approval is in the best interests of the parties to the action as being the approval of sales which will be most beneficial to them. In that fundamental question Larco has no interest at all. Its only interest is in seeking to have its offer accepted with whatever advantages will accrue to it as a result. That interest is purely incidental and collateral to the central issue in the substantive motion and, in my view, would not justify an exercise of the discretion given by the rule.
>
> Nor, in my view, can Larco resort successfully to cl. (b) of rule 13.01(1) which raises the question whether it may be adversely affected by a judgment in the proceeding. For these purposes I leave aside the technical difficulties with respect to the word

"judgment". In my view, Larco will not be adversely affected in respect of any legal or proprietary right. It has no such right to be adversely affected. The most it will lose as a result of an order approving the sales as recommended, thereby excluding it, is a potential economic advantage only.

**13**    The British Columbia Supreme Court reached a similar conclusion in British Columbia Development Corporation v. Spun Cast Industries Limited et al. (1977), 26 C.B.R. (N.S.) 28 (B.C.S.C.). In that case the receiver in a debenture holder's action for foreclosure moved for an order to approve the sale of assets. A group of companies, the Shaw group, had made an offer and sought to be added as a party under a rule which authorized the Court to add as a party any person "whose participation in the proceeding is necessary to ensure that all matters in the proceeding may be effectively adjudicated upon ...". Berger J. dismissed this motion. At p. 30, he said:

> The Shaw group of companies has no legal interest in the litigation at bar. It has a commercial interest, but that is not, in my view, sufficient to bring it within the rule. Simply because it has made an offer to purchase the assets of the company does not entitle it to be joined as a party. Nothing in Gurtner v. Circuit, [1968] 2 Q.B. 587, goes so far. No order made in this action will result in any legal liability being imposed on the Shaw group, and no claim can be made against it on the strength of any such order.

**14**    Although the issues considered in these cases are not identical to the case at bar, the reasoning applies to the issue raised on this appeal. If an unsuccessful prospective purchaser does not acquire an interest sufficient to warrant being added as a party to a motion to approve a sale, it follows that it does not have a right that is finally disposed of by an order made on that motion.

**15**    There are two main reasons why an unsuccessful prospective purchaser does not have a right or interest that is affected by a sale approval order. First, a prospective purchaser has no legal or proprietary right in the property being sold. Offers are submitted in a process in which there is no requirement that a particular offer be accepted. Orders appointing receivers commonly give the receiver a discretion as to which offers to accept and to recommend to the court for approval. The duties of the receiver and the court are to ensure that the sales are in the best interests of those with an interest in the proceeds of the sale. There is no right in a party who submits an offer to have the offer, even if the highest, accepted by either the receiver or the court: Crown Trust v. Rosenberg, supra.

**16**    Moreover, the fundamental purpose of the sale approval motion is to consider the best interests of the parties with a direct interest in the proceeds of the sale, primarily the creditors. The unsuccessful would be purchaser has no interest in this issue. Indeed, the involvement of unsuccessful prospective purchasers could seriously distract from this fundamental purpose by including in the motion other issues with the potential for delay and additional expense.

**17**    In making these comments, I recognize that a court conducting a sale approval motion is required to consider the integrity of the process by which the offers have been obtained and to consider whether there has been unfairness in the working out of that process. Crown Trust v. Rosenberg, supra; Royal Bank of Canada v. Soundair Corp., (1991), 4 O.R. (3d) 1 (C.A.). The examination of the sale process will in normal circumstances be focussed on the integrity of that process from the perspective of those for whose benefit it has been conducted. The inquiry into the integrity of the process may incidentally address the fairness of the process to prospective purchasers, but that in itself does not create a right or interest in a prospective purchaser that is affected by a sale approval order.

**18**    In Soundair, the unsuccessful would be purchaser was a party to the proceedings and the court considered the fairness of the sale process from its standpoint. However, I do not think that the decision

in Soundair conflicts with the position I have set out above for two reasons. First, the issue of whether the prospective purchaser had a legal right or interest was not specifically addressed by the court. Indeed, in describing the general principles that govern a sale approval motion, Galligan J.A., for the majority, adopted the approach in Crown Trust v. Rosenberg. Under the heading "Consideration of the interests of all the parties", he referred to the interests of the creditors, the debtor and a purchaser who has negotiated an agreement with the receiver. He did not mention the interests of unsuccessful would be purchasers. Second, the facts in Soundair were unusual. The unsuccessful offeror was a company in which Air Canada had a substantial interest. The order appointing the receiver specifically directed the receiver "to do all things necessary or desirable to complete a sale to Air Canada" and if a sale to Air Canada could not be completed to sell to another party. Arguably, this provision in the order of the court created an interest in Air Canada which could be affected by the sale approval order and which entitled it to standing in the sale approval proceedings.

19    In limited circumstances, a prospective purchaser may become entitled to participate in a sale approval motion. For that to happen, it must be shown that the prospective purchaser acquired a legal right or interest from the circumstances of a particular sale process and that the nature of the right or interest is such that it could be adversely affected by the approval order. A commercial interest is not sufficient.

20    There is a sound policy reason for restricting, to the extent possible, the involvement of prospective purchasers in sale approval motions. There is often a measure of urgency to complete court approved sales. This case is a good example. When unsuccessful purchasers become involved, there is a potential for greater delay and additional uncertainty. This potential may, in some situations, create commercial leverage in the hands a disappointed would be purchaser which could be counterproductive to the best interests of those for whose benefit the sale is intended.

21    In arguing that simply being a prospective purchaser accords a broader right or interest than I have set out above, Bioglan relies on the decision of the Nova Scotia Court of Appeal in Cameron v. Bank of Nova Scotia (1981), 38 C.B.R. (N.S.) 1, 45 N.S.R. (2d) 303, 86 A.P.R. 303 (C.A.). In that case, the receiver invited tenders to purchase lands of the debtor and received three offers. The receiver accepted Cameron's offer and inserted a clause in the sale agreement calling for court approval. On the application to approve the sale, Treby, an unsuccessful bidder, was joined as an intervener. Treby opposed approval, arguing that he had been misled into believing that he would have another opportunity to bid on the property. The court directed that all three bidders be given a further opportunity to bid by way of sealed tender. Cameron appealed the order. The tender process proceeded. Treby and the third bidder submitted bids; Cameron did not. The receiver accepted Treby's offer and the court approved the sale to Treby. Cameron also appealed this order and Cameron's two appeals were heard together. Hart J.A. held that both Cameron and Treby had a right to appear at the original hearing because both were parties directly affected by the decision of the court. He concluded that the first decision reopening the bidding process and the order approving the sale to Treby were both final in their nature in that they amounted to a final determination of the rights of Cameron and Treby. He did not set out specifically what "rights" he was referring to. Having regard to the facts in the case, it is not clear to me that Cameron stands for the proposition asserted by Bioglan, that an unsuccessful would be purchaser, without more, has a right that is finally determined by an order approving a sale. If it does, I would, with respect, disagree.

22    In the result, I conclude that the fact that Bioglan made an offer to purchase Hyal's assets did not give it a right or interest that was affected by the sale approval order. It was not entitled to standing on the motion on that basis nor is it now entitled to bring this appeal on that basis.

23    As an alternative, Bioglan relies upon three circumstances in this case, each of which it says, in

somewhat different ways, results in it having the right to appeal the sale approval order to this court. First, Bioglan submits that it acquired this necessary right under the provision in the order of September 28 which directed that "no party shall be entitled to retract, withdraw, vary or countermand any offer submitted to the receiver prior to October 29 1999."

24    Bioglan's offer was, by its terms, to expire on October 4. Bioglan argues that the order of September 28 imposed an obligation on it to keep that offer open until October 29. That being the case, Bioglan maintains that it acquired a right to appear and oppose the motion to approve the sale.

25    I do not accept this argument. The ordinary meaning of the language in the order did not require Bioglan to extend its outstanding offer. The order did nothing more than preclude parties from taking steps to either amend or withdraw their offers before October 29. By its terms, Bioglan's offer was to expire on October 4. The order of September 28 did not affect the expiry date of the offer.

26    Even if the language of the September 28 order is interpreted to preclude an existing offer from expiring in accordance with its terms, the result would be the same. Bioglan made its offer to the receiver under terms and conditions of sale approved by the court on August 26. The terms and conditions of the sale were deemed to be part of each offer made to the receiver. Clause 14 of the terms and conditions provided:

> ... No party shall be entitled to retract, withdraw, vary or countermand its offer prior to acceptance or rejection thereof by the vendor (receiver). [My emphasis.]

27    The order of September 28 tracks the emphasized language. If the language in the order is interpreted to preclude an existing offer from expiring according to its terms, then when Bioglan submitted its offer it agreed, by virtue of clause 14 in the terms and conditions of sale ,that its offer would remain open until it was either accepted or rejected by the receiver. Assuming this interpretation, the order of September 28 added nothing to the obligation that Bioglan had assumed when it made its offer.

28    Accordingly I would not give effect to this argument.

29    Next, Bioglan submits that the order of September 28 created a duty on the receiver to negotiate further with the non-exclusive bidders once it determined that a transaction based on the tax benefits of Hyal's tax loss position could not be structured. This duty, it is argued, created a corresponding legal right in Bioglan to participate further in the process. This right, Bioglan maintains, was violated by the receiver when it recommended the Skyepharma agreement.

30    I do not read the order of September 28 as imposing this duty on the receiver. The order provided the receiver with a discretion as to whether to negotiate further with the non-exclusive bidders. It did not require the receiver to do so. Moreover, the order of September 28 did not limit the receiver to entering into an agreement with the exclusive bidders only if an agreement could be structured to take advantage of the tax losses. The order of September 28 did not create either the duty or the right asserted by Bioglan.

31    Finally, Bioglan submits that it acquired the necessary right to bring this appeal because the motions judge permitted it to make submissions on the sale approval motion. Again, I see no merit in this argument. As I have set out above, it seems apparent that the motions judge heard Bioglan's argument solely because it was a creditor of Hyal and not because it was an unsuccessful prospective purchaser. Bioglan does not seek to bring this appeal in its role as a creditor, nor does it complain that the sale approval order is unfair to the creditors of Hyal.

**32**    The motions judge approved the sale based on the recommendation of the receiver that it was in the best interests of the creditors. The fact that Bioglan was given an opportunity to be heard in these circumstances did not create a right which would provide standing to bring this appeal. The order sought to be appealed does not finally dispose of any right of Bioglan as creditor.

DISPOSITION

**33**    In the result, I would allow the motion and quash the appeal with costs to the moving party.

O'CONNOR J.A.
CARTHY J.A. -- I agree.
GOUDGE J.A. -- I agree.

cp/e/nc/qlmcc/qlalm/qlbxm

1 These offers were superior in that they were the only two that attempted to provide value for the tax loss positions of Hyal.

2 The rule as presently worded is not.

**COURT FILE NO.: 09-CL-7950**
**DATE: 20090723**

**SUPERIOR COURT OF JUSTICE – ONTARIO**
**(COMMERCIAL LIST)**

**RE:**       **IN THE MATTER OF THE *COMPANIES' CREDITORS***
              ***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

              **AND IN THE MATTER OF A PLAN OF COMPROMISE OR**
              **ARRANGEMENT OF NORTEL NETWORKS CORPORATION,**
              **NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL**
              **CORPORATION, NORTEL NETWORKS INTERNATIONAL**
              **CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
              **CORPORATION**

                                                              **APPLICANTS**

              **APPLICATION UNDER THE *COMPANIES' CREDITORS***
              ***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**BEFORE:**   **MORAWETZ J.**

**COUNSEL:**  **Derrick Tay and Jennifer Stam, for Nortel Networks Corporation, et al**

              **Lyndon Barnes and Adam Hirsh, for the Board of Directors of Nortel**
              **Networks Corporation and Nortel Networks Limited**

              **J. Carfagnini and J. Pasquariello, for Ernst & Young Inc., Monitor**

              **M. Starnino, for the Superintendent of Financial Services and**
              **Administrator of PBGF**

              **S. Philpott, for the Former Employees**

              **K. Zych, for Noteholders**

              **Pamela Huff and Craig Thorburn, for MatlinPatterson Global Advisors**
              **LLC, MatlinPatterson Global Opportunities Partners III L.P. and Matlin**
              **Patterson Opportunities Partners (Cayman) III L.P.**

              **David Ward, for UK Pension Protection Fund**

              **Leanne Williams, for Flextronics Inc.**

Page: 2

Alex MacFarlane, for the Official Committee of Unsecured Creditors

Arthur O. Jacques and Tom McRae, for Felske & Sylvain (de facto Continuing Employees' Committee)

Robin B. Schwill and Matthew P. Gottlieb, for Nortel Networks UK Limited

A. Kauffman, for Export Development Canada

D. Ullman, for Verizon Communications Inc.

G. Benchetrit, for IBM

HEARD &
DECIDED:        JUNE 29, 2009

## E N D O R S E M E N T

### INTRODUCTION

[1]    On June 29, 2009, I granted the motion of the Applicants and approved the bidding procedures (the "Bidding Procedures") described in the affidavit of Mr. Riedel sworn June 23, 2009 (the "Riedel Affidavit") and the Fourteenth Report of Ernst & Young, Inc., in its capacity as Monitor (the "Monitor") (the "Fourteenth Report"). The order was granted immediately after His Honour Judge Gross of the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") approved the Bidding Procedures in the Chapter 11 proceedings.

[2]    I also approved the Asset Sale Agreement dated as of June 19, 2009 (the "Sale Agreement") among Nokia Siemens Networks B.V. ("Nokia Siemens Networks" or the "Purchaser"), as buyer, and Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks, Inc. ("NNI") and certain of their affiliates, as vendors (collectively the "Sellers") in the form attached as Appendix "A" to the Fourteenth Report and I also approved and accepted the Sale Agreement for the purposes of conducting the "stalking horse" bidding process in accordance with the Bidding Procedures including, the Break-Up Fee and the Expense Reimbursement (as both terms are defined in the Sale Agreement).

