## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Nortel Networks Inc., *et al.*, | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. 1131** |

### LIMITED OBJECTION OF MATLINPATTERSON GLOBAL ADVISERS LLC TO DEBTORS' MOTION FOR APPROVAL OF BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF THE ENTERPRISE SOLUTIONS BUSINESS

MatlinPatterson Global Opportunities Partners III L.P. and MatlinPatterson Global Opportunities Partners (Cayman) III L.P. (together, "MP"), by and through their undersigned counsel, submit this limited objection (the "Limited Objection") to the Debtors' Motion for Orders (I)(A) Authorizing Debtors' Entry into the Asset Sale Agreement (the "Sale Agreement"), (B) Authorizing and Approving the Bidding Procedures (the "Bidding Procedures"), (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Enterprise Solutions Business, (B) the Assumption and Assignment of Certain Contracts and (C) the Assumption and Sublease of Certain Leases (the "Sale Motion").[1]  In support of this Limited Objection, MP respectfully states as follows:

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sale Motion.

## BACKGROUND

1.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      Among other debt, Nortel had $4.175 billion of bond debt outstanding, in the aggregate, as of December 31, 2008.  MP holds approximately $400 million in principal amount of the total aggregate bond debt.

3.      On June 19, 2009, the Debtors filed a motion (the "CDMA/LTE Sale Motion") seeking, among other things, authorization to enter into an asset purchase agreement with Nokia Siemens Networks B.V. for the sale of Nortel's Code Division Multiple Access ("CDMA") and Long Term Evolution ("LTE") businesses.  MP objected to the CDMA/LTE Sale Motion on the basis that, among other things, the sale process should preserve the right of creditors to propose a chapter 11 plan as a qualified bid.  In response to the limited objection filed by MP, the Debtors amended the bidding procedures to permit MP, and other creditors, to propose a transaction predicated on a chapter 11 plan as a qualified bid.

4.      On July 20, 2009, the Debtors filed the Sale Motion seeking, among other things, authorization to enter into the Sale Agreement with Avaya Inc. ("Avaya"), pursuant to which Avaya, one of the leading players in the telecommunications business, will purchase the Debtors' Enterprise Solutions Business for a purchase price of $475 million, less various purchase-price adjustments, subject to higher and better offers in accordance with the Bidding Procedures.  The Sale Motion and attendant bidding procedures, however, once again fail to preserve the right of creditors to propose a plan of reorganization as a qualified bid.

5.      In addition, by requesting approval to sell the Enterprise Solutions Business to a leading player in the telecommunications industry, the Debtors are proposing a transaction that could implicate significant anti-trust and other regulatory risks.  While MP is not opposed to the sale to Avaya if it is the highest and best bid, MP objects to the fact that the Sale Agreement puts all of the risk of getting the necessary regulatory approvals on the Debtors' estates.  Specifically, Section 8.1 of the Sale Agreement includes a condition to Closing that all Regulatory Approvals be obtained, but does not require Avaya to take any actions or make any divestures that, individually or in the aggregate, would have a material relation to the value of the Enterprise Solutions Business to secure such approvals.  Therefore, the Sale Agreement has the Debtors locked into a deal and continuing to fund operating expenses of this business without any assurance from Avaya that it will close this transaction.  Indeed, absent a breach, the earliest that the Sale Agreement could be terminated by the Debtors under Section 9.1 of the Sale Agreement would be 270 days from July 20, 2009, or 210 days from the entry of the Sale Order, if the Closing does not occur.  Thus, under the Sale Agreement, Avaya would have seven (7) months from approval of the sale to obtain the necessary Regulatory Approvals.

## LIMITED OBJECTION

6.      MP, a significant bondholder and creditor of the Debtors, once again feels compelled to object to the Debtors' sales process because the Debtors' Bidding Procedures, unless modified, constrain the Debtors from exercising their fiduciary duties and entertaining alternative transactions, even when such offers are better for the Debtors' estates and creditors than Avaya's Sale Agreement.  Specifically:

(a)      Under the Debtors' proposed bidding procedures, the ability to obtain anti-trust approvals on a short time frame is given secondary consideration to the dollar value of a competing bid.  Given the critical role that anti-trust approval will play in this transaction, it is

disconcerting that it is lumped among several factors for "Evaluation of Competing Bids" or "Selection of Successful Bids" rather than a primary factor defining whether a bid is a "Qualified Bid" or "Successful Bid".  It is axiomatic given the nature of Enterprise Solutions Business that certainty and speed of obtaining regulatory approvals should be separately considered and rank highly among the considerations of the Debtors;

