**EXHIBIT B**

EXECUTION VERSION

## SIDE AGREEMENT

This Side Agreement (the "**Agreement**") is dated as of July 20, 2009, among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**" and, together with NNC, the "**Canadian Main Sellers**"), (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with the Canadian Main Sellers, the "**Main Sellers**"), (iv) the affiliates of the Main Sellers listed in Schedule A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**"), (v) the entities listed on Schedule B hereto (the "**EMEA Sellers**"), which in the case of the EMEA Debtors are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan Robert Bloom serve as joint administrators) (collectively, the "**Joint Administrators**") who act as agents, for the EMEA Debtors without any personal liability whatsoever and, in the case of the Israeli Companies (as defined below) are acting by their joint administrators Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") who act as agents of the Israeli Companies without any personal liability whatsoever, (vi) the Joint Administrators and (vii) the Joint Israeli Administrators.  The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 2.8, 3.1 and 3.15.  The Joint Israeli Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 2.8, 3.2 and 3.15.

## W I T N E S S E T H :

WHEREAS, the Main Sellers and the Other Sellers (collectively, the "**Sellers**" and, together with the EMEA Sellers, the "**Selling Parties**"), the EMEA Sellers, the NGS Companies and DiamondWare beneficially own and operate the Business;

WHEREAS, on the Petition Date, the Canadian Debtors filed with the Canadian Court an application for protection under the CCAA and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and was extended by further order of the Canadian Court on April 28, 2009, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, the U.S. Debtors are debtors-in-possession under the U.S. Bankruptcy Code, which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware;

WHEREAS, the EMEA Debtors on the Petition Date filed applications with the English Court pursuant to the Insolvency Act and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings and the English Court appointed Joint Administrators under the Insolvency Act;

WHEREAS, the Israeli Companies on January 18, 2009, filed applications with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings, and the Israeli Court appointed the Joint Israeli Administrators on January 19, 2009, as joint administrators of the Israeli Companies under the Israeli Companies Law;

WHEREAS, the Non-Debtor Sellers and the EMEA Non-Debtor Sellers are not subject to any Bankruptcy Proceedings;

WHEREAS, on June 9, 2009, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and the Joint Administrators entered into an Interim Funding and Settlement Agreement (the "**IFSA**") governing certain intercompany matters, including the obligation of the parties thereto to (a) negotiate in good faith and attempt to reach agreement on a timely basis on a protocol (the "**Interim Sales Protocol**") for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (each as defined in the IFSA), which Interim Sales Protocol shall provide binding procedures for the allocation of Sale Proceeds where the relevant parties in such Sale Transaction have been unable to reach agreement regarding such allocation, and (b) following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol (failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds);

WHEREAS, the Sellers have today entered into an Asset and Share Sale Agreement with Avaya Inc. ("**Purchaser**") relating to the part of the Business owned and operated by the Sellers, the NGS Companies and DiamondWare (the "**North American Agreement**");

WHEREAS, the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators have today entered into an Asset Sale Agreement with Purchaser relating to the part of the Business owned and operated by the EMEA Sellers (the "**EMEA Agreement**" and, together with the North American Agreement, the "**Sale Agreements**");

WHEREAS, as soon as practicable after the execution of this Agreement, in accordance with Section 12.b of the IFSA, the parties hereto will enter into an escrow agreement with the Distribution Agent (the "**Distribution Escrow Agreement**") governing, among other things, the Distribution Agent's collection, holding in escrow in an escrow account at the Distribution Agent (the "**Distribution Escrow Account**") and distribution to the Sellers and the EMEA Sellers (in accordance with the Allocation Rules) of the proceeds of the Stalking Horse Transaction (or an Alternative Transaction) and other payments to be made by the Purchaser (or any Designated Purchaser or EMEA Designated Purchaser) to the Selling Parties under or in relation to the Sale Agreements or the sale agreements governing an Alternative Transaction;

WHEREAS, for the purpose of facilitating the completion of a Transaction (as defined below) and maximizing the value arising therefrom for their respective stakeholders, the parties hereto intend to assume certain mutual cooperation and other covenants relating to the pursuit and completion of the sale of the Business (the "**Transaction**") pursuant to the Sale

Agreements or otherwise, as well as govern certain other matters of common interest relating to the prospective Transaction, including certain matters relating to the allocation among the parties of the benefits and burdens of the Transaction.

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree as follows:

ARTICLE I

INTERPRETATION

SECTION 1.1.  Definitions.

(a)     To the extent capitalized words used herein (including in the recitals hereof) are not defined in this Agreement, those words shall have the meanings given to them (i) in the North American Agreement or (ii) to the extent they are not defined in the North American Agreement, in the EMEA Agreement.

(b)     The following capitalized terms shall have the meanings set forth below:

(i)     "**Advisor Fees**" means any fees paid or payable to Lazard Frères & Co. in connection with the sale of the Business;

(ii)     "**Agreed Respective Percentage**" means the percentage of Total Payments pertaining to each of the Parties and, with respect to NNI and NNL only, their respective Respective Affiliates, pursuant to the Allocation Rules.

(iii)     "**Allocation Rules**" means the rules (expressed as percentages or otherwise) to be used to allocate among the various Sellers and EMEA Sellers the benefit of the Total Proceeds and the burden of any payments owed by the Sellers and/or the EMEA Sellers to the Purchaser pursuant to the Sale Agreements, as such rules shall be agreed upon among the relevant Selling Parties pursuant to Section 12.d of the IFSA or shall be otherwise determined in accordance with the binding procedures to be set forth in the Interim Sales Protocol pursuant to Section 12.c of the IFSA.

(iv)     "**Dispute Resolver Retainer**" means any retainer paid or payable to one or more dispute resolvers appointed pursuant to the Interim Sales Protocol to determine the Allocation Rules.

