# EXHIBIT A

Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**MOTION RECORD**
**(returnable August 4, 2009)**

July 30, 2009

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4  CANADA

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930
Lawyers for the Applicants

TO:        Attached Service List

# INDEX

Court File No.  09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### INDEX

| Tab No. | | Pages |
|---------|---|-------|
| 1. | Notice of Motion returnable August 4, 2009 | 1 – 23 |
| 2. | Affidavit of George Riedel sworn July 30, 2009 | 24 – 44 |
| 3. | Draft Order (Bidding Procedures) | 45 – 63 |
| 4. | Draft Order (Side Agreement and Sealing Order) | 64 - 67 |

**TAB 1**

*/*

Court File No.  09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

### NOTICE OF MOTION
### (returnable August 4, 2009)

Nortel Networks Corporation, Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") will make a motion to Justice Morawetz of the Commercial List court on <u>**Tuesday, August 4, 2009 at 9:00am at 393 University Avenue**</u>, Toronto, Ontario.

PROPOSED METHOD OF HEARING: The motion is to be heard:

☐ in writing under subrule 37.12.1(1) because it is on consent or unopposed or made without notice;

☐ in writing as an opposed motion under subrule 37.12.1(4);

☒ orally.

THE MOTION IS FOR AN ORDER:

(a)     Abridging the time for service of the Notice of Motion and Motion Record in respect of this motion and dispensing with further service thereof;

(b)     Approving the bidding procedures (the "Bidding Procedures") described in the affidavit of George Riedel, to be sworn (the "Riedel Affidavit") and the eighteenth report (the "Eighteenth Report") of Ernst & Young Inc., in its capacity as monitor (the "Monitor"), subject to approval of the Bidding Procedures by the United States Bankruptcy Court for the District of Delaware in the Chapter 11 Proceedings of the Chapter 11 Debtors and authorizing the Applicants to conduct the sale process and auction contemplated therein;

(c)     Approving the asset and share sale agreement dated as of July 20, 2009 (the "Sale Agreement") among NNC, NNL and Nortel Networks Inc. and their affiliates, as sellers (the "Sellers") and Avaya Inc., as purchaser (the "Purchaser") attached as an exhibit to the Eighteenth Report and approving and accepting the Sale Agreement for the purposes of conducting the stalking horse process including, without limitation, payment of the Break-Up Fee and the Expense Reimbursement (as such terms are defined in the Sale Agreement);

(d)     Approving the Side Agreement dated as of July 20, 2009 among the Sellers and court-appointed administrators, attached as an exhibit to the Eighteenth Report;

(e)     Sealing the confidential appendix to the Eighteenth Report pending further order of this Court; and

(f)     Such further and other relief as counsel may request and this Honourable Court deem just.

THE GROUNDS FOR THE MOTION ARE:

**BACKGROUND**

(a)     On January 14, 2009 (the "Filing Date"), this Honourable Court made an Initial Order granting the CCAA stay of proceedings against the Applicants and appointing Ernst & Young Inc. as Monitor in the CCAA proceedings;

(b)     Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including NNI, made voluntary filings under Chapter 11 of the United States Bankruptcy Code (the "Code").

On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases in the U.S. as "foreign proceedings" in Canada and giving effect to the automatic stay under the Code in Canada;

(c)     Additionally, on January 15, 2009, Nortel Networks UK Limited and certain subsidiaries of the Nortel group incorporated in the Europe Middle East and Africa region each obtained an administration order from the English High Court of Justice under the Insolvency Act 1986;

(d)     References to "Nortel" herein shall be to the global enterprise as a whole;

**THE BIDDING PROCEDURES AND SALE AGREEMENT**

(e)     Nortel's Enterprise Solutions business unit provides solutions for addressing the communication needs of large and small businesses globally across a wide variety of industries and governmental agencies by building new networks and transforming existing networks into more cost-effective, packet-based networks supporting data, voice and multimedia communications (the "Enterprise Solutions Business"). In particular, the Enterprise Solutions Business specializes in providing solutions that allow its customers to integrate and remove barriers between voice, email, conferencing, video and instant messaging technologies;

(f)     The environment in which the Enterprise Solutions Business operates is highly competitive;

(g)     Nortel believes that a sale of this business at this time is in the best interests of the company and its stakeholders;

(h)     After extensive negotiations with a number of prospective bidders, Nortel negotiated and entered into the Sale Agreement with the Purchaser for the sale of certain of the Sellers' assets relating to the Enterprise Solutions Business and shares of Nortel Government Solutions Incorporated and DiamondWare, Ltd. (the "Assets");

(i)    The terms and conditions of the Sale Agreement, and the agreements to be entered into in connection with the closing of the transactions contemplated in the Sale Agreement are described in further detail in the Riedel Affidavit and the Eighteenth Report;

(j)    In connection with having entered into the Sale Agreement subject to court approvals, Nortel will conduct an auction process for the sale of the Assets to ensure that the Sellers receive the maximum value for the Assets and the Sellers have agreed that the Sale Agreement is subject to higher or better offers;

(k)    It is anticipated that in the next month, Nortel will conduct an expedited sale process and follow the Bidding Procedures with a view to ultimately conducting an auction amongst Qualified Bidders (as described below);

(l)    An agreed upon set of Bidding Procedures have been developed, which provide for a process through which an interested party may become a "Qualified Bidder";

(m)    Bids from Qualified Bidders must be submitted no later than 12:00 pm (ET) on September 4, 2009. The auction is scheduled to take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York City at 9:30 am (ET) on September 11, 2009;

(n)    In the circumstances, the proposed process presents the best way to maximize the value of recovery for the Assets;

(o)    In connection with the stalking horse process, and pursuant to the framework set out in the Interim Funding and Settlement Agreement approved by this Court on June 29, 2009, the Sellers and court-appointed administrators entered into the Side Agreement on July 20, 2009 (the "Side Agreement");

(p)    The Side Agreement addresses certain issues among the Sellers raised by their entry into the Sale Agreement;

(q)    The confidential appendix to the Eighteenth Report contains sensitive competitive and, in some instances, personal information;

(r)     Sealing the confidential appendix is appropriate in the circumstances;

**MISCELLANEOUS**

(s)     The provisions of the CCAA; and

(t)     Such further and other grounds as counsel may advise and this Honourable Court permit.

THE FOLLOWING DOCUMENTARY EVIDENCE will be used at the hearing of the motion:

(a)     The Riedel Affidavit;

(b)     The Eighteenth Report; and

(c)     Such further and other relief as counsel may request and this Honourable Court deem just.

July 29, 2009

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4  CANADA

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930
Lawyers for the Applicants

TO:     Attached Service List

Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**SERVICE LIST**

TO:      **OGILVY RENAULT LLP**
         Royal Bank Plaza, South Tower
         200 Bay Street, Suite 3800
         Toronto, Ontario M5J 2Z4

         Derrick Tay
         Mario Forte
         Jennifer Stam

         Email:    dtay@ogilvyrenault.com
                   mforte@ogilvyrenault.com
                   jstam@ogilvyrenault.com

         Tel:      416.216.4000
         Fax:      416.216.3930

         Lawyers for the Applicants

- 2 -

TO:  **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, ON  M5K 1J7

Murray McDonald
Brent Beekenkamp

Email:  nortel.monitor@ca.ey.com

Tel:    416.943.3016
Fax:    416.943.3300

AND
TO:  **GOODMANS LLP**
250 Yonge Street
Suite 2400
Toronto, ON  M5B 2M6

Jay Carfagnini
Joseph Pasquariello
Chris Armstrong

Email:  jcarfagnini@goodmans.ca
        jpasquariello@goodmans.ca
        carmstrong@goodmans.ca

Tel:    416.597.4107
Fax:    416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND
TO:  **OSLER HOSKIN AND HARCOURT LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, ON  M5X 1B8

Lyndon Barnes
Rupert Chartrand
Edward Sellers
Adam Hirsh

Email:  lbarnes@osler.com
        rchartrand@osler.com
        esellers@osler.com
        ahirsh@osler.com

Tel:    416.362.2111
Fax:    416.862.6666

Lawyers for the Boards of Directors of
Nortel Networks Corporation and Nortel
Networks Limited

AND
TO:  **FASKEN MARTINEAU DUMOULIN LLP**
66 Wellington Street West
Toronto Dominion Bank Tower
P.O. Box 20, Suite 4200
Toronto, ON  M5K 1N6

Donald E. Milner
Aubrey Kauffman
Edmond Lamek
Jon Levin

Email:  dmilner@fasken.com
        akauffman@fasken.com
        elamek@fasken.com
        jlevin@fasken.com

Tel:    416.868.3538
Fax:    416.364.7813

Lawyers for Export Development Canada

- 3 -

| | |
|---|---|
| AND TO: | **EXPORT DEVELOPMENT CANADA**<br>151 O'Connor Street<br>Ottawa, ON  K1A 1K3<br><br>Jennifer Sullivan<br><br>Email:   jsullivan@edc.ca<br><br>Tel:   613.597.8651<br>Fax:   613.598.3113 | AND TO: | **THORNTON GROUT FINNIGAN LLP**<br>3200-100 Wellington Street West<br>Toronto-Dominion Centre, Canadian Pacific Tower<br>Toronto, ON  M5K 1K7<br><br>Robert I. Thornton<br>Michael Barrack<br>Rachelle Moncur<br>Leanne M. Williams<br><br>Email:   rthornton@tgf.ca<br>            mbarrack@tgf.ca<br>            rmoncur@tgf.ca<br>            lwilliams@tgf.ca<br><br>Tel:   416.304.1616<br>Fax:   416.304.1313<br><br>Lawyers for Flextronics Telecom Systems Ltd. |
| AND TO: | **McINNES COOPER**<br>Purdy's Wharf Tower II<br>1300 – 1969 Upper Water Street<br>Halifax, NS  B3J 2V1<br><br>John Stringer, Q.C.<br>Stephen Kingston<br><br>Email:   john.stringer@mcinnescooper.com<br>            stephen.kingston@mcinnescooper.com<br><br>Tel:   902.425.6500<br>Fax:   902.425.6350<br><br>Lawyers for Convergys EMEA Limited | AND TO: | **MILLER THOMSON LLP**<br>Scotia Plaza<br>40 King Street West, Suite 5800<br>P.O. Box 1011<br>Toronto, ON  M5H 3S1<br><br>Jeffrey Carhart<br>Margaret Sims<br><br>Email:   jcarhart@millerthomson.com<br>            msims@millerthomson.com<br><br>Tel:   416.595.8615/8577<br>Fax:   416.595.8695<br><br>Lawyers for Toronto-Dominion Bank |
| AND TO: | **CAW-CANADA**<br>Legal Department<br>205 Placer Court<br>Toronto, ON M2H 3H9<br><br>Barry E. Wadsworth<br>Lewis Gottheil<br><br>Email:   barry.wadsworth@caw.ca<br>            lewis.gottheil@caw.ca<br><br>Tel.:   416.495.3776<br>Fax:   416.495.3786<br><br>Lawyers for all active and retired Nortel employees represented by the CAW-Canada | AND TO: | **BOUGHTON LAW CORPORATION**<br>Suite 700<br>595 Burrard Street<br>Vancouver, BC  V7X 1S8<br><br>R. Hoops Harrison<br><br>Email:   hharrison@boughton.ca<br><br>Tel:   604.687.6789<br>Fax:   604.683.5317<br><br>Lawyers for Tonko Realty Advisors (BC) Ltd. |

