# EXHIBIT A

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION (the "Applicants")**

**EIGHTEENTH REPORT OF THE MONITOR**
**DATED JULY 31, 2009**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date") Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited
    ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks
    International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC")
    (collectively the "Applicants") filed for and obtained protection under the *Companies'*
    *Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court
    dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc.
    ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA
    proceeding. The stay of proceedings was extended to October 30, 2009 by this
    Honourable Court in its Order dated July 30, 2009.

- 2 -

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the U.S. Court on January 14, 2009.

3.  Nortel Networks (CALA) Inc. ("NCI") (together with NNI and certain of its subsidiaries filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009. As required by U.S. law, an official unsecured creditors committee ("UCC") was established in January, 2009. In addition, an ad hoc group of holders of bonds issued by NNL and NNC (the "Bondholders' Committee") has been organized and is participating in these proceedings as well as those in the U.S..

4.  Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court") on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "U.K. Administrators").

5.  On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel (the "Joint Israeli Administrators") and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

6.  Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France

- 3 -

pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court.

**PURPOSE**

7.    The purpose of this Eighteenth Report of the Monitor ("Eighteenth Report") is to provide this Honourable Court with information regarding the Applicants' motion seeking approval of:

- an asset and share sale agreement dated July 20, 2009 (the "Avaya Agreement") amongst NNC, NNL and NNI (the "Main Sellers") and certain of their affiliates (the "Other Sellers"), Avaya Inc. ("Avaya" or the "Purchaser") and, for the purposes of certain provisions only, certain of the EMEA Debtors, NN Israel and certain affiliates of the EMEA Debtors (collectively, the "EMEA Sellers") in respect of the sale of the Enterprise Solutions business (the "Business") as a "stalking horse" agreement;

- a sealing order in respect of the exhibits and schedules to the Avaya Agreement for the reasons set out below;

- the Bidding Procedures (as defined below);

- the terms and conditions of the Break-Up Fee and Expense Reimbursement (as defined below);

- the Side Agreement (as defined below) amongst the Main Sellers and the EMEA Sellers; and

- to provide the Monitor's support thereof.

- 4 -

**TERMS OF REFERENCE**

8.  In preparing this Eighteenth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. EYI has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Report.

9.  Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

10. Capitalized terms not defined in this Eighteenth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor, the Bidding Procedures or in the Avaya Agreement.

**GENERAL BACKGROUND**

11. Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

12. As at June 30, 2009, Nortel conducts its global business through four reportable business unit segments, Carrier Networks ("CN"), Enterprise Solutions ("ES"), Metro Ethernet Networks ("MEN") and LG Nortel Co. Ltd. ("LGN"). The revenue and assets of each of the business units, except for LGN, is distributed among the multiple Nortel legal entities and joint ventures around the world.

- 5 -

13.   The Monitor has made various materials relating to the CCAA proceedings available on its
      website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to
      Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings
      under Chapter 11 of the Code are posted.

**THE ENTERPRISE SOLUTIONS BUSINESS**

*Background*

14.   The Business is not operated through a dedicated legal entity or stand-alone division.
      Generally, Nortel has one legal entity in each country in which it operates and sales of all
      Nortel products in that country are made through the single legal entity.  A more detailed
      description of this structure is set out in the Pre-Filing Report.

15.   The Business addresses the communication needs of large and small businesses across
      various industries by providing products and services that integrate voice, email,
      conferencing, video and instant messaging.  The ES portfolio includes products spanning
      Unified Communications, Ethernet routing and multiservice switching, IP and digital
      telephony (including phones), wireless LANs, security, IP and SIP contact centres, self-
      service solutions, messaging, conferencing and SIP-based multimedia solutions.

16.   Competitors to the Business include Cisco, Avaya, Alcatel-Lucent, Siemens Enterprise
      Communications, NEC and others.

17.   The Business operates globally in approximately 121 countries.  It has an installed base
      with over 75 million voice lines and 75 million data ports.  Fiscal 2008 revenues were
      $2.8 billion representing approximately 27% of Nortel's 2008 revenues.

18.   Fiscal 2008 revenues in Canada were $183 million representing approximately 26% of
      Nortel's 2008 Canadian revenue.

19.   In addition, the Applicants have an interest in the intellectual property upon which the
      products of the Business are based.  Generally speaking, the owner of the intellectual

- 6 -

property in the Nortel group, which in most cases is NNL, licenses the intellectual property in question to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. These Nortel entities in turn license the intellectual property related to the Business to customers in their respective geographic regions.

20.    The Business currently employs approximately 7,800 full time equivalents. This includes individuals directly involved in the Business as well as individuals in other Nortel functional areas and corporate departments that are dedicated to the Business. Of the 7,800 employees dedicated to the Business, approximately 1,040 are located in Canada. The majority of the remaining employees are located in the United States, the U.K., India and Ireland with the balance located in 47 other countries. Generally, these individuals are employed by the Nortel legal entity established in the country in which they work.

21.    The environment in which the Business operates is highly competitive. To effectively compete in the industry, parties must continue to make significant investments in research and development as well as in building sales and marketing infrastructures. Given Nortel's limited available financial resources, management determined in 2008 that the value of the Business would best be maximized through a sale to a buyer who can leverage its own existing customer relationships and the acquired customer relationships as well as continue to make the necessary investments in technology. As a result, in late 2008, Nortel began to explore the potential sale of the Business.

*Initial Sale Process*

22.    Prior to commencing insolvency proceedings, as discussed in the Affidavit of George Riedel dated July 30, 2009, Nortel contacted eight parties including one financial investor and seven strategic buyers. Expressions of interest were received from six of these parties. Three of these parties participated in management presentations and due diligence sessions and ultimately, two of these parties submitted non-binding proposals. However, as a result of the commencement of the insolvency proceedings on January 14, 2009, the process was subsequently put on hold.

- 7 -

*Post-filing Sale Process*

23.   In March, 2009, Nortel recommenced efforts to market the Business. With the assistance
      of Lazard Frères & Co., the Company approached ten parties including all of the parties
      that had previously indicated interest in acquiring the Business. Upon execution of a
      confidentiality agreement, each of the ten parties were provided access to confidential
      information relating to the Business via an electronic data room ("EDR") and were invited
      to attend in person information sessions with management of the Business.

24.   Eight parties participated in management presentations commencing March 16, 2009. In
      addition, the Company received and responded to numerous information requests from
      these parties.

25.   Four parties submitted proposals to acquire the Business. The Company determined that
      three of these proposals were viable and proceeded to engage in extensive negotiations
      with these three parties in parallel. These negotiations culminated with Nortel entering
      into an agreement with Avaya as described below.

26.   The Monitor has had extensive involvement in the post-filing sale process including
      attending and participating in the management presentations and negotiations with
      prospective buyers described above, performing its own review of materials submitted by
      prospective purchasers including the Avaya Agreement and providing input to the
      Company with respect to these matters.

**THE AVAYA AGREEMENT**

27.   On July 20, 2009, the Main Sellers and the Other Sellers (collectively, the "Sellers") and
      for the purposes of certain provisions only, the EMEA Sellers entered into the Avaya
      Agreement with the Purchaser. Concurrently, the EMEA Sellers entered into a separate
      Asset Sale Agreement (the "EMEA ASA") with Avaya dated July 20, 2009. Collectively,
      the Avaya Agreement and EMEA ASA outline the terms of the Sellers' and the EMEA
      Sellers' sale of the assets and certain associated liabilities of the Business to Avaya. The

- 8 -

Avaya Agreement (without Exhibits or Schedules) is attached as Appendix "A". A copy of the exhibits and schedules to the Avaya Agreement are attached as confidential Appendix "B" hereto. As these exhibits and schedules contain sensitive competitive information as well as personal information with respect to employees, the Monitor requests that confidential Appendix "B" to this Eighteenth Report be sealed by this Honourable Court.

28.    Avaya provides enterprise communications systems including unified communications, contact centers and related services to businesses around the world. Avaya is a privately held company owned by funds associated with Silver Lake Partners and TPG Capital.

29.    A summary of the key provisions of the Avaya Agreement is provided in the paragraphs that follow. Reference should be made directly to the Avaya Agreement, a copy of which is attached as Appendix "A" hereto, for a complete understanding of the terms governing the transaction.

