Execution Copy

---

ASSET AND SHARE SALE AGREEMENT

BY AND AMONG

NORTEL NETWORKS CORPORATION

NORTEL NETWORKS LIMITED

NORTEL NETWORKS INC.

AND

THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

AND

THE ENTITIES IDENTIFIED HEREIN AS EMEA SELLERS

AND

AVAYA INC.

DATED AS OF JULY 20, 2009

---

## TABLE OF CONTENTS

Page

ARTICLE I
INTERPRETATION

Section 1.1.    Definitions....................................................................................... 3
Section 1.2.    Interpretation................................................................................. 46
    1.2.1.  Gender and Number................................................................. 46
    1.2.2.  Certain Phrases and Calculation of Time................................ 46
    1.2.3.  Headings, etc........................................................................... 46
    1.2.4.  Currency and Calculations...................................................... 46
    1.2.5.  Statutory References............................................................... 47

ARTICLE II
PURCHASE AND SALE OF ASSETS AND SHARES

Section 2.1.    Purchase and Sale ......................................................................... 47
    2.1.1.  Assets and Shares.................................................................... 47
    2.1.2.  Excluded Assets...................................................................... 49
    2.1.3.  Assumed Liabilities ............................................................... 50
    2.1.4.  Excluded Liabilities ............................................................... 53
    2.1.5.  Assumption and/or Assignment or Rejection of 365 Contracts......................... 54
    2.1.6.  Assignment of Non-365 Contracts........................................... 58
    2.1.7.  Cure Costs; Adequate Assurance............................................. 61
    2.1.8.  Local Sale Agreements .......................................................... 63
    2.1.9.  EMEA Asset Sale Agreement.................................................. 63
    2.1.10. Non-Assignable Assets.......................................................... 63
Section 2.2.    Purchase Price............................................................................... 64
    2.2.1.  Purchase Price; Delay Fee ..................................................... 64
    2.2.2.  Estimated Purchase Price........................................................ 65
    2.2.3.  Post-Closing Purchase Price Adjustment................................. 66
    2.2.4.  Security for Purchase Price Adjustment; Status ...................... 71
    2.2.5.  Good Faith Deposit................................................................. 72
    2.2.6.  Escrows .................................................................................. 73
    2.2.7.  Purchase Price Allocation ...................................................... 74
    2.2.8.  Accrued Cash-Out Vacation Escrow Amount .......................... 74

i

**TABLE OF CONTENTS**
(continued)

Page

Section 2.3.        Closing ........................................................................................... 75

   2.3.1.    Closing Date................................................................................. 75

   2.3.2.    Closing Actions and Deliveries .................................................. 75

Section 2.4.        Designated Purchaser(s)............................................................. 77

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Section 3.1.        Organization and Corporate Power.............................................. 77

Section 3.2.        Authorization; Binding Effect; No Breach ................................... 78

Section 3.3.        Financing..................................................................................... 78

Section 3.4.        Adequate Assurance of Future Performance .............................. 79

Section 3.5.        Purchaser's Acknowledgments; Exclusivity of Representations and
               Warranties .................................................................................. 79

Section 3.6.        Brokers......................................................................................... 80

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Section 4.1.        Organization and Corporate Power.............................................. 81

Section 4.2.        Authorization; Binding Effect; No Breach ................................... 82

Section 4.3.        Capitalization; Title to Shares; Equity Interests .......................... 82

Section 4.4.        Title to Assets; Sufficiency of Assets .......................................... 83

Section 4.5.        Material Contracts........................................................................ 84

Section 4.6.        Intellectual Property..................................................................... 85

Section 4.7.        Litigation...................................................................................... 88

Section 4.8.        Financial Statements ................................................................... 88

Section 4.9.        Compliance with Laws; Consents................................................ 89

Section 4.10.      Privacy Laws................................................................................ 90

Section 4.11.      Real Property ............................................................................... 90

Section 4.12.      Environmental Matters................................................................. 92

Section 4.13.      Taxes............................................................................................ 93

Section 4.14.      Labor and Employee Benefits Matters ........................................ 94

Section 4.15.      Brokers......................................................................................... 97

Section 4.16.      Government Contracts ................................................................. 97

ii

TABLE OF CONTENTS
(continued)

Page

Section 4.17.    UK Defined Benefit Plan ........................................................ 98
Section 4.18.    Representations and Warranties by the Other Sellers..................................... 99
    4.18.1. Organization and Corporate Power..................................................... 99
    4.18.2. Authorization; Binding Effect; No Breach ........................................... 99

ARTICLE V
COVENANTS AND OTHER AGREEMENTS

Section 5.1.     U.S. Bankruptcy Actions ........................................................ 100
Section 5.2.     Canadian Bankruptcy Actions .................................................. 101
    5.2.1.  Canadian Sales Process Order .......................................................... 101
    5.2.2.  Canadian Approval and Vesting Order ............................................... 101
Section 5.3.     Consultation; Notification........................................................ 102
Section 5.4.     Pre-Closing Cooperation.......................................................... 103
Section 5.5.     Antitrust and Other Regulatory Approvals ................................... 104
Section 5.6.     Pre-Closing Access to Information ............................................. 107
Section 5.7.     Public Announcements ........................................................... 108
Section 5.8.     Further Actions .................................................................... 108
Section 5.9.     Conduct of Business .............................................................. 109
Section 5.10.    Transaction Expenses............................................................. 112
Section 5.11.    Confidentiality .................................................................... 112
Section 5.12.    Certain Payments or Instruments Received from Third Parties.................. 113
Section 5.13.    Non-Assignable Contracts and Other Assets............................... 113
Section 5.14.    Bundled Contracts; Selected Rejected Customer Contracts ......................... 116
Section 5.15.    Post-Closing Assistance for Litigation ........................................ 119
Section 5.16.    Tangible Asset Removal .......................................................... 119
Section 5.17.    Termination of Overhead and Shared Services ............................... 124
Section 5.18.    [Reserved] .......................................................................... 124
Section 5.19.    Cancellation of Intercompany Accounts......................................... 124
Section 5.20.    Directors' and Officers' Release, Indemnification and Insurance............... 124
Section 5.21.    Insurance Matters.................................................................. 126
Section 5.22.    Sellers Deposits, Guarantees and Other Credit Support of the Business..... 128

TABLE OF CONTENTS
(continued)

Page

Section 5.23.    Use of Sellers' Trademarks................................................................. 129
Section 5.24.    Maintenance of Books and Records ................................................... 129
Section 5.25.    Right to Exclude .................................................................................. 131
Section 5.26.    Certain Ancillary Agreements ........................................................... 132
Section 5.27.    Avoidance Actions............................................................................... 133
Section 5.28.    Subleases.............................................................................................. 133
Section 5.29.    Competing Transaction ...................................................................... 136
Section 5.30.    Direct Leases........................................................................................ 136
Section 5.31.    Rejection and Expiration of Real Estate Leases ............................. 138
Section 5.32.    Restructure of Leases......................................................................... 144
Section 5.33.    Non-Compete....................................................................................... 146
Section 5.34.    Financial Statements ......................................................................... 147
Section 5.35.    Certain Acknowledgements Regarding PBGC ................................. 150
Section 5.36.    Finalization of Transition Services Agreement .............................. 150
Section 5.37.    Assistance for Proxy Agreement ...................................................... 155
Section 5.38.    Customer Contract Review and Selection ....................................... 155

ARTICLE VI
TAX MATTERS

Section 6.1.     Transfer Taxes .................................................................................... 158
Section 6.2.     Withholding Taxes............................................................................... 159
Section 6.3.     Tax Characterization of Payments Under This Agreement .......... 159
Section 6.4.     Apportionment of Taxes .................................................................... 160
Section 6.5.     Section 338 Election ........................................................................... 160
Section 6.6.     Records ................................................................................................ 161
Section 6.7.     Tax Disclosure .................................................................................... 162
Section 6.8.     Tax Returns......................................................................................... 162
Section 6.9.     Tax Sharing Agreements.................................................................... 164
Section 6.10.    Canadian Tax Election........................................................................ 164
Section 6.11.    Cooperation......................................................................................... 165

ARTICLE VII
EMPLOYMENT MATTERS

iv

TABLE OF CONTENTS
(continued)

Page

Section 7.1.    Employment Obligations with Respect to Non-Union Employees ............. 165

7.1.1.    Employment Terms .................................................................................... 165

7.1.2.    Employee Benefits ................................................................................... 166

Section 7.2.    Employment Obligations with Respect to Union Employees .................... 170

Section 7.3.    Excluded Employee Liabilities ............................................................... 170

Section 7.4.    Other Employee Covenants .................................................................... 171

Section 7.5.    No Amendment of Plans ......................................................................... 174

ARTICLE VIII
CONDITIONS TO THE CLOSING

Section 8.1.    Conditions to Each Party's Obligation ..................................................... 174

Section 8.2.    Conditions to Sellers' Obligation .............................................................. 175

Section 8.3.    Conditions to Purchaser's Obligation ........................................................ 176

ARTICLE IX
TERMINATION

Section 9.1.    Termination ............................................................................................. 177

Section 9.2.    Break-Up Fee; Expense Reimbursement .................................................. 180

Section 9.3.    Reverse Termination Fee ......................................................................... 182

Section 9.4.    Effects of Termination ............................................................................. 183

ARTICLE X
MISCELLANEOUS

Section 10.1.    No Survival of Representations and Warranties or Covenants .................... 184

Section 10.2.    Remedies ............................................................................................... 184

Section 10.3.    No Third-Party Beneficiaries ................................................................... 184

Section 10.4.    Consent to Amendments; Waivers ............................................................ 184

Section 10.5.    Successors and Assigns ........................................................................... 184

Section 10.6.    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial ............. 185

Section 10.7.    Notices .................................................................................................. 187

Section 10.8.    Exhibits; Sellers Disclosure Schedule ...................................................... 189

Section 10.9.    Counterparts ........................................................................................... 189

Section 10.10.    No Presumption ................................................................................... 189

Section 10.11.    Severability .......................................................................................... 190

v

## TABLE OF CONTENTS
(continued)

Page

Section 10.12.    Headings ................................................................................................ 190

Section 10.13.    Entire Agreement ................................................................................... 190

Section 10.14.    Limitations on Pre-Closing Remedies .................................................. 190

Section 10.15.    Bulk Sales Laws.................................................................................... 192

Section 10.16.    Main Sellers as Representatives of Other Sellers ................................. 193

Section 10.17.    Obligations of Sellers and EMEA Sellers............................................. 193

Section 10.18.    Execution by Other Sellers ................................................................... 193

Section 10.19.    Exclusion of Liability of Administrators and Acknowledgement .............. 194

## EXHIBITS

Exhibit A – Other Sellers

Exhibit B – EMEA Sellers

Exhibit C – Canadian Debtors; U.S. Debtors; EMEA Debtors; Israeli Companies; Non-Debtor Sellers

Exhibit D – EMEA Asset Sale Agreement

Exhibit E – Contract Manufacturing Inventory Agreements Term Sheet

Exhibit F – Escrow Agreement

Exhibit G – Intellectual Property License Agreement

Exhibit H – Knowledge of the Purchaser

Exhibit I – Letter of Credit

Exhibit J – Loaned Employee Agreement

Exhibit K – Mandatory Antitrust Approvals - Relevant Antitrust Jurisdictions / Authorities

Exhibit L – Interdependencies

Exhibit M – Reserved

Exhibit N – Real Estate Agreements

Exhibit O – Trademark License Agreement

Exhibit P – Transition Services Agreement

Exhibit 2.1.5(b)(v) – Lease B Sublease Premises or Removal Premises

Exhibit 5.1(a) – Forms of U.S. Bidding Procedures Order and U.S. Sale Order

Exhibit 5.2.1 – Form of Canadian Sales Process Order

Exhibit 5.2.2 – Form of Canadian Approval and Vesting Order

Exhibit 5.4(d) – Form of Notice

Exhibit 5.7 – Certain Communications

Exhibit 5.28(g) – Terms and Conditions of Lease A Sublease and Replacement Campus Consolidation

Exhibit 5.32(c) – Consolidation of C Campus

## ASSET AND SHARE SALE AGREEMENT

This Asset and Share Sale Agreement is dated as of July 20, 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the affiliates of the Main Sellers listed in Exhibit A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**") and Avaya Inc., a corporation organized under the laws of the State of Delaware (the "**Purchaser**") and, only for the purposes of Sections 2.2, 5.26, 9.2, 9.3, 9.4, 10.14, 10.17 and 10.19 of this Agreement, the EMEA Sellers (as defined below) and, solely in the case of Nortel Networks UK Limited and Nortel Networks (Ireland) Limited, also Section 5.36 of this Agreement.

