orders, without modification that is material and adverse to the terminating Party unless such Party expressly consented to such modification (such consent not to be unreasonably withheld), set forth in Exhibit 5.1(a) (in the case of the U.S. Bidding Procedures Order) and Exhibit 5.2.1 (in the case of the Canadian Sales Process Order);

(ii)    on or prior to the fifth (5th) Business Day after entry of the U.S. Sale Order or the Canadian Approval and Vesting Order, if the U.S. Sale Order and the Canadian Approval and Vesting Order are not entered within ten (10) Business Days if terminated by the Purchaser or twenty (20) Business Days if terminated by the Main Sellers after the conclusion of the Auction in the form of orders, without modification that is material and adverse to the terminating Party unless such Party expressly consented to such modification (such consent not to be unreasonably withheld), set forth in Exhibit 5.1(a) (in the case of the U.S. Bidding Procedures Order) and Exhibit 5.2.1 (in the case of the Canadian Sales Process Order);

(iii)    upon or following the entry of an order by the U.S. Bankruptcy Court or the Canadian Court approving an Alternative Transaction;

(iv)    if the EMEA Asset Sale Agreement is terminated in accordance with its terms;

(v)    upon or following the sale, transfer or other disposition, directly or indirectly, of any material portion of the Business or the Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers or the Companies;

(vi)    if the Closing does not take place on or prior to the date that is 270 days from the date of this Agreement in the case of a termination by the Main Sellers, or the date that is 365 days from the date of this Agreement in the case of a termination by the Purchaser; or

(vii)    if any Antitrust Law is enacted in the U.S. or Canada or by the European Union, or any Court or other Government Entity in the U.S. or Canada or any Government Entity of the European Union issues a final order, injunction, decree, ruling or judgment based on Antitrust Laws, in each case permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement; or

(c)    (i) by the Purchaser, upon written notice to the Main Sellers, in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure of the conditions to Closing set forth in Section 8.1(a), Section 8.1(e), Section 8.1(f), Section 8.3(a) or Section 8.3(b), as applicable, or (ii) by the Main Sellers, upon written notice to the Purchaser, in the event of a material breach by the Purchaser of the Purchaser's representations, warranties,

178

agreements or covenants set forth in this Agreement or the EMEA Asset Sale Agreement, which breach would result in a failure of the conditions to Closing set forth in Section 8.1(a), Section 8.1(c), Section 8.1(f), Section 8.2(a) or Section 8.2(b), as applicable, and, in each case, which, if capable of being cured, has not been cured within twenty-five (25) days from receipt of a written notice thereof from the non-breaching Party; or

      (d)     by the Main Sellers, upon written notice to the Purchaser:

          (i)     upon Purchaser's material breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within five (5) days from the receipt of a written notice thereof from the Main Sellers; or

          (ii)    in the event of a material breach by the Purchaser of the Purchaser's covenants set forth in Section 5.5, which breach, if capable of being cured, is not cured within fifteen (15) days from receipt of a written notice thereof from the Main Sellers;

      (e)     by the Purchaser, upon written notice to the Main Sellers, if at the conclusion of the Auction, the Purchaser is not selected as the Successful Bidder (as defined in the U.S. Bidding Procedures Order);

      (f)     by the Purchaser, upon written notice to the Main Sellers delivered prior to the entry of the U.S. Sale Order, if the Auction does not conclude by the later of (x) the forty-fifth (45th) Business Day after the entry of the U.S. Bidding Procedures Order and (y) September 15, 2009;

      (g)     by the Purchaser, upon written notice to the Main Sellers;

          (i)     upon revocation or alteration of the Bidding Procedures (as defined in the U.S. Bidding Procedures Order), the Bidding Process (as defined in the U.S. Bidding Procedures Order) or the Auction, in each case pursuant to the last paragraph of the section of the Bidding Procedures titled "Reservation of Rights;"

          (ii)    upon any Sellers' material breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within twenty-five (25) days from the receipt of a written notice thereof from the Purchaser; or

          (iii)   within thirty (30) days of delivery by the Purchaser of the related written notice of breach to the Sellers, in the event that (A) on or subsequent to the date hereof and prior to the entry of the Bidding Procedures Order or (B) subsequent to the conclusion of the Auction, in the event there is a material breach by the Sellers of the covenants set forth in Section 5.29 that occurred during such period which breach, if capable of being cured, has not been cured within five (5) days from receipt of a written notice thereof from the Purchaser (provided that, with respect to a breach occurring in the period contemplated by clause (A), no termination notice shall be given by the Purchaser after the entry of the Bidding Procedures Order);

(h)     by the Purchaser, upon written notice to the Main Sellers delivered within fifteen (15) days of delivery to the Purchaser of the Audited Financial Statements for fiscal year 2008, if the Adjusted Audited Standard Margin is less than ninety percent (90%) of the Unaudited Standard Margin; or

(i)     by the Purchaser, upon written notice to the Main Sellers delivered before the expiration of the Contract Review Period, provided that the Reverse Termination Fee is paid to Sellers in accordance with Section 9.3 prior to or concurrently with such termination;

provided, however, that (x) the right to terminate this Agreement pursuant to Section 9.1(b)(i), Section 9.1(b)(ii), Section 9.1(b)(vii), Section 9.1(e) or Section 9.1(f) shall not be available to any Party whose breach hereof was a principal cause of the event or condition purportedly giving rise to a right to terminate this Agreement under such clause and; provided further, however, that (y) the right to terminate this Agreement pursuant to Section 9.1(b)(vi) shall not be available to the Sellers, if any Seller or any EMEA Seller is in breach of its obligation to close the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement during the twenty-five (25) days prior to the two-hundred seventieth (270th) day from the date hereof, until forty-five (45) days after such breach has been cured and (z) the right to terminate this Agreement pursuant to Section 9.1(b)(vi) shall not be available to the Purchaser, if the Purchaser is in breach of its obligation to close the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement during the five (5) days prior to the date that is 365 days after the date hereof, until forty-five (45) days after such breach has been cured.

SECTION 9.2.    Break-Up Fee; Expense Reimbursement.

(a)     In the event that (i) this Agreement is terminated (x) by either Primary Party pursuant to Section 9.1(b)(ii) (provided that an Alternative Transaction has been proposed or re-proposed to the Main Sellers after the date hereof and prior to such termination, and an Alternative Transaction is entered into before, on or within sixty (60) days following such termination of this Agreement), Section 9.1(b)(iii) or Section 9.1(b)(v) or (y) by the Purchaser pursuant to Section 9.1(c)(i) (as a result of an Intentional Breach by the Sellers), Section 9.1(e), Section 9.1(f), Section 9.1(g)(i), Section 9.1(g)(ii) (as a result of an Intentional Breach by the Sellers) or, subsequent to the conclusion of the Auction, Section 9.1(g)(iii) (as a result of an Intentional Breach by the Sellers), or (z) by either Primary Party pursuant to Section 9.1(b)(iv) (as a result of a termination of the EMEA Asset Sale Agreement pursuant to Clause 15.4.2(C), Clause 15.4.2(E) or Clause 15.4.4 (as a result of an Intentional Breach by the EMEA Sellers of the EMEA Asset Sale Agreement) of the EMEA Asset Sale Agreement), (ii) when this Agreement is terminated, the Purchaser is not in breach of this Agreement or the EMEA Asset Sale Agreement as a result of an Intentional Breach which Intentional Breach would result in a failure to satisfy the conditions to Closing set forth in Section 8.1 and/or Section 8.2, as applicable, and, in each case, which, if capable of being cured, has not been cured within the applicable Breach Cure Period, and (iii) an Alternative Transaction is entered into before, on or within nine (9) months following such termination and is eventually consummated, the Sellers and the EMEA Debtors shall pay to the Purchaser in immediately available funds, within five (5) Business Days of the consummation of such Alternative Transaction, an aggregate cash fee equal to (x) $14,250,000 (the "Break-Up Fee"), minus (y) one-half of the Expense Reimbursement paid hereunder.

(b)    In the event that (i) (A) this Agreement is terminated pursuant to any provision in Section 9.1 (other than Section 9.1(a), Section 9.1(b)(iv) (as a result of a termination of the EMEA Asset Sale Agreement pursuant to Clause 15.4.1, Clause 15.4.2(G), Clause 15.4.3, or Clause 15.4.9 of the EMEA Asset Sale Agreement), Section 9.1(b)(vii), Section 9.1(c)(ii), Section 9.1(d) or Section 9.1(i)), or (B) this Agreement is terminated pursuant to any provision in Section 9.1 and, prior to such termination, the Sellers publicly announce (1) the retention of the Business by all or some of the Sellers (or their successor entities) under a stand-alone plan of reorganization approved by the U.S. Bankruptcy Court or any plan of arrangement approved by the Canadian Court, or (2) that any portion of the Business or the Assets and the EMEA Assets will be sold, transferred or otherwise disposed, directly or indirectly, in connection with the closure, liquidation or winding up of the Business or any of the Sellers, the EMEA Sellers or the Companies (except for any sale to the Purchaser or a Designated Purchaser contemplated by the Transaction Documents), and (ii) when this Agreement is terminated, the Purchaser is not in breach of this Agreement or the EMEA Asset Sale Agreement as a result of an Intentional Breach which breach would result in a failure to satisfy any of the conditions to Closing set forth in Section 8.1 and/or Section 8.2 or Clause 15.1 and/or Clause 15.2 of the EMEA Asset Sale Agreement, as applicable, and, in each case, which, if capable of being cured, has not been cured within the applicable Breach Cure Period, the Sellers and the EMEA Sellers shall pay the Purchaser an aggregate amount in cash equal to the total amount of all reasonable and documented fees, costs and expenses incurred by the Purchaser in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all filing and notification fees, and all fees and expenses of the Purchaser's representatives (the "**Expense Reimbursement**"); provided, however, that the Expense Reimbursement shall not be payable in the event that the Agreement is terminated pursuant to Section 9.1(b)(vi) if at the time of such termination (i) the condition set forth in Section 8.1(a) is not satisfied and (ii) the conditions set forth in Section 8.1(b), Section 8.1(d), Section 8.3(a), Section 8.3(b), Section 8.3(d) and Section 8.3(e) are satisfied other than any failure to satisfy any such condition listed in clause (ii) that is caused by the failure to obtain any Antitrust Approval or an Intentional Breach by Purchaser of this Agreement which, if capable of being cured, has not been cured within the applicable Breach Cure Period. Notwithstanding the foregoing, the Expense Reimbursement shall not exceed $9,500,000 in the aggregate (the "**Expense Reimbursement Limit**"). If the Expense Reimbursement does not exceed the Expense Reimbursement Limit, the Sellers and the EMEA Sellers agree that the Expense Reimbursement is a reasonable amount given the size and complexity of the transactions contemplated by this Agreement and the EMEA Asset Sale Agreement. The Expense Reimbursement shall be paid by wire transfer or other means reasonably acceptable to the Purchaser not later than five (5) Business Days following the receipt by the Main Sellers and NNUK of written notice from the Purchaser describing the fees and expenses that constitute the Expense Reimbursement in reasonable detail.

(c)    The Sellers shall pay two-thirds (2/3) and the EMEA Debtors shall pay one-third (1/3) of each of the Break-Up Fee and the Expense Reimbursement if payable hereunder. The Sellers' and the EMEA Debtors' obligations to pay their respective shares of the Break-Up Fee and the Expense Reimbursement pursuant to this Section 9.2 shall be several and not joint (but the obligation of the Sellers to pay two-thirds (2/3) of each of the Break-Up Fee and Expense Reimbursement shall be joint and several among the Sellers and the obligation of

the EMEA Debtors to pay one-third (1/3) of each of the Break-Up Fee and Expense Reimbursement shall be joint and several among the EMEA Debtors) and shall survive termination of this Agreement or the EMEA Asset Sale Agreement and shall (i) to the extent owed by the U.S. Debtors constitute an administrative expense of the U.S. Debtors under sections 503(b) of the U.S. Bankruptcy Code and (ii) to the extent owed by the EMEA Debtors, constitute an expense of the administration under Paragraph 99 of Schedule B1 to the Insolvency Act 1986 and/ or Rule 2.67 of the Insolvency Rules 1986; provided, however, in the event that any Seller or any EMEA Seller or any Affiliate of any Seller or EMEA Seller agrees to pay a break-up fee or expense reimbursement to any subsequent purchaser of assets or shares, with an unadjusted, aggregate purchase price greater than or equal to $100,000,000 and such break-up fee or expense reimbursement has priority over any administrative expenses specified in section 503(b) or 507(b) of the U.S. Bankruptcy Code, then the portion of the Break-Up Fee and Expense Reimbursement payable to the Purchaser or its Affiliates by the Sellers shall have administrative expense status under section 364(c) of the U.S. Bankruptcy Code with priority over any and all administrative expenses specified in section 503(b) or 507(b) of the U.S. Bankruptcy Code (to the extent such concept is applicable to such Sellers).

(d)     Notwithstanding anything to the contrary herein, the Sellers' obligation to pay the Break-Up Fee and/or Expense Reimbursement pursuant to this Section 9.2 is expressly subject to entry of the U.S. Bidding Procedures Order and Canadian Sales Process Order.

SECTION 9.3.     Reverse Termination Fee.

