IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| NORTEL NETWORKS, INC., | . | Case No. 09-10138(KG) |
| *et al.,* | . | Jointly Administered |
| | . | |
| Debtors. | . | July 28, 2009 (1:06 p.m.) |
| | . | (Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY COURT JUDGE

<u>Appearances</u>:

| | |
|---|---|
| For the Debtor: | Derek C. Abbott, Esquire |
| | Morris, Nichols, Arsht & Tunnell |
| | James L. Bromley, Esquire |
| | Lisa M. Schweitzer, Esquire |
| | Jane Kim, Esquire |
| | Cleary Gottlieb Steen & Hamilton |
| | Jennifer Stam, Esquire |
| | Ogilvy Renault, LLP |
| | |
| For Ericsson: | Steven Shimshak, Esquire |
| | Paul, Weiss |
| | |
| For SNMP Research: | Anthony M. Saccullo, Esquire |
| | Ciardi, Ciardi & Astin |
| | |
| For Nokia Siemens: | Sarah Pierce, Esq. |
| | Skadden, Arps |
| | |
| For the UK Administrator: | Ed Harron, Esquire |
| | Young, Conaway, Stargatt & Taylor |
| | |
| For Motorola, Inc.: | Elihu E. Allinson, III, Esq. |
| | Sullivan Hazaltine Allinson |
| | |
| For the Committee: | Fred Hodara, Esq. |
| | Akin Gump |
| | |
| For the Ad Hoc Bondholder Group: | Thomas Kreller, Esquire |
| | Milbank, Tweed, Hadley & McCloy |

2

For the Monitor:          Jay Carfagnini, Esq.
                          Goodmans LLP

Audio Operator:           Jennifer Pasierb

Transcriber:              Elaine M. Ryan
                          (302) 683-0221

        Proceedings recorded by electronic sound recording;
           transcript produced by transcription service.

1          THE CLERK: Please rise.

2          THE COURT: Good afternoon, everyone, thank you, and

3    please be seated.  Mr. Abbott, and I see Mr. Justice Morawetz

4    on the bench.  Good afternoon.

5          JUSTICE MORAWETZ (VIDEO): Good afternoon, Judge

6    Gross.

7          MR. ABBOTT: Good afternoon, Your Honor.  Derek

8    Abbott here on behalf of the U.S. Nortel debtors.  I didn't

9    mean - Did I -

10          THE COURT: Well, I think that Mr. Justice Morawetz

11    was going to make some opening comments.  Is that correct,

12    sir?

13          JUSTICE MORAWETZ (VIDEO): Yes, it is.

14          THE COURT: Okay.

15          JUSTICE MORAWETZ (VIDEO): This will take about one

16    minute and then it will be over to you, Judge Gross, but this

17    afternoon we are conducting this joint hearing in accordance

18    with the cross-border protocol that has previously been

19    approved by both the United States Bankruptcy Court and by

20    this Court.   Today's motions are to approve a sale

21    transaction.  Judge Gross and I, in accordance with the Court

22    to Court Communication Guidelines, have had a discussion

23    regarding procedure, and subject to any objections by counsel

24    and the views they wish to express our view is that the

25    matter will first be heard by Judge Gross in Delaware with

1  respect to the U.S. motion.  We will then deal with the

2  motion in this Court, whatever submissions, at the conclusion

3  of which there will be a recess, both Courts consider the

4  submissions that have been made, and then we'll proceed from

5  there.  Are there any questions or comments from counsel in

6  Toronto with respect to that process?  Seeing none, Judge

7  Gross, I turn it over to you to make similar inquiries in

8  your court and then to proceed if there are no problems.

9         THE COURT: Thank you, sir.  Mr. Abbott, good

10  afternoon.

11         MR. ABBOTT: Good afternoon, Your Honor.  I'm not

12  sure if the Court had some comments or questions akin to Mr.

13  Justice Morawetz' comments or if we should jump right into

14  it.

15         THE COURT: My only comments would be that I think

16  the concept is that we should proceed first with the sale

17  motion and then when we have concluded that, we can turn to

18  the other matters on the agenda for today.

19         MR. ABBOTT: Thank you, Your Honor.  For that matter

20  I'll turn the podium over to Mr. Bromley from the Cleary

21  Gottlieb firm.

22         THE COURT: Alright, thank you.  Mr. Bromley, good

23  afternoon.

24         MR. BROMLEY: Good afternoon, Your Honor.

25         THE COURT: I hope that doesn't throw off your

1    presentation in any way.

2            MR. BROMLEY: Not at all, Your Honor.  I have to say

3    though it was difficult to hear exactly what Justice Morawetz

4    was saying.  So, I want to make sure that we're going in the

5    correct order as -

6            THE COURT: Yeah, the concept is that we'll proceed

7    here first and then they'll proceed in Canada, and then Mr.

8    Justice Morawetz and I will take a brief recess and consult

9    with one another, and then we'll come out and make our

10   rulings.

11           MR. BROMLEY: Very good.  Thank you very much, Your

12   Honor.  James Bromley of Cleary Gottlieb on behalf of Nortel

13   Networks, Inc., and the other Nortel U.S. debtors.  Good

14   afternoon and good afternoon to Justice Morawetz.  It's a

15   pleasure to be here before you both today.  We are at the

16   conclusion of a very big week in the Nortel consolidated

17   cases.  On Friday, I think it's fair to say that we were able

18   to conduct one of the most successful and seamless

19   international auctions in a bankruptcy proceeding ever.  We

20   were able to, with the participation of over 150 people, over

21   a course of 13 hours and 6 rounds of bidding involving two of

22   the largest strategic players in the telecom world and a

23   major well-known private equity firm, representing the

24   countries of Sweden, Finland, Germany, and the United States,

25   and Canada, we were able to conduct an auction over the

1   course of 12 hours that increased the proceeds that are going

2   to come into these consolidated states by nearly a half of a

3   billions dollars.  We were able to increase the transaction

4   price from 650 million to 1.13 billion.  To say that Friday's

5   events were successful is a bit of an understatement.  We

6   started off at about 9:30 in the morning in our offices in

7   New York City after having had a short hearing with you, Your

8   Honor, a chambers conference I should say about process, and

9   we continued through a number of rounds of bidding throughout

10   the day.  To show you how vigorous the bidding was, at one

11   point during the day, each of the three bidders, Ericsson,

12   Nokia Siemens Networks, and MatlinPatterson, at one point,

13   each of them was the leading bidder for one of the rounds.

14   As the day worn on and the bidding continued, we were able to

15   have a convergence, a convergence on the terms.  The

16   differences in the documentation fell away as the day

17   proceeded and the focus became, as it should be, on price.

18   As the debtors and their advisors conducted a sort of shuttle

19   diplomacy throughout the 39th floor in our offices, moving

20   between rooms where the bidders and their representatives

21   were located, the debtors and their advisors consulted on

22   each round with the advisors for the unofficial group of

23   bondholders, for the Official Creditors Committee, and, of

24   course, for the Monitor in Canada, and I think it's important

25   to note that at each step and on each material point, never

1    once did we fail to have consensus.  Never once did we fail

2    to have consensus on what the leading bid should be, on what

3    the negotiating strategies should be, on what we should ask

4    for, and what we should give.  Never once did we lack

5    consensus on the adjustments to the process that were made

6    during the day.  We did, I should note, increase the bidding

7    increments from $5 million to $25 million, and at the very

8    end we engaged in live bidding, and I'm happy to say that we

9    had complete consensus at the end of a very long day on what

10   the winning bid should be.  So by the end of the day, as the

11   sun was setting over the Statute of Liberty, literally,

12   around a large U-shaped table in our offices, we had Nokia

13   Siemens Networks sitting on one side of the table and

14   Ericsson sitting at the other, and as the auction concluded,

15   with Ericsson's bid of $1.13 billion and we notified Ericsson

16   that they would be the winning bid and that we notified Nokia

17   Siemens Networks that their next bid of $1,032,500,000 would

18   be the alternate bid, we adjourned the auction and we moved

19   to documentation.  Throughout the day, as we went through the

20   auction process, the documentation trailed, not by very much

21   in terms of time, the bids that were being submitted, and so

22   we adjourned the auction to allow that documentation to be

23   executed and finalized, and so, by midnight on Friday, we

24   were able to finalize the documents, sign them, and issue

25   press releases, and it is our intention to work towards the

1   closing dates which we anticipate should be no later than

2   September 30th or in the event of certain regulatory issues as

3   late as October 31st.  And so, by the end of the day on

4   Friday, I think we had accomplished quite a bit for all of

5   the interested parties, and we had seen a process that had

6   worked across borders quite effectively to increase the

7   proceeds by almost a half of a billion dollars.  As we moved

8   through Saturday, Sunday, and Monday the focus then turned to

9   resolving objections, and I'm pleased to say that one by one

10  we had been resolving those objections.  One, we had a little

11  bit of a tussle with our Flextronics friends.  So while we

12  were on the 39th floor of our offices having an auction on the

13  45th floor we were deposing a Flextronics witness, but I am

14  happy to say that over the weekend we were even able to

15  resolve that on a consensual basis.  And so, we're able to be

16  here today before both Courts simultaneously to seek approval

17  of this milestone transaction, a transaction that we first

18  brought to both Courts on June 19th after we had signed a

19  stalking horse transaction with Nokia Siemens Networks, and

20  it was on June 19th that we had issued press releases about

21  that stalking horse transaction.  It was on June 19th that we

22  had for the first time issued the bidding procedures that we

23  sought to have approved by both Courts.  So as of June 19th,

24  the public and indeed any interested bidders were fully aware

25  of what was being sold and how we were proposing to sell

1    those assets.  Ten days later on June 29th, we had the first

2    joint hearing in these proceedings.  It took us awhile to

3    have the joint hearings, but I suspect we'll be having quite

4    a few lately, and so, on June 29th, we had an all day hearing,

5    almost 7 hours, and this is the first opportunity we've had,

6    Your Honor, to thank you very much for sitting while I know

7    that you were quite ill that day, and by the end of that

8    hearing we were able to enter the bidding procedures and they

9    were entered by both Courts, issued first in Canada and then

10   the next day in the United States, and if Your Honors will

11   remember, we had one major objector at that hearing,

12   MatlinPatterson.  MatlinPatterson wanted more time.  They

13   claimed they were extraordinarily interested in these assets,

14   and I think I'll have to confess, I was a little bit

15   skeptical at that point.  I think I referred to them as a

16   tease at this podium, and I'm happy to say, Your Honors, that

17   as soon as those bidding procedures were entered,

18   MatlinPatterson came at us guns a blazing, and they were

19   very, very active in this process.  They quickly signed up

20   conforming non-disclosure agreements, and they got to work,

21   and as I mentioned already, Your Honor, they were active

22   bidders in the process.  As those bidding procedures

23   required, we went through the process looking at three main

24   requirements from our bidders, that they sign a conforming

25   non-disclosure agreement and the non-disclosure agreement

1   that would be based on the form that had been signed by Nokia

2   Siemens Networks, that's what the bidding procedures

3   required, and then it's very important to note that that is

4   not a frivolous requirement.  The bidders each had access to

5   the most confidential information relating to these business,

6   and those non-disclosure agreements have to be able to be

7   transferred to the winning bidder so that they will be able

8   to enforce them after the Court approves the winning bid.  So

9   it is an absolute requirement that we have acceptable non-

10  disclosure agreements, and it's important to note that Nokia

11  Siemens Networks and MatlinPatterson and Ericsson all had

12  acceptable non-disclosure agreements.  We also required

13  financials in non-binding proposals from our qualified

14  bidders, and so by the time this process moved through, we

15  had three qualified bidders.  We had a very busy month of

16  diligence, meetings, negotiations, and discussions with all

17  of our bidders.  There was constant engagement with the

18  Monitor, with our bondholders, and with our Official

19  Committee of Unsecured Creditors.  It is fair to say that the

20  debtors' business people were fully consumed over the past

21  four weeks in moving through and dealing with each of the

22  requests for information and worked literally around the

23  clock, 7 days a week to make sure that everyone had a full

24  and adequate opportunity to look at these assets and bid for

25  them.  Finally, we got to last week and on Monday of last

1   week, nothing of moment happened for the carrier business,

2   the CDMA or LTE business, but we did sign a stalking horse

3   agreement for another material element of Nortel's business.

4   We signed a stalking horse agreement last Monday with Airvana

5   at a purchase of $475 million for the sale of Nortel's

6   Enterprise Solutions business.  Entering into that stalking

7   horse agreement was the culmination of many months of

8   difficult negotiations, and we have asked the Courts to set

9   September 11th as the auction date, and we hope to be back

10  here after that reporting similar results.  On Tuesday, focus

11  went back to the CDMA and LTE businesses.  Tuesday was the

12  bid deadline, and we received bids.  We received bids from

13  each of our qualified bidders.  The advisors, the bankers,

14  the financial advisors for all the interested parties sat

15  down and started reviewing all of the bids.  On Wednesday,

16  there was a Board meeting of the Nortel companies at which

17  all of the bids were reviewed.  The prices and terms were

18  compared throughout the day by all the various advisors and

19  recommendations were prepared with respect to which would be

20  the starting bid.  On Thursday, we had meetings about what

21  would be the starting bid with all of our constituents, with

22  the Monitor, the Unsecured Creditors Committee, and the

23  bondholders, and the bid submitted by Ericsson was chosen to

24  be the starting bid, and so, we came again full circle back

25  to Friday and the auction commenced.  It was quite a busy

1    week.  It was quite a successful week from the perspective of

2    the Nortel debtors and in particular from the perspective of

3    the Nortel creditors in the U.S.  I think that this was a

4    successful exercise, a vigorous international auction that

5    has yielded substantial results, and it is our pleasure,

6    frankly, to be before both Courts today seeking approval -

7    you'll be doing the approving hopefully, of this very

8    monumental transaction.  That is the introduction that I'd

9    like to make, Your Honor.  I think it summarizes everything

10   that occurred last week.  We will have proffers here for the

11   record in the U.S.

12        THE COURT: Yes.

13        MR. BROMLEY: From George Riedel, the chief strategy

14   officer from Nortel and from Michael Murray, the investment

15   banker from Lazard, both of whom appeared before you live at

16   the hearing on the 29th.

17        THE COURT: Yes.

18        MR. BROMLEY: At this point I would like to hand

19   over the podium to my partner, Lisa Schweitzer, who will go

20   through the legal basis for the approval of the sale

21   transaction under U.S. law as well as to address the proffers

22   of Mr. Murray and Mr. Riedel.

23        THE COURT: Thank you very much, Mr. Bromley.

24        MR. BROMLEY: Thank you, Your Honor.

25        THE COURT: It's unordinarily warm in here, I think,

1    today.  The air conditioning doesn't seem to be working as

2    well as it should, and I invite anyone who wishes to, to take

3    off his or her jacket to be more comfortable.  Ms.

4    Schweitzer, good afternoon.

5         MS. SCHWEITZER: Good afternoon, Your Honor.  Just

6    to preview where we're intending to go with the hearing this

7    afternoon, is I thought that we could start by handing you

8    the revised order because so many of the objections have been

9    resolved that we could show you the changes in the order at

10   the same time walk through how the objections have been

11   resolved, and we can talk to any remaining objections, then

12   talk about the evidence that's coming in, and close with the

13   legal arguments regarding approval of the sale.

14        THE COURT: That's fine, that would be helpful.

15        MS. SCHWEITZER: Okay.  May I approach to give you -

16        THE COURT: Yes, yes, please.  Thank you.

17        MS. SCHWEITZER: So, for the record, I've just

18   handed you a clean copy of the sale order with the exhibits

19   and a blackline of the sale order and a blackline of the

20   assets sale agreement.  I believe we have copies in the

21   courtroom for other parties who wish to have copies of them

22   which is -

23        THE COURT: Are they in those boxes in the back?

24        MS. SCHWEITZER: No, I think they're in her lap,

25   they're hiding -

1          THE COURT: Oh, they're the copies.

2          MS. SCHWEITZER: Literally hot off the presses.

3          THE COURT: Okay.

4          MS. SCHWEITZER: So, as Mr. Bromley indicated, we

5     have resolved most of our objections and that we believe that

6     we've actually fully resolved the substantive objections that

7     the Court would have to deal with today.  As you're aware

8     that we're seeking approval today of an asset sale agreement

9     with Ericsson as the purchaser for a sale price of $1.13

10    billion.

