## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------X

*In re*                                               :       Chapter 11

                                                      :

Nortel Networks Inc., *et al.*,[1]                      :       Case No. 09-10138 (KG)

                        Debtors.                      :       Jointly Administered

                                                      :

                                                      :       **Hearing date: August 18, 2009 at 10:00 AM (ET) (requested)**
                                                      :       **Objections due: August 17, 2009 at 12:00 PM (ET) (requested)**

------------------------------------------------------------X

## DEBTORS' MOTION FOR AN ORDER (I) APPROVING AND AUTHORIZING THE DEBTORS TO ENTER INTO AND DELIVER A NEW LEASE AND RELATED DOCUMENTS BY AND BETWEEN NORTEL NETWORKS INC. AND THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, (II) APPROVING THE ABANDONMENT OF PERSONAL PROPERTY, AND (III) WAIVING THE LANDLORD'S REJECTION DAMAGES

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, authorizing (i) the Debtors to enter into and deliver a lease agreement (the "New Lease"), substantially in the form attached hereto as Exhibit B, by and between The Prudential Insurance Company of America (the "Landlord" and, together with NNI, the "Parties"), as landlord, and NNI, as tenant, for premises

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

located at 4655 Great American Parkway, Santa Clara, California (the "Premises"); (ii) the

Debtors to abandon any personal property located at the Former Locations (as defined below) in

accordance with the Abandonment Procedures Order (as defined below); (iii) the Landlord's

waiver of any and all lease rejection or termination damages that may be owing pursuant to

Bankruptcy Code section 365 or 502(b)(6) as a result of the rejection of that certain unexpired

lease of real property by and between NNI and the Landlord, dated as of January 13, 2001 for the

Premises and space in certain other buildings located on the campus in Santa Clara, California,

including in 4555 Great American Parkway and 4557 Great American Parkway (the "Existing

Lease") as consideration for NNI's entry into the New Lease; and (iv) granting such other and

further relief as is just and proper.  In support of this Motion, the Debtors respectfully represent

as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 363, 365

and 554(a) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and

Rules 6004, 6006 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules").

## Background

**A.    Introduction**

3.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario

Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement

Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian

Proceedings").  The Canadian Debtors continue to manage their properties and operate their

businesses under the supervision of the Canadian Court.  Ernst & Young Inc., as court-appointed

Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the

"Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as

foreign main proceedings under chapter 15 of the Bankruptcy Code.  On January 14, 2009, the

Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign

proceeding under section 18.6 of the CCAA.  On February 27, 2009, this Court entered an order

recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the

Bankruptcy Code.  In addition, at 8 p.m. (London time) on January 14, 2009, the High Court of

---

[2]      The Canadian Debtors include the following entities:   NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators").  On May 28, 2009, at the request of the Administrators, the Commercial Court of Versailles, France (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA will continue to operate as a going concern for an initial period of three months.  In accordance with the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA.  On June 8, 2009, Nortel Networks UK Limited ("NNUK") filed petitions in this Court for recognition of the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.  On June 26, 2009, the Court entered an order recognizing the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

6.    On January 15, 2009, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Bankruptcy Rules that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

7.    On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad

---

[3]    The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

hoc group of bondholders holding claims against certain of the Debtors and certain of the

Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner

has been appointed in the Debtors' cases.

       8.     On July 14, 2009, NN CALA, an affiliate of NNI, filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code.  On July 15, NN CALA and the Debtors filed

motions seeking (i) joint administration and consolidation of NN CALA's chapter 11 case with

the Debtors' chapter 11 cases for procedural proposes, and (ii) the application to NN CALA of

certain previously entered orders in the Debtors' chapter 11 cases.

**B.**      **Debtors' Corporate Structure and Business**

       9.     A description of the Debtors' corporate structure and business and the events

leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First

Day Motions and Applications [D.I. 3].

**Relief Requested**

       10.    By this Motion, the Debtors seek an order authorizing and approving (i) NNI to

enter into and deliver the New Lease (ii) the Debtors to abandon any personal property located at

the Former Locations (as defined below) in accordance with the Abandonment Procedures Order

(as defined below); and (iii) the Landlord's waiver of any and all lease rejection or termination

damages pursuant to Bankruptcy Code section 365 or 502(b)(6) with respect to the Existing

Lease in consideration for NNI's entry into the New Lease.  For the reasons discussed below, the

Debtors believe that entering into and delivering the New Lease, abandoning personal property at

Former Locations, and the waiver of the Landlord's lease rejection damages are in the best

interests of the Debtors, their estates and their creditors.

