**EXHIBIT B**

# LEASE AGREEMENT

**By and Between**

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,**
a New Jersey corporation

**("Landlord")**

**and**

**NORTEL NETWORKS INC.,**
a Delaware corporation

**("Tenant")**

**June 1, 2009**

## LEASE AGREEMENT

This LEASE AGREEMENT, (this "Lease") is made and entered into as of June 1, 2009 by and between THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation ("Landlord"), and NORTEL NETWORKS INC., a Delaware corporation ("Tenant").

### BASIC LEASE INFORMATION

Premises:  The North Building, outlined in Exhibit B to this Lease.

North Building:  The building commonly known as 4655 Great America Parkway, Santa Clara, California.

South Building:  The building commonly known as 4555 Great America Parkway, Santa Clara, California .

Cafetorium:  The building located east of the South Building, containing approximately 19,800 square feet.

Base Rent:

| Period (In Months) | Annual Base Rent* | Monthly Base Rent* |
|---|---|---|
| 1-12 | $7,250,400.00 | $604,200.00 |
| 13-24 | $7,467,912.00 | $622,326.00 |
| 25-36 | $7,691,949.36 | $640,995.78 |
| 37-48 | $7,922,707.84 | $660,225.65 |
| 49-60 | $8,160,389.08 | $680,032.42 |

* The initial Annual Base Rent is equal to twelve times the initial Monthly Base Rent, which such amount is based on a rate per rentable square foot of $1.90, times the 318,000 rentable square feet (being the square footage of Rentable Area of the Premises plus one-half of the Rentable Area of the Cafetorium).  If a remeasurement of the Premises pursuant to Section 1.2 results in a different Rentable Area than set forth in the foregoing sentence, then the initial Lease Year's Monthly Base Rent and Annual Base Rent shall be recalculated upward or downward, as the case may be, and the Base Rent for subsequent Lease Years shall calculated on the revised Annual Rent figure plus a three percent (3%) increase per Lease Year.

Security Amount:       $1,840,678.20, which is an amount equal to three (3) times the initial monthly Base Rent (for purposes of clarification, however, the Security Amount is not prepaid Rent or allocable to any particular Rent obligations of Tenant).

Tenant's Project Percentage:  50.11% (includes one-half of the rentable square footage of the Cafetorium).

1

Commencement Date:          June 1, 2009.  Landlord and Tenant agree that the Commencement Date is firm, regardless of the date of the rejection or termination of the Prior Nortel Lease (as defined below).

Expiration Date:            May 31, 2014.

Landlord's Address:

c/o Prudential Real Estate Investors
4 Embarcadero Center, Suite 2700
San Francisco, California 94111
Attention:  Jeff Mills

With a copy by the same method to:

The Prudential Insurance Company of America
8 Campus Drive, 4th Floor
Parsippany, New Jersey  07054
Attention:  Greg Shanklin, Esquire

With a copy by the same method to:

Lewis and Roca LLP
40 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
Attention:  Andy Carper, Esquire

Address for rental payments:

c/o Harvest Properties
6475 Christie Avenue, Suite 550
Emeryville, California 94608
Attention:  Mark Chedekel

Tenant's Address:

2221 Lakeside Boulevard
MS 991-01-A10
Richardson, Texas 75082
Attention:  Real Estate Department

Tenant's Broker:            Fischer & Company

Parking Allocation:          Nine hundred fifty-four (954), which is based on three (3) spaces per 1,000 rentable square feet of area in the Premises.  These spaces include the area taken up by the Trailers, as defined in Section 16.4(c) and shown on Exhibit C.

2

<u>Prior Nortel Lease</u>:           That certain Lease Agreement dated as of December 13, 2001, by and between Landlord, as "Lessor", and Tenant, as "Lessee".

The Basic Lease Information is incorporated into and made a part of this Lease. Each reference in this Lease to any Basic Lease Information shall mean the applicable information set forth in the Basic Lease Information, except that in the event of any conflict between an item in the Basic Lease Information and this Lease, this Lease shall control. Additional defined terms used in the Basic Lease Information shall have the meanings given those terms in this Lease.

ARTICLE 1
PREMISES

1.1     Subject to all of the terms and conditions hereinafter set forth, and subject to the satisfaction of the Conditions Precedent (as defined in Section 1.3 below), Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises. The land described on <u>Exhibit A</u> to this Lease and all improvements thereon and appurtenances on that land thereto, including, but not limited to, the North Building, the Cafetorium, the South Building, parking, structures and parking areas, access roadways, and all other related areas, shall be collectively hereinafter referred to as the "Project." Subject to (a) all of the terms and conditions of this Lease, including the Rules and Regulations attached hereto as <u>Exhibit D</u>, (b) emergency situations or other matters outside the reasonable control of Landlord, and (c) the requirements of applicable laws, Tenant shall have access to and use of the Premises, and a non-exclusive right to use (i) the Common Areas in common with other tenants in the Project, 24 hours per day, 7 days per week, 365 days per year throughout the Lease term, and (ii) the Cafetorium during such hours as Landlord shall reasonably determine and on request for scheduled meetings, as available and per procedures to be reasonably established by Landlord. In the event of a conflict between this Lease and the Rules and Regulations, this Lease shall control.

1.2     For purposes of this Lease, (1) "<u>rentable area</u>" and "<u>usable area</u>" shall be calculated pursuant to the Standard Method for Measuring Floor Area in Office Buildings (ANSI/BOMA Z65.1, 1996 for a single tenant occupied building); (2) "<u>rentable square feet</u>" and "<u>rentable footage</u>" shall have the same meaning as the term "rentable area;" and (3) "<u>usable square feet</u>" and "<u>usable square footage</u>" shall have the same meaning as the term "usable area", <u>provided</u> that the rentable square footage of the Premises and the other buildings in the Project shall include all of (and the rentable square footage of the Premises, therefore, shall include a portion of) (i) the Common Areas and (ii) the occupied space of the portion of the Project dedicated to the service of the Project. The rentable square feet of the Premises, North Building, and the Project (a) shall be remeasured within one hundred thirty-five (135) days of the Commencement Date by an architect reasonably acceptable to each of Landlord and Tenant, with the cost thereof split evenly between Landlord and Tenant, and using the Standard Method for Measuring Floor Area in Office Buildings (ANSI/BOMA Z65.1, 1996 for a single tenant occupied building) and such other joint instructions as may be required and are reasonably agreed to by Landlord and Tenant; and (b) are thereafter subject to verification from time to time by Landlord's planner/designer at Landlord's cost and such verification shall be made in

accordance with the provisions of this Article 1.  If the remeasurement under foregoing clause (a), or a determination by Landlord's planner/designer under foregoing clause (b), determines that the amounts thereof are different from those set forth in this Lease, all amounts, percentages and figures appearing or referred to in this Lease based upon such incorrect amount (including, without limitation, the amount of the "Rent" and the "Security Amount," as those terms are defined in this Lease) shall be modified in accordance with such determination, either prospectively in the case of a clause (b) remeasurement or from the Commencement Date in the case of a clause (a) remeasurement.  If such determination is made, it will be confirmed in writing by Landlord and Tenant.

      1.3     The occurrence of the following, or the waiver of such requirement by Landlord in Landlord's sole and absolute discretion, shall be conditions precedent to the effectiveness of this Lease (the "Conditions Precedent"):

      (a)     The Prior Nortel Lease has been terminated or rejected in the bankruptcy proceeding *Nortel Networks Inc., et al.*, Case No. 09-10138-KG, United States Bankruptcy Court, District of Delaware; and Landlord shall have waived any claim for termination or rejection damages or any other damages to which Landlord may have been entitled under 11 U.S.C. Sections 365 or 502(b)(6) with respect to such termination or rejection.  Notwithstanding the foregoing, Tenant shall have sixty (60) days from the execution of this Lease to remove its furniture, fixtures, and equipment from space included under the Prior Nortel Lease but not a part of the Premises under this Lease, and to relocate the same into the Premises;

      (b)     Prior to the occurrence of the termination or rejection described in clause (a), Landlord shall have received (i) an estoppel from each subtenant and sub-subtenant under the Prior Nortel Lease, each such estoppel to be reasonably acceptable to Landlord, and (ii) an attornment from each subtenant in the South Building, whereby such subtenant agrees that upon the termination of the Prior Nortel Lease such subtenant shall become a direct tenant of Landlord in the South Building, under the terms of such subtenant's sublease as of June 1, 2009, subject to clause (c) below, and Tenant hereby agrees that it will reasonably cooperate, at its costs, with causing the existing subtenants to issue such estoppels and provide such attornments; and

      (c)     Landlord shall have received such amendments to the subleases for subtenants in the South Building as Landlord may reasonably request, and Tenant hereby agrees that it will reasonably cooperate, at its costs, with causing the existing subtenants to agree to such amendments, provided, that the receipt of such amendments shall not be a Condition Precedent so long as Landlord has received the acceptable estoppel and the attornment described in clause (b).

