## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

## NOTICE OF FILING OF NINETEENTH REPORT OF THE
## MONITOR OF THE CANADIAN NORTEL COMPANIES
## <u>IN THE CANADIAN PROCEEDINGS</u>

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

**PLEASE TAKE NOTICE** that on August 12, 2009, Ernst & Young Inc., the Monitor and foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation, in proceedings under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List), by its undersigned counsel, filed, in the above-captioned cases, a copy of the Nineteenth Report of the Monitor (the "**Nineteenth Report**"), dated August 11, 2009. A copy of the Nineteenth Report is annexed hereto as Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Nineteenth Report is also available on the Monitor's website, www.ey.com/ca/nortel or upon request to the Monitor's counsel.

Dated: Wilmington, Delaware
     August 12, 2009

ALLEN & OVERY LLP

Ken Coleman
Lisa Kraidin
1221 Avenue of the Americas
New York, New York 10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
ken.coleman@allenovery.com
lisa.kraidin@allenovery.com

-and-

BUCHANAN INGERSOLL & ROONEY

By: /s/ Mary F. Caloway
Mary F. Caloway (No. 3059)
Peter J. Duhig (No. 4024)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
Telephone (302) 552-4200
Facsimile (302) 552-4295
mary.caloway@bipc.com

Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian Nortel
Group

## EXHIBIT A

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**NINETEENTH REPORT OF THE MONITOR**
**DATED AUGUST 11, 2009**

**INTRODUCTION**

1.    On January 14, 2009 (the "Filing Date") Nortel Networks Corporation ("NNC" and
      collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks
      Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel
      Networks International Corporation ("NNIC") and Nortel Networks Global
      Corporation ("NNGC") (collectively the "Applicants") filed for and obtained
      protection under the Companies' Creditors Arrangement Act ("CCAA").  Pursuant
      to the Order of this Honourable Court dated January 14, 2009, as amended and
      restated (the "Initial Order").  Ernst & Young Inc. ("EYI") was appointed as the
      Monitor of the Applicants (the "Monitor") in the CCAA proceeding.   The stay of
      proceedings was extended to October 30, 2009 by this Honourable Court in its
      Order dated July 30, 2009.

2.    Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed
      voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in
      the U.S. Court on January 14, 2009. As required by U.S. law, an official unsecured
      creditors committee ("UCC") was established in January, 2009.   In addition, an

ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as those in the U.S. (the "Bondholder Group").

3. Nortel Networks (CALA) Inc. ("NCI") (together with NNI and certain of its subsidiaries which filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

4. Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court") on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "U.K. Administrators").

5. On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel (the "Joint Israeli Administrators") and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

6. Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court.

**PURPOSE**

7.   The purpose of this nineteenth report of the Monitor (the "Nineteenth Report") is to update and report to this Honourable court on:

   a)  the status of the Applicants' restructuring initiatives;

   b)  changes to the Applicants' corporate governance; and

   c)  the motion seeking the approval of this Honourable Court for expanding the powers and duties of the Monitor to permit it to undertake activities necessary to oversee and continue the administration of the Applicants' restructuring.

**TERMS OF REFERENCE**

8.   In preparing this Nineteenth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel.  EYI has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Nineteenth Report.

9.   Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

10.  Capitalized terms not defined in this Nineteenth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report or previous Reports of the Monitor.

**GENERAL BACKGROUND**

11.  Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and

maintained from its R&D activities, its customers and other significant contracts and agreements.

12. Effective July 1, 2009 Nortel conducts its global business through five reportable business unit segments, Carrier Networks ("CN"), Carrier VoIP and Application Solutions ("CVAS"), Enterprise Solutions ("ES"), Metro Ethernet Networks ("MEN") and LG Nortel Co. Ltd. ("LGN"). The revenue and assets of each of the business units, except for LGN, is distributed among the multiple Nortel legal entities and joint ventures around the world.

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

## STATUS OF RESTRUCTURING INITITTIVES

14. As discussed in previous reports of the Monitor, the Applicants, with the assistance of the Monitor and in consultation with certain stakeholders, have developed a restructuring strategy which principally focuses on the divestiture of Nortel's main business unit segments: CN, CVAS, ES, MEN and LGN.

15. On June 19, 2009, NNC issued a press release announcing it was engaging in discussions with numerous parties for the sale of its various businesses.

16. NNC also announced its intention to apply for a delisting of its common shares and the NNL preferred shares from trading on the Toronto Stock Exchange and delisting occurred on June 26, 2009 at the close of trading.

17. As further described below, the Applicants continue to make progress in the implementation of their restructuring strategy.

*Sales Process*

18. As discussed in the Seventeenth Report, pursuant to the Bidding Procedures approved by this Honourable Court on June 29, 2009, Nortel selected Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") as the Successful Bidder for the sale of substantially all of its CDMA Business and LTE Assets for US $1.13 billion. The Ericsson Sale Agreement was approved by this Honourable Court and the U.S. Court on July 28, 2009 and is anticipated to close in September 2009.

