UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF DELAWARE

```
                              )
IN RE:                        )
                              )          Bankruptcy Action
 NORTEL NETWORKS, INC.,       )          Case No. 09-10138(KG)
 et al.,                      )
                              )          Chapter 11
              Debtors,        )          Wilmington, DE
                              )          August 4, 2009
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            JAMES L. BROMLEY, ESQUIRE
                           Cleary, Gottlieb, Steen &
                           Hamilton, LLP
                           One Liberty Plaza
                           New York, New York

                           DEREK C. ABBOTT, ESQUIRE
                           Morris, Nichols, Arsht & Tunnell,
                           LLP
                           1201 North Market Street
                           18th Floor
                           Wilmington, Delaware 19899

For Anixter:               JON VIGANO, ESQUIRE
                           Schiff, Hardin, LLP
                           233 South Wacker Drive
                           Chicago, Illinois 60606


Audio Operator:            Jennifer Pasiers

Transcribed by:            DIANA DOMAN TRANSCRIBING
                           P.O. Box 129
                           Gibbsboro, New Jersey  08026-129
                           PHONE:  (856)435-7172
                           FAX:    (856) 435-7124
                           Email:  Dianadoman@comcast.net




Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

(Appearances Continued)

For MatlinPatterson:          JENNIFER FELDSHER, ESQUIRE
                              Bracewell & Giuliani
                              1177 Avenue of the Americas
                              New York, New York 10036

For Verizon:                  DARRYL LADDIN, ESQUIRE
                              Arnall, Golden, Gregory, LP
                              171 17th Street NW
                              Atlanta, Georgia 30363

For Creditors Committee:      FRED HODARA, ESQUIRE
                              Akin, Gump
                              1 Bryant Park
                              New York, New York

For Robert J. Cabral:         ROBERT J. CABRAL
                              (Via Telephone)

For Flextronics:              JAMES DREW, ESQUIRE
                              (Via Telephone)
                              Curtis, Mallet-Prevost, Colt,
                              Mosle, LLP
                              202 Park Avenue
                              New York, New York

I N D E X

U.S. PROCEEDING

  BIDDING PROCEDURE MOTION

  Mr. Bromley                      6

PROFFERS:

  By Mr. Bromley:

  Mr. Riedel                      49
  Mr. Murray                      68

THE COURT: Ruling               87

CANADA PROCEEDING

  Mr. Tay                        76
  Mr. Carfagnini              84

JUSTICE MOROWETZ - RULING     89

1    (Call to the Order of the Court)

2         THE COURT:  Please be seated.  Thank you.  I don't

3    believe that Justice Morowetz has entered the courtroom yet.

4    But we're going to basically proceed the way we did the last

5    time, with Justice Morowetz just making a few very preliminary

6    remarks, and then we'll proceed here with our case.

7         Any preliminary comments?  Mr. Abbott?  I saw you

8    start to rise.

9         MR. ABBOTT:  Thank you, Your Honor.  I appreciate it.

10   We'll proceed as the Court directs.  Obviously, Mr. Bromley,

11   again, will be presenting for the debtors.  So once Justice

12   Morowetz makes his comments, then Mr. Bromley will address the

13   Court on the issues at hand.

14        THE COURT:  All right.  Thank you, Mr. Abbott.  Mr.

15   Hodara.

16        MR. HODARA:  Good morning, Your Honor.

17        THE COURT:  Good morning.

18        MR. HODARA:  Your Honor, today I have Tony Feuerstein

19   from our office with us.

20        THE COURT:  It's good to see you.  Welcome.

21        MR. FEUERSTEIN:  Thank you.

22        THE COURT:  I don't think we have anything separate

23   from what's proceeding in Canada, is that correct?  I did enter

24   orders under certificate of no objection, so those have been

25   entered.

1    MR. BROMLEY:  We do have a couple of other -- think

2    there are two other matters, Your Honor.  The bar date order

3    and a request --

4           THE COURT:  Yes.

5           MR. BROMLEY:  -- from an individual creditor.

6           THE COURT:  Yes.

7           MR. BROMLEY:  I think Justice Morowetz is now on the

8    Bench.

9           JUSTICE MOROWETZ:  Good morning, Judge Gross.

10          THE COURT:  Good morning, Mr. Justice Morowetz.

11          JUSTICE MOROWETZ:  Are you ready to proceed at your

12   end?

13          THE COURT:  Yes.

14          JUSTICE MOROWETZ:  Okay.  Good morning, counsel.  And

15   this, again, is the motion that is being brought in accordance

16   with the prosper (phonetic) of protocol, as previously been

17   approved in Nortel.

18          Today's motion, as I understand it, is being brought

19   by Nortel for approval of the asset sale agreement with Avaya,

20   Inc. in connection with Nortel's Enterprise Solutions.  Subject

21   to comments of counsel, Judge Gross and I have discussed the

22   process for proceeding today.  It would, again, involve,

23   because the formal objections have been filed in the U.S.

24   Bankruptcy Court, to proceed with the hearing in Delaware to

25   deal with those objections first.

1    Followed by any arguments in the U.S. Court.  We will

2    then deal with submissions and argument in the Canadian Court.

3    Judge Gross and I will then take a recess, and will then

4    reconvene with any endorsements or decisions for today.  Is

5    that acceptable to everybody here in this room?

6    That's fine for the Ontario end of things, Judge

7    Gross.  And I assume it's fine at your end.

8    THE COURT:  Yes, it is.

9    So we will proceed here with the bidding procedures

10   motion.  Good morning, Mr. Bromley.

11   MR. BROMLEY:  Good morning, Your Honor.  James

12   Bromley, Cleary, Gottlieb, on behalf of Nortel Networks, Inc.

13   and the U.S. debtors.

14   Good morning, Mr. Justice Morowetz.  Thank you very

15   much, once again, for accommodating us on a joint hearing

16   basis.  And, again, for doing so so quickly on the heels of our

17   last appearance.  I think it was just a week ago today that we

18   were here for the approval of the CDMA sale to Ericsson.

19   There are a couple of non joint hearing matters that

20   we have on the calendar here in the United States.  So what I

21   would propose to do is to deal with all of the joint hearing

22   issues first, and then allow both courts to consult, and then

23   rule, and then we can deal with our U.S. only issues after

24   that.

25   THE COURT:  Yes.

1          MR. BROMLEY:  I think they're very brief and,

2     hopefully, will go very quickly.

3          THE COURT:  Yes.  I think that's wise.

4          MR. BROMLEY:  And so let me get started then with

5     respect to our motion on a joint hearing basis.  The matter

6     that we're here on before both courts today has to do with

7     approval of bidding procedures with respect to the sale of the

8     Nortel Enterprise Solutions business.

9          And we have two motions that relate to that.  One is

10    the motion for the approval of the bidding procedures, setting

11    up the time line for the commencement and the completion of the

12    auctions, setting the sale hearing, approving certain notices.

13         And also a motion for the approval of a side

14    agreement, an agreement among the various debtor estates.  In

15    particular, between the U.S. debtors, the Canadian debtors and

16    the EMEA debtors, the European, Middle Eastern and African

17    debtors, with respect to the certain issues relating to the

18    allocation of proceeds.

19         So the side agreement relates to the now somewhat

20    infamous interim funding and settlement agreement.  So they go

21    hand-in-hand.

22         So by way of background, Your Honor, what we're

23    talking about today is the second major asset sale that we are

24    attempting to accomplish within the Nortel cases, within the

25    time of about a month.

1      The completion of the CDMA auction process, as I

2  mentioned, took place last week when we had approval of the

3  sale transaction by both courts, after a very successful

4  auction.

5      And we certainly hope that this exercise with respect

6  to the Enterprise Solutions business will yield a similar

7  result.  The matter that we have before the courts today has

8  taken a longer period of time to get before the courts.  It's a

9  more complicated business, and the transaction structure is a

10  bit more complicated.  And we'll attempt to describe that in

11  the course of today's hearing.

12      There also were objections filed in the U.S. with

13  respect to the bidding procedures.  A total of 9 formal and

14  informal objections have been lodged.  And I'm happy to report

15  that we have been able to resolve on a consensual basis each of

16  these objections.

17      And I would propose to first deal with those

18  objections, to go through the resolutions and allow counsel who

19  is present in the courtroom or on the phone, to confirm the

20  resolution of each of those objections.

21      After that, I then would propose to go to our

22  witnesses.  We have two witnesses, Mr. Riedel, the chief

23  strategy officer for Nortel, and Mr. Murray, our investment

24  banker from Lazard.

25      Because of the resolution of all the objections, I

1    think we will be able to proceed by proffer.  Although both of

2    the witnesses are available and present in the courtroom, if

3    anyone has the desire to cross-examine either of the witnesses.

4           And then after that, Your Honor, I would propose to

5    go through the legal standards for approval of the bidding

6    procedures, in particular the bid protections under Third

7    Circuit law.

8           So let's first, if I may, move to the resolution of

9    the objections.

10          THE COURT:  Yes.

11          MR. BROMLEY:  The bidding procedures for the Equinox

12   sale, as we call it, the Enterprise Solutions business, have

13   come in from a number of different areas.  And I think in some

14   respects the objections themselves give an indication of the

15   diversity of interests that are brought to bear with respect to

16   this particular transaction.

17          And I will go through them in the order that we had

18   dealt with them, and then ask counsel to come up and confirm

19   the resolutions.

20          And I should note, Your Honor, that in connection

21   with these resolutions, we have been conferring throughout the

22   process with counsel for Avaya, the purchaser.  Because it is

23   important to note that the bidding procedures order needs to be

24   in form and substance satisfactory to Avaya, in terms of the

25   terms and conditions of our agreement.

1      So it is our understanding that these resolutions are

2    satisfactory to Avaya, as well.

3          The first objection that we received was from a group

4    called Enterprise Networks Holdings BV.  This is an objection

5    that was filed by an interested party that describes itself as

6    a keen and interested bidder.

7          THE COURT:  Yes.

8          MR. BROMLEY:  And so I think that is a good place to

9    start.  So we are certainly hopeful that we are going to have a

10   process that's going to be active, and we certainly believe

11   that we're going to have competing interests in connection with

12   this auction.

13         Enterprise Networks Holdings had a number of requests

14   and clarifications.  First, with respect to due diligence,

15   there had been a request to add to the bidding procedures

16   themselves, which are attached to the order, a statement that

17   the sellers will provide access to each qualified bidder to all

18   material due diligence materials.

19         So what we have agreed to add to the bidding

20   procedures themselves, is a statement on due diligence as

21   follows.

22         In addition, the seller shall provide prompt access

23   to each qualified bidder, including the purchaser, to all

24   material due diligence materials, management presentations, on-

25   site inspections, and other information provided to any

1    qualified bidder, after the approval of these bidding

2    procedures.

3           Your Honor, we believe that the bidding procedures

4    already created that level playing field.  But in terms of the

5    clarification of the avoidance of doubt, we're certainly happy

6    to include that.

7           With respect to the qualified bid definition in the

8    bidding procedures, there is a process that is in place in

9    connection with the submission of bids, and the distribution of

10   the bids themselves to the other bidders.

11          And Enterprise Networks Holdings had requested the

12   following clarification, which we have agreed to, and as has

13   Avaya, which is that we will insert in the last paragraph

14   relating to qualified bid the statement, "In addition, no later

15   than 3 business days prior to the auction, a copy of each

16   qualified bid will be provided to all qualified bidders."

17          So just to give you a little bit of context, in terms

18   of the time line that we're talking about here, it's a little

19   longer time line for both the bidding process and for the --

20   and the time line between the submission of bids and the actual

21   commencement of the auction, then we had in connection with CDM

22   -- the CDMA transaction.

23          And so the agreement that we've made here is that,

24   all qualified bidders will receive a copy of each qualified bid

25   three business days prior to the auction.

1          In connection with the CDMA transaction, I believe

2     that we provided each qualified bid on the day before the

3     auction.

4          THE COURT:  Yes.

5          MR. BROMLEY:  So here we have a little more time, and

6     therefore we've extended that.  I think it's important that --

7     to note that the request was made in the context of recognizing

8     that this transaction is more complicated, in the way of

9     structure.  And we'll go into that in a little more detail, and

10    so the additional days were requested, and therefore we were

11    happy to accommodate them.

12         The third addition is a clarification, which is that

13    attendance at the auction itself, in terms of physical

14    attendance, will include advisors to the qualified bidders.  We

15    had -- we believe that that was inherent in the bid procedures,

16    but we're happy to add that clarification.  And I should note

17    that in the context of the CDMA transaction we had lots of

18    advisors from all the qualified bidders present.

19         So we will certainly encourage that going forward.

20    In connection with the sale hearing as the fourth

21    clarification, which is that what we have in the bidding

22    procedures is a defined term that's called the alternate bid

23    expiration date.

24         THE COURT:  Yes.

25         MR. BROMLEY:  And again that has to do with our

1    backup bid, the second bid that is submitted in the auction,

2    and when that bid expires.  And we had, at the time that we

3    filed the motion, a relatively complicated calculation of when

4    the bid would expire.  And Enterprise Network Holdings has

5    suggested, and we have agreed, as well as Avaya has agreed, to

6    simply make the alternative -- alternate bid expiration date

7    simply be September 30th, 2009.

8            THE COURT:  Okay.

9            MR. BROMLEY:  With the idea that what we'll have is

10   an auction on September 11th, and a sale hearing on September

11   15th.  So this would be basically having the alternate bid open

12   for another 2 weeks.  Those are the four changes to the bidding

13   procedures themselves that have been requested by Enterprise

14   Networks, and we've agreed to, as has Avaya.

15           Also there was a request for a statement on the

16   record, which I'm happy to make, which is that the electronic

17   data room that has been established, will be loaded for all

18   those who have signed appropriate NDA's, or non-disclosure

19   agreements, it will be loaded with copies of all of the

20   transaction documents.

21           There are a series of ancillary agreements that go on

22   that relate to the asset share and sale agreement.  The ASSA.

23   They were not filed publicly, because of the sensitivity of

24   those documents.  But they will be made available on the

25   electronic data room to all who are qualified to review

1    materials on that data room.

2         So that is the resolution that we've been able to

3    reach with the Enterprise Networks Holdings folks.  And I would

4    ask that their counsel just confirm that that accurately

5    reflects the resolution.

6         THE COURT:  Very well.  Good morning, Mr. Bifferato.

7         MR. BIFFERATO:  Good morning, Your Honor.  Connor

8    Bifferato on behalf of Enterprise Networks Holdings.  And I can

9    confirm for the record that the representations on the record

10   and the changes that counsel described that are in the current

11   version of the order, satisfies Enterprise Network's Holdings

12   objection.

13        THE COURT:  Okay.  Thank you.

14        MR. BIFFERATO:  Thank you, Your Honor.

15        MR. BROMLEY:  Moving on, Your Honor, the next

16   objection that was filed was from our friends at

17   MatlinPatterson Group.

18        THE COURT:  Yes.

19        MR. BROMLEY:  And there have -- and they may seem a

20   bit familiar, because there were certain echos related to the

21   objections that had been filed in connection with the CDMA

22   process.  As you will recall, Your Honor, at the bidding

23   procedures hearing relating to the CDMA sale, MatlinPatterson

24   had made certain objections, including asking for clarifying

25   language that would allow a plan of reorganization to be

1    considered in connection with the sale transaction.  At the

2    sale -- at the bidding procedures hearing for the CDMA

3    transaction, we simply added in the term plan of reorganization

4    into the litany of things that we had for qualified bids.

5            In retrospect, we actually recognized that that was

6    probably too blunt a term to simply insert in, and there's lots

7    of things that that could qualify.  So what we've done, in

8    response to the objection that was filed here, is trim up and

9    actually expand the language a little bit, to make it clear

10   that what exactly we're talking about.

11           So that in the definition of qualified bid, we will

12   be including in a parenthetical after the term "alternative

13   structure," a parenthetical that says:

14           "Including, without limitation, an offer conditioned

15   upon confirmation of a plan of reorganization proposed by the

16   U.S. debtors, either individually or in collaboration with such

17   qualified bidder."

