## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
---------------------------------------------------------X
                                                         :
In re                                                    :     Chapter 11
                                                         :
Nortel Networks Inc., et al.,¹                           :     Case No. 09-10138 (KG)
                                                         :
                              Debtors.                   :     Jointly Administered
                                                         :
                                                         :     Hearing date: September 15, 2009 9:00 AM (ET)
                                                         :     Objections due: September 8, 2009 4:00 PM (ET)
---------------------------------------------------------X
```

### DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING PAYMENT OF PREPETITION TERMINATION BENEFITS TO CERTAIN FOREIGN EMPLOYEES

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing the Debtors, in their sole discretion, to pay termination benefits to certain foreign employees; and granting them such other and further relief as the Court deems just and proper.  In support of this Motion, the Debtors rely on the Declaration of Charles S. Laubach (the "Laubach Declaration"), to be filed concurrently with or shortly after the filing of this Motion.  In further support of this Motion, the Debtors respectfully represent as follows:

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

**Jurisdiction**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 363(b)

of the Bankruptcy Code.

**Background**

**A.      Introduction**

3.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario

Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement

Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian

Proceedings").  The Canadian Debtors continue to manage their properties and operate their

businesses under the supervision of the Canadian Court.  Ernst & Young Inc., as court-appointed

Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the

"Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

foreign main proceedings under chapter 15 of the Bankruptcy Code.  On January 14, 2009, the

Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign

proceeding under section 18.6 of the CCAA.  On February 27, 2009, this Court entered an order

recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the

Bankruptcy Code.  In addition, at 8 p.m. (London time) on January 14, 2009, the High Court of

Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA

Debtors")[3] into administration under the control of individuals from Ernst & Young LLC

(collectively, the "Joint Administrators").  On May 28, 2009, at the request of the

Administrators, the Commercial Court of Versailles, France (Docket No. 2009P00492) ordered

the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"),

which consist of liquidation proceedings during which NNSA will continue to operate as a going

concern for an initial period of three months.  In accordance with the European Union's Council

Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings remain

the main proceedings in respect of NNSA.  On June 8, 2009, Nortel Networks UK Limited

("NNUK") filed petitions in this Court for recognition of the English Proceedings as foreign

main proceedings under chapter 15 of the Bankruptcy Code.  On June 26, 2009, the Court

entered an order recognizing the English Proceedings as foreign main proceedings under chapter

15 of the Bankruptcy Code.

6.    On January 15, 2009, this Court entered an order of joint administration pursuant

to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that

---

[3]     The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A.,
Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel
Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks
B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel
Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks
Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

7.        On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

8.        On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor together with NNI and certain of its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, the Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA of certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

**B.        Debtors' Corporate Structure and Business**

9.        A description of the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").[4]

**C.        The Enterprise Solutions Business Transaction**

10.        On July 20, 2009, the Debtors filed a motion (the "Sale Motion") seeking authorization to enter into a stalking-horse asset share and sale agreement (the "Enterprise

---

[4]        Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

4

Agreement") to sell their Enterprise Solutions business to Avaya Inc. (the "Purchaser"), and to sell the assets pursuant to an auction scheduled for September 11, 2009 (the "Enterprise Transaction").  On August 4, 2009, this Court authorized the Debtors' entry into the Enterprise Agreement as a stalking horse agreement and approved the bidding procedures related to the Enterprise Transaction.  A final hearing on the Sale Motion is scheduled for September 15, 2009. As part of the Enterprise Agreement, the Purchaser has agreed to accept the transfer of a number of Nortel's employees to the Purchaser on a worldwide basis, with the specific employees to be transferred to be determined prior to closing the transaction.

## Relief Requested

11.    By this Motion, the Debtors seek an order authorizing but not directing the Debtors to pay as when due, in their sole discretion and in the ordinary course of business, the Foreign Termination Expenses (as defined below).

