STOCK PURCHASE AGREEMENT

by and among

NORTEL NETWORKS INC.,
a Delaware corporation,

DIAMONDWARE, LTD.,
an Arizona corporation,

and

KEITH WEINER,
as Seller and as Holder Representative

Dated as of August 1, 2008

5772110v22

EXHIBIT
1

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ................................................................................................1
    1.1     Definitions.............................................................................................1
    1.2     Certain Additional Definitions.............................................................11
    1.3     Accounting Terms................................................................................13
    1.4     Monetary Terms...................................................................................13

ARTICLE II SALE AND TRANSFER OF SHARES; TERMINATION OF OPTIONS.............13
    2.1     Sale and Purchase of Shares ................................................................13
    2.2     Purchase Price......................................................................................13
    2.3     Adjustment...........................................................................................14
    2.4     Escrow..................................................................................................15
    2.5     Closing Deliveries................................................................................16
    2.6     Payment of Third Party Transaction Costs ..........................................16
    2.7     Cancellation of Company Options........................................................16
    2.8     Earn-Out Payments...............................................................................18

ARTICLE III CLOSING .....................................................................................................20

ARTICLE IV REPRESENTATIONS AND WARRANTIES REGARDING SELLER ..............20
    4.1     Due Authorization................................................................................20
    4.2     No Conflict...........................................................................................20
    4.3     Brokers' Fees .......................................................................................21
    4.4     The Shares............................................................................................21

ARTICLE V REPRESENTATIONS AND WARRANTIES REGARDING THE
COMPANY    21
    5.1     Organization, Power, Standing; No Subsidiaries; Due Authorization.............21
    5.2     Capitalization.......................................................................................22
    5.3     No Conflict; Third Party Consents ......................................................22
    5.4     Governmental Authorizations...............................................................23
    5.5     Financial Information...........................................................................23
    5.6     Events Subsequent to December 31, 2007............................................23
    5.7     Accounts Receivable............................................................................25
    5.8     Material Contracts................................................................................25
    5.9     Government Contracts..........................................................................27
    5.10    Real Property; Tangible Personal Property...........................................29
    5.11    Intellectual Property.............................................................................30
    5.12    Tax Matters..........................................................................................34
    5.13    Litigation.............................................................................................37
    5.14    Employees; Contractors.......................................................................38
    5.15    Employee and Labor Relations ............................................................39
    5.16    Employee Plans....................................................................................39
    5.17    Environmental Matters.........................................................................41

i

| | | |
|---|---|---|
| 5.18 | Entire Business | 42 |
| 5.19 | Compliance with Law; Governmental Authorizations. | 42 |
| 5.20 | Warranties. | 43 |
| 5.21 | Insurance | 43 |
| 5.22 | Certain Business Practices | 43 |
| 5.23 | List of Accounts | 43 |
| 5.24 | Powers of Attorney | 43 |
| 5.25 | Insolvency Proceedings | 43 |
| 5.26 | Affiliated Transactions | 44 |
| 5.27 | Foreign Disclosure | 44 |
| 5.28 | Books and Records | 44 |
| 5.29 | Brokers | 44 |

ARTICLE VI REPRESENTATIONS AND WARRANTIES REGARDING BUYER .............. 44

| | | |
|---|---|---|
| 6.1 | Organization, Power, Standing | 44 |
| 6.2 | Due Authorization | 45 |
| 6.3 | No Conflict; Third Party Consents | 45 |
| 6.4 | Investment Representations | 45 |
| 6.5 | Brokers | 46 |

ARTICLE VII CONDITIONS PRECEDENT TO CLOSING .............. 46

| | | |
|---|---|---|
| 7.1 | Conditions Precedent to the Obligations of Buyer | 46 |
| 7.2 | Conditions Precedent to the Obligations of Seller and the Company | 49 |

ARTICLE VIII COVENANTS .............. 49

| | | |
|---|---|---|
| 8.1 | Examinations and Investigations | 49 |
| 8.2 | Conduct of Business | 50 |
| 8.3 | Best Efforts; Notices; Governmental Authorizations. | 51 |
| 8.4 | Governmental Authorizations | 52 |
| 8.5 | Employees; Employee Benefits. | 52 |
| 8.6 | General Releases | 53 |
| 8.7 | Confidentiality | 53 |
| 8.8 | Other Tax Matters. | 53 |
| 8.9 | Publicity. | 55 |
| 8.10 | Assistance in Proceedings | 55 |
| 8.11 | No Solicitation. | 55 |
| 8.12 | Meeting with DARPA; CFIUS | 56 |
| 8.13 | Termination of Liens, Guarantees and Credit Facilities | 57 |
| 8.14 | 409A Amendments; 280G Approval | 57 |
| 8.15 | Termination of Contracts with Neal Shact | 58 |

ARTICLE IX INDEMNIFICATION; SURVIVAL .............. 58

| | | |
|---|---|---|
| 9.1 | Indemnification by Seller, Optionholders and Option Right Holder | 58 |
| 9.2 | Indemnification by Buyer | 59 |
| 9.3 | Losses Net of Insurance, Etc | 60 |
| 9.4 | Termination of Indemnification | 61 |
| 9.5 | Procedures Relating to Indemnification | 62 |

| 9.6 | Survival of Representations and Warranties | 63 |
|---|---|---|
| 9.7 | Set-Off; Escrow Account | 64 |
| 9.8 | Personal Obligation | 64 |
| 9.9 | Holder Representative | 64 |

**ARTICLE X TERMINATION OF AGREEMENT** ................................................................. 65

| 10.1 | Termination | 65 |
|---|---|---|
| 10.2 | Effect of Termination | 66 |

**ARTICLE XI MISCELLANEOUS** ................................................................. 66

| 11.1 | Expenses | 66 |
|---|---|---|
| 11.2 | Governing Law | 66 |
| 11.3 | Enforcement | 66 |
| 11.4 | Jurisdiction; Service of Process | 67 |
| 11.5 | Waiver of Jury Trial | 67 |
| 11.6 | Attorneys' Fees | 67 |
| 11.7 | Waiver; Remedies Cumulative | 67 |
| 11.8 | Notices | 68 |
| 11.9 | Assignment | 69 |
| 11.10 | No Third-Party Beneficiaries | 69 |
| 11.11 | Amendments | 69 |
| 11.12 | Interpretation, Exhibits and Schedules | 69 |
| 11.13 | Entire Agreement | 69 |
| 11.14 | Severability | 70 |
| 11.15 | Mutual Drafting | 70 |
| 11.16 | Counterparts | 70 |

## LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Optionholder Agreement |
| Exhibit B | Form of Company's Officer's Certificate |
| Exhibit C | Form of Holder Representative's Certificate |
| Exhibit D | Form of Legal Opinion of Stubbs Alderton & Markiles, LLP |
| Exhibit E | Form of General Release |
| Exhibit F | Form of Non-Competition Agreement |
| Exhibit G | Form of Employee Confidentiality Agreement |
| Exhibit H | Form of FIRPTA Certificate |
| Exhibit I | Form of Buyer's Officer's Certificate |

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (this "Agreement") is made and entered into as of August 1, 2008, by and among NORTEL NETWORKS INC., a Delaware corporation ("Buyer"), DIAMONDWARE, LTD., an Arizona corporation (the "Company"), and Keith Weiner ("Seller"), as Seller and also in his capacity as Holder Representative (as defined below).

## RECITALS

A.     Seller is the record and beneficial owner of all of the issued and outstanding shares of capital stock of the Company (collectively, the "Shares").

B.     The parties hereto desire that Seller sell, transfer, assign, convey and deliver to Buyer all of the Shares, and that Buyer purchase, acquire and accept the same, upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

1.1     Definitions.  As used in this Agreement, the following terms have the following meanings unless the context otherwise requires (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Accounts Receivable" means all trade accounts receivable and other rights to payment from customers of the Company, and all other accounts or notes receivable of the Company.

"Affiliate" means with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such first Person.  The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Applicable Percentage" means with respect to any holder of Company Common Stock, any Optionholder or the Option Right Holder, a ratio, expressed as a percentage, equal to (i) the sum of (a) the number of shares of Company Common Stock held by such holder immediately prior to the Closing, (b) the number of shares of Company Common Stock subject to Company Options held by such holder immediately prior to the Closing (whether or not

vested) and (c) the number of shares of Company Common Stock subject to the Option Right in the case of the Option Right Holder, divided by (ii) the Outstanding Common Stock Number.

"Balance Sheet Closing Adjustment Amount" means, as of the Closing Date, the amount by which total liabilities exceed total assets (if any) as reflected in the estimated Closing Balance Sheet delivered by the Company pursuant to Section 2.3(a).

"Balance Sheet Post-Closing Adjustment Amount" means the amount by which total liabilities exceed total assets (if any) as reflected in the Closing Balance Sheet after taking into account any adjustments or corrections to the Closing Balance Sheet finally determined pursuant to Section 2.3(b).

"Bid" means any outstanding quotation, bid or proposal by the Company that, if accepted or awarded, would lead to a Government Contract.

"Business Day" means any day (other than a Saturday or Sunday) on which banks are not required or authorized to close in the State of New York.

"CFIUS" means the Committee on Foreign Investment in the United States.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Common Stock" means the Common Stock, par value $0.0001 per share, of the Company.

"Company IP" means all Intellectual Property used, held for use or exploited by Company in connection with the conduct of its business or for any other purpose or activity.

"Company Options" means options outstanding as of a particular date to purchase or otherwise acquire shares of Company Common Stock, whether vested or unvested.

"Company Products" means the products (including any components, subcomponents and/or subassemblies thereof, whether or not sold separately) currently or previously offered for sale or licensed by the Company and any future products (including any components, subcomponents and/or subassemblies thereof, whether or not sold separately) of the Company that are (or have been) under development as of the date of this Agreement and any modified, enhanced or next generation versions of such Company products (including any components, subcomponents and/or subassemblies thereof, whether or not sold separately), as well as any consulting, integration and installation services directly related to any of the foregoing referenced products (and/or any components, subcomponents and/or subassemblies thereof, whether or not sold separately) of the Company.

"Company Software" means any Software, whether or not owned by the Company, incorporated in any of the Company Products or that was used in the design or development of any of the Company Products.

"Company Source Code" means the Source Code that is part of the Owned Company IP.

2

"Consultant Closing Transaction Fee" means the sum of $225,000.

"Context Closing Transaction Fee" means an amount equal to the sum of (i) $60,000, plus (ii) an amount equal to four percent (4%) of the Closing Purchase Price.

"Contracts" means all contracts, agreements, subcontracts, indentures, notes, bonds, loans, instruments, leases, mortgages, franchises, licenses, purchase orders, sale orders, understandings, arrangements or commitments, whether written or oral, that are legally binding.

"Critical Buyer Representations" means the representations and warranties contained in Section 6.1 (Organization, Power and Standing) and Section 6.2 (Due Authorization).

"Critical Covenants" means the covenants and obligations contained in Article II, Section 8.2, Section 8.8, Article IX, Section 11.1, and Section 11.6.

"Critical Representations" means the representations and warranties contained in Section 4.1 (Due Authorization), Section 4.4 (The Shares), Section 5.1(c) (Due Authorization), Section 5.2 (Capitalization), Section 5.10(e) (Title to Assets), Section 5.11 (Intellectual Property), Section 5.12 (Tax Matters), Section 5.16 (Employee Plans), and Section 5.17 (Environmental Matters).

"Deferred Tax Liabilities" means Taxes payable with respect to, or reduction of any Tax asset resulting from, any item of income referred to in Section 5.12(j) (for the avoidance of doubt, without regard to any carrybacks or carryforwards of net operating losses or other tax attributes).

"Earn-Out Period" means each of the following: (i) the period commencing August 12, 2008 and ending December 31, 2009 (such period, the "First Earn-Out Period"), (ii) the period commencing August 12, 2008 and ending December 31, 2010 (such period, the "Second Earn-Out Period"), and (iii) the period commencing August 12, 2008 and ending December 31, 2011 (such period, the "Third Earn-Out Period").

"Earn-Out Transaction Fees" means, with respect to any Earn-Out Payment, an amount equal to four percent (4%) of such Earn-Out Payment.

"Employee Benefit Arrangements" means each and all pension, supplemental pension, deferred compensation, option or other equity-based program, accidental death and dismemberment, life and health insurance and benefits (including medical, mental health, dental, vision and hospitalization), short- and long-term disability, fringe benefit, cafeteria plan, flexible spending account programs, bonus or incentive compensation (including such compensation related to the Transactions, whether paid by the Company or others), employment, severance, any plans, arrangements, or agreements providing benefits or payments in the event of a change of control, change in ownership or effective control or sale of a substantial portion (including all or substantially all) of the assets of any business or portion thereof, and any other employee benefit arrangements, plans, Contracts, policies or practices providing employee or executive compensation or benefits to any employee or former employee of the Company or any of its Affiliates or that is or has at any time been maintained, contributed to, or required to be

3

contributed to by the Company or any of its Affiliates or pursuant to which the Company or any of its Affiliates has or may have any liability, contingent or otherwise, other than the Employee Plans.

"Employee Plans" means each and all "employee benefit plans," as defined in Section 3(3) of ERISA, maintained or contributed to by the Company or any of its Affiliates or in which the Company or any of its Affiliates participates or participated and which provides benefits to any employee or former employee (including leased employees within the meaning of Code Section 414(n)) of the Company or any of its Affiliates or arrangements that would be so defined if they were not (i) otherwise exempt from ERISA by that or another section or (ii) maintained outside the United States.

"Environmental Claim" means, with respect to any Person, any notice or claim by any other Person alleging or asserting any Liability for investigatory costs, cleanup costs, Governmental or Regulatory Body response costs, damages to natural resources or other property, personal injuries, fines, penalties or other Losses arising out of, based on or resulting from (a) the presence or Release into the environment of any Hazardous Material, or (b) circumstances forming the basis of any violation or alleged violation of any Environmental Law.

"Environmental Law" means collectively the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), the Resource Conservation and Recovery Act of 1976, as amended, the Clean Water Act, as amended, the Clean Air Act, as amended, OSHA and any other applicable federal, state, local or foreign Laws that relate to protection of the environment, human health or safety or to Releases or threatened Releases of Hazardous Materials in the environment, or otherwise relating to the treatment, storage, disposal, transport or handling of any Hazardous Material.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"Escrow Transaction Fees" means, with respect to any portion of the Escrow Amount payable by Buyer hereunder, an amount equal to four percent (4%) of such portion of the Escrow Amount.

"GAAP" means United States generally accepted accounting principles consistently applied throughout the periods presented.

"Government Contract" means any Contract, entered into between the Company and (a) any Governmental or Regulatory Body, (b) any prime contractor to any Governmental or Regulatory Body (in its capacity as such), or (c) any subcontractor with respect to any Contract described in clause (a) or (b).

