and to enter into the Transaction Documents to which it is a party, to consummate the Transactions and perform its obligations under the Transaction Documents.

6.2    Due Authorization. The execution and delivery by Buyer of the Transaction Documents to which it is a party, the performance by it of its obligations thereunder, and the Transactions have been duly and validly authorized by all necessary corporate action on the part of Buyer. This Agreement has been, and each of the other Transaction Documents to which Buyer is to become a party, when executed, will be, duly executed and delivered by Buyer and (assuming the valid authorization, execution and delivery by the Company and Seller of this Agreement and the other Transaction Documents to which the Company and/or Seller is to become a party) constitute valid and legally binding obligations of Buyer enforceable against Buyer in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general application relating to or affecting creditors' rights and to general equity principles.

6.3    No Conflict; Third Party Consents. Except as set forth on Schedule 6.3, the execution and delivery of this Agreement by Buyer do not, and of the other Transaction Documents will not, and the consummation of the Transactions will not, (i) violate or conflict with the provisions of the Certificate of Incorporation or Bylaws of Buyer, or (ii) result in a breach or violation by Buyer of any of the terms, conditions or provisions of any Law or Order or any Contract or permit to which Buyer is a party or by which Buyer is bound. Except as set forth on Schedule 6.3, no consent, approval or authorization of, or registration or filing with, any Person is required in connection with the execution or delivery by Buyer of this Agreement or any of the other Transaction Documents to which Buyer is or is to become party or the consummation of the Transactions.

6.4    Investment Representations. Buyer is purchasing the Shares for its own account for investment and not with a view to, or for sale in connection with, any distribution of any of the Shares. Buyer acknowledges that the sale of the Shares has not been registered under the Securities Act of 1933, as amended, or any applicable state securities laws and that such Shares may only be sold or otherwise disposed of under an effective registration statement under the Securities Act of 1933, as amended, or under an exemption therefrom. Buyer has no Contract with any person to sell, hypothecate, pledge, donate, or otherwise transfer (with or without consideration) to any such person any of the Shares, and Buyer has no present plans or intention to enter into any such Contract. Without limiting the terms of the representations and warranties of Seller and the Company set forth herein, Buyer represents that Buyer has had an opportunity to ask questions and receive answers from Seller and the Company regarding matters relevant to Company and the purchase of the Shares. Buyer has performed its own due diligence review of the Company, its business and operations. Notwithstanding anything contained in this Agreement to the contrary, other than the representations and warranties of the Company, Seller, Optionholders and the Option Right Holder in this Agreement and the other Transaction Documents (as applicable), in connection with the transactions contemplated hereby and the Transaction Documents, Buyer is relying on its own investigation and examination of Company and its business and has not based any decision with respect to the purchase of the Shares on statements from Company, Seller or any of Company's officers, employees, agents or other representatives.

45

6.5     Brokers.  Buyer has not employed any broker or finder and has not incurred and will not incur any broker's, finder's or similar fees, commissions or expenses payable by Buyer or Seller in connection with the Transactions.

## ARTICLE VII

## CONDITIONS PRECEDENT TO CLOSING

7.1     Conditions Precedent to the Obligations of Buyer.  The obligations of Buyer to consummate the Transactions are subject to the fulfillment on or prior to the Closing of the following conditions, any one or more of which may be waived in writing by Buyer:

(a)     Representations; Performance.  The representations and warranties of the Company and Seller made in this Agreement and the other Transaction Documents shall be true, correct and complete in all material respects (provided that any of such representations and warranties that are qualified as to materiality, including by a Material Adverse Effect qualifier, shall be true, correct and complete in all respects) as of the date of this Agreement and as of the Closing Date, with the same force and effect as if made on and as of the Closing Date, except for those representations and warranties which address matters only as of a particular date, which shall be true, correct and complete in all or in all material respects (as applicable) as of such date. The Company and Seller shall have performed or complied in all material respects with all obligations and covenants required by this Agreement and the other Transaction Documents to be performed or complied with by the Company and/or Seller at or prior to the Closing.  The Company and Seller shall have delivered to Buyer certificates, dated the Closing Date, and signed by its duly authorized officer in the case of the certificate from the Company, confirming the matters set forth in the foregoing substantially in the forms of Exhibit B and Exhibit C hereto, respectively.

(b)     No Order or Proceeding.  No Order prohibiting, restraining, preventing or making illegal the consummation of the Transactions shall be in effect. and no Proceeding shall have been instituted before any Governmental or Regulatory Body to prohibit, restrain or prevent any of the Transactions.

(c)     No Law.  Neither the consummation nor the performance of any of the Transactions will, directly or indirectly (with or without notice or lapse of time), contravene or conflict with or result in a violation of or cause Buyer or the Company to suffer any adverse consequence under any applicable Law.

(d)     Governmental Approvals; Consents.  All consents and approvals of Governmental or Regulatory Bodies and other third parties set forth on Schedules 5.3 and 6.3 and such other approvals and consents of Governmental or Regulatory Bodies and third parties as are necessary for consummation of the Transactions shall have been obtained.

(e)     No Material Adverse Effect.  Since the Balance Sheet Date, there shall not have occurred a Material Adverse Effect or any event or circumstance or combination of events or circumstances that individually or in the aggregate are reasonably likely to result in a Material Adverse Effect.

46

(f)    <u>Legal Opinion</u>. The Company shall have delivered to Buyer a legal opinion of Stubbs Alderton & Markiles, LLP, counsel to the Company and Seller, substantially in the form of <u>Exhibit D</u> hereto (subject to customary assumptions, qualifications and limitations), and such opinion shall be in form and substance reasonably acceptable to Buyer.

(g)    <u>No Liens</u>. All Liens on or affecting the Shares and all Liens on the assets of the Company other than the Permitted Liens shall have been released and satisfactory evidence of such release (including Uniform Commercial Code termination statements and all other related or necessary documentation) shall have been delivered to Buyer prior to or concurrently with the Closing.

(h)    <u>Certificates for Shares</u>. Seller shall have delivered to Buyer at the Closing all certificates representing the Shares, duly endorsed in blank or accompanied by stock powers duly endorsed in blank, in proper form for transfer, which certificates shall be submitted to the Company for transfer.

(i)    <u>Resignations</u>. Buyer shall have received a letter of resignation from each member of the Board of Directors and each officer of the Company which shall become effective as of the Closing.

(j)    <u>Directors' and Officers' General Releases</u>. Seller, each of the Key Employees and each of the directors and officers of the Company shall have executed and delivered to Buyer and the Company a General Release, substantially in the form of <u>Exhibit E</u> hereto (each, a "<u>General Release</u>").

(k)    <u>Key Employee Agreements</u>. Each Key Employee, on the one hand, and the Company, on the other hand, shall have, as provided in <u>Section 8.6(a)</u>, executed and delivered to Buyer (i) a Non-Competition and Retention Agreement substantially in the form of <u>Exhibit F</u> hereto (a "<u>Non-Competition Agreement</u>"), (ii) a Proprietary Information and Inventions Agreement substantially in the form of <u>Exhibit G</u> hereto (an "<u>Employee Confidentiality Agreement</u>"), and (iii) such other agreements and documents as Buyer requires generally of its employees (the "<u>Employee Documentation</u>"). All such agreements shall remain in full force and effect in accordance with their terms without any modification or amendment, and each Key Employee shall continue to be a full time employee of the Company.

(l)    <u>FIRPTA Certificate</u>. Seller shall have delivered to Buyer a properly executed statement described in Treas. Reg. Section 1.1445-2(b)(2), substantially in the form of <u>Exhibit H</u> hereto, certifying that Seller is not a foreign person for purposes of Code Section 1445 (the "<u>FIRPTA Certificate</u>").

(m)    <u>Forms W-9 and W-8</u>. Each Person who is to receive consideration pursuant to <u>Section 2.2</u> or <u>Section 2.7</u> hereto shall have furnished a fully executed IRS Form W-9 or Form W-8BEN (or other Form W-8 if applicable), or any successor form, as applicable.

(n)    <u>Optionholder Agreements</u>. Each of the Optionholders and the Option Right Holder, on the one hand, and the Company, on the other hand, shall have, as provided in <u>Section 2.7(e)</u>, executed and delivered to Buyer an Optionholder Agreement, and all such

agreements shall remain in full force and effect in accordance with their terms and without any modification or amendment.

(o)    <u>Nortel Employee Documentation</u>. Each of the Company's employees other than Key Employees shall have, as provided in <u>Section 8.6(a)</u>, executed and delivered to Buyer an Employee Confidentiality Agreement and Employee Documentation, and all such agreements and documentation shall remain in full force and effect in accordance with their terms without any modification or amendment.

(p)    <u>Lien Releases</u>. The Company shall have delivered to Buyer evidence reasonably satisfactory to Buyer of the termination of all Liens (other than Permitted Liens) on the Company's assets, including the security interests (and related UCC-1 financing statements) of BankOne, N.A. and JPMorgan Chase Bank, N.A.

(q)    <u>Guarantee Releases</u>. The Company shall have delivered to Buyer evidence reasonably satisfactory to Buyer of the termination of the guarantees made by the Company in favor of Wells Fargo Bank, N.A. in respect of obligations of JEK Enterprises, LLC. and the release of all Liabilities of the Company thereunder.

(r)    <u>Termination of Line of Credit</u>. The Company shall have delivered to Buyer evidence reasonably satisfactory to Buyer of the termination of its loan facility with JPMorgan Chase Bank, N.A. and all Contracts relating thereto and the release of all Liabilities thereunder.

(s)    <u>Transaction Documents</u>. The form and substance of all Transaction Documents executed and delivered by the Company, the Optionholders, the Option Right Holder and Seller in connection with the Closing shall be reasonably acceptable to Buyer.

(t)    <u>Amendments to Company Options</u>. Each Company Option outstanding immediately prior to the Closing shall have been amended in accordance with <u>Section 8.14(a)</u>.

(u)    <u>280G Approval</u>. The Company shall have undertaken the 280G Approval as provided in <u>Section 8.14(b)</u>, and shall have provided Buyer with documentation thereof in form and substance satisfactory to Buyer.

(v)    <u>Termination of Neal Shact Contracts</u>. As provided in Section 8.15, the Company shall have terminated all Contracts between the Company and Neal Shact, and shall have paid all amounts owing to Mr. Shact thereunder.

(w)    <u>CFIUS</u>. The parties shall have received written notice from CFIUS that review under Section 721 of the United States Defense Production Act of 1950, as amended, of the Transactions has been concluded; and CFIUS shall have determined that there are no issues of national security sufficient to warrant investigation under said Section 721 and advised that action under said Section 721 has been concluded with respect to such Transactions.

(x)    <u>Context Capital and Neal Shact Releases</u>. Each of Neal Shact and Context Capital Group shall have delivered to the Company and Buyer a written release of any and all claims against the Company, Buyer or Seller for fees, compensation, expenses, costs or other

amounts (other than amounts expressly payable under this Agreement), and such release shall be in form and substance reasonably acceptable to Buyer.

