# NON-COMPETITION & RETENTION BONUS AGREEMENT

This NON-COMPETITION & RETENTION BONUS AGREEMENT (this "Agreement") is made and entered into as of August 18, 2008, by and between DIAMONDWARE, LTD., an Arizona corporation (the "Company"), Nortel Networks Inc., a Delaware corporation ("Nortel"), and Keith Weiner ("Employee").

## RECITALS

A.    The Company, Nortel and Employee, as Seller and as Holder Representative, have entered into a Stock Purchase Agreement, dated as of August 1, 2008 (the "Stock Purchase Agreement"), pursuant to which Nortel is acquiring all of the issued and outstanding shares of capital stock of the Company (the "Shares").

B.    Employee is the sole owner of the Shares; and at the Closing under the Stock Purchase Agreement, Employee will receive substantial cash consideration.

C.    As a condition to its entering into the Stock Purchase Agreement and as a material inducement for the sale of Employee's Shares under the Stock Purchase Agreement, Employee has required that the Company agree to pay, and that Nortel agree to cause the Company to pay, retention bonuses to Employee subject to the terms and conditions set forth in this Agreement.

D.    Nortel believes that Employee is a key employee of the Company and an important contributor to its business.

E.    As a further condition to its entering into the Stock Purchase Agreement, and in order to preserve the value of the business being acquired by Nortel pursuant thereto, Nortel has required that Employee enter into this Agreement and thereby agree to abide by and comply with the non-competition and non-solicitation obligations set forth herein.

F.    In conjunction with the execution of the Stock Purchase Agreement, the Company and Employee entered into a Non-Competition & Retention Bonus Agreement dated August 1, 2008 (the "Prior Agreement"). This Agreement is intended to supersede the Prior Agreement, which is hereby terminated.

NOW, THEREFORE, in consideration of the mutual covenants and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties mutually agree as follows:

1.    Definitions. As used in this Agreement, the following terms have the following meanings unless the context otherwise requires:

"Affiliate" means with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such first Person. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common

6123044 v2

GROUP EXHIBIT 2

control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Cause" means (i) failure to substantially perform Employee's duties and responsibilities as an employee of the Nortel Parties (provided that such duties and responsibilities have been reasonably communicated to Employee in advance); (ii) any deliberate and substantial violation of a material written policy of the Nortel Parties applicable and made available to Employee; (iii) commission of any act of fraud, embezzlement or dishonesty that has caused or is reasonably expected to result in material damage or injury to any of the Nortel Parties; (iv) any material breach of any of Employee's material obligations under this Agreement or any other employment-related written agreement with any of the Nortel Parties (including the Confidentiality Agreement); (v) Employee is convicted of, or enters a plea of guilty or nolo contendere to, a felony offense (but excluding any felony traffic violation (including driving under the influence) which did not also involve criminal charges or otherwise constitute a violation of clause (vi) below); (vi) Employee knowingly uses illegal drugs or habitually consumes alcohol and such consumption causes material damage to the business or reputation of the Company; or (vii) any misconduct not described in (ii), (iii), (iv), (v) or (vi) that has caused material damage or injury to any of the Nortel Parties; provided, however, that in the event that a failure, commission or breach under (i), (ii), (iv) or (vii) above is reasonably capable of being cured within the Cure Period (defined below), such breach shall only constitute "Cause" if Employee is provided written notice from a Nortel Party of such failure, commission or breach and Employee does not cure such failure, commission or breach within thirty (30) days from the date of such notice ("Cure Period").

"Closing" and "Closing Date" have the meanings given to such terms in the Stock Purchase Agreement.

"Confidentiality Agreement" means the Employee Proprietary Information and Inventions Agreement of even date herewith between Employee and Nortel.

"Constructive Termination" means (i) a reduction in Employee's base salary on the Closing Date of more than ten percent (10%), except for a broad-based proportional reduction for all U.S. employees at the same level at Nortel, (ii) relocation of Employee's principal place of employment by more than thirty-five (35) miles from his then-current location of employment (provided that if more than one relocation occurs in the same twelve (12) month period, the mileage for each such relocation shall be measured from Employee's principal place of business at the beginning of such twelve month period), without his prior consent, (iii) a material breach of any obligations of any of the Nortel Parties under any employment-related agreement with Employee, or (iv) a material adverse diminution (without Employee's consent) in the nature or scope of Employee's employment-related duties and responsibilities (but excluding any such diminution made to address any inability of or failure by Employee to adequately and fully perform his employment-related duties or responsibilities), any of the foregoing of which is not cured on or before thirty (30) days following the date that Nortel receives written notice from Employee of such reduction in base salary, relocation, material breach or diminution. In order to make a claim of Constructive Termination, Employee must provide written notice to Nortel no later than thirty (30) days following the date of Employee's

knowledge of the occurrence of such reduction in base salary, relocation, material breach or diminution.

"Designated Business" means the business conducted by the Company as of the Closing Date or any business of the Nortel Parties related to the development, production, marketing, sale, licensing and/or delivery of 3D voice spatial audio or conferencing products or technology (or in another business of the Company or any other Nortel Party approved in advance in writing by Nortel).

"Nortel Parties" means collectively the Company, Nortel and all Affiliates of Nortel.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, government or governmental body or other entity.

"Restricted Business" means the business conducted by the Company as of the Closing Date and any business related to the development, production, marketing, sale, licensing and/or delivery of 3D voice spatial audio or conferencing products or technology that compete with any current or future products or technology of the Company, Nortel and/or any of its Affiliates at any time during the Restricted Period.

"Restricted Period" means the period ending on the later of (i) three years from the Closing Date or (ii) six months after cessation of Employee's employment with the Nortel Parties for any reason.

2.    Retention Bonus Payments.

(a)    Subject to the terms and provisions of this Section 2, the Company shall, and Nortel shall cause the Company to, pay Employee (i) a retention bonus equal to $360,000 on the payroll date immediately following the first anniversary of the Closing Date (the "First Bonus"), (ii) a retention bonus equal to $360,000 on the payroll date immediately following the second anniversary of the Closing Date (the "Second Bonus"), and (iii) a retention bonus equal to $360,000 on the payroll date immediately following the third anniversary of the Closing Date (the "Third Bonus" and together with the First Bonus and Second Bonus, the "Retention Bonuses"). The foregoing dates on which Retention Bonuses are to be paid are referred to as "Payment Dates."

(b)    Notwithstanding Section 2(a) or any other provision of this Agreement, subject to the terms and provisions hereof, the Company shall have no obligation to pay, and Nortel shall have no obligation to cause the Company to pay, and Employee shall have no entitlement to receive, a given Retention Bonus if any of the following statements is not true as of the Payment Date with respect to the applicable Retention Bonus:

(i)    Either (A) Employee is actively employed on a full-time basis by any of the Nortel Parties in a Designated Business or (B) Employee's employment with the Nortel Parties has been terminated by any of the Nortel Parties other than for Cause and Employee has executed and not revoked a comprehensive release of claims against the Company

and the other Nortel Parties in a form reasonably acceptable to Nortel (which release shall provide, among other things, that such release shall not apply to claims with respect to obligations of the Nortel Parties hereunder, the Transaction Documents and other written agreements with the Employee)] or (C) Employee's employment with the Nortel Parties has been terminated by Employee by reason of Constructive Termination; and

(ii)    Employee (A) has complied in all material respects with all of the requirements set forth in <u>Section 3</u> of this Agreement (and has not instituted or threatened to institute any legal proceeding to contest the enforceability of such requirements), (B) has complied in all material respects with the obligations set forth in the Confidentiality Agreements, (C) has not disclosed the terms contained in this <u>Section 2</u> to any Person other than Employee's spouse, attorney, or professional tax or financial advisors who have a need to know such information, and (D) has not breached the terms of the General Release of even date herewith between Employee and the Company or otherwise sought to contest the enforceability or validity thereof.

(c)    Notwithstanding <u>Section 2(a)</u> or any other provision of this Agreement, if Employee takes a leave of absence (excluding vacation and sick days in accordance with applicable personnel policies) at any time during the twelve (12) month period preceding any Payment Date, the Retention Bonus to be paid to Employee on such Payment Date shall be reduced to be equal to the amount of the applicable Retention Bonus specified in <u>Section 2(a)</u> multiplied by a fraction, the numerator of which is the number of days during such period that Employee was not on a leave of absence and the denominator of which is 365.

(d)    The Company (or another Nortel Party) shall determine and withhold from each Retention Bonus the amount of any withholding or other federal, state or local Taxes, including, but not limited to, income or excise taxes, required to be withheld upon payment of any Retention Bonus.

3.    <u>Non-Competition</u>.

(a)    During the Restricted Period, except for Employee's service with and for one or more of the Nortel Parties, Employee will not (i) enter into or participate in the Restricted Business, whether acting alone or in conjunction with others, or (ii) directly or indirectly, whether alone or in conjunction with others, own, manage, operate, control or otherwise engage or participate in, or be connected as an owner, partner, principal, creditor, salesman, guarantor, advisor, member of the board of directors or other governing body of, employee or contractor of, consultant in, or service provider to or for the benefit of, any Person or business, or any division, group, or other subset of any Person or business, engaged (or to Employee's knowledge, planning to engage) in the Restricted Business.

