UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                      .      Case Nos.  09-10164 (KG)
                            .                 09-10138 (KG)
                            .      Jointly Administered
NORTEL NETWORKS             .
CORPORATION, et al.,        .
                            .      824 Market Street
                            .      Wilmington, Delaware  19801
              Debtors.  .
                            .      March 5, 2009
. . . . . . . . . . . . ..      10:07 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Cleary Gottlieb Steen & Hamilton LLP
                          By:  JAMES L. BROMLEY, ESQ.
                               JANE KIM, ESQ.
                          One Liberty Plaza
                          New York, NY

For the Debtors:          Morris, Nichols, Arsht & Tunnell LLP
                          By:  ANN CORDO, ESQ.
                               DEREK C. ABBOTT, ESQ.
                          1001 North Market Street
                          Wilmington, DE  19801

Audio Operator:           Brandon McCarthy

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

```
APPEARANCES (CONT'D):

For E&Y, as Monitor:        Allen & Overy LLP
                            By:  LISA KRAIDIN, ESQ.
                            1221 Avenue of the Americas
                            New York, NY  10020


For E&Y, as Monitor:        Buchanan Ingersoll & Rooney PC
                            By:  MARY F. CALOWAY, ESQ.
                            The Brandywine Building
                            1000 West Street, Suite 1410
                            Wilmington, DE  19801


For the Committee:          Akin Gump Strauss Hauer & Feld LLP
                            By:  KENNETH A. DAVIS, ESQ.
                                 DAVID H. BOTTER, ESQ.
                            590 Madison Avenue
                            New York, NY


For the Committee:          Richards, Layton & Finger, P.A.
                            By:  CHRISTOPHER M. SAMIS, ESQ.
                            One Rodney Square, 920 N. King St.
                            Wilmington, DE  19801


For the U.S. Trustee:       Office of the U.S. Trustee
                            By:  PATRICK TINKER, ESQ.
                            844 King Street, Suite 207
                            Lockbox 35
                            Wilmington, DE  19801


For Jefferies:              Young Conaway Stargatt & Taylor LLP
                            By:  SEAN M. BEACH, ESQ.
                            The Brandywine Building
                            1000 West Street, 17th Floor
                            Wilmington, DE  19899


For FlexTronics:            Curtis, Mallet-Prevost, Colt, Mosle
                             LLP
                            By:  JAMES V. DREW, ESQ.
                            101 Park Avenue
                            New York, NY  10178-0061
                            (Telephonic appearance)


For Morgan Stanley:         Morgan Stanley
                            By:  JIM MARTIN
                            (Telephonic appearance)
```

APPEARANCES (CONT'D):

```
For Verizon:            Arnall, Golden & Gregory LLP
                        By:  FRANK N. WHITE, ESQ.
                             DARRYL S. LADDIN, ESQ.
                        171 17th Street, NW
                        Suite 2100
                        Atlanta, GA  30363
                        (Telephonic appearance)

For Silver Lake         Ropes & Gray LLP
Capital, et al:         By:  ANNELIESE H. PAK, ESQ.
                        1211 Avenue of the Americas
                        New York, NY  10036-8704
                        (Telephonic appearance)

For the Debtor:         By:  TRACY McGILLEY
                        (Telephonic appearance)
```

4

**I N D E X**

| | PAGE |
|---|---|
| **WITNESSES** | |
| JOHN DEMPSEY | |
|     Direct Examination by Mr. Bromley | 27 |
|     Cross Examination by Mr. Tinker | 43 |
|     Redirect Examination by Mr. Bromley | 84 |

| **EXHIBITS** | ID. | EVD. |
|---|---|---|
| D-1   Mercer Document (under seal) | | 107 |

**J&J COURT TRANSCRIBERS, INC.**

1          THE CLERK:  Please rise.

2          THE COURT:  Good morning, everyone.  Please be

3  seated.  Thank you.  Good morning, Ms. Caloway.

4          MS. CALOWAY:  Good morning, Your Honor.

5          THE COURT:  I hope everyone agrees it makes sense to

6  start with the Chapter 15 case?

7          MS. CALOWAY:  I think everyone does, Your Honor.

8          THE COURT:  Okay.  We should be finished much

9  quicker.

10          THE COURT:  Yes.

11          MS. CALOWAY:  For the record, Your Honor, Mary

12  Caloway, Buchanan, Ingersoll & Rooney, here on behalf of Ernst

13  & Young, the monitor and foreign representative of the Nortel

14  Networks Corporation and the related Chapter 15 debtors.  We

15  have but one matter on our agenda today, and I would like to

16  cede the podium to my co-counsel, Lisa Kraidin, who will

17  present that matter to the Court.

18          THE COURT:  Thank you, Ms. Caloway.  Good morning,

19  Ms. Kraidin.

20          MS. KRAIDIN:  Good morning, Your Honor.  We will be

21  quick so we can get to the main event.

22          THE COURT:  Okay.

23          MS. KRAIDIN:  We're here today on the monitor's

24  motion to enforce the bid procedures order of the Canadian

25  Court, which was entered last week.  I would just remind Your

1  Honor that last Friday this Court granted the monitor's Chapter

2  15 petitions for recognition of the Canadian proceedings as --

3          THE COURT:  Yes.

4          MS. KRAIDIN:  -- foreign main proceedings.

5          THE COURT:  Yes.

6          MS. KRAIDIN:  And that as foreign main proceedings

7  the monitor, as the foreign representative, is entitled

8  automatically to application of Section 363 of the Bankruptcy

9  Code, as well as at the Court's discretion any additional

10 relief under Sections 1507, 1521, or 105(a) of the Bankruptcy

11 Code.  The monitor filed last week a motion to enforce the bid

12 procedures order of the Ontario Court, and a similar

13 application is being -- was made in Canada to enforce this

14 Court's order in the Chapter 11 proceedings, and that motion, I

15 believe, is on for a hearing in Canada tomorrow.

16         THE COURT:  Okay.  So, today's motion is simply

17 seeking to enforce the Canadian Court's order with respect to

18 the bid procedures, and that's being made so that we can ensure

19 that all parties know that there's a single unified bid

20 procedures process in both the U.S. and Canada, and the

21 Canadian Court, as you might expect, requests the assistance of

22 this Court in carrying out the terms of its order, which is, of

23 course, consistent with the purpose of Chapter 15, so long as

24 there is no public policy violation.  And surely that can't be

25 the case when this Court has, in fact, approved the same bid

1  procedures in the Chapter 11 cases.

2           THE COURT:  Yes.

3           MS. KRAIDIN:  This Court also approved the motion to

4  shorten the notice period on our motion so that this

5  consistency can be enforced as soon as possible.  There were no

6  objections filed to our motion, and at this time we would

7  request that the Court grant the motion and enter a proposed

8  order.

9           THE COURT:  Does anyone wish to be heard on this?

10  All right.  Well, I am pleased to grant the motion.

11           MS. KRAIDIN:  Thank you, Your Honor.

12           THE COURT:  It certainly is appropriate in the

13  context of these Chapter 15 cases, and as you indicated I have

14  myself approved those bid procedures, and I believe that the

15  bid procedures are identical to mine, so clearly it is

16  appropriate to grant the motion.

17           MS. KRAIDIN:  Thank you, Your Honor.  May I approach?

18           THE COURT:  You may.  Thank you, Ms. Kraidin.

19                          (Pause)

20           THE COURT:  The order has been signed.

21           MS. KRAIDIN:  Terrific, Your Honor.  That's all I

22  have today, Your Honor.

23           THE COURT:  All right.  Thank you, Ms. Kraidin.

24           MS. KRAIDIN:  On to the main event.

25           THE COURT:  You're excused.

1                        (Pause)

2              THE COURT:  Good morning, Mr. Abbott.

3              MR. ABBOTT:  Good morning, Your Honor.  Derek Abbott

4    here on behalf of the Nortel U.S. debtors for the Chapter 11

5    proceedings.  And Your Honor, I gather, has been busy in

6    chambers knocking out a lot of those orders that we had

7    submitted certificates on.  So, I think this will hopefully be

8    relatively brief and concise.  I'd like to cede the podium to

9    Ms. Kim, who will start, and then Mr. Bromley will pick up with

10   the KEIP and KERP motion, Your Honor.

11             THE COURT:  I have just one little housekeeping

12   matter, and it may be more appropriately addressed to someone

13   else in your office, but I thought I would raise it.  I

14   received the other day an order on the utilities, the final

15   order regarding restraining utility companies from

16   discontinuing, etcetera, and I think I've already entered that

17   order, so I wasn't quite certain why I had received an

18   additional --

19             MR. ABBOTT:  Your Honor, why don't I look into that,

20   and we'll give Ms. Scaruzzi (phonetic) a call, and let her know

21   the upshot?

22             THE COURT:  Excellent.  I think there might have been

23   the -- you know, a minor, minor difference in them, but I

24   thought I would raise it this morning rather than just overlook

25   something.

1          MR. ABBOTT:  I appreciate it, Your Honor.  We'll look

2   into it and certainly get that squared away.

3          THE COURT:  Excellent.  Thank you, Mr. Abbott.

4          MR. ABBOTT:  Thank you, Your Honor.

5          THE COURT:  Good morning.

6          MS. KIM:  Good morning, Your Honor.  So, as Mr.

7   Abbott mentioned, Your Honor has entered a number of orders

8   this morning --

9          THE COURT:  Yes.

10         MS. KIM:  -- which makes my job much easier today.

11   The -- if we just march through the agenda, the first --

12         THE COURT:  Make sure we don't miss anything.

13         MS. KIM:  Sure.  The first four items on the agenda,

14   which are the cash management motion, ExcelLite's motion for

15   its administrative claim under Section 503(b)(9), Andrew's

16   similar motion, and the retention application for Lazard Frere

17   have all been adjourned.  Item Number 5 and Item Number 6 on

18   the agenda, which are the Crowell & Moring and Jackson Lewis

19   retention applications, were, I understand, entered by --

20   granted by the Court this morning.

21         THE COURT:  Yes.  Yes.  And I appreciate counsel's

22   effort in providing those.  It certainly makes our hearing much

23   more streamlined.

24         MS. KIM:  Thank you.  Item Number 7 on the agenda is

25   the motion for an extension of the schedules and SOFAs of the

**J&J COURT TRANSCRIBERS, INC.**

1  debtors.  The debtors yesterday filed a revised order after

2  having some discussions with the U.S. Trustee about the

3  proposed schedule.  The revised schedule -- the original motion

4  had requested an extension to May 29th for the schedules and

5  SOFAs for the debtors.  The revised schedule has two dates.

6  The first is April 20th would be the proposed deadline for

7  filing the SOFAs for all of the debtors, as well as the

8  schedules for 11 debtor entities that are largely inactive.

9  And May 29th would be the proposed deadline for the filing of

10 the schedules of the -- of four active entities, which are NNI,

11 Nortel Networks Capital Corporation, Alteon Web Systems, Inc.,

12 and Nortel Networks International, Inc.

13          Paul Karr from Nortel and Jim Lukenda from Huron are

14 on video --

15          THE COURT:  Yes.

16          MS. KIM:  -- in case the Court would like to hear

17 testimony as to the need for the extensions, but I would note

18 that the debtors' position is that at this point there are no

19 objections to the extension motion, and we would request the

20 Court grant that motion.

21          THE COURT:  I am pleased to grant that motion without

22 questions for the gentlemen in Canada.  Certainly I appreciate

23 the oversight of the Office of the United State Trustee.

24 That's always helpful.  And I certainly recognize that in cases

25 of this nature and size that additional time is necessary and

1  appropriate, so I will be pleased to grant the --

2           MR. ABBOTT:  Your Honor, may I approach?

3           THE COURT:  You may.  Yes, Mr. Abbott.

4           MR. ABBOTT:  I have a clean and a black line.

5           THE COURT:  Thank you.  Good.  Thank you, Mr. Abbott.

6           MS. KIM:  Thank you, Your Honor.  And with that, if

7  Your Honor would excuse the witnesses?  If they want to stay

8  on, they might want to watch the rest of the hearing, but if

9  not, I would ask that Your Honor excuse the witnesses.

10          THE COURT:  Gentlemen, you're welcome to be excused,

11 or to remain if you are so inclined.

12          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

13          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

14          THE COURT:  You're welcome.  Good day.

15          MS. KIM:  Before I cede the podium to Mr. Bromley for

16 the main event, I wanted to have one additional housekeeping

17 matter.

18          THE COURT:  Yes.

19          MS. KIM:  There is -- at an earlier hearing I had

20 mentioned to Your Honor that we might need to come back to this

21 Court for relief with respect to certain pre-petition income,

22 tax-related payments.

23          THE COURT:  Yes.

24          MS. KIM:  We have a motion that we are in the process

25 of preparing that relate to income franchise business, license

1  type taxes that are going to be coming payable in the near

2  future, and we would like to be able to file that motion and

3  have it heard on the 25th, which would be the date that this

4  Court has reserved for the sale hearing.  It's -- we don't

5  expect it to take a lot of this Court's time, and just for

6  convenience and because of the timing of the payments that are

7  coming due we would ask that this Court allow us to be able to

8  present that motion on that date, as well.

9          THE COURT:  I'll be pleased to do so.  Yes.  I think

10  in the state of Delaware our franchise due are maybe April 1st,

11  as I recall, or some time in April.  And that is certainly

12  acceptable.

13          MS. KIM:  Thank you, Your Honor.  And with that I

14  will step down and cede the podium to Mr. Bromley.

15          THE COURT:  Thank you.  Let's see if Mr. Bromley can

16  do as well.

17          MR. BROMLEY:  I certainly hope so, Your Honor.

18          THE COURT:  Yes.

19          MR. BROMLEY:  Good morning, Your Honor.

20          THE COURT:  Good morning, Mr. Bromley.

21          MR. BROMLEY:  Jim Bromley of Cleary Gottlieb on

22  behalf of the Nortel U.S. debtors.

23          THE COURT:  You know, I'm just getting a message from

24  chambers that we don't have a Nortel hearing on May 25th.

25          MR. BROMLEY:  That is the --

1          MS. KIM:  March 25th?

2          MR. BROMLEY:  That was the date you scheduled, Your

3 Honor, last week, for the sale hearing relating to the Velocity

4 transaction, which we --

5          THE COURT:  I will double check that, and -- yes.

6 Okay.

7          MS. KIM:  I believe it's scheduled for 10:30 a.m.

8          THE COURT:  Okay.  I may be afraid to go back into

9 chambers now, but that's the risk.  We'll work that out.

10          MR. BROMLEY:  The telekinetic powers of chambers are

11 quite impressive.

12          THE COURT:  Yes.  Aren't they, though.

13                    (Laughter)

14          MR. BROMLEY:  And I'll have to remember that for the

15 future.  Your Honor, we are here today to discuss the debtors'

16 motion for the approval of a key employee incentive plan and

17 key employee retention plan.

18          THE COURT:  Yes.

19          MR. BROMLEY:  And Your Honor was kind enough to

20 schedule this on shortened notice, and we very much appreciate

21 it.  If I could, Your Honor, I'd like to make a couple of

22 statements to begin, and then talk a bit about the witness that

23 we have brought with us today for the hearing.  I think that it

24 will be necessary to put on direct testimony.  We have --

25          THE COURT:  Yes.  I think so in this circumstance.

1           MR. BROMLEY:  We have been in conversations with the

2    Office of the U.S. Trustee, and we would ask that once we get

3    to the testimony part we may have to proceed in little baby

4    steps.  There are certain elements that may touch on areas of

5    confidentiality, but we can get to that in a bit.  And I have

6    just taken a chance outside the courtroom with Mr. Tinker to go

7    over a few of the ground rules we've sort of agreed to on that

8    so that we are careful about those points.

9           Your Honor, as we mentioned in the motion, the

10   debtors are currently facing some extraordinary challenges in

11   the marketplace, and accompanying those challenges are morale

12   issues with respect to the employees.  When we filed these

13   cases on January 14th we mentioned that there were a total of

14   30,000 employees for Nortel around the world and of those

15   30,000 approximately 6,000 are employed by joint ventures,

16   primarily in Asia.  So, really, in terms of the Nortel payroll

17   it's in the neighborhood of 24 to 25,000.  Prior to the filing

18   there had been an announcement of a planned reduction in force

19   of 1,800 employees, and last week, it was unfortunate, but the

20   decision was made and the announcement was made that an

21   additional 3,200 employees would have to be reduced --

22           THE COURT:  Yes.

23           MR. BROMLEY:  -- and lose their jobs.  It is an

24   unfortunate circumstance, and we hear it all too often today on

25   the news, in the papers, and Nortel is by no means immune from

**J&J COURT TRANSCRIBERS, INC.**

1  the same pressures that so many other companies are facing.

2  And it is with a heavy heart that they certainly do these

3  reductions.

