IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------X
: Chapter 11
*In re* :
: Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*, :
: Jointly Administered
:
Debtors. : Related Docket No. 1131
: Hearing Date: 9/15/09 @ 9:00 a.m.
:
:
------------------------------------------------X

## OBJECTION OF THE AFFILIATES OF VERIZON COMMUNICATIONS INC. TO DEBTORS' MOTION FOR AN ORDER AUTHORIZING AND APPROVING THE SALE OF CERTAIN ASSETS OF, AND EQUITY INTERESTS IN, DEBTORS' ENTERPRISE SOLUTIONS BUSINESS

The affiliates of Verizon Communications Inc. (collectively, "Verizon")[1] hereby submit this Objection to the Debtors' Motion for an Order Authorizing and Approving The Sale Of Certain Assets Of, And Equity Interests In, Debtors' Enterprise Solutions Business (the "Sale Motion"). In support of this Objection, Verizon respectfully states as follows:

### BACKGROUND FACTS

1. In the Sale Motion, the Debtors seek the Court's approval of the sale of their entire Enterprise Solutions ("Enterprise") Business, which includes, among other things, certain products and services in the Debtors' Customer Premises Equipment ("CPE") portfolio.

### The Business Relationship Between The Debtors and Verizon

2. Verizon is a major purchaser and reseller of products and services in the Debtors'

---

[1] The definition of Verizon includes, without limitation, all wholly-owned subsidiaries of Verizon Communications Inc. (including, without limitation, Verizon Corporate Services Group Inc., Verizon Services Corp., Verizon Network Integration Corp., Verizon Business Network Services Inc., Verizon Select Services Inc., MCI Communications Services, Inc. d/b/a Verizon Business Services and the local operating telephone company subsidiaries of Verizon Communications Inc.) and Cellco Partnership d/b/a Verizon Wireless.

{09032}2670268v1

CPE portfolio -- namely, certain routers, switches and other networking components, associated software, and maintenance and support services -- under various executory contracts between Verizon and the Debtors (the "Verizon CPE Contracts").[2]

### The Critical Nature of the Debtors' CPE Products and Services

3. Verizon installs or has installed, across the United States, Canada and elsewhere in the world, tens of thousands of the Debtors' CPE devices and associated software in the communications networks of its own end-user, large business and governmental customers.

4. The Verizon customer base in which products and services in the Debtors' CPE portfolio are currently embedded includes virtually every department and agency of the United States government, both civilian and military (including those agencies with critical national law enforcement, anti-terrorism and national defense responsibilities, as well as military bases and installations in and outside the continental United States), the United States Congress, the United States court system, departments and agencies of numerous state and local governments (including 911 call centers), as well as banks, manufacturers, hospitals (including veterans hospitals), other private sector customers, universities, schools and libraries.

5. The Debtors' CPE products thus enable Verizon to satisfy all of the connectivity needs of these various end-users, and to provide the communications networks that allow these end-users to perform their mission-critical functions. The CPE products that Verizon obtains from the Debtors are therefore essential to the communications needs of these government agencies, businesses and institutions.

6. Moreover, Verizon relies upon the Debtors to provide ongoing repair, maintenance and support services, as well as spare parts; software upgrades, patches and fixes;

---

[2] In 2008, Verizon purchased approximately $140 Million in CPE products and services from the Debtors in the United States alone.

warranty repairs and other services in connection with these products. Without this ongoing maintenance, service and support by the Debtors, the continued communications capabilities of the government and business customers that are served by Verizon through the re-sale of the Debtor's CPE products and services – specifically including the federal departments, agencies and installations with critical national law enforcement, anti-terrorism and national defense responsibilities – are at significant risk of disruption, which in turn poses a significant hazard to the public's welfare, security and safety.

7. So integral are the Debtors' CPE products and services to these critical communications systems, in fact, that if they fail to operate – due to a lack of maintenance or repair, the inability to obtain spare parts or software fixes, or for some similar reason – entire systems will immediately be disrupted or otherwise compromised, and in due time may cease to function entirely.

