IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X
                                                         :
                                                         :   Chapter 11
*In re*                                                  :
                                                         :   Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,[1]                       :
                                                         :   Jointly Administered
                              Debtors.                   :
                                                         :   Hearing Date: October 13, 2009 at 10:00 a.m.
                                                         :   [ET] [Proposed]
                                                         :   Response Deadline: October 6, 2009 at 4:00 p.m.
                                                         :   [ET] [Proposed]
                                                         :
---------------------------------------------------------X

## DEBTOR NNI'S OBJECTION TO PROOF OF CLAIM FILED BY THE INTERNAL REVENUE SERVICE

Debtor Nortel Networks Inc., as debtor and debtor in possession ("NNI" or the "Debtor"), by and through its undersigned counsel, for its objection pursuant to 502(b) of title 11 of the United States Code (the "Bankruptcy Code"), to the amended proof of claim filed by defendant the Internal Revenue Service (the "IRS") against NNI, currently listed on Debtor's claim log as claim number 1935 (the "IRS Claim"), hereby alleges as follows:

### JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

of the Debtors' chapter 11 cases and this Complaint is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105, 501, 502(b), and 507 of the Bankruptcy Code and Rules 3007(a) and 9014, *et seq.* of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

**A. Introduction**

3. On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").

6. The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court. Ernst & Young Inc., as court-

---

[2] The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

2

appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

7. In addition, at 8 p.m. (London time) on January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators").

8. On May 28, 2009, at the request of the Administrators, the Commercial Court of Versailles, France (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA will continue to operate as a going concern for an initial period of three months. In accordance with the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA.

9. On June 8, 2009, Nortel Networks UK Limited ("NNUK") filed petitions in this Court for recognition of the English Proceedings as foreign main proceedings under

---

[3] The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

chapter 15 of the Bankruptcy Code. On June 26, 2009, the Court entered an order recognizing the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

10. On January 15, 2009, this Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

11. On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142]. An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group"). No trustee or examiner has been appointed in the Debtors' cases.

12. On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On July 17, the Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

**B.    Bar Date**

13. On August 4, 2009, the Court entered the Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (the "Bar Date Order") [D.I. 1084].

14. Pursuant to the procedures set forth in the Bar Date Order, with certain exceptions, all entities (including governmental units) that assert a claim, as defined in section 101(5) of the Bankruptcy Code, against the Debtors that arose prior to the filing of the chapter 11

4

petitions on the Petition Date, must file a proof of claim in writing so that it is received on or before September 30, 2009, at 4:00 p.m. (prevailing Eastern Time) (the "General Bar Date").

**C.     The IRS Claim**

15.     NNI and its subsidiaries file federal tax returns on a consolidated basis (collectively the "NNI Filing Group"). The Filing Group includes both Debtors and non-debtors.

16.     On or about February 13, 2009, the IRS filed a proof of claim against NNI in the aggregate amount of $15,042,552.67, listed on Debtor's claim log as claim number 250 (the "Original IRS Claim"). The Original IRS Claim asserted an unsecured priority claim pursuant to section 507(a)(8) of the Bankruptcy Code for income taxes, FUTA, and FICA withholding for the tax years 1998, 2001-2008, and excise taxes through 3/31/2009, in the aggregate amount of $15,032,353.58, plus interest to the Petition Date in the amount of $199.09, for a total alleged unsecured priority claim of $15,032,552.67. The IRS also asserted a general unsecured claim for income taxes for the tax years 1999-2000 in the amount of $10,000.00. A copy of the Original IRS Claim is attached hereto as Exhibit A. On or about May 22, 2009, the IRS filed an "amendment" to the Original IRS Claim, listed on Debtor's claim log as claim number 1226, reducing the amount claimed to $171,918.00, of which $35,000 was asserted as an unsecured priority claim and $136,918.00 as a general unsecured claim. A copy of this amended claim (the "First Amendment") is attached hereto as Exhibit B.

