IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------X
                                                            :   Chapter 11
                                                            :
*In re*                                                     :   Case No. 09-10138 (KG)
                                                            :
Nortel Networks Inc., *et al.*,[1]                          :   Jointly Administered
                                    Debtors.                :
                                                            :   **Hearing Date:  September 16, 2009 at 10:00 a.m.**
                                                            :   **[ET] [Proposed]**
                                                            :   **Response Deadline: September 16,  2009 at 10:00**
                                                            :   **a.m. [ET] [Proposed]**
                                                            :
                                                            :
------------------------------------------------------------X

**DEBTOR NNI'S MOTION FOR AN ORDER SHORTENING THE TIME BY WHICH
THE IRS MUST RESPOND TO DISCOVERY REQUEST**

Nortel Networks Inc. ("NNI" or the "Debtor") moves this Court (the "Motion")

for entry of an order pursuant to section 105(a) of title 11 of the United States Code (the

"Bankruptcy Code") and rules 7026, 7030, 7034, 9006 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") in the form attached hereto as Exhibit A,

shortening the time by which the Internal Revenue Service (the "IRS") must respond, to Request

No. 1 of Debtor NNI's First Request for Production of Documents Directed to the Internal

Revenue Service, dated September 15, 2009 (the "Expedited Discovery Request") (Exhibit B

hereto), and setting a status conference on September 30, 2009, or as shortly thereafter as NNI

may be heard.

Expedited discovery is required to allow the Debtor to obtain fundamental

---

[1]       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

information regarding the basis of the IRS' Claim against NNI, in the amount of $3,016,650,830.82, listed on the Debtor's claim log as claim number 1935, (the "IRS Claim"), which the Debtor believes is partially time-barred and without any reasonable or realistic basis. The IRS Claim poses a significant obstacle to the Debtor's ability to maximize the full value of the assets that were the subject to the recent auction for the Enterprise Business.  In view of the time constraints involved in closing a sale of the Enterprise Business, and the need for a timely resolution of the IRS Claim, NNI seeks and believes it is entitled to obtain on an expedited basis the information on which the IRS Claim was based and to come before the Court for a status conference on an expedited schedule.  In support of the Motion, NNI respectfully represents as follows:

## JURISDICTION

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.     The statutory predicates for the relief requested herein are section 105(a) of the Bankruptcy Code, Bankruptcy Rules 7026, 7030, 7034, 9006 and 9014 and Del. Bankr. L.R. 7026-1.

## BACKGROUND

**A.     Introduction**

1.     On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2

2.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.  Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.  On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA.  On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.  In addition, at 8 p.m. (London time) on January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration (the "EMEA Proceedings") under the control of individuals from

---

[2]      The Canadian Debtors include the following entities:   NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[3]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks

Ernst & Young LLC (collectively, the "Joint Administrators").  On May 28, 2009, at the request of the Administrators, the Commercial Court of Versailles, France (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA will continue to operate as a going concern for an initial period of three months.  In accordance with the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings, the English law proceedings remain the main proceedings in respect of NNSA.  On June 8, 2009, Nortel Networks UK Limited ("NNUK") filed petitions in this Court for recognition of the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.  On June 26, 2009, the Court entered an order recognizing the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

4.      On January 15, 2009, this Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

5.      On January 26, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

6.      On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor), an affiliate of NNI, filed a voluntary petition for relief under

---

Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

chapter 11 of the Bankruptcy Code.  On July 17, the Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

### Facts Relevant to this Motion

**B.    Bar Date**

7.    On August 4, 2009, the Court entered the Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof  (the "<u>Bar Date Order</u>") [D.I. 1084].

8.    Pursuant to the procedures set forth in the Bar Date Order, with certain exceptions, all entities (including governmental units) that assert a "claim," as that term is defined in section 101(5) of the Bankruptcy Code, against the Debtors; which claim arose prior to the filing of the chapter 11 petitions on the Petition Date, must file a proof of claim in writing so that it is received on or before September 30, 2009, at 4:00 p.m. (prevailing Eastern Time) (the "<u>General Bar Date</u>").

