IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------X
                                                            :
                                                            :   Chapter 11
*In re*                                                     :
                                                            :   Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,[1]                          :
                                                            :   Jointly Administered
                              Debtors.                      :
                                                            :   **Hearing Date: September 16, 2009, at 10:00**
                                                            :   **a.m. (ET)**
                                                            :
                                                            :   **Re: D.I. 1483**
------------------------------------------------------------X

## DEBTORS' REPLY TO THE OBJECTION OF AFFILIATES OF VERIZON COMMUNICATIONS INC. TO DEBTORS' MOTION FOR AN ORDER AUTHORIZING AND APPROVING THE SALE OF CERTAIN ASSETS OF, AND EQUITY INTERESTS IN, DEBTORS' ENTERPRISE SOLUTIONS BUSINESS

Nortel Networks Inc. and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby respond to the Objection of the Affiliates of Verizon Communications Inc. To Debtors' Motion For An Order Authorizing And Approving The Sale Of Certain Assets Of, And Equity Interests In, Debtors' Enterprise Solutions Business [D.I. 1483] (the "Verizon Objection") filed by Verizon Communications Inc. and certain of its affiliates (collectively, "Verizon").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

**Preliminary Statement**

At 2:30 a.m. in the early morning hours of September 14, 2009 and after nearly four days, the auction for Nortel's worldwide Enterprise Solutions Business came to a successful conclusion, with the selection of a winning bid from Avaya, Inc. ("Avaya"), a bid with a total value of $915 million, a full $440 million more than the $475 million offered by Avaya in the stalking horse agreement. This result is a substantial victory for Nortel – not just for the US Debtors, but also for the Canadian Debtors and the EMEA Debtors – as this transaction is both interdependent and multi-jurisdictional. Indeed, if this transaction fails in the United States, it fails in Canada, Europe, Africa, Asia, Latin America and the Middle East. Unfortunately, this is exactly what Verizon asks from this Court – that this transaction fail around the world, and fail due to Verizon's own parochial economic interests.

Although this transaction is complex and worldwide, it involves a business that designs and sells communications systems that operate within large businesses and similar organizations, both public and private. There are many complicated turns of phrase that are used to describe the business segment, but the Enterprise Solutions Business provides systems such as phones, video conferencing, voicemail and the like. Products such as these are provided by a number of large companies in addition to Nortel, including Cisco, Avaya and Siemens in a highly competitive environment where customers have choices among several aggressive market participants. It is no secret that it is because of the fierce competition facing the Enterprise Solutions Business that Nortel has concluded it needs to exit the business through this sale process.

This undisputed background has been the subject of repeated testimony and stipulated evidence before this Court, including in connection with the first day hearings, the bidding procedures and sale hearings for Nortel's CDMA/LTE business and the bidding procedures

hearing for this Enterprise Solutions Business. Nevertheless, Verizon has created out of whole cloth its argument that this sale somehow violates national interest and endangers public health and safety if Nortel's contracts with Verizon should the transaction with Avaya not provide for the assumption and assignment of Verizon's contracts. However, Verizon's national interest/public health and safety arguments quite simply fail on the law. Verizon does not cite a single case for the proposition that a section 363 sale of assets must fail if section 365 contracts that implicate national security/public health and safety could be left behind.

The lack of case law is striking because it is standard practice for section 363 asset purchasers to pick and choose among section 365 executory contracts -- choosing to take the good contracts and leave the debtor-sellers with the bad contracts. If Verizon's arguments were colorable there would be case law to support them. Perhaps there is no case law because were Verizon to prevail, the entire section 363 sale mechanic would be eviscerated, a mechanic that is a cornerstone of bankruptcy practice and one that has saved the going concern value of countless businesses, including those of Lehman Brothers, General Motors, Chrysler, and Nortel's own CDMA/LTE business in the last year alone.

