# EXHIBIT A

Court file No. 09-CL-7950

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### TWENTIETH REPORT OF THE MONITOR
### DATED SEPTEMBER 15, 2009

#### INTRODUCTION

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") (collectively, the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceeding. The stay of proceedings was extended to October 30, 2009, by this Honourable Court in its Order dated July 30, 2009.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the U.S. Court on January 14, 2009. As required by U.S. law, an official unsecured creditors

committee ("UCC") was established in January, 2009. In addition, an ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as those in the U.S. (the "Bondholder Group").

3. Nortel Networks (CALA) Inc. ("NCI") (together with NNI and certain of its subsidiaries filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

4. Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court") on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "U.K. Administrators").

5. On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

6. Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court.

2

**PURPOSE**

7.   The purpose of this Twentieth Report of the Monitor (the "Twentieth Report") is to provide information regarding the Applicants' motion seeking approval of a sale of the Applicants' Enterprise Solutions business (the "Business") pursuant to an amended and restated asset and share sale agreement dated September 14, 2009 (the "Avaya Final ASSA"), amongst NNC, NNL and NNI (the "Main Sellers") and certain of their affiliates (the "Other Sellers"), Avaya Inc. ("Avaya" or the "Purchaser") and, for the purposes of certain provisions only, certain of the EMEA Debtors, NN Israel and certain affiliates of the EMEA Debtors (collectively, the "EMEA Sellers") and to provide the Monitor's support thereof.

**TERMS OF REFERENCE**

8.   In preparing this Twentieth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company, and discussions with management of Nortel. EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Twentieth Report.

9.   Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

10.  Capitalized terms not defined in this Twentieth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor, the Avaya Final ASSA or the Bidding Procedures (as defined below).

3

## GENERAL BACKGROUND

11. In the Eighteenth Report, the Monitor noted that prior to commencing insolvency proceedings, Nortel management had determined that the Company should explore the possibility of divesting its Enterprise Solutions business. The Eighteenth Report provided a description of the Business and set out the process conducted by the Company both prior to and immediately after its CCAA filing to identify potential purchasers and to negotiate a definitive agreement for the sale of the Business. As noted, the Monitor was present at certain discussions held with three potential buyers including the discussions that resulted in the Main Sellers and the Other Sellers (collectively, the "Sellers") and, for the purposes of certain provisions only, the EMEA Sellers entering into an asset and share sale agreement dated July 20, 2009 (the "Avaya Stalking Horse ASSA"), with the Purchaser. Concurrently, the EMEA Sellers entered into a separate Asset Sale Agreement (the "EMEA Stalking Horse ASA" and collectively with the Avaya Stalking Horse ASSA, the "Avaya Stalking Horse Agreement") with Avaya dated July 20, 2009. The Avaya Stalking Horse Agreement outlined the terms of the Sellers' and EMEA Sellers' sale of certain assets, shares and associated liabilities of the Business to Avaya. The Avaya Stalking Horse ASSA is attached as Appendix "A" to the Eighteenth Report.

12. The Eighteenth Report also noted that as certain of the U.S. Debtors are parties to the Avaya Stalking Horse Agreement and given the desire to maximize value for the benefit of stakeholders in relation to the assets which are the subject of the Avaya Stalking Horse Agreement, Nortel determined and agreed with Avaya that the Avaya Stalking Horse Agreement would be subject to higher or better offers being obtained pursuant to a section 363 type sale process subject to the approval of both this Honourable Court and the U.S. Court and that the Avaya Stalking Horse Agreement would serve as a stalking horse bid pursuant to that process.

13. The bidding procedures to be employed in connection with the sale process (the "Bidding Procedures") were approved by this Honourable Court and the U.S. Court on August 4, 2009. A copy of the Bidding Procedures is attached at Appendix "A". The Bidding

4

Procedures provided that all bids were to be received by the Sellers not later than September 4, 2009, at 12:00 p.m. ET giving interested parties 31 days to conduct due diligence and submit a bid. Such bids had to be accompanied by a Good Faith Deposit in the amount of $30 million. The Bidding Procedures also provided that the Auction would be held on September 11, 2009 at 9:30 a.m. ET.

## BIDDING PROCEDURES AND AUCTION PROCESS

14. Subsequent to this Honourable Court's approval of the Bidding Procedures, two potential buyers that had previously been in discussions with Nortel with respect to the acquisition of the Business indicated their interest in participating in the sale process. These parties were Enterprise Network Holdings BV ("ENH") and another potential buyer. After consultation with the Monitor, the UCC and the Bondholder Group, both of these potential buyers were deemed Qualified Bidders pursuant to the Bidding Procedures. In addition, Avaya was deemed a Qualified Bidder.

15. No other parties expressed interest in the Business pursuant to the Bidding Procedures.

16. In the period up to September 4, 2009, ENH and the other potential buyer: a) were given access to the confidential data room; b) accessed the data room; c) engaged legal counsel and other advisors; d) participated in meetings and other discussions with management of Nortel and Nortel's advisors; e) held discussions with key customers and suppliers which were co-ordinated through Nortel; f) met and / or held discussions with representatives of the Monitor, the UCC, the Bondholder Group and / or the U.K Administrators; and g) in the case of ENH, prepared marked up versions of the Avaya Stalking Horse Agreement as well as various ancillary agreements.

17. During this period, the Monitor was kept apprised of all activity conducted between Nortel and the potential buyers. In addition, the Monitor participated in several conference calls with the potential buyers. The Monitor conducted its own independent review and analysis of materials submitted by the potential buyers.

18. On August 27, 2009, and August 31, 2009, the draft proposals submitted by ENH to the Sellers prior to such dates were provided to Avaya in accordance with the provisions of the Avaya Stalking Horse Agreement.

19. On September 2, 2009, the other potential buyer submitted a written notice that it would be unable to submit a bid by the Bid Deadline.

20. On September 4, 2009, prior to the bid deadline, ENH submitted a bid. In accordance with the Bidding Procedures, ENH also submitted a Good Faith Deposit in the amount of $30 million. This Good Faith Deposit is currently being held in a sole purpose bank account with Citibank New York. The ENH bid was reviewed by the Sellers and the Monitor in detail. A copy of the ENH bid was also provided to representatives of the UCC, the Bondholder Group and the U.K. Administrators for their review. All of these parties concurred that the bid as submitted either conformed to the requirements of a Qualified Bid pursuant to the Bidding Procedures or, where it did not conform, should be deemed to be a Qualified Bid pursuant to, and as permitted by, the Bidding Procedures. In accordance with the Bidding Procedures, the Avaya Stalking Horse Agreement was deemed to be a Qualified Bid.

21. On September 4, 2009, in accordance with the Bidding Procedures, a copy of the ENH bid was provided to Avaya.

22. After consultation with the Monitor and representatives of the UCC, the Bondholder Group and the U.K. Administrators, the Sellers determined that the highest or otherwise best offer as between the two bids was the bid represented by the Avaya Stalking Horse Agreement. Accordingly, on September 10, 2009, ENH and Avaya were informed that the Avaya Stalking Horse Agreement had been selected as the Starting Bid pursuant to the Bidding Procedures.

23. The auction commenced on September 11, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York. In attendance at the auction were representatives of the Sellers, the Monitor, the two Qualified Bidders, the UCC, the Bondholder Group and

6

the U.K. Administrators. Also in attendance were representatives of certain creditors and other interested parties admitted at the discretion of the Sellers.

24. The Avaya Stalking Horse Agreement was announced as the Starting Bid. The Sellers then adjourned the auction to allow ENH time to prepare a written bid. Once a written bid was received from ENH and the Sellers had consulted with the Monitor, the UCC, the Bondholder Group and the U.K. Administrators, the auction was re-convened and the Sellers announced the ENH bid as the Leading Bid. The Sellers then asked for a second round of bidding. Once again, the auction was adjourned, this time to allow Avaya time to prepare a written bid.

25. The auction continued over the next several days in a similar fashion for several additional rounds of bidding. After the third round of bidding, the Sellers exercised their discretion pursuant to the Bidding Procedures, following consultation with the Monitor and representatives of the UCC, the Bondholder Group, and the U.K. Administrators and increased the incremental net value threshold for the fourth and subsequent rounds of bidding to $25 million. Pursuant to the Bidding Procedures, the incremental bid threshold had originally been set at $2.375 million.

26. In the fifth round of bidding, ENH was declared to have the Leading Bid. The Sellers then asked that both parties submit their best bid in the next round. Avaya was advised that, as it was not the lead bidder, it was required to submit a bid in the sixth round in order to remain in the process. ENH was advised that it could either stand on its fifth round bid or submit a new bid. The Sellers also advised that following the submission of these bids, and a brief adjournment to permit the Sellers to consult with the Monitor and representatives of the UCC, the Bondholder Group and the U.K. Administrators, a new Leading Bid would be announced. The Sellers further advised that from that point forward, the Sellers would require that further bids be submitted without any further adjournment of the Auction (although the Sellers noted that Bidders would be permitted to step out of the room briefly to formulate their bids).

7

27. On September 14, 2009, in the sixth of bidciing, a bid was submitted by Avaya. ENH advised that it would stand on its round bid. The auction was briefly adjourned to allow the Sellers to review the Avaid and co rsult with the Monitor and representatives of the UCC, the Bondholder Grou‡ the U.K. Administrators. During this period of adjournment, ENH indicated to the ers that it would not be submitting an additional bid in further rounds. Accordingly, ‡uction was re-convened and the sixth round bid submitted by Avaya was announced the Leading Bid as well as the Successful Bid.

28. The auction was then adjourned aĝ, solely t ⊙ permit the completion of documentation between the Sellers and Avaya relat to the Successful Bid. On September 15, 2009, the documentation was finalized and spature pages were exchanged. At that point, the auction was concluded.

## THE SUCCESSFUL BID

29. The Successful Bid includes the Avaya Final ASSA, a separate amended and restated asset sale agreement entered into by the BMEA Sellers (the "BMEA Final ASA") and various ancillary agreements. A copy of the Avaya Final ASSA is attached as Appendix "B". A copy of the Avaya Final ASSA blacklined against the Avaya Stalking Horse ASSA is attached as Appendix "C". A copy of the exhibits and schedules to the Avaya Final ASSA are attached as confidential Appendix "D" hereto. As these exhibits and schedules contain sensitive competitive information as well as personal information with respect to employees, the Monitor requests that confidential Appendix "D" to this Twentieth Report be sealed by this Honourable Court.

30. The terms and conditions of the Avaya Final ASSA are substantially the same as the Avaya Stalking Horse ASSA described in the Eighteenth Report. The significant differences between the Avaya Stalking Horse ASSA and the Avaya Final ASSA include the following:

8

- Purchase Price. The Base Purchase Price has been increased from $475 million to $900 million plus the obligation of the Purchaser to pay, perform and discharge the Assumed Liabilities and the EMEA Assumed Liabilities. The adjustments to the Base Purchase Price in respect of the Accrued Vacation Amount and the EMEA Holiday Adjustment have been eliminated. If, prior to October 15, 2009, the Sellers decide to commence proceedings under Chapter 11 of the Code with respect to the Companies (being the NGS Companies and DiamondWare) (the "Asset Sale Election"), there will be an additional adjustment to the Base Purchase Price (the "-6 Purchase Price Adjustment") for each Customer Contract of the NGS Companies that does not by its terms expire within 180 days after the Closing Date and is not transferred or subcontracted to the Purchaser prior to Closing (the "-6 Contracts"). The –6 Purchase Price Adjustment will be in an amount, with respect to each –6 Contract, equal to i) the Base Purchase Price multiplied by 1.3 (or if the Customer Contract of the NGS Companies is with the Department of State, 2.0) and divided by the revenues of the Business in respect of the last twelve months preceding the Closing Date for which financial information is available as of the Closing Date; multiplied by ii) the revenues received by the NGS Companies in respect of such -6 Contract for the period October 1, 2008, to September 30, 2009.

- Escrow Amounts.

  o The Purchaser will assume all liabilities related to any payments with respect to accrued and unpaid vacation days owing to Transferred Employees and therefore the Accrued Cash-Out Vacation Escrow has been eliminated.

  o In the event the Asset Sale Election is made and the –6 Purchase Price Adjustment is a positive number, a new escrow account will be set up at Closing under the Escrow Agreement (the "Estimated –6 Liability Escrow Account") in which the Purchaser will provide funds equal to the estimated

9

-6 Purchase Price Adjustment as of the Closing Date. If, within 180 days after the Closing Date, any -6 Contract is transferred or subcontracted such that Purchaser receives the same economic benefits as it would if it were a direct party to the relevant Customer Contract, then an amount equal to the -6 Purchase Price Adjustment with respect to such -6 Contract will be released by the Escrow Agent to the Sellers. If, however, at the end of such 180-day period, any amounts remain in the Estimated -6 Liability Escrow Account, all such amounts will be released by the Escrow Agent to the Purchaser.

- Employee Retention Plan. The Purchaser will pay at Closing $15 million of cash payable to employees of the Sellers under an employee retention plan (to be implemented with guidance from the Sellers' management team).

- Asset Sale Election. The Sellers will use commercially reasonable efforts to resolve, as against the Companies, a claim filed in the Chapter 11 proceedings by the Internal Revenue Service (the "-6 Liability") in a manner reasonably acceptable to the Purchaser. If such efforts are unsuccessful, the Sellers may, on or prior to October 15, 2009, and following notice to the Purchaser, elect to satisfy their obligation to transfer the shares of the Companies to the Purchaser by transferring the assets and liabilities of the Companies.

In the event that the Asset Sale Election is made:

  o The Sellers shall, within three calendar days of the Asset Sale Election, and in any case, no later than October 18, 2009, commence proceedings under Chapter 11 of the Code with respect to the Companies;

  o The Sellers and the Purchaser shall amend the Successful Bid to effect such election and the amendment shall provide in particular that:

i)  all of the assets of the Companies (except as contemplated in the -6 Purchase Price Adjustment); and

ii) all of the liabilities of the Companies other than (x) the -6 Liability; (y) any similar claims under similar state, local or foreign tax principles by state, local or foreign taxing authorities (the "Related - 6 Liabilities") and (z) actual or potential claims, liens or liabilities arising or that could be asserted under certain provisions of the U.S. Internal Revenue Code of 1986, the Employee Retirement Income Security Act of 1974 or the UK Pensions Act of 2004 (the "Specified Pension Liabilities"),

will transfer to the Purchaser at Closing;

o  The parties will use commercially reasonable efforts to obtain at the Sellers' expense the novation or assignment of the Customer Contracts of the Companies to the Purchaser and any consents or other authorizations necessary to effect such transfer;

o  If any consent is not received on or before the Closing Date, the Sellers and the Purchaser shall, subject to applicable law and the terms of the applicable Customer Contract of the Companies, enter into a subcontract pursuant to which the Purchaser will provide products or services on the terms of such Customer Contract for the shortest of i) 18 months; ii) the remaining life of such Customer Contract; or iii) the period until such Customer Contract is validly assigned to the Purchaser from and after the Closing, provided that the Sellers shall use reasonable best efforts to maintain the good standing of the Nortel entity that is a party to each such Customer Contract during the subcontract period at no additional cost to the Purchaser;

11

o  The Sellers shall use reasonable best efforts to have a final order approving
the transfer of such assets and liabilities entered by the Bankruptcy Court
prior to December 1, 2009; and

o  The Sellers will also use reasonable best efforts to include in all Customer
Contracts entered into by the Companies after September 14, 2009 that are
expected to generate total contract value of at least $5 million terms that
will permit the Customer Contracts to be assigned to the Purchaser without
third party consent.

To the extent the Sellers make the Asset Sale Election, the Purchaser will not
become liable on account of, or assume, any claim or liability asserted against the
Companies if such claim or liability would not have remained a valid claim
against any of the Companies had the Sellers transferred the shares to the
Purchaser. In addition, it is a condition to closing that a final order approving the
transfer of the Companies' assets, in form and substance reasonably satisfactory
to the Purchaser, be entered by the Bankruptcy Court and that such order provide
that the assets are transferred to the Purchaser free and clear of any liens or claims
arising out of the -6 Liabilities, the -6 Related Liabilities or the Specified Pension
Liabilities.

If the Asset Sale Election is made, and not all Customer Contracts of the NGS
Companies are transferred or subcontracted such that the Purchaser receives the
same economic benefits as it would if it were a direct party to the relevant
Customer Contract, on or within 180 days after the Closing Date, the Escrow
Agent will release any amounts that remain in the Estimated -6 Liability Escrow
Account at the end of such 180-day period to the Purchaser as described above.

- Closing Conditions. In addition to the closing conditions set forth in the Avaya
  Stalking Horse Agreement and described in the Eighteenth Report:

12

o in the event the Asset Sale Election is made, the obligation of the Purchaser to close will be conditional upon either: a) Customer Contracts of the Companies that account for not less than 65% of the last twelve months' revenues of the Companies as of the Closing Date shall transfer or, to the extent not prohibited by applicable law or the terms of such Customer Contract, subcontracted (on terms under which the Purchaser receives the economic benefits that it would have received if it were a direct party to the relevant Customer Contract) to the Purchaser at Closing in compliance with an effective order of the Bankruptcy Court; or b) the Sellers shall have delivered to the Purchaser a second set of all financial statements and other information required to be delivered pursuant to the financial statements covenant in the Avaya Final ASSA, which set of financial statements and other information shall have been prepared excluding the Companies; and

o In the event the Asset Sale Election is not timely made, the obligation of the Purchaser to close will be conditional upon any material tax liability of the Companies relating to the -6 Liability having been resolved in a manner reasonably acceptable to the Purchaser.

- Closing Deadline. The Purchaser's termination right has been advanced such that the Purchaser may terminate the Successful Bid if Closing does not occur on or prior to the date that is the earlier of i) 365 days from the date of the Successful Bid; or ii) the later of 270 days from the date of the Successful Bid or the thirtieth day after the date on which the condition with respect to Regulatory Approvals has been satisfied.

- Reverse Termination Fee. The Reverse Termination Fee has been increased from $100 million to $200 million if the Avaya Final ASSA is terminated by the Main Sellers for breach of the Purchaser, or by either Primary Party due to the occurrence of the closing deadline or issuance of a final antitrust injunction and, at the time of termination, the conditions with respect to Regulatory Approvals

13

have not been satisfied or, any Regulatory Approval(s) require any divestitures, licenses or hold separate or similar arrangements or any material actions, undertakings or arrangements for the conduct of any business and / or terminating any relationships or contractual rights or obligations that the Purchaser determines not to accept. The Reverse Termination Fee remains at $100 million in all other circumstances where the Reverse Termination Fee is payable.

• Limitation of Liability. The Parties have agreed that irreparable damages would occur in the event that any of the provisions of the Avaya Final ASSA were not performed in accordance with their specific terms or were otherwise breached. Accordingly, subject to the limitations set forth below and in addition to any other remedies to which the Parties are entitled at law or in equity, each of the Parties will be entitled to equitable relief to prevent or remedy breaches of the Avaya Final ASSA (including injunctions and orders for specific performance in respect of such breaches). Each Party will be entitled to all remedies against the other Parties available to it at law or in equity (including specific performance and damages) for post-Closing breaches of the Avaya Final ASSA, the EMEA Final ASSA and any Transaction Documents. In no circumstance shall any Person be liable for punitive or special damages arising out of the Avaya Final ASSA (or the transactions contemplated thereby), or any breach or alleged breach of any terms of the Avaya Final ASSA, the EMEA Final ASSA or any Transaction Documents, including damages alleged as a result of tortious conduct. Notwithstanding anything to the contrary set forth above, if (i) the closing conditions regarding Regulatory Approvals have not been satisfied (other than as a result of a material intentional Purchaser breach), or (ii) any Regulatory Approval requires any divestiture, license or hold separate or similar arrangements or any material actions, undertakings or arrangements for the conduct of any business and/or terminating any relationships or contractual rights or obligations that Purchaser determines not to accept, then specific performance will not be available against the Purchaser and the sole and exclusive remedy of the Nortel Parties against the

Purchaser will be termination of the Avaya Final ASSA and the EMEA Final ASSA and payment of the Reverse Termination Fee by the Purchaser, when, as and if required pursuant to the Avaya Final ASSA (and no other additional money damages will be payable by the Purchaser) for the failure of the transactions contemplated by the Avaya Final ASSA or the EMEA Final ASSA to be consummated, or in respect of any liabilities relating to the Avaya Final ASSA, the EMEA Final ASSA or any other Transaction Document (or the transactions contemplated thereby) prior to the Closing.

• Real Estate. Since the Avaya Stalking Horse Agreement was executed, the Purchaser has made the following elections: (i) the Purchaser elected to purchase the Owned Real Estate, (ii) the Purchaser elected to take an assignment of certain real estate leases, (iii) the Purchaser elected to enter into subleases with the Sellers with respect to certain premises leased by the Sellers; and (iv) the Purchaser elected to enter into Direct Leases with the Sellers with respect to certain property owned by the Sellers.

### APPROVAL AND VESTING ORDER AND OTHER CLOSING CONDITIONS

31. The assets to be transferred by the Applicants and the U.S. Debtors pursuant to the Avaya Final ASSA are to be transferred free and clear of all liens, claims and encumbrances of any kind other than permitted liens and those expressly assumed by Avaya pursuant to the Avaya Final ASSA. Accordingly, the Applicants are seeking an order of this Honourable Court vesting in Avaya all of the Applicants' right, title and interest in the Assets as defined in the Avaya Final ASSA. The Monitor understands that no leased assets are being conveyed as part of this transaction. Nevertheless, the Monitor understands that notice has been or will be provided by the Applicants to all personal property security registrants (save for two registrants the Applicants have previously attempted to serve where the materials have been returned as undeliverable) out of an abundance of caution.

15

32. The Monitor understands that a joint hearing has been scheduled before the U.S. Court and this Honourable Court on September 16, 2009, for approval of the Avaya Final ASSA. The Monitor understands that the Successful Bid is also subject to court approvals in France and Israel. Closing of the transaction is dependent on the timing of various regulatory approvals. Subject to the approval of the Courts and these regulatory approvals, closing is currently anticipated to occur in December, 2009.

## ALLOCATION OF SALES PROCEEDS

33. As noted in the Eighteenth Report, the Business is not operated through a dedicated legal entity or stand-alone division. Amongst other things, the Applicants have an interest in intellectual property related to the Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from the Successful Bid amongst the various Nortel entities in the various jurisdictions is complex.

34. As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties to the IFSA agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes

16

concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation.

