that are so designated pursuant to this Section 2.1.6(a)(ii), the "**Designated Other Non-365 Contracts**").

(iii)    The (w) Designated Non-365 SI/SP Contracts, (x) Designated Other Non-365 Contracts, (y) Non-365 Customer Contracts that are not Rejected Pre-Signing Customer Contracts or Rejected Post-Signing Customer Contracts, and (z) the Designated Non-365 Real Estate Leases are collectively referred to as the "**Designated Non-365 Contracts**".

(iv)    Any (v) Rejected Non-365 SI/SP Contracts, (w) Other Non-365 Contracts that are not Designated Other Non-365 Contracts, (x) Rejected Pre-Signing Customer Contracts, (y) Rejected Post-Signing Customer Contracts, and (z) Non-365 Real Estate Leases under which the Purchaser has not elected to enter into a Sublease pursuant to Section 2.1.6(b) (other than Non-365 Real Estate Leases that are Designated Non-365 Contracts) shall be referred to as "**Excluded Non-365 Contracts**," shall not be Assigned Contracts hereunder and all Liabilities thereunder shall be Excluded Liabilities.

(v)    Except as otherwise provided in Section 2.1.6(a)(ii) above, subsequent to the relevant Contract Designation Date, the Purchaser shall not have the right to make or change any designation of Designated Non-365 SI/SP Contracts, Designated Other Non-365 Contracts, Rejected Pre-Signing Customer Contracts or Rejected Post-Signing Customer Contracts without the prior written consent of the Main Sellers, which shall not be unreasonably withheld.

(b)    Non-365 Real Estate Leases

(i)    Section 2.1.6(b)(i) of the Sellers Disclosure Schedule sets forth a list prepared by Sellers (the "**Non-365 Real Estate Lease List**") of all real estate subject to leases, subleases, space licenses or other agreements permitting a Seller to occupy real property, other than 365 Real Estate Leases (the "**Non-365 Real Estate Leases**").

(ii)    Section 2.1.6(b)(ii) of the Sellers Disclosure Schedule sets forth a list of the Non-365 Real Estate Leases that the Purchaser has elected to have the relevant Seller assign to the Purchaser or a Designated Purchaser at Closing (the "**Designated Non-365 Real Estate Leases**").

(iii)    Section 2.1.6(b)(iii) of the Sellers Disclosure Schedule sets forth a list of the Non-365 Real Estate Leases with respect to which the Purchaser has elected to have the relevant Seller enter into a Sublease (as defined in Section 5.28) with the Purchaser or a Designated Purchaser (together with any additional Non-365 Real Estate Leases that Purchaser has elected to have assumed and subleased under Section 2.1.6(b)(iv), the "**Non-365 Subleased Real Estate Leases**") at Closing, in accordance with and subject to the terms of the relevant Lease, with each such Sublease to have a term to expire as specified in Section 5.28.

(iv)   It is understood and agreed that following the date of this Agreement but prior to the applicable Contract Designation Date, the Purchaser shall be entitled, by written notice to the Main Sellers, to designate additional Non-365 Real Estate Leases for entry into a Sublease with the Purchaser or a Designated Purchaser at Closing solely from the list of Non-365 Real Estate Leases set forth in Section 2.1.6(b)(iv) of the Sellers Disclosure Schedule that are designated for "Sublease". Other than as expressly permitted in this Section 2.1.6(b)(iv), the Purchaser shall have no right to designate additional Non-365 Real Estate Leases for assignment to or entry into a Sublease with the Purchaser or Designated Purchaser or to remove any Non-365 Real Estate Lease which has or shall have previously been designated by Purchaser for assumption or sublease under this Section 2.1.6(b), without the prior written consent of the Main Sellers.

(v)   It is further understood and agreed that the Purchaser shall be obligated to accept assignment of all Designated Non-365 Real Estate Leases and enter into Subleases of all Non-365 Subleased Real Estate Leases.

(c)   Subject to Section 2.1.6(d), Section 2.1.10 and Section 5.13 and the receipt of any required Consent, all the Designated Non-365 Contracts in effect as of the Closing shall be assigned to the Purchaser or a Designated Purchaser at Closing (or as soon as practicable thereafter for those Designated Non-365 Contracts that the Purchaser has designated for assignment or elected not to reject, as applicable, less than three (3) Business Days before the Closing Date) pursuant to Section 2.1.1(d) and the Purchaser or a Designated Purchaser shall enter into a Sublease at Closing pursuant to Section 5.28 with the relevant Seller under each of the Non-365 Subleased Real Estate Leases in effect as of the Closing.

(d)   The Parties shall, and the Purchaser shall cause the Designated Purchasers to, use their reasonable best efforts to obtain all Consents required to permit the assignment to the Purchaser (or, if specified by the Purchaser, to a Designated Purchaser) of the Designated 365 Contracts and the Designated Non-365 Contracts in force as of the Closing Date, the change of control of the tenant under any Company Leases in force as of the Closing Date and the entry into the Subleases and the Lease A Sublease; provided, however, that, except as expressly provided in Section 2.1.7(c) with respect to Cure Costs for Customer Contracts, the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in seeking such Consents and provided further that the Purchaser shall comply with the requirements set forth in Section 5.4 of the Sellers Disclosure Schedule in connection therewith. For greater certainty, the failure to obtain any or all of such Consents shall not in itself entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment to the Purchase Price.

### 2.1.7.   Cure Costs; Adequate Assurance.

(a)   The Sellers have provided to the Purchaser a good faith estimate of the amount of the Cure Cost for each 365 Real Estate Lease or Non-365 Real Estate Lease listed of the date hereof on Sections 2.1.5(b)(ii), 2.1.5(b)(iii), 2.1.6(b)(ii) or 2.1.6(b)(iii) of the Sellers Disclosure Schedule, provided that the Sellers may supplement such estimate as further information is received from landlords.

61

(b)    Representatives of the Sellers and the Purchaser have met to discuss, subject to applicable Law (including any applicable Antitrust Law), Purchaser's post-Closing strategy with respect to the assignment, novation, termination or rejection of the Other Contracts of the Business. Within five (5) Business Days after such meeting, subject to the Main Sellers compliance with its obligations under Sections 2.1.5(a)(ii) and 2.1.6(a)(ii), the Purchaser has provided to the Main Sellers a list of those suppliers of the Business that are party to Other Contracts that the Purchaser may wish to have assigned to the Purchaser or a Designated Purchaser at Closing (the "Selected Suppliers"). The Purchaser shall be entitled to supplement the list of Selected Suppliers by written notice to the Main Sellers within the thirty- (30-) Business Day period following the date on which this initial list was delivered by Purchaser to the Sellers. On or before the thirtieth (30th) day after the date when the Purchaser delivered to the Main Sellers the list of Selected Suppliers (or provides a supplement thereto) in accordance with the previous sentences, the Main Sellers provided or, with respect to supplements, shall provide to the Purchaser a good faith estimate of the amount of the Cure Cost aggregated for each Selected Supplier under the Other Contracts with each Selected Supplier, as of the date thereof. If, subsequent to the delivery of such good faith estimates, it is determined that the Cure Costs under the Other Contracts with a Selected Supplier exceed by more than ten percent (10%) the good faith estimate provided by the Main Sellers to the Purchaser, the Contract Designation Date for such Other Contracts shall be extended pursuant to clause (a)(ii) of the definition of Contract Designation Date.

(c)    To the extent that the assumption and assignment of any 365 Customer Contract or 365 SI/SP Contract entails the payment of any Cure Cost, NNI shall, or shall cause the relevant U.S. Debtor to, pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order. To the extent that assumption and assignment of any Assumed and Assigned Contract (other than a 365 Customer Contract or 365 SI/SP Contract) entails the payment of any Cure Cost, the Purchaser shall directly pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order and such payment shall not entitle the Purchaser to any adjustment to the Purchase Price.

(d)    To the extent that assignment to the Purchaser or a Designated Purchaser of any Non-365 Customer Contract or Non-365 SI/SP Contract entails the payment of any Cure Cost, the relevant Main Sellers shall, or shall cause the relevant Seller to, pay such amounts directly to such counterparty in a manner agreed between such Main Seller or such relevant Seller, as applicable, and such counterparty or ordered by a court of competent jurisdiction. To the extent that assignment to the Purchaser or a Designated Purchaser of any Assigned Contract other than a Non-365 Customer Contract or Non-365 SI/SP Contract or an Assumed and Assigned Contract entails the payment of Cure Costs, the Purchaser shall pay such amounts directly to such contracting party in a manner agreed between the Purchaser and such contracting party or ordered by a court of competent jurisdiction, and such payment shall not entitle the Purchaser to any adjustment to the Purchase Price.

(e)    To the extent that entry into a Sublease with the Purchaser or a Designated Purchaser of any Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease entails the payment of Cure Costs, the Purchaser shall pay its pro-rata share (based on the ratio of the rentable square footage of the premises subject to such sublease to the overall

62

rentable square footage of the premises demised under such Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease) of such Cure Costs directly to such contracting party in a manner agreed between the Purchaser and such contracting party or ordered by a court of competent jurisdiction and the Main Seller or relevant Seller shall be responsible to pay the remainder of such Cure Costs in a manner agreed between such Main Seller or such relevant Seller, as applicable, and such counterparty or ordered by a court of competent jurisdiction (or, at the election of Purchaser, Purchaser shall be entitled to pay the entirety of such Cure Costs and receive an adjustment to the Purchase Price for the Cure Costs paid on Sellers' behalf). In the case of any Cure Costs relating to any Non-365 Real Estate Lease, the Sellers and the Purchaser shall agree as to the amounts required to be paid to the relevant landlord prior to payment by either the Sellers or the Purchaser with respect to the same.

(f)      Prior to the hearing before the U.S. Bankruptcy Court to assume the Assumed and Assigned Contracts, the Purchaser shall provide adequate assurance of its and the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of section 365(f)(2)(B) of the U.S. Bankruptcy Code and to the extent required by the U.S. Sale Order; provided, however, that the Purchaser may, subject to the conditions set forth herein (and other than with respect to a Real Estate Lease, Customer Contract or SI/SP Contract), elect to forego performing such actions and incurring such costs and expenses, in which case the relevant Assumed and Assigned Contract shall be deemed a Non-Assigned Contract at Closing and all liabilities thereunder shall be Excluded Liabilities.

(g)      The Parties shall, and shall cause the Other Sellers and the Designated Purchasers, as applicable, to, use reasonable best efforts to obtain all Consents required to permit the assignment to the Purchaser (or, if specified by the Purchaser, a Designated Purchaser) of the Designated 365 Contracts and the Designated Non-365 Contracts in force as of the Closing Date and the entry into Subleases; provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in seeking  ···  such Consents other than filing and application fees to Government Entities and payment of Cure Costs for which such Party is responsible pursuant to Section 2.1.7, and, for greater certainty, the failure to obtain any or all of such Consents shall not entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment to the Purchase Price.

2.1.8.   Local Sale Agreements. Subject to the terms and conditions hereof, to the extent necessary or desirable to effect the Closing on the terms hereof, the relevant Sellers shall, and the Purchaser shall, and shall cause the relevant Designated Purchasers to, enter into such agreements or instruments, including a sale agreement and quit-claim deed for the Owned Real Estate (but only in the event that Purchaser exercises its election under Section 2.1.1 to include the Owned Real Estate among the Assets) and bills of sale and/or assignment and assumption agreements (the "Local Sale Agreements"), providing for (i) the sale, transfer, assignment or other conveyance to the Purchaser and/or relevant Designated Purchasers, in accordance with the requirements of applicable local Law, of any Assets, located in countries where such Local Sale Agreements are required or desirable, and (ii) the assumption by the Designated Purchasers of any Assumed Liability that the Purchaser intends to allocate to them.

63

2.1.9.    EMEA Asset Sale Agreement.  Except as expressly set forth in Sections 2.2, 5.26, 9.2, 9.3, 9.4, 10.14, 10.17 and 10.19 and (in the case of NNUK and Nortel Networks (Ireland) Limited only) Section 5.36, none of the EMEA Sellers, the Joint Administrators or the Joint Israeli Administrators shall assume, or be deemed to assume, any Liability whatsoever under this Agreement and nothing in this Agreement (except to the extent expressly incorporated into the EMEA Asset Sale Agreement) shall apply to, or govern, the sale, assignment, transfer, retention or assumption of assets, rights, properties or Liabilities of, or by, any EMEA Sellers in any manner whatsoever.  The only assets, rights, properties and Liabilities of the EMEA Sellers that are being sold, assigned or transferred to, and assumed by, the Purchaser or the EMEA Designated Purchasers, and the terms and conditions thereof, and representations with respect thereto, are solely as expressly set forth in the EMEA Asset Sale Agreement.

2.1.10.    Non-Assignable Assets.  Notwithstanding anything in this Agreement to the contrary, if the requisite Consent has not been obtained on or prior to Closing, then, unless such Consent is subsequently obtained, this Agreement shall not constitute an agreement to sell, transfer or assign, directly or indirectly, any Asset or any obligation or benefit arising thereunder if an attempted direct or indirect sale, transfer, lease, sublease or assignment thereof, without the Consent of a third party (including a Government Entity), would constitute a breach, default, violation or other contravention of the rights of such third party or would be ineffective with respect to any party to a Contract concerning such Asset.  For greater certainty, failure to obtain any such Consent shall not entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment of the Purchase Price and the Main Sellers and the Purchaser shall each act in accordance with Section 5.13 hereof in relation to any Deferred Transfer Purchased Assets.

SECTION 2.2.    Purchase Price.

2.2.1.    Purchase Price; Delay Fee.

(a)    Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the sale of the Assets and the Shares pursuant to the terms hereof, the sale of the EMEA Assets pursuant to the EMEA Asset Sale Agreement and of the rights granted by certain Sellers and certain EMEA Sellers under the Intellectual Property License Agreement and the Trademark License Agreement, the Purchaser and each of the Designated Purchasers shall assume and become obligated to pay, perform and discharge, when due, the Assumed Liabilities and the EMEA Assumed Liabilities being assumed hereunder or under the EMEA Asset Sale Agreement by such Person and the Purchaser, on its own behalf and as agent for the Designated Purchasers, shall pay to the Escrow Agent the Escrow Amount and to the Distribution Agent as agent for the Sellers and the EMEA Sellers an aggregate amount of cash (the "Purchase Price") equal to (i) nine hundred million dollars ($900,000,000) (the "Base Purchase Price") less the Escrow Amount and as adjusted pursuant to Sections 2.2.1(b), 2.2.2 and 2.2.3, plus (ii) any Delay Fee accrued in accordance with the terms hereof; provided that, for the avoidance of doubt, amounts of or in respect of VAT (as defined in the EMEA Asset Sale Agreement) and/or Transfer Taxes shall be paid directly to the relevant Seller, EMEA Seller, Joint Administrators, Joint Israeli Administrators or Tax Authority pursuant to and in accordance with the relevant provisions of this Agreement and the EMEA Asset Sale Agreement and shall not be paid to the Distribution Agent.

(b)     If, on the Satisfaction Date, the Closing has not yet occurred and the condition to Closing set forth in Section 8.1(a) has not been satisfied, then in respect of each calendar day that is a Compliance Day beginning with the first Compliance Day after such Satisfaction Date and ending on the Final Date (as defined below), the Purchaser shall pay to the Escrow Agent, as an adjustment to the Purchase Price, a fee, to be held in accordance with Section 2.2.1(c), equal to ninety-seven thousand six hundred dollars ($97,600) per day (the "**Daily Fee**"). Such Daily Fee shall be payable to the Escrow Agent in respect of all preceding days for which such fee is due (but has not yet been paid) on the earlier of (i) the Final Date and (ii) the last Business Day of each calendar month ending prior to the Final Date. The aggregate amount of all such Daily Fees payable pursuant to this Section, as of any relevant time of determination, shall be referred to as the "**Delay Fee**". The "**Final Date**" shall be the date that is the earlier of (x) the date when the condition to Closing set forth in Section 8.1(a) has been satisfied and (y) the date of any termination of this Agreement in accordance with its terms.

(c)     All Delay Fees paid by the Purchaser in accordance with Section 2.2.1(b) (the "**Delay Fee Payments**") shall be held by the Escrow Agent pursuant to the Escrow Agreement to serve as earnest money under this Agreement and the EMEA Asset Sale Agreement and shall then (together with actual earnings thereon):

(i)     become property of the Sellers and the EMEA Sellers at the Closing and be therefore paid by the Escrow Agent to the Distribution Agent (as agent of the Sellers and the EMEA Sellers) at Closing pursuant to Section 2.3.2(b); or

(ii)     be applied to (i) the Reverse Termination Fee payable by the Purchaser pursuant to Section 9.3 (and therefore become property of the Sellers and the EMEA Sellers as of the effective date of the termination of this Agreement that triggered the obligation to pay such Reverse Termination Fee and be paid by the Escrow Agent to the Distribution Agent (as agent of the Sellers and the EMEA Sellers) within fifteen (15) Business Days after such effective date of termination hereof) and/or (ii) damages payable to the Sellers or the EMEA Sellers by the Purchaser or a Designated Purchaser or an EMEA Designated Purchaser hereunder or under the EMEA Asset Sale Agreement; or

(iii)     be promptly returned to the Purchaser by the Escrow Agent promptly after the earlier of (A) the thirtieth (30th) day following termination of this Agreement in accordance with its terms, if, within thirty (30) days of such termination, the Sellers or the EMEA Sellers have not made a written claim for damages and/or the Reverse Termination Fee from the Purchaser or a Designated Purchaser or an EMEA Designated Purchaser hereunder or under the EMEA Asset Sale Agreement and (B) final resolution of any such claim.

2.2.2.     Estimated Purchase Price.

(a)     For purposes of determining the amount of cash to be paid as the Estimated Purchase Price by the Purchaser (on its own behalf and as agent for the Designated Purchasers) to the Distribution Agent as agent for the Sellers and the EMEA Sellers at the

Closing pursuant to Section 2.3.2(a), at least three (3) Business Days prior to the Closing Date, the Main Sellers and the EMEA Sellers shall deliver to the Purchaser a statement prepared in good faith in accordance with the Calculation Principles and the terms hereof setting forth (i) the estimated Closing Inventory Adjustment (the **"Estimated Closing Inventory Adjustment"**) together with the estimated Closing Date Inventory Schedule and calculations used to determine the Estimated Closing Inventory Adjustment, (ii) the estimated Companies Net Working Capital as of the Closing (the **"Estimated Closing Companies Net Working Capital"**), (iii) the estimated Retirement Obligation Amount as of the Closing (the **"Estimated Closing Retirement Obligation Amount"**), (iv) the estimated Net Debt Adjustment as of the Closing (the **"Estimated Closing Net Debt Adjustment"**), (v) the estimated Adjustment Payment (the **"Estimated Adjustment Payment"**), (vi) the estimated EMEA Downward Adjustment as of the Closing Date (the **"Estimated Closing EMEA Downward Adjustment"**), (vii) the Estimated -6 Liability Escrow Amount and (viii) the Estimated Purchase Price.

(b)     As used in this Agreement, **"Estimated Purchase Price"** shall mean an amount equal to:

        (i)     the Base Purchase Price; minus

        (ii)     the Estimated Closing Inventory Adjustment; plus

        (iii)     the difference (whether positive or negative) of the Estimated Closing Companies Net Working Capital minus the Target Closing Companies Net Working Capital; minus

        (iv)     the Estimated Closing Retirement Obligation Amount; minus

        (v)     the Estimated Closing Net Debt Adjustment; minus

        (vi)     the Estimated Adjustment Payment; minus

        (vii)     the Estimated Closing EMEA Downward Adjustment; minus

        (viii)     the Estimated -6 Liability Escrow Amount.

2.2.3.     Post-Closing Purchase Price Adjustment.

        2.2.3.1     Closing Statement; Dispute Resolution

(a)     As promptly as practicable (and in any event within sixty (60) days after the Closing), the Main Sellers and the EMEA Sellers shall deliver to the Purchaser a written statement (the **"Closing Statement"**) that shall contain their final calculation of (i) the Closing Inventory Adjustment, (ii) the Companies Net Working Capital as of the Closing (the **"Closing Companies Net Working Capital"**), (iii) the Retirement Obligation Amount as of the Closing Date for the relevant Transferred Employees (the **"Closing Retirement Obligation Amount"**), (iv) the Net Debt Adjustment as of the Closing (the **"Closing Net Debt Adjustment"**), (v) the Adjustment Payment, (vi) the EMEA Downward Adjustment as of the Closing (the **"Closing EMEA Downward Adjustment"**), (vii) the final Purchase Price, and (viii) the amounts payable

66

by either Party pursuant to Sections 2.2.3.2(a) through 2.2.3.2(f) as an adjustment to the Estimated Purchase Price. The Closing Statement shall be prepared in accordance with the Calculation Principles and the terms hereof. Throughout the periods during which the Closing Statement is being prepared and any disputes that may arise under this Section 2.2.3 are being resolved, the Purchaser and the Designated Purchasers shall, promptly upon request, provide the Main Sellers, the EMEA Sellers and their respective accountants reasonable access to the books, records, documents, schedules and workpapers and personnel of the Business and the Companies in connection with the preparation of the Closing Statement and resolution of any disagreements with respect thereto.

(b)    If the Purchaser (acting on its own behalf and as agent of the Designated Purchasers (if applicable)) disagrees with the determination of the Closing Statement, the Purchaser shall notify the Main Sellers and the EMEA Sellers of such disagreement within sixty (60) days after delivery of the Closing Statement (such notice, the "Disagreement Notice"). The Disagreement Notice shall set forth, in reasonable detail, any disagreement with, and any requested adjustment to, the Closing Statement. If the Purchaser fails to deliver the Disagreement Notice by the end of such sixty- (60-) day period, the Purchaser shall be deemed to have accepted as final the Closing Statement delivered by the Main Sellers and the EMEA Sellers. Matters included in the calculations in the Closing Statement to which the Purchaser does not object in the Disagreement Notice shall be deemed accepted by the Purchaser and shall not be subject to further dispute or review. Throughout the periods during which the Closing Statement is being prepared and any disputes that may arise under this Section 2.2.3 are being resolved, the Main Sellers and the EMEA Sellers shall, promptly upon request, provide the Purchaser, the Designated Purchasers and their respective accountants reasonable access to the books, records, documents, schedules, workpapers and personnel of the Main Sellers and the EMEA Sellers in connection with the Purchaser's and its accountants' review of the Closing Statement (other than any such documents, schedules and workpapers that are subject to attorney-client privilege; it being understood, however, that Main Sellers and EMEA Sellers shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the Purchaser, the Designated Purchasers or their respective representatives to occur without so jeopardizing privilege). The Purchaser, the Main Sellers and the EMEA Sellers shall negotiate in good faith to resolve any disagreement with respect to the Closing Statement, and any resolution agreed to in writing by the Purchaser and the Main Sellers and the EMEA Sellers shall be final and binding upon the Parties.

(c)    If the Purchaser and the Main Sellers and the EMEA Sellers are unable to resolve any disagreement as contemplated by Section 2.2.3.1(b) within fourteen (14) days after delivery of a Disagreement Notice by the Purchaser, either the Main Sellers, the EMEA Sellers or the Purchaser may appoint the Accounting Arbitrator, on behalf of all Parties and the EMEA Sellers, to resolve such disagreement. The Accounting Arbitrator's determination shall be based only on the written submissions by the Main Sellers, the EMEA Sellers and the Purchaser and not upon any independent review by the Accounting Arbitrator. The Primary Parties and NNUK shall instruct the Accounting Arbitrator and the Accounting Arbitrator shall consider only those items and amounts set forth in the Closing Statement as to which the Main Sellers, the EMEA Sellers and the Purchaser have not resolved their disagreement. With respect to each such item, the decision of the Accounting Arbitrator shall be the amount claimed by the Main Sellers and the EMEA Sellers, the amount claimed by the Purchaser, or an amount between the amount

67

claimed by the Main Sellers and the EMEA Sellers and the amount claimed by the Purchaser. The Main Sellers, NNUK and the Purchaser shall instruct, and they shall use their reasonable best efforts to cause, the Accounting Arbitrator to deliver to the Primary Parties and NNUK, as promptly as practicable (and in no event later than thirty (30) days after his or her appointment), a written report setting forth the resolution of any such disagreement determined in accordance with the terms of this Agreement. Such report and the Closing Statement, as adjusted thereby, shall be final and binding upon the Parties and the EMEA Sellers. Neither the Main Sellers or the EMEA Sellers nor the Purchaser shall have any ex parte communications or meetings with the Accounting Arbitrator regarding the subject matter hereof without the other Party's prior consent. In the event the Accounting Arbitrator concludes that the Purchaser was correct as to a majority (by dollar amount) of the disputed items, then the Sellers and the EMEA Sellers shall pay the Accounting Arbitrator's fees, costs and expenses. In the event the Accounting Arbitrator concludes that the Main Sellers and the EMEA Sellers were correct as to a majority (by dollar amount) of the disputed items, then the Purchaser shall pay the Accounting Arbitrator's fees, costs and expenses.

### 2.2.3.2 Purchase Price Adjustment

(a) Inventory Adjustment

(i) If the Closing Inventory Adjustment as finally determined in accordance with Section 2.2.3.1 is higher than the Estimated Closing Inventory Adjustment, the Main Sellers, acting on their own behalf and as agent of the Other Sellers and the EMEA Sellers, shall pay or cause to be paid to the Purchaser, acting on its own behalf and as agent of the Designated Purchasers (if applicable), an amount equal to the positive difference between the Closing Inventory Adjustment and the Estimated Closing Inventory Adjustment.

(ii) If, instead, the Closing Inventory Adjustment as finally determined in accordance with Section 2.2.3.1 is lower than the Estimated Closing Inventory Adjustment, the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, shall pay to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, an amount equal to the positive difference between the Estimated Closing Inventory Adjustment and the Closing Inventory Adjustment.

(b) Companies Net Working Capital Adjustment

(i) If the Closing Companies Net Working Capital as finally determined in accordance with Section 2.2.3.1 is lower than the Estimated Closing Companies Net Working Capital, the Main Sellers, acting on their own behalf and as agent of the Other Sellers and the EMEA Sellers, shall pay or cause to be paid to the Purchaser, acting on its own behalf and as agent of the Designated Purchasers (if applicable), an amount equal to the positive difference between the Estimated Closing Companies Net Working Capital and the Closing Companies Net Working Capital.

68

(ii)    If, instead, the Closing Companies Net Working Capital as finally determined in accordance with Section 2.2.3.1 is higher than the Estimated Closing Companies Net Working Capital, the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, shall pay to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, an amount equal to the positive difference between the Closing Companies Net Working Capital and the Estimated Closing Companies Net Working Capital. '

(c)    Retirement Obligation Amount Adjustment

(i)    If the Closing Retirement Obligation Amount as finally determined in accordance with Section 2.2.3.1 is higher than the Estimated Closing Retirement Obligation Amount, the Main Sellers, acting on their own behalf and as agent of the Other Sellers and the EMEA Sellers, shall pay or cause to be paid to the Purchaser, acting on its own behalf and as agent of the Designated Purchasers (if applicable), an amount equal to the positive difference between the Closing Retirement Obligation Amount and the Estimated Closing Retirement Obligation Amount.

(ii)    If, instead, the Closing Retirement Obligation Amount as finally determined in accordance with Section 2.2.3.1 is lower than the Estimated Closing Retirement Obligation Amount, the Purchaser, acting on its own behalf and as agent of the Designated Purchasers (if applicable), shall pay to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, an amount equal to the positive difference between the Estimated Closing Retirement Obligation Amount and the Closing Retirement Obligation Amount.

(d)    Net Debt Adjustment

(i)    If the Closing Net Debt Adjustment as finally determined in accordance with Section 2.2.3.1 is higher than the Estimated Closing Net Debt Adjustment, the Main Sellers, acting on their own behalf and as agent of the Other Sellers and the EMEA Sellers, shall pay or cause to be paid to the Purchaser, acting on its own behalf and as agent of the Designated Purchasers (if applicable), an amount equal to the positive difference between the Closing Net Debt Adjustment and the Estimated Closing Net Debt Adjustment.

(ii)    If, instead, the Closing Net Debt Adjustment as finally determined in accordance with Section 2.2.3.1 is lower than the Estimated Closing Net Debt Adjustment, the Purchaser, acting on its own behalf and as agent of the Designated Purchasers (if applicable), shall pay to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, an amount equal to the positive difference between the Estimated Closing Net Debt Adjustment and the Closing Net Debt Adjustment.

(e)    Adjustment Payment

69

(i)    If the Adjustment Payment as finally determined in accordance with Section 2.2.3.1 is higher than the Estimated Adjustment Payment, the Main Sellers, acting on their own behalf and as agent of the Other Sellers and the EMEA Sellers, shall pay or cause to be paid to the Purchaser, acting on its own behalf and as agent of the Designated Purchasers (if applicable), an amount equal to the positive difference between the Adjustment Payment and the Estimated Adjustment Payment.

(ii)    If, instead, the Adjustment Payment as finally determined in accordance with Section 2.2.3.1 is lower than the Estimated Adjustment Payment, the Purchaser, acting on its own behalf and as agent of the Designated Purchasers (if applicable), shall pay to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, an amount equal to the positive difference between the Estimated Adjustment Payment and the final Adjustment Payment.

(f)    EMEA Downward Adjustment

(i)    If the Closing EMEA Downward Adjustment as finally determined in accordance with Section 2.2.3.1 is higher than the Estimated Closing EMEA Downward Adjustment, the Main Sellers, acting on their own behalf and as agent of the Other Sellers and the EMEA Sellers, shall pay or cause to be paid to the Purchaser, acting on its own behalf and as agent of the Designated Purchasers (if applicable), an amount equal to the positive difference between the Closing EMEA Downward Adjustment and the Estimated Closing EMEA Downward Adjustment.

(ii)    If, instead, the Closing EMEA Downward Adjustment as finally determined in accordance with Section 2.2.3.1 is lower than the Estimated Closing EMEA Downward Adjustment, the Purchaser, acting on its own behalf and as agent of the Designated Purchasers (if applicable), shall pay to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, an amount equal to the positive difference between the Estimated Closing EMEA Downward Adjustment and the Closing EMEA Downward Adjustment.

(g)    Purchase Price Adjustment Payments

(i)    Any payments to be made under Section 2.2.3.2 (a) through (f) shall be netted, and the net amount of such payment shall (x) if payable to the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, be made in cash by wire transfer of immediately available funds to the bank account(s) designated in writing by the Purchaser within five (5) Business Days of the final determination of the last of the Closing Inventory Adjustment,Closing Retirement Obligation Amount, Closing Net Debt Adjustment, Closing Companies Net Working Capital, Adjustment Payment , Closing EMEA Downward Adjustment, and (y) if payable to the Main Sellers, acting on their own behalf and as agent of the Other Sellers and the EMEA Sellers, be made in cash by wire transfer of immediately available funds to the bank account(s)

designated in writing by the Main Sellers, within five (5) Business Days of the final determination of the last of the Closing Inventory Adjustment, Closing Retirement Obligation Amount, Closing Net Debt Adjustment, Closing Companies Net Working Capital, Adjustment Payment and Closing EMEA Downward Adjustment.

(ii)     Any payment to be made under Section 2.2.3.2 shall include interest thereon calculated from the Closing Date to the date of payment at a rate per annum of three (3)%. Such interest shall accrue from day to day.

2.2.4.    Security for Purchase Price Adjustment; Status.

(a)     Payments of any amounts owed by the Main Sellers, acting on their own behalf and as agent of the Other Sellers and the EMEA Sellers, to the Purchaser pursuant to Section 2.2.3.2(f) shall be secured, for a period of one-hundred eighty (180) days from the Closing Date or, if longer, until the amount of the Purchase Price adjustment is finally determined pursuant to Section 2.2.3.1, by funds held in deposit by the Escrow Agent in the Purchase Price Adjustment Escrow Account. Such funds shall be released to the Purchaser to the extent, if any, of any amount payable to Purchaser pursuant to Section 2.2.3.2(f), with the remainder of the Purchase Price Adjustment Escrow Amount being released to the Distribution Agent (as agent for the Sellers and the EMEA Sellers).

(b)     The Sellers shall pay two-thirds (2/3) and the EMEA Sellers shall pay one-third (1/3) of any amounts owed to the Purchaser pursuant to Section 2.2.3.2(f) and Paragraph 1.3 of Schedule 9 to the EMEA Asset Sale Agreement. The Sellers' and the EMEA Sellers' obligations to pay their respective shares of such amounts shall be several and not joint (but the obligation of the Sellers to pay two-thirds (2/3) of such amounts shall be joint and several among the Sellers and the obligation of the EMEA Sellers to pay one-third (1/3) of such amounts shall be joint and several among the EMEA Sellers) and shall: (x) to the extent owed by the U.S. Debtors, constitute an administrative expense of the U.S. Debtors under sections 503(b) or 507(b) of the U.S. Bankruptcy Code, and (y) to the extent owed by the EMEA Debtors, constitute an expense of the administration under Paragraph 99 of Schedule B1 to the Insolvency Act 1986 and/ or Rule 2.67 of the Insolvency Rules 1986.

