thereof as may be necessary or convenient. The obligation to cooperate pursuant to this Section 6.6 shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

       (b)    On or prior to Closing, the Sellers shall cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for ten (10) years in accordance with an escrow agreement between the Purchaser, the Sellers and the Records Custodian, in form satisfactory to the Purchaser and the Seller. The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by tax advisors of any purchaser ("**Tax Credit Purchaser**") of the scientific research and experimental development Tax credits of the Sellers under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser. The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or NNTC as qualified expenditures on scientific research and experimental development for purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**").

       (c)    The Purchaser shall use reasonable efforts to make available to the relevant Taxing Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Taxing Authority of the characterization of expenditures by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided that such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser.

       (d)    The Purchaser shall have no obligation to provide any access under this provision unless the Seller (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

       (e)    On or prior to Closing, the Sellers shall use their reasonable best efforts to calculate and provide to the Purchaser (with expenses reasonably allocable to such calculations split evenly between the Sellers, on the one hand, and the Purchaser, on the other hand) historical data relating to the qualified research expenses and gross receipts of the Business pursuant to Section 41 of the Code (including in particular Section 41(f)(3)(A) of the Code) and any analogous data under corresponding provisions of state, local or foreign law as requested by the Purchasers, provided that such historical data is available to the Sellers or could be made available to the Sellers with Sellers' reasonable best efforts. Sellers shall use their reasonable best efforts to update such historical data to reflect any relevant adjustments arising after the Closing and provide copies of any such updates to the Purchaser within 10 days of the date on which such adjustment is made. Notwithstanding the foregoing, nothing herein shall require Sellers to indemnify the Purchaser to the extent a credit of the Purchaser under section 41 of the

Code (or any corresponding provisions of state, local or foreign law) is unavailable or challenged by the relevant Taxing Authority.

SECTION 6.7.    Tax Disclosure. Notwithstanding anything to the contrary in this Agreement, except as reasonably necessary to comply with applicable securities laws and regulations, any party may (i) consult any Tax adviser regarding the U.S. federal income Tax treatment or Tax structure of the transactions contemplated by this Agreement, and (ii) disclose to any and all persons, without limitation of any kind, the U.S. federal income Tax treatment and Tax structure of the transactions contemplated hereunder and all materials of any kind (including opinions or other Tax analyses) that are provided to the taxpayer relating to such Tax treatment and Tax structure (but without disclosure of identifying information or any non-public commercial or financial information); provided, however, that clause (ii) of this paragraph shall not apply until the date of the public announcement of the execution of this Agreement and performance of the transactions contemplated hereunder. For this purpose, "Tax structure" is limited to any facts relevant to the U.S. federal income Tax treatment of the transactions contemplated hereunder.

SECTION 6.8.    Tax Returns.

(a)    The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets, the Business or the Companies, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("Transfer Tax Returns") described below in Section 6.8(b)). Such Tax Returns shall be true, correct and complete in all material respects. Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) Sellers as and when required by Law. In every case permitted by Law, the Sellers shall elect to treat the Closing Date as the close of a taxable period, so as to minimize the number of Straddle Period Tax Returns and Straddle Periods.

(b)    Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated hereunder or in respect of the execution of any other Transaction Document shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws. Any Transfer Tax Returns prepared by the Sellers pursuant to this Section 6.8(b) shall be made available to the Purchaser at least five (5) Business Days before such Tax Returns are due to be filed. Notwithstanding the above, the Sellers shall use their reasonable best efforts to make available to the Purchaser such information as will enable the Purchaser to review that portion of the Transfer Tax Returns applicable to the sale and purchase transaction contemplated by this Agreement no later than eight (8) Business Days prior to the date on which such Tax Returns are due to be filed. The Purchaser shall be entitled to review and comment on any Transfer Tax Return prepared by a Seller prior to making any payment in respect thereof, such comments to be provided at least three (3) Business Days before such Transfer Tax Returns are due to be filed, and in the event of disagreement between the Parties, the relevant Transfer Tax Return shall be filed in accordance with the Purchaser's reasonable comments, it being understood that the Purchaser shall remain responsible for any Transfer Taxes whether or not shown on such Tax Return. The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect

of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.8(b) at least one (1) Business Day before such Transfer Tax becomes due and payable.

(c)     The Purchaser or a Designated Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets, the Business or the Companies for all Post-Closing Taxable Periods and Straddle Periods. Such Tax Returns shall be true, correct and complete in all material respects and shall be prepared on a basis consistent with Tax Returns prepared for prior taxable periods unless a different treatment of any item is required by an intervening change in Law or this Transaction. All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Purchaser or a Designated Purchaser as and when required by Law, except for such Taxes that are the responsibility of the Sellers pursuant to this Article VI; such Taxes shall be paid to the Purchaser or a Designated Purchaser no later than ten (10) Business Days prior to the due date for the applicable Straddle Period Tax Return.

(d)     The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.8(b)) prepared by the Purchaser, a Designated Purchaser or the Companies for any Straddle Period before any such Tax Return is filed. The Purchaser shall submit a draft of any such Tax Return to the Main Sellers at least sixty (60) days before the date such Tax Return is required to be filed with the relevant Tax Authority (provided, however, that if the information necessary to prepare a draft of any such Tax Return is not available to the Purchaser at least ninety (90) days before the date such Tax Return is required to be filed with the relevant Tax Authority, then the timeframe set forth in Section 6.8(e) shall apply). The Main Sellers shall have fifteen (15) days after the date of receipt thereof to submit to the Purchaser, in writing, the Main Sellers' written comments with respect to such Tax Return. The Purchaser shall notify the Main Sellers within fifteen (15) days after receipt of such comments of (a) the extent, if any, to which the Purchaser accepts such comments and will file such Tax Return in accordance therewith and (b) the extent, if any, to which the Purchaser rejects such comments. To the extent the Purchaser rejects the comments of the Main Sellers, the Purchaser and the Main Sellers promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within ten (10) days, the parties immediately shall appoint an Accounting Arbitrator to determine the correct manner for reporting the items that are in dispute and shall provide to the Accounting Arbitrator all relevant information. The Accounting Arbitrator shall have fifteen (15) days to submit its determination, which shall be binding upon the Parties, and the Purchaser shall file such Tax Return in accordance therewith. The fees and expenses of the Accounting Arbitrator shall be paid by the Party whose position is deemed to be least correct by the Accounting Arbitrator.

(e)     If the information necessary to prepare a draft of any Tax Return for a Straddle Period (other than a Transfer Tax Return described in Section 6.8(b)) is not available to the Purchaser at least ninety (90) days before the date such Tax Return is required to be filed with the relevant Tax Authority, then (i) the Purchaser shall submit a draft of such Tax Return to the Main Sellers as soon as practicable after such information becomes available (but in no event later than the earlier of (a) thirty (30) days after the necessary information becomes available to the Purchaser or to a Designated Purchaser, or (b) twenty-one (21) days before the date such Tax Return is required to be filed with the relevant Tax Authority), (ii) the Main Sellers shall provide

their comments to the Purchaser as soon as practicable, the Purchaser shall respond to such comments as soon as practicable and, if necessary, the Parties shall appoint an Accounting Arbitrator as soon as practicable (but in no event shall the Accounting Arbitrator be appointed later than ten (10) days before the date such Tax Return is required to be filed with the relevant Tax Authority), and (iii) the Accounting Arbitrator shall have no more than five (5) days to submit its determination.

SECTION 6.9.   Tax Sharing Agreements. Any Tax allocation or sharing agreement or arrangement entered into by any Seller, on the one hand, and the Companies, on the other hand, shall be extinguished and terminated as of the Closing Date.

SECTION 6.10.   Canadian Tax Election.

(a)     The Sellers and the Purchaser acknowledge that a portion of the Assets transferred pursuant to this Agreement by the Sellers to the Purchaser or each Designated Purchaser which is a resident of Canada for purposes of the Income Tax Act (Canada) is being transferred to the Purchaser (or the relevant Designated Purchaser) in consideration for the Purchaser (or the relevant Designated Purchaser) assuming prepaid obligations of the Seller to deliver goods or provide services in the future. The Sellers and the Purchaser (or the relevant Designated Purchaser) will prepare, execute and file, on a timely basis and using any prescribed form, a joint election under subsection 20(24) of the Income Tax Act (Canada) as to such assumption hereunder, and prepare their respective Tax Returns in a manner consistent with such joint election. The elected amount will be jointly determined by the Sellers and the Purchaser (or relevant Designated Purchaser), acting reasonably. The Sellers and the Purchaser (or relevant Designated Purchaser) will make any required elections under corresponding provincial or territorial law and the foregoing provisions will apply *mutatis mutandis* in respect thereof.

(b)     To the extent the Seller and the Purchaser (or the relevant Designated Purchaser) cannot agree on the amount to be elected under subsection 20(24) of the Income Tax Act (Canada), the Seller and the Purchaser (or the relevant Designated Purchaser) promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within five (5) days, the relevant parties immediately shall appoint an Accounting Arbitrator to determine the correct amount to be elected and shall provide to the Accounting Arbitrator all relevant information. The Accounting Arbitrator shall have thirty (30) days to submit its determination, which shall be binding upon the Parties, and the Parties shall file all relevant elections and Tax Returns in accordance therewith. The fees and expenses of the Accounting Arbitrator shall be paid by the Party whose position is deemed to be least correct by the Accounting Arbitrator.

SECTION 6.11.   Cooperation. The Sellers and the Purchaser shall reasonably cooperate with each other in connection with the conduct of any Tax audit, investigation, dispute, or appeal relating to any Pre-Closing Taxable Period.

163

## ARTICLE VII

## EMPLOYMENT MATTERS

SECTION 7.1.  Employment Obligations with Respect to Non-Union Employees. Except as provided in the first sentence of Section 7.1.1, the first sentence of Section 7.1.2(c)(ii) and except as the schedules referenced in Section 7.1.2(e) may apply to Union Employees, the provisions of this Section 7.1 shall apply to Non-Union Employees.

7.1.1.  Employment Terms. Purchaser hereby agrees to offer employment to that aggregate number of Employees (other than Share Transfer Employees) set forth in Section 7.1.1 of the Sellers Disclosure Schedule (which Section 7.1.1 of the Sellers Disclosure Schedule shall separately identify that number of Employees (including Union Employees in Canada) to be offered employment in each of Canada, China/Hong Kong/Taiwan, and the United States, and the aggregate number of Employees to be offered employment in each of the Remaining APAC Countries and the Remaining CALA Countries). Within thirty (30) days following the date hereof, the Purchaser shall identify the minimum aggregate number of employees in Australia/Japan to whom the Purchaser shall make an offer of employment, provided that, promptly after the date hereof, the relevant Sellers have permitted the Purchaser access to such information as the Purchaser reasonably requires in accordance with Sections 5.6(a) and 7.4(d) in order to make such identifications (except as prohibited by Law). Within one hundred and five (105) days following the date hereof, the Purchaser shall notify the Sellers of the identity of the Employees (other than Share Transfer Employees or other Employees whose employment transfers automatically by operation of Law to the Purchaser or a Designated Purchaser) the Purchaser and/or the Designated Purchasers intend to hire as of the Closing Date. Promptly following the latest of the granting of the U.S. Sale Order and the Canadian Approval and Vesting Order and receipt of Regulatory Approvals, the Purchaser shall, or shall cause a Designated Purchaser to, extend a written offer of employment in a manner that provides no less than a two-week Employee consideration period ("Offer Consideration Period"), in a form agreed by the Primary Parties and in compliance with applicable Law, to those Employees identified by Purchaser in accordance with the immediately preceding sentence, with such employment to take effect under the terms stated herein as of the Effective Hire Date, as defined below. Such offers shall, except to the extent otherwise required by Law, be for employment on terms and conditions that are substantially comparable to those terms and conditions of employment of similarly situated employees of the Purchaser or a Designated Purchaser, as applicable, and, without limiting the generality of the foregoing, shall include (i) an annual base salary for each such Employee that is equal to the annual base salary for such Employee as set out in the Employee Information, (ii) employment in a reasonably comparable position as set out for the Employee in the Employee Information, (iii) a location reasonably contiguous to their current location as set out in the Employee Information and (iv) other terms and conditions of employment as set forth in this Section 7.1. Purchaser shall provide in its offers of employment that the Employee's acceptance of such offer will be deemed to be a consent to the transfer of his particular Employee Record. Share Transfer Employees and Employees whose employment transfers by operation of Law shall be employed on terms and conditions of employment that are no less favorable than those set out in the sentence before the preceding sentence. For purposes of this Agreement, to the extent certain terms and conditions of employment are required to be maintained under applicable Law or Seller Employee Plans in order to avoid Sellers' incurring

164

severance or other employment termination obligations or Liability under the WARN Act with respect to Employees at any time after the Closing Date such terms and conditions shall be deemed to be required by applicable Law. Seller shall provide to the Purchaser such available and relevant information, and Seller and Purchaser shall cooperate in good faith, so as to enable Purchaser to comply with its undertakings under this Section 7.1.1. Employees' employment with Purchaser or a Designated Purchaser or, with respect to Share Transfer Employees or other Employees whose employment transfers by operation of Law, continued employment after the Employee Transfer Date, shall not include a probationary period and shall not be conditioned upon such employees satisfactorily completing a background investigation, drug test or other employment screening processes unless such screening process is required by applicable Law, a relevant Purchaser contract, or other customer requirement; provided, however, the Purchaser or Designated Purchaser may require Employees to provide evidence that they are legally permitted to be employed by the Purchaser or a Designated Purchaser, as required by applicable Law. Purchaser shall notify the Main Sellers of the acceptance and rejections of offers of employment that have been received from each of the Employees (x) on at least a weekly basis during the Offer Consideration Period and (y) in total within three (3) Business Days following the end of the Offer Consideration Period. Any Employee who accepts such offer of employment and commences employment with Purchaser or a Designated Purchaser, as applicable, pursuant to this Agreement, and any Employees whose employment transfers by operation of Law and Share Transfer Employees, shall all be deemed to be a Transferred Employee for all purposes of this Agreement. Inactive Employees shall remain employed by the relevant Seller until the first Business Day immediately following the date the Inactive Employee is released to return to active employment in accordance with Sellers' leave policies and on which such Inactive Employee reports to work with the Purchaser or a Designated Purchaser. The Purchaser or a Designated Purchaser shall use reasonable best efforts from the date hereof until the Closing Date to obtain, at its cost, such visas or permits as are required for it to employ Employees with visas or permits as indicated in the Employee Information. Visa Employees and Other Loaned Employees shall remain employed by the relevant Seller under the terms and conditions of the Loaned Employee Agreement. The Effective Hire Date for Non-Union Employees is (a) the Employee Transfer Date for those Employees other than Inactive Employees, Visa Employees and Other Loaned Employees, (b) 12:01 a.m. on the first Business Day following the release to return to active employment from leave for all Inactive Employees and on which such Inactive Employee reports to work with the Purchaser or Designated Purchaser and (c) the date specified in the Loaned Employee Agreement with respect to Visa Employees and Other Loaned Employees.

### 7.1.2. Employee Benefits.

(a)     The Purchaser or a Designated Purchaser shall, and shall cause its relevant Affiliates to, recognize the service date of each Transferred Employee as set out in the Employee Information, to the same extent that service credit would be given under the analogous Seller Employee Plan, for purposes of eligibility and vesting, and with respect to any severance or vacation plan, the determination of levels of benefits, but not for purposes of benefit accrual, or otherwise for determination of the amount or duration of benefits under any Purchaser Employee Plans, except (i) with respect to Transferred Employee Plans, or (ii) as otherwise required by applicable Law.

(b)     After the date hereof, the Sellers and the Purchaser shall cooperate promptly and in good faith in preparing the transition of the Transferred Employees as applicable from coverage under the Seller Employee Plans to coverage under the Purchaser Employee Plans effective as of the Transferred Employee's Effective Hire Date.

(c)     Without limiting the generality of the foregoing, the Purchaser shall, or shall cause its relevant Affiliates to, provide the following benefits to Transferred Employees:

      (i)     For the period beginning on the Closing Date and ending on the date that is twelve (12) months from the Closing Date, the Purchaser shall, or shall cause its relevant Affiliates to, provide Transferred Employees with the same severance payments and benefits as similarly situated employees of Purchaser or a Designated Purchaser.

      (ii)     Where the Sellers determine they are required by applicable Law or policy to pay the amount of compensation with respect to such accrued and unused vacation days that are due and owing to Transferred Employees, including Union Employees, as of their Effective Hire Date, the Sellers shall pay such amount within 30 days following their Effective Hire Date, or such earlier time as may be required by Law. Upon certification by an officer of the Sellers to the Purchaser of the actual payment of such amount to any such Transferred Employee and withholding and payment of Taxes in connection therewith, the Purchaser shall reimburse the Seller for such payment within 10 Business Days of the receipt of such certification. The Purchaser will, and will cause the relevant Designated Purchasers to, make reasonable best efforts to accommodate time off requests of such Transferred Employees until such time as they accrue sufficient paid time off under the Purchaser Employee Plans to address their vacation plans.

      (iii)     Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule will set forth the amount of accrued and unused vacation days that are due and owing to the Transferred Employees within 15 Business Days after Purchaser notifies Sellers of the Employees to whom employment offers will be made pursuant to Section 7.1.1 as of the date hereof and such amount shall be updated by the Sellers as of each Transferred Employee's Effective Hire Date. The Purchaser shall, or shall cause its relevant Affiliates to, grant each such Transferred Employee (other than those Loaned Employees whose accrued and unused vacation days are cashed out by Sellers or their Affiliates in connection with the termination of employment with Sellers or their Affiliates and those Transferred Employees whose accrued and unused vacation days are cashed out in accordance with Section 7.1.2(c)(ii) above) paid time off in an amount equal to such accrued unused vacation days set forth for such Transferred Employee in the applicable Section of the Sellers Disclosure Schedule. If such Transferred Employee terminates employment with the Purchaser or an Affiliate of Purchaser prior to receiving such paid time off, as described above, the Purchaser shall pay such Transferred Employee an amount equal to any such unused paid time off upon such employment termination; provided that the Purchaser shall only be required to make such payment if such Transferred Employee's employment terminates

166

prior to the date which is twelve (12) months following the Closing Date, unless otherwise required by applicable Law.

(iv)    Under the vacation policy of the Purchaser or an Affiliate of the Purchaser, the vacation accrual rate and maximum accrual of each Transferred Employee on and after the Effective Hire Date shall be determined under the vacation policy of the Purchaser or its relevant Affiliate following the crediting of such Transferred Employee with service as provided in Section 7.1.2(a). For the avoidance of doubt, such vacation accrual rate and maximum accrual applicable to Transferred Employees whose accrued vacation is specified in Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule (other than Transferred Employees whose accrued and unused vacation days are cashed out in accordance with Section 7.1.2(c)(ii) above) shall not be decreased prior to the date which is twelve (12) months following the Closing Date, or later if required by applicable Law, by the Purchaser or its Affiliates as a result of the obligation in Section 7.1.2(c)(iii) that Purchaser or its Affiliates grant or compensate such Employees with respect to accrued and unused vacation days due and owing as of the Effective Hire Date. Notwithstanding the foregoing, such Transferred Employees shall have only through and until the date which is twelve (12) months following the Closing Date, or later if required by applicable Law, during which to use accrued and unused vacation days due and owing as of the Effective Hire Date. Any such accrued vacation days that remain unused at such time shall be automatically forfeited.

(v)    The Purchaser or Designated Purchaser shall provide each Transferred Employee employed in India with the benefit of the amount set forth on Section 7.1.2(c)(v) of the Sellers Disclosure Schedule of gratuity payment, at such time, if any, as such payment thereof is due and owing to each such Transferred Employee under applicable Law, taking into account in the calculation of such payment the service of such Transferred Employee as set forth in the Employee Information and such Transferred Employee's service with Purchaser on and after the Closing Date. The Purchaser or Designated Purchaser shall provide each Transferred Employee employed in Australia with the benefit of the amount set forth on Section 7.1.2(c)(v) of the Sellers Disclosure Schedule of long service leave and sick leave, at such time, if any, as payment of such amount is due and owing to each such Transferred Employee under applicable Law, taking into account in the calculation of such payment the service of such Transferred Employee as set forth in the Employee Information and such Transferred Employee's service with Purchaser on and after the Closing Date. Section 7.1.2(c)(v) of the Sellers Disclosure Schedule shall be updated no later than ten (10) Business Days prior to the Closing Date to reflect employee hiring, promotions, demotions, transfers or other status changes and attrition, and further accruals or reductions or other changes from the date hereof to the Closing Date, in each case if and only to the extent permitted under Section 5.9.

(vi)    For the avoidance of doubt, Inactive Employees as of the Closing Date will be listed on Section 2.2.8 of the Sellers Disclosure Schedule, Section

167

7.1.2(c)(iii) of the Sellers Disclosure Schedule and Section 7.1.2(c)(v) of the Sellers Disclosure Schedule, as applicable, provided, however, that unless and until such Inactive Employees become Transferred Employees, the Purchaser shall have no obligation with respect to Inactive Employees under this Section 7.1.2(c).

(d)     Except with respect to Share Transfer Employees or any Employee whose benefits are specified by applicable Law, each Transferred Employee (and their eligible dependents, as applicable), shall be eligible as of the relevant Effective Hire Date to participate in and accrue benefits under the Purchaser Employee Plans, in each case under the terms of such Purchaser Employee Plans, which apply to employees of the Purchaser or a Designated Purchaser in the country where such Transferred Employee is employed as of the relevant Effective Hire Date and at a cost to such Transferred Employee, which is substantially comparable to the costs of those parallel benefit plans of similarly situated employees of the Purchaser. With respect to each Transferred Employee (and their eligible dependents, as applicable), the Purchaser or the relevant Purchaser's Affiliates shall use reasonable best efforts to cause such plans to (i) waive any eligibility periods, evidence of insurability or pre-existing condition limitations and (ii) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employees, including with respect to their dependents, under comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Effective Hire Date occurs, provided that such employee provides an explanation of benefits or similar documentation of such expenses paid or incurred to the Purchaser or its Affiliates. With respect to Transferred Employees who are Share Transfer Employees, the above provisions shall apply to any Purchaser Employee Plan that the Purchaser offers to such Transferred Employees but not with respect to any Transferred Employee Plans. Nothing in this paragraph or otherwise in this Article 7 shall be construed as constituting an amendment of any employee benefit plan.

(e)     The Parties agree to comply with provisions set forth in Section 7.1.2(c) of the Sellers Disclosure Schedule, relating to Canadian Pension Plans.

(f)     Neither Section 7.1.1 nor this Section 7.1.2 restricts the right of the Purchaser to terminate the employment of any Transferred Employee after the Closing, provided any such termination is effected in accordance with applicable Law, the terms of any applicable Purchaser Employee Plan or Transferred Employee Plan and the terms and conditions of this Section 7.1.

SECTION 7.2.     Employment Obligations with Respect to Union Employees. The provisions of this Section 7.2 shall apply to Union Employees. As of the Closing Date, the Purchaser or its relevant Affiliate will be bound by the terms and obligations of the Collective Labor Agreements specified in the Employee Information with respect to the employment of the relevant Union Employees as a successor, assign or purchaser of the relevant Seller and shall employ the Union Employees in accordance therewith.

SECTION 7.3.     Excluded Employee Liabilities. For purposes of clarity, except as otherwise provided in the Loaned Employee Agreement, the Sellers shall retain, and neither

168

the Purchaser nor any of the Designated Purchasers shall assume at the Closing, any of the following Liabilities of the Sellers (the "Excluded Employee Liabilities"):

(a) except with respect to any Share Transfer Employees of the NGS Companies and/or their qualified beneficiaries, any obligation to provide continuation coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to any Transferred Employees and/or their qualified beneficiaries who have a COBRA qualifying event prior to such Employees' Effective Hire Date;

(b) any Liabilities resulting from any Action (i) by any Employee (other than a Share Transfer Employee or another Employee whose employment transfers to the Purchaser or a Designated Purchaser by operation of Law) relating to his/her employment or termination of employment with any of the Sellers, except any Action related to Purchaser's failure to perform its obligations under Sections 7.1.2(e)(ii), (iii), (iv) and (v), or (ii) an applicant with respect to potential employment with any of the Sellers in the Business;

(c) any Liabilities under the WARN Act which arise out of or result from any layoff, termination of employment or the closing or relocation of worksites or the like by the Sellers on or before the Closing Date other than Liabilities related to the Transferred Employees as a result of the actions or inactions of the Purchaser as provided in Section 2.1.3(e)(ii) and (iv) or as provided in Section 2.1.3(e)(iii);

(d) other than with respect to the Companies and the Share Transfer Employees, any Liabilities for Employees and independent contractors related to the Business that are not Transferred Employees; and

(e) other than with respect to the Companies and the Share Transfer Employees, any other Liabilities relating to Employees, independent contractors or Seller Employee Benefit Plans that are not expressly assumed under this Agreement.

