(i)    negotiate in good faith with the relevant contract manufacturers to finalize the terms of the Contract Manufacturing Inventory Agreements based on the term sheet attached hereto as Exhibit B;

      (ii)   negotiate in good faith with the LGN Joint Venture the LGN/Korea Distribution Agreement and the LGN/Korea Supply Agreement, subject to the Sellers' production of sufficient information on the relevant entities and documents; and

      (iii)  negotiate in good faith with Uni-Nortel the Uni-Nortel Distribution Agreement, subject to the Sellers' production of sufficient information on the relevant entities and documents.

      (b)    The Parties and the EMEA Sellers acknowledge that, as of the date hereof, the Business entertains several bilateral relationships with other businesses, business segments or divisions of certain Sellers for the supply and/or development of products and services (including certain Products and Services). To the extent such relationships are required to be in place in order to fulfill customer commitments existing as of the Closing Date and which will continue thereafter (for the duration of any individual customer contract including frame contracts), the Primary Parties and the relevant EMEA Sellers shall use their reasonable best efforts to negotiate, or to cause to be negotiated, in good faith commercially reasonable terms in order to address the interdependencies among businesses set forth in Exhibit L, including through a potential Mutual Development Agreement, Purchaser Supply Agreement, Seller Supply Agreement or other appropriate commercial arrangements, and taking into account options available to the Primary Parties. The Primary Parties shall also use their reasonable best efforts to negotiate in good faith Subcontract Agreements.

      (c)    On or before the Closing, the relevant Parties shall enter into the Transition Services Agreement, the Intellectual Property License Agreement and the Trademark License Agreement, each in the form attached hereto.

      (d)    Within the earlier of (i) one hundred and five (105) days from the date hereof or (ii) thirty (30) Business Days prior to the Closing Date, the relevant Parties shall enter into the Loaned Employee Agreement in the form attached hereto as Exhibit J.

      SECTION 5.27.   Avoidance Actions.  The Sellers covenant that they shall not commence any action under sections 544 through 551, 553 and 558 of the U.S. Bankruptcy Code against any customer, contract party or vendor of the Business.

      SECTION 5.28.   Subleases.

      (a)    For each Assumed and Subleased Real Estate Lease designated to be subleased pursuant to Section 2.1.5(b) or Non-365 Subleased Real Estate Lease designated to be subleased pursuant to Section 2.1.6(b), the relevant Seller, as sublandlord, and Purchaser or a Designated Purchaser, as subtenant, will enter into a sublease in the form attached hereto as Exhibit N (each such sublease a "**Sublease**") at Closing with a term to expire one Business Day

<del>145</del>

**145**

prior to the scheduled expiration date of the applicable Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease (subject to the provisions of Section 5.31) with respect to the portion of the applicable property to be used by the Purchaser or a Designated Purchaser for the Business.

(b)     The Sellers and the Purchaser will cooperate to determine how to segregate and demise the subleased premises, including the size and configuration of space to be subleased to Purchaser or a Designated Purchaser (which shall, other than in the case of any Sublease relating to Lease A or Replacement Lease A (which shall be determined in accordance with Exhibit 5.28(g)) and any Sublease relating to Lease B (which shall be determined in accordance with Exhibit 2.1.5(b)(v)), be based upon the contemplated use of the demised premises and employee headcount reasonably agreed between Purchaser and Sellers on or prior to the Closing Date and shall also take into account the continued marketability and required contiguity of that portion of the premises to be subject to the related Sublease and the premises not to be subject to the related Sublease) and provide relevant information (subject to confidentiality limitations) on the subleased premises to the other provided that it is understood and agreed that all costs of such segregation and demising will be the sole responsibility of Purchaser (other than in the case of the Sublease relating to Replacement Lease A (which shall be determined in accordance with Exhibit 5.28(g)) and the Sublease relating to Lease C (which shall be determined in accordance with Exhibit 5.32(c)) and that Purchaser's plans and specifications therefor will be subject to Sellers' reasonable approval.

(c) ·     From and after the date hereof and subject in all cases to Section 5.28(d), Purchaser shall be permitted to contact and have reasonable access to any landlord under the Assumed and Subleased Real Estate Leases or Non-365 Subleased Real Estate Leases for the purpose of (x) negotiating a direct lease between such landlord and Purchaser or Designated Purchaser for all or a portion of the space covered or reasonably anticipated to be covered by the relevant Sublease, (y) recognition and non-disturbance protections for the benefit of Purchaser, and/or (z) leasing other space in the building to which the Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease relates (it being agreed that the leasing or subleasing of such other space shall not relieve Purchaser or a Designated Purchaser of its obligations in respect of the relevant Sublease) and for no other purpose. Seller shall cooperate with Purchaser or Designated Purchaser and use commercially reasonable efforts, without incurring any third-party costs, to assist Purchaser or Designated Purchaser in connection with such negotiations.

(d)     Purchaser's rights set forth in Section 5.28(c) shall be subject to applicable Law and the following conditions:

(i)     Seller and Purchaser or Designated Purchaser shall have reasonably agreed on a mutually acceptable strategy for negotiations with each landlord (including, without limitation, the ability of the Purchaser or a Designated Purchaser to enter into a direct lease for all or less than all of the space covered or reasonably anticipated to be covered by the relevant Sublease in lieu of

446

**146**

a Sublease) and the Main Sellers shall be afforded the right to participate in all such communications with the landlord to the extent that they wish to do so,

(ii)    neither any Seller nor Purchaser nor Designated Purchaser shall have any obligation to agree to any increase in any of its obligations under the applicable Assumed and Subleased Real Estate Lease, Non-365 Subleased Real Estate Lease or Sublease in connection with such discussions with the landlords,

(iii)    such negotiations shall be immediately terminated if they are having an adverse impact on the landlord-tenant relationship between the Sellers and such landlord, as determined by the Sellers in their reasonable discretion,

(iv)    the Sellers shall have no obligations under or with respect to such direct lease negotiated by Purchaser or any Designated Purchaser, and

(v)    neither Purchaser nor any Designated Purchaser shall be permitted to enter into a direct lease without obtaining NNI's prior written consent, which consent may be granted or withheld in the Seller's sole discretion, unless:

(A)    there is no modification to the terms of the related Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease that is adverse to the Sellers in connection with the entry into such direct lease,

(B)    the Sellers shall not be obligated to pay any fees, penalties or other charges in connection with the entry into the direct lease by the Purchasers or the Designated Purchaser,

(C)    Sellers are fully and finally released from all obligations and liability to such landlord and any other parties with respect to the space subject to the direct lease, and

(D)    either (x) all, but not less than all, of the space covered or reasonably anticipated to be covered by the relevant Sublease is subject to such direct lease or (y) if such proposed direct lease covers less than all of the space covered or reasonably expected to be covered by the relevant Sublease then (A) the remainder of such space (taking into account the relevant loss factors and all common area cost allocation) is expressly removed from the demised premises for all purposes covered by the relevant Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease and the rent and additional rent obligations of Seller is reduced accordingly and (B) the demised premises which thereafter remain subject to a Seller's Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease is not divided into two or more non-contiguous portions and is not less marketable than it was prior to Purchaser's or Designated Purchaser's entry into such direct lease.

(e)     After the Closing, the subtenant under each Sublease shall also be permitted to have contact with the landlord under the related Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease on routine facilities maintenance matters, and the applicable sublandlord will reasonably cooperate with such subtenant, at Purchaser's expense, to enforce the obligations of such landlord under the applicable Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease.

(f)     With respect to the Sublease of property located at Belleville, Ontario, the Sellers agree that they will not exercise any options to extend the applicable Non-365 Subleased Real Estate Lease related thereto and the Purchaser or a Designated Purchaser will in its sole discretion be permitted to negotiate a direct lease with the landlord with respect to the time after the expiration of the term of the applicable Non-365 Subleased Real Estate Lease and Sellers shall have no obligations under or with respect to such direct lease.

(g)     Notwithstanding any provision of this Agreement to the contrary, Purchaser (on behalf of itself and any Designated Purchaser) and Sellers agree to be bound by and comply with the terms set forth in Exhibit 5.28(g) with respect to the 365 Real Estate Lease identified as "Lease A" in Section 2.1.5(b)(iii) of the Sellers Disclosure Schedule and the "Replacement Lease A" identified in such Exhibit 5.28(g).

SECTION 5.29.   Competing Transaction.   From the date of this Agreement until the entry of the U.S. Bidding Procedures Order, and from the date of the conclusion of the Auction (as defined in the U.S. Bidding Procedures Order) until the Closing Date or termination of this Agreement, neither any Seller nor any Affiliate of any Seller shall, directly or indirectly through any of its officers, directors, employees, agents, professional advisors or other representatives (collectively, the "Representatives"), (i) solicit, initiate or encourage or engage in discussions or negotiations with respect to any proposal or offer from any Person (other than the Purchaser or its affiliates) relating to in each case any acquisition, divestiture, recapitalization, business combination or reorganization of or involving all or a substantial part of the business and operations of the Business (a "Competing Transaction"), (ii) furnish any information with respect to, or participate in, or assist, any effort or attempt by any Person to do or seek the foregoing, (iii) execute any letter of intent or agreement providing for a Competing Transaction, or (iv) seek or support Bankruptcy Court approval of a motion or Order inconsistent with the transactions contemplated herein (provided, however, that nothing contained herein shall prohibit the Sellers from providing any Person with the Bidding Procedures and related documents, answering questions about the Bidding Procedures or announcing the execution of this Agreement or the Auction). Notwithstanding the foregoing, from the date of this Agreement until the entry of the U.S. Bidding Procedures Order, the Sellers may provide continued access to written due diligence materials about the Business in an electronic data room (including written responses to requests for information made after the date hereof), to only such Person or Persons that (A) have access to such electronic data room as of the date hereof and (B) have satisfied the requirements of paragraph (a) of the "Participation Requirements" of the U.S. Bidding Procedures Order within ten (10) Business Days from the date hereof (it being understood that, during such ten (10) Business Day period, the Sellers will be allowed to (x) request such Persons to enter into amendments to their existing confidentiality agreements in order to render them

compliant with the requirements of the U.S. Bidding Procedures, (y) discuss and negotiate such amendments with those Persons and (z) execute such amendments, and each such action shall not constitute a breach of this Section 5.29); provided, however, that the Sellers must provide the Purchaser at least equivalent access to all such written due diligence materials. Without prejudice to any other methods or actions that may result in the cure of any breach of this Section 5.29, the Parties acknowledge and agree that in the event that any officer or other employee of any Seller acting alone (without the assistance of outside advisors) in violation of a corporate policy approved by the board of directors of NNC takes an action that constitutes a breach of clause (i) of this Section 5.29 but does not constitute a breach of any other clause of this Section 5.29, such breach shall be deemed cured in the event such action ceases and one or more of the Sellers notifies the counterparty or counterparties to the potential Competing Transaction in writing that the Sellers will not undertake such Competing Transaction, in each case no later than the fifth (5th) day after the Sellers become aware of such breach (for such purposes excluding the knowledge of the employee or officer whose action constitutes such breach), provided that such action that constituted the breach did not involve substantive negotiations regarding the terms of such Competing Transaction.

SECTION 5.30.    Direct Leases.

    (a)    For each of the properties owned in fee by the Sellers identified on Section 5.30(a) of the Sellers Disclosure Schedule (the "**Direct Lease Real Estate**"), Purchaser agrees that the relevant Seller and Purchaser or a Designated Purchaser will enter into a lease on fair market terms for a term of 3 years and otherwise in substantially the form attached hereto as Exhibit N (the "**Direct Leases**") and a notice of lease with respect thereto for recording in the registry of deeds to the extent possible in each relevant jurisdiction (the "**Notices of Lease**") with respect to the portion of the Direct Lease Real Estate to be leased by the Purchaser or a Designated Purchaser for the Business.

    (b)    ~~The Purchaser will have until the relevant Contract Designation Date to elect to have the Purchaser or a Designated Purchaser enter into a Direct Lease with the relevant Seller at Closing with respect to any properties identified in Section 5.30(b) of the Sellers Disclosure Schedule or with respect to the Owned Real Estate. Following any election, prior to the relevant Contract Designation Date, by Purchaser to enter into a Direct Lease with respect to the Owned Real Estate or a property identified in such Section 5.30(b), the Owned Real Estate or such site, as applicable, shall thereafter be deemed included among the Direct Lease Real Estate for all purposes hereunder. It is understood that the Purchaser shall be entitled, by written notice to NNI to elect to remove entirely any Direct Lease Real Estate which had therefore been set forth in Section 5.30 of the Sellers Disclosure Schedule prior to the applicable Contract Designation Date.~~ **Reserved.**

    (c)    The Sellers' obligation to make any Direct Lease Real Estate available to the Purchaser or a Designated Purchaser, either at Closing or during the term of a Direct Lease, shall be subject to the Sellers' right to implement their global real estate strategy, as such strategy develops over time, and, in connection therewith, to dispose of or retain Direct Lease Real Estate as the Sellers deem appropriate in their sole discretion, either, at Sellers' election,

-149

<u>149</u>

subject to the related Direct Lease or, in accordance with the requirements of this Section 5.30(c), free and clear of the same. Sellers shall give Purchaser or a Designated Purchaser reasonable prior notice, not less than the number of days specified in Section 5.30(a) or 5.30(b), as applicable, of the Sellers Disclosure Schedule with respect to such property, of any such disposition of Direct Lease Real Estate, and Purchasers shall be permitted to remain at such property under the terms of the Direct Lease until the end of the notice period. Sellers' only liability to the Purchaser or any other party in the event that any Direct Lease Real Estate with respect to which Purchaser has, prior to the relevant Contract Designation Date, elected to enter into a Direct Lease is not made available at Closing or, following entry into a Direct Lease, the relevant Seller terminates such Direct Lease in order to sell or otherwise disposes of such Direct Lease Real Estate free and clear of such Direct Lease shall be to pay the Relocation Costs of Purchaser or Designated Purchaser relating to the relocation of all Assets and business operations required as a result of such sale or other disposition. To the extent that the relevant Seller sells or otherwise disposes of any Direct Lease Real Estate with respect to which Purchaser has, prior to the relevant Contract Designation Date, elected to enter into a Direct Lease prior to Closing, the relevant Seller and Purchaser or a Designated Purchaser shall further comply with the requirements of clauses (ii), (iii) and (v) of Section 5.31(g) relating to Mission Critical Leases, to the extent applicable.

(d) Sellers and Purchaser will cooperate to determine how to segregate and demise the leased premises to Purchaser or a Designated Purchaser (which shall be based upon the contemplated use of the demised premises and employee headcount reasonably agreed between Purchaser and Sellers on or prior to the Closing Date and shall also take into account the continued marketability and required contiguity of those portions of such Direct Lease Real Estate to be subject and not to be subject, respectively, to the related Direct Lease) and provide relevant information (subject to confidentiality limitations) on the Direct Lease Real Estate to the other provided that it is understood and agreed that all costs of such segregation and demising will be the sole responsibility of Purchaser and that Purchaser's plans and specifications therefor will be subject to Sellers' reasonable approval.

SECTION 5.31. Rejection and Expiration of Real Estate Leases.

(a) Notwithstanding any provision of this Agreement to the contrary, it is understood and agreed that the Sellers' obligations to (i) assign any 365 Real Estate Lease to the Purchaser or a Designated Purchaser and (ii) enter into or continue to sublease pursuant to a Sublease under any Assumed and Subleased Real Estate Lease (the "Conditional Subleases") shall be subject to the Sellers' right to reject such 365 Real Estate Lease (including Assumed and Subleased Real Estate Leases) at any time on or before the Latest Lease Rejection Date, except, only in the event the Purchaser exercises its election under Section 2.1.5(b)(v) to remove all Assets, Employees and operations relating to the Business from the premises covered by the Lease identified as Lease B on Section 2.1.5(b)(iii) of the Sellers Disclosure Schedule, which is governed by Section 2.1.5(b)(v). The Sellers may exercise such right to reject any 365 Real Estate Lease and, as applicable, either be relieved of their obligation to assign such 365 Real Estate Lease to the Purchaser or a Designated Purchaser or terminate, or be relieved of their obligation to enter, the related Conditional Sublease at any time following the execution of this

Agreement, including, as applicable, following the execution of such Conditional Sublease with the Purchaser or a Designated Purchaser (provided that after Closing, the Sellers will not reject any 365 Real Estate Leases that are Assumed and Assigned Contracts).

(b) In each instance in which a Seller on or before the applicable Latest Lease Rejection Date, in its sole discretion, rejects a 365 Real Estate Lease that Sellers would otherwise be obligated to assign to the Purchaser or a Designated Purchaser or under which Sellers would otherwise be obligated to enter into a Sublease,

(i) Sellers will provide Purchaser a copy of the rejection notice delivered to the relevant landlord; provided that no failure to provide any such copy shall impair or impact the effectiveness of such rejection;

(ii) except as provided in Section 5.31(g) with respect to Relocation Costs, no reimbursements for any costs, expenses or damages shall be payable by any Seller or any of their Affiliates to Purchaser, any Designated Purchaser, any of their Affiliates or any other Person as a result of such rejection; provided that if the Seller performs the relocation of Assets, Employees or business operations in connection with any such rejection occurring after the Closing that, individually or in the aggregate with other relocations, has a Material Adverse Effect, then, to the extent that such Material Adverse Effect resulted from Seller's gross negligence in performing such relocation, Seller shall be responsible for the Relocation Damages resulting therefrom;

(iii) Sellers agree that such rejection shall only be effective (except with respect to Mission Critical Leases, as to which the terms of Section 5.31(g) shall apply) upon reasonable prior notice to Purchaser from Sellers, no less than ten days following Sellers' notification to Purchaser of the same, and termination of the related Conditional Sublease (as applicable) shall be effective upon reasonable prior notice from Sellers, no less than nine days following Sellers' notification to Purchaser of the same; provided, however, that any rejection of the 365 Real Estate Lease identified in Section 2.1.5(b)(iv)(B) of the Sellers Disclosure Schedule shall only be effective, to the extent that such 365 Real Estate Lease becomes an Assumed and Subleased Real Estate Lease hereunder, on not less than one year notice;

(iv) Purchaser shall be relieved of its obligation to accept assignment or enter into a Sublease with respect to the applicable 365 Real Estate Lease; and

(v) the Sellers will cooperate with Purchaser or a Designated Purchaser and use commercially reasonable efforts, in each instance, to minimize the disruption to the affected business operations as a result of any rejections.

(c) If the rejection is effective on or prior to Closing, Seller will give Purchaser access to the subject premises for not less than ten (10) Business Days after receipt of the rejection notice to identify any Assets acquired hereunder located at the subject premises.

151

**151**

The Sellers agree that they will remove and store such Assets at the Seller's sole cost and expense until delivery to the Purchaser or a Designated Purchaser at Closing (it being understood that the Sellers shall not be obligated to remove trade fixtures or fixtures, furniture, furnishings or fittings from any such real property or to store the same or to deliver the same at any point to the Purchaser or a Designated Purchaser at Closing unless the same are included in the Assets and are specifically identified by Purchaser for removal). It is further understood that transfer of the Assets stored in accordance herewith may be made by delivery of a receipt from any warehouse or storage facility entitling the Purchaser or a Designated Purchaser to retrieve all such Assets and the Purchaser or a Designated Purchaser shall be responsible for the cost of delivering such Assets to the Purchaser or a Designated Purchaser on or after the Closing Date. In the event the Purchaser fails to identify any Assets within ten (10) Business Days that it wishes to have stored within the above time frame, the Sellers shall be entitled to abandon or otherwise dispose of such Assets in their sole discretion without any liability to Purchaser.

(d)    If a rejection of an Assumed and Subleased Real Estate Lease is effective after Closing, subject to the provisions of Section 5.31(g) with respect to Mission Critical Leases, the Purchaser agrees to, or to cause a Designated Purchaser to, vacate the premises which are subject to such Conditional Sublease in conformance with the requirements of the relevant Assumed and Subleased Real Estate Lease and as otherwise required by such Conditional Sublease.

(e)    In connection with any 365 Real Estate Lease as to which the Sellers give a notice of rejection, at the Purchaser's option and written request and sole cost and expense exercised within ten (10) Business Days following receipt of the rejection notice referred to above, the Sellers will reasonably cooperate (without incurring any third-party costs) with the Purchaser's efforts to enter into a new lease with respect to all of the subject premises directly with the relevant landlord (it being agreed that Sellers shall have no obligations under or with respect to any such direct lease). Purchaser further acknowledges that the Sellers have requested the agreement of the landlord under each Designated 365 Real Estate Lease and Assumed and Subleased Real Estate Lease to an extension of the relevant Latest Lease Rejection Date to a date beyond the latest date when the parties estimate a Closing might reasonably occur, provided that it is agreed that, other than for Mission Critical Leases:

(i)    should any such landlord agree to such extension, then at Purchaser's election exercised within ten (10) Business Days following notice by Sellers of such extension and Sellers' intention to reject, the applicable 365 Real Estate Lease will be deemed an Assumed and Assigned Lease and Purchaser shall take an assignment of such 365 Real Estate Lease at Closing (regardless of whether such lease was designated as of the date hereof for assignment or for entry into a Sublease) and Purchaser shall pay Sellers, irrespective of whether Closing subsequently occurs, (A) at the time of such agreement by landlord, one hundred percent (100%) of any extension or option fees imposed by such landlord or otherwise payable by Sellers and (B) prior to the date upon which any such payments are due to landlord, fifty percent (50%) of all of Sellers' actual, out of pocket rent and other occupancy costs under such 365 Real Estate Lease through

Closing (regardless of whether all such space is used by the Business as of the date of this Agreement); and

(ii)    should such landlord refuse to agree to such extension, or if Closing does not occur on or before the Latest Lease Rejection Date as extended, or if Purchaser elects not to take an assignment of such 365 Real Estate Lease, Sellers shall be free to reject such 365 Real Estate Lease in accordance with the provisions set forth above.

(f)    In the case of Real Estate Leases scheduled to expire prior to the Closing that the Sellers are not otherwise planning to extend, at the request of the Purchaser or a Designated Purchaser, the Sellers will use commercially reasonable efforts, without incurring third party costs, to obtain the agreement of the relevant landlord to a short-term extension of the relevant lease expiration date to a date beyond the latest date when the parties estimate a Closing might reasonably occur, provided it is agreed that:

(i)    should such landlord agree to such extension, Purchaser or a Designated Purchaser shall take an assignment of such Real Estate Lease at Closing (regardless of whether such lease was designated as of the date hereof for assignment or for entry into a Sublease) and Purchaser shall pay Sellers, irrespective of whether Closing subsequently occurs,  (A) at the time of such agreement by landlord, one hundred percent (100%) of any extension option fees, increased rent or other increased occupancy costs imposed by such landlord or otherwise payable by Sellers and (B) prior to the date upon which any such payments are due to landlord, fifty percent (50%) of all of Sellers' actual, out of pocket rent and other occupancy costs (without taking into account any increased charges which are the subject of (A) above) under such 365 Real Estate Lease through Closing (regardless of whether all such space is used by the Business as of the date of this Agreement); and

(ii)    should such landlord refuse to agree to such extension, or if Closing does not occur on or before the extended expiration date of such lease, Sellers shall be free to allow such lease to expire.

(g)    Notwithstanding anything to the contrary in this Agreement, if the Sellers elect to reject any Designated 365 Real Estate Lease or Assumed and Subleased Real Estate Lease identified in Section 5.31(g) of the Sellers Disclosure Schedule (collectively, the "**Mission Critical Leases**"),

(i)    in the case of any rejection which is to be effective prior to Closing, Sellers will give Purchaser or a Designated Purchaser reasonable prior notice, not less than thirty (30) days subject to Sellers' obligations pursuant to Section 5.31(g)(v) (subject to Sellers' obligation to comply with their covenant in Section 5.31(g)(ii)), of their intent to reject such Mission Critical Lease and will provide Purchaser or such Designated Purchaser a copy of the rejection notice;

provided that no failure to provide any such notice or copy shall impair or impact the effectiveness of such rejection;

(ii) in the case of any rejection which is to be effective prior to Closing, the relevant Seller and the Purchaser or a Designated Purchaser shall convene to discuss and agree on a mutually acceptable strategy for negotiating and entering into an Equivalent Lease for Equivalent Space, including without limitation determining whether a Seller or the Purchaser will be the tenant under such Equivalent Lease, which party will enter into a lease, sublease or other arrangement for temporary space, which may include corporate office sharing, home-basing or other similar alternative arrangements (each, a "Temporary Lease"), and which party will be primarily responsible for the negotiations of the Equivalent Lease and/or the Temporary Lease. Both parties will have a reasonable opportunity to participate in the negotiations for the Temporary Lease and the Equivalent Lease. If a Temporary Lease is to be entered into, it will be sufficient, throughout the temporary occupancy period and until the Purchaser or a Designated Purchaser is able to commence operations at the Equivalent Space, to reasonably continue operation of the Business conducted at the property subject to the rejected Mission Critical Lease in the manner in which the same is conducted at such property on the date of this Agreement, taking into account the agreement of Purchaser and Sellers to minimize the costs associated with outfitting such alternative temporary space. If the Sellers enter into an Equivalent Lease or a Temporary Lease, such Equivalent Lease or Temporary Lease shall, following its execution, be deemed an Included Real Estate Lease for all purposes hereunder and shall be assigned to the Purchaser or a Designated Purchaser at Closing. If the Purchaser or a Designated Purchaser enters into an Equivalent Lease or a Temporary Lease prior to Closing, the Purchaser or a Designated Purchaser and the Sellers will enter into a sublease thereof on terms to be reasonably agreed between the parties (it being understood that the occupancy costs under such sublease shall be set so that Purchaser is merely passing through such costs under such Equivalent Lease or Temporary Lease) for the term of the Equivalent Lease or Temporary Lease, with respect to the property covered by such Equivalent Lease or Temporary Lease, provided that (A) the Sellers will post a letter of credit covering the rent and other occupancy costs due under such sublease during the term thereof, (B) the sublease will provide that it will terminate at the Closing, if the Closing occurs, and (C) nothing herein shall be construed to require either party to enter into or assume any liability with respect to an Equivalent Lease or any sublease thereunder prior to Closing so long as other means of reasonably continuing operation of the Business conducted at the property subject to the rejected Mission Critical Lease substantially in the manner in which the same is conducted at such property on the date of this Agreement are available including but not limited to entry into a Temporary Lease prior to Closing followed by entry into an Equivalent Lease following Closing;

154

(iii)    in the case of any rejection which is to be effective prior to
Closing, the Sellers shall relocate the Assets, Employees and business operations
at their sole cost and expense from the property subject to the rejected Mission
Critical lease into the property subject to the Temporary Lease or into the
Equivalent Space on or prior to the effective date of the rejection in such a
manner as to reasonably permit the continued operation of the Business conducted
at the property subject to the rejected Mission Critical Lease. If a Temporary
Lease is entered into, the Sellers will relocate the Assets, Employees and business
operations at their sole cost and expense from the property subject to the
Temporary Lease into the Property subject to Equivalent Space. The occupancy
and operating costs under the Temporary Lease or Equivalent Lease and the
property subject thereto shall be borne by Sellers for all periods up to the Closing
Date, either directly, if the Sellers enter into such Temporary Lease or Equivalent
Lease, or via a sublease as described above, if the Purchaser enters into such
Temporary Lease or Equivalent Lease. If such Temporary Lease remains in place
after the Closing Date, the occupancy and operating costs under the Temporary
Lease and the property subject thereto for the period after Closing shall be borne
exclusively by Purchaser, unless and until Purchaser has entered into and
commenced paying rent and occupancy costs on an Equivalent Lease, in which
case the Sellers shall pay fifty percent (50%) of the rent and occupancy costs
under the Temporary Lease for six months commencing on the date on which
Purchaser commences monthly rental payments under the Equivalent Lease. If
such Temporary Lease remains in effect after the Closing, Purchaser shall
diligently pursue its procurement of Equivalent Space to which to relocate the
Assets, Employees and business operations subject to the terms of this Section
5.31(g);

(iv)    in the case of any rejection which is to be effective prior to
Closing, the Sellers shall pay all Relocation Costs of Purchaser or Designated
Purchaser relating to the relocation of all Assets, Employees and business
operations required as a result of said rejection, including without limitation any
relocation of all Assets, Employees and business operations from the property
subject to the rejected Mission Critical Lease to the property subject to the
Temporary Lease and, thereafter, to Equivalent Space; provided that Sellers shall
not be required to compensate Purchaser or any other party for any other amounts
or damages of any kind in connection with such relocation except as expressly set
forth in Section 5.31(b)(ii), including but not limited to as a result of any
difference in the economic terms of the rejected Mission Critical Lease and any
new Equivalent Lease entered into by Purchaser or an Affiliate of Purchaser;

(v)    the Sellers shall cooperate with Purchaser or a Designated
Purchaser and use reasonable efforts, in each instance to minimize the disruption
to the affected business operations as a result of such relocation;

(vi)    notwithstanding the foregoing, if the Sellers elect to reject, effective on or after the Closing Date, a Mission Critical Lease, (A) the Sellers will give the Purchaser or a Designated Purchaser reasonable (but in no event less than thirty (30) days) prior notice (provided that thirty (30) days is sufficient notice for Sellers to comply with their covenant in Section 5.31(g)(v)), of their intent to reject such Mission Critical Lease and will provide the Purchaser or such Designated Purchaser a copy of the rejection notice (provided that no failure to provide any such notice or copy shall impair or impact the effectiveness of such rejection), (B) the Seller and the Purchaser or a Designated Purchaser shall convene to discuss and agree on a mutually acceptable strategy for negotiating a lease for Equivalent Space, (C) the Purchaser or such Designated Purchaser and the Sellers shall cooperate to make arrangements for securing Equivalent Space and the relocation of all Assets and business operations thereto, (D) the Seller shall cooperate with Purchaser or a Designated Purchaser and use commercially reasonable efforts, in each instance to minimize the disruption to the affected business operation as a result of such relocation, and (E) the Sellers shall pay all Relocation Costs of the Purchaser or such Designated Purchaser relating to the relocation to Equivalent Space of all Assets, Employees and business operations required as a result of said rejection, including without limitation any relocation of all Assets, Employees and business operations from the property subject to the rejected Mission Critical Lease to the property subject to the Temporary Lease and, thereafter, to Equivalent Space; provided that Sellers shall not be required to compensate Purchaser or any other party for any other amounts, including but not limited to as a result of any difference in the economic terms of the rejected Mission Critical Lease and any new lease entered into by Purchaser or an Affiliate of Purchaser; and provided further if Purchaser has commenced paying rent and occupancy costs on a lease for Equivalent Space, Sellers shall be obligated to pay fifty percent (50%) of the rent and occupancy costs under the related Temporary Lease, if applicable, for six months commencing on the date on which Purchaser commences monthly rental payments under the lease for Equivalent Space. If Purchaser or an Affiliate of Purchaser enters into a Temporary Lease following a rejection, effective on or after the Closing Date, of a Mission Critical Lease, Purchaser shall diligently pursue its procurement of Equivalent Space to which to relocate the Assets, Employees and business operations subject to the terms of this Section 5.31(g);

(vii)    if the Sellers elect to reject Lease C, the provisions of Exhibit 5.32(c) shall apply in addition to the provisions of this Section 5.31(g).

Notwithstanding the foregoing, if Purchaser elects, pursuant to Section 2.1.5(b)(v), neither to take an Assignment of Lease B nor to remove all Assets, Employees, and operations relating to the Business from the premises covered by such Lease B and Sellers elect to reject Lease B, Purchaser agrees that Sellers' obligation to pay Relocation Costs of Purchaser or Designated Purchaser shall be limited to the relocation of Assets, Employees and business operations located as of the date of this Agreement in the premises indicated in Exhibit 2.1.5(b)(v).

156

156

(h)     If the relevant landlord has refused to provide its required Consent to a Sublease under a Mission Critical Lease or does not respond to a request for such Consent, then the Sellers shall pay all Relocation Costs of Purchaser or Designated Purchaser relating to the relocation of all Assets and business operations required as a result of Seller's inability to enter into such Sublease; provided that Sellers shall not be required to pay any Relocation Costs of Purchaser or any other party in any instance where a landlord under a Mission Critical Lease has refused to deliver a required Consent as a result of Purchaser's or a Designated Purchaser's refusal or other failure to comply with the provisions of Section 5.4 of the Sellers Disclosure Schedule; and provided further that Sellers shall not be required to compensate Purchaser or any other party for any other amounts, including but not limited to as a result of any difference in the economic terms of the relevant Mission Critical Lease and any new lease entered into by Purchaser or an Affiliate of Purchaser and provided further that Sellers and Purchaser or a Designated Purchaser shall be obligated to comply with the requirements of Section 5.13 prior to the completion of such relocation.

SECTION 5.32.   Restructure of Leases.

(a)     The Purchaser acknowledges that the Sellers have commenced negotiations with certain of the landlords under certain 365 Real Estate Leases and Non-365 Real Estate Leases with the intention of agreeing to modifications of such Real Estate Leases. The Purchaser agrees that the Sellers shall be permitted to restructure the 365 Real Estate Leases and the Non-365 Real Estate Leases, including to reduce the size of the premises demised thereby and to vacate one or more buildings covered by single Real Estate Leases, and, in connection therewith, at the Sellers' sole cost and expense, to relocate applicable Employees, Assets and business operations within the facilities subject to such Real Estate Leases (including, in the case of Sellers' operations at the C Campus as defined in Section 5.32(e) of the Sellers Disclosure Schedule, relocation of Employees, Assets and business operations between facilities covered by separate Real Estate Leases) so long as:

(i)     the space made available to the Purchaser at Closing under such Real Estate Lease contains usable and rentable square footage sufficient to reasonably support the contemplated use of the demised premises and employee headcount reasonably agreed between Purchaser and Sellers on or prior to the Closing Date and to conduct the Business at such premises in a manner substantially similar to the manner conducted at such premises (and any adjacent premises from which Employees, Assets and business operations are being transferred) as of the date hereof and such space is not divided into two or more non-contiguous portions,

(ii)     upon Purchaser's request, the relevant Seller and the Purchaser shall convene to discuss and agree on a mutually acceptable strategy for approaching such negotiations with the relevant landlord and Purchaser shall provide the relevant Seller with a detailed description of its contemplated use of

157

**157**

the premises and employee headcount and space needs (subject to reasonable confidentiality limitations),

(iii)     the occupancy costs or security deposit to the Purchaser or a Designated Purchaser at such real property shall not be increased in any material respect over what they would be in the absence of such amendment of such Real Estate Leases, it being agreed specifically that Purchaser or a Designated Purchaser shall be subject to no increased security deposit requirements as a result of such amendment,

(iv)     the Sellers shall pay all Relocation Costs of the Purchaser or Designated Purchaser relating to the relocation required as a result of said restructuring,

(v)     except as provided in Section 5.32(a)(iv) with respect to Relocation Costs, no reimbursements for any costs, expenses or damages shall be payable by any Seller or any of their Affiliates to Purchaser, any Designated Purchaser, any of their Affiliates or any other Person as a result of such restructuring; provided that if the Seller performs the relocation of Assets, Employees or business operations in connection with any such restructuring occurring after the Closing that, individually or in the aggregate with other relocations, has a Material Adverse Effect, then to the extent that such Material Adverse Effect resulted from Seller's gross negligence in performing such relocation, Seller shall be responsible for the Relocation Damages resulting therefrom; and

(vi)     the Sellers shall cooperate with Purchaser or a Designated Purchaser and use reasonable efforts, in each instance, to minimize the disruption to the affected business operations as a result of such relocation.

(b)     In the event that Sellers have not, prior to Closing, completed the consolidation of operations at any premises pursuant to a restructure of an Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease, the relevant Seller and Purchaser or Designated Purchaser shall enter into the contemplated Sublease on the Closing Date but, prior to the completion of such consolidation, such Seller shall make available in lieu of the premises which are to be the subject of such Sublease alternative space at the same facility designated by such Seller (the "Relocation Space") in a notice given to Purchaser or Designated Purchaser from which the impacted business operations can be conducted. The Relocation Space shall be reasonably comparable to the premises which are the subject of such Sublease with respect to internal configuration, quality of finish and rentable square foot area (i.e., plus or minus ten (10%) percent). Such Seller shall, at such Seller's cost and expense, complete the build-out of the premises which are to be the subject of the Sublease and, following the same, remove and reinstall Purchaser's or Designated Purchaser's personal property, trade fixtures and equipment in such premises as promptly as reasonably practicable provided that Purchaser or Designated Purchaser cooperates with such Seller and gives such Seller full access to the

<del>158</del>

<u>158</u>

premises which are to be the subject of such Sublease in order to facilitate the performance of such required work. During such entire period, Purchaser or Designated Purchaser shall be obligated to pay all rent and additional rent required under the terms of such Sublease but not with respect to the Relocation Space, regardless of whether Purchaser or Designated Purchaser is then occupying the premises which are to be the subject thereof.

(c)     The Sellers shall consolidate the C Campus (as defined in Section 5.32(c) of the Sellers Disclosure Schedule) in accordance with the provisions of Exhibit 5.32(c), subject to the rights of the Sellers in Section 5.31.

SECTION 5.33.  Non-Compete.  Except as permitted pursuant to Section 5.25(b) with respect to any Excluded Sellers, for a period of three (3) years from and after the Closing Date, none of the Sellers shall, or shall permit or cause any of their Wholly-Owned Subsidiaries to, (i) sell a product or service competitive with any product or service contemplated in the definition of the Business in any geographic area in which the Business is conducted on the date hereof (unless purchased from the Purchaser or a Designated Purchaser), or (ii) acquire or hold voting securities of any Person that is engaged in a business competitive with the Business as conducted on the date hereof, provided that the foregoing restrictions shall not prohibit or restrict (a) performance by the Sellers or a Seller Wholly-Owned Subsidiary under the Rejected Customer Contracts, through the subcontract arrangement contemplated by Section 5.14(b) or 5.14(c), as applicable, if such arrangement is entered into pursuant to the provisions therein, or otherwise if such arrangement is not entered into or, with respect to NNSA, performance by NNSA of the Contract listed on Schedule 5.33 to the extent such Contract shall not transfer to the Purchaser or any Designated Purchaser, (b) the acquisition or holding of a passive investment in up to 5% of the outstanding stock of a corporation that does not give such Seller or Wholly-Owned Subsidiary of such Seller the right to appoint directors or management of such Person or to otherwise exercise control over the management of such Person, (c) the passive holding of the securities any of the Sellers owns as of the date hereof and the holding of the equity interests in the joint ventures listed in Section 1.1(a) of the Sellers Disclosure Schedule that the Sellers own as of the date hereof or (d) the sale of Sellers' Converging Products. In the event that any Seller or any Wholly-Owned Subsidiary of any Seller is acquired by, merged with or otherwise combined with (whether in a single transaction or a series of related transactions or whether structured as an acquisition of assets, securities or otherwise) (any such transaction, a "Seller Acquisition") any other Person (an "Acquiring Person"), the provisions of this Section 5.33 shall not restrict the ability of the Acquiring Person or its Affiliates to continue to operate the type of business or own the type of assets that they respectively operated or owned prior to the Seller Acquisition. If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section 5.33 is invalid or unenforceable, the parties hereto agree that the court making the determination of invalidity or unenforceability will have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement will be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

159

SECTION 5.34.   Financial Statements.

(a)     Subject to the last sentence of this Section 5.34(a), the Main Sellers shall
provide the Audited Financial Statements and the Audited 2009 Interim Financial Statements to
the Purchaser as promptly as reasonably practicable, but in any event no later than (i) July 31,
2009, in the case of the Audited Financial Statements and, (ii) subject to Section 5.34(b),
December 7, 2009 in the case of the Audited 2009 Interim Financial Statements. Subject to the
last sentence of this Section 5.34(a), all Unaudited Interim Financial Statements with respect to
periods ending prior to the Closing Date shall be delivered as follows: (a) (i) by August 29,
2009, in the case of the June 30, 2009 Unaudited Interim Financial Statements and the income
statement information for the quarter ended December 31, 2008, (ii) if (A) the Registration
Statement is not effective or the Closing Date is on or after November 5, 2009 and (B) the
waiver request referred to in Section 5.34(b) is granted by the SEC, by November 29, 2009, in
the case of the September 30, 2009 Unaudited Interim Financial Statements, and (iii and (ii) if
the Registration Statement is not effective or the Closing Date is on or after May 11, 2010, by
May 30, 2010 in the case of the March 31, 2010 Unaudited Interim Financial Statements.
Notwithstanding the foregoing or any other provision of this Section 5.34, and in any event, the
Main Sellers shall deliver to the Purchaser prior to the Closing all Audited Financial Statements,
Audited 2009 Interim Financial Statements, Additional Audited 2009 Financial Statements and
all Unaudited Interim Financial Statements in respect of fiscal quarters ended prior to the Closing
Date that are required to be included in the registration statement on Form S-4 (or any
amendment thereto) under the Securities Act of 1933, as amended, relating to an exchange offer
for outstanding debt securities to be made by the Purchaser or any of its affiliates (the
"Registration Statement"), or any current report on Form 8-K required to be filed by the
Purchaser or any of its affiliates under the Securities Exchange Act of 1934 with respect to the
transactions contemplated by this Agreement (the "8-K").

(b)     For forty-five (45) days from the date hereof or, if the Registration
Statement has been filed as of the date hereof or is filed within fifteen (15) days of the date
hereof, for forty-five (45) days from the date the SEC notifies the Purchaser (or one of its
affiliates) as to whether the SEC will review the Registration Statement, the Purchaser shall use
its commercially reasonable efforts to obtain as promptly as practicable from the SEC a waiver
with respect to any requirement to include audited financial statements other than the Audited
Financial Statements in the Registration Statement and the 8-K (and in connection therewith
shall use its commercially reasonable efforts to prepare applicable materials (as determined by
Purchaser) for submission to the SEC as promptly as practicable). The Purchaser shall keep the
Main Sellers promptly informed of any material developments in its discussions with the SEC
regarding such waiver. If the Purchaser obtains such waiver in respect of both the Registration
Statement and the 8-K, then the Main Sellers shall not be required to deliver the Audited 2009
Interim Financial Statements pursuant to the provisions of Section 5.34(a), but may nonetheless
be required to deliver such Audited 2009 Interim Financial Statements pursuant to the provisions
of Section 5.34(d)(ii).[Intentionally Omitted.]

(c)     If the Closing Date is after December 31, 2009 and the Registration
Statement is not effective prior to the Closing Date, then the Main Sellers shall deliver to the

160

Purchaser the Additional Audited 2009 Financial Statements not later than March 15, 2010, and such delivery shall be prior to the Closing Date. If the Closing Date is on or after March 25, 2010, then the Main Sellers shall deliver to the Purchaser the Additional Audited 2009 Financial Statements not later than 3 ~~business days~~**Business Days** prior to the Closing Date.

(d) **If the closing condition in Section 8.3(g) is satisfied in the manner provided in Section 8.3(g)(ii), then within 30 days following the Closing, the Purchaser may notify the Main Sellers that each of the financial statements to be delivered pursuant to this Section 5.34(d) is to exclude the financial statements and information for the Companies in which case each such financial statement shall exclude the financial statements and information of the Companies.** Following the Closing, unless delivered prior to the Closing, the Main Sellers shall deliver to the Purchaser the following financial statements:

(i) if the Closing Date is before October 1, 2009, the Audited 2009 Closing Date Financial Statements and income statements meeting the requirements of the Unaudited Interim Financial Statements for each quarter beginning with the quarter ending December 31, 2008 through the quarter ending June 30, 2009;

(ii) if the Closing Date is on or after October 1, 2009, but on or before December 31, 2009, the Audited 2009 Interim Financial Statements and income statements meeting the requirements of the Unaudited Interim Financial Statements for each quarter beginning with the quarter ending December 31, 2008 through the quarter ending June 30, 2009;

(iii) if the Closing Date is after December 31, 2009, the Additional Audited 2009 Financial Statements, the Unaudited Interim Financial Statements for the last fiscal quarter ending after December 31, 2009 and prior to the Closing Date and income statements meeting the requirements of the Unaudited Interim Financial Statements for each quarter beginning with the quarter ending December 31, 2008 through the last fiscal quarter ending prior to the Closing Date; and

(iv) the unaudited income statement information specified in the definition of Unaudited Interim Financial Statements from the date of last fiscal quarter ended prior to the Closing Date, which fiscal quarter may be a year end, through the Closing Date (the **"Information"**).

(e) If any financial statements or Information are required to be delivered pursuant to Section 5.34(d), the Main Sellers shall comply with the following provisions:

(i) to the extent the Main Sellers are required to deliver any audited financial statements under Section 5.34(d), the Sellers shall engage KPMG LLP (**"KPMG"**) no later than ten (10) Business Days prior to the Closing Date to audit the related financial statements;

~~161~~

**161**

       (ii)    to the extent the Main Sellers are required to deliver any audited financial statements under Section 5.34(d), such audited financial statements shall be delivered no later than the date that is ninety (90) days after the Closing Date; and

       (iii)    to the extent the Main Sellers are required to deliver any unaudited financial statements or Information under Section 5.34(d), such unaudited financial statements or Information shall be delivered no later than the date that is sixty (60) days after the Closing Date.

       (f)    If any financial statements or Information required to be delivered pursuant to Section 5.34(d) have not been delivered prior to Closing, the Purchaser shall deliver an amount equal to the Holdback Escrow Amount to the Escrow Agent at Closing and the Holdback Escrow Amount shall be held by the Escrow Agent in accordance with this Agreement and the Escrow Agreement. If the Main Sellers are required to deliver any financial statements or Information pursuant to Section 5.34(d) and the Main Sellers (i) do not engage KPMG for purposes of auditing any of these financial statements or Information that are required to be audited financial statements or (ii) do not deliver such financial statements or deliver them more than twenty-five (25) days later than the dates provided in Section 5.34(e)(ii) or Section 5.34(e)(iii), as applicable, then the Holdback Escrow Amount (together with any actual interest earned thereon) shall be returned to the Purchaser by the Escrow Agent.

       (g)    In the event that following the Closing (A) the Main Sellers will not be required to deliver to the Purchaser any financial statements pursuant to Section 5.34(d) or (B) the Main Sellers have complied with the obligations set forth in Section 5.34(d) and Section 5.34(e), as applicable, then the Purchaser shall promptly instruct the Escrow Agent to immediately release the Holdback Escrow Amount to the Distribution Agent (as agent for the Sellers and the EMEA Sellers).

       (h)    The Main Sellers shall cooperate in Purchaser's efforts to obtain consent from Sellers' independent auditors for the inclusion of the Audited Financial Statements and, if applicable, the Audited 2009 Closing Date Financial Statements, the Audited 2009 Interim Financial Statements and/or the Additional Audited 2009 Financial Statements in any registration statement or other filing with the SEC. Subject to the limitations set forth in Section 5.6 (except that the Main Sellers acknowledge and agree that such information as is necessary to be included in a registration statement or other filing with the SEC need not be kept confidential by the Purchaser), the Main Sellers shall provide the Purchaser, the relevant Designated Purchasers and their representative accountants reasonable access to the books, records and personnel of the Business and the Companies and all documents, schedules and work papers that are reasonably necessary to prepare any financial statements that are required to be delivered pursuant to the terms of this Section 5.34. The Sellers shall reasonably cooperate in the Purchaser's efforts, whether pre- or post-Closing, to prepare the Registration Statement, the 8-K and any other filings with the SEC that are required to include any financial statements of the Business (or portion thereof), provided that such reasonable assistance shall include providing the Purchaser, the relevant Designated Purchasers and their representative accountants

reasonable access to the books, records and personnel of the Business and the Companies and all documents, schedules and work papers that are reasonably necessary to prepare the Audited Financial Statements, the Unaudited Interim Financial Statements, any quarterly combined income statement information of the Business, the income statement information from the date of the last interim balance sheet required to be delivered to the Purchaser through the Closing Date, the pro forma financial statements of the combined entity and, if applicable, the Audited 2009 Closing Date Financial Statements, the Audited 2009 Interim Financial Statements and/or the Additional Audited 2009 Financial Statements, together with any related financial disclosures to be included in the Registration Statement or other filing with the SEC.

(i)        If the Audited 2009 Interim Financial Statements are required to be provided pursuant to the provisions of Section 5.34(a), the Purchaser shall use its commercially reasonable efforts to obtain as promptly as practicable a determination from the SEC with respect to whether the Audited 2009 Interim Financial Statements must include combined statements of income and cash flows and footnote information for the nine month period ended September 30, 2008 to meet the requirements of Regulation S-X and Rule 3-05 thereunder, for inclusion in the Registration Statement and the 8-K. The Purchaser shall keep the Main Sellers promptly informed of any material developments in its discussions with the SEC regarding such determination. If the Purchaser obtains a determination that such combined statements of income and cash flows and footnote information for the nine month period ended September 30, 2008 are not required to meet the requirements of Regulation S-X and Rule 3-05 thereunder, for inclusion of the Audited 2009 Interim Financial Statements in the Registration Statement and the 8-K, then the Main Sellers shall not be required to deliver the combined statements of income and cash flows and footnote information for the nine month period ended September 30, 2008 with the Audited 2009 Interim Financial Statements pursuant to the provisions of Section 5.34(a), but may nonetheless be required to deliver such combined statements of income and cash flows and footnote information for the nine month period ended September 30, 2008 with the Audited 2009 Interim Financial Statements pursuant to the provisions of Section 5.34(d)(ii).

SECTION 5.35.    Certain Acknowledgements Regarding PBGC. The Purchaser acknowledges and agrees that none of the actions or occurrences referred to in clauses (i) through (iv) of Section 8.3(d) hereof in and of itself shall constitute or be construed as a breach by any of the Sellers of any of their representations, warranties, covenants or agreements set forth in this Agreement or any other Transaction Document. Notwithstanding the foregoing, nothing in this Section shall limit or be construed as limiting the scope, application or effect of Section 8.3(d). To the extent the PBGC terminates the NNRIP (or any other Seller Employee Plan) or imposes any Lien on the assets of any of the Companies or any of the Sellers, or in the event of any other action or occurrence referred to in clauses (i) through (iv) of Section 8.3(d), then the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable to obtain from the PBGC a waiver of its Claims against Purchaser, its Affiliates (including the Companies) or the holder of any Assets in connection with the NNRIP and a release of such Lien in order to cause the satisfaction of the condition set forth in Section 8.3(d) at the earliest practicable date; provided that the Purchaser shall not be required to make any

163

payment, relinquish any right, or deliver or relinquish anything of value in order to obtain such waiver (other than payment of the Purchase Price).

SECTION 5.36.   Finalization of Transition Services Agreement.

(a)     The Parties acknowledge that Schedule 1 (the **"Schedule 1 Included Services"**), Schedule 5 and Schedule 6 (collectively, the **"General Scope of Services"**) attached to the form Transition Services Agreement contained in Exhibit P hereto reflects the general scope of certain services to be provided pursuant to the Transition Services Agreement by the TSA Sellers and TSA EMEA Sellers (and may reflect greater detail as to some of such services), but is not sufficiently refined to define all such services in operational detail. Accordingly, the Parties agree that, between the time of the execution of this Agreement and two Business Days prior to the Closing Date, they (i) will negotiate in good faith and use reasonable efforts expeditiously to refine the description of the services included within the General Scope of Services so as to provide sufficient operational detail (as mutually agreed or as determined by arbitration in accordance with clause (h), the **"Included Services"**) and (ii) will provide each other with such information that is reasonably requested in connection with such negotiation. The Parties agree that Included Services will be finally determined prior to Closing by such negotiation or by arbitration in accordance with this Section 5.36, provided that the Included Services will be consistent with, and will omit any services not reasonably within the service description categories contained in, the General Scope of Services. The Parties further agree that such negotiation and arbitration will be subject to the following general limitations and conditions (the **"Scope Guidelines"**): (i) the Included Services will exclude any portion of any service that has at no time on or after April 1, 2009 been provided by any Seller or any EMEA Seller (or any Affiliate of any of them) nor provided or procured by any Seller or any EMEA Seller (or any Affiliate of any of them) from a third party (the services within the General Scope of Services that have been provided either by such a Seller or any EMEA Seller (or any Affiliate of any of them) entity or by a third party at any time on or after April 1, 2009, the **"Current Services"**) (it being understood and agreed that (a) each Seller under the Transition Services Agreement will be committed reasonably to cooperate with Purchaser to coordinate interaction, execution and process steps so that the services of such Seller are delivered in a manner to facilitate the orderly transition of the Business to the Purchaser and (b) from and after the time of execution of this Agreement until the Closing, the Sellers, the EMEA Sellers and their respective Affiliates will provide, or cause to be provided, to the Business the Current Services, subject to modifications that would be permitted if the Transition Services Agreement were currently in effect), (ii) if and to the extent that employees of a Seller or an EMEA Seller or a Subsidiary of a Seller or an EMEA Seller performing services as of the date of execution of this Agreement are Transferred Employees under this Agreement or Transferring Employees under the EMEA Asset Sale Agreement, then the human tasks formerly undertaken by such Transferred Employees or Transferring Employees will no longer be required to be provided under the Transition Services Agreement (but equipment, licenses and other resources not transferred shall, in accordance with the terms of the Transition Services Agreement, continue to be made available as necessary to perform such tasks under the Transition Services Agreement as contemplated by this Section 5.36), and (iii) services will be limited to those reasonably advisable to carry on the Business after the Closing in a manner consistent with the operation of the Business at the time of

~~164~~

**164**

execution of this Agreement. It is understood and agreed that the services described in the General Scope of Services attached to the Transition Services Agreement have all been provided by or procured by a Seller or an EMEA Seller (or a respective Affiliate) to or for the Business after April 1, 2009. On the Closing Date but before the Closing, the TSA Sellers and the TSA EMEA Sellers shall be ready, willing and able to satisfy their obligations pursuant to the Transition Services Agreement in all material respects and the Main Sellers will deliver a certificate to the Purchaser to that effect.

      (b)    If, between the time of execution of this Agreement and Closing, Purchaser identifies services not described within the General Scope of Services which are reasonably advisable in order to assist with the orderly transition of the Business to the Purchaser, then the Parties agree that such additional services (defined in operational detail as described herein) will be provided under the Transition Services Agreement, and the Parties will negotiate in good faith and use reasonable efforts expeditiously to refine such additional services in operational detail consistent with the Scope Guidelines specified in Section 5.36(a) (as mutually agreed or as determined by arbitration in accordance with clause (h), the "Type 1 Extra Services"). If, between the time of the execution of this Agreement and Closing, Purchaser identifies further services reasonably advisable to carry on the Business which are not described within the General Scope of Services and which are not consistent with the Scope Guidelines, but which can reasonably be provided by the applicable Seller (but not an EMEA Seller) without hiring new employees and without materially changing or burdening the operations of such Seller, then the Parties agree that such further services (defined in operational detail as described herein) will be provided under the Transition Services Agreement, and the Parties will negotiate in good faith and use reasonable efforts expeditiously to define such ancillary services in operational detail (as mutually agreed or as determined by arbitration in accordance with clause (h), "Type 2 Extra Services;" together with Type 1 Extra Services, the "Extra Services").

      (c)    The Parties acknowledge and agree that, subject to the provisions below, the Included Services ultimately provided under the Transition Services Agreement are to be billed by the applicable TSA Seller or TSA EMEA Seller under the Transition Services Agreement to the Purchaser at the "Direct Cost" of such Included Services as specified in the Transition Services Agreement. However, the Parties further agree that, from and after the execution of this Agreement, they will negotiate in good faith to quantify and stipulate by mutual agreement the Direct Cost of each such Included Service as a specific monetary amount for each such Service (the "Monetary Cost" of such Service); provided, that Monetary Cost shall exclude Special Third-Party Costs (as defined in the Transition Services Agreement). Notwithstanding the foregoing, upon mutual agreement (or resolution by arbitration as provided herein) as to Monetary Cost for any Service under the Transition Services Agreement, the price for such Service shall thenceforth equal the sum of such Monetary Cost plus Special Third-Party Costs (as defined in the Transition Services Agreement) allocable to such Service, and such price will apply regardless of the Direct Cost actually incurred by the applicable Sellers under the Transition Services Agreement in providing such Service. The Parties acknowledge that attached to the form of Transition Services Agreement in Exhibit P is (1) a schedule showing an assumed volume of product flow through the order-to-cash cycle (reflecting both timing and

amounts of products) over the 12-month period following Closing (the "**Product Volume Forecast**"), (2) a schedule showing an assumed headcount for personnel constituting "Active Employees" and employees of "Contract Service Providers" as defined in the Transition Services Agreement (the "**IT Headcount Forecast**"), and (3) the estimated cost of providing services to support the product flow contemplated by the Product Volume Forecast, consistent with the IT Headcount Forecast, during the 12-month period following Closing (the "**Estimated Cost Schedule**", as revised in accordance with Section 5(a) of the Transition Services Agreement to account for TUPE Employees. Notwithstanding anything to the contrary in this Agreement or in the Transition Services Agreement, the Parties agree that the outcome of the price negotiation described above in this Section 5.36(c) (or determined by arbitration as provided in clause (h)) with respect to the Schedule 1 Included Services) will be such that the aggregate Monetary Cost of all Schedule 1 Included Services to be delivered over the 12-month period following Closing to support the product flow contemplated by the Product Volume Forecast, using headcount assumptions consistent with the IT Headcount Forecast, (x) will not be less than 90% of the aggregate estimated cost of all services reflected in the Estimated Cost Schedule, and (y) will not be greater than 110% of such aggregate estimated cost of all services reflected in the Estimated Cost Schedule. The Transition Services Agreement contains provisions regarding certain price adjustments for Schedule 1 Included Services in the event that (i) Purchaser revises the anticipated product volume which results in a change in forecast revenues (output of the monthly Sales and Operations Plan) of 5% or more for any three-month period commencing 3 months from the approved monthly Sales and Operations Plan, or (ii) Purchaser revises the headcount of Active Employees and/or employees of Contract Service Providers (as defined in the Transition Services Agreement), with the result that the Direct Cost of delivering IT Infrastructure Services and IT Applications Services included within Schedule 1 Included Services changes by more than 5% from the aggregate cost of such IT Infrastructure Services and IT Applications Services reflected on the Estimated Cost Schedule. Notwithstanding anything to the contrary in this Agreement or in the Transition Services Agreement, it is understood and agreed that the aggregate price to be paid by the Purchasers to the TSA Sellers for services under the Transition Services Agreement will be reduced by $10 million, the application of such reduction to be determined by the Purchaser subject to the consent of the TSA Sellers (which consent will not be unreasonably withheld). For the avoidance of doubt, such reduction shall not apply to any services provided by the TSA EMEA Sellers pursuant to the Transition Services Agreement.

(d)     The determination of the stipulated, monetary price of any Extra Services requested by the Purchaser will be determined in manner analogous to the determination of Monetary Cost of Included Services, except that the price of such Extra Services will be the "Direct Cost" thereof as defined in the form of Transition Services Agreement in Exhibit P hereto (plus any Special Third-Party Costs not reflected in such monetary price), with no further restriction.

(e)     Until the Monetary Cost of any service has been agreed and stipulated by the Parties or determined by arbitration in accordance with clause (h), the price of such service will be the Direct Cost thereof, as reasonably determined by the applicable TSA Sellers or TSA EMEA Sellers under the Transition Services Agreement. Upon final determination of the Monetary Cost as contemplated herein, the parties will promptly reconcile any prior payments

166

made by the Purchaser that were based on TSA Seller's or TSA EMEA Seller's estimates of Direct Cost (with the applicable TSA Seller or TSA EMEA Seller paying to the Purchaser any amount by which such estimated amounts exceeded the proper amounts based on Monetary Cost as so finally determined, or with the Purchaser paying to the applicable TSA Seller or TSA EMEA Seller any deficiency by which such estimated amounts were less than the proper amounts based on such Monetary Cost).

(f)    Prior to the 45th day following the execution of this Agreement ("**Arbitration Trigger Date**"), each TSA Seller and TSA EMEA Seller shall consult with each other and notify Purchaser of the name of the single person designated to serve on all such parties'' behalf as an arbitrator in case of any arbitration hereunder (except that the TSA EMEA Sellers may designate a single person to serve as an arbitrator for all TSA EMEA Sellers, and the TSA Sellers may designate a different person to serve as an arbitrator for all Sellers), and the Purchaser shall notify each TSA Seller and TSA EMEA Seller of the name of the person or, if the TSA Sellers and TSA EMEA Sellers have each appointed an arbitrator, the name of two persons designated to serve as Purchaser's arbitrator(s) in case of any arbitration hereunder. If the TSA Sellers and TSA EMEA Sellers have not designated their'arbitrator or Purchaser has not designated its arbitrator(s) prior to the Arbitration Trigger Date ("**Non-Designating Party**"), and if thereafter such Non-Designating Party does not name an arbitrator (and provide notice thereof to the other applicable parties) within five Business Days after notice from any other Party requesting that such an arbitrator be named, then such Non-Designating Party shall lose the right to appoint an arbitrator hereunder, and the arbitration shall be conducted exclusively by the arbitrator named by the other Party to the applicable arbitration.

(g)    At any time after the Arbitration Trigger Date, any affected Party may submit any disagreements relating to the Included Services or the Extra Services, or the Monetary Cost of any Included Service or the stipulated, monetary price of any Extra Service to binding arbitration for resolution, which arbitration proceeding will be initiated by notice delivered by such Party to the applicable counterparty. Such arbitration shall be conducted in accordance with Section 5.36(h). The parties will use commercially reasonable efforts to resolve any disagreement as expeditiously as practicable.

(h)    If any Party shall give notice of arbitration pursuant to Section 5.36(g), then, within ten days following initiation of such arbitration, the arbitrators theretofore designated by the applicable parties to such arbitration shall jointly appoint a neutral arbitrator (the "**Neutral Arbitrator**"), who shall be unaffiliated with any Party (in the event such two arbitrators do not so jointly appoint a neutral arbitrator, then, upon the request of any party to such arbitration, such neutral arbitrator, who must be unaffiliated with any Party, will be promptly appointed by the American Arbitration Association). Any arbitration hereunder shall be conducted by such three arbitrators (except as provided in Section 5.36(f) or below in this Section 5.36(h)), and shall take place in New York City in accordance with the Commercial Arbitration Rules of the American Arbitration Association. If an arbitrator named by a Party hereunder ceases to serve for any reason, then such Party shall name a successor arbitrator within five Business Days following notice from an adverse Party ("**Notifying Party**") requesting that such a successor be named (if a successor is not so named, then the arbitration will be conducted

<del>167</del>

**167**

solely by the Neutral Arbitrator if theretofore appointed, and otherwise by the arbitrator named by the Notifying Party). The arbitrators will resolve the matters in dispute within thirty (30) days following the selection of the Neutral Arbitrator; provided, however, that if any disagreement with respect to Included Services has not been resolved by the one hundred twentieth (120th) day after the date of this Agreement (or if earlier the fifteenth (15th) day prior to the Closing Date), then at any time thereafter any Party to such arbitration may serve notice on the arbitrators demanding that the Neutral Arbitrator alone render a final decision within 10 days following receipt of such notice (any decision by a majority of the arbitrators shall otherwise be deemed the decision of the arbitrators). The decision of a majority of the arbitrators, or of the Neutral Arbitrator alone, as applicable, shall be in writing, shall be final and conclusive on the Parties, and counterpart copies thereof shall be delivered to all of the Parties. Judgment may be had on the decision of the arbitrators so rendered in any court of competent jurisdiction. The Purchaser shall bear the fees and expenses of the arbitrator it designates, the applicable TSA Seller or TSA EMEA Seller shall bear the fees and expenses of the arbitrator it designates, and the Purchaser and the applicable TSA Seller or TSA EMEA Seller shall equally share the fees and expenses of the Neutral Arbitrator. Notwithstanding anything to the contrary in this Agreement or in the Transition Services Agreement, if any arbitration hereunder to finalize the scope of any Included Service has not been completed, and an arbitral decision rendered, by the second Business Day preceding the Closing Date, then (i) the applicable TSA Seller or TSA EMEA Seller shall provide such Service after Closing with the scope advocated by the Purchaser (and the Purchaser will pay Direct Cost for such Services, as provided in the Transition Services Agreement and as reasonably determined by the applicable TSA Seller or TSA EMEA Seller, until the Monetary Cost for such service is determined in accordance with the provisions of this Section 5.36 upon which a reconciliation will occur as described in Section 5.36(e)), and (ii) such arbitration will terminate with respect to the scope of service as of such second Businesss Day preceding the Closing (with the arbitrators deemed to have rendered a decision defining such scope as so advocated by the Purchaser). Nothing herein will affect any arbitration to the extent the subject matter thereof relates to (i) any Extra Service or (ii) the price, Monetary Cost or Direct Cost of any service.

(i)     Solely, for purposes of this Section 5.36, the term "Parties" shall also include the TSA EMEA Sellers.

SECTION 5.37.   Assistance for Proxy Agreement.   From the date hereof, the Main Sellers shall use their reasonable best efforts to assist the Purchaser to seek any Consent required in order to terminate the Proxy Agreement and allow the Purchaser to acquire and exercise control over NGS and its business effective as of or before the Closing Date without a proxy arrangement. Such assistance shall include promptly notifying the U.S. Defense Security Service of the transactions contemplated hereby pursuant to the NISPOM and Proxy Agreement, agreeing to terminate the Proxy Agreement effective as of the Closing Date and engaging in discussions with the U.S. Defense Security Service in preparation for that result, and providing all information requested by the U.S. Defense Security Service related to the transactions contemplated hereby. Notwithstanding the foregoing, between the date hereof and the conclusion of the Auction, none of the Sellers or the Companies shall be required to take any action pursuant to this Section 5.37 that would irrevocably modify, cancel or amend the Proxy

168

~~Agreement.~~

SECTION 5.38.   Customer Contract Review and Selection.

(a)     In accordance with applicable Law and subject to the provisions of the
Clean Team Confidentiality Agreement and the Confidentiality Agreement, within seven (7)
days of the date hereof, the Sellers shall provide the Clean Team Members with (i) access to the
electronic databases and centralized file cabinets at Sellers' workplaces or other sites where the
Customer Contracts are maintained and/or stored (such databases and file cabinets, the "Sellers'
Files"), where "centralized file cabinets" shall mean that the Sellers use their reasonably best
efforts to cause the file cabinets containing the Sellers' Files, to the extent reasonably practicable
given existing resources and spaces at the relevant facilities, to be aggregated, organized and
labeled in a single, localized filing room, which Sellers shall have clearly identified prior to the
arrival of Clean Team Members, at each applicable site, and (ii) training of one (1) day (initially,
in a single session for the Clean Team Members, which training shall be accessible by
videoconference and/or teleconference) and additional training as shall be reasonably requested
by Clean Team Members, including specific training as is reasonably necessary to review the
Sellers' Files at any particular site, such as (y) training on how to access specific electronic
databases at such site and (z) training on how to locate specific information within file cabinets
at such site. Sellers shall also provide existing indices, maps, tables of contents or equivalent
references for the purpose of identifying hard copies of materials within any filing cabinets or
similar storage units. The Purchaser shall provide sufficient computer equipment to enable the
Clean Team Members to access such electronic databases, and such computer equipment shall be
compatible with Sellers' electronic databases, which the Parties shall engage in their reasonable
best efforts to confirm with each other prior to a visit by Clean Team Members to any site.

(b)     The relevant Sellers shall cause their personnel responsible for
maintaining and operating the Customer Contract databases, at the locations where the Customer
Contracts are retained in hard or soft copy form, to reasonably assist the Clean Team Members to
locate copies of the relevant Customer Contracts and such information about or related to the
Customer Contracts as the Clean Team Members may reasonably request. Furthermore, the
relevant Sellers shall allow the Persons listed in Section 5.38(b)(i) of the Sellers Disclosure
Schedule to perform searches on the electronic databases comprising the Sellers' Files and assist
with the identification of documents within the Sellers' Files, as reasonably requested by Clean
Team Members. Subject to applicable Law and the provisions of the Clean Team
Confidentiality Agreement and the Confidentiality Agreement, the relevant Sellers shall also use
their reasonable best efforts to cause (i) the Persons listed in Section 5.38(b)(ii) of the Sellers
Disclosure Schedule to be available, and, if such Persons are not available, the Purchaser will
accept the designation of an alternative representative from the applicable geographical and
functional area, who has comparable knowledge to the unavailable Person, and (ii) without
exception, each of the individuals listed in Section 5.38(b)(iii) of the Sellers Disclosure Schedule
to be made available, and if any such Person can not be made available, then Purchaser shall
have the right to select, in its reasonable discretion, a suitable replacement for such unavailable
Person; each of the Persons in (i) and (ii) to be made available, at times designated by the Sellers,
for two or, at the option of the Sellers, more separate meetings covering, in the aggregate, all the

169

regions, in each case with Clean Team Members and to take place in person or by teleconference within ten (10) days from the date hereof, to answer reasonable questions from the Clean Team Members about the content of Customer Contracts, the status of the relevant Seller's relationship with the counterparties to such Customer Contracts, the economic performance under such Customer Contracts and any material issues that have arisen under such Customer Contracts. Following such meeting(s), subject to applicable Law and the provisions of the Clean Team Confidentiality Agreement and the Confidentiality Agreement, the relevant Sellers shall cause members of their relevant management personnel knowledgeable about issues related to Customer Contracts, including without limitation, global accounts, services and major geographical regions of the Business to be available at reasonable times and upon reasonable notice to answer reasonable questions from the Clean Team Members about the content of the Customer Contracts, the status of the relevant Seller's relationship with the counterparties to such Customer Contracts, the economic performance under such Customer Contracts and any material issues that have arisen under such Customer Contracts.

(c)     The Main Sellers shall use their reasonable best efforts to produce and place in the Clean Team Data Room, as soon as practical and in any event within ten (10) days of the date hereof, all material documentation that forms part of the Customer Contracts in force as of the date hereof with customers of the Business whose customer contracts with the Sellers generated more than $1,000,000 in aggregate revenues for the Business during calendar year 2008 (each Customer Contract with such customers, a "**Major 2008 Customer Contract**").

(d)     The Sellers shall use reasonable best efforts to produce and place in the Clean Team Data Room, as soon as practical and in any event within fifteen (15) days of the date hereof, any additional Customer Contracts which, prior to the date hereof, have been identified in the Sellers' sales forecasting process that is maintained in the Ordinary Course and which the relevant Sellers, in the exercise of their reasonable judgment, believe may result in revenues of the Business in either (i) 2009 or (ii) if the relevant Contract was or is entered into after January 1, 2009, the period beginning on the date of execution of such Contract and ending twelve (12) months from the date of such Contract, of greater than $500,000 (each, a "**Major 2009 Customer Contract**", and together with any Major 2008 Customer Contracts, the "**Major Customer Contracts**").

(e)     In accordance with applicable Law and subject to the provisions of the Clean Team Confidentiality Agreement and the Confidentiality Agreement, the Purchaser shall use its reasonable best efforts to cause its representatives, with any and all reasonably requested assistance from the Sellers pursuant to Sections 5.38(a), 5.38(b), 5.38(c) and 5.38(d) to (i) promptly review the Sellers' Files and identify those Customer Contracts that it seeks to review, including, at the Purchaser's sole option, employing appropriate professional third parties as Clean Team Members to expedite such review and (ii) work with the Sellers to minimize the disruption to Sellers' workplaces or other sites caused by the Clean Team Members' visits and review, and to leave such sites in substantially the same condition as when the Clean Team Members first occupied such sites.

(f)     On or before the relevant Contract Designation Date, the Purchaser shall

~~170~~

**170**

notify the Main Sellers in writing of those 365 Customer Contracts and Non-365 Customer Contracts entered into prior to the date hereof which fail to meet the Pre-Signing Inclusion Criteria and the Purchaser elects not to have assigned by the relevant Seller to the Purchaser or a Designated Purchaser at Closing (as adjusted to reflect the resolution of any objection by the Main Seller to such notification, the "Rejected Pre-Signing Customer Contracts"). Such written notice to the Main Sellers shall also indicate which specific Pre-Signing Inclusion Criteria the relevant 365 Customer Contract or Non-365 Customer Contract, as applicable, fails to meet. If the Main Sellers disagree with such notice, the Main Sellers shall promptly notify the Purchaser thereof and the Purchaser and the Main Sellers shall then negotiate in good faith to resolve such disagreement. If either (i) the Purchaser and the Main Sellers fail to resolve such disagreement within ten (10) Business Days from the delivery of the notice to the Purchaser (or such shorter period as will end on the Business Day before the Closing Date), or (ii) the Main Sellers do not object to the notice received from the Purchaser, the Purchaser's categorization of such Pre-Signing Customer Contract shall be given effect, save in the case of manifest error.

(g)     Not later than (30) days from the date hereof, the Sellers shall prepare and deliver to the Purchaser a list (to be updated each fifteen (15) days thereafter) (the "Non-Qualified Post-Signing Customer Contract List") of all the Customer Contracts entered into after the date hereof that fail to meet the Post-Signing Inclusion Criteria (the "Non-Qualified Post-Signing Customer Contracts") and a list (to be updated each fifteen (15) days thereafter) that identifies all Major 2009 Customer Contracts entered into after the date hereof (whether they meet the Post-Signing Inclusion Criteria or not). The Sellers shall use reasonable best efforts to include the relevant Customer Contracts on the first update of the applicable lists following the execution of such Customer Contracts, to the extent commercially practicable. If the Purchaser disagrees with the categorization of a Post-Signing Customer Contract as a Non-Qualified Post-Signing Customer Contract or becomes aware of a Customer Contract omitted from such list, it shall promptly notify the Main Sellers thereof and, the Purchaser and the Main Sellers shall then negotiate in good faith to resolve such disagreement or agree on the proper categorization of such omitted Post-Signing Customer Contract. If the Purchaser and the Main Sellers fail to resolve such disagreement or agree on such categorization within ten (10) Business Days from the delivery of the notice to the Main Sellers (or such shorter period as will end on the relevant Contract Designation Date), then the Purchaser's categorization of such Post-Signing Customer Contract shall be given effect, save in the case of manifest error. On or prior to the relevant Contract Designation Date, the Purchaser shall notify the Main Sellers in writing whether the Purchaser elects not to have a Non-Qualified Post-Signing Customer Contract assigned by the relevant Seller to the Purchaser or a Designated Purchaser at the Closing (any Customer Contract so designated by the Purchaser for rejection shall be deemed a "Rejected Post-Signing Customer Contract" and shall not be assigned to the Purchaser or a Designated Purchaser at Closing).

**SECTION 5.39.   Retention Plan.  The Purchaser shall pay fifteen million dollars ($15 million) of cash payable to employees of the Nortel Group at or, with the consent of the Main Sellers and NNUK, after Closing under an employee retention plan (to be implemented with guidance from Sellers' management team).**

~~171~~

**171**

## ARTICLE VI

## TAX MATTERS

### SECTION 6.1.    Transfer Taxes.

(a)     The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. The Purchaser shall (on behalf of itself and the Designated Purchasers) promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the execution of any other Transaction Document; provided, that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller or any Subsidiary, Affiliate, representative or agent thereof, such Transfer Taxes shall be paid by the Purchaser to such Seller, Subsidiary, Affiliate or agent, as applicable, at the Closing or thereafter, as requested of or by the applicable Seller. Upon request from a Seller, the Purchaser shall provide to such Seller an original receipt (or such other evidence as shall be reasonably satisfactory to such Seller) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1. For the avoidance of doubt, Purchaser shall remain liable in respect of any Transfer Taxes regardless of the date that the Assets are removed from the premises of a Seller or any Seller's supplier. All other Closing expenses will be paid by the Party incurring such expenses.

(b)     If the Purchaser or any Designated Purchaser wishes to claim any exemption relating to, or a reduced rate of, or make an election with the effect of reducing, Transfer Taxes, in connection with this Agreement or the transactions contemplated herein, or in connection with the execution of any other Transaction Document, the Purchaser or any Designated Purchaser, as the case may be, shall be solely responsible for ensuring that such exemption, reduction or election applies and, in that regard, shall provide the Sellers prior to Closing with its permit number, GST, VAT, provincial sales taxes or other similar registration numbers and/or any appropriate certificate of exemption, election and/or other document or evidence to support the claimed entitlement to such exemption or reduction by the Purchaser or such Designated Purchaser, as the case may be. All parties shall make reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduction. If the Purchaser or any Designated Purchaser pays any Transfer Taxes pursuant to this Section 6.1 and a Seller thereafter becomes entitled to an actual cash refund for, or an actual reduction in Liability for, Transfer Taxes payable by such Seller in respect of such Transfer Taxes paid by the Purchaser or a Designated Purchaser pursuant to this Section 6.1, then such Seller shall reimburse the

Purchaser or Designated Purchaser for an amount equal to such refund or actual reduction (net of reasonable costs and expenses incurred in obtaining such refund or reduction).

(c)     The applicable Seller(s) and Purchaser (or relevant Designated Purchaser) will, on or before the Closing, jointly prepare and execute an election, in the prescribed form and containing the prescribed information, to have subsection 167(1) of the Excise Tax Act (Canada)

172

172

apply to the sale and purchase of the Assets which would otherwise be subject to GST so that no GST is payable in respect of such sale and purchase under Part IX of the Excise Tax Act (Canada). Purchaser (or the relevant Designated Purchaser) will file such election with the relevant Tax Authority in the manner and within the time prescribed by Law and will provide the applicable Seller with a copy of the election and with satisfactory evidence that the election has been filed in a timely manner. The applicable Seller(s) confirms that it is registered for purposes of the Excise Tax Act (Canada) and its GST registration number is 119409258RT0001 (in the case of NNL) and 118802974RT0001 (in the case of Nortel Networks Technology Corporation ("NNTC"). The Parties will make any required elections under corresponding provincial or territorial laws and the foregoing provisions will apply *mutatis mutandis* in respect thereof. Purchaser (or the relevant Designated Purchaser) shall be responsible and indemnify and hold harmless the applicable Seller(s) for any GST (and any comparable provincial Taxes) to the extent payable notwithstanding the elections contemplated by this Section, plus any interest and/or penalties payable as a consequence thereof.

SECTION 6.2.  Withholding Taxes.  Subject to Section 2.4, the Purchaser and the Designated Purchasers shall be entitled to deduct and withhold from the Purchase Price, and the Purchaser shall be entitled to deduct and withhold from the Reverse Termination Fee, such amounts as the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold under the Code or any provision of state, local or foreign Tax Law, with respect to the making of such payment. To the extent such amounts are so withheld by the Purchaser or a Designated Purchaser, as the case may be, such withheld amounts shall be treated for all purposes of this Agreement and the Ancillary Agreements as having been paid to the relevant Seller in respect of whom such deduction and withholding was made by such Purchaser or Designated Purchaser. None of the Parties is aware of any obligation to deduct and withhold any amounts from the Purchase Price or the Reverse Termination Fee under the Code, or any provision of state, local or foreign Tax Law, with respect to the making of such payment. If any of the Parties learns of any such obligation on or prior to the Closing Date, then (i) in the case of a Seller, such Seller shall promptly provide reasonable notice of such obligation to the Purchaser, and (ii) in the case of the Purchaser, the Purchaser shall promptly provide reasonable notice of such obligation to the Sellers. The Parties shall make reasonable efforts to cooperate in good faith to minimize the amounts that the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold.

SECTION 6.3.  Tax Characterization of Payments Under This Agreement.  The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than payment of the Estimated Purchase Price and any interest payments) as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

SECTION 6.4.  Apportionment of Taxes.

(a)    Except as otherwise provided in this Article VI, (i) the Sellers shall and shall cause the Other Sellers, as the case may be, to bear all Taxes of any kind relating to the Assets or the conduct or operation of the Business (including Taxes in respect of the income,

business, property or operations of the Companies) for all Tax periods or portions thereof ending on or before the Closing Date and (ii) the Purchaser shall and shall cause the Designated Purchasers to bear all Taxes relating to the Assets or the conduct or operation of the Business (including Taxes in respect of the income, business, property or operations of the Companies) for all Tax periods or portions thereof beginning after the Closing Date.

(b)     For purposes of this Agreement, any Taxes for a **"Straddle Period"** (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of the period beginning after the Closing Date, respectively. The amount of any Taxes based on or measured by income or receipts of the Business (including the business and operations of the Companies) shall be allocated between the Pre-Closing Taxable Period and the Post-Closing Taxable Period on a closing-of-the-books basis. The amount of other Taxes shall be allocated between the Pre-Closing Taxable Period and the Post-Closing Taxable Period in the following manner: (i) in the case of a Tax imposed in respect of property (excluding, for the avoidance of doubt, any income Tax) and that applies ratably to a Straddle Period, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of sales, value-added and similar transaction-based Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be allocated to the portion of the Straddle Period in which the relevant transaction occurred.

SECTION 6.5.     Section 338 Election. Upon the written request of the Purchaser, in its sole and exclusive discretion, (x) the Sellers and the Purchaser or, as applicable, any Designated Purchaser shall join in making elections under Code section 338(h)(10) (and any corresponding election under state, local, or foreign law) (a **"Section 338(h)(10) Election"**) with respect to the Purchaser's (or any Designated Purchaser's) purchase of the Shares of the Companies pursuant to this Agreement, or (y) the Sellers shall make or cause to be made such stock basis reduction elections under Treas. Reg. Section 1.1502-36(d)(6)(i)(A) (**"Loss Duplication Elections"**) as are necessary to reduce as far as possible the potential for loss duplication. The Purchaser shall indemnify the Sellers for any actual Tax Liability that (i) arises during the taxable year that includes the Closing Date or the two (2) taxable years immediately following and (ii) would not have arisen but for a Section 338(h)(10) Election or a Loss Duplication Election made pursuant to this Section 6.5; provided, however, that the Purchaser shall have no obligation to indemnify the Sellers for any Tax Liabilities pursuant to this Section 6.5 with respect to which the Sellers do not deliver notice to the Purchaser prior to December 31, 2013.

SECTION 6.6.     Records.

(a)     Notwithstanding the provisions of Section 5.24, but subject to the provisions of Section 5.6, (i) after the Closing Date, the Purchaser, the Designated Purchasers and the Companies, on the one hand, and the Sellers, on the other hand, will make available to

the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets, the Assumed Liabilities, the Business or the Companies for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Assets, the Assumed Liabilities, the Business or the Companies for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow representatives of the other party access to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be necessary or convenient. The obligation to cooperate pursuant to this Section 6.6 shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

(b)      On or prior to Closing, the Sellers shall cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for ten (10) years in accordance with an escrow agreement between the Purchaser, the Sellers and the Records Custodian, in form satisfactory to the Purchaser and the Seller. The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by tax advisors of any purchaser ("Tax Credit Purchaser") of the scientific research and experimental development Tax credits of the Sellers under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser. The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or NNTC as qualified expenditures on scientific research and experimental development for purposes of the applicable provisions of the Income Tax Act (Canada) ("Qualified Expenditures").

(c)      The Purchaser shall use reasonable efforts to make available to the relevant Taxing Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Taxing Authority of the characterization of expenditures by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided that such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser.

(d)      The Purchaser shall have no obligation to provide any access under this provision unless the Seller (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to former

175

employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

    (e)    On or prior to Closing, the Sellers shall use their reasonable best efforts to calculate and provide to the Purchaser (with expenses reasonably allocable to such calculations split evenly between the Sellers, on the one hand, and the Purchaser, on the other hand) historical data relating to the qualified research expenses and gross receipts of the Business pursuant to Section 41 of the Code (including in particular Section 41(f)(3)(A) of the Code) and any analogous data under corresponding provisions of state, local or foreign law as requested by the Purchasers, provided that such historical data is available to the Sellers or could be made available to the Sellers with Sellers' reasonable best efforts. Sellers shall use their reasonable best efforts to update such historical data to reflect any relevant adjustments arising after the Closing and provide copies of any such updates to the Purchaser within 10 days of the date on which such adjustment is made. Notwithstanding the foregoing, nothing herein shall require Sellers to indemnify the Purchaser to the extent a credit of the Purchaser under section 41 of the Code (or any corresponding provisions of state, local or foreign law) is unavailable or challenged by the relevant Taxing Authority.

    SECTION 6.7.    Tax Disclosure.  Notwithstanding anything to the contrary in this Agreement, except as reasonably necessary to comply with applicable securities laws and regulations, any party may (i) consult any Tax adviser regarding the U.S. federal income Tax treatment or Tax structure of the transactions contemplated by this Agreement, and (ii) disclose to any and all persons, without limitation of any kind, the U.S. federal income Tax treatment and Tax structure of the transactions contemplated hereunder and all materials of any kind (including opinions or other Tax analyses) that are provided to the taxpayer relating to such Tax treatment and Tax structure (but without disclosure of identifying information or any non-public commercial or financial information); provided, however, that clause (ii) of this paragraph shall not apply until the date of the public announcement of the execution of this Agreement and performance of the transactions contemplated hereunder. For this purpose, "Tax structure" is limited to any facts relevant to the U.S. federal income Tax treatment of the transactions contemplated hereunder.

    SECTION 6.8.    Tax Returns.

    (a)    The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets, the Business or the Companies, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("**Transfer Tax Returns**") described below in Section 6.8(b)). Such Tax Returns shall be true, correct and complete in all material respects. Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) Sellers as and when required by Law. In every case permitted by Law, the Sellers shall elect to treat the Closing Date as the close of a taxable period, so as to minimize the number of Straddle Period Tax Returns and Straddle Periods.

(b)     Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated hereunder or in respect of the execution of any other Transaction Document shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws. Any Transfer Tax Returns prepared by the Sellers pursuant to this Section 6.8(b) shall be made available to the Purchaser at least ten~~five~~ (~~105~~) Business Days before such Tax Returns are due to be filed. **Notwithstanding the above, the Sellers shall use their reasonable best efforts to make available to the Purchaser such information as will enable the Purchaser to review that portion of the Transfer Tax Returns applicable to the sale and purchase transaction contemplated by this Agreement no later than eight (8) Business Days prior to the date on which such Tax Returns are due to be filed.** The Purchaser shall be entitled to review and comment on any Transfer Tax Return prepared by a Seller prior to making any payment in respect thereof, **such comments to be provided at least three (3) Business Days before such Transfer Tax Returns are due to be filed,** and in the event of disagreement between the Parties, the relevant Transfer Tax Return shall be filed in accordance with the Purchaser's reasonable comments, it being understood that the Purchaser shall remain responsible for any Transfer Taxes whether or not shown on such Tax Return. The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.8(b) at least ~~five~~one (~~5~~1) Business ~~Days~~Day before such Transfer Tax becomes due and payable.

(c)     The Purchaser or a Designated Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets, the Business or the Companies for all Post-Closing Taxable Periods and Straddle Periods. Such Tax Returns shall be true, correct and complete in all material respects and shall be prepared on a basis consistent with Tax Returns prepared for prior taxable periods unless a different treatment of any item is required by an intervening change in Law or this Transaction. All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Purchaser or a Designated Purchaser as and when required by Law, except for such Taxes that are the responsibility of the Sellers pursuant to this Article VI; such Taxes shall be paid to the Purchaser or a Designated Purchaser no later than ten (10) Business Days prior to the due date for the applicable Straddle Period Tax Return.

(d)     The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.8(b)) prepared by the Purchaser, a Designated Purchaser or the Companies for any Straddle Period before any such Tax Return is filed. The Purchaser shall submit a draft of any such Tax Return to the Main Sellers at least sixty (60) days before the date such Tax Return is required to be filed with the relevant Tax Authority (provided, however, that if the information necessary to prepare a draft of any such Tax Return is not available to the Purchaser at least ninety (90) days before the date such Tax Return is required to be filed with the relevant Tax Authority, then the timeframe set forth in Section 6.8(e) shall apply). The Main Sellers shall have fifteen (15) days after the date of receipt thereof to submit to the Purchaser, in writing, the Main Sellers' written comments with respect to such Tax Return. The Purchaser shall notify the Main Sellers within fifteen (15) days after receipt of

477

**177**

such comments of (a) the extent, if any, to which the Purchaser accepts such comments and will file such Tax Return in accordance therewith and (b) the extent, if any, to which the Purchaser rejects such comments. To the extent the Purchaser rejects the comments of the Main Sellers, the Purchaser and the Main Sellers promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within ten (10) days, the parties immediately shall appoint an Accounting Arbitrator to determine the correct manner for reporting the items that are in dispute and shall provide to the Accounting Arbitrator all relevant information. The Accounting Arbitrator shall have fifteen (15) days to submit its determination, which shall be binding upon the Parties, and the Purchaser shall file such Tax Return in accordance therewith. The fees and expenses of the Accounting Arbitrator shall be paid by the Party whose position is deemed to be least correct by the Accounting Arbitrator.

(e) If the information necessary to prepare a draft of any Tax Return for a Straddle Period (other than a Transfer Tax Return described in Section 6.8(b)) is not available to the Purchaser at least ninety (90) days before the date such Tax Return is required to be filed with the relevant Tax Authority, then (i) the Purchaser shall submit a draft of such Tax Return to the Main Sellers as soon as practicable after such information becomes available (but in no event later than the earlier of (a) thirty (30) days after the necessary information becomes available to the Purchaser or to a Designated Purchaser, or (b) twenty-one (21) days before the date such Tax Return is required to be filed with the relevant Tax Authority), (ii) the Main Sellers shall provide their comments to the Purchaser as soon as practicable, the Purchaser shall respond to such comments as soon as practicable and, if necessary, the Parties shall appoint an Accounting Arbitrator as soon as practicable (but in no event shall the Accounting Arbitrator be appointed later than ten (10) days before the date such Tax Return is required to be filed with the relevant Tax Authority), and (iii) the Accounting Arbitrator shall have no more than five (5) days to submit its determination.

SECTION 6.9.   Tax Sharing Agreements.  Any Tax allocation or sharing agreement or arrangement entered into by any Seller, on the one hand, and the Companies, on the other hand, shall be extinguished and terminated as of the Closing Date.

SECTION 6.10.   Canadian Tax Election.

(a) The Sellers and the Purchaser acknowledge that a portion of the Assets transferred pursuant to this Agreement by the Sellers to the Purchaser or each Designated Purchaser which is a resident of Canada for purposes of the Income Tax Act (Canada) is being transferred to the Purchaser (or the relevant Designated Purchaser) in consideration for the Purchaser (or the relevant Designated Purchaser) assuming prepaid obligations of the Seller to deliver goods or provide services in the future. The Sellers and the Purchaser (or the relevant Designated Purchaser) will prepare, execute and file, on a timely basis and using any prescribed form, a joint election under subsection 20(24) of the Income Tax Act (Canada) as to such assumption hereunder, and prepare their respective Tax Returns in a manner consistent with such joint election. The elected amount will be jointly determined by the Sellers and the Purchaser (or relevant Designated Purchaser), acting reasonably. The Sellers and the Purchaser (or relevant

178

178

Designated Purchaser) will make any required elections under corresponding provincial or territorial law and the foregoing provisions will apply *mutatis mutandis* in respect thereof.

(b)     To the extent the Seller and the Purchaser (or the relevant Designated Purchaser) cannot agree on the amount to be elected under subsection 20(24) of the Income Tax Act (Canada), the Seller and the Purchaser (or the relevant Designated Purchaser) promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within five (5) days, the relevant parties immediately shall appoint an Accounting Arbitrator to determine the correct amount to be elected and shall provide to the Accounting Arbitrator all relevant information. The Accounting Arbitrator shall have thirty (30) days to submit its determination, which shall be binding upon the Parties, and the Parties shall file all relevant elections and Tax Returns in accordance therewith. The fees and expenses of the Accounting Arbitrator shall be paid by the Party whose position is deemed to be least correct by the Accounting Arbitrator.

SECTION 6.11.    Cooperation.    The Sellers and the Purchaser shall reasonably cooperate with each other in connection with the conduct of any Tax audit, investigation, dispute, or appeal relating to any Pre-Closing Taxable Period.

## ARTICLE VII

## EMPLOYMENT MATTERS

SECTION 7.1.    Employment Obligations with Respect to Non-Union Employees.    Except as provided in the first sentence of Section 7.1.1, the first sentence of Section 7.1.2(c)(ii) and except as the schedules referenced in Section 7.1.2(e) may apply to Union Employees, the provisions of this Section 7.1 shall apply to Non-Union Employees.

7.1.1.    Employment Terms.    Purchaser hereby agrees to offer employment to that aggregate number of Employees (other than Share Transfer Employees) set forth in Section 7.1.1 of the Sellers Disclosure Schedule (which Section 7.1.1 of the Sellers Disclosure Schedule shall separately identify that number of Employees (including Union Employees in Canada) to be offered employment in each of Canada, China/Hong Kong/Taiwan, and the United States, and the aggregate number of Employees to be offered employment in each of the Remaining APAC Countries and the Remaining CALA Countries). Within thirty (30) days following the date hereof, the Purchaser shall identify the minimum aggregate number of employees in Australia/Japan to whom the Purchaser shall make an offer of employment, provided that, promptly after the date hereof, the relevant Sellers have permitted the Purchaser access to such information as the Purchaser reasonably requires in accordance with Sections 5.6(a) and 7.4(d) in order to make such identifications (except as prohibited by Law). Within one hundred and five (105) days following the date hereof, the Purchaser shall notify the Sellers of the identity of the Employees (other than Share Transfer Employees or other Employees whose employment transfers automatically by operation of Law to the Purchaser or a Designated Purchaser) the Purchaser and/or the Designated Purchasers intend to hire as of the Closing Date. Promptly following the latest of the granting of the U.S. Sale Order and the Canadian Approval and

179

<u>179</u>

Vesting Order and receipt of Regulatory Approvals, the Purchaser shall, or shall cause a Designated Purchaser to, extend a written offer of employment in a manner that provides no less than a two-week Employee consideration period ("**Offer Consideration Period**"), in a form agreed by the Primary Parties and in compliance with applicable Law, to those Employees identified by Purchaser in accordance with the immediately preceding sentence, with such employment to take effect under the terms stated herein as of the Effective Hire Date, as defined below. Such offers shall, except to the extent otherwise required by Law, be for employment on terms and conditions that are substantially comparable to those terms and conditions of employment of similarly situated employees of the Purchaser or a Designated Purchaser, as applicable, and, without limiting the generality of the foregoing, shall include (i) an annual base salary for each such Employee that is equal to the annual base salary for such Employee as set out in the Employee Information, (ii) employment in a reasonably comparable position as set out for the Employee in the Employee Information, (iii) a location reasonably contiguous to their current location as set out in the Employee Information and (iv) other terms and conditions of employment as set forth in this Section 7.1. Purchaser shall provide in its offers of employment that the Employee's acceptance of such offer will be deemed to be a consent to the transfer of his particular Employee Record. Share Transfer Employees and Employees whose employment transfers by operation of Law shall be employed on terms and conditions of employment that are no less favorable than those set out in the sentence before the preceding sentence. For purposes of this Agreement, to the extent certain terms and conditions of employment are required to be maintained under applicable Law or Seller Employee Plans in order to avoid Sellers' incurring severance or other employment termination obligations or Liability under the WARN Act with respect to Employees at any time after the Closing Date such terms and conditions shall be deemed to be required by applicable Law. Seller shall provide to the Purchaser such available and relevant information, and Seller and Purchaser shall cooperate in good faith, so as to enable Purchaser to comply with its undertakings under this Section 7.1.1. Employees' employment with Purchaser or a Designated Purchaser or, with respect to Share Transfer Employees or other Employees whose employment transfers by operation of Law, continued employment after the Employee Transfer Date, shall not include a probationary period and shall not be conditioned upon such employees satisfactorily completing a background investigation, drug test or other employment screening processes unless such screening process is required by applicable Law, a relevant Purchaser contract, or other customer requirement; provided, however, the Purchaser or Designated Purchaser may require Employees to provide evidence that they are legally permitted to be employed by the Purchaser or a Designated Purchaser, as required by applicable Law. Purchaser shall notify the Main Sellers of the acceptance and rejections of offers of employment that have been received from each of the Employees (x) on at least a weekly basis during the Offer Consideration Period and (y) in total within three (3) Business Days following the end of the Offer Consideration Period. Any Employee who accepts such offer of employment and commences employment with Purchaser or a Designated Purchaser, as applicable, pursuant to this Agreement, and any Employees whose employment transfers by operation of Law and Share Transfer Employees, shall all be deemed to be a Transferred Employee for all purposes of this Agreement. Inactive Employees shall remain employed by the relevant Seller until the first Business Day immediately following the date the Inactive Employee is released to return to active employment in accordance with Sellers' leave policies and on which such Inactive Employee reports to work with the Purchaser or a Designated Purchaser. The Purchaser or a

~~180~~

Designated Purchaser shall use reasonable best efforts from the date hereof until the Closing Date to obtain, at its cost, such visas or permits as are required for it to employ Employees with visas or permits as indicated in the Employee Information. Visa Employees and Other Loaned Employees shall remain employed by the relevant Seller under the terms and conditions of the Loaned Employee Agreement. The Effective Hire Date for Non-Union Employees is (a) the Employee Transfer Date for those Employees other than Inactive Employees, Visa Employees and Other Loaned Employees, (b) 12:01 a.m. on the first Business Day following the release to return to active employment from leave for all Inactive Employees and on which such Inactive Employee reports to work with the Purchaser or Designated Purchaser and (c) the date specified in the Loaned Employee Agreement with respect to Visa Employees and Other Loaned Employees.

### 7.1.2. Employee Benefits.

(a)      The Purchaser or a Designated Purchaser shall, and shall cause its relevant Affiliates to, recognize the service date of each Transferred Employee as set out in the Employee Information, to the same extent that service credit would be given under the analogous Seller Employee Plan, for purposes of eligibility and vesting, and with respect to any severance or vacation plan, the determination of levels of benefits, but not for purposes of benefit accrual, or otherwise for determination of the amount or duration of benefits under any Purchaser Employee Plans, except (i) with respect to Transferred Employee Plans, or (ii) as otherwise required by applicable Law.

(b)      After the date hereof, the Sellers and the Purchaser shall cooperate promptly and in good faith in preparing the transition of the Transferred Employees as applicable from coverage under the Seller Employee Plans to coverage under the Purchaser Employee Plans effective as of the Transferred Employee's Effective Hire Date.

(c)      Without limiting the generality of the foregoing, the Purchaser shall, or shall cause its relevant Affiliates to, provide the following benefits to Transferred Employees:

(i)      For the period beginning on the Closing Date and ending on the date that is twelve (12) months from the Closing Date, the Purchaser shall, or shall cause its relevant Affiliates to, provide Transferred Employees with the same severance payments and benefits as similarly situated employees of Purchaser or a Designated Purchaser.

(ii)      The~~Where the~~ Sellers shall~~determine they are required by applicable Law or policy to~~ pay the amount of compensation with respect to such accrued and unused vacation days that are due and owing to the~~Transferred Employees, including the Union Employees, (other than Transferred Employees who are (x) Share Transfer Employees, whose accrued vacation is specified in Section 7.1.2(c)(ii)(A) of the Sellers Disclosure Schedule, and (y) those Transferred Employees whose accrued vacation is specified in Section 7.1.2(c)(ii)(B) of the Sellers Disclosure Schedule)~~Union Employees, as of their

Effective Hire Date, to such ~~Transferred Employees at or as soon as reasonably practicable~~the Sellers shall pay such amount within 30 days following their Effective Hire Date, or such earlier time as may be required by Law. Upon certification by an officer of the Sellers to the Purchaser of the actual payment of such amount to any such Transferred Employee and withholding and payment of Taxes in connection therewith, the Purchaser shall reimburse the Seller for such payment within 10 Business Days of the receipt of such certification. The Purchaser will, and will cause the relevant Designated Purchasers to, make reasonable best efforts to accommodate time off requests of such Transferred Employees until such time as they accrue sufficient paid time off under the Purchaser Employee Plans to address their vacation plans.

(iii)    Section 7.1.2(c)~~(ii)(A)~~(iii) of the Sellers Disclosure Schedule ~~sets~~will set forth the amount of accrued and unused vacation days that are due and owing to the ~~Share Transfer Employees~~Transferred Employees within 15 Business Days after Purchaser notifies Sellers of the Employees to whom employment offers will be made pursuant to Section 7.1.1 as of the date hereof and such amount shall be updated by the Sellers as of each ~~Share Transfer~~Transferred Employee's Effective Hire Date. ~~Section 7.1.2(c)(ii)(B) of the Sellers Disclosure Schedule sets forth the amount of accrued and unused vacation days that are due and owing to certain Transferred Employees as of the date hereof, and such amount shall be updated by the Sellers in respect of such Employees and to include all Loaned Employees as of the Closing Date.~~ The Purchaser shall, or shall cause its relevant Affiliates to, grant each ~~Share Transfer Employee and each~~ such Transferred Employee (other than those Loaned Employees whose accrued and unused vacation days are cashed out by Sellers or their Affiliates in connection with the termination of employment with Sellers or their Affiliates and those Transferred Employees whose accrued and unused vacation days are cashed out in accordance with Section 7.1.2(c)(ii) above) paid time off in an amount equal to such accrued unused vacation days set forth for such ~~Share Transfer Employee or such~~ Transferred Employee in the applicable Section of the Sellers Disclosure Schedule. If such ~~Share Transfer Employee or such~~ Transferred Employee terminates employment with the Purchaser or an Affiliate of Purchaser prior to receiving such paid time off, as described above, the Purchaser shall pay such Transferred Employee an amount equal to any such unused paid time off upon such employment termination; provided that the Purchaser shall only be required to make such payment if such Transferred Employee's employment terminates prior to the date which is twelve (12) months following the Closing Date, unless otherwise required by applicable Law. ~~Each Transferred Employee listed on Section 2.2.8 of the Sellers Disclosure Schedule who has pre-Closing accrued vacation that remains unused or unpaid after the Accrued Vacation Amount Final Payment Date shall be subject to the provisions of this Section 7.1.2(c)(iii) in respect of any such pre-Closing accrued vacation that is not otherwise paid to such Transferred Employee except where payment of accrued amounts instead of carryover is required under applicable Law, in which~~

~~182~~

~~ease the Purchaser shall make such payments to the applicable Transferred Employee.~~

(iv)     Under the vacation policy of the Purchaser or an Affiliate of the Purchaser, the vacation accrual rate and maximum accrual of each Transferred Employee on and after the Effective Hire Date shall be determined under the vacation policy of the Purchaser or its relevant Affiliate following the crediting of such Transferred Employee with service as provided in Section 7.1.2(a). For the avoidance of doubt, such vacation accrual rate and maximum accrual applicable to ~~Share-Transfer Employees and to~~ Transferred Employees whose accrued vacation is specified in Section 7.1.2(c)(ii)~~(3iii)~~ of the Sellers Disclosure Schedule (other than ~~those Loaned~~**Transferred** Employees whose accrued and unused vacation days are cashed out by ~~Sellers or their Affiliates in connection with the termination of employment with Sellers or their Affiliates~~**in accordance with Section 7.1.2(c)(ii) above**) shall not be decreased prior to the date which is twelve (12) months following the Closing Date, **or later if required by applicable Law,** by the Purchaser or its Affiliates as a result of the obligation in Section 7.1.2(c)(iii) that Purchaser or its Affiliates grant or compensate such Employees with respect to accrued and unused vacation days due and owing as of the Effective Hire Date. Notwithstanding the foregoing, ~~Share-Transfer Employees and~~ such Transferred Employees shall have only through and until the date which is twelve (12) months following the Closing Date, **or later if required by applicable Law,** during which to use accrued and unused vacation days due and owing as of the Effective Hire Date. Any such accrued vacation days that remain unused at such time shall be automatically forfeited.

(v)     The Purchaser or Designated Purchaser shall provide each Transferred Employee employed in India with the benefit of the amount set forth on Section 7.1.2(c)(v) of the Sellers Disclosure Schedule of gratuity payment, at such time, if any, as such payment thereof is due and owing to each such Transferred Employee under applicable Law, taking into account in the calculation of such payment the service of such Transferred Employee as set forth in the Employee Information and such Transferred Employee's service with Purchaser on and after the Closing Date. The Purchaser or Designated Purchaser shall provide each Transferred Employee employed in Australia with the benefit of the amount set forth on Section 7.1.2(c)(v) of the Sellers Disclosure Schedule of long service leave and sick leave, at such time, if any, as payment of such amount is due and owing to each such Transferred Employee under applicable Law, taking into account in the calculation of such payment the service of such Transferred Employee as set forth in the Employee Information and such Transferred Employee's service with Purchaser on and after the Closing Date. Section 7.1.2(c)(v) of the Sellers Disclosure Schedule shall be updated no later than ten (10) Business Days prior to the Closing Date to reflect employee hiring, promotions, demotions, transfers or other status changes and attrition, and further

accruals or reductions or other changes from the date hereof to the Closing Date, in each case if and only to the extent permitted under Section 5.9.

(vi) ~~For purposes of clarification, the Parties agree that Inactive Employees who become Transferred Employees before the date when the Main Sellers and the EMEA Sellers deliver to the Purchaser pursuant to 2.2.3.1(a) the Closing Statement including the calculation of the Closing Accrued Vacation Amount will be considered Transferred Employees for purposes of determining the Closing Accrued Vacation Amount or any other provisions that adjust the Purchase Price in respect of Transferred Employees' vacation or, if applicable, gratuity pay in respect of Transferred Employees located in India and sick leave and long service leave in respect of Transferred Employees located in Australia.~~ For the avoidance of doubt, Inactive Employees as of the Closing Date will be listed on Section 2.2.8 of the Sellers Disclosure Schedule, Section 7.1.2(c)~~(ii)(3)~~iii) of the Sellers Disclosure Schedule and Section 7.1.2(c)(v) of the Sellers Disclosure Schedule, as applicable, but ~~will not be treated as Transferred Employees for purposes of determining the Accrued Cash-Out Vacation Escrow Amount or, if they have not become Transferred Employees before the date when the Main Sellers and the EMEA Sellers deliver to the Purchaser pursuant to Section 2.2.3.1(a) the Closing Statement including the calculation of the Closing Accrued Vacation Amount, the Accrued Vacation Amount. The Parties further agree that Seller shall pay to Inactive Employees who become Transferred Employees on or after the date when the Main Sellers and the EMEA Sellers deliver to the Purchaser pursuant to Section 2.2.3.1(a) the Closing Statement including the calculation of the Closing Accrued Vacation Amount all accrued and unused vacation and, if applicable, gratuity pay with respect to such Transferred Employees located in India and long service leave and sick leave with respect to such Transferred Employees located in Australia through the date of employment termination with Seller, unless the Parties otherwise agree in writing at or after the Closing with respect to any~~provided, however, that unless and until such Inactive Employees ~~in India or Australia~~ who become Transferred Employees~~,~~, the Purchaser shall have no obligation with respect to Inactive Employees under this Section 7.1.2(c).

(d) Except with respect to Share Transfer Employees or any Employee whose benefits are specified by applicable Law, each Transferred Employee (and their eligible dependents, as applicable), shall be eligible as of the relevant Effective Hire Date to participate in and accrue benefits under the Purchaser Employee Plans, in each case under the terms of such Purchaser Employee Plans, which apply to employees of the Purchaser or a Designated Purchaser in the country where such Transferred Employee is employed as of the relevant Effective Hire Date and at a cost to such Transferred Employee, which is substantially comparable to the costs of those parallel benefit plans of similarly situated employees of the Purchaser. With respect to each Transferred Employee (and their eligible dependents, as applicable), the Purchaser or the relevant Purchaser's Affiliates shall use reasonable best efforts to cause such plans to (i) waive any eligibility periods, evidence of insurability or pre-existing

~~184~~

**184**

condition limitations and (ii) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employees, including with respect to their dependents, under comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Effective Hire Date occurs, provided that such employee provides an explanation of benefits or similar documentation of such expenses paid or incurred to the Purchaser or its Affiliates. With respect to Transferred Employees who are Share Transfer Employees, the above provisions shall apply to any Purchaser Employee Plan that the Purchaser offers to such Transferred Employees but not with respect to any Transferred Employee Plans. Nothing in this paragraph or otherwise in this Article 7 shall be construed as constituting an amendment of any employee benefit plan.

      (e)    The Parties agree to comply with provisions set forth in Section 7.1.2(e) of the Sellers Disclosure Schedule, relating to Canadian Pension Plans.

      (f)    Neither Section 7.1.1 nor this Section 7.1.2 restricts the right of the Purchaser to terminate the employment of any Transferred Employee after the Closing, provided any such termination is effected in accordance with applicable Law, the terms of any applicable Purchaser Employee Plan or Transferred Employee Plan and the terms and conditions of this Section 7.1.

      SECTION 7.2.    Employment Obligations with Respect to Union Employees. The provisions of this Section 7.2 shall apply to Union Employees. As of the Closing Date, the Purchaser or its relevant Affiliate will be bound by the terms and obligations of the Collective Labor Agreements specified in the Employee Information with respect to the employment of the relevant Union Employees as a successor, assign or purchaser of the relevant Seller and shall employ the Union Employees in accordance therewith.

      SECTION 7.3.    Excluded Employee Liabilities. For purposes of clarity, except as otherwise provided in the Loaned Employee Agreement, the Sellers shall retain, and neither the Purchaser nor any of the Designated Purchasers shall assume at the Closing, any of the following Liabilities of the Sellers (the "Excluded Employee Liabilities"):

      (a)    except with respect to any Share Transfer Employees of the NGS Companies and/or their qualified beneficiaries, any obligation to provide continuation coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to any Transferred Employees and/or their qualified beneficiaries who have a COBRA qualifying event prior to such Employees' Effective Hire Date;

      (b)    any Liabilities resulting from any Action (i) by any Employee (other than a Share Transfer Employee or another Employee whose employment transfers to the Purchaser or a Designated Purchaser by operation of Law) relating to his/her employment or termination of employment with any of the Sellers, except any Action related to Purchaser's failure to perform its obligations under Sections 7.1.2(c)(ii), (iii), (iv) and (v), or (ii) an applicant with respect to potential employment with any of the Sellers in the Business;

(c)     any Liabilities under the WARN Act which arise out of or result from any layoff, termination of employment or the closing or relocation of worksites or the like by the Sellers on or before the Closing Date other than Liabilities related to the Transferred Employees as a result of the actions or inactions of the Purchaser as provided in Section 2.1.3(e)(ii) and (iv) or as provided in Section 2.1.3(e)(iii);

(d)     other than with respect to the Companies and the Share Transfer Employees, any Liabilities for Employees and independent contractors related to the Business that are not Transferred Employees; and

(e)     other than with respect to the Companies and the Share Transfer Employees, any other Liabilities relating to Employees, independent contractors or Seller Employee Benefit Plans that are not expressly assumed under this Agreement.

SECTION 7.4.     Other Employee Covenants.

(a)     After the date hereof, and subject to each Party's disclosure obligations imposed by Law or by Government Entities and each Party's obligations hereunder, the Parties shall not, and shall procure that each of their Affiliates shall not, issue any announcement or communication to their respective employees or the Employees, prior to consultation with, and the approval of, the other Party (not to be unreasonably withheld or delayed) with respect to this Agreement or any of the transactions contemplated hereby (including any announcement or communication to any individual employee that the Purchaser is required to provide under applicable Law). Each Party shall cooperate in respect of the development and distribution of any announcement and communication to the employees of the other Party including Employees thereof, with respect to this Agreement or any of the transactions contemplated hereby.

(b)     The Purchaser undertakes to keep the Employee Information in confidence and that, until the relevant Employee Transfer Date with respect to those Employees who become Transferred Employees, and at all times with respect to those Employees who do not become Transferred Employees:

        (i)     the Purchaser shall, and shall cause the Designated Purchasers to, restrict the disclosure of the Employee Information only to such of its employees, agents and advisors as is reasonably appropriate for the purposes of complying with its obligations pursuant to this Agreement prior to the Employee Transfer Date;

        (ii)     the Employee Information shall not be disclosed to any other Person (including, for the avoidance of doubt, any other employee of the Purchaser or any Designated Purchaser or other Affiliate of the Purchaser) without the consent of the Main Sellers, such consent not to be unreasonably withheld;

        (iii)     the Employee Information shall not be used except for the purposes of complying with the obligations of the Purchaser and the Designated

186

Purchasers pursuant to this Agreement, and for the purposes reasonably related to the same, and shall be returned to the Sellers or destroyed, at the Sellers' election, if this Agreement is terminated; and

(iv)    the Purchaser shall, and shall cause the Designated Purchasers to, comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

(c)    The Sellers shall use reasonable efforts to provide updated Employee Information to the Purchaser on the first Business Day of each month beginning after the date hereof, provided that from and after the date on which the Purchaser determines its final list of Employees to whom offers shall be made under Section 7.1.1, Sellers shall provide updated Employee Information only with respect to such Employees, and shall provide the Purchaser with the final updated Employee Information with respect to those Employees to whom the Purchaser has made offers of employment under Section 7.1.1 ten (10) Business Days prior to the Closing Date in order to reflect Employee hiring, promotions, demotions, transfers, or other status changes and attrition, and further accruals or reductions or, if and to the extent applicable to such Schedule, other changes in a Transferred Employee's compensation from the date hereof to the Closing Date, in each case if and only to the extent permitted under Section 5.9.

(d)    The Purchaser and the Sellers shall cooperate with each other in connection with the process by which Employees are designated to become or not become Transferred Employees, and otherwise provide for an orderly transition of the Transferred Employees from the Sellers to the Purchaser or the Designated Purchasers, as applicable, and to minimize the disruption to the respective businesses of the Parties resulting from the transactions contemplated hereby. Without limiting the generality of the foregoing, within 105 days following the date hereof, the Sellers agree to commence discussions with the Purchaser regarding the identity of the Employees who will be offered employment under Section 7.1.1, and promptly after the date hereof, as permitted by applicable Law, provide the Purchaser reasonable access to books, records, personnel files, or other documentation as provided in Section 5.6(a). For the avoidance of doubt, for purposes of Section 5.6(a), the Sellers agree to use reasonable best efforts to obtain any consent of employees necessary to provide the Purchaser with such access.

(e)    During the Non-Solicitation Period the Sellers shall not, and shall not permit, cause or encourage any of their Affiliates to, without the advance written consent of Purchaser, either directly or indirectly solicit for employment, hire or otherwise engage to provide services any Transferred Employee or other employee of the Purchaser or Designated Purchaser unless the Purchaser or a Designated Purchaser involuntarily terminate the employment of such employee, without cause, prior to such action by the Sellers; provided, however, that nothing in this Section 7.4(e) shall prevent the Sellers from conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such Transferred Employees. During the Non-Solicitation Period, Purchaser and the Designated Purchasers shall not, and shall not permit, cause or encourage any of their Affiliates to, without the Seller's advance written consent, either directly or indirectly solicit for

187

employment, hire or otherwise engage to provide services (i) any of the employees of the Sellers (other than Employees), unless the Sellers involuntarily terminate the employment of such employee, without cause, prior to such action by the Purchaser or the Designated Purchasers, or (ii) any Employees who have rejected the employment offer of Purchaser or a Designated Purchasers or objected to their transfer of employment to the Purchaser or a Designated Purchasers pursuant to this Agreement or Employees to whom Purchaser or a Designated Purchaser did not make an offer pursuant to Section 7.1.1; provided, however, that nothing in this Section 7.4(e) shall prevent Purchaser or the Designated Purchasers from conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such employees or former employees of the Designated Sellers.

(f)     As of the Effective Hire Date, the Sellers shall release any non-competition or confidentiality obligations in respect of the Business or Assets binding to the Transferred Employees which would survive the termination of the employment relationship between the Sellers and the Transferred Employees. For the avoidance of doubt, this release shall operate only to facilitate the Transferred Employees' employment with the Purchaser or a Designated Purchaser, as applicable, in the Business and the subject non-competition and confidentiality obligations shall remain in full force and effect as to all other aspects of the Sellers' business and all other Persons.

(g)     Each Party shall reasonably cooperate to communicate relevant information to Employees relating to this Agreement and the transactions contemplated hereunder, and shall provide copies of all notices required by Law and related to the transactions contemplated by this Agreement to the other Party. Each Party shall provide copies of such communications to the other Party reasonably in advance of distribution, and shall provide an opportunity for such other Party to comment.

(h)     In the event and for so long as Seller is actively contesting or defending against any third party Action in which the Employee Records are pertinent, the Purchaser or Designated Purchaser agrees to provide reasonable access to Employee Records, at the cost of the Sellers.

(i)     In respect of the employees employed by NN International and providing services in Saudi Arabia, as set forth on Section 7.4(i) of the Sellers Disclosure Schedule: (i) the Main Sellers shall cause NN International, from the date hereof, to comply with the provisions of Paragraphs 6.1, 6.3 and 6.5 (to the extent applicable) and 8.1 through 8.3 of Schedule 6 to the EMEA Asset Sale Agreement as if NN International were a Relevant EMEA Seller thereunder and Clauses 10.21.7(D), (E), (G) or (J) of the EMEA Asset Sale Agreement as if NN International were an EMEA Seller in respect of those clauses; (ii) NN International shall comply with all of the relevant terms of Schedule 6 to the EMEA Asset Sale Agreement as if it were a Relevant EMEA Seller under the EMEA Asset Sale Agreement and Clauses 10.21.7(D), (E), (G) or (J) of the EMEA Asset Sale Agreement as if it was an EMEA Seller in respect of those clauses; and (iii) the Purchaser shall, or shall procure that the relevant EMEA Designated Purchaser shall, comply from the date hereof with its relevant obligations to NN International as if NN International were a Relevant EMEA Seller for the purposes of Schedule 6 of the EMEA

488

188

Asset Sale Agreement. In addition, employees of NN International performing services in Saudi Arabia in respect of the Business shall be treated as based in Saudi Arabia for purposes of Schedule 6 to the EMEA Asset Sale Agreement and, for the avoidance of doubt, any such employees who are selected by the Purchaser or relevant EMEA Designated Purchaser pursuant to Paragraph 1.1.12 of Schedule 6 to the EMEA Asset Sale Agreement shall be deemed to be Non-ARD Transferring Employees (as defined in the EMEA Asset Sale Agreement) for the purposes of the EMEA Asset Sale Agreement. For the avoidance of doubt, the employees listed in Section 7.4(i) of the Sellers Disclosure Schedule are not deemed to be Employees or Transferred Employees for the purposes of this Agreement.

SECTION 7.5.    No Amendment of Plans.  Notwithstanding anything in the Agreement to the contrary, no provision of this Agreement is intended to, or does, constitute the establishment or adoption of, or amendment to, any employee benefit plan (within the meaning of Section 3(3) of, or subject to, ERISA), and no person participating in any such employee benefit plan maintained by either the Seller or the Purchaser or the Designated Purchaser, shall have any claim or cause of action, under ERISA or otherwise, in respect of any provision of this Agreement as it relates to any such employee benefit plan or otherwise.

ARTICLE VIII

CONDITIONS TO THE CLOSING

SECTION 8.1.    Conditions to Each Party's Obligation. The Parties' obligation
to effect, and, as to the Purchaser, to cause the relevant Designated Purchasers to effect, the
Closing is subject to the satisfaction or the express written waiver of the Primary Parties, at or
prior to the Closing, of the following conditions:

(a)    Regulatory Approvals. All Regulatory Approvals shall have been
obtained and, unless the Purchaser expressly agrees otherwise, the Regulatory Approvals shall
not require the Purchaser, any Designated Purchaser, any EMEA Designated Purchaser or any of
their respective subsidiaries to commit to any actions, undertakings, divestitures, licenses or hold
separate or similar arrangements or any arrangements for the conduct of any business and/or
terminating any relationships or contractual rights or obligations that, individually or in the
aggregate, would be material in relation to the value of the Acquired Business.

(b)    No Injunctions or Restraints. There shall be in effect no Law, or any
material order, injunction, decree or judgment of any Court or other Government Entity in the
U.S., Canada or the United Kingdom, or of any European Union Entity, prohibiting the
consummation of any of the transactions contemplated hereby or by the EMEA Asset Sale
Agreement.

(c)    Reserved.

(d)    U.S. Sale Order and Canadian Approval and Vesting Order. The U.S.
Sale Order and the Canadian Approval and Vesting Order (i) shall have been entered without
material modification, unless the Purchaser expressly consented to such modification, which
consent shall not be unreasonably withheld and (ii) shall not have been stayed as of the Closing
Date, amended, modified, reversed, vacated, revoked or appealed and shall be in full force and
effect as of the Closing Date; provided that this condition shall be deemed satisfied even if the
U.S. Sale Order has been appealed, so long as (x) the applicable appeal period has expired, (y)
the effectiveness of the U.S. Sale Order has not been stayed by the U.S. Bankruptcy Court
pending appeal and (z) the Purchaser shall have concluded, after consultation with the Main
Sellers, the Monitor, the Committee and the Bondholder Group and their respective counsel, that
there is no material risk that any pending appeal of the U.S. Sale Order will not be rendered moot
following Closing by operation of Section 363(m) of the U.S. Bankruptcy Code.
Notwithstanding the foregoing, any modification of Paragraphs L and Q and Sections 6, 7 and 8
of the U.S. Sale Order by the U.S. Bankruptcy Court to comply with applicable law shall not
affect the Purchaser's obligation to close hereunder.

(e)    Satisfaction of Conditions under EMEA Asset Sale Agreement. The
conditions to Closing of the EMEA Asset Sale Agreement set out in Clause 15.1 thereof (other
than the conditions regarding the satisfaction or waiver of the conditions set out in this Section

190

8.1) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement.

(f) *Consummation of Closing under EMEA Asset Sale Agreement.* The transactions contemplated by the EMEA Asset Sale Agreement to be completed as of the Closing shall be completed contemporaneously with the Closing hereunder.

SECTION 8.2. Conditions to Sellers' Obligation. The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Main Sellers), at or prior to the Closing, of each of the following conditions:

(a) *No Breach of Representations and Warranties.* Each of the representations and warranties contained in Article III (disregarding all materiality and material adverse effect qualifications contained therein) shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually and together with other such failures, has not had a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement.

(b) *No Breach of Covenants.* The Purchaser shall have performed in all material respects all material covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing.

(c) *Officer Certificate.* The Sellers shall be furnished with a certificate of one of the senior officers of the Purchaser certifying that the conditions set forth in Section 8.2(a) and (b) have been satisfied.

(d) *Satisfaction of Conditions under EMEA Asset Sale Agreement.* The conditions to Closing of the EMEA Asset Sale Agreement set out in Clause 15.2 thereof (other than the conditions regarding the satisfaction or waiver of the conditions set out in this Section 8.2) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement.

SECTION 8.3. Conditions to Purchaser's Obligation. The Purchaser's obligation to effect, and to cause the relevant Designated Purchasers to effect, the Closing shall be subject to the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a) *No Breach of Representations and Warranties.* Each of the representations and warranties set forth in Article IV, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except in each case for any failure to be true and correct that, individually and together with other such failures, has not had a Material Adverse Effect.

191

191

(b)  *No Breach of Covenants.*  Sellers shall have ~~performed~~complied (i) with all pre-Closing obligations set forth in Section 5.9(v) and Section 5.34 and (ii) in all material respects with all other material covenants, obligations and agreements contained in this Agreement required to be performed by the Sellers on or before the Closing.

(c)  *Officer Certificate.*  The Purchaser shall be furnished with a certificate of one a senior officer of one of the Main Sellers that the conditions set forth in paragraphs (a) and (b) of this Section have been satisfied.

(d)  *No Plan Termination of or Lien with Respect Thereto.*  ~~With~~If the Asset Sale Election is not made, with reference to occurrences at any time before, on or after the date hereof (i) the NNRIP shall not have been terminated prior to the Closing in a distress termination (under Section 4041 of ERISA) or an involuntary termination (under Section 4042 of ERISA), (ii) Seller (or any Person that would be considered a single employer with Seller under ERISA or the Code) shall not have issued a notice of intent to terminate the NNRIP or received notice that the PBGC has initiated a proceeding to terminate the NNRIP, in either case with a proposed date of plan termination on or before the Closing Date, which termination could result in related liabilities to the Purchaser or its Affiliates (including the Companies), (iii) no Lien shall have arisen under Section 430 of the Code or Section 4068 of ERISA with respect to such NNRIP that could apply to any of the assets of the Purchaser or any of its Affiliates (including the Companies), and (iv) no liability could be asserted against the Companies under Section 412 of the Code or Section 4062 of ERISA, unless, in the case of each of clauses (i), (ii), (iii) and (iv), either the PBGC shall have waived its Claims or potential Claims against Purchaser or any of its Affiliates (including the Companies) in relation to such potential liabilities and, if applicable, any such Lien or potential Lien shall have been released, or as of the Closing Date shall be released, by the PBGC. The Sellers expressly acknowledge, for the avoidance of doubt, that Purchaser is entitled to the benefit of this Section 8.3(d) with respect to, without limiting the generality of clauses (i), (ii), (iii) and (iv) of the preceding sentence, the Complaint For Pension Plan Termination dated July 16, 2009 filed by the PBGC in the U.S. District Court for the Middle District of Tennessee (Nashville Division) and the PBGC Notice of Determination addressed to the Retirement Plan Committee of Nortel Networks Retirement Income Plan and any related plan termination or actual or potential Claim, Lien or ~~liability~~Liability as described above.

(e)  *UK Defined Benefit Plan.*

(i)  ~~(e) UK Defined Benefit Plan.~~ There~~If the Asset Sale Election is not made, there~~ shall be no pending Action by the UK Pensions Regulator, the PPF or the Pension Trustees seeking to assert liability against the Companies or in respect of the Shares under the UK Pensions Act 2004. For the purposes of this clause an Action to assert such liability shall be deemed to have occurred and to be pending (unless such action shall have been formally terminated or withdrawn), without limitation upon and following the occurrence of any of:

(A)    (i) The issue of a warning notice in respect of the imposition of a contribution notice or a financial support direction (as defined under the UK Pensions Act 2004) on either of the Companies by the UK Pensions Regulator; or

(B)    (ii) The issue of a determination notice in respect of the imposition of a contribution notice or a financial support direction (as defined under the UK Pensions Act 2004) on either of the Companies by the UK Pensions Regulator; or

(C)    (iii) any written communication from the UK Pensions Regulator, the PPF or the Pensions Trustees which is received by or addressed to the attention of any Sellers, any EMEA Sellers, any Company, the Joint Administrators, the Joint Israeli Administrators, the Pension Trustees or the Purchaser or the representative of or successor to (including any administrator of) any of the foregoing and which makes reference to either of the Companies and/or the matters covered by the Transaction Documents and states that the UK Pensions Regulator is reviewing the position of either of the Companies and/or the matters covered by the Transaction Documents with a view to imposing or determining whether to impose a contribution notice or financial support direction (as defined under the UK Pensions Act 2004) on either of the Companies.

(f)    *Satisfaction of Conditions under EMEA Asset Sale Agreement.* The conditions to Closing of the EMEA Asset Sale Agreement set out in Clause 15.3 thereof (other than the conditions regarding the satisfaction or waiver of the conditions set out in this Section 8.3) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement.

(g)    *Customer Contracts; Financial Statements.* If the Asset Sale Election is made, then either (i) Customer Contracts of the Companies that accounted for not less than 65 % of LTM revenues of the Companies as of the Closing Date shall have been transferred or, to the extent not prohibited by applicable Law or the terms of such Customer Contract, sub-contracted (on terms under which Purchaser or a Designated Purchaser receives the economic benefits that it would have received if it were a direct party to the relevant Customer Contract) to Purchaser or a Designated Purchaser on the Closing Date in compliance with an effective order of the Bankruptcy Court or (ii) Sellers shall have delivered a second set of all financial statements and information required to be delivered before Closing under Section 5.34, which set of financial statements and information shall have been prepared excluding the Companies.

(h)    *Resolution of Certain Tax Issues.* In the event the Asset Sale Election is not timely made, any material Tax Liability of the Companies arising pursuant to Treasury Regulation Section 1.1502-6 and relating to the IRS Claim (the "-6 Liability") shall have been resolved in a manner reasonably acceptable to the Purchaser.

193

193

## ARTICLE IX

### TERMINATION

SECTION 9.1.    Termination. This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of the Primary Parties;

(b)    by either Primary Party, upon written notice to the other:

(i)    on or prior to the fifth (5th) Business Day after entry of the U.S. Bidding Procedures Order or the Canadian Sales Process Order, if the U.S. Bidding Procedures Order and the Canadian Sales Process Order have not been entered within thirty (30) days from the date of this Agreement in the form of orders, without modification that is material and adverse to the terminating Party unless such Party expressly consented to such modification (such consent not to be unreasonably withheld), set forth in Exhibit 5.1(a) (in the case of the U.S. Bidding Procedures Order) and Exhibit 5.2.1 (in the case of the Canadian Sales Process Order);

(ii)    on or prior to the fifth (5th) Business Day after entry of the U.S. Sale Order or the Canadian Approval and Vesting Order,(ii) if the U.S. Sale Order and the Canadian Approval and Vesting Order are not entered in satisfaction of the condition set forth in Section 8.1(d) within ten (10) Business Days if terminated by the Purchaser or twenty (20) Business Days if terminated by the Main Sellers after the conclusion of the Auction in the form of orders, without modification that is material and adverse to the terminating Party unless such Party expressly consented to such modification (such consent not to be unreasonably withheld), set forth in Exhibit 5.1(a) (in the case of the U.S. Bidding Procedures Order) and Exhibit 5.2.1 (in the case of the Canadian Sales Process Order);

(iii)    upon or following the entry of an order by the U.S. Bankruptcy Court or the Canadian Court approving an Alternative Transaction;

(iv)    if the EMEA Asset Sale Agreement is terminated in accordance with its terms;

(v)    upon or following the sale, transfer or other disposition, directly or indirectly, of any material portion of the Business or the Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers or the Companies;

(vi)    if the Closing does not take place on or prior to the date that is (a) 270 days from the date of this Agreement in the case of a termination by the Main

194

**194**

Sellers, or ~~(h)~~ the ~~date that is~~ **earlier of (1)** 365 days from the date of this Agreement **or (2) the later of 270 days from the date of this Agreement or the thirtieth (30th) day after the date on which the condition set forth in Section 8.1(a) hereof is satisfied,** in the case of a termination by the Purchaser; or

(vii)   if any Antitrust Law is enacted in the U.S. or Canada or by the European Union, or any Court or other Government Entity in the U.S. or Canada or any Government Entity of the European Union issues a final order, injunction, decree, ruling or judgment based on Antitrust Laws, in each case permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement~~; or~~**.**

(c)   (i) by the Purchaser, upon written notice to the Main Sellers, in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure of the conditions to Closing set forth in Section 8.1(a), Section 8.1(c), Section 8.1(f), Section 8.3(a) or Section 8.3(b), as applicable, or (ii) by the Main Sellers, upon written notice to the Purchaser, in the event of a material breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement or the EMEA Asset Sale Agreement, which breach would result in a failure of the conditions to Closing set forth in Section 8.1(a), Section 8.1(c), Section 8.1(f), Section 8.2(a) or Section 8.2(b), as applicable, and, in each case, which, if capable of being cured, has not been cured within twenty-five (25) days from receipt of a written notice thereof from the non-breaching Party; or

(d)   by the Main Sellers, upon written notice to the Purchaser:

(i)   upon Purchaser's material breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within five (5) days from the receipt of a written notice thereof from the Main Sellers; or

(ii)   in the event of a material breach by the Purchaser of the Purchaser's covenants set forth in Section 5.5, which breach, if capable of being cured, is not cured within fifteen (15) days from receipt of a written notice thereof from the Main Sellers;

(e)   by the Purchaser, upon written notice to the Main Sellers, if at the conclusion of the Auction, the Purchaser is not selected as the Successful Bidder ~~(as defined in the U.S. Bidding Procedures Order)~~;

(f)   by the Purchaser, upon written notice to the Main Sellers delivered prior to the entry of the U.S. Sale Order, if the Auction does not conclude by the later of (x) the forty-fifth (45th) Business Day after the entry of the U.S. Bidding Procedures Order and (y) September ~~15~~**,16,** 2009;

(g)   by the Purchaser, upon written notice to the Main Sellers;

195

**195**

(i)    upon revocation or alteration of the Bidding Procedures (as defined in the U.S. Bidding Procedures Order), the Bidding Process (as defined in the U.S. Bidding Procedures Order) or the Auction, in each case pursuant to the last paragraph of the section of the Bidding Procedures titled "Reservation of Rights;"

(ii)    upon any Sellers' material breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within twenty-five (25) days from the receipt of a written notice thereof from the Purchaser; or

(iii)    within thirty (30) days of delivery by the Purchaser of the related written notice of breach to the Sellers, in the event that (A) on or subsequent to the date hereof and prior to the entry of the Bidding Procedures Order or (B) subsequent to the conclusion of the Auction, in the event there is a material breach by the Sellers of the covenants set forth in Section 5.29 that occurred during such period which breach, if capable of being cured, has not been cured within five (5) days from receipt of a written notice thereof from the Purchaser (provided that, with respect to a breach occurring in the period contemplated by clause (A), no termination notice shall be given by the Purchaser after the entry of the Bidding Procedures Order);

(h)    by the Purchaser, upon written notice to the Main Sellers delivered within fifteen (15) days of delivery to the Purchaser of the Audited Financial Statements for fiscal year 2008, if the Adjusted Audited Standard Margin is less than ninety percent (90%) of the Unaudited Standard Margin; or

(i)    by the Purchaser, upon written notice to the Main Sellers delivered before the expiration of the Contract Review Period, provided that the Reverse Termination Fee is paid to Sellers in accordance with Section 9.3 prior to or concurrently with such termination;

provided, however, that (x) the right to terminate this Agreement pursuant to Section 9.1(b)(i), Section 9.1(b)(ii), Section 9.1(b)(vii), Section 9.1(c) or Section 9.1(f) shall not be available to any Party whose breach hereof was a principal cause of the event or condition purportedly giving rise to a right to terminate this Agreement under such clause and; provided further, however, that (y) the right to terminate this Agreement pursuant to Section 9.1(b)(vi) shall not be available to the Sellers, if any Seller or any EMEA Seller is in breach of its obligation to close the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement during the twenty-five (25) days prior to the two-hundred seventieth (270th) day from the date hereof, until forty-five (45) days after such breach has been cured and (z) the right to terminate this Agreement pursuant to Section 9.1(b)(vi) shall not be available to the Purchaser, if the Purchaser is in breach of its obligation to close the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement during the five (5) days prior to the date that is 365 days after the date hereof, until forty-five (45) days after such breach has been cured.

SECTION 9.2.    Break-Up Fee; Expense Reimbursement.

(a)    In the event that (i) this Agreement is terminated (x) by either Primary Party pursuant to Section 9.1(b)(ii) (provided that an Alternative Transaction has been proposed or re-proposed to the Main Sellers after the date hereof and prior to such termination, and an Alternative Transaction is entered into before, on or within sixty (60) days following such termination of this Agreement), Section 9.1(b)(iii) or Section 9.1(b)(v) or (y) by the Purchaser pursuant to Section 9.1(c)(i) (as a result of an Intentional Breach by the Sellers), Section 9.1(e), Section 9.1(f), Section 9.1(g)(i), Section 9.1(g)(ii) (as a result of an Intentional Breach by the Sellers) or, subsequent to the conclusion of the Auction, Section 9.1(g)(iii) (as a result of an Intentional Breach by the Sellers), or (z) by either Primary Party pursuant to Section 9.1(b)(iv) (as a result of a termination of the EMEA Asset Sale Agreement pursuant to Clause 15.4.2(C), Clause 15.4.2(E) or Clause 15.4.4 (as a result of an Intentional Breach by the EMEA Sellers of the EMEA Asset Sale Agreement) of the EMEA Asset Sale Agreement), (ii) when this Agreement is terminated, the Purchaser is not in breach of this Agreement or the EMEA Asset Sale Agreement as a result of an Intentional Breach which Intentional Breach would result in a failure to satisfy the conditions to Closing set forth in Section 8.1 and/or Section 8.2, as applicable, and, in each case, which, if capable of being cured, has not been cured within the applicable Breach Cure Period, and (iii) an Alternative Transaction is entered into before, on or within nine (9) months following such termination and is eventually consummated, the Sellers and the EMEA Debtors shall pay to the Purchaser in immediately available funds, within five (5) Business Days of the consummation of such Alternative Transaction, an aggregate cash fee equal to (x) $14,250,000 (the "Break-Up Fee"), minus (y) one-half of the Expense Reimbursement paid hereunder.

(b)    In the event that (i) (A) this Agreement is terminated pursuant to any provision in Section 9.1 (other than Section 9.1(a), Section 9.1(b)(iv) (as a result of a termination of the EMEA Asset Sale Agreement pursuant to Clause 15.4.1, Clause 15.4.2(G), Clause 15.4.3, or Clause 15.4.9 of the EMEA Asset Sale Agreement), Section 9.1(b)(vii), Section 9.1(c)(ii), Section 9.1(d) or Section 9.1(i)), or (B) this Agreement is terminated pursuant to any provision in Section 9.1 and, prior to such termination, the Sellers publicly announce (1) the retention of the Business by all or some of the Sellers (or their successor entities) under a stand-alone plan of reorganization approved by the U.S. Bankruptcy Court or any plan of arrangement approved by the Canadian Court, or (2) that any portion of the Business or the Assets and the EMEA Assets will be sold, transferred or otherwise disposed, directly or indirectly, in connection with the closure, liquidation or winding up of the Business or any of the Sellers, the EMEA Sellers or the Companies (except for any sale to the Purchaser or a Designated Purchaser contemplated by the Transaction Documents), and (ii) when this Agreement is terminated, the Purchaser is not in breach of this Agreement or the EMEA Asset Sale Agreement as a result of an Intentional Breach which breach would result in a failure to satisfy any of the conditions to Closing set forth in Section 8.1 and/or Section 8.2 or Clause 15.1 and/or Clause 15.2 of the EMEA Asset Sale Agreement, as applicable, and, in each case, which, if capable of being cured, has not been cured within the applicable Breach Cure Period, the Sellers and the EMEA Sellers shall pay the Purchaser an aggregate amount in cash equal to the total amount of all reasonable and documented fees, costs and expenses incurred by the Purchaser in connection with the

197

**197**

preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all filing and notification fees, and all fees and expenses of the Purchaser's representatives (the "**Expense Reimbursement**"); provided, however, that the Expense Reimbursement shall not be payable in the event that the Agreement is terminated pursuant to Section 9.1(b)(vi) if at the time of such termination (i) the condition set forth in Section 8.1(a) is not satisfied and (ii) the conditions set forth in Section 8.1(b), Section 8.1(d), Section 8.3(a), Section 8.3(b), Section 8.3(d) and Section 8.3(e) are satisfied other than any failure to satisfy any such condition listed in clause (ii) that is caused by the failure to obtain any Antitrust Approval or an Intentional Breach by Purchaser of this Agreement which, if capable of being cured, has not been cured within the applicable Breach Cure Period. Notwithstanding the foregoing, the Expense Reimbursement shall not exceed $9,500,000 in the aggregate (the "**Expense Reimbursement Limit**"). If the Expense Reimbursement does not exceed the Expense Reimbursement Limit, the Sellers and the EMEA Sellers agree that the Expense Reimbursement is a reasonable amount given the size and complexity of the transactions contemplated by this Agreement and the EMEA Asset Sale Agreement. The Expense Reimbursement shall be paid by wire transfer or other means reasonably acceptable to the Purchaser not later than five (5) Business Days following the receipt by the Main Sellers and NNUK of written notice from the Purchaser describing the fees and expenses that constitute the Expense Reimbursement in reasonable detail.

(c)     The Sellers shall pay two-thirds (2/3) and the EMEA Debtors shall pay one-third (1/3) of each of the Break-Up Fee and the Expense Reimbursement if payable hereunder. The Sellers' and the EMEA Debtors' obligations to pay their respective shares of the Break-Up Fee and the Expense Reimbursement pursuant to this Section 9.2 shall be several and not joint (but the obligation of the Sellers to pay two-thirds (2/3) of each of the Break-Up Fee and Expense Reimbursement shall be joint and several among the Sellers and the obligation of the EMEA Debtors to pay one-third (1/3) of each of the Break-Up Fee and Expense Reimbursement shall be joint and several among the EMEA Debtors) and shall survive termination of this Agreement or the EMEA Asset Sale Agreement and shall (i) to the extent owed by the U.S. Debtors constitute an administrative expense of the U.S. Debtors under sections 503(b) of the U.S. Bankruptcy Code and (ii) to the extent owed by the EMEA Debtors, constitute an expense of the administration under Paragraph 99 of Schedule B1 to the Insolvency Act 1986 and/ or Rule 2.67 of the Insolvency Rules 1986; provided, however, in the event that any Seller or any EMEA Seller or any Affiliate of any Seller or EMEA Seller agrees to pay a break-up fee or expense reimbursement to any subsequent purchaser of assets or shares, with an unadjusted, aggregate purchase price greater than or equal to $100,000,000 and such break-up fee or expense reimbursement has priority over any administrative expenses specified in section 503(b) or 507(b) of the U.S. Bankruptcy Code, then the portion of the Break-Up Fee and Expense Reimbursement payable to the Purchaser or its Affiliates by the Sellers shall have administrative expense status under section 364(c) of the U.S. Bankruptcy Code with priority over any and all administrative expenses specified in section 503(b) or 507(b) of the U.S. Bankruptcy Code (to the extent such concept is applicable to such Sellers).

(d) ~~Notwithstanding anything to the contrary herein, the Sellers' obligation to pay the Break-Up Fee and/or Expense Reimbursement pursuant to this Section 9.2 is expressly subject to entry of the U.S. Bidding Procedures Order and Canadian Sales Process Order.~~

SECTION 9.3.    Reverse Termination Fee.

(a)     The Purchaser shall pay the Reverse Termination Fee to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) ~~a cash fee in an aggregate amount equal to~~ \$100 million (such aggregate cash fee, the "Reverse Termination Fee") in the event that:

(i)     this Agreement is terminated by Purchaser pursuant to Section 9.1(i); or

(ii)     (A) ~~at~~At the time of termination of the Agreement, (1) the conditions set forth in Section 8.1(a) of this Agreement or Clause 15.1.3 of the EMEA Asset Sale Agreement have not been satisfied ~~because of the failure~~ to ~~obtain any Antitrust Approval and/or (2) the Purchaser is in breach in any material respect of its representations, warranties, agreements or covenants set forth in this Agreement or the EMEA Asset Sale Agreement as a result of an Intentional Breach which~~ breach (x) ~~would result in a failure to satisfy any of the conditions to Closing set forth in Section 8.1 and/or Section 8.2, as applicable, or the conditions to Closing (as defined in the EMEA Asset Sale Agreement) set forth in Clause 15.1 and/or Clause 15.2 of the EMEA Asset Sale Agreement, as applicable, and (y) if capable of being cured, such breach by the Purchaser is not cured within the applicable Breach Cure Period (such breach, a "~~, (2) any Regulatory Approval(s) require any divestiture, license or hold separate or similar arrangements or any material actions, undertakings or arrangements for the conduct of any business and/or terminating any relationships or contractual rights or obligations that Purchaser determines not to accept, or (3) there is a Material Intentional Purchaser Breach")~~;~~ and

(B)(1) this Agreement is terminated by the Main Sellers pursuant to Section 9.1(c)(ii) or Section 9.1(d) hereof, (2) the EMEA Asset Sale Agreement is terminated by the Joint Administrators pursuant to Clause 15.4.3 thereof, or (3) this Agreement is terminated by either Primary Party pursuant to Section 9.1(b)(vi) or Section 9.1(b)(vii) hereof or the EMEA Asset Sale Agreement is terminated by the Joint Administrator or the Purchaser pursuant to Clause 15.4.2(F) or Clause 15.4.2(G) thereof;

provided, however, that notwithstanding the foregoing, the Reverse Termination Fee shall not be payable pursuant to this clause (ii) if at the time of termination:

(x) (1) the Sellers are in breach of this Agreement in any material respect as a result of an Intentional Breach, which breach would result in a failure of the conditions to Closing set forth in Section 8.1 or Section 8.3 to be satisfied, and in each case, which, if capable of being cured, is not cured within the applicable

~~199~~

Breach Cure Period or (2y) the EMEA Sellers are in breach of the EMEA Asset Sale Agreement in any material respect as a result of an Intentional Breach, which breach would result in a failure of the conditions to Closing (as defined in the EMEA Asset Sale Agreement) set forth in Clause 15.3.1 thereof to be satisfied, and in each case, which, if capable of being cured, is not cured within the applicable Breach Cure Period; or

(y) any of the conditions to Purchaser's obligations set forth in Section 8.1 or Section 8.3 cannot be satisfied on or before the date that is 365 days from the date of this Agreement (other than any such condition that by its nature is to be satisfied at the Closing or any such condition that cannot be satisfied as a result of (1) a Material Intentional Purchaser Breach or (2) the failure to obtain any Antitrust Approval).

(b)     If payable pursuant to Section 9.3(a) the Reverse Termination Fee shall be paid by the Purchaser to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) as follows:

(i)     by application of the Good Faith Deposit and the portion of the Delay Fee that shall have already been paid to the Escrow Agent in the form of Delay Fee Payments pursuant to Section 2.2.1(b) and the actual earnings thereon, as contemplated in Section 2.2.1(c)(ii); and

(ii)     as for the balance of the Reverse Termination Fee, if any, in immediately available funds, within two (2) Business Days of the termination of this Agreement, by way of wire transfer to an account of the Distribution Agent, as distribution agent for the Sellers, to be notified by the Main Sellers or the Distribution Agent to the Purchaser in writing.

SECTION 9.4.     Effects of Termination. If this Agreement is terminated pursuant to Section 9.1:

(a)     all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of or as provided in (i) Section 2.2.6(b) (Escrows), (ii) Section 5.7 (Public Announcements), (iii) Section 5.10 (Transaction Expenses), (iv) Section 5.11 (Confidentiality), (v) Section 7.4(b)(iii) (Other Employee Covenants), (vi) Section 9.2 (Break-Up Fee; Expense Reimbursement), (vii) Section 9.3 (Reverse Termination Fee), (viii) Section 9.4 (Effects of Termination), and (ix) Article X;

(b)     except as required by applicable Law, the Purchaser shall return to the Sellers all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; and

(c)     the provisions of the Confidentiality Agreement will continue in full force and effect.

200

**200**

## ARTICLE X

### MISCELLANEOUS

SECTION 10.1.    No Survival of Representations and Warranties or Covenants. Except for the representations set forth in Section 3.5, no representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants set forth in Article VI and covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

SECTION 10.2.    Remedies. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 10.3.    No Third-Party Beneficiaries. Except for the rights of the Indemnified Persons under Section 5.20, the rights of the Avaya Parties and the Nortel Parties pursuant to Section 10.14 and any acknowledgments, rights, undertakings, representations or warranties expressed to be for the benefit of the EMEA Sellers, the Joint Administrators or the Joint Israeli Administrators, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 10.4.    Consent to Amendments; Waivers. No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement and the Ancillary Agreements shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.

SECTION 10.5.    Successors and Assigns. Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Main Sellers in case of an assignment by the Purchaser or the Purchaser in case of an assignment by any Seller, which consent may be withheld in such party's sole discretion, except for the following assignments which shall not require consent: (i) assignment to an Affiliate of a Party (provided that such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Party), (ii) assignment by a U.S. Debtor to a succeeding entity following such U.S. Debtor's emergence from the Chapter 11 11 Cases, (iii) assignment by any

of the Canadian Debtors pursuant to any plan of arrangement approved by the Canadian Court and (iv) designation by the Purchaser of Designated Purchasers pursuant to Section 2.4.

SECTION 10.6.   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)   Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

(b)   To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (A) the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, provided that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors, the Canadian Debtors or the Purchaser may, in accordance with the Cross-Border Protocol, move the U.S. Bankruptcy Court and the Canadian Court to hold a joint hearing of the U.S. Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, action or proceeding, or (B) in the Federal Courts in the Southern District of New York or the State Courts of the State of New York, County of Manhattan (collectively, the **"New York Courts"**), if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases (the courts specified in clauses (A) and (B) collectively, the **"Designated Courts"**), and shall not be brought in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the Designated Courts for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any Designated Court or any claim that any such action brought in any Designated Court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)   The Purchaser hereby appoints McCarthy Tétrault, as its authorized agent (the **"Purchaser Authorized Canadian Agent"**) upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable. The Purchaser further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointments in full force and effect

as aforesaid. Service of process upon the Purchaser Authorized Canadian Agent in respect of the relevant jurisdiction and written notice of such service to the Purchaser shall be deemed, in every respect, effective service of process upon the Purchaser in relation to such jurisdiction.

(d)    Each Seller hereby appoints (i) NNI as its authorized agent (the "Seller Authorized U.S. Agent") upon whom process and any other documents may be served in the Chapter 11 Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the U.S. Bankruptcy Court or in the NY Courts by any other party hereto, and (ii) NNL as its authorized agent (the "Seller Authorized Canadian Agent" and together with the Seller Authorized U.S. Agent, the "Seller Authorized Agents") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable. Each such Seller further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointment in full force and effect as aforesaid. Service of process upon the applicable Seller Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Main Sellers shall be deemed, in every respect, effective service of process upon every such Seller.

(e)    Section 10.6(b) shall not limit the jurisdiction of (i) the Accounting Arbitrator set forth in Section 2.2.3.1 (c) or (ii) the arbitrator(s) entrusted with the resolution of disputes relating to the Transition Services Agreement pursuant to Section 5.36, although claims may be asserted in the courts referred to in Section 10.6(b) for purposes of enforcing the jurisdiction and judgments of the Accounting Arbitrator or such arbitrator(s).

(f)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

(g)    Notwithstanding Sections 10.6(a) and (b), the Parties and the EMEA Sellers agree that any questions, claims, disputes, remedies or Actions arising under Sections 2.2.4(b)(y), 9.2(c)(ii) and 10.19 and any questions, claims, disputes, remedies or Actions arising from or related to (i) the agency of the Joint Administrators, (ii) the personal liability of the Joint Administrators, their firm, partners, employees, advisors, representatives and agents, (iii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act

203

or (iv) their appointment as joint administrators of the EMEA Sellers and their status as such, to the extent separable from other claims made hereunder, shall be governed by English law and be subject to the exclusive jurisdiction of the English courts.

SECTION 10.7.    Notices.    All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Purchaser to:

Avaya Inc.
211 Mount Airy Road
Basking Ridge, NJ 07920-2332
United States
Attention: Pamela F. Craven, Chief Administrative Officer
            Frank J. Mahr, Corporate Counsel & Corporate Secretary
Facsimile: +1-908-953-3902

With copies (that shall not constitute notice) to:

Ropes & Gray LLP
One International Place
Boston, MA 02110
United States
Attention: Alfred O. Rose
            Howard S. Glazer
Facsimile: +1-617-951-7050

If to the Main Sellers or the Sellers, to:

Nortel Networks Corporation
195 The West Mall
Mailstop: T0503006
Toronto, Ontario, Canada M9C 5K1
Attention:    Gordon A. Davies
              Chief Legal Officer & Corporate Secretary
Facsimile:    +1-905-863-7386

Nortel Networks Limited
195 The West Mall

204

204

Mailstop: T0503006
Toronto, Ontario, Canada M9C 5K1
Attention:    Gordon A. Davies
              Chief Legal Officer & Corporate Secretary
Facsimile:    +1-905-863-7386

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA  37228
Attention:    Lynn C. Egan
              Assistant Secretary
Facsimile:    +1-615-432-4067

With copies (that shall not constitute notice) to:

**Nortel Networks Limited**
195 The West Mall
Mailstop: T0505009
Toronto, ON  M9C 5K1
Canada
Attn:   Douglas Parker
        Associate General Counsel, Corporate
Facsimile:  +1-905-863-7739

and

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, TN  37228
USA
Attention:    Robert Fishman
              Senior Counsel
Facsimile:    +1-347-427-3815 & +1-615-432-4067

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
United States
Attention: Neil Q. Whoriskey

David Leinwand
Facsimile: +1-212-225-3999

and

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention: Michael Lang
Facsimile: +1-416-216-3930

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

SECTION 10.8.    Exhibits; Sellers Disclosure Schedule.

(a)    The Sellers Disclosure Schedule and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)    For purposes of the representations and warranties of the Sellers contained in this Agreement, disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances with respect to all representations or warranties by the Sellers, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably apparent from the Sellers Disclosure Schedule that such disclosure is applicable. The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

SECTION 10.9.    Counterparts. The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

SECTION 10.10.    No Presumption. The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this

Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

SECTION 10.11. Severability. If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 10.12. Headings. The headings used in this Agreement are for the purpose of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.

SECTION 10.13. Entire Agreement.

(a)     This Agreement, the EMEA Asset Sale Agreement, the Ancillary Agreements, the Confidentiality Agreement and any written notice relating to Excluded Sellers delivered pursuant to Section 5.25(a) on the date hereof, together set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the Ancillary Agreements and the Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated. In the event of any irreconcilable conflict between this Agreement and any of the Ancillary Agreements or the Confidentiality Agreement, the provisions of this Agreement shall prevail, regardless of the fact that certain Ancillary Agreements, such as the Local Sale Agreement, may be subject to different governing Laws (unless the Ancillary Agreement expressly provides otherwise).

(b)     For the sake of clarity, the provisions of the EMEA Asset Sale Agreement have been drafted separately from the provisions in the body of this Agreement to reflect differing market practices in the countries of jurisdiction of the EMEA Sellers. Unless the context specifically requires, the provisions contained in the body of this Agreement and the provisions of the EMEA Asset Sale Agreement shall be interpreted independently and without reference to each other.

SECTION 10.14. Limitations on Pre-Closing Remedies.

(a)     Except as provided in Section 5.36, termination of this Agreement and the EMEA Asset Sale Agreement and payment of the Break-Up Fee and the Expense

207

~~Reimbursement (which shall be payable only when, as and if required pursuant to the terms of Section 9.2) shall constitute the sole and exclusive remedies of the Purchaser, any Designated Purchasers and EMEA Designated Purchasers, any of their respective Subsidiaries and any former, current or future general or limited partners, directors, officers, employees, agents, managers, members, Affiliates, stockholders, assignees and representatives of any of the foregoing in their capacity as such (collectively, the "Avaya Parties"), against the Sellers, any of the bankruptcy estates, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators, the Canadian Monitor (and any other Administrator, Monitor or other Person acting in a similar capacity) and any Person (i) in which, as of or subsequent to the date hereof, any Seller or EMEA Seller holds more than fifty percent (50%) of the capital stock or other equity interests or (ii) that is or was a Seller or an EMEA Seller and their respective Affiliates, and any former, current or future general or limited partners, directors, officers, employees, agents, managers, members, stockholders, assignees and representatives of any of the foregoing in their capacity as such (collectively, the "Nortel Parties"), as a result of the failure of the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement (including transactions contemplated under Clause 7 of the EMEA Asset Sale Agreement or Paragraph 2 of Schedule 9 to the EMEA Asset Sale Agreement) to be consummated, or in respect of any Liabilities arising under, or relating to, this Agreement, the EMEA Asset Sale Agreement, or any other Transaction Document~~The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, subject to the limitations set forth in this Section 10.14 and in addition to any other remedies to which the Parties are entitled at Law or in equity, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches; provided, however, that under no circumstances shall any Avaya Party other than the Purchaser and/or any Designated Purchaser, as applicable, be subject to claims for equitable relief, including specific performance of any kind. Each Party agrees, to the extent that such Party is subject to any equitable remedy, to waive any requirement for the security or posting of any bond in connection with any such equitable remedy. Under no circumstances shall any Avaya Party other than the Purchaser and/or any Designated Purchaser, as applicable, be liable for damages arising out of, or in connection with, this Agreement ~~or the transactions contemplated hereby or thereby prior to the Closing, including as a result of an intentional breach of this Agreement, the EMEA Asset Sale Agreement or any other Transaction Document prior to the Closing. Nothing set forth in this Agreement shall confer or give or shall be construed to confer or give to any Person (including any Person acting in a representative capacity) any rights or remedies against any Person other than the parties hereto~~any breach or alleged breach of any of the terms hereof or of the EMEA Asset Sale Agreement or any other Transaction Document, including damages alleged as a result of tortious conduct. Without limiting the preceding provisions of this Section 10.14(a), it is acknowledged and agreed that under no circumstances shall any Person be liable for punitive damages (including multiple damages assessed as a punitive measure) or special damages arising out of, or in connection with, this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof or of the EMEA Asset Sale Agreement or any other Transaction Document, including damages alleged as a result

208

of tortious conduct, or for specific performance of the obligations it is to perform hereunder or thereunder at or prior to the Closing nor shall any Nortel Party be liable for tortious interference with Purchaser's rights hereunder., Nothing set forth in this Agreement shall confer or give or shall be construed to confer or give to any Person (including any Person acting in a representative capacity) any rights or remedies against any Person other than the Parties. The Parties acknowledge and agree that each Party will be entitled to all the remedies against the other Parties available to it at Law or in equity for post-Closing breaches of this Agreement, the EMEA Asset Sale Agreement and any Transaction Documents, including specific performance and/or damages.

(b)     Except as expressly provided in Section 5.36, in no event shall the Avaya Parties be subject to any Liability to the Nortel PartiesNotwithstanding anything to the contrary set forth in Section 10.14(a), if (1) the conditions set forth in Section 8.1(a) of this Agreement or Clause 15.1.3 of the EMEA Asset Sale Agreement have not been satisfied (other than as a result of a Material Intentional Purchaser Breach), or (2) any Regulatory Approval(s) require any divestiture, license or hold separate or similar arrangements or any material actions, undertakings or arrangements for the conduct of any business and/or terminating any relationships or contractual rights or obligations that Purchaser determines not to accept then specific performance shall not be available against any of the Avaya Parties and the sole and exclusive remedy of the Nortel Parties against any of the Avaya Parties shall be termination of this Agreement and the EMEA Asset Sale Agreement and payment of the Reverse Termination Fee by the Purchaser, when, as and if required pursuant to Section 9.3 (and no other additional money damages shall be payable by any Avaya Party) for the failure of the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement (including transactions contemplated under Clause 7 of the EMEA Asset Sale Agreement or Paragraph 2 of Schedule 9 to the EMEA Asset Sale Agreement) to be consummated, or in respect of any Liabilities arising under, or relating to, this Agreement, the EMEA Asset Sale Agreement or any other Transaction Document, or the transactions contemplated hereby or thereby prior to the Closing, including as a result of an intentional breach of this Agreement, the EMEA Asset Sale Agreement or any other Transaction Document prior to the Closing, other than: (i) money damages payable by the Purchaser and/or any Designated Purchaser (but, for the avoidance of doubt, no other Avaya Party) as a result of Material Intentional Purchaser Breaches and (ii) the Reverse Termination Fee payable by the Purchaser (but for the avoidance of doubt, no other Avaya Party) when, as and if required pursuant to Section 9.3, in an aggregate amount not to exceed the Liability Limitation Amount; provided, however, notwithstanding the foregoing, termination of this Agreement, the EMEA Asset Sale Agreement and any Transaction Document and payment of the Reverse Termination Fee (which shall be payable by the Purchaser only when, as and if required in accordance with the terms of Section 9.3 and Clause 15.7 of the EMEA Asset Sale Agreement), shall constitute the sole and exclusive remedies of the Nortel Parties against the Avaya Parties as a result of (and no additional money damages shall be payable by any Avaya Party in connection with) any breach of this Agreement, the EMEA Asset Sale Agreement or any Transaction Document by the Purchaser, any Designated Purchaser or any EMEA Designated Purchaser in the event that (i) this Agreement shall have been terminated pursuant to and in accordance with Section 9.1(f) and/or the EMEA Asset Sale Agreement shall have been terminated in accordance with Clause

209

~~15.4.9 thereof and, in either case, the Reverse Termination Fee shall have been paid to the Distribution Agent as agent of the Sellers and the EMEA Sellers or (ii) as of the time of termination of this Agreement or the EMEA Asset Sale Agreement there is no existing Material Intentional Purchaser Breach. Nothing set forth in this Agreement shall confer or give or shall be construed to confer or give to any Person (including any Person acting in a representative capacity) any rights or remedies against any Person other than the Parties. Without limiting the preceding provisions of this subsection (b), it is acknowledged and agreed that under no circumstances shall any Person be liable for punitive damages (including multiple damages assessed as a punitive measure) or special damages arising out of, or in connection with, this Agreement, the EMEA Asset Sale Agreement or the transactions contemplated hereby or thereby or any breach or alleged breach of any of the terms hereof or of the EMEA Asset Sale Agreement or any other Transaction Document, including damages alleged as a result of tortious conduct, or for specific performance of the obligations it is to perform hereunder at or prior to the Closing nor shall any Avaya Party be liable for tortious interference with Sellers' rights hereunder.~~, In a situation in which the Reverse Termination Fee does not constitute the sole remedy, any damages award will be reduced by the amount of the Reverse Termination Fee that has been paid.

~~(c)  Notwithstanding Sections 10.14(a) and 10.14(b), the Parties acknowledge and agree that each Party will be entitled to all the remedies against the other Parties available to it at Law or in equity for post-Closing breaches of this Agreement, the EMEA Asset Sale Agreement and any Transaction Documents, including specific performance and/or damages.~~

(c)    (d) Each of the Parties acknowledges that the agreements contained in this Section 10.14, Section 9.2 and Section 9.3, are each an integral part of the transactions contemplated by this Agreement and the EMEA Asset Sale Agreement. In the event that (i) the Sellers or the EMEA Sellers shall fail to pay the Break-Up Fee or Expense Reimbursement when due, or (ii) Purchaser shall fail to pay the Reverse Termination Fee when due, then Sellers or the EMEA Sellers in the case of clause (i) and Purchaser in the case of clause (ii), shall reimburse the other Parties for all reasonable costs and expenses actually incurred or accrued by such other Parties (including reasonable fees and expenses of counsel) in connection with the collection under and enforcement of Section 9.2 or Section 9.3 and Clauses 15.5 to 15.7 of the EMEA Asset Sale Agreement as applicable, together with interest on such unpaid amount at the prime rate of Citibank N.A. in effect on the date such payment was required to be made through the date of payment.

SECTION 10.15. Bulk Sales Laws. Subject to the entry of the U.S. Sale Order, each Party waives compliance by the other Party with any applicable bulk sales Law, provided, however, that the Parties shall use their reasonable efforts to cooperate to the extent necessary to obtain a reduction in, or exemption from, any applicable sales or use Taxes.

SECTION 10.16.  Main Sellers as Representatives of Other Sellers.

(a)     For all purposes of this Agreement:

(i)     each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNL as its representative; and

(ii)    each Other Seller not listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNI as its representative.

(b)     Pursuant to Section 10.16(a), each of NNL and NNI shall expressly have the power to, in the name and on behalf of each of its Respective Affiliates (as defined below), (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

(c)     For the purposes of this Agreement, **"Respective Affiliates"** means: (i) with respect to NNL, each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule, and (ii) with respect to NNI, all the other U.S. Debtors and each Other Seller not listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule.

SECTION 10.17.  Obligations of Sellers and EMEA Sellers.  When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor – other than NNC - and a Non-Debtor Seller).  Notwithstanding anything to the contrary herein, except as set forth in Section 2.2.4(b) and Section 9.2(c) the obligations of each EMEA Seller hereunder shall be several and not joint.  Effective as of the date of signing, the parties are fully bound by the terms of this Agreement; provided, however, that none of the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators shall have any obligations or incur any liabilities under this Agreement unless and until (i) the U.S. Bankruptcy Court enters the U.S. Bidding Procedures Order and (ii) the Canadian Court enters the Canadian Sales Process Order.  For the avoidance of doubt, the intent of Parties and the EMEA Sellers is that the obligations and any liabilities of the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators under this Agreement will arise concurrently with the obligations and liabilities of the Sellers under this Agreement.

SECTION 10.18.  Execution by Other Sellers.  The Purchaser hereby acknowledges that the Other Sellers are not executing this Agreement as of the date hereof.  This Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers have done so.  Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall cause each Other Seller to execute a counterpart to this Agreement no later than the day prior to the thirtieth (30sixtieth (60th) day following completion of the Auction (provided that the Main Sellers shall use their reasonable best efforts to cause such execution to occur no later than the last day of the Contract Review

214

Period), agreeing to be bound as a Seller under this Agreement and authorizing NNI, or NNI, as applicable, to act as its representative under Section 10.16.

SECTION 10.19. Exclusion of Liability of Administrators and Acknowledgement.

(a)   Notwithstanding that this Agreement shall have been signed by the Joint Administrators and the Joint Israeli Administrators in their capacities as administrators of the EMEA Debtors for and on behalf of the EMEA Debtors and of the Israeli Companies for and on behalf of the Israeli Companies, respectively, it is hereby expressly agreed and declared that no personal Liability under or in connection with this Agreement shall fall on the Joint Administrators, the Joint Israeli Administrators or their firm, partners, employees, agents, advisers or representatives whether such Liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act 1986, the Israeli Companies Law 1999, or otherwise.

(b)   The Purchaser acknowledges and agrees that in the negotiation and the completion of this Agreement the Joint Administrators and the Joint Israeli Administrators are acting only as agents for and on behalf of the EMEA Debtors and the Israeli Companies, respectively, and without any personal Liability whatsoever.

(c)   The Purchaser further acknowledges that it has entered into this Agreement without reliance on any warranties or representations made by the EMEA Sellers or by any of their employees, agents or representatives, or by the Joint Administrators, the Joint Israeli Administrators or any of their firm, partners, employees, agents, advisors or representatives and (save in respect of fraud, fraudulent misrepresentation or fraudulent misstatement) it shall not have any remedy in respect of any misrepresentation or untrue statement made by or on behalf of the EMEA Sellers or their employees, agents or representatives, or by the Joint Administrators, the Joint Israeli Administrators or any of their firm, partners, employees, agents, advisors or representatives.

SECTION 10.20.  Asset Sale Election.

(a)   Prior to making any "Asset Sale Election" (defined below), the Sellers shall use commercially reasonable efforts (which reasonable efforts shall include but not be limited to the filing of an objection to the allowance of the IRS Claim with the Bankruptcy Court no later than September 16, 2009) to resolve the -6 Liability in a manner reasonably acceptable to the Purchaser. If such commercially reasonable efforts are unsuccessful, the Sellers may elect to satisfy their obligation under the Agreement to transfer the Shares to Purchaser by transferring to Purchaser the assets and liabilities of the Companies as described below (the "Asset Sale Election"). To the extent the Sellers determine to exercise the Asset Sale Election, such election shall be made no later than October 15, 2009, and notice thereof shall be provided to the Purchaser, in writing, on or before such date. In the event that the Asset Sale Election is timely made: (a) Sellers shall, within three (3) calendar days of the Asset Sale Election, and in any case, no later than October 18, 2009, commence proceedings under Chapter 11 of the U.S. Bankruptcy Code with respect to the Companies,

212

(b) the Parties shall amend this Agreement to effect such election, with (i) all of the assets of the Companies (except as contemplated in the -6 Purchase Price Adjustment, as defined below) and (ii) all of the Liabilities of the Companies, other than the -6 Liability, the Related -6 Liabilities and the Specified Pension Liabilities, being transferred to Purchaser to the same extent as such assets and liabilities would have been transferred indirectly to Purchaser pursuant to a transfer of the Shares on the terms set forth herein, and otherwise on the same terms and conditions as the assets and liabilities of the Sellers, *mutatis mutandis*, but only to the extent permitted by sections 363 and 365 of the U.S. Bankruptcy Code, (c) the Sellers and the Purchaser shall, at the Sellers' expenses, use their commercially reasonable efforts to obtain any novations, consents, assignments or other authorizations necessary to validly transfer the Customer Contracts of the Companies to Purchaser or a Designated Purchaser and (d) if any such novation, consent, assignment or other authorization is not received on or before the Closing Date, then subject to applicable Law and the terms of the applicable Customer Contract, the applicable Seller(s), on the one hand, and the Purchaser or the applicable Designated Purchaser, on the other hand, shall enter into a Subcontract that will have effect, from and after the Closing Date, under which the Purchaser or such Designated Purchaser will provide products or services on the terms of such Customer Contract for the shortest of (i) eighteen (18) months, (ii) the remaining life of such Customer Contract or (iii) the period until such Customer Contract is validly assigned to Purchaser or such Designated Purchaser; provided, that the Sellers shall use their reasonable best efforts to maintain the good standing of the Nortel Party to each such Customer Contract as the prime contractor thereunder during such subcontract period at no additional cost to Purchaser and unless NNI and the Purchaser otherwise agree, including retaining any "key men" under such Customer Contract as employees of the Companies (instead of transferring their employment to the Purchaser or a Designated Purchaser) under arrangements governed by the terms of the Transition Services Agreement for the duration of such Subcontract if doing so would permit such Customer Contract to be subcontracted without Third Party consent (and the Purchaser or a Designated Purchaser will accept the transfer of the employment of such "key men" after the termination of such Subcontract), and (e) the Sellers shall use their reasonable best efforts to have a final order approving the transfer of such assets and liabilities entered by the Bankruptcy Court prior to December 1, 2009. The Sellers will use their reasonable best efforts to include in all Customer Contracts that the Companies enter into after September 14, 2009 that are expected to generate a total contract value of at least $5 million terms that will permit such Customer Contracts to be assigned to the Purchaser or a Designated Purchaser without Third Party consent. Notwithstanding the Asset Sale Election or anything set forth herein, in no event shall the Purchaser become liable on account of, or assume, any Claim or Liability asserted against the Companies to the extent such Claim or Liability would not have remained a valid Claim against any Company had the Sellers transferred the Shares to the Purchaser, and it shall be a condition precedent to Closing under the Agreement that a final order approving the transfer of the Companies' assets as set forth above in a form and substance reasonably satisfactory to the Purchaser be entered by the U.S. Bankruptcy Court and consistent with the U.S. Sale Order and that such order provide that such assets are transferred to the Purchaser free and clear of any Liens or

Claims arising out of or related to the -6 Liabilities, the -6 Related Liabilities or the Specified Pension Liabilities.

(b)    If the Asset Sale Election is made, and not all Customer Contracts of the NGS Companies are transferred, or subcontracted such that Purchaser receives the same economic benefits as it would if it were a direct party to the relevant Customer Contract, to Purchaser or a Designated Purchaser on or within one hundred and eighty days (180) days after the Closing Date, the Sellers shall pay to the Purchaser an amount equal to the -6 Purchase Price Adjustment. The "-6 Purchase Price Adjustment" shall mean with respect to each Customer Contract of an NGS Company that does not by its terms expire within 180 days after the Closing Date and is not transferred or subcontracted as described above ("-6 Contracts"), an amount equal to the -6 Factor multiplied by the revenues received by the NGS Companies in respect of such -6 Contract in respect of the period from October 1, 2008 to September 30, 2009; provided that with respect to any -6 Contract with the Department of State such revenues shall be multiplied by the Janus -6 Factor.

(c)    The estimated -6 Purchase Price Adjustment as of the Closing Date shall be calculated by Sellers at least five (5) Business Days prior to the Closing Date (the "Estimated -6 Liability Escrow Amount"), and a written copy of the -6 Purchase Price Adjustment (showing with reasonable specificity such calculation and the amounts used therefor) shall be delivered to the Purchaser on or prior to the fifth (5th) Business Day, and such amount shall be paid to the Escrow Agent as provided in Article II and the Escrow Agreement. If within one hundred and eighty (180) days after the Closing Date, any -6 Contract is transferred, or subcontracted such that Purchaser receives the same economic benefits as it would if it were a direct party to the relevant Customer Contract, to Purchaser or a Designated Purchaser, then an amount equal to the -6 Purchase Price Adjustment with respect to such -6 Contract shall be released by the Escrow Agent to the Sellers in accordance with the Escrow Agreement. At the end of such one hundred and eighty- (180-) day period, if any amounts remain in the Estimated -6 Liability Escrow Account, all such amounts shall be released by the Escrow Agent to the Purchaser in accordance with the Escrow Agreement.

[Remainder of this page intentionally left blank. Signature pages follow.]

IN WITNESS WHEREOF, the Main Sellers and the Purchaser have duly executed this ~~amendment to the~~ Asset and Share Sale Agreement as of the date first written above.

AVAYA INC.

By:_____
    Name:
    Title:

**NORTEL NETWORKS
CORPORATION**

By:
    **Name:**
    **Title:**

**By:**
    Name:
    Title:

**NORTEL NETWORKS LIMITED**

By:_____
    Name:
    Title:

**By:**_____
    **Name:**
    **Title:**

**NORTEL NETWORKS INC.**

By:_____
    Name:
    Title:

**AVAYA INC.**

By:_____
   Name:
   Title:

The undersigned EMEA Sellers are executing this Agreement solely for purposes of agreeing to Sections 2.2, 5.26, **5.39,** 9.2, 9.3, 9.4, 10.14, 10.17 and 10.19 of this Agreement and, solely in the case of Nortel Networks UK Limited and Nortel Networks (Ireland) Limited, for purposes of agreeing to Section 5.36 of this Agreement.

**SIGNED** for and on behalf of **Nortel Networks** )
**UK Limited** (in administration) by Christopher )  Christopher Hill
Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

........................................................................ )
Name: )
Address: )

**SIGNED** for and on behalf of **Nortel GmbH** )
(in administration) by Christopher Hill )  Christopher Hill
 )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

........................................................................ )
Name: )
Address: )

**SIGNED** for and on behalf of **Nortel Networks** )
~~France S.A.S.SpA~~ (in administration) by ~~Kerry~~ )  ~~Kerry~~Christopher ~~Trigg~~Hill
~~Trigg acting as authorised representative for~~ )
**Christopher Hill** )
 )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

........................................................................ )
Name: )
Address: )

**ASSA Amendment Agreement - Avaya**

SIGNED for and on behalf of Nortel Networks    )
SpA (in administration) by Christopher Hill     )    Christopher Hill
                                                )
as Joint Administrator (acting as agent and     )
without personal liability) in the presence of:

Witness signature

                                                )
Name:                                           )
Address:                                        )

SIGNED for and on behalf of Nortel Networks    )    ..............................................................
Hispania S.A. (in administration) by            )    Christopher Hill
Christopher Hill                                )
as Joint Administrator (acting as agent and     )
without personal liability) in the presence of:

Witness signature

..............................................................    )
Name:                                           )
Address:                                        )

**ASSA Amendment Agreement - Avaya**

**SIGNED for and on behalf of Nortel Networks** )  .............................................................
**B.V. (in administration) by Christopher Hill** )  Christopher Hill
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

.............................................................. )
Name: )
Address: )

**SIGNED for and on behalf of Nortel** )  .............................................................
**Networks AB (in administration) by** )  **Christopher Hill**
**Christopher Hill** )
)

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

**Witness signature**

.............................................................. )
**Name:** )
**Address:** )

**ASSA Amendment Agreement - Avaya**

SIGNED for and on behalf of Nortel Networks ⟩
AB (in administration) by Christopher Hill ⟩   Christopher Hill
⟩
as Joint Administrator (acting as agent and ⟩
without personal liability) in the presence of:

Witness signature

⟩
Name: ⟩
Address: ⟩

SIGNED for and on behalf of **Nortel Networks** )   ......................................................
N.V. (in administration) by Christopher Hill )   Christopher Hill
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

)
Name: )
Address: )

SIGNED for and on behalf of Nortel Networks ⟩
(Austria) GmbH (in administration) by ⟩   Christopher Hill
Christopher Hill ⟩
as Joint Administrator (acting as agent and ⟩
without personal liability) in the presence of:

Witness signature

⟩
Name: ⟩
Address: ⟩

**ASSA Amendment Agreement - Avaya**

**SIGNED for and on behalf of Nortel**
**Networks (Austria) GmbH (in**
**administration) by Christopher Hill**
**as Joint Administrator (acting as agent and**
**without personal liability) in the presence of:**

}
}
}
}

Christopher Hill

**Witness signature**

..............................................................................
**Name:**
**Address:**

}
}
}

SIGNED for and on behalf of Nortel Networks
Polska Sp. z.o.o. (in administration) by
Christopher Hill
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

}
}
}
}

Christopher Hill

Witness signature

..............................................................................
Name:
Address:

)
)
)

**ASSA Amendment Agreement - Avaya**

**SIGNED for and on behalf of Nortel Networks**  )  ...........................................................................
**Oy (in administration) by Christopher Hill**  )  Christopher Hill
                                                )
as Joint Administrator (acting as agent and  )
without personal liability) in the presence of:

Witness signature

                                                )
...........................................................................  )
Name:  )
Address:  )

**SIGNED for and on behalf of Nortel Networks**  )  ...........................................................................
**Portugal S.A. (in administration) by**  )  Christopher Hill
**Christopher Hill**  )
                                                )
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Witness signature

                                                )
...........................................................................  )
Name:  )
Address:  ).

**ASSA Amendment Agreement - Avaya**

**SIGNED** for and on behalf of **Nortel Networks**    )    .........................................................................
**s.r.o.** (in administration) by Christopher Hill    )    Christopher Hill
                                                      )
as Joint Administrator (acting as agent and           )
without personal liability) in the presence of:


Witness signature

.........................................................................    )
Name:                                                                      )
Address:                                                                   )

SIGNED for and on behalf of Nortel Networks )
Romania s.r.l. (in administration) by ) Christopher Hill
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

.................................................................... )
Name: )
Address: )

SIGNED for and on behalf of Nortel Networks )
Engineering Service kft (in administration) by ) Christopher Hill
Christopher Hill )
)
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Witness signature

.................................................................... )
Name: )
Address: )

SIGNED for and on behalf of Nortel )
Networks Slovensko s.r.o. (in administration) ) Christopher Hill
by Christopher Hill )
)
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Witness signature

.................................................................... )
Name: )
Address: )

**ASSA Amendment Agreement - Avaya**

SIGNED for and on behalf of Nortel    )    ...........................................................................
Networks France S.A.S. (in administration)    )    Kerry Trigg
by Kerry Trigg acting as authorised    )
representative for    )

as Joint Administrator (acting as agent and
without personal liability) in the presence of:


Witness signature

...........................................................................    )
Name:    )
Address:    )

**SIGNED** for and on behalf of Nortel Networks   )   ...............................................................

(Ireland) Limited (in administration) by David   )   David Hughes

Hughes as Joint Administrator (acting as agent   )

and without personal liability) in the presence   )

of:

Witness signature

...............................................................   )

Name:                                              )

Address:                                           )

SIGNED by Sergei Fishkin                                )   .................................................................................
duly authorised for and on behalf of o.o.o.            )   Sergei Fishkin
Nortel Networks in the presence of:                    )


Witness signature

.....................................................................................   )
Name:                                                   )
Address:                                                )

SIGNED by Sharon Rolston )
duly authorised for and on behalf of Nortel ) Sharon Rolston
Networks AG in the presence of: )

Witness signature

................................................................. )
Name: )
Address: )

SIGNED by Sharon Rolston and Simon )
Freemantle duly authorised for and on behalf of ) Sharon Rolston
Nortel Networks South Africa (Pty) Limited )
in the presence of:

...................................................
Simon Freemantle

Witness signature

................................................................. )
Name: )
Address: )

SIGNED by Sharon Fennessy and Simon )
Freemantle duly authorised for and on behalf ) Sharon Fennessy
of Nortel Networks AS in the presence of: )

...................................................
Simon Freemantle

Witness signature

................................................................. )
Name: )
Address: )

ASSA Amendment Agreement - Avaya

SIGNED by Sharon Fennessy and Simon )  ...................................................................
Freemantle duly authorised for and on behalf of ) Sharon Fennessy
Nortel Networks AS in the presence of: )

Simon Freemantle

Witness signature

Name:                                      )
Address:                                   )

ASSA Amendment Agreement - Avaya

ASSA Amendment Agreement - Avaya

**SIGNED** for and on behalf of **Nortel**          )
**Communications Holdings (1997) Limited (in**       .....................................................................
administration) by Yaron Har-Zvi and Avi D.         )    Yaron Har-Zvi
Pelossof as Joint Israeli Administrators (acting    )
jointly and without personal liability) in          )
connection with the Israeli Assets and              )
Liabilities:                                        )
                                                    )    .....................................................................
                                                         Avi D. Pelossof

Witness signature

.....................................................................    )
Name:                                               )
Address:                                            )

**SIGNED** for and on behalf of **Nortel Networks**  )
**Israel (Sales and Marketing) Limited (in**         )    .....................................................................
administration) by Yaron Har-Zvi and Avi D.         )    Yaron Har-Zvi
Pelossof as Joint Israeli Administrators (acting
jointly and without personal liability) in          )
connection with the Israeli Assets and              )    .....................................................................
Liabilities:                                        )    Avi D. Pelossof
                                                    )
                                                    )

Witness signature

.....................................................................    )
Name:                                               )
Address:                                            )

**ASSA Amendment Agreement - Avaya**

ASSA Amendment Agreement - Avaya

**SIGNED** by Christopher Hill                    )

                                                                  )    Christopher Hill

in his own capacity and on behalf of the Joint        )
Administrators without personal liability and
solely for the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the Joint Administrators:

Witness signature

..........................................................................    )
Name:                                                                           )
Address:                                                                      )

~~SIGNED~~ for and on behalf of Nortel Networks    }
~~Slovensko s.r.o (in administration) by~~    }    ~~Stephen Harris~~
~~Stephen Harris~~    }
~~as Joint Administrator (acting as agent and~~    }
~~without personal liability) In the presence of:~~

~~Witness signature~~

    }
~~Name:~~    }
~~Address:~~    }

**ASSA Amendment Agreement - Avaya**

CONFIDENTIAL APPENDIX "D"

[REDACTED]

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

---

TWENTIETH REPORT OF THE MONITOR
DATED SEPTEMBER 15, 2009

---

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada M5B 2M6

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.