("**NNTC**"). The Parties will make any required elections under corresponding provincial or territorial laws and the foregoing provisions will apply *mutatis mutandis* in respect thereof. Purchaser (or the relevant Designated Purchaser) shall be responsible and indemnify and hold harmless the applicable Seller(s) for any GST (and any comparable provincial Taxes) to the extent payable notwithstanding the elections contemplated by this Section, plus any interest and/or penalties payable as a consequence thereof.

SECTION 6.2.     Withholding Taxes.   Subject to Section 2.4, the Purchaser and the Designated Purchasers shall be entitled to deduct and withhold from the Purchase Price, and the Purchaser shall be entitled to deduct and withhold from the Reverse Termination Fee, such amounts as the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold under the Code or any provision of state, local or foreign Tax Law, with respect to the making of such payment. To the extent such amounts are so withheld by the Purchaser or a Designated Purchaser, as the case may be, such withheld amounts shall be treated for all purposes of this Agreement and the Ancillary Agreements as having been paid to the relevant Seller in respect of whom such deduction and withholding was made by such Purchaser or Designated Purchaser. None of the Parties is aware of any obligation to deduct and withhold any amounts from the Purchase Price or the Reverse Termination Fee under the Code, or any provision of state, local or foreign Tax Law, with respect to the making of such payment. If any of the Parties learns of any such obligation on or prior to the Closing Date, then (i) in the case of a Seller, such Seller shall promptly provide reasonable notice of such obligation to the Purchaser, and (ii) in the case of the Purchaser, the Purchaser shall promptly provide reasonable notice of such obligation to the Sellers. The Parties shall make reasonable efforts to cooperate in good faith to minimize the amounts that the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold.

SECTION 6.3.     Tax Characterization of Payments Under This Agreement.   The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than payment of the Estimated Purchase Price and any interest payments) as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

SECTION 6.4.     Apportionment of Taxes.

(a)     Except as otherwise provided in this Article VI, (i) the Sellers shall and shall cause the Other Sellers, as the case may be, to bear all Taxes of any kind relating to the Assets or the conduct or operation of the Business (including Taxes in respect of the income, business, property or operations of the Companies) for all Tax periods or portions thereof ending on or before the Closing Date and (ii) the Purchaser shall and shall cause the Designated Purchasers to bear all Taxes relating to the Assets or the conduct or operation of the Business (including Taxes in respect of the income, business, property or operations of the Companies) for all Tax periods or portions thereof beginning after the Closing Date.

(b)     For purposes of this Agreement, any Taxes for a "**Straddle Period**" (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of

the period beginning after the Closing Date, respectively. The amount of any Taxes based on or measured by income or receipts of the Business (including the business and operations of the Companies) shall be allocated between the Pre-Closing Taxable Period and the Post-Closing Taxable Period on a closing-of-the-books basis. The amount of other Taxes shall be allocated between the Pre-Closing Taxable Period and the Post-Closing Taxable Period in the following manner: (i) in the case of a Tax imposed in respect of property (excluding, for the avoidance of doubt, any income Tax) and that applies ratably to a Straddle Period, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of sales, value-added and similar transaction-based Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be allocated to the portion of the Straddle Period in which the relevant transaction occurred.

SECTION 6.5.    Section 338 Election. Upon the written request of the Purchaser, in its sole and exclusive discretion, (x) the Sellers and the Purchaser or, as applicable, any Designated Purchaser shall join in making elections under Code section 338(h)(10) (and any corresponding election under state, local, or foreign law) (a "**Section 338(h)(10) Election**") with respect to the Purchaser's (or any Designated Purchaser's) purchase of the Shares of the Companies pursuant to this Agreement, or (y) the Sellers shall make or cause to be made such stock basis reduction elections under Treas. Reg. Section 1.1502-36(d)(6)(i)(A) ("**Loss Duplication Elections**") as are necessary to reduce as far as possible the potential for loss duplication. The Purchaser shall indemnify the Sellers for any actual Tax Liability that (i) arises during the taxable year that includes the Closing Date or the two (2) taxable years immediately following and (ii) would not have arisen but for a Section 338(h)(10) Election or a Loss Duplication Election made pursuant to this Section 6.5; provided, however, that the Purchaser shall have no obligation to indemnify the Sellers for any Tax Liabilities pursuant to this Section 6.5 with respect to which the Sellers do not deliver notice to the Purchaser prior to December 31, 2013.

SECTION 6.6.    Records.

(a)    Notwithstanding the provisions of Section 5.24, but subject to the provisions of Section 5.6, (i) after the Closing Date, the Purchaser, the Designated Purchasers and the Companies, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets, the Assumed Liabilities, the Business or the Companies for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Assets, the Assumed Liabilities, the Business or the Companies for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow representatives of the other party access to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies

159

thereof as may be necessary or convenient. The obligation to cooperate pursuant to this Section 6.6 shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

(b)     On or prior to Closing, the Sellers shall cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for ten (10) years in accordance with an escrow agreement between the Purchaser, the Sellers and the Records Custodian, in form satisfactory to the Purchaser and the Seller. The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by tax advisors of any purchaser ("**Tax Credit Purchaser**") of the scientific research and experimental development Tax credits of the Sellers under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser. The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or NNTC as qualified expenditures on scientific research and experimental development for purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**").

(c)     The Purchaser shall use reasonable efforts to make available to the relevant Taxing Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Taxing Authority of the characterization of expenditures by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided that such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser.

(d)     The Purchaser shall have no obligation to provide any access under this provision unless the Seller (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

(e)     On or prior to Closing, the Sellers shall use their reasonable best efforts to calculate and provide to the Purchaser (with expenses reasonably allocable to such calculations split evenly between the Sellers, on the one hand, and the Purchaser, on the other hand) historical data relating to the qualified research expenses and gross receipts of the Business pursuant to Section 41 of the Code (including in particular Section 41(f)(3)(A) of the Code) and any analogous data under corresponding provisions of state, local or foreign law as requested by the Purchasers, provided that such historical data is available to the Sellers or could be made available to the Sellers with Sellers' reasonable best efforts. Sellers shall use their reasonable best efforts to update such historical data to reflect any relevant adjustments arising after the Closing and provide copies of any such updates to the Purchaser within 10 days of the date on which such adjustment is made. Notwithstanding the foregoing, nothing herein shall require Sellers to indemnify the Purchaser to the extent a credit of the Purchaser under section 41 of the

Code (or any corresponding provisions of state, local or foreign law) is unavailable or challenged by the relevant Taxing Authority.

SECTION 6.7. Tax Disclosure. Notwithstanding anything to the contrary in this Agreement, except as reasonably necessary to comply with applicable securities laws and regulations, any party may (i) consult any Tax adviser regarding the U.S. federal income Tax treatment or Tax structure of the transactions contemplated by this Agreement, and (ii) disclose to any and all persons, without limitation of any kind, the U.S. federal income Tax treatment and Tax structure of the transactions contemplated hereunder and all materials of any kind (including opinions or other Tax analyses) that are provided to the taxpayer relating to such Tax treatment and Tax structure (but without disclosure of identifying information or any non-public commercial or financial information); provided, however, that clause (ii) of this paragraph shall not apply until the date of the public announcement of the execution of this Agreement and performance of the transactions contemplated hereunder. For this purpose, "Tax structure" is limited to any facts relevant to the U.S. federal income Tax treatment of the transactions contemplated hereunder.

SECTION 6.8. Tax Returns.

(a) The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets, the Business or the Companies, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("**Transfer Tax Returns**") described below in Section 6.8(b)). Such Tax Returns shall be true, correct and complete in all material respects. Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) Sellers as and when required by Law. In every case permitted by Law, the Sellers shall elect to treat the Closing Date as the close of a taxable period, so as to minimize the number of Straddle Period Tax Returns and Straddle Periods.

(b) Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated hereunder or in respect of the execution of any other Transaction Document shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws. Any Transfer Tax Returns prepared by the Sellers pursuant to this Section 6.8(b) shall be made available to the Purchaser at least five (5) Business Days before such Tax Returns are due to be filed. Notwithstanding the above, the Sellers shall use their reasonable best efforts to make available to the Purchaser such information as will enable the Purchaser to review that portion of the Transfer Tax Returns applicable to the sale and purchase transaction contemplated by this Agreement no later than eight (8) Business Days prior to the date on which such Tax Returns are due to be filed. The Purchaser shall be entitled to review and comment on any Transfer Tax Return prepared by a Seller prior to making any payment in respect thereof, such comments to be provided at least three (3) Business Days before such Transfer Tax Returns are due to be filed, and in the event of disagreement between the Parties, the relevant Transfer Tax Return shall be filed in accordance with the Purchaser's reasonable comments, it being understood that the Purchaser shall remain responsible for any Transfer Taxes whether or not shown on such Tax Return. The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect

161

of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.8(b) at least one (1) Business Day before such Transfer Tax becomes due and payable.

(c)     The Purchaser or a Designated Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets, the Business or the Companies for all Post-Closing Taxable Periods and Straddle Periods. Such Tax Returns shall be true, correct and complete in all material respects and shall be prepared on a basis consistent with Tax Returns prepared for prior taxable periods unless a different treatment of any item is required by an intervening change in Law or this Transaction. All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Purchaser or a Designated Purchaser as and when required by Law, except for such Taxes that are the responsibility of the Sellers pursuant to this Article VI; such Taxes shall be paid to the Purchaser or a Designated Purchaser no later than ten (10) Business Days prior to the due date for the applicable Straddle Period Tax Return.

(d)     The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.8(b)) prepared by the Purchaser, a Designated Purchaser or the Companies for any Straddle Period before any such Tax Return is filed. The Purchaser shall submit a draft of any such Tax Return to the Main Sellers at least sixty (60) days before the date such Tax Return is required to be filed with the relevant Tax Authority (provided, however, that if the information necessary to prepare a draft of any such Tax Return is not available to the Purchaser at least ninety (90) days before the date such Tax Return is required to be filed with the relevant Tax Authority, then the timeframe set forth in Section 6.8(e) shall apply). The Main Sellers shall have fifteen (15) days after the date of receipt thereof to submit to the Purchaser, in writing, the Main Sellers' written comments with respect to such Tax Return. The Purchaser shall notify the Main Sellers within fifteen (15) days after receipt of such comments of (a) the extent, if any, to which the Purchaser accepts such comments and will file such Tax Return in accordance therewith and (b) the extent, if any, to which the Purchaser rejects such comments. To the extent the Purchaser rejects the comments of the Main Sellers, the Purchaser and the Main Sellers promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within ten (10) days, the parties immediately shall appoint an Accounting Arbitrator to determine the correct manner for reporting the items that are in dispute and shall provide to the Accounting Arbitrator all relevant information. The Accounting Arbitrator shall have fifteen (15) days to submit its determination, which shall be binding upon the Parties, and the Purchaser shall file such Tax Return in accordance therewith. The fees and expenses of the Accounting Arbitrator shall be paid by the Party whose position is deemed to be least correct by the Accounting Arbitrator.

(e)     If the information necessary to prepare a draft of any Tax Return for a Straddle Period (other than a Transfer Tax Return described in Section 6.8(b)) is not available to the Purchaser at least ninety (90) days before the date such Tax Return is required to be filed with the relevant Tax Authority, then (i) the Purchaser shall submit a draft of such Tax Return to the Main Sellers as soon as practicable after such information becomes available (but in no event later than the earlier of (a) thirty (30) days after the necessary information becomes available to the Purchaser or to a Designated Purchaser, or (b) twenty-one (21) days before the date such Tax Return is required to be filed with the relevant Tax Authority), (ii) the Main Sellers shall provide

their comments to the Purchaser as soon as practicable, the Purchaser shall respond to such comments as soon as practicable and, if necessary, the Parties shall appoint an Accounting Arbitrator as soon as practicable (but in no event shall the Accounting Arbitrator be appointed later than ten (10) days before the date such Tax Return is required to be filed with the relevant Tax Authority), and (iii) the Accounting Arbitrator shall have no more than five (5) days to submit its determination.

SECTION 6.9.   Tax Sharing Agreements. Any Tax allocation or sharing agreement or arrangement entered into by any Seller, on the one hand, and the Companies, on the other hand, shall be extinguished and terminated as of the Closing Date.

SECTION 6.10.   Canadian Tax Election.

(a)   The Sellers and the Purchaser acknowledge that a portion of the Assets transferred pursuant to this Agreement by the Sellers to the Purchaser or each Designated Purchaser which is a resident of Canada for purposes of the Income Tax Act (Canada) is being transferred to the Purchaser (or the relevant Designated Purchaser) in consideration for the Purchaser (or the relevant Designated Purchaser) assuming prepaid obligations of the Seller to deliver goods or provide services in the future. The Sellers and the Purchaser (or the relevant Designated Purchaser) will prepare, execute and file, on a timely basis and using any prescribed form, a joint election under subsection 20(24) of the Income Tax Act (Canada) as to such assumption hereunder, and prepare their respective Tax Returns in a manner consistent with such joint election. The elected amount will be jointly determined by the Sellers and the Purchaser (or relevant Designated Purchaser), acting reasonably. The Sellers and the Purchaser (or relevant Designated Purchaser) will make any required elections under corresponding provincial or territorial law and the foregoing provisions will apply *mutatis mutandis* in respect thereof.

(b)   To the extent the Seller and the Purchaser (or the relevant Designated Purchaser) cannot agree on the amount to be elected under subsection 20(24) of the Income Tax Act (Canada), the Seller and the Purchaser (or the relevant Designated Purchaser) promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within five (5) days, the relevant parties immediately shall appoint an Accounting Arbitrator to determine the correct amount to be elected and shall provide to the Accounting Arbitrator all relevant information. The Accounting Arbitrator shall have thirty (30) days to submit its determination, which shall be binding upon the Parties, and the Parties shall file all relevant elections and Tax Returns in accordance therewith. The fees and expenses of the Accounting Arbitrator shall be paid by the Party whose position is deemed to be least correct by the Accounting Arbitrator.

SECTION 6.11.   Cooperation. The Sellers and the Purchaser shall reasonably cooperate with each other in connection with the conduct of any Tax audit, investigation, dispute, or appeal relating to any Pre-Closing Taxable Period.

163

## ARTICLE VII

## EMPLOYMENT MATTERS

SECTION 7.1.    Employment Obligations with Respect to Non-Union
Employees.  Except as provided in the first sentence of Section 7.1.1, the first sentence of
Section 7.1.2(c)(ii) and except as the schedules referenced in Section 7.1.2(e) may apply to
Union Employees, the provisions of this Section 7.1 shall apply to Non-Union Employees.

7.1.1.    Employment Terms.  Purchaser hereby agrees to offer employment to that
aggregate number of Employees (other than Share Transfer Employees) set forth in Section 7.1.1
of the Sellers Disclosure Schedule (which Section 7.1.1 of the Sellers Disclosure Schedule shall
separately identify that number of Employees (including Union Employees in Canada) to be
offered employment in each of Canada, China/Hong Kong/Taiwan, and the United States, and
the aggregate number of Employees to be offered employment in each of the Remaining APAC
Countries and the Remaining CALA Countries).  Within thirty (30) days following the date
hereof, the Purchaser shall identify the minimum aggregate number of employees in
Australia/Japan to whom the Purchaser shall make an offer of employment, provided that,
promptly after the date hereof, the relevant Sellers have permitted the Purchaser access to such
information as the Purchaser reasonably requires in accordance with Sections 5.6(a) and 7.4(d) in
order to make such identifications (except as prohibited by Law).  Within one hundred and five
(105) days following the date hereof, the Purchaser shall notify the Sellers of the identity of the
Employees (other than Share Transfer Employees or other Employees whose employment
transfers automatically by operation of Law to the Purchaser or a Designated Purchaser) the
Purchaser and/or the Designated Purchasers intend to hire as of the Closing Date.  Promptly
following the latest of the granting of the U.S. Sale Order and the Canadian Approval and
Vesting Order and receipt of Regulatory Approvals, the Purchaser shall, or shall cause a
Designated Purchaser to, extend a written offer of employment in a manner that provides no less
than a two-week Employee consideration period ("**Offer Consideration Period**"), in a form
agreed by the Primary Parties and in compliance with applicable Law, to those Employees
identified by Purchaser in accordance with the immediately preceding sentence, with such
employment to take effect under the terms stated herein as of the Effective Hire Date, as defined
below.  Such offers shall, except to the extent otherwise required by Law, be for employment on
terms and conditions that are substantially comparable to those terms and conditions of
employment of similarly situated employees of the Purchaser or a Designated Purchaser, as
applicable, and, without limiting the generality of the foregoing, shall include (i) an annual base
salary for each such Employee that is equal to the annual base salary for such Employee as set
out in the Employee Information, (ii) employment in a reasonably comparable position as set
out for the Employee in the Employee Information, (iii) a location reasonably contiguous to their
current location as set out in the Employee Information and (iv) other terms and conditions of
employment as set forth in this Section 7.1.  Purchaser shall provide in its offers of employment
that the Employee's acceptance of such offer will be deemed to be a consent to the transfer of his
particular Employee Record.  Share Transfer Employees and Employees whose employment
transfers by operation of Law shall be employed on terms and conditions of employment that are
no less favorable than those set out in the sentence before the preceding sentence.  For purposes
of this Agreement, to the extent certain terms and conditions of employment are required to be
maintained under applicable Law or Seller Employee Plans in order to avoid Sellers' incurring

164

severance or other employment termination obligations or Liability under the WARN Act with respect to Employees at any time after the Closing Date such terms and conditions shall be deemed to be required by applicable Law. Seller shall provide to the Purchaser such available and relevant information, and Seller and Purchaser shall cooperate in good faith, so as to enable Purchaser to comply with its undertakings under this Section 7.1.1. Employees' employment with Purchaser or a Designated Purchaser or, with respect to Share Transfer Employees or other Employees whose employment transfers by operation of Law, continued employment after the Employee Transfer Date, shall not include a probationary period and shall not be conditioned upon such employees satisfactorily completing a background investigation, drug test or other employment screening processes unless such screening process is required by applicable Law, a relevant Purchaser contract, or other customer requirement; provided, however, the Purchaser or Designated Purchaser may require Employees to provide evidence that they are legally permitted to be employed by the Purchaser or a Designated Purchaser, as required by applicable Law. Purchaser shall notify the Main Sellers of the acceptance and rejections of offers of employment that have been received from each of the Employees (x) on at least a weekly basis during the Offer Consideration Period and (y) in total within three (3) Business Days following the end of the Offer Consideration Period. Any Employee who accepts such offer of employment and commences employment with Purchaser or a Designated Purchaser, as applicable, pursuant to this Agreement, and any Employees whose employment transfers by operation of Law and Share Transfer Employees, shall all be deemed to be a Transferred Employee for all purposes of this Agreement. Inactive Employees shall remain employed by the relevant Seller until the first Business Day immediately following the date the Inactive Employee is released to return to active employment in accordance with Sellers' leave policies and on which such Inactive Employee reports to work with the Purchaser or a Designated Purchaser. The Purchaser or a Designated Purchaser shall use reasonable best efforts from the date hereof until the Closing Date to obtain, at its cost, such visas or permits as are required for it to employ Employees with visas or permits as indicated in the Employee Information. Visa Employees and Other Loaned Employees shall remain employed by the relevant Seller under the terms and conditions of the Loaned Employee Agreement. The Effective Hire Date for Non-Union Employees is (a) the Employee Transfer Date for those Employees other than Inactive Employees, Visa Employees and Other Loaned Employees, (b) 12:01 a.m. on the first Business Day following the release to return to active employment from leave for all Inactive Employees and on which such Inactive Employee reports to work with the Purchaser or Designated Purchaser and (c) the date specified in the Loaned Employee Agreement with respect to Visa Employees and Other Loaned Employees.

### 7.1.2. Employee Benefits.

(a)     The Purchaser or a Designated Purchaser shall, and shall cause its relevant Affiliates to, recognize the service date of each Transferred Employee as set out in the Employee Information, to the same extent that service credit would be given under the analogous Seller Employee Plan, for purposes of eligibility and vesting, and with respect to any severance or vacation plan, the determination of levels of benefits, but not for purposes of benefit accrual, or otherwise for determination of the amount or duration of benefits under any Purchaser Employee Plans, except (i) with respect to Transferred Employee Plans, or (ii) as otherwise required by applicable Law.

(b)      After the date hereof, the Sellers and the Purchaser shall cooperate promptly and in good faith in preparing the transition of the Transferred Employees as applicable from coverage under the Seller Employee Plans to coverage under the Purchaser Employee Plans effective as of the Transferred Employee's Effective Hire Date.

(c)      Without limiting the generality of the foregoing, the Purchaser shall, or shall cause its relevant Affiliates to, provide the following benefits to Transferred Employees:

(i)      For the period beginning on the Closing Date and ending on the date that is twelve (12) months from the Closing Date, the Purchaser shall, or shall cause its relevant Affiliates to, provide Transferred Employees with the same severance payments and benefits as similarly situated employees of Purchaser or a Designated Purchaser.

(ii)      Where the Sellers determine they are required by applicable Law or policy to pay the amount of compensation with respect to such accrued and unused vacation days that are due and owing to Transferred Employees, including Union Employees, as of their Effective Hire Date, the Sellers shall pay such amount within 30 days following their Effective Hire Date, or such earlier time as may be required by Law.  Upon certification by an officer of the Sellers to the Purchaser of the actual payment of such amount to any such Transferred Employee and withholding and payment of Taxes in connection therewith, the Purchaser shall reimburse the Seller for such payment within 10 Business Days of the receipt of such certification.  The Purchaser will, and will cause the relevant Designated Purchasers to, make reasonable best efforts to accommodate time off requests of such Transferred Employees until such time as they accrue sufficient paid time off under the Purchaser Employee Plans to address their vacation plans.

(iii)      Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule will set forth the amount of accrued and unused vacation days that are due and owing to the Transferred Employees within 15 Business Days after Purchaser notifies Sellers of the Employees to whom employment offers will be made pursuant to Section 7.1.1 as of the date hereof and such amount shall be updated by the Sellers as of each Transferred Employee's Effective Hire Date.  The Purchaser shall, or shall cause its relevant Affiliates to, grant each such Transferred Employee (other than those Loaned Employees whose accrued and unused vacation days are cashed out by Sellers or their Affiliates in connection with the termination of employment with Sellers or their Affiliates and those Transferred Employees whose accrued and unused vacation days are cashed out in accordance with Section 7.1.2(c)(ii) above) paid time off in an amount equal to such accrued unused vacation days set forth for such Transferred Employee in the applicable Section of the Sellers Disclosure Schedule. If such Transferred Employee terminates employment with the Purchaser or an Affiliate of Purchaser prior to receiving such paid time off, as described above, the Purchaser shall pay such Transferred Employee an amount equal to any such unused paid time off upon such employment termination; provided that the Purchaser shall only be required to make such payment if such Transferred Employee's employment terminates

166

prior to the date which is twelve (12) months following the Closing Date, unless otherwise required by applicable Law.

(iv)    Under the vacation policy of the Purchaser or an Affiliate of the Purchaser, the vacation accrual rate and maximum accrual of each Transferred Employee on and after the Effective Hire Date shall be determined under the vacation policy of the Purchaser or its relevant Affiliate following the crediting of such Transferred Employee with service as provided in Section 7.1.2(a). For the avoidance of doubt, such vacation accrual rate and maximum accrual applicable to Transferred Employees whose accrued vacation is specified in Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule (other than Transferred Employees whose accrued and unused vacation days are cashed out in accordance with Section 7.1.2(c)(ii) above) shall not be decreased prior to the date which is twelve (12) months following the Closing Date, or later if required by applicable Law, by the Purchaser or its Affiliates as a result of the obligation in Section 7.1.2(c)(iii) that Purchaser or its Affiliates grant or compensate such Employees with respect to accrued and unused vacation days due and owing as of the Effective Hire Date. Notwithstanding the foregoing, such Transferred Employees shall have only through and until the date which is twelve (12) months following the Closing Date, or later if required by applicable Law, during which to use accrued and unused vacation days due and owing as of the Effective Hire Date. Any such accrued vacation days that remain unused at such time shall be automatically forfeited.

(v)    The Purchaser or Designated Purchaser shall provide each Transferred Employee employed in India with the benefit of the amount set forth on Section 7.1.2(c)(v) of the Sellers Disclosure Schedule of gratuity payment, at such time, if any, as such payment thereof is due and owing to each such Transferred Employee under applicable Law, taking into account in the calculation of such payment the service of such Transferred Employee as set forth in the Employee Information and such Transferred Employee's service with Purchaser on and after the Closing Date. The Purchaser or Designated Purchaser shall provide each Transferred Employee employed in Australia with the benefit of the amount set forth on Section 7.1.2(c)(v) of the Sellers Disclosure Schedule of long service leave and sick leave, at such time, if any, as payment of such amount is due and owing to each such Transferred Employee under applicable Law, taking into account in the calculation of such payment the service of such Transferred Employee as set forth in the Employee Information and such Transferred Employee's service with Purchaser on and after the Closing Date. Section 7.1.2(c)(v) of the Sellers Disclosure Schedule shall be updated no later than ten (10) Business Days prior to the Closing Date to reflect employee hiring, promotions, demotions, transfers or other status changes and attrition, and further accruals or reductions or other changes from the date hereof to the Closing Date, in each case if and only to the extent permitted under Section 5.9.

(vi)    For the avoidance of doubt, Inactive Employees as of the Closing Date will be listed on Section 2.2.8 of the Sellers Disclosure Schedule, Section

167

7.1.2(c)(iii) of the Sellers Disclosure Schedule and Section 7.1.2(c)(v) of the Sellers Disclosure Schedule, as applicable, provided, however, that unless and until such Inactive Employees become Transferred Employees, the Purchaser shall have no obligation with respect to Inactive Employees under this Section 7.1.2(c).

(d)     Except with respect to Share Transfer Employees or any Employee whose benefits are specified by applicable Law, each Transferred Employee (and their eligible dependents, as applicable), shall be eligible as of the relevant Effective Hire Date to participate in and accrue benefits under the Purchaser Employee Plans, in each case under the terms of such Purchaser Employee Plans, which apply to employees of the Purchaser or a Designated Purchaser in the country where such Transferred Employee is employed as of the relevant Effective Hire Date and at a cost to such Transferred Employee, which is substantially comparable to the costs of those parallel benefit plans of similarly situated employees of the Purchaser. With respect to each Transferred Employee (and their eligible dependents, as applicable), the Purchaser or the relevant Purchaser's Affiliates shall use reasonable best efforts to cause such plans to (i) waive any eligibility periods, evidence of insurability or pre-existing condition limitations and (ii) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employees, including with respect to their dependents, under comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Effective Hire Date occurs, provided that such employee provides an explanation of benefits or similar documentation of such expenses paid or incurred to the Purchaser or its Affiliates. With respect to Transferred Employees who are Share Transfer Employees, the above provisions shall apply to any Purchaser Employee Plan that the Purchaser offers to such Transferred Employees but not with respect to any Transferred Employee Plans. Nothing in this paragraph or otherwise in this Article 7 shall be construed as constituting an amendment of any employee benefit plan.

(e)     The Parties agree to comply with provisions set forth in Section 7.1.2(e) of the Sellers Disclosure Schedule, relating to Canadian Pension Plans.

(f)     Neither Section 7.1.1 nor this Section 7.1.2 restricts the right of the Purchaser to terminate the employment of any Transferred Employee after the Closing, provided any such termination is effected in accordance with applicable Law, the terms of any applicable Purchaser Employee Plan or Transferred Employee Plan and the terms and conditions of this Section 7.1.

SECTION 7.2.     Employment Obligations with Respect to Union Employees. The provisions of this Section 7.2 shall apply to Union Employees. As of the Closing Date, the Purchaser or its relevant Affiliate will be bound by the terms and obligations of the Collective Labor Agreements specified in the Employee Information with respect to the employment of the relevant Union Employees as a successor, assign or purchaser of the relevant Seller and shall employ the Union Employees in accordance therewith.

SECTION 7.3.     Excluded Employee Liabilities. For purposes of clarity, except as otherwise provided in the Loaned Employee Agreement, the Sellers shall retain, and neither

168

the Purchaser nor any of the Designated Purchasers shall assume at the Closing, any of the following Liabilities of the Sellers (the "**Excluded Employee Liabilities**"):

(a) except with respect to any Share Transfer Employees of the NGS Companies and/or their qualified beneficiaries, any obligation to provide continuation coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to any Transferred Employees and/or their qualified beneficiaries who have a COBRA qualifying event prior to such Employees' Effective Hire Date;

(b) any Liabilities resulting from any Action (i) by any Employee (other than a Share Transfer Employee or another Employee whose employment transfers to the Purchaser or a Designated Purchaser by operation of Law) relating to his/her employment or termination of employment with any of the Sellers, except any Action related to Purchaser's failure to perform its obligations under Sections 7.1.2(c)(ii), (iii), (iv) and (v), or (ii) an applicant with respect to potential employment with any of the Sellers in the Business;

(c) any Liabilities under the WARN Act which arise out of or result from any layoff, termination of employment or the closing or relocation of worksites or the like by the Sellers on or before the Closing Date other than Liabilities related to the Transferred Employees as a result of the actions or inactions of the Purchaser as provided in Section 2.1.3(e)(ii) and (iv) or as provided in Section 2.1.3(e)(iii);

(d) other than with respect to the Companies and the Share Transfer Employees, any Liabilities for Employees and independent contractors related to the Business that are not Transferred Employees; and

(e) other than with respect to the Companies and the Share Transfer Employees, any other Liabilities relating to Employees, independent contractors or Seller Employee Benefit Plans that are not expressly assumed under this Agreement.

SECTION 7.4.   Other Employee Covenants.

(a) After the date hereof, and subject to each Party's disclosure obligations imposed by Law or by Government Entities and each Party's obligations hereunder, the Parties shall not, and shall procure that each of their Affiliates shall not, issue any announcement or communication to their respective employees or the Employees, prior to consultation with, and the approval of, the other Party (not to be unreasonably withheld or delayed) with respect to this Agreement or any of the transactions contemplated hereby (including any announcement or communication to any individual employee that the Purchaser is required to provide under applicable Law). Each Party shall cooperate in respect of the development and distribution of any announcement and communication to the employees of the other Party including Employees thereof, with respect to this Agreement or any of the transactions contemplated hereby.

(b) The Purchaser undertakes to keep the Employee Information in confidence and that, until the relevant Employee Transfer Date with respect to those Employees who

169

become Transferred Employees, and at all times with respect to those Employees who do not become Transferred Employees:

> (i)      the Purchaser shall, and shall cause the Designated Purchasers to, restrict the disclosure of the Employee Information only to such of its employees, agents and advisors as is reasonably appropriate for the purposes of complying with its obligations pursuant to this Agreement prior to the Employee Transfer Date;

> (ii)     the Employee Information shall not be disclosed to any other Person (including, for the avoidance of doubt, any other employee of the Purchaser or any Designated Purchaser or other Affiliate of the Purchaser) without the consent of the Main Sellers, such consent not to be unreasonably withheld;

> (iii)    the Employee Information shall not be used except for the purposes of complying with the obligations of the Purchaser and the Designated Purchasers pursuant to this Agreement, and for the purposes reasonably related to the same, and shall be returned to the Sellers or destroyed, at the Sellers' election, if this Agreement is terminated; and

> (iv)    the Purchaser shall, and shall cause the Designated Purchasers to, comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

(c)      The Sellers shall use reasonable efforts to provide updated Employee Information to the Purchaser on the first Business Day of each month beginning after the date hereof, provided that from and after the date on which the Purchaser determines its final list of Employees to whom offers shall be made under Section 7.1.1, Sellers shall provide updated Employee Information only with respect to such Employees, and shall provide the Purchaser with the final updated Employee Information with respect to those Employees to whom the Purchaser has made offers of employment under Section 7.1.1 ten (10) Business Days prior to the Closing Date in order to reflect Employee hiring, promotions, demotions, transfers, or other status changes and attrition, and further accruals or reductions or, if and to the extent applicable to such Schedule, other changes in a Transferred Employee's compensation from the date hereof to the Closing Date, in each case if and only to the extent permitted under Section 5.9.

(d)      The Purchaser and the Sellers shall cooperate with each other in connection with the process by which Employees are designated to become or not become Transferred Employees, and otherwise provide for an orderly transition of the Transferred Employees from the Sellers to the Purchaser or the Designated Purchasers, as applicable, and to minimize the disruption to the respective businesses of the Parties resulting from the transactions contemplated hereby. Without limiting the generality of the foregoing, within 105 days following the date hereof, the Sellers agree to commence discussions with the Purchaser regarding the identity of the Employees who will be offered employment under Section 7.1.1, and promptly after the date hereof, as permitted by applicable Law, provide the Purchaser reasonable access to books, records, personnel files, or other documentation as provided in

170

Section 5.6(a). For the avoidance of doubt, for purposes of Section 5.6(a), the Sellers agree to use reasonable best efforts to obtain any consent of employees necessary to provide the Purchaser with such access.

(e)     During the Non-Solicitation Period the Sellers shall not, and shall not permit, cause or encourage any of their Affiliates to, without the advance written consent of Purchaser, either directly or indirectly solicit for employment, hire or otherwise engage to provide services any Transferred Employee or other employee of the Purchaser or Designated Purchaser unless the Purchaser or a Designated Purchaser involuntarily terminate the employment of such employee, without cause, prior to such action by the Sellers; provided, however, that nothing in this Section 7.4(e) shall prevent the Sellers from conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such Transferred Employees. During the Non-Solicitation Period, Purchaser and the Designated Purchasers shall not, and shall not permit, cause or encourage any of their Affiliates to, without the Seller's advance written consent, either directly or indirectly solicit for employment, hire or otherwise engage to provide services (i) any of the employees of the Sellers (other than Employees), unless the Sellers involuntarily terminate the employment of such employee, without cause, prior to such action by the Purchaser or the Designated Purchasers, or (ii) any Employees who have rejected the employment offer of Purchaser or a Designated Purchasers or objected to their transfer of employment to the Purchaser or a Designated Purchasers pursuant to this Agreement or Employees to whom Purchaser or a Designated Purchaser did not make an offer pursuant to Section 7.1.1; provided, however, that nothing in this Section 7.4(e) shall prevent Purchaser or the Designated Purchasers from conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such employees or former employees of the Designated Sellers.

(f)     As of the Effective Hire Date, the Sellers shall release any non-competition or confidentiality obligations in respect of the Business or Assets binding to the Transferred Employees which would survive the termination of the employment relationship between the Sellers and the Transferred Employees. For the avoidance of doubt, this release shall operate only to facilitate the Transferred Employees' employment with the Purchaser or a Designated Purchaser, as applicable, in the Business and the subject non-competition and confidentiality obligations shall remain in full force and effect as to all other aspects of the Sellers' business and all other Persons.

(g)     Each Party shall reasonably cooperate to communicate relevant information to Employees relating to this Agreement and the transactions contemplated hereunder, and shall provide copies of all notices required by Law and related to the transactions contemplated by this Agreement to the other Party. Each Party shall provide copies of such communications to the other Party reasonably in advance of distribution, and shall provide an opportunity for such other Party to comment.

(h)     In the event and for so long as Seller is actively contesting or defending against any third party Action in which the Employee Records are pertinent, the Purchaser or Designated Purchaser agrees to provide reasonable access to Employee Records, at the cost of the Sellers.

171

(i)     In respect of the employees employed by NN International and providing services in Saudi Arabia, as set forth on Section 7.4(i) of the Sellers Disclosure Schedule: (i) the Main Sellers shall cause NN International, from the date hereof, to comply with the provisions of Paragraphs 6.1, 6.3 and 6.5 (to the extent applicable) and 8.1 through 8.3 of Schedule 6 to the EMEA Asset Sale Agreement as if NN International were a Relevant EMEA Seller thereunder and Clauses 10.21.7(D), (E), (G) or (J) of the EMEA Asset Sale Agreement as if NN International were an EMEA Seller in respect of those clauses; (ii) NN International shall comply with all of the relevant terms of Schedule 6 to the EMEA Asset Sale Agreement as if it were a Relevant EMEA Seller under the EMEA Asset Sale Agreement and Clauses 10.21.7(D), (E), (G) or (J) of the EMEA Asset Sale Agreement as if it was an EMEA Seller in respect of those clauses; and (iii) the Purchaser shall, or shall procure that the relevant EMEA Designated Purchaser shall, comply from the date hereof with its relevant obligations to NN International as if NN International were a Relevant EMEA Seller for the purposes of Schedule 6 of the EMEA Asset Sale Agreement. In addition, employees of NN International performing services in Saudi Arabia in respect of the Business shall be treated as based in Saudi Arabia for purposes of Schedule 6 to the EMEA Asset Sale Agreement and, for the avoidance of doubt, any such employees who are selected by the Purchaser or relevant EMEA Designated Purchaser pursuant to Paragraph 1.1.12 of Schedule 6 to the EMEA Asset Sale Agreement shall be deemed to be Non-ARD Transferring Employees (as defined in the EMEA Asset Sale Agreement) for the purposes of the EMEA Asset Sale Agreement. For the avoidance of doubt, the employees listed in Section 7.4(i) of the Sellers Disclosure Schedule are not deemed to be Employees or Transferred Employees for the purposes of this Agreement.

SECTION 7.5.     No Amendment of Plans.  Notwithstanding anything in the Agreement to the contrary, no provision of this Agreement is intended to, or does, constitute the establishment or adoption of, or amendment to, any employee benefit plan (within the meaning of Section 3(3) of, or subject to, ERISA), and no person participating in any such employee benefit plan maintained by either the Seller or the Purchaser or the Designated Purchaser, shall have any claim or cause of action, under ERISA or otherwise, in respect of any provision of this Agreement as it relates to any such employee benefit plan or otherwise.

## ARTICLE VIII

## CONDITIONS TO THE CLOSING

SECTION 8.1.    Conditions to Each Party's Obligation. The Parties' obligation
to effect, and, as to the Purchaser, to cause the relevant Designated Purchasers to effect, the
Closing is subject to the satisfaction or the express written waiver of the Primary Parties, at or
prior to the Closing, of the following conditions:

(a)    *Regulatory Approvals*. All Regulatory Approvals shall have been
obtained and, unless the Purchaser expressly agrees otherwise, the Regulatory Approvals shall
not require the Purchaser, any Designated Purchaser, any EMEA Designated Purchaser or any of
their respective subsidiaries to commit to any actions, undertakings, divestitures, licenses or hold
separate or similar arrangements or any arrangements for the conduct of any business and/or
terminating any relationships or contractual rights or obligations that, individually or in the
aggregate, would be material in relation to the value of the Acquired Business.

(b)    *No Injunctions or Restraints*. There shall be in effect no Law, or any
material order, injunction, decree or judgment of any Court or other Government Entity in the
U.S., Canada or the United Kingdom, or of any European Union Entity, prohibiting the
consummation of any of the transactions contemplated hereby or by the EMEA Asset Sale
Agreement.

(c)    Reserved.

(d)    *U.S. Sale Order and Canadian Approval and Vesting Order*. The U.S.
Sale Order and the Canadian Approval and Vesting Order (i) shall have been entered without
material modification, unless the Purchaser expressly consented to such modification, which
consent shall not be unreasonably withheld and (ii) shall not have been stayed as of the Closing
Date, amended, modified, reversed, vacated, revoked or appealed and shall be in full force and
effect as of the Closing Date; provided that this condition shall be deemed satisfied even if the
U.S. Sale Order has been appealed, so long as (x) the applicable appeal period has expired, (y)
the effectiveness of the U.S. Sale Order has not been stayed by the U.S. Bankruptcy Court
pending appeal and (z) the Purchaser shall have concluded, after consultation with the Main
Sellers, the Monitor, the Committee and the Bondholder Group and their respective counsel, that
there is no material risk that any pending appeal of the U.S. Sale Order will not be rendered moot
following Closing by operation of Section 363(m) of the U.S. Bankruptcy Code.
Notwithstanding the foregoing, any modification of Paragraphs L and Q and Sections 6, 7 and 8
of the U.S. Sale Order by the U.S. Bankruptcy Court to comply with applicable law shall not
affect the Purchaser's obligation to close hereunder.

(e)    *Satisfaction of Conditions under EMEA Asset Sale Agreement*. The
conditions to Closing of the EMEA Asset Sale Agreement set out in Clause 15.1 thereof (other
than the conditions regarding the satisfaction or waiver of the conditions set out in this Section
8.1) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale
Agreement.

(f)     *Consummation of Closing under EMEA Asset Sale Agreement.* The transactions contemplated by the EMEA Asset Sale Agreement to be completed as of the Closing shall be completed contemporaneously with the Closing hereunder.

SECTION 8.2.     Conditions to Sellers' Obligation. The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Main Sellers), at or prior to the Closing, of each of the following conditions:

(a)     *No Breach of Representations and Warranties.* Each of the representations and warranties contained in Article III (disregarding all materiality and material adverse effect qualifications contained therein) shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually and together with other such failures, has not had a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement.

(b)     *No Breach of Covenants.* The Purchaser shall have performed in all material respects all material covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing.

(c)     *Officer Certificate.* The Sellers shall be furnished with a certificate of one of the senior officers of the Purchaser certifying that the conditions set forth in Section 8.2(a) and (b) have been satisfied.

(d)     *Satisfaction of Conditions under EMEA Asset Sale Agreement.* The conditions to Closing of the EMEA Asset Sale Agreement set out in Clause 15.2 thereof (other than the conditions regarding the satisfaction or waiver of the conditions set out in this Section 8.2) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement.

SECTION 8.3.     Conditions to Purchaser's Obligation. The Purchaser's obligation to effect, and to cause the relevant Designated Purchasers to effect, the Closing shall be subject to the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a)     *No Breach of Representations and Warranties.* Each of the representations and warranties set forth in Article IV, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except in each case for any failure to be true and correct that, individually and together with other such failures, has not had a Material Adverse Effect.

(b)     *No Breach of Covenants.* Sellers shall have complied (i) with all pre-Closing obligations set forth in Section 5.9(v) and Section 5.34 and (ii) in all material respects with all other material covenants, obligations and agreements contained in this Agreement required to be performed by the Sellers on or before the Closing.

(c)     *Officer Certificate.* The Purchaser shall be furnished with a certificate of one a senior officer of one of the Main Sellers that the conditions set forth in paragraphs (a) and (b) of this Section have been satisfied.

(d)     *No Plan Termination of or Lien with Respect Thereto.* If the Asset Sale Election is not made, with reference to occurrences at any time before, on or after the date hereof (i) the NNRIP shall not have been terminated prior to the Closing in a distress termination (under Section 4041 of ERISA) or an involuntary termination (under Section 4042 of ERISA), (ii) Seller (or any Person that would be considered a single employer with Seller under ERISA or the Code) shall not have issued a notice of intent to terminate the NNRIP or received notice that the PBGC has initiated a proceeding to terminate the NNRIP, in either case with a proposed date of plan termination on or before the Closing Date, which termination could result in related liabilities to the Purchaser or its Affiliates (including the Companies), (iii) no Lien shall have arisen under Section 430 of the Code or Section 4068 of ERISA with respect to such NNRIP that could apply to any of the assets of the Purchaser or any of its Affiliates (including the Companies), and (iv) no liability could be asserted against the Companies under Section 412 of the Code or Section 4062 of ERISA, unless, in the case of each of clauses (i), (ii), (iii) and (iv), either the PBGC shall have waived its Claims or potential Claims against Purchaser or any of its Affiliates (including the Companies) in relation to such potential liabilities and, if applicable, any such Lien or potential Lien shall have been released, or as of the Closing Date shall be released, by the PBGC. The Sellers expressly acknowledge, for the avoidance of doubt, that Purchaser is entitled to the benefit of this Section 8.3(d) with respect to, without limiting the generality of clauses (i), (ii), (iii) and (iv) of the preceding sentence, the Complaint For Pension Plan Termination dated July 16, 2009 filed by the PBGC in the U.S. District Court for the Middle District of Tennessee (Nashville Division) and the PBGC Notice of Determination addressed to the Retirement Plan Committee of Nortel Networks Retirement Income Plan and any related plan termination or actual or potential Claim, Lien or Liability as described above.

(e)     *UK Defined Benefit Plan.*

(i)     If the Asset Sale Election is not made, there shall be no pending Action by the UK Pensions Regulator, the PPF or the Pension Trustees seeking to assert liability against the Companies or in respect of the Shares under the UK Pensions Act 2004. For the purposes of this clause an Action to assert such liability shall be deemed to have occurred and to be pending (unless such action shall have been formally terminated or withdrawn), without limitation upon and following the occurrence of any of:

(A)     The issue of a warning notice in respect of the imposition of a contribution notice or a financial support direction (as defined under the UK Pensions Act 2004) on either of the Companies by the UK Pensions Regulator; or

(B)     The issue of a determination notice in respect of the imposition of a contribution notice or a financial support direction (as defined under the UK Pensions Act 2004) on either of the Companies by the UK Pensions Regulator; or

(C)   any written communication from the UK Pensions Regulator, the PPF or the Pensions Trustees which is received by or addressed to the attention of any Sellers, any EMEA Sellers, any Company, the Joint Administrators, the Joint Israeli Administrators, the Pension Trustees or the Purchaser or the representative of or successor to (including any administrator of) any of the foregoing and which makes reference to either of the Companies and/or the matters covered by the Transaction Documents and states that the UK Pensions Regulator is reviewing the position of either of the Companies and/or the matters covered by the Transaction Documents with a view to imposing or determining whether to impose a contribution notice or financial support direction (as defined under the UK Pensions Act 2004) on either of the Companies.

(f)   *Satisfaction of Conditions under EMEA Asset Sale Agreement.* The conditions to Closing of the EMEA Asset Sale Agreement set out in Clause 15.3 thereof (other than the conditions regarding the satisfaction or waiver of the conditions set out in this Section 8.3) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement.

(g)   *Customer Contracts; Financial Statements.* If the Asset Sale Election is made, then either (i) Customer Contracts of the Companies that accounted for not less than 65 % of LTM revenues of the Companies as of the Closing Date shall have been transferred or, to the extent not prohibited by applicable Law or the terms of such Customer Contract, sub-contracted (on terms under which Purchaser or a Designated Purchaser receives the economic benefits that it would have received if it were a direct party to the relevant Customer Contract) to Purchaser or a Designated Purchaser on the Closing Date in compliance with an effective order of the Bankruptcy Court or (ii) Sellers shall have delivered a second set of all financial statements and information required to be delivered before Closing under Section 5.34, which set of financial statements and information shall have been prepared excluding the Companies.

(h)   *Resolution of Certain Tax Issues.* In the event the Asset Sale Election is not timely made, any material Tax Liability of the Companies arising pursuant to Treasury Regulation Section 1.1502-6 and relating to the IRS Claim (the "**-6 Liability**") shall have been resolved in a manner reasonably acceptable to the Purchaser.

## ARTICLE IX

## TERMINATION

SECTION 9.1.   Termination.   This Agreement may be terminated at any time prior to the Closing:

(a)   by mutual written consent of the Primary Parties;

(b)   by either Primary Party, upon written notice to the other:

(i)   on or prior to the fifth (5th) Business Day after entry of the U.S. Bidding Procedures Order or the Canadian Sales Process Order, if the U.S.

Bidding Procedures Order and the Canadian Sales Process Order have not been entered within thirty (30) days from the date of this Agreement in the form of orders, without modification that is material and adverse to the terminating Party unless such Party expressly consented to such modification (such consent not to be unreasonably withheld), set forth in Exhibit 5.1(a) (in the case of the U.S. Bidding Procedures Order) and Exhibit 5.2.1 (in the case of the Canadian Sales Process Order);

(ii)     (ii) if the U.S. Sale Order and the Canadian Approval and Vesting Order are not entered in satisfaction of the condition set forth in Section 8.1(d) within ten (10) Business Days if terminated by the Purchaser or twenty (20) Business Days if terminated by the Main Sellers after the conclusion of the Auction;

(iii)     upon or following the entry of an order by the U.S. Bankruptcy Court or the Canadian Court approving an Alternative Transaction;

(iv)     if the EMEA Asset Sale Agreement is terminated in accordance with its terms;

(v)     upon or following the sale, transfer or other disposition, directly or indirectly, of any material portion of the Business or the Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers or the Companies;

(vi)     if the Closing does not take place on or prior to the date that is (a) 270 days from the date of this Agreement in the case of a termination by the Main Sellers, or (b) the earlier of (1) 365 days from the date of this Agreement or (2) the later of 270 days from the date of this Agreement or the thirtieth (30th) day after the date on which the condition set forth in Section 8.1(a) hereof is satisfied, in the case of a termination by the Purchaser; or

(vii)     if any Antitrust Law is enacted in the U.S. or Canada or by the European Union, or any Court or other Government Entity in the U.S. or Canada or any Government Entity of the European Union issues a final order, injunction, decree, ruling or judgment based on Antitrust Laws, in each case permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement.

(c)     (i) by the Purchaser, upon written notice to the Main Sellers, in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure of the conditions to Closing set forth in Section 8.1(a), Section 8.1(e), Section 8.1(f), Section 8.3(a) or Section 8.3(b), as applicable, or (ii) by the Main Sellers, upon written notice to the Purchaser, in the event of a material breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement or the EMEA Asset Sale Agreement, which

177

breach would result in a failure of the conditions to Closing set forth in Section 8.1(a), Section 8.1(e), Section 8.1(f), Section 8.2(a) or Section 8.2(b), as applicable, and, in each case, which, if capable of being cured, has not been cured within twenty-five (25) days from receipt of a written notice thereof from the non-breaching Party; or

        (d)      by the Main Sellers, upon written notice to the Purchaser:

        (i)      upon Purchaser's material breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within five (5) days from the receipt of a written notice thereof from the Main Sellers; or

        (ii)      in the event of a material breach by the Purchaser of the Purchaser's covenants set forth in Section 5.5, which breach, if capable of being cured, is not cured within fifteen (15) days from receipt of a written notice thereof from the Main Sellers;

        (e)      by the Purchaser, upon written notice to the Main Sellers, if at the conclusion of the Auction, the Purchaser is not selected as the Successful Bidder;

        (f)      by the Purchaser, upon written notice to the Main Sellers delivered prior to the entry of the U.S. Sale Order, if the Auction does not conclude by the later of (x) the forty-fifth (45th) Business Day after the entry of the U.S. Bidding Procedures Order and (y) September 16, 2009;

        (g)      by the Purchaser, upon written notice to the Main Sellers;

        (i)      upon revocation or alteration of the Bidding Procedures (as defined in the U.S. Bidding Procedures Order), the Bidding Process (as defined in the U.S. Bidding Procedures Order) or the Auction, in each case pursuant to the last paragraph of the section of the Bidding Procedures titled "Reservation of Rights;"

        (ii)      upon any Sellers' material breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within twenty-five (25) days from the receipt of a written notice thereof from the Purchaser; or

        (iii)     within thirty (30) days of delivery by the Purchaser of the related written notice of breach to the Sellers, in the event that (A) on or subsequent to the date hereof and prior to the entry of the Bidding Procedures Order or (B) subsequent to the conclusion of the Auction, in the event there is a material breach by the Sellers of the covenants set forth in Section 5.29 that occurred during such period which breach, if capable of being cured, has not been cured within five (5) days from receipt of a written notice thereof from the Purchaser (provided that, with respect to a breach occurring in the period contemplated by clause (A), no termination notice shall be given by the Purchaser after the entry of the Bidding Procedures Order);

(h)    by the Purchaser, upon written notice to the Main Sellers delivered within fifteen (15) days of delivery to the Purchaser of the Audited Financial Statements for fiscal year 2008, if the Adjusted Audited Standard Margin is less than ninety percent (90%) of the Unaudited Standard Margin; or

(i)    by the Purchaser, upon written notice to the Main Sellers delivered before the expiration of the Contract Review Period, provided that the Reverse Termination Fee is paid to Sellers in accordance with Section 9.3 prior to or concurrently with such termination;

provided, however, that (x) the right to terminate this Agreement pursuant to Section 9.1(b)(i), Section 9.1(b)(ii), Section 9.1(b)(vii), Section 9.1(e) or Section 9.1(f) shall not be available to any Party whose breach hereof was a principal cause of the event or condition purportedly giving rise to a right to terminate this Agreement under such clause and; provided further, however, that (y) the right to terminate this Agreement pursuant to Section 9.1(b)(vi) shall not be available to the Sellers, if any Seller or any EMEA Seller is in breach of its obligation to close the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement during the twenty-five (25) days prior to the two-hundred seventieth (270th) day from the date hereof, until forty-five (45) days after such breach has been cured and (z) the right to terminate this Agreement pursuant to Section 9.1(b)(vi) shall not be available to the Purchaser, if the Purchaser is in breach of its obligation to close the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement during the five (5) days prior to the date that is 365 days after the date hereof, until forty-five (45) days after such breach has been cured.

SECTION 9.2.    Break-Up Fee; Expense Reimbursement.

(a)    In the event that (i) this Agreement is terminated (x) by either Primary Party pursuant to Section 9.1(b)(ii) (provided that an Alternative Transaction has been proposed or re-proposed to the Main Sellers after the date hereof and prior to such termination, and an Alternative Transaction is entered into before, on or within sixty (60) days following such termination of this Agreement), Section 9.1(b)(iii) or Section 9.1(b)(v) or (y) by the Purchaser pursuant to Section 9.1(c)(i) (as a result of an Intentional Breach by the Sellers), Section 9.1(e), Section 9.1(f), Section 9.1(g)(i), Section 9.1(g)(ii) (as a result of an Intentional Breach by the Sellers) or, subsequent to the conclusion of the Auction, Section 9.1(g)(iii) (as a result of an Intentional Breach by the Sellers), or (z) by either Primary Party pursuant to Section 9.1(b)(iv) (as a result of a termination of the EMEA Asset Sale Agreement pursuant to Clause 15.4.2(C), Clause 15.4.2(E) or Clause 15.4.4 (as a result of an Intentional Breach by the EMEA Sellers of the EMEA Asset Sale Agreement) of the EMEA Asset Sale Agreement), (ii) when this Agreement is terminated, the Purchaser is not in breach of this Agreement or the EMEA Asset Sale Agreement as a result of an Intentional Breach which Intentional Breach would result in a failure to satisfy the conditions to Closing set forth in Section 8.1 and/or Section 8.2, as applicable, and, in each case, which, if capable of being cured, has not been cured within the applicable Breach Cure Period, and (iii) an Alternative Transaction is entered into before, on or within nine (9) months following such termination and is eventually consummated, the Sellers and the EMEA Debtors shall pay to the Purchaser in immediately available funds, within five (5) Business Days of the consummation of such Alternative Transaction, an aggregate cash fee equal to (x) $14,250,000 (the "**Break-Up Fee**"), minus (y) one-half of the Expense Reimbursement paid hereunder.

179

(b) In the event that (i) (A) this Agreement is terminated pursuant to any provision in Section 9.1 (other than Section 9.1(a), Section 9.1(b)(iv) (as a result of a termination of the EMEA Asset Sale Agreement pursuant to Clause 15.4.1, Clause 15.4.2(G), Clause 15.4.3, or Clause 15.4.9 of the EMEA Asset Sale Agreement), Section 9.1(b)(vii), Section 9.1(c)(ii), Section 9.1(d) or Section 9.1(i)), or (B) this Agreement is terminated pursuant to any provision in Section 9.1 and, prior to such termination, the Sellers publicly announce (1) the retention of the Business by all or some of the Sellers (or their successor entities) under a stand-alone plan of reorganization approved by the U.S. Bankruptcy Court or any plan of arrangement approved by the Canadian Court, or (2) that any portion of the Business or the Assets and the EMEA Assets will be sold, transferred or otherwise disposed, directly or indirectly, in connection with the closure, liquidation or winding up of the Business or any of the Sellers, the EMEA Sellers or the Companies (except for any sale to the Purchaser or a Designated Purchaser contemplated by the Transaction Documents), and (ii) when this Agreement is terminated, the Purchaser is not in breach of this Agreement or the EMEA Asset Sale Agreement as a result of an Intentional Breach which breach would result in a failure to satisfy any of the conditions to Closing set forth in Section 8.1 and/or Section 8.2 or Clause 15.1 and/or Clause 15.2 of the EMEA Asset Sale Agreement, as applicable, and, in each case, which, if capable of being cured, has not been cured within the applicable Breach Cure Period, the Sellers and the EMEA Sellers shall pay the Purchaser an aggregate amount in cash equal to the total amount of all reasonable and documented fees, costs and expenses incurred by the Purchaser in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all filing and notification fees, and all fees and expenses of the Purchaser's representatives (the "**Expense Reimbursement**"); provided, however, that the Expense Reimbursement shall not be payable in the event that the Agreement is terminated pursuant to Section 9.1(b)(vi) if at the time of such termination (i) the condition set forth in Section 8.1(a) is not satisfied and (ii) the conditions set forth in Section 8.1(b), Section 8.1(d), Section 8.3(a), Section 8.3(b), Section 8.3(d) and Section 8.3(e) are satisfied other than any failure to satisfy any such condition listed in clause (ii) that is caused by the failure to obtain any Antitrust Approval or an Intentional Breach by Purchaser of this Agreement which, if capable of being cured, has not been cured within the applicable Breach Cure Period. Notwithstanding the foregoing, the Expense Reimbursement shall not exceed $9,500,000 in the aggregate (the "**Expense Reimbursement Limit**"). If the Expense Reimbursement does not exceed the Expense Reimbursement Limit, the Sellers and the EMEA Sellers agree that the Expense Reimbursement is a reasonable amount given the size and complexity of the transactions contemplated by this Agreement and the EMEA Asset Sale Agreement. The Expense Reimbursement shall be paid by wire transfer or other means reasonably acceptable to the Purchaser not later than five (5) Business Days following the receipt by the Main Sellers and NNUK of written notice from the Purchaser describing the fees and expenses that constitute the Expense Reimbursement in reasonable detail.

(c) The Sellers shall pay two-thirds (2/3) and the EMEA Debtors shall pay one-third (1/3) of each of the Break-Up Fee and the Expense Reimbursement if payable hereunder. The Sellers' and the EMEA Debtors' obligations to pay their respective shares of the Break-Up Fee and the Expense Reimbursement pursuant to this Section 9.2 shall be several and not joint (but the obligation of the Sellers to pay two-thirds (2/3) of each of the Break-Up Fee and Expense Reimbursement shall be joint and several among the Sellers and the obligation of

180

the EMEA Debtors to pay one-third (1/3) of each of the Break-Up Fee and Expense Reimbursement shall be joint and several among the EMEA Debtors) and shall survive termination of this Agreement or the EMEA Asset Sale Agreement and shall (i) to the extent owed by the U.S. Debtors constitute an administrative expense of the U.S. Debtors under sections 503(b) of the U.S. Bankruptcy Code and (ii) to the extent owed by the EMEA Debtors, constitute an expense of the administration under Paragraph 99 of Schedule B1 to the Insolvency Act 1986 and/ or Rule 2.67 of the Insolvency Rules 1986; provided, however, in the event that any Seller or any EMEA Seller or any Affiliate of any Seller or EMEA Seller agrees to pay a break-up fee or expense reimbursement to any subsequent purchaser of assets or shares, with an unadjusted, aggregate purchase price greater than or equal to $100,000,000 and such break-up fee or expense reimbursement has priority over any administrative expenses specified in section 503(b) or 507(b) of the U.S. Bankruptcy Code, then the portion of the Break-Up Fee and Expense Reimbursement payable to the Purchaser or its Affiliates by the Sellers shall have administrative expense status under section 364(c) of the U.S. Bankruptcy Code with priority over any and all administrative expenses specified in section 503(b) or 507(b) of the U.S. Bankruptcy Code (to the extent such concept is applicable to such Sellers).

SECTION 9.3.    Reverse Termination Fee.

(a)     The Purchaser shall pay the Reverse Termination Fee to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) in the event that:

(i)     this Agreement is terminated by Purchaser pursuant to Section 9.1(i); or

(ii)     (A) At the time of termination of the Agreement (1) the conditions set forth in Section 8.1(a) of this Agreement or Clause 15.1.3 of the EMEA Asset Sale Agreement have not been satisfied, (2) any Regulatory Approval(s) require any divestiture, license or hold separate or similar arrangements or any material actions, undertakings or arrangements for the conduct of any business and/or terminating any relationships or contractual rights or obligations that Purchaser determines not to accept, or (3) there is a Material Intentional Purchaser Breach, and

(B)(1) this Agreement is terminated by the Main Sellers pursuant to Section 9.1(c)(ii) or Section 9.1(d) hereof, (2) the EMEA Asset Sale Agreement is terminated by the Joint Administrators pursuant to Clause 15.4.3 thereof, or (3) this Agreement is terminated by either Primary Party pursuant to Section 9.1(b)(vi) or Section 9.1(b)(vii) hereof or the EMEA Asset Sale Agreement is terminated by the Joint Administrator or the Purchaser pursuant to Clause 15.4.2(F) or Clause 15.4.2(G) thereof;

provided, however, that notwithstanding the foregoing, the Reverse Termination Fee shall not be payable pursuant to this clause (ii) if at the time of termination:

(x) the Sellers are in breach of this Agreement in any material respect as a result of an Intentional Breach, which breach would result in a failure of the

181

conditions to Closing set forth in Section 8.1 or Section 8.3 to be satisfied, and in each case, which, if capable of being cured, is not cured within the applicable Breach Cure Period or (y) the EMEA Sellers are in breach of the EMEA Asset Sale Agreement in any material respect as a result of an Intentional Breach, which breach would result in a failure of the conditions to Closing (as defined in the EMEA Asset Sale Agreement) set forth in Clause 15.3.1 thereof to be satisfied, and in each case, which, if capable of being cured, is not cured within the applicable Breach Cure Period; or

(y) any of the conditions to Purchaser's obligations set forth in Section 8.1 or Section 8.3 cannot be satisfied on or before the date that is 365 days from the date of this Agreement (other than any such condition that by its nature is to be satisfied at the Closing or any such condition that cannot be satisfied as a result of (1) a Material Intentional Purchaser Breach or (2) the failure to obtain any Antitrust Approval).

(b)     If payable pursuant to Section 9.3(a) the Reverse Termination Fee shall be paid by the Purchaser to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) as follows:

(i)     by application of the Good Faith Deposit and the portion of the Delay Fee that shall have already been paid to the Escrow Agent in the form of Delay Fee Payments pursuant to Section 2.2.1(b) and the actual earnings thereon, as contemplated in Section 2.2.1(c)(ii); and

(ii)     as for the balance of the Reverse Termination Fee, if any, in immediately available funds, within two (2) Business Days of the termination of this Agreement, by way of wire transfer to an account of the Distribution Agent, as distribution agent for the Sellers, to be notified by the Main Sellers or the Distribution Agent to the Purchaser in writing.

SECTION 9.4.     Effects of Termination.  If this Agreement is terminated pursuant to Section 9.1:

(a)     all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of or as provided in (i) Section 2.2.6(b) (Escrows), (ii) Section 5.7 (Public Announcements), (iii) Section 5.10 (Transaction Expenses), (iv) Section 5.11 (Confidentiality), (v) Section 7.4(b)(iii) (Other Employee Covenants), (vi) Section 9.2 (Break-Up Fee; Expense Reimbursement), (vii) Section 9.3 (Reverse Termination Fee), (viii) Section 9.4 (Effects of Termination), and (ix) Article X;

(b)     except as required by applicable Law, the Purchaser shall return to the Sellers all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; and

(c)     the provisions of the Confidentiality Agreement will continue in full force and effect.

182

## ARTICLE X

## MISCELLANEOUS

SECTION 10.1.   No Survival of Representations and Warranties or Covenants. Except for the representations set forth in Section 3.5, no representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants set forth in Article VI and covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

SECTION 10.2.   Remedies. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 10.3.   No Third-Party Beneficiaries. Except for the rights of the Indemnified Persons under Section 5.20, the rights of the Avaya Parties and the Nortel Parties pursuant to Section 10.14 and any acknowledgments, rights, undertakings, representations or warranties expressed to be for the benefit of the EMEA Sellers, the Joint Administrators or the Joint Israeli Administrators, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 10.4.   Consent to Amendments; Waivers. No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement and the Ancillary Agreements shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.

SECTION 10.5.   Successors and Assigns. Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Main Sellers in case of an assignment by the Purchaser or the Purchaser in case of an assignment by any Seller, which consent may be withheld in such party's sole discretion, except for the following assignments which shall not require consent: (i) assignment to an Affiliate of a Party (provided that such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Party), (ii) assignment by a U.S. Debtor to a succeeding entity following such U.S. Debtor's emergence from the Chapter 11 Cases, (iii) assignment by any of the Canadian Debtors pursuant to any plan of arrangement approved by the Canadian Court and (iv) designation by the Purchaser of Designated Purchasers pursuant to Section 2.4.

SECTION 10.6.   Governing Law; Submission to Jurisdiction; Waiver of Jury

Trial.

(a)   Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

(b)   To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (A) the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, provided that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors, the Canadian Debtors or the Purchaser may, in accordance with the Cross-Border Protocol, move the U.S. Bankruptcy Court and the Canadian Court to hold a joint hearing of the U.S. Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, action or proceeding, or (B) in the Federal Courts in the Southern District of New York or the State Courts of the State of New York, County of Manhattan (collectively, the "**New York Courts**"), if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases (the courts specified in clauses (A) and (B) collectively, the "**Designated Courts**"), and shall not be brought in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the Designated Courts for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any Designated Court or any claim that any such action brought in any Designated Court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)   The Purchaser hereby appoints McCarthy Tétrault, as its authorized agent (the "**Purchaser Authorized Canadian Agent**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable. The Purchaser further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointments in full force and effect as aforesaid. Service of process upon the Purchaser Authorized Canadian Agent in respect of the relevant jurisdiction and written notice of such service to the Purchaser shall be deemed, in every respect, effective service of process upon the Purchaser in relation to such jurisdiction.

184

(d)     Each Seller hereby appoints (i) NNI as its authorized agent (the "**Seller Authorized U.S. Agent**") upon whom process and any other documents may be served in the Chapter 11 Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the U.S. Bankruptcy Court or in the NY Courts by any other party hereto, and (ii) NNL as its authorized agent (the "**Seller Authorized Canadian Agent**" and together with the Seller Authorized U.S. Agent, the "**Seller Authorized Agents**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable. Each such Seller further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointment in full force and effect as aforesaid. Service of process upon the applicable Seller Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Main Sellers shall be deemed, in every respect, effective service of process upon every such Seller.

(e)     Section 10.6(b) shall not limit the jurisdiction of (i) the Accounting Arbitrator set forth in Section 2.2.3.1 (c) or (ii) the arbitrator(s) entrusted with the resolution of disputes relating to the Transition Services Agreement pursuant to Section 5.36, although claims may be asserted in the courts referred to in Section 10.6(b) for purposes of enforcing the jurisdiction and judgments of the Accounting Arbitrator or such arbitrator(s).

(f)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

(g)     Notwithstanding Sections 10.6(a) and (b), the Parties and the EMEA Sellers agree that any questions, claims, disputes, remedies or Actions arising under Sections 2.2.4(b)(y), 9.2(c)(ii) and 10.19 and any questions, claims, disputes, remedies or Actions arising from or related to (i) the agency of the Joint Administrators, (ii) the personal liability of the Joint Administrators, their firm, partners, employees, advisors, representatives and agents, (iii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iv) their appointment as joint administrators of the EMEA Sellers and their status as such, to the extent separable from other claims made hereunder, shall be governed by English law and be subject to the exclusive jurisdiction of the English courts.

SECTION 10.7.     Notices.  All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile

185

transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Purchaser to:

Avaya Inc.
211 Mount Airy Road
Basking Ridge, NJ 07920-2332
United States
Attention:   Pamela F. Craven, Chief Administrative Officer
                  Frank J. Mahr, Corporate Counsel & Corporate Secretary
Facsimile: +1-908-953-3902

With copies (that shall not constitute notice) to:

Ropes & Gray LLP
One International Place
Boston, MA 02110
United States
Attention: Alfred O. Rose
                 Howard S. Glazer
Facsimile: +1-617-951-7050


If to the Main Sellers or the Sellers, to:

**Nortel Networks Corporation**
195 The West Mall
Mailstop: T0503006
Toronto, Ontario, Canada M9C 5K1
Attention:   Gordon A. Davies
                  Chief Legal Officer & Corporate Secretary
Facsimile:   +1-905-863-7386


**Nortel Networks Limited**
195 The West Mall
Mailstop: T0503006
Toronto, Ontario, Canada M9C 5K1
Attention:   Gordon A. Davies
                 Chief Legal Officer & Corporate Secretary
Facsimile:   +1-905-863-7386

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA 37228
Attention:    Lynn C. Egan
              Assistant Secretary
Facsimile:    +1-615-432-4067

With copies (that shall not constitute notice) to:

**Nortel Networks Limited**
195 The West Mall
Mailstop: T0505009
Toronto, ON  M9C 5K1
Canada
Attn:   Douglas Parker
        Associate General Counsel, Corporate
Facsimile:  +1-905-863-7739

and

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, TN  37228
USA
Attention:    Robert Fishman
              Senior Counsel
Facsimile:    +1-347-427-3815 & +1-615-432-4067

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
United States
Attention: Neil Q. Whoriskey
           David Leinwand
Facsimile: +1-212-225-3999

and

Ogilvy Renault LLP
200 Bay Street

187

Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention: Michael Lang
Facsimile: +1-416-216-3930

Any such demand, notice, communication or report shall be deemed to have been given pursuant
to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on
the calendar day after deposit with a reputable overnight courier service, as applicable.

SECTION 10.8.   Exhibits; Sellers Disclosure Schedule.

(a)    The Sellers Disclosure Schedule and the Exhibits attached hereto
constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if
fully set forth herein.

(b)    For purposes of the representations and warranties of the Sellers contained
in this Agreement, disclosure in any section of the Sellers Disclosure Schedule of any facts or
circumstances shall be deemed to be adequate response and disclosure of such facts or
circumstances with respect to all representations or warranties by the Sellers, whether or not such
disclosure is specifically associated with or purports to respond to one or more of such
representations or warranties, if it is reasonably apparent from the Sellers Disclosure Schedule
that such disclosure is applicable. The inclusion of any information in any section of the Sellers
Disclosure Schedule or other document delivered by the Sellers pursuant to this Agreement shall
not be deemed to be an admission or evidence of the materiality of such item, nor shall it
establish a standard of materiality for any purpose whatsoever.

SECTION 10.9.   Counterparts.  The Parties may execute this Agreement in two
or more counterparts (no one of which need contain the signatures of all Parties), each of which
will be an original and all of which together will constitute one and the same instrument.

SECTION 10.10.  No Presumption.  The Parties agree that this Agreement was
negotiated fairly between them at arm's length and that the final terms of this Agreement are the
product of the Parties' negotiations. Each Party represents and warrants that it has sought and
received experienced legal counsel of its own choosing with regard to the contents of this
Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement
shall be deemed to have been jointly and equally drafted by them, and that the provisions of this
Agreement therefore should not be construed against a Party on the grounds that such Party
drafted or was more responsible for drafting the provisions.

SECTION 10.11.  Severability.  If any provision, clause, or part of this
Agreement, or the application thereof under certain circumstances, is held invalid, illegal or
incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this
Agreement or the application of such provision, clause or part under other circumstances, and (ii)
as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall
remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability

188

in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 10.12. Headings. The headings used in this Agreement are for the purpose of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.

SECTION 10.13. Entire Agreement.

(a)    This Agreement, the EMEA Asset Sale Agreement, the Ancillary Agreements, the Confidentiality Agreement and any written notice relating to Excluded Sellers delivered pursuant to Section 5.25(a) on the date hereof, together set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the Ancillary Agreements and the Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated. In the event of any irreconcilable conflict between this Agreement and any of the Ancillary Agreements or the Confidentiality Agreement, the provisions of this Agreement shall prevail, regardless of the fact that certain Ancillary Agreements, such as the Local Sale Agreement, may be subject to different governing Laws (unless the Ancillary Agreement expressly provides otherwise).

(b)    For the sake of clarity, the provisions of the EMEA Asset Sale Agreement have been drafted separately from the provisions in the body of this Agreement to reflect differing market practices in the countries of jurisdiction of the EMEA Sellers. Unless the context specifically requires, the provisions contained in the body of this Agreement and the provisions of the EMEA Asset Sale Agreement shall be interpreted independently and without reference to each other.

SECTION 10.14. Limitations on Pre-Closing Remedies.

(a)    The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, subject to the limitations set forth in this Section 10.14 and in addition to any other remedies to which the Parties are entitled at Law or in equity, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches; provided, however, that under no circumstances shall any Avaya Party other than the Purchaser and/or any Designated Purchaser, as applicable, be subject to claims for equitable relief, including specific performance of any kind. Each Party agrees, to the extent that such Party is subject to any equitable remedy, to waive any requirement for the security or posting of any bond in connection with any such equitable remedy. Under no circumstances shall any Avaya Party other than the

189

Purchaser and/or any Designated Purchaser, as applicable, be liable for damages arising out of, or in connection with, this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof or of the EMEA Asset Sale Agreement or any other Transaction Document, including damages alleged as a result of tortious conduct. Without limiting the preceding provisions of this Section 10.14(a), it is acknowledged and agreed that under no circumstances shall any Person be liable for punitive damages (including multiple damages assessed as a punitive measure) or special damages arising out of, or in connection with, this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof or of the EMEA Asset Sale Agreement or any other Transaction Document, including damages alleged as a result of tortious conduct. Nothing set forth in this Agreement shall confer or give or shall be construed to confer or give to any Person (including any Person acting in a representative capacity) any rights or remedies against any Person other than the Parties. The Parties acknowledge and agree that each Party will be entitled to all the remedies against the other Parties available to it at Law or in equity for post-Closing breaches of this Agreement, the EMEA Asset Sale Agreement and any Transaction Documents, including specific performance and/or damages.

(b)     Notwithstanding anything to the contrary set forth in Section 10.14(a), if (1) the conditions set forth in Section 8.1(a) of this Agreement or Clause 15.1.3 of the EMEA Asset Sale Agreement have not been satisfied (other than as a result of a Material Intentional Purchaer Breach), or (2) any Regulatory Approval(s) require any divestiture, license or hold separate or similar arrangements or any material actions, undertakings or arrangements for the conduct of any business and/or terminating any relationships or contractual rights or obligations that Purchaser determines not to accept then specific performance shall not be available against any of the Avaya Parties and the sole and exclusive remedy of the Nortel Parties against any of the Avaya Parties shall be termination of this Agreement and the EMEA Asset Sale Agreement and payment of the Reverse Termination Fee by the Purchaser, when, as and if required pursuant to Section 9.3 (and no other additional money damages shall be payable by any Avaya Party) for the failure of the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement (including transactions contemplated under Clause 7 of the EMEA Asset Sale Agreement or Paragraph 2 of Schedule 9 to the EMEA Asset Sale Agreement) to be consummated, or in respect of any Liabilities arising under, or relating to, this Agreement, the EMEA Asset Sale Agreement or any other Transaction Document, or the transactions contemplated hereby or thereby prior to the Closing. In a situation in which the Reverse Termination Fee does not constitute the sole remedy, any damages award will be reduced by the amount of the Reverse Termination Fee that has been paid.

(c)     Each of the Parties acknowledges that the agreements contained in this Section 10.14, Section 9.2 and Section 9.3, are each an integral part of the transactions contemplated by this Agreement and the EMEA Asset Sale Agreement. In the event that (i) the Sellers or the EMEA Sellers shall fail to pay the Break-Up Fee or Expense Reimbursement when due, or (ii) Purchaser shall fail to pay the Reverse Termination Fee when due, then Sellers or the EMEA Sellers in the case of clause (i) and Purchaser in the case of clause (ii), shall reimburse the other Parties for all reasonable costs and expenses actually incurred or accrued by such other Parties (including reasonable fees and expenses of counsel) in connection with the collection under and enforcement of Section 9.2 or Section 9.3 and Clauses 15.5 to 15.7 of the EMEA Asset Sale Agreement as applicable, together with interest on such unpaid amount at the prime

190

rate of Citibank N.A. in effect on the date such payment was required to be made through the date of payment.

SECTION 10.15. Bulk Sales Laws. Subject to the entry of the U.S. Sale Order, each Party waives compliance by the other Party with any applicable bulk sales Law, provided, however, that the Parties shall use their reasonable efforts to cooperate to the extent necessary to obtain a reduction in, or exemption from, any applicable sales or use Taxes.

SECTION 10.16. Main Sellers as Representatives of Other Sellers.

(a)     For all purposes of this Agreement:

(i)     each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNL as its representative; and

(ii)     each Other Seller not listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNI as its representative.

(b)     Pursuant to Section 10.16(a), each of NNL and NNI shall expressly have the power to, in the name and on behalf of each of its Respective Affiliates (as defined below), (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

(c)     For the purposes of this Agreement, **"Respective Affiliates"** means: (i) with respect to NNL, each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule, and (ii) with respect to NNI, all the other U.S. Debtors and each Other Seller not listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule.

SECTION 10.17. Obligations of Sellers and EMEA Sellers. When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor – other than NNC - and a Non-Debtor Seller). Notwithstanding anything to the contrary herein, except as set forth in Section 2.2.4(b) and Section 9.2(c) the obligations of each EMEA Seller hereunder shall be several and not joint. Effective as of the date of signing, the parties are fully bound by the terms of this Agreement; provided, however, that none of the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators shall have any obligations or incur any liabilities under this Agreement unless and until (i) the U.S. Bankruptcy Court enters the U.S. Bidding Procedures Order and (ii) the Canadian Court enters the Canadian Sales Process Order. For the avoidance of doubt, the intent of Parties and the EMEA Sellers is that the obligations and any liabilities of the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators under this Agreement will arise concurrently with the obligations and liabilities of the Sellers under this Agreement.

SECTION 10.18. Execution by Other Sellers. The Purchaser hereby acknowledges that the Other Sellers are not executing this Agreement as of the date hereof. This

Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers have done so. Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall cause each Other Seller to execute a counterpart to this Agreement no later than the day prior to the sixtieth (60th) day following completion of the Auction (provided that the Main Sellers shall use their reasonable best efforts to cause such execution to occur no later than the last day of the Contract Review Period), agreeing to be bound as a Seller under this Agreement and authorizing NNL or NNI, as applicable, to act as its representative under Section 10.16.

SECTION 10.19.  Exclusion of Liability of Administrators and Acknowledgement.

(a)    Notwithstanding that this Agreement shall have been signed by the Joint Administrators and the Joint Israeli Administrators in their capacities as administrators of the EMEA Debtors for and on behalf of the EMEA Debtors and of the Israeli Companies for and on behalf of the Israeli Companies, respectively, it is hereby expressly agreed and declared that no personal Liability under or in connection with this Agreement shall fall on the Joint Administrators, the Joint Israeli Administrators or their firm, partners, employees, agents, advisers or representatives whether such Liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act 1986, the Israeli Companies Law 1999, or otherwise.

(b)    The Purchaser acknowledges and agrees that in the negotiation and the completion of this Agreement the Joint Administrators and the Joint Israeli Administrators are acting only as agents for and on behalf of the EMEA Debtors and the Israeli Companies, respectively, and without any personal Liability whatsoever.

(c)    The Purchaser further acknowledges that it has entered into this Agreement without reliance on any warranties or representations made by the EMEA Sellers or by any of their employees, agents or representatives, or by the Joint Administrators, the Joint Israeli Administrators or any of their firm, partners, employees, agents, advisors or representatives and (save in respect of fraud, fraudulent misrepresentation or fraudulent misstatement) it shall not have any remedy in respect of any misrepresentation or untrue statement made by or on behalf of the EMEA Sellers or their employees, agents or representatives, or by the Joint Administrators, the Joint Israeli Administrators or any of their firm, partners, employees, agents, advisors or representatives.

SECTION 10.20.  Asset Sale Election.

(a)    Prior to making any "Asset Sale Election" (defined below), the Sellers shall use commercially reasonable efforts (which reasonable efforts shall include but not be limited to the filing of an objection to the allowance of the IRS Claim with the Bankruptcy Court no later than September 16, 2009) to resolve the -6 Liability in a manner reasonably acceptable to the Purchaser. If such commercially reasonable efforts are unsuccessful, the Sellers may elect to satisfy their obligation under the Agreement to transfer the Shares to Purchaser by transferring to Purchaser the assets and liabilities of the Companies as described below (the "**Asset Sale Election**"). To the extent the Sellers determine to exercise the Asset Sale Election, such election shall be made no later than October 15, 2009, and notice thereof shall be provided to the

192

Purchaser, in writing, on or before such date. In the event that the Asset Sale Election is timely made: (a) Sellers shall, within three (3) calendar days of the Asset Sale Election, and in any case, no later than October 18, 2009, commence proceedings under Chapter 11 of the U.S. Bankruptcy Code with respect to the Companies, (b) the Parties shall amend this Agreement to effect such election, with (i) all of the assets of the Companies (except as contemplated in the -6 Purchase Price Adjustment, as defined below) and (ii) all of the Liabilities of the Companies, other than the -6 Liability, the Related –6 Liabilities and the Specified Pension Liabilities, being transferred to Purchaser to the same extent as such assets and liabilities would have been transferred indirectly to Purchaser pursuant to a transfer of the Shares on the terms set forth herein, and otherwise on the same terms and conditions as the assets and liabilities of the Sellers, *mutatis mutandis*, but only to the extent permitted by sections 363 and 365 of the U.S. Bankruptcy Code, (c) the Sellers and the Purchaser shall, at the Sellers' expenses, use their commercially reasonable efforts to obtain any novations, consents, assignments or other authorizations necessary to validly transfer the Customer Contracts of the Companies to Purchaser or a Designated Purchaser and (d) if any such novation, consent, assignment or other authorization is not received on or before the Closing Date, then subject to applicable Law and the terms of the applicable Customer Contract, the applicable Seller(s), on the one hand, and the Purchaser or the applicable Designated Purchaser, on the other hand, shall enter into a Subcontract that will have effect, from and after the Closing Date, under which the Purchaser or such Designated Purchaser will provide products or services on the terms of such Customer Contract for the shortest of (i) eighteen (18) months, (ii) the remaining life of such Customer Contract or (iii) the period until such Customer Contract is validly assigned to Purchaser or such Designated Purchaser; provided, that the Sellers shall use their reasonable best efforts to maintain the good standing of the Nortel Party to each such Customer Contract as the prime contractor thereunder during such subcontract period at no additional cost to Purchaser and unless NNI and the Purchaser otherwise agree, including retaining any "key men" under such Customer Contract as employees of the Companies (instead of transferring their employment to the Purchaser or a Designated Purchaser) under arrangements governed by the terms of the Transition Services Agreement for the duration of such Subcontract if doing so would permit such Customer Contract to be subcontracted without Third Party consent (and the Purchaser or a Designated Purchaser will accept the transfer of the employment of such "key men" after the termination of such Subcontract), and (e) the Sellers shall use their reasonable best efforts to have a final order approving the transfer of such assets and liabilities entered by the Bankruptcy Court prior to December 1, 2009.  The Sellers will use their reasonable best efforts to include in all Customer Contracts that the Companies enter into after September 14, 2009 that are expected to generate a total contract value of at least $5 million terms that will permit such Customer Contracts to be assigned to the Purchaser or a Designated Purchaser without Third Party consent.  Notwithstanding the Asset Sale Election or anything set forth herein, in no event shall the Purchaser become liable on account of, or assume, any Claim or Liability asserted against the Companies to the extent such Claim or Liability would not have remained a valid Claim against any Company had the Sellers transferred the Shares to the Purchaser, and it shall be a condition precedent to Closing under the Agreement that a final order approving the transfer of the Companies' assets as set forth above in a form and substance reasonably satisfactory to the Purchaser be entered by the U.S. Bankruptcy Court and consistent with the U.S. Sale Order and that such order provide that such assets are transferred to the Purchaser free and clear of any Liens or Claims arising out of or related to the -6 Liabilities, the -6 Related Liabilities or the Specified Pension Liabilities.

(b)     If the Asset Sale Election is made, and not all Customer Contracts of the NGS Companies are transferred, or subcontracted such that Purchaser receives the same economic benefits as it would if it were a direct party to the relevant Customer Contract, to Purchaser or a Designated Purchaser on or within one hundred and eighty days (180) days after the Closing Date, the Sellers shall pay to the Purchaser an amount equal to the –6 Purchase Price Adjustment. The "**-6 Purchase Price Adjustment**" shall mean with respect to each Customer Contract of an NGS Company that does not by its terms expire within 180 days after the Closing Date and is not transferred or subcontracted as described above ("**-6 Contracts**"), an amount equal to the –6 Factor multiplied by the revenues received by the NGS Companies in respect of such -6 Contract in respect of the period from October 1, 2008 to September 30, 2009; provided that with respect to any –6 Contract with the Department of State such revenues shall be multiplied by the Janus –6 Factor.

(c)     The estimated –6 Purchase Price Adjustment as of the Closing Date shall be calculated by Sellers at least five (5) Business Days prior to the Closing Date (the "**Estimated –6 Liability Escrow Amount**"), and a written copy of the -6 Purchase Price Adjustment (showing with reasonable specificity such calculation and the amounts used therefor) shall be delivered to the Purchaser on or prior to the fifth (5th) Business Day, and such amount shall be paid to the Escrow Agent as provided in Article II and the Escrow Agreement. If within one hundred and eighty (180) days after the Closing Date, any -6 Contract is transferred, or subcontracted such that Purchaser receives the same economic benefits as it would if it were a direct party to the relevant Customer Contract, to Purchaser or a Designated Purchaser, then an amount equal to the -6 Purchase Price Adjustment with respect to such -6 Contract shall be released by the Escrow Agent to the Sellers in accordance with the Escrow Agreement. At the end of such one hundred and eighty- (180-) day period, if any amounts remain in the Estimated - 6 Liability Escrow Account, all such amounts shall be released by the Escrow Agent to the Purchaser in accordance with the Escrow Agreement.

**[Remainder of this page intentionally left blank. Signature pages follow.]**

IN WITNESS WHEREOF, the Main Sellers and the Purchaser have duly executed this amendment to the Asset and Share Sale Agreement as of the date first written above.

**NORTEL NETWORKS CORPORATION**

By:_____

Name: Anna Ventresca
Title:  General Counsel-Corporate
and Corporate Secretary

By:_____

Name: John Doolittle
Title:  Senior Vice-President,
Finance and Corporate Services

**NORTEL NETWORKS LIMITED**

By:_____

Name: Anna Ventresca
Title:  General Counsel-Corporate
and Corporate Secretary

By:_____

Name: John Doolittle
Title:  Senior Vice-President,
Finance and Corporate Services

**NORTEL NETWORKS INC.**

By:_____

Name: John Doolittle
Title:  Vice-President

**AVAYA INC.**

By: _____

Name: Pamela F. Craven
Title: Chief Administrative Officer

The undersigned EMEA Sellers are executing this Agreement solely for purposes of agreeing to Sections 2.2, 5.26, 5.39, 9.2, 9.3, 9.4, 10.14, 10.17 and 10.19 of this Agreement and, solely in the case of Nortel Networks UK Limited and Nortel Networks (Ireland) Limited, for purposes of agreeing to Section 5.36 of this Agreement.

SIGNED for and on behalf of Nortel Networks )
UK Limited (in administration) by Christopher )
Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Christopher Hill

Witness signature

Name:    WILMA  GRAHAM
Address:  NO 1 MORE LONDON PLACE
          LONDON SE1 2AF
SIGNED for and on behalf of Nortel GmbH )
(in administration) by Christopher Hill )
                                         )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

Name:    WILMA  GRAHAM
Address:  NO 1 MORE LONDON PLACE
          LONDON SE 12AF
SIGNED for and on behalf of Nortel Networks )
SpA (in administration) by Christopher Hill )
                                            )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

Name:    WILMA  GRAHAM
Address:  NO 1 MORE LONDON PLACE )
          LONDON SE 1 2AF

ASSA Amendment Agreement - Avaya

**SIGNED for and on behalf of Nortel Networks**    )
**Hispania S.A.** (in administration) **by**    )    Christopher Hill
Christopher Hill    )
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Witness signature

*W. Graham*    )

Name:    WILMA   GRAHAM    )
Address: NO 1   MORE LONDON PLACE )
         LONDON SE1 2AF
**SIGNED for and on behalf of Nortel Networks**    )
**B.V.** (in administration) **by Christopher Hill**    )    Christopher Hill
    )
as Joint Administrator (acting as agent and    ) .
without personal liability) in the presence of:

Witness signature

*W. Graham*    )

Name:    WILMA   GRAHAM    )
Address: NO 1   MORE LONDON PLACE )
         LONDON SE1 2AF
**SIGNED for and on behalf of Nortel Networks**    )
**AB** (in administration) **by Christopher Hill**    )    Christopher Hill
    )
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Witness signature

*W. Graham*    )

Name:    WILMA   GRAHAM    )
Address: NO1   MORE LONDON PLACE )
         LONDON SE1 2AF

SIGNED for and on behalf of Nortel Networks )
N.V. (in administration) by Christopher Hill )
                                   )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Christopher Hill

Witness signature

Name:  WILM  GRAHAM )
Address: NO 1 MORE LONDON PLACE )
          LONDON  SE1 2AF

SIGNED for and on behalf of Nortel Networks )
(Austria) GmbH (in administration) by )
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Christopher Hill

Witness signature

Name:  WILM  GRAHAM )
Address: NO 1 MORE LONDON PLACE )
          LONDON  SE1 2AF

SIGNED for and on behalf of Nortel Networks )
Polska Sp. z.o.o. (in administration) by )
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Christopher Hill

Witness signature

Name:  WILM  GRAHAM )
Address: NO 1 MORE LONDON PLACE )
          LONDON  SE1 2AF

ASSA Amendment Agreement - Avaya

SIGNED for and on behalf of Nortel Networks )
Oy (in administration) by Christopher Hill )
)
Christopher Hill
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

W. Graham )
Name:    WILMA GRAHAM )
Address:   NO 1 MORE LONDON PLACE )
LONDON SE1 2AF

SIGNED for and on behalf of Nortel Networks )
Portugal S.A. (in administration) by )
Christopher Hill )
Christopher Hill
)
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Witness signature

W. Graham
Name:    WILMA GRAHAM )
Address: NO1 MORE LONDON PLACE )
LONDON SE1 2AF )

SIGNED for and on behalf of Nortel Networks )
s.r.o. (in administration) by Christopher Hill )
Christopher Hill
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

W. Graham )
Name:    WILMA GRAHAM )
Address:    NO 1 MORE LONDON PLACE )
LONDON SE1 2AF

ASSA Amendment Agreement - Avaya

**SIGNED for and on behalf of Nortel Networks**       )
Romania s.r.l. (in administration) by                 )     ...................................................
Christopher Hill                                      )     Christopher Hill
as Joint Administrator (acting as agent and           )
without personal liability) in the presence of:

Witness signature

*W. Galam*
....................................................  )
Name:      *WILMA GRAHAM*                             )
Address: *NO1 MORE LONDON PLACE*                      )
          *LONDON SE1 2AF*                            )

**SIGNED for and on behalf of Nortel Networks**       )
**Engineering Service kft** (in administration) by    )     ...................................................
Christopher Hill                                      )     Christopher Hill
                                                      )

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Witness signature

*W. Graham*
....................................................  )
Name:      *WILMA GRAHAM*                             )
Address: *NO 1 MORE LONDON PLACE*                     )
          *LONDON SE1 2AF*                            )

· SIGNED for and on behalf of Nortel Networks         )
Slovensko s.r.o. (in administration) by               )     ...................................................
Christopher Hill                                      )     Christopher Hill
                                                      )

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Witness signature

*W. Galam*
....................................................  )
Name:      *WILMA GRAHAM*                             )
Address: *NO 1 MORE LONDON PLACE*                     )
          *LONDON SE1 2AF*

ASSA Amendment Agreement - Avaya

SIGNED for and on behalf of Nortel Networks )
France S.A.S. (in administration) by Kerry )
Trigg acting as authorised representative for )
                                          )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Kerry Trigg

Witness signature

Name: Jean Luc Schayat
Address: 69 rue de Paris,
          92110 Clichy - France

SIGNED for and on behalf of Nortel Networks )
(Ireland) Limited (in administration) by David )
Hughes as Joint Administrator (acting as agent )
and without personal liability) in the presence )
of:

David Hughes

Witness signature

.Eimear Mi Ghríofa...............................)
Name: EIMEAR NI GHRIOFA )
Address: 87 RAHEEN ROAD, )
          TALLAGHT, DUBLIN 24,
          IRELAND.

ASSA Amendment Agreement - Avaya

**SIGNED by Sergei Fishkin**
duly authorised for and on behalf of o.o.o.
Nortel Networks in the presence of:

)
) Sergei Fishkin
)

Witness signature          *Bor/-*

)
Name:   Bagachkina Maria     )
Address:  19-2-267, Gurievsky pr,
          Moscow, Russia

"Нортел
Нетворкс"
Limited Liability Company
"Nortel Networks OOO"
(для документов 1)

**SIGNED** by Sharon Rolston )

duly authorised for and on behalf of Nortel )

Networks AG in the presence of: )

Sharon Rolston

Witness signature

*B. Scherwah*

Name: BRIGITTE SCHERWATH )

Address: C/O NORTEL NETWORKS )

    MAIDENHEAD , SL6-3QH )

**SIGNED** by Sharon Rolston and Simon )

Freemantle duly authorised for and on behalf of )

**Nortel Networks South Africa (Pty) Limited** )

in the presence of:

Sharon Rolston

.....................................................................

Simon Freemantle

Witness signature

*B. Scherwah*

Name: BRIGITTE SCHERWATH )

Address: C/O NORTEL NETWORKS )

    MAIDENHEAD , SL6 3QH )

**SIGNED** by Sharon Fennessy and Simon )

Freemantle duly authorised for and on behalf of )

Nortel Networks AS in the presence of: )

Sharon Fennessy

.....................................................................

Simon Freemantle

Witness signature

*B. Scherwah*

Name: BRIGITTE SCHERWATH )

Address: C/O NORTEL NETWORKS )

    MAIDENHEAD , SL6 3QH )

ASSA Amendment Agreement - Avaya

SIGNED by Sharon Rolston ) ....................................................................
duly authorised for and on behalf of Nortel ) Sharon Rolston
Networks AG in the presence of: )


Witness signature

.................................................................... )
Name: )
Address: )

SIGNED by Sharon Rolston and Simon ) ....................................................................
Freemantle duly authorised for and on behalf of ) Sharon Rolston
Nortel Networks South Africa (Pty) Limited )
in the presence of: )

....................................................................
Simon Freemantle

Witness signature

....................................................................
Name:    B. DANDRIDGE )
Address: C/O NORTEL NETWORKS )
         MAIDENHEAD, UK )

SIGNED by Sharon Fennessy and Simon ) ....................................................................
Freemantle duly authorised for and on behalf of ) Sharon Fennessy
Nortel Networks AS in the presence of: )

....................................................................
Simon Freemantle

Witness signature

....................................................................
Name:    B. DANDRIDGE )
Address: C/O NORTEL NETWORKS )
         MAIDENHEAD, UK )


ASSA Amendment Agreement – Avaya

SIGNED for and on behalf of Nortel )
Communications Holdings (1997) Limited (in )     Yaron Har-Zvi
administration) by Yaron Har-Zvi and Avi D. )
Pelossof as Joint Israeli Administrators (acting )
jointly and without personal liability) in )
connection with the Israeli Assets and )
Liabilities: )     Avi D. Pelossof

Witness signature
שרית/מוסאיוף, עו"ד
20507 מ.ד.
........................................................    )
Name: SARIT MOUSSAYOFF    )
Address: 20 Lincoln st.    )
Tel-Aviv
SIGNED for and on behalf of Nortel Networks )
Israel (Sales and Marketing) Limited (in )
administration) by Yaron Har-Zvi and Avi D. )     Yaron Har-Zvi
Pelossof as Joint Israeli Administrators (acting )
jointly and without personal liability) in )
connection with the Israeli Assets and )     Avi D. Pelossof
Liabilities: )
)
)

Witness signature שרית מוסאיוף, עו"ד
20507 מ.ר.
........................................................    )
Name: SARIT MOUSSALOFF    )
Address: 20 Lincoln St.    )
Tel-Aviv

ASSA Amendment Agreement - Avaya

**SIGNED by Christopher Hill**

in his own capacity and on behalf of the Joint
Administrators without personal liability and
solely for the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the Joint Administrators:

)
)  Christopher Hill
)



Witness signature

Name: WILMA GRAHAM.
Address: No 1 MORE LONDON PLACE )
LONDON SE1 2AF

ASSA Amendment Agreement - Avaya