## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X
        :

*In re*                           :        Chapter 11

                                 :

Nortel Networks Inc., *et al.*,[1]     :        Case No. 09-10138 (KG)

                                 :

              Debtors.       :        Jointly Administered

                                 :

                                 :        **Hearing date: September 30, 2009 at 10 a.m. (ET) (proposed)**

                                 :        **Objections due: September 25, 2009 at noon (ET) (proposed)**

-------------------------------------------------------- X

## DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING AND APPROVING SALE PROCEDURES, (B) AUTHORIZING AND APPROVING NOTICE PROCEDURES, AND (C) SETTING A DATE FOR SALE HEARING, AND (II) AUTHORIZING AND APPROVING SALE OF DEBTORS' NEXT GENERATION SERVING PACKET CORE NETWORK COMPONENTS <u>FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES</u>

Nortel Networks Inc. ("<u>NNI</u>") and certain of its affiliates, as debtors and debtors in possession (collectively, the "<u>Debtors</u>"), hereby move this Court (the "<u>Motion</u>") for the entry of Orders substantially in the form attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u> pursuant to sections 105 and 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>") (i)(a) authorizing and approving the sale

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems, Inc. (9769), Nortel Altsystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

procedures (the "Sale Procedures") attached hereto as Exhibit C in connection with the proposed

sale of the Assets (as defined below) by the Debtors (the "Transaction" or "Sale"),

(b) authorizing and approving the forms of Sale Procedure Notice and Publication Notice,

attached hereto respectively as Exhibit D and Exhibit E, and approving the manner of solicitation

of bids and notice of the sale (collectively, the "Notice Procedures"), (c) setting the time, date

and place of a hearing to consider the sale (the "Sale Hearing"), (ii) authorizing and approving

the sale of the Debtors' Next Generation Packet Core network components (the "Assets") Free

and Clear of All Liens, Claims and Encumbrances, and (iii) granting them such other and further

relief as the Court deems just and proper authorizing and approving the sale of the Debtors'

right, title and interest in the Assets to the successful bidder, free and clear of all liens, claims,

encumbrances and interests, pursuant to section 363 of the Bankruptcy Code, except as set forth

in the form Transaction Agreement (the "Agreement") attached hereto as Exhibit F or as

otherwise stated in the Transaction Agreement to be executed with the successful bidder, and (iv)

granting them such other and further relief as the Court deems just and proper.  In support of the

Motion, the Debtors rely on the declaration of Hyacinth DeAlmeida (the "DeAlmeida

Declaration"), attached hereto as Exhibit G.  In further support of this Motion, the Debtors

respectfully represent as follows:

### Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105 and 363 of the

Bankruptcy Code, Rules 2002, 6004 and 9014 of the Bankruptcy Rules and Rule 6004-1 of the

Local Rules.

**Background**

**A.      Introduction**

3.        On January 14, 2009 (the "Petition Date"), the Debtors other than NN CALA (as

defined below) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.        The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.        Also on the Petition Date, the Debtors' ultimate corporate parent NNC, NNI's

direct corporate parent NNL (together with NNC and their affiliates, including the Debtors,

"Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an

application with the Ontario Superior Court of Justice (the "Canadian Court") under the

Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their

creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors continue to manage

their properties and operate their businesses under the supervision of the Canadian Court.  Ernst

& Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign

representative for the Canadian Debtors (the "Monitor"), has filed petitions in this Court for

recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the

Bankruptcy Code.  On January 14, 2009, the Canadian Court entered an order recognizing these

chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA.  On February

27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main

proceedings under chapter 15 of the Bankruptcy Code.  In addition, at 8 p.m. (London time) on

January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European

---

[2]        The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA will continue to operate as a going concern for an initial period of three months, which period has since been further extended.  In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings remain the main proceedings in respect of NNSA.  On June 8, 2009, Nortel Networks UK Limited ("NNUK") filed petitions in this Court for recognition of the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.  On June 26, 2009, the Court entered an order recognizing the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

6.      On January 15, 2009, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Bankruptcy Rules that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

7.      On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the

---

[3]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

8.      On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor together with NNI and certain of its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, the Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA of certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

**B.      Debtors' Corporate Structure and Business**

9.      A description of the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3].

**C.      The Next Generation Packet Core Network Components**

10.      Nortel's Carrier Network's wireless business ("Wireless") offers wireless network solutions to service providers that supply mobile voice, data and multimedia communications services to individuals and enterprises using cellular telephones, personal digital assistants, laptops, soft-clients, and other wireless computing and communications devices.  As part of the Wireless business, Nortel has been developing technologies focused in the areas of 2G, 3G and 4G broadband wireless.  In this regard, Nortel has been conducting research and development on network components designed to provide data network connectivity for 2G GPRS, 3G UMTS and 4G LTE wireless networks and increase network bandwidth for multimedia content and applications over wireless networks (such components, the "Next Generation Packet Core network components").

11.     In particular, the Assets consist principally of certain non-patent intellectual property, and related tangible assets, associated with the design, development, commercialization, customization and support of the Next Generation Packet Core network components, which consist of the following network components: (a) a Next Generation Serving GPRS Support Node on Advance TeleComputing Architecture ("ATCA"); (b) a Next Generation Gateway GPRS Support Node on ATCA; (c) a Mobility Manager Element on ATCA; (d) an AGW Serving Gateway on ATCA; (e) an AGW Packet Data Gateway on ATCA; and (f) a Network Element Manager associated with each of the aforementioned components.

12.     The Next Generation Packet Core network components are being developed from technology based on Nortel's legacy packet core solutions with the goal of readiness for commercial deployment by mid-2010.  The activity currently has no customer contracts associated with it, but does have continuing cash requirements, primarily in the United States, associated with the ongoing research and development efforts and their related infrastructure requirements.

13.     As set forth in the DeAlmeida Declaration, the environment in which the Sellers operate is highly competitive, the competition for market share is fierce, and the cost of rapid technological development is steep.  Due to the global economic downturn, Nortel is experiencing significant pressure on its businesses and facing competing demands on its cash resources, globally as well as on a regional basis, as customers across all businesses delay and reduce capital expenditures.  As a result, Nortel has commenced a process for the orderly disposition of its businesses and dispositions of two major business units – the CDMA/LTE business and the Enterprise Solutions business – have been approved by this Court and the Canadian Court.  As with Nortel's other assets and businesses, a review has been undertaken

with respect to the Next Generation Packet Core network components and the Debtors have been unable to market these Assets with any other major transaction. In addition, it is necessary to note that, since the commencement of the U.S. and Canadian Proceedings, Nortel has not been able to successfully pursue Requests for Proposals from prospective customers for its Next Generation Packet Core network components despite the fact that several potential customers have issued such requests that have been successfully pursued by competing vendors. The Debtors, together with the Canadian Debtors,[4] therefore have concluded that proposed sale process is the best opportunity to maximize the value of the Assets and reduce the continuing cost relating to the support and development of the Assets.

14.     In particular, as set forth in more detail below, NNL proposes to transfer its interests in certain non-patent intellectual property included in the Assets and grant a non-exclusive license to patent intellectual property included in the Assets, and NNI (together with NNL, the "Sellers") proposes to transfer equipment and other tangible assets included in the Assets to the purchaser pursuant to the Agreement. The Sellers also contemplate entering into certain ancillary agreements with the purchaser, in particular an Intellectual Property License Agreement and a Transition Services Agreement. Unlike prior transactions as to which the Debtors have sought this Court's approval, this transaction will proceed without a traditional "stalking horse" bidder. For the reasons set forth below, the Debtors believe that the Assets present a compelling case for moving forward without a stalking horse bidder.

**D.      The Market for the Assets**

15.     As discussed in the DeAlmeida Declaration, given that the Assets relate to a technology that is still under development, with no current customers or revenue stream (other

---

[4]      The Canadian Debtors are seeking complimentary relief from the Canadian Court.

than a possible future royalty deriving from a single limited license) and that continued development of the technology internally would require significant expenditures before becoming revenue producing, Nortel determined it is in the company's interest to consider a sale process for the Assets at this time, in order to realize value through a divestiture of the Assets rather than through the continued development of the technology internally. Nortel has over the last several months explored the interest of third parties in acquiring the Assets. Discussions with potential purchasers and expressions of interest from this exploratory process have provided Nortel's management with a view of the potential market for the Assets, as well as the Assets' value to the major market participants.

16.      In its exploratory efforts to market the Assets, Nortel approached eight parties that it had identified, in consultation with its financial advisors, as likely to be interested and able to acquire the Assets, including two financial investors and six strategic buyers. An information memorandum was provided to those parties who executed confidentiality agreements. Nortel also conducted management presentations with those parties who requested one, and required an expression of interest before providing access to due diligence materials through an electronic data room.

17.      Based on the expressions of interest it has received, Nortel has determined it is in the company's interest to proceed further with a sale process for the Assets at this time. The Debtors therefore propose to market and seek bids for the Assets pursuant to the proposed Sale Procedures set forth herein, with the goal of realizing the maximum value for the estates.

### Relief Requested

18.      By this Motion, the Debtors seek orders (i) authorizing and approving the sale of the Debtors' right, title and interest in the Assets to the successful bidder free and clear of all liens, claims and interests except as set forth in the Agreement or as otherwise stated in the

8

Transaction Agreement to be executed with the successful bidder, and (ii)(a) authorizing and approving the Sale Procedures, (b) authorizing and approving the Notice Procedures, and (c) setting the time, date and place of the Sale Hearing, and (iii) granting them such other and further relief as the Court deems just and proper.

## A.     The Agreement

19.     The Debtors propose to offer for sale the Assets in a competitive sale process run jointly with NNL, one of the Canadian Debtors.  The Sellers attach the Agreement, which should be executed in substantially the form attached hereto by the successful bidder.  The Sellers reserve the right to make changes to the Agreement; any changes will be distributed to the Committee, Bondholders, Monitor, Qualified Bidders and, upon request, any potential bidder. The material provisions of the Agreement include:[5]

- Assets.  The assets to be acquired by the Purchaser comprise certain (i) equipment and other tangible assets, (ii) non-patent intellectual property, subject to existing licenses, (iii) rights under warranties, representations and guarantees by suppliers, manufacturers and third parties, and (iv) governmental consents.

- Assumed Liabilities.   The liabilities to be assumed by the Purchaser include (i) liabilities arising after the Closing Date to the extent related to the Business or the operations or ownership thereof after the closing, (ii) certain tax liabilities, and (iii) certain liabilities related to employees and employee benefit plans and under employment laws.

- Sale Free and Clear.  The assets to be transferred by the Debtors will be transferred free and clear of all Liens and Claims, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the Agreement.

- Ancillary Agreements.  Pursuant to the Agreement, at or prior to the closing, Sellers and the Purchaser will enter into, among others, a Transition Services Agreement and an Intellectual Property License Agreement.

- Closing Conditions.   In addition to certain other customary closing conditions, including conditions relating to bankruptcy court approvals, the obligation of the Purchaser to close the sale is subject to the satisfaction of the following conditions: (i) the accuracy of the Sellers' representations and warranties, except as would not

---

[5] Capitalized terms not defined herein shall have the meaning ascribed to them in the Agreement.

have a Material Adverse Effect, and (ii) the Sellers' compliance in all material respects with all covenants, obligations and agreements required to be performed by the Sellers on or before the Closing.

- <u>Cooperation on Seller Contracts</u>.  The Sellers shall use their reasonable efforts to assist the Purchaser (i) to transition the benefits of any Active RFPs to the Purchaser and (ii) in communications with counterparties to the Supplier Contracts and the Outsourcing Contracts with respect to the Purchaser's entry into new arrangements with such counterparties to provide similar goods, services or licenses as currently being provided to the Sellers.

- <u>Post-Closing Access to Books and Records</u>.  For three (3) years after the Closing (or such longer period as may be required under applicable document retention policies), the Purchaser must preserve pre-closing records.  After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable advance notice and during regular business hours, the Purchaser shall, and/or shall cause the Person holding such records to provide the Sellers or their representatives reasonable access to such records and permit the Sellers or their representatives to make copies of such records, in each case at no cost to the Sellers or their representatives (other than for reasonable out-of-pocket expenses).  The Agreement contains further provisions related to tax records and information.

## B.    **The Sale Procedures**

20.    The Debtors have determined, in the exercise of their business judgment, that it is in the best interest of their creditors to explore offers for the sale of the Assets in whole or in part and, if the Debtors determine that adequate value is being offered for the Assets, to consummate a sale of the Assets.  The Debtors believe that a sale pursuant to the Sale Procedures described below will provide the best opportunity to maximize the reasonable value of the Assets.

21.    The key provisions of the Sale Procedures the Debtors propose are:

a.    <u>Communication with Potential Interested Parties</u>.  The Sellers will contact parties who have expressed an interest in acquiring the Assets in the last six months to invite them to participate in the sale process.  The Sellers also may contact such other or additional potential interested parties to invite them to participate in the sale process. The Sellers will also entertain unsolicited requests from qualified persons to participate in the sale process.

b.    <u>Provisions Governing Qualifications of Bidders</u>.  Unless otherwise ordered by both this Court and the Canadian Court, for cause shown, or as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), in order to participate in the sale process, each person who wishes to participate in the sale process (a "<u>Potential Bidder</u>") will be required to execute a confidentiality agreement (to be delivered prior to the

10

distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of the Assets (in the event that the Potential Bidder has already entered into an otherwise satisfactory confidentiality agreement with the Sellers, it must provide a supplemental agreement that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets and waiving any of its rights under such confidentiality agreement that are in conflict with the sale process or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transaction it may enter into, to the Notice Parties) (collectively, the "Confidentiality Agreement").

A Potential Bidder who delivers a Confidentiality Agreement in accordance with the preceding paragraph and who the Sellers determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is likely to submit a bid that will constitute a Qualified Bid (defined below) will be deemed a "Qualified Bidder."

c.    Bid Deadline.  A Qualified Bidder who desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"):  (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn:  Anna Ventresca, General Counsel, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905) 863-2057; (ii) U.S. Debtors' counsel:  Cleary Gottlieb Steen & Hamilton LLP, Attn:  James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel:  Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors: Lazard Frères & Co., Attn:  Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (v) counsel to the Committee:  Akin Gump Strauss Hauer & Feld LLP, Attn:  Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vi) financial advisor to the Committee:  Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (vii) counsel to the Bondholder Group:  Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; and (viii) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; so as to be received not later than **October 16, 2009 at 4:00 p.m. (ET)** (the "Bid Deadline") by the Sellers.  The Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so.  If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders and the other Notice Parties of such extension.

d.    Qualified Bids.  A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

1.    it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or upon alternative terms and conditions that the Sellers determine, after

11

consultation with the Committee, the Bondholders Committee and the Monitor, provide maximum value to the estates;

2.      it states that the bidder's offer is irrevocable until the closing of the Sale;

3.      it includes a duly authorized and executed Agreement, reflecting, if any, the Qualified Bidder's proposed amendments and modifications thereto, as well as the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules to the Agreement, including a license agreement and a transaction services agreement, and/or any additional ancillary agreements required in connection with the sale of the Assets (the "Sale" or "Transaction"), with all exhibits and schedules thereto, (or term sheets that describe the material terms and provisions of such agreements) and copies of such materials marked to show those amendments and modifications to the Agreement ("Marked Agreement") and to such ancillary agreements (the "Marked Ancillary Agreements");

4.      it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreement and the Marked Ancillary Agreements;

5.      it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

6.      it fully discloses the identity of each entity that will be purchasing the Assets;

7.      it includes an acknowledgement and representation that the bidder:  (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the Marked Agreement or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

8.      it includes evidence, in form and substance satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

9.      it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may

determine) in an amount equal to the greater of 5% of the Purchase Price or $1,000,000 to be dealt with in accordance with the "Good Faith Deposit" paragraph herein;

10.     it contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will be offered employment by the Qualified Bidder and any proposed measures associated with their continued employment;

11.     it contains other information reasonably requested by the Sellers; and

12.     it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids.

The Sellers shall notify any Qualified Bidders in writing as to whether or not their bid constitutes a Qualified Bid promptly following the expiration of the Bid Deadline.

e.     <u>Evaluation of Competing Bids</u>.  A Qualified Bid will be evaluated based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Transaction, the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.  Following their review of the Qualified Bids and in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, the Sellers reserve the right, in their sole discretion, to (i) negotiate the terms and conditions of one or more Qualified Bids, with or without notice to any other Qualified Bidder(s) with a view to selecting one successful bid (the "<u>Successful Bid</u>"), (ii) without further negotiation or notice to any Qualified Bidder, select one Qualified Bid as the Successful Bid, or (iii) reject all Qualified Bids and/or withdraw from sale, in whole or in part, any Assets.

f.     <u>No Qualified Bids</u>.  If the Sellers do not receive any Qualified Bids, the Sellers reserve the right, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, to (i) extend the deadlines set forth in the Sale Procedures without further notice, and (ii) withdraw from sale, in whole or in part, any Assets at any time and to make subsequent attempts to market the same.

g.     <u>Successful Bid</u>.  To the extent that the Sellers select a Successful Bid in accordance with the "Evaluation of Competing Bids" paragraph above, the Sellers shall file a notice of the

Successful Bid and the purchaser under the Successful Bid (the "Successful Bidder") with this Court and seek approval from this Court and the Canadian Court of the Transaction Agreement, which approval will include authorization to sell the Assets free and clear of all liens, claims and encumbrances. This Court has currently scheduled a hearing to approve the sale of the Assets for **October 28, 2009 at 2:00 p.m. (ET)**, which hearing may be adjourned, rescheduled or cancelled at the Debtors' discretion.

h.    Good Faith Deposits. The Good Faith Deposit of any bidder shall be retained by the Sellers until the close of the Sale and returned to any unsuccessful bidder within five (5) Business Days thereafter. The Good Faith Deposit of the Successful Bidder will become nonrefundable upon the approval by this Court and the Canadian Court of the Sale to the Successful Bidder and will be applied toward the purchase price.

i.    Reservation of Rights. The Sellers reserve the right in their discretion to (i) impose additional terms and conditions and otherwise modify the Sale Procedures at any time; (ii) extend the deadlines set forth in the Sale Procedures without further notice; (iii) withdraw from sale any Assets at any time and make subsequent attempts to market the same; and (iv) reject all bids.

## C.    The Notice Procedures

22.    The Debtors propose to give notice, as soon as reasonably practicable after the entry of the Sale Procedures Order, of the Sale Procedures and the General Objection Deadline (as defined below), and the time, date and place of the Sale Hearing to: (i) all taxing authorities or recording offices which have a reasonably known interest in the relief requested; (ii) the U.S. Trustee; (iii) the Monitor; (iv) counsel to the Official Committee; (v) counsel to the Bondholder Group; (vi) all federal, state, and local regulatory authorities with jurisdiction over the Debtors; (vii) all non-debtor parties to relevant contracts or leases; (viii) each of the entities that had received an invitation from the Sellers to acquire or had previously expressed an interest in acquiring the Assets; and (ix) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002.

23.    In addition, as soon as reasonably practicable after entry of the Sale Procedures Order and the Canadian Sale Procedures Order (as defined below), the Sellers shall publish notice of the Sale Procedures in The Wall Street Journal (National Edition) and The Globe &

14

Mail (National Edition), substantially in the form attached hereto as <u>Exhibit E</u> (the "<u>Publication</u>

<u>Notice</u>").

**D.      Assumption and Assignment of Contracts**

24.      The Sellers are currently assembling a list of contracts related to the Assets.  To

the extent that the Sellers deem it necessary to assume and assign any contracts pursuant to

section 365 of the Bankruptcy Code in conjunction with the Sale, they will file a separate motion

seeking approval for such assumptions and assignments to be heard at the Sale Hearing.

**E.      Request to Set a Date and Objection Procedures for the Sale Hearing**

25.      The Debtors intend to present the Successful Bid, if any, for approval by the

Court pursuant to the provisions of sections 105 and 363 of the Bankruptcy Code at the Sale

Hearing to be scheduled by the Court and currently proposed as **<u>October 28, 2009 at 2 p.m.</u>**

**<u>(ET)</u>**.  The Debtors reserve the right to request the adjournment of the Sale Hearing.  The

Debtors shall be deemed to have accepted a bid only when the Court has approved the bid at the

Sale Hearing.

26.      All objections to the relief sought in the Motion must be:  (a) in writing;

(b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy

Rules and the Local Rules, (d) served in accordance with the Local Rules on the following

(collectively, the "<u>Objection Notice Parties</u>"):  (i) counsel to the Debtors:  Cleary Gottlieb Steen

& Hamilton LLP, One Liberty Plaza, New York, New York 10006, Fax:  (212) 225-3999

(Attention:  James L. Bromley and Lisa M. Schweitzer) and Morris, Nichols, Arsht & Tunnell

LLP, 1201 North Market Street, Wilmington, Delaware 19801, Fax:  (302) 658-3989 (Attention:

Derek C. Abbott); (ii) counsel to the Committee:  Akin Gump Strauss Hauer & Feld LLP, One

Bryant Park, New York, New York 10036, Fax:  (212) 872-1002 (Attention:  Fred S. Hodara,

Stephen Kuhn and Kenneth Davis) and Richards, Layton & Finger, P.A., One Rodney Square,

920 North King Street, Wilmington, Delaware 19801 (Attention:  Christopher M. Samis), and (iii) counsel to the Bondholder Group:  Milbank, Tweed, Hadley & McCloy, One Chase Manhattan Plaza, New York, New York 10006, Fax:  (212) 822-5735 (Attention:  Roland Hlawaty) and (iv) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn:  Thomas P. Tinker), and (e) all objections to the relief requested in the Motion and conduct of the sale process must be filed with the Clerk of the Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801 and served on the Objection Notice Parties so as to be received by no later than **4 p.m. (ET) on October 21, 2009**  (the "General Objection Deadline") (these procedures collectively referred to as the "General Objection Procedures").

27.    Each objection shall state the legal and factual basis of such objection and may be orally supplemented at the hearing on the Motion.

28.    Only those objections made in compliance with the General Objection Procedures will be considered by the Court at the hearing on the Motion.  The failure of any objecting person or entity to file its objections by the Sale Procedures Objection Deadline or the General Objection Deadline and in accordance with the General Objection Procedures, as appropriate, will be a bar to the assertion, at the Sale Hearing or thereafter, of any objection, and shall be deemed to be "consent" for purposes of Bankruptcy Code section 363(f).

**F.    Canadian Proceedings**

29.    Concurrently with the Debtors seeking the relief herein, the Canadian Debtors intend to seek approval of the Sale Procedures from the Canadian Court (the "Canadian Sale Procedures Order").  The final sale and assignment of the Assets also will be submitted for approval by the Canadian Court.

**Basis for Relief**

**A.    Sale of the Assets Is a Product of the Debtors' Reasonable Business Judgment**

30.    Section 363(b)(1) of the Bankruptcy Code provides:  "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part:  "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

31.    Virtually all courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession.  See In re Abbotts Dairies of Pa., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"); In re Stroud Ford, Inc., 164 B.R. 730, 732 (Bankr. M.D. Pa 1993); Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a

section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

32.     The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements:  (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee or the debtor-in-possession has obtained a fair and reasonable price; and (4) good faith.  In re Titusville Country Club, 128 B.R. at 399; In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R. at 335-36; see also Stephens Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.[6]

33.     Additionally, prior to and after enactment of the Bankruptcy Code, courts have permitted a proposed sale of all or substantially all assets of a trustee outside the ordinary course of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  See In re Abbotts Dairies of Pa., Inc., 788 F.2d at 143; In re Lionel Corp., 722 F.2d at 1063 (passim).

34.     While the Debtors propose to sell the Assets through an auction process, such sale alternatively could be approved as a private sale.[7]

35.     The proposed procedures for the sale of the Debtors' Assets meet the "sound business reason" test.  First, sound business purposes justify the sale.  The Debtors believe that a

---

[6]     Lionel's "sound business purpose test" replaces an older rule that held that sales of substantially all of a debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i.e. when the assets to be sold were "wasting" or perishable.  Lionel, 722 F.2d at 1071.

[7]     In accordance with Bankruptcy Rule 6004, sale of property rights outside of the ordinary course of business may be by private sale or public auction.  See Fed. R. Bankr. P. 6004 ("All sales not in the ordinary course of business may be by private sale or by public auction.").  As this Court has recognized, whether to proceed by public or private asset sale is committed to the sound discretion of the trustee or debtor in possession, as applicable.  See In re Alisa P'Ship, 15 B.R. 801, 802 (Bankr. D. Del. 1981).  Indeed, it has been stated that a "bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b)."  In re Ancor Exploration Co., 30 B.R. 802, 808 (N.D. Okla. 1983).

prompt sale of the Assets conducted pursuant to the Sale Procedures presents the best opportunity to realize the maximum value of the Assets for distribution to the Debtors' estates and their creditors. The Debtors further believe that the benefit to their creditors will be adversely affected absent an immediate sale. See In re Lionel Corp., 722 F.2d at 1071 (of factors for court to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").

36.     The proposed procedures for the sale of the Assets also meet the other factors of the "sound business reason" test. As part of this Motion, the Debtors have sought to establish procedures for notice to creditors and other prospective bidders. Under the circumstances of this case, the Debtors submit that the notice period proposed satisfies the requirements of the Bankruptcy Rules, see Bankruptcy Rule 2002, and provides sufficient time for parties in interest to submit objections to the proposed sale and for bidders to formulate and submit competing proposals.

37.     Finally, the proposed procedures for the sale of the Assets, which require the Debtors to consult with the Committee, the Bondholder Group and the Monitor throughout the process, satisfy the good faith requirement of Abbotts Dairies. The Debtors submit that the results of the sale process will be the product of good faith, arm's length negotiations with respect to the price and other terms of the sale of the Assets between the Debtors and highest and best bidder at the conclusion of the sale process.

38.     As set forth above, the Debtors have demonstrated compelling and sound business justifications for authorizing the sale of the Assets and the Sale Procedures. The sale of the Assets pursuant to the Sale Procedures will afford the Debtors' estates an opportunity to maximize the recoveries to creditors. Accordingly, the Debtors request that the Court approve

19

the proposed procedures for sale of the Assets and approve the Sale presented to the Court at the

Sale Hearing and authorize the Debtors to take such other steps as are necessary to consummate

the Transaction.

**B.      Sale of the Assets Should Be Free and Clear of Liens, Claims and Interests**

39.      Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to

sell and transfer the Debtors' right, interest and title in the Assets to the successful bidder free

and clear of all liens, claims and interests, except as set forth in the Agreement or the Transaction

Agreement executed with the Successful Purchaser, with such liens, claims, and interests to

attach to the proceeds of the sale of the Assets, subject to any rights and defenses of the Debtors

and other parties in interest with respect thereto.  Section 363(f) of the Bankruptcy Code

provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this
> section free and clear of any interest in such property of an entity
> other than the estate, only if –
>
> (1)      applicable nonbankruptcy law permits sale of such property
> free and clear of such interest;
>
> (2)      such entity consents;
>
> (3)      such interest is a lien and the price at which such property
> is to be sold is greater than the aggregate value of all liens on such
> property;
>
> (4)      such interest is in bona fide dispute; or
>
> (5)      such entity could be compelled, in a legal or equitable
> proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section

363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the

requirements is met).

40.      With respect to each creditor asserting an interest, one or more of the standards

set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied.  Those holders of interests who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2).  Those holders of interests who did object fall within one or more of the other subsections of Bankruptcy Code Section 363(f).

41.     A sale free and clear of liens, claims and interests is necessary to maximize the value of the Assets.  A sale of the Assets other than one free and clear of all interests would yield substantially less value for the Debtors' estates, with less certainty than a transaction free and clear of all interests.  Therefore, the Transaction contemplated by the Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.  A sale free and clear of liens, claims and interests is particularly appropriate under the circumstances because any lien or claim in, to or against the Debtors' right, interest and title in the Assets that exists immediately prior to the closing of any sales will attach to the sale proceeds allocated to the Debtors with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in interest.  The Debtors submit that holders of liens, claims and interests, if any, will be adequately protected by the availability of the proceeds of the sale to satisfy their liens, claims and interests.

## C.     The Sale Procedures Are Appropriate Under the Circumstances

42.     A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business.  11 U.S.C. § 363.  Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case.  See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand); In re Integrated

Res., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

43.     The implementation of competitive sale procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate.  The Debtors submit that the opportunity for competitive bidding embodied in the Sale Procedures will generate the highest or otherwise best offer for the Assets and therefore is designed to maximize the value of the Assets.

44.     The Debtors believe that the exploration of a potential sale of the Assets through a prompt sale process is the best way to maximize the value of the Debtors' Assets for the benefit of their estates, creditors and other stakeholders.  Accordingly, the Debtors, in their business judgment, have concluded that:  (a) a prompt sale of the Assets is the best way to maximize value for these estates, and (b) the proposed Sale Procedures described herein are fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale of the Assets.

**D.     Notice of the Proposed Sale Is Reasonable Under the Circumstances**

45.     The Debtors submit that the Notice Procedures as set forth above are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Sale Procedures.

**E.     Waiver of Automatic Ten-Day Stay Under Bankruptcy Rule 6004(h)**

46.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are

automatically stayed for ten days after entry of the order.  The purpose of Bankruptcy Rule
6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal
before the order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P.
6004(h).

47.    Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent
as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period,
commentators agree that the 10-day stay period should be eliminated to allow a sale or other
transaction to close immediately where there has been no objection to the procedure.  See
generally 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection is
filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may
be reduced to the amount of time necessary to file such appeal.  Id.

48.    Pursuant to the Agreement, and because of the potentially diminishing value of
the Assets, the Debtors [must] close this sale promptly after all closing conditions have been met
or waived.  Thus, waiver of any applicable stays is appropriate in this circumstance.

**F.    Privacy Ombudsman**

49.    Under section 363(b)(1) of the Bankruptcy Code, if the sale of a consumer
customer list containing personal information relating to individual persons is inconsistent with
the Debtors' consumer privacy policy, section 332 governs the appointment of a consumer
privacy ombudsman.  11 U.S.C. § 332(b)(1).  Here, there are no customer contracts, and the
Debtors do not have a consumer privacy policy, so section 363(b)(1) does not apply, and a
consumer privacy ombudsman is not required.

**Notice**

50.    Notice of the Motion has been given via first-class mail, facsimile, electronic
transmission, hand delivery or overnight mail to (i) the U.S. Trustee; (ii) the Monitor; (iii)

counsel to the Committee; (iv) counsel to the Bondholder Group; and (v) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  The Debtors submit that under the circumstances no other or further notice is necessary.

### No Prior Request

51.    No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed orders attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  September 21, 2009  
Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (No. 5125)  
Lisa M. Schweitzer (No. 1033)  
One Liberty Plaza  
New York, New York 10006  
Telephone:  (212) 225-2000  
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s Ann C. Cordo_____  
Derek C. Abbott (No. 3376)  
Eric D. Schwartz (No. 3134)  
Ann C. Cordo (No. 4817)  
Andrew R. Remming (No. 5120)  
1201 North Market Street  
P.O. Box 1347  
Wilmington, Delaware 19801  
Telephone:  (302) 658-9200  
Facsimile: (302) 658-3989

*Counsel for the Debtors*  
*and Debtors in Possession*

3128482.1