IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | No. 09-10138 (KG) |
| NORTEL NETWORKS INC. et al., | ) | |
| | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | |

**UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR WITHDRAWAL OF REFERENCE OF ALL ISSUES RELATING TO DEBTOR NNI'S OBJECTION TO PROOF OF CLAIM FILED BY THE INTERNAL REVENUE <u>SERVICE</u>**

The United States of America, on behalf of the Internal Revenue Service (the "Service"), seeks mandatory withdrawal, pursuant to 28 U.S.C. § 157(d) and Fed. R. Bankr. P. 5011, to the District Court of Delaware ("District Court") of all issues relating to Debtor NNI's objection to proof of claim filed by the Internal Revenue Service on September 15, 2009.  (Docket No. 1495.)  The proof of claim asserts a $3 billion liability over nine years.  (Gov't Exh. 103.)

This federal income tax dispute arose because Nortel Networks, Inc. ("NNI") has refused to sign an agreement negotiated by the competent authorities of Canada and the United States.  To avoid the prospect of double-taxation, NNI invoked the United States-Canada Income Tax Convention (the "Convention).  (Gov't Exh. 101.)  The Convention allows taxpayers to request assistance from the competent authorities to avoid double taxation.  (Gov't Exh. 101, Art. XXVI.)  By choosing to invoke the Convention, NNI agreed "that competent authority negotiations are a government-to-government activity that does not include the taxpayer's participation in the negotiation

2

proceedings." Rev. Proc. 2006-54, § 12.04 (Gov't Exh. 102.)  Rather than agree to the

result of the negotiations that span multiple years, NNI rushed into the bankruptcy

court seeking a determination, within 30 days of filing the objection, that no taxes were

owed.

NNI, as any taxpayer, is free to reject the result reached by the competent

authorities.  That decision, however, still leaves nine taxable years and five highly

complicated legal and factual issues, totaling $3 billion.  Of the five issues, two have

never been litigated anywhere, two have been litigated just once in the Ninth Circuit,

and one involves a complex recalculation of NNI's liability under 26 U.S.C. § 482.  Any

suggestion that all these issues can be resolved in less than 30 days is ludicrous.  In fact,

NNI has had two months to decide whether to agree to the proposed adjustments.  It

has not been able to decide despite having intimate knowledge of all relevant facts and

law.  Yet NNI expects the bankruptcy court to decide this matter after 30 days of

discovery and a one-day hearing.

Pursuant to 28 U.S.C. § 157(d), withdrawal of the objection is mandatory where,

as here, resolution of the federal income tax issue requires substantial and material

consideration of non-bankruptcy law.  In other words, the case requires a significant

interpretation of various federal tax statutes; the issue presented in the objection is one

of first impression within the Circuit, and the case is factually voluminous.  There is a

Congressional presumption that a case such as this be adjudicated by a district court

3

where, as here, the non-bankruptcy issue is predominant.

For the reasons set forth below, the District Court ought to order withdrawal of the bankruptcy reference.

I.    **FACTUAL BACKGROUND**

    A.    **Bankruptcy Proceedings**

On January 14, 2009, NNI and various affiliated entities (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On August 4, 2009, the bankruptcy court entered the Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (the "Bar Date Order") (Docket No. 1084.)  Pursuant to the procedures set forth in the Bar Date Order, the Service had to assert its claims against the Debtors before September 30, 2009.  *Id*.

On August 20, 2009, the Service filed an amended proof of claim asserting an unsecured priority claim against NNI pursuant to 11 U.S.C. § 507(a)(8) for the tax years 1998-2005 and 2007, for income taxes due in the amount of $1,804,637,586.00, and interest to the Petition Date in the amount of $1,162,748,632.82, for an aggregate amount of $2,967,386,218.82, and an unsecured non-priority claim for penalties (including interest thereon) to date in the amount of $49,264,612.00, for a total claim of $3,016,650,830.82.  (Gov't Exh. 103.)

On September 15, 2009, NNI filed an objection to this claim seeking a hearing

4

date of October 13, 2009.  (Docket No. 1495).

      B.    **Basis for the claim**

The $3 billion claim is premised on the following annual liability: $379,232,841 for 1998, $269,847,546 for 1999, $163,600,825 for 2000, $5,000 for 2001, $5,000 for 2002, $438,470,651 for 2003, $209,405,631 for 2004, $344,065,092 for 2005, and $5,000 for 2007. (Gov't Exh. 103).  Government Exhibit 104 illustrates how each of these items were derived.  (Gov't Exh. 104 at 1.)  Critical to the amount of liability for each year is the line titled "Total 482 Adjustment" in the amount of $7,430,668,000.  *Id*.  The "Total 482 Adjustment" of $7,430,668,000 is further broken down by year into five categories: "R&D," "SG&A," "APA TP Adj.," "Restructure," and "Vendor Finance."  *Id*. at 2.  The United States will set out an explanation of each category below.

      1.    *R&D*

Research & Development ("R&D") costs were subject to an audit by the Service. *See generally* Gov't Exhibit 105.  The International Examiner identified the following issues related to R&D: "(1) determine whether the costs included in the R&D global cost share pool in tax years 1998 and 1999 qualify for inclusion under IRC § 482 and Treasury Regulations §§ 1.482-7 and 1.482-5(d)(3); (2) determine the corrected R&D Cost Share Agreement allocations for each of the cost share participants in tax years 1998 and 1999; (3) based upon the results of the examination of this issue, determine the corrected beginning balance of R&D capital stock for each of the cost share participants for use in

the computation of taxable income for tax years 2000 and 2001 under Residual Profit

Split (RPS) transfer pricing methodology; (4) consider the administrative effects of the

transfer pricing adjustment(s)." *Id.* at 1.

NNI entered into an Advance Pricing Agreement ("APA") with the Service to

share costs attributable to the development of intangibles under a Cost Sharing

Agreement ("CSA") pursuant to 26 C.F.R. § 1.482-7. *Id.* The entities signing the CSA

included Nortel Networks, Ltd (NNL, the Canadian parent), Nortel Networks Ireland

(NN Ireland), Nortel Networks, S.A. (NNSA, an entity in France), Nortel Networks UK

Limited (NN UK), Nortel Networks Australia (NN Australia), Nortel Networks, Inc.

(NNI, the US entity), Nortel Networks Japan (NNJ), and Northern Telecom de Brasil

Industria e comercio Ltda (Nortel Brazil). *Id.* at 2-3.

"Analysis of the cost share agreement indicates that Nortel allocated R&D global

pool of expenses to the cost share participants based upon three income streams,

royalties, net customer sales, and modified operating income." *Id.* at 3. To determine

the R&D global pool, Nortel captured and monitored R&D costs through a software

program known as "Hyperview." *Id.* The Hyperview system captures costs related to

900 R&D expense accounts, such as professional fees, legal services, laboratory

materials, etc. *Id.* "Each expense is referred to as a 'TOE' ('type of expense') and

assigned a three-digit number for accounting, monitoring, and internal reporting

purposes." *Id.* The Service selected certain TOEs for further examination. *Id.*

6

Additionally, the Service examined (1) non-qualifying costs, (2) salaries and benefits, and (3) awards and bonuses.  *Id.* at 4.  Based on all this extensive examination, the Service concluded that certain adjustments were necessary.

Overall, "the total adjustments to the R&D global pool costs are primarily attributable to two factors.  It was determined that certain costs were included in the R&D global pool that did not qualify for inclusion because the costs were attributable to functions other than R&D and a relationship could not be established between the incurred costs and the development of intangibles.  In other instances, Nortel was unable to provide substantiation for tested transactions."  *Id*. at 7.

2.    *SG&A*

Based on the examination related to the R&D expenses, *see above*, the Service disallowed certain expenses.  (Gov't Exh. 106 at 1.)  Nortel had then submitted certain disallowed expenses for reclassification as SG&A (selling, general, and administrative) expenses.  *Id*.  The Service examined the support for certain expenses and allowed them as SG&A.  *Id.*

3.    *APA TP Adjustment*

NNI, in its own submission to the Service has a line "Add back Interim TP Adjustment" for each of the years starting in 2000 through 2005.  (Gov't Exh. 107 at 6-10.)   The amounts, which increase NNI's tax liability, identified by NNI match those on Government Exhibit 104.  NNI has not explained yet how it derived this number but the

7

Service believes it is meant to address non arm's-length transfer prices.  *Id*. at 14 ("The

APA Team's analysis identified several elements of Nortel's TPM that are irrational

given Nortel's facts.  Each of these elements is addressed below . . ..")

In any event, the Service reserves the right to calculate its own transfer pricing

adjustment using its own inputs for the residual split profit model.[1]

4.    *Restructuring Costs*

NNI, in its own submission to the Service has a line "Restructuring Cost" for

each of the years starting in 2000 through 2005.  (Gov't Exh. 107 at 6-10.)   The numbers

identified by NNI match those on Government Exhibit 104.  No support has been

provided for this number by NNI.

5.    *Vendor Finance*

Nortel incurred material vendor financing losses during 2000 through 2004.

(Gov't Exh. 107 at 8.)  During all relevant time periods, NNL's (Canadian parent) Credit

Committee was the organization fully responsible for the evaluation of the credit risk.

*Id*.  "The role of the Global Credit Management (GCM) is that of a facilitator.  GCM is

responsible for creating, distributing and maintaining credit procedures, organizing and

arbitrating credit and pre-credit committee meetings, assisting in the due diligence of

---

[1]Since the Service relied on NNI's number for this adjustment, the Service will
not detail the complexity of this issue at the time.  However, the Service reserves the
right to do so at a later time and draws the Court's attention to the entirety of
Government Exhibit 108, which lays out in great detail the issues involved.
Government Exhibit 108 is hereby incorporated by reference.

8

customer financing (credit reviews), preparing credit recommendations and managing

the overall credit process.  *Id.*  "GCM had a very limited level of approval authority.

Only the top position of GCM serves as a member of the Credit Committee."  *Id..*  "It is

up to each LOB [line of business] to determine what business transactions that they are

willing to accept."  *Id.*  "The customer financing allows for the customer to obtain credit,

however it is the LOB that determines the terms and conditions of the sales

transaction."  *Id.*

    NNI disagrees with the Service's view on how vendor finance losses should be

treated:

> Nortel proposes that vendor financing losses should be allocated pursuant to its
>
> proposed RPSM [residual profit split method] with the result being that any
>
> residual loss generated by these losses should be split among various Nortel
>
> entities, essentially in proportion to their R&D stocks.
>
>
> The APA Team recommends that NNL should bear the entire loss associated
>
> with vendor financing.  Nortel's Corporate Procedure No. 302.48, which explains
>
> in detail the approval process that was in place from October 25, 2001 through
>
> October 23, 2005, clearly states that the Credit Committee, whose members are
>
> employees of NNL, was the organization fully responsible for the evaluation of
>
> credit risk.  (See Appendix 4.)

9

Nortel has argued that even though customer financing is centrally located in

NNL, each subsidiary should share proportionately in the risk.  Nortel states that,

> Credit is granted by the Line of Business (LOB) to facilitate
> commercially attractive sales within acceptable risk tolerance
> levels on obligor credit worthiness and the term of the
> exposure.  In circumstances where credit terms are not
> within trade terms, term credit (in excess of 180 days) may
> be granted.  It is up to each LOB to determine what business
> transactions they are willing to accept. The customer
> financing allows for the customer to obtain credit, however it
> is the LOB that determines the terms and conditions of the
> sales transaction. A customer finance sale in Europe or Asia
> may involve product sales from the U.S. and thus the U.S.
> would benefit from the sale.

The APA Team accepts that a Nortel subsidiary would initially identify a

customer and propose terms of sale. However, Nortel's corporate policy is

unambiguous as to who grants or withholds the credit.

Nortel also argues that subsidiaries should share proportionately in the vendor financing losses NNL approved because, according to Nortel, each entity benefited from the increased sales the vendor financing afforded.  It provides as an example, "A customer finance sale in Europe or Asia may involve product sales from the US and thus the US would benefit from the sale ultimately in the RPS [residual profit split] calculation" (emphasis added).  We find this argument not persuasive because of the indirect benefit.

Finally, Nortel argues that bad debt is a cost that is included in G&A expenses. As such, expenses of this nature are shared in the RPS pool.  We believe that the nature of the vendor financing losses requires them to be removed from the RPS pool.

*Id.* at 30-31.

II.    **SUMMARY OF ARGUMENT**

This income tax dispute requires a determination of a proper allocation of various expenses and revenues between NNI and NNL.  It has taken the competent authorities of Canada and the United States years to reach a proposed resolution of the many legal and factual issues involved.  Consequently, litigation of these issues would

11

take years, not days as envisioned by the bankruptcy court's order.  Yet NNI is insisting

that the bankruptcy court reach a resolution less than two weeks from now.

Congress, in 28 U.S.C. § 157(d), directed district courts to withdraw references to

any portion of any bankruptcy proceeding, if appropriate.  The district court should

follow the Congressional direction and withdraw the reference to this objection.

## III.    **ARGUMENT**

Pursuant to 28 U.S.C. § 157(a), the Bankruptcy Court derives its authority to

entertain bankruptcy proceedings from the reference of the district court.  Conversely,

Section 157(d) authorizes a district court to *withdraw* the reference of a bankruptcy case

to the bankruptcy court if certain conditions are met:

> The district court may withdraw, in whole or in part, any case or
>
> proceeding referred under this section, on its own motion or on timely
>
> motion of any party, for cause shown.  The district court *shall*, on timely
>
> motion of a party, so withdraw a proceeding if the court determines that
>
> resolution of the proceeding requires consideration of both title 11 and
>
> other laws of the United States regulating organizations or activities
>
> affecting interstate commerce.

28 U.S.C. § 157(d) (emphasis added).  As §157(d) makes clear, the district court can

withdraw the reference in two ways: (i) mandatory withdrawal, or (ii) permissive

12

withdrawal.  *In re Homeland Stores, Inc.*, 204 B.R. 427, 430 (D. Del. 1997).  The United

States seeks only mandatory withdrawal at this time.

Withdrawal of the reference is mandatory whenever "substantial and material

consideration of non-bankruptcy law is necessary to resolve the case."  *United States v.*

*Wood*, 161 B.R. 17, 20 (D.N.J. 1993); *In re G-I Holdings,* 295 B.R. 222, 224 (D.N.J. 2003); *see*

*also In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 995 (2d Cir. 1990); *In re Vicars Ins. Agency,*

*Inc.*, 96 F.3d 949, 952 (7th Cir. 1996); *In re CM Holdings, Inc.*, 221 B.R. 715, 721 (D. Del.

1998); *In re Johns-Manville Corp.*, 63 B.R. 600, 602 (S.D.N.Y. 1986); *In re White Motor Corp.*,

42 B.R. 693, 700-05 (N.D. Ohio 1984); *Hatzel & Buehler v. Orange & Rockland Utilities*, 107

B.R. 34, 38 (D. Del. 1989) (Mandatory withdrawal required where consideration of non-

bankruptcy law is necessary for resolution of the case and that substantial and material

consideration of those non-bankruptcy statutes must be involved to resolve the

proceeding); *Franklin Sav. Ass'n v. Office of Thrift Supervision*, 150 B.R. 976, 979-981 (D.

Kan. 1993) (surveying precedents and concluding that test for mandatory withdrawal is

"substantial and material consideration" of non-bankruptcy federal law).

The guiding distinction is that withdrawal is mandatory in cases presenting

"issues requiring *significant* interpretation of federal laws that Congress would have

intended to have decided by a district judge rather than a bankruptcy judge," rather

than the "straightforward application of a [non-bankruptcy] federal statute to a

particular set of facts."  *Johns-Manville*, 63 B.R. at 602 (emphasis in original); *see also In re*

13

*G-I Holdings, Inc.,* 295 B.R. at 225 (significant interpretation of a federal tax statute was required and acknowledging Congressional presumption that Article III court conduct that interpretation); *CM Holdings,* 221 B.R. at 722 (distinguishing "substantial and material consideration of the tax law" from "mere straightforward application of tax law"); *Franklin,* 150 B.R. at 980 ("Withdrawal is required if the bankruptcy court would be called upon to make a significant interpretation of a non-[bankruptcy] federal statute," as distinguished from "its routine application to the facts.") (citing *City of New York v. Exxon Corp.,* 932 F.2d 1020, 1026 (2d Cir. 1991); *In re Ionosphere Clubs,* 922 F.2d at 995; *Wittes v. Interco, Inc.,* 137 B.R. 328, 329 (E.D. Mo. 1992); *In re Coated Sales, Inc.,* 146 B.R. 83, 84 (S.D.N.Y. 1992); *In re National Gypsum Co.,* 145 B.R. 539, 541 (N.D. Tex. 1992)). Moreover, withdrawal of a bankruptcy proceeding is mandatory whenever "the non-[bankruptcy] issues can be said to dominate the bankruptcy issues."  *Franklin,* 150 B.R. at 980 (citing *In re Lenard,* 124 B.R. 101, 102 (D. Colo. 1991); *In re Texaco, Inc.,* 84 B.R. 911, 921 (S.D.N.Y. 1988)).

Federal courts have not hesitated to conclude that matters involving significant interpretation of the Internal Revenue Code are subject to mandatory withdrawal under 28 U.S.C. § 157(d).  *See In re G-I Holdings, Inc.* 295 B.R. at 295, 296 (mandatory withdrawal ordered where proceeding required significant interpretation of federal tax statutes, case was factually complex and concerned whether a disguised sale occurred for tax purposes, and case was one of first impression; district court also noted that in

14

such circumstances, "[s]uch determinations have been reserved for Article III [District] Courts."); *CM Holdings*, 221 B.R. at 722-24 (mandatory withdrawal where objection to IRS claim presented *unsettled issues of law*, as well as issues of first impression, relating to tax treatment of corporate-owned life insurance (COLI)); *In re Ionosphere Clubs, Inc.* 142 B.R. 645, 649 (S.D.N.Y. 1992) (adversary proceeding requiring significant interpretation of Internal Revenue Code and ERISA, held subject to mandatory withdrawal); *In re Oil Company*, 140 B.R. 30, 34-35 (E.D.N.Y. 1992) (objection to IRS claim subject to mandatory withdrawal in case presenting complex issues of first impression under Internal Revenue Code); *In re Pan Am Corp.,* 133 B.R. 700, 704 (S.D.N.Y. 1991) (objection to claim involving interaction of Title 11, Internal Revenue Code, and ERISA subject to mandatory withdrawal); *Century Hotels v. United States*, 952 F.2d 107, 108 n.1 (5th Cir. 1992) (noting district court's withdrawal of reference in adversary proceeding seeking turnover of property and asserting wrongful levy claim under 26 U.S.C. § 6426).

Here, in addition to the factual issues that are highly complex as illustrated in section I.B., the merits of the objection hinge on the interpretation of the 26 U.S.C. §§ 482 and 162, and applicable Treasury Regulations, including 26 C.F.R. §§ 1.482-7 and 1.482-5(d)(3) in effect during the periods in issue.  Both regulations (affecting R&D and SG&A) were litigated only once and not in this Circuit.  *See Xilinx, Inc. v. Commissioner*, 567 F.3d 482, 487 (9th Cir. 2009).[2]   Restructuring costs have never been litigated under

---

[2]26 C.F.R. § 1.482-5(d)(3) was also cited in *United States v. Certain Real Property Known as and Located at 1461 West 42nd Street, Miami, Florida*, 1999 WL 33283339, * 3

26 U.S.C. § 482.  Neither have the vendor financing losses.  Moreover, NNI has provided no detail for its "APA TP Adjustment."  However, the Service believes that it is a complex recalculation that endeavors to address the myriad of its concerns.  There is simply no "routine application" of tax law to the facts in this objection.

In sum, the District Court should find that mandatory withdrawal is warranted and grant the United States' motion for withdrawal.

A.    **CONCLUSION**

The withdrawal of the reference of the objection is mandatory under 28 U.S.C. § 157(d), because the objection requires the substantial and material consideration of various income tax statutes and regulations, presents a factually and legally complex federal tax issue of first impression requiring intensive discovery, including, in all likelihood, expert analysis and testimony.  Moreover, in light of the significance of the federal tax issues presented by the objection, as well as the fiscal magnitude of this controversy withdrawing the reference will streamline this litigation.  Lastly, mandatory withdrawal of the reference to the Bankruptcy Court acknowledges the District Court's greater experience with administering and deciding large, complex cases involving significant non-bankruptcy issues of law, and intensive discovery, in addition to honoring the intent of Congress that such issues be reserved to Article III courts in the first instance.

_____

(M.D. Fla. Mar. 10, 1999).

4661321.1

16

DATE: September 24, 2009

Respectfully submitted,

 /s/ Jan M. Geht
JAN M. GEHT
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 227
Washington, D.C.  20044
Telephone: (202) 307-6449
Fax: (202) 514-6866
E-mail: jan.m.geht@usdoj.gov
*Counsel for the United States*

4661321.1