| Form **5701** | Department of the Treasury - Internal Revenue Service<br>**Notice of Proposed Adjustment** | |
|---|---|---|
| Name of Taxpayer<br><br>Nortel Networks Inc. & Subsidiaries      TIN:04-2486332 | | Issue No.<br><br>526-050 |
| Name and Title of person to whom delivered<br><br>Connie Mersch, Manager, Tax Examinations | | Date Issued:<br><br>07-16-2004 |
| Entity for this proposed adjustment<br><br>Nortel Networks, Inc. and Subsidiaries | | Response Due:<br><br>08-14-2004 |

Based on the information we now have available and our discussions with you, we believe the proposed adjustment listed below should be included in the revenue agent's report. However, if you have additional information that would alter or reverse this proposal, please furnish this information as soon as possible.

| Years | Amount | SAIN | Account or Return Line |
|---|---|---|---|
| 1998 | 24,200,000 | 526-050 | R&D Cost Share Agreement Allocations – Decrease |
| 1999 | 10,800,000 | 526-050 | R&D Cost Share Agreement Allocations – Decrease |

**Issue**

See attached Form 886-A


**Reasons for Proposed Adjustment**




Taxpayer Representative's Action    Initial here :_____

Please check the appropriate box for both factual accuracy and legal conclusion

**Factual Information**
[ ] Agree
[ ] Agree In Part
[ ] Disagreed
[ ] Have additional information; will
    submit by: Date

**Law Conclusions**:
[ ] Agree
[ ] Disagree In Part
[ ] Disagreed
[ ] Have additional information; will
    submit by: Date

| Prepared By:<br>  *Tammy Withers*, International Examiner | Date:<br>09/08/04<br>Modified on 09/16/04 |
|---|---|
| International Group Manager:<br>  *Cassandra D. Weissend* | Date:<br>9/23/04 |
| Case Manager:<br>/S/ Howard E. Reams, Acting Manager | Date:<br>9/30/04 |

Iss 526-050 - RD CSA Alloc - 98 & 99 - 5701   Modified on 09-16-04.doc         Form **5701**



GOVERNMENT EXHIBIT 105

| Form 886-A | EXPLANATION OF ADJUSTMENTS | Schedule No.or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>Nortel Networks, Inc. & Subsidiaries | | Year/Period Ended<br><br>1998 and 1999 |

**R&D COST SHARE AGREEMENT ALLOCATIONS**                    **SAIN ISSUE 526-050**

| | 199812 | 199912 |
|---|---|---|
| R&D CSA Allocation – Revised Allocation | 1,640,000,000 | 1,968,500,000 |
| R&D CSA Allocation – As Originally Allocated | 1,664,200,000 | 1,979,300,000 |
| R&D CSA Allocations – Proposed Adjustment | 24,200,000 [1] | 10,800,000 [2] |

**ISSUE:**

1) Determine whether the costs included in the R&D global cost share pool in tax years 1998 and 1999 qualify for inclusion under IRC § 482 and Treasury Regulations §§ 1.482-7 and 1.482-5(d)(3).

2) Determine the corrected R&D Cost Share Agreement allocations for each of the cost share participants in tax years 1998 and 1999.

3) Based upon the results of the examination of this issue, determine the corrected beginning balance of R&D capital stock for each of the cost share participants for use in the computation of taxable income for tax years 2000 and 2001 under the Residual Profit Split (RPS) transfer pricing methodology.

4) Consider the administrative effects of the transfer pricing adjustment(s). In essence, determine the proper correlative adjustment, and advise Nortel of their rights to Competent Authority Relief from double taxation. (Note: See "Taxpayer Position" for additional details.)

**FACTS:**

Nortel Networks, Inc. & Subs. (hereafter referred to as NNI) entered into an Advanced Pricing Agreement (APA) with the IRS to share costs attributable to the development of intangibles under a Cost Share Agreement (CSA) pursuant to Treasury Regulations § 1.482-7. Under the

---

[1] The above adjustment reflects only the change to the R&D Cost Share Agreement Allocation of Nortel Networks, Inc. & Subs. (the US Cost Share Participant). In **1998**, a total reduction in costs of $52,315,204 (52.3 million) was made to the R&D Global Pool of Expenses for all cost share participants. That reduction in costs is allocated among the cost share participants (CSPs) as follows: Canada (22.0 million), US (24.2 million), UK (5.8 million), and Others (0.3).

[2] The above adjustment reflects only the change to the R&D Cost Share Agreement Allocation of Nortel Networks, Inc. & Subs. (the US Cost Share Participant). In **1999**, a total reduction in costs of $27,689,230 (27.7 million) was made to the R&D Global Pool of Expenses for all cost share participants. That reduction in costs is allocated among the cost share participants (CSPs) as follows: Canada (12.4 million), US (10.8 million), UK (3.5 million), and Others (1.1).

Department of the Treasury -- Internal Revenue Service                    Form 886-A

Iss 526-050 - R&D CSA Alloc - 98 & 99 - 886-A   Modified on 02-22-05.doc          Page 1

| Form 886-A | EXPLANATION OF ADJUSTMENTS | Schedule No.or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>Nortel Networks, Inc. & Subsidiaries | | Year/Period Ended<br><br>1998 and 1999 |

R&D cost share agreement, each of the cost share participants (CSPs) were treated as owning the technology created by all CSPs and were entitled to use that technology in their respective geographic markets. The R&D Cost Share Agreement APA in question covered tax years 1992 through 1999. Although the R&D CSA APA expired in 1999, documentation was provided that established that Nortel Networks, Inc. & Subs. (NNI) was determined to be a participant in a qualified cost share agreement that continued to exist between the Nortel cost share participants throughout tax year 2000. NNI provided a copy of the Amended R&D Cost Share Agreement having an effective date of 01/01/92, and Nortel provided a copy of the Termination Agreement with an effective date of 2001. Accordingly, NNI properly applied the R&D Cost Share Agreement methodology in the preparation of the 2000 income tax return. In tax year 2001, Nortel filed its income tax return applying the Residual Profit Split methodology. Subsequently, in March, 2002, Nortel filed a formal APA Submission with the IRS requesting the approval of the Residual Profit Split methodology for tax years 2000 through 2004, indicating that an amended return would be filed to convert the 2000 tax return from the R&D CSA methodology to the RPS methodology. Accordingly, for purposes of this examination, only 1998 and 1999 R&D global pool expenses were examined, in anticipation of Nortel's filing of an amended return (Form 1120X) to convert the 2000 income tax return from the R&D CSA methodology to the Residual Profit Split (RPS) methodology consistent with the corporation's 2000-2004 RPS APA submission. As the examination progressed, it was determined that the Residual Profit Split APA negotiations would not be completed prior to closure of this exam. However, based upon the results of the examination of the R&D Global Pool Expenses for tax years 1998 and 1999, it was reasonable to believe that the 2000 R&D global pool expenses warranted adjustment as well. Accordingly, an adjustment is being proposed, in a separate Form 5701, to project or extrapolate the 1998 and 1999 exam findings to the 2000 year.

Nortel[3] included Nortel Networks, Ltd (NNL, the Canadian parent), Nortel Networks Ireland (NN Ireland), Nortel Networks, S.A. (NNSA, an entity in France), Nortel Networks UK Limited (NN UK), Nortel Networks Australia (NN Australia), Nortel Networks, Inc. (NNI, the US entity), Nortel Networks Japan (NNJ)[4], and Northern Telecom de Brasil Industria e comercio Ltda (Nortel Brazil)[5] as participants in the R&D cost share agreement due to their significant contributions to

---

[3]  This reference to "Nortel" is intended to mean the Nortel group as a global consolidated corporation.
[4]  Page 2, footnote 1, of the economic analysis of the 2000-2004 Residual Profit Split submission (filed March, 2002) indicated that in tax years following 1999, Nortel Networks Japan (NNJ) no longer incurs R&D expenses as do the other former cost share participants. In an interview conducted on 05/28/04, I questioned Nortel employees Ron Horn, Director – Technical R&D, and Mark Weisz, Director of International Tax, regarding the termination of research in Japan. They indicated that the research performed in the Japanese labs benefited the Japanese market. Due to changes within the Japanese market, there was no longer a need for a lab. Accordingly, research there was terminated and special provisions were made in the 2000-2004 APA submission to compensate Japan (through a split of the residual profits) for the previous research it performed as a cost share participant.
[5]  In March, 2002 Nortel submitted a new comprehensive APA to replace the transfer pricing methodologies approved under the former APAs (i.e. R&D CSA APA, Headquarters Expense CSA APA, and Tangible Property Sales APA). The 2000-2004 APA submission proposes the use of the Residual Profit Split (RPS) methodology for related party transactions. In the economic analysis of that submission, pg 2, footnote 1, additional information is provided relative to Northern Telecom do Brasil

Department of the Treasury -- Internal Revenue Service                              Form 886-A

Iss 526-050 - R&D CSA Alloc - 98 & 99 - 886-A    Modified on 02-22-05.doc                    Page 2

| Form 886-A | EXPLANATION OF ADJUSTMENTS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>Nortel Networks, Inc. & Subsidiaries | | Year/Period Ended<br><br>1998 and 1999 |

the development of intangibles. However, the scope of the examination was ultimately limited to costs incurred by three of the cost share participants (i.e. Canada, UK, and the US) due to the minimal research performed, and amount of costs incurred, by all other cost share participants. Analysis of the cost share agreement indicates that Nortel allocated R&D global pool expenses to the cost share participants based upon three income streams, royalties[6], net customer sales[7], and modified operating income[8] as described in detail below[9]. A determination was made, with regard to the scope of the examination, to accept the income amounts as reported by Nortel in the R&D CSA APA Annual Report without further analysis for purposes of computing the R&D expense allocation formula. Accordingly, examination of the allocation of R&D among cost share participants was limited to audit of only the expense component of the allocation formula.

During the examination of this issue, meetings were held to determine the process used by Nortel to approve and fund R&D, account for and monitor R&D costs, and identify expenses qualifying for inclusion in the R&D global pool. It was determined that Nortel captured and monitored R&D costs through a software program known as "Hyperview". The Hyperview system captures costs related to over 900 R&D expense accounts, such as professional fees, legal services, laboratory materials, etc. Each expense is referred to as a "TOE" ("type of expense") and assigned a three-digit number for accounting, monitoring, and internal reporting purposes. Certain expenses (TOEs) were identified for examination based upon materiality and/or their questionable/unusual nature as an intangible development expense. In addition, expenses were analyzed to verify that manufacturing, quality testing, warranty, and similar costs were not included in the global pool as expenses attributable to the

---

Industria e Comercio Ltda (Nortel Brazil). There it states, "Northern Telecom do Brasil Industria e Comercio Ltda ("Nortel Brazil"), a Brazilian manufacturer, executed an R&D cost sharing agreement with Nortel but, for reasons associated with Brazilian tax law, did not effectively share in R&D expenses with the other former participants. ..." In a 05/28/04 interview with Ron Horn & Mark Weisz, I was advised that there was relatively little activity in Brazil. There were 10-20 working within R&D operations. In 1999, Brazil experienced their biggest involvement in R&D. It was significantly decreased in 2000 and further decreased in 2001.

[6] Royalty income is defined in the R&D CSA APA, pg 7, as, "income (net of any income paid to other Cost Sharing Participants and which is included in such other Cost Sharing Partipant's Royalty Income) generated during and APA year through the licensing of NT Technology."

[7] Customer sales less discounts and returns, R&D CSA APA, pg 5.

[8] To give significance and meaning to the term "Modified Operating Income", without providing the complex formula as outlined in the R&D APA, suffice it to say that this term represents operating income of the cost share participant modified to eliminate the effects of intercompany sales.

[9] Under the R&D CSA APA, as described in pages 13 and 14 of the APA, the amount of R&D expenses allocated to NNI for an APA year would be computed in two steps: (1) The amount of R&D expenses to be attributed to royalty income will be determined, then allocated between NNL and NNI, and (2) The "residual" amount of R&D expense (i.e. total R&D less the R&D allocated to royalty income) would be allocated between NNL & NNI in the following manner: (a) 10% of the "residual" for the year would be allocated between NNI and NNL on the basis of "Net Customer Sales" and (b) 90% of the "residual" shall be allocated between NNL and NNI on the basis of "Modified Operating Income".

---

| Form 886-A | EXPLANATION OF ADJUSTMENTS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>Nortel Networks, Inc. & Subsidiaries | | Year/Period Ended<br><br>1998 and 1999 |

development of intangibles. The spreadsheets supporting this issue write-up reflect the results of the examination of those R&D expenses (TOEs). As previously stated, the R&D expenses of only Canada, UK, and US were examined for tax years 1998 and 1999. IDRs were issued to test a sample[10] of general ledger transactions (hereafter referred to as "tested transactions") within each of the examined expenses. All three cost share participants (CSPs) were examined with regard to certain expenses, such as salaries, awards, and bonuses, due materiality and to determine Nortel's level of compliance with IRC § 482 and Treasury Regulations §§ 1.482-7 and 1.482-5(d)(3). However, in certain instances, the R&D costs of only one or two of the three CSPs was/were examined. This difference in examination treatment is attributable to differences in materiality between expense amounts claimed by each CSP within a given expense category. In all cases, the results of the sampled transactions have been projected or extrapolated over the total population of costs for that expense (TOE), for that cost share participant, and only for that year. The following example illustrates the examination technique employed with regard to R&D costs. Assume that US expenses for Consulting Services, TOE 811, was examined for tax year 1998. In addition, assume that 15 transactions were tested and the taxpayer provided no substantiation for one of the tested transactions. However, the taxpayer did provide substantiation for the remaining 14 tested transactions. Further assume that, after review of the taxpayer's documentation, it was determined that costs associated with only 12 of the transactions were qualifying as R&D costs related to the development of intangibles. Accordingly, 80% (12/15) of the U.S. tested transactions for Consulting Services for 1998 were determined to be qualifying for inclusion in the R&D global pool. Those examination findings would be projected or extrapolated across the total population of U.S. costs for Consulting Services for 1998. Those findings would not be extrapolated into tax year 1999 for the US, nor would those findings be extrapolated over the population of costs for Consulting Services for Canada or the UK in tax year 1998 or 1999.

The above examination technique was employed in all instances except the following: (1) non-qualifying costs (also referred to as "taxpayer conceded costs"), (2) salaries and benefits, and (3) awards and bonuses. With regard to the first category of expenses, "Non-qualifying costs or Taxpayer Conceded Costs", review of the list of expenses included in the R&D global pool
indicated inclusion of certain non-qualifying costs, such as "Club Dues and Membership Fees", TOE 650, "Gifts", TOE 835, "Charitable Contribution—Canada Cash Payment", TOE 832, etc. The taxpayer was questioned regarding these, and similar, expenses. Ultimately, in a meeting on 10/01/03, Nortel conceded the inclusion of certain expenses in the R&D global pool. Included in the list of expenses Nortel conceded were software and hardware costs that should have been capitalized, rather than expensed. Accordingly, as part of this examination, those costs have been capitalized and an allowance for depreciation and amortization has been provided pursuant to IRC §§ 167 and 168. Also included in the list of conceded

---

[10] The "sample" referred to above represents a judgment sample based upon materiality and/or unusual items identified from review of general ledger postings (e.g. miscellaneous descriptions, etc.). It was not feasible, in the examination of this issue, to conduct a statistical sample of R&D global costs due to taxpayer and IRS resource limitations and time constraints.

Department of the Treasury -- Internal Revenue Service                                    Form 886-A

| Form 886-A | EXPLANATION OF ADJUSTMENTS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>Nortel Networks, Inc. & Subsidiaries | | Year/Period Ended<br><br>1998 and 1999 |

expenses were several types of expenses (TOEs) that contained meal and entertainment costs. Subsequently, on 06/21/04, Nortel requested that they be given consideration for 50% of the meals and entertainment that they previously conceded, due to their classification as a qualifying business expense under the Internal Revenue Code. Due to the immateriality of the overall expenses, and the late stage of the examination, it was determined that the expenses would be allowed, subject to the 50% limitation, without further examination.

Salaries and benefits were examined to determine whether costs were included in the R&D global pool that were unrelated to the development of intangibles. Based upon information Nortel provided in response to IDRs, and through the assistance of the Computer Audit Specialists (CASs), those employees included in the R&D pool were identified by name, position description/job code, global ID number, number of months worked each year, and "pay band"[11]. For purposes of this examination, tasks performed by managers in Pay Band 8 and above from operational functions other than R&D (e.g. Finance, Human Resources, Executives, Marketing, etc) were analyzed to determine how the various employees responsibilities related to the development of intangibles. The Engineers assigned to the case conducted interviews of certain R&D personnel for purposes of examining the U.S. R&E credit. Although those interviews were conducted for R&E credit purposes, they identify the "nature" of the tasks performed by the employee(s) interviewed. It is the "nature" of the tasks performed, and the relationship of those tasks to the development of intangibles, that governs the inclusion of those salaries and benefits in the R&D global pool pursuant to IRC § 482 and the underlying Treasury Regulations. Based upon the information provided by Nortel and review of the Engineer interview notes, a list of non-qualifying employees was prepared and their respective salaries and benefits were computed to be removed from the R&D global pool. Nortel was advised of the tentative change to salaries and benefits. Accordingly, Nortel provided additional information to justify their inclusion of salaries and benefits of Band 8 and above managers from non-R&D functions in the R&D global pool. In certain cases, Nortel asked their employees to provide written narratives of the tasks and functions they performed in relation to R&D. Based upon analysis of the additional documentation provided, modifications were made to allow the inclusion of additional salary and benefits costs for Band 8 and above non-R&D function managers for whom Nortel could establish a relationship to intangibles development (e.g. Finance employees devoted to providing funding for R&D operations, Human Relations employees devoted to staffing R&D labs, etc.) However, other job codes/position descriptions are determined to be non-qualifying for inclusion in the pool after review of the additional information/documentation provided, employee narratives, and review of the Engineer interviews (e.g. Troubleshooters, Customer Service Reps, etc.) Nortel's records were inspected to determine that allocations of time between R&D and non-R&D functions were properly made for those salaries determined to be qualifying for inclusion in the global pool. It was determined that proper allocations of time were made. Accordingly, the adjustment related to salaries and benefits is attributable only to the disallowance of compensation costs that were determined to be non-related to the development of intangibles, based upon functions performed. No portion of the salaries adjustment is attributable to the allocation of time spent in R&D and non-R&D functions. It is important to

---

[11] "Pay Band" refers to the compensation level for particular position descriptions/job codes.

Department of the Treasury -- Internal Revenue Service                                    Form 886-A

Iss 526-050 - R&D CSA Alloc - 98 & 99 - 886-A   Modified on 02-22-05.doc              Page 5

| Form 886-A | EXPLANATION OF ADJUSTMENTS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>Nortel Networks, Inc. & Subsidiaries | | Year/Period Ended<br><br>1998 and 1999 |

emphasize that the scope of this examination was limited to consideration and analysis of only Pay Band 8 and Above Managers. Due to resource limitations and time constraints, no examination of salaries and benefits was conducted related to non-supervisory employees or management level employees that fall below pay band 8.

Awards and bonuses were examined to determine the nature of the awards and bonuses and to establish the relationship to R&D. An IDR was issued requesting records to support all awards and bonuses paid to Canadian, UK, and US employees for 1998 and 1999. Nortel provided substantiation (i.e. employee name, global ID#, and nature/basis) for the awards and bonuses paid to U.S employees. However, no documentation was provided to support the awards and bonuses paid to Canadian and UK employees. In response to IDRs INT-0077, INT-0078, and INT-0079, Nortel replied, "...Please note that the information enclosed within this response pertains to the U.S. piece only, as that was the only piece readily available. We have not been able to obtain usable data from Canada or the UK due to system issues. If we are able to obtain this data at a later date we will submit it as a supplemental response." Based upon review of the IDR response, it was determined that Nortel included all awards and bonuses paid to R&D employees in the global pool, regardless of the nature of the award or bonus and without regard to the existence of a relationship between the award payment and the development of intangibles. Based upon review of the information provided by Nortel, which includes a list of the types of awards and bonuses paid and a description of the basis for the payment, it was the government's position that 64.2% and 48.7% of the U.S. awards and bonuses qualified for inclusion in 1998 and 1999, respectively, due to their relationship to the development of intangibles. Nortel was notified of the government's concerns regarding the lack of documentation for Canadian and UK awards and bonuses, and a follow-up IDR was issued that requested documentation to substantiate specific tested transactions from the general ledgers of Canada and the UK. Nortel responded by providing documentation for the Canadian and UK tested transactions. The documentation provided employee names, ID numbers, and amounts paid. However, Nortel indicated that they were unable to provide the basis for, or the nature of, the award and bonus payments for Canadian and UK employees. In light of that fact, the government was unable to determine the amount of Canadian and UK awards and bonuses that were paid as a result of the development of intangibles. However, it was reasonable to believe that Nortel would have incurred Canadian and UK award and bonus costs related to the development of intangibles in 1998 and 1999 that would qualify for inclusion in the R&D global pool. Accordingly, since adequate records exist to establish the percentage of qualifying awards and bonuses for U.S. purposes, a determination was made to project or extrapolate the allowable US percentages to Canadian and UK award and bonus costs in an attempt to provide for some measure of reasonableness. It is important to note that this exam technique was applied only to the examination of Awards and Bonuses, TOEs 131, 132, and 134 as a concession to Nortel and was not intended to serve as a precedent to be applied to the examination of other expenses included in the R&D global pool. On 08/16/04, a conference call was conducted between Nortel and the IRS to discuss the results of the examination of the R&D global pool of expenses. In that conference call, Nortel indicated that they objected to the disallowance of awards and bonuses when they had provided evidence that the awards and bonuses in question were paid to R&D employees. Furthermore, Nortel indicated that they felt that the inclusion of awards and bonuses in the

Department of the Treasury -- Internal Revenue Service                    Form 886-A

| Form 886-A | EXPLANATION OF ADJUSTMENTS | Schedule No.or Exhibit |
|---|---|---|
| Name of Taxpayer  Nortel Networks, Inc. & Subsidiaries | | Year/Period Ended  1998 and 1999 |

R&D global pool should be determined by the functions performed by the individuals to whom the awards/bonuses were paid, rather than by the "nature" of the payment itself and whether or not the payment could be traced to the development of intangibles. Nortel requested that further consideration be given to the awards/bonuses. It was determined that further research was warranted. In addition, it was determined that contact with the International Technical Advisor and International Counsel was warranted to ensure that uniformity existed between the government's position with regard to the awards and bonuses paid by Nortel and the position taken by the government with regard to awards and bonuses in other cases. Based upon the additional research performed and the guidance received, it was ultimately determined that the awards and bonuses paid to employees performing R&D functions were qualifying for inclusion in the R&D global pool. Accordingly, modifications were made to allow the awards and/or bonuses paid to US, Canadian, and UK, R&D employees as qualifying costs for inclusion in the R&D global pool.

The results of this examination are reflected in more detail on an expense-by-expense (i.e. TOE-by-TOE) basis in the spreadsheets and footnotes associated with this write-up. In summary, the total adjustments to the R&D global pool costs are primarily attributable to two factors. It was determined that certain costs were included in the R&D global pool that did not qualify for inclusion because the costs were attributable to functions other than R&D and a relationship could not be established between the incurred costs and the development of intangibles. In other instances, Nortel was unable to provide substantiation for tested transactions. Accordingly, the costs attributable to those transactions were disallowed.

## LAW AND ARGUMENT:

Internal Revenue Code § 482, and the underlying Treasury Regulations, govern tangible and intangible transfer pricing issues between related parties. Cost sharing agreements are specifically governed by Treasury Regulations §1.482-7. In Treasury Regulations §1.482-7(a) it states, "a cost sharing arrangement is an agreement under which the parties agree to share the costs of development of one or more intangibles in proportion to their shares of reasonably anticipated benefits[12] from their individual exploitation of the interests in the intangibles assigned to them under the arrangement." Costs that are qualifying for inclusion in the R&D global pool are defined in Treasury Regulations §1.482-7(d)(1) as the "...costs of developing intangibles for a taxable year mean of all of the costs incurred by that participant related to the intangible development area, plus all of the cost sharing payments it makes to other controlled and uncontrolled participants, minus all of the cost sharing payments it receives from other controlled and uncontrolled participants. Costs incurred related to the intangible development area consist of the following items: operating expenses as defined in §1.482-5(d)(3)[13], other

---

[12]  Treasury Regulations §1.482-7(e)(2) Reasonably anticipated benefits. For purposes of this section, a controlled participant's reasonably anticipated benefits are the aggregate benefits that it reasonably anticipates that it will derive from covered intangibles.

[13]  Treasury Regulations §1.482-5(d)(3) defines "Operating Expenses" as, "...all expenses not included in cost of goods sold except for interest expense, foreign income taxes (as defined in § 1.901-2(a)), domestic income taxes, and any other expenses not related to the operation of the relevant business

Department of the Treasury -- Internal Revenue Service                              Form 886-A

Iss 526-050 - R&D CSA Alloc - 98 & 99 - 886-A   Modified on 02-22-05.doc                Page 7

| Form 886-A | EXPLANATION OF ADJUSTMENTS | Schedule No.or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>Nortel Networks, Inc. & Subsidiaries | | Year/Period Ended<br><br>1998 and 1999 |

than depreciation or amortization expense, plus (to the extent not included in such operating expenses, as defined in §1.482-5(d)(3)) the charge for the use of any tangible property made available to the qualified cost sharing arrangement. ..." The spreadsheets associated with this issue write-up identify the R&D costs examined during the course of this exam. As stated in §1.482-7, costs qualifying for inclusion in the global pool must be related to the development of intangibles. In addition, adequate documentation must exist to establish the nature of the costs and to determine the relationship of those costs to the development of intangibles. The maintenance of records is required as stipulated in Treasury Regulations §1.6038A. Treasury Regulations § 1.6038A-3 addresses record maintenance. There it states, "(a) General maintenance requirements--(1) Section 6001 and section 6038A. A reporting corporation must keep the permanent books of account or records as required by section 6001 that are sufficient to establish the correctness of the federal income tax return of the corporation, including information, documents, or records ("records") to the extent they may be relevant to determine the correct U.S. tax treatment of transactions with related parties. Under section 6001, the District Director may require any person to make such returns, render such statements, or keep such specific records as will enable the District Director to determine whether or not that person is liable for any of the taxes to which the regulations under Part I have application. See section 6001 and the regulations thereunder. Such records must be permanent, accurate, and complete, and must clearly establish income, deductions, and credits. Additionally, in appropriate cases, such records include sufficient relevant cost data from which a profit and loss statement may be prepared for products or services transferred between a reporting corporation and its foreign related parties. This requirement includes records of the reporting corporation itself, as well as to records of any foreign related party that may be relevant to determine the correct U.S. tax treatment of transactions between the reporting corporation and foreign related parties. The relevance of such records with respect to related party transactions shall be determined upon the basis of all the facts and circumstances. Section 6038A and this section provide detailed guidance regarding the required maintenance of records with respect to such transactions and specify penalties for noncompliance. ..."

## TAXPAYER'S POSITION:
The taxpayer is in agreement with this position. On 10/04/04, IRS issued Letter 1853, notifying Nortel of their rights to request competent authority relief. On 12/15/04, Nortel filed a request for relief with the US Competent Authority for tax years 2000 and 2001. On 12/21/04, pursuant to Section 9.02 of Rev. Proc. 2002-52, Nortel filed a joint notification with the US, UK, and Canadian Competent Authorities advising of their desire to obtain competent authority relief related to the transfer pricing adjustments. However, Nortel recently completed a restatement of their financials. Pursuant to their written request, Nortel desires competent authority relief once the tax impacts of the restated financials can be determined.

## CONCLUSION:

---

activity. Operating expenses ordinarily include expenses associated with advertising, promotion, sales, marketing, warehousing and distribution, administration, and a reasonable allowance for depreciation and amortization."

| Form 886-A | EXPLANATION OF ADJUSTMENTS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer<br>Nortel Networks, Inc. & Subsidiaries | | Year/Period Ended<br>1998 and 1999 |

Based upon examination of the information and documentation provided in meetings, responses to IDRs, review of the Engineer's R&D employee interview notes, and review of the Amended R&D Cost Share Agreement and related Termination Agreement, it is the government's position that adjustments are warranted to the costs qualifying for inclusion in the R&D global pool. As a result of the adjustments to those costs, changes to the R&D Cost Share Agreement allocations are proposed for tax years 1998 and 1999. These adjustments are proposed under the authority of IRC § 482 and Treasury Regulations §§1.482-7, 1.482-5(d)(3) and §1.6038A.

**Note from IE:** See Form 1042 International Exam Report, and the corresponding Form 886-A write-up, for the correlative adjustment warranted under Treas. Regs. § 1.482-1(g). As stated elsewhere in this write-up, Nortel has recently restated their financials. On 02/21/05, Nortel filed a request for relief under Rev. Proc. 65-17 and 99-32, allowing for the tax free repatriation of cash attributable to the correlative adjustment via an interest-bearing accounts receivable. That action did constitute a timely election, pursuant to the Rev. Proc., because it was received prior to the taxpayer taking closing action on the IRC § 482 adjustment. However, as a result of the restatement, and the uncertainty of the impact of that restatement upon Nortel's tax returns and the exam adjustments proposed during the 1998-2001 exam cycle, IRS is currently unable to enter into a closing agreement with Nortel. Accordingly, a deemed dividend and applicable withholdings tax is being proposed as the correlative adjustment under Treas. Regs. § 1.482-1(g). As a result of the restatement, the IRS is currently unable to determine Nortel's current and accumulated E&P. Upon computation of that amount by Nortel, if it is determined that current and accumulated E&P is lower than the proposed adjustment for withholdings, the proposed adjustment should be revised to reflect a conforming adjustment of only the amount up to the current and accumulated E&P amounts.

| Department of the Treasury -- Internal Revenue Service | Form 886-A |
|---|---|
| Iss 526-050 - R&D CSA Alloc - 98 & 99 - 886-A   Modified on 02-22-05.doc | Page 9 |