## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

## NOTICE OF FILING OF TWENTY-FIRST REPORT OF THE MONITOR OF THE CANADIAN NORTEL COMPANIES IN THE CANADIAN PROCEEDINGS

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

**PLEASE TAKE NOTICE** that on September 25, 2009, Ernst & Young Inc., the Monitor and foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation, in proceedings under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List), by its undersigned counsel, filed, in the above-captioned cases, a copy of the Twenty-First Report of the Monitor (the **"Twenty-First Report"**), dated September 24, 2009. A copy of the Twenty-First Report is annexed hereto as Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Twenty-First Report is also available on the Monitor's website, www.ey.com/ca/nortel or upon request to the Monitor's counsel.

Dated: Wilmington, Delaware
September 25, 2009

ALLEN & OVERY LLP

Ken Coleman
Lisa Kraidin
1221 Avenue of the Americas
New York, New York 10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
ken.coleman@allenovery.com
lisa.kraidin@allenovery.com

-and-

BUCHANAN INGERSOLL & ROONEY

By: /s/ Mary F. Caloway
Mary F. Caloway (No. 3059)
Peter J. Duhig (No. 4024)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
Telephone (302) 552-4200
Facsimile (302) 552-4295
mary.caloway@bipc.com

Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian Nortel
Group

2

## EXHIBIT A

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE COMPANIES' CREDITORS**
**ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION (the**
**"Applicants")**

**TWENTY-FIRST REPORT OF THE MONITOR**
**DATED SEPTEMBER 24, 2009**

**INTRODUCTION**

1.   On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
     collectively with all its subsidiaries, "Nortel" or the "Company"), Nortel Networks
     Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks
     International Corporation and Nortel Networks Global Corporation (collectively, the
     "Applicants") filed for and obtained protection under the *Companies' Creditors*
     *Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated
     January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was
     appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceeding.
     The stay of proceedings was extended to October 30, 2009, by this Honourable Court in
     its Order dated July 30, 2009.

2.   Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed
     voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the

U.S. Court on January 14, 2009. As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009. In addition, an ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as those in the U.S. (the "Bondholder Group").

3.    Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

4.    Nortel Networks UK Limited and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed.

5.    On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

6.    Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

**PURPOSE**

7.      The purpose of this Twenty-First Report of the Monitor (the "Twenty-First Report") is to
        provide support for the Applicants' motion with respect to approval to conduct a sales
        process (the "Sales Process") to market certain assets (the "Assets") associated with
        Nortel's Next Generation Packet Core ("NG-PC") research and development ("R&D")
        activities.

**TERMS OF REFERENCE**

8.      In preparing this Twenty-First Report, EYI has relied upon unaudited financial
        information, the Company's books and records, financial information prepared by the
        Company and discussions with management of Nortel. EYI has not audited, reviewed, or
        otherwise attempted to verify the accuracy or completeness of the information and,
        accordingly, EYI expresses no opinion or other form of assurance on the information
        contained in this Twenty-First Report.

9.      Unless otherwise stated, all monetary amounts contained herein are expressed in
        Canadian dollars.

10.     Capitalized terms not defined in this Report are as defined in the Affidavit of John
        Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Sale Procedures (as
        defined below) or previous Reports of the Monitor.

**GENERAL BACKGROUND**

11.     Nortel is a technology company that designs, develops and deploys communication
        products, systems, and solutions to its carrier and enterprise customers around the globe.
        Its principal assets include its people, the intellectual property derived and maintained
        from its R&D activities, its customers and other significant contracts and agreements.

- 3 -

**THE NEXT GENERATION PACKET CORE ASSETS**

12.    NG-PC is a sub-unit of Nortel's wider Carrier Networks' ("CN") wireless business that develops network components designed to provide data network connectivity for GPRS (General Packet Radio Service), UMTS (Universal Mobile Telecommunications Systems) and LTE (Long Term Evolution) wireless technologies and increase network bandwidth for multimedia content and applications over wireless networks. Following a joint hearing on July 28, 2009, Orders were issued by this Honourable Court and the U.S. Court approving a sale of substantially all of Nortel's assets related to the CDMA and LTE-access portions of the CN business to Telefonaktiebolaget L M Ericsson (publ); however, the NG-PC Assets were not included in that sale.

13.    NG-PC operations are conducted principally out of Nortel's R&D centre of excellence in Richardson, Texas. Approximately 40 NNI employees (the "Employees") are presently employed in connection with NG-PC activity. Approximately 95 third party contract employees are presently engaged through out-sourcing arrangements in connection with the NG-PC operations.

14.    As with other Nortel technologies, the underlying intellectual property associated with the NG-PC Assets is owned by NNL and is subject to various inter-company licensing agreements. NNI owns the fixed assets associated with the NG-PC operations.

15.    NG-PC conducts R&D activities to develop the following components:

- A Next Generation Serving GPRS Support Node ("SGSN") on Advance TeleComputing Architecture ("ATCA");

- A Next Generation Gateway GPRS Support Node ("GGSN") on ATCA;

- A Mobility Manager Element ("MME") on ATCA;

- An AGW Serving Gateway on ATCA;

- An AGW Packet Data Gateway on ATCA; and

- 4 -

- A Network Element Manager associated with each of the above.

16.    Nortel has made considerable R&D investments in its NG-PC product offerings.

17.    The NG-PC products are being developed from technology based on Nortel's legacy packet core solutions with the goal of readineess for commercial deployment by mid-2010. In advance of this commercial deployment, a number of large wireless carriers are in the early stages of testing and selecting product offerings that will include the NG-PC components described above.

18.    Nortel currently has no customer contracts for its NG-PC products.

19.    On May 26, 2009, NNL agreed to provide Hitachi Communication Technologies, Ltd. ("Hitachi") with a non-exclusive license for its LTE MME product (i.e. a specific technology that is part of the NG-PC Business) pursuant to a License Agreement between NNL and Hitachi dated May 26, 2009 (the "License Agreement"). Under the License Agreement, Hitachi's use of the LTE MME product is limited to the development of a network for a particular Hitachi customer in Japan. The License Agreement was approved by this Honourable Court on June 1, 2009, and is not intended to be affected by the proposed Sales Process.

20.    Nortel, as a result of its ongoing restructuring, has not been able to successfully pursue requests for proposals from prospective customers for its NG-PC products. As such, Nortel believes that it is in its best interest to divest the Assets in a relatively expedient manner in order to maximize value realized from these Assets. Nortel believes that any significant delays in doing so could result in a material reduction in value to a buyer which will result in a lower transaction value.

21.    The draft Transaction Agreement, a copy of which is attached as Appendix "A" hereto, contemplates that the divestiture of the Assets will be structured as follows:

- An assignment of Nortel owned non-patent intellectual property ("IP") (i.e. software) predominantly used in the NG-PC products;

- A non-exclusive license in the appropriate field of use of Nortel owned non-patent IP used in the NG-PC products but not assigned to the purchaser;

- A global, non-exclusive license of Nortel owned patent IP used in the NG-PC products;

- A mechanism permitting a purchaser to make offers of employment to the Employees; and

- The transfer of certain fixed assets predominantly used in the NG-PC operations (primarily R&D lab assets, tools and testing equipment).

22.    It is contemplated that in connection with the Transaction Agreement, the purchaser and the relevant Nortel parties will also enter into a Transition Services Agreement and an Intellectual Property License Agreement.


**THE SALES PROCESS**

23.    The NG-PC Assets have been the subject of a sale process for approximately six months. From March through June, 2009, Nortel, with the assistance of its investment banker, Lazard Frères & Co., contacted buyers who it thought might be interested in acquiring the NG-PC Assets. Following this, Nortel short listed nine potential buyers who were contacted to execute a project-specific non-disclosure agreement ("NDA"). Of these, five executed the NDA and were provided with a Confidential Information Memorandum and access to the management team for additional diligence. To date, management presentations have been made to three of the five potential buyers who executed NDAs. Access to an electronic data room was provided to any party who provided an expression of interest.

24.    At this time, Nortel has determined that it should conduct an expedited, court-approved Sales Process as a means of completing a definitive transaction in respect of the Assets. In connection with the Sales Process, the Applicants are seeking approval of certain sale

procedures (the "Sale Procedures"), a copy of which is attached as Appendix "B" hereto. The Sale Procedures provide, in part, as follows:

- Communication with Potential Interest Parties. The Sellers will contact parties who have expressed an interest in acquiring the Assets in the last six months to invite them to participate in the Sales Process. The Sellers also may contact such other or additional potential interested parties to invite them to participate in the Sales Process. The Sellers will also entertain unsolicited requests from qualified persons to participate in the Sales Process.

- Participation Requirements. Unless otherwise ordered by both the U.S. Court and this Honourable Court, for cause shown, or as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), in order to participate in the Sales Process, each person who wishes to participate in the Sales Process (a "Potential Bidder") will be required to execute a confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of the Assets. A Potential Bidder who delivers a Confidentiality Agreement and who the Sellers determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is likely to submit a bid that will constitute a Qualified Bid (defined below) will be deemed a "Qualified Bidder."

- Due Diligence. As promptly as practicable after a Potential Bidder becomes a Qualified Bidder, the Sellers will provide such Qualified Bidder with a confidential information memorandum containing information in respect of the Assets, access to an electronic data room, and a form of the Transaction Agreement (and related agreements and schedules) that is acceptable to the Sellers. Due diligence access may include management presentations and such other matters as may be reasonably requested by a Qualified Bidder and as to which the Sellers, in their reasonable business judgment, may agree. No additional due

diligence will continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise.

- Bid Deadline. A Qualified Bidder who desires to make a bid will deliver written copies of its bid to the Notice Parties so as to be received not later than October 16, 2009, at 4:00 p.m. (ET) (the "Bid Deadline") by the Sellers. The Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders and the other Notice Parties of such extension.

- Qualified Bid. A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous provision and complies with all of the following (a "Qualified Bid"):

  o it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Transaction Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or upon alternative terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholders Committee and the Monitor, provide maximum value to the estates;

  o it states that the bidder's offer is irrevocable until the closing of the Sale;

  o it includes a duly authorized and executed Transaction Agreement, reflecting, if any, the Qualified Bidder's proposed amendments and modifications thereto,

- 8 -

as well as the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules to the Transaction Agreement, including a license agreement and a transaction services agreement, and/or any additional ancillary agreements required in connection with the sale of the Assets (the "Sale" or "Transaction"), with all exhibits and schedules thereto, (or term sheets that describe the material terms and provisions of such agreements) and copies of such materials marked to show those amendments and modifications to the Transaction Agreement ("Marked Agreement") and to such ancillary agreements (the "Marked Ancillary Agreements");

o   it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreement and the Marked Ancillary Agreements;

o   it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

o   it fully discloses the identity of each entity that will be purchasing the Assets;

o   it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the Marked Agreement or the Marked Ancillary

Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

o it includes evidence, in form and substance satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

o it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to the greater of 5% of the Purchase Price or $1,000,000 to be dealt with in accordance with the "Good Faith Deposit" provision of the Sale Procedures;

o it contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will be offered employment by the Qualified Bidder and any proposed measures associated with their continued employment;

o it contains other information reasonably requested by the Sellers; and

o it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified in the Sale Procedures and deem such bids to be Qualified Bids. The Sellers shall notify any Qualified Bidders in writing as to whether or not their bid constitutes a Qualified Bid promptly following the expiration of the Bid Deadline.

• Evaluation of Competing Bids. A Qualified Bid will be evaluated based upon several factors including, without limitation, items such as the Purchase Price and

the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed and certainty of closure, the value of the Transaction, the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor. Following their review of the Qualified Bids and in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, the Sellers reserve the right, in their sole discretion, to (i) negotiate the terms and conditions of one or more Qualified Bids, with or without notice to any other Qualified Bidder(s) with a view to selecting one successful bid (the "Successful Bid"), (ii) without further negotiation or notice to any Qualified Bidder, select one Qualified Bid as the Successful Bid, or (iii) reject all Qualified Bids and/or withdraw from sale, in whole or in part, any Assets.

- <u>No Qualified Bids</u>. If the Sellers do not receive any Qualified Bids, the Sellers reserve the right, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, to (i) extend the deadlines set forth in the Sale Procedures without further notice, and (ii) withdraw from sale, in whole or in part, any Assets at any time and to make subsequent attempts to market the same.

- <u>Successful Bid</u>. To the extent that the Sellers select a Successful Bid in accordance with the "Evaluation of Competing Bids" provision of the Sale Procedures, the Sellers shall file a notice of the Successful Bid and the purchaser under the Successful Bid (the "Successful Bidder") with the Bankruptcy Court and seek

approval from the U.S. Court and this Honourable Court of the Transaction Agreement, which approval will include authorization to sell the Assets free and clear of all liens, claims and encumbrances.    The U.S. Court has currently scheduled a hearing to approve the sale of the Assets for October 28, 2009, at 2:00 p.m. (ET), which hearing may be adjourned, rescheduled or cancelled at the U.S. Debtors' discretion.   The Monitor understands that the Applicants will seek to schedule a sale approval motion for the NG-PC Business before this Honourable Court on or about October 28, 2009, as well.

- <u>Good Faith Deposits</u>. The Good Faith Deposit of any bidder shall be retained by the Sellers until the close of the Sale and returned to any unsuccessful bidder within five (5) Business Days thereafter.    The Good Faith Deposit of the Successful Bidder will become nonrefundable upon the approval by the U.S. Court and this Honourable Court of the Sale to the Successful Bidder and will be applied toward the Purchase Price.

- <u>Reservation of Rights</u>. The Sellers reserve the right in their discretion, after consultation with the Committee, the Bondholder Group and the Monitor, to (i) impose additional terms and conditions and otherwise modify the Sale Procedures at any time; (ii) extend the deadlines set forth in the Sale Procedures without further notice; (iii) withdraw from sale any Assets at any time and make subsequent attempts to market the same; and (iv) reject all bids.

**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

25.    The Monitor is of the view that the Sales Process described above is designed to provide a commercially reasonable approach for Nortel to attempt to maximize value for its NG-PC Business.   The Monitor will be involved in the Sales Process.   Accordingly, the Monitor recommends that the Applicants' motion for approval of the Sale Procedures be approved by this Honourable Court.

All of which is respectfully submitted this 24th day of September, 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

**APPENDIX "A"**

**Draft Transaction Agreement**

**[Attached.]**

DRAFT OF SEPTEMBER 21, 2009

# TRANSACTION AGREEMENT

## BY AND AMONG

## NORTEL NETWORKS LIMITED,

## NORTEL NETWORKS INC.

## AND

## [PURCHASER]

## DATED AS OF [        ], 2009

# TABLE OF CONTENTS

Page

ARTICLE I       INTERPRETATION

    Section 1.1.    Definitions...................................................................................... 2
    Section 1.2.    Interpretation................................................................................ 13

ARTICLE II      PURCHASE AND SALE OF ASSETS

    Section 2.1.    Purchase and Sale ........................................................................ 14
    Section 2.2.    Purchase Price................................................................................ 15
    Section 2.3.    Closing .......................................................................................... 16

ARTICLE III     REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

    Section 3.1.    Organization and Corporate Power.................................................. 17
    Section 3.2.    Authorization; Binding Effect; No Breach ........................................ 17
    Section 3.3.    Financing........................................................................................ 18
    Section 3.4.    Purchaser's Acknowledgments; Exclusivity of Representations
                 and Warranties ............................................................................... 18
    Section 3.5.    Brokers.......................................................................................... 19

ARTICLE IV      REPRESENTATIONS AND WARRANTIES OF THE SELLERS

    Section 4.1.    Organization and Corporate Power.................................................. 19
    Section 4.2.    Authorization; Binding Effect; No Breach ........................................ 19
    Section 4.3.    Title to Tangible Assets .................................................................. 20
    Section 4.4.    Seller Contracts.............................................................................. 20
    Section 4.5.    Intellectual Property........................................................................ 21
    Section 4.6.    Labor and Employee Benefits Matters ............................................ 21
    Section 4.7.    Brokers.......................................................................................... 22
    Section 4.8.    Valid Transfers............................................................................... 22
    Section 4.9.    Interdependency Schedule ............................................................. 23
    Section 4.10.   EMEA Debtors unrelated to Business or Assets............................... 23
    Section 4.11.   Sellers' Acknowledgment; Exclusivity of Representations and
                 Warranties ..................................................................................... 23

ARTICLE V       COVENANTS AND OTHER AGREEMENTS

    Section 5.1.    U.S. Bankruptcy Actions ................................................................ 23
    Section 5.2.    Canadian Bankruptcy Actions ......................................................... 24
    Section 5.3.    Consultation; Notification................................................................ 24
    Section 5.4.    Pre-Closing Cooperation................................................................. 25
    Section 5.5.    Public Announcements .................................................................... 25
    Section 5.6.    Post-Closing Cooperation ............................................................... 26
    Section 5.7.    Conduct of Business ....................................................................... 26

Error! Unknown document
property name.

Section 5.8.     Transaction Expenses...................................................................... 27
Section 5.9.     Confidentiality ............................................................................... 27
Section 5.10.    Delivery of Assets.......................................................................... 27
Section 5.11.    Termination of Overhead and Shared Services ................................. 27
Section 5.12.    Insurance Matters........................................................................... 28
Section 5.13.    Use of Trademarks.......................................................................... 28
Section 5.14.    Sellers' Accessible Information; Cooperation .................................... 28
Section 5.15.    Maintenance of Books and Records ................................................. 29
Section 5.16.    Casualty........................................................................................ 29
Section 5.17.    Cooperation on Seller Contracts ....................................................... 30

ARTICLE VI     TAX MATTERS

Section 6.1.     Transfer Taxes ............................................................................... 30
Section 6.2.     Tax Characterization of Payments Under This Agreement............... 31
Section 6.3.     Apportionment of Taxes ................................................................. 31
Section 6.4.     Withholding Taxes.......................................................................... 31
Section 6.5.     Records ......................................................................................... 32
Section 6.6.     Tax Returns.................................................................................... 33
Section 6.7.     Allocation of Purchase Price............................................................ 34

ARTICLE VII     EMPLOYMENT MATTERS

Section 7.1.     Employment Terms.......................................................................... 35
Section 7.2.     Employee Benefits .......................................................................... 35
Section 7.3.     Other Employee Covenants ............................................................. 37
Section 7.4.     Sole Benefit of Sellers and Purchaser ............................................... 38

ARTICLE VIII     CONDITIONS TO THE CLOSING

Section 8.1.     Conditions to Each Party's Obligation .............................................. 38
Section 8.2.     Conditions to Sellers' Obligation ...................................................... 39
Section 8.3.     Conditions to Purchaser's Obligation ............................................... 39

ARTICLE IX     TERMINATION

Section 9.1.     Termination.................................................................................... 40
Section 9.2.     Effects of Termination .................................................................... 40

ARTICLE X     MISCELLANEOUS

Section 10.1.    No Survival of Representations and Warranties or Covenants.......... 41
Section 10.2.    Remedies....................................................................................... 41
Section 10.3.    No Third Party Beneficiaries ........................................................... 41
Section 10.4.    Consent to Amendments; Waivers.................................................... 41
Section 10.5.    Successors and Assigns.................................................................... 41
Section 10.6.    Governing Law; Submission to Jurisdiction; Waiver of Jury
                 Trial............................................................................................. 42

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property          ii          Error! Unknown document
                                                           property name.

Section 10.7.    Notices .................................................................................... 43
Section 10.8.    Exhibits; Sellers Disclosure Schedule .............................................. 45
Section 10.9.    Counterparts .............................................................................. 45
Section 10.10.    No Presumption; Mutual Drafting ................................................... 45
Section 10.11.    Severability .............................................................................. 45
Section 10.12.    Entire Agreement ....................................................................... 46
Section 10.13.    Availability of Equitable Relief ....................................................... 46
Section 10.14.    Bulk Sales Laws ......................................................................... 46
Section 10.15.    Obligations of the Sellers .............................................................. 46
Section 10.16.    Limitation on Losses .................................................................... 46

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

iii

Error! Unknown document
property name.

## EXHIBITS

Exhibit A - EMEA Debtors

Exhibit B - Transition Services Agreement

Exhibit C - Intellectual Property License Agreement

Exhibit D - Knowledge of the Sellers

Exhibit 5.1 - Form of U.S. Sale Order

Exhibit 5.2.1 - Form of Canadian Approval and Vesting Order

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

iv

Error! Unknown document
property name.

## TRANSACTION AGREEMENT

This Transaction Agreement is dated as of [      ], 2009, among Nortel Networks Limited, a corporation organized under the laws of Canada ("NNL"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("NNI" and, together with NNL, the "Sellers") and [Purchaser] a corporation organized under the laws of [      ] (the "Purchaser").

W I T N E S S E T H:

WHEREAS, the Sellers beneficially own and operate the Business (as defined below);

WHEREAS, on January 14, 2009 (the "Petition Date"), NNL and certain Affiliates of the Sellers (together, the "Canadian Debtors") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "CCAA") (the proceedings commenced by such application, the "CCAA Cases") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and was extended by further order of the Canadian Court on February 10, 2009, April 28, 2009 and July 30, 2009, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and certain Affiliates of the Sellers (the "U.S. Debtors") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) having commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "Chapter 11 Cases");

WHEREAS, the Sellers have agreed to transfer to the Purchaser, and the Purchaser has agreed to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser of the Assets (as defined below), the license of Intellectual Property under the Intellectual Property License Agreement (as defined below), and the assumption by the Purchaser of the Assumed Liabilities (as defined below) are being made at arms' length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates; and

WHEREAS, in addition, as of the Closing, the Purchaser (or Affiliates of the Purchaser) and certain Sellers (or Affiliates of the Sellers) will enter into (i) the Transition Services Agreement, a form of which is attached hereto as Exhibit B and (ii) the Intellectual Property License Agreement a form of which is attached hereto as Exhibit C, in each case in form and substance substantially similar to the corresponding Exhibits attached hereto ((i) and (ii) together, the "Ancillary Agreements").

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I

## INTERPRETATION

Section 1.1.    <u>Definitions.</u>Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Action**" means any litigation, action, suit, charge, binding arbitration, Tax audit or investigation or other legal, administrative, regulatory or judicial proceeding.

"**Active RFPs**" means the "requests for proposals" or "requests for information" related to the Business, in each case which have been received by the Sellers but for which the due date has not yet occurred, the due date occurred within the last month prior to the date hereof or with respect to which there continues to be active discussion among the relevant parties.

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person.

"**Agreement**" means this Transaction Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Intellectual Property**" means the Intellectual Property (other than Patents and Trademarks) owned by the Sellers as of the Closing Date that is embodied as of the Closing Date in (i) the Software listed in Section 1.1(a)(i) of the Sellers Disclosure Schedule, which constitutes the Software predominately used in the Business and (ii) the Documentation listed in Section 1.1(a)(ii) of the Sellers Disclosure Schedule, which constitutes the Documentation used exclusively in the Business.

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.2.

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court or any other court before which Bankruptcy Proceedings are held.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings concerning any of the Sellers that are held from time to time.

"**Business**" means the business activities of the Sellers as of the date of this Agreement, individually or jointly, to design, develop, commercialize, customize and support the following Next Generation Packet Core network components: (A) a Next Generation Serving GPRS Support Node ("**SGSN**") on Advance TeleComputing Architecture ("**ATCA**"), (B) a Next Generation Gateway GPRS Support Node ("**GGSN**") on ATCA, (C) a Mobility Manager Element on ATCA, (D) a AGW Serving Gateway on ATCA, (E) a AGW Packet Data Gateway on ATCA and (F) a Network Element Manager associated with each of the aforementioned components (the components listed in (A) through (F) collectively, the "**Next Generation Packet Core Products**"). "Business" does not include (A) Overhead and Shared Services; and (B) any products and/or services provided by, or any of the business activities of any businesses or business segments of the Sellers or any of their Affiliates other than those specified above.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States and (ii) Toronto, Ontario, Canada.

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.

"**Canadian Court**" means the Ontario Superior Court of Justice.

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Sales Process Order**" means the order entered on June 29, 2009 approving the items described in the Canadian Sales Process Order Motion.

"**Canadian Sales Process Order Motion**" means the motion filed by the Canadian Debtors on June 23, 2009 with the Canadian Court seeking an order for approval of, among other things, a process of the sale of the Canadian Debtors' rights, title and interests in and to the "Assets" (as defined therein).

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 2.3.1.

"**Closing Date**" has the meaning set forth in Section 2.3.1.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" means the (i) confidentiality agreement among the Purchaser, the Sellers listed therein and the Joint Administrators dated June 9, 2009, as amended and (ii) the packet core letter agreement among the Purchaser and the Sellers listed therein dated August 12, 2009.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by, or notice to (including the expiry of any related notice or waiting period), any Government Entity or other Third Party.

"**Contract**" means any written binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, mortgage, commitment, covenant or undertaking.

"**Control**" (together with its correlative meanings, "Controlled by" and "under common Control with") means, in connection with a given Person, the possession, directly or indirectly, or as trustee or executor, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract, credit arrangement or otherwise.

"**Covered Assets and Persons**" means the Business and the assets (including the Assets), tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of the Business.

"**Cross-Border Protocol**" means the certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same may be amended from time to time.

"**Documentation**" means design documentation, product and commercial specifications, manufacturing documentation, user manuals, schematics, architectural designs, development notes, manuals of test procedures, training documentation, and test results.

"**EMEA Cases**" means the proceedings commenced by the applications filed with the English Court on the Petition Date, pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings.

"**EMEA Debtors**" means the entities listed in Exhibit A hereto.

"**Employee**" means any of those persons listed in Section 4.6(b) of the Sellers Disclosure Schedule.

"**Employee Information**" has the meaning set forth in Section 4.6(b).

"**Employee Records**" means books, records, files, or other documentation with respect to Employees.

"**Employee Transfer Date**" means, with respect to each Employee who will become a Transferring Employee in accordance with this Agreement, 12:01 a.m. local time at such Employee's work location, as indicated in the Employee Information, on the day following (i) the Closing Date with respect to Employees other than Inactive Employees and (ii) the end of the leave with respect to Inactive Employees.

"**English Court**" means the High Court of Justice of England and Wales.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Final Order**" means an order of any Bankruptcy Court or other court of competent jurisdiction (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 ("**Rule 9024**") or Federal Rule of Civil Procedure 60 ("**Rule 60**") shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

"**GAAP**" means the United States generally accepted accounting principles.

"**Government Entity**" means any U.S., Canadian and any other applicable supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**GST**" means goods and services Tax payable under Part IX of the Excise Tax Act (Canada).

"**Inactive Employees**" means Employees on a Seller-approved leave of absence who are expected to return and actually return to work within the relevant time period set out

5

below. An Employee shall be an Inactive Employee for purposes hereof only if such individual is absent on a Seller approved leave of absence or any leave provided under applicable Law and is expected to return to work and actually returns to work in the time permitted for such leave under applicable Law and, for any other leave, is expected to return to work and actually returns to work in accordance with the terms of such leave but not longer than six (6) months following the Closing Date.

"**Inbound License Agreement**" means Contracts granting to the Sellers any license under or to Intellectual Property owned by a Third Party that is, as of the date hereof, incorporated in the Next Generation Packet Core Products.

"**Insolvency Act**" has the meaning set forth in the definition of the EMEA Cases.

"**Intellectual Property**" means any and all intellectual and industrial property rights, whether protected or arising under the Laws of the United States, Canada or any other jurisdiction, including all intellectual or industrial property rights in any of the following: (i) Trademarks; (ii) Patents and invention disclosures; (iii) works of authorship (including any registrations or applications for registration of copyrights); (iv) mask works; (v) trade secrets, know-how and confidential information; (vi) industrial designs; and (vii) Software.

"**Intellectual Property License Agreement**" means the agreement to be entered into between the relevant Sellers and the Purchaser on the Closing Date in the form attached hereto as Exhibit C.

"**Joint Administrators**" means Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes and Alan Bloom serve as joint administrators) as appointed by the English Court under the Insolvency Act.

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase means, with reference to the Sellers, the actual knowledge of those Persons listed on Exhibit D hereto.

"**Law**" means any U.S., Canadian and any other applicable foreign, supranational, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, judicial, administrative or other order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser under the Intellectual Property License Agreement.

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance on real property, easement,

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

6

Error! Unknown document
property name.

encroachment, right-of-way, restrictive covenant on real property, real property license, lease or conditional sale arrangement.

"**Losses**" means all losses, damages, Liabilities, deficiencies, interest, awards, judgments, fines, penalties and reasonable and documented out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements and the costs of litigation, including reasonable amount paid in investigation, defense or settlement of an Action).

"**Material Adverse Effect**" means any circumstance, state of fact, event, change or effect (each an "**Effect**") that, individually or in the aggregate with all other Effects, (a) is or could reasonably be materially adverse to the business, operations, assets, liabilities, results of operations or financial condition of the Business, taken as a whole, or (b) prevents or could reasonably be expected to prevent the ability of the Sellers to perform their obligations under this Agreement or the timely consummation of the transactions contemplated by this Agreement, but excluding, for purposes of clauses (a) and (b), (i) Effects resulting from changes in general economic conditions in the United States or Canada, (ii) Effects arising from the execution or delivery of this Agreement or the public announcement thereof, (iii) Effects that result from any action required to be taken pursuant to this Agreement or any action taken pursuant to the written request or with the prior written consent of the Purchaser, (iv) Effects relating to the industries and markets to the Business relates, (v) Effects relating to changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (vi) Effects relating to the pendency of the Bankruptcy Proceedings and any action approved by, or motion made before, the Bankruptcy Courts; it being understood that the failure of the Business to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect or (vii) Effects relating to the attrition of Employees; provided, that, with respect to clauses (i), (iv), and (v), any such Effect shall be included to the extent such Effect has a materially disproportionate effect on the Business, taken as a whole as compared to other similar business activities conducted by third parties.

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNTC**" has the meaning set forth in Section 6.5(b).

"**Next Generation Packet Core Products**" has the meaning set forth in the definition of the Business.

"**Non-Solicitation Period**" means the twenty-four (24) month period immediately following the Closing Date.

"**Ordinary Course**" means the ordinary course of business through the date of this Agreement consistent with past practice since the filing of the Bankruptcy Proceedings, as such practice may be modified from time to time to the extent necessary to reflect the Bankruptcy Proceedings.

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    7              Error! Unknown document
property name.

"**Overhead and Shared Services**" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services or provided to both (i) the Business and (ii) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, Tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software and other Intellectual Property necessary for or used in connection therewith, including the Licensed Applications (as defined in the Transition Services Agreement).

"**Outsourcing Contracts**" means (i) Schedule A, dated January 1, 2009, to the services agreement, dated September 1, 2002, by and between NNL and Infosys Technologies Limited and (ii) Project Schedule #7, dated April 20, 2009, to the development agreement, dated October 25, 1999, by and between NNL f/k/a Nortel Networks Corporation and Guangdong Nortel Telecommunications Equipment Co. Ltd., in each case as amended through the date of this Agreement.

"**Partial Allocation**" has the meaning set forth in Section 6.7(b).

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patents**" means all national (including without limitation the United States and Canada) and multinational patents and utility models (petty patents) as well as all applications and provisional applications for any of the foregoing, and further including without limitation all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, and all rights therein provided by multinational treaties or conventions.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP, other than Liens that may be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue; (iii) zoning, entitlement, building and land use regulations, customary covenants, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted provided that same are complied with in all material respects; and (iv) minor title defects or irregularities which do not impair, individually

8

or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Pre-Closing Taxable Period**" means any Taxable period ending on or prior to the Closing Date.

"**Purchase Price**" has the meaning set forth in Section 2.2.

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, severance plan or agreement, relocation plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in the United States.

"**Qualified Expenditures**" has the meaning set forth in Section 6.5(b).

"**Records Custodian**" means Deloitte & Touche LLP or in case such firm is unable to carry out its duties for whatever reason, such other auditing firm of international reputation that is acceptable to each of the Purchaser and the Sellers, each acting reasonably.

"**Representatives**" means as to any Person, the attorneys, accountants, financing sources, consultants, financial advisors and other representatives and agents of such Person.

"**Restricted Technical Records**" means the Livelink database or any other similar database containing only all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2002 and subsequent taxation years.

"**Seller Consents**" has the meaning set forth in Section 2.1.1(d).

"**Seller Contracts**" means the Contracts listed in Section 4.4 of the Sellers Disclosure Schedule.

"**Seller Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP, other than Liens that may be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue; (iii) Liens arising hereunder; (iv) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (v) any other Liens set forth on Exhibit G; (vi) zoning, entitlement, building and land use regulations, customary covenants, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted provided that same are complied with in all material respects; and (vii) minor title defects or irregularities which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted.

"**Seller Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, meal allowance plan, severance plan or agreement, relocation plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy under which the Sellers or any of their Subsidiaries or Affiliates have any Liabilities, or that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates, in each case with respect to Employees, or pursuant to which payments are made, or benefits are provided to, or an entitlement to payments or benefits may arise with respect to any Employees (or any spouses, dependants or beneficiaries of any such individuals).

"**Seller Insurance Policies**" means all current or previous insurance policies of the Sellers and their Affiliates, including all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, contaminated products insurance policies and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing.

"**Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

10

"**Software**" means any and all computer programs, in source code or object code, including computerized databases and compilations.

"**Straddle Period**" has the meaning set forth in Section 6.3(b).

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Supplier Contracts**" has the meaning set forth in Section 4.4(i).

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity, including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, gross receipts, sales, use, ad valorem, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto, and (b) any obligation to pay Taxes of a Third Party, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S. or Canadian or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

"**Tax Credit Purchaser**" has the meaning set forth in Section 6.5(b).

"**Tax Returns**" means all returns, reports (including elections, declarations, disclosures, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes, including any amendments thereto.

"**Termination Date**" has the meaning set forth in Section 9.1(b).

"**Third Party**" means any Person that is neither a Party nor an Affiliate of a Party.

"**Trademarks**" means all trademarks, service marks, trade dress, logos, trade names, corporate names, business names, Internet domain names, whether or not registered, together with all goodwill associated therewith and including all common law rights, and registrations, applications for registration and renewals thereof, including all marks registered in the United States Patent and Trademark Office, the trademark offices of the states and territories of the United States of America, and the trademark offices of other nations throughout the world (including the Canadian Intellectual Property Office), and all rights therein provided by multinational treaties or conventions.

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    11                    Error! Unknown document
property name.

"**Transfer Taxes**" means all goods and services, sales, excise, use, transfer, gross receipts, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees and notarial fees), together with interest, penalties and additional amounts imposed with respect thereto.

"**Transfer Tax Returns**" has the meaning set forth in Section 6.6(a).

"**Transferring Employee**" means Employees who accept an offer of employment by, and commence employment with, the Purchaser in accordance with the terms of Section 7.1.

"**Transition Services Agreement**" means the agreement to be entered into between the relevant Sellers and the Purchaser on the Closing Date in the form attached hereto as Exhibit B.[1]

"**Transferred Tangible Assets**" means the equipment and other tangible assets listed in Section 1.1(b) of the Sellers Disclosure Schedule, and excluding in all cases any Intellectual Property.

"**Treasury Regulations**" means the regulations promulgated under the Code.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**U.S. Debtors**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Sale Order**" has the meaning set forth in Section 5.1.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act or any similar Law requiring notice to employees in the event of a plant closing or mass layoff.

---

[1] TSA to include short-term occupancy license for Richardson facility, subject to landlord consent; provided, however, that the failure to obtain such consent shall not in itself entitle the Purchaser to terminate this Agreement or to any adjustment of the Purchase Price, and provided further that the Sellers shall only be required to take commercially reasonable efforts to obtain such consent (without any requirement to incur expenses or liability in connection with obtaining such consent).

Error! Unknown document property name.Error! Unknown document property name.Error! Unknown document property

12

Error! Unknown document property name.

Section 1.2.    Interpretation.

### 1.2.1.  Gender and Number.

Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

### 1.2.2.  Certain Phrases and Calculation of Time.

In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding". If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

### 1.2.3.  Headings, etc.

The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

### 1.2.4.  Currency.

All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency. All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency. All payments required under this Agreement shall be paid in United States currency in immediately available funds, unless otherwise specifically indicated herein. Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the *Wall Street Journal* newspaper for the day in question.

### 1.2.5.  Miscellaneous.

Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

Section 2.1.    Purchase and Sale.

2.1.1.    Assets.

Subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall purchase or accept assignment and assume from the relevant Sellers (including legal title, equitable title and risk of loss), and each Seller shall transfer or assign to the Purchaser all of such Seller's right, title and interest in to the assets described in clauses (a) through (d) of this Section 2.1.1 (such assets, the "**Assets**") (x) in the case of Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens and Claims (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser or any of its Affiliates) pursuant to and to the extent provided by Sections 363 of the U.S. Bankruptcy Code, (y) in the case of Assets that are transferred or assigned by Canadian Debtors, free and clear of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser or any of its Affiliates) pursuant to the Canadian Approval and Vesting Order, when granted:

(a)    the Transferred Tangible Assets as of the Closing Date;

(b)    the Assigned Intellectual Property as of the Closing Date, subject to any and all licenses granted under such Intellectual Property prior to the Closing Date, together with all claims against Third Parties for infringement, misappropriation or other violation of any Law with respect to any of the Assigned Intellectual Property, whether for any past, present or future infringement, misappropriation or other violation;

(c)    all rights as of the Closing under all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Transferred Tangible Assets and the Assigned Intellectual Property; and

(d)    to the extent assignable under applicable Law, all Consents of Government Entities exclusively pertaining to the Business (the "**Seller Consents**").

2.1.2.    Assumed Liabilities.

Subject to the terms of this Agreement, at the Closing, the Purchaser shall assume and become responsible for, and perform, discharge and pay when due, solely the Liabilities described in clauses (a) through (d) of this Section 2.1.2 (the "**Assumed Liabilities**"):

(a)    all Liabilities to the extent related to or arising from the conduct, operation or ownership of the Business after the Closing Date, including (i) all such Liabilities with respect to the ownership, exploitation and operation of the Assets incurred on or after the Closing Date, and (ii) all such Liabilities related to Actions or claims related to or arising from the conduct, operation or ownership of the Assets after the Closing Date;

(b)     all Liabilities for, or related to or arising from any obligation for, any Tax that the Purchaser bears under ARTICLE VI;

(c)     all Liabilities related to or arising from: (i) the Purchaser's (or any of its Affiliates') employment or termination of employment of Transferring Employees arising after the Closing Date; (ii) the terms of any offer of employment to any Employee who is provided an offer pursuant to Section 7.1 of this Agreement; (iii) the Purchaser's (or any of its Affiliates') decision to make or not make offers of employment to Employees, to the extent such offer violates applicable Law with respect to discrimination among employees or potential employees; and (iv) the failure of the Purchaser (or any of its Affiliates) to satisfy its obligations with respect to the Employees, including the Transferring Employees, as set out in ARTICLE VII; and

(d)     all Liabilities related to Transferring Employees expressly assumed by the Purchaser as set forth in ARTICLE VII.

For the avoidance of doubt, the Purchaser shall not pursuant to this Agreement assume or be deemed to have assumed any Liabilities of the Sellers or any Third Party other than the Assumed Liabilities.

### 2.1.3.  EMEA Debtors.

None of the EMEA Debtors or the Joint Administrators shall assume, or be deemed to assume, any Liability whatsoever under this Agreement and nothing in this Agreement shall apply to, or govern, the sale, assignment, transfer, retention or assumption of assets, rights, properties or Liabilities of, or by, any EMEA Debtors or the Joint Administrators in any manner whatsoever. The Purchaser shall not be entitled to make any claim under this Agreement, or assert any right hereunder, against any Person other than the Sellers.

### 2.1.4.  Non-Assignable Assets.

Notwithstanding anything in this Agreement to the contrary, if a Consent of a Third Party (including a Government Entity) has not been obtained on or prior to Closing, then, unless such Consent is subsequently obtained, this Agreement shall not constitute an agreement to sell, transfer or assign, directly or indirectly, any Asset or any obligation or benefit arising thereunder if an attempted direct or indirect sale, transfer or assignment thereof, without such Consent, would constitute a breach, default, violation or other contravention of the rights of such Third Party or would be ineffective with respect to any party to a Contract concerning such Asset; provided, however, that the Sellers shall use their reasonable efforts to cooperate with the Purchaser in connection with any commercially reasonable arrangement to provide the Purchaser the same interest, benefits and rights with respect to such Asset as the applicable Seller had immediately prior to the Closing.

Section 2.2.    Purchase Price. Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the sale of the Assets pursuant to the terms hereof, and of the rights granted by the Sellers under the Intellectual Property License Agreement, the Purchaser shall (x) assume and become responsible for, and obligated to perform, discharge and

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    15                    Error! Unknown document
property name.

pay, when due, the Assumed Liabilities and (y) pay to the Sellers an amount of cash (the "**Purchase Price**") equal to [        ]($        ).

Section 2.3.    Closing.

2.3.1.    Closing Date.

The completion of the purchase and sale of the Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York, commencing at 10:00 a.m. local time on (i) the date which is five (5) Business Days after the day upon which all of the conditions set forth under ARTICLE VIII (other than conditions to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions) have been satisfied, or if permissible, waived by the Sellers and/or the Purchaser (as applicable), or (ii) on such other place, date and time as shall be mutually agreed upon in writing by the Purchaser and the Sellers (the day on which the Closing takes place being the "**Closing Date**").

2.3.2.    Closing Actions and Deliveries.

(a)    At the Closing, the Sellers and the Purchaser shall execute and deliver to the other (i) the Ancillary Agreements substantially in the forms attached hereto; and (ii) instruments of assignment and assumption effecting the transfer of the Assets and the Assigned Intellectual Property from the Sellers to the Purchaser;

(b)    At the Closing, each Seller shall deliver to the Purchaser:

(i)    in the case of a Seller that is a "United States person" within the meaning of Section 7701 of the Code and applicable Treasury Regulations, a duly executed certificate of non-foreign status in accordance with Section 1445 of the Code and applicable Treasury Regulations; and

(ii)    (x) a duly executed certificate certifying that such Seller is not a non-resident of Canada for purposes of section 116 of the *Income Tax Act* (Canada), or (y) in the case of a Seller that is a non-resident of Canada for purposes of section 116 of the *Income Tax Act* (Canada), a duly executed certificate certifying that the Assets transferred or assigned to the Purchaser pursuant to this Agreement by such Seller do not include any taxable Canadian property as defined in the *Income Tax Act* (Canada), of such non-resident Seller.

(c)    At the Closing, the Purchaser shall deliver or cause to be delivered to the Sellers:

(i)    an amount equal to the Purchase Price by wire transfer in immediately available funds to an account or accounts designated by the Sellers in a written notice to the Purchaser at least two (2) Business Days prior to the Closing Date; and

(ii)     a duly executed certificate of an executive officer of the Purchaser certifying the fulfillment of the conditions set forth in Section 8.2.

(d)     At the Closing, NNI shall deliver or cause to be delivered a duly executed certificate of an executive officer of NNI certifying the fulfillment of the conditions set forth in Section 8.3.

(e)     At the Closing, each Party shall deliver, or cause to be delivered, to the other any other documents reasonably requested by such other Party in order to effect, or evidence the consummation of, the transactions contemplated herein.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Sellers as follows:

Section 3.1.    Organization and Corporate Power.

(a)     The Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of [     ]. The Purchaser has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to this Agreement and each of the Ancillary Agreements and (ii) to own, lease and operate its assets (including the Assets).

(b)     The Purchaser is duly qualified or licensed to own or lease and operate its properties and assets (including the Assets), and is in good standing, in each jurisdiction in which its ownership of assets or operation of business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not materially hinder, delay or impair the Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements.

Section 3.2.    Authorization; Binding Effect; No Breach.

(a)     The execution, delivery and performance of this Agreement and the Ancillary Agreements have been duly authorized by the Purchaser. This Agreement has been duly executed and delivered by the Purchaser, and this Agreement and the Ancillary Agreements have been or will be duly executed and delivered by the Purchaser. Assuming due authorization, execution and delivery by the relevant Sellers, this Agreement and the Ancillary Agreements constitutes, or upon execution thereof will constitute, a valid and binding obligation of the Purchaser, enforceable against such Person in accordance with its respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b)     The execution, delivery and performance by the Purchaser of this Agreement and the Ancillary Agreements do not and will not conflict with or result in a breach

of the terms, conditions or provisions of, constitute a default under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, or require any Consent or approval or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the Purchaser, (ii) any Contract to which the Purchaser is a party or to which any of its assets is subject or (iii) any Laws to which the Purchaser or any of its assets is subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that have not materially hindered, delayed or impaired, and would not reasonably be expected to, individually or in the aggregate, materially hinder, delay or impair, the performance by the Purchaser of any of their obligations under this Agreement and the Ancillary Agreements.

Section 3.3.   Financing.

The Purchaser has, as of the date hereof, and will have as of the Closing (i) sufficient funds available for purposes of paying the Purchase Price and paying any other amount due hereunder or in respect hereof and (ii) the resources and capabilities (financial or otherwise) to perform its obligations hereunder, including the Assumed Liabilities. The Purchaser has not, as of the date hereof, and will not have as of the Closing, incurred any obligation, commitment, restriction or liability of any kind, which would impair or adversely affect such resources and capabilities. Notwithstanding anything to the contrary herein, the Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person.

Section 3.4.   Purchaser's Acknowledgments; Exclusivity of Representations and Warranties.

The Purchaser acknowledges and agrees that (i) except for the representations and warranties expressly set forth herein or in any Ancillary Agreement, the Purchaser has not relied on any representation or warranty from the Sellers or any Affiliate of the Sellers or any employee, officer, director, accountant, financial, legal or other Representative of the Sellers or its Affiliates in determining whether to enter into this Agreement; (ii) except for the representations and warranties expressly set forth herein or in any Ancillary Agreement, none of the Sellers or any employee, officer, director, accountant, financial, legal or other Representative of the Sellers or any Affiliate of the Sellers has made any representation or warranty, express or implied, as to the Business (or the value or future thereof) or the Assets (including any implied representation or warranty as to the condition, merchantability, suitability or fitness for a particular purpose of any of the Assets, including under the International Convention on Contracts for the Sale of Goods (Geneva Convention) and any other applicable sale of goods Laws), the Assumed Liabilities, or any Affiliate of any such Person or the accuracy or completeness of any information regarding any of the foregoing that the Sellers or any other Person furnished or made available to the Purchaser and its Representatives (including any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials).

18

Section 3.5.   Brokers.

Except for fees and commissions that will be paid by the Purchaser, no broker, finder or investment banker is entitled to any brokerage, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement and the Ancillary Agreements based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except (a) for disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably apparent on its face from the Sellers Disclosure Schedule that such disclosure is applicable, or (b) as expressly contemplated by this Agreement, each of the Sellers jointly and severally represents and warrants to the Purchaser as set forth in this ARTICLE IV:

Section 4.1.   Organization and Corporate Power.

(a)   Each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is organized. Subject to entry of the U.S. Sale Order in the case of the U.S. Debtors and the Canadian Approval and Vesting Order in the case of the Canadian Debtors and receipt of other Consents from the U.S. Bankruptcy Court and the Canadian Court in connection with the transactions contemplated hereby and in the Ancillary Agreements (collectively, the "**Bankruptcy Consents**"), each of the Sellers has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to each of this Agreement and the Ancillary Agreements to which it is or will become a party and (ii) own, lease and operate its assets, including the Assets, as applicable, and to carry on the Business as it is now being conducted.

(b)   Each of the Sellers is duly qualified or licensed to do business and to own, lease and operate its properties and assets, including the Assets, and to carry on the Business as it is currently being conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or to be so licensed and is in good standing in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or be licensed, except to the extent that the failure to be so qualified, licensed or in good standing would not, individually or in the aggregate, materially hinder, delay or impair the performance by the Sellers of any of their obligations under this Agreement and the Ancillary Agreements.

Section 4.2.   Authorization; Binding Effect; No Breach.

(a)   Subject to the receipt of the Bankruptcy Consents (i) the execution, delivery and performance by each Seller of this Agreement and the Ancillary Agreements has been duly authorized by such Seller, (ii) this Agreement has been duly executed and delivered by the Sellers, and the Ancillary Agreements have been or will be executed and delivered by the

Sellers thereto. Subject to receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser, this Agreement and the Ancillary Agreements will constitute, a legal, valid and binding obligation of such Seller, enforceable against such Person in accordance with its respective terms.

(b)    Subject to receipt of the Bankruptcy Consents (where applicable) and any other Consents expressly provided for herein, the execution, delivery and performance by each Seller of this Agreement and the Ancillary Agreements do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, or result in the creation or imposition of any Lien upon any of the Assets, or require any Consent or approval (other than the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the relevant Sellers, (ii) any Contract to which the relevant Seller is a party and to which any of the Assets are subject, (iii) any order of any Government Entity applicable to any Seller or by which any of the Assets are bound or (iv) any Laws to which any of the Sellers, or any of the Assets are subject, except, in the case of (ii), (iii), and (iv) above, for such defaults, violations and notifications that, individually or in the aggregate, have not materially hindered, delayed or impaired, and would not reasonably be expected to, materially hinder, delay or impair the performance by the Sellers of any of their obligations under this Agreement and the Ancillary Agreements.

Section 4.3.    Title to Tangible Assets. Except for Seller Encumbrances, the Transferred Tangible Assets are owned beneficially by one or more of the Sellers, free and clear of all Liens and such Sellers have good and marketable title thereto.

Section 4.4.    Seller Contracts.[2]

To the Knowledge of the Sellers, Section 4.4 of the Sellers Disclosure Schedule sets forth, as of the date hereof:

(i)    all of the material agreements with Third Parties providing goods, services or Licenses to the Business (excluding all Inbound License Agreements, all of which are addressed in Section 4.5 below), none of which are exclusive to the Business (collectively, the "**Supplier Contracts**"),

(ii)    the Active RFPs and related agreements; and

---

[2] Sellers are currently conducting an internal review of all contracts associated with the Business to determine whether any are exclusively used in the Business and can be assigned pursuant to applicable bankruptcy procedures. Subsequent versions of this agreement will be updated to reflect the results of such review, including allocation of cure costs, if any, associated with any assigned contracts.

(iii)    the Outsourcing Contracts ((i), (ii) and (iii), collectively, the "**Seller Contracts**").

Section 4.5.    Intellectual Property.

(a)    To the Knowledge of the Sellers, the Sellers own the Assigned Intellectual Property and the Licensed Intellectual Property.

(b)    To the Knowledge of the Sellers, no Seller has received any written assertions during the two (2) years prior to the date hereof that (i) the operation of the Business infringes, misappropriates or violates any Intellectual Property right of any Third Party; or (ii) the use or exploitation of any of the Assigned Intellectual Property infringes or violates any Intellectual Property of or was misappropriated from a Third Party.

(c)    To the Knowledge of the Sellers, as of the date hereof, there has been no assertion or claim made in writing to the Sellers during the two (2) years prior to the date hereof asserting invalidity, misuse or unenforceability of any Assigned Intellectual Property or challenging the Sellers' right to use, right to transfer, or ownership of the Assigned Intellectual Property.

(d)    To the Knowledge of the Sellers, NNL has the right and power to grant the licenses to be granted to the Purchaser pursuant to Article III of the Intellectual Property License Agreement.

(e)    To the Knowledge of the Sellers, Section 4.5(e) of the Sellers Disclosure Schedule sets forth a list of all material Inbound Licenses Agreements.

(f)    Notwithstanding any provision herein to the contrary, this Section 4.5 consists of the sole representation and warranty in this Agreement regarding non-infringement, non-violation and non-misappropriation of Intellectual Property.

Section 4.6.    Labor and Employee Benefits Matters.

(a)    Section 4.6(a) of the Sellers Disclosure Schedule contains a list of all material Seller Employee Plans. The Sellers have provided the Purchaser with a true and complete copy of the plan document or summary plan description of each of Seller Employee Plan listed in Section 4.6(a) of the Sellers Disclosure Schedule or, if such plan document or summary plan description does not exist, an accurate written summary of such Seller Employee Plan.

(b)    The information contained in Section 4.6(b) of the Sellers Disclosure Schedule in respect of the Employees (the "**Employee Information**") is accurate in all material respects as of the date hereof, and sets forth with respect to each Employee (except where not permissible under applicable data privacy Laws): (i) unique identifier, (ii) service date, (iii) position, (iv) annual base salary and annual target incentive (v) work location, (vi) visa type, if any, (vii) vacation accrual rate, (viii) status as full-time or part-time, (ix) telecommuter arrangement, if any, and (x) status as an Inactive Employee, type of leave and expected date of return to work, if known.

21

(c)     No Employee is covered by a collective bargaining agreement.  There has not been for a period of twelve (12) consecutive months prior to the date hereof, nor is there existent or, to the Sellers' Knowledge, has there been threatened, any strike, slowdown, lockout, picketing or work stoppage against the Sellers or any of their Affiliates by or on behalf of any of the Employees.

(d)     For a period of twelve (12) consecutive months prior to the date hereof, no petition has been filed or proceedings instituted by a union, collective bargaining agent, employee or group of employees with any Government Entity seeking recognition of a collective bargaining agent with respect to any Employees, no voluntary recognition has been given by the Sellers or any Affiliate, and, to the Sellers' Knowledge, no such organizational effort is currently being made or has been threatened in writing by or on behalf of any union, employee, group of employees or collective bargaining agent to organize any Employees.

(e)     Except as set forth in Section 4.6(e) of the Sellers Disclosure Schedule, with respect to the Employees, the Sellers and their Affiliates are in material compliance with all applicable Laws respecting employment and employment practices, including, without limitation, all Laws respecting terms and conditions of employment, health and safety, wages and hours, child labor, immigration, employment discrimination, disability rights or benefits, equal opportunity, the WARN Act, affirmative action, workers' compensation, labor relations and employee leaves.

(f)     The consummation of the transactions contemplated by this Agreement will not, either alone or in combination with another event, (i) entitle any Employee to severance pay or any other payment, except to the extent such severance pay is required under applicable Law or any Seller Employee Plan or (ii) accelerate the time of payment or vesting, or increase the amount of compensation due any such Employee.

Section 4.7.    Brokers.

Except for fees and commissions that will be paid or otherwise settled or provided for by the Sellers, no broker, finder or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement and the Ancillary Agreements based upon arrangements made by or on behalf of the Sellers or any of their Affiliates.

Section 4.8.    Valid Transfers.

The transfer of Assets and the grant of rights pursuant to the Intellectual Property License Agreement by the Sellers to the Purchaser and pursuant to this Agreement and the Ancillary Agreements has been and will be made at arms length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers or their Affiliates, and the Sellers acknowledge that they have received, in the aggregate, fair consideration and reasonably equivalent value for the purchase by the Purchaser of the Assets, the rights granted pursuant to the Intellectual Property License Agreement and the assumption by the Purchaser of the Assumed Liabilities hereunder and under the Ancillary Agreements.

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

22

Error! Unknown document
property name.

Section 4.9.    Interdependency Schedule.

Section 4.9 of the Sellers Disclosure Schedule sets out a matrix describing the material technology platforms that are shared between the Business and the other businesses of the Sellers.

Section 4.10.    EMEA Debtors unrelated to Business or Assets.

None of the EMEA Debtors (i) owns any of the Assets; or (ii) employs any Employee.

Section 4.11.    Sellers' Acknowledgment; Exclusivity of Representations and Warranties.

The Sellers acknowledge and agree that except for the representations and warranties expressly set forth herein or in any Ancillary Agreement, the Sellers have not relied on any representation or warranty from the Purchaser or any Affiliate of the Purchaser or any employee, officer, director, accountant, financial, legal or other Representative of the Purchaser or its Affiliates in determining whether to enter into this Agreement and the Ancillary Agreements.

## ARTICLE V

## COVENANTS AND OTHER AGREEMENTS

Section 5.1.    U.S. Bankruptcy Actions.

As promptly as practicable after the date hereof, the Sellers who are U.S. Debtors shall (i) file a motion with the U.S. Bankruptcy Court seeking approval by the U.S. Bankruptcy Court of the transactions contemplated by this Agreement and the Ancillary Agreements, including the sale of the Assets to the Purchaser and the assumption by the Purchaser of the Assumed Liabilities, pursuant to an order of the Bankruptcy Court under Sections 105, 363 and 365 of the U.S. Bankruptcy Code in substantially the form attached hereto as Exhibit 5.1 (the "**U.S. Sale Order**"); (ii) notify, as required by the U.S. Bankruptcy Code, the U.S. Bankruptcy Rules and any order of the U.S. Bankruptcy Court, all parties entitled to notice of such motion and order, as modified by orders in respect of notice which may be issued at any time and from time to time by the U.S. Bankruptcy Court, and such additional parties as the Purchaser may reasonably request, and (iii) subject to the provisions of this Agreement, including the provisions of Section 9.1, use their reasonable efforts to obtain U.S. Bankruptcy Court approval of the U.S. Sale Order. The Sellers shall not propose or consent to any material changes to the U.S. Sale Order from the form attached hereto as Exhibit 5.1 without the Purchaser's prior approval, which shall not be unreasonably withheld and it being understood that certain of the provisions of the U.S. Sale Order must constitute findings of fact or conclusions of Law to be made by the U.S. Bankruptcy Court.

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

23

Error! Unknown document
property name.

Section 5.2.    Canadian Bankruptcy Actions.

As promptly as practicable, but in no event later than the date on which the U.S. Sale Order is granted, and subject to their rights and obligations set forth in the Canadian Sales Process Order, the Canadian Debtors shall file with the Canadian Court one or more motions (the "**Canadian Approval and Vesting Order Motion**") seeking to obtain entry of an order in substantially in the form set forth in Exhibit 5.2 (with such changes thereto as the Parties shall reasonably approve, provided that material changes thereto shall require the Purchaser's approval in its reasonable discretion) (such order as approved, the "**Canadian Approval and Vesting Order**") of the Canadian Court approving this Agreement and the transactions contemplated herein.

Section 5.3.    Consultation; Notification.

(a)    The Purchaser and the U.S. Debtors shall cooperate with each other in seeking entry of the U.S. Sale Order, and the U.S. Debtors shall deliver to the Purchaser prior to filing copies of all proposed pleadings, motions, objections, responses to objections, notices, statements, schedules, applications, reports and other material papers to be filed by the U.S. Debtors in connection with such motions and relief requested therein and any challenges thereto.

(b)    The Purchaser and the Canadian Debtors shall cooperate with each other in filing and prosecuting the Canadian Approval and Vesting Order Motion and in seeking entry of the Canadian Approval and Vesting Order, and the Canadian Debtors shall deliver to the Purchaser prior to filing copies of all proposed pleadings, motions, notices, statements, schedules, applications, reports and other material papers to be filed by the Canadian Debtors in connection with such motions and relief requested therein and any challenges thereto.

(c)    If the U.S. Sale Order or any other order of the U.S. Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the U.S. Debtors shall take all reasonable steps, and use their reasonable efforts, including incurring reasonable expenses, to defend against such appeal, petition or motion, and the Purchaser shall cooperate and use its reasonable efforts, including incurring reasonable expenses, in such efforts. Each of the Parties hereby agrees to take all reasonable steps, and use its reasonable efforts, to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein and assuming the Parties are not precluded pursuant to Section 5.3(d) from consummating the transactions contemplated by this Agreement, nothing contained in this Section shall preclude the Parties from consummating the transactions contemplated hereby if the U.S. Sale Order shall have been entered and shall not have been stayed, modified, revised or amended, in which event the Purchaser shall be able to assert the benefits of Section 363(m) of the U.S. Bankruptcy Code and, as a consequence of which, such appeal shall become moot.

(d)    If the Canadian Approval and Vesting Order or any other order of the Canadian Court relating to this Agreement shall be appealed by any Person (or a motion for rehearing, re-argument or stay shall be filed with respect thereto), the Canadian Debtors shall, and shall cause their Affiliates (other than any EMEA Debtors or their respective Subsidiaries)

to, take all reasonable steps, and use their reasonable efforts, including incurring reasonable expenses, to defend against such appeal or motion, and the Purchaser shall cooperate and use its reasonable efforts, including incurring reasonable expenses, in such efforts. Each of the Parties hereby agrees to take all reasonable steps, and use its reasonable efforts, to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein and assuming the Parties are not precluded pursuant to Section 5.3(c) from consummating the transactions contemplated by this Agreement, nothing in this Section shall preclude the Parties from consummating the transactions contemplated hereby if the Canadian Approval and Vesting Order shall have been entered and shall not have been stayed, modified, revised or amended

Section 5.4.    Pre-Closing Cooperation.

(a)    Prior to the Closing, upon the terms and subject to the conditions of this Agreement, each of the Parties shall use their reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement as soon as practicable and cause the fulfillment at the earliest practicable date of all of the conditions to the other Parties' obligations to consummate the transactions contemplated by this Agreement, including using reasonable efforts in connection with: (i) the preparation and filing of all forms, registrations and notices required to be filed to consummate the Closing and the taking of such actions as are necessary to obtain any requisite Consent; provided, that the Sellers shall not be obligated to make any payment or deliver anything of value to any Government Entity in order to obtain any such Consent (other than filing and application fees to Government Entities), (ii) defending all lawsuits and other proceedings by or before any Government Entity challenging this Agreement or the consummation of the Closing, (iii) causing to be lifted or rescinded any injunction, decree, ruling, order or other action of any Government Entity that would prohibit, prevent, restrict or materially delay the consummation of the transactions contemplated by this Agreement; (iv) and (v) assisting the Purchaser in the offer process and facilitating the transactions contemplated hereby.

(b)    Each Party shall promptly notify the other Party of the occurrence, to such Party's knowledge, of any event or condition, or the existence, to such Party's knowledge, of any fact, that would reasonably be expected to result in any of the conditions set forth in ARTICLE VIII not being satisfied.

Section 5.5.    Public Announcements.

Subject to (a) the provisions of ARTICLE VII with respect to communications and announcements to the Employees and the employees of the Purchaser and (b) each Party's disclosure obligations imposed by Law or stock exchange regulation (including any obligations under any Bankruptcy Laws), during the period from the date hereof until the Closing Date, the Purchaser and the Sellers shall, and shall cause their respective Affiliates (other than any EMEA Debtors or their respective Subsidiaries) to, (i) cooperate with each other Party in the development and distribution of all news releases, other public information disclosures and announcements, including announcements and notices to customers, suppliers and Employees, with respect to this Agreement, or any of the transactions contemplated by this Agreement and

the Ancillary Agreements and (ii) not issue any such announcement or statement prior to consultation with, and the approval of, the other Parties (such approval not to be unreasonably withheld or delayed); provided, that approval shall not be required where the disclosing Party determines, based on advice of counsel and after consultation with the other Parties, that such disclosure is required by Law or stock exchange regulation.

Section 5.6.  Post-Closing Cooperation.

From and after the Closing Date, each of the Parties shall execute and deliver such documents and other papers and take such further actions as may reasonably be required to carry out the provisions of this Agreement and the Ancillary Agreements and give effect to the transactions contemplated herein and therein, including (i) the execution and delivery of such assignments, deeds and other documents as may be necessary to transfer any Assets as provided in this Agreement and, unless executed and delivered prior to Closing.

Section 5.7.  Conduct of Business.

The Sellers covenant that, subject to any limitation imposed as a result of being subject to the Bankruptcy Proceedings and except as (i) the Purchaser may approve otherwise in writing as set forth below (such approval not to be unreasonably withheld or delayed), (ii) otherwise expressly required by this Agreement or the Ancillary Agreements, (iii) required by Law (including any applicable Bankruptcy Law or by any order of a Bankruptcy Court entered as of the date hereof), the Sellers shall and shall cause their Affiliates (other than the EMEA Debtors and their respective Subsidiaries) to (A) conduct the Business in the Ordinary Course and (B) abstain from any of the following actions:

(a)  sell, lease or dispose of the Assets;

(b)  incur any Lien on any of the Assets, other than Liens that will be discharged at or prior to Closing and Seller Encumbrances;

(c)  enter into any exclusive license that would restrict the Purchaser's use of the Assets after the Closing in any material respect or which is in conflict with the provisions of this Agreement or the Intellectual Property License Agreement; or sell, transfer, or assign any of the Licensed Intellectual Property unless the relevant Sellers receive a written license from the buyer, transferee or assignee of such Licensed Intellectual Property sufficient for the Purchaser to retain all its rights in such Licensed Intellectual Property as provided in the Intellectual Property License Agreement;

(d)  increase the cash compensation or other fringe, incentive, equity incentive, pension, welfare or other employee benefits paid or payable to the Transferring Employees, other than increases required by applicable Law, Contracts or Seller Employee Plans in effect as of the date hereof or increases in the Ordinary Course that apply to substantially all similarly situated employees (including the Transferring Employees) of the Sellers or the applicable Affiliates of the Sellers;

(e)  enter into, adopt, amend or modify any Collective Labor Agreement affecting Transferring Employees except as required by applicable Law; or

(f)     authorize, or commit or agree to take, any of the foregoing actions.

Section 5.8.    Transaction Expenses.

Except as otherwise provided in this Agreement or the Ancillary Agreements, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby.

Section 5.9.    Confidentiality.

The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement and any Ancillary Agreement to any court or to any liquidator or in connection with any auction process approved by the Bankruptcy Court, or in connection with the offer for sale or divestiture or any of the Sellers' product lines, operating units or business divisions or assets, and show appropriate figures in their administration records, accounts and returns; provided, that after the Closing Date, the Purchaser's confidentiality obligations under this Section 5.9 and the Confidentiality Agreement with respect to information and data relating to the Business and/or the Assets shall terminate (except to the extent, if any, otherwise provided in the Ancillary Agreements).

Section 5.10.    Delivery of Assets.

To the extent not provided for in the Transition Services Agreement, the Purchaser shall, within [     ] days[3] after the Closing Date, remove at the Purchaser's cost all of the Transferred Tangible Assets and activities of the Business all premises owned or leased by the Sellers or their Affiliates after the Closing.

Section 5.11.    Termination of Overhead and Shared Services.

The Purchaser acknowledges and agrees that, except as otherwise expressly provided in the Transition Services Agreement, effective as of the Closing Date (i) all Overhead and Shared Services provided to the Business shall cease and (ii) the Sellers or their Affiliates shall have no further obligation to provide any Overhead and Shared Services to the Business.

---

[3] Time period will tie to duration of short-term occupancy license for Richardson facility that will be set forth in the TSA.

Section 5.12.  Insurance Matters.

(a)     The Purchaser acknowledges and agrees that coverage of the Covered Assets and Persons under the Seller Insurance Policies shall cease as of the Closing Date and the Covered Assets and Persons (other than assets used in, and Persons engaged in, the provision of services under the Transition Services Agreement, except as otherwise set forth therein) will be deleted in all respects as insured (or additional insured, as the case may be) under all Seller Insurance Policies.  Notwithstanding anything herein to the contrary, the Sellers shall retain any rights to, including any right to any proceeds received in respect of, any claim pending as of the date hereof or made after the date hereof under any Seller Insurance Policy.

(b)     If after the Closing Date the Purchaser or the Sellers (or any of their respective Affiliates) reasonably require any information regarding claim data or other information pertaining to a claim or an occurrence reasonably likely to give rise to a claim (including any pre-Closing claims under the Seller Insurance Policies that are to be covered under the retrospective component of the new insurance policy) in order to give notice to or make filings with insurance carriers or claims adjustors or administrators or to adjust, administer or otherwise manage a claim, then the Sellers or the Purchaser, as the case may be, shall cause such information to be supplied to the other (or their designee), to the extent such information is in their possession and control or can be reasonably obtained by the Sellers or the Purchaser (or their respective Affiliates (other than, in the case of the Sellers, any EMEA Debtors or their respective Subsidiaries)), as applicable, promptly upon a written request therefore.  If the Purchaser desires access to, and utilization of, claims data or information maintained by an insurance company or other Third Party in respect of any claim (including any pre-Closing claims under any Seller Insurance Policies that are covered under the retrospective component of the new insurance policies), the Purchaser shall be exclusively responsible for acquiring from such insurance company or Third Party, at the Purchaser's sole cost and expense, the rights necessary to permit them to obtain access to and utilization of such claims data or information, provided that Sellers and their Affiliates (other than any EMEA Debtors or their respective Subsidiaries) shall reasonably cooperate with the Purchaser's efforts.  If any Third Party requires the consent of the Sellers or any of their Affiliates (other than any EMEA Debtors or their respective Subsidiaries) to the disclosure of such information, such consent shall not be unreasonably withheld.

Section 5.13.  Use of Trademarks.

As of the Closing Date, the Purchaser shall not have the right to use the name "Nortel" or any other Trademarks owned by the Sellers or any of their Affiliates or any other Trademark employing the word "Nortel" or any confusingly similar Trademarks to any of the foregoing.

Section 5.14.  Sellers' Accessible Information; Cooperation.

After the Closing, the Purchaser shall have the right to reasonably request from the Sellers copies of all books, records, files, documentation and sales literature in the possession or under control of the Sellers and held or used in the Business (other than Employee Records or Tax records), to which the Purchaser in good faith determines it needs access for bona fide

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    28                    Error! Unknown document
property name.

business or legal purposes.  The Sellers shall, or cause their respective Affiliates (other than any EMEA Debtors or their respective Subsidiaries) to, provide such copies to the Purchaser (at the Purchaser's expense) as soon as reasonably practicable; provided, that the Sellers shall be allowed to redact any such requested document in order to delete any information and data relating to business segments of any such Seller and its Respective Affiliates (other than any EMEA Debtors or their respective Subsidiaries) not included in the Business; provided, further, that nothing herein shall (i) require the Sellers to disclose any information to the Purchaser if such information disclosure would jeopardize any attorney-client or legal privilege or (ii) contravene any applicable Law, fiduciary duty or agreement (including any confidentiality agreement to which the Sellers or any of their Affiliates is a party); it being understood, that Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement).

Section 5.15.   Maintenance of Books and Records.

(a)   After the Closing, the Purchaser shall preserve, until at least the greater of the third (3rd) anniversary of the Closing Date or as otherwise provided in the Purchaser's applicable document retention policies, all pre-Closing Date records to the extent relating to the Business possessed or to be possessed by such Person.  After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable advance notice and during regular business hours, the Purchaser shall, and/or shall cause the Person holding such records to, (i) provide to the Sellers or their Representatives reasonable access to such records during normal business hours and (ii) permit the Sellers or their Representatives to make copies of such records; provided, however, that (A) any such access shall be conducted at Sellers' expense, in accordance with Law, under the supervision of the Purchaser's personnel and in such a manner as to maintain confidentiality and not to interfere with the normal operations of the businesses of the Purchaser and its Affiliates, and (B) the Purchaser will not be required to provide to the Sellers access to or copies of any Employee Records.

(b)   Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof, the Purchaser shall not have any obligation to make available to the Sellers or its Representatives, or provide the Sellers or its Representatives with (i) any income Tax Return or any combined or consolidated Tax Return filed by the Purchaser or any of its Affiliates or predecessors, or any related material, or (ii) more generally, any information if making such information available would (A) jeopardize any attorney-client or other legal privilege or (B) potentially cause the Purchaser to be found in contravention of any applicable Law or contravene any fiduciary duty or agreement (including any confidentiality agreement to which the Purchaser or any of its Affiliates is a party), it being understood that the Purchaser shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Sellers to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

Section 5.16.   Casualty.

At Closing the Sellers shall assign to the Purchaser, and the Purchaser shall be entitled to receive the benefits of, any and all claims and proceeds the Sellers may have with

respect to any casualty insurance policies with respect to any Transferred Tangible Assets which related to a casualty occurring after the date of this Agreement but prior to the Closing, and the Purchaser shall have the right to proceed against any insurance company to recover any such items and will have the right prior to the Closing to participate in all negotiations and discussions regarding the adjustment and settlement of any insurance claims with respect to any property or group of properties having a value in excess of five hundred thousand dollars ($500,000). The Sellers shall notify the Purchaser in writing of the occurrence of any casualty or similar event with respect to any of the Transferred Tangible Assets promptly after learning of such event.

Section 5.17.  Cooperation on Seller Contracts.

Prior to the Closing, the Sellers shall use their reasonable efforts to assist the Purchaser (i) to transition the benefits of each Active RFP, if any, to the Purchaser, including (A) by providing prior material communications with counterparties to each relevant Active RFP, if any, (B) by identifying relevant Employees with respect to each Active RFP and (C) by providing such other assistance Purchaser may reasonably request to enable the Purchaser to enter each Active RFP process following the Closing, in each case, subject to the Sellers' non-disclosure and confidentiality obligations to the Active RFP counterparties; (ii) in communications with counterparties to the Supplier Contracts and the Outsourcing Contracts with respect to the Purchaser's entry into new arrangements with such counterparties to provide similar goods, services or licenses as currently being provided under the relevant Seller Contract, including (A) by identifying the relevant counterparty contacts, (B) by providing access to any Employees who engage with the Supplier Contract and Outsourcing Contract counterparties and (C) in the case of the Outsourcing Contracts, by enabling the orderly transfer of the headcounts that are covered by the relevant Outsourcing Contract; provided, that the Purchaser shall timely, and in any event no later than three (3) Business Days following the date hereof, identify (x) each Active RFP in which the Purchaser intends to participate and (y) each Supplier Contract and Outsourcing Contract counterparty with respect to which the Purchaser requires Sellers' assistance pursuant to this Section 5.17.

**ARTICLE VI**

**TAX MATTERS**

Section 6.1.  Transfer Taxes.

(a)    The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. The Purchaser shall promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the execution of any Ancillary Agreement; provided, that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller or any Subsidiary, Affiliate, Representative or agent thereof, such Transfer Taxes shall be paid by the Purchaser to such Seller, Subsidiary, Affiliate, Representative or agent, as applicable, at the Closing or thereafter, as requested of or by the applicable Seller. All other Closing expenses will be paid by the Party incurring such expenses. Upon request from a Seller, the

Purchaser shall provide to such Seller an original receipt (or such other evidence as shall be reasonably satisfactory to such Seller) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1(a).

(b)    If the Purchaser wishes to claim any exemption relating to, or a reduced rate of, or make an election with the effect of reducing, Transfer Taxes, in connection with this Agreement or the transactions contemplated herein, or in connection with the execution of any Ancillary Agreement, the Purchaser shall be solely responsible for ensuring that such exemption, reduction or election applies and, in that regard, shall provide the Sellers prior to Closing with its permit number, GST, VAT or other similar registration numbers and/or any appropriate certificate of exemption and/or other document or evidence to support the claimed entitlement to such exemption or reduction by the Purchaser.

Section 6.2.    Tax Characterization of Payments Under This Agreement.

The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

Section 6.3.    Apportionment of Taxes.

(a)    Except as otherwise provided in this ARTICLE VI, (i) the Sellers shall bear all Taxes of any kind relating to the Assets or the conduct or operation of the Business for all Tax periods or portions thereof ending on or before the Closing Date and (ii) the Purchaser shall bear all Taxes relating to the Assets or the conduct or operation of the Business for all Tax periods or portions thereof beginning after the Closing Date.

(b)    For purposes of this Agreement, any Taxes for a "**Straddle Period**" (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of the period beginning after the Closing Date, respectively. The amount of Taxes shall be allocated between portions of a Straddle Period in the following manner: (i) in the case of a Tax imposed in respect of property (excluding, for the avoidance of doubt, any income Tax) and that applies ratably to a Straddle Period, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of sales, value-added and similar transaction-based Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be allocated to the portion of the Straddle Period in which the relevant transaction occurred.

Section 6.4.    Withholding Taxes.

The Purchaser shall be entitled to deduct and withhold from the Purchase Price such amounts as the Purchaser is required to deduct and withhold under the Code, or any provision of state, local or foreign Tax Law, with respect to the making of such payment. To the

extent such amounts are so withheld by the Purchaser, such withheld amounts shall be treated for all purposes of this Agreement and the Ancillary Agreements as having been paid to the relevant Seller in respect of whom such deduction and withholding was made by such Purchaser. None of the Parties is aware of any obligation to deduct and withhold any amounts from the Purchase Price under the Code, or any provision of state, local or foreign Tax Law, with respect to the making of such payment. If any of the Parties learns of any such obligation on or prior to the Closing Date, then (i) in the case of a Seller, such Seller shall promptly provide reasonable notice of such obligation to the Purchaser, and (ii) in the case of the Purchaser, the Purchaser shall promptly provide reasonable notice of such obligation to the Sellers. In the event that a Tax withholding obligation arises with respect to payment of the Purchase Price, the Parties shall cooperate in good faith to minimize the amounts that the Purchaser is required to deduct and withhold.

Section 6.5.    Records.

(a)    Notwithstanding the provisions of Section 5.10 or Section 5.11, (i) after the Closing Date, the Purchaser, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets, the Assumed Liabilities, or the Business for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Assets, the Assumed Liabilities or the Business for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow Representatives of the other party access to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be necessary or convenient. The obligation to cooperate pursuant to this Section 6.5 shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

(b)    On or prior to Closing, the Sellers shall cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for ten (10) years in accordance with an escrow agreement between the Purchaser, the Sellers and the Records Custodian, in form satisfactory to the Purchaser and the Sellers. The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by Tax advisors of any purchaser ("**Tax Credit Purchaser**") of the scientific research and experimental development tax credits of the Sellers under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser. The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or Nortel Networks Technology Corporation ("**NNTC**") as qualified expenditures on scientific research and experimental development for purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**").

(c)    The Purchaser shall use reasonable efforts to make available to the relevant Tax Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Tax Authority of the characterization of expenditures by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser.

(d)    The Purchaser shall have no obligation to provide any access under this provision unless the Seller (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

(e)    At the request of the Purchaser, the Sellers shall provide reasonable access to records and employees of the Sellers to assist the Purchaser in claiming any future scientific research and experimental development Tax credits for Qualified Expenditures.

(f)    The Sellers shall have no obligation to provide any access under this provision unless the Purchaser pays all of the Sellers' reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to employees of the Sellers (based on the total compensation of the employee at the time access is provided).

Section 6.6.    <u>Tax Returns.</u>

(a)    The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets or the Business, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes (**"Transfer Tax Returns"**) described below in Section 6.6(b)). Such Tax Returns shall be true, correct and complete in all material respects. Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) Sellers as and when required by Law.

(b)    Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated herein or in respect of the execution of any Ancillary Agreement shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws. Any Transfer Tax Returns prepared by the Sellers pursuant to this Section 6.6(b) shall be made available to the Purchaser at least five (5) Business Days before such Tax Returns are due to be filed. The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.6(b) at least one (1) Business Day before such Transfer Tax becomes due and payable.

(c)    The Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax

33

Returns with respect to the Assets or the Business for all Straddle Periods. Such Tax Returns shall be true, correct and complete in all material respects. All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Purchaser as and when required by Law.

(d)     The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.6(b)) prepared by the Purchaser for any Straddle Period before any such Tax Return is filed. The Purchaser shall submit a draft of any such Tax Return to the Sellers at least thirty (30) days before the date such Tax Return is required to be filed with the relevant Tax Authority. The Sellers shall have ten (10) days after the date of receipt thereof to submit to the Purchaser, in writing, the Sellers' written comments with respect to such Tax Return. The Purchaser shall file such Tax Return in accordance with the Sellers' reasonable comments.

(e)     Notwithstanding any contrary provision in this ARTICLE VI, each Seller shall pay to the Purchaser the amount of its liability for Taxes shown to be due on any Tax Return for a Straddle Period at least three (3) Business Days prior to the due date thereof, giving effect to valid extensions; provided, however, that (i) if such Seller and the Purchaser are unable to agree as to the amount of such liability prior to such due date, such Seller shall pay to the Purchaser such amount as it in good faith believes that it owes.

(f)     Notwithstanding any contrary provision in this ARTICLE VI, the Sellers shall not be entitled to any Tax-related information, including any Tax Return, that includes assets or operations of the Purchaser or any of its Affiliates in addition to the Assets; provided, however, that the Purchaser shall provide the Sellers with a copy of a pro forma Tax Return relating solely to the Assets for any Straddle Period.

Section 6.7.     Allocation of Purchase Price.

(a)     The Parties shall (i) allocate to the Transferred Tangible Assets a portion of the Purchase Price equal to the net book value of such Transferred Tangible Assets as of the Closing Date, and (ii) allocate to the intangible Assets the balance of the Purchase Price.

(b)     To the extent necessary to file Transfer Tax Returns, the Sellers shall reasonably and in good faith determine an allocation of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities) among the Assets in accordance with the principles of Section 1060 of the Code and the Treasury Regulations promulgated thereunder and other applicable Tax Laws, which allocation shall be subject to the principles of Section 6.7(a) (such allocation, a "**Partial Allocation**"); provided, however, that if a different Partial Allocation is required by a Government Entity (including as a result of the Bankruptcy Proceedings), then the Partial Allocation shall be modified as necessary to be consistent with the required allocation but in all cases shall be subject to the principles of Section 6.7(a). The Parties agree (i) to be bound by the final Partial Allocation (as modified to be consistent with the allocation required by a Government Entity, as described above) and (ii) to act in accordance with the allocations contained in such final Partial Allocation for all purposes relating to Transfer Taxes, including the preparation, filing and audit of any Transfer Tax Returns.

**ARTICLE VII**

**EMPLOYMENT MATTERS**

Section 7.1.    Employment Terms.

(a)    Not less than [ ] Business Days prior to Closing, the Purchaser or its Affiliates shall extend a written offer of employment to at least ninety percent (90%) of the Employees who are then employed by the Sellers, such offer being contingent in the case of Inactive Employees upon their return to active status. The Sellers shall have the right to review and approve, which approval shall not be unreasonably withheld, any offer of employment made pursuant to this Section 7.1 prior to it being sent to any Employee. Such offer of employment shall provide for an employee consideration period of at least one week. Such offers shall be consistent with the requirements of applicable Law and on terms and conditions no less favorable, in the aggregate, than those the Employees have as of the date hereof including (i) an annual base salary and annual target incentive compensation at least equal to such amounts set out with respect to such Employee in the Employee Information; (ii) a work location no more than twenty-five (25) miles from the Employee's current work location as set out in the Employee Information and (iii) a position that is substantially similar to the Employee's position as set out in the Employee Information. The Sellers shall provide the Purchaser with such additional information as the Purchaser may reasonably require in order to comply with its obligations under this ARTICLE VII. Employees' employment with the Purchaser shall not be conditioned upon such Employee satisfactorily completing a background investigation, drug test or other employee screening process and shall not include a probationary period; provided, however, that the Purchaser may require Employees to provide evidence they are legally permitted to be employed by the Purchaser.  Any Employee who accepts such offer of employment and commences employment with the Purchaser or its Affiliates shall be deemed to be a Transferring Employee for all purposes of this Agreement, effective as of the Employee Transfer Date.

(b)    For the twelve (12) month period following the Closing Date (or for such shorter period as a Transferring Employee remains employed by the Purchaser or its Affiliates), such Transferring Employee, subject to applicable Law, shall be employed on terms and conditions of employment not less favorable, in the aggregate, than the terms and conditions of employment provided to such Employees as of the date hereof; provided, however, that neither this Section 7.1 nor Section 7.2 restricts the right of Purchaser to terminate the employment of any Transferring Employee after the Closing; provided, further, that, following the Employee Transfer Date, except as provided in Section 7.2(b), nothing shall prohibit the Purchaser from amending or terminating, in whole or in part, any Purchaser Employee Plan or from making changes to such terms and conditions of employment that are generally applicable and broadly based across the Purchaser's employee population.

Section 7.2.    Employee Benefits.

(a)    The Purchaser shall, and shall cause its relevant Affiliates to, recognize the service date of each Transferring Employee as set out in the Employee Information for all

purposes other than benefit accrual under any defined benefit pension plan and except as would result in a duplication of benefits.

(b)    Without limiting the generality of the foregoing, the following shall apply to Transferring Employees:

(i)    For the period beginning on the Closing Date and ending on the date that is twelve (12) months from the Closing Date, the Purchaser shall, or shall cause its relevant Affiliates to, provide Transferring Employees with at least the severance payments and benefits to which the Transferring Employee would have been entitled under the applicable severance plan covering the Transferring Employee immediately prior to the Employee Transfer Date.

(ii)    Following the Employee Transfer Date the Sellers shall pay to the Transferring Employees the amount of compensation with respect to the accrued and unused vacation days that is due and owing to such Transferred Employees by the date required under applicable Law. The Purchaser will, and will cause its Affiliates to, make commercially reasonable efforts to accommodate requests for unpaid time off of such Transferring Employees until such time as they accrue sufficient paid time off under the Purchaser Employee Plans to address their vacation plans.

(iii)    Under the vacation policy of the Purchaser or an Affiliate of the Purchaser, the vacation accrual rate of each Transferring Employee on and after the Employee Transfer Date shall be the greater of such Transferring Employee's vacation accrual rate (i) as reflected in the Employee Information, or (ii) under the vacation policy of the Purchaser or its Affiliates following the crediting of such Transferring Employee with service as provided in Section 7.2(a).

(iv)    Each Transferring Employee (and their eligible dependents, as applicable), shall be eligible, effective as of the relevant Employee Transfer Date, to participate in and accrue benefits under the Purchaser Employee Plans that the Purchaser or its Affiliates extends to similarly situated employees of the Purchaser. With respect to each Transferring Employee (and their eligible dependents, as applicable) the Purchaser shall or shall cause its Affiliates to, (x) waive any eligibility periods, evidence of insurability or pre-existing condition limitations under any health benefit plan to the extent such limitations no longer apply to such Transferring Employees under a comparable Seller Employee Plan and (y) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employees, including with respect to their dependents, under any such Seller Employee Plans during the year in which the relevant Employee Transfer Date occurs.

(c)    The Sellers shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Employees that occur on or prior to the Closing Date provided that the Purchaser has satisfied their obligations set out in Section 7.1 and Section 7.2. The Purchaser shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Transferring Employees that occur on or after the Closing Date.

36

Section 7.3.    Other Employee Covenants.

(a)    After the date hereof, and subject to each Party's disclosure obligations imposed by Law or by Government Entities and each Party's obligations hereunder, neither the Purchaser, the Sellers nor any of their respective Affiliates shall issue any announcement or communication to their respective employees or the Employees, prior to consultation with, and the approval of, the other Party (not to be unreasonably withheld or delayed) with respect to this Agreement or any of the transactions contemplated hereby.  If requested, the Parties shall reasonably cooperate in respect of the development and distribution of any announcement and communication to the employees of the Sellers, including Employees, with respect to this Agreement or any of the transactions contemplated hereby.

(b)    Prior to the Employee Transfer Date (for Transferring Employees) and before and after the Closing Date for all other Employees, the Purchaser undertakes (and shall cause its Affiliates to undertake) to keep the Employee Information in confidence including taking the following actions:

(i)    the Purchaser shall restrict the disclosure of the Employee Information only to such of its employees, agents and advisors as is reasonably necessary for the purposes of complying with its obligations pursuant to this Agreement;

(ii)    the Employee Information shall not be disclosed to any Person other than those set forth in Section 7.3(b)(i) above (including, for the avoidance of doubt, any other employee of the Purchaser or other Affiliate of the Purchaser) without the consent of the Sellers, such consent not to be unreasonably withheld;

(iii)    the Employee Information shall not be used except for the purposes of complying with the obligations of the Purchaser pursuant to this Agreement and shall be returned to the Sellers or destroyed, at the Sellers' election, if this Agreement is terminated; and

(iv)    the Purchaser shall comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

(c)    During the Non-Solicitation Period, the Sellers shall not, without the advance written consent of the Purchaser, either directly or indirectly solicit for employment or hire any Transferring Employee unless the employment of such Transferring Employee is involuntarily terminated without cause by the Purchaser prior to such action by the Sellers (other than any termination in connection with such Transferring Employee seeking employment with Sellers); provided, however, that nothing in this Section 7.3(c) shall prevent the Sellers from (i) conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such Transferring Employees or (ii) hiring such Transferring Employees identified through such employment searches.

(d)    During the Non-Solicitation Period, the Purchaser shall not and shall cause its Affiliates to not either directly or indirectly solicit for employment or hire any employee of the Sellers who is not an Employee unless (i) the employment of such employee is involuntarily

37

terminated without cause by the Seller prior to such action by the Purchaser (other than any termination in connection with such employee seeking employment with the Purchaser), or (ii) otherwise permitted by the Transition Services Agreement.

        (e)    During the Non-Solicitation Period, the Purchaser shall not and shall cause its Affiliates to not either directly or indirectly solicit for employment or hire any Employee who has rejected an offer of employment from the Purchaser or its Affiliates or to whom Purchaser or its Affiliates did not make an offer of employment; provided, that this Section 7.3(e) shall not apply if the Purchaser gives the Sellers prior notice of such solicitation or hire and such employee, if applicable, returns to the Sellers any severance payments paid by the Sellers to such employee and, if applicable, releases the Sellers from any right to severance payments.

    Section 7.4.   Sole Benefit of Sellers and Purchaser.

        The terms and provisions of this ARTICLE VII are for the sole benefit of the Sellers and the Purchaser. Nothing contained herein, express or implied (i) shall be construed to establish, amend, or modify any Seller Employee Plan, any Purchaser Employee Plan, or any other benefit plan, program, agreement or arrangement, (ii) shall alter or limit the ability of the Purchaser, the Sellers, or any of their respective Affiliates to amend, modify or terminate any Seller Employee Plan, any Purchaser Employee Plan (other than as provided in Section 7.2(b)) or any other benefit or employment plan, program, agreement or arrangement after the Closing Date, (iii) is intended to confer or shall confer upon any current or former employee any right to employment or continued employment, or constitute or create an employment agreement with any Transferring Employee, or (iv) is intended to confer or shall confer upon any individual or any legal representative of any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees and including collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement.

## ARTICLE VIII

## CONDITIONS TO THE CLOSING

    Section 8.1.   Conditions to Each Party's Obligation.

        The Parties' obligation to effect the Closing is subject to the fulfillment (or the express written waiver of the Parties), at or prior to the Closing, of each of the following conditions:

        (a)    *No Injunctions or Restraints.* There shall be in effect no Law, order, injunction, decree or judgment of any court or other Government Entity in the U.S. or Canada prohibiting the consummation of the transactions contemplated hereby, and there shall not be any proceedings pending by any Government Entity in the U.S. or Canada seeking such prohibition.

        (b)    *U.S. Sale Order and Canadian Approval and Vesting Order.* The U.S. Sale Order and the Canadian Approval and Vesting Order shall have been granted and shall not, on the Closing Date, have been stayed or varied.

Section 8.2.    Conditions to Sellers' Obligation.

The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or the express written waiver by the Sellers), at or prior to the Closing, of each of the following conditions:

(a)    *No Breach of Representations and Warranties.*

(i)    Each of the representations and warranties of the Purchaser set forth in ARTICLE III (other than those referred to in clause (ii) below), disregarding all materiality qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that has not had, and would not reasonably be expected to have, a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

(ii)    Each of the representations and warranties set forth in Sections 3.1, 3.2 and 3.3, disregarding all materiality and material adverse effect qualifications contained therein, shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

(b)    *No Breach of Covenants.* Each of the covenants, obligations and agreements contained in this Agreement to be complied with by the Purchaser on or before the Closing shall not have been breached in any material respect.

(c)    *Ancillary Agreements.* The Purchaser shall have delivered to the Sellers duly executed copies of each of the Ancillary Agreements.

Section 8.3.    Conditions to Purchaser's Obligation.

The Purchaser's obligation to effect the Closing shall be subject to the fulfillment (or the express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a)    *No Breach of Representations and Warranties.*

(i)    Each of the representations and warranties of the Sellers set forth in ARTICLE IV (other than those referred to in clause (ii) below), disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that has not had, and would not reasonably be expected to have, a Material Adverse Effect.

(ii)    Each of the representations and warranties set forth in Sections 4.1, 4.2 and 4.3, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

(b)    *No Breach of Covenants.* Each of the covenants, obligations and agreements contained in this Agreement to be complied with by the Sellers on or before the Closing shall not have been breached in any material respect.

(c)    *Certificates.* The Sellers shall have delivered to the Purchaser duly executed certificates, as set forth in Section 2.3.2(b).

(d)    *Ancillary Agreements.* The applicable Seller shall have delivered to the Purchaser a duly executed copy of each of the Ancillary Agreements.

## ARTICLE IX

## TERMINATION

Section 9.1.    Termination.

This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of each of the Sellers and the Purchaser;

(b)    by either the Sellers or the Purchaser, upon written notice to the other if the Closing does not take place by December 31, 2009 (the "**Termination Date**"); provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(b) shall not be available to the Party seeking to terminate if such Party or one of its Affiliates is then in breach of this Agreement and such breach has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to this Section 9.1(b); or

(c)    by the Purchaser if any of the Sellers withdraw or seek authority to withdraw the Canadian Approval and Vesting Order Motion or the motion seeking approval of the U.S. Sale Order;

Section 9.2.    Effects of Termination.

If this Agreement is terminated pursuant to Section 9.1:

(a)    all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of (i) Section 5.5 (Public Announcements), (ii) Section 5.8 (Transaction Expenses), (iii) Section 5.9 (Confidentiality), with respect to the last sentence thereof, (v) Section 7.3(b) (Other Employee Covenants), (vi) Section 9.1 (Termination), (vii) Section 9.2 (Effects of Termination) and (viii) ARTICLE X (Miscellaneous); provided, that neither the termination of this Agreement nor anything in this Section 9.2 shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof;

(b)    except as required by applicable Law, the Purchaser shall return to the Sellers or destroy all documents, work papers and other material of any of the Sellers relating to

the transactions contemplated hereby, whether so obtained before or after the execution hereof; and

(c)    the provisions of the Confidentiality Agreement shall continue in full force and effect.

## ARTICLE X

## MISCELLANEOUS

Section 10.1.    <u>No Survival of Representations and Warranties or Covenants.</u>

No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be performed or satisfied after the Closing Date, which covenants and agreements shall survive until performed or satisfied in accordance with their terms.

Section 10.2.    <u>Remedies.</u>

No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

Section 10.3.    <u>No Third Party Beneficiaries.</u>

Except for any acknowledgments, rights, undertakings, representations or warranties expressed to be for the benefit of the EMEA Debtors or the Joint Administrators, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.4.    <u>Consent to Amendments; Waivers.</u>

No Party shall be deemed to have waived any provision of this Agreement or any of the Ancillary Agreements unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement and the Ancillary Agreements shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.

Section 10.5.    <u>Successors and Assigns.</u>

Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the

benefit of such parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Sellers in case of an assignment by the Purchaser or the Purchaser in case of an assignment by any Seller, which consent may be withheld in such party's sole discretion, except for the following assignment which shall not require consent (i) assignment to an Affiliate of a Party (provided that such Party remains liable jointly and severally with its assignee Affiliate to the other Parties for the assigned obligations), (ii) assignment by a U.S. Debtor to a succeeding entity following such U.S. Debtor's emergence from Chapter 11, and (iii) assignment by any of the Canadian Debtors pursuant to any plan of arrangement approved by the Canadian Court.

Section 10.6.  Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)     Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York applicable to Contracts made and to be performed in that State and without regard to the rules of conflict of laws of any other jurisdiction.

(b)     To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, Action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, provided that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors or the Canadian Debtors may, in accordance with the Cross-Border Protocol, request that the Bankruptcy Court or the Canadian Court, as case may be, to hold a joint hearing of the Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, Action or proceeding, and (b) in the United States District Court for the Southern District of New York or, if that court lacks subject matter jurisdiction, the Supreme Court of the State of New York, County of New York, if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases, and shall not be brought, in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the U.S. Bankruptcy Court, the Canadian Court, in the United States District Court for the Southern District of New York and the Supreme Court of the State of New York, County of New York and the Canadian Court, as applicable, pursuant to the preceding clauses (a) and (b) for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such Action brought in any such court or any claim that any such Action brought in such court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such Action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

Section 10.7.   Notices.

All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below, by electronic mail with confirmation to any Party at the address specified below, or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Purchaser to:

[          ]

With copies (that shall not constitute notice) to:

[          ]

and

[          ]

If to the Sellers to:

Nortel Networks Limited
195 The West Mall
Mailstop: T0503006
Toronto, Ontario, Canada M9C 5K1
Attention: [          ]

Facsimile: +1-905-863-7386

Error! Unknown document property name.Error! Unknown document property name.Error! Unknown document property

43

Error! Unknown document property name.

Nortel Networks Inc.
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA 37228
Attention:  Lynn C. Egan
            Assistant Secretary
Facsimile:  +1-615-432-4067

With copies (that shall not constitute notice) to:

Nortel Networks Limited
195 The West Mall
Mailstop:  T0505009
Toronto, Ontario, Canada M9C 5K1
Attention:  [      ]
Facsimile:  +1-905-863-7739

and

Nortel Networks Inc.
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee 37228
USA
Attention:  Robert Fishman
            Senior Counsel
Facsimile:  +1-347-427-3815 & +1-615-432-4067

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York, USA 10006
Attention:  Daniel S. Sternberg
Facsimile:  +1-212-225-3999

and

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention:  Michael Lang
Facsimile:  +1-416-216-3930

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                44                Error! Unknown document
                                                                        property name.

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the second calendar day after deposit with a reputable overnight courier service, as applicable.

Section 10.8.  Exhibits; Sellers Disclosure Schedule.

(a)     The Sellers Disclosure Schedule and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)     The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

Section 10.9.  Counterparts.

The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterparty of this Agreement

Section 10.10. No Presumption; Mutual Drafting.

The parties hereto are sophisticated and have been represented by lawyers who have carefully negotiated the provisions hereof.  As a consequence, the parties do not intend that the presumptions of any Laws relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement and therefore waive the effects of such Laws.

Section 10.11. Severability.

If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

45

Error! Unknown document
property name.

Section 10.12. <u>Entire Agreement.</u>

This Agreement, the Ancillary Agreements and the Confidentiality Agreement set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the Ancillary Agreements and the Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated. In the event of any irreconcilable conflict between this Agreement and any of the Ancillary Agreements or the Confidentiality Agreement, the provisions of this Agreement shall prevail.

Section 10.13. <u>Availability of Equitable Relief.</u>

The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, calculation of which the Parties agree would be uncertain and difficult to ascertain, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches.

Section 10.14. <u>Bulk Sales Laws.</u>

Subject to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, each Party waives compliance by the other Party with any applicable bulk sales Law.

Section 10.15. <u>Obligations of the Sellers.</u>

When references are made in this Agreement to certain Sellers causing other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor) and Affiliates of any Sellers shall in no event include any EMEA Debtors or their respective Subsidiaries.

Section 10.16. <u>Limitation on Losses.</u>

Except in the case of a Liability arising from a cash payment obligation due to a party in respect of which the party seeking set-off has received a final judgment in an Action or Proceeding in accordance with Section 10.6, no party shall be entitled to set-off any Liabilities or Losses under this Agreement against any amounts due to such party under any other agreement with the other parties or any Affiliate thereof. In no event shall any party be responsible or liable for any Losses that are consequential, in the nature of lost profits, diminution in the value of property, special or punitive or otherwise not actual damages.

**[Remainder of this page intentionally left blank. Signature page follows.]**

Error! Unknown document property name.Error! Unknown document property name.Error! Unknown document property

46

**Error! Unknown document property name.**

IN WITNESS WHEREOF, the Parties have duly executed this Transaction Agreement as of the date first written above.

[Purchaser]

By:_____

    Name:
    Title:


By:_____

    Name:
    Title:


Nortel Networks Limited


By:_____

    Name:
    Title:


By:_____

    Name:
    Title:


Nortel Networks Inc.


By:_____

    Name:
    Title:

Error! Unknown document property name.Error! Unknown document property name.Error! Unknown document property

Error! Unknown document property name.

**APPENDIX "B"**

Sale Procedures

[Attached.]

32

## SCHEDULE "A"

## SALE PROCEDURES

Set forth below are the sale procedures to be employed with respect to the proposed sale of assets pertaining to the Next Generation Packet Core network components as defined below.

Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries (collectively, the U.S. Debtors") are debtors and debtors-in-possession in chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Nortel Networks Limited ("NNL") and certain other affiliates of the U.S. Debtors have commenced proceedings under the *Canadian Companies' Creditors Arrangement Act* (the "Canadian Debtors"). NNI and NNL (together, the "Sellers") and their affiliated debtors have determined that a sale of the Assets (as defined below) pursuant to the competitive sale process as set forth herein is in the best interests of their estates.

The Sellers have determined that: (A) the potential sale of the Assets should be subject to a competitive sale process as set forth herein; (B) the eventual transfer of the U.S. Debtors' rights, title and interests in and to the Assets will be subject to approval by the Bankruptcy Court pursuant to section 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended; and (C) the eventual transfer of the rights, title and interests of the Canadian Debtors in and to the Assets will be subject to approval by the Ontario Superior Court of Justice (the "Canadian Court").

### Sale Procedures

The Sale Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner and timing within which bids must be submitted, and the evaluation of bids received (collectively, the "Sale Procedures"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., *et al.* (Case No. 09-10138) involving the U.S. Debtors (the "Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the *Companies' Creditors Arrangement Act* (the "Monitor"), and their respective advisors, throughout the Sale Procedures. In the event that the Sellers and any party disagree as to the interpretation or application of this sale process, except with respect to the application of the terms of any order of the Canadian Court or any requirement for approval by the Canadian Court or the Monitor, the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.[1]

---

[1]    For the avoidance of doubt, this Sale Process shall not govern any disagreements among the Sellers.

- 2 -

### Assets To Be Sold

The Sellers are offering for sale certain of the Sellers' tangible and intangible assets pertaining to the Next Generation Packet Core network components as more fully described in the Riedel Affidavit and the Twenty-First Report (the "Assets").

### "As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except to the extent set forth in the transaction agreement(s) with the successful bidder (collectively, the "Transaction Agreement").

### Communication with Potential Interested Parties

The Sellers will contact parties who have expressed an interest in acquiring the Assets in the last six months to invite them to participate in the sale process. The Sellers also may contact such other or additional potential interested parties to invite them to participate in the sale process. The Sellers will also entertain unsolicited requests from qualified persons to participate in the sale process.

### Participation Requirements

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court, for cause shown, or as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), in order to participate in the Sale process, each person who wishes to participate in the sale process (a "Potential Bidder") will be required to execute a confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of the Assets (in the event that the Potential Bidder has already entered into an otherwise satisfactory confidentiality agreement with the Sellers, it must provide a supplemental agreement that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets and waiving any of its rights under such confidentiality agreement that are in conflict with the sale process or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transaction it may enter into, to the Notice Parties) (collectively, the "Confidentiality Agreement").

A Potential Bidder who delivers a Confidentiality Agreement in accordance with the preceding paragraph and who the Sellers determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is likely to submit a bid that will constitute a Qualified Bid (defined below) will be deemed a "Qualified Bidder."

### Due Diligence

As promptly as practicable after a Potential Bidder becomes a Qualified Bidder, the Sellers will provide such Qualified Bidder with a confidential information memorandum containing information in respect of the Assets, access to an electronic data room, and a form of the Transaction Agreement (and related agreements and schedules) that is acceptable to the

- 3 -

Sellers. Due diligence access may include management presentations and such other matters as may be reasonably requested by a Qualified Bidder and as to which the Sellers, in their reasonable business judgment, may agree. No additional due diligence will continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise.

Bid Deadline

A Qualified Bidder who desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Anna Ventresca, General Counsel, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905) 863-2057; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (v) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vi) financial advisor to the Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (vii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; and (viii) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; so as to be received not later than **October 16, 2009 at 4:00 p.m. (ET)** (the "Bid Deadline") by the Sellers. The Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders and the other Notice Parties of such extension.

Qualified Bid

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(a)    it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Transaction Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or upon alternative terms and conditions that the Sellers

- 4 -

determine, after consultation with the Committee, the Bondholders Committee and the Monitor, provide maximum value to the estates;

(b)    it states that the bidder's offer is irrevocable until the closing of the Sale;

(c)    it includes a duly authorized and executed Transaction Agreement, reflecting, if any, the Qualified Bidder's proposed amendments and modifications thereto, as well as the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules to the Transaction Agreement, including a license agreement and a transaction services agreement, and/or any additional ancillary agreements required in connection with the sale of the Assets (the "Sale" or "Transaction"), with all exhibits and schedules thereto, (or term sheets that describe the material terms and provisions of such agreements) and copies of such materials marked to show those amendments and modifications to the Transaction Agreement ("Marked Agreement") and to such ancillary agreements (the "Marked Ancillary Agreements");

(d)    it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreement and the Marked Ancillary Agreements;

(e)    it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

(f)    it fully discloses the identity of each entity that will be purchasing the Assets;

(g)    it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the Marked Agreement or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(h)    it includes evidence, in form and substance satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(i)    it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may

- 5 -

determine) in an amount equal to the greater of 5% of the Purchase Price or $1,000,000 to be dealt with in accordance with the "Good Faith Deposit" paragraph herein;

(j)     it contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will be offered employment by the Qualified Bidder and any proposed measures associated with their continued employment;

(k)     it contains other information reasonably requested by the Sellers; and

(l)     it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids.

The Sellers shall notify any Qualified Bidders in writing as to whether or not their bid constitutes a Qualified Bid promptly following the expiration of the Bid Deadline.

<u>Evaluation of Competing Bids</u>

A Qualified Bid will be evaluated based upon several factors including, without limitation, items such as the Purchase Price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed and certainty of closure, the value of the Transaction, the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor. Following their review of the Qualified Bids and in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, the Sellers reserve the right, in their sole discretion, to (i) negotiate the terms and conditions of one or more Qualified Bids, with or without notice to any other Qualified Bidder(s) with a view to selecting one successful bid (the "<u>Successful Bid</u>"), (ii) without further negotiation or notice to any Qualified Bidder, select one Qualified Bid as the Successful Bid, or (iii) reject all Qualified Bids and/or withdraw from sale, in whole or in part, any Assets.

<u>No Qualified Bids</u>

If the Sellers do not receive any Qualified Bids, the Sellers reserve the right, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, to (i) extend the deadlines set forth in the Sale Procedures without further notice, and (ii) withdraw

- 6 -

from sale, in whole or in part, any Assets at any time and to make subsequent attempts to market the same.

### Successful Bid

To the extent that the Sellers select a Successful Bid in accordance with the "Evaluation of Competing Bids" paragraph above, the Sellers shall file a notice of the Successful Bid and the purchaser under the Successful Bid (the "Successful Bidder") with the Bankruptcy Court and seek approval from the Bankruptcy Court and the Canadian Court of the Transaction Agreement, which approval will include authorization to sell the Assets free and clear of all liens, claims and encumbrances. The Bankruptcy Court has currently scheduled a hearing to approve the sale of the Assets for **October 28, 2009 at 2:00 p.m. (ET)**, which hearing may be adjourned, rescheduled or cancelled at the U.S. Debtors' discretion. That hearing is anticipated to be a joint hearing with the Canadian Court.

### Good Faith Deposits

The Good Faith Deposit of any bidder shall be retained by the Sellers until the close of the Sale and returned to any unsuccessful bidder within five (5) Business Days thereafter. The Good Faith Deposit of the Successful Bidder will become nonrefundable upon the approval by the Bankruptcy Court and the Canadian Court of the Sale to the Successful Bidder and will be applied toward the purchase price.

### Reservation Of Rights

The Sellers reserve the right in their discretion, after consultation with the Committee, the Bondholder Group and the Monitor, to (i) impose additional terms and conditions and otherwise modify the Sale Procedures at any time; (ii) extend the deadlines set forth in the Sale Procedures without further notice; (iii) withdraw from sale any Assets at any time and make subsequent attempts to market the same; and (iv) reject all bids.

Court File No.: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
(COMMERCIAL LIST)

Proceeding commenced at Toronto

---

**TWENTY-FIRST REPORT OF THE MONITOR**
(dated September 24, 2009)

---

**Goodmans LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada M5B 2M6

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Applicants

GOODMANS\5764065