## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
         :

*In re*              :     Chapter 11

Nortel Networks Inc., *et al.*,[1]   :     Case No. 09-10138 (KG)
         :
        Debtors.   :     Jointly Administered
         :
         :     **Hearing date: October 15, 2009 at 2:00 PM (ET)**
         :     **(proposed)**
         :     **Objections due: October 12, 2009 at 4:00 PM (ET)**
         :     **(proposed)**
         :
-------------------------------------------------------X

## DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES, (B) APPROVING THE NOTICE PROCEDURES, AND (C) SETTING A DATE FOR THE SALE HEARING, AND (II) AUTHORIZING AND APPROVING THE SALE OF CERTAIN ASSETS OF DEBTORS' GSM/GSM-R BUSINESS

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of orders pursuant to sections 105 and 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 9018-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (i)(a) authorizing and approving the bidding procedures (as appended to the Bidding Procedures Order (as defined below), the "Bidding Procedures") for

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

the sale of substantially all of the assets of the GSM/GSM-R Business (as defined below) of Nortel (collectively, the "Assets"), (b) approving the form and manner of sale notices (the "Notice Procedures"), and (c) setting the time, date and place of a hearing (the "Sale Hearing") to consider the sale of certain assets relating to the Debtors' GSM/GSM-R Business (the "Sale Transaction"); (ii) authorizing and approving the sale of certain assets of the Debtors' GSM/GSM-R Business; and (iii) granting them such other relief as the Court deems just and proper.  In support of the Motion, the Debtors rely on the declaration of George Riedel (the "Declaration"), attached hereto as Exhibit A.  In further support of the Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105 and 363 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9014 and 9018 of the Bankruptcy Rules, and Rules 6004-1 and 9018-1 of the Local Rules.

## Background

**A.      Introduction**

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA (defined below), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors"[2], and together with the Debtors, the "North American Debtors") filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.  Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.  On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA.  On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.  In addition, at 8 p.m. (London time) on January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators").  On May 28, 2009, at the request of the UK Administrator of NNSA and in accordance with Council Regulation (EC) No 1346/2000 of 29 May 2000 on insolvency proceedings (the "EC Regulation"), the Commercial Court of Versailles, France, (the "French

---

[2]     The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[3]     The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

Court") ordered the commencement of secondary proceedings (the "Secondary Proceedings") in respect of NNSA.  In accordance with the EC Regulation and applicable French laws, the Secondary Proceedings consist of liquidation proceedings during which NNSA continued to operate as a going concern for an initial three-month period and, in accordance with a judgment of the French Court of August 20, 2009, will continue to operate as a going concern for another three-month period, provided that this second three-month period has been further extended as a result of the suspension of the liquidation process under the Secondary Proceedings in accordance with a judgment of the French Court of October 1, 2009 rendered at the request of the U.K. Administrator.  In accordance with the EC Regulation, the U.K. administration proceedings remain the main proceedings in respect of NNSA.  However, a French administrator (the "French Administrator") has been appointed and is in charge of the day-to-day affairs and continuing business of NNSA and a French liquidator (the "French Liquidator") has also been appointed and is in charge of the sale process of the business of NNSA.  The French Administrator and the French Liquidator will remain in place during the suspension of the Secondary Proceedings.

6.    On January 15, 2009, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

7.    On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the

Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

8.      On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor together with NNI and its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, 2009 this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

**B.      Debtors' Corporate Structure and Business**

9.      A description of the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").[4]

**C.      Nortel's GSM/GSM-R Business**

10.     Global System for Mobile communications ("GSM") is a widely deployed wireless technology standard for mobile phone networks.  Nortel is a supplier of GSM networks to operators globally and works with such operators to implement various GSM products.  In this regard, Nortel develops, manufactures, tests, sells and supplies GSM access and core infrastructure, services and solutions (the "GSM Business").  Also based on GSM technology is a variant of GSM for Railways, which provides a secure communications system for railways operators (together with the GSM Business, the "GSM/GSM-R Business").

---

[4]      Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

11.     Nortel has worked with more than 100 operators in over 65 countries to
implement cost-effective, high-performance GSM/GPRS/EDGE networks.  Built on Nortel's
GSM access and core network solutions, the networks are characterized by high voice quality,
security, radio performance and leading-edge wireless voice and data capabilities.  Nortel
recently introduced Nortel Smart Power Management software, which, combined with other
enhancements made to Nortel's GSM technology that makes today's Nortel GSM portfolio up to
50% more energy efficient than it was five years ago.  Nortel has more than 15 years experience
with GSM-R mobile communications technology and currently provides GSM-R solutions on
three continents.  With several thousands of kilometers of rail tracks installed using Nortel's
GSM-R products, Nortel is the leading GSM-R provider globally.

12.     As set forth in the Declaration, the environment in which Nortel entities that own
the Assets (the "Sellers") operate is highly competitive, the competition for market share is
fierce, and the cost of rapid technological development is steep.  Due to the global economic
downturn, Nortel is experiencing significant pressure on its businesses and facing competing
demands on its cash resources, globally as well as on a regional basis, as customers across all
businesses delay and reduce capital expenditures.  As a result, Nortel has commenced a process
for the orderly disposition of its businesses and dispositions of two major business units – the
CMDA/LTE business and the Enterprise Solutions business – have been approved by this Court
and the Canadian Court.  As with Nortel's other assets and businesses, a review has been
undertaken with respect to Nortel's GSM/GSM-R Business.  Since the commencement of the
creditor protection proceedings in the U.S. and Canada, Nortel has experienced significant
hurdles in pursuing new customers for its GSM/GSM-R Business.  The Debtors, together with

the Canadian Debtors[5] and the EMEA Debtors[6], therefore have concluded that the proposed sale

process is the best opportunity to maximize the value of the Assets and reduce the continuing

cost relating to the support and development of the Assets.

**D.    Development of a Sale Strategy for the GSM/GSM-R Business**

13.    The Sellers have extensively marketed the Assets.  In April 2009, Nortel began to

explore the potential sale of GSM/GSM-R Business.  In preparation for the sale, the Sellers and

their financial advisors prepared a confidential information memorandum ("IM") regarding the

GSM/GSM-R Business and established an electronic dataroom ("EDR") for the GSM/GSM-R

Business.

14.    As part of this exercise, the Sellers entered into confidentiality agreements with

twenty-six potential bidders who have received the IM, and eleven potential bidders submitted

expressions of interest for all or a portion of the GSM/GSM-R Business and have been granted

access to the EDR.  In addition, the Sellers conducted one or more management presentations

with several potential bidders.

15.    The Sellers entered into negotiations with several potential bidders and continue

to pursue these efforts.  Notwithstanding diligent efforts of the Sellers, the Sellers' efforts to

enter into a binding "stalking horse" agreement have been unsuccessful for a range of legal and

economic reasons.  While the Sellers have engaged in discussions with various potential bidders,

the GSM/GSM-R Business is experiencing significant pressure from its existing and potential

customers to provide a definitive timeline for the transfer of the GSM/GSM-R Business to a third

party.  Without a definitive timeline, sales to customers will diminish more quickly resulting in a

---

[5]    The Canadian Debtors are seeking complimentary relief from the Canadian Court.

[6]    The EMEA Debtors, other than NNSA, do not require relief from the UK Court to sell the GSM/GSM-R Assets located in their jurisdictions. For NNSA, complimentary relief will be sought from the French Court.

lower valuation of the GSM/GSM-R Business.  Therefore, for the reasons set forth above, the Debtors believe that the Assets present a compelling case for moving forward without a stalking horse bidder.

Relief Requested

16.    By this Motion, the Debtors seek orders:  (i) (a) authorizing and approving the Bidding Procedures, (b) approving the Notice Procedures, and (c) setting the time, date, and place of the Sale Hearing (such order, substantially in the form attached hereto as Exhibit B, the "Bidding Procedures Order"); (ii) authorizing and approving the sale of the Debtors' rights, title and interests in the Assets (the "Debtors' Assets") (such order, substantially in the form attached hereto as Exhibit C, the "Sale Order"); and (iii) granting them such other relief as the Court deems just and proper.

**E.    The Bidding Procedures**

17.    Although the Sellers would prefer to receive bids to convey all of the Assets to a single buyer, the Sellers will entertain joint bids for all of the Assets from a team of two or more bidders bidding together (each such bid, a "Joint Bid").

18.    The key provisions of the Bidding Procedures to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities (the "Sale") as set forth in the relevant sale agreements (the sale agreements and other ancillary agreements to such sale agreements to be entered among the Sellers and the Successful Bidder, the "Sale Agreement") with respect to a Successful Bidder (as defined below) (the transactions contemplated by such

agreements and any ancillary agreements discussed therein, collectively, the "<u>Transaction</u>") are

as follows:[7]

> a.    <u>Bid Deadline</u>.  A Qualified Bidder (as defined below) that desires to make a bid must deliver written copies of its bid to the following parties (collectively, the "<u>Notice Parties</u>"):  (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn:  Anna Ventresca, General Counsel, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile:  (905) 863-2075; (ii) U.S. Debtors' counsel:  Cleary Gottlieb Steen & Hamilton LLP, Attn:  James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile:  (212) 225-3999; (iii) Canadian Debtors' counsel:  Ogilvy Renault LLP, Attn:  Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile:  (416) 216-3930; (iv) Sellers' financial advisors:  Lazard Frères & Co., Attn:  Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile:  (212) 332-1748; (v) counsel to the Committee:  Akin Gump Strauss Hauer & Feld LLP, Attn:  Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile:  (212) 872-1002; (vi) financial advisor to the Committee:  Jefferies & Company, Inc., Attn:  General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile:  (212) 284-2280; (vii) counsel to the Bondholder Group:  Milbank, Tweed, Hadley & McCloy, Attn:  Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile:  (212) 822-5735; (viii) the Monitor:  Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile:  (416) 943-3300; (ix) the Administrators:  Ernst & Young LLP, Attn:  Stephen Harris, 1 More Place, London SE1 2AF, United Kingdom, Facsimile +44 20 7951 9002; and (x) counsel to the Administrators:  Herbert Smith LLP, Attn:  Stephen Gale, Exchange House, Primrose Street, London, EC2A 2HS, Facsimile:  +44 20 7098 4878; so as to be received not later than November 5**,** 2009 at 12 p.m. (Eastern) by the Sellers (the "<u>Bid Deadline</u>"). The Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so.  If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders and the other Notice Parties of such extension.

---

[7]    To the extent that there are inconsistencies between the description of the provisions of the Bidding Procedures contained in this Motion and the terms and conditions of the Bidding Procedures set forth in Exhibit 1 to the proposed form of Bidding Procedures Order attached hereto as Exhibit B, the terms and conditions of the Bidding Procedures set forth in Exhibit 1 to the proposed form of Bidding Procedures Order attached hereto as Exhibit B shall control.

b.    <u>Provisions Governing Qualifications of Bidders</u>.  Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court and accepted by the Administrators, for cause shown or, as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), prior to the Bid Deadline, in order to participate in the Bidding Process, each bidder (each such bidder, a "<u>Potential Bidder</u>") must deliver to the Notice Parties at the addresses provided above:

(i)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of the Assets (in the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets and waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transaction it may enter into, to the Notice Parties;

(ii)    current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements and latest unaudited financial statements of the equity holders or sponsors of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transaction; and

(iii)    a preliminary (non-binding) written proposal regarding:  (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any portion of the assets expected to be excluded; (iii) the structure (including, without limitation, in the case of each potential Joint Bid, the structure of such Joint Bid) and financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial

10

assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Potential Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Purchase Agreements, where for the purposes of these Bidding Procedures, "<u>Purchase Agreements</u>" means the sale agreements and other ancillary agreements provided by the Sellers to each Potential Bidder for the proposed Sale. The Sellers shall provide such Purchase Agreements in consultation with the Committee, the Bondholder Group and the Monitor.

A Potential Bidder, or in the case of a Joint Bid, all of the Potential Bidders participating in such Joint Bid, which shall be collectively considered a single bidder, that delivers the documents described above, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction will be deemed a "<u>Qualified Bidder</u>". For the avoidance of any doubt, in the case of a proposed Joint Bid, the Potential Bidders participating in such Joint Bid shall together constitute a single Qualified Bidder.

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder either by itself or, in the case of a proposed Joint Bid, in conjunction with other bidders participating in such Joint Bid, is a Qualified Bidder.  At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence as provided in the following paragraph with respect to the Assets.

c.    <u>Provisions Governing Qualified Bids</u>.  A bid, including a Joint Bid, will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to paragraph a. above and complies with all of the following (a "<u>Qualified Bid</u>"):

(i)    it states that the applicable Qualified Bidder offers to purchase all or substantially all of the Assets upon the terms and conditions substantially as set forth in the Purchase Agreements, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure (including, without limitation, an offer conditioned upon confirmation of a plan of reorganization proposed by the U.S. Debtors either individually or in collaboration with such Qualified Bidder) or upon alternative terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholders Committee and the Monitor, are no less favorable than the terms and conditions of the Purchase Agreements;

(ii)    it includes a letter stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), <u>provided</u> that if such Qualified Bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, 180 days from the entry of the Sale Order, and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(iii)    it includes duly authorized and executed purchase agreements, including the purchase price for the Assets expressed in U.S. Dollars (the "<u>Purchase Price</u>"), together with all exhibits and schedules thereto, including the French Offer (as such term is defined in <u>Schedule 1</u> attached to the Bidding Procedures) and, to the extent required by the terms and conditions of such bid, any ancillary agreements as described in the Purchase Agreements with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and ancillary modifications to the Purchase Agreements ("<u>Marked Agreements</u>"), the French Offer (the "<u>Marked French Offer</u>") and such ancillary agreements (the "<u>Marked</u>

12

Ancillary Agreements") and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the Qualified Bidder;

(iv)     it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements, the Marked French Offer and the Marked Ancillary Agreements;

(v)      it is not conditioned on (i) the outcome of unperformed due diligence by the Qualified Bidder (and includes an acknowledgement and representation that the Qualified Bidder has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer); (ii) obtaining financing and (iii) in the case of a Joint Bid, the resolution of any Interdependencies (as defined in the Bidding Procedures attached hereto as Exhibit 1 to Exhibit B) among the various Assets or entry of a cooperation agreement or similar agreement among the various participants in the Joint Bid;

(vi)     it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(vii)    it includes an acknowledgment and representation that the Qualified Bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreements (or identifies with particularity which of such contracts and leases of the US and Canada Debtors that the Qualified Bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases of the US and Canada Debtors that the Qualified Bidder wishes to assume), contains full details of the Qualified Bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

13

(viii)    it includes an acknowledgement and representation that the Qualified Bidder:  (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements, the Marked French Offer, or the Marked Ancillary Agreements; and (iii) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(ix)    it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery  and closing of the Marked Agreements, the Marked French Offer, and Marked Ancillary Agreements;

(x)    it is accompanied by a good faith deposit (each, a "<u>Good Faith Deposit</u>") in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to US$10 million to be dealt with as provided for under "<u>Good Faith Deposit</u>" herein;

(xi)    it (a) contains full details of the proposed number of employees of the Sellers, including, without limitation, NNSA (apportioned by jurisdiction(s)) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment and associated with the employment of all employees who will become employees of the Qualified Bidder, and (b) identifies any pension liabilities and assets related to any employees currently covered under any Nortel registered pension or retirement income plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(xii)    it includes evidence of the Qualified Bidder's ability to comply with Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate

14

assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Qualified Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(xiii)   it contains other information reasonably requested by the Sellers; and

(xiv)   it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids.

The Sellers shall notify any Qualified Bidders in writing as to whether or not their bid constitutes a Qualified Bid promptly following the expiration of the Bid Deadline.

d.   <u>Evaluation of Competing Bids</u>.  A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Transaction (including any regulatory approvals required to close the Transaction), any assets excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction(s)) to be offered post-closing employment by the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment of all employees who will become the employees of the Qualified Bidder, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.  Following their review of the Qualified Bids and in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, the Sellers reserve the right, in their sole discretion, to reject all Qualified Bids and/or withdraw from sale, in whole or in part, any Assets.

15

e.      <u>No Qualified Bids</u>.  If the Sellers do not receive any Qualified Bids, the Sellers reserve the right, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, to (i) extend the deadlines set forth in the Bidding Procedures without further notice, and (ii) withdraw from sale, in whole or in part, any Assets at any time and to make subsequent attempts to market the same.

f.      <u>Auction</u>.  If the Sellers receive two or more Qualified Bids, the Sellers will conduct an auction (the "<u>Auction</u>") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at 9:30 a.m. on November 9, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned without the prior written consent of any Qualified Bidder.  Copies of all Qualified Bids shall be delivered to the Committee, the Bondholder Group, the Monitor and the Administrators at such time that such bid is deemed a Qualified Bid but no later than one (1) Business Day prior to the Auction.  The Auction shall run in accordance with the following procedures:

(i)      Only the Qualified Bidders that have timely submitted Qualified Bids, the Sellers, the Committee, the Bondholder Group, the Monitor and the Administrators (and the advisors to each of the foregoing), and any creditor of the North American Debtors shall attend the Auction in person (and the advisors to such Qualified Bidder), and only such Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(ii)     Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(iii)    At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction, <u>provided</u> that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date. At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid which the Sellers believe, in their reasonable business judgment,

16

after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "<u>Starting Bid</u>") to <u>all</u> Qualified Bidders that have timely submitted Qualified Bids and have informed the Sellers of their intent to attend the Auction.

(iv)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction, <u>provided</u> that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(v)      The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (<u>e.g.</u>, the amount of time allotted to make Subsequent Bids) for conducting the Auction, <u>provided</u> that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(vi)     Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "<u>Subsequent Bid</u>") and (ii) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below).  Each incremental bid at the Auction shall provide net value to the estate of at least US $3 million over the Starting Bid or the Leading Bid, as the case may be, <u>provided</u> that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction, and <u>provided</u>,

17

further that the Sellers in determining the net value of any incremental bid to the estate shall not be limited to evaluating the incremental dollar value of such bid and may consider other factors as identified in the "Selection of Successful Bid" section of these Bidding Procedures, including, without limitation, factors affecting speed and certainty of obtaining regulatory approvals required to close the Transaction.  After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid").  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.  Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids, the Sellers will, at each round of bidding, give effect to any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

g.    Selection Of Successful Bid.  Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid that is either the Leading Bid or submitted subsequent to and as an improvement to the submission of the Leading Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including, among other things, the proposed revisions to the transaction documents, the effect of the Sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), the counterparties to such transactions, the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, other factors affecting the speed, certainty and value of the Sale (including any regulatory approvals required to close the Transaction), any assets excluded from the bid, the estimated number of in-scope employees of the Sellers to be offered post-closing employment by the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, (b) identify the highest or otherwise best offer for the Assets received in accordance with the Bidding Procedures (such bid, the "Successful Bid" and the Qualified

18

Bidder making such bid, collectively, the "Successful Bidder"), and (c) communicate to the Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any.  The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by the Canadian Court and any required approvals of any other applicable court(s) with such Successful Bidder and approval and execution by the Administrators of the relevant Successful Bid transaction documents with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

**F.     The Notice Procedures**

19.     The Debtors propose to give notice, immediately after the entry of the Bidding Procedures Order (or as soon thereafter as reasonably practicable), of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing by sending a notice (the "Sale Notice"), substantially in the form attached to this Motion as Exhibit D, to (i) the U.S. Trustee, (ii) counsel to the Committee, (iii) counsel to the Bondholder Group, (iv) all entities known to have a claim, lien, interest or encumbrance against the Assets, (v) the Monitor, (vi) the Administrators, (vii) the Internal Revenue Service and applicable federal and state taxing authorities, (viii) the Department of Justice, (ix) the Pension Benefit Guaranty Corporation and all regulatory authorities of the North American Debtors' pension plans in Canada and the United Kingdom, (x) each of the entities that had received an invitation from the North American Debtors to acquire or had expressed an interest in acquiring the Assets, and (xi) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002.

20.    In addition, as soon as practicable after entry of the Bidding Procedures Order and the Canadian Bidding Procedures Order (as defined below), but in any event no more than five (5) days after entry of such orders, the North American Debtors shall publish notice of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing in The Wall Street Journal (National Edition), The Globe & Mail (National Edition), and The Financial Times (International Edition), substantially in the form attached hereto as Exhibit E (the "Publication Notice").

**G.    Assumption and Assignment of Contracts**

21.    The Sellers are currently assembling a list of contracts related to the Assets.  To the extent that the Sellers deem it necessary to assume and assign any contracts pursuant to section 365 of the Bankruptcy Code in conjunction with the Sale, they will file a separate motion seeking approval for such assumptions and assignments or procedures for such assumptions and agreements to be heard at the Sale Hearing.

**H.    Request to Set a Date for the Sale Hearing**

22.    The Debtors intend to present the Successful Bid and the Alternate Bid, if any, for approval by the Court pursuant to the provisions of sections 105 and 363 of the Bankruptcy Code at the Sale Hearing to be scheduled by the Court and currently proposed as November 19, 2009 at 2:00 p.m. (ET).  The Debtors shall be deemed to have accepted a bid only when the Court has approved the bid at the Sale Hearing.  Upon the failure to consummate a sale of the Assets after the Sale Hearing because of the occurrence of a breach or default under the terms of the Successful Bid, the next highest or otherwise best Alternate Bid, if any, as disclosed at the Sale Hearing, shall be deemed the Successful Bid without further order of the Court, and the parties shall be authorized to consummate the transaction contemplated by the Alternate Bid.

**I.**      **Canadian and UK Proceedings**

23.      Once this Court approves the Bidding Procedures, the Bidding Procedures will be submitted to the Canadian Court for approval (the "Canadian Bidding Procedures Order").  The final sale and assignment of the Assets also will be submitted for approval by the Canadian Court.  With respect to the Assets owned by the EMEA Debtors, the Administrators have the power and authority to sell such assets pursuant to the EMEA Agreement without seeking a separate order from the UK Court.

**Basis for Relief**

**J.**      **Sale of the Assets Is a Product of the Debtors' Reasonable Business Judgment**

24.      Section 363(b)(1) of the Bankruptcy Code provides:  "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part:  "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

25.      Virtually all courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession.  See In re Abbotts Dairies of Pa., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale:  "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and

21

whether the asset is decreasing or increasing in value"); In re Stroud Ford, Inc., 164 B.R. 730,

732 (Bankr. M.D. Pa 1993); Titusville Country Club v. Pennbank (In re Titusville Country

Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Industrial Valley Refrigeration & Air

Conditioning Supplies Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); In re Lionel Corp., 722 F.2d

1063 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re

Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82

B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a

section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is

a good business reason for completing the sale and the transaction is in good faith").

26.     The "sound business reason" test requires a trustee or debtor-in-possession to

establish four elements:  (1) that a sound business purpose justifies the sale of assets outside the

ordinary course of business; (2) that accurate and reasonable notice has been provided to

interested persons; (3) that the trustee or the debtor-in-possession has obtained a fair and

reasonable price; and (4) good faith.  In re Titusville Country Club, 128 B.R. at 399; In re

Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R.

at 335-36; see also Stephens Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.[8]

27.     Additionally, prior to and after enactment of the Bankruptcy Code, courts have

permitted a proposed sale of all or substantially all assets of a trustee outside the ordinary course

of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or

---

[8]     Lionel's "sound business purpose test" replaces an older rule that held that sales of substantially all of a debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i.e. when the assets to be sold were "wasting" or perishable.  Lionel, 722 F.2d at 1071.

interest holders.  See In re Abbotts Dairies of Pa., Inc., 788 F.2d at 143; In re Lionel Corp., 722

F.2d at 1063 (passim).

28.     The proposed procedures for the sale of the Debtors' interests in the Assets meet

the "sound business reason" test.  First, sound business purposes justify the sale.  The Debtors

believe that a prompt sale of the Assets conducted pursuant to the Bidding Procedures presents

the best opportunity to realize the maximum value of the Assets for distribution to the Sellers,

including the Debtors' estates and their creditors.  The Debtors further believe that the benefit to

their creditors will be adversely affected absent an immediate sale.  See In re Lionel Corp., 722

F.2d at 1071 (of factors for court to evaluate on motion under section 363(b), "most important

perhaps, [is] whether the asset is increasing or decreasing in value").

29.     The proposed procedures for the sale of the Assets also meet the other factors of

the "sound business reason" test.  As part of this Motion, the Debtors have sought to establish

procedures for notice to creditors and other prospective bidders.  Under the circumstances of this

case, the Debtors submit that the notice period proposed satisfies the requirements of the

Bankruptcy Rules, see Bankruptcy Rule 2002, and provides sufficient time for parties in interest

to submit objections to the proposed sale and for bidders to formulate and submit competing

proposals.

30.     Finally, the proposed procedures for the sale of the Debtors' Assets, which require

the Debtors to consult with the Committee, the Bondholder Group and the Monitor throughout

the process, satisfy the good faith requirement of Abbotts Dairies.  The Debtors submit that the

results of the Auction will be the product of good faith, arm's length negotiations with respect to

the price and other terms of the sale of the Assets between the Sellers (including the Debtors)

and highest and best bidder at the conclusion of the Auction.

31.     As set forth above, the Debtors have demonstrated compelling and sound business justifications for authorizing the sale of the Assets.  The sale of the Assets pursuant to the Bidding Procedures will afford the Debtors' estates an opportunity to maximize the recoveries to creditors.  Accordingly, the Debtors request that the Court approve the proposed procedures for sale of the Assets to the highest or otherwise best bidder at the Auction and approve the sale presented to the Court at the Sale Hearing and authorize the Debtors to take such other steps as are necessary to consummate the Sale Transaction.

## K.     The Bidding Procedures Are Appropriate Under the Circumstances

32.     A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business.  11 U.S.C. § 363.  Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case.  See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand); In re Integrated Res., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

33.     The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate.  The Debtors submit that the opportunity for competitive bidding embodied in the Bidding Procedures will generate the highest or otherwise best offer for the Assets and therefore is designed to maximize the value of the Assets.

34.     The Debtors believe that a prompt sale process is the best way to maximize the value of the Debtors' Assets for the benefit of their estates, creditors and other stakeholders. Accordingly, the Debtors have concluded that:  (a) a prompt sale of the Assets is the best way to maximize value for these estates, and (b) the proposed Bidding Procedures described herein are fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale of the Assets.

**L.     Privacy Ombudsman**

35.     Under section 363(b)(1) of the Bankruptcy Code, if the sale of a consumer customer list containing personal information relating to individual persons is inconsistent with the Debtors consumer privacy policy, section 332 governs the appointment of a consumer privacy ombudsman.  11 U.S.C. § 363(b)(1).  Here, none of the Debtors' customers that are subject to the sale of the Debtors' Assets are individuals, and the Debtors do not have a consumer privacy policy, so section 363(b)(1) does not apply, and a consumer privacy ombudsman is not required.

**M.     Sale of the Debtors' Assets Should Be Free and Clear of Liens and Claims**

36.     Pursuant to, and to the fullest extent permitted by, section 363(f) of the Bankruptcy Code, the Debtors seek authority to sell and transfer the Debtors' right, interest and title in the Assets to the Successful Bidder free and clear of all liens, claims, encumbrances and other interests, except as set forth in the Agreement, with such liens, claims, encumbrances and other interests to attach to the proceeds of the sale of the Debtors' Assets, subject to any rights and defenses of the Debtors and other parties in interest with respect thereto.  Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

25

>    (1)    applicable nonbankruptcy law permits sale of such property
>    free and clear of such interest;
>
>    (2)    such entity consents;
>
>    (3)    such interest is a lien and the price at which such property
>    is to be sold is greater than the aggregate value of all liens on such
>    property;
>
>    (4)    such interest is in bona fide dispute; or
>
>    (5)    such entity could be compelled, in a legal or equitable
>    proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section

363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the

requirements is met).

    37.    With respect to each creditor asserting an interest, one or more of the standards

set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied.  Those holders of interests who

do not object or who withdraw their objections to the Sale or the Motion will be deemed to have

consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2).  Those holders of

interests who do object fall within one or more of the other subsections of Bankruptcy Code

section 363(f).

    38.    A sale free and clear of liens, claims and interests is necessary to maximize the

value of the Assets. A sale of the Assets other than one free and clear of all interests would yield

substantially less value for the Debtors' estates, with less certainty than a transaction free and

clear of all interests. Therefore, the Transaction contemplated by the Agreement is in the best

interest of the Debtors, their estates and creditors, and all other parties in interest.  A sale free

and clear of liens, claims and interests is particularly appropriate under the circumstances

because any lien or claim in, to or against the Debtors' right, interest and title in the Assets that

exists immediately prior to the closing of any sales will attach to the sale proceeds allocated to

the Debtors with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in interest. The Debtors submit that holders of liens, claims and interests, if any, will be adequately protected by the availability of the proceeds of sale to satisfy their liens, claims and interests.

**N.      Notice of the Proposed Sale Is Reasonable Under the Circumstances**

39.      The Debtors submit that the Sale Notice as set forth above, along with the Publication Notice in <u>The Wall Street Journal</u> (National Edition), <u>The Globe & Mail</u> (National Edition), and <u>The Financial Times</u> (International Edition), is reasonable and appropriate and will be adequate to ensure that all interested parties have the opportunity to bid for the Assets, and/or to object to the proposed sale of the Debtors' Assets.

**O.      Waiver of Automatic Ten-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)**

40.      Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for ten days after entry of the order.  Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for ten days after entry of the order.  The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

41.      Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, commentators agree that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. <u>See</u> <u>generally</u> 10 <u>Collier on Bankruptcy</u> ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection

is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  Id.

42.     Because of the potentially diminishing value of the Assets, the Debtors need the flexibility to close this sale promptly after all closing conditions have been met or waived. While the Successful Bidder likely will not be able to close within 10 days of entry of the Sale Order, it is quite possible that another bidder may condition its bid on the ability to close promptly.  Thus, in an excess of caution, the Debtors submit that waiver of any applicable stays is appropriate in this circumstance.

## Notice

43.     Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to (i) the U.S. Trustee; (ii) the Monitor; (iii) counsel to the Committee; (iv) counsel to the Bondholder Group; (v) the Department of Justice; and (vi) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

44.     No prior request for the relief sought herein has been made to this or any other court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

28

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed orders attached hereto; and (iii) grant such other relief as it deems just and proper.

Dated:  September 30, 2009
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (No. 5125)
Lisa M. Schweitzer (No. 1033)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors and Debtors in Possession*

3148693.1