**<u>EXHIBIT A</u>**

## SALE PROCEDURES

Set forth below are the sale procedures to be employed with respect to the proposed sale of assets pertaining to the Next Generation Packet Core network components as set forth in the Motion and defined below. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries (collectively, the U.S. Debtors") are debtors and debtors-in-possession in chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Nortel Networks Limited ("NNL") and certain other affiliates of the U.S. Debtors have commenced proceedings under the Canadian Companies' Creditors Arrangement Act (the "Canadian Debtors"). NNI and NNL (together, the "Sellers") and their affiliated debtors have determined that a sale of the Assets (as defined below) pursuant to the competitive sale process as set forth herein is in the best interests of their estates.

The Sellers have determined that: (A) the potential sale of the Assets contemplated by the Motion should be subject to a competitive sale process as set forth herein; (B) the eventual transfer of the U.S. Debtors' rights, title and interests in and to the Assets will be subject to approval by the Bankruptcy Court pursuant to section 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended; and (C) the eventual transfer of the rights, title and interests of the Canadian Debtors in and to the Assets will be subject to approval by the Ontario Superior Court of Justice (the "Canadian Court").

### Sale Procedures

The Sale Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner and timing within which bids must be submitted, and the evaluation of bids received (collectively, the "Sale Procedures"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., *et al.* (Case No. 09-10138) involving the U.S. Debtors (the "Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor"), and their respective advisors, throughout the Sale Procedures. In the event that the Sellers and any party disagree as to the interpretation or application of this sale process, except with respect to the application of the terms of any order of the Canadian Court or any requirement for approval by the Canadian Court or the Monitor, the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.[1]

---

[1]    For the avoidance of doubt, this Sale Process shall not govern any disagreements among the Sellers.

### Assets To Be Sold

The Sellers are offering for sale certain of the Sellers' tangible and intangible assets pertaining to the Next Generation Packet Core network components as more fully described in the Motion (the "Assets").

### "As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except to the extent set forth in the transaction agreement(s) with the successful bidder (collectively, the "Transaction Agreement").

### Communication with Potential Interested Parties

The Sellers will contact parties who have expressed an interest in acquiring the Assets in the last six months to invite them to participate in the sale process. The Sellers also may contact such other or additional potential interested parties to invite them to participate in the sale process. The Sellers will also entertain unsolicited requests from qualified persons to participate in the sale process.

### Participation Requirements

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court, for cause shown, or as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), in order to participate in the Sale process, each person who wishes to participate in the sale process (a "Potential Bidder") will be required to execute a confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of the Assets (in the event that the Potential Bidder has already entered into an otherwise satisfactory confidentiality agreement with the Sellers, it must provide a supplemental agreement that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets and waiving any of its rights under such confidentiality agreement that are in conflict with the sale process or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transaction it may enter into, to the Notice Parties) (collectively, the "Confidentiality Agreement").

A Potential Bidder who delivers a Confidentiality Agreement in accordance with the preceding paragraph and who the Sellers determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is likely to submit a bid that will constitute a Qualified Bid (defined below) will be deemed a "Qualified Bidder."

### Due Diligence

As promptly as practicable after a Potential Bidder becomes a Qualified Bidder, the Sellers will provide such Qualified Bidder with a confidential information memorandum containing information in respect of the Assets, access to an electronic data room, and a form of the Transaction Agreement (and related agreements and schedules) that is acceptable to the

2

Sellers. Due diligence access may include management presentations and such other matters as may be reasonably requested by a Qualified Bidder and as to which the Sellers, in their reasonable business judgment, may agree. No additional due diligence will continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise.

Bid Deadline

A Qualified Bidder who desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Anna Ventresca, General Counsel, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905) 863-2057; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (v) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vi) financial advisor to the Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (vii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; and (viii) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; so as to be received not later than **October 16, 2009 at 4:00 p.m. (ET)** (the "Bid Deadline") by the Sellers. The Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders and the other Notice Parties of such extension.

Qualified Bid

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(a)    it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or upon alternative terms and conditions that the Sellers determine,

3

after consultation with the Committee, the Bondholders Committee and the Monitor, provide maximum value to the estates;

(b)      it states that the bidder's offer is irrevocable until the closing of the Sale;

(c)      it includes a duly authorized and executed Agreement, reflecting, if any, the Qualified Bidder's proposed amendments and modifications thereto, as well as the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules to the Agreement, including a license agreement and a transaction services agreement, and/or any additional ancillary agreements required in connection with the sale of the Assets (the "Sale" or "Transaction"), with all exhibits and schedules thereto, (or term sheets that describe the material terms and provisions of such agreements) and copies of such materials marked to show those amendments and modifications to the Agreement ("Marked Agreement") and to such ancillary agreements (the "Marked Ancillary Agreements");

(d)      it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreement and the Marked Ancillary Agreements;

(e)      it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

(f)      it fully discloses the identity of each entity that will be purchasing the Assets;

(g)      it includes an acknowledgement and representation that the bidder:  (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the Marked Agreement or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(h)      it includes evidence, in form and substance satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(i)      it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may

determine) in an amount equal to the greater of 5% of the Purchase Price or $1,000,000 to be dealt with in accordance with the "Good Faith Deposit" paragraph herein;

(j)      it contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will be offered employment by the Qualified Bidder and any proposed measures associated with their continued employment;

(k)      it contains other information reasonably requested by the Sellers; and

(l)      it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids.

The Sellers shall notify any Qualified Bidders in writing as to whether or not their bid constitutes a Qualified Bid promptly following the expiration of the Bid Deadline.

<u>Evaluation of Competing Bids</u>

A Qualified Bid will be evaluated based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed and certainty of closure, the value of the Transaction, the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.  Following their review of the Qualified Bids and in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, the Sellers reserve the right, in their sole discretion, to (i) negotiate the terms and conditions of one or more Qualified Bids, with or without notice to any other Qualified Bidder(s) with a view to selecting one successful bid (the "<u>Successful Bid</u>"), (ii) without further negotiation or notice to any Qualified Bidder, select one Qualified Bid as the Successful Bid, or (iii) reject all Qualified Bids and/or withdraw from sale, in whole or in part, any Assets.

<u>No Qualified Bids</u>

If the Sellers do not receive any Qualified Bids, the Sellers reserve the right, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, to (i) extend the deadlines set forth in the Sale Procedures without further notice, and (ii) withdraw

from sale, in whole or in part, any Assets at any time and to make subsequent attempts to market the same.

Successful Bid

To the extent that the Sellers select a Successful Bid in accordance with the "Evaluation of Competing Bids" paragraph above, the Sellers shall file a notice of the Successful Bid and the purchaser under the Successful Bid (the "Successful Bidder") with the Bankruptcy Court and seek approval from the Bankruptcy Court and the Canadian Court of the Transaction Agreement, which approval will include authorization to sell the Assets free and clear of all liens, claims and encumbrances. The Bankruptcy Court has currently scheduled a hearing to approve the sale of the Assets for **October 28, 2009 at 2:00 p.m. (ET)**, which hearing may be adjourned, rescheduled or cancelled at the U.S. Debtors' discretion.

Good Faith Deposits

The Good Faith Deposit of any bidder shall be retained by the Sellers until the close of the Sale and returned to any unsuccessful bidder within five (5) Business Days thereafter. The Good Faith Deposit of the Successful Bidder will become nonrefundable upon the approval by the Bankruptcy Court and the Canadian Court of the Sale to the Successful Bidder and will be applied toward the purchase price.

Reservation Of Rights

The Sellers reserve the right in their discretion, after consultation with the Committee, the Bondholder Group and the Monitor, to (i) impose additional terms and conditions and otherwise modify the Sale Procedures at any time; (ii) extend the deadlines set forth in the Sale Procedures without further notice; (iii) withdraw from sale any Assets at any time and make subsequent attempts to market the same; and (iv) reject all bids.