[3]    An order was also granted sealing confidential Appendix "B" to the Fourteenth Report containing the schedules and exhibits to the Sale Agreement pending further order of this court.

[4]    The following are my reasons for granting these orders.

Page: 3

[5]    The hearing on June 29, 2009 (the "Joint Hearing") was conducted by way of video conference with a similar motion being heard by the U.S. Court. His Honor Judge Gross presided over the hearing in the U.S. Court. The Joint Hearing was conducted in accordance with the provisions of the Cross-Border Protocol, which had previously been approved by both the U.S. Court and this court.

[6]    The Sale Agreement relates to the Code Division Multiple Access ("CMDA") business Long-Term Evolution ("LTE") Access assets.

[7]    The Sale Agreement is not insignificant. The Monitor reports that revenues from CDMA comprised over 21% of Nortel's 2008 revenue. The CDMA business employs approximately 3,100 people (approximately 500 in Canada) and the LTE business employs approximately 1,000 people (approximately 500 in Canada). The purchase price under the Sale Agreement is $650 million.

**BACKGROUND**

[8]    The Applicants were granted CCAA protection on January 14, 2009.  Insolvency proceedings have also been commenced in the United States, the United Kingdom, Israel and France.

[9]    At the time the proceedings were commenced, Nortel's business operated through 143 subsidiaries, with approximately 30,000 employees globally.  As of January 2009, Nortel employed approximately 6,000 people in Canada alone.

[10]    The stated purpose of Nortel's filing under the CCAA was to stabilize the Nortel business to maximize the chances of preserving all or a portion of the enterprise. The Monitor reported that a thorough strategic review of the company's assets and operations would have to be undertaken in consultation with various stakeholder groups.

[11]    In April 2009, the Monitor updated the court and noted that various restructuring alternatives were being considered.

[12]    On June 19, 2009, Nortel announced that it had entered into the Sale Agreement with respect to its assets in its CMDA business and LTE Access assets (collectively, the "Business") and that it was pursuing the sale of its other business units. Mr. Riedel in his affidavit states that Nortel has spent many months considering various restructuring alternatives before determining in its business judgment to pursue "going concern" sales for Nortel's various business units.

[13]    In deciding to pursue specific sales processes, Mr. Riedel also stated that Nortel's management considered:

(a)    the impact of the filings on Nortel's various businesses, including deterioration in sales; and

(b)    the best way to maximize the value of its operations, to preserve jobs and to continue businesses in Canada and the U.S.

Page: 4

[14]  Mr. Riedel notes that while the Business possesses significant value, Nortel was faced with the reality that:

      (a)    the Business operates in a highly competitive environment;

      (b)    full value cannot be realized by continuing to operate the Business through a restructuring; and

      (c)    in the absence of continued investment, the long-term viability of the Business would be put into jeopardy.

[15]  Mr. Riedel concluded that the proposed process for the sale of the Business pursuant to an auction process provided the best way to preserve the Business as a going concern and to maximize value and preserve the jobs of Nortel employees.

[16]  In addition to the assets covered by the Sale Agreement, certain liabilities are to be assumed by the Purchaser. This issue is covered in a comprehensive manner at paragraph 34 of the Fourteenth Report. Certain liabilities to employees are included on this list. The assumption of these liabilities is consistent with the provisions of the Sale Agreement that requires the Purchaser to extend written offers of employment to at least 2,500 employees in the Business.

[17]  The Monitor also reports that given that certain of the U.S. Debtors are parties to the Sale Agreement and given the desire to maximize value for the benefit of stakeholders, Nortel determined and it has agreed with the Purchaser that the Sale Agreement is subject to higher or better offers being obtained pursuant to a sale process under s. 363 of the U.S. Bankruptcy Code and that the Sale Agreement shall serve as a "stalking horse" bid pursuant to that process.

[18]  The Bidding Procedures provide that all bids must be received by the Seller by no later than July 21, 2009 and that the Sellers will conduct an auction of the purchased assets on July 24, 2009. It is anticipated that Nortel will ultimately seek a final sales order from the U.S. Court on or about July 28, 2009 and an approval and vesting order from this court in respect of the Sale Agreement and purchased assets on or about July 30, 2009.

[19]  The Monitor recognizes the expeditious nature of the sale process but the Monitor has been advised that given the nature of the Business and the consolidation occurring in the global market, there are likely to be a limited number of parties interested in acquiring the Business.

[20]  The Monitor also reports that Nortel has consulted with, among others, the Official Committee of Unsecured Creditors (the "UCC") and the bondholder group regarding the Bidding Procedures and is of the view that both are supportive of the timing of this sale process. (It is noted that the UCC did file a limited objection to the motion relating to certain aspects of the Bidding Procedures.)

[21]  Given the sale efforts made to date by Nortel, the Monitor supports the sale process outlined in the Fourteenth Report and more particularly described in the Bidding Procedures.

Page: 5

[22]    Objections to the motion were filed in the U.S. Court and this court by MatlinPatterson Global Advisors LLC, MatlinPatterson Global Opportunities Partners III L.P. and Matlin Patterson Opportunities Partners (Cayman) III L.P. (collectively, "MatlinPatterson") as well the UCC.

[23]    The objections were considered in the hearing before Judge Gross and, with certain limited exceptions, the objections were overruled.

## ISSUES AND DISCUSSION

[24]    The threshold issue being raised on this motion by the Applicants is whether the CCAA affords this court the jurisdiction to approve a sales process in the absence of a formal plan of compromise or arrangement and a creditor vote. If the question is answered in the affirmative, the secondary issue is whether this sale should authorize the Applicants to sell the Business.

[25]    The Applicants submit that it is well established in the jurisprudence that this court has the jurisdiction under the CCAA to approve the sales process and that the requested order should be granted in these circumstances.

[26]    Counsel to the Applicants submitted a detailed factum which covered both issues.

[27]    Counsel to the Applicants submits that one of the purposes of the CCAA is to preserve the going concern value of debtors companies and that the court's jurisdiction extends to authorizing sale of the debtor's business, even in the absence of a plan or creditor vote.

[28]    The CCAA is a flexible statute and it is particularly useful in complex insolvency cases in which the court is required to balance numerous constituents and a myriad of interests.

[29]    The CCAA has been described as "skeletal in nature". It has also been described as a "sketch, an outline, a supporting framework for the resolution of corporate insolvencies in the public interest". *ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.* (2008), 45 C.B.R. (5th) 163 (Ont. C.A.) at paras. 44, 61, leave to appeal refused [2008] SCCA 337. ("ATB Financial").

[30]    The jurisprudence has identified as sources of the court's discretionary jurisdiction, *inter alia*:

    (a)    the power of the court to impose terms and conditions on the granting of a stay under s. 11(4) of the CCAA;

    (b)    the specific provision of s. 11(4) of the CCAA which provides that the court may make an order "on such terms as it may impose"; and

    (c)    the inherent jurisdiction of the court to "fill in the gaps" of the CCAA in order to give effect to its objects. *Re Canadian Red Cross Society* (1998), 5 C.B.R. (4th) 299 (Ont. Gen. Div.) at para. 43; *Re PSINet Ltd.* (2001), 28 C.B.R. (4th) 95 (Ont. S.C.J.) at para. 5, *ATB Financial, supra*, at paras. 43-52.

[31]   However, counsel to the Applicants acknowledges that the discretionary authority of the court under s. 11 must be informed by the purpose of the CCAA.

> Its exercise must be guided by the scheme and object of the Act and by the legal principles that govern corporate law issues. *Re Stelco Inc.* (2005), 9 C.B.R. (5th) 135 (Ont. C.A.) at para. 44.

[32]   In support of the court's jurisdiction to grant the order sought in this case, counsel to the Applicants submits that Nortel seeks to invoke the "overarching policy" of the CCAA, namely, to preserve the going concern. *Re Residential Warranty Co. of Canada Inc.* (2006), 21 C.B.R. (5th) 57 (Alta. Q.B.) at para. 78.

[33]   Counsel to the Applicants further submits that CCAA courts have repeatedly noted that the purpose of the CCAA is to preserve the benefit of a going concern business for all stakeholders, or "the whole economic community":

> The purpose of the CCAA is to facilitate arrangements that might avoid liquidation of the company and allow it to continue in business to the benefit of the whole economic community, including the shareholders, the creditors (both secured and unsecured) and the employees. *Citibank Canada v. Chase Manhattan Bank of Canada* (1991), 5 C.B.R. (3rd) 167 (Ont. Gen. Div.) at para. 29. *Re Consumers Packaging Inc.* (2001) 27 C.B.R. (4th) 197 (Ont. C.A.) at para. 5.

[34]   Counsel to the Applicants further submits that the CCAA should be given a broad and liberal interpretation to facilitate its underlying purpose, including the preservation of the going concern for the benefit of all stakeholders and further that it should not matter whether the business continues as a going concern under the debtor's stewardship or under new ownership, for as long as the business continues as a going concern, a primary goal of the CCAA will be met.

[35]   Counsel to the Applicants makes reference to a number of cases where courts in Ontario, in appropriate cases, have exercised their jurisdiction to approve a sale of assets, even in the absence of a plan of arrangement being tendered to stakeholders for a vote. In doing so, counsel to the Applicants submits that the courts have repeatedly recognized that they have jurisdiction under the CCAA to approve asset sales in the absence of a plan of arrangement, where such sale is in the best interests of stakeholders generally. *Re Canadian Red Cross Society, supra, Re PSINet, supra, Re Consumers Packaging, supra, Re Stelco Inc.* (2004), 6 C.B.R. (5th) 316 (Ont. S.C.J.) at para. 1, *Re Tiger Brand Knitting Co.* (2005) 9 C.B.R. (5th) 315, *Re Caterpillar Financial Services Ltd. v. Hardrock Paving Co.* (2008), 45 C.B.R. (5th) 87 and *Re Lehndorff General Partner Ltd.* (1993), 17 C.B.R. (3rd) 24 (Ont. Gen. Div.).

[36]   In *Re Consumers Packaging, supra,* the Court of Appeal for Ontario specifically held that a sale of a business as a going concern during a CCAA proceeding is consistent with the purposes of the CCAA:

The sale of Consumers' Canadian glass operations as a going concern pursuant to the Owens-Illinois bid allows the preservation of Consumers' business (albeit under new ownership), and is therefore consistent with the purposes of the CCAA.

...we cannot refrain from commenting that Farley J.'s decision to approve the Owens-Illinois bid is consistent with previous decisions in Ontario and elsewhere that have emphasized the broad remedial purpose of flexibility of the CCAA and have approved the sale and disposition of assets during CCAA proceedings prior to a formal plan being tendered. *Re Consumers Packaging, supra, at paras. 5, 9.*

[37]    Similarly, in *Re Canadian Red Cross Society, supra,* Blair J. (as he then was) expressly affirmed the court's jurisdiction to approve a sale of assets in the course of a CCAA proceeding before a plan of arrangement had been approved by creditors. *Re Canadian Red Cross Society, supra,* at paras. 43, 45.

[38]    Similarly, in *PSINet Limited, supra,* the court approved a going concern sale in a CCAA proceeding where no plan was presented to creditors and a substantial portion of the debtor's Canadian assets were to be sold. Farley J. noted as follows:

[If the sale was not approved,] there would be a liquidation scenario ensuing which would realize far less than this going concern sale (which appears to me to have involved a transparent process with appropriate exposure designed to maximize the proceeds), thus impacting upon the rest of the creditors, especially as to the unsecured, together with the material enlarging of the unsecured claims by the disruption claims of approximately 8,600 customers (who will be materially disadvantaged by an interrupted transition) plus the job losses for approximately 200 employees. *Re PSINet Limited, supra,* at para. 3.

[39]    In *Re Stelco Inc., supra,* in 2004, Farley J. again addressed the issue of the feasibility of selling the operations as a going concern:

I would observe that usually it is the creditor side which wishes to terminate CCAA proceedings and that when the creditors threaten to take action, there is a realization that a liquidation scenario will not only have a negative effect upon a CCAA applicant, but also upon its workforce. Hence, the CCAA may be employed to provide stability during a period of necessary financial and operational restructuring – and if a restructuring of the "old company" is not feasible, then there is the exploration of the feasibility of the sale of the operations/enterprise as a going concern (with continued employment) in whole or in part. *Re Stelco Inc, supra,* at para. 1.

[40]    I accept these submissions as being general statements of the law in Ontario. The value of equity in an insolvent debtor is dubious, at best, and, in my view, it follows that the determining factor should not be whether the business continues under the debtor's stewardship

or under a structure that recognizes a new equity structure. An equally important factor to consider is whether the case can be made to continue the business as a going concern.

[41]    Counsel to the Applicants also referred to decisions from the courts in Quebec, Manitoba and Alberta which have similarly recognized the court's jurisdiction to approve a sale of assets during the course of a CCAA proceeding. *Re Boutique San Francisco Inc.* (2004), 7 C.B.R. (5th) 189 (Quebec S. C.), *Re Winnipeg Motor Express Inc.* (2008), 49 C.B.R. (5th) 302 (Man. Q.B.) at paras. 41, 44, and *Re Calpine Canada Energy Limited* (2007), 35 C.B.R. (5th) at para. 75.

[42]    Counsel to the Applicants also directed the court's attention to a recent decision of the British Columbia Court of Appeal which questioned whether the court should authorize the sale of substantially all of the debtor's assets where the debtor's plan "will simply propose that the net proceeds from the sale...be distributed to its creditors". In *Cliffs Over Maple Bay Investments Ltd. v. Fisgard Capital Corp.* (2008), 46 C.B.R. (5th) 7 (B.C.C.A.) ("*Cliffs Over Maple Bay*"), the court was faced with a debtor who had no active business but who nonetheless sought to stave off its secured creditor indefinitely. The case did not involve any type of sale transaction but the Court of Appeal questioned whether a court should authorize the sale under the CCAA without requiring the matter to be voted upon by creditors.

[43]    In addressing this matter, it appears to me that the British Columbia Court of Appeal focussed on whether the court should grant the requested relief and not on the question of whether a CCAA court has the jurisdiction to grant the requested relief.

[44]    I do not disagree with the decision in *Cliffs Over Maple Bay*. However, it involved a situation where the debtor had no active business and did not have the support of its stakeholders. That is not the case with these Applicants.

[45]    The *Cliffs Over Maple Bay* decision has recently been the subject of further comment by the British Columbia Court of Appeal in *Asset Engineering L.P. v. Forest and Marine Financial Limited Partnership* (2009) B.C.C.A. 319.

[46]    At paragraphs 24 - 26 of the *Forest and Marine* decision, Newbury J.A. stated:

> 24. In *Cliffs Over Maple Bay*, the debtor company was a real estate developer whose one project had failed. The company had been dormant for some time. It applied for CCAA protection but described its proposal for restructuring in vague terms that amounted essentially to a plan to "secure sufficient funds" to complete the stalled project (Para. 34). This court, per Tysoe J.A., ruled that although the Act can apply to single-project companies, its purposes are unlikely to be engaged in such instances, since mortgage priorities are fully straight forward and there will be little incentive for senior secured creditors to compromise their interests (Para. 36). Further, the Court stated, the granting of a stay under s. 11 is "not a free standing remedy that the court may grant whenever an insolvent company wishes to undertake a "restructuring"...Rather, s. 11 is ancillary to the fundamental purpose of the CCAA, and a stay of proceedings freezing the rights of creditors should only be granted in furtherance of the CCAA's fundamental

purpose". That purpose has been described in *Meridian Developments Inc. v. Toronto Dominion Bank* (1984) 11 D.L.R. (4th) 576 (Alta. Q.B.):

> The legislation is intended to have wide scope and allow a judge to make orders which will effectively maintain the status quo for a period while the insolvent company attempts to gain the approval of its creditors for a proposed arrangement which will enable the company to remain in operation for what is, hopefully, the future benefit of both the company and its creditors. [at 580]

25. The Court was not satisfied in *Cliffs Over Maple Bay* that the "restructuring" contemplated by the debtor would do anything other than distribute the net proceeds from the sale, winding up or liquidation of its business. The debtor had no intention of proposing a plan of arrangement, and its business would not continue following the execution of its proposal – thus it could not be said the purposes of the statute would be engaged...

26. In my view, however, the case at bar is quite different from *Cliffs Over Maple Bay*. Here, the main debtor, the Partnership, is at the centre of a complicated corporate group and carries on an active financing business that it hopes to save notwithstanding the current economic cycle.  (The business itself which fills a "niche" in the market, has been carried on in one form or another since 1983.) The CCAA is appropriate for situations such as this where it is unknown whether the "restructuring" will ultimately take the form of a refinancing or will involve a reorganization of the corporate entity or entities and a true compromise of the rights of one or more parties. The "fundamental purpose" of the Act – to preserve the *status quo* while the debtor prepares a plan that will enable it to remain in business to the benefit of all concerned – will be furthered by granting a stay so that the <u>means</u> contemplated by the Act – a compromise or arrangement – can be developed, negotiated and voted on if necessary...

[47]    It seems to me that the foregoing views expressed in *Forest and Marine* are not inconsistent with the views previously expressed by the courts in Ontario. The CCAA is intended to be flexible and must be given a broad and liberal interpretation to achieve its objectives and a sale by the debtor which preserves its business as a going concern is, in my view, consistent with those objectives.

[48]    I therefore conclude that the court does have the jurisdiction to authorize a sale under the CCAA in the absence of a plan.

[49]    I now turn to a consideration of whether it is appropriate, in this case, to approve this sales process. Counsel to the Applicants submits that the court should consider the following factors in determining whether to authorize a sale under the CCAA in the absence of a plan:

(a)      is a sale transaction warranted at this time?

(b)    will the sale benefit the whole "economic community"?

(c)    do any of the debtors' creditors have a *bona fide* reason to object to a sale of the business?

(d)    is there a better viable alternative?

I accept this submission.

[50]    It is the position of the Applicants that Nortel's proposed sale of the Business should be approved as this decision is to the benefit of stakeholders and no creditor is prejudiced. Further, counsel submits that in the absence of a sale, the prospects for the Business are a loss of competitiveness, a loss of value and a loss of jobs.

[51]    Counsel to the Applicants summarized the facts in support of the argument that the Sale Transaction should be approved, namely:

(a)    Nortel has been working diligently for many months on a plan to reorganize its business;

(b)    in the exercise of its business judgment, Nortel has concluded that it cannot continue to operate the Business successfully within the CCAA framework;

(c)    unless a sale is undertaken at this time, the long-term viability of the Business will be in jeopardy;

(d)    the Sale Agreement continues the Business as a going concern, will save at least 2,500 jobs and constitutes the best and most valuable proposal for the Business;

(e)    the auction process will serve to ensure Nortel receives the highest possible value for the Business;

(f)    the sale of the Business at this time is in the best interests of Nortel and its stakeholders; and

(g)    the value of the Business is likely to decline over time.

[52]    The objections of MatlinPatterson and the UCC have been considered. I am satisfied that the issues raised in these objections have been addressed in a satisfactory manner by the ruling of Judge Gross and no useful purpose would be served by adding additional comment.

[53]    Counsel to the Applicants also emphasize that Nortel will return to court to seek approval of the most favourable transaction to emerge from the auction process and will aim to satisfy the elements established by the court for approval as set out in *Royal Bank v. Soundair* (1991), 7 C.B.R. (3rd) 1 (Ont. C.A.) at para. 16.

Page: 11

## DISPOSITION

[54]   The Applicants are part of a complicated corporate group.  They carry on an active international business. I have accepted that an important factor to consider in a CCAA process is whether the case can be made to continue the business as a going concern. I am satisfied having considered the factors referenced at [49], as well as the facts summarized at [51], that the Applicants have met this test. I am therefore satisfied that this motion should be granted.

[55]   Accordingly, I approve the Bidding Procedures as described in the Riedel Affidavit and the Fourteenth Report of the Monitor, which procedures have been approved by the U.S. Court.

[56]   I am also satisfied that the Sale Agreement should be approved and further that the Sale Agreement be approved and accepted for the purposes of conducting the "stalking horse" bidding process in accordance with the Bidding Procedures including, without limitation the Break-Up Fee and the Expense Reimbursement (as both terms are defined in the Sale Agreement).

[57]   Further, I have also been satisfied that Appendix B to the Fourteenth Report contains information which is commercially sensitive, the dissemination of which could be detrimental to the stakeholders and, accordingly, I order that this document be sealed, pending further order of the court.

[58]   In approving the Bidding Procedures, I have also taken into account that the auction will be conducted prior to the sale approval motion. This process is consistent with the practice of this court.

[59]   Finally, it is the expectation of this court that the Monitor will continue to review ongoing issues in respect of the Bidding Procedures. The Bidding Procedures permit the Applicants to waive certain components of qualified bids without the consent of the UCC, the bondholder group and the Monitor. However, it is the expectation of this court that, if this situation arises, the Applicants will provide advance notice to the Monitor of its intention to do so.

MORAWETZ J.

**Heard and Decided:  June 29, 2009**

**Reasons Released:    July 23, 2009**

*Indexed as:*
## Royal Bank of Canada v. Soundair Corp.

**Royal Bank of Canada v. Soundair Corp., Canadian Pension
Capital Ltd. and Canadian Insurers Capital Corp.**

[1991] O.J. No. 1137

4 O.R. (3d) 1

83 D.L.R. (4th) 76

46 O.A.C. 321

7 C.B.R. (3d) 1

27 A.C.W.S. (3d) 1178

Action No. 318/91

Court of Appeal for Ontario

**Goodman, Mckinlay and Galligan JJ.A.**

July 3, 1991

**Counsel:**

J.B. Berkow and Steven H. Goldman, for appellants.

John T. Morin, Q.C., for Air Canada.

L.A.J. Barnes and Lawrence E. Ritchie, for Royal Bank of Canada.

Sean F. Dunphy and G.K. Ketcheson for Ernst & Young Inc., receiver of Soundair Corp., respondent.

W.G. Horton, for Ontario Express Ltd.

Nancy J. Spies, for Frontier Air Ltd.

---

**1    GALLIGAN J.A.:**-- This is an appeal from the order of Rosenberg J. made on May 1, 1991 (Gen.
Div.). By that order, he approved the sale of Air Toronto to Ontario Express Limited and Frontier Air
Limited and he dismissed a motion to approve an offer to purchase Air Toronto by 922246 Ontario

Limited.

2    It is necessary at the outset to give some background to the dispute. Soundair Corporation (Soundair) is a corporation engaged in the air transport business. It has three divisions. One of them is Air Toronto. Air Toronto operates a scheduled airline from Toronto to a number of mid-sized cities in the United States of America. Its routes serve as feeders to several of Air Canada's routes. Pursuant to a connector agreement, Air Canada provides some services to Air Toronto and benefits from the feeder traffic provided by it. The operational relationship between Air Canada and Air Toronto is a close one.

3    In the latter part of 1989 and the early part of 1990, Soundair was in financial difficulty. Soundair has two secured creditors who have an interest in the assets of Air Toronto. The Royal Bank of Canada (the Royal Bank) is owed at least $65,000,000. The appellants Canadian Pension Capital Limited and Canadian Insurers Capital Corporation (collectively called CCFL) are owed approximately $9,500,000. Those creditors will have a deficiency expected to be in excess of $50,000,000 on the winding-up of Soundair.

4    On April 26, 1990, upon the motion of the Royal Bank, O'Brien J. appointed Ernst & Young Inc. (the receiver) as receiver of all of the assets, property and undertakings of Soundair. The order required the receiver to operate Air Toronto and sell it as a going concern. Because of the close relationship between Air Toronto and Air Canada, it was contemplated that the receiver would obtain the assistance of Air Canada to operate Air Toronto. The order authorized the receiver:

> (b)    to enter into contractual arrangements with Air Canada to retain a manager or operator, including Air Canada, to manage and operate Air Toronto under the supervision of Ernst & Young Inc. until the completion of the sale of Air Toronto to Air Canada or other person ...

Also because of the close relationship, it was expected that Air Canada would purchase Air Toronto. To that end, the order of O'Brien J. authorized the receiver:

> (c)    to negotiate and do all things necessary or desirable to complete a sale of Air Toronto to Air Canada and, if a sale to Air Canada cannot be completed, to negotiate and sell Air Toronto to another person, subject to terms and conditions approved by this Court.

5    Over a period of several weeks following that order, negotiations directed towards the sale of Air Toronto took place between the receiver and Air Canada. Air Canada had an agreement with the receiver that it would have exclusive negotiating rights during that period. I do not think it is necessary to review those negotiations, but I note that Air Canada had complete access to all of the operations of Air Toronto and conducted due diligence examinations. It became thoroughly acquainted with every aspect of Air Toronto's operations.

6    Those negotiations came to an end when an offer made by Air Canada on June 19, 1990, was considered unsatisfactory by the receiver. The offer was not accepted and lapsed. Having regard to the tenor of Air Canada's negotiating stance and a letter sent by its solicitors on July 20, 1990, I think that the receiver was eminently reasonable when it decided that there was no realistic possibility of selling Air Toronto to Air Canada.

7    The receiver then looked elsewhere. Air Toronto's feeder business is very attractive, but it only has value to a national airline. The receiver concluded reasonably, therefore, that it was commercially necessary for one of Canada's two national airlines to be involved in any sale of Air Toronto. Realistically, there were only two possible purchasers whether direct or indirect. They were Air Canada

and Canadian Airlines International.

**8**   It was well known in the air transport industry that Air Toronto was for sale. During the months following the collapse of the negotiations with Air Canada, the receiver tried unsuccessfully to find viable purchasers. In late 1990, the receiver turned to Canadian Airlines International, the only realistic alternative. Negotiations began between them. Those negotiations led to a letter of intent dated February 11, 1991. On March 6, 1991, the receiver received an offer from Ontario Express Limited and Frontier Airlines Limited, who are subsidiaries of Canadian Airlines International. This offer is called the OEL offer.

**9**   In the meantime, Air Canada and CCFL were having discussions about making an offer for the purchase of Air Toronto. They formed 922246 Ontario Limited (922) for the purpose of purchasing Air Toronto. On March 1, 1991, CCFL wrote to the receiver saying that it proposed to make an offer. On March 7, 1991, Air Canada and CCFL presented an offer to the receiver in the name of 922. For convenience, its offers are called the 922 offers.

**10**   The first 922 offer contained a condition which was unacceptable to the receiver. I will refer to that condition in more detail later. The receiver declined the 922 offer and on March 8, 1991, accepted the OEL offer. Subsequently, 922 obtained an order allowing it to make a second offer. It then submitted an offer which was virtually identical to that of March 7, 1991, except that the unacceptable condition had been removed.

**11**   The proceedings before Rosenberg J. then followed. He approved the sale to OEL and dismissed a motion for the acceptance of the 922 offer. Before Rosenberg J., and in this court, both CCFL and the Royal Bank supported the acceptance of the second 922 offer.

**12**   There are only two issues which must be resolved in this appeal. They are:

> (1)   Did the receiver act properly when it entered into an agreement to sell Air Toronto to OEL?
> (2)   What effect does the support of the 922 offer by the secured creditors have on the result?

**13**   I will deal with the two issues separately.

I. DID THE RECEIVER ACT PROPERLY
IN AGREEING TO SELL TO OEL?

**14**   Before dealing with that issue there are three general observations which I think I should make. The first is that the sale of an airline as a going concern is a very complex process. The best method of selling an airline at the best price is something far removed from the expertise of a court. When a court appoints a receiver to use its commercial expertise to sell an airline, it is inescapable that it intends to rely upon the receiver's expertise and not upon its own. Therefore, the court must place a great deal of confidence in the actions taken and in the opinions formed by the receiver. It should also assume that the receiver is acting properly unless the contrary is clearly shown. The second observation is that the court should be reluctant to second-guess, with the benefit of hindsight, the considered business decisions made by its receiver. The third observation which I wish to make is that the conduct of the receiver should be reviewed in the light of the specific mandate given to him by the court.

**15**   The order of O'Brien J. provided that if the receiver could not complete the sale to Air Canada that it was "to negotiate and sell Air Toronto to another person". The court did not say how the receiver was to negotiate the sale. It did not say it was to call for bids or conduct an auction. It told the receiver to

negotiate and sell. It obviously intended, because of the unusual nature of the asset being sold, to leave the method of sale substantially in the discretion of the receiver. I think, therefore, that the court should not review minutely the process of the sale when, broadly speaking, it appears to the court to be a just process.

**16**   As did Rosenberg J., I adopt as correct the statement made by Anderson J. in Crown Trust Co. v. Rosenberg (1986), 60 O.R. (2d) 87, 39 D.L.R. (4th) 526 (H.C.J.), at pp. 92-94 O.R., pp. 531-33 D.L.R., of the duties which a court must perform when deciding whether a receiver who has sold a property acted properly. When he set out the court's duties, he did not put them in any order of priority, nor do I. I summarize those duties as follows:

> 1.   It should consider whether the receiver has made a sufficient effort to get the best price and has not acted improvidently.
> 2.   It should consider the interests of all parties.
> 3.   It should consider the efficacy and integrity of the process by which offers are obtained.
> 4.   It should consider whether there has been unfairness in the working out of the process.

**17**   I intend to discuss the performance of those duties separately.

> 1.   Did the receiver make a sufficient effort to get the best price and did it act providently?

**18**   Having regard to the fact that it was highly unlikely that a commercially viable sale could be made to anyone but the two national airlines, or to someone supported by either of them, it is my view that the receiver acted wisely and reasonably when it negotiated only with Air Canada and Canadian Airlines International. Furthermore, when Air Canada said that it would submit no further offers and gave the impression that it would not participate further in the receiver's efforts to sell, the only course reasonably open to the receiver was to negotiate with Canadian Airlines International. Realistically, there was nowhere else to go but to Canadian Airlines International. In doing so, it is my opinion that the receiver made sufficient efforts to sell the airline.

**19**   When the receiver got the OEL offer on March 6, 1991, it was over ten months since it had been charged with the responsibility of selling Air Toronto. Until then, the receiver had not received one offer which it thought was acceptable. After substantial efforts to sell the airline over that period, I find it difficult to think that the receiver acted improvidently in accepting the only acceptable offer which it had.

**20**   On March 8, 1991, the date when the receiver accepted the OEL offer, it had only two offers, the OEL offer which was acceptable, and the 922 offer which contained an unacceptable condition. I cannot see how the receiver, assuming for the moment that the price was reasonable, could have done anything but accept the OEL offer.

**21**   When deciding whether a receiver had acted providently, the court should examine the conduct of the receiver in light of the information the receiver had when it agreed to accept an offer. In this case, the court should look at the receiver's conduct in the light of the information it had when it made its decision on March 8, 1991. The court should be very cautious before deciding that the receiver's conduct was improvident based upon information which has come to light after it made its decision. To do so, in my view, would derogate from the mandate to sell given to the receiver by the order of O'Brien J. I agree with and adopt what was said by Anderson J. in Crown Trust v. Rosenberg, supra, at p. 112 O.R., p. 551 D.L.R.:

Its decision was made as a matter of business judgment on the elements then available to it. It is of the very essence of a receiver's function to make such judgments and in the making of them to act seriously and responsibly so as to be prepared to stand behind them.

If the court were to reject the recommendation of the Receiver in any but the most exceptional circumstances, it would materially diminish and weaken the role and function of the Receiver both in the perception of receivers and in the perception of any others who might have occasion to deal with them. It would lead to the conclusion that the decision of the Receiver was of little weight and that the real decision was always made upon the motion for approval. That would be a consequence susceptible of immensely damaging results to the disposition of assets by court-appointed receivers.

(Emphasis added)

**22**    I also agree with and adopt what was said by Macdonald J.A. in Cameron v. Bank of Nova Scotia (1981), 38 C.B.R. (N.S.) 1, 45 N.S.R. (2d) 303 (C.A.), at p. 11 C.B.R., p. 314 N.S.R.:

In my opinion if the decision of the receiver to enter into an agreement of sale, subject to court approval, with respect to certain assets is reasonable and sound under the circumstances at the time existing it should not be set aside simply because a later and higher bid is made. To do so would literally create chaos in the commercial world and receivers and purchasers would never be sure they had a binding agreement.

(Emphasis added)

**23**    On March 8, 1991, the receiver had two offers. One was the OEL offer which it considered satisfactory but which could be withdrawn by OEL at any time before it was accepted. The receiver also had the 922 offer which contained a condition that was totally unacceptable. It had no other offers. It was faced with the dilemma of whether it should decline to accept the OEL offer and run the risk of it being withdrawn, in the hope that an acceptable offer would be forthcoming from 922. An affidavit filed by the president of the receiver describes the dilemma which the receiver faced, and the judgment made in the light of that dilemma:

24.    An asset purchase agreement was received by Ernst & Young on March 7, 1991 which was dated March 6, 1991. This agreement was received from CCFL in respect of their offer to purchase the assets and undertaking of Air Toronto. Apart from financial considerations, which will be considered in a subsequent affidavit, the Receiver determined that it would not be prudent to delay acceptance of the OEL agreement to negotiate a highly uncertain arrangement with Air Canada and CCFL. Air Canada had the benefit of an "exclusive" in negotiations for Air Toronto and had clearly indicated its intention to take itself out of the running while ensuring that no other party could seek to purchase Air Toronto and maintain the Air Canada connector arrangement vital to its survival. The CCFL offer represented a radical reversal of this position by Air Canada at the eleventh hour. However, it contained a significant number of conditions to closing which were entirely beyond the control of the Receiver. As well, the CCFL offer came less than 24 hours before signing of the agreement with OEL which had been negotiated over a

period of months, at great time and expense.

(Emphasis added)
I am convinced that the decision made was a sound one in the
circumstances faced by the receiver on March 8, 1991.

24   I now turn to consider whether the price contained in the OEL offer was one which it was
provident to accept. At the outset, I think that the fact that the OEL offer was the only acceptable one
available to the receiver on March 8, 1991, after ten months of trying to sell the airline, is strong
evidence that the price in it was reasonable. In a deteriorating economy, I doubt that it would have been
wise to wait any longer.

25   I mentioned earlier that, pursuant to an order, 922 was permitted to present a second offer. During
the hearing of the appeal, counsel compared at great length the price contained in the second 922 offer
with the price contained in the OEL offer. Counsel put forth various hypotheses supporting their
contentions that one offer was better than the other.

26   It is my opinion that the price contained in the 922 offer is relevant only if it shows that the price
obtained by the Receiver in the OEL offer was not a reasonable one. In Crown Trust v. Rosenberg,
supra, Anderson J., at p. 113 O.R., p. 551 D.L.R., discussed the comparison of offers in the following
way:

> No doubt, as the cases have indicated, situations might arise where the disparity was
> so great as to call in question the adequacy of the mechanism which had produced the
> offers. It is not so here, and in my view that is substantially an end of the matter.

27   In two judgments, Saunders J. considered the circumstances in which an offer submitted after the
receiver had agreed to a sale should be considered by the court. The first is Re Selkirk (1986), 58 C.B.R.
(N.S.) 245 (Ont. Bkcy.), at p. 247:

> If, for example, in this case there had been a second offer of a substantially higher
> amount, then the court would have to take that offer into consideration in assessing
> whether the receiver had properly carried out his function of endeavouring to obtain
> the best price for the property.

28   The second is Re Beauty Counsellors of Canada Ltd. (1986), 58 C.B.R. (N.S.) 237 (Ont. Bkcy.), at
p. 243:

> If a substantially higher bid turns up at the approval stage, the court should consider
> it. Such a bid may indicate, for example, that the trustee has not properly carried out
> its duty to endeavour to obtain the best price for the estate.

29   In Re Selkirk (1987), 64 C.B.R. (N.S.) 140 (Ont. Bkcy.), at p. 142, McRae J. expressed a similar
view:

> The court will not lightly withhold approval of a sale by the receiver, particularly
> in a case such as this where the receiver is given rather wide discretionary authority
> as per the order of Mr. Justice Trainor and, of course, where the receiver is an officer
> of this court. Only in a case where there seems to be some unfairness in the process of
> the sale or where there are substantially higher offers which would tend to show that
> the sale was improvident will the court withhold approval. It is important that the
> court recognize the commercial exigencies that would flow if prospective purchasers

    are allowed to wait until the sale is in court for approval before submitting their final offer. This is something that must be discouraged.

(Emphasis added)

30    What those cases show is that the prices in other offers have relevance only if they show that the price contained in the offer accepted by the receiver was so unreasonably low as to demonstrate that the receiver was improvident in accepting it. I am of the opinion, therefore, that if they do not tend to show that the receiver was improvident, they should not be considered upon a motion to confirm a sale recommended by a court-appointed receiver. If they were, the process would be changed from a sale by a receiver, subject to court approval, into an auction conducted by the court at the time approval is sought. In my opinion, the latter course is unfair to the person who has entered bona fide into an agreement with the receiver, can only lead to chaos, and must be discouraged.

31    If, however, the subsequent offer is so substantially higher than the sale recommended by the receiver, then it may be that the receiver has not conducted the sale properly. In such circumstances, the court would be justified itself in entering into the sale process by considering competitive bids. However, I think that that process should be entered into only if the court is satisfied that the receiver has not properly conducted the sale which it has recommended to the court.

32    It is necessary to consider the two offers. Rosenberg J. held that the 922 offer was slightly better or marginally better than the OEL offer. He concluded that the difference in the two offers did not show that the sale process adopted by the receiver was inadequate or improvident.

33    Counsel for the appellants complained about the manner in which Rosenberg J. conducted the hearing of the motion to confirm the OEL sale. The complaint was, that when they began to discuss a comparison of the two offers, Rosenberg J. said that he considered the 922 offer to be better than the OEL offer. Counsel said that when that comment was made, they did not think it necessary to argue further the question of the difference in value between the two offers. They complain that the finding that the 922 offer was only marginally better or slightly better than the OEL offer was made without them having had the opportunity to argue that the 922 offer was substantially better or significantly better than the OEL offer. I cannot understand how counsel could have thought that by expressing the opinion that the 922 offer was better, Rosenberg J. was saying that it was a significantly or substantially better one. Nor can I comprehend how counsel took the comment to mean that they were foreclosed from arguing that the offer was significantly or substantially better. If there was some misunderstanding on the part of counsel, it should have been raised before Rosenberg J. at the time. I am sure that if it had been, the misunderstanding would have been cleared up quickly. Nevertheless, this court permitted extensive argument dealing with the comparison of the two offers.

34    The 922 offer provided for $6,000,000 cash to be paid on closing with a royalty based upon a percentage of Air Toronto profits over a period of five years up to a maximum of $3,000,000. The OEL offer provided for a payment of $2,000,000 on closing with a royalty paid on gross revenues over a five-year period. In the short term, the 922 offer is obviously better because there is substantially more cash up front. The chances of future returns are substantially greater in the OEL offer because royalties are paid on gross revenues while the royalties under the 922 offer are paid only on profits. There is an element of risk involved in each offer.

35    The receiver studied the two offers. It compared them and took into account the risks, the advantages and the disadvantages of each. It considered the appropriate contingencies. It is not necessary to outline the factors which were taken into account by the receiver because the manager of its insolvency practice filed an affidavit outlining the considerations which were weighed in its evaluation of the two offers. They seem to me to be reasonable ones. That affidavit concluded with the following

paragraph:

> 24.    On the basis of these considerations the Receiver has approved the OEL offer and has concluded that it represents the achievement of the highest possible value at this time for the Air Toronto division of SoundAir.

36    The court appointed the receiver to conduct the sale of Air Toronto and entrusted it with the responsibility of deciding what is the best offer. I put great weight upon the opinion of the receiver. It swore to the court which appointed it that the OEL offer represents the achievement of the highest possible value at this time for Air Toronto. I have not been convinced that the receiver was wrong when he made that assessment. I am, therefore, of the opinion that the 922 offer does not demonstrate any failure upon the part of the receiver to act properly and providently.

37    It follows that if Rosenberg J. was correct when he found that the 922 offer was in fact better, I agree with him that it could only have been slightly or marginally better. The 922 offer does not lead to an inference that the disposition strategy of the receiver was inadequate, unsuccessful or improvident, nor that the price was unreasonable.

38    I am, therefore, of the opinion that the receiver made a sufficient effort to get the best price and has not acted improvidently.

> 2.    Consideration of the interests of all parties

39    It is well established that the primary interest is that of the creditors of the debtor: see Crown Trust Co. v. Rosenberg, supra, and Re Selkirk (1986, Saunders J.), supra. However, as Saunders J. pointed out in Re Beauty Counsellors, supra, at p. 244 C.B.R., "it is not the only or overriding consideration".

40    In my opinion, there are other persons whose interests require consideration. In an appropriate case, the interests of the debtor must be taken into account. I think also, in a case such as this, where a purchaser has bargained at some length and doubtless at considerable expense with the receiver, the interests of the purchaser ought to be taken into account. While it is not explicitly stated in such cases as Crown Trust Co. v. Rosenberg, supra, Re Selkirk (1986, Saunders J.), supra, Re Beauty Counsellors, supra, Re Selkirk (1987, McRae J.), supra, and Cameron, supra, I think they clearly imply that the interests of a person who has negotiated an agreement with a court-appointed receiver are very important.

41    In this case, the interests of all parties who would have an interest in the process were considered by the receiver and by Rosenberg J.

> 3.    Consideration of the efficacy and integrity of the process by which the offer was obtained

42    While it is accepted that the primary concern of a receiver is the protecting of the interests of the creditors, there is a secondary but very important consideration and that is the integrity of the process by which the sale is effected. This is particularly so in the case of a sale of such a unique asset as an airline as a going concern.

43    The importance of a court protecting the integrity of the process has been stated in a number of cases. First, I refer to Re Selkirk (1986), supra, where Saunders J. said at p. 246 C.B.R.:

> In dealing with the request for approval, the court has to be concerned primarily with protecting the interest of the creditors of the former bankrupt. A secondary but important consideration is that the process under which the sale agreement is arrived

at should be consistent with commercial efficacy and integrity.

In that connection I adopt the principles stated by Macdonald J.A. of the Nova Scotia Supreme Court (Appeal Division) in Cameron v. Bank of N.S. (1981), 38 C.B.R. (N.S.) 1, 45 N.S.R. (2d) 303, 86 A.P.R. 303 (C.A.), where he said at p. 11:

In my opinion if the decision of the receiver to enter into an agreement of sale, subject to court approval, with respect to certain assets is reasonable and sound under the circumstances at the time existing it should not be set aside simply because a later and higher bid is made. To do so would literally create chaos in the commercial world and receivers and purchasers would never be sure they had a finding agreement. On the contrary, they would know that other bids could be received and considered up until the application for court approval is heard -- this would be an intolerable situation.

While those remarks may have been made in the context of a bidding situation rather than a private sale, I consider them to be equally applicable to a negotiation process leading to a private sale. Where the court is concerned with the disposition of property, the purpose of appointing a receiver is to have the receiver do the work that the court would otherwise have to do.

**44**    In Salima Investments Ltd. v. Bank of Montreal (1985), 41 Alta. L.R. (2d) 58, 21 D.L.R. (4th) 473 (C.A.), at p. 61 Alta. L.R., p. 476 D.L.R., the Alberta Court of Appeal said that sale by tender is not necessarily the best way to sell a business as an ongoing concern. It went on to say that when some other method is used which is provident, the court should not undermine the process by refusing to confirm the sale.

**45**    Finally, I refer to the reasoning of Anderson J. in Crown Trust Co. v. Rosenberg, supra, at p. 124 O.R., pp. 562-63 D.L.R.:

While every proper effort must always be made to assure maximum recovery consistent with the limitations inherent in the process, no method has yet been devised to entirely eliminate those limitations or to avoid their consequences. Certainly it is not to be found in loosening the entire foundation of the system. Thus to compare the results of the process in this case with what might have been recovered in some other set of circumstances is neither logical nor practical.

(Emphasis added)

**46**    It is my opinion that the court must exercise extreme caution before it interferes with the process adopted by a receiver to sell an unusual asset. It is important that prospective purchasers know that, if they are acting in good faith, bargain seriously with a receiver and enter into an agreement with it, a court will not lightly interfere with the commercial judgment of the receiver to sell the asset to them.

**47**    Before this court, counsel for those opposing the confirmation of the sale to OEL suggested many different ways in which the receiver could have conducted the process other than the way which he did. However, the evidence does not convince me that the receiver used an improper method of attempting to sell the airline. The answer to those submissions is found in the comment of Anderson J. in Crown Trust Co. v. Rosenberg, supra, at p. 109 O.R., p. 548 D.L.R.:

The court ought not to sit as on appeal from the decision of the Receiver, reviewing in

minute detail every element of the process by which the decision is reached. To do so
would be a futile and duplicitous exercise.

**48**   It would be a futile and duplicitous exercise for this court to examine in minute detail all of the
circumstances leading up to the acceptance of the OEL offer. Having considered the process adopted by
the receiver, it is my opinion that the process adopted was a reasonable and prudent one.

> 4.    Was there unfairness in the process?

**49**   As a general rule, I do not think it appropriate for the court to go into the minutia of the process or
of the selling strategy adopted by the receiver. However, the court has a responsibility to decide whether
the process was fair. The only part of this process which I could find that might give even a superficial
impression of unfairness is the failure of the receiver to give an offering memorandum to those who
expressed an interest in the purchase of Air Toronto.

**50**   I will outline the circumstances which relate to the allegation that the receiver was unfair in failing
to provide an offering memorandum. In the latter part of 1990, as part of its selling strategy, the receiver
was in the process of preparing an offering memorandum to give to persons who expressed an interest in
the purchase of Air Toronto. The offering memorandum got as far as draft form, but was never released
to anyone, although a copy of the draft eventually got into the hands of CCFL before it submitted the
first 922 offer on March 7, 1991. A copy of the offering memorandum forms part of the record and it
seems to me to be little more than puffery, without any hard information which a sophisticated purchaser
would require in order to make a serious bid.

**51**   The offering memorandum had not been completed by February 11, 1991. On that date, the
receiver entered into the letter of intent to negotiate with OEL. The letter of intent contained a provision
that during its currency the receiver would not negotiate with any other party. The letter of intent was
renewed from time to time until the OEL offer was received on March 6, 1991.

**52**   The receiver did not proceed with the offering memorandum because to do so would violate the
spirit, if not the letter, of its letter of intent with OEL.

**53**   I do not think that the conduct of the receiver shows any unfairness towards 922. When I speak of
922, I do so in the context that Air Canada and CCFL are identified with it. I start by saying that the
receiver acted reasonably when it entered into exclusive negotiations with OEL. I find it strange that a
company, with which Air Canada is closely and intimately involved, would say that it was unfair for the
receiver to enter into a time-limited agreement to negotiate exclusively with OEL. That is precisely the
arrangement which Air Canada insisted upon when it negotiated with the receiver in the spring and
summer of 1990. If it was not unfair for Air Canada to have such an agreement, I do not understand why
it was unfair for OEL to have a similar one. In fact, both Air Canada and OEL in its turn were acting
reasonably when they required exclusive negotiating rights to prevent their negotiations from being used
as a bargaining lever with other potential purchasers. The fact that Air Canada insisted upon an
exclusive negotiating right while it was negotiating with the receiver demonstrates the commercial
efficacy of OEL being given the same right during its negotiations with the receiver. I see no unfairness
on the part of the receiver when it honoured its letter of intent with OEL by not releasing the offering
memorandum during the negotiations with OEL.

**54**   Moreover, I am not prepared top find that 922 was in any way prejudiced by the fact that it did not
have an offering memorandum. It made an offer on March 7, 1991, which it contends to this day was a
better offer than that of OEL. 922 has not convinced me that if it had an offering memorandum its offer
would have been any different or any better than it actually was. The fatal problem with the first 922
offer was that it contained a condition which was completely unacceptable to the receiver. The receiver

properly, in my opinion, rejected the offer out of hand because of that condition. That condition did not relate to any information which could have conceivably been in an offering memorandum prepared by the receiver. It was about the resolution of a dispute between CCFL and the Royal Bank, something the receiver knew nothing about.

**55**    Further evidence of the lack of prejudice which the absence of an offering memorandum has caused 922 is found in CCFL's stance before this court. During argument, its counsel suggested, as a possible resolution of this appeal, that this court should call for new bids, evaluate them and then order a sale to the party who put in the better bid. In such a case, counsel for CCFL said that 922 would be prepared to bid within seven days of the court's decision. I would have thought that, if there were anything to CCFL's suggestion that the failure to provide an offering memorandum was unfair to 922, it would have told the court that it needed more information before it would be able to make a bid.

**56**    I am satisfied that Air Canada and CCFL have, and at all times had, all of the information which they would have needed to make what to them would be a commercially viable offer to the receiver. I think that an offering memorandum was of no commercial consequence to them, but the absence of one has since become a valuable tactical weapon.

**57**    It is my opinion that there is no convincing proof that if an offering memorandum had been widely distributed among persons qualified to have purchased Air Toronto, a viable offer would have come forth from a party other than 922 or OEL. Therefore, the failure to provide an offering memorandum was neither unfair nor did it prejudice the obtaining of a better price on March 8, 1991, than that contained in the OEL offer. I would not give effect to the contention that the process adopted by the receiver was an unfair one.

**58**    There are two statements by Anderson J. contained in Crown Trust Co. v. Rosenberg, supra, which I adopt as my own. The first is at p. 109 O.R., p. 548 D.L.R.:

> The court should not proceed against the recommendations of its Receiver except in special circumstances and where the necessity and propriety of doing so are plain. Any other rule or approach would emasculate the role of the Receiver and make it almost inevitable that the final negotiation of every sale would take place on the motion for approval.

The second is at p. 111 O.R., p. 550 D.L.R.:

> It is equally clear, in my view, though perhaps not so clearly enunciated, that it is only in an exceptional case that the court will intervene and proceed contrary to the Receiver's recommendations if satisfied, as I am, that the Receiver has acted reasonably, prudently and fairly and not arbitrarily.

In this case the receiver acted reasonably, prudently, fairly and not arbitrarily. I am of the opinion, therefore, that the process adopted by the receiver in reaching an agreement was a just one.

**59**    In his reasons for judgment, after discussing the circumstances leading to the 922 offer, Rosenberg J. said this [at p. 31 of the reasons]:

> They created a situation as of March 8, where the receiver was faced with two offers, one of which was in acceptable form and one of which could not possibly be accepted in its present form. The receiver acted appropriately in accepting the OEL offer.

I agree.

60    The receiver made proper and sufficient efforts to get the best price that it could for the assets of Air Toronto. It adopted a reasonable and effective process to sell the airline which was fair to all persons who might be interested in purchasing it. It is my opinion, therefore, that the receiver properly carried out the mandate which was given to it by the order of O'Brien J. It follows that Rosenberg J. was correct when he confirmed the sale to OEL.

## II.    THE EFFECT OF THE SUPPORT OF THE 922 OFFER BY THE TWO SECURED CREDITORS

61    As I noted earlier, the 922 offer was supported before Rosenberg J., and in this court, by CCFL and by the Royal Bank, the two secured creditors. It was argued that, because the interests of the creditors are primary, the court ought to give effect to their wish that the 922 offer be accepted. I would not accede to that suggestion for two reasons.

62    The first reason is related to the fact that the creditors chose to have a receiver appointed by the court. It was open to them to appoint a private receiver pursuant to the authority of their security documents. Had they done so, then they would have had control of the process and could have sold Air Toronto to whom they wished. However, acting privately and controlling the process involves some risks. The appointment of a receiver by the court insulates the creditors from those risks. But insulation from those risks carries with it the loss of control over the process of disposition of the assets. As I have attempted to explain in these reasons, when a receiver's sale is before the court for confirmation the only issues are the propriety of the conduct of the receiver and whether it acted providently. The function of the court at that stage is not to step in and do the receiver's work or change the sale strategy adopted by the receiver. Creditors who asked the court to appoint a receiver to dispose of assets should not be allowed to take over control of the process by the simple expedient of supporting another purchaser if they do not agree with the sale made by the receiver. That would take away all respect for the process of sale by a court-appointed receiver.

63    There can be no doubt that the interests of the creditor are an important consideration in determining whether the receiver has properly conducted a sale. The opinion of the creditors as to which offer ought to be accepted is something to be taken into account. But, if the court decides that the receiver has acted properly and providently, those views are not necessarily determinative. Because, in this case, the receiver acted properly and providently, I do not think that the views of the creditors should override the considered judgment of the receiver.

64    The second reason is that, in the particular circumstances of this case, I do not think the support of CCFL and the Royal Bank of the 922 offer is entitled to any weight. The support given by CCFL can be dealt with summarily. It is a co-owner of 922. It is hardly surprising and not very impressive to hear that it supports the offer which it is making for the debtors' assets.

65    The support by the Royal Bank requires more consideration and involves some reference to the circumstances. On March 6, 1991, when the first 922 offer was made, there was in existence an interlender agreement between the Royal Bank and CCFL. That agreement dealt with the share of the proceeds of the sale of Air Toronto which each creditor would receive. At the time, a dispute between the Royal Bank and CCFL about the interpretation of that agreement was pending in the courts. The unacceptable condition in the first 922 offer related to the settlement of the interlender dispute. The condition required that the dispute be resolved in a way which would substantially favour CCFL. It required that CCFL receive $3,375,000 of the $6,000,000 cash payment and the balance, including the royalties, if any, be paid to the Royal Bank. The Royal Bank did not agree with that split of the sale proceeds.

66    On April 5, 1991, the Royal Bank and CCFL agreed to settle the interlender dispute. The settlement was that if the 922 offer was accepted by the court, CCFL would receive only $1,000,000 and the Royal Bank would receive $5,000,000 plus any royalties which might be paid. It was only in consideration of that settlement that the Royal Bank agreed to support the 922 offer.

67    The Royal Bank's support of the 922 offer is so affected by the very substantial benefit which it wanted to obtain from the settlement of the interlender dispute that, in my opinion, its support is devoid of any objectivity. I think it has no weight.

68    While there may be circumstances where the unanimous support by the creditors of a particular offer could conceivably override the proper and provident conduct of a sale by a receiver, I do not think that this is such a case. This is a case where the receiver has acted properly and in a provident way. It would make a mockery out of the judicial process, under which a mandate was given to this receiver to sell this airline, if the support by these creditors of the 922 offer were permitted to carry the day. I give no weight to the support which they give to the 922 offer.

69    In its factum, the receiver pointed out that, because of greater liabilities imposed upon private receivers by various statutes such as the Employment Standards Act, R.S.O. 1980, c. 137, and the Environmental Protection Act, R.S.O. 1980, c. 141, it is likely that more and more the courts will be asked to appoint receivers in insolvencies. In those circumstances, I think that creditors who ask for court-appointed receivers and business people who choose to deal with those receivers should know that if those receivers act properly and providently their decisions and judgments will be given great weight by the courts who appoint them. I have decided this appeal in the way I have in order to assure business people who deal with court-appointed receivers that they can have confidence that an agreement which they make with a court-appointed receiver will be far more than a platform upon which others may bargain at the court approval stage. I think that persons who enter into agreements with court-appointed receivers, following a disposition procedure that is appropriate given the nature of the assets involved, should expect that their bargain will be confirmed by the court.

70    The process is very important. It should be carefully protected so that the ability of court-appointed receivers to negotiate the best price possible is strengthened and supported. Because this receiver acted properly and providently in entering into the OEL agreement, I am of the opinion that Rosenberg J. was right when he approved the sale to OEL and dismissed the motion to approve the 922 offer.

71    I would, accordingly, dismiss the appeal. I would award the receiver, OEL and Frontier Airlines Limited their costs out of the Soundair estate, those of the receiver on a solicitor-and-client scale. I would make no order as to the costs of any of the other parties or interveners.

72    MCKINLAY J.A. (concurring in the result):-- I agree with Galligan J.A. in result, but wish to emphasize that I do so on the basis that the undertaking being sold in this case was of a very special and unusual nature. It is most important that the integrity of procedures followed by court-appointed receivers be protected in the interests of both commercial morality and the future confidence of business persons in their dealings with receivers. Consequently, in all cases, the court should carefully scrutinize the procedure followed by the receiver to determine whether it satisfies the tests set out by Anderson J. in Crown Trust Co. v. Rosenberg (1986), 60 O.R. (2d) 87, 39 D.L.R. (4th) 526 (H.C.J.). While the procedure carried out by the receiver in this case, as described by Galligan J.A., was appropriate, given the unfolding of events and the unique nature of the assets involved, it is not a procedure that is likely to be appropriate in many receivership sales.

73    I should like to add that where there is a small number of creditors who are the only parties with a real interest in the proceeds of the sale (i.e., where it is clear that the highest price attainable would result

in recovery so low that no other creditors, shareholders, guarantors, etc., could possibly benefit therefrom), the wishes of the interested creditors should be very seriously considered by the receiver. It is true, as Galligan J.A. points out, that in seeking the court appointment of a receiver, the moving parties also seek the protection of the court in carrying out the receiver's functions. However, it is also true that in utilizing the court process the moving parties have opened the whole process to detailed scrutiny by all involved, and have probably added significantly to their costs and consequent shortfall as a result of so doing. The adoption of the court process should in no way diminish the rights of any party, and most certainly not the rights of the only parties with a real interest. Where a receiver asks for court approval of a sale which is opposed by the only parties in interest, the court should scrutinize with great care the procedure followed by the receiver. I agree with Galligan J.A. that in this case that was done. I am satisfied that the rights of all parties were properly considered by the receiver, by the learned motions court judge, and by Galligan J.A.

74    GOODMAN J.A. (dissenting):-- I have had the opportunity of reading the reasons for judgment herein of Galligan and McKinlay JJ.A. Respectfully, I am unable to agree with their conclusion.

75    The case at bar is an exceptional one in the sense that upon the application made for approval of the sale of the assets of Air Toronto two competing offers were placed before Rosenberg J. Those two offers were that of Frontier Airlines Ltd. and Ontario Express Limited (OEL) and that of 922246 Ontario Limited (922), a company incorporated for the purpose of acquiring Air Toronto. Its shares were owned equally by Canadian Pension Capital Limited and Canadian Insurers Capital Corporation (collectively CCFL) and Air Canada. It was conceded by all parties to these proceedings that the only persons who had any interest in the proceeds of the sale were two secured creditors, viz., CCFL and the Royal Bank of Canada (the Bank). Those two creditors were unanimous in their position that they desired the court to approve the sale to 922. We were not referred to nor am I aware of any case where a court has refused to abide by the unanimous wishes of the only interested creditors for the approval of a specific offer made in receivership proceedings.

76    In British Columbia Development Corp. v. Spun Cast Industries Inc. (1977), 5 B.C.L.R. 94, 26 C.B.R. (N.S.) 28 (S.C.), Berger J. said at p. 95 B.C.L.R., p. 30 C.B.R.:

> Here all of those with a financial stake in the plant have joined in seeking the court's approval of the sale to Fincas. This court does not having a roving commission to decide what is best for investors and businessmen when they have agreed among themselves what course of action they should follow. It is their money.

77    I agree with that statement. It is particularly apt to this case. The two secured creditors will suffer a shortfall of approximately $50,000,000. They have a tremendous interest in the sale of assets which form part of their security. I agree with the finding of Rosenberg J., Gen. Div., May 1, 1991, that the offer of 922 is superior to that of OEL. He concluded that the 922 offer is marginally superior. If by that he meant that mathematically it was likely to provide slightly more in the way of proceeds it is difficult to take issue with that finding. If on the other hand he meant that having regard to all considerations it was only marginally superior, I cannot agree. He said in his reasons [pp. 17-18]:

> I have come to the conclusion that knowledgeable creditors such as the Royal Bank would prefer the 922 offer even if the other factors influencing their decision were not present. No matter what adjustments had to be made, the 922 offer results in more cash immediately. Creditors facing the type of loss the Royal Bank is taking in this case would not be anxious to rely on contingencies especially in the present circumstances surrounding the airline industry.

**78** I agree with that statement completely. It is apparent that the difference between the two offers insofar as cash on closing is concerned amounts to approximately $3,000,000 to $4,000,000. The Bank submitted that it did not wish to gamble any further with respect to its investment and that the acceptance and court approval of the OEL offer, in effect, supplanted its position as a secured creditor with respect to the amount owing over and above the down payment and placed it in the position of a joint entrepreneur but one with no control. This results from the fact that the OEL offer did not provide for any security for any funds which might be forthcoming over and above the initial downpayment on closing.

**79** In Cameron v. Bank of Nova Scotia (1981), 38 C.B.R. (N.S.) 1, 45 N.S.R. (2d) 303 (C.A.), Hart J.A., speaking for the majority of the court, said at p. 10 C.B.R., p. 312 N.S.R.:

> Here we are dealing with a receiver appointed at the instance of one major creditor, who chose to insert in the contract of sale a provision making it subject to the approval of the court. This, in my opinion, shows an intention on behalf of the parties to invoke the normal equitable doctrines which place the court in the position of looking to the interests of all persons concerned before giving its blessing to a particular transaction submitted for approval. In these circumstances the court would not consider itself bound by the contract entered into in good faith by the receiver but would have to look to the broader picture to see that the contract was for the benefit of the creditors as a whole. When there was evidence that a higher price was readily available for the property the chambers judge was, in my opinion, justified in exercising his discretion as he did. Otherwise he could have deprived the creditors of a substantial sum of money.

**80** This statement is apposite to the circumstances of the case at bar. I hasten to add that in my opinion it is not only price which is to be considered in the exercise of the judge's discretion. It may very well be, as I believe to be so in this case, that the amount of cash is the most important element in determining which of the two offers is for the benefit and in the best interest of the creditors.

**81** It is my view, and the statement of Hart J.A. is consistent therewith, that the fact that a creditor has requested an order of the court appointing a receiver does not in any way diminish or derogate from his right to obtain the maximum benefit to be derived from any disposition of the debtor's assets. I agree completely with the views expressed by McKinlay J.A. in that regard in her reasons.

**82** It is my further view that any negotiations which took place between the only two interested creditors in deciding to support the approval of the 922 offer were not relevant to the determination by the presiding judge of the issues involved in the motion for approval of either one of the two offers nor are they relevant in determining the outcome of this appeal. It is sufficient that the two creditors have decided unanimously what is in their best interest and the appeal must be considered in the light of that decision. It so happens, however, that there is ample evidence to support their conclusion that the approval of the 922 offer is in their best interests.

**83** I am satisfied that the interests of the creditors are the prime consideration for both the receiver and the court. In Re Beauty Counsellors of Canada Ltd. (1986), 58 C.B.R. (N.S.) 237 (Ont. Bkcy.) Saunders J. said at p. 243:

> This does not mean that a court should ignore a new and higher bid made after acceptance where there has been no unfairness in the process. The interests of the creditors, while not the only consideration, are the prime consideration.

**84**    I agree with that statement of the law. In Re Selkirk (1986), 58 C.B.R. (N.S.) 245 (Ont. Bkcy.) Saunders J. heard an application for court approval for the sale by the sheriff of real property in bankruptcy proceedings. The sheriff had been previously ordered to list the property for sale subject to approval of the court. Saunders J. said at p. 246 C.B.R.:

> In dealing with the request for approval, the court has to be concerned primarily with protecting the interests of the creditors of the former bankrupt. A secondary but important consideration is that the process under which the sale agreement is arrived at should be consistent with the commercial efficacy and integrity.

**85**    I am in agreement with that statement as a matter of general principle. Saunders J. further stated that he adopted the principles stated by Macdonald J.A. in Cameron, supra, at pp. 92-94 O.R., pp. 531-33 D.L.R., quoted by Galligan J.A. in his reasons. In Cameron, the remarks of Macdonald J.A. related to situations involving the calling of bids and fixing a time limit for the making of such bids. In those circumstances the process is so clear as a matter of commercial practice that an interference by the court in such process might have a deleterious effect on the efficacy of receivership proceedings in other cases. But Macdonald J.A. recognized that even in bid or tender cases where the offeror for whose bid approval is sought has complied with all requirements a court might not approve the agreement of purchase and sale entered into by the receiver. He said at pp. 11-12 C.B.R., p. 314 N.S.R.:

> There are, of course, many reasons why a court might not approve an agreement of purchase and sale, viz., where the offer accepted is so low in relation to the appraised value as to be unrealistic; or, where the circumstances indicate that insufficient time was allowed for the making of bids or that inadequate notice of sale by bid was given (where the receiver sells property by the bid method); or, where it can be said that the proposed sale is not in the best interest of either the creditors or the owner. Court approval must involve the delicate balancing of competing interests and not simply a consideration of the interests of the creditors.

**86**    The deficiency in the present case is so large that there has been no suggestion of a competing interest between the owner and the creditors.

**87**    I agree that the same reasoning may apply to a negotiation process leading to a private sale but the procedure and process applicable to private sales of a wide variety of businesses and undertakings with the multiplicity of individual considerations applicable and perhaps peculiar to the particular business is not so clearly established that a departure by the court from the process adopted by the receiver in a particular case will result in commercial chaos to the detriment of future receivership proceedings. Each case must be decided on its own merits and it is necessary to consider the process used by the receiver in the present proceedings and to determine whether it was unfair, improvident or inadequate.

**88**    It is important to note at the outset that Rosenberg J. made the following statement in his reasons [p. 15]:

> On March 8, 1991 the trustee accepted the OEL offer subject to court approval. The receiver at that time had no other offer before it that was in final form or could possibly be accepted. The receiver had at the time the knowledge that Air Canada with CCFL had not bargained in good faith and had not fulfilled the promise of its letter of March 1. The receiver was justified in assuming that Air Canada and CCFL's offer was a long way from being in an acceptable form and that Air Canada and CCFL's objective was to interrupt the finalizing of the OEL agreement and to retain

as long as possible the Air Toronto connector traffic flowing into Terminal 2 for the benefit of Air Canada.

89    In my opinion there was no evidence before him or before this court to indicate that Air Canada with CCFL had not bargained in good faith and that the receiver had knowledge of such lack of good faith. Indeed, on this appeal, counsel for the receiver stated that he was not alleging Air Canada and CCFL had not bargained in good faith. Air Canada had frankly stated at the time that it had made its offer to purchase which was eventually refused by the receiver that it would not become involved in an "auction" to purchase the undertaking of Air Canada and that, although it would fulfil its contractual obligations to provide connecting services to Air Toronto, it would do no more than it was legally required to do insofar as facilitating the purchase of Air Toronto by any other person. In so doing Air Canada may have been playing "hard ball" as its behaviour was characterized by some of the counsel for opposing parties. It was nevertheless merely openly asserting its legal position as it was entitled to do.

90    Furthermore there was no evidence before Rosenberg J. or this court that the receiver had assumed that Air Canada and CCFL's objective in making an offer was to interrupt the finalizing of the OEL agreement and to retain as long as possible the Air Toronto connector traffic flowing into Terminal 2 for the benefit of Air Canada. Indeed, there was no evidence to support such an assumption in any event although it is clear that 922 and through it CCFL and Air Canada were endeavouring to present an offer to purchase which would be accepted and/or approved by the court in preference to the offer made by OEL.

91    To the extent that approval of the OEL agreement by Rosenberg J. was based on the alleged lack of good faith in bargaining and improper motivation with respect to connector traffic on the part of Air Canada and CCFL, it cannot be supported.

92    I would also point out that, rather than saying there was no other offer before it that was final in form, it would have been more accurate to have said that there was no unconditional offer before it.

93    In considering the material and evidence placed before the court I am satisfied that the receiver was at all times acting in good faith. I have reached the conclusion, however, that the process which he used was unfair insofar as 922 is concerned and improvident insofar as the two secured creditors are concerned.

94    Air Canada had been negotiating with Soundair Corporation for the purchase from it of Air Toronto for a considerable period of time prior to the appointment of a receiver by the court. It had given a letter of intent indicating a prospective sale price of $18,000,000. After the appointment of the receiver, by agreement dated April 30, 1990, Air Canada continued its negotiations for the purchase of Air Toronto with the receiver. Although this agreement contained a clause which provided that the receiver "shall not negotiate for the sale ... of Air Toronto with any person except Air Canada", it further provided that the receiver would not be in breach of that provision merely by receiving unsolicited offers for all or any of the assets of Air Toronto. In addition, the agreement, which had a term commencing on April 30, 1990, could be terminated on the fifth business day following the delivery of a written notice of termination by one party to the other. I point out this provision merely to indicate that the exclusivity privilege extended by the Receiver to Air Canada was of short duration at the receiver's option.

95    As a result of due diligence investigations carried out by Air Canada during the month of April, May and June of 1990, Air Canada reduced its offer to 8.1 million dollars conditional upon there being $4,000,000 in tangible assets. The offer was made on June 14, 1990 and was open for acceptance until June 29, 1990.

96    By amending agreement dated June 19, 1990 the receiver was released from its covenant to refrain

from negotiating for the sale of the Air Toronto business and assets to any person other than Air Canada. By virtue of this amending agreement the receiver had put itself in the position of having a firm offer in hand with the right to negotiate and accept offers from other persons. Air Canada in these circumstances was in the subservient position. The receiver, in the exercise of its judgment and discretion, allowed the Air Canada offer to lapse. On July 20, 1990 Air Canada served a notice of termination of the April 30, 1990 agreement.

97    Apparently as a result of advice received from the receiver to the effect that the receiver intended to conduct an auction for the sale of the assets and business of the Air Toronto Division of Soundair Corporation, the solicitors for Air Canada advised the receiver by letter dated July 20, 1990 in part as follows:

> Air Canada has instructed us to advise you that it does not intend to submit a
> further offer in the auction process.

98    This statement together with other statements set forth in the letter was sufficient to indicate that Air Canada was not interested in purchasing Air Toronto in the process apparently contemplated by the receiver at that time. It did not form a proper foundation for the receiver to conclude that there was no realistic possibility of selling Air Toronto to Air Canada, either alone or in conjunction with some other person, in different circumstances. In June 1990 the receiver was of the opinion that the fair value of Air Toronto was between $10,000,000 and $12,000,000.

99    In August 1990 the receiver contacted a number of interested parties. A number of offers were received which were not deemed to be satisfactory. One such offer, received on August 20, 1990, came as a joint offer from OEL and Air Ontario (an Air Canada connector). It was for the sum of $3,000,000 for the good will relating to certain Air Toronto routes but did not include the purchase of any tangible assets or leasehold interests.

100    In December 1990 the receiver was approached by the management of Canadian Partner (operated by OEL) for the purpose of evaluating the benefits of an amalgamated Air Toronto/Air Partner operation. The negotiations continued from December of 1990 to February of 1991 culminating in the OEL agreement dated March 8, 1991.

101    On or before December, 1990, CCFL advised the receiver that it intended to make a bid for the Air Toronto assets. The receiver, in August of 1990, for the purpose of facilitating the sale of Air Toronto assets, commenced the preparation of an operating memorandum. He prepared no less than six draft operating memoranda with dates from October 1990 through March 1, 1991. None of these were distributed to any prospective bidder despite requests having been received therefor, with the exception of an early draft provided to CCFL without the receiver's knowledge.

102    During the period December 1990 to the end of January 1991, the receiver advised CCFL that the offering memorandum was in the process of being prepared and would be ready soon for distribution. He further advised CCFL that it should await the receipt of the memorandum before submitting a formal offer to purchase the Air Toronto assets.

103    By late January CCFL had become aware that the receiver was negotiating with OEL for the sale of Air Toronto. In fact, on February 11, 1991, the receiver signed a letter of intent with OEL wherein it had specifically agreed not to negotiate with any other potential bidders or solicit any offers from others.

104    By letter dated February 25, 1991, the solicitors for CCFL made a written request to the Receiver for the offering memorandum. The receiver did not reply to the letter because he felt he was precluded from so doing by the provisions of the letter of intent dated February 11, 1991. Other prospective

purchasers were also unsuccessful in obtaining the promised memorandum to assist them in preparing their bids. It should be noted that exclusivity provision of the letter of intent expired on February 20, 1991. This provision was extended on three occasions, viz., February 19, 22 and March 5, 1991. It is clear that from a legal standpoint the receiver, by refusing to extend the time, could have dealt with other prospective purchasers and specifically with 922.

**105**    It was not until March 1, 1991 that CCFL had obtained sufficient information to enable it to make a bid through 922. It succeeded in so doing through its own efforts through sources other than the receiver. By that time the receiver had already entered into the letter of intent with OEL. Notwithstanding the fact that the receiver knew since December of 1990 that CCFL wished to make a bid for the assets of Air Toronto (and there is no evidence to suggest that at any time such a bid would be in conjunction with Air Canada or that Air Canada was in any way connected with CCFL) it took no steps to provide CCFL with information necessary to enable it to make an intelligent bid and, indeed, suggested delaying the making of the bid until an offering memorandum had been prepared and provided. In the meantime by entering into the letter of intent with OEL it put itself in a position where it could not negotiate with CCFL or provide the information requested.

**106**    On February 28, 1991, the solicitors for CCFL telephoned the receiver and were advised for the first time that the receiver had made a business decision to negotiate solely with OEL and would not negotiate with anyone else in the interim.

**107**    By letter dated March 1, 1991 CCFL advised the receiver that it intended to submit a bid. It set forth the essential terms of the bid and stated that it would be subject to customary commercial provisions. On March 7, 1991 CCFL and Air Canada, jointly through 922, submitted an offer to purchase Air Toronto upon the terms set forth in the letter dated March 1, 1991. It included a provision that the offer was conditional upon the interpretation of an interlender agreement which set out the relative distribution of proceeds as between CCFL and the Royal Bank. It is common ground that it was a condition over which the receiver had no control and accordingly would not have been acceptable on that ground alone. The receiver did not, however, contact CCFL in order to negotiate or request the removal of the condition although it appears that its agreement with OEL not to negotiate with any person other than OEL expired on March 6, 1991.

**108**    The fact of the matter is that by March 7, 1991, the receiver had received the offer from OEL which was subsequently approved by Rosenberg J. That offer was accepted by the receiver on March 8, 1991. Notwithstanding the fact that OEL had been negotiating the purchase for a period of approximately three months the offer contained a provision for the sole benefit of the purchaser that it was subject to the purchaser obtaining:

> ... a financing commitment within 45 days of the date hereof in an amount not less than the Purchase Price from the Royal Bank of Canada or other financial institution upon terms and conditions acceptable to them. In the event that such a financing commitment is not obtained within such 45 day period, the purchaser or OEL shall have the right to terminate this agreement upon giving written notice of termination to the vendor on the first Business Day following the expiry of the said period.

The purchaser was also given the right to waive the condition.

**109**    In effect the agreement was tantamount to a 45-day option to purchase excluding the right of any other person to purchase Air Toronto during that period of time and thereafter if the condition was fulfilled or waived. The agreement was, of course, stated to be subject to court approval.

**110**    In my opinion the process and procedure adopted by the receiver was unfair to CCFL. Although

it was aware from December 1990 that CCFL was interested in making an offer, it effectively delayed the making of such offer by continually referring to the preparation of the offering memorandum. It did not endeavour during the period December 1990 to March 7, 1991 to negotiate with CCFL in any way the possible terms of purchase and sale agreement. In the result no offer was sought from CCFL by the receiver prior to February 11, 1991 and thereafter it put itself in the position of being unable to negotiate with anyone other than OEL. The receiver, then, on March 8, 1991 chose to accept an offer which was conditional in nature without prior consultation with CCFL (922) to see whether it was prepared to remove the condition in its offer.

**111**   I do not doubt that the receiver felt that it was more likely that the condition in the OEL offer would be fulfilled than the condition in the 922 offer. It may be that the receiver, having negotiated for a period of three months with OEL, was fearful that it might lose the offer if OEL discovered that it was negotiating with another person. Nevertheless it seems to me that it was imprudent and unfair on the part of the receiver to ignore an offer from an interested party which offered approximately triple the cash down payment without giving a chance to the offeror to remove the conditions or other terms which made the offer unacceptable to it. The potential loss was that of an agreement which amounted to little more than an option in favour of the offeror.

**112**   In my opinion the procedure adopted by the receiver was unfair to CCFL in that, in effect, it gave OEL the opportunity of engaging in exclusive negotiations for a period of three months notwithstanding the fact that it knew CCFL was interested in making an offer. The receiver did not indicate a deadline by which offers were to be submitted and it did not at any time indicate the structure or nature of an offer which might be acceptable to it.

**113**   In his reasons Rosenberg J. stated that as of March 1, CCFL and Air Canada had all the information that they needed and any allegations of unfairness in the negotiating process by the receiver had disappeared. He said [p. 31]:

> They created a situation as of March 8, where the receiver was faced with two offers, one of which was in acceptable form and one of which could not possibly be accepted in its present form. The receiver acted appropriately in accepting the OEL offer.

If he meant by "acceptable in form" that it was acceptable to the receiver, then obviously OEL had the unfair advantage of its lengthy negotiations with the receiver to ascertain what kind of an offer would be acceptable to the receiver. If, on the other hand, he meant that the 922 offer was unacceptable in its form because it was conditional, it can hardly be said that the OEL offer was more acceptable in this regard as it contained a condition with respect to financing terms and conditions "acceptable to them".

**114**   It should be noted that on March 13, 1991 the representatives of 922 first met with the receiver to review its offer of March 7, 1991 and at the request of the receiver withdrew the inter- lender condition from its offer. On March 14, 1991 OEL removed the financing condition from its offer. By order of Rosenberg J. dated March 26, 1991, CCFL was given until April 5, 1991 to submit a bid and on April 5, 1991, 922 submitted its offer with the interlender condition removed.

**115**   In my opinion the offer accepted by the receiver is improvident and unfair insofar as the two creditors are concerned. It is not improvident in the sense that the price offered by 922 greatly exceeded that offered by OEL. In the final analysis it may not be greater at all. The salient fact is that the cash down payment in the 922 offer constitutes approximately two-thirds of the contemplated sale price whereas the cash down payment in the OEL transaction constitutes approximately 20 to 25 per cent of the contemplated sale price. In terms of absolute dollars, the down payment in the 922 offer would likely exceed that provided for in the OEL agreement by approximately $3,000,000 to $4,000,000.

116    In Re Beauty Counsellors of Canada Ltd., supra, Saunders J. said at p. 243 C.B.R.:

> If a substantially higher bid turns up at the approval stage, the court should consider it. Such a bid may indicate, for example, that the trustee has not properly carried out its duty to endeavour to obtain the best price for the estate. In such a case the proper course might be to refuse approval and to ask the trustee to recommence the process.

117    I accept that statement as being an accurate statement of the law. I would add, however, as previously indicated, that in determining what is the best price for the estate the receiver or court should not limit its consideration to which offer provides for the greater sale price. The amount of down payment and the provision or lack thereof to secure payment of the balance of the purchase price over and above the down payment may be the most important factor to be considered and I am of the view that is so in the present case. It is clear that that was the view of the only creditors who can benefit from the sale of Air Toronto.

118    I note that in the case at bar the 922 offer in conditional form was presented to the receiver before it accepted the OEL offer. The receiver in good faith, although I believe mistakenly, decided that the OEL offer was the better offer. At that time the receiver did not have the benefit of the views of the two secured creditors in that regard. At the time of the application for approval before Rosenberg J. the stated preference of the two interested creditors was made quite clear. He found as a fact that knowledgeable creditors would not be anxious to rely on contingencies in the present circumstances surrounding the airline industry. It is reasonable to expect that a receiver would be no less knowledgeable in that regard and it is his primary duty to protect the interests of the creditors. In my view it was an improvident act on the part of the receiver to have accepted the conditional offer made by OEL and Rosenberg J. erred in failing to dismiss the application of the receiver for approval of the OEL offer. It would be most inequitable to foist upon the two creditors who have already been seriously hurt more unnecessary contingencies.

119    Although in other circumstances it might be appropriate to ask the receiver to recommence the process, in my opinion, it would not be appropriate to do so in this case. The only two interested creditors support the acceptance of the 922 offer and the court should so order.

120    Although I would be prepared to dispose of the case on the grounds stated above, some comment should be addressed to the question of interference by the court with the process and procedure adopted by the receiver.

121    I am in agreement with the view expressed by McKinlay J.A. in her reasons that the undertaking being sold in this case was of a very special and unusual nature. As a result the procedure adopted by the receiver was somewhat unusual. At the outset, in accordance with the terms of the receiving order, it dealt solely with Air Canada. It then appears that the receiver contemplated a sale of the assets by way of auction and still later contemplated the preparation and distribution of an offering memorandum inviting bids. At some point, without advice to CCFL, it abandoned that idea and reverted to exclusive negotiations with one interested party. This entire process is not one which is customary or widely accepted as a general practice in the commercial world. It was somewhat unique having regard to the circumstances of this case. In my opinion the refusal of the court to approve the offer accepted by the receiver would not reflect on the integrity of procedures followed by court-appointed receivers and is not the type of refusal which will have a tendency to undermine the future confidence of business persons in dealing with receivers.

122    Rosenberg J. stated that the Royal Bank was aware of the process used and tacitly approved it. He said it knew the terms of the letter of intent in February 1991 and made no comment. The Royal Bank

did, however, indicate to the receiver that it was not satisfied with the contemplated price nor the amount of the down payment. It did not, however, tell the receiver to adopt a different process in endeavouring to sell the Air Toronto assets. It is not clear from the material filed that at the time it became aware of the letter of intent, it knew that CCFL was interested in purchasing Air Toronto.

**123**    I am further of the opinion that a prospective purchaser who has been given an opportunity to engage in exclusive negotiations with a receiver for relatively short periods of time which are extended from time to time by the receiver and who then makes a conditional offer, the condition of which is for his sole benefit and must be fulfilled to his satisfaction unless waived by him, and which he knows is to be subject to court approval, cannot legitimately claim to have been unfairly dealt with if the court refuses to approve the offer and approves a substantially better one.

**124**    In conclusion I feel that I must comment on the statement made by Galligan J.A. in his reasons to the effect that the suggestion made by counsel for 922 constitutes evidence of lack of prejudice resulting from the absence of an offering memorandum. It should be pointed out that the court invited counsel to indicate the manner in which the problem should be resolved in the event that the court concluded that the order approving the OEL offer should be set aside. There was no evidence before the court with respect to what additional information may have been acquired by CCFL since March 8, 1991 and no inquiry was made in that regard. Accordingly, I am of the view that no adverse inference should be drawn from the proposal made as a result of the court's invitation.

**125**    For the above reasons I would allow the appeal with one set of costs to CCFL-922, set aside the order of Rosenberg J., dismiss the receiver's motion with one set of costs to CCFL-922 and order that the assets of Air Toronto be sold to numbered corporation 922246 on the terms set forth in its offer with appropriate adjustments to provide for the delay in its execution. Costs awarded shall be payable out of the estate of Soundair Corporation. The costs incurred by the receiver in making the application and responding to the appeal shall be paid to him out of the assets of the estate of Soundair Corporation on a solicitor-and-client basis. I would make no order as to costs of any of the other parties or interveners.

Appeal dismissed.

*Case Name:*
# Tiger Brand Knitting Co. (Re)

**IN THE MATTER OF The Companies' Creditors Arrangement
Act, R.S.C. 1985, c. C-36, as amended
AND IN THE MATTER OF a plan of compromise or arrangement
of Tiger Brand Knitting Company Limited, applicants**

[2005] O.J. No. 1259

[2005] O.T.C. 238

9 C.B.R. (5th) 315

138 A.C.W.S. (3d) 221

2005 CarswellOnt 1240

Court File No. 04-CL-5532

Ontario Superior Court of Justice

**C.L. Campbell J.**

Heard: April 1, 2005.
Judgment: April 5, 2005.

(43 paras.)

*Insolvency law -- Practice -- Proceedings in bankruptcy -- Jurisdiction of courts -- Orders.*

Application by Tiger Brand Knitting and the Monitor, RSM Richter, for a 15-day extension of time to present an offer to the court for the sale of the business and assets of Tiger Brand. Tiger Brand was under CCAA protection and in the midst of a court-ordered sale process. A potential purchaser came forward, but the major secured creditor, GMAC, and Tiger Brand's union, the USWA, believed that a superior offer was available. Accordingly, the deadline for the sale process was extended. At the date of the hearing, two potential purchasers executed non-binding agreements and the Monitor sought an extension to finalize a third bid. The union sought a condition that the Monitor be directed to negotiate with other potential parties before the acceptance of a bid, and a condition that the purchaser provide the opportunity of some or all of the jobs occupied by the union. The potential third bidder provided the possibility for preservation of some employment. The Monitor submitted that adding conditions to the grant of extension would undermine and violate the process.

HELD: Application allowed. There was no accepted offer before the court for approval and the actions of the Monitor in soliciting a third bid were appropriate. No conditions were warranted at this stage of the sale process. It was necessary to the administration of the CCAA to honour the terms of the current

process. To effectively re-open the offering process would amount to unfairness and favour the interests of the union over other stakeholders.

**Statutes, Regulations and Rules Cited:**

Bankruptcy and Insolvency Act.

Companies' Creditors Arrangement Act.

**Counsel:**

Scott A. Bomhof, for the Monitor RSM Richter Inc.

Orestes Pasparakis, for GMAC Commercial Finance Corporation-Canada.

Sean Dewart for the USWA.

Renée B. Brosseau, for Tiger Brand Knitting Company Limited.

Steven L. Graff, for Geetex Global Sourcing Inc.

Christopher Besant, for Joan Fisk.

Fred Myers, for the prospective purchaser.

Hugh Mackenzie, for Andrew Warnock and James Warnock.

Leonard Alksnis, for the majority of the members of the Board.

---

## REASONS FOR DECISION

**1    C.L. CAMPBELL J.**:-- Tiger Brand Knitting Company Limited ("the Applicant") and RSM Richter Inc. ("the Monitor") seek an extension of the time within which to present an offer to the Court for the sale of the business and assets of the Applicant.

**2**    The extension of up to 15 days is not opposed. Counsel on behalf of the United Steel Workers of America ("USWA") urges the Court to add a condition to the granting of any extension, namely, that the Monitor be directed not to accept a bid offer that it has received and to negotiate with another party that may make an offer.

**3**    USWA seeks to add the condition with the prospect that a new offer, if it comes forward, would provide the opportunity of some or all of the 200 jobs now occupied by its members at the Applicant's facility in Cambridge.

**4**    Very simply, it is urged that the broad considerations available to the Court to provide remedy under The Companies' Creditors Arrangement Act ("CCAA") permit the Court to take into account and balance the interests of all stakeholders, not just those of a purchaser who would provide the greatest immediate monetary recovery to a secured creditor.

Background Facts

**5**    On August 30, 2004, the Applicant filed for, and obtained, protection from its creditors under the CCAA pursuant to the "Initial Order." The stay of proceedings was initially for a period of 30 days and since September 29, 2004, has been extended on a number of occasions, the last being March 15, 2005.

**6**    Tiger Brand, which is in the business of design and manufacture of casual clothing, has been subject to the impact of globalization, which has seen cheaper goods manufactured abroad displace domestic production. This, together with the rise of the Canadian dollar relative to the United States dollar, has resulted in a deterioration of financial performance.

**7**    The impact will particularly felt by the employees in head office and manufacturing facilities in Cambridge, Ontario, but as well by the Company's three retail outlets.

**8**    From the commencement of its involvement, the Monitor has recognized that a so-called multi-track process provided the only realistic opportunity to maximize stakeholder returns. As set out in the Monitor's First Report, these included (a) soliciting offers for the business and assets; (b) considering shareholders' restructuring plans; (c) the liquidation value of assets; and (d) assisting in identification of potential investors.

**9**    Subject to comments below, none of the interested parties has taken the position that the Monitor has not reasonably or appropriately carried out its duties in accordance with Court Orders.

**10**    By this Court's Order of September 13, 2004, a Sale Process was approved, as it was recognized that a sale of assets rather than a restructuring of the Company was the more likely result of the ongoing effort.

**11**    The marketing process was extended and by Order of November 3, 2004, amended as set out in that Order with the explanation and rationale for it contained in the Monitor's Fifth Report to the Court dated January 11, 2005:

- The Monitor originally identified a sale transaction with Geetex which, at the time, provided the highest value to the stakeholders and had the greatest probability of closing. Importantly, the Geetex offer was premised on an asset acquisition which would likely result in Geetex carrying on an importing operation; and, as such, an orderly wind-down and termination of the Company's manufacturing and possibly other operations in Cambridge, Ontario;
- Geetex agreed that its offer would be a "stalking horse" in the amended sale process. Parties interested in purchasing the Assets for an amount greater than the Geetex stalking horse bid had to submit offers by a November 12, 2004 deadline;

**12**    A deadline of November 12, 2004 was set for the receipt of offers pursuant to the Amended Sale Process, the short time period being considered necessary due to a belief by, among others, Geetex that, "if a transaction was not consummated in short order, the assets and the business of Tiger Brand generally would deteriorate significantly and rapidly in value."

**13**    Apparently, both the major secured creditor GMAC and the Union were of the view that superior offers were available, the process was extended and in early January 2005, a "stay fee" was negotiated between the Monitor and Geetex, whereby Geetex kept its offer open to February 15, 2005.

**14**    Geetex takes the position that there has not been until most recently an offer superior to its and that

either the new offer from a new purchaser of assets should be accepted and closed, or Geetex's offer accepted and completed, or it be paid the break fee plus costs.

**15**   As of the time of its Sixth Report, the Monitor had executed non-binding non-exclusive memoranda of understanding with two prospective purchasers and looked forward to one or both of the parties presenting a final form of asset purchase agreement for consideration.

**16**   Since that time, the Monitor has been negotiating an agreement with one prospective purchaser, which is expected to be finalized and executed shortly. Hence the request for an extension to April 15, 2005.

**17**   The affidavit material filed on behalf of USWA identifies a potential bidder, which, if successful, would provide the opportunity for preservation of some employment in Cambridge.

**18**   In effect, USWA complains that the Monitor will not now consider and negotiate an offer from this bidder, which effectively eliminates the possibility of saving employment in Cambridge.

**19**   The Monitor reports in its Seventh Report that efforts to identify going-concern purchasers that would preserve employment at Cambridge have been unsuccessful.

**20**   The position of the Monitor, supported by the major secured creditor, Geetex and the prospective purchaser, is that to add a condition to the grant of extension would undermine and violate the process that has been followed to date.

Analysis & Law

**21**   Two principles involving the Court's jurisdiction and discretion are urged, one by USWA and another by those who oppose an extension of the time to complete a plan on terms.

**22**   USWA submits that the broad discretion given to the Court to take into account the interests of all stakeholders not just secured creditors, directs that in these circumstances, every reasonable consideration be given to the saving of jobs and of the Company to operate as an entity.

**23**   Mr. Dewart submits that the broad and flexible discretion given to the Court under the CCAA favours any reasonable effort to preserve the business under a restructuring as opposed to a liquidation, which is more properly achieved under the BIA.

**24**   The balancing effort, it is suggested, should allow those stakeholders who wish to achieve continuance of the enterprise every reasonable opportunity to do so and in this case, the only way to do so is to require the Monitor to not accept an offer to purchase assets until it at least considers a bid from an entity that might allow continuance of at least some of the business.

**25**   The Court of Appeal for Ontario rendered a decision on March 31, 2005 dealing with the issue of removal of directors in the context of a CCAA proceeding.

**26**   In Re Stelco Inc and others, [2005] O.J. No. 1171, the reasons of Blair J. for the Court considered the extent to which the Court's "inherent jurisdiction" and "discretion" under the CCAA might be involved to provide the remedy sought.

**27**   After adopting the observation from I.H. Jacob's "The Inherent Jurisdiction of the Court" (1970), 23 Current Legal Problems at p. 2, that there is a vital distinction between jurisdiction and discretion that must be observed, he went on to say at paragraph 38:

[38] I do not mean to suggest that inherent jurisdiction can never apply in a CCAA context. The court retains the ability to control its own process, should the need arise. There is a distinction, however -- difficult as it may be to draw -- between the court's process with respect to the restructuring, on the one hand, and the course of action involving the negotiations and corporate actions accompanying them, which are the company's process, on the other hand. The court simply supervises the latter process through its ability to stay, restrain or prohibit proceedings against the company during the plan negotiation period "on such terms as it may impose." Hence the better view is that a judge is generally exercising the court's statutory discretion under s. 11 of the Act when supervising a CCAA proceeding. [Footnote omitted]

28    At paragraph 39, in commenting on the discretion of a judge under s. 11 of the CCAA to, among other things, stay, restrain further proceedings or prohibit actions against the Company acting in good faith and with due diligence, Blair J.A. went on to say:

> In my view, the s. 11 discretion -- in spite of its considerable breadth and flexibility -- does not permit the exercise of such a power in and of itself.

29    Paragraph 44 reads:

> [44] What the court does under s. 11 is to establish the boundaries of the playing field and act as a referee in the process. The company's role in the restructuring, and that of its stakeholders, is to work out a plan or compromise that a sufficient percentage of creditors will accept and the court will approve and sanction. The corporate activities that take place in the course of the workout are governed by the legislation and legal principles that normally apply to such activities. In the course of acting as referee, the court has great leeway, as Farley J. observed in Lehndorff, 17 C.B.R. (3d) 24, supra, at para 5, "to make order[s] so as to effectively maintain the status quo in respect of an insolvent company while it attempts to gain the approval of its creditors for the proposed compromise or arrangement which will be to the benefit of both the company and its creditors". But the s. 11 discretion is not open-ended and unfettered. Its exercise must be guided by the scheme and object of the Act and by the legal principles that govern corporate law issues. ...

30    This leads to the principle relied on by those who oppose the extension on conditions that would favour a new offer.

31    The principle is that process that has been put in place for receiving offers in respect of either the business as a going concern or of its assets, should be honoured. The process is integral to the administration of statutes such as the BIA and the CCAA.

32    Royal Bank v. Soundair Corp (1991), 7 C.B.R. (3d) 1 is a decision of the Court of Appeal for Ontario. At issue was the power of the Court to review a decision of a receiver to approve one offer over another for the sale of an airline as a going concern.

33    At paragraph 42, Galligan J.A. for the majority (himself and McKinlay J.A.) said:

> While it is accepted that the primary concern of a receiver is the protecting of the interests of the creditors, there is a secondary but very important consideration, and that is the integrity of the process by which the sale is effected.

**34**    At paragraph 16, the statement made by Anderson J. in Crown Trust Co. v. Rosenberg (1986), 60 O.R. (2d) 87 at p. 92 was adopted and the duties of the Court summarized as follows:

1. It should consider whether the receiver has made a sufficient effort to get the best price and has not acted improvidently.
2. It should consider the interests of all parties.
3. It should consider the efficacy and integrity of the process by which offers are obtained.
4. It should consider whether there has been unfairness in the working out of the process.

**35**    To my mind, those same duties of the Court are implicit in a marketing and sale process pursuant to Court Order under the CCAA.

**36**    There is nothing in the material before me or in the submissions of Mr. Dewart that suggest that any of those duties have to date been breached by the Monitor in the negotiation or offer process.

**37**    At this point in time, I am of the view that to allow the offering process to in effect be re-opened by enjoining the Monitor from completing a proposed transaction would amount to an unfairness in the working out of the process to the prospective purchaser, to Geetex and to GMAC the secured creditor. As well, it would interfere with the efficacy and integrity of the process and prefer the interests of one party (the USWA, albeit an important one) over others. As noted at paragraph 46 of Soundair

> [46] It is my opinion that the court must exercise extreme caution before it interferes with the process adopted by a receiver to sell an unusual asset. It is important that prospective purchasers know that, if they are acting in good faith, bargain seriously with a receiver and enter into an agreement with it, a court will not lightly interfere with the commercial judgment of the receiver to sell the asset to them.

**38**    This is not to suggest that the interests urged by the USWA would be without remedy in appropriate circumstances.

**39**    The dissent of Goodman J.A. in Soundair was really on the factual side, as he concluded that in his view, the conditional offer accepted by the Receiver in that case was "...an improvident one..." [at paragraph 118.]

**40**    In this case, there is no accepted offer before the Court for approval. When there is, should there be another offer that would meet the test of rendering the accepted offer improvident, the Court can and perhaps should intervene.

**41**    Until that occurs, I do not conclude on the facts before me, that the Monitor has acted improvidently in failing to negotiate with a party who did not bring forward an offer capable of acceptance within the process set out in the previous Order of the Court. The actions of the Monitor appear entirely appropriate.

**42**    For the above reasons, the motion to extend the time within which to present an offer for sale of the business and assets of the Applicant is extended to April 15, 2005 or such earlier date as may be appropriate without the condition as sought by the USWA.

**43**    If it is necessary to deal with any issue of costs, they may be spoken to at a 9:30 appointment.

C.L. CAMPBELL J.

cp/e/qlamb/qlkjg