(b)    For a period of 7 months following the approval of the sale to Avaya, the Debtors will be required to bear the expense of carrying the Enterprise Solutions Business while Avaya seeks regulatory approvals from the U.S., Canada and European Union.  Moreover, the Sale Agreement has no "hell or high water clause" requiring Avaya to do all things necessary to consummate the transactions.  However, the Sale Agreement strips the Debtors' board of directors of the right to exercise their fiduciary duties to consider alternative transactions pending the closing of the Avaya deal, so that the Debtors are not left with 7 months of expenses and no purchaser if Avaya fails to Close; and

(c)    Less than two months ago, in connection with the Debtors' request to approve the bidding procedures for the CDMA Business and LTE Business, this Court determined that parties could propose a plan of reorganization as part of the sale process if it maximized value for the Debtors' stakeholders.  However, the Debtors' bidding procedures once again fail to preserve that right for the Debtors' creditors.

7.    To address these concerns, MP submits the following modifications to the Debtors proposed bidding procedures should be made:

(a)    Bidding Procedures Subsection (g) of the Definition of Qualified Bid.  Insertion of the following text at the end of subsection (g):  " . . . ; provided that in determining such value, the Sellers will not be limited to evaluating the dollar amount of a competing bid, but may also consider such factors identified in the Evaluation of Competing Bids section of these Bidding

-4-

Procedures, including, but limited to, factors affecting speed and certainty of obtaining regulatory approvals required to close the Transaction"; and

(b)      Bidding Procedures Subsection (f) of the Auction Procedures: Amending the second sentence of subsection (f) to include the following bolded text: "Each incremental bid at the Auction shall provide net value to the estate of at least U.S. $2.375 million over the Bid or the Leasing Bid, as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the auction; **provided, further that the Sellers in determining the net value of any incremental bid the Sellers will not be limited to evaluating the dollar amount of a competing bid and may consider such factors identified in the Selection of Successful Bid section of these Bidding Procedures, including, but not limited to, affecting speed and certainty of obtaining regulatory approvals required to close the Transaction.**"

8.      Further, the Debtors should revise Section 5.29 of the Sale Agreement to include that, between the consummation of the Auction and satisfaction of the Regulatory Approvals Closing condition set forth in Section 8.1(a) of the Sale Agreement, the board of directors shall have the right, in the exercise of their good faith fiduciary duties, to consider another offer that is a higher or better than the Sale Agreement and to terminate the Sale Agreement and pay the Break-Up Fee and Expense Reimbursement to Avaya, in lieu of waiting up to 7 months to see if Avaya can close.

9.      Finally, as permitted by this Court with respect to the bidding procedures for the CDMA Business and LTE Business, the Bidding Procedures should make clear that the Debtors can consider all offers in their sales process, including restructuring offers predicated on a chapter 11 plan.

10.     In sum, MP believes that even after the sale of the CDMA Business and LTE Business there is significant value to be preserved in the Debtors' estates.  MP is only asking that the Debtors implement a sales process that will consider all resources of maximizing value and that does not forego options that may, in the long run, turn out to be in the best interests of the Debtors' creditors.  By doing so, the Debtors' stakeholders can be more reasonably assured of

40000/9150-5891024v1

real and fair auction process, conducted within the confines of what (at the end of the day) is a restructuring process under the Bankruptcy Code,  that is designed to maximize value in these cases.

[Remainder of Page Intentionally Left Blank]

40000/9150-5891024v1

## CONCLUSION

WHEREFORE, for the reasons stated above, MP respectfully request that this Court enter an order (i) amending the Bidding Procedures to clarify that the Debtors may consider other factors, including the speed and certainty of obtaining Regulatory Approvals, in valuing whether a competing bid is a Qualified Bid or the Successful Bid, (ii) preserving the Debtors' fiduciary duty to consider Competing Transactions until the Closing Date under the Sale Agreement without resulting in a breach thereof, (iii) amending the Bidding Procedures to permit MP to submit and the Debtors to consider a competing bid predicated on a chapter 11 plan as a Qualified Bid and (iv) granting such other and further relief as is just and appropriate.

Date:   July 28, 2009
        Wilmington, Delaware

By: _Sanjay Bhatnagar_

Norman L. Pernick (No. 2290)
Sanjay Bhatnagar (No. 4829)
**COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.**
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

-and-

Jennifer Feldsher
**BRACEWELL & GIULIANI LLP**
1177 Avenue of the Americas
New York, NY 10036-2714
Telephone: (212) 508-6137
Facsimile: (212) 938-3837

Attorneys for MatlinPatterson Global Advisers LLC

40000/9150-5891024v1