(v)     "**Distribution Agent**" means a Person appointed by mutual agreement by NNL, NNI and NNUK, provided that if such Parties fail to agree within thirty (30) days of the date hereof, JPMorgan Chase Bank, N.A. shall be automatically appointed as the Distribution Agent.

3

(vi)    "**Initial Respective Percentage**" means one third (1/3) for NNI and its Respective Affiliates, one third (1/3) for NNC, NNL and its Respective Affiliates, and one third (1/3) for the EMEA Sellers.

(vii)    "**New Bankruptcy Proceedings**" means any voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings commenced after the date hereof.

(viii)    "**Party**" means (w) each of the Canadian Main Sellers and their Respective Affiliates, (x) each of NNI and its Respective Affiliates, and (y) each of the EMEA Sellers and (z) for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 2.8, 3.1, 3.2 and 3.15 only, the Joint Administrators and/or the Joint Israeli Administrators, as applicable.

(ix)    "**Respective Sale Agreement**" means (x) with respect to the Canadian Main Sellers, NNI and the Other Sellers, the North American Agreement, and (y) with respect to the EMEA Sellers, the EMEA Agreement.

(x)    "**Secondary Proceedings**" shall have the meaning attributed to such words in the EMEA Agreement.

(xi)    "**Stalking Horse Transaction**" means the sale of the Business to the Purchaser pursuant to the Sale Agreements (as amended from time to time in accordance with this Agreement).

(xii)    "**Total Payments**" means the aggregate amounts paid or payable by the Selling Parties to the Purchaser (and any Designated Purchaser and EMEA Designated Purchaser) under the terms of the Sale Agreements as Break-Up Fee and Expense Reimbursement.

(xiii)    "**Total Proceeds**" means the aggregate amounts paid by the Purchaser (and any Designated Purchaser and EMEA Designated Purchaser) to the Selling Parties under or in respect of the Sale Agreements, including as Purchase Price, Purchase Price adjustments, Reverse Termination Fee and damages, subject to Section 2.4(b).

SECTION 1.2. Interpretation.

1.2.1. Gender and Number. Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2. Certain Phrases and Calculation of Time. In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Section and Schedule references are to the Sections and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later

4

specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding". If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

1.2.3. <u>Headings, etc.</u> The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

## ARTICLE II

## COVENANTS

SECTION 2.1. <u>Efforts to Complete the Stalking Horse Transaction</u>.

(a)     Subject to the requirements of any applicable Law, each of the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other and the Purchaser in good faith in order to do, all things necessary, proper or advisable under applicable Law to perform their obligations under their Respective Sale Agreement and consummate the transactions contemplated by the North American Agreement and the EMEA Agreement, as applicable, as soon as practicable in accordance with the provisions thereof and cause the fulfillment at the earliest practicable date of all of the conditions to the Purchaser's obligations to consummate the transactions contemplated by their Respective Sale Agreement.

(b)     The mutual efforts of the Parties pursuant to Section 2.1(a) shall include:

(i)     cooperating with the other Parties in good faith in any manner reasonably required to facilitate the consummation of the Stalking Horse Transaction, including by sharing information to the extent necessary or opportune and keeping the other Parties informed of any matter of relevance relating to the Stalking Horse Transaction and their Respective Sale Agreement;

(ii)     (A) defending all Actions by or before any Government Entity challenging the Sale Agreements or the consummation of the Stalking Horse Transaction and (B) seeking rescission or repeal of any injunction, decree, ruling, order or other action of any Government Entity adversely affecting the ability of the Parties to consummate Stalking Horse Transaction;

(iii)     cooperating with the other Parties and the Purchaser in good faith in any manner reasonably required to facilitate the preparation and making of any filings with Government Entities required to seek and obtain the Regulatory Approvals; and

5

(iv)    upon becoming aware of any material issue that may result in a breach by the Sellers or the EMEA Sellers under either Sale Agreement, promptly informing the other Parties of such potential breach and consulting with the other Parties with a view to ensuring that there is no breach of the relevant Sale Agreement and/or any breach is timely cured in accordance with the Sale Agreements.

SECTION 2.2.  Notice and Consultation.

(a)    Each of NNL, NNI and NNUK and, to the extent applicable, the Joint Administrators and/or the Israeli Joint Administrators, shall provide to the others as much notice as possible, and in any case no less than five (5) Business Day written advance notice if possible, and shall consult in good faith with the others, prior to taking or agreeing to take, any of the following actions under their respective Sale Agreement:

(i)    subject to Section 2.3, amending any material provision of their Respective Sale Agreement;

(ii)    subject to Section 2.3, waiving any of their material rights or provisions under their Respective Sale Agreement; and

(iii)    with respect to the EMEA Sellers only, consenting to the entry into, or requesting, promoting or instituting, any Secondary Proceedings in relation to any EMEA Seller; and

(iv)    with respect to the Main Sellers only, voluntarily commencing, or otherwise consenting to, any New Bankruptcy Proceedings relating to any Company or any Non-Debtor Seller.

(b)    If an EMEA Seller, after having acted in accordance with Section 2.2(a)(iii), resolves to enter into Secondary Proceedings and the Main Sellers have a right under the Law applicable to the Secondary Proceedings to appear at these Secondary Proceedings (under any capacity whatsoever), that EMEA Seller shall facilitate the Main Sellers being heard at such Secondary Proceedings, to the maximum extent allowed by the Law applicable to them.

SECTION 2.3.  No Termination or Material Amendments.  No Party shall, without the prior written consent of the other Parties (such consent not to be unreasonably withheld, delayed or conditioned):

(a)    exercise any termination right pursuant to their Respective Sale Agreement (excluding the Main Sellers' right to terminate the North American Agreement under Section 9.1(b)(vi) of the North American Agreement and the EMEA Sellers' right to terminate the EMEA Agreement under clause 15.4.2(F) of the EMEA Agreement) or otherwise agree with the Purchaser to terminate such Respective Sale Agreement;

(b)    with respect to the Main Sellers only, amend the provisions of Sections 2.2, 2.3, 8, 9.2, 9.3, and 10.14 of the North American Agreement;

6

(c)    with respect to the EMEA Sellers only, amend the provisions of Clause 3 and Clause 15 of the EMEA Agreement, Paragraph 11 of Schedule 6, and Schedule 9 to the EMEA Agreement; or

(d)    enter into any amendment to or waive any provision of its Respective Sale Agreement or any other Transaction Document to which such Party is a party that would cause a material detriment to any of the other Parties.

SECTION 2.4.  <u>Collection and Allocation of Total Proceeds</u>.

(a)    Subject to Section 2.4(c), in accordance with the provisions of Section 12.b of the IFSA, the Parties agree that any payment due by the Purchaser (and any Designated Purchaser and any EMEA Designated Purchaser) to the Selling Parties under the Sale Agreements that is included in the Total Proceeds shall be collected and held in escrow in the Distribution Escrow Account by the Distribution Agent (as agent for the Sellers and the EMEA Sellers), which will then allocate and distribute the Total Proceeds to the Sellers and the EMEA Sellers in accordance with the Allocation Rules and the Distribution Escrow Agreement.

(b)    The Parties agree and acknowledge that the Total Proceeds do not include amounts of or in respect of "VAT" or "Transfer Taxes" (each term as defined in the relevant Sale Agreement) paid or payable by the Purchaser or any Designated Purchaser or any EMEA Designated Purchaser or any affiliate of the Purchaser to the Sellers or the EMEA Sellers or the Joint Administrators or the Joint Israeli Administrators or pursuant to the terms of the Sale Agreements. The Parties agree that it is not intended that such amounts of VAT or Transfer Taxes will be payable into the Distribution Escrow Account but, notwithstanding this Agreement, where such amounts are paid into the Distribution Escrow Account, the Distribution Agent shall be instructed under the procedures in the Distribution Escrow Agreement to promptly pay such amounts to the Sellers and EMEA Sellers or Joint Administrators or Joint Israeli Administrators (as relevant).

(c)    To the extent that there are funds available in the Distribution Escrow Account that are attributable to the sale of the Business at the date of payment of any Break-Up Fee or Expense Reimbursement, the obligation of the Selling Parties to make such payment under Section 9.2(c) of the North American Agreement or the payment of any Advisor Fees or Dispute Resolver Retainer shall (subject to adjustment in accordance with Section 2.5) be satisfied by causing the Distribution Agent to pay the relevant amount out of the Distribution Escrow Account.

(d)    To the extent that any Expense Reimbursement cannot be satisfied by payment out of the Distribution Escrow Account, any amounts actually paid by any Selling Party to the Purchaser as Expense Reimbursement shall be deducted from any subsequent amounts payable or paid into the Distribution Escrow Account under Section 2.4(a) and shall (subject to adjustment in accordance with Section 2.5) be paid directly to such Selling Party that made the relevant payment.

SECTION 2.5. <u>Allocation of Total Payments</u>.

(a)     Irrespective of the individual/joint payment obligations of each Selling Party or their Respective Affiliates vis-à-vis the Purchaser pursuant to the Sale Agreements (which shall be duly complied with by the relevant Selling Party in accordance with the terms thereof), the Parties agree that, among them, each Party (and, with respect to the Main Sellers, their respective Respective Affiliates) shall ultimately bear the Agreed Respective Percentage of the Total Payments, subject to Section 2.5(c).

(b)     To the extent the Agreed Respective Percentage differs from the Initial Respective Percentage, any amount actually paid by a Party to the Purchaser as part of the Total Payments, shall be promptly (re)adjusted among the Parties so that each Party  (and, with respect to the Main Sellers, their respective Respective Affiliates) ultimately bears a share of those Total Payments that corresponds to its Agreed Respective Percentage. Any adjustment payments to be made among the Parties pursuant to the previous sentence shall be made without set off.

(c)     Notwithstanding Section 2.5(a), the Parties agree that, to the extent the event triggering the obligation of the Sellers and the EMEA Sellers to pay to the Purchaser the Break-Up Fee and the Expense Reimbursement under the Sale Agreements is attributable to the action or omission of one or more Parties only, such Parties shall be responsible, as among the Sellers and the EMEA Sellers, for the entire Break-Up Fee and the Expense Reimbursement actually paid by the Sellers and/or the EMEA Sellers (or, if applicable, the Distribution Agent on behalf of the Sellers and the EMEA Sellers) to the Purchaser under the Sale Agreements and shall therefore reimburse to the other Parties, without set-off, any such amount actually paid by them (or the Distribution Agent) to the Purchaser in respect of such Break-Up Fee and the Expense Reimbursement.

SECTION 2.6. <u>Alternative Transaction</u>.

(a)     The Parties shall cooperate in good faith for the purpose of selecting in accordance with the Bid Procedures the best prospective Transaction based on the criteria set forth in the paragraph of the Bid Procedures headed "Evaluation of Competing Bids".  Except as permitted under the Bid Procedures, no Party shall be allowed to enter into any Alternative Transaction without the prior written consent of NNL, NNI and NNUK.

(b)     In the event the Parties, in accordance with Section 2.6(a) and to the extent allowed by the Bid Procedures, decide to terminate the Sale Agreements and enter into an Alternative Transaction, the Parties shall use their reasonable best efforts to finalize and execute as soon as possible with the relevant bidder the necessary contractual documentation governing such Alternative Transaction, and shall use their reasonable best efforts to consummate such Alternative Transaction as soon as possible.  In such event, the covenants of each Party set forth in Sections 2.1 through 2.3 and, to the extent applicable, Sections 2.4 and 2.5, shall continue to apply as if such Alternative Transaction were the Stalking Horse Transaction hereunder and any reference herein to the Sale Agreements shall be deemed to be a reference to the new sale agreements governing such Alternative Transaction, *mutatis mutandis*.

SECTION 2.7.  Irrevocable Offers under the EMEA Agreement.  In relation to paragraph 5 of Schedule 6 of the EMEA Agreement, the Reserved Territory Sellers and the Joint Administrators agree:

(a)    to commence and progress the information and consultation process in a timely manner; and

(b)    to deliver acceptance of Irrevocable Offers to the Purchaser as soon as possible after appropriate completion of each relevant consultation process.

SECTION 2.8.  Fiduciary Duties.  The entirety of this Agreement (other than Sections 2.4 and 2.5), including the obligations of each Party under this Agreement, is subject to the rights of each Party to exercise its fiduciary duties, the statutory duties or the legal obligations of the Joint Administrators or the Joint Israeli Administrators in relation to the exercise of their duties or functions as administrators of certain Selling Parties, provided that to the extent that such exercise of fiduciary duties results in a breach of any Selling Party's obligations under this Agreement, the Sale Agreements or other Transaction Documents, the other Parties shall have the rights as are set forth in Section 2.5(c) of this Agreement.

SECTION 2.9.  Excluded Sellers.  The Parties hereby agree that if any Excludable Other Seller becomes an Excluded Seller, or any EMEA Excludable Seller becomes an EMEA Excluded Seller, the allocation of Total Proceeds that would otherwise have been payable to such Excluded Seller or EMEA Excluded Seller, if any, as determined pursuant to the Interim Sales Protocol shall not be reduced as a result of such Excludable Seller becoming an Excluded Seller or such EMEA Excludable Seller becoming an EMEA Excluded Seller, provided that such allocation of any Total Proceeds to such Excluded Seller or Excludable Other Seller, as applicable, shall be reduced as  result of the receipt of the proceeds, if any, by such Excluded Seller or EMEA Excluded Seller in respect of the sale or liquidation of the Assets of such Excluded Seller or the EMEA Assets of such EMEA Excluded Seller, provided, further that such payment shall be made only after all of the Assets of such Excluded Seller or EMEA Excluded Seller have been sold to a *bona fide* third-party purchaser or liquidated.

SECTION 2.10.  Tax Cooperation.  In the event that the preparation or filing of a Tax Return could reasonably be expected to require a Partial Allocation or a Selling Party is preparing any Partial Allocation with the Purchaser (whether by agreement or submission to the Accounting Arbitrator), the Selling Party responsible for filing such Tax Return or preparing such Partial Allocation shall provide notice to the other Selling Parties and shall consider in good faith any comments by the other Selling Parties with respect to such Tax Return and any Partial Allocation related thereto, provided, and for the avoidance of doubt, that the other Selling Parties shall not have a consent or veto right with respect to such Tax Returns or Partial Allocations related thereto.  It is understood that neither this Section 2.10 nor the exercise or failure to exercise of any rights or privileges provided herein shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation of proceeds from the sale of the Business among the Selling Parties.

ARTICLE III

MISCELLANEOUS

SECTION 3.1.   Exclusion of Liability and Acknowledgments re Joint Administrators.

(a)      The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal Liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(b)      The Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 2.8, 3.1 and 3.15.

(c)      Notwithstanding anything in Section 3.7, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm or partners, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of the EMEA Debtors and their remaining as current joint administrators thereof under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

SECTION 3.2.   Exclusion of Liability and Acknowledgments re Joint Israeli Administrators.

(a)      The Parties agree that the Joint Israeli Administrators have negotiated and are entering into this Agreement as agents for the Israeli Companies and that none of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal Liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(b)      The Joint Israeli Administrators are a party to this Agreement: (i) as agents of each of the Israeli Companies; and (ii) in their own capacities solely for (1) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (2) enforcing the obligations of the other Parties to this Agreement and (3) for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 2.8, 3.2 and 3.15.

10

(c)     Notwithstanding anything in Section 3.7, any claim, action or proceeding against the Joint Israeli Administrators in their personal capacities (and not as agents for any Israeli Company) under this Agreement shall be governed exclusively by Israeli law and subject to the exclusive jurisdiction of the Courts of Israel.

SECTION 3.3.    Remedies.  No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 3.4.    No Third-Party Beneficiaries.  Except as provided in Section 3.5, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 3.5.    Consent to Amendments; Waivers.  No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.  This Agreement, or any provision hereof, may be waived or amended, on no less than 5 days' notice, only by means of a writing signed by all Parties, and approved by the Committee, the Bondholder Group and the Monitor (each as defined in the U.S. Bidding Procedures Order), which amendments, if material in the judgment of the Parties, must be approved by each of the Courts that initially approved this Agreement.

SECTION 3.6.    Successors.  Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors.

SECTION 3.7.    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)     The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; provided, however, that Section 3.1 shall be governed exclusively by English law and Section 3.2 shall be governed exclusively by Israeli law.

(b)     To the fullest extent permitted by applicable Law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Bankruptcy Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Protocol adopted by such courts, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement may be brought in the U.S. Bankruptcy Court and the Canadian Court, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been

11

brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law; provided, however, that any claim, action or proceeding set forth in Section 3.1 shall be brought exclusively in the English courts and any claim, action or proceeding set forth in Section 3.2 shall be brought exclusively in the Israeli courts.

(c)      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 3.7.

SECTION 3.8. <u>Notices</u>. All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 3.8.

**If to NNI and its Respective Affiliates:**
c/o Nortel Networks Inc.
Attention: Gordon A. Davies, Esq.
      Chief Legal Officer
Address: 2221 Lakeside Boulevard
      Richardson, Texas 75082
      U.S.A.
Facsimile No.: +1 905 863 8386
Telephone No.: +1 905 863 7000

**With a copy to:**
Cleary Gottlieb Steen & Hamilton LLP
Attention: Neil Q. Whoriskey, Esq.
Address: One Liberty Plaza
      New York, New York 10006
      U.S.A.
Facsimile No.: +1 212 225 3999
Telephone No.: +1 212 225 2163

**If to the Canadian Main Sellers and their Respective Affiliates:**
c/o Nortel Networks Limited
Attention: Gordon A. Davies, Esq.
      Chief Legal Officer
Address: 195 The West Mall
      Toronto, Ontario M9C 5K1
      Canada

**With a copy to:**

Ogilvy Renault LLP
Attention: Michael Lang, Esq.
Address: Suite 3800
      Royal Bank Plaza, South Tower
      200 Bay Street, P.O. Box 84
      Toronto, Ontario M5J 2Z4

Facsimile No.: +1 905 863 8386
Telephone No.: +1 905 863 1144

Canada
Facsimile No.: +1 416 216 3930
Telephone No.: +1 416 216 4832 /
               +1 416 216 3939

**If to the EMEA Sellers:**
c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
         London SE1 2AF
         United Kingdom
Facsimile No.: +44 (0) 20 7951 1345
Telephone No.: +44 (0) 20 7951 9898

**With a copy to:**
Herbert Smith LLP
Attention: Alan Montgomery and Ben Ward,
Esq.
Address: Exchange House
         Primrose Street
         London EC2A 2HS
         United Kingdom
Facsimile No.: +44 (0) 20 7098 4878
Telephone No.: +44 (0) 20 7466 2878

**If to the Joint Israeli Administrators:**
Avi D. Pelossof
Zellermayer, Pelossof & Co.
The Rubenstein House
20 Lincoln Street
Tel Aviv
67131
Israel
Facsimile: +972 3 6255500

**If to the Joint Administrators**
c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
         London SE1 2AF
         United Kingdom
Facsimile No.: +44 (0) 20 7951 1345
Telephone No.: +44 (0) 20 7951 9898

**If to the Committee:**
Akin Gump Strauss Hauer & Feld LLP
Attention:  Fred S. Hodara and Stephen B.
Kuhn, Esq.
One Bryant Park
New York, New York 10036
Facsimile:  (212) 872-1002

**If to the Bondholder Group:**
Milbank, Tweed, Hadley & McCloy
Attention:  Roland Hlawaty, Esq.
One Chase Manhattan Plaza
New York, New York, 10006
Facsimile:  (212) 822-5735

**If to the Monitor:**
Murray A. McDonald
Ernst & Young Inc.
Ernst & Young Tower
222 Bay Street, P. O. Box 251
Toronto, ON M5K 1J7
Canada
Facsimile:  (416) 943-3300

Any such demand, notice, communication or report shall be deemed to have been given pursuant

13

to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

SECTION 3.9. Counterparts. The Parties may execute this Agreement in three or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

SECTION 3.10. Severability. If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 3.11. Termination. This Agreement will automatically terminate on the earliest of (a) consummation of the Closing and (b) consummation of the closing of an Alternative Transaction entered into by the Parties pursuant to Section 2.6(b). Upon termination, the Parties' rights and obligations under this Agreement, other than in respect of the obligations under Sections 3.1, 3.2, 3.7, 3.11, 3.15 and 3.16, shall cease immediately but without prejudice to the rights and obligations of the Parties existing prior to the termination of the Agreement.

SECTION 3.12. Obligations of the Parties.

(a)     The obligations of the Canadian Main Sellers and the other Canadian Debtors under this Agreement shall be joint and several.

(b)     The obligations of NNI and the other U.S. Debtors under this Agreement shall be joint and several.

(c)     The obligations of the EMEA Debtors under this Agreement shall be joint and several.

SECTION 3.13.    Effectiveness.

(a)     No provision of this Agreement (other than as set forth in Section 3.13(d)) shall be effective until each of the US Court and the Canadian Court approves the entirety of this Agreement and all of the provisions hereof (the "**Court Approval Condition**").

(b)     All provisions of this Agreement shall be effective as of the date of the satisfaction of the Court Approval Condition.

(c)     Each Party hereto shall:

14

(i)    use commercially reasonable efforts to satisfy the Court Approval Condition as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

(ii)    keep all other Parties reasonably apprised of the progress of the satisfaction of the Court Approval Condition and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

(iii)    use commercially reasonable efforts to allow any other Party, which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Court Approval Condition.

(d)    Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 3.1 through 3.13 and Section 3.13(b), (c) and (d).

(e)    No provision of this Agreement shall become effective so far as the Israeli Companies are concerned until the Israeli Court approves this Agreement. The Parties shall use their commercially reasonable efforts to cause the Israeli Companies to obtain such approval.

SECTION 3.14.    Execution by Other Sellers. The Parties hereby acknowledge that the Other Sellers are not executing this Agreement as of the date hereof. Subject to Section 3.13, this Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers have done so. Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall use their reasonable best efforts to cause each Other Seller to execute a counterpart to this Agreement as soon as practicable, agreeing to be bound as a Party under this Agreement.

SECTION 3.15.    Limitations of Remedies. The Parties expressly agree that the sole and exclusive remedy of any Party (the "**Claiming Party**") against any other Party for a breach of this Agreement, the Sale Agreements or the other Transaction Documents shall be payment of damages to the Claiming Party in an amount not to exceed the amount, if any, of the Break-Up Fee and/or Expense Reimbursement actually paid by the Claiming Party to the Purchaser or a Designated Purchaser under the Sale Agreements. For the avoidance of doubt, the Parties further agree that in no event shall any Party be entitled to equitable relief, including in the form of an injunction or injunctions or orders for specific performance, to prevent or remedy breaches of this Agreement, the Sale Agreements or the other Transaction Documents by any other Party.

SECTION 3.16.    Reservation of Rights. The Parties hereby agree that nothing in this Agreement shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation or distribution of proceeds from the sale of the Business among the Selling Parties. Without limiting the generality of the foregoing, the Parties hereby agree that the Initial Respective Percentage among the Parties shall not in any way determine the final

allocation or distribution of proceeds from the sale of the Business or otherwise bind the Parties in respect of the final allocation.

**[Remainder of this page intentionally left blank.  Signature pages follow.]**

IN WITNESS WHEREOF, the Parties have duly executed this Side Agreement as of the date first written above.

**Nortel Networks Corporation**

By: _____

Name: Mike S. Zafirovski

Title: President & CEO

By: _____

Name:

Title: Tracy S.J. Connelly McGilley
Assistant Secretary

**Nortel Networks Limited**

By: _____

Name: Mike S. Zafirovski

Title: President & CEO

By: _____

Name:

Title: Tracy S.J. Connelly McGilley
Assistant Secretary

**Nortel Networks Inc.**

By: _____

Name: J Doolittle

Title: Vice President

Signature Page – Side Agreement

**SIGNED** for and on behalf of **Nortel Networks**
**UK Limited** (in administration) by Christopher
Hill
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)
)

.............................................................
Christopher Hill

Witness signature

.............................................................
Name:                    Herbert Smith LLP
Address:                 Exchange House
                         Primrose Street
                         London EC2A 2HS

)
)
)

**SIGNED** for and on behalf of **Nortel GmbH**
(in administration) by Christopher Hill

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)
)

.............................................................
Christopher Hill

Witness signature

.............................................................
Name:                    Herbert Smith LLP
Address:                 Exchange House
                         Primrose Street
                         London EC2A 2HS

)
)
)

**SIGNED** for and on behalf of **Nortel Networks**
**France S.A.S.** (in administration) by Kerry
Trigg acting as authorised representative for

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)
)

.............................................................
Kerry Trigg

Witness signature

.............................................................
Name:
Address:

)
)
)

Signature Page – Side Agreement

**SIGNED** for and on behalf of **Nortel Networks**
**UK Limited** (in administration) by

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)

..................................................................

Witness signature

..................................................................
Name:
Address:

)
)
)

**SIGNED** for and on behalf of **Nortel GmbH**
(in administration) by

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)

..................................................................

Witness signature

..................................................................
Name:
Address:

)
)
)

**SIGNED** for and on behalf of **Nortel Networks**
**France S.A.S.** (in administration) by Kerry
Trigg acting as authorised representative for

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)
)
)

*Kerry Trigg*
..................................................................
Kerry Trigg

Witness signature

*Perlmutter*
..................................................................
Name: SHARON PERLMUTTER
Address: 1 MORE LONDON PLACE
LONDON SE1 2AF

)
)
)

Signature Page – Side Agreement

**SIGNED** for and on behalf of **Nortel Networks**  )
**SpA** (in administration) by Christopher Hill   )
                                                  )
as Joint Administrator (acting as agent and       )
without personal liability) in the presence of:   )

.................................................
Christopher Hill

Witness signature

Name: ......................................  )
         Herbert Smith LLP                    )
Address:   Exchange House                     )
         Primrose Street                      )
         London EC2A 2HS                       )

.................................................
Christopher Hill

**SIGNED** for and on behalf of **Nortel Networks**  )
**Hispania S.A.** (in administration) by          )
Christopher Hill                                  )
as Joint Administrator (acting as agent and       )
without personal liability) in the presence of:   )

Witness signature

Name: ......................................  )
         Herbert Smith LLP                    )
Address:   Exchange House                     )
         Primrose Street                      )
         London EC2A 2HS                       )

.................................................
Christopher Hill

**SIGNED** for and on behalf of **Nortel Networks**  )
**B.V.** (in administration) by Christopher Hill    )
                                                  )
as Joint Administrator (acting as agent and       )
without personal liability) in the presence of:   )

.................................................
Christopher Hill

Witness signature

Name: ......................................  )
Address:   Herbert Smith LLP                  )
         Exchange House                        )
         Primrose Street                       )
         London EC2A 2HS

Signature Page – Side Agreement

**SIGNED** for and on behalf of **Nortel Networks**
**AB** (in administration) by Christopher Hill

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)
)

......................................................
Christopher Hill

Witness signature

......................................................

Name:
Address:

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS

**SIGNED** for and on behalf of **Nortel Networks**
**N.V.** (in administration) by Christopher Hill

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)
)
)

......................................................
Christopher Hill

Witness signature

......................................................

Name:
Address:

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS

**SIGNED** for and on behalf of **Nortel Networks**
**(Austria) GmbH** (in administration) by
Christopher Hill
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)
)

......................................................
Christopher Hill

Witness signature

......................................................

Name:
Address:

)
)
)

Herbert Smith
Exchange House
Primrose Street
London EC2A 2HS

Signature Page – Side Agreement

**SIGNED** for and on behalf of **Nortel Networks**  )
**Polska Sp. z.o.o.** (in administration) by  )
Christopher Hill  )
as Joint Administrator (acting as agent and  )
without personal liability) in the presence of:  )

.............................................................................
Christopher Hill

Witness signature

.............................................................................
Name:          Herbert Smith LLP
Address:       Exchange House
               Primrose Street
**SIGNED** for and on behalf of **Nortel Networks**  London EC2A 2HS
**Oy** (in administration) by Christopher Hill  )
  )
  )
as Joint Administrator (acting as agent and  )
without personal liability) in the presence of:  )

.............................................................................
Christopher Hill

Witness signature

.............................................................................
Name:          Herbert Smith LLP
Address:       Exchange House
               Primrose Street
               London EC2A 2HS
**SIGNED** for and on behalf of **Nortel Networks**  )
**Portugal S.A.** (in administration) by  )
Christopher Hill  )
  )
  )
as Joint Administrator (acting as agent and  )
without personal liability) in the presence of:  )

.............................................................................
Christopher Hill

Witness signature

.............................................................................
Name:          )
Address:       )
  )
Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS

Signature Page – Side Agreement

**SIGNED** for and on behalf of **Nortel Networks**
**s.r.o.** (in administration) by Christopher Hill

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)
)

........................................................
Christopher Hill

Witness signature

........................................................
Name:
Address:

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS

)
)
)
)

**SIGNED** for and on behalf of **Nortel Networks**
**Romania s.r.l** (in administration) by
Christopher Hill
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)

........................................................
Christopher Hill

Witness signature

........................................................
Name:
Address:

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS

)
)
)

**SIGNED** for and on behalf of **Nortel Networks**
**Engineering Service kft** (in administration) by
Christopher Hill

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)
)

........................................................
Christopher Hill

Witness signature

........................................................
Name:
Address:

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS

).
)
)

Signature Page – Side Agreement

**SIGNED** for and on behalf of **Nortel Networks**
**(Ireland) Limited** (in administration) by David
Hughes as Joint Administrator (acting as agent
and without personal liability) in the presence
of:

)
)
)
)

David Hughes

Witness signature

Name: Colin FARQUHARSON
Address: Veldonstown
Ratstown
Navan
Co Meath

)
)
)

Signature Page – Side Agreement

**SIGNED** by Sergei Fishkin
duly authorised for and on behalf of o.o.o.
**Nortel Networks** in the presence of:

)
)
)
)

Sergei Fishkin

Witness signature

....................................................)
Name: GALINA SVETLYSHEVA )
Address: RUSSIA, Moscow )
Rublevskoye shosse, 52-377

**SIGNED** by Sharon Rolston
duly authorised for and on behalf of **Nortel**
**Networks AG** in the presence of:

)
)
)

....................................................
Sharon Rolston

Witness signature

....................................................)
Name: )
Address: )

**SIGNED** by Sharon Rolston and Simon
Freemantle duly authorised for and on behalf of
**Nortel Networks South Africa (Pty) Limited**
in the presence of:

)
)
)
)

....................................................
Sharon Rolston

....................................................
Simon Freemantle

Witness signature

....................................................)
Name: )
Address: )

Signature Page – Side Agreement

**SIGNED** by Sergei Fishkin                )    ...........................................
duly authorised for and on behalf of **o.o.o.**    )    Sergei Fishkin
**Nortel Networks** in the presence of:       )


Witness signature

...........................................                 )
Name:                                     )
Address:                                  )

**SIGNED** by Sharon Rolston                )    *Sharon Rolston*
duly authorised for and on behalf of **Nortel**    )    Sharon Rolston
**Networks AG** in the presence of:          )


Witness signature

*B. Scherwall*
Name:  B. SCHERWATH                        )
Address: C/O NORTEL NETWORKS               )
        MAIDENHEAD, UK                     )
**SIGNED** by Sharon Rolston and Simon          )    *Sharon Rolston*
Freemantle duly authorised for and on behalf of    )    Sharon Rolston
**Nortel Networks South Africa (Pty) Limited**    )
in the presence of:                       )    *Simon Freemantle*
                                              Simon Freemantle


Witness signature

*B. Scherwall*
Name:  B. SCHERWATH                        )
Address: C/O NORTEL NETWORKS               )
        MAIDENHEAD, UK

Signature Page – Side Agreement

**SIGNED** by Sharon Fennessy and Simon
Freemantle duly authorised for and on behalf of
**Nortel Networks AS** in the presence of:

      )
      )
      )

Sharon Fennessy

Simon Freemantle

Witness signature

Name:   B. SCHERWATH

Address:  C/O NORTEL NETWORKS
            MAIDENHEAD, UK

      )
      )
      )

Signature Page – Side Agreement

הנאמן בהקפאת הליכים

**SIGNED** for and on behalf of **Nortel**   )   ..................................................
**Communications Holdings (1997) Limited** (in   )   Yaron Har-Zvi
administration) by Yaron Har-Zvi and Avi D.   )
Pelossof as Joint Israeli Administrators (acting   )
jointly and without personal liability) in   )
connection with the Israeli Assets and   )   ..................................................
Liabilities:   )   Avi D. Pelossof


Witness signature

..................................................   )
Name: SARIT MOUSSAYOFF   )
Address: The Rubinstein House, 20 Lincoln Street, Tel-Aviv

הנאמן בהקפאת הליכים

**SIGNED** for and on behalf of **Nortel Networks**   )
**Israel (Sales and Marketing) Limited** (in   )   Yaron Har-Zvi
administration) by Yaron Har-Zvi and Avi D.   )
Pelossof as Joint Israeli Administrators (acting   )
jointly and without personal liability) in   )   ..................................................
connection with the Israeli Assets and   )   Avi D. Pelossof
Liabilities:   )
   )
   )


Witness signature
..................................................
Name: SARIT MOUSSAYOFF   )
Address: The Rubinstein House, 20 Lincoln Street, Tel-Aviv


Signature Page – Side Agreement

**SIGNED** by Christopher Hill                )
                                              )        ..................................................................
in his own capacity and on behalf of the Joint        )        Christopher Hill
Administrators without personal liability and
solely for the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the Joint Administrators:

Witness signature

..................................................................
Name:                                         )
Address:                                      )
                                              )
        Herbert Smith LLP
        Exchange House
        Primrose Street
        **London EC2A 2HS**

Signature Page – Side Agreement

**SIGNED** for and on behalf of Nortel Networks )
**Slovensko s.r.o.** (in administration) by )
Stephen Harris )
                                              )

......................................
Stephen Harris

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Witness signature
......................................  )
Name:  SHARON PERLMUTTER )
Address:  1 MORE LONDON PLACE
         LONDON  SE1 2AF

         Secretary

Signature Page – Side Agreement

**Schedule A – Other Sellers**

Nortel Altsystems, Inc. (f/k/a Alteon Websystems, Inc. name change effective 4/30/09)

Nortel Networks Technology Corporation

Nortel Networks International Inc.

Nortel Networks (CALA) Inc.

Nortel Networks de Argentina, S.A.

Nortel Networks Chile S.A.

Nortel Networks de Mexico, S.A. de C.V.

Nortel de Mexico, S. de R.L. de C.V.

Nortel Networks Peru S.A.C.

Nortel Networks Australia Pty Limited

Nortel Networks de Colombia, S.A.

Nortel Networks (India) Private Limited

Nortel Technology Excellence Centre Private Limited

PT Nortel Networks Indonesia

Nortel Networks Japan (Japanese name is Nortel Networks Kabushiki Kaisha)

Nortel Networks Malaysia Sdn. Bhd.

Nortel Networks New Zealand Limited

Nortel Networks Singapore Pte. Limited

Nortel Networks (Asia) Limited

Nortel Networks (China) Limited

Nortel Networks (Thailand) Ltd.

Nortel Vietnam Limited

Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd.

**Schedule B – EMEA Sellers**

| EMEA Seller | Jurisdiction | Registered Number | Registered Office |
|---|---|---|---|
| Nortel Networks UK Limited (in administration) | United Kingdom | 3937799 | Maidenhead Office Park, Westacott Way, Maidenhead, Berks SL6 3QH, United Kingdom |
| Nortel Networks (Ireland) Limited (in administration) | Ireland | 40287 | Mervue Business Park, Mervue, Galway, Ireland |
| Nortel GmbH (in administration) | Germany | HRB 12489 | Main Airport Center, Unterschweinstiege 6, 60549, Frankfurt am Main, Germany |
| Nortel Networks France SAS (in administration) | France | 552 150 724 R.C.S. Versailles | Parc d'Activites de Magny-Châteaufort, Châteaufort 78117, France |
| Nortel Networks SpA (in administration) | Italy | 1307425 Milan 05650 290017 | Via Montefeltro no. 6, Milan, 20156, Italy |
| Nortel Networks Hispania SA (in administration) | Spain | A-78693603 | Camino del Cerro de los Gamos, no. 1 Edificio 6, 28.224 Pozuelo de Alarcon, Madrid, Spain |
| Nortel Networks B.V. (in administration) | Netherlands | 34054624 | Siriusdreef 42-72, 2132WT Hoofddorp, Netherlands |
| o.o.o. Nortel Networks | Russia | 1047796092960 | 9th Floor, Krasnopresnenskaya, Naberezhnaya, |

| | | | |
|---|---|---|---|
| | | | Moscow 123317, Russia |
| Nortel Networks AG | Switzerland | CH-020.3.918.846-4 | Flughofstrasse 54, 8152 Opfikon, Switzerland |
| Nortel Networks South Africa (Pty) Limited | South Africa | 1998/001845/07 | 13 Wellington Road, Parktown, South Africa 2193 |
| Nortel Networks AB (in administration) | Sweden | 556453-7305 | Box 6701, 113 85 Stockholm, Sweden |
| Nortel Networks N.V. (in administration) | Belgium | Brussels 378.358 | Ikaroslaan 14, 1930 Zaventem, Belgium |
| Nortel Networks AS | Norway | 961 797 020 | Hieronnymus Heyerdahls Gt 1, 0160 Oslo, Norway |
| Nortel Networks (Austria) GmbH (in administration) | Austria | FN 173973v | 1100 Wien, Business Park, Vienna, Clemens-Holzmeisterstrasse 4, Austria |
| Nortel Networks Polska Sp z.o.o. (in administration) | Poland | KRS 158506 (former RHB 49656) | 47 a Nowogrodzka Street, 00-695 Warsaw, Poland |
| Nortel Networks Oy (in administration) | Finland | 1039 1404 (Y reg) | Arabianranta 6, 00560 Helsinki, Finland |
| Nortel Portugal SA (in administration) | Portugal | 502 338 393 | Edificio Tivoli-Forum, Avda da Liberdade no. 180-3o andar, Lisbon, Portugal |
| Nortel Networks s.r.o. (in administration) | Czech Republic | 25 79 84 72 | Klimentska 1216/46, 11002 Prague 1, |

Schedule B

Czech Republic

| | | | |
|---|---|---|---|
| Nortel Networks Romania srl (in administration) | Romania | J40/3642/1999 | 3A Promoroaca Street, Sector 1, Bucharest 014013, Romania |
| Nortel Networks Engineering Services kft (in administration) | Hungary | Cg 01-09-681308 | 1117 Budapest, Infopark setany 1, Hungary |
| Nortel Networks Slovensko s.r.o. (in administration) | Slovakia | [35 716 428] | [Obchodna 2, 811 06, Bratislava, Slovak Republic] |

**The Israeli Companies**

| | | | |
|---|---|---|---|
| Nortel Networks Israel (Sales and Marketing) Limited (in administration) | Israel | 51-295692-1 | Ha'arava Street, Lod 70151 at Airport City, PoB 266, Ben-Gurion Airport, 70100 Israel |
| Nortel Communications and Holdings (1997) Limited (in administration) | Israel | 51-243502-5 | Ha'arava Street, Lod 70151 at Airport City, PoB 266, Ben-Gurion Airport, 70100 Israel |

Schedule B