AND TO:

**BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, ON  M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email:   mmacnaughton@blgcanada.com
Tel:     416. 367.6646
Fax:     416. 682.2837

Email:   rjaipargas@blgcanada.com
Tel:     416.367.6266
Fax:     416.361.7067

Email:   srappos@blgcanada.com
Tel:     416.367.6033
Fax:     416.361.7306

Lawyers for Bell Canada

AND TO:

**SISKINDS LLP**
680 Waterloo Street
London, ON  N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein

Email:   ray.leach@siskinds.com
          dimitri.lascaris@siskinds.com
          monique.radlein@siskinds.com

Tel:     519.672.2121
Fax:     519.672.6065

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare

AND TO:

**LANG MICHNER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

Leslie A. Wittlin
John Contini
Aaron Rousseau

Email:   lwittlin@langmichener.ca
Tel:     416.307.4087
Fax:     416.304.3855

Email   jcontini@langmichener.ca
Tel:     416.307.4148
Fax:     416.304.3767

Email   arousseau@langmichener.ca
Tel:     416.307.4081
Fax:     416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON  M5X 1A4

Kevin Zych
S. Richard Orzy
Robert W. Staley
Gavin Finlayson

Email:   zychk@bennettjones.com
Tel:     416.777.5738
Fax:     416.863.1716

Email:   orzyr@bennettjones.com
Tel:     416.777.5737
Fax:     416.863.1716

Email:   staleyr@bennettjones.com
Tel:     416.777.4857
Fax:     416.863.1716

Email:   finlaysong@bennettjones.com
Tel:     416.777.5762
Fax:     416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

AND
TO:

**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, ON  M5H 3R3

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon

Email:  mzigler@kmlaw.ca
Tel:     416.595.2090
Fax:    416.204.2877

Email:  sphilpott@kmlaw.ca
Tel:     416.595.2104
Fax:    416.204.2882

Email:  dyiokaris@kmlaw.ca
Tel:     416.595.2130
Fax:    416.204.2810

Email:  amckinnon@kmlaw.ca
Tel:     416.595.2150
Fax:    416.204.2874

Lawyers for the Former Employees of Nortel

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:  jcarhart@millerthomson.com
Tel:     416.595.8615
Fax:    416.595.8695

Email  msims@millerthomson.com
Tel:     416.595.8577
Fax:    416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

Email:  jcarhart@millerthomson.com
Tel:     416.595.8615
Fax:    416.595.8695

Email:  msims@millerthomson.com
Tel:     416.595.8577
Fax:    416.595.8695

Email:  jmklotz@millerthomson.com
Tel:     416.595.4373
Fax:    416.595.8695

Lawyers for LG Electronics Inc.

AND
TO:

**LG ELECTRONICS INC.**
11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongduengpo-gu
Seoul 150-721, Korea

Joseph Kim

Email:  joseph.kim@lge.com

Tel:     +82.2.3777.3171
Fax:    +82.2.3777.5345

AND
TO:

**CHAITONS LLP**
185 Sheppard Avenue West
Toronto, ON M2N 1M9

Harvey G. Chaiton

Email: harvey@chaitons.com

Tel: 416.218.1129
Fax: 416.218.1849

Lawyers for IBM Canada Limited

AND
TO:

**FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, ON M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder

Email: Shayne.kukulowicz@fmc-law.com
Alex.macfarlane@fmc-law.com
Michael.wunder@fmc-law.com

Tel: 416.863.4511
Fax: 416.863.4592

Canadian Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, ON M5H 3E5

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email: ken.rosenberg@paliareroland.com
Tel: 416.646.4304
Fax: 416.646.4301

Email: max.starnino@paliareroland.com
Tel: 416.646.7431
Fax: 416.646.4301

Email: lily.harmer@paliareroland.com
Tel: 416.646.4326
Fax: 416.646.4301

Email: tina.lie@paliareroland.com
Tel: 416.646.4332
Fax: 416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON M5X 1G5

E. Patrick Shea

Email: patrick.shea@gowlings.com

Tel: 416.369.7399
Fax: 416.862.7661

Lawyers for Westcon Group

| | |
|---|---|
| AND TO: | **MINDEN GROSS LLP**<br>145 King Street West, Suite 2200<br>Toronto, ON  M5H 4G2<br><br>Raymond M. Slattery<br>David T. Ullmann<br><br>Email:   rslattery@mindengross.com<br>            dullmann@mindengross.com<br>Tel:      416.369.4149<br>Fax:     416.864.9223<br><br>Lawyers for Verizon Communications Inc. | AND TO: | **AIRD & BERLIS**<br>Brookfield Place<br>181 Bay Street, Suite 1800<br>Toronto, ON  M5J 2T9<br><br>Harry Fogul<br>Peter K. Czegledy<br><br>Email:   hfogul@airdberlis.com<br>Tel:      416.865.7773<br>Fax:     416.863.1515<br><br>Email:   pczegledy@airdberlis.com<br>Tel:      416.865.7749<br>Fax:     416.863.1515<br><br>Lawyers for Microsoft Corporation |

**AND TO:   MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, ON  M5H 4G2

Raymond M. Slattery
David T. Ullmann

Email:   rslattery@mindengross.com
            dullmann@mindengross.com
Tel:      416.369.4149
Fax:     416.864.9223

Lawyers for Verizon Communications Inc.

**AND TO:   AIRD & BERLIS**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Harry Fogul
Peter K. Czegledy

Email:   hfogul@airdberlis.com
Tel:      416.865.7773
Fax:     416.863.1515

Email:   pczegledy@airdberlis.com
Tel:      416.865.7749
Fax:     416.863.1515

Lawyers for Microsoft Corporation

**AND TO:   GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:   jwigley@gardiner-roberts.com
Tel:      416.865.6655
Fax:     416.865.6636

Email:   vdare@gardiner-roberts.com
Tel:      416.865.6641
Fax:     416.865.6636

Lawyers for Andrew, LLC

**AND TO:   AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email:   renglish@airdberlis.com
            smitra@airdberlis.com

Tel:      416.863.1500
Fax:     416.863.1515

Lawyers for Tata Consultancy Services Limited
and Tata America International Corporation

**AND TO:   AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Canadian Lawyers for Tellabs, Inc.

**AND TO:   ALEXANDER HOLBURN BEAUDIN & LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia  V7Y 1B8

Sharon M. Urquhart

Email:   surquhart@ahbl.ca
Tel:      604.484.1757
Fax:     604.484.1957

Lawyers for Algo Communication Products Ltd.

13

| | |
|---|---|
| AND TO: | **MILLER THOMSON LLP**<br>Scotia Plaza<br>40 King Street, West, Suite 5800<br>P.O. Box 1011<br>Toronto, ON  M5H 3S1 |

Maurice Fleming

Email:  mfleming@millerthomson.com
Tel:    416.595.8686
Fax:    416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

AND TO:   **DAVIS LLP**
          1 First Canadian Place
          Suite 5600
          100 King Street West
          Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:  bdarlington@davis.ca
Tel:    416.365.3529
Fax:    416.369.5210

Email:  jdavissydor@davis.ca
Tel:    416.941.5397
Fax:    416.365.7886

Lawyers for Brookfield LePage Johnson Controls
Facility Management Services

AND TO:   **McMILLAN LLP**
          Brookfield Place, Suite 4400
          181 Bay Street
          Toronto, Ontario  M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:  andrew.kent@mcmillan.ca
Tel:    416.865.7160
Fax:    416.865.7048

Email:  hilary.clarke@mcmillan.ca
Tel:    416.865.7286
Fax:    416.865.7048

Email:  tushara.weerasooriya@mcmillan.ca
Tel:    416.865.7262
Fax:    416.865.7048

Lawyers for Royal Bank of Canada

AND TO:   **AIRD & BERLIS LLP**
          Barristers & Solicitors
          Brookfield Place, P.O. Box 754
          181 Bay Street, Suite 1800
          Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:    416.865.7726
Fax:    416.863.1515

Email:  iaversa@airdberlis.com
Tel:    416.865.3082
Fax:    416.863.1515

Lawyers for Perot Systems Corporation

14

| | |
|---|---|
| AND TO: | **McMILLAN LLP**<br>Brookfield Place, Suite 4400<br>181 Bay Street<br>Toronto, Ontario  M5J 2T3 |

Lawrence J. Crozier
Adam C. Maerov

Email:   lawrence.crozier@mcmillan.ca
Tel:      416.865.7178
Fax:     416.865.7048

Email:   adam.maerov@mcmillan.ca
Tel:      416.865.7285
Fax:     416.865.7048

Lawyers for Citibank

AND TO:   **BLANEY McMURTRY LLP**
Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, Ontario  M5C 3G5

Domenico Magisano

Email:   dmagisano@blaney.com
Tel:      416.593.2996
Fax:     416.593.5437

Lawyers for Expertech Network Installation Inc.

AND TO:   **LANG MICHENER LLP**
Brookfield Place
Suite 2500, 181 Bay Street
P.O. Box 747
Toronto, Ontario  M5J 2T7

Leslie Wittlin
Aaron Rousseau

Email:   lwittlin@langmichener.ca
Tel:      416.307.4087
Fax:     416.365.1719

Email:   arousseau@langmichener.ca
Tel:      416.307.4081
Fax:     416.365.1719

Lawyers for Right Management Inc.

AND TO:   **BLANEY McMURTRY LLP**
2 Queen Street East,
Suite 1500
Toronto, ON  M5C 3G5

Deborah S. Grieve

Email:   dgrieve@blaney.com
Tel:      416.593.2951
Fax:     416.593.5437

Lawyers for Alvarion Ltd.

AND TO:   **GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:   jwigley@gardiner-roberts.com
Tel:      416.865.6655
Fax:     416.865.6636

Email:   vdare@gardiner-roberts.com
Tel:      416.865.6641
Fax:     416.865.6636

Lawyers for Amphenol Corporation

AND TO:   **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

Sanjeev P.R. Mitra
Sandra A. Vitorovich

Email:   smitra@airdberlis.com
           svitorovich@airdberlis.com

Tel:      416.863.1500
Fax:     416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

- 10 -

| | | | |
|---|---|---|---|
| AND TO: | **NELLIGAN O'BRIEN PAYNE LLP**<br>Barristers and Solicitors<br>50 O'Connor Street<br>Suite 1500<br>Ottawa, Ontario  K1P 6L2 | AND TO: | **CASSELS BROCK & BLACKWELL LLP**<br>2100 Scotia Plaza<br>40 King Street West<br>Toronto, Ontario  M5H 3C2 |

**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Ainslie Benedict
Steven Levitt
Christopher Rootham

Email:   janice.payne@nelligan.ca
ainslie.benedict@nelligan.ca
steven.levitt@nelligan.ca
christopher.rootham@nelligan.ca

Tel:     613.231.8245
Fax:    613.788.3655

Lawyers for the Steering Committee of Recently
Severed Canadian Nortel Employees

**CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, Ontario  M5H 3C2

E. Bruce Leonard
Harvey Garman

Email:   bleonard@casselsbrock.com
hgarman@casselsbrock.com

Tel:     416.860.6455
Fax:    416.640.3054

Lawyers for the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

AND TO:   **CALEYWRAY**
Labour/Employment Lawyers
1600-65 Queen Street West
Toronto, Ontario  M5H 2M5

Gail E. Misra

Email:   misrag@caleywray.com

Tel:     416.775.4680
Fax:    416.366.3293

Lawyers for the Communication, Energy and
Paperworkers Union of Canada

AND TO:   **MCFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, Ontario  K2P 0A2

Paul K. Lepsoe

Email:   pklepsoe@mcfarlanelaw.com

Tel:     613.233.2679
Fax:    613.233.3774

Lawyers for Iron Mountain Canada Corporation
and Iron Mountain Information Management, Inc.

AND TO:   **COLBY, MONET DEMERS, DELAGE &
CREVIER LLP**
Tour McGill College
1501 McGill College Avenue
Suite 2900
Montreal, Quebec  H3A 3M8

David J. Dropsy

Email:   ddropsy@colby-monet.com
Tel:     514.284.3663
Fax:    514.284.1961

Lawyers for GFI INC., a division of Thomas &
Betts Manufacturing Inc.

AND TO:   **SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec  H9S 2A5

Dan Goldstein
Marco Gaggino

Email:   dgoldstein@schneidergaggino.com
mgaggino@schneidergaggino.com

Tel:     514.631.8787
Fax:    514.631.0220

Lawyers for the Teamsters Quebec Local 1999

- 11 -

AND
TO:

**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email:   janice.payne@nelligan.ca
         steven.levitt@nelligan.ca
         christopher.rootham@nelligan.ca

Tel:    613.231.8245
Fax:    613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA
as at January 14, 2009

AND
TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario  M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:   ryanbellr@bennettjones.com
         laugesenm@bennettjones.com

Tel:    416.863.1200
Fax:    416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

AND
TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, Ontario  M5H 4G2

Timothy R. Dunn

Email:   tdunn@mindengross.com
Tel:    416.369.4335
Fax:    416.864.9223

Lawyers for 2748355 Canada Inc.

AND
TO:

**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Chris Besant
Lydia Salvi

Email:   chris.besant@bakernet.com

Tel:    416.865.2318
Fax:    416.863.6275

Email:   lydia.salvi@bakernet.com

Tel:    416.865.6944
Fax:    416.863.6275

Lawyers for Jabil Circuit Inc.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email:   theintzm@mccarthy.ca
Tel:    416.601.7627
Fax:    416.868.0673

Email:   jsirivar@mccarthy.ca
Tel:    416.601.7750
Fax:    416.868.0673

Lawyers for Frank Andrew Dunn

AND
TO:

**EURODATA**
2574 Sheffield Road
Ottawa, Ontario  K1B 3V7

Nanci Shore

Email:   nanci@eurodata.ca
Tel:    613.745.0921
Fax:    613.745.1172

17

AND TO:
**BALDWIN LAW PROFESSIONAL CORPORATION**
54 Victoria Avenue
Belleville, Ontario K8N 5J2

Ian W. Brady

Email:   lbrady@baldwinlaw.ca
Tel:     613.771.9991
Fax:     613.771.9998

Lawyers for Sydney Street Properties Corp.

AND TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:     416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:     416.865.3082
Fax:     416.863.1515

Lawyers for Huawei Technologies Co. Ltd.

AND TO:
**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:   arthur.jacques@shibleyrighton.com
Tel:     416.214.5213
Fax:     416.214.5413

Email :  thomas.mcrae@shibleyrighton.com
Tel :    416.214.5206
Fax :    416.214.5400

Co-Counsel for the Steering Committee of
Nortel Canadian Continuing Employees – Post
CCAA as at January 14, 2009

AND TO:
**AETL TESTING, INC.**
130 Chaparral Court, Suite 250
Anaheim, California 92808

Cynthia R. Maher

Email:   cynthia.maher@ntscorp.com
Tel:     714.998.4351
Fax:     714.998.7142

Lawyers for AETL Testing, Inc.

AND TO:
**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:   arthur.jacques@shibleyrighton.com
Tel:     416.214.5213
Fax:     416.214.5413

Email :  thomas.mcrae@shibleyrighton.com
Tel :    416.214.5206
Fax :    416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee

AND TO:
**LAVERY, DE BILLY, LLP**
Barristers & Solicitors
Suite 2400, 600 de la Gauchetière West
Montreal, Quebec H3B 4L8

Jean-Yves Simard

Email :  jysimard@lavery.ca
Tel :    514.871.1522
Fax :    514.871.8977

Lawyers for Texas Landlords to Nortel Networks
Inc.

AND
TO: **NATIONAL TECHNICAL SYSTEMS**
130 Chaparral Ct., Suite 250
Anaheim, California, U.S.A.
92808

Cynthia Maher

Email:   cynthia.maher@ntscorp.com
Tel:     714.998.4351


AND
TO: **GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

David F.W. Cohen

Email:   david.cohen@gowlings.com

Tel:     416.369.6667
Fax:     416.862.7661

Lawyers for General Electric Canada Equipment
Finance G.P. and GE Capital Canada Leasing
Services Inc.


AND
TO: **DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:   bdarlington@davis.ca
Tel:     416.365.3529
Fax:     416.369.5210

Email:   jdavissydor@davis.ca
Tel:     416.941.5397
Fax:     416.365.7886

Lawyers for Computershare Trust Company of
Canada


AND
TO: **DAVIES WARD PHILLIPS & VINEBERG
LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:   rschwill@dwpv.com
Tel:     416.863.0900
Fax:     416.863.0871

Email:   mgottlieb@dwpv.com
Tel:     416.863.0900
Fax:     416.863.0871

Lawyers for Nortel Networks UK Limited (In
Administration


AND
TO: **LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

E-mail:   tosullivan@counsel-toronto.com
Tel:      416.598.1744
Fax:      416.598.3730

Email:    slaubman@counsel-toronto.com
Tel:      416.598.1744
Fax:      416.598.3730

Lawyers for William A. Owens


AND
TO: **BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Lydia Salvi

Email:   lydia.salvi@bakernet.com

Tel:     416.865.6944
Fax:     416.863.6275

Lawyers for Wipro Limited

19

- 14 -

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Lawyers for the Current and Former Employees of
Nortel Networks Inc. who are or were Participants
in the Long-Term Investment Plan Sponsored by
Nortel Networks Inc.

AND
TO:

**TORYS LLP**
79 Wellington Street West, Suite 3000
Box 270, TD Centre
Toronto, Ontario  M5K 1N2

Scott Bomhof

Email:   sbomhof@torys.com
Tel:      416.865.7370
Fax:     416.865.7380

Lawyers for Nokia Siemens Networks B.V.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, Ontario  M5K 1E6

Heather Meredith

Email:   hmeredith@mccarthy.ca
Tel:      416.601.8342
Fax:     416.868.0673

Lawyers for Hitachi Communications
Technologies, Ltd.

AND
TO:

**DEPARTMENT OF JUSTICE**
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario  M5X 1K6

Diane Winters

Email: dwinters@justice.gc.ca
Tel:      416.973.3172
Fax:     416.973.0810

- 15 -

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
P.O. Box 25
Commerce Court West
Toronto, Ontario M5L 1A9

Pamela Huff
Milly Chow
Hugh DesBrisay
Craig Thorburn

Email: pamela.huff@blakes.com
Tel:    416.863.2958
Fax:    416.863.2653

Email:  milly.chow@blakes.com
Tel:    416.863.2594
Fax:    416.863.2653

Email:  hugh.desbrisay@blakes.com
Tel:    416.863.2426
Fax:    416.863.2653

Email:  craig.thorburn@blakes.com
Tel:    416.863.2965
Fax:    416.863.2653

Lawyers for MatlinPatterson Global Advisers
LLC, MatlinPatterson Global Opportunities
Partners III L.P. and MatlinPatterson
Opportunities Partners (Cayman) III L.P.

AND
TO:

**LANG MICHENER LLP**
Brookfield Place
181 Bay Street, Suite 2500
Toronto, Ontario, M5J 2T7

Sheryl E. Seigel

Email:  sseigel@langmichener.ca
Tel:    416.307.4063
Fax:    416.365.1719

Lawyers for The Bank of New York Mellon

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
P.O. Box 25
Commerce Court West
Toronto, Ontario M5L 1A9

Susan M. Grundy
Marc Flynn

Email: susan.grundy@blakes.com
Tel:    416.863.2572
Fax:    416.863.2653

Email:  marc.flynn@blakes.com
Tel:    416.863.2685
Fax:    416.863.2653

Lawyers for Telefonaktiebolaget L M
Ericsson (publ)

- 16 -

21

**COURTESY COPIES:**

AND
TO:

**LEWIS AND ROCA**
40 North Central Avenue
Phoenix, Arizona
USA 85004-4429

Scott K. Brown

Email:   sbrown@lrlaw.com

Tel:     602.262.5321
Fax:     602.734.3866

Lawyers for The Prudential Insurance
Company of America

AND
TO:

**CURTIS, MALLET-PREVOST, COLT &**
**MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061

Steven J. Reisman
James V. Drew

E-mail:  sreisman@curtis.com
         jdrew@curtis.com

Tel:     212.696.6000
Fax:     212-697-1559

Lawyers for Flextronics International

AND
TO:

**AKIN GUMP STRAUSS HAUER &**
**FELD LLP**
One Bryant Park
New York, NY  10036

Fred S. Hodara
Ryan C. Jacobs

Email:   fhodara@akingump.com
         rjacobs@akingump.com

Tel:     212.872.1000
Fax:     212.872.1002

U.S. Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**MILBANK, TWEED, HADLEY**
**McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY  10005

Dennis F. Dunne
Andrew M. Leblanc
Albert A. Pisa

Email:   DDunne@milbank.com
Tel:     212.530.5770
Fax:     212.530.5219

Email:   ALeblanc@milbank.com
Tel:     212.835.7574
Fax:     212.530.5219

Email:   APisa@milbank.com
Tel:     212.530.5319
Fax:     212.530.5219

U.S. Lawyers for The Informal Nortel
Noteholder Group

- 17 -

AND
TO:

**VEDDER PRICE P.C.**
1633 Broadway, 47th Floor
New York, New York 10019

Michael L. Schein

Email:   mschein@vedderprice.com

Tel:      212.407.6920
Fax:     212.407.7799

U.S. Lawyers for Telmar Network Technology,
Inc. and Precision Communication Services, Inc.

AND
TO:

**MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta  T2P 4H2

Andrew Robertson
Caylee M. Rieger

Email :  andrew.robertson@macleoddixon.com
caylee.rieger@macleoddixon.com

Tel :     403.267.8222
Fax :    403.264.5973

Agent for Nelligan O'Brien Payne LLP, lawyers
for the Steering Committee of Recently Severed
Canadian Nortel Employees and lawyers for the
Steering Committee of Nortel Canadian
Continuing Employees – Post CCAA as at
January 14, 2009

AND
TO:

**BRYAN CAVE LLP**
161 North Clark Street, Suite 4300
Chicago, Illinois  60601

Eric S. Prezant

Email:   eric.prezant@bryancave.com
Tel:      312.602.5033
Fax:     312.602.5050

U.S. Lawyers for Tellabs, Inc.

23

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Applicants

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

Proceeding commenced at Toronto

NOTICE OF MOTION
(returnable August 4, 2009)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4
CANADA

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 1737674\1

**TAB 2**

24

Court File No: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**AFFIDAVIT OF GEORGE RIEDEL**
**(sworn July 30, 2009)**

I, George Riedel, of the city of Boston in the State of Massachusetts, MAKE OATH
AND SAY:

1.     I am the Chief Strategy Officer of Nortel Networks Corporation ("NNC") and Nortel
Networks Limited ("NNL") and have held those positions since February, 2006. As such, I have
personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where I do
not possess personal knowledge, I have stated the source of my information and, in all such
cases, believe it to be true.

2.     I swear this Affidavit in support of the motion to approve, among other things, the
bidding procedures and a "stalking horse" asset and share sale agreement dated as of July 20,
2009 (the "Sale Agreement") among NNC, NNL and Nortel Networks Inc. ("NNI") and certain
of their affiliates, as vendors (the "North American Sellers"), certain other entities defined
therein as the EMEA Sellers (the "EMEA Sellers" and together with the North American Sellers,
the "Sellers") and Avaya Inc., as purchaser ("Avaya" or the "Purchaser"), in respect of the sale
of certain of the North American Sellers' assets relating to the Enterprise Solutions Business (as
such phrase is defined and described in further detail below) and shares of Nortel Government
Solutions Incorporated ("NGS") and DiamondWare, Ltd. (collectively, such assets and shares are

referred to herein as the "North American Assets"). A copy of the Sale Agreement (without exhibits or schedules) is attached as an appendix to the eighteenth report (the "Eighteenth Report") of the Monitor (as defined below) to be filed in connection with this motion. References to "Nortel" herein are references to the global enterprise of NNC, NNL, NNI and their respective affiliates as a whole. In connection with entering into the Sale Agreement, the EMEA Sellers, as vendors and the Purchaser, as purchaser, entered into an asset sale agreement relating to the sale and purchase dated as of July 20, 2009 (the "EMEA Agreement" and together with the Sale Agreement, the "Purchase Agreements") in respect of the sale of certain of the assets of the EMEA Sellers relating to the Enterprise Solutions Business (such assets together with the North American Assets, referred to herein as the "Assets").

3.     All dollar references are US$ unless otherwise indicated.

**BACKGROUND**

4.     On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court and Ernst & Young Inc. was appointed as monitor (the "Monitor") in the CCAA proceedings.

5.     Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "Chapter 11 Debtors"), made voluntary filings in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

6.     Additionally, on January 15, 2009, Nortel Networks UK Limited ("NNUK") and certain subsidiaries of the Nortel group incorporated in Europe, the Middle East or Africa each obtained an administration order for the appointment of administrators from the English High Court of Justice under the Insolvency Act 1986.

- 3 -

7.    On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

8.    On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA will continue to operate as a going concern for an initial period of three months.    In accordance with the European Union's Counsel Regulation, the English law proceedings remain the main proceedings in respect of NNSA.

9.    On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code.  On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

10.    On July 15, 2009, Nortel Networks (CALA) Inc. made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

11.    Further details regarding the background to these proceedings are set out in the affidavit of John Doolittle sworn January 14, 2009 (the "Initial Order Affidavit") previously filed in these proceedings and are therefore not repeated herein.

12.    The Applicants have previously obtained various relief related to the sale of certain other their assets including:

    (a)    The sale of Nortel's Layer 4-7 Application Delivery Business, which sale closed on April 1, 2009;

    (b)    The sale of NNL's real property known as the "Westwinds Facility" in Alberta, which sale closed on June 16, 2009;

    (c)    A sale process for the divestiture of NNL's interest in its joint venture with LG Electronics Inc., which process is still underway; and

- 4 -

(d)   Bidding procedures and a stalking horse agreement entered into with Nokia Siemens Networks B.V. for the sale of certain of Nortel's CDMA and LTE related assets, followed by the sale itself.

13.   The Sale Agreement is the stalking horse agreement for the sale of the Enterprise Solutions Business, another significant business division of Nortel.

**THE TRANSACTION**

14.   Capitalized terms used in this section of my Affidavit not otherwise defined herein shall have the meanings given to them in the Sale Agreement.

*The Enterprise Solutions Business*

15.   Nortel's Enterprise Solutions business unit provides solutions for addressing the communication needs of large and small businesses globally across a wide variety of industries and governmental agencies by building new networks and transforming existing networks into more cost-effective, packet-based networks supporting data, voice and multimedia communications (the "Enterprise Solutions Business"). In particular, the Enterprise Solutions Business specializes in providing solutions that allow its customers to integrate and remove barriers between voice, email, conferencing, video and instant messaging technologies. In addition, NGS performs the role of a systems integrator and channel for Nortel Enterprise products in the US Federal government markets.

16.   The Enterprise Solutions Business has a global presence with operations and customers in the United States, Canada, Central and Latin America, Europe, the Middle East, Africa, and Asia. The Enterprise Solutions Business (including NGS, its subsidiaries and Diamondware Ltd., each of which are U.S. companies that are not part of the proceedings), has approximately 7,900 employees, who are located in various locations worldwide.

17.   The environment in which the Enterprise Solutions Business operates is highly competitive. Competitors to this Business include some of the world's leading technology companies such as Cisco, Siemens Enterprise Communications, Alcatel-Lucent, NEC and many others. The enterprise communications industry is highly dynamic and the competitive landscape is constantly changing. Simply put, the competition for market share is fierce, and

28

- 5 -

therefore the value of achieving scale and other efficiencies is important in this business. Taking into account these challenges, Nortel concluded that it would be difficult to compete in this market and selling its Enterprise Solutions Business should be seriously investigated.

*Previous Marketing Efforts*

18.    Until 2008, the Enterprise Solutions Business was integrated with Nortel's other businesses, including its carrier business. In the summer of 2008, as part of its overall restructuring efforts, Nortel began the separation of the Enterprise Solutions Business into an independent business, an effort that is continuing.

19.    In late 2008, Nortel began to explore the potential sale of the Enterprise Solutions Business. In connection with those efforts, Nortel approached eight (8) parties, including one (1) financial investor and seven (7) strategic buyers. Nortel received six (6) expressions of interest, and three (3) of the interested parties participated in management presentations and due diligence sessions, resulting in the receipt of two (2) non-binding proposals.

20.    The commencement of the various insolvency proceedings temporarily interrupted Nortel's exploration of the potential sale of the Enterprise Solutions Business. Shortly after the Filing Date, Nortel began evaluating various potential strategic options for its reorganization, with its advisors along with the Monitor and certain of its key stakeholders. Ultimately, Nortel determined that it is in Nortel's best interests to divest the Enterprise Solutions Business in the near term to maximize the value that can be realized from such a sale.

21.    In furtherance of exploring such a sale, in early March 2009, Nortel and its financial advisor contacted potential bidders for the Enterprise Solutions Business, including all of the parties that had previously expressed interest in acquiring the Enterprise Solutions Business and with whom active discussions took place prior to the Filing Date, and a number of new parties (together, the "Prospective Bidders"). The Prospective Bidders were invited by Nortel to commence (or recommence, as the case may be) their due diligence efforts and were provided access to key information regarding the Enterprise Solutions Business. Shortly thereafter, the Prospective Bidders carrying out due diligence were invited to attend in-person information sessions with the management of the Enterprise Solutions Business. Nortel subsequently invited

- 6 -

the Prospective Bidders to submit definitive proposals to acquire the Enterprise Solutions Business.

22.    During the course of this process, the field of Prospective Bidders was narrowed to three (3) prospective stalking horse bidders (the "Bidders") who submitted definitive proposals to acquire the Enterprise Solutions Business.  Nortel engaged in further discussions with each of the three (3) Bidders in parallel, and evaluated their bids in light of a number of criteria, such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by each Bidder, the claims likely to be created by such bid in relation to other bids, the counterparties to such transactions, the proposed transaction documentation or terms, the effect of the sale on the value of the ongoing businesses of Nortel (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the sale (including any regulatory approvals required to close the transactions), the assets included or excluded from the bid, the estimated number of in-scope employees to be offered post-closing employment by the Bidder and any proposed measures associated with their continued employment, the transition services required from Nortel post closing and any related restructuring costs, and the likelihood and timing of consummating such transaction.  Based upon this evaluation, Nortel ultimately decided, in consultation with its advisors along with the Monitor and certain of its key stakeholders, that the Purchaser's bid offered the most advantageous terms and best value.

*The Sale Agreement*

23.    After extensive arm's-length, good faith negotiations among the Sellers and the Purchaser and their respective advisors, the parties have agreed, among other undertakings, to convey the Assets including by assigning the Designated Agreements to the Purchaser or certain other purchasers designated by the Purchaser all in accordance with the terms and conditions of the Purchase Agreements, subject to the approval of the transaction in a number of the jurisdictions in which the Sellers are subject to creditor protection proceedings.

24.    The Purchase Agreements contemplate the sale of the Assets, subject to higher and/or better bids, on the following material terms:

  (a)    Good Faith Deposit.  The Purchaser has delivered to Wells Fargo Bank, National Association, as escrow agent, $100 million as a Good Faith Deposit, to be applied

- 7 -

against the purchase price, the Reverse Termination Fee (described below), or damages payable by the Purchaser. Under the terms of the Escrow Agreement, the Purchaser may substitute such amount with Letters of Credit.

(b)  <u>Purchase Price</u>.  At the closing, the Purchaser will pay an amount of $475 million less the Escrow Amount (described below) to the Sellers, adjusted based on estimates of, *inter alia*, inventory and amounts relating to accrued and unused vacations of the employees of the Business, retirement obligations, working capital and net debt of certain Nortel entities included in the Transaction, certain adjustments relating to the EMEA Sellers, and the standard margin (as adjusted) for the Enterprise Solutions Business.  These adjustments will not take into account (and therefore the purchase price will not be reduced by) approximately $28 million of liabilities of one of the transferred companies under a certain lease. After the closing, a further adjustment payment, together with interest at the rate of 3% per annum, may be required to be made, 2/3 by the North American Sellers and 1/3 by the EMEA Sellers, based on differences between the estimated and final amounts of the various adjustments.  The purchase price may also be reduced if the assets of any EMEA Seller are excluded in certain circumstances under the EMEA Agreement.  Lastly, the purchase price has been effectively reduced by a further $10 million by means of a reduction in the aggregate price to be paid by the Purchaser to the Sellers for services under the Transition Services Agreement.  The purchase price adjustments are set forth in the Sale Agreement.

(c)  <u>Escrow Amounts</u>.  The Purchaser will pay the following portions of the purchase price into escrow at closing:

(i)  $30 million as security for any payments required upon the final determination of the adjustments to the purchase price;

(ii)  $25 million as security for certain obligations of NNC, NNL and NNI (the "Main Sellers") in relation to the post-closing delivery of certain financial statements and engagement of KPMG in relation thereto;

- 8 -

(iii)    certain amounts as security for payments by Sellers of accrued and unused vacation days for certain transferred employees, and for certain severance and carrying costs incurred with respect to redundancy of transferring employees in certain EMEA jurisdictions; and

(iv)    an amount as security for certain French tax obligations.

(d)    Certain Fees.

(i)    Fees Payable by the Sellers.

(1)    In certain circumstances the Sellers may be required to pay to the Purchaser a break-up fee and/or an expense reimbursement which is discussed in more detail below.

(ii)    Fees Payable by the Purchaser.

(1)    Reverse Termination Fee:  Upon the termination of the Sale Agreement by the Purchaser before the earlier of (i) the 60th day after the date of the Sale Agreement and (ii) the Bid Deadline (as defined in the Bidding Procedures Order), the Purchaser may terminate the Purchase Agreements provided that the Purchaser pays a cash fee of $100 million (the "Reverse Termination Fee") to the Sellers. The Reverse Termination Fee may also be payable by the Purchaser upon termination of the Sale Agreement by the Main Sellers in certain other circumstances, generally involving a failure to obtain antitrust approvals, and/or certain material intentional uncured breaches by the Purchaser of its representations, warranties, agreements or covenants resulting in a failure to satisfy conditions to the Sellers' obligation to close under the Purchase Agreements (see below for further discussion on closing conditions of the Sellers and the Purchaser), in each case unless:

(A)    the Sellers are in intentional breach of either of the Purchase Agreements in any material respect which breach:

32

- 9 -

        (I)     would result in a failure of the conditions to the Purchaser's obligations to close under either of the Purchase Agreements, and

        (II)    is not cured in the period permitted by the relevant Purchase Agreement, or

    (B)    the conditions to the Purchaser's obligations to close under the Sale Agreement cannot be satisfied on or before 365 days after the date of the Sale Agreement.

  (2)    <u>Delay Fee:</u> The Purchaser is required to pay a Delay Fee that accrues at a rate of $97,600 per day[1] from the 150th day after the date of the Sale Agreement, if the regulatory approvals are then still pending and the other conditions to Closing are otherwise satisfied, until all regulatory approvals have been obtained or the Sale Agreement is terminated.

(e)    <u>Assets and Shares to be Transferred.</u>  At the closing, the North American Sellers will transfer, subject to certain exceptions, their rights, title and interests in the North American Assets.  The Excluded Assets not being transferred to the Purchaser by the North American Sellers include cash, cash equivalents and accounts receivable of the North American Sellers, customer contracts not satisfying specified criteria and rejected by the Purchaser, supply contracts not elected by the Purchaser to assume, security deposits provided by the North American Sellers to their contractual counterparties, any assets owned by NN Turkey, the LGN Joint Venture, Uni-Nortel or certain other foreign subsidiaries of NNL or NNI that the Purchaser can elect after signing not to purchase (without adjustments to the purchase price) or, in the case of certain foreign subsidiaries in bankruptcy proceedings that elect not to participate in the transaction (with appropriate adjustments to the purchase price), and any shares owned by the

---

[1]    This is equivalent to 7.5% annual interest on the Base Purchase Price.

- 10 -

North American Sellers in any entity (including joint ventures) other than the shares of NGS and DiamondWare, Ltd.

(f)     Assumed Liabilities.  The liabilities to be assumed by the Purchaser include, among others, (i) liabilities arising after the Closing Date to the extent related to the Enterprise Solutions Business (to the extent acquired) or the operations or ownership thereof after the closing, (ii) certain liabilities arising from assigned contracts, (iii) certain liabilities relating to intellectual property, (iv) certain tax liabilities, (v) certain liabilities related to employees and employee benefit plans and under employment laws, (vi) certain liabilities relating to certain executory supply purchase orders, and (vii) certain liabilities relating to bids made by any Seller or a contractor team or joint venture in which a Seller is participating, which are capable of acceptance after closing.

(g)     Sale Free and Clear.  The Sale Agreement requires assets to be transferred by the North American Sellers, including the Applicants', free and clear of all Interests.

(h)     Ancillary Agreements.  Pursuant to the Sale Agreement, on or before the closing, the Purchaser or its designates and certain Sellers (or their affiliates) will enter into a number of ancillary agreements dealing with, *inter alia*, provision of transition services to the Purchaser, licensing of intellectual property, and secondment of certain employees.  In addition, the Sellers and the Purchaser will use reasonable best efforts to negotiate in good faith certain contracts among themselves and/or with third parties, including contract manufacturers, the LGN Joint Venture and Uni-Nortel.

(i)     Closing Conditions:  The obligation of each of the Sellers on the one hand and the Purchaser on the other hand, to close the Transactions is subject to a number of conditions. The obligation of the Purchaser to close the Transactions is subject to, among other things, the satisfaction of the following conditions:

         (i)     the accuracy of the Sellers' representations and warranties, except as would not result in a Material Adverse Effect,

34

- 11 -

(ii)     the performance in all material respects of all material covenants, obligations and agreements required to be performed by the Sellers on or before the closing (except the covenant to deliver certain financial information must be fully performed by the Sellers and the breach of this covenant is not subject to a materiality qualifier),

(iii)    the receipt of all antitrust approvals in a number of jurisdictions, including the United States, Canada and the European Union, and an approval under the *Investment Canada Act*,

(iv)    the Sale Order and the Canadian Approval and Vesting Order shall have been entered without material modification from the forms contemplated in the exhibits to the Sale Agreement, unless the Purchaser expressly consented to such modification, which consent shall not be unreasonably withheld and shall not have been stayed, amended or, in certain circumstances, appealed as of the Closing Date,

(v)     certain termination and similar events having not occurred with respect to the Nortel Networks Retirement Income Plan, unless the Pension Benefit Guaranty Corporation shall have waived its claims against the Purchaser or any of its Affiliates in relation to any potential liabilities and, if applicable, any lien shall have been released by the Pension Benefit Guaranty Corporation in the U.S., and

(vi)    there being no pending action by the UK Pensions Regulator, the PPF, or the Pension Trustees against the companies (meaning, among other things, the issuance of a warning notice or determination notice in respect of the imposition of a contribution notice or a financial support direction on either of the companies).

In addition, the Purchaser's obligation to close under the Sale Agreement is conditioned upon satisfaction of all conditions to the closing under the EMEA Agreement.

- 12 -

(j)     Termination Rights:  The Sale Agreement may be terminated prior to the Closing in a number of instances, including, among others:

    (i)     by the Purchaser and the Main Sellers if the Bidding Procedures Order, the Canadian Approval and Vesting Order or certain other U.S. approvals have not been entered within a specified period,

    (ii)    by the Purchaser, as noted above, at any time until the earlier of (i) the sixtieth (60th) day after the date of the Sale Agreement and (ii) the Bid Deadline (as defined in the Bidding Procedures Order), provided that the Reverse Termination Fee is paid to the Sellers in accordance with the Sale Agreement, and

    (iii)   by the Purchaser, if the Adjusted Audited Standard Margin of the Business in 2008 is less than ninety percent (90%) of the Unaudited Standard Margin.  (The Unaudited Standard  Margin is $1,383.5 million.  The Adjusted Audited Standard Margin will be calculated based on audited financial information.)

(k)     Closing Deadlines:  If the closing has not taken place within 270 days from the date of the Sale Agreement, the Main Sellers may terminate the Sale Agreement. If the closing has not taken place within 365 days from the date of the Sale Agreement, the Purchaser may terminate the Sale Agreement.

(l)     Ongoing Covenants and Restrictions:  In addition to certain other customary post-closing obligations such as sharing of information and redirection of customers and payments, the Sellers have agreed to, among other things:  (i) cooperate with the Purchaser in relation to arrangements regarding non-assignable contracts and bundled contracts during an agreed period after the closing, (ii) sublease certain real estate to the Purchaser, (iii) assume certain non-compete obligations in favor of the Purchaser and (iv) perform certain transition services for the Purchaser.

(m)     Other Significant Provisions:

- 13 -

(i)     Taxes.  The Sellers will bear all taxes relating to the Assets or the
        Business for all tax periods or portions thereof ending on or before the
        closing, and the Purchaser will bear all taxes for all tax periods or portions
        thereof beginning after the closing.  The taxes for any straddle period will
        be apportioned between the Sellers and the Purchaser based on the portion
        of the period ending on and including the closing date and the portion
        beginning after the closing date, respectively.  The Purchaser will bear all
        transfer taxes in connection with the Sale Agreement, the transactions
        contemplated by the Sale Agreement, or the other Transaction Documents.
        In the event of any withholding taxes applicable to the Purchase Price or
        the Reverse Termination Fee paid by the Purchaser, the Purchaser will
        deduct such amount from the payment.  The Purchaser is not obliged to
        compensate the Sellers in respect of the withheld amount.  The Purchaser
        also has the right to make (or direct the Sellers to make) certain tax
        elections, provided that the Purchaser indemnifies the Sellers for any
        increased tax liability of the Sellers caused by the elections for a specified
        period.

(ii)    Competing Transaction.  Except during the period from entry of the
        Bidding Procedures Order until conclusion of the Auction, the Sellers and
        their affiliates are restricted from soliciting, engaging in discussions with
        any person (other than the Purchaser) in relation to, and taking certain
        other actions in furtherance of, any transaction that is alternative to the
        Sale Transaction governed by the Purchase Agreements.

(iii)   Liability Limitation. The liability of the Purchaser to the Sellers and their
        affiliates or related parties for any failure of the transactions contemplated
        by the Purchase Agreements to be consummated or in respect of any
        liabilities or obligations arising under, or relating to, the Purchase
        Agreements or the transactions contemplated thereby prior to the closing,
        including an intentional breach prior to the closing, is limited to (i) a
        maximum of $200 million (including the Reverse Termination Fee, if
        payable) or (ii) a maximum of $100 million in the event that (A) at the

- 14 -

time of termination the Standard Margin of the Business for a four fiscal quarter measurement period is less than $640 million, (B) the Purchaser is not in a material Intentional Breach of the Purchase Agreements, or (C) the Purchaser terminates the Sale Agreement within the earlier of (x) the 60th day after the date of the Sale Agreement and (y) the Bid Deadline (as defined in the Bidding Procedures Order) and pays the Reverse Termination Fee. The liability of the Sellers and their affiliates to the Purchaser for pre-closing breaches of the Purchase Agreements is limited to the Break-Up Fee and the Expense Reimbursement, when payable.

(iv) <u>Additional Financial Information</u>. The Main Sellers will be required to provide before and after closing certain financial statements (included audited financial statements) of the Business that the Purchaser may require for the purpose of, *inter alia*, (i) an exchange offer for outstanding debt securities to be made by the Purchaser or its affiliates, or (ii) any current reports required to be filed by the Purchaser or its affiliates in connection with the acquisition.

(v) <u>Transition Services</u>. The parties have agreed to a form of Transition Services Agreement, which sets out the general scope of transition services to be provided by certain Sellers and other entities. The parties have agreed to negotiate in good faith and use reasonable efforts expeditiously to refine the description of Included Services[2] and to agree certain Extra Services. The parties have agreed to an arbitration procedure to resolve any disputes regarding the services to be provided or the amount to be billed for such services.

---

[2] Included Services will exclude any portion of any service that has at no time on or after April 1, 2009 been provided by any North American Seller or any EMEA Seller (or any Affiliate of any of them) nor provided or procured by any North American Seller or any EMEA Seller (or any Affiliate of any of them) from a third party (the services within the General Scope of Services that have been provided either by such a North American Seller or any EMEA Seller (or any Affiliate of any of them) entity or by a third party at any time on or after April 1, 2009.

- 15 -

*Employees*

25.     As part of the Sale Agreement, the Purchaser has agreed to make offers to certain Nortel employees associated with the Enterprise Solutions Business. The Sale Agreement provides that the Purchaser shall be entitled to make offers of employment to such employees after the granting of the U.S. Sale Order and the Canadian Approval and Vesting Order as well as receipt of the Regulatory Approvals required under the Sale Agreement.

*Break Up Fee and Expense Reimbursement*

26.     The Purchaser and its advisors have expended, and expect to continue to expend, considerable time, energy, and resources pursuing the purchase of the Assets and the assumption and assignment of the Designated Agreements, and have engaged in extended good faith negotiations. The Purchase Agreements are the culmination of these efforts.

27.     In recognition of this expenditure of time, energy, and resources, the Sellers have agreed that if the Purchaser is not the Successful Bidder, the Sellers will, to the extent due under Section 9.2 of the Sale Agreement, pay to the Purchaser: (i) an aggregate cash fee equal to $14.25 million minus one-half of any Expense Reimbursement (as defined below) paid under the Sale Agreement (the "Break-Up Fee") and (ii) an aggregate amount in cash equal to the total amount of all reasonable and documented fees, costs and expenses incurred by the Purchaser in connection with the preparation, execution and performance of the Sale Agreement and the transactions contemplated thereby, including all filing and notification fees, and all fees and expenses of the Purchaser's representatives (the "Expense Reimbursement," and together with the Break-Up Fee, the "Bid Protections"), provided that the Expense Reimbursement will be capped at $9.5 million. The North American Sellers shall pay two-thirds (2/3) and the EMEA Debtors shall pay one-third (1/3) of each of the Break-Up Fee and the Expense Reimbursement. The North American Sellers' and the EMEA Debtors' obligations to pay their respective shares of the Break-Up Fee and the Expense Reimbursement pursuant to Section 9.2 of the Sale Agreement shall be several and not joint (but the obligation of the North American Sellers to pay two-thirds (2/3) of each of the Break-Up Fee and Expense Reimbursement shall be joint and several among the North American Sellers and the obligation of the EMEA Debtors to pay one-third (1/3) of each of the Break-Up Fee and Expense Reimbursement shall be joint and several among the EMEA Debtors).

28.    I believe, based on my discussions with the Monitor, that the Eighteenth Report will be providing more detail as to the circumstances in which the Bid Protections are payable as well as certain arrangements that have been agreed upon regarding allocation as between the Sellers.

29.    The Sellers have further agreed that their obligation to pay the Break-Up Fee and Expense Reimbursement shall survive termination of the Purchase Agreements.

*The Sale and Bid Process*

30.    In connection with having entered into the Purchase Agreements and subject to approvals by the U.S. Court and this Honourable Court, Nortel will conduct an auction process for the sale of the Assets to ensure that the Sellers receive the maximum value for the Assets and the Sellers and the Purchaser have agreed that the Sale Agreement is subject to higher or better offers. It is anticipated that in the next month, Nortel will conduct an expedited sale process and follow the Bidding Procedures (as defined below) with a view to the ultimate conduct of an auction.

31.    An agreed upon set of bidding procedures (the "Bidding Procedures") have been developed, which provide for a process through which an interested party may become a "Qualified Bidder". Bids from Qualified Bidders must be submitted no later than **12:00 p.m. (ET) on September 4, 2009.** The auction is scheduled to take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York City at **9:30 a.m. (ET) on September 11, 2009.**

32.    I am aware that the Eighteenth Report will attach and outline the proposed sale process and the Bidding Procedures in more detail. I have reviewed the Bidding Procedures and believe them to be fair in the circumstances.

**THE SIDE AGREEMENT**

33.    On June 9, 2009, the Applicants, the Chapter 11 Debtors and court-appointed administrators entered into an Interim Funding and Settlement Agreement (the "IFSA") providing for interim funding to be provided to NNL. The Side Agreement also contained terms governing certain intercompany matters, including the obligation of the parties to the IFSA to (a) negotiate in good faith and attempt to reach agreement on a timely basis on a protocol (the "Interim Sales Protocol") for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (each as defined in the IFSA), which Interim Sales Protocol shall provide

*40*

- 17 -

binding procedures for the allocation of Sale Proceeds where the relevant parties in such Sale Transaction have been unable to reach agreement regarding such allocation, and (b) following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol (failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds). On June 29, 2009, this Court entered an Order approving the IFSA.

34.    In connection with the Sale Agreement and the Bidding Procedures, and pursuant to the framework set out in the IFSA, the Sellers and court-appointed administrators entered into a Side Agreement on July 20, 2009 (the "Side Agreement"). I am aware that the Side Agreement will be attached as an appendix to the Eighteenth Report.

35.    The Side Agreement addresses a number of issues among the Sellers raised by their entry into the Sale Agreement, including:

(a)    Efforts to Complete the Stalking Horse Transaction. Each of the parties to the Side Agreement shall use their reasonable best efforts to cooperate with the Purchaser and with each other to complete the stalking horse transaction, including:

(i)    to inform each other of matters relating to the stalking horse transaction and each of the Purchase Agreements, and to facilitate the process required to obtain certain regulatory approvals;

(ii)    to defend all governmental actions challenging the stalking horse transaction; and

(iii)    to promptly inform each other of any material issue that may result in a breach by the Sellers under the Purchase Agreements.

(b)    Notice and Consultation. Each of NNL, NNI, NNUK and, to the extent applicable, the Joint Administrators and the Israeli Joint Administrators, will consult in good faith amongst themselves prior to (a) agreeing to materially amend or waive any provisions under the Purchase Agreements, or (b) consenting

41

- 18 -

to commencement of any Secondary Proceedings in relation to any EMEA Seller, or any bankruptcy proceedings relating to any Non-Debtor Sellers (as defined in the Side Agreement) or any company.

(c)   <u>Collection and Allocation of Total Proceeds</u>.  Any payments by the Purchaser to the Sellers shall be held in an escrow account.  These sale proceeds will be distributed in accordance with the Interim Sales Protocol.

(d)   <u>Allocation of Total Payments</u>.

   (i)   The Sellers have agreed that if the Purchaser is not the successful bidder, the Sellers will, to the extent due under, and subject to the terms of, the Purchase Agreements, pay to the Purchaser the Break-Up Fee and the Expense Reimbursement.

   (ii)   The parties have agreed that initially two-thirds of the Bid Protections will be paid by the North American Sellers and the remaining one-third will be paid by the EMEA Sellers.  Under the Side Agreement, the parties have agreed that each party to the Side Agreement will ultimately bear its pro-rata share of the Bid Protections based on each party's Agreed Respective Percentage (as defined in the Side Agreement).

   (iii)   In addition, if the payment of the Bid Protections is attributable to the actions or omissions of one or more of the parties to the Side Agreement, then such breaching parties will reimburse other non-breaching parties for Bid Protection payments.

(e)   <u>Alternative Transaction</u>.  If the parties to the Side Agreement enter into an alternative transaction in accordance with the Bid Procedures, the relevant provisions of the Side Agreement shall apply to such an alternative transaction, *mutatis mutandis*.

36.   The Side Agreement (other than Sections 2.4 and 2.5) also provides that it is subject to the rights of each party to exercise its fiduciary duties, the statutory duties or the legal

obligations of the court-appointed administrators in relation to the exercise of their duties or functions as administrators of certain parties.

*Sealing*

37.     I am aware that the Monitor has or will be filing a confidential appendix to the Eighteenth Report which contains the disclosure schedules and exhibits to the Sale Agreement.   These disclosure schedules and exhibits contain sensitive competitive and, in some instances, personal information. I believe sealing this confidential appendix is appropriate in the circumstances.

**CONCLUSION**

38.     I believe that the Sale Agreement is the product of a vigorous, comprehensive and fair process.  The proposed auction sale process for the Enterprise Solutions Business, based on the Sale Agreement as a stalking horse bid, is the best way to preserve the business as a going concern and to maximize value and preserve as many jobs as possible for the Applicants' employees.   I further believe that exploration of the sale of the other businesses as a going concern through this process will provide the greatest chances for further value maximization and job preservation.

39.     Based on the Applicants' previous consideration of potential transactions involving the Enterprise Solutions Business and after re-canvassing the marketplace since the commencement of these proceedings, I believe that the proposed transaction with the Purchaser represents the highest and best proposal available for the Enterprise Solutions Business, subject to the receipt of a better bid through the auction process contemplated in this motion.

40.     The Sale Agreement requires an expeditious sale process and provides the Purchaser the right to terminate the Sale Agreement if certain milestones in the sale process are not timely met. For these reasons, the expeditious sale of the Assets is critical to the maximization of the value of the Applicants' assets and, in turn, to a recovery for the Applicants' estates.

43

- 20 -

SWORN BEFORE ME at the City of
~~Boston~~, in the State of Massachusetts
on this 30th day of July, 2009.

WESTON

_(signature)_

Commissioner for Taking Affidavits or
Notary Public   M. Elizabeth Nolan

My Commission expires: 2/15/2013
Notary Public.

_(signature)_
George Riedel

44

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

AFFIDAVIT OF GEORGE RIEDEL
(sworn July 30, 2009)

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

**TAB 3**

45

Court File No.:  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | TUESDAY, THE 4TH |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF AUGUST, 2009 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**ORDER**
**(Enterprise Solutions Business Bidding Procedures Order)**

**THIS MOTION**, made by Nortel Networks Corporation ("NNC"), Nortel Networks

Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global

Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for

the relief set out in the Applicants' notice of motion dated July 29, 2009 was heard this day at

393 University Avenue, Toronto, Ontario.

**ON READING** the affidavit of George Riedel sworn July 30, 2009 (the "Riedel Affidavit") and the eighteenth report of Ernst & Young Inc. dated July ●, 2009 (the "Eighteenth Report") in its capacity as monitor (the "Monitor") and on hearing submissions of counsel for the Applicants, the Monitor and those other parties present, no one appearing for any other person on the service list, although served as appears from the Affidavit of Service of Michael Kotrly sworn July 30, 2009, filed.

1.      **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the Eighteenth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Riedel Affidavit.

3.      **THIS COURT ORDERS** that the bidding procedures (the "Bidding Procedures") described in the Riedel Affidavit, the Eighteenth Report and attached as Schedule "A" hereto are hereby approved and, subject to approval of the Bidding Procedures substantially in the same form by the United States Bankruptcy Court for the District of Delaware in the Chapter 11 Proceedings of the Chapter 11 Debtors, the Applicants shall be authorized to conduct the sale process and auction (the "Stalking Horse Process") contemplated therein.

4.      **THIS COURT ORDERS** that the asset and share sale agreement dated as of July 20, 2009 (the "Stalking Horse ASSA") among NNC, NNL, Nortel Networks Inc. and their affiliates, as sellers and Avaya Inc., as purchaser (the "Purchaser") attached as an exhibit to the Eighteenth Report be and is hereby approved and the execution, delivery and performance of the Stalking Horse ASSA is hereby approved and accepted for the purposes of conducting the Stalking Horse

Process including, without limitation, payment of the Break-Up Fee and the Expense Reimbursement by NNC and NNL in accordance with the terms specified in the Stalking Horse ASSA.

5.    **THIS COURT ORDERS** that in connection with the Stalking Horse Process and pursuant to clause 7(3)(c) of the Canada *Personal Information Protection and Electronic Documents Act,* the Applicants shall disclose personal information of identifiable individuals to prospective purchasers or bidders for the assets and/or shares to be sold pursuant to the Stalking Horse Process and to their advisors, but only to the extent desirable or required to negotiate and attempt to complete one or more sales of the Business (each, a "Sale"). Each prospective purchaser or bidder to whom such personal information is disclosed shall maintain and protect the privacy of such information and limit the use of such information to its evaluation of the Sale, and if it does not complete a Sale, shall return all such information to the Applicants, or in the alternative destroy all such information. The purchaser of any assets or shares associated with the Business shall be entitled to continue to use the personal information provided to it in a manner which is in all material respects identical to the prior use of such information by the Applicants, and shall return all other personal information to the Applicants, or ensure that all other personal information is destroyed.

6.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be

48

- 4 -

necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

7.     **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

_____

49

- 5 -

### Schedule "A" – Bidding Procedures

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities (the "Sale") as set forth in the Purchase Agreements (as defined below) with respect to the Purchaser, or, as set forth in the relevant sale agreements with respect to a Successful Bidder (as defined below). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement (as defined below).

On January 14, 2009, Nortel Networks Inc. and certain of its U.S. subsidiaries that are debtors and debtors-in-possession (collectively, the "U.S. Debtors") as well as Nortel Networks Limited and certain other affiliates of the U.S. Debtors that have commenced proceedings under the Canadian Companies' Creditors Arrangement Act (the "Canadian Debtors"), and certain non-debtor affiliates of the U.S. Debtors and the Canadian Debtors (together with the U.S. Debtors and the Canadian Debtors, the "North American Sellers") executed that certain Asset and Share Sale Agreement (the "Agreement") with Avaya Inc. (together with any of its designees, the "Purchaser").

On January 14, 2009, certain other affiliates of the North American Sellers (the "EMEA Sellers" and together with the North American Sellers, the "Sellers"), certain of which are in administration proceedings in which Alan Bloom, Stephen Harris, Chris Hill, Alan Hudson and David Hughes of Ernst & Young LLP, have been appointed as the joint administrators of those EMEA Sellers by the English High Court of Justice in connection with the proceedings (the "UK Proceedings") under the Insolvency Act 1986 (such individuals collectively, the "Administrators"), and the Administrators executed that certain Asset Sale Agreement relating to the sale and purchase of the EMEA Assets with the Purchaser (the "EMEA Agreement" and together with the Agreement, the "Purchase Agreements").

The Sellers have determined that: (A) the transactions contemplated by the Purchase Agreements and the ancillary agreements discussed therein with respect to the Purchaser, or, as set forth in the relevant sale agreements and ancillary agreements with respect to a Successful Bidder, (collectively, the "Transaction") should be subject to competitive bidding as set forth herein; (B) the transfer of the U.S. Debtors' rights, title and interests in and to the Assets (as defined below) should be subject to approval by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to Sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"); (C) the transfer of the rights, title and interests of the Canadian Debtors (as such term is defined in the Agreement) in and to the Assets should be subject to approval by the Ontario Superior Court of Justice (the "Canadian Court"); and (D) the Transaction shall be subject to approval by such other applicable court(s) as the Sellers, in consultation with the Committee (as defined below), the Bondholder Group (as defined below) and the Monitor (as defined below), may reasonably determine in good faith is legally required and certain other closing conditions as set forth in the Purchase Agreements.

On July 20, 2009, the U.S. Debtors filed a Motion for Orders (I)(A) Authorizing Debtors' Entry into the Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing

50

- 6 -

the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of, and Equity Interests in, Debtors' Enterprise Solutions Business, (B) the Assumption and Assignment of Certain Contracts and Leases and (C) the Assumption and Sublease of Certain Leases (the "Sale Motion").

On [●], 2009, the Bankruptcy Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Bidding Procedures Order").

On [●], 2009, the Canadian Debtors filed a motion with the Canadian Court seeking an order for approval of (I) execution and delivery of the Agreement by the Canadian Debtors, (II) payment of the Break-Up Fee and Expense Reimbursement in the circumstances provided for in the Agreement, and (III) a process for the Sale of the Canadian Debtors' rights, title and interests in and to the Assets (as defined below).

On [●], 2009, the Canadian Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Canadian Sales Process Order").

Bidding Process

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's and the Canadian Court's and, if required, such other applicable courts' approval thereof (collectively, the "Bidding Process"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., et al. (Case No. 09-10138) involving the U.S. Debtors (the "Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor"), the Administrators in connection with the UK Proceedings, and their respective advisors throughout the Bidding Process. In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, the Bankruptcy Court and the Canadian Court will have jurisdiction to hear and resolve such dispute.[i]

Assets To Be Sold

The Sellers are offering for sale, in one or more transactions, certain of the Sellers' assets (including the stock of certain subsidiaries of the Sellers) pertaining to the business segments

---

[i] For the avoidance of doubt, this Bidding Process shall not govern any disagreements among the Sellers.

described in the Purchase Agreements with respect to the Purchaser, or, as set forth in the relevant sale agreements with respect to a Successful Bidder, and related schedules and in an information memorandum made available by the Sellers to the Purchaser and other potential bidders, which will also be made available to other prospective purchasers that have executed a confidentiality agreement with the Sellers (the "Assets").

"As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except, with respect to the Purchaser, to the extent set forth in the Purchase Agreements or, with respect to a Successful Bidder (as defined below), to the extent set forth in the relevant sale agreements of such Successful Bidder. In addition, in the case of the EMEA Sellers, the sale of whatever rights, title and interests that such EMEA Seller may have (if any) in and to the Assets will be on an "as-is" basis and will be without any representations or warranties.

Free Of Any And All Claims And Interests

All of the rights, title and interests of the U.S. Debtors and the Canadian Debtors in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests") pursuant to sections 363 and 365 of the Bankruptcy Code, such Claims and Interests to attach to the net proceeds of the sale of such Assets (without prejudice to any claims or causes of action regarding the priority, validity or enforceability thereof), except, with respect to the Purchaser, to the extent otherwise set forth in the Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant sale agreement of such Successful Bidder with the U.S. Debtors and the Canadian Debtors.

Publication Notice

As soon as reasonably practicable after entry of orders by the Bankruptcy Court and the Canadian Court approving these Bidding Procedures, but in any event no more than three (3) Business Days after the entry of such orders, the Sellers shall publish notice of these Bidding Procedures, the time and place of the Auction (as defined below), if required, the time and place of the Sale Hearing (as defined below), and the objection deadline for the Sale Hearing in The Wall Street Journal (National Edition), The Globe & Mail (National Edition) and The Financial Times (International Edition).

Participation Requirements

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court and accepted by the Administrators, for cause shown or, with regard to paragraphs (b) and (c) below, as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), prior to the Bid Deadline (as defined below), in order to participate in the Bidding Process, each person, other than the Purchaser, who wishes to participate in the

52

- 8 -

Bidding Process (a "Potential Bidder") must deliver to the Notice Parties (as defined below) at the addresses provided below:

(a)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, that shall not be on terms that, in the Sellers' reasonable judgment, are more favorable to the Potential Bidder than the confidentiality agreement executed by the Purchaser and which shall inure to the benefit of any purchaser of the Assets (in the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets and waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transaction it may enter into, to the Notice Parties (as defined below));

(b)    current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transaction; and

(c)    a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Purchase Agreements.

A Potential Bidder that delivers the documents described above, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability

of financing, experience and other considerations) to be able to consummate the Transaction will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence as provided in the following paragraph with respect to the Assets.

### Due Diligence

The Sellers may in their reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a confidentiality agreement with the Sellers such due diligence access to materials and information relating to the Assets as the Sellers deem appropriate after consultation with the Committee, the Bondholder Group and the Monitor. Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their reasonable business judgment, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. No additional due diligence for any party other than a Qualified Bidder who has submitted a Qualified Bid will continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate due diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. In any event, the Purchaser shall be provided prompt access to all material due diligence materials, management presentations, on site inspections and other information provided to Qualified Bidders that were not previously made available to the Purchaser. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Purchase Agreements or any other definitive sale agreements with any Successful Bidder executed and delivered by Sellers.

### Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Gordon A. Davies, Esq., Chief Legal Officer, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905) 863-8386; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (v)

counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vi) financial advisor to the Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (vii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; (viii) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; (ix) the Administrators: Ernst & Young LLP, Attn: Stephen Harris, 1 More Place, London SE1 2AF, United Kingdom, Facsimile +44 20 7951 9002; and (x) counsel to the Administrators: Herbert Smith LLP, Attn: Stephen Gale, Exchange House, Primrose Street, London, EC2A 2HS, Facsimile: +44 20 7098 4878; so as to be received not later than September 4, 2009 at 12:00 pm (Eastern) by the Sellers (the "Bid Deadline").

Qualified Bid

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(a)      it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Purchase Agreements, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or upon alternative terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholders Committee and the Monitor, are no less favorable than the terms and conditions of the Purchase Agreements;

(b)      it includes a letter stating that the bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), provided that if such bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, 180 days from the later of the Sale Hearing and the entry of the Sale Order and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)      it includes duly authorized and executed Purchase Agreements (as modified by the bidder to reflect the terms and conditions of its bid), including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, including, to the extent required by the terms and conditions of such bid, the Local Sale Agreements, the Real Estate Agreements, the Intellectual Property License Agreement, the Transition Services Agreement, the Trademark License Agreement, the Loaned Employee Agreement (each as defined in the Agreement and each as modified by the bidder to reflect the terms and conditions of its bid), the other ancillary agreements as described in the Purchase Agreements and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and

55

- 11 -

modifications to the Purchase Agreements ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the bidder;

(d)     it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(e)     it is not conditioned on (i) the outcome of unperformed due diligence by the bidder (and includes an acknowledgement and representation that the bidder has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer) and/or (ii) obtaining financing;

(f)     it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(g)     it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Purchase Agreements, plus (i) the amount of the Break-Up Fee and Expense Reimbursement (each as defined in the Purchase Agreements), plus (ii) U.S. $4.75 million.

(h)     it includes an acknowledgment and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreements (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)     it includes an acknowledgement and representation that the bidder: (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; and (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (iii) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)      it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(k)      it is accompanied by a good faith deposit (each, together with the good faith deposit of the Purchaser, a "Good Faith Deposit") in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to $30 million to be dealt with as provided for under "Good Faith Deposit" herein;

(l)      it (a) contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction(s)) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment and associated with the employment of all employees who will become employees of the Qualified Bidder, and (b) identifies any pension liabilities and assets related to any employees currently covered under any Nortel registered pension or retirement income plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m)      it includes evidence of the Potential Bidder's ability to comply with Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)      it contains other information reasonably requested by the Sellers; and

(o)      it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids, provided that the Sellers in evaluating such bids, may not waive substantial compliance with any items in paragraphs (b), (d), (e), (f), (i), (j), (k), (l), (m), (n), and (o) without the consent of the Purchaser, the Committee, the Bondholder Group and the Monitor, and such consent shall not be unreasonably withheld in connection with any bid that (1) would otherwise fully satisfy the requirements of a Qualified Bid hereunder but for a de minimis failure to comply with paragraphs (b), (d), (e), (f), (i), (j), (k), (l), (m), (n), or (o) and (2) such noncompliance is cured within 24 hours of the Bid Deadline. Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Purchase Agreements will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction and the Sale.

The Sellers shall deliver copies of any bids deemed to be Qualified Bids to Purchaser in accordance with section 5.1(c) of the Agreement, and notify the Purchaser and all Qualified

Bidders in writing as to whether or not any bids constitute Qualified Bids no later than three (3) days following the expiration of the Bid Deadline.

<u>Aggregate Bids</u>

The Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; <u>provided</u> that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

<u>Evaluation of Competing Bids</u>

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Transaction (including any regulatory approvals required to close the Transaction), the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction(s)) to be offered post-closing employment by the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment of all employees who will become the employees of the Qualified Bidder, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

<u>No Qualified Bids</u>

If the Sellers do not receive any Qualified Bids other than the Purchase Agreements received from the Purchaser, the Auction shall be cancelled and the U.S. Debtors shall report the same to the Bankruptcy Court, the Canadian Debtors shall report the same to the Canadian Court and the Monitor and subject to requiring and obtaining approvals of the Bankruptcy Court, the Canadian Court or any other applicable court and satisfaction of the conditions set forth in the Purchase Agreements, the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Purchase Agreements. In addition, if no Qualified Bid is received, the U.S. Debtors reserve the right to request that the Bankruptcy Court advance the date of the Sale Hearing (as defined below) and provide notice of such new date to those parties in interest entitled to notice thereof and the Canadian Debtors reserve the right to file a motion with the Canadian Court seeking the approval of the sale of the Canadian Debtors' rights, title and interests in and to the Assets to the Purchaser. In addition, if approval of any other applicable court is required, the Sellers will as soon as practicable file an appropriate pleading with such court(s) seeking approval of the Transaction.

<u>Break-Up Fee and Expense Reimbursement</u>

Recognizing the value and benefits that Purchaser has provided to the U.S. Debtors and the other Sellers by entering into the Purchase Agreements, as well as the Purchaser's

expenditure of time, energy and resources, the Sellers have agreed that the Purchaser is entitled to a Break-Up Fee and Expense Reimbursement in amounts and under the circumstances set forth in the Purchase Agreements and as set forth in the Bidding Procedures Order and the Canadian Sales Process Order.

## Auction

If the Sellers receive one or more Qualified Bids in addition to the Purchase Agreements, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at 9:30 a.m. on September 11, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned without the prior written consent of the Purchaser, subject to the terms of the Purchase Agreements and the Bidding Procedures Order. Copies of all Qualified Bids shall be delivered to the Committee, the Bondholder Group, the Monitor, the Administrators and the Purchaser at such time that such bid is deemed a Qualified Bid but no later than two (2) Business Days prior to the Auction. The Auction shall run in accordance with the following procedures:

(a)     Only the Sellers, the Purchaser, the Committee, the Bondholder Group, the Monitor and the Administrators (and the advisors to each of the foregoing), any creditor of the North American Sellers and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)     Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(c)     At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date. At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders.

(d)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(e)    The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(f)    Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least U.S. $2.375 million over the Starting Bid or the Leading Bid, as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the Purchase Agreements as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

<u>Selection Of Successful Bid</u>

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid that is either the Leading Bid or submitted subsequent to and as an improvement to the submission of the Leading Bid (except in the event that there is no Leading Bid, in which case the Qualified Bids to be considered will be the Starting Bid and any bids submitted subsequent and as an improvement to the Starting Bid) on the basis of financial and contractual terms and the factors relevant to the sale process, including, among other things, the proposed revisions to the transaction documents, the effect of the Sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), the counterparties to such transactions, the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, other factors affecting the speed, certainty and value of the Sale (including any regulatory approvals required to close the Transaction), the Assets included or excluded from the bid, the estimated number of in-scope employees of the

Sellers to be offered post-closing employment by the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by the Canadian Court and any required approvals of any other applicable court(s) with such Successful Bidder and approval and execution by the Administrators of the relevant Successful Bid transaction documents with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

Sale Hearing

The sale hearing to authorize certain of the Sellers to enter into agreements with respect to the Successful Bid (the "Sale Hearing") will be held, in respect of those Sellers that are U.S. Debtors, before the Honorable Judge Kevin Gross (or any substitute therefor) in the United States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as September 15, 2009 at 9 a.m. (Eastern), and, in respect of those Sellers that are Canadian Debtors, before the Honourable Mr. Justice Geoffrey B. Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto, Ontario, and in any other applicable court(s) whose approval is required, as soon as practicable following the date of the Sale Hearing (or, with respect to the Canadian Court, in a joint hearing with the Bankruptcy Court at the Sale Hearing). The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing. If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Sellers shall proceed as set forth in the "No Qualified Bids" section above. If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is legally required, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance

will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval is legally required. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court. The Alternate Bid shall remain open until the earlier of (a) eleven (11) days following the entry of the Sale Order or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date"). All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

## Good Faith Deposits

The Good Faith Deposit of any Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within five (5) Business Days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within five (5) Business Days of the date of the selection of the Successful Bidder and the Alternate Bidder. The Good Faith Deposit of the Successful Bidder will be applied in accordance with the terms of the Successful Bid, and, except in the case of the Purchaser, where the Purchaser's Good Faith Deposit shall be governed by the terms and conditions of the Purchase Agreements, will become nonrefundable upon the approval by the Bankruptcy Court and the Canadian Court of the Sale to the Successful Bidder.

## Reservation Of Rights

The Sellers, after consultation with their advisors, the Committee, the Bondholder Group and the Monitor, and their respective advisors, (a) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof, except that a Qualified Bid not selected as a Starting Bid or Leading Bid cannot subsequently be determined to be higher or better than the Starting Bid or Leading Bid, as applicable; and (b) may reject, at any time, any bid (other than the Purchaser's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, any orders of the Canadian Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, or (iv) contrary to the statutory duties or legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers.

Notwithstanding any of the foregoing, or anything else contained herein, however, the Sellers may not, without prior written consent of the Committee, the Bondholder Group and the Monitor, which consent may not be unreasonably withheld, (i) extend the deadlines set forth in the Auction procedures for more than three (3) Business Days, (ii) adjourn the Auction for more

62

than three (3) Business Days, or (iii) adjourn the Sale Hearing for more than three (3) Business Days if the Auction has concluded.

For the purposes of these Bidding Procedures and all matters relating to them, the Administrators are acting only as agents for and on behalf of the EMEA Sellers that are controlled by the Administrators pursuant to the UK Proceedings and without personal liability. Notwithstanding the foregoing and subject to the following paragraph, the Sellers may not, without the prior written consent of the Purchaser, impair or modify the Purchaser's rights and obligations under the Purchase Agreements or the Purchaser's right to credit the Break-Up Fee and the Expense Reimbursement as part of any subsequent bids (except as specifically set forth herein).

The entirety of the Bidding Procedures are subject to the rights of the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, to revoke these Bidding Procedures, the Bidding Process or the Auction at any time to satisfy their fiduciary duties or the statutory duties or the legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers, provided that such revocation will result in a breach of the Purchase Agreements entitling the Purchaser to such rights as are set forth in the Purchase Agreements in respect of such breach.

63

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**ORDER**
**(Enterprise Services Bidding Procedures Order)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

**TAB 4**

64

Court File No.: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | TUESDAY, THE 4TH |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF AUGUST, 2009 |

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**ORDER**
**(Side Agreement and Sealing Order)**

**THIS MOTION**, made by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for the relief set out in the Applicants' notice of motion dated July 29, 2009 was heard this day at 393 University Avenue, Toronto, Ontario.

- 2 -

**ON READING** the affidavit of George Riedel sworn July 30, 2009 (the "Riedel Affidavit") and the eighteenth report of Ernst & Young Inc. dated July ●, 2009 (the "Eighteenth Report") in its capacity as monitor (the "Monitor") and on hearing submissions of counsel for the Applicants, the Monitor and those other parties present, no one appearing for any other person on the service list, although served as appears from the Affidavit of Service of Michael Kotrly sworn July 30, 2009, filed.

1.    **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the Eighteenth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.    **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Riedel Affidavit.

3.    **THIS COURT ORDERS** that the Side Agreement dated as of July 20, 2009 among the Sellers and court-appointed administrators attached as an appendix to the Eighteenth Report is hereby approved.

4.    **THIS COURT ORDERS** that the confidential appendix to the Eighteenth Report be and is hereby sealed pending further order of this Court.

5.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be

66

- 3 -

necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

6.     **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

_____

67

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**ORDER**
**(Side Agreement and Sealing Order)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Applicants

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**MOTION RECORD**
**(returnable August 4, 2009)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4
CANADA

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 1758916\1