30.    Assets and Shares. The assets and shares of the Sellers relating to the Business being sold are as follows (collectively, the "Purchased Assets"):

- the Owned Inventory including supplies as of the Closing Date;

- the Owned Equipment as of the Closing Date;

- the Owned Real Estate, to the extent that the Purchaser elects to purchase it within forty-five days of the date of the Avaya Agreement;

- the Assigned Contracts in force as of the Closing Date and prepaid expenses of the Sellers thereunder;

- the Business Information existing as of the Closing Date, subject to applicable confidentiality restrictions;

- i) the Transferred Intellectual Property as of the Closing Date, subject to any and all licenses granted under such Intellectual Property prior to the Closing

- 9 -

Date, ii) subject to certain exceptions, all income, royalties, damages and payments due or payable after the Closing Date relating to the Transferred Intellectual Property, (iii) the right, if any, to register, prosecute, maintain and defend the Transferred Intellectual Property before any public or private agency or registrar; and (iv) the right to sue and recover damages or other compensation for past or future infringements or misappropriations of the Transferred Intellectual Property, the right to sue and obtain equitable relief in respect of such infringements or misappropriations and the right to fully and entirely stand in the place of the Sellers and their subsidiaries in all matters related thereto;

- all trust funds or other entities holding assets that consist of contributions made by Transferred Employees, or by the Sellers on behalf of the Transferred Employees, that are intended to fund any obligation owed to any Transferred Employee under any Transferred Employee Plans;

- all Consents of Government Entities used by the Sellers primarily in the Business to the extent assignable under applicable law;

- all rights of the Sellers under non-disclosure, confidentiality, non-compete and non-solicitation agreements that are Assigned Contracts at the Closing Date or relate to the Business, the U.S. Bidding Procedures Order, the Canadian Sales Process Order, the Shares or the Purchased Assets (subject to certain limitations);

- all avoidance actions and similar rights and causes of action, including causes of action under Sections 544 through 553 of the Code, against the Purchaser or any of the Purchaser's affiliates;

- all past and present goodwill of that portion of the Business which is symbolized by the Trademarks included in the Transferred Intellectual Property;

- 10 -

- all rights as of the Closing Date in connection with any Seller Bid made prior to the Closing Date by the Sellers which is capable of acceptance after the Closing, and if accepted, would result in the award of a Direct Customer Contract that (if entered into after the date of the Avaya Agreement and prior to the Closing Date) would be an Assigned Contract or to which the Purchaser has provided its prior written consent;

- all rights as of the Closing Date under all warranties, representations and guarantees made by suppliers, manufacturers, contractors, and third parties to the extent related to the Purchased Assets described above;

- any rights, claims, causes of action against third parties, to the extent not asserted by any Seller prior to the Closing Date that relate to any of the foregoing;

- any net insurance proceeds received or to be received in respect of Owned Equipment or the improvements or leasehold improvements at the Included Real Estate to the extent payable by the Purchaser; and

- the shares of DiamondWare, Ltd. ("DiamondWare") and Nortel Government Solutions Incorporated together with its two subsidiaries, Integrated Technology Corporation and AC Technologies, Inc. (collectively, "NGS").

31.    The Purchased Assets to be acquired by the Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable, bank account balances and petty cash of the Sellers, certain rights relating to the pre-closing period, security deposits provided by the Sellers to their contractual counterparties, any assets owned by certain joint ventures of the Sellers (NN Turkey, LGN and Uni-Nortel) or certain foreign subsidiaries of NNL or NNI that the Purchaser can elect after signing not to purchase (without adjustments to the purchase price), and any shares owned by the Sellers in any entity (including joint ventures) other than the shares of NGS and DiamondWare.

- 11 -

32.  Purchase Price. The Base Purchase Price is $475 million plus the Purchaser's obligation to pay, perform and discharge the Assumed Liabilities and the EMEA Assumed Liabilities. On the Closing Date, the Purchaser will pay to the Sellers the Estimated Purchase Price calculated and adjusted as follows:

- The Base Purchase Price
  - o minus:
    - the Estimated Closing Inventory Adjustment;
    - the Estimated Closing Accrued Vacation Amount;
    - the Estimated Closing Retirement Obligation Amount;
    - the Estimated Closing Net Debt Adjustment (relating to net debt of DiamondWare and NGS);
    - the Estimated Adjustment Payment (depending on the difference between the unaudited 2008 standard margin of the Business communicated to the Purchaser and the audited number subsequently calculated);
    - the Estimated Closing EMEA Downward Adjustment (relating to certain EMEA subsidiaries in bankruptcy proceedings that elect not to participate in the transaction governed by the EMEA ASA);
    - the Estimated Closing EMEA Holiday Adjustment;
  - o plus:
    - the difference (whether positive or negative) of the Estimated Closing DiamondWare and NGS Net Working Capital minus the Target Closing DiamondWare and NGS Net Working Capital of $16.1 million;
  - o minus the Escrow Amount (as described below);
  - o plus the Delay Fee (as described below), if any.

33.  After the Closing, the Estimated Purchase Price will be further adjusted based on differences between the estimated and final amounts of the various adjustments listed above. The process to determine these post-Closing adjustments, and therefore the final Purchase Price, is described in paragraphs 37 to 39 below.

34.  The Purchaser has delivered a Good Faith Deposit of $100 million in cash which amount is being held by Wells Fargo Bank, National Association, as escrow agent (the "Escrow Agent"). The Good Faith Deposit plus actual earnings will be: (i) applied to the Estimated

- 12 -

Purchase Price on Closing; or (ii) applied to the Reverse Termination Fee (as described below) or damages payable to the Sellers or EMEA Sellers. The Purchaser may, at any time prior to Closing, substitute the cash provided to the Escrow Agent with one or more letters of credit in the form agreed with the Sellers.

35.    NNL, NNI, NNUK and the Purchaser have entered into the Escrow Agreement with the Escrow Agent pursuant to which the following escrow amounts (collectively, the "Escrow Amount") will be set up at Closing with funds provided by the Purchaser (and forming part of the Base Purchase Price):

- the Purchase Price Adjustment Escrow of $30 million to secure any amounts that may be owed to the Purchaser as post-Closing Purchase Price adjustments;

- the Holdback Escrow of $25 million to be held pending the Sellers' post-Closing delivery to the Purchaser of certain audited and unaudited financial statements of the Business;

- the EMEA Employment Escrow to be determined before Closing pursuant to the formula set out in the EMEA ASA, to cover certain severance and carrying costs incurred with respect to redundancy of transferring employees in certain EMEA jurisdictions;

- the Accrued Cash-Out Vacation Escrow to be determined before Closing, to be held as security for the payment by the Sellers of accrued and unused vacation days, plus applicable taxes, to certain Transferred Employees; and

- the French Tax Escrow to be determined before Closing pursuant to the EMEA ASA, to secure the payment of certain French tax obligations.

36.    In addition, the Escrow Agent already holds in escrow the $100 million Good Faith Deposit and will also receive and hold in escrow the Delay Fee, if applicable.

37.    Within 60 days of Closing, the Main Sellers and the EMEA Sellers shall deliver to the Purchaser a statement of, among other things, the calculation of the final Purchase Price.

- 13 -

The Purchaser shall have 60 days from delivery of this statement to issue a Disagreement Notice. The Purchaser, the Main Sellers and the EMEA Sellers shall negotiate in good faith to resolve any disagreements and any agreed resolution shall be final and binding upon the parties.

38.  If the parties are unable to resolve the disagreements within 14 days of delivery of the Disagreement Notice, either the Main Sellers, the EMEA Sellers or the Purchaser may appoint an Accounting Arbitrator. Within 30 days from being appointed, the Accounting Arbitrator shall issue a written report setting forth the resolution of such disagreement, and such report shall be final and binding on the parties.

39.  The escrow agent will make a payment to the Purchaser or the Distribution Agent (as agent of the Sellers and the EMEA Sellers), as the case may be from the Purchase Price Adjustment Escrow upon determination of the final Purchase Price as adjusted in accordance with the Purchase Price adjustments in the Avaya Agreement. Such payment shall include interest from the Closing Date at the rate of 3% per annum.

40.  Assumed Liabilities. The Purchaser will assume the following liabilities:

- all liabilities of the Business arising after the Closing Date to the extent related to the conduct or operation of the Business after the Closing Date including (i) all such liabilities with respect to the ownership, exploitation and operation of the Purchased Assets; (ii) all such liabilities related to actions or claims brought against the Business or DiamondWare or NGS; (iii) all such liabilities under any environmental laws; (iv) all such liabilities under any product liability laws or similar laws concerning defective products delivered by the Business after the Closing Date; and (v) all such liabilities under any applicable laws in relation to telecommunications providers;

- all liabilities arising from or in connection with the performance (or breach) of the Assigned Contracts after the Closing Date and all liabilities arising from or in connection with the performance (or breach) of the Assigned Contracts, whether occurring before or after the Closing Date, relating to Cure Costs

- 14 -

(subject to certain exceptions), obligations to buy back from resellers the products sold to resellers under Seller Contracts that are Assigned Contracts, obligations under any warranty liabilities and known product defects relating to products and services supplied under any Assigned Contract or any Bundled Contract subcontracted to the Purchaser under the Subcontract Agreement and Contractual Liabilities under customer contracts and SI/SP Contracts that are Assigned Contracts;

- all liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property or Acquired Company Intellectual Property which the Sellers may have granted or committed to third parties (but only to the extent their terms require assumption of such liabilities by the assignee of the relevant Transferred Intellectual Property or Acquired Company Intellectual Property) and liabilities resulting from the assurances, declarations, and undertakings made to standard setting bodies, that are listed in the Sellers Disclosure Schedule;

- all liabilities for, or related to any obligation for, any tax (including transfer taxes) that the Purchaser bears pursuant to the Avaya Agreement;

- except to the extent otherwise set forth in the Avaya Agreement, all liabilities related to any of the following: (i) the Purchaser's employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees arising on or after the Effective Hire Date; (ii) the terms of any offer of employment or notice of continued employment to any employee who is provided an offer pursuant to the Avaya Agreement, (iii) the Purchaser's decision to make or not make an offer of employment to any employee that violates applicable law; (iv) the employment, prospective employment or termination of any Share Transfer Employee or, to the extent arising after Closing, other employees whose employment transfers by operation of law, and the employment, prospective employment or termination of employment or other employment related liability of NGS or

- 15 -

DiamondWare in respect of any person, whether arising prior to, on, or after Closing; and (v) the failure of the Purchaser to satisfy its obligations with respect to the employees, including the Transferred Employees as set out in the Avaya Agreement;

- all liabilities under any Purchaser Employee Plan;

- all liabilities in connection with any Seller Employee Plan transferred to the Purchaser or which remains with DiamondWare or NGS;

- any obligation to provide continuation coverage pursuant to COBRA or any similar law under any Purchaser Employee Plan that is a "group health plan" (as defined in section 5000(b)(1) of the Code) to Transferred Employees and/or their qualified beneficiaries who have a qualifying event on or after such Transferred Employees' Employee Transfer Date;

- all liabilities payable or to be provided after the Closing Date related to the Transferred Employees as set forth in Sellers Disclosure Schedule;

- all liabilities related to Transferred Employees expressly assumed by the Purchaser as set out in the Avaya Agreement;

- all liabilities related to Transferred Employees under the WARN Act which arise out of or result from any termination of employment, layoff, or the closing or relocation of worksites or the like of such Transferred Employees by the Purchaser on or after the Effective Hire Date of such Transferred Employees;

- all liabilities relating to executory supply purchase orders for products or services (other than purchases to be delivered to contract manufacturers), entered into by the Sellers in the ordinary course prior to Closing under which products and/or services have not been delivered or supplied as of the Closing Date;

- all liabilities related to a Seller Bid; and

- 16 -

- all other liabilities listed in the Seller Disclosure Schedule.

41.  Financial Statements – The Sellers shall deliver to the Purchaser certain audited and
unaudited financial statements of the Business prior to Closing and within certain
prescribed timelines after Closing, failing which the Holdback Escrow Amount will be
returned to the Purchaser.

42.  Employees – The Purchaser has committed to offer employment to a specified number of
employees of the Business and the Share Transfer Employees will transfer by operation of
law.  The Purchaser's employment offers will, except to the extent otherwise required by
law, be for employment on terms and conditions that are substantially comparable to those
terms and conditions of the employment of similarly situated employees of the Purchaser
and, without limiting the generality of the foregoing, shall include: i) an annual base salary
for each such employee that is equal to the current annual base salary for such employee;
ii) employment in a reasonably comparable position to their present position; and iii) a
location reasonably contiguous to their present location of employment.  The Purchaser's
employment offers will also include any other terms and conditions that are required by
applicable law or Seller Employee Plans in order to avoid triggering severance obligations
or other liabilities under the WARN Act for the Sellers.  Employees of NGS and
DiamondWare, and employees whose employment transfers by operation of law, will
continue to be employed, and will enjoy terms and conditions no less favourable than
those set out above.

43.  Assignment of Contracts.  The Purchaser will assume certain customer contracts
associated with the Business.  The Purchaser may also assume selected supplier contracts,
real estate leases and certain other contracts identified by the Purchaser within certain
prescribed time periods.

44.  Cure Costs.  The Sellers will pay Cure Costs required under the Code or other amounts
required to cure defaults in respect of customer contracts and SI/SP Contracts, and in
certain circumstances, a portion of the Cure Costs of certain real estate leases to be
assumed by the Purchaser.  The Purchaser will be responsible for payment of Cure Costs

- 17 -

and other similar costs in respect of supplier contracts or real estate leases to be assumed by the Purchaser.

45.    Sale Free and Clear.  The Purchased Assets to be transferred by the Applicants will be transferred free and clear of all liens, claims and interests, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the Avaya Agreement.

46.    Representations and Warranties or Covenants.  The Avaya Agreement contains a number of representations, warranties and covenants by the Main Sellers or the Sellers, as applicable, with respect to various matters including disclosure of information, status of real property, environmental matters, compliance with laws, taxes, employee matters and status of the UK defined benefit plan.  In addition, the Avaya Agreement includes a number of covenants with respect to matters including pre-Closing cooperation and access to information, pre-Closing conduct of the Business; post-Closing assistance and maintenance of books and records, post-Closing arrangements with respect to certain non-assignable and/or Bundled Contracts, insurance and real estate matters including the sub-lease of certain real property to the Purchaser.

47.    Survival of Representations and Warranties or Covenants  No representations or warranties, covenants, or agreements contained in the Avaya Agreement or any instrument delivered pursuant to the Avaya Agreement shall survive beyond the Closing Date, except for the Purchaser's representation regarding certain aspects of the transaction including the exclusivity of the Sellers' representations, certain tax covenants and other covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.  These ongoing covenants include, among other things, the Sellers' covenants to: i) cooperate with the Purchaser in relation to arrangements regarding non-assignable contracts and Bundled Contracts during an agreed period after Closing; ii) sublease certain real estate to the Purchaser; iii) deliver certain financial statements to the Purchaser; and iv) perform certain transition services for the Purchaser.

- 18 -

48. <u>Non-Compete.</u> Subject to certain qualifications and exceptions, the Sellers will refrain from taking certain competitive activities with respect to the Business for a period of three years following Closing.

49. <u>Contract Review Period and Termination Right.</u> Subject to compliance with applicable antitrust laws, the Sellers will provide to selected representatives of the Purchaser access to all customer contracts and related documentation for its review within a specified number of days after signing. The Purchaser may elect to terminate the Avaya Agreement at any time prior to the earlier of i) the sixtieth day after the date of the Avaya Agreement; and ii) the Bid Deadline, provided that the Reverse Termination Fee (as described below) is paid to the Sellers and the EMEA Sellers concurrent with such termination.

50. <u>Closing Deadline.</u> The Avaya Agreement may be terminated by the Main Sellers if Closing does not occur within 270 days and by the Purchaser if Closing does not occur within 365 days.

51. <u>Additional Termination Rights.</u> The Avaya Agreement may be terminated prior to Closing in a number of instances including:

- by mutual consent;

- by the Purchaser or the Main Sellers if: i) the U.S. Bidding Procedures Order, the Canadian Sales Process Order, the U.S. Sale Order or the Canadian Approval and Vesting Order have not been entered within a specified period without modifications that are material and adverse to the terminating party; ii) this Honourable Court or the U.S. Court approves an Alternative Transaction; iii) the EMEA ASA is terminated; iv) in the event of a sale, or other disposition of a material portion of the Business or the Purchased Assets in connection with the liquidation of the Business or any of the Sellers, NGS or DiamondWare; or v) an antitrust law or order is issued in the U.S., Canada or by the European Union permanently prohibiting the transaction;

- 19 -

- by the Purchaser in the event of a material breach by the Sellers of the Avaya Agreement, which breach would result in a failure of certain of the conditions to closing which is not cured within a specified period of time;

- by the Main Sellers in the event of a material breach by the Purchaser of the Avaya Agreement or EMEA ASA, which breach would result in a failure of certain of the conditions to closing and which is not cured within a specified period of time; or

- by the Purchaser if: i) the Purchaser is not selected as the Successful Bidder at the auction; ii) the auction does not conclude within a specified period of time; iii) the Bidding Procedures, the Bidding Process or Auction is revoked or altered; iv) the Sellers materially breach their obligation to close the transactions contemplated pursuant to the Avaya Agreement or not to solicit competing transactions and such breach is not cured within a specified period of time; or iv) the Adjusted Audited Standard Margin of the Business in fiscal 2008 is less than 90% of the Unaudited Standard Margin as defined in the Avaya Agreement.

52. <u>Delay Fee</u>. If Closing has not occurred within 150 days of the date of the Avaya Agreement and the closing condition with respect to regulatory approvals has not been satisfied while the other closing conditions (except those to be satisfied by a delivery on the Closing Date) have been satisfied, the Purchaser shall pay to the Escrow Agent a fee equal to $97,600 per day (the "Delay Fee") for each Compliance Day until such closing condition is satisfied or the Avaya Agreement is terminated. The Delay Fee shall be payable on the last business day of each month with the final payment due on the date the regulatory approval condition is satisfied. The Delay Fee shall be held by the Escrow Agent in an interest bearing account and (i) paid to the Sellers at Closing; or (ii) applied to either the Reverse Termination Fee and/or damages due to the Sellers pursuant to the Avaya Agreement; or (iii) returned to the Purchaser if the Avaya Agreement is terminated and no Reverse Termination Fee or damages have been claimed by the Sellers.

- 20 -

53. Reverse Termination Fee. The Purchaser shall pay to the Sellers a cash fee of $100 million if:

- the Purchaser exercises its right to terminate the Avaya Agreement for any reason before the expiration of the Contract Review Period; or

- the Avaya Agreement is terminated:

  o i) by the Main Sellers on a date that is more than 270 days after the date of the Avaya Agreement or by the Purchaser on a date that is more than 365 days after the date of the Avaya Agreement; or ii) by the Main Sellers as a result of certain material uncured breaches by the Purchaser; or iii) by the Main Sellers or the Purchaser if an antitrust law or order is issued permanently prohibiting the transaction, or iv) the EMEA ASA is terminated in similar circumstances; and

  o at the time of termination: i) the closing condition with respect to regulatory approvals has not been satisfied due to the failure to obtain certain specified antitrust approvals; and / or ii) the Purchaser is in material breach of certain provisions of the Avaya Agreement or the EMEA ASA, which breach is a result of an Intentional Breach and would cause the conditions to Closing under the Avaya Agreement or the EMEA ASA not to be satisfied, and has failed to cure such breach within the specified cure period;

  o unless, at the time of termination: i) the Sellers are in Intentional Breach of the Avaya Agreement in any material respect which breach would result in a failure of any of the conditions to the Purchaser's obligations to close and is not cured within a specified period of time; or ii) the conditions to the Purchaser's obligations to close cannot be satisfied within 365 days of the date of the Avaya Agreement.

54. Break-Up Fee. The Sellers and the EMEA Debtors shall pay to the Purchaser an aggregate Break-Up Fee of $14.25 million less half of any expenses reimbursed to the Purchaser if:

- 21 -

- the Avaya Agreement is terminated as a result of:

    o  the Canadian Approval and Vesting Order or U.S. Sale Order not being
       entered within prescribed time periods and without material modification
       adverse to the terminating party provided that an Alternative Transaction
       is proposed or re-proposed to the Sellers after the date of the Avaya
       Agreement and prior to such termination, and entered into within 60 days
       of termination;

    o  the approval by this Honourable Court or the U.S. Court of an Alternative
       Transaction;

    o  the disposal of a material portion of the Business or the Purchased Assets
       in connection with a liquidation or winding up of the Business, any Seller,
       DiamondWare or NGS;

    o  a material Intentional Breach by the Sellers of the Sellers' representations,
       warranties, agreements, or covenants that would result in the failure of
       certain conditions to Closing and is not timely cured;

    o  the Purchaser not being selected as the Successful Bidder in the Auction;

    o  the Auction not concluding by the later of: i) 45 business days after the
       entry of the U.S. Bidding Procedures Order; and ii) September 15, 2009;

    o  a revocation or alteration of the Bidding Procedures, the Bidding Process
       or the Auction pursuant to certain provisions of the Bidding Procedures;

    o  a material Intentional Breach by the Sellers of their obligation to close the
       transaction which breach is not cured within a specified period of time;

    o  a material Intentional Breach by the Sellers, occurring after the Auction,
       of its covenant not to solicit a competing transaction, which breach is not
       cured within a specified period of time; or

    o  the EMEA ASA being terminated in certain circumstances; and

- 22 -

- at the time of termination, the Purchaser is not in breach of the Avaya Agreement or the EMEA ASA due to an Intentional Breach that would result in a failure to satisfy any of the conditions to Closing and which has not been cured within a specified period of time; and

- an Alternative Transaction is entered into within 9 months of termination and eventually consummated, it being understood that the Break-Up Fee will be payable only after such consummation.

55. Expense Reimbursement. – The Sellers and the EMEA Sellers shall reimburse the Purchaser for all reasonable and documented fees, costs and expenses incurred in connection with the transaction to a maximum of $9.5 million in the following circumstances:

- if:

  o the Avaya Agreement is terminated pursuant to its termination provisions except where such termination is: i) by mutual consent; ii) as a result of the termination of the EMEA ASA in certain circumstances; iii) as a result of an antitrust law or order prohibiting the transaction; iv) as a result of a material breach by the Purchaser of the Avaya Agreement or the EMEA ASA which breach would result in a failure to satisfy certain conditions to closing or certain material breaches by the Purchaser (relating to the consummation of the Closing and the Purchaser's efforts to obtain the regulatory approvals), in each case which are not cured within a specified period of time; or v) effected by the Purchaser within the Contract Review Period; or

  o the Avaya Agreement is terminated pursuant to any of its termination provisions and, prior to the termination, the Sellers publicly announce: i) the retention of the Business under a court approved stand-alone plan of reorganization or plan of arrangement; or ii) that any portion of the

- 23 -

Business, Purchased Assets or EMEA Assets will be disposed of in a
liquidation or winding up of all or part of the Business; and

- at the time of termination, the Purchaser is not in material breach of the Avaya
Agreement or the EMEA ASA as a result of an Intentional Breach that would
cause certain specified conditions to Closing not to be satisfied and has not
been timely cured; and

- provided that the Expense Reimbursement is not payable if a) the Avaya
Agreement is terminated by the Sellers as a result of Closing not occurring
within 270 days of the date of the Avaya Agreement or by the Purchaser as a
result of Closing not occurring within 365 days of the date of the Avaya
Agreement; and b) at the time of such termination, i) the condition with respect
to regulatory approvals has not been satisfied and ii) certain other conditions to
the Purchaser's obligations to close under the Avaya Agreement have been
satisfied, other than any failure to satisfy them as a result of a failure to obtain
any mandatory antitrust approvals or a breach by the Purchaser which breach is
an Intentional Breach and if capable of being cured, has not been cured within
the cure period permitted by the Avaya Agreement.

56. Limitation of Liability. Termination of the Avaya Agreement and payment of the Break-
Up Fee and Expense Reimbursement, if payable, are the sole and exclusive remedies of the
Purchaser and certain related parties against the Sellers, the EMEA Sellers and certain
related parties for any liabilities arising pre-Closing pursuant to the Avaya Agreement or
the EMEA ASA (including as a result of an Intentional Breach by the Sellers or the EMEA
Sellers) or in the event that the transactions contemplated by the Avaya Agreement and the
EMEA ASA fail to be consummated. The liability of the Purchaser and certain related
parties to the Sellers, the EMEA Sellers and certain related parties in the event that the
transactions contemplated by the Avaya Agreement and the EMEA ASA fail to be
consummated or for liabilities arising pursuant to the Avaya Agreement or the EMEA
ASA prior to the Closing, including for Intentional Breaches of the Avaya Agreement or
the EMEA ASA, is limited to $200 million, including the Reverse Termination Fee, if

- 24 -

payable. However, if i) at the time of termination of the Avaya Agreement, the Standard
Margin of the Business for a twelve month measurement period is less than $640 million,
or ii) if the Purchaser terminates prior to the expiration of the Contract Review Period and
pays the Reverse Termination Fee, or iii) at the time of termination of the Avaya
Agreement, the Purchaser is not in a Material Intentional Purchaser Breach, the liability of
the Purchaser and certain related parties to the Sellers, the EMEA Sellers and certain
related parties will be limited to $100 million.

57.    Ancillary Agreements. On or before Closing, the Purchaser and the relevant Sellers and
       EMEA Sellers will enter into the following ancillary agreements, forms of which have
       been agreed:

   •    Intellectual Property License Agreement - an intellectual property license
        agreement ("IPLA") between NNL, NNI, the EMEA Sellers, the U.K.
        Administrators and the Purchaser pursuant to which NNL, NNI, and the EMEA
        Sellers and their affiliates will grant a license to the Purchaser to, among other
        things, make, use, distribute, sell, develop and service certain retained
        intellectual property assets and receive a license back to, among other things,
        make, use, develop and sell certain other intellectual property assets sold to the
        Purchaser. The Licensed Business Intellectual Property and Licensed
        Enterprise Patents shall (subject to certain exceptions) be exclusive within the
        Exclusive Purchaser Field for (5) years beginning on the Effective Date.

   •    Trademark License Agreement – a transitional agreement between NNL and
        the Purchaser permitting the Purchaser and its affiliates to, among other things,
        use the "Nortel" trademark and logo and certain other Nortel marks in its sales
        of the Products and Services for a transitional period after Closing. The
        Trademark License Agreement also provides that NNL shall not, for a period of
        7 years, grant to third parties rights to use such licensed marks in connection
        with Competitive Offerings (as defined therein), subject, however, to certain
        broad exceptions.

- 25 -

- <u>Transition Services Agreement</u> – an agreement between NNL, NNC, NNI, NNUK, NN Ireland, certain Other Sellers, the U.K. Administrators and the Purchaser pursuant to which the Sellers and their affiliates will agree to provide certain information technology, business transition and related services to the Purchaser for up to 12 months post-Closing. The fees to be paid by the Purchaser to the Sellers for these services shall be set out in the Transition Services Agreement and shall incorporate an aggregate $10 million reduction from the amount that would otherwise be payable. The agreed form of Transition Services Agreement sets out the general scope of transition services to be provided. The parties have agreed to negotiate in good faith and use reasonable efforts expeditiously to refine the description of "Included Services" and to agree certain "Extra Services". The parties have agreed to an arbitration procedure to resolve any disputes regarding the services to be provided or the amount to be billed for such services.

- <u>Loaned Employee Agreement</u> – an agreement between the relevant Sellers and the Purchaser pursuant to which certain employees of the Sellers that cannot be transferred to the Purchaser at Closing will be seconded to the Purchaser for a period of, in certain cases, up to 12 months. The Loaned Employees will remain on the payroll of the applicable Seller and will continue to participate in the Seller's pension and benefit plans. The Purchaser shall reimburse the Sellers for the cost of retaining the Loaned Employees.

The Purchaser and the relevant Sellers and EMEA Sellers will also enter into, among other things, the following ancillary agreements:

- <u>Real Estate Agreements</u> - agreements between the Seller and the Purchaser with respect to the post-Closing direct lease or sublease by the Purchaser of certain owned and leased properties of the Sellers on the following terms:.

    o    Direct Lease Real Estate: The Purchaser may elect to enter into Direct Leases with the Sellers with respect to certain property owned by the

Sellers. These Direct Leases will be for a term of 3 years and be subject to
the Sellers' right to implement their global real estate strategy including
deciding to dispose of any of the Direct Lease Real Estate upon specified
prior notice to the Purchaser. If such disposition causes the Sellers to
terminate a Direct Lease, the Sellers shall bear the cost of relocating the
Business and Purchased Assets to an alternative space. If such disposition
occurs prior to Closing, the Sellers and the Purchaser shall co-operate to
relocate the impacted Business and Purchased Assets, including by
determining which party will enter into the lease for the alternative space.

o    Subleases: The Sellers and the Purchaser shall enter into subleases with
respect to leased premises designated by the Purchaser for subletting. The
size and configuration of subleased premises will be reasonably agreed by
the Sellers and the Purchaser prior to Closing by reference to certain
specified factors. Alternatively, if certain specific conditions are met, the
Purchaser shall have the right to negotiate with the landlord a direct lease
of the space. The Purchaser shall be responsible for the costs of the
segregation and demising of the locations (except in the case of subleases
expected to be entered under two Mission Critical Leases, with respect to
which Sellers will be responsible for such costs). The Sellers' obligation
under any subleases entered into with the Purchaser shall be subject to the
Sellers' right to reject the related lease. If the Sellers reject such lease
prior to Closing, the Sellers shall, at their expense, remove and store any
Purchased Assets until Closing. If the rejection of the lease is effective on
or after Closing, the Purchaser shall vacate the subleased premises upon
notice from the Sellers.

o    Mission Critical Leases: In addition to the provisions described above
with respect to subleases, the Sellers shall be responsible for the
Purchaser's relocation costs if: i) the landlord in respect of any of three
specific property leases designated as Mission Critical Leases refuses to
consent to a sublease to the Purchaser (unless such refusal is a result of the

- 27 -

> Purchaser's failure to comply with certain specified requests of such
> landlord); or ii) the Sellers reject any of the Mission Critical Leases.

In addition, the Sellers and the Purchaser will use their reasonable best efforts to negotiate between themselves and, when applicable, with the relevant third parties, the following ancillary agreements, among others, in good faith:

- **LGN/Korea Distribution and Supply Agreements** - two agreements between LGN and the Purchaser with respect to, respectively, the sale of certain products by the Business to LGN for resale in South Korea and the supply of certain products by LGN to the Business.

- **Contract Manufacturing Inventory Agreements** – three-party agreements among the Sellers, the Purchaser and the Contract Manufacturers ("CMs") of the Business that provide a plan for the disposition of, and allocation of liabilities pertaining to certain inventory that the Sellers are required to purchase from the CMs and that is excluded from the Purchased Assets.

- **Mutual Development Agreement** - an agreement between the Sellers and the Purchaser with respect to the ongoing development by either party of new features of certain of the products used by either party.

58. **Closing Conditions**. The obligation of the Purchaser to close the sale is subject to satisfaction of the following conditions, among others:

- the Sellers' representations and warranties being true and correct, except as would not result in a Material Adverse Effect;

- the performance by the Sellers of: i) all pre-Closing covenants relating to the delivery of certain audited and unaudited financial statements; and ii) in all material respects, all other material pre-Closing covenants, obligations and agreements;

- 28 -

- the receipt of all antitrust and other regulatory approvals in a number of jurisdictions including approval in Canada pursuant to the *Investment Canada Act*;

- no law, or any material order, injunction, decree or judgement of any Court or other governmental entity in Canada, the United States or the United Kingdom, or of any European Union Entity, prohibiting the consummation of any of the transactions contemplated by the Avaya Agreement or the EMEA ASA;

- no termination or notice of intent to terminate in certain circumstances or certain other events (including liens that could apply to the assets of the Purchaser or its affiliates (including NGS and DiamondWare)) having occurred with respect to the Nortel Networks Retirement Incentive Plan ("NNRIP") unless the PBGC has waived its claims against the Purchaser or its affiliates (including NGS and DiamondWare) in relation to any potential liabilities and if applicable, any liens by the PBGC are released;

- no pending action by the UK Pensions Regulator, the PPF or the Pension Trustees seeking to assert liabilities against NGS and / or DiamondWare or in respect of their shares under the UK Pension Act 2004;

- the U.S. Court's Sale Order and this Honourable Court's Approval and Vesting Order having been issued without material modification (except for certain modifications introduced in order to comply with applicable law and modifications which the Purchaser has expressly consented to, such consent not to be unreasonably withheld) from the form appended to the Avaya Agreement and not having been stayed, amended, modified, reversed, vacated, revoked or (subject to certain exceptions) appealed as of the Closing Date; and

- the satisfaction of conditions to closing under the EMEA ASA and the simultaneous consummation of the transaction governed by the EMEA ASA.

- 29 -

59.    Post-Closing Access to Books and Records.  For five years after the Closing Date (or such
       longer period as may be required under applicable Law), the Purchaser and the Sellers
       must preserve pre-Closing records relating to the Business.  After the Closing Date and
       until the fifth anniversary of the Closing Date, upon any reasonable request from the other
       party, the Purchaser or the Sellers, as applicable, shall provide the requesting party
       reasonable access to such records during normal business hours and permit the requesting
       party to make copies of such records in each case at no cost to the requesting party (other
       than reasonable out-of- pocket expenses).

60.    Competing Transaction.  From the date of the Avaya Agreement to the entry of the U.S.
       Bidding Procedures Order and from the conclusion of the Auction to Closing, the Sellers
       and their affiliates are prohibited from soliciting, initiating, encouraging or engaging in
       any discussions or negotiations with any party, or taking any other action, with respect to a
       proposal or offer relating to the acquisition, divestiture, recapitalization, business
       combination or reorganization of all or a substantial part of the Business.  Notwithstanding
       the foregoing, from the date of the Avaya Agreement to the entry of the U.S. Bidding
       Procedures Order, the Sellers may continue to provide written due diligence materials in
       an EDR to parties that already have access to the EDR and have satisfied the Qualified
       Bidder requirements as set out in the Bidding Procedures.


**BIDDING PROCEDURES AND AUCTION PROCESS**

61.    Given that certain of the U.S. Debtors are parties to the Avaya Agreement and given the
       desire to maximize value for the benefit of stakeholders in relation to the assets which are
       the subject of the Avaya Agreement, Nortel has determined and has agreed with Avaya
       that the Avaya Agreement is subject to higher or better offers being obtained pursuant to a
       sale process under section 363 of the Code and that the Avaya Agreement shall serve as a
       "stalking horse" bid pursuant to that process.  The Purchased Assets may be sold in a
       single sale to a single purchaser or in parts to several purchasers.

- 30 -

62.   The U.S. Debtors have filed a bidding procedures motion with the U.S. Court. A copy of
      the proposed bidding procedures is attached as Appendix "C" (the "Bidding Procedures").

63.   It is a condition of the Avaya Agreement that Nortel shall have filed a motion seeking the
      approval of the Bidding Procedures by the U.S. Court by the third business day after
      signing of the Avaya Agreement. This motion was filed with the U.S. Court on July 20,
      2009. It is also a condition of the Avaya Agreement that Nortel shall have filed a similar
      motion seeking the approval of the same Bidding Procedures by this Honourable Court by
      the date that the U.S. Court grants an Order approving the Bidding Procedures. The
      Monitor understands that the Applicants and the U.S. Debtors will seek approval of the
      Bidding Procedures at a videoconference joint hearing between this Honourable Court and
      the U.S. Court scheduled for August 4, 2009, conducted pursuant to the Cross-Border
      Insolvency Protocol previously approved by both Courts.

64.   Pursuant to the Avaya Agreement, the Sellers who are U.S. Debtors shall use their
      reasonable best efforts to cause the U.S. Court to schedule a hearing to consider the
      Bidding Procedures and Sale Motion and to enter the U.S. Bidding Procedures Order
      within two business days of the hearing to approve the Bidding Procedures.

65.   The Bidding Procedures provide that all bids must be received by the Sellers not later than
      12:00 p.m. (Eastern Time) on September 4, 2009 and that the Sellers will conduct an
      auction of the Purchased Assets on September 11, 2009 at 9:30 a.m. (the "Auction").

66.   Pursuant to the Avaya Agreement, the Sellers who are U.S. Debtors shall request the U.S.
      Court to schedule a Sale Hearing on the first business day following the conclusion of the
      Auction and shall use their reasonable best efforts to cause the Sale Hearing to be heard on
      that date or the earliest date thereafter permitted by the U.S. Court's schedule. In no event
      later than three business days after the date on which the U.S. Sale Motion is granted, the
      Applicants shall file a motion for an Approval and Vesting Order from this Honourable
      Court.

67.   The Monitor recognizes the expeditious nature of the proposed sale process. However,
      given the extensive process conducted to date and that there are likely to be a limited

- 31 -

number of parties interested in acquiring the Business, the Monitor is supportive of the proposed sale process. In addition, Nortel has consulted with, among others, the UCC regarding the Bidding Procedures and believe that the UCC is supportive of the timing of this sale process.

68.    As described in the relevant motion materials filed with the U.S. Court, the key provisions of the Bidding Procedures are outlined in the paragraphs that follow.

### Bid Deadline

69.    A Qualified Bidder (as defined below) that desires to make a bid will deliver written copies of its bid to: the Sellers, counsel and financial advisors to the Sellers, counsel and financial advisors to the UCC, counsel to the Bondholders' Committee, the Monitor, the U.K. Administrators and counsel to the U.K. Administrators (collectively, the "Notice Parties"); so as to be received not later than 12:00 p.m. (Eastern Time) on September 4, 2009 (the "Bid Deadline").

### Provisions Governing Qualifications of Bidders

70.    Unless otherwise ordered by the U.S. Court and this Honourable Court and accepted by the U.K. Administrators, for cause shown, or, with regards to paragraphs b) and c) below, as otherwise determined by the Sellers, in consultation with the UCC, the Bondholders' Committee and the Monitor, in order to participate in the bidding process, each person (a "Potential Bidder"), other than Avaya, must deliver (unless previously delivered) to the Notice Parties:

    a)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers and on terms that are not more favourable to the Potential Bidder than those contained in the confidentiality agreement executed by Avaya;

    b)    financial information that will allow the Sellers and their financial advisors, in consultation with the UCC, the Bondholders' Committee and the Monitor, to

- 32 -

make a reasonable determination as to the Potential Bidder's financial and
other capabilities to consummate a purchase of the Purchased Assets; and

c)      a preliminary (non-binding) written proposal regarding: (i) the purchase price
range (including liabilities to assumed by the Potential Bidder); (ii) any
Purchased Assets expected to be excluded or any additional assets desired to be
included; (iii) the structure and financing of the transaction (including, but not
limited to, the sources of financing for the purchase price and all requisite
financial assurance); (iv) any anticipated corporate, stockholder, internal or
regulatory approvals required to close the transaction, the anticipated time
frame and any anticipated impediments for obtaining such approvals; (v) the
proposed number of employees of the Sellers who will become employees of
the Potential Bidder, and any proposed measures associated with their
continued employment; and (vi) any conditions to closing that the Potential
Bidder may wish to impose in addition to those set forth in the Avaya
Agreement.

71.    A Potential Bidder that satisfies the above requirements, whose financial information and
credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial
capability of the Potential Bidder to consummate the transaction, and who has submitted a
reasonably competitive and realistic non-binding proposal, as described above, and who
has executed a confidentiality agreement, as described above, and that the Sellers
determine in their reasonable business judgement, after consultation with their counsel and
financial advisors, the UCC, the Bondholders' Committee and the Monitor, is likely (based
on availability of financing, experience and other considerations) to be able to
consummate the transaction, will be deemed a "Qualified Bidder". The determination as
to whether a Potential Bidder meets the requirements of a Qualified Bidder will be made
as promptly as practicable and the Sellers will so notify the Potential Bidder. The Sellers
will immediately allow Qualified Bidders to begin to conduct due diligence with respect to
the Purchased Assets as provided in the Bidding Procedures.

- 33 -

*Provisions Governing Qualified Bids*

72.   A bid submitted pursuant to the Bidding Procedures will be considered a Qualified Bid
      only if the bid is submitted by a Qualified Bidder and complies with all of the following
      (a "Qualified Bid"):

      a)      the Qualified Bidder offers to purchase the Purchased Assets upon the terms
              and conditions substantially as set forth in the Avaya Agreement, or pursuant to
              alternate terms and conditions that the Sellers determine, after consultation with
              the UCC, the Bondholders' Committee and the Monitor, are no less favourable
              than the terms and conditions of the Avaya Agreement;

      b)      the Qualified Bidder's offer is irrevocable until the selection of the Successful
              Bidder (as defined below) and, if applicable, the Alternate Bidder (as defined
              below), provided that if such bidder is selected as the Successful Bidder or the
              Alternative Bidder, its offer shall remain irrevocable until the earlier of (i)
              closing of the sale to the Successful Bidder or the Alternate Bidder, and (ii) (x)
              with respect to the Successful Bidder only, 180 days from the later of the Sale
              Hearing and the entry of the Sale Order and (y) with respect to the Alternate
              Bidder only, the Alternate Bid Expiration Date (as defined below);

      c)      it includes a duly authorized and executed sale agreement, including the
              purchase price for the Purchased Assets expressed in U.S. Dollars (the
              "Purchase Price"), together with all exhibits and schedules thereto including to
              the extent required by such bid, all applicable ancillary agreements as well as
              copies of such materials marked to show those amendments and modifications
              to the Avaya Agreement, the EMEA ASA and related ancillary agreements and
              proposed orders to approve the sale by the U.S. Court, this Honourable Court
              and any other applicable court(s) whose approval may be required, as proposed
              by the Qualified Bidder;

      d)      it includes written evidence of a firm, irrevocable commitment for financing, or
              other evidence of ability to consummate the proposed transaction;

- 34 -

e)   it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

f)   it fully discloses the identity of each entity that will be bidding for the Purchased Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

g)   it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the UCC, the Bondholders' Committee and the Monitor that either individually or, when evaluated in conjunction with any other Qualified Bid for the Purchased Assets, is greater than or equal to the sum of the value offered under the Avaya Agreement plus (i) the amount of the Break-Up Fee and Expense Reimbursement plus (ii) $4.75 million;

h)   it includes an acknowledgement and representation with respect to the executory contracts and unexpired leases which the Qualified Bidder proposes to assume or not assume, the Qualified Bidder's proposal for the treatment of related Cure Costs and any executory contract or unexpired lease the assumption and assignment of which is a condition to Closing;

i)   it includes an acknowledgement and representation that the Qualified Bidder: (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets; (ii) has not relied upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, except as expressly stated in its bid; and (iii) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

j)   it includes evidence of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body);

k)   it is accompanied by a good faith deposit in an amount equal to $30 million;

- 35 -

l) it contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder and any proposed measures associated with their continued employment and identifies any pension liabilities and assets related to any employees currently covered under any Nortel registered pension or retirement income plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

m) it includes evidence of the Qualified Bidder's ability to comply with Section 365 of the Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed to be assigned or subleased to the Potential Bidder;

n) it contains other information reasonably requested by the Sellers; and

o) it is received by the Bid Deadline.

73. The Sellers will determine, in their reasonable business judgment, after consultation with the UCC, the Bondholders' Committee and the Monitor, whether to deem bids for the Purchased Assets that do not conform to one or more of the requirements specified in the Bidding Procedures to be Qualified Bids, provided that the Sellers may not waive substantial compliance with any items in paragraphs b), d), e), f), i), j), k), l), m), n) and o) above without the consent of Avaya, the UCC, the Bondholders' Committee and the Monitor, and such consent shall not be unreasonably withheld in connection with any bid that (i) would otherwise fully satisfy the requirements of a Qualified Bid hereunder but for a de minimums failure to comply with in paragraphs b), d), e), f), i), j), k), l), m), n) and (o) ; and (ii) such noncompliance is cured within 24 hours of the Bid Deadline.

74. The Sellers shall deliver copies of any bids deemed to be Qualified Bids to Avaya in accordance with the Avaya Agreement. The Sellers shall notify Avaya and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids no later than three days following the expiration of the Bid Deadline.

- 36 -

75.    Notwithstanding the foregoing, Avaya will be deemed a Qualified Bidder, and the Avaya
       Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding
       process, the Auction, and the sale.

76.    A Qualified Bid will be valued based upon several factors including, without limitation,
       items such as the purchase price and the net value provided by such bid, the claims likely
       to be created by such bid in relation to other bids, the counterparties to such transaction,
       the proposed revisions to the relevant transaction documents, the effect of the transaction
       on the value of the ongoing businesses of Sellers, other factors affecting the speed,
       certainty and value of the transaction, the assets included or excluded from the bid, the
       estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be
       offered post-closing employment by the Qualified Bidder and any proposed measures
       associated with their continued employment, the transition services required from the
       Sellers post-closing and any related restructuring costs, and the likelihood and timing of
       consummating such transaction, each as determined by the Sellers, in consultation with
       their advisors, the UCC, the Bondholders' Committee and the Monitor.

77.    If the Sellers do not receive any Qualified Bids other than the Avaya Agreement, the
       Auction shall be cancelled and the Sellers shall promptly proceed to complete the
       transactions contemplated by the terms of the Avaya Agreement subject to obtaining any
       relevant court approvals.

***Auction Process***

78.    If the Sellers receive one or more Qualified Bids in addition to the Avaya Agreement, the
       Sellers will conduct the Auction of the Purchased Assets, upon notice to all Qualified
       Bidders who have submitted Qualified Bids, on September 11, 2009, which Auction may
       be cancelled or adjourned without the prior consent of Avaya, subject to the terms of the
       Avaya Agreement and the Bidding Procedures Order.  Copies of all Qualified Bids shall
       be delivered to the UCC, the Bondholders' Committee, the Monitor, the U.K.
       Administrators and Avaya promptly after such time that such bid is deemed a Qualified
       Bid, but no later than two business days prior to the Auction.

- 37 -

79.  The Auction shall run in accordance with the following procedures:

- only the Sellers, the Purchaser, the UCC, the Bondholders' Committee, the Monitor and the U.K. Administrators (and the advisors to each of the foregoing), any creditor of the U.S. Debtors or the Applicants and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction;

- each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

- at least one business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction;

- at least one business day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the UCC, the Bondholders' Committee and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders;

- all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as explained below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction;

- the Sellers, after consultation with their counsel and financial advisors, the UCC, the Bondholders' Committee and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction provided that such rules are (i)

- 38 -

not inconsistent with the Bidding Procedures, the Code, or any order of the
U.S. Court, this Honourable Court or any other applicable court entered in
connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction;

- bidding at the Auction will begin with the Starting Bid and continue, in one or
more rounds of bidding, so long as during each round at least one subsequent
bid is submitted by a Qualified Bidder that in the determination of the Sellers,
in consultation with their advisers, the UCC, the Bondholders' Committee and
the Monitor, improves upon the Starting Bid or previous Leading Bid (as
defined below). Each incremental bid at the Auction shall provide net value to
the estate of at least $2.375 million, or such amount to be determined by the
Sellers, in consultation with the UCC, the Bondholders' Committee and the
Monitor, over the Starting Bid or the Leading Bid. After each round of
bidding, the Sellers shall announce the bid or combination of bids (and the
value of such bid(s)) that it believes to be the highest or otherwise better offer
(the "Leading Bid"). A round of bidding will conclude after each participating
Qualified Bidder has had the opportunity to submit a Subsequent Bid with full
knowledge of the Leading Bid.

### *Selection of Successful Bid*

80.    Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the
UCC, the Bondholders' Committee and the Monitor, will (a) review each Qualified Bid
and evaluate each Qualified Bid on the basis of a number of financial and other factors, (b)
identify the highest or otherwise best offer or offers for the Purchased Assets received at
the Auction (the "Successful Bid" and the bidder making such bid, the "Successful
Bidder"), and (c) communicate to Avaya and the other Qualified Bidders the identity of
the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of
the Successful Bid and Alternate Bid (as defined below), if any. The determination of the
Successful Bid and Alternate Bid shall be final and subject to approval by the U.S. Court
and this Honourable Court.

- 39 -

81. The Sellers will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon approval of such Successful Bid by the U.S. Court, this Honourable Court and any required approvals of any other applicable court(s) and execution by the U.K. Administrators of the relevant Successful Bid transaction documents (or, under certain circumstances described herein, the Alternate Bidder).

*Closing with Alternative Bidders*

82. If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid," and such bidder, the "Alternate Bidder"). Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a sale to the Alternate Bidder subject to the terms of the Alternate Bid. If a Qualified Bid other than the Avaya Agreement is selected as the Alternate bid, then the Alternate Bid shall remain open until the earlier of (a) eleven 11 days following the entry of the Sale Order by the U.S. Court and this Honourable Court or (b) the consummation of the sale to the Successful Bidder (the "Alternate Bid Expiration Date").

*Court Approval*

83. The Bidding Procedures are being submitted to this Honourable Court and to the U.S. Court for approval and the Avaya Agreement is being submitted for approval as the stalking horse bid pursuant to those Bidding Procedures. The final sale and assignment of the Purchased Assets will also be submitted to this Honourable Court and to the U.S. Court for approval. With respect to those assets owned by the EMEA Debtors, the U.K. Administrators have the power and authority to sell the assets without seeking a separate order from the U.K. Court.

- 40 -

*Reservation of Rights*

84.     The Bidding Procedures are subject to the rights of the Sellers, in consultation with the
        UCC, the Bondholders' Committee and the Monitor, to revoke the Bidding Procedures, the
        Bidding Process or the Auction at any time to satisfy their fiduciary duties or the statutory
        duties or legal obligations of the U.K. Administrators provided that any such revocation is
        subject to the rights of the Purchaser under the Avaya Agreement.

## ALLOCATION OF PROCEEDS OF SALE AMONGST NORTEL ENTITIES AND THE SIDE AGREEMENT

85.     As previously indicated, the Business is not operated through a dedicated legal entity or
        stand-alone division. The Applicants have an interest in intellectual property of the
        Business which, in turn, is subject to various intercompany licensing agreements.
        Therefore, the task of allocating the sale proceeds stemming from a sale agreement
        amongst the various Nortel entities in the various jurisdictions is complex.

86.     As set out in the Fifteenth Report, the Applicants, the U.S. Debtors, and certain of the
        EMEA Debtors, through their U.K. Administrators, entered into the Interim Funding and
        Settlement Agreement dated June 9, 2009 (the "IFSA") which was approved by this
        Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S.
        Debtors, and EMEA Debtors agreed that their execution of definitive documentation with
        a purchaser of any material Nortel assets shall not be conditional upon reaching an
        agreement regarding the allocation of the sale proceeds or binding procedures for the
        allocation of the sale proceeds. In addition, the parties agreed that in the absence of any
        agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in
        an escrow account and any distribution from the escrow account shall be contingent upon
        (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case
        where the Selling Debtors fail to reach an agreement, a determination of the allocation by
        the relevant dispute resolvers under the terms of a sales protocol. The parties also agreed
        to negotiate in good faith and attempt to reach an agreement on a sales protocol for

- 41 -

resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation.

87. As of the current date, no agreement has been reached regarding the allocation of any sales proceeds. In addition, the terms of a sales protocol with respect to the resolution of disputes in connection with the allocation of proceeds are still under discussion between the Applicants, the U.S. Debtors, the U.K. Administrators, the Monitor, the UCC and the Bondholders' Committee. However, the Monitor expects that Nortel will return before this Honourable Court prior to closing of the transaction contemplated by the Avaya Agreement or any Alternative Transaction to seek approval of these matters including terms of an escrow arrangement and the sales protocol.

88. In the interim, the Applicants, the U.S. Debtors and certain other Nortel entities (each a "Party" and collectively, the "Parties") have entered into a side agreement, dated July 20, 2009 (the "Side Agreement"). The Side Agreement, among other things, implements, in part, certain elements of the framework set forth in the IFSA. A copy of the Side Agreement is attached at Appendix "D".

89. The significant terms of the Side Agreement are as follows:

- Each of the Parties shall use their reasonable best efforts to cooperate with the Purchaser and with each other to complete the transactions contemplated by the Avaya Agreement and the EMEA ASA including:

  o informing other Parties of matters relating to the Avaya Agreement or EMEA ASA and facilitating the process required to obtain certain regulatory approvals;

  o defending all governmental actions challenging the Avaya Agreement or EMEA ASA or the consummation of the transactions contemplated thereby;

- 42 -

- o   cooperating with the other Parties and the Purchaser to facilitate the
  making of any filings required for regulatory approvals; and

- o   promptly informing the other Parties of any material issue that may result
  in a breach by the Sellers or the EMEA Sellers under the Avaya
  Agreement or EMEA ASA with a view to ensuring there is no breach or
  that any breach is timely cured.

- Each of NNL, NNI, NNUK and, to the extent applicable, the Joint
  Administrators and the Israeli Joint Administrators, will a) consult in good faith
  amongst themselves prior to i) agreeing to materially amend or waive any
  provisions under the Avaya Agreement or the EMEA ASA; or ii) commencing
  or consenting to the commencement of any secondary proceedings in relation
  to any EMEA Seller, or any bankruptcy proceedings relating to any non-debtor
  Sellers or new bankruptcy proceedings relating to the Main Sellers; and b) not,
  without the consent of the other Parties, i) exercise its right to terminate the
  Avaya Agreement or the EMEA ASA, as applicable, except as a result of the
  expiration of the 270-day Closing deadline; or ii) agree to the amendment of
  certain key provisions of the Avaya Agreement or the EMEA ASA, as
  applicable, or other amendments that would cause a material detriment to any
  of the other Parties; or iii) enter into any amendment or waive any provision of
  the Avaya Agreement or the EMEA ASA, as applicable, that would cause a
  material detriment to any of the other Parties.

- Any payments by the Purchaser to the Parties under the Purchase Agreements
  shall be held in an escrow account. These sale proceeds will be distributed to
  the Parties in accordance with the mechanisms to be developed pursuant to the
  IFSA. To the extent there are funds available in the escrow account that are
  attributable to the sale of the Business at the day any Break-up Fee or Expense
  Reimbursement under the Avaya Agreement becomes payable, the obligation
  of the Sellers to make such payments will be satisfied by causing the escrow
  agent to pay the relevant amount of out of the escrow account.

- 43 -

- Irrespective of the payment obligations of the Sellers to the Purchaser under, as applicable, the Avaya Agreement or the EMEA ASA, the Parties agree that, among them, each Party will bear a pro-rata share of the Break-Up Fee and Expense Reimbursement in accordance with the finally agreed respective allocations of sale proceeds. However, if the payment of the Break-Up Fee and Expense Reimbursement is attributable to the actions or omissions of one or more Parties, then such breaching Party or Parties will reimburse the other non-breaching Parties for any portion of the Break-Up Fee and Expense Reimbursement paid by such Parties.

- In the event a transaction other than the transaction contemplated by the Avaya Agreement and the EMEA ASA is selected as the Successful Bid following the Auction, the Parties shall use their reasonable best efforts to finalize and execute as soon as possible the necessary documentation in connection with such alternative transaction.

- The Side Agreement is subject to the rights of each Party to exercise its fiduciary duties, as well as the statutory duties or the legal obligations of the U.K. Administrators and the Joint Israeli Administrators in relation to the exercise of their duties or functions as administrators of certain Parties, and the liabilities of the Parties under the Side Agreement is subject to certain limitations.

**FUNDING OF OPERATIONS TO CLOSING**

90.    As set out above, other than in specific instances, the Sellers may not terminate the Avaya Agreement for failure to close in a timely manner until at least 270 days after signing (i.e. April 16, 2010). The Business currently operates on a negative cash flow basis, particularly in Canada where the Business conducts significant research and development activities.

- 44 -

91.  As set out in the Sixteenth Report, the IFSA provides funding for NNL through to the end
of the Company's fiscal third quarter. It is the Monitor's view that NNL currently has
adequate resources to fund operations through to the current expiry of the stay of
proceedings on October 30, 2009. If Closing of the transactions contemplated by the
Avaya Agreement is not effected by this date, further arrangements will be necessary in
order to address NNL liquidity needs related to the Business.


**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

92.  The Monitor has reviewed Nortel's efforts to divest its Enterprise Solutions business and is
of the view that the Company is acting in good faith to maximize value. The Monitor
recommends approval of the Avaya Agreement as a "stalking horse" bid, approval of the
Bidding Procedures as described above and approval of the Side Agreement. In so doing,
the Monitor considers the potential payment of the Break Fee and Expense Reimbursement
to Avaya as reasonable in the circumstances.

93.  For the reasons described in Paragraph 27, the Monitor recommends that confidential
Appendix "B" to this Eighteenth Report be sealed by this Honourable Court.

All of which is respectfully submitted this 31st day of July 2009.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:


Murray A. McDonald
President

APPENDIX "A"

[ATTACHED]