### W I T N E S S E T H:

WHEREAS, the Sellers, the affiliates of the Main Sellers listed in Exhibit B hereto (the "**EMEA Sellers**"), the NGS Companies and DiamondWare (each as defined below) beneficially own and operate the Business (as defined below);

WHEREAS, on January 14, 2009 (the "**Petition Date**"), NNC, NNL and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and was extended by further order of the Canadian Court on February 10, 2009, as the same may be amended and restated from time to time by the Canadian Court (the "**Canadian Initial Order**");

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit C hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the entities listed under the heading "EMEA Debtors" in part 3 of Exhibit C hereto (the "**EMEA Debtors**") on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "**EMEA Cases**") and the English Court appointed Alan Bloom, Stephen Harris, Christopher Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants and Alan Bloom serve as joint administrators) (the "**Joint Administrators**") under the Insolvency Act;

WHEREAS, the entities listed under the heading "Israeli Companies" in part 4 of Exhibit C hereto (the "**Israeli Companies**") on January 18, 2009 filed applications with the Tel-

Aviv-Jaffa District Court (the "**Israeli Court**"), pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto (collectively, the "**Israeli Companies Law**") for a stay of proceedings, and the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") on January 19, 2009, as joint administrators of the Israeli Companies under the Israeli Companies Law;

WHEREAS, the Other Sellers listed in part 5 of Exhibit C hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, NNI beneficially owns 100% of the stock of NGS and DiamondWare (each as defined below);

WHEREAS, the Sellers have agreed to transfer to the Purchaser or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, or cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers and the Shares (as defined below) from NNI, upon the terms and conditions set forth hereinafter;

WHEREAS, simultaneously with the execution of this Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser are entering into a separate agreement in the form set forth in Exhibit D hereto (the "**EMEA Asset Sale Agreement**") providing for the sale to the Purchaser (or the EMEA Designated Purchasers (as defined therein)) of the assets of the Business held by such EMEA Sellers;

WHEREAS, the Parties acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers and the EMEA Designated Purchasers, if any) of the Shares, the Assets and the EMEA Assets (as defined below), the license of Intellectual Property rights under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser, the Designated Purchasers and the EMEA Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their affiliates and each Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisitions by the Purchaser, the Designated Purchasers and the EMEA Designated Purchasers of the Shares, the Assets and the EMEA Assets, the license of Intellectual Property rights under the Intellectual Property License Agreement and the Trademark License Agreement and the assumption by the Purchaser, the Designated Purchasers and the EMEA Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities, as set forth hereunder and in the EMEA Asset Sale Agreement; and

WHEREAS, in addition, on or before the Closing, the Purchaser, certain Sellers (or Affiliates of the Sellers) and certain EMEA Sellers will enter into the following ancillary agreements (together, the "**Ancillary Agreements**"): (i) the Intellectual Property License Agreement, (ii) the Transition Services Agreement, (iii) the Trademark License Agreement and (iv) the Loaned Employee Agreement (each as defined below) and will use their reasonable best

efforts to negotiate in good faith (v) the LGN/Korea Distribution Agreement, (vi) the Local Sale Agreements, (vii) the Real Estate Agreements, (viii) the Contract Manufacturing Inventory Agreements, (ix) the Mutual Development Agreement, (x) the Purchaser Supply Agreement, (xi) the Seller Supply Agreement, (xii) the Subcontract Agreement, (xiii) the LGN/Korea Supply Agreement and (xiv) the Uni-Nortel Distribution Agreement (each as defined below).

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties (as defined below) agree as follows:

ARTICLE I

INTERPRETATION

SECTION 1.1.    Definitions.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"Accounting Arbitrator" means the auditing firm of international reputation that is (i) jointly selected by the Primary Parties and NNUK, or (ii) in case they cannot agree on any such firm, such other auditing firm of international reputation (or, if the Primary Parties and NNUK agree on other criteria, such Person as satisfies such other criteria) that is selected by the American Arbitration Association at the request of the first of the Primary Parties and NNUK to move.

"Accrued Cash-Out Vacation Escrow Amount" means the amount of compensation with respect to accrued and unused vacation, including all Taxes required to be withheld on behalf of the applicable Transferred Employee by his or her respective employer but excluding employer Taxes, that is due and owing with respect to the Transferred Employees (other than Share Transfer Employees) from their respective employer as of the Closing that the Sellers intend to pay out in the period commencing immediately after the Closing and ending forty-five (45) days thereafter, as listed (by Employee) on Section 2.2.8 of the Sellers Disclosure Schedule (as updated prior to Closing pursuant to Section 2.2.8), plus the aggregate amount of employer Taxes required to be paid in connection with such amounts, in each case as calculated pursuant to the Calculation Principles.

"Accrued Vacation Amount" means, at any given time, (x) (i) the amount of compensation with respect to the accrued and unused vacation (including all Taxes required to be withheld on behalf of the applicable Transferred Employee by his or her respective employer but excluding employer Taxes) that is due and owing (and not yet actually paid) with respect to the Transferred Employees (other than Share Transfer Employees but including, for purposes of this clause, Loaned Employees) from their respective employer, (ii) in respect of Transferred Employees located in India, the amount specified on Section 7.1.2(c)(v) of the Sellers Disclosure Schedule in respect of gratuity payments, and (iii) in respect of Transferred Employees in Australia, the amount specified in Section 7.1.2(c)(v) of the Sellers Disclosure Schedule in respect of the long service leave and sick leave, in each case to be calculated in accordance with the Calculation Principles, plus, in the case of (i), (ii) and (iii), the aggregate amount of employer Taxes required to be paid in connection with such amounts; less (y) when calculating the

3

Estimated Closing Accrued Vacation Amount, the amount of cash to be deposited in the Accrued Cash-Out Vacation Escrow Account and, when calculating the Closing Accrued Vacation Amount, the portion of the accrued but unused vacation amount that is owed to the Transferred Employees as of the Closing Date listed on Section 2.2.8 of the Sellers Disclosure Schedule that is actually paid by the Sellers to such Transferred Employees on or after the Closing Date and before the Accrued Vacation Amount Final Payment Date, together with any employer Taxes thereon that are timely paid to appropriate Government Entities in connection therewith.

"**Accrued Vacation Amount Final Payment Date**" means the earlier of (A) forty-five (45) days after the Closing and (B) the date when the Main Sellers and the EMEA Sellers deliver to the Purchaser pursuant to Section 2.2.3.1(a) the Closing Statement including the calculation of the Closing Accrued Vacation Amount.

"**Acquired Business**" means, collectively, the Business to the extent acquired or assumed hereunder and under the EMEA Asset Sale Agreement.

"**Acquired Company Intellectual Property**" means Intellectual Property owned by the Companies.

"**Acquiring Person**" has the meaning set forth in Section 5.33.

"**Action**" means any litigation, action, suit, charge, binding arbitration, Tax audit, or other legal, administrative or judicial proceeding, including Intellectual Property litigation (including infringement, indemnification, and declaratory judgment actions).

"**Additional Audited 2009 Financial Statements**" means, collectively, (i) the carve-out combined balance sheet of the Business as of December 31, 2009 and (ii) the carve-out combined statements of income and cash flows of the Business and changes in parent's net investment in the Business for the year ended December 31, 2009, in each case prepared in accordance with GAAP and prepared and audited in accordance with the applicable rules and regulations promulgated by the SEC, including Regulation S-X and Rule 3-05 thereunder, and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with GAAS or, if such financial statements are required to be included in the Registration Statement or Form 8-K and a PCAOB audit is necessary therefor, in accordance with PCAOB and shall not be subject to any qualification or exception as to the scope of such audit.

"**Adjusted Audited Standard Margin**" means the Audited Standard Margin less the Standard Margin, if any, which is included in the Audited Standard Margin and relates to: (i) the Layer 4-7 Data Portfolio, (ii) the LGN Joint Venture, or (iii) to the extent not included in the calculation of the Unaudited Standard Margin, any other revenue streams not contemplated in the transaction governed by this Agreement and the EMEA Asset Sale Agreement.

"**Adjustment Amount**" means (i) if the Unaudited Standard Margin is less than or equal to one hundred and three percent (103%) of the Adjusted Audited Standard Margin, zero, or (ii) if the Unaudited Standard Margin is greater than one hundred and three percent

4

(103%) of the Adjusted Audited Standard Margin, an amount equal to the Unaudited Standard Margin <u>minus</u> the Adjusted Audited Standard Margin.

"**Adjustment Factor**" means the amount of the Base Purchase Price divided by the Unaudited Standard Margin.

"**Adjustment Payment**" means, (i) if the Adjustment Amount is a positive number, the Adjustment Amount, multiplied by the Adjustment Factor or (ii) if the Adjustment Amount is not a positive number, zero.

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; provided, however, that (i) no Fund shall be deemed an Affiliate of the Purchaser or the Designated Purchasers under this Agreement and no portfolio company of any Fund shall be deemed an Affiliate of the Purchaser if it is not a Subsidiary of the Purchaser and is operated, managed and financed independently of the Purchaser, (ii) no EMEA Seller or Subsidiary of an EMEA Seller shall be deemed an Affiliate of any Seller, and (iii) no joint venture listed in Section 1.1(a) of the Sellers Disclosure Schedule shall be deemed an Affiliate of any Seller.

"**Affiliate Transaction**" means any Contract in existence as of the date of this Agreement between any of the Sellers, on the one hand, and, on the other hand, any (i) present executive officer or director of any of the Sellers or any person that has served as such an executive officer or director within the last twelve (12) months or (ii) record or beneficial owner of more than five percent (5%) of the equity securities of NNC, in each case, other than any employment-related Contracts or consulting Contracts and other than any Seller Employee Plans.

"**Agreement**" means this Asset and Share Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Alternative Transaction**" means (A) any of the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation or other similar transaction, of (i) all or a substantial portion of the Acquired Business, or all of the Assets and the EMEA Assets, or a portion of the Assets and/or the EMEA Assets that constitutes a substantial portion of the Assets and the EMEA Assets considered as a whole, in a transaction or a series of transactions with one or more Persons other than the Purchaser and/or its Affiliates or (ii) all or a portion of the Acquired Business or all or a portion of the Assets or the EMEA Assets in a transaction or series of transactions with one or more Persons other than the Purchaser and/or its Affiliates that results or evolves from a Successful Bid, an Alternate Bid or a Qualified Bid (each as defined in the U.S. Bidding Procedures Order) or (B) the retention by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) of all or substantial portion of the Acquired Business, all of the Assets or the EMEA Assets, or a portion of the Assets and/or the EMEA Assets that constitutes a substantial portion of the Assets and the EMEA Assets considered as a whole, pursuant to a plan of reorganization under Section 1129 of the Bankruptcy Code filed or otherwise sponsored by one or more third-party creditors of the Sellers; <u>provided</u>, however, that an "Alternative

5

Transaction" shall not include: (i) except as specified in clause (B) above, the retention of the Business by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings), (ii) the sale, transfer or other disposition, directly or indirectly, of any portion of the Business or the Assets and the EMEA Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers or the Companies, (iii) the sale, assignment, leasing, expiration, termination or other disposition by the Sellers of any real estate or Real Estate Lease, as applicable, not in violation of this Agreement, in connection with the implementation of the Sellers' global real estate strategy and not as part of a sale of a going concern, or (iv) the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the U.S. Bankruptcy Code. For the purpose of this definition, "substantial portion" means more than forty percent (40%) of the Assets and the EMEA Assets (taken as a whole).

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Antitrust Approvals**" means the HSR Approval, the Competition Act Approval, and the Mandatory Antitrust Approvals.

"**Antitrust Laws**" means the Competition Act, the HSR Act, the EC Merger Regulation, and any competition, merger control and antitrust Law of the European Union, any applicable European Union member states and EFTA states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"**Applicable Latest Termination Notification Date**" means, with respect to any real property subject to the provisions of Section 5.16(a) (other than real property identified in Section 5.16(a) of the Sellers Disclosure Schedule) and any termination by any Seller of its interest in such property (whether pursuant to sale of owned property, termination or rejection of a lease or otherwise), ten (10) days prior to such proposed termination.

"**Applicable Transitional Occupancy Period**" means, in the case of any real property subject to the provisions of Section 5.16(a), the period of time commencing on the Closing Date and ending on the date which is (a) for those properties identified in Section 5.16(a) of the Sellers Disclosure Schedule, the length of time following the Closing Date which is indicated in such Section 5.16(a) of the Sellers Disclosure Schedule with respect to such property and (b) for all properties not identified in Section 5.16(a) of the Sellers Disclosure Schedule, thirty (30) days after the Closing Date.

"**Arbitration Trigger Date**" has the meaning set forth in Section 5.36(f).

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Contracts**" means all Seller Contracts except (i) the Excluded 365 Contracts, (ii) the Excluded Non-365 Contracts and (iii) the Non-Assigned Contracts.

6

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(a)(iii).

"**Assumed and Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.5(b)(iii).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Auction**" has the meaning attributed to such term in the U.S. Bidding Procedures Order.

"**Audited 2009 Closing Date Financial Statements**" means, collectively, (i) the carve-out combined balance sheet of the Business as of the Closing Date and (ii) the carve-out combined statements of income and cash flows of the Business and changes in parent's net investment in the Business for the period beginning January 1, 2009 and ending on the Closing Date, in each case prepared in accordance with GAAP and prepared and audited in accordance with the applicable rules and regulations promulgated by the SEC, including Regulation S-X and Rule 3-05 thereunder, and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with GAAS or, if such financial statements are required to be included in the Registration Statement or Form 8-K and a PCAOB audit is necessary therefor, in accordance with PCAOB, and shall not be subject to any qualification or exception as to the scope of such audit.

"**Audited 2009 Interim Financial Statements**" means, collectively, (i) the carve-out combined balance sheet of the Business as of September 30, 2009 and (ii) the carve-out combined statements of income and cash flows of the Business for the nine-month periods ended September 30, 2008 and September 30, 2009, and changes in parent's net investment in the Business for the nine-month period ended September 30, 2009, in each case prepared in accordance with GAAP and prepared and audited in accordance with the applicable rules and regulations promulgated by the SEC, including Regulation S-X and Rule 3-05 thereunder, and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with GAAS or, if such financial statements are required to be included in the Registration Statement or Form 8-K and a PCAOB audit is necessary therefor, in accordance with PCAOB, and shall not be subject to any qualification or exception as to the scope of such audit.

"**Audited Financial Statements**" means, collectively, (i) the carve out combined balance sheets of the Business as of December 31, 2007 and December 31, 2008 and (ii) the carve-out combined statements of income and cash flows of the Business and changes in parent's net investment in the Business for the years ended December 31, 2007 and December 31, 2008, in each case prepared in accordance with GAAP and prepared and audited in accordance with the applicable rules and regulations promulgated by the SEC, including Regulation S-X and Rule 3-05 thereunder, and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with GAAS or, if such financial statements are required to be included in the Registration Statement or Form 8-K and a PCAOB audit is necessary therefor, in accordance

with PCAOB, and shall not be subject to any qualification or exception as to the scope of such audit.

"**Audited Standard Margin**" means the (i) the 2008 revenues of the Business as shown in the 2008 income statement that is part of the Audited Financial Statements minus (ii) Nortel's standard cost of the revenue in (i) and any other costs included in the 2008 income statement that is part of the Audited Financial Statements that would be included in the calculation of standard margin using the accounting principles, practices and methods used in the calculation of Unaudited Standard Margin on Section 1.1(b) of the Sellers Disclosure Schedule. For the avoidance of doubt, in connection with the calculation of the Audited Standard Margin it shall be assumed that all Excluded Other Sellers are Sellers and all Excluded EMEA Sellers (as defined in the EMEA Asset Sale Agreement) and any EMEA Seller whose EMEA Assets and EMEA Liabilities are designated Removed Assets and Removed Liabilities or Excluded Assets and Excluded Liabilities under the terms of the EMEA Asset Sale Agreement are EMEA Sellers.

"**Avaya Parties**" has the meaning set forth in Section 10.14(a).

"**Balance Sheet Date**" has the meaning set forth in Section 4.8.

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court, the Israeli Court or any other court before which Bankruptcy Proceedings are held.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act, the Israeli Companies Law and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings occurring or authorized thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial or other proceedings concerning any of the Sellers, the EMEA Sellers or the Companies that are held from time to time.

"**Base Purchase Price**" has the meaning set forth in Section 2.2.1(a).

"**Bid**" means any bid, proposal, offer or quotation which, if accepted, would result in the award of a Contract.

"**Breach Cure Period**" means, with respect to a breach by any party of this Agreement or the EMEA Asset Sale Agreement, a period beginning at the time of delivery of a written notice of such breach to the breaching party and ending on the earlier of (i) the End Date and (ii) the last Business Day prior to any termination or purported termination of this Agreement or the EMEA Asset Sale Agreement by the breaching party. For purposes of this definition, "End Date" means the twentieth (20th) day after delivery of a written notice of such breach to the breaching party; provided, however, that in the case of a breach of the obligation to close the transactions contemplated hereby at the Closing, a breach of the obligation to close the

8

transactions contemplated by the EMEA Asset Sale Agreement at the Closing (as defined in the EMEA Asset Sale Agreement), or a breach of Section 5.29 or a breach of Clauses 10.53, 10.54 and 10.55 of the EMEA Asset Sale Agreement, "End Date" shall mean the fifth (5th) day after delivery of a written notice of such breach to the breaching Party; and provided further, however, that in the case of a breach of Section 5.5 or a breach of Clauses 10.7 through 10.12 of the EMEA Asset Sale Agreement, "End Date" shall mean the fifteenth (15th) day after delivery of a written notice of such breach to the breaching party.

"**Break-Up Fee**" has the meaning set forth in Section 9.2(a).

"**Bundled Contract**" has the meaning set forth in Section 5.14(a).

"**Business**" means, collectively, the following business segments of the Sellers and the EMEA Sellers and the business of the NGS Companies and DiamondWare as described below:

(i)     the "Enterprise Solutions" business segment of the Sellers, the EMEA Sellers and DiamondWare, comprising Employees; partner, customer and supplier relationships and the goodwill associated therewith, through which such entities, individually, jointly or in collaboration with or pursuant to contracts with Third Parties, and using any variety of technologies, research, design, develop, process, manufacture (through contract manufacturers), assemble, test, support, market and sell globally to end users and resellers the Products, which are communications products and solutions, including legacy products currently being supported and future products and solutions described in the "plan of record" or "plan of intent", in the areas of networked communications, converged voice and data, digital and internet protocol (IP) telephony, communication application devices, local area networks, messaging, contact center solutions, multimedia communications, including audio, video and web conferencing, telepresence and other similar enterprise solutions (the "**Enterprise Solutions Business**");

(ii)    the "Global Services" business segment of the "Enterprise Solutions Business" of the Sellers, the EMEA Sellers and DiamondWare, which provides, individually or with Third Parties, the following services to Enterprise Solutions Business customers (collectively, the "**Services**"):

(a)     implementation and enhancement services, including network planning, engineering, installation, integration, convergence, optimization and security services;

(b)     support services, including the support of multi-vendor voice-data-converged networks, including providing software, technical support, hardware and software maintenance, corrective content management, equipment spares logistics, and on-site engineers;

9

(c)    managed and outsourced services, ranging from support of individual solutions to entire multi-vendor networks running carrier and optical equipment;

(d)    hosted services, including single and multi-tenant hosted services, hosted multimedia services, including high-definition telepresence, desktop video conferencing, and applications performance engineering;

(e)    application services, including application development, integration and communications-enabled application solutions; and

(f)    communications integration services provided in connection with third party equipment as part of security, healthcare and high-definition video solutions,

and all research and development associated with any of the foregoing, but, in each case, only to the extent that the services relate to, are ancillary to, implement, support and manage, the Products and Third Party equipment supplied by the Enterprise Solutions Business or equipment supplied by Third Parties if, as of the date hereof, the Sellers generally provide such services with respect to such equipment; and

(iii)    the business of the NGS Companies, through which the NGS Companies directly or indirectly, individually or through or with Third Parties, provide integrated information technology services and communications, communications products, business collaboration technology, information technology solutions and services to Government Entities and all research and development associated therewith,

but excluding, in each of clauses (i) and (ii) above: (A) the LGN Joint Venture, NN Turkey, Uni-Nortel, any Person the assets of which are designated Excluded Assets pursuant to Section 5.25 or EMEA Excluded Assets pursuant to Clauses 10.58 and 10.59 of the EMEA Asset Sale Agreement, and the assets of each of the Persons identified in this clause (A), (B) any Excluded Asset or EMEA Excluded Asset, (C) Overhead and Shared Services (other than Transferred Overhead and Shared Services), and (D) any products and/or services provided during the period from January 1, 2008 through the date hereof by businesses or business segments of any Seller or EMEA Seller other than those specified in clauses (i) and (ii) above.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, and (iii) London, England, United Kingdom.

"**Business Information**" means (i) if used exclusively in connection with the Business, all books, records, files, documentation and sales literature in the possession or under control of the Sellers or the Companies, including information (including information on past, present and prospective customers and suppliers), policies and procedures, Owned Equipment manuals and materials and procurement documentation exclusively used in the Business or in respect of any Asset, and (ii) if used primarily, but not exclusively, in connection with the Business or in respect of any Asset, to the extent reasonably separable from such items of any

10

other business of the Sellers, copies of all books, records, files, documentation and sales literature in the possession or under control of the Sellers or the Companies, including information (including information on past, present and prospective customers and suppliers), policies and procedures and materials and procurement documentation used primarily in the Business or in respect of any Asset, including, in each of clauses (i) and (ii), any Employee Records.

"Calculation Principles" means (i) the Nortel Accounting Principles, to the extent applicable to the determination of the Inventory Value, the Accrued Vacation Amount, the Net Debt, the Companies Net Working Capital, the EMEA Downward Adjustment, the Accrued Cash-Out Vacation Escrow Amount and the EMEA Holiday Adjustment, and the other accounting principles, methodologies and policies for the determination of the Inventory Value, the Accrued Vacation Amount, the Net Debt, the Companies Net Working Capital, the EMEA Downward Adjustment, the Accrued Cash-Out Vacation Escrow Amount and the EMEA Holiday Adjustment, set forth in Section 1.1(c) of the Sellers Disclosure Schedule, and (ii) GAAP, to the extent applicable to the determination of the Retirement Obligation Amount.

"Canadian Approval and Vesting Order" has the meaning set forth in Section 5.2.2.

"Canadian Approval and Vesting Order Motion" has the meaning set forth in Section 5.2.2.

"Canadian Court" means the Ontario Superior Court of Justice (Commercial List).

"Canadian Debtors" has the meaning set forth in the recitals to this Agreement.

"Canadian Initial Order" has the meaning set forth in the recitals to this Agreement.

"Canadian Sales Process Order" has the meaning set forth in Section 5.2.1.

"Canadian Sales Process Order Motion" has the meaning set forth in Section 5.2.1.

"CCAA" has the meaning set forth in the recitals to this Agreement.

"CCAA Cases" has the meaning set forth in the recitals to this Agreement.

"Chapter 11 Cases" has the meaning set forth in the recitals to this Agreement.

"Claim" has the meaning set forth in section 101(5) of the U.S. Bankruptcy Code.

"Clean Team Confidentiality Agreement" means the clean team confidentiality agreement by and between NNL and its Subsidiaries and Purchaser and its Subsidiaries, dated as of March 19, 2009, as amended from time to time.

11

"Clean Team Data Room" has the meaning attributed to the term "Clean Data Room" in the Clean Team Confidentiality Agreement.

"Clean Team Members" has the meaning attributed to that term in the Clean Team Confidentiality Agreement.

"Closing" has the meaning set forth in Section 2.3.1.

"Closing Accrued Vacation Amount" has the meaning set forth in Section 2.2.3.1(a).

"Closing Companies Net Working Capital" has the meaning set forth in Section 2.2.3.1(a).

"Closing Date" has the meaning set forth in Section 2.3.1.

"Closing Date Data Inventory Value" means the net Inventory Value related to data products as specified on the Closing Date Inventory Schedule, subject to the limitation that in determining the Closing Date Data Inventory Value, the value of raw material and works-in-process cannot exceed fifteen percent (15%) of the Data Inventory Floor.

"Closing Date Inventory Schedule" shall be a schedule detailing the Closing Date Inventory Value in the same categories as shown on Section 1.1(d)(i) of the Sellers Disclosure Schedule as finally determined in accordance with Section 2.2.3.1.

"Closing Date Spares and Service Inventory Value" will be the net Inventory Value related to Spares and Service Inventory as specified on the Closing Date Inventory Schedule.

"Closing Date Voice Inventory Value" means the net Inventory Value related to voice and applications products as specified on the Closing Date Inventory Schedule, subject to the limitation that, in determining the Closing Date Voice Inventory Value, the value of raw materials and works-in-process cannot exceed fifteen percent (15%) of the Voice Inventory Floor.

"Closing EMEA Downward Adjustment" has the meaning set forth in Section 2.2.3.1(a).

"Closing EMEA Holiday Adjustment" has the meaning set forth in Section 2.2.3.1(a).

"Closing Inventory Adjustment" means (i) the Data Inventory Adjustment plus (ii) the Spares and Service Inventory Adjustment plus (iii) the Voice Inventory Adjustment.

"Closing Net Debt Adjustment" has the meaning set forth in Section 2.2.3.1(a).

"Closing Retirement Obligation Amount" has the meaning set forth in Section 2.2.3.1(a).

12

"**Closing Statement**" has the meaning set forth in Section 2.2.3.1(a).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement, or addendum appendix or side letter thereto, that a Person has entered into with any union or collective bargaining agent with respect to terms and conditions of employment of such Person's employees.

"**Commissioner**" means the Commissioner of Competition appointed under the Competition Act or any person duly authorized to exercise the powers and perform the duties of the Commissioner of Competition.

"**Companies**" means the NGS Companies and DiamondWare.

"**Companies Cash and Investment Securities**" means, as of the time of determination, the aggregate amount of unrestricted cash or currency, cash equivalents and short term investments (including auction rate securities) that the Companies have on hand in bank accounts, calculated in accordance with the Calculation Principles.

"**Companies Net Accounts Receivable**" means, as of the time of determination, the consolidated accounts receivable of the Companies, excluding any intercompany receivables or receivables from Affiliates, net of reserves for doubtful accounts and related provisions, calculated in accordance with the Calculation Principles.

"**Companies Net Working Capital**" means, as of the time of determination, an amount equal to (w) the Companies Net Accounts Receivable plus (x) the Companies Cash and Investment Securities including the UBS Put Option, minus (y) all current liabilities of the Companies (including deferred revenues, but excluding the current portion of Indebtedness), in each case calculated in accordance with the Calculation Principles.

"**Company Leases**" has the meaning set forth in Section 4.11(d).

"**Competition Act**" means the Competition Act (Canada), as amended.

"**Competition Act Approval**" means that: (a) the applicable waiting period has expired or been terminated pursuant to Section 123 of the Competition Act; (b) the Commissioner or his/her authorized representative shall have provided the Purchaser with a waiver from complying with Part IX of the Competition Act pursuant to Section 113(c) of the Competition Act and, in the case of (a) or (b), the Commissioner or his/her authorized representative shall have advised the Purchaser in writing that the Commissioner does not intend to make an application under Section 92 of the Competition Act with respect to the transactions contemplated by this Agreement, and neither the Commissioner nor any of his/her authorized representatives shall have rescinded or amended such advice; or (c) the Commissioner shall have

13

issued an advance ruling certificate pursuant to Section 102 of the Competition Act in respect of the transactions contemplated by this Agreement.

"**Compliance Day**" means any day on which each of the conditions set forth in Section 8.1 and Sections 8.3(a), 8.3(b), 8.3(d) and 8.3(e) has been satisfied or waived (except for failure to satisfy (i) the conditions set forth in Section 8.1(a), Section 8.1(b), Section 8.1(e) or Section 8.1(f) due to the failure to obtain any Regulatory Approval, and (ii) those conditions that by their terms are to be satisfied by a delivery on the Closing Date).

"**Conditional Subleases**" has the meaning set forth in Section 5.31(a).

"**Confidential Information**" has the meaning set forth in Section 5.11(b).

"**Confidentiality Agreement**" means the confidentiality agreement by and among the Purchaser and NNI, among other parties, dated March 13, 2009.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by any Government Entity or other Third Party.

"**Consolidated Returns**" has the meaning set forth in Section 4.13(d).

"**Contract**" means any written binding contract, agreement, instrument, lease, ground lease or commitment.

"**Contract Designation Date**" means:

(a)      with respect to each Other Contract listed in the Other 365 Contract List prepared or updated pursuant to Section 2.1.5(a)(ii) or the Other Non-365 Contract List prepared or updated pursuant to Section 2.1.6(a)(ii), the date that is thirty (30) days after the later of (i) the date the relevant Other Contract is included on the relevant list and all material documentation that forms part of such Contract is made available to the Purchaser and (ii) only with respect to an Other Contract with a Selected Supplier, the date the Main Sellers provide the Purchaser with an estimate of the Cure Cost for such Selected Supplier pursuant to Section 2.1.7(b); provided, that, in each case, if the Main Sellers make available all material documentation that forms part of such Other Contract and, if applicable, the Cure Cost estimate for the relevant Selected Supplier no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, the Contract Designation Date shall not be later than such Final Contract Designation Date. Notwithstanding anything in this Agreement to the contrary, (a) if it is determined by either Party following the Contract Designation Date that not all material documentation that forms part of an Other Contract (other than a Real Estate Lease) has been made available to the Purchaser, the relevant Seller shall use its reasonable best efforts to promptly provide all material documentation that forms part of such Contract and the Contract Designation Date for such Contract shall be no earlier than the thirtieth (30th) day after the Purchaser's receipt thereof and (b) with respect to an Other Contract with a Selected Supplier, if it is determined following the Contract Designation Date that the actual Cure Costs with respect to such Selected Supplier exceed by more than ten percent (10%) the good-faith estimate of such Cure Costs provided by the Main Sellers to the Purchaser pursuant to Section 2.1.7(b), the Contract Designation Date for such Contract shall be no earlier than the thirtieth (30th) day after

14

the date of such determination of the Cure Costs for the relevant Selected Supplier; provided that, in each case, if the Main Sellers make available all material documentation that forms part of such Other Contract and, if applicable, a Cure Cost estimate no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, then the Contract Designation Date shall never be later than such Final Contract Designation Date;

      (b)    (i)    with respect to each Pre-Signing Customer Contract that is not a Major Customer Contract, the later of (i) the date that is forty-five (45) days from the date hereof or (ii) thirty (30) days from the latest of (A) the date when all material documentation that forms part of such Pre-Signing Customer Contract is "Made Available to the Purchaser" (as defined below at the end of this definition), (B) the date the initial one-day training session contemplated by Section 5.38(a)(ii) is made available to Clean Team Members, and (C) the date when the relevant Sellers make available to the Purchaser selected members of management personnel of the Business for the meeting contemplated by the penultimate sentence of Section 5.38(b); and

      (ii)    with respect to each Pre-Signing Customer Contract that is a Major Customer Contract, the later of (i) the date that is forty-five (45) days from the date hereof or (ii) thirty (30) days from the date when all material documentation that forms part of such Pre-Signing Customer Contract is Made Available to the Purchaser,

provided, however, for the avoidance of doubt, that the setting of the Contract Designation Date for a Pre-Signing Customer Contract that has already been Made Available to the Purchaser as of the date hereof shall not deprive the Purchaser of a thirty- (30-) day Contract review period for any additional Pre-Signing Customer Contracts that are subsequently Made Available to the Purchaser; provided further, that, if the Main Sellers Make Available to the Purchaser all material documentation that forms part of such Pre-Signing Customer Contract no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, then the Contract Designation Date shall not be later than such Final Contract Designation Date. Notwithstanding anything in this Agreement to the contrary, if it is determined by either Party following the Contract Designation Date that not all material documentation that forms part of a Pre-Signing Customer Contract has been Made Available to the Purchaser, the relevant Seller shall use its reasonable best efforts to promptly Make Available to the Purchaser all material documentation that forms part of such Contract and the Contract Designation Date for such Contract shall be no earlier than the thirtieth (30th) day after the Purchaser's receipt thereof, provided, that, if the Main Sellers Make Available to the Purchaser all material documentation that forms part of such Pre-Signing Customer Contract no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, then the Contract Designation Date shall not be later than such Final Contract Designation Date;

      (c)    with respect to each Post-Signing Customer Contract that is added to the Non-Qualified Post-Signing Customer Contract List, the date that is thirty (30) days from the later of (A) the date that such Contract is added to such list or (B) the date when all material documentation that forms part of such Post-Signing Customer Contract is Made Available to the Purchaser; provided, that, in each case, if the Main Sellers Make Available to the Purchaser all material documentation that forms part of such Post-Signing Customer Contract no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, then the Contract

Designation Date shall not be later than such Final Contract Designation Date. Notwithstanding anything in this Agreement to the contrary, if it is determined by either Party following the Contract Designation Date that not all material documentation that forms part of a Post-Signing Customer Contract has been Made Available to the Purchaser, the relevant Seller shall use its reasonable best efforts to promptly Make Available to the Purchaser all material documentation that forms part of such Contract and the Contract Designation Date for such Contract shall be no earlier than the thirtieth (30th) day after Purchaser's receipt thereof; provided, that, if the Main Sellers Make Available to the Purchaser all material documentation that forms part of such Post-Signing Customer Contract no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, then in no event shall the Contract Designation Date be later than such Final Contract Designation Date; and

(d) with respect to (i) the 365 Real Estate Lease identified in Section 2.1.5(b)(iv)(B) of the Sellers Disclosure Schedule, the date that is thirty (30) days from the date hereof; and (ii) any Non-365 Real Estate Leases identified in Section 2.1.6(b)(ii), 2.1.6(b)(iii) or 2.1.6(b)(iv) of the Sellers Disclosure Schedule or any Direct Lease Real Estate, the date that is forty-five (45) days from the date hereof.

For the purposes of this definition, "**Make Available to the Purchaser**" means (i) with respect to a Customer Contract other than a Major Customer Contract, include in the Sellers' Files that have been physically or electronically made available to the Purchaser or to appropriate Clean Team Members and/or make available to the Purchaser in the Data Room or to appropriate Clean Team Members and (ii) with respect to a Major Customer Contract, make available to appropriate Clean Team Members in the Clean Team Data Room.

"**Contractual Liabilities**" means all Liabilities of the Sellers that arise in the Ordinary Course under Customer Contracts and SI/SP Contracts relating to marketing, allowance funds, technical training, demonstration equipment, events, trade shows, advertising, other direct marketing activities and rebate programs.

"**Contract Manufacturing Inventory Agreements**" means the agreements among the Purchaser and/or any Designated Purchasers, the relevant Sellers, and the contract manufacturers of the Business listed in Section 1.1(e) of the Sellers Disclosure Schedule that the relevant Parties will negotiate in good faith pursuant to Section 5.26 on the basis of the term sheet attached hereto as Exhibit E.

"**Contract Review Period**" means a period ending on the earlier of (i) the sixtieth (60th) day after the date hereof and (ii) the Bid Deadline (as defined in the U.S Bidding Procedures Order).

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract or otherwise.

16

"**Converging Products**" means all prior and current versions of the Products set forth in Section 1.1(f) of the Sellers Disclosure Schedule.

"**Covered Assets and Persons**" has the meaning set forth in Section 5.21.

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court's Order Pursuant to 11 U.S.C. §§ 105(a) Approving Cross-Border Court-to-Court Protocol, dated January 15, 2009, and the Canadian Court in an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cross-License Agreements**" has the meaning set forth in Section 4.6(f).

"**Cure Cost**" means (i) any amounts required by section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under a 365 Contract (other than an Assumed and Subleased Real Estate Lease) and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract, (ii) any amounts required by section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under an Assumed and Subleased Real Estate Lease and to pay any actual pecuniary losses that have resulted from such defaults under such Assumed and Subleased Real Estate Lease, (iii) with respect to any Non-365 Seller Contract (other than Contracts of a Canadian Debtor that are assignable to the Purchaser without the consent of the counterparty), any amounts necessary to cure any defaults and to pay any actual pecuniary losses under such Seller Contract in respect of the period prior to the Petition Date, and (iv) any amounts required to cure any defaults under a Non-365 Subleased Real Estate Lease and to pay any actual pecuniary losses under such Non-365 Subleased Real Estate Lease in respect of the period prior to the Petition Date.

"**Current Policies**" has the meaning set forth in Section 5.20(d).

"**Current Services**" has the meaning set forth in Section 5.36(a).

"**Customer Contract**" means any Direct Customer Contract or Indirect Customer Contract but excluding, in each case, any SI/SP Contract.

"**Daily Fee**" has the meaning set forth in Section 2.2.1(b).

"**Data Inventory Adjustment**" means the Data Inventory Floor less the Closing Date Data Inventory Value; provided that, if the calculated Data Inventory Adjustment is a negative amount, the Data Inventory Adjustment will be zero.

"**Data Inventory Floor**" means the Inventory Value related to data products of the Business as set forth in the Sellers Inventory Schedule (the "**Data Inventory Value**") as of the Closing Date, <u>provided</u> that, if the Closing Date falls on a date that is not at the end of any fiscal quarter, the Data Inventory Value on the Closing Date shall equal the sum of (i) the Data Inventory Value as of the last day of the prior fiscal quarter, plus (ii) (x) (A) the Data Inventory Value as of the last day of the fiscal quarter in which the Closing Date occurred, minus (B) the Data Inventory Value for the last day of the prior fiscal quarter, multiplied by (y) (A) the number of days elapsed prior to the Closing Date during the fiscal quarter in which the Closing Date

17

occurred, divided by (B) the total number of days in the fiscal quarter in which the Closing Date occurred.

"**Data Room**" means the "Equinox" electronic data room at https://datasite.merrillcorp.com/bidder/splash_check.do?locale=en.

"**Deferred Transfer Assumed Liability**" has the meaning set forth in Section 5.13(d).

"**Deferred Transfer Purchased Asset**" has the meaning set forth in Section 5.13(c).

"**Delay Fee**" has the meaning set forth in Section 2.2.1(b).

"**Delay Fee Payments**" has the meaning set forth in Section 2.2.1(c).

"**Designated Courts**" has the meaning set forth in Section 10.6(b).

"**Designated Non-365 Contracts**" has the meaning set forth in Section 2.1.6(a)(iii).

"**Designated Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(b)(ii).

"**Designated Non-365 SI/SP Contracts**" has the meaning set forth in Section 2.1.6(a)(i).

"**Designated Other Non-365 Contracts**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Designated Other 365 Contracts**" has the meaning set forth in Section 2.1.5(a)(ii).

"**Designated Purchaser**" has the meaning set forth in Section 2.4.

"**Designated 365 Real Estate Leases**" has the meaning set forth in Section 2.1.5(b)(ii).

"**Designated 365 SI/SP Contracts**" has the meaning set forth in Section 2.1.5(a)(i).

"**DiamondWare**" means DiamondWare, Ltd., a corporation organized under the laws of Arizona, with executive offices at 2221 Lakeside Boulevard, Richardson, Texas.

"**DiamondWare Shares**" means all the equity interests in DiamondWare.

"**Direct Customer Contract**" means any Seller Contract pursuant to which a Seller provides Products and/or Services to an end-user.

18

"**Direct Lease Real Estate**" has the meaning set forth in Section 5.30; <u>provided</u> that, if the Purchaser elects prior to the relevant Contract Designation Date not to purchase the Owned Real Estate but to enter into a Direct Lease with respect to such Owned Real Estate at Closing, the Owned Real Estate shall thereafter be deemed included among the Direct Lease Real Estate for all purposes hereunder.

"**Direct Leases**" has the meaning set forth in Section 5.30.

"**Disagreement Notice**" has the meaning set forth in Section 2.2.3.1(b).

"**Distribution Agent**" means the Person that will act as distribution agent for the Sellers and the EMEA Sellers hereunder, to be notified by the Main Sellers to the Purchaser and the Escrow Agent by and not later than five (5) Business Days before the Closing.

"**Domain Name**" means an alphanumeric name that identifies a specific computer or website on the Internet, and all rights in and to such domain name, including any registrations therefor with a domain name registrar.

"**EC Merger Regulation**" means Council Regulation (EC) No 139/2004 of January 20, 2004 on the control of concentrations between undertakings, as amended.

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**EMEA Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Assumed Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Debtors**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Designated Purchaser**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Downward Adjustment**" has the meaning attributed to the term "Downward Adjustment" in Paragraph 1.1 of Schedule 9 to the EMEA Asset Sale Agreement.

"**EMEA Employment Escrow Amount**" has the meaning attributed to the term "Employment Escrow Amount" in Paragraph 11 of Schedule 6 to the EMEA Asset Sale Agreement.

19

"**EMEA Holiday Adjustment**" means, at any given date, the greater of (i) the EMEA Holiday Downward Adjustment or (ii) zero.

"**EMEA Holiday Downward Adjustment**" has the meaning attributed to such term in Paragraph 6.2 of Schedule 6 to the EMEA Asset Sale Agreement.

"**EMEA Owned Inventory**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Sellers**" has the meaning set forth in the recitals to this Agreement.

"**Employee**" means any Share Transfer Employee and any employee of the Sellers engaged in the Business, in each instance as listed in Section 4.14(b)(i) of the Sellers Disclosure Schedule.

"**Employee Information**" has the meaning set forth in Section 4.14(b).

"**Employee Records**" means books, records, files, or other documentation with respect to Transferred Employees, to the extent such records are reasonably within the possession, custody or control of the Sellers.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferred Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day immediately following the Closing Date; provided, that (i) in respect of any Inactive Employee the Employee Transfer Date means 12:01 a.m. on the first day after the Closing Date on which the Employee reports to work; (ii) in respect of any Visa Employees, the Employee Transfer Date means 12:01 a.m. on the first day after the Closing Date on which the Purchaser or a Designated Purchaser has obtained the required visa or permit with respect to such Employee's employment and the Visa Employee reports to work; and (iii) in respect of any Other Loaned Employee, the Employee Transfer Date means the date on which such Employee's employment transfers to the Purchaser or a Designated Purchaser under the terms of the Loaned Employee Agreement.

"**Employment Contract**" means any Seller Employee Plan or other plan, program, agreement or arrangement pursuant to which any Person provides employment or consulting services to the Business.

"**English Court**" means the High Court of Justice of England and Wales.

"**Enterprise Portion**" has the meaning set forth in Section 5.14(b).

"**Environmental Law**" means any applicable Law relating to pollution or protection of the environment, natural resources or human health and safety.

"**Environmental Permit**" means any permit, approval, license or other authorization required under any Environmental Law to conduct the Business as currently conducted.

20

"**Equivalent Lease**" means a lease or sublease for Equivalent Space for a term of three years, in the case of Lease A and Lease B as shown on Section 5.31(g) of the Sellers Disclosure Schedule or five years, in the case of Lease C as shown on Section 5.31(g) of the Sellers Disclosure Schedule, under which the annual rental obligations and other express monetary obligations of the tenant or subtenant do not exceed in the aggregate, except to de minimis extent, the same costs under the Mission Critical Lease which is thereby being replaced (or, in the case of the Mission Critical Lease identified as "Lease A" in Section 5.31(g) of the Sellers Disclosure Schedule, the term and the costs indicated in Exhibit 5.28(g)); provided that Sellers shall make reasonable attempts to negotiate a market rent under any such lease or sublease and provided further that, prior to entry into any such lease or sublease, the relevant Seller and the Purchaser or a Designated Purchaser shall convene to discuss and agree on a mutually acceptable strategy for the location of the premises and negotiating such lease or sublease and Purchaser or a Designated Purchaser shall have a reasonable opportunity to participate in the process.

"**Equivalent Space**" means, with respect to any Mission Critical Lease, premises reasonably acceptable to the Purchaser which are located in the same general real estate market as the space demised under such Mission Critical Lease, which contain usable and rentable square footage sufficient to reasonably support the contemplated use of the demised premises and employee headcount reasonably agreed between the Purchaser and the Sellers on or prior to the Closing Date and to permit the Purchaser or a Designated Purchaser to conduct the Business at such premises in a manner substantially similar to the manner conducted at such premises as of the date hereof and which are of substantially the same quality (including as to tenant improvements and fit-out and related services and amenities) as the premises provided under such Mission Critical Lease.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Account**" means the following seven (7) escrow accounts to be set up by the Escrow Agent pursuant to the Escrow Agreement: (i) an escrow account for the Purchase Price Adjustment Escrow Amount (the "**Purchase Price Adjustment Escrow Account**"), (ii) an escrow account for the Holdback Escrow Amount (the "**Holdback Escrow Account**"), (iii) an escrow account for the EMEA Employment Escrow Amount (the "**EMEA Employment Escrow Account**"), (iv) an escrow account for the Accrued Cash-Out Vacation Escrow Amount (the "**Accrued Cash-Out Vacation Escrow Account**"), (v) an escrow account for the French Tax Escrow Amount (the "**French Tax Escrow Account**"), (vi) an escrow account holding the Good Faith Deposit (the "**Good Faith Deposit Escrow Account**"), and (vii) an escrow account holding the Delay Fee (the "**Delay Fee Escrow Account**").

"**Escrow Agent**" means Wells Fargo Bank, National Association.

"**Escrow Agreement**" means the escrow agreement among NNI, NNL, NNUK, the Purchaser and the Escrow Agent to be entered into in the form of Exhibit F in accordance with Section 2.2.6(a).

"**Escrow Amount**" means the amount to be paid by the Purchaser by wire transfer of immediately available funds to the Escrow Agent on the Closing Date, which amount will consist of (i) the EMEA Employment Escrow Amount, (ii) the Holdback Escrow Amount, (iii) the Purchase Price Adjustment Escrow Amount, (iv) the Accrued Cash-Out Vacation Escrow Amount and (v) the French Tax Escrow Amount.

"**Estimated Closing Accrued Vacation Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Companies Net Working Capital**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing EMEA Holiday Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Inventory Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Net Debt Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Retirement Obligation Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Cost Schedule**" has the meaning set forth in Section 5.36(c).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.2.2(b).

"**European Union Entity**" means a Government Entity of the European Union. For the avoidance of doubt, "European Union Entity" means a supranational Government Entity and not a Government Entity of any member State of the European Union.

"**Excludable Other Seller**" means any Other Seller that is not listed in Section 1.1(g) of the Sellers Disclosure Schedule.

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.3.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded Non-365 Contract**" has the meaning set forth in Section 2.1.6(a)(iv).

"**Excluded Other Seller**" has the meaning set forth in Section 5.25(a).

"**Excluded Seller**" has the meaning set forth in Section 5.25(a).

22

"Excluded 365 Contract" has the meaning set forth in Section 2.1.5(a)(v).

"Executory Contract" means an "executory contract" for the purposes of the U.S. Bankruptcy Code.

"Expense Reimbursement" has the meaning set forth in Section 9.2(b).

"Expense Reimbursement Limit" has the meaning set forth in Section 9.2(b).

"Extra Services" has the meaning set forth in Section 5.36(b).

"Final Contract Designation Date" means (a) for a 365 Contract, the twentieth (20th) day prior to the Closing Date and (b) for a Non-365 Contract, the third (3rd) Business Day prior to the Closing Date.

"Final Date" has the meaning set forth in Section 2.2.1(b).

"Financial Statements" has the meaning set forth in Section 4.8.

"French Tax Escrow Amount" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"Fund" means any partnership, limited liability company or other investment vehicle that is a direct or indirect stockholder of the Purchaser.

"GAAP" means the United States generally accepted accounting principles, consistently applied.

"GAAS" means the United States generally accepted auditing standards.

"General Scope of Services" has the meaning set forth in Section 5.36(a).

"Good Faith Deposit" has the meaning set forth in Section 2.2.5(a).

"Government Bid" means any Bid made by any Seller or Company or by a contractor team or joint venture, in which any Seller or Company is participating that, if accepted, would result in the award of a Government Contract or a Government Subcontract.

"Government Contract" means any prime contract, multiple award schedule contract, basic ordering agreement, letter contract or any task order or purchase order issued thereunder or other written agreement between any Seller or Company and either the U.S. Government or a State Government.

"Government Entity" means any U.S., Canadian, Indian, UK, supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal or organization or any regulatory, administrative or other

23

agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**Government Subcontract**" means any subcontract issued to any Seller or Company by a prime contractor, including any basic ordering agreement, letter subcontract, task order, purchase order, or other written agreement between any Seller and any prime contractor to either the U.S. Government or a State Government.

"**GST**" means goods and services tax payable under Part IX of the Excise Tax Act (Canada).

"**Hazardous Materials**" means (a) petroleum, petroleum products, asbestos in any form that is friable or polychlorinated biphenyls and (b) any chemical, material or other substance regulated as hazardous or as a pollutant, contaminant or waste under any Environmental Law.

"**Holdback Escrow Amount**" means $25 million, which amount will be paid by the Purchaser to the Escrow Agent on the Closing Date and shall be held by the Escrow Agent pending the Sellers post-Closing delivery of financial statements to the Purchaser pursuant to the terms of Section 5.34(f).

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means that the responsible Minister under the Investment Canada Act shall have notified the Purchaser that he/she is satisfied, or such Minister shall be deemed to be satisfied, that the transactions contemplated in this Agreement that are subject to the provisions of the Investment Canada Act are likely to be of net benefit to Canada.

"**Inactive Employees**" means Employees (other than Share Transfer Employees and Employees whose employment transfers to the Purchaser or a Designated Purchaser by operation of Law) who have accepted Purchaser's or a Designated Purchaser's offer of employment as provided in Section 7.1 and are on a leave of absence for military service, short- or long-term disability, Family and Medical Leave Act or other leave of absence provided under applicable Law on the day immediately following the Closing Date as of 12:01 a.m. local time in such jurisdiction where Employees would have otherwise become Transferred Employees in accordance with this Agreement.

"**Inbound License Agreements**" has the meaning set forth in Section 4.6(j).

"**Included Real Estate Leases**" means each Designated 365 Real Estate Lease, Assumed and Subleased Real Estate Lease, Designated Non-365 Real Estate Lease, Non-365 Subleased Real Estate Lease and Company Lease, collectively, and, if applicable, Replacement Lease A, and any Equivalent Lease (to the extent that the Seller is the tenant thereunder).

24

"**Included Real Estate**" means the Owned Real Estate (if the Purchaser has elected to purchase such Owned Real Estate) and the real estate which is the demised premises under each Designated 365 Real Estate Lease, Assumed and Subleased Real Estate Lease, Designated Non-365 Real Estate Lease, Non-365 Subleased Real Estate Leases, Company Lease or Direct Lease, collectively, or under Replacement Lease A and any Equivalent Lease (to the extent that the Seller is the tenant thereunder), if applicable.

"**Included Services**" has the meaning set forth in Section 5.36(a).

"**Indebtedness**" of any Person means at any date, without duplication, all obligations (including all obligations in respect of principal, accrued interest, penalties, fees and premiums) of such Person (a) for indebtedness for borrowed money (including overdraft facilities), (b) for indebtedness evidenced by promissory notes, bonds, debentures, notes or similar instruments, (c) any "earn-out" obligations and other obligations for the deferred purchase price of property, goods or services (excluding trade payables), (d) in respect of letters of credit and bankers' acceptances, (e) in respect of leases that are capitalized in accordance with GAAP under which such Person is the lessee, (f) research and development funds received or invoiced under any alliance agreement that may be required to be earned by future performance or repaid thereunder and (g) in respect of any guarantees of such Person in connection with any of the foregoing.

"**Indemnified Expenses**" has the meaning set forth in Section 5.20(c).

"**Indemnified Person**" has the meaning set forth in Section 5.20(c).

"**Indirect Customer Contracts**" means any Seller Contract pursuant to which a Seller provides Products and/or Services to a reseller, distributor, system integrator or service provider (including Seller Contracts for Products or Services to be utilized by such reseller or distributor itself).

"**Information**" has the meaning set forth in Section 5.34(d)(iv).

"**Insolvency Act**" has the meaning set forth in the recitals to this Agreement.

"**Intellectual Property**" means all intellectual and industrial property as recognized under the laws of the United States of America, Canada and/or other countries or jurisdictions, including: (a) Trademarks; (b) Domain Names; (c) Patents; (d) copyrights and works of authorship (including any registrations therefor or applications for registration, and the benefit of any waiver of moral rights therein, to the extent such waiver is transferable by law); (e) mask works and integrated circuit topographies (including any registrations therefor or applications for registration); (f) trade secrets, know-how and proprietary and confidential technical or business information; (g) any Software; (h) any technology and (i) *sui generis* design rights.

"**Intellectual Property License Agreement**" means the agreement to be entered into between NNL, NNI, the relevant EMEA Sellers and the Joint Administrators, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit G.

25

"Intentional Breach" means, with respect to an agreement, an action or omission (including a failure to cure circumstances) that the breaching party knows or reasonably should have known is or would result in a breach of the agreement.

"Inventory Value" means, as of any given date, the book value, net of all applicable reserves and provisions, of the Owned Inventory and the EMEA Owned Inventory calculated in accordance with the Nortel Accounting Principles, and the Calculation Principles and the revenue assumptions presented in the Sellers Forecast set forth in Section 1.1(d)(ii) of the Sellers Disclosure Schedule.

"Investment Canada Act" means the Investment Canada Act, as amended.

"IP Escrow Agreement" has the meaning set forth in Section 5.9(c).

"IRS" means the United States Internal Revenue Service.

"Israeli Companies" has the meaning set forth in the recitals to this Agreement.

"Israeli Companies Law" has the meaning set forth in the recitals to this Agreement.

"Israeli Court" has the meaning set forth in the recitals to this Agreement.

"IT Headcount Forecast" has the meaning set forth in Section 5.36(c).

"Joint Administrators" has the meaning set forth in the recitals to this Agreement.

"Joint Israeli Administrators" has the meaning set forth in the recitals to this Agreement.

"KEIP" means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in part on March 5, 2009, and in part on March 20, 2009, and substantially approved by the Canadian Court in part on March 6, 2009, and in part on March 20, 2009, as the same may be amended, modified, supplemented or replaced from time to time in accordance with Section 5.9(d).

"KERP" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court on March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time in accordance with Section 5.9(d).

"Knowledge" or "aware of" or "notice of" or a similar phrase shall mean, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(h) of the Sellers Disclosure Schedule, and, with reference to the Purchaser, the actual knowledge of those Persons listed on Exhibit H.

"KPMG" has the meaning set forth in Section 5.34(e).

26

"**Latest Lease Rejection Date**" means (i) August 12, 2009, the deadline under the U.S. Bankruptcy Code, by which the Sellers must elect to either assume or reject 365 Real Estate Leases, or (ii) if the Sellers (in their sole discretion) request and a landlord under a 365 Real Estate Lease agrees to an extension of the date by which the relevant Seller must elect to either assume or reject such 365 Real Estate Lease to a date following August 12, 2009, then on the date to which such deadline has been extended by agreement of such Seller and such landlord.

"**Law**" means any U.S., Canadian, UK, Israeli, supranational, foreign, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**Lease A Sublease**" has the meaning set forth in Exhibit 5.28(g).

"**Letter of Credit**" means the letter of credit in the form of Exhibit I hereto issued by Citibank, N.A. (or any financial institution having at least an investment grade rating and capital and surplus of not less than $500 million) in favor of the Escrow Agent.

"**LGN Joint Venture**" means LG-Nortel Co. Ltd., which was established in November 2005 as a joint venture between NNL and LG Electronics Inc. for the purpose of jointly developing and marketing certain telecommunications equipment and network solutions.

"**LGN/Korea Distribution Agreement**" means the agreement between the Purchaser and/or a Designated Purchaser, on the one hand, and the LGN Joint Venture, on the other hand, governing the sale of certain Products by the Business to the LGN Joint Venture for resale.

"**LGN/Korea Supply Agreement**" means an agreement between the Purchaser and/or a Designated Purchaser and the LGN Joint Venture governing the supply of certain products by the LGN Joint Venture to the Business.

"**Liabilities**" means debts, liabilities, commitments and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or undeterminable, including those arising under any Law or Action and those arising under any contract, agreement, arrangement, commitment or undertaking or otherwise, including any Tax liability or tort liability.

"**Liability Limitation Amount**" means $200,000,000; provided, that in the event that at the time of termination of this Agreement the Standard Margin for the LTM Measurement Period is less than $640,000,000, then "**Liability Limitation Amount**" shall mean $100,000,000.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchaser(s) under the Intellectual Property License Agreement and the Trademark License Agreement.

27

"**Lien**" means any lien, mortgage, pledge or security interest, hypothec, adverse claim, a claim of adverse possession, right of first refusal, option, hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, prior claim, lease, lien or charge of any kind (including any conditional sale arrangement or other title retention agreement).

"**Loaned Employee Agreement**" means the agreement between the Main Sellers and certain of the Other Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed before the Closing in the form attached hereto as Exhibit J.

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Loss Duplication Elections**" has the meaning set forth in Section 6.5.

"**Losses**" means all losses, damages and reasonable and documented out-of-pocket costs and expenses.

"**LTM Measurement Period**" means (i) during the first 45 days after the end of any fiscal quarter of the Business, the period of four consecutive fiscal quarters of the Business ended on or prior to such time in respect of which financial statements for each quarter are available and (ii) any other time during such fiscal quarter, the period of four consecutive fiscal quarters of the Business ended on or prior to such time.

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Major Customer Contract**" has the meaning set forth in Section 5.38(d).

"**Major 2008 Customer Contract**" has the meaning set forth in Section 5.38(c).

"**Major 2009 Customer Contract**" has the meaning set forth in Section 5.38(d).

"**Mandatory Antitrust Approvals**" means a decision, in whatever form (including a declaration of lack of jurisdiction or a mere filing or notification, if the Closing can take place, pursuant to the applicable Antitrust Law, without a decision or the expiry of any waiting period) by any Government Entity under the Antitrust Laws of any of the jurisdictions listed in Exhibit K (the "**Relevant Antitrust Jurisdiction / Authorities**") or the expiry of the applicable waiting period, as applicable, under the Antitrust Laws of any of the jurisdictions listed in Exhibit K, authorizing or not objecting to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), which includes any decision or consent by any such Government Entity setting forth conditions or obligations on the Purchaser or any of its Affiliates if such conditions or obligations have been or, pursuant to Section 5.5(e) or Clause 10.11 of the EMEA Asset Sale Agreement are required to be, accepted by the Purchaser.

"**Material Adverse Effect**" means any change, event, fact, condition, occurrence or circumstance that, individually or in the aggregate, has or would reasonably be expected to have a material adverse effect on the business, operations, results of operations, properties, assets

28

or condition of the Business to be transferred hereunder, taken as a whole, but in each case shall not include the effect of events, changes, facts, conditions, occurrences or circumstances relating to (a) the industries and markets in which such Business operates, but only to the extent that such events, changes, facts, conditions, occurrences or circumstances do not have a materially disproportionate effect on such Business as compared to other industry participants, (b) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, acts of God, war, terrorism or hostilities, but only to the extent that such events, changes, facts, conditions, occurrences or circumstances do not have a materially disproportionate effect on such Business as compared to other industry participants, (c) changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (d) compliance with this Agreement, (e) the transactions contemplated hereby or any announcement hereof or the identity of the Purchaser, (f) any action taken by the Purchaser or its Affiliates, or (g) the pendency of the Bankruptcy Proceedings and any action approved by, or motion made before, the Bankruptcy Courts; it being understood that the failure of the Business to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect although the factors underlying such failure may be considered in determining whether or not there has been a Material Adverse Effect.

"**Material Contracts**" has the meaning set forth in Section 4.5.

"**Material Intentional Purchaser Breach**" has the meaning set forth in Section 9.3(a)(ii).

"**Mission Critical Leases**" has the meaning set forth in Section 5.31(g).

"**Monetary Cost**" has the meaning set forth in Section 5.36(c).

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**Multiemployer Plan**" has the meaning set forth in Section 4.14(j).

"**Mutual Development Agreement**" means an agreement between the Purchaser and/or any Designated Purchasers, on the one hand, and the relevant Sellers, on the other hand, governing the development (i) by the Purchaser and/or any Designated Purchasers of new features of certain of the products used by the Sellers and/or (ii) by the relevant Sellers of new features of certain of the Products.

"**Net Debt**" means, as of any time of determination, any Indebtedness of the Companies.

"**Net Debt Adjustment**" means the amount, if any, by which the Closing Net Debt exceeds the amount determined by reference to Section 1.1(c) of the Sellers Disclosure Schedule at the time of Closing. For the avoidance of doubt, if the Closing Net Debt is less than such amount, the Net Debt Adjustment shall be equal to zero and there shall be no Purchase Price adjustment in relation thereto.

"**Neutral Arbitrator**" has the meaning set forth in Section 5.36(h).

29

"NGS" means Nortel Government Solutions Incorporated, a corporation organized under the laws of Delaware with offices at 12730 Fair Lakes Circle, Fairfax, Virginia.

"NGS Companies" means, collectively, NGS and its two Subsidiaries, Integrated Information Technology Corporation and AC Technologies, Inc.

"NGS Shares" means all the equity interests in NGS.

"NISPOM" means the National Industrial Security Program Operating Manual, DoD 5220.22-M dated February 28, 2006.

"NNC" has the meaning set forth in the preamble to this Agreement.

"NNFSAS Succession Tax Liabilities" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"NNI" has the meaning set forth in the preamble to this Agreement.

"NNI Group" means an "affiliated group" as defined in Code section 1504(a) (or under a comparable provision of the Tax Laws of a jurisdiction within the United States) of which NNI is the common parent.

"NN International" means Nortel Networks International, Inc.

"NNL" has the meaning set forth in the preamble to this Agreement.

"NNRIP" means the Nortel Networks Retirement Income Plan.

"NNTC" has the meaning set forth in Section 6.1(c).

"NN Turkey" means Nortel Networks Netas Telekomunikasyon A.S., a joint stock corporation formed under the laws of Turkey.

"NNUK" means Nortel Networks UK Limited.

"Non-Assignable Contracts" has the meaning set forth in Section 5.13(a).

"Non-Assigned Contracts" means the Non-Assignable Contracts, to the extent all applicable Consents to assignment thereof to the Purchaser or a Designated Purchaser have not been granted prior to the Closing Date.

"Non-Debtor Sellers" has the meaning set forth in the recitals to this Agreement.

"Non-Designating Party" has the meaning set forth in Section 5.36(f).

"Non-Qualified Post-Signing Customer Contracts" has the meaning set forth in Section 5.38(g).

30

"**Non-Qualified Post-Signing Customer Contract List**" has the meaning set forth in Section 5.38(g).

"**Non-Solicitation Period**" means the twenty-four (24) month period immediately following the Closing Date.

"**Non-Union Employee**" means an Employee whose terms and conditions of employment are not governed by a Collective Labor Agreement.

"**Non-365 Customer Contract**" means any Customer Contract that is not a 365 Customer Contract.

"**Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(b)(i).

"**Non-365 Real Estate Lease List**" has the meaning set forth in Section 2.1.6(b)(i).

"**Non-365 Seller Contract**" means Seller Contracts other than 365 Contracts.

"**Non-365 SI/SP Contract**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 SI/SP Contract List**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.6(b)(iii).

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Financial Statements, as set forth in Section 1.1(i) of the Sellers Disclosure Schedule.

"**Nortel Parties**" has the meaning set forth in Section 10.14(a).

"**Notices of Lease**" has the meaning set forth in Section 5.30.

"**Notifying Party**" has the meaning set forth in Section 5.36(h).

"**Offer Consideration Period**" has the meaning set out in Section 7.1.1.

"**Open Source Software**" means Software that is made available under a license agreement that (i) conditions use, modification or distribution of any Software program, or any Software integrated with or derived from such Software program, or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software) or (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software.

"**Ordinary Course**" means the ordinary course of the Business consistent with past practice, as such practice may be modified from time to time to the extent necessary to

reflect the separation of the Business from the other businesses of the Sellers in a manner consistent with the terms of the Transaction Documents.

"**Other Contract**" means any Seller Contract that is not a Customer Contract, a SI/SP Contract, an Employment Contract or a Real Estate Lease.

"**Other Loaned Employees**" has the meaning set forth in the recitals to the Loaned Employee Agreement.

"**Other Non-365 Contract**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Other Non-365 Contract List**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Other Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Other 365 Contract**" has the meaning set forth in Section 2.1.5(a)(ii).

"**Other 365 Contract List**" has the meaning set forth in Section 2.1.5(a)(ii).

"**Overhead and Shared Services**" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services and which are provided to both (a) the Business and (b) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and Software in object code form used by Employees, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and Software (in object code form) or other Intellectual Property necessary for or used in connection therewith.

"**Owned Equipment**" means (a) those items of tangible personal property owned by the Sellers that are held or used primarily in connection with the Business and are located at the network operating centers, lab facilities and other facilities in each case listed in Section 1.1(j) of the Sellers Disclosure Schedule (the "**Sites**"), and (b) those other items of tangible personal property owned by the Sellers not included in clause (a) above that are held or used exclusively in connection with the Business, including, in each case, all trade fixtures and fixtures, furniture, furnishings, fittings, equipment, apparatus, appliances, test equipment, tooling and other articles of personal property which are owned by the Sellers and which are located at the Owned Real Estate (to the extent the Purchaser exercises its election under Section 2.1.1 to include the Owned Real Estate among the Assets), the Direct Lease Real Estate, any customer, supplier or other worksites or at the Sites or at the demised premises which are (i) the subject of any real property lease included in the Assigned Contracts or (ii) the subject of any Sublease,

32

provided, however, that, in each case, the term "Owned Equipment" shall not include fixtures other than trade fixtures located at the Direct Lease Real Estate or the Sites and shall not include any leasehold improvements located at the demised premises which are the subject of any Sublease; and, provided, further, that, "Owned Equipment" shall not include any Owned Inventory, any items of tangible property personally assigned to a single employee who is not (A) a Transferred Employees as of the Employee Transfer Date or (B) a Visa Employee, and any Intellectual Property.

"**Owned Inventory**" means any inventories of raw materials, manufactured and purchased parts, work in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise, in each case owned by the Sellers and held or used exclusively in connection with the Business, including any of the above items which is owned by the Sellers but remains in the possession or control of a contract manufacturer or another Third Party (but excluding any inventory that is purchased by any of the Sellers from any contract manufacturer after the Closing Date under any agreement between such Sellers and contract manufacturers or under any Contract Manufacturing Inventory Agreement and excluding any inventory that is required to be purchased by any of the Sellers from a contract manufacturer after the date of this Agreement but prior to the Closing Date in connection with the Ordinary Course quarterly review process completed by such contract manufacturer to determine inventory levels in excess of Sellers' forecasts).

"**Owned Real Estate**" means the real property owned by NNI and located in Bohemia, New York.

"**Partial Allocation**" has the meaning set forth in Section 2.2.7(b).

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patents**" includes all national (of any country of origin) and multinational statutory invention registrations, patents, patent applications, provisional patent applications, industrial designs, industrial models, and inventions (including any inventions disclosed in such patents and applications whether or not patentable), including all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, and all rights therein provided by multinational treaties or conventions.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**PCAOB**" means the Public Company Accounting Oversight Board auditing standards.

"**Pension Trustees**" means the trustees of the UK Defined Benefit Plan.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP other than Liens that

33

are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP; (iii) with respect to the NGS Shares, the Liens contemplated by the Proxy Agreement; (iv) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (v) any other Liens set forth in Section 1.1(k) of the Sellers Disclosure Schedule; and (vi) zoning, entitlement, building and land use regulations, customary covenants, defects of title, easements, rights of way, restrictions and other similar charges or encumbrances which (A) do not impair in any material respect the use or value of the related assets in the Business as currently conducted or (B), with respect to the Owned Real Estate, if included among the Assets, are disclosed on existing title reports or surveys.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Personal Information**" means information about an identifiable individual or other information that is subject to any Privacy Law and received, collected, used, stored, processed, disclosed or disposed of by the Sellers, including such information regarding individuals who are customers, suppliers, employees and agents of the Business, such as an individual's name, address, identification number, payment records, credit information, personal references and health records.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Post-Closing Taxable Period**" means any taxable period or portion thereof beginning after the Closing Date.

"**Post-Signing Customer Contract**" means a Customer Contract entered into after the date hereof.

"**Post-Signing Inclusion Criteria**" means the criteria described in Section 1.1(l) of the Sellers Disclosure Schedule.

"**PPF**" means the Pension Protection Fund created and operated in accordance with the UK Pensions Act 2004.

"**Pre-Closing Taxable Period**" means any taxable period or portion thereof ending on or prior to the Closing Date.

"**Pre-Signing Inclusion Criteria**" means the criteria described in Section 1.1(m) of the Sellers Disclosure Schedule.

"**Pre-Signing Customer Contract**" means a Customer Contract entered into prior to the date hereof.

34

"**Primary Party**" means (i) each of the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Privacy Laws**" means all applicable Laws of any Government Entity in any jurisdiction governing the receipt, collection, use, storage, processing, disclosure or disposal of information about an identifiable individual, including the Personal Information and Protection of Electronic Documents Act (Canada) and equivalent provincial legislation.

"**Product Volume Forecast**" has the meaning set forth in Section 5.36(c).

"**Products**" means those products that are manufactured by or on behalf of and/or marketed by the Business, as set forth in Section 1.1(n) of the Sellers Disclosure Schedule and all versions thereof that are supported as of the date hereof.

"**Proxy Agreement**" means the Proxy Agreement with respect to capital stock of NGS entered into on July 29, 2005, by and among NNC, NNL, NNI, NGS, James Frey, Thomas McInerney, Gregory Newbold and the United States Department of Defense.

"**Purchase Price**" has the meaning set forth in Section 2.2.1(a).

"**Purchase Price Adjustment Escrow Amount**" shall mean $30 million.

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Authorized Canadian Agent**" has the meaning set forth in Section 10.6(c).

"**Purchaser Employee Plan**" means any "employee benefit plan," whether or not in writing and whether covering a single individual or a group of individuals, within the meaning of Section 3(3) of ERISA and any other employee benefit plan, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, meal allowance plan, redundancy or severance plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferred Employees pursuant to this Agreement.

"**Purchaser Supply Agreement**" means an agreement between the Purchaser and/or any Designated Purchasers, on the one hand, and the relevant Sellers, on the other hand, governing the supply by the Purchaser and/or any Designated Purchasers to the relevant Sellers of certain products and services.

35

"**Qualified Expenditures**" has the meaning set forth in Section 6.6(b).

"**Real Estate Agreements**" means the leases, sub-leases or license agreements between the relevant Sellers, on the one hand, and the Purchaser or any Designated Purchasers, on the other hand, including the Subleases and the Direct Leases to be executed on or prior to the Closing, in the forms attached hereto as Exhibit N.

"**Real Estate Lease**" means any Seller Contract, Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease that is a lease, sublease, license or other agreements for occupancy of real estate.

"**Records Custodian**" means a Person of international reputation that is acceptable to the Purchaser and the Main Sellers, acting reasonably.

"**Registration Statement**" has the meaning set forth in Section 5.34(a).

"**Regulation S-X**" means Regulation S-X promulgated by the SEC as amended and in effect at the time in question.

"**Regulatory Approvals**" means the Antitrust Approvals and the ICA Approval.

"**Rejected Customer Contracts**" means, collectively, (i) the Rejected 365 SI/SP Contracts, (ii) Customer Contracts entered into prior to the Closing Date by an Excluded Seller that either (1) are entered into prior to the date hereof or (2) are entered into after the date hereof in the Ordinary Course and either enable termination without penalty with one-hundred eighty (180) days' notice or have a duration no longer than twelve (12) months following execution thereof, (iii) the Rejected Non-365 SI/SP Contracts, (iv) the Rejected Pre-Signing Customer Contracts and (v) the Enterprise Portion of those Pre-Signing Bundled Contracts that the Purchaser does not agree to accept in subcontract or elects to replace with new Contracts pursuant to Section 5.14(b) because the Enterprise Portion thereof does not meet the Pre-Signing Inclusion Criteria for Major Customer Contracts, in each case without giving effect to any material amendment or modification thereto entered into after the date hereof other than an amendment entered into in the Ordinary Course (x) prior to the Closing Date by an Excluded Seller that either enables termination without penalty with one-hundred eighty (180) days' notice or has a duration no longer than twelve (12) months following execution thereof or (y) by a Seller that does not materially expand the customer's rights under such agreement; provided that a Contract shall cease to be a Rejected Customer Contract upon the earliest of (A) the expiration of such Rejected Customer Contract (without giving effect to any extension of the term thereof other than at the option of the counterparty thereto), (B) the earliest date on which the relevant Seller has the right to terminate such Contract without penalty or (C) the date on which such Contract is terminated by the counterparty thereto.

"**Rejected Non-365 SI/SP Contracts**" has the meaning set forth in Section 2.1.6(a)(i).

"**Rejected Post-Signing Customer Contract**" has the meaning set forth in Section 5.38(g).

"**Rejected Pre-Signing Customer Contract**" has the meaning set forth in Section 5.38(f).

"**Rejected 365 SI/SP Contracts**" has the meaning set forth in Section 2.1.5(a)(i).

"**Relocation Costs**" means all reasonable and actual out-of-pocket costs and expenses incurred for the relocation of the Business, the Transferred Employees, Assets and business operations to be acquired by Purchaser, including moving costs, reasonable legal fees incurred for the purpose of reviewing and negotiating leases, rental costs for temporary space, leasing commissions, and tenant improvement and fit-out costs (hard and soft costs); provided that Relocation Costs shall not include, among other items, any business interruption costs or other damages (actual, consequential or otherwise) incurred by the Purchaser or any other party and the Purchaser waives any and all rights to recover any such amounts from the Seller or its Affiliates in connection with any relocation hereunder; and provided further that the Purchaser shall consult with the Sellers prior to incurring any such costs and, with respect only to space to be utilized on a temporary basis by Purchaser or a Designated Purchaser prior to the relocation of Business, Transferred Employees, Assets and business operations to Equivalent Space, Purchaser shall be required to obtain the agreement of Sellers prior to incurring any particular costs subject to reimbursement by Sellers hereunder.

"**Relocation Damages**" means all costs, expenses and damages resulting from any relocation performed by the Sellers of the Assets, Employees and business operation following any rejection of a 365 Real Estate Lease after the Closing, including, without limitation, business interruption costs or other damages (actual, consequential or otherwise).

"**Relocation Space**" has the meaning set forth in Section 5.32(b).

"**Remaining APAC Countries**" means India, Indonesia, Malaysia, Australia, New Zealand, the Philippines, Singapore, Japan, Thailand, Vietnam, Pakistan, Egypt and the United Arab Emirates.

"**Remaining CALA Countries**" means Mexico, Chile, Argentina, Colombia, Peru and Trinidad and Tobago.

"**Replacement Lease A**" has the meaning set forth in Exhibit 5.28(g).

"**Representative**" has the meaning set forth in Section 5.29.

"**Respective Affiliates**" has the meaning set forth in Section 10.16(c).

"**Restricted Technical Records**" means the Livelink database or any other similar database containing all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2007 and subsequent taxation years.

"**Retirement Obligation Amount**" means the amount of the actual unfunded obligations accrued in any period preceding the Closing Date that will be assumed by the Purchaser, a Designated Purchaser or an EMEA Designated Purchaser at Closing or retained by any Company at Closing (i) under the plans set forth in Section 1.1(o)(i) of the Sellers Disclosure

37

Schedule, or (ii) except with respect to the plans set forth in Section 1.1(o)(i) or Section 1.1(o)(ii) of the Sellers Disclosure Schedule, under a plan (including a non-U.S. plan) providing retirement or retiree welfare benefits of any Seller or EMEA Seller or any Company, in each case determined in accordance with GAAP. For purposes of this definition, an unfunded obligation (A) shall be deemed to be under a plan providing retirement or retiree welfare benefits (except as set forth in Section 1.1(o)(ii) of the Sellers Disclosure Schedule) to the extent it is required to be accounted for under FAS 87 (paragraphs 11, 72 and 73) or FAS 106 (paragraphs 16 and 85), and (B) shall not be taken into account to the extent it is (I) a Liability funded out of the EMEA Employment Escrow Account, (II) a Liability in respect of which there is, and to the extent of, a separate Purchase Price adjustment under this Agreement or the EMEA Asset Sale Agreement, and/or (III) a Liability for which Assets, EMEA Assets or assets of the Companies transferred to the Purchaser, a Designated Purchaser or an EMEA Designated Purchaser at Closing or retained by the Companies, in each case under Section 2.1.1(g) of this Agreement or Clause 2.1.6 of the EMEA Asset Sale Agreement, have been set aside as a funding source, to the extent of such funding.

"**Reverse Termination Fee**" has the meaning set forth in Section 9.3(a).

"**Satisfaction Date**" means the date one hundred and fifty (150) days after the date of this Agreement.

"**Schedule 1 Included Services**" has the meaning set forth in Section 5.36(a).

"**Scope Guidelines**" has the meaning set forth in Section 5.36(a).

"**SEC**" means the Securities and Exchange Commission.

"**Section 338(h)(10) Election**" has the meaning set forth in Section 6.5.

"**Section 5.25 Assets**" means (i) the assets, interests and rights of an Excluded Seller designated by the Purchaser as Excluded Assets in accordance with Section 5.25(a) and (ii) the assets, interests and rights of each such Person.

"**Section 5.25 Liability**" means all Liabilities to the extent arising from or related to a Section 5.25 Asset.

"**Securities Disclosure Documents**" has the meaning set forth in the first sentence of Article IV.

"**Security Deposits**" has the meaning set forth in Section 5.22(a)(i).

"**Selected Rejected Customer Contracts**" has the meaning set forth in Section 5.14(c).

"**Selected Supplier**" has the meaning set forth in Section 2.1.7(b).

"**Seller Acquisition**" has the meaning set forth in Section 5.33.

"**Seller Authorized Agents**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized Canadian Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized U.S. Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Bid**" has the meaning set forth in Section 2.1.1(m).

"**Seller Consents**" has the meaning set forth in Section 2.1.1(h).

"**Seller Contracts**" means (i) those Contracts of a Seller that relate exclusively to the Business or to the Assets (including Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business or any Asset, but excluding any other licenses of Intellectual Property) and (ii) the Contracts of a Seller listed in Section 1.1(p) of the Sellers Disclosure Schedule.

"**Seller Employee Plan**" means any "employee benefit plan," whether or not reduced to writing and whether covering a single individual or a group of individuals, within the meaning of Section 3(3) of ERISA and any other employee benefit plan including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, meal allowance plan, redundancy or severance plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries (other than any EMEA Sellers, if any) or Affiliates with respect to Employees, or under which the Companies has or may have any liability.

"**Seller Insurance Policies**" has the meaning set forth in 5.21(a).

"**Seller Supply Agreement**" means an agreement between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, governing the supply by the relevant Sellers to the Purchaser and/or any Designated Purchasers of certain products and services.

"**Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Sellers' Files**" has the meaning set forth in Section 5.38(a).

39

"**Sellers Forecast**" means Sellers' demand forecast for the Business, including Sellers' projected demand for voice, applications and data Products, as previously provided to the Purchaser and as attached hereto as Section 1.1(d)(ii) of Sellers Disclosure Schedule.

"**Sellers Inventory Schedule**" means the schedule set forth in Section 1.1(d)(i) of the Sellers Disclosure Schedule.

"**Sellers' Trademarks**" has the meaning set forth in Section 5.23.

"**Services**" means those services described in clause (ii) of the definition of "Business" hereunder.

"**Share Transfer Employee**" means any Employee who is employed by any of the Companies.

"**Shares**" means, collectively, the NGS Shares and the DiamondWare Shares.

"**SI/SP Contracts**" means only the Seller Contracts listed in Section 1.1(q) of the Sellers Disclosure Schedule as of the date hereof.

"**Software**" means any source code, object code, and updates thereto, and all related documentation, user and operational guides and/or manuals and the copyrights, if any, in and to all of the above.

"**Spares and Service Inventory Adjustment**" means (i) the Spares and Service Inventory Floor less (ii) the Closing Date Spares and Service Inventory Value; provided, that, if the calculated Spares and Service Inventory Adjustment is a negative number, the Spares and Service Inventory Adjustment will be zero.

"**Spares and Service Inventory Floor**" means $12,000,000.

"**Special Agreements**" has the meaning set forth in Section 4.14(a).

"**Standard Margin**" means, for any period, (i) revenue of the Business during such period determined in accordance with U.S. GAAP less (ii) the Sellers' and the EMEA Sellers' standard cost of the products and services for which revenue has been recognized by the Business during such period and any other costs included in the calculation of standard margin using the accounting principles, practices and methods used in the calculation of Unaudited Standard Margin on Section 1.1(b) of Sellers Disclosure Schedule. The Sellers' and the EMEA Sellers' standard cost includes direct material, direct labor and manufacturing overhead and does not include costs and expenses that the Sellers define as "Other Costs Not in Standard" ("**OCNIS**"). OCNIS includes freight, purchase price variances (*e.g.*, increases or decreases in cost of revenues resulting from standard to actual cost variance adjustments), warranty expense, known product defect expense, royalties, changes in excess and obsolete ("**E&O**") inventory provisions and other corporate overhead charges, including rental charges for the use of shared service assets and/or facilities. For the purposes of this definition and the related calculations, it shall be assumed that all Excluded Other Sellers are Sellers and all Excluded EMEA Sellers (as defined in the EMEA Asset Sale Agreement) and any EMEA Seller whose EMEA Assets and

40

EMEA Liabilities are designated Removed Assets and Removed Liabilities or Excluded Assets and Excluded Liabilities under the terms of the EMEA Asset Sale Agreement are EMEA Sellers.

"**State Government**" means any state, territory or possession of the United States or any department or agency of any of such state, territory or possession with jurisdiction and responsibility throughout such state, territory or possession.

"**Straddle Period**" has the meaning set forth in Section 6.4(b).

"**Subcontract Agreement**" means one or more agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand.

"**Subleases**" has the meaning set forth in Section 5.28(a).

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Target Closing Companies Net Working Capital**" means $16,100,000.

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity, including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, gross receipts, sales, use, ad valorem, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto whether or not disputed, and (b) any obligation to pay any amounts set forth in clause (a) with respect to another Person, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group or otherwise for any period.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian, U.K. or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

"**Tax Credit Purchaser**" has the meaning set forth in Section 6.6(b).

"**Tax Returns**" means all returns, reports (including any amendments, elections, declarations, disclosures, claims for refunds, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes.

"**Temporary Lease**" has the meaning set forth in Section 5.31(g)(ii).

"**Third Party**" means any Person that is neither a Party nor an Affiliate of a Party.

41

"**Trademarks**" means, together with the goodwill associated therewith, all trademarks, service marks, trade dress, logos, distinguishing guises and indicia, trade names, corporate names, business names, whether or not registered, including all common law rights, and registrations, applications for registration and renewals thereof, including all marks registered in the United States Patent and Trademark Office, the trademark offices of the states and territories of the United States of America, and the trademark offices of other nations throughout the world (including the Canadian Intellectual Property Office), and all rights therein provided by multinational treaties or conventions.

"**Trademark License Agreement**" means the trademark license agreement between the relevant Sellers, on the one hand, and the Purchaser, any Designated Purchasers, and/or any EMEA Designated Purchasers, on the other hand, in respect of certain Trademarks used in the Business to be entered into on or before the Closing in the form attached hereto as Exhibit O.

"**Transaction Documents**" means this Agreement, the EMEA Asset Sale Agreement, the Ancillary Agreements and all other ancillary agreements to be entered into, or documentation delivered by, any Party, any EMEA Seller, any Designated Purchaser and/or any EMEA Designated Purchaser pursuant to this Agreement or the EMEA Asset Sale Agreement or any Local Sale Agreement.

"**Transfer Taxes**" means (a) all goods and services, sales, excise, use, transfer, gross receipts, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees and notarial fees), together with interest, penalties and additional amounts imposed with respect thereto whether or not disputed, and (b) any obligation to pay any amounts set forth in clause (a) with respect to another Person, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group or otherwise for any period.

"**Transferred Employee**" means (i) Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1 or Section 7.2, (ii) those Employees, other than Share Transfer Employees, whose employment transfers by operation of Law, and (iii) those Employees who are Share Transfer Employees, provided that no Employee (other than any Share Transfer Employee or any Employee whose employment transfers by operation of Law) who is an Inactive Employee shall be a Transferred Employee unless such Employee reports to work with the Purchaser or a Designated Purchaser no later than the later of (A) the earlier of (x) the date the Seller-approved leave of absence ends or (y) six (6) months from the Closing Date and (B) the end of such longer period as provided with respect to such leave under applicable Law; and provided, further, that no Employee (other than any Share Transfer Employee or any Employee whose employment transfers by operation of Law) who is on leave of absence for any reason other than those reasons listed in the definition of Inactive Employees as of the Closing shall be a Transferred Employee.

42

"**Transferred Employee Plans**" means Seller Employee Plans in respect of which Liabilities are (i) Assumed Liabilities under Section 2.1.3(g) or (ii) owed by a Company to its employees or former employees.

"**Transferred Intellectual Property**" means (i) the Patents set forth in Section 1.1(r)(i) of the Sellers Disclosure Schedule, (ii) the Trademarks set forth in Section 1.1(r)(ii) of the Sellers Disclosure Schedule, (iii) the Domain Names listed in Section 1.1(r)(iii) of the Sellers Disclosure Schedule, and (iv) any Intellectual Property (other than Patents, Domain Names or Trademarks) owned by any of the Sellers that is used exclusively in connection with the Business, including without limitation the Software listed in Section 1.1(r)(iv) of the Sellers Disclosure Schedule.

"**Transferred Overhead and Shared Services**" means Overhead and Shared Services to be provided to or in support of the Business post-Closing by Transferred Employees.

"**Transition Services Agreement**" means an agreement between the Main Sellers, the relevant Other Sellers and the TSA EMEA Sellers, on the one hand, and the Purchaser and the relevant Designated Purchasers and/or EMEA Designated Purchasers, on the other hand, to be executed on or prior to the Closing Date, in the form attached hereto as Exhibit P, except that the Schedules to such agreement shall be determined in accordance with Section 5.36.

"**TSA EMEA Sellers**" means NNUK and Nortel Networks (Ireland) Limited.

"**TSA Sellers**" means the Main Sellers and those entities listed in Exhibit A attached to the form Transition Services Agreement contained in Exhibit P hereto.

"**Type 1 Extra Services**" has the meaning set forth in Section 5.36(b).

"**Type 2 Extra Services**" has the meaning set forth in Section 5.36(b).

"**UK Defined Benefit Plan**" means the Nortel Networks UK Pension Plan or any other UK defined benefit occupational pension scheme operated by any company connected with or associated with the Companies.

"**UK Pensions Act 2004**" means the UK Pensions Act 2004, including any amendments thereto and regulations promulgated thereunder.

"**UK Pensions Regulator**" means the regulator of UK based occupational pension schemes in accordance with the UK Pensions Act 2004 and known as the Pensions Regulator.

"**Unaudited Interim Financial Statements**" means collectively, (i) the carve-out combined balance sheets of the Business as of the last day of each fiscal quarter ending after January 1, 2009 and on or prior to the Closing Date, (ii) the carve-out combined statements of income of the Business for the three month and year-to date periods then ended and cash flows of the Business for the year-to-date periods then ended, together with the statements for the corresponding periods of the immediately preceding year and (iii) the carve-out combined

statements of income (a) for the three month period ended December 31, 2008, and (b) from the most recently completed fiscal quarter, which fiscal quarter may be the last fiscal quarter of a year, through the Closing Date, in each case to the extent required to be delivered pursuant to Section 5.34 and prepared in accordance with GAAP and the applicable rules and regulations promulgated by the SEC for interim financial information, including Regulation S-X and Rule 3-05 thereunder.

"**Unaudited Standard Margin**" means $1,383.5 million, which is the Standard Margin of the Business for the calendar year ended December 31, 2008, based on the Financial Statements, less the standard margin associated with the Layer 4-7 Data Portfolio and the LGN Joint Venture included in the Financial Statements as calculated on Schedule 1.1(b) of the Sellers Disclosure Schedule.

"**Undisclosed Liability Threshold Amount**" means, with respect to any Excludable Other Seller, the higher of (a) an amount equal to (i) the Base Purchase Price, multiplied by (ii) 0.50, multiplied by (iii) the quotient of (A) total statutory entity revenues of such Excludable Other Seller related to the Business for fiscal year 2008, divided by, (B) total 2008 revenues of the Business, and (b) $2 million.

"**Undisclosed Material Liability**" means, with respect to any Excludable Other Seller, a Liability of such Excludable Other Seller (i) that would not constitute an "Assumed Liability", (ii) the existence of which was not known to the Purchaser or its representatives as of the date hereof and (iii) that exceeds or is reasonably expected to exceed the Undisclosed Liability Threshold Amount for such Excludable Other Seller.

"**Uni-Nortel**" means Uni-Nortel Communication Technologies (Hellas), S.A., a company organized under the laws of Greece, which was established in July 2005 as a joint venture between Nortel Networks International Finance & Holding, B.V. and UniSystems, S.A. for the purposes of marketing and selling certain telecommunications equipment and systems in Greece and the Republic of Cyprus.

"**Uni-Nortel Distribution Agreement**" means an agreement between Uni-Nortel, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, governing the sale of certain Products of the Business from the Purchaser or Designated Purchaser to Uni-Nortel.

"**Union Employee**" means an Employee whose terms and conditions of employment are covered by a Collective Labor Agreement as specified in Section 4.14(b)(i) of the Sellers Disclosure Schedule.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

44

"U.S. Bidding Procedures and Sale Motion" has the meaning set forth in Section 5.1(a).

"U.S. Bidding Procedures Order" has the meaning set forth in Section 5.1(a).

"U.S. Debtor Contract" means any Seller Contract to which a U.S. Debtor is a party.

"U.S. Debtors" has the meaning set forth in the recitals to this Agreement.

"U.S. Government" means the United States Government or any department, agency or instrumentality thereof.

"U.S. Sale Order" has the meaning set forth in Section 5.1(a).

"Visa Employees" means Employees (other than Share Transfer Employees and Employees whose employment transfers by operation of Law) who are identified as having a visa or permit in Section 4.14(b)(i) of the Sellers Disclosure Schedule and whose employment with Purchaser or a Designated Purchaser cannot commence or continue on the day immediately following the Closing Date as of 12:01 a.m. local time in such jurisdiction where such Employee would have otherwise become a Transferred Employee, solely due to the Purchaser or a Designated Purchaser's inability to obtain the required visa or permit with respect to such Employee's employment on such date; provided, however, that no such Employee shall be a Visa Employee or a Transferred Employee unless such Employee reports to work with the Purchaser or a Designated Purchaser no later than the earlier of the date such Employee's required visa or permit is obtained or twelve (12) months from the Closing Date.

"Voice Inventory Adjustment" will be the Voice Inventory Floor less the Closing Date Voice Inventory Value; provided that, if the calculated Voice Inventory Adjustment is a negative amount, the Voice Inventory Adjustment will be zero.

"Voice Inventory Floor" means the Inventory Value related to voice products of the Business as set forth in the Sellers Inventory Schedule (the "Voice Inventory Value") on the Closing Date, provided that, if the Closing Date falls on a date that is not at the end of any fiscal quarter, the Voice Inventory Value shall equal the sum of (i) the Voice Inventory Value as of the last day of the prior fiscal quarter, plus (ii) (x) (A) the Voice Inventory Value for the last day of the fiscal quarter in which the Closing Date occurred, minus (B) the Voice Inventory Value for the last day of the prior fiscal quarter, multiplied by (y) (A) the number of days elapsed prior to the Closing Date during the fiscal quarter in which the Closing Date occurred, divided by (B) the total number of days in the fiscal quarter in which the Closing Date occurred.

"WARN Act" has the meaning set forth in Section 4.14(f).

"Wholly-Owned Subsidiary" means, as to any Person, any Subsidiary of such Person all of the capital stock or other equity interests in which is held directly or indirectly by such Person except, if applicable, for any capital stock or equity interest which is held by a director of such Subsidiary as required by applicable Laws.

45

"**365 Contracts**" means U.S. Debtor Contracts that are Executory Contracts and were entered into before the Petition Date that the Purchaser may elect to have a U.S. Debtor assume and assign pursuant to section 365 of the U.S. Bankruptcy Code.

"**365 Customer Contracts**" means Customer Contracts of a U.S. Debtor that are Executory Contracts and were entered into before the Petition Date.

"**365 Real Estate Lease List**" has the meaning set forth in Section 2.1.5(b)(i).

"**365 Real Estate Leases**" has the meaning set forth in Section 2.1.5(b)(i).

"**365 SI/SP Contract**" has the meaning set forth in Section 2.1.5(a)(i).

"**365 SI/SP Contract List**" has the meaning set forth in Section 2.1.5(a)(i).

"**8-K**" has the meaning set forth in Section 5.34(a).

SECTION 1.2.    Interpretation.

1.2.1.    Gender and Number. Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2.    Certain Phrases and Calculation of Time. In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from but excluding" and the words "to" and "until" each mean "to and including". If the last day of any such period is not a Business Day, such period will end on the next Business Day. In determining whether an asset is "exclusively" used in connection with the Business, incidental, de minimis or casual uses outside the Business shall not be considered.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

1.2.3.    Headings, etc. The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

1.2.4.    Currency and Calculations. All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency. All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency. All payments required under this Agreement shall be paid

46