(a)     The Purchaser shall pay to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) a cash fee in an aggregate amount equal to $100 million (such aggregate cash fee, the "**Reverse Termination Fee**") in the event that:

(i)     this Agreement is terminated by Purchaser pursuant to Section 9.1(i); or

(ii)     (A) at the time of termination of the Agreement, (1) the conditions set forth in Section 8.1(a) have not been satisfied because of the failure to obtain any Antitrust Approval and/or (2) the Purchaser is in breach in any material respect of its representations, warranties, agreements or covenants set forth in this Agreement or the EMEA Asset Sale Agreement as a result of an Intentional Breach which breach (x) would result in a failure to satisfy any of the conditions to Closing set forth in Section 8.1 and/or Section 8.2, as applicable, or the conditions to Closing (as defined in the EMEA Asset Sale Agreement) set forth in Clause 15.1 and/or Clause 15.2 of the EMEA Asset Sale Agreement, as applicable, and (y) if capable of being cured, such breach by the Purchaser is not cured within the applicable Breach Cure Period (such breach, a "**Material Intentional Purchaser Breach**"); and

(B)(1) this Agreement is terminated by the Main Sellers pursuant to Section 9.1(c)(ii) or Section 9.1(d) hereof, (2) the EMEA Asset Sale Agreement is terminated by the Joint Administrators pursuant to Clause 15.4.3 thereof, or (3) this Agreement is terminated by either Primary Party pursuant to

182

Section 9.1(b)(vi) or Section 9.1(b)(vii) hereof or the EMEA Asset Sale Agreement is terminated by the Joint Administrator or the Purchaser pursuant to Clause 15.4.2(F) or Clause 15.4.2(G) thereof;

provided, however, that notwithstanding the foregoing, the Reverse Termination Fee shall not be payable pursuant to this clause (ii) if at the time of termination:

(x) (1) the Sellers are in breach of this Agreement in any material respect as a result of an Intentional Breach, which breach would result in a failure of the conditions to Closing set forth in Section 8.1 or Section 8.3 to be satisfied, and in each case, which, if capable of being cured, is not cured within the applicable Breach Cure Period or (2) the EMEA Sellers are in breach of the EMEA Asset Sale Agreement in any material respect as a result of an Intentional Breach, which breach would result in a failure of the conditions to Closing (as defined in the EMEA Asset Sale Agreement) set forth in Clause 15.3.1 thereof to be satisfied, and in each case, which, if capable of being cured, is not cured within the applicable Breach Cure Period; or

(y) any of the conditions to Purchaser's obligations set forth in Section 8.1 or Section 8.3 cannot be satisfied on or before the date that is 365 days from the date of this Agreement (other than any such condition that by its nature is to be satisfied at the Closing or any such condition that cannot be satisfied as a result of (1) a Material Intentional Purchaser Breach or (2) the failure to obtain any Antitrust Approval).

(b)    If payable pursuant to Section 9.3(a) the Reverse Termination Fee shall be paid by the Purchaser to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) as follows:

(i)    by application of the Good Faith Deposit and the portion of the Delay Fee that shall have already been paid to the Escrow Agent in the form of Delay Fee Payments pursuant to Section 2.2.1(b) and the actual earnings thereon, as contemplated in Section 2.2.1(c)(ii); and

(ii)    as for the balance of the Reverse Termination Fee, if any, in immediately available funds, within two (2) Business Days of the termination of this Agreement, by way of wire transfer to an account of the Distribution Agent, as distribution agent for the Sellers, to be notified by the Main Sellers or the Distribution Agent to the Purchaser in writing.

SECTION 9.4.    Effects of Termination.  If this Agreement is terminated pursuant to Section 9.1:

(a)    all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of or as provided in (i) Section 2.2.6(b) (Escrows), (ii) Section 5.7 (Public Announcements), (iii) Section 5.10 (Transaction Expenses), (iv) Section 5.11 (Confidentiality), (v) Section 7.4(b)(iii) (Other Employee Covenants), (vi) Section 9.2 (Break-Up Fee; Expense Reimbursement), (vii) Section 9.3 (Reverse Termination Fee), (viii) Section 9.4 (Effects of Termination), and (ix) Article X;

(b)      except as required by applicable Law, the Purchaser shall return to the Sellers all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; and

(c)      the provisions of the Confidentiality Agreement will continue in full force and effect.

## ARTICLE X

### MISCELLANEOUS

SECTION 10.1.    No Survival of Representations and Warranties or Covenants. Except for the representations set forth in Section 3.5, no representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants set forth in Article VI and covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

SECTION 10.2.    Remedies. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 10.3.    No Third-Party Beneficiaries. Except for the rights of the Indemnified Persons under Section 5.20, the rights of the Avaya Parties and the Nortel Parties pursuant to Section 10.14 and any acknowledgments, rights, undertakings, representations or warranties expressed to be for the benefit of the EMEA Sellers, the Joint Administrators or the Joint Israeli Administrators, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 10.4.    Consent to Amendments; Waivers. No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement and the Ancillary Agreements shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.

SECTION 10.5.    Successors and Assigns. Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Main Sellers in case of an assignment by the Purchaser or the Purchaser in case of an assignment

by any Seller, which consent may be withheld in such party's sole discretion, except for the following assignments which shall not require consent: (i) assignment to an Affiliate of a Party (provided that such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Party), (ii) assignment by a U.S. Debtor to a succeeding entity following such U.S. Debtor's emergence from Chapter 11, (iii) assignment by any of the Canadian Debtors pursuant to any plan of arrangement approved by the Canadian Court and (iv) designation by the Purchaser of Designated Purchasers pursuant to Section 2.4.

SECTION 10.6.    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

(b)    To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (A) the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, provided that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors, the Canadian Debtors or the Purchaser may, in accordance with the Cross-Border Protocol, move the U.S. Bankruptcy Court and the Canadian Court to hold a joint hearing of the U.S. Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, action or proceeding, or (B) in the Federal Courts in the Southern District of New York or the State Courts of the State of New York, County of Manhattan (collectively, the "**New York Courts**"), if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases (the courts specified in clauses (A) and (B) collectively, the "**Designated Courts**"), and shall not be brought in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the Designated Courts for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any Designated Court or any claim that any such action brought in any Designated Court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)    The Purchaser hereby appoints McCarthy Tétrault, as its authorized agent (the "**Purchaser Authorized Canadian Agent**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian

Court by any other party hereto, which appointment in each case shall be irrevocable. The Purchaser further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointments in full force and effect as aforesaid. Service of process upon the Purchaser Authorized Canadian Agent in respect of the relevant jurisdiction and written notice of such service to the Purchaser shall be deemed, in every respect, effective service of process upon the Purchaser in relation to such jurisdiction.

(d)     Each Seller hereby appoints (i) NNI as its authorized agent (the "**Seller Authorized U.S. Agent**") upon whom process and any other documents may be served in the Chapter 11 Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the U.S. Bankruptcy Court or in the NY Courts by any other party hereto, and (ii) NNL as its authorized agent (the "**Seller Authorized Canadian Agent**" and together with the Seller Authorized U.S. Agent, the "**Seller Authorized Agents**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable. Each such Seller further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointment in full force and effect as aforesaid. Service of process upon the applicable Seller Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Main Sellers shall be deemed, in every respect, effective service of process upon every such Seller.

(e)     Section 10.6(b) shall not limit the jurisdiction of (i) the Accounting Arbitrator set forth in Section 2.2.3.1 (c) or (ii) the arbitrator(s) entrusted with the resolution of disputes relating to the Transition Services Agreement pursuant to Section 5.36, although claims may be asserted in the courts referred to in Section 10.6(b) for purposes of enforcing the jurisdiction and judgments of the Accounting Arbitrator or such arbitrator(s).

(f)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

(g)     Notwithstanding Sections 10.6(a) and (b), the Parties and the EMEA Sellers agree that any questions, claims, disputes, remedies or Actions arising under Sections 2.2.4(b)(y), 9.2(c)(ii) and 10.19 and any questions, claims, disputes, remedies or Actions arising from or related to (i) the agency of the Joint Administrators, (ii) the personal liability of the Joint Administrators, their firm, partners, employees, advisors, representatives and agents, (iii) their

qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iv) their appointment as joint administrators of the EMEA Sellers and their status as such, to the extent separable from other claims made hereunder, shall be governed by English law and be subject to the exclusive jurisdiction of the English courts.

SECTION 10.7. Notices. All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Purchaser to:

Avaya Inc.
211 Mount Airy Road
Basking Ridge, NJ 07920-2332
United States
Attention:  Pamela F. Craven, Chief Administrative Officer
            Frank J. Mahr, Corporate Counsel & Corporate Secretary
Facsimile: +1-908-953-3902

With copies (that shall not constitute notice) to:

Ropes & Gray LLP
One International Place
Boston, MA 02110
United States
Attention: Alfred O. Rose
           Howard S. Glazer
Facsimile: +1-617-951-7050

If to the Main Sellers or the Sellers, to:

**Nortel Networks Corporation**
195 The West Mall
Mailstop: T0503006
Toronto, Ontario, Canada  M9C 5K1
Attention:   Gordon A. Davies
             Chief Legal Officer & Corporate Secretary
Facsimile:   +1-905-863-7386

**Nortel Networks Limited**
195 The West Mall

187

Mailstop: T0503006
Toronto, Ontario, Canada  M9C 5K1
Attention:    Gordon A. Davies
              Chief Legal Officer & Corporate Secretary
Facsimile:    +1-905-863-7386

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA  37228
Attention:    Lynn C. Egan
              Assistant Secretary
Facsimile:    +1-615-432-4067

With copies (that shall not constitute notice) to:

**Nortel Networks Limited**
195 The West Mall
Mailstop: T0505009
Toronto, ON  M9C 5K1
Canada
Attn:    Douglas Parker
         Associate General Counsel, Corporate
Facsimile: +1-905-863-7739

and

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, TN  37228
USA
Attention:    Robert Fishman
              Senior Counsel
Facsimile:    +1-347-427-3815 & +1-615-432-4067

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
United States
Attention: Neil Q. Whoriskey
           David Leinwand
Facsimile: +1-212-225-3999

188

and

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention: Michael Lang
Facsimile: +1-416-216-3930

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

SECTION 10.8.    Exhibits; Sellers Disclosure Schedule.

(a)    The Sellers Disclosure Schedule and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)    For purposes of the representations and warranties of the Sellers contained in this Agreement, disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances with respect to all representations or warranties by the Sellers, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably apparent from the Sellers Disclosure Schedule that such disclosure is applicable. The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

SECTION 10.9.    Counterparts.  The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

SECTION 10.10. No Presumption. The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

SECTION 10.11. <u>Severability</u>. If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 10.12. <u>Headings</u>. The headings used in this Agreement are for the purpose of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.

SECTION 10.13. <u>Entire Agreement</u>.

(a)    This Agreement, the EMEA Asset Sale Agreement, the Ancillary Agreements, the Confidentiality Agreement and any written notice relating to Excluded Sellers delivered pursuant to Section 5.25(a) on the date hereof, together set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the Ancillary Agreements and the Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated. In the event of any irreconcilable conflict between this Agreement and any of the Ancillary Agreements or the Confidentiality Agreement, the provisions of this Agreement shall prevail, regardless of the fact that certain Ancillary Agreements, such as the Local Sale Agreement, may be subject to different governing Laws (unless the Ancillary Agreement expressly provides otherwise).

(b)    For the sake of clarity, the provisions of the EMEA Asset Sale Agreement have been drafted separately from the provisions in the body of this Agreement to reflect differing market practices in the countries of jurisdiction of the EMEA Sellers. Unless the context specifically requires, the provisions contained in the body of this Agreement and the provisions of the EMEA Asset Sale Agreement shall be interpreted independently and without reference to each other.

SECTION 10.14. <u>Limitations on Pre-Closing Remedies</u>.

(a)    Except as provided in Section 5.36, termination of this Agreement and the EMEA Asset Sale Agreement and payment of the Break-Up Fee and the Expense Reimbursement (which shall be payable only when, as and if required pursuant to the terms of Section 9.2) shall constitute the sole and exclusive remedies of the Purchaser, any Designated Purchasers and EMEA Designated Purchasers, any of their respective Subsidiaries and any former, current or future general or limited partners, directors, officers, employees, agents,

190

managers, members, Affiliates, stockholders, assignees and representatives of any of the foregoing in their capacity as such (collectively, the **"Avaya Parties"**), against the Sellers, any of the bankruptcy estates, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators, the Canadian Monitor (and any other Administrator, Monitor or other Person acting in a similar capacity) and any Person (i) in which, as of or subsequent to the date hereof, any Seller or EMEA Seller holds more than fifty percent (50%) of the capital stock or other equity interests or (ii) that is or was a Seller or an EMEA Seller and their respective Affiliates, and any former, current or future general or limited partners, directors, officers, employees, agents, managers, members, stockholders, assignees and representatives of any of the foregoing in their capacity as such (collectively, the **"Nortel Parties"**), as a result of the failure of the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement (including transactions contemplated under Clause 7 of the EMEA Asset Sale Agreement or Paragraph 2 of Schedule 9 to the EMEA Asset Sale Agreement) to be consummated, or in respect of any Liabilities arising under, or relating to, this Agreement, the EMEA Asset Sale Agreement, or any other Transaction Document or the transactions contemplated hereby or thereby prior to the Closing, including as a result of an intentional breach of this Agreement, the EMEA Asset Sale Agreement or any other Transaction Document prior to the Closing. Nothing set forth in this Agreement shall confer or give or shall be construed to confer or give to any Person (including any Person acting in a representative capacity) any rights or remedies against any Person other than the parties hereto. Without limiting the preceding provisions of this Section 10.14(a), it is acknowledged and agreed that under no circumstances shall any Person be liable for punitive damages (including multiple damages assessed as a punitive measure) or special damages arising out of, or in connection with, this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof or of the EMEA Asset Sale Agreement or any other Transaction Document, including damages alleged as a result of tortious conduct, or for specific performance of the obligations it is to perform hereunder or thereunder at or prior to the Closing nor shall any Nortel Party be liable for tortious interference with Purchaser's rights hereunder.

(b)    Except as expressly provided in Section 5.36, in no event shall the Avaya Parties be subject to any Liability to the Nortel Parties for the failure of the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement (including transactions contemplated under Clause 7 of the EMEA Asset Sale Agreement or Paragraph 2 of Schedule 9 to the EMEA Asset Sale Agreement) to be consummated, or in respect of any Liabilities arising under, or relating to, this Agreement, the EMEA Asset Sale Agreement or any other Transaction Document or the transactions contemplated hereby or thereby prior to the Closing, including as a result of an intentional breach of this Agreement, the EMEA Asset Sale Agreement or any other Transaction Document prior to the Closing, other than: (i) money damages payable by the Purchaser and/or any Designated Purchaser (but, for the avoidance of doubt, no other Avaya Party) as a result of Material Intentional Purchaser Breaches and (ii) the Reverse Termination Fee payable by the Purchaser (but for the avoidance of doubt, no other Avaya Party) when, as and if required pursuant to Section 9.3, in an aggregate amount not to exceed the Liability Limitation Amount; provided, however, notwithstanding the foregoing, termination of this Agreement, the EMEA Asset Sale Agreement and any Transaction Document and payment of the Reverse Termination Fee (which shall be payable by the Purchaser only when, as and if required in accordance with the terms of Section 9.3 and Clause 15.7 of the EMEA Asset Sale

Agreement), shall constitute the sole and exclusive remedies of the Nortel Parties against the Avaya Parties as a result of (and no additional money damages shall be payable by any Avaya Party in connection with) any breach of this Agreement, the EMEA Asset Sale Agreement or any Transaction Document by the Purchaser, any Designated Purchaser or any EMEA Designated Purchaser in the event that (i) this Agreement shall have been terminated pursuant to and in accordance with Section 9.1(i) and/or the EMEA Asset Sale Agreement shall have been terminated in accordance with Clause 15.4.9 thereof and, in either case, the Reverse Termination Fee shall have been paid to the Distribution Agent as agent of the Sellers and the EMEA Sellers or (ii) as of the time of termination of this Agreement or the EMEA Asset Sale Agreement there is no existing Material Intentional Purchaser Breach. Nothing set forth in this Agreement shall confer or give or shall be construed to confer or give to any Person (including any Person acting in a representative capacity) any rights or remedies against any Person other than the Parties. Without limiting the preceding provisions of this subsection (b), it is acknowledged and agreed that under no circumstances shall any Person be liable for punitive damages (including multiple damages assessed as a punitive measure) or special damages arising out of, or in connection with, this Agreement, the EMEA Asset Sale Agreement or the transactions contemplated hereby or thereby or any breach or alleged breach of any of the terms hereof or of the EMEA Asset Sale Agreement or any other Transaction Document, including damages alleged as a result of tortious conduct, or for specific performance of the obligations it is to perform hereunder at or prior to the Closing nor shall any Avaya Party be liable for tortious interference with Sellers' rights hereunder.

(c)    Notwithstanding Sections 10.14(a) and 10.14(b), the Parties acknowledge and agree that each Party will be entitled to all the remedies against the other Parties available to it at Law or in equity for post-Closing breaches of this Agreement, the EMEA Asset Sale Agreement and any Transaction Documents, including specific performance and/or damages.

(d)    Each of the Parties acknowledges that the agreements contained in this Section 10.14, Section 9.2 and Section 9.3, are each an integral part of the transactions contemplated by this Agreement and the EMEA Asset Sale Agreement. In the event that (i) the Sellers or the EMEA Sellers shall fail to pay the Break-Up Fee or Expense Reimbursement when due, or (ii) Purchaser shall fail to pay the Reverse Termination Fee when due, then Sellers or the EMEA Sellers in the case of clause (i) and Purchaser in the case of clause (ii), shall reimburse the other Parties for all reasonable costs and expenses actually incurred or accrued by such other Parties (including reasonable fees and expenses of counsel) in connection with the collection under and enforcement of Section 9.2 or Section 9.3 and Clauses 15.5 to 15.7 of the EMEA Asset Sale Agreement as applicable, together with interest on such unpaid amount at the prime rate of Citibank N.A. in effect on the date such payment was required to be made through the date of payment.

SECTION 10.15.  Bulk Sales Laws.  Subject to the entry of the U.S. Sale Order, each Party waives compliance by the other Party with any applicable bulk sales Law, provided, however, that the Parties shall use their reasonable efforts to cooperate to the extent necessary to obtain a reduction in, or exemption from, any applicable sales or use Taxes.

192

SECTION 10.16.  Main Sellers as Representatives of Other Sellers.

(a)     For all purposes of this Agreement:

(i)     each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNL as its representative; and

(ii)    each Other Seller not listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNI as its representative.

(b)     Pursuant to Section 10.16(a), each of NNL and NNI shall expressly have the power to, in the name and on behalf of each of its Respective Affiliates (as defined below), (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

(c)     For the purposes of this Agreement, **"Respective Affiliates"** means: (i) with respect to NNL, each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule, and (ii) with respect to NNI, all the other U.S. Debtors and each Other Seller not listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule.

SECTION 10.17.  Obligations of Sellers and EMEA Sellers.  When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor – other than NNC - and a Non-Debtor Seller).  Notwithstanding anything to the contrary herein, except as set forth in Section 2.2.4(b) and Section 9.2(c) the obligations of each EMEA Seller hereunder shall be several and not joint.  Effective as of the date of signing, the parties are fully bound by the terms of this Agreement; provided, however, that none of the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators shall have any obligations or incur any liabilities under this Agreement unless and until (i) the U.S. Bankruptcy Court enters the U.S. Bidding Procedures Order and (ii) the Canadian Court enters the Canadian Sales Process Order. For the avoidance of doubt, the intent of Parties and the EMEA Sellers is that the obligations and any liabilities of the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators under this Agreement will arise concurrently with the obligations and liabilities of the Sellers under this Agreement.

SECTION 10.18.  Execution by Other Sellers.  The Purchaser hereby acknowledges that the Other Sellers are not executing this Agreement as of the date hereof.  This Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers have done so.  Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall cause each Other Seller to execute a counterpart to this Agreement no later than the day prior to the thirtieth (30th) day following completion of the Auction (provided that the Main Sellers shall use their reasonable best efforts to cause such execution to occur no later than the last day of the Contract Review Period),

193

agreeing to be bound as a Seller under this Agreement and authorizing NNL or NNI, as applicable, to act as its representative under Section 10.16.

SECTION 10.19.  Exclusion of Liability of Administrators and Acknowledgement.

(a)    Notwithstanding that this Agreement shall have been signed by the Joint Administrators and the Joint Israeli Administrators in their capacities as administrators of the EMEA Debtors for and on behalf of the EMEA Debtors and of the Israeli Companies for and on behalf of the Israeli Companies, respectively, it is hereby expressly agreed and declared that no personal Liability under or in connection with this Agreement shall fall on the Joint Administrators, the Joint Israeli Administrators or their firm, partners, employees, agents, advisers or representatives whether such Liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act 1986, the Israeli Companies Law 1999, or otherwise.

(b)    The Purchaser acknowledges and agrees that in the negotiation and the completion of this Agreement the Joint Administrators and the Joint Israeli Administrators are acting only as agents for and on behalf of the EMEA Debtors and the Israeli Companies, respectively, and without any personal Liability whatsoever.

(c)    The Purchaser further acknowledges that it has entered into this Agreement without reliance on any warranties or representations made by the EMEA Sellers or by any of their employees, agents or representatives, or by the Joint Administrators, the Joint Israeli Administrators or any of their firm, partners, employees, agents, advisors or representatives and (save in respect of fraud, fraudulent misrepresentation or fraudulent misstatement) it shall not have any remedy in respect of any misrepresentation or untrue statement made by or on behalf of the EMEA Sellers or their employees, agents or representatives, or by the Joint Administrators, the Joint Israeli Administrators or any of their firm, partners, employees, agents, advisors or representatives.

[Remainder of this page intentionally left blank.  Signature pages follow.]

194

IN WITNESS WHEREOF, the Main Sellers and the Purchaser have duly executed this Asset and Share Sale Agreement as of the date first written above.

AVAYA INC.

By: _Kevin Kennedy_
    Name: Kevin J. Kennedy
    Title: President and Chief Executive Officer

NORTEL NETWORKS
CORPORATION

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

NORTEL NETWORKS LIMITED

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

NORTEL NETWORKS INC.

By: _____
    Name:
    Title:

Asset and Share Sale Agreement - Signature Page

IN WITNESS WHEREOF, the Main Sellers and the Purchaser have duly executed this Asset and Share Sale Agreement as of the date first written above.

AVAYA INC.

By:_____
    Name:
    Title:

NORTEL NETWORKS CORPORATION

By:_____
    Name:  Gordon A. Davies
    Title:  Chief Legal Officer
          and Corporate Secretary

By:_____
    Name:
    Title:  Tracy S.J. Connelly McGilley
          Assistant Secretary

NORTEL NETWORKS LIMITED

By:_____
    Name:  Gordon A. Davies
    Title:  Chief Legal Officer
          and Corporate Secretary

By:_____
    Name:
    Title:  Tracy S.J. Connelly McGilley
          Assistant Secretary

NORTEL NETWORKS INC.

By:_____
    Name:  Paul Karr
    Title:  Controller

Asset and Share Sale Agreement – Signature Page

The undersigned EMEA Sellers are executing this Agreement solely for purposes of agreeing to Sections 2.2, 5.26, 9.2, 9.3, 9.4 and 10.14 of this Agreement and, solely in the case of Nortel Networks UK Limited and Nortel Networks (Ireland) Limited, for purposes of agreeing to Section 5.36 of this Agreement.

*[Signatures on following page]*

Asset and Share Sale Agreement -- Signature Page

SIGNED for and on behalf of Nortel Networks    )
UK Limited (in administration) by Christopher    )
Hill    )
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Christopher Hill

Witness signature

Name:    )
Address:    Herbert Smith LLP    )
Exchange House    )
Primrose Street
London EC2A 2HS
SIGNED for and on behalf of Nortel GmbH    )
(in administration) by Christopher Hill    )
    )
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Christopher Hill

Witness signature

Name:    )
Address:    )
    )
SIGNED for and on behalf of Nortel Networks    )
France S.A.S. (in administration) by Kerry    )
Trigg acting as authorised representative for    )
    )
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Kerry Trigg

Witness signature

Name:    )
Address:    )
    )

Asset and Share Sale Agreement – Signature Page

SIGNED for and on behalf of Nortel Networks  )    ...................................................................................
UK Limited (in administration) by                  )
                                                              )
as Joint Administrator (acting as agent and     )
without personal liability) in the presence of:

Witness signature

...................................................................    )
Name:                                                          )
Address:                                                       )

SIGNED for and on behalf of Nortel GmbH  )    ...................................................................................
(in administration) by                               )
                                                              )
as Joint Administrator (acting as agent and     )
without personal liability) in the presence of:

Witness signature

...................................................................    )
Name:                                                          )
Address:                                                       )

SIGNED for and on behalf of Nortel Networks  )    *Kerry Trigg*
France S.A.S. (in administration) by Kerry       )    ...................................................................................
Trigg acting as authorised representative for   )    Kerry Trigg
                                                              )
as Joint Administrator (acting as agent and     )
without personal liability) in the presence of:

Witness signature

...................................................................
Name: SHARON PERLMUTTER
Address: 1 MORE LONDON PLACE )
          LONDON  SE1 2AF

Asset and Share Sale Agreement – Signature Page

**SIGNED** for and on behalf of Nortel Networks )
SpA (in administration) by Christopher Hill )
)
Christopher Hill
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

Name:            Herbert Smith LLP
Address:         Exchange House
                 Primrose Street
                 London EC2A 2HS
**SIGNED** for and on behalf of Nortel Networks )
Hispania S.A. (in administration) by )
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

Name:
Address:

**SIGNED** for and on behalf of Nortel Networks )
B.V. (in administration) by Christopher Hill )
)
Christopher Hill
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

Name:
Address:         Herbert Smith LLP
                 Exchange House
                 Primrose Street
                 London EC2A 2HS

Asset and Share Sale Agreement – Signature Page

SIGNED for and on behalf of Nortel Networks )
AB (in administration) by Christopher Hill )
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

)
Name: )
Address: )

SIGNED for and on behalf of Nortel Networks )
N.V. (in administration) by Christopher Hill )
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

)
Name:    Herbert Smith LLP )
Address:    Exchange House )
Primrose Street
SIGNED for and on behalf of Nortel Networks )
London EC2A 2HS
(Austria) GmbH (in administration) by )
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

)
Name: )
Address: )

Asset and Share Sale Agreement – Signature Page

SIGNED for and on behalf of Nortel Networks        )
Polska Sp. z.o.o. (in administration) by             )
Christopher Hill                                    )
as Joint Administrator (acting as agent and         )
without personal liability) in the presence of:

............................................
Christopher Hill

Witness signature

.....O̶ - S̶c̶h̶r̶e̶b̶r̶e̶l̶.....................

Name:          Herbert Smith LLP                    )
Address:       Exchange House                       )
               Primrose Street                      )
SIGNED for and on behalf of Nortel Networks        )
Oy (in administration) by Christopher Hill          )
                                                    )
as Joint Administrator (acting as agent and         )
without personal liability) in the presence of:

............................................
Christopher Hill

Witness signature

.....O̶ . S̶c̶h̶r̶e̶b̶r̶e̶l̶.....................

Name:          .................................    )
Address:       .................................    )
               .................................    )
SIGNED for and on behalf of Nortel Networks        )
Portugal S.A. (in administration) by               )
Christopher Hill                                    )
                                                    )
as Joint Administrator (acting as agent and        )
without personal liability) in the presence of:

............................................
Christopher Hill

Witness signature

.....O̶ . S̶c̶h̶r̶e̶b̶r̶e̶l̶.....................

Name:          Herbert Smith LLP                    )
Address:       Exchange House                       )
               Primrose Street                      )
               London EC2A 2HS

Asset and Share Sale Agreement – Signature Page

SIGNED for and on behalf of Nortel Networks )
s.r.o. (in administration) by Christopher Hill )
)
Christopher Hill
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

..............................................................
Name: )
Address: )
)
SIGNED for and on behalf of Nortel Networks )
Romania s.r.l. (in administration) by )
Christopher Hill
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

..............................................................
Name: )
Herbert Smith LLP
Address: )
Exchange House
Primrose Street )
SIGNED for and on behalf of Nortel Networks )
London EC2A 2HS
Engineering Service kft (in administration) by )
Christopher Hill )
Christopher Hill
)

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Witness signature

..............................................................
Name: )
Address: )
)

Asset and Share Sale Agreement – Signature Page

SIGNED for and on behalf of Nortel Networks ⟩
(Ireland) Limited (in administration) by David ⟩    David Hughes
Hughes as Joint Administrator (acting as agent ⟩
and without personal liability) in the presence ⟩
of:

Witness signature

Name: COLIN FARQUHARSON    ⟩
Address:    Veldenstown    ⟩
            Knockstown
            Navan
            Co Meath.

Asset and Share Sale Agreement -- Signature Page

SIGNED by Sergei Fishkin ) 
duly authorised for and on behalf of o.o.o. ) Sergei Fishkin
Nortel Networks in the presence of: )

Witness signature

............................................................... )
Name: GALINA Fred Cyshena )
Address: RUSSIA, MOSCOW )
Publishoye Shosse 52·377
SIGNED by Sharon Rolston ) ...............................................................
duly authorised for and on behalf of Nortel ) Sharon Rolston
Networks AG in the presence of: )

Witness signature

............................................................... )
Name: )
Address: )

SIGNED by Sharon Rolston and Simon ) ...............................................................
Freemantle duly authorised for and on behalf of ) Sharon Rolston
Nortel Networks South Africa (Pty) Limited )
in the presence of: )

...............................................................
Simon Freemantle

Witness signature

............................................................... )
Name: )
Address: )

Asset and Share Sale Agreement -- Signature Page

SIGNED by Sergei Fishkin )  ..............................................................
duly authorised for and on behalf of o.o.o. )  Sergei Fishkin
Nortel Networks in the presence of: )


Witness signature

.................................................................. )
Name: )
Address: )

SIGNED by Sharon Rolston )  _Sharon Rolston_ (signature) ...........................
duly authorised for and on behalf of Nortel )  Sharon Rolston
Networks AG in the presence of: )


Witness signature
    _B. Scherwath_ (signature)
.................................................................. )
Name:  B. SCHERWATH )
Address: C/O NORTEL NETWORKS )
         MAIDENHEAD, UK
SIGNED by Sharon Rolston and Simon )  _Sharon Rolston_ (signature) ...........................
Freemantle duly authorised for and on behalf of )  Sharon Rolston
Nortel Networks South Africa (Pty) Limited )
in the presence of: )  _Simon Freemantle_ (signature) ...........................
                                                        Simon Freemantle


Witness signature
    _B. Scherwath_ (signature)
.................................................................. )
Name:  B. SCHERWATH )
Address: C/O NORTEL NETWORKS )
         MAIDENHEAD, UK

Asset and Share Sale Agreement – Signature Page

SIGNED by Sharon Fennessy and Simon   )
Freemantle duly authorised for and on behalf of   )
Nortel Networks AS in the presence of:   )

Sharon Fennessy

Simon Freemantle

Witness signature

3. Scherath

.......................................................................

Name: B. SCHERWATH   )
Address: C/O NORTEL NETWORKS   )
   MAIDEN HEAD, UK   )

Asset and Share Sale Agreement -- Signature Page

הנאמן בהקפאת הליכים

SIGNED for and on behalf of Nortel )  .................................................
Communications Holdings (1997) Limited (in )  Yaron Har-Zvi
administration) by Yaron Har-Zvi and Avi D. )
Pelossof as Joint Israeli Administrators (acting )
jointly and without personal liability) in )
connection with the Israeli Assets and )  .................................................
Liabilities: )  Avi D. Pelossof

Witness signature

.................................................  )
Name: SARIT MOUSSAYOFF )
Address: The Rubinstein House, 20 Lincoln Street,
                                                        Tel-Aviv            הנאמן בהקפאת הליכים

SIGNED for and on behalf of Nortel Networks )  .................................................
Israel (Sales and Marketing) Limited (in )  Yaron Har-Zvi
administration) by Yaron Har-Zvi and Avi D. )
Pelossof as Joint Israeli Administrators (acting
jointly and without personal liability) in )  .................................................
connection with the Israeli Assets and )  Avi D. Pelossof
Liabilities: )
                                         )
                                         )

Witness signature

.................................................  )
Name: SARIT MOUSSAYOFF )
Address: The Rubinstein House, 20 Lincoln  Street, Tel-Aviv

**SIGNED** by Christopher Hill                )
                                              )
in his own capacity and on behalf of the Joint    )
Administrators without personal liability and
solely for the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the Joint Administrators:

Christopher Hill

Witness signature

                                              )
Name:                                         )
Address:        Herbert Smith LLP             )
                Exchange House
                Primrose Street
                London EC2A 2HS

Asset and Share Sale Agreement – Signature Page

SIGNED for and on behalf of Nortel Networks )
Slovensko s.r.o (in administration) by )        Stephen Harris
Stephen Harris )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

Name: S HARON (ERLINWTTER )
Address: 1 MORE LONDON PLACE )
        LONDON SE1 2AF
        Secretary

Asset and Share Sale Agreement – Signature Page

# APPENDIX "B"

## [CONFIDENTIAL]

APPENDIX "C"

[ATTACHED]

**EXHIBIT 1**
(U.S. Bidding Procedures Order)

BIDDING PROCEDURES

Set forth below are the bidding procedures (the "<u>Bidding Procedures</u>") to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities (the "<u>Sale</u>") as set forth in the Purchase Agreements (as defined below) with respect to the Purchaser, or, as set forth in the relevant sale agreements with respect to a Successful Bidder (as defined below). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement (as defined below).

On January 14, 2009, Nortel Networks Inc. and certain of its U.S. subsidiaries that are debtors and debtors-in-possession (collectively, the "<u>U.S. Debtors</u>") as well as Nortel Networks Limited and certain other affiliates of the U.S. Debtors that have commenced proceedings under the Canadian Companies' Creditors Arrangement Act (the "<u>Canadian Debtors</u>"), and certain non-debtor affiliates of the U.S. Debtors and the Canadian Debtors (together with the U.S. Debtors and the Canadian Debtors, the "<u>North American Sellers</u>") executed that certain Asset and Share Sale Agreement (the "<u>Agreement</u>") with Avaya Inc. (together with any of its designees, the "<u>Purchaser</u>").

On January 14, 2009, certain other affiliates of the North American Sellers (the "<u>EMEA Sellers</u>" and together with the North American Sellers, the "<u>Sellers</u>"), certain of which are in administration proceedings in which Alan Bloom, Stephen Harris, Chris Hill, Alan Hudson and David Hughes of Ernst & Young LLP, have been appointed as the joint administrators of those EMEA Sellers by the English High Court of Justice in connection with the proceedings (the "<u>UK Proceedings</u>") under the Insolvency Act 1986 (such individuals collectively, the "<u>Administrators</u>"), and the Administrators executed that certain Asset Sale Agreement relating to the sale and purchase of the EMEA Assets with the Purchaser (the "<u>EMEA Agreement</u>" and together with the Agreement, the "<u>Purchase Agreements</u>").

The Sellers have determined that: (A) the transactions contemplated by the Purchase Agreements and the ancillary agreements discussed therein with respect to the Purchaser, or, as set forth in the relevant sale agreements and ancillary agreements with respect to a Successful Bidder, (collectively, the "<u>Transaction</u>") should be subject to competitive bidding as set forth herein; (B) the transfer of the U.S. Debtors' rights, title and interests in and to the Assets (as defined below) should be subject to approval by the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") pursuant to Sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "<u>Bankruptcy Code</u>"); (C) the transfer of the rights, title and interests of the Canadian Debtors (as such term is defined in the Agreement) in and to the Assets should be subject to approval by the Ontario Superior Court of Justice (the "<u>Canadian Court</u>"); and (D) the Transaction shall be subject to approval by such other applicable court(s) as the Sellers, in consultation with the Committee (as defined below), the Bondholder Group (as defined below) and the Monitor (as defined below), may reasonably determine in good faith is legally required and certain other closing conditions as set forth in the Purchase Agreements.

On [●], 2009, the U.S. Debtors filed a Motion for Orders (I)(A) Authorizing Debtors' Entry into the Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D) Approving the

Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of, and Equity Interests in, Debtors' Enterprise Solutions Business, (B) the Assumption and Assignment of Certain Contracts and Leases and (C) the Assumption and Sublease of Certain Leases (the "Sale Motion").

On [●], 2009, the Bankruptcy Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Bidding Procedures Order").

On [●], 2009, the Canadian Debtors filed a motion with the Canadian Court seeking an order for approval of (I) execution and delivery of the Agreement by the Canadian Debtors, (II) payment of the Break-Up Fee and Expense Reimbursement in the circumstances provided for in the Agreement, and (III) a process for the Sale of the Canadian Debtors' rights, title and interests in and to the Assets (as defined below).

On [●], 2009, the Canadian Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Canadian Sales Process Order").

Bidding Process

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's and the Canadian Court's and, if required, such other applicable courts' approval thereof (collectively, the "Bidding Process"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., *et al.* (Case No. 09-10138) involving the U.S. Debtors (the "Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor"), the Administrators in connection with the UK Proceedings, and their respective advisors throughout the Bidding Process. In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, the Bankruptcy Court and the Canadian Court will have jurisdiction to hear and resolve such dispute.[1]

Assets To Be Sold

The Sellers are offering for sale, in one or more transactions, certain of the Sellers' assets (including the stock of certain subsidiaries of the Sellers) pertaining to the business segments

---

[1] For the avoidance of doubt, this Bidding Process shall not govern any disagreements among the Sellers.

2

described in the Purchase Agreements with respect to the Purchaser, or, as set forth in the relevant sale agreements with respect to a Successful Bidder, and related schedules and in an information memorandum made available by the Sellers to the Purchaser and other potential bidders, which will also be made available to other prospective purchasers that have executed a confidentiality agreement with the Sellers (the "Assets").

"As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except, with respect to the Purchaser, to the extent set forth in the Purchase Agreements or, with respect to a Successful Bidder, to the extent set forth in the relevant sale agreements of such Successful Bidder. In addition, in the case of the EMEA Sellers, the sale of whatever rights, title and interests that such EMEA Seller may have (if any) in and to the Assets will be on an "as-is" basis and will be without any representations or warranties.

Free Of Any And All Claims And Interests

All of the rights, title and interests of the U.S. Debtors and the Canadian Debtors in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests") pursuant to sections 363 and 365 of the Bankruptcy Code, such Claims and Interests to attach to the net proceeds of the sale of such Assets (without prejudice to any claims or causes of action regarding the priority, validity or enforceability thereof), except, with respect to the Purchaser, to the extent otherwise set forth in the Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant sale agreement of such Successful Bidder with the U.S. Debtors and the Canadian Debtors.

Publication Notice

As soon as reasonably practicable after entry of orders by the Bankruptcy Court and the Canadian Court approving these Bidding Procedures, but in any event no more than three (3) Business Days after the entry of such orders, the Sellers shall publish notice of these Bidding Procedures, the time and place of the Auction (as defined below), if required, the time and place of the Sale Hearing (as defined below), and the objection deadline for the Sale Hearing in The Wall Street Journal (National Edition), The Globe & Mail (National Edition) and The Financial Times (International Edition).

Participation Requirements

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court and accepted by the Administrators, for cause shown or, with regard to paragraphs (b) and (c) below, as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), prior to the Bid Deadline (as defined below), in order to participate in the Bidding Process, each person, other than the Purchaser, who wishes to participate in the

3

Bidding Process (a "<u>Potential Bidder</u>") must deliver to the Notice Parties (as defined below) at the addresses provided below:

(a) an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, that shall not be on terms that, in the Sellers' reasonable judgment, are more favorable to the Potential Bidder than the confidentiality agreement executed by the Purchaser and which shall inure to the benefit of any purchaser of the Assets (in the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets and waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transaction it may enter into, to the Notice Parties (as defined below));

(b) current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transaction; and

(c) a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Purchase Agreements.

A Potential Bidder that delivers the documents described above, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability

4

of financing, experience and other considerations) to be able to consummate the Transaction will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence as provided in the following paragraph with respect to the Assets.

### Due Diligence

The Sellers may in their reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a confidentiality agreement with the Sellers such due diligence access to materials and information relating to the Assets as the Sellers deem appropriate after consultation with the Committee, the Bondholder Group and the Monitor. Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their reasonable business judgment, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. No additional due diligence for any party other than a Qualified Bidder who has submitted a Qualified Bid will continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. In any event, the Purchaser shall be provided prompt access to all material due diligence materials, management presentations, on site inspections and other information provided to Qualified Bidders that were not previously made available to the Purchaser. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Purchase Agreements or any other definitive sale agreements with any Successful Bidder executed and delivered by Sellers.

### Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Gordon A. Davies, Esq., Chief Legal Officer, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905) 863-8386; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank

A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (v)
counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara,
Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New
York 10036, Facsimile: (212) 872-1002; (vi) financial advisor to the Committee: Jefferies &
Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York,
New York, Facsimile: (212) 284-2280; (vii) counsel to the Bondholder Group: Milbank,
Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York,
New York, 10006, Facsimile: (212) 822-5735; (viii) the Monitor: Murray A. McDonald, Ernst
& Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7
Canada, Facsimile: (416) 943-3300; (ix) the Administrators: Ernst & Young LLP, Attn:
Stephen Harris, 1 More Place, London SE1 2AF, United Kingdom, Facsimile +44 20 7951 9002;
and (x) counsel to the Administrators: Herbert Smith LLP, Attn: Stephen Gale, Exchange
House, Primrose Street, London, EC2A 2HS, Facsimile: +44 20 7098 4878; so as to be received
not later than September 4, 2009 at 12:00 pm (Eastern) by the Sellers (the "Bid Deadline").

Qualified Bid

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a
Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a
"Qualified Bid"):

(a)    it states that the applicable Qualified Bidder offers to purchase the Assets
upon the terms and conditions substantially as set forth in the Purchase Agreements,
including, without limitation, with respect to certainty and timing of closing, or pursuant
to an alternative structure or upon alternative terms and conditions that the Sellers
determine, after consultation with the Committee, the Bondholders Committee and the
Monitor, are no less favorable than the terms and conditions of the Purchase Agreements;

(b)    it includes a letter stating that the bidder's offer is irrevocable until the
selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined
below), provided that if such bidder is selected as the Successful Bidder or the Alternate
Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the
Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful
Bidder only, 180 days from the later of the Sale Hearing and the entry of the Sale Order
and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as
defined below);

(c)    it includes duly authorized and executed Purchase Agreements (as
modified by the bidder to reflect the terms and conditions of its bid), including the
purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together
with all exhibits and schedules thereto, including, to the extent required by the terms and
conditions of such bid, the Local Sale Agreements, the Real Estate Agreements, the
Intellectual Property License Agreement, the Transition Services Agreement, the
Trademark License Agreement, the Loaned Employee Agreement (each as defined in the
Agreement and each as modified by the bidder to reflect the terms and conditions of its
bid), the other ancillary agreements as described in the Purchase Agreements and such
additional ancillary agreements as may be required by the bidder with all exhibits and

6

schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Purchase Agreements ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the bidder;

(d)    it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(e)    it is not conditioned on (i) the outcome of unperformed due diligence by the bidder (and includes an acknowledgement and representation that the bidder has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer) and/or (ii) obtaining financing;

(f)    it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(g)    it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Purchase Agreements, plus (i) the amount of the Break-Up Fee and Expense Reimbursement (each as defined in the Purchase Agreements), plus (ii) U.S. $4.75 million.

(h)    it includes an acknowledgment and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreements (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)    it includes an acknowledgement and representation that the bidder: (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; and (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and

7

(iii) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)    it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(k)    it is accompanied by a good faith deposit (each, together with the good faith deposit of the Purchaser, a "Good Faith Deposit") in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to $30 million to be dealt with as provided for under "Good Faith Deposit" herein;

(l)    it (a) contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction(s)) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment and associated with the employment of all employees who will become employees of the Qualified Bidder, and (b) identifies any pension liabilities and assets related to any employees currently covered under any Nortel registered pension or retirement income plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m)    it includes evidence of the Potential Bidder's ability to comply with Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)    it contains other information reasonably requested by the Sellers; and

(o)    it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids, provided that the Sellers in evaluating such bids, may not waive substantial compliance with any items in paragraphs (b), (d), (e), (f), (i), (j), (k), (l), (m), (n), and (o) without the consent of the Purchaser, the Committee, the Bondholder Group and the Monitor, and such consent shall not be unreasonably withheld in connection with any bid that (1) would otherwise fully satisfy the requirements of a Qualified Bid hereunder but for a de minimis failure to comply with paragraphs (b), (d), (e), (f), (i), (j), (k), (l), (m), (n), or (o) and (2) such noncompliance is cured within 24 hours of the Bid Deadline. Notwithstanding the foregoing, the Purchaser will be

8

deemed a Qualified Bidder, and the Purchase Agreements will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction and the Sale.

The Sellers shall deliver copies of any bids deemed to be Qualified Bids to Purchaser in accordance with section 5.1(c) of the Agreement, and notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids no later than three (3) days following the expiration of the Bid Deadline.

Aggregate Bids

The Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Transaction (including any regulatory approvals required to close the Transaction), the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction(s)) to be offered post-closing employment by the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment of all employees who will become the employees of the Qualified Bidder, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

No Qualified Bids

If the Sellers do not receive any Qualified Bids other than the Purchase Agreements received from the Purchaser, the Auction shall be cancelled and the U.S. Debtors shall report the same to the Bankruptcy Court, the Canadian Debtors shall report the same to the Canadian Court and the Monitor and subject to requiring and obtaining approvals of the Bankruptcy Court, the Canadian Court or any other applicable court and satisfaction of the conditions set forth in the Purchase Agreements, the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Purchase Agreements. In addition, if no Qualified Bid is received, the U.S. Debtors reserve the right to request that the Bankruptcy Court advance the date of the Sale Hearing (as defined below) and provide notice of such new date to those parties in interest entitled to notice thereof and the Canadian Debtors reserve the right to file a motion with the Canadian Court seeking the approval of the sale of the Canadian Debtors' rights, title and interests in and to the Assets to the Purchaser. In addition, if approval of any other

9

applicable court is required, the Sellers will as soon as practicable file an appropriate pleading with such court(s) seeking approval of the Transaction.

### Break-Up Fee and Expense Reimbursement

Recognizing the value and benefits that Purchaser has provided to the U.S. Debtors and the other Sellers by entering into the Purchase Agreements, as well as the Purchaser's expenditure of time, energy and resources, the Sellers have agreed that the Purchaser is entitled to a Break-Up Fee and Expense Reimbursement in amounts and under the circumstances set forth in the Purchase Agreements and as set forth in the Bidding Procedures Order and the Canadian Sales Process Order.

### Auction

If the Sellers receive one or more Qualified Bids in addition to the Purchase Agreements, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at 9:30 a.m. on September 11, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned without the prior written consent of the Purchaser, subject to the terms of the Purchase Agreements and the Bidding Procedures Order. Copies of all Qualified Bids shall be delivered to the Committee, the Bondholder Group, the Monitor, the Administrators and the Purchaser at such time that such bid is deemed a Qualified Bid but no later than two (2) Business Days prior to the Auction. The Auction shall run in accordance with the following procedures:

(a)    Only the Sellers, the Purchaser, the Committee, the Bondholder Group, the Monitor and the Administrators (and the advisors to each of the foregoing), any creditor of the North American Sellers and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(c)    At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date. At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders.

(d)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(e)     The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(f)     Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least U.S. $2.375 million over the Starting Bid or the Leading Bid, as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the Purchase Agreements as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

<u>Selection Of Successful Bid</u>

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid that is either the Leading Bid or submitted subsequent to and as an improvement to the submission of the Leading Bid (except in the event that there is no Leading Bid, in which case the Qualified

Bids to be considered will be the Starting Bid and any bids submitted subsequent and as an improvement to the Starting Bid) on the basis of financial and contractual terms and the factors relevant to the sale process, including, among other things, the proposed revisions to the transaction documents, the effect of the Sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), the counterparties to such transactions, the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, other factors affecting the speed, certainty and value of the Sale (including any regulatory approvals required to close the Transaction), the Assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers to be offered post-closing employment by the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by the Canadian Court and any required approvals of any other applicable court(s) with such Successful Bidder and approval and execution by the Administrators of the relevant Successful Bid transaction documents with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

Sale Hearing

The sale hearing to authorize certain of the Sellers to enter into agreements with respect to the Successful Bid (the "Sale Hearing") will be held, in respect of those Sellers that are U.S. Debtors, before the Honorable Judge Kevin Gross (or any substitute therefor) in the United States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as September 15, 2009 at [•] (Eastern), and, in respect of those Sellers that are Canadian Debtors, before the Honourable Mr. Justice Geoffrey B. Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto, Ontario, and in any other applicable court(s) whose approval is required, as soon as practicable following the date of the Sale Hearing (or, with respect to the Canadian Court, in a joint hearing with the Bankruptcy Court at the Sale Hearing). The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an

12

announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing. If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Sellers shall proceed as set forth in the "No Qualified Bids" section above. If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is legally required, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval is legally required. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court. The Alternate Bid shall remain open until the earlier of (a) eleven (11) days following the entry of the Sale Order or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date"). All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

## Good Faith Deposits

The Good Faith Deposit of any Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within five (5) Business Days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within five (5) Business Days of the date of the selection of the Successful Bidder and the Alternate Bidder. The Good Faith Deposit of the Successful Bidder will be applied in accordance with the terms of the Successful Bid, and, except in the case of the Purchaser, where the Purchaser's Good Faith Deposit shall be governed by the terms and conditions of the Purchase Agreements, will become nonrefundable upon the approval by the Bankruptcy Court and the Canadian Court of the Sale to the Successful Bidder.

## Reservation Of Rights

The Sellers, after consultation with their advisors, the Committee, the Bondholder Group and the Monitor, and their respective advisors, (a) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof, except that a Qualified Bid not selected as a Starting Bid or Leading Bid cannot subsequently be determined to be higher or better than the Starting Bid or Leading Bid, as applicable; and (b) may reject, at any time, any bid (other than the Purchaser's initial bid) that is

(i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, any orders of the Canadian Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, or (iv) contrary to the statutory duties or legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers.

Notwithstanding any of the foregoing, or anything else contained herein, however, the Sellers may not, without prior written consent of the Committee, the Bondholder Group and the Monitor, which consent may not be unreasonably withheld, (i) extend the deadlines set forth in the Auction procedures for more than three (3) Business Days, (ii) adjourn the Auction for more than three (3) Business Days, or (iii) adjourn the Sale Hearing for more than three (3) Business Days if the Auction has concluded.

For the purposes of these Bidding Procedures and all matters relating to them, the Administrators are acting only as agents for and on behalf of the EMEA Sellers that are controlled by the Administrators pursuant to the UK Proceedings and without personal liability. Notwithstanding the foregoing and subject to the following paragraph, the Sellers may not, without the prior written consent of the Purchaser, impair or modify the Purchaser's rights and obligations under the Purchase Agreements or the Purchaser's right to credit the Break-Up Fee and the Expense Reimbursement as part of any subsequent bids (except as specifically set forth herein).

The entirety of the Bidding Procedures are subject to the rights of the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, to revoke these Bidding Procedures, the Bidding Process or the Auction at any time to satisfy their fiduciary duties or the statutory duties or the legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers, provided that such revocation will result in a breach of the Purchase Agreements entitling the Purchaser to such rights as are set forth in the Purchase Agreements in respect of such breach.

14

APPENDIX "D"

[ATTACHED]

EXECUTION VERSION

## SIDE AGREEMENT

This Side Agreement (the "**Agreement**") is dated as of July 20, 2009, among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**" and, together with NNC, the "**Canadian Main Sellers**"), (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with the Canadian Main Sellers, the "**Main Sellers**"), (iv) the affiliates of the Main Sellers listed in Schedule A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**"), (v) the entities listed on Schedule B hereto (the "**EMEA Sellers**"), which in the case of the EMEA Debtors are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan Robert Bloom serve as joint administrators) (collectively, the "**Joint Administrators**") who act as agents, for the EMEA Debtors without any personal liability whatsoever and, in the case of the Israeli Companies (as defined below) are acting by their joint administrators Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") who act as agents of the Israeli Companies without any personal liability whatsoever, (vi) the Joint Administrators and (vii) the Joint Israeli Administrators. The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 2.8, 3.1 and 3.15. The Joint Israeli Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 2.8, 3.2 and 3.15.

## W I T N E S S E T H:

WHEREAS, the Main Sellers and the Other Sellers (collectively, the "**Sellers**" and, together with the EMEA Sellers, the "**Selling Parties**"), the EMEA Sellers, the NGS Companies and DiamondWare beneficially own and operate the Business;

WHEREAS, on the Petition Date, the Canadian Debtors filed with the Canadian Court an application for protection under the CCAA and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and was extended by further order of the Canadian Court on April 28, 2009, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, the U.S. Debtors are debtors-in-possession under the U.S. Bankruptcy Code, which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware;

WHEREAS, the EMEA Debtors on the Petition Date filed applications with the English Court pursuant to the Insolvency Act and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings and the English Court appointed Joint Administrators under the Insolvency Act;

1

WHEREAS, the Israeli Companies on January 18, 2009, filed applications with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings, and the Israeli Court appointed the Joint Israeli Administrators on January 19, 2009, as joint administrators of the Israeli Companies under the Israeli Companies Law;

WHEREAS, the Non-Debtor Sellers and the EMEA Non-Debtor Sellers are not subject to any Bankruptcy Proceedings;

WHEREAS, on June 9, 2009, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and the Joint Administrators entered into an Interim Funding and Settlement Agreement (the "**IFSA**") governing certain intercompany matters, including the obligation of the parties thereto to (a) negotiate in good faith and attempt to reach agreement on a timely basis on a protocol (the "**Interim Sales Protocol**") for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (each as defined in the IFSA), which Interim Sales Protocol shall provide binding procedures for the allocation of Sale Proceeds where the relevant parties in such Sale Transaction have been unable to reach agreement regarding such allocation, and (b) following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol (failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds);

WHEREAS, the Sellers have today entered into an Asset and Share Sale Agreement with Avaya Inc. ("**Purchaser**") relating to the part of the Business owned and operated by the Sellers, the NGS Companies and DiamondWare (the "**North American Agreement**");

WHEREAS, the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators have today entered into an Asset Sale Agreement with Purchaser relating to the part of the Business owned and operated by the EMEA Sellers (the "**EMEA Agreement**" and, together with the North American Agreement, the "**Sale Agreements**");

WHEREAS, as soon as practicable after the execution of this Agreement, in accordance with Section 12.b of the IFSA, the parties hereto will enter into an escrow agreement with the Distribution Agent (the "**Distribution Escrow Agreement**") governing, among other things, the Distribution Agent's collection, holding in escrow in an escrow account at the Distribution Agent (the "**Distribution Escrow Account**") and distribution to the Sellers and the EMEA Sellers (in accordance with the Allocation Rules) of the proceeds of the Stalking Horse Transaction (or an Alternative Transaction) and other payments to be made by the Purchaser (or any Designated Purchaser or EMEA Designated Purchaser) to the Selling Parties under or in relation to the Sale Agreements or the sale agreements governing an Alternative Transaction;

WHEREAS, for the purpose of facilitating the completion of a Transaction (as defined below) and maximizing the value arising therefrom for their respective stakeholders, the parties hereto intend to assume certain mutual cooperation and other covenants relating to the pursuit and completion of the sale of the Business (the "**Transaction**") pursuant to the Sale

2

Agreements or otherwise, as well as govern certain other matters of common interest relating to the prospective Transaction, including certain matters relating to the allocation among the parties of the benefits and burdens of the Transaction.

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree as follows:

## ARTICLE I

## INTERPRETATION

SECTION 1.1. Definitions.

(a)     To the extent capitalized words used herein (including in the recitals hereof) are not defined in this Agreement, those words shall have the meanings given to them (i) in the North American Agreement or (ii) to the extent they are not defined in the North American Agreement, in the EMEA Agreement.

(b)     The following capitalized terms shall have the meanings set forth below:

(i)     **"Advisor Fees"** means any fees paid or payable to Lazard Frères & Co. in connection with the sale of the Business;

(ii)     **"Agreed Respective Percentage"** means the percentage of Total Payments pertaining to each of the Parties and, with respect to NNI and NNL only, their respective Respective Affiliates, pursuant to the Allocation Rules.

(iii)     **"Allocation Rules"** means the rules (expressed as percentages or otherwise) to be used to allocate among the various Sellers and EMEA Sellers the benefit of the Total Proceeds and the burden of any payments owed by the Sellers and/or the EMEA Sellers to the Purchaser pursuant to the Sale Agreements, as such rules shall be agreed upon among the relevant Selling Parties pursuant to Section 12.d of the IFSA or shall be otherwise determined in accordance with the binding procedures to be set forth in the Interim Sales Protocol pursuant to Section 12.c of the IFSA.

(iv)     **"Dispute Resolver Retainer"** means any retainer paid or payable to one or more dispute resolvers appointed pursuant to the Interim Sales Protocol to determine the Allocation Rules.

(v)     **"Distribution Agent"** means a Person appointed by mutual agreement by NNL, NNI and NNUK, <u>provided</u> that if such Parties fail to agree within thirty (30) days of the date hereof, JPMorgan Chase Bank, N.A. shall be automatically appointed as the Distribution Agent.

3

(vi)    **"Initial Respective Percentage"** means one third (1/3) for NNI and its Respective Affiliates, one third (1/3) for NNC, NNL and its Respective Affiliates, and one third (1/3) for the EMEA Sellers.

(vii)    **"New Bankruptcy Proceedings"** means any voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings commenced after the date hereof.

(viii)    **"Party"** means (w) each of the Canadian Main Sellers and their Respective Affiliates, (x) each of NNI and its Respective Affiliates, and (y) each of the EMEA Sellers and (z) for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 2.8, 3.1, 3.2 and 3.15 only, the Joint Administrators and/or the Joint Israeli Administrators, as applicable.

(ix)    **"Respective Sale Agreement"** means (x) with respect to the Canadian Main Sellers, NNI and the Other Sellers, the North American Agreement, and (y) with respect to the EMEA Sellers, the EMEA Agreement.

(x)    **"Secondary Proceedings"** shall have the meaning attributed to such words in the EMEA Agreement.

(xi)    **"Stalking Horse Transaction"** means the sale of the Business to the Purchaser pursuant to the Sale Agreements (as amended from time to time in accordance with this Agreement).

(xii)    **"Total Payments"** means the aggregate amounts paid or payable by the Selling Parties to the Purchaser (and any Designated Purchaser and EMEA Designated Purchaser) under the terms of the Sale Agreements as Break-Up Fee and Expense Reimbursement.

(xiii)    **"Total Proceeds"** means the aggregate amounts paid by the Purchaser (and any Designated Purchaser and EMEA Designated Purchaser) to the Selling Parties under or in respect of the Sale Agreements, including as Purchase Price, Purchase Price adjustments, Reverse Termination Fee and damages, subject to Section 2.4(b).

SECTION 1.2. Interpretation.

1.2.1. Gender and Number. Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2. Certain Phrases and Calculation of Time. In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Section and Schedule references are to the Sections and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later

4

specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding". If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

1.2.3. Headings, etc. The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

## ARTICLE II

## COVENANTS

SECTION 2.1. Efforts to Complete the Stalking Horse Transaction.

(a)     Subject to the requirements of any applicable Law, each of the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other and the Purchaser in good faith in order to do, all things necessary, proper or advisable under applicable Law to perform their obligations under their Respective Sale Agreement and consummate the transactions contemplated by the North American Agreement and the EMEA Agreement, as applicable, as soon as practicable in accordance with the provisions thereof and cause the fulfillment at the earliest practicable date of all of the conditions to the Purchaser's obligations to consummate the transactions contemplated by their Respective Sale Agreement.

(b)     The mutual efforts of the Parties pursuant to Section 2.1(a) shall include:

(i)     cooperating with the other Parties in good faith in any manner reasonably required to facilitate the consummation of the Stalking Horse Transaction, including by sharing information to the extent necessary or opportune and keeping the other Parties informed of any matter of relevance relating to the Stalking Horse Transaction and their Respective Sale Agreement;

(ii)     (A) defending all Actions by or before any Government Entity challenging the Sale Agreements or the consummation of the Stalking Horse Transaction and (B) seeking rescission or repeal of any injunction, decree, ruling, order or other action of any Government Entity adversely affecting the ability of the Parties to consummate Stalking Horse Transaction;

(iii)     cooperating with the other Parties and the Purchaser in good faith in any manner reasonably required to facilitate the preparation and making of any filings with Government Entities required to seek and obtain the Regulatory Approvals; and

        (iv)    upon becoming aware of any material issue that may result in a breach by the Sellers or the EMEA Sellers under either Sale Agreement, promptly informing the other Parties of such potential breach and consulting with the other Parties with a view to ensuring that there is no breach of the relevant Sale Agreement and/or any breach is timely cured in accordance with the Sale Agreements.

SECTION 2.2. <u>Notice and Consultation</u>.

        (a)    Each of NNL, NNI and NNUK and, to the extent applicable, the Joint Administrators and/or the Israeli Joint Administrators, shall provide to the others as much notice as possible, and in any case no less than five (5) Business Day written advance notice if possible, and shall consult in good faith with the others, prior to taking or agreeing to take, any of the following actions under their respective Sale Agreement:

        (i)    subject to Section 2.3, amending any material provision of their Respective Sale Agreement;

        (ii)    subject to Section 2.3, waiving any of their material rights or provisions under their Respective Sale Agreement; and

        (iii)    with respect to the EMEA Sellers only, consenting to the entry into, or requesting, promoting or instituting, any Secondary Proceedings in relation to any EMEA Seller; and

        (iv)    with respect to the Main Sellers only, voluntarily commencing, or otherwise consenting to, any New Bankruptcy Proceedings relating to any Company or any Non-Debtor Seller.

        (b)    If an EMEA Seller, after having acted in accordance with Section 2.2(a)(iii), resolves to enter into Secondary Proceedings and the Main Sellers have a right under the Law applicable to the Secondary Proceedings to appear at these Secondary Proceedings (under any capacity whatsoever), that EMEA Seller shall facilitate the Main Sellers being heard at such Secondary Proceedings, to the maximum extent allowed by the Law applicable to them.

SECTION 2.3. <u>No Termination or Material Amendments</u>. No Party shall, without the prior written consent of the other Parties (such consent not to be unreasonably withheld, delayed or conditioned):

        (a)    exercise any termination right pursuant to their Respective Sale Agreement (excluding the Main Sellers' right to terminate the North American Agreement under Section 9.1(b)(vi) of the North American Agreement and the EMEA Sellers' right to terminate the EMEA Agreement under clause 15.4.2(F) of the EMEA Agreement) or otherwise agree with the Purchaser to terminate such Respective Sale Agreement;

        (b)    with respect to the Main Sellers only, amend the provisions of Sections 2.2, 2.3, 8, 9.2, 9.3, and 10.14 of the North American Agreement;

6

(c)     with respect to the EMEA Sellers only, amend the provisions of Clause 3 and Clause 15 of the EMEA Agreement, Paragraph 11 of Schedule 6, and Schedule 9 to the EMEA Agreement; or

(d)     enter into any amendment to or waive any provision of its Respective Sale Agreement or any other Transaction Document to which such Party is a party that would cause a material detriment to any of the other Parties.

SECTION 2.4. Collection and Allocation of Total Proceeds.

(a)     Subject to Section 2.4(c), in accordance with the provisions of Section 12.b of the IFSA, the Parties agree that any payment due by the Purchaser (and any Designated Purchaser and any EMEA Designated Purchaser) to the Selling Parties under the Sale Agreements that is included in the Total Proceeds shall be collected and held in escrow in the Distribution Escrow Account by the Distribution Agent (as agent for the Sellers and the EMEA Sellers), which will then allocate and distribute the Total Proceeds to the Sellers and the EMEA Sellers in accordance with the Allocation Rules and the Distribution Escrow Agreement.

(b)     The Parties agree and acknowledge that the Total Proceeds do not include amounts of or in respect of "VAT" or "Transfer Taxes" (each term as defined in the relevant Sale Agreement) paid or payable by the Purchaser or any Designated Purchaser or any EMEA Designated Purchaser or any affiliate of the Purchaser to the Sellers or the EMEA Sellers or the Joint Administrators or the Joint Israeli Administrators or pursuant to the terms of the Sale Agreements. The Parties agree that it is not intended that such amounts of VAT or Transfer Taxes will be payable into the Distribution Escrow Account but, notwithstanding this Agreement, where such amounts are paid into the Distribution Escrow Account, the Distribution Agent shall be instructed under the procedures in the Distribution Escrow Agreement to promptly pay such amounts to the Sellers and EMEA Sellers or Joint Administrators or Joint Israeli Administrators (as relevant).

(c)     To the extent that there are funds available in the Distribution Escrow Account that are attributable to the sale of the Business at the date of payment of any Break-Up Fee or Expense Reimbursement, the obligation of the Selling Parties to make such payment under Section 9.2(c) of the North American Agreement or the payment of any Advisor Fees or Dispute Resolver Retainer shall (subject to adjustment in accordance with Section 2.5) be satisfied by causing the Distribution Agent to pay the relevant amount out of the Distribution Escrow Account.

(d)     To the extent that any Expense Reimbursement cannot be satisfied by payment out of the Distribution Escrow Account, any amounts actually paid by any Selling Party to the Purchaser as Expense Reimbursement shall be deducted from any subsequent amounts payable or paid into the Distribution Escrow Account under Section 2.4(a) and shall (subject to adjustment in accordance with Section 2.5) be paid directly to such Selling Party that made the relevant payment.

7

SECTION 2.5. Allocation of Total Payments.

(a)    Irrespective of the individual/joint payment obligations of each Selling Party or their Respective Affiliates vis-à-vis the Purchaser pursuant to the Sale Agreements (which shall be duly complied with by the relevant Selling Party in accordance with the terms thereof), the Parties agree that, among them, each Party (and, with respect to the Main Sellers, their respective Respective Affiliates) shall ultimately bear the Agreed Respective Percentage of the Total Payments, subject to Section 2.5(c).

(b)    To the extent the Agreed Respective Percentage differs from the Initial Respective Percentage, any amount actually paid by a Party to the Purchaser as part of the Total Payments, shall be promptly (re)adjusted among the Parties so that each Party (and, with respect to the Main Sellers, their respective Respective Affiliates) ultimately bears a share of those Total Payments that corresponds to its Agreed Respective Percentage. Any adjustment payments to be made among the Parties pursuant to the previous sentence shall be made without set off.

(c)    Notwithstanding Section 2.5(a), the Parties agree that, to the extent the event triggering the obligation of the Sellers and the EMEA Sellers to pay to the Purchaser the Break-Up Fee and the Expense Reimbursement under the Sale Agreements is attributable to the action or omission of one or more Parties only, such Parties shall be responsible, as among the Sellers and the EMEA Sellers, for the entire Break-Up Fee and the Expense Reimbursement actually paid by the Sellers and/or the EMEA Sellers (or, if applicable, the Distribution Agent on behalf of the Sellers and the EMEA Sellers) to the Purchaser under the Sale Agreements and shall therefore reimburse to the other Parties, without set-off, any such amount actually paid by them (or the Distribution Agent) to the Purchaser in respect of such Break-Up Fee and the Expense Reimbursement.

SECTION 2.6. Alternative Transaction.

(a)    The Parties shall cooperate in good faith for the purpose of selecting in accordance with the Bid Procedures the best prospective Transaction based on the criteria set forth in the paragraph of the Bid Procedures headed "Evaluation of Competing Bids". Except as permitted under the Bid Procedures, no Party shall be allowed to enter into any Alternative Transaction without the prior written consent of NNL, NNI and NNUK.

(b)    In the event the Parties, in accordance with Section 2.6(a) and to the extent allowed by the Bid Procedures, decide to terminate the Sale Agreements and enter into an Alternative Transaction, the Parties shall use their reasonable best efforts to finalize and execute as soon as possible with the relevant bidder the necessary contractual documentation governing such Alternative Transaction, and shall use their reasonable best efforts to consummate such Alternative Transaction as soon as possible. In such event, the covenants of each Party set forth in Sections 2.1 through 2.3 and, to the extent applicable, Sections 2.4 and 2.5, shall continue to apply as if such Alternative Transaction were the Stalking Horse Transaction hereunder and any reference herein to the Sale Agreements shall be deemed to be a reference to the new sale agreements governing such Alternative Transaction, *mutatis mutandis*.

8

SECTION 2.7. <u>Irrevocable Offers under the EMEA Agreement</u>. In relation to paragraph 5 of Schedule 6 of the EMEA Agreement, the Reserved Territory Sellers and the Joint Administrators agree:

(a)    to commence and progress the information and consultation process in a timely manner; and

(b)    to deliver acceptance of Irrevocable Offers to the Purchaser as soon as possible after appropriate completion of each relevant consultation process.

SECTION 2.8. <u>Fiduciary Duties</u>. The entirety of this Agreement (other than Sections 2.4 and 2.5), including the obligations of each Party under this Agreement, is subject to the rights of each Party to exercise its fiduciary duties, the statutory duties or the legal obligations of the Joint Administrators or the Joint Israeli Administrators in relation to the exercise of their duties or functions as administrators of certain Selling Parties, <u>provided</u> that to the extent that such exercise of fiduciary duties results in a breach of any Selling Party's obligations under this Agreement, the Sale Agreements or other Transaction Documents, the other Parties shall have the rights as are set forth in Section 2.5(c) of this Agreement.

SECTION 2.9. <u>Excluded Sellers</u>. The Parties hereby agree that if any Excludable Other Seller becomes an Excluded Seller, or any EMEA Excludable Seller becomes an EMEA Excluded Seller, the allocation of Total Proceeds that would otherwise have been payable to such Excluded Seller or EMEA Excluded Seller, if any, as determined pursuant to the Interim Sales Protocol shall not be reduced as a result of such Excludable Seller becoming an Excluded Seller or such EMEA Excludable Seller becoming an EMEA Excluded Seller, <u>provided</u> that such allocation of any Total Proceeds to such Excluded Seller or Excludable Other Seller, as applicable, shall be reduced as  result of the receipt of the proceeds, if any, by such Excluded Seller or EMEA Excluded Seller in respect of the sale or liquidation of the Assets of such Excluded Seller or the EMEA Assets of such EMEA Excluded Seller, <u>provided</u>, <u>further</u> that such payment shall be made only after all of the Assets of such Excluded Seller or EMEA Excluded Seller have been sold to a *bona fide* third-party purchaser or liquidated.

SECTION 2.10. <u>Tax Cooperation</u>. In the event that the preparation or filing of a Tax Return could reasonably be expected to require a Partial Allocation or a Selling Party is preparing any Partial Allocation with the Purchaser (whether by agreement or submission to the Accounting Arbitrator), the Selling Party responsible for filing such Tax Return or preparing such Partial Allocation shall provide notice to the other Selling Parties and shall consider in good faith any comments by the other Selling Parties with respect to such Tax Return and any Partial Allocation related thereto, <u>provided</u>, and for the avoidance of doubt, that the other Selling Parties shall not have a consent or veto right with respect to such Tax Returns or Partial Allocations related thereto. It is understood that neither this Section 2.10 nor the exercise or failure to exercise of any rights or privileges provided herein shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation of proceeds from the sale of the Business among the Selling Parties.

9

ARTICLE III

MISCELLANEOUS

SECTION 3.1.  Exclusion of Liability and Acknowledgments re Joint Administrators.

(a)    The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal Liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(b)    The Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 2.8, 3.1 and 3.15.

(c)    Notwithstanding anything in Section 3.7, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm or partners, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of the EMEA Debtors and their remaining as current joint administrators thereof under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

SECTION 3.2.  Exclusion of Liability and Acknowledgments re Joint Israeli Administrators.

(a)    The Parties agree that the Joint Israeli Administrators have negotiated and are entering into this Agreement as agents for the Israeli Companies and that none of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal Liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(b)    The Joint Israeli Administrators are a party to this Agreement: (i) as agents of each of the Israeli Companies; and (ii) in their own capacities solely for (1) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (2) enforcing the obligations of the other Parties to this Agreement and (3) for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 2.8, 3.2 and 3.15.

10

(c)    Notwithstanding anything in Section 3.7, any claim, action or proceeding against the Joint Israeli Administrators in their personal capacities (and not as agents for any Israeli Company) under this Agreement shall be governed exclusively by Israeli law and subject to the exclusive jurisdiction of the Courts of Israel.

SECTION 3.3.  Remedies.  No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 3.4.  No Third-Party Beneficiaries.  Except as provided in Section 3.5, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 3.5.  Consent to Amendments; Waivers.  No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.  This Agreement, or any provision hereof, may be waived or amended, on no less than 5 days' notice, only by means of a writing signed by all Parties, and approved by the Committee, the Bondholder Group and the Monitor (each as defined in the U.S. Bidding Procedures Order), which amendments, if material in the judgment of the Parties, must be approved by each of the Courts that initially approved this Agreement.

SECTION 3.6.  Successors.  Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors.

SECTION 3.7.  Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; provided, however, that Section 3.1 shall be governed exclusively by English law and Section 3.2 shall be governed exclusively by Israeli law.

(b)    To the fullest extent permitted by applicable Law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Bankruptcy Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Protocol adopted by such courts, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement may be brought in the U.S. Bankruptcy Court and the Canadian Court, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been

11

brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law; provided, however, that any claim, action or proceeding set forth in Section 3.1 shall be brought exclusively in the English courts and any claim, action or proceeding set forth in Section 3.2 shall be brought exclusively in the Israeli courts.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 3.7.

SECTION 3.8. <u>Notices</u>. All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 3.8.

**If to NNI and its Respective Affiliates:**
c/o Nortel Networks Inc.
Attention: Gordon A. Davies, Esq.
    Chief Legal Officer
Address: 2221 Lakeside Boulevard
    Richardson, Texas 75082
    U.S.A.
Facsimile No.: +1 905 863 8386
Telephone No.: +1 905 863 7000

**With a copy to:**
Cleary Gottlieb Steen & Hamilton LLP
Attention: Neil Q. Whoriskey, Esq.
Address: One Liberty Plaza
    New York, New York 10006
    U.S.A.
Facsimile No.: +1 212 225 3999
Telephone No.: +1 212 225 2163

**If to the Canadian Main Sellers and their Respective Affiliates:**
c/o Nortel Networks Limited
Attention: Gordon A. Davies, Esq.
    Chief Legal Officer
Address: 195 The West Mall
    Toronto, Ontario M9C 5K1
    Canada

**With a copy to:**

Ogilvy Renault LLP
Attention: Michael Lang, Esq.
Address: Suite 3800
    Royal Bank Plaza, South Tower
    200 Bay Street, P.O. Box 84
    Toronto, Ontario M5J 2Z4

Facsimile No.: +1 905 863 8386
Telephone No.: +1 905 863 1144

Canada
Facsimile No.: +1 416 216 3930
Telephone No.: +1 416 216 4832 /
            +1 416 216 3939

**If to the EMEA Sellers:**
c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
        London SE1 2AF
        United Kingdom
Facsimile No.: +44 (0) 20 7951 1345
Telephone No.: +44 (0) 20 7951 9898

**With a copy to:**
Herbert Smith LLP
Attention: Alan Montgomery and Ben Ward,
Esq.
Address: Exchange House
        Primrose Street
        London EC2A 2HS
        United Kingdom
Facsimile No.: +44 (0) 20 7098 4878
Telephone No.: +44 (0) 20 7466 2878

**If to the Joint Israeli Administrators:**
Avi D. Pelossof
Zellermayer, Pelossof & Co.
The Rubenstein House
20 Lincoln Street
Tel Aviv
67131
Israel
Facsimile: +972 3 6255500

**If to the Joint Administrators:**
c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
        London SE1 2AF
        United Kingdom
Facsimile No.: +44 (0) 20 7951 1345
Telephone No.: +44 (0) 20 7951 9898

**If to the Committee:**
Akin Gump Strauss Hauer & Feld LLP
Attention: Fred S. Hodara and Stephen B.
Kuhn, Esq.
One Bryant Park
New York, New York 10036
Facsimile: (212) 872-1002

**If to the Bondholder Group:**
Milbank, Tweed, Hadley & McCloy
Attention: Roland Hlawaty, Esq.
One Chase Manhattan Plaza
New York, New York, 10006
Facsimile: (212) 822-5735

**If to the Monitor:**
Murray A. McDonald
Ernst & Young Inc.
Ernst & Young Tower
222 Bay Street, P. O. Box 251
Toronto, ON M5K 1J7
Canada
Facsimile: (416) 943-3300

Any such demand, notice, communication or report shall be deemed to have been given pursuant

13

to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

SECTION 3.9. Counterparts. The Parties may execute this Agreement in three or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

SECTION 3.10. Severability. If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 3.11. Termination. This Agreement will automatically terminate on the earliest of (a) consummation of the Closing and (b) consummation of the closing of an Alternative Transaction entered into by the Parties pursuant to Section 2.6(b). Upon termination, the Parties' rights and obligations under this Agreement, other than in respect of the obligations under Sections 3.1, 3.2, 3.7, 3.11, 3.15 and 3.16, shall cease immediately but without prejudice to the rights and obligations of the Parties existing prior to the termination of the Agreement.

SECTION 3.12. Obligations of the Parties.

(a)    The obligations of the Canadian Main Sellers and the other Canadian Debtors under this Agreement shall be joint and several.

(b)    The obligations of NNI and the other U.S. Debtors under this Agreement shall be joint and several.

(c)    The obligations of the EMEA Debtors under this Agreement shall be joint and several.

SECTION 3.13.    Effectiveness.

(a)    No provision of this Agreement (other than as set forth in Section 3.13(d)) shall be effective until each of the US Court and the Canadian Court approves the entirety of this Agreement and all of the provisions hereof (the "**Court Approval Condition**").

(b)    All provisions of this Agreement shall be effective as of the date of the satisfaction of the Court Approval Condition.

(c)    Each Party hereto shall:

14

       (i)      use commercially reasonable efforts to satisfy the Court Approval Condition as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

       (ii)     keep all other Parties reasonably apprised of the progress of the satisfaction of the Court Approval Condition and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

       (iii)    use commercially reasonable efforts to allow any other Party, which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Court Approval Condition.

       (d)     Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 3.1 through 3.13 and Section 3.13(b), (c) and (d).

       (e)     No provision of this Agreement shall become effective so far as the Israeli Companies are concerned until the Israeli Court approves this Agreement. The Parties shall use their commercially reasonable efforts to cause the Israeli Companies to obtain such approval.

       SECTION 3.14.     Execution by Other Sellers. The Parties hereby acknowledge that the Other Sellers are not executing this Agreement as of the date hereof. Subject to Section 3.13, this Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers have done so. Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall use their reasonable best efforts to cause each Other Seller to execute a counterpart to this Agreement as soon as practicable, agreeing to be bound as a Party under this Agreement.

       SECTION 3.15.     Limitations of Remedies. The Parties expressly agree that the sole and exclusive remedy of any Party (the **"Claiming Party"**) against any other Party for a breach of this Agreement, the Sale Agreements or the other Transaction Documents shall be payment of damages to the Claiming Party in an amount not to exceed the amount, if any, of the Break-Up Fee and/or Expense Reimbursement actually paid by the Claiming Party to the Purchaser or a Designated Purchaser under the Sale Agreements. For the avoidance of doubt, the Parties further agree that in no event shall any Party be entitled to equitable relief, including in the form of an injunction or injunctions or orders for specific performance, to prevent or remedy breaches of this Agreement, the Sale Agreements or the other Transaction Documents by any other Party.

       SECTION 3.16.     Reservation of Rights. The Parties hereby agree that nothing in this Agreement shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation or distribution of proceeds from the sale of the Business among the Selling Parties. Without limiting the generality of the foregoing, the Parties hereby agree that the Initial Respective Percentage among the Parties shall not in any way determine the final

15

allocation or distribution of proceeds from the sale of the Business or otherwise bind the Parties in respect of the final allocation.

[Remainder of this page intentionally left blank.  Signature pages follow.]

IN WITNESS WHEREOF, the Parties have duly executed this Side Agreement as of the date first written above.

**Nortel Networks Corporation**

By:_____
Name: Mike S. Zafirovski
Title: President & CEO

By:_____
Name:
Title:    Tracy S.J. Connelly McGilley
          Assistant Secretary

**Nortel Networks Limited**

By:_____
Name: Mike S. Zafirovski
Title: President & CEO

By:_____
Name:
Title:    Tracy S.J. Connelly McGilley
          Assistant Secretary

**Nortel Networks Inc.**

By:_____
Name: J Doolittle
Title: ~~Treasurer~~ Vice President

Signature Page – Side Agreement

**SIGNED** for and on behalf of **Nortel Networks**
**UK Limited** (in administration) by Christopher
Hill
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)

..................................................................
Christopher Hill

Witness signature

..................................................................
Name:                    Herbert Smith LLP
Address:                 Exchange House
                         Primrose Street
                         London EC2A 2HS

)
)
)

**SIGNED** for and on behalf of **Nortel GmbH**
(in administration) by Christopher Hill

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)

..................................................................
Christopher Hill

Witness signature

..................................................................
Name:                    Herbert Smith LLP
Address:                 Exchange House
                         Primrose Street
                         London EC2A 2HS

)
)
)

**SIGNED** for and on behalf of **Nortel Networks**
**France S.A.S.** (in administration) by Kerry
Trigg acting as authorised representative for

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)
)

..................................................................
Kerry Trigg

Witness signature

..................................................................
Name:
Address:

)
)
)

SIGNED for and on behalf of **Nortel Networks**  )  ........................................................................
**UK Limited** (in administration) by  )
  )
as Joint Administrator (acting as agent and  )
without personal liability) in the presence of:

Witness signature

........................................................................  )
Name:  )
Address:  )

SIGNED for and on behalf of **Nortel GmbH**  )  ........................................................................
(in administration) by  )
  )
as Joint Administrator (acting as agent and  )
without personal liability) in the presence of:

Witness signature

........................................................................  )
Name:  )
Address:  )

SIGNED for and on behalf of **Nortel Networks**  )
**France S.A.S.** (in administration) by Kerry  )  ........................................................................
Trigg acting as authorised representative for  )  Kerry Trigg
  )
as Joint Administrator (acting as agent and  )
without personal liability) in the presence of:

Witness signature

........................................................................  )
Name: SHARON PERLMUTTER  )
Address:  1 MORE LONDON PLACE  )
    LONDON SE1 2AF

Signature Page – Side Agreement

**SIGNED** for and on behalf of Nortel Networks    )
**SpA** (in administration) by Christopher Hill      )
                                                      )
as Joint Administrator (acting as agent and          )
without personal liability) in the presence of:      )

............................................................
Christopher Hill

Witness signature

..............................................
Name:        Herbert Smith LLP
Address:     Exchange House
             Primrose Street
             London EC2A 2HS

**SIGNED** for and on behalf of Nortel Networks    )
**Hispania S.A.** (in administration) by             )
Christopher Hill                                     )
as Joint Administrator (acting as agent and          )
without personal liability) in the presence of:      )

............................................................
Christopher Hill

Witness signature

..............................................
Name:        Herbert Smith LLP
Address:     Exchange House
             Primrose Street
             London EC2A 2HS

**SIGNED** for and on behalf of Nortel Networks    )
**B.V.** (in administration) by Christopher Hill     )
                                                      )
as Joint Administrator (acting as agent and          )
without personal liability) in the presence of:      )

............................................................
Christopher Hill

Witness signature

..............................................
Name:        )
Address:     Herbert Smith LLP    )
             Exchange House       )
             Primrose Street
             London EC2A 2HS

Signature Page — Side Agreement

**SIGNED** for and on behalf of Nortel Networks )
**AB** (in administration) by Christopher Hill )
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

Name:                           Herbert Smith LLP )
Address:                        Exchange House )
                                Primrose Street )
**SIGNED** for and on behalf of Nortel Networks )
**N.V.** (in administration) by Christopher Hill )
London EC2A 2HS
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

Name:                           Herbert Smith LLP )
Address:                        Exchange House )
                                Primrose Street )
**SIGNED** for and on behalf of Nortel Networks )
London EC2A 2HS
**(Austria) GmbH** (in administration) by )
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

Name:                           )
Address:                        )
        Herbert Smith            )
        Exchange House
        Primrose Street
        London EC2A 2HS

Signature Page – Side Agreement

**SIGNED** for and on behalf of Nortel Networks )
Polska Sp. z.o.o. (in administration) by )
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

Name:            Herbert Smith LLP )
Address:         Exchange House )
                 Primrose Street )
**SIGNED** for and on behalf of Nortel Networks )
Oy (in administration) by Christopher Hill )
                                             )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

                 Herbert Smith LLP
Name:            Exchange House )
Address:         Primrose Street )
                 London EC2A 2HS )
**SIGNED** for and on behalf of Nortel Networks )
Portugal S.A. (in administration) by )
Christopher Hill )
                 )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Christopher Hill

Witness signature

Name:            )
Address:         )
  Herbert Smith LLP )
  Exchange House
  Primrose Street
  London EC2A 2HS

Signature Page – Side Agreement

**SIGNED** for and on behalf of Nortel Networks    )
s.r.o. (in administration) by Christopher Hill    )
                                                   )
as Joint Administrator (acting as agent and        )
without personal liability) in the presence of:    )

.............................................
Christopher Hill

Witness signature

..............................................    )
Name:                    Herbert Smith LLP          )
Address:                 Exchange House             )
                         Primrose Street            )
**SIGNED** for and on behalf of Nortel Networks     )
Romania s.r.l. (in administration) by               )
Christopher Hill                                    )
as Joint Administrator (acting as agent and         )
without personal liability) in the presence of:     )

.............................................
Christopher Hill

Witness signature

..............................................    )
Name:                    Herbert Smith LLP          )
Address:                 Exchange House             )
                         Primrose Street            )
                         London EC2A 2HS            )
**SIGNED** for and on behalf of Nortel Networks     )
Engineering Service kft (in administration) by      )
Christopher Hill                                     )
                                                    )
as Joint Administrator (acting as agent and         )
without personal liability) in the presence of:     )

.............................................
Christopher Hill

Witness signature

..............................................    ).
Name:                                               )
Address:                                            )
              Herbert Smith LLP
              Exchange House
              Primrose Street
              London EC2A 2HS

Signature Page -- Side Agreement

**SIGNED** for and on behalf of Nortel Networks          )
(Ireland) Limited (in administration) by David           )       .................................................................
Hughes as Joint Administrator (acting as agent           )       David Hughes
and without personal liability) in the presence          )
of:                                                      )


Witness signature
.................................................................      )
Name: Colin Farquharson                                               )
Address:  Veldonstown                                                 )
          Ratstown
          Navan
          Co Meath

SIGNED by Sergei Fishkin                           )          ..................................
duly authorised for and on behalf of o.o.o,        )          Sergei Fishkin
Nortel Networks in the presence of:                )

Witness signature

..........................................................  )
Name: GALINA SVETLYSHEVA                            )
Address: RUSSIA, MOSCOW,                            )
Rublivskoye mosse, 52-377                           )
SIGNED by Sharon Rolston                            )          ..................................................
duly authorised for and on behalf of Nortel        )          Sharon Rolston
Networks AG in the presence of:                     )


Witness signature

..........................................................  )
Name:                                               )
Address:                                            )

SIGNED by Sharon Rolston and Simon    .             )          ..................................................
Freemantle duly authorised for and on behalf of    )          Sharon Rolston
Nortel Networks South Africa (Pty) Limited          )
in the presence of:                                 )

                                                               ..................................................
                                                               Simon Freemantle

Witness signature

..........................................................  )
Name:                                               )
Address:                                            )

**SIGNED** by Sergei Fishkin )
duly authorised for and on behalf of o.o.o. )
Nortel Networks in the presence of: )

.......................................................
Sergei Fishkin

Witness signature

.......................................................
Name:                    )
Address:                 )

**SIGNED** by Sharon Rolston )
duly authorised for and on behalf of Nortel )
Networks AG in the presence of: )

.......................................................
Sharon Rolston

Witness signature

*B. Schwath*
.......................................................
Name:   B. SCHERWATH      )
Address: C/O NORTEL NETWORKS )
         MAIDEN HEAD, UK   )

**SIGNED** by Sharon Rolston and Simon )
Freemantle duly authorised for and on behalf of )
Nortel Networks South Africa (Pty) Limited )
in the presence of:

.......................................................
Sharon Rolston

.......................................................
Simon Freemantle

Witness signature

*B. Schwath*
.......................................................
Name:   B. SCHERWATH      )
Address: C/O NORTEL NETWORKS )
         MAIDEN HEAD, UK

Signature Page – Side Agreement

**SIGNED** by Sharon Fennessy and Simon
Freemantle duly authorised for and on behalf of
Nortel Networks AS in the presence of:.

)
)
)

*[signature]*

Sharon Fennessy

*[signature]*

Simon Freemantle

Witness signature

*B. Schwell*

Name:    B. SCHERWATH

Address:  C/O NORTEL NETWORKS
          MAIDENHEAD, UK

)

)
)

Signature Page -- Side Agreement

הנאמן בהקפאת הליכים

SIGNED for and on behalf of Nortel    )    .................................
Communications Holdings (1997) Limited (in    )    Yaron Har-Zvi
administration) by Yaron Har-Zvi and Avi D.    )
Pelossof as Joint Israeli Administrators (acting    )
jointly and without personal liability) in    )    .................................
connection with the Israeli Assets and    )    Avi D. Pelossof
Liabilities:    )

Witness signature

.................................    )
Name: SARIT    )
Address: The Rubinstein House, 20 Lincoln Street, Tel Aviv    )

הנאמן בהקפאת הליכים

SIGNED for and on behalf of Nortel Networks    )    .................................
Israel (Sales and Marketing) Limited (in    )    Yaron Har-Zvi
administration) by Yaron Har-Zvi and Avi D.    )
Pelossof as Joint Israeli Administrators (acting    )    .................................
jointly and without personal liability) in    )    Avi D. Pelossof
connection with the Israeli Assets and    )
Liabilities:    )
    )
    )

Witness signature

.................................    )
Name: SARIT MOUSSAYOFF    )
Address: The Rubinstein House, 20 Lincoln Street, Tel-Aviv    )

Signature Page – Side Agreement

**SIGNED** by Christopher Hill

)
)
)

in his own capacity and on behalf of the Joint
Administrators without personal liability and
solely for the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the Joint Administrators:

Christopher Hill

Witness signature

Name:
Address:
       Herbert Smith LLP
       Exchange House
       Primrose Street
       London EC2A 2HS

)
)
)

SIGNED for and on behalf of Nortel Networks )
Slovensko s.r.o. (in administration) by )        Stephen Harris
Stephen Harris )
)

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Witness signature
............................................................ )
Name: SHARON PERLMUTTER )
Address: 1 MORE LONDON PLACE
         LONDON  SE1 2AF
         Secretary

Signature Page – Side Agreement

## Schedule A – Other Sellers

Nortel Altsystems, Inc. (f/k/a Alteon Websystems, Inc. name change effective 4/30/09)

Nortel Networks Technology Corporation

Nortel Networks International Inc.

Nortel Networks (CALA) Inc.

Nortel Networks de Argentina, S.A.

Nortel Networks Chile S.A.

Nortel Networks de Mexico, S.A. de C.V.

Nortel de Mexico, S. de R.L. de C.V.

Nortel Networks Peru S.A.C.

Nortel Networks Australia Pty Limited

Nortel Networks de Colombia, S.A.

Nortel Networks (India) Private Limited

Nortel Technology Excellence Centre Private Limited

PT Nortel Networks Indonesia

Nortel Networks Japan (Japanese name is Nortel Networks Kabushiki Kaisha)

Nortel Networks Malaysia Sdn. Bhd.

Nortel Networks New Zealand Limited

Nortel Networks Singapore Pte. Limited

Nortel Networks (Asia) Limited

Nortel Networks (China) Limited

Nortel Networks (Thailand) Ltd.

Nortel Vietnam Limited

Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd.

**Schedule B – EMEA Sellers**

| EMEA Seller | Jurisdiction | Registered Number | Registered Office |
|---|---|---|---|
| Nortel Networks UK Limited (in administration) | United Kingdom | 3937799 | Maidenhead Office Park, Westacott Way, Maidenhead, Berks SL6 3QH, United Kingdom |
| Nortel Networks (Ireland) Limited (in administration) | Ireland | 40287 | Mervue Business Park, Mervue, Galway, Ireland |
| Nortel GmbH (in administration) | Germany | HRB 12489 | Main Airport Center, Unterschweinstiege 6, 60549, Frankfurt am Main, Germany |
| Nortel Networks France SAS (in administration) | France | 552 150 724 R.C.S. Versailles | Parc d'Activites de Magny-Châteaufort, Châteaufort 78117, France |
| Nortel Networks SpA (in administration) | Italy | 1307425 Milan 05650 290017 | Via Montefeltro no. 6, Milan, 20156, Italy |
| Nortel Networks Hispania SA (in administration) | Spain | A-78693603 | Camino del Cerro de los Gamos, no. 1 Edificio 6, 28.224 Pozuelo de Alarcon, Madrid, Spain |
| Nortel Networks B.V. (in administration) | Netherlands | 34054624 | Siriusdreef 42-72, 2132WT Hoofddorp, Netherlands |
| o.o.o. Nortel Networks | Russia | 1047796092960 | 9th Floor, Krasnopresnenskaya, Naberezhnaya, |

|  |  |  | Moscow 123317, Russia |
|---|---|---|---|
| Nortel Networks AG | Switzerland | CH-020.3.918.846-4 | Flughofstrasse 54, 8152 Opfikon, Switzerland |
| Nortel Networks South Africa (Pty) Limited | South Africa | 1998/001845/07 | 13 Wellington Road, Parktown, South Africa 2193 |
| Nortel Networks AB (in administration) | Sweden | 556453-7305 | Box 6701, 113 85 Stockholm, Sweden |
| Nortel Networks N.V. (in administration) | Belgium | Brussels 378.358 | Ikaroslaan 14, 1930 Zaventem, Belgium |
| Nortel Networks AS | Norway | 961 797 020 | Hieronnymus Heyerdahls Gt 1, 0160 Oslo, Norway |
| Nortel Networks (Austria) GmbH (in administration) | Austria | FN 173973v | 1100 Wien, Business Park, Vienna, Clemens-Holzmeisterstrasse 4, Austria |
| Nortel Networks Polska Sp z.o.o. (in administration) | Poland | KRS 158506 (former RHB 49656) | 47 a Nowogrodzka Street, 00-695 Warsaw, Poland |
| Nortel Networks Oy (in administration) | Finland | 1039 1404 (Y reg) | Arabianranta 6, 00560 Helsinki, Finland |
| Nortel Portugal SA (in administration) | Portugal | 502 338 393 | Edificio Tivoli-Forum, Avda da Liberdade no. 180-3o andar, Lisbon, Portugal |
| Nortel Networks s.r.o. (in administration) | Czech Republic | 25 79 84 72 | Klimentska 1216/46, 11002 Prague 1, |

Schedule B

|  |  |  | Czech Republic |
|---|---|---|---|
| Nortel Networks Romania srl (in administration) | Romania | J40/3642/1999 | 3A Promoroaca Street, Sector 1, Bucharest 014013, Romania |
| Nortel Networks Engineering Services kft (in administration) | Hungary | Cg 01-09-681308 | 1117 Budapest, Infopark setany 1, Hungary |
| Nortel Networks Slovensko s.r.o. (in administration) | Slovakia | [35 716 428] | [Obchodna 2, 811 06, Bratislava, Slovak Republic] |

**The Israeli Companies**

|  |  |  |  |
|---|---|---|---|
| Nortel Networks Israel (Sales and Marketing) Limited (in administration) | Israel | 51-295692-1 | Ha'arava Street, Lod 70151 at Airport City, PoB 266, Ben-Gurion Airport, 70100 Israel |
| Nortel Communications and Holdings (1997) Limited (in administration) | Israel | 51-243502-5 | Ha'arava Street, Lod 70151 at Airport City, PoB 266, Ben-Gurion Airport, 70100 Israel |

Schedule B

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

EIGHTEENTH REPORT OF THE MONITOR
DATED JULY 31, 2009

GOODMANS LLP
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada M5B 2M6

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5726305