11         THE COURT: Yes.

12         MS. SCHWEITZER: And we've also designated an

13    alternative transaction with Nokia Siemens Network at a price

14    of $1.0325 billion as an alternative bid.

15         THE COURT: Good.

16         MS. SCHWEITZER: And so this order provides for

17    approval of both of those agreements in both of those bids,

18    the second one in accordance with the terms submitted at

19    auction rather than through the attachment of a second asset

20    sale agreement today.  If I could just start flipping through

21    the blackline.  I won't go through every last cleanup change,

22    but I'll point out the more substantive changes and if you

23    have questions anywhere else, feel free to stop me.

24         THE COURT: And we're starting with the agreement?

25         MS. SCHWEITZER: Yes - I was going to start with the

1      order.  I think the asset sale agreement we can flip through

2      the whole thing but it's probably easier for me to tell you

3      substantively what some of the changes are -

4              THE COURT: Very well.

5              MS. SCHWEITZER: - because there's a lot of cleanup

6      in that document.

7              THE COURT: Okay.

8              MS. SCHWEITZER: In the order itself, the second

9      page just notes that there was a second round of Chapter 11

10     cases commenced by the Nortel affiliate Nortel Networks

11     (CALA), Inc.

12             THE COURT: Yes.

13             MS. SCHWEITZER: And that was on July 14th.  So they

14     were thereby subsequently added to the relief sought herein

15     and aligned into the bidding procedures.  I would also note

16     that Ericsson rather than NSN is the purchaser under the sale

17     agreement that's being approved.  Page 3 is more in the

18     nature of cleanup.  This is all off the blackline.  The next

19     page I view as cleanup, paragraphs (g), (k), and (l).  I

20     think these are again conforming and cleanup changes.  (M),

21     (n), and (o), cleanup, and then to flip ahead, I think that

22     the next substantive provision comes - it's the actual

23     decretal paragraphs starting with paragraph number (3).

24             THE COURT: Okay.

25             MS. SCHWEITZER: So, the top of the page it says,

1   "Ordered, adjudged, and decreed that -" and then paragraph

2   (3) is where we've added language providing that we're

3   seeking approval not only of the sale agreement but of the

4   alternative bid that's been submitted by Nokia Siemens

5   Networks as alternative bidder, and that we seek approval and

6   authorization in the event that we needed to, to go forward

7   and consummate that sale as well.  The next page is cleanup

8   and conforming changes and then on paragraph (7) at the

9   bottom, this is the free and clear language.  It says that

10  after assets are sold free and clear that those claims in

11  interest will attach to the proceeds of the sale, and there's

12  an objection filed by Fairfax County, Virginia with their

13  concern that they had $15,000 in, I believe, ad valorem

14  taxes, and they said that to the extent that property was

15  being sold, that they wanted to make sure their claim was not

16  released, so they confirmed that their objection was resolved

17  by making clear their lien if valid, would attach to the sale

18  proceeds.  So, it's an issue for another day, but their

19  rights are preserved.

20          THE COURT: Good.

21          MS. SCHWEITZER: The next substantive change is on

22  paragraph (10) of the order where it's talking about the cure

23  payments for their various contracts and leases that are

24  being assumed and some of them assigned pursuant to the sale

25  agreement, and there was a series of parties who had raised

1    either assignment or cure objections.  The first one that we

2    resolved is the objection of Airvana, Inc., and they had a

3    cure objection, not an objection to assignment, and there's

4    an agreement that the purchaser would pay the cure and the

5    cure amounts in the contracts just for the avoidance of doubt

6    are listed now on Schedule 1 to the final order, and so the

7    purchaser's responsible for that payment.  There are also, as

8    part of the asset sale agreement, one of the assets being

9    conveyed that's different than Nokia Siemens Networks is that

10   the debtors are providing that to the extent that they assign

11   contracts to the purchaser and that there would be avoidance

12   actions that could be asserted in connection with those

13   contracts, that they're going over to the purchaser.  So

14   effectively the debtors are not preserving their right to

15   keep the avoidance actions to themselves.  Airvana asked the

16   purchasers to confirm and mainly Ericsson to confirm that

17   Ericsson does not intend to pursue avoidance actions against

18   Airvana, and so we were told to make that representation on

19   the record that Ericsson does not now intend to pursue

20   avoidance actions against Airvana for the contracts that

21   would be transferred to it relating to Airvana, and I'll turn

22   to the purchaser.  Have I represented that correctly?

23          MR. SHIMSHAK: Yes, you have.  Steven Shimshak, Paul

24   Weiss, Your Honor, for Ericsson.  Counsel has correctly

25   reflected our agreement.

1          THE COURT: If you could perhaps - I hate to do this

2     to you, but if you would speak into the microphone.

3          MR. SHIMSHAK: Yes, sure, I'll go to the podium.

4          THE COURT: Thank you, good afternoon.

5          MR. SHIMSHAK: Good afternoon, Your Honor.  Steven

6     Shimshak, Paul, Weiss for Ericsson, and counsel has correctly

7     reflected our agreement on this point.

8          THE COURT: Thank you, Mr. Shimshak.

9          MS. SCHWEITZER: The next substantive change is a

10    little farther back in paragraph (25).

11         THE COURT: Yes.

12         MS. SCHWEITZER: This is just a clarification or a

13    secondary authority language that was added to the sale order

14    which provides that if parties had liens on the property and

15    had not filed releases of their liens that the debtor and

16    purchasers are authorized to file documents releasing those

17    liens for the property that's conveyed, and just so Your

18    Honor recalls, is that there's no significant secured debt

19    outstanding, so this isn't talking about a secured loan

20    facility or anything of the like, but this is more just

21    secondary authority to make sure that we get the free and

22    clear order entered cleanly.  The next paragraph of change is

23    paragraph (30).  PBGC had asked for clarification given that

24    there's a cross-border aspect to the sale to make clear that

25    the order here is only seeking the conveyance of assets owned

1    by the debtors and that the free and clear, particularly the

2    free and clear sale of the assets being granted by this Court

3    relates to the debtors so that PBGC had asked for

4    clarification that the relief granted with respect to free

5    and clear sales is a debtor-type relief.

6             THE COURT: Okay.

7             MS. SCHWEITZER: And we were fine with that comment.

8    The next paragraph, paragraph (31) also references an

9    agreement reached with the PBGC in connection with the

10   discussions regarding this sale and there's attached as

11   Exhibit B to the order a stipulation that the debtors and

12   certain of their Canadian affiliates were willing to enter

13   into the PBGC which provides for the payment of $250,000 and

14   in exchange the PBGC will confirm and grant a release for the

15   non-debtor assets being conveyed as comfort to the purchaser.

16   So the full - I would just say that with qualification to the

17   full text of the stipulation that's actually attached, but as

18   a result of those negotiations and that agreement and these

19   additions to the order, it's our understanding that - well,

20   the PBGC did not file an objection and we're not aware of any

21   objection they have to this sale.  And the next -

22            THE COURT: Yes.

23            MS. SCHWEITZER: Okay.

24            THE COURT: I'm sorry.

25            MS. SCHWEITZER: Not, that's okay.  In the next

1    paragraph, paragraph (32) -

2            THE COURT: Yes.

3            MS. SCHWEITZER: That Verizon had raised some

4    informal comments again to the sale order and those comments

5    were resolved such that they didn't need to file an

6    objection.  The one point that they asked us to make clear in

7    the order is that there are certain of their contracts being

8    conveyed and that to the extent they have a claim of setoff

9    against various of the debtors that those are not being

10   affected by this order, and we're happy to provide that

11   clarification as part of the resolution of their comments.

12           THE COURT: Okay.

13           MS. SCHWEITZER: The next paragraph, paragraph (32),

14   a landlord known as iStar had filed a cure objection or

15   purported cure objection to the assignment and sublease of

16   its property, and under the asset sale agreement bid for a

17   few properties, the debtors would assume the property and

18   then, in connection with that assumption, obtain the consent

19   of the landlord to sublease a portion or all that property

20   over to the purchaser, and so the assumption is contingent on

21   the consent to the sublease as well.

22           THE COURT: Okay.

23           MS. SCHWEITZER: That they're linked and so iStar

24   had asserted a $5,000 attorney's fee claim, which they called

25   cure.  We don't necessarily think it's cure, but the

1    purchaser was generous enough to pay it such that we don't

2    waste attorney's fees having that conversation at this point.

3            THE COURT: Fine.

4            MS. SCHWEITZER: In the next couple of paragraphs,

5    there are more reservations of rights types of objections.

6    There are a couple of objections filed by counterparties

7    seeking comfort as to whether their contracts were being

8    assigned over as part of the sale.  So the next one in

9    paragraph (34) is OSS Nokalva, Inc., or we refer to it as

10   OSS, and we gave them confirmation in the sale order that

11   we're not assigning their contracts pursuant to 365 of the

12   Bankruptcy Code and that if we were to assign the contracts

13   outside of the 365, such as if their post-petition contracts

14   sought consensual assignment, we would do so in accordance

15   with applicable law and the terms of the contract which may

16   or may not in different cases involve consent of the counter-

17   party.  So, again, a reservation of rights and acknowledgment

18   that this order itself is not intending to convey contracts

19   over.  Motorola has a similar reservation of rights, that

20   there are no contracts being assigned over pursuant to § 365

21   and that we would follow the relevant law or contracts if we

22   were to assign other contracts over.  It's slightly longer

23   because Motorola wanted similar comfort for its affiliates

24   but didn't have a list of affiliates ready by the time of the

25   sale order, so we provided a little file-on mechanism that

1    they'll in a couple of days give us a list of their

2    affiliates and then we'll work through with them to either

3    confirm that those contracts are not going over or if they

4    are being assigned and they have an objection, we'll come

5    back to Your Honor if we need to resolve that.

6              THE COURT: Okay.

7              MS. SCHWEITZER:  Otherwise, if no further steps are

8    taken by Motorola, there's no further release needed from

9    your Court so they would have to do something in order to

10   come back.

11             THE COURT: Okay.

12             MS. SCHWEITZER: The next objection in paragraph

13   (36) was an objection by Sprint with respect to its contract

14   which is, in fact, being assigned and they had certain cure-

15   related objections or more of a reservation of rights with

16   cure where it may or may not be a matter of certain amounts

17   due with respect to indemnification for certain litigation

18   claims, but they wanted some comfort and clarification with

19   respect to the allocation of different indemnification claim

20   responsibilities that may arise pre- or post-closing, so

21   we've confirmed that - and again, I would refer to the

22   language set forth here specifically, but if they were filing

23   to determine liabilities that we, the debtors, owed under the

24   contract that arose prior to closing, that we, the debtors,

25   would pay those administrative claims which we would be

1   obligated to do in any event, and if their post-closing

2   obligations including indemnifications that came due after

3   the closing that those are covered by the purchaser, and

4   there's some provision for us paying attorney's fees for

5   certain attorney's fees that accrue, again, to the extent

6   that we would be required to do so under the relevant

7   contract.  So it's more clarification of the division of

8   liability in connection with the assignment of the contract,

9   and again, Sprint and the purchaser are in agreement with

10  that language.  The next paragraph is - well, we thought we

11  were giving as a very hardy reservation of rights but I

12  understand their counsel may want to seek even more

13  clarification on their reservation of rights.  Paragraph (37)

14  deals with a contract with SNMP Research International, and

15  my understanding is, the contract is actually with the

16  Canadian debtors and it's IP license agreement, but as other

17  folks, SNMP had asked for confirmation that we, the debtors,

18  were not assuming and assigning that agreement over which we

19  gave them.  We also agreed that if we were to have a contract

20  and were to sign it over that we'd do so in accordance with

21  applicable contract and applicable - in fact, if they need a

22  consent, we would get consent.  So, we thought we had

23  buttoned it up.  We also make clear in here that no

24  intellectual property rights or intellectual property license

25  through contracts with SNMP and Nortel are being conveyed

1   again by the debtors pursuant to the order and the sale

2   agreement and ancillary agreements.  We understand that SNMP

3   asked for even further clarification language specifying in

4   the order that their rights would be reserved with respect to

5   the fact, if in fact their IP license had, you know, any IP

6   rights had been conveyed, and I think we - looking at the

7   amount of reservation of rights we gave them and fearing the

8   Pandora's box of, as you see, we've valiantly taken care of

9   many and we would like not to have a repeating pattern of

10  taking care of insuring every contract party who comes before

11  us ask that we're not in breach of their contracts in

12  connection with a sale, that we think that - we had promised

13  SNMP that we would represent on the record that sure their

14  rights are what they are under the contract and all parties'

15  rights are reserved under whatever agreements they have and

16  particularly this being a Canadian contract, we can't speak

17  to the Canadian debtors, but they haven't lodged an objection

18  in Canada with respect to the agreement.  So, as promised,

19  I'm happy to make that representation on the record, but I'll

20  allow SNMP's counsel to speak if they'd like to, if they want

21  more added to the order.

22          THE COURT: Mr. Saccullo, good afternoon.

23          MR. SACCULLO: Good afternoon, Your Honor.  Anthony

24  Saccullo of Ciardi, Ciardi & Astin on behalf of SNMP, and,

25  Your Honor, first, I'd like to thank the debtors for their

1   graciousness in coming very, very close to resolving our

2   issue, and I think the one sentence that hasn't been added

3   that we would like added into the order requires me to give a

4   little bit of background about we're actually talking about

5   here.  Your Honor, our intellectual property that we discuss

6   both in the objection and in this order is source code and

7   license code which at one point, I guess before technology

8   has become quite as advanced as it is now, was relatively

9   difficult to transfer.  We're now at a point where almost

10  effortlessly you could inadvertently transfer a source code

11  to another party.  Our source code is protected by

12  intellectual property rights including copyrights.  It is

13  proprietary and it is confidential, and from what I

14  understand, it is necessary for virtually every

15  telecommunications device to have this type of source code.

16  So, this is not a unique thing, and obviously it is very,

17  very important to our company and the telecommunications

18  industry.  We are pleased that we got a representation by the

19  debtor that we are not being assumed and assigned and that

20  our intellectual property rights are not being transferred.

21  Now the question arises is what exactly are our rights and

22  what prejudice does this order have on our rights if that

23  intellectual property is inadvertently transferred over to

24  the purchaser.  Your Honor, what we asked for was a simple

25  sentence.  It said nothing herein shall prejudice the rights

1    or remedies of SNMP in the event that intellectual property

2    licensed by a contract between SNMP and Nortel were

3    transferred by the debtors to the purchaser.  I would just

4    make it clear that in the event that it turns out that this

5    was erroneously transferred, we would have all of our rights

6    and they would be effected by this order especially when we

7    have an order that says that these assets are being sold free

8    and clear of all liens, claims, and encumbrances to a good-

9    faith purchaser.  We appreciate the representation on the

10   record.  It concerns me a little bit, and I'm a little bit

11   hesitant to agree that just a representation on the record

12   when we have an order that's very clear to the contrary,

13   meaning an order that is very clear that we have a good-faith

14   purchaser for value who's taking free and clear of liens,

15   claims, and encumbrances and certainly, Your Honor, it's not

16   our intent to stand in the way of a $1.13 billion sale, but

17   we would just like a little bit more comfort that this order

18   is not impacting our rights should there be an inadvertent

19   transfer of our intellectual property.

20         THE COURT: Thank you Mr. Saccullo.  Ms. Schweitzer.

21         MS. SCHWEITZER: Your Honor, I think that again

22   we're in violent agreement as to the fact that we're not

23   trying to release them from their contract rights, but I do

24   think that we have to be careful and give them more comfort

25   but it's not in this Court's job to give everyone comfort or

1    to that nth degree particular with contracts that are not

2    U.S. debtor contracts and particularly on - there's no

3    evidence that we're breaching.  There's no evidence that

4    there's any particular concern that's different for this

5    counterparty than any other counterparty and this sale or any

6    other sale that is, has been, or will be before this Court,

7    and in that way, I think that we, you know, it's very typical

8    for parties to know where there contracts stand, in fact, are

9    those contracts being conveyed or not conveyed, are there

10   assets being conveyed or not being conveyed, but I think it's

11   a dangerous precedent to ask us to start making

12   representations about reservation of rights without even

13   identifying what those rights are or without even having come

14   to the conclusion, any of us, that we're not even authorized

15   under that relevant agreement to transfer some sort of

16   imbedded source code.  I'm not saying we are.  I'm not saying

17   we aren't.  I'm saying that the rights are what they are and

18   we should deal with it at another time, and he has a

19   contract, he doesn't need a court ordered right to protect

20   his contract right, and that's where we came out in balance

21   of trying to resolve the objection rationally and reasonably,

22   and consistent with the way we're treating other

23   counterparties with similar inquiries.

24          THE COURT: Alright.  Any last response, Mr.

25   Saccullo?

1          MR. SACCULLO: I do, if possible.  Your Honor, just

2     to be clear, what we're talking about here isn't just

3     protection of contract rights.  What we're talking about is

4     what happens if the inadvertent transfer of property happens

5     to a party with whom we don't currently have a contract with

6     regard to its intellectual property.  We want to make sure

7     that this order doesn't impact it.  Do I believe that it does

8     not impact it?  Certainly.  Do I believe that later on if

9     something happens there could be an argument made that this

10    order does indeed waive any rights that we have versus the

11    purchaser or the debtor?  I believe that argument will

12    certainly be made if we have to seek to enforce our rights.

13    We're not seeking comfort from this Court.  What we're

14    seeking is a clear order that says that although we have a

15    lot of protection in here for the purchaser our rights are

16    not being waived through this order, and when we speak of

17    opening the floodgates here, I'm not sure that all that many

18    people are behind me with regard to the floodgates opening up

19    with this type of situation, and this is a little bit of a

20    unique situation, Your Honor, where the intellectual

21    property, aside from the fact that it's licensed over, could

22    be so easily inadvertently transferred over to a purchaser,

23    and that's the right that we're seeking to protect here, Your

24    Honor.

25          THE COURT: I'll just - let me rule, if I may.

1          MS. SCHWEITZER: Sure.

2          THE COURT: Because I do believe that from what I

3    have seen the debtors have been very generous in their

4    accommodations and that the Court is satisfied that the

5    representation made on the record here meets the objecting

6    party's concerns, SNMP's concerns and accordingly I'll

7    overrule that objection.

8          MS. SCHWEITZER: Thank you, Your Honor.  To turn

9    back to the order, paragraph (38) is the clarification and

10   I'll summarize it at high level.  This is an intercompany

11   clarification so I will insist on deferring to the document

12   itself on the final meaning of the words and offering an

13   explanation at the highest level.  As a result of the

14   approval of this transaction, assuming it's approved today,

15   the debtors and the Canadian debtors would be viable to pay

16   in a sense as the stalking horse bidder certain break-fee

17   protections in accordance with the terms of the stalking

18   horse bid, and there is an agreement between the states that

19   NNI as a U.S. debtor and NNL, the Canadian debtor, will each

20   pay 50 percent of the break-fee protections that will become

21   due and payable to Nokia Siemens in accordance with the prior

22   orders and their prior agreement.  And then there's further

23   provisions here for how if the closing occurs that that

24   break-fee will be paid out of the ultimate sale proceeds

25   conveyed by Ericsson and then there are further provisions

1    regarding that the sale proceeds will ultimately go into an

2    escrow subject to the larger IFSA, the interim funding and

3    settlement agreement order that was approved dated June 9th,

4    2009, and the allocation between the estates is a problem for

5    another day.  So, without going into more details than that,

6    I'll say that the words are what they are, but it's a very

7    simple concept which as this paragraph provides for the

8    escrow of the ultimate sale proceeds and allocates the

9    responsibility for paying the break-fee between the U.S. and

10   Canadian debtors to make sure that it's paid if and when it's

11   owed.  And just as a point of clarification on the record on

12   this point, this isn't really intending to trump the IFSA

13   with respect to the remaining sale proceeds that are going

14   into escrow.  That again is an issue for another day, and I

15   know the UK administrator wanted comfort on that point that

16   we're not trying to re-litigate the IFSA.   What we're saying

17   is that the break-fee would come off of the top of the

18   proceeds, and then the remaining proceeds go into escrow for

19   side letters and other days.  So, I make sure that the UK

20   administrator counsel doesn't want to make any further

21   clarifications on the record, but I believe that's consistent

22   with everyone's understanding.

23            THE COURT: Ms. Pierce?

24            MS. PIERCE: Good afternoon, Your Honor.

25            THE COURT: Good afternoon.

1          MS. PIERCE: Sarah Pierce of Skadden, Arps on behalf

2  of NSN.  Having just gotten this language now, and listening

3  to counsel's statement on the record, it seems to me that

4  counsel for the debtor is just stating that the breakup fee

5  and expense reimbursement is going to be payable to NSN out

6  of the proceeds of the Ericsson sale.  That is not our

7  understanding, Your Honor, and that is not what the documents

8  we agreed to provide.  The bid procedures order and the

9  stalking horse agreement provide that the breakup fee is

10 payable to NSN within two business days of termination of the

11 stalking horse agreement, and it does not require NSN to meet

12 until the closing, so I just wanted to make sure nothing just

13 stated by counsel on the record seeks to pay us upon closing

14 with Ericsson.

15         MS. SCHWEITZER: Just to repeat my clarification,

16 actually the reason that this paragraph is necessary is that

17 the fees are going to be paid out of closing.  They need to

18 be paid prior to closing -

19         THE COURT: Yes.

20         MS. SCHWEITZER:  - so that language is indicating

21 that we're coming out of pocket for the fees today and that

22 we have the right to reimburse ourselves effectively before

23 it goes into the pot with the remaining purchase proceeds.

24 So, again, it's an intercompany issue rather than a timing of

25 when we would pay and it's under an obligation to pay in a

1   sense.

2          THE COURT: I think Ms. Pierce has gotten her

3   clarification.

4          MS. PIERCE: Yes, that's all I sought, Your Honor.

5   I wasn't stating anything that's changed, just to be sure.

6          THE COURT: Absolutely.

7          MS. PIERCE: Thank you, Your Honor.

8          THE COURT: Thank you.

9          MS. SCHWEITZER: I believe that counsel to the UK

10   administrator also wanted to speak on the record.

11          THE COURT: Alright.

12          MR. HARRON: Thank you, Judge Gross.  For the

13   record, Ed Harron from Young, Conaway, Stargatt & Taylor for

14   the UK administrator.

15          THE COURT: Good afternoon.

16          MR. HARRON: Good afternoon.  Just a quick point of

17   clarification.  I do believe that Ms. Schweitzer's comments

18   did for the most part resolve our concern, Your Honor.  My

19   clients wanted to make clear for the record that the EMEA

20   debtors are involved in agreeing to terminate certain license

21   rights as part of the contemplated sale here.  As such, I

22   believe they are selling the debtors, as that term is defined

23   in the interim funding and settlement agreement that this

24   Court previously approved, and we just wanted to make clear

25   for the record that the sale proceeds are subject to that

1   agreement and particularly are subject to sections 11 and 12

2   of that agreement.  I believe as I mentioned, Ms.

3   Schweitzer's comments do convey that point but because

4   paragraph (38) of the sale order could be read potentially as

5   inconsistent with the IFSA, I just wanted to be crystal clear

6   on that point, Your Honor.  Thank you.

7        THE COURT: Thank you, Mr. Harron.  You can remain

8   here while Ms. Schweitzer addresses your concern.

9        MR. HARRON: Thank you.

10       MS. SCHWEITZER: Without going into any particular

11   provisions of the IFSA, I believe we're saying that they do

12   not conflict with the IFSA in the entirety.  We're not

13   intending to trump that, and that any IFSA issues will be an

14   issue for another day.  The principal here is that to the

15   extent this closes, the break-fee comes out of the top and

16   the proceeds are effectively the net proceeds which will be

17   dealt with through the IFSA, and I believe again we're in

18   violent agreement on that point.

19       MR. HARRON: That's correct.  Thank you, Your Honor.

20       THE COURT: Thank you, Mr. Harron.  Thank you, Ms.

21   Schweitzer.  Alright.

22       MS. SCHWEITZER: So, to turn back to the sale

23   agreement, paragraph (39) is just an approval of an ancillary

24   agreement, but we thought, given the type of agreement it is,

25   it's worthy of attaching it to the document itself, and I

1    believe a similar agreement is being presented in Canada.  As

2    part of the sale agreement, there's a conveyance to the

3    buyers in Canada, certain rights with respect to the Carling

4    facility over in the Canadian - it's a Canadian property and

5    the Carling facility is subject to the lien of the U.S.

6    debtors for a loan that was previously made.  I believe it's

7    a rental agreement.  It's not a sale of the property, but in

8    connection with that, that there is an agreement that we

9    would enter into a non-disturbance agreement with the U.S.

10   estate such that we agree that if we were ever foreclosed on

11   the property, we're not going to kick them out effectively,

12   and since it relates to the prior liens and it related to a

13   property that everyone was focused on we specifically

14   attached it and it's not one of the ancillary agreements

15   attached to the sale agreement, we attached it here too to be

16   clear that there's express authority to sign the non-

17   disturbance agreement.  That said, the Creditor Committee in

18   the U.S. has been actively involved in negotiating that

19   document as has the debtors, the Canadian debtors.  So, I

20   don't think there's any particular controversy on the terms,

21   but it's more of a belt and suspenders authority for that

22   agreement.  Is that right -

23            JUSTICE MORAWETZ (VIDEO): Judge Gross, I hesitate

24   to interrupt, but if we could just back up to the previous -

25            THE COURT: I'm sorry, Justice Morawetz, we're

1    having a little difficulty hearing at this end, and I think

2    we've got our volume turned about as high as we can.

3          JUSTICE MORAWETZ (VIDEO): Is that better?

4          THE COURT: It's a little bit better.

5          JUSTICE MORAWETZ (VIDEO): Okay, Judge Gross, sorry

6    to interrupt, but counsel on behalf of Nortel Networks UK had

7    risen during the submission of the previous attorney before

8    you and wanted to make some remark, I assume, with respect to

9    the - I have to say, Mr. Shrell?

10         MR. SHRELL (VIDEO): Your Honor, I'm happy to -

11         THE COURT: I'm sorry, you faded out on me again.

12         JUSTICE MORAWETZ (VIDEO): Counsel is just coming to

13   the microphone to make that brief submission.

14         THE COURT: Thank you.

15         MR. SHRELL (VIDEO): Your Honor, just before there

16   was a joint ruling on the issues in connection with paragraph

17   (38) of the U.S. order which has a parallel provision to the

18   Canadian order.  I understood the statements being made on

19   record about the concept of dealing with the break-fee, and

20   that's fine, but you will see that language in the order.  It

21   goes on to talk about how the sale proceeds ought to be dealt

22   with in connection with the main sellers and the like.  I

23   just wanted to raise a point and I'm happy to sit down and

24   speak to it later before there's a joint ruling, but the

25   concept of having something on the record or that type of

1   statement in the U.S. versus Canada given that we do have a

2   U.S. court order approving the terms of the interim funding

3   and settlement agreement, and we have an order of this Court

4   on June 29th approving the terms of the interim funding and

5   settlement agreement.  To the extent that there's an

6   understanding that nothing in this order is designed to

7   somehow modify or vary the previous orders of the Court, then

8   our issue goes away, but I'm not sure that just a statement

9   of that fact from counsel is sufficient for doing that given

10  that we will have your order of June 29th approving the terms

11  of the IFSA which are somehow modified by this order.

12         THE COURT: So, if I understand you, you would like

13  specific language in our order here?

14         JUSTICE MORAWETZ (VIDEO): Judge Gross, we're just

15  going to hear briefly from Mr. Tay and then I'll  make some

16  remark and then turn it back to you.

17         MR. TAY (VIDEO): Thank you, Your Honor, and Judge

18  Gross.  I think we can solve this issue quite quickly.  I

19  think all of what's being requested is that we in Canada

20  acknowledge that we have the same understanding and unlike

21  Ms. Schweitzer, I am in peaceful agreement with the

22  principle, and that is that the reimbursement of the funds

23  that both the U.S. estate and the Canadian estate are going

24  to pay in respect to the break-fee, that will be reimbursed

25  by the proceeds first.  The remaining proceeds, the net

1    proceeds will be dealt with in accordance with the provisions

2    of the IFSA.  So I think we'll all agree, and I think we have

3    it on the record on both sides of the border and that should

4    settle the matter.

5         JUSTICE MORAWETZ (VIDEO): Okay, Mr. Shrall, might I

6    suggest that to the extent this remains an issue, at the

7    conclusion of the submissions in the U.S. Court and in this

8    Court, while Judge Gross and I are recessing, that if there

9    is one or two sentences that you would want to be considered

10   for purpose of endorsement, you work it out with Mr. Tay and

11   let the registrar know.  Judge Gross, sorry for the

12   interruption, and we'll now turn it back to you to conclude

13   with your hearing.

14        THE COURT: Alright.  I think it was a timely matter

15   to address.

16        MS. SCHWEITZER: And a point of clarification for

17   the record as well, that there is a parallel provision that

18   was proposed in the Canadian orders, so that this is

19   carefully crafted language that we worked on before the

20   hearing so that they have a matching provision on the 50/50

21   and the escrow of the proceeds and the like.  So this isn't -

22   we want sync up the orders either way so that the provisions

23   match, but we all feel that this language is adequate and

24   coupled with the representations that we're not trumping that

25   we prefer to leave the written language un-offended.

1          THE COURT: Alright.

2          MS. SCHWEITZER: Then to turn back to - that was

3     paragraph (39), I believe, we discussed the non-disturbance

4     agreement, and then other than that the rest of the changes

5     are more cleanup and conforming changes.  The exhibits as

6     discussed are the PBGC, the full first asset sale agreement

7     is attached and this is the final assets sale agreement with

8     Ericsson that was executed Friday night, and then the non-

9     disturbance agreement that relates to the Carling property,

10    the schedule that relates to the Airvana contract and that's

11    the amendments to the order.  With respect to objections, I

12    believe the only other objection was from Jonathan Lee Riches

13    who purports to have interest as a fund manager of the like.

14    We are not aware of him as an actual creditor of the United

15    States.  We are actually aware of him from no better hearsay

16    source than Wikipedia as being designated the most litigious

17    man in the world by the Guinness Book of World Records, who

18    he proceeded to sue after that.  He has sued Somalia pirates

19    and the Eiffel Tower and the like, so we feel in good company

20    that he has included us as a subject of his objections, but

21    we with that still believe that there's much substantive

22    merit or that he has an interest that needs to be addressed

23    with respect to the hearing.

24          THE COURT: Alright, and I don't believe he is in

25    the courtroom or on the telephone?

1          MS. SCHWEITZER: No, he's not.  Oh, and there's one

2     final housekeeping point just for the record is the flex in

3     their objection had actually filed an objection and withdrawn

4     their objection.

5          THE COURT: Yes, they did.

6          MS. SCHWEITZER: And so that fully resolved any

7     objection that they have or any claim that they might have

8     with respect to the transfer of assets and any arrangements

9     that are being entered into with respect to the asset sale

10    agreement at this point.

11         THE COURT: And as far as Mr. Riches' objection, I

12    will overrule that very carefully.

13         MS. SCHWEITZER: Thank you.  After due deliberation.

14         THE COURT: Yes.

15         MS. SCHWEITZER: Which I guess means that you'll be

16    sued next.  You're in good company with the rest of us is all

17    we can promise you.  With that, I think that we've walked

18    through the changes to the sale order.  We can walk through

19    next the asset sale agreement.  I would prefer, unless Your

20    Honor would prefer otherwise, I don't want to turn pages on

21    the asset sale agreement.  I think that we're not overruling

22    objections, but I can walk through the higher level changes.

23         THE COURT: Please.

24         MS. SCHWEITZER: Obviously, the one we're most proud

25    of is that the purchase price has increased significantly.

1          THE COURT: Oh, yes.  It's beautiful.

2          MS. SCHWEITZER: And the purchaser has made a good-

3    faith deposit of $36 1/2 million as well that would be

4    applied to the purchase price at closing.  The purchased

5    assets are similar in kind to the purchased assets that were

6    sold before.  There are a couple of additions that there were

7    avoidance actions, as I mentioned that, with respect to

8    certain contracts being assigned.  The avoidance actions the

9    debtors might have are effectively released through the

10   transfer to the purchaser, that there are certain casualty

11   insurance policies that if there were a casualty that

12   occurred after signing prior to closing that we would sign

13   over the casualty insurance to protect them.  There's an

14   extension of the termination date under the asset sale

15   agreement that the prior agreement had a drop-dead date of

16   August 31st, and a regulatory drop-dead date of September 30th,

17   and those moved out one month to September 30th and October

18   31st.  There's no further provision for a breakup fee or an

19   expense reimbursement by Ericsson in the event the deal is

20   not closed and that in connection with the asset sale

21   agreement that the purchaser agreed to pay certain amounts

22   and - a resolution of certain objections had been filed, but

23   we walked through those along the way that they picked up

24   certain secondary liabilities and agreed to make changes in

25   order to account for counterparty objections to the sale.

1    There's other cleanup with respect to the document regarding

2    certain setoff rights and how the transition services

3    agreements work but we view those as all beneficial to the

4    debtors and in fact many of them were requested by the

5    debtors along the way.  So there were secondary improvements

6    in the documents and the mechanics that would be economic or

7    non-economic to the debtor that we are pleased that we were

8    able to obtain, and I think those are the main changes and

9    just for Your Honor's reference, that it's on the record, but

10   the Canadian Monitor had filed a 17th report of the Monitor

11   of the Canadian proceedings, and that sets forth further

12   detail regarding these changes to the asset sale agreement

13   and it also further details with respect to the auction

14   process itself.  I know the intention was to introduce that

15   into evidence in Canada.  We would want that introduced into

16   evidence in the same way in the United States.  I don't

17   believe that there would be an objection to it, but we wanted

18   it incorporated into the record so I so offer it as part of

19   the record.

20         THE COURT: Any objection?  It is so admitted as

21   part of this record.

22         MS. SCHWEITZER: Along with that, there's a

23   declaration of George Riedel who's the chief strategy officer

24   in Nortel that was also - it is dated July 25th, 2009, that

25   was also filed on the docket in furtherance of the Canadian

1  proceedings that we would offer for the record, again, Mr.

2  Riedel provides further facts and backgrounds regarding the

3  auction and sale process, and we would offer that into

4  evidence for the record as it's in the Canadian record as

5  well.

6         THE COURT: Any objection?  Alright, Mr. Riedel's

7  declaration is admitted into evidence in this proceeding.

8         MS. SCHWEITZER: And as a matter of housekeeping

9  that there were various affidavits of service that have been

10  filed on the docket since the time of the last hearing, their

11  affidavits of service, and then there's also an affidavit of

12  publication that there were publications made in the Wall

13  Street Journal and the Globe and Bounds (phonetical) so that

14  we would want the affidavits of service and the affidavit of

15  publication of notice to be incorporated into the record as

16  well for purposes of just keeping a full record.

17         THE COURT: Yes, so admitted.

18         MS. SCHWEITZER: Thank you.  And then finally, in

19  order to reduce the time that we'd need to proffer testimony

20  in the United States - Well, first we would have witnesses

21  present in the courtroom with Mr. Riedel, who again is the

22  chief strategy officer at Nortel, and Michael Murray, a

23  managing director at Lazard, who both testified at the last

24  hearing.

25         THE COURT: Yes.

1           MS. SCHWEITZER: And given the lack of objections or

2    substantive objections remaining to the sale, that we would

3    start by just offering to incorporate their testimony from

4    the prior hearing on June 29th into the record here as well,

5    which I believe is a technical matter, it might be, but for

6    the record to bring it down to this hearing to avoid having

7    to recant that history again.

8           THE COURT: So ordered, yes.

9           MS. SCHWEITZER: Okay.  And then I can introduce a

10   further proffer or they're available for direct and cross

11   examination but in order to move things along, I would

12   propose to offer a proffer of George Riedel and Mike Murray

13   right now in order to finish our evidentiary case in support

14   of the sale.

15          THE COURT: Does anyone object to the proffer?

16   Alright, please.

17          MS. SCHWEITZER: So, as last time, we'll start with

18   the proffer of George Riedel who is, as I said, the chief

19   strategy officer employed at Nortel Corporation, Nortel

20   Networks Limited, which are both Canadian companies and also

21   he is employed by NNI or Nortel Networks, Inc., which is the

22   U.S. debtor.  As I stated he's in the courtroom.  He's

23   available to testify and we'll proffer this as his direct

24   testimony in lieu of having to put him on the stand right

25   away, and it is his testimony with respect to the sale of

1   assets relating to the CDMA and LTE businesses.  Mr. Riedel

2   has been with Nortel since 2006, and his job responsibilities

3   as well as his prior experience is set forth in his prior

4   testimony from June 29th, and Mr. Riedel also on June 29th had

5   provided extensive testimony regarding the nature of the

6   assets being sold which are specifically the CDMA and LTE

7   assets within Nortel's carrier business.  This is basically

8   cell phone technology, and Mr. Riedel previously testified

9   and would be available to testify again that while this

10  business is a profitable business and that there is a source

11  of revenue for the company, that you cannot maximize the

12  value of these assets by a standalone restructuring and that

13  customers, particularly, had encouraged the company to pursue

14  a sale transaction in order to keep long-term confidence in

15  the current products and to be able to develop the LTE or

16  Next Generation Technology.  And so, therefore, the company

17  concluded, after consulting with its advisors, that the sale

18  of assets at this time is the best way to maximize the value

19  for the debtors' assets.  And again, he testified to more at

20  length on the June 29th hearing, that there was a long-term

21  exploration of a possible sale of the business, and that

22  there were seven non-disclosure agreements signed up with

23  seven different parties prior to the identification of NSN as

24  the stalking horse bid.  Two bidders were actively working

25  towards being the stalking horse bidder.  NSN ultimately won

1    in that round, and the bidding procedures were approved on a

2    hearing on June 29th, an order entered on June 30th of this

3    year approving an incentive stalking horse bid and also

4    approving the bidding procedures that would be used to

5    auction off the assets in the U.S. and a parallel order was

6    entered in Canada on June 29th approving the bidding

7    procedures for the Canadian entities.  Mr. Riedel would also

8    then testify that following that hearing that one additional

9    party known to all of us, which is MatlinPatterson executed a

10   confidentiality agreement, also conducted due diligence, and

11   in fact participated in the auction process quite vigorously.

12   After the time the bidding procedures were also approved,

13   there ultimately became three qualified bidders in the

14   auction process.  There was NSN, who is the stalking horse

15   bidder.  There's MatlinPatterson and there was Ericsson, and

16   each of the parties was approved first as a qualified bidder

17   and then on or prior to July 21st they each submitted a bid

18   that was ultimately deemed to be a qualified bid in the

19   process.  Again, consistent with the bidding procedures

20   approved by this Court and the Canadian Court.   There's one

21   other potential bidder, RIM, R-I-M, that on July 15th - well,

22   first had had previous discussions with Nortel regarding

23   other asset sales and was familiar to Nortel but only for its

24   expressing interests in participating as a qualified bidder.

25   In this process by letter dated July 15th, 2009, a non-

1    disclosure agreement similar in kind to the one executed by

2    the stalking horse bidder was offered to RIM.  They declined

3    to sign that non-disclosure agreement and then they didn't

4    seek further to become a qualified bidder prior to the bid

5    deadline.  So, and then we had three bids come in.  We had

6    the stalking horse bid that was already in, the Ericsson bid

7    and the MatlinPatterson bid.  They were all received July 21st

8    and we determined in consultation - I'm sorry, Mr Riedel

9    would testify that in consultation with the Committee, the

10   bondholder group, and the Monitor that Nortel ultimately

11   decided that they had three qualified bids and that they

12   designated Ericsson as the starting bid in the process.  So

13   that was effectively the lead bid at auction.  The auction,

14   Mr. Riedel would further testify that he was actually present

15   at the auction and that he was actively participating in the

16   auction process along with other representatives of Nortel,

17   and the auction was held, for the record, at Cleary

18   Gottlieb's office in New York on July 24th, 2009.  Mr. Riedel

19   would testify that the auction began at 9:30 in the morning

20   and ran about 12 hours and that Ericsson's ultimate bid was

21   reflected in the asset sale agreement before Your Honor

22   today, resulted from several rounds of competitive bidding

23   and vigorous bidding.  Ericsson, as I said, was the starting

24   bidder at the auction and each of the three qualified bidders

25   at one point in the auction were the leading bidder for a

1    specific round so there in fact was vigorous bidding in each

2    round.  After several rounds, MatlinPatterson indicated that

3    they would not submit further bids once the price had reached

4    a certain level, and at the end, in the last two rounds of

5    bidding, Nokia Siemens Network came in with a final bid price

6    of $1.0325 billion, and then Ericsson came in with a bid of

7    $1.13 billion and was selected as the highest bid at that

8    point.  Nokia Siemens Network indicated it was not in a

9    position to put in a further bid that evening, and the

10   auction concluded following documentation of the bid to

11   Ericsson.  So the bid that we're accepting as an alternative

12   bid, is a final bid that Nokia Siemens Network submitted that

13   evening through the bidding process.  For the record, and

14   I'll step out of the proffer for one second, is that there

15   was a transcription made of the auction process so we've a

16   written court reporter record of the auction process.  So, in

17   addition to the highest price being offered that Mr. Riedel

18   would testify that were other changes made to the asset sale

19   agreement that were more favorable to the debtors than the

20   original stalking horse bid as I've outlined for you before,

21   and Mr. Riedel would testify that the bid was found to be the

22   highest and best and the different bids were evaluated

23   throughout the auction by considering a whole host of factors

24   and in particular the purchase price and net value that was

25   offered to the company including the different assumed

1    liabilities and other obligations that were to be performed

2    by a specific bidder.  Any revisions to the transaction

3    documents are offered by the bidders.  Different factors

4    revolving around the speed, certainty, and value of the

5    transactions, including without limitation any regulatory

6    approvals that would be required as closing conditions or

7    otherwise in order to confirm a particular transaction, and

8    of course, the likelihood and timing of consummating any of

9    the different transactions.  There are other factors, but

10   those were some of the more significant ones during the

11   rounds of bidding.  On other factors the bids, after a few

12   rounds, weren't materially different on the ASA.  There were

13   differences, but they weren't as material as the purchase

14   price increases in subsequent rounds, and Mr. Riedel also

15   would testify that as required by the bidding procedures that

16   every round of bidding that was effect given to the breakup

17   fee and expense reimbursement that would be payable to Nokia

18   Siemens Networks in valuing the different bids.  In light of

19   the fulsome auction process and the notices being given to

20   people and efforts made to sell the business over time and

21   through this auction process most recently, Mr. Riedel would

22   testify if he is called that it's his opinion and certainly

23   the debtors' conclusion that the successful bid is the

24   highest and best offer that has been received by the debtor

25   and it does maximize the value that could be achieved by the

1    debtors' estate through this process.  That he would testify

2    that certainly all discussions with bidders and the entire

3    auction process were run at arm's length and that none of the

4    bidders involved insiders or there's no evidence of collusion

5    between any of the bidders, and that there was no evidence

6    that any of the sale prices offered by any of the DIP bidders

7    were resulting as from agreements controlling potential

8    bidders or from any unknown bidders that were not disclosed,

9    and in fact, Mr. Riedel would testify that per Mr. Oscarsson

10    who's a representative to Ericsson confirmed to him that

11    there were no co-bidders that Ericsson had been partnered

12    with that were undisclosed to the debtors and that Ericsson

13    did not ask any other party to not participate in the auction

14    process or not make a bid in connection with their own

15    pursuit of the sale.  Mr. Riedel if called to testify also

16    could testify that he's familiar with the asset sale

17    agreement and he could walk the Court through the changes on

18    the asset sale agreement, which again, revolve around the

19    purchase price increase, slight ancillary assets including

20    avoidance actions that are now being included in the asset

21    transaction, and an extended termination date in the absence

22    of bidding procedures, and other changes in the asset sale

23    agreement.  Mr. Riedel's familiar with all of those, and he

24    would also finally testify to his belief that the approval

25    and consummation of this sale at this time is in the best

1    interest of the debtors and their creditors.  Mr. Riedel also

2    could provide testimony regarding his view of Ericsson's

3    ability to perform on the contracts being assigned over to

4    Ericsson and that he would feel that Ericsson is well-

5    positioned to perform on such contracts given that their

6    strategic place in the market and their substantial resources

7    at hand and that by selling to Ericsson that he is optimistic

8    they'll be a smooth transition for customers and suppliers in

9    connection with the sale.  Mr. Riedel also could testify that

10   he's familiar with the terms of the Nokia Siemens Network bid

11   as an alternative bid including the purchase price and the

12   terms thereof, and that he would conclude that it was, again,

13   in the debtors' best interest to select the Nokia Siemens

14   Network bid as the alternative bid in this transaction, and

15   if we were unable to close with the Ericsson bid that it's in

16   his view that the Nokia Siemens bid should be pursued and

17   closed in accordance with the terms of that agreement.  And

18   that would conclude Mr. Riedel's testimony so I would -

19   There's one more point to Mr. Riedel's testimony that we

20   added that there also was Board approval obtained to pursue

21   the different auction process and the actual sale agreements

22   themselves, and Mr. Riedel was one of the designated

23   authorized officers who was able to pursue the sale and

24   negotiate to conclusion.  So with that, I would proffer Mr.

25   Riedel's testimony and again would indicate that he's

1   available in the courtroom for cross-examination if

2   necessary.

3        THE COURT: Alright, thank you, Ms. Schweitzer.

4   Does anyone wish to cross examine Mr. Riedel?  Hearing no

5   one, the proffer is admitted.

6        MS. SCHWEITZER: Thank you, Your Honor.  I'll make a

7   secondary proffer for Michael Murray who is the managing

8   director at Lazard.  As you're well aware, Michael Murray

9   testified at the last sale hearing -

10        THE COURT: Yes.

11        MS. SCHWEITZER:  - or at the bidding procedure

12   hearing.  So we'll rely on his prior testimony for the pre-

13   auction period.

14        THE COURT: Yes.

15        MS. SCHWEITZER: But again, Mr. Murray, based on his

16   background with the company and his participation in the

17   auction, is familiar with the auction process, the sale

18   agreement, and the different discussions that have gone on.

19   He also was actively involved at the auction process and

20   entered into extensive consultation with the other advisors,

21   the Monitor, the Committee of Unsecured Creditors, and the Ad

22   Hoc Bondholder Group, and their respective advisors and

23   listened and took their views seriously throughout the

24   auction process, advising the debtors as to the highest and

25   best bids that were received in each round and ultimately

1   through the auction process.  Mr. Murray would further

2   testify that the bid from Ericsson was in fact, in his view,

3   the highest and best offer received for the assets as a

4   result of the auction process, and that while the auction

5   process effectively was 22 days that he believes that that in

6   fact did maximize the value that could be achieved as

7   evidenced by the fact that there was active negotiation from

8   the obvious parties - the obvious parties participated in the

9   auction and in the significant jump in the purchase price as

10  a result of the auction.  He would similarly conclude that

11  the Nokia Siemens Network offer was in fact the second

12  highest and best offer received for the assets.  Finally, Mr.

13  Murray could provide testimony to the fact that in his view

14  the sale of the assets pursuant to the ASA to Ericsson is in

15  the best interest of the debtors and their creditors both in

16  terms of pursuing a sale and in terms of pursuing this sale

17  as the best alternative, and Mr. Murray would also testify,

18  similar to Mr. Riedel, that the negotiations were hard fought

19  and at arm's length at all points and that he is not aware of

20  any facts or circumstances that arose during the auction that

21  would suggest in any way that Ericsson acted with any sort of

22  bad faith collusion or otherwise inappropriately and in fact

23  that he believes that all parties operated in the best faith

24  possible in trying to reach the highest value through the

25  auction process.  With that, I would offer Mr. Murray's

1    testimony as a proffer, and again, he's in the courtroom

2    available for cross-examination if necessary.

3         THE COURT: Does anyone wish to cross-examine Mr.

4    Murray?  Alright, hearing no one, that proffer is likewise

5    admitted into evidence, Ms. Schweitzer.

6         MS. SCHWEITZER: Thank you, Your Honor.  So, as a

7    final cleanup point, it's up to us lawyers to prove to you as

8    a legal matter that we're entitled to the sale relief today,

9    and I think that we have ample evidence now in the record to

10   prove that, but it is worth taking a moment to walk through

11   the proper legal standards.  At the high level, obviously

12   they're set forth in our motion papers, and I wouldn't want

13   to go through them at length but just to keep a full record

14   here, that we're seeking a sale under § 363 of the Bankruptcy

15   Code of the CDMA and LTE assets of the debtor.  The debtors,

16   through the testimony of Mr. Riedel and Mr. Murray and the

17   prior testimony that's incorporated herein, have articulated

18   a sound business reason for the sale and certainly that there

19   was adequate notice of the sale and through the different

20   publication notices the creditors served through the sale and

21   the parties contacted in order to get the highest and best

22   value through the sale process.  We have substantial

23   testimony offered through proffer that the prices paid is not

24   only adequate but it's the highest and best offer that could

25   be received through this auction, and certainly it's, you

1    know, everyone from the debtor is more than pleased with the

2    results of the auction given the time frame and generally

3    even putting aside the time frame of the auction, that

4    certainly we've consulted with the Creditor Committee, the

5    Bondholder Committee, and the Monitor, and given the joint

6    hearing, I wouldn't speak for the Monitor, but other than to

7    say that we're aware that all constituencies are in support

8    of the sale at this time.  There's certainly good faith for

9    the sale itself through the arm's length negotiations, the

10   heavy advertising, certainly the press around the sale, and

11   that we're not selling to an insider, and similarly we

12   believe that we could establish and have in fact established

13   the standards for a 363(m) and 363(n) in that there's good

14   faith to the purchaser that they're entitled to a 363(m)

15   finding and that there's no collusion among the bidders and

16   certainly with the purchasers such that there would be any

17   relief afforded to anyone under 363(n).  So, again, there's

18   the testimony of Mr. Riedel and Mr. Murray and the

19   representations of Mr. Oscarsson of Ericsson to that effect,

20   that there was arm's length negotiation and good faith at all

21   times.  As previously discussed on the record, we're seeking

22   relief to sell the assets free and clear pursuant to § 363(f)

23   and we believe that the standards for 363(f) have been met

24   and other parties must as well because we only had one minor

25   objection which is easily resolved by confirmation consistent

1   with 363(f) that that one texting would attach to the

2   proceeds as with other secured claims that were found to be

3   ultimately valid.  We finally are transferring contracts

4   under § 365 of the Bankruptcy Code including without

5   limitations supplier contracts, customer contracts, and

6   various leases.  Some of these are being assumed and some of

7   them are being assumed and assigned over, but in any event

8   the debtors provided notice that counterparties whose

9   contracts are subject to the 365 assumptions or 365

10  assumptions and assignments, and also in connection with the

11  auction process provided notice of that adequate assurance

12  representations made by each of the qualified bidders in

13  advance of the sale.  Such that the parties were given an

14  opportunity to object to whether they were given adequate

15  assurances by the various counterparties.  We received no

16  objections in that regard, and we believe, given the bidder

17  as a strategic and a serious player in the market, that there

18  should be no concerns around that adequate assurance of their

19  ability to perform.  And with that, I believe that we have

20  satisfied the record of showing.  One other thing I would

21  note, just for the record, is that creditors were allowed

22  consistent with the bidding procedures to appear at auction,

23  and in fact there were certain creditors participating in the

24  auction by phone or either by phone or in person.  When I say

25  "participating" I guess I mean sitting in the room observing,

1   but they certainly were allowed in consistent with the

2   bidding procedures which we think, again, furthers the

3   interest of the debtors in insuring that maximum value has

4   been achieved.  So with that, I would proffer our evidence

5   and turn over our legal arguments to Your Honor.  I know that

6   we also have to turn it over to the Canadian Court before

7   there's any ruling, but unless there are any concerns or

8   questions by Your Honor or anyone else wants to be heard,

9   that would conclude our U.S. showing on the sale.

10           THE COURT: Thank you, Ms. Schweitzer, thank you

11   very much.  That was very complete.  Does anyone else wish to

12   be heard?

13           MR. ALLINSON: Good afternoon, Your Honor.

14           THE COURT: Good afternoon.

15           MR. ALLINSON: Elihu Allinson on behalf of Motorola,

16   Inc.  In consideration of the language included in the

17   revised sale order at paragraph (35), Motorola's objection at

18   docket item 1105 is withdrawn.

19           THE COURT: Alright, thank you very much, thank you.

20           MR. ALLINSON: Thank you.

21           MS. SCHWEITZER: Thank you for that confirmation.

22           THE COURT: Does the Committee wish to be heard?

23   Mr. Hodara, good afternoon, good to see you.

24           MR. HODARA: Thank you, Your Honor, good afternoon.

25   Your Honor, Mr. Justice Morawetz, for the completion of the

1    record, I'll state what I think should be the obvious.  The

2    Creditors Committee is extremely pleased with the result of

3    the auction and wishes to express its gratitude to the two

4    courts for establishing the bidding procedures which were

5    handled by the parties so deftly and of course our gratitude

6    to the debtors, their management, and the parties involved

7    amongst the professionals in carrying the auction through in

8    such a professional manner.

9         THE COURT: Thank you, Mr. Hodara.

10        MR. HODARA: Thank you, Your Honor.

11        THE COURT: Anything further, Ms. Schweitzer, before

12   I ask -

13        MR. KRELLER (TELEPHONIC): Your Honor, this is Tom

14   Kreller of Milbank on the phone if this is an appropriate

15   time?

16        THE COURT: Yes.

17        MR. KRELLER (TELEPHONIC): Your Honor, Thomas

18   Kreller of Milbank, Tweed, Hadley & McCloy appearing on

19   behalf of the Ad Hoc Bondholder Group.  First of all, thank

20   you for accommodating a telephonic appearance.  I would

21   simply like for both yourself and Justice Morawetz to concur

22   and echo the comments of Mr. Hodara on behalf of the Official

23   Committee.  The Ad Hoc Bondholder Committee also would like

24   to express its full support for the sale motion.  I also

25   thank the Courts for establishing this process which has been

1    carried to its conclusion so successfully and congratulate

2    the debtors as well on their execution of the process.

3        THE COURT: Alright, Mr. Kreller, thank you.  Ms.

4    Schweitzer?

5        MS. SCHWEITZER: I believe that's all from our side.

6        THE COURT: Alright.

7        MS. SCHWEITZER: I know the Canadian colleagues are

8    probably excited to talk.

9        THE COURT: Yes.  Justice Morawetz, we are now

10   turning the matter over to your Court.

11       JUSTICE MORAWETZ (VIDEO): Thank you, Judge Gross

12   and just before we get going I just would like to address one

13   housekeeping matter.  Ms. Schweitzer introduced into evidence

14   before your Court the report of the Monitor.  Just for

15   clarification, before me on the record is the 17th report of

16   the Monitor, but there is an outstanding request for a

17   sealing order with respect to Appendix D to that report.  I

18   do not know whether that makes a difference as to how the

19   matter is to be introduced into evidence before you.

20       MS. SCHWEITZER: That's it, and for clarification,

21   that we'd be happy to admit it in the U.S. as evidence

22   without the seal to Exhibit B, it's just the ancillary

23   agreements to the ASA.  So we were hoping - we're interested

24   in the report itself, and I believe it attaches the ASA

25   without the exhibits as was filed in the U.S. and we're happy

1    with that as submitted on the record for the U.S.

2        THE COURT: Alright, very well.  Thank you, Ms.

3    Schweitzer.

4        JUSTICE MORAWETZ (VIDEO): Okay, thank you.  Good

5    afternoon.  Mr. Tay, you may proceed with your motion.

6        MR. TAY (VIDEO): Thank you very much, Mr. Justice

7    Morawetz, Judge Gross.  First of all, I'd like to thank both

8    judges for making Mr. Bromley go first because there's no way

9    at all I could have competed with his dramatic flair

10   describing the auction.  I think it's fair to say, I've never

11   in any submission for any court invoke the image of the sun

12   setting behind the Statute of Liberty, and I hope this is the

13   last time I mention it.  What I hope to deal with today is

14   the very unusual situation that we find ourselves in, in

15   terms of process, and because this matter was coming up

16   before both the Courts, we have tried to be very careful

17   about not fighting fights in the press, however, we have the

18   unusual situation where there's a party which although it has

19   not deigned to appear before either the U.S. or the Canadian

20   Court has instead rather chosen to engage in a fight in the

21   court of public and political opinion, and I think it's very

22   important for the process that both the Courts be very

23   satisfied that the bid procedures that the Courts approved

24   have been strictly complied with and that anyone who wanted

25   to participate in this process was allowed to participate in

1   this process and that the process in fact has been completed

2   with integrity.  The two main complaints that have been put

3   out in the press, based largely on misinformation and

4   untruths, is that firstly, that that party was prevented from

5   participating in the process unfairly because of an onerous

6   non-disclosure agreement that they would not sign.  And in

7   that regard - and Judge Gross, just so you can follow along,

8   I hope you have what's known as the motion record -

9           THE COURT: Yes.

10          MR. TAY (VIDEO): And also the Monitor's report, the

11  17th report of the Monitor.

12          THE COURT: I do, yes, sir.

13          MR. TAY (VIDEO): And I had to also ask Mr. Ken

14  Coleman to hand up to you four Canadian cases that I will be

15  referring to and I don't know if you got them yet.

16          THE COURT: I believe they're attached to some

17  documents I previously received.

18          MR. TAY (VIDEO): And the same as to Justice

19  Morawetz.

20          THE COURT: Yes, thank you.  I have those, yes,

21  thank you, Mr. Coleman.

22          MR. TAY (VIDEO): Thank you.  So, with respect to

23  the first issue of the non-disclosure agreement, I would like

24  to take you to paragraph (14) of the Monitor's report, and

25  the Court should be aware that the Monitor, as an officer of

1    the Court, has been intimately involved in this process in

2    constant consultation with the company, with the various

3    creditor constituents and is aware of all the material things

4    that are going on in the company, and the report of the Court

5    officer in paragraph (14) is that on July 15, 2009, one

6    additional party submitted a non-binding letter of intent and

7    requested that they be deemed a qualified bidder.  Upon

8    receiving this request, the company provided that party with

9    a form of non-disclosure agreement substantially in the same

10   form as that previously executed by Nokia Siemens, the

11   stalking horse, and if I can then take you to page 93 of my

12   motion record, you will find there a copy of the bidding

13   procedures that was approved by both Courts, and on page 93

14   under the participation requirements at the bottom of the

15   page, you will see that the process requires that in order to

16   participate in the bidding process, each person, other than

17   the purchaser - in other words, other than the stalking

18   horse, who wishes to participate in the bidding process must

19   deliver an executed confidentiality agreement in form and

20   substance satisfactory to the sellers that shall not be on

21   terms that in the seller's reasonable judgment are more

22   favorable to the potential bidder than the confidentiality

23   agreement executed by the purchaser.  Now, in order to comply

24   with that, we used as a standard NDA form for anyone who

25   wanted to participate, substantially the same form that Nokia

1    Siemens executed as the stalking horse, that being the

2    standard.  You will see on page 7 that the rules also

3    accommodate the situation where in the parenthetical on the

4    top of page - Sorry, if you're looking at the motion record

5    it's page 94, in the event that the potential bidder, and

6    this is the case with Ericsson, has already entered into a

7    confidentiality agreement with the sellers, it must provide a

8    statement agreeing that its obligations under such agreement

9    shall inure to the benefit of any purchaser of the assets and

10   waiving any of its rights under such confidentiality

11   agreement that are in conflict with the bidding procedures or

12   that would otherwise prohibit disclosures regarding the

13   potential bidder or any transaction it may enter into to the

14   noticed parties.  Ericsson did that.  And so what we have are

15   three parties that have expressly complied with the bidding

16   procedures, Nokia, MatlinPatterson, and Ericsson, and they

17   were permitted to participate in the court of true process

18   and auction, and when this third party was denied access into

19   the process for refusing to comply with the court-approved

20   process it was not a decision taken lightly nor was it a

21   decision taken unilaterally by the company.  You will see the

22   report of the court officer that this was done in

23   consultation with the Monitor, the UCC, and the bondholder

24   group, and everybody agreed that they should not be a

25   qualified bidder because they would not comply with the

1    court-approved process.  And if I can now take you to

2    paragraph (16) of the Monitor's report, I think this says it

3    all.  The Monitor is of the view that any party that wanted

4    to bid for the business and complied with the bidding

5    procedures was permitted to do so.  It is a firm and

6    unequivocal statement of the court officer who was involved

7    in this process that the bidding procedures were complied

8    with and that no one was unfairly barred or refused

9    participation in this process.  Those are the facts.  There

10   is no other fact before this Court or I suggest to you

11   anywhere else that suggests differently.  So that's the first

12   issue and first complaint.  The second complaint is that

13   somehow important and sensitive technology is being sold that

14   might somehow jeopardize national security, and again,

15   there's a lot of misinformation here.  If I can take you to

16   page 45 of my motion record, which contains paragraph (19) of

17   Mr. George Riedel's affidavit, you will see there that what's

18   happening as part of this transaction is that NNL will enter

19   into an intellectual property license agreement and trademark

20   license agreement with the purchaser pursuant to which NNL

21   will license such intellectual property to the purchaser, and

22   let me elaborate on that.  Nortel has over 5,500 patents of

23   which approximately 600 are being transferred as part of this

24   deal, however, contrary to the erroneous suggestions of the

25   press that important and sensitive LTE patents are being

 1   transferred or are being sold as part of this deal, the

 2   actual fact is that Nortel still owns all of the LTE patents

 3   and as part of this deal LTE-related patents are being

 4   licensed with a scope that's consistent with and covers the

 5   LTE infrastructure products being sold to Ericsson.  That's

 6   all that's happening.  There is no process currently in place

 7   for the sale of the LTE and other patents.  When the process

 8   is ready and it will only be ready when the company in

 9   consultation with the Monitor and the creditor constituencies

10   decides that it's ready and that there is an appropriate

11   process to bring forward to the Courts, we will bring it

12   forward to both these Courts for approval.  When the process

13   is brought before these Courts for approval and when these

14   Courts approve that process, then we would do it exactly the

15   same way which is, we will again comply with whatever bidding

16   procedures are approved by both these Courts and that anyone

17   who wants to play fairly and in compliance with the rules set

18   by the Court will be permitted to bid, and if people will not

19   comply with the rules, again, they will not be permitted to

20   bid.  Those are the facts.  So again, there's no evidence

21   before this Court of any unfairness, in fact, evidence before

22   this Court is to the absolute contrary.  That party has been

23   given a chance to participate but refused to comply and

24   therefore was not allowed to participate.  They complain

25   about the confi-agreement, but it's the same confi-agreement

1   assigned by Nokia and mandated by the court process.  This

2   party never showed up either in this Court or in the U.S.

3   Court, although we all know that the Courts are open for

4   business and we all know that the proper place for complaints

5   about a court process is before the courts that set that

6   process up.  Instead, they tried to interfere with the court-

7   approved process by going to the media and the politicians.

8   So I'd like to take you now to the cases that I've handed up

9   and to certain paragraphs in these cases which will deal with

10  the integrity of the process and how important it is for the

11  process to be protected so that people who play by the rules

12  can reasonably expect that the rules will be followed.  I

13  will take you first to the case of Royal Bank of Canada vs.

14  Soundair Corp., and I will take you to page 5 of that and

15  under the heading, "Did receiver act properly in agreeing to

16  sell", there is a paragraph that I'd like to take both Courts

17  through.  And although this talks about a receiver, the

18  principles are exactly the same in terms of a court-approved

19  process.  In this case it involved the sale of an airline,

20  and so the Judge said - and this is from the Ontario Court of

21  Appeal, and this is the leading case in terms of a court-

22  ordered process.  It says there are three general

23  observations which I think I should make.  The first is that

24  the sale of an airline as a going concern is very complex

25  process.  Clearly, the analogies here are appropriate.  The

1    best method of selling an airline at the best price is

2    something far removed from the expertise of a court.  When a

3    court appoints a receiver to use its commercial expertise to

4    sell an airline, it is then inescapable that it intends to

5    rely upon the receiver's expertise and not upon its own, that

6    the Court must place a great deal of confidence in the

7    actions taken and in the opinions formed by the receiver.  It

8    should also assume that the receiver's acting properly unless

9    the contrary is clearly shown.  The second observation is

10   that the Court should be reluctant to second-guess with the

11   benefit of hindsight the considered best interest decisions

12   made by its receiver.  The third observation which I wish to

13   make is that the conduct of the receiver should be reviewed

14   in the light of the specific mandate given to him by the

15   court, and if you apply those questions to what's going on

16   here, I think there's no doubt whatsoever that the

17   recommendations of the court officer here are beyond reproach

18   and should be very persuasive for the Courts.  Let me take

19   you now to page 11 of that same case and just about the

20   middle of the page where the Court said, "It is my opinion

21   that the Court must exercise extreme caution before it

22   interferes with the process adopted by a receiver to sell an

23   unusual asset.  It is important that the respective

24   purchasers know that if they are acting in good faith,

25   bargain seriously with the receiver, and enter into an

1    agreement with it, a Court will not likely interfere with the

2    commercial judgment of the receiver to sell the asset to

3    them."  And that paragraph speaks to the integrity of the

4    court process that people need to be able to rely on the

5    court process and one would hope that this message would also

6    go to the politicians.  As to the standing - Sorry, let me

7    take you next to the Tiger Brand Knitting Company

8    (phonetical) case, and what this case does amongst other

9    things is to apply those principles that have been enunciated

10   with respect to the receiver to a CCAA situation, and if you

11   look at paragraph (31) of that case, the principle endorsed

12   by Court in that case is this: The principle as a process

13   that has been put in place for receiving offers in respect to

14   either the business as a going concern or of its assets

15   should be honored.  The process is integral to the

16   administration of statutes such as the BIA, which is our

17   Bankruptcy and Insolvency Act, and the CCAA.  It then goes on

18   in paragraph (34) to speak to the principles that were raised

19   and which are the legal basis for which this Canadian Court

20   should revert to in deciding whether or not to approve a

21   sale, and it talks about whether the receiver has made a

22   sufficient effort to get the best price and has not acted

23   improvidently.  It should consider the interest of all

24   parties.  It should consider the efficacy and integrity of

25   the process by which the offer's obtained, and it should

1    consider whether there has been unfairness in the working out

2    of the process.  Paragraph (35), "To my mind, those same

3    duties of the Court are implicit in a marketing and sales

4    process pursuant to court order under the CCAA."  So, in

5    other words, it's the same principles that dictate how we

6    should conduct our sales process in the CCAA.  There's

7    nothing in the material before me or in the submissions of

8    opposing counsel in this case that suggests any of those

9    duties to have to date been breached by the Monitor in the

10   negotiation offering process.  Again, strong analogies to

11   what's happening here.  He says in paragraph (37), "I am of

12   the view that to allow the offering process to in effect be

13   reopened by enjoining the Monitor from completing a proposed

14   transaction would amount to an unfairness in the working out

15   of the process to the perspective purchaser and basically to

16   the creditors.  As well, it would interfere with the efficacy

17   and integrity of the process and prefer the interests of one

18   party over others."  He then goes on to repeat that paragraph

19   in Soundair that I've read about the reluctance that the

20   Court must exercise an extreme caution before interfering

21   with the process.  And finally, in paragraph (41), he says,

22   "I do not conclude on the facts before me that the Monitor

23   has acted improvidently in failing to negotiate with a party

24   who did not bring forward an offer capable of acceptance

25   within the process set out in the previous order of the

1    Court.  The actions of the Monitor appear entirely

2    appropriate."  And if he can say that about a party who was

3    actually there participating, how much more should that

4    principle apply to a party that didn't even bother to show up

5    or really participate in the process other than to say, I

6    don't want to play by your rules.  So, let's talk about what

7    the Canadian law says in terms of the standing of a

8    disgruntled or unhappy purchaser in the process, and to that

9    I will take you to the case of Sky Farmer and to paragraph

10   (15) where the Court says, "There are two main reasons why an

11   unsuccessful perspective purchaser does not have a rightful

12   interest that is affected by a sale approval order.  First,

13   the perspective purchaser has no legal or proprietary right

14   in the property being sold.  Offers are submitted in the

15   process in which there is no requirement that a particular

16   offer be accepted."  Skipping a sentence, "The duties of the

17   receiver and the Court are to insure that the sale are in the

18   best interest of those with an interest in the proceeds of a

19   sale.  There is no right in a party who submits an offer to

20   have the offer or even if the highest accepted by either the

21   receiver or the Court."  In paragraph (16), "The fundamental

22   purpose of the sale approval motion is to consider the best

23   interests of the parties with a direct interest in the

24   proceeds of a sale, primarily the creditors.  The

25   unsuccessful would-be purchaser has no interest in this

1    issue.  Indeed, the involvement of the unsuccessful

2    perspective purchasers could seriously distract from this

3    fundamental purpose by including in the motion other issues

4    with a potential for delay and additional expenses."

5    Paragraph (20), "There is a sound policy reason for

6    restricting to the extent possible the involvement of

7    perspective purchasers in sale approval motions.  There is

8    often a measure of urgency to complete court-approved sales.

9    This case is a good example.  When unsuccessful purchasers

10   become involved, there's a potential for greater delay and

11   additional uncertainty.  This potential may, in some

12   situations, create commercial leverage in the hands of a

13   disappointed would-be purchaser which could be

14   counterproductive to the best interests of those for whose

15   benefit the sale is intended."  I think I've covered the

16   ground enough to show that number one, there was no

17   impropriety in the process that was conducted in accordance

18   with the rules set out by both Courts and that secondly,

19   people who don't - even the people who show up and are

20   unsuccessful in a court-approved process are not given

21   standing to complain.  It, therefore, stands to reason that

22   people who don't even bother to show up but simply voice

23   dissatisfaction through the press and through politicians

24   should not be allowed to derail the process that has been

25   approved by the Court in terms of the approval of the sale.

1    So, in conclusion, I think the facts are very clear.  The

2    Courts have laid out the process to be followed.  The

3    evidence is clear that the process has been followed.  A

4    great result has been achieved . . . (break in audio) that it

5    should not be permitted to interfere directly nor indirectly

6    or delay this process.  The Monitor and all other interested

7    parties who have a legitimate interest are supportive of this

8    deal, and so, with that point, let me take you to the most

9    persuasive authority of all, and that's the last case and

10   that's your endorsement, Justice Morawetz, in the last time

11   we were before you, and if I can take you to paragraph (51)

12   where you acknowledged and this was the basis for your

13   approval, you said that, "Counsel to the applicants

14   summarized the facts in support of the argument that the sale

15   transaction should be approved" and you named these, and I

16   suggest to you and I submit to both Your Honors that these

17   conditions on which you originally based your approval still

18   apply in this case.  Nortel has been working diligently for

19   months on a plan to reorganize its business.  In the exercise

20   of its business judgment, Nortel has concluded that it cannot

21   continue to operate the business successfully within the CCAA

22   framework.  Unless a sale is undertaken at this time, the

23   long term viability of the business will be in jeopardy.  A

24   sale agreement continues the business as a going concern and

25   will save at least 2,500 jobs and that has been confirmed

1   again in the materials as part of the Ericsson deal and

2   constitutes the best and most valuable proposal for the

3   business.  The auction process - this has shown to be true,

4   the auction process has insured that Nortel has received the

5   highest possible value for the business, and that the sale of

6   the business at this time is in the best interest of Nortel

7   and its stakeholders and the value of the business is likely

8   to decline over time.  So I suggest to you that in my

9   respectful submissions for the same reasons that you approved

10  the stalking horse sale, that this Court should approve the

11  sale before you today to Ericsson.  Thank you.

12        THE COURT: Thank you.

13        JUSTICE MORAWETZ (VIDEO): Thank you, Mr. Tay.  I do

14  have to note that the paragraph that you think is the most

15  persuasive of all is nothing more than a summary of the

16  arguments that you put before me the last time.

17        MR. TAY (VIDEO): I'm in violent agreement with

18  that.

19        JUSTICE MORAWETZ (VIDEO): I'm not seeing anybody

20  rise.  Mr. Carfagnini are you next or is there any other

21  party that wishes to speak prior to presenting the position

22  of the Monitor?  Go ahead.

23        MR. CARFAGNINI (VIDEO): Thank you, Your Honor.  Jay

24  Carfagnini from Goodmans LLP on behalf of the Monitor.  I'm

25  usually at that cleanup, so I will go forward.  The Monitor

1   as an officer of this Court is present and does have some

2   submissions in respect of the court-approval motion before

3   these Courts.  Representatives of Ernst & Young, the Monitor,

4   are here in the courtroom.  Mr. McDonald and Ms. Hamilton are

5   here, and as the Courts have noted, the Monitor's 17th report

6   has been filed with both Courts.  Your Honor, the process by

7   which these assets and this business unit was offered for

8   sale were set out in detail in the Monitor's 14th report which

9   Mr. Tay has alluded to.  It is the Monitor's submission that

10  the process was fair, open, and transparent, and indeed, both

11  Courts have heard submissions this afternoon from the

12  stakeholders with direct interest in this case that that was

13  the case.  Justice Morawetz and Judge Gross, Mr. Tay talked

14  to the Courts to paragraph (16) of the Monitor's 17th report

15  where the Monitor, as Mr. Tay points out quite directly

16  states, that in its view any party who wanted to bid and

17  follow the bidding procedures was permitted to do so.  I

18  would point out for the benefit of both Courts also paragraph

19  (18) of the Monitor's report.  Your court officer

20  participated fully in the bidding process, was actively

21  involved at all stages of the bidding and auction, and the

22  Monitor, importantly, the Monitor conducted its own

23  independent review and analysis of the potential buyers and

24  the bids.  If I can then turn you to the Monitor's analysis

25  and recommendations in its report.  In the Monitor's report

1   at paragraph (41), the Monitor is of the view that the

2   company's efforts to market these assets was comprehensive

3   and conducted in accordance with the bidding procedures.

4   Two, the sale and auction process undertaken provided a

5   mechanism to fully determine market value.  Three, the

6   Monitor is satisfied that the purchase price constitutes a

7   fair consideration.  Four, the Monitor is satisfied this deal

8   represents the best transaction for the sale of these assets.

9   And five, therefore, the Monitor recommends the Court approve

10  it.  It is concise, precise, and directly on point.  I think

11  the report in that regard, Your Honors, speaks for itself, so

12  subject to any questions you may have of me or of the Monitor

13  directly or any submissions the Monitor's U.S. counsel may

14  wish to make to Judge Gross, Mr. Coleman is in the courtroom

15  in Delaware, and unless you have any questions those are our

16  submissions on behalf of the Monitor.

17          JUSTICE MORAWETZ (VIDEO): Thank you, Mr.

18  Carfagnini, I have no questions.

19          MR. CARFAGNINI (VIDEO): We will have to address the

20  sealing of the exhibits if you and Judge Gross decide to

21  proceed, Your Honor.

22          JUSTICE MORAWETZ (VIDEO): Would you like to perhaps

23  make those brief submissions now.

24          MR. CARFAGNINI (VIDEO): Yes, quite happy to, Your

25  Honor, and at paragraph (30) of the Monitor's report -

1   actually it's paragraph (28), there are exhibits and

2   schedules contained there that contain sensitive competitor

3   information as well as personal information, and the Monitor

4   is requesting that for those reasons they be sealed.

5   Certainly, all of the stakeholder parties in this Court

6   concur with that, and we would ask that to be done.

7        JUSTICE MORAWETZ (VIDEO): Thank you.  I take it

8   that that, and you may wish to consult with your colleague

9   Mr. Armstrong, is Appendage D, as well as the full stack of

10  spreadsheets that I have here.

11       MR. CARFAGNINI (VIDEO): Correct.

12       JUSTICE MORAWETZ (VIDEO): Thank you.  Is there any

13  other party that wishes to address the Court?  Mr. Zigler, on

14  behalf of the former employees?

15       MR. ZIGLER (VIDEO): Yes.  Justice Morawetz, Justice

16  Gross, a very brief submission, nothing to do with the sale

17  itself.  I believe all the creditors are in support of that.

18  There was circulated today some changes to the order

19  pertaining to - I think it was paragraph (13)(b) that I wish

20  to address.  I don't know what the comparable provision in

21  the U.S. order is, and this has to do with the proceeds of

22  the sale.

23       JUSTICE MORAWETZ (VIDEO): Perhaps, Ms. Stam

24  (phonetical) do you have some current copies of the order you

25  could hand them up at this time?

1        MS. STAM (VIDEO): Yes, Your Honor, and in terms of

2   going through the order, we also . . . (audio not recording)

3   as opposed to being . . .

4        MR. ZIGLER (VIDEO): I can speak to it at that time

5   if Your Honor prefers that.

6        JUSTICE MORAWETZ (VIDEO): Is it possible that Ms.

7   Stam has taken your concerns into account and perhaps it

8   might be easier, Mr. Zigler, if we go through the order and

9   then see if there's any comment that you require.

10       MS. STAM (VIDEO): Your Honor, I'm handing up to you

11  two copies of the clean version of the order as well as a

12  blackline reflecting changes from the version that was

13  included in the motion materials served yesterday.

14       JUSTICE MORAWETZ (VIDEO): Thank you.

15       MR. TAY (VIDEO): Sorry, just as clarification, Your

16  Honor, I just received a note from my client that the 600

17  patents that I referred to, they believe refers to IP

18  generally, and that the actual patents transferred it closer

19  to 125.

20       JUSTICE MORAWETZ (VIDEO): Thank you, Mr. Tay.  Ms.

21  Stam, I'm looking at your blackline version that you just

22  handed up.

23       MS. STAM (VIDEO): Yes, Your Honor, and there are

24  really - the main changes can be found in paragraphs (13) and

25  (11) of the proposed order.  The paragraph that has been of

1   some discussion already is paragraph (13) and that is the

2   paragraph dealing with the payment of the breakup fee and

3   expense reimbursement and subject to the submissions of Ms.

4   Schweitzer in the U.S.  The changes, most of which appear in

5   paragraph (13)(b), were as a result of discussions with

6   primarily the Unsecured Creditors Committee and . . .

7   (indiscernible) over the past couple of days, and as Ms.

8   Schweitzer said, we - and Mr. Tay said, we certain echo that

9   other than with respect to the bid protections nothing's

10  meant to trump the IFA.  We certainly continue to intend to

11  abide by it.  I believe Your Honor suggested that we work out

12  some endorsement language and we need to speak to our U.S.

13  counterparts during the break, but I think that that

14  discussion can be had.  I would also add to hopefully address

15  what I believe Mr. Zigler is concerned to be that we are

16  certainly going to have to come back to court to have a sales

17  protocol approved.  You've made submissions to that affect

18  before.  Nothing has changed as a result of this paragraph.

19  This paragraph is meant to deal with the bid protections, the

20  payment of those to Nokia Siemens in accordance with the

21  bidding procedures and the stalking horse agreement, and the

22  reimbursement of those on closing to the two estates.  If

23  Your Honor has any other questions on that paragraph, I'm

24  happy to answer them, otherwise I'll just turn to paragraph

25  (11) very quickly.

1        JUSTICE MORAWETZ (VIDEO): You may go to paragraph

2    (11).

3        MS. STAM (VIDEO):   And if I may hand up a

4    subordination non-disturbance and attornment agreement, which

5    has been agreed to by the parties and which was submitted for

6    approval with the U.S. Court just now.  That has been

7    referred to you in the revised language at paragraph (11).

8    It has been agreed to by Nortel and also with input from the

9    Secured Creditors Committee.

10       JUSTICE MORAWETZ (VIDEO): Thank you.

11       MS. STAM (VIDEO): There were no other substantive

12   changes to the order from the draft that was included in the

13   motion materials.  We did include with our materials a

14   blackline to the model order and Your Honor will have noted

15   that were significant changes so the blackline may not have

16   read well.  I'm happy to answer any questions with respect to

17   any of the other paragraphs of the order Your Honor may have,

18   but otherwise would not propose to take Your Honor through it

19   paragraph by paragraph.

20       JUSTICE MORAWETZ (VIDEO): I was able to get through

21   it fine, thank you.

22       MS. STAM (VIDEO): Thank you, Your Honor.

23       JUSTICE MORAWETZ (VIDEO): Returning now to Mr.

24   Zigler.

25       MR. ZIGLER (VIDEO): Thank you, Your Honor and Judge

1   Gross.  My only request is at paragraph (13)(b) state

2   explicitly what you were just advised by counsel from Nortel

3   and it is implicit and that is that any allocation protocol

4   be adopted by either of the Courts in both jurisdictions.

5   That was in the original wording which has been removed and

6   replaced by wording that cites the IFA, the IFA is a document

7   that was intended to fund the operations of the company in

8   Canada on an interim basis, not intended to deal with the

9   ultimate protocol, and I think it would be appropriate in

10  this order and in the endorsement to the Courts to simply say

11  that any allocation of proceeds will be subject to an

12  allocation protocol to be approved by the Courts.

13          JUSTICE MORAWETZ (VIDEO): Thank you.  I have no

14  doubt that during the break between yourself and Ms. Stam you

15  can either come up with some additional wording for

16  consideration and the endorsement towards the slight

17  amendments to the form of order.

18          MR. ZIGLER (VIDEO): Thank you, Your Honor.

19          JUSTICE MORAWETZ (VIDEO): Thank you.  Any reply,

20  Mr. Tay?

21          MR. TAY (VIDEO): No, Your Honor, thank you.

22          JUSTICE MORAWETZ (VIDEO): Thank you.  Well, this

23  concludes the submissions before the Canadian Court, Judge

24  Gross.  I would suggest that we now break to give people an

25  appropriate time for a comfort break and for us to gather our

1  thoughts.  It may be appropriate to break for 20 minutes.

2          THE COURT: Before we break, Justice Morawetz, I

3  believe people perhaps in this courtroom would like to be

4  heard.  Ms. Schweitzer.

5          MS. SCHWEITZER: Your Honor, Lisa Schweitzer from

6  Cleary Gottlieb.  Just to close the loop on the U.S. side,

7  the Committee and the debtor are happy to consult during the

8  break on this paragraph (38) or paragraph (13) language.

9          THE COURT: Yes.

10          MS. SCHWEITZER: And believe we can probably come up

11  with something agreeable, so we're happy to present that to

12  you after the break.

13          THE COURT: Thank you, thank you, Ms. Schweitzer.

14  And Mr. Coleman, I know that you were -

15          JUSTICE MORAWETZ (VIDEO): To the extent that you

16  may need a few more minutes, you know, I hesitate to let the

17  respective registrars know.  Mr. Coleman?

18          THE COURT: Mr. Coleman, yes.

19          MR. COLEMAN: Your Honor, just - nothing to add from

20  the comments by Mr. Carfagnini on the Monitor's report.  I do

21  think the conclusions are clear.  Just to make sure that Your

22  Honor caught the reference to the 14th report which also talks

23  about the pre- and immediate post-petition marketing efforts

24  for this business.

25          THE COURT: Exactly.

1        MR. COLEMAN: Thank you, Your Honor.

2        THE COURT: Thank you, Mr. Coleman.  Justice

3    Morawetz, shall we retire to our chambers?

4        JUSTICE MORAWETZ (VIDEO): We shall, thank you.

5        THE COURT: Alright.  We stand in recess.

6        (Whereupon at 3:05 p.m., a recess was taken in the

7    hearing in this matter.)

8        (Whereupon at 3:35 p.m., the hearing in this matter

9    reconvened and the following proceedings were had:)

10        THE CLERK: Please rise.

11        THE COURT: Thank you, everyone, please be seated,

12    and we will just wait for Justice Morawetz to return, and I

13    think he's going to provide his ruling first, and then I'll

14    follow.  And I think the language has been changed and you

15    have the order to check.

16        MS. SCHWEITZER: Your Honor, Lisa Schweitzer for the

17    debtors.  We did add some supplemental language in paragraph

18    (38) and already have the order typed if I can approach to

19    hand it up?

20        THE COURT: You sure may, and you were smart enough

21    to put it together for me because I never would have gotten

22    it right.  Thank you.

23        UNIDENTIFIED SPEAKER (VIDEO): Sorry, Judge Gross.

24    I don't know if you know, but Mr. Justice Morawetz hasn't

25    quite arrived yet.  So I wanted to give him a couple of

1    minutes?

2              THE COURT: That's fine, absolutely.

3              THE CLERK (VIDEO): Order, all rise.  Court is

4    resumed, please be seated.

5              JUSTICE MORAWETZ (VIDEO): Ms. Stam.

6              MS. STAM (VIDEO): Your Honor, we made a bit of

7    progress although I believe you've been advised that there is

8    still some further submissions to be made by Mr. Zigler on

9    the issue that he has raised.  We have, however, discussed

10   language for the concerns raised by the UK administrator and

11   have written out some suggested language if Your Honor is

12   prepared to make the order to be included in the endorsement,

13   and I believe that the same will be incorporated into the

14   U.S. order also.  I also should have mentioned earlier when I

15   was going through the draft order that as part of the

16   agreement and the relief being sought, the purchaser had

17   requested that we ask Your Honor to entertain some

18   endorsement language with respect to the value received for

19   the assets.  I have typed out some proposed language and

20   would be happy to read it out -

21             JUSTICE MORAWETZ (VIDEO): Hopefully, it's the same

22   as the language I have.

23             MS. STAM (VIDEO): The proposed language is, "The

24   consideration provided by Ericsson pursuant to the sale

25   agreement constitutes reasonably equivalent value and fair

1    consideration for the assets."  With respect to the issues

2    raised by the UK administrator, we have agreed to additional

3    language for the endorsement, if Your Honor is so inclined,

4    that reads as follows: "Other than with respect to the

5    payment and reimbursement of amounts with respect to the bid

6    protections, nothing in this order is meant to modify or vary

7    any of the selling debtors as such term is defined in the

8    IFA, their rights or obligations under the IFA."  We have

9    further proposed to address the concerns of Mr. Zigler that

10   we include an additional sentence in the endorsement that

11   says, "It is further acknowledged that Nortel has advised the

12   interim sale protocol shall be subject to approval by this

13   Court."  If Your Honor would like, I'd be happy to hand up

14   the written -

15          JUSTICE MORAWETZ (VIDEO): Please.  Thank you.

16          MS. STAM (VIDEO): As I mentioned, I believe that

17   Mr. Zigler has a response to that and then I imagine Mr. Tay

18   will want to reply.

19          JUSTICE MORAWETZ (VIDEO): Mr. Zigler.

20          MR. ZIGLER (VIDEO): Your Honor, the concern is not

21   just with respect to the interim sales protocol.  I

22   appreciate what Ms. Stam has said.  My client's concern is

23   that any distribution of proceeds be subject to approval by

24   the Court not just under the interim sales protocol. It is

25   possible that a different method of distribution can be

1   arrived at under paragraph (13)(b) as currently drafted, and

2   our concern is simply that proceeds are not to be distributed

3   without further order of this Court and the U.S. Court,

4   period.

5        MR. TIE (VIDEO): If I can respond to that, Your

6   Honor.  The interim funding agreement, as you know, took

7   months of work, months of work among the three different

8   estates and it was a very complicated agreement.  This

9   paragraph today that we're dealing with simply intended to

10  deal with one simple issue, and that is the reimbursement of

11  the breakup fee that both the Canadian estate and the U.S.

12  estate is paying.  It is not intended to affect the operation

13  of agreements that have already been blessed by both Courts.

14  We are very concerned about adding the language that Mr.

15  Zigler wants because it could have the inadvertent effect of

16  interfering with agreements and superceding these complex

17  agreements that have already been blessed by the Courts, and

18  we have consulted with the UCC's Canadian counsel, the

19  Bondholders Committee counsel, and the Monitor and none of

20  the parties want this change because we are concerned about

21  what it might inadvertently do, and so we should not allow

22  this paragraph, which as I've said, is simply to insure the

23  reimbursement of the breakup fee to become something else.

24        JUSTICE MORAWETZ (VIDEO): Okay.  Mr. Zigler, do you

25  have any response?

1          MR. ZIGLER (VIDEO): Well, Your Honor, I always felt

2    that it was implicit that no allocation of proceeds would be

3    dealt with without approval of the Court no matter how it was

4    arrived at.  My concern is that there is a gap in the interim

5    funding agreement and it keeps getting bootstrapped into more

6    and more orders every time these things are put before you.

7    It is not a difficult matter for both Courts, I submit, to

8    say, We will not be dealing with the distribution of these

9    proceeds which are explicitly referred to in 13(b), there's

10   nothing inadvertent about that, until such time as both this

11   Court and the U.S. Court approve the allocation.  That's all.

12         JUSTICE MORAWETZ (VIDEO): Thank you.  Judge Gross,

13   unless you have something to add on that issue, I intend to

14   just address that summarily at this time.

15         THE COURT: Does anyone wish to be heard in this

16   courtroom first?

17         MS. SCHWEITZER: Your Honor, Lisa Schweitzer from

18   Cleary Gottlieb.  Just to clear the context, Mr. Zigler is

19   counsel to an employee representative appointed in Canada to

20   deal with Canadian employee issues.  So he's seeking,

21   apparently, additional protections through the Canadian

22   process on the release of proceeds.  So, while we're

23   concerned, as our Canadian colleagues have said, that the

24   proceeds, at least with respect to the U.S. we've spent time

25   negotiating them, they should be governed by the IFSA.  That

1   this is a Canadian objection apparently coming forward.  He

2   doesn't have standing facially in the U.S. to raise that

3   objection.

4          THE COURT: Justice Morawetz, I would simply state

5   that I too would be concerned, however, with any, if you

6   will, amendment to the IFSA or anything that may implicate

7   the IFSA given the lengthy hearing we conducted and our

8   approval of that interim agreement, which I think is very

9   significant, and I also will note that the breakup fee which

10  is addressed in this order is an extremely small number in

11  comparison to the $1.13 billion.

12         JUSTICE MORAWETZ (VIDEO): Thank you, Judge Gross.

13  Mr. Zigler, in my view, paragraph (13) deals with the

14  stalking horse agreement pending procedures, period.  There

15  has been enough discussion today to, I think, provide

16  significant assurance and I'm sure the Monitor could provide

17  more if it's needed that your issue dealing with distribution

18  is not going to be affected by what's going on today.  If

19  there is a clause in my proposed endorsement that deals with

20  the allocation of sales proceeds, it's not being dealt with

21  today, so I think that should be satisfactory for you.  Judge

22  Gross and I have had an opportunity to consider this matter

23  individually, and we have decided that the endorsement from

24  the Canadian Court will go first and then Judge Gross will

25  provide his opinion thereafter.  It is my intention to try to

1    work into appropriate place the endorsement language dealing

2    with Ericsson and also with the IFA issue.  I think, just to

3    avoid getting myself even more confused than I likely will be

4    going through this, I'll read that part at the end and

5    reserve the right to insert it and amend the transcript which

6    I hope will be available for you tomorrow.

7         THE COURT: Justice Morawetz, if I may just

8    interrupt you for a moment.  I don't know if the microphone

9    could be moved any closer to you, it might be helpful.

10        JUSTICE MORAWETZ (VIDEO): There, we've had the tech

11   people adjust it.

12        THE COURT: That's fine.

13        JUSTICE MORAWETZ (VIDEO): Alright, Mr. Reporter,

14   all set?

15        THE REPORTER (VIDEO):  Okay.

16        JUSTICE MORAWETZ (VIDEO):  Nortel Networks

17   Corporation, defined as NNC, Nortel Networks Limited, defined

18   as NNL, Nortel Networks Technology Corporation, Nortel

19   Networks International Corporation and Nortel Networks Global

20   Corporation, collectively defined as the applicants, bring

21   this motion for an order approving and authorizing the

22   execution of the asset sale agreement dated as of July 24,

23   2009, defined as the sale agreement, among Ericsson as

24   purchaser as the buyer, and NNL, NNC, Nortel Networks, Inc.,

25   which is defined as NNI, and certain of their affiliates as .

1    . . (indiscernible).  They collectively are referred to as

2    the sellers in the form attached as an appendix to the 17th

3    report of Ernst & Young, Inc., in its capacity as Monitor in

4    the CCAA proceedings.  The applicants also request, among

5    other things, a vesting order, an order approving and

6    authorizing the execution and compliance with the

7    intellectual property license agreement substantially in the

8    form of trust to the confidential appendix of the 17th report,

9    the trademark license agreement, substantially in the form

10   attached to the appendix, an order declaring that the

11   ancillary agreements as defined in the sale agreement

12   including the IP licenses shall be binding on the applicants

13   that are a party thereto and shall not be repudiated,

14   disclaimed, or otherwise . . . this proceedings and that the

15   intellectual property subject to the IP licenses shall not be

16   sold, transferred, conveyed or assigned by any of applicants

17   unless the buyer or assignee of such intellectual property

18   assumes all of the obligations of NNL under the IP licenses

19   and executes an assumption agreement in favor of the

20   purchaser in a form satisfactory to the purchaser.  Finally,

21   the applicants seek an order sealing the confidential

22   appendices to the 17th report pending further order of this

23   Court.  This joint hearing is being conducted by way of video

24   conference.  His Honor Judge Gross is presiding over the

25   hearing in the U.S. Court.  This joint hearing is being

1    conducted in accordance with the provisions of the cross-

2    border protocol which has previously been approved by both

3    the U.S. Court and this Court.  The applicants have filed two

4    affidavits in support of the motion.  The first is that of

5    Mr. George Riedel, sworn July 25th, 2009.  Mr. Riedel is the

6    chief strategy officer of NNC and NNL.  Mr. Riedel also swore

7    an affidavit on June 23, 2009 in support of the motion to

8    approve the bidding procedures.  The second affidavit is that

9    of Mr. Michael Humphrey which relates to an issue involving

10   Flextronics which was resolved prior to this hearing.   The

11   Monitor has also filed its 17th report with respect to this

12   motion.  The Monitor recommends that the requested relief be

13   granted.  The applicants' position is also supported by the

14   Unsecured Creditors Committee in the Chapter 11 proceedings

15   and the noteholders, both of whom enthusiastically support

16   the applicants' position.  No party is opposed to the

17   requested relief.  On June 29th, 2009, this Court entered an

18   order approving the bidding procedures for a sale process for

19   certain of Nortel's Code Division Multiple Access, CDMA

20   business, and long-term inclusion LTE access assets.  The

21   procedures were attached to the form of order.  The Court

22   also approved the stalking horse agreement dated as of June

23   19th, 2009 among Nokia and the sellers and accepted the sale

24   agreement for the purposes of conducting the stalking horse

25   bidding process in accordance with the bidding procedures

1 including the breakup fee and expense reimbursement as both

2 terms are defined in this the stalking horse agreement.  The

3 order of this Court is granted immediately after His Honor

4 Judge Gross of the United States Bankruptcy Court for the

5 District of Delaware approved the bidding procedures in the

6 Chapter 11 proceedings.  The bidding procedures contemplated

7 a bid deadline of 4 p.m. on July 21st, 2009.  This gave

8 interested parties 22 days to conduct due diligence and

9 submit a bid.  By the bid deadline, three bids were

10 acknowledged as qualified bids as contemplated by the bidding

11 procedures.  Qualified bids were received from MPAM Wireless,

12 Inc., otherwise known as MatlinPatterson, and Ericsson.  The

13 Monitor also reports that on July 15 one additional party

14 submitted a non-binding letter of intent and requested that

15 it be deemed a qualified bidder.  The Monitor further reports

16 that upon receiving this request, the applicants provides

17 such party with a form of non-disclosure agreement

18 substantially in the form previously executed by Nokia

19 Siemens.  This party declined to execute a non-disclosure

20 agreement and was not deemed a qualified bidder.  The Monitor

21 further reports that the UCC and the bondholder group were

22 all consulted in connection with the request that such party

23 be considered a qualified bidder.  The Monitor also reports

24 that it is of the view that any party that wanted to bid for

25 the business and complied with the bidding procedures was

1    permitted to do so.  In the period up to July 21, 2009, the

2    Monitor reports that it was kept apprised of all activity

3    conducted between Nortel and the potential buyers.  In

4    addition, the Monitor participated in conference calls and

5    meetings with the potential buyers both with Nortel and

6    independently.  The Monitor further reports that it conducted

7    it's own independent review and analysis of materials

8    submitted by the potential buyers.  On July 22, 2009, in

9    accordance with the bidding procedures, copies of both the

10   MPAM bid and the Ericsson bid were provided to Nokia.  MPAM

11   and Ericsson were both notified that three qualified bids had

12   been received.  After consultation with the Monitor and

13   representatives of the UCC and the bondholder group, the

14   sellers determined that the highest offer amongst the three

15   bids was submitted by Ericsson, and accordingly on July 22,

16   the three qualified bidders were informed that the Ericsson

17   bid had been selected as the starting bid pursuant to the

18   bidding procedures.  Copies of the Ericsson bid were

19   distributed to Nokia and MPAM.  The Monitor reports that the

20   auction was held in New York on July 24, 2009.  Pursuant to

21   the bidding procedures, the auction went through several

22   rounds of bidding.  The sellers finally determined that the

23   Ericsson bid submitted in the sixth round should be declared

24   the successful bid, and that the Nokia bid submitted in the

25   fifth round should be the alternate bid.  The Monitor reports

1   that these determinations were made in accordance with

2   consultations with the Monitor and representatives of the UCC

3   and the bondholder group held during the seventh round of . .

4   .  The Monitor reports that the terms and conditions of the

5   successful bid are substantially the same as the Nokia

6   agreement described in the 14th report with the significant

7   differences being as follows: One, the purchase price has

8   been increased from U.S. $650 million to U.S. $1.13 billion,

9   plus the obligation of the purchaser to pay per form of

10  discharge the assumed liabilities.  A good faith deposit of

11  $36.5 million has been received.  Two, the termination date

12  has been extended to September 30, 2009 or in the event that

13  closing has not occurred solely because of regulatory

14  approvals have not yet been obtained, October 31, 2009 as

15  opposed to August 31 and September 30 respectively per the

16  Nokia agreement.  Three, the provisions in the Nokia

17  agreement with respect to the breakup fee and expense

18  reimbursement have been deleted.  Further, I note that the

19  stalking horse agreement provided for a commitment to take at

20  least 2,500 Nortel employees worldwide.  Under the sale

21  agreement, the purchaser has also committed to make

22  employment offers to at least 2,500 Nortel employees

23  worldwide.  The Nokia agreement provided for a payment of a

24  breakup fee of 19.5 million and the expense reimbursement to

25  a maximum of 3 million upon termination of the Nokia

1    agreement.  The Monitor reports that if both this Court and

2    the U.S. Court approve the successful bid, the applicants are

3    of the view that the breakup fee and the expense

4    reimbursement will be payable and, in accordance with the

5    order of June 29, the company intends to make such a payment.

6    The Monitor reports that is currently contemplated that 50

7    percent of the amount be funded by NNL and 50 percent by NNI.

8    The assets to be transferred by the applicants and the U.S.

9    debtor, pursuant to the successful bidder, are to be

10   transferred free and clear of all liens of any kind.  The

11   Monitor is of the understanding that no leased assets are

12   being conveyed as part of this transaction.  The Monitor also

13   reports that at the request of the purchaser, the proposed

14   approval and vesting order specifically approves the

15   intellectual property license agreement and trademark license

16   agreement, collectively defined as the IP licenses entered

17   into between NNL and the purchaser in connection with the

18   successful bid.  The Monitor also reports that subject to

19   Court approval, closing is anticipated to occur in September

20   2009.  The bidding procedures provides that the seller may

21   seek approval of the next highest or otherwise best offer as

22   the alternate bid.  If the closing of the transaction

23   contemplated fails to occur, the sellers would then be

24   authorized but not directed to proceed with to effect the

25   sale pursuant to the terms of the alternate bid without

1    further Court approval.  The sellers in consultation with the

2    Monitor, the UCC, and the bondholders determined that the bid

3    submitted by Nokia in the fifth round for the purchase price

4    of 1.032.5 - that's 1,032,500,000 is the next highest and

5    best offer and is deemed to be the alternative bid.

6    Accordingly, the company is seeking Court approval of the

7    alternative bid pursuant to the bidding procedures.  The

8    Monitor reports that as noted in its 14th report, the CMDA

9    Division and the LTE business are not operated through a

10   dedicated legal entity or standalone division.  The

11   applicants have an interest in intellectual property of the

12   CMDA business and the LTE business, which is subject to

13   various intercompany licensing agreements with other Nortel

14   legal entities around the world, in some cases on an

15   exclusive basis and in other cases on a non-exclusive basis.

16   The Monitor is of the view that the task of allocating sale

17   proceeds stemming from the successful bids amongst various

18   Nortel entities and the various jurisdictions is complex.

19   Further, as set out in the 15th report, the applicants, the

20   U.S. debtors, and certain of the Europe, Middle East, Asia

21   entities, the EMEA, through their UK administrators entered

22   into the interim funding and settlement agreement, the IFSA

23   which was approved by this Court on June 29, 2009.  Pursuant

24   to the IFSA, each of the applicants, the U.S. debtors, and

25   EMEA debtors agreed that the execution of definitive

1   documentation with the purchaser of any material Nortel

2   assets was not conditional upon reaching an agreement

3   regarding the allocation of sale proceeds or binding

4   procedures for the allocation of the sale proceeds.  The

5   Monitor reports that the parties have agreed to negotiate in

6   good faith in an attempt to reach an agreement on a protocol

7   for resolving disputes concerning the allocation of sale

8   proceeds, but as of the current date, no agreement has been

9   reached regarding the allocation of any sales proceeds.

10  Accordingly, the selling debtors have determined that the

11  proceeds are to be deposited in an escrow account.  The issue

12  of allocation of sale proceeds will be addressed at a later

13  date.  The Monitor expects the company will return to Court

14  prior to the closing of the transaction to seek approval of

15  the escrow agreement and a protocol for resolving disputes

16  regarding the allocation of sale proceeds.  In his affidavit,

17  Mr. Riedel concludes that the sale process was conducted by

18  Nortel with consultation from its financial advisor, the

19  Monitor, and several of its significant stakeholders in

20  accordance with the bidding procedures, and that the auction

21  resulted in a significantly increased purchase price on terms

22  that are the same or better than those contained in the

23  stalking horse agreement.  He is of the view that the

24  proposed transaction as set out in the sale agreement is the

25  best offer available for the assets and that the ultimate bid

1    represents the second best offer available for the assets.

2    The Monitor concludes that the company's efforts to market

3    the CMDA business and the LTE business were comprehensive and

4    conducted in accordance with the bidding procedures, and is

5    further the view that the § 363 type . . . process provided a

6    mechanism to fully determine the market value of these

7    assets.  The Monitor is satisfied the purchase price

8    constitutes fair consideration for such assets and as a

9    result the Monitor is of the view that the successful bid

10   represents the best transaction for the sale of these assets,

11   and the Monitor, therefore, recommends that the Court approve

12   the applicant's motion.  A number of objections have been

13   considered by the U.S. Court and I note that they have been

14   either resolved or overruled.  I'm satisfied that no useful

15   purpose would be served by adding additional comment on this

16   issue.  Turning now to whether it is appropriate to approve

17   the transaction, I refer back to my endorsement on the

18   bidding procedures motion.  At that time I indicated that

19   counsel to the applicants had emphasized that Nortel would

20   aim to satisfy the elements established by the Court for

21   approval as set out in the decision of World Bank and

22   Soundair, which in turn accept certain standards as set out

23   by this Court in Crown Trust and Rosenberg.  Although the

24   Soundair and Crown Trust tests were established for the sale

25   of assets by a receiver, the principles have been considered

1  to be appropriate for sale of assets as part of a court-

2  supervised sales process in a CCAA proceeding for authorities

3  to read Tiger Brand Knitting Company.  The duties of the

4  Court in reviewing a proposed sale of assets are as follows:

5  One, it should consider whether sufficient effort has been

6  made to obtain the best price and that the debtor has not

7  acted improvidently.  Two, it should consider the interests

8  of all parties.  Three, it should consider the efficacy and

9  integrity of the process in which offers have been obtained;

10  and four, it should consider whether there had been

11  unfairness in working out the process.  I am satisfied that

12  the unchallenged record clearly establishes that the sale

13  process has been conducted in accordance with the bidding

14  procedures and with the principles set out in Soundair and

15  Crown Trust.  All parties are of the view that the purchase

16  price represents fair consideration for the assets included

17  in the sale agreement.  I accept the submissions that the

18  purchase price represents fair consideration.  In my view, it

19  is appropriate to approve the sale agreement as between the

20  sellers and the purchaser, and I'm also satisfied it is

21  appropriate to grant the relief relating to the vesting

22  order, the IP licences, the ancillary agreements, and the

23  alternate bid, all of which are approved.  The applicants

24  also requested an order sealing the confidential appendices

25  of the 17th report, pending further order.  In considering

1    this request, I refer to the decision of the Supreme Court of

2    Canada in <u>Sierra Club of Canada v. Canada, Minister of</u>

3    <u>Finance</u> 2002 SCC41, which addresses the issue of a sealing

4    order.  The Supreme Court of Canada held that such orders

5    should only be granted when one, an order is needed to

6    prevent serious risk to an important interest because

7    reasonable alternative measures will not prevent the risk.

8    Two, the salutary effects of the order outweigh its downside

9    effects including effects on the right to free expression

10   which includes public interest in open and access of the

11   court proceedings.  I have reviewed the confidential

12   appendices to the 17th report.  I'm satisfied that the

13   appendices contain sensitive commercial information, the

14   release of which could be prejudicial to the stakeholders.

15   I'm satisfied that the request for a sealing order is

16   appropriate and it is so granted.  And then this claim . . .

17   refer to these two handwritten or one typed, one handwritten

18   endorsements which will be inserted at the appropriate place.

19   The consideration provided by Ericsson pursuant to the sale

20   agreement, in my view, constitutes reasonable equivalent

21   value and fair consideration of the assets, and second other

22   than with respect to the payments and reimbursement of

23   amounts in respect to the bid - Objections?

24           UNIDENTIFIED SPEAKER (VIDEO): I'm sorry.

25           JUSTICE MORAWETZ (VIDEO):  That's good.  Nothing in

1   this order is meant to modify or vary any of the selling

2   debtors' (as such term is defined in the IFA) rights,

3   obligations under the IFA.  It is further acknowledged that

4   Nortel has advised that the interim sales protocol shall be

5   subject to approval by the Court.  An order shall issue in

6   the form presented as amended to give effect to the foregoing

7   reasons.  Thank you, Judge Gross and those in the Canadian

8   Court, those conclude the reasons from the Canadian Court on

9   this issue today.

10          THE COURT: Thank you, Mr. Justice Morawetz.  My

11   ruling will be somewhat briefer because I have the benefit of

12   a very extensive proposed findings of fact in the order which

13   is to be entered, and these findings of fact, I find are

14   fully supported by the record in this case, both the bidding

15   procedures hearing as well as the hearing here today, and the

16   proffers of Mr. Riedel and Mr. Murray, and indeed, the entire

17   record of the case as necessary.  As I said, I have an order

18   to enter which has extensive findings of fact, but most

19   importantly the findings of fact that support the order and

20   the sale are my findings that the notice was completely

21   adequate in this case, that the bidding procedures were fully

22   complied with, that the auction was a vigorous auction which

23   in and of itself establishes a fair consideration for the

24   assets being sold.  There's no better test, of course, than

25   the market test.  That the auction was conducted at arm's

1    length without collusion or fraud and in good faith, and

2    accordingly that the purchaser is entitled to the protections

3    of §§ 363(m) and (n) of the Bankruptcy Code.  That the debtor

4    in entering into the sale agreement with Ericsson constitutes

5    the exercise by the debtors of sound business judgment and

6    such acts are in the best interest of the debtors, their

7    estates, and creditors, and all parties in interest, and

8    there are sufficient business reasons for justifying the

9    sale.  I also find that the alternate bid of Nokia Siemens is

10   an appropriate bid for the same reasons and that in the event

11   Ericsson is unable to close on the transaction, that the

12   debtors may close with Nokia Siemens on the terms set forth

13   at a price of $1,000,325,000 - or is it $325 million, excuse

14   me, if I may, Mr. Bromley.

15          MR. BROMLEY: It's $1,032,500,000.

16          THE COURT: Thank you.  $32,500,000, and for all of

17   those reasons, I am very enthusiastically prepared to enter

18   the sale order in this matter.  Mr. Bromley, anything

19   further?

20          MR. BROMLEY: Nothing further, Your Honor, just our

21   sincere thanks for all of the help that you've given us and

22   also to the Justice on behalf of the debtors, we'd like to

23   thank all that participated, in particular our Official

24   Committee of Unsecured Creditors, the Ad Hoc Bondholders, the

25   Monitor and the bidders, as well as these Courts.  We are

1     very happy with the result, and thank you for your time.

2          THE COURT: Well, it's rare that a bankruptcy judge

3     is able to be enthusiastic but I certainly am enthusiastic

4     about this transaction, and I am very complimentary of the

5     professionals involved, and I wish the purchasers success

6     with these assets, and with that, I suppose, Justice

7     Morawetz, thank you very much, sir.

8          JUSTICE MORAWETZ (VIDEO): Just in closing, Judge

9     Gross, I would also like to express appreciation to all of

10    the counsel and other professionals who worked, obviously,

11    exceedingly hard to produce what I thought were outstanding

12    briefs in a very, very short period of time, that obviously

13    gave me great assistance in preparing these reasons today.

14         THE COURT: Thank you, Justice Morawetz.  And with

15    that, I'm signing the order.

16         MR. BROMLEY: Thank you very much, Your Honor.

17         JUSTICE MORAWETZ (VIDEO): I have signed mine and we

18    stand adjourned.

19         THE COURT: Good day.

20         MR. BROMLEY: Your Honor, we have a few more

21    housekeeping matters in the U.S., if we could.

22         THE COURT: Yes.  Alright, congratulations again.

23         MR. BROMLEY: Thank you very much, Your Honor.  If I

24    could cede the podium to my colleague, Ms. Kim, to go over a

25    couple of -

1          THE COURT: Absolutely, and I should say that anyone

2     who would like to leave the courtroom at this time is welcome

3     to do so.

4          ALL: Thank you, Your Honor.

5          THE COURT: Good day, everyone.  Ms. Kim, it's good

6     to see you.

7          MS. KIM: Good afternoon, Your Honor.  Thank you for

8     indulging.  For the record, Jane Kim from Clearly Gottlieb

9     Steen & Hamilton on behalf of the debtors.  Actually, I don't

10    believe that I need to be up here because I was going to

11    speak about items 4 through 7 of the agenda but I understand

12    that your chambers has been busy putting together orders and

13    entering them -

14         THE COURT: Yes.

15         MS. KIM:  - in response to the CNOs that we filed

16    so unless Your Honor has any further questions, I think that

17    would be it to conclude the agenda for today.

18         THE COURT: Alright.  Thank you, Ms. Kim.  Mr.

19    Abbott, anything further?

20         MR. ABBOTT: Your Honor, there was one matter we

21    brought to Ms. Scaruzzi's attention that the Committee and

22    the debtors and the U.S. Trustee would like to have just a

23    brief moment.

24         THE COURT: Absolutely, we have time.

25         MR. ABBOTT: On a unrelated matter, if we may, Your

1   Honor.

2           THE COURT: Alright.  Come back into chambers and

3   I'll see you there.

4           MR. ABBOTT: Thank you, Your Honor.

5           THE COURT: Good day, everyone, we'll stand in

6   recess.

7           (Whereupon at 4:12 p.m., the hearing in this matter

8   was concluded for this date.)

9

10

11

12

13

14

15

16

17

18           I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   /s/ Elaine M. Ryan_____August 4, 2009
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221