**Facts Relevant to this Motion**

11.     As of the Petition Date, the Debtors were lessees under approximately seventy-five (75) leases of non-residential real property.  Since the Petition Date, the Debtors have rejected forty-six (46) leases and three (3) leases have expired by their terms in the ordinary course of business.  Thus, the Debtors are currently lessees under approximately twenty-six (26) unexpired leases of non-residential real property, including the Existing Lease.[4]

12.     On February 18, 2009, this Court entered an Order Approving Debtors' Motion for Authorization and Approval of Procedures for the Sale or Abandonment of De Minimis Assets [D.I. 322] (the "Abandonment Procedures Order").

13.     On May 7, 2009, this Court entered an Order Pursuant to Section 365(d)(4) of the Bankruptcy Code Extending The Deadline By Which The Debtors Must Assume Or Reject Unexpired Leases Of Nonresidential Real Property, extending the Debtors' time to assume or reject unexpired leases of nonresidential real property through and including August 12, 2009 [D.I. 717] (the "First Extension Order").

14.     On June 26, 2009, this Court entered an Order Under 11 U.S.C. 363(b)(1) And 365(d)(4) Granting Extension Of The Deadline By Which The Debtors Must Assume Or Reject Unexpired Leases Of Non-Residential Real Property Upon Receipt Of Written Consent From Lessors, extending the deadline by which the Debtors must assume or reject an unexpired

---

[4]     The Leases include all unexpired leases of nonresidential real property to which the Debtors are lessees and have not been previously assumed or rejected.  To the extent additional leases of nonresidential real property to which the Debtors are parties exist, the Debtors are seeking an extension of time to assume or reject those leases as well.  For purposes of this Motion, the Debtors may have included certain instruments or financing arrangements that are not true leases, but are included as Leases for the purposes of this Motion in an abundance of caution, so that such instruments will not be deemed automatically rejected if they are found to be true leases after the 120 day period for assumption or rejection allowed by Section 365(d)(4) of the Bankruptcy Code has elapsed.  Inclusion or omission of any instrument as a lease does not constitute an admission by the Debtors that such instrument is or is not a true lease or otherwise.

lease of nonresidential real property upon the Debtors' receipt of a landlord's written consent to such extension [D.I. 965] (the "Second Extension Order").

15.    Currently, the Debtors have received written consents for a 365(d)(4)(B)(ii) extension from a substantial number of landlords, and are in discussions with other landlords to obtain their consent to a 365(d)(4)(B)(ii) extension or reach alternative arrangements. The Debtors also continue to assess which leases may no longer be necessary for their continued business operations.

16.    The Premises are used to house essential facilities, including research and development laboratories, relating to the Enterprise Solutions Business. The Enterprise Solutions Business is currently up for sale. On July 20, 2009 the Debtors and certain other Nortel entities entered into the Asset and Share Sale Agreement with Avaya Inc., which will serve as the stalking horse bid in an auction for the Enterprise Solutions Business to be conducted in accordance with the procedures set forth in the Order Pursuant to Bankruptcy Code Sections 105, 363 and 365 (a) Authorizing Debtors' Entry into the Asset and Share Sale Agreement, (b) Authorizing and Approving the Bidding Procedures, (c) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (d) Approving the Notice Procedures, (e) Approving the Filing of Certain Documents Under Seal, and (G) Setting a Date for the Sale Hearing entered by this Court on August 4, 2009 [D.I. 1278] (the "Bidding Procedures Order").

17.    The Debtors understand that there is no time available on the Court's schedule on or before August 12, 2009 to schedule a hearing to consider the Motion. The next omnibus hearing scheduled in this matter is set for August 18, 2009. The Debtors asked the Landlord to consent to extending the deadline by which the Debtors must assume or reject the Existing Lease pursuant to the Second Extension Order to August 18, 2009. The Landlord has

7

refused to grant the Debtors such an extension. As a result, the Existing Lease will be deemed

rejected as of August 12, 2009. Through this Motion, the Debtors seek to enter into the New

Lease as of August 18, 2009. The Landlord has offered the Debtors no comfort that they will

agree to a hearing to consider the Motion beyond August 18, 2009. However, the Landlord has

agreed that it will refrain from exercising any remedies or lease enforcement actions available to

Prudential under federal and/or state law against the Debtors during the period from August 12,

2009 through and including August 24, 2009. The Debtors reserve all of their rights and

defenses should the Landlord take any action, including without limitation making any demands

to vacate the Premises, whether under bankruptcy law or pursuant to state eviction proceedings.

18.    During the pendency of these chapter 11 cases, the Debtors have

continued to pay rent. As of the date of this Motion, to the Debtors' knowledge, the Debtors

have fulfilled all material obligations of the Existing Lease and have not received a notice of

default from the landlord of the Lease.

19.    The Parties desire to enter into the New Lease to provide the Debtors with

the ability to continue to conduct operations at the Premises. After lengthy negotiations, the

Parties have agreed to enter into the New Lease pending Court approval. As part of the

consideration conveyed to the Debtors in exchange for the New Lease, the Landlord has agreed

to waive any and all rejection or termination damages resulting from the Debtors' rejection of the

Existing Lease (the "Waiver"). Furthermore, under the New Lease, the Debtors have reduced

the square footage of the space they are leasing from the Landlord as compared to the Existing

Lease (any premises governed by the Existing Lease that are not also part of the property leased

to Nortel under the New Lease, the "Former Locations"). In connection with this reduction, the

8

Debtors anticipate they may abandon certain de minimis assets in accordance with the

Abandonment Procedures Order.

      20.    Following lengthy and good faith negotiations, the Parties have agreed to

the key terms of the New Lease.  The New Lease has not been executed and is still subject to

review and approval.  Should the terms of the New Lease change materially, the Debtors intend

to file a supplemental pleading summarizing the changes.  The main terms of the New Lease

are:[5]

- Base Rent:

| Period (In Months) | Annual Base Rent* | Monthly Base Rent* |
|---|---|---|
| 1-12 | $7,250,400.00 | $604,200.00 |
| 13-24 | $7,467,912.00 | $622,326.00 |
| 25-36 | $7,691,949.36 | $640,995.78 |
| 37-48 | $7,922,707.84 | $660,225.65 |
| 49-60 | $8,160,389.08 | $680,032.42 |

- Security Amount:   $1,840,678.20, which is an amount equal to three (3) times the initial monthly Base Rent (for purposes of clarification, however, the Security Amount is not prepaid Rent or allocable to any particular Rent[6] obligations of Tenant).

- Tenant's Project Percentage:  50.11% (includes one-half of the rentable square footage of the Cafetorium).

- Commencement Date:   June 1, 2009.  Landlord and Tenant agree that the Commencement Date is firm, regardless of the date of the rejection or termination of the Prior Nortel Lease.

---

[5] The summaries and descriptions of the terms and conditions of the New Lease set forth in the Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in their entirety by the terms of the New Lease.  In the event there is a conflict between the Motion and the terms of the New Lease, the terms of the New Lease shall control in all respects.

[6] Any capitalized terms not defined herein shall have the meaning ascribed to them in the New Lease.

- Expiration Date:        May 31, 2014.

- Conditions Precedent:        In relevant part, the New Lease will not become effective until the Existing Lease has been terminated or rejected in the bankruptcy proceeding *Nortel Networks Inc., et al.*, Case No. 09-10138-KG, United States Bankruptcy Court, District of Delaware; and Landlord shall have waived any claim for termination or rejection damages or any other damages to which Landlord may have been entitled under 11 U.S.C. Sections 365 or 502(b)(6) with respect to such termination or rejection. Notwithstanding the foregoing, Tenant shall have sixty (60) days from the execution of this Lease to remove its furniture, fixtures, and equipment from space included under the Existing Lease but not a part of the Premises under this Lease, and to relocate the same into the Premises.

- Termination Options: (a)        Provided that at the time of the giving of the Termination Notice, no Event of Default under the New Lease exists or would exist but for the passage of time or the giving of notice, or both, then Tenant shall have the right to terminate this Lease as of December 31, 2010 (the "First Early Termination Date" and such option the "First Termination Option"). If Tenant desires to exercise the First Termination Option, Tenant shall give Landlord written notice (the "Termination Notice") of its election to terminate this Lease no later than June 30, 2010, and the Termination Notice shall be accompanied by a payment (the "First Termination Penalty") to Landlord equal to (i) aggregate Base Rent which would accrue for the eighteen (18) months following the First Early Termination Date, plus (ii) that portion of the leasing commission described in Section 42.1 allocable to the portion of the Term after the First Early Termination Date, if such leasing commission were amortized over the Term on a straight-line basis.

    (b)        Provided that at the time of the giving of the Termination Notice, no Event of Default under the New Lease exists or would exist but for the passage of time or the giving of notice, or both, then Tenant shall have the right to terminate this Lease as of the end of the 36th month of the Term (the "Second Early Termination Date" and such option the "Second Termination Option"). If Tenant desires to exercise the Second Termination Option, Tenant shall give Landlord a Termination Notice at least twelve (12) months prior to the Second Early Termination Date, and the Termination Notice shall be accompanied by a payment (the "Second Termination Penalty") to Landlord equal to (i) aggregate Base Rent which would accrue for the four and one-half (4 1/2) months following the Second Early Termination Date, plus (ii) that portion of the leasing commission described in Section 42.1 allocable to the portion of the Term after the Second Early Termination Date, if such leasing commission were amortized over the Term on a straight-line basis.

## Basis for Relief

A. **Entry Into the New Lease is Authorized Under Sections 105(a) and 363 of the Bankruptcy Code.**

21.     The relief requested herein is authorized by sections 105(a) and 363(b) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105.

22.     Section 363(b) of the Bankruptcy Code permits a debtor to use property of the estate outside of the ordinary course of business after notice and a hearing.  11 U.S.C. § 363. Section 363 applies when an agreement involves the disposition of the estate's assets in such a way that it ventures beyond an ordinary course transaction.  Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996).

23.     The use or transfer of estate property under this provision must be supported by a sound business purpose.  The Committee of Equity Security Holders v. Lionel Corporation (In re Lionel Corporation), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Industries, Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); The Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); Travelers Casualty and Surety Company v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008).

24.     A court reviews the business justifications provided by a debtor by applying the business judgment rule.  That rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest

11

belief that the action was in the best interests of the company." In re Integrated Res., Inc., 147

B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

The rule operates from a presumption that the debtor's decision is reasonable. See id. A court

determining whether a sound business purpose justifies the transaction "should consider all

salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of

the debtor, creditors and equity holders, alike." In re Montgomery Ward, 242 B.R. at 153-54

(quoting In re Lionel, 722 F.2d at 1071). In addition, a Debtor must show that the transaction

has been proposed in good faith, that adequate and reasonable notice has been provided, and that

it is receiving fair and reasonable value in exchange. See In re Delaware & Hudson Ry. Co., 124

B.R. at 176; In re Decora Industries, Inc., 2002 WL 32332749, at *2.

      25.     Approval of a debtor's decision to enter into a contract and use estate

property under section 363 is in harmony with a court's equity powers. Under section 105(a) of

the Bankruptcy Code, the Court is imbued with expansive equitable powers to fashion any order

or decree that preserves the value of the debtor's estate and thereby protects the creditors'

interests in distribution of the debtor's assets. See, e.g., Bird v. Crown Convenience (In re

NWFX, Inc.), 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy

. . . is that equitable principles govern.") (citations omitted); In re Cooper Properties Liquidating

Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) ("[T]he Bankruptcy Court is one of

equity and as such it has a duty to protect whatever equities a debtor may have in property for the

benefit of their creditors as long as that protection is implemented in a manner consistent with

the bankruptcy laws.") (citation omitted).

      26.     The Debtors' decision to enter into the New Lease is premised on several

business justifications. As set forth above, the Premises governed by the New Lease are

important to Nortel's Enterprise Solutions Business, which is currently up for sale in accordance with the terms of the Bidding Procedures Order. They contain laboratory space and equipment, which is very difficult and costly to relocate. Moreover, employees essential to the research and development efforts of the Enterprise Solutions Business are also based out of the Premises. It is likely that the Premises would be subleased to any purchaser of the Enterprise Solutions Business in accordance with the proposed sale. Furthermore, the Landlord has indicated that it is unwilling to grant an extension of the lease rejection deadline with respect to the Existing Lease. Entry into the New Lease will ensure that the Debtors have a lease in place to govern their tenancy at the Premises. As a result, entering into the New Lease will prevent disruption to Nortel's business operations and its customer obligations.

27.     Furthermore, entering into the New Lease is preferable to assuming the Existing Lease given the reduction in rent and square footage contemplated by the New Lease. As part of the consideration conveyed to the Debtors for entering into the New Lease, the Landlord has also agreed to the Waiver, which will save the Debtors from paying any claim that the Landlord would otherwise have for termination or rejection damages arising from the rejection of the Existing Lease. Thus, the Debtors believe that entry into the New Lease is in the best interests of the Debtors' estates and their stakeholders.

28.     The Debtors exercised deliberate care while negotiating the terms of the New Lease and the conditions of the Parties' entry into the New Lease. These qualities are shown in the terms and conditions of the New Lease, such as the contingencies favoring the Debtors, and are fair and reasonable. Thus, the business judgment rule has been met and the Court may approve the New Lease.

**B.     The Abandonment of Personal Property is**
       **Authorized Under Section 554(a) of the Bankruptcy Code.**

29.     Although the Debtors believe they have removed, or are in the process of removing, all personal property of more than *de minimis* value from the Former Locations, to the extent that the Debtors leave any property, including, but not limited to, personal property, furniture, fixtures and/or equipment (collectively, "Personal Property"), at the Former Locations, the Debtors request that such Personal Property be deemed abandoned pursuant to Section 554 of the Bankruptcy Code in accordance with the procedures set forth in the Abandonment Procedures Order.

30.     Section 554(a) of the Bankruptcy Code provides that "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a).

31.     The Debtors submit that any Personal Property remaining in the Former Locations will be of inconsequential value or burdensome to the Debtors' estates to remove. The Debtors believe that the cost of retrieving, marketing and reselling the abandoned Personal Property far outweighs any recovery the Debtors could hope to attain for the Personal Property. Accordingly, the Debtors have determined that the abandonment of any such Personal Property in accordance with the procedures set forth in the Abandonment Procedures Order is in the best interests of the Debtors, their estates and creditors.

**D.     The Landlord's Waiver of Any and All Lease Rejection or**
       **Termination Damages in Consideration for the**
       **Debtors' Entry Into the New Lease is Authorized by Rule 9019.**

32.     Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed.

R. Bankr. P. 9019. Under this authority, the Third Circuit has emphasized that "[c]ompromises are favored in bankruptcy." Martin, 91 F.3d at 393 (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)). In addition, the District of Delaware has recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy court. See In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

33.    Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the interest of the estate." In re Marvel Entertainment Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997)). Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation." Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968). The court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in a range of reasonableness." Travelers, 2008 WL 821088, at *5 (citing Matter of Jasmine, Ltd., 258 B.R. 119 (D.N.J. 2000); Coram, 315 B.R. at 330; Pennsylvania Truck Lines, 150 B.R. at 598. The court need not be convinced that the settlement is the best possible compromise in order to approve it. Coram, 315 B.R. at 330.

34.    The Third Circuit has set out four criteria for a bankruptcy court to consider when evaluating a settlement proposal (the "Martin Factors"): "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Martin, 91 F.3d at 393.

35.    The Debtors respectfully submit that the Debtors' entry into the New Lease in exchange for the Landlord's Waiver meets each of the requirements under Bankruptcy

Rule 9019.  The Landlord agreed to enter into the Waiver as part of the consideration it conveyed to NNI in exchange for its entry into the New Lease.  The compromise is fair and reasonable.  As set forth above, entry into the New Lease is more beneficial to the Debtors' estates than the assumption of the Existing Lease or not entering into a new lease to govern the Debtors' tenancy at the Premises.  Furthermore, if the Landlord did not agree to the Waiver, the Debtors and the Landlord may be forced to litigate the proper amount of the Landlord's rejection damages.  Any such lawsuit is likely to be complicated and drawn out given the factual nature of the dispute, and will drain resources from the Debtors' estates and detract attention from other important matters facing the Debtors' estates.

### Notice

36.     Notice of the Motion has been given via overnight mail to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) counsel to the Landlord; and (v) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

### No Prior Request

37.     No prior request for the relief sought herein has been made to this or any other court.

16

Dated:  August 7, 2009
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley
Lisa M. Schweitzer
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*

17