      1.4     Landlord is in discussions with SODEXO, a division of Marriott ("Provider"), counterparty to a services contract with Tenant, for the provision of cafeteria services at the Cafetorium prior to the date hereof (the "Prior Cafetorium Contract").  Landlord shall use commercially reasonable efforts to negotiate a services contract for the provision of cafeteria services at the Cafetorium with Provider, or with another food services provider reasonably acceptable to Landlord (the "New Cafetorium Contract"), and Landlord shall enter

into the New Cafetorium Contract within three (3) months of the Commencement Date.  Tenant shall continue operations under and keep in force and effect the Prior Cafetorium Contract until no earlier than August 31, 2009; provided, that promptly after the effectiveness of the New Cafetorium Contract, the Tenant shall provide reasonable evidence that the Prior Cafetorium Contract has been terminated.

ARTICLE 2
TERM AND CONDITION OF PREMISES

2.1     The term of this Lease (the "Term") shall commence on the Commencement Date and end on the Expiration Date, unless sooner terminated (the actual date of Lease termination is referred to as the "Termination Date") as hereinafter provided.  The Commencement Date of this Lease and the obligation of Tenant to pay Base Rent, Additional Rent and all other charges hereunder shall not be delayed or postponed by reason of any delay by Tenant in performing changes or alteration in the Premises not required to be performed by Landlord.

2.2     Landlord has no obligation to construct improvements in the Premises, which are accepted by Tenant in their "as is, where is" condition.

2.3     Tenant shall have two (2) options to terminate this Lease prior to the Expiration Date.

(a)     Provided that at the time of the giving of the Termination Notice (as defined herein), no Event of Default under Sections 22.1(a) exists or would exist but for the passage of time or the giving of notice, or both, then Tenant shall have the right to terminate this Lease as of December 31, 2010 (the "First Early Termination Date" and such option the "First Termination Option").  If Tenant desires to exercise the First Termination Option, Tenant shall give Landlord written notice (the "Termination Notice") of its election to terminate this Lease no later than June 30, 2010, and the Termination Notice shall be accompanied by a payment (the "First Termination Penalty") to Landlord equal to (i) aggregate Base Rent which would accrue for the eighteen (18) months following the First Early Termination Date, plus (ii) that portion of the leasing commission described in Section 42.1 allocable to the portion of the Term after the First Early Termination Date, if such leasing commission were amortized over the Term on a straight-line basis.

(b)     Provided that at the time of the giving of the Termination Notice, no Event of Default under Sections 22.1(a) exists or would exist but for the passage of time or the giving of notice, or both, then Tenant shall have the right to terminate this Lease as of the end of the 36th month of the Term (the "Second Early Termination Date" and such option the "Second Termination Option").  If Tenant desires to exercise the Second Termination Option, Tenant shall give Landlord a Termination Notice at least twelve (12) months prior to the Second Early Termination Date, and the Termination Notice shall be accompanied by a payment (the "Second Termination Penalty") to Landlord equal to (i) aggregate Base Rent which would accrue for the four and one-half (4 1/2) months following the Second Early Termination Date, plus (ii) that portion of the

5

leasing commission described in Section 42.1 allocable to the portion of the Term after the Second Early Termination Date, if such leasing commission were amortized over the Term on a straight-line basis.

(c)     If this Lease is properly terminated pursuant to this Section 2.3, then Landlord shall prepare and Tenant shall execute a termination agreement confirming the termination and the terms thereof (the "Termination Agreement"), pursuant to which both parties shall be released from all obligations accruing under the Lease after the effective date of such termination, but not any obligations accruing under the Lease prior to the effective date of such termination or those Lease obligations expressly surviving the termination of the Lease.  If Tenant does not deliver a Termination Notice within the time period set forth above, or if Tenant fails to deliver a Termination Penalty contemporaneously with the Termination Notice, Tenant's right to terminate the Lease pursuant to this Section 2.3 shall automatically become null and void and of no further force or effect.  Time is of the essence with respect to the giving of the Termination Notice and the payment of the Termination Penalty.

2.4     The taking of possession of the Premises by Tenant shall be conclusive evidence that the Premises and the Project were in good and satisfactory condition at the time possession was taken by Tenant.  Neither Landlord nor Landlord's agents have made any representations or promises with respect to the condition of the Project, the Premises, the land upon which the Project is constructed, or any other matter or thing affecting or related to the Project or the Premises, except as herein expressly set forth, and no rights, easements or licenses are acquired by Tenant by implication or otherwise except as expressly set forth in this Lease.

ARTICLE 3
USE, NUISANCE, OR HAZARD

3.1     The Premises shall be used and occupied by Tenant solely for research and development use, including without limitation general office purposes, electronic laboratory purposes, and customer demonstrations, and for no other purposes inconsistent with prior usage without the prior written consent of Landlord.

3.2     Tenant shall not use, occupy, or permit the use or occupancy of the Premises for any purpose which Landlord, in its reasonable discretion, deems to be illegal, immoral, or dangerous; permit any public or private nuisance; do or permit any act or thing which may disturb the quiet enjoyment of any other tenant of the Project; keep any substance or carry on or permit any operation which might introduce offensive odors or conditions into other portions of the Project, use any apparatus which might make undue noise or set up vibrations in or about the Project; permit anything to be done which would increase the premiums paid by Landlord for special causes of loss form property insurance on the Project or its contents or cause a cancellation of any insurance policy covering the Project or any part thereof or any of its contents; or permit anything to be done which is prohibited by or which shall in any way conflict with any law, statute, ordinance, or governmental rule, regulation or covenants, conditions and restrictions affecting the Project, now or hereinafter in force.  Should Tenant do any of the foregoing without the prior written consent of Landlord, and the same is not cured within ten (10) business days after notice from Landlord (which ten (10) business day period shall be

6

subject to extension if the nature of the breach is such that it is not possible to cure the same within such ten (10) business day period so long as the Tenant commences the cure of such breach within such ten (10) day period and diligently prosecutes the same to completion) it shall constitute an Event of Default (as hereinafter defined) and shall enable Landlord to resort to any of its remedies hereunder.

3.3    This Lease and Tenant's operating, maintenance and use of the Premises are subject to all matters of record that affect the Project or the Premises, including without limitation all covenants, conditions and restrictions contained in instruments recorded or to be recorded against title to the Project ("CC&R's"). Tenant agrees that regardless of when those CC&R's are so recorded, this Lease and all provisions hereof shall be subject and subordinate thereto. Tenant shall, promptly upon request of Landlord, sign all documents reasonably required to carry out the foregoing into effect. In addition to and without limiting the foregoing, as between Landlord and Tenant, Tenant shall be solely liable for all costs and performance obligations arising under or with respect to (a) that certain Agreement and Covenant Running with the Land to Maintain Two Non-Standard Driveway Approaches by and between Tenant and the City of Santa Clara ("City"), recorded in the Official Records of Santa Clara County, California (the "Official Records") as Document No. 1607183 (the "Driveway Easement"), and (b) that certain Street Encroachment License from the City of Santa Clara, recorded in the Official Records as Document No. 17783576 (the "Facility Easement"), including without limitation the costs of removing the Improvements (as defined in the Driveway Easement) and of removing or sealing the Facility (as defined in the Facility Easement). The foregoing allocation of costs and obligations shall survive the expiration or earlier termination of the Lease and Tenant's right to use and possession of the Premises.

ARTICLE 4
RENT

4.1    Tenant hereby agrees to pay Landlord the Base Rent. For purposes of Rent adjustment under the Lease, the number of months is measured from the first day of the calendar month in which the Commencement Date falls. Each monthly installment (the "Monthly Rent") shall be payable at Tenant's option by check or by money order, or by wire transfer (through such wiring instructions as Landlord may provide from time to time, upon request by Tenant), in each case on or before the first day of each calendar month. In addition to the Base Rent, Tenant also agrees to pay Tenant's Share of the Operating Expenses and Taxes (each as hereinafter defined), and any and all other sums of money as shall become due and payable by Tenant as hereinafter set forth, all of which shall constitute additional rent under this Lease (the "Additional Rent"). The Monthly Rent and the Additional Rent are sometimes hereinafter collectively called "Rent" and shall be paid when due in lawful money of the United States without demand, deduction, abatement, or offset to the address for rental payment set forth in the Basic Lease Information, or as Landlord may designate from time to time. Landlord expressly reserves the right to apply any payment received to Base Rent or any other items of Rent that are not paid by Tenant.

4.2    In the event any Monthly Rent or Additional Rent or other amount payable by Tenant hereunder is not paid within five (5) days after its due date, Tenant shall pay to

7

Landlord within thirty (30) days of such fifth (5th) day a late charge (the "Late Charge"), as Additional Rent, in an amount of five percent (5%) of the amount of such late payment. Failure to pay any Late Charge shall be deemed a Monetary Default (as hereinafter defined). Provision for the Late Charge shall be in addition to all other rights and remedies available to Landlord hereunder, at law or in equity, and shall not be construed as liquidated damages or limiting Landlord's remedies in any manner. Failure to charge or collect such Late Charge in connection with any one (1) or more such late payments shall not constitute a waiver of Landlord's right to charge and collect such Late Charges in connection with any other similar or like late payments.

       4.3       Simultaneously with the execution hereof, Tenant shall deliver to Landlord (i) an amount equal to the first month's Base Rent as payment of the first installment of Monthly Rent due hereunder and (ii) an amount equal to the Security Amount Amount to be held by Landlord as security for Tenant's faithful performance of all of the terms, covenants, conditions, and obligations required to be performed by Tenant hereunder (the "Security Amount"). The Security Amount shall be held by Landlord as security for the performance by Tenant of all of the covenants of this Lease to be performed by Tenant and Tenant shall not be entitled to interest thereon. The Security Amount is not an advance rent deposit, an advance payment of any other kind, or a measure of Landlord's damages in any case of Tenant's default. If Tenant fails to perform any of the covenants of this Lease to be performed by Tenant, including without limitation the provisions relating to payment of Rent, the removal of property at the end of the term, the repair of damage to the Premises caused by Tenant, and the cleaning of the Premises upon termination of the tenancy created hereby, then Landlord shall have the right, but no obligation, to apply the Security Amount, or so much thereof as may be necessary, for the payment of any Rent or any other sum in default and/or to cure any other such failure by Tenant. If Landlord applies the Security Amount or any part thereof for payment of such amounts or to cure any such other failure by Tenant, then Tenant shall immediately pay to Landlord the sum necessary to restore the Security Amount to the full amount then required by this Section 4.3 Landlord's obligations with respect to the Security Amount are those of a debtor and not a trustee. Landlord shall not be required to maintain the Security Amount separate and apart from Landlord's general or other funds and Landlord may commingle the Security Amount with any of Landlord's general or other funds. Upon termination of the original Landlord's or any successor owner's interest in the Premises or the Project, the original Landlord or such successor owner shall be released from further liability with respect to the Security Amount upon the original Landlord's or such successor owner's complying with California Civil Code Section 1950.7. Subject to the foregoing, Tenant hereby waives the provisions of Section 1950.7 of the California Civil Code, and all other provisions of law, now or hereafter in force, which (a) establish a time frame within which a landlord must refund a security deposit under a lease, and/or (b) provide that Landlord may claim from a security deposit only those sums reasonably necessary to remedy defaults in the payment of Rent, to repair damage caused by Tenant or to clean the Premises, it being agreed that Landlord may, in addition, claim those sums reasonably necessary to compensate Landlord for any other loss or damage caused by the default of Tenant under this Lease, including without limitation all damages or Rent due upon termination of this Lease pursuant to Section 1951.2 of the California Civil Code. If Tenant performs every provision of this Lease to be performed by Tenant, the unused portion of the Security Amount shall be returned to Tenant or the last assignee of Tenant's interest under this Lease within thirty (30) days following expiration or termination of the term of this Lease.

4.4     If the Term commences on a date other than the first day of a calendar month or expires or terminates on a date other than the last day of a calendar month, the Rent for any such partial month shall be prorated to the actual number of days Tenant is in occupancy of the Premises for such partial month.

4.5     All Rents and any other amount payable by Tenant to Landlord hereunder, if not paid when due, shall bear interest from the date due until paid at a rate equal to the prime commercial rate established from time to time by Bank of America, plus four percent (4%) per annum; but not in excess of the maximum legal rate permitted by law.  Failure to charge or collect such interest in connection with any one (1) or more delinquent payments shall not constitute a waiver of Landlord's right to charge and collect such interest in connection with any other or similar or like delinquent payments.

4.6     If Tenant fails to make when due two (2) consecutive payments of Monthly Rent or makes two (2) consecutive payments of Monthly Rent which are returned to Landlord by Tenant's financial institution for insufficient funds, Landlord may require, by giving written notice to Tenant, that all future payments of Rent shall be made in cashier's check or by money order.  The foregoing is in addition to any other remedy of Landlord hereunder, at law or in equity.

4.7     Tenant shall promptly forward to Landlord any rent or consideration received from any subtenant and sub-subtenant in the South Building (as described in Section 1.3 above) for any period from and after June 1, 2009, in the event that any such party pays such rent or consideration to Tenant instead of Landlord.  This obligation shall survive the expiration or earlier termination of the Lease and Tenant's right to use and possession of the Premises.  Any such amounts paid prior to the effective date of this Lease shall be paid in three equal installments in the first three months after the effective date of this Lease.

ARTICLE 5
RENT ADJUSTMENT

5.1     Definitions.

(a)     "Operating Expenses", as such term is used herein, shall mean all expenses, costs, and disbursements of every kind and nature which Landlord shall pay or become obligated to pay because of or in connection with the ownership, operation, or maintenance of the Project.  Operating Expenses shall be computed in accordance with generally accepted real estate practices, consistently applied, and shall include, but not be limited to, the items as listed below:

(i)     Wages, salaries, and any and all employment, unemployment and social security taxes, insurance and benefits of the property manager and any clerical, maintenance, or other management employees directly associated with the operation of the Project;

(ii)     All expenses for the property management office including rent, office supplies, and materials therefor, and the property management fee paid to the property manager;

(iii)     All supplies, materials, and tools used by the property manager and/or Landlord in connection with the Project;

(iv)     All costs incurred in connection with the operation, maintenance, and repair of the Project including, but not limited to, the following: elevators; heating, ventilating and air conditioning systems and other building and mechanical systems; roof and roof membranes; security; cleaning and janitorial; parking lot and landscape; window washing; building painting; and license, permit and inspection fees;

(v)     Costs of water, pure water, sewer, electric, and any other utility charges, subject however to Section 6.6;

(vi)     Costs of casualty, rental interruption, and liability insurance, and any deductibles payable thereunder including without limitation Landlord's cost of any self insurance deductible or retention;

(vii)     Capital improvements made to or capital assets acquired for the Project after the Commencement Date that (1) are intended to reduce Operating Expenses or (2) are reasonably necessary for the health and safety of the occupants of the Project or (3) are required under any and all applicable laws, statutes, codes, ordinances, orders, rules, regulations, conditions of approval and requirements of all federal, state, county, municipal and governmental authorities and all administrative or judicial orders or decrees and all permits, licenses, approvals and other entitlements issued by governmental entities relating to or affecting the Project, the Premises or the North Building or the use or operation thereof, whether now existing or hereafter enacted, including, without limitation, the Americans with Disabilities Act of 1990, 42 USC 12111 et seq. (the "ADA") as the same may be amended from time to time, all Environmental Laws (as hereinafter defined), and any CC&Rs, or any corporation, committee or association formed in connection therewith, or any supplement thereto recorded in any official or public records with respect to the Project or any portion thereof (collectively, "Applicable Laws"), which capital costs shall be amortized over the useful life of the improvements, together with interest on the unamortized balance at a rate of ten percent (10%) per annum;

(viii)     Reasonable out-of-pocket legal, accounting, inspection, and consultation fees incurred in connection with the operation of the Project; and property and parking association fees and dues, central plant charges, and all payments under any CC&Rs; and

(ix)     Any other costs incurred by Landlord related to the Project as a whole which are not excluded by clauses (x) through (xxv), including any

amenities provided from time to time by Landlord, if any, such as the Cafetorium and a fitness center.

Expressly excluded from Operating Expenses are the following items:

(x)    Advertising and leasing commissions;

(xi)    Repairs and restoration paid for by the proceeds of any insurance policies or amounts otherwise reimbursed to Landlord or paid by any other source (other than by tenants paying their share of Operating Expenses);

(xii)    Principal, interest, and other costs directly related to financing the Project or ground lease rental or depreciation;

(xiii)    The cost of non-standard or unique services provided to one or more tenants (including Tenant);

(xiv)    The costs of repair of casualty damage or for restoration following condemnation to the extent covered by insurance proceeds or condemnation awards;

(xv)    The costs of any capital expenditures except as expressly permitted to be included in Operating Expenses as provided under clauses (vi) and (vii) above;

(xvi)    The costs, including permit, license and inspection costs and supervision fees, incurred with respect to the installation of tenant improvements within the Project or incurred in renovating or otherwise improving, decorating, painting or redecorating vacant space within the Project or promotional or other costs in order to market space to potential tenants;

(xvii)    The legal fees and related expenses and legal costs incurred by Landlord (together with any damages awarded against Landlord) due to the material violation by Landlord or any tenant of the terms and conditions of any other lease of space in the Project;

(xviii)    The costs incurred:  (x) to comply with Applicable Laws with respect to any Hazardous Materials (as defined below) which were in existence in, on, under or about the Project (or any portion thereof) prior to the Commencement Date, and were of such a nature that a federal, state or municipal governmental or quasi-governmental authority, if it had then had knowledge of the presence of such Hazardous Materials, in the state, and under the conditions that they then existed in, on, under or about the Project, would have then required the removal, remediation or other action with respect thereto; (y) with respect to Hazardous Materials which are disposed of or otherwise introduced into, on, under or about the Project after the date hereof by Landlord and are of such a nature, at time of disposition or introduction, that a federal, state or municipal

11

governmental or quasi-governmental authority, if it had then had knowledge of the presence of such Hazardous Materials, in the state, and under the conditions, that they then existed in, on, under or about the Project, would have then required the removal, remediation or other action with respect thereto; provided, however, Operating Expenses shall include costs incurred in connection with the clean-up, remediation, monitoring, management and administration of (and defense of claims related to) the presence of (1) Hazardous Materials used by Landlord (provided such use is not negligent and is in compliance with Applicable Laws) in connection with the operation, repair and maintenance of the Project to perform Landlord's obligations under this Lease (such as, without limitation, fuel oil for generators, cleaning solvents, and lubricants) and which are customarily found or used in Comparable Buildings and (2) Hazardous Materials created, released or placed in the Premises, Building or the Project by Tenant (or Tenant's affiliates or their tenants, contractors, employees or agents) prior to or after the Commencement Date;

   (xix) The attorneys' fees in connection with the negotiation and preparation of letters, deal memos, letters of intent, leases, subleases and/or assignments, space planning costs, and other costs and expenses incurred in connection with lease, sublease and/or assignment negotiations and transactions with other present or prospective tenants or other occupants of the Project;

   (xx) The overhead and profit paid to Landlord or to subsidiaries or affiliates of Landlord for goods and/or services in the Project to the extent the same exceeds the costs of such goods and/or services rendered by qualified, unaffiliated third parties on a competitive basis;

   (xxi) The costs arising from Landlord's charitable or political contributions;

   (xxii) The interest and penalties resulting from Landlord's failure to pay any items of Operating Expense when due, except to the extent arising solely from Tenant's failure to pay Rent;

   (xxiii) The Landlord's general corporate overhead and general and administrative expenses, costs of entertainment, dining, automobiles or travel for Landlord's employees, and costs associated with the operation of the business of the partnership or entity which constitutes Landlord as the same are distinguished from the costs of the operation of the Project, including partnership accounting and legal matters, costs of defending any lawsuits with any mortgagee, costs of selling, syndicating, financing, mortgaging or hypothecating any of Landlord's interest in the Project, costs of any disputes between Landlord and its employees (if any) not engaged in the operation of the Project, disputes of Landlord with management, or outside fees paid in connection with disputes with other Project tenants or occupants (except to the extent such dispute is based on Landlord's good faith efforts to benefit Tenant or meet Landlord's obligations under this Lease);

(xxiv)    The costs arising from the gross negligence or willful misconduct of Landlord; and

(xxv)    The costs of correction of latent defects in the Project.

(b)    "Taxes" shall mean all ad valorem taxes, personal property taxes, and all other taxes, assessments, embellishments, use and occupancy taxes, transit taxes, water, sewer and pure water charges not included in Section 5.1.(a)(v) above, excises, levies, license fees or taxes, and all other similar charges, levies, penalties, or taxes, if any, which are levied, assessed, or imposed, by any Federal, State, county, or municipal authority, whether by taxing districts or authorities presently in existence or by others subsequently created, upon, or due and payable in connection with, or a lien upon, all or any portion of the Project, the North Building, or facilities used in connection therewith, and rentals or receipts therefrom and all taxes of whatsoever nature that are imposed in substitution for or in lieu of any of the taxes, assessments, or other charges included in its definition of Taxes, and any costs and expenses of contesting the validity of same. "Taxes" shall not include income or franchise taxes or the like assessed on Landlord's gross or net income.

(c)    "Lease Year" shall mean the twelve (12) month period commencing January 1st and ending December 31st.

(d)    "Tenant's Project Percentage" shall mean Tenant's percentage of the entire Project as determined by dividing the Rentable Area of the Premises (including the Cafetorium, subject to Sections 6.6 and 6.7) by the total Rentable Area of the Project.

(e)    "Common Areas" shall mean those portions of the Project which are provided, from time to time, for use in common by Landlord, Tenant and any other tenants of the Project, whether or not those areas are open to the general public, together with such other portions of the Project designated by Landlord, in its discretion, including certain areas to be shared by Landlord and all tenants, and may include, without limitation, any parking facilities, fixtures, systems, signs, facilities, lakes, gardens, parks or other landscaping used in connection with the Project, and may include any city sidewalks adjacent to the Project, pedestrian walkway system, whether above or below grade, park or other facilities open to the general public and roadways, sidewalks, walkways, parkways, driveways, and landscape areas appurtenant to the Project.

(f)    "Market Area" shall mean the City of Santa Clara, City of San Jose and Silicon Valley.

(g)    "Comparable Buildings" shall mean comparable Class "A" office use buildings in the Market Area.

5.2    Subject to the potential credit available under Section 6.7, Tenant shall pay to Landlord, as Additional Rent, Tenant's Share (as hereinafter defined) of the Operating Expenses for a particular Lease Year. "Tenant's Share" shall be determined by multiplying any such Operating Expenses for any Lease Year or pro rata portion thereof by Tenant's Project

13

Percentage, provided, however, that Landlord may equitably allocate costs under foregoing clause 5.1(a)(vii) to the extent that such capital improvements only benefit one building, in which case the Tenant shall pay based on its proportionate share (if any) of that building. Landlord shall, in advance of each Lease Year, estimate what Tenant's Share will be for such Lease Year based, in part, on Landlord's operating budget for such Lease Year, and Tenant shall pay Tenant's Share as so estimated each month (the "Monthly OpEx Payments"). The Monthly OpEx Payments shall be due and payable at the same time and in the same manner as the Monthly Rent. Landlord may elect to segregate Operating Expenses into two or more subcategories. For example, Landlord may segregate electrical costs and/or other utility costs from other Operating Expenses (subject to Sections 6.6 and 6.7). If Landlord elects to make that segregation, (a) Tenant's Share of Operating Expenses shall be determined separately for each such subcategory by making separate calculations of the cost of each subcategory of Operating Expense, and (b) Tenant shall pay as Tenant's Share of Operating Expenses Tenant's Share of each such subcategory.

      5.3    Landlord shall, within one hundred fifty (150) days after the end of each Lease Year, or as soon thereafter as reasonably possible, provide Tenant with a written statement of the actual Operating Expenses incurred during such Lease Year for the Project and such statement shall set forth Tenant's Share of such Operating Expenses. Tenant shall pay Landlord, as Additional Rent, the difference between Tenant's Share of Operating Expenses and the amount of Monthly OpEx Payments made by Tenant attributable to such Lease Year, such payment to be made within fifteen (15) days of the date of Tenant's receipt of such statement (except as provided in Section 5.4 below); similarly, Tenant shall receive a credit if Tenant's Share is less than the amount of Monthly OpEx Payments collected by Landlord during such Lease Year, such credit to be applied to future Monthly OpEx Payments to become due hereunder. If utilities, janitorial services or any other components of Operating Expenses increase during any Lease Year, Landlord may revise Monthly OpEx Payments due during such Lease Year by giving Tenant written notice to that effect; and thereafter, Tenant shall pay, in each of the remaining months of such Lease Year, a sum equal to the amount of the revised difference in Operating Expenses multiplied by Tenant's Project Percentage divided by the number of months remaining in such Lease Year.

      5.4    If, within ninety (90) days following Tenant's receipt of the Operating Expense statement or Taxes statement, neither party hereto delivers to the other party a notice referring in reasonable detail to one (1) or more errors in such statement, it shall be deemed conclusively that the information set forth in such statement is correct. Tenant shall, however, be entitled to conduct or require an audit to be conducted, provided that (a) not more than one (1) such audit may be conducted during any Lease Year of the Term, (b) the records for each Lease Year may be audited only once, (c) such audit is commenced within ninety (90) days following Tenant's receipt of the applicable statement, (d) such audit is completed and a copy thereof is delivered to Landlord within ninety (90) days following Tenant's receipt of the applicable statement, and (e) the accountants conducting the audit are not paid on a percentage of cost savings basis or similar basis. If Landlord responds to any such audit with an explanation of any issues raised in the audit, such issues shall be deemed resolved unless Tenant responds to Landlord with further written objections within thirty (30) days after receipt of Landlord's response to the audit. In no event shall payment of Rent ever be contingent upon the

performance of such audit. For purposes of any audit, Tenant or Tenant's duly authorized representative, at Tenant's sole cost and expense, shall have the right, upon fifteen (15) days' written notice to Landlord, to inspect Landlord's books and records pertaining to Operating Expenses and Taxes at the offices of Landlord or Landlord's managing agent during ordinary business hours, provided that such audit must be conducted so as not to interfere with Landlord's business operations and must be reasonable as to scope and time. Alternatively, at Landlord's sole discretion, Landlord may provide an audit of such books and records prepared by a certified public accountant of Landlord's selection, prepared at Tenant's expense, which shall be deemed to be conclusive for the purposes of this Lease. If actual Operating Expenses or Taxes are determined to have been overstated or understated by Landlord for any calendar year by more than five percent (5%), then the parties shall within thirty (30) days thereafter make such adjustment payment or refund as is applicable, and if actual Operating Expenses or Taxes are determined to have been overstated by Landlord for any calendar year by in excess of ten percent (10%), then Landlord shall pay the reasonable cost of Tenant's audit, not to exceed $1,500.00. There shall be no adjustment for variances of five percent (5%) or less between actual and invoiced Operating Expenses or Taxes.

     5.5    If the Termination Date under this Lease does not fall on December 31 of any given year, then: (i) the period commencing on the January 1 immediately preceding such Termination Date and continuing through, to and, including such Termination Date shall be referred to in this Lease as the "Last Partial Year" and (ii) Tenant's Share of Operating Expenses for the Last Partial Year shall be calculated by proportionately reducing the Operating Expenses (including if applicable any credit arising under Section 6.7) to reflect the number of calendar months in such Last Partial Year (the "Adjusted Operating Expenses"). Tenant shall pay its Tenant's Share of any such increases within fifteen (15) days following the receipt of a final statement or, as applicable, Landlord shall refund any overpayment concurrently with delivery of such final statement.

     5.6    If the occupancy of the Project during any part of any Lease Year is less than ninety-five percent (95%), Landlord shall make an appropriate adjustment of the variable components of Operating Expenses for that Lease Year, as reasonably determined by Landlord using sound accounting and management principles, to determine the amount of Operating Expenses that would have been incurred had the Project been ninety-five percent (95%) occupied. This amount shall be considered to have been the amount of Operating Expenses for that Lease Year. For purposes of this Section 5.6, "variable components" include only those component expenses that are affected by variations in occupancy levels.

     5.7    Tenant shall pay to Landlord, as Additional Rent, "Tenant's Share" (as hereinafter defined) of the Taxes for a particular Lease Year. "Tenant's Share" shall be determined by multiplying any such Taxes for any Lease Year or pro rata portion thereof by Tenant's Project Percentage. Landlord shall, in advance of each Lease Year, estimate what Tenant's Share will be for such Lease Year and Tenant shall pay Tenant's Share as so estimated each month (the "Monthly Tax Payments"). The Monthly Tax Payments shall be due and payable at the same time and in the same manner as the Monthly Rent.

5.8     Landlord shall, within one hundred fifty (150) days after the end of each Lease Year, or as soon thereafter as reasonably possible, provide Tenant with a written statement of the actual Taxes incurred during such Lease Year for the Project and such statement shall set forth Tenant's Share of such Taxes.  Tenant shall pay Landlord, as Additional Rent, the difference between Tenant's Share of any increases in Taxes and the amount of Monthly Tax Payments made by Tenant attributable to such Lease Year, such payment to be made within fifteen (15) days of the date of Tenant's receipt of such statement; similarly, Tenant shall receive a credit if Tenant's Share is less than the amount of Monthly Tax Payments collected by Landlord during such Lease Year, such credit to be applied to future Monthly Tax Payments and Rent to become due hereunder.  If Taxes increase during any Lease Year, Landlord may revise Monthly Tax Payments due during such Lease Year by giving Tenant written notice to that effect; and, thereafter, Tenant shall pay, in each of the remaining months of such Lease Year, a sum equal to the amount of revised difference in Taxes multiplied by Tenant's Project Percentage divided by the number of months remaining in such Lease Year.

5.9     Despite any other provision of this Article 5, Landlord may adjust Operating Expenses and/or Taxes and submit a corrected statement to account for Taxes or other government public-sector charges (including utility charges) that are for that given year but that were first billed to Landlord after the date that is ten (10) business days before the date on which the statement was furnished.

5.10    Tenant's Share of Taxes for the Last Partial Year shall be calculated by proportionately reducing the Taxes to reflect the number of calendar months in such Last Partial Year (the "Adjusted Taxes").  The Adjusted Taxes shall then be compared with the actual Taxes for such Last Partial Year to determine the amount of any increases or decreases in the actual Taxes for such Last Partial Year over the Adjusted Taxes that Tenant shall pay its Tenant's Share of any such Adjusted Taxes within fifteen (15) days following the receipt of a final statement or, as applicable, Landlord shall refund any overpayment concurrently with delivery of such final statement.

5.11    If the Taxes for any Lease Year are changed as a result of protest, appeal or other action taken by a taxing authority, the Taxes as so changed (the "Revised Taxes") shall be deemed the Taxes for such Lease Year.  If in any year the Project is less than ninety-five percent (95%) occupied, the elements of Taxes which vary depending upon the occupancy of the Project (e.g., Taxes attributable to the build out of leasable floor area), shall be adjusted to reflect such amount as would have been incurred had the Project been at least ninety-five percent (95%) occupied during such year.  Any expenses incurred by Landlord in attempting to protest, reduce or minimize Taxes shall be included in Taxes in the Lease Year in which those expenses are paid.  Landlord shall have the exclusive right to conduct such contests, protests and appeals of the Taxes as Landlord shall determine is appropriate in Landlord's sole discretion.  Tenant shall have the right to contest or protest any Taxes applicable to Tenant's personal property, and the foregoing shall not affect such right, provided that Tenant shall continue paying Monthly Tax Payments based on assessed Taxes unless and until such contest or protest is successful.

5.12    Tenant's obligation with respect to Additional Rent and the payment of Tenant's Share of Operating Expenses and Tenant's Share of Taxes shall survive the Expiration

Date or Termination Date of this Lease and Landlord shall have the right to retain the Security Amount, or so much thereof as it deems necessary, to secure payment of Tenant's Share of Operating Expenses and Tenant's Share of Taxes for the final year of the Lease, or part thereof, during which Tenant was obligated to pay such expenses.

## ARTICLE 6
## SERVICES TO BE PROVIDED BY LANDLORD

6.1     Subject to Articles 5 and 10 and Section 6.6, Landlord shall pay for and furnish to the Premises, the following services:

(a)     Electrical facilities to furnish sufficient power for lighting in the Premises, typewriters, voice writers, calculating machines, personal computers, and other machines of similar low electrical consumption; but not including electricity required for any other item of electrical equipment which use in excess of that which is customary for first-class general office use in Comparable Buildings, but in no event in excess of current electrical capacity in the Building;

(b)     Basic janitorial service on a five (5) day week basis consistent with the services provided in Comparable Buildings.  Carpet cleaning, except as provided in normal business services, shall be performed at Tenant's request and at Tenants expense;

(c)     Air conditioning and heating ("HVAC") to the Premises (with no hourly limitations thereon, so long as the North Building is separately metered as described in Section 6.6);

(d)     Replacement of all standard fluorescent bulbs in all areas and all incandescent bulbs in public areas, rest room areas, and stairwells. Routine maintenance and electric lighting service for all public areas of the Project in a manner and to the extent deemed by Landlord to be standard;

(e)     Subject to provisions set forth below, Landlord shall at all times furnish the Premises with elevator service, and water for lavatory and drinking purposes in the North Building core areas; and

(f)     Except to the extent that electricity provided to the Premises is separately metered as described in Section 6.6, Landlord may impose reasonable charges for any utilities or services, including, but not limited to, electric current required to be provided by Landlord by reason of any substantial recurrent use of the Premises at any time other than Normal Business Hours.  In connection with such after-hours electrical usage, Landlord may (but shall not be obligated to) install separate meters to measure such excess usage.

6.2     Landlord shall not be liable for any loss or damage arising or alleged to arise in connection with the failure, stoppage, or interruption of any such services; nor shall the same be construed as an eviction of Tenant, work an abatement of Rent, entitle Tenant to any reduction in Rent, or relieve Tenant from the operation of any covenant or condition herein

contained; it being further agreed that Landlord reserves the right to discontinue temporarily such services or any of them at such times as may be necessary by reason of repair or capital improvements performed within the Project, accident, unavailability of employees, repairs, alterations or improvements, or whenever by reason of strikes, lockouts, riots, acts of nature, or any other happening or occurrence beyond the reasonable control of Landlord. In the event of any such failure, stoppage or interruption of services, Landlord shall use reasonable diligence to have the same restored. Neither diminution nor shutting off of light or air or both, nor any other effect on the Project by any structure erected or condition now or hereafter existing on lands adjacent to the Project, shall affect this Lease, abate Rent, or otherwise impose any liability on Landlord.

       6.3    Landlord shall have the right to reduce heating, cooling, or lighting within the Premises and in the public area in the Project as required by any fuel or energy-saving program mandated by local, state or federal law or other legal requirement applicable to Landlord and/or Tenant and/or the Project.

       6.4    Unless otherwise provided by Landlord, Tenant shall separately arrange with the applicable local public authorities or utilities, as the case may be, for the furnishing of and payment of all telephone and facsimile services as may be required by Tenant in the use of the Premises. Tenant shall directly pay for such telephone and facsimile services as may be required by Tenant in the use of the Premises. Tenant shall directly pay for such telephone and facsimile services, including the establishment and connection thereof, at the rates charged for such services by such authority or utility; and the failure of Tenant to obtain or to continue to receive such services for any reason whatsoever shall not relieve Tenant of any of its obligations under this Lease.

       6.5    Landlord shall also have the exclusive right, but not the obligation, to provide any additional services which may be required by Tenant, including, without limitation, locksmithing, lamp replacement, additional janitorial service, and additional repairs and maintenance, provided that Tenant shall pay to Landlord upon billing, the sum of all costs to Landlord of such additional services plus an administration fee equal to the fee (percentage or dollar amount) charged by Landlord's property manager for the provision of such additional services. Charges for any utilities or service for which Tenant is required to pay from time to time hereunder, shall be deemed Additional Rent hereunder and shall be billed on a monthly basis.

       6.6    The North Building is separately metered for electricity, and Tenant shall be responsible for and pay prior to delinquency all electrical costs for the North Building. Tenant shall not be responsible for the cost of electricity to the South Building, either directly or as a pass-through of Operating Expenses. Tenant shall pay a pro-rata portion of the electricity costs for the Cafetorium, based on Tenant's Share, but subject to Section 6.7.

       6.7    Following effectiveness of the New Cafetorium Contract, Landlord shall operate the Cafetorium as a stand-alone enterprise pursuant to the New Cafetorium Contract or any replacement thereto. Any profits accruing to Landlord with respect to the Cafetorium operations shall reduce (on a pro-rata basis) Tenant's Share of the Operating Expenses that are allocable to or arise from the Cafetorium.

ARTICLE 7
REPAIRS AND MAINTENANCE BY LANDLORD

7.1     Landlord shall provide for the cleaning and maintenance of the public portions of the Project in keeping with the ordinary standard for Comparable Buildings as part of Operating Expenses.  Unless otherwise expressly stipulated herein, Landlord shall not be required to make any improvements or repairs of any kind or character to the Premises during the Term, except such repairs as may be required to the exterior walls, corridors, windows, roof, integrated building utility and mechanical systems and other base building elements and other structural elements and equipment of the Project, and subject to Section 13.4, below, such additional maintenance as may be necessary because of the damage caused by persons other than Tenant, its agents, employees, licensees, or invitees.

7.2     Landlord or Landlord's officers, agents, and representatives (subject to any security regulations imposed by any governmental authority) shall have the right to enter all parts of the Premises, at all reasonable hours upon reasonable prior notice (but no less than twenty-four (24) hours' notice) to Tenant (other than in an emergency), to inspect, clean, make repairs, alterations, and additions to the Project or the Premises which it may deem necessary or desirable, to make repairs to adjoining spaces, to cure any defaults of Tenant hereunder that Landlord elects to cure pursuant to Section 22.5, below, to show the Premises to prospective tenants (during the final nine (9) months of the Term or at any time after the occurrence of an Event of Default that remains uncured), mortgagees or purchasers of the Project or North Building, or to provide any service which it is obligated or elects to furnish to Tenant; and Tenant shall not be entitled to any abatement or reduction of Rent by reason thereof.  Landlord shall have the right to enter the Premises at any time and by any reasonable means in the case of an emergency.

7.3     Except as otherwise expressly provided in this Lease, Tenant hereby waives all rights it would otherwise have under California Civil Code Sections 1932(1) and 1942(a) or any successor statutes to deduct repair costs from Rent and/or terminate this Lease as the result of any failure by Landlord to maintain or repair.

ARTICLE 8
REPAIRS AND CARE OF PROJECT BY TENANT

8.1     If the North Building, the Project, or any portion thereof, including but not limited to, the elevators, boilers, engines, pipes, and other apparatus, or members of elements of the North Building (or any of them) used for the purpose of climate control of the North Building or operating of the elevators, or of the water pipes, drainage pipes, electric lighting, or other equipment of the North Building or the roof or outside walls of the North Building and also the Premises improvements, including but not limited to, the carpet, wall coverings, doors, and woodwork, become damaged or are destroyed through the negligence, carelessness, or misuse of Tenant, its servants, agents, employees, or anyone permitted by Tenant to be in the Project (ordinary wear and tear excepted), or through it or them, then the reasonable cost of the necessary repairs, replacements, or alterations shall be borne by Tenant who shall pay the same to Landlord as Additional Rent within fifteen (15) days after demand, subject to Section 13.4

19

below.  Landlord shall have the exclusive right, but not the obligation, to make any repairs necessitated by such damage.

8.2     Subject to Section 13.4 below, Tenant agrees, at its sole cost and expense, to repair or replace any damage or injury done to the Project, or any part thereof, caused by Tenant, Tenant's agents, employees, licensees, or invitees which Tenant elects not to repair. Tenant shall not injure the Project or the Premises and shall maintain the elements of the Premises not to be maintained by Landlord pursuant to this Lease in a clean, attractive condition and in good repair (ordinary wear and tear excepted).  If Tenant fails to keep such elements of the Premises in such good order, condition, and repair as required hereunder to the satisfaction of Landlord, Landlord may (but has no obligation to) restore the Premises to such good order and condition and make such repairs, in each case without liability to Tenant for any loss or damage that may accrue to Tenant's property or business by reason thereof except to the degree arising from Landlord's negligence or willful misconduct, provided, that Landlord shall have no liability whatsoever from a decision not to repair or restore under this sentence.  Within fifteen (15) days after completion of such Landlord repair or restoration, if any, Tenant shall pay to Landlord, as Additional Rent, upon demand, the cost of restoring the Premises to such good order and condition and of the making of such repairs, plus an additional charge of five percent (5%) thereof.  Tenant shall leave the Premises at the end of each business day in a reasonably tidy condition for the purpose of allowing the performance of Landlord's cleaning services.  Upon the Termination Date, Tenant shall surrender and deliver up the Premises to Landlord in the same condition in which it existed at the Commencement Date, excepting only ordinary wear and tear and damage arising from any cause not required to be repaired by Tenant.  Upon the Termination Date, Landlord shall have the right to re-enter and take possession of the Premises.

8.3     Notwithstanding Section 6.1, Tenant may contract for its own janitorial or cleaning services for the North Building, without Landlord's written consent and at Tenant's sole responsibility and expense, and by a janitorial or cleaning contractor or employees at all times reasonably satisfactory to Landlord.  In such event Tenant shall not be responsible for paying or reimbursing such charges to Landlord or Landlord's contractor as provided in Articles 5 and 6 with respect to such services in the North Building.

ARTICLE 9
TENANT'S EQUIPMENT AND INSTALLATIONS IN THE PREMISES

9.1     If heat-generating machines or equipment, including telephone equipment, cause the temperature in the Premises, or any part thereof, to generate heat in excess of that currently generated by the use of the Building such that the North Building's air conditioning system can no longer maintain in such Premises an acceptable temperature, then Landlord reserves the right to install supplementary air conditioning units in the Premises, and the cost thereof, including the cost of installation and the cost of operation and maintenance thereof, including water, shall be paid by Tenant to Landlord within thirty (30) days after invoice by Landlord.

9.2     Except for desk or table-mounted typewriters, adding machines, office calculators, dictation equipment, personal computers, and other similar office equipment consistent with the current use of the Building for research and development, including

electronic laboratory and first-class general office use in Comparable Buildings, Tenant shall not install within the Premises any fixtures, equipment, facilities, or other improvements without the specific written consent of Landlord, subject to Article 15. Tenant shall not, without the specific written consent of Landlord (which consent shall not be unreasonably withheld, conditioned, or delayed), install or maintain any apparatus or device within the Premises which shall increase the usage of electrical power or water for the Premises over the amount currently available for existing use; and if any such apparatus or device is so installed, Tenant agrees to furnish Landlord a written agreement to pay for any additional costs of utilities as the result of such installation.

ARTICLE 10
FORCE MAJEURE

10.1    It is understood and agreed that with respect to any service or other obligation to be furnished or obligations to be performed by either party that in no event shall either party be liable for failure to furnish or perform the same when prevented from doing so by strike, lockout, breakdown, accident, supply, or inability by the exercise of reasonable diligence to obtain supplies, parts, or employees necessary to furnish such service or meet such obligation; or because of war or other emergency; or for any cause beyond the reasonable control with the party obligated for such performance; or for any cause due to any act or omission of the other party or its agents, employees, licensees, invitees, or any persons claiming by, through, or under the other party; or because of the failure of any public utility to furnish services; or because of order or regulation of any federal, state, county or municipal authority (collectively, "Force Majeure Events"). Nothing in this Section 10.1 shall limit or otherwise modify or waive Tenant's obligation to pay Base Rent and Additional Rent as and when due pursuant to the terms of this Lease.

ARTICLE 11
CONSTRUCTION, MECHANICS' AND MATERIALMAN'S LIENS

11.1    Tenant shall not suffer or permit any construction, mechanics' or materialman's lien to be filed against the Premises or any portion of the Project by reason of work, labor services, or materials supplied or claimed to have been supplied to Tenant. Nothing herein contained shall be deemed or construed in any way as constituting the consent or request of Landlord, expressed or implied, by inference or otherwise, for any contractor, subcontractor, laborer, or materialman to perform any labor or to furnish any materials or to make any specific improvement, alteration, or repair of or to the Premises or any portion of the Project; nor of giving Tenant any right, power, or authority to contract for, or permit the rendering of, any services or the furnishing of any materials that could give rise to the filing of any construction, mechanics' or materialman's lien against the Premises or any portion of the Project.

11.2    If any such construction, mechanics' or materialman's lien shall at any time be filed against the Premises or any portion of the Project as the result of any act or omission of Tenant, Tenant covenants that it shall, within twenty (20) days after Tenant has notice of the claim for lien, procure the discharge thereof by payment or by giving security or in such other manner as is or may be required or permitted by law or which shall otherwise satisfy Landlord. The time period in the foregoing sentence is not subject to an additional cure period

21

under Section 22.1. If Tenant fails to take such action, or at any other time if deemed reasonably necessary by Landlord, in addition to any other right or remedy it may have Landlord may take such action as may be reasonably necessary to protect its interests. Any amounts paid by Landlord in connection with such action, all other expenses of Landlord incurred in connection therewith, including reasonable attorneys' fees, court costs, and other necessary disbursements shall be repaid by Tenant to Landlord within fifteen (15) days after demand.

ARTICLE 12
*INTENTIONALLY OMITTED*

12.1    *Intentionally Omitted.*

ARTICLE 13
INSURANCE

13.1    Landlord shall maintain, as a part of Operating Expenses, special causes of loss form property insurance on the Project in an amount equal to the full replacement cost of the Project, subject to such deductibles as Landlord may determine. Landlord shall not be obligated to insure, and shall not assume any liability of risk of loss for, any of Tenant's furniture, equipment, machinery, goods, supplies, improvements or alterations upon the Premises. Such insurance shall be maintained with an insurance company selected, and in amounts desired, by Landlord or Landlord's mortgagee, and payment for losses thereunder shall be made solely to Landlord subject to the rights of the holder of any mortgage or deed of trust which may now or hereafter encumber the Project. Additionally Landlord may maintain such additional insurance, including, without limitation, earthquake insurance, flood insurance, liability insurance and/or rent insurance, as Landlord may in its sole discretion elect. The cost of all such additional insurance shall also be part of the Operating Expenses. Any or all of Landlord's insurance may be provided by blanket coverage maintained by Landlord or any affiliate of Landlord under its insurance program for its portfolio of properties or by Landlord or any affiliate of Landlord's program of self insurance, and in such event Operating Expenses shall include the portion of the reasonable cost of blanket insurance or self-insurance that is allocated to the Project.

13.2    Tenant, at its own expense, shall maintain with insurers authorized to do business in the State of California and which are rated A- and have a financial size category of at least VIII in the most recent Best's Key Rating Guide, or any successor thereto (or if there is none, an organization having a national reputation), (a) commercial general liability insurance on an occurrence form including premises operations, products/completed operations, hazard and contractual coverage with limits of no less than $2,000,000 per occurrence, $5,000,000 General Aggregate and $5,000,000 Completed Operations Aggregate; the deductible or self-insured retention under such policy shall not exceed $10,000 unless otherwise agreed by Landlord in writing; (b) Umbrella/Excess Liability on a following form basis with the following minimum limits: General Aggregate $10,000,000; Each Occurrence $10,000,000; (c) Workers' Compensation with statutory limits; (d) Employer's Liability insurance with the following limits: Bodily injury by disease per person $1,000,000; Bodily injury by accident policy limit $1,000,000; Bodily injury by disease policy limit $1,000,000; (e) property insurance on a special form (all risk) covering any and all personal property of Tenant including but not limited to alterations, improvements, betterments, furniture, fixtures and equipment, and including the

22

Trailers and the Tenant Generator (as defined in Section 16.4(b) and (c)), and including theft and sprinkler leakage, in an amount not less than their full replacement cost, with a deductible not to exceed $25,000 unless otherwise agreed by Landlord in writing, and (f) business auto liability insurance having a combined single limit of not less than $1,000,000 per occurrence and insuring Tenant against liability for claims arising out of ownership, maintenance or use of any owned, hired or non-owned automobiles.  At all times during the Term, such insurance shall be maintained, and Tenant shall cause a current and valid certificate of such policies to be deposited with Landlord.  If Tenant fails to have a current and valid certificate of such policies on deposit with Landlord at all times during the Term and such failure is not cured within three (3) business days following Tenant's receipt of notice thereof from Landlord, Landlord shall have the right, but not the obligation, to obtain such an insurance policy, and Tenant shall be obligated to pay Landlord the amount of the premiums applicable to such insurance within ten (10) days after Tenant's receipt of Landlord's request for payment thereof.  Such policy of liability insurance shall name Landlord and Landlord's managing agent as additional insureds and Tenant as the insured and shall be noncancellable with respect to Landlord except after insurers endeavor to provide thirty (30) days' written notice to Landlord.

13.3    Tenant shall adjust annually the amount of coverage established in Article 13.2 hereof to such amount as in Landlord's reasonable opinion, adequately protects Landlord's interest; provided the same is consistent with the amount of coverage customarily required of comparable tenants in Comparable Buildings.

13.4    Notwithstanding anything herein to the contrary, Landlord and Tenant each hereby waives any and all rights of recovery, claim, action, or cause of action against the other, its agents, employees, licensees, or invitees for any loss or damage to or at the Premises or the Project or any personal property of such party therein or thereon by reason of fire, the elements, or any other cause which would be insured against under the terms of (i) special causes of loss form property insurance or (ii) the liability insurance referred to in Article 13.2, to the extent of such insurance, regardless of cause or origin, including omission of the other party hereto, its agents, employees, licensees, or invitees.  Landlord and Tenant covenant that no insurer shall hold any right of subrogation against either of such parties with respect thereto.  This waiver shall be ineffective against any insurer of Landlord or Tenant to the extent that such waiver is prohibited by the laws and insurance regulations of the State of California.  The parties hereto agree that any and all such insurance policies required to be carried by either shall be endorsed with a subrogation clause, substantially as follows: "This insurance shall not be invalidated should the insured waive, in writing prior to a loss, any and all right of recovery against any party for loss occurring to the property described therein, " and shall provide that such party's insurer waives any right of recovery against the other party in connection with any such loss or damage.

13.5    In the event Tenant's occupancy or conduct of business in or on the Premises, whether or not Landlord has consented to the same, results in any increase in premiums for the insurance carried from time to time by Landlord with respect to the Project, Tenant shall pay any such increase in premiums as Rent within thirty (30) days after bills for such additional premiums shall be rendered by Landlord.  In determining whether increased premiums are a result of Tenant's use or occupancy of the Premises, a schedule issued by the

23

organization computing the insurance rate on the Project showing the various components of such rate, shall be conclusive evidence of the several items and charges which make up such rate. Tenant shall promptly comply with all reasonable requirements of the insurance authority or of any insurer now or hereafter in effect relating to the Premises.

## ARTICLE 14
## QUIET ENJOYMENT

14.1    Provided Tenant is not in default under this Lease after the expiration of any period for cure in the performance of all its obligations under this Lease, including, but not limited to, the payment of Rent and all other sums due hereunder, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term, without hindrance by Landlord, subject to the provisions and conditions set forth in this Lease.

## ARTICLE 15
## ALTERATIONS

15.1    Tenant agrees that it shall not make or allow to be made any alterations, physical additions, or improvements in or to the Premises, other than Minor Alterations (which do not require Landlord's consent), without first obtaining the written consent of Landlord in each instance.  As used herein, the term "Minor Alteration" refers to an alteration that (i) does not cost, in the aggregate for any individual alteration, in excess of $75,000, and (ii)(a) does not affect the outside appearance of the Project and is not visible from the Common Areas, (b) is non-structural and does not impair the strength or structural integrity of the North Building, and (c) does not affect or overload the core or primary mechanical, electrical, HVAC or other systems of the North Building.  Landlord's consent to any alteration that is not a Minor Alteration shall not be unreasonably withheld, conditioned or delayed.  At the time of any request for alterations other than Minor Alterations, Tenant shall submit to Landlord plans and specifications of the proposed alterations, additions, or improvements, together with all other materials reasonably necessary for Landlord to review and consider consenting to such alterations; and Landlord shall have a period of twenty (20) days from submission of such packet of information in which to review and approve or disapprove such alterations; provided that if Landlord determines in good faith that Landlord requires a third party to assist in reviewing such proposed alterations, Landlord shall instead have a period of thirty (30) days in which to review and approve or disapprove such plans.  Tenant shall pay to Landlord upon demand the reasonable, out-of-pocket cost and expense of Landlord in (A) reviewing such proposed alterations, and (B) inspecting the alterations, additions, or improvements to determine whether the same are being performed in accordance with the approved plans and specifications and all laws and requirements of public authorities, including, without limitation, the reasonable, out-of-pocket fees of any architect or engineer employed by Landlord for such purpose.  In any instance where Landlord grants such consent, and permits Tenant to use its own contractors, laborers, materialmen, and others furnishing labor or materials for Tenant's construction (collectively, "Tenant's Contractors"), Landlord's consent shall be deemed conditioned upon each of Tenant's Contractors (1)  not unreasonably interfering with any laborer utilized by Landlord, Landlord's contractors, laborers, or materialmen; (2) not interfering with the rights of other tenants and invitees of the Project, and (3) furnishing Landlord with evidence of acceptable builder's risk

24

insurance, liability insurance, worker's compensation coverage and if required by Landlord, completion bonding, and if at any time such entry by one or more persons furnishing labor or materials for Tenant's work shall cause such unreasonable interference, or fail to maintain such insurance, then the consent granted by Landlord to Tenant may be withdrawn immediately upon written notice from Landlord to Tenant.

15.2    Tenant, at its expense, shall obtain all necessary governmental permits and certificates for the commencement and prosecution of alterations, additions, or improvements and for final approval thereof upon completion, and shall cause any alterations, additions, or improvements to be performed in compliance therewith and with all applicable laws and requirements of public authorities and with all applicable requirements of insurance bodies. All alterations, additions, or improvements shall be diligently performed in a good and workmanlike manner, using new materials and equipment at least equal in quality and class to (a) the original installations of the North Building, or (b) the then standards for the Comparable Building. Upon the completion of work and upon request by Landlord, Tenant shall provide Landlord copies of all waivers or releases of lien from each of Tenant's Contractors. No alterations, modifications, or additions to the Project or the Premises shall be removed by Tenant either during the Term or upon the Termination Date without the express written approval of Landlord. Tenant shall not be entitled to any reimbursement or compensation resulting from its payment of the cost of constructing all or any portion of such improvements or modifications thereto unless otherwise expressly agreed by Landlord in writing. Tenant agrees specifically that no food, soft drink, or other vending machine shall be installed within the Premises, without the prior written consent of Landlord; vending machines in the Premises as of the date hereof are deemed consented to by Landlord. Upon completion of any Alterations, Tenant shall cause a Notice of Completion to be recorded in the office of the Recorder of the County of Santa Clara, in accordance with Section 2092 of the California Civil Code or any successor statute, and Tenant shall deliver to the property management office a reproducible copy of the "as built" drawings of the alterations unless the same are Minor Alterations that were only cosmetic or aesthetic in nature.

15.3    Landlord's approval of Tenant's plans for work shall create no responsibility or liability on the part of Landlord for their completeness, design sufficiency, or compliance with all laws, rules, and regulations of governmental agencies or authorities, including, but not limited to, the Americans with Disabilities Act. Landlord may, at its option, at Tenant's expense, require that Landlord's contractors be engaged for any work upon the integrated building mechanical or electrical systems.

15.4    At least ten (10) days prior to the commencement of any work permitted to be done by persons requested by Tenant on the Premises, Tenant shall notify Landlord of the proposed work and the names and addresses of Tenant's Contractors. During any such work on the Premises, Landlord, or its representatives, shall have the right to go upon and inspect the Premises at all reasonable times, and shall have the right to post and keep posted thereon notices of non-responsibility, building permits, and other notices, and/or to take any further action which Landlord may reasonably deem to be proper for the protection of Landlord's interest in the Premises.

ARTICLE 16

FURNITURE, FIXTURES, AND PERSONAL PROPERTY

16.1    Subject to Section 16.4, Tenant, at its sole cost and expense, may remove its trade fixtures, office supplies and moveable office furniture and equipment not attached to the Project or Premises provided:

(a)    Such removal is made prior to the Termination Date;

(b)    No Event of Default exists under this Lease at the time of such removal; and

(c)    Tenant promptly repairs all damage caused by such removal.

16.2    If Tenant does not remove its trade fixtures, office supplies, and moveable furniture and equipment as herein above provided prior to the Termination Date (unless prior arrangements have been made with Landlord and Landlord has agreed in writing to permit Tenant to leave such items in the Premises for an agreed period, and except as set forth in Section 16.4), then, in addition to its other remedies, at law or in equity, Landlord shall have the right to have such items removed and stored at Tenant's sole cost and expense and all damage to the Project or the Premises resulting from such removal shall be repaired at the cost of Tenant; Landlord may elect that such items automatically become the property of Landlord upon the Termination Date, and Tenant shall not have any further rights with respect thereto or reimbursement therefor subject to the provisions of applicable law.  All other property in the Premises, any alterations, or additions to the Premises (including wall-to-wall carpeting, paneling, wall covering, specially constructed or built-in cabinetry or bookcases), and any other article attached or affixed to the floor, wall, or ceiling of the Premises shall become the property of Landlord and shall remain upon and be surrendered with the Premises as a part thereof at the Termination Date regardless of who paid therefor; and Tenant hereby waives all rights to any payment or compensation therefor.  If, however, Landlord so requests, in writing, Tenant shall remove, prior to the Termination Date, any and all alterations, additions, fixtures, equipment, and property placed or installed in the Premises and shall repair any damage caused by such removal. In addition, if any alterations performed by Tenant do not use materials that conform to the building standards used by Landlord at the time of the particular alteration, Tenant shall (a) at Tenant's sole cost and expense, no later than the expiration of the Term (or no later than fifteen (15) days after the earlier termination of the Term) cause the improvements in the Premises to be restored to conform to Landlord's building standard at Tenant's sole cost and expense, or (b) if Landlord so elects in writing, Tenant shall pay Landlord a lump-sum amount determined by Landlord in its reasonable judgment sufficient to pay the cost of restoring the improvements in the Premises to building standard.  Prior to commencing any alteration, Tenant may request that Landlord notify Tenant whether or not the proposed alteration will be required by Landlord to be removed at the end of the term.

16.3    All the furnishings, fixtures, equipment, effects, and property of every kind, nature, and description of Tenant and of all persons claiming by, through, or under Tenant which, during the continuance of this Lease or any occupancy of the Premises by Tenant or anyone claiming under Tenant, may be on the Premises or elsewhere in the Project shall be at the

26

sole risk and hazard of Tenant, and if the whole or any part thereof shall be destroyed or damaged by fire, water, or otherwise, or by the leakage or bursting of water pipes, steam pipes, or other pipes, by theft, or from any other cause, no part of such loss or damage is to be charged to or be borne by Landlord unless due to the gross negligence or willful misconduct of Landlord or its employees, agents or contractors.

   16.4 Notwithstanding the foregoing, certain personal property, fixtures and equipment of Tenant shall be subject to the following provisions regarding ownership, use and location:

     (a) Upon the Commencement Date, all of Tenant's personal property, fixtures and equipment in the Cafetorium (including café equipment and fitness equipment) and the South Building shall be become the property of and vest in Landlord, without further payment or action by Landlord or Tenant, excepting from the foregoing only Tenant's personal property, fixtures and equipment located in certain areas of the first floor of the South Building, being the spaces depicted on Exhibit E.

     (b) As of the Commencement Date, Tenant owns two backup electricity generators which are located on the grounds of the North Building, as shown on Exhibit C attached hereto. As indicated on Exhibit C, one of the generators is dedicated to the emergency back-up systems of the North Building (the "Back-up Generator"). Upon the effectiveness of this Lease pursuant to Article 1, the Back-up Generator shall become the sole property of Landlord without further payment or action by Landlord or Tenant. Thereafter Landlord shall be solely responsible for the repair and maintenance thereof, if any, in Landlord's sole discretion (the foregoing not being a covenant by Landlord and Tenant that such Back-up Generator will be maintained, but merely an allocation of responsibility between Landlord and Tenant), with any costs thereof being an Operating Expense allocable solely to the North Building. The other generator shown on Exhibit C serves Tenant's exclusive needs (the "Tenant Generator"). During the Term, Tenant shall keep the Tenant Generator in good working order at Tenant's sole cost and expense, and upon the termination of this Lease for any cause the Tenant Generator shall become the sole property of Landlord without further payment or action by Landlord or Tenant. Tenant shall reasonably cooperate with Landlord and provide such bills of sale or other documentation as Landlord may reasonably require, at Landlord's expense, to document the transfer of the Back-up Generator and/or the Tenant Generator, and such obligation shall survive the termination of the Lease and Tenant's right to use and possession of the Premises.

     (c) As of the Commencement Date, Tenant has two emergency response trailers located on the Project (the "Trailers"). Promptly after the effectiveness of this Lease pursuant to Article 1, Landlord and Tenant shall confer on an alternative location or locations for the Trailers, and upon the mutual agreement of such alternative location(s) Tenant shall relocate the Trailers. Such relocation shall occur no later than the ninetieth (90th) day after the execution of this Lease. If Landlord and Tenant are unable to agree on a new location for the Trailers, and/or if the relocation is not concluded by such ninetieth (90th) day, then Landlord may screen the Trailers in a

manner acceptable to Landlord in its sole discretion.  Tenant shall pay all of the reasonable out-of-pocket costs of such screening, the maintenance thereof, and the removal thereof, such costs to be paid in each case within thirty (30) days of Landlord's invoice to Tenant.  On or before the termination of this Lease for any cause, Tenant shall remove the Trailers from the Project, at Tenant's sole cost and expense.

## ARTICLE 17
## PERSONAL PROPERTY AND OTHER TAXES

17.1    During the Term hereof, Tenant shall pay, prior to delinquency, all business and other taxes, charges, notes, duties, and assessments levied, and rates or fees imposed, charged, or assessed against or in respect of Tenant's occupancy of the Premises or in respect of the personal property, trade fixtures, furnishings, equipment, and all other personal and other property of Tenant contained in the Project (including without limitation taxes and assessments attributable to the cost or value of any leasehold improvements made in or to the Premises by or for Tenant (to the extent that the cost or value of those leasehold improvements exceeds the cost or value of the Tenant Improvement Allowance regardless of whether title to those improvements is vested in Tenant or Landlord)), and shall hold Landlord harmless from and against all payment of such taxes, charges, notes, duties, assessments, rates, and fees, and against all loss, costs, charges, notes, duties, assessments, rates, and fees, and any and all such taxes.  Tenant shall cause such fixtures, furnishings, equipment, and other personal property to be assessed and billed separately from the real and personal property of Landlord.  In the event any or all of Tenant's fixtures, furnishings, equipment, and other personal property shall be assessed and taxed with Landlord's real property, Tenant shall pay to Landlord Tenant's share of such taxes within thirty (30) days after delivery to Tenant by Landlord of a statement in writing setting forth the amount of such taxes applicable to Tenant's property.

## ARTICLE 18
## ASSIGNMENT AND SUBLETTING

18.1    Tenant shall not, without the prior written consent of Landlord, which shall not be unreasonably withheld, conditioned, or delayed (except that Landlord shall in no event be obligated to consent to an encumbrance of this Lease or any transfer by operation of law):  (a) assign, sublease, convey, mortgage or otherwise transfer this Lease or any interest hereunder, or sublease the Premises, or any part thereof, whether voluntarily or by operation of law; nor (b) permit the use of the Premises or any part thereof by any person other than Tenant and its employees.  Any such assignment, sublease, conveyance, mortgage or use described in the preceding sentence (a "Transfer") occurring without the prior written consent of Landlord shall, at Landlord's option, be void and of no effect.  Landlord's consent to any Transfer shall not constitute a waiver of Landlord's right to withhold its consent to any future Transfer.  Landlord may require as a condition to its consent to any assignment of this Lease that the assignee execute an instrument in which such assignee assumes the remaining obligations of Tenant hereunder; provided that the acceptance of any assignment of this Lease by the applicable assignee shall automatically constitute the assumption by such assignee of all of the remaining obligations of Tenant that accrue following such assignment.  The voluntary or other surrender of this Lease by Tenant or a mutual cancellation hereof shall not work a merger and shall, at the

28