19. As discussed in the Eighteenth Report, on July 20, 2009, Nortel announced NNL, NNI and certain of its other subsidiaries entered into an asset and share sale agreement with Avaya Inc. ("Avaya") for its North American, CALA and APAC enterprise solutions business as well as the shares of Nortel Government Solutions Incorporated and DiamondWare, Ltd. At the same time, NNUK, through the U.K. Administrator, entered into an asset sale agreement with Avaya for the EMEA portion of its enterprise solutions business. These agreements include the planned sale of substantially all of the assets of the enterprise solutions business globally for a purchase price of US $475 million.

20. The Bidding Procedures to be employed in connection with the sale process were approved by this Honourable Court and by the U.S. Court on August 4, 2009.

21. The Bidding Procedures provide that all bids must be received by the Sellers not later than 12:00 p.m. (prevailing Eastern Time) on September 4, 2009 and that the Sellers will conduct an auction of the Purchased Assets on September 11, 2009.

22. Nortel continues to advance its discussions with interested parties for its other businesses. In parallel with these sales discussions, the Company continues to assess other restructuring alternatives for these businesses in the event it is unable to maximize value through a sale of these assets.

23. The Monitor believes the Applicants are working diligently and in good faith to execute their restructuring strategy and continue to progress toward development of a Plan.

**CHANGES IN APPLICANTS' CORPORATE GOVERNANCE**

24. Prior to commencing insolvency proceedings, Nortel operated and functioned as a global firm. Generally, Nortel has one legal entity in each country in which it operates and sales of all Nortel products in that country are made through the single legal entity. A more detailed description of this global structure is set out in the Pre-Filing Report.

25. The Board of Directors of NNC and NNL (the "Board") is responsible for the governance of the Applicants. As of August 1, 2009, the Board was comprised of 9 individuals.

26. As discussed in paragraphs 2 through 6 of this Report, certain of the other Nortel entities have commenced their own individual insolvency proceedings. Each proceeding impacts on other Nortel entities due to the many intercompany relationships but each entity also has unique stakeholders. The interest of the Nortel entities and the unique stakeholders may differ.

27. The Applicants have indicated that the Board and its Chief Executive Officer ("CEO") believe Nortel has reached an appropriate transition point for its governance structure. Since filing the Applicants have:

    a) stabilized the business operations;

    b) made progress with respect to the sale of the various businesses, as described in more detail above;

    c) made organizational and reporting structure changes towards stand alone business units; and

d) established both Nortel Business Services ("NBS"), a business reporting unit to provide transitional services with respect to the sale of the business, and Corporate Group ("CG") to continue the implementation of Nortel's restructuring strategy.

28. Nortel has announced that effective August 10, 2009, its CEO is stepping down and the number of Board members is being reduced from 9 to 3.

29. The Applicants have indicated that as a result of additional responsibilities being assumed by the 3 remaining directors, their compensation, specifically the director fees, will be increased to $225,000 per director per annum and the fee for the Chairman of the Board will increase to $325,000 per annum (inclusive of the Chairman's director fees).

30. These governance changes will not impact on the level of customer service and supplier relationships on an on-going, day-to-day, operational basis.

31. In conjunction with these governance changes, the Applicants are also seeking an enhanced role for the Monitor with respect to the oversight of the business, sales processes and other restructuring activities pursuant to the CCAA proceedings. These enhanced powers are described in more detail later in this Report.

32. In addition, the Company is in the process of identifying a principal officer for the Nortel companies in the U.S. Chapter 11 proceedings who will work in conjunction with the UCC, the Bondholder Group and the Monitor to ensure the interests of Nortel's U.S. creditors continue to be served.

33. The CRO, Chief Strategy Officer and the leaders of NBS and CG will report to the Board, the Monitor and the proposed U.S. Chapter 11 principal officer.

**EXPANDED POWERS AND DUTIES OF THE MONITOR**

34. The Applicants, to date, have made progress in implementing their restructuring strategy, however, there is significant work still to be completed, including without limitation:

    a)  closing the sale of the CDMA Business and LTE Assets to Ericsson;

    b)  identifying stalking horse bidders, conducting auctions and closing sales for business units;

    c)  fulfilling transition service obligations with respect to the sale of business units in respect of which the Applicants and other Nortel entities are required to provide support and service to various purchasers for a certain time frame post-closing of a sale transaction;

    d)  realizing upon residual assets;

    e)  administering the claims process; and

    f)  development of a Plan.

35. In conjunction with the organizational changes described in the previous section, the Applicants have concluded it is necessary and appropriate to seek additional powers for the Monitor. These additional powers have been developed with Nortel's legal and financial advisors and the Monitor to address the appropriate governance requirements of the Applicants during the remainder of the CCAA proceedings.

36. The Applicants' motion proposes that the Monitor be granted the following additional powers and be authorized to perform the following duties, in addition to the powers and duties set out in the Initial Order (capitalized terms, unless otherwise defined, have the meaning as ascribed in the Initial Order):

    (a)    cause the Applicants, or any one or more of them, to exercise rights under paragraph 11 of the Initial Order to permit the Applicants to proceed with

an orderly restructuring of the Business, including, subject to certain conditions outlined in the Initial Order, the following rights of the Applicants:

    (i)    permanently or temporarily cease, downsize or shut down any of its business or operations and to dispose of redundant or non-material assets;

    (ii)    terminate the employment of such of its employees or temporarily lay off such of its employees as it deems appropriate and to deal with the consequences thereof in the Plan or on further order of the Court;

    (iii)    vacate, abandon or quit the whole but not part of any leased premises and/or repudiate any real property lease and any ancillary agreements relating to any leased premises, on written notice to the landlord on such terms as may be agreed upon between the Applicant and such landlord, or failing such agreement, to deal with the consequences thereof in the Plan;

    (iv)    repudiate such of its arrangements or agreements of any nature whatsoever, including, without limitation, any of its deferred compensation, or bonus plans, change of control plans, stock options or restructured stock unit plans and shareholder rights plans whether oral or written, as such Applicant may deem appropriate on such terms as may be agreed upon between such Applicant or any one of them and such counter-parties, or failing such agreement, to deal with the consequences thereof in the Plan; and

    (v)    pursue all avenues of refinancing and offers for material parts of its Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing or any sale.

(b)    cause the Applicants to perform such other functions or duties as the Monitor considers necessary or desirable in order to facilitate or assist the Applicants' operations, restructuring, wind-down, liquidation or other activities;

(c)    conduct, supervise and direct one or more sales processes for the Property or the Business and any procedure regarding the allocation and/or distribution of proceeds of any sales, and such authority shall be in respect

of sales processes and/or sales that have already been or may be in the future approved by this Court;

(d)    cause the Applicants to administer the business, affairs and operations of the Applicants as the Monitor considers necessary or desirable for the purposes of completing any transaction (whether or not already approved by this Court) for the sale of the Business or any part of it;

(e)    administer the Applicants' claims process (established pursuant to an Order of this Court dated July 30, 2009) and any other claims bar and/or claims resolution process approved by Order of this Court within these proceedings;

(f)    propose or cause the Applicants or any one or more of them to propose one or more plans of compromise and/or arrangement in respect of the Applicants or any one or more of them;

(g)    engage assistants or advisors or cause the Applicants to engage assistants or advisors as the Monitor deems necessary or desirable to carry out the terms of the Initial Order or any other Order made in these proceedings or for the purposes of the Plan and such persons shall be deemed to be "Assistants" under the Initial Order;

(h)    apply for any orders necessary or advisable to carry out its powers and obligations under this Order or any other Order granted by this Court including for advice and directions with respect to any matter;

(i)    meet and coordinate with the chief restructuring officer of the Applicants or any person holding any similar position;

(j)    cause the Applicants to exercise any and all of their authority in their capacities as shareholder(s) of any subsidiary of the Applicants, or any one of them;

    (k)    meet and consult with the board of directors of the Applicants as it deems necessary or appropriate;

    (l)    meet with and direct management of the Applicants with respect to any of the foregoing including, without limitation, operational and restructuring matters; and

    (m)    coordinate with individual appointed as the principal officer or any person holding a similar title of NNI or any successor or assign of such entity with respect to operational and restructuring matters.

37.    The proposed Order sought by the Applicants in their motion expanding the powers of the Monitor also includes the following safeguard provisions:

    (a)    The Applicants shall remain in possession and control of the Property and the Business and that the Monitor shall not take possession of the Property and/or the Business and shall not by fulfilling its obligations under this Order or any other Order be deemed to have taken or maintained possession or control of the Property or Business or any part thereof;

    (b)    All employees of the Applicants shall remain employees of the Applicants until such time as the Applicants may terminate the employment of such employees. The Monitor shall not be liable for any employee-related liabilities, including wages, severance pay, termination pay, vacation pay and pension or benefit amounts; and

    (c)    The Monitor shall continue to have the benefit of all of the protections and priorities as set out in the Initial Order and any such protections and priorities shall apply to the Monitor in fulfilling its duties under this Order or carrying out the provisions of this Order.

**MONITOR'S CONSENT**

38. Ernst & Young Inc. has indicated its willingness and consent to the proposed

    expansion of the power and duties of the Monitor as contemplated in the Applicants'

    motion and as reflected in the draft proposed Order sought therein.

All of which is respectfully submitted this 11th day of August, 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**


Per:


Murray A. McDonald
President