18           So that would mean, in connection with these assets

19   that are being sold, that if a proposal is put in that is

20   conditioned upon confirmation of a plan relating to these

21   assets, that it is something that could be considered in the

22   process.

23           We believe that we had the latitude already in the

24   language to consider that.  But in order to make it absolutely

25   clear, we were happy to add that.  And we consulted with Avaya,

1    who has agreed with that, as well.

2          That is in subparagraph (a) in the bidding

3    procedures, under the term -- the definition of qualified bid.

4          THE COURT:  Yes.

5          MR. BROMLEY:  The next change that we agreed to has

6    to do -- would appear in subparagraph (g) of qualified bid.

7    And this was a request from MatlinPatterson to provide a little

8    more context to the considerations that would go into looking

9    at a qualified bid.

10         And so at the end of subparagraph (g), we've agreed

11   to add in the following statement that says:

12         "Provided that in determining such value, the sellers

13   will not be limited to evaluating the dollar amount of a

14   competing bid, but may also consider such factors identified in

15   the evaluation of competing bid section of these bidding

16   procedures, including without limitation, factors effecting the

17   speed and certainty of obtaining regulatory approvals required

18   to close the transaction."

19         That, I think it goes primarily to the fact that

20   there is an antitrust issue that has to be addressed in the

21   context of this transaction.  Again, we believe that that was

22   already embedded within the discretion of the debtors and its

23   constituents to consider competing bids.  But for the sake of

24   clarity, we agreed to add that in and -- oh, I'm sorry, Your

25   Honor --

1          MR. ABBOTT:  May I approach with the black line --

2          THE COURT:  Yes.

3          MR. ABBOTT:  I think it will be a little easier to

4     follow, Your Honor.  I apologize.

5          THE COURT:  I know the provisions.  But, thank you,

6     this will be helpful.

7          MR. BROMLEY:  I'm sorry, Your Honor.

8          THE COURT:  That's quite all right.  We're in the

9     bidding procedures --

10         MR. BROMLEY:  Yes.

11         THE COURT:  -- section and I did read those -- that

12    language in preparing.  And I think that you're right.  I think

13    that was certainly inherent in what can be considered in

14    determining higher and best, but the language is certainly

15    helpful, I think, in resolving the objection in any event.

16         MR. BROMLEY:  So -- yeah, I think in terms of, you

17    know, for the sake of clarity, we're happy to add that.  The

18    next has to do with under paragraph -- subparagraph (f)

19    relating to auction.

20         And this is the paragraph begins, "Bidding at the

21    auction will begin with the starting bid."

22         THE COURT:  Yes.

23         MR. BROMLEY:  At the -- in the middle of that

24    subparagraph, there's a sentence that begins "Each incremental

25    bid..."

1          So I'll just read the entire sentence and then get to

2     the point where we have added new language.

3          "Each incremental bid at the auction shall provide

4     net value to the estate of at least U.S. 2.375 million over the

5     starting bid, or the leading bid, as the case may be, provided

6     that the sellers, in consultation with the committee, the bond

7     holder group and the monitor, shall retain the right to modify

8     the increment requirements at the auction."

9          Then we'll add new language which says:

10         "And provided further that the sellers, in

11    determining the net value of any incremental bid to the estate,

12    shall not be limited to evaluating the incremental dollar value

13    of such bid, and may consider other factors as identified in

14    the selection of successful bid section of these bidding

15    procedures, including, without limitation, factors effecting

16    speed and certainty of obtaining regulatory approvals required

17    to close the transaction."

18         So that simply duplicates in the auction section the

19    same language we've just added into the qualified bid section.

20         THE COURT:  Yes.

21         MR. BROMLEY:  Okay.  So that I think with those three

22    additions, which we've discussed with MatlinPatterson and the

23    debtors, and Avaya have agreed to, I think resolves

24    MatlinPatterson's objection.  And would ask counsel to just

25    confirm that on the record.

1          THE COURT:  All right.

2          MS. FELDSHER:  Good morning, Your Honor.  Jennifer

3     Feldsher from Bracewell & Giuliani on behalf of

4     MatlinPatterson.

5          THE COURT:  Yes, Ms. Feldsher.

6          MS. FELDSHER:  Mr. Bromley is correct.  And we thank

7     the debtors and Avaya for the changes that they've agreed to.

8     As Your Honor can tell, we raised three issues, but the issues

9     are all very related, in that our concerns here are Avaya's

10     obviously a big player in this field, and we believe that

11     regulatory approvals here may be, you know, an uphill battle.

12     We certainly hope that, if Avaya's the winning bidder, that

13     they will overcome that battle, and do so expeditiously.

14          But as a creditor in this case, you know, we remain

15     concerned about certain provisions in the contract that relate

16     to that.

17          So we are thankful for the language that the debtors

18     have agreed to and Avaya's agreed to include.  And also just

19     note for the Court, that on our remaining objection, while

20     we've consulted with the debtors and the committee and don't

21     believe any additional language is necessary about, you know,

22     what occurs between closing -- between approval of the

23     transaction and closing, you know, if circumstances change and

24     our worse fears come to fruition, we may be back before this

25     Court.

1           And just wanted to call Your Honor's attention to

2      that, that, you know, if that occurs we may have to be back

3      here.

4           THE COURT:  All right.

5           MS. FELDSHER:  Thank you, Your Honor.

6           THE COURT:  Thank you, Ms. Feldsher.  I think the

7      language is helpful.  Thank you.

8           MR. BROMLEY:  Yes.  And certainly MatlinPatterson was

9      a helpful participant in our last process, so we appreciate

10     that.

11          THE COURT:  Yes.

12          MR. BROMLEY:  The next objection that we had was an

13     objection by the Pension Benefit Guaranty Corporation, the

14     PBGC.

15          THE COURT:  Yes.

16          MR. BROMLEY:  You will recall that the PBGC filed a

17     similar objection in connection with our CDMA sale process.

18     And we will resolve it here as we did there.  Which is to point

19     out that the final sale order will not seek to transfer any

20     non-debtor assets free and clear of liens and claims, and that

21     the relief that we are seeking is not intended to seek approval

22     of the transfer of any non-debtor assets free and clear of

23     liens and claims.

24          It is important to note, in this transaction, we will

25     be transferring, under the proposed agreement, the stock of two

1    non-debtors.

2          But the stock itself constitutes assets of debtors.

3    So we're not seeking to transfer the assets of those non-

4    debtors free and clear, but we will be seeking to transfer the

5    stock of those non-debtors free and clear.

6          So that is the clarification for the PBGC.  I'm not

7    sure if they're in the courtroom.  Yes.

8          THE COURT:  Good morning.

9          MR. MURELL:  Good morning, Your Honor.  Vincente

10   Mattias Murell on behalf of the pension benefit guarantee

11   corporation.  Your Honor, what Mr. Bromley has said summarizes

12   our discussion with the debtors and is accurate.

13         And we look forward to resolving with the debtor

14   appropriate language in a sale order that transfers debtor

15   assets, but leaves -- but does not transfer debtor assets free

16   and clear.

17         THE COURT:  All right.

18         MR. MURELL:  Thank you, Your Honor.

19         THE COURT:  Thank you.

20         MR. BROMLEY:  Your Honor, the next objection is from

21   a landlord.  UCM/SREP, Corp.

22         THE COURT:  Yes.

23         MR. BROMLEY:  Woods, LLC.  The objection has been

24   resolved without need for any statements on the record.  It

25   really has to do with certain noticing issues.  So we have been

1    able to reach an agreement.  With that, we will be proceeding

2    on that basis.

3         THE COURT:  All right.  Thank you.  Does Mr. Wisler

4    (phonetic) wish to be heard?  I don't believe he's here, so he

5    must be fully satisfied.

6         MR. BROMLEY:  The next objection, Your Honor, is from

7    Flextronics.

8         THE COURT:  Yes.

9         MR. BROMLEY:  The objection from Flextronics is

10   similar to the objection that was filed by Flextronics in

11   connection with the CDMA bidding procedures.

12        As you will recall, Flextronics is a major supplier

13   to the Nortel Businesses, and we have mentioned them on a

14   number of occasions, and had a settlement agreement approved

15   with them, as well as a substantial agreement of proof on the

16   first day of the case by Mr. Justice Morowetz.

17        The resolution with respect to this motion, is the

18   addition of two pieces of text that would be added into the

19   bidding procedures order.

20        And this, to give a bit of context, has to do

21   primarily with respect to the process by which we are going to

22   be assuming and assigning contracts.

23        THE COURT:  And there were a few other objections

24   also relating to that objection.

25        MR. BROMLEY:  Yes.  And it might be worthwhile as --

1    just as a sort of introduction to the resolution, to describe a

2    little bit the way this process is going to work.

3              THE COURT:  Yes.

4              MR. BROMLEY:  You will hear in the proffer of Mr.

5    Riedel that the Enterprise business is different from the CDMA

6    business, in terms of the way the contracts and the customers

7    are structured.

8              Whereas the CDMA business had relatively few

9    customers and very big contracts that lasted over long periods

10   of time, the Enterprise businesses is the opposite.  There are

11   many, many smaller contracts, and they have much shorter

12   durations.

13             And so in particular on the customer side, we're

14   talking contract -- the number of contracts in the tens of

15   thousands.

16             THE COURT:  Yes.

17             MR. BROMLEY:  And so the process that we've put in

18   place is a process very similar to the process that is being

19   used in cases such as General Motors and Chrysler, where there

20   are substantial amounts of contracts, all of which need to be

21   dealt with, but cannot be dealt with by the time of the sale

22   hearing.

23             So there is a process that we had put in place that

24   we seek approval for, which is that we will be providing notice

25   after the sale hearing, after the purchaser or the successful

Bromley - Presentation                          Page 24

1    bidder has been able to identify the contracts that it wishes

2    to take and wishes the debtors to assume and assign.

3            And that process requires notice to be given and an

4    opportunity to be heard and object and make the typical

5    assumption objections relating to adequate protection -- or

6    adequate assurance, I'm sorry, of future performance, as well

7    as objections relating to the amount of cure, if any, that's

8    due.  And just to step back for a moment, we do -- we have had

9    a transaction already, a smaller one, the Radware transaction.

10           THE COURT:  Yes.

11           MR. BROMLEY:  The level 7 transaction, which was

12   approved several months ago, where we did have a large number,

13   relatively speaking, of customer contracts.  And in those

14   circumstances, it was our estimate that the cure costs would be

15   zero on the customer contracts.  And I think, aside from one or

16   two, we proved -- that proved to be correct.

17           And so we anticipate that it will similar in this

18   situation.  Nevertheless, the sheer number of contracts that

19   are at issue will require that the process take place after the

20   sale hearing.  But all of the procedural protections and legal

21   protections available to counter parties will be preserved.

22           Also complicating this somewhat is the fact that,

23   again, striking a familiar theme, this is a multi-

24   jurisdictional case and we do have, not just contracts in the

25   United States that are subject to Section 365 assumption and

1    assignment, but also contracts in other jurisdictions around

2    the world, in Canada and EMEA in particular.

3         And so part of the process that the purchaser or a

4    successful bidder will need to go through, is to look at all of

5    those contracts, not just the U.S. contracts.  So it will

6    require some more time.

7         And, again, as I said, Your Honor, these procedures

8    are procedures that I think are very consistent with those that

9    have been employed with success in the recent <u>Chrysler</u> and <u>GM</u>

10   cases, as well as the <u>Lehman Brothers</u> case of late last year.

11        So with that as a bit of background, with respect to

12   Flextronics, there have been two changes that we've agreed to,

13   and Avaya has agreed to, in the context of the bidding

14   procedures order.

15        The first is the inclusion of a statement that says:

16        "Notwithstanding anything to the contrary in the

17   assignment procedures, Flextronics must file a written

18   objection with the Court no later than 30 days following the

19   service of any initial or final notice."

20        So what this means is that, with respect to

21   Flextronics, we are going to be able to tee up any issues that

22   we have with Flextronics because of the size of their

23   relationship with the debtors, in a more defined and early

24   stage.  This is, I think both to the benefit of Flextronics as

25   well as to the benefit of the debtors and any -- the purchaser

Bromley - Presentation                    Page 26

1    or any successful bidder.

2         The second is that the debtors shall use commercially

3    reasonable efforts to provide Flextronics Corporation and

4    Flextronics Telecom Systems Limited, together Flextronics, with

5    notice prior to the sale hearing of the proposed treatment by

6    the purchaser under the agreement, that is our agreement as

7    defined in the motion, of executory contracts between one or

8    more of the debtors in Flextronics, provided, however, that the

9    disclosure of the treatment of such executory contracts by the

10   purchaser, or any other qualified bidder, is not a prerequisite

11   to a determination of qualified bidder status participation in

12   the auction, the selection of a successful bidder, or the

13   collaboration of the debtors with a successful bidder to close

14   the transaction.

15        Now there's a lot there, but what that means

16   essentially, Your Honor, is that, as it relates to Flextronics,

17   and this purchaser, Avaya, there will be a requirement that we

18   provide notice to Flextronics prior to the sale hearing.

19        Or we use our -- I'm sorry, use our commercially

20   reasonable efforts to provide notice to Flextronics prior to

21   the sale hearing of the proposed treatment of the contracts

22   between the debtors and Flextronics.

23        We can't guarantee it, we will use our commercially

24   reasonable efforts to do so.

25        And that there's no prejudice to Flextronics' rights

1    to say that a failure to do so is a problem as it relates to

2    the sale hearing.

3            So what we could find ourselves in is a situation

4    where we have a determination with respect to this purchaser as

5    to how Flextronics' contracts will be treated.  And that would

6    be notice -- they would be provided notice of that prior to

7    sale hearing.

8            It's also possible that, despite commercially

9    reasonable efforts to do so, that it's not possible to do that.

10   In either case, Flextronics will have all of its rights to

11   press any objection at the sale hearing, and the debtors will

12   have all of its rights to assert any defenses at the sale

13   hearing.

14           So this is a commercially reasonable effort to

15   undertaking so that we can provide Flextronics with disclosure,

16   to the extent possible, prior to the sale hearing.

17           Now of course because this is an auction, we have

18   complicating this the fact that Avaya may not be the successful

19   bidder, as was the case in the CDMA context.

20           And, again, in that situation, all of the rights of

21   both the debtors and Flextronics are reserved, both for making

22   objections and making any responses to those objections at the

23   sale hearing.

24           THE COURT:  Okay.  Does anyone wish to be heard for

25   Flextronics?  Mr. Bowdin?  All right.

1          MR. DREW:  Your Honor, on the phone, James Drew from

2     Curtis Mallet-Prevost.  Mr. Bromley's statement was accurate.

3     And of course we reserve all rights to object to the sale

4     itself and our treatment under the sale.

5          Though we're going to work cooperatively with Nortel

6     to try to resolve any objections.

7          THE COURT:  All right.  Thank you.

8          MR. BROMLEY:  Okay.  Good.  Well that's Flextronics.

9     Then moving on to our next objection, which is an objection

10    filed by Verizon.

11         THE COURT:  Yes.

12         MR. BROMLEY:  As Your Honor is aware, Verizon is an

13    important customer and reseller with respect to Nortel, and the

14    reseller context is in the -- in the Enterprise Solutions

15    business, as you'll hear in the proffer of Mr. Riedel.

16         The -- Nortel sells both directly to end users and

17    through other channels, resellers such as Verizon.  And Verizon

18    had -- has requested that a couple of statements be put on the

19    record that we are willing to make.

20         That Verizon, and I'll ask for counsel to confirm

21    this, that Verizon intends to object to any sale where the

22    successful bidder has not notified Verizon of its intent to

23    instruct the debtors to assume and assign the Verizon executory

24    contracts prior to the sale hearing.

25         And Nortel, in turn, is going to put a statement on

1    the -- the following statement on the record.  Which is that we

2    will oppose Verizon in taking any such position at the sale

3    hearing.  And ask that the Court permit the successful bidder

4    to instruct the debtors to notify Verizon of the assumption and

5    assignment at a date later than the date requested by Verizon.

6         The reason for this clarification on the record, Your

7    Honor, is I think to make it clear that Verizon wants

8    notification of the treatment of its contracts earlier, rather

9    than later.  And that it is making clear and public its intent

10   to object, to the extent that -- at the sale hearing to the

11   extent that that is not done.

12        And in -- at the same time the debtors are reserving

13   their rights oppose that.  But given the importance of the

14   Verizon relationship, we thought it prudent to make that clear

15   on the record.

16        THE COURT:  All right.  Good morning.

17        MR. LADDIN:  Good morning, Your Honor, Darryl Laddin

18   on behalf of the affiliates of Verizon Communications, Inc.

19        I have a couple of comments, and I think it may be

20   helpful for me to provide a little bit of background, Your

21   Honor.  And I will be brief.  There are several points that we

22   had discussed with debtor's counsel and I think one of those

23   was missed.  So I'll try to go over this.

24        But as Mr. Bromley indicated, and is indicated in our

25   papers, Verizon is a major, major purchaser and reseller of

1    Nortel's products and services.

2         And to give the Court an idea, in the asset purchase

3    agreement a major customer is defined as a million dollar a

4    year customer.

5         THE COURT:  Yes.

6         MR. LADDIN:  Verizon, in 2008, was a 140 million

7    dollar customer.  So that is a very significant difference.

8    And in the nature of the products and services that are

9    provided by Nortel to Verizon, and in turn by Verizon to its

10   customers, are pretty important to understand here in the

11   context of why Verizon has the concerns that it has.

12        Long gone are the days when you simply pickup a phone

13   and use it actually just to talk.  A big difference today, as I

14   think the Court has become well aware from -- by virtue of this

15   case, communications systems now involve voice, data, and a

16   substantial intelligence component, that is dependent upon a

17   variety of equipment systems, support and maintenance that's

18   very, very sophisticated and involves routers, switches and all

19   the services that are necessary to support the communications

20   needs.

21        Verizon has installed these systems, tens of

22   thousands of these systems, in thousands of customers across

23   the country.

24        And the customer base, it is important to note who it

25   is, or at least the types of customers.  Almost every federal

1   agency is a customer using this equipment and these services.

2   That includes civilian and military, those with significant

3   national law enforcement, intelligence gathering, anti-

4   terrorism, and national defense responsibilities.

5         As well as military bases in the United States,

6   continental United States and outside the continental United

7   States.

8         The court systems of this country, branches of the

9   Federal Government, banks with a need for security, is

10  particularly important.  Hospitals, universities, schools,

11  libraries, manufacturers.  And to give, you know, the Court a

12  little bit more background, and this is near and dear to my

13  heart, take 911 calls as an example.  Voice isn't the only

14  thing that's implicated there.

15        God forbid you had a fire or an emergency at your

16  house, which I happen to have had recently, when you call 911,

17  the phone system you -- it tells the system, the operator where

18  you live, and who you are, and it routes the call to the

19  nearest center.

20        That's all a part of the intelligence that's

21  associated with the phone systems that are, many of which are

22  supported with the Nortel Equipment's -- equipment services.

23        So a failure of those kind of systems, whether it's

24  the federal level or the state level, or whether it's a bank

25  failure of those systems to operate, would be critical.  And

1   there's no such thing, given the nature of these systems and

2   how complex they are, there's no such thing as a short and easy

3   transition.  It's not 15 days, it's not 30 days, it's not 75

4   days.  But for many of these systems, we're talking about a

5   year or more to do a transition.

6          So as a result of that, Verizon had a significant

7   problem with bid procedures that proposed to notify a customer

8   such as Verizon after the sale hearing and up to as little as

9   15 days prior to closing.

10          And so it's not just a question of, again, the 15 or

11   30 days, but because the necessary transition is so long,

12   because the products and services that Nortel provides are so

13   mission critical and so imbedded, and because the damages and

14   the risk to national security, the risk to the public is so

15   significant, we thought it was very important to bring now to

16   the Court's attention the problem with these procedures.

17          It's also, interestingly, as I mentioned, it's

18   critical to valuation as well.  It's critical to the ability to

19   close the deal, and it's critical to valuation, given the size

20   customer that Verizon is.

21          So, obviously, we're not here to litigate that now.

22   But I thought it was important, in case it were to come up

23   later, for the Court to have that background.  So what we've

24   agreed on are two sets of procedures.

25          The first ones, I think Mr. Bromley meant to mention,

1    is as to Avaya, who is currently the stalking horse, they have

2    agreed to let Verizon know at least 10 calendar days prior to

3    Verizon's deadline to object to the sale motion, what Verizon

4    contracts that Avaya is designating for assumption or

5    rejection, including by sending those notices to me as counsel

6    by e-mail.

7          And I'll obviously let Avaya's counsel confirm that

8    on the record.  So but right now, for example, in the proposed

9    order that's been handed up to Your Honor, the objection

10   deadline is September 4th for the sale.

11          THE COURT:  Correct.

12          MR. LADDIN:  So that would require those notices of

13   assumption or rejection to come to me by August 25th, which is

14   10 calendar days prior to September 4th.  If the objection

15   deadline moves, similarly so would the notice deadline.

16   Secondly, as has obviously been mentioned, Avaya may not be the

17   winning bidder.

18          And so we had to deal with the alternative of another

19   potential successful purchaser.  And as Mr. Bromley indicated,

20   the debtor has agreed to use commercially reasonable efforts to

21   have the successful bidder identified before the sale hearing,

22   whether each of the Verizon contracts will be assumed and

23   assigned at closing.  And if they do not do that, Verizon would

24   have the right to object to the sale on that basis.  And we

25   would expect to do that.

1          Nothing in the procedures order that Your Honor is

2      entering will be res judicata or collateral estoppel of that

3      issue.

4          And as Mr. Bromley indicated, we have informed the

5      debtor that, if the Verizon contracts are not designated to be

6      assumed prior to the sale hearing, then we would object, for

7      all of the reasons that I've indicated to Your Honor.

8          In addition, nothing in our agreement that we've

9      reflected here on the record would restrict Verizon's right to

10     object to the sale for any other reasons.

11         THE COURT:  All right.

12         MR. LADDIN:  Thank you, Your Honor.

13         THE COURT:  Let me just hear from Mr. Bromley, to

14     make sure that, aside, obviously, from some of the background

15     information and argument to the extent there was some, do you

16     agree with the position they're taking?

17         MR. BROMLEY:  Yes.  I want to apologize, Your Honor.

18     In terms of my notes with -- we have another objection,

19     Anixter, Inc., which I'll do next.

20         THE COURT: Okay.

21         MR. BROMLEY:  I actually had built into the Anixter

22     description, but not into the Verizon description, the 10

23     calendar days concept.  And it applies both to Verizon and to

24     Anixter, and that has been agreed to by Avaya, as well.

25         So I'm happy to make that clarification.

1       THE COURT:  All right.

2       MR. BROMLEY:  I think it's worthwhile, though, as Mr.

3   Laddin has made some statements, just to respond to a couple of

4   them while we're here.  I think it's -- there's a couple of

5   things to keep in mind.  Nortel is the company that's in

6   bankruptcy and seeking to sell this business and to put it into

7   safe hands.

8       As well as to maximize the value of its assets.

9   Verizon is one of the largest and most successful companies in

10  the world.  And I can hear them now.  So the fact is, is that

11  if there's anyone who's able to take care of their customers,

12  it's Verizon.

13      And a lot of what Mr. Laddin has said on the record

14  is argument, without any evidence supporting any of it.

15      I don't think anyone denies that Verizon is a major

16  customer.  I don't think anyone denies that Verizon has been a

17  purchaser and a reseller of substantial amounts of product and

18  services.  What we're trying to do through these procedures, is

19  to preserve the debtors' rights as it relates to Verizon to be

20  able to have a process that maximizes the value of the

21  Enterprise business.

22      But when push comes to shove, at the end of the day,

23  we have the ability to reject contracts, and the ability to

24  reject those contracts is governed by Section 365 in the

25  Federal Bankruptcy Rules.

1           And the provisions that we've agreed to build into

2      the Verizon -- into the bidding procedures and to make

3      clarifications, we think actually take the process beyond what

4      is actually required by the statute and the rules.

5           And so, while we're very happy to try to accommodate

6      Verizon to the extent possible, certainly we do reserve all of

7      our rights in connection with any sale, and we recognize the

8      need to balance things.

9           But what we are doing here is attempting to maximize

10     value, and we're not trying to do anything that is not

11     permitted by the Rules or the Code.

12          I don't think we need to go any further than that, at

13     this point, but I just didn't want that not to go -- to go

14     unsaid.

15          THE COURT:  All right.  I understand.  And clearly

16     the importance of Verizon and Nortel to one another, I would

17     hope would generate some discussion and resolution.

18          MR. BROMLEY:  Yes, there's been a long and successful

19     relationship between both companies, and certainly we hope to

20     continue that.  And as we go through these sale processes, to

21     work closely with Verizon to make sure that the value of that

22     relationship is realized through the sale process.

23          THE COURT:  Absolutely.

24          MR. BROMLEY:  While we're on it, why don't I deal

25     with Anixter, as well.

Bromley - Presentation                    Page 37

1          THE COURT:  Yes.

2          MR. BROMLEY:  Because Anixter is a related matter.

3     First, I will note that Anixter's objection was filed several

4     days after the expiration of the objection deadline.  And while

5     that might be fun to argue whether or not it's appropriate,

6     we've decided to not do that and to try to resolve the

7     objection, late though it may be.

8          THE COURT:  And I did receive it this morning and

9     reviewed it.

10         MR. BROMLEY:  Thank you, Your Honor.  And so,

11    basically, Anixter is a both a customer and a supplier to the

12    Enterprise business.

13         And so we have agreed, and Avaya has agreed, that it

14    will let Anixter know by at least 10 calendar days prior to the

15    deadline for Anixter to object to the Enterprise sale motion,

16    what contracts Avaya will be designating for assumption.

17    Including by sending such notices to Anixter's counsel by e-

18    mail.

19         So the same time lines that Mr. Laddin put on the

20    record with respect to Verizon would apply with respect to

21    Anixter.

22         And to the extent that Avaya is not the successful

23    bidder at the auction, Nortel will use commercially reasonable

24    efforts to have the successful bidder inform Anixter before the

25    sale hearing whether Anixter executory contracts will be

Bromley - Presentation                    Page 38

1    instructed to be assumed and assigned.

2            And if the successful bidder does not do so,

3    Anixter's rights to object to the sale at the sale hearing,

4    will be preserved, as will any rights that Nortel has to object

5    and oppose that objection.

6            And, again, as Mr. Laddin said, that the approval of

7    the bidding procedures will not act as res judicata or

8    collateral estoppel as to any objection or defense that can be

9    raised at the sale hearing, and nothing contained in the

10   bidding procedures would limit Anixter's right to object to the

11   sale on any other basis, or Nortel's right to oppose any

12   objection on any basis.

13           THE COURT:  All right.  Does anyone wish to be heard

14   for Anixter?  Good morning.

15           MR. VIGANO:  Good morning, Your Honor.  John Vigano

16   on behalf of Anixter, Inc.  I'd just like to share that Mr.

17   Bromley's statements are accurate.  And thank you to Nortel and

18   Avaya for considering Anixter's request with respect to its

19   objection to the sale procedures.

20           Lastly, Your Honor, without getting into the history

21   and relationship Anixter has with Nortel currently, just to

22   give the Court some sense of the relationship, it's my

23   understanding that Anixter purchases approximately 70 percent

24   of its sales in Latin America from Nortel.

25           And we view our customer contract as a major contract

1    under the sale, as well.  So we will reserve our rights, as Mr.

2    Bromley indicated, with respect to the sale agreement.  And,

3    again, thank Nortel, this Court, and Avaya for accommodating

4    our request with respect to the objection.  Thank you.

5          THE COURT:  Thank you, Mr. Vigano.

6          MR. BROMLEY:  The next objection, Your Honor, was an

7    informal objection, so nothing was filed.

8          THE COURT:  Okay.

9          MR. BROMLEY:  So let me take a little bit more time

10   to explain it.  This was an informal objection that we received

11   form the United States Department of Justice.

12         This has to do with a statute that's known as the

13   Anti-Assignment Act.  The Anti-Assignment Act is a statute that

14   essentially exempts from the 365 overruling of anti-assignment

15   provisions, contracts with the Federal Government.

16         So whereas any anti-assignment provisions with a non-

17   governmental contract can be overridden by Your Honor under

18   Section 365, the Anti-Assignment Act doesn't allow that with

19   respect to contracts with the Federal Government.

20         So that has two implications with respect to this

21   transaction.  The first is, that NNI, a debtor, has a couple of

22   contracts with Government entities.

23         And so -- not many.  Literally just one or two.  And

24   the Department of Justice has asked that the bidding procedures

25   order contain two statements that relate to those contracts.

1           And basically, in sum and substance, I'll read it

2    into the record.  But the idea is that, we are not seeking to

3    override the Anti-Assignment Act as it relates to those

4    particular contracts that are contracts with debtors.  So what

5    we would propose to add, and the Department of Justice has

6    agreed to, are the following two statements.

7           "That the debtors recognize that the United States

8    and certain of its departments, agencies and instrumentalities,

9    other than the Pension Benefit Guaranty Corporation,

10   collectively the United States Government, may be a counter

11   party to certain enterprise agreements."

12          And that's the defined term for the contracts

13   relating to this business.

14          "To the extent that any Enterprise agreement with the

15   United States Government is designated for assumption and

16   assignment, pursuant to the assignment procedures..."

17          Again a defined term.

18          "...the debtors will seek the consent of the

19   applicable Governmental counter party in compliance with 41

20   U.S.C. 15 and 31 U.S.C. 3727.  And comply with applicable laws,

21   regulations and novation procedures."

22          In substance what that means is that the Government

23   needs to consent to any assignment.

24          THE COURT:  Okay.

25          MR. BROMLEY:  And we are happy to put that into the

Bromley - Presentation                    Page 41

1   bidding procedures order.  The second statement is that:

2           "Notwithstanding anything to the contrary in the

3   assignment procedures, the United States Government must file a

4   written objection with the Court no later than 45 days

5   following the service of any initial or final notice."

6           So the assignment and assumption procedures flow off

7   of the provision of notices relating to the contracts.  And so

8   this simply memorializes the fact that the Government has 45

9   days following the service of any initial or final notice to

10  lodge an objection.

11          It is longer than other parties get.  But that is

12  part of the, I guess, the privilege we have.  And I should note

13  that the Department of Justice is acting as the representative

14  of a number of different governmental agencies.  Other than the

15  PBGC.

16          THE COURT:  All right.

17          MR. BROMLEY:  The second relationship of the Anti-

18  Assignment Act to this transaction relates to a specific

19  subsidiary, an entity known as Nortel Government Solutions.

20          THE COURT:  Yes.

21          MR. BROMLEY:  And you may recall, Your Honor, during

22  the first day proceedings, we noted that there was an entity

23  that had not filed for Chapter 11, named Nortel Government

24  Solutions.  NGS for short.  And NGS has remained as a non-

25  debtor entity.  And the transaction with Avaya proposes to

Bromley - Presentation                    Page 42

1    transfer the stock of NGS, and not the assets of NGS.

2              THE COURT:  Okay.

3              MR. BROMLEY:  We have been contacted by the

4    Department of Justice, who indicated that it is their view that

5    the Anti-Assignment Act would apply to transactions where the

6    sale is the sale of the stock of NGS, not simply to

7    transactions where we attempted to transfer individual

8    contracts.

9              I think it's fair to say that it is a firmly held

10   position of Nortel that that is a very incorrect reading of the

11   Anti-Assignment Act.

12             Nevertheless, that was the reading that the

13   Government informed us that they had.  And so that led us to

14   craft the following, which is, the following.

15             "That the debtors will, by August 6th 2009 and

16   subject to the execution of an appropriate confidentiality

17   agreement with the Department of Justice, provide the

18   Department of Justice with the names of entities expected to

19   submit bids in the upcoming auction."

20             And to the extent that after August 6th anyone else

21   shows up, we will let them know promptly.  And, again, this is

22   subject to the execution of an appropriate confidentiality

23   agreement.

24             If the DOJ, on behalf of its agency clients, intends

25   to assert an objection to the sale of the stock of NGS, based

Bromley - Presentation                Page 43

1    on the Anti-Assignment Act, it will do so no later than August

2    17th.

3            If the DOJ, on behalf of its agency clients, does not

4    file an objection based on the Anti-Assignment Act by August

5    17th, it agrees that any objection to the NGS stock sale based

6    on the Anti-Assignment Act will be automatically waived.

7            And if DOJ files such an objection, DOJ will serve

8    and file its papers in support of its objection by 5 p.m.

9    eastern time on August 21, 2009.  The debtors will serve and

10   file their responsive papers by 5 p.m. eastern time on August

11   28th.  And the parties agree that the objection, if any, will

12   be heard during the scheduled September 2nd omnibus hearing.

13           And the parties will reserve all of their rights

14   regarding the matter, including, but not limited to, the

15   applicability of the Anti-Assignment Act to the sale of the NGS

16   stock by the debtors.

17           What this does, Your Honor, is create a sub

18   process --

19           THE COURT:  Yes.

20           MR. BROMLEY:  -- to resolve this issue prior to the

21   auction, as well as prior to the sale hearing.  And we

22   certainly hope that the Department of Justice comes to our view

23   as to the reading of the Anti-Assignment Act.  Perhaps that

24   will be informed by the identity of those who are participating

25   in the process.  And that is the intention behind entering into

1     the confidentiality agreement and providing that information to

2     Department of Justice.

3                They clearly already know of Avaya's identity.  And

4     it is our hope that this is a process that will never have to

5     be implemented.  But, nevertheless, we felt it prudent that if

6     this was an issue that the Government needed to raise, that

7     they would do it in a manner that would allow us to have this

8     information at the time of the auction.

9                THE COURT:  Very well.

10               MR. BROMLEY:  So that is the resolution of the

11    informal objections of the Department of Justice.  I don't know

12    if anyone is present from DOJ.

13               THE COURT:  And no one is on the telephone, from what

14    I can see, either.  It's nice to know the Government trusts

15    you, Mr. Bromley.

16               MR. BROMLEY:  Well that's an interesting statement,

17    Your Honor.  My suspicion is they actually are on vacation at

18    the moment, rather than trust.  But I'll take whatever we have.

19               THE COURT:  You bet.

20               MR. BROMLEY:  The -- but I do believe that is the

21    basis on which we've had a number of conversations over the

22    past several days and week.  So we do believe it's an accurate

23    representation.

24               THE COURT:  Okay.

25               MR. BROMLEY:  The final objection, Your Honor, is an

1    objection from the Ad Hoc Bondholder group.

2            THE COURT:  Yes.

3            MR. BROMLEY:  It is a very limited objection.  I

4    think Mr. Kreller is on the phone.  It's my understanding that,

5    based on the resolution of the MatlinPatterson objection, that

6    that objection should be resolved, as well.

7            THE COURT:  Mr. Kreller, good morning.

8            MR. KRELLER:  Good morning, Your Honor.  And thank

9    you and counsel for accommodating a telephonic appearance this

10   morning.

11           Your Honor, as Mr. Bromley noted, our objection was a

12   limited objection.  The comment and the revision to the order

13   we have reviewed, and we find them -- particularly those that

14   are responsive to the points raised by MatlinPatterson, some of

15   which we shared.  Your Honor, obviously this is a complicated

16   transaction with a fair number of moving parts.

17           We continue to hope to work with the debtors to

18   understand the elements of the transaction and to address some

19   of the issues and uncertainties around it.  And certainly we

20   reserve the right to object to, or otherwise address issues at

21   the ultimate sale hearing.

22           But, at this point, with the revisions to the order

23   put on the record, we have no further objection to the sale

24   procedures order being entered.

25           THE COURT:  All right.  Thank you, Mr. Kreller.

1      MR. BROMLEY:  And, Your Honor, that summarizes all of

2  the resolutions, and I believe resolves all of the objections.

3      THE COURT:  All right.

4      MR. BROMLEY:  I'd like to just ask if anyone else has

5  anything they'd like to add, but I believe that resolves it and

6  we can move on.

7      THE COURT:  All right.  Yes, Mr. Hodara.

8      MR. HODARA:  Good morning, Your Honor.

9      THE COURT:  Good morning.

10      MR. HODARA:  I'm Fred Hodara for the Official

11  Committee.  Good morning, Mr. Justice Morowetz, as well.  Your

12  Honor, the bid procedures were carefully crafted between the

13  debtor and a well-represented, focused and demanding stalking

14  horse bidder.

15      The committee was integrally involved in the process

16  that led up to the bid procedures, and was requested by the

17  bidder, the stalking horse bidder to indicate that it had no

18  objection, that the committee had no objection to the bid

19  procedures.

20      And the committee in fact had no objections to the

21  procedures, under those circumstances.

22      The committee does believe that the modifications

23  that have been described to the Court today are helpful and

24  reasonable, and the committee states here for the record that

25  it reserves all of its rights with respect to the auction

1     itself and the sale.

2                THE COURT:  All right.

3                MR. HODARA:  Thank you, Your Honor.

4                THE COURT:  Thank you.  All right.

5                MR. BROMLEY:  I would just like to take a opportunity

6     to echo Mr. Hodara's statements, in terms of the collaborative

7     process that we went through in terms of negotiating this

8     transaction over a very long period of time.

9                We certainly appreciate the input and participation

10    of the Akin, Gump firm, in particular Mr. Hodara's partner, Mr.

11    Kuhn, who was up very late, and Mr. Feuerstein, as well, who

12    spent very late nights with us making sure that we got this

13    done, and done on a timely and effective basis.

14               The Milbank firm was also very helpful in that

15    regard.  And I should note that the monitor was an active

16    participant in all of these conversations and negotiations, as

17    well.

18               And that we thank everybody for that those efforts.

19    The -- let me move on, if I may, Your Honor, to establish the

20    record for the approval.

21               I should note that, apart from the bidding procedures

22    order, the changes of which I've walked through, and the

23    bidding procedures themselves, which are attached to the

24    bidding procedures order, there are a number of other

25    attachments that were filed with the motion.

1       There's a proposed form of sale order, that's exhibit

2   D.  Obviously, that's not up for approval today.  But I should

3   note that, in the context of this transaction, any changes to

4   the sale order obviously will need to be approved by Avaya, if

5   they prove to be the successful bidder.

6       Exhibit E is a form of sale notice that we will be

7   publishing and serving -- I'm sorry, serving, in accordance

8   with the noticing procedures that are set forth in the motion.

9       Exhibit F is a form of publication notice, which we

10  will be publishing.  It might be worthwhile to just stop for a

11  moment here and pause to make a point, which is that the -- in

12  the CDMA transaction, it was primarily a North American

13  transaction, and so our publication notice was limited to the

14  Wall Street Journal and the Globe and mail.

15      Because this is also a transaction that relates to

16  the EMEA entities, that it will also be published in the

17  Financial Times.

18      So this is a worldwide notice that will be going out.

19  Exhibit G is the form of initial customer notices.  It relates

20  to the contract assumption and assignment procedures.  Exhibit

21  H is the form of final customer notice.  Again, those are

22  relating to the two notices that we have to give to our

23  customers.  Exhibit I is the form of lease notice for those 365

24  qualified leases.  Exhibit J and Exhibit K are the initial and

25  final omnibus notices, again, relating to our assumption and

Riedel - Proffer                    Page 49

1    assignment procedures.  We have not received any objections to

2    the form of those notices.

3         Your Honor, if I may, we would like to then move into

4    the evidence section of the presentation.  And as I -- as we

5    did last week in connection with the approval of the CDMA sale,

6    we would propose to proceed by proffer, unless there's anyone

7    that has a problem with that.

8         We have in the courtroom Mr. George Riedel who's the

9    chief strategy officer of Nortel, and Mr. Michael Murray,

10   managing director at Lazard and our investment banker in this

11   transaction.

12        And --

13        THE COURT:  Let me just ask if anyone objects to

14   proceeding by proffer, with the opportunity of course to cross-

15   examine, if it's necessary.  All right.

16        MR. BROMLEY:  Thank you, Your Honor.  And I'll try to

17   tread lightly on going over the parts that you already heard.

18   But we'll have to put that in the record, for the sake of

19   clarity.

20        THE COURT:  Absolutely.

21        MR. BROMLEY:  And completeness.  Your Honor, Mr.

22   Riedel, who's present in the courtroom, is the chief strategy

23   office of the Canadian parents of Nortel Networks, Inc., of

24   Nortel Networks Corporation and Nortel Networks Limited.

25        He's also employed by Nortel Networks, Inc., the U.S.

1    debtor.  Mr. Riedel is in the courtroom and available to

2    testify with respect to the debtors' motion to sell certain

3    assets relating to the Enterprise Solutions business, and for

4    the approval of the bidding procedures in relation to that

5    sale.

6          If called to testify, Mr. Riedel would testify as

7    follows.  That he has been the chief strategy officer and has

8    held that position since February of 2006.  That his job

9    responsibilities include oversight of corporate strategy,

10   mergers, acquisitions, business development, strategic

11   partnerships, and the investment of money into new businesses.

12         Prior to taking his current position at Nortel, Mr.

13   Riedel was employed by Juniper Networks as a vice president of

14   M&A, and before that worked for Mackenzie & Company.

15         Mr. Riedel previously testified in this Court with

16   respect to the sale of the CDMA LTE assets.  And you are aware

17   of that testimony.

18         THE COURT:  Yes.

19         MR. BROMLEY:  If called to testify, Mr. Riedel would

20   testify that he oversaw the sale and auction process for the

21   Enterprise Solutions business assets, including the negotiation

22   of the terms of the sale with interested parties and the

23   selection of Avaya as the stalking horse bidder.

24         Mr. Riedel would testify that the assets being sold

25   in this transaction consist essentially of Nortel's Enterprise

1    Solutions business.

2          That Nortel's main business divisions have been the

3    carrier Enterprise, MEN,  Metro Ethernet, and Global Services

4    businesses.  And up until 2008, Nortel's Enterprise Solutions

5    business was integrated with its other businesses, including

6    the carrier business.

7          He would testify that in the summer of 2008, as part

8    of its overall restructuring efforts, Nortel began to separate

9    Enterprise Solutions into an independent business.

10         He would testify that Nortel's Enterprise Solutions

11   business provides solutions for addressing communications needs

12   for large and small businesses globally, across a variety of

13   industries and Government agencies, by building networks and

14   transforming existing networks into cost effective, packet

15   based networks, supporting voice data and multi media

16   communications.

17         He would testify that in particular the Enterprise

18   business specializes in providing solutions, allowing customers

19   to integrate and remove barriers between voice, e-mail,

20   conferencing, video and instant messaging technologies.

21         He would testify that Nortel's Enterprise business

22   historically contributes approximately 20 to 30 percent of

23   Nortel's overall revenue on a global basis.  Accounting for

24   approximately 2.5 billion in revenue in 2008, or 29 percent of

25   Nortel's total during that year.

1        Mr. Riedel would testify that the Enterprise business

2   has a global presence, with operations in business -- in

3   customers in the United States, Canada, Central and Latin

4   America, Europe, the Middle East, Africa and Asia.

5        He would testify that the Enterprise business,

6   including Nortel Government Solutions, has approximately 7,800

7   employees at the end of Q 2 of 2009.  With a target of 7,000

8   employees by the end of Q 3, the third quarter of 2009.

9        In the United States, by the end of the third

10  quarter, there will be approximately 3,900 employees, and in

11  Canada, approximately 1,000 employees.

12       Mr. Riedel would testify that, unlike the carrier

13  business, which featured large contracts with few main

14  customers, the Enterprise Solutions business features smaller

15  contracts and a larger number of customers.

16       And that the customer base is divided among partner

17  resellers, such as Verizon, Dell and Microsoft, and end user

18  customers.

19       Mr. Riedel would also note that, it's important that

20  the customer relationship information be kept confidential,

21  because a substantial and significant value aspect of the value

22  of the business is in the established relationships that the

23  debtors maintain with their customers.

24       It's for that reason that we are seeking to have the

25  customer information filed -- not filed with the Court and be

1    kept confidential.  It will, of course, be made available,

2    subject to confidentiality restricts, to competing bidders.

3         Mr. Riedel would testify that, if a list of the

4    counter parties on customer contracts were publicly available,

5    the asset values would decline further.  And as a result, the

6    purchaser would be less likely to consummate the transaction.

7    And that such lists of customer information constitutes

8    confidential proprietary information essential to the business.

9         Mr. Riedel would testify that in the current

10   environment in which the Enterprise Solution business operates,

11   the competition is fierce.

12        And that the competition has increased over the past

13   decade, as Nortel and other vendors coming out of the telephone

14   and telecommunications business, no longer dominate this

15   market, as data networking focused vendors, such as Cisco, have

16   taken substantial steps to improve their strategic position.

17        Mr. Riedel would testify that the main competitors of

18   Nortel in the Enterprise states are Avaya, Siemens, Alcatel,

19   Cisco, 3Com and HP ProCurve.

20        And that the competition associated with the

21   Enterprise business, combined with the steep cost of rapid

22   technological development, and the value of scale in this

23   business has therefore become very important.

24        Mr. Riedel would note that the Enterprise business

25   faces -- is vulnerable, in at least -- as the result of at

1    least 3 factors.  That there has been a decline in the business

2    as a result of the bankruptcy filings.

3          That there has been substantial attrition among

4    certain key employees.  And that the competition has increased,

5    with both partner resalers and customer -- end user customers

6    being taken away.

7          He would also testify that the main competitor in

8    this space, Cisco, is very strong.  Mr. Riedel would testify

9    that, while significant value exists in the Enterprise

10   business, the full value of these assets cannot be realized in

11   a stand alone restructuring.

12         That as a result of the significant pressure that

13   Nortel is facing in its business and the customer demands on

14   its cash resources, both globally and regionally, that the

15   decision was made by the debtors to seek the sale of the

16   Enterprise business.

17         He would testify that bankruptcy and the commencement

18   of insolvency proceedings around the world, has hurt this

19   business more than other business lines.

20         As a result of the short sale cycle, the fact that

21   they are shorter duration contracts and for smaller amounts and

22   in a higher volume, that Nortel in this area is sub-scale, that

23   revenue has declined since the filing, and pre-filing

24   challenges have intensified.

25         That the Enterprise business faces cash losses in

1    operating in all of its jurisdictions, and that its competitors

2    have been focused heavily on taking Nortel's customers away in

3    a so-called rip and replace, as they say, paying people to

4    actually remove the Nortel product and install other product.

5         Mr. Riedel would testify that the success of this

6    business is dependent on substantial investments in research

7    and development, and on building strong sales and marketing

8    infrastructure.

9         And that, while Nortel has in the past been a market

10   leader in connection with IP and R&D, the resources that are

11   necessary for the future financial commitment are beyond

12   Nortel's current capacities.

13        The intellectual property that would be transferred

14   in connection with this sale, Mr. Riedel would testify, is a

15   number of 632 patents that are assigned to the Enterprise

16   business.

17        As a result of the foregoing, Mr. Riedel would

18   testify that it is his conclusion that selling the Enterprise

19   assets now, is the best way to maximize the value of these

20   assets for the debtors estates, not just the U.S. debtors, but

21   for all of the debtors around the world.

22        Mr. Riedel would testify that Nortel's pre-filing

23   strategic plan included a plan to divest the Enterprise

24   business.  So this plan existed prior to the commencement of

25   these proceedings.

1          He would testify that in late 2008, Nortel began to

2     explore the potential sale of Enterprise -- the Enterprise

3     business.  And in connection with those efforts Nortel

4     approached 8 parties, including one financial investor and 7

5     strategic buyers.

6          That Nortel received 6 expressions of interest.  That

7     three of the interested parties participated in management

8     presentations and due diligence sessions.  And two non-binding

9     proposals were received.

10          Mr. Riedel would testify that the commencement of

11     creditor protection proceedings around the world interrupted

12     the potential sale of the Enterprise business, but those

13     efforts were recommenced in the early March time frame.

14          That Nortel and its financial advisor engaged in a

15     robust marketing effort, pursuant to which they contacted

16     potential bidders for the Enterprise business, including all of

17     the bidders who had been contacted prior to the filing, as well

18     as a number of new parties.

19          That these parties were invited by Nortel to commence

20     due diligence efforts.  And in some cases to recommence the

21     diligence efforts that had begun prior to the commencement of

22     the proceedings.

23          In addition, there were in person information

24     sessions conducted with management personnel, as well as in

25     person information presentations made by the Nortel team to its

1   creditor constituents.

2        Mr. Riedel would testify that approximately 15

3   parties have been contacted in the post filing period.  Eleven

4   of those parties have signed non-disclosure agreements.  Eight

5   of those parties had meetings with management.  There were four

6   bids.  Three bids which were more substantial that were

7   submitted, and that with respect to those bids the debtors

8   worked with each of the potential bidders, eventually settling

9   on Avaya as being the stalking horse bidder.

10       Mr. Riedel would testify that, in his opinion, that

11  the most likely potential buyers for the Enterprise business

12  are market competitors looking to increase the scale and

13  geographic scope of their businesses.

14       And that he believes that that -- that all the

15  potential interested parties have been contacted in the context

16  of the marketing process.  Mr. Riedel would testify that it is

17  his view that the most likely purchaser of the Enterprise

18  business would be looking to benefit from the large installed

19  customer base of Nortel to increase its scale and to bring

20  synergies that relate to the merging of existing businesses and

21  Nortel businesses.

22       He would also testify that Avaya fits this profile.

23  Mr. Riedel would testify as well that it's his opinion that now

24  is the right time to sell the Enterprise Solutions business.

25       That the value of the business is likely to decline

1  over time, if the assets remain unsold.  And while the assets

2  should have substantial value, the full value would not be

3  realized if the sale is not consummated quickly.

4        He would testify that the diminution performance of

5  the Enterprise Solutions business since the filing, would be

6  anticipated to accelerate, particularly without the

7  announcement of the sale.

8        And that the potential for growth in this business is

9  dependent on continued investment in R & D and building strong

10  sales and marketing.  As to which Nortel does not have the

11  resources in the current situation.

12        Mr. Riedel would further testify that he is familiar

13  with the asset share and sale agreement, the ASSA.  He would

14  testify that, subsequent to expressions of interest and

15  information sessions, that Nortel sat down with three

16  prospective stalking horse bidders and negotiated documentation

17  with respect to each.

18        That these discussions took place over a period of 4

19  months.  That the discussions and negotiations were intense and

20  contentious at times.  But as a result of that process, it was

21  Nortel's view, a view that it discussed and consulted on with

22  its constituents, that at the present time, Avaya's bid offer's

23  the most advantageous terms and the best value to Nortel as a

24  whole, and the debtors in particular.

25        The criteria -- and Mr. Riedel would testify that the

1  criteria used to evaluate the prospective bids included the

2  purchase price, the net value, the claims likely to be created,

3  the counter parties to the transactions, the proposed

4  transaction documentation, the effect of the sale on the

5  ongoing business of Nortel.

6         Other factors effecting the speed, certainty and

7  value of the sale, including regulatory approval such as

8  antitrust.  The estimated number of in scope employees to be

9  offered employment post-closing.  The transition services

10  required from Nortel post-closing, and related restructuring

11  costs.

12         Mr. Riedel would testify that the ASSA with Avaya

13  includes substantially all of the North American assets of the

14  Enterprise Solutions business, including the stock of two of

15  the debtors' subsidiaries Nortel Government Solutions, Inc.,

16  and Diamondware Limited.

17         He would also testify that the total purchase price

18  for the assets is in an amount of 475 million dollars, subject

19  to certain adjustments.  And this purchase price is with

20  respect to the assets, not just in North America, the United

21  States and Canada, but also with respect to the EMEA entities.

22         And that the allocation of the proceeds of the sale

23  will be dealt with in accordance with allocation procedures to

24  be established.

25         Mr. Riedel would testify that, in order to facilitate

Riedel - Proffer                    Page 60

1    the sale, the debtors plan to assume certain pre-petition

2    executory contracts and leases that are exclusively related to

3    the Enterprise Solutions business, and to assign or sublease

4    these agreements to Avaya.

5           He would testify that the university -- universe of

6    agreements that may be designated is quite large and could well

7    run into tens of thousands, particularly on the customer side.

8           And that as the result of the large number of

9    agreements, Nortel and Avaya have not yet finalized the list of

10   agreements that are to be assumed and assigned.

11          And, therefore, the establishment of the assumption

12   and assignment procedures was an essential part of the

13   transaction structure.

14          In particular, the ASSA allows the purchaser to

15   designate certain agreements for assumption and assignment, or

16   assumption and sublease, until a contract designation date, a

17   defined term, a date that is different, depending on the type

18   of contract at issue.

19          And for a number of designated agreements, this date

20   may be well after the date of the sale hearing.  It is the view

21   of the debtors at this point that in respect of customer

22   contracts, that the cure amounts, if any, would be at or near

23   zero.

24          It's worthwhile to mention that there are two leases

25   that are related to this that are material.  One is with

1   respect to a piece of real property in Santa Clara, California.

2   And on that, Your Honor, if I can step out of the proffer for

3   one moment.

4           THE COURT:  Yes.

5           MR. BROMLEY:  The Santa Clara lease is a lease that

6   we may be coming to you on an expedited basis with respect to

7   entry into a new lease.  The Santa Clara property is one of the

8   main locations out of which the Enterprise business is

9   conducted.  And we have been engaged in active negotiations

10  with the landlord at that facility.

11          The deadline for the assumption or assignment of non

12  -- of executory nonresidential real property leases is now

13  August 12.  We wanted to be before Your Honor with an agreement

14  to enter into a new lease and to deal with certain claims

15  relating to rejection, prior to August 12th.

16          And it now appears that we may be coming to you

17  shortly thereafter.  We are still in discussions with counsel

18  for Santa Clara to deal with that.

19          But it is a -- the most material lease that we'll be

20  dealing with.

21          Going back into the proffer, Your Honor, there's also

22  a capital lease relating to NGS.  But, again, because that is a

23  stock sale, it is not a lease issue per se.

24          So we don't have to deal with the question as to

25  whether or not it's a true lease or not.  Mr. Riedel would also

1    testify that, in addition to the ASSA, as to which the U.S. and

2    Canadian debtors are parties, there is a separate asset sale

3    agreement with the EMEA debtors.

4         And in particular signed on behalf of the EMEA

5    debtors by the joint administrators.  He would testify that the

6    negotiation of the EMEA ASA took place coincident with and at

7    the same pace with the ASSA, and that it is the intention of

8    the parties that the ASSA for North America and the EMEA ASA

9    are interrelated and co-dependent.

10        That the two agreements envision a single common

11   regime with respect to purchase price and adjustments, a

12   sharing of any breakup fee, and bidding protections, expense

13   reimbursement and the like.

14        He would testify that while there are differences

15   between the two agreements, those differences are dictated

16   mostly by specific local requirements.  Relating to the EMEA

17   countries and to the rules and practice relating to the various

18   jurisdictions.  I should note, however, Your Honor, that there

19   are proceedings, insolvency proceedings with respect to

20   Nortel's Israeli subsidiary, and they are also a party to this

21   agreement to the EMEA agreement.

22        Mr. Riedel would testify that there are various

23   purchase price adjustments contemplated under the ASSA,

24   primarily relating to inventory, working capital, accrued and

25   unused vacation, and certain other adjustments that relate to

1    the net debt of the subsidiaries of the debtors included in the

2    transaction.

3          Mr. Riedel would testify, that based on the long term

4    considerations of the potential transactions relating to

5    Enterprise, and after reviewing the marketplace since the

6    commencement of these cases, that it is his view that the

7    transaction represents the highest and best proposal currently

8    available for the Enterprise business, subject to the receipt

9    of a better bid through the auction process.

10         That it is his view that it is a prudent exercise of

11   the debtors' business judgment to enter into this asset sale

12   agreement, and to provide the protections to the bidder that

13   are provided under the agreement.

14         In particular, Mr. Riedel would testify that his view

15   that at the present time Avaya's bid is the highest and best,

16   as Avaya has the capital at its disposal to accomplish the

17   transaction.  That the reasons for Avaya to enter into the

18   transaction are strategic and important, and that Avaya has

19   evidenced a consistent interest in acquiring business.

20         Mr. Riedel would also testify that there are a number

21   of important ancillary agreements relating to the asset -- to

22   the ASSA.  In particular, that there is a transition services

23   agreement associated with this transaction.

24         He would testify that, as was the case in the CDMA

25   transaction, there is a transition services agreement here.

Riedel - Proffer                              Page 64

1    And that this transition services agreement will -- is

2    different than the CDMA transition services agreement in two

3    material ways.

4           One, it's 12 months in duration, as opposed to the

5    CDMA transition services agreement which is 2 years in

6    duration.  Also, the parties to the agreement are not simply

7    the North American entities, but also the EMEA entities, as the

8    services that are required will also be required in Europe and

9    the rest of the world.

10          There's also, as there was in the CDMA sale

11   transaction, an intellectual property license agreement.

12   Again, among all of the entities here, not simply the North

13   American entities.

14          He would testify that there's a trademark license

15   agreement, an escrow agreement with respect to a number of

16   different deposits and escrows that are setup under the

17   agreement.  Indeed, there are 7 separate escrows that would

18   need to be established under this agreement.

19          There's also an agreement relating to the secondment

20   of Nortel employees to Avaya for up to 12 months for employees,

21   that for reason or another, cannot be transferred at the

22   closing.

23          Mr. Riedel would also testify that there are a number

24   of other ancillary agreements that would need to be negotiated

25   between the approval of the transaction at closing.

1          And that, as a result of the potential for regulatory

2     review, both in the United States and in Europe, that the

3     closing of the transaction is anticipated to take place in the

4     fourth quarter -- or the first quarter of 2010.

5          Though there are no assurances as to the exact

6     timing, given the contingencies.  Mr. Riedel would also testify

7     that he's generally familiar with the bidding procedures

8     submitted to the Court for  approval.  That it is Nortel's

9     intention to take measures to ensure that the auction and sale

10    process is fair, as it was in connection with the CDMA

11    transaction, and that those measures include that prospective

12    bidders have to sign a confidentiality agreement to have access

13    to the electronic data room.

14         That management will make itself available to answer

15    questions and provide additional diligence materials as

16    requested.  And that processes are in place to get the

17    confidentiality agreements signed up as soon as possible, with

18    benefits that have to flow to the successful bidder, so that

19    all bidders can be fully involved in the process.

20         Mr. Riedel would testify that he believes that these

21    procedures, as was the case in the CDMA process, will help

22    maximize the value of these assets to the debtors estates, not

23    simply the U.S. debtors, but all of the Nortel entities around

24    the world.

25         He would also testify that it is his view that the

1   Avaya transaction provides a benefit as a stalking horse

2   transaction to kickoff this asset sale.  That it provides a

3   solid offer as a starting place or a floor for bidding.  That

4   the negotiation of the ASSA helps expedite the bidding process,

5   by providing a reasonable starting point for negotiations of

6   what are very complicated issues in a very complex business.

7           And that overall using a stalking horse bidding

8   process creates the opportunity to ultimately provide more

9   value to the estate.

10          He would testify that the ASSA and bid procedures

11  contemplate bid protections.  Described more extensively in the

12  motion.  But including the payment of a breakup fee in the

13  amount of 14.25 million, minus one half of an expense

14  reimbursement to be paid to cover all reasonable and documented

15  fees, expenses and costs.

16          The expense reimbursement is capped at 9.5 million.

17  So basically, Your Honor, we have fourteen and a half million

18  as a breakup fee, and nine and a half as a cap reimbursement.

19          The ASSA provides for numerous additional conditions

20  around the bid procedures and bid protections.  But he would

21  also testify that with respect to the cost of any bid

22  protections that would have to be paid to Avaya, that two-

23  thirds of the bid protections would be paid by the U.S. and

24  Canadian debtors, and one-third to be paid by the EMEA,

25  debtors.

1           He would also testify that in his experience, the bid

2     protections provide a benefit to the estate, because they

3     induce others to participate.  That they have negotiated a very

4     complex and extensive agreement that others can shoot for.

5           And that the bid protections generally create

6     stronger bid dynamics.

7           And that as a result of that, he believes that the

8     bid protections proposed to be provided to Avaya, are

9     reasonable, customary, and arrived at arms length negotiations.

10          In particular, he would also note that in the context

11    of these negotiations that Avaya, the debtors, the creditors

12    committees and the monitor, were all represented by competent

13    counsel and advisors, that the negotiations were at arms

14    length, vigorous, at time contentious, but always in good

15    faith.

16          And that, Your Honor, would complete the proffer of

17    Mr. Riedel.

18          THE COURT:  Thank you, Mr. Bromley.  Does anyone wish

19    to cross-examine Mr. Riedel?

20          All right.  Hearing no one, the proffer is admitted

21    into evidence.

22          MR. BROMLEY:  Thank you very much, Your Honor.

23          I would then like to proceed with the much shorter

24    proffer of Mr. Murray.

25          THE COURT:  Yes.

1          MR. BROMLEY:  As you've seen earlier in the CDMA

2    process, Mr. Murray has appeared before you.  Mr. Murray is a

3    managing director at Lazard, the financial advisor to the

4    debtors.  He is in the courtroom and available to to testify

5    with respect to the debtors' motion.

6          If called to testify, Mr. Murray would testify that

7    he is a managing director at Lazard, specializing in the

8    technology industry.

9          That he's been employed by Lazard since the fall of

10   2007.  And prior to that time that he was the co-head of the

11   technology investment banking group for Deutsche Bank.

12         He would testify that he was employed by Deutsche

13   Bank for 13 years and served as the co-heard of the technology

14   group for 5 of those years.  And that he has previously

15   participated in distressed asset sales, including one within

16   the last couple of weeks.

17         THE COURT:  Yes.

18         MR. BROMLEY:  That he has a bachelors degree from

19   Brown University and an MBA from Harvard University.  If called

20   to testify, Mr. Murray would testify that Lazard was retained

21   by Nortel as its restructuring advisor and its M&A advisor in

22   connection with the filings for these proceedings.  That he has

23   a team of approximately 25 professionals dedicated to working

24   on all aspects of Nortel's restructuring.  And that he has

25   personally served as an advisor on the restructuring matters,

1   but has focused in particular on the M&A aspects of the Nortel

2   assignment.

3          He would testify that he is personally familiar with

4   Nortel's various businesses, including in particular the

5   Enterprise business, as well as its customers, common practices

6   and the industry in general.

7          He would testify that, after the bankruptcy filing,

8   he participated in analysis of viability with respect to Nortel

9   and its business units, and in particular in comparison of

10  stand-alone restructuring's, versus asset sale options.

11         And it was concluded by the debtors, following that

12  analysis, that the stand-alone scenario resulted in lower

13  potential value to the estate than the asset sale scenario.

14  And that in connection with reaching those conclusions, that

15  Mr. Murray had participated in conversations and discussions

16  with the creditor constituencies in this case, as well as the

17  monitor.

18         He would testify that in light of this analysis, it

19  was determined that the best course of action was to sell the

20  Enterprise business.  And that once that was determined, that

21  Lazard contacted approximately 15 potential buyers.

22         Of those contacted, 11 signed non-disclosure

23  agreements, and 3 bidders emerged as potential stalking horse

24  bidders, who submitted proposals and as to which documentation

25  was negotiated.

1        He would testify that aside from those contacted,

2    he's aware of no other obvious entitles that could be

3    potentially interested parties.

4        That Lazard and Nortel performed a comprehensive

5    search contacting, in his view, 90 to 100 percent of those

6    entities that might be interested.  And that no entity was

7    intentionally omitted, and the intention was to approach

8    everyone that could be interested.

9        He would testify that, based on his experience in the

10   industry, all potential counter parties were approached about

11   their interest in the assets.

12       Mr. Murray would also testify that he's familiar with

13   the asset sale -- share and sale agreement.  That he was

14   involved in the process of negotiating that agreement.  That

15   the process took place over a course of approximately four

16   months.  And that he or representatives of Lazard met with

17   representatives of the bidders on numerous occasions during

18   that time.

19       And that his major involvement in the negotiations

20   related to price and terms.  He would testify that, in his

21   view, Avaya was represented by qualified counsel and financial

22   advisors during the course of these negotiations, that the

23   discussions were vigorous and contentious at times.  That no

24   facts or circumstances arose during the course of those

25   negotiations that led him to believe that the transaction was

1     any -- on anything other than an arms length basis.

2          In addition, Mr. Murray would testify that, in his

3     view, Nortel did not prefer Avaya over any other potential

4     buyer.  He would testify that, in his opinion, that the net

5     value that is offered to the debtors' estates from the proposed

6     transaction at present, constitutes a fair and reasonable value

7     for the assets being sold.

8          And that that should be tested in the asset -- in the

9     auction process that is being considered today.  He would

10    testify that the highest and best value would be achieved

11    through an auction, and that at least two likely and

12    competitive bidders are very familiar with the market and the

13    assets, and, in his view, will participate in the auction

14    process.

15         Mr. Murray would testify that, in his experience, the

16    bid protections involved in the transaction are reasonable.

17    That the presence of a stalking horse bidder contributes value,

18    because the bidding is more robust where there is a bid on the

19    table.

20         And there's a great benefit to having a signed and

21    announced deal, as customers are happy to see that there is a

22    bid on the table, and the future of the business is going to be

23    preserved.

24         He would further testify that the specific bid

25    protections envisioned in the ASSA, in particular the breakup

1    fee and expense reimbursement, are within the typical range for

2    a transaction of this magnitude, and therefore should be

3    approved.

4         And that's all we have for Mr. Murray's proffer, Your

5    Honor.

6         THE COURT:  All right.  Does anyone wish to cross-

7    examine Mr. Murray?  All right.  Hearing no one, his proffer is

8    admitted into evidence.  Thank you, Mr. Bromley.

9         MR. BROMLEY:  Your Honor, at -- with the fear that

10   I've put everyone to sleep by this point, I now would like to

11   go through the legal basis for this relief, and try to do that

12   very quickly.

13        THE COURT:  Okay.

14        MR. BROMLEY:  But I think it's important for the

15   record.

16        THE COURT:  Of course.  And take your time.

17        MR. BROMLEY:   The basis on which we're proceeding is

18   first under Section 363(b) of the Bankruptcy Code.  And the

19   basis for the relief being sought is first under the Abbotts

20   Dairy case, that we are proceeding in a manner that is a

21   reasonable exercise of the business judgment of the debtors.

22        That there's a sound business reason for this

23   transaction.  That the transaction is necessary to preserve the

24   value of the assets of the estate.  That it's been designed in

25   a way to present the best opportunity to realize the maximum

1   value of the assets.  And that, absent the approval of an

2   immediate sale process, recoveries for creditors would be

3   adversely effected.

4           So we believe, Your Honor, that based on the evidence

5   and the proffers and the papers and the resolution of the

6   objections as discussed on the record, that we believe there

7   has been a sound business judgment -- sound business reason

8   established.  We also believe, Your Honor, that the procedures

9   for notification as required by the motion are appropriate,

10  that there's been evidence presented that the price to be paid

11  is adequate, and that under the <u>Abbotts Dairies</u> case that there

12  is ample evidence that this is an exercise -- this transaction

13  is an exercise in good faith.

14          That the stalking horse agreement were conducted in

15  good faith, with the participation of all constituents, and

16  that the negotiations were on an arms length basis over a long

17  period of time.

18          And that there's -- the debtors are not aware of any

19  collusion in reaching the stalking horse bid.  Next, Your

20  Honor, that the bidding procedures themselves are appropriate

21  under the circumstances, and that they are designed, in

22  particular, to make sure that the highest and best offer will

23  be obtained through this process.

24          That these are competitive bidding procedures that

25  are routinely approved by the Bankruptcy Courts, both in the

1    Second Circuit and the Third Circuit, but in particular the

2    Third Circuit.

3            And that this is consistent with the debtor's duties

4    to obtain the highest and best and overall benefit for the

5    estates.

6            As it relates to the bid protections, Your Honor,

7    that we believe that under the O'Brien standard that we are

8    well within the appropriate range of both the size of these --

9    of the bidding protections, that they should be granted as

10   administrative expenses.

11           We do have the somewhat different twist here that the

12   bid protections, to the extent that they have to be paid, will

13   be paid not only by the U.S. debtors, but also by the Canadian

14   debtors and the EMEA debtors.  But we believe that in light of

15   the complexity of these proceedings that the division of

16   responsibility and the process of determining ultimate

17   responsibility as to the bid protection cost, if they have to

18   be paid, is an appropriate exercise and an appropriate

19   accommodation for the complexity of this case.

20           The -- we believe that the evidence shows that the

21   bid protections are appropriate here to promote competitive

22   bidding.  That the proposed transaction submits -- has been

23   submitted in the manner that establishes a floor on which other

24   bidders can rely.

25           And that they are fair, reasonably and generally

Murray - Proffer                    Page 75

1    consistent with the range of bidding protections approved by

2    bankruptcy courts in this district.

3         Indeed, it's odd to be before you so quickly upon the

4    -- with the memories fresh in our minds of the process that

5    took place less than 2 weeks ago.

6         But in summary, we believe that the business

7    judgement rule has been met in terms of approving these bidding

8    procedures, as well as the bid protections.

9         We also believe, Your Honor, that the information

10   regarding customer contracts and -- is confidential commercial

11   information, and should be filed under seal, and only made

12   available to certain -- to competing bidders, to the extent

13   that they have signed applicable NDA's.

14        And we've heard nothing in opposition on that point.

15   But we would -- we do believe that Mr. Riedel's proffer

16   establishes the basis for that confidential treatment.

17        So with that, Your Honor, I think that we've -- those

18   are the legal standards for the approval.  We believe that

19   we've met them, and would ask that Your Honor and Mr. Justice

20   Morowetz consider the approval of the transaction as

21   appropriate.

22        And I think, unless anyone else here in Delaware has

23   anything to say, and I'm certainly not cutting anyone off, I

24   think I could then turn it over to Mr. Tay, who will do it, I'm

25   sure, much more succinctly and humorously than I can.

1          THE COURT:  All right.  Thank you, Mr. Bromley.  Mr.

2    Justice Morowetz, we're sending this back to Canada.

3          JUSTICE MOROWETZ:  Thank you, Judge Gross and Mr.

4    Bromley.  And, Mr. Tay, it's your motion, you may proceed.

5          MR. TAY:  Thank you, good morning, Your Honor.  Good

6    morning, Judge Gross.

7          THE COURT:  Good morning.

8          MR. TAY:  We've heard a lot of evidence being

9    proffered and being read into the -- and being accepted into

10   evidence, in great detail.  And as usual I'm thankful to my

11   good friend Mr. Bromley for bearing that load.

12         And to congratulate him on his spellbinding and

13   hypnotic performance in that regard.

14         The -- I think what's important is that we take some

15   of this and step back a little bit and get a little perspective

16   on what's happening today, and why we're before both courts

17   seeking this approval today.

18         So we're talking about the Enterprise business, and

19   very simply put, the Enterprise business is the business that

20   the end users of technology would have.  So my firm would have

21   a Nortel system that's part of the Enterprise business.  This

22   joint hearing today is made possible by the audio-visual aides

23   supplied by the Nortel Enterprise business.

24         So that's the business that we're selling.  It's a

25   business that ultimately has tens of thousands of end users all

1    around the world.  And up until last year, the Enterprise

2    business, which is part of the whole integrated Nortel

3    business, and so when we talk about selling the Enterprise

4    business, it's not about saying that's the Enterprise business,

5    it's discrete and separate, and let's just go sell that.

6         And so a huge amount of effort has taken place over

7    many months to try and separate, you know, the financial

8    aspects of the business, the people aspects of the business,

9    the operational aspects of the business.

10        So that we can be here today to try and sell this

11   Enterprise business.  So when you think about it, because it's

12   largely an end user business, one, you're really relying upon

13   and dependant upon a huge marketing and sales forces deployed

14   all around the world.

15        This is not one legal entity that's doing this, it's

16   being done basically through many, many, many legal entities,

17   and in essence it's done through a legal entity in each of the

18   jurisdictions where this business is being marketed.

19        And you will see from the evidence that the

20   operations being carried out in excess of 120 countries.  And

21   so that as Mr. Bromley has said, there are tens of thousands of

22   customers in all these countries.  And this business involves

23   something in excess of, or approximately 7,800 people.

24        And of that about 1,000 are in Canada.  Now as part

25   of the Avaya stalking horse agreement, we are not permitted to

1   state publicly the number of jobs that Avaya is planning to

2   offer as part of this deal.

3          But you can rest assured that that is a significant

4   consideration that the company evaluated in considering the

5   Avaya deal.

6          And the reason we have to sell this business, is that

7   because of the nature of this business, it requires huge

8   amounts of expenditure and infrastructure in R & D.  You've got

9   to maintain your R & D, you've got to maintain a large sales

10  force. You've got to maintain a large marketing force.

11         And even if we were to be able to do it, you've heard

12  from the testimony, that Nortel's footprint in this particular

13  business is too small to effectively be competitive.  And so

14  there's no question, I think that this business needs to be

15  sold in order to preserve maximum value for all stakeholders

16  involved.

17         You've also heard that this sales process started

18  prior to the filing, for all the same reasons that we have to

19  sell it now, those were the same reasons that were considered

20  in a proposed sale prior to the filing.

21         However, it just was too difficult, the intricacies

22  of trying to sell this thing outside of a filing, were just

23  almost impossible to achieve.  And so when we filed, there was

24  a temporary hiatus while we sort of focused, all of us, on

25  stabilizing the business.  But pretty soon it became clear that

1    this was a priority that we had to again address.

2         And in talking to the monitor and talking to the

3    various creditor groups, everyone was of the view that it's

4    necessary that we sell the Enterprise business as quickly as

5    possible.  And so this business has been well marketed, not

6    just since the filing, but even before the filing.

7         And so now we come to this point where, through this

8    complex and very rigorous process, we've identified a potential

9    stalking horse bidder.  And in addition to the normal

10   complications that are involved when you talk about a sale and

11   when you talk sale, you're usually thinking about, you know,

12   the rights vis-a-vis the seller's versus the purchasers.

13        There are a number of things here that add to the

14   complexity of the sale of this business.  And because of the

15   nature of the business that I've described, this really

16   requires compliance.  To give effect to the sale, requires

17   compliance of each of the legal entities all around the world.

18   Some of them are filed, some of them are not filed.

19        As you know, in numerous insolvency filings, some of

20   these entities in EMEA have already gone into secondary

21   insolvency filings.  And may or may not choose to participate,

22   and so you've got to make accommodations in the agreement for

23   that kind of thing.

24        There are a particular labor laws in the EMEA

25   jurisdictions that might impose certain liability on potential

1   purchasers, even for the employees they don't take on as part

2   of a sale.  And so that's got to be dealt with, in terms of

3   this.

4          You've already heard in spades about the Government

5   entities that are involved, and their rights and the hoops that

6   have to be jumped through in order to assign contracts that

7   Government entities are involved in.

8          And so the added complication here comes not only

9   vis-a-vis the sellers, but inter se the file estates

10  themselves.

11         And so you've got issues that are very complicated,

12  where the North American estates and Canadian estate, the U.S.

13  estate and the EMEA estates have to figure out, how do we

14  insure compliance by each of the participants in the estate, in

15  order to make sure that we can actually deliver on this sale?

16         And then there are costs involved here.  You've got

17  issues about who should bear that costs, and in what

18  proportion.  Because again, as a result of the separate

19  filings, you've got now estates with discrete pots of creditors

20  who are looking at their estate as if it was separate from

21  everything else.  And so, while we're trying to sell this

22  business on an integrated basis, we have this added complexity

23  that each participant and each group of creditors, each of the

24  estates is trying to say, how does this impact me and why

25  should I pay for that?

1          And then you've got the issue that you'll keep

2    hearing about, which is the allocation of proceeds.  So even if

3    we are able to sell all of this, how do we allocate those

4    proceeds?

5          And in the middle of all that, you've got insolvent

6    estates, filed estates where there are fiduciaries, who in

7    addition to trying to do the right thing for the integrated

8    company, has to worry about -- each of them has to worry about,

9    are they fulfilling their own fiduciary obligations in their

10   own estates?

11         And so part of what we're seeking today is, is there

12   is a side letter that's been entered into between the sellers

13   and the EMEA administrators, which implements some of the

14   mechanics that are contemplated in the IFSA, which both courts

15   have approved and which, as you know, are very, very complex.

16         And so all of this is to say that we are very pleased

17   to be standing before both courts today, with a deal that takes

18   into account the myriad considerations, sensitivities and

19   realities of what we have to do.

20         And we're here to ask for approval of the stalking

21   horse agreement, but also the bid and auction process.  And,

22   again, it's been a very heavily negotiated document, trying to

23   balance appropriate protections to Avaya, on the one hand, but

24   also to be flexible enough to encourage better and higher bids

25   in the auction process.

1          From the Canadian estates aspect, we were specially

2     pleased with the clarifications that were requested by

3     MatlinPatterson.  Because in this context, this is not just an

4     academic exercise.  We're talking about, you know, money, or

5     the highest price, is not necessarily the best deal.

6          That is a very real issue in this particular sale.

7     And it's particularly relevant form the Canadian estate's

8     perspective, because a better price doesn't necessarily mean

9     the best deal.

10          What we're more concerned about is the speed and the

11     certainty of closing.  Because, let's be clear, this estate --

12     I'm sorry, this business bleeds, and the longer that we take to

13     sell this business, means that all the estates, and especially

14     Canada, which has historically been designed as a cost center,

15     is paying the price for maintaining this business to maintain

16     the ability to sell it.

17          And so we are paying the price between now and actual

18     closing.  And so to us, the greatest thing here is to make sure

19     that we have a deal that is going to be closed and is going to

20     be closed quickly, with certainty.

21          So, hopefully, as we've seen in the CDMA sale, that

22     the competitive tension of this process, and that an auction

23     would bring, would help to bring clarity to some of these

24     issues.

25          So in conclusion, I think the evidence is absolutely

1    clear that this sale is necessary, is in the best interests of

2    the stakeholders, and should be done, approved and completed as

3    quickly as possible.

4           The process getting to the stalking horse agreement

5    has been along and rigorous process.  This is the best deal

6    that we can put forward at this time.  And if this Court and

7    the Court in the U.S. should see fit to approve this process,

8    then what we're really hoping for is that the bid process and

9    the auction process will serve as a catalyst for hopefully

10   securing an even better and higher deal at the end of this

11   process.

12          I'm going to hand it up to you, Justice Morowetz, the

13   two orders that are being sought from Canada.

14          JUSTICE MOROWETZ:  Thank you.

15          MR. TAY:  The one order approves the stalking horse

16   agreement and the bid process that's been described in great

17   length.  And the bid process document that's been attached to

18   the order now is the same document that has been described in

19   the U.S. with all the changes.

20          The second order that we're seeking is an order

21   approving the entering into of the side agreement that -- or

22   the side letter, as I described, with the administrators, and

23   also seeking a ceiling of the confidential appendices that have

24   been filed as part of the monitors report.

25          JUSTICE MOROWETZ:  I take it those are the two

Harvini - Presentation                    Page 84

1    volumes here.

2            MR. TAY:  Yes.

3            JUSTICE MOROWETZ:  Thank you.

4            MR. TAY:  So I think that puts it in perspective, in

5    my humble submission, we would ask that both courts approve

6    this process so that we can move ahead with it for the benefit

7    of all stakeholders involved.  Thank you.

8            JUSTICE MOROWETZ:  Thank you, Mr. Tay.  All right.

9    The next party would be, Mr. Carfagnini is it?

10           MR. CARFAGNINI:  Thank you, Your Honor.  Jay

11   Carfagnini from Goodmans, representing the Canadian monitor.

12   Your Honor, Ms. Hamilton of Ernst & Young is here in Court,

13   should Your Honor have any direct questions.  The monitor's

14   eighteenth report has been filed with this Court, and I believe

15   a copy has also been filed in Delaware, a very extensive report

16   describing in detail this agreement.

17           To cut to the chase, if I could refer to paragraph 92

18   off the monitor's report, and the recommendations are set out

19   in paragraph 92.  Your Honor, the monitor has been intimately

20   involved in this process.  The monitor has concluded and

21   recommends that the Avaya agreement be approved by this Court,

22   and by the U.S. Court as a stalking horse type bid.

23           And the monitor also, in doing so, considers the

24   break fee and expense reimbursement amounts to be reasonable

25   under the circumstances.  Paragraph 93, Your Honor, the monitor

1   also is recommending that the confidential information set

2   forth in Appendix B to the eighteenth report be sealed.

3         I would submit that the test for such an order, as

4   set out in the Supreme Court of Canada decisions here, have

5   been met, as this order is necessary to prevent serious risk to

6   the interested persons being Nortel and the other parties.

7         And, clearly, based on the evidence that Your Honor

8   has heard today, the salutary effects outweigh the mischief

9   and, therefore, the monitor is comfortable and recommends that

10  the exhibits be sealed.

11        So unless you have any specific questions of me or

12  the monitor directly, I have nothing further to add.

13        JUSTICE MOROWETZ:  Thank you.  Any other party

14  wishing to address the Court?  Mr. Thorgran (phonetic), I

15  assume that I do have the Matlin records.  I assume that you

16  are satisfied with the resolution that has been described in

17  the U.S. proceedings?

18        MR. THORGRAN:  That's correct, Your Honor.

19        JUSTICE MOROWETZ:  Thank you.  Mr. Tay, I do not

20  think it's necessary for any further comment.  Judge Gross, I

21  would suggest at this time we recess for 20 minutes and we'll

22  have our very --

23        THE COURT:  Mr. Justice Morowetz, Mr. Bromley wants

24  to add something, I believe.

25        MR. BROMLEY:  Judge Gross, I would just like to

Colloquy                          Page 86

1   approach with our two orders for the --

2          THE COURT:  Oh, yes, please.

3          MR. BROMLEY:  -- as well.

4          THE COURT:  Thank you, Mr. Bromley. I have the black

5   line, but this will be more helpful.

6          Anyone else?

7          JUSTICE MOROWETZ:  We'll recess then for 20 minutes.

8          THE COURT:  Mr. Bromley?

9          MR. BROMLEY:  If we could also just ask while you are

10  consulting with Mr. Justice Morowetz, also take into account

11  that we had requested a joint sale hearing for the fifteenth of

12  September.

13         THE COURT:  Yes.

14         MR. BROMLEY:  So if that works with your respective

15  calendars, that would be wonderful.

16         THE COURT:  Excellent.  All right.  We will discuss

17  that scheduling, as well.

18         MR. BROMLEY:  Great.  Thank you very much.

19         THE COURT:  Thank you, Mr. Bromley.  So we'll take a

20  20 minute recess now, and I'll return shortly.  Thank you.

21                       (Recess)

22         THE COURT:  Thank you and please be seated.  Justice

23  Morowetz, I believe you were to defer to me to rule first?

24         JUSTICE MOROWETZ:  Yes, Judge Gross.  If you would.

25  Obviously, counsel, we have had a telephone conference and

Ruling - The Court                    Page 87

1    discussed the process for going forward.  Judge Gross will be

2    delivering his ruling first.

3         THE COURT:  Thank you.  Thank you, Justice Morowetz.

4    Pending before the Court are the debtors' motions for an order

5    authorizing debtors' entry for the asset and share sale

6    agreement and other related relief, including bidding

7    procedures.  And also a motion for an order to approve a side

8    agreement relating to the allocation of costs.

9         In support of the motions, the debtors have presented

10   the testimony by way of uncontested proffer of Mr. Riedel, the

11   chief strategy officer of Nortel, and Mr. Murray, debtors'

12   investment advisor.

13        A number of objections to the bidding motion were

14   raised, both filed and informal, and the debtors have resolved

15   each of those objections so that both motions are now

16   unopposed.

17        The Court finds that based upon the evidence

18   presented, the debtors have satisfied all of the legal

19   requirements for the Court to approve the motions.  First with

20   respect to what I'll call the bidding motion, notice is

21   adequate and appropriate here.

22        The bidding procedures are fair, reasonable and

23   appropriate, and designed to maximize recovery for the sale of

24   the debtors' Enterprise Solutions business and assets.  The

25   evidence demonstrates compelling and sound business

1    justifications for authorizing the sale of the business and

2    assets.  And the stalking horse provisions provide a clear

3    benefit to the debtors' estate and creditors in providing

4    certainty of price and terms.

5         And are fairly designed to promote a fair and robust

6    auction, and are reasonable and appropriate and necessary to

7    insure the proposed purchaser, Avaya, will continue to pursue

8    the proposed agreement for the sale of the debtors' business

9    and assets.

10        It is very clear to the Court that the entry of the

11   order is in the best interest of debtors and their estates,

12   creditors and interest holders, and all other parties in

13   interest.  And, accordingly, the relief requested is granted.

14        Likewise, the motion for approval of the side

15   agreement is granted, as it corresponds with relief previously

16   granted relating to the allocation between the various debtors

17   of the costs for matters relating to these motions.

18        And as I said, both motions will be granted.

19        The one thing that I neglected to do with Mr. Justice

20   Morowetz, and I apologize, was to discuss the date for the sale

21   hearing.  But we will discuss that in just a moment after Mr.

22   Justice Morowetz has had a opportunity to rule himself.

23        JUSTICE MOROWETZ:  Thank you, Judge Gross.  This

24   hearing was conducted by way of video conference with a similar

25   motion being heard in the United States Bankruptcy Court, with

Ruling - Justice Morowetz                    Page 89

1   His Honor Judge Gross presiding over the hearing in the U.S.

2   Court.

3          The joint hearing was conducted in accordance with

4   the provisions of the cross border protocol which has

5   previously been approved by both the U.S. Court and by this

6   Court.

7          Nortel brings this motion for the approval of bidding

8   procedures relating to the Enterprise Solutions business.  It

9   seeks approval of the sale agreement among Nortel Networks

10  Corporation, Nortel Networks Limited and Nortel Networks, Inc.,

11  and their affiliates, as sellers, and Avaya Inc. as purchaser.

12         In addition to the approval of the sale agreement,

13  the applicants also request the approval of a side agreement

14  among the sellers, and the Court appointed administrators,

15  which side agreement is attached to the eighteenth report filed

16  by Ernst & Young, Inc., the monitor.

17         Finally, the applicants seek a sealing order to seal

18  the confidential appendix to the eighteenth report, pending

19  further order of this Court.

20         The bidding procedures and sale agreement are

21  described in the affidavit of Mr. George Riedel, chief strategy

22  officer of Nortel, sworn July 30, 2009.  It is also described

23  in the eighteenth report of the monitor.

24         Nine formal and informal objections were filed to the

25  U.S. proceedings.  These objections have been -- objections

Ruling - Justice Morowetz                    Page 90

1    have been resolved.  And in some cases minor modifications have

2    been made to the bidding procedures.

3         I am satisfied that no further comment is required,

4    and this endorsement with respect to the objections filed to

5    the U.S. proceedings.

6         The transactions described in the sale agreement is

7    very complex.  The monitor has made specific reference to the

8    transaction.  The business involved addresses the

9    communications aides of large and small businesses across

10   various industries, by providing products and services that

11   integrate voice, e-mail conferencing, video and instant

12   messaging.

13        Competitors to the business include Cisco, Avaya,

14   Alcatel, Lucent, Siemens, Enterprise Communications, NEC, and

15   others.

16        This business operates globally in approximately 121

17   countries.  The monitor has indicated that it has -- the

18   business has installed -- the installed base with over 75

19   million voice lines and 75 million data ports.  The fiscal

20   revenues in 2008 were 2.8 billion, representing approximately

21   27 percent of Nortel's 2008 revenues.

22        With respect to the Canadian aspect, fiscal 2008

23   revenues, had 183 million dollars representing approximately 26

24   percent of Nortel's 2008 Canadian revenue.

25        The base purchase price, as set out in the stalking

1    horse agreement, is 475 million dollars.  It also provides for

2    a breakup fee of 14.25 million and an expense reimbursement

3    capped at 9.5 million dollars.

4            And materials indicate that bids are to be received

5    by September 4th, with the sellers to conduct an auction on

6    September 11th, followed by a motion to approve any

7    transaction, both before this Court and the U.S. Court.

8            With respect to the evidence in support of the

9    transaction, I will refer to the conclusions of Mr. Riedel at

10   paragraphs 38 to 40 of his affidavit, where he states as

11   follows:

12           "I believe that the sale agreement is the product of

13   a vigorous, comprehensive and fair process.  The proposed

14   auction sale process for the Enterprise Solutions business,

15   based on the sale agreement as a stalking horse bid, is the

16   best way to preserve the business as a going concern, and to

17   maximize value and preserve as many jobs as possible for the

18   applicant's employees.

19           I further believe that exploration of the sale of the

20   other businesses as a going concern through this process will

21   provide the greatest chances for further value maximization and

22   job preservation.

23           "Based on the applicant's previous consideration of

24   potential transactions involving the Enterprise Solutions

25   business, and after re-canvassing the marketplace since the

1    commencement of these proceedings, I believe that the proposed

2    transaction with the purchaser represents the highest and best

3    proposal available for the Enterprise Solutions business,

4    subject to the receipt of a better bid through the auction

5    process contemplated in this motion.  The sale agreement

6    requires an expeditious sale process and provides the purchaser

7    of the right to terminate the sale agreement if certain

8    milestones in the sale process are not timely had.

9         For these reasons, the expeditious sale of the assets

10   is critical to the maximization of the value of the applicant's

11   assets, and, in turn, to a recovery for the applicant's

12   estates."

13        The monitor has similarly provided extensive

14   background to the transaction.  And reports its analysis and

15   recommendations at paragraph 92 of the eighteenth report.

16   Where it states as follows:

17        "The monitor has reviewed Nortel's efforts to divest

18   its Enterprise Solutions business, and is of the view that the

19   company is acting in good faith to maximize the value.  The

20   monitor recommends approval of the Avaya agreement as a

21   stalking horse bid, approval of the bidding procedures as

22   described, and approval of the side agreement.  In so doing,

23   the monitor considers the potential payment of the break fee

24   and expense reimbursement to Avaya, as reasonable in the

25   circumstances."

Ruling - Justice Morowetz                    Page 93

1        The bidding procedures as proposed are not unlike the

2   bidding procedures which have previously approved in the sale

3   of the CDMA business and the LTE business.

4        The bidding procedures in respect of these businesses

5   were approved by this Court on June 29th, 2009, with reasons

6   released on July 23, 2009.

7        Likewise, as with the previous transaction, I am

8   satisfied that this Court has the jurisdiction to authorize the

9   sale.  See reasons from July 23.  Turning now to a

10  consideration of whether it is appropriate in this case to

11  approve the sale process, the factors to consider on a sales

12  process under the CCAA, and the absence of a plan have of

13  previously been considered in these proceedings, and, again, I

14  refer to the Nortel reasons of July 23 in paragraph 49.

15       And those factors are as follows.  One, is a sale

16  transaction warranted at this time?  Two, will the sale benefit

17  the whole economic community?  Three, do any of the debtors

18  creditors have a bona fide reason to object to a sale of the

19  business?  Four, is there a better viable alternative?

20       In this case, the details of the transaction and the

21  sales process as described in Mr. Riedel's affidavit and in the

22  monitor's eighteenth report establish, in my view, that it is

23  appropriate to approve the sale, the factors as set out and

24  previously approved in the reasons of July 23, are equally

25  applicable in this transaction.

1      I also note that there were no objections with

2  respect to the sale process.  I also note that the sale is

3  subject to further Court approval.  And, again, the Court will

4  expect that the debtors make reference to the sound air

5  principle (phonetic) at such time.

6      As previously noted in the reason of July 23, the

7  applicants are part of a complicated corporate group.  They

8  carry on an active international business.

9      And I accept that an important factor to consider in

10 the CCA process is why the case can be made to continue the

11 business as a going concern.  I'm satisfied, having considered

12 the factors referenced above, as well as the facts summarized

13 in the affidavit of Mr. Riedel, and in the eighteenth report,

14 that the applicants have met the test, and I'm therefore

15 satisfied that this motion should be granted.

16     Accordingly I approve the bidding procedures, as

17 described in Mr. Riedel's affidavit and in the eighteenth

18 report, which procedures have also been approved this morning

19 by Judge Gross in the U.S. Court.

20     I'm also satisfied that the sale agreement should be

21 approved.  Further that sale agreement be accepted for purposes

22 of conducting the stalking horse bid in accordance with the

23 bidding procedures, including, without limitation, the breakup

24 fee and the expense reimbursement.

25     Further, I've also been satisfied that Appendix B to

Colloquy                                    Page 95

1      the eighteenth report contains information which is

2      commercially sensitive, the dissemination of which could be

3      detrimental to the stakeholders.  And, accordingly, I'll order

4      that this document be sealed, pending further order of the

5      Court.  In approving the bidding procedures, I have also taken

6      into account that the auction will be conducted prior to the

7      sale approval motion.  This process is consistent with the

8      practice of this Court.

9            And this concludes my endorsement in respect of the

10     bidding procedures and sale agreement.  At this time, I'm

11     advised that Judge Gross will be continuing with the hearing in

12     the United States Bankruptcy Court with some matters that are

13     specific to the Chapter 11 proceedings.

14           And immediately after the adjournment of the -- or

15     the termination of these Canadian proceedings, I would like to

16     see counsel in chambers.  I understand that there are some

17     matters to consider on the continuing employee situation and

18     they will be dealt with in the counsel room on this floor.

19           THE COURT:  Justice Morowetz before we --

20           JUSTICE MOROWETZ:  Subject to any further comments or

21     directives that you have, I am completed here.

22           THE COURT:  Justice Morowetz, before we depart, I

23     just wanted to determine whether you have scheduled the sale

24     hearing for September 15th at 9:00.

25           JUSTICE MOROWETZ:  Mr. Carfagnini?

1          MR. CARFAGNINI:  Your Honor, that's the date that has

2    been discussed, but not scheduled with your Court yet.  We

3    would propose to do that, if it suits Your Honor.

4          JUSTICE MOROWETZ:  I will be sitting that day, and

5    I'm certain that we can make appropriate accommodations.

6          MR. CARFAGNINI:  Was there a time set, Judge Gross,

7    on your end?

8          THE COURT:  9 a.m., at this end.

9          JUSTICE MOROWETZ:  9:00 on September the 15th will

10   be --

11         THE COURT:  2 p.m., excuse me, I apologize.  2 p.m.

12         JUSTICE MOROWETZ:  2 p.m.?

13         THE COURT:  Yes.

14         MR. CARFAGNINI:  Your Honor, we'll make those

15   arrangements with the clerk.

16         JUSTICE MOROWETZ:  Okay.  Just before we close, Mr.

17   Tay, the motion record has been endorsed.  For all reasons

18   delivered today, the motion is granted.  Two copies of both

19   orders have been signed.

20         MR. TAY:  Thank you very much, Your Honor.

21         JUSTICE MOROWETZ:  Thank you, Judge Gross.

22         THE COURT:  Thank you.  Thank you Mr. Justice

23   Morowetz.

24         What time did we decide?

25         MR. BROMLEY:  I think it's 9 a.m.

Colloquy                                    Page 97

1          THE COURT:  Good.

2          MR. BROMLEY:  I don't want that door to open.

3          THE COURT:  No, no, no.  That's what I have in the

4     order.  And --

5          MR. BROMLEY:  I apologize, Your Honor.

6          THE COURT:  All right.

7          MR. BROMLEY:  We just have a couple of cleanup

8     things.  Thank you very much, Your Honor, for accommodating

9     us --

10         THE COURT:  Of course.

11         MR. BROMLEY:  And thank you very much for finishing

12    before noon.  Because I know Mr. Tay is very prompt about his

13    lunch.

14         THE COURT:  Okay.  And I might note, by the way, that

15    Justice Morowetz makes far more extensive findings, because

16    unlike us he does not have an order which lays out the findings

17    and rulings.  It is -- what he says that basically is what we

18    have as an order.

19         So I try and keep mine a little bit briefer than he

20    does.

21         MR. BROMLEY:  Your Honor, we have 2 other things.

22         THE COURT:  Yes.

23         MR. BROMLEY:  One is the bar date, so if we can

24    just --

25         THE COURT:  Absolutely.

1          MR. BROMLEY:  -- bring that up.

2          THE COURT:  Absolutely.

3          THE COURT:  Thank you.

4          MR. BROMLEY:  So if I can just go through -- actually

5    why don't I just go through the rest of the agenda letter, Your

6    Honor, so we can make clear what we're dealing with.

7          THE COURT:  Yes.

8          MR. BROMLEY:  There have been a number of matters

9    that have been continued.  There's a motion from -- for relief

10   from the stay to effectuate a setoff filed by American Express

11   travel related services.

12          That has been adjourned to September 2nd.  That was

13   number one on our agenda letter -- or our amended agenda

14   letter.  There was a motion for relief from the automatic stay

15   to effectuate a setoff filed by Test Design, Inc.  And that has

16   been adjourned as well.  That to August 18th, which is our next

17   omnibus date.

18          Oh, I'm sorry no --

19          THE COURT:  And you missed -- yes.

20          MR. BROMLEY:  I'm sorry, that one has been adjourned

21   to September 30th, excuse me.

22          THE COURT:  There you are.  Yes.

23          MR. BROMLEY:  And the motion for allowance and

24   payment of administrative expenses by Safe Record Center, LLC,

25   that has been adjourned to August 18th.

Colloquy                           Page 99

1          THE COURT:  Good.

2          MR. BROMLEY:  Then we had certificates of no

3     objection filed and orders entered with respect to number 4.

4     The motion for an order authorizing the assumption of an

5     unexpired lease of real property.  And with respect to item

6     number 5, which was debtors' supplemental motion for entry of

7     an order clarifying relief granted in connection with the

8     letter of credit and bonding facility.

9          Then, Your Honor, we have two uncontested matters,

10    the first relates to the debtors' motion for the establishment

11    of a bar date.  And we -- while it's not contested, there have

12    been a number of clarifications that have been made and we've

13    given you a black line.

14         THE COURT:  Yes.

15         MR. BROMLEY:  In very general terms, we're talking

16    about setting a bar date of September 30th.  We have -- that

17    will not relate to the CALA debtor, which has been filed

18    recently.  And it dovetails with a similar motion for relief

19    that's been filed before Justice Morowetz, so that we will have

20    a bar date consistency between the United States and Canada.

21         THE COURT:  Okay.

22         MR. BROMLEY:  It is a relatively common structure for

23    the bar date motion and the order.  One thing that we have

24    added, at the request of the creditors committee, if you look

25    on page 4 of the black line in paragraph 6, this is a list of

Colloquy                                    Page 100

1    the entities that need not file a proof of claim on or prior to

2    the general bar date.

3            Number F -- or letter F, I'm sorry, we have added

4    additional language to make it clear that claims, inter company

5    claims that do not need to be filed by the bar date, but in

6    particular whether or not they're liquidated, unliquidated,

7    fixed, contingent, matured, un-matured, disputed, undisputed,

8    etcetera.  So we have the fairly long list of things, just to

9    make absolutely clear that inter company claims are not

10   governed by the bar date.

11           THE COURT:  Of course.

12           MR. BROMLEY:  Indeed, you know, that will be a part

13   of the process for allocation and the like, so we think that

14   will -- we'll have our little process on that front.  Footnote

15   4 on page 5 is simply a change to make sure that we're

16   accurately describing the notes, the bonds that are

17   outstanding.

18           So this is more a clarification of the correct

19   description of our -- of the notes that we have.

20           Paragraph 7 is, again, clarification with respect to

21   the claims that would need to be filed with respect to the

22   rejection of an executory contract or unexpired lease.

23           Making it clear that such bar date is a separate

24   rejection bar date and is the later of the general bar date, or

25   35 days after the debtors file and serve notice of rejection.

Colloquy                              Page 101

1    So it's a subtle clarification.

2          The other changes are all simply grammatical,

3    attached hereto's and changing A's to B's and things like that.

4          But they are all very de minimis changes.

5          So, Your Honor, with respect to the bar date motion

6    we think that the changes as made are appropriate, that the

7    relief being sought is standard, and that the approval of the

8    bar date motion is important for us to be able to move down the

9    road and be able to reconcile our claims and allocate proceeds

10   as quickly as possible.

11         THE COURT:  Yes.  And I'll just note for the record

12   that the notices incorporate the changes in the proposed order.

13         MR. BROMLEY:  That's correct, Your Honor.

14         THE COURT:  And obviously this is a rather lengthy

15   process, or can be a lengthy process, and it is well to begin

16   it now.  So unless anyone wishes -- does anyone wish to be

17   heard?  Let me ask first.  And I note the changes that were

18   requested by the committee are incorporated in the proposed

19   order and in the notices.  And unless someone wishes to be

20   heard, I will sign the order.

21         MR. CABRAL:  Your Honor, this is Robert J. Cabral.

22   And I have item number 8, the motion that I provided to the

23   Court.

24         THE COURT:  Yes.  And --

25         MR. CABRAL:  For your consideration.

Colloquy                                    Page 102

1          THE COURT:  Absolutely.  And you will be next, Mr.

2     Cabral.  We are still on the bar date order and I'm about to

3     sign that, and then we will turn -- I believe, we will be

4     turning to your matter.

5          MR. CABRAL:  Thank you.

6          THE COURT:  All right.  I've signed the order.  And

7     if you just want to continue with the agenda.

8          MR. BROMLEY:  Yes.  I believe that the Cabral

9     matter --

10          THE COURT:  Is next.

11          MR. BROMLEY:  -- is the next and final item on the

12     agenda.

13          THE COURT:  All right.

14          MR. BROMLEY:  As it is Mr. Cabral's motion, I will

15     let him go first.  I believe it's a motion for severance

16     compensation and proceeding on a pro se basis.

17          THE COURT:  Yes.  Thank you, Mr. Bromley.  Mr.

18     Cabral, good morning still, sir.

19          MR. CABRAL:  Good morning.  Thank you, Your Honor.  I

20     appreciate the time to be on call and to bring my motion in

21     front of the Court.

22          I think I have a unique set of circumstances, that

23     are a little different, due to the way that my termination

24     occurred with my former employer being Nortel Networks.

25          And I was actually a member of the Nortel Enterprise

1   division.  And what I have before the Court is a few motions,

2   due to my set of circumstances.  And one of the things that

3   troubled me was the fact that Nortel liquidated my retirement

4   account, and I had a substantial interest in the Nortel stock,

5   by purchasing it and putting it in my retirement account.

6          And believing in the company, I very faithfully and

7   even to today even, though the Enterprise division is

8   profitable and can become profitable division and -- in any

9   event, did substantiate my motions with an affidavit on my

10  behalf to further clarify my position, in conjunction with

11  prior claim that I put in.

12         And this information is being presented accurate and

13  to the best of knowledge.

14         And I just ask that the -- that this Honorable Court

15  take it under advisement and consider the motions.

16         THE COURT:  All right.  Thank you Mr. Cabral.  I'll

17  hear now from the debtors.

18         MR. BROMLEY:  Your Honor, it is indeed a difficult

19  circumstance that the debtors find themselves in, and but not

20  as difficult as Mr. Cabral is facing on a personal basis.

21         And we recognize that he, like thousands of other

22  Nortel employees, have lost a lot as a result of the bankruptcy

23  filing.  And the relief that Mr. Cabral seeks, while certainly

24  understandable, is in the view of the debtors, at this point,

25  not timely.

Colloquy                          Page 104

1      Mr. Cabral has filed two notices with the debtors,

2 with Epic Bankruptcy Solutions, our claims processing agent,

3 both of them are claims that relate to compensation that Mr.

4 Cabral would be entitled to as a result of this employment and

5 certain benefits that he was entitled to as an employee.

6      But the proper method for dealing with those sorts of

7 claims, Your Honor, is not through filing a motion at this

8 point in time, but rather through the claims reconciliation

9 process.  And so it doesn't mean that any of his rights would

10 be prejudiced to go through that process.  Indeed, the

11 Bankruptcy Code envisions that all similarly situated creditors

12 will have to deal with the process in a consolidated basis.

13      So the motion that we just addressed, which is the

14 bar date motion, is the one that states the parameters for the

15 filing of those claims.  Certainly the debtors have received

16 these claims from Mr. Cabral, but we're not yet required to, or

17 in a position to respond to them.

18      The -- and certainly all the rights that the debtors

19 may have with respect to Mr. Cabral's claims are preserved.

20 The, you know, the bar date motion that we just filed, or that

21 was just approved, will provide notice to all of Nortel's

22 creditors, but in particular to all of the current and former

23 employees who might have claims, we do anticipate that there

24 will be thousands of claims filed by employees, many of which

25 will be very similarly situated to Mr. Cabral.

Colloquy                                    Page 105

1        The way the process works from this point, as you

2   know, Your Honor, is that those claims will need to be filed by

3   the bar date, by the 30th of September.  We will be putting

4   together a process that will analyze all of those claims,

5   determine which ones should be allowed, which ones should be

6   objected to.  In order to come to conclusions with respect to

7   Mr. Cabral's claims, we will have to take into account all of

8   the other similarly situated creditors who have claims relating

9   both to the benefits and to their termination of employment.

10       And only then will the debtors be able to agree, if

11  possible, to an allowed amount.  And at that -- or indeed to

12  object, if necessary.

13       And we recognize that that process provides cold

14  comfort to those who have suffered.  But, unfortunately, it is

15  the process that we have.  It really dovetails with the

16  exercise that we're undertaking to sell assets and maximize

17  value, because without the receipt of proceeds, we will not

18  have the funds available to prosecute these -- well to allow

19  these claims, to review them and allow them and to make

20  distributions on them.

21       And so while we certainly sympathize with Mr. Cabral,

22  we would respectfully submit that the time to deal with these

23  claims is not now, that they appear on their face to be pre-

24  petition unsecured claims, and that they should be dealt with

25  during the course of the claims reconciliation process.

Colloquy                                   Page 106

1          And so on that basis, Your Honor, we would ask that

2     the current request be denied without prejudice either to Mr.

3     Cabral's rights to file additional claims, or pursue his rights

4     generally.  Or for the debtors to assert any defenses to those

5     claims.

6          THE COURT:  Thank you, Mr. Bromley.  Mr. Cabral, you

7     have the right to respond, at this point.

8          MR. CABRAL:  Thank you, Your Honor.  My response is

9     that, you know, I believe that, under the circumstances, my

10    circumstances are unique, in the sense that I was basically

11    wrongfully terminated, rehired, reinstated, and then terminated

12    a second time.

13         And because of that, my matter is somewhat unique and

14    very detailed -- a very, very detailed claim explaining such in

15    the 713 -- claim number 713.

16         And I do request that this Honorable Court at least

17    have the opportunity to review the information contained in

18    Claim number 713 in conjunction with my affidavit, before

19    rendering any type of motion on this particular matter.

20         And also in that claim of 713, I also requested to

21    stay on as an employee, at a 50 percent reduction in pay.  I

22    had been with the company for 16 years, in the Enterprise

23    Solution division in a very, very senior network engineer in

24    that division.

25         And one of the requests that I made of my employer

Colloquy                                    Page 107

1    was to be reinstated at a lower cost to them, which would

2    benefit Nortel Networks.  And under such consideration, I would

3    like the Court -- this Honorable Court to just review the

4    paperwork, before making any decision, in order to review my

5    unique set of circumstances in the situation, where it is in

6    the best interest to retain top talent at that company, and an

7    employee like myself willing to make a sacrifice in pay for the

8    benefit of Nortel Networks, which I put it in writing in my

9    claim.

10           You know, it's really something that needs to be

11   looked at I think on a unique basis.

12           THE COURT:  Thank you, Mr. Cabral.  I have read the

13   papers.  But out of concern for your position I will go back --

14   I would like to go back and reread those papers.  And I will

15   then issue an order.  It's a difficult situation.  Were you in

16   the courtroom, Mr. Cabral, I think you would see the pain and

17   sensitivity that appears on everyone's face in the courtroom

18   for your situation.

19           And certainly I am equally, if not more concerned.

20   And I will certainly take your submissions into account with a

21   re-review of them, and the difficulty, as Mr. Bromley has

22   pointed out, is that there are many people who are similarly

23   situated.  And one of the functions of the Bankruptcy process,

24   and one of my functions is to make sure that all of those who

25   are similarly situated are similarly treated, and that is

Colloquy                              Page 108

1    always a concern.

2           And it may be that the timing is the main issue, and

3    by timing, I mean not so much the fact that you are in

4    difficulty and have submitted claims to the debtor, but rather

5    that we have just started the claim process, and in order to

6    treat everyone fairly, obviously we -- the debtors first have

7    to receive an review everyone's claims.

8           But out of respect for your position and the time

9    you've taken, I will re-review, as I said, the papers and issue

10   an order as promptly as I can.

11          MR. CABRAL:  Thank you, Your Honor.  I appreciate the

12   time.

13          THE COURT:  All right.  Thank you, Mr. Cabral.

14   Anything further?

15          MR. BROMLEY:  We have nothing further, Your Honor.

16          THE COURT:  All right, everyone.  Well

17   congratulations.  I hope your auction is  -- I know Avaya may

18   not like to hear this, but I hope the auction is as successful

19   as the previous was.  And good luck to you.  And as I've always

20   said, if issues arise at the auction I will be available,

21   regardless of the time.

22          And I know the last one went late, but that doesn't

23   matter.  Regardless of the time, to address matters which

24   perhaps make the sale hearing itself a little bit easier to

25   conduct.

Colloquy                                    Page 109

1          MR. BROMLEY:  Thank you very much, Your Honor.

2          THE COURT:  All right.  Good day, everyone.

3      (Court adjourned)

4                          * * * * *

5                   C E R T I F I C A T I O N

6  I, Josette Jones, court approved transcriber, certify that the

7  foregoing is a correct transcript from the official electronic

8  sound recording of the proceedings in the above-entitled

9  matter.

10

11  -------------------------------        -------------------

12  JOSETTE JONES                          DATE

13  DIANA DOMAN TRANSCRIBING