## Facts Relevant to the Motion

12.    In the ordinary course of its business, NNI maintains a branch office dedicated to sales and distribution in Dubai, United Arab Emirates (the "Dubai Office").  A total of 41 employees currently work in the Dubai Office, approximately 36 of whom support the Debtors' Enterprise Solutions business and five (5) of whom support the Debtors' Carrier VoIP and Application Solutions ("CVAS") business, which is part of the Debtors' Carrier business.  An additional 11 employees, nine (9) of whom support the Enterprise Solutions business and two (2) of whom support the CVAS business, serve the Dubai Office but are based in Saudi Arabia,

13.    As part of their ongoing restructuring efforts, the Debtors have concluded that they must now terminate the employment of eight (8) employees in the Dubai Office because their positions have become economically redundant (the "Near-Term Terminations").  These

Near-Term Terminations are necessary to ensure the efficient use of the Debtors' limited resources. The Near-Term Terminations are expected to occur by the end of September 2009.[5]

14.     In addition, the Debtors anticipate that in the coming months, upon determining with greater certainty which (if any) of the employees from the Dubai Office will be transferred to the Purchaser (or the successful bidder, if not the Purchaser) as part of the Enterprise Transaction and any transaction involving the CVAS business, the Debtors will have to undertake additional terminations in the Dubai Office, including those employees based in Saudi Arabia (the "Long-Term Terminations"). The Debtors believe that it is important to continue to operate the Dubai Office in the interim because many of the employees in the Dubai Office are integral to the Enterprise Solutions and CVAS businesses, and, in order to maximize the value of those businesses in possible transactions, it is necessary for the Debtors to provide potential purchasers with the option to transfer the Dubai Office's employees as part of those transactions.

15.     In order to carry out both the Near-Term and Long-Term Terminations, the Debtors will incur certain termination costs imposed by domestic law in the United Arab Emirates (the "Foreign Termination Expenses"). As described in greater detail below, these Foreign Termination Expenses are calculated largely by reference to the length of the employees' tenure with the Debtors, most of which will have occurred prepetition. If the Foreign Termination Expenses are not paid, the Debtors will likely be unable to continue to operate the Dubai Office, as courts and other entities in the United Arab Emirates ("U.A.E.") are unlikely to respect the automatic stay imposed by U.S. law, leaving the Debtors liable for the Foreign Termination Expenses while incurring additional costs for litigation.

---

[5]     The Debtors reserve the right to return to the Court to seek similar relief with regard to future terminations in other countries, as necessary.

16.    As set forth in the Laubach Declaration, U.A.E. law entitles terminated employees to several kinds of termination benefits.  Payment of end-of-service gratuity in the U.A.E. is governed by U.A.E. Federal Law No. 8 of 1980, as amended (the "Labor Law") and the Ministerial Resolutions issued thereunder.  In the U.A.E., there are several types of payments that could be received upon termination of a contract which are (i) gratuity payments, (ii) pension payments for U.A.E. nationals mandated by U.A.E. law ("U.A.E. Pension Payments"), (iii) saving schemes payments and (iv) other payments.

17.    With regard to gratuity payments, these would be payable if an employee has completed one or more years of continuous employment as of the date of termination.  An employee who has been previously employed by his employer or a related corporate entity outside the U.A.E. in a jurisdiction in which gratuity is payable but was not paid, is generally allowed to claim gratuity for such previous period(s) of employment.  Gratuity is calculated on the basis of the basic salary of the employee at the time of termination in accordance with the following formula:

    a.    21 days' basic salary for each of the first five years of employment; and

    b.    30 days' basic salary for each additional year.

18.    Employment periods of less than a year are prorated.  The maximum amount payable as gratuity is two years of the employee's total salary at the time of termination.  Days of absence for which no salary is payable are not included in the calculation of gratuity.  The basic salary of the employee is the gross wage of the employee less all allowances, bonuses, and benefits.  The employer may deduct from the gratuity any amounts payable to it by the employee.

19.     With regard to U.A.E. Pension Payments, these are payable only to employees who are U.A.E. nationals.  The employees to be terminated in the Near-Term Terminations are not U.A.E. nationals, and therefore these payments are not applicable to the Near-Term Terminations.  It is possible that the Long-Term Terminations will include U.A.E. nationals entitled to U.A.E. Pension Payments.

20.     With regard to savings fund schemes, an employer can establish a savings fund scheme and make contributions to the savings fund in lieu of its obligation to pay gratuity, provided that such payment is higher than the gratuity benefits.  Where the employer fails to expressly state that the contributions of the employer are in lieu of its obligation to pay gratuity, then upon termination, the employee will be entitled to claim both the savings fund proceeds and the end-of-service gratuity benefits.

21.     With regard to the other payments, upon termination, the employer will be required to bear the repatriation expenses of the employee to employee's home country unless he or she obtains employment with another employer in the U.A.E.  In addition, an employee will also be eligible to receive notice pay (e.g., an unspecified term employment contract may be terminated for a "legitimate reason" with one month's notice), unutilized vacation pay and any contractual termination benefits as agreed with the employer.

22.     If the Debtors were to terminate eight employees in the Dubai Office as planned in the Near-Term Terminations, the Debtors estimate that they would owe approximately $264,733 in Foreign Termination Expenses including notice and gratuity payments, payments for unused vacation days and payments for repatriation to the employees' home countries.

23.     The Debtors further estimate that they will owe, at most, approximately $1,203,402 in Foreign Termination Expenses to carry out the Long-Term Terminations.  This

estimate is based on a worst-case scenario in which no employees are transferred to the purchaser as part of the Enterprise Transaction and/or any sale of the CVAS business, because the number of employees that will be transferred ultimately in connection with such sales is not determinable at this time.  The Debtors have not to date sold assets relating to their CVAS business, nor has it been determined how many (if any) of the employees from the Dubai Office will be transferred to the Purchaser (or the successful bidder, if not the Purchaser) as part of the Enterprise Transaction, and therefore the extent of the Long-Term Terminations remains uncertain at this time.  However, the Debtors anticipate that the actual cost of the Long-Term Terminations could be significantly lower than the estimate presented in this Motion.

24.    Under well-established Third Circuit precedent, termination benefits can only be accorded administrative priority status if they were actually earned by employees postpetition. Typically, this has meant that while lump sum fixed or salary-based payments provided in lieu of advance notice of termination is an administrative expense, payments for severance and unused vacation accrued prepetition, such as where the amount of severance owed is linked to the length of employment, constitute prepetition claims.  See, e.g., In re Hechinger Inv. Co. of Delaware, 298 F.3d 219, 226-27 (3d Cir. 2002); In re Roth American, Inc., 975 F.2d 949, 957-58 (3d Cir. 1992).  As a result, the automatic stay currently prevents the Debtors from paying most of the Foreign Termination Expenses since they are tied to the employees' prepetition service, and therefore earned by the employees prepetition.

25.    However, as described in the Laubach Declaration, it is unlikely that courts and other entities in the U.A.E. would respect the jurisdiction of this Court and the automatic stay imposed by U.S. law.  As a result, if the Debtors were to attempt to enforce the automatic stay in U.A.E. courts, such an attempt would likely be unsuccessful, leaving the Debtors liable for the

Foreign Termination Expenses while incurring additional costs for litigation.  This added expense would needlessly drain the assets of the Debtors' estates, to the detriment of both the Debtors and their creditors, and could result in the closure of the Dubai Office.  As noted, it is important to continue to operate the Dubai Office as the Debtors pursue transactions involving the Enterprise Solutions and CVAS businesses, as the Dubai Office employs individuals critical to both of those businesses.  Therefore, the Debtors seek by this Motion authority to pay as when due, in their sole discretion and in the ordinary course of business, the Foreign Termination Expenses.

**Basis for Relief**

26.     The Debtors submit that the relief requested is reasonable and necessary under the circumstances and justified by applicable law.  Section 363(b)(1) of the Bankruptcy Code provides that, after notice and a hearing, the trustee "may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  The Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a) of the Bankruptcy Code, courts may permit pre-plan payments of prepetition obligations when essential to the continued operation and reorganization of the debtor's business.  Specifically, this Court may use its power under section 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").

27.     The "doctrine of necessity" or the "necessity of payment" rule originated in railway cases and was first articulated by the United States Supreme Court in <u>Miltenberger v.</u>

Logansport, C. & S. W. R. Co., 106 U.S. 286 (1882).  The Third Circuit recognized the

"necessity of payment" doctrine in In re Lehigh & New England Railway Co., 657 F.2d 570, 581

(3d Cir. 1981).  The Third Circuit has held that a court could authorize the payment of

prepetition claims if such payment was essential to the continued operation of the debtor.  See In

re Just for Feet, Inc., 242 B.R. 821, 824-26 (D. Del. 1999) (noting that, in the Third Circuit,

debtors may pay prepetition claims that are essential to continued operation of business); In re

Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).[6]

28.     Today, the rationale for the necessity of payment rule – the rehabilitation of a

debtor in reorganization cases – is "the paramount policy and goal of Chapter 11."  In re

Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); see also Burchinal v. Cent.

Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that

allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation" is

appropriate); In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991)

("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of

reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has

developed . . . where bankruptcy courts permit the payment of certain pre-petition claims,

pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such

payment."); Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay

Corp.), 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition worker's

---

[6]      Additionally, the Bankruptcy Code contemplates prepetition payments in some circumstances.  Section
549(a), which deals with postpetition transfers, provides that "the trustee may avoid a transfer of property of the
estate . . . that occurs after the commencement of the case . . . that is not authorized . . . by the court."  11 U.S.C. §
549(a).  Thus, by necessary implication, a bankruptcy court may authorize limited postpetition payments to satisfy
prepetition obligations.  See In re Isis Foods, Inc., 37 B.R. 334, 336 n.3 (W.D. Mo. 1984) (noting that "proposed
transfers [to pay prepetition claims may] be presented in advance to a bankruptcy court for its approval and would
thereafter be insulated from attack" under section 549(a); see also 11 U.S.C. § 363(b)(1) (allowing the trustee, after
notice and hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate").

compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately").

29.     Since payment of the Foreign Termination Expenses is essential to the Debtors' restructuring and cost savings efforts in the U.A.E., and because the Dubai Office must remain open as the Debtors pursue transactions involving the Enterprise and CVAS businesses, the Debtors have met the standard for authorizing payment of prepetition obligations under section 105(a).  Such restructuring and cost-saving measures play a key role in the Debtors' ability to continue to operate and maximize value of the Debtors' estates.  It is not uncommon for foreign entities and courts to assert that they are not subject to the jurisdiction of a United States bankruptcy court and, as such, not subject to the automatic stay provisions of 11 U.S.C. section 362.  Although the Debtors vigorously dispute such contentions, if the Debtors proceeded with their planned terminations without paying the Foreign Termination Expenses, the automatic stay would likely not protect them under U.A.E. law.  As a result, attempting to enforce the automatic stay would merely impose additional litigation expenses on the Debtors, while failing to shield the Debtors from paying the Foreign Termination Expenses.

30.     Such added litigation expense would needlessly drain the assets of the Debtors' estates.  During this difficult period, the Debtors have limited resources, and therefore must eliminate the positions of certain employees.  Since the purpose of these terminations is to preserve the limited assets of the Debtors' estates, and because the Debtors need to continue operating the Dubai Office in order to maximize those assets, increasing the expenses associated

with these terminations clearly runs contrary to the interests of the Debtors, their estates and their creditors.

31.    Bankruptcy courts routinely grant authorization for chapter 11 debtors to pay claims owing to foreign entities against which the automatic stay cannot be readily enforced in the United States and as to which it would be unduly time-consuming and expensive to seek to enforce an order of the bankruptcy court in the creditor's home country.  See, e.g., In re Nortel Networks Inc., Case No. 09-10138 (KG) (Bankr. D. Del. Jan. 16, 2009); In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005); In re Northwest Airlines Corp., Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sept. 15, 2005); In re US Airways Group, Inc., Case No. 02-83983 (SSM) (Bankr. E.D. Va. Aug. 12, 2002); In re WorldCom, Inc., Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. July 22, 2002 and Aug. 13, 2002); In re Global Crossing Ltd., Case Nos. 02-40187 through 02-40241 (REG) (Bankr. S.D.N.Y. Jan. 28, 2002); In re Kmart Corp., Case No. 02-02474 (SPS) (Bankr. N.D. Ill. Jan. 25, 2002); In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Dec. 4, 2001).

32.    The Debtors submit that, to the best of their knowledge, section 503(c)(2) of the Bankruptcy Code, which places restrictions on "severance payment[s]" to "insider[s]," 11 U.S.C. § 503(c)(2), does not apply here because none of the employees receiving payments for Foreign Termination Expenses is an insider, as such term is defined by the Bankruptcy Code.

33.    Nothing contained herein is intended or should be construed as:  (i) an admission as to the validity of any claim against the Debtors; (ii) an admission that any claims that might arise upon the termination of the employment of an employee, including without limitation claims relating to severance, notice pay and repatriation expenses, are entitled to payment as an administrative expense; (iii) a waiver of the Debtors' rights to dispute any claim on any grounds

13

or assert any counterclaims or affirmative defenses; (iv) a promise to pay any claim; (v) an implication or admission that any particular claim would constitute Foreign Termination Expenses; or (vi) a request to assume any executory contract or unexpired lease, pursuant to section 365 of the Bankruptcy Code.

### Request for Waiver of Stay

34.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." As set forth above, the immediate payment of the Foreign Termination Expenses is essential to protect the value of the Debtors' estates.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the ten-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

### Notice

35.     Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to the (i) Office of the United States Trustee for the District of Delaware; (ii) the Committee; and (iii) the Bondholder Group; and (iv) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

### No Prior Request

36.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  August 26, 2009
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley
Lisa M. Schweitzer
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*

3094663.1

15