"Governmental Authorization" means any consent, approval, order, license, franchise, registration, security clearance, authorization, variance, exemption, certificate or permit issued, granted, given or otherwise made available by or under the authority of any Governmental or Regulatory Body or pursuant to any Law.

4

"Governmental or Regulatory Body" means any court, tribunal, arbitrator or any government or quasi-governmental entity, or municipality or political or other subdivision thereof, whether federal, state, city, county, local, provincial, foreign or multinational, or any agency, department, board, self-regulating authority, bureau, branch, commission, authority, organization, official or instrumentality of any of the foregoing, or other entity or official exercising governmental or quasi-governmental authority, including any branch of the military or any local or county fire or police department or agency.

"Hazardous Material" means (a) any petroleum, crude oil, natural gas, or any fraction, product or derivative thereof, radioactive materials or asbestos (whether or not friable); (b) any chemicals, materials, substances or wastes that are defined as or included in the definition of hazardous substances, hazardous wastes, hazardous materials, extremely hazardous substances, toxic substances, pollutants, contaminants or words of similar import under any Environmental Law; (c) perchlorate; and (d) any other chemical, material, substance, waste or exposure that is limited or regulated by any Governmental or Regulatory Body.

"Income Taxes" means all foreign or U.S. federal, state, local or municipal net income, alternative or add-on minimum, gross income, adjusted gross income, profits or excess profits, gross receipts, franchise, or similar taxes, including taxes arising under Section 1445 of the Internal Revenue Code and other withholding or backup withholding taxes.

"Indebtedness" means, without duplication, the aggregate amount of (i) all obligations for borrowed money, or with respect to deposits or advances of any kind, and all accrued but unpaid prepayment premiums or penalties and any other fees and expenses paid to satisfy such indebtedness, (ii) all obligations evidenced by bonds, debentures, notes or similar instruments, (iii) all obligations upon which interest charges are customarily paid, (iv) all obligations under conditional sale or other title retention agreements relating to property purchased, (v) all obligations issued or assumed as the deferred purchase price of property or services (excluding obligations to creditors for goods and services incurred in the ordinary course of business), (vi) all capitalized lease obligations, (vii) all obligations of others secured by any Lien on property or assets owned or acquired, whether or not the obligations secured thereby have been assumed, (viii) all obligations under standby letters of credit, (ix) all obligations to purchase securities (or other property) that arise out of or in connection with the sale of the same or substantially similar securities or property, and (x) all guarantees and arrangements having the economic effect of a guarantee of any indebtedness of any other Person.

"Indemnified Person" means any Person(s) claiming indemnification under any provision of ARTICLE IX.

"Indemnifying Person" means any Person(s) against whom a claim for indemnification is being asserted pursuant to the provisions of ARTICLE IX.

"Intellectual Property" means all intellectual property and other similar proprietary rights in any jurisdiction, whether owned or held for use under license, whether registered or unregistered, including such rights in and to:

(a)    United States and foreign patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof, continuing patent applications, reexaminations, and extensions thereof, any counterparts claiming priority therefrom, utility models, patents of importation/confirmation, certificates of invention, certificates of registration and like rights ("Patents");

(b)    copyrightable works, United States and foreign copyrights, all applications, registrations and renewals thereof and all other rights corresponding thereto throughout the world ("Copyrights");

(c)    trade names, fictional business names, corporate names, product names, logos, trademarks and service marks, trade dress, certification marks, slogans and other indicia of source or origin and the goodwill associated with the foregoing, together with all translations, adaptations, derivations and combinations and like intellectual property rights ("Trademarks");

(d)    trade secrets (including, those trade secrets defined in the Uniform Trade Secrets Act and under corresponding foreign statutory and common law), inventions, invention disclosures, discoveries, concepts, ideas, and improvements, whether or not patentable, business, technical and know-how information and confidential information, formulations, methods, algorithms, research and development results, compositions, techniques, processes, technical data, designs, drawings, diagrams, specifications, product road maps, catalogs, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, and manufacturing, engineering, quality control, testing, operations, logistical, maintenance and other technical information and technology, including databases and data collections and all rights therein, in each case that derives economic value (actual or potential) from not being generally known to other persons who could obtain economic value from its disclosure, and in each case excluding any Patents, Copyrights or Mask Works that cover or protect any of the foregoing (collectively, "Trade Secrets");

(e)    computer programs and software, including data files, source code, object code, application programming interfaces, architecture, documentation, files, records, schematics, emulation and simulation reports, test vectors and hardware development tools, databases and other software-related specifications and documentation (collectively, "Software");

(f)    Internet domain names and uniform resource locater addresses;

(g)    all mask work rights and other rights protecting integrated circuit or chip topographies or designs (collectively, "Mask Works");

(h)    data base rights, moral rights and any other proprietary, intellectual or industrial property rights of any kind or nature that do not comprise or are not protected by Patents, Copyrights, Trademarks, Trade Secrets or Mask Works; and

(i)    any right to sue for past, present or future infringement, misappropriation or dilution of any of the foregoing.

6

"Inventory" means items of inventory and supplies, including raw materials and supplies, work-in-process, finished goods and merchandise, products under research and development, demonstration equipment, samples, office and other supplies, spare parts, packaging materials and other accessories related thereto.

"Key Employees" means Seller, Rudy Mathieu, Charles Rowe and Allen Neff.

"Knowledge of the Company" means those facts or circumstances actually known by any of the Key Employees or Neal Shact and any facts or circumstances that would be known after reasonable inquiry by such individuals.

"Law" means any law, statute, rule, regulation, ordinance, constitution, treaty, code, order, rule of common law or other pronouncement having the effect of law of the United States of America, any foreign country or any domestic or foreign state, or of any Governmental or Regulatory Body.

"Leased Real Property" means all Real Property leased pursuant to the Leases.

"Leases" means the leases, subleases, use agreements and occupancy agreements pursuant to which the Company is the lessee, sublessee, user or occupant of Real Property.

"Liabilities" means any direct or indirect liability, Indebtedness, guaranty, claim, loss, damage, deficiency, assessment or obligation, whether fixed or unfixed, determined or determinable, due or to become due, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued or unaccrued, absolute, known or unknown, asserted or unasserted, matured or unmatured, or contingent or otherwise.

"Licensed Company IP" means all Company IP owned by a third party that the Company has a legal right to use or exploit by virtue of any Contract entered into with or other authorization from such third party.

"Lien" means any mortgage, deed of trust, lien, pledge, hypothecation, charge, preference, security interest, attachment, claim, contractual restriction, including transfer restrictions, put, call, right of first refusal, easement, servitude, right-of-way, option, conditional sale or installment contract or encumbrance of any kind and any financing lease involving substantially the same effect.

"Loss" or "Losses" means any direct or indirect liability, indebtedness, claim, loss, damage, Lien, deficiency, obligation, cause of action, lawsuit, administrative proceeding, investigation, audit, judgment, penalty, responsibility, fine, costs, charges or expenses (including reasonable attorneys' fees and disbursements and the costs of investigation and litigation) of any nature.

"Material Adverse Effect" means any circumstance, change or effect that, individually or in the aggregate with all other circumstances, changes or effects, is or could reasonably be expected to be materially adverse to (a) the business, assets, condition (financial or otherwise), or results of operations of the Company or (b) the ability of Buyer or the Company to operate the business of the Company after the Closing as it is presently operated; but excluding

in each of cases (a) and (b), changes or conditions as and to the extent such changes or conditions relate to or result from (i) public or industry knowledge of the transactions contemplated by this Agreement, (ii) the announcement of the transactions contemplated hereby, or the communication by Buyer of its plans or intentions with respect to the Company, (iii) the consummation of the transactions contemplated by this Agreement or any actions taken by Buyer, the Company or Holder Representative pursuant to this Agreement, or (iv) general economic conditions, conditions affecting U.S. or world financial markets or other conditions generally affecting the industries in which the Company or Buyer compete.

"MRAP Business Revenues" means, for a given Earn-Out Period, all revenues (net of all discounts, returns, allowances, rebates and refunds) recognized by the Company, Buyer and its Affiliates (without duplication) during such Earn-Out Period in accordance with GAAP applied on a consistent basis that arise from the sale or provision of Company Products (directly or indirectly) to the U.S. Department of Defense or any department or agency thereof (including any such sale or provisioning that is made through or directly to a prime contractor, subcontractor, reseller or other third party) pursuant to or in connection with Contracts awarded under or as part of the MRAP Program; but *excluding* any and all revenues recognized from or pursuant to such Contracts from the sale or provision of (i) products or services other than Company Products, (ii) any Company Products or components, subcomponents or subassemblies of Company Products that have been embedded or incorporated into other products of Buyer or any of its Affiliates where such Company Products or components, subcomponents or subassemblies have not been marketed, priced or invoiced by Buyer or any of its Affiliates as a separate product offering or option, and (iii) any delivery, installation or integration services related to any product or component included in clauses (i) and (ii) of this sentence.

"MRAP Program" means the U.S. Department of Defense program to procure mine resistant ambush protected (MRAP) armored vehicles pursuant to Contracts awarded in 2007 to BAE Systems/Force Protection Inc (FPI) and Navistar International Military Group (IMG) and any Contracts awarded pursuant to the MRAP II pre-solicitation launched in July 2007 by the Marine Corps Systems Command.

"Neutral Accounting Firm" means PricewaterhouseCoopers or such other independent accounting firm of nationally recognized standing as is selected by mutual agreement of Buyer and Holder Representative.

"Non-MRAP Business Revenues" means, for a given Earn-Out Period, all revenues (net of all discounts, returns, allowances, rebates and refunds) recognized by the Company, Buyer and its Affiliates (without duplication) during such Earn-Out Period in accordance with GAAP applied on a consistent basis that arise from the sale or provision of Company Products (directly or indirectly) to a Governmental or Regulatory Body (including any such sale or provisioning that is made through or directly to a prime contractor, subcontractor, reseller or other third party); but *excluding* (a) all MRAP Business Revenues, and (b) any and all revenues recognized from the sale or provision to any such Governmental or Regulatory Body (or prime contractor) of (i) products or services other than Company Products, (ii) any Company Products or components, subcomponents or subassemblies of Company Products that have been embedded or incorporated into other products of Buyer or any of its Affiliates where such Company Products or components, subcomponents or subassemblies have not been marketed,

priced or invoiced by Buyer or any of its Affiliates as a separate product offering or option, and (iii) any delivery, installation or integration services related to any product or component included in clauses (i) and (ii) of this sentence.

"Option Right" means the contractual right to be granted a Company Option for 907 shares of Company Common Stock held by the Option Right Holder.

"Option Right Holder" means William Weidner.

"Order" means any writ, judgment, decree, award, assessment, stipulation, determination, ruling, injunction or similar order of any Governmental or Regulatory Body, in each case whether preliminary or final.

"OSHA" means the Occupational, Safety and Health Act of 1970 and regulations, decisions or Orders promulgated thereunder, as amended.

"Outstanding Common Stock Number" means the sum of (a) the aggregate number of shares of Company Common Stock outstanding immediately prior to the Closing, exclusive of any treasury shares, (b) the aggregate number of shares of Company Common Stock subject to all Company Options held by Optionholders immediately prior to the Closing (whether or not vested), and (c) the aggregate number of shares of Company Common Stock subject to the Option Right.

"Outstanding Loan Balance" means the unpaid balance due at the Closing Date under that certain Promissory Note dated July 30, 2008, made by Seller in favor of the Company.

"Owned Company IP" means all Company IP that is owned by the Company.

"Permitted Lien" means (a) any Lien for Taxes not yet due or payable if a reserve shall have been made therefor on the Financial Statements and the Closing Balance Sheet, or (b) any statutory Lien arising in the ordinary course of business by operation of Law with respect to an obligation or liability that is not yet due or payable, if a reserve shall have been made therefor on the Financial Statements and the Closing Balance Sheet.

"Per Share Closing Purchase Price" means the quotient of (i) the Closing Purchase Price, as adjusted pursuant to Section 2.3(d), divided by (ii) the Outstanding Common Stock Number.

"Per Share Escrow Amount" means $825,000 divided by the Outstanding Common Stock Number.

"Per Share Transaction Cost Amount" means the quotient of (i) an amount equal to the sum of US $ 225,000 plus the Context Closing Transaction Fee, divided by (ii) the Outstanding Common Stock Number.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental or Regulatory Body or other entity.

9

"Pre-Closing Tax Period" means (i) any Tax period ending on or before the Closing Date and (ii) the portion of any Straddle Period ending on the Closing Date.

"Proceeding" means any action, suit, claim, complaint, investigation, litigation, demand, grievance, citation, summons, subpoena, inquiry, audit, proceeding or arbitration, civil, criminal, regulatory or otherwise, by or before any Person.

"Real Property" means real property together with all easements, licenses, interests and all of the rights arising out of the ownership thereof or appurtenant thereto and together with all buildings, structures, facilities, fixtures and other improvements thereon.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, dumping, discharge, dispersal, leaching, escaping, emanation or migration of any Hazardous Material in, into or onto the environment.

"Source Code" means Software in a form which is readable by humans without reverse assembly, reverse-compiling or reverse engineering but not suitable for machine execution without the intervening steps of interpretation, assembly or compilation.

"Straddle Period" means any taxable period beginning before and ending after the Closing Date.

"Subsidiary" means, with respect to any party, any corporation or other organization, whether incorporated or unincorporated, (i) of which such party or any other Subsidiary of such party is a general partner (excluding partnerships, the general partnership interests of which held by such party or any Subsidiary of such party do not have a majority of the voting interests in such partnership) or (ii) at least a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the Board of Directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such party or by any one or more of its Subsidiaries, or by such party and one or more of its Subsidiaries.

"Tangible Property" means all furniture, fixtures, equipment (including network, office and test equipment and apparatuses), motor vehicles, computers, servers, tools, machinery, Inventory, cables and supplies and other tangible property of every kind owned or leased by the Company wherever located.

"Tax" or "Taxes" (and, with correlative meanings "Taxable" or "Taxing") mean, with respect to any Person, (i) all Income Taxes, (ii) all sales, use, ad valorem, transfer, license, recording, employment (including federal and state income tax withholding, backup withholding, FICA, FUTA or other payroll taxes), environmental, excise, severance, stamp, occupation, premium, prohibited transaction, property, value-added, net worth, or any other taxes, customs, tariffs, imposts, levies, duties, government fees or other like assessments or charges of any kind, (iii) any interest, penalties and additions attributable to any items listed in clauses (i) and (ii), and (iv) any Liability in respect of any items described in clauses (i), (ii) and/or (iii) payable by reason of contract, assumption, transferee liability, operation of law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof) or any similar provision under Law or otherwise.

10

"Tax Return" means all U.S. federal, state, local, provincial and foreign returns, declarations, claims for refunds, forms, statements, reports, schedules, information returns or similar statements or documents, and any amendments thereof (including any related or supporting information or schedule attached thereto) required to be filed with any Taxing Authority in connection with the determination, assessment or collection of any Tax or Taxes.

"Taxing Authority" means any Governmental or Regulatory Body responsible for or having jurisdiction over the assessment, determination, collection or other imposition of Taxes.

"Third Party Transaction Costs" means all fees, compensation, expenses and costs owing to Transaction Service Providers and incurred by the Company or the Seller in connection with the negotiation, documentation and completion of this Agreement, the Transaction Documents and/or the Transactions, but excluding the amounts expressly specified to be paid Context Capital Group and Neal Shact in this Agreement.

"Transaction Documents" means (a) this Agreement, (b) each agreement, instrument or document attached hereto as an Exhibit, and (c) all other agreements, documents, certificates and instruments to be executed by the Company, Buyer, Seller, the Optionholders, the Option Right Holder or the Key Employees at or prior to the Closing pursuant to this Agreement or any agreement, document, certificate or instrument delivered in connection with this Agreement.

"Transaction Service Providers" means all attorneys, investment bankers, accountants and other Persons who have provided services or other benefits to, and/or are otherwise entitled to compensation (other than as part of such Person's salary and/or compensation as an employee of the Company in the ordinary course and unrelated to the Transactions) or reimbursement of costs and expenses from, the Company and/or Seller in connection with the negotiation, documentation and completion of this Agreement, the Transaction Documents and/or the Transactions.

"Transactions" means the transactions contemplated by the Transaction Documents.

1.2    Certain Additional Definitions.  As used in this Agreement, the following terms shall have the respective meanings ascribed thereto in the respective Sections of this Agreement set forth opposite each such term below:

| Term | Section |
|------|---------|
| Accounting Arbitrator | 2.3(b) |
| Acquisition Proposal | 8.11(b) |
| Acquisition Transaction | 8.11(b) |
| Agreement | Preamble |
| Audited Financial Statements | 5.5(a) |
| Balance Sheet | 5.5(a) |
| Balance Sheet Date | 5.5(a) |
| Buyer Indemnitees | 9.1(a) |

11

| | |
|---|---|
| Claim Notice | 9.4 |
| Closing | 3.1 |
| Closing Balance Sheet | 2.3(a) |
| Closing Date | 3.1 |
| Closing Purchase Price | 2.2(a) |
| Company | Preamble |
| Company IP Agreements | 5.11(d) |
| Company Option Plan | 2.7(a) |
| Company Software | 5.11(m) |
| Confidentiality Agreement | 8.7 |
| Determination Date | 2.3(c) |
| Earn-Out Payments | 2.8(b) |
| Earn-Out Statement | 2.8(b) |
| Employee Confidentiality Agreement | 7.1(k) |
| Employee Documentation | 7.1(k) |
| ERISA Affiliates | 5.16(b) |
| Escrow Account | 2.4(a) |
| Escrow Amount | 2.2(b) |
| Financial Statements | 5.5(a) |
| FIRPTA Certificate | 7.1(l) |
| General Release | 7.1(j) |
| GFE | 5.9(j) |
| Holder Representative | 9.9(a) |
| Inbound Licenses | 5.11(d) |
| Indemnifying Securityholders | 9.1(a) |
| Intellectual Property Assignment Agreements | 5.11(h) |
| Joint Filing | 8.12 |
| Material Contracts | 5.8(a) |
| May Balance Sheet | 5.5(a) |
| Multiemployer Plan | 5.16(b) |
| Non-Competition Agreement | 7.1(k) |
| Notice Period | 9.5(a) |
| Open Source Software | 5.11(m) |
| Optionholder | 2.7(b) |
| Optionholder Agreement | 2.7(e) |
| Outbound Licenses | 5.11(d) |
| Purchase Price | 2.2(a) |
| Qualified Plan | 5.16(f) |
| Section 5.26 Affiliate | 5.26 |
| Seller Indemnitees | 9.2 |
| Seller | Preamble |
| Shares | Recital A |
| Third Party Claim | 9.5(b) |
| Third Party Transaction Costs Statement | 2.2(c) |
| Transfer Taxes | 8.8 |

| Unaudited Financial Statements | 5.5(a) |
| --- | --- |

1.3    Accounting Terms.  All accounting terms shall have the meaning specified by GAAP unless otherwise specified.

1.4    Monetary Terms.  All references to "Dollars" or "$" shall mean U.S. Dollars unless otherwise specified.

## ARTICLE II

## SALE AND TRANSFER OF SHARES; TERMINATION OF OPTIONS

2.1    Sale and Purchase of Shares.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, transfer, assign and convey the Shares to Buyer, and Buyer shall purchase and accept the Shares from Seller, free and clear of all Liens.

2.2    Purchase Price.

(a)    The aggregate purchase price for the Shares and the cancellation of all Company Options pursuant to Section 2.7 (the "Purchase Price") shall be equal to the sum of (i) US $4,750,000 less the Balance Sheet Closing Adjustment Amount (the "Closing Purchase Price"), subject to further adjustment pursuant to Section 2.3(d), and (ii) any and all Earn-Out Payments payable by Buyer pursuant to Section 2.8.

(b)    The Closing Purchase Price shall be paid at the Closing as follows:  (i) Buyer shall withhold US $825,000 (together with all interest accruing thereon pursuant to Section 2.4(a), the "Escrow Amount") in escrow in accordance with Section 2.4, (ii) Buyer shall pay to Seller an amount equal to (A) (1) the Per Share Closing Purchase Price less the Per Share Escrow Amount and less the Per Share Transaction Cost Amount, multiplied by (2) the number of shares of Company Common Stock held by Seller immediately prior to the Closing, less (B) the Outstanding Loan Balance (as set forth in the certificate delivered pursuant to Section 2.2(d)), (iii) Buyer shall pay to Context Capital Group the Context Closing Transaction Fee, (iv) Buyer shall pay to Neal Shact the Consultant Closing Transaction Fee, and (v) Buyer shall pay to the Company the remainder of the Closing Purchase Price, for distribution to the Optionholders and the Option Right Holder in accordance with Section 2.7. Each portion of the Purchase Price payable to Seller or the Company, as and when due, shall be payable in cash by wire transfer of immediately available funds to the bank account that Seller or the Company, as applicable, has designated in writing at least three Business Days prior to the due date for such payment.  Each of the Context Closing Transaction Fee and the Consultant Closing Transaction Fee payable to Context Capital Group and Neal Shact, respectively shall be payable in cash by wire transfer of immediately available funds to the bank account that Context Capital Group or Neal Shact, as applicable, has designated in writing at least three Business Days prior to the Closing.

(c)    At least one Business Day prior to the Closing, the Company shall deliver to Buyer a written itemized statement (the "Third Party Transaction Costs Statement") setting forth all Third Party Transaction Costs payable by the Company, which statement shall be true and correct as of the Closing and so certified by the Chief Executive Officer of the Company.

13

The aggregate amount of Third Party Transaction Costs shown on the Third Party Transaction Costs Statement shall be included in the Closing Balance Sheet.

(d)     At least one Business Day prior to the Closing, the Company shall deliver to Buyer a written statement setting forth the Outstanding Loan Balance amount, which statement shall be true and correct as of the Closing Date and so certified by the Chief Executive Officer of the Company.

2.3     Adjustment.

(a)     The Company shall prepare and deliver to Buyer not less than two (2) and not more than five (5) Business Days prior to the Closing Date (or such later or earlier date as Buyer may agree) an estimated balance sheet of the Company as of the Closing Date (as the same may be modified and finally determined pursuant to Section 2.3(b), the "Closing Balance Sheet"), which shall be accurate and complete to the Knowledge of the Company at time of its delivery. The Closing Balance Sheet shall (x) fairly present the financial position of the Company as of the Closing Date, and (y) be prepared in accordance with GAAP and utilize the same accounting policies, methodologies and principles, with consistent classifications and estimation methodologies, as were used to prepare the May Balance Sheet (but in each case only to the extent such policies, methodologies and principles are in accordance with GAAP, as in effect at the time of preparation of the May Balance Sheet). For purposes of preparation of the Closing Balance Sheet, (i) the Company's obligation to make payments to Optionholders and the Option Right Holder pursuant to Section 2.7(b) shall be disregarded, (ii) the amounts paid to the Company by Buyer pursuant to Section 2.2 shall be disregarded, (iii) the Closing Balance Sheet shall be deemed not to include any Tax asset (including any Tax deduction) that will result from payments made in respect of Company Options under this Agreement, and (iv) all Third Party Transaction Costs included in the Third Party Transaction Costs Statement shall reflected in the Closing Balance Sheet.

(b)     If after the Closing Buyer determines that the Closing Balance Sheet delivered by Seller pursuant to Section 2.3(a) was inaccurate or incorrect in any respect (and provided such inaccuracy or error gives rise to a positive Balance Sheet Post-Closing Adjustment Amount), it may, within sixty (60) days after the Closing Date, notify the Holder Representative of such determination and its basis therefor. Buyer's right to deliver such notice shall not be limited by any failure to raise any objections to the Closing Balance Sheet prior to the Closing. For a period of ten (10) days after giving such notice (or such longer period as may be agreed upon by Buyer and Holder Representative), Buyer and the Holder Representative shall negotiate in good faith and endeavor to reach a definitive agreement on any adjustments or corrections to the Closing Balance Sheet and on the corresponding computation of the Balance Sheet Post-Closing Adjustment Amount. Buyer and the Holder Representative shall cooperate with each other in connection with, and shall provide the other and its representatives reasonable access to books and records, working papers and relevant personnel during, the preparation of statements and information to be delivered pursuant to this Section 2.3(b) and the resolution of any disputes that may arise under this Section 2.3. If Buyer and Holder Representative are unable to reach such an agreement during such ten (10) day period (or longer period, if applicable), then all remaining disagreements relating to the Closing Balance Sheet shall be submitted for final and binding resolution to a Neutral Accounting Firm (the "Accounting Arbitrator"), which shall be

14

instructed to make a final determination of the Closing Balance Sheet and Balance Sheet Post-Closing Adjustment Amount in accordance with the guidelines and procedures set forth in this Agreement. The Accounting Arbitrator will only consider those items and amounts set forth in the Closing Balance Sheet as to which Buyer and Holder Representative have disagreed and must resolve the matter in accordance with the terms and provisions of this Agreement and shall deliver to Buyer and Holder Representative, as promptly as practicable and in any event within sixty (60) days after its appointment, a written report setting forth the resolution of all such disagreements determined in accordance with the terms of this Agreement. In reaching its determination, the only alternatives available to the Accounting Arbitrator will be to (i) accept the position of Buyer, (ii) accept the position of Holder Representative or (iii) accept a position between these two positions; *provided further* that the Accounting Arbitrator shall in no case take a position with respect to any item that is more favorable to a party than the position taken with respect to such item by such party. The Accounting Arbitrator shall make its determination based solely on presentations and supporting material provided by Buyer and the Holder Representative and not pursuant to any independent review. The determination of the Accounting Arbitrator shall be final and binding upon Buyer, Holder Representative, Seller, all Optionholders and the Option Right Holder. Judgment may be entered upon the determination of the Accounting Arbitrator in any court having jurisdiction over the party against which such determination is to be enforced. The fees, expenses and costs of the Accounting Arbitrator shall be borne one-half by Buyer and one-half by Seller.

(c)     The date on which the Closing Balance Sheet and the Balance Sheet Post-Closing Adjustment Amount are finally determined in accordance with this Section 2.3(b) is hereinafter referred to as the "Determination Date."

(d)     If the Balance Sheet Post-Closing Adjustment Amount as finally determined in accordance with Section 2.3(b) is greater than zero, the Closing Purchase Price shall be decreased on a dollar-for-dollar basis by (i) the Balance Sheet Post-Closing Adjustment Amount, or (ii) if the Balance Sheet Closing Adjustment Amount was also greater than zero, by the amount by which the Balance Sheet Post-Closing Adjustment Amount is greater than the Balance Sheet Closing Adjustment Amount. If the application of this Section 2.3(d) results in a reduction in the Closing Purchase Price, then, within five (5) days after the Determination Date, Buyer shall subtract and retain from the Escrow Account and Escrow Amount the amount of such reduction; and if the Escrow Amount is not sufficient to effect such reduction fully, Seller shall pay the deficiency to Buyer.

2.4     Escrow.

(a)     Pursuant to Section 2.2, at the Closing, Buyer will withhold $825,000 from the Purchase Price and deposit such amount in a bank account maintained by Buyer for such purpose (the "Escrow Account"). Buyer shall utilize the Escrow Amount as a source of funds for any payments due to Buyer pursuant to Section 2.3(d) and for any indemnification liabilities of Seller, Optionholders and the Option Right Holder in accordance with the provisions of Article IX. Buyer shall credit and deposit in the Escrow Account interest on the Escrow Amount (or any portion thereof remaining in the Escrow Account) at a rate of three percent (3%) per annum.

15

(b)     On the eighteen (18) month anniversary of the Closing Date, Buyer shall distribute all of the Escrow Amount remaining in the Escrow Account (if any) to Seller, the Optionholders and the Option Right Holder in accordance with the procedures specified in Section 2.4(c); *provided, however,* that if any Buyer Indemnified Party has asserted any claims pursuant to Article IX, Buyer shall continue to hold in escrow all amounts necessary to satisfy all such claims until all related claims for indemnification have been satisfied or otherwise resolved as provided in ARTICLE IX.

(c)     If and as any amount of the Escrow Amount becomes owing under Section 2.4(b), Buyer shall (i) pay to Seller his Applicable Percentage of such amount less his Applicable Percentage of the Escrow Transaction Fees corresponding with such amount of the Escrow Amount, (ii) pay to Context Capital Group the Escrow Transaction Fees corresponding with such amount of the Escrow Amount and (iii) pay the remainder of such amount to the Company, for distribution to the Optionholders and the Option Right Holder in accordance with Section 2.7.

2.5     Closing Deliveries.

(a)     At the Closing, (i) Seller shall assign and transfer to Buyer good and valid title to the Shares by delivering to Buyer certificates representing the Shares, duly endorsed (or accompanied by duly executed stock powers) and (ii) Seller shall deliver to Buyer a FIRPTA Certificate.

(b)     At or prior to the Closing, the Company shall (i) deliver to Buyer the stock books, stock ledgers, minute books and corporate seals of the Company, and (ii) deliver to Buyer the certificates executed by the Company as required by Section 7.1(a).

(c)     At or prior to the Closing, Buyer shall (i) deliver the Closing Purchase Price in accordance with Section 2.2 and (ii) deliver to Seller the certificates executed by Buyer as required by Section 7.2(a).

2.6     Payment of Third Party Transaction Costs.  At or not later than five (5) Business Days following the Closing, the Company shall pay, and Buyer shall cause the Company to pay, all Third Party Transaction Costs included on the Third Party Transaction Costs Statement.

2.7     Cancellation of Company Options.

(a)     The Company shall take all necessary action to (i) terminate, effective as of the Closing, the Company's 2007 Stock Incentive Plan, as amended through the date of this Agreement (the "Company Option Plan"), (ii) cause each Company Option that is outstanding and unexercised immediately prior to the Closing, whether or not vested or exercisable, to become fully vested and exercisable as of the Closing, and (iii) cause each such Company Option and the Option Right, effective as of the Closing, to be automatically cancelled without any further action of the Company, any Optionholder or the Option Right Holder and converted into the right to receive a portion of the Purchase Price as provided in Section 2.7(b).

(b)     Each holder of a Company Option (an "Optionholder") that is outstanding and unexercised immediately prior to the Closing and the Option Right Holder shall be paid by the Company (and Buyer shall cause the Company to make such payment) in exchange for the

16

cancellation of such Company Option or the Option Right (in the case of the Option Right Holder), as follows:

      (i)     not later than the ending date of the first full employee payroll period of the Company following the Closing, an amount in cash, without interest, equal to (A) the Per Share Closing Purchase Price less the Per Share Escrow Amount, less the Per Share Transaction Cost Amount and less $1.56 (which corresponds to the per share exercise price applicable to each Company Option and the Option Right), multiplied by (B) the number of shares of Company Common Stock subject to such Company Option or Option Right;

      (ii)     not later than the ending date of the first full employee payroll period of the Company following the date Buyer pays Seller his Applicable Percentage of an Earn-Out Payment pursuant to Section 2.8(e), an amount in cash, without interest, equal to (A) such holder's Applicable Percentage multiplied by (B) (1) the total amount of such Earn-Out Payment less (2) the Earn-Out Transaction Fees corresponding with such Earn-Out Payment; and

      (iii)     not later than the ending date of the first full employee payroll period of the Company following the date Buyer pays Seller his Applicable Percentage of any portion of the Escrow Amount pursuant to Section 2.4, an amount in cash, without interest, equal to (A) such holder's Applicable Percentage multiplied by (B) (1) the total amount of the Escrow Amount then being paid by Buyer less (2) the Escrow Transaction Fees corresponding with such Escrow Amount.

In addition, as further consideration for the execution and delivery of an Optionholder Agreement by each Optionholder and the Option Right Holder, each of the Optionholders and the Option Rights Holder shall be paid not later than the ending date of the first full employee payroll period of the Company following the Closing, an amount in cash, without interest, equal to $1.56 multiplied by the number of shares of Company Common Stock subject to the Company Option or Option Right held by such holder immediately prior to the Closing. Each payment under the preceding sentence shall be treated as a bonus.

      (c)     Notwithstanding anything to the contrary herein, the Company shall deduct and withhold from all amounts payable to each Optionholder and the Option Rights Holder under this Agreement (i) such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code and the rules and regulations promulgated thereunder or any provision of any Tax Law, and (ii) the amount of any loan or other indebtedness that such holder may owe to the Company. To the extent that amounts are so withheld by the Company, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Optionholder or the Option Rights Holder, as the case may be, in respect to which such deduction and withholding was made by the Company.

      (d)     Prior to the Closing, the Company and Seller shall use their respective commercially reasonable efforts to cause each Optionholder and the Option Right Holder to execute and deliver an Option Termination Agreement substantially in the form of Exhibit A

17

hereto (each an "Optionholder Agreement"). Neither any Optionholder nor the Option Right Holder shall be entitled to receive any portion of the Purchase Price otherwise due to such holder pursuant to this Section 2.7 unless and until such holder has executed and delivered an Optionholder Agreement.

2.8    Earn-Out Payments.

(a)    As additional consideration for the Shares and the cancellation of all Company Options pursuant to Section 2.7, subject to and in accordance with the remaining provisions of this Section 2.8, Buyer shall pay an earn-out payment (each, an "Earn-Out Payment") with respect to each Earn-Out Period, determined as follows:

(i)    The Earn-Out Payment for the First Earn-Out Period shall be an amount equal to eighty-three and one-third percent (83 1/3%) of the amount, if any, by which Non-MRAP Business Revenues recognized during the First Earn-Out Period exceed $2,500,000; *provided, however,* that in no event shall the Earn-Out Payment for the First Earn-Out Period exceed $1,250,000; and *provided, further,* that no Earn-Out Payment shall be paid with respect to the First Earn-Out Period if Non-MRAP Business Revenues for such period do not exceed $2,500,000.

(ii)    The Earn-Out Payment for the Second Earn-Out Period shall be an amount equal to sixteen and two-thirds percent (16 2/3%) of the amount, if any, by which Non-MRAP Business Revenues recognized during the Second Earn-Out Period exceed $5,000,000; *provided, however,* that in no event shall the Earn-Out Payment for the Second Earn-Out Period exceed $500,000; and *provided, further,* that no Earn-Out Payment shall be paid with respect to the Second Earn-Out Period if Non-MRAP Business Revenues for such period do not exceed $5,000,000.

(iii)    The Earn-Out Payment for the Third Earn-Out Period shall be an amount equal to ten percent (10%) of the amount of all MRAP Business Revenues earned during the Third Earn-Out Period; *provided, however,* that in no event shall the Earn-Out Payment for the Third Earn-Out Period exceed $1,500,000; and *provided, further,* that no Earn-Out Payment shall be paid with respect to the Third Earn-Out Period if Non-MRAP Business Revenues for such period do not exceed $12,500,000.

(b)    Buyer shall maintain appropriate systems in place to properly and accurately account for Non-MRAP Business Revenues and MRAP Business Revenues and calculate Earn-Out Payments. No later than thirty (30) days following the date on which Buyer (or a parent Affiliate of Buyer) publicly states its earnings for the year that ends on the last day of an Earn-Out Period, Buyer shall prepare and deliver to Holder Representative an itemized statement setting forth by customer and Contract all Non-MRAP Business Revenues and MRAP Business Revenues recognized during such Earn-Out Period (for each Earn-Out Period, an "Earn-Out Statement"), and a calculation of the Earn-Out Payment(s), if any, owing for such

Earn-Out Period. The Earn-Out Statement shall be prepared and Non-MRAP Business Revenues and MRAP Business Revenues shall be computed in accordance with GAAP.

(c)     If Holder Representative (acting on behalf Seller, all Optionholders and the Option Right Holder) disagrees with Buyer's determination of an Earn-Out Payment amount as set forth in the Earn-Out Statement for any Earn-Out Period, Holder Representative shall notify Buyer in writing of such disagreement within thirty (30) days after delivery of such Earn-Out Statement, which notice shall describe the nature of any such disagreement in reasonable detail. During the thirty (30) day period of Holder Representative's review, Buyer shall provide the Accounting Arbitrator, which shall be jointly retained by Holder Representative and Buyer, with reasonable access to relevant books, records, documents, schedules and work papers of Buyer to the extent reasonably necessary (as determined by the Accounting Arbitrator) to enable the Accounting Arbitrator to verify Buyer's determination of the Earn-Out Payment amount(s) for the Earn-Out Period covered by such Earn-Out Statement; *provided*, that access shall be provided during regular business hours and at other reasonable times upon at least reasonable prior notice to Buyer; *provided, further*, that such access shall not unreasonably interfere with the business operations of Buyer. If Holder Representative fails to deliver such a notice of disagreement in such thirty (30) day period, Holder Representative, Seller, all Optionholders and the Option Right Holder shall have waived their right to contest, and shall be deemed to have agreed to, the Earn-Out Statement at issue and the Earn-Out Payment amount(s) shown thereon.

(d)     The Accounting Arbitrator will only consider those issues and matters as to which Buyer and Holder Representative have disagreed and shall deliver to Buyer and Holder Representative a written report setting forth the resolution of any such disagreement. Buyer and Holder Representative shall instruct the Accounting Arbitrator to make a final determination of disputed amounts pursuant to this Section 2.8 within a reasonable period of time, but in any event within thirty (30) days of its engagement. The parties shall cooperate with all reasonable requests of the Accounting Arbitrator throughout the term of its engagement. The determination of the Accounting Arbitrator shall be final and binding upon Buyer, Seller, the Optionholders and the Option Right Holder. Judgment may be entered upon the determination of the Accounting Arbitrator in any court having jurisdiction over the party against which such determination is to be enforced. The fees and expenses of the Accounting Arbitrator incurred in the resolution of such disagreements shall be borne one-half by Buyer and one-half by Seller.

(e)     If an Earn-Out Statement delivered by Buyer pursuant to Section 2.7(b) shows that an Earn-Out Payment is owing with respect to the Earn-Out Period covered thereby, Buyer shall, within five (5) Business Days after the delivery of such Earn-Out Statement, (i) pay to Seller his Applicable Percentage of the amount of such Earn-Out Payment as shown on such Earn-Out Statement less his Applicable Percentage of the Earn-Out Transaction Fees corresponding with such Earn-Out Payment, (ii) pay to Context Capital Group the Earn-Out Transaction Fees corresponding with such Earn-Out Payment, and (iii) pay the remainder of such Earn-Out Payment amount to the Company, for distribution to the Optionholders and the Option Right Holder in accordance with Section 2.7. In addition, if Holder Representative disagrees with any Earn-Out Statement pursuant to Section 2.7(c), and if as a result of such disagreement it is finally determined pursuant to Sections 2.7(b) – (d) that the Earn-Out Payment amount shown on such Earn-Out Statement was understated, then Buyer shall, within five (5) Business Days after such final determination, (i) pay to Seller his Applicable Percentage of the amount by which

19

such Earn-Out Payment was understated, (ii) pay to Context Capital Group the Earn-Out Transaction Fees corresponding with the amount by which such Earn-Out Payment was understated, and (iii) pay the remainder of such amount to the Company, for distribution to the Optionholders and the Option Right Holder in accordance with Section 2.7.

### ARTICLE III

### CLOSING

The Closing hereunder (the "Closing") shall take place at 10:00 a.m., Eastern Time, at the offices of Crowell & Moring LLP, 1001 Pennsylvania Avenue, N.W., Washington, D.C. 20004, on the third business day after satisfaction or waiver of all of the conditions set forth in ARTICLE VII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other date or at such other place or time as the parties may mutually agree upon but in any event not later than (i) August 29, 2008, if the CFIUS closing condition is waived by Buyer prior to such date pursuant to Section 8.12(a), or (ii) September 30, 2008, if such a waiver does not occur, unless this Agreement is earlier terminated in accordance with Section 10.1 (such date of the Closing is hereinafter referred to as the "Closing Date"). The Closing will be deemed effective at 5:00 p.m. Eastern Time on the Closing Date.

### ARTICLE IV

### REPRESENTATIONS AND WARRANTIES REGARDING SELLER

Seller hereby represents and warrants to Buyer that the following statements contained in this Article IV are correct and complete as of the date hereof and as of the Closing Date, except as specifically disclosed in the Schedules delivered to Buyer on the date hereof and attached to this Agreement:

4.1    Due Authorization.  Seller has full power, authority and legal capacity to execute and deliver the Transaction Documents to which he is, or will be, a party, to perform his obligations thereunder, and to consummate the Transactions. This Agreement has been, and each of the other Transaction Documents to which Seller is a party, when executed, will be, duly executed and delivered by Seller and (assuming the valid authorization, execution and delivery by Buyer of this Agreement and the other Transaction Documents to which Buyer is to become a party) constitute the valid and legally binding obligations of Seller, enforceable against Seller in accordance with their respective terms, subject to bankruptcy, insolvency, moratorium and similar laws of general application relating to or affecting creditors' rights and to general equity principles.

4.2    No Conflict.  The execution and the delivery by Seller of this Agreement do not, and the other Transaction Documents to which Seller is, or will be, a party will not, the performance by Seller of his obligations hereunder and thereunder will not, and the consummation of the Transactions will not (directly or indirectly) (i) result in the imposition of any Lien (other than the rights of Buyer hereunder) upon or with respect to the Shares or other assets, (ii) except as set forth on Schedule 4.2(ii), violate or conflict with, result in a breach of,

20

constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice, report or other filing (whether with a Governmental or Regulatory Body or other third party) under any Contract, Governmental Authorization, instrument, or other arrangement to which Seller is a party or by which Seller is bound or to which the Shares or other assets are subject, (iii) result in a breach or violation by Seller of any of the terms, conditions or provisions of any Law or Order, or (iv) require on the part of Seller any Governmental Authorization or any filing with or notice to any Governmental or Regulatory Body.

    4.3    Brokers' Fees.  Except as set forth on Schedule 4.3, Seller has no Liability or obligation to pay any fees or commissions to any broker, finder, investment banker agent or other Person with respect to the Transactions.

    4.4    The Shares.  Seller holds of record and owns beneficially all of the Shares free and clear of any Taxes, Liens, Contracts, commitments, equities, claims, and demands.  Upon delivery of the Shares to Buyer on the Closing Date in accordance with this Agreement and upon Buyer's payment of the Closing Purchase Price in accordance with Section 2.2(b), good, valid and marketable title to the Shares, free and clear of all Liens, will pass to Buyer.  Seller is not a party to any option, warrant, purchase right, or other Contract or commitment that could require him to sell, transfer, or otherwise dispose of any capital stock of the Company (other than this Agreement).  Seller is not a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any capital stock of the Company.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY

    The Company and Seller, jointly and severally, hereby represent and warrant to Buyer that the following statements contained in this Article V are correct and complete as of the date hereof and as of the Closing Date, except as specifically disclosed in the Schedules delivered to Buyer on the date hereof and attached to this Agreement:

    5.1    Organization, Power, Standing; No Subsidiaries; Due Authorization

    (a)    The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Arizona.  The Company has all requisite corporate power and authority to carry on its business as presently conducted, to own or lease and to operate its properties as and in the places where such properties are owned, leased or operated, and to enter into the Transaction Documents to which it is, or will be, a party and to consummate the Transactions.  The Company is duly qualified or registered to conduct business and is in good standing in each jurisdiction where such authorization is required to conduct its business as presently conducted.  Schedule 5.1(a) sets forth a list of the jurisdictions in which the Company is qualified or registered to do business as a foreign corporation.

    (b)    The Company does not have, and has never had, any Subsidiaries.  The Company does not own, directly or indirectly, any interest or investment (whether in equity or debt) in any Person.

(c)     The execution and delivery by the Company of the Transaction Documents to which it is, or will be, a party, the performance by it of its obligations thereunder, and the Transactions have been duly and validly authorized by all necessary action on the part of the Company and its shareholders. This Agreement has been, and each of the other Transaction Documents to which the Company is to become a party, when executed, will be, duly executed and delivered by the Company and (assuming the valid authorization, execution and delivery by Buyer of this Agreement and the other Transaction Documents to which Buyer is to become a party) constitute valid and legally binding obligations of the Company enforceable against the Company in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general application relating to or affecting creditors' rights and to general equity principles.

      5.2     Capitalization. The entire authorized capital stock of the Company consists of one million (1,000,000) shares of Company Common Stock, 640,000 shares of which are issued and outstanding, and no shares are held in treasury. Schedule 5.2 accurately and fully sets forth (a) the name of each holder of shares of the Company Common Stock and the number of shares of Company Common Stock held of record by each such shareholder, (b) the name of each Optionholder and the number of shares of Company Common Stock subject to the Company Option held by such Optionholder, and (c) the number of shares of Common Stock subject to the Option Right. The Shares (i) have been duly authorized, are validly issued, fully paid, and nonassessable, (ii) are held of record by Seller as set forth in Schedule 5.2, and (iii) were not issued in violation of any preemptive rights or rights of first refusal or first offer. Except as set forth on Schedule 5.2, (w) there are no equity securities, partnership interests or similar ownership interests of any class in the Company, (x) there are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other Contracts or commitments that could require the Company to issue, sell, or otherwise cause to become outstanding any of its capital stock, (y) there are no outstanding or authorized stock appreciation, phantom stock, profit participation, or similar rights with respect to the Company, nor has the Company committed to issue any of the foregoing, and (z) there are no voting trusts, proxies, shareholder agreements or other Contracts or understandings with respect to the voting of the capital stock of the Company. There are no accrued or unpaid dividends with respect to the Shares.

      5.3     No Conflict; Third Party Consents. Except as set forth on Schedule 5.3, the execution and delivery by the Company of this Agreement do not, and of the other Transaction Documents to which it is, or will be, a party will not, the performance of the Company's obligations hereunder and thereunder will not, and the consummation of the Transactions will not (directly or indirectly) (i) violate or conflict with the provisions of the Articles of Incorporation or Bylaws of the Company, (ii) result in the imposition of any Lien (other than the rights of Buyer hereunder) upon any of the assets of the Company or the Shares, (iii) violate or conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice, report or other filing (whether with a Governmental or Regulatory Body or other third party) under any Contract, Governmental Authorization, instrument, or other arrangement to which the Company is a party or by which the Company or any of its assets or the Shares are subject, (iv) result in a breach or violation by the Company of any of the terms, conditions or provisions of any applicable Law or Order, or (v) cause the Company to become subject to, or become liable for

22

the payment of any Tax. Except as set forth on <u>Schedule 5.3</u>, no consent, approval or authorization of, or registration or filing with, any Person is required in connection with the execution or delivery by the Company of this Agreement or any of the other Transaction Documents to which the Company is or is to become party or the consummation of the Transactions.

     5.4    <u>Governmental Authorizations</u>. The execution, delivery and performance of this Agreement and the other Transaction Documents by the Company, and consummation of the Transactions will not require on the part of the Company any Governmental Authorization or any filing with or notification to any Governmental or Regulatory Body.

     5.5    <u>Financial Information</u>.

     (a)    The Company has delivered to Buyer and <u>Schedule 5.5(a)</u> contains true, correct and complete copies of (i) the audited financial statements of the Company (including the balance sheet and the related statements of income and cash flows) as of and for each of the twelve (12) month periods ended December 31, 2006 and 2007, respectively (the "<u>Audited Financial Statements</u>"), and (ii) the unaudited financial statements of the Company (including the balance sheet and the related statements of income and cash flows) as of and for the four (4) month period ended May 31, 2008 (the "<u>Unaudited Financial Statements</u>" and, together with the Audited Financial Statements, the "<u>Financial Statements</u>"). The balance sheet of the Company as of May 31, 2008 shall be referred to herein as the "<u>May Balance Sheet</u>" and the date thereof shall be referred to herein as the "<u>Balance Sheet Date</u>." Except as may be indicated in the notes thereto, the Financial Statements (x) fairly present, in all material respects, the financial condition and results of operations of the Company at and as of the respective dates and during the respective periods indicated therein, (y) were compiled from books and records regularly maintained by management of the Company used to prepare the financial statements of the Company, and (z) were prepared in accordance with GAAP; *provided, however*, the Unaudited Financial Statements lack footnotes and other presentation items normally included only with audited financial statements and are subject to normal year end adjustments. Since December 31, 2006, there have been no material changes in the accounting policies of the Company (including any change in depreciation or amortization policies or rates) and no revaluation of any of the assets or properties of the Company. <u>Schedule 5.5(a)</u> contains a true, correct and complete list of all Indebtedness of the Company and identifies for each item of Indebtedness the outstanding principal and accrued but unpaid interest thereon. The Company has delivered to Buyer true and complete copies of all management letters, if any, relating to any audit or review of the financial statements or books of the Company, and all letters or documentation, if any, relating to the internal controls of other accounting practices of the Company.

     (b)    Except as and to the extent reflected on the Financial Statements or on <u>Schedule 5.5(b)</u>, the Company does not have any Liabilities that are of a nature customarily reflected on a balance sheet in accordance with GAAP.

     5.6    <u>Events Subsequent to December 31, 2007</u>. Except as set forth on <u>Schedule 5.6</u> or as consented to in writing by Buyer, since December 31, 2007, there has not been any Material Adverse Effect. Without limiting the foregoing, except as set forth on <u>Schedule 5.6</u> or as consented to in writing by Buyer (and excluding the Transactions), since such date:

23

(a)    The Company has carried on its business in the ordinary course of business and consistent with past practice;

(b)    The Company has not sold, leased, transferred, or assigned any of its properties, rights or assets having a value in excess of $5,000 in the aggregate or an individual value in excess of $5,000, excluding sales of Inventory in the ordinary course of business consistent with past practices;

(c)    The Company has not entered into any Contract or agreed to or suffered any termination, material modification, amendment or extension of or waiver of any material rights under any Contract that, in any such case, would require or would likely require payments to or from the Company in any one year of more than $5,000;

(d)    The Company has not entered into any Contract with any employee, contractor or consultant of the Company, including any Contract relating to employment, compensation, benefits, termination, retention, or severance;

(e)    The Company has not created or permitted the creation of any Lien (other than Permitted Liens) on any of its assets or properties;

(f)    The Company has not incurred, assumed, guaranteed or discharged any Liability, except current Liabilities for trade or business obligations incurred in connection with the purchase of goods or services in the ordinary course of business;

(g)    The Company has not suffered any damage, destruction or loss (whether or not covered by insurance), in any case or in the aggregate, in excess of $5,000;

(h)    Other than in the ordinary course of business consistent with past practice, the Company has not transferred or granted any rights under or entered into any settlement regarding the breach or infringement of, any Intellectual Property, or modified any existing rights with respect thereto;

(i)    The Company has not made any change in its Tax methods, practices or principles;

(j)    The Company has not made or rescinded any express or deemed election relating to Taxes, or settled or compromised any Proceeding relating to Taxes;

(k)    The Company has not made any capital expenditure (or series of related capital expenditures) involving more than $5,000;

(l)    The Company has not implemented, modified or terminated any Employee Benefit Arrangement or Employee Plan;

(m)    The Company has not committed to do any of the foregoing;

24

(n)    No employee of the Company has left employment or provided notice of future resignation, nor has the Company terminated the employment of or given notice of termination to any employee; and

(o)    There has not been any cancellation, or agreement to cancel, any Indebtedness or other obligation owing to the Company, including any Indebtedness or obligation of any current or former officer, director, or employee of the Company, any Affiliate thereof, or Seller.

5.7    <u>Accounts Receivable</u>. All Accounts Receivable of the Company are valid receivables, were incurred in the ordinary course of business consistent with past practice for bona fide products sold and delivered or services rendered, and unless paid prior to the Closing, will be current as of the Closing Date. No portion of the Company's Accounts Receivable is to be paid to any Person other than the Company. No notice has been received from any account debtor that any amount of any Accounts Receivable is subject to any pending or threatened set-off, discount or counterclaim of any kind, other than any amount for which a reserve has been established consistent with past practices and calculated in accordance with GAAP (as specifically shown on the Balance Sheet). <u>Schedule 5.7</u> contains a list of account debtors as of the Balance Sheet Date, the amount of all of the Company's Accounts Receivable and the aging thereof.

5.8    <u>Material Contracts.</u>

(a)    <u>Schedule 5.8(a)</u> sets forth a true, correct and complete list, as of the date hereof, of each of the following Contracts to which the Company is a party or otherwise subject (each a "<u>Material Contract</u>" and, collectively, the "<u>Material Contracts</u>"). Prior to the Closing, Seller or the Company shall deliver to Buyer an updated version of <u>Schedule 5.8(a)</u> which shall include a list of all Contracts referred to in this <u>Section 5.8(a)</u> to which the Company became a party or subject after the date hereof; all such additional Contracts shall thereafter constitute Material Contracts hereunder.

(i)    Contracts for the future acquisition or sale of any assets involving $5,000 individually (or in the aggregate, in the case of any related series of Contracts).

(ii)    Contracts calling for future aggregate purchase prices or payments to or from the Company in any one year of more than $5,000 in any one case (or in the aggregate, in the case of any related series of Contracts).

(iii)Contracts    relating to joint ventures, partnerships or teaming arrangements or like agreements, or involving a sharing of profits, losses, costs or Liabilities of the Company with another Person.

(iv)    Contracts containing covenants of the Company prohibiting or limiting the right to compete or engage in any line of business or prohibiting or restricting its ability to conduct business with any Person or in any geographical area or to solicit or hire any individual or group of individuals or that restrict the purchasing relationships of the Company.

25

(v)     Contracts relating to the acquisition by the Company of any operating business or the capital stock of any other Person.

(vi)     Contracts requiring the payment by the Company of a royalty, override or similar commission or fee and Contracts relating to Intellectual Property owned or used by the Company or its research and development, including Contracts granting the Company a license for the use of Intellectual Property or in which the Company has granted another Person license for the use of Intellectual Property.

(vii)     Indentures, mortgages, promissory notes, loan agreements, letters of credit or other agreements or instruments of the Company or commitments for the borrowing or lending of money by the Company, including Contracts under which the Company has advanced or loaned any amount to Seller or any of its directors, officers or employees.

(viii)     Contracts relating to the creation of Liens or the guarantee of the payment of liabilities or performance of obligations of any other Person by the Company.

(ix)     Contracts relating to the purchase, sale, lease or other use of Real Property.

(x)     Non-disclosure or confidentiality Contracts.

(xi)     Government Contracts.

(xii)     Employment, consulting, agency, compensation, benefits, retention, severance, termination, collective bargaining or other similar Contracts, relating to or for the benefit of current or former employees, sales representatives, distributors, dealers, agents, consultants or independent contractors.

(xiii)     Brokerage or finder's agreements.

(xiv)     Contracts with respect to the representation of the Company in foreign countries.

(xv)     Any Contracts providing for material liquidated damages or similar material penalties in the event of a breach.

(xvi)     Contracts under which the consequences of a default or termination could reasonably be expected to have a Material Adverse Effect.

(b)     The Company has provided to Buyer true, correct and complete copies of all Material Contracts. Except as set forth on Schedule 5.8(b), (i) each Material Contract is legally binding on and enforceable against the Company, valid and in full force and effect, and will continue to be in full force and effect following the Closing, (ii) the Company is not, and to the Knowledge of the Company, no other party is, in breach or violation in any material respect of, or default under, any Contract to which the Company is a party or otherwise subject, (iii) to the Knowledge of the Company, no event has occurred which with notice or lapse of time would

26

constitute a breach or default in any material respect of, or permit termination, modification, or acceleration under, any Contract to which the Company is a party or otherwise subject, and (iv) to the Knowledge of the Company (but without inquiry to any third party), no party has repudiated any provision of any Contract to which the Company is a party or otherwise subject.

5.9    <u>Government Contracts</u>.

(a)    A true, correct and complete list of each Government Contract that is in effect as of the date of this Agreement and each Bid is set forth in <u>Schedule 5.9(a)</u>. On or prior to the Closing Date, <u>Schedule 5.9(a)</u> will be amended by the Company to include each Government Contract that was entered into and each Bid that was submitted by the Company between the date of this Agreement and the Closing Date. As amended, <u>Schedule 5.9(a)</u> sets forth a true and correct list of each Government Contract that is in effect as of the Closing Date and each Bid.

(b)    Except as set forth in <u>Schedule 5.9(b)</u>, (i) the Company has complied in all material respects with all the terms and conditions of each of its Government Contracts and Bids as required; (ii) the Company has complied in all material respects with all requirements of Law applicable to each of its Government Contracts and Bids; (iii) all representations and certifications made by the Company with respect to each of its Government Contracts and Bids were complete and accurate in all material respects as of their effective date and the Company has fully complied with all such representations and certifications; (iv) no termination or default, cure notice or show cause notice is currently in effect or has been issued or, to the Knowledge of the Company (but without inquiry to any third party), is expected with respect to any of the Government Contracts or Bids; (v) neither any Governmental or Regulatory Body nor any prime contractor, subcontractor or other Person has notified the Company, either in writing or, to the Knowledge of the Company, orally, that the Company has breached or violated any Law, certification, representation, clause, provision or requirement pertaining to any Government Contract or Bid; (vi) other than pursuant to Government Contract requirements for withholding of fees under cost plus fixed fee contracts and labor withholdings under time and materials/labor hour contracts, no money due to the Company pertaining to any Government Contract or Bid has been withheld or set off nor has any claim been made to withhold or set off money, and the Company is entitled to all progress payments received with respect thereto; (vii) no stop work order has been issued with respect to any Government Contract or Bid; (viii) to the Knowledge of the Company, no material cost incurred by the Company pertaining to any Government Contract or Bid has been formally questioned or challenged, is the subject of any investigation or has been disallowed by any Governmental or Regulatory Body; and (ix) there have not been any written notices challenging, questioning or disallowing any costs with respect to any Government Contract or Bid.

(c)    Except as set forth in <u>Schedule 5.9(c)</u>, (i) neither the Company nor, to the Knowledge of the Company, any of the directors, officers, employees, consultants, contractors or agents of the Company is (or during the last five years has been) under administrative, civil or criminal investigation or indictment by any Governmental or Regulatory Body; (ii) there is no pending audit or investigation of the Company or any of its directors, officers, employees or representatives, (iii) within the last five years, there has not been any audit or investigation of the Company or any of its directors, officers, employees or representatives with respect to any

27

alleged irregularity, misstatement, noncompliance or omission arising under or relating to any Government Contract or Bid or any Laws, nor to the Knowledge of the Company is any such audit or investigation threatened; and (iv) during the last five years, the Company has not conducted or initiated any internal investigation or made any voluntary disclosure to any Governmental or Regulatory Body with respect to any alleged irregularity, misstatement, noncompliance or omission arising under or relating to a Government Contract or Bid or any Laws (including ITAR).  Except as set forth in Schedule 5.9(c), the Company has not had any irregularities, misstatements, noncompliance or omissions arising under or relating to any Government Contract or Bid that has led or is expected to lead, either before or after the Closing Date, to any of the consequences set forth in clause (i) or (ii) of the immediately preceding sentence or, to the extent material, any other damage, penalty assessment, recoupment of payment or disallowance of cost.

(d)     Except as set forth in Schedule 5.9(d), there are (i) no outstanding claims against the Company, by any Governmental or Regulatory Body or by any prime contractor, subcontractor, vendor or other third party arising under or relating to any Government Contract or Bid, and (ii) no disputes between the Company and any Governmental or Regulatory Body under the Contract Disputes Act or any other Federal statute or between the Company and any prime contractor, subcontractor, vendor or other third party arising under or relating to any such Government Contract or Bid.  Except as set forth in Schedule 5.9(d), to the Knowledge of the Company there are no existing facts that could reasonably be expected to result in a claim or dispute under clause (i) or (ii) of the immediately preceding sentence.

(e)     Neither the Company nor, to the Knowledge of the Company, any of its directors, officers, employees, consultants, contractors or agents is (or during the last five years has been) (i) suspended or debarred from doing business with any Governmental or Regulatory Body, (ii) subject to any debarment or suspension inquiry, or (iii) the subject of a finding of non-responsibility or ineligibility for government contracting.  There exist no facts or circumstances that would warrant the institution of suspension or debarment proceedings or the finding of non-responsibility or ineligibility on the part of the Company with respect to any prior, current, or future Government Contract or Bid.  Except as set forth in Schedule 5.9(e), during the last five (5) years the Company has conducted its operations in compliance in all material respects with the Laws pertaining to all Government Contracts and Bids.

(f)     Except as set forth in Schedule 5.9(f), no statement, representation or warranty made by the Company in any Government Contract, any Bid or any exhibit thereto or in any certificate, statement, list, schedule or other document submitted or furnished to the U.S. Government or any non-U.S. government in connection with any Government Contract or Bid contained on the date so furnished or submitted (or on any other date where such statement, representation or warranty is deemed made or brought down as of a subsequent date either under applicable Law or pursuant to the applicable Government Contract or Bid or any exhibit thereto or in any written certificate, statement, list, schedule or other document submitted or furnished to the U.S. Government or any non-U.S. Government in connection with such Government Contract or Bid) any untrue statement of material fact, or failed to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

28

(g)    Except as set forth on Schedule 5.9(g), the Company has reached agreement with the responsible U.S. Government contracting officers and applicable agencies with respect to closing all overhead and other costs charged to all Government Contracts that have been completed and billed prior to the date of the Closing Balance Sheet. The Company has disclosed to Buyer and submitted to the responsible U.S. Government contracting officers and applicable agencies all forward pricing indirect rates to be bid, billed and charged under Government Contracts for the years ended December 31, 2005, 2006 and 2007 and which rates cover any costs charged to Government Contracts that have not been completed prior to the date of the Closing Balance Sheet. In addition, the Company has disclosed to Buyer and submitted to the responsible U.S. Government contracting officer and applicable agencies any required incurred cost submissions for the years ended December 2005 through 2007.

(h)    The Company is not in receipt or possession of any competitor or government proprietary or procurement sensitive information under circumstances where there is a reasonable basis to believe that such receipt or possession is unlawful or unauthorized.

(i)    Except as set forth on Schedule 5.9(i), the Company has not submitted to any Governmental or Regulatory Body any inaccurate, untruthful or misleading cost or pricing data, certification, bid, proposal, report, claim or any other information relating to a Government Contract or Bid.

(j)    Schedule 5.9(j) identifies by description or by inventory number and contract all property, equipment, fixtures and software loaned, bailed or otherwise furnished to or held by the Company (or any subcontractors on behalf of the Company) by or on behalf of the United States or any foreign country as of the date of this Agreement. Said property, equipment, fixtures and software are herein referred to as the "GFE"). The Company has certified to the applicable Governmental or Regulatory Body in a timely manner that all GFE is in good working order, reasonable wear and tear excepted, and otherwise meets the requirements of the applicable contract and all applicable Laws. There are no outstanding loss, damage or destruction reports that have been or should have been submitted to any Governmental or Regulatory Body in respect of any GFE.

5.10    Real Property; Tangible Personal Property.

(a)    The Company does not own and has never owned any real property. Schedule 5.10(a) lists all Leases and sets forth in each case a description (including street address, legal description, and use) of the Leased Real Property and a statement of all security or other deposits made by the Company. The Company has provided Buyer with true and complete copies of all Leases (including all amendments and supplements thereto).

(b)    Except as set forth on Schedule 5.10(b):

(i)    There are no parties other than the Company in possession of any of the Leased Real Property or any portion thereof, and there are no leases, subleases, licenses, concessions or other agreements, written or oral, granting to any party or parties (other than the Company) the right of use or occupancy of any portion of the Leased Real Property.

29

(ii)     (1) all structures and all structural, mechanical and other physical systems that constitute part of the Leased Real Property are free of known defects and in good operating condition and repair; (2) no maintenance or repair to the Leased Real Property has been unreasonably deferred; and (3) there is no water, chemical or gaseous seepage, diffusion or other intrusion into the Leased Real Property, including any subterranean portions, that would impair beneficial use of the Leased Real Property.

(c)     None of the equipment at the Leased Real Property or the operation or maintenance thereof, or the conduct of the Company, violates any restrictive covenant or encroaches on any property or property rights owned by others or any easement, right of way or other restriction affecting the Leased Real Property in any respect. The Leased Real Property and its continued use, occupancy and operations as used, occupied and operated in the conduct of the Company's business as presently conducted does not constitute a nonconforming use and is not the subject of a special use permit under any applicable Law.

(d)     Schedule 5.10(d) sets forth a true, correct and complete list of each material item of the Tangible Property of the Company, each of which is located at the Leased Real Property. Such Tangible Property has been maintained in accordance with the Company's normal practice and in a reasonably prudent manner and are in good operating condition and repair for the operation of its business, ordinary wear and tear and aging excepted. Such Tangible Property is sufficient for the conduct of the business of the Company as presently conducted.

(e)     The Company has good, valid and marketable title to, or in the case of property held under lease, a valid leasehold interest in, all Tangible Property used or held for use by the Company in connection with the conduct of its business, free and clear of any Liens, other than Permitted Liens, and such Tangible Property is not subject to any lease, security agreement, conditional sales agreement, or other title retention or security arrangement, in each case except as set forth on Schedule 5.10(e).

5.11    Intellectual Property.

(a)     Certain Owned Company IP. Schedule 5.11(a) contains a complete and accurate list, as of the date hereof, of the following Owned Company IP: (i) all registered Trademarks and unregistered Trademarks; (ii) all Patents; (iii) all written invention disclosures within the last two years; (iv) all registered Copyrights; (v) all registered Internet domain names; and (vi) all Company Software (excluding any off-the-shelf shrinkwrap, clickwrap or similar commercially available non-custom Software and data files), in each case listing, as applicable, (x) the name of the current owner and (y) with respect to Owned Company IP which is registered or for which registration is pending, (A) the applicant/registrant, (B) the jurisdiction where the application/registration is located and (C) the application or registration number.

(b)     Good Standing. The Company has made all prosecution and maintenance payments and all filings due or required to be filed prior to the Closing Date, to prosecute and maintain each item of registered, issued and applied for Owned Company IP. There are no pending, or, to the Knowledge of the Company, threatened interferences, re-examinations, oppositions, reissues, appeals or cancellation proceedings involving any Patents or Trademarks

30

owned by the Company. The Company has taken appropriate steps to ensure compliance with all Laws relating to patent marking requirements and trademark and copyright notice requirements (including trademark and copyright legends and symbols, such as ©, ®, $^{TM}$, $^{SM}$) with respect to any Owned Company IP that has been issued, granted or registered by or with any Governmental or Regulatory Body or for which an application therefor has been filed with any Governmental or Regulatory Body, and all such registered, issued and applied for Owned Company IP is duly registered, issued and/or filed in the name of the Company. All registrations of Owned Company IP are currently in good standing and the chain of title recorded by the Company with the applicable Governmental or Regulatory Body, including the U.S. Patent and Trademark Office, is correct against each item of registered, issued or applied for Owned Company IP.

      (c)    <u>Enforceability</u>. To the Knowledge of the Company, the Owned Company IP is valid and enforceable. No false allegations of use or other false statements have been made in connection with the filing, prosecution or maintenance of any Trademarks or Patents included in the Owned Company IP. To the Knowledge of the Company, no reasonable basis exists for any claim that any of the Owned Company IP is either invalid or unenforceable. The Company has not taken any action or failed to take any action that would result in the abandonment, cancellation, forfeiture, relinquishment, invalidation, waiver or unenforceability of the Owned Company IP. To the Knowledge of the Company, there is no relevant prior art pertaining to any issued Patent owned by the Company that was not disclosed during the prosecution of the patent application(s) therefor, but which if such prior art had been disclosed reasonably would have been expected to have adversely affected the prosecution thereof or the scope of the patent claims ultimately granted in respect thereof.

      (d)    <u>Company IP Agreements</u>.

      (i)    <u>Schedule 5.11(d)(i)</u> contains a complete and accurate list, as of the date hereof, of all Contracts granting to the Company a license, covenant not to sue or any other interest in, or any right to use or exploit any Intellectual Property, other than off-the-shelf shrinkwrap, clickwrap or similar commercially available non-custom Software (such agreements, the "<u>Inbound Licenses</u>").

      (ii)    <u>Schedule 5.11(d)(ii)</u> contains a complete and accurate list, as of the date hereof, of all Contracts under which the Company has granted to others a license, covenant not to sue or any other interest in, or any right to use or exploit any Company IP (such agreements, the "<u>Outbound Licenses</u>" and together with the Inbound Licenses, the "<u>Company IP Agreements</u>").

      (iii)T    he Company has not granted any Person any exclusive rights in, to or under any Owned Company IP. Except as set forth in Schedule 5.11(d)(iii), no Company IP Agreement may be unilaterally terminated by any party to such Agreement as a result of the consummation of the Transactions. Except as set forth in Schedule 5.11(d)(iii), the Company has not entered into any Contract to indemnify any other Person against any claim of infringement or misappropriation of any Intellectual Property. All Intellectual Property that has been distributed, sold or licensed to a third party by the Company and is covered by a warranty by the Company, conformed to or

31

conforms to, and performed or performs in all material respects in accordance with, the representations and warranties provided with respect to such Intellectual Property by or on behalf of the Company for the time period during which such representations and warranties apply.  No loss or expiration of the Company's right to use any Licensed Company IP is pending, reasonably foreseeable or, to the Knowledge of the Company, threatened.  True, correct and complete copies of all Company IP Agreements have been made available to Buyer.

(e)     Sufficiency of Company IP.  The Owned Company IP, together with the Licensed Company IP, constitutes all the Intellectual Property that is used in or is necessary for the conduct of the business of the Company as currently conducted.

(f)     No Liens/Ownership.  The Company owns all right, title and interest in the Owned Company IP free and clear of all Liens other than Permitted Liens.  No Person jointly owns any Owned Company IP pursuant to any Contract with the Company, by operation of law or otherwise.  No material license fees in respect of any such joint Owned Company IP will be payable by the Company following the Closing to any Person for the use or exploitation of such Intellectual Property.  The Company has not received any written or, to the Knowledge of the Company, oral notice or claim challenging the Company's ownership of any Owned Company IP or asserting that any other Person has any claim of legal or beneficial ownership or exclusive rights with respect thereto, nor, to the Knowledge of the Company, is there a reasonable basis for any such notice or claim.

(g)     Protection of Proprietary Information.

(i)     The Company has taken all reasonable and customary steps to protect its rights in and preserve the secrecy and confidentiality of all Intellectual Property developed or acquired by the Company that constitutes or at any time constituted Trade Secrets.  Without limiting the foregoing, the Company has and enforces a policy requiring all employees, consultants and contractors, and any other person with access to Trade Secrets of the Company to execute a proprietary information, confidentiality and assignment agreement substantially in the Company's standard form[s] previously provided to Buyer.

(ii)     To the Knowledge of the Company, neither the Company nor any Person employed by or affiliated with the Company in connection with or by reason of such Person's employment or affiliation with the Company (A) has violated or is violating any employment, invention disclosure or assignment, confidentiality, non-disclosure, non-competition or similar Contract with any Person, or (B) has disclosed or utilized or is utilizing any Trade Secret or proprietary information or documentation of any Person (excluding any Licensed Company IP); and the Company has not received any claim or assertion from any Person that the Company or any Person employed by or affiliated with the Company has engaged in or is engaging in the conduct described in clause (A) or (B) of this sentence.

(h)     Employees and Consultants.  All former and current employees, consultants and contractors of the Company who contribute or have contributed to the creation or

32

development of any of the Owned Company IP have duly executed written Contracts with the Company that assign to the Company all rights, title and interest in and to any such contributions that the Company does not already own by operation of Law (each an "Intellectual Property Assignment Agreement"). No inventor listed on the Company's Patents is under any obligation to assign its rights in the Company's Patents to a former employer or any other Person. The Company has not released or waived any material right under any Intellectual Property Assignment Agreement.

(i)    Infringement. To the Knowledge of the Company, neither the Company, nor any products or services distributed, sold, licensed or offered by the Company, nor the operation of the Company's business as previously or currently conducted have infringed upon, misappropriated or violated, or do infringe upon, misappropriate or violate any Intellectual Property of any Person; and the Company has not received any notice or claim asserting that any such infringement, misappropriation or violation has occurred or is occurring, nor, to the Knowledge of the Company, is there any reasonable basis for such a claim. To the Knowledge of the Company, no Person is infringing upon, misappropriating or violating any Owned Company IP or any Licensed Company IP that is exclusively licensed to the Company.

(j)    IP Proceedings. As of the date hereof, there is no Proceeding pending or, to the Knowledge of the Company, threatened with respect to, (i) any alleged infringement, misappropriation or violation of the Intellectual Property of any Person by the Company or any of its current products or services or otherwise by the conduct of the Company's business as previously or currently conducted; (ii) any claim challenging the validity or enforceability of any item of Owned Company IP, or the ownership by the Company of such item; or (iii) any claim contesting the Company's rights with respect to any of the Licensed Company IP. The Company is not subject to any Order that restricts or impairs the use of any Company IP.

(k)    Settlements. No limitations or restrictions on the use or enforceability of any of the Company IP have been agreed by the Company with any Person pursuant to a settlement agreement or a similar Contract intended to settle a dispute, and the Company has not granted any covenants not to sue with respect to any of the Company IP.

(l)    Software. Schedule 5.11(l) sets forth a true, correct and complete list, and brief description of, all Software included in the Owned Company IP. Except as expressly stated on Schedule 5.11(l), all Software included in the Owned Company IP was either (i) developed by employees of the Company within the scope of their employment, (ii) developed by consultants or contractors who have expressly assigned their rights and interest therein to the Company pursuant to written Contracts, or (iii) otherwise acquired by the Company from a third party pursuant to a written Contract in which the ownership rights therein were expressly assigned to the Company.

(m)    Open Source Software. (i) Except as set forth in Schedule 5.11(m)-1, the Company has never incorporated into any Company product, or any Software that the Company has distributed or published, any "freeware," "shareware" or other Software obtained pursuant to any open source, community source, copy left or similar publicly available source code license ("Open Source Software") and subsequently distributed such product or other Software with such Open Source Software incorporated therein, (ii) except as set forth in Schedule 5.11(m)-2,

33

none of the Company Software incorporates, contains or requires use of any Open Source Software, and (iii) except as set forth in Schedule 5.11(m)-3, none of the Company Software incorporates, contains, is bundled with or is distributed with any Open Source Software in a manner that requires disclosure of the source code of, or licensing of, any such Company Software or any other Company Owned IP.  To the extent Software is listed on Schedule 5.11(m)-2 or Schedule 5.11(m)-3, the Company has also described (x) the Company products in which such Software is used and (y) what license governs the Company's use of such Software.

(n)    Source Code.  Schedule 5.11(n) sets forth all Contracts pursuant to which the Company has agreed to deposit any Company Source Code in a source code escrow account, or has otherwise agreed to deliver or make available to any Person any Company Source Code. To the Knowledge of the Company, no condition has occurred, and no circumstance or condition exists, that would be sufficient to entitle the beneficiary under any source code escrow arrangement under which the Company has deposited any Company Source Code to require release of such material Company Source Code.  The consummation of the Transactions will not constitute a condition sufficient to entitle the beneficiary under any source code escrow arrangement under which the Company has deposited any Company Source Code to require release of such Company Source Code.

(o)    Viruses.  The Company has in place, consistent with general industry practices, systems to identify and detect any computer code which may: (i) irreparably disrupt, disable, erase or harm operation of material Software included in the Owned Company IP, or cause such Software to irreparably damage or corrupt any data, hardware, storage media, programs, equipment or communications, or (ii) permit any Person to access material Software included in the Owned Company IP without authorization.

(p)    Government Rights.  Schedule 5.11(p) identifies all Intellectual Property, and all rights in technical data and/or computer software (each as defined in the Federal Acquisition Regulations (and the Governmental or Regulatory Body supplements thereto)), in each case, related to, used, held for use, exploited or necessary for the conduct of the Business as presently conducted, in which Seller or any Affiliate of Seller has rights, that (i) were developed, in whole or in part, with full- or partial- funding from a Governmental or Regulatory Body, including the United States Government or any agency thereof, or in the performance of a Government Contract, or (ii) were delivered to the U.S. Government.

5.12    Tax Matters.

(a)    The Company has timely and duly filed all Tax Returns that are or were required to be filed by the Company, and such Tax Returns are true, complete and accurate in all respects.  Schedule 5.12(a) sets forth a true, correct and complete list of all jurisdictions (whether domestic or foreign) in which the Company currently files Tax Returns.  The Company is not and has never been a member of an affiliated group within the meaning of Section 1504(a) of the Code, or any similar affiliated or consolidated group for Tax purposes under state, local, or foreign Law, and the Company has never filed or been included in a combined, consolidated, or unitary Tax Return.  The Company has never received any written notice or written inquiry from any jurisdiction where the Company does not currently file Tax Returns to the effect that such filings may be required or that the Company may otherwise be subject to taxation by such

34

jurisdiction. No U.S. federal, state, or local, or foreign audit, proceeding, or other examination of any Tax Return of the Company is presently in progress, nor, to the knowledge of the Company, is any such audit, proceeding, or other examination threatened or contemplated. No issue has been raised by any Taxing Authority in any current or prior audit of the Company which, by application of the same principles, would reasonably be expected to result in a material deficiency for any subsequent Tax period. No deficiencies for any Taxes have been proposed, asserted or assessed against the Company which have not been resolved and paid in full.

(b)    All Taxes of the Company (whether or not shown as due on the Company's Tax Returns) have been timely paid. The unpaid Taxes of the Company for Tax periods through the Closing do not exceed the accruals and reserves for Taxes (excluding accruals and reserves for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the Balance Sheet. Since the Balance Sheet Date, the Company has incurred no liabilities for Taxes except in the ordinary course of business consistent with past practices. The Company (i) has complied in all respects with applicable Laws relating to the withholding of Taxes (including withholding of Taxes pursuant to Sections 1441, 1442, 3121, and 3402 of the Code or similar provisions under any other Laws) and has, in all respects within the time and manner prescribed by Law, paid to the proper Taxing Authority all amounts required to be withheld and paid under all applicable Laws and (ii) is not liable for any Taxes or any penalty for failure to comply with the foregoing.

(c)    Except as set forth in Schedule 5.12(c), the Company has not (i) filed an outstanding request for extension of time within which to file Tax Returns, (ii) executed a waiver or consent extending any statute of limitations for the assessment or collection of any Taxes which remains outstanding, (iii) applied for a ruling relative to Taxes, (iv) entered into a closing agreement with any Tax Authority, or (v) made or entered into any election, consent or agreement as to Taxes in effect with respect to the Company that will remain in effect following the Closing and which have had a material adverse effect on the taxable income of the Company prior to the Closing Date.

(d)    The Company is not liable for any payment that is due but has not been made to any trust or other fund or to any governmental or administrative authority with respect to unemployment compensation or social security benefits for current and former employees, directors, officers, contractors or consultants of the Company.

(e)    The Company is, and since January 1, 2005 has been, a C corporation for United States federal income tax purposes and has had comparable status under the laws of any state or local jurisdiction in which it was required to file any Tax Return at the time it was required to file such Tax Return. From the time of its formation until January 1, 2005, the Company was an S corporation for United States federal income tax purposes and had comparable status under the laws of any state or local jurisdiction in which it was required to file any Tax Return at the time it was required to file such Tax Return. No filing or election was made with any Taxing Authority between the time of the Company's formation and January 1, 2005 for the Company to be treated as anything other than an S corporation for United States federal income tax purposes, and no filing or election has been  made with any Taxing Authority

since January 1, 2005 for the Company to be treated as anything other than a C corporation for United States federal income tax purposes.

(f)     There are no Liens with respect to Taxes upon any of the Company's assets, other than with respect to Taxes not yet due and payable.

(g)     The Company does not (i) have any Liability for the Income Taxes of any Person other than the Company under Treasury Regulations Section 1.1502-6 (or any similar provision of state, foreign or local Law) or (ii) have any Liability for the Taxes of any other Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or foreign Law), as a transferee or successor, by contract or otherwise.  The Company is not and has never been a party to any Contract (whether express or implied) providing for the allocation or sharing of Taxes, including any terminated agreement as to which the Company could have any continuing Liabilities.

(h)     Schedule 5.12(h) lists the entities that are disregarded entities or partnerships for Tax purposes and in which the Company owns an interest.  The Company does not have a permanent establishment or branch outside the United States and does not conduct business outside the United States in such a way that it is deemed to have a permanent establishment or a foreign branch, as that term is defined in Temporary Treasury Regulation § 1.367(a)-6T(g)(1).

(i)     The Company has not been the "distributing company" (within the meaning of Code Section 355(a)(1)) or the "controlled corporation" (within the meaning of Code Section 355(a)(1)) (i) within the two-year period ending as of the date of this Agreement or (ii) in a distribution that could otherwise constitute part of a "plan" or "series of transactions" (within the meaning of Code Section 355(e)) in conjunction with this Agreement and the Transactions.

(j)     Except as set forth on Schedule 5.12(j), the Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing as a result of any:  (i) adjustment pursuant to Section 481(c) of the Code by reason of any voluntary or involuntary change in method of accounting for a taxable period ending on or prior to the Closing; (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign income tax law) executed on or prior to the Closing; (iii) installment sale or open transaction disposition made on or prior to the Closing; (iv) prepaid amount received on or prior to the Closing; or (v) any similar election, action or agreement that would have the effect of deferring any Liability for Taxes of the Company from any period ending on or before the Closing Date to any period ending after such date.

(k)     There is no limitation on the utilization by the Company of its net operating losses, built-in losses, Tax credits, or similar items under Sections 382, 383, or 384 of the Code or comparable provisions of state Law.

(l)     The Company has never entered into or been a party to (i) a transaction subject to registration pursuant to Code Section 6111 as a "reportable transaction" within the

meaning of Code Section 6111(b)(2) or as a "tax shelter" as defined in former Code Sections 6111(c) or (d), (ii) a transaction subject to the list requirements of Code Section 6112, (iii) a tax shelter within the meaning of Code Section 6662(d), or (iv) a "listed transaction" as set forth in written guidance or a notice issued by the Internal Revenue Service. None of the Tax Returns of the Company contained or were required to contain a disclosure statement under Sections 6011 or 6662 of the Code (or any predecessor statute) or any similar provision of state, local or foreign Law.

(m)    The Company has never participated in or cooperated with an international boycott within the meaning of Section 999 of the Code or has been requested to do so in connection with any transaction or proposed transaction.

(n)    Any "non-qualified deferred compensation plan" (as such term is defined under section 409A(d)(1) of the Code and the guidance issued thereunder) of the Company under which the Company makes, is obligated to make, or promises to make any payments or other awards (i) meets and has met the requirements of Code Sections 409A(a)(2), (3) and (4), (ii) is and has been operated in accordance therewith, (iii) is and has been operated in good faith compliance with the transitional relief and all guidance and regulations provided by the Internal Revenue Service under section 409A of the Code, and (iv) has not been funded by an off-shore arrangement described in Code Section 409A(b)(1).

(o)    Except as set forth in Schedule 5.12(o), the Company is not a party to any (i) Contract with any Person who is reasonably likely to continue to provide services to the Company at any time following the Closing (A) the benefits of which are contingent, or the terms of which are materially altered, upon a Change of Control involving the Company, (B) providing any term of employment, compensation, or benefit guarantee, or (C) providing severance benefits or other benefits after the termination of employment of such person; (ii) agreement, plan or arrangement under which any person may receive payments from the Company that may be subject to the tax imposed by Section 4999 of the Internal Revenue Code or included in the determination of such person's "parachute payment" under Section 280G of the Internal Revenue Code (without regard to Section 280G(b)(4)); or (iii) agreement or plan binding the Company, including any stock option plan, stock appreciation right plan, restricted stock plan, stock purchase plan, or severance benefit plan, any of the benefits of which will be increased, or the vesting of the benefits of which will be accelerated, by the occurrence of any of the transactions contemplated by this Agreement or the value of any of the benefits of which will be calculated on the basis of any of the transactions contemplated by this Agreement, which would result in a liability for the Company.

5.13    Litigation. Except as set forth on Schedule 5.13, (a) there is not, and has never been, any Proceeding pending or, to the Knowledge of the Company, threatened against or relating to the Company, any of its assets or properties, or any of its directors or officers in their capacities as such, (b) none of the Company or any of its assets or properties, or any of its directors or officers in their capacities as such are subject to any Orders, (c) there is no pending, or to the Knowledge of the Company, threatened Proceeding against any Person whom the Company has agreed to indemnify, and (d) there is not, and has never been, any Proceeding pending or threatened in which the Company is the initiating party. The Company has delivered to Buyer copies of all pleadings, correspondence and other documents relating to each

37

Proceeding listed on <u>Schedule 5.13</u>. There are no Proceedings listed on <u>Schedule 5.13</u> that could reasonably be expected to have a Material Adverse Effect.

5.14    <u>Employees; Contractors</u>.

(a)    <u>Schedule 5.14(a)(i)</u> sets forth a true, correct and complete list of the following information with respect to each employee of the Company as of the date hereof: (i) name; (ii) departments and titles; (iii) home address; (iii) current compensation paid or payable, including base salary and any incentive compensation, and any change in compensation since December 31, 2007; (iii) date of hire and, if different than date of hire, any service date used for purposes of participation in any Employee Plan or any Employee Benefit Arrangement with such plan specified; (iv) vacation leave accrued but unused, and, if applicable, any sick leave accrued and unused, and the rate and timing of accrual; (v) severance pay potential (if any) and any notice of termination requirements; (vi) whether the employee is on active or inactive status and the nature of any inactive status (e.g., type of leave of absence), the date inactive status commenced and the date it is anticipated to end; (vii)  the employee's work location, including home if applicable; (viii) each Employee Plan or Employee Benefit Arrangement in which such employee participates or is eligible to participate; (ix) whether temporary or permanent, hourly weekly or monthly paid, and full-time or part-time, including number of working hours per week; (x) any visa or work permit status; (xi) exempt or non-exempt classification under the Fair Labor Standards Act; (xi) any perquisites or employment terms or conditions not generally extended Company employees (e.g,, company car or vehicle allowance, club membership, tax preparation or financial planning services, Company loans); (xii) collective bargaining status and specifying, if applicable, the relevant labor union; (xiii) any special protection from employment termination under individual arrangements; (xiii) any post-employment restrictions on conduct; (xiv) any governmental authorization, permit, license or clearance that is held by such employee and used in connection with the Company's business; (xv) any loans from the Company and the amount and terms of such loans; (xvi) whether such employee has executed the Company's standard form nondisclosure, confidentiality and assignment of inventions agreement; (xvii) except as provided in this Agreement, any benefits, compensation or rights that will become due or  increase or the vesting of which will accelerate by the occurrence of the transaction contemplated by this Agreement and the terms of such increase or acceleration; and (xviii) any familial relationship between the employee and any other Company employee.  <u>Schedule 5.14(a)(ii)</u> sets forth a true, correct and complete list of all employees of the Company who have been terminated by the Company or who have resigned since June 30, 2007.  Except as set forth on <u>Schedule 5.14(a)(i)</u>, no employee of the Company has given formal, express or written notice to the Company that he or she plans to give notice of terminating his or her employment and the Company has given no notice of termination to any employee.  Except as set forth on <u>Schedule 5.14(a)(i)</u>, the Company has not entered into any agreement that obligates or purports to obligate the Company to employ any individual or made promises or assurances (contingent or otherwise) to any applicant for employment or employee of any terms or conditions of employment that are different than those set out in the list with respect to each employee in <u>Schedule 5.14(a)(i)</u> or disclosed pursuant to <u>Section 5.16(a)</u>.

(b)    <u>Schedule 5.14(b)</u> set forth a true, correct and complete list of all Persons who, as of the date hereof, are consultants or contractors to the Company and for each such consultant or contractor the following information: (i) the date that such consultant or contractor

began performing services for the Company and the date such services are scheduled or expected to terminate; (ii) the nature of such services; (iii) the respective compensation of each such consultant or contractor; (iii) the number of hours per week that such consultant or contractor provides services to the Company and the location at which such services are provided; (iv) each Employee Plan or Employee Benefit Arrangement in which such consultant or contractor participates or is eligible to participate; (v) except as provided in this Agreement, any benefits, compensation or rights that will become due or increased or the vesting of which will accelerate by the occurrence of the transaction contemplated by this Agreement and the terms of such increase or acceleration; and (vi) whether the Company is a party to a consulting, independent contractor or other agreement with the individual or in respect of the individual.  Any such Contracts, including any amendment thereto, have been delivered to Buyer and are set forth on Schedule 5.14(b).

     5.15   Employee and Labor Relations.  Except as set forth on Schedule 5.15:

     (a)   The Company has complied with all applicable Laws relating to employment and employment practices, terms and conditions of employment and wages and hours, immigration, including any such Laws respecting employment discrimination, employee classification, workers' compensation, family and medical leave, the Immigration Reform and Control Act, the Legal Arizona Workers Act, the Fair Labor Standards Act, the National Labor Relations Act, Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act and occupational safety and health requirements; no Proceedings are pending or, to the Knowledge of the Company, threatened with respect to such Laws or the employment of employees or prospective employees, including breach of contract, wrongful termination, intentional infliction of emotional distress or invasion of privacy or other torts, and there have been no such Proceedings during the last thirty-six (36) month period; and all employees of the Company are at-will;

     (b)   There has not been in the last thirty-six (36) months any strike, slowdown, work stoppage or lockout with respect to any employees of the Company;

     (c)   All Persons, including contractors and consultants, who have performed services for the Company and have been classified by the Company as independent contractors have satisfied the requirements of Law to be so classified and have been engaged in accordance with applicable Laws, and the Company has accurately reported their compensation on IRS Forms 1099 or other applicable tax forms for independent contractors when required to do so. There are no Proceedings pending or, to the Knowledge of the Company, threatened with respect to any such Persons and there have been no such Proceedings during the last thirty-six (36) month period; and

     (d)   The Company is not, and has not been during the last thirty-six (36 months), a party to or bound by any collective bargaining agreement.  There are no labor unions or other organizations representing, purporting to represent or attempting to represent any of the employees of the Company and there has not been in the last thirty-six (36) months any such representation or attempted representation.

     5.16   Employee Plans.

(a)    Schedule 5.16(a) identifies each Employee Plan and Employee Benefit Arrangement that is currently maintained or contributed to by the Company or an ERISA Affiliate, and each terminated Employee Plan or Employee Benefit Arrangement with respect to which the Company may have any actual or contingent obligation. With respect to all such Employee Plans and Employee Benefit Arrangements, the Company has furnished to Buyer true, correct and complete copies of all plan documents, plan amendments, summary plan descriptions, summaries of material modifications, summary annual reports, insurance contracts, third-party administration contracts, trusts, insurance policies, procedural manuals, and any other material documentation created to embody or administer all such plans or arrangements. The Company also has, with respect to each Employee Plan that is subject to ERISA's reporting requirements, provided copies of the three (3) most recently filed Form 5500 reports. In addition, the Company has set forth in Schedule 5.16(a) an accurate summary of any Employee Plan or Employee Benefit Arrangement that has not been reduced to writing.

(b)    Neither the Company, nor any other Person or entity that, together with the Company is treated as a single employer under Section 414(b) (c) or (m) of the Code or Section 4001 of ERISA (collectively "ERISA Affiliates") at any time has maintained, administered, contributed to, been required to contribute to or has any Liability arising under, resulting from, or relating to: (i) any "single-employer plan" (as defined in Section 4001(a)(15) of ERISA) subject to Title IV of ERISA, Section 302 of ERISA, or Section 412 of the Code (ii) any multiemployer plan (as defined in Section 3(37) or 4001(a)(3) of ERISA ("Multiemployer Plan") or (iii) any other Employee Plan subject to the requirements of Section 412 of the Code.

(c)    Each Employee Plan and Employee Benefit Arrangement has been administered in all material respects in accordance with ERISA, the Code and any other provision of applicable Law and the terms of such plan or arrangement.

(d)    No circumstances exist or have existed with respect to any Employee Plan, including the consummation of the transactions contemplated by this Agreement, that could give rise to the imposition of any of the penalty taxes imposed by Code Sections 4971 through 4980B, or 4980D.

(e)    Neither the Company nor any ERISA Affiliate has at any time maintained, sponsored, contributed to, or had any obligation with respect to, any Employee Plan or Employee Benefit Arrangement providing post-employment medical or life insurance benefits or death benefits other than (i) coverage mandated by applicable Law or (ii) death or retirement benefits provided under an Employee Plan that is qualified under Section 401 (a) of the Code. Furthermore, neither the Company nor any ERISA Affiliate has obligated itself to pay any such benefit.

(f)    To the Company's Knowledge, each employee pension benefit plan within the meaning of Section 3(3) of ERISA maintained by the Company or an ERISA Affiliate that is intended to meet the qualification requirements of Section 401(a) of the Code ("Qualified Plan") now meets, and since its inception has met, such requirements and nothing has occurred that would adversely affect the tax-qualified status of any such plan. The IRS has issued a current favorable determination or opinion letter with respect to the qualification under the Code of each such plan and, to the Knowledge of the Company, the IRS has not taken any action to revoke any

40

such letter. The Company has furnished Buyer with the most recent IRS determination or opinion letter issued with respect to each such plan. No such plan has been amended since the date of its most recent determination letter or opinion letter in any respect that would adversely affect the qualified and tax-exempt status of such plan and its related trust under Sections 401(a) and 501(a) of the Code, respectively.

(g)     There are no pending Proceedings (other than routine benefit claims) that have been asserted or instituted by, against, or relating to, any Employee Benefit Arrangement or Employee Plan or any fiduciary responsible therefor, nor, to the Knowledge of the Company, is there any basis for any such Proceeding. The Company has not received any notice of any, and to the Knowledge of the Company there is no, Employee Benefit Arrangement or Employee Plan that is or has been under audit or examination by any domestic or foreign governmental agency or entity (including the IRS and Department of Labor), nor has the Company received any notice of any such potential audit or examination; and no matters are pending under the IRS's Employee Plans Compliance Resolutions System or any successor or predecessor program.

(h)     The Company and all ERISA Affiliates have made all contributions required to be made to each Employee Plan and Employee Benefit Arrangement under the terms of such plan or arrangement and of applicable Law. No prohibited transaction (as defined in Section 4975 of the Code or Section 406 of ERISA) has occurred with respect to any Employee Plan, which could subject any Employee Plan or any related trust, the Company, any ERISA Affiliate, Buyer or any director, employee or fiduciary of any of the foregoing to any tax or penalty imposed under Section 4975 of the Code or Section 502(i) or 502(l) of ERISA, either directly or indirectly, and whether by way of indemnity or otherwise.

(i)     Except as set forth on Schedule 5.16(i), all unfunded Liabilities under all Employee Plans and Employee Benefit Arrangements (including paid time off accruals) are fully reflected as liabilities on the Balance Sheet and will be fully reflected on the books and records of the Company as of the Closing Date.

(j)     Except as set forth on Schedule 5.16(j), each fiduciary and every plan official of each Employee Plan is bonded to the extent required by Section 412 of ERISA.

(k)     Neither the Company nor any ERISA Affiliate has at any time maintained, sponsored, contributed to or been obligated to contribute to any Employee Plan that is funded by a voluntary employees' beneficiary association described in Section 501(c) (9) of the Code.

5.17    Environmental Matters.

(a)     Each of the Company and its current and former Affiliates has complied and is in compliance in all material respects with all applicable Environmental Laws and is aware of no facts or circumstances that, absent material expenditures, would prevent such compliance in the future.

(b)     Neither the Company nor any of its current or former Affiliates has received any Environmental Claim that relates in any way to any Hazardous Materials Released, handled, stored or disposed on, in, under or from, or generated by or derived or transported from, the Leased Real Property or any other property formerly owned or leased by the Company.

41

(c)    The Company has all Governmental Authorizations required for the conduct of its business and operation of the Leased Real Property under applicable Environmental Laws, and the Company is in compliance in all material respects with all such Governmental Authorizations.

(d)    The Company is not party to, or subject to the terms of, any Order under any applicable Environmental Law.

(e)    To the Knowledge of the Company, there are no facts, conditions, or circumstances that could reasonably give rise to material Liability for the Company under any applicable Environmental Law.

(f)    Except as disclosed on Schedule 5.17(f), the Company has not treated, stored, disposed of or Released any Hazardous Material at, on, or under any Leased Real Property or other Real Property currently or formerly owned, leased, operated or used by the Company (including any current or former Affiliate of the Company).  Neither the Company nor any current or former Affiliate of the Company has purchased, stored or otherwise used any Hazardous Materials in violation of any applicable Environmental Laws.  Neither the Company nor any current or former Affiliate of the Company has owned or operated any underground storage tank.

(g)    The Company has not received any notice or other communication concerning any alleged Liability for Environmental Claims in connection with any Leased Real Property or other properties or assets currently or formerly owned, leased, operated or used by the Company, any predecessor of Company, or any current or former Affiliate of the Company.

5.18    Entire Business.  Except as set forth on Schedule 5.18, the assets owned, leased and licensed by the Company include all assets required for the continued conduct of the Company's business in the manner in which it is currently conducted by the Company.

5.19    Compliance with Law; Governmental Authorizations.

(a)    Except as set forth on Schedule 5.19(a), the Company is and has been in compliance with all Laws or Orders to which it is subject.  The Company has received no notice and to the Knowledge of the Company there are no threatened or alleged claims of violation, liability or potential responsibility under any Law or Order to which it is subject.  The Company has never conducted any internal investigation with respect to any actual, potential or alleged material violation of any Law or Order by any of its directors, officers or employees.

(b)    The Company possesses all Governmental Authorizations necessary to carry on its business or that the Company is otherwise required to have under applicable Law. Each such Governmental Authorization is set forth on Schedule 5.19(b).  Each such Governmental Authorization is validly and presently in effect and the continuing validity and effectiveness of such Governmental Authorization will not be affected by the consummation of the Transactions, and the Company is not in default (with or without notice or lapse of time, or both) under any such Governmental Authorization in any material respect.  There are no Proceedings pending, nor to the Knowledge of the Company, threatened, that seek the revocation, cancellation, suspension, failure to renew or adverse modification of any such

42

Governmental Authorization. All required filings with respect to such Governmental Authorization have been timely made and all required applications for renewal thereof have been timely filed.

5.20    Warranties. Schedule 5.20 sets forth (i) a description of all product warranties and guarantees given by the Company to any customer in connection with the sale, licensing or distribution of products or services and (ii) all standard warranty terms delivered by the Company in connection with products sold or licensed or services rendered by the Company. Each of the products sold or licensed by the Company meets, and at all times has met, in all material respects, all standards for quality and workmanship prescribed by applicable Law or contractual agreements. Except as described on Schedule 5.20, no claims have been made or are, to the Knowledge of the Company (but without inquiry to any third party), threatened, under the product warranties of the Company. There are no warranty reserves reflected on the Balance Sheet.

5.21    Insurance. Schedule 5.21 sets forth a true, correct and complete list, as of the Balance Sheet Date, of all insurance policies carried by the Company and all insurance loss runs or worker's compensation claims received by the Company for the past two policy years. The Company has delivered to Buyer true, correct and complete copies of all current insurance policies covering the Company's business, all of which are in full force and effect. All premiums due and payable under all such policies have been paid and the Company is otherwise in full compliance with the terms of such policies.

5.22    Certain Business Practices. Neither the Company, nor any of its officers, employees, securityholders, agents or representatives, nor (to the Knowledge of the Company) any other Person acting for or on behalf of the Company, has directly or indirectly (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of what form, whether in money, property, or services (i) to obtain favorable treatment for business or Contracts secured by the Company or, to the Knowledge of the Company, by any other Person, (ii) to pay for favorable treatment for business or Contracts secured by the Company or, to the Knowledge of the Company, by any other Person, or (iii) to obtain special concessions or for special concessions already obtained by the Company, or (b) established or maintained any fund or asset for the benefit of the Company that has not been recorded in the books or records of the Company.

5.23    List of Accounts. Schedule 5.23 lists the names and locations of all banks and other financial institutions with which the Company maintains an account (or at which an account is maintained to which the Company has access as to which deposits are made on behalf of the Company), in each case listing the type of account, the account number therefore, and the names of all Persons authorized to draw thereupon or have access thereto and lists the locations of all safe deposit boxes used by the Company.

5.24    Powers of Attorney. There are no outstanding powers of attorney executed on behalf of the Company.

5.25    Insolvency Proceedings. The Company is not the subject of any pending, rendered or threatened insolvency proceedings of any character. The Company has not made an

assignment for the benefit of creditors or taken any action with a view to or that would constitute a valid basis for the institution of any such insolvency proceedings. The Company is not insolvent and will not become insolvent as a result of entering into this Agreement.

5.26    Affiliated Transactions. Except as set forth on Schedule 5.26, no employee, officer, director or securityholder of the Company, or any family member of any such Person, or any Affiliate of any such Person or family member (each such Person, a "Section 5.26 Affiliate") (x) is presently, or within the past three (3) years has been, a party to any Contract, or transaction with the Company or that pertains to the business of the Company, excluding employment or other compensation, non-competition, confidentiality or other similar agreements entered in the ordinary course of business between the Company and any such Person; or (y) owns, leases, or has any economic or other interest in any asset, tangible or intangible, that is used by the Company in carrying out its business. As of the Closing, except for compensation and benefits owing to employees of the Company in the ordinary course of business, there shall be no outstanding or unsatisfied financial obligations of any kind (including inter-company accounts, notes, guarantees, loans, or advances) between the Company on the one hand and a Section 5.26 Affiliate on the other hand.

5.27    Foreign Disclosure. Except as set forth on Schedule 5.27, the Company has not manufactured "defense articles," exported "defense articles" or furnished "defense services" or "technical data" to foreign nationals in the United States or abroad, as those terms are defined in 22 C.F.R. 120.6, 120.9 and 120.10, respectively.

5.28    Books and Records. The Company has made and kept (and given Buyer access to) business records, financial books and records, sales order files, purchase order files, engineering order files, warranty and repair files, supplier lists, customer lists, dealer, representative and distributor lists, studies, surveys, analyses, strategies, plans, forms, designs, diagrams, drawings, specifications, technical data, production and quality control records and formulations which, in reasonable detail, accurately and fairly reflect the activities of the Company.

5.29    Brokers. Except as set forth on Schedule 5.29, neither Seller nor the Company has employed any broker or finder, and neither Seller nor the Company has incurred or will incur any broker's, finder's or similar fees, commissions or expenses payable by the Company or Seller in connection with the Transactions.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES REGARDING BUYER

Buyer hereby represents and warrants to Seller that the following statements contained in this Article VI are correct and complete as of the date hereof and as of the Closing Date:

6.1    Organization, Power, Standing. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has all requisite corporate power and authority and legal capacity to conduct its business as presently conducted

44