7.2     Conditions Precedent to the Obligations of Seller and the Company.  The obligations of Seller and the Company to consummate the Transactions are subject to the fulfillment on or prior to the Closing of the following conditions, any one or more of which may be waived in writing by the Company and Seller:

(a)     Representations; Performance.  The representations and warranties of Buyer made in this Agreement and the other Transaction Documents shall be true, correct and complete in all material respects (provided that any of such representations and warranties that are qualified as to materiality shall be true, correct and complete in all respects) as of the date of this Agreement and as of the Closing Date, with the same force and effect as if made on and as of the Closing Date, except for those representations and warranties which address matters only as of a particular date, which shall be true, correct and complete in all or in all material respects (as applicable) as of such date.  Buyer shall have performed or complied in all material respects with all obligations and covenants required by this Agreement and the other Transaction Documents to be performed or complied with by Buyer at or prior to the Closing.  Buyer shall have delivered to Seller a certificate, dated the Closing Date, and signed by an authorized officer of Buyer confirming the matters set forth in the foregoing substantially in the form of Exhibit I hereto.

(b)     No Order or Proceeding.  No Order prohibiting, restraining, preventing or making illegal the consummation of the Transactions shall be in effect and no Proceeding shall have been instituted before any Governmental or Regulatory Body to prohibit, restrain or prevent any of the Transactions.

(c)     No Law.  Neither the consummation nor the performance of any of the Transactions will, directly or indirectly (with or without notice or lapse of time), contravene or conflict with or result in a violation of or cause the Company to suffer any adverse consequence under any applicable Law.

**ARTICLE VIII**

**COVENANTS**

8.1     Examinations and Investigations.  At any time between the date hereof and the Closing Date, Buyer shall be entitled, through its employees and representatives, to enter upon and make such reasonable investigation of the assets, properties, business and operations of the Company, and such examination of the books and records, financial condition and operations of the Company as Buyer may reasonably request, including pursuant to access to the Company's employees, customers, vendors, suppliers and creditors.  Any such investigation and examination shall be conducted at reasonable times upon reasonable prior notice to the Company.  No information or knowledge obtained in any investigation pursuant to this Section 8.1 shall affect or be deemed to modify any representation or warranty contained in this Agreement or the conditions to the obligations of the parties to consummate the Transactions.  All information

49

obtained pursuant to this <u>Section 8.1</u> shall remain subject to the terms and conditions of the Confidentiality Agreement.

    8.2    <u>Conduct of Business</u>.  From the date hereof through the Closing Date, the Company shall, and Seller shall cause the Company to:

    (a)    conduct its business in the ordinary course consistent with past practice in all material respects;

    (b)    take all commercially reasonable steps to preserve and protect the Company's assets and properties in good working order and condition, ordinary wear and tear excepted,

    (c)    except as otherwise required in <u>Sections 8.5(d)</u> and <u>8.15</u>, use commercially reasonable efforts to preserve intact its business organization, keep available the services of its officers, employees, agents, consultants and contractors and maintain its relations and goodwill with suppliers, customers, landlords, creditors, employees, agents and others having business relationships with it;

    (d)    continue in full force and effect all insurance coverage in effect as of the date hereof or substantially equivalent policies;

    (e)    except as otherwise required in <u>Sections 8.5(d)</u> and <u>8.15</u>, ensure that, except in the ordinary course of business, no change is made to any Contract with any of the officers, directors, employees, contractors or consultants of the Company, including any Contract relating to employment, compensation, benefits, termination, retention, or severance;

    (f)    not sell, lease, license, encumber, transfer or dispose of any of the Company's assets or properties, other than the sale of Inventory and/or license or transfer of the Company's Intellectual Property in the ordinary course of business consistent with past practice;

    (g)    without the prior approval of Buyer, not modify or amend in any material respect or terminate any Contract to which the Company is a party, other than pursuant to the expiration of any such Contract in accordance with its terms;

    (h)    not enter into any teaming agreement without the prior approval of Buyer;

    (i)    not loan or advance any money or other property to any of its present or former securityholders, directors, officers or employees, or family members of any such Persons, or Affiliates of any such Persons or family members (except for travel and other similar advances in the ordinary course of business consistent with past practice);

    (j)    not make any declaration of, or set aside or pay, any dividend or other distribution (whether in cash, stock or other property) with respect to its equity securities or issue, pledge or sell any of its shares of capital stock, interests in its equity securities or any other securities or rights, convertible into or exchangeable for or conferring the right to purchase its shares of capital stock or any interests therein or directly or indirectly purchase, redeem, retire or otherwise acquire any of its shares of capital stock, interests therein or other securities

convertible into, exchangeable for or conferring the right to purchase its shares of capital stock or interests therein (or enter into any agreement, arrangement or other understanding to do the same);

      (k)    pay its debts and Taxes when due subject to good faith disputes over such debts and Taxes;

      (l)    not acquire (by merger, consolidation or combination, or acquisition of stock or assets) any corporation, partnership or other business organization or division thereof;

      (m)    except in the ordinary course of business consistent with past practice, not transfer or license to any Person or otherwise extend, amend or modify in any respect any right in or to any Company IP, or enter into grants to transfer or license to any Person any present or future rights to any Company IP;

      (n)    not adopt, enter into, terminate or amend any Employee Plan or Employee Benefit Arrangement for the current or future benefit or welfare of any officer, director, current or former employee except as provided herein;

      (o)    not make or change any Tax election, change any annual Tax accounting period, adopt or change any method of Tax accounting, file any amended Tax Return (unless required by applicable Law and provided the Company provides Buyer with a copy thereof), enter into any closing agreement with respect to Taxes, settle any Tax claim or assessment, surrender any right to claim a Tax refund, or consent to any extension or waiver of the limitations period applicable to any Tax claim or assessment;

      (p)    not hire any employee or engage any contractor or consultant without the prior approval of Buyer;

      (q)    not amend its Articles of Incorporation or Bylaws;

      (r)    not agree to do any of the foregoing; and

      (s)    not take, or agree to take, any action that would make any representation or warranty regarding the Company contained in this Agreement untrue or incorrect as of the date when made or as of the Closing Date, or that could prevent the satisfaction of any condition to closing set forth in <u>ARTICLE VII</u>.

    8.3    <u>Best Efforts; Notices; Governmental Authorizations</u>.

      (a)    Subject to the terms and conditions herein provided, the parties agree to use their respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the Transactions as promptly as practicable. If, at any time after the Closing Date, any further action is necessary or desirable to carry out the purposes of this Agreement or the Transaction Documents, the parties hereto or their officers, directors or representatives (including Holder Representative) shall take all such necessary or desirable action reasonably requested by any party.

(b)      Each party hereto shall use its reasonable best efforts to obtain those authorizations, consents, orders and approvals of, and give those notices to and make all filings with, all Governmental or Regulatory Bodies and other third parties referenced on Schedules 4.2(ii), 5.3 and 6.3, as applicable, and such other authorizations, consents, orders, and approvals of, notices to and filings with Governmental or Regulatory Bodies that may be or become necessary or advisable for the performance of its obligations under this Agreement and the consummation of the Transactions. Each party hereto shall cooperate fully with the other parties hereto in promptly seeking to obtain all such authorizations, consents, orders and approvals, giving such notices, and making such filings. The parties hereto shall not take any action that is reasonably likely to have the effect of unreasonably delaying, impairing or impeding the receipt of any such required authorizations, consents, orders or approvals.

(c)      The Company and Seller shall promptly notify Buyer in writing of (i) the occurrence or failure to occur of any event which occurrence or failure causes or is reasonably likely to cause any of the representations or warranties of the Company or Seller set forth in Article IV or ARTICLE V to be untrue or inaccurate in any material respect, or, individually or in the aggregate, results in or is reasonably likely to result in, a Material Adverse Effect, and (ii) any material failure of the Company, any Optionholder, the Option Right Holder, any employee of the Company or Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by Company, any Optionholder, the Option Right Holder, any employee of the Company or Seller hereunder prior to the Closing Date. No notice delivered pursuant this subsection shall be deemed to (x) modify any representation, warranty or covenant set forth herein, or any Schedule, (y) cure or prevent any inaccuracy, failure or breach included therein, or (z) limit or otherwise affect the remedies available hereunder to Buyer.

(d)      Subject to applicable Law or requirements of any Governmental or Regulatory Body, each party hereto shall promptly inform the other party of any material communication from any Governmental or Regulatory Body (including the United States Federal Trade Commission or the Department of Justice) regarding any of the Transactions. Each party hereto will advise the other parties promptly in respect of any understandings, undertakings or agreements (oral or written) that such party proposes to make or enter into with any Governmental or Regulatory Body (including the United States Federal Trade Commission or the Department of Justice) in connection with the Transactions, and shall in good faith take into account all reasonable comments by the other parties with respect thereto.

8.4      Governmental Authorizations. The Company and Seller shall maintain all Governmental Authorizations that continue to be necessary in order for the Company to own its assets and properties and continue to conduct its business as it is then conducted in full force and effect, and will file timely, all reports, statements, renewals applications and other filings that are required to keep such Governmental Authorizations in full force and effect, and will pay timely all fees and charges in connection therewith that are required to keep all such Governmental Authorizations in full force and effect.

8.5      Employees; Employee Benefits.

(a)      At or prior to the Closing, the Company and Seller shall execute and deliver to Buyer a Non-Competition Agreement, an Employee Confidentiality Agreement and

52

the Employee Documentation. After the date hereof, the Company and Seller shall use their respective commercially reasonable efforts to (i) cause each of the Company's employees, including Key Employees, to remain employees of the Company, (ii) cause each Key Employee other than Seller to execute and deliver to Buyer a Non-Competition Agreement, an Employee Confidentiality Agreement and the Employee Documentation not less than five (5) Business Days prior to the Closing, and (iii) cause each employee of the Company whose name appears on Schedule 5.14(a) and who is not a Key Employee to execute and deliver to Buyer an Employee Confidentiality Agreement and Employee Documentation not less than five (5) Business Days prior to the Closing.

(b)    Following the execution of this Agreement, the Company shall provide Buyer reasonable access to, and facilitate meetings with, the employees, officers, consultants and contractors of the Company for the purposes of making announcements concerning, and preparing for the consummation of, the Transactions, and to help facilitate transition and integration activities.

(c)    With respect to any current employees of the Company who continue employment with the Company subsequent to Closing, Buyer shall provide such employees with the opportunity to participate in Buyer's Employee Plans and Employee Benefit Arrangements that are available to Buyer's new employees in comparable jobs in accordance with the terms of such plans and arrangements. Buyer shall have no responsibility for and no liability or obligation with respect to any Employee Plan or Employee Benefit Arrangement maintained by the Company prior to Closing (including any bonus programs maintained by the Company). With respect to any Employee Plan or Employee Benefit Arrangement maintained by the Company, the Company shall take all such actions reasonably necessary to, effective immediately prior to Closing, amend, merge, freeze or terminate such Employee Plan or Employee Benefit Arrangement as shall be requested by Buyer, and shall provide Buyer with reasonable written evidence that all such actions have been taken prior to the Closing.

(d)    If so requested by Buyer prior to the Closing, the Company shall take all such actions necessary to, effective prior to Closing, terminate the Company's engagement of any consultant or contractor utilized by the Company and any related Contract, and shall provide Buyer with reasonable written evidence that each such termination has been effected prior to the Closing.

8.6    General Releases. The parties agree that as part of the Closing, Seller, each Key Employee and each director and officer of the Company shall execute and deliver to Buyer and the Company a General Release.

8.7    Confidentiality. The terms and conditions of this Agreement shall be subject to the provisions of the Nondisclosure and Confidentiality Agreement between the Company and Buyer, dated as of January 7, 2008 (the "Confidentiality Agreement").

8.8    Other Tax Matters.

(a)    All Tax Returns of the Company required to be filed between the date hereof and the Closing (i) will be filed by the Company when due (after taking into account

53

timely filed extensions) in accordance with all applicable Laws and (ii) as of the time of filing, will be complete and accurate in all respects.  Seller shall be responsible for filing or causing to be filed the Company's United States federal income tax return and Arizona corporate income tax return, if applicable, for the short period beginning January 1, 2008 and ending on (and including) the Closing Date, and such tax return(s) (x) will be filed or caused to be filed when due (after taking into account timely filed extensions) in accordance with all applicable Laws and (y) at the time of filing, will be complete and accurate in all respects.  Buyer shall be permitted to review and comment on each such Tax Return filed pursuant to this Section 8.9(a) prior to filing for at least seven (7) days prior to the due date thereof.  The Company shall pay, and Buyer shall cause the Company to pay, all Taxes with respect to such Tax Returns.

(b)    Buyer shall be responsible for filing or causing to be filed all Tax Returns required to be filed by the Company other than Tax Returns described in Section 8.9(a) above, and Buyer shall, subject to Section 8.9(c) below, pay or cause to be paid the Taxes shown to be due on any such Tax Returns.

(c)    Subject to the limitations of Article IX, Seller will indemnify and hold harmless Buyer for (i) any Taxes imposed on or payable with respect to the Company for any Pre-Closing Tax Period and (ii) any Taxes of any person (other than the Company) imposed on the Company (as of the Closing) as a transferee or successor, by Contract or pursuant to any Law, rule, or regulation, which Taxes relate to an event or transaction occurring before the Closing, to the extent such Taxes described in clauses (i) and (ii) of this Section 8.9(c) are not included as a liability on the Balance Sheet.

(d)    In order to apportion appropriately any Taxes relating to a Straddle Period to the Pre-Closing Tax Period, the parties hereto shall, to the extent permitted under applicable Law, elect with the relevant Taxing Authority to treat for all Tax purposes the Closing Date as the last day of the taxable year or period of the Company.  In any case where applicable Law does not permit the Company to treat the Closing Date as the last day of the taxable year or period, the portion of any Taxes that are allocable to the Pre-Closing Tax Period shall be:  (A) in the case of Taxes that are imposed on a periodic basis (and not based on invoices, receipts, sales or payments), deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of calendar days in the Straddle Period ending on (and including) the Closing Date and the denominator of which is the number of calendar days in the entire relevant Straddle Period, and (B) in the case of Taxes not described in (A) (such as taxes that are either (x) Income Taxes, or (y) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible)), deemed equal to the amount that would be payable if the taxable year or period ended and the books closed at the close of the Closing Date.

(e)    After the Closing Date, Seller shall (i) provide to Buyer such assistance as may reasonably be requested by Buyer in connection with the preparation, or audit or other controversy, of or with respect to any Tax Return with respect to Pre-Closing Tax Periods and Straddle Periods and (ii) retain, or cause to be retained, for so long as any such taxable years or audits shall remain open for adjustments, any records or information which may be relevant to any such Tax Returns or audits.

54

(f)     Notwithstanding anything to the contrary herein, if a claim shall be made by any Taxing Authority which, if successful, might result in an indemnity payment from the Seller pursuant to Section 9.1, Seller shall have the right to control the conduct of any audit or proceeding related to such claim; *provided, however*, with respect to claims relating to Taxes of the Company for any Straddle Period, Buyer may participate in such audit or proceeding to the at its own expense and Seller may not settle such.claim without the consent of Buyer, which shall not be unreasonably withheld or delayed. Seller shall promptly notify Buyer if it decides not to control the defense or settlement of any claim which it is entitled to control pursuant to this Section 8.9(f), and Buyer shall thereupon be permitted to defend and settle such proceeding.

(g)     All transfer, documentary, sales and use, registration, value-added, stamp or other similar Taxes, if any, arising out of or in connection with the transactions contemplated by this Agreement (collectively, "Transfer Taxes") incurred in connection with this Agreement and the Transactions shall be borne 50% by Buyer and 50% by Seller, and Seller and Buyer shall cooperate in preparing and filing all Tax Returns and other documentation with respect to such Transfer Taxes on a timely basis as may be required to comply with the provisions of applicable Tax Laws.

8.9 Publicity. No publicity release or announcement concerning this Agreement or the Transactions shall be made without advance approval thereof by Buyer, the Company (prior to the Closing Date only) and Holder Representative (which approval shall not be unreasonably withheld or delayed). Buyer, the Company and Holder Representative agree to cooperate in issuing any press release or other public announcement, including announcements to the employees of the Company, concerning this Agreement or the Transactions. Subject to the previous sentence, Buyer, the Company and Holder Representative shall each furnish to the other drafts of all such press releases or announcements prior to their release. Nothing contained in this Section 8.10 shall prevent any party from (i) at any time furnishing any information to any Governmental or Regulatory Body or from making any disclosures required under the Securities Exchange Act of 1934, as amended, or under the rules and regulations of any national securities exchange on which such party's (or its Affiliates') shares of capital stock are listed, or (ii) furnishing any information concerning the Transactions to such party's officers, directors, employees, stockholders, partners, Affiliates, lenders, accountants, consultants, advisers, counsel or representatives.

8.10    Assistance in Proceedings. Seller will reasonably cooperate with Buyer and its counsel, at Buyer's expense, in the contest or defense of, and provide any testimony and access to its books and records in connection with, any proceeding involving or relating to (i) the Transactions or (ii) any action, activity, circumstance, condition, conduct, event, fact, failure to act, incident, occurrence, plan, practice, situation, status or transaction on or before the Closing Date involving Seller or the Company.

8.11    No Solicitation.

(a)     From and after the date of this Agreement and continuing until the earlier to occur of the Closing and the termination of this Agreement pursuant to and in accordance with Section 10.1, the Company and Seller shall not, nor shall the Company or Seller authorize or permit any officers, directors, shareholders, Affiliates or employees of the Company or any

55

investment banker, attorney or other advisor or representative retained by the Company or Seller to, directly or indirectly (i) solicit, initiate, or induce the making, submission or announcement of any Acquisition Proposal, (ii) participate in any discussions or negotiations regarding, or furnish to any Person any non-public information with respect to, or take any other action to facilitate any inquiries or the making of any proposal that constitutes or would reasonably be expected to lead to, any Acquisition Proposal, (iii) engage in discussions with any Person with respect to any Acquisition Proposal, except as to the existence of these provisions, (iv) approve, endorse or recommend any Acquisition Proposal, or (v) enter into any letter of intent or similar document or any contract, agreement or commitment contemplating or otherwise relating to any Acquisition Transaction. The Company and Seller will immediately cease any and all existing activities, discussions or negotiations with any parties conducted heretofore with respect to any Acquisition Proposal. Without limiting the foregoing, it is understood that any violation of the restrictions set forth in the preceding two sentences by any officer or director of the Company or any investment banker, attorney or other advisor or representative of the Company or Seller shall be deemed to be a breach of this Section 8.11 by the Company and Seller.

(b)     For purposes of this Agreement, "Acquisition Proposal" shall mean any offer or proposal (other than an offer or proposal by Buyer) relating to any Acquisition Transaction. For the purposes of this Agreement, "Acquisition Transaction" shall mean any transaction or series of related transactions other than the transactions contemplated by this Agreement involving: (i) any acquisition or purchase from the Company or Seller by any Person or "group" (as defined under Section 13(d) of the Exchange Act and the rules and regulations thereunder) of more than a 5% interest in the total outstanding voting securities of the Company or any tender offer or exchange offer that if consummated would result in any Person or "group" (as defined under Section 13(d) of the Exchange Act and the rules and regulations thereunder) beneficially owning 5% or more of the total outstanding voting securities of the Company or any merger, consolidation, business combination or similar transaction involving the Company or Seller pursuant to which the shareholders of the Company immediately preceding such transaction hold less than 95% of the equity interests in the surviving or resulting entity of such transaction; (ii) any sale, lease (other than in the ordinary course of business), exchange, transfer, license (other than in the ordinary course of business), acquisition or disposition of more than 5% of the assets of the Company; or (iii) any liquidation or dissolution of the Company.

8.12   Meeting with DARPA; CFIUS .

(a)     As soon as practicable after the execution of this Agreement, Seller and the Company shall arrange, facilitate and implement a face-to-face meeting or telephone conference between Buyer, Seller and the Contract Officer at the Defense Advanced Research Projects Agency ("DARPA") for the Company's Contract with Total Immersion Software for the purpose of determining whether DARPA has any objections or concerns regarding the transactions contemplated by this Agreement. On the basis of this meeting, Buyer shall determine whether it wishes to prepare and submit the Joint Filing to CFIUS pursuant to Section 8.12(b). Such determination shall be in Buyer's sole discretion. Seller shall advise the Company and Seller of its determination in writing not later than three (3) Business Days after the date such meeting occurs. If Buyer at that time determines not to submit the Joint Filing, the condition set forth in Section 7.1(w) shall be deemed to have been waived by Buyer, and Section 8.12(b) shall not be applicable.

56

(b)     If Buyer pursuant to <u>Section 8.12(a)</u> determines to proceed with such filing, the Company and Buyer agree that as soon as reasonably practicable after such determination, they will submit a joint filing and any requested supplemental information (collectively, the "<u>Joint Filing</u>") to CFIUS pursuant to 31 C.F.R. Part 800 with regard to the Transactions. Buyer hereby agrees to take responsibility for preparation and submission of the Joint Filing. The Company and Seller hereby agree to provide to Buyer all requisite information in a timely fashion in order for Buyer to complete preparation and submission of the Joint Filing in accordance with this <u>Section 8.4</u>. Buyer will keep the Company and Holder Representative appraised in a timely manner of all communications with CFIUS and any interested U.S. Government agency with regard to the Joint Filing and the subject therein related. The parties agree that all meetings relating to the Joint Filing with either CFIUS or any interested U.S. Government agency will include representatives of Buyer and the Company. All written requests for supplemental information from CFIUS or any interested U.S. Government agency relating to the Joint Filing shall be coordinated in advance among Buyer, the Company and Holder Representative. Submission of additional written information by Buyer pursuant to such requests will only be made with the final timely approval of the Company and Seller. Buyer shall pay all filing fees associated with the Joint Filing to CFIUS.

8.13    <u>Termination of Liens, Guarantees and Credit Facilities</u>. Prior to the Closing, the Company shall cause (i) all Liens (other than Permitted Liens) on the Company's assets, including the security interests (and related UCC-1 financing statements) of BankOne, N.A. and JPMorgan Chase Bank, N.A., to be terminated, (ii) all guarantees made by the Company in favor of Wells Fargo Bank, N.A. in respect of obligations of JEK Enterprises, LLC. to be terminated and all Liabilities of the Company thereunder to be released, and (iii) its loan facility with JPMorgan Chase Bank, N.A. and all Contracts relating thereto to be terminated and all Liabilities thereunder to be released.

8.14    <u>409A Amendments; 280G Approval</u>.

(a)     Prior to the Closing, the Company shall enter into a written amendment with each Optionholder that (i) will result in all Company Options held by such Optionholder to comply with the requirements of Code section 409A(a)(2), (3), and (4) and the Treasury Regulations related thereto, and (ii) is in form and substance reasonably acceptable to Buyer .

(b)     Prior to the Closing, the Company (i) shall solicit the necessary stockholder approval of any payments or benefits that would otherwise be an "excess parachute payment" under Code Section 280G as a result of the transactions contemplated by this Agreement (without regard to the potential applicability of Code section 280G(b)(5)(A)(i)), and (ii) shall deliver to Buyer reasonable evidence that (A) the stockholder approval was solicited in conformance with Code Section 280G and the regulations promulgated thereunder and the necessary stockholder approval was obtained with respect to any payments and/or benefits that were subject to the stockholder vote (the "<u>280G Approval</u>"), or (B) that the 280G Approval was not obtained and as a consequence, that such "parachute payments" shall not be made or provided, as authorized under the waivers of those payments and/or benefits that were executed by all of the affected individuals, to the extent necessary to avoid treatment as an excess parachute payment. Any documentation submitted to stockholders and affected individuals in connection with the Company's seeking the 280G Approval shall be presented to the Buyer for

its review and approval (not to be unreasonably withheld) prior to any submission to the stockholders or the affected individuals.

8.15    Termination of Contracts with Neal Shact.  Prior to the Closing, the Company shall cause all Contracts between the Company and Neal Shact to be terminated (except only for the Contract governing the Company Options held by Mr. Shact), and shall cause any and all amounts and other Liabilities owing to Mr. Shact under such Contracts to have been paid or otherwise fully satisfied and discharged.


**ARTICLE IX**

**INDEMNIFICATION; SURVIVAL**

9.1    Indemnification by Seller, Optionholders and Option Right Holder.

(a)    Subject to the terms and conditions of this ARTICLE IX, following the Closing, Seller, the Optionholders and the Option Right Holder (together, the "Indemnifying Securityholders"), jointly and severally, shall indemnify Buyer, each of its Affiliates (including the Company), and their respective successors, assigns, officers, directors, stockholders, employees and agents (collectively, the "Buyer Indemnitees") against, and hold them harmless from, any Loss suffered or incurred by any such Buyer Indemnitee, whether such Loss exists or accrues prior to, on or subsequent to the Closing Date, directly or indirectly arising or resulting from, based upon or relating to:

(i)    any breach of any representation or warranty of the Company or Seller contained in this Agreement or any certificate executed by the Company or Seller at or prior to Closing (it being understood that each such representation and warranty shall be deemed to have been made by the Company or Seller as of the date hereof and as of Closing (except to the extent that representations are made as of a later date, in which case, such representations shall be deemed to have been made as of such date));

(ii)    the breach of any covenant of the Company or Seller contained in this Agreement;

(iii)T    axes imposed on the Company and/or any current or former shareholder of the Company with respect to Pre-Closing Tax Periods as provided in Section 8.9(c) above;

(iv)    Transfer Taxes for which Seller is responsible pursuant to Section 8.9(g) above;

(v)    any Liability (other than payment obligations of the Company and Buyer expressly set forth in Section 2.7) arising from or based upon any stock appreciation right, any Company Option, the granting, exercise or termination of any Company Option or the Option Right or any claim of a holder of any of the foregoing rights or instruments with respect to such holder's interests and rights therein ;

(vi)    any Liability arising from or based on any termination of any consultant or contractor of the Company pursuant to <u>Section 8.5(d)</u>;

(vii)    any Third Party Transaction Costs paid or payable by the Company that are not included in the Third Party Transaction Costs Statement or any inaccuracy in the certificate delivered pursuant to <u>Section 2.2(d)</u>.

(b)    The Indemnifying Securityholders shall not be required to indemnify Buyer Indemnitees with respect to any claim for indemnification arising or resulting from any matter described in <u>Section 9.1(a)(i)</u> (other than indemnification obligations arising out of a breach of any Critical Representation) unless and until the aggregate amount of all Losses arising or resulting from such matters described in <u>Section 9.1(a)(i)</u> exceed $50,000, in which case the Indemnifying Securityholders shall be required to indemnify Buyer Indemnitees against all such Losses (from the first dollar).

(c)    The aggregate amount of indemnification obligations of the Indemnifying Securityholders under <u>Sections 9.1(a)(i)</u> and <u>9.1(a)(ii)</u> (other than indemnification obligations arising out of a breach of any Critical Representation or Critical Covenant) shall not exceed $1,500,000. The aggregate amount of indemnification obligations of the Indemnifying Securityholders under <u>Section 9.1(a)</u> (other than indemnification obligations arising out of a breach of any Critical Covenant) shall not exceed the lesser of (A) $5,500,000 or (B) the aggregate Purchase Price actually paid by Buyer under this Agreement (for the avoidance of doubt, including all amounts paid to Context Capital Group and Neal Shact and including any Earn-Out Payments set-off against pursuant to <u>Section 9.7</u>, but excluding any amounts or consideration received under any other documents or agreements).

(d)    In all cases, notwithstanding anything contained herein to the contrary, each Indemnifying Securityholder's indemnification obligation with respect to claims for indemnification under <u>Section 9.1(a)</u> shall (i) be limited to such Indemnifying Securityholder's Applicable Percentage of the total amount of Losses attributable to such claims, and (ii) shall not exceed an amount equal to such Indemnifying Securityholder's Applicable Percentage of the aggregate Purchase Price actually paid by Buyer under this Agreement (for the avoidance of doubt, including all amounts paid to Context Capital Group and Neal Shact and including any Earn-Out Payments set-off against pursuant to <u>Section 9.7</u>, but excluding any amounts or consideration received under any other documents or agreements); *except, however,* that Seller's indemnification obligation with respect to any breach of his representations and warranties in <u>Article IV</u> shall not be subject to clause (i) of this sentence. In all events and for the avoidance of any doubt, the satisfaction of any indemnification claim out of the Escrow Account or by set off against Earn-Out Payments pursuant to <u>Section 9.7</u> shall be deemed to be in accordance with this <u>Section 9.1(d)</u>.

(e)    The indemnification obligations of the Indemnifying Securityholders under <u>Section 9.1(a)(ii)</u> with respect to any breach of a Critical Covenant shall not be subject to the financial limitations set forth in <u>Sections 9.1(b)</u>, <u>9.1(c)</u> and clause (ii) of <u>Section 9.1(d)</u>.

9.2    <u>Indemnification by Buyer</u>. Subject to the terms and conditions of this <u>ARTICLE IX</u>, following the Closing, Buyer shall indemnify Seller, the Optionholders, the Option Right

59

Holder and their respective successors, assigns, estates, heirs and personal representatives (the "Seller Indemnitees") against, and hold them harmless from, any Loss suffered or incurred by any such Seller Indemnitee, whether such Loss exists or accrues prior to, on or subsequent to the Closing Date, directly or indirectly arising or resulting from or based upon:

      (a)     any breach of any representation or warranty of Buyer contained in this Agreement or any certificate executed by Buyer at or prior to Closing; or

      (b)     the breach of any covenant of Buyer contained in this Agreement.

Buyer shall not be required to indemnify Seller Indemnitees with respect to any claim for indemnification arising or resulting from any matter described in Section 9.2(a) unless and until the aggregate amount of all such Losses arising or resulting from matters described in clause (a) of this Section 9.2 exceeds $50,000, in which case Buyer shall be required to indemnify the Seller Indemnitees against all such Losses (from the first dollar). The aggregate amount of indemnification obligations of Buyer under Section 9.2 (other than indemnification obligations arising out of a breach of any Critical Buyer Representation or Critical Covenant) shall not exceed $1,500,000. The aggregate amount of indemnification obligations of Buyer under Section 9.2 (other than indemnification obligations arising out of a breach of any Critical Covenant) shall not exceed the lesser of (A) $5,500,000 or (B) the aggregate Purchase Price actually paid by Buyer under this Agreement (for the avoidance of doubt, including all amounts paid to Context Capital Group and Neal Shact and including any Earn-Out Payments set-off against pursuant to Section 9.7, but excluding any amounts or consideration received under any other documents or agreements). The indemnification obligations of Buyer under Section 9.2 with respect to any breach of a Critical Covenant shall not be subject to the financial limitations set forth in the preceding two sentences.

      9.3     Losses Net of Insurance, Etc. Subject to the terms and conditions of this ARTICLE IX, following the Closing:

      (a)     The amount of any Loss for which indemnification is provided under this ARTICLE IX shall be net of any amounts actually recovered by the Indemnified Person under insurance policies in effect and applicable to such Loss.

      (b)     In calculating the amount of Losses for which indemnification is provided under this Article IX, such Losses:

      (i)     shall be reduced by the amount of any Tax benefits or Tax losses that the Indemnified Person actually realizes as a result of the incurrence of Losses from which indemnification is sought; and

      (ii)     shall be increased by the amount of any increase in the Tax Liability of the Indemnified Person with respect to the receipt of payments under this Agreement (including this Section 9.3(b)(ii)).

In determining the adjustment to any payment or indemnity in order to accomplish the foregoing, the parties hereto agree (x) to treat all Taxes required to be paid by, and all reductions in Tax realized by any Indemnified Person, as if such Indemnified Person were subject to Tax at the

highest marginal tax rates (for both federal and state, as determined on a combined basis) applicable to such Indemnified Person and (y) to treat any indemnification payments made pursuant to this Agreement as an adjustment to the Closing Purchase Price, unless either party receives a written opinion, reasonably satisfactory in form and substance to the other party, of a law firm with appropriate experience to the effect that it is not or it is not likely to be permissible to treat such payments in that manner on a Tax Return.

(c)     No party shall have any liability for any consequential damages, except to the extent such consequential damages were reasonably foreseeable, or for any exemplary or punitive damages under or by reason of this Agreement.

(d)     Upon making any payment to an Indemnified Person for any indemnification claim pursuant to this Article VI, the Indemnifying Person shall be subrogated, to the extent of such payment, to any rights which the Indemnified Person may have against any third parties (excluding the Company and all officers, directors and employees of the Company) with respect to the subject matter underlying such indemnification claim and the Indemnified Person shall assign any such rights to the Indemnifying Person.

(e)     Subject to Sections 2.3 and 2.8, indemnification provided in this Article IX shall be deemed to be the sole and exclusive remedy available to all Indemnified Persons with respect to the matters for which indemnification is provided pursuant to Sections 9.1 and 9.2; *provided, however,* that nothing contained herein shall preclude any party from seeking injunctive or other equitable relief. The limitations in the preceding sentence shall in no event apply, and Article IX hereof shall not be the exclusive remedy, with respect to any Losses arising from fraud, intentional and knowing misrepresentation or criminal activity. Notwithstanding the foregoing, the exercise by any Person of any of its rights under this Article IX shall not be deemed to prejudice, or to constitute or operate as a waiver of, any non-monetary remedy that such Person may be entitled to exercise (whether under this Agreement, under any other Contract, under any applicable law, at common law, in equity or otherwise).

(f)     The indemnities herein are intended solely for the benefit of the Persons expressly identified in this ARTICLE IX (and their permitted successors and assigns) and are in no way intended to, nor shall they, constitute an agreement for the benefit of, or be enforceable by, any other Person.

(g)     Notwithstanding anything to the contrary herein, the right of any party hereto to indemnification, payment of Losses, or injunctive and equitable relief will not be affected in any way by any investigation (including any environmental investigation) conducted or knowledge acquired at any time by such party with respect to the accuracy or inaccuracy of or compliance with or performance of, any representation, warranty, covenant, agreement or obligation or by the waiver of any condition. The waiver of any condition based upon the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to indemnification, reimbursement or other remedy based upon such representations, warranties, covenants and obligations.

9.4     Termination of Indemnification. The obligations to indemnify and hold harmless an Indemnified Person pursuant to Sections 9.1(a)(i) and 9.2(a) shall terminate when the

applicable representation or warranty terminates pursuant to <u>Section 9.6</u>, *provided, however*, that such obligations to indemnify and hold harmless shall not terminate with respect to any specific matter as to which the person to be indemnified shall have, before the expiration of the applicable period, previously made a claim by delivering a written notice thereof (stating in reasonable detail the basis of such claim to the extent then known to the party giving notice) (a "<u>Claim Notice</u>") to the Indemnifying Person (or Holder Representative if the Indemnifying Person is an Indemnifying Securityholder).

   9.5    <u>Procedures Relating to Indemnification</u>.

           (a)    In the event that any Indemnified Person has a claim against any Indemnifying Person pursuant to <u>Sections 9.1</u> or <u>9.2</u> that does not involve a claim being sought to be collected by a third party, such Indemnified Person shall with reasonable promptness send a Claim Notice to each Indemnifying Person (or Holder Representative if the Indemnifying Person is an Indemnifying Securityholder). If the Indemnifying Person does not notify the Indemnified Person or the Holder Representative, as applicable, within ten (10) Business Days from receipt of the Claim Notice (the "<u>Notice Period</u>") that the Indemnifying Person or the Holder Representative, as applicable, disputes such claim, the amount of such claim shall be conclusively deemed a liability of the Indemnifying Person hereunder. In case an objection is made in writing in accordance with this <u>Section 9.5(a)</u>, the Indemnified Person shall have ten (10) Business Days to respond in a written statement to the objection. If after such ten (10) Business Day period there remains a dispute as to any claims, the parties shall attempt in good faith for ten (10) Business Days to agree upon the rights of the respective parties with respect to each of such claims. If the parties should so agree, a memorandum setting forth such agreement shall be prepared and signed by both parties. If such parties shall not agree, each Indemnified Person shall be entitled to take any action in law or in equity as such Indemnified Person shall deem necessary to enforce the provisions of this <u>Article IX</u> against the applicable Indemnifying Person.

           (b)    In order for an Indemnified Person to be entitled to any indemnification provided for under this Agreement in respect of, arising out of or involving a claim made by any third party against the Indemnified Person (a "<u>Third-Party Claim</u>"), such Indemnified Person must provide the Indemnifying Person (or Holder Representative if the Indemnifying Person is an Indemnifying Securityholder) with a Claim Notice regarding the Third-Party Claim promptly and in any event within ten (10) days after receipt by such Indemnified Person of written notice of the Third-Party Claim; *provided, however*, that failure to give such notification shall not affect the indemnification provided hereunder except to the extent the Indemnifying Person shall have been actually prejudiced as a result of such failure. Thereafter, the Indemnified Person shall deliver to the Indemnifying Person (or Holder Representative if the Indemnifying Person is an Indemnifying Securityholder), promptly after the Indemnified Person's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Person relating to the Third-Party Claim.

           (c)    If a Third-Party Claim is made against an Indemnified Person, the Indemnifying Person will be entitled to participate in the defense thereof and, if it so chooses, to assume the defense thereof with counsel selected by the Indemnifying Person. If the Third-Party Claim includes allegations for which the Indemnifying Person both would and would not be

obligated to indemnify the Indemnified Person, the Indemnifying Person and the Indemnified Person shall in that case jointly assume the defense thereof. Should the Indemnifying Person so elect to assume the defense of a Third-Party Claim, the Indemnifying Person will not be liable to the Indemnified Person for legal fees and expenses subsequently incurred by the Indemnified Person in connection with the defense thereof. If the Indemnifying Person assumes such defense, the Indemnified Person shall have the right to participate in the defense thereof and, at its own expense, to employ counsel reasonably acceptable to the Indemnifying Person, separate from the counsel employed by the Indemnifying Person, it being understood that the Indemnifying Person shall control such defense. The Indemnifying Person shall be liable for the fees and expenses of counsel employed by the Indemnified Person for any period during which the Indemnifying Person has not assumed the defense thereof. If the Indemnifying Person chooses to defend or prosecute any Third-Party Claim, all the parties hereto shall cooperate in the defense or prosecution thereof. Such cooperation shall include the retention and (upon the Indemnifying Person's request) the provision to the Indemnifying Person of records and information which are reasonably relevant to such Third-Party Claim, and making officers, directors, employees and agents of the Indemnified Person available on a mutually convenient basis to provide information, testimony at depositions, hearings or trials, and such other assistance as may be reasonably requested by the Indemnifying Person. Notwithstanding the foregoing, in the event a Third-Party Claim is made against an Indemnified Person as to which such Indemnified Person is entitled to seek indemnification hereunder and such Indemnified Person reasonably concludes that the Indemnifying Person has failed to assume the defense of the Indemnified Person, or that the Indemnifying Person is not diligently defending such Indemnified Person, then in such case the Indemnified Person may elect to retain the defense of such Third-Party Claim and will be entitled to be reimbursed by the Indemnifying Person for its Losses incurred in such defense (including reasonable attorneys fees). Whether or not the Indemnifying Person shall have assumed the defense of a Third-Party Claim, the Indemnified Person shall not admit any liability with respect to, or settle, compromise or discharge, such Third-Party Claim without the Indemnifying Person's prior written consent (which consent shall not be unreasonably withheld or delayed). The Indemnifying Person shall not admit any liability with respect to, or settle, compromise or discharge any Third-Party Claim without the Indemnified Person's prior written consent (which consent shall not be unreasonably withheld or delayed); *provided, however,* that the Indemnified Person shall agree to any settlement, compromise or discharge of a Third-Party Claim that (i) the Indemnifying Person may recommend, (ii) by its terms obligates the Indemnifying Person to pay the full amount of the liability in connection with such Third-Party Claim, (iii) releases the Indemnified Person completely in connection with such Third-Party Claim, and (iv) contains no sanction or restriction upon the future activities or business of the Indemnified Person.

      9.6    <u>Survival of Representations and Warranties</u>. All representations and warranties contained in this Agreement shall survive the Closing and remain in full force and effect (a) indefinitely, with respect to matters covered by <u>Section 4.1</u> (Due Authorization), <u>Section 4.4</u> (The Shares), <u>Section 5.1(c)</u> (Due Authorization) and <u>Section 5.2</u> (Capitalization), (b) until the date that is six (6) months after the longest applicable statute of limitations (including extensions thereof) or, if there is no applicable statute of limitations, for a period of five (5) years following the Closing Date, with respect to matters covered by <u>Section 5.10(e)</u> (Title to Assets), <u>Section 5.11</u> (Intellectual Property), <u>Section 5.12</u> (Tax Matters), <u>Section 5.15</u> (Employee and Labor Relations), <u>Section 5.16</u> (Employee Plans) and <u>Section 5.17</u> (Environmental Matters), and (c) for

a period of eighteen (18) months following the Closing Date, with respect to all other representations and warranties, except that any representation or warranty that would otherwise terminate in accordance with clause (a), (b) or (c) will continue to survive if a written notice of a breach thereof shall have been timely given to the breaching party by the other party on or prior to such termination date, until the related claim for indemnification has been satisfied or otherwise resolved as provided in this <u>ARTICLE IX</u>.

     9.7    <u>Set-Off; Escrow Account</u>.  If any of the Indemnifying Securityholders shall become obligated to indemnify Buyer or any other Indemnified Party against any Losses pursuant to <u>Section 9.1</u>, Buyer shall be entitled, in addition to any other right or remedy it may have, to set-off all or any portion of such Losses against any Earn-Out Payments that may become payable under <u>Section 2.8</u>.  In addition, subject to the procedures set forth in <u>Section 9.5</u>, Buyer may, from time to time and in accordance with the terms of <u>Section 2.4</u>, apply and retain amounts held in the Escrow Account to satisfy any of the Indemnifying Securityholders' indemnification obligations under the terms of this Agreement, in accordance with the terms of this <u>Article IX</u>.

     9.8    <u>Personal Obligation</u>.  The obligations of the Indemnifying Securityholders to indemnify Buyer or any other Indemnified Party pursuant to <u>Section 9.1</u> are personal to the Indemnifying Securityholders and are assumed in light of the consideration the Indemnifying Securityholders are to receive at the Closing hereunder, and the Indemnifying Securityholders from and after the Closing hereby waive any rights and release such Indemnified Parties (including the Company but excluding Buyer) from any claims or assertions of cross-indemnification or contribution from any such Indemnified Party, whether arising in law or in equity, as a result of the Indemnifying Securityholders' payment, coverage or assumption of any Losses incurred by any such Indemnified Party pursuant to this <u>Article IX</u>, including any claims or contribution in respect of any attorneys fees and expenses incurred by the Indemnifying Securityholders in defending against, or seeking contribution or recovery arising from, his or her indemnification obligations under this <u>Article IX</u>.

     9.9    <u>Holder Representative</u>.

     (a)    Seller hereby and each Optionholder and the Option Right Holder by his execution of an Optionholder Agreement irrevocably appoints Keith Weiner as his, her or its true and lawful attorney-in-fact and agent, with full power of substitution or resubstitution, to act solely and exclusively on behalf of Seller, each Optionholder and the Option Right Holder with respect to any matters relating to this Agreement (the "<u>Holder Representative</u>"), including the matters where action by the Holder Representative is specifically required by the terms of this Agreement.  If Keith Weiner is ever unable and/or unwilling to act as Holder Representative, Seller, the Optionholders and the Option Right Holder hereby appoint Neal Shact Holder Representative as the successor to Keith Weiner, and if Neal Shact is ever unable and/or unwilling to so act, Seller shall appoint a successor to Neal Shact, as the case may be, to serve as Holder Representative.

(b)     Holder Representative shall act as the representative of Seller, the Optionholders and the Option Right Holder, and shall be authorized to act on behalf of Seller, the Optionholders and the Option Right Holder and to take any and all actions required or permitted to be taken by Holder Representative under this Agreement, with respect to any claims (including the settlement thereof) made by Buyer for indemnification pursuant to this Article IX. Seller, the Optionholders and the Option Right Holder shall be bound by all actions taken by Holder Representative in his capacity as such.  Holder Representative shall promptly, and in any event within five (5) Business Days thereof, provide written notice to Seller, the Optionholders and the Option Right Holder of any action taken on behalf of the Optionholders and the Option Right Holder by Holder Representative pursuant to the authority delegated to Holder Representative under this Section 9.9.  Holder Representative shall at all times act in his or her capacity as Holder Representative in a manner that Holder Representative believes to be in the best interest of Seller, the Optionholders and Option Right Holder as group.

(c)     Neither Holder Representative (nor any of his/her directors, officers, agents or any employees, if applicable) shall be liable to any Person for any error of judgment, or any action taken, suffered or omitted to be taken, under this Agreement or any other Transaction Document, except in the case of his/her bad faith or willful misconduct.  Holder Representative may consult with legal counsel, independent public accountants and other experts selected by him or her and shall not be liable for any action taken or omitted to be taken in good faith in accordance with the advice of counsel, accountants or experts.  Holder Representative shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement.  As to any matters not expressly provided for in this Agreement or the other Transaction Documents, Holder Representative shall not be required to exercise any discretion or take any action.  Seller, each Optionholder and the Option Right Holder severally shall indemnify and hold harmless and reimburse Holder Representative from and against his, her or its Applicable Percentage of any and all Losses incurred by Holder Representative arising out of or resulting from any action taken or omitted to be taken by Holder Representative under this Agreement, other than such Losses arising out of or resulting from Holder Representative's bad faith or willful misconduct.

(d)     In all matters relating to this Article IX, Holder Representative shall be the only party entitled to assert the rights of Seller, the Optionholders and the Option Right Holder.  Buyer shall be entitled to rely on all statements, representations, and decisions of Holder Representative.

## ARTICLE X

## TERMINATION OF AGREEMENT

10.1    Termination.

This Agreement may be terminated prior to the Closing as follows:

(a)     By the mutual written consent of Holder Representative, the Company and Buyer;

65

(b)     By either Holder Representative or Buyer by written notice to the other if the Closing shall not have occurred by (i) August 29, 2008, if the CFIUS closing condition is waived (or deemed waived) by Buyer prior to such date pursuant to Section 8.12(a), or (ii) September 30, 2008, if such a waiver (or deemed waived) does not occur; *provided, however,* that the right to terminate this Agreement under this subsection (b) shall not be available to any party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or resulted in, the failure of the Closing to occur prior to such date;

(c)     By either Buyer or Holder Representative, by giving written notice to the other party, in the event of a material breach of this Agreement by a non-terminating party if such non-terminating party fails to cure such breach within ten (10) days following notification thereof by the terminating party; or

(d)     By either Buyer or Holder Representative if (i) the consummation of the Transactions shall violate any Order that shall have become final and nonappealable or (ii) there shall be a Law which makes the Transactions illegal or otherwise prohibited; *provided, however,* that the provisions of this subsection (d) shall not be available to any party unless such party shall have used its commercially reasonable efforts to oppose any such Order or to have such Order vacated or made inapplicable to the Transactions.

10.2    Effect of Termination. In the event of termination of this Agreement as permitted by Section 10.1, this Agreement shall become void and of no further force and effect, except for the following provisions, which shall remain in full force and effect: (a) Section 5.29 (Brokers), (b) Section 8.8 (Confidentiality), (c) Section 8.11 (Publicity), (d) this Section 10.2, and (e) ARTICLE XI. Nothing in this Article X shall be deemed to release any party from any liability for any breach by such party of the terms and provisions of this Agreement or to impair the right of any party to compel specific performance by any other party of its surviving obligations under this Agreement.

## ARTICLE XI

## MISCELLANEOUS

11.1    Expenses. Whether or not the Transactions are consummated, and except as otherwise provided in this Agreement, each party to this Agreement will bear its respective fees, costs and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement, the other Transaction Documents or the Transactions, including all investment banker, legal, audit, accounting and other third party advisory fees and expenses incurred by such party.

11.2    Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles that would require the application of any other Law.

11.3    Enforcement. The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their

specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to specifically enforce the terms and provisions of this Agreement, in addition to any other remedy to which any party is entitled at law or in equity.

11.4    Jurisdiction; Service of Process. Except for any disputes relating to purchase price adjustments covered by Section 2.3 or the amount of any Earn-Out Payment covered by Section 2.8, (which shall be resolved pursuant to Section 2.3 or 2.8, as the case may be), any action or proceeding arising out of or relating to this Agreement or any transaction contemplated hereby may be brought in the courts of the State of Delaware, County of New Castle, or, if it has or can acquire jurisdiction, in the United States District Court for the District of Delaware, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such action or proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the action or proceeding shall be heard and determined only in any such court and agrees not to bring any action or proceeding arising out of or relating to this Agreement or any transaction contemplated hereby in any other court. The parties agree that any party may file a copy of this paragraph with any court as written evidence of the knowing, voluntary and bargained agreement among the parties irrevocably to waive any objections to venue or to convenience of forum. Process in any action or proceeding referred to in the first sentence of this Section 11.4 may be served on any party anywhere in the world.

11.5    Waiver of Jury Trial. THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY AND THAT ANY ACTION OR PROCEEDING WHATSOEVER BETWEEN OR AMONG THEM RELATING TO THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

11.6    Attorneys' Fees. If any action, suit, arbitration or other proceeding for the enforcement of this Agreement is brought with respect to or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions hereof, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that proceeding, in addition to any other relief to which it may be entitled.

11.7    Waiver; Remedies Cumulative. The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither any failure nor any delay by any party in exercising any right, power or privilege under this Agreement or any of the other Transaction Documents will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such

right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by applicable Law, (a) no claim or right arising out of this Agreement or any of the other Transaction Documents can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party or parties entitled to the benefits thereof; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of that party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or any of the other Transaction Documents.

11.8    Notices.  All notices or other communications required or permitted to be given hereunder shall be in writing and shall be deemed given to a party when (a) delivered by hand or by a nationally recognized overnight courier service (costs prepaid) or (b) sent by registered or certified mail, postage prepaid, return receipt requested, in each case to the following:

*if to Buyer to:*

> Nortel Networks Inc.
> 2221 Lakeside Blvd.
> Richardson, TX, 75082
> Attention:  Hyacinth G. DeAlmeida
>                     Leader, Corporate Business Development

*with copies (which shall not constitute notice)  to:*

> Nortel Networks Inc.
> 195 The West Mall
> Toronto, Ontario M9C 5K1
> Attention: Douglas M. Parker, Esq., Associate General Counsel -
>                     Corporate

> and to:

> Crowell & Moring LLP
> 1001 Pennsylvania Avenue, NW
> Washington, DC  20004-2595
> Attention:  James R. Stuart, III, Esq.

*if to the Company or Seller, to:*

> Keith Weiner
> 19865 East Via del Palo
> Queen Creek, AZ 85242

*with a copy to:*

68

Stubbs Alderton & Markiles, LLP
15260 Ventura Boulevard, 20th Floor
Sherman Oaks, CA 91403
Attention: Albert P. Asatoorian

Any party hereto may change its contact information for notices and other communications hereunder by notice to the other parties hereto.

    11.9    Assignment.  This Agreement and the rights and obligations hereunder shall not be assignable or transferable by any party (including, by operation of law or in connection with a merger or sale of substantially all the assets, stock or membership interests of such party) without the prior written consent of the other parties (which shall not be unreasonably withheld); *provided, however,* that after the Closing Buyer may assign all or any of its rights and obligations hereunder to an Affiliate and to any Person who acquires all or substantially all of the assets or equity securities of Buyer (whether by operation of law or in connection with a merger or sale of substantially all of the assets, stock or membership interests of such Person). Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon and inure to the benefit of the permitted assigns of the parties.

    11.10    No Third-Party Beneficiaries.  Except with respect to the Indemnified Persons under Sections 9.1 and 9.2, this Agreement is for the sole benefit of the parties hereto and their permitted successors and assigns, and nothing herein expressed or implied shall give or be construed to give to any Person, other than the parties hereto and such successors and assigns, any legal or equitable rights, remedy or claim hereunder.

    11.11    Amendments.  No amendment to this Agreement shall be effective unless it shall be in writing and signed by the Company, Buyer and Holder Representative.

    11.12    Interpretation, Exhibits and Schedules.  The headings contained in this Agreement, in any Exhibit or Schedule and in the table of contents to this Agreement, are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Except when the context otherwise requires, references to Sections, Articles, Exhibits or Schedules refer to Sections, Articles, Exhibits or Schedules of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized term used in any Schedule or Exhibit, but not otherwise defined therein, shall have the meaning ascribed to such term in this Agreement. Whenever used in this Agreement, a singular number shall include the plural and a plural the singular. Pronouns of one gender shall include all genders. The words "hereof," "herein," and terms of similar import shall refer to this entire Agreement. Unless the context clearly requires otherwise, the use of the terms "including," "included," "such as," or terms of similar meaning, shall not be construed to imply the exclusion of any other particular elements and shall be deemed to be followed by the words "without limitation."

    11.13    Entire Agreement.  This Agreement and the Transaction Documents contain the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede all prior oral and written agreements and understandings relating to such subject matter.

11.14  <u>Severability</u>.  If any provision of this Agreement or the application of any such provision to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof and all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the essential economic or legal substance of the Transactions is not affected.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Company, Buyer and Seller shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the Transactions be consummated as originally contemplated to the greatest extent possible.

11.15  <u>Mutual Drafting</u>.  The parties hereto are sophisticated and have been represented by lawyers who have carefully negotiated the provisions hereof.  As a consequence, the parties do not intend that the presumptions of any laws or rules relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement and therefore waive their effects.

11.16  <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be considered one and the same agreement, and shall become effective when all such counterparts have been signed by each of the parties and delivered to the other parties.  Any signature delivered by a facsimile machine shall be binding to the same extent as an original signature page with regard to this Agreement or any other Transaction Document or any amendments thereof, subject to the terms thereof.  A party that delivers a signature page in this manner agrees to later deliver an original counterpart signature page to the other parties.

[SIGNATURE PAGE FOLLOWS ON NEXT PAGE]

70

SIGNATURE PAGE TO STOCK PURCHASE AGREEMENT

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have duly executed this Agreement on the date first above written.

NORTEL NETWORKS INC., as Buyer

By: _____

Name: HYACINTH DEALMEIDA
Title: LEADER, CORPORATE BUSINESS DEVELOPMENT

DIAMONDWARE, LTD., as the Company

By: _____

Name: Keith Weiner
Title: Chief Executive Officer

_____

Keith Weiner, as Seller

_____

Keith Weiner (in his capacity as Holder Representative)

Spousal Consent

The undersigned Joyce Weiner, the wife of Seller Keith Weiner, hereby (i) consents and agrees to the sale of the Shares as provided for in the above Stock Purchase Agreement, (ii) represents and warrants that my husband Keith Weiner is fully authorized to enter into the above Stock Purchase Agreement with respect to any and all community property, statutory and other rights and interests I may have in the Shares, and (iii) effective as of the Closing under the above Stock Purchase Agreement, relinquishes any and all such rights and interests in the Shares.

_____

Joyce Weiner
Date: _____

## SIGNATURE PAGE TO STOCK PURCHASE AGREEMENT

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have duly executed this Agreement on the date first above written.

NORTEL NETWORKS INC., as Buyer

By: _____

Name:

Title:

DIAMONDWARE, LTD., as the Company

By: _____

Name:  Keith Weiner

Title:  Chief Executive Officer

_____

Keith Weiner, as Seller

_____

Keith Weiner (in his capacity as Holder Representative)

### Spousal Consent

The undersigned Joyce Weiner, the wife of Seller Keith Weiner, hereby (i) consents and agrees to the sale of the Shares as provided for in the above Stock Purchase Agreement, (ii) represents and warrants that my husband Keith Weiner is fully authorized to enter into the above Stock Purchase Agreement with respect to any and all community property, statutory and other rights and interests I may have in the Shares, and (iii) effective as of the Closing under the above Stock Purchase Agreement, relinquishes any and all such rights and interests in the Shares.

_____

Joyce Weiner

Date:  8/1/2008

**EXHIBIT F**

**NON-COMPETITION & RETENTION BONUS AGREEMENT**

This NON-COMPETITION & RETENTION BONUS AGREEMENT (this "Agreement") is made and entered into as of [_____], 2008, by and between DIAMONDWARE, LTD., an Arizona corporation (the "Company"), and _____ ("Employee").

**RECITALS**

A.    The Company, Nortel Networks Inc., a Delaware corporation ("Nortel"), and [Employee][Keith Weiner], as Seller and as Holder Representative, have entered into a Stock Purchase Agreement, dated as of August 1, 2008 (the "Stock Purchase Agreement"), pursuant to which Nortel is acquiring all of the issued and outstanding shares of capital stock of the Company (the "Shares").

B.    [Employee is the sole owner of the Shares; and at the Closing under the Stock Purchase Agreement, Employee will receive substantial cash consideration.] [Employee holds certain options to acquire shares of capital stock of the Company; and at the Closing under the Stock Purchase Agreement, Employee will receive substantial cash consideration in exchange for the cancellation of such options.]

C.    [As a condition to its entering into the Stock Purchase Agreement and as a material inducement for the sale of Employee's Shares under the Stock Purchase Agreement, Employee has required that the Company agree to pay, and that Nortel agree to cause the Company to pay, retention bonuses to Employee subject to the terms and conditions set forth in this Agreement. ] [FOR KEITH WEINER'S AGREEMENT ONLY]

D.    Nortel believes that Employee is a key employee of the Company and an important contributor to its business.  [As a condition to its entering into the Stock Purchase Agreement, and to provide Employee with financial incentives to continue his employment with the Company, Nortel has required that the Company agree to pay retention bonuses to Employee subject to the terms and conditions set forth in this Agreement.]  [DELETE FOR KEITH WEINER'S AGREEMENT.]

E.    As a further condition to its entering into the Stock Purchase Agreement, and in order to preserve the value of the business being acquired by Nortel pursuant thereto, Nortel has required that Employee enter into this Agreement and thereby agree to abide by and comply with the non-competition and non-solicitation obligations set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties mutually agree as follows:

6120256v6

1.    <u>Definitions</u>. As used in this Agreement, the following terms have the following meanings unless the context otherwise requires:

"<u>Affiliate</u>" means with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such first Person.  The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Cause</u>" means (i) failure to substantially perform Employee's duties and responsibilities as an employee of the Nortel Parties (provided that such duties and responsibilities have been reasonably communicated to Employee in advance); (ii) any deliberate and substantial violation of a material written policy of the Nortel Parties applicable and made available to Employee; (iii) commission of any act of fraud, embezzlement or dishonesty that has caused or is reasonably expected to result in material damage or injury to any of the Nortel Parties; (iv) any material breach of any of Employee's material obligations under this Agreement or any other employment-related written agreement with any of the Nortel Parties (including the Confidentiality Agreement[s]); (v) Employee is convicted of, or enters a plea of guilty or nolo contendere to, a felony offense (but excluding any felony traffic violation (including driving under the influence) which did not also involve criminal charges or otherwise constitute a violation of clause (vi) below); (vi) Employee knowingly uses illegal drugs or habitually consumes alcohol and such consumption causes material damage to the business or reputation of the Company; or (vii) any misconduct not described in (ii), (iii), (iv), (v) or (vi) that has caused material damage or injury to any of the Nortel Parties; *provided, however,* that in the event that a failure, commission or breach under (i), (ii), (iv) or (vii) above is reasonably capable of being cured within the Cure Period (defined below), such breach shall only constitute "Cause" if Employee is provided written notice from a Nortel Party of such failure, commission or breach and Employee does not cure such failure, commission or breach within thirty (30) days from the date of such notice ("<u>Cure Period</u>").

"<u>Closing</u>" and "<u>Closing Date</u>" have the meanings given to such terms in the Stock Purchase Agreement.

["<u>Confidentiality Agreements</u>" means the DiamondWare Employment Agreement dated [date] and the Employee Proprietary Information and Inventions Agreement of even date herewith between Employee and Nortel.] [DELETE FOR KEITH WEINER'S AGREEMENT.]

["<u>Confidentiality Agreement</u>" means the Employee Proprietary Information and Inventions Agreement of even date herewith between Employee and Nortel.] [FOR KEITH WEINER'S AGREEMENT ONLY.]

"<u>Constructive Termination</u>" means (i) a reduction in Employee's base salary on the Closing Date of more than ten percent (10%), except for a broad-based proportional reduction for all U.S. employees at the same level at Nortel, (ii) relocation of Employee's principal place of employment by more than thirty-five (35) miles from his then-current location of employment (provided that if more than one relocation occurs in the same twelve (12) month

period, the mileage for each such relocation shall be measured from Employee's principal place of business at the beginning of such twelve month period), without his prior consent, (iii) a material breach of any obligations of any of the Nortel Parties under any employment-related agreement with Employee, or (iv) a material adverse diminution (without Employee's consent) in the nature or scope of Employee's employment-related duties and responsibilities (but excluding any such diminution made to address any inability of or failure by Employee to adequately and fully perform his employment-related duties or responsibilities), any of the foregoing of which is not cured on or before thirty (30) days following the date that Nortel receives written notice from Employee of such reduction in base salary, relocation, material breach or diminution. In order to make a claim of Constructive Termination, Employee must provide written notice to Nortel no later than thirty (30) days following the date of Employee's knowledge of the occurrence of such reduction in base salary, relocation, material breach or diminution.

"Designated Business" means the business conducted by the Company as of the Closing Date or any business of the Nortel Parties related to the development, production, marketing, sale, licensing and/or delivery of 3D voice spatial audio or conferencing products or technology (or in another business of the Company or any other Nortel Party approved in advance in writing by Nortel).

"Nortel Parties" means collectively the Company, Nortel and all Affiliates of Nortel.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, government or governmental body or other entity.

"Restricted Business" means the business conducted by the Company as of the Closing Date and any business related to the development, production, marketing, sale, licensing and/or delivery of 3D voice spatial audio or conferencing products or technology that compete with any current or future products or technology of the Company, Nortel and/or any of its Affiliates at any time during the Restricted Period.

"Restricted Period" means the period ending on the later of (i) two years from the Closing Date [NTD: THREE YEARS FOR KEITH WEINER'S AGREEMENT] or (ii) six months after cessation of Employee's employment with the Nortel Parties for any reason.

2.    Retention Bonus Payments.

(a)    Subject to the terms and provisions of this Section 2, the Company shall (and Nortel shall cause the Company to) pay Employee (i) a retention bonus equal to $_____ on the payroll date immediately following the [first] anniversary of the Closing Date (the "First Bonus"), (ii) a retention bonus equal to $_____ on the payroll date immediately following the [second] anniversary of the Closing Date (the "Second Bonus"), and (iii) a retention bonus equal to $_____ on the payroll date immediately following the [third] anniversary of the Closing Date (the "Third Bonus" and together with the First Bonus and

3

Second Bonus, the "Retention Bonuses"). The foregoing dates on which Retention Bonuses are to be paid are referred to as "Payment Dates."

(b)        Notwithstanding Section 2(a) or any other provision of this Agreement, subject to the terms and provisions hereof, the Company shall have no obligation to pay, and Employee shall have no entitlement to receive, a given Retention Bonus if any of the following statements is not true as of the Payment Date with respect to the applicable Retention Bonus:

(i)        Either (A) Employee is actively employed on a full-time basis by any of the Nortel Parties in a Designated Business or (B) Employee's employment with the Nortel Parties has been terminated by any of the Nortel Parties other than for Cause and Employee has executed and not revoked a comprehensive release of claims against the Company and the other Nortel Parties in a form reasonably acceptable to Nortel (which release shall provide, among other things, that such release shall not apply to claims with respect to obligations of the Nortel Parties hereunder, the Transaction Documents and other written agreements with the Employee)] or (C) Employee's employment with the Nortel Parties has been terminated by Employee by reason of Constructive Termination; and

(ii)        Employee (A) has complied in all material respects with all of the requirements set forth in Section 3 of this Agreement (and has not instituted or threatened to institute any legal proceeding to contest the enforceability of such requirements), (B) has complied in all material respects with the obligations set forth in the Confidentiality Agreement[s], (C) has not disclosed the terms contained in this Section 2 to any Person other than Employee's spouse, attorney, or professional tax or financial advisors who have a need to know such information, and (D) has not breached the terms of the General Release of even date herewith between Employee and the Company or otherwise sought to contest the enforceability or validity thereof.

(c)        Notwithstanding Section 2(a) or any other provision of this Agreement, if Employee takes a leave of absence (excluding vacation and sick days in accordance with applicable personnel policies) at any time during the twelve (12) month period preceding any Payment Date, the Retention Bonus to be paid to Employee on such Payment Date shall be reduced to be equal to the amount of the applicable Retention Bonus specified in Section 2(a) multiplied by a fraction, the numerator of which is the number of days during such period that Employee was not on a leave of absence and the denominator of which is 365.

(d)        The Company (or another Nortel Party) shall determine and withhold from each Retention Bonus the amount of any withholding or other federal, state or local Taxes, including, but not limited to, income or excise taxes, required to be withheld upon payment of any Retention Bonus.

3.        Non-Competition.

(a)        During the Restricted Period, except for Employee's service with and for one or more of the Nortel Parties, Employee will not (i) enter into or participate in the Restricted Business, whether acting alone or in conjunction with others, or (ii) directly or indirectly, whether alone or in conjunction with others, own, manage, operate, control or otherwise engage

4

or participate in, or be connected as an owner, partner, principal, creditor, salesman, guarantor, advisor, member of the board of directors or other governing body of, employee or contractor of, consultant in, or service provider to or for the benefit of, any Person or business, or any division, group, or other subset of any Person or business, engaged (or to Employee's knowledge, planning to engage) in the Restricted Business.

      (b)    Employee acknowledges that the Restricted Business conducted by the Nortel Parties is international in scope and their related products and services are designed to be utilized throughout the United States, Canada and other countries of the world. Accordingly, the restrictions set forth in this <u>Section 3</u> shall be effective within all cities, counties and states of the United States, all cities and provinces in Canada and throughout all other countries in the world.

      (c)    Notwithstanding the provisions of <u>Sections 3(a)</u> and <u>(b)</u> and the restrictions set forth therein, Employee may own equity securities in any publicly-held corporation or other publicly-held entity that is covered by the restrictions set forth in <u>Sections 3(a)</u> and <u>(b)</u>, but (i) only to the extent that Employee does not own, of record or beneficially, more than 3% of the outstanding equity securities of such corporation and (ii) only if such investment is a passive investment and Employee is not engaging in any other conduct that would constitute a violation of any provision of this Agreement.

      (d)    The non-competition provisions of this Agreement shall be deemed to consist of a series of separate covenants, one for each line of the Restricted Business of the Nortel Parties and for each region included within the geographic area referred to above. The parties expressly agree that the character, duration and geographical scope of such provisions in this Agreement are reasonable in light of the circumstances as they exist on the date upon which this Agreement has been executed. However, should a determination nonetheless be made by a court of competent jurisdiction at a later date that the character, duration or geographical scope of such provisions, or the character or duration of the non-solicitation provisions in Section 4 below, in either case, is unreasonable in light of the circumstances as they then exist, then it is the intention and the agreement of Employee and the Company that such non-competition provisions of this Agreement shall be construed by the court in such a manner as to impose only those restrictions on the conduct of Employee which are reasonable in light of the circumstances as they then exist and as are necessary to assure the Nortel Parties of the intended benefits of this Agreement. If, in any judicial proceeding, a court shall refuse to enforce all of the separate covenants deemed included herein because, taken together they are more extensive than necessary to assure the Nortel Parties of the intended benefit of such non-competition and non-solicitation provisions, it is expressly understood and agreed between the parties hereto that those of such covenants which, if modified or eliminated, would permit the separate covenants or remaining separate covenants, as applicable, to be enforced in such proceeding shall, for the purpose of such proceeding, be deemed modified or eliminated from the provisions hereof.

    4.    <u>Non-Solicitation</u>. During the Restricted Period, Employee will not, directly or indirectly, (i) solicit, induce, recruit, encourage, hire or engage, or assist any other person to solicit, induce, recruit, encourage, hire or engage, any of the Nortel Parties' employees, contractors or consultants (which contractors and/or consultants are natural persons) (each a "<u>Company Service Provider</u>"), or otherwise cause any Company Service Provider to cease or curtail his or her relationship with any Nortel Party, or (ii) solicit, induce, encourage, engage, or

5

assist any other Person to solicit, induce, encourage or engage, any licensor, licensee, customer, or supplier of any Nortel Party that became or becomes known to Employee or with whom Employee worked or interacted while an employee, contractor or consultant of any Nortel Party, to change its business relationship with any Nortel Party in any manner that is detrimental to any Nortel Party.

5.      Independence of Obligations. The covenants and obligations of Employee set forth in this Agreement shall be construed as independent of any other agreement or arrangement between Employee, on the one hand, and any Nortel Party, on the other hand.

6.      Condition of Purchase; Consideration. Employee agrees that the covenants provided for in Sections 3 and 4 are necessary and reasonable (i) in order to protect the Nortel Parties in their conduct of the Restricted Business, (ii) for the utilization of their respective assets, tangible and intangible, including goodwill, (iii) to preserve and protect the tangible and intangible assets of the Nortel Parties, including the Company's goodwill, and (iv) in view of Nortel entering into the Stock Purchase Agreement and the payment rights granted to Employee under the Stock Purchase Agreement and this Agreement.

7.      Non-Exclusivity. The rights and remedies of the parties hereunder are not exclusive of or limited by any other rights or remedies which any of them may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative (and not alternative). Without limiting the generality of the foregoing, the rights and remedies of the Nortel Parties hereunder, and the obligations and liabilities of Employee hereunder, are in addition to their respective rights, remedies, obligations and liabilities under the law of unfair competition, misappropriation of trade secrets, the obligations that employees owe to their employers and the like. This Agreement does not limit Employee's obligations or the rights of the Company or Nortel under the terms of (a) the Confidentiality [NTD: OTHER THAN FOR WEINER AGREEMENT: Agreements][NTD: FOR WEINER AGREEMENT: Agreement]; [NTD: OTHER THAN FOR WEINER AGREEMENT: (b) the Option Termination Agreement of even date herewith between Employee and the Company, or (c)][FOR WEINER AGREEMENT: or (b)] any other written agreement between Employee and any Nortel Party. The term of the Restricted Period as it relates solely to the obligations of Employee set forth under this Agreement shall have no effect on the term of any other obligation that Employee may have to any Nortel Party under applicable Law or under the terms of any agreement (other than this Agreement), policy or arrangement to which Employee is subject.

8.      Termination of Agreement if Stock Purchase does not Occur. This Agreement shall terminate and cease to have any further force or effect immediately upon the termination of the Stock Purchase Agreement pursuant to Section 10.1 thereof.

9.      Miscellaneous.

(a)      No Conflict. Employee represents that the execution and performance by Employee of this Agreement does not and will not conflict with or breach the terms of any other agreement by which Employee is bound.

6

(b)     Waiver of Rights.  No delay or omission by the Company or any other Nortel Party in exercising any right under this Agreement will operate as a waiver of that or any other right.  A waiver or consent given by the Company or any Nortel Party on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

(c)     Equitable Remedies.  Employee agrees that any breach or threatened breach by Employee of any covenant, obligation or other provision contained in this Agreement is likely to cause the Nortel Parties substantial and irreparable damage and therefore, in the event of any such breach, the Nortel Parties shall be entitled (in addition to any other remedy that may be available to them) to the extent permitted by applicable law to (a) a decree or order of specific performance to enforce the observance and performance of such covenant, obligation or other provision, and (b) an injunction restraining such breach or threatened breach.

(d)     Assignment.  The Company or Nortel may assign this Agreement to (i) any other company or entity which acquires (whether by purchase, merger, consolidation or otherwise) all or substantially all of the business and/or assets of the Company and/or Nortel.

(e)     Notices.  All notices or other communications given pursuant to this Agreement shall be in writing and shall be deemed given to a party when (a) delivered by hand or by a nationally recognized overnight courier service (costs prepaid) or (b) sent by registered or certified mail, postage prepaid, return receipt requested, in each case to the following:

> If to Employee:                          The address set forth on the signature
>                                           page to this Agreement
>
>
> If to the Company:                       DiamondWare Ltd.
>
>                                           _____
>                                           _____
>                                           Facsimile: _____
>
>
>
>                                           Copy to: Nortel Networks Inc.
>
>
>                                           Attention: _____
>                                           Facsimile: _____

or to such other address as the person to whom notice is given may have previously furnished to the other in writing in the manner set forth above.

7

(f)     Third Party Beneficiary.  Nortel and all of its Affiliates (other than the Company) shall be third-party beneficiaries of this Agreement.

(g)     Governing Law; Jurisdiction.  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles that would require the application of any other law.  Any action or proceeding arising out of or relating to this Agreement or any transaction contemplated hereby may be brought in the courts of the State of Arizona located in Phoenix, or, if it has or can acquire jurisdiction, in the United States District Court for the District of Arizona, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such action or proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the action or proceeding shall be heard and determined only in any such court and agrees not to bring any action or proceeding arising out of or relating to this Agreement or any transaction contemplated hereby in any other court.

(h)     Effect of Partial Invalidity.  Whenever possible, each provision of this Agreement shall be construed in such a manner as to be effective and valid under applicable Law.  Without limiting Section 3(d), if any provision of this Agreement or the application thereof to any party or circumstance shall be prohibited by or invalid under applicable law, such provisions shall be ineffective to the extent of such prohibition without invalidating the remainder of such provision or any other provisions of this Agreement or the application of such provision to the other party or other circumstances.

(i)     Entire Agreement.  This Agreement, together with the Confidentiality [NTD: OTHER THAN FOR WEINER AGREEMENT: Agreements][NTD: FOR WEINER AGREEMENT: Agreement], contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior oral and written agreements and understandings relating to such subject matter.

(j)     Amendments.  No amendment to this Agreement shall be effective unless it shall be in writing and signed by both parties hereto, and no waiver of any provision hereof shall be effective unless expressed in a writing signed by the party entitled to the benefits of such provision.

(k)     Counterparts.  This Agreement may be executed in counterparts, each of which shall be considered one and the same agreement, and shall become effective when all such counterparts have been signed by each of the parties and delivered to the other party.  Any signature delivered by a facsimile machine shall be binding to the same extent as an original signature.

[Remainder of Page Intentionally Left Blank]

8

EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS IN THIS AGREEMENT.

IN WITNESS WHEREOF, this Agreement has been executed by each of the parties hereto as of the date first above written.

DIAMONDWARE, LTD.

By:_____
    Employee:
    Title:

NAME

_____
(print name)

Address:

_____
_____
_____

9