(b)    Employee acknowledges that the Restricted Business conducted by the Nortel Parties is international in scope and their related products and services are designed to be utilized throughout the United States, Canada and other countries of the world. Accordingly, the restrictions set forth in this <u>Section 3</u> shall be effective within all cities, counties and states of the United States, all cities and provinces in Canada and throughout all other countries in the world.

4

(c)    Notwithstanding the provisions of <u>Sections 3(a)</u> and <u>(b)</u> and the restrictions set forth therein, Employee may own equity securities in any publicly-held corporation or other publicly-held entity that is covered by the restrictions set forth in <u>Sections 3(a)</u> and <u>(b)</u>, but (i) only to the extent that Employee does not own, of record or beneficially, more than 3% of the outstanding equity securities of such corporation and (ii) only if such investment is a passive investment and Employee is not engaging in any other conduct that would constitute a violation of any provision of this Agreement.

(d)    The non-competition provisions of this Agreement shall be deemed to consist of a series of separate covenants, one for each line of the Restricted Business of the Nortel Parties and for each region included within the geographic area referred to above. The parties expressly agree that the character, duration and geographical scope of such provisions in this Agreement are reasonable in light of the circumstances as they exist on the date upon which this Agreement has been executed. However, should a determination nonetheless be made by a court of competent jurisdiction at a later date that the character, duration or geographical scope of such provisions, or the character or duration of the non-solicitation provisions in Section 4 below, in either case, is unreasonable in light of the circumstances as they then exist, then it is the intention and the agreement of Employee and the Company that such non-competition provisions of this Agreement shall be construed by the court in such a manner as to impose only those restrictions on the conduct of Employee which are reasonable in light of the circumstances as they then exist and as are necessary to assure the Nortel Parties of the intended benefits of this Agreement. If, in any judicial proceeding, a court shall refuse to enforce all of the separate covenants deemed included herein because, taken together they are more extensive than necessary to assure the Nortel Parties of the intended benefit of such non-competition and non-solicitation provisions, it is expressly understood and agreed between the parties hereto that those of such covenants which, if modified or eliminated, would permit the separate covenants or remaining separate covenants, as applicable, to be enforced in such proceeding shall, for the purpose of such proceeding, be deemed modified or eliminated from the provisions hereof.

4.    <u>Non-Solicitation</u>. During the Restricted Period, Employee will not, directly or indirectly, (i) solicit, induce, recruit, encourage, hire or engage, or assist any other person to solicit, induce, recruit, encourage, hire or engage, any of the Nortel Parties' employees, contractors or consultants (which contractors and/or consultants are natural persons) (each a "<u>Company Service Provider</u>"), or otherwise cause any Company Service Provider to cease or curtail his or her relationship with any Nortel Party, or (ii) solicit, induce, encourage, engage, or assist any other Person to solicit, induce, encourage or engage, any licensor, licensee, customer, or supplier of any Nortel Party that became or becomes known to Employee or with whom Employee worked or interacted while an employee, contractor or consultant of any Nortel Party, to change its business relationship with any Nortel Party in any manner that is detrimental to any Nortel Party.

5.    <u>Independence of Obligations</u>. The covenants and obligations of Employee set forth in this Agreement shall be construed as independent of any other agreement or arrangement between Employee, on the one hand, and any Nortel Party, on the other hand.

6.    <u>Condition of Purchase; Consideration</u>. Employee agrees that the covenants provided for in <u>Sections 3</u> and <u>4</u> are necessary and reasonable (i) in order to protect the Nortel

Parties in their conduct of the Restricted Business, (ii) for the utilization of their respective assets, tangible and intangible, including goodwill, (iii) to preserve and protect the tangible and intangible assets of the Nortel Parties, including the Company's goodwill, and (iv) in view of Nortel entering into the Stock Purchase Agreement and the payment rights granted to Employee under the Stock Purchase Agreement and this Agreement.

7.    <u>Non-Exclusivity</u>.  The rights and remedies of the parties hereunder are not exclusive of or limited by any other rights or remedies which any of them may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative (and not alternative). Without limiting the generality of the foregoing, the rights and remedies of the Nortel Parties hereunder, and the obligations and liabilities of Employee hereunder, are in addition to their respective rights, remedies, obligations and liabilities under the law of unfair competition, misappropriation of trade secrets, the obligations that employees owe to their employers and the like.  This Agreement does not limit Employee's obligations or the rights of the Company or Nortel under the terms of (a) the Confidentiality Agreement or (b) any other written agreement between Employee and any Nortel Party.  The term of the Restricted Period as it relates solely to the obligations of Employee set forth under this Agreement shall have no effect on the term of any other obligation that Employee may have to any Nortel Party under applicable Law or under the terms of any agreement (other than this Agreement), policy or arrangement to which Employee is subject.

8.    <u>Termination of Agreement if Stock Purchase does not Occur</u>.  This Agreement shall terminate and cease to have any further force or effect immediately upon the termination of the Stock Purchase Agreement pursuant to <u>Section 10.1</u> thereof.

9.    <u>Miscellaneous</u>.

(a)    <u>No Conflict</u>.  Employee represents that the execution and performance by Employee of this Agreement does not and will not conflict with or breach the terms of any other agreement by which Employee is bound.

(b)    <u>Waiver of Rights</u>.  No delay or omission by the Company or any other Nortel Party in exercising any right under this Agreement will operate as a waiver of that or any other right.  A waiver or consent given by the Company or any Nortel Party on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

(c)    <u>Equitable Remedies</u>.  Employee agrees that any breach or threatened breach by Employee of any covenant, obligation or other provision contained in this Agreement is likely to cause the Nortel Parties substantial and irreparable damage and therefore, in the event of any such breach, the Nortel Parties shall be entitled (in addition to any other remedy that may be available to them) to the extent permitted by applicable law to (a) a decree or order of specific performance to enforce the observance and performance of such covenant, obligation or other provision, and (b) an injunction restraining such breach or threatened breach.

(d)    Assignment. The Company or Nortel may assign this Agreement to (i) any other company or entity which acquires (whether by purchase, merger, consolidation or otherwise) all or substantially all of the business and/or assets of the Company and/or Nortel.

(e)    Notices. All notices or other communications given pursuant to this Agreement shall be in writing and shall be deemed given to a party when (a) delivered by hand or by a nationally recognized overnight courier service (costs prepaid) or (b) sent by registered or certified mail, postage prepaid, return receipt requested, in each case to the following:

If to Employee:                    The address set forth on the signature
                                   page to this Agreement

If to the Company or Nortel:       DiamondWare Ltd.
                                   4856 E. Baseline Rd. Ste. 101
                                   Mesa, AZ 85206
                                   Facsimile: (480) 380-1133

                                   With copies to:

                                   Nortel Networks Inc.
                                   2221 Lakeside Blvd.
                                   Richardson, TX, 75082
                                   Attention: Hyacinth G. DeAlmeida

                                   Nortel Networks Inc.
                                   195 The West Mall
                                   Toronto, Ontario M9C 5K1
                                   Attention: Douglas M. Parker, Esq.

or to such other address as the person to whom notice is given may have previously furnished to the other in writing in the manner set forth above.

(f)    Third Party Beneficiary. The Nortel Parties (other than Nortel and the Company) shall be third-party beneficiaries of this Agreement.

(g)    Governing Law; Jurisdiction. This Agreement will be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles that would require the application of any other law. Any action or proceeding arising out of or relating to this Agreement or any transaction contemplated hereby may be brought in the courts of the State of Arizona located in Phoenix, or, if it has or can acquire jurisdiction, in the United States District Court for the District of Arizona, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such action or proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the action or proceeding shall be heard and determined only in any such court and agrees not to bring any action or proceeding arising out of or relating to this Agreement or any transaction contemplated hereby in any other court.

(h)     <u>Effect of Partial Invalidity</u>.  Whenever possible, each provision of this Agreement shall be construed in such a manner as to be effective and valid under applicable Law.  Without limiting <u>Section 3(d)</u>, if any provision of this Agreement or the application thereof to any party or circumstance shall be prohibited by or invalid under applicable law, such provisions shall be ineffective to the extent of such prohibition without invalidating the remainder of such provision or any other provisions of this Agreement or the application of such provision to the other party or other circumstances.

(i)     <u>Entire Agreement</u>.  This Agreement, together with the Confidentiality Agreement, contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior oral and written agreements and understandings relating to such subject matter (including the Prior Agreement).

(j)     <u>Amendments</u>.  No amendment to this Agreement shall be effective unless it shall be in writing and signed by both parties hereto, and no waiver of any provision hereof shall be effective unless expressed in a writing signed by the party entitled to the benefits of such provision.

(k)     <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be considered one and the same agreement, and shall become effective when all such counterparts have been signed by each of the parties and delivered to the other party.  Any signature delivered by a facsimile machine shall be binding to the same extent as an original signature.

[Remainder of Page Intentionally Left Blank]

EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS IN THIS AGREEMENT.

IN WITNESS WHEREOF, this Agreement has been executed by each of the parties hereto as of the date first above written.

DIAMONDWARE, LTD.

By: _____
Name:  Joyce Weiner
Title:  Secretary and Authorized Signatory

NORTEL NETWORKS, INC.

By: _____
Name:  RON SAVINO
Title:  GLOBAL HR M&A PRIME

EMPLOYEE:

_____
Keith Weiner

Address:
19865 East Via del Palo
Queen Creek, AZ 85242

9

Global/Employee ID 5098057

## NON-COMPETITION & RETENTION BONUS AGREEMENT

This NON-COMPETITION & RETENTION BONUS AGREEMENT (this "Agreement") is made and entered into effective August 8, 2008, by and among DIAMONDWARE, LTD., an Arizona corporation (the "Company"), Nortel Networks Inc., a Delaware corporation ("Nortel"), and Rudy Mathieu ("Employee").

### RECITALS

A. The Company, Nortel and Keith Weiner, as Seller and as Holder Representative, have entered into a Stock Purchase Agreement, dated as of August 1, 2008 (the "Stock Purchase Agreement"), pursuant to which Nortel is acquiring all of the issued and outstanding shares of capital stock of the Company (the "Shares").

B. Employee holds certain options to acquire shares of capital stock of the Company; and at the Closing under the Stock Purchase Agreement, Employee will receive substantial cash consideration in exchange for the cancellation of such options.

C. Nortel believes that Employee is a key employee of the Company and an important contributor to its business. As a condition to its entering into the Stock Purchase Agreement, and to provide Employee with financial incentives to continue his employment with the Company, Nortel has required that the Company agree to pay retention bonuses to Employee subject to the terms and conditions set forth in this Agreement.

D. As a further condition to its entering into the Stock Purchase Agreement, and in order to preserve the value of the business being acquired by Nortel pursuant thereto, Nortel has required that Employee enter into this Agreement and thereby agree to abide by and comply with the non-competition and non-solicitation obligations set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties mutually agree as follows:

1. Definitions. As used in this Agreement, the following terms have the following meanings unless the context otherwise requires:

"Affiliate" means with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such first Person. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Cause" means (i) failure to substantially perform Employee's duties and responsibilities as an employee of the Nortel Parties (provided that such duties and

Global/Employee ID 5098057

responsibilities have been reasonably communicated to Employee in advance); (ii) any deliberate and substantial violation of a material written policy of the Nortel Parties applicable and made available to Employee; (iii) commission of any act of fraud, embezzlement or dishonesty that has caused or is reasonably expected to result in material damage or injury to any of the Nortel Parties; (iv) any material breach of any of Employee's material obligations under this Agreement or any other employment-related written agreement with any of the Nortel Parties (including the Confidentiality Agreements); (v) Employee is convicted of, or enters a plea of guilty or nolo contendere to, a felony offense (but excluding any felony traffic violation (including driving under the influence) which did not also involve criminal charges or otherwise constitute a violation of clause (vi) below); (vi) Employee knowingly uses illegal drugs or habitually consumes alcohol and such consumption causes material damage to the business or reputation of the Company; or (vii) any misconduct not described in (ii), (iii), (iv), (v) or (vi) that has caused material damage or injury to any of the Nortel Parties; *provided, however,* that in the event that a failure, commission or breach under (i), (ii), (iv) or (vii) above is reasonably capable of being cured within the Cure Period (defined below), such breach shall only constitute "Cause" if Employee is provided written notice from a Nortel Party of such failure, commission or breach and Employee does not cure such failure, commission or breach within thirty (30) days from the date of such notice ("Cure Period").

"Closing" and "Closing Date" have the meanings given to such terms in the Stock Purchase Agreement.

"Confidentiality Agreements" means the DiamondWare Employment Agreement effective as of November 22, 2003, and the Employee Proprietary Information and Inventions Agreement of even date herewith between Employee and DIAMONDWARE, LTD.

"Constructive Termination" means (i) a reduction in Employee's base salary on the Closing Date of more than ten percent (10%), except for a broad-based proportional reduction for all U.S. employees at the same level at Nortel, (ii) relocation of Employee's principal place of employment by more than thirty-five (35) miles from his then-current location of employment (provided that if more than one relocation occurs in the same twelve (12) month period, the mileage for each such relocation shall be measured from Employee's principal place of business at the beginning of such twelve month period), without his prior consent, (iii) a material breach of any obligations of any of the Nortel Parties under any employment-related agreement with Employee, or (iv) a material adverse diminution (without Employee's consent) in the nature or scope of Employee's employment-related duties and responsibilities (but excluding any such diminution made to address any inability of or failure by Employee to adequately and fully perform his employment-related duties or responsibilities), any of the foregoing of which is not cured on or before thirty (30) days following the date that Nortel receives written notice from Employee of such reduction in base salary, relocation, material breach or diminution. In order to make a claim of Constructive Termination, Employee must provide written notice to Nortel no later than thirty (30) days following the date of Employee's knowledge of the occurrence of such reduction in base salary, relocation, material breach or diminution.

"Designated Business" means the business conducted by the Company as of the Closing Date or any business of the Nortel Parties related to the development, production,

marketing, sale, licensing and/or delivery of 3D voice spatial audio or conferencing products or technology (or in another business of the Company or any other Nortel Party approved in advance in writing by Nortel).

"Nortel Parties" means collectively the Company, Nortel and all Affiliates of Nortel.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, government or governmental body or other entity.

"Restricted Business" means the business conducted by the Company as of the Closing Date and any business related to the development, production, marketing, sale, licensing and/or delivery of 3D voice spatial audio or conferencing products or technology that compete with any current or future products or technology of the Company, Nortel and/or any of its Affiliates at any time during the Restricted Period.

"Restricted Period" means the period ending on the later of (i) two years from the Closing Date or (ii) six months after cessation of Employee's employment with the Nortel Parties for any reason.

2.    Retention Bonus Payments.

(a)    Subject to the terms and provisions of this Section 2, the Company shall, and Nortel shall cause the Company to, pay Employee (i) a retention bonus equal to $60,000 on the payroll date immediately following the first anniversary of the Closing Date (the "First Bonus"), (ii) a retention bonus equal to $60,000 on the payroll date immediately following the second anniversary of the Closing Date (the "Second Bonus"), and (iii) a retention bonus equal to $60,000 on the payroll date immediately following the third anniversary of the Closing Date (the "Third Bonus" and together with the First Bonus and Second Bonus, the "Retention Bonuses"). The foregoing dates on which Retention Bonuses are to be paid are referred to as "Payment Dates."

(b)    Notwithstanding Section 2(a) or any other provision of this Agreement, subject to the terms and provisions hereof, the Company shall have no obligation to pay, Nortel shall have no obligation to cause the Company to pay, and Employee shall have no entitlement to receive, a given Retention Bonus if any of the following statements is not true as of the Payment Date with respect to the applicable Retention Bonus:

(i)    Either (A) Employee is actively employed on a full-time basis by any of the Nortel Parties in a Designated Business or (B) Employee's employment by the Nortel Parties has been terminated by any of the Nortel Parties other than for Cause and Employee has executed and not revoked a comprehensive release of claims against the Company and the other Nortel Parties in a form reasonably acceptable to Nortel (which release shall provide, among other things, that such release shall not apply to claims with respect to obligations of the Nortel Parties hereunder, the Transaction Documents and other written agreements with the Employee)] or (C) Employee's employment with the Nortel Parties has been terminated by Employee by reason of Constructive Termination; and

3

Global/Employee ID 5098057

(ii)    Employee (A) has complied in all material respects with all of the requirements set forth in Section 3 of this Agreement (and has not instituted or threatened to institute any legal proceeding to contest the enforceability of such requirements), (B) has complied in all material respects with the obligations set forth in the Confidentiality Agreements, (C) has not disclosed the terms contained in this Section 2 to any Person other than Employee's spouse, attorney, or professional tax or financial advisors who have a need to know such information, and (D) has not breached the terms of the General Release of even date herewith between Employee and the Company or otherwise sought to contest the enforceability or validity thereof.

(c)    Notwithstanding Section 2(a) or any other provision of this Agreement, if Employee takes a leave of absence (excluding vacation and sick days in accordance with applicable personnel policies) at any time during the twelve (12) month period preceding any Payment Date, the Retention Bonus to be paid to Employee on such Payment Date shall be reduced to be equal to the amount of the applicable Retention Bonus specified in Section 2(a) multiplied by a fraction, the numerator of which is the number of days during such period that Employee was not on a leave of absence and the denominator of which is 365.

(d)    The Company (or another Nortel Party) shall determine and withhold from each Retention Bonus the amount of any withholding or other federal, state or local Taxes, including, but not limited to, income or excise taxes, required to be withheld upon payment of any Retention Bonus.

3.    Non-Competition.

(a)    During the Restricted Period, except for Employee's service with and for one or more of the Nortel Parties, Employee will not (i) enter into or participate in the Restricted Business, whether acting alone or in conjunction with others, or (ii) directly or indirectly, whether alone or in conjunction with others, own, manage, operate, control or otherwise engage or participate in, or be connected as an owner, partner, principal, creditor, salesman, guarantor, advisor, member of the board of directors or other governing body of, employee or contractor of, consultant in, or service provider to or for the benefit of, any Person or business, or any division, group, or other subset of any Person or business, engaged (or to Employee's knowledge, planning to engage) in the Restricted Business.

(b)    Employee acknowledges that the Restricted Business conducted by the Nortel Parties is international in scope and their related products and services are designed to be utilized throughout the United States, Canada and other countries of the world. Accordingly, the restrictions set forth in this Section 3 shall be effective within all cities, counties and states of the United States, all cities and provinces in Canada and throughout all other countries in the world.

(c)    Notwithstanding the provisions of Sections 3(a) and (b) and the restrictions set forth therein, Employee may own equity securities in any publicly-held corporation or other publicly-held entity that is covered by the restrictions set forth in Sections 3(a) and (b), but (i) only to the extent that Employee does not own, of record or beneficially, more than 3% of the outstanding equity securities of such corporation and (ii) only if such

4

investment is a passive investment and Employee is not engaging in any other conduct that would constitute a violation of any provision of this Agreement.

(d)     The non-competition provisions of this Agreement shall be deemed to consist of a series of separate covenants, one for each line of the Restricted Business of the Nortel Parties and for each region included within the geographic area referred to above. The parties expressly agree that the character, duration and geographical scope of such provisions in this Agreement are reasonable in light of the circumstances as they exist on the date upon which this Agreement has been executed. However, should a determination nonetheless be made by a court of competent jurisdiction at a later date that the character, duration or geographical scope of such provisions, or the character or duration of the non-solicitation provisions in Section 4 below, in either case, is unreasonable in light of the circumstances as they then exist, then it is the intention and the agreement of Employee and the Company that such non-competition provisions of this Agreement shall be construed by the court in such a manner as to impose only those restrictions on the conduct of Employee which are reasonable in light of the circumstances as they then exist and as are necessary to assure the Nortel Parties of the intended benefits of this Agreement. If, in any judicial proceeding, a court shall refuse to enforce all of the separate covenants deemed included herein because, taken together they are more extensive than necessary to assure the Nortel Parties of the intended benefit of such non-competition and non-solicitation provisions, it is expressly understood and agreed between the parties hereto that those of such covenants which, if modified or eliminated, would permit the separate covenants or remaining separate covenants, as applicable, to be enforced in such proceeding shall, for the purpose of such proceeding, be deemed modified or eliminated from the provisions hereof.

4.     Non-Solicitation. During the Restricted Period, Employee will not, directly or indirectly, (i) solicit, induce, recruit, encourage, hire or engage, or assist any other person to solicit, induce, recruit, encourage, hire or engage, any of the Nortel Parties' employees, contractors or consultants (which contractors and/or consultants are natural persons) (each a "Company Service Provider"), or otherwise cause any Company Service Provider to cease or curtail his or her relationship with any Nortel Party, or (ii) solicit, induce, encourage, engage, or assist any other Person to solicit, induce, encourage or engage, any licensor, licensee, customer, or supplier of any Nortel Party that became or becomes known to Employee or with whom Employee worked or interacted while an employee, contractor or consultant of any Nortel Party, to change its business relationship with any Nortel Party in any manner that is detrimental to any Nortel Party.

5.     Independence of Obligations. The covenants and obligations of Employee set forth in this Agreement shall be construed as independent of any other agreement or arrangement between Employee, on the one hand, and any Nortel Party, on the other hand.

6.     Condition of Purchase; Consideration. Employee agrees that the covenants provided for in Sections 3 and 4 are necessary and reasonable (i) in order to protect the Nortel Parties in their conduct of the Restricted Business, (ii) for the utilization of their respective assets, tangible and intangible, including goodwill, (iii) to preserve and protect the tangible and intangible assets of the Nortel Parties, including the Company's goodwill, and (iv) in view of Nortel entering into the Stock Purchase Agreement and the payment rights granted to Employee under the Stock Purchase Agreement and this Agreement.

Global/Employee ID 5098057

7.    Non-Exclusivity. The rights and remedies of the parties hereunder are not exclusive of or limited by any other rights or remedies which any of them may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative (and not alternative). Without limiting the generality of the foregoing, the rights and remedies of the Nortel Parties hereunder, and the obligations and liabilities of Employee hereunder, are in addition to their respective rights, remedies, obligations and liabilities under the law of unfair competition, misappropriation of trade secrets, the obligations that employees owe to their employers and the like. This Agreement does not limit Employee's obligations or the rights of the Company or Nortel under the terms of (a) the Confidentiality Agreements, (b) the Option Termination Agreement to be entered into by the Employee and the Company prior to the Closing, or (c) any other written agreement between Employee and any Nortel Party. The term of the Restricted Period as it relates solely to the obligations of Employee set forth under this Agreement shall have no effect on the term of any other obligation that Employee may have to any Nortel Party under applicable Law or under the terms of any agreement (other than this Agreement), policy or arrangement to which Employee is subject.

8.    Termination of Agreement if Stock Purchase does not Occur. This Agreement shall terminate and cease to have any further force or effect immediately upon the termination of the Stock Purchase Agreement pursuant to Section 10.1 thereof.

9.    Miscellaneous.

(a)    No Conflict. Employee represents that the execution and performance by Employee of this Agreement does not and will not conflict with or breach the terms of any other agreement by which Employee is bound.

(b)    Waiver of Rights. No delay or omission by the Company or any other Nortel Party in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company or any Nortel Party on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

(c)    Equitable Remedies. Employee agrees that any breach or threatened breach by Employee of any covenant, obligation or other provision contained in this Agreement is likely to cause the Nortel Parties substantial and irreparable damage and therefore, in the event of any such breach, the Nortel Parties shall be entitled (in addition to any other remedy that may be available to them) to the extent permitted by applicable law to (a) a decree or order of specific performance to enforce the observance and performance of such covenant, obligation or other provision, and (b) an injunction restraining such breach or threatened breach.

(d)    Assignment. The Company or Nortel may assign this Agreement to (i) any other company or entity which acquires (whether by purchase, merger, consolidation or otherwise) all or substantially all of the business and/or assets of the Company and/or Nortel.

(e)    Notices. All notices or other communications given pursuant to this Agreement shall be in writing and shall be deemed given to a party when (a) delivered by hand

6

Global/Employee ID 5098057

or by a nationally recognized overnight courier service (costs prepaid) or (b) sent by registered or certified mail, postage prepaid, return receipt requested, in each case to the following:

If to Employee:                    The address set forth on the signature
                                   page to this Agreement

If to the Company or Nortel:       DiamondWare, Ltd.
                                   4856 E. Baseline Rd. Ste. 101
                                   Mesa, AZ 85206
                                   Facsimile: (480) 380-1133

                                   With copies to:

                                   Nortel Networks Inc.
                                   2221 Lakeside Blvd.
                                   Richardson, TX, 75082
                                   Attention: Hyacinth G. DeAlmeida

                                   Nortel Networks Inc.
                                   Suite 300
                                   220 Athens Way
                                   Nashville TN 37228
                                   Attention: Corporate Secretary

or to such other address as the person to whom notice is given may have previously furnished to the other in writing in the manner set forth above.

(f)    Third Party Beneficiary. The Nortel Parties (other than Nortel and the Company) shall be third-party beneficiaries of this Agreement.

(g)    Governing Law; Jurisdiction. This Agreement will be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles that would require the application of any other law. Any action or proceeding arising out of or relating to this Agreement or any transaction contemplated hereby may be brought in the courts of the State of Arizona located in Phoenix, or, if it has or can acquire jurisdiction, in the United States District Court for the District of Arizona, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such action or proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the action or proceeding shall be heard and determined only in any such court and agrees not to bring any action or proceeding arising out of or relating to this Agreement or any transaction contemplated hereby in any other court.

(h)    Effect of Partial Invalidity. Whenever possible, each provision of this Agreement shall be construed in such a manner as to be effective and valid under applicable Law. Without limiting Section 3(d), if any provision of this Agreement or the application

7

Global/Employee ID 5098057

thereof to any party or circumstance shall be prohibited by or invalid under applicable law, such provisions shall be ineffective to the extent of such prohibition without invalidating the remainder of such provision or any other provisions of this Agreement or the application of such provision to the other party or other circumstances.

(i)    Entire Agreement. This Agreement, together with the Confidentiality Agreements, contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior oral and written agreements and understandings relating to such subject matter.

(j)    Amendments. No amendment to this Agreement shall be effective unless it shall be in writing and signed by both parties hereto, and no waiver of any provision hereof shall be effective unless expressed in a writing signed by the party entitled to the benefits of such provision.

(k)    Counterparts. This Agreement may be executed in counterparts, each of which shall be considered one and the same agreement, and shall become effective when all such counterparts have been signed by each of the parties and delivered to the other party. Any signature delivered by a facsimile machine shall be binding to the same extent as an original signature.

[Remainder of Page Intentionally Left Blank]

8

Global/Employee ID 5098057

EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS IN THIS AGREEMENT.

IN WITNESS WHEREOF, this Agreement has been executed by each of the parties hereto as of the date first above written.

DIAMONDWARE, LTD.

By: _____

Name: Keith Weiner

Title: CEO

NORTEL NETWORKS INC.

By: _____

Name: HUMAN RESOURCES

Title: RON SAVINO

EMPLOYEE

_____

Rudy Mathieu

Address:

1074 W 20th Ave,
Apache Junction, AZ
85220

9

## NON-COMPETITION & RETENTION BONUS AGREEMENT

This NON-COMPETITION & RETENTION BONUS AGREEMENT (this "Agreement") is made and entered into effective August 8, 2008, by and among DIAMONDWARE, LTD., an Arizona corporation (the "Company"), Nortel Networks Inc., a Delaware corporation ("Nortel"), and Wendell Allen Neff ("Employee").

### RECITALS

A.      The Company, Nortel and Keith Weiner, as Seller and as Holder Representative, have entered into a Stock Purchase Agreement, dated as of August 1, 2008 (the "Stock Purchase Agreement"), pursuant to which Nortel is acquiring all of the issued and outstanding shares of capital stock of the Company (the "Shares").

B.      Employee holds certain options to acquire shares of capital stock of the Company; and at the Closing under the Stock Purchase Agreement, Employee will receive substantial cash consideration in exchange for the cancellation of such options.

C.      Nortel believes that Employee is a key employee of the Company and an important contributor to its business.  As a condition to its entering into the Stock Purchase Agreement, and to provide Employee with financial incentives to continue his employment with the Company, Nortel has required that the Company agree to pay retention bonuses to Employee subject to the terms and conditions set forth in this Agreement.

D.      As a further condition to its entering into the Stock Purchase Agreement, and in order to preserve the value of the business being acquired by Nortel pursuant thereto, Nortel has required that Employee enter into this Agreement and thereby agree to abide by and comply with the non-competition and non-solicitation obligations set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties mutually agree as follows:

1.      Definitions.  As used in this Agreement, the following terms have the following meanings unless the context otherwise requires:

"Affiliate" means with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such first Person.  The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Cause" means (i) failure to substantially perform Employee's duties and responsibilities as an employee of the Nortel Parties (provided that such duties and

responsibilities have been reasonably communicated to Employee in advance); (ii) any deliberate and substantial violation of a material written policy of the Nortel Parties applicable and made available to Employee; (iii) commission of any act of fraud, embezzlement or dishonesty that has caused or is reasonably expected to result in material damage or injury to any of the Nortel Parties; (iv) any material breach of any of Employee's material obligations under this Agreement or any other employment-related written agreement with any of the Nortel Parties (including the Confidentiality Agreements); (v) Employee is convicted of, or enters a plea of guilty or nolo contendere to, a felony offense (but excluding any felony traffic violation (including driving under the influence) which did not also involve criminal charges or otherwise constitute a violation of clause (vi) below); (vi) Employee knowingly uses illegal drugs or habitually consumes alcohol and such consumption causes material damage to the business or reputation of the Company; or (vii) any misconduct not described in (ii), (iii), (iv), (v) or (vi) that has caused material damage or injury to any of the Nortel Parties; *provided, however,* that in the event that a failure, commission or breach under (i), (ii), (iv) or (vii) above is reasonably capable of being cured within the Cure Period (defined below), such breach shall only constitute "Cause" if Employee is provided written notice from a Nortel Party of such failure, commission or breach and Employee does not cure such failure, commission or breach within thirty (30) days from the date of such notice ("Cure Period").

"Closing" and "Closing Date" have the meanings given to such terms in the Stock Purchase Agreement.

"Confidentiality Agreements" means the DiamondWare Software Engineer Employment Agreement effective as of August 28, 2000, and the Employee Proprietary Information and Inventions Agreement of even date herewith between Employee and DIAMONDWARE, LTD.

"Constructive Termination" means (i) a reduction in Employee's base salary on the Closing Date of more than ten percent (10%), except for a broad-based proportional reduction for all U.S. employees at the same level at Nortel, (ii) relocation of Employee's principal place of employment by more than thirty-five (35) miles from his then-current location of employment (provided that if more than one relocation occurs in the same twelve (12) month period, the mileage for each such relocation shall be measured from Employee's principal place of business at the beginning of such twelve month period), without his prior consent, (iii) a material breach of any obligations of any of the Nortel Parties under any employment-related agreement with Employee, or (iv) a material adverse diminution (without Employee's consent) in the nature or scope of Employee's employment-related duties and responsibilities (but excluding any such diminution made to address any inability of or failure by Employee to adequately and fully perform his employment-related duties or responsibilities), any of the foregoing of which is not cured on or before thirty (30) days following the date that Nortel receives written notice from Employee of such reduction in base salary, relocation, material breach or diminution. In order to make a claim of Constructive Termination, Employee must provide written notice to Nortel no later than thirty (30) days following the date of Employee's knowledge of the occurrence of such reduction in base salary, relocation, material breach or diminution.

2

"Designated Business" means the business conducted by the Company as of the Closing Date or any business of the Nortel Parties related to the development, production, marketing, sale, licensing and/or delivery of 3D voice spatial audio or conferencing products or technology (or in another business of the Company or any other Nortel Party approved in advance in writing by Nortel).

"Nortel Parties" means collectively the Company, Nortel and all Affiliates of Nortel.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, government or governmental body or other entity.

"Restricted Business" means the business conducted by the Company as of the Closing Date and any business related to the development, production, marketing, sale, licensing and/or delivery of 3D voice spatial audio or conferencing products or technology that compete with any current or future products or technology of the Company, Nortel and/or any of its Affiliates at any time during the Restricted Period.

"Restricted Period" means the period ending on the later of (i) two years from the Closing Date or (ii) six months after cessation of Employee's employment with the Nortel Parties for any reason.

2.    Retention Bonus Payments.

(a)    Subject to the terms and provisions of this Section 2, the Company shall, and Nortel shall cause the Company to, pay Employee (i) a retention bonus equal to $20,000 on the payroll date immediately following the first anniversary of the Closing Date (the "First Bonus"), (ii) a retention bonus equal to $20,000 on the payroll date immediately following the second anniversary of the Closing Date (the "Second Bonus"), and (iii) a retention bonus equal to $20,000 on the payroll date immediately following the third anniversary of the Closing Date (the "Third Bonus" and together with the First Bonus and Second Bonus, the "Retention Bonuses"). The foregoing dates on which Retention Bonuses are to be paid are referred to as "Payment Dates."

(b)    Notwithstanding Section 2(a) or any other provision of this Agreement, subject to the terms and provisions hereof, the Company shall have no obligation to pay, Nortel shall have no obligation to cause the Company to pay, and Employee shall have no entitlement to receive, a given Retention Bonus if any of the following statements is not true as of the Payment Date with respect to the applicable Retention Bonus:

(i)    Either (A) Employee is actively employed on a full-time basis by any of the Nortel Parties in a Designated Business or (B) Employee's employment with the Nortel Parties has been terminated by any of the Nortel Parties other than for Cause and Employee has executed and not revoked a comprehensive release of claims against the Company and the other Nortel Parties in a form reasonably acceptable to Nortel (which release shall provide, among other things, that such release shall not apply to claims with respect to obligations of the Nortel Parties hereunder, the Transaction Documents and other written

3

agreements with the Employee)] or (C) Employee's employment with the Nortel Parties has been terminated by Employee by reason of Constructive Termination; and

(ii)    Employee (A) has complied in all material respects with all of the requirements set forth in Section 3 of this Agreement (and has not instituted or threatened to institute any legal proceeding to contest the enforceability of such requirements), (B) has complied in all material respects with the obligations set forth in the Confidentiality Agreements, (C) has not disclosed the terms contained in this Section 2 to any Person other than Employee's spouse, attorney, or professional tax or financial advisors who have a need to know such information, and (D) has not breached the terms of the General Release of even date herewith between Employee and the Company or otherwise sought to contest the enforceability or validity thereof.

(c)    Notwithstanding Section 2(a) or any other provision of this Agreement, if Employee takes a leave of absence (excluding vacation and sick days in accordance with applicable personnel policies) at any time during the twelve (12) month period preceding any Payment Date, the Retention Bonus to be paid to Employee on such Payment Date shall be reduced to be equal to the amount of the applicable Retention Bonus specified in Section 2(a) multiplied by a fraction, the numerator of which is the number of days during such period that Employee was not on a leave of absence and the denominator of which is 365.

(d)    The Company (or another Nortel Party) shall determine and withhold from each Retention Bonus the amount of any withholding or other federal, state or local Taxes, including, but not limited to, income or excise taxes, required to be withheld upon payment of any Retention Bonus.

3.    Non-Competition.

(a)    During the Restricted Period, except for Employee's service with and for one or more of the Nortel Parties, Employee will not (i) enter into or participate in the Restricted Business, whether acting alone or in conjunction with others, or (ii) directly or indirectly, whether alone or in conjunction with others, own, manage, operate, control or otherwise engage or participate in, or be connected as an owner, partner, principal, creditor, salesman, guarantor, advisor, member of the board of directors or other governing body of, employee or contractor of, consultant in, or service provider to or for the benefit of, any Person or business, or any division, group, or other subset of any Person or business, engaged (or to Employee's knowledge, planning to engage) in the Restricted Business.

(b)    Employee acknowledges that the Restricted Business conducted by the Nortel Parties is international in scope and their related products and services are designed to be utilized throughout the United States, Canada and other countries of the world. Accordingly, the restrictions set forth in this Section 3 shall be effective within all cities, counties and states of the United States, all cities and provinces in Canada and throughout all other countries in the world.

(c)    Notwithstanding the provisions of Sections 3(a) and (b) and the restrictions set forth therein, Employee may own equity securities in any publicly-held corporation or other publicly-held entity that is covered by the restrictions set forth in Sections

4

3(a) and (b), but (i) only to the extent that Employee does not own, of record or beneficially, more than 3% of the outstanding equity securities of such corporation and (ii) only if such investment is a passive investment and Employee is not engaging in any other conduct that would constitute a violation of any provision of this Agreement.

(d)    The non-competition provisions of this Agreement shall be deemed to consist of a series of separate covenants, one for each line of the Restricted Business of the Nortel Parties and for each region included within the geographic area referred to above. The parties expressly agree that the character, duration and geographical scope of such provisions in this Agreement are reasonable in light of the circumstances as they exist on the date upon which this Agreement has been executed. However, should a determination nonetheless be made by a court of competent jurisdiction at a later date that the character, duration or geographical scope of such provisions, or the character or duration of the non-solicitation provisions in Section 4 below, in either case, is unreasonable in light of the circumstances as they then exist, then it is the intention and the agreement of Employee and the Company that such non-competition provisions of this Agreement shall be construed by the court in such manner as to impose only those restrictions on the conduct of Employee which are reasonable in light of the circumstances as they then exist and as are necessary to assure the Nortel Parties of the intended benefits of this Agreement. If, in any judicial proceeding, a court shall refuse to enforce all of the separate covenants deemed included herein because, taken together they are more extensive than necessary to assure the Nortel Parties of the intended benefit of such non-competition and non-solicitation provisions, it is expressly understood and agreed between the parties hereto that those of such covenants which, if modified or eliminated, would permit the separate covenants or remaining separate covenants, as applicable, to be enforced in such proceeding shall, for the purpose of such proceeding, be deemed modified or eliminated from the provisions hereof.

4.    <u>Non-Solicitation</u>. During the Restricted Period, Employee will not, directly or indirectly, (i) solicit, induce, recruit, encourage, hire or engage, or assist any other person to solicit, induce, recruit, encourage, hire or engage, any of the Nortel Parties' employees, contractors or consultants (which contractors and/or consultants are natural persons) (each a "<u>Company Service Provider</u>"), or otherwise cause any Company Service Provider to cease or curtail his or her relationship with any Nortel Party, or (ii) solicit, induce, encourage, engage, or assist any other Person to solicit, induce, encourage or engage, any licensor, licensee, customer, or supplier of any Nortel Party that became or becomes known to Employee or with whom Employee worked or interacted while an employee, contractor or consultant of any Nortel Party, to change its business relationship with any Nortel Party in any manner that is detrimental to any Nortel Party.

5.    <u>Independence of Obligations</u>. The covenants and obligations of Employee set forth in this Agreement shall be construed as independent of any other agreement or arrangement between Employee, on the one hand, and any Nortel Party, on the other hand.

6.    <u>Condition of Purchase; Consideration</u>. Employee agrees that the covenants provided for in <u>Sections 3</u> and <u>4</u> are necessary and reasonable (i) in order to protect the Nortel Parties in their conduct of the Restricted Business, (ii) for the utilization of their respective assets, tangible and intangible, including goodwill, (iii) to preserve and protect the tangible and intangible assets of the Nortel Parties, including the Company's goodwill, and (iv) in view of

5

Nortel entering into the Stock Purchase Agreement and the payment rights granted to Employee under the Stock Purchase Agreement and this Agreement.

7.    Non-Exclusivity.  The rights and remedies of the parties hereunder are not exclusive of or limited by any other rights or remedies which any of them may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative (and not alternative). Without limiting the generality of the foregoing, the rights and remedies of the Nortel Parties hereunder, and the obligations and liabilities of Employee hereunder, are in addition to their respective rights, remedies, obligations and liabilities under the law of unfair competition, misappropriation of trade secrets, the obligations that employees owe to their employers and the like.  This Agreement does not limit Employee's obligations or the rights of the Company or Nortel under the terms of (a) the Confidentiality Agreements, (b) the Option Termination Agreement to be entered into by the Employee and the Company prior to the Closing, or (c) any other written agreement between Employee and any Nortel Party.  The term of the Restricted Period as it relates solely to the obligations of Employee set forth under this Agreement shall have no effect on the term of any other obligation that Employee may have to any Nortel Party under applicable Law or under the terms of any agreement (other than this Agreement), policy or arrangement to which Employee is subject.

8.    Termination of Agreement if Stock Purchase does not Occur.  This Agreement shall terminate and cease to have any further force or effect immediately upon the termination of the Stock Purchase Agreement pursuant to Section 10.1 thereof.

9.    Miscellaneous.

(a)    No Conflict.  Employee represents that the execution and performance by Employee of this Agreement does not and will not conflict with or breach the terms of any other agreement by which Employee is bound.

(b)    Waiver of Rights.  No delay or omission by the Company or any other Nortel Party in exercising any right under this Agreement will operate as a waiver of that or any other right.  A waiver or consent given by the Company or any Nortel Party on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

(c)    Equitable Remedies.  Employee agrees that any breach or threatened breach by Employee of any covenant, obligation or other provision contained in this Agreement is likely to cause the Nortel Parties substantial and irreparable damage and therefore, in the event of any such breach, the Nortel Parties shall be entitled (in addition to any other remedy that may be available to them) to the extent permitted by applicable law to (a) a decree or order of specific performance to enforce the observance and performance of such covenant, obligation or other provision, and (b) an injunction restraining such breach or threatened breach.

(d)    Assignment.  The Company or Nortel may assign this Agreement to (i) any other company or entity which acquires (whether by purchase, merger, consolidation or otherwise) all or substantially all of the business and/or assets of the Company and/or Nortel.

(e)    Notices.  All notices or other communications given pursuant to this Agreement shall be in writing and shall be deemed given to a party when (a) delivered by hand or by a nationally recognized overnight courier service (costs prepaid) or (b) sent by registered or certified mail, postage prepaid, return receipt requested, in each case to the following:

If to Employee:    The address set forth on the signature
    page to this Agreement

If to the Company or Nortel:    DiamondWare, Ltd.
    4856 E. Baseline Rd. Ste. 101
    Mesa, AZ 85206
    Facsimile:  (480) 380-1133

    With copies to:

    Nortel Networks Inc.
    2221 Lakeside Blvd.
    Richardson, TX, 75082
    Attention:  Hyacinth G. DeAlmeida

    Nortel Networks Inc.
    Suite 300
    220 Athens Way
    Nashville TN 37228
    Attention:  Corporate Secretary

or to such other address as the person to whom notice is given may have previously furnished to the other in writing in the manner set forth above.

(f)    Third Party Beneficiary.  The Nortel Parties (other than Nortel and the Company) shall be third-party beneficiaries of this Agreement.

(g)    Governing Law; Jurisdiction.  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles that would require the application of any other law.  Any action or proceeding arising out of or relating to this Agreement or any transaction contemplated hereby may be brought in the courts of the State of Arizona located in Phoenix, or, if it has or can acquire jurisdiction, in the United States District Court for the District of Arizona, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such action or proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the action or proceeding shall be heard and determined only in any such court and agrees not to bring any action or proceeding arising out of or relating to this Agreement or any transaction contemplated hereby in any other court.

7

(h)    Effect of Partial Invalidity.  Whenever possible, each provision of this Agreement shall be construed in such a manner as to be effective and valid under applicable Law.  Without limiting Section 3(d), if any provision of this Agreement or the application thereof to any party or circumstance shall be prohibited by or invalid under applicable law, such provisions shall be ineffective to the extent of such prohibition without invalidating the remainder of such provision or any other provisions of this Agreement or the application of such provision to the other party or other circumstances.

(i)    Entire Agreement.  This Agreement, together with the Confidentiality Agreements, contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior oral and written agreements and understandings relating to such subject matter.

(j)    Amendments.  No amendment to this Agreement shall be effective unless it shall be in writing and signed by both parties hereto, and no waiver of any provision hereof shall be effective unless expressed in a writing signed by the party entitled to the benefits of such provision.

(k)    Counterparts.  This Agreement may be executed in counterparts, each of which shall be considered one and the same agreement, and shall become effective when all such counterparts have been signed by each of the parties and delivered to the other party.  Any signature delivered by a facsimile machine shall be binding to the same extent as an original signature.

[Remainder of Page Intentionally Left Blank]

8

EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS IN THIS AGREEMENT.

IN WITNESS WHEREOF, this Agreement has been executed by each of the parties hereto as of the date first above written.

DIAMONDWARE, LTD.

By: _____
   Name: _Keith Weihe_
   Title: _CEO_

NORTEL NETWORKS INC.

By: _____
   Name: _RONALD P. SAVINO_
   Title: _HUMAN Resources_

EMPLOYEE

_____

Wendell Allen Neff

Address:

_1361 South Greenfield Rd. #1074_
_Mesa, AZ 85206_

9

Emp ID 5098053

## NON-COMPETITION & RETENTION BONUS AGREEMENT

This NON-COMPETITION & RETENTION BONUS AGREEMENT (this "Agreement") is made and entered effective August 8, 2008, by and among DIAMONDWARE, LTD., an Arizona corporation (the "Company"), Nortel Networks Inc., a Delaware corporation ("Nortel"), and Charles Rowe ("Employee").

### RECITALS

A.    The Company, Nortel and Keith Weiner, as Seller and as Holder Representative, have entered into a Stock Purchase Agreement, dated as of August 1, 2008 (the "Stock Purchase Agreement"), pursuant to which Nortel is acquiring all of the issued and outstanding shares of capital stock of the Company (the "Shares").

B.    Employee holds certain options to acquire shares of capital stock of the Company; and at the Closing under the Stock Purchase Agreement, Employee will receive substantial cash consideration in exchange for the cancellation of such options.

C.    Nortel believes that Employee is a key employee of the Company and an important contributor to its business.  As a condition to its entering into the Stock Purchase Agreement, and to provide Employee with financial incentives to continue his employment with the Company, Nortel has required that the Company agree to pay retention bonuses to Employee subject to the terms and conditions set forth in this Agreement.

D.    As a further condition to its entering into the Stock Purchase Agreement, and in order to preserve the value of the business being acquired by Nortel pursuant thereto, Nortel has required that Employee enter into this Agreement and thereby agree to abide by and comply with the non-competition and non-solicitation obligations set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties mutually agree as follows:

1.    Definitions.  As used in this Agreement, the following terms have the following meanings unless the context otherwise requires:

"Affiliate" means with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such first Person.  The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Cause" means (i) failure to substantially perform Employee's duties and responsibilities as an employee of the Nortel Parties (provided that such duties and

responsibilities have been reasonably communicated to Employee in advance); (ii) any deliberate and substantial violation of a material written policy of the Nortel Parties applicable and made available to Employee; (iii) commission of any act of fraud, embezzlement or dishonesty that has caused or is reasonably expected to result in material damage or injury to any of the Nortel Parties; (iv) any material breach of any of Employee's material obligations under this Agreement or any other employment-related written agreement with any of the Nortel Parties (including the Confidentiality Agreements); (v) Employee is convicted of, or enters a plea of guilty or nolo contendere to, a felony offense (but excluding any felony traffic violation (including driving under the influence) which did not also involve criminal charges or otherwise constitute a violation of clause (vi) below); (vi) Employee knowingly uses illegal drugs or habitually consumes alcohol and such consumption causes material damage to the business or reputation of the Company; or (vii) any misconduct not described in (ii), (iii), (iv), (v) or (vi) that has caused material damage or injury to any of the Nortel Parties; *provided, however*, that in the event that a failure, commission or breach under (i), (ii), (iv) or (vii) above is reasonably capable of being cured within the Cure Period (defined below), such breach shall only constitute "Cause" if Employee is provided written notice from a Nortel Party of such failure, commission or breach and Employee does not cure such failure, commission or breach within thirty (30) days from the date of such notice ("Cure Period").

"Closing" and "Closing Date" have the meanings given to such terms in the Stock Purchase Agreement.

"Confidentiality Agreements" means the DiamondWare Employment Agreement effective as of March 11, 2005, and the Employee Proprietary Information and Inventions Agreement of even date herewith between Employee and DIAMONDWARE, LTD.

"Constructive Termination" means (i) a reduction in Employee's base salary on the Closing Date of more than ten percent (10%), except for a broad-based proportional reduction for all U.S. employees at the same level at Nortel, (ii) relocation of Employee's principal place of employment by more than thirty-five (35) miles from his then-current location of employment (provided that if more than one relocation occurs in the same twelve (12) month period, the mileage for each such relocation shall be measured from Employee's principal place of business at the beginning of such twelve month period), without his prior consent, (iii) a material breach of any obligations of any of the Nortel Parties under any employment-related agreement with Employee, or (iv) a material adverse diminution (without Employee's consent) in the nature or scope of Employee's employment-related duties and responsibilities (but excluding any such diminution made to address any inability of or failure by Employee to adequately and fully perform his employment-related duties or responsibilities), any of the foregoing of which is not cured on or before thirty (30) days following the date that Nortel receives written notice from Employee of such reduction in base salary, relocation, material breach or diminution. In order to make a claim of Constructive Termination, Employee must provide written notice to Nortel no later than thirty (30) days following the date of Employee's knowledge of the occurrence of such reduction in base salary, relocation, material breach or diminution.

"Designated Business" means the business conducted by the Company as of the Closing Date or any business of the Nortel Parties related to the development, production,

marketing, sale, licensing and/or delivery of 3D voice spatial audio or conferencing products or technology (or in another business of the Company or any other Nortel Party approved in advance in writing by Nortel).

"Nortel Parties" means collectively the Company, Nortel and all Affiliates of Nortel.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, government or governmental body or other entity.

"Restricted Business" means the business conducted by the Company as of the Closing Date and any business related to the development, production, marketing, sale, licensing and/or delivery of 3D voice spatial audio or conferencing products or technology that compete with any current or future products or technology of the Company, Nortel and/or any of its Affiliates at any time during the Restricted Period.

"Restricted Period" means the period ending on the later of (i) two years from the Closing Date or (ii) six months after cessation of Employee's employment with the Nortel Parties for any reason.

2.   Retention Bonus Payments.

(a)   Subject to the terms and provisions of this Section 2, the Company shall, and Nortel shall cause the Company to, pay Employee (i) a retention bonus equal to $60,000 on the payroll date immediately following the first anniversary of the Closing Date (the "First Bonus"), (ii) a retention bonus equal to $60,000 on the payroll date immediately following the second anniversary of the Closing Date (the "Second Bonus"), and (iii) a retention bonus equal to $60,000 on the payroll date immediately following the third anniversary of the Closing Date (the "Third Bonus" and together with the First Bonus and Second Bonus, the "Retention Bonuses"). The foregoing dates on which Retention Bonuses are to be paid are referred to as "Payment Dates."

(b)   Notwithstanding Section 2(a) or any other provision of this Agreement, subject to the terms and provisions hereof, the Company shall have no obligation to pay, Nortel shall have no obligation to cause the Company to pay, and Employee shall have no entitlement to receive, a given Retention Bonus if any of the following statements is not true as of the Payment Date with respect to the applicable Retention Bonus:

(i)   Either (A) Employee is actively employed on a full-time basis by any of the Nortel Parties in a Designated Business or (B) Employee's employment with the Nortel Parties has been terminated by any of the Nortel Parties other than for Cause and Employee has executed and not revoked a comprehensive release of claims against the Company and the other Nortel Parties in a form reasonably acceptable to Nortel (which release shall provide, among other things, that such release shall not apply to claims with respect to obligations of the Nortel Parties hereunder, the Transaction Documents and other written agreements with the Employee)) or (C) Employee's employment with the Nortel Parties has been terminated by Employee by reason of Constructive Termination; and

3

(ii)     Employee (A) has complied in all material respects with all of the requirements set forth in Section 3 of this Agreement (and has not instituted or threatened to institute any legal proceeding to contest the enforceability of such requirements), (B) has complied in all material respects with the obligations set forth in the Confidentiality Agreements, (C) has not disclosed the terms contained in this Section 2 to any Person other than Employee's spouse, attorney, or professional tax or financial advisors who have a need to know such information, and (D) has not breached the terms of the General Release of even date herewith between Employee and the Company or otherwise sought to contest the enforceability or validity thereof.

(c)     Notwithstanding Section 2(a) or any other provision of this Agreement, if Employee takes a leave of absence (excluding vacation and sick days in accordance with applicable personnel policies) at any time during the twelve (12) month period preceding any Payment Date, the Retention Bonus to be paid to Employee on such Payment Date shall be reduced to be equal to the amount of the applicable Retention Bonus specified in Section 2(a) multiplied by a fraction, the numerator of which is the number of days during such period that Employee was not on a leave of absence and the denominator of which is 365.

(d)     The Company (or another Nortel Party) shall determine and withhold from each Retention Bonus the amount of any withholding or other federal, state or local Taxes, including, but not limited to, income or excise taxes, required to be withheld upon payment of any Retention Bonus.

3.     Non-Competition.

(a)     During the Restricted Period, except for Employee's service with and for one or more of the Nortel Parties, Employee will not (i) enter into or participate in the Restricted Business, whether acting alone or in conjunction with others, or (ii) directly or indirectly, whether alone or in conjunction with others, own, manage, operate, control or otherwise engage or participate in, or be connected as an owner, partner, principal, creditor, salesman, guarantor, advisor, member of the board of directors or other governing body of, employee or contractor of, consultant in, or service provider to or for the benefit of, any Person or business, or any division, group, or other subset of any Person or business, engaged (or to Employee's knowledge, planning to engage) in the Restricted Business.

(b)     Employee acknowledges that the Restricted Business conducted by the Nortel Parties is international in scope and their related products and services are designed to be utilized throughout the United States, Canada and other countries of the world. Accordingly, the restrictions set forth in this Section 3 shall be effective within all cities, counties and states of the United States, all cities and provinces in Canada and throughout all other countries in the world.

(c)     Notwithstanding the provisions of Sections 3(a) and (b) and the restrictions set forth therein, Employee may own equity securities in any publicly-held corporation or other publicly-held entity that is covered by the restrictions set forth in Sections 3(a) and (b), but (i) only to the extent that Employee does not own, of record or beneficially, more than 3% of the outstanding equity securities of such corporation and (ii) only if such

investment is a passive investment and Employee is not engaging in any other conduct that would constitute a violation of any provision of this Agreement.

(d)   The non-competition provisions of this Agreement shall be deemed to consist of a series of separate covenants, one for each line of the Restricted Business of the Nortel Parties and for each region included within the geographic area referred to above. The parties expressly agree that the character, duration and geographical scope of such provisions in this Agreement are reasonable in light of the circumstances as they exist on the date upon which this Agreement has been executed. However, should a determination nonetheless be made by a court of competent jurisdiction at a later date that the character, duration or geographical scope of such provisions, or the character or duration of the non-solicitation provisions in Section 4 below, in either case, is unreasonable in light of the circumstances as they then exist, then it is the intention and the agreement of Employee and the Company that such non-competition provisions of this Agreement shall be construed by the court in such manner as to impose only those restrictions on the conduct of Employee which are reasonable in light of the circumstances as they then exist and as are necessary to assure the Nortel Parties of the intended benefits of this Agreement. If, in any judicial proceeding, a court shall refuse to enforce all of the separate covenants deemed included herein because, taken together they are more extensive than necessary to assure the Nortel Parties of the intended benefit of such non-competition and non-solicitation provisions, it is expressly understood and agreed between the parties hereto that those of such covenants which, if modified or eliminated, would permit the separate covenants or remaining separate covenants, as applicable, to be enforced in such proceeding shall, for the purpose of such proceeding, be deemed modified or eliminated from the provisions hereof.

4.   Non-Solicitation. During the Restricted Period, Employee will not, directly or indirectly, (i) solicit, induce, recruit, encourage, hire or engage, or assist any other person to solicit, induce, recruit, encourage, hire or engage, any of the Nortel Parties' employees, contractors or consultants (which contractors and/or consultants are natural persons) (each a "Company Service Provider"), or otherwise cause any Company Service Provider to cease or curtail his or her relationship with any Nortel Party, or (ii) solicit, induce, encourage, engage, or assist any other Person to solicit, induce, encourage or engage, any licensor, licensee, customer, or supplier of any Nortel Party that became or becomes known to Employee or with whom Employee worked or interacted while an employee, contractor or consultant of any Nortel Party, to change its business relationship with any Nortel Party in any manner that is detrimental to any Nortel Party.

5.   Independence of Obligations. The covenants and obligations of Employee set forth in this Agreement shall be construed as independent of any other agreement or arrangement between Employee, on the one hand, and any Nortel Party, on the other hand.

6.   Condition of Purchase; Consideration. Employee agrees that the covenants provided for in Sections 3 and 4 are necessary and reasonable (i) in order to protect the Nortel Parties in their conduct of the Restricted Business, (ii) for the utilization of their respective assets, tangible and intangible, including goodwill, (iii) to preserve and protect the tangible and intangible assets of the Nortel Parties, including the Company's goodwill, and (iv) in view of Nortel entering into the Stock Purchase Agreement and the payment rights granted to Employee under the Stock Purchase Agreement and this Agreement.

7.    Non-Exclusivity.  The rights and remedies of the parties hereunder are not exclusive of or limited by any other rights or remedies which any of them may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative (and not alternative). Without limiting the generality of the foregoing, the rights and remedies of the Nortel Parties hereunder, and the obligations and liabilities of Employee hereunder, are in addition to their respective rights, remedies, obligations and liabilities under the law of unfair competition, misappropriation of trade secrets, the obligations that employees owe to their employers and the like. This Agreement does not limit Employee's obligations or the rights of the Company or Nortel under the terms of (a) the Confidentiality Agreements, (b) the Option Termination Agreement to be entered into by the Employee and the Company prior to the Closing, or (c) any other written agreement between Employee and any Nortel Party. The term of the Restricted Period as it relates solely to the obligations of Employee set forth under this Agreement shall have no effect on the term of any other obligation that Employee may have to any Nortel Party under applicable Law or under the terms of any agreement (other than this Agreement), policy or arrangement to which Employee is subject.

8.    Termination of Agreement if Stock Purchase does not Occur.  This Agreement shall terminate and cease to have any further force or effect immediately upon the termination of the Stock Purchase Agreement pursuant to Section 10.1 thereof.

9.    Miscellaneous.

(a)    No Conflict.  Employee represents that the execution and performance by Employee of this Agreement does not and will not conflict with or breach the terms of any other agreement by which Employee is bound.

(b)    Waiver of Rights.  No delay or omission by the Company or any other Nortel Party in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company or any Nortel Party on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

(c)    Equitable Remedies.  Employee agrees that any breach or threatened breach by Employee of any covenant, obligation or other provision contained in this Agreement is likely to cause the Nortel Parties substantial and irreparable damage and therefore, in the event of any such breach, the Nortel Parties shall be entitled (in addition to any other remedy that may be available to them) to the extent permitted by applicable law to (a) a decree or order of specific performance to enforce the observance and performance of such covenant, obligation or other provision, and (b) an injunction restraining such breach or threatened breach.

(d)    Assignment.  The Company or Nortel may assign this Agreement to (i) any other company or entity which acquires (whether by purchase, merger, consolidation or otherwise) all or substantially all of the business and/or assets of the Company and/or Nortel.

(e)    Notices.  All notices or other communications given pursuant to this Agreement shall be in writing and shall be deemed given to a party when (a) delivered by hand

6

or by a nationally recognized overnight courier service (costs prepaid) or (b) sent by registered or certified mail, postage prepaid, return receipt requested, in each case to the following:

If to Employee:                     The address set forth on the signature
                                    page to this Agreement

If to the Company or Nortel:        DiamondWare, Ltd.
                                    4856 E. Baseline Rd. Ste. 101
                                    Mesa, AZ 85206
                                    Facsimile:  (480) 380-1133

                                    With copies to:

                                    Nortel Networks Inc.
                                    2221 Lakeside Blvd.
                                    Richardson, TX, 75082
                                    Attention:  Hyacinth G. DeAlmeida

                                    Nortel Networks Inc.
                                    Suite 300
                                    220 Athens Way
                                    Nashville TN 37228
                                    Attention:  Corporate Secretary

or to such other address as the person to whom notice is given may have previously furnished to the other in writing in the manner set forth above.

(f)     Third Party Beneficiary.  The Nortel Parties (other than Nortel and the Company) shall be third-party beneficiaries of this Agreement.

(g)     Governing Law; Jurisdiction.  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles that would require the application of any other law.  Any action or proceeding arising out of or relating to this Agreement or any transaction contemplated hereby may be brought in the courts of the State of Arizona located in Phoenix, or, if it has or can acquire jurisdiction, in the United States District Court for the District of Arizona, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such action or proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the action or proceeding shall be heard and determined only in any such court and agrees not to bring any action or proceeding arising out of or relating to this Agreement or any transaction contemplated hereby in any other court.

(h)     Effect of Partial Invalidity.  Whenever possible, each provision of this Agreement shall be construed in such a manner as to be effective and valid under applicable Law.  Without limiting Section 3(d), if any provision of this Agreement or the application

7

thereof to any party or circumstance shall be prohibited by or invalid under applicable law, such provisions shall be ineffective to the extent of such prohibition without invalidating the remainder of such provision or any other provisions of this Agreement or the application of such provision to the other party or other circumstances.

(i)     Entire Agreement.  This Agreement, together with the Confidentiality Agreements, contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior oral and written agreements and understandings relating to such subject matter.

(j)     Amendments.  No amendment to this Agreement shall be effective unless it shall be in writing and signed by both parties hereto, and no waiver of any provision hereof shall be effective unless expressed in a writing signed by the party entitled to the benefits of such provision.

(k)     Counterparts.  This Agreement may be executed in counterparts, each of which shall be considered one and the same agreement, and shall become effective when all such counterparts have been signed by each of the parties and delivered to the other party.  Any signature delivered by a facsimile machine shall be binding to the same extent as an original signature.

[Remainder of Page Intentionally Left Blank]

Emp ID 5098053

EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ
THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS
IN THIS AGREEMENT.

IN WITNESS WHEREOF, this Agreement has been executed by each of the parties
hereto as of the date first above written.

DIAMONDWARE, LTD.

By:
Name:  Keith Weiner
Title:  CEO

NORTEL NETWORKS INC.

By:
Name:  RON SAVINO
Title:  HUMAN RESOURCES

EMPLOYEE

Charles Rowe

Address:

515 E Carefree Hwy PMB 1031
Phoenix, AZ 85085