4          The issues, though, that we're facing with reductions

5  in a company like Nortel are a little different than the other

6  companies.  And not to by any stretch downplay the personal

7  issues that anyone faces in these times, but the Nortel

8  situation is, as we've mentioned, a worldwide operation in over

9  140 countries, and so, the reductions in force are happening

10 across all of those jurisdictions, and we are operating in a

11 three proceeding environment, with proceedings here in the

12 United States, in Canada, and in the United Kingdom.  And

13 historically, as Nortel has operated as a unified entity there

14 has been a unified compensation program around the world.  And

15 it is in part because of that unified compensation structure

16 that we've asked to do this on an expedited basis.

17         There is a need to cut costs.  The need to cut costs

18 is obviously kind of self-evident in an environment where the

19 economy is acting as it is.  But that need is exacerbated by

20 the fact that we have three jurisdictions that move at

21 different speeds.  And at times, Your Honor, I have to admit, I

22 am a bit of an apologist for the U.S. legal system when I am in

23 these tri-party conversations because the U.K. can operate

24 immediately, somewhat akin to their constitutional monarchy

25 past.  The Canadians are able to move faster than the United

1  States.  And we, in the United States, have a system which, I

2  believe, is the best system, but nevertheless a system which

3  does rub up against the other two.  And as we're trying to take

4  these steps around the world we have to recognize that in

5  Europe, the Middle East and Africa, these steps can be taken

6  immediately, in Canada they can be taken very quickly, and in

7  the U.S. we have the time lines that the code and rules impose.

8        Historically, Your Honor, it would be worthwhile for

9  me to go through a little bit of the background on the

10 compensation structure of the company.

11        THE COURT:  Certainly.

12        MR. BROMLEY:  And certain of these elements will be

13 touched on by Mr. Dempsey, John Dempsey, who is a principal

14 with Mercer U.S., which is one of the premier compensation

15 advisors in the industry.  But historically, Your Honor, the

16 Nortel compensation structure has been comprised of two parts,

17 base salary and something called AIP, the annual incentive

18 plan.  And the annual incentive plan has been in place for

19 years, and some years it's performed well, and some years not

20 so well.  But it is a broad-based plan covering, this year,

21 over 18,000 employees.

22        And the -- as we had mentioned in our first day

23 pleadings the AIP will be continuing.  It is a program that

24 we're not seeking permission to continue because we believe it

25 is a part of the ordinary course business operations of the

1  business.  We've been in substantial conversations over the

2  past several weeks with the creditors' committee and the

3  bondholder group, and have gone over the AIP with them in quite

4  a lot of detail.  And this year, Your Honor, the only change,

5  in substance, is that instead of having an annual payout there

6  will be quarterly payouts, and we have agreed with the

7  creditors' committee that we will continue to, as we have

8  discussed with them, the parameters for the payouts and the

9  performance metrics under the AIP, which are, as I said, tied

10  to the typical operations of the business, issues like revenue,

11  performance, and cash levels, and operational performances like

12  how many days of outages there are, and how fast you return

13  phone calls, and customer service levels and the like.  And so,

14  part of our negotiations with the creditors' committee has been

15  that we will agree that we will continue to consult with them

16  on an on-going basis with respect to that AIP.  With respect to

17  the -- and we announced last week at the same time that we did

18  the job reductions that the AIP would continue into 2009 on

19  that basis with those three metrics, and those three metrics

20  are set for the first and second quarters, and we will discuss

21  the appropriate metrics for the third and fourth quarters, as

22  well as the payouts with the committees as we move forward.

23        Your Honor, though, with respect to the

24  reorganization process the companies have come to the view that

25  there needs to be an additional program, and indeed, two

1  additional programs, incentives that relate specifically to the

2  reorganization process.  And it kind of goes back to the

3  amendments in some respects to the Bankruptcy Code in 2005 --

4          THE COURT:  Sure.

5          MR. BROMLEY:  -- as they relate to 503(c).  I think

6  as we're all acutely aware in the United States that changes to

7  503(c) have changed the landscape as we had gotten comfortable

8  with and familiar with the old fashioned retention programs,

9  the statute changed and requires us with respect to insiders to

10 put together programs that if they're retention based meet very

11 specific criteria of 503(c)(1), and with respect to programs

12 that are not trying to do that where we have to go person by

13 person and prove that each person has an alternative offer in

14 order to have a retention payment made really go into 503(c)(3)

15 where you're talking about ordinary course and facts and

16 circumstances programs, which have developed over time towards

17 reasonable incentives based on the restructuring process.

18         THE COURT:  Right.

19         MR. BROMLEY:  So, what we have done here in the U.S.

20 is we have a program that has two characteristics.  For the

21 employees who are in the lower job classifications, JC-4, 5 and

22 6 -- JCI -- I'm sorry, which is Job Complexity Indicator 4, 5

23 and 6, the program is a KERP, it's a traditional KERP, because

24 it doesn't relate at all to insiders.

25         THE COURT:  Correct.


                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. BROMLEY:  And these are folks whose pay grade is

2  relatively lower compared to the higher end people.  But it

3  also is important to note that it is completely consistent

4  across jurisdictions with Canada.  In Canada there's no

5  prohibition on retention programs at all, and that would

6  include all the way up to the very top of the organization.

7  And so, for the JC-4's 5's and 6's, and that total in the U.S.

8  is 446 individuals, a total of 880 individual outside of the

9  EMEA (sic) areas, again, that's Europe, Middle East, and Africa

10 --

11         THE COURT:  Yes.

12         MR. BROMLEY:  So, 446 are in the U.S., but in Canada

13 they're also receiving a program that -- or, proposing a

14 program that will be a retention program, so it will be

15 completely consistent across the jurisdictions.  That has been

16 an important goal because of the fact that these folks are

17 working side by side every day in this enterprise.

18         We also have the key employee incentive plan, and

19 that deals with the folks who are the higher level employees.

20 One of the interesting issues that we face in dealing with

21 503(c) is the definition of insider, and it's clear that it's

22 unclear, which is the beauty of the statute, I guess, in some

23 respects.  And we had a lot of debate in structuring the

24 program whether we would, one, have a program in Canada that

25 would be retention based instead of incentive based; and two,

1  whether or not we would have a program that was only based on

2  people who were officers with a capital O so to speak was one

3  of the terms that we heard, folks who are officers or

4  directors, and officers who were specifically appointed by the

5  board of directors.  And I think that that is a fair

6  interpretation of what the statute requires, but thankfully I

7  don't think we have to argue about that because what we have

8  done in putting together this program is we've simply taken

9  everyone in the two highest job classifications, which is JCI-

10 55, who are the ELTs, the executive leadership team, and the

11 SLTs, the senior leadership team, and we've created across both

12 countries, both Canada and the U.S., an incentive program.

13         And I'd like to just pause there for a moment to

14 mention that that is a little different than we need to do,

15 because in Canada we can go for a retention program.  And in

16 our conversations with the creditors' committee it became clear

17 that it was a good idea that we have an incentive based program

18 in both jurisdictions.  There were, of course, independent

19 reasons to do that, as well, that it was an indication of unity

20 and leadership that both the U.S. and Canada would be following

21 the same plan, and an incentive plan, notwithstanding the fact

22 that that's not required in Canada.  But indeed, the creditors'

23 committee was quite emphatic about this, and we agreed with it.

24 So, what we have is a key employee incentive plan that does not

25 require the Court to have any determination as to who is an

1  officer with a capital O, and who is an insider.   We have

2  simply said everyone in these two categories are going to be

3  subject to the incentive plan.

4       And there are 92 employees.   It's important to keep

5  in mind that we're talking about 92 employees out of what will

6  be about 19,000, 92 that are in North America.   And of the 92,

7  eight of them are in this senior leadership team, 82 are in the

8  ELT, the executive leadership team, and two are in this

9  category for other reasons because they happen to be officers

10  of entities, even though they have lower job classifications.

11       So, in reality, Your Honor, what we have for the U.S.

12  are five senior leadership teams, 46 of the executive

13  leadership team, and two additional officers, for a total of 53

14  employees in the U.S. that would be subject to the incentive

15  plan, the key employee incentive plan.

16       The costs of these two plans should be taken into

17  account the following way.   The costs are a worldwide basis for

18  the KERP, the retention plan, $22 million, and the U.S. share

19  of that is 12.4 million.   And for the incentive plan the

20  worldwide cost is $23 million, of which 14.6 relates to the

21  U.S.   And as you'll hear from Mr. Dempsey, that relates -- that

22  compares to worldwide revenue for Nortel last year of 8.1

23  billion.   So, we believe that well within the realm of

24  reasonableness in terms of the dollar amounts that we're

25  talking about.

1          I should also mention, Your Honor, that the CEO of

2    Nortel is not Nortel Networks Corporation, which is the parent

3    company.  He's a Canadian employee.  He's not part of either

4    program.  It is not impossible that we may come back, or go

5    back to the Canadian Court later, but there are no current

6    plans for a program for the CEO.

7          With respect to the incentive elements of the plan,

8    Your Honor, there are three main incentives, milestones that

9    have been put in place, and Mr. Dempsey will talk about those,

10   but we believe that they are well within the normal range of

11   reasonableness with respect to reorganization incentives.  The

12   first relates, very broadly speaking, to cost reductions.  The

13   cost reductions are essential to reduce the cash burn that the

14   company is suffering.  An element of that, of course, is the --

15   you know, a clear manifestation of that is the down sizing and

16   the reduction in force, but also the closing of locations and

17   the consolidation of operations.

18         The second category, Your Honor, has a little more

19   sensitivity to it but still is a milestone which Mr. Dempsey

20   will talk about relating to certain things that we've disclosed

21   to the creditors' committee, the bondholder group, and the

22   Office of the U.S. Trustee relating to steps that will be taken

23   to make the company a leaner operation, and I say the company

24   in the broadest sense of the word, and to help align its

25   strategic plan going forward.

1    And then the third, Your Honor, is -- relates to the

2  typical final objective, which is the confirmation of a plan

3  here in the U.S. and the approval of a plan in Canada.

4    So, those are the broad based incentives that are

5  underlying the KEIP, the key employee -- the key executive

6  incentive plan.

7    And what we have done with respect to the retention

8  plan for the lower level employees is we have tied those dates

9  to, you know, in a rough sense to the incentive plan payment so

10 that if you are, for instance, entitled to under the retention

11 plan a payment, but the incentive has been accomplished, then

12 you, as the lower level employee, will get paid on the earlier

13 of the two dates, either the date that the retention payment

14 was due, or the date that the incentive was accomplished for

15 the senior people --

16    THE COURT:  Okay.

17    MR. BROMLEY:  -- which we think is a convenient way,

18 and frankly a good way of putting together the two incentives.

19 It is a -- you know, it is a difficult time to be running a

20 company, as I've mentioned, Your Honor, and the company worked

21 very hard trying to put these things together in a way that

22 would be as non -- sort of -- as attractive as possible in the

23 context to our main constituencies.  And so, in that context I

24 should note that we have had a great deal of conversations with

25 the creditors' committee, as well as the bondholder group, both

1  of whom have signed confidentiality agreements, including long

2  meetings over weekends and substantial provisions of downloads.

3  I can't say that it's always been the smoothest of processes,

4  but that, frankly, is to be expected.  But I think overall we

5  got to the right spot and we're happy that the committee

6  supports the exercise.  One of those things I will mention is

7  that we have undertaken, as well, to improve certain aspects of

8  the information flow to the creditors' committee, and

9  particularly with respect to some historic information, and

10  that is in process as we speak.  So, it is certainly our hope

11  that the committee will be satisfied with that information

12  flow, and if they're not I'm sure they'll let us know.  And if

13  we can't help them they'll let you know.

14         So, Your Honor, that's the sort of background.  I do

15  have Mr. Dempsey as a witness --

16         THE COURT:  Yes.

17         MR. BROMLEY:  -- and I'm happy to put him on.  I'm

18  also happy to go through the law, but perhaps I think what we

19  should do is hear from Mr. Dempsey and then also hear from the

20  Office of the U.S. Trustee if they have any issues, and then we

21  can take it from there.

22         THE COURT:  I think that's a good way to proceed.  I

23  had just one question on the milestones.

24         MR. BROMLEY:  Yes, Your Honor?

25         THE COURT:  And the second component, which is those

1  parameters to make the company leaner, I have not seen those,

2  and I just wondered, are they very specific and measurable

3  parameters?

4         MR. BROMLEY:  Your Honor, that is -- that's probably

5  the crux of the confidential point of this, and we have --

6         THE COURT:  And I'm not asking what they are.

7         MR. BROMLEY:  Well, I mean, here's the issue, Your

8  Honor.  We're actually very happy to talk to you about them

9  because we have disclosed them to the creditors' committee --

10        THE COURT:  Sure.

11        MR. BROMLEY:  -- and to the Office of the U.S.

12 Trustee.  If you would like to see those parameters now we'd be

13 happy to talk to you in chambers with them very briefly, or I

14 can actually give you a copy of a document and point you to

15 them so you can see them in the context of the testimony.

16        THE COURT:  Okay.

17        MR. BROMLEY:  Right now we have not been asked by any

18 of the parties in interest to actually put this sort of

19 information into Evidence affirmatively --

20        THE COURT:  And I'm not asking for that, either.

21        MR. BROMLEY:  I just wanted to let you know that if

22 we were to ask that we would want to talk about it from a

23 sealing perspective because of the confidential nature.

24        THE COURT:  Understood.  And I can understand why

25 they are proprietary in nature, certainly.

1          MR. BROMLEY:  Would you like to see?

2          THE COURT:  I would.

3          MR. BROMLEY:  Okay.

4          THE COURT:  I think that would be helpful to me, and

5    clearly it's -- we're not making this part of the record, we're

6    not introducing it into Evidence, but it would be helpful to

7    me, I think, as --

8          MR. BROMLEY:  You may, Mr. Bromley.  Mr. Tinker, I

9    feeling you have an administrative matter to discuss.

10         MR. TINKER:  Well, Your Honor, I don't know that it's

11   an administrative matter.  The material that's being handed up

12   to you, while it may help Your Honor understand some of the

13   testimony, as I go through my cross examination, and I

14   anticipate doing that, I'll be trying to draw responses to help

15   me with regards to the record here, and also so the people in

16   the room can understand as much as they can of that.  So, I'll

17   be asking Your Honor's forbearance as I try to get into

18   materials which maybe are in the boundary between confidential

19   and not confidential.  So, I'd like to just reserve my rights

20   with regards to that particular document and how it's handled.

21         THE COURT:  Okay.  And it may -- I don't know if it

22   will be possible for you to, for example, ask the witness a

23   question about Item Number 2, or, you know, something of that

24   nature, but let's see how it goes, and obviously I'll be

25   sensitive, and I know that debtors' counsel will be, as well.

Dempsey - Direct                              27

1          MR. TINKER:  Right.  Thank you, Your Honor.

2          THE COURT:  Yes.

3          MR. BROMLEY:  May I approach, Your Honor?

4          THE COURT:  Yes, Mr. Bromley.  Certainly.  Sure.

5          MR. BROMLEY:  You're free to take a look at

6  everything, but it's on Page 9.

7          THE COURT:  Okay.  Thank you.  All right.  Are you

8  ready for Mr. Dempsey?

9          MR. BROMLEY:  I am.

10         THE COURT:  Mr. Dempsey, please come forward, sir.

11 If you would just stand in the box for a moment while you're

12 sworn, Mr. Dempsey?

13         THE CLERK:  Raise your right hand, place your left

14 hand on the Bible.

15             JOHN BOURNE DEMPSEY, DEBTORS' WITNESS, SWORN

16         THE CLERK:  Please state your full name and spell

17 your last name for the record?

18         MR. DEMPSEY:  John Bourne Dempsey, D-e-m-p-s-e-y.

19         THE COURT:  You may be seated.  Thank you, Mr.

20 Dempsey.

21                      DIRECT EXAMINATION

22 BY MR. BROMLEY:

23 Q    Good morning, Mr. Dempsey.

24 A    Good morning.

25 Q    Could you again state your full name for the record?

**J&J COURT TRANSCRIBERS, INC.**

1  A     John Bourne Dempsey.

2  Q     Thank you.  And where are you employed, Mr. Dempsey?

3  A     For Mercer U.S. Incorporated.

4  Q     And what's your title at Mercer?

5  A     Principal.

6  Q     What kind of company is Mercer?

7  A     Mercer is a global human resources consulting firm.

8  Q     And how long have you been with Mercer?

9  A     For over 20 years.

10 Q     Can you please describe very briefly your educational

11 background for the Court.

12 A     I have a Bachelor's Degree from Yale, and a Master's in

13 Business Administration from Ohio State University.

14 Q     In connection with your employment at Mercer could you

15 describe briefly your duties and responsibilities?

16 A     I'm a compensation consultant, and one of my specialities

17 is to work with companies in distressed situations developing

18 compensation programs to assure that they can achieve their

19 objectives through the process of restructuring.

20 Q     And have you advised clients in Chapter 11 contexts in the

21 past?

22 A     Yes.  I've worked with a number of companies including

23 Owens Corning, Solutia, Kaiser Aluminum, Venture Industries,

24 Intermet and Allied Holdings.

25 Q     And have you also advised clients in out of Court

**J&J COURT TRANSCRIBERS, INC.**

Dempsey - Direct                                            29

1  restructuring contexts, as well?

2  A    Yes.  I've worked with numerous companies through the

3  years, including Barrett Gold and Archipelago, and others.

4  Q    And have you had the opportunity to provide testimony in

5  prior Chapter 11 proceedings?

6  A    Yes.  In Owens Corning, in Venture, Intermet, Allied

7  Holdings.

8  Q    And has that testimony been in connection with incentive

9  programs similar to the ones we're talking about here today?

10 A    Yes, although some of them in the pre 2005 context.

11 Q    So, is it fair to say that you've testified both with

12 respect to the pre-2005 and post-2005 --

13 A    Yes.

14 Q    -- context?  And so, you're familiar with the changes that

15 took place --

16 A    Very familiar, yes.

17 Q    Thank you.  Let's focus on Nortel.  Can you tell the Court

18 when you were engaged by Nortel?

19 A    Mercer has been working for Nortel in executive

20 compensation matters since 1998.

21 Q    And was there a particular time that you were asked to

22 focus on the creation of a program with respect to a potential

23 Chapter 11 and CCAA proceeding?

24 A    Yes.  That began in December of last year.

25 Q    And with respect to your work that started in December of

**J&J COURT TRANSCRIBERS, INC.**

1  2008, can you tell us sort of what you did and what you

2  accomplished in that regard?

3  A    Well, what we did is we worked closely with Nortel to

4  assess the current situation of their risks in terms of

5  potentially employees losing focus, potentially departing the

6  organization if we did not develop compensation programs that

7  would fit their current situation.  We showed them case studies

8  to help them understand the kinds of programs that other

9  debtors had used in this kind of situation, and then partnered

10 to develop a particular program that would be effective to

11 engage their employees through this process.

12 Q    And did you focus on the creation of a single program or

13 more than one program?

14 A    There were really three programs I worked on.  There was

15 an annual incentive plan, and then there were two special

16 programs that we're discussing today, the key executive

17 incentive plan, which is focused at an insider level, and then

18 the key employee retention program that you've discussed

19 already, which is more broad based.

20 Q    Now, Mr. Dempsey, you've provided a declaration in

21 connection with this.  Are you familiar with that?

22 A    I did.  Yes.

23 Q    And you signed that declaration, read it and signed it?

24 A    Yes, I did.

25 Q    And do you have personal knowledge of the facts that were

Dempsey - Direct                                    31

1  set forth in that declaration?

2  A    Yes, I do.

3  Q    And do you believe that the information that was set forth

4  in that declaration is true and accurate to the best of your

5  knowledge?

6  A    Yes.

7         MR. BROMLEY:  Your Honor, at this point I'd like to

8  pause a minute.  While Mr. Dempsey is a fact witness, we'd also

9  like to offer him as an expert witness based on his

10 qualifications.  I don't know if anyone has any objection?

11        THE COURT:  Any objection?  Mr. Tinker?

12        MR. TINKER:  No, Your Honor.

13        THE COURT:  All right.  I certainly recognize Mr.

14 Dempsey's qualifications and will admit him as an expert.

15        MR. BROMLEY:  Thank you very much, Your Honor.

16 Q    Mr. Dempsey, could you describe, in broad terms, the

17 motivation for the plans?  And let's take them one at a time.

18 First let's talk about the retention plan, the key employee

19 retention plan, and then talk about the key executive incentive

20 plan if you could?

21 A    Sure.  The issue with talking about the retention program

22 is that the employees are acutely aware of the distressed

23 situation that Nortel is in, and there is concern that they

24 will lose focus, check out, search for other employment,

25 potentially.  And it's considered a really serious risk that we

1  will lose the focus of our team.  And the retention program is

2  a portion of the program to keep people and to retain them.  It

3  is a very stirred up workforce, and there is -- the substantial

4  headcount reductions have been announced, and that distresses

5  the employees tremendously, the ones who are staying, as well

6  as the ones who are going, and we believe that there is a need

7  to send a strong message to key employees that we need them,

8  that we want them, and to keep them focused, and the retention

9  program is a part of that effort.

10 Q    Mr. Dempsey, in the current environment we've heard quite

11 a lot about job reductions in many industries, and I think a

12 question that is fair to ask in these circumstances is is it

13 important to have a program, notwithstanding the fact that

14 there are substantial job losses elsewhere in the economy?

15 A    I mean, absolutely.  This is a narrow program focused on

16 the most effective rated people in Nortel that are also

17 critical to the restructuring.  And the most highly effective

18 people always have the ability to search for a job.  It's clear

19 to me from my interactions with the Human Resources folks that

20 their employees are being approached constantly by other

21 employers, and even in this slower business environment they

22 are having to manage through people with job offers.  So, I

23 don't think there's any question that these employees are in

24 play.

25      Nortel has been a leading company in Canada for many

1 years, and is fortunate to have really some outstanding people,

2 and they are in demand.

3 Q    Mr. Dempsey, I believe you testified in your declaration

4 that you were involved in the design of the plans?

5 A    Yes, I was.

6 Q    Now, in designing the plans can you give us some -- a

7 color on the factors that you considered in designing the

8 plans?

9 A    We took a look at the market pay levels that people are --

10 for the jobs that are in the -- in Nortel, and we took a look

11 at what Nortel was offering.  And so, what we did is we tried

12 to bring pay closer to market pay levels in total for the

13 employee population.  And we -- the AIP was a piece of that,

14 which applies to most all employees other than sales

15 professionals.  And then this key employee retention plan

16 brings the pay up to market.

17     In addition to that, we took a look at -- we established

18 the criteria that we looked at to decide who would be in this

19 program, and those included key people in R&D, key people in

20 sales, key people in operations, people with critical roles in

21 the restructuring and in leadership roles that were vital.  We

22 also took a look at the need to, you know, who would be hard to

23 replace.  Nortel does employee people with some very scarce and

24 highly specialized skills, people with key relationships, and

25 it would be extremely costly, if not impossible, to replace at

1 this stage.

2 Q    When you talk about replacement, is it -- and you just

3 mentioned it would be impossible in certain respects, is

4 replacement cost an important element of the considerations of

5 the program?

6 A    Well, what we -- yes, it is.  And, I mean, there are

7 people who would be irreplaceable, people with key customer

8 relationships.  I mean, there are folks in these large

9 relationships, large customer relationships that we would just

10 not be able to hire anyone who could do that work.  There are

11 other roles where the restructuring firms could provide talent

12 to do this, but that is inevitably far more expensive than

13 trying to -- than using employees who are, in fact, better

14 because they are closer to the situation and understand

15 Nortel's particular context.

16 Q    Did you take into account the cost of these programs as it

17 relates to the size of Nortel and its revenue base?

18 A    We did.  And we found that the cost of the program was

19 well within the range of market practice, and we believe it to

20 be reasonable.

21 Q    Did you take into account the performance reviews of the

22 individuals that were selected for the programs?

23 A    We did.  And the performance reviews were the highest

24 rating, most effective, and then the second highest rating were

25 the groups that were included in that population.

1 Q    Mr. Dempsey, focusing on the key executive incentive

2 program, and in particular the milestones that we talked about,

3 there are three milestones, is that correct?

4 A    Yes.

5 Q    And could you describe how the payments would take place

6 in terms of, you know, what percentage for each milestone --

7 A    Yes.

8 Q    -- without describing the milestone?

9 A    Well, there are two milestones with 25 percent weightings,

10 and then a third milestone with a 50 percent weighting.

11 Q    If we could start backwards on the third milestone, that's

12 the heaviest weighted, 50 percent?

13 A    That's correct.

14 Q    And what is that milestone?

15 A    It would be -- it's confirmation of a plan of

16 reorganization in the U.S., and then the equivalent in Canada.

17 Q    Now, in your experience have you found that that's a

18 typical incentive goal, milestone in the creation of programs

19 that are sort of post-2005 qualified incentive programs?

20 A    Yes.  Definitely.  It's the most common milestone.

21 Q    That's the most common milestone?  And how about the

22 weighting of 50 percent of the --

23 A    That's consistent with practice, as well.

24 Q    Okay.  Let's go back to the first milestone.  The first

25 milestone, you said, is 25 percent?

Dempsey - Direct                                36

1   A    Yes.

2   Q    Could you describe, in broad terms, the first milestone?

3   A    It's associated with achieving cost reduction objectives.

4   Q    And in terms of the cost reduction objectives, in your

5   conversations with the company and the design of the plan, how

6   important have you seen the cost reduction milestones are to

7   the reorganization process?

8   A    It's absolutely vital that management is extremely focused

9   on keeping the cost structure of Nortel in line with market

10  conditions.

11  Q    Um-hmm.

12  A    And so, that unfortunately will involve some cost

13  reductions.

14  Q    And in your experience is the achievement of cost

15  reductions in the reorganization process, is that a typical

16  incentive milestone for these sorts of plans?

17  A    Yes.  It's one of the more common ones.

18  Q    And in the context of the Nortel plans do you think it's

19  an appropriate milestone?

20  A    Absolutely vital, and it makes a lot of sense.  It's a big

21  focus of many of their leaders within the company.  So, it

22  makes a tremendous amount of sense.

23  Q    And do you think it's an appropriate first milestone?

24  A    Yes.

25  Q    If we could focus a little bit on milestone two, which is

1 the one that we've discussed with some sensitivity.  And if you

2 could keep that in mind for the present time?  Could you give

3 us a broad description of that milestone?

4 A    It's -- the idea is to make the company sort of leaner, as

5 has been announced publicly.

6 Q    And from your perspective in the conversations with

7 respect to that milestone, do you think it's an important

8 milestone for the company's efforts?

9 A    Yes.  It's vital.

10 Q    And do you believe, in your experience, that it's a

11 typical milestone?

12 A    Yes.

13 Q    Overall, with respect to the key employee incentive plan,

14 I mean the key executive incentive plan, do you believe it's

15 important for the reorganization efforts of the U.S. debtors?

16 A    Yes, I do.

17 Q    And do you think it's important for the reorganization

18 efforts of all the debtors around the world?

19 A    Definitely.

20 Q    How important is it, in your view, that the programs in

21 the three major jurisdictions be as consistent and coordinated

22 as possible?

23 A    I think it's very important.  It's been a practice of

24 Nortel for many years to have a single integrated compensation

25 program globally, and we're trying to maintain, be as close to

1  that as we can.  It is an integrated business, and people team

2  across borders all the time on a daily basis, and it's -- so,

3  it really isn't -- the company really isn't organized on a

4  geographic basis.  So, I think it's very important that we have

5  an integrated program.  And that's been clearly the direction

6  from senior management at Nortel.

7  Q    In your experience with respect to other programs that

8  you've been involved with, as well as other programs that

9  you've looked at, do you believe that the Nortel program is

10 reasonable and fair in the context of the market?

11 A    Yes, I do.

12 Q    And where would you say it fits?  Is it in the middle?  At

13 the high end?  At the low end?

14 A    The program is a little bit broader in eligibility than

15 the typical program, which I encouraged Nortel to pursue given

16 the large number of key professional employees that they have.

17 And so, there's about five percent of the North American

18 employees in the program, and that's a bit broader than

19 typical.  And the cost, consequently, is a bit higher than your

20 median program, but it's certainly well within the range of

21 what I've seen in other organizations.

22 Q    Now, when you mentioned key professional employees, could

23 you just give a little context of the term professional?

24 A    The -- well, it's the salaried workforce.  They do have a

25 tremendous number of technical and operational employees who

Dempsey - Direct                                          39

1  service the customers.  One of the Nortel characteristics is

2  the manufacturing is outsourced, so there's, you know, where

3  compared to many of the manufacturing companies that I've

4  worked with and studied that have large numbers of

5  manufacturing employees, they -- the narrower -- have a -- that

6  part of the organization doesn't exist.  It's outsourced, so

7  it's a very technical, very highly educated work force that is

8  vital to maintaining their products and servicing their

9  customers.

10 Q    When -- in your experience, do you think that the amount

11 of time and effort that was put into designing the Nortel

12 program is consistent with what you've seen in prior

13 experiences?

14 A    Yes.  It's -- we worked very intensely with management,

15 and then had a thorough review with advisors to the creditors'

16 committee, and also discussed it with the creditors' committee

17 itself.  So, it was a -- we also discussed it in some detail

18 with the compensation committee and the entire board of

19 directors of both companies.

20 Q    If we could just focus for a moment on the retention plan

21 for the lower level employees, or the lower job

22 classifications.  The -- the program is consistent across North

23 America.  Is that correct?

24 A    Yes, it is.  Yes.

25 Q    And how important do you think it is for folks in those

1  job classifications in the U.S. and Canada to be treated

2  consistently?

3  A    The comments I made before apply equally to the -- JCI-4

4  through 6.

5  Q    And in terms of identifying the individuals who would

6  participate in the JCI-4 through 6 levels, how rigorous do you

7  think that exercise was?

8  A    It was similar to -- it was done at the same time as the

9  key executive incentive plan, and therefore was very thorough.

10            MR. BROMLEY:  Your Honor, that's all I have for

11 direct testimony.  I reserve my rights for cross --

12            THE COURT:  Of course.

13            MR. BROMLEY:  -- and would invite anyone who would

14 like to speak to Mr. Dempsey to do so.

15            THE COURT:  All right.  Thank you very much, Mr.

16 Bromley.  The committee wishes to be heard?  Good morning.

17            MR. BOTTER:  Good morning, Your Honor.  David Botter,

18 Akin, Gump, Strauss, Hauer & Feld on behalf of the official

19 committee.

20            THE COURT:  Good morning.

21            MR. BOTTER:  Good morning.  First, let me say it's an

22 honor and pleasure to appear before you for the first time.

23            THE COURT:  And it's good to have you here, Mr.

24 Botter.  Thank you.

25            MR. BOTTER:  Thank you.  Your Honor, the way in which

**J&J COURT TRANSCRIBERS, INC.**

1  this hearing has been broken up, and with two distinct

2  hearings, today's hearing and on March 20th, the committee is

3  supportive of the relief requested by the debtors today.

4  Hopefully we will be supportive on March 20th, as well.

5  However, given that there are two distinct hearings, and the

6  witness will be, I assume, the witness for both hearings, we

7  would reserve our right to cross the witness on March 20th to

8  the extent that that becomes necessary.  Today it is not

9  necessary.

10         THE COURT:  All right.  That's fine with the Court,

11 of course, and I notice Mr. Bromley acknowledging that Mr.

12 Dempsey will be back here on the 20th.

13         MR. BOTTER:  Good.  Thank you, Your Honor.

14         THE COURT:  You're welcome.  Anyone else before Mr.

15 Tinker takes the stand?  Or I should say the podium.  Excuse

16 me, Mr. Tinker.  Whenever you're ready, sir.

17         MR. TINKER:  Thank you, Your Honor.

18         THE COURT:  If I may just ask, Mr. Tinker, is the

19 Office of the United States Trustee objecting to the motion, or

20 are you waiting to see the results of your cross examination?

21 Or what?

22         MR. TINKER:  Your Honor, first of all, let me thank

23 you for indulging the United States Trustee, and debtors'

24 counsel, as well --

25         THE COURT:  Certainly.

1           MR. TINKER:  -- in regards to the deadline for our

2    office to object.  The notice deadline was yesterday at noon.

3    Debtors' counsel extended the deadline for, and Mr. Bromley and

4    I have talked extensively yesterday, and I talked previously

5    with debtors' counsel earlier in the week.  And Your Honor has

6    indicated that the United States Trustee would be permitted to

7    raise any objections or comments, or whatever, this morning --

8           THE COURT:  Yes.

9           MR. TINKER:  -- so that we didn't have to file

10   written objection and we could try to work things out, and to a

11   large degree we have obtained -- the Office of the U.S. Trustee

12   has obtained more information.  It's been very helpful for us,

13   and hopefully will be helpful with my cross examination, as

14   well.

15          With regards to the motion, we -- at this point in

16   time I do oppose the motion, but what I want to do is, through

17   cross examination, ensure that we have a good showing for Your

18   Honor as to any of those facts that do, in fact, support the

19   granting of the relief here.  My concerns are going to be the

20   concerns one might expect under 503(c), and namely concerns

21   under (c)(1) with regards to insiders perhaps receiving a

22   retention benefit, the possibility that some of these benefits

23   might be severance in nature.  But also with regards to both

24   the KEIP and the KERP, as well, the appropriateness of relief

25   under 503(c)(3), which has its own legal standard.

1    So, my objection, I guess, right now is so broad

2 brushed that it's hard for me to answer Your Honor directly.

3    THE COURT:  I understand.  And you'll want to

4 evaluate it, perhaps, after your cross examination, as well?

5    MR. TINKER:  Yes.

6    THE COURT:  Good.

7    MR. TINKER:  Thank you, Your Honor.

8                    CROSS EXAMINATION

9 BY MR. TINKER:

10 Q    Mr. Dempsey, as you started your direct examination you

11 were asked about the people who were employed by Nortel and

12 that sort of thing, and I think you indicated that there are

13 around 24, 25,000 persons employed by Nortel generally?

14 A    Yes.

15 Q    Okay.  And how many of those people are employed by Nortel

16 debtors in the United States?

17 A    I don't have that number off the top of my head.

18 Q    The persons who are -- whose jobs are going to be

19 terminated, pre-petition there was an announcement of 1,800,

20 and then post-petition, more recently, an announcement of 3,200

21 persons who would be -- would have their positions eliminated.

22 Can you -- that's roughly 5,000 persons, right?  The number of

23 those persons who are employees of the United States debtors,

24 can you tell me how many of those there are?

25 A    I really have not been that focused on the breaking out

Dempsey - Cross/Tinker                    44

1  the cost for the employee population by legal entity.  We've

2  primarily tried to look at Nortel on a combined basis.  And so,

3  I'm not able to string off those statistics on the U.S. debtor.

4  Q    Would I be correct in saying, then, that with regards to

5  Nortel generally, we're talking about a reduction of about one-

6  fifth of the labor force?

7  A    Yes.

8  Q    And that's probably roughly true for the United States, as

9  well?

10  A    Yes.

11  Q    Your next topic of testimony I think had to do with

12  historically the kinds of compensation that was given to

13  employees, and you mentioned an annual incentive plan.  Can you

14  tell me how many of those are -- of Nortel's current employees

15  are covered by the annual incentive plan?

16  A    There's about 14,000.  The idea of that program is to be

17  very broad based and to align all of the entire employee

18  population with Nortel's financial objectives for this year,

19  and that there are other programs, such as sales incentive

20  plans, which have not been modified and continue to operate,

21  that cover many of the remaining employees.

22  Q    What I'm trying to do is just figure out in my own mind to

23  what extent the concerns about the debtors' workforce, you

24  know, might be addressed through the annual incentive plan and

25  its benefits for employees.  The annual incentive plan, can you

**J&J COURT TRANSCRIBERS, INC.**

Dempsey - Cross/Tinker                          45

1  tell me roughly how much money that entails, for example for

2  this year or for last year, or in 2007?

3  A     It is well in excess of $100 million globally.

4  Q     And that plan is available for most of the employees of

5  Nortel, including the key employees?

6  A     Yes.

7  Q     And including the two levels of executive personnel?

8  A     Yes.

9  Q     I think you indicated that the persons who are eligible

10 under the KERP, key employees, those are selected from a couple

11 different salary levels?

12 A     Three salary levels.

13 Q     And that's JCI-4, 5 and 6?

14 A     Correct.

15 Q     Okay.  And to the extent that those individuals received

16 payments under the annual incentive plan that's currently in

17 effect, can you tell me how their compensation is determined

18 under that plan?

19 A     Well, there is -- their package would include a base

20 salary, their AIP target, or whatever is earned based on the

21 company's actual performance I should say.  And then there is

22 this -- the key employee retention plan.  But even then

23 generally speaking their pay is not up to full market median

24 relative to their competitors.

25 Q     The JCI-4, 5 and 6, if we go from four to five, generally

1 speaking that's associated with also an increase in salary?

2 A    Yes.

3 Q    And 5 to 6 is a further increase, generally?

4 A    That is correct.  That is also true in the marketplace,

5 where the higher you go in an organization your role is

6 different, and the competitive market for your position is

7 different, and therefore pay is different.

8 Q    Now, if Nortel did as well as expected and these

9 individuals did as well as hoped, can you tell me -- can you

10 describe for me generally the kind of increased compensation

11 that they would receive?  In other words, if they met target,

12 what can an individual who is in JCI-4, 5 or 6 expect?

13 A    Well, JCI-4 would earn another ten, 11, 15 percent of

14 their base pay in the AIP, and then a similar amount in the

15 retention program.

16 Q    Similar to that in the KERP?

17 A    That is correct.

18 Q    So, we're then talking about --

19 A    Either the same amount as the AIP, or a bit more.  There

20 are a couple of tiers that we identified for them.

21 Q    All right.  So, under the ACI (sic), then, you would have

22 ten to 15, and if they met that goal plus the KERP goal, you

23 would be talking about maybe 20 to 30 or so?

24 A    That's correct.

25 Q    20 to 30 percent.  That's correct.

Dempsey - Cross/Tinker                    47

1  Q    And if they're in JCI-5, your higher level employee, is it

2  comparable to that?

3  A    It's a bit more.  It's more like 20 percent.

4  Q    Now, just stay with the ACI so I can keep it straight in

5  my own mind.  For the ACI, if you're JCI-5, it would be what

6  range?

7  A    It would be -- for JCI-5 the AIP would -- and this is

8  from memory, would be about 20 percent or so, and then

9  similarly you would see the same amount in the retention

10  program, or a bit more.  It's a very similar -- the retention

11  awards are sized to be equivalent to the AIP award. That is it

12  doesn't -- you know, we don't always do it that way, but that

13  happened to work well in Nortel's situation.

14  Q    And with regards to JCI-6, for the annual incentive plan

15  --

16  A    Yes.

17  Q    -- it would be --

18  A    A bit higher, 40 or so.

19  Q    40 percent?

20  A    Uh-huh.  And for both plans.

21  Q    So, painting with a really broad brush, if the Court were

22  to approve the KERP and if all the targets were met, the

23  milestones, or any other requirements that might come into play

24  for the KERP, we're basically talking about a doubling of the

25  payment under the annual incentive plan?

1  A    Yes.

2  Q    That's helpful.  Thank you.  Now, if you then go to

3  persons that Nortel might consider to be executives, and I

4  think we have two levels of those?

5  A    Yes.  In the key executive incentive plan there are two

6  levels.  There's the SLT, which is about the top nine people,

7  of which eight are participating, and then there -- and

8  excluding the chief executive, and then there's the ELT, which

9  is the population of, sort of their direct reports, if you

10 will.

11 Q    I'm sorry?

12 A    The ELT is the next level down, sort of generally the

13 direct reports of the SLT.

14 Q    The direct?

15 A    The direct reports in the organizational hierarchy, the

16 people who's reporting relationship is one layer down.

17 Q    So if I looked on the organizational chart for the Nortel

18 corporate enterprise, at the top we would have these eight or

19 nine, and then if you drew the lines of command, if you will,

20 the persons at the next level would be those who are ELTs?

21 A    That's correct.

22 Q    These designations, are they created for the purposes of

23 these two plans, or were they pre-dating --

24 A    Oh, yes.  This is the way Nortel organizes its job

25 hierarchy, generally speaking.

1  Q    Okay.  Again, if you go back once more to the annual

2  incentive plan, can you tell me how, if all the goals are met

3  under that annual incentive plan, what kind of additional

4  compensation would somebody in the ELT category receive?

5  A    In theory it's pretty substantially, but in the ELTs it

6  would be more in the 80 percent range --

7  Q    Eight?

8  A    80 percent of salary.

9  Q    Oh.  Okay.  And the persons in that level, they're not

10  participating in the KERP, right?

11  A    Not in the KERP.

12  Q    Okay.

13  A    Not in the key employee retention plan.  That's correct.

14  Q    All right.  But they will be participating in the KEIP?

15  A    That's correct.

16  Q    Okay.  So that if, under the KEIP, all of the milestones

17  were satisfied, and they met all the other requirements,

18  whatever they are in the KEIP plan, can you tell me how much

19  additional compensation --

20  A    It's the same exact --

21  Q    -- ELTs would --

22  A    -- relationship we just discussed, where it would be

23  roughly the -- it would be the same as their AIP targets, or

24  somewhat more for a tier two, most selective group.

25  Q    All right.  So, if they met targets we're talking about

1  basically an 80 percent additional compensation under the

2  annual incentive plan plus another 80 percent additional

3  compensation under the KEIP?

4  A    Uh-huh.

5  Q    Okay.  Now, if we then -- I understand it's not up to

6  date, but I'm trying to get kind of a bigger picture of it, but

7  for the SLTs, how are they treated under the annual incentive

8  plan that's already in existence?

9  A    Most common is 100 percent of base salary.

10  Q    And is there a range?

11  A    There are a few people with lower targets, I believe.

12  Q    Anybody with higher than 100 percent?

13  A    Not in the program.

14  Q    Okay.  Now, if the persons who are SLTs were to receive

15  the full amount that they might be entitled to under the KEIP,

16  assuming all the milestones are met, and satisfied all the

17  other requirements, whatever they are, can you tell me how much

18  additional compensation they may have under the KEIP?

19  A    It would be -- they're all in tier two, as it happens, so

20  they would be -- they would receive more than one times their

21  AIP target.  Generally it's two times their AIP target.

22  Q    All right.  You're speaking English, but my mind isn't

23  thinking that way.  So, you have your base salary.  If they met

24  all the AIP targets you'd have another 100 percent, so twice

25  the base salary.  And if you then, in addition, satisfied the

1 keep you would have an additional how much?

2 A    One to two times their base salary.  Yes.

3 Q    All right.  So, it would be three to four times the base

4 salary if they satisfied the KEIP requirements?

5 A    That is correct.  The thing that is really important to

6 understand about this is that Nortel has historically had a

7 very highly incentivized program for paying its executives, so

8 if you think about, you know, for a company as big as Nortel,

9 you would typically find that the base salary would only be a

10 third to a quarter of their total package.  And so, that is

11 essentially the problem that we're trying to fix.  If we do

12 nothing we would find ourselves with a pay package that is so

13 far below market that we're assured to have major problems.

14 And so, that's really the problem we're trying to solve here,

15 and that's why it is that you do see these -- you know, the mix

16 of pay is still heavily weighted towards at risk compensation,

17 both the annual plan and these milestones in the KEIP.  So,

18 we're trying to keep to Nortel's historical practice of

19 incentivizing its employees but if today we have to do this

20 through the restructuring incentive rather than what we used to

21 do, which was, you know, other forms of incentive compensation.

22 Q    The SLTs are not up to date, and so I -- we may have

23 additional questions later, but moving on.  The persons who are

24 JCI-4, 5 and 6, who are going to be the beneficiaries, if you

25 will, of the KERP, there are no insiders included there?  Right

1  -- I'm sorry -- no officers or persons in control of a company?

2  A    Yes.  My -- yes.  We've designed it so that there will be

3  no insiders in the KERP.

4  Q    Okay.

5  A    We actually had to take a few people in JCI-6 out of the

6  KERP, even though they would ordinarily have been in it because

7  were advised by Nortel's counsel that they could potentially be

8  insiders, and therefore there are a couple of miscellaneous

9  sixes who are included in the KEIP.

10          THE COURT:  I just wanted to interrupt for one

11  minute, Mr. Tinker, if I may, because I think you've stated a

12  couple of times that the SLTs are not involved today?  But

13  aren't a number of SLTs involved, senior leadership

14  individuals?

15          MR. BROMLEY:  Your Honor, we have a hearing on the

16  20th --

17          THE COURT:  On those?

18          MR. BROMLEY:  On those.  The senior leadership team

19  will be addressed on the 20th.

20          THE COURT:  Thank you.  Okay.  Thank you, Mr.

21  Bromley.  I apologize.

22          MR. TINKER:  Well, I should probably add something

23  just to clarify it a little bit more.  As it was originally

24  noticed, we have today everybody but the SLTs.  And when I

25  first saw that right down between the first group and then the

Dempsey - Cross/Tinker                          53

1  SLTs, in fact, I thought it was a great idea, because it takes
2  the insiders and puts them on a later date.  The problem is
3  that, and what we were working with yesterday, is that Mr.
4  Bromley and I could not come to grips quite to my satisfaction
5  with regards to who is an insider.  And that's why today we
6  need to address the KEIP issues, even though perhaps, you know,
7  in other circumstances we might have put that off.  The result,
8  Your Honor, is that -- I think you're going to be asked to
9  approve the KEIP today, as well as the KERP, and the SLTs would
10 fall within that same program, so that when we come on the 20th
11 I guess what we're left with is whether or not the Court should
12 approve the SLTs as part of that already approved KEIP plan.
13            THE COURT:  Okay.
14            MR. TINKER:  So, I guess I -- in my mind I'm thinking
15 of the 20th as really being a much smaller issue than today.
16            THE COURT:  Yes.  Well, certainly we won't have the
17 retention program on the 20th.
18            MR. TINKER:  Thank goodness.  Yes.  Well -- maybe we
19 will, but if we can resolve that issue today that would be
20 fantastic.
21            MR. BOTTER:  Your Honor?
22            THE COURT:  Yes, Mr. Botter?
23            MR. BOTTER:  Your Honor, David Botter again for the
24 committee.
25            THE COURT:  Yes, Mr. Botter?

1          MR. BOTTER:  I'm not sure that Mr. Tinker has stated

2   that absolutely correctly.  I think that the 20th will be an

3   approval of the KEIP program.  The senior leadership team are

4   the ones who are subject to the KEIP program, so it's a much

5   broader context, I thought, than --

6          MR. BROMLEY:  No.  The ELTs are still subject to the

7   KEIP, as well.

8          MR. BOTTER: Okay.  I'm sorry.  But the entire KEIP

9   program for the most senior executives is on for the 20th, and

10  that's why I had reserved with respect to the cross on the

11  SLTs.

12         THE COURT:  Exactly.

13         MR. BOTTER:  So, it is a reconsideration -- a full

14  consideration of that program for the senior leadership team on

15  the 20th.

16         MR. BROMLEY:  Your Honor, I mean, when you come down

17  to it, most of these things always boil down to the top ten or

18  so people in the company, so our view has been that the senior

19  leadership team, five of whom are in the U.S., and three of

20  which are in Canada, one is in the U.K., beyond our reach and

21  control, that that is the issue, that -- and that with respect

22  to the KEIP, the metrics, and the dollar amounts, and

23  everything with respect to those individuals, will be up for

24  consideration on the 20th.  With respect to the ELT group, the

25  45 or 46 people, we're looking for approval of that today.  It

Dempsey - Cross/Tinker                    55

1  is not inconceivable at all that people couldn't say that the

2  metrics or the numbers with respect to those individuals who

3  are the very top of the house should be considered differently,

4  and that's what would be up for the 20th.  So, to the extent

5  that there's any confusion, we would not see anything that

6  would be decided here with respect to the ELT program

7  compromising anyone's rights to argue anything with respect to

8  the SLT program or any aspect of the program as it relates to

9  the SLTs.

10          THE COURT:  That's helpful, Mr. Bromley.  Yes.  Mr.

11  Botter?

12          MR. BOTTER:  And, Your Honor, the reason this was set

13  up this way, and this was pursuant to discussions between the

14  debtors and the creditors' committee, was that the senior

15  leadership team are the people who really are the most

16  responsible for the success and/or failure of the

17  restructuring.  And so, we needed some more time to have

18  continued discussions and to see more information with respect

19  to that particular portion of the program.  and as Mr. Bromley

20  said, you know, that is sort of up for grabs as of the 20th.

21          THE COURT:  Okay.  It's been a helpful discussion.

22  Thank you.

23          MR. TINKER: Your Honor, could I just have one moment?

24          THE COURT:  You may, Mr. Tinker.  Certainly.

25                      (Pause)


**J&J COURT TRANSCRIBERS, INC.**

1          MR. TINKER:  Your Honor, I think I agree with what

2   Mr. Bromley has stated and what committee's counsel has stated.

3   My own formulation of those concerns is that for purposes of

4   today in approving particularly the KEIP, but maybe to some

5   extent the KERP today, Your Honor is going to have to consider,

6   I think, the metrics or the triggers under the KEIP, because we

7   have people who are going to be potentially the recipients of

8   benefits under the KEIP, and I have not conceded that all of

9   the ELTs, or perhaps, you know, key employees are not insiders.

10  And because I have not been able to do that 503(c)(1) and

11  3(c)(2) necessarily come into play today.

12         THE COURT:  Well, my understanding, again, let's just

13  clarify this, is that without conceding that they are insiders

14  for purposes of this motion the debtor is saying look at them

15  as if they were insiders.

16         MR. BROMLEY:  I think that's right, Your Honor.

17         THE COURT:  Okay.

18         MR. BROMLEY:  I mean, there's -- for the retention

19  plan people, the JCI-4, 5 and 6's, we are making the statement,

20  and Mr. Dempsey has testified that they are not insiders --

21         THE COURT:  Right.

22         MR. BROMLEY:  -- and indeed that we found two that we

23  felt could be insiders and we moved them up.  And so, on those

24  I think the issue of the individuals, are they insiders or not,

25  yes, with the KEIP -- the KERP, the retention plan, we're

1  certainly making the showing today that they are not insiders.

2         With respect to everyone above that, we're not

3  disputing that they are insiders.  We don't think it's relevant

4  because then we move out of the question of whether or not what

5  we have is a 503(c)(1) plan.  We're not seeking to say to

6  retain those people and therefore prove on an individual by

7  individual basis that they have an offer and that they would

8  take that offer.  What we are saying is with respect to that

9  group is that we've put together a program that has built into

10 it incentives, three incentives that are milestones that are

11 tied to particular reorganization targets that are typical in

12 the industry that are seen as appropriate, ordinary course

13 under the facts and circumstances, and therefore satisfying

14 503(c)(3).  So --

15        THE COURT:  But if there were a problem with your

16 motion, I think you may just want to make this clear, and I'd

17 like to know as well, you would reserve the right to argue at a

18 later date that any number of the parties in the KEIP, the K-E-

19 I-P, the incentive program, are not insiders if you had to --

20        MR. BROMLEY:  If I had to.

21        THE COURT:  Yes.

22        MR. BROMLEY:  And indeed, Your Honor, you know,

23 because it's such a large organization, you know, the idea of

24 actually having a half in camera, half out camera so to speak

25 hearing, where we go through every one of these individuals and

1 say that the person who is with this job title in this area is

2 not an insider, we just thought that that was not the best use

3 of the debtors' resources and the Court's time, and that's why

4 we've decided to put together a program.

5          We certainly believe that if you want to debate the

6 capital O, officer point, that the statutory history of

7 503(c)(3) is that what we're talking about is the people at the

8 very top of the organization.  If you think back to why 503(c)

9 has been put in there, it was the Worldcom Bernie Ebbers world

10 of the bad guy getting away with murder, so to speak, not the

11 guy who is the team leader for sales for our largest client.

12 You know, and so, when you take that background out of this, we

13 actually think that the case law does support the fact that

14 it's officer with a capital O, a board appointed officer, but

15 we didn't think we should actually argue that because we

16 thought it is appropriate, frankly, to have an incentive

17 program consistent with past practice and the historic approach

18 within Nortel that everyone in the top levels, whether or not

19 they were officers or people in control so to speak, should be

20 incentivized to accomplish things.

21          And if you look at the entire compensation structure,

22 you know, the folks who are at the lower end, ten or 15 percent

23 of salary, they are the folks who have the least ability to

24 impact what's happening to them on a daily basis in terms of

25 the performance of the company.  And it goes up where more and

1 more of the compensation is put at risk so that the people at

2 the very top have the highest risk and the highest reward

3 opportunities.  And in this circumstance, consistent with

4 market practice, 50 percent of the key executive incentive plan

5 is tied to the plan, you know, and that is the most traditional

6 of goals in a reorganization.

7          And so, you know, in our view if you're looking at

8 that and you said, well, somebody who is an SLT gets 100

9 percent of his salary in AIP, and then potentially 200 percent,

10 well, 100 percent of that is tied to the plan, and the other is

11 tied to cost reductions, and tied to the other material issues

12 that we've discussed.  These are all -- and so, for us I think

13 the issue on the KEIP has been are these reasonable milestones

14 and appropriate milestones in the market and in the exercise of

15 the debtors' business judgment with advice of competent and

16 expert outside advisors to put in place in this context for

17 this ELT program.

18          And we perfectly understand that folks can have a

19 different point of view for the guys who are driving the bus,

20 and that's why we have a separate hearing.  And certainly we've

21 had a lot of conversations with the creditors' committee about

22 that.  You know, our view is we're going to give them the

23 information that they've desired, and we're going to be there

24 with them because we've had a lot of conversations.  You know,

25 this is -- you know, you -- for better or for worse, you know,

1  the creditors' committee and the bondholder group are the folks

2  who are representing the key constituencies here, and we have

3  tried very hard, and have succeeded in every instance so far,

4  but we're working hard to be as transparent and accommodating

5  as possible, and that's certainly the way we want to do it.

6  We're having an in-person meeting with the creditors' committee

7  and executives next Wednesday in New York City to facilitate

8  that.  We had meetings last week on transfer pricing.  There's

9  lots of meetings, Your Honor.

10         And so, it's in that context that we're thinking of

11 this, that for the KEIP program for the ELTs we're looking for

12 approval for that today.  We believe the milestones are

13 appropriate and satisfy 503(c).  For the SLTs, we understand

14 the people who are -- you know, have -- in the spotlight have

15 to bear a little bit of the heat, and will have to be dealt

16 with on the 20th.  We believe that that's appropriate, and that

17 we can -- we can prevail there, as well.  But I don't want to

18 get sort of apples and oranges mixed up.  So, I hope that's

19 clarified it.

20         THE COURT:  It is.  And just so nobody's overly

21 concerned, it was one of those momentary points of confusion on

22 my part, but obviously I had read the papers, and the papers

23 were clear about all of that.  So, I appreciate the

24 clarification again, Mr. Bromley.  Mr. Tinker, you may proceed

25 when ready.

1          MR. TINKER:  Yes, Your Honor.  One last comment, and

2  --

3          THE COURT:  Okay.

4          MR. TINKER:  -- I hope I'm just not trying to get the

5  last word in.  Mr. Bromley had indicated the debtors' position

6  that -- I think the position was that all the persons in the

7  KERP were not insiders.  And our office has not conceded that

8  point.  And I just want to make that additional point of

9  clarification.  If it needs to be addressed in further

10 testimony I'm more than happy to hear that, as well.  But it

11 may be that at the end of the day if Your Honor were to approve

12 let's say the KERP, we may be able to deal with that as a

13 matter of drafting the order, because I've not been able to

14 look at the key employees and what role they play in the

15 various debtors.  And, you know, sometimes debtors, they think

16 of officer with a big O, but they're thinking of the enterprise

17 as a whole.  But as in a lot of large enterprises, you have

18 various debtors with a small D, and there are lots of officer

19 positions there, maybe not, but there are potentially.  And, of

20 course, the definition of insider includes not just officers

21 but persons in control.  We may be talking about entities that

22 are defunct, may have particular kind of role where the

23 salesperson would be the primary person in the company, that

24 sort of thing.  Our office, because of the tightness of the

25 time constraints with this motion filed Friday evening, and

1 having a hearing with roughly three business days' notice, you

2 know, we've not been able to get into all of those.

3          THE COURT:  I understand.

4          MR. TINKER:  Maybe we can deal with it by drafting

5 the order in a certain way.

6          THE COURT:  All right.  Thank you, Mr. Tinker.

7          MR. TINKER:  And I'm sorry for the entire digression.

8 Your Honor has touched on things which are obviously a little

9 bit difficult or complex, but hopefully we've helped clarify it

10 a little bit.

11          THE COURT:  Yes.  Thank you.

12 BY MR. TINKER:

13 Q    Mr. Dempsey, I'm trying to get a feel for who the

14 beneficiaries of the KERP are going to be within the company.

15 And I understand they are Levels 4, 5 and 6.  If I were to look

16 at the list of all the employees for Nortel, or for the Nortel

17 American debtors, can you tell me roughly what percentage of

18 all those employees fall within JCI-4, 5 and 6?

19 A    I can't cite that off the top of my head.  I believe you

20 were actually provided with that information, though.

21 Q    I can't give any confidential information out, and I don't

22 know if it is or not.  Do you have a rough idea of what portion

23 of the employee population --

24 A    This is really ballpark, but I would say it's probably a

25 third.

Dempsey - Cross/Tinker                          63

1  Q    A third?

2  A    A third.  Yes.  It's about half of the -- there are six

3  levels, three of them are eligible to participate, and as I --

4  you know, three, four, five are the largest in headcount.  So,

5  I mean, I think, you know, the top half of it there's probably

6  roughly a third of the employees.

7  Q    All right.  Let me work through the numbers which I think

8  are part of the record here today.  And I think it was

9  announced how many people benefit under the KEIP, total

10  executives.

11  A    Under the KEIP?

12  Q    Yes.

13  A    It's about 92.

14  Q    Okay.  And how many people will benefit under the KERP?

15  A    About 900.

16  Q    All right.  So, we're talking about under 1,000 people

17  overall?

18  A    Roughly, yes.

19  Q    And 1,000 out of, say, 24,000 or 25,000?

20  A    I think I may have misunderstood your question.  It's

21  about five percent of the total employee population that are a

22  part of the program.

23         THE COURT:  That's participation in both plans,

24  actually, is five percent.

25         THE WITNESS:  Right.


**J&J COURT TRANSCRIBERS, INC.**

1 Q    On direct examination, Mr. Dempsey, you testified with

2 regards to how these forms of compensation compare to revenues,

3 and I think you indicated that revenues last year were eight

4 million in revenues.  Can you tell me in whatever way you want

5 a measure of profitability, if you will, for last year, and how

6 these sums compare to that, whether it's net profits, or some

7 other kind of measure that you might be familiar with.

8 A    Well, the cost of the program would be a very small

9 percentage of last year's EBITDA.  It's been publicly disclosed

10 the company did lose money on a net basis last year.  This is

11 Bankruptcy Court, after all.  So, I mean, it's -- I generally

12 do not look so much at profitability because profitability is

13 always distressed in these situations, and it's better to look

14 at the overall company size as a way of assessing whether or

15 not the program is sort of a reasonable scope of what's needed.

16 Q    Can you tell me how much the company did lose last year?

17 A    Off the top of my head, it was a couple of billion

18 dollars.

19 Q    A couple of billion?  So, your opinion is, then, is that

20 these amounts are small in comparison to the overall losses of

21 the companies in the last year?

22 A    Well, I think it's -- I think what you're saying is a

23 fact, but I think the point is more that it's a small -- it's

24 small in relation to the size of Nortel, which is an enormous

25 organization, and this is a reasonable expense in the context

1  of Nortel's overall size and the scope of its operations.

2  Q    At this point I should probably apologize, Mr. Dempsey.  A

3  couple of times I have indicated prior testimony, and looking

4  back on it I realize it was Mr. Dempsey's (sic) statement of

5  the facts that I was looking at.  And not you, Mr. Dempsey, so

6  if you're confused, I'm at fault.  But I'd point out to the

7  questions that you had been asked.  You indicated that there

8  was a concern with Nortel with regards to employees being aware

9  of the acute situation that Nortel is in, with concern for --

10 and there's concern for employees losing focus and concern for

11 employees leaving.  These -- the two programs, the KERP and the

12 KEIP programs, how is it that those programs will ameliorate

13 those concerns, the loss of focus among employees and concerns

14 about people leaving?

15 A    What we're doing is offering incentive payments for

16 achieving objectives that the company has.  So, I mean, they

17 can, you know, be more confident that they're being paid fairly

18 and competitively for the roles they're performing and have a

19 financial stake in achieving the company's objectives.

20 Q    The -- if you're a key employee, at least after this

21 program is approved, you would know that, right?  You would

22 learn that you are a key employee?  Maybe they already know?

23 A    This has not been rolled out.  The communication of this

24 has not been rolled out in detail.  Obviously it's public

25 information and people are aware of it, but I am not aware that

1  employees have been notified.

2  Q    But you would anticipate that they would be notified?

3  A    They would be.

4  Q    And for those who are notified, your contention, then, is

5  that this would help them to have an increased focus and not to

6  leave?

7  A    Yes.  Focus on achieving the company's objectives, yes.

8  Q    Okay.  Now, for the 90-some percent, 95 percent of the

9  employees who are not beneficiaries of these programs, what do

10 you think the effect of finding out you're not a key employee

11 would have on them?

12 A    Well, I think that the message that I would send to them

13 is that they are participants in incentive plans that just

14 don't happen to be, you know, being addressed today, and that

15 they also are critical -- they wouldn't be continuing on as

16 employees if they weren't deemed important to fulfilling the

17 company's needs, and that we're looking for their participation

18 in the work of the company, and that they have a financial

19 incentive through the AIP to continue on and do their work.

20 Q    The reductions in the labor force that were described at

21 the outset of the hearing by Mr. Bromley, the 1,800 and the

22 3,200, can you tell me roughly when those come into effect?

23 I'm trying to figure out what the effect is on the employees of

24 Nortel, and they're our concern today.  will they know in the

25 near term if they are within -- not key employees, will they

1  know within the near term if they are among the 1,800 or the

2  3,200?

3  A    The company has already begun that process, and it will be

4  continuing on as quickly as possible to work through.  It is a

5  staged process because it's cuts of this magnitude involve re-

6  engineering work, and making sure that we maintain -- that

7  Nortel maintains its service levels.  So, this is a delicate

8  process, and so it doesn't all happen just with a click of the

9  finger.

10 Q    I can appreciate that, Mr. Dempsey.  The KERP and the

11 KEIP, you compared those to other compensation programs in the

12 market generally?

13 A    Yes.

14 Q    And as part of that process did you take into account

15 competitors of the debtor?

16 A    We took into account the competitors of the debtor when we

17 were assessing overall compensation levels in the organization.

18 When we were assessing the cost and the plan design of the key

19 employee plans we -- you know, we did not focus purely on their

20 industry.  We looked at large complex Chapter 11 cases which

21 fortunately there haven't been that many telecom equipment

22 companies to file for Chapter 11, so, you know, we look across

23 industries, and that is our standard practice as we analyze

24 these programs.

25 Q    The Nortel debtors are reducing the labor force.  Can you

1  tell me if the primary competitors of the debtors are reducing

2  their labor forces?

3  A    I do not have direct knowledge of that, but it would not

4  surprise me if they were.

5  Q    What I'm trying to do is have testimony to evaluate the

6  risk, if you would, of key employees leaving when you have

7  competitors who are also reducing -- perhaps reducing their

8  labor force.  You've not analyzed that?

9  A    Well, I have analyzed the risk that employees will leave,

10  and I have observed situations at Nortel where key employees

11  have been poached.  People that definitely would be part of

12  this program had they remained with the company have left

13  already in the last few months.  And there's just no question

14  that -- and that all occurred in the current economic

15  environment, and the company has also succeeded in convincing

16  people to stay in part on the basis that some of these programs

17  were being developed.

18  Q    When you were evaluating the risk -- I appreciate the fact

19  that you've encountered instances, and I would expect that you

20  would, since this is your -- part of your job, if you will, for

21  the debtors here today, but when you were looking at the risk

22  of people leaving, are there particular things you were looking

23  for?  Did you go in and say, well, to determine the risk of

24  people being poached, if you would, I'm going to look at this,

25  this, and this?  Or is it primarily, indeed, learning what's

1  happening by news coming to you, and percolating, if you will,

2  up through the companies to you?

3  A    I'm not sure I understand the question.

4  Q    It was too long.  There's a risk of people leaving.

5  That's your belief.  Can you tell me specifically what you did

6  to determine that risk?

7  A    We had provided a set of criteria to the human resources

8  staff at Nortel, and they -- the human resources staff worked

9  with general managers throughout the organization and assessed,

10 you know, each key person in the company as to whether or not

11 they were at risk of leaving, how critical -- how difficult

12 they were to replace, whether their role was essential, and

13 that process worked through -- not every that was identified

14 was able to be fit into the program, so they had to prioritize,

15 and work through the process of getting the right list of

16 folks.

17 Q    Okay.  I think maybe you misunderstood my question.  I

18 think what you're describing is how you determined who would be

19 a key employee.  What I'm trying to figure out is how you

20 determined the key employees who were at a high risk of leaving

21 in this current economic client.

22 A    We determined it based on the observation that we could

23 tell that our employees were getting calls and were, you know,

24 it was clear that people were being approached, so that it was

25 evident that we were at risk.

1 Q    And I don't want to re-cast your testimony, but I'm trying

2 to pin it down a little bit.  I think what you're saying is

3 that you had enough anecdotal information so that you can make

4 that statement with confidence?

5 A    Yes.

6 Q    Okay.  Nortel has had significant reduction of its labor

7 force over the past several years?

8 A    Yes.

9 Q    And it's clear from the first day affidavit and elsewhere.

10 Can you compare what -- and I'm sure that employee retention

11 was an issue then as well, right?

12 A    Yes.

13 Q    Can you describe what we're doing today in comparison to

14 what happened in the past, and why it is that we need this

15 today but we didn't need it in the past years when the labor

16 force went down so much?

17 A    Well, I think there's two main factors of this.  Number

18 one is that historically Nortel paid severance.  And

19 unfortunately, Nortel is not in a financial position to offer

20 severance at this time except where legally required.  And so,

21 the employee population is at a much, much more at risk

22 environment.  It's not only insiders, everybody is in the same

23 boat here.  And that, I think, is unusual, you know, for a

24 Chapter 11 of this size.  And so, I think that's a very big

25 difference.

1     The other big difference is there's just so much more

2 uncertainty.  I think that their being in bankruptcy, there's

3 just more uncertainty than there was even during the tremendous

4 reductions that occurred when the telecommunications boom came

5 to an end.

6 Q    Going back, or maybe staying with this notion of the

7 market generally, and declining economy, and whatever --

8 A    I'm sorry.  The market what?

9 Q    The economy generally --

10 A    Oh.

11 Q    -- plus the market for employees, and how it's changing,

12 those are the themes I'm trying to elicit testimony on.  The

13 plans that we have being proposed here today, do you know how

14 they compare to the competitors' plans for compensation?

15 A    They're -- and again, I do not have direct research for

16 the competitors, but it would be my expectation relative --

17 Nortel's program relative to your typical company not in

18 bankruptcy.  It is somewhat different because it is -- it's --

19 Nortel is in bankruptcy and these other organizations are

20 operating in a very different financial environment.

21 Q    Stock options wouldn't be very valuable?

22 A    At Nortel they are not valuable.

23 Q    At least at this point in time.  If I could turn now to

24 the KEIP program and the milestones?  The cost reduction

25 milestone, if you are a key employee, so that as you indicated

1| if this plan is approved you're going to find out you're a key

2| employee, first of all, how would you know if you were -- if

3| your milestone is achieved?

4| A     Employees will -- and these are managers and directors and

5| so on, and they will receive individual objectives for cost

6| reduction in their department whether they are in these

7| programs or not.  I mean, that's just a -- that's how Nortel

8| manages, so the objectives of the company will cascade down

9| through the organization, and each person will know their role

10| to play.  That is not an HR driven compensation activity.

11| That's the management of the company trying to get its work

12| done.

13| Q     Now, this first milestone, is it a milestone that each

14| person reaches individually, or that Nortel as a whole would be

15| reaching?

16| A     Nortel as a whole reaching.

17| Q     All right.  So, I guess there would be an announcement

18| that the goal was reached, and that's how you would know?

19| A     You mean whether -- yes.  There would be an announcement

20| when the goal is reached to the participants, and they would

21| then receive their payment.

22| Q     All right.  Now, we're speaking -- with regards to the

23| KEIP, we're speaking of these milestones as tied somehow to

24| incentives, I take it.  And I'm trying to figure out if you're

25| one of these beneficiaries under the KEIP, how are you

1  incentivized to achieve this first milestone?

2  A    Well, as I explained, the KEIP participants are executive

3  level employees who have a host of financial responsibilities,

4  each and every one of them, and so they will know -- you know,

5  they know what their tasks are as executives, which they will

6  have to fulfill one way or the other, and when the company has

7  achieved its objectives, then they will be notified that the

8  goal was reached.

9  Q   So, are you saying, then, that -- knowing what they know

10 of the milestone as a whole, because these are managers who

11 know their own jobs, they will know what they need to do in

12 order to achieve that milestone?

13 A    Oh, yes.  They already know what the cost reduction

14 objectives are for their groups within the company.  Every

15 member of the ELT knows that already.

16 Q    While it may not be a part of the motion, the details, if

17 you will, of how to achieve the milestone are known to the

18 people who are beneficiaries of KEIP?

19 A    Yes.  I want to be clear.  What the executives know is

20 what their responsibilities are in terms of cost reduction

21 generally, and that, you know, there is a link from that to the

22 key employee incentive plan goals.  Is there a piece of paper

23 that says in order to achieve your part of the key incentive

24 plan goals you must do the following?  No, there is not.  I

25 mean, it's two separate things.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    The cost reduction milestone, you testified that this was

2  one of the more typical kind of forms of compensation that one

3  might find.  When you say more typical, can you give me

4  examples that other firms have that are similar to this?

5  A    Well, as I -- in my materials there's about a third of the

6  companies on that list that have those objectives.

7  Q    With regard to the second milestone, the milestone, in

8  essence, has something to do with having a leaner organization.

9  Can you tell me how an employee who is going to be incentivized

10  would know what they need to do in order to achieve that leaner

11  milestone?

12  A    A similar process is going on with respect to that, where

13  employees have jobs associated with making the company leaner,

14  and they are working towards that objective.

15  Q    Well, you haven't gone into it today.  Am I to understand

16  that there is, you know, a statement of what these

17  considerations are for the leaner milestone set down somewhere

18  on paper that people will be able to refer to?

19  A    It's been disclosed to the committee, and is actively in

20  discussion amongst the executive leaders so that they are all

21  focused on that objective.

22  Q    All right.  So, while the milestone is not set forth in

23  paper here today as part of the record, your testimony is that

24  the ELTs and the two other persons who are the subject of the

25  KEIP for purposes of today, those individuals know what that

1  milestone is all about?  Or, they will know once --

2  A    Yes.  I'm not certain that that's all been explained to

3  everyone, but yes, they will.

4  Q    And you've testified that that second milestone, whatever

5  it is, is typical?

6  A    Yes.  It's one of the ones we typically see.

7  Q    Without describing that milestone for purposes of Nortel,

8  can you describe something you would describe as typical with

9  other companies, noting that it might be a little bit different

10 because you have confidentiality concerns to some degree.

11 A    Yes.  I mean, it would range from -- what I've seen is --

12 well, in automotive cases I've seen, you know, organizations

13 where they've closed plants, or exited, you know, particular

14 customers, or varieties of re-engineering the business

15 processes of the company to become more efficient.

16 Q    Part of your testimony was that the -- I think you were

17 talking about KEIP, that the KEIP is reasonable and fair, and

18 in fact that it's, I think, broader than the typical program.

19 And, again, I don't want to re --

20 A    I think you used the word KEIP, but I would say in general

21 the combined programs are definitely a little bit broader than

22 the typical, but within the range among the practice.

23 Q    All right.  So, we're talking about the KERP and KEIP, in

24 other words, about five percent of the population, and your

25 testimony is that that's broader than a typical KERP and KEIP

1  combination?

2  A    Within the range of competitive practice, but it's a bit

3  more than what we typically see.  Well -- there are -- it is

4  within the range, and it's a little above the -- the median of

5  the sample that we handle.

6  Q    And is it therefore your testimony that because it falls

7  within the median of other plans, that it is therefore

8  reasonable and fair in the context of Nortel's situation?

9  A    Yes.

10 Q    When you testified that it's reasonable and fair, and I

11 understand you're an expert in this area, but when you say it's

12 reasonable and fair, were you thinking of anything else aside

13 from that?

14 A    This is the situation of the company, and it's

15 uncertainty, and what the organization needs to do, and those

16 sorts of things.

17 Q    Why, as a non-expert, when I think of reasonable and fair,

18 I automatically ask reasonable and fair to who?  And what would

19 your answer be to that?

20 A    It would be reasonable and fair to the stakeholders of the

21 estate.  But the point of this program is to make sure that it

22 is a fair expenditure of the estate's resources in order to

23 achieve the -- to maximize the value of the estate to creditors

24 and other stake holders.

25 Q    Thank you.  That's the kind of answer I was looking for in

1  the sense of trying to find something other than just that it's

2  typical.  Okay.

3          MR. TINKER:  Your Honor, if I could just have one

4  moment as I try to recap what I have here?

5          THE COURT:  Of course.  Yes, Mr. Tinker.  Of course

6  you may.

7          MR. TINKER:  Thank you.

8                          (Pause)

9          THE COURT:  Mr. Dempsey, we've been going a while.

10  Do you need a break, or are you holding up well?

11          THE WITNESS:  I'm okay for the moment.  Actually,

12  could I take a break for a minute?

13          THE COURT:  Yes.

14          THE WITNESS:  I'm sorry to --

15          THE COURT:  During the break --

16          THE WITNESS:  -- change my answer.

17          THE COURT:  No, no.  That's fine.  Is that acceptable

18  to everyone here?

19          MR. TINKER:  It is acceptable for me.  It would

20  ensure that I don't have to come back to him.  I don't know

21  yet.  That's --

22          THE COURT:  Okay.  Then let's take a five minute

23  break.  That might be well -- and we'll have a more comfortable

24  witness.  We'll stand in recess for five minutes.

25                          (Recess)


**J&J COURT TRANSCRIBERS, INC.**

1    THE CLERK:  Please rise.

2                    (Pause)

3    THE COURT:  Thank you, everyone.  Please be seated.

4 Mr. Dempsey, thank you, sir.  You may proceed when ready.

5    MR. TINKER:  Thank you, Your Honor.  I really don't

6 have very more questions.

7                CONTINUED CROSS EXAMINATION

8 BY MR. TINKER:

9 Q    Mr. Dempsey, the milestones that have been discussed

10 today, those apply to both the KERP and the KEIP, right?

11 A    The payments under the KEIP are contingent on the

12 achievement of the milestones, and under the KERP it serves as

13 an accelerator, if you will, if the milestone is achieved prior

14 to the fixed date, then the payment is made.

15 Q    The three milestones that we've talked about, the

16 confirmation of a plan, the cost reduction milestone, and the

17 -- whatever it is milestone, the parameters that have been

18 disclosed to some people, are these three milestones commonly

19 used by businesses in the debtor's industry outside of

20 bankruptcy?

21 A    Well, they are the -- the first two milestones are used in

22 incentive plans, cost reductions, leaner organization.  Of

23 course, the third milestone would be -- is very specific to a

24 Chapter 11 environment.

25 Q    So, your testimony would be, then, that at least half of

                J&J COURT TRANSCRIBERS, INC.

1 the compensation that could potentially be awarded is not the

2 kind of compensation that's granted on the basis of that kind

3 of event, the confirmation of a plan?

4 A    That has a specific Chapter 11 related objective, the

5 latter half of the payment.

6        MR. BROMLEY:  Your Honor, I haven't objected, but I'm

7 not sure I fully understood the question.  I'm not sure that

8 the witness did, as well.  If I could ask Mr. Tinker to

9 rephrase it, perhaps?

10        MR. TINKER:  If you didn't understand it, then maybe

11 I didn't say it properly.  I was throwing to throw up a

12 softball.

13 Q    The confirmation milestone, that is not a milestone that

14 you would find in the industry outside of bankruptcy?

15 A    Correct.

16 Q    Okay.  Consequently, if we look at the benefits that could

17 be paid to somebody under the KEIP, at least half of those

18 benefits, the monetary amount, 50 percent, would not be awarded

19 under a similar plan outside of bankruptcy because you wouldn't

20 have similar plans like that?

21 A    It is true that the particular milestone is specific to

22 Chapter 11.  However, it is market practice to offer incentives

23 adapted to each organization's goals and objectives, and my

24 testimony is that the overall level of pay is competitive with

25 the market.  So, I mean, while there would not be the specific

1  incentive outside bankruptcy, Nortel's competitors certainly do

2  have incentives that offer similar amounts of money for things

3  that are particular to their organizations.

4  Q    Fair enough.  Thank you.  The KERP and KEIP plans that are

5  being discussed today, those are rather different from plans

6  that have been existence in the past in this -- for Nortel?

7  A    Yes.

8  Q    All right.  You didn't have these plans before?  These are

9  not modifications of a prior plan?  They are new plans?

10 A    The company has some history of paying retention bonuses

11 in certain situations, but I'm not aware of retention programs

12 as large as this one in their past.

13 Q    With regards to the confirmation milestone, does that

14 milestone, if I were to go to the KEIP plan, a document, and I

15 were to look at the milestone, does the milestone say anything

16 about the type of plan that would have to be confirmed in order

17 for that milestone to be achieved?

18 A    What it says right now is it's a plan of reorganization.

19 Q    Can you tell me -- you're the one drafting that plan,

20 right?  Can you tell me what that means?

21 A    Well, it means that the -- I mean, I'm conscious I'm

22 saying this in a room full of lawyers, but it's -- my

23 understanding is that it involves establishing a plan to

24 distribute the proceeds from the reorganization, whether that

25 be common stock, or proceeds of a sale process, or whatever

1  turns out to be appropriate in the context of the case.

2  Q    I'm just trying to make that should we have a plan I just

3  want to know if that plan, if it's confirmed, will lead to this

4  kind of milestone having been achieved.  I mean, for example,

5  let's say we had a plan and the Court confirmed it, and it

6  provides for, you know, a fire sale liquidation of all of

7  Nortel's assets.  As a person who was involved in the drafting

8  of this plan, would that qualify in your mind?

9           MR. BROMLEY:  Objection, Your Honor.  First, it's a

10 hypothetical, and I understand that we've been allowing leeway

11 with that --

12          THE COURT:  Yes.

13          MR. BROMLEY:  I am concerned, though, about the

14 format of the hypothetical.  You know, we're not -- we do have

15 press in the room.  We're not talking about a fire sale

16 situation, and I want to make it absolutely clear -- I mean,

17 what we have said is a Court approved plan of reorganization.

18 That's what we've disclosed.  That's what the plan states.

19 There's no --

20          THE COURT:  Yes.

21          MR. BROMLEY:  -- there's no need for confidentiality

22 about that.  So, that's, I think the framework, a Court

23 approved plan of reorganization.  And, you know, we all know

24 what that is.

25          MR. TINKER:  Respectfully, Your Honor, I don't know

1 what it is, which is why I'm asking, because in Chapter 11 we

2 have -- a lot of times people say a plan of reorganization, and

3 they mean confirmation of a plan.  And if that's what we mean

4 here, I'd rather have it specified now than wait until later to

5 have it come up as an issue, much as anybody drafting a

6 contract, for example, you want to have it specified as much as

7 you can at the outset.  So, if there is going to be any kind of

8 a plan, then fine, we would just say confirmation of a plan as

9 the milestone.

10        THE COURT:  I understand the debtors' sensitivity on

11 the issue, but to the extent there is any press, no one is

12 talking about, I don't think, a fire sale at this point.  But

13 at least we could understand, I think more definitively, what a

14 plan of reorganization contemplates in this witness's mind, and

15 I'll overrule the objection, particularly because we're really

16 operating on such a fast track here that there's been no

17 opportunity for discovery and that sort of thing.

18 A    It is anticipated that under this plan that if Nortel

19 comes along, restructures and emerges as a standalone, that

20 that would constitute reorganization under a plan.  If it turns

21 out that the company needs to be sold according to a -- what in

22 the U.S. we call the 363 process, or something of that nature,

23 that that would constitute achievement of the milestone.  And

24 my -- the discussions we've had is that, you know, a --

25 literally a liquidation where the company shuts down and sells

1  of the pieces of equipment, and, you know, the chairs and

2  tables, and so on, that that would not constitute a plan under

3  this.

4  Q    Now, we hit on this a little bit earlier, but if you were

5  an employee who is -- who would be the beneficiary of either a

6  KERP or a KEIP, and you're looking at these milestones, because

7  even under the KERP it's important to you because you can

8  accelerate your payment, if you're an IT person, how would you

9  be incentivized by this confirmation milestone?

10 A    By keeping the company running.  I mean, we can't get to

11 the end of this without -- you know, in a successful way unless

12 people continue to focus on their day job, keep the company

13 running along, and generate the kinds of revenues and cash

14 that's needed to sustain the organization going forward.

15 Another thing to keep in mind about this is that the KEIP is

16 focused on the top of the house, so, I mean, within that small

17 population at the top there are many restructuring

18 responsibilities that everybody has, and that they do

19 participate in in the decision making process, and -- but it is

20 more than just the legal and financial work of drafting a

21 disclosure statement, or a plan of reorganization.

22         MR. TINKER:  Your Honor, I have no other questions.

23         THE COURT:  Okay.  Thank you, Mr. Tinker.

24         MR. TINKER:  Thank you, Your Honor.  And thank you

25 for your patience.  I appreciate it.

1    THE COURT:  Of course.  Of course.  Any redirect?  Or

2 further examination of Mr. Dempsey?

3    MR. BROMLEY:  I just have two or three very short

4 questions, Your Honor.

5                    REDIRECT EXAMINATION

6 BY MR. BROMLEY:

7 Q   Mr. Dempsey, I think you testified on cross examination

8 that the creation of an incentive program such as we have

9 before us today is not typical, particularly with Chapter 11

10 triggers, for a company outside of Chapter 11.  Is that

11 correct?

12 A    Yes.

13 Q    Is it ordinary course for Chapter 11 debtors to put in

14 place special retention and incentive programs once they're in

15 Chapter --

16 A    Well, I know that ordinary course is kind a defined term,

17 but my sense is that it is very common to provide these kinds

18 of incentive plans in large complex restructurings.

19 Q    And do you feel that in your experience the program that

20 has been put in place for the key executives, the incentive

21 program, that it's justified by the facts and circumstances of

22 the Nortel bankruptcies?

23 A    Yes.

24 Q    And do you, as well, feel that the retention program for

25 the JCI-4's, 5's and 6's are justified by the facts and

                    **J&J COURT TRANSCRIBERS, INC.**

1 circumstances of these proceedings?

2 A    Yes.

3          MR. BROMLEY:  Thank you, Your Honor.  I don't have

4 anything further.

5          THE COURT:  I just have one question for Mr. Dempsey,

6 and that is this, just so I'm clear, and I think your testimony

7 was clear, but I just want to make certain.  The determination

8 of those people included as key employees, was that made on an

9 individual basis?

10          THE WITNESS:  Yes.

11          THE COURT:  Okay.  That's fine.  Nothing further.

12 You may step down Mr. Dempsey.  The Court is grateful to you

13 for being helpful with your testimony.

14          THE WITNESS:  Thank you.

15          THE COURT:  Mr. Bromley, any summation that you would

16 like to make?  Or -- there's a lot to sum up, I suppose, but --

17          MR. BROMLEY:  I do have a few things to say in

18 summation, but I'm not actually sure whether we have an

19 objection at this point, so --

20          THE COURT:  Oh.

21          MR. BROMLEY:  -- I know Mr. Tinker --

22          THE COURT:  Do you want a couple of minutes to talk

23 it over?  Or --

24          MR. BROMLEY:  I mean, I'm happy to -- just to --

25          THE COURT:  Would that be helpful?  I'll ask Mr.

1  Tinker, more than anyone, if you would like a few minutes to

2  discuss anything with debtors' counsel and the committee.

3          MR. TINKER:  I'm trying not to state my issues until

4  I hear summation, but it is fair, I mean, he needs to know what

5  issues I may have.  And that's eminently fair, so maybe a

6  minute or two would be appropriate and then we can come back

7  and tailor our closing then.

8          THE COURT:  Let's do that.  I think it would be a

9  worthwhile exercise, and it certainly may narrow, I suppose,

10  even the summation that debtors' counsel will be making.  So,

11  we'll stand in recess.  Let's say I'll be back out in five

12  minutes.  If you need more -- or, ten -- let's say ten minutes.

13  Do you think that's more reasonable?

14          MR. BROMLEY:  That should be fair, Your Honor.

15          THE COURT:  Ten minutes.  Thank you, counsel.

16                          (Recess)

17          THE CLERK:  Please rise.

18                          (Pause)

19          THE COURT:  Please be seated.  Thank you very much.

20  Mr. Tinker?

21          MR. TINKER:  Thank you, Your Honor. I think the break

22  will -- it was helpful to us, and I hope it will become clear

23  that it's maybe helpful to Your Honor, as well, because I think

24  we've removed an issue or two, and probably delineated the

25  other issues, as I see it, and as debtors' counsel see it

1 today.

2      Your Honor, I think in terms of a statute, and so,

3 what we did is, you know, outside of the courtroom Mr. Bromley

4 and I were going through the statute, 503(c) is what I'm

5 referring to, of course.

6      THE COURT:  Of course.

7      MR. TINKER:  And, you know, I kind of start at the

8 beginning, and so we did that, starting with (c)(1) and working

9 our way through.  And, Your Honor, with regards to (c)(1), that

10 being the preclusion of retention payments to insiders absent

11 certain extraordinary circumstances that are set forth in the

12 statute, we have agreed to language for the order which

13 provides that, you know, if the Court were to find that the

14 KERP is appropriate, that, you know, under (c)(3), that the

15 relief would be granted today only as to non-insiders as to the

16 KERP, thereby removing any kind of issue that Mr. Bromley and I

17 may have with regards to, well, who's an insider, who is not an

18 insider, and -- again, this is -- this was a problem because of

19 the shortness of time, and, you know, difficulty getting

20 information in a short period of time.

21      THE COURT:  Yes, sir.  I know that.

22      MR. TINKER:  It's just a problem.  So, that's the way

23 we're dealing with that insider issue as to the KERP.

24      So, moving on -- in other words, the debtor is not

25 trying to satisfy (c)(1).  We're carving out insiders from the

1  KERP, and that --

2                THE COURT:  Okay.

3                MR. TINKER:  -- takes care of it for (c)(1) purposes.

4                Moving to (c)(2), we didn't have testimony regarding

5  severance aspects of the KERP or the KEIP, and therefore I

6  don't think I have a (c)(2) objection.  If I wanted to raise

7  that issue I should have asked those questions, and I did not

8  do that, so I think we're okay under (c)(2).  Which then takes

9  us to (c)(3), which is what most of the testimony today was

10 about.

11               THE COURT:  Yes.

12               MR. TINKER:  And under (c)(3), the Court has to find,

13 in exercise of its own judgment, that the -- the KERP and the

14 KEIP are appropriate under the facts and circumstances.

15               THE COURT:  Yes, sir.

16               MR. TINKER:  And there is extensive case law

17 regarding what that means, the factors that are considered, and

18 Your Honor has written on that issue, and I won't try to repeat

19 to Your Honor your own analysis for the factors.

20               What I have is, you know, legally an objection on the

21 grounds that the programs are not justified under the

22 circumstances.  I'd say objection/concerns, and it's concerns I

23 need to voice to the Court.  And the first concern is that the

24 amounts of compensation that we're talking about, whether under

25 the KERP or the KEIP, is quite significant in my view, and we

1 had Mr. Dempsey testify that essentially by approving the KERP

2 or the KEIP, if all of the milestones were met or all of the

3 criteria or targets were met under the KERP, that if that was

4 done then we would in essence be doubling the annual incentive

5 compensation that they would otherwise be entitled to.  So, in

6 other words it would be they'd be getting their base salary

7 plus the annual incentive payment that is part of a

8 longstanding plan, plus they would be getting another -- either

9 a percentage or more than 100 percent of their base salary by

10 reason of the KERP or the KEIP.  And as the testimony showed

11 that, you know, as you get higher up in the hierarchy of job

12 classifications, the percentage of your base salary gets higher

13 and higher, and goes over 100 percent at a certain point for

14 certain kinds of employees.  And today they were just talking

15 about nine SLTs.

16          My first point, then, is that the amounts are quite

17 large, and to persons who, you know, are not getting those

18 benefits, it may seem unjustified under the facts and

19 circumstances given the Nortel bankruptcy and it's effect on

20 everybody.

21          The second concern I have, Your Honor, and again,

22 these can play across a number of the factors, so I'm not

23 trying to pose it in terms of one, two, three or four different

24 factors, but these are factual issues that were brought out.

25          THE COURT:  Okay.

1        MR. TINKER:  We had discussion of the reductions here

2   at Nortel, but at the same time all you have to do is pick up a

3   newspaper and see that we have reductions in the labor force

4   across the board.  For example, today I was reading in <u>The News</u>

5   <u>Journal</u> that we get in our office, and the biggest headline is

6   "Delaware Jobs Vanish, Setting Grim Records."  So, Mr. Bromley

7   addressed this a little bit in his opening arguments, but the

8   concern in my mind should still be there, and that is that when

9   you have extremely difficult financial times for companies and

10  you have a company or an enterprise like Nortel, which has to

11  reduce its force, its labor force as well, in that kind of

12  environment do you really need to incentivize people to stay

13  with these kinds of additional compensation?

14        The third concern I have, again arising from the

15  testimony, I'm stating it in factual terms, is that while te

16  key employees and the ELTs clearly would rather have these

17  benefits than not, when we're looking at the facts and

18  circumstances we're looking at it overall, and my point, Your

19  Honor, is that for the 95 percent of the Nortel employees who

20  are not getting these benefits, what it sends, you know, is a

21  very different kind of message, and that is that the people at

22  the higher salary levels are getting paid more, and the other

23  95 percent of the labor force is -- well, about one fifth of

24  them are going to be terminated, and the rest of them they

25  don't get any kind of incentive to stay.

**J&J COURT TRANSCRIBERS, INC.**

1          So, those are my three concerns, and I think they

2    play into the factors, but I'm not going to walk through each

3    of the factors.  Your Honor understands that?

4               THE COURT:  Yes.

5               MR. TINKER:  Now, with regards to the KEIP --

6               THE COURT:  Yes.

7               MR. TINKER:  So far under (c)(3) I've been addressing

8    really the KERP, although those factual circumstances play out

9    for the KEIP, as well --

10              THE COURT:  Yes.

11              MR. TINKER:  -- and I won't repeat all that.  But for

12   the KEIP we have additional considerations.  That is because

13   with regards to the KEIP we are talking about people who may be

14   insiders, and to the extent that they are insiders but not

15   SLTs, they would be covered by the order today.  We've not been

16   able to identify those people and carve them out for the March

17   20th hearing, so Your Honor needs to do some today, I think.

18   Whether or not the ELTs under the KEIP would be -- payment of

19   those people would be okay even if they were insiders.

20              THE COURT:  That's right.  That's my understanding of

21   what the debtor is proposing.

22              MR. TINKER:  Right.  Okay.  My first concern with

23   regards to the KEIP in particular is that these milestones

24   really don't have much detail, information presented as to them

25   in the motion.  And my own personal view of the testimony was

1  that we don't have much detail in the testimony regarding what

2  these milestones really are.  I think the testimony really was

3  that for those people who are subject to the KEIP, they either

4  know or will know how to translate these milestones into some

5  kind of actions on their part which causes them to be

6  incentivized.  My problem, Your Honor, is that I don't think

7  the testimony really shows on the record how that is

8  accomplished, and the reason is we just don't have enough

9  detail in the milestones to help us understand, you know, what

10 is the incentivization process, if you would.  In a lot of

11 ways, Your Honor, that's a factual issue, and Your Honor has to

12 make that call, and I understand that.

13          Aside from not having that detail as part of the

14 description of the milestone, my concern is that, you know, we

15 don't have it disclosed as part of the record, those kinds of

16 details.  And the reason I voice that concern is really a

17 reason that I'm here today.  My role is to try to promote the,

18 you know, transparency of the process to really encourage

19 people to -- people's understanding that things are done openly

20 in bankruptcy, you don't have, you know, a bankruptcy club, you

21 don't have things being hidden, dimes on the sly, those kinds

22 of things.  That's part of my role with the U.S. Trustee's

23 Office.  And so, that's the concern I have here is that we have

24 an evidentiary hearing brought on, you know, very short notice.

25 It was filed late on Friday.  The Court was closed on Monday.

93

So, we're talking about Tuesday, Wednesday, and Thursday
morning.  And while the information -- a lot of the information
was shared for some time with the monitor and the committee, we
don't have those disclosures made necessarily in total to
either the Court or to myself.  And I feel somewhat fortunate
that I was able to get some information during the past couple
days, and the debtor has been very helpful in regard to trying
to get me some information to help to satisfy me.  But the
overall concern is still there that because of the very short
time period we are not able to get as much into the record as I
would really like.  And more important, other people have not
been able to address the issue.  You know, so if somebody calls
my office and is concerned about it, there's not even time for
somebody to hire counsel to look into it.

Now, I understand the committee plays a role here and
they've looked at it.  I have a more general concern as to
people who benefit from the system as a whole, not just the
committee.  So, I would state that concern.  So, I think, Your
Honor, that really is all that I have to say in regards to my
objection to both the KERP and the KEIP, reserving issues as to
the SLTs, if you will, until March 20th.  Thank you, Your
Honor.

THE COURT:  Thank you very much, Mr. Tinker.  Mr.
Botter, for the committee?

MR. BOTTER:  Your Honor, David Botter, Akin Gump, for

1  the committee again.  I'll let Mr. Bromley have the last word,

2  and I'll be fairly brief.  With respect to the point that the

3  U.S. Trustee just made with respect to transparency, obviously

4  we are tremendous fans of transparency in the process, but

5  unfortunately sometimes the process can't be absolutely

6  transparent.  That is why the statute contemplates the

7  appointment of an unsecured creditors' committee who has the

8  ability to get confi'd up (sic) and be in the seat of

9  confidential information from the company itself, and which

10  will allow the company to maintain its competitive edge in the

11  business in which it operates.

12        This -- Mr. Bromley had said that we spent an awful

13  lot of time, and he's absolutely correct, Sunday mornings,

14  Sunday nights over the course of many weekends discussing the

15  intricacies of this plan, as well as the intricacies of the key

16  portion of the plan that we'll hear about on March 20th.  We

17  have advisors, Capstone, who has spent more time even than the

18  lawyers have with respect to this particular plan.  And so,

19  while we would love for this to be purely and completely

20  transparent because of the needs of Nortel and ultimately the

21  needs of the creditor constituencies because they're going to

22  benefit from Nortel maintaining its competitive posture in the

23  industry, it can't be transparent, can't be perfectly

24  transparent.  But as the representative of the unsecured

25  creditors here, we have vetted this completely and we don't

1  have any objection and our support of the entry of the portion

2  of the relief that Your Honor is being asked to approve today.

3        Mr. Bromley also said at the beginning of the hearing

4  with respect to information flow, I was before Judge Peck in

5  the Southern District of New York a few months ago in a cross

6  border case, also a Canadian-U.S. cross border case, and I

7  complained to Judge Peck that the committee was not thrilled

8  with the information that was coming out of the debtor, and

9  Judge Peck looked at me and said I have never seen a committee

10  counsel ever thrilled with the information that is coming out

11  of the debtor.  And so, today I say to you that I am still not

12  thrilled, but the debtors are making efforts, and as part of

13  this process and part of the committee's review of the plan

14  that's before Your Honor, we asked the debtors for a lot of

15  information, and we asked the debtors for a lot of information

16  with respect to other issues that are important in these cases,

17  and we are hopeful that the debtors will improve the

18  information flow.  Mr. Bromley has pledged to me that they are

19  making a great effort to do so, and I am optimistic that will

20  change, and as Mr. Bromley said, if it doesn't I'm sure that we

21  won't be bashful and we will come to Your Honor.

22        So, to sum up, Your Honor, we have done the work

23  that's required for an official committee to look at a program

24  of this magnitude.  This is a very large business.  Yes, we are

25  in uncertain economic times.  I think that when you look at the

1 five percent versus 95 percent factor, maybe the 95 percent of

2 the employees have to look outside the window and look at the

3 newspapers and see what's going on out there and realize that

4 maybe that is why, in fact, they're not part of this plan, but

5 there are some very special people at this company that do have

6 mobility, even in uncertain economic times.  And in order to

7 protect the enterprise value here for the benefit of unsecured

8 creditors, we think that this is an appropriate plan.

9        So, with that, Your Honor, I'll turn it over to Mr.

10 Bromley.

11        THE COURT:  Mr. Botter, thank you so much.  And now

12 Mr. Bromley.

13        MR. BROMLEY:  Your Honor, if I may?  Just very

14 briefly, there are, you know, a few things that I think are

15 worthwhile to mention.

16        I think it's important that the Court know that

17 Nortel has an incredible amount of sympathy for the

18 transparency issues that Mr. Tinker has raised, and has tried

19 very hard to be as accommodating as possible.  And it is

20 unfortunate that we couldn't have Mr. Tinker in his office in

21 all of the conversations that we had with the U.S. Trustee -- I

22 mean with the official creditors' committee and the bondholder

23 group.  We think we would have wore him out, in all honesty, if

24 he had been involved in all of them, because they clearly were

25 wearing me out.  But we are faced with, you know, a number of

1    catch 22's in any of these situations.  On the one hand it

2    would be wonderful to say it's 100 percent of the employees,

3    they are all important and we need every one of you every

4    moment, and here's an incentive to stay.  But if we tried to

5    put a program in place like that, one, we would have to be able

6    to prove we could afford it, and two, we would be criticized

7    for saying you haven't done enough of your homework to narrow

8    it down to the absolute key people.  So -- and on the same

9    token, if you only pick a few people, then you have the ones

10   who aren't part of the program who are going to feel pressure,

11   and dissatisfaction as a result of it.  It's an uneasy process,

12   and frankly, an unappetizing process.  The leaders within the

13   organization have to make difficult choices with people that

14   they've worked with for years.  And they do it with a lot of

15   sensitivity and a heavy heart, and knowing full well that the

16   decisions that they make are not going to be very happy ones

17   for a lot of people, but that doesn't mean, Your Honor, that

18   the decisions shouldn't be made.

19           And it is important to recognize that what we're

20   talking about is an organization that will yield benefits to

21   all of the people employed, or those who have been formally

22   employed by maximizing value, and that's really the focus.  And

23   so, when you're talking about balancing the issues of

24   transparency of telling everyone absolutely everything about

25   how the compensation structures are put in place and incentives

1 are developed, you have to keep in mind that certain times you

2 say things that could then have a detrimental impact on the

3 value.  And we have, we think, tried to balance that carefully,

4 certainly in the conversations with the creditors' committee.

5 I think that they understand the importance of making sure that

6 the competitive edge of Nortel is maintained.  And, you know,

7 so from that perspective it is a delicate balance.

8         We have noted there is ample case law out there to

9 justify the filing of all these materials under seal.  We

10 consciously decided not to do that.  We wanted to be as open as

11 possible with the idea that if it turned into a greater degree

12 of controversy that we may have to come and seek that sort of

13 relief.  But I think, thankfully, we've been able to avoid

14 that.  And certainly our colleagues in Canada are approaching

15 it with the same level of sensitivity.

16         So, that was by way of background, Your Honor.  In

17 terms of the statute, and I think it is helpful, as Mr. Tinker

18 has said, to focus on the statute, and I think it's easy to go

19 through it first with the KERP, the retention plan.  You did

20 hear testimony, Your Honor, from Mr. Dempsey that there are no

21 insiders who are members of the KERP, and Mr. Tinker had

22 indicated some concern that he hadn't been able to fully vet

23 that.  So, what we would agree to is to insert some language in

24 the order that gives comfort to Mr. Tinker that no non-insiders

25 are participants in the KERP.  (c)(2) is a severance section.

**J&J COURT TRANSCRIBERS, INC.**

1  There's no severance elements here, so we don't have to deal

2  with that.  (c)(3), you know, we did talk about this.  We

3  talked about ordinary course of business.  That's what the AIP

4  is.  We talked about outside of the ordinary course.  That's

5  what the KERP is, and the KEIP.  And so, we do have to satisfy

6  (c)(3), both for the KERP and the KEIP.  And when you're

7  talking about the KERP, we don't have to get into really the

8  incentive versus retention issues, but we do have to talk about

9  whether it's justified under the facts and circumstances.  And

10 I think, Your Honor, you know, when looking at the facts and

11 circumstances, it's also worthwhile to look at some of the

12 facts and circumstances that have been used to justify the

13 incentive programs under 503(c)(3), including the ones that you

14 set forth in the Global Home Products case.  And I think

15 actually, Your Honor, we satisfy all of them, in my view.

16          So, you know, with respect to the KERP, again, we're

17 talking about 440 individuals.  They are folks who are

18 important, but keeping in mind that, you know, along with the

19 other ones we're only talking about five percent of the

20 population.  But, you know, is the plan calculated to achieve

21 the desired performance?  I think it is.  These folks are

22 important to stay around.  They are not the people who are

23 driving the programs, but they are essential to keep the

24 business running.  Is the cost reasonable?  I think the cost is

25 reasonable in light of the $8 billion of revenues that were had

1  last year.

2  Mr. Dempsey did mention that the plan, the KERP plan

3  was fair and reasonable, and consistent with industry

4  standards.  Mr. Dempsey also testified at length about the

5  debtor engaging in diligence with respect to the plan, who

6  should participate in it, how they should be incentivized, and

7  how the plans are put together with respect to both Chapter 11

8  companies and non-Chapter 11 companies, and Mr. Dempsey himself

9  is prima facie evidence of the debtors' receiving independent

10  counsel on the matter.

11  So, I think from the KERP perspective the statute is

12  satisfied, as well as the case law.  I think the -- leaving

13  aside all of the other color about it being consistent with

14  what's happening in other jurisdictions, we believe that the

15  KERP is justified under the circumstances.

16  With respect to the KEIP and the ELTs, and again, not

17  prejudicing the hearing on the SLTs that will take place on the

18  20th, Mr. Tinker had some concerns about the milestones, and

19  that there was not much detail in the motion, and the not

20  sufficient detail in the testimony, either.  And I think that

21  concern/objection really has two aspects.  One is the on the

22  record aspect, the public disclosure point.  And picking up on

23  Mr. Botter's point, there are certain things that we have to

24  rely on the system for, the system which has appointed a

25  creditors' committee with fiduciary duties with the ability to

1  hire professionals to drill down on this information, with the

2  ability to seek confidential information and engage in active

3  and consistent and constant day after day after day meetings

4  with the company, to figure out whether or not it's

5  appropriate.  And it's in those circumstances where the system

6  actually does work.  It's not that the system isn't working,

7  it's just that a different part of the system is working to

8  give protection to those who don't have the complete ability to

9  get the transparency.  So, we believe that that actually has

10  worked quite well in this situation, Your Honor.

11         And when you look at the milestones themselves, that

12  really brings us into the sort of home court on Global Home

13  Products and Dana.  Are these milestones incentive based rather

14  than retentive based?  Cost reductions.  We have companies in

15  all of the economies around the world right now that are

16  focused keenly on cost reductions, but no place is it more

17  important than in a Chapter 11 environment, where the

18  companies' operations are circumscribed by Court processes,

19  challenged by competitors, and in those circumstances bringing

20  down the cash burn, so to speak, in all of the jurisdictions is

21  essential.  So, we think that the cost reduction metric is

22  appropriate, common, indeed the most common, I think, other

23  than the plan confirmation, which we also have to talk about.

24         The second one, which is a more sensitive one, Your

25  Honor, we believe that that is perfectly appropriate, as well.

**J&J COURT TRANSCRIBERS, INC.**

1  We have not gone into incredible detail on the record, and we

2  understand that.  We have provided Your Honor with the document

3  which sets forth exactly what the metric is, and I hope you can

4  understand the sensitivity relating to it.  But with respect to

5  what we're talking about here is making this company a more

6  lean, a more effective organization, and an organization that

7  is going to be better positioned in order to achieve a

8  reorganization.  And so, we believe that that is an incentive

9  -- a goal that will be communicated if it hasn't already within

10 this limited universe of key executives.

11         And then finally, Your Honor, the confirmation of a

12 plan of reorganization.  And it is not just a plan of

13 reorganization, but it's also a plan of arrangement in Canada,

14 so it's a double trigger.  So, you know, the aspect of this is

15 not only will be faced with a need to bring a plan before Your

16 Honor, but also before Justice Morawetz in Toronto?

17         And when you look at the weighting that has been

18 provided, what we're talking about is 50 percent of this key

19 executive incentive payment plan to be allocated to that final,

20 and in many respects most important milepost.

21         With that, Your Honor, we do believe that, you know,

22 the trickiness of 503(c), which is something that we all have

23 to grapple with, is, we think, satisfied.  We believe it's

24 satisfied both with respect to the KERP program for the non

25 insiders, and for the ELTs with respect to those who may be

1  insiders.  But again, since we've crafted it as an incentive

2  program we're not even arguing at this point as to whether or

3  not there's a need to distinguish between the participants as

4  insiders or not insiders.

5            And with that, Your Honor, I think, you know, we will

6  rest on the record, and the papers, unless you have any further

7  questions.

8            THE COURT:  No, I don't.  I think it's been a very

9  thorough airing of the issues, and first I'm going to start by

10  expressing appreciation for Mr. Tinker's role and the fact that

11  this went forward at a very fast pace and placed a lot of

12  pressure on Mr. Tinker and his office, and the Court

13  acknowledges that and is grateful to -- I'm grateful to you for

14  getting up to speed quickly and being able to make an excellent

15  presentation here today, Mr. Tinker.  You know, I've heard too

16  many times, and I didn't hear it today, and I complement

17  counsel on it, but I've heard too many times the comment that,

18  you know, the Office of the Unites States Trustee is not in the

19  money, and I always bridle at that because in my view that

20  office plays an extremely important role in these cases, and I

21  acknowledge that that role was played very well today.

22            We have a very ample record, and in fact I was

23  thinking at a time during the hearing that parties who have a

24  motion such as this I think would in other cases would do well

25  to review the transcript, and the motion, and the documents,

1 because I think that the process that the debtors employed in

2 this case was strong, and really helpful, and I'm going to say

3 right up front so that as I sort of go through my ruling

4 everyone isn't sitting there wondering which way I'm going,

5 that I'm going to grant the motion, and I'll explain a little

6 bit more about it.  But first I just want to say that, you

7 know, the Court is considering this in a very, very difficult

8 and uncertain time, and motions like this are always somewhat

9 sensitive, and I think this motion is particularly sensitive

10 coming as it does at this time in the aftermath of large

11 numbers of employee layoffs, and layoffs still to come.  And

12 it's in this factual setting, in the context of these times

13 that the Court is being asked to provide what are, in effect,

14 bonus payments to select key employees.

15       I have to say that if denying the motion would in

16 some way restore or maintain those jobs for those employees, my

17 decision would be much more difficult.  But doing so would not,

18 and instead really, if —- were I to deny this motion, it would

19 really only harm the debtors by creating uncertainty among

20 management and key employees upon whom these debtors are

21 depending to reorganize these companies, companies which employ

22 many, many thousands, and whose businesses are integral to many

23 other businesses who in turn also employ many, many people.

24 So, the Court's sensitivity to the distress of the Nortel

25 employees who are out of work or who may be out of work cannot

1    override the ample record which overwhelmingly supports the

2    granting of the motion.   Were I to do otherwise I would really

3    have to ignore the facts and circumstances which the debtors

4    have carefully considered in proposing and crafting the plans.

5        First, with respect to the KERP, the key employee

6    retention program, the program includes key non-insider

7    employees who have been carefully selected by the debtors as

8    essential to the debtors' reorganization efforts.   Here the

9    Court's review s to determine if the retention plan represents

10   a sound business purpose and is justified under the

11   circumstances.   It is.   Debtors are in the throes of a massive

12   and difficult restructuring and reorganization, and they cannot

13   do so without the active and positive support of key employees

14   who not only remain committed and loyal to the debtors, but who

15   are also undistracted by their personal employment needs.

16       Because the retention plan is applicable to non-

17   insiders, the applicable Bankruptcy Code provision is Section

18   503(c)(3), a facts and circumstances analysis which as the

19   Court has indicated is fully satisfied here.   Now, a number of

20   cases have developed factors to apply in determining whether

21   the debtors have appropriately exercised their

22   responsibilities, and Mr. Bromley went through those factors.

23   I'm not going to repeat them because I did cite them in the

24   Global Home Products case, and I find that all of those factors

25   are satisfied here.   Now, I know that Mr. Tinker raised some

1  concerns and just going through those concerns, the amount of

2  money involved.  It is a large amount of money, but we have

3  testimony on the record that it is not unusual, it is within a

4  range of the normal practice.  Also, I think that it's very

5  significant that this is an incentive-based employee -- salary

6  structure.  That is clear.  And as such, we don't have a, as we

7  might find in some companies, a very high base salary where

8  these amounts would just overly amplify the amount, and we also

9  know that from the testimony, and I must say the very credible

10  and helpful testimony of Mr. Dempsey that Nortel has always

11  been sort of at the low end, if anything, that these amounts

12  will bring Nortel more into a range of normalcy than an

13  excessive amount of money.  So, I think that's very

14  significant.

15           You know -- I know that the Office of the United

16  States Trustee was also concerned about what happens to those

17  employees who are not included within the program.  Well, as is

18  necessary, the debtors have made a decision based upon a

19  review, a careful review of information available, that Mr.

20  Dempsey testified to, as well, that those included in the

21  program are the key employees.  That means employees who are

22  not only critical, but who are of such a stature that they are

23  more likely to be hired away from Nortel in the absence of the

24  retention program.  And to the extent that others have not been

25  included within the key employee classification, I think that

1  that indicates that those employees may be lost but if they are

2  that it will not be as detrimental to the debtors as it would

3  be were these key employees to be lost.

4        So, I think those were Mr. Tinker's concerns on the

5  KERP.  And as I said, I just think that it is certainly

6  justified under the facts and circumstances, and we do have an

7  ample record justifying that.

8        One thing I would like to do with the debtors'

9  permission, you know, I want to make sure we don't have an

10  evidentiary hole in the record in the event of an appeal, or

11  anyone else coming along and challenging my rulings, I would

12  like to designate the Mercer document as Debtor's Exhibit 1,

13  and maintain it in -- under seal in my chambers, but at least

14  it would be part of this record.  And to the extent that the

15  Office of the United States Trustee has a concern, I certainly

16  will give you an opportunity to file an objection to the filing

17  of this under seal, or to maintaining it under seal.  But I

18  think for the moment, at least to have a complete record I

19  think we ought to have this in there, and I think we can

20  accomplish having it in the record and maintaining its

21  confidentiality by my keeping it in a desk drawer.

22        MR. BROMLEY:  We certainly trust you in that regard,

23  Your Honor.

24        THE COURT:  The only danger is having to find it

25  later, because I've -- I've often been called the squirrel.

**J&J COURT TRANSCRIBERS, INC.**

1  You know, I bury things and then no one can find them.  So, in

2  conclusion on the KERP, the evidence supports the Court's

3  finding that the debtors have met all or nearly all of the

4  factors, that it's justified under the circumstances, and the

5  retention program is approved.

6          Next, turning to the key employee incentive program,

7  this program is applicable to senior executives who are, at

8  least for purposes of this hearing, without waiving an argument

9  later, being deemed insiders just for purposes of this motion.

10 And the Court's analysis has to begin with whether this is an

11 incentive or a retention program for a determination as to

12 which subsection of Section 503 of the Code applies.  And in

13 this case that determination justifies -- is that this is a

14 Section 503(c)(3) incentive program.  It is beyond question in

15 the Court's mind that this is an incentive program.  The

16 incentive awards are dependent upon specific, measurable

17 results.  Of course, every incentive program has some retention

18 elements, but here the program is far and away incentive based.

19         And I'll also note, and I think it was a good line of

20 questioning, and it helped the Court to crystallize -- for me

21 to crystallize my thinking, and that is I know that Mr. Tinker

22 was concerned about specific employees and specific incentives,

23 but to some extent it is a team approach.  None of these

24 employees operate in a vacuum.  They work together.  And to the

25 extent that these incentives, these milestones are achieved,

Case 09-10138-MFW    Doc 1438    Filed 03/12/09    Page 109 of 112

1 everyone has a role in achieving those milestones and as a

2 consequence everyone may be afforded the benefit of achieving

3 those milestones.

4        The Court is very much satisfied that the debtors

5 have met the factors necessary, again, which I applied under --

6 for the KERP program, and which I also apply to the incentive

7 program, and I find that all of those factors have been met,

8 and that under the facts and circumstances of this case and the

9 need of key employees, the necessity of key employees for this

10 reorganization process, I will grant the motion and enter an

11 order which I understand may be somewhat modified from what I

12 had in order to address Mr. Tinker's concern --

13        MR. ABBOTT:  Your Honor, may I approach?

14        THE COURT:  Mr. Abbott, you're already there.  Thank

15 you, sir.

16        MR. ABBOTT:  I can't take credit for the handwriting,

17 Your Honor --

18        THE COURT:  I hope not.

19                    (Laughter)

20        THE COURT:  All right.  Have you seen the revision,

21 Mr. Tinker?

22        MR. TINKER:  Yes, Your Honor, I have, and that

23 revision is fine with me.

24        THE COURT:  Okay.  All right.  So, with this I am

25 going to -- I'll sign the motion.  Did you have something --

**J&J COURT TRANSCRIBERS, INC.**

1  sign the order.  I'm sorry.

2          MR. TINKER:  No, I -- yes.  Sign the order.  Your

3  Honor, by placing -- by taking the document within chambers, if

4  you will --

5          THE COURT:  Just long enough to give you an

6  opportunity, at least, to determine whether or not you object

7  to it being under seal, or you want to take an appeal, you

8  know, that sort of thing.

9          MR. TINKER: Okay.  So, Your Honor, I take it, then,

10  we would have -- if we had an objection to it we would have ten

11  days to do that?  Afterwards it would be deemed not objected

12  to?

13          THE COURT:  Is that sufficient time, Mr. Tinker?  I

14  don't want --

15          MR. TINKER:  Yes.  Yes.  I think so.  And if we have

16  an issue we can raise it with Your Honor, and --

17          THE COURT:  And extend it.

18          MR. TINKER:  And extend it, or whatever.  And just --

19  just give rise to an issue that we hadn't -- I had actually

20  been trying to avoid it, but I understand why Your Honor is

21  doing it, and I'll take that back to my office and consider the

22  issue.

23          THE COURT:  Okay.  Thank you, sir.  Thank you very

24  much.  Let me sign.

25                          (Pause)


                J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  Anything further, counsel?

2          MR. ABBOTT:  Your Honor, I believe that's it for

3   today.  We did discover in chambers that date, the 25th,

4   apparently it moved to the 26th at noon to --

5          THE COURT:  Is that --

6          MR. ABBOTT:  -- to accommodate the Court's calendar

7   --

8          THE COURT:  And that works --

9          MR. ABBOTT:  -- better, and we'll send a re-notice of

10  that hearing in due course, Your Honor.

11         THE COURT:  I'm sorry for the glitch.

12         MR. ABBOTT:  No problem, Your Honor.

13         THE COURT:  I'm bad about scheduling, I'll tell you.

14  Anything else?

15         MR. ABBOTT:  No, Your Honor.

16         THE COURT:  Counsel, thank you for, really, an

17  excellent presentation, and we will stand in recess.  Good day,

18  everyone.

19                       * * * * *

20

21

22

23

24

25

# **C E R T I F I C A T I O N**

I, TAMMY DeRISI, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/s/ Tammy DeRisi                    Date:  March 12, 2009

TAMMY DeRISI

J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**