### The Proposed Sale of the Debtors' Enterprise Assets

8. Notwithstanding all of the foregoing – and pursuant to the agreement among the Debtors, Avaya and Verizon that resolved Verizon's objection to the bid procedures originally proposed in connection with the Sale Motion – on September 2, 2009, the Debtors provided written notice to Verizon that the "stalking horse" bidder for the Enterprise business, Avaya, Inc. ("Avaya"), had determined not to designate the Verizon CPE Contracts for assumption and assignment by the Debtors in connection with the proposed transaction.

9. In related discussions with representatives of and counsel for Avaya, Verizon was informed that Avaya had decided not to take an assignment of the Verizon CPE Contracts because it did not wish to assume a contingent liability that the Debtors currently face in connection with a patent infringement lawsuit that is currently pending against Verizon in the

United States District Court for the Eastern District of Texas and not scheduled to be tried until February of 2010. Verizon has denied any and all liability in this patent infringement lawsuit and is asserting a vigorous defense. To the as-yet-undetermined extent that (a) Verizon is ultimately adjudicated to be liable for infringement damages in that suit and (b) the infringement is found to have been caused by a functionality performed by one of the CPE products (currently believed to be a PBX device) that Verizon has obtained from the Debtors and installed in the networks of its own end-user customers, however, then the Debtors are potentially obligated to indemnify Verizon for a portion of such damages under the Verizon CPE Contracts.

10. This highly contingent indemnification liability is the only justification that Avaya has provided to date for its decision not to designate the Verizon CPE Contracts for assumption and assignment by the Debtors in connection with the proposed sale of their Enterprise business assets.

11. At the subsequent auction of the Debtors' Enterprise business conducted over the weekend of September 11-13, 2009, Avaya was the winning bidder. Consequently, Avaya is now definitively proposed to be the purchaser of the Debtors' Enterprise business and related assets.

12. The determination by Avaya that it does not wish to take an assumption and assignment from the Debtors of the Verizon CPE Contracts means that the Debtors will seek to reject the Verizon CPE Contracts upon or shortly after the closing of the sale of their Enterprise business assets, which is expected to occur by early December, 2009, or less than three months from now. At that point, the Debtors will have neither the intention nor – because they will have no remaining Enterprise assets after the proposed sale closes, and are already well into an effective liquidation of *all* of their assets in Chapter 11 – the resources or ability to continue to

satisfy all of their duties and obligations under the Verizon CPE Contracts.

## Consequences of Exclusion of the Verizon Contracts From The Sale

13. If the Court permits the proposed sale of the Debtors' Enterprise business assets to proceed and close without an assumption and assignment of the Verizon CPE contracts to Avaya, the consequences to the Verizon end-users that depend on the Debtors' CPE products and continuing services in order for their communications networks to function – including the federal departments, agencies and military installations with critical national law enforcement, anti-terrorism and national defense responsibilities, as well as local law enforcement, emergency response and such critical public sector operations as banks and hospitals – will be serious. As a result, the public's safety, welfare and security will be placed at an immediate and considerable measure of risk that cannot be simply or quickly rectified.

14. Without the continuing ability to obtain the equipment, software, maintenance and support that the Debtors provide under the Verizon CPE Contracts, and that is so deeply embedded in the networks of its end-user customers, Verizon will need significant lead-time in order to make alternate arrangements to obtain similar products and services from other suppliers, access each of the thousands of affected customer installations to determine whether such products and services are compatible with existing network technology, and then re-work each of those customers' networks to incorporate these significant changes to its communications infrastructure.

15. Verizon must also obtain these alternate products and services from an entity that can supply them directly, and that will provide the required maintenance, service and support for as long as it may be necessary. Where the embedded installations are especially large and/or in particularly sensitive locations, such as military bases and national security agencies, re-working

the communications infrastructure to ensure network compatibility and continuity is vital, access is restricted, and the required work is extensive and complicated. In the best of cases involving both sensitive governmental and large commercial end-users, and regardless of the resources that are devoted to such a project, a transition of this nature could take Verizon a year or more to complete for each such customer. As such, less than three months of lead-time is not even remotely sufficient to effectuate these transitions.

16. Moreover, and until such transitions were completed, Verizon would have substantial difficulty supporting the basic communications needs of its critical CPE customer base. In such an event, the voice and data communications capabilities of these customers would be severely compromised, and a very real and substantial risk to the public would exist for an unavoidably and unacceptably lengthy period of time.

## ARGUMENT AND CITATION OF AUTHORITIES

17. For all of the foregoing reasons, Verizon submits that a sale of the Debtors' Enterprise business and related assets simply cannot be approved unless it includes, with absolute certainty, the assumption and assignment of the Verizon CPE Contracts to Avaya, and a resulting commitment by Avaya to continue to perform all of the Debtors' duties and obligations to Verizon thereunder. Verizon has no other existing contracts, with Avaya or any other supplier, under which it can definitively continue to obtain either the products and related repair, maintenance and support services provided by the Debtors, or any products and services that are known to be compatible with those provided by the Debtors.

18. At the same time, the threat to public health, safety and security that will result from the rejection of the Verizon CPE Contracts is simply too great for this Court to permit. The consequences would include an almost immediate disruption – and eventually, the possible

failure – of the communications networks utilized by virtually every department and agency of the federal government, both civilian and military, including agencies with critical national law enforcement, anti-terrorism and national defense responsibilities, military bases and installations in and outside the continental United States, departments and agencies of numerous state and local governments (including 911 call centers and other emergency responders), as well as banks, manufacturers, hospitals, other private sector customers, universities, schools and libraries in the United States, Canada and elsewhere.

19. These are consequences that would be irreparable, and that could not be redressed by allowing Verizon a rejection damages claim under section 365(g) of the Bankruptcy Code, no matter how large, or mitigated to any meaningful extent by any other relief that this Court could possibly formulate. To the contrary, given the serious consequences to safety, welfare and security that would otherwise result, across the United States, the assumption and assignment of the Verizon CPE Contracts, and Verizon's continuing ability to obtain products and services thereunder, amounts to a matter of public necessity.

20. Accordingly, Verizon respectfully requests that the Court approve the Sale Motion in this case *only* on the condition that the Verizon CPE Contracts be among the assets assumed, assigned and transferred to Avaya in the course of the transaction. Barring satisfaction of this condition, Verizon requests that the Sale Motion be denied in its entirety.

21. It is now thoroughly established that significant threats to public safety or security can trump provisions of the Bankruptcy Code, and permit courts to place conditions upon, or even deny altogether, relief that otherwise would be plainly authorized.

22. For example, a risk of "imminent and identifiable harm" to public health or safety will prevent a bankruptcy trustee from exercising his or her otherwise unfettered abandonment

power under section 554 of the Code. *See, e.g.,* Midlantic National Bank v. New Jersey Dept. of Environmental Protection, 474 U.S. 494, 507 (1986). *See also, e.g.,* In re Lewis Jones, Inc., 1 Bankr. Ct. Dec. 277, 280 (Bankr. E.D.Pa. 1974) (bankruptcy court invoked its equitable power to "safeguard the public interest" by requiring debtor utilities to take safety measures with respect to underground facilities before abandoning them).

23.  Similarly, the Fifth Circuit has held that when the proposed rejection of an executory contract poses a threat to the national public interest, the Bankruptcy Court should apply a more heightened and "rigorous" standard for approval of the rejection than the "business judgment" inquiry that usually applies in such cases. *See* In re Mirant Corp., 378 F.3d 511, 524-525 (5th Cir. 2004) ("Use of the business judgment standard would be inappropriate in this case because it would not account for the public interest inherent in the transmission and sale of electricity."). In such a case, the Mirant court held, the court should balance the equities, "carefully scrutinize the impact of rejection upon the public interest [and] ensure that rejection does not cause any disruption in the supply" of the public services at issue. Id. at 525.[3]

24.  In addition, at least one Bankruptcy Court has expressly conditioned approval of a debtor's motion to sell assets under section 363(b) of the Code on the taking of measures necessary to protect "the public health and welfare." In re Borne Chemical Co., 54 B.R. 126, 132 (Bankr. D.N.J. 1984) (court is authorized to deny a sale of real property under section 363(b) unless the sale first complies with state and federal environmental protection provisions). *See also* Lewis Jones, 1 Bankr. Ct. Dec. at 280 (as court of equity, Bankruptcy Court, in the exercise of its discretion and jurisdiction, may "grant or deny relief upon performance of a condition

---

[3]  On remand to the United States District Court (which had withdrawn the reference from the Bankruptcy Court), the debtor's rejection motion in the Mirant case was scrutinized under this heightened standard and denied. After a second appeal to the Fifth Circuit, the District Court's order denying the rejection motion was affirmed in an unpublished opinion. In re Mirant Corp., 2006 WL 2034612 (5th Cir. 2006).

{09032}                                8

which will safeguard the public interest") (*citing* Continental Illinois Nat'l Bank & Trust Co. v. C.R.I. & Pacific Railway, 294 U.S. 648 (1935)).

25. While measures necessary to protect public health, safety and security are not required to be imposed by statute in order for the principles embodied in cases such as Midlantic, Mirant and Borne Chemical to apply, *see* Lewis Jones, 1 Bankr. Ct. Dec. at 280 ("[E]ven absent the violation of a state or federal act, the public interest must be protected by the Bankruptcy Court"), numerous federal and state statutes do, in fact, require and/or confirm the public's interest in the quality and continuity of telecommunications services. *See, e.g.*, Telecommunications Act of 1996, 47 U.S.C. § 254(b)(1) (service quality is a key element of universal telecommunications service goals); Lilia Perez-Chavolla, SURVEY OF STATE RETAIL TELEPHONE QUALITY OF SERVICE REGULATIONS FOR SELECTED CATEGORIES OF SERVICE (National Regulatory Research Institute 2004) (available at http://www.nrri.org/pubs/telecommunications/04-09.pdf) (state service quality regulations address numerous dimensions of service, including unscheduled services outages, customer trouble occurrence rates, responsiveness to trouble calls, network downtime and emergency service continuity plans).

26. In the present case, and in light of the immediate and serious consequences that will otherwise result, inclusion of the Verizon CPE Contracts in any sale of the Debtors' Enterprise business assets is an absolute necessity in order to insure that communications systems critical to public, health, safety and security are not disrupted (or worse) for a year or longer. Such a profound public interest vastly outweighs the potential harm to Avaya that may be posed by the highly contingent liability that it has cited as its only reason for not wishing to

take an assignment of the Verizon CPE Contracts in the course of the transaction.[4] Under the foregoing authorities, as well as pursuant to section 105(a) of the Bankruptcy Code, this Court is empowered to fashion appropriate relief, and in this instance to place a condition on approval of the Sale Motion that is necessary to protect the public interest, while at the same time permitting the proposed asset sale to go forward.

27.     Finally, Verizon reiterates that the Court must address the public health, safety and security issues raised in this Objection *now*, in the course of its decision to approve or deny the Sale Motion as a whole, and *not* – as was suggested by the Debtors and Avaya during the telephonic hearing that the Court conducted on September 11, 2009 – only after the Debtor's have filed a formal motion to reject the Verizon CPE Contracts at some unspecified, later time. This is *not* an objection to the rejection of the Verizon CPE Contracts under section 365; rather, it is an objection to the Sale Motion under section 363.

28.     While its designation could possibly be changed at some point, the current and express indication from Avaya is that it will not designate the Verizon CPE Contracts for assumption and assignment in connection with the proposed transaction. There is no dispute on this point. At the same time, Verizon's position, stated as plainly as it possibly can be, is that the absolute and definitive inclusion of the Verizon CPE Contracts in any sale of the Debtors' Enterprise business amounts to a matter if public necessity. Consequently, and because of the threat to the public welfare that will otherwise result, the Sale Motion must be denied in its entirety so long as there is *any* possibility that the Verizon CPE Contracts will not be assumed

---

[4]     The Court also should not lose sight of the fact that assumption and assignment of the Verizon CPE Contracts is likely to be richly rewarding to Avaya. In essence, the transaction proposed in the Sale Motion is nothing more than an acquisition of the Debtors' Enterprise customer base. Verizon is certainly among the very largest of such customers, having spent in approximately $140 Million on the Debtors' CPE products and services, in the United States alone, in 2008.

and assigned to Avaya when the sale closes.

29. If the Court defers these public safety and security issues until the Debtors file a formal motion to reject the Verizon CPE Contracts under section 365, but approves the Sale Motion in the interim, it will effectively divest itself of any power or ability to craft meaningful, remedial relief. By that time, as the Court expressly noted during the September 11 telephonic hearing, the Debtors will be without any remaining and relevant resources and in no position to continue to satisfy their repair, maintenance, warranty and other critical obligations under the Verizon CPE Contracts. Any order denying the Debtors' motion to reject the Verizon CPE Contracts and requiring the Debtors to continue to perform would therefore be meaningless. Meanwhile, with the Sale Motion already approved by that time, the Court also would have no remaining ability to require Avaya to assume the Debtors' obligations under the Verizon CPE Contracts in order to avoid the threat to the public welfare that would otherwise result.

30. Accordingly, Verizon respectfully prays that the Court address the issues raised in this Objection *now*, in the course of considering its ruling on the Sale Motion as a whole,[5] and that it approve the Sale Motion *only* on the condition that the Verizon CPE Contracts will definitely be included among the assets assumed, assigned and transferred by the Debtors to Avaya in the course of the transaction. Barring satisfaction of this condition by the Debtors and Avaya, Verizon requests that the Sale Motion be denied in its entirety.

### Reservations of Additional Rights By Verizon

31. Verizon hereby continues to reserve the pre-petition setoff rights that it has asserted and expressly reserved at every step from the inception of this case. Verizon has

---

[5] The Court's inquiry in this regard will be extremely fact-intensive. Accordingly, and as was also discussed during the September 11 telephone hearing, Verizon submits that the Court should adjourn the hearing on the Sale Motion currently scheduled for September 15, 2009, permit Verizon, the Debtors and Avaya to take targeted discovery on an expedited basis, and in short order schedule an evidentiary hearing to address the public safety and security issues raised in this Objection.

conveyed to counsel for the Debtors that – apart from grounds for objection discussed above – Verizon insists upon either the full effectuation of its setoff rights in advance of the closing of the sale or a further reservation of those rights that preserves Verizon's ability fully to effectuate such rights at a later date, notwithstanding a completed sale of the Enterprise business assets. To date, however, the Debtors have not provided any definitive response to Verizon's concerns or stated conditions with respect to its setoff rights. This Court's previous orders approving sales of the Debtors' assets in these cases have included a provision expressly reserving Verizon's setoff rights. (*See* Order approving the sale of the Debtors' CDMA and LTE assets, Docket no. 1205, at ¶ 32.) Verizon insists, at a minimum, that any order entered on the present Sale Motion include the same such provision.

32. In addition, in the event that circumstances change and the Verizon CPE Contracts are designated for assumption and assignment between the filing of this Objection and the hearing on the Sale Motion, then Verizon adopts and hereby reserves the right to object to the Sale Motion on the same grounds – relating to indemnification and other obligations under assumed executory contracts – that are set forth in the Limited Objection to the Sale Motion (Docket No. 1432) that was filed by AT&T Services, Inc. on September 4, 2009, as well as on some additional grounds that would apply specifically to the Verizon CPE Contracts in that instance.

WHEREFORE, Verizon respectfully requests that the Court

(a) sustain this Objection;

(b) deny the Sale Motion in its entirety, unless the Verizon CPE Contracts are definitively included among the assets assumed, assigned and transferred by the Debtors to Avaya in the course of the sale of the Debtors' Enterprise business and related assets; and

(c) afford Verizon such other and further relief as this Court may deem just and proper.

Dated: September 14, 2009

Respectfully submitted,

ARNALL GOLDEN GREGORY LLP
Darryl S. Laddin
Frank N. White
171 17th Street, N.W., Suite 2100
Atlanta, Georgia 30363
(404) 873-8500
dladdin@agg.com

-and-

SMITH, KATZENSTEIN & FURLOW LLP

/s/ Kathleen M. Miller
Kathleen M. Miller, Esq. (No. 2898)
800 Delaware Avenue, 10th Floor
P. O. Box 410
Wilmington, DE 19899
(302) 652-8405
kmiller@skfdelaware.com

ATTORNEYS FOR VERIZON