17.     On or about August 20, 2009, the IRS filed a further amendment to the Original IRS Claim, the IRS Claim. The IRS Claim asserts an unsecured priority claim against NNI pursuant to section 507(a)(8) of the Bankruptcy Code for the tax years 1998-2007, for income taxes due in the amount of $1,804,637,586.00, and interest to the Petition Date in the amount of $1,162,748,632.82, for an aggregate amount of $2,967,386,218.82 (the "Income Tax

5

Claim"), and an unsecured non-priority claim for penalties (including interest thereon) to date in the amount of $49,264,612.00, for a total claim of $3,016,650,830.82. The IRS Claim also includes an unassessed, unliquidated and contingent U.S. federal FICA withholding tax claim. A copy of the IRS Claim is attached hereto as Exhibit C.

18. Apart from a year by year breakdown of the alleged unsecured priority claim amounts, and the identification of the "Date Tax Assessed" as "Pending Examination," the IRS Claim provides no backup or explanation of the basis for the amounts asserted as due and owing, or for the significant difference between the amounts claimed in the IRS Claim and the amount claimed in the Original IRS Claim and in the First Amendment.

19. Aside from what is set forth in the Original IRS Claim, and the First Amendment, prior to August 20, 2009, neither NNI nor any other member of the NNI Filing Group had been notified by the IRS of the existence of any cash tax liabilities attributable to the periods at issue in the IRS Claim.

## THE COURT SHOULD DISALLOW THE IRS CLAIM PURSUANT TO SECTION 502(b) OF THE BANKRUPTCY CODE

### A. There Is No Reasonable or Realistic Basis for the IRS Claim

20. The IRS Claim should be disallowed in full under section 502(b) because the IRS overstates the amount of income of the NNI Filing Group that could be subject to U.S. federal income tax, and thus erroneously asserts a claim for income tax due. NNI has reviewed its books, records and financial statements relating to the period covered by the IRS Claim, and has been unable to identify any reasonable or realistic basis for the amounts the IRS seeks.

21. The purported tax claims bear no rational relationship to any measure of the income (or loss) of the NNI Filing Group, either as reported on the Filing Group's tax returns

("taxable income" or "taxable loss"), or filed in accordance with U.S. generally accepted accounting principles in Nortel's consolidated financial statements ("accounting income" or "accounting loss") attached to NNC's annual reports filed with the Securities Exchange Commission on Form 10-K. Indeed, the IRS Claim bears no relationship to the domestic or global Nortel income reported during the time period in question.

22. The NNI Filing Group had no cash tax liability for the 1998 through 2007 taxable periods, aside from approximately $6 million cash tax paid for alternative minimum tax liability. In fact, in 2002, the IRS paid to NNI a refund of approximately $717 million that the NNI Filing Group had originally paid in income taxes for taxable years 1998, 1999 and 2000. This refund was paid because substantial net operating losses were generated in the 2001 and 2002 taxable years and were carried back to earlier periods.

23. There is no basis now for the IRS to assert that taxes are due for the 1998, 1999 and 2000 tax years. Moreover, the consolidated tax returns filed by the NNI Filing Group reveal a net taxable loss for this period of more than $3.6 billion, with the group showing taxable losses in five years out of the ten years in question, and nearly $5.6 billion of losses in 2001 and 2002 alone.

24. In addition, even if the IRS could theoretically assert a claim, the only way it could claim over $1.8 billion in back taxes in 2009, plus $1.2 billion in interest, is to ignore the NNI Filing Group's substantial net operating losses in the United States[4] that were available to offset all or a portion of its taxable income.

---

[4] The NNI Filing Group had approximately $2.4 billion of net operating loss carryforwards from prior years available to offset its 2008 taxable income.

7

25. The NNI Filing Group reported taxable losses of nearly $5.6 billion in 2001 and 2002, and an additional $626 million of losses in 2003, 2004 and 2007. These taxable losses correspond to huge accounting losses reported both for Nortel's U.S. and non-U.S. operations between 1998 and 2007, and are sufficient to completely offset all taxable income reported during that time period. In addition to losses the NNI Filing Group has substantial credit carryovers totaling $305 million as of December 31, 2008.

26. Also not taken into account are 2008 taxable losses of $355 million and, aside from any profits generated by the Debtors' sales of its business units, any losses in 2009, the year in which Nortel suffered tremendous financial harm from the worst financial crisis since the Great Depression.

27. Based on a 35 percent corporate tax rate, the $1.8 billion tax liability alleged in the IRS Claim would imply that the NNI Filing Group had taxable income of $5.2 billion from 1998 through 2007. Yet even if the IRS took the most aggressive position, and only included the five years in which the NNI Filing Group reported positive taxable income on its tax returns,[5] while at the same time ignoring the enormous losses from the other years that were available to offset such income, the NNI Filing Group's reported income would be just $2.6 billion — only half the amount of income that would have been required to generate tax liabilities in the amounts alleged on the IRS Claim.

28. The accounting income and losses reported on NNC's consolidated financial statements, both on a global basis and as attributable to U.S. and other non-Canadian operations, also fail to provide any basis for the tax liability alleged in the IRS Claim. NNC's

---

[5] The NNI Filing Group reported taxable income, prior to applying any net operating loss carryforward or carryback to offset such income, in 1998, 1999, 2000, 2005 and 2006.

8

consolidated financial statements reflect substantial overall accounting losses in the 1998 to 2007 period for Nortel's worldwide and U.S. and other non-Canadian operations. Even considering only the profitable years, the accounting income reported in such years was far short of the $5.2 billion of taxable income implied by the IRS Claim.

29. The claims relating to the 2005 taxable year exemplify the objectionable nature of the entire IRS Claim. The IRS has claimed a $344 million tax liability for 2005, plus $108 million of interest. The NNI Filing Group reported only $269 million of taxable income in that year and, because the Group had sufficient net operating loss carryforwards available to offset the income, no regular tax liability. Based on a 35 percent tax rate, the NNI Filing Group would need to have reported nearly $1.0 billion in income during 2005, suggesting that with respect to that tax year alone, the IRS Claim reflects an adjustment to the NNI Filing Group's income of over $700 million. Nortel is aware of no realistic or reasonable basis for such an adjustment.

30. The IRS Claim also appears to ignore the IRS's own internal procedures manual, which cautions against overstating the tax liability of a debtor in a proof of claim. The manual instructs that an IRS proof of claim "must have a factual basis and cannot be inflated;"[6] and that an unassessed tax liability must be based on "as much information as possible;"[7] and cautions examiners that "[e]very effort should be made to insure that the initial claims filed are as accurate and complete as possible even if estimates are necessary."[8] The manual also notes that the IRS "should be in a position to show the court that the liability is reasonable."[9]

---

[6] Internal Revenue Manual § 5.9.13.18.1(3).

[7] Id.

[8] Internal Revenue Manual § 34.3.1.3.3(3)(a).

[9] Internal Revenue Manual § 5.17.8.13(6).

9

**B.     The Statute of Limitations Bars A Substantial Portion of the IRS Claim**

31.     The material elements of the IRS Claim are also invalid because the applicable statute of limitations for much of the period for which the IRS seeks to assess tax against the NNI Filing Group expired prior to the Petition Date.

32.     The IRS Claim with respect to the tax years 1998, 1999, 2000, 2001, 2002, 2003 and 2004 is untimely and is barred by section 6501(a) of the Internal Revenue Code of 1986, as amended (the "Code").  Code sections 6501(a) and (b)(1) specify that "the amount of any tax . . . shall be assessed within 3 years after the return was filed," or, the last day prescribed by law, if later.

33.     Each United States federal corporate income tax return filed by Nortel Networks Inc. on Form 1120 with respect to tax years 1998, 1999, 2000, 2001, 2002, 2003 and 2004 was timely filed, and the statute of limitations on the most recent of such tax returns expired, except for a short consensual extension relating solely to transfer pricing issues, in September 2008.[10]

34.     Accordingly, the IRS Claim with respect to tax years 1998, 1999, 2000, 2001, 2002, 2003 and 2004 must be disallowed to the extent the amounts claimed by the IRS do not relate to the limited transfer pricing issues as to which there has been a consensual extension.

**C.     The Need for a Timely Determination of this Objection to the IRS Claim**

35.     The Debtors are involved in a number of well-publicized sales of major business units, in which the sales procedures are being coordinated in multiple jurisdictions

---

[10]     The statute of limitations for the 2005 taxable year will expire on September 15, 2009, except for adjustments related to transfer pricing issues currently pending.

10

around the world. These include the sale of Nortel's Enterprise Solutions Business (the "Enterprise Business").

36. The sale of the Enterprise Business is generally structured as an asset sale, but the assets being sold, as originally negotiated between the Debtors and the Avaya, Inc., the stalking horse bidder and the party eventually designated by the Debtors as the Successful Bidder ("Avaya"), also included 100 percent of the shares of two non-debtor subsidiaries of NNI, Nortel Government Solutions Inc. ("NGS")[11] and DiamondWare Ltd. ("DiamondWare" and together with NGS, the "Non-Debtor Subsidiaries"). Both Non-Debtor Subsidiaries are part of the NNI Filing Group.

37. The auction for the Enterprise Business was scheduled to begin on September 11. The IRS Claim threatened to derail the auction, given that the Debtors had no supporting information to provide bidders concerning the IRS's asserted $3,016,650,830.82 claim.

38. In order to avoid this potentially disastrous result and allow the auction to go forward, which it did on September 11-14, the Debtors had to agree to implement substantial structural changes to the proposed Asset and Share Sale Agreement for the Enterprise Business ("ASSA"). One such change was the addition of a condition precedent to the closing of the transaction requiring the Debtors to resolve the IRS Claim in a manner reasonably acceptable to the purchasers. The Debtors also reserved the right to restructure the transaction as a sale of the assets from the Non-Debtor Subsidiaries, an option that could potentially result in delay and

---

[11] NGS also has two domestic subsidiaries: AC Technologies, Inc., and Information Integration Technologies Corporation.

significant costs to the Debtors, and which would require that the Non-Debtor Subsidiaries file for Chapter 11 on or before October 15, 2009.

39. Accordingly, in order to maximize the value of the Enterprise Business sale to the estates, the Debtors must resolve the IRS Claim, which is unsupported, unexplained, and, based on NNI's analysis of its books, records, and financial statements, baseless. To achieve such a resolution, NNI requests that this Court hold a timely hearing to determine the Debtor's objection to the IRS Claim.

## RESERVATION OF RIGHTS

40. This Objection is based on the limited information relating to the IRS Claim known by Nortel as of the date hereof. NNI expressly reserves the right to supplement this Objection, in whole or in part, and to file additional objections and adversary proceedings, on any factual or legal basis, including, without limitation, an adversary proceeding seeking a determination of tax liability pursuant to section 505(a)(1) of the Bankruptcy Code, should additional information, facts or circumstances, including, without limitation, information provided by the IRS concerning the basis for the IRS Claim, become known to it.

## NO PRIOR REQUEST

41. No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, NNI respectfully requests that the Court (i) disallow the IRS Claim in full pursuant to section 502(b) of the Bankruptcy Code; and (ii) grant such other and further relief as the Court deems just and proper.

Dated: September 15, 2009
       Wilmington, Delaware

                           CLEARY GOTTLIEB STEEN & HAMILTON LLP

                           James L. Bromley (No. 5125)
                           Lisa M. Schweitzer (No. 1033)
                           One Liberty Plaza
                           New York, New York 10006
                           Telephone: (212) 225-2000
                           Facsimile: (212) 225-3999

                           - and -

                         MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                         /s/ Ann C. Cordo
                         Derek C. Abbott (No. 3376)
                         Eric D. Schwartz (No. 3134)
                         Ann C. Cordo (No. 4817)
                         Andrew R. Remming (No. 5120)
                         1201 North Market Street
                         P.O. Box 1347
                         Wilmington, Delaware 19801
                         Telephone: (302) 658-9200
                         Facsimile: (302) 658-3989

                         *Counsel for the Debtors*
                         *and Debtors in Possession*