**C.    The IRS Claim**

9.    NNI and its subsidiaries file federal tax returns on a consolidated basis (collectively the "<u>NNI Filing Group</u>").  On February 13, 2009, the IRS filed a proof of claim against NNI in the aggregate amount of $15,042,552.67, listed on Debtor's claim log as claim number 250 (the "<u>Original IRS Claim</u>").  The Original IRS Claim asserted an unsecured priority claim pursuant to section 507(a)(8) of the Bankruptcy Code for income taxes, FUTA, and FICA withholding for the tax years 1998, 2001-2008, and excise taxes through 3/31/2009, in the

aggregate amount of $15,032,353.58, plus interest to the Petition Date in the amount of $199.09, for a total alleged unsecured priority claim of $15,032,552.67. The IRS also asserted a general unsecured claim for income taxes for the tax years 1999-2000 in the amount of $10,000.00. A copy of the Original IRS Claim is attached hereto as Exhibit C. On or about May 22, 2009, the IRS filed an "amendment" to the Original IRS Claim, listed on Debtor's claim log as claim number 1226, reducing the amount claimed to $171,918.00, of which $35,000 was asserted as an unsecured priority claim and $136,918.00 as a general unsecured claim. A copy of this amended claim (the "First Amendment") is attached hereto as Exhibit D.

10.    The IRS filed a further amendment to the Original IRS Claim on August 20, 2009, the IRS Claim. The IRS Claim asserts an unsecured priority claim against NNI pursuant to section 507(a)(8) of the Bankruptcy Code for the tax years 1998-2007, for income taxes due in the amount of $1,804,637,586.00, and interest to the Petition Date in the amount of $1,162,748,632.82, for an aggregate amount of $2,967,386,218.82 (the "Income Tax Claim"), and an unsecured non-priority claim for penalties (including interest thereon) to date in the amount of $49,264,612.00, for a total claim of $3,016,650,830.82. The IRS Claim also includes an unassessed, unliquidated and contingent U.S. federal FICA withholding tax claim. A copy of the IRS Claim is attached hereto as Exhibit E.

11.    Apart from a year by year breakdown of the alleged unsecured priority claim amounts, and the identification of the "Date Tax Assessed" as "Pending Examination," the IRS Claim provides no backup or explanation of the basis for the amounts asserted as due and owing, or for the significant difference between the amounts claimed in the IRS Claim and the First Amendment and the amount claimed in the Original IRS Claim.

12.    The filing of the IRS Claim came as a shock to NNI.  First, the Original IRS Claim and the First Amendment showed significantly lower tax liabilities for the same years. Indeed, none of the Debtors or any of their affiliates had been notified by the IRS prior to August 20, 2009, of the existence of any other cash tax liabilities attributable to the periods reported in the IRS Claim beyond those reflected in the Original IRS Claim and the First Amendment. Apart from a year by year breakdown of the alleged unsecured priority claim amounts, and the identification of the "Date Tax Assessed" as "Pending Examination," the IRS Claim provides no backup or explanation of the basis for the amounts asserted as due and owing, or for the significant difference between the amount claimed in the IRS Claim and the amount claimed in the Original IRS Claim.

**D.    Interference with Debtors' Sale of the Enterprise Business**

13.    The Debtors are involved in a number of well-publicized sales of major business units, where the sales procedures are being coordinated in multiple jurisdictions around the world.  The recent filing of the IRS Claim, without support or explanation, has created a great deal of uncertainty among bidders and other interested parties, particularly with respect to the sale of Nortel's Enterprise Solutions Business (the "Enterprise Business").  The cause of this uncertainty is a federal tax regulation which purportedly holds each subsidiary corporation and the parent corporation that join in the filing of a consolidated federal income tax return "severally" liable for the entire income tax liability of the consolidated group for tax years in which the corporation was a member of the consolidated group ("-6 Liability").  *See* Treasury regulation section 1.1502-6(a).

14.    The sale of the Enterprise Business is structured as an asset sale, but the assets being sold, as originally negotiated between the Debtors and Avaya, Inc., the stalking horse

bidder ("Avaya"), also included 100 percent of the shares of two non-debtor subsidiaries of NNI, Nortel Government Solutions Inc. ("NGS")[4] and DiamondWare Ltd. ("DiamondWare" and together with NGS, the "Non-Debtor Subsidiaries"). Both Non-Debtor Subsidiaries are part of the NNI Filing Group.

15.    The Non-Debtor Subsidiaries' contributions represented just a small fraction of the total taxable income reported by the NNI Filing Group during 2005. Prior to offsetting all of its income with net operating loss carryforwards, the NNI Filing Group reported consolidated taxable income of $269 million on its income tax return for 2005. Of this amount, only $14 million was attributable to NGS and its subsidiaries. Because it was able to fully offset its taxable income with net operating losses from prior tax years, the NNI Filing Group incurred no cash tax liability in 2005. The NNI Filing Group also reported tax losses in 2007 that could be used to reduce a tax liability for 2005. Nevertheless, the IRS Claim asserts that the group is liable for $452 million in taxes attributable to that year. Because the IRS has historically asserted that, under –6 Liability, each member of a consolidated group could potentially be liable for the entire tax liability of that group, the Non-Debtor Subsidiaries could conceivably incur a $452 million federal income tax liability for 2005, despite their meager $14 million in taxable income during that year, if the IRS position is asserted and upheld.

16.    Negotiating the stalking horse Asset and Share Sale Agreement for the Enterprise Business ("ASSA") was extremely complex, and the process lasted over seven months. The ASSA was finally signed on July 20, 2009. On September 11 through September 14, 2009, an auction took place for the Enterprise Business. The results of this auction were impressive – a

---

[4]    NGS also has two domestic subsidiaries: AC Technologies, Inc., and Information Integration Technologies Corporation.

revised agreement with Avaya for a cash purchase price of $915 million, nearly double the stalking horse purchase price of $475 million. The IRS Claim, however, loomed large over the auction and remains a very large issue.

17.    The IRS Claim, which was filed after the ASSA was signed but prior to the auction, substantially lengthened, and nearly derailed, the entire auction. Because the IRS provided no information regarding the basis of its claim before the auction commenced, despite numerous requests from Nortel and its counsel to do so, as described in more detail below, there was no way for NNI to provide comfort to the bidders about the risk associated with this liability, nor was NNI able to offer any substantive explanation of the IRS Claim. The bidders in the Enterprise Business auction were unwilling to assume the risk for a liability of such magnitude.

18.    To ensure that the auction, and thus the acquisition could go forward, the Debtor was forced to concede to modifications to the ASSA. The most significant of these modifications is the addition of a condition precedent to closing the acquisition, requiring the Debtor to resolve the IRS Claim and related claims in a manner reasonably acceptable to the purchasers (the "Closing Condition"). If Debtor is unable to resolve the IRS Claim in a manner reasonably acceptable to the purchasers, the Debtor reserved the election to file the Non-Debtor Subsidiaries for bankruptcy under Chapter 11, and structure the acquisition as a sale of the assets from the Non-Debtor Subsidiaries (the "Asset Sale Election"). NNI must give notice of its decision to exercise its rights under the Asset Sale Election, which election would require that the Non Debtor Subsidiaries file for Chapter 11 on or before October 15, 2009. These modifications to the ASSA may result in a significant loss of economic value to the Debtor.

19.    The Closing Condition could significantly delay the closing date of the Enterprise Business sale, depriving the Debtor of the sale proceeds pending negotiations with the IRS to

resolve the IRS Claim or, if the Debtor makes the Asset Sale Election, pending assignment of valuable contracts, including government contracts subject to regulatory approval requirements. In addition, the Closing Condition could lead NNI to incur additional expenses to effect the closing, and continued operating expenses of the Enterprise Business prior to the delayed closing.

20.    Moreover, if the Debtor must exercise its rights under the Asset Sale Election, that option will be costly for the estate.  Not only will there be significant costs associated with those filings, but complications attendant to the assignment of government contracts, the main assets of NGS, could cost the Debtor additional millions in costs, fees and expenses, and a potential reduction of the purchase price (the "Purchase Price Adjustment").[5]

**E.    NNI's Failed Consensual Attempt to Obtain Information about the IRS Claim**

21.    In the two weeks between the filing of the IRS Claim and the Enterprise Business auction, NNI attempted to confer with the IRS to obtain information about the IRS Claim in a consensual fashion.    During this period, NNI contacted representatives from at least five different divisions of the Internal Revenue Service involved in this matter, including the Competent Authority division, the Large and Mid Sized Business division, the Small Business division, the Examination Division, and the Collections division.  None of these representatives was able to provide the Debtor with any reasonable explanation of the amounts claimed in the IRS Claim, nor any consistent guidance about which individual, or even which division, was responsible for calculating these amounts.

---

[5]    The Purchase Price Adjustment is a reduction in purchase price calculated as a function of loss in revenues that occur due to the renegotiation of contracts due to, *inter alia*, the Anti-Assignment Act.

22.     During these conversations, NNI explained the exigent circumstances created by the IRS Claim with respect to the Enterprise Business sale, including the potential –6 Liability risk involved.  The Debtor suggested alternatives to the IRS, but those alternatives were rejected.

**F.      The Claim Objection and Expedited Discovery Request**

23.     On September 15, 2009, Debtor filed with this Court Debtor NNI's Objection to Proof of Claim Filed by the Internal Revenue Service (the "Claim Objection"), pursuant to 502(d) of title 11 of the United States Code (the "Bankruptcy Code").  In the Claim Objection, Debtor seeks disallowance of the IRS Claim on the grounds that it is partially time-barred and without reasonable or realistic basis.

24.     Also on September 15, 2009, the Debtor served the IRS with the Expedited Discovery Request, which seeks all documents that the IRS relied on in preparing the IRS Claim and that are relevant to the amounts showed as owing by NNI on the IRS Claim with respect to taxable years 2005 through 2007.

## RELIEF REQUESTED

25.     By this Motion, the Debtor seeks the entry of an order pursuant to section 105(a) of the Bankruptcy Code, Bankruptcy Rules 7026, 7030, 7034, 9006 and 9014 and Del. Bankr. L. R. 7026-1 shortening the time by which the IRS must respond to the Expedited Discovery Request attached hereto as Exhibit B, to such date as the Court directs but no later than September 30, 2009, at 4:00 p.m. (E.T.), and setting a status conference on September 30, 2009, at 4:00 p.m. (E.T.) or as shortly thereafter as Debtor may be heard.

## BASIS FOR RELIEF

26.     The Courts of this Circuit have recognized the need for expedited discovery in bankruptcy proceedings. *See, e.g., In re Cometrol Acquisition Partnership, L.P.*, 176 B.R. 723, 731 (D. Del. 1994); *In re Nutri/System, Inc.*, Case No. 93-12725S, 1993 WL 367107, at *3 (Bankr. E.D. Pa. Sept. 13, 1993), *aff'd*, 159 B.R. 725 (E.D. Pa. 1993); *In re C & C TV & Appliance Inc.*, Case No. 88-14430S, 1989 WL 123247, at *2 (Bankr. E.D. Pa. Oct. 16, 1989).

27.     Under Federal Rule of Civil Procedure 34(b), made applicable to this proceeding by Bankruptcy Rule 7034, when a discovery request is made, "[t]he party to whom the request is directed must respond in writing within 30 days after being served.  A shorter or longer time may be . . . ordered by the court." Fed. R. Bankr. P. 7034(b)(2)(A).

28.     NNI seeks disallowance of the IRS Claim to the extent it exceeds the amount, if any, the Court so determines.  There can be no doubt that NNI urgently requires resolution of this claim, given its effect on the sale process ongoing for estate assets.  NNI believes that the IRS Claim is erroneous, and that the claims are in any event at least partially barred by relevant statutes of limitations.  The discovery sought in the Expedited Discovery Request is necessary so that Debtor may attempt to resolve the issue on an expedited basis.

29.     The IRS Claim – with the prospect of joint and several liability for the NNI Filing Group – is creating an overhang of uncertainty that threatens the loss of value for the estates. Because of the assertion of what NNI believes is an unsupportable mega-claim, the Debtors were required to revise the ASSA to include provisions that work to the estate's disadvantage.  The Closing Condition regarding the IRS Claim alone could significantly delay the closing (and the receipt of the sales proceeds); moreover if the Debtors proceed with the alternative Asset Sale

Election there will be costs of delay and procedure, as well as the risk of purchase price adjustments.

30.    NNI believes that the IRS Claim has no reasonable or realistic basis.  For example, NNI asserts that certain portions of the IRS Claim are barred by the statute of limitations.  The IRS Claim with respect to tax years 1998, 1999, 2000, 2001, 2002, 2003 and 2004 is untimely and barred by section 6501(a) of the Internal Revenue Code of 1986, as amended (the "Code"), which specifies, *inter alia*, that "the amount of any tax . . . shall be assessed within 3 years after the return was filed," or, the last day prescribed by law, if later. Expedited discovery is necessary to determine whether the IRS records show any basis for these claims that is not time-barred.  Independent of the statute of limitations issues, the Debtors have reviewed their books, records and financial statements relating to the period covered by the IRS Claim and have been unable to identify any reasonable or realistic basis for the massive claim now asserted.  NNI seeks to address the uncertainty that the IRS Claim has created in the case, but cannot do so without having a fundamental understanding of the alleged basis for the IRS Claim.  NNI has tried unsuccessfully to obtain this information consensually; given the pressing sale requirements and related financial issues there is no other course but to proceed with the Court's assistance.

31.    The IRS Claim poses significant risk to the estate maximizing the potential value obtained through the auction.  Expedition is necessary to preserve value for the estates.

### DEL. BANKR. L.R. 7026-1(C) STATEMENT

32.    The undersigned counsel hereby certifies in accordance with Rule 7026-1(c) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware that a reasonable effort has been made to reach agreement with the IRS

with respect to the subject matter of this Motion.  The IRS has rejected the Debtor's request that

they agree to respond to the Discovery Request on an expedited basis.

    WHEREFORE, the Debtor respectfully requests that the Court enter an order,

substantially in the form attached hereto shortening the time by which the IRS must respond to

the Expedited Discovery Request attached hereto as Exhibit B, to no later than September 30,

2009, at 4:00 p.m. (E.T.), and setting a status conference on September 30, 2009, or as shortly

thereafter as the Debtor may be heard.

Dated: September 15, 2009    CLEARY GOTTLIEB STEEN & HAMILTON LLP
   Wilmington, Delaware

              James L. Bromley (No. 5125)
              Lisa M. Schweitzer (No. 1033)
              One Liberty Plaza
              New York, New York 10006
              Telephone:  (212) 225-2000
              Facsimile:  (212) 225-3999

             - and -

            MORRIS, NICHOLS, ARSHT & TUNNELL LLP

            Derek C. Abbott (No. 3376)
            Eric D. Schwartz (No. 3134)
            Ann C. Cordo (No. 4817)
            Andrew R. Remming (No. 5120)
            1201 North Market Street
            P.O. Box 1347
            Wilmington, Delaware 19801
            Telephone:  (302) 658-9200
            Facsimile: (302) 658-3989

            *Counsel for the Debtors*
            *and Debtors-in-Possession*

3121478.1