Moreover, Verizon's national interest and public health and safety arguments hold no water even if they applied to section 363 sales. The cases cited by Verizon relate exclusively to businesses that are either highly regulated (such as energy transmission) or involve serious environmental contamination issues. Here, there is no regulatory or statutory scheme that governs the provision of phone systems (as opposed to local or national telecommunications networks, which is Verizon's business). Here, the potential rejection of Verizon's contracts is nothing but an economic matter for a wealthy company. Verizon has the resources, the wherewithal and most importantly, the alternate suppliers to service its customers in the event of

a rejection. It can and should do so without disrupting this sale, which is so critical to the resources of Nortel creditors in every corner of the world.

Finally, Verizon is unhappy with the assignment and assumption process governing its contracts. This process provides Verizon with the same protection required by the Bankruptcy Code and Rules. Verizon is entitled to no special treatment and has provided no cognizable justification for deviating from this process.

## Background

### A. The Sale Motion and the Auction

1. On July 20, 2009, the Debtors filed the Debtors' Motion For An Order Authorizing And Approving The Sale Of Certain Assets Of, And Equity Interests In, Debtors' Enterprise Solutions Business [D.I. 1131] (the "Sale Motion").[2]

2. On August 4, 2009, this Court granted the Sale Motion and entered an Order Pursuant to Bankruptcy Code Sections 105, 363 And 365 (A) Authorizing Debtors' Entry Into The Asset And Share Sale Agreement, (B) Authorizing And Approving The Bidding Procedures, (C) Authorizing And Approving A Break-Up Fee And Expense Reimbursement, (D) Approving The Notice Procedures, (E) Approving The Assumption And Assignment Procedures, (F) Authorizing The Filing of Certain Documents Under Seal, and (G) Setting A Date for The Sale Hearing [D.I. 1278] (the "Sale Order"). The Sale Order also approved the bidding procedures ("Bidding Procedures", Exhibit 1 to Sale Order) and the assignment procedures ("Assignment Procedures", Exhibit 2 to Sale Order).

---

[2] Capitalized terms not defined herein shall have the meanings set forth in the Sale Motion.

3.      Pursuant to the Sale Order and the Bidding Procedures, an auction of the Enterprise Solutions Business assets was held from September 11, 2009 through September 14, 2009, with signature of documents taking place on September 15, 2009. As per the Notice of Filing of Successful Bid [D.I. 1489], Avaya Inc. was selected as the Successful Bidder in accordance with the Bidding Procedures.

**B.      The Verizon Objection**

4.      On September 14, 2009, Verizon filed its Objection to the Sale asking the Court to deny the Sale Motion or approve it only on the condition that certain Verizon contracts "be among the assets assumed, assigned and transferred to Avaya in the course of the transaction." Verizon Objection ¶ 20.

## ARGUMENT

**A.      The Verizon Objection is Premature**

5.      This Court has approved an orderly process for the assumption and assignment of the Debtors' executory contracts and any objections thereto. In Exhibit 2 of the Sale Order this Court provides that counterparties to executory contracts with the Debtors are permitted to object <u>only</u> upon receipt of an assumption or rejection notice pursuant to the Assignment Procedures, which provide all parties with a full and complete opportunity to contest any decision by the Debtors with respect to executory contracts governed by section 365 of the Bankruptcy Code. The Debtors have provided no assumption and assignment notice to Verizon under the Assignment Procedures, nor have the Debtors filed a motion to reject the contracts of Verizon. In the absence of the service of a notice of assumption and assignment on Verizon or the filing of a motion to reject any executory contracts to which Verizon is a counterparty, any

objections raised by Verizon to the possibility that its contracts will not be assumed are premature.[3]

6.  Despite Verizon's claim that it is objecting to the Sale Motion under section 363, rather than objecting to the anticipated rejection of its contracts under section 365, Verizon Objection ¶ 27, a review of the Objection belies this position. There can be no doubt that Verizon's objection is a section 365 objection. It is well-established law that a proposed sale under section 363 should be approved if the court finds that the sale represents a reasonable business judgment and is made in good faith. See In re Abbotts Dairies of Pa. Inc., 788 F.2d 143 (3d. Cir. 1986). Verizon has not disputed that the sale is an exercise of the reasonable business judgment of the US Debtors (or of the Canadian or the EMEA Debtors) or that Avaya is a good faith purchaser; it argues only that the sale should not be approved because of the potential negative economic impact on Verizon and its customers if Verizon's contracts are not assumed. Verizon cites no case supporting an objection to a sale motion on the ground that a particular contract may not be assumed and assigned. Thus, Verizon is attempting to transform a premature objection to the potential rejection of a contract into an objection to the Sale Motion simply by labeling it as such.

---

[3] Verizon argues that its objection must be addressed now because if it is addressed after a rejection motion is filed, the Debtors will be unable to perform their obligations under the contracts. Verizon Objection ¶ 29. But, as was mentioned in the telephonic conference on September 11, 2009, the Debtors twice offered to give Verizon at least ninety days written notice so that Verizon could make alternative arrangements for its customers. Ninety days would be more than ample time for Verizon to transition its customers and avoid any imagined "threat to the public welfare," Verizon Objection ¶ 29. Both offers were rejected.

B.  **Even if Verizon's Objection were not Premature, it should be Overruled**

7.  Even if the court could consider Verizon's objection to the possible rejection of its contracts at this stage, Verizon provides no recognized legal basis for disturbing a decision to reject the contracts (a decision that, at this stage, has not yet been made). It is black letter law that the debtors in Chapter 11 cases have a virtually unfettered right to reject executory contracts under section 365 of the Bankruptcy Code. In NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984), the United States Supreme Court set forth the following rationale for this bedrock principle of bankruptcy law:

> [T]he authority to reject an executory contract is vital to the basic purpose to a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization.

Id. The right of debtors to reject an executory contract under section 365 of the Bankruptcy Code is in no way compromised by the fact that the rejection is in connection with the sale of certain assets of debtors, and Verizon has cited no law suggesting otherwise.

8.  In evaluating a rejection decision made under section 365, a bankruptcy court should "presume that the [debtors] acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." In re Pomona Valley Med. Group, Inc., 476 F.3d 665, 670 (9th Cir. 2007). Accordingly, "[i]t should approve the rejection of an executory contract under section 365(a) unless it finds that the [debtors'] conclusion that rejection would be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." Id. (citing Lubrizol Enter. v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985)). Effects on counterparties or their customers are not factors to be weighed. In re Wheeling-

7

Pittsburgh Steel Corp., 72 B.R. 845, 847-48 (Bankr. W.D. Pa. 1987) (holding that rejection of public utility contracts is not entitled to heightened review: "[I]n determining the propriety of the debtor's decision to reject the Contract, we are not free to deviate from a traditional business judgment analysis and weigh the effect of rejection on West Penn Power or its customers."). Generally, absent a showing of bad faith or an abuse of business discretion, the debtor's business judgment will not be altered. In re G Survivor Corp., 171 B.R. 755, 757-58 (Bankr. S.D.N.Y. 1994).

9. Verizon has not asserted that any rejection of its contracts would be in bad faith or lacking any basis in sound business judgment. Instead, it argues, with no support in the case law, that it is entitled to special treatment because its contracts involve the public interest in some way.

10. The so-called public interest cases Verizon cites are distinguishable, and easily so. These cases fall into several discrete categories. First, Verizon cites cases that involved attempts by debtors to abandon property without complying with environmental statutes or taking basic safety measures. In Midlantic National Bank v. New Jersey Department of Environmental Protection, 474 U.S. 494, 507 (1986) (cited in Verizon Objection ¶ 22), the Supreme Court held that a debtor could not abandon property without complying with environmental laws "designed to protect the public health or safety from identified hazards." 474 U.S. at 507. Because "Congress did not intend for § 554(a) to pre-empt all state and local laws," a bankruptcy court "does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety." Id. Similarly, In re Lewis Jones, Inc., 1 Bankr. Ct. Dec. 277, 280 (Bankr. E.D.Pa. 1974) (cited in Verizon Objection ¶ 22) came to the unsurprising conclusion that a debtor could not abandon

underground facilities without taking safety measures to protect the public. These abandonment cases do not stand for the sweeping proposition that a bankruptcy sale can be held up any time a party claims that rejection of its contracts will affect the public interest. There is no abandonment here. There is no environmental impact here. These cases do not apply.

11.     The only case involving a sale that Verizon cites is In re Borne Chemical Co., 54 B.R. 126 (D.N.J. 1984) (cited in Verizon Objection ¶ 24). That case too is distinguishable. The sale related to discrete real property, involved no section 365 contracts and did not relate to the sale of an ongoing business (let alone one operating simultaneously in multiple jurisdictions around the world). Once again, environmental concerns dominated. There, the court considered whether a New Jersey environmental statute that imposed certain conditions was preempted by the Bankruptcy Code and held that it was not. Thus, the court held that it could deny a sale of real property unless the sale complied with the environmental statute. 54 B.R. at 131 ("Neither the provisions of § 363(b) nor its legislative history suggests that sales of assets in bankruptcy should be immune from regulatory provisions which apply inside and outside of bankruptcy."). There is no basis to argue that Borne Chemical controls with the fact pattern at issue.

12.     Furthermore, Verizon fails to point to any statute "reasonably designed to protect the public health or safety from imminent and identifiable harm." Midlantic, 474 U.S. at 507. Its inappropriate reference to the Telecommunications Act of 1996, Verizon Objection ¶ 25, fails as well. This statute, which governs Verizon's business – not Nortel's, the provision of services on the telecommunications grid, primarily concerns competition in the market for local telephone service. See 47 U.S.C. § 254. This statute has no application to, and creates no conditions that must be complied with before, the sale of a business that sells telephones and similar equipment.

13. Verizon's citation of In re Mirant Corp., 378 F.3d 511 (5th Cir. 2004) (cited in Verizon Objection ¶ 23), also is inapposite. The debtor in Mirant argued that it was entitled to reject a contract for the purchase of electricity, and the Federal Energy Regulatory Commission ("FERC") argued that any such rejection should occur in a FERC administrative proceeding. Id. at 515. The Fifth Circuit disagreed and held that a contract subject to FERC regulation could be rejected, but declined to rule on the motion to reject, holding that the factual record needed to be developed in the bankruptcy and district courts. Id. at 524. The court held that the district court, on remand, should apply "a more rigorous standard" in light of the specific statutory and regulatory scheme applicable to contracts for the purchase of electricity. Id. at 525. On remand, the district court did not reach the issue but noted that, if it did reach the issue, it would apply a more rigorous standard and would allow the FERC to participate in proceedings. In re Mirant Corp., 318 B.R. 100, 108 (N.D. Tex. 2004). Here, there is no regulatory body with congressionally granted power over the industry at issue. Instead, Verizon argues that a private party should be able to disrupt the entire sale based on its own unsupported allegations of public interest impact if its contracts are rejected at some later date. There is simply no support for this position.

C. **Verizon's Opposition is Nothing More than a Negotiating Tactic**

14. Although they have no obligation to do so, the Debtors twice offered to provide Verizon with at least 90 days written notice prior to the rejection of any contracts of Verizon with the Enterprise Solutions Business of the Debtors. The Debtors believed 90 days prior written notice would provide Verizon with more than sufficient opportunity to make alternative arrangements for its customers. These offers were rejected. It cannot be lost on this Court that Verizon is one of the largest providers of telecommunications services in the world, with assets

and resources commensurate with its status. Verizon has so far refused even to discuss any measures that would allow Verizon to mitigate any potential inconvenience that would be caused to its customers in the event of rejection of Verizon's contracts by the Debtors.

15. There is only one conclusion to be drawn from this behavior – that Verizon's allegations are driven entirely by its goal of extracting better commercial terms from Avaya. This is a matter between Verizon and Avaya and this important worldwide transaction should not be held hostage to that negotiation.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court approve the debtors' motion for an order authorizing and approving the sale of certain assets of, and equity interests in, debtors' enterprise solutions business and grant such other and further relief as it deems just and proper.

Dated: September 16, 2009
Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (No. 5125)
Lisa M. Schweitzer (No. 1033)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*