35. As of the current date, no agreement has been reached regarding the allocation of any sales proceeds and the terms of a protocol with respect to the resolution of disputes in connection with the allocation of sale proceeds are still under discussion. Accordingly, the Selling Debtors have determined that the proceeds shall be deposited in an escrow account. The Applicants and the U.S. Debtors are currently in discussions with a major financial institution with respect to having this institution act as escrow agent.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

36. The Monitor is of the view that the Company's efforts to market the Business were comprehensive and conducted in accordance with the Bidding Procedures and that the Section 363 type auction process provided a mechanism to fully determine the market value of the Business. The Monitor is satisfied that the Purchase Price for the Assets constitutes fair consideration for such Assets. As a result, the Monitor is of the view that the Avaya Final ASSA represents the best transaction for the sale of the Business. The Monitor therefore recommends that this Honourable Court approve the Applicants' motion authorizing the Applicants to complete the transaction contemplated by the Avaya Final ASSA and vesting all of the Applicants' right, title and interest in the Purchased Assets in Avaya.

37.  For the reasons described above at paragraph 29, the Monitor recommends that confidential Appendix "D" to this Twentieth Report be sealed by this Honourable Court.

All of which is respectfully submitted this 15th day of September, 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

APPENDIX "A"

[ATTACHED]

## Schedule "A" – Bidding Procedures

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities (the "Sale") as set forth in the Purchase Agreements (as defined below) with respect to the Purchaser, or, as set forth in the relevant sale agreements with respect to a Successful Bidder (as defined below). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement (as defined below).

On January 14, 2009, Nortel Networks Inc. and certain of its U.S. subsidiaries that are debtors and debtors-in-possession (collectively, the "U.S. Debtors") as well as Nortel Networks Limited and certain other affiliates of the U.S. Debtors that have commenced proceedings under the Canadian Companies' Creditors Arrangement Act (the "Canadian Debtors"), and certain non-debtor affiliates of the U.S. Debtors and the Canadian Debtors (together with the U.S. Debtors and the Canadian Debtors, the "North American Sellers") executed that certain Asset and Share Sale Agreement (the "Agreement") with Avaya Inc. (together with any of its designees, the "Purchaser").

On January 14, 2009, certain other affiliates of the North American Sellers (the "EMEA Sellers" and together with the North American Sellers, the "Sellers"), certain of which are in administration proceedings in which Alan Bloom, Stephen Harris, Chris Hill, Alan Hudson and David Hughes of Ernst & Young LLP, have been appointed as the joint administrators of those EMEA Sellers by the English High Court of Justice in connection with the proceedings (the "UK Proceedings") under the Insolvency Act 1986 (such individuals collectively, the "Administrators"), and the Administrators executed that certain Asset Sale Agreement relating to the sale and purchase of the EMEA Assets with the Purchaser (the "EMEA Agreement" and together with the Agreement, the "Purchase Agreements").

The Sellers have determined that: (A) the transactions contemplated by the Purchase Agreements and the ancillary agreements discussed therein with respect to the Purchaser, or, as set forth in the relevant sale agreements and ancillary agreements with respect to a Successful Bidder, (collectively, the "Transaction") should be subject to competitive bidding as set forth herein; (B) the transfer of the U.S. Debtors' rights, title and interests in and to the Assets (as defined below) should be subject to approval by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to Sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"); (C) the transfer of the rights, title and interests of the Canadian Debtors (as such term is defined in the Agreement) in and to the Assets should be subject to approval by the Ontario Superior Court of Justice (the "Canadian Court"); and (D) the Transaction shall be subject to approval by such other applicable court(s) as the Sellers, in consultation with the Committee (as defined below), the Bondholder Group (as defined below) and the Monitor (as defined below), may reasonably determine in good faith is legally required and certain other closing conditions as set forth in the Purchase Agreements.

On July 20, 2009, the U.S. Debtors filed a Motion for Orders (I)(A) Authorizing Debtors' Entry into the Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing

- 6 -

the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of, and Equity Interests in, Debtors' Enterprise Solutions Business, (B) the Assumption and Assignment of Certain Contracts and Leases and (C) the Assumption and Sublease of Certain Leases (the "Sale Motion").

On [●], 2009, the Bankruptcy Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Bidding Procedures Order").

On [●], 2009, the Canadian Debtors filed a motion with the Canadian Court seeking an order for approval of (I) execution and delivery of the Agreement by the Canadian Debtors, (II) payment of the Break-Up Fee and Expense Reimbursement in the circumstances provided for in the Agreement, and (III) a process for the Sale of the Canadian Debtors' rights, title and interests in and to the Assets (as defined below).

On [●], 2009, the Canadian Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Canadian Sales Process Order").

## Bidding Process

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's and the Canadian Court's and, if required, such other applicable courts' approval thereof (collectively, the "Bidding Process"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., et al. (Case No. 09-10138) involving the U.S. Debtors (the "Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor"), the Administrators in connection with the UK Proceedings, and their respective advisors throughout the Bidding Process. In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, the Bankruptcy Court and the Canadian Court will have jurisdiction to hear and resolve such dispute.[1]

## Assets To Be Sold

· The Sellers are offering for sale, in one or more transactions, certain of the Sellers' assets (including the stock of certain subsidiaries of the Sellers) pertaining to the business segments

[1] For the avoidance of doubt, this Bidding Process shall not govern any disagreements among the Sellers.

- 7 -

described in the Purchase Agreements with respect to the Purchaser, or, as set forth in the relevant sale agreements with respect to a Successful Bidder, and related schedules and in an information memorandum made available by the Sellers to the Purchaser and other potential bidders, which will also be made available to other prospective purchasers that have executed a confidentiality agreement with the Sellers (the "Assets").

## "As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except, with respect to the Purchaser, to the extent set forth in the Purchase Agreements or, with respect to a Successful Bidder (as defined below), to the extent set forth in the relevant sale agreements of such Successful Bidder. In addition, in the case of the EMEA Sellers, the sale of whatever rights, title and interests that such EMEA Seller may have (if any) in and to the Assets will be on an "as-is" basis and will be without any representations or warranties.

## Free Of Any And All Claims And Interests

All of the rights, title and interests of the U.S. Debtors and the Canadian Debtors in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests") pursuant to sections 363 and 365 of the Bankruptcy Code, such Claims and Interests to attach to the net proceeds of the sale of such Assets (without prejudice to any claims or causes of action regarding the priority, validity or enforceability thereof), except, with respect to the Purchaser, to the extent otherwise set forth in the Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant sale agreement of such Successful Bidder with the U.S. Debtors and the Canadian Debtors.

## Publication Notice

As soon as reasonably practicable after entry of orders by the Bankruptcy Court and the Canadian Court approving these Bidding Procedures, but in any event no more than three (3) Business Days after the entry of such orders, the Sellers shall publish notice of these Bidding Procedures, the time and place of the Auction (as defined below), if required, the time and place of the Sale Hearing (as defined below), and the objection deadline for the Sale Hearing in The Wall Street Journal (National Edition), The Globe & Mail (National Edition) and The Financial Times (International Edition).

## Participation Requirements

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court and accepted by the Administrators, for cause shown or, with regard to paragraphs (b) and (c) below, as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), prior to the Bid Deadline (as defined below), in order to participate in the Bidding Process, each person, other than the Purchaser, who wishes to participate in the

- 8 -

Bidding Process (a "Potential Bidder") must deliver to the Notice Parties (as defined below) at the addresses provided below:

    (a)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, that shall not be on terms that, in the Sellers' reasonable judgment, are more favorable to the Potential Bidder than the confidentiality agreement executed by the Purchaser and which shall inure to the benefit of any purchaser of the Assets (in the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets and waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transaction it may enter into, to the Notice Parties (as defined below));

    (b)    current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transaction; and

    (c)    a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Purchase Agreements.

A Potential Bidder that delivers the documents described above, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability

- 9 -

of financing, experience and other considerations) to be able to consummate the Transaction will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence as provided in the following paragraph with respect to the Assets.

### Due Diligence

The Sellers may in their reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a confidentiality agreement with the Sellers such due diligence access to materials and information relating to the Assets as the Sellers deem appropriate after consultation with the Committee, the Bondholder Group and the Monitor. Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their reasonable business judgment, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. No additional due diligence for any party other than a Qualified Bidder who has submitted a Qualified Bid will continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. In any event, the Purchaser shall be provided prompt access to all material due diligence materials, management presentations, on site inspections and other information provided to Qualified Bidders that were not previously made available to the Purchaser. In addition, the Sellers shall provide prompt access to each Qualified Bidder (including the Purchaser) to all material due diligence materials, management presentations, on site inspections and other information provided to any Qualified Bidder after the approval of these Bidding Procedures. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Purchase Agreements or any other definitive sale agreements with any Successful Bidder executed and delivered by Sellers.

### Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Gordon A. Davies, Esq., Chief Legal Officer, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905) 863-8386; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam,

Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (v) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vi) financial advisor to the Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (vii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; (viii) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; (ix) the Administrators: Ernst & Young LLP, Attn: Stephen Harris, 1 More Place, London SE1 2AF, United Kingdom, Facsimile +44 20 7951 9002; and (x) counsel to the Administrators: Herbert Smith LLP, Attn: Stephen Gale, Exchange House, Primrose Street, London, EC2A 2HS, Facsimile: +44 20 7098 4878; so as to be received not later than September 4, 2009 at 12:00 pm (Eastern) by the Sellers (the "Bid Deadline").

## Qualified Bid

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(a)   it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Purchase Agreements, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure (including, without limitation, an offer conditioned upon confirmation of a plan of reorganization proposed by the U.S. Debtors either individually or in collaboration with such Qualified Bidder) or upon alternative terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholders Committee and the Monitor, are no less favorable than the terms and conditions of the Purchase Agreements;

(b)   it includes a letter stating that the bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), provided that if such bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, 180 days from the later of the Sale Hearing and the entry of the Sale Order and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)   it includes duly authorized and executed Purchase Agreements (as modified by the bidder to reflect the terms and conditions of its bid), including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, including, to the extent required by the terms and conditions of such bid, the Local Sale Agreements, the Real Estate Agreements, the Intellectual Property License Agreement, the Transition Services Agreement, the

- 11 -

Trademark License Agreement, the Loaned Employee Agreement (each as defined in the Agreement and each as modified by the bidder to reflect the terms and conditions of its bid), the other ancillary agreements as described in the Purchase Agreements and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Purchase Agreements ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the bidder;

(d)     it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(e)     it is not conditioned on (i) the outcome of unperformed due diligence by the bidder (and includes an acknowledgement and representation that the bidder has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer) and/or (ii) obtaining financing;

(f)     it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(g)     it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Purchase Agreements, plus (i) the amount of the Break-Up Fee and Expense Reimbursement (each as defined in the Purchase Agreements), plus (ii) U.S. $4.75 million, provided that in determining such value, the Sellers will not be limited to evaluating the dollar amount of a competing bid, but may also consider such factors identified in the "Evaluation of Competing Bids" section of these Bidding Procedures, including, without limitation, the factors affecting the speed and certainty of obtaining regulatory approvals required to close the Transaction.

(h)     it includes an acknowledgment and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreements (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

- 12 -

(i)     it includes an acknowledgement and representation that the bidder: (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; and (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (iii) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)     it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(k)     it is accompanied by a good faith deposit (each, together with the good faith deposit of the Purchaser, a "Good Faith Deposit") in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to $30 million to be dealt with as provided for under "Good Faith Deposit" herein;

(l)     it (a) contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction(s)) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment and associated with the employment of all employees who will become employees of the Qualified Bidder, and (b) identifies any pension liabilities and assets related to any employees currently covered under any Nortel registered pension or retirement income plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m)     it includes evidence of the Potential Bidder's ability to comply with Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)     it contains other information reasonably requested by the Sellers; and

(o)     it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids, provided that the Sellers in evaluating such bids, may not waive substantial compliance with any items in paragraphs (b), (d), (e), (f), (i), (j), (k), (l), (m), (n), and (o) without the consent of the Purchaser, the Committee, the Bondholder Group and the Monitor, and such

- 13 -

consent shall not be unreasonably withheld in connection with any bid that (1) would otherwise fully satisfy the requirements of a Qualified Bid hereunder but for a de minimis failure to comply with paragraphs (b), (d), (e), (f), (i), (j), (k), (l), (m), (n), or (o) and (2) such noncompliance is cured within 24 hours of the Bid Deadline. Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Purchase Agreements will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction and the Sale.

The Sellers shall deliver copies of any bids deemed to be Qualified Bids to Purchaser in accordance with section 5.1(c) of the Agreement, and notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids no later than three (3) days following the expiration of the Bid Deadline. In addition, no later than three (3) Business Days prior to the Auction, a copy of each Qualified Bid will be provided to all Qualified Bidders.

## Aggregate Bids

The Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

## Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Transaction (including any regulatory approvals required to close the Transaction), the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction(s)) to be offered post-closing employment by the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment of all employees who will become the employees of the Qualified Bidder, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

## No Qualified Bids

If the Sellers do not receive any Qualified Bids other than the Purchase Agreements received from the Purchaser, the Auction shall be cancelled and the U.S. Debtors shall report the same to the Bankruptcy Court, the Canadian Debtors shall report the same to the Canadian Court and the Monitor and subject to requiring and obtaining approvals of the Bankruptcy Court, the Canadian Court or any other applicable court and satisfaction of the conditions set forth in the Purchase Agreements, the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Purchase Agreements. In addition, if no Qualified Bid is received, the U.S. Debtors reserve the right to request that the Bankruptcy Court advance the date of the Sale Hearing (as defined below) and provide notice of such new date to those parties

- 14 -

in interest entitled to notice thereof and the Canadian Debtors reserve the right to file a motion
with the Canadian Court seeking the approval of the sale of the Canadian Debtors' rights, title
and interests in and to the Assets to the Purchaser. In addition, if approval of any other
applicable court is required, the Sellers will as soon as practicable file an appropriate pleading
with such court(s) seeking approval of the Transaction.

## Break-Up Fee and Expense Reimbursement

Recognizing the value and benefits that Purchaser has provided to the U.S. Debtors and
the other Sellers by entering into the Purchase Agreements, as well as the Purchaser's
expenditure of time, energy and resources, the Sellers have agreed that the Purchaser is entitled
to a Break-Up Fee and Expense Reimbursement in amounts and under the circumstances set
forth in the Purchase Agreements and as set forth in the Bidding Procedures Order and the
Canadian Sales Process Order.

## Auction

If the Sellers receive one or more Qualified Bids in addition to the Purchase Agreements,
the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or
recorded on video to the extent required under Delaware local practice, at 9:30 a.m. on
September 11, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One
Liberty Plaza, New York, New York 10006 or such other location as shall be timely
communicated to all entities entitled to attend the Auction, which Auction may be cancelled or
adjourned without the prior written consent of the Purchaser, subject to the terms of the Purchase
Agreements and the Bidding Procedures Order. Copies of all Qualified Bids shall be delivered
to the Committee, the Bondholder Group, the Monitor, the Administrators and the Purchaser at
such time that such bid is deemed a Qualified Bid but no later than two (2) Business Days prior
to the Auction. The Auction shall run in accordance with the following procedures:

    (a)    Only the Sellers, the Purchaser, the Committee, the Bondholder Group, the
Monitor and the Administrators (and the advisors to each of the foregoing), any creditor
of the North American Sellers and any other Qualified Bidder that has timely submitted a
Qualified Bid, shall attend the Auction in person (and the advisors to such Qualified
Bidder), and only the Purchaser and such other Qualified Bidders will be entitled to make
any subsequent bids at the Auction.

    (b)    Each Qualified Bidder shall be required to confirm that it has not engaged
in any collusion with respect to the bidding or the Sale.

    (c)    At least one (1) Business Day prior to the Auction, each Qualified Bidder
who has timely submitted a Qualified Bid must inform the Sellers whether it intends to
attend the Auction; provided that in the event a Qualified Bidder elects not to attend the
Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully
enforceable against such Qualified Bidder until (i) the date of the selection of the
Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an
Alternate Bidder (as defined below), the Alternate Bid Expiration Date. At least one (1)
Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or
combination of Qualified Bids which the Sellers believe, in their reasonable business
judgment, after consultation with the Committee, the Bondholder Group and the Monitor,

is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders.

(d)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(e)     The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(f)     Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least U.S. $2.375 million over the Starting Bid or the Leading Bid, as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction, and provided, further that the Sellers in determining the net value of any incremental bid to the estate shall not be limited to evaluating the incremental dollar value of such bid and may consider other factors as identified in the "Selection of Successful Bid" section of these Bidding Procedures, including, without limitation, factors affecting speed and certainty of obtaining regulatory approvals required to close the Transaction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the Purchase Agreements as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

## Selection Of Successful Bid

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid that is either the Leading Bid or submitted subsequent to and as an improvement to the submission of the Leading Bid (except in the event that there is no Leading Bid, in which case the Qualified Bids to be considered will be the Starting Bid and any bids submitted subsequent and as an improvement to the Starting Bid) on the basis of financial and contractual terms and the factors relevant to the sale process, including, among other things, the proposed revisions to the transaction documents, the effect of the Sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), the counterparties to such transactions, the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, other factors affecting the speed, certainty and value of the Sale (including any regulatory approvals required to close the Transaction), the Assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers to be offered post-closing employment by the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by the Canadian Court and any required approvals of any other applicable court(s) with such Successful Bidder and approval and execution by the Administrators of the relevant Successful Bid transaction documents with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

## Sale Hearing

The sale hearing to authorize certain of the Sellers to enter into agreements with respect to the Successful Bid (the "Sale Hearing") will be held, in respect of those Sellers that are U.S. Debtors, before the Honorable Judge Kevin Gross (or any substitute therefor) in the United States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as September 15, 2009 at 9 a.m. (Eastern), and, in respect of those Sellers that are Canadian Debtors, before the Honourable Mr. Justice Geoffrey B. Morawetz (or any substitute therefor) in the Ontario Superior Court of

- 17 -

Justice, in Toronto, Ontario, and in any other applicable court(s) whose approval is required, as soon as practicable following the date of the Sale Hearing (or, with respect to the Canadian Court, in a joint hearing with the Bankruptcy Court at the Sale Hearing). The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing. If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Sellers shall proceed as set forth in the "No Qualified Bids" section above. If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is legally required, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval is legally required. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court. The Alternate Bid shall remain open until September 30, 2009 (the "Alternate Bid Expiration Date"). All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

## Good Faith Deposits

The Good Faith Deposit of any Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within five (5) Business Days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within five (5) Business Days of the date of the selection of the Successful Bidder and the Alternate Bidder. The Good Faith Deposit of the Successful Bidder will be applied in accordance with the terms of the Successful Bid, and, except in the case of the Purchaser, where the Purchaser's Good Faith Deposit shall be governed by the terms and conditions of the Purchase Agreements, will become nonrefundable upon the approval by the Bankruptcy Court and the Canadian Court of the Sale to the Successful Bidder.

## Reservation Of Rights

The Sellers, after consultation with their advisors, the Committee, the Bondholder Group and the Monitor, and their respective advisors, (a) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value

- 18 -

thereof, except that a Qualified Bid not selected as a Starting Bid or Leading Bid cannot subsequently be determined to be higher or better than the Starting Bid or Leading Bid, as applicable; and (b) may reject, at any time, any bid (other than the Purchaser's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, any orders of the Canadian Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, or (iv) contrary to the statutory duties or legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers.

Notwithstanding any of the foregoing, or anything else contained herein, however, the Sellers may not, without prior written consent of the Committee, the Bondholder Group and the Monitor, which consent may not be unreasonably withheld, (i) extend the deadlines set forth in the Auction procedures for more than three (3) Business Days, (ii) adjourn the Auction for more than three (3) Business Days, or (iii) adjourn the Sale Hearing for more than three (3) Business Days if the Auction has concluded.

For the purposes of these Bidding Procedures and all matters relating to them, the Administrators are acting only as agents for and on behalf of the EMEA Sellers that are controlled by the Administrators pursuant to the UK Proceedings and without personal liability. Notwithstanding the foregoing and subject to the following paragraph, the Sellers may not, without the prior written consent of the Purchaser, impair or modify the Purchaser's rights and obligations under the Purchase Agreements or the Purchaser's right to credit the Break-Up Fee and the Expense Reimbursement as part of any subsequent bids (except as specifically set forth herein).

The entirety of the Bidding Procedures are subject to the rights of the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, to revoke these Bidding Procedures, the Bidding Process or the Auction at any time to satisfy their fiduciary duties or the statutory duties or the legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers, provided that such revocation will result in a breach of the Purchase Agreements entitling the Purchaser to such rights as are set forth in the Purchase Agreements in respect of such breach.

APPENDIX "B"

[ATTACHED]

EXECUTION VERSION

---

## AMENDED AND RESTATED ASSET AND SHARE SALE AGREEMENT

BY AND AMONG

### NORTEL NETWORKS CORPORATION

### NORTEL NETWORKS LIMITED

### NORTEL NETWORKS INC.

AND

### THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

AND

### THE ENTITIES IDENTIFIED HEREIN AS EMEA SELLERS

AND

### AVAYA INC.

DATED AS OF SEPTEMBER 14, 2009

---

# TABLE OF CONTENTS

Page

## ARTICLE I
### INTERPRETATION

Section 1.1.    Definitions........................................................................................................ 4

Section 1.2.    Interpretation.................................................................................................. 48

1.2.1.   Gender and Number.......................................................................................... 48

1.2.2.   Certain Phrases and Calculation of Time......................................................... 48

1.2.3.   Headings, etc...................................................................................................... 48

1.2.4.   Currency and Calculations................................................................................ 48

1.2.5.   Statutory References.......................................................................................... 49

## ARTICLE II
### PURCHASE AND SALE OF ASSETS AND SHARES

Section 2.1.    Purchase and Sale ........................................................................................ 49

2.1.1.   Assets and Shares.............................................................................................. 49

2.1.2.   Excluded Assets................................................................................................. 51

2.1.3.   Assumed Liabilities .......................................................................................... 52

2.1.4.   Excluded Liabilities .......................................................................................... 55

2.1.5.   Assumption and/or Assignment or Rejection of 365 Contracts........................ 56

2.1.6.   Assignment of Non-365 Contracts.................................................................... 59

2.1.7.   Cure Costs; Adequate Assurance...................................................................... 61

2.1.8.   Local Sale Agreements ..................................................................................... 63

2.1.9.   EMEA Asset Sale Agreement............................................................................ 64

2.1.10.  Non-Assignable Assets ..................................................................................... 64

Section 2.2.    Purchase Price.............................................................................................. 64

2.2.1.   Purchase Price; Delay Fee ................................................................................ 64

2.2.2.   Estimated Purchase Price.................................................................................. 65

2.2.3.   Post-Closing Purchase Price Adjustment.......................................................... 66

2.2.4.   Security for Purchase Price Adjustment; Status ............................................... 71

2.2.5.   Good Faith Deposit ........................................................................................... 71

2.2.6.   Escrows.............................................................................................................. 72

i

## TABLE OF CONTENTS
### (continued)

Page

2.2.7.    Purchase Price Allocation ................................................................................. 73

Section 2.3.        Closing ................................................................................................. 74

2.3.1.    Closing Date ........................................................................................................ 74

2.3.2.    Closing Actions and Deliveries ......................................................................... 74

Section 2.4.        Designated Purchaser(s) .................................................................... 75

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Section 3.1.        Organization and Corporate Power ..................................................... 76

Section 3.2.        Authorization; Binding Effect; No Breach ........................................... 77

Section 3.3.        Financing ............................................................................................. 77

Section 3.4.        Adequate Assurance of Future Performance ..................................... 77

Section 3.5.        Purchaser's Acknowledgments; Exclusivity of Representations and
                    Warranties ........................................................................................... 78

Section 3.6.        Brokers ................................................................................................ 79

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Section 4.1.        Organization and Corporate Power ..................................................... 80

Section 4.2.        Authorization; Binding Effect; No Breach ........................................... 80

Section 4.3.        Capitalization; Title to Shares; Equity Interests ................................. 81

Section 4.4.        Title to Assets; Sufficiency of Assets ................................................. 82

Section 4.5.        Material Contracts .............................................................................. 83

Section 4.6.        Intellectual Property ........................................................................... 84

Section 4.7.        Litigation .............................................................................................. 87

Section 4.8.        Financial Statements .......................................................................... 87

Section 4.9.        Compliance with Laws; Consents ....................................................... 88

Section 4.10.       Privacy Laws ....................................................................................... 89

Section 4.11.       Real Property ...................................................................................... 89

Section 4.12.       Environmental Matters ........................................................................ 90

Section 4.13.       Taxes ................................................................................................... 91

ii

## TABLE OF CONTENTS
### (continued)

Section 4.14.   Labor and Employee Benefits Matters ................................................................ 92

Section 4.15.   Brokers...................................................................................................................... 96

Section 4.16.   Government Contracts ............................................................................................ 96

Section 4.17.   UK Defined Benefit Plan ....................................................................................... 97

Section 4.18.   Representations and Warranties by the Other Sellers ..................................... 97

   4.18.1. Organization and Corporate Power ................................................................. 97

   4.18.2. Authorization; Binding Effect; No Breach ..................................................... 97

### ARTICLE V
### COVENANTS AND OTHER AGREEMENTS

Section 5.1.    U.S. Bankruptcy Actions ........................................................................................ 98

Section 5.2.    Canadian Bankruptcy Actions .............................................................................. 99

   5.2.1. Canadian Sales Process Order ........................................................................... 99

   5.2.2. Canadian Approval and Vesting Order ........................................................... 100

Section 5.3.    Consultation; Notification .................................................................................... 100

Section 5.4.    Pre-Closing Cooperation ...................................................................................... 101

Section 5.5.    Antitrust and Other Regulatory Approvals ...................................................... 102

Section 5.6.    Pre-Closing Access to Information ...................................................................... 105

Section 5.7.    Public Announcements ......................................................................................... 106

Section 5.8.    Further Actions ...................................................................................................... 106

Section 5.9.    Conduct of Business .............................................................................................. 107

Section 5.10.   Transaction Expenses ............................................................................................ 111

Section 5.11.   Confidentiality ....................................................................................................... 111

Section 5.12.   Certain Payments or Instruments Received from Third Parties................... 112

Section 5.13.   Non-Assignable Contracts and Other Assets ................................................... 112

Section 5.14.   Bundled Contracts; Selected Rejected Customer Contracts ......................... 115

Section 5.15.   Post-Closing Assistance for Litigation .............................................................. 118

Section 5.16.   Tangible Asset Removal ........................................................................................ 119

Section 5.17.   Termination of Overhead and Shared Services ................................................ 123

Section 5.18.   [Reserved] ................................................................................................................ 123

iii

## TABLE OF CONTENTS
### (continued)

Page

Section 5.19.   Cancellation of Intercompany Accounts........................................................ 123
Section 5.20.   Directors' and Officers' Release, Indemnification and Insurance............... 123
Section 5.21.   Insurance Matters.......................................................................................... 125
Section 5.22.   Sellers Deposits, Guarantees and Other Credit Support of the Business..... 127
Section 5.23.   Use of Sellers' Trademarks........................................................................... 128
Section 5.24.   Maintenance of Books and Records .............................................................. 128
Section 5.25.   Right to Exclude ............................................................................................ 130
Section 5.26.   Certain Ancillary Agreements ...................................................................... 131
Section 5.27.   Avoidance Actions......................................................................................... 132
Section 5.28.   Subleases........................................................................................................ 132
Section 5.29.   Competing Transaction ................................................................................. 134
Section 5.30.   Direct Leases................................................................................................. 135
Section 5.31.   Rejection and Expiration of Real Estate Leases ........................................... 136
Section 5.32.   Restructure of Leases.................................................................................... 143
Section 5.33.   Non-Compete ................................................................................................. 145
Section 5.34.   Financial Statements ..................................................................................... 145
Section 5.35.   Certain Acknowledgements Regarding PBGC .............................................. 148
Section 5.36.   Finalization of Transition Services Agreement ............................................ 149
Section 5.37.   Assistance for Proxy Agreement ................................................................... 153
Section 5.38.   Customer Contract Review and Selection ..................................................... 154
Section 5.39.   Retention Plan................................................................................................ 156

### ARTICLE VI
### TAX MATTERS

Section 6.1.   Transfer Taxes ................................................................................................ 156
Section 6.2.   Withholding Taxes........................................................................................... 158
Section 6.3.   Tax Characterization of Payments Under This Agreement ............................ 158
Section 6.4.   Apportionment of Taxes................................................................................... 158
Section 6.5.   Section 338 Election ........................................................................................ 159
Section 6.6.   Records ............................................................................................................ 159
Section 6.7.   Tax Disclosure ................................................................................................. 161

**TABLE OF CONTENTS**
(continued)

| Section 6.8. | Tax Returns | 161 |
| Section 6.9. | Tax Sharing Agreements | 163 |
| Section 6.10. | Canadian Tax Election | 163 |
| Section 6.11. | Cooperation | 163 |

## ARTICLE VII
## EMPLOYMENT MATTERS

| Section 7.1. | Employment Obligations with Respect to Non-Union Employees | 164 |
| 7.1.1. | Employment Terms | 164 |
| 7.1.2. | Employee Benefits | 165 |
| Section 7.2. | Employment Obligations with Respect to Union Employees | 168 |
| Section 7.3. | Excluded Employee Liabilities | 168 |
| Section 7.4. | Other Employee Covenants | 169 |
| Section 7.5. | No Amendment of Plans | 172 |

## ARTICLE VIII
## CONDITIONS TO THE CLOSING

| Section 8.1. | Conditions to Each Party's Obligation | 173 |
| Section 8.2. | Conditions to Sellers' Obligation | 174 |
| Section 8.3. | Conditions to Purchaser's Obligation | 174 |

## ARTICLE IX
## TERMINATION

| Section 9.1. | Termination | 176 |
| Section 9.2. | Break-Up Fee; Expense Reimbursement | 179 |
| Section 9.3. | Reverse Termination Fee | 181 |
| Section 9.4. | Effects of Termination | 182 |

## ARTICLE X
## MISCELLANEOUS

| Section 10.1. | No Survival of Representations and Warranties or Covenants | 183 |
| Section 10.2. | Remedies | 183 |

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| Section 10.3. | No Third-Party Beneficiaries | 183 |
| Section 10.4. | Consent to Amendments; Waivers | 183 |
| Section 10.5. | Successors and Assigns | 183 |
| Section 10.6. | Governing Law; Submission to Jurisdiction; Waiver of Jury Trial | 184 |
| Section 10.7. | Notices | 185 |
| Section 10.8. | Exhibits; Sellers Disclosure Schedule | 188 |
| Section 10.9. | Counterparts | 188 |
| Section 10.10. | No Presumption | 188 |
| Section 10.11. | Severability | 188 |
| Section 10.12. | Headings | 189 |
| Section 10.13. | Entire Agreement | 189 |
| Section 10.14. | Limitations on Pre-Closing Remedies | 189 |
| Section 10.15. | Bulk Sales Laws | 191 |
| Section 10.16. | Main Sellers as Representatives of Other Sellers | 191 |
| Section 10.17. | Obligations of Sellers and EMEA Sellers | 191 |
| Section 10.18. | Execution by Other Sellers | 191 |
| Section 10.19. | Exclusion of Liability of Administrators and Acknowledgement | 192 |
| Section 10.20. | Asset Sale Election | 192 |

## EXHIBITS

Exhibit A – Other Sellers

Exhibit B – EMEA Sellers

Exhibit C – Canadian Debtors; U.S. Debtors; EMEA Debtors; Israeli Companies; Non-Debtor Sellers

Exhibit D – EMEA Asset Sale Agreement

Exhibit E – Contract Manufacturing Inventory Agreements Term Sheet

Exhibit F – Escrow Agreement

Exhibit G – Intellectual Property License Agreement

Exhibit H – Knowledge of the Purchaser

Exhibit I – Letter of Credit

Exhibit J – Loaned Employee Agreement

Exhibit K – Mandatory Antitrust Approvals - Relevant Antitrust Jurisdictions / Authorities

Exhibit L – Interdependencies

Exhibit M – Reserved

Exhibit N – Real Estate Agreements

Exhibit O – Trademark License Agreement

Exhibit P – Transition Services Agreement

Exhibit 5.1(a) – Forms of U.S. Bidding Procedures Order and U.S. Sale Order

Exhibit 5.2.1 – Form of Canadian Sales Process Order

Exhibit 5.2.2 – Form of Canadian Approval and Vesting Order

Exhibit 5.4(d) – Form of Notice

Exhibit 5.7 – Certain Communications

Exhibit 5.28(g) – Terms and Conditions of Lease A Sublease and Replacement Campus Consolidation

Exhibit 5.32(c) – Consolidation of C Campus

# AMENDED AND RESTATED ASSET AND SHARE SALE AGREEMENT

This Amended and Restated Asset and Share Sale Agreement is dated as of September 14, 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("NNC"), Nortel Networks Limited, a corporation organized under the laws of Canada ("NNL"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("NNI" and, together with NNC and NNL, the "Main Sellers"), the affiliates of the Main Sellers listed in Exhibit A hereto (the "Other Sellers" and, together with the Main Sellers, the "Sellers") and Avaya Inc., a corporation organized under the laws of the State of Delaware (the "Purchaser") and, only for the purposes of Sections 2.2, 5.26, 5.39, 9.2, 9.3, 9.4, 10.14, 10.17 and 10.19 of this Agreement, the EMEA Sellers (as defined below) and, solely in the case of Nortel Networks UK Limited and Nortel Networks (Ireland) Limited, also Section 5.36 of this Agreement.

## WITNESSETH:

WHEREAS, the Sellers, the affiliates of the Main Sellers listed in Exhibit B hereto (the "EMEA Sellers"), the NGS Companies and DiamondWare (each as defined below) beneficially own and operate the Business (as defined below);

WHEREAS, on January 14, 2009 (the "Petition Date"), NNC, NNI, and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "Canadian Debtors") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "CCAA") (the proceedings commenced by such application, the "CCAA Cases") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and was extended by further order of the Canadian Court on February 10, 2009, as the same may be amended and restated from time to time by the Canadian Court (the "Canadian Initial Order");

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit C hereto (the "U.S. Debtors") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "Chapter 11 Cases");

WHEREAS, the entities listed under the heading "EMEA Debtors" in part 3 of Exhibit C hereto (the "EMEA Debtors") on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "Insolvency Act") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "EMEA Cases") and the English Court appointed Alan Bloom, Stephen Harris, Christopher Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants and Alan Bloom serve as joint administrators) (the "Joint Administrators") under the Insolvency Act;

1

WHEREAS, the entities listed under the heading "Israeli Companies" in part 4 of Exhibit C hereto (the "Israeli Companies") on January 18, 2009 filed applications with the Tel-Aviv-Jaffa District Court (the "Israeli Court"), pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto (collectively, the "Israeli Companies Law") for a stay of proceedings, and the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof (the "Joint Israeli Administrators") on January 19, 2009, as joint administrators of the Israeli Companies under the Israeli Companies Law;

WHEREAS, the Other Sellers listed in part 5 of Exhibit C hereto (the "Non-Debtor Sellers") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, NNI beneficially owns 100% of the stock of NGS and DiamondWare (each as defined below);

WHEREAS, the Sellers have agreed to transfer to the Purchaser or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, or cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers and the Shares (as defined below) from NNI, upon the terms and conditions set forth hereinafter;

WHEREAS, the Sellers, the Purchaser and the EMEA Sellers, Nortel Networks UK Limited and Nortel Networks (Ireland) Limited, as applicable, previously entered into that certain Asset and Share Sale Agreement, dated as of July 20, 2009 (the "Original Agreement"), pursuant to which the Purchaser was selected as the stalking horse bidder for the purposes of the Auction (as defined below);

WHEREAS, simultaneously with the execution of the Original Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser have entered into a separate agreement (the "Original EMEA Asset Sale Agreement") providing for the sale to the Purchaser (or the EMEA Designated Purchasers (as defined therein)) of the assets of the Business held by such EMEA Sellers;

WHEREAS, on August 19, 2009, the Sellers and Purchaser entered into a side letter with respect to the treatment of Other Contracts (as defined below) under the Original Agreement (the "Side Letter") and into a side letter with respect to the treatment of Other EMEA Contracts (as defined in the Original EMEA Asset Sale Agreement) under the Original EMEA Asset Sale Agreement (the "EMEA Side Letter");

WHEREAS, on September 11-14, 2009, the Auction was held, during which time the Sellers and Purchaser agreed to modify a number of terms in connection with the Sellers' selection of Purchaser as the Successful Bidder (as defined below) at the Auction;

WHEREAS, the Purchaser, the Sellers and the EMEA Sellers, Nortel Networks UK Limited and Nortel Networks (Ireland) Limited, as applicable, desire to amend and restate the Original Agreement in its entirety to incorporate (i) the terms of the Side Letter and (ii) the

2

terms agreed to in connection with Sellers' selection of Purchaser as the Successful Bidder at the Auction;

WHEREAS, simultaneously with the execution of this Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser desire to amend and restate the Original EMEA Asset Sale Agreement in its entirety to incorporate the terms of the EMEA Side Letter and (ii) the terms agreed to in connection with Sellers' selection of Purchaser as the Successful Bidder at the Auction (the Original EMEA Asset Sale Agreement so restated, the "EMEA Asset Sale Agreement" a form of which is set forth in Exhibit D hereto);

WHEREAS, the Parties acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers and the EMEA Designated Purchasers, if any) of the Shares, the Assets and the EMEA Assets (as defined below), the license of Intellectual Property rights under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser, the Designated Purchasers and the EMEA Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their affiliates and each Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisitions by the Purchaser, the Designated Purchasers and the EMEA Designated Purchasers of the Shares, the Assets and the EMEA Assets, the license of Intellectual Property rights under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below) and the assumption by the Purchaser, the Designated Purchasers and the EMEA Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities, as set forth hereunder and in the EMEA Asset Sale Agreement; and

WHEREAS, in addition, on or before the Closing, the Purchaser, certain Sellers (or Affiliates of the Sellers) and certain EMEA Sellers will enter into the following ancillary agreements (together, the "Ancillary Agreements"): (i) the Intellectual Property License Agreement, (ii) the Transition Services Agreement, (iii) the Trademark License Agreement and (iv) the Loaned Employee Agreement (each as defined below) and will use their reasonable best efforts to negotiate in good faith (v) the LGN/Korea Distribution Agreement, (vi) the Local Sale Agreements, (vii) the Real Estate Agreements, (viii) the Contract Manufacturing Inventory Agreements, (ix) the Mutual Development Agreement, (x) the Purchaser Supply Agreement, (xi) the Seller Supply Agreement, (xii) the Subcontract Agreement, (xiii) the LGN/Korea Supply Agreement and (xiv) the Uni-Nortel Distribution Agreement (each as defined below).

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties (as defined below) agree as follows:

3

## ARTICLE I

### INTERPRETATION

SECTION 1.1.    Definitions.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accounting Arbitrator**" means the auditing firm of international reputation that is (i) jointly selected by the Primary Parties and NNUK, or (ii) in case they cannot agree on any such firm, such other auditing firm of international reputation (or, if the Primary Parties and NNUK agree on other criteria, such Person as satisfies such other criteria) that is selected by the American Arbitration Association at the request of the first of the Primary Parties and NNUK to move.

"**Acquired Business**" means, collectively, the Business to the extent acquired or assumed hereunder and under the EMEA Asset Sale Agreement.

"**Acquired Company Intellectual Property**" means Intellectual Property owned by the Companies.

"**Acquiring Person**" has the meaning set forth in Section 5.33.

"**Action**" means any litigation, action, suit, charge, binding arbitration, Tax audit, or other legal, administrative or judicial proceeding, including Intellectual Property litigation (including infringement, indemnification, and declaratory judgment actions).

"**Additional Audited 2009 Financial Statements**" means, collectively, (i) the carve-out combined balance sheet of the Business as of December 31, 2009 and (ii) the carve-out combined statements of income and cash flows of the Business and changes in parent's net investment in the Business for the year ended December 31, 2009, in each case prepared in accordance with GAAP and prepared and audited in accordance with the applicable rules and regulations promulgated by the SEC, including Regulation S-X and Rule 3-05 thereunder, and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with GAAS or, if such financial statements are required to be included in the Registration Statement or Form 8-K and a PCAOB audit is necessary therefor, in accordance with PCAOB and shall not be subject to any qualification or exception as to the scope of such audit.

"**Adjusted Audited Standard Margin**" means the Audited Standard Margin less the Standard Margin, if any, which is included in the Audited Standard Margin and relates to: (i) the Layer 4-7 Data Portfolio, (ii) the LGN Joint Venture, or (iii) to the extent not included in the calculation of the Unaudited Standard Margin, any other revenue streams not contemplated in the transaction governed by this Agreement and the EMEA Asset Sale Agreement.

"**Adjustment Amount**" means (i) if the Unaudited Standard Margin is less than or equal to one hundred and three percent (103%) of the Adjusted Audited Standard Margin, zero, or (ii) if the Unaudited Standard Margin is greater than one hundred and three percent

4

(103%) of the Adjusted Audited Standard Margin, an amount equal to the Unaudited Standard Margin minus the Adjusted Audited Standard Margin.

"Adjustment Factor" means the amount of the Base Purchase Price divided by the Unaudited Standard Margin.

"Adjustment Payment" means, (i) if the Adjustment Amount is a positive number, the Adjustment Amount, multiplied by the Adjustment Factor or (ii) if the Adjustment Amount is not a positive number, zero.

"Affiliate" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; provided, however, that (i) no Fund shall be deemed an Affiliate of the Purchaser or the Designated Purchasers under this Agreement and no portfolio company of any Fund shall be deemed an Affiliate of the Purchaser if it is not a Subsidiary of the Purchaser and is operated, managed and financed independently of the Purchaser, (ii) no EMEA Seller or Subsidiary of an EMEA Seller shall be deemed an Affiliate of any Seller, and (iii) no joint venture listed in Section 1.1(a) of the Sellers Disclosure Schedule shall be deemed an Affiliate of any Seller.

"Affiliate Transaction" means any Contract in existence as of the date of this Agreement between any of the Sellers, on the one hand, and, on the other hand, any (i) present executive officer or director of any of the Sellers or any person that has served as such an executive officer or director within the last twelve (12) months or (ii) record or beneficial owner of more than five percent (5%) of the equity securities of NNC, in each case, other than any employment-related Contracts or consulting Contracts and other than any Seller Employee Plans.

"Agreement" means this Amended and Restated Asset and Share Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"Alternative Transaction" means (A) any of the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation or other similar transaction, of (i) all or a substantial portion of the Acquired Business, or all of the Assets and the EMEA Assets, or a portion of the Assets and/or the EMEA Assets that constitutes a substantial portion of the Assets and the EMEA Assets considered as a whole, in a transaction or a series of transactions with one or more Persons other than the Purchaser and/or its Affiliates or (ii) all or a portion of the Acquired Business or all or a portion of the Assets or the EMEA Assets in a transaction or series of transactions with one or more Persons other than the Purchaser and/or its Affiliates that results in or evolves from a Successful Bid, an Alternate Bid or a Qualified Bid (each as defined in the U.S. Bidding Procedures Order) or (B) the retention by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) of all or substantial portion of the Acquired Business, all of the Assets or the EMEA Assets, or a portion of the Assets and/or the EMEA Assets that constitutes a substantial portion of the Assets and the EMEA Assets considered as a whole, pursuant to a plan of reorganization under Section 1129 of the Bankruptcy Code filed or otherwise sponsored by one or more third-party creditors of the Sellers; provided, however, that an "Alternative

5

Transaction" shall not include: (i) except as specified in clause (B) above, the retention of the Business by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings), (ii) the sale, transfer or other disposition, directly or indirectly, of any portion of the Business or the Assets and the EMEA Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers or the Companies, (iii) the sale, assignment, leasing, expiration, termination or other disposition by the Sellers of any real estate or Real Estate Lease, as applicable, not in violation of this Agreement, in connection with the implementation of the Sellers' global real estate strategy and not as part of a sale of a going concern, or (iv) the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the U.S. Bankruptcy Code. For the purpose of this definition, "substantial portion" means more than forty percent (40%) of the Assets and the EMEA Assets (taken as a whole).

"Ancillary Agreements" has the meaning set forth in the recitals to this Agreement.

"Antitrust Approvals" means the HSR Approval, the Competition Act Approval, and the Mandatory Antitrust Approvals.

"Antitrust Laws" means the Competition Act, the HSR Act, the EC Merger Regulation, and any competition, merger control and antitrust Law of the European Union, any applicable European Union member states and EFTA states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"Applicable Latest Termination Notification Date" means, with respect to any real property subject to the provisions of Section 5.16(a) (other than real property identified in Section 5.16(a) of the Sellers Disclosure Schedule) and any termination by any Seller of its interest in such property (whether pursuant to sale of owned property, termination or rejection of a lease or otherwise), ten (10) days prior to such proposed termination.

"Applicable Transitional Occupancy Period" means, in the case of any real property subject to the provisions of Section 5.16(a), the period of time commencing on the Closing Date and ending on the date which is (a) for those properties identified in Section 5.16(a) of the Sellers Disclosure Schedule, the length of time following the Closing Date which is indicated in such Section 5.16(a) of the Sellers Disclosure Schedule with respect to such property and (b) for all properties not identified in Section 5.16(a) of the Sellers Disclosure Schedule, thirty (30) days after the Closing Date.

"Arbitration Trigger Date" has the meaning set forth in Section 5.36(f).

"Asset Sale Election" has the meaning set forth in Section 10.20.

"Assets" has the meaning set forth in Section 2.1.1.

"Assigned Contracts" means all Seller Contracts except (i) the Excluded 365 Contracts, (ii) the Excluded Non-365 Contracts and (iii) the Non-Assigned Contracts.

6

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(a)(iii).

"**Assumed and Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.5(b)(iii).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Auction**" has the meaning attributed to such term in the U.S. Bidding Procedures Order.

"**Audited 2009 Closing Date Financial Statements**" means, collectively, (i) the carve-out combined balance sheet of the Business as of the Closing Date and (ii) the carve-out combined statements of income and cash flows of the Business and changes in parent's net investment in the Business for the period beginning January 1, 2009 and ending on the Closing Date, in each case prepared in accordance with GAAP and prepared and audited in accordance with the applicable rules and regulations promulgated by the SEC, including Regulation S-X and Rule 3-05 thereunder, and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with GAAS or, if such financial statements are required to be included in the Registration Statement or Form 8-K and a PCAOB audit is necessary therefor, in accordance with PCAOB, and shall not be subject to any qualification or exception as to the scope of such audit.

"**Audited 2009 Interim Financial Statements**" means, collectively, (i) the carve-out combined balance sheet of the Business as of September 30, 2009 and (ii) the carve-out combined statements of income and cash flows of the Business for the nine-month periods ended September 30, 2008 and September 30, 2009, and changes in parent's net investment in the Business for the nine-month period ended September 30, 2009, in each case prepared in accordance with GAAP and prepared and audited in accordance with the applicable rules and regulations promulgated by the SEC, including Regulation S-X and Rule 3-05 thereunder, and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with GAAS or, if such financial statements are required to be included in the Registration Statement or Form 8-K and a PCAOB audit is necessary therefor, in accordance with PCAOB, and shall not be subject to any qualification or exception as to the scope of such audit.

"**Audited Financial Statements**" means, collectively, (i) the carve out combined balance sheets of the Business as of December 31, 2007 and December 31, 2008 and (ii) the carve-out combined statements of income and cash flows of the Business and changes in parent's net investment in the Business for the years ended December 31, 2007 and December 31, 2008, in each case prepared in accordance with GAAP and prepared and audited in accordance with the applicable rules and regulations promulgated by the SEC, including Regulation S-X and Rule 3-05 thereunder, and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with GAAS or, if such financial statements are required to be included in the Registration Statement or Form 8-K and a PCAOB audit is necessary therefor, in accordance

7

with PCAOB, and shall not be subject to any qualification or exception as to the scope of such audit.

"Audited Standard Margin" means the (i) the 2008 revenues of the Business as shown in the 2008 income statement that is part of the Audited Financial Statements minus (ii) Nortel's standard cost of the revenue in (i) and any other costs included in the 2008 income statement that is part of the Audited Financial Statements that would be included in the calculation of standard margin using the accounting principles, practices and methods used in the calculation of Unaudited Standard Margin on Section 1.1(b) of the Sellers Disclosure Schedule. For the avoidance of doubt, in connection with the calculation of the Audited Standard Margin it shall be assumed that all Excluded Other Sellers are Sellers and all Excluded EMEA Sellers (as defined in the EMEA Asset Sale Agreement) and any EMEA Seller whose EMEA Assets and EMEA Liabilities are designated Removed Assets and Removed Liabilities or Excluded Assets and Excluded Liabilities under the terms of the EMEA Asset Sale Agreement are EMEA Sellers.

"Avaya Parties" means the Purchaser, any Designated Purchasers and any EMEA Designated Purchasers, any of their respective Subsidiaries and any former, current or future general or limited partners, directors, officers, employees, agents, managers, members, Affiliates, stockholders, assignees and representatives of any of the foregoing in their capacity as such.

"Balance Sheet Date" has the meaning set forth in Section 4.8.

"Bankruptcy Consents" has the meaning set forth in Section 4.1(a).

"Bankruptcy Court" means the U.S. Bankruptcy Court, the Canadian Court, the English Court, the Israeli Court or any other court before which Bankruptcy Proceedings are held.

"Bankruptcy Laws" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act, the Israeli Companies Law and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"Bankruptcy Proceedings" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings occurring or authorized thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial or other proceedings concerning any of the Sellers, the EMEA Sellers or the Companies that are held from time to time.

"Base Purchase Price" has the meaning set forth in Section 2.2.1(a).

"Bid" means any bid, proposal, offer or quotation which, if accepted, would result in the award of a Contract.

"Breach Cure Period" means, with respect to a breach by any party of this Agreement or the EMEA Asset Sale Agreement, a period beginning at the time of delivery of a written notice of such breach to the breaching party and ending on the earlier of (i) the End Date and (ii) the last Business Day prior to any termination or purported termination of this Agreement or the EMEA Asset Sale Agreement by the breaching party. For purposes of this

8

definition, "End Date" means the twentieth (20th) day after delivery of a written notice of such breach to the breaching party; provided, however, that in the case of a breach of the obligation to close the transactions contemplated hereby at the Closing, a breach of the obligation to close the transactions contemplated by the EMEA Asset Sale Agreement at the Closing (as defined in the EMEA Asset Sale Agreement), or a breach of Section 5.29 or a breach of Clauses 10.53, 10.54 and 10.55 of the EMEA Asset Sale Agreement, "End Date" shall mean the fifth (5th) day after delivery of a written notice of such breach to the breaching Party; and provided further, however, that in the case of a breach of Section 5.5 or a breach of Clauses 10.7 through 10.12 of the EMEA Asset Sale Agreement, "End Date" shall mean the fifteenth (15th) day after delivery of a written notice of such breach to the breaching party.

"Break-Up Fee" has the meaning set forth in Section 9.2(a).

"Bundled Contract" has the meaning set forth in Section 5.14(a).

"Business" means, collectively, the following business segments of the Sellers and the EMEA Sellers and the business of the NGS Companies and DiamondWare as described below:

(i)     the "Enterprise Solutions" business segment of the Sellers, the EMEA Sellers and DiamondWare, comprising Employees, partner, customer and supplier relationships and the goodwill associated therewith, through which such entities, individually, jointly or in collaboration with or pursuant to contracts with Third Parties, and using any variety of technologies, research, design, develop, process, manufacture (through contract manufacturers), assemble, test, support, market and sell globally to end users and resellers the Products, which are communications products and solutions, including legacy products currently being supported and future products and solutions described in the "plan of record" or "plan of intent", in the areas of networked communications, converged voice and data, digital and internet protocol (IP) telephony, communication application devices, local area networks, messaging, contact center solutions, multimedia communications, including audio, video and web conferencing, telepresence and other similar enterprise solutions (the "Enterprise Solutions Business");

(ii)    the "Global Services" business segment of the "Enterprise Solutions Business" of the Sellers, the EMEA Sellers and DiamondWare, which provides, individually or with Third Parties, the following services to Enterprise Solutions Business customers (collectively, the "Services"):

(a)     implementation and enhancement services, including network planning, engineering, installation, integration, convergence, optimization and security services;

(b)     support services, including the support of multi-vendor voice-data-converged networks, including providing software, technical support, hardware and software maintenance, corrective content management, equipment spares logistics, and on-site engineers;

9

(c)     managed and outsourced services, ranging from support of individual solutions to entire multi-vendor networks running carrier and optical equipment;

(d)     hosted services, including single and multi-tenant hosted services, hosted multimedia services, including high-definition telepresence, desktop video conferencing, and applications performance engineering;

(e)     application services, including application development, integration and communications-enabled application solutions; and

(f)     communications integration services provided in connection with third party equipment as part of security, healthcare and high-definition video solutions,

and all research and development associated with any of the foregoing, but, in each case, only to the extent that the services relate to, are ancillary to, implement, support and manage, the Products and Third Party equipment supplied by the Enterprise Solutions Business or equipment supplied by Third Parties if, as of the date hereof, the Sellers generally provide such services with respect to such equipment; and

(iii)     the business of the NGS Companies, through which the NGS Companies directly or indirectly, individually or through or with Third Parties, provide integrated information technology services and communications, communications products, business collaboration technology, information technology solutions and services to Government Entities and all research and development associated therewith,

but excluding, in each of clauses (i) and (ii) above: (A) the LGN Joint Venture, NN Turkey, Uni-Nortel, any Person the assets of which are designated Excluded Assets pursuant to Section 5.25 or EMEA Excluded Assets pursuant to Clauses 10.58 and 10.59 of the EMEA Asset Sale Agreement, and the assets of each of the Persons identified in this clause (A), (B) any Excluded Asset or EMEA Excluded Asset, (C) Overhead and Shared Services (other than Transferred Overhead and Shared Services), and (D) any products and/or services provided during the period from January 1, 2008 through the date hereof by businesses or business segments of any Seller or EMEA Seller other than those specified in clauses (i) and (ii) above.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, and (iii) London, England, United Kingdom.

"**Business Information**" means (i) if used exclusively in connection with the Business, all books, records, files, documentation and sales literature in the possession or under control of the Sellers or the Companies, including information (including information on past, present and prospective customers and suppliers), policies and procedures, Owned Equipment manuals and materials and procurement documentation exclusively used in the Business or in respect of any Asset, and (ii) if used primarily, but not exclusively, in connection with the Business or in respect of any Asset, to the extent reasonably separable from such items of any

10

other business of the Sellers, copies of all books, records, files, documentation and sales literature in the possession or under control of the Sellers or the Companies, including information (including information on past, present and prospective customers and suppliers), policies and procedures and materials and procurement documentation used primarily in the Business or in respect of any Asset, including, in each of clauses (i) and (ii), any Employee Records.

"**Calculation Principles**" means the Nortel Accounting Principles, to the extent applicable to the determination of the Inventory Value, the Net Debt, the Companies Net Working Capital and the EMEA Downward Adjustment, and the other accounting principles, methodologies and policies for the determination of the Inventory Value, the Net Debt, the Companies Net Working Capital and the EMEA Downward Adjustment, set forth in Section 1.1(c) of the Sellers Disclosure Schedule.

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.2.

"**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List).

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Initial Order**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Sales Process Order**" has the meaning set forth in Section 5.2.1.

"**Canadian Sales Process Order Motion**" has the meaning set forth in Section 5.2.1.

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning set forth in section 101(5) of the U.S. Bankruptcy Code.

"**Clean Team Confidentiality Agreement**" means the clean team confidentiality agreement by and between NNL and its Subsidiaries and Purchaser and its Subsidiaries, dated as of March 19, 2009, as amended from time to time.

"**Clean Team Data Room**" has the meaning attributed to the term "Clean Data Room" in the Clean Team Confidentiality Agreement.

11

"Clean Team Members" has the meaning attributed to that term in the Clean Team Confidentiality Agreement.

"Closing" has the meaning set forth in Section 2.3.1.

"Closing Companies Net Working Capital" has the meaning set forth in Section 2.2.3.1(a).

"Closing Date" has the meaning set forth in Section 2.3.1.

"Closing Date Data Inventory Value" means the net Inventory Value related to data products as specified on the Closing Date Inventory Schedule, subject to the limitation that in determining the Closing Date Data Inventory Value, the value of raw material and works-in-process cannot exceed fifteen percent (15%) of the Data Inventory Floor.

"Closing Date Inventory Schedule" shall be a schedule detailing the Closing Date Inventory Value in the same categories as shown on Section 1.1(d)(i) of the Sellers Disclosure Schedule as finally determined in accordance with Section 2.2.3.1.

"Closing Date Spares and Service Inventory Value" will be the net Inventory Value related to Spares and Service Inventory as specified on the Closing Date Inventory Schedule.

"Closing Date Voice Inventory Value" means the net Inventory Value related to voice and applications products as specified on the Closing Date Inventory Schedule, subject to the limitation that, in determining the Closing Date Voice Inventory Value, the value of raw materials and works-in-process cannot exceed fifteen percent (15%) of the Voice Inventory Floor.

"Closing EMEA Downward Adjustment" has the meaning set forth in Section 2.2.3.1(a).

"Closing Inventory Adjustment" means (i) the Data Inventory Adjustment plus (ii) the Spares and Service Inventory Adjustment plus (iii) the Voice Inventory Adjustment.

"Closing Net Debt Adjustment" has the meaning set forth in Section 2.2.3.1(a).

"Closing Retirement Obligation Amount" has the meaning set forth in Section 2.2.3.1(a).

"Closing Statement" has the meaning set forth in Section 2.2.3.1(a).

"COBRA" means the continuation coverage required by Section 4980B of the Code.

"Code" means the United States Internal Revenue Code of 1986, as amended.

12

"**Collective Labor Agreement**" means any written agreement, or addendum appendix or side letter thereto, that a Person has entered into with any union or collective bargaining agent with respect to terms and conditions of employment of such Person's employees.

"**Commissioner**" means the Commissioner of Competition appointed under the Competition Act or any person duly authorized to exercise the powers and perform the duties of the Commissioner of Competition.

"**Companies**" means the NGS Companies and DiamondWare.

"**Companies Cash and Investment Securities**" means, as of the time of determination, the aggregate amount of unrestricted cash or currency, cash equivalents and short term investments (including auction rate securities) that the Companies have on hand in bank accounts, calculated in accordance with the Calculation Principles.

"**Companies Net Accounts Receivable**" means, as of the time of determination, the consolidated accounts receivable of the Companies, excluding any intercompany receivables or receivables from Affiliates, net of reserves for doubtful accounts and related provisions, calculated in accordance with the Calculation Principles.

"**Companies Net Working Capital**" means, as of the time of determination, an amount equal to (w) the Companies Net Accounts Receivable plus (x) the Companies Cash and Investment Securities including the UBS Put Option, minus (y) all current liabilities of the Companies (including deferred revenues, but excluding the current portion of Indebtedness), in each case calculated in accordance with the Calculation Principles.

"**Company Leases**" has the meaning set forth in Section 4.11(d).

"**Competing Transaction**" has the meaning set forth in Section 5.29.

"**Competition Act**" means the Competition Act (Canada), as amended.

"**Competition Act Approval**" means that: (a) the applicable waiting period has expired or been terminated pursuant to Section 123 of the Competition Act; (b) the Commissioner or his/her authorized representative shall have provided the Purchaser with a waiver from complying with Part IX of the Competition Act pursuant to Section 113(c) of the Competition Act and, in the case of (a) or (b), the Commissioner or his/her authorized representative shall have advised the Purchaser in writing that the Commissioner does not intend to make an application under Section 92 of the Competition Act with respect to the transactions contemplated by this Agreement, and neither the Commissioner nor any of his/her authorized representatives shall have rescinded or amended such advice; or (c) the Commissioner shall have issued an advance ruling certificate pursuant to Section 102 of the Competition Act in respect of the transactions contemplated by this Agreement.

"**Compliance Day**" means any day on which each of the conditions set forth in Section 8.1 and Sections 8.3(a), 8.3(b), 8.3(d) and 8.3(e) has been satisfied or waived (except for failure to satisfy (i) the conditions set forth in Section 8.1(a), Section 8.1(b), Section 8.1(e) or

13

Section 8.1(f) due to the failure to obtain any Regulatory Approval, and (iii) those conditions that by their terms are to be satisfied by a delivery on the Closing Date).

"**Conditional Subleases**" has the meaning set forth in Section 5.31(a).

"**Confidential Information**" has the meaning set forth in Section 5.11(b).

"**Confidentiality Agreement**" means the confidentiality agreement by and among the Purchaser and NNI, among other parties, dated March 13, 2009.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by any Government Entity or other Third Party.

"**Consolidated Returns**" has the meaning set forth in Section 4.13(d).

"**Contract**" means any written binding contract, agreement, instrument, lease, ground lease or commitment.

"**Contract Designation Date**" means:

(a)      (i) with respect to each Other Contract listed in the Other 365 Contract List (except for any Selected Supplier Other 365 Contract or Documented Other 365 Contract) prepared or updated pursuant to Section 2.1.5(a)(ii) or the Other Non-365 Contract List prepared or updated pursuant to Section 2.1.6(a)(ii) (except for any Selected Supplier Other Non-365 Contract or Documented Other Non-365 Contract), the earlier of (A) the date that is thirty (30) days after the end of the thirty (30) Business Day-period during which the Purchaser is entitled to supplement the list of Selected Suppliers pursuant to Section 2.1.7(b) and (B) the applicable Final Contract Designation Date; provided, that, with respect to any Other Contract added to the Other 365 Contract List (except for any Selected Supplier Other 365 Contract or Documented Other 365 Contract) or the Other Non-365 Contract List (except for any Selected Supplier Other Non-365 Contract or Documented Other Non-365 Contract) after the end of the thirty (30) Business Day-period during which the Purchaser is entitled to supplement the list of Selected Suppliers pursuant to Section 2.1.7(b), the Contract Designation Date shall be the earlier of (A) the date that is thirty (30) days after the date that such Other Contract is added to the Other 365 Contract List or the Other Non-365 Contract List, as applicable or (B) the applicable Final Contract Designation Date;

(ii) with respect to each Selected Supplier Other 365 Contract, Selected Supplier Other Non-365 Contract, Documented Other 365 Contract and Documented Other Non-365 Contract (collectively, the "**Selected Other Contracts**"), the date that is thirty (30) days after the later of (i) the date the relevant Selected Other Contract is included on the relevant list and all material documentation that forms part of such Contract is made available to the Purchaser and (ii)(A) only with respect to an Other Contract with a Selected Supplier, the date the Main Sellers provide the Purchaser with an estimate of the Cure Cost for such Selected Supplier pursuant to Section 2.1.7(b); and (B) only with respect to a Documented Other 365 Contract or Documented Other Non-365 Contract, the date that is thirty (30) days after the end of the thirty (30) Business Day Period during which the Purchaser is entitled to supplement the list of Selected Suppliers pursuant to Section 2.1.7(b); provided, that, in each case, if the Main

14

Sellers make available all material documentation that forms part of such Selected Other Contract and, if applicable, the Cure Cost estimate for the relevant Selected Supplier no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, the Contract Designation Date shall not be later than such Final Contract Designation Date. Notwithstanding anything in this Agreement to the contrary, (x) if it is determined by either Party following the Contract Designation Date that not all material documentation that forms part of a Selected Other Contract (other than a Real Estate Lease) has been made available to the Purchaser, the relevant Seller shall use its reasonable best efforts to promptly provide all material documentation that forms part of such Contract and the Contract Designation Date for such Contract shall be no earlier than the thirtieth (30th) day after the Purchaser's receipt thereof and (y) with respect to an Other Contract with a Selected Supplier, if it is determined following the Contract Designation Date that the actual Cure Costs with respect to such Selected Supplier exceed by more than ten percent (10%) the good-faith estimate of such Cure Costs provided by the Main Sellers to the Purchaser pursuant to Section 2.1.7(b), the Contract Designation Date for such Contract shall be no earlier than the thirtieth (30th) day after the date of such determination of the Cure Costs for the relevant Selected Supplier; provided that, in each case, if the Main Sellers make available all material documentation that forms part of such Selected Other Contract and, if applicable, a Cure Cost estimate no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, then the Contract Designation Date shall never be later than such Final Contract Designation Date;

(b)    (i)    with respect to each Pre-Signing Customer Contract that is not a Major Customer Contract, the later of (i) the date that is forty-five (45) days from the date hereof or (ii) thirty (30) days from the latest of (A) the date when all material documentation that forms part of such Pre-Signing Customer Contract is "Made Available to the Purchaser" (as defined below at the end of this definition), (B) the date the initial one-day training session contemplated by Section 5.38(a)(ii) is made available to Clean Team Members, and (C) the date when the relevant Sellers make available to the Purchaser selected members of management personnel of the Business for the meeting contemplated by the penultimate sentence of Section 5.38(b); and

(ii)    with respect to each Pre-Signing Customer Contract that is a Major Customer Contract, the later of (i) the date that is forty-five (45) days from the date hereof or (ii) thirty (30) days from the date when all material documentation that forms part of such Pre-Signing Customer Contract is Made Available to the Purchaser,

provided, however, for the avoidance of doubt, that the setting of the Contract Designation Date for a Pre-Signing Customer Contract that has already been Made Available to the Purchaser as of the date hereof shall not deprive the Purchaser of a thirty- (30-) day Contract review period for any additional Pre-Signing Customer Contracts that are subsequently Made Available to the Purchaser; provided further, that, if the Main Sellers Make Available to the Purchaser all material documentation that forms part of such Pre-Signing Customer Contract no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, then the Contract Designation Date shall not be later than such Final Contract Designation Date. Notwithstanding anything in this Agreement to the contrary, if it is determined by either Party following the Contract Designation Date that not all material documentation that forms part of a Pre-Signing Customer Contract has been Made Available to the Purchaser, the relevant Seller shall use its

15

reasonable best efforts to promptly Make Available to the Purchaser all material documentation that forms part of such Contract and the Contract Designation Date for such Contract shall be no earlier than the thirtieth (30th) day after the Purchaser's receipt thereof, provided, that, if the Main Sellers Make Available to the Purchaser all material documentation that forms part of such Pre-Signing Customer Contract no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, then the Contract Designation Date shall not be later than such Final Contract Designation Date;

(c)  with respect to each Post-Signing Customer Contract that is added to the Non-Qualified Post-Signing Customer Contract List, the date that is thirty (30) days from the later of (A) the date that such Contract is added to such list or (B) the date when all material documentation that forms part of such Post-Signing Customer Contract is Made Available to the Purchaser; provided, that, in each case, if the Main Sellers Make Available to the Purchaser all material documentation that forms part of such Post-Signing Customer Contract no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, then the Contract Designation Date shall not be later than such Final Contract Designation Date. Notwithstanding anything in this Agreement to the contrary, if it is determined by either Party following the Contract Designation Date that not all material documentation that forms part of a Post-Signing Customer Contract has been Made Available to the Purchaser, the relevant Seller shall use its reasonable best efforts to promptly Make Available to the Purchaser all material documentation that forms part of such Contract and the Contract Designation Date for such Contract shall be no earlier than the thirtieth (30th) day after Purchaser's receipt thereof; provided, that, if the Main Sellers Make Available to the Purchaser all material documentation that forms part of such Post-Signing Customer Contract no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, then in no event shall the Contract Designation Date be later than such Final Contract Designation Date; and

(d)  with respect to any Non-365 Real Estate Leases identified in Section 2.1.6(b)(iv) of the Sellers Disclosure Schedule, the date that is September 15, 2009.

For the purposes of this definition, "Make Available to the Purchaser" means (i) with respect to a Customer Contract other than a Major Customer Contract, include in the Sellers' Files that have been physically or electronically made available to the Purchaser or to appropriate Clean Team Members and/or make available to the Purchaser in the Data Room or to appropriate Clean Team Members and (ii) with respect to a Major Customer Contract, make available to appropriate Clean Team Members in the Clean Team Data Room.

"Contractual Liabilities" means all Liabilities of the Sellers that arise in the Ordinary Course under Customer Contracts and SI/SP Contracts relating to marketing, allowance funds, technical training, demonstration equipment, events, trade shows, advertising, other direct marketing activities and rebate programs.

"Contract Manufacturing Inventory Agreements" means the agreements among the Purchaser and/or any Designated Purchasers, the relevant Sellers, and the contract manufacturers of the Business listed in Section 1.1(e) of the Sellers Disclosure Schedule that the relevant Parties will negotiate in good faith pursuant to Section 5.26 on the basis of the term sheet attached hereto as Exhibit B.

16

"**Contract Review Period**" means a period ending on the earlier of (i) the sixtieth (60th) day after the date hereof and (ii) the Bid Deadline (as defined in the U.S Bidding Procedures Order).

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract or otherwise.

"**Converging Products**" means all prior and current versions of the Products set forth in Section 1.1(f) of the Sellers Disclosure Schedule.

"**Covered Assets and Persons**" has the meaning set forth in Section 5.21.

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court's Order Pursuant to 11 U.S.C. §§ 105(a) Approving Cross-Border Court-to-Court Protocol, dated January 15, 2009, and the Canadian Court in an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cross-License Agreements**" has the meaning set forth in Section 4.6(f).

"**Cure Cost**" means (i) any amounts required by section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under a 365 Contract (other than an Assumed and Subleased Real Estate Lease) and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract, (ii) any amounts required by section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under an Assumed and Subleased Real Estate Lease and to pay any actual pecuniary losses that have resulted from such defaults under such Assumed and Subleased Real Estate Lease, (iii) with respect to any Non-365 Seller Contract (other than Contracts of a Canadian Debtor that are assignable to the Purchaser without the consent of the counterparty), any amounts necessary to cure any defaults and to pay any actual pecuniary losses under such Seller Contract in respect of the period prior to the Petition Date, and (iv) any amounts required to cure any defaults under a Non-365 Subleased Real Estate Lease and to pay any actual pecuniary losses under such Non-365 Subleased Real Estate Lease in respect of the period prior to the Petition Date.

"**Current Policies**" has the meaning set forth in Section 5.20(d).

"**Current Services**" has the meaning set forth in Section 5.36(a).

"**Customer Contract**" means any Direct Customer Contract or Indirect Customer Contract but excluding, in each case, any SI/SP Contract.

"**Daily Fee**" has the meaning set forth in Section 2.2.1(b).

"**Data Inventory Adjustment**" means the Data Inventory Floor less the Closing Date Data Inventory Value; provided that, if the calculated Data Inventory Adjustment is a negative amount, the Data Inventory Adjustment will be zero.

17

"**Data Inventory Floor**" means the Inventory Value related to data products of the Business as set forth in the Sellers Inventory Schedule (the "**Data Inventory Value**") as of the Closing Date, provided that, if the Closing Date falls on a date that is not at the end of any fiscal quarter, the Data Inventory Value on the Closing Date shall equal the sum of (i) the Data Inventory Value as of the last day of the prior fiscal quarter, plus (ii) (x) (A) the Data Inventory Value as of the last day of the fiscal quarter in which the Closing Date occurred, minus (B) the Data Inventory Value for the last day of the prior fiscal quarter, multiplied by (y) (A) the number of days elapsed prior to the Closing Date during the fiscal quarter in which the Closing Date occurred, divided by (B) the total number of days in the fiscal quarter in which the Closing Date occurred.

"**Data Room**" means the "Equinox" electronic data room at https://datasite.merrillcorp.com/bidder/splash_check.do?locale=en.

"**Deferred Transfer Assumed Liability**" has the meaning set forth in Section 5.13(d).

"**Deferred Transfer Purchased Asset**" has the meaning set forth in Section 5.13(c).

"**Delay Fee**" has the meaning set forth in Section 2.2.1(b).

"**Delay Fee Payments**" has the meaning set forth in Section 2.2.1(c).

"**Designated Courts**" has the meaning set forth in Section 10.6(b).

"**Designated Non-365 Contracts**" has the meaning set forth in Section 2.1.6(a)(iii).

"**Designated Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(b)(ii).

"**Designated Non-365 SI/SP Contracts**" has the meaning set forth in Section 2.1.6(a)(i).

"**Designated Other Non-365 Contracts**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Designated Other 365 Contracts**" has the meaning set forth in Section 2.1.5(a)(ii).

"**Designated Purchaser**" has the meaning set forth in Section 2.4.

"**Designated 365 Real Estate Leases**" has the meaning set forth in Section 2.1.5(b)(ii).

"**Designated 365 SI/SP Contracts**" has the meaning set forth in Section 2.1.5(a)(i).

18

"DiamondWare" means DiamondWare, Ltd., a corporation organized under the laws of Arizona, with executive offices at 2221 Lakeside Boulevard, Richardson, Texas.

"DiamondWare Shares" means all the equity interests in DiamondWare.

"Direct Customer Contract" means any Seller Contract pursuant to which a Seller provides Products and/or Services to an ond-user.

"Direct Lease Real Estate" has the meaning set forth in Section 5.30.

"Direct Leases" has the meaning set forth in Section 5.30.

"Disagreement Notice" has the meaning set forth in Section 2.2.3.1(b).

"Distribution Agent" means the Person that will act as distribution agent for the Sellers and the EMEA Sellers hereunder, to be notified by the Main Sellers to the Purchaser and the Escrow Agent by and not later than five (5) Business Days before the Closing.

"Documented Other Non-365 Contract" means any Other Non-365 Contract for which the Purchaser has reasonably requested in writing that the Sellers provide all information in accordance with Section 2.1.6(a)(ii).

"Documented Other 365 Contract" means any Other 365 Contract for which the Purchaser has reasonably requested in writing that the Sellers provide all information in accordance with Section 2.1.5(a)(ii).

"Domain Name" means an alphanumeric name that identifies a specific computer or website on the Internet, and all rights in and to such domain name, including any registrations therefor with a domain name registrar.

"EC Merger Regulation" means Council Regulation (EC) No 139/2004 of January 20, 2004 on the control of concentrations between undertakings, as amended.

"Effective Hire Date" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"EMEA Asset Sale Agreement" has the meaning set forth in the recitals to this Agreement.

"EMEA Assets" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"EMEA Assumed Liabilities" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"EMEA Cases" has the meaning set forth in the recitals to this Agreement.

"EMEA Debtors" has the meaning set forth in the recitals to this Agreement.

19

"**EMEA Designated Purchaser**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Downward Adjustment**" has the meaning attributed to the term "Downward Adjustment" in Paragraph 1.1 of Schedule 9 to the EMEA Asset Sale Agreement.

"**EMEA Employment Escrow Amount**" has the meaning attributed to the term "Employment Escrow Amount" in Paragraph 11 of Schedule 6 to the EMEA Asset Sale Agreement.

"**EMEA Owned Inventory**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Sellers**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Side Letter**" has the meaning set forth in the recitals to this Agreement.

"**Employee**" means any Share Transfer Employee and any employee of the Sellers engaged in the Business, in each instance as listed in Section 4.14(b)(i) of the Sellers Disclosure Schedule.

"**Employee Information**" has the meaning set forth in Section 4.14(b).

"**Employee Records**" means books, records, files, or other documentation with respect to Transferred Employees, to the extent such records are reasonably within the possession, custody or control of the Sellers.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferred Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day immediately following the Closing Date; provided, that (i) in respect of any Inactive Employee the Employee Transfer Date means 12:01 a.m. on the first day after the Closing Date on which the Employee reports to work; (ii) in respect of any Visa Employees, the Employee Transfer Date means 12:01 a.m. on the first day after the Closing Date on which the Purchaser or a Designated Purchaser has obtained the required visa or permit with respect to such Employee's employment and the Visa Employee reports to work; and (iii) in respect of any Other Loaned Employee, the Employee Transfer Date means the date on which such Employee's employment transfers to the Purchaser or a Designated Purchaser under the terms of the Loaned Employee Agreement.

"**Employment Contract**" means any Seller Employee Plan or other plan, program, agreement or arrangement pursuant to which any Person provides employment or consulting services to the Business.

"**English Court**" means the High Court of Justice of England and Wales.

"**Enterprise Portion**" has the meaning set forth in Section 5.14(b).

"**Environmental Law**" means any applicable Law relating to pollution or protection of the environment, natural resources or human health and safety.

"**Environmental Permit**" means any permit, approval, license or other authorization required under any Environmental Law to conduct the Business as currently conducted.

"**Equivalent Lease**" means a lease or sublease for Equivalent Space for a term of three years, in the case of Lease A and Lease B as shown on Section 5.31(g) of the Sellers Disclosure Schedule or five years, in the case of Lease C as shown on Section 5.31(g) of the Sellers Disclosure Schedule, under which the annual rental obligations and other express monetary obligations of the tenant or subtenant do not exceed in the aggregate, except to de minimis extent, the same costs under the Mission Critical Lease which is thereby being replaced (or, in the case of the Mission Critical Lease identified as "Lease A" in Section 5.31(g) of the Sellers Disclosure Schedule, the term and the costs indicated in Exhibit 5.28(g)); provided that Sellers shall make reasonable attempts to negotiate a market rent under any such lease or sublease and provided further that, prior to entry into any such lease or sublease, the relevant Seller and the Purchaser or a Designated Purchaser shall convene to discuss and agree on a mutually acceptable strategy for the location of the premises and negotiating such lease or sublease and Purchaser or a Designated Purchaser shall have a reasonable opportunity to participate in the process.

"**Equivalent Space**" means, with respect to any Mission Critical Lease, premises reasonably acceptable to the Purchaser which are located in the same general real estate market as the space demised under such Mission Critical Lease, which contain usable and rentable square footage sufficient to reasonably support the contemplated use of the demised premises and employee headcount reasonably agreed between the Purchaser and the Sellers on or prior to the Closing Date and to permit the Purchaser or a Designated Purchaser to conduct the Business at such premises in a manner substantially similar to the manner conducted at such premises as of the date hereof and which are of substantially the same quality (including as to tenant improvements and fit-out and related services and amenities) as the premises provided under such Mission Critical Lease.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Account**" means the following six (6) escrow accounts to be set up by the Escrow Agent pursuant to the Escrow Agreement: (i) an escrow account for the Purchase Price Adjustment Escrow Amount (the "**Purchase Price Adjustment Escrow Account**"), (ii) an escrow account for the Holdback Escrow Amount (the "**Holdback Escrow Account**"), (iii) an escrow account for the EMEA Employment Escrow Amount (the "**EMEA Employment Escrow Account**"), (iv) an escrow account for the French Tax Escrow Amount (the "**French Tax Escrow Account**"), (v) an escrow account holding the Good Faith Deposit (the "**Good Faith Deposit Escrow Account**"), and (vi) an escrow account holding the Delay Fee (the "**Delay Fee Escrow Account**").

"**Escrow Agent**" means Wells Fargo Bank, National Association.

21

"**Escrow Agreement**" means the escrow agreement entered into on July 20, 2009 among NNI, NNL, NNUK, the Purchaser and the Escrow Agent in accordance with Section 2.2.6(a) of the Original Agreement, as amended and restated by the parties thereto following the Auction and as may be further amended from time to time (a copy thereof is set forth as Exhibit F hereto).

"**Escrow Amount**" means the amount to be paid by the Purchaser by wire transfer of immediately available funds to the Escrow Agent on the Closing Date, which amount will consist of (i) the EMEA Employment Escrow Amount, (ii) the Holdback Escrow Amount, (iii) the Purchase Price Adjustment Escrow Amount, and (iv) the French Tax Escrow Amount.

"**Estimated Adjustment Payment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Companies Net Working Capital**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Inventory Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Net Debt Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Retirement Obligation Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Cost Schedule**" has the meaning set forth in Section 5.36(c).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.2.2(b).

"**Estimated –6 Liability Escrow Account**" has the meaning set forth in the Escrow Agreement.

"**Estimated –6 Liability Escrow Amount**" has the meaning set forth in Section 10.20(b).

"**European Union Entity**" means a Government Entity of the European Union. For the avoidance of doubt, "European Union Entity" means a supranational Government Entity and not a Government Entity of any member State of the European Union.

"**Excludable Other Seller**" means any Other Seller that is not listed in Section 1.1(g) of the Sellers Disclosure Schedule.

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.3.

22

"Excluded Liabilities" has the meaning set forth in Section 2.1.4.

"Excluded Non-365 Contract" has the meaning set forth in Section 2.1.6(a)(iv).

"Excluded Other Seller" has the meaning set forth in Section 5.25(a).

"Excluded Seller" has the meaning set forth in Section 5.25(a).

"Excluded 365 Contract" has the meaning set forth in Section 2.1.5(a)(v).

"Executory Contract" means an "executory contract" for the purposes of the U.S. Bankruptcy Code.

"Expense Reimbursement" has the meaning set forth in Section 9.2(b).

"Expense Reimbursement Limit" has the meaning set forth in Section 9.2(b).

"Extra Services" has the meaning set forth in Section 5.36(b).

"Final Contract Designation Date" means (a) for a 365 Contract, the twentieth (20th) day prior to the Closing Date and (b) for a Non-365 Contract, the third (3rd) Business Day prior to the Closing Date.

"Final Date" has the meaning set forth in Section 2.2.1(b).

"Financial Statements" has the meaning set forth in Section 4.8.

"French Tax Escrow Amount" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"Fund" means any partnership, limited liability company or other investment vehicle that is a direct or indirect stockholder of the Purchaser.

"GAAP" means the United States generally accepted accounting principles, consistently applied.

"GAAS" means the United States generally accepted auditing standards.

"General Scope of Services" has the meaning set forth in Section 5.36(a).

"Good Faith Deposit" has the meaning set forth in Section 2.2.5(a).

"Government Bid" means any Bid made by any Seller or Company or by a contractor team or joint venture, in which any Seller or Company is participating that, if accepted, would result in the award of a Government Contract or a Government Subcontract.

"Government Contract" means any prime contract, multiple award schedule contract, basic ordering agreement, letter contract or any task order or purchase order issued

23

thereunder or other written agreement between any Seller or Company and either the U.S. Government or a State Government.

"**Government Entity**" means any U.S., Canadian, Indian, UK, supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**Government Subcontract**" means any subcontract issued to any Seller or Company by a prime contractor, including any basic ordering agreement, letter subcontract, task order, purchase order, or other written agreement between any Seller and any prime contractor to either the U.S. Government or a State Government.

"**GST**" means goods and services tax payable under Part IX of the Excise Tax Act (Canada).

"**Hazardous Materials**" means (a) petroleum, petroleum products, asbestos in any form that is friable or polychlorinated biphenyls and (b) any chemical, material or other substance regulated as hazardous or as a pollutant, contaminant or waste under any Environmental Law.

"**Holdback Escrow Amount**" means $25 million, which amount will be paid by the Purchaser to the Escrow Agent on the Closing Date and shall be held by the Escrow Agent pending the Sellers post-Closing delivery of financial statements to the Purchaser pursuant to the terms of Section 5.34(f).

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means that the responsible Minister under the Investment Canada Act shall have notified the Purchaser that he/she is satisfied, or such Minister shall be deemed to be satisfied, that the transactions contemplated in this Agreement that are subject to the provisions of the Investment Canada Act are likely to be of net benefit to Canada.

"**Inactive Employees**" means Employees (other than Share Transfer Employees and Employees whose employment transfers to the Purchaser or a Designated Purchaser by operation of Law) who have accepted Purchaser's or a Designated Purchaser's offer of employment as provided in Section 7.1 and are on a leave of absence for military service, short- or long-term disability, Family and Medical Leave Act or other leave of absence provided under applicable Law on the day immediately following the Closing Date as of 12:01 a.m. local time in such jurisdiction where Employees would have otherwise become Transferred Employees in accordance with this Agreement.

24

"**Inbound License Agreements**" has the meaning set forth in Section 4.6(j).

"**Included Real Estate Leases**" means each Designated 365 Real Estate Lease, Assumed and Subleased Real Estate Lease, Designated 365 Real Estate Lease, Non-365 Subleased Real Estate Lease and Company Lease, collectively, and, if applicable, Replacement Lease A, and any Equivalent Lease (to the extent that the Seller is the tenant thereunder).

"**Included Real Estate**" means the Owned Real Estate and the real estate which is the demised premises under each Designated 365 Real Estate Lease, Assumed and Subleased Real Estate Lease, Designated Non-365 Real Estate Lease, Non-365 Subleased Real Estate Leases, Company Lease or Direct Lease, collectively, or under Replacement Lease A and any Equivalent Lease (to the extent that the Seller is the tenant thereunder), if applicable.

"**Included Services**" has the meaning set forth in Section 5.36(a).

"**Indebtedness**" of any Person means at any date, without duplication, all obligations (including all obligations in respect of principal, accrued interest, penalties, fees and premiums) of such Person (a) for indebtedness for borrowed money (including overdraft facilities), (b) for indebtedness evidenced by promissory notes, bonds, debentures, notes or similar instruments, (c) any "earn-out" obligations and other obligations for the deferred purchase price of property, goods or services (excluding trade payables), (d) in respect of letters of credit and bankers' acceptances, (e) in respect of leases that are capitalized in accordance with GAAP under which such Person is the lessee, (f) research and development funds received or invoiced under any alliance agreement that may be required to be earned by future performance or repaid thereunder and (g) in respect of any guarantees of such Person in connection with any of the foregoing.

"**Indemnified Expenses**" has the meaning set forth in Section 5.20(c).

"**Indemnified Person**" has the meaning set forth in Section 5.20(c).

"**Indirect Customer Contracts**" means any Seller Contract pursuant to which a Seller provides Products and/or Services to a reseller, distributor, system integrator or service provider (including Seller Contracts for Products or Services to be utilized by such reseller or distributor itself).

"**Information**" has the meaning set forth in Section 5.34(d)(iv).

"**Insolvency Act**" has the meaning set forth in the recitals to this Agreement.

"**Intellectual Property**" means all intellectual and industrial property as recognized under the laws of the United States of America, Canada and/or other countries or jurisdictions, including: (a) Trademarks; (b) Domain Names; (c) Patents; (d) copyrights and works of authorship (including any registrations therefor or applications for registration, and the benefit of any waiver of moral rights therein, to the extent such waiver is transferable by law); (e) mask works and integrated circuit topographies (including any registrations therefor or applications for registration); (f) trade secrets, know-how and proprietary and confidential

25

technical or business information; (g) any Software; (h) any technology and (i) *sui generis* design rights.

"Intellectual Property License Agreement" means the agreement to be entered into between NNL, NNI, the relevant EMEA Sellers and the Joint Administrators, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit G.

"Intentional Breach" means, with respect to an agreement, an action or omission (including a failure to cure circumstances) that the breaching party knows or reasonably should have known is or would result in a breach of the agreement.

"Inventory Value" means, as of any given date, the book value, net of all applicable reserves and provisions, of the Owned Inventory and the EMEA Owned Inventory calculated in accordance with the Nortel Accounting Principles, and the Calculation Principles and the revenue assumptions presented in the Sellers Forecast set forth in Section 1.1(d)(ii) of the Sellers Disclosure Schedule.

"Investment Canada Act" means the Investment Canada Act, as amended.

"IP Escrow Agreements" has the meaning set forth in Section 5.9(c).

"IRS" means the United States Internal Revenue Service.

"IRS Claim" means, collectively, the claims asserted in the Amended Proof of Claim dated August 18, 2009 and filed by the IRS on August 20, 2009 and any other related Actions or Claims asserted by the IRS or a Federal agency.

"Israeli Companies" has the meaning set forth in the recitals to this Agreement.

"Israeli Companies Law" has the meaning set forth in the recitals to this Agreement.

"Israeli Court" has the meaning set forth in the recitals to this Agreement.

"IT Headcount Forecast" has the meaning set forth in Section 5.36(c).

"Janus -6 Factor" means an amount equal to the Base Purchase Price multiplied by 2.0, and divided by the revenues of the Business in respect of the latest period of twelve whole months preceding the Closing Date for which financial information is available as of the Closing Date .

"Joint Administrators" has the meaning set forth in the recitals to this Agreement.

"Joint Israeli Administrators" has the meaning set forth in the recitals to this Agreement.

26

"KEIP" means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in part on March 5, 2009, and in part on March 20, 2009, and substantially approved by the Canadian Court in part on March 6, 2009, and in part on March 20, 2009, as the same may be amended, modified, supplemented or replaced from time to time in accordance with Section 5.9(d).

"KERP" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court on March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time in accordance with Section 5.9(d).

"Knowledge" or "aware of" or "notice of" or a similar phrase shall mean, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(h) of the Sellers Disclosure Schedule, and, with reference to the Purchaser, the actual knowledge of those Persons listed on Exhibit H.

"KPMG" has the meaning set forth in Section 5.34(e).

"Latest Lease Rejection Date" means (i) August 12, 2009, the deadline under the U.S. Bankruptcy Code, by which the Sellers must elect to either assume or reject 365 Real Estate Leases, or (ii) if the Sellers (in their sole discretion) request and a landlord under a 365 Real Estate Lease agrees to an extension of the date by which the relevant Seller must elect to either assume or reject such 365 Real Estate Lease to a date following August 12, 2009, then on the date to which such deadline has been extended by agreement of such Seller and such landlord.

"Law" means any U.S., Canadian, UK, Israeli, supranational, foreign, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"Lease A Sublease" has the meaning set forth in Exhibit 5.28(g).

"Letter of Credit" means the letter of credit in the form of Exhibit I hereto issued by Citibank, N.A. (or any financial institution having at least an investment grade rating and capital and surplus of not less than $500 million) in favor of the Escrow Agent.

"LGN Joint Venture" means LG-Nortel Co. Ltd., which was established in November 2005 as a joint venture between NNL and LG Electronics Inc. for the purpose of jointly developing and marketing certain telecommunications equipment and network solutions.

"LGN/Korea Distribution Agreement" means the agreement between the Purchaser and/or a Designated Purchaser, on the one hand, and the LGN Joint Venture, on the other hand, governing the sale of certain Products by the Business to the LGN Joint Venture for resale.

27

"LGN/Korea Supply Agreement" means an agreement between the Purchaser and/or a Designated Purchaser and the LGN Joint Venture governing the supply of certain products by the LGN Joint Venture to the Business.

"Liabilities" means debts, liabilities, commitments and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or undeterminable, including those arising under any Law or Action and those arising under any contract, agreement, arrangement, commitment or undertaking or otherwise, including any Tax liability or tort liability.

"Licensed Intellectual Property" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchaser(s) under the Intellectual Property License Agreement and the Trademark License Agreement.

"Lien" means any lien, mortgage, pledge or security interest, hypothec, adverse claim, a claim of adverse possession, right of first refusal, option, hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, prior claim, lease, lien or charge of any kind (including any conditional sale arrangement or other title retention agreement).

"Loaned Employee Agreement" means the agreement between the Main Sellers and certain of the Other Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed before the Closing in the form attached hereto as Exhibit J.

"Local Sale Agreements" has the meaning set forth in Section 2.1.8.

"Loss Duplication Elections" has the meaning set forth in Section 6.5.

"Losses" means all losses, damages and reasonable and documented out-of-pocket costs and expenses.

"LTM Measurement Period" means as of any date, if such date is (i) during the first 45 days after the end of any fiscal quarter of the Business, the period of four consecutive fiscal quarters of the Business ended on or prior to such date in respect of which financial statements for each quarter are available and (ii) any other date during a fiscal quarter, the period of four consecutive fiscal quarters of the Business ended on or prior to such date.

"LTM Revenues" means, with respect to a Customer Contract of any of the Companies, the revenues of the Companies with respect to such Customer Contract during the latest period of twelve whole months preceding the Closing Date for which financial information is available as of the Closing Date, determined in accordance with GAAP.

"Main Sellers" has the meaning set forth in the preamble to this Agreement.

"Major Customer Contracts" has the meaning set forth in Section 5.38(d).

"Major 2008 Customer Contract" has the meaning set forth in Section 5.38(c).

28

"Major 2009 Customer Contract" has the meaning set forth in Section 5.38(d).

"Mandatory Antitrust Approvals" means a decision, in whatever form (including a declaration of lack of jurisdiction or a mere filing or notification, if the Closing can take place, pursuant to the applicable Antitrust Law, without a decision or the expiry of any waiting period) by any Government Entity under the Antitrust Laws of any of the jurisdictions listed in Exhibit K (the "Relevant Antitrust Jurisdiction / Authorities") or the expiry of the applicable waiting period, as applicable, under the Antitrust Laws of any of the jurisdictions listed in Exhibit K, authorizing or not objecting to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), which includes any decision or consent by any such Government Entity setting forth conditions or obligations on the Purchaser or any of its Affiliates if such conditions or obligations have been or, pursuant to Section 5.5(e) or Clause 10.11 of the EMEA Asset Sale Agreement are required to be, accepted by the Purchaser.

"Material Adverse Effect" means any change, event, fact, condition, occurrence or circumstance that, individually or in the aggregate, has or would reasonably be expected to have a material adverse effect on the business, operations, results of operations, properties, assets or condition of the Business to be transferred hereunder, taken as a whole, but in each case shall not include the effect of events, changes, facts, conditions, occurrences or circumstances relating to (a) the industries and markets in which such Business operates, but only to the extent that such events, changes, facts, conditions, occurrences or circumstances do not have a materially disproportionate effect on such Business as compared to other industry participants, (b) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, acts of God, war, terrorism or hostilities, but only to the extent that such events, changes, facts, conditions, occurrences or circumstances do not have a materially disproportionate effect on such Business as compared to other industry participants, (c) changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (d) compliance with this Agreement, (e) the transactions contemplated hereby or any announcement hereof or the identity of the Purchaser, (f) any action taken by the Purchaser or its Affiliates, or (g) the pendency of the Bankruptcy Proceedings and any action approved by, or motion made before, the Bankruptcy Courts; it being understood that the failure of the Business to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect although the factors underlying such failure may be considered in determining whether or not there has been a Material Adverse Effect.

"Material Contracts" has the meaning set forth in Section 4.5.

"Material Intentional Purchaser Breach" means a breach in any material respect of Purchaser's representations, warranties, agreements or covenants set forth in this Agreement or the EMEA Asset Sale Agreement as a result of an Intentional Breach which breach (i) would result in a failure to satisfy the conditions to Closing set forth in Section 8.1 and/or Section 8.2, as applicable, or the conditions to Closing (as defined in the EMEA Asset Sale Agreement) set forth in Clause 15.1 and/or Clause 15.2 of the EMEA Asset Sale Agreement, as applicable, and (ii) if capable of being cured, such breach by the Purchaser is not cured within the applicable Breach Cure Period; provided that a determination by the Purchaser not to accept any requirement of a Regulatory Approval with respect to any divestiture, license

29

or hold separate or similar arrangements or any material actions, undertakings or arrangements for the conduct of any business and/or terminating any relationships or contractual rights or obligations shall not constitute a Material Intentional Purchaser Breach.

"**Mission Critical Leases**" has the meaning set forth in Section 5.31(g).

"**Monetary Cost**" has the meaning set forth in Section 5.36(c).

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**Multiemployer Plan**" has the meaning set forth in Section 4.14(j).

"**Mutual Development Agreement**" means an agreement between the Purchaser and/or any Designated Purchasers, on the one hand, and the relevant Sellers, on the other hand, governing the development (i) by the Purchaser and/or any Designated Purchasers of new features of certain of the products used by the Sellers and/or (ii) by the relevant Sellers of new features of certain of the Products.

"**Net Debt**" means, as of any time of determination, any Indebtedness of the Companies.

"**Net Debt Adjustment**" means the amount, if any, by which the Closing Net Debt exceeds the amount determined by reference to Section 1.1(c) of the Sellers Disclosure Schedule at the time of Closing. For the avoidance of doubt, if the Closing Net Debt is less than such amount, the Net Debt Adjustment shall be equal to zero and there shall be no Purchase Price adjustment in relation thereto.

"**Neutral Arbitrator**" has the meaning set forth in Section 5.36(h).

"**New York Courts**" has the meaning set forth in Section 10.6(b).

"**NGS**" means Nortel Government Solutions Incorporated, a corporation organized under the laws of Delaware with offices at 12730 Fair Lakes Circle, Fairfax, Virginia.

"**NGS Companies**" means, collectively, NGS and its two Subsidiaries, Integrated Information Technology Corporation and AC Technologies, Inc.

"**NGS Shares**" means all the equity interests in NGS.

"**NISPOM**" means the National Industrial Security Program Operating Manual, DoD 5220.22-M dated February 28, 2006.

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNFSAS Succession Tax Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

30

"NNI" has the meaning set forth in the preamble to this Agreement.

"NNI Group" means an "affiliated group" as defined in Code section 1504(a) (or under a comparable provision of the Tax Laws of a jurisdiction within the United States) of which NNI is the common parent.

"NN International" means Nortel Networks International, Inc.

"NNL" has the meaning set forth in the preamble to this Agreement.

"NNRIP" means the Nortel Networks Retirement Income Plan.

"NNSA" shall mean Nortel Networks SA, a company incorporated in accordance with the laws of France and with registered number 389 516 741.

"NNTC" has the meaning set forth in Section 6.1(c).

"NN Turkey" means Nortel Networks Netas Telekommikasyon A.S., a joint stock corporation formed under the laws of Turkey.

"NNUK" means Nortel Networks UK Limited.

"Non-Assignable Contracts" has the meaning set forth in Section 5.13(a).

"Non-Assigned Contracts" means the Non-Assignable Contracts, to the extent all applicable Consents to assignment thereof to the Purchaser or a Designated Purchaser have not been granted prior to the Closing Date.

"Non-Debtor Sellers" has the meaning set forth in the recitals to this Agreement.

"Non-Designating Party" has the meaning set forth in Section 5.36(f).

"Non-Qualified Post-Signing Customer Contracts" has the meaning set forth in Section 5.38(g).

"Non-Qualified Post-Signing Customer Contract List" has the meaning set forth in Section 5.38(g).

"Non-Solicitation Period" means the twenty-four (24) month period immediately following the Closing Date.

"Non-Union Employee" means an Employee whose terms and conditions of employment are not governed by a Collective Labor Agreement.

"Non-365 Customer Contract" means any Customer Contract that is not a 365 Customer Contract.

"Non-365 Real Estate Leases" has the meaning set forth in Section 2.1.6(b)(i).

31

"Non-365 Real Estate Lease List" has the meaning set forth in Section 2.1.6(b)(i).

"Non-365 Seller Contract" means Seller Contracts other than 365 Contracts.

"Non-365 SI/SP Contracts" has the meaning set forth in Section 2.1.6(a)(i).

"Non-365 SI/SP Contract List" has the meaning set forth in Section 2.1.6(a)(i).

"Non-365 Subleased Real Estate Leases" has the meaning set forth in Section 2.1.6(b)(iii).

"Nortel Accounting Principles" means the accounting principles employed in the preparation of the Financial Statements, as set forth in Section 1.1(i) of the Sellers Disclosure Schedule.

"Nortel Parties" means the Sellers, any of the bankruptcy estates, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators, the Canadian Monitor (and any other Administrator, Monitor or other Person acting in a similar capacity) and any Person (i) in which, as of or subsequent to the date hereof, any Seller or EMEA Seller holds more than fifty percent (50%) of the capital stock or other equity interests or (ii) that is or was a Seller or an EMEA Seller, and their respective Affiliates, and any former, current or future general or limited partners, directors, officers, employees, agents, managers, members, stockholders, assignees and representatives of any of the foregoing in their capacity as such.

"Notices of Lease" has the meaning set forth in Section 5.30.

"Notifying Party" has the meaning set forth in Section 5.36(h).

"Offer Consideration Period" has the meaning set out in Section 7.1.1.

"Open Source Software" means Software that is made available under a license agreement that (i) conditions use, modification or distribution of any Software program, or any Software integrated with or derived from such Software program, or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software) or (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software.

"Ordinary Course" means the ordinary course of the Business consistent with past practice, as such practice may be modified from time to time to the extent necessary to reflect the separation of the Business from the other businesses of the Sellers in a manner consistent with the terms of the Transaction Documents.

"Original Agreement" has the meaning set forth in the recitals to this Agreement.

32

"Original EMEA Asset Sale Agreement" has the meaning set forth in the recitals to this Agreement.

"Other Contract" means any Seller Contract that is not a Customer Contract, a SI/SP Contract, an Employment Contract or a Real Estate Lease.

"Other Loaned Employees" has the meaning set forth in the recitals to the Loaned Employee Agreement.

"Other Non-365 Contracts" has the meaning set forth in Section 2.1.6(a)(ii).

"Other Non-365 Contract List" has the meaning set forth in Section 2.1.6(a)(ii).

"Other Sellers" has the meaning set forth in the preamble to this Agreement.

"Other 365 Contracts" has the meaning set forth in Section 2.1.5(a)(ii).

"Other 365 Contract List" has the meaning set forth in Section 2.1.5(a)(ii).

"Overhead and Shared Services" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services and which are provided to both (a) the Business and (b) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and Software in object code form used by Employees, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and Software (in object code form) or other Intellectual Property necessary for or used in connection therewith.

"Owned Equipment" means (a) those items of tangible personal property owned by the Sellers that are held or used primarily in connection with the Business and are located at the network operating centers, lab facilities and other facilities in each case listed in Section 1.1(j) of the Sellers Disclosure Schedule (the "Sites"), and (b) those other items of tangible personal property owned by the Sellers not included in clause (a) above that are held or used exclusively in connection with the Business, including, in each case, all trade fixtures and fixtures, furniture, furnishings, fittings, equipment, apparatus, appliances, test equipment, tooling and other articles of personal property which are owned by the Sellers and which are located at the Owned Real Estate , the Direct Lease Real Estate, any customer, supplier or other worksites or at the Sites or at the demised premises which are (i) the subject of any real property lease included in the Assigned Contracts or (ii) the subject of any Sublease, provided, however, that, in each case, the term "Owned Equipment" shall not include fixtures other than trade fixtures

33

located at the Direct Lease Real Estate or the Sites and shall not include any leasehold improvements located at the demised premises which are the subject of any Sublease; and, provided, further, that, "Owned Equipment" shall not include any Owned Inventory, any items of tangible property personally assigned to a single employee who is not (A) a Transferred Employee as of the Employee Transfer Date or (B) a Visa Employee, and any Intellectual Property.

"Owned Inventory" means any inventories of raw materials, manufactured and purchased parts, work in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise, in each case owned by the Sellers and held or used exclusively in connection with the Business, including any of the above items which is owned by the Sellers but remains in the possession or control of a contract manufacturer or another Third Party (but excluding any inventory that is purchased by any of the Sellers from any contract manufacturer after the Closing Date under any agreement between such Sellers and contract manufacturers or under any Contract Manufacturing Inventory Agreement and excluding any inventory that is required to be purchased by any of the Sellers from a contract manufacturer after the date of this Agreement but prior to the Closing Date in connection with the Ordinary Course quarterly review process completed by such contract manufacturer to determine inventory levels in excess of Sellers' forecasts).

"Owned Real Estate" means the real property owned by NNI and located in Bohemia, New York.

"Partial Allocation" has the meaning set forth in Section 2.2.7(b).

"Party" or "Parties" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"Patents" includes all national (of any country of origin) and multinational statutory invention registrations, patents, patent applications, provisional patent applications, industrial designs, industrial models, and inventions (including any inventions disclosed in such patents and applications whether or not patentable), including all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, and all rights therein provided by multinational treaties or conventions.

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board auditing standards.

"Pension Trustees" means the trustees of the UK Defined Benefit Plan.

"Permitted Encumbrances" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP other than Liens that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting

34

Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP; (iii) with respect to the NGS Shares, the Liens contemplated by the Proxy Agreement; (iv) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (v) any other Liens set forth in Section 1.1(k) of the Sellers Disclosure Schedule; and (vi) zoning, entitlement, building and land use regulations, customary covenants, defects of title, easements, rights of way, restrictions and other similar charges or encumbrances which (A) do not impair in any material respect the use or value of the related assets in the Business as currently conducted or (B), with respect to the Owned Real Estate, are disclosed on existing title reports or surveys.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Personal Information**" means information about an identifiable individual or other information that is subject to any Privacy Law and received, collected, used, stored, processed, disclosed or disposed of by the Sellers, including such information regarding individuals who are customers, suppliers, employees and agents of the Business, such as an individual's name, address, identification number, payment records, credit information, personal references and health records.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Post-Closing Taxable Period**" means any taxable period or portion thereof beginning after the Closing Date.

"**Post-Signing Customer Contract**" means a Customer Contract entered into after the date hereof.

"**Post-Signing Inclusion Criteria**" means the criteria described in Section 1.1(l) of the Sellers Disclosure Schedule.

"**PPF**" means the Pension Protection Fund created and operated in accordance with the UK Pensions Act 2004.

"**Pre-Closing Taxable Period**" means any taxable period or portion thereof ending on or prior to the Closing Date.

"**Pre-Signing Inclusion Criteria**" means the criteria described in Section 1.1(m) of the Sellers Disclosure Schedule.

"**Pre-Signing Customer Contract**" means a Customer Contract entered into prior to the date hereof.

35

"**Primary Party**" means (i) each of the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Privacy Laws**" means all applicable Laws of any Government Entity in any jurisdiction governing the receipt, collection, use, storage, processing, disclosure or disposal of information about an identifiable individual, including the Personal Information and Protection of Electronic Documents Act (Canada) and equivalent provincial legislation.

"**Product Volume Forecast**" has the meaning set forth in Section 5.36(c).

"**Products**" means those products that are manufactured by or on behalf of and/or marketed by the Business, as set forth in Section 1.1(n) of the Sellers Disclosure Schedule and all versions thereof that are supported as of the date hereof.

"**Proxy Agreement**" means the Proxy Agreement with respect to capital stock of NGS entered into on July 29, 2005, by and among NNC, NNL, NNI, NGS, James Frey, Thomas McInerney, Gregory Newbold and the United States Department of Defense.

"**Purchase Price**" has the meaning set forth in Section 2.2.1(a).

"**Purchase Price Adjustment Escrow Amount**" shall mean $30 million.

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Authorized Canadian Agent**" has the meaning set forth in Section 10.6(c).

"**Purchaser Employee Plan**" means any "employee benefit plan," whether or not in writing and whether covering a single individual or a group of individuals, within the meaning of Section 3(3) of ERISA and any other employee benefit plan, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, meal allowance plan, redundancy or severance plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferred Employees pursuant to this Agreement.

"**Purchaser Supply Agreement**" means an agreement between the Purchaser and/or any Designated Purchasers, on the one hand, and the relevant Sellers, on the other hand, governing the supply by the Purchaser and/or any Designated Purchasers to the relevant Sellers of certain products and services.

36

"Qualified Expenditures" has the meaning set forth in Section 6.6(b).

"Real Estate Agreements" means the leases, sub-leases or license agreements between the relevant Sellers, on the one hand, and the Purchaser or any Designated Purchasers, on the other hand, including the Subleases and the Direct Leases to be executed on or prior to the Closing, in the forms attached hereto as Exhibit N.

"Real Estate Lease" means any Seller Contract, Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease that is a lease, sublease, license or other agreements for occupancy of real estate.

"Records Custodian" means a Person of international reputation that is acceptable to the Purchaser and the Main Sellers, acting reasonably.

"Registration Statement" has the meaning set forth in Section 5.34(a).

"Regulation S-X" means Regulation S-X promulgated by the SEC as amended and in effect at the time in question.

"Regulatory Approvals" means the Antitrust Approvals and the ICA Approval.

"Rejected Customer Contracts" means, collectively, (i) the Rejected 365 SI/SP Contracts, (ii) Customer Contracts entered into prior to the Closing Date by an Excluded Seller that either (1) are entered into prior to the date hereof or (2) are entered into after the date hereof in the Ordinary Course and either enable termination without penalty with one-hundred eighty (180) days' notice or have a duration no longer than twelve (12) months following execution thereof, (iii) the Rejected Non-365 SI/SP Contracts, (iv) the Rejected Pre-Signing Customer Contracts, and (v) the Enterprise Portion of those Pre-Signing Bundled Contracts that the Purchaser does not agree to accept in subcontract or elects to replace with new Contracts pursuant to Section 5.14(b) because the Enterprise Portion thereof does not meet the Pre-Signing Inclusion Criteria for Major Customer Contracts, in each case without giving effect to any material amendment or modification thereto entered into after the date hereof other than an amendment entered into in the Ordinary Course (x) prior to the Closing Date by an Excluded Seller that either enables termination without penalty with one-hundred eighty (180) days' notice or has a duration no longer than twelve (12) months following execution thereof or (y) by a Seller that does not materially expand the customer's rights under such agreement; provided that a Contract shall cease to be a Rejected Customer Contract upon the earliest of (A) the expiration of such Rejected Customer Contract (without giving effect to any extension of the term thereof other than at the option of the counterparty thereto), (B) the earliest date on which the relevant Seller or Seller Wholly-Owned Subsidiary or a Wholly-Owned Subsidiary of a Seller has the right to terminate such Contract without penalty or (C) the date on which such Contract is terminated by the counterparty thereto.

"Rejected Non-365 SI/SP Contracts" has the meaning set forth in Section 2.1.6(a)(i).

"Rejected Post-Signing Customer Contract" has the meaning set forth in Section 5.38(g).

37

"Rejected Pre-Signing Customer Contracts" has the meaning set forth in Section 5.38(f).

"Rejected 365 SI/SP Contracts" has the meaning set forth in Section 2.1.5(a)(i).

"Related -6 Liabilities" shall mean any material Tax Liability of a Company arising pursuant to Treasury Regulation Section 1.1502-6 (or any similar state, local, or foreign tax principles) and relating to the IRS Claim (or any similar claims by state, local or foreign taxing authorities).

"Relocation Costs" means all reasonable and actual out-of-pocket costs and expenses incurred for the relocation of the Business, the Transferred Employees, Assets and business operations to be acquired by Purchaser, including moving costs, reasonable legal fees incurred for the purpose of reviewing and negotiating leases, rental costs for temporary space, leasing commissions, and tenant improvement and fit-out costs (hard and soft costs); provided that Relocation Costs shall not include, among other items, any business interruption costs or other damages (actual, consequential or otherwise) incurred by the Purchaser or any other party and the Purchaser waives any and all rights to recover any such amounts from the Seller or its Affiliates in connection with any relocation hereunder; and provided further that the Purchaser shall consult with the Sellers prior to incurring any such costs and, with respect only to space to be utilized on a temporary basis by Purchaser or a Designated Purchaser prior to the relocation of Business, Transferred Employees, Assets and business operations to Equivalent Space, Purchaser shall be required to obtain the agreement of Sellers prior to incurring any particular costs subject to reimbursement by Sellers hereunder.

"Relocation Damages" means all costs, expenses and damages resulting from any relocation performed by the Sellers of the Assets, Employees and business operation following any rejection of a 365 Real Estate Lease after the Closing, including business interruption costs or other damages (actual, consequential or otherwise).

"Relocation Space" has the meaning set forth in Section 5.32(b).

"Remaining APAC Countries" means India, Indonesia, Malaysia, Australia, New Zealand, the Philippines, Singapore, Japan, Thailand, Vietnam, Pakistan, Egypt and the United Arab Emirates.

"Remaining CALA Countries" means Mexico, Chile, Argentina, Colombia, Peru and Trinidad and Tobago.

"Replacement Lease A" has the meaning set forth in Exhibit 5.28(g).

"Representatives" has the meaning set forth in Section 5.29.

"Respective Affiliates" has the meaning set forth in Section 10.16(c).

"Restricted Technical Records" means the Livelink database or any other similar database containing all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2007 and subsequent taxation years.

38

"**Retirement Obligation Amount**" means the amount of the actual unfunded obligations accrued in any period preceding the Closing Date that will be assumed by the Purchaser, a Designated Purchaser or an EMEA Designated Purchaser at Closing or, if the Asset Sale Election is not made, retained by any Company at Closing (i) under the plans set forth in Section 1.1(o)(i) of the Sellers Disclosure Schedule, or (ii) except with respect to the plans set forth in Section 1.1(o)(i) or Section 1.1(o)(ii) of the Sellers Disclosure Schedule, under a plan (including a non-U.S. plan) providing retirement or retiree welfare benefits of any Seller or EMEA Seller or any Company, in each case determined in accordance with GAAP. For purposes of this definition, an unfunded obligation (A) shall be deemed to be under a plan providing retirement or retiree welfare benefits (except as set forth in Section 1.1(o)(ii) of the Sellers Disclosure Schedule) to the extent it is required to be accounted for under FAS 87 (paragraphs 11, 72 and 73) or FAS 106 (paragraphs 16 and 85), and (B) shall not be taken into account to the extent it is (I) a Liability funded out of the EMEA Employment Escrow Account, (II) a Liability in respect of which there is, and to the extent of, a separate Purchase Price adjustment under this Agreement or the EMEA Asset Sale Agreement, and/or (III) a Liability for which Assets, EMEA Assets or assets of the Companies transferred to the Purchaser, a Designated Purchaser or an EMEA Designated Purchaser at Closing or retained by the Companies, in each case under Section 2.1.1(g) of this Agreement or Clause 2.1.6 of the EMEA Asset Sale Agreement, have been set aside as a funding source, to the extent of such funding.

"**Reverse Termination Fee**" shall mean a cash fee in an aggregate amount equal to (a) two hundred million dollars ($200,000,000) if (1) the conditions set forth in Section 8.1(a) of this Agreement or Clause 15.1.3 of the EMEA Asset Sale Agreement have not been satisfied and/or (2) the Regulatory Approvals require any divestitures, licenses or hold separate or similar arrangements or any material actions, undertakings or arrangements for the conduct of any business and/or terminating any relationships or contractual rights or obligations that Purchaser determines not to accept, and (b) one hundred million dollars ($100,000,000) in all other circumstances.

"**Satisfaction Date**" means the date one hundred and fifty (150) days after July 20, 2009.

"**Schedule 1 Included Services**" has the meaning set forth in Section 5.36(a).

"**Scope Guidelines**" has the meaning set forth in Section 5.36(a).

"**SEC**" means the Securities and Exchange Commission.

"**Section 338(h)(10) Election**" has the meaning set forth in Section 6.5.

"**Section 5.25 Assets**" means (i) the assets, interests and rights of an Excluded Seller designated by the Purchaser as Excluded Assets in accordance with Section 5.25(a) and (ii) the assets, interests and rights of each such Person.

"**Section 5.25 Liability**" means all Liabilities to the extent arising from or related to a Section 5.25 Asset.

39

"**Securities Disclosure Documents**" has the meaning set forth in the first sentence of Article IV.

"**Security Deposits**" has the meaning set forth in Section 5.22(a)(i).

"**Selected Rejected Customer Contracts**" has the meaning set forth in Section 5.14(c).

"**Selected Suppliers**" has the meaning set forth in Section 2.1.7(b).

"**Selected Supplier Other Non-365 Contract**" means any Other Non-365 Contract with a Selected Supplier.

"**Selected Supplier Other 365 Contract**" means any Other 365 Contract with a Selected Supplier.

"**Seller Acquisition**" has the meaning set forth in Section 5.33.

"**Seller Authorized Agents**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized Canadian Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized U.S. Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Bid**" has the meaning set forth in Section 2.1.1(m).

"**Seller Consents**" has the meaning set forth in Section 2.1.1(h).

"**Seller Contracts**" means (i) those Contracts of a Seller that relate exclusively to the Business or to the Assets (including Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business or any Asset, but excluding any other licenses of Intellectual Property) and (ii) the Contracts of a Seller listed in Section 1.1(p) of the Sellers Disclosure Schedule.

"**Seller Employee Plan**" means any "employee benefit plan," whether or not reduced to writing and whether covering a single individual or a group of individuals, within the meaning of Section 3(3) of ERISA and any other employee benefit plan including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, meal allowance plan, redundancy or severance plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their

40

Subsidiaries (other than any EMEA Sellers, if any) or Affiliates with respect to Employees, or under which the Companies has or may have any liability.

"Seller Insurance Policies" has the meaning set forth in 5.21(a).

"Seller Supply Agreement" means an agreement between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, governing the supply by the relevant Sellers to the Purchaser and/or any Designated Purchasers of certain products and services.

"Sellers" has the meaning set forth in the preamble to this Agreement.

"Sellers Disclosure Schedule" means the disclosure schedule delivered by the Sellers to the Purchaser on September 14, 2009.

"Sellers' Files" has the meaning set forth in Section 5.38(a).

"Sellers Forecast" means Sellers' demand forecast for the Business, including Sellers' projected demand for voice, applications and data Products, as previously provided to the Purchaser and as attached hereto as Section 1.1(d)(ii) of Sellers Disclosure Schedule.

"Sellers Inventory Schedule" means the schedule set forth in Section 1.1(d)(i) of the Sellers Disclosure Schedule.

"Sellers' Trademarks" has the meaning set forth in Section 5.23.

"Services" means those services described in clause (ii) of the definition of "Business" hereunder.

"Share Transfer Employee" means any Employee who is employed by any of the Companies.

"Shares" means, collectively, the NGS Shares and the DiamondWare Shares.

"Side Letter" has the meaning set forth in the recitals to this Agreement.

"SI/SP Contracts" means only the Seller Contracts listed in Section 1.1(q) of the Sellers Disclosure Schedule as of the date hereof.

"Software" means any source code, object code, and updates thereto, and all related documentation, user and operational guides and/or manuals and the copyrights, if any, in and to all of the above.

"Solicitation Period" has the meaning set forth in Section 5.1(c).

"Spares and Service Inventory Adjustment" means (i) the Spares and Service Inventory Floor less (ii) the Closing Date Spares and Service Inventory Value; provided, that, if

41

the calculated Spares and Service Inventory Adjustment is a negative number, the Spares and Service Inventory Adjustment will be zero.

"**Spares and Service Inventory Floor**" means $12,000,000.

"**Special Agreements**" has the meaning set forth in Section 4.14(a).

"**Specified Pension Liabilities**" shall mean any actual or potential Claim, Lien or Liability arising or that could be asserted under (i) Sections 412 or 430 of the Code or Sections 4006, 4062 or 4068 of ERISA, or (ii) the UK Pensions Act of 2004.

"**Standard Margin**" means, for any period, (i) revenue of the Business during such period determined in accordance with U.S. GAAP less (ii) the Sellers' and the EMEA Sellers' standard cost of the products and services for which revenue has been recognized by the Business during such period and any other costs included in the calculation of standard margin using the accounting principles, practices and methods used in the calculation of Unaudited Standard Margin on Section 1.1(b) of Sellers Disclosure Schedule. The Sellers' and the EMEA Sellers' standard cost includes direct material, direct labor and manufacturing overhead and does not include costs and expenses that the Sellers define as "Other Costs Not in Standard" ("OCNIS"). OCNIS includes freight, purchase price variances (*e.g.*, increases or decreases in cost of revenues resulting from standard to actual cost variance adjustments), warranty expense, known product defect expense, royalties, changes in excess and obsolete ("E&O") inventory provisions and other corporate overhead charges, including rental charges for the use of shared service assets and/or facilities. For the purposes of this definition and the related calculations, it shall be assumed that all Excluded Other Sellers are Sellers and all Excluded EMEA Sellers (as defined in the EMEA Asset Sale Agreement) and any EMEA Seller whose EMEA Assets and EMEA Liabilities are designated Removed Assets and Removed Liabilities or Excluded Assets and Excluded Liabilities under the terms of the EMEA Asset Sale Agreement are EMEA Sellers. For the avoidance of doubt, "Standard Margin" shall be calculated based on the entirety of the Business, as defined herein, not the Acquired Business, regardless of whether the Asset Sale Election is made.

"**State Government**" means any state, territory or possession of the United States or any department or agency of any of such state, territory or possession with jurisdiction and responsibility throughout such state, territory or possession.

"**Straddle Period**" has the meaning set forth in Section 6.4(b).

"**Subcontract Agreement**" means one or more agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand.

"**Subleases**" has the meaning set forth in Section 5.28(a).

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Successful Bidder**" has the meaning set forth in the U.S. Bidding Procedures Order.

42

"Target Closing Companies Net Working Capital" means $16,100,000.

"Tax" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity, including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, gross receipts, sales, use, ad valorem, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto whether or not disputed, and (b) any obligation to pay any amounts set forth in clause (a) with respect to another Person, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group or otherwise for any period.

"Tax Authority" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian, U.K. or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

"Tax Credit Purchaser" has the meaning set forth in Section 6.6(b).

"Tax Returns" means all returns, reports (including any amendments, elections, declarations, disclosures, claims for refunds, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes.

"Temporary Lease" has the meaning set forth in Section 5.31(g)(ii).

"Third Party" means any Person that is neither a Party nor an Affiliate of a Party.

"Trademarks" means, together with the goodwill associated therewith, all trademarks, service marks, trade dress, logos, distinguishing guises and indicia, trade names, corporate names, business names, whether or not registered, including all common law rights, and registrations, applications for registration and renewals thereof, including all marks registered in the United States Patent and Trademark Office, the trademark offices of the states and territories of the United States of America, and the trademark offices of other nations throughout the world (including the Canadian Intellectual Property Office), and all rights therein provided by multinational treaties or conventions.

"Trademark License Agreement" means the trademark license agreement between the relevant Sellers, on the one hand, and the Purchaser, any Designated Purchasers, and/or any EMEA Designated Purchasers, on the other hand, in respect of certain Trademarks used in the Business to be entered into on or before the Closing in the form attached hereto as Exhibit O.

"**Transaction Documents**" means this Agreement, the EMEA Asset Sale Agreement, the Ancillary Agreements and all other ancillary agreements to be entered into, or documentation delivered by, any Party, any EMEA Seller, any Designated Purchaser and/or any EMEA Designated Purchaser pursuant to this Agreement or the EMEA Asset Sale Agreement or any Local Sale Agreement.

"**Transfer Taxes**" means (a) all goods and services, sales, excise, use, transfer, gross receipts, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees and notarial fees), together with interest, penalties and additional amounts imposed with respect thereto whether or not disputed, and (b) any obligation to pay any amounts set forth in clause (a) with respect to another Person, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group or otherwise for any period.

"**Transfer Tax Return**" has the meaning set forth in Section 6.8.

"**Transferred Employee**" means (i) Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1 or Section 7.2, (ii) those Employees, other than Share Transfer Employees, whose employment transfers by operation of Law, and (iii) those Employees who are Share Transfer Employees, provided that no Employee (other than any Share Transfer Employee or any Employee whose employment transfers by operation of Law) who is an Inactive Employee shall be a Transferred Employee unless such Employee reports to work with the Purchaser or a Designated Purchaser no later than the later of (A) the earlier of (x) the date the Seller-approved leave of absence ends or (y) six (6) months from the Closing Date and (B) the end of such longer period as provided with respect to such leave under applicable Law; and provided, further, that no Employee (other than any Share Transfer Employee or any Employee whose employment transfers by operation of Law) who is on leave of absence for any reason other than those reasons listed in the definition of Inactive Employees as of the Closing shall be a Transferred Employee.

"**Transferred Employee Plans**" means Seller Employee Plans in respect of which Liabilities are (i) Assumed Liabilities under Section 2.1.3(g) or (ii) owed by a Company to its employees or former employees.

"**Transferred Intellectual Property**" means (i) the Patents set forth in Section 1.1(r)(i) of the Sellers Disclosure Schedule, (ii) the Trademarks set forth in Section 1.1(r)(ii) of the Sellers Disclosure Schedule, (iii) the Domain Names listed in Section 1.1(r)(iii) of the Sellers Disclosure Schedule, and (iv) any Intellectual Property (other than Patents, Domain Names or Trademarks) owned by any of the Sellers that is used exclusively in connection with the Business, including the Software listed in Section 1.1(r)(iv) of the Sellers Disclosure Schedule.

"**Transferred Overhead and Shared Services**" means Overhead and Shared Services to be provided to or in support of the Business post-Closing by Transferred Employees,

44

"Transition Services Agreement" means an agreement between the Main Sellers, the relevant Other Sellers and the TSA EMEA Sellers, on the one hand, and the Purchaser and the relevant Designated Purchasers and/or EMEA Designated Purchasers, on the other hand, to be executed on or prior to the Closing Date, in the form attached hereto as Exhibit P, except that the Schedules to such agreement shall be determined in accordance with Section 5.36.

"TSA EMEA Sellers" means NNUK and Nortel Networks (Ireland) Limited.

"TSA Sellers" means the Main Sellers and those entities listed in Exhibit A attached to the form Transition Services Agreement contained in Exhibit P hereto."

"Type 1 Extra Services" has the meaning set forth in Section 5.36(b).

"Type 2 Extra Services" has the meaning set forth in Section 5.36(b).

"Type I Rejected Contracts" has the meaning set forth in Section 5.14(c).

"Type II Rejected Contracts" has the meaning set forth in Section 5.14(c).

"UK Defined Benefit Plan" means the Nortel Networks UK Pension Plan or any other UK defined benefit occupational pension scheme operated by any company connected with or associated with the Companies.

"UK Pensions Act 2004" means the UK Pensions Act 2004, including any amendments thereto and regulations promulgated thereunder.

"UK Pensions Regulator" means the regulator of UK based occupational pension schemes in accordance with the UK Pensions Act 2004 and known as the Pensions Regulator.

"Unaudited Interim Financial Statements" means collectively, (i) the carve-out combined balance sheets of the Business as of the last day of each fiscal quarter ending after January 1, 2009 and on or prior to the Closing Date, (ii) the carve-out combined statements of income of the Business for the three month and year-to-date periods then ended and cash flows of the Business for the year-to-date periods then ended, together with the statements for the corresponding periods of the immediately preceding year and (iii) the carve-out combined statements of income (a) for the three month period ended December 31, 2008, and (b) from the most recently completed fiscal quarter, which fiscal quarter may be the last fiscal quarter of a year, through the Closing Date, in each case to the extent required to be delivered pursuant to Section 5.34 and prepared in accordance with GAAP and the applicable rules and regulations promulgated by the SEC for interim financial information, including Regulation S-X and Rule 3-05 thereunder.

"Unaudited Standard Margin" means $1,383.5 million, which is the Standard Margin of the Business for the calendar year ended December 31, 2008, based on the Financial Statements, less the standard margin associated with the Layer 4-7 Data Portfolio and the LGN

45

Joint Venture included in the Financial Statements as calculated on Schedule 1.1(b) of the Sellers Disclosure Schedule.

"**Undisclosed Liability Threshold Amount**" means, with respect to any Excludable Other Seller, the higher of (a) an amount equal to (i) the Base Purchase Price, multiplied by (ii) 0.50, multiplied by (iii) the quotient of (A) total statutory entity revenues of such Excludable Other Seller related to the Business for fiscal year 2008, divided by, (B) total 2008 revenues of the Business, and (b) $2 million.

"**Undisclosed Material Liability**" means, with respect to any Excludable Other Seller, a Liability of such Excludable Other Seller (i) that would not constitute an "Assumed Liability", (ii) the existence of which was not known to the Purchaser or its representatives as of the date hereof and (iii) that exceeds or is reasonably expected to exceed the Undisclosed Liability Threshold Amount for such Excludable Other Seller.

"**Uni-Nortel**" means Uni-Nortel Communication Technologies (Hellas), S.A., a company organized under the laws of Greece, which was established in July 2005 as a joint venture between Nortel Networks International Finance & Holding, B.V. and UniSystems, S.A. for the purposes of marketing and selling certain telecommunications equipment and systems in Greece and the Republic of Cyprus.

"**Uni-Nortel Distribution Agreement**" means an agreement between Uni-Nortel, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, governing the sale of certain Products of the Business from the Purchaser or Designated Purchaser to Uni-Nortel.

"**Union Employee**" means an Employee whose terms and conditions of employment are covered by a Collective Labor Agreement as specified in Section 4.14(b)(i) of the Sellers Disclosure Schedule.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**U.S. Bidding Procedures and Sale Motion**" has the meaning set forth in Section 5.1(a).

"**U.S. Bidding Procedures Order**" has the meaning set forth in Section 5.1(a).

"**U.S. Debtor Contract**" means any Seller Contract to which a U.S. Debtor is a party.

"**U.S. Debtors**" has the meaning set forth in the recitals to this Agreement.

46

"**U.S. Government**" means the United States Government or any department, agency or instrumentality thereof.

"**U.S. Sale Order**" has the meaning set forth in Section 5.1(a).

"**Visa Employees**" means Employees (other than Share Transfer Employees and Employees whose employment transfers by operation of Law) who are identified as having a visa or permit in Section 4.14(b)(i) of the Sellers Disclosure Schedule and whose employment with Purchaser or a Designated Purchaser cannot commence or continue on the day immediately following the Closing Date as of 12:01 a.m. local time in such jurisdiction where such Employee would have otherwise become a Transferred Employee, solely due to the Purchaser or a Designated Purchaser's inability to obtain the required visa or permit with respect to such Employee's employment on such date; provided, however, that no such Employee shall be a Visa Employee or a Transferred Employee unless such Employee reports to work with the Purchaser or a Designated Purchaser no later than the earlier of the date such Employee's required visa or permit is obtained or twelve (12) months from the Closing Date.

"**Voice Inventory Adjustment**" will be the Voice Inventory Floor less the Closing Date Voice Inventory Value; provided that, if the calculated Voice Inventory Adjustment is a negative amount, the Voice Inventory Adjustment will be zero.

"**Voice Inventory Floor**" means the Inventory Value related to voice products of the Business as set forth in the Sellers Inventory Schedule (the "**Voice Inventory Value**") on the Closing Date, provided that, if the Closing Date falls on a date that is not at the end of any fiscal quarter, the Voice Inventory Value shall equal the sum of (i) the Voice Inventory Value as of the last day of the prior fiscal quarter, plus (ii) (x) (A) the Voice Inventory Value for the last day of the fiscal quarter in which the Closing Date occurred, minus (B) the Voice Inventory Value for the last day of the prior fiscal quarter, multiplied by (y) (A) the number of days elapsed prior to the Closing Date during the fiscal quarter in which the Closing Date occurred, divided by (B) the total number of days in the fiscal quarter in which the Closing Date occurred.

"**WARN Act**" has the meaning set forth in Section 4.14(f).

"**Wholly-Owned Subsidiary**" means, as to any Person, any Subsidiary of such Person all of the capital stock or other equity interests in which is held directly or indirectly by such Person except, if applicable, for any capital stock or equity interest which is held by a director of such Subsidiary as required by applicable Laws.

"**365 Contracts**" means U.S. Debtor Contracts that are Executory Contracts and were entered into before the Petition Date that the Purchaser may elect to have a U.S. Debtor assume and assign pursuant to section 365 of the U.S. Bankruptcy Code.

"**365 Customer Contracts**" means Customer Contracts of a U.S. Debtor that are Executory Contracts and were entered into before the Petition Date.

"**365 Real Estate Lease List**" has the meaning set forth in Section 2.1.5(b)(i).

"**365 Real Estate Leases**" has the meaning set forth in Section 2.1.5(b)(i).

47

"365 SI/SP Contracts" has the meaning set forth in Section 2.1.5(a)(i).

"365 SI/SP Contract List" has the meaning set forth in Section 2.1.5(a)(i).

"8-K" has the meaning set forth in Section 5.34(a).

"-6 Contracts" has the meaning set forth in Section 10.20(a).

"-6 Factor" means an amount equal to the Base Purchase Price multiplied by 1.3, and divided by the revenues of the Business in respect of the latest period of twelve whole months preceding the Closing Date for which financial information is available as of the Closing Date.

"-6 Liability" has the meaning set forth in Section 8.3(h).

"-6 Purchase Price Adjustment" has the meaning set forth in Section 10.20(a).

SECTION 1.2.    Interpretation.

1.2.1.  Gender and Number.  Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2.  Certain Phrases and Calculation of Time.  In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from but excluding" and the words "to" and "until" each mean "to and including", and (iv) the words "date hereof" or "date of this Agreement" shall mean July 20, 2009. If the last day of any such period is not a Business Day, such period will end on the next Business Day. In determining whether an asset is "exclusively" used in connection with the Business, incidental, *de minimis* or casual uses outside the Business shall not be considered.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

1.2.3.  Headings, etc.  The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

1.2.4.  Currency and Calculations.  All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency. All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be

48

expressed in United States currency. All payments required under this Agreement shall be paid in United States currency in immediately available funds, unless otherwise specifically indicated. Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the Wall Street Journal, Eastern Edition for the day in question.

       1.2.5.  Statutory References. Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS AND SHARES

       SECTION 2.1.   Purchase and Sale.

       2.1.1.  Assets and Shares. Subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall, or shall cause the relevant Designated Purchasers to, purchase or be assigned and assume from the relevant Sellers, and each Seller shall transfer or assign to the Purchaser or the relevant Designated Purchasers, all of its right, title and interest in and to the Shares and the following assets other than the Excluded Assets (such assets, excluding the Shares and the Excluded Assets, the "Assets") (x) in the case of Assets and Shares that are transferred or assigned by U.S. Debtors, free and clear of all Liens and Claims (other than the Permitted Encumbrances described in clauses (iii), (v) and (vi) of the definition of Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to sections 363 and 365 of the U.S. Bankruptcy Code, (y) in the case of Assets that are transferred or assigned by the Canadian Debtors, free and clear of all Liens (other than the Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to the Canadian Approval and Vesting Order, when granted, and (z) in the case of Assets that are transferred or assigned by the other Other Sellers, free and clear of all Liens (other than the Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates):

       (a)    the Owned Inventory as of the Closing Date;

       (b)    the Owned Equipment as of the Closing Date;

       (c)    the Owned Real Estate;

       (d)    the Assigned Contracts in force as of the Closing Date, and prepaid expenses of the Sellers thereunder;

       (e)    the Business Information existing as of the Closing Date, subject to Section 2.1.2(g);

       (f)    the Transferred Intellectual Property as of the Closing Date, subject to any and all licenses granted under such Intellectual Property prior to the Closing Date not in violation of Section 5.9, and (A) all income, royalties, damages and payments due or payable after the

49

Closing Date relating to the Transferred Intellectual Property, except for (x) any income, royalties, damages from claims asserted prior to the Closing Date or payment obligations accrued for periods prior to the Closing Date, whether or not due or payable after the Closing Date, and (y) any income or royalties payable under any contract, arrangement or agreement other than the Assigned Contracts; (B) the right, if any, to register, prosecute, maintain and defend the Transferred Intellectual Property before any public or private agency or registrar; and (C) the right to sue and recover damages or other compensation for past or future infringements or misappropriations thereof, the right to sue and obtain equitable relief in respect of such infringements or misappropriations and the right to fully and entirely stand in the place of the Sellers and their Subsidiaries in all matters related thereto;

(g)    all trust funds or other entities holding assets (or, in the case of a dedicated bank account held by the Sellers, the assets of such account) that consist of contributions made by Transferred Employees, or by the Sellers or predecessors of the Sellers on behalf of Transferred Employees, in each case that are intended to fund, in whole or in part, any obligation owed to any Transferred Employee under any Transferred Employee Plans;

(h)    all Consents of Government Entities used by the Sellers primarily in the Business, to the extent assignable under applicable Law, including the Consents listed in Section 2.1.1(h) of the Sellers Disclosure Schedule (the "Seller Consents");

(i)    to the extent not already included in the definition of Owned Inventory or Owned Equipment, all supplies owned by the Sellers and used primarily in connection with the Business;

(j)    all rights of the Sellers under non-disclosure, confidentiality, non-compete or non-solicitation agreements that are Assigned Contracts or, to the extent they relate exclusively to the Business or to the extent the rights are transferable without loss of rights to the Sellers, with employees, contractors and agents of the Sellers or with Third Parties to the extent relating to the Business, the U.S. Bidding Procedures Order, the Canadian Sales Process Order, the Shares or the Assets (or any portion thereof);

(k)    all avoidance actions and similar rights and causes of action, including causes of action under sections 544 through 553 of the U.S. Bankruptcy Code, against the Purchaser or any of the Purchaser's Affiliates;

(l)    all past and present goodwill of that portion of the Business which is symbolized by the Trademarks included in the Transferred Intellectual Property;

(m)    all rights as of the Closing Date arising from or in connection with any Bid made prior to the Closing Date by any Seller or by a contractor team or joint venture in which any Seller is participating, which is capable of acceptance after the Closing and, if accepted, would result in the award of a Direct Customer Contract that (if entered into after the date hereof and prior to the Closing Date) would be an Assigned Contract hereunder or to which the Purchaser has provided its prior written consent (to the extent required pursuant to Section 5.9) (any such Bid, a "Seller Bid");

50

(n)    all rights as of the Closing under all warranties, representations and guarantees made by suppliers, manufacturers, contractors and Third Parties to the extent related to the Assets described above;

(o)    any rights, claims, choses in action, or other causes of action, against Third Parties, to the extent not asserted by any Seller prior to the Closing Date, whether contingent or existing as of the Closing that arise from or relate to any of the foregoing; and

(p)    any net insurance proceeds received or to be received in respect of the Owned Equipment or the improvements or leasehold improvements at the Included Real Estate to the extent payable to the Purchaser pursuant to Section 5.21(c).

2.1.2.    Excluded Assets.  Notwithstanding anything in this Section 2.1 or elsewhere in this Agreement or in any of the Transaction Documents to the contrary, the Sellers shall retain their respective right, title and interest in and to, and the Purchaser and the Designated Purchasers shall have no rights with respect to the right, title and interest of the Sellers in and to, the following assets (collectively, the "Excluded Assets"):

(a)    cash and cash equivalents, accounts receivable (including intercompany receivables), bank account balances and all petty cash of the Sellers (other than any of the same listed in Section 2.1.1(g));

(b)    any refunds due from, or payments due on, claims with the insurers of any of the Sellers in respect of losses arising prior to the Closing Date;

(c)    all rights to Tax refunds, credits or similar benefits relating to the Assets or the Business allocable to a Pre-Closing Taxable Period or to the portion of a Straddle Period ending on and including the Closing Date, except to the extent expressly transferred by this Agreement to the Purchaser or a Designated Purchaser;

(d)    any security deposits of the Sellers (including those relating to Assigned Contracts);

(e)    other than the Assigned Contracts and other contract rights included in the Assets, any rights of the Sellers under any Contract (including, for the avoidance of doubt, and without limiting any rights under, the Subcontract Agreement, the Excluded 365 Contracts, the Non-Assigned Contracts, the Bundled Contracts and the Excluded Non-365 Contracts);

(f)    the minute books, stock ledgers and Tax records of the Sellers other than the minute books, stock ledgers and Tax records that relate solely to the Companies (provided that, for the avoidance of doubt, Excluded Assets shall include any combined or consolidated Tax Return of an NNI Group);

(g)    (i) any books, records, files, documentation or sales literature other than the Business Information and (ii) such portion of the Business Information that the Sellers are required by Law (including Laws relating to privacy) or by any agreement with a Third Party to retain (provided that copies of such information shall be provided to the Purchaser to the extent permitted by applicable Law or such agreement) and/or not to disclose;

51

(h)     any rights to any Intellectual Property (i) of any Seller (including Sellers' names) or any Affiliates of any Seller except for (A) the Acquired Company Intellectual Property, (B) the Transferred Intellectual Property, and (C) Intellectual Property to the extent rights are granted thereto pursuant to the Intellectual Property License Agreement or the Trademark License Agreement, and (ii) of any Third Party, except to the extent licensed under an Assigned Contract;

(i)     all rights of the Sellers under this Agreement and the Transaction Documents;

(j)     except as provided in Section 2.1.1.(k), all of the rights and claims of the U.S. Debtors available to the U.S. Debtors under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code, and any related claims and actions arising under such sections by operation of Law or otherwise, including any and all proceeds of the foregoing;

(k)     all records prepared in connection with the sale of the Shares and the Assets to the Purchaser and the Designated Purchasers (other than the minute books, stock ledgers and Tax records that relate solely to the Companies; provided that, for the avoidance of doubt, any combined or consolidated Tax Return of an NNI Group shall be an Excluded Asset);

(l)     all stock or other equity interests in any Person, other than the Shares;

(m)     any asset owned by NN Turkey, the LGN Joint Venture or Uni-Nortel;

(n)     all Section 5.25 Assets;

(o)     any assets set forth on Section 2.1.2(o) of the Sellers Disclosure Schedule;

(p)     any Contract deemed an Excluded Asset pursuant to Sections 2.1.5 and 2.1.6; and

(q)     any and all other assets and rights of the Sellers not specifically included in Section 2.1.1.

In addition to the above, the Sellers shall have the right to retain, following the Closing, copies of any book, record, literature, list and any other written or recorded information constituting Business Information to which the Sellers in good faith determine they are reasonably likely to need access for bona fide business or legal purposes.

2.1.3.   Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall, or shall cause the relevant Designated Purchasers to, assume and become responsible for, and perform, discharge and pay when due, the following Liabilities of the Sellers (the "Assumed Liabilities"):

(a)     all Liabilities of the Acquired Business arising after the Closing Date to the extent related to the conduct or operation of the Acquired Business after the Closing Date, including (i) all such Liabilities with respect to the ownership, exploitation and operation of the

52

Assets and the Companies, (ii) all such Liabilities related to Actions or claims brought against the Acquired Business or any of the Companies, (iii) all such Liabilities under any Environmental Laws, (iv) all such Liabilities under any products liability Laws or similar Laws concerning defective products delivered by the Acquired Business to a customer or reseller after the Closing Date, and (v) all such Liabilities under any applicable Laws in relation to telecommunications providers;

     (b)     (i) all Liabilities arising from or in connection with the performance of the Assigned Contracts (or breach thereof) after the Closing Date and (ii) all Liabilities arising from or in connection with the performance of the Assigned Contracts (or breach thereof), whether occurring before or after the Closing Date, relating to (A) any Cure Costs payable by the Purchaser pursuant to Section 2.1.7 (to the extent applicable) but excluding any Cure Costs payable by the Sellers pursuant to Section 2.1.7 (to the extent applicable), (B) any obligation to buy back from resellers the Products sold by the Business to its resellers under the Seller Contracts (to the extent such Contracts are Assigned Contracts), (C) any obligations under any warranty liabilities and Known Product Defects (as defined in the Nortel Accounting Principles) relating to Products and Services which have been supplied under any Assigned Contract or any Bundled Contract subcontracted to the Purchaser or any Designated Purchaser under the Subcontract Agreement, and (D) all Contractual Liabilities under Customer Contracts and SI/SP Contracts that are Assigned Contracts;

     (c)     (i) all Liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property or Acquired Company Intellectual Property which the Sellers may have granted or committed to Third Parties, solely to the extent that the terms of such licensing assurances, declarations, agreements, or undertakings require assignees of the Transferred Intellectual Property or Acquired Company Intellectual Property to assume such Liability, and (ii) Liabilities resulting from the assurances, declarations and undertakings made to standard-setting bodies as listed in Section 2.1.3(c) of the Sellers Disclosure Schedule (including, with respect to such Liabilities, the name of each relevant standard-setting body and, to the extent available, any Patents included in the Transferred Intellectual Property or Acquired Company Intellectual Property that are subject to such Liability), it being understood that Sellers or their Affiliates may have made other licensing assurances, declarations or undertakings to various standard-setting bodies concerning the Transferred Intellectual Property or the Acquired Company Intellectual Property, the Liabilities for such other assurances, declarations or undertakings are not assumed hereunder but are being referenced merely to provide notice thereof;

     (d)     all Liabilities for, or related to any obligation for, any Tax that the Purchaser or any Designated Purchaser bears under Article VI (including, for the avoidance of doubt, Transfer Taxes imposed in connection with this Agreement and the transactions contemplated hereunder or in connection with the execution of any other Transaction Document), it being understood that Tax Liabilities described in Article VI shall be considered Assumed Liabilities only to the extent provided in this clause (d);

     (e)     except to the extent otherwise expressly set forth in Article VII, all Liabilities related to or arising from or in connection with: (i) the Purchaser's or any Designated Purchasers' (or any of their Affiliates') employment or termination of employment (whether or

53

not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees, to the extent arising on or after the Effective Hire Date of such Transferred Employees; (ii) except where such Liability is attributable to an act or omission of the Sellers, the Purchaser's or relevant Designated Purchasers' (or any of their Affiliates') offer of employment or notice of continued employment (including any Liability, other than a Liability attributable to an act or omission by the Sellers, arising as a result of any breach of applicable employment Law by the Purchaser or relevant Designated Purchaser in connection with any pre-employment screening process), as applicable, to any Employee pursuant to the terms of Section 7.1, (iii) except where such Liability is attributable to an act or omission of the Sellers, the Purchaser's or relevant Designated Purchasers' (or any of their Affiliates') decision to make or not make offers of employment to Employees, to the extent such offer violates applicable Law with respect to discrimination among employees or potential employees, (iv) the employment, prospective employment or termination of employment of any Share Transfer Employee or, to the extent arising after Closing, other Employee whose employment transfers by operation of Law and the employment, prospective employment or termination of employment or other employment-related Liability of the Companies in respect of any Person, whether arising prior to, on, or after Closing, (v) the failure of the Purchaser or any Designated Purchasers or their Affiliates to satisfy their obligations with respect to the Employees, including the Transferred Employees, as set out in Article VII;

     (f)    all Liabilities under any Purchaser Employee Plan;

     (g)    all Liabilities related to any payments with respect to accrued and unpaid vacation days to the extent provided in and in accordance with Sections 7.1.2(c)(ii), (iii), (iv) and (v);

     (h)    all Liabilities that relate to or arise from or in connection with any Seller Employee Plan (x) transferred (or the liabilities of which are transferred) to the Purchaser or a Designated Purchaser pursuant to this Agreement or by operation of Law or (y) which remains with the Companies;

     (i)    any obligation to provide continuation coverage pursuant to COBRA or any similar Law (I) in respect of the NGS Companies, to any Person entitled to such coverage and/or their qualified beneficiaries and (ii) under any Purchaser Employee Plan that is a "group health plan" (as defined in section 5000(b)(1) of the Code) to Transferred Employees and/or their qualified beneficiaries who have a qualifying event on or after such Transferred Employees' Employee Transfer Date;

     (j)    all Liabilities payable or to be provided after the Closing Date related to the Transferred Employees set forth on Section 2.1.3(j) of the Sellers Disclosure Schedule, as updated prior to Closing in accordance with Section 7.1.2(c)(v);

     (k)    all Liabilities related to Transferred Employees expressly assumed by the Purchaser or a Designated Purchaser as set out in Article VII;

     (l)    all Liabilities related to Transferred Employees under the WARN Act which arise out of or result from any termination of employment, layoff, or the closing or

54

relocation of worksites or the like of such Transferred Employees by the Purchaser or a Designated Purchaser on or after the Effective Hire Date of such Transferred Employees;

(m)     all Liabilities relating to executory supply purchase orders for products or services (other than raw materials, manufactured or purchased parts, work in process, packaging, stores, tooling, finished goods or supplies, in each case to be delivered to contract manufacturers), entered into by the Sellers in connection with the Business in the Ordinary Course before the Closing with any Person (other than a contract manufacturer) who is a supplier of the Business as of the date hereof (or a replacement supplier for any such supplier) and under which products and/or services have not been delivered or supplied as of the Closing Date;

(n)     all Liabilities related to a Seller Bid; and

(o)     all other Liabilities listed in Section 2.1.3(n) of the Sellers Disclosure Schedule.

2.1.4.    Excluded Liabilities.  Except as provided in Section 2.1.3 or in other provisions hereof, neither the Purchaser nor any of the Designated Purchasers shall assume at the Closing any of the Liabilities of any Seller, including the Excluded Employee Liabilities (collectively, the "Excluded Liabilities").  Without limiting the foregoing, Excluded Liabilities include:

(a)     all obligations to provide continuation coverage pursuant to COBRA or any similar Law to any Person who has been employed in the Business and who does not become a Transferred Employee, it being understood that the Sellers will provide such continuation coverage except as provided in Section 2.1.3(i);

(b)     all Liabilities or other obligations arising from Seller Employee Plans except as provided in Section 2.1.3;

(c)     all Liabilities of any Seller or of any Affiliate of any Seller under Contracts that are not Assigned Contracts;

(d)     all Liabilities for, or related to any obligation for, any Tax that the Sellers are required to bear under Article VI;

(e)     all Liabilities with respect to the matters that are the subject of the following Actions pending against Sellers: (i) In re: Nortel Networks Corp. "ERISA" Litig., 3:03-md-1537 (M.D. Tenn.), (ii) Kent Felske v. Nortel Networks Corporation and Nortel Networks Limited (Court File No.08-CV-41878 CP) and (iii) Linex Technologies v. NNI, et al. (U.S.S.D. Fla);

(f)     all Liabilities with respect to the UK Defined Benefit Plan;

(g)     all Liabilities with respect to the NNRIP, including amounts paid, contributed, or required to be paid or contributed in connection with Section 5.35 or 8.3(d) or otherwise; and

55

(h)    all Liabilities accruing before the Closing Date arising from the Third Party Intellectual Property assertions identified in Section 2.1.4(h) of the Sellers Disclosure Schedule;

(i)    all Liabilities of NN Turkey, the LGN Joint Venture, Uni-Nortel and (ii) Section 5.25 Liabilities;

(j)    except as provided in Section 2.1.3(b), all Liabilities with respect to products or services acquired or received by the Business prior to the Closing Date, including all such Liabilities for accounts payable and accrued liabilities; and

(k)    all Liabilities with respect to Permitted Encumbrances, other than those described in clauses (iii), (v) and (vi) of the definition of Permitted Encumbrances.

2.1.5.    Assumption and/or Assignment or Rejection of 365 Contracts.

(a)    365 Contracts

(i)    Section 2.1.5(a)(i) of the Sellers Disclosure Schedule sets forth a list (the "**365 SI/SP Contract List**") of those SI/SP Contracts of a U.S. Debtor that are Executory Contracts for purposes of the U.S. Bankruptcy Code and were entered into before the Petition Date (the "**365 SI/SP Contracts**") which (A) the Purchaser has elected to have the relevant U.S. Debtor pursuant to section 365 of the U.S. Bankruptcy Code assume and assign to the Purchaser or a Designated Purchaser to the extent allowed by applicable Law (such Contracts on the 365 SI/SP Contract List shall be collectively referred to as the "**Designated 365 SI/SP Contracts**") or (B) the Purchaser has elected not to have the relevant U.S. Debtor pursuant to section 365 of the U.S. Bankruptcy Code assume and assign to the Purchaser or a Designated Purchaser (such Contracts on the 365 SI/SP Contract List shall be collectively referred to as the "**Rejected 365 SI/SP Contracts**"). In accordance with applicable Law and subject to the provisions of the Clean Team Confidentiality Agreement and the Confidentiality Agreement, the Sellers have used their reasonable best efforts to (x) make available to the Purchaser in the Data Room or to appropriate Clean Team Members all material documentation that forms part of the 365 SI/SP Contracts and (y) provide in the Data Room or to appropriate Clean Team Members all information about such Contracts that the Purchaser had previously reasonably requested in writing, in each case, not later than two (2) Business Days before the date hereof.

(ii)    The Sellers have prepared a list (the "**Other 365 Contract List**") of all U.S. Debtor Contracts (other than Customer Contracts, SI/SP Contracts and Real Estate Leases) that are Executory Contracts for purposes of the U.S. Bankruptcy Code and were entered into before the Petition Date (Contracts that may be included on the Other 365 Contract List, the "**Other 365 Contracts**"). In accordance with applicable Law and subject to the provisions of the Clean Team Confidentiality Agreement and the Confidentiality Agreement, the Sellers will use their reasonable best efforts to, pursuant to Section 5.8(b), provide in the Data

56

Room or to appropriate Clean Team Members all information about such Contracts that the Purchaser reasonably requests in writing. The Purchaser shall have until the relevant Contract Designation Date to designate, by written notice to NNI, the Other 365 Contracts listed in the Other 365 Contract List (as supplemented and/or updated) that the Purchaser wishes the relevant U.S. Debtor to assume and assign to the Purchaser or a Designated Purchaser at Closing pursuant to section 365 of the U.S. Bankruptcy Code, to the extent allowed by applicable Law; provided, that notwithstanding anything to the contrary in this Agreement, following the applicable Contract Designation Date, the Purchaser shall remain entitled to designate, by written notice to the Main Sellers, any Other 365 Contract as a Designated Other 365 Contract to the extent that (A) the assignment of such Other 365 Contract is allowed by applicable Law and (B) as of the date of the Purchaser's designation, the Sellers have not filed with any Bankruptcy Court any motion to reject such Other 365 Contract or otherwise taken any steps to terminate such Other 365 Contract such that the Purchaser's designation of such Other 365 Contract as a Designated Other 365 Contract would adversely affect the Sellers' economic interest or other rights with respect to such Other 365 Contract (Contracts that are so designated pursuant to this Section 2.1.5(a)(ii), the "Designated Other 365 Contracts").

(iii)    The (w) Designated 365 SI/SP Contracts, (x) Designated Other 365 Contracts, (y) 365 Customer Contracts that are not Rejected Pre-Signing Customer Contracts pursuant to Section 5.38(f), and (z) Designated 365 Real Estate Leases are collectively referred to as the "Assumed and Assigned Contracts".

(iv)    The U.S. Debtors shall seek the approval of the U.S. Bankruptcy Court to the assumption and assignment of the Assumed and Assigned Contracts effective as of Closing (or as soon as practicable thereafter for those Assumed and Assigned Contracts that the Purchaser has designated for assumption and assignment or elected not to reject, as applicable, less than twenty (20) days before the Closing Date) and the assumption of the Assumed and Subleased Real Estate Leases and the entry into Subleases thereunder effective as of Closing as part of the U.S. Sale Order in accordance with Section 5.1.

(v)    Any (w) Rejected 365 SI/SP Contracts, (x) Other 365 Contracts that are not Designated Other 365 Contracts, (y) 365 Customer Contracts that are Rejected Pre-Signing Customer Contracts, and (z) 365 Real Estate Leases under which the Purchaser has not elected to enter into a Sublease pursuant to Section 2.1.5(b) (other than 365 Real Estate Leases that are Assumed and Assigned Contracts) shall be referred to as an "Excluded 365 Contract," shall not be an Assigned Contract hereunder and all Liabilities thereunder shall be Excluded Liabilities.

(vi)    Except as otherwise provided in Section 2.1.5(a)(ii), subsequent to the relevant Contract Designation Date, the Purchaser shall not have the right to make or change any designation of Designated 365 SI/SP Contracts, Designated

57

Other 365 Contracts or Rejected Pre-Signing Customer Contracts without the prior written consent of NNI, which shall not be unreasonably withheld.

(b)     365 Real Estate Leases

(i)     Section 2.1.5(b)(i) of the Sellers Disclosure Schedule sets forth a list prepared by the Sellers (the "**365 Real Estate Lease List**") of all real property subject to leases, subleases, space licenses or other agreements permitting a U.S. Debtor to occupy real property, which were entered into before the Petition Date and are "unexpired leases" for purposes of the U.S. Bankruptcy Code (Contracts that may be included on the 365 Real Estate Lease List, the "**365 Real Estate Leases**").

(ii)     Section 2.1.5(b)(ii) of the Sellers Disclosure Schedule sets forth a list of all 365 Real Estate Leases that the Purchaser has elected to have the relevant U.S. Debtor pursuant to section 365 of the U.S. Bankruptcy Code assume and assign to the Purchaser or a Designated Purchaser at Closing. Such designated 365 Real Estate Leases are referred to herein as the "**Designated 365 Real Estate Leases**".

(iii)     Section 2.1.5(b)(iii) of the Sellers Disclosure Schedule sets forth a list of all 365 Real Estate Leases that the Purchaser has elected to have the relevant U.S. Debtor pursuant to section 365 of the U.S. Bankruptcy Code assume and under which the Purchaser or a Designated Purchaser will enter into a Sublease (as defined in Section 5.28) in accordance with the terms of the related 365 Real Estate Lease (the "**Assumed and Subleased Real Estate Leases**") at Closing, with each such Sublease to have a term to expire as specified in Section 5.28.

(iv)     The Purchaser shall have no right to (a) designate additional 365 Real Estate Leases for assumption by the relevant U.S. Debtors and assignment to or entry into a Sublease with the Purchaser or Designated Purchaser at Closing or (b) to remove any 365 Real Estate Leases which had previously been designated by Purchaser for assumption or sublease under this Section 2.1.5(b), in each case, without the prior written consent of NNI.

(v)     It is understood and agreed that the Purchaser shall be obligated to accept assignment of all Designated 365 Real Estate Leases and enter into Subleases of all Assumed and Subleased Real Estate Leases.

(vi)     Notwithstanding the foregoing and subject to the terms of Section 5.31 and Section 5.32, the Sellers' obligation to make 365 Real Estate Leases available for designation by the Purchaser pursuant to this Section 2.1.5(b)(vii) shall be subject to the Sellers' right in all instances to reject such leases pursuant to the U.S. Bankruptcy Code in accordance with the terms of Section 5.31 and the Sellers' right in all instances to restructure such leases in accordance with the terms of Section 5.32.

### 2.1.6. Assignment of Non-365 Contracts.

(a)    Non-365 Contracts

(i)    Section 2.1.6(a)(i) of the Sellers Disclosure Schedule sets forth a list (the "**Non-365 SI/SP Contract List**") of all Sellers' SI/SP Contracts other than 365 SI/SP Contracts (the "**Non-365 SI/SP Contracts**") (A) which the Purchaser has elected to have the relevant Seller assign to the Purchaser or a Designated Purchaser at Closing (such Non-365 SI/SP Contracts listed on the Non-365 SI/SP Contract List shall be collectively referred to as the "**Designated Non-365 SI/SP Contracts**") or (B) which the Purchaser has elected not to have the relevant Seller assign to the Purchaser or a Designated Purchaser (such Contracts on the Non-365 SI/SP Contract List shall be collectively referred to as the "**Rejected Non-365 SI/SP Contracts**"). In accordance with applicable Law and subject to the provisions of the Clean Team Confidentiality Agreement and the Confidentiality Agreement, the Sellers have used their reasonable best efforts to (x) make available to the Purchaser in the Data Room or to appropriate Clean Team Members all material documentation that forms part of the Non-365 SI/SP Contracts and (y) provide in the Data Room or to appropriate Clean Team Members all information about such Contracts that the Purchaser had previously reasonably requested in writing, in each case, not later than two (2) Business Days before the date hereof.

(ii)    The Sellers have prepared a list (to be updated every seven (7) days) (the "**Other Non-365 Contract List**") of all the Other Contracts that are not Other 365 Contracts (Contracts that may be included on the Other Non-365 Contract List, the "**Other Non-365 Contracts**"). In accordance with applicable Law and subject to the provisions of the Clean Team Confidentiality Agreement and the Confidentiality Agreement, the Sellers will use their reasonable best efforts to, pursuant to Section 5.8(b), provide in the Data Room or to appropriate Clean Team Members all information about such Contracts that the Purchaser reasonably requests in writing. The Purchaser shall have until the relevant Contract Designation Date to designate, by written notice to the Main Sellers, the Other Non-365 Contracts listed in the Other Non-365 Contract List (as supplemented and/or updated) that the Purchaser wishes the relevant Seller to assign to the Purchaser or a Designated Purchaser at Closing, to the extent allowed by applicable Law; provided, that notwithstanding anything to the contrary in this Agreement, following the applicable Contract Designation Date, the Purchaser shall remain entitled to designate, by written notice to the Main Sellers, any Other Non-365 Contract as a Designated Other Non-365 Contract to the extent that (A) the assignment of such Other Non-365 Contract is allowed by applicable Law and (B) as of the date of the Purchaser's designation, the Sellers have not filed with any Bankruptcy Court any motion to reject such Other Non-365 Contract or otherwise taken any steps to terminate such Other Non-365 Contract such that the Purchaser's designation of such Other Non-365 Contract as a Designated Other 365 Contract would adversely affect the Sellers' economic interest or other rights with respect to such Other Non-365 Contract (Contracts

59