(c)     The Parties expressly agree that, in the event the Purchaser is owed any amount pursuant to Section 2.2.3.2(f), the Purchaser shall be entitled to receive payment from the Purchase Price Adjustment Escrow Account under the Escrow Agreement and the Purchaser shall be entitled to payment directly from the Sellers or the EMEA Sellers pursuant to Section 2.2.4(b) only if and to the extent that, at the time when such payment is due from the Sellers or the EMEA Sellers following final determination of the amount of such payment pursuant to Section 2.2.3.1, (i) the Sellers or the EMEA Sellers breach their obligations under Section 2.2.6(b) with respect to payment of such amount from the Purchase Price Adjustment Escrow Account and (ii) in any event, any amount is owed to the Purchaser to the extent such amount owed exceeds the funds remaining from time to time in the Purchase Price Adjustment Escrow Account.

2.2.5.    Good Faith Deposit.

71

(a)    No later than Monday, July 20, 2009, the Purchaser will deliver to the Escrow Agent cash in the amount of $100,000,000 to serve as earnest money under this Agreement and the EMEA Asset Sale Agreement. As set forth in the Escrow Agreement, the Purchaser shall have the right from time to time to substitute one or more Letters of Credit for such cash (or to replace one or more previously delivered Letters of Credit) or cash for any Letters of Credit held by the Escrow Agent (the amount of cash and letters of credit, the "Good Faith Deposit").

(b)    The Good Faith Deposit, together with actual earnings thereon, shall:

(i)    to the extent of the cash portion thereof, be applied to the Estimated Purchase Price to be paid by the Purchaser pursuant to Section 2.3.2(a) and therefore be paid by the Escrow Agent to the Distribution Agent (as agent of the Sellers and the EMEA Sellers) at Closing pursuant to Section 2.3.2(b); or

(ii)    be applied to (x) the Reverse Termination Fee payable by the Purchaser pursuant to Section 9.3 and/or (y) damages payable to the Sellers or the EMEA Sellers by the Purchaser or a Designated Purchaser or an EMEA Designated Purchaser hereunder or under the EMEA Asset Sale Agreement, and therefore be paid by the Escrow Agent to the Distribution Agent (as agent of the Sellers and the EMEA Sellers) within two (2) Business Days after the date when such Reverse Termination Fee becomes payable pursuant to Section 9.3 or such damages are definitively determined to be payable.

(c)    If not previously paid to Sellers, the Good Faith Deposit shall be held by the Escrow Agent until the Closing or, in the event this Agreement or the EMEA Asset Sale Agreement is terminated before the Closing, the later of (i) thirty (30) days after the effective date of such termination and (ii) ten (10) Business Days after all disputes among the Parties or any of the parties to the EMEA Asset Sale Agreement have been finally resolved and are not subject to appeal in accordance with Section 10.6(b) or Clause 21.2 of the EMEA Asset Sale Agreement, as applicable.

2.2.6.    Escrows.

(a)    Each of NNL, NNI, NNUK and the Purchaser have entered into the Escrow Agreement with the Escrow Agent in order to (i) secure payment of the Delay Fee and the Good Faith Deposit as provided in this Agreement, (ii) secure payment by the Sellers or the EMEA Sellers, as appropriate, of (A) with respect to the Purchase Price Adjustment Escrow Amount exclusively, amounts owed to the Purchaser pursuant to Section 2.2.3.2(f) as post-Closing Purchase Price adjustments, (B) with respect to the Holdback Escrow Amount exclusively, compliance with the Sellers' obligations relating to post-Closing delivery of financial statements pursuant to Section 5.34(d) or (e), (C) with respect to the EMEA Employment Escrow Amount exclusively, payment of the amount calculated pursuant to Paragraph 11 of Schedule 6 to the EMEA Asset Sale Agreement (subject to the conditions and limitations set forth therein) and (D) with respect to the French Tax Escrow Amount exclusively, payment of the NNFSAS Succession Tax Liabilities and (iii) with respect to the Estimated -6 Liability Escrow Amount exclusively, secure payment of amounts due to Sellers under Section

72

10.20.

(b)     Each of NNL, NNI, NNUK and the Purchaser hereby undertake to promptly execute and deliver to the Escrow Agent, in accordance with the formalities set forth in the Escrow Agreement, joint instructions to (i) draw on (in the case of a payment to the Distribution Agent) or cancel (in any other case) the Letter(s) of Credit (if any) or (ii) pay to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) or the Purchaser, as applicable, funds from the relevant Escrow Account any time that any Person becomes entitled to such payment from the relevant Escrow Account pursuant to this Agreement or the EMEA Asset Sale Agreement, including pursuant to Section 2.2.1(c), Section 2.2.5(b), Section 2.2.5(c), Section 2.2.8, Section 2.3.2(b), Section 2.2.3.2(f), Section 5.34(f) or Section 10.20 or as a result of a decision issued by a competent court pursuant to Section 10.6.

2.2.7.   Purchase Price Allocation.

(a)     The Parties and the EMEA Sellers shall (i) first allocate to the tangible Assets a proportion of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities, and after reducing such Purchase Price by the $10 million reduction for transition services described in Section 5.36(c)), equal to the net book value of such Assets as of the Closing Date and (ii) then allocate the balance of the Purchase Price, as adjusted in clause (i) of this Section, to the tangible Assets and intangible Assets as the Parties and the EMEA Sellers may agree.

(b)     To the extent necessary to file Transfer Tax Returns, or to implement a Section 338(h)(10) Election or a Loss Duplication Election (if such an election is made), the Parties shall negotiate in good faith to determine an allocation of the Purchase Price, less the $10 million reduction for transition services described in Section 5.36(c), (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities) among the Assets, the EMEA Assets and the Shares (and, if applicable, the non-compete agreement as set forth in Section 5.33) in accordance with the principles of Section 1060 of the Code and the Treasury regulations promulgated thereunder and other applicable Tax Laws, which allocation shall be subject to the principles of Section 2.2.7(a) (such allocation, a **"Partial Allocation"**). If the Parties do not reach agreement on a Partial Allocation after negotiating in good faith, the Partial Allocation shall be submitted to the Accounting Arbitrator, which shall prepare a final Partial Allocation; provided, however, that if a different Partial Allocation is required by a Government Entity (including for this purpose an allocation required, approved or authorized pursuant to a Bankruptcy Proceeding), then the Partial Allocation shall be modified as necessary to be consistent with the required allocation (but in all cases shall be subject to the principles of Section 2.2.7(a)). Notwithstanding the preceding sentence, if the Parties have not reached agreement on the Partial Allocation and the Accounting Arbitrator has not submitted its determination on or before the date that a Transfer Tax Return is required to be filed with the relevant Tax Authority (giving effect to any valid extensions) pursuant to Section 6.8(b), then such Transfer Tax Return shall be timely filed in the manner that the Party with primary responsibility for filing such return reasonably determines and shall, upon receiving the Accounting Arbitrator's later determination and to the extent permitted under applicable Law, promptly file an amended return in accordance therewith. The Parties agree (i) to be bound by the final Partial Allocation accepted by the Parties or prepared by the Accounting Arbitrator (as

73

modified to be consistent with the allocation required by a Government Entity, as described above), as applicable, and (ii) to act in accordance with the allocations contained in such final Partial Allocation for all purposes relating to Transfer Taxes (including the preparation, filing and audit of any Transfer Tax Returns) and to a Section 338(h)(10) Election or a Loss Duplication Election. For purposes of this Section 2.2.7(b), the term Parties shall include the EMEA Sellers to the extent any negotiations or agreement required hereunder concern Transfer Tax Returns.

SECTION 2.3.    Closing.

2.3.1.    Closing Date.  The completion of the purchase and sale of the Assets and the Shares and the assumption of the Assumed Liabilities (the "Closing") shall occur simultaneously with closing of the transaction contemplated by the EMEA Asset Sale Agreement and shall take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York, commencing at Noon New York time on the date which is five (5) Business Days after the day upon which all of the conditions set forth under Article VIII (other than conditions to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions) have been satisfied or, if permissible, waived by the Main Sellers and/or the Purchaser (as applicable), or on such other place, date and time as shall be mutually agreed upon in writing by the Purchaser, the Main Sellers, the Joint Administrators and the EMEA Sellers; provided that, unless the Purchaser otherwise agrees, the Closing shall not be prior to September 30, 2009 (the day on which the Closing takes place being the "Closing Date").

Legal title, equitable title and risk of loss with respect to the Assets and the Shares will transfer to the Purchaser or the relevant Designated Purchaser, and the Assumed Liabilities will be assumed by the Purchaser and the relevant Designated Purchasers, at the Closing.

2.3.2.    Closing Actions and Deliveries.  At the Closing:

(a)    The Purchaser shall deliver:

(i)    to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, an amount equal to:

(A)    the Estimated Purchase Price (minus the sum of (i) the amount of cash in the Good Faith Deposit Escrow Account (including any actual earnings thereon) and (ii) the Escrow Amount); plus

(B)    any accrued Delay Fee that shall not yet have been paid to the Escrow Agent in the form of Delay Fee Payments pursuant to Section 2.2.1(c),

by wire transfer in immediately available funds to an account or accounts designated at least two Business Days prior to the Closing Date by the Distribution Agent in a written notice to the Purchaser; and

(ii)    to the Escrow Agent, an aggregate amount equal to the Escrow Amount, by wire transfer in immediately available funds as follows:

74

(A)    the EMEA Employment Escrow Amount shall be wired to the EMEA Employment Escrow Account;

(B)    the Holdback Escrow Amount shall be wired to the Holdback Escrow Account;

(C)    the Purchase Price Adjustment Escrow Amount shall be wired to the Purchase Price Adjustment Escrow Account;

(D)    the French Tax Escrow Amount shall be wired to the French Tax Escrow Account; and

(E)    the Estimated -6 Liability Escrow Amount shall be wired to the Estimated -6 Liability Escrow Account;

(b)    NNL, NNI and NNUK and the Purchaser shall cause the Escrow Agent to deliver to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) all amounts of cash held by the Escrow Agent in the Delay Fee Escrow Account and the Good Faith Deposit Escrow Account (including actual earnings thereon) by wire transfer in immediately available funds to an account or accounts designated at least two Business Days prior to the Closing Date by the Distribution Agent in a written notice to NNL, NNI and NNUK and the Purchaser;

(c)    NNI shall deliver or cause to be delivered to the Purchaser evidence reasonably satisfactory to the Purchaser of the sale and transfer at the Closing of the Shares to the Purchaser (or the relevant Designated Purchaser as provided hereunder);

(d)    if requested by the Purchaser in writing at least fifteen (15) Business Days prior to the Closing Date (i) the Sellers shall deliver letters of resignations, in a form reasonably acceptable to the Purchaser, from each director and officer of DiamondWare listed in Section 2.3.2(d) of the Sellers Disclosure Schedule and (ii) If the Purchaser determines that the Proxy Agreement will not remain in place after the Closing, the Sellers shall use their reasonable best efforts to deliver letters of resignations, in a form reasonably acceptable to the Purchaser, of each director and officer of an NGS Company specified by the Purchaser, in each case containing a waiver of any claims against such Company;

(e)    the Sellers shall, or shall cause the Companies to, deliver or cause to be delivered to the Purchaser their then current share ledgers and issued share certificates; and

(f)    each Party shall deliver, or cause to be delivered, to the other any other documents reasonably requested by such other Party in order to effect, or evidence the consummation of, the transactions contemplated herein including (i) customary transfer documents relating to the quit-claim deed to be recorded with respect to the Owned Real Estate, including an affidavit of non-foreign status from NNI that complies with the requirements of Section 1445 of the Code and (ii) any Notices of Lease required in accordance with the provisions of Section 5.30.

SECTION 2.4.    Designated Purchaser(s). The Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.4,

75

one or more Wholly-Owned Subsidiaries or any Person that directly or indirectly holds all of the capital stock of the Purchaser to (i) purchase specified Assets (including specified Assigned Contracts) or the Shares, (ii) assume specified Assumed Liabilities, and/or (iii) employ identified Transferred Employees (other than Share Transfer Employees) on and after the Closing Date (any Person that shall be properly designated by the Purchaser in accordance with this clause, a "Designated Purchaser"); it being understood and agreed, however, that any such right of the Purchaser to designate a Designated Purchaser is conditioned upon (x) such Designated Purchaser being able to perform the covenants under Sections 2.1.6(d) and Section 2.1.7 and Article VII and demonstrate satisfaction of the requirements of section 365 of the U.S. Bankruptcy Code, including the provision of adequate assurance for future performance, with respect to the Assumed and Assigned Contracts and (y) any such designation not creating any Liability (including any Liability relating to Taxes other than Taxes for which the Purchaser is liable pursuant to Article VI) for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the Purchased Assets, assumed the Assumed Liabilities or employed the Transferred Employees. No such designation shall relieve the Purchaser of any of its obligations to the Sellers and the EMEA Sellers hereunder.

The above designation shall be made by the Purchaser by way of a written notice to be delivered to the Sellers as soon as reasonably practicable and in no event later than the ninetieth (90th) day after the date hereof, which written notice shall contain appropriate information about the Designated Purchaser(s) and shall indicate which Assets, Shares, Assumed Liabilities and Transferred Employees (other than the Share Transfer Employees) the Purchaser intends such Designated Purchaser(s) to purchase, assume and/or employ, as applicable, hereunder and include a signed counterpart to this Agreement in a form acceptable to the Main Sellers, agreeing to be bound by the terms of this Agreement and authorizing the Purchaser to act as such Designated Purchaser(s)' agent for all purposes hereunder.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Sellers and the EMEA Sellers as follows:

### SECTION 3.1.    Organization and Corporate Power.

(a)    The Purchaser is a corporation duly organized and validly existing and in good standing under the Laws of the State of Delaware. Each Designated Purchaser other than the Purchaser is duly organized and validly existing under the Laws of the jurisdiction in which it is organized. Each of the Purchaser and the Designated Purchasers has the requisite power and authority to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party.

(b)    Each of the Purchaser and the Designated Purchasers is qualified to do business as contemplated by this Agreement and the other Transaction Documents and to own or lease and operate its properties and assets, including the Assets, except to the extent that the failure to be so qualified would not materially hinder, delay or impair the Purchaser's or any

76

such Designated Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is or will become a party.

SECTION 3.2. Authorization; Binding Effect; No Breach.

(a) The execution, delivery and performance of each Transaction Document to which the Purchaser or any of the Designated Purchasers is, or at the Closing Date will be, a party have been duly authorized by the Purchaser and the relevant Designated Purchasers, as applicable. Assuming due authorization, execution and delivery by the relevant Sellers, each Transaction Document to which the Purchaser or any Designated Purchaser is, or at the Closing Date will be, a party constitutes, or upon execution thereof will constitute, a valid and binding obligation of the Purchaser or such Designated Purchaser, as applicable, enforceable against such Person in accordance with its respective terms.

(b) Assuming the accuracy of Sellers' representations and warranties set forth in Article IV and satisfaction of the Closing Conditions set forth in Sections 8.1 and 8.3, the execution, delivery and performance by each of the Purchaser and the Designated Purchasers of the Transaction Documents to which the Purchaser or such Designated Purchaser is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, or require any Consent of any Person (other than the Regulatory Approvals) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the Purchaser or the relevant Designated Purchaser, (ii) any contract or other document to which the Purchaser or the relevant Designated Purchaser is a party or to which any of its assets is subject or (iii) any Laws to which the Purchaser, the relevant Designated Purchaser, or any of their assets is subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that would not individually or in the aggregate materially hinder, delay or impair the performance by the Purchaser or the Designated Purchasers of any of their obligations under any Transaction Document.

SECTION 3.3. Financing. As of June 30, 2009, the Purchaser and its Subsidiaries had unrestricted cash and cash equivalents recorded on their consolidated balance sheet of approximately $530,000,000. As of the date hereof, subject to applicable borrowing conditions, the Purchaser and its Subsidiaries have undrawn committed revolving credit facilities of no less than $200,000,000.

SECTION 3.4. Adequate Assurance of Future Performance. To the extent required by any U.S. Bankruptcy Laws, the Purchaser will be able to provide, at Closing or on such earlier date as is designated by the U.S. Bankruptcy Court, adequate assurance of its and/or the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of section 365(f)(2)(B) of the U.S. Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Assumed and Assigned Contract. The Purchaser acknowledges and agrees that, if it becomes necessary to provide an Assumed and Assigned Contract counterparty or a landlord under any Included Real Estate Lease with additional assurances to satisfy the Purchaser's or a Designated Purchaser's obligations under Section 2.1.6(d) or Section 2.1.7, the Purchaser shall,

and shall cause the relevant Designated Purchasers to, perform all actions and bear all such costs and expenses as may be necessary or advisable in connection with their obligations under Section 2.1.6(d) and Section 2.1.7 without recourse to any Seller; provided, however, that the Purchaser may, subject to the conditions set forth herein (and other than with respect to a Real Estate Lease, Customer Contract or SI/SP Contract), elect to forego performing such actions and incurring such costs and expenses, in which event the relevant Assumed and Assigned Contract shall be deemed to be a Non-Assigned Contract at Closing, unless otherwise agreed in writing by the Seller that is a party thereto.

SECTION 3.5.    Purchaser's Acknowledgments; Exclusivity of Representations and Warranties.

(a)     The Purchaser is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement and the other Transaction Documents. In consultation with experienced counsel and advisors of its choice, the Purchaser has conducted its own independent review and analysis of the Business, the Assets, the EMEA Assets, the Assumed Liabilities, the EMEA Assumed Liabilities, the Companies and the rights and obligations it is acquiring and assuming under this Agreement and the other Transaction Documents. The Purchaser acknowledges that it and its representatives have been permitted such access to the books and records, facilities, equipment, contracts and other properties and assets of the Business and the Companies as it required to complete its review, and that it and its representatives have had an opportunity to meet with the officers and other employees of the Sellers, the EMEA Sellers, the Business and the Companies to discuss the Business.

(b)     The Purchaser acknowledges and agrees that:

(i)     except for the representations and warranties expressly set forth in Article IV, the Purchaser has not relied on any representation or warranty from the Sellers, the EMEA Sellers or the Companies, or any Affiliate of any such Person or any employee, officer, director, accountant, financial, legal or other representative of the Sellers, the EMEA Sellers or the Companies in determining whether to enter into this Agreement;

(ii)     except for the representations and warranties expressly set forth in Article IV, none of the Sellers, the EMEA Sellers, the Companies, or any employee, officer, director, accountant, financial, legal or other representative of the Sellers, the EMEA Sellers, the Companies, or any Affiliate of any such Person has made any representation or warranty, express or implied, as to the Business (or the value or future thereof), the Assets or the EMEA Assets (including any implied representation or warranty as to the condition, merchantability, suitability or fitness for a particular purpose of any of the Assets or the EMEA Assets, including under the International Convention on Contracts for the Sale of Goods (Geneva Convention) and any other applicable sale of goods Laws), the Assumed Liabilities, the EMEA Assumed Liabilities, the Companies or any Affiliate of any such Person or as to the accuracy or completeness of any information regarding any of the foregoing that the Sellers, the EMEA Sellers or any other Person furnished or made available to the Purchaser and its representatives (including

78

any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials);

(iii)   no Seller, EMEA Seller or any other Person shall have or be subject to any liability to the Purchaser, any Designated Purchaser or any other Person resulting from the distribution to the Purchaser or any Designated Purchaser, or the Purchaser's or any Designated Purchaser's use, of the information referred to in Section 3.5(b)(ii);

(iv)   subject to the terms of the Bankruptcy Consents, the Purchaser or any Designated Purchaser takes the Assets on an "as is" and "where is" basis;

(v)   the enforceability of this Agreement against the Sellers is subject to receipt of the Bankruptcy Consents; and

(vi)   notwithstanding anything to the contrary contained herein, the Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person or the availability of funds to the Purchaser.

(c)   Without limiting the generality of the foregoing, PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED HEREIN, THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT OF THIRD PARTY INTELLECTUAL PROPERTY RIGHTS, OR REGARDING THE SCOPE, VALIDITY OR ENFORCEABILITY OF ANY TRANSFERRED INTELLECTUAL PROPERTY, ACQUIRED COMPANY INTELLECTUAL PROPERTY OR LICENSED INTELLECTUAL PROPERTY RIGHTS.

SECTION 3.6.   Brokers.   Except for fees and commissions that will be paid by the Purchaser, no broker, finder or investment banker is entitled to any brokerage, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except (a) as set forth in the applicable sections (subject to the provisions of Section 10.8(b)) of the Sellers Disclosure Schedule, (b) as set forth in the registration statements, prospectuses, reports, schedules, forms and other filings (excluding any exhibits thereto but including any documents incorporated by reference and any amendments thereto) filed by the Sellers with the SEC or the Canadian securities regulatory authorities (collectively, the "**Securities Disclosure Documents**") (but excluding any forward-looking disclosures in Securities Disclosure Documents as to risk factors, forward-looking statements and other similarly cautionary or generic disclosure contained or incorporated by reference therein) and/or

79

in any filings made in the Bankruptcy Proceedings, in each case publicly filed between January 1, 2007 and September 14, 2009, or (c) to the extent relating to the Excluded Assets or the Excluded Liabilities, each of the Main Sellers jointly and severally represents and warrants to the Purchaser as set forth in Section 4.1 through Section 4.17:

SECTION 4.1.    Organization and Corporate Power.

(a)    Each Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized. Subject to entry of the U.S. Bidding Procedures Order and the U.S. Sale Order in the case of the U.S. Debtors and the Canadian Sales Process Order and Canadian Approval and Vesting Order in the case of the Canadian Debtors and receipt of other Consents from the U.S. Bankruptcy Court and the Canadian Court in connection with the transactions contemplated hereby and in the other Transaction Documents (collectively, the "Bankruptcy Consents"), each of the Main Sellers has, and each Other Seller that will execute this Agreement will have, the requisite corporate power and authority to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party.

(b)    Each of the Sellers is qualified to do business and to own, lease or otherwise hold its properties and assets, including the Assets, and to conduct its business as presently conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify, except to the extent that the failure to be so qualified does not have, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    Each of the Companies is duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is organized and has all requisite power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted and to own or use the respective properties and assets that it purports to own or use and to perform all its respective obligations under the Material Contracts to which it is a party, except where the failure to be in good standing would not, individually or in the aggregate, have a Material Adverse Effect. Each of the Companies is duly qualified to do business in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed or qualified has not had, would not have or would not reasonably be expected to have a Material Adverse Effect.

SECTION 4.2.    Authorization; Binding Effect; No Breach.

(a)    Subject to the receipt of the Bankruptcy Consents, (i) the execution, delivery and performance by each Main Seller of the Transaction Documents to which such Main Seller is, or at the Closing will be, a party has been duly authorized by such Main Seller and (ii) the execution, delivery and performance by each Other Seller of the Transaction Documents to which such Seller will be a party will have been duly authorized by such Other Seller by the time such Other Seller executes this Agreement. Subject to receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser and the Designated Purchasers parties thereto, the Transaction Documents to which any Seller is

80

or will be a party, will constitute a legal, valid and binding obligation of such Seller, enforceable against it in accordance with its terms.

(b)     Assuming the accuracy of Purchaser's representations and warranties set forth in Article III and satisfaction of the Closing Conditions set forth in Sections 8.1 and 8.2, subject to receipt of the Bankruptcy Consents and the Regulatory Approvals, the execution, delivery and performance by each Seller of the Transaction Documents to which such Seller is or will be a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, result in the creation or imposition of any Lien upon any of the Assets, or (subject to the receipt of Consents in connection with the Assigned Contracts, any Subleases and any other Consents expressly provided for herein) require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity (other than the advance notice to the U.S. Defense Security Service pursuant to the Proxy Agreement) pursuant to (i) the articles, charter or by-laws of the relevant Sellers or the Companies, (ii) any Material Contract to which the relevant Seller or any of the Companies is a party or to which any of their assets are subject, (iii) any order of any Government Entity applicable to any Company or any Seller or by which any of their respective properties or Assets are bound or (iv) any Laws to which any of the Sellers or the Companies, or any of the Assets or any of the assets owned by the Companies are subject, except, in the case of (ii), (iii) and (iv) above, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 4.3.     Capitalization; Title to Shares; Equity Interests.

(a)     The authorized capital stock of NGS consists of 1,000 shares, with no par value, of which 100 shares are issued and outstanding. The NGS Shares represent 100% of the issued and outstanding capital stock of NGS. The NGS Shares have been duly authorized, validly issued and are fully paid and nonassessable and are owned by NNI free and clear of all Liens except Permitted Encumbrances.

(b)     The authorized capital stock of DiamondWare consists of 30,000,000 shares, consisting of (i) 20,000,000 shares of common stock with a par value of $0.001 per share, of which 64,000 are issued and outstanding and (ii) 10,000,000 shares of preferred stock with a par value of $0.001, none of which are issued and outstanding. The DiamondWare Shares represent 100% of the issued and outstanding capital stock of DiamondWare. The DiamondWare Shares have been duly authorized, validly issued and are fully paid and nonassessable and are owned by NNI free and clear of all Liens except Permitted Encumbrances.

(c)     Section 4.3(c) of the Sellers Disclosure Schedule lists, for each NGS Company (other than NGS): (i) the authorized stock capital of such NGS Company, (ii) the issued and outstanding stock capital of such NGS Company and (iii) the par value of the shares of such NGS Company. All the shares of the NGS Companies (other than NGS) have been duly authorized, validly issued and are fully paid and nonassessable and are owned by NGS free and clear of all Liens except Permitted Encumbrances.

81

(d)      There are no outstanding or authorized options, convertible or exchangeable securities or instruments, warrants, rights, contracts, calls, puts, rights to subscribe, conversion rights or other agreements or commitments to which the Sellers or the Companies are a party or which are binding on any of them providing for the issuance, disposition or acquisition of any equity interest of any of the Companies.

(e)      Except as set forth in the Proxy Agreement, there are no voting trusts, proxies or other agreements or understandings with respect to the voting of any equity interest of the Companies.

(f)      Except, with respect to NGS, for the equity interests in the other NGS Companies, the Companies do not own or hold of record or beneficially any equity interests in any corporation, limited liability company, partnership, business trust, joint venture or other legal entity.

SECTION 4.4.      Title to Assets; Sufficiency of Assets.

(a)      Except for Permitted Encumbrances, the Owned Inventory and the Owned Equipment is owned beneficially by one or more of the Sellers, free and clear of all Liens, and such Sellers have good and marketable title thereto. Except for Permitted Encumbrances, all tangible assets, including inventory, property and equipment that the Companies purport to own is owned beneficially by one or more of the Companies, free and clear of all Liens, and such Companies have good and marketable title thereto.

(b)      All tangible assets included in the Owned Equipment and all tangible assets owned or leased by the Companies are in satisfactory operating condition for the uses to which they are being put, subject to ordinary wear and tear and ordinary maintenance requirements, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)      As of the date hereof and assuming the assignment or novation of all Seller Contracts and all Non-Assignable Contracts to the Purchaser or a Designated Purchaser, the assets and rights of the Companies, together with the Assets and the rights of, or to be acquired by, the Purchaser and/or the Designated Purchasers under this Agreement and the EMEA Asset Sale Agreement, together with the rights to be provided to the Purchaser and/or Designated Purchasers under the other Transaction Documents, considered together, include such assets, properties and rights of every type and description, whether real or personal (other than Intellectual Property, Overhead and Shared Services, non-exclusive supply contracts of the Business, the services of those Employees that will not be considered Transferred Employees for purposes of this Agreement and any services currently being provided to the Business as of the Closing Date that the Purchaser elects not to receive or continue and other than the real estate assets of the Business that Purchaser has agreed or elects not to have transferred or subleased to it hereunder) as are necessary and sufficient to conduct the Business substantially in the manner conducted by the Sellers and the Companies as of the date hereof (as such conduct may reasonably be modified as a result of the restructuring plan previously disclosed to the Purchaser), except where the absence of such assets or rights would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

82

SECTION 4.5.   Material Contracts.

(a)   Section 4.5(a) of the Sellers Disclosure Schedule sets forth, as of the date hereof, a true, accurate and complete list of every Seller Contract and every other Contract of the Business to which any Company is a party or by which any property of any Company is bound but excluding (x) all licenses of Intellectual Property, all of which are addressed by Section 4.6, and (y) all Real Estate Leases, all of which are addressed by Section 4.11, in each case other than purchase orders and invoices and any third-party or intercompany agreements related to Overhead and Shared Services, that:

> (i)   in the most recent fiscal year of the Main Sellers resulted in, or is reasonably expected by its terms in the future to result in, (a) the payment of more than $10,000,000 per annum in the aggregate or (b) the receipt by the Business of more than $10,000,000 per annum in the aggregate, except any contracts referred to in clauses (i) through (x) below;

> (ii)   relates to an acquisition, divestiture, merger or similar transaction of the Companies that contains representations, covenants, indemnities or other obligations (including indemnification, "earn out" or other contingent obligations), that are still in effect and, individually or in the aggregate, could reasonably be expected to result in payment in excess of $10,000,000;

> (iii)   is an Affiliate Transaction to which one of the Companies is a party;

> (iv)   evidences, governs or relates to (a) Indebtedness of any Company or (b) any Indebtedness of a Seller that will be an Assumed Liability hereunder at the Closing, in each case having an aggregate outstanding principal amount in excess of $10,000,000;

> (v)   contains any material obligation secured by a Lien on any material Asset or any material asset of a Company (other than by a Permitted Encumbrance or by any encumbrance that will be released prior to or at Closing);

> (vi)   after the Closing would materially restrict the Purchaser or an Affiliate of the Purchaser from engaging in any business activity anywhere in the world;

> (vii)   is a material joint venture Contract;

> (viii)   is a research and development Contract involving consideration or expenditures in excess of $10,000,000 per annum;

> (ix)   is a sale, reseller, distribution, systems integration or other Contract for the sale or distribution of Products or Services involving annual revenues in excess of $10,000,000 in the previous fiscal year; or

83

        (x)    is a Contract to which any Government Entity is a party and has a contract value in excess of $10,000,000 per annum,

(all the above, collectively, the "**Material Contracts**").

        (b)    To the Knowledge of the Sellers: each Material Contract is valid, binding and in full force and effect and (with respect only to the Material Contracts under Section 4.5(a)(iii), (iv), (vi), (viii) and (ix)), was entered into in the Ordinary Course, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and the general principles of equity. Neither any Seller or any Company nor, to the Sellers' Knowledge, any other party thereto, is in material violation, breach of or default under a Material Contract, and no event has occurred that with notice or lapse of time, or both, would constitute a material violation, breach of or default under a Material Contract by any Seller or any Company or, to the Sellers' Knowledge, any other Party thereto, except for any breach of any Material Contract included in the Assets that will be cured prior to the Closing in accordance with Section 2.1.7 or of any Material Contract not included in the Assets.

        SECTION 4.6.    Intellectual Property.

        (a)    The Acquired Company Intellectual Property, the Transferred Intellectual Property and the Licensed Intellectual Property include all the Intellectual Property owned at least in part by the Sellers or the Companies that, as of the date hereof, covers or is used to conduct and operate the Business, except with respect to any Intellectual Property used in connection with any Overhead and Shared Services.

        (b)    An accurate, true and complete list of:

        (i)    all the Transferred Intellectual Property registered in the name of the Sellers is set forth in Section 4.6(b)(i) of the Sellers Disclosure Schedule;

        (ii)    all the Acquired Company Intellectual Property registered in the name of the Companies is set forth in Section 4.6(b)(ii) of the Sellers Disclosure Schedule.

The lists identified in Sections 4.6(b)(i) and (ii) will include: (a) for each issued Patent and Patent application, the Patent number or application serial number for each jurisdiction in which filed, and date issued and filed; (b) for each registered Trademark, the application serial number or registration number, by country, province and state; (c) for any Domain Names, the registration date and name of registry; and (d) for each copyright registration or application, the number and date of such registration or application by country, province and state.

        (c)    The Acquired Company Intellectual Property, the Transferred Intellectual Property, the Licensed Intellectual Property and the Intellectual Property rights granted to the Sellers or the Companies under the Cross-License Agreements and the Inbound License Agreements together include all the material Intellectual Property that, as of the date hereof, is used in connection with the conduct and operation of the Business, in each case except with respect to any Intellectual Property used in connection with any Overhead and Shared Services.

(d)    The Transferred Intellectual Property and the Acquired Company Intellectual Property are not subject to any Liens other than Permitted Encumbrances, and, to the Knowledge of the Sellers, except for Material Contracts referenced in Section 4.5(a)(vi), none of the Sellers or Companies have entered into any contract or agreement containing a covenant not to compete with respect to Transferred Intellectual Property or Acquired Company Intellectual Property or otherwise limiting the Purchaser's ability to use any of the Transferred Intellectual Property and Acquired Company Intellectual Property to conduct the Business, in each case that would bind the Purchaser or an Affiliate of the Purchaser after the Closing. To the Knowledge of the Sellers, neither any Seller nor Company has granted any exclusive license to any Third Party with respect to any Transferred Intellectual Property or Acquired Company Intellectual Property, nor to the Knowledge of the Sellers would the source code escrow arrangements described in Section 5.9(c) of the Sellers Disclosure Schedule reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the operation and conduct of the Business.

(e)    With respect to the Transferred Intellectual Property and the Acquired Company Intellectual Property, the Sellers or the Companies, as applicable, own right, title, and interest in and to each such item of Intellectual Property, and, to the Knowledge of the Sellers, such rights, title, and interest are sufficient for the Sellers or the Companies, as applicable, to independently bring suit against a Third Party to enforce the issued patents, registered trademarks and registered service marks included in the Transferred Intellectual Property or the Acquired Company Intellectual Property. With respect to the Licensed Intellectual Property (other than any Intellectual Property owned by a Third Party), to the Knowledge of the Sellers, the Sellers own right, title, and interest in and to each such item of Intellectual Property, such rights, title, and interest being sufficient to permit the Sellers to license such Intellectual Property as set forth in the Intellectual Property License Agreement and the Trademark License Agreement. The Parties acknowledge and agree that the foregoing sentence does not constitute, and shall not be construed as, a representation or warranty with respect to non-infringement or non-misappropriation of Intellectual Property.

(f)    To the Knowledge of the Sellers, Section 4.6(f) of the Sellers Disclosure Schedule sets forth all Contracts between Sellers or the Companies, or their respective Affiliates, and a Third Party under which the Sellers or the Companies, or their respective Affiliates, as applicable, both (i) grant a license under Patents (other than inventions, industrial designs or industrial models) owned by (or licensed to) them and (ii) receive from the counter-party a license under Patents (other than inventions, industrial designs or industrial models) owned by (or licensed to) such counter-party (but other than inbound or outbound license agreements where the only grant back from the licensee is under improvements on the licensed Intellectual Property), to the extent such Contracts are used in the Business (collectively, the "Cross-License Agreements"), except to the extent a Cross-License Agreement prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to obtain, in which case it has been omitted from Section 4.6(f) of the Sellers Disclosure Schedule, but the number of such Cross-License Agreements that have been omitted is set forth in Section 4.6(f) of the Sellers Disclosure Schedule, and the Sellers shall use reasonable efforts to provide such other information as reasonably requested by the Purchaser regarding such Cross-License Agreements the disclosure of which does not breach such prohibition.

85

(g)    Neither any Seller nor any Company has received any written assertions or, to the Knowledge of the Sellers, explicit oral assertions, during the past two (2) years preceding the date of this Agreement that (i) any Seller's or Company's operations of the Business, including such Seller's or Company's use, performance, licensing, copying, distribution, sale, offer for sale, lease, manufacture, having made, importation, or any other exploitation of the Products sold by the Business or of the Services rendered by the Business infringes any intellectual property right or moral right of any Third Party; or (ii) any of the Transferred Intellectual Property, Acquired Company Intellectual Property, or Licensed Intellectual Property infringes any Intellectual Property right or moral right of or was misappropriated from a Third Party, or is invalid or unenforceable; in each case, except where such assertions would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(h)    To the Knowledge of the Sellers, there has been no assertion or claim made in writing to the Sellers or the Companies during the past two (2) years preceding the date of this Agreement asserting invalidity, misuse or unenforceability of the Transferred Intellectual Property and Acquired Company Intellectual Property or challenging the Sellers' or the Companies' right to use, right to transfer, or ownership of the Transferred Intellectual Property or Acquired Company Intellectual Property; in each case, except where such assertions or claims would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(i)    To the Knowledge of the Sellers, each of the registrations for the Transferred Intellectual Property or Acquired Company Intellectual Property is valid and subsisting, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The foregoing will not be construed as a warranty that any Patent, or any Trademark registration, will issue based on a Patent or Trademark application.

(j)    To the Knowledge of the Sellers, Section 4.6(j) of the Sellers Disclosure Schedule sets forth all material Contracts (other than Cross-License Agreements) granting to the Sellers or the Companies, or any of their respective Affiliates, any license under or to any Intellectual Property owned by a Third Party that is, as of the date hereof, incorporated into the Products, used in the performance of the Services or otherwise utilized by the Business in its operations in the ordinary course (collectively, the "Inbound License Agreements"), indicating for each Inbound License Agreement, the title and the parties thereto, except to the extent an Inbound License Agreement prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers or the Companies, as applicable, were unable to obtain, in which case it has been omitted from Section 4.6(j) of the Sellers Disclosure Schedule.

(k)    To the Knowledge of the Sellers, Section 4.6(k) of the Sellers Disclosure Schedule sets forth a true, accurate and complete list of any Open Source Software used in each of the Products and describes (i) the specific Open Source Software used; (ii) the specific Open Source Software version; (iii) the vendor of the specific Open Source Software; and (iv) the Products or portions thereof into which such Open Source Software is incorporated. To the Knowledge of the Sellers, the Business is in full compliance with all license obligations associated with such Open Source Software, except as would not reasonably be expected to have, individually, or in the aggregate, a Material Adverse Affect.

86

(l)     The Sellers and the Companies (with respect to the Business) have used reasonable efforts to establish measures regarding data security. To the Knowledge of the Sellers, with respect to data security, the Business is in compliance with all the requirements of Law, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(m)    The Sellers and the Companies (with respect to the Business) have used reasonable efforts to establish measures pertaining to the protection of trade secret information in the Sellers' and the Companies' possession, custody or control. To the Knowledge of the Sellers, in the last two (2) years, neither the Sellers nor the Companies have received any written notice alleging unauthorized access to or disclosure of Third Party trade secret information.

(n)     To the Knowledge of the Sellers, there is no Action pending or allegation, claim, or threat in writing that the Business as presently conducted infringes or misappropriates the Intellectual Property rights of a Third Party, except as would not reasonably be expected to have, individually, or in the aggregate, a Material Adverse Effect.

(o)     Notwithstanding any provision herein to the contrary, this Section 4.6 consists of the sole representation and warranty in this Agreement regarding non-infringement and non-misappropriation of Intellectual Property.

(p)     The NORTEL Trademarks (as defined in the Trademark License Agreement) and the Trademarks included in the Transferred Intellectual Property are all the Trademarks owned by the Sellers and used with the Products and Services as of the Closing Date.

SECTION 4.7.    Litigation. As of the date hereof, except for the Bankruptcy Proceedings, there is no Action pending or, to the Knowledge of the Sellers, threatened in writing against any Seller or Company involving the Business or Assets that would be reasonably expected to result in, individually or in the aggregate, a Material Adverse Effect.

SECTION 4.8.    Financial Statements.

(a)     Section 4.8 of the Sellers Disclosure Schedule sets forth the unaudited management statements of certain assets and liabilities of the Business as of December 31, 2008 (the "Balance Sheet Date") and the related unaudited management statements of income of the Business for the one- (1-) year period ended on the Balance Sheet Date (together, the "Financial Statements"). Except as set forth in the Financial Statements, such Financial Statements were prepared based on the financial books and records maintained by the Sellers, the BMBA Sellers and the Companies for the Business on the basis of the Nortel Accounting Principles and represent the Sellers' good faith estimate of the selected balance sheet accounts and income statements set forth therein for the Business, in each case as of the dates and for the periods presented therein. The Financial Statements (a) have not been prepared in accordance with GAAP, (b) include estimated costs that do not necessarily represent the costs that were actually allocated to the Business for the relevant periods (or that the Companies and/or the Business will incur after the Closing), (c) include assets that have not been tested for impairment or otherwise adjusted for fair value, (d) reflect the estimated historical operation of the Business (including

87

the Overhead and Shared Services and the Excluded Assets) for the periods specified therein and (e) do not represent the balance sheet accounts or the income statements that would have occurred if the Business had been operated by the Sellers as a "stand alone" entity.

(b)    Except as would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect, none of the Sellers (with respect to the Acquired Business) or Companies has any material Liabilities except for (i) Liabilities of the Sellers that will not be Assumed Liabilities and for which neither the Purchaser nor any Designated Purchaser will have liability by operation of Law, (ii) Liabilities set forth on the face of the Financial Statements, (iii) Liabilities incurred in the Ordinary Course of Business since the Balance Sheet Date (none of which results from, arises out of, or relates to any breach or violation of, or default under, a Contract or applicable Law) and (iv) Liabilities that may be satisfied by the payment of Cure Costs.

SECTION 4.9.    Compliance with Laws; Consents.

(a)    To the Knowledge of the Sellers: (i) no Company is or since January 1, 2007 has been in violation of any applicable Law and (ii) no Seller is or since January 1, 2007 has been in violation of any applicable Law in connection with the Business (including its performance of Government Contracts and Government Subcontracts), in each case except for such violations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. None of the Sellers or the Companies has received any written notice or written claims from any Government Entity within the twelve (12) months preceding the date hereof relating to any material non-compliance of the Business or the Assets with any applicable Law nor are there, based on the Knowledge of the Sellers, any such notice or claims threatened or pending, except where such claims would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    To the Knowledge of the Sellers: (i) all the Consents of Government Entities necessary for, or otherwise material to, the conduct of the Business as conducted on the date hereof, have been duly obtained and are in full force and effect and (ii) the relevant Sellers and Companies are in compliance with the terms of each of such Consents, in each case except for such violations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. None of the Sellers or the Companies has received any notice or written claims from any Government Entity relating to any material non-compliance of the Business or the Assets with such Consents nor are there, based on the Knowledge of the Sellers, any such notice or claims threatened or pending, except where such claims would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    To the Knowledge of the Sellers, none of the Companies or, to the extent relating to the Business, the Sellers nor any of their respective executives, officers, representatives, agents or employees has violated since January 1, 2007 any provision of the Foreign Corrupt Practices Act of 1977 of the United States or any other applicable anti-corruption law.

(d)    To the Knowledge of the Sellers, no Company is party to a Material Contract that contains a provision allowing for the termination of such Material Contract upon

88

the acquisition of the NGS Shares or DiamondWare Shares by the Purchaser hereunder, including any change of control provisions.

SECTION 4.10.  Privacy Laws.

(a)    To the Knowledge of the Sellers, the receipt, collection, use, storage, processing, disclosure or disposal of the Personal Information by the Companies comply with all Privacy Laws, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    With respect to the Business, there are no Actions pending, ongoing, or to the Knowledge of the Sellers, threatened in writing with respect to the Sellers' or the Companies' receipt, collection, use, storage, processing, disclosure or disposal of the Personal Information, except where such Actions would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 4.11.  Real Property.

(a)    Each parcel of real property leased pursuant to any real property lease included in the Included Real Estate Leases is leased by a Seller or an NGS Company or DiamondWare free and clear of all Liens on such Seller's leasehold interest, as applicable, except for Permitted Encumbrances. The Sellers have made available to the Purchaser true, correct and complete copies of the Included Real Estate Leases, in each case as amended or otherwise modified and in effect. There are no written or oral subleases, licenses, concessions, occupancy agreements or other contractual obligations granting to any other Person the right of use or occupancy of real property leased pursuant to any Included Real Estate Lease and there is no Person (other than the Sellers) in possession of such real property (provided that, in the case of Assumed and Subleased Real Estate Leases and Non-365 Real Estate Leases, this representation is being made only with respect to that portion of the premises subject thereto which, following the completion of the segregation of such premises contemplated by Section 5.28, will be subject to a Sublease).

(b)    Except for Permitted Encumbrances:

(i)    no Seller has made any other agreement to lease, sell, mortgage or otherwise encumber the Owned Real Estate (or any portion thereof) or given any Person an option to purchase or lease or rights of first refusal over the Owned Real Estate (or any portion thereof);

(ii)    no Seller has made any other agreement to lease, sell, mortgage or otherwise encumber the portion of the Direct Lease Real Estate that on the date hereof is used for the Business or given any Person an option to purchase or lease or rights of first refusal over such portion of any Direct Lease Real Estate;

(iii)    NNI has good title to the Owned Real Estate and Direct Lease Real Estate (other than the Direct Lease Real Estate located in Ottawa, Ontario) free and clear of all Liens; and

89

(iv)    NNTC has good title to the Direct Lease Real Estate located in Ottawa, Ontario, free and clear of all Liens,

(c)    Following the completion of the segregation of the Direct Lease Real Estate contemplated by Section 5.30, there will be no written or oral subleases, licenses, concessions, occupancy agreements or other contractual obligations granting to any other Person the right of use or occupancy of the premises to be subject to Direct Leases and there will be no Person (other than the Sellers) in possession of such premises.

(d)    The Companies do not own any real property. Section 4.11(d) of the Sellers Disclosure Schedule sets forth a true, correct and complete list of the addresses of all real property leased, subleased, licensed or with respect to which a right to use or occupy has been granted to or by the Companies (the "Company Leases").

(e)    To the Knowledge of the Sellers, each Included Real Estate Lease is valid, binding and in full force and effect, is enforceable in accordance with its terms and was entered into in the Ordinary Course, subject to applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally and to general principles of equity. To the Knowledge of Sellers, since the Petition Date, neither Sellers nor any Company, as applicable, has materially breached any Included Real Estate Lease, and no event has occurred that with notice or passage of time, or both, would constitute a material breach or default by a Seller or a Company, as applicable, under any Included Real Estate Lease, except for any breach that can be cured prior to Closing by payment of Cure Costs in accordance with Section 2.1.7. Since the Petition Date, neither any Seller nor any Company nor any Affiliate of either has given written notice to any landlord claiming a default by such landlord under an Included Real Estate Lease. To the Knowledge of the Sellers, no landlord under an Included Real Estate Lease has notified a Seller, a Company or any of their Affiliates that it intends to terminate such Included Real Estate Lease prior to its scheduled expiration.

(f)    The representations set forth in clauses (a), (c), (d) and (e) of this Section 4.11 are not being made on the date hereof with respect to any Real Estate Leases identified in Section 2.1.6(b)(iv) of the Sellers Disclosure Schedule and will only be made with respect to such Real Property Leases if, prior to the relevant Contract Designation Date, Purchaser provides the written notice to NNI specified in Section 2.1.6(b)(iv) of this Agreement, as applicable, and in such case such representations will be deemed made as of the date of this Agreement and as of the Closing Date.

SECTION 4.12.    Environmental Matters.

(a)    To the Knowledge of the Sellers, the Business is in compliance with Environmental Laws and has obtained and is in compliance with all Environmental Permits, except where failure to comply with Environmental Laws, or to obtain or comply with Environmental Permits, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    There are no Actions relating to the Business, the Assets or the assets of the Companies pending or, to the Knowledge of the Sellers, threatened against any of the Sellers

90

or Companies pursuant to Environmental Laws, in each case except those Actions that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)     To the Knowledge of the Sellers, no Hazardous Materials are present at, on or under the Owned Real Estate or the Direct Lease Real Estate and any other real property owned or operated by the Companies and associated with the Business that are reasonably anticipated to result in liabilities or obligations for investigation or remediation to any of the Sellers or the Companies pursuant to Environmental Laws, except those liabilities or obligations that (i) are set forth on Section 4.12 of the Sellers Disclosure Schedule or (ii) would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and as set forth on Section 4.12 of the Sellers Disclosure Schedule.

(d)     Notwithstanding anything in this Article IV to the contrary, none of the representations and warranties in this Article IV other than this Section 4.12 shall relate to environmental matters.

SECTION 4.13.   Taxes.

(a)     Each of the Companies has filed all material Tax Returns (or such Tax Returns have been filed on behalf of such Person) required to be filed by applicable Law as of the date hereof, which Tax Returns are true, correct and complete in all material respects, and has paid all material Taxes shown to be payable on such Tax Returns, except to the extent such Taxes are being contested in good faith.

(b)     To the Knowledge of the Sellers, there are no pending federal, state, local or foreign Tax audits concerning material Taxes of the Companies.

(c)     No pending material claim or assessment has been asserted in writing or, to the Knowledge of the Sellers, has been threatened against any of the Companies for any alleged deficiency in Taxes, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and there are no agreements in effect to extend the period of limitations for the assessment or collection of any material Tax for which any of the Companies may be liable.

(d)     All material Tax Returns that are required by applicable Law to have been filed with respect to each NNI Group as of the date hereof (the "Consolidated Returns") have been duly and timely filed, and all such Consolidated Returns were true, correct and complete in all material respects.

(e)     To the Knowledge of the Sellers, there are no pending federal, state, local or foreign Tax audits concerning material Taxes of any NNI Group.

(f)     No pending claim or assessment has been asserted in writing or, to the Knowledge of the Sellers, has been threatened against any member of the NNI Group for any alleged deficiency in Taxes for which any of the Companies may be liable on account of its inclusion as a member of any such NNI Group, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and there are no agreements in effect to extend the period of limitations for the assessment or collection of any material Tax for

91

which any of the Companies may be liable on account of their inclusion as members of any such NNI Group.

(g)     No Company is required to make any adjustment pursuant to Code section 481(a) (or any predecessor provision) or any similar provision of state, local or foreign Tax Law by reason of any change in any accounting methods, no Company will be required to make such an adjustment as a result of the transactions contemplated by this Agreement, there is no application pending with any Tax Authority requesting permission for any changes in any Company's accounting methods for Tax purposes, and no Tax Authority has proposed any such adjustment or change in accounting method with respect to any Company.

(h)     No Company has been a "distributing corporation" or a "controlled corporation" within the meaning of Code section 355(a)(1)(A).

(i)     To the Knowledge of the Sellers, the Companies have withheld and timely paid to the appropriate Government Entity all material Taxes required to be withheld or paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other Third Party, and the Companies have complied with all material related reporting and recordkeeping requirements.

(j)     The Sellers represent that none of the Sellers is a non-resident of Canada within the meaning of the Income Tax Act (Canada) and, in particular, section 116 thereof, except for any Sellers which are conveying solely Assets which do not constitute (i) "taxable Canadian property" within the meaning of the Income Tax Act (Canada) or (ii) "taxable Quebec property" within the meaning of the Quebec Taxation Act.

SECTION 4.14.   Labor and Employee Benefits Matters.

(a)     Section 4.14(a) of the Sellers Disclosure Schedule contains an accurate and complete list of all material Seller Employee Plans and all employment agreements or other commitments for employment or engagement (i) by the Sellers or the Companies with respect to Employees providing for compensation that deviate in any material respect from the standard form offer letter for the applicable jurisdiction or provide for retention, severance or change in control payments or benefits to the Employees and (ii) by the Companies with respect to independent contractors providing more than a de minimis amount of services that deviate in any material respect from the standard form agreement for the applicable jurisdiction or provide for retention, severance or change in control payments or benefits, excluding in each case Seller Employee Plans (collectively, the "Special Agreements"). The Sellers have provided the Purchasers with a true, accurate and complete copy of (i) the plan document and summary plan description for each material Seller Employee Plan, to the extent applicable, and, if no such plan document or summary plan description exists, an accurate written summary of the material terms of such Seller Employee Plan, (ii) for any Transferred Employee Plan, copies of any trust, custodial, investment management, administrative services or similar agreement, (iii) for each Transferred Employee Plan which is intended to be tax-advantaged under applicable Law (including Code Section 401(a)), a copy of the most recent determination, opinion or similar documentation relating to the plan's tax status, (iv) in the case of any Transferred Employee Plan for which Forms 5500 are required to be filed, a copy of the most recently filed Form 5500, with

92

schedules attached, and (v) annual reports or similar disclosure documents for any Transferred Employee Plan for the most recent year for which such reports or documents have been filed, and the most recent actuarial report.

     (b)    The information contained in Section 4.14(b)(i) of the Sellers Disclosure Schedule in respect of the Employees (the "**Employee Information**") is accurate in all material respects as of the date hereof, and sets forth with respect to each Employee (except where that is not permissible under applicable data privacy Laws): (i) unique identifier, (ii) service date, (iii) position, (iv) annual base salary and annual target incentive, (v) work location, (vi) visa type, if any, (vii) the applicable Collective Labor Agreement, if any, and (viii) vacation accrual rate. Such information shall be updated in accordance with the requirements of Section 7.4(c). In addition, Section 4.14(b)(i) of the Sellers Disclosure Schedule provides a summary of the material terms of the Special Agreements.

     (c)    To the Knowledge of the Sellers, no Employee who is an executive or manager of any Seller or Company is a party to any confidentiality, noncompetition, proprietary rights or other such agreement with any Person other than such Seller or Company which has a material adverse effect on such executive or manager's ability to perform his applicable services to the Business. To the Knowledge of the Sellers, no Employee is in violation of any term of any employment contract, confidentiality, noncompetition or other proprietary rights agreement or any other contract relating to the right of such Employee to be employed by, or provide services to, such Seller (with respect to the Business) or Company.

     (d)    There has not been for a period of twenty-four (24) consecutive months prior to the date hereof, nor is there existent or, to the Knowledge of the Sellers, has been threatened, any strike, material grievance under a Collective Labor Agreement, slowdown, lockout, picketing or work stoppage against any Seller or Company by or on behalf of the Employees.

     (e)    Section 4.14(e) of the Sellers Disclosure Schedule lists all the Collective Labor Agreements in effect with respect to the Employees. For a period of twenty-four (24) consecutive months prior to the date hereof, no petition has been filed or proceedings instituted by, or on behalf of, a union, collective bargaining agent (including any unit clarification proceeding under the National Labor Relations Act or analogous law), employee or group of employees with any Government Entity seeking recognition of a collective bargaining agent with respect to any Employees, and, to any of the Sellers' Knowledge, no such organizational effort is currently being made or has been threatened by or on behalf of any union, employee, group of employees or collective bargaining agent to organize any Employees. The Sellers and the Companies have provided the Purchaser with a true and complete copy of each of the Collective Labor Agreements listed in Section 4.14(e) of the Sellers Disclosure Schedule.

     (f)    Within the past three years prior to the date hereof, the Companies have not implemented any plant closing or layoff of employees that implicates (without regard to any actions that could be taken by the Companies following the Closing Date) the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar foreign, state or local law (collectively, the "**WARN Act**"). At or prior to the Closing, the Sellers shall provide Purchaser, in writing, the number of employees of the Companies, by facility and operating unit,

who have experienced an "employment loss" (as defined under the WARN Act in the ninety (90) days immediately preceding the Closing. With respect to the Companies, there are no pending workman's compensation liabilities or matters that, individually would reasonably be expected to result in liability in excess of $100,000 or collectively in excess of $500,000. To the Knowledge of the Sellers, there is no employment-related Action pending before any Government Entity or threatened, relating to an alleged violation or breach of any employment-related Law, or contract with respect to the Employees.

(g)     To the Knowledge of the Sellers, all of the Employees employed in the United States are either United States citizens or are legally entitled to work in the United States under the Immigration Reform and Control Act of 1986, as amended, other United States immigration Laws and the Laws related to the employment of non-United States citizens applicable in the state in which the Employees are employed. To the Knowledge of the Sellers, all Employees employed outside the United States are legally entitled to work in the country in which they are employed.

(h)     With respect to the Employees: (i) the Sellers and the Companies are in compliance with all applicable Laws respecting employment and employment practices, terms and conditions of employment, including wages and hours and the classification of employees, and independent contractors, and have not been within the past twelve (12) months and are not now engaged in any unfair labor practice as defined in the National Labor Relations Act or analogous Laws, in each case except for such violations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (ii) the Sellers and the Companies have not incurred, and no circumstances exist under which the Sellers or the Companies would reasonably be expected to incur, any liability arising from the misclassification of employees as exempt from the requirements of the Fair Labor Standards Act or analogous Laws or the misclassification of employees as independent contractors, in each case except for such violations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and (iii) no arbitration, court decision or governmental order to which the Sellers or the Companies are or would reasonably be expected to become a party or are subject in any way limits or restricts any of the Sellers or Companies from relocating or closing any of the operations of such Seller or Company. No Transferred Employee Plan is or, within the last three (3) years, has been the subject of an application or filing under, or is a participant in, a government-sponsored amnesty, voluntary compliance, self-correction or similar program.

(i)     With respect to each Transferred Employee Plan: (i) if intended to qualify under Section 401(a), 401(k) or 403(a) of the Code, such plan and the related trust have received a favorable determination letter, which has not been revoked, from the IRS covering all provisions of such plan (or the deadline for seeking such a determination letter has not passed) and to the Knowledge of the Sellers, no event or circumstance exists that has or is likely to adversely affect such qualification or exemption; (ii) if intended to qualify for tax-favorable treatment under other applicable Law, to the Knowledge of the Sellers, there exists no event or circumstance that has or is likely to adversely affect such qualification or exemption; (iii) the Transferred Employee Plan has been operated and administered in all material respects in compliance with its terms and applicable Law, and, in particular, there has been no withdrawal of assets or any other amounts therefrom other than proper payments of benefits to eligible

94

beneficiaries, refunds of over-contributions to plan members and permitted payments of reasonable expenses incurred by or in respect of such plans; all employer contribution holidays have been permitted; where a partial wind-up has occurred, any surplus assets existing as of the date of such wind up has been dealt with in accordance with applicable Laws; and no such plan is the result of a merger of one or more plans the assets of which were at the time of the merger or previously held in trust; (iv) no circumstance exists, nor has any event occurred that has resulted or is likely to result in the imposition of any fine, penalty or excise Tax on any Person in respect of the funding or operation of such plan; (v) there are no pending or, to the Knowledge of the Sellers, threatened claims against, by, on behalf of, or with respect to any Transferred Employee Plan or the assets, fiduciaries or administrators thereof (other than routine claims for benefits); and (vi) all required employer contributions, premiums and expenses to or in respect of such Transferred Employee Plans have been timely paid in full or, to the extent not yet due, have been properly accrued. To the Knowledge of the Sellers, no prohibited transaction (as described in Section 406 of ERISA or Section 4975 of the Code) which can reasonably be expected to result in material liability has occurred with respect to any Transferred Employee Plan.

(j)  (i) No Transferred Employee Plan is a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA or a multi- or multiple employer plan subject to other applicable Law (a "Multiemployer Plan"), and none of the Companies or any other Person that would be considered a single employer with any of the Companies under the Code or ERISA currently contributes or is required to contribute to, or in the last six years has contributed or been required to contribute to, or had any liability with respect to, any Multiemployer Plan or to any other plan subject to Title IV of ERISA or Section 412 of the Code.  (ii) With respect to each Multiemployer Plan, there has been no event or circumstance that has resulted in a withdrawal liability that would have, or would reasonably be expected to have, a Material Adverse Effect.

(k)  None of the Companies has any liability for, nor does any Transferred Employee Plan provide for, any life, health, medical or welfare benefits following retirement or termination of employment to former employees or beneficiaries or dependents thereof, except for health continuation coverage to the extent required by Section 601 et seq. of ERISA.

(l)  No circumstance exists which has resulted in or likely to result in a liability to any of the Companies or the Purchasers, whether by reason of reimbursement obligation or otherwise, in respect of a failure to comply with Code Section 409A.

(m)  Except as required under the terms of this Agreement or applicable Law, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereunder will (i) result in, cause the accelerated vesting or delivery of, or materially increase the amount or value of, any payment or benefit to any Transferred Employee, (ii) either alone or in connection with another event, result in any "excess parachute payment" as defined in Section 280G of the Code that would (x) be paid to any Transferred Employee, or (y) result in a non-deductible payment by the Companies, (iii) require or accelerate funding of any Transferred Employee Plan, (iv) materially increase any benefits otherwise payable under any Transferred Employee Plan, or (v) limit the ability to amend or terminate any Transferred Employee Plan or related trust.

95

SECTION 4.15.   Brokers.   Except for fees and commissions that will be paid or otherwise settled or provided for by the Sellers, no broker, finder or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates.

SECTION 4.16.   Government Contracts.

(a)   To the Knowledge of the Sellers, with respect to each material Government Contract, Government Subcontract and Government Bid to which a Company or (to the extent any such Government Contract, Government Subcontract or Government Bid is an Assigned Contract or a Seller Bid, as applicable) a Seller is a Party: (A) such Company or Seller has complied in all material respects with all terms and conditions of such Government Contract, Government Subcontract or Government Bid and any requirements of Law pertaining to such Government Contract, Government Subcontract or Government Bid; (B) each representation and certificate executed by such Company or Seller pertaining to such Government Contract, Government Subcontract or Government Bid was true and correct in all materials respects as of its effective date; (C) such Company or Seller has not intentionally submitted any materially inaccurate or untruthful cost or pricing data or claim for payment to any Government Entity in connection with such Government Contract, Government Subcontract or Government Bid; (D) such Company or Seller is in compliance with the applicable Government Cost Accounting Standards in respect of such Government Contract, Government Subcontract or Government Bid; (E) there is no suspension, stop work order, cure notice or show cause notice in effect for such Government Contract nor has any Government Entity threatened in writing to issue one; and (F) no formal protest of such Government Contract, Government Subcontract or Bid is pending as of the date hereof, except, in the case of (A), (B) and (F) above, for any breach of a Government Contract, Government Subcontract or Government Bids that is an Assigned Contract or a Seller Bid that will be cured prior to the Closing in accordance with Section 2.1.7.

(b)   To the Knowledge of the Sellers: (i) none of the Sellers, the Companies or any of their respective directors, officers or employees is, or has been at any time since January 1, 2007, suspended or debarred from doing business with the U.S. Government or any State Government, or is (or has been at any time since January 1, 2007) under administrative, civil (including, but not limited to, claims under the False Claims Act, 18 U.S.C. § 287) or criminal investigation with respect to any alleged irregularity, misstatement, act or omission relating to any Government Contract or Government Subcontract of the Business, or is (or has been at any time since January 1, 2007) deemed nonresponsible or ineligible for U.S. Government, State Government or Government Entity contracting; and (ii) there are no circumstances relating to the Business that would likely warrant in the future the institution of suspension or debarment proceedings, criminal or civil fraud or other criminal or civil proceedings or a determination of nonresponsibility or ineligibility against any Seller, Company or any of their respective directors, officers or employees;

(c)   To the Knowledge of the Sellers, since January 1, 2007, none of the officers, directors or employees of the Companies and none of the officers or employees of the Sellers working for the Business has: (i) made any payments or used any funds to influence federal transactions in violation of federal Laws; (ii) used any corporate or other funds or given

96

anything of value for unlawful commissions, gratuities, contributions, payments, gifts or entertainment, or made any unlawful expenditures relating to political activity to government officials or others or established or maintained any unlawful or unrecorded funds in violation of any applicable foreign, federal, provincial or state Law; or (iii) accepted or received any material unlawful contributions, payments, expenditures or gifts; and

      (d)    No Seller or Company has waived any material rights under a Government Contract or Government Subcontract pertaining to the Business.

      SECTION 4.17.   UK Defined Benefit Plan. As of the date hereof, there are no Actions pending or threatened relating to the UK Defined Benefit Plan that could result in liability of any Company with respect to the underfunding of such plan.

      SECTION 4.18.   Representations and Warranties by the Other Sellers.  Except (a) as set forth in the Sellers Disclosure Schedule, (b) as set forth in the Securities Disclosure Documents (but excluding any forward-looking disclosures in Securities Disclosure Documents made as to risk factors, forward-looking statements and other similarly cautionary or generic disclosure contained or incorporated by reference therein) and/or in any public filings made in the Bankruptcy Proceedings on or prior to the Closing, in each case publicly filed between January 1, 2007 and the date hereof, (c) as disclosed in the Financial Statements, (d) as expressly contemplated by this Agreement or (e) to the extent relating to the Excluded Assets or the Excluded Liabilities, each Other Seller severally but not jointly will, as of the date such Other Seller will execute this Agreement pursuant to Section 10.8, represent and warrant to the Purchaser as follows:

      4.18.1.  Organization and Corporate Power.

      (a)    Such Other Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized. Subject to the receipt of the Bankruptcy Consents, at the time it executes this Agreement such Other Seller will have the requisite corporate power and authority to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or, at the Closing Date, will become a party.

      (b)    Such Other Seller is qualified to do business and to own, lease or otherwise hold its properties and assets, including the Assets, and to conduct its business as presently conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify, except to the extent that the failure to be so qualified would not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

      4.18.2.  Authorization; Binding Effect; No Breach.

      (a)    Subject to the receipt of the Bankruptcy Consents, the execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller will be a party will have been duly authorized by such Other Seller. Subject to receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser, the Transaction Documents to which such Other Seller will be a party will constitute a legal,

valid and binding obligation of such Other Seller, enforceable against it in accordance with its terms, except to the extent that such enforceability may be limited by applicable principles of equity regarding the availability of remedies (whether in proceeding at law or in equity).

(b) The execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller will be a party will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, result in the creation or imposition of any Lien upon any of the Assets, or (subject to the receipt of Consents in connection with the Assigned Contracts and other Consents expressly provided for herein) require any Consent of any Person (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity (other than the advance notice to the U.S. Defense Security Service pursuant to the Proxy Agreement) pursuant to (i) the articles, charter or by-laws of such Other Seller, (ii) any Material Contract to which the such Other Seller is a party or to which any of its assets is subject, (iii) any order of any Government Entity applicable to such Other Seller or by which any of its properties or Assets are bound or (iv) any Laws to which such Other Seller, or any of the Assets owned by such Other Seller is subject, except, in the case of (ii), (iii) and (iv) above, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

## ARTICLE V

## COVENANTS AND OTHER AGREEMENTS

SECTION 5.1. U.S. Bankruptcy Actions. On the timetables and subject to the terms set forth below, the U.S, Debtors shall (i) file with the U.S. Bankruptcy Court one or more motions and proposed orders as set forth below each in form and substance reasonably satisfactory to the Purchaser, (ii) notify, as required by the U.S, Bankruptcy Code and the U.S, Bankruptcy Rules, all parties entitled to notice of such motions and orders, as modified by orders in respect of notice which may be issued at any time and from time to time by the U.S, Bankruptcy Court, and such additional parties as the Purchaser may reasonably request, and (iii) subject to the provisions of this Agreement, including the provisions of Section 9.1, and the U.S. Bidding Procedures Order, if entered, use their reasonable best efforts to obtain U.S, Bankruptcy Court approval of such orders without stay, modification, reversal or amendment adverse or unacceptable to the Purchaser.

(a) As promptly as possible, but in no event later than the third $(3^{rd})$ Business Day after the date hereof, the U.S. Debtors shall file with the U.S. Bankruptcy Court a motion (the **"U.S. Bidding Procedures and Sale Motion"**) and two proposed orders in the forms set forth in Exhibit 5.1(a) (as approved, the **"U.S. Bidding Procedures Order"** and the **"U.S. Sale Order"**) seeking approval by the U.S. Bankruptcy Court of, respectively, (i) as for the U.S, Bidding Procedures Order, the bidding procedures for the sale of the Business, and (ii) as for the U.S. Sale Order, the sale of the Assets and Shares to the Purchaser or a Designated Purchaser and the assumption by the U.S. Debtors and assignment to the Purchaser or a Designated Purchaser of the Assumed and Assigned Contracts and the Assumed Liabilities pursuant to sections 105, 363 and 365 of the U.S, Bankruptcy Code, as specified below.

(b)     The U.S. Debtors shall use their reasonable best efforts to cause the U.S. Bankruptcy Court to (i) schedule a hearing to consider the U.S. Bidding Procedures and Sale Motion and (ii) enter the U.S. Bidding Procedures Order within two (2) Business Days of the hearing referred to in clause (i) of this sentence.

(c)     The U.S. Bidding Procedures Order shall be in the form of Exhibit 5.1(a) attached hereto, without material modification thereto unless the Purchaser expressly consents in writing to such modification (which consent shall not be unreasonably withheld), shall approve the Break-Up Fee and Expense Reimbursement, and shall provide that from the date of the entry of the U.S. Bidding Procedures Order until the conclusion of the Auction ("Solicitation Period"), the Sellers are permitted to cause their Representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to the Purchaser and its Affiliates, agents and Representatives) in connection with any Competing Transaction. In addition, during such Solicitation Period, the Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Business and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable Law, including supplying information relating to the Business and assets of the Companies to prospective buyers. The Sellers shall contemporaneously provide Purchaser with any information concerning the Business or Assets provided to any prospective purchasers not previously provided to the Purchaser. On the tenth (10th) Business Day prior to the scheduled commencement of the Auction, the Main Sellers shall provide the Purchaser with a copy of any then current proposal received by any Seller with respect to any Competing Transaction and the Main Sellers shall provide the Purchaser with a copy of each proposal received after such date (i) as soon as reasonably practicable and in any event within forty-eight (48) hours of receipt of such proposal and (ii) in any event, on the Bid Deadline (as defined in the U.S. Bidding Procedures Order).

(d)     The U.S. Sale Order shall contain the provisions (it being understood that certain of such provisions must constitute findings of fact or conclusions of Law to be made by the U.S. Bankruptcy Court as part of the U.S. Sale Order) set forth in the form of Exhibit 5.1(g) attached hereto, without material modification thereto that is adverse to the Purchaser other than (i) any modification of Paragraphs L and Q and Sections 6, 7 and 8 of the U.S. Sale Order by the U.S. Bankruptcy Court to comply with applicable law or (ii) modifications to which the Purchaser expressly consents in writing, which consent shall not be unreasonably withheld.

(e)     The U.S. Debtors shall request that the U.S. Bankruptcy Court conduct a hearing to approve the U.S. Sale Order and the transactions contemplated by this Agreement (the "Sale Hearing") on September 16, 2009 at 1:30 p.m. and shall use their reasonable best efforts to cause the Sale Hearing to be heard on that date or the earliest date thereafter permitted by the U.S. Bankruptcy Court's schedule and to cause the U.S. Bankruptcy Court approve the U.S. Sale Order on that date or the earliest date thereafter permitted by the U.S. Bankruptcy Court.

SECTION 5.2.     Canadian Bankruptcy Actions.

5.2.1.  Canadian Sales Process Order.  As promptly as possible, but in no event later than the date on which the U.S. Bidding Procedures Order is granted, the Canadian Debtors shall file with the Canadian Court a motion (the "Canadian Sales Process Order Motion") and

99

a proposed order (as approved, the "Canadian Sales Process Order") seeking approval of the execution, delivery and performance of this Agreement, including payment of the Break-Up Fee and the Expense Reimbursement and a process for the sale of the Business, such order substantially in the form set forth in Exhibit 5.2.1.

5.2.2. Canadian Approval and Vesting Order. As promptly as practicable, but in no event later than three (3) Business Days after the date on which the U.S. Sale Motion is granted, and subject to their rights and obligations set forth in the Canadian Sales Process Order, the Canadian Debtors shall file with the Canadian Court one or more motions (the "Canadian Approval and Vesting Order Motion") seeking an order substantially in the form set forth in Exhibit 5.2.2 (subject to any changes consented to in writing by the Parties) (such order as approved, the "Canadian Approval and Vesting Order") of the Canadian Court approving this Agreement and the transactions contemplated herein, such order to include the following:

(a)     the transactions contemplated by this Agreement are approved;

(b)     the execution of the Sale Agreement by the Canadian Debtors is authorized and approved, and the Canadian Debtors are authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the transactions contemplated in this Agreement and for the conveyance of the Canadian Debtors' right, title and interest in the Assets to the Purchaser or a Designated Purchaser, as applicable;

(c)     all of the Canadian Debtors' right, title and interest in and to the Assets shall vest absolutely in the Purchaser, free and clear of and from any and all Liens (except Permitted Encumbrances) and, to the extent permitted by applicable Law, Excluded Liabilities; and

(d)     the sale of the Assets is exempt from the application of the Bulk Sales Act (Ontario).

SECTION 5.3.     Consultation; Notification.

(a)     The Purchaser and the U.S. Debtors shall cooperate with filing and prosecuting the U.S. Bidding Procedures and Sale Motion, a draft of which shall be delivered by the Sellers to the Purchaser no later than one (1) day after the date hereof, and obtaining entry of the U.S. Bidding Procedures Order and the U.S. Sale Order, and the U.S. Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, notices, statements schedules, applications, reports and other material papers to be filed by the U.S. Debtors in connection with such motions and relief requested therein.

(b)     The Purchaser and the Canadian Debtors shall cooperate with filing and prosecuting the Canadian Sales Process Order Motion and the Canadian Approval and Vesting Order Motion, and obtaining entry of the Canadian Sales Process Order and the Canadian Approval and Vesting Order, and the Canadian Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the

100

Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, notices, statements schedules, applications, reports and other material papers to be filed by the Canadian Debtors in connection with such motions and relief requested therein.

(c)  If the U.S. Sale Order or any other order of the U.S. Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the U.S. Debtors agree to, and to cause their Affiliates to, use their reasonable best efforts, to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing contained in this Section shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the U.S. Sale Order shall have been entered and shall not have been stayed, modified, revised or amended, in which event the Purchaser and the relevant Designated Purchasers shall be able to assert the benefits of section 363(m) of the U.S. Bankruptcy Code and, as a consequence of which, such appeal shall become moot.

(d)  If the Canadian Approval and Vesting Order or any other order of the Canadian Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the Canadian Debtors agree to, and to cause their Affiliates to, take all commercially reasonable steps, and use their reasonable best efforts, to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing in this Section shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the Canadian Approval and Vesting Order shall have been entered and shall not have been stayed, modified, revised or amended.

SECTION 5.4.    Pre-Closing Cooperation.

(a)  Prior to the Closing, upon the terms and subject to the terms and conditions of this Agreement, each of the Parties shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement as soon as practicable and cause the fulfillment at the earliest practicable date of all of the conditions to the other Parties' obligations to consummate the transactions contemplated by this Agreement, including: (i) the preparation and filing of all forms, registrations and notices required to be filed to consummate the Closing and the taking of such actions as are necessary to obtain any requisite Consent, provided that the Sellers shall not be obligated to make any payment or deliver anything of value to any Third Party in order to obtain any Consent (other than filing and application fees to Government Entities, and payment of Cure Costs by the Party or Parties responsible therefor pursuant to Section 2.1.7) and provided further that Purchaser shall be obligated to cooperate with Sellers in order to obtain any required Consents from landlords under Included Real Estate Leases (to the extent consent is required) and to enter into Subleases by fulfilling its obligations under Section 5.4 of the Sellers Disclosure Schedule, (ii) defending all lawsuits and other proceedings by or

101

before any Government Entity challenging this Agreement or the consummation of the Closing, (iii) causing to be lifted or rescinded any injunction, decree, ruling, order or other action of any Government Entity adversely affecting the ability of the Parties to consummate the Closing and (iv) more generally, to facilitate an orderly transition at Closing, working with outside counsel on the prosecution of pending patent applications and maintenance of existing patents.

(b) Each Main Seller will take all actions necessary or desirable, to the extent reasonably within its power and control, to cause any of its Subsidiaries, which is the owner of any of the Assets, that has otherwise not executed and delivered this Agreement, to execute and deliver to the Purchaser a joinder to this Agreement.

(c) Each Primary Party shall promptly notify the other Primary Party of the occurrence, to such party's Knowledge, of any event or condition, or the existence, to such party's Knowledge, of any fact, that would reasonably be expected to result in any of the conditions to the other Primary Party's obligation to effect the Closing set forth in Article VIII not being satisfied.

(d) NNC and NNL shall execute at Closing, upon the Purchaser's request, a written notice to Microsoft Corporation, which notice will be substantially in the form set forth in Exhibit 5.4(d), notifying Microsoft Corporation that the Sellers have sold the Business to Purchaser at Closing, that the Business is an "Eligible Spin Off" (as defined in the Patent Cross-License Agreement dated as of July 17, 2006 among Microsoft Corporation, NNC and NNL), and that as such it will receive an "Extended License" in accordance with the terms of such agreement, and the Sellers agree that the Business shall receive such an "Extended License."

(e) Prior to taking any action that would result in a material deviation from the forecast set forth on Section 5.4(e) of the Sellers Disclosure Schedule it being understood that the Sellers are attempting to preserve the marketability, viability and competitiveness of the Business, subject to applicable Law (including Antitrust Law) the Main Sellers shall consult with the Purchaser and consider in good faith any proposals made by Purchaser with respect to any such action. Subject to applicable Law (including Antitrust Law), the Purchaser and the Sellers shall cooperate with each other to provide for an orderly transition at Closing of the Business, including the Transferred Employees, from the Sellers to the Purchaser or the Designated Purchasers, as applicable, and to use their reasonable best efforts to minimize, consistent with the terms hereof, the disruption to the Business resulting from the transactions contemplated hereby, including any disruption caused by termination of Employees by the Sellers.

SECTION 5.5. Antitrust and Other Regulatory Approvals.

(a) In furtherance and not in limitation of the provisions of Section 5.4, each of the Parties agrees to (i) prepare and file as promptly as practicable, and in any event by no later than ten (10) Business Days from the date of this Agreement, an appropriate filing of a Notification and Report Form pursuant to the HSR Act and a request for an advance ruling certificate pursuant to Section 102 of the Competition Act, and if deemed advisable by the Purchaser, acting reasonably, a pre-merger notification filing under the Competition Act; (ii) prepare and file as promptly as practicable, and in any event by no later than twenty (20) Business Days from the date of this Agreement (or the earlier date required by the applicable

102

Law), a draft Form CO filing under the EC Merger Regulation; and (iii) prepare and file as promptly as practicable all other necessary documents, registrations, statements, petitions, filings and applications for other Antitrust Approvals, the ICA Approval, and any other Consent of any other Government Entities either required or that the Primary Parties mutually and reasonably agree are advisable to satisfy the condition set forth in Section 8.1(a) as expeditiously as possible.

(b)    If a Party or any of its Affiliates receives a request for information or documentary material from any Government Entity with respect to this Agreement or any of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), then such Party shall endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request.

(c)    The Parties shall keep each other apprised of the status of matters relating to the completion of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and work cooperatively in connection with obtaining the Regulatory Approvals of each applicable Government Entity, including:

> (i)    cooperating with each other in connection with the filings required under the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and each Antitrust Approval, and liaising with each other in relation to each step of the procedure before the relevant Government Entities and as to the contents of all communications with such Government Entities. In particular, to the extent permitted by Law or Government Entity, no Party will make any notification in relation to the transactions contemplated hereunder without first providing the other Parties with a copy of such notification in draft form (subject to reasonable redactions or limiting such draft, or parts thereof, on an outside-counsel only basis where appropriate) and giving such other party a reasonable opportunity to discuss its content before it is filed with the relevant Government Entities, and such first Party shall consider and take account of all reasonable comments timely made by the other Parties in this respect;

> (ii)    furnishing to the other Primary Parties all information within its possession that is required for obtaining the Antitrust Approvals, or required for any application or other filing to be made by the other Party pursuant to the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement); provided, however, that (a) no such information shall be required to be provided by a Party if it determines, acting reasonably, that, such information is material and competitively sensitive or that the provision of such information could reasonably be expected to have a material adverse effect upon it if the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) were not completed or that the provision of such information would jeopardize any attorney-client or other legal privilege (it

103

being understood, however, that the parties shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the other parties to occur without so jeopardizing privilege), and (b) in any such case the Purchaser and the Main Sellers shall cooperate with a view to establishing a mutually satisfactory procedure for providing such information directly to the Government Entity requiring or requesting such information, and the relevant · Main Seller or the Purchaser or the relevant Designated Purchaser required to provide such information shall provide it directly to such Government Entity requiring or requesting such information;

(iii)    promptly notifying each other of any substantive communications from or with any Government Entity with respect to the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement and each of the Primary Parties agrees not to participate in any scheduled meeting or substantive discussion, either in person or by telephone, with any Government Entity in connection with the proposed transactions unless it consults with the other Primary Parties in advance and, to the extent not prohibited by such Government Entity, gives the other Primary Parties (limited to external counsel as appropriate) the opportunity to attend and participate; and

(iv)    consulting and cooperating with one another in connection with all analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with proceedings under or relating to the Antitrust Approvals, the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction, in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement).

(d)    In addition, the Purchaser shall, and shall cause each of the Designated Purchasers to, use its reasonable best efforts to satisfy (or cause the satisfaction of) the conditions precedent to the Purchaser's obligations hereunder as set forth in Section 8.1(a) to the extent the same is within its control and to take, or cause to be taken, all other action and to do, or cause to be done, all other things necessary, proper or advisable under all applicable Laws to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), including using its reasonable best efforts to make all required filings and obtain all Antitrust Approvals, the ICA Approval, and any other Consent of a Government Entity required to be obtained in order for the Parties to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement).

(e)    The obligations of the Purchaser pursuant to Section 5.5(d) shall include committing, and causing the Designated Purchasers and/or the EMEA Designated Purchasers to commit, to undertakings, divestitures, licenses or hold separate or similar arrangements with respect to their respective assets, the Assets and/or the EMEA Assets and to any and all arrangements for the conduct of any business and/or terminating any and all existing relationships and contractual rights and obligations as a condition to obtaining any and all Consents from any Government Entity necessary to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), including taking any and all

actions necessary in order to ensure the receipt of the necessary Consents, the obtaining of all Antitrust Approvals, or the termination, waiver or expiration of the necessary waiting periods, under the Investment Canada Act, the Competition Act, the HSR Act, the EC Merger Regulation or any other applicable Antitrust Laws or investment or similar Law without any reduction of the consideration paid to the Sellers and the EMEA Sellers; provided, however, that nothing in this Agreement or the EMEA Asset Sale Agreement shall require the Purchaser, any Designated Purchaser, any EMEA Designated Purchaser or any of their respective subsidiaries to commit to any actions, undertakings, divestitures, licenses or hold separate or similar arrangements or any arrangements for the conduct of any business and/or terminating any relationships or contractual rights or obligations that, individually or in the aggregate, would be material in relation to the value of the Acquired Business.

    (f)    For the avoidance of doubt, the covenants under this Section 5.5 shall not apply to any action, effort, filing, Consent, proceedings, or other activity or matter under any Bankruptcy Law relating to the Bankruptcy Courts, the Bankruptcy Proceedings and/or the Bankruptcy Consents.

    SECTION 5.6.    Pre-Closing Access to Information.

    (a)    Without prejudice to the clauses of this Agreement governing the Sellers' reasonable best efforts obligations to make available to the Purchaser or to appropriate Clean Team Members documentation and information relating to Seller Contracts, the Main Sellers shall, and shall cause their Subsidiaries (other than the EMEA Sellers) to (i) give the Purchaser and its authorized representatives, upon reasonable advance notice and during regular business hours, reasonable access to (x) all books, records, personnel, officers and other facilities and properties of the Business and the Companies and (y) only after the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, all product documentation and design specifications of the Business and the Companies and all Software that is included in the Products, (ii) permit the Purchaser to make such copies and inspections thereof, upon reasonable advance notice and during regular business hours, as the Purchaser may reasonably request and (iii) cause the Sellers and the Companies to furnish the Purchaser with such unaudited financial and operating data and other information with respect to the Business and the Companies as is regularly prepared in the Ordinary Course that the Purchaser may from time to time reasonably request; provided, however, that (A) any such access shall be conducted at Purchaser's expense, in accordance with Law (including any applicable Antitrust Law and Bankruptcy Law), at a reasonable time, under the supervision of the Sellers' or Companies' personnel and in such a manner as to maintain confidentiality and not to unreasonably interfere with the normal operations of the Business or the other businesses of the Sellers and their Affiliates, (B) the Sellers will not be required to provide to the Purchaser access to or copies of any Employee Records if the provision of such Employee Records would cause the Sellers to be in contravention of any applicable Law (but shall cooperate in good faith and use reasonable best efforts to provide Purchaser with the maximum employee information, excluding health and protected status data, allowed by Law), (C) access to information which the Main Sellers reasonably consider to be commercially sensitive shall only be provided to appropriate Clean Team Members in accordance with applicable Law and subject to the provisions of the Clean Team Confidentiality Agreement and the Confidentiality Agreement, as applicable, and (D) with respect to the NGS Companies, any such access shall be consistent with the applicable legal and

regulatory requirements set by the United States Government, including such requirements under the Proxy Agreement and the NISPOM.

(b) Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof, the Sellers shall not have any obligation to make available to the Purchaser or its representatives, or provide the Purchaser or its representatives with, (i) any Tax Return filed by the Sellers or any of their Affiliates or predecessors, or any related material or (ii) more generally, any information if, in the good faith opinion of the Sellers, making such information available would (A) result in the loss of any attorney-client or other legal privilege or (B) cause the Sellers to be found in contravention of any applicable Law, or contravene any fiduciary duty or agreement existing on the date hereof (including any confidentiality agreement to which the Sellers or any of their Affiliates are a party), it being understood that the Sellers shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

SECTION 5.7. Public Announcements. Subject to (i) the provisions of Section 7.4(a) with respect to communications and announcements to the Employees and the employees of the Purchaser and the Designated Purchasers and the last sentence of this Section 5.7 and (ii) the Parties' disclosure obligations imposed by Law (including any obligations under any Bankruptcy Laws), the Parties shall (a) cooperate with each other in the development and distribution of all news releases, other public information disclosures and announcements, including announcements and notices to customers, suppliers and Employees, with respect to this Agreement, or any of the transactions contemplated by this Agreement and the other Transaction Documents and (b) not issue any such announcement or statement prior to consultation with, and the approval of, the Primary Parties (such approval not to be unreasonably withheld or delayed); provided that approval shall not be required where a Party determines, based on advice of counsel and after consultation with the Primary Parties, that such disclosure is required by Law. The Parties shall comply with the provisions of Exhibit 5.7.

SECTION 5.8. Further Actions.

(a) Without limiting the foregoing, on and after the Closing Date, each Party shall cooperate with the other Parties, without any further consideration, to cause to be executed and delivered, all instruments, including instruments of conveyance, novations assignment and transfer, and to make all filings with, and to obtain all consents, under any permit, license, agreement, indenture or other instrument or regulation, and to take all such other actions as any of the Parties may reasonably request to take by any other Parties from time to time, consistent with the terms of this Agreement, in order to effectuate the provisions and purposes of this Agreement and the Transaction Documents; provided that, subject to Section 2.1.6(d), Section 2.1.7(g), Section 5.4, Section 5.5 and Section 5.36, neither the Purchaser nor the Sellers shall be obligated to make any payment or deliver anything of value to any Third Party (other than filing and application fees to Government Entities and payment of Cure Costs for which such Party is responsible pursuant to Section 2.1.7 and in order to obtain any Consent to the transfer of Assets or the assumption of Assumed Liabilities).

106

(b)     The Sellers shall use their reasonable best efforts to make available (in accordance with applicable Law and subject to the provisions of the Clean Team Confidentiality Agreement and the Confidentiality Agreement), to the Purchaser in the Data Room or to appropriate Clean Team Members, as soon as practicable, all material documentation that forms part of, and all other information reasonably requested by the Purchaser in writing to enable the Purchaser to review by the relevant Contract Designation Date, the Other 365 Contracts and Other Non-365 Contracts.

(c)     Notwithstanding anything herein to the contrary and in addition to any other indemnities contained therein, the Sublease with respect to the Non-365 Subleased Real Estate Lease related to the Belleville, Ontario real estate shall contain an indemnity from the relevant Seller to the Purchaser or Designated Purchaser with respect to the environmental conditions present at the Belleville, Ontario real estate prior to or as of the Closing Date, such indemnity to be in form and substance reasonably equivalent to that specified in Seller's existing Non-365 Real Estate Lease related to the Belleville, Ontario real estate.

SECTION 5.9.     Conduct of Business.  The Sellers covenant that except as (i) the Purchaser may approve otherwise in writing (such approval not to be unreasonably withheld or delayed), (ii) set forth in Section 5.9 of the Sellers Disclosure Schedule, (iii) otherwise expressly contemplated or permitted by this Agreement or another Transaction Document, (iv) required by Law (including any applicable Bankruptcy Law) or by any order of a Bankruptcy Court, or (v) relates solely to Excluded Assets or Excluded Liabilities, the Sellers shall, and shall cause each of the Companies (other than the NGS Companies) and each of their Subsidiaries which are listed on Exhibit A hereunder (other than any Excluded Other Seller) to, and shall use reasonable best efforts (consistently with the terms of the Proxy Agreement and subject to the last sentence of this Section 5.9) to cause the NGS Companies to, (A) conduct the Business in the Ordinary Course and (B) abstain from any of the following actions:

(a)     sell, lease, license or otherwise dispose of material Assets (other than Intellectual Property), other than dispositions in the Ordinary Course;

(b)     incur any Lien on (i) the Shares, (ii) any assets of the Companies or (iii) any Assets, other than, in the case of clauses (ii) and (iii), (A) Liens that will be discharged at or prior to Closing and (B) Permitted Encumbrances specified in clauses (i), (ii), (iv) and (vi) of the definition of Permitted Encumbrances;

(c)     grant any license or sublicense of any rights under or with respect to any Acquired Company Intellectual Property or Transferred Intellectual Property other than (i) licenses or sublicenses granted in the Ordinary Course, (ii) licenses or sublicenses as would be permitted by the grant back license rights set forth in Section 2.05 of the Intellectual Property License Agreement, or (iii) licenses or sublicenses granted pursuant to source code escrow arrangements listed in Section 5.9(c) of the Sellers Disclosure Schedule (the "IP Escrow Agreements") provided that the Sellers agree to cooperate with the Purchaser and to take all commercially reasonable steps required to perform the terms of the IP Escrow Agreements that will prevent the release of escrowed code to the counterparty of the respective IP Escrow Agreements; or grant any license under or with respect to any Licensed Intellectual Property or Licensed Enterprise Patents, in each case except for Predominantly Non-Enterprise IP, within the

Exclusive Purchaser Field (as the foregoing terms are defined in the Intellectual Property License Agreement) other than in the Ordinary Course; or sell, transfer, or assign any Licensed Intellectual Property or Licensed Enterprise Patents (as defined in the Intellectual Property License Agreement) except as part of a sale, divestiture or auction of a retained product line, operating unit, business division and/or retained assets of Nortel and in such case, only with a written license from the buyer of the Licensed Intellectual Property or Licensed Enterprise Patents sufficient for Purchaser to retain all its rights in such Licensed Intellectual Property or Licensed Enterprise Patents as set out in the Intellectual Property License Agreement;

(d)     increase or commit to increase the rate of cash compensation or other fringe, incentive, equity incentive, pension, welfare or other employee benefits payable to the Transferred Employees, other than increases in the Ordinary Course for employees whose annual compensation after such increase does not exceed $200,000 or as required by applicable Law, Contracts or Seller Employee Plans in effect as of the date hereof (including pursuant to the KEIP or KERP), provided that the Sellers provide the Purchaser with notice of amendments, modifications, supplements or replacements to the KEIP as may be approved by the Canadian Court or to the KERP as may be approved by the Canadian Court or the U.S. Bankruptcy Court) or institute any Seller Employee Plan that provides payments or benefits to any Transferred Employees;

(e)     voluntarily terminate or materially amend (by materially increasing the obligations of the Sellers or the Companies under a supply Contract or materially reducing the obligations of a customer under a customer Contract of the Sellers or the Companies) any Material Contract that is a customer or a supply contract (unless such Contract has become an Excluded 365 Contract, an Excluded Non-365 Contract or a Non-Assigned Contract) other than in the Ordinary Course;

(f)     hire any Person employed or to be employed in the Business or engage any independent contractor to be engaged in the Business for total annual base remuneration in excess of $200,000 per year;

(g)     waive, release, assign, settle or compromise any material Action relating to the Business or the Companies to the extent that such waiver, release, assignment, settlement or compromise imposes any binding obligation, whether contingent or realized, on the Business that will bind the Companies and/or the Designated Purchasers after the Closing Date and is materially adverse to the Business;

(h)     as to the Companies only, merge or consolidate with, or agree to merge or consolidate with, or purchase substantially all of the assets of, or otherwise acquire, any business, business organization or division thereof, or any other Person;

(i)     except with respect to endorsement of negotiable instruments in the Ordinary Course, incur, assume or guarantee any Indebtedness that will be an Assumed Liability or is a Liability of a Company, except for (A) purchase money borrowings and capitalized leases in the Ordinary Course in principal amount not exceeding $5,000,000 in the aggregate, (B) Indebtedness owed between a Company, on the one hand, and the Sellers or an Affiliate of the Sellers (other than the Companies), on the other hand, that will be repaid on or prior to Closing,

108

(C) Indebtedness owed between or among the Companies (not to exceed $5,000,000 in principal amount in the aggregate if the Proxy Agreement is not terminated on or prior to the Closing), and (D) pension accruals in the Ordinary Course under Seller Employee Plans in existence on the date immediately prior to the date hereof;

(j)     enter into any employment or independent contractor agreement with a Person employed, engaged, or to be employed or engaged, in the Business on a basis that is not terminable at will and with severance benefits other than, in each case, employment or independent contractor agreements providing for (A) total annual base remuneration not to exceed $200,000 per person and (B) severance benefits pursuant to applicable Law or the Sellers Employee Plans in accordance with past practice;

(k)     make any material change in the financial accounting principles, practices or methods of the Companies, other than as required by GAAP, the Sellers' outside auditors, applicable Law or regulatory guidelines;

(l)     as to the Companies only, materially amend their certificates of incorporation or bylaws (or comparable organizational documents) in a manner adverse to the Business or the Company;

(m)     as to the Companies only, make any material loans, advances or capital contributions to or equity investments in any other Person;

(n)     as to the Companies only make or commit to make any capital expenditures in excess of $10,000,000;

(o)     except in each case in the Ordinary Course, (i) accelerate the billing or collection of or discount any receivables, including accounts receivables and trade receivables, or otherwise modify their policies and practices regarding the billing and collection of accounts receivable related to the Business in any material respect from those in effect immediately prior to the date hereof, (ii) accrue any payables, including accounts payables or trade payables or (iii) take any action that would increase the outstanding amount of Contractual Liabilities or stock rotation rights, return rights, special business approval and similar credits;

(p)     enter into any Contract other than in the Ordinary Course that would be a Material Contract;

(q)     as to the Companies only, (i) change any material Tax election, (ii) change any annual Tax accounting period or method of Tax accounting in any material respect, (iii) file any amended Tax Return, (iv) enter into any closing agreement relating to any material Tax, (v) settle any material Tax claim or assessment or (vi) surrender any right to claim a material Tax refund or any extension or waiver of the limitations period applicable to any material Tax claim or assessment (provided that except as contemplated in Section 6.5, nothing contained herein shall preclude NNI from changing any Tax election, annual Tax accounting period or method of Tax accounting, filing any amended Tax Return, entering into any closing agreement relating to Tax, settling any Tax claim or assessment, or surrendering any right to claim a Tax refund or any

extension or waiver of a limitations period, with respect to any consolidated or affiliated group, except to the extent that such acts would materially increase the Tax liability of a Company); or

(r)    enter into any Contract not to compete in any line of business or geographic area that would reasonably be expected to bind the Purchaser or any of its Affiliates after the Closing in any material respect, except for Contracts that will not be, or that the Purchaser may elect not to have, assigned to the Purchaser hereunder;

(s)    enter into any Contract granting an indemnity in respect of intellectual property infringement or misappropriation other than in the Ordinary Course that would bind the Purchaser or any of its Affiliates after the Closing in any material respect, except for those Contracts that will not be, or that the Purchaser may elect not to have, assigned to the Purchaser hereunder;

(t)    permit any Company to enter into any agreement or transaction with an Affiliate other than a Company other than (i) in the Ordinary Course and on terms at least as favorable to such Company as such Company would obtain at arm's length terms or consistent with practices in effect prior to the date hereof or (ii) any agreement or transaction that is terminable at will without penalty or cost or that terminates on or before Closing;

(u)    intentionally fail to make any filing, pay any fee, or take any other action necessary to maintain the ownership, validity and enforceability of any material Transferred Intellectual Property or material Acquired Company Intellectual Property; provided that if the Sellers unintentionally fail to make any filing, pay any fee, or take any other action necessary to maintain the ownership, validity and enforceability of any material Transferred Intellectual Property or material Acquired Company Intellectual Property, the Sellers will, upon becoming aware of any such failure, make all reasonable efforts to correct any adverse effects of such failure.

(v)    commence a voluntary filing or take any other action that leads to the commencement of any voluntary or involuntary proceeding under any Bankruptcy Law for any of the Companies or any of their Subsidiaries at any time after October 15, 2009, unless requested to do so by Purchaser pursuant to Section 10.20;

(w)    permit any Company to make a distribution or dividend to stockholders other than in the form of a working capital asset;

(x)    terminate or amend any put right related to auction rate securities held by a Company; or

(y)    authorize or commit or agree to take any of the foregoing actions.

Nothing in this Section 5.9 shall prohibit any of the Companies from making any dividend or distribution in cash (or in the form of other working capital assets) to its shareholders. No provision of this Section 5.9 shall be deemed to require any action by the NGS Companies that is inconsistent with the applicable legal and regulatory requirements set by the United States Government, including the requirements under the Proxy Agreement and the NISPOM.

110

SECTION 5.10.    Transaction Expenses. Except as otherwise provided in this Agreement or the Transaction Documents, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby; provided, however, that costs and expenses of the Companies shall be deemed to be costs and expenses of the Sellers.

## SECTION 5.11.    Confidentiality.

(a)    The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement to any court or to any liquidator or in connection with any auction process approved by the Bankruptcy Court and show appropriate figures in their administration records, accounts and returns.

(b)    From the Closing Date until the date that is five (5) years after the Closing Date, the Sellers shall not, and shall cause their Affiliates not to, and shall use reasonable best efforts to cause the respective representatives of the Sellers and their Affiliates not to, use or disclose to any Third Party, any Confidential Information. For purposes of this Agreement, "Confidential Information" consists of all competitively sensitive information and data related to the Business, the Assets and/or the Companies (including Transferred Intellectual Property and competitively sensitive Business Information existing as of the Closing Date), Purchaser or its Affiliates that is not, in each case, already available to the public, provided that nothing herein or in the other Transaction Documents shall be construed as precluding, prohibiting, restricting or otherwise limiting the ability of the Sellers, Seller's Affiliates or their respective representatives to (i) disclose the terms of any of the Transaction Documents to any court or to any liquidator or in connection with any auction process approved by a Bankruptcy Court and show appropriate figures in their administration records, accounts and return; (ii) make permitted disclosures under Section 5.7; (iii) exercise or enforce any of its rights, or perform any obligations under this Agreement or the other Transaction Documents, including the Transition Services Agreement and the Intellectual Property License Agreement, (iv) make any disclosures that are required by applicable Law; (v) own, use or disclose Confidential Information that is not exclusive to the Business to the extent necessary to (in the reasonable judgment of the Sellers) operate the other business segments of the Sellers or their Affiliates or otherwise engage in any manner in any business activities unrelated to the Business in compliance with Section 5.33; (vi) use Confidential Information to the extent necessary to perform Rejected Customer Contracts; or (vii) make customary disclosures, subject to customary confidentiality agreements, regarding Confidential Information that is not exclusive to the Business and is primarily related to other business segments of the Sellers in connection with acquiring, merging or otherwise combining with, or being acquired by, or selling all or part of their assets to, any Person (whether in a single transaction or a series of related transactions or whether structured as an acquisition of assets, securities or otherwise).

111

SECTION 5.12.   Certain Payments or Instruments Received from Third Parties. To the extent that, after the Closing Date, (a) the Purchaser, any Designated Purchaser or any Company receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document, the Purchaser shall, and shall cause the Designated Purchasers and the Companies to, promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment that is for the account of the Purchaser, any of the Designated Purchasers or the Companies according to the terms of any Transaction Document, the Sellers shall, and shall cause the other Sellers to promptly deliver such amount or instrument to the Purchaser or the relevant Designated Purchaser or Company, as applicable. All amounts due and payable under this Section 5.12 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use reasonable best efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

SECTION 5.13.   Non-Assignable Contracts and Other Assets.

(a)        To the extent that any Seller Contract or any Seller Consent is not capable of being assigned under section 365 of the U.S. Bankruptcy Code (or, if inapplicable, pursuant to other applicable Laws or the terms of such Contract or Consent) to the Purchaser or a Designated Purchaser at the Closing, or that any Sublease cannot be entered into, without the Consent of the issuer thereof or the other party thereto or the master landlord or any Third Party (including a Government Entity) (collectively, the "**Non-Assignable Contracts**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, nor shall any Sublease be entered under any Non-Assignable Contract, unless any such Consent is obtained following Closing; provided, however, that the Sellers will use their reasonable best efforts to cooperate with the Purchaser in any commercially reasonable arrangement to provide the Purchaser the same interest, benefits, rights and Liabilities under any such Non-Assignable Contracts as the applicable Seller had immediately prior to the Closing, including using reasonable best efforts to enter into one or more mutually agreed Subcontract Agreements. As between the Sellers and the Purchaser (or the relevant Designated Purchaser), such Non-Assignable Contracts shall be deemed to be assigned or subleased, as the case may be, and the Purchaser (or the relevant Designated Purchaser) shall perform all obligations and covenants thereunder. Notwithstanding the foregoing sentences: (i) nothing in this Section 5.13 shall require any Seller to renew any Non-Assignable Contract once it has expired, (ii) any efforts required of the Sellers pursuant to this paragraph shall (A) be subject to receipt of adequate compensation in respect of all direct incremental costs and expenses incurred in respect of or related to such arrangement, (B) be strictly on an interim basis and in no event required to continue after the expiration of the term of the Transition Services Agreement, and (C) to the extent not prohibited, be of an administrative nature only, without any substantive function, and shall be carried out by employees of the Sellers under the Transition Services Agreement. The Purchaser or the Designated Purchaser, as applicable, shall reimburse the relevant Seller for any direct incremental cost incurred and indemnify and hold each Seller harmless from and against all Liabilities, incurred or asserted, as a result of any actions taken pursuant to this Section 5.13. For the avoidance of doubt, the Parties acknowledge that the fact that any Contract constitutes a Non-Assignable Contract shall not (i) constitute a breach of any covenant hereunder, (ii) entitle Purchaser to terminate this Agreement or (iii) result in any reduction of the Purchase Price payable hereunder. Any Non-

112

Assignable Contract assigned pursuant to the terms of this Section 5.13 shall, when assigned, constitute an Assigned Contract hereunder from and after such date.

(b)    For the purposes of this Agreement (including Section 5.13(a) and all representations and warranties of the Sellers contained herein), the relevant Sellers shall be deemed to have obtained all required Consents in respect of the assignment of any Assumed and Assigned Contract if, and to the extent that, pursuant to the U.S. Sale Order, the Sellers are authorized to assume and assign to the Designated Purchasers such Seller Contract pursuant to section 365 of the U.S. Bankruptcy Code and any applicable Cure Cost has been satisfied as provided in Section 2.1.7;

(c)    If and to the extent that sale to the Purchaser or any Designated Purchaser of any Assets pursuant to Section 2.1.1 would be a violation of applicable Law or require any Consent or the approval of any Government Entity or the fulfillment of any condition that cannot be fulfilled by the Purchaser prior to the Closing, then, to the extent permitted by applicable Law, including any Antitrust Laws, and unless the Purchaser shall otherwise agree, the sale to the Purchaser or any Designated Purchaser of such Asset shall be, without any further action by any Party hereto, automatically deferred and any sale of such Asset pursuant to Section 2.1.1 or otherwise shall be null and void until such time as all such violations of applicable Law are eliminated, such consents or approvals of Government Entities are obtained and such conditions are fulfilled, which in all cases shall be no later than 12 months from the Closing Date unless otherwise agreed to by the Parties hereto. Any such Asset shall be deemed a "**Deferred Transfer Purchased Asset**."

(d)    If and to the extent that the allocation to Purchaser or any Designated Purchaser, and Purchaser's or any Designated Purchaser's becoming responsible for, any Assumed Liabilities pursuant to Section 2.1.3 or otherwise would be a violation of applicable Law or require any Consent or the approval of any Government Entity or the fulfillment of any condition that cannot be fulfilled by Sellers prior to the Closing, then, to the extent permitted by applicable Law, including any Antitrust Laws and unless the parties hereto shall otherwise agree, the allocation to Purchaser or any of its Subsidiaries of, and Purchaser's or any such Designated Purchaser's becoming responsible for, such Assumed Liability shall, without any further action by any party, be automatically deferred and any allocation or responsibility for such Assumed Liability pursuant to Section 2.1.3 or otherwise shall be null and void until such time as all violations of applicable Law are eliminated, such consents or approvals of Government Entities are obtained, and such conditions are fulfilled. Any such Assumed Liability shall be deemed a "**Deferred Transfer Assumed Liability.**"

(e)    With respect to any Deferred Transfer Purchased Asset or any Deferred Transfer Assumed Liability, insofar as it is reasonably possible and permitted under applicable Law, including any Antitrust Laws, (i) Sellers shall, following the Closing, hold such Deferred Transfer Purchased Asset for the use and benefit of the Purchaser and its Subsidiaries (at the expense of the Purchaser) and (ii) the Purchaser shall, or shall cause its applicable Subsidiary to, pay or reimburse Seller for all amounts paid or incurred in connection with the retention of such Deferred Transfer Assumed Liability. Sellers shall, insofar as reasonably possible and to the extent permitted by applicable Law, including any Antitrust Laws, hold and treat such Deferred Transfer Purchased Asset in the Ordinary Course and take such other actions as may be

113

reasonably requested by the Purchaser in order to place the Purchaser or any of its Subsidiaries, insofar as permissible under applicable Law, including any Antitrust Laws, and reasonably possible, in the same position as if such Deferred Transfer Purchased Asset had been sold to the Purchaser or a Designated Purchaser at the Closing and so that, to the extent possible, all the benefits and burdens relating to such Deferred Transfer Purchased Asset, including possession, use, risk of loss, potential for gain, and dominion, control and command over such Deferred Transfer Purchased Asset, are to inure from and after the Closing to the Purchaser or its applicable Subsidiary entitled to the receipt of such Deferred Transfer Purchased Asset.

(f)     If and when the violations of applicable Law are eliminated and such consents, approvals and/or conditions of Government Entities are obtained the absence or non-satisfaction of which caused the deferral of transfer of any Deferred Transfer Purchased Asset pursuant to Sections 5.13(b), the sale of the applicable Deferred Transfer Purchased Asset shall be effected in accordance with and subject to the terms of this Agreement.

(g)     Notwithstanding any other provision of this Section 5.13, any efforts required of the Sellers pursuant to this Section 5.13 in respect of Deferred Transfer Purchased Asset shall (A) be subject to receipt of adequate compensation in respect of all incremental costs and expenses incurred in respect of or related to such arrangement, (B) be strictly on an interim basis and in no event required to continue after the expiration of the term under the Transition Services Agreement, (C) to the extent not prohibited, be of an administrative nature only, without any substantive function, and be carried out by employees of the Sellers under the Transition Services Agreement. In no event shall the Sellers be under any obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in order to comply with its obligations under this Section 5.13 for which they are not reimbursed (other than filing and application fees to Government Entities and payment of Cure Costs for which the Sellers are responsible pursuant to Section 2.1.7).

(h)     Each of the Purchaser and the Sellers shall, and the Purchaser shall cause any relevant Designated Purchaser and the Sellers shall cause any Subsidiary (other than the EMEA Sellers) to, use reasonable efforts and work cooperatively in good faith to facilitate the Purchaser's negotiation with the counter-party to any Inbound License Agreement or any Cross-License Agreement listed in Section 5.13(h) of the Sellers Disclosure Schedule that, in each case, is not a Seller Contract and is not assigned to the Purchaser or a Designated Purchaser to obtain rights for the Purchaser or a Designated Purchaser to use the Intellectual Property that is licensed to the Sellers or a Subsidiary under such Inbound License Agreement or Cross-License Agreement, or, if that negotiation is unsuccessful, the Sellers shall use reasonable efforts to provide the same interests, benefits, and rights under such Inbound License Agreement or such Cross-License Agreement, in each case, as reasonably necessary to effectively operate the Business from and after Closing, including in the case of the Sellers requesting Consent to the grant of such rights from the relevant third party; provided, however, that the Sellers shall be under no obligation to seek any such Consent prior to the completion of the Auction or to compromise any right, asset, or benefit (including relinquishment of rights outside the Exclusive Purchaser Field, as defined in the Intellectual Property License Agreement) or to expend any amount or incur any Liability or provide any other consideration in complying with its obligations under this Section 5.13(h).

114

SECTION 5.14.   Bundled Contracts; Selected Rejected Customer Contracts.

(a)       Subject to applicable Law, each of the Purchaser and the Sellers shall, and the Purchaser shall cause any relevant Designated Purchaser, as applicable, to, use its reasonable best efforts to, at least fifteen (15) Business Days prior to the Closing Date, enter into arrangements with the counterparty to each Contract that provides for the sale or provision of Products and/or Services and the sale or provision of other products and/or services of the Sellers or their Affiliates and is listed in Section 5.14 of the Sellers Disclosure Schedule (a "**Bundled Contract**"), to amend such Bundled Contract so as to delete all obligations and Liabilities therefrom as they relate to the Products and the Services and enter into a new Contract (effective as of, and conditioned upon the occurrence of, the Closing) with the applicable customer and which only relates to Products and Services and, unless otherwise agreed by the Purchaser, is on commercially reasonable terms that are consistent with contract terms that the Purchaser generally offers to similarly situated customers, in which event such new Contract shall be deemed to be a Seller Contract; provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in obtaining such arrangements with respect to any Bundled Contract. For the avoidance of doubt, the parties acknowledge that the failure to enter into such arrangements shall not entitle the Purchaser to terminate this Agreement, not to complete the transactions contemplated hereby or reduce the Purchase Price payable hereunder. The Sellers shall use reasonable best efforts not to enter into any Bundled Contracts after the date hereof. For the avoidance of doubt, under no circumstances shall the Purchaser be required to enter into any new customer contract (including, for the avoidance of doubt, a customer contract that relates to an SI/SP Contract) or, pursuant to Section 5.14(b), any Subcontract with any customer that requires the Purchaser to deliver products and services of the Sellers other than the Products and the Services.

(b)       Subject to applicable Law, for those Bundled Contracts that are not Post-Signing Customer Contracts and for which the arrangements mentioned in Section 5.14(a) could not be entered into fifteen (15) Business Days prior to the Closing Date: (i) if requested by the Purchaser, the Sellers shall use reasonable best efforts to facilitate the entry by the Purchaser or the relevant Designated Purchaser and the other party to each such Bundled Contract into a new Contract that only relates to Products and/or Services, and (ii) the Sellers and the Purchaser shall use reasonable best efforts to cooperate in any commercially reasonable arrangement to provide the Purchaser or a Designated Purchaser, as applicable, with the same interest, benefits, rights and Liabilities (including obligations relating to warranties and Known Product Defects (as defined in the Nortel Accounting Principles)) as the applicable Seller had immediately prior to the Closing under any such Bundled Contract in so far as they relate to the Business, including by entering into Subcontract Agreements as follows: (A) if the economic and other terms and conditions of the portion of any such Bundled Contract that relate to the Business (the "**Enterprise Portion**") can be reasonably identified and the Enterprise Portion meets the Pre-Signing Inclusion Criteria for Major Customer Contracts, the Purchaser or a Designated Purchaser shall enter into a Subcontract Agreement relating to such Enterprise Portion on the same terms as those set forth in the relevant Bundled Contract or (B) if the Enterprise Portion of any such Bundled Contract cannot be reasonably identified or the Enterprise Portion does not meet the Pre-Signing Inclusion Criteria for Major Customer Contracts the Purchaser or a Designated Purchaser and the relevant Seller shall use their reasonable best efforts to agree on commercially reasonable terms for the subcontract of such Enterprise Portion under a

115

Subcontract Agreement and then enter into such Subcontract Agreement, it being understood that the terms of such a Subcontract Agreement shall be considered commercially reasonable if and only if the terms of such Subcontract Agreement: (1) are at least as favorable to the Purchaser or the relevant Designated Purchaser as the terms generally offered by the Purchaser or its Subsidiaries to customers that are similarly situated to the counterparty to the relevant Bundled Contract and (2) provide for material terms (including any terms addressed by the Pre-Signing Inclusion Criteria for Major Customer Contracts) that are in the aggregate equivalent to, or better than, the material terms associated with the relevant Bundled Contract or the Enterprise Portion thereof; provided that (w) nothing in this Section 5.14 shall require the Sellers to renew any Bundled Contract once it has expired, (x) the Sellers shall have the right, any time after the expiration of the Transition Services Agreement, to exercise any right to terminate any Bundled Contract and (y) the Sellers shall be under no obligation with respect to the Enterprise Portion of any Bundled Contract that is, or is to be, subcontracted hereunder to compromise any right, asset or benefit or to expend any amount or incur any Liability in order to comply with its obligations under this sentence for which they are not reimbursed (other than filing and application fees to Government Entities, payment of Cure Costs for which the Sellers are responsible pursuant to Section 2.1.7). Any Subcontract Agreement entered into pursuant to clause (A) or (B) above shall not require the Purchaser or the Designated Purchaser to perform under such Subcontract Agreement to the extent that the TSA Sellers are in material breach of their obligation to perform services under the Transition Services Agreement and such breach frustrates the Purchaser's ability to perform and (y) permit the Purchaser or the Designated Purchaser to terminate such subcontract upon the earliest of (i) in the case of a Subcontract Agreement described in clause (A) above, twelve (12) months from the Closing Date and in the case of a Subcontract Agreement described in clause (B) above, six (6) months from the Closing Date, (ii) the expiration of the relevant Bundled Contract (without giving effect to any extension of the term thereof other than at the option of the counterparty thereto), (iii) the earliest date on which the relevant Seller has the right to terminate the relevant Bundled Contract without penalty or (iv) the date on which the relevant Bundled Contract is terminated by the counterparty thereto. Notwithstanding the foregoing, the Purchaser shall be allowed to refuse to enter into a Subcontract Agreement relating to a Bundled Contract if (i) the Purchaser offers to contract directly with the counterparty to such Bundled Contract on commercially reasonable terms that are consistent with contract terms that the Purchaser generally offers to similarly situated customers or (ii) the Purchaser has an existing contract with the counterparty to such Bundled Contract and offers to provide the applicable Products and/or Services under such Bundled Contract through Purchaser's existing contract and pursuant to the terms thereof; provided that, in each of clauses (i) and (ii) of this sentence, the counterparty to the relevant Bundled Contract accepts the offer from the Purchaser and releases in writing the relevant Seller from any obligation to perform and any other Liability under the Enterprise Portion of the relevant Bundled Contract.

(c)     At least thirty (30) days prior to the Closing Date, the Sellers will deliver to the Purchaser a list of those Rejected Customer Contracts, if any, that the Sellers want the Purchaser to perform on a subcontract basis after Closing (the "Selected Rejected Customer Contracts"); provided that, the Sellers shall not be allowed to include in such list of Selected Rejected Customer Contracts any (i) (A) Rejected Non-365 SI/SP Contract or (B) Rejected Customer Contract that is an Indirect Customer Contract, which, in each case, (1) if it is a 365

116

Contract, at the time of such inclusion in the list can still be rejected by the relevant U.S. Debtor pursuant to section 365 of the U.S. Bankruptcy Code or (2) for any Contract, can be terminated by the relevant Seller at will without penalty, (ii) Customer Contract that has expired pursuant to its terms, (iii) Post-Signing Customer Contract and (iv) any Bundled Contract. Subject to applicable Law, the Purchaser or a Designated Purchaser and the relevant Seller shall use their reasonable best efforts to enter into Subcontract Agreements under which the Purchaser or a Designated Purchaser would provide products or services required by the terms of the relevant Selected Rejected Customer Contract, provided that,

> (x)     for each Selected Rejected Contract designated by Purchaser as Type I (the "Type I Rejected Contracts"), the Subcontract Agreement shall (1) provide for financial terms, including price, volume and discount terms that are at least as favorable to the Purchaser or the Designated Purchaser as the relevant Type I Rejected Contract, (2) provide for non-financial terms, including liquidated damages, renewal, limitation of liability and indemnification provisions that are at least as favorable to the Purchaser or the relevant Designated Purchaser as the terms generally offered by the Purchaser or its Subsidiaries to customers that are similarly situated to the counterparty to the relevant Type I Rejected Contract and under no circumstances shall the Purchaser or any Designated Purchaser be bound to, obligated under or otherwise face any Liability or Loss pursuant to the terms of the relevant Type I Rejected Contract addressing or relating to any non-financial terms, and (3) permit the Purchaser or the Designated Purchaser to terminate such Subcontract Agreement upon the earliest of (A) six (6) months from the Closing Date, (B) the expiration of the relevant Type I Rejected Contract (without giving effect to any extension of the term thereof other than at the option of the counterparty thereto), (C) the earliest date on which the relevant Seller has the right to terminate the relevant Type I Rejected Contract without penalty or (D) the date on which the relevant Type I Rejected Contract is terminated by the counterparty thereto; or

> (y)     for each Selected Rejected Contract designated by Purchaser as Type II (the "Type II Rejected Contracts"), the Subcontract Agreement shall be entered into on commercially reasonable terms, (1) it being understood that the terms of any such Subcontract Agreement shall be considered commercially reasonable if and only if the terms of such Subcontract Agreement: (A) are at least as favorable to the Purchaser or the relevant Designated Purchaser as the terms generally offered by the Purchaser or its Subsidiaries to customers that are similarly situated to the counterparty to the relevant Type II Rejected Contract, (B) provide for terms that are in the aggregate equivalent to, or better for the Purchaser or the relevant Designated Purchaser than, the material terms associated with the Type II Rejected Contract and (C) permit the Purchaser or the Designated Purchaser to terminate such Subcontract Agreement upon the earliest of (i) six (6) months from the Closing Date, (ii) the expiration of the relevant Type II Rejected Contract (without giving effect to any extension of the term thereof other than at the option of the counterparty thereto), (iii) the earliest date on which the relevant Seller has the right to terminate the relevant Type II

117

Rejected Contract without penalty or (iv) the date on which the relevant Type II Rejected Contract is terminated by the counterparty thereto.

Notwithstanding anything to the contrary set forth in Section 5.14(c) any Subcontract Agreement entered into pursuant to this clause 5.14(c) shall not require the Purchaser or the Designated Purchaser to perform under such Subcontract Agreement to the extent that the TSA Sellers are in material breach of their obligation to perform services under the Transition Services Agreement and such breach frustrates the Purchaser's ability to perform. In addition to the foregoing, the Purchaser shall be allowed to refuse to enter into a Subcontract Agreement relating to a Selected Rejected Customer Contract if (a) the Purchaser offers to contract directly with the counterparty to such Selected Rejected Customer Contract on commercially reasonable terms that are consistent with contract terms that the Purchaser generally offers to similarly situated customers or (b) the Purchaser has an existing contract with the counterparty to such Selected Rejected Customer Contract and offers to provide the applicable Products and/or Services under such Selected Rejected Customer Contract through Purchaser's existing contract with that counterparty and pursuant to the terms thereof; provided that, in each of clauses (a) and (b) of this sentence, the relevant counterparty to the Selected Rejected Customer Contract accepts the offer from the Purchaser and releases in writing the relevant Seller from any obligation to perform and any other Liability under the relevant Selected Rejected Customer Contract.

SECTION 5.15.   Post-Closing Assistance for Litigation.

(a)     After the Closing, the Purchaser shall, upon the request of the Sellers, and at no cost to the Sellers (other than reimbursement of out of pocket expenses), make the Transferred Employees available at reasonable times and cooperate in all reasonable respects with the Sellers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action (whether disclosed or not disclosed in the Sellers Disclosure Schedule) filed or claimed against the Sellers or any of their Affiliates or any of the respective agents, directors, officers and employees of the Sellers and their Affiliates, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, however, that the obligations of the Purchasers or their Affiliates hereunder shall only extend to the employees of such Purchasers or Purchasers' Affiliates as of the date such employees are to be made available and shall not apply to former employees of such Purchaser or Purchaser's Affiliates that have been terminated prior to such date.

(b)     After the Closing, the Sellers and their Affiliates shall, upon the request of the Purchaser, and at no cost to the Purchaser or its Affiliates (other than reimbursement of out of pocket expenses), make employees of the Sellers or their Affiliates and all necessary documents available at reasonable times and cooperate in all reasonable respects with the Purchaser and its Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action filed or claimed against the Purchaser or any of its Affiliates or any of the respective agents, directors, officers and employees of the Purchaser and its Affiliates, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, however, that the obligations of the Sellers or their Affiliates hereunder shall only extend to the employees of such Sellers or Sellers' Affiliates as of the date such employees are to

118

be made available and shall not apply to former employees of such Sellers or Seller's Affiliates that have been terminated prior to such date.

### SECTION 5.16.   Tangible Asset Removal.

(a)     The Purchaser shall, and shall cause the relevant Designated Purchasers to, within thirty (30) days after the Closing Date, relocate all tangible Assets and Purchaser's activities from all premises owned or leased by the Sellers or their Affiliates after the Closing (other than those premises to be occupied by the Purchaser or any Designated Purchasers after the Closing Date pursuant to the provisions of the Real Estate Agreements, the Assumed and Assigned Contracts, and the Company Leases) with Sellers' cooperation; provided, however, that, subject to receipt of landlord Consent where required (it being agreed that Sellers shall only be obligated to use commercially reasonable efforts, without incurring any third-party costs, to obtain any such required Consents) and subject to Purchaser's obligation to use commercially reasonable efforts to vacate all such premises as soon as reasonably practicable regardless of the length of the Applicable Transitional Occupancy Period, the Purchaser shall be permitted to remain in occupancy, pursuant to the terms of customary forms of license agreements reasonably acceptable to the Purchaser and Sellers, at those premises identified in Section 5.16(a) of the Sellers Disclosure Schedule (to the extent such premises are not to be occupied by the Purchaser or any Designated Purchasers after the Closing Date pursuant to the provisions of the Real Estate Agreements, the Assumed and Assigned Contracts, and the Company Leases), for, in each instance, the Applicable Transitional Occupancy Period, subject to the following conditions:

(i)     in all instances other than the properties identified in Section 5.16(a) of the Sellers Disclosure Schedule, Sellers' obligation to make any space available to the Purchaser or any other party on the date of or following Closing shall be subject to Sellers' right to implement their global real estate strategy, as such strategy develops over time, and in connection therewith to dispose of or retain real estate assets as the Sellers deem appropriate in their sole discretion and the Sellers shall have no liability to the Purchaser or any other party resulting from the implementation of the Sellers' real estate strategy as contemplated hereby; provided that, if the Sellers exercise their right to dispose of any real estate asset prior to the earlier of (A) the date on which the Purchaser vacates the related property at its own election and (B) the expiration of the Applicable Transitional Occupancy Period, the Sellers shall give the Purchaser or the relevant Designated Purchaser reasonable prior notice of such disposal and a reasonable opportunity to remove the Assets located thereon; and provided further that such notice from the Sellers shall in no event be given later than the Applicable Latest Termination Notification Date.

(ii)     The Purchaser or the relevant Designated Purchasers shall only be entitled to remain in occupancy of the premises identified in Section 5.16(a) of the Sellers Disclosure Schedule during the Applicable Transitional Occupancy Period so long as the Purchaser or the relevant Designated Purchasers (I) in the case of any real property identified in Section 5.16(a) of the Sellers Disclosure Schedule which is leased by a Seller as a tenant, compensates Sellers for Sellers' actual, out of pocket rent and other occupancy costs with respect to either, as indicated in

119

Section 5.16(a) of the Sellers Disclosure Schedule, (A) the space actually being occupied by the Purchaser or such Designated Purchaser or (B) the entire premises subject to the applicable real estate lease, and in either case indemnifies the Seller for any liability or damages resulting from the Purchaser's or such Designated Purchaser's continued occupancy from the Closing Date through the date upon which the Purchaser or such Designated Purchaser actually surrenders such property in accordance with the requirements of the license agreement referenced above, and (2) in the case of any real property identified in Section 5.16 of the Sellers Disclosure Schedule which is owned by a Seller, compensates Sellers for the Purchaser's or such Designated Purchaser's occupancy of such property by paying fair market rental for such portion of the property that the Purchaser or such Designated Purchaser is actually occupying and indemnifying Seller for any liability or damages resulting from the Purchaser's occupancy.

(iii) In any circumstance where a landlord's Consent is required to permit the Purchaser's continued occupancy of premises identified in Section 5.16(a) of the Sellers Disclosure Schedule during the Applicable Transitional Occupancy Period and Sellers have been unable, despite using commercially reasonable efforts, to procure such Consent prior to the Closing Date, (A) the Purchaser shall not have the right to continue in occupancy of such premises and, notwithstanding any provision herein to the contrary, the Applicable Transitional Occupancy Period shall not extend beyond the Closing Date and (B) the Sellers will cooperate with the Purchaser, at the Purchaser's sole cost and expense, to provide access to the applicable premises for the purpose of expediting the Purchaser's removal of assets therefrom; provided that the Purchaser (or the relevant Designated Purchaser) shall perform all obligations and covenants set forth in this Section 5.16 with respect to such premises for so long as its property remains in such premises and provided further that neither any Seller nor any Affiliate of any Seller shall have any liability to the Purchaser (or a Designated Purchaser) for the refusal by any landlord to grant a consent to any transitional occupancy by the Purchaser (or a Designated Purchaser). Notwithstanding the foregoing, nothing in this Section 5.16 shall require any Seller to renew or extend the term of any lease once it has by its terms expired. The Purchaser or the Designated Purchaser, as applicable, shall hold each Seller harmless from and against all Liabilities, incurred or asserted, as a result of any actions taken pursuant to this Section 5.16.

(iv) To the extent that the Sellers elect to, prior to Closing, terminate a Lease or otherwise dispose of real property which is not included among the Assets and which is neither an Assumed and Subleased Real Estate Lease nor a Non-365 Subleased Real Estate Lease and at which Owned Equipment is located and which is not identified in Section 5.16(a) of the Sellers Disclosure Schedule, the Sellers shall provide the Purchaser reasonable prior notice of such termination or disposal (provided that such notice from the Sellers shall in no event be given later than the Applicable Latest Termination Notification Date) and, following receipt of such notice, the Purchaser shall be permitted reasonable access to the real property for not less than ten (10) Business Days after receipt of the

120

termination notice to identify any Assets acquired hereunder located at the subject premises. The Sellers agree that they will remove and store such Assets at the Seller's sole cost until delivery to the Purchaser or a Designated Purchaser at Closing (it being understood that Sellers shall not be obligated to remove trade fixtures or fixtures, furniture, furnishings or fittings from any such real property or to store the same or to deliver the same at any point to the Purchaser or a Designated Purchaser unless the same are included in the Assets and are specifically identified by the Purchaser for removal). It is further agreed that transfer of any Assets stored in accordance herewith may be made by delivery of a receipt from any warehouse or storage facility entitling the Purchaser or a Designated Purchaser to retrieve all such Assets and the Purchaser shall be responsible for the cost of delivering such Assets to the Purchaser or a Designated Purchaser on or after the Closing Date. In the event the Purchaser fails to identify any Assets that it wishes to have stored, the Sellers shall be entitled to abandon or otherwise dispose of such Assets in their sole discretion without any liability to the Purchaser.

(v)     The Purchaser or the relevant Designated Purchaser shall surrender any such premises in substantially the same condition in which the Purchaser or such Designated Purchaser received it (with the Assets removed and broom clean).

(b)     The Sellers shall, within thirty (30) days after the Closing Date, relocate all the Excluded Assets and Seller's activities from all owned real property or other leased or subleased real property covered by this Agreement with the Purchaser's cooperation; provided, however, that, subject to receipt of landlord Consent where required (it being agreed that the Purchaser shall only be obligated to use commercially reasonable efforts, without incurring any third-party costs, to obtain any such required Consents), pursuant to the terms of license agreements referred to in Section 5.16(a) above, the Sellers shall have up to six (6) months after the date of the Closing to relocate all the Excluded Assets and Sellers' activities from the premises listed in Section 5.16(b) of the Sellers Disclosure Schedule, subject to the following conditions:

(i)     in all instances other than in the case of the premises shown on Section 5.16(b) of the Sellers Disclosure Schedule, the Purchaser's obligation to make any space available to the Sellers or any other party on the date of or following Closing shall be subject to the Purchaser's right to implement its global real estate strategy, as such strategy develops over time, and in connection therewith to dispose of or retain real estate assets as the Purchaser deems appropriate in its sole discretion and the Purchaser shall have no liability to the Sellers or any other party resulting from the implementation of the Sellers' real estate strategy as contemplated hereby; provided that if the Purchaser exercises its right to dispose of real estate assets prior to the earlier of (A) the date on which Sellers vacate the related property at their own election and (B) the six (6) month anniversary of the Closing, in the case of any real property identified in Section 5.16(b) of the Sellers Disclosure Schedule, or thirty (30) days after the Closing Date in the case of any other real property, the Purchaser shall give the Sellers

121

reasonable notice, not less than thirty (30) days, of such disposal and a reasonable opportunity to remove the Excluded Assets located thereon;

(ii)    the Sellers shall only be entitled to remain in occupancy of the premises identified in Section 5.16(b) of the Sellers Disclosure Schedule for periods of up to six (6) months from the date of Closing so long as the Sellers (1) in the case of any real property identified in Section 5.16(b) of the Sellers Disclosure Schedule which is leased by the Purchaser or a Designated Purchaser as a tenant, compensates the Purchaser or such Designated Purchaser for the Purchaser's or such Designated Purchaser's actual, out of pocket rent and other occupancy costs with respect to the space actually being occupied by the Seller and indemnifies the Purchaser or such Designated Purchaser for any liability or damages resulting from the Seller's continued occupancy from the Closing Date through the date upon which Seller actually surrenders such property in accordance with the requirements of the license agreement referenced above, and (2) in the case of any real property identified in Section 5.16(b) of the Sellers Disclosure Schedule which is owned by the Purchaser or a Designated Purchaser, compensates the Purchaser or such Designated Purchaser for the Seller's occupancy of such property by paying fair market rental for such portion of the property that Seller is actually occupying and indemnifying the Purchaser or such Designated Purchaser for any liability or damages resulting from the Seller's occupancy;

(iii)    in any circumstance where a landlord's Consent is required to permit a Seller's occupancy of premises identified in Section 5.16(b) of the Sellers Disclosure Schedule for up to six (6) months following the Closing Date and the Purchaser has been unable, despite using commercially reasonable efforts, to procure such Consent prior to the Closing Date, (A) the relevant Seller shall not have the right to continue in occupancy of such premises beyond the Closing Date and (B) the Purchaser will cooperate with the Sellers, at Sellers' sole cost and expense, to provide access to the applicable premises for the purpose of expediting Sellers' removal of assets therefrom; provided that the relevant Seller shall perform all obligations and covenants set forth in this Section 5.16(b) with respect to such premises for so long as its property remains in such premises and provided further that neither the Purchaser nor any Designated Purchaser nor any Affiliate of any either shall have any liability to any Seller for the refusal by any landlord to grant a consent to any transitional occupancy by a Seller. Notwithstanding the foregoing, nothing in this Section 5.16 shall require the Purchaser or a Designated Purchaser to renew or extend the term of any lease once it has by its terms expired. The relevant Seller shall hold the Purchaser or a Designated Purchaser harmless from and against all Liabilities, incurred or asserted, as a result of any actions taken pursuant to this Section 5.16; and

(iv)    the Sellers shall surrender any such premises in the substantially the same condition in which the Sellers received it (with the Excluded Assets removed and broom clean),

122

(c) In furtherance of the foregoing Sections 5.16(a) and 5.16(b), the Sellers and the Purchaser shall use reasonable efforts to agree on reasonable transition arrangements that provide for reasonable conditions under which each party shall vacate those premises intended to be used exclusively by the other party after the Closing Date.

(d) From the date hereof until the Closing Date, in addition to providing the reasonable notice specified above of Sellers' intent to reject or otherwise terminate any 365 Real Estate Leases, any Non-365 Real Estate Leases and any other leases where Assets are located, Sellers shall keep Purchaser reasonably informed of any activities at any of the premises subject to a Real Estate Lease that may impact the transition arrangements. Sellers and Purchaser shall cooperate to plan reasonable transition arrangements at the real property listed in Sections 5.16(a) and 5.16(b) of the Sellers Disclosure Schedule as well as other real property subject to this Agreement, in accordance with the principles set forth in this Section 5.16.

SECTION 5.17. ·Termination of Overhead and Shared Services. The Purchaser acknowledges and agrees that, except as otherwise expressly provided in the Transition Services Agreement, effective as of the Closing Date (i) all Overhead and Shared Services provided to the Business or the Companies (except the Transferred Overhead and Shared Services) shall cease and (ii) the Sellers or their Affiliates shall have no further obligation to provide any Overhead and Shared Services to the Companies and/or the Business.

SECTION 5.18. [Reserved].

SECTION 5.19. Cancellation of Intercompany Accounts. The Sellers shall procure that all payables and/or receivables between the Sellers or any of their Affiliates (other than the Companies), on the one hand, and the Companies, on the other hand, be cancelled without payment prior to or as of the Closing Date.

SECTION 5.20. Directors' and Officers' Release, Indemnification and Insurance.

(a) The Purchaser shall cause the Companies to irrevocably release and discharge, effective as of the Closing Date, the directors and officers of the Companies holding office as of the Closing Date and any former director or officer of the Companies from and against any and all past, existing or future, claims, demands, obligations and Liabilities, whether known or unknown, suspected or unsuspected, at law or in equity, arising from or related to any act or omission by any of those individuals in their capacity of directors or officers of the Companies prior to the Closing Date; provided, however, that nothing herein shall release or discharge the directors and officers of the Companies of any criminal acts, fraud or other intentional malfeasance contrary to the interests of the Companies.

(b) The Purchaser further agrees that all rights to exculpation, indemnification and advancement of expenses now existing in favor of the current or former directors, officers or employees, as the case may be, of the Companies as provided in their respective certificates of incorporation or by-laws or other similar constituent documents or in the agreements listed on Section 5.20 of the Sellers Disclosure Schedule shall continue in full force and effect after the Closing. For a period of 6 years from the Closing Date, the Purchaser shall cause the Companies

123

to (i) maintain in effect the exculpation, indemnification and advancement of expenses provisions of any Company's certificates of incorporation and by-laws or similar constituent documents as in effect on the date hereof or in any indemnification agreements listed on Section 5.20 of the Sellers Disclosure Schedule, and (ii) not amend, repeal or otherwise modify any such provisions in any manner that would adversely affect the rights thereunder of any individuals who at the Closing Date were current or former directors, officers or employees of the Companies; provided, however, that all rights to indemnification in respect of any actual or threatened Action pending or asserted or any claim made within such period shall continue until the disposition of such Action or resolution of such claim. From and after the Closing Date, the Purchaser shall cause the Companies to honor, in accordance with their respective terms, each of the covenants contained in this Section 5.20 without limit as to time.

(c)   From and after the Closing, the Purchaser shall, and shall cause the Companies to, to the fullest extent permitted under applicable Law, indemnify and hold harmless (and advance funds in respect of each of the foregoing) each current and former director or officer of the Companies (each, together with such Person's heirs, executors or administrators, an "Indemnified Person") against any costs or expenses (including advancing reasonable attorneys' fees and expenses in advance of the final disposition of any claim or Action to each Indemnified Person to the fullest extent permitted by Law), judgments, fines, losses, claims, damages, Liabilities and amounts paid in settlement in connection with any Action, arising out of, relating to or in connection with any such Person's service as a director or officer of the Companies or services performed in connection with such Person's serving as an officer or director or other fiduciary in any entity if such service was at the request or for the benefit of the Companies, in each case, at or prior to the Closing Date (collectively, the "Indemnified Expenses"); provided, however, that the Purchaser and the Companies shall not be liable for any settlement effected without their prior written consent and the Purchaser and the Companies shall not be obligated to pay the fees and expenses of more than one counsel (selected by a plurality of the applicable Indemnified Persons and reasonably satisfactory to the Purchaser or the Companies, as applicable) for all Indemnified Persons in any jurisdiction with respect to any single such claim or Action, unless the use of one counsel for such Indemnified Persons would present such counsel with a conflict of interest that would make such joint representation inappropriate. In the event of any such Action, the Purchaser shall, and shall cause the Companies to, reasonably cooperate with the Indemnified Person in the defense of any such Action. Notwithstanding the foregoing, nothing herein shall require the Purchaser to, or cause the Companies to, reasonably cooperate with or indemnify and hold harmless any current or former director or officer of a Company against any Indemnified Expenses arising out of, relating to or in connection with any criminal acts, fraud or other intentional malfeasance contrary to the interests of such Company.

(d)   The Purchaser shall, and shall cause the Companies to, obtain, effective as of the Closing Date, "tail" insurance policies with a claims period of at least six years from the Closing Date with respect to directors' and officers' liability insurance of the type and with an amount of coverage as are substantially similar to those of the directors' and officers' liability insurance maintained as of the date hereof by the Sellers and the Companies (the "Current Policies"), and with such other terms as are no less favorable than those of the Current Policies; provided that, in satisfying such obligation, the Companies shall not be obligated to pay aggregate premiums in excess of 225% of the aggregate per annum amount that the Sellers or the

124

Companies paid for such coverage of such directors' and officers' liability under the Current Policies in the last full year prior to the date hereof, it being understood and agreed that the Companies shall nevertheless be obligated to provide the maximum coverage as may be obtained for such amount.

(e)    The Purchaser shall cause the Companies to pay all reasonable expenses, including reasonable attorneys' fees, that may be incurred by any Indemnified Person in enforcing the indemnity and other obligations provided in Section 5.20.

(f)    The rights of each Indemnified Person hereunder shall be in addition to, and not in limitation of, any other rights such Indemnified Person may have under the certificates of incorporation or by-laws or other constituent documents of the Companies, any other indemnification arrangement, the Delaware General Corporation Law or otherwise.. The provisions of this Section 5.20 expressly are intended to benefit, and are enforceable by, each of the Indemnified Persons.

(g)    In the event the Purchaser or any Company or any of their successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, then, and in either such case, proper provision shall be made so that the successors and assigns of the Purchaser or the Companies shall assume the obligations set forth in this Section 5.20.

SECTION 5.21.    Insurance Matters.

(a)    The Purchaser acknowledges and agrees that coverage of the assets, tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of, the Business and the Companies (collectively with the Business and the Companies, the "Covered Assets and Persons") under all current or previous insurance policies of the Sellers and their Affiliates (other than the Companies), including all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, and contaminated products insurance policies and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates (other than the Companies) that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing (the "Seller Insurance Policies") shall cease as of the Closing Date and the Covered Assets and Persons shall be deleted in all respects as insured (or additional insured, as the case may be) under all Seller Insurance Policies. Except to the extent provided in Section 2.1.1(p) or Section 5.21(c), the Sellers shall retain any rights to, including any right to any proceeds received in respect of, any claim pending as of the date hereof or made after the date hereof under any Seller Insurance Policy, even if such claims relates to the capital assets or properties of the Business or the Companies.

(b)    If after the Closing Date the Purchaser or the Sellers (or any of their respective Affiliates) reasonably require any information regarding claim data or other information pertaining to a claim or an occurrence reasonably likely to give rise to a claim (including any pre-Closing claims under the Seller Insurance Policies that are to be covered

125

under the retrospective component of the new insurance policy) in order to give notice to or make filings with insurance carriers or claims adjustors or administrators or to adjust, administer or otherwise manage a claim, then the Sellers or the Purchaser, as the case may be, shall cause such information to be supplied to the other (or their designee), to the extent such information is in their possession and control or can be reasonably obtained by the Sellers or the Purchaser (or their respective Affiliates), as applicable, promptly upon a written request therefore. If the Purchaser desires access to, and utilization of, claims data or information maintained by an insurance company or other Third Party in respect of any claim (including any pre-Closing claims under any Seller Insurance Policies that are covered under the retrospective component of the new insurance policies), the Purchaser shall be exclusively responsible for acquiring from such insurance company or Third Party, at the Purchaser's sole cost and expense, the rights necessary to permit them to obtain access to and utilization of such claims data or information. If any Third Party requires the consent of the Sellers or any of their Affiliates to the disclosure of such information, such consent shall not be unreasonably withheld.

(c)    Prior to Closing, the Sellers shall at all times maintain their current property insurance in respect of the Included Real Estate and the Owned Equipment (including buildings, equipment, leasehold improvements and business interruption) and make and diligently pursue any applicable insurance claims related to damage or destruction to any Owned Equipment wherever located, or any damage or destruction to improvements or leasehold improvements owned by, or the responsibility of, the Sellers and located at or on any Included Real Estate, it being acknowledged that the insurance provisions in the relevant Real Estate Leases will apply where damage or destruction has occurred to the extent applicable. Notwithstanding anything in this Agreement to the contrary:

> (i)    if and to the extent that any Owned Equipment, wherever located, is destroyed or damaged prior to Closing, and is not replaced or repaired or restored to its condition prior to such damage or destruction, then at Closing, the Sellers shall pay to the Purchaser the amount of any net insurance proceeds received in respect of such Owned Equipment (excluding any insurance proceeds related to business interruption insurance) that have not been applied to repair, replacement or restoration, as applicable, and assign any such claim and the rights to receive the proceeds of any such claim that has not yet been finally adjusted;

> (ii)    if and to the extent that the Owned Real Estate is destroyed or damaged prior to Closing and is not replaced or repaired or restored to its condition prior to such damage or destruction, then at Closing, the Sellers shall pay to the Purchaser the amount of any net insurance proceeds received in respect of such Owned Real Estate (excluding any proceeds related to business interruption insurance) that have not been applied to repair, replacement or restoration, as applicable, and assign any such claim and the rights to receive the proceeds of any such claim that has not yet been finally adjusted;

> (iii)    if and to the extent that any leasehold improvements at any property that is subject to a Designated 365 Real Estate Lease, Designated Non-365 Real Estate Lease, or Company Lease are destroyed or damaged prior to Closing and are not replaced or repaired or restored to their condition prior to

126

such damage or destruction, then at Closing, with respect to any such leasehold improvements (excluding any proceeds related to business interruption insurance), the Sellers shall pay to the Purchaser the amount of any net insurance proceeds received in respect of such leasehold improvements that have not been applied to repair, replacement or restoration, as applicable, and assign any such claim and the rights to receive the proceeds of any such claim that has not yet been finally adjusted;

(iv)    if and to the extent that any improvements or leasehold improvements at any property that is subject to a Sublease are destroyed or damaged prior to Closing, to the extent of the receipt of insurance proceeds (excluding any proceeds related to business interruption insurance) and subject to the terms of the overlease, the Sellers shall be responsible to the extent required under the terms of the Sublease (as if the Sublease were in effect prior to Closing and as if the sublandlord were obligated to restore such improvements and leasehold improvements under the Sublease, unless and to the extent the prime landlord is expressly obligated to restore such improvements under the terms of the overlease), to restore the applicable improvements and leasehold improvements to the condition prior to such damage or destruction. To the extent that any property subject to a Sublease is destroyed or damaged after Closing, the applicable terms of the Sublease shall apply; and

(v)    if and to the extent that any Direct Lease Real Estate is destroyed or damaged prior to Closing, to the extent of the receipt of insurance proceeds (excluding any proceeds related to business interruption insurance), the Sellers shall be responsible to the extent required under the terms of the Direct Lease (as if the Direct Lease were in effect prior to Closing and as if the landlord were required to restore tenant improvements in the same manner as other improvements) to restore the applicable improvements and leasehold improvements to the condition prior to such damage or destruction. To the extent that any Direct Lease Real Estate is destroyed or damaged after Closing, the applicable terms of the Direct Lease shall apply.

SECTION 5.22.    Sellers Deposits, Guarantees and Other Credit Support of the Business. Following the Closing, the Purchaser shall, or shall cause a Designated Purchaser to:

(a)    procure the return and/or release by the applicable counterparty, as soon as reasonably practicable but in no event later than thirty (30) days after the Closing Date, of:

(i)    any lease security deposits given by the Sellers under those real estate leases listed in Section 5.22(a)(i) of the Sellers Disclosure Schedule that are Assigned Contracts that have not been set off or otherwise applied by the holders thereof (the "Security Deposits"); and

(ii)    any guarantee, counter guarantee or credit support provided or procured by, or any letter of credit, performance bond or surety posted or procured by, any Seller or any of its Affiliates (other than the Companies) or any

127

Third Party on behalf (and with a counter guarantee of) the Sellers in favor of Third Parties, securing Liabilities of the Business under the Assigned Contracts or Liabilities of the Companies; provided that the obligations of Purchaser or any Designated Purchaser under this Section 5.22(a)(ii) shall be limited, in the case of any Real Estate Lease, to guaranties, credit support, letters of credit, performance bonds and sureties identified in Section 5.22(a)(ii) of the Sellers Disclosure Schedule;

(b)      if the Security Deposits are not released or returned to the relevant Seller within thirty (30) days from Closing, pay to the relevant Seller an amount equal to such outstanding Security Deposits (in which case, effective upon such payment, the relevant Seller hereby assigns to the Purchaser any right or credit against the relevant lessor relating to such Security Deposit); and

(c)      hold harmless the Sellers and their Affiliates from and against any Loss resulting from, or relating to, any obligation set forth in clauses (a) and (b) of this Section 5.22.

SECTION 5.23.   Use of Sellers' Trademarks.   Except as expressly provided in the Trademark License Agreement, as of the Closing Date, neither Purchaser nor the Companies shall have the right to use, and the Purchaser shall cause the Companies to cease and desist from all use of, the name "Nortel" or any Trademarks owned by the Sellers or any of their Affiliates or any other mark employing the word "Nortel" or any confusingly similar Trademarks to any of the foregoing (collectively, the "Sellers' Trademarks") and the Purchaser shall cause the Companies to adopt new Trademarks related thereto which are not confusingly similar to the Sellers' Trademarks and logos.

SECTION 5.24.   Maintenance of Books and Records.

(a)      After the Closing, the Purchaser shall, and shall cause the Designated Purchasers and the Companies to, preserve, until the fifth (5th) anniversary of the Closing Date (or such longer period as may be required under applicable Law), all pre-Closing Date records to the extent relating to the Business possessed or to be possessed by such Person. After the Closing Date and until the fifth (5th) anniversary of the Closing Date (or such longer period as may be required under applicable Law), upon any reasonable request from the Sellers or their representatives, the Purchaser shall, and/or shall cause the Person holding such records to, (a) provide to the Sellers or their representatives reasonable access to such records during normal business hours and (b) permit the Sellers or their representatives to make copies of such records, in each case at no cost to the Sellers or their representatives (other than for reasonable out-of-pocket expenses). In addition, in the event that the financial statements of the Business or the Companies are audited for any period prior to the Closing Date, upon execution of a customary access letter if required, the Sellers and their representatives (including their outside accountants) shall be granted access to all relevant work papers, schedules, memoranda and other documents prepared by the Companies or their representatives (including outside accountants) in connection with the Sellers' completing the audit of their accounts for the 2009 fiscal year; provided, however, that nothing herein shall require the Purchaser to disclose any information to the Sellers if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement (it being understood that the

128

Purchaser shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the Sellers to occur without so jeopardizing privilege or contravening such Law, duty or agreement) or require the Purchaser to disclose its Tax records. Such records may be sought under this Section 5.24 for any reasonable purpose, including to the extent reasonably required in connection with accounting, litigation, federal securities disclosure or other similar needs of the Sellers (other than claims between the Sellers and the Purchaser or any of their respective Subsidiaries under this Agreement or any Ancillary Agreement). Notwithstanding the foregoing, (i) any and all such records may be destroyed by the Purchaser if the Purchaser sends to the Sellers written notice of its intent to destroy such records, specifying in reasonable detail the contents of the records to be destroyed; such records may then be destroyed after the sixtieth (60th) day following such notice unless the Sellers notify the destroying party that the Sellers desire to obtain possession of such records, in which event the Purchaser shall transfer or cause to be transferred the records to the Sellers and the Sellers shall pay all reasonable expenses of the Purchaser in connection therewith and (ii) the Purchaser shall not be required to provide the Sellers access to, or copies of, any Tax records or audited financial statements covering any pre-Closing period.

      (b)    After the Closing, Sellers shall preserve, until the fifth (5th) anniversary of the Closing Date (or such longer period as may be required under applicable Law), all pre-Closing Date records to the extent relating to the Business possessed or to be possessed by such Person. After the Closing Date and until the fifth (5th) anniversary of the Closing Date (or such longer period as may be required under applicable Law), upon any reasonable request from the Purchaser, any Designated Purchaser or their respective representatives, the relevant Seller shall, and/or shall cause the Person holding such records to, (a) provide to the Purchaser, any Designated Purchaser or their respective representatives reasonable access to such records during normal business hours and (b) permit the Purchaser, any Designated Purchaser or their respective representatives to make copies of such records, in each case at no cost to the Purchaser, such Designated Purchaser or their respective representatives (other than for reasonable out-of-pocket expenses); provided, however, that nothing herein shall require any Seller to disclose any information to the Purchaser, any Designated Purchaser or their respective representatives if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement (it being understood that the Sellers shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the Purchaser, any Designated Purchaser or their respective representatives to occur without so jeopardizing privilege or contravening such Law, duty or agreement) or require the Sellers to disclose their Tax records. Such records may be sought under this Section 5.24(b) for any reasonable purpose, including to the extent reasonably required in connection with accounting, litigation, federal securities disclosure or other similar needs of the Purchaser, any Designated Purchaser or their respective representatives (other than claims between the Sellers and the Purchaser or any of their respective Subsidiaries under this Agreement or any Ancillary Agreement). Notwithstanding the foregoing, (i) any and all such records may be destroyed by the Sellers if the Sellers send to the Purchaser written notice of their intent to destroy such records, specifying in reasonable detail the contents of the records to be destroyed; such records may then be destroyed after the sixtieth (60th) day following such notice unless the Purchaser notifies the destroying party that the Purchaser desires to obtain possession of such records, in which event the Sellers shall transfer or cause to be transferred the records to the Purchaser and

129

the Purchaser shall pay all reasonable expenses of the Sellers in connection therewith and (ii) the Sellers shall not be required to provide the Purchaser, any Designated Purchaser or their respective representatives access to, or copies of, any Tax records or audited financial statements covering any pre-Closing period.

SECTION 5.25. Right to Exclude.

(a) At any time from the execution of this Agreement until the end of the Contract Review Period, the Purchaser may elect, by written notice to the Main Sellers, but without any effect on the Purchase Price or the Purchaser's obligation to offer employment to at least the numbers of Employees set out in Section 7.1.1 of the Sellers Disclosure Schedule, to designate as Excluded Assets all of the assets, interests and rights of any Excludable Other Seller if (i) such Excludable Other Seller is listed on Section 5.25(a) of the Sellers Disclosure Schedule, or (ii) it is the case that, absent such election, by consummating the transactions contemplated hereby, the Purchaser or a Designated Purchaser would succeed to an Undisclosed Material Liability of such Excludable Other Seller or an Undisclosed Material Liability of such Excludable Other Seller would be transferred to or assumed by the Purchaser or a Designated Purchaser (any such Excludable Other Seller so designated by the Purchaser, an "Excluded Other Seller" and, together with any Excluded EMEA Seller, the "Excluded Sellers"), whereupon such assets, interests and rights shall be Excluded Assets and any Liabilities to the extent arising from or related to such assets, interests or rights shall be Excluded Liabilities, and such Excluded Other Seller shall not be a Party to this Agreement, shall not be an Other Seller, and shall have no rights or obligations hereunder, provided that (x) each Excluded Other Seller shall remain bound by the provisions of Article X, (y) the Data Inventory Floor, the Voice Inventory Floor, the Spares and Services Inventory Floor, the Inventory Value, the Sellers Inventory Schedule and the revenue assumptions presented in the Sellers Forecast set forth in Section 1.1(d)(ii) of the Sellers Disclosure Schedule shall be adjusted after the end of the Contract Review Period to reflect the exclusion of the relevant revenues and inventory of the Excluded Sellers, and (z) and each Excluded Other Seller shall retain the right to designate (A) any Customer Contracts to which it is a party that was entered into in the Ordinary Course and meets the requirements of the first sentence of Section 5.14(c) (other than clause (iii) thereof) as a Selected Rejected Customer Contract entitled to the benefits of Section 5.14(c) and (B) the Enterprise Portion of each Bundled Contract to which it is a party as an Enterprise Portion entitled to the benefits of Section 5.14(b)(B). In addition to the foregoing, following such election of an Excluded Other Seller by the Purchaser, no Sublease and no license or other arrangement pursuant to Section 5.16(a) shall be required to be entered into with respect to any premises related to such Excluded Other Seller's operations prior to the date of the Purchaser's election. For the avoidance of doubt, the designation of assets, interests or rights in any country as Excluded Assets shall not in any way prevent the Purchaser or any of its Affiliates from engaging in the Business (defined as if such assets, interests or rights were not Excluded Assets) in such country either before or after the Closing. Any Customer Contract to which any Seller (or any of its Subsidiaries) that is designated as an Excluded Asset is party will be deemed to be a Rejected Customer Contract. If a TSA Seller becomes an Excluded Other Seller pursuant to this Section 5.25(a), such entity shall not be required to be a party to the Transition Services Agreement. For the avoidance of doubt, the failure of any TSA Seller to become party to the Transition Services Agreement shall not in any way diminish the obligations of the remaining TSA Sellers to provide, or to cause one or more of the Providers (as defined in the Transition

130

Services Agreement) to provide, all Services (as defined therein). Notwithstanding anything herein to the contrary, the Parties agree that neither the Included Services nor the Extra Services shall include any service currently provided by an Excluded Seller unless such service can reasonably be provided by the TSA Sellers without materially changing or burdening the operations of the TSA Sellers.

(b)     The Main Sellers agree that, as of the Closing, (i) neither any Seller nor any Seller's Affiliate will be a party to any Contract with any Excluded Seller that will restrict the Purchaser or a Designated Purchaser, in any material respect, from engaging after the Closing in any business activity relating to the Business in the country where such Excluded Seller is located or organized; and (ii) the Sellers and their Affiliates will cease to supply Products or Services or provide other assistance to an Excluded Seller with respect to the Business (except to the extent required in order to allow such Excluded Seller to continue to perform any obligations under (x) a contract with one of its customers existing as of the date hereof, or (y) a contract with one of its customers entered into after the date hereof but before Closing that complies with the Post-Signing Inclusion Criteria entered into in the Ordinary Course, in each case which such Excluded Seller is required by such contract to perform until the earliest of (A) the expiration of such contract (without giving effect to any extension of the term thereof other than at the option of the counterparty thereto), (B) the earliest date on which such Excluded Seller has the right to terminate such contract without penalty or (C) the date on which such contract is terminated by the counterparty thereto; provided that the Purchaser and its Affiliates shall be under no obligation to make Products or Services (or any other products or services) available to the Sellers or their Affiliates or provide other assistance in connection therewith) and the Purchaser and its Affiliates will have no obligation to supply Products or Services (or any other products or services) or provide other assistance to the Excluded Sellers; provided that, notwithstanding clauses (i) and (ii) above, the Purchaser or a Designated Purchaser will, if requested to do so, perform any Subcontracts that it enters into pursuant to Section 5.14(c) or Clause 10.35 of the EMEA Asset Sale Agreement at the request of an Excluded Seller and the Sellers may be a conduit through which the Purchaser supplies Products or Services to an Excluded Seller.

SECTION 5.26.   Certain Ancillary Agreements.

(a)     The Primary Parties and, to the extent applicable, the relevant EMEA Sellers, shall use their reasonable best efforts to:

(i)     negotiate in good faith with the relevant contract manufacturers to finalize the terms of the Contract Manufacturing Inventory Agreements based on the term sheet attached hereto as Exhibit E;

(ii)     negotiate in good faith with the LGN Joint Venture the LGN/Korea Distribution Agreement and the LGN/Korea Supply Agreement, subject to the Sellers' production of sufficient information on the relevant entities and documents; and

(iii)     negotiate in good faith with Uni-Nortel the Uni-Nortel Distribution Agreement, subject to the Sellers' production of sufficient information on the relevant entities and documents.

131

(b)     The Parties and the EMEA Sellers acknowledge that, as of the date hereof, the Business entertains several bilateral relationships with other businesses, business segments or divisions of certain Sellers for the supply and/or development of products and services (including certain Products and Services). To the extent such relationships are required to be in place in order to fulfill customer commitments existing as of the Closing Date and which will continue thereafter (for the duration of any individual customer contract including frame contracts), the Primary Parties and the relevant EMEA Sellers shall use their reasonable best efforts to negotiate, or to cause to be negotiated, in good faith commercially reasonable terms in order to address the interdependencies among businesses set forth in Exhibit L, including through a potential Mutual Development Agreement, Purchaser Supply Agreement, Seller Supply Agreement or other appropriate commercial arrangements, and taking into account options available to the Primary Parties. The Primary Parties shall also use their reasonable best efforts to negotiate in good faith Subcontract Agreements.

(c)     On or before the Closing, the relevant Parties shall enter into the Transition Services Agreement, the Intellectual Property License Agreement and the Trademark License Agreement, each in the form attached hereto.

(d)     Within the earlier of (i) one hundred and five (105) days from the date hereof or (ii) thirty (30) Business Days prior to the Closing Date, the relevant Parties shall enter into the Loaned Employee Agreement in the form attached hereto as Exhibit J.

SECTION 5.27.   Avoidance Actions.   The Sellers covenant that they shall not commence any action under sections 544 through 551, 553 and 558 of the U.S. Bankruptcy Code against any customer, contract party or vendor of the Business.

SECTION 5.28.   Subleases.

(a)     For each Assumed and Subleased Real Estate Lease designated to be subleased pursuant to Section 2.1.5(b) or Non-365 Subleased Real Estate Lease designated to be subleased pursuant to Section 2.1.6(b), the relevant Seller, as sublandlord, and Purchaser or a Designated Purchaser, as subtenant, will enter into a sublease in the form attached hereto as Exhibit N (each such sublease a "Sublease") at Closing with a term to expire one Business Day prior to the scheduled expiration date of the applicable Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease (subject to the provisions of Section 5.31) with respect to the portion of the applicable property to be used by the Purchaser or a Designated Purchaser for the Business.

(b)     The Sellers and the Purchaser will cooperate to determine how to segregate and demise the subleased premises, including the size and configuration of space to be subleased to Purchaser or a Designated Purchaser (which shall, other than in the case of any Sublease relating to Replacement Lease A (which shall be determined in accordance with Exhibit 5.28(g)), be based upon the contemplated use of the demised premises and employee headcount reasonably agreed between Purchaser and Sellers on or prior to the Closing Date and shall also take into account the continued marketability and required contiguity of that portion of the premises to be subject to the related Sublease and the premises not to be subject to the related Sublease) and provide relevant information (subject to confidentiality limitations) on the

132

subleased premises to the other provided that it is understood and agreed that all costs of such segregation and demising will be the sole responsibility of Purchaser (other than in the case of the Sublease relating to Replacement Lease A (which shall be determined in accordance with Exhibit 5.28(g)) and the Sublease relating to Lease C (which shall be determined in accordance with Exhibit 5.32(c)) and that Purchaser's plans and specifications therefor will be subject to Sellers' reasonable approval.

(c)    From and after the date hereof and subject in all cases to Section 5.28(d), Purchaser shall be permitted to contact and have reasonable access to any landlord under the Assumed and Subleased Real Estate Leases or Non-365 Subleased Real Estate Leases for the purpose of (x) negotiating a direct lease between such landlord and Purchaser or Designated Purchaser for all or a portion of the space covered or reasonably anticipated to be covered by the relevant Sublease, (y) recognition and non-disturbance protections for the benefit of Purchaser, and/or (z) leasing other space in the building to which the Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease relates (it being agreed that the leasing or subleasing of such other space shall not relieve Purchaser or a Designated Purchaser of its obligations in respect of the relevant Sublease) and for no other purpose. Seller shall cooperate with Purchaser or Designated Purchaser and use commercially reasonable efforts, without incurring any third-party costs, to assist Purchaser or Designated Purchaser in connection with such negotiations.

(d)    Purchaser's rights set forth in Section 5.28(c) shall be subject to applicable Law and the following conditions:

(i)    Seller and Purchaser or Designated Purchaser shall have reasonably agreed on a mutually acceptable strategy for negotiations with each landlord (including the ability of the Purchaser or a Designated Purchaser to enter into a direct lease for all or less than all of the space covered or reasonably anticipated to be covered by the relevant Sublease in lieu of a Sublease) and the Main Sellers shall be afforded the right to participate in all such communications with the landlord to the extent that they wish to do so,

(ii)    neither any Seller nor Purchaser nor Designated Purchaser shall have any obligation to agree to any increase in any of its obligations under the applicable Assumed and Subleased Real Estate Lease, Non-365 Subleased Real Estate Lease or Sublease in connection with such discussions with the landlords,

(iii)    such negotiations shall be immediately terminated if they are having an adverse impact on the landlord-tenant relationship between the Sellers and such landlord, as determined by the Sellers in their reasonable discretion,

(iv)    the Sellers shall have no obligations under or with respect to such direct lease negotiated by Purchaser or any Designated Purchaser, and

(v)    neither Purchaser nor any Designated Purchaser shall be permitted to enter into a direct lease without obtaining NNI's prior written consent, which consent may be granted or withheld in the Seller's sole discretion, unless:

133

(A)     there is no modification to the terms of the related Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease that is adverse to the Sellers in connection with the entry into such direct lease,

(B)     the Sellers shall not be obligated to pay any fees, penalties or other charges in connection with the entry into the direct lease by the Purchasers or the Designated Purchaser,

(C)     Sellers are fully and finally released from all obligations and liability to such landlord and any other parties with respect to the space subject to the direct lease, and

(D)     either (x) all, but not less than all, of the space covered or reasonably anticipated to be covered by the relevant Sublease is subject to such direct lease or (y) if such proposed direct lease covers less than all of the space covered or reasonably expected to be covered by the relevant Sublease then (A) the remainder of such space (taking into account the relevant loss factors and all common area cost allocation) is expressly removed from the demised premises for all purposes covered by the relevant Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease and the rent and additional rent obligations of Seller is reduced accordingly and (B) the demised premises which thereafter remain subject to a Seller's Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease is not divided into two or more non-contiguous portions and is not less marketable than it was prior to Purchaser's or Designated Purchaser's entry into such direct lease.

(e)     After the Closing, the subtenant under each Sublease shall also be permitted to have contact with the landlord under the related Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease on routine facilities maintenance matters, and the applicable sublandlord will reasonably cooperate with such subtenant, at Purchaser's expense, to enforce the obligations of such landlord under the applicable Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease.

(f)     With respect to the Sublease of property located at Belleville, Ontario, the Sellers agree that they will not exercise any options to extend the applicable Non-365 Subleased Real Estate Lease related thereto and the Purchaser or a Designated Purchaser will in its sole discretion be permitted to negotiate a direct lease with the landlord with respect to the time after the expiration of the term of the applicable Non-365 Subleased Real Estate Lease and Sellers shall have no obligations under or with respect to such direct lease.

(g)     Notwithstanding any provision of this Agreement to the contrary, Purchaser (on behalf of itself and any Designated Purchaser) and Sellers agree to be bound by and comply with the terms set forth in Exhibit 5.28(g) with respect to "Replacement Lease A" identified in such Exhibit 5.28(g).

SECTION 5.29.   Competing Transaction.   From the date of this Agreement until the entry of the U.S. Bidding Procedures Order, and from the date of the conclusion of the

134

Auction (as defined in the U.S. Bidding Procedures Order) until the Closing Date or termination of this Agreement, neither any Seller nor any Affiliate of any Seller shall, directly or indirectly through any of its officers, directors, employees, agents, professional advisors or other representatives (collectively, the "Representatives"), (i) solicit, initiate or encourage or engage in discussions or negotiations with respect to any proposal or offer from any Person (other than the Purchaser or its affiliates) relating to in each case any acquisition, divestiture, recapitalization, business combination or reorganization of or involving all or a substantial part of the business and operations of the Business (a "Competing Transaction"), (ii) furnish any information with respect to, or participate in, or assist, any effort or attempt by any Person to do or seek the foregoing, (iii) execute any letter of intent or agreement providing for a Competing Transaction, or (iv) seek or support Bankruptcy Court approval of a motion or Order inconsistent with the transactions contemplated herein (provided, however, that nothing contained herein shall prohibit the Sellers from providing any Person with the Bidding Procedures and related documents, answering questions about the Bidding Procedures or announcing the execution of this Agreement or the Auction). Notwithstanding the foregoing, from the date of this Agreement until the entry of the U.S. Bidding Procedures Order, the Sellers may provide continued access to written due diligence materials about the Business in an electronic data room (including written responses to requests for information made after the date hereof), to only such Person or Persons that (A) have access to such electronic data room as of the date hereof and (B) have satisfied the requirements of paragraph (a) of the "Participation Requirements" of the U.S. Bidding Procedures Order within ten (10) Business Days from the date hereof (it being understood that, during such ten (10) Business Day period, the Sellers will be allowed to (x) request such Persons to enter into amendments to their existing confidentiality agreements in order to render them compliant with the requirements of the U.S. Bidding Procedures, (y) discuss and negotiate such amendments with those Persons and (z) execute such amendments, and each such action shall not constitute a breach of this Section 5.29); provided, however, that the Sellers must provide the Purchaser at least equivalent access to all such written due diligence materials. Without prejudice to any other methods or actions that may result in the cure of any breach of this Section 5.29, the Parties acknowledge and agree that in the event that any officer or other employee of any Seller acting alone (without the assistance of outside advisors) in violation of a corporate policy approved by the board of directors of NNC takes an action that constitutes a breach of clause (i) of this Section 5.29 but does not constitute a breach of any other clause of this Section 5.29, such breach shall be deemed cured in the event such action ceases and one or more of the Sellers notifies the counterparty or counterparties to the potential Competing Transaction in writing that the Sellers will not undertake such Competing Transaction, in each case no later than the fifth (5th) day after the Sellers become aware of such breach (for such purposes excluding the knowledge of the employee or officer whose action constitutes such breach), provided that such action that constituted the breach did not involve substantive negotiations regarding the terms of such Competing Transaction.

### SECTION 5.30.    Direct Leases.

(a)    For each of the properties owned in fee by the Sellers identified on Section 5.30(a) of the Sellers Disclosure Schedule (the "Direct Lease Real Estate"), Purchaser agrees that the relevant Seller and Purchaser or a Designated Purchaser will enter into a lease on fair market terms for a term of 3 years and otherwise in substantially the form attached hereto as Exhibit N (the "Direct Leases") and a notice of lease with respect thereto for recording in the

135

registry of deeds to the extent possible in each relevant jurisdiction (the "**Notices of Lease**") with respect to the portion of the Direct Lease Real Estate to be leased by the Purchaser or a Designated Purchaser for the Business.

    (b)    Reserved.

    (c)    The Sellers' obligation to make any Direct Lease Real Estate available to the Purchaser or a Designated Purchaser, either at Closing or during the term of a Direct Lease, shall be subject to the Sellers' right to implement their global real estate strategy, as such strategy develops over time, and, in connection therewith, to dispose of or retain Direct Lease Real Estate as the Sellers deem appropriate in their sole discretion, either, at Sellers' election, subject to the related Direct Lease or, in accordance with the requirements of this Section 5.30(c), free and clear of the same. Sellers shall give Purchaser or a Designated Purchaser reasonable prior notice, not less than the number of days specified in Section 5.30(a), of the Sellers Disclosure Schedule with respect to such property, of any such disposition of Direct Lease Real Estate, and Purchasers shall be permitted to remain at such property under the terms of the Direct Lease until the end of the notice period. Sellers' only liability to the Purchaser or any other party in the event that any Direct Lease Real Estate with respect to which Purchaser has elected to enter into a Direct Lease is not made available at Closing or, following entry into a Direct Lease, the relevant Seller terminates such Direct Lease in order to sell or otherwise disposes of such Direct Lease Real Estate free and clear of such Direct Lease shall be to pay the Relocation Costs of Purchaser or Designated Purchaser relating to the relocation of all Assets and business operations required as a result of such sale or other disposition. To the extent that the relevant Seller sells or otherwise disposes of any Direct Lease Real Estate with respect to which Purchaser has elected to enter into a Direct Lease prior to Closing, the relevant Seller and Purchaser or a Designated Purchaser shall further comply with the requirements of clauses (ii), (iii) and (v) of Section 5.31(g) relating to Mission Critical Leases, to the extent applicable.

    (d)    Sellers and Purchaser will cooperate to determine how to segregate and demise the leased premises to Purchaser or a Designated Purchaser (which shall be based upon the contemplated use of the demised premises and employee headcount reasonably agreed between Purchaser and Sellers on or prior to the Closing Date and shall also take into account the continued marketability and required contiguity of those portions of such Direct Lease Real Estate to be subject and not to be subject, respectively, to the related Direct Lease) and provide relevant information (subject to confidentiality limitations) on the Direct Lease Real Estate to the other provided that it is understood and agreed that all costs of such segregation and demising will be the sole responsibility of Purchaser and that Purchaser's plans and specifications therefor will be subject to Sellers' reasonable approval.

### SECTION 5.31.   Rejection and Expiration of Real Estate Leases.

    (a)    Notwithstanding any provision of this Agreement to the contrary, it is understood and agreed that the Sellers' obligations to (i) assign any 365 Real Estate Lease to the Purchaser or a Designated Purchaser and (ii) enter into or continue to sublease pursuant to a Sublease under any Assumed and Subleased Real Estate Lease (the "**Conditional Subleases**") shall be subject to the Sellers' right to reject such 365 Real Estate Lease (including Assumed and Subleased Real Estate Leases) at any time on or before the Latest Lease Rejection Date. The

Sellers may exercise such right to reject any 365 Real Estate Lease and, as applicable, either be relieved of their obligation to assign such 365 Real Estate Lease to the Purchaser or a Designated Purchaser or terminate, or be relieved of their obligation to enter, the related Conditional Sublease at any time following the execution of this Agreement, including, as applicable, following the execution of such Conditional Sublease with the Purchaser or a Designated Purchaser (provided that after Closing, the Sellers will not reject any 365 Real Estate Leases that are Assumed and Assigned Contracts).

(b)      In each instance in which a Seller on or before the applicable Latest Lease Rejection Date, in its sole discretion, rejects a 365 Real Estate Lease that Sellers would otherwise be obligated to assign to the Purchaser or a Designated Purchaser or under which Sellers would otherwise be obligated to enter into a Sublease,

(i)      Sellers will provide Purchaser a copy of the rejection notice delivered to the relevant landlord; provided that no failure to provide any such copy shall impair or impact the effectiveness of such rejection;

(ii)      except as provided in Section 5.31(g) with respect to Relocation Costs, no reimbursements for any costs, expenses or damages shall be payable by any Seller or any of their Affiliates to Purchaser, any Designated Purchaser, any of their Affiliates or any other Person as a result of such rejection; provided that if the Seller performs the relocation of Assets, Employees or business operations in connection with any such rejection occurring after the Closing that, individually or in the aggregate with other relocations, has a Material Adverse Effect, then, to the extent that such Material Adverse Effect resulted from Seller's gross negligence in performing such relocation, Seller shall be responsible for the Relocation Damages resulting therefrom;

(iii)      Sellers agree that such rejection shall only be effective (except with respect to Mission Critical Leases, as to which the terms of Section 5.31(g) shall apply) upon reasonable prior notice to Purchaser from Sellers, no less than ten days following Sellers' notification to Purchaser of the same, and termination of the related Conditional Sublease (as applicable) shall be effective upon reasonable prior notice from Sellers, no less than nine days following Sellers' notification to Purchaser of the same

(iv)      Purchaser shall be relieved of its obligation to accept assignment or enter into a Sublease with respect to the applicable 365 Real Estate Lease; and

(v)      the Sellers will cooperate with Purchaser or a Designated Purchaser and use commercially reasonable efforts, in each instance, to minimize the disruption to the affected business operations as a result of any rejections

(c)      If the rejection is effective on or prior to Closing, Seller will give Purchaser access to the subject premises for not less than ten (10) Business Days after receipt of the rejection notice to identify any Assets acquired hereunder located at the subject premises. The Sellers agree that they will remove and store such Assets at the Seller's sole cost and

137

expense until delivery to the Purchaser or a Designated Purchaser at Closing (it being understood that the Sellers shall not be obligated to remove trade fixtures or fixtures, furniture, furnishings or fittings from any such real property or to store the same or to deliver the same at any point to the Purchaser or a Designated Purchaser at Closing unless the same are included in the Assets and are specifically identified by Purchaser for removal). It is further understood that transfer of the Assets stored in accordance herewith may be made by delivery of a receipt from any warehouse or storage facility entitling the Purchaser or a Designated Purchaser to retrieve all such Assets and the Purchaser or a Designated Purchaser shall be responsible for the cost of delivering such Assets to the Purchaser or a Designated Purchaser on or after the Closing Date. In the event the Purchaser fails to identify any Assets within ten (10) Business Days that it wishes to have stored within the above time frame, the Sellers shall be entitled to abandon or otherwise dispose of such Assets in their sole discretion without any liability to Purchaser.

(d)     If a rejection of an Assumed and Subleased Real Estate Lease is effective after Closing, subject to the provisions of Section 5.31(g) with respect to Mission Critical Leases, the Purchaser agrees to, or to cause a Designated Purchaser to, vacate the premises which are subject to such Conditional Sublease in conformance with the requirements of the relevant Assumed and Subleased Real Estate Lease and as otherwise required by such Conditional Sublease.

(e)     In connection with any 365 Real Estate Lease as to which the Sellers give a notice of rejection, at the Purchaser's option and written request and sole cost and expense exercised within ten (10) Business Days following receipt of the rejection notice referred to above, the Sellers will reasonably cooperate (without incurring any third-party costs) with the Purchaser's efforts to enter into a new lease with respect to all of the subject premises directly with the relevant landlord (it being agreed that Sellers shall have no obligations under or with respect to any such direct lease). Purchaser further acknowledges that the Sellers have requested the agreement of the landlord under each Designated 365 Real Estate Lease and Assumed and Subleased Real Estate Lease to an extension of the relevant Latest Lease Rejection Date to a date beyond the latest date when the parties estimate a Closing might reasonably occur, provided that it is agreed that, other than for Mission Critical Leases:

(i)     should any such landlord agree to such extension, then at Purchaser's election exercised within ten (10) Business Days following notice by Sellers of such extension and Sellers' intention to reject, the applicable 365 Real Estate Lease will be deemed an Assumed and Assigned Lease and Purchaser shall take an assignment of such 365 Real Estate Lease at Closing (regardless of whether such lease was designated as of the date hereof for assignment or for entry into a Sublease) and Purchaser shall pay Sellers, irrespective of whether Closing subsequently occurs, (A) at the time of such agreement by landlord, one hundred percent (100%) of any extension or option fees imposed by such landlord or otherwise payable by Sellers and (B) prior to the date upon which any such payments are due to landlord, fifty percent (50%) of all of Sellers' actual, out of pocket rent and other occupancy costs under such 365 Real Estate Lease through Closing (regardless of whether all such space is used by the Business as of the date of this Agreement); and

138

(ii)    should such landlord refuse to agree to such extension, or if Closing does not occur on or before the Latest Lease Rejection Date as extended, or if Purchaser elects not to take an assignment of such 365 Real Estate Lease, Sellers shall be free to reject such 365 Real Estate Lease in accordance with the provisions set forth above.

(f)    In the case of Real Estate Leases scheduled to expire prior to the Closing that the Sellers are not otherwise planning to extend, at the request of the Purchaser or a Designated Purchaser, the Sellers will use commercially reasonable efforts, without incurring third party costs, to obtain the agreement of the relevant landlord to a short-term extension of the relevant lease expiration date to a date beyond the latest date when the parties estimate a Closing might reasonably occur, provided it is agreed that:

(i)    should such landlord agree to such extension, Purchaser or a Designated Purchaser shall take an assignment of such Real Estate Lease at Closing (regardless of whether such lease was designated as of the date hereof for assignment or for entry into a Sublease) and Purchaser shall pay Sellers, irrespective of whether Closing subsequently occurs, (A) at the time of such agreement by landlord, one hundred percent (100%) of any extension option fees, increased rent or other increased occupancy costs imposed by such landlord or otherwise payable by Sellers and (B) prior to the date upon which any such payments are due to landlord, fifty percent (50%) of all of Sellers' actual, out of pocket rent and other occupancy costs (without taking into account any increased charges which are the subject of (A) above) under such 365 Real Estate Lease through Closing (regardless of whether all such space is used by the Business as of the date of this Agreement); and

(ii)    should such landlord refuse to agree to such extension, or if Closing does not occur on or before the extended expiration date of such lease, Sellers shall be free to allow such lease to expire.

(g)    Notwithstanding anything to the contrary in this Agreement, if the Sellers elect to reject any Designated 365 Real Estate Lease or Assumed and Subleased Real Estate Lease identified in Section 5.31(g) of the Sellers Disclosure Schedule (collectively, the "Mission Critical Leases"),

(i)    in the case of any rejection which is to be effective prior to Closing, Sellers will give Purchaser or a Designated Purchaser reasonable prior notice, not less than thirty (30) days subject to Sellers' obligations pursuant to Section 5.31(g)(v) (subject to Sellers' obligation to comply with their covenant in Section 5.31(g)(ii)), of their intent to reject such Mission Critical Lease and will provide Purchaser or such Designated Purchaser a copy of the rejection notice; provided that no failure to provide any such notice or copy shall impair or impact the effectiveness of such rejection;

(ii)    in the case of any rejection which is to be effective prior to Closing, the relevant Seller and the Purchaser or a Designated Purchaser shall

139

convene to discuss and agree on a mutually acceptable strategy for negotiating and entering into an Equivalent Lease for Equivalent Space, including determining whether a Seller or the Purchaser will be the tenant under such Equivalent Lease, which party will enter into a lease, sublease or other arrangement for temporary space, which may include corporate office sharing, home-basing or other similar alternative arrangements (each, a "**Temporary Lease**"), and which party will be primarily responsible for the negotiations of the Equivalent Lease and/or the Temporary Lease. Both parties will have a reasonable opportunity to participate in the negotiations for the Temporary Lease and the Equivalent Lease. If a Temporary Lease is to be entered into, it will be sufficient, throughout the temporary occupancy period and until the Purchaser or a Designated Purchaser is able to commence operations at the Equivalent Space, to reasonably continue operation of the Business conducted at the property subject to the rejected Mission Critical Lease in the manner in which the same is conducted at such property on the date of this Agreement, taking into account the agreement of Purchaser and Sellers to minimize the costs associated with outfitting such alternative temporary space. If the Sellers enter into an Equivalent Lease or a Temporary Lease, such Equivalent Lease or Temporary Lease shall, following its execution, be deemed an Included Real Estate Lease for all purposes hereunder and shall be assigned to the Purchaser or a Designated Purchaser at Closing. If the Purchaser or a Designated Purchaser enters into an Equivalent Lease or a Temporary Lease prior to Closing, the Purchaser or a Designated Purchaser and the Sellers will enter into a sublease thereof on terms to be reasonably agreed between the parties (it being understood that the occupancy costs under such sublease shall be set so that Purchaser is merely passing through such costs under such Equivalent Lease or Temporary Lease) for the term of the Equivalent Lease or Temporary Lease, with respect to the property covered by such Equivalent Lease or Temporary Lease, provided that (A) the Sellers will post a letter of credit covering the rent and other occupancy costs due under such sublease during the term thereof, (B) the sublease will provide that it will terminate at the Closing, if the Closing occurs, and (C) nothing herein shall be construed to require either party to enter into or assume any liability with respect to an Equivalent Lease or any sublease thereunder prior to Closing so long as other means of reasonably continuing operation of the Business conducted at the property subject to the rejected Mission Critical Lease substantially in the manner in which the same is conducted at such property on the date of this Agreement are available including but not limited to entry into a Temporary Lease prior to Closing followed by entry into an Equivalent Lease following Closing;

(iii)    in the case of any rejection which is to be effective prior to Closing, the Sellers shall relocate the Assets, Employees and business operations at their sole cost and expense from the property subject to the rejected Mission Critical lease into the property subject to the Temporary Lease or into the Equivalent Space on or prior to the effective date of the rejection in such a manner as to reasonably permit the continued operation of the Business conducted at the property subject to the rejected Mission Critical Lease. If a Temporary

140

Lease is entered into, the Sellers will relocate the Assets, Employees and business operations at their sole cost and expense from the property subject to the Temporary Lease into the Property subject to Equivalent Space. The occupancy and operating costs under the Temporary Lease or Equivalent Lease and the property subject thereto shall be borne by Sellers for all periods up to the Closing Date, either directly, if the Sellers enter into such Temporary Lease or Equivalent Lease, or via a sublease as described above, if the Purchaser enters into such Temporary Lease or Equivalent Lease. If such Temporary Lease remains in place after the Closing Date, the occupancy and operating costs under the Temporary Lease and the property subject thereto for the period after Closing shall be borne exclusively by Purchaser, unless and until Purchaser has entered into and commenced paying rent and occupancy costs on an Equivalent Lease, in which case the Sellers shall pay fifty percent (50%) of the rent and occupancy costs under the Temporary Lease for six months commencing on the date on which Purchaser commences monthly rental payments under the Equivalent Lease. If such Temporary Lease remains in effect after the Closing, Purchaser shall diligently pursue its procurement of Equivalent Space to which to relocate the Assets, Employees and business operations subject to the terms of this Section 5.31(g);

(iv)     in the case of any rejection which is to be effective prior to Closing, the Sellers shall pay all Relocation Costs of Purchaser or Designated Purchaser relating to the relocation of all Assets, Employees and business operations required as a result of said rejection, including any relocation of all Assets, Employees and business operations from the property subject to the rejected Mission Critical Lease to the property subject to the Temporary Lease and, thereafter, to Equivalent Space; provided that Sellers shall not be required to compensate Purchaser or any other party for any other amounts or damages of any kind in connection with such relocation except as expressly set forth in Section 5.31(b)(ii), including but not limited to as a result of any difference in the economic terms of the rejected Mission Critical Lease and any new Equivalent Lease entered into by Purchaser or an Affiliate of Purchaser;

(v)     the Sellers shall cooperate with Purchaser or a Designated Purchaser and use reasonable efforts, in each instance to minimize the disruption to the affected business operations as a result of such relocation;

(vi)     notwithstanding the foregoing, if the Sellers elect to reject, effective on or after the Closing Date, a Mission Critical Lease, (A) the Sellers will give the Purchaser or a Designated Purchaser reasonable (but in no event less than thirty (30) days) prior notice (provided that thirty (30) days is sufficient notice for Sellers to comply with their covenant in Section 5.31(g)(v)), of their intent to reject such Mission Critical Lease and will provide the Purchaser or such Designated Purchaser a copy of the rejection notice (provided that no failure to provide any such notice or copy shall impair or impact the effectiveness of such rejection), (B) the Seller and the Purchaser or a Designated Purchaser shall convene to discuss and agree on a mutually acceptable strategy for negotiating a

141

lease for Equivalent Space, (C) the Purchaser or such Designated Purchaser and the Sellers shall cooperate to make arrangements for securing Equivalent Space and the relocation of all Assets and business operations thereto, (D) the Seller shall cooperate with Purchaser or a Designated Purchaser and use commercially reasonable efforts, in each instance to minimize the disruption to the affected business operation as a result of such relocation, and (E) the Sellers shall pay all Relocation Costs of the Purchaser or such Designated Purchaser relating to the relocation to Equivalent Space of all Assets, Employees and business operations required as a result of said rejection, including any relocation of all Assets, Employees and business operations from the property subject to the rejected Mission Critical Lease to the property subject to the Temporary Lease and, thereafter, to Equivalent Space; provided that Sellers shall not be required to compensate Purchaser or any other party for any other amounts, including but not limited to as a result of any difference in the economic terms of the rejected Mission Critical Lease and any new lease entered into by Purchaser or an Affiliate of Purchaser; and provided further if Purchaser has commenced paying rent and occupancy costs on a lease for Equivalent Space, Sellers shall be obligated to pay fifty percent (50%) of the rent and occupancy costs under the related Temporary Lease, if applicable, for six months commencing on the date on which Purchaser commences monthly rental payments under the lease for Equivalent Space. If Purchaser or an Affiliate of Purchaser enters into a Temporary Lease following a rejection, effective on or after the Closing Date, of a Mission Critical Lease, Purchaser shall diligently pursue its procurement of Equivalent Space to which to relocate the Assets, Employees and business operations subject to the terms of this Section 5.31(g);

(vii)    if the Sellers elect to reject Lease C, the provisions of Exhibit 5.32(c) shall apply in addition to the provisions of this Section 5.31(g).

(h)     If the relevant landlord has refused to provide its required Consent to a Sublease under a Mission Critical Lease or does not respond to a request for such Consent, then the Sellers shall pay all Relocation Costs of Purchaser or Designated Purchaser relating to the relocation of all Assets and business operations required as a result of Seller's inability to enter into such Sublease; provided that Sellers shall not be required to pay any Relocation Costs of Purchaser or any other party in any instance where a landlord under a Mission Critical Lease has refused to deliver a required Consent as a result of Purchaser's or a Designated Purchaser's refusal or other failure to comply with the provisions of Section 5.4 of the Sellers Disclosure Schedule; and provided further that Sellers shall not be required to compensate Purchaser or any other party for any other amounts, including but not limited to as a result of any difference in the economic terms of the relevant Mission Critical Lease and any new lease entered into by Purchaser or an Affiliate of Purchaser and provided further that Sellers and Purchaser or a Designated Purchaser shall be obligated to comply with the requirements of Section 5.13 prior to the completion of such relocation.

SECTION 5.32.   Restructure of Leases.

(a)     The Purchaser acknowledges that the Sellers have commenced negotiations with certain of the landlords under certain 365 Real Estate Leases and Non-365 Real Estate Leases with the intention of agreeing to modifications of such Real Estate Leases.  The Purchaser agrees that the Sellers shall be permitted to restructure the 365 Real Estate Leases and the Non-365 Real Estate Leases, including to reduce the size of the premises demised thereby and to vacate one or more buildings covered by single Real Estate Leases, and, in connection therewith, at the Sellers' sole cost and expense, to relocate applicable Employees, Assets and business operations within the facilities subject to such Real Estate Leases (including, in the case of Sellers' operations at the C Campus as defined in Section 5.32(c) of the Sellers Disclosure Schedule, relocation of Employees, Assets and business operations between facilities covered by separate Real Estate Leases) so long as:

         (i)     the space made available to the Purchaser at Closing under such Real Estate Lease contains usable and rentable square footage sufficient to reasonably support the contemplated use of the demised premises and employee headcount reasonably agreed between Purchaser and Sellers on or prior to the Closing Date and to conduct the Business at such premises in a manner substantially similar to the manner conducted at such premises (and any adjacent premises from which Employees, Assets and business operations are being transferred) as of the date hereof and such space is not divided into two or more non-contiguous portions,

         (ii)    upon Purchaser's request, the relevant Seller and the Purchaser shall convene to discuss and agree on a mutually acceptable strategy for approaching such negotiations with the relevant landlord and Purchaser shall provide the relevant Seller with a detailed description of its contemplated use of the premises and employee headcount and space needs (subject to reasonable confidentiality limitations),

143

(iii)    the occupancy costs or security deposit to the Purchaser or a Designated Purchaser at such real property shall not be increased in any material respect over what they would be in the absence of such amendment of such Real Estate Leases, it being agreed specifically that Purchaser or a Designated Purchaser shall be subject to no increased security deposit requirements as a result of such amendment,

(iv)    the Sellers shall pay all Relocation Costs of the Purchaser or Designated Purchaser relating to the relocation required as a result of said restructuring,

(v)    except as provided in Section 5.32(a)(iv) with respect to Relocation Costs, no reimbursements for any costs, expenses or damages shall be payable by any Seller or any of their Affiliates to Purchaser, any Designated Purchaser, any of their Affiliates or any other Person as a result of such restructuring; provided that if the Seller performs the relocation of Assets, Employees or business operations in connection with any such restructuring occurring after the Closing that, individually or in the aggregate with other relocations, has a Material Adverse Effect, then to the extent that such Material Adverse Effect resulted from Seller's gross negligence in performing such relocation, Seller shall be responsible for the Relocation Damages resulting therefrom; and

(vi)    the Sellers shall cooperate with Purchaser or a Designated Purchaser and use reasonable efforts, in each instance, to minimize the disruption to the affected business operations as a result of such relocation.

(b)    In the event that Sellers have not, prior to Closing, completed the consolidation of operations at any premises pursuant to a restructure of an Assumed and Subleased Real Estate Lease or Non-365 Sublensed Real Estate Lease, the relevant Seller and Purchaser or Designated Purchaser shall enter into the contemplated Sublease on the Closing Date but, prior to the completion of such consolidation, such Seller shall make available in lieu of the premises which are to be the subject of such Sublease alternative space at the same facility designated by such Seller (the "Relocation Space") in a notice given to Purchaser or Designated Purchaser from which the impacted business operations can be conducted. The Relocation Space shall be reasonably comparable to the premises which are the subject of such Sublease with respect to internal configuration, quality of finish and rentable square foot area (i.e., plus or minus ten (10%) percent). Such Seller shall, at such Seller's cost and expense, complete the build-out of the premises which are to be the subject of the Sublease and, following the same, remove and reinstall Purchaser's or Designated Purchaser's personal property, trade fixtures and equipment in such premises as promptly as reasonably practicable provided that Purchaser or Designated Purchaser cooperates with such Seller and gives such Seller full access to the premises which are to be the subject of such Sublease in order to facilitate the performance of such required work. During such entire period, Purchaser or Designated Purchaser shall be obligated to pay all rent and additional rent required under the terms of such Sublease but not with respect to the Relocation Space, regardless of whether Purchaser or Designated Purchaser is then occupying the premises which are to be the subject thereof.

144

(c)     The Sellers shall consolidate the C Campus (as defined in Section 5.32(c) of the Sellers Disclosure Schedule) in accordance with the provisions of Exhibit 5.32(c), subject to the rights of the Sellers in Section 5.31.

SECTION 5.33.   Non-Compete.   Except as permitted pursuant to Section 5.25(b) with respect to any Excluded Sellers, for a period of three (3) years from and after the Closing Date, none of the Sellers shall, or shall permit or cause any of their Wholly-Owned Subsidiaries to, (i) sell a product or service competitive with any product or service contemplated in the definition of the Business in any geographic area in which the Business is conducted on the date hereof (unless purchased from the Purchaser or a Designated Purchaser), or (ii) acquire or hold voting securities of any Person that is engaged in a business competitive with the Business as conducted on the date hereof, provided that the foregoing restrictions shall not prohibit or restrict (a) performance by the Sellers or a Seller Wholly-Owned Subsidiary under the Rejected Customer Contracts, through the subcontract arrangement contemplated by Section 5.14(b) or 5.14(c), as applicable, if such arrangement is entered into pursuant to the provisions therein or otherwise if such arrangement is not entered into or, with respect to NNSA, performance by NNSA of the Contract listed on Schedule 5.33 to the extent such Contract shall not transfer to the Purchaser or any Designated Purchaser, (b) the acquisition or holding of a passive investment in up to 5% of the outstanding stock of a corporation that does not give such Seller or Wholly-Owned Subsidiary of such Seller the right to appoint directors or management of such Person or to otherwise exercise control over the management of such Person, (c) the passive holding of the securities any of the Sellers owns as of the date hereof and the holding of the equity interests in the joint ventures listed in Section 1.1(a) of the Sellers Disclosure Schedule that the Sellers own as of the date hereof or (d) the sale of Sellers' Converging Products. In the event that any Seller or any Wholly-Owned Subsidiary of any Seller is acquired by, merged with or otherwise combined with (whether in a single transaction or a series of related transactions or whether structured as an acquisition of assets, securities or otherwise) (any such transaction, a "Seller Acquisition") any other Person (an "Acquiring Person"), the provisions of this Section 5.33 shall not restrict the ability of the Acquiring Person or its Affiliates to continue to operate the type of business or own the type of assets that they respectively operated or owned prior to the Seller Acquisition. If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section 5.33 is invalid or unenforceable, the parties hereto agree that the court making the determination of invalidity or unenforceability will have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement will be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

SECTION 5.34.   Financial Statements.

(a)     Subject to the last sentence of this Section 5.34(a), the Main Sellers shall provide the Audited Financial Statements and the Audited 2009 Interim Financial Statements to the Purchaser as promptly as reasonably practicable, but in any event no later than (i) July 31, 2009, in the case of the Audited Financial Statements and, (ii) December 7, 2009 in the case of the Audited 2009 Interim Financial Statements. Subject to the last sentence of this Section 5.34(a), all Unaudited Interim Financial Statements with respect to periods ending prior to the

Closing Date shall be delivered as follows: (i) by August 29, 2009, in the case of the June 30, 2009 Unaudited Interim Financial Statements and the income statement information for the quarter ended December 31, 2008, and (ii) if the Registration Statement is not effective or the Closing Date is on or after May 11, 2010, by May 30, 2010 in the case of the March 31, 2010 Unaudited Interim Financial Statements. Notwithstanding the foregoing or any other provision of this Section 5.34, and in any event, the Main Sellers shall deliver to the Purchaser prior to the Closing all Audited Financial Statements, Audited 2009 Interim Financial Statements, Additional Audited 2009 Financial Statements and all Unaudited Interim Financial Statements in respect of fiscal quarters ended prior to the Closing Date that are required to be included in the registration statement on Form S-4 (or any amendment thereto) under the Securities Act of 1933, as amended, relating to an exchange offer for outstanding debt securities to be made by the Purchaser or any of its affiliates (the "**Registration Statement**"), or any current report on Form 8-K required to be filed by the Purchaser or any of its affiliates under the Securities Exchange Act of 1934 with respect to the transactions contemplated by this Agreement (the "8-K").

       (b)    [Intentionally Omitted.]

       (c)    If the Closing Date is after December 31, 2009 and the Registration Statement is not effective prior to the Closing Date, then the Main Sellers shall deliver to the Purchaser the Additional Audited 2009 Financial Statements not later than March 15, 2010, and such delivery shall be prior to the Closing Date. If the Closing Date is on or after March 25, 2010, then the Main Sellers shall deliver to the Purchaser the Additional Audited 2009 Financial Statements not later than 3 Business Days prior to the Closing Date.

       (d)    If the closing condition in Section 8.3(g) is satisfied in the manner provided in Section 8.3(g)(ii), then within 30 days following the Closing, the Purchaser may notify the Main Sellers that each of the financial statements to be delivered pursuant to this Section 5.34(d) is to exclude the financial statements and information for the Companies in which case each such financial statement shall exclude the financial statements and information of the Companies. Following the Closing, unless delivered prior to the Closing, the Main Sellers shall deliver to the Purchaser the following financial statements:

           (i)    if the Closing Date is before October 1, 2009, the Audited 2009 Closing Date Financial Statements and income statements meeting the requirements of the Unaudited Interim Financial Statements for each quarter beginning with the quarter ending December 31, 2008 through the quarter ending June 30, 2009;

           (ii)    if the Closing Date is on or after October 1, 2009, but on or before December 31, 2009, the Audited 2009 Interim Financial Statements and income statements meeting the requirements of the Unaudited Interim Financial Statements for each quarter beginning with the quarter ending December 31, 2008 through the quarter ending June 30, 2009;

           (iii)    if the Closing Date is after December 31, 2009, the Additional Audited 2009 Financial Statements, the Unaudited Interim Financial Statements for the last fiscal quarter ending after December 31, 2009 and prior to the Closing

146

Date and income statements meeting the requirements of the Unaudited Interim Financial Statements for each quarter beginning with the quarter ending December 31, 2008 through the last fiscal quarter ending prior to the Closing Date; and

(iv)     the unaudited income statement information specified in the definition of Unaudited Interim Financial Statements from the date of last fiscal quarter ended prior to the Closing Date, which fiscal quarter may be a year end, through the Closing Date (the "**Information**").

(e)     If any financial statements or Information are required to be delivered pursuant to Section 5.34(d), the Main Sellers shall comply with the following provisions:

(i)     to the extent the Main Sellers are required to deliver any audited financial statements under Section 5.34(d), the Sellers shall engage KPMG LLP ("**KPMG**") no later than ten (10) Business Days prior to the Closing Date to audit the related financial statements;

(ii)     to the extent the Main Sellers are required to deliver any audited financial statements under Section 5.34(d), such audited financial statements shall be delivered no later than the date that is ninety (90) days after the Closing Date; and

(iii)     to the extent the Main Sellers are required to deliver any unaudited financial statements or Information under Section 5.34(d), such unaudited financial statements or Information shall be delivered no later than the date that is sixty (60) days after the Closing Date.

(f)     If any financial statements or Information required to be delivered pursuant to Section 5.34(d) have not been delivered prior to Closing, the Purchaser shall deliver an amount equal to the Holdback Escrow Amount to the Escrow Agent at Closing and the Holdback Escrow Amount shall be held by the Escrow Agent in accordance with this Agreement and the Escrow Agreement. If the Main Sellers are required to deliver any financial statements or Information pursuant to Section 5.34(d) and the Main Sellers (i) do not engage KPMG for purposes of auditing any of these financial statements or Information that are required to be audited financial statements or (ii) do not deliver such financial statements or deliver them more than twenty-five (25) days later than the dates provided in Section 5.34(e)(ii) or Section 5.34(e)(iii), as applicable, then the Holdback Escrow Amount (together with any actual interest earned thereon) shall be returned to the Purchaser by the Escrow Agent.

(g)     In the event that following the Closing (A) the Main Sellers will not be required to deliver to the Purchaser any financial statements pursuant to Section 5.34(d) or (B) the Main Sellers have complied with the obligations set forth in Section 5.34(d) and Section 5.34(e), as applicable, then the Purchaser shall promptly instruct the Escrow Agent to immediately release the Holdback Escrow Amount to the Distribution Agent (as agent for the Sellers and the EMEA Sellers).

147

(h)     The Main Sellers shall cooperate in Purchaser's efforts to obtain consent from Sellers' independent auditors for the inclusion of the Audited Financial Statements and, if applicable, the Audited 2009 Closing Date Financial Statements, the Audited 2009 Interim Financial Statements and/or the Additional Audited 2009 Financial Statements in any registration statement or other filing with the SEC. Subject to the limitations set forth in Section 5.6 (except that the Main Sellers acknowledge and agree that such information as is necessary to be included in a registration statement or other filing with the SEC need not be kept confidential by the Purchaser), the Main Sellers shall provide the Purchaser, the relevant Designated Purchasers and their representative accountants reasonable access to the books, records and personnel of the Business and the Companies and all documents, schedules and work papers that are reasonably necessary to prepare any financial statements that are required to be delivered pursuant to the terms of this Section 5.34. The Sellers shall reasonably cooperate in the Purchaser's efforts, whether pre- or post-Closing, to prepare the Registration Statement, the 8-K and any other filings with the SEC that are required to include any financial statements of the Business (or portion thereof), provided that such reasonable assistance shall include providing the Purchaser, the relevant Designated Purchasers and their representative accountants reasonable access to the books, records and personnel of the Business and the Companies and all documents, schedules and work papers that are reasonably necessary to prepare the Audited Financial Statements, the Unaudited Interim Financial Statements, any quarterly combined income statement information of the Business, the income statement information from the date of the last interim balance sheet required to be delivered to the Purchaser through the Closing Date, the pro forma financial statements of the combined entity and, if applicable, the Audited 2009 Closing Date Financial Statements, the Audited 2009 Interim Financial Statements and/or the Additional Audited 2009 Financial Statements, together with any related financial disclosures to be included in the Registration Statement or other filing with the SEC.

(i)     If the Audited 2009 Interim Financial Statements are required to be provided pursuant to the provisions of Section 5.34(a), the Purchaser shall use its commercially reasonable efforts to obtain as promptly as practicable a determination from the SEC with respect to whether the Audited 2009 Interim Financial Statements must include combined statements of income and cash flows and footnote information for the nine month period ended September 30, 2008 to meet the requirements of Regulation S-X and Rule 3-05 thereunder, for inclusion in the Registration Statement and the 8-K. The Purchaser shall keep the Main Sellers promptly informed of any material developments in its discussions with the SEC regarding such determination. If the Purchaser obtains a determination that such combined statements of income and cash flows and footnote information for the nine month period ended September 30, 2008 are not required to meet the requirements of Regulation S-X and Rule 3-05 thereunder, for inclusion of the Audited 2009 Interim Financial Statements in the Registration Statement and the 8-K, then the Main Sellers shall not be required to deliver the combined statements of income and cash flows and footnote information for the nine month period ended September 30, 2008 with the Audited 2009 Interim Financial Statements pursuant to the provisions of Section 5.34(a), but may nonetheless be required to deliver such combined statements of income and cash flows and footnote information for the nine month period ended September 30, 2008 with the Audited 2009 Interim Financial Statements pursuant to the provisions of Section 5.34(d)(ii).

SECTION 5.35.   Certain Acknowledgements Regarding PBGC.  The Purchaser acknowledges and agrees that none of the actions or occurrences referred to in clauses (i)

148

through (iv) of Section 8.3(d) hereof in and of itself shall constitute or be construed as a breach by any of the Sellers of any of their representations, warranties, covenants or agreements set forth in this Agreement or any other Transaction Document. Notwithstanding the foregoing, nothing in this Section shall limit or be construed as limiting the scope, application or effect of Section 8.3(d). To the extent the PBGC terminates the NNRIP (or any other Seller Employee Plan) or imposes any Lien on the assets of any of the Companies or any of the Sellers, or in the event of any other action or occurrence referred to in clauses (i) through (iv) of Section 8.3(d), then the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable to obtain from the PBGC a waiver of its Claims against Purchaser, its Affiliates (including the Companies) or the holder of any Assets in connection with the NNRIP and a release of such Lien in order to cause the satisfaction of the condition set forth in Section 8.3(d) at the earliest practicable date; provided that the Purchaser shall not be required to make any payment, relinquish any right, or deliver or relinquish anything of value in order to obtain such waiver (other than payment of the Purchase Price).

SECTION 5.36. Finalization of Transition Services Agreement.

(a) The Parties acknowledge that Schedule 1 (the "Schedule 1 Included Services"), Schedule 5 and Schedule 6 (collectively, the "General Scope of Services") attached to the form Transition Services Agreement contained in Exhibit P hereto reflects the general scope of certain services to be provided pursuant to the Transition Services Agreement by the TSA Sellers and TSA EMEA Sellers (and may reflect greater detail as to some of such services), but is not sufficiently refined to define all such services in operational detail. Accordingly, the Parties agree that, between the time of the execution of this Agreement and two Business Days prior to the Closing Date, they (i) will negotiate in good faith and use reasonable efforts expeditiously to refine the description of the services included within the General Scope of Services so as to provide sufficient operational detail (as mutually agreed or as determined by arbitration in accordance with clause (h), the "Included Services") and (ii) will provide each other with such information that is reasonably requested in connection with such negotiation. The Parties agree that Included Services will be finally determined prior to Closing by such negotiation or by arbitration in accordance with this Section 5.36, provided that the Included Services will be consistent with, and will omit any services not reasonably within the service description categories contained in, the General Scope of Services. The Parties further agree that such negotiation and arbitration will be subject to the following general limitations and conditions (the "Scope Guidelines"): (i) the Included Services will exclude any portion of any service that has at no time on or after April 1, 2009 been provided by any Seller or any EMEA Seller (or any Affiliate of any of them) nor provided or procured by any Seller or any EMEA Seller (or any Affiliate of any of them) from a third party (the services within the General Scope of Services that have been provided either by such a Seller or any EMEA Seller (or any Affiliate of any of them) entity or by a third party at any time on or after April 1, 2009, the "Current Services") (it being understood and agreed that (a) each Seller under the Transition Services Agreement will be committed reasonably to cooperate with Purchaser to coordinate interaction, execution and process steps so that the services of such Seller are delivered in a manner to facilitate the orderly transition of the Business to the Purchaser and (b) from and after the time of execution of this Agreement until the Closing, the Sellers, the EMEA Sellers and their respective Affiliates will provide, or cause to be provided, to the Business the Current Services, subject to

149

modifications that would be permitted if the Transition Services Agreement were currently in effect), (ii) if and to the extent that employees of a Seller or an EMEA Seller or a Subsidiary of a Seller or an EMEA Seller performing services as of the date of execution of this Agreement are Transferred Employees under this Agreement or Transferring Employees under the EMEA Asset Sale Agreement, then the human tasks formerly undertaken by such Transferred Employees or Transferring Employees will no longer be required to be provided under the Transition Services Agreement (but equipment, licenses and other resources not transferred shall, in accordance with the terms of the Transition Services Agreement, continue to be made available as necessary to perform such tasks under the Transition Services Agreement as contemplated by this Section 5.36), and (iii) services will be limited to those reasonably advisable to carry on the Business after the Closing in a manner consistent with the operation of the Business at the time of execution of this Agreement. It is understood and agreed that the services described in the General Scope of Services attached to the Transition Services Agreement have all been provided by or procured by a Seller or an EMEA Seller (or a respective Affiliate) to or for the Business after April 1, 2009. On the Closing Date but before the Closing, the TSA Sellers and the TSA EMEA Sellers shall be ready, willing and able to satisfy their obligations pursuant to the Transition Services Agreement in all material respects and the Main Sellers will deliver a certificate to the Purchaser to that effect.

(b) If, between the time of execution of this Agreement and Closing, Purchaser identifies services not described within the General Scope of Services which are reasonably advisable in order to assist with the orderly transition of the Business to the Purchaser, then the Parties agree that such additional services (defined in operational detail as described herein) will be provided under the Transition Services Agreement, and the Parties will negotiate in good faith and use reasonable efforts expeditiously to refine such additional services in operational detail consistent with the Scope Guidelines specified in Section 5.36(a) (as mutually agreed or as determined by arbitration in accordance with clause (h), the "Type 1 Extra Services"). If, between the time of the execution of this Agreement and Closing, Purchaser identifies further services reasonably advisable to carry on the Business which are not described within the General Scope of Services and which are not consistent with the Scope Guidelines, but which can reasonably be provided by the applicable Seller (but not an EMEA Seller) without hiring new employees and without materially changing or burdening the operations of such Seller, then the Parties agree that such further services (defined in operational detail as described herein) will be provided under the Transition Services Agreement, and the Parties will negotiate in good faith and use reasonable efforts expeditiously to refine such ancillary services in operational detail (as mutually agreed or as determined by arbitration in accordance with clause (h), "Type 2 Extra Services;" together with Type 1 Extra Services, the "Extra Services").

(c) The Parties acknowledge and agree that, subject to the provisions below, the Included Services ultimately provided under the Transition Services Agreement are to be billed by the applicable TSA Seller or TSA EMEA Seller under the Transition Services Agreement to the Purchaser at the "Direct Cost" of such Included Services as specified in the Transition Services Agreement. However, the Parties further agree that, from and after the execution of this Agreement, they will negotiate in good faith to quantify and stipulate by mutual agreement the Direct Cost of each such Included Service as a specific monetary amount for each such Service (the "Monetary Cost" of such Service); provided, that Monetary Cost shall exclude

150

Special Third-Party Costs (as defined in the Transition Services Agreement). Notwithstanding the foregoing, upon mutual agreement (or resolution by arbitration as provided herein) as to Monetary Cost for any Service under the Transition Services Agreement, the price for such Service shall thenceforth equal the sum of such Monetary Cost plus Special Third-Party Costs (as defined in the Transition Services Agreement) allocable to such Service, and such price will apply regardless of the Direct Cost actually incurred by the applicable Sellers under the Transition Services Agreement in providing such Service. The Parties acknowledge that attached to the form of Transition Services Agreement in Exhibit P is (1) a schedule showing an assumed volume of product flow through the order-to-cash cycle (reflecting both timing and amounts of products) over the 12-month period following Closing (the "Product Volume Forecast"), (2) a schedule showing an assumed headcount for personnel constituting "Active Employees" and employees of "Contract Service Providers" as defined in the Transition Services Agreement (the "IT Headcount Forecast"), and (3) the estimated cost of providing services to support the product flow contemplated by the Product Volume Forecast, consistent with the IT Headcount Forecast, during the 12-month period following Closing (the "Estimated Cost Schedule", as revised in accordance with Section 5(a) of the Transition Services Agreement to account for TUPE Employees. Notwithstanding anything to the contrary in this Agreement or in the Transition Services Agreement, the Parties agree that the outcome of the price negotiation described above in this Section 5.36(c) (or determined by arbitration as provided in clause (h)) with respect to the Schedule 1 Included Services) will be such that the aggregate Monetary Cost of all Schedule 1 Included Services to be delivered over the 12-month period following Closing to support the product flow contemplated by the Product Volume Forecast, using headcount assumptions consistent with the IT Headcount Forecast, $(x)$ will not be less than 90% of the aggregate estimated cost of all services reflected in the Estimated Cost Schedule, and $(y)$ will not be greater than 110% of such aggregate estimated cost of all services reflected in the Estimated Cost Schedule. The Transition Services Agreement contains provisions regarding certain price adjustments for Schedule 1 Included Services in the event that (i) Purchaser revises the anticipated product volume which results in a change in forecast revenues (output of the monthly Sales and Operations Plan) of 5% or more for any three-month period commencing 3 months from the approved monthly Sales and Operations Plan, or (ii) Purchaser revises the headcount of Active Employees and/or employees of Contract Service Providers (as defined in the Transition Services Agreement), with the result that the Direct Cost of delivering IT Infrastructure Services and IT Applications Services included within Schedule 1 Included Services changes by more than 5% from the aggregate cost of such IT Infrastructure Services and IT Applications Services reflected on the Estimated Cost Schedule. Notwithstanding anything to the contrary in this Agreement or in the Transition Services Agreement, it is understood and agreed that the aggregate price to be paid by the Purchasers to the TSA Sellers for services under the Transition Services Agreement will be reduced by $10 million, the application of such reduction to be determined by the Purchaser subject to the consent of the TSA Sellers (which consent will not be unreasonably withheld). For the avoidance of doubt, such reduction shall not apply to any services provided by the TSA EMEA Sellers pursuant to the Transition Services Agreement.

(d)     The determination of the stipulated, monetary price of any Extra Services requested by the Purchaser will be determined in manner analogous to the determination of Monetary Cost of Included Services, except that the price of such Extra Services will be the "Direct Cost" thereof as defined in the form of Transition Services Agreement in Exhibit P

151

hereto (plus any Special Third-Party Costs not reflected in such monetary price), with no further restriction.

(e)    Until the Monetary Cost of any service has been agreed and stipulated by the Parties or determined by arbitration in accordance with clause (h), the price of such service will be the Direct Cost thereof, as reasonably determined by the applicable TSA Sellers or TSA EMEA Sellers under the Transition Services Agreement. Upon final determination of the Monetary Cost as contemplated herein, the parties will promptly reconcile any prior payments made by the Purchaser that were based on TSA Seller's or TSA EMEA Seller's estimates of Direct Cost (with the applicable TSA Seller or TSA EMEA Seller paying to the Purchaser any amount by which such estimated amounts exceeded the proper amounts based on Monetary Cost as so finally determined, or with the Purchaser paying to the applicable TSA Seller or TSA EMEA Seller any deficiency by which such estimated amounts were less than the proper amounts based on such Monetary Cost).

(f)    Prior to the 45th day following the execution of this Agreement ("Arbitration Trigger Date"), each TSA Seller and TSA EMEA Seller shall consult with each other and notify Purchaser of the name of the single person designated to serve on all such parties' behalf as an arbitrator in case of any arbitration hereunder (except that the TSA EMEA Sellers may designate a single person to serve as an arbitrator for all TSA EMEA Sellers, and the TSA Sellers may designate a different person to serve as an arbitrator for all Sellers), and the Purchaser shall notify each TSA Seller and TSA EMEA Seller of the name of the person or, if the TSA Sellers and TSA EMEA Sellers have each appointed an arbitrator, the name of two persons designated to serve as Purchaser's arbitrator(s) in case of any arbitration hereunder. If the TSA Sellers and TSA EMEA Sellers have not designated their arbitrator or Purchaser has not designated its arbitrator(s) prior to the Arbitration Trigger Date ("Non-Designating Party"), and if thereafter such Non-Designating Party does not name an arbitrator (and provide notice thereof to the other applicable parties) within five Business Days after notice from any other Party requesting that such an arbitrator be named, then such Non-Designating Party shall lose the right to appoint an arbitrator hereunder, and the arbitration shall be conducted exclusively by the arbitrator named by the other Party to the applicable arbitration.

(g)    At any time after the Arbitration Trigger Date, any affected Party may submit any disagreements relating to the Included Services or the Extra Services, or the Monetary Cost of any Included Service or the stipulated, monetary price of any Extra Service to binding arbitration for resolution, which arbitration proceeding will be initiated by notice delivered by such Party to the applicable counterparty. Such arbitration shall be conducted in accordance with Section 5.36(h). The parties will use commercially reasonable efforts to resolve any disagreement as expeditiously as practicable.

(h)    If any Party shall give notice of arbitration pursuant to Section 5.36(g), then, within ten days following initiation of such arbitration, the arbitrators theretofore designated by the applicable parties to such arbitration shall jointly appoint a neutral arbitrator (the "Neutral Arbitrator"), who shall be unaffiliated with any Party (in the event such two arbitrators do not so jointly appoint a neutral arbitrator, then, upon the request of any party to such arbitration, such neutral arbitrator, who must be unaffiliated with any Party, will be promptly appointed by the American Arbitration Association). Any arbitration hereunder shall

152

be conducted by such three arbitrators (except as provided in Section 5.36(f) or below in this Section 5.36(h)), and shall take place in New York City in accordance with the Commercial Arbitration Rules of the American Arbitration Association. If an arbitrator named by a Party hereunder ceases to serve for any reason, then such Party shall name a successor arbitrator within five Business Days following notice from an adverse Party ("**Notifying Party**") requesting that such a successor be named (if a successor is not so named, then the arbitration will be conducted solely by the Neutral Arbitrator if theretofore appointed, and otherwise by the arbitrator named by the Notifying Party). The arbitrators will resolve the matters in dispute within thirty (30) days following the selection of the Neutral Arbitrator; provided, however, that if any disagreement with respect to Included Services has not been resolved by the one hundred twentieth (120th) day after the date of this Agreement (or if earlier the fifteenth (15th) day prior to the Closing Date), then at any time thereafter any Party to such arbitration may serve notice on the arbitrators demanding that the Neutral Arbitrator alone render a final decision within 10 days following receipt of such notice (any decision by a majority of the arbitrators shall otherwise be deemed the decision of the arbitrators). The decision of a majority of the arbitrators, or of the Neutral Arbitrator alone, as applicable, shall be in writing, shall be final and conclusive on the Parties, and counterpart copies thereof shall be delivered to all of the Parties. Judgment may be had on the decision of the arbitrators so rendered in any court of competent jurisdiction. The Purchaser shall bear the fees and expenses of the arbitrator it designates, the applicable TSA Seller or TSA EMEA Seller shall bear the fees and expenses of the arbitrator it designates, and the Purchaser and the applicable TSA Seller or TSA EMEA Seller shall equally share the fees and expenses of the Neutral Arbitrator. Notwithstanding anything to the contrary in this Agreement or in the Transition Services Agreement, if any arbitration hereunder to finalize the scope of any Included Service has not been completed, and an arbitral decision rendered, by the second Business Day preceding the Closing Date, then (i) the applicable TSA Seller or TSA EMEA Seller shall provide such Service after Closing with the scope advocated by the Purchaser (and the Purchaser will pay Direct Cost for such Services, as provided in the Transition Services Agreement and as reasonably determined by the applicable TSA Seller or TSA EMEA Seller, until the Monetary Cost for such service is determined in accordance with the provisions of this Section 5.36 upon which a reconciliation will occur as described in Section 5.36(c)), and (ii) such arbitration will terminate with respect to the scope of service as of such second Businesses Day preceding the Closing (with the arbitrators deemed to have rendered a decision defining such scope as so advocated by the Purchaser). Nothing herein will affect any arbitration to the extent the subject matter thereof relates to (i) any Extra Service or (ii) the price, Monetary Cost or Direct Cost of any service.

      (i)    Solely, for purposes of this Section 5.36, the term "Parties" shall also include the TSA EMEA Sellers.

      SECTION 5.37.  Assistance for Proxy Agreement.  From the date hereof, the Main Sellers shall use their reasonable best efforts to assist the Purchaser to seek any Consent required in order to terminate the Proxy Agreement and allow the Purchaser to acquire and exercise control over NGS and its business effective as of or before the Closing Date without a proxy arrangement. Such assistance shall include promptly notifying the U.S. Defense Security Service of the transactions contemplated hereby pursuant to the NISPOM and Proxy Agreement, agreeing to terminate the Proxy Agreement effective as of the Closing Date and engaging in discussions with the U.S. Defense Security Service in preparation for that result, and providing

all information requested by the U.S. Defense Security Service related to the transactions contemplated hereby.

### SECTION 5.38.  Customer Contract Review and Selection.

(a)    In accordance with applicable Law and subject to the provisions of the Clean Team Confidentiality Agreement and the Confidentiality Agreement, within seven (7) days of the date hereof, the Sellers shall provide the Clean Team Members with (i) access to the electronic databases and centralized file cabinets at Sellers' workplaces or other sites where the Customer Contracts are maintained and/or stored (such databases and file cabinets, the "Sellers' Files"), where "centralized file cabinets" shall mean that the Sellers use their reasonable best efforts to cause the file cabinets containing the Sellers' Files, to the extent reasonably practicable given existing resources and spaces at the relevant facilities, to be aggregated, organized and labeled in a single, localized filing room, which Sellers shall have clearly identified prior to the arrival of Clean Team Members, at each applicable site, and (ii) training of one (1) day (initially, in a single session for the Clean Team Members, which training shall be accessible by videoconference and/or teleconference) and additional training as shall be reasonably requested by Clean Team Members, including specific training as is reasonably necessary to review the Sellers' Files at any particular site, such as (y) training on how to access specific electronic databases at such site and (z) training on how to locate specific information within file cabinets at such site. Sellers shall also provide existing indices, maps, tables of contents or equivalent references for the purpose of identifying hard copies of materials within any filing cabinets or similar storage units. The Purchaser shall provide sufficient computer equipment to enable the Clean Team Members to access such electronic databases, and such computer equipment shall be compatible with Sellers' electronic databases, which the Parties shall engage in their reasonable best efforts to confirm with each other prior to a visit by Clean Team Members to any site.

(b)    The relevant Sellers shall cause their personnel responsible for maintaining and operating the Customer Contract databases, at the locations where the Customer Contracts are retained in hard or soft copy form, to reasonably assist the Clean Team Members to locate copies of the relevant Customer Contracts and such information about or related to the Customer Contracts as the Clean Team Members may reasonably request. Furthermore, the relevant Sellers shall allow the Persons listed in Section 5.38(b)(i) of the Sellers Disclosure Schedule to perform searches on the electronic databases comprising the Sellers' Files and assist with the identification of documents within the Sellers' Files, as reasonably requested by Clean Team Members. Subject to applicable Law and the provisions of the Clean Team Confidentiality Agreement and the Confidentiality Agreement, the relevant Sellers shall also use their reasonable best efforts to cause (i) the Persons listed in Section 5.38(b)(ii) of the Sellers Disclosure Schedule to be available, and, if such Persons are not available, the Purchaser will accept the designation of an alternative representative from the applicable geographical and functional area, who has comparable knowledge to the unavailable Person, and (ii) without exception, each of the individuals listed in Section 5.38(b)(iii) of the Sellers Disclosure Schedule to be made available, and if any such Person can not be made available, then Purchaser shall have the right to select, in its reasonable discretion, a suitable replacement for such unavailable Person; each of the Persons in (i) and (ii) to be made available, at times designated by the Sellers, for two or, at the option of the Sellers, more separate meetings covering, in the aggregate, all the regions, in each case with Clean Team Members and to take place in person or by teleconference

within ten (10) days from the date hereof, to answer reasonable questions from the Clean Team Members about the content of Customer Contracts, the status of the relevant Seller's relationship with the counterparties to such Customer Contracts, the economic performance under such Customer Contracts and any material issues that have arisen under such Customer Contracts. Following such meeting(s), subject to applicable Law and the provisions of the Clean Team Confidentiality Agreement and the Confidentiality Agreement, the relevant Sellers shall cause members of their relevant management personnel knowledgeable about issues related to Customer Contracts, including global accounts, services and major geographical regions of the Business to be available at reasonable times and upon reasonable notice to answer reasonable questions from the Clean Team Members about the content of the Customer Contracts, the status of the relevant Seller's relationship with the counterparties to such Customer Contracts, the economic performance under such Customer Contracts and any material issues that have arisen under such Customer Contracts.

(c)      The Main Sellers shall use their reasonable best efforts to produce and place in the Clean Team Data Room, as soon as practical and in any event within ten (10) days of the date hereof, all material documentation that forms part of the Customer Contracts in force as of the date hereof with customers of the Business whose customer contracts with the Sellers generated more than $1,000,000 in aggregate revenues for the Business during calendar year 2008 (each Customer Contract with such customers, a **"Major 2008 Customer Contract"**).

(d)      The Sellers shall use reasonable best efforts to produce and place in the Clean Team Data Room, as soon as practical and in any event within fifteen (15) days of the date hereof, any additional Customer Contracts which, prior to the date hereof, have been identified in the Sellers' sales forecasting process that is maintained in the Ordinary Course and which the relevant Sellers, in the exercise of their reasonable judgment, believe may result in revenues of the Business in either (i) 2009 or (ii) if the relevant Contract was or is entered into after January 1, 2009, the period beginning on the date of execution of such Contract and ending twelve (12) months from the date of such Contract, of greater than $500,000 (each, a **"Major 2009 Customer Contract"**, and together with any Major 2008 Customer Contracts, the **"Major Customer Contracts"**).

(e)      In accordance with applicable Law and subject to the provisions of the Clean Team Confidentiality Agreement and the Confidentiality Agreement, the Purchaser shall use its reasonable best efforts to cause its representatives, with any and all reasonably requested assistance from the Sellers pursuant to Sections 5.38(a), 5.38(b), 5.38(c) and 5.38(d) to (i) promptly review the Sellers' Files and identify those Customer Contracts that it seeks to review, including, at the Purchaser's sole option, employing appropriate professional third parties as Clean Team Members to expedite such review and (ii) work with the Sellers to minimize the disruption to Sellers' workplaces or other sites caused by the Clean Team Members' visits and review, and to leave such sites in substantially the same condition as when the Clean Team Members first occupied such sites.

(f)      On or before the relevant Contract Designation Date, the Purchaser shall notify the Main Sellers in writing of those 365 Customer Contracts and Non-365 Customer Contracts entered into prior to the date hereof which fail to meet the Pre-Signing Inclusion Criteria and the Purchaser elects not to have assigned by the relevant Seller to the Purchaser or a

155

Designated Purchaser at Closing (as adjusted to reflect the resolution of any objection by the Main Seller to such notification, the "**Rejected Pre-Signing Customer Contracts**"). Such written notice to the Main Sellers shall also indicate which specific Pre-Signing Inclusion Criteria the relevant 365 Customer Contract or Non-365 Customer Contract, as applicable, fails to meet. If the Main Sellers disagree with such notice, the Main Sellers shall promptly notify the Purchaser thereof and the Purchaser and the Main Sellers shall then negotiate in good faith to resolve such disagreement. If either (i) the Purchaser and the Main Sellers fail to resolve such disagreement within ten (10) Business Days from the delivery of the notice to the Purchaser (or such shorter period as will end on the Business Day before the Closing Date), or (ii) the Main Sellers do not object to the notice received from the Purchaser, the Purchaser's categorization of such Pre-Signing Customer Contract shall be given effect, save in the case of manifest error.

(g)   Not later than (30) days from the date hereof, the Sellers shall prepare and deliver to the Purchaser a list (to be updated each fifteen (15) days thereafter) (the "**Non-Qualified Post-Signing Customer Contract List**") of all the Customer Contracts entered into after the date hereof that fail to meet the Post-Signing Inclusion Criteria (the "**Non-Qualified Post-Signing Customer Contracts**") and a list (to be updated each fifteen (15) days thereafter) that identifies all Major 2009 Customer Contracts entered into after the date hereof (whether they meet the Post-Signing Inclusion Criteria or not). The Sellers shall use reasonable best efforts to include the relevant Customer Contracts on the first update of the applicable lists following the execution of such Customer Contracts, to the extent commercially practicable. If the Purchaser disagrees with the categorization of a Post-Signing Customer Contract as a Non-Qualified Post-Signing Customer Contract or becomes aware of a Customer Contract omitted from such list, it shall promptly notify the Main Sellers thereof and, the Purchaser and the Main Sellers shall then negotiate in good faith to resolve such disagreement or agree on the proper categorization of such omitted Post-Signing Customer Contract. If the Purchaser and the Main Sellers fail to resolve such disagreement or agree on such categorization within ten (10) Business Days from the delivery of the notice to the Main Sellers (or such shorter period as will end on the relevant Contract Designation Date), then the Purchaser's categorization of such Post-Signing Customer Contract shall be given effect, save in the case of manifest error. On or prior to the relevant Contract Designation Date, the Purchaser shall notify the Main Sellers in writing whether the Purchaser elects not to have a Non-Qualified Post-Signing Customer Contract assigned by the relevant Seller to the Purchaser or a Designated Purchaser at the Closing (any Customer Contract so designated by the Purchaser for rejection shall be deemed a "**Rejected Post-Signing Customer Contract**" and shall not be assigned to the Purchaser or a Designated Purchaser at Closing).

SECTION 5.39.   Retention Plan.   The Purchaser shall pay fifteen million dollars ($15 million) of cash payable to employees of the Nortel Group at or, with the consent of the Main Sellers and NNUK, after Closing under an employee retention plan (to be implemented with guidance from Sellers' management team).

## ARTICLE VI

## TAX MATTERS

SECTION 6.1.   Transfer Taxes.

(a) The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. The Purchaser shall (on behalf of itself and the Designated Purchasers) promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the execution of any other Transaction Document; provided, that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller or any Subsidiary, Affiliate, representative or agent thereof, such Transfer Taxes shall be paid by the Purchaser to such Seller, Subsidiary, Affiliate or agent, as applicable, at the Closing or thereafter, as requested of or by the applicable Seller. Upon request from a Seller, the Purchaser shall provide to such Seller an original receipt (or such other evidence as shall be reasonably satisfactory to such Seller) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1. For the avoidance of doubt, Purchaser shall remain liable in respect of any Transfer Taxes regardless of the date that the Assets are removed from the premises of a Seller or any Seller's supplier. All other Closing expenses will be paid by the Party incurring such expenses.

(b) If the Purchaser or any Designated Purchaser wishes to claim any exemption relating to, or a reduced rate of, or make an election with the effect of reducing, Transfer Taxes, in connection with this Agreement or the transactions contemplated herein, or in connection with the execution of any other Transaction Document, the Purchaser or any Designated Purchaser, as the case may be, shall be solely responsible for ensuring that such exemption, reduction or election applies and, in that regard, shall provide the Sellers prior to Closing with its permit number, GST, VAT, provincial sales taxes or other similar registration numbers and/or any appropriate certificate of exemption, election and/or other document or evidence to support the claimed entitlement to such exemption or reduction by the Purchaser or such Designated Purchaser, as the case may be. All parties shall make reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduction. If the Purchaser or any Designated Purchaser pays any Transfer Taxes pursuant to this Section 6.1 and a Seller thereafter becomes entitled to an actual cash refund for, or an actual reduction in Liability for, Transfer Taxes payable by such Seller in respect of such Transfer Taxes paid by the Purchaser or a Designated Purchaser pursuant to this Section 6.1, then such Seller shall reimburse the

Purchaser or Designated Purchaser for an amount equal to such refund or actual reduction (net of reasonable costs and expenses incurred in obtaining such refund or reduction).

(c) The applicable Seller(s) and Purchaser (or relevant Designated Purchaser) will, on or before the Closing, jointly prepare and execute an election, in the prescribed form and containing the prescribed information, to have subsection 167(1) of the Excise Tax Act (Canada) apply to the sale and purchase of the Assets which would otherwise be subject to GST so that no GST is payable in respect of such sale and purchase under Part IX of the Excise Tax Act (Canada). Purchaser (or the relevant Designated Purchaser) will file such election with the relevant Tax Authority in the manner and within the time prescribed by Law and will provide the applicable Seller with a copy of the election and with satisfactory evidence that the election has been filed in a timely manner. The applicable Seller(s) confirms that it is registered for purposes of the Excise Tax Act (Canada) and its GST registration number is 119409258RT0001 (in the case of NNI) and 118802974RT0001 (in the case of Nortel Networks Technology Corporation

157

("NNTC"). The Parties will make any required elections under corresponding provincial or territorial laws and the foregoing provisions will apply *mutatis mutandis* in respect thereof. Purchaser (or the relevant Designated Purchaser) shall be responsible and indemnify and hold harmless the applicable Seller(s) for any GST (and any comparable provincial Taxes) to the extent payable notwithstanding the elections contemplated by this Section, plus any interest and/or penalties payable as a consequence thereof.

SECTION 6.2.   Withholding Taxes. Subject to Section 2.4, the Purchaser and the Designated Purchasers shall be entitled to deduct and withhold from the Purchase Price, and the Purchaser shall be entitled to deduct and withhold from the Reverse Termination Fee, such amounts as the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold under the Code or any provision of state, local or foreign Tax Law, with respect to the making of such payment. To the extent such amounts are so withheld by the Purchaser or a Designated Purchaser, as the case may be, such withhold amounts shall be treated for all purposes of this Agreement and the Ancillary Agreements as having been paid to the relevant Seller in respect of whom such deduction and withholding was made by such Purchaser or Designated Purchaser. None of the Parties is aware of any obligation to deduct and withhold any amounts from the Purchase Price or the Reverse Termination Fee under the Code, or any provision of state, local or foreign Tax Law, with respect to the making of such payment. If any of the Parties learns of any such obligation on or prior to the Closing Date, then (i) in the case of a Seller, such Seller shall promptly provide reasonable notice of such obligation to the Purchaser, and (ii) in the case of the Purchaser, the Purchaser shall promptly provide reasonable notice of such obligation to the Sellers. The Parties shall make reasonable efforts to cooperate in good faith to minimize the amounts that the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold.

SECTION 6.3.   Tax Characterization of Payments Under This Agreement. The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than payment of the Estimated Purchase Price and any interest payments) as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

SECTION 6.4.   Apportionment of Taxes.

(a)   Except as otherwise provided in this Article VI, (i) the Sellers shall and shall cause the Other Sellers, as the case may be, to bear all Taxes of any kind relating to the Assets or the conduct or operation of the Business (including Taxes in respect of the income, business, property or operations of the Companies) for all Tax periods or portions thereof ending on or before the Closing Date and (ii) the Purchaser shall and shall cause the Designated Purchasers to bear all Taxes relating to the Assets or the conduct or operation of the Business (including Taxes in respect of the income, business, property or operations of the Companies) for all Tax periods or portions thereof beginning after the Closing Date.

(b)   For purposes of this Agreement, any Taxes for a "Straddle Period" (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of

158

the period beginning after the Closing Date, respectively. The amount of any Taxes based on or measured by income or receipts of the Business (including the business and operations of the Companies) shall be allocated between the Pre-Closing Taxable Period and the Post-Closing Taxable Period on a closing-of-the-books basis. The amount of other Taxes shall be allocated between the Pre-Closing Taxable Period and the Post-Closing Taxable Period in the following manner: (i) in the case of a Tax imposed in respect of property (excluding, for the avoidance of doubt, any income Tax) and that applies ratably to a Straddle Period, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of sales, value-added and similar transaction-based Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be allocated to the portion of the Straddle Period in which the relevant transaction occurred.

SECTION 6.5.    Section 338 Election.    Upon the written request of the Purchaser, in its sole and exclusive discretion, (x) the Sellers and the Purchaser or, as applicable, any Designated Purchaser shall join in making elections under Code section 338(h)(10) (and any corresponding election under state, local, or foreign law) (a "Section 338(h)(10) Election") with respect to the Purchaser's (or any Designated Purchaser's) purchase of the Shares of the Companies pursuant to this Agreement, or (y) the Sellers shall make or cause to be made such stock basis reduction elections under Treas. Reg. Section 1.1502-36(d)(6)(i)(A) ("Loss Duplication Elections") as are necessary to reduce as far as possible the potential for loss duplication. The Purchaser shall indemnify the Sellers for any actual Tax Liability that (i) arises during the taxable year that includes the Closing Date or the two (2) taxable years immediately following and (ii) would not have arisen but for a Section 338(h)(10) Election or a Loss Duplication Election made pursuant to this Section 6.5; provided, however, that the Purchaser shall have no obligation to indemnify the Sellers for any Tax Liabilities pursuant to this Section 6.5 with respect to which the Sellers do not deliver notice to the Purchaser prior to December 31, 2013.

SECTION 6.6.    Records.

(a)    Notwithstanding the provisions of Section 5.24, but subject to the provisions of Section 5.6, (i) after the Closing Date, the Purchaser, the Designated Purchasers and the Companies, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets, the Assumed Liabilities, the Business or the Companies for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Assets, the Assumed Liabilities, the Business or the Companies for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow representatives of the other party access to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies

159