SECTION 7.4.    Other Employee Covenants.

(a) After the date hereof, and subject to each Party's disclosure obligations imposed by Law or by Government Entities and each Party's obligations hereunder, the Parties shall not, and shall procure that each of their Affiliates shall not, issue any announcement or communication to their respective employees or the Employees, prior to consultation with, and the approval of, the other Party (not to be unreasonably withheld or delayed) with respect to this Agreement or any of the transactions contemplated hereby (including any announcement or communication to any individual employee that the Purchaser is required to provide under applicable Law). Each Party shall cooperate in respect of the development and distribution of any announcement and communication to the employees of the other Party including Employees thereof, with respect to this Agreement or any of the transactions contemplated hereby.

(b) The Purchaser undertakes to keep the Employee Information in confidence and that, until the relevant Employee Transfer Date with respect to those Employees who

169

become Transferred Employees, and at all times with respect to those Employees who do not become Transferred Employees:

(i)    the Purchaser shall, and shall cause the Designated Purchasers to, restrict the disclosure of the Employee Information only to such of its employees, agents and advisors as is reasonably appropriate for the purposes of complying with its obligations pursuant to this Agreement prior to the Employee Transfer Date;

(ii)   the Employee Information shall not be disclosed to any other Person (including, for the avoidance of doubt, any other employee of the Purchaser or any Designated Purchaser or other Affiliate of the Purchaser) without the consent of the Main Sellers, such consent not to be unreasonably withheld;

(iii)  the Employee Information shall not be used except for the purposes of complying with the obligations of the Purchaser and the Designated Purchasers pursuant to this Agreement, and for the purposes reasonably related to the same, and shall be returned to the Sellers or destroyed, at the Sellers' election, if this Agreement is terminated; and

(iv)   the Purchaser shall, and shall cause the Designated Purchasers to, comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

(c)    The Sellers shall use reasonable efforts to provide updated Employee Information to the Purchaser on the first Business Day of each month beginning after the date hereof, provided that from and after the date on which the Purchaser determines its final list of Employees to whom offers shall be made under Section 7.1.1, Sellers shall provide updated Employee Information only with respect to such Employees, and shall provide the Purchaser with the final updated Employee Information with respect to those Employees to whom the Purchaser has made offers of employment under Section 7.1.1 ten (10) Business Days prior to the Closing Date in order to reflect Employee hiring, promotions, demotions, transfers, or other status changes and attrition, and further accruals or reductions or, if and to the extent applicable to such Schedule, other changes in a Transferred Employee's compensation from the date hereof to the Closing Date, in each case if and only to the extent permitted under Section 5.9.

(d)    The Purchaser and the Sellers shall cooperate with each other in connection with the process by which Employees are designated to become or not become Transferred Employees, and otherwise provide for an orderly transition of the Transferred Employees from the Sellers to the Purchaser or the Designated Purchasers, as applicable, and to minimize the disruption to the respective businesses of the Parties resulting from the transactions contemplated hereby. Without limiting the generality of the foregoing, within 105 days following the date hereof, the Sellers agree to commence discussions with the Purchaser regarding the identity of the Employees who will be offered employment under Section 7.1.1, and promptly after the date hereof, as permitted by applicable Law, provide the Purchaser reasonable access to books, records, personnel files, or other documentation as provided in

170

Section 5.6(a). For the avoidance of doubt, for purposes of Section 5.6(a), the Sellers agree to use reasonable best efforts to obtain any consent of employees necessary to provide the Purchaser with such access.

(e)     During the Non-Solicitation Period the Sellers shall not, and shall not permit, cause or encourage any of their Affiliates to, without the advance written consent of Purchaser, either directly or indirectly solicit for employment, hire or otherwise engage to provide services any Transferred Employee or other employee of the Purchaser or Designated Purchaser unless the Purchaser or a Designated Purchaser involuntarily terminate the employment of such employee, without cause, prior to such action by the Sellers; provided, however, that nothing in this Section 7.4(e) shall prevent the Sellers from conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such Transferred Employees. During the Non-Solicitation Period, Purchaser and the Designated Purchasers shall not, and shall not permit, cause or encourage any of their Affiliates to, without the Seller's advance written consent, either directly or indirectly solicit for employment, hire or otherwise engage to provide services (i) any of the employees of the Sellers (other than Employees), unless the Sellers involuntarily terminate the employment of such employee, without cause, prior to such action by the Purchaser or the Designated Purchasers, or (ii) any Employees who have rejected the employment offer of Purchaser or a Designated Purchasers or objected to their transfer of employment to the Purchaser or a Designated Purchasers pursuant to this Agreement or Employees to whom Purchaser or a Designated Purchaser did not make an offer pursuant to Section 7.1.1; provided, however, that nothing in this Section 7.4(e) shall prevent Purchaser or the Designated Purchasers from conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such employees or former employees of the Designated Sellers.

(f)     As of the Effective Hire Date, the Sellers shall release any non-competition or confidentiality obligations in respect of the Business or Assets binding to the Transferred Employees which would survive the termination of the employment relationship between the Sellers and the Transferred Employees. For the avoidance of doubt, this release shall operate only to facilitate the Transferred Employees' employment with the Purchaser or a Designated Purchaser, as applicable, in the Business and the subject non-competition and confidentiality obligations shall remain in full force and effect as to all other aspects of the Sellers' business and all other Persons.

(g)     Each Party shall reasonably cooperate to communicate relevant information to Employees relating to this Agreement and the transactions contemplated hereunder, and shall provide copies of all notices required by Law and related to the transactions contemplated by this Agreement to the other Party. Each Party shall provide copies of such communications to the other Party reasonably in advance of distribution, and shall provide an opportunity for such other Party to comment.

(h)     In the event and for so long as Seller is actively contesting or defending against any third party Action in which the Employee Records are pertinent, the Purchaser or Designated Purchaser agrees to provide reasonable access to Employee Records, at the cost of the Sellers.

171

(i)     In respect of the employees employed by NN International and providing services in Saudi Arabia, as set forth on Section 7.4(i) of the Sellers Disclosure Schedule: (i) the Main Sellers shall cause NN International, from the date hereof, to comply with the provisions of Paragraphs 6.1, 6.3 and 6.5 (to the extent applicable) and 8.1 through 8.3 of Schedule 6 to the EMEA Asset Sale Agreement as if NN International were a Relevant EMEA Seller thereunder and Clauses 10.21.7(D), (E), (G) or (J) of the EMEA Asset Sale Agreement as if NN International were an EMEA Seller in respect of those clauses; (ii) NN International shall comply with all of the relevant terms of Schedule 6 to the EMEA Asset Sale Agreement as if it were a Relevant EMEA Seller under the EMEA Asset Sale Agreement and Clauses 10.21.7(D), (E), (G) or (J) of the BMEA Asset Sale Agreement as if it was an EMEA Seller in respect of those clauses; and (iii) the Purchaser shall, or shall procure that the relevant EMEA Designated Purchaser shall, comply from the date hereof with its relevant obligations to NN International as if NN International were a Relevant EMEA Seller for the purposes of Schedule 6 of the EMEA Asset Sale Agreement. In addition, employees of NN International performing services in Saudi Arabia in respect of the Business shall be treated as based in Saudi Arabia for purposes of Schedule 6 to the EMEA Asset Sale Agreement and, for the avoidance of doubt, any such employees who are selected by the Purchaser or relevant EMEA Designated Purchaser pursuant to Paragraph 1.1.12 of Schedule 6 to the EMEA Asset Sale Agreement shall be deemed to be Non-ARD Transferring Employees (as defined in the EMEA Asset Sale Agreement) for the purposes of the EMEA Asset Sale Agreement. For the avoidance of doubt, the employees listed in Section 7.4(i) of the Sellers Disclosure Schedule are not deemed to be Employees or Transferred Employees for the purposes of this Agreement.

SECTION 7.5.    No Amendment of Plans.    Notwithstanding anything in the Agreement to the contrary, no provision of this Agreement is intended to, or does, constitute the establishment or adoption of, or amendment to, any employee benefit plan (within the meaning of Section 3(3) of, or subject to, ERISA), and no person participating in any such employee benefit plan maintained by either the Seller or the Purchaser or the Designated Purchaser, shall have any claim or cause of action, under ERISA or otherwise, in respect of any provision of this Agreement as it relates to any such employee benefit plan or otherwise.

172

## ARTICLE VIII

### CONDITIONS TO THE CLOSING

SECTION 8.1.    Conditions to Each Party's Obligation.    The Parties' obligation to effect, and, as to the Purchaser, to cause the relevant Designated Purchasers to effect, the Closing is subject to the satisfaction or the express written waiver of the Primary Parties, at or prior to the Closing, of the following conditions:

(a)    *Regulatory Approvals.*    All Regulatory Approvals shall have been obtained and, unless the Purchaser expressly agrees otherwise, the Regulatory Approvals shall not require the Purchaser, any Designated Purchaser, any EMEA Designated Purchaser or any of their respective subsidiaries to commit to any actions, undertakings, divestitures, licenses or hold separate or similar arrangements or any arrangements for the conduct of any business and/or terminating any relationships or contractual rights or obligations that, individually or in the aggregate, would be material in relation to the value of the Acquired Business.

(b)    *No Injunctions or Restraints.*    There shall be in effect no Law, or any material order, injunction, decree or judgment of any Court or other Government Entity in the U.S., Canada or the United Kingdom, or of any European Union Entity, prohibiting the consummation of any of the transactions contemplated hereby or by the EMEA Asset Sale Agreement.

(c)    Reserved.

(d)    *U.S. Sale Order and Canadian Approval and Vesting Order.*    The U.S. Sale Order and the Canadian Approval and Vesting Order (i) shall have been entered without material modification, unless the Purchaser expressly consented to such modification, which consent shall not be unreasonably withheld and (ii) shall not have been stayed as of the Closing Date, amended, modified, reversed, vacated, revoked or appealed and shall be in full force and effect as of the Closing Date; provided that this condition shall be deemed satisfied even if the U.S. Sale Order has been appealed, so long as (x) the applicable appeal period has expired, (y) the effectiveness of the U.S. Sale Order has not been stayed by the U.S. Bankruptcy Court pending appeal and (z) the Purchaser shall have concluded, after consultation with the Main Sellers, the Monitor, the Committee and the Bondholder Group and their respective counsel, that there is no material risk that any pending appeal of the U.S. Sale Order will not be rendered moot following Closing by operation of Section 363(m) of the U.S. Bankruptcy Code. Notwithstanding the foregoing, any modification of Paragraphs L and Q and Sections 6, 7 and 8 of the U.S. Sale Order by the U.S. Bankruptcy Court to comply with applicable law shall not affect the Purchaser's obligation to close hereunder.

(e)    *Satisfaction of Conditions under EMEA Asset Sale Agreement.*    The conditions to Closing of the EMEA Asset Sale Agreement set out in Clause 15.1 thereof (other than the conditions regarding the satisfaction or waiver of the conditions set out in this Section 8.1) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement.

173

(f)    *Consummation of Closing under EMEA Asset Sale Agreement.* The transactions contemplated by the EMEA Asset Sale Agreement to be completed as of the Closing shall be completed contemporaneously with the Closing hereunder.

SECTION 8.2.    Conditions to Sellers' Obligation. The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Main Sellers), at or prior to the Closing, of each of the following conditions:

(a)    *No Breach of Representations and Warranties.* Each of the representations and warranties contained in Article III (disregarding all materiality and material adverse effect qualifications contained therein) shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually and together with other such failures, has not had a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement.

(b)    *No Breach of Covenants.* The Purchaser shall have performed in all material respects all material covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing.

(c)    *Officer Certificate.* The Sellers shall be furnished with a certificate of one of the senior officers of the Purchaser certifying that the conditions set forth in Section 8.2(a) and (b) have been satisfied.

(d)    *Satisfaction of Conditions under EMEA Asset Sale Agreement.* The conditions to Closing of the EMEA Asset Sale Agreement set out in Clause 15.2 thereof (other than the conditions regarding the satisfaction or waiver of the conditions set out in this Section 8.2) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement.

SECTION 8.3.    Conditions to Purchaser's Obligation. The Purchaser's obligation to effect, and to cause the relevant Designated Purchasers to effect, the Closing shall be subject to the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a)    *No Breach of Representations and Warranties.* Each of the representations and warranties set forth in Article IV, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except in each case for any failure to be true and correct that, individually and together with other such failures, has not had a Material Adverse Effect.

(b)    *No Breach of Covenants.* Sellers shall have complied (i) with all pre-Closing obligations set forth in Section 5.9(v) and Section 5.34 and (ii) in all material respects with all other material covenants, obligations and agreements contained in this Agreement required to be performed by the Sellers on or before the Closing.

174

(c)      *Officer Certificate.* The Purchaser shall be furnished with a certificate of one a senior officer of one of the Main Sellers that the conditions set forth in paragraphs (a) and (b) of this Section have been satisfied.

(d)      *No Plan Termination of or Lien with Respect Thereto.* If the Asset Sale Election is not made, with reference to occurrences at any time before, on or after the date hereof (i) the NNRIP shall not have been terminated prior to the Closing in a distress termination (under Section 4041 of ERISA) or an involuntary termination (under Section 4042 of ERISA), (ii) Seller (or any Person that would be considered a single employer with Seller under ERISA or the Code) shall not have issued a notice of intention to terminate the NNRIP or received notice that the PBGC has initiated a proceeding to terminate the NNRIP, in either case with a proposed date of plan termination on or before the Closing Date, which termination could result in related liabilities to the Purchaser or its Affiliates (including the Companies), (iii) no Lien shall have arisen under Section 430 of the Code or Section 4068 of ERISA with respect to such NNRIP that could apply to any of the assets of the Purchaser or any of its Affiliates (including the Companies), and (iv) no liability could be asserted against the Companies under Section 412 of the Code or Section 4062 of ERISA, unless, in the case of each of clauses (i), (ii), (iii) and (iv), either the PBGC shall have waived its Claims or potential Claims against Purchaser or any of its Affiliates (including the Companies) in relation to such potential liabilities and, if applicable, any such Lien or potential Lien shall have been released, or as of the Closing Date shall be released, by the PBGC. The Sellers expressly acknowledge, for the avoidance of doubt, that Purchaser is entitled to the benefit of this Section 8.3(d) with respect to, without limiting the generality of clauses (i), (ii), (iii) and (iv) of the preceding sentence, the Complaint For Pension Plan Termination dated July 16, 2009 filed by the PBGC in the U.S. District Court for the Middle District of Tennessee (Nashville Division) and the PBGC Notice of Determination addressed to the Retirement Plan Committee of Nortel Networks Retirement Income Plan and any related plan termination or actual or potential Claim, Lien or Liability as described above.

(e)      *UK Defined Benefit Plan.*

(i)      If the Asset Sale Election is not made, there shall be no pending Action by the UK Pensions Regulator, the PPF or the Pension Trustees seeking to assert liability against the Companies or in respect of the Shares under the UK Pensions Act 2004. For the purposes of this clause an Action to assert such liability shall be deemed to have occurred and to be pending (unless such action shall have been formally terminated or withdrawn), without limitation upon and following the occurrence of any of:

(A)      The issue of a warning notice in respect of the imposition of a contribution notice or a financial support direction (as defined under the UK Pensions Act 2004) on either of the Companies by the UK Pensions Regulator; or

(B)      The issue of a determination notice in respect of the imposition of a contribution notice or a financial support direction (as defined under the UK Pensions Act 2004) on either of the Companies by the UK Pensions Regulator; or

175

(C)     any written communication from the UK Pensions Regulator, the PPF or the Pensions Trustees which is received by or addressed to the attention of any Sellers, any EMEA Sellers, any Company, the Joint Administrators, the Joint Israeli Administrators, the Pension Trustees or the Purchaser or the representative of or successor to (including any administrator of) any of the foregoing and which makes reference to either of the Companies and/or the matters covered by the Transaction Documents and states that the UK Pensions Regulator is reviewing the position of either of the Companies and/or the matters covered by the Transaction Documents with a view to imposing or determining whether to impose a contribution notice or financial support direction (as defined under the UK Pensions Act 2004) on either of the Companies.

(f)     *Satisfaction of Conditions under EMEA Asset Sale Agreement.* The conditions to Closing of the EMEA Asset Sale Agreement set out in Clause 15.3 thereof (other than the conditions regarding the satisfaction or waiver of the conditions set out in this Section 8.3) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement.

(g)     *Customer Contracts; Financial Statements.* If the Asset Sale Election is made, then either (i) Customer Contracts of the Companies that accounted for not less than 65 % of LTM revenues of the Companies as of the Closing Date shall have been transferred or, to the extent not prohibited by applicable Law or the terms of such Customer Contract, sub-contracted (on terms under which Purchaser or a Designated Purchaser receives the economic benefits that it would have received if it were a direct party to the relevant Customer Contract) to Purchaser or a Designated Purchaser on the Closing Date in compliance with an effective order of the Bankruptcy Court or (ii) Sellers shall have delivered a second set of all financial statements and information required to be delivered before Closing under Section 5.34, which set of financial statements and information shall have been prepared excluding the Companies.

(h)     *Resolution of Certain Tax Issues.* In the event the Asset Sale Election is not timely made, any material Tax Liability of the Companies arising pursuant to Treasury Regulation Section 1.1502-6 and relating to the IRS Claim (the "**-6 Liability**") shall have been resolved in a manner reasonably acceptable to the Purchaser.

## ARTICLE IX

## TERMINATION

SECTION 9.1.    Termination. This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written consent of the Primary Parties;

(b)     by either Primary Party, upon written notice to the other:

(i)     on or prior to the fifth (5th) Business Day after entry of the U.S. Bidding Procedures Order or the Canadian Sales Process Order, if the U.S.

Bidding Procedures Order and the Canadian Sales Process Order have not been entered within thirty (30) days from the date of this Agreement in the form of orders, without modification that is material and adverse to the terminating Party unless such Party expressly consented to such modification (such consent not to be unreasonably withheld), set forth in Exhibit 5.1(a) (in the case of the U.S. Bidding Procedures Order) and Exhibit 5.2.1 (in the case of the Canadian Sales Process Order);

(ii)    (ii) if the U.S. Sale Order and the Canadian Approval and Vesting Order are not entered in satisfaction of the condition set forth in Section 8.1(d) within ten (10) Business Days if terminated by the Purchaser or twenty (20) Business Days if terminated by the Main Sellers after the conclusion of the Auction;

(iii)    upon or following the entry of an order by the U.S. Bankruptcy Court or the Canadian Court approving an Alternative Transaction;

(iv)    if the EMEA Asset Sale Agreement is terminated in accordance with its terms;

(v)    upon or following the sale, transfer or other disposition, directly or indirectly, of any material portion of the Business or the Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers or the Companies;

(vi)    if the Closing does not take place on or prior to the date that is (a) 270 days from the date of this Agreement in the case of a termination by the Main Sellers, or (b) the earlier of (1) 365 days from the date of this Agreement or (2) the later of 270 days from the date of this Agreement or the thirtieth (30ᵗʰ) day after the date on which the condition set forth in Section 8.1(a) hereof is satisfied, in the case of a termination by the Purchaser; or

(vii)    if any Antitrust Law is enacted in the U.S. or Canada or by the European Union, or any Court or other Government Entity in the U.S. or Canada or any Government Entity of the European Union issues a final order, injunction, decree, ruling or judgment based on Antitrust Laws, in each case permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement.

(c)    (i) by the Purchaser, upon written notice to the Main Sellers, in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure of the conditions to Closing set forth in Section 8.1(a), Section 8.1(e), Section 8.1(f), Section 8.3(a) or Section 8.3(b), as applicable, or (ii) by the Main Sellers, upon written notice to the Purchaser, in the event of a material breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement or the EMEA Asset Sale Agreement, which

177

breach would result in a failure of the conditions to Closing set forth in Section 8.1(a), Section 8.1(e), Section 8.1(f), Section 8.2(a) or Section 8.2(b), as applicable, and, in each case, which, if capable of being cured, has not been cured within twenty-five (25) days from receipt of a written notice thereof from the non-breaching Party; or

    (d)    by the Main Sellers, upon written notice to the Purchaser:

    (i)    upon Purchaser's material breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within five (5) days from the receipt of a written notice thereof from the Main Sellers; or

    (ii)    in the event of a material breach by the Purchaser of the Purchaser's covenants set forth in Section 5.5, which breach, if capable of being cured, is not cured within fifteen (15) days from receipt of a written notice thereof from the Main Sellers;

    (e)    by the Purchaser, upon written notice to the Main Sellers, if at the conclusion of the Auction, the Purchaser is not selected as the Successful Bidder;

    (f)    by the Purchaser, upon written notice to the Main Sellers delivered prior to the entry of the U.S. Sale Order, if the Auction does not conclude by the later of (x) the forty-fifth (45th) Business Day after the entry of the U.S. Bidding Procedures Order and (y) September 16, 2009;

    (g)    by the Purchaser, upon written notice to the Main Sellers;

    (i)    upon revocation or alteration of the Bidding Procedures (as defined in the U.S. Bidding Procedures Order), the Bidding Process (as defined in the U.S. Bidding Procedures Order) or the Auction, in each case pursuant to the last paragraph of the section of the Bidding Procedures titled "Reservation of Rights;"

    (ii)    upon any Sellers' material breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within twenty-five (25) days from the receipt of a written notice thereof from the Purchaser; or

    (iii)    within thirty (30) days of delivery by the Purchaser of the related written notice of breach to the Sellers, in the event that (A) on or subsequent to the date hereof and prior to the entry of the Bidding Procedures Order or (B) subsequent to the conclusion of the Auction, in the event there is a material breach by the Sellers of the covenants set forth in Section 5.29 that occurred during such period which breach, if capable of being cured, has not been cured within five (5) days from receipt of a written notice thereof from the Purchaser (provided that, with respect to a breach occurring in the period contemplated by clause (A), no termination notice shall be given by the Purchaser after the entry of the Bidding Procedures Order);

178

(h)  by the Purchaser, upon written notice to the Main Sellers delivered within fifteen (15) days of delivery to the Purchaser of the Audited Financial Statements for fiscal year 2008, if the Adjusted Audited Standard Margin is less than ninety percent (90%) of the Unaudited Standard Margin; or

(i)  by the Purchaser, upon written notice to the Main Sellers delivered before the expiration of the Contract Review Period, provided that the Reverse Termination Fee is paid to Sellers in accordance with Section 9.3 prior to or concurrently with such termination;

provided, however, that (x) the right to terminate this Agreement pursuant to Section 9.1(b)(i), Section 9.1(b)(ii), Section 9.1(b)(vii), Section 9.1(e) or Section 9.1(f) shall not be available to any Party whose breach hereof was a principal cause of the event or condition purportedly giving rise to a right to terminate this Agreement under such clause and; provided further, however, that (y) the right to terminate this Agreement pursuant to Section 9.1(b)(vi) shall not be available to the Sellers, if any Seller or any EMEA Seller is in breach of its obligation to close the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement during the twenty-five (25) days prior to the two-hundred seventieth (270th) day from the date hereof, until forty-five (45) days after such breach has been cured and (z) the right to terminate this Agreement pursuant to Section 9.1(b)(vi) shall not be available to the Purchaser, if the Purchaser is in breach of its obligation to close the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement during the five (5) days prior to the date that is 365 days after the date hereof, until forty-five (45) days after such breach has been cured.

SECTION 9.2.    Break-Up Fee; Expense Reimbursement.

(a)  In the event that (i) this Agreement is terminated (x) by either Primary Party pursuant to Section 9.1(b)(ii) (provided that an Alternative Transaction has been proposed or re-proposed to the Main Sellers after the date hereof and prior to such termination, and an Alternative Transaction is entered into before, on or within sixty (60) days following such termination of this Agreement), Section 9.1(b)(iii) or Section 9.1(b)(v) or (y) by the Purchaser pursuant to Section 9.1(e)(i) (as a result of an Intentional Breach by the Sellers), Section 9.1(e), Section 9.1(f), Section 9.1(g)(i), Section 9.1(g)(ii) (as a result of an Intentional Breach by the Sellers) or, subsequent to the conclusion of the Auction, Section 9.1(g)(iii) (as a result of an Intentional Breach by the Sellers), or (z) by either Primary Party pursuant to Section 9.1(b)(iv) (as a result of a termination of the EMEA Asset Sale Agreement pursuant to Clause 15.4.2(C), Clause 15.4.2(E) or Clause 15.4.4 (as a result of an Intentional Breach by the EMEA Sellers of the EMEA Asset Sale Agreement) of the EMEA Asset Sale Agreement), (ii) when this Agreement is terminated, the Purchaser is not in breach of this Agreement or the EMEA Asset Sale Agreement as a result of an Intentional Breach which Intentional Breach would result in a failure to satisfy the conditions to Closing set forth in Section 8.1 and/or Section 8.2, as applicable, and, in each case, which, if capable of being cured, has not been cured within the applicable Breach Cure Period, and (iii) an Alternative Transaction is entered into before, on or within nine (9) months following such termination and is eventually consummated, the Sellers and the EMEA Debtors shall pay to the Purchaser in immediately available funds, within five (5) Business Days of the consummation of such Alternative Transaction, an aggregate cash fee equal to (x) $14,250,000 (the "Break-Up Fee"), minus (y) one-half of the Expense Reimbursement paid hereunder.

179

(b)    In the event that (i) (A) this Agreement is terminated pursuant to any provision in Section 9.1 (other than Section 9.1(a), Section 9.1(b)(iv) (as a result of a termination of the EMEA Asset Sale Agreement pursuant to Clause 15.4.1, Clause 15.4.2(G), Clause 15.4.3, or Clause 15.4.9 of the EMEA Asset Sale Agreement), Section 9.1(b)(vii), Section 9.1(c)(ii), Section 9.1(d) or Section 9.1(f)), or (B) this Agreement is terminated pursuant to any provision in Section 9.1 and, prior to such termination, the Sellers publicly announce (1) the retention of the Business by all or some of the Sellers (or their successor entities) under a stand-alone plan of reorganization approved by the U.S. Bankruptcy Court or any plan of arrangement approved by the Canadian Court, or (2) that any portion of the Business or the Assets and the EMEA Assets will be sold, transferred or otherwise disposed, directly or indirectly, in connection with the closure, liquidation or winding up of the Business or any of the Sellers, the EMEA Sellers or the Companies (except for any sale to the Purchaser or a Designated Purchaser contemplated by the Transaction Documents), and (ii) when this Agreement is terminated, the Purchaser is not in breach of this Agreement or the EMEA Asset Sale Agreement as a result of an Intentional Breach which breach would result in a failure to satisfy any of the conditions to Closing set forth in Section 8.1 and/or Section 8.2 or Clause 15.1 and/or Clause 15.2 of the EMEA Asset Sale Agreement, as applicable, and, in each case, which, if capable of being cured, has not been cured within the applicable Breach Cure Period, the Sellers and the EMEA Sellers shall pay the Purchaser an aggregate amount in cash equal to the total amount of all reasonable and documented fees, costs and expenses incurred by the Purchaser in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all filing and notification fees, and all fees and expenses of the Purchaser's representatives (the "Expense Reimbursement"); provided, however, that the Expense Reimbursement shall not be payable in the event that the Agreement is terminated pursuant to Section 9.1(b)(vi) if at the time of such termination (i) the condition set forth in Section 8.1(a) is not satisfied and (ii) the conditions set forth in Section 8.1(b), Section 8.1(d), Section 8.3(a), Section 8.3(b), Section 8.3(d) and Section 8.3(e) are satisfied other than any failure to satisfy any such condition listed in clause (ii) that is caused by the failure to obtain any Antitrust Approval or an Intentional Breach by Purchaser of this Agreement which, if capable of being cured, has not been cured within the applicable Breach Cure Period. Notwithstanding the foregoing, the Expense Reimbursement shall not exceed $9,500,000 in the aggregate (the "Expense Reimbursement Limit"). If the Expense Reimbursement does not exceed the Expense Reimbursement Limit, the Sellers and the EMEA Sellers agree that the Expense Reimbursement is a reasonable amount given the size and complexity of the transactions contemplated by this Agreement and the EMEA Asset Sale Agreement. The Expense Reimbursement shall be paid by wire transfer or other means reasonably acceptable to the Purchaser not later than five (5) Business Days following the receipt by the Main Sellers and NNUK of written notice from the Purchaser describing the fees and expenses that constitute the Expense Reimbursement in reasonable detail.

(c)    The Sellers shall pay two-thirds (2/3) and the EMEA Debtors shall pay one-third (1/3) of each of the Break-Up Fee and the Expense Reimbursement if payable hereunder. The Sellers' and the EMEA Debtors' obligations to pay their respective shares of the Break-Up Fee and the Expense Reimbursement pursuant to this Section 9.2 shall be several and not joint (but the obligation of the Sellers to pay two-thirds (2/3) of each of the Break-Up Fee and Expense Reimbursement shall be joint and several among the Sellers and the obligation of

the EMEA Debtors to pay one-third (1/3) of each of the Break-Up Fee and Expense Reimbursement shall be joint and several among the EMEA Debtors) and shall survive termination of this Agreement or the EMEA Asset Sale Agreement and shall (i) to the extent owed by the U.S. Debtors constitute an administrative expense of the U.S. Debtors under sections 503(b) of the U.S. Bankruptcy Code and (ii) to the extent owed by the EMEA Debtors, constitute an expense of the administration under Paragraph 99 of Schedule B1 to the Insolvency Act 1986 and/ or Rule 2.67 of the Insolvency Rules 1986; provided, however, in the event that any Seller or any EMEA Seller or any Affiliate of any Seller or EMEA Seller agrees to pay a break-up fee or expense reimbursement to any subsequent purchaser of assets or shares, with an unadjusted, aggregate purchase price greater than or equal to $100,000,000 and such break-up fee or expense reimbursement has priority over any administrative expenses specified in section 503(b) or 507(b) of the U.S. Bankruptcy Code, then the portion of the Break-Up Fee and Expense Reimbursement payable to the Purchaser or its Affiliates by the Sellers shall have administrative expense status under section 364(c) of the U.S. Bankruptcy Code with priority over any and all administrative expenses specified in section 503(b) or 507(b) of the U.S. Bankruptcy Code (to the extent such concept is applicable to such Sellers).

SECTION 9.3.    Reverse Termination Fee.

(a)    The Purchaser shall pay the Reverse Termination Fee to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) in the event that:

(i)    this Agreement is terminated by Purchaser pursuant to Section 9.1(i); or

(ii)    (A) At the time of termination of the Agreement (1) the conditions set forth in Section 8.1(a) of this Agreement or Clause 15.1.3 of the EMEA Asset Sale Agreement have not been satisfied, (2) any Regulatory Approval(s) require any divestiture, license or hold separate or similar arrangements or any material actions, undertakings or arrangements for the conduct of any business and/or terminating any relationships or contractual rights or obligations that Purchaser determines not to accept, or (3) there is a Material Intentional Purchaser Breach, and

(B)(1) this Agreement is terminated by the Main Sellers pursuant to Section 9.1(c)(ii) or Section 9.1(d) hereof, (2) the EMEA Asset Sale Agreement is terminated by the Joint Administrators pursuant to Clause 15.4.3 thereof, or (3) this Agreement is terminated by either Primary Party pursuant to Section 9.1(b)(vi) or Section 9.1(b)(vii) hereof or the EMEA Asset Sale Agreement is terminated by the Joint Administrator or the Purchaser pursuant to Clause 15.4.2(F) or Clause 15.4.2(G) thereof;

provided, however, that notwithstanding the foregoing, the Reverse Termination Fee shall not be payable pursuant to this clause (ii) if at the time of termination:

(x) the Sellers are in breach of this Agreement in any material respect as a result of an Intentional Breach, which breach would result in a failure of the

181

conditions to Closing set forth in Section 8.1 or Section 8.3 to be satisfied, and in each case, which, if capable of being cured, is not cured within the applicable Breach Cure Period or (y) the EMEA Sellers are in breach of the EMEA Asset Sale Agreement in any material respect as a result of an Intentional Breach, which breach would result in a failure of the conditions to Closing (as defined in the EMEA Asset Sale Agreement) set forth in Clause 15.3.1 thereof to be satisfied, and in each case, which, if capable of being cured, is not cured within the applicable Breach Cure Period; or

(y) any of the conditions to Purchaser's obligations set forth in Section 8.1 or Section 8.3 cannot be satisfied on or before the date that is 365 days from the date of this Agreement (other than any such condition that by its nature is to be satisfied at the Closing or any such condition that cannot be satisfied as a result of (1) a Material Intentional Purchaser Breach or (2) the failure to obtain any Antitrust Approval).

(b)     If payable pursuant to Section 9.3(a) the Reverse Termination Fee shall be paid by the Purchaser to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) as follows:

(i)     by application of the Good Faith Deposit and the portion of the Delay Fee that shall have already been paid to the Escrow Agent in the form of Delay Fee Payments pursuant to Section 2.2.1(b) and the actual earnings thereon, as contemplated in Section 2.2.1(c)(ii); and

(ii)     as for the balance of the Reverse Termination Fee, if any, in immediately available funds, within two (2) Business Days of the termination of this Agreement, by way of wire transfer to an account of the Distribution Agent, as distribution agent for the Sellers, to be notified by the Main Sellers or the Distribution Agent to the Purchaser in writing.

SECTION 9.4.     Effects of Termination.  If this Agreement is terminated pursuant to Section 9.1:

(a)     all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of or as provided in (i) Section 2.2.6(b) (Escrows), (ii) Section 5.7 (Public Announcements), (iii) Section 5.10 (Transaction Expenses), (iv) Section 5.11 (Confidentiality), (v) Section 7.4(h)(iii) (Other Employee Covenants), (vi) Section 9.2 (Break-Up Fee; Expense Reimbursement), (vii) Section 9.3 (Reverse Termination Fee), (viii) Section 9.4 (Effects of Termination), and (ix) Article X;

(b)     except as required by applicable Law, the Purchaser shall return to the Sellers all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; and

(c)     the provisions of the Confidentiality Agreement will continue in full force and effect.

182

## ARTICLE X

### MISCELLANEOUS

SECTION 10.1.   No Survival of Representations and Warranties or Covenants. Except for the representations set forth in Section 3.5, no representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants set forth in Article VI and covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

SECTION 10.2.   Remedies.   No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 10.3.   No Third-Party Beneficiaries.   Except for the rights of the Indemnified Persons under Section 5.20, the rights of the Avaya Parties and the Nortel Parties pursuant to Section 10.14 and any acknowledgments, rights, undertakings, representations or warranties expressed to be for the benefit of the EMEA Sellers, the Joint Administrators or the Joint Israeli Administrators, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 10.4.   Consent to Amendments; Waivers.   No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement and the Ancillary Agreements shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.

SECTION 10.5.   Successors and Assigns.   Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Main Sellers in case of an assignment by the Purchaser or the Purchaser in case of an assignment by any Seller, which consent may be withheld in such party's sole discretion, except for the following assignments which shall not require consent: (i) assignment to an Affiliate of a Party (provided that such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Party), (ii) assignment by a U.S. Debtor to a succeeding entity following such U.S. Debtor's emergence from the Chapter 11 Cases, (iii) assignment by any of the Canadian Debtors pursuant to any plan of arrangement approved by the Canadian Court and (iv) designation by the Purchaser of Designated Purchasers pursuant to Section 2.4.

183

SECTION 10.6.    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

(b)    To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (A) the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, provided that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors, the Canadian Debtors or the Purchaser may, in accordance with the Cross-Border Protocol, move the U.S. Bankruptcy Court and the Canadian Court to hold a joint hearing of the U.S. Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, action or proceeding, or (B) in the Federal Courts in the Southern District of New York or the State Courts of the State of New York, County of Manhattan (collectively, the "New York Courts"), if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases (the courts specified in clauses (A) and (B) collectively, the "Designated Courts"), and shall not be brought in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the Designated Courts for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any Designated Court or any claim that any such action brought in any Designated Court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)    The Purchaser hereby appoints McCarthy Tétrault, as its authorized agent (the "Purchaser Authorized Canadian Agent") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable. The Purchaser further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointments in full force and effect as aforesaid. Service of process upon the Purchaser Authorized Canadian Agent in respect of the relevant jurisdiction and written notice of such service to the Purchaser shall be deemed, in every respect, effective service of process upon the Purchaser in relation to such jurisdiction.

184

(d)     Each Seller hereby appoints (i) NNI as its authorized agent (the "Seller Authorized U.S. Agent") upon whom process and any other documents may be served in the Chapter 11 Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the U.S. Bankruptcy Court or in the NY Courts by any other party hereto, and (ii) NNL as its authorized agent (the "Seller Authorized Canadian Agent" and together with the Seller Authorized U.S. Agent, the "Seller Authorized Agents") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable. Each such Seller further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointment in full force and effect as aforesaid. Service of process upon the applicable Seller Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Main Sellers shall be deemed, in every respect, effective service of process upon every such Seller.

(e)     Section 10.6(b) shall not limit the jurisdiction of (i) the Accounting Arbitrator set forth in Section 2.2.3.1 (c) or (ii) the arbitrator(s) entrusted with the resolution of disputes relating to the Transition Services Agreement pursuant to Section 5.36, although claims may be asserted in the courts referred to in Section 10.6(b) for purposes of enforcing the jurisdiction and judgments of the Accounting Arbitrator or such arbitrator(s).

(f)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

(g)     Notwithstanding Sections 10.6(a) and (b), the Parties and the EMEA Sellers agree that any questions, claims, disputes, remedies or Actions arising under Sections 2.2.4(b)(y), 9.2(c)(ii) and 10.19 and any questions, claims, disputes, remedies or Actions arising from or related to (i) the agency of the Joint Administrators, (ii) the personal liability of the Joint Administrators, their firm, partners, employees, advisors, representatives and agents, (iii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iv) their appointment as joint administrators of the EMEA Sellers and their status as such, to the extent separable from other claims made hereunder, shall be governed by English law and be subject to the exclusive jurisdiction of the English courts.

SECTION 10.7.   Notices.  All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile

185

transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Purchaser to:

> Avaya Inc.
> 211 Mount Airy Road
> Basking Ridge, NJ 07920-2332
> United States
> Attention:  Pamela F. Craven, Chief Administrative Officer
>           Frank J. Mahr, Corporate Counsel & Corporate Secretary
> Facsimile: +1-908-953-3902

With copies (that shall not constitute notice) to:

> Ropes & Gray LLP
> One International Place
> Boston, MA 02110
> United States
> Attention: Alfred O. Rose
>         Howard S. Glazer
> Facsimile: +1-617-951-7050

If to the Main Sellers or the Sellers, to:

> **Nortel Networks Corporation**
> 195 The West Mall
> Mailstop: T0503006
> Toronto, Ontario, Canada M9C 5K1
> Attention:  Gordon A. Davies
>           Chief Legal Officer & Corporate Secretary
> Facsimile:  +1-905-863-7386

> **Nortel Networks Limited**
> 195 The West Mall
> Mailstop: T0503006
> Toronto, Ontario, Canada M9C 5K1
> Attention:  Gordon A. Davies
>           Chief Legal Officer & Corporate Secretary
> Facsimile:  +1-905-863-7386

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA  37228
Attention:     Lynn C. Egan
               Assistant Secretary
Facsimile:     +1-615-432-4067

With copies (that shall not constitute notice) to:

**Nortel Networks Limited**
195 The West Mall
Mailstop: T0505009
Toronto, ON  M9C 5K1
Canada
Attn:  Douglas Parker
       Associate General Counsel, Corporate
Facsimile:  +1-905-863-7739

and

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, TN  37228
USA
Attention:     Robert Fishman
               Senior Counsel
Facsimile:     +1-347-427-3815 & +1-615-432-4067

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
United States
Attention: Neil Q. Whoriskey
           David Leinwand
Facsimile: +1-212-225-3999

and

Ogilvy Renault LLP
200 Bay Street

187

Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention: Michael Lang
Facsimile: +1-416-216-3930

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

SECTION 10.8. Exhibits; Sellers Disclosure Schedule.

(a)    The Sellers Disclosure Schedule and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)    For purposes of the representations and warranties of the Sellers contained in this Agreement, disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances with respect to all representations or warranties by the Sellers, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably apparent from the Sellers Disclosure Schedule that such disclosure is applicable. The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

SECTION 10.9.    Counterparts.   The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

SECTION 10.10.    No Presumption.    The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

SECTION 10.11.    Severability.    If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability

188

in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 10.12. Headings. The headings used in this Agreement are for the purpose of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.

SECTION 10.13. Entire Agreement.

(a)   This Agreement, the EMEA Asset Sale Agreement, the Ancillary Agreements, the Confidentiality Agreement and any written notice relating to Excluded Sellers delivered pursuant to Section 5.25(a) on the date hereof, together set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the Ancillary Agreements and the Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated. In the event of any irreconcilable conflict between this Agreement and any of the Ancillary Agreements or the Confidentiality Agreement, the provisions of this Agreement shall prevail, regardless of the fact that certain Ancillary Agreements, such as the Local Sale Agreement, may be subject to different governing Laws (unless the Ancillary Agreement expressly provides otherwise).

(b)   For the sake of clarity, the provisions of the EMEA Asset Sale Agreement have been drafted separately from the provisions in the body of this Agreement to reflect differing market practices in the countries of jurisdiction of the EMEA Sellers. Unless the context specifically requires, the provisions contained in the body of this Agreement and the provisions of the EMEA Asset Sale Agreement shall be interpreted independently and without reference to each other.

SECTION 10.14. Limitations on Pre-Closing Remedies.

(a)   The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, subject to the limitations set forth in this Section 10.14 and in addition to any other remedies to which the Parties are entitled at Law or in equity, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches; provided, however, that under no circumstances shall any Avaya Party other than the Purchaser and/or any Designated Purchaser, as applicable, be subject to claims for equitable relief, including specific performance of any kind. Each Party agrees, to the extent that such Party is subject to any equitable remedy, to waive any requirement for the security or posting of any bond in connection with any such equitable remedy. Under no circumstances shall any Avaya Party other than the

189

Purchaser and/or any Designated Purchaser, as applicable, be liable for damages arising out of, or in connection with, this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof or of the EMEA Asset Sale Agreement or any other Transaction Document, including damages alleged as a result of tortious conduct. Without limiting the preceding provisions of this Section 10.14(a), it is acknowledged and agreed that under no circumstances shall any Person be liable for punitive damages (including multiple damages assessed as a punitive measure) or special damages arising out of, or in connection with, this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof or of the EMEA Asset Sale Agreement or any other Transaction Document, including damages alleged as a result of tortious conduct. Nothing set forth in this Agreement shall confer or give or shall be construed to confer or give to any Person (including any Person acting in a representative capacity) any rights or remedies against any Person other than the Parties. The Parties acknowledge and agree that each Party will be entitled to all the remedies against the other Parties available to it at Law or in equity for post-Closing breaches of this Agreement, the EMEA Asset Sale Agreement and any Transaction Documents, including specific performance and/or damages.

(b)    Notwithstanding anything to the contrary set forth in Section 10.14(a), if (1) the conditions set forth in Section 8.1(a) of this Agreement or Clause 15.1.3 of the EMEA Asset Sale Agreement have not been satisfied (other than as a result of a Material Intentional Purchaer Breach), or (2) any Regulatory Approval(s) require any divestiture, license or hold separate or similar arrangements or any material actions, undertakings or arrangements for the conduct of any business and/or terminating any relationships or contractual rights or obligations that Purchaser determines not to accept then specific performance shall not be available against any of the Avaya Parties and the sole and exclusive remedy of the Nortel Parties against any of the Avaya Parties shall be termination of this Agreement and the EMEA Asset Sale Agreement and payment of the Reverse Termination Fee by the Purchaser, when, as and if required pursuant to Section 9.3 (and no other additional money damages shall be payable by any Avaya Party) for the failure of the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement (including transactions contemplated under Clause 7 of the EMEA Asset Sale Agreement or Paragraph 2 of Schedule 9 to the EMEA Asset Sale Agreement) to be consummated, or in respect of any Liabilities arising under, or relating to, this Agreement, the EMEA Asset Sale Agreement or any other Transaction Document, or the transactions contemplated hereby or thereby prior to the Closing. In a situation in which the Reverse Termination Fee does not constitute the sole remedy, any damages award will be reduced by the amount of the Reverse Termination Fee that has been paid.

(c)    Each of the Parties acknowledges that the agreements contained in this Section 10.14, Section 9.2 and Section 9.3, are each an integral part of the transactions contemplated by this Agreement and the EMEA Asset Sale Agreement. In the event that (i) the Sellers or the EMEA Sellers shall fail to pay the Break-Up Fee or Expense Reimbursement when due, or (ii) Purchaser shall fail to pay the Reverse Termination Fee when due, then Sellers or the EMEA Sellers in the case of clause (i) and Purchaser in the case of clause (ii), shall reimburse the other Parties for all reasonable costs and expenses actually incurred or accrued by such other Parties (including reasonable fees and expenses of counsel) in connection with the collection under and enforcement of Section 9.2 or Section 9.3 and Clauses 15.5 to 15.7 of the EMEA Asset Sale Agreement as applicable, together with interest on such unpaid amount at the prime

rate of Citibank N.A. in effect on the date such payment was required to be made through the date of payment.

SECTION 10.15. Bulk Sales Laws. Subject to the entry of the U.S. Sale Order, each Party waives compliance by the other Party with any applicable bulk sales Law, provided, however, that the Parties shall use their reasonable efforts to cooperate to the extent necessary to obtain a reduction in, or exemption from, any applicable sales or use Taxes.

SECTION 10.16. Main Sellers as Representatives of Other Sellers.

(a)  For all purposes of this Agreement:

(i)  each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNL as its representative; and

(ii)  each Other Seller not listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNI as its representative.

(b)  Pursuant to Section 10.16(a), each of NNL and NNI shall expressly have the power to, in the name and on behalf of each of its Respective Affiliates (as defined below), (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

(c)  For the purposes of this Agreement, "Respective Affiliates" means: (i) with respect to NNL, each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule, and (ii) with respect to NNI, all the other U.S. Debtors and each Other Seller not listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule.

SECTION 10.17. Obligations of Sellers and EMEA Sellers. When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor – other than NNC - and a Non-Debtor Seller). Notwithstanding anything to the contrary herein, except as set forth in Section 2.2.4(b) and Section 9.2(c) the obligations of each EMEA Seller hereunder shall be several and not joint. Effective as of the date of signing, the parties are fully bound by the terms of this Agreement; provided, however, that none of the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators shall have any obligations or incur any liabilities under this Agreement unless and until (i) the U.S. Bankruptcy Court enters the U.S. Bidding Procedures Order and (ii) the Canadian Court enters the Canadian Sales Process Order. For the avoidance of doubt, the intent of Parties and the EMEA Sellers is that the obligations and any liabilities of the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators under this Agreement will arise concurrently with the obligations and liabilities of the Sellers under this Agreement.

SECTION 10.18. Execution by Other Sellers. The Purchaser hereby acknowledges that the Other Sellers are not executing this Agreement as of the date hereof. This

191

Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers have done so. Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall cause each Other Seller to execute a counterpart to this Agreement no later than the day prior to the sixtieth (60th) day following completion of the Auction (provided that the Main Sellers shall use their reasonable best efforts to cause such execution to occur no later than the last day of the Contract Review Period), agreeing to be bound as a Seller under this Agreement and authorizing NNL or NNI, as applicable, to act as its representative under Section 10.16.

SECTION 10.19. Exclusion of Liability of Administrators and Acknowledgement.

(a)     Notwithstanding that this Agreement shall have been signed by the Joint Administrators and the Joint Israeli Administrators in their capacities as administrators of the EMEA Debtors for and on behalf of the EMEA Debtors and of the Israeli Companies for and on behalf of the Israeli Companies, respectively, it is hereby expressly agreed and declared that no personal Liability under or in connection with this Agreement shall fall on the Joint Administrators, the Joint Israeli Administrators or their firm, partners, employees, agents, advisers or representatives whether such Liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act 1986, the Israeli Companies Law 1999, or otherwise.

(b)     The Purchaser acknowledges and agrees that in the negotiation and the completion of this Agreement the Joint Administrators and the Joint Israeli Administrators are acting only as agents for and on behalf of the EMEA Debtors and the Israeli Companies, respectively, and without any personal Liability whatsoever.

(c)     The Purchaser further acknowledges that it has entered into this Agreement without reliance on any warranties or representations made by the EMEA Sellers or by any of their employees, agents or representatives, or by the Joint Administrators, the Joint Israeli Administrators or any of their firm, partners, employees, agents, advisors or representatives and (save in respect of fraud, fraudulent misrepresentation or fraudulent misstatement) it shall not have any remedy in respect of any misrepresentation or untrue statement made by or on behalf of the EMEA Sellers or their employees, agents or representatives, or by the Joint Administrators, the Joint Israeli Administrators or any of their firm, partners, employees, agents, advisors or representatives.

SECTION 10.20. Asset Sale Election.

(a)     Prior to making any "Asset Sale Election" (defined below), the Sellers shall use commercially reasonable efforts (which reasonable efforts shall include but not be limited to the filing of an objection to the allowance of the IRS Claim with the Bankruptcy Court no later than September 16, 2009) to resolve the -6 Liability in a manner reasonably acceptable to the Purchaser. If such commercially reasonable efforts are unsuccessful, the Sellers may elect to satisfy their obligation under the Agreement to transfer the Shares to Purchaser by transferring to Purchaser the assets and liabilities of the Companies as described below (the "Asset Sale Election"). To the extent the Sellers determine to exercise the Asset Sale Election, such election shall be made no later than October 15, 2009, and notice thereof shall be provided to the

192

Purchaser, in writing, on or before such date. In the event that the Asset Sale Election is timely made: (a) Sellers shall, within three (3) calendar days of the Asset Sale Election, and in any case, no later than October 18, 2009, commence proceedings under Chapter 11 of the U.S. Bankruptcy Code with respect to the Companies, (b) the Parties shall amend this Agreement to effect such election, with (i) all of the assets of the Companies (except as contemplated in the -6 Purchase Price Adjustment, as defined below) and (ii) all of the Liabilities of the Companies, other than the -6 Liability, the Related –6 Liabilities and the Specified Pension Liabilities, being transferred to Purchaser to the same extent as such assets and liabilities would have been transferred indirectly to Purchaser pursuant to a transfer of the Shares on the terms set forth herein, and otherwise on the same terms and conditions as the assets and liabilities of the Sellers, *mutatis mutandis*, but only to the extent permitted by sections 363 and 365 of the U.S. Bankruptcy Code, (c) the Sellers and the Purchaser shall, at the Sellers' expenses, use their commercially reasonable efforts to obtain any novations, consents, assignments or other authorizations necessary to validly transfer the Customer Contracts of the Companies to Purchaser or a Designated Purchaser and (d) if any such novation, consent, assignment or other authorization is not received on or before the Closing Date, then subject to applicable Law and the terms of the applicable Customer Contract, the applicable Seller(s), on the one hand, and the Purchaser or the applicable Designated Purchaser, on the other hand, shall enter into a Subcontract that will have effect, from and after the Closing Date, under which the Purchaser or such Designated Purchaser will provide products or services on the terms of such Customer Contract for the shortest of (i) eighteen (18) months, (ii) the remaining life of such Customer Contract or (iii) the period until such Customer Contract is validly assigned to Purchaser or such Designated Purchaser; provided, that the Sellers shall use their reasonable best efforts to maintain the good standing of the Nortel Party to each such Customer Contract as the prime contractor thereunder during such subcontract period at no additional cost to Purchaser and unless NNI and the Purchaser otherwise agree, including retaining any "key men" under such Customer Contract as employees of the Companies (instead of transferring their employment to the Purchaser or a Designated Purchaser) under arrangements governed by the terms of the Transition Services Agreement for the duration of such Subcontract if doing so would permit such Customer Contract to be subcontracted without Third Party consent (and the Purchaser or a Designated Purchaser will accept the transfer of the employment of such "key men" after the termination of such Subcontract), and (c) the Sellers shall use their reasonable best efforts to have a final order approving the transfer of such assets and liabilities entered by the Bankruptcy Court prior to December 1, 2009. The Sellers will use their reasonable best efforts to include in all Customer Contracts that the Companies enter into after September 14, 2009 that are expected to generate a total contract value of at least $5 million terms that will permit such Customer Contracts to be assigned to the Purchaser or a Designated Purchaser without Third Party consent. Notwithstanding the Asset Sale Election or anything set forth herein, in no event shall the Purchaser become liable on account of, or assume, any Claim or Liability asserted against the Companies to the extent such Claim or Liability would not have remained a valid Claim against any Company had the Sellers transferred the Shares to the Purchaser, and it shall be a condition precedent to Closing under the Agreement that a final order approving the transfer of the Companies' assets as set forth above in a form and substance reasonably satisfactory to the Purchaser be entered by the U.S. Bankruptcy Court and consistent with the U.S. Sale Order and that such order provide that such assets are transferred to the Purchaser free and clear of any Liens or Claims arising out of or related to the -6 Liabilities, the -6 Related Liabilities or the Specified Pension Liabilities.

(b)    If the Asset Sale Election is made, and not all Customer Contracts of the NGS Companies are transferred, or subcontracted such that Purchaser receives the same economic benefits as it would if it were a direct party to the relevant Customer Contract, to Purchaser or a Designated Purchaser on or within one hundred and eighty days (180) days after the Closing Date, the Sellers shall pay to the Purchaser an amount equal to the 6 Purchase Price Adjustment. The "-6 Purchase Price Adjustment" shall mean with respect to each Customer Contract of an NGS Company that does not by its terms expire within 180 days after the Closing Date and is not transferred or subcontracted as described above ("-6 Contracts"), an amount equal to the −6 Factor multiplied by the revenues received by the NGS Companies in respect of such -6 Contract in respect of the period from October 1, 2008 to September 30, 2009; provided that with respect to any −6 Contract with the Department of State such revenues shall be multiplied by the Janus −6 Factor.

(c)    The estimated - 6 Purchase Price Adjustment as of the Closing Date shall be calculated by Sellers at least five (5) Business Days prior to the Closing Date (the "Estimated −6 Liability Escrow Amount"), and a written copy of the -6 Purchase Price Adjustment (showing with reasonable specificity such calculation and the amounts used therefor) shall be delivered to the Purchaser on or prior to the fifth (5th) Business Day, and such amount shall be paid to the Escrow Agent as provided in Article II and the Escrow Agreement. If within one hundred and eighty (180) days after the Closing Date, any -6 Contract is transferred, or subcontracted such that Purchaser receives the same economic benefits as it would if it were a direct party to the relevant Customer Contract, to Purchaser or a Designated Purchaser, then an amount equal to the -6 Purchase Price Adjustment with respect to such -6 Contract shall be released by the Escrow Agent to the Sellers in accordance with the Escrow Agreement. At the end of such one hundred and eighty- (180-) day period, if any amounts remain in the Estimated - 6 Liability Escrow Account, all such amounts shall be released by the Escrow Agent to the Purchaser in accordance with the Escrow Agreement.

[Remainder of this page intentionally left blank. Signature pages follow.]

IN WITNESS WHEREOF, the Main Sellers and the Purchaser have duly
executed this amendment to the Asset and Share Sale Agreement as of the date first written
above.

NORTEL NETWORKS
CORPORATION

By:
　　Name: Anna Ventresca
　　Title: General Counsel-Corporate
　　and Corporate Secretary

By:
　　Name: John Doolittle
　　Title: Senior Vice-President,
　　Finance and Corporate Services

NORTEL NETWORKS LIMITED

By:
　　Name: Anna Ventresca
　　Title: General Counsel-Corporate
　　and Corporate Secretary

By:
　　Name: John Doolittle
　　Title: Senior Vice-President,
　　Finance and Corporate Services

NORTEL NETWORKS INC.

By:
　　Name: John Doolittle
　　Title: Vice-President

ASSA Amendment Agreement - Avaya

AVAYA INC.

By: _____

Name: Pamela F. Craven
Title: Chief Administrative Officer

The undersigned EMEA Sellers are executing this Agreement solely for purposes of agreeing to Sections 2.2, 5.26, 5.39, 9.2, 9.3, 9.4, 10.14, 10.17 and 10.19 of this Agreement and, solely in the case of Nortel Networks UK Limited and Nortel Networks (Ireland) Limited, for purposes of agreeing to Section 5.36 of this Agreement.

SIGNED for and on behalf of Nortel Networks )
UK Limited (in administration) by Christopher )
Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Christopher Hill

Witness signature

Name: WILMA GRAHAM )
Address: NO 1 MORE LONDON PLACE )
LONDON SE1 2AF )

SIGNED for and on behalf of Nortel GmbH )
(in administration) by Christopher Hill )
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Christopher Hill

Witness signature

Name: WILMA GRAHAM )
Address: NO 1 MORE LONDON PLACE )
LONDON SE1 2AF )

SIGNED for and on behalf of Nortel Networks )
SpA (in administration) by Christopher Hill )
)
as joint Administrator (acting as agent and )
without personal liability) in the presence of:

Christopher Hill

Witness signature

Name: WILMA GRAHAM )
Address: NO 1 MORE LONDON PLACE )
LONDON SE1 2AF )

ASSA Amendment Agreement - Avaya

SIGNED for and on behalf of Nortel Networks )
Hispania S.A. (in administration) by )
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Christopher Hill

Witness signature

*W. Graham*

Name:    WILMA GRAHAM
Address: NO 1 MORE LONDON PLACE )
         LONDON SE1 2AF

SIGNED for and on behalf of Nortel Networks )
B.V. (in administration) by Christopher Hill )
                                             )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: ) .

Christopher Hill

Witness signature

*W. Graham*

Name:    WILMA GRAHAM
Address: NO 1 MORE LONDON PLACE )
         LONDON SE1 2AF.

SIGNED for and on behalf of Nortel Networks )
AB (in administration) by Christopher Hill )
                                            )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

*W. Graham*

Name:    WILMA GRAHAM
Address: NO 1 MORE LONDON PLACE )
         LONDON SE1 2AF

ASSA Amendment Agreement - Avaya

SIGNED for and on behalf of Nortel Networks    )
N.V. (in administration) by Christopher Hill     )    Christopher Hill
                                                 )
as Joint Administrator (acting as agent and      )
without personal liability) in the presence of:

Witness signature

........................................... )
Name:      WILMA   GRAHAM              )
Address: NO 1 MORE LONDON PLACE )
          LONDON  SE1 2AF
SIGNED for and on behalf of Nortel Networks      )
(Austria) GmbH (in administration) by            )·   Christopher Hill
Christopher Hill                                 )
as Joint Administrator (acting as agent and      )
without personal liability) in the presence of:

· Witness signature

........................................... )
Name:     WILMA   GRAHAM               ):
Address: No 1 MORE LONDON PLACE )
          LONDON  SE1 2AF

SIGNED for and on behalf of Nortel Networks      )
Polska Sp. z.o.o. (in administration) by         )    Christopher Hill
Christopher Hill                                 )
as Joint Administrator (acting as agent and      )
without personal liability) in the presence of:

Witness signature

........................................... )
Name:     WILMA   GRAHAM               )
Address: No 1 MORE LONDON PLACE )
          LONDON  SE1 2AF

ASSA Amendment Agreement - Avaya

SIGNED for and on behalf of Nortel Networks )
Oy (in administration) by Christopher Hill )
                                            )
                                            )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

*Wk Galam*
.......................................................... )
Name:       *WILIM   GRAHAM* )
Address:    *NO 1 MORE London PLACE* )
            *LONDON SE1 2AF*

SIGNED for and on behalf of Nortel Networks )
Portugal S.A. (in administration) by )
Christopher Hill )
                                            )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

*W. Galam*
.......................................................... )
Name:       *WILIM  GRAHAM* )
Address: *NO1  MORE LONDON PLACE* )
         *LONDON SE1 2AF*

SIGNED for and on behalf of Nortel Networks )
s.r.o. (in administration) by Christopher Hill )
                                            )
                                            )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

*W. Galam*
.......................................................... )
Name:       *WILIM   GRAHAM* )
Address:    *NO 1 MORE LONDON PLACE* )
            *LONDON SE1 2AF*

ASSA Amendment Agreement - Avaya

SIGNED for and on behalf of Nortel Networks )
Romania s.r.l. (in administration) by )
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Christopher Hill

Witness signature

Name:     WILMA GRAHAM )
Address: NO 1 MORE LONDON PLACE )
          LONDON SE1 2AF

SIGNED for and on behalf of Nortel Networks )
Engineering Service kft (in administration) by )
Christopher Hill )
                                               )
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Christopher Hill

Witness signature

Name:     WILMA GRAHAM )
Address: NO 1 MORE LONDON PLACE )
          LONDON SE1 2AF

SIGNED for and on behalf of Nortel Networks )
Slovensko s.r.o. (in administration) by )
Christopher Hill )
                                              )
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Christopher Hill

Witness signature

Name:     WILMA GRAHAM )
Address: NO 1 MORE LONDON PLACE )
          LONDON SE1 2AF

ASSA Amendment Agreement - Avaya

SIGNED for and on behalf of Nortel Networks )
France S.A.S. (in administration) by Kerry )
Trigg acting as authorised representative for )
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Kerry Trigg

Witness signature

Name: Dean Lea Schayart )
Address: 29 rue de Paris )
         92110 Clichy - France

ASSA Amendment Agreement - Avaya

SIGNED for and on behalf of Nortel Networks )
(Ireland) Limited (in administration) by David )    David Hughes
Hughes as Joint Administrator (acting as agent )
and without personal liability) in the presence )
of:

Witness signature:

..Eimear.M..Ghriofa........................... )
Name: EIMEAR NI GHRIOFA                )
Address: 87 RAHEEN ROAD,              )
          TALLAGHT, DUBLIN 24,.
          IRELAND.

ASSA Amendment Agreement - Avaya

SIGNED by Sergei Fishkin
duly authorised for and on behalf of o.o.o.
Nortel Networks in the presence of:

Sergei Fishkin

Witness signature

Name: Bogachkina Maria
Address: 19-2-267, Gurievsky pr,
Moscow, Russia

SIGNED by Sharon Rolston                          )    Sharon Rolston
duly authorised for and on behalf of Nortel       )
Networks AG in the presence of:                   )


Witness signature

B Shewell

Name: BRIGITTE SCHERWATH                           )
Address: C/O NORTEL NETWORKS                        )
MAIDENHEAD , SL6-3QH                                )

SIGNED by Sharon Rolston and Simon                 )    Sharon Rolston
Freemantle duly authorised for and on behalf of    )
Nortel Networks South Africa (Pty) Limited         )
in the presence of:                                )

                                                        Simon Freemantle

Witness signature

B Shewall

Name: BRIGITTE SCHERWATH                            )
Address: C/O NORTEL NETWORKS                         )
MAIDENHEAD , SL6 3QH                                 )

SIGNED by Sharon Fennessy and Simon                 · )    Sharon Fennessy
Freemantle duly authorised for and on behalf of      )
Nortel Networks AG in the presence of:               )

                                                          Simon Freemantle

Witness signature

B Shewelk

Name: BRIGITTE SCHERWATH                             )
Address: C/O NORTEL NETWORKS                          )
MAIDENHEAD , SL6 3QH                                  )


ASSA Amendment Agreement - Avaya

SIGNED by Sharon Rolston                    )
duly authorised for and on behalf of Nortel  )     Sharon Rolston
Networks AG in the presence of:             )


Witness signature

..................................................................... )
Name:                                       )
Address:                                    )


SIGNED by Sharon Rolston and Simon          )
Freemantle duly authorized for and on behalf of  )    Sharon Rolston
Nortel Networks South Africa (Pty) Limited   )
in the presence of:

                                                 Simon Freemantle


Witness signature

Name:   B.DANDRIDALE                         )
Address: C/O NORTEL NETWORKS                 )
         MAIDENHEAD, UK


SIGNED by Sharon Fennessy and Simon          )
Freemantle duly authorised for and on behalf of  )    Sharon Fennessy
Nortel Networks AS in the presence of:       )

                                                 Simon Freemantle


Witness signature

Name:   B.DANDRIDGE                          )
Address: C/O NORTEL NETWORKS                 )
         MAIDENHEAD, UK


ASSA Amendment Agreement - Avaya

SIGNED for and on behalf of Nortel
Communications Holdings (1997) Limited (in
administration) by Yaron Har-Zvi and Avi D.
Pelossof as Joint Israeli Administrators (acting
jointly and without personal liability) in
connection with the Israeli Assets and
Liabilities:

)
)
)
)
)
)
)

Yaron Har-Zvi

Avi D. Pelossof

Witness signature
שרות/מוסיאוף ש"ד
..............................20507...צמ...................................

Name: SARIT MOUSSAYOFF
Address: 20 Lincoln st.
Tel-Aviv

SIGNED for and on behalf of Nortel Networks
Israel (Sales and Marketing) Limited (in
administration) by Yaron Har-Zvi and Avi D.
Pelossof as Joint Israeli Administrators (acting
jointly and without personal liability) in
connection with the Israeli Assets and
Liabilities:

)
)
)
)
)
)
)
)
)

Yaron Har-Zvi

Avi D. Pelossof

Witness signature
שרות מוסיאוף ש"ד
מ. 20507 /

Name: SARIT MOUSSALOFF
Address: 20 Lincoln st.
Tel-Aviv

)
)
)

ASSA Amendment Agreement - Avaya

SIGNED by Christopher Hill

in his own capacity and on behalf of the Joint
Administrators without personal liability and
solely for the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the Joint Administrators:

)
) Christopher Hill :
)

Witness signature

Name:    WILMA  GEATMN.
Address:  No 1 MORE  LONDON PLACE )
          LONDON  SE1 2AF

ASSA Amendment Agreement - Avaya

APPENDIX "C"

[ATTACHED]

Execution CopyEXECUTION VERSION

AMENDED AND RESTATED ASSET AND SHARE SALE AGREEMENT

BY AND AMONG

## NORTEL NETWORKS CORPORATION

## NORTEL NETWORKS LIMITED

## NORTEL NETWORKS INC.

AND

## THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

AND

## THE ENTITIES IDENTIFIED HEREIN AS EMEA SELLERS

AND

## AVAYA INC.

DATED AS OF JULY 20,SEPTEMBER 14, 2009

# TABLE OF CONTENTS

Page

## ARTICLE I
### INTERPRETATION

| | | |
|---|---|---|
| Section 1.1. | Definitions | 34 |
| Section 1.2. | Interpretation | 4648 |
| 1.2.1. | Gender and Number | 4648 |
| 1.2.2. | Certain Phrases and Calculation of Time | 4648 |
| 1.2.3. | Headings, etc. | 4648 |
| 1.2.4. | Currency and Calculations | 4648 |
| 1.2.5. | Statutory References | 4749 |

## ARTICLE II
### PURCHASE AND SALE OF ASSETS AND SHARES

| | | |
|---|---|---|
| Section 2.1. | Purchase and Sale | 4749 |
| 2.1.1. | Assets and Shares | 4749 |
| 2.1.2. | Excluded Assets | 4951 |
| 2.1.3. | Assumed Liabilities | 5052 |
| 2.1.4. | Excluded Liabilities | 5355 |
| 2.1.5. | Assumption and/or Assignment or Rejection of 365 Contracts | 5456 |
| 2.1.6. | Assignment of Non-365 Contracts | 5859 |
| 2.1.7. | Cure Costs; Adequate Assurance | 61 |
| 2.1.8. | Local Sale Agreements | 63 |
| 2.1.9. | EMEA Asset Sale Agreement | 6364 |
| 2.1.10. | Non-Assignable Assets | 6364 |
| Section 2.2. | Purchase Price | 64 |
| 2.2.1. | Purchase Price; Delay Fee | 64 |
| 2.2.2. | Estimated Purchase Price | 65 |
| 2.2.3. | Post-Closing Purchase Price Adjustment | 66 |
| 2.2.4. | Security for Purchase Price Adjustment; Status | 71 |
| 2.2.5. | Good Faith Deposit | 7271 |
| 2.2.6. | Escrows | 7372 |

**TABLE OF CONTENTS**
(continued)

Page

2.2.7.   Purchase Price Allocation ................................................................ 74̶73

2.2.8.   Accrued Cash-Out Vacation Escrow Amount .................................... 74

Section 2.3.       Closing .......................................................................... 75̶74

2.3.1.   Closing Date.................................................................................. 75̶74

2.3.2.   Closing Actions and Deliveries ...................................................... 75̶74

Section 2.4.       Designated Purchaser(s)................................................... 77̶75

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Section 3.1.       Organization and Corporate Power................................... 77̶76

Section 3.2.       Authorization; Binding Effect; No Breach ......................... 78̶77

Section 3.3.       Financing..................................................................... 78̶77

Section 3.4.       Adequate Assurance of Future Performance ...................... 79̶77

Section 3.5.       Purchaser's Acknowledgments; Exclusivity of Representations and
                   Warranties,.................................................................... 79̶78

Section 3.6.       Brokers........................................................................ 80̶79

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Section 4.1.       Organization and Corporate Power................................... 81̶80

Section 4.2.       Authorization; Binding Effect; No Breach ......................... 82̶80

Section 4.3.       Capitalization; Title to Shares; Equity Interests ................ 82̶81

Section 4.4.       Title to Assets; Sufficiency of Assets .............................. 83̶82

Section 4.5.       Material Contracts........................................................ 84̶83

Section 4.6.       Intellectual Property..................................................... 85̶84

Section 4.7.       Litigation,.................................................................... 88̶87

Section 4.8.       Financial Statements .................................................... 88̶87

Section 4.9.       Compliance with Laws; Consents,.................................... 89̶88

Section 4.10.      Privacy Laws................................................................ 90̶89

Section 4.11.      Real Property ............................................................... 90̶89

ii

ii

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| Section 4.12. | Environmental Matters | 9290 |
| Section 4.13. | Taxes | 9391 |
| Section 4.14. | Labor and Employee Benefits Matters | 9492 |
| Section 4.15. | Brokers | 9796 |
| Section 4.16. | Government Contracts | 9796 |
| Section 4.17. | UK Defined Benefit Plan | 9897 |
| Section 4.18. | Representations and Warranties by the Other Sellers | 9997 |
| | 4.18.1. Organization and Corporate Power | 9997 |
| | 4.18.2. Authorization; Binding Effect; No Breach | 9997 |

## ARTICLE V
## COVENANTS AND OTHER AGREEMENTS

| | | |
|---|---|---|
| Section 5.1. | U.S. Bankruptcy Actions | 10098 |
| Section 5.2. | Canadian Bankruptcy Actions | 10199 |
| | 5.2.1. Canadian Sales Process Order | 10199 |
| | 5.2.2. Canadian Approval and Vesting Order | 101100 |
| Section 5.3. | Consultation; Notification | 102100 |
| Section 5.4. | Pre-Closing Cooperation | 103101 |
| Section 5.5. | Antitrust and Other Regulatory Approvals | 104102 |
| Section 5.6. | Pre-Closing Access to Information | 107105 |
| Section 5.7. | Public Announcements | 108106 |
| Section 5.8. | Further Actions | 108106 |
| Section 5.9. | Conduct of Business | 109107 |
| Section 5.10. | Transaction Expenses | 112111 |
| Section 5.11. | Confidentiality | 112111 |
| Section 5.12. | Certain Payments or Instruments Received from Third Parties | 113112 |
| Section 5.13. | Non-Assignable Contracts and Other Assets | 113112 |
| Section 5.14. | Bundled Contracts; Selected Rejected Customer Contracts | 116115 |
| Section 5.15. | Post-Closing Assistance for Litigation | 119118 |

iii

iii

## TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| Section 5.16. | Tangible Asset Removal | 119 |
| Section 5.17. | Termination of Overhead and Shared Services | 124123 |
| Section 5.18. | [Reserved] | 124123 |
| Section 5.19. | Cancellation of Intercompany Accounts | 124123 |
| Section 5.20. | Directors' and Officers' Release, Indemnification and Insurance | 124123 |
| Section 5.21. | Insurance Matters | 126125 |
| Section 5.22. | Sellers Deposits, Guarantees and Other Credit Support of the Business128127 |
| Section 5.23. | Use of Sellers' Trademarks | 129128 |
| Section 5.24. | Maintenance of Books and Records | 129128 |
| Section 5.25. | Right to Exclude | 131130 |
| Section 5.26. | Certain Ancillary Agreements | 132131 |
| Section 5.27. | Avoidance Actions | 133132 |
| Section 5.28. | Subleases | 133132 |
| Section 5.29. | Competing Transaction | 136134 |
| Section 5.30. | Direct Leases | 136135 |
| Section 5.31. | Rejection and Expiration of Real Estate Leases | 138136 |
| Section 5.32. | Restructure of Leases | 144143 |
| Section 5.33. | Non-Compete | 146145 |
| Section 5.34. | Financial Statements | 147145 |
| Section 5.35. | Certain Acknowledgements Regarding PBGC | 150148 |
| Section 5.36. | Finalization of Transition Services Agreement | 150149 |
| Section 5.37. | Assistance for Proxy Agreement | 155153 |
| Section 5.38. | Customer Contract Review and Selection | 155154 |
| Section 5.39. | Retention Plan | 156 |

### ARTICLE VI
### TAX MATTERS

| | | |
|---|---|---|
| Section 6.1. | Transfer Taxes | 158156 |
| Section 6.2. | Withholding Taxes | 159158 |
| Section 6.3. | Tax Characterization of Payments Under This Agreement | 159158 |

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| Section 6.4. | Apportionment of Taxes | ~~160~~158 |
| Section 6.5. | Section 338 Election | ~~160~~159 |
| Section 6.6. | Records | ~~161~~159 |
| Section 6.7. | Tax Disclosure | ~~162~~161 |
| Section 6.8. | Tax Returns | ~~162~~161 |
| Section 6.9. | Tax Sharing Agreements | ~~164~~163 |
| Section 6.10. | Canadian Tax Election | ~~164~~163 |
| Section 6.11. | Cooperation | ~~165~~163 |

### ARTICLE VII
### EMPLOYMENT MATTERS

| | | |
|---|---|---|
| Section 7.1. | Employment Obligations with Respect to Non-Union Employees | ~~165~~164 |
| 7.1.1. | Employment Terms | ~~165~~164 |
| 7.1.2. | Employee Benefits | ~~166~~165 |
| Section 7.2. | Employment Obligations with Respect to Union Employees | ~~170~~168 |
| Section 7.3. | Excluded Employee Liabilities | ~~170~~168 |
| Section 7.4. | Other Employee Covenants | ~~171~~169 |
| Section 7.5. | No Amendment of Plans | ~~174~~172 |

### ARTICLE VIII
### CONDITIONS TO THE CLOSING

| | | |
|---|---|---|
| Section 8.1. | Conditions to Each Party's Obligation | ~~174~~173 |
| Section 8.2. | Conditions to Sellers' Obligation | ~~175~~174 |
| Section 8.3. | Conditions to Purchaser's Obligation | ~~176~~174 |

### ARTICLE IX
### TERMINATION

| | | |
|---|---|---|
| Section 9.1. | Termination | ~~177~~176 |
| Section 9.2. | Break-Up Fee; Expense Reimbursement | ~~180~~179 |
| Section 9.3. | Reverse Termination Fee | ~~182~~181 |
| Section 9.4. | Effects of Termination | ~~183~~182 |

## TABLE OF CONTENTS
(continued)

Page

### ARTICLE X
### MISCELLANEOUS

| | | |
|---|---|---|
| Section 10.1. | No Survival of Representations and Warranties or Covenants.............. ~~184~~183 |
| Section 10.2. | Remedies........................................................................................ ~~184~~183 |
| Section 10.3. | No Third-Party Beneficiaries.......................................................... ~~184~~183 |
| Section 10.4. | Consent to Amendments; Waivers.................................................... ~~184~~183 |
| Section 10.5. | Successors and Assigns.................................................................... ~~184~~183 |
| Section 10.6. | Governing Law; Submission to Jurisdiction; Waiver of Jury Trial....... ~~185~~184 |
| Section 10.7. | Notices .......................................................................................... ~~187~~185 |
| Section 10.8. | Exhibits; Sellers Disclosure Schedule ............................................. ~~189~~188 |
| Section 10.9. | Counterparts.................................................................................... ~~189~~188 |
| Section 10.10. | No Presumption ............................................................................. ~~189~~188 |
| Section 10.11. | Severability ................................................................................... ~~190~~188 |
| Section 10.12. | Headings ........................................................................................ ~~190~~189 |
| Section 10.13. | Entire Agreement........................................................................... ~~190~~189 |
| Section 10.14. | Limitations on Pre-Closing Remedies ............................................. ~~190~~189 |
| Section 10.15. | Bulk Sales Laws............................................................................. ~~192~~191 |
| Section 10.16. | Main Sellers as Representatives of Other Sellers ............................. 193191 |
| Section 10.17. | Obligations of Sellers and EMEA Sellers......................................... ~~193~~191 |
| Section 10.18. | Execution by Other Sellers ............................................................. ~~193~~191 |
| Section 10.19. | Exclusion of Liability of Administrators and Acknowledgement......... ~~194~~192 |
| Section 10.20. | Asset Sale Election...............................................................192 |

## EXHIBITS

Exhibit A – Other Sellers

Exhibit B – EMEA Sellers

Exhibit C – Canadian Debtors; U.S. Debtors; EMEA Debtors; Israeli Companies; Non-Debtor Sellers

Exhibit D – EMEA Asset Sale Agreement

Exhibit E – Contract Manufacturing Inventory Agreements Term Sheet

Exhibit F – Escrow Agreement

Exhibit G – Intellectual Property License Agreement

Exhibit H – Knowledge of the Purchaser

Exhibit I – Letter of Credit

Exhibit J – Loaned Employee Agreement

Exhibit K – Mandatory Antitrust Approvals - Relevant Antitrust Jurisdictions / Authorities

Exhibit L – Interdependencies

Exhibit M – Reserved

Exhibit N – Real Estate Agreements

Exhibit O – Trademark License Agreement

Exhibit P – Transition Services Agreement

~~Exhibit 2.1.5(b)(v)—Lease B Sublease Premises or Removal Premises~~

Exhibit 5.1(a) – Forms of U.S. Bidding Procedures Order and U.S. Sale Order

Exhibit 5.2.1 – Form of Canadian Sales Process Order

Exhibit 5.2.2 – Form of Canadian Approval and Vesting Order

Exhibit 5.4(d) – Form of Notice

Exhibit 5.7 – Certain Communications

Exhibit 5.28(g) – Terms and Conditions of Lease A Sublease and Replacement Campus Consolidation

Exhibit 5.32(c) – Consolidation of C Campus

## AMENDED AND RESTATED ASSET AND SHARE SALE AGREEMENT

This Amended and Restated Asset and Share Sale Agreement is dated as of July 20, September 14, 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("NNC"), Nortel Networks Limited, a corporation organized under the laws of Canada ("NNL"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("NNI" and, together with NNC and NNL, the "Main Sellers"), the affiliates of the Main Sellers listed in Exhibit A hereto (the "Other Sellers" and, together with the Main Sellers, the "Sellers") and Avaya Inc., a corporation organized under the laws of the State of Delaware (the "Purchaser") and, only for the purposes of Sections 2.2, 5.26, 5.39, 9.2, 9.3, 9.4, 10.14, 10.17 and 10.19 of this Agreement, the EMEA Sellers (as defined below) and, solely in the case of Nortel Networks UK Limited and Nortel Networks (Ireland) Limited, also Section 5.36 of this Agreement.

### W I T N E S S E T H:

WHEREAS, the Sellers, the affiliates of the Main Sellers listed in Exhibit B hereto (the "EMEA Sellers"), the NGS Companies and DiamondWare (each as defined below) beneficially own and operate the Business (as defined below);

WHEREAS, on January 14, 2009 (the "Petition Date"), NNC, NNL and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "Canadian Debtors") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "CCAA") (the proceedings commenced by such application, the "CCAA Cases") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and was extended by further order of the Canadian Court on February 10, 2009, as the same may be amended and restated from time to time by the Canadian Court (the "Canadian Initial Order");

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit C hereto (the "U.S. Debtors") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "Chapter 11 Cases");

WHEREAS, the entities listed under the heading "EMEA Debtors" in part 3 of Exhibit C hereto (the "EMEA Debtors") on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "Insolvency Act") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "EMEA Cases") and the English Court appointed Alan Bloom, Stephen Harris, Christopher Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants and Alan Bloom serve as joint administrators) (the "Joint Administrators") under the Insolvency Act;

1

WHEREAS, the entities listed under the heading "Israeli Companies" in part 4 of Exhibit C hereto (the "Israeli Companies") on January 18, 2009 filed applications with the Tel-Aviv-Jaffa District Court (the "Israeli Court"), pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto (collectively, the "Israeli Companies Law") for a stay of proceedings, and the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof (the "Joint Israeli Administrators") on January 19, 2009, as joint administrators of the Israeli Companies under the Israeli Companies Law;

WHEREAS, the Other Sellers listed in part 5 of Exhibit C hereto (the "Non-Debtor Sellers") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, NNI beneficially owns 100% of the stock of NGS and DiamondWare (each as defined below);

WHEREAS, the Sellers have agreed to transfer to the Purchaser or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, or cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers and the Shares (as defined below) from NNI, upon the terms and conditions set forth hereinafter;

WHEREAS, the Sellers, the Purchaser and the EMEA Sellers, Nortel Networks UK Limited and Nortel Networks (Ireland) Limited, as applicable, previously entered into that certain Asset and Share Sale Agreement, dated as of July 20, 2009 (the "Original Agreement"), pursuant to which the Purchaser was selected as the stalking horse bidder for the purposes of the Auction (as defined below);

WHEREAS, simultaneously with the execution of this~~the~~ Original Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser ~~are entering~~have entered into a separate agreement ~~in the form set forth in Exhibit D hereto~~ (the "Original EMEA Asset Sale Agreement") providing for the sale to the Purchaser (or the EMEA Designated Purchasers (as defined therein)) of the assets of the Business held by such EMEA Sellers;

WHEREAS, on August 19, 2009, the Sellers and Purchaser entered into a side letter with respect to the treatment of Other Contracts (as defined below) under the Original Agreement (the "Side Letter") and into a side letter with respect to the treatment of Other EMEA Contracts (as defined in the Original EMEA Asset Sale Agreement) under the Original EMEA Asset Sale Agreement (the "EMEA Side Letter");

WHEREAS, on September 11-14, 2009, the Auction was held, during which time the Sellers and Purchaser agreed to modify a number of terms in connection with the Sellers' selection of Purchaser as the Successful Bidder (as defined below) at the Auction;

WHEREAS, the Purchaser, the Sellers and the EMEA Sellers, Nortel Networks UK Limited and Nortel Networks (Ireland) Limited, as applicable, desire to amend and restate the Original Agreement in its entirety to incorporate (i) the terms of the Side Letter and (ii) the terms agreed to in connection with Sellers' selection of Purchaser as the Successful Bidder at the Auction;

WHEREAS, simultaneously with the execution of this Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser desire to amend and restate the Original EMEA Asset Sale Agreement in its entirety to incorporate the terms of the EMEA Side Letter and (ii) the terms agreed to in connection with Sellers' selection of Purchaser as the Successful Bidder at the Auction (the Original EMEA Asset Sale Agreement so restated, the "EMEA Asset Sale Agreement" a form of which is set forth in Exhibit D hereto);

WHEREAS, the Parties acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers and the EMEA Designated Purchasers, if any) of the Shares, the Assets and the EMEA Assets (as defined below), the license of Intellectual Property rights under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser, the Designated Purchasers and the EMEA Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their affiliates and each Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisitions by the Purchaser, the Designated Purchasers and the EMEA Designated Purchasers of the Shares, the Assets and the EMEA Assets, the license of Intellectual Property rights under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below) and the assumption by the Purchaser, the Designated Purchasers and the EMEA Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities, as set forth hereunder and in the EMEA Asset Sale Agreement; and

WHEREAS, in addition, on or before the Closing, the Purchaser, certain Sellers (or Affiliates of the Sellers) and certain EMEA Sellers will enter into the following ancillary agreements (together, the "Ancillary Agreements"): (i) the Intellectual Property License Agreement, (ii) the Transition Services Agreement, (iii) the Trademark License Agreement and (iv) the Loaned Employee Agreement (each as defined below) and will use their reasonable best efforts to negotiate in good faith (v) the LGN/Korea Distribution Agreement, (vi) the Local Sale Agreements, (vii) the Real Estate Agreements, (viii) the Contract Manufacturing Inventory Agreements, (ix) the Mutual Development Agreement, (x) the Purchaser Supply Agreement, (xi) the Seller Supply Agreement, (xii) the Subcontract Agreement, (xiii) the LGN/Korea Supply Agreement and (xiv) the Uni-Nortel Distribution Agreement (each as defined below).

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties (as defined below) agree as follows:

3

3

## ARTICLE I

### INTERPRETATION

SECTION 1.1. <u>Definitions</u>. Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accounting Arbitrator**" means the auditing firm of international reputation that is (i) jointly selected by the Primary Parties and NNUK, or (ii) in case they cannot agree on any such firm, such other auditing firm of international reputation (or, if the Primary Parties and NNUK agree on other criteria, such Person as satisfies such other criteria) that is selected by the American Arbitration Association at the request of the first of the Primary Parties and NNUK to move.

"Accrued Cash-Out-Vacation Escrow Amount" means the amount of compensation with respect to accrued and unused vacation, including all Taxes required to be withheld on behalf of the applicable Transferred Employee by his or her respective employer but excluding employer Taxes, that is due and owing with respect to the Transferred Employees (other than Share Transfer Employees) from their respective employer as of the Closing that the Sellers intend to pay out in the period commencing immediately after the Closing and ending forty-five (45) days thereafter, as listed (by Employee) on Section 2.2.8 of the Sellers Disclosure Schedule (as updated prior to Closing pursuant to Section 2.2.8), plus the aggregate amount of employer Taxes required to be paid in connection with such amounts, in each case as calculated pursuant to the Calculation Principles.

"Accrued Vacation Amount" means, at any given time, (x) (i) the amount of compensation with respect to the accrued and unused vacation (including all Taxes required to be withheld on behalf of the applicable Transferred Employee by his or her respective employer but excluding employer Taxes) that is due and owing (and not yet actually paid) with respect to the Transferred Employees (other than Share Transfer Employees but including, for purposes of this clause, Loaned Employees) from their respective employer, (ii) in respect of Transferred Employees located in India, the amount specified on Section 7.1.2(c)(v) of the Sellers Disclosure Schedule in respect of gratuity payments, and (iii) in respect of Transferred Employees in Australia, the amount specified in Section 7.1.2(c)(v) of the Sellers Disclosure Schedule in respect of the long service leave and sick leave, in each case to be calculated in accordance with the Calculation Principles, plus, in the case of (i), (ii) and (iii), the aggregate amount of employer Taxes required to be paid in connection with such amounts; less (y) when calculating the Estimated Closing Accrued Vacation Amount, the amount of cash to be deposited in the Accrued Cash-Out Vacation Escrow Account and, when calculating the Closing Accrued Vacation Amount, the portion of the accrued but unused vacation amount that is owed to the Transferred Employees as of the Closing Date listed on Section 2.2.8 of the Sellers Disclosure Schedule that is actually paid by the Sellers to such Transferred Employees on or after the Closing Date and before the Accrued Vacation Amount Final Payment Date, together with any employer Taxes thereon that are timely paid to appropriate Government Entities in connection therewith.

4

4

~~"Accrued Vacation Amount Final Payment Date" means the earlier of (A) forty-five (45) days after the Closing and (B) the date when the Main Sellers and the EMBA Sellers deliver to the Purchaser pursuant to Section 2.2.3.1(a) the Closing Statement including the calculation of the Closing Accrued Vacation Amount.~~

"Acquired Business" means, collectively, the Business to the extent acquired or assumed hereunder and under the EMEA Asset Sale Agreement.

"Acquired Company Intellectual Property" means Intellectual Property owned by the Companies.

"Acquiring Person" has the meaning set forth in Section 5.33.

"Action" means any litigation, action, suit, charge, binding arbitration, Tax audit, or other legal, administrative or judicial proceeding, including Intellectual Property litigation (including infringement, indemnification, and declaratory judgment actions).

"Additional Audited 2009 Financial Statements" means, collectively, (i) the carve-out combined balance sheet of the Business as of December 31, 2009 and (ii) the carve-out combined statements of income and cash flows of the Business and changes in parent's net investment in the Business for the year ended December 31, 2009, in each case prepared in accordance with GAAP and prepared and audited in accordance with the applicable rules and regulations promulgated by the SEC, including Regulation S-X and Rule 3-05 thereunder, and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with GAAS or, if such financial statements are required to be included in the Registration Statement or Form 8-K and a PCAOB audit is necessary therefor, in accordance with PCAOB and shall not be subject to any qualification or exception as to the scope of such audit.

"Adjusted Audited Standard Margin" means the Audited Standard Margin less the Standard Margin, if any, which is included in the Audited Standard Margin and relates to: (i) the Layer 4-7 Data Portfolio, (ii) the LGN Joint Venture, or (iii) to the extent not included in the calculation of the Unaudited Standard Margin, any other revenue streams not contemplated in the transaction governed by this Agreement and the EMEA Asset Sale Agreement.

"Adjustment Amount" means (i) if the Unaudited Standard Margin is less than or equal to one hundred and three percent (103%) of the Adjusted Audited Standard Margin, zero, or (ii) if the Unaudited Standard Margin is greater than one hundred and three percent (103%) of the Adjusted Audited Standard Margin, an amount equal to the Unaudited Standard Margin minus the Adjusted Audited Standard Margin.

"Adjustment Factor" means the amount of the Base Purchase Price divided by the Unaudited Standard Margin.

"**Adjustment Payment**" means, (i) if the Adjustment Amount is a positive number, the Adjustment Amount, multiplied by the Adjustment Factor or (ii) if the Adjustment Amount is not a positive number, zero.

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; provided, however, that (i) no Fund shall be deemed an Affiliate of the Purchaser or the Designated Purchasers under this Agreement and no portfolio company of any Fund shall be deemed an Affiliate of the Purchaser if it is not a Subsidiary of the Purchaser and is operated, managed and financed independently of the Purchaser, (ii) no EMEA Seller or Subsidiary of an EMEA Seller shall be deemed an Affiliate of any Seller, and (iii) no joint venture listed in Section 1.1(a) of the Sellers Disclosure Schedule shall be deemed an Affiliate of any Seller.

"**Affiliate Transaction**" means any Contract in existence as of the date of this Agreement between any of the Sellers, on the one hand, and, on the other hand, any (i) present executive officer or director of any of the Sellers or any person that has served as such an executive officer or director within the last twelve (12) months or (ii) record or beneficial owner of more than five percent (5%) of the equity securities of NNC, in each case, other than any employment-related Contracts or consulting Contracts and other than any Seller Employee Plans.

"**Agreement**" means this **Amended and Restated** Asset and Share Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Alternative Transaction**" means (A) any of the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation or other similar transaction, of (i) all or a substantial portion of the Acquired Business, or all of the Assets and the EMEA Assets, or a portion of the Assets and/or the EMEA Assets that constitutes a substantial portion of the Assets and the EMEA Assets considered as a whole, in a transaction or a series of transactions with one or more Persons other than the Purchaser and/or its Affiliates or (ii) all or a portion of the Acquired Business or all or a portion of the Assets or the EMEA Assets in a transaction or series of transactions with one or more Persons other than the Purchaser and/or its Affiliates that results or evolves from a Successful Bid, an Alternate Bid or a Qualified Bid (each as defined in the U.S. Bidding Procedures Order) or (B) the retention by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) of all or substantial portion of the Acquired Business, all of the Assets or the EMEA Assets, or a portion of the Assets and/or the EMEA Assets that constitutes a substantial portion of the Assets and the EMEA Assets considered as a whole, pursuant to a plan of reorganization under Section 1129 of the Bankruptcy Code filed or otherwise sponsored by one or more third-party creditors of the Sellers; provided, however, that an "Alternative Transaction" shall not include: (i) except as specified in clause (B) above, the retention of the Business by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings), (ii) the sale, transfer or other disposition, directly or indirectly, of any portion of the Business or the Assets and the EMEA Assets (other than as a going concern) in connection

6

<u>6</u>

with the closure, liquidation or winding up of the Business or any of the Sellers or the Companies, (iii) the sale, assignment, leasing, expiration, termination or other disposition by the Sellers of any real estate or Real Estate Lease, as applicable, not in violation of this Agreement, in connection with the implementation of the Sellers' global real estate strategy and not as part of a sale of a going concern, or (iv) the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the U.S. Bankruptcy Code. For the purpose of this definition, "substantial portion" means more than forty percent (40%) of the Assets and the EMEA Assets (taken as a whole).

"Ancillary Agreements" has the meaning set forth in the recitals to this Agreement.

"Antitrust Approvals" means the HSR Approval, the Competition Act Approval, and the Mandatory Antitrust Approvals.

"Antitrust Laws" means the Competition Act, the HSR Act, the EC Merger Regulation, and any competition, merger control and antitrust Law of the European Union, any applicable European Union member states and EFTA states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"Applicable Latest Termination Notification Date" means, with respect to any real property subject to the provisions of Section 5.16(a) (other than real property identified in Section 5.16(a) of the Sellers Disclosure Schedule) and any termination by any Seller of its interest in such property (whether pursuant to sale of owned property, termination or rejection of a lease or otherwise), ten (10) days prior to such proposed termination.

"Applicable Transitional Occupancy Period" means, in the case of any real property subject to the provisions of Section 5.16(a), the period of time commencing on the Closing Date and ending on the date which is (a) for those properties identified in Section 5.16(a) of the Sellers Disclosure Schedule, the length of time following the Closing Date which is indicated in such Section 5.16(a) of the Sellers Disclosure Schedule with respect to such property and (b) for all properties not identified in Section 5.16(a) of the Sellers Disclosure Schedule, thirty (30) days after the Closing Date.

"Arbitration Trigger Date" has the meaning set forth in Section 5.36(f).

"Asset Sale Election" has the meaning set forth in Section 10.20.

"Assets" has the meaning set forth in Section 2.1.1.

"Assigned Contracts" means all Seller Contracts except (i) the Excluded 365 Contracts, (ii) the Excluded Non-365 Contracts and (iii) the Non-Assigned Contracts.

7

7

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(a)(iii).

"**Assumed and Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.5(b)(iii).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Auction**" has the meaning attributed to such term in the U.S. Bidding Procedures Order.

"**Audited 2009 Closing Date Financial Statements**" means, collectively, (i) the carve-out combined balance sheet of the Business as of the Closing Date and (ii) the carve-out combined statements of income and cash flows of the Business and changes in parent's net investment in the Business for the period beginning January 1, 2009 and ending on the Closing Date, in each case prepared in accordance with GAAP and prepared and audited in accordance with the applicable rules and regulations promulgated by the SEC, including Regulation S-X and Rule 3-05 thereunder, and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with GAAS or, if such financial statements are required to be included in the Registration Statement or Form 8-K and a PCAOB audit is necessary therefor, in accordance with PCAOB, and shall not be subject to any qualification or exception as to the scope of such audit.

"**Audited 2009 Interim Financial Statements**" means, collectively, (i) the carve-out combined balance sheet of the Business as of September 30, 2009 and (ii) the carve-out combined statements of income and cash flows of the Business for the nine-month periods ended September 30, 2008 and September 30, 2009, and changes in parent's net investment in the Business for the nine-month period ended September 30, 2009, in each case prepared in accordance with GAAP and prepared and audited in accordance with the applicable rules and regulations promulgated by the SEC, including Regulation S-X and Rule 3-05 thereunder, and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with GAAS or, if such financial statements are required to be included in the Registration Statement or Form 8-K and a PCAOB audit is necessary therefor, in accordance with PCAOB, and shall not be subject to any qualification or exception as to the scope of such audit.

"**Audited Financial Statements**" means, collectively, (i) the carve out combined balance sheets of the Business as of December 31, 2007 and December 31, 2008 and (ii) the carve-out combined statements of income and cash flows of the Business and changes in parent's net investment in the Business for the years ended December 31, 2007 and December 31, 2008, in each case prepared in accordance with GAAP and prepared and audited in accordance with the applicable rules and regulations promulgated by the SEC, including Regulation S-X and Rule 3-05 thereunder, and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in

8

8

accordance with GAAS or, if such financial statements are required to be included in the Registration Statement or Form 8-K and a PCAOB audit is necessary therefor, in accordance with PCAOB, and shall not be subject to any qualification or exception as to the scope of such audit.

"**Audited Standard Margin**" means the (i) the 2008 revenues of the Business as shown in the 2008 income statement that is part of the Audited Financial Statements minus (ii) Nortel's standard cost of the revenue in (i) and any other costs included in the 2008 income statement that is part of the Audited Financial Statements that would be included in the calculation of standard margin using the accounting principles, practices and methods used in the calculation of Unaudited Standard Margin on Section 1.1(b) of the Sellers Disclosure Schedule. For the avoidance of doubt, in connection with the calculation of the Audited Standard Margin it shall be assumed that all Excluded Other Sellers are Sellers and all Excluded EMEA Sellers (as defined in the EMEA Asset Sale Agreement) and any EMEA Seller whose EMEA Assets and EMEA Liabilities are designated Removed Assets and Removed Liabilities or Excluded Assets and Excluded Liabilities under the terms of the EMEA Asset Sale Agreement are EMEA Sellers.

"**Avaya Parties**" ~~has the meaning set forth in Section 10.14(a)~~**means the Purchaser, any Designated Purchasers and any EMEA Designated Purchasers, any of their respective Subsidiaries and any former, current or future general or limited partners, directors, officers, employees, agents, managers, members, Affiliates, stockholders, assignees and representatives of any of the foregoing in their capacity as such.**

"**Balance Sheet Date**" has the meaning set forth in Section 4.8.

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court, the Israeli Court or any other court before which Bankruptcy Proceedings are held.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act, the Israeli Companies Law and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings occurring or authorized thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial or other proceedings concerning any of the Sellers, the EMBA Sellers or the Companies that are held from time to time.

"**Base Purchase Price**" has the meaning set forth in Section 2.2.1(a).

"**Bid**" means any bid, proposal, offer or quotation which, if accepted, would result in the award of a Contract.

9

<u>9</u>

"**Breach Cure Period**" means, with respect to a breach by any party of this Agreement or the EMEA Asset Sale Agreement, a period beginning at the time of delivery of a written notice of such breach to the breaching party and ending on the earlier of (i) the End Date and (ii) the last Business Day prior to any termination or purported termination of this Agreement or the EMEA Asset Sale Agreement by the breaching party. For purposes of this definition, "End Date" means the twentieth (20th) day after delivery of a written notice of such breach to the breaching party; provided, however, that in the case of a breach of the obligation to close the transactions contemplated hereby at the Closing, a breach of the obligation to close the transactions contemplated by the EMEA Asset Sale Agreement at the Closing (as defined in the EMEA Asset Sale Agreement), or a breach of Section 5.29 or a breach of Clauses 10.53, 10.54 and 10.55 of the EMEA Asset Sale Agreement, "End Date" shall mean the fifth (5th) day after delivery of a written notice of such breach to the breaching Party; and provided further, however, that in the case of a breach of Section 5.5 or a breach of Clauses 10.7 through 10.12 of the EMEA Asset Sale Agreement, "End Date" shall mean the fifteenth (15th) day after delivery of a written notice of such breach to the breaching party.

"**Break-Up Fee**" has the meaning set forth in Section 9.2(a).

"**Bundled Contract**" has the meaning set forth in Section 5.14(a).

"**Business**" means, collectively, the following business segments of the Sellers and the EMEA Sellers and the business of the NGS Companies and DiamondWare as described below:

      (i)      the "Enterprise Solutions" business segment of the Sellers, the EMEA Sellers and DiamondWare, comprising Employees, partner, customer and supplier relationships and the goodwill associated therewith, through which such entities, individually, jointly or in collaboration with or pursuant to contracts with Third Parties, and using any variety of technologies, research, design, develop, process, manufacture (through contract manufacturers), assemble, test, support, market and sell globally to end users and resellers the Products, which are communications products and solutions, including legacy products currently being supported and future products and solutions described in the "plan of record" or "plan of intent", in the areas of networked communications, converged voice and data, digital and internet protocol (IP) telephony, communication application devices, local area networks, messaging, contact center solutions, multimedia communications, including audio, video and web conferencing, telepresence and other similar enterprise solutions (the "**Enterprise Solutions Business**");

      (ii)     the "Global Services" business segment of the "Enterprise Solutions Business" of the Sellers, the EMEA Sellers and DiamondWare, which provides, individually or with Third Parties, the following services to Enterprise Solutions Business customers (collectively, the "**Services**"):

(a)     implementation and enhancement services, including network planning, engineering, installation, integration, convergence, optimization and security services;

(b)     support services, including the support of multi-vendor voice-data-converged networks, including providing software, technical support, hardware and software maintenance, corrective content management, equipment spares logistics, and on-site engineers;

·   (c)     managed and outsourced services, ranging from support of individual solutions to entire multi-vendor networks running carrier and optical equipment;

(d)     hosted services, including single and multi-tenant hosted services, hosted multimedia services, including high-definition telepresence, desktop video conferencing, and applications performance engineering;

(e)     application services, including application development, integration and communications-enabled application solutions; and

(f)     communications integration services provided in connection with third party equipment as part of security, healthcare and high-definition video solutions,

and all research and development associated with any of the foregoing, but, in each case, only to the extent that the services relate to, are ancillary to, implement, support and manage, the Products and Third Party equipment supplied by the Enterprise Solutions Business or equipment supplied by Third Parties if, as of the date hereof, the Sellers generally provide such services with respect to such equipment; and

(iii)     the business of the NGS Companies, through which the NGS Companies directly or indirectly, individually or through or with Third Parties, provide integrated information technology services and communications, communications products, business collaboration technology, information technology solutions and services to Government Entities and all research and development associated therewith,

but excluding, in each of clauses (i) and (ii) above: (A) the LGN Joint Venture, NN Turkey, Uni-Nortel, any Person the assets of which are designated Excluded Assets pursuant to Section 5.25 or EMEA Excluded Assets pursuant to Clauses 10.58 and 10.59 of the EMEA Asset Sale Agreement, and the assets of each of the Persons identified in this clause (A), (B) any Excluded Asset or EMEA Excluded Asset, (C) Overhead and Shared Services (other than Transferred Overhead and Shared Services), and (D) any products and/or services provided during the period from January 1, 2008 through the date hereof by businesses or business segments of any Seller or EMEA Seller other than those specified in clauses (i) and (ii) above.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, and (iii) London, England, United Kingdom.

"**Business Information**" means (i) if used exclusively in connection with the Business, all books, records, files, documentation and sales literature in the possession or under control of the Sellers or the Companies, including information (including information on past, present and prospective customers and suppliers), policies and procedures, Owned Equipment manuals and materials and procurement documentation exclusively used in the Business or in respect of any Asset, and (ii) if used primarily, but not exclusively, in connection with the Business or in respect of any Asset, to the extent reasonably separable from such items of any other business of the Sellers, copies of all books, records, files, documentation and sales literature in the possession or under control of the Sellers or the Companies, including information (including information on past, present and prospective customers and suppliers), policies and procedures and materials and procurement documentation used primarily in the Business or in respect of any Asset, including, in each of clauses (i) and (ii), any Employee Records.

"**Calculation Principles**" means (i) the Nortel Accounting Principles, to the extent applicable to the determination of the Inventory Value, the ~~Accrued Vacation~~ Amount, ~~the~~ Net Debt, the Companies Net Working Capital, **and** the EMEA Downward ~~Adjustment,~~ ~~the~~ ~~Accrued Cash-Out Vacation Escrow Amount and the EMEA Holiday~~ Adjustment, and the other accounting principles, methodologies and policies for the determination of the Inventory Value, the ~~Accrued Vacation Amount, the~~ Net Debt, the Companies Net Working Capital, **and** the EMEA Downward ~~Adjustment, the Accrued Cash-Out Vacation Escrow Amount~~ and the EMEA ~~Holiday~~ Adjustment, set forth in Section 1.1(c) of the Sellers Disclosure Schedule, ~~and (ii)~~ ~~GAAP, to the extent applicable to the determination of the Retirement Obligation Amount.~~

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.2.

"**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List).

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Initial Order**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Sales Process Order**" has the meaning set forth in Section 5.2.1.

"**Canadian Sales Process Order Motion**" has the meaning set forth in Section 5.2.1.

"CCAA" has the meaning set forth in the recitals to this Agreement.

"CCAA Cases" has the meaning set forth in the recitals to this Agreement.

"Chapter 11 Cases" has the meaning set forth in the recitals to this Agreement.

"Claim" has the meaning set forth in section 101(5) of the U.S. Bankruptcy Code.

"Clean Team Confidentiality Agreement" means the clean team confidentiality agreement by and between NNL and its Subsidiaries and Purchaser and its Subsidiaries, dated as of March 19, 2009, as amended from time to time.

"Clean Team Data Room" has the meaning attributed to the term "Clean Data Room" in the Clean Team Confidentiality Agreement.

"Clean Team Members" has the meaning attributed to that term in the Clean Team Confidentiality Agreement.

"Closing" has the meaning set forth in Section 2.3.1.

~~"Closing Accrued Vacation Amount" has the meaning set forth in Section 2.2.3.1(a).~~

"Closing Companies Net Working Capital" has the meaning set forth in Section 2.2.3.1(a).

"Closing Date" has the meaning set forth in Section 2.3.1.

"Closing Date Data Inventory Value" means the net Inventory Value related to data products as specified on the Closing Date Inventory Schedule, subject to the limitation that in determining the Closing Date Data Inventory Value, the value of raw material and works-in-process cannot exceed fifteen percent (15%) of the Data Inventory Floor.

"Closing Date Inventory Schedule" shall be a schedule detailing the Closing Date Inventory Value in the same categories as shown on Section 1.1(d)(i) of the Sellers Disclosure Schedule as finally determined in accordance with Section 2.2.3.1.

"Closing Date Spares and Service Inventory Value" will be the net Inventory Value related to Spares and Service Inventory as specified on the Closing Date Inventory Schedule.

"Closing Date Voice Inventory Value" means the net Inventory Value related to voice and applications products as specified on the Closing Date Inventory Schedule, subject to the limitation that, in determining the Closing Date Voice Inventory Value, the value of raw materials and works-in-process cannot exceed fifteen percent (15%) of the Voice Inventory Floor.

"**Closing EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

~~"**Closing EMEA Holiday Adjustment**" has the meaning set forth in Section 2.2.3.1(a).~~

"**Closing Inventory Adjustment**" means (i) the Data Inventory Adjustment plus (ii) the Spares and Service Inventory Adjustment plus (iii) the Voice Inventory Adjustment.

"**Closing Net Debt Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Retirement Obligation Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Statement**" has the meaning set forth in Section 2.2.3.1(a).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement, or addendum appendix or side letter thereto, that a Person has entered into with any union or collective bargaining agent with respect to terms and conditions of employment of such Person's employees.

"**Commissioner**" means the Commissioner of Competition appointed under the Competition Act or any person duly authorized to exercise the powers and perform the duties of the Commissioner of Competition.

"**Companies**" means the NGS Companies and DiamondWare.

"**Companies Cash and Investment Securities**" means, as of the time of determination, the aggregate amount of unrestricted cash or currency, cash equivalents and short term investments (including auction rate securities) that the Companies have on hand in bank accounts, calculated in accordance with the Calculation Principles.

"**Companies Net Accounts Receivable**" means, as of the time of determination, the consolidated accounts receivable of the Companies, excluding any intercompany receivables or receivables from Affiliates, net of reserves for doubtful accounts and related provisions, calculated in accordance with the Calculation Principles.

"**Companies Net Working Capital**" means, as of the time of determination, an amount equal to (w) the Companies Net Accounts Receivable plus (x) the Companies Cash and Investment Securities including the UBS Put Option, minus (y) all current liabilities of the

14

<u>14</u>

Companies (including deferred revenues, but excluding the current portion of Indebtedness), in each case calculated in accordance with the Calculation Principles.

"**Company Leases**" has the meaning set forth in Section 4.11(d).

"**Competing Transaction**" has the meaning set forth in Section 5.29.

"**Competition Act**" means the Competition Act (Canada), as amended.

"**Competition Act Approval**" means that: (a) the applicable waiting period has expired or been terminated pursuant to Section 123 of the Competition Act; (b) the Commissioner or his/her authorized representative shall have provided the Purchaser with a waiver from complying with Part IX of the Competition Act pursuant to Section 113(c) of the Competition Act and, in the case of (a) or (b), the Commissioner or his/her authorized representative shall have advised the Purchaser in writing that the Commissioner does not intend to make an application under Section 92 of the Competition Act with respect to the transactions contemplated by this Agreement, and neither the Commissioner nor any of his/her authorized representatives shall have rescinded or amended such advice; or (c) the Commissioner shall have issued an advance ruling certificate pursuant to Section 102 of the Competition Act in respect of the transactions contemplated by this Agreement.

"**Compliance Day**" means any day on which each of the conditions set forth in Section 8.1 and Sections 8.3(a), 8.3(b), 8.3(d) and 8.3(e) has been satisfied or waived (except for failure to satisfy (i) the conditions set forth in Section 8.1(a), Section 8.1(b), Section 8.1(e) or Section 8.1(f) due to the failure to obtain any Regulatory Approval, and (iiiii) those conditions that by their terms are to be satisfied by a delivery on the Closing Date).

"**Conditional Subleases**" has the meaning set forth in Section 5.31(a).

"**Confidential Information**" has the meaning set forth in Section 5.11(b).

"**Confidentiality Agreement**" means the confidentiality agreement by and among the Purchaser and NNI, among other parties, dated March 13, 2009.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by any Government Entity or other Third Party.

"**Consolidated Returns**" has the meaning set forth in Section 4.13(d).

"**Contract**" means any written binding contract, agreement, instrument, lease, ground lease or commitment.

"**Contract Designation Date**" means:

(a)     (i) with respect to each Other Contract listed in the Other 365 Contract List (except for any Selected Supplier Other 365 Contract or Documented Other 365

15

<u>15</u>

Contract) prepared or updated pursuant to Section 2.1.5(a)(ii) or the Other Non-365 Contract List prepared or updated pursuant to Section 2.1.6(a)(ii) (except for any Selected Supplier Other Non-365 Contract or Documented Other Non-365 Contract), the earlier of (A) the date that is thirty (30) days after the end of the thirty (30) Business Day period during which the Purchaser is entitled to supplement the list of Selected Suppliers pursuant to Section 2.1.7(b) and (B) the applicable Final Contract Designation Date; provided, that, with respect to any Other Contract added to the Other 365 Contract List (except for any Selected Supplier Other 365 Contract or Documented Other 365 Contract) or the Other Non-365 Contract List (except for any Selected Supplier Other Non-365 Contract or Documented Other Non-365 Contract) after the end of the thirty (30) Business Day period during which the Purchaser is entitled to supplement the list of Selected Suppliers pursuant to Section 2.1.7(b), the Contract Designation Date shall be the earlier of (A) the date that is thirty (30) days after the date that such Other Contract is added to the Other 365 Contract List or the Other Non-365 Contract List, as applicable or (B) the applicable Final Contract Designation Date;

(ii) with respect to each Selected Supplier Other 365 Contract, Selected Supplier Other Non-365 Contract, Documented Other 365 Contract and Documented Other Non-365 Contract (collectively, the "Selected Other Contracts"), the date that is thirty (30) days after the later of (i) the date the relevant Selected Other Contract is included on the relevant list and all material documentation that forms part of such Contract is made available to the Purchaser and (ii)(A) only with respect to an Other Contract with a Selected Supplier, the date the Main Sellers provide the Purchaser with an estimate of the Cure Cost for such Selected Supplier pursuant to Section 2.1.7(b); and (B) only with respect to a Documented Other 365 Contract or Documented Other Non-365 Contract, the date that is thirty (30) days after the end of the thirty (30) Business Day Period during which the Purchaser is entitled to supplement the list of Selected Suppliers pursuant to Section 2.1.7(b); provided, that, in each case, if the Main Sellers make available all material documentation that forms part of such Selected Other Contract and, if applicable, the Cure Cost estimate for the relevant Selected Supplier no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, the Contract Designation Date shall not be later than such Final Contract Designation Date. Notwithstanding anything in this Agreement to the contrary, (ax) if it is determined by either Party following the Contract Designation Date that not all material documentation that forms part of any Selected Other Contract (other than a Real Estate Lease) has been made available to the Purchaser, the relevant Seller shall use its reasonable best efforts to promptly provide all material documentation that forms part of such Contract and the Contract Designation Date for such Contract shall be no earlier than the thirtieth (30th) day after the Purchaser's receipt thereof and (by) with respect to an Other Contract with a Selected Supplier, if it is determined following the Contract Designation Date that the actual Cure Costs with respect to such Selected Supplier exceed by more than ten percent (10%) the good-faith estimate of such Cure Costs provided by the Main Sellers to the Purchaser pursuant to Section 2.1.7(b), the Contract Designation Date for such Contract shall be no earlier than the thirtieth (30th) day after the date of such determination of the Cure Costs for the relevant Selected Supplier; provided that, in each case, if the Main Sellers make available all material documentation that forms part of such Selected Other Contract and, if applicable, a Cure Cost

+6

estimate no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, then the Contract Designation Date shall never be later than such Final Contract Designation Date;

 (b) (i) with respect to each Pre-Signing Customer Contract that is not a Major Customer Contract, the later of (i) the date that is forty-five (45) days from the date hereof or (ii) thirty (30) days from the latest of (A) the date when all material documentation that forms part of such Pre-Signing Customer Contract is "Made Available to the Purchaser" (as defined below at the end of this definition), (B) the date the initial one-day training session contemplated by Section 5.38(a)(ii) is made available to Clean Team Members, and (C) the date when the relevant Sellers make available to the Purchaser selected members of management personnel of the Business for the meeting contemplated by the penultimate sentence of Section 5.38(b); and

  (ii) with respect to each Pre-Signing Customer Contract that is a Major Customer Contract, the later of (i) the date that is forty-five (45) days from the date hereof or (ii) thirty (30) days from the date when all material documentation that forms part of such Pre-Signing Customer Contract is Made Available to the Purchaser,

provided, however, for the avoidance of doubt, that the setting of the Contract Designation Date for a Pre-Signing Customer Contract that has already been Made Available to the Purchaser as of the date hereof shall not deprive the Purchaser of a thirty- (30-) day Contract review period for any additional Pre-Signing Customer Contracts that are subsequently Made Available to the Purchaser; provided further, that, if the Main Sellers Make Available to the Purchaser all material documentation that forms part of such Pre-Signing Customer Contract no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, then the Contract Designation Date shall not be later than such Final Contract Designation Date. Notwithstanding anything in this Agreement to the contrary, if it is determined by either Party following the Contract Designation Date that not all material documentation that forms part of a Pre-Signing Customer Contract has been Made Available to the Purchaser, the relevant Seller shall use its reasonable best efforts to promptly Make Available to the Purchaser all material documentation that forms part of such Contract and the Contract Designation Date for such Contract shall be no earlier than the thirtieth (30th) day after the Purchaser's receipt thereof, provided, that, if the Main Sellers Make Available to the Purchaser all material documentation that forms part of such Pre-Signing Customer Contract no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, then the Contract Designation Date shall not be later than such Final Contract Designation Date;

 (c) with respect to each Post-Signing Customer Contract that is added to the Non-Qualified Post-Signing Customer Contract List, the date that is thirty (30) days from the later of (A) the date that such Contract is added to such list or (B) the date when all material documentation that forms part of such Post-Signing Customer Contract is Made Available to the Purchaser; provided, that, in each case, if the Main Sellers Make Available to the Purchaser all material documentation that forms part of such Post-Signing Customer Contract no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, then the Contract

i

Designation Date shall not be later than such Final Contract Designation Date. Notwithstanding anything in this Agreement to the contrary, if it is determined by either Party following the Contract Designation Date that not all material documentation that forms part of a Post-Signing Customer Contract has been Made Available to the Purchaser, the relevant Seller shall use its reasonable best efforts to promptly Make Available to the Purchaser all material documentation that forms part of such Contract and the Contract Designation Date for such Contract shall be no earlier than the thirtieth (30th) day after Purchaser's receipt thereof; provided, that, if the Main Sellers Make Available to the Purchaser all material documentation that forms part of such Post-Signing Customer Contract no later than the fifth (5th) Business Day before the applicable Final Contract Designation Date, then in no event shall the Contract Designation Date be later than such Final Contract Designation Date; and

        (d)    with respect to ~~(i) the 365 Real Estate Lease identified in Section 2.1.5(b)(iv)(B) of the Sellers Disclosure Schedule, the date that is thirty (30) days from the date hereof; and (ii)~~ any Non-365 Real Estate Leases identified in Section 2.1.6(b)(ii), 2.1.6(b)(iii) or 2.1.6(b)(iv) of the Sellers Disclosure Schedule ~~or any Direct Lease Real Estate~~, the date that is ~~forty-five (45) days from the date hereof;~~ **September 15, 2009.**

For the purposes of this definition, **"Make Available to the Purchaser"** means (i) with respect to a Customer Contract other than a Major Customer Contract, include in the Sellers' Files that have been physically or electronically made available to the Purchaser or to appropriate Clean Team Members and/or make available to the Purchaser in the Data Room or to appropriate Clean Team Members and (ii) with respect to a Major Customer Contract, make available to appropriate Clean Team Members in the Clean Team Data Room.

        **"Contractual Liabilities"** means all Liabilities of the Sellers that arise in the Ordinary Course under Customer Contracts and SI/SP Contracts relating to marketing, allowance funds, technical training, demonstration equipment, events, trade shows, advertising, other direct marketing activities and rebate programs.

        **"Contract Manufacturing Inventory Agreements"** means the agreements among the Purchaser and/or any Designated Purchasers, the relevant Sellers, and the contract manufacturers of the Business listed in Section 1.1(e) of the Sellers Disclosure Schedule that the relevant Parties will negotiate in good faith pursuant to Section 5.26 on the basis of the term sheet attached hereto as Exhibit E.

        **"Contract Review Period"** means a period ending on the earlier of (i) the sixtieth (60th) day after the date hereof and (ii) the Bid Deadline (as defined in the U.S Bidding Procedures Order).

        **"Control"**, including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract or otherwise.

~~18~~

18

"**Converging Products**" means all prior and current versions of the Products set forth in Section 1.1(f) of the Sellers Disclosure Schedule.

"**Covered Assets and Persons**" has the meaning set forth in Section 5.21.

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court's Order Pursuant to 11 U.S.C. §§ 105(a) Approving Cross-Border Court-to-Court Protocol, dated January 15, 2009, and the Canadian Court in an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cross-License Agreements**" has the meaning set forth in Section 4.6(f).

"**Cure Cost**" means (i) any amounts required by section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under a 365 Contract (other , than an Assumed and Subleased Real Estate Lease) and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract, (ii) any amounts required by section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under an Assumed and Subleased Real Estate Lease and to pay any actual pecuniary losses that have resulted from such defaults under such Assumed and Subleased Real Estate Lease, (iii) with respect to any Non-365 Seller Contract (other than Contracts of a Canadian Debtor that are assignable to the Purchaser without the consent of the counterparty), any amounts necessary to cure any defaults and to pay any actual pecuniary losses under such Seller Contract in respect of the period prior to the Petition Date, and (iv) any amounts required to cure any defaults under a Non-365 Subleased Real Estate Lease and to pay any actual pecuniary losses under such Non-365 Subleased Real Estate Lease in respect of the period prior to the Petition Date.

"**Current Policies**" has the meaning set forth in Section 5.20(d).

"**Current Services**" has the meaning set forth in Section 5.36(a).

"**Customer Contract**" means any Direct Customer Contract or Indirect Customer Contract but excluding, in each case, any SI/SP Contract.

"**Daily Fee**" has the meaning set forth in Section 2.2.1(b).

"**Data Inventory Adjustment**" means the Data Inventory Floor less the Closing Date Data Inventory Value; provided that, if the calculated Data Inventory Adjustment is a negative amount, the Data Inventory Adjustment will be zero.

"**Data Inventory Floor**" means the Inventory Value related to data products of the Business as set forth in the Sellers Inventory Schedule (the "**Data Inventory Value**") as of the Closing Date, provided that, if the Closing Date falls on a date that is not at the end of any fiscal quarter, the Data Inventory Value on the Closing Date shall equal the sum of (i) the Data Inventory Value as of the last day of the prior fiscal quarter, plus (ii) (x) (A) the Data Inventory Value as of the last day of the fiscal quarter in which the Closing Date occurred, minus (B) the Data Inventory Value for the last day of the prior fiscal quarter, multiplied by (y) (A) the number

49

of days elapsed prior to the Closing Date during the fiscal quarter in which the Closing Date occurred, divided by (B) the total number of days in the fiscal quarter in which the Closing Date occurred.

"**Data Room**" means the "Equinox" electronic data room at https://datasite.merrillcorp.com/bidder/splash_check.do?locale=en.

"**Deferred Transfer Assumed Liability**" has the meaning set forth in Section 5.13(d).

"**Deferred Transfer Purchased Asset**" has the meaning set forth in Section 5.13(c).

"**Delay Fee**" has the meaning set forth in Section 2.2.1(b).

"**Delay Fee Payments**" has the meaning set forth in Section 2.2.1(c).

"**Designated Courts**" has the meaning set forth in Section 10.6(b).

"**Designated Non-365 Contracts**" has the meaning set forth in Section 2.1.6(a)(iii).

"**Designated Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(b)(ii).

"**Designated Non-365 SI/SP Contracts**" has the meaning set forth in Section 2.1.6(a)(i).

"**Designated Other Non-365 Contracts**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Designated Other 365 Contracts**" has the meaning set forth in Section 2.1.5(a)(ii).

"**Designated Purchaser**" has the meaning set forth in Section 2.4.

"**Designated 365 Real Estate Leases**" has the meaning set forth in Section 2.1.5(b)(ii).

"**Designated 365 SI/SP Contracts**" has the meaning set forth in Section 2.1.5(a)(i).

"**DiamondWare**" means DiamondWare, Ltd., a corporation organized under the laws of Arizona, with executive offices at 2221 Lakeside Boulevard, Richardson, Texas.

"**DiamondWare Shares**" means all the equity interests in DiamondWare.

"**Direct Customer Contract**" means any Seller Contract pursuant to which a Seller provides Products and/or Services to an end-user.

"**Direct Lease Real Estate**" has the meaning set forth in Section 5.30; ~~provided~~ that, ~~if the Purchaser elects prior to the relevant Contract Designation Date not to purchase the Owned Real Estate but to enter into a Direct Lease with respect to such Owned Real Estate at Closing, the Owned Real Estate shall thereafter be deemed included among the Direct Lease Real Estate for all purposes hereunder.~~ **5.30.**

"**Direct Leases**" has the meaning set forth in Section 5.30.

"**Disagreement Notice**" has the meaning set forth in Section 2.2.3.1(b).

"**Distribution Agent**" means the Person that will act as distribution agent for the Sellers and the EMEA Sellers hereunder, to be notified by the Main Sellers to the Purchaser and the Escrow Agent by and not later than five (5) Business Days before the Closing.

"**Documented Other Non-365 Contract**" means any Other Non-365 Contract for which the Purchaser has reasonably requested in writing that the Sellers provide all information in accordance with Section 2.1.6(a)(ii).

"**Documented Other 365 Contract**" means any Other 365 Contract for which the Purchaser has reasonably requested in writing that the Sellers provide all information in accordance with Section 2.1.5(a)(ii).

"**Domain Name**" means an alphanumeric name that identifies a specific computer or website on the Internet, and all rights in and to such domain name, including any registrations therefor with a domain name registrar.

"**EC Merger Regulation**" means Council Regulation (EC) No 139/2004 of January 20, 2004 on the control of concentrations between undertakings, as amended.

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**EMEA Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Assumed Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Debtors**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Designated Purchaser**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Downward Adjustment**" has the meaning attributed to the term "Downward Adjustment" in Paragraph 1.1 of Schedule 9 to the EMEA Asset Sale Agreement.

"**EMEA Employment Escrow Amount**" has the meaning attributed to the term "Employment Escrow Amount" in Paragraph 11 of Schedule 6 to the EMEA Asset Sale Agreement.

"~~**EMEA Holiday Adjustment**~~" ~~means, at any given date, the greater of (i) the EMEA Holiday Downward Adjustment or (ii) zero.~~

"~~**EMEA Holiday Downward Adjustment**~~" ~~has the meaning attributed to such term in Paragraph 6.2 of Schedule 6 to the EMEA Asset Sale Agreement.~~

"**EMEA Owned Inventory**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Sellers**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Side Letter**" has the meaning set forth in the recitals to this Agreement.

"**Employee**" means any Share Transfer Employee and any employee of the Sellers engaged in the Business, in each instance as listed in Section 4.14(b)(i) of the Sellers Disclosure Schedule.

"**Employee Information**" has the meaning set forth in Section 4.14(b).

"**Employee Records**" means books, records, files, or other documentation with respect to Transferred Employees, to the extent such records are reasonably within the possession, custody or control of the Sellers.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferred Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day immediately following the Closing Date; provided, that (i) in respect of any Inactive Employee the Employee Transfer Date means 12:01 a.m. on the first day after the Closing Date on which the Employee reports to work; (ii) in respect of any Visa Employees, the Employee Transfer Date means 12:01 a.m. on the first day after the Closing Date on which the Purchaser or a Designated Purchaser has obtained the required visa or permit with respect to such Employee's employment and the Visa Employee reports to work; and (iii) in respect of any Other Loaned Employee, the Employee Transfer Date means the date on which

22

**22**

such Employee's employment transfers to the Purchaser or a Designated Purchaser under the terms of the Loaned Employee Agreement.

"**Employment Contract**" means any Seller Employee Plan or other plan, program, agreement or arrangement pursuant to which any Person provides employment or consulting services to the Business.

"**English Court**" means the High Court of Justice of England and Wales.

"**Enterprise Portion**" has the meaning set forth in Section 5.14(b).

"**Environmental Law**" means any applicable Law relating to pollution or protection of the environment, natural resources or human health and safety.

"**Environmental Permit**" means any permit, approval, license or other authorization required under any Environmental Law to conduct the Business as currently conducted.

"**Equivalent Lease**" means a lease or sublease for Equivalent Space for a term of three years, in the case of Lease A and Lease B as shown on Section 5.31(g) of the Sellers Disclosure Schedule or five years, in the case of Lease C as shown on Section 5.31(g) of the Sellers Disclosure Schedule, under which the annual rental obligations and other express monetary obligations of the tenant or subtenant do not exceed in the aggregate, except to de minimis extent, the same costs under the Mission Critical Lease which is thereby being replaced (or, in the case of the Mission Critical Lease identified as "Lease A" in Section 5.31(g) of the Sellers Disclosure Schedule, the term and the costs indicated in Exhibit 5.28(g)); provided that Sellers shall make reasonable attempts to negotiate a market rent under any such lease or sublease and provided further that, prior to entry into any such lease or sublease, the relevant Seller and the Purchaser or a Designated Purchaser shall convene to discuss and agree on a mutually acceptable strategy for the location of the premises and negotiating such lease or sublease and Purchaser or a Designated Purchaser shall have a reasonable opportunity to participate in the process.

"**Equivalent Space**" means, with respect to any Mission Critical Lease, premises reasonably acceptable to the Purchaser which are located in the same general real estate market as the space demised under such Mission Critical Lease, which contain usable and rentable square footage sufficient to reasonably support the contemplated use of the demised premises and employee headcount reasonably agreed between the Purchaser and the Sellers on or prior to the Closing Date and to permit the Purchaser or a Designated Purchaser to conduct the Business at such premises in a manner substantially similar to the manner conducted at such premises as of the date hereof and which are of substantially the same quality (including as to tenant improvements and fit-out and related services and amenities) as the premises provided under such Mission Critical Lease.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

23

**23**

"**Escrow Account**" means the following ~~seven~~six (7~~6~~) escrow accounts to be set up by the Escrow Agent pursuant to the Escrow Agreement: (i) an escrow account for the Purchase Price Adjustment Escrow Amount (the "**Purchase Price Adjustment Escrow Account**"), (ii) an escrow account for the Holdback Escrow Amount (the "**Holdback Escrow Account**"), (iii) an escrow account for the EMEA Employment Escrow Amount (the "**EMEA Employment Escrow Account**"), (iv) an escrow account for the ~~Accrued Cash-Out Vacation~~French Tax Escrow Amount (the "**~~Accrued Cash-Out Vacation~~French Tax Escrow Account**"), (v) an escrow account for ~~the French Tax Escrow Amount ((the "French Tax Escrow Account"), (vi) an escrow account~~ holding the Good Faith Deposit (the "**Good Faith Deposit Escrow Account**"), and (v~~ii~~vi) an escrow account holding the Delay Fee (the "**Delay Fee Escrow Account**").

"**Escrow Agent**" means Wells Fargo Bank, National Association.

"**Escrow Agreement**" means the escrow agreement entered into on July 20, 2009 among NNI, NNL, NNUK, the Purchaser and the Escrow Agent ~~to be entered into in the form of Exhibit F~~ in accordance with Section 2.2.6(a) of the Original Agreement, as amended and restated by the parties thereto following the Auction and as may be further amended from time to time (a copy thereof is set forth as Exhibit F hereto).

"**Escrow Amount**" means the amount to be paid by the Purchaser by wire transfer of immediately available funds to the Escrow Agent on the Closing Date, which amount will consist of (i) the EMEA Employment Escrow Amount, (ii) the Holdback Escrow Amount, (iii) the Purchase Price Adjustment Escrow Amount, and (iv) the ~~Accrued Cash-Out Vacation Escrow Amount and (v) the~~ French Tax Escrow Amount.

"**Estimated ~~Closing Accrued Vacation Amount~~Adjustment Payment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Companies Net Working Capital**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

~~"Estimated Closing EMEA Holiday Adjustment" has the meaning set forth in Section 2.2.2(a).~~

"**Estimated Closing Inventory Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Net Debt Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Retirement Obligation Amount**" has the meaning set forth in Section 2.2.2(a).

"Estimated Cost Schedule" has the meaning set forth in Section 5.36(c).

"Estimated Purchase Price" has the meaning set forth in Section 2.2.2(b).

"Estimated –6 Liability Escrow Account" has the meaning set forth in the Escrow Agreement.

"Estimated –6 Liability Escrow Amount" has the meaning set forth in Section 10.20(b).

"European Union Entity" means a Government Entity of the European Union. For the avoidance of doubt, "European Union Entity" means a supranational Government Entity and not a Government Entity of any member State of the European Union.

"Excludable Other Seller" means any Other Seller that is not listed in Section 1.1(g) of the Sellers Disclosure Schedule.

"Excluded Assets" has the meaning set forth in Section 2.1.2.

"Excluded Employee Liabilities" has the meaning set forth in Section 7.3.

"Excluded Liabilities" has the meaning set forth in Section 2.1.4.

"Excluded Non-365 Contract" has the meaning set forth in Section 2.1.6(a)(iv).

"Excluded Other Seller" has the meaning set forth in Section 5.25(a).

"Excluded Seller" has the meaning set forth in Section 5.25(a).

"Excluded 365 Contract" has the meaning set forth in Section 2.1.5(a)(v).

"Executory Contract" means an "executory contract" for the purposes of the U.S. Bankruptcy Code.

"Expense Reimbursement" has the meaning set forth in Section 9.2(b).

"Expense Reimbursement Limit" has the meaning set forth in Section 9.2(b).

"Extra Services" has the meaning set forth in Section 5.36(b).

"Final Contract Designation Date" means (a) for a 365 Contract, the twentieth (20th) day prior to the Closing Date and (b) for a Non-365 Contract, the third (3rd) Business Day prior to the Closing Date.

"Final Date" has the meaning set forth in Section 2.2.1(b).

"Financial Statements" has the meaning set forth in Section 4.8.

25

25

"**French Tax Escrow Amount**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**Fund**" means any partnership, limited liability company or other investment vehicle that is a direct or indirect stockholder of the Purchaser.

"**GAAP**" means the United States generally accepted accounting principles, consistently applied.

"**GAAS**" means the United States generally accepted auditing standards.

"**General Scope of Services**" has the meaning set forth in Section 5.36(a).

"**Good Faith Deposit**" has the meaning set forth in Section 2.2.5(a).

"**Government Bid**" means any Bid made by any Seller or Company or by a contractor team or joint venture, in which any Seller or Company is participating that, if accepted, would result in the award of a Government Contract or a Government Subcontract.

"**Government Contract**" means any prime contract, multiple award schedule contract, basic ordering agreement, letter contract or any task order or purchase order issued thereunder or other written agreement between any Seller or Company and either the U.S. Government or a State Government.

"**Government Entity**" means any U.S., Canadian, Indian, UK, supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**Government Subcontract**" means any subcontract issued to any Seller or Company by a prime contractor, including any basic ordering agreement, letter subcontract, task order, purchase order, or other written agreement between any Seller and any prime contractor to either the U.S. Government or a State Government.

"**GST**" means goods and services tax payable under Part IX of the Excise Tax Act (Canada).

"**Hazardous Materials**" means (a) petroleum, petroleum products, asbestos in any form that is friable or polychlorinated biphenyls and (b) any chemical, material or other substance regulated as hazardous or as a pollutant, contaminant or waste under any Environmental Law.

"**Holdback Escrow Amount**" means $25 million, which amount will be paid by the Purchaser to the Escrow Agent on the Closing Date and shall be held by the Escrow Agent

26

**26**

pending the Sellers post-Closing delivery of financial statements to the Purchaser pursuant to the terms of Section 5.34(f).

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means that the responsible Minister under the Investment Canada Act shall have notified the Purchaser that he/she is satisfied, or such Minister shall be deemed to be satisfied, that the transactions contemplated in this Agreement that are subject to the provisions of the Investment Canada Act are likely to be of net benefit to Canada.

"**Inactive Employees**" means Employees (other than Share Transfer Employees and Employees whose employment transfers to the Purchaser or a Designated Purchaser by operation of Law) who have accepted Purchaser's or a Designated Purchaser's offer of employment as provided in Section 7.1 and are on a leave of absence for military service, short- or long-term disability, Family and Medical Leave Act or other leave of absence provided under applicable Law on the day immediately following the Closing Date as of 12:01 a.m. local time in such jurisdiction where Employees would have otherwise become Transferred Employees in accordance with this Agreement.

"**Inbound License Agreements**" has the meaning set forth in Section 4.6(j).

"**Included Real Estate Leases**" means each Designated 365 Real Estate Lease, Assumed and Subleased Real Estate Lease, Designated Non-365 Real Estate Lease, Non-365 Subleased Real Estate Lease and Company Lease, collectively, and, if applicable, Replacement Lease A, and any Equivalent Lease (to the extent that the Seller is the tenant thereunder).

"**Included Real Estate**" means the Owned Real Estate ~~(if the Purchaser has elected to purchase such Owned Real Estate)~~ and the real estate which is the demised premises under each Designated 365 Real Estate Lease, Assumed and Subleased Real Estate Lease, Designated Non-365 Real Estate Lease, Non-365 Subleased Real Estate Leases, Company Lease or Direct Lease, collectively, or under Replacement Lease A and any Equivalent Lease (to the extent that the Seller is the tenant thereunder), if applicable.

"**Included Services**" has the meaning set forth in Section 5.36(a).

"**Indebtedness**" of any Person means at any date, without duplication, all obligations (including all obligations in respect of principal, accrued interest, penalties, fees and premiums) of such Person (a) for indebtedness for borrowed money (including overdraft facilities), (b) for indebtedness evidenced by promissory notes, bonds, debentures, notes or similar instruments, (c) any "earn-out" obligations and other obligations for the deferred purchase price of property, goods or services (excluding trade payables), (d) in respect of letters of credit and bankers' acceptances, (e) in respect of leases that are capitalized in accordance with

27

**27**

GAAP under which such Person is the lessee, (f) research and development funds received or invoiced under any alliance agreement that may be required to be earned by future performance or repaid thereunder and (g) in respect of any guarantees of such Person in connection with any of the foregoing.

"**Indemnified Expenses**" has the meaning set forth in Section 5.20(c).

"**Indemnified Person**" has the meaning set forth in Section 5.20(c).

"**Indirect Customer Contracts**" means any Seller Contract pursuant to which a Seller provides Products and/or Services to a reseller, distributor, system integrator or service provider (including Seller Contracts for Products or Services to be utilized by such reseller or distributor itself).

"**Information**" has the meaning set forth in Section 5.34(d)(iv).

"**Insolvency Act**" has the meaning set forth in the recitals to this Agreement.

"**Intellectual Property**" means all intellectual and industrial property as recognized under the laws of the United States of America, Canada and/or other countries or jurisdictions, including: (a) Trademarks; (b) Domain Names; (c) Patents; (d) copyrights and works of authorship (including any registrations therefor or applications for registration, and the benefit of any waiver of moral rights therein, to the extent such waiver is transferable by law); (e) mask works and integrated circuit topographies (including any registrations therefor or applications for registration); (f) trade secrets, know-how and proprietary and confidential technical or business information; (g) any Software; (h) any technology and (i) *sui generis* design rights.

"**Intellectual Property License Agreement**" means the agreement to be entered into between NNL, NNI, the relevant EMEA Sellers and the Joint Administrators, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit G.

"**Intentional Breach**" means, with respect to an agreement, an action or omission (including a failure to cure circumstances) that the breaching party knows or reasonably should have known is or would result in a breach of the agreement.

"**Inventory Value**" means, as of any given date, the book value, net of all applicable reserves and provisions, of the Owned Inventory and the EMEA Owned Inventory calculated in accordance with the Nortel Accounting Principles, and the Calculation Principles and the revenue assumptions presented in the Sellers Forecast set forth in Section 1.1(d)(ii) of the Sellers Disclosure Schedule.

"**Investment Canada Act**" means the Investment Canada Act, as amended.

"**IP Escrow AgreementAgreements**" has the meaning set forth in Section 5.9(c).

28

"IRS" means the United States Internal Revenue Service.

"IRS Claim" means, collectively, the claims asserted in the Amended Proof of Claim dated August 18, 2009 and filed by the IRS on August 20, 2009 and any other related Actions or Claims asserted by the IRS or a Federal agency.

"Israeli Companies" has the meaning set forth in the recitals to this Agreement.

"Israeli Companies Law" has the meaning set forth in the recitals to this Agreement.

"Israeli Court" has the meaning set forth in the recitals to this Agreement.

"IT Headcount Forecast" has the meaning set forth in Section 5.36(c).

"Janus -6 Factor" means an amount equal to the Base Purchase Price multiplied by 2.0, and divided by the revenues of the Business in respect of the latest period of twelve whole months preceding the Closing Date for which financial information is available as of the Closing Date.

"Joint Administrators" has the meaning set forth in the recitals to this Agreement.

"Joint Israeli Administrators" has the meaning set forth in the recitals to this Agreement.

"KEIP" means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in part on March 5, 2009, and in part on March 20, 2009, and substantially approved by the Canadian Court in part on March 6, 2009, and in part on March 20, 2009, as the same may be amended, modified, supplemented or replaced from time to time in accordance with Section 5.9(d).

"KERP" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court on March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time in accordance with Section 5.9(d).

"Knowledge" or "aware of" or "notice of" or a similar phrase shall mean, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(h) of the Sellers Disclosure Schedule, and, with reference to the Purchaser, the actual knowledge of those Persons listed on Exhibit II.

"KPMG" has the meaning set forth in Section 5.34(c).

"Latest Lease Rejection Date" means (i) August 12, 2009, the deadline under the U.S. Bankruptcy Code, by which the Sellers must elect to either assume or reject 365 Real

29

22

Estate Leases, or (ii) if the Sellers (in their sole discretion) request and a landlord under a 365 Real Estate Lease agrees to an extension of the date by which the relevant Seller must elect to either assume or reject such 365 Real Estate Lease to a date following August 12, 2009, then on the date to which such deadline has been extended by agreement of such Seller and such landlord.

"**Law**" means any U.S., Canadian, UK, Israeli, supranational, foreign, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**Lease A Sublease**" has the meaning set forth in Exhibit 5.28(g).

"**Letter of Credit**" means the letter of credit in the form of Exhibit I hereto issued by Citibank, N.A. (or any financial institution having at least an investment grade rating and capital and surplus of not less than $500 million) in favor of the Escrow Agent.

"**LGN Joint Venture**" means LG-Nortel Co. Ltd., which was established in November 2005 as a joint venture between NNL and LG Electronics Inc. for the purpose of jointly developing and marketing certain telecommunications equipment and network solutions.

"**LGN/Korea Distribution Agreement**" means the agreement between the Purchaser and/or a Designated Purchaser, on the one hand, and the LGN Joint Venture, on the other hand, governing the sale of certain Products by the Business to the LGN Joint Venture for resale.

"**LGN/Korea Supply Agreement**" means an agreement between the Purchaser and/or a Designated Purchaser and the LGN Joint Venture governing the supply of certain products by the LGN Joint Venture to the Business.

"**Liabilities**" means debts, liabilities, commitments and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or undeterminable, including those arising under any Law or Action and those arising under any contract, agreement, arrangement, commitment or undertaking or otherwise, including any Tax liability or tort liability.

"~~Liability Limitation Amount~~" means $200,000,000; provided, that in the event that at the time of termination of this Agreement the Standard Margin for the LTM Measurement Period is less than $640,000,000, then "Liability Limitation Amount" shall mean $100,000,000.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchaser(s) under the Intellectual Property License Agreement and the Trademark License Agreement.

30

**30**

"Lien" means any lien, mortgage, pledge or security interest, hypothec, adverse claim, a claim of adverse possession, right of first refusal, option, hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, prior claim, lease, lien or charge of any kind (including any conditional sale arrangement or other title retention agreement).

"Loaned Employee Agreement" means the agreement between the Main Sellers and certain of the Other Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed before the Closing in the form attached hereto as Exhibit J.

"Local Sale Agreements" has the meaning set forth in Section 2.1.8.

"Loss Duplication Elections" has the meaning set forth in Section 6.5.

"Losses" means all losses, damages and reasonable and documented out-of-pocket costs and expenses.

"LTM Measurement Period" means as of any date, if such date is (i) during the first 45 days after the end of any fiscal quarter of the Business, the period of four consecutive fiscal quarters of the Business ended on or prior to such time~~date~~ in respect of which financial statements for each quarter are available and (ii) any other time~~date~~ during such~~h~~a fiscal quarter, the period of four consecutive fiscal quarters of the Business ended on or prior to such time~~date~~.

"LTM Revenues" means, with respect to a Customer Contract of any of the Companies, the revenues of the Companies with respect to such Customer Contract during the latest period of twelve whole  months preceding the Closing Date for which financial information is available as of the Closing Date, determined in accordance with GAAP.

"Main Sellers" has the meaning set forth in the preamble to this Agreement.

"Major Customer ~~Contract~~Contracts" has the meaning set forth in Section 5.38(d).

"Major 2008 Customer Contract" has the meaning set forth in Section 5.38(c).

"Major 2009 Customer Contract" has the meaning set forth in Section 5.38(d).

"Mandatory Antitrust Approvals" means a decision, in whatever form (including a declaration of lack of jurisdiction or a mere filing or notification, if the Closing can take place, pursuant to the applicable Antitrust Law, without a decision or the expiry of any waiting period) by any Government Entity under the Antitrust Laws of any of the jurisdictions listed in Exhibit K (the "Relevant Antitrust Jurisdiction / Authorities") or the expiry of the applicable waiting period, as applicable, under the Antitrust Laws of any of the jurisdictions listed in Exhibit K, authorizing or not objecting to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), which includes any decision or

consent by any such Government Entity setting forth conditions or obligations on the Purchaser or any of its Affiliates if such conditions or obligations have been or, pursuant to Section 5.5(e) or Clause 10.11 of the EMEA Asset Sale Agreement are required to be, accepted by the Purchaser.

"**Material Adverse Effect**" means any change, event, fact, condition, occurrence or circumstance that, individually or in the aggregate, has or would reasonably be expected to have a material adverse effect on the business, operations, results of operations, properties, assets or condition of the Business to be transferred hereunder, taken as a whole, but in each case shall not include the effect of events, changes, facts, conditions, occurrences or circumstances relating to (a) the industries and markets in which such Business operates, but only to the extent that such events, changes, facts, conditions, occurrences or circumstances do not have a materially disproportionate effect on such Business as compared to other industry participants, (b) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, acts of God, war, terrorism or hostilities, but only to the extent that such events, changes, facts, conditions, occurrences or circumstances do not have a materially disproportionate effect on such Business as compared to other industry participants, (c) changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (d) compliance with this Agreement, (e) the transactions contemplated hereby or any announcement hereof or the identity of the Purchaser, (f) any action taken by the Purchaser or its Affiliates, or (g) the pendency of the Bankruptcy Proceedings and any action approved by, or motion made before, the Bankruptcy Courts; it being understood that the failure of the Business to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect although the factors underlying such failure may be considered in determining whether or not there has been a Material Adverse Effect.

"**Material Contracts**" has the meaning set forth in Section 4.5.

"~~Material Intentional Purchaser Breach~~" ~~has the meaning set forth in Section 9.3(a)(ii).~~

"**Material Intentional Purchaser Breach**" means a breach in any material respect of Purchaser's representations, warranties, agreements or covenants set forth in this Agreement or the EMEA Asset Sale Agreement as a result of an Intentional Breach which breach (i) would result in a failure to satisfy the conditions to Closing set forth in Section 8.1 and/or Section 8.2, as applicable, or the conditions to Closing (as defined in the EMEA Asset Sale Agreement) set forth in Clause 15.1 and/or Clause 15.2 of the EMEA Asset Sale Agreement, as applicable, and (ii) if capable of being cured, such breach by the Purchaser is not cured within the applicable Breach Cure Period; provided that a determination by the Purchaser not to accept any requirement of a Regulatory Approval with respect to any divestiture, license or hold separate or similar arrangements or any material actions, undertakings or arrangements for the conduct of any business and/or terminating any relationships or contractual rights or obligations shall not constitute a Material Intentional Purchaser Breach.

32

**32**

· **"Mission Critical Leases"** has the meaning set forth in Section 5.31(g).

**"Monetary Cost"** has the meaning set forth in Section 5.36(c).

**"Monitor"** means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

**"Multiemployer Plan"** has the meaning set forth in Section 4.14(j).

**"Mutual Development Agreement"** means an agreement between the Purchaser and/or any Designated Purchasers, on the one hand, and the relevant Sellers, on the other hand, governing the development (i) by the Purchaser and/or any Designated Purchasers of new features of certain of the products used by the Sellers and/or (ii) by the relevant Sellers of new features of certain of the Products.

**"Net Debt"** means, as of any time of determination, any Indebtedness of the Companies.

**"Net Debt Adjustment"** means the amount, if any, by which the Closing Net Debt exceeds the amount determined by reference to Section 1.1(c) of the Sellers Disclosure Schedule at the time of Closing. For the avoidance of doubt, if the Closing Net Debt is less than such amount, the Net Debt Adjustment shall be equal to zero and there shall be no Purchase Price adjustment in relation thereto.

**"Neutral Arbitrator"** has the meaning set forth in Section 5.36(h).

**"New York Courts" has the meaning set forth in Section 10.6(b).**

**"NGS"** means Nortel Government Solutions Incorporated, a corporation organized under the laws of Delaware with offices at 12730 Fair Lakes Circle, Fairfax, Virginia.

**"NGS Companies"** means, collectively, NGS and its two Subsidiaries, Integrated Information Technology Corporation and AC Technologies, Inc.

**"NGS Shares"** means all the equity interests in NGS.

**"NISPOM"** means the National Industrial Security Program Operating Manual, DoD 5220.22-M dated February 28, 2006.

**"NNC"** has the meaning set forth in the preamble to this Agreement.

**"NNFSAS Succession Tax Liabilities"** has the meaning attributed to that term in the EMEA Asset Sale Agreement.

**"NNI"** has the meaning set forth in the preamble to this Agreement.

33

"NNI Group" means an "affiliated group" as defined in Code section 1504(a) (or under a comparable provision of the Tax Laws of a jurisdiction within the United States) of which NNI is the common parent.

"NN International" means Nortel Networks International, Inc.

"NNL" has the meaning set forth in the preamble to this Agreement.

"NNRIP" means the Nortel Networks Retirement Income Plan.

"NNSA" shall mean Nortel Networks SA, a company incorporated in accordance with the laws of France and with registered number 389 516 741.

"NNTC" has the meaning set forth in Section 6.1(c).

"NN Turkey" means Nortel Networks Netas Telekomunikasyon A.S., a joint stock corporation formed under the laws of Turkey.

"NNUK" means Nortel Networks UK Limited.

"Non-Assignable Contracts" has the meaning set forth in Section 5.13(a).

"Non-Assigned Contracts" means the Non-Assignable Contracts, to the extent all applicable Consents to assignment thereof to the Purchaser or a Designated Purchaser have not been granted prior to the Closing Date.

"Non-Debtor Sellers" has the meaning set forth in the recitals to this Agreement.

"Non-Designating Party" has the meaning set forth in Section 5.36(f).

"Non-Qualified Post-Signing Customer Contracts" has the meaning set forth in Section 5.38(g).

"Non-Qualified Post-Signing Customer Contract List" has the meaning set forth in Section 5.38(g).

"Non-Solicitation Period" means the twenty-four (24) month period immediately following the Closing Date.

"Non-Union Employee" means an Employee whose terms and conditions of employment are not governed by a Collective Labor Agreement.

"Non-365 Customer Contract" means any Customer Contract that is not a 365 Customer Contract.

"Non-365 Real Estate Leases" has the meaning set forth in Section 2.1.6(b)(i).

34

**34**

"**Non-365 Real Estate Lease List**" has the meaning set forth in Section 2.1.6(b)(i).

·"**Non-365 Seller Contract**" means Seller Contracts other than 365 Contracts.

"**Non-365 SI/SP** ~~Contract~~Contracts" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 SI/SP Contract List**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.6(b)(iii).

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Financial Statements, as set forth in Section 1.1(i) of the Sellers Disclosure Schedule.

~~"Nortel Parties" has the meaning set forth in Section 10.14(a).~~

"**Nortel Parties**" means the Sellers, any of the bankruptcy estates, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators, the Canadian Monitor (and any other Administrator, Monitor or other Person acting in a similar capacity) and · any Person (i) in which, as of or subsequent to the date hereof, any Seller or EMEA Seller holds more than fifty percent (50%) of the capital stock or other equity interests or (ii) that is or was a Seller or an EMEA Seller, and their respective Affiliates, and any former, current or future general or limited partners, directors, officers, employees, agents, managers, members, stockholders, assignees and representatives of any of the foregoing in their capacity as such.

"**Notices of Lease**" has the meaning set forth in Section 5.30.

"**Notifying Party**" has the meaning set forth in Section 5.36(h).

"**Offer Consideration Period**" has the meaning set out in Section 7.1.1.

"**Open Source Software**" means Software that is made available under a license agreement that (i) conditions use, modification or distribution of any Software program, or any Software integrated with or derived from such Software program, or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software) or (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or · distributing such Software program or Software.

"**Ordinary Course**" means the ordinary course of the Business consistent with past practice, as such practice may be modified from time to time to the extent necessary to

reflect the separation of the Business from the other businesses of the Sellers in a manner consistent with the terms of the Transaction Documents.

"Original Agreement" has the meaning set forth in the recitals to this Agreement.

"Original EMEA Asset Sale Agreement" has the meaning set forth in the recitals to this Agreement.

"Other Contract" means any Seller Contract that is not a Customer Contract, a SI/SP Contract, an Employment Contract or a Real Estate Lease.

"Other Loaned Employees" has the meaning set forth in the recitals to the Loaned Employee Agreement.

"Other Non-365 ~~Contract~~Contracts" has the meaning set forth in Section 2.1.6(a)(ii).

"Other Non-365 Contract List" has the meaning set forth in Section 2.1.6(a)(ii).

"Other Sellers" has the meaning set forth in the preamble to this Agreement.

"Other 365 ~~Contract~~Contracts" has the meaning set forth in Section 2.1.5(a)(ii).

"Other 365 Contract List" has the meaning set forth in Section 2.1.5(a)(ii).

"Overhead and Shared Services" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services and which are provided to both (a) the Business and (b) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and Software in object code form used by Employees, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and Software (in object code form) or other Intellectual Property necessary for or used in connection therewith.

"Owned Equipment" means (a) those items of tangible personal property owned by the Sellers that are held or used primarily in connection with the Business and are located at the network operating centers, lab facilities and other facilities in each case listed in Section

1.1(j) of the Sellers Disclosure Schedule (the "**Sites**"), and (b) those other items of tangible personal property owned by the Sellers not included in clause (a) above that are held or used exclusively in connection with the Business, including, in each case, all trade fixtures and fixtures, furniture, furnishings, fittings, equipment, apparatus, appliances, test equipment, tooling and other articles of personal property which are owned by the Sellers and which are located at the Owned Real Estate (to the extent the Purchaser exercises its election under Section 2.1.1 to include the Owned Real Estate among the Assets), the Direct Lease Real Estate, any customer, supplier or other worksites or at the Sites or at the demised premises which are (i) the subject of any real property lease included in the Assigned Contracts or (ii) the subject of any Sublease, provided, however, that, in each case, the term "Owned Equipment" shall not include fixtures other than trade fixtures located at the Direct Lease Real Estate or the Sites and shall not include any leasehold improvements located at the demised premises which are the subject of any Sublease; and, provided, further, that, "Owned Equipment" shall not include any Owned Inventory, any items of tangible property personally assigned to a single employee who is not (A) a Transferred EmployeesEmployee as of the Employee Transfer Date or (B) a Visa Employee, and any Intellectual Property.

"**Owned Inventory**" means any inventories of raw materials, manufactured and purchased parts, work in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise, in each case owned by the Sellers and held or used exclusively in connection with the Business, including any of the above items which is owned by the Sellers but remains in the possession or control of a contract manufacturer or another Third Party (but excluding any inventory that is purchased by any of the Sellers from any contract manufacturer after the Closing Date under any agreement between such Sellers and contract manufacturers or under any Contract Manufacturing Inventory Agreement and excluding any inventory that is required to be purchased by any of the Sellers from a contract manufacturer after the date of this Agreement but prior to the Closing Date in connection with the Ordinary Course quarterly review process completed by such contract manufacturer to determine inventory levels in excess of Sellers' forecasts).

"**Owned Real Estate**" means the real property owned by NNI and located in Bohemia, New York.

"**Partial Allocation**" has the meaning set forth in Section 2.2.7(b).

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patents**" includes all national (of any country of origin) and multinational statutory invention registrations, patents, patent applications, provisional patent applications, industrial designs, industrial models, and inventions (including any inventions disclosed in such patents and applications whether or not patentable), including all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, and all rights therein provided by multinational treaties or conventions.

37

**37**

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board auditing standards.

"Pension Trustees" means the trustees of the UK Defined Benefit Plan.

"Permitted Encumbrances" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP other than Liens that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP; (iii) with respect to the NGS Shares, the Liens contemplated by the Proxy Agreement; (iv) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (v) any other Liens set forth in Section 1.1(k) of the Sellers Disclosure Schedule; and (vi) zoning, entitlement, building and land use regulations, customary covenants, defects of title, easements, rights of way, restrictions and other similar charges or encumbrances which (A) do not impair in any material respect the use or value of the related assets in the Business as currently conducted or (B), with respect to the Owned Real Estate, if included among the Assets, are disclosed on existing title reports or surveys.

"Person" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"Personal Information" means information about an identifiable individual or other information that is subject to any Privacy Law and received, collected, used, stored, processed, disclosed or disposed of by the Sellers, including such information regarding individuals who are customers, suppliers, employees and agents of the Business, such as an individual's name, address, identification number, payment records, credit information, personal references and health records.

"Petition Date" has the meaning set forth in the recitals to this Agreement.

"Post-Closing Taxable Period" means any taxable period or portion thereof beginning after the Closing Date.

"Post-Signing Customer Contract" means a Customer Contract entered into after the date hereof.

38

"**Post-Signing Inclusion Criteria**" means the criteria described in Section 1.1(l) of the Sellers Disclosure Schedule.

"**PPF**" means the Pension Protection Fund created and operated in accordance with the UK Pensions Act 2004.

"**Pre-Closing Taxable Period**" means any taxable period or portion thereof ending on or prior to the Closing Date.

"**Pre-Signing Inclusion Criteria**" means the criteria described in Section 1.1(m) of the Sellers Disclosure Schedule.

"**Pre-Signing Customer Contract**" means a Customer Contract entered into prior to the date hereof.

"**Primary Party**" means (i) each of the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Privacy Laws**" means all applicable Laws of any Government Entity in any jurisdiction governing the receipt, collection, use, storage, processing, disclosure or disposal of information about an identifiable individual, including the Personal Information and Protection of Electronic Documents Act (Canada) and equivalent provincial legislation.

"**Product Volume Forecast**" has the meaning set forth in Section 5.36(c).

"**Products**" means those products that are manufactured by or on behalf of and/or marketed by the Business, as set forth in Section 1.1(n) of the Sellers Disclosure Schedule and all versions thereof that are supported as of the date hereof.

"**Proxy Agreement**" means the Proxy Agreement with respect to capital stock of NGS entered into on July 29, 2005, by and among NNC, NNI, NNI, NGS, James Frey, Thomas McInerney, Gregory Newbold and the United States Department of Defense.

"**Purchase Price**" has the meaning set forth in Section 2.2.1(a).

"**Purchase Price Adjustment Escrow Amount**" shall mean $30 million.

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Authorized Canadian Agent**" has the meaning set forth in Section 10.6(c).

"**Purchaser Employee Plan**" means any "employee benefit plan," whether or not in writing and whether covering a single individual or a group of individuals, within the meaning of Section 3(3) of ERISA and any other employee benefit plan, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred

39

<u>39</u>

compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, meal allowance plan, redundancy or severance plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferred Employees pursuant to this Agreement.

"**Purchaser Supply Agreement**" means an agreement between the Purchaser and/or any Designated Purchasers, on the one hand, and the relevant Sellers, on the other hand, governing the supply by the Purchaser and/or any Designated Purchasers to the relevant Sellers of certain products and services.

"**Qualified Expenditures**" has the meaning set forth in Section 6.6(b).

"**Real Estate Agreements**" means the leases, sub-leases or license agreements between the relevant Sellers, on the one hand, and the Purchaser or any Designated Purchasers, on the other hand, including the Subleases and the Direct Leases to be executed on or prior to the Closing, in the forms attached hereto as Exhibit N.

"**Real Estate Lease**" means any Seller Contract, Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease that is a lease, sublease, license or other agreements for occupancy of real estate.

"**Records Custodian**" means a Person of international reputation that is acceptable to the Purchaser and the Main Sellers, acting reasonably.

"**Registration Statement**" has the meaning set forth in Section 5.34(a).

"**Regulation S-X**" means Regulation S-X promulgated by the SEC as amended and in effect at the time in question.

"**Regulatory Approvals**" means the Antitrust Approvals and the ICA Approval.

"**Rejected Customer Contracts**" means, collectively, (i) the Rejected 365 SI/SP Contracts, (ii) Customer Contracts entered into prior to the Closing Date by an Excluded Seller that either (1) are entered into prior to the date hereof or (2) are entered into after the date hereof in the Ordinary Course and either enable termination without penalty with one-hundred eighty (180) days' notice or have a duration no longer than twelve (12) months following execution thereof, (iii) the Rejected Non-365 SI/SP Contracts, (iv) the Rejected Pre-Signing Customer Contracts, and (v) the Enterprise Portion of those Pre-Signing Bundled Contracts that the Purchaser does not agree to accept in subcontract or elects to replace with new Contracts

pursuant to Section 5.14(b) because the Enterprise Portion thereof does not meet the Pre-Signing Inclusion Criteria for Major Customer Contracts, in each case without giving effect to any material amendment or modification thereto entered into after the date hereof other than an amendment entered into in the Ordinary Course (x) prior to the Closing Date by an Excluded Seller that either enables termination without penalty with one-hundred eighty (180) days' notice or has a duration no longer than twelve (12) months following execution thereof or (y) by a Seller that does not materially expand the customer's rights under such agreement; provided that a Contract shall cease to be a Rejected Customer Contract upon the earliest of (A) the expiration of such Rejected Customer Contract (without giving effect to any extension of the term thereof other than at the option of the counterparty thereto), (B) the earliest date on which the relevant Seller or Seller Wholly-Owned Subsidiary or a Wholly-Owned Subsidiary of a Seller has the right to terminate such Contract without penalty or (C) the date on which such Contract is terminated by the counterparty thereto.

"Rejected Non-365 SI/SP Contracts" has the meaning set forth in Section 2.1.6(a)(i).

"Rejected Post-Signing Customer Contract" has the meaning set forth in Section 5.38(g).

"Rejected Pre-Signing Customer ContractContracts" has the meaning set forth in Section 5.38(f).

"Rejected 365 SI/SP Contracts" has the meaning set forth in Section 2.1.5(a)(i).

"Related -6 Liabilities" shall mean any material Tax Liability of a Company arising pursuant to Treasury Regulation Section 1.1502-6 (or any similar state, local, or foreign tax principles) and relating to the IRS Claim (or any similar claims by state, local or foreign taxing authorities).

"Relocation Costs" means all reasonable and actual out-of-pocket costs and expenses incurred for the relocation of the Business, the Transferred Employees, Assets and business operations to be acquired by Purchaser, including moving costs, reasonable legal fees incurred for the purpose of reviewing and negotiating leases, rental costs for temporary space, leasing commissions, and tenant improvement and fit-out costs (hard and soft costs); provided that Relocation Costs shall not include, among other items, any business interruption costs or other damages (actual, consequential or otherwise) incurred by the Purchaser or any other party and the Purchaser waives any and all rights to recover any such amounts from the Seller or its Affiliates in connection with any relocation hereunder; and provided further that the Purchaser shall consult with the Sellers prior to incurring any such costs and, with respect only to space to be utilized on a temporary basis by Purchaser or a Designated Purchaser prior to the relocation of Business, Transferred Employees, Assets and business operations to Equivalent Space, Purchaser shall be required to obtain the agreement of Sellers prior to incurring any particular costs subject to reimbursement by Sellers hereunder.

"Relocation Damages" means all costs, expenses and damages resulting from any relocation performed by the Sellers of the Assets, Employees and business operation following any rejection of a 365 Real Estate Lease after the Closing, including, without limitation, business interruption costs or other damages (actual, consequential or otherwise).

"Relocation Space" has the meaning set forth in Section 5.32(b).

"Remaining APAC Countries" means India, Indonesia, Malaysia, Australia, New Zealand, the Philippines, Singapore, Japan, Thailand, Vietnam, Pakistan, Egypt and the United Arab Emirates.

"Remaining CALA Countries" means Mexico, Chile, Argentina, Colombia, Peru and Trinidad and Tobago.

"Replacement Lease A" has the meaning set forth in Exhibit 5.28(g).

"RepresentativeRepresentatives" has the meaning set forth in Section 5.29.

"Respective Affiliates" has the meaning set forth in Section 10.16(c).

"Restricted Technical Records" means the Livelink database or any other similar database containing all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2007 and subsequent taxation years.

"Retirement Obligation Amount" means the amount of the actual unfunded obligations accrued in any period preceding the Closing Date that will be assumed by the Purchaser, a Designated Purchaser or an EMEA Designated Purchaser at Closing or, if the Asset Sale Election is not made, retained by any Company at Closing (i) under the plans set forth in Section 1.1(o)(i) of the Sellers Disclosure Schedule, or (ii) except with respect to the plans set forth in Section 1.1(o)(i) or Section 1.1(o)(ii) of the Sellers Disclosure Schedule, under a plan (including a non-U.S. plan) providing retirement or retiree welfare benefits of any Seller or EMEA Seller or any Company, in each case determined in accordance with GAAP. For purposes of this definition, an unfunded obligation (A) shall be deemed to be under a plan providing retirement or retiree welfare benefits (except as set forth in Section 1.1(o)(ii) of the Sellers Disclosure Schedule) to the extent it is required to be accounted for under FAS 87 (paragraphs 11, 72 and 73) or FAS 106 (paragraphs 16 and 85), and (B) shall not be taken into account to the extent it is (I) a Liability funded out of the EMEA Employment Escrow Account, (II) a Liability in respect of which there is, and to the extent of, a separate Purchase Price adjustment under this Agreement or the EMEA Asset Sale Agreement, and/or (III) a Liability for which Assets, EMEA Assets or assets of the Companies transferred to the Purchaser, a Designated Purchaser or an EMEA Designated Purchaser at Closing or retained by the Companies, in each case under Section 2.1.1(g) of this Agreement or Clause 2.1.6 of the EMEA Asset Sale Agreement, have been set aside as a funding source, to the extent of such funding.

"Reverse Termination Fee" has the meaning set forth in Section 9.3(a).shall mean a cash fee in an aggregate amount equal to (a) two hundred million dollars

42

**42**

($200,000,000) if (1) the conditions set forth in Section 8.1(a) of this Agreement or Clause 15.1.3 of the EMEA Asset Sale Agreement have not been satisfied and/or (2) the Regulatory Approvals require any divestitures, licenses or hold separate or similar arrangements or any material actions, undertakings or arrangements for the conduct of any business and/or terminating any relationships or contractual rights or obligations that Purchaser determines not to accept, and (b) one hundred million dollars ($100,000,000) in all other circumstances.

"**Satisfaction Date**" means the date one hundred and fifty (150) days after ~~the date of this Agreement.~~ July 20, 2009.

"**Schedule 1 Included Services**" has the meaning set forth in Section 5.36(a).

"**Scope Guidelines**" has the meaning set forth in Section 5.36(a).

"**SEC**" means the Securities and Exchange Commission.

"**Section 338(h)(10) Election**" has the meaning set forth in Section 6.5.

"**Section 5.25 Assets**" means (i) the assets, interests and rights of an Excluded Seller designated by the Purchaser as Excluded Assets in accordance with Section 5.25(a) and (ii) the assets, interests and rights of each such Person.

"**Section 5.25 Liability**" means all Liabilities to the extent arising from or related to a Section 5.25 Asset.

"**Securities Disclosure Documents**" has the meaning set forth in the first sentence of Article IV.

"**Security Deposits**" has the meaning set forth in Section 5.22(a)(i).

"**Selected Rejected Customer Contracts**" has the meaning set forth in Section 5.14(c).

"**Selected ~~Supplier~~Suppliers**" has the meaning set forth in Section 2.1.7(b).

"**Selected Supplier Other Non-365 Contract**" means any Other Non-365 Contract with a Selected Supplier.

"**Selected Supplier Other 365 Contract**" means any Other 365 Contract with a Selected Supplier.

"**Seller Acquisition**" has the meaning set forth in Section 5.33.

"**Seller Authorized Agents**" has the meaning set forth in Section 10.6(d).