1          IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE DISTRICT OF DELAWARE

3  IN RE:                        :
                                 : Chapter 11
4  NORTEL NETWORKS, INC., et al., :
                                 :
5                                 : Case No. 09-10138 (KG)
       Debtors.                  :
6  . . . . . . . . . . . . . . . .: Jointly Administered

7                   Wilmington, Delaware
                    September 16, 2009
8                      10:10 a.m.

9       TRANSCRIPT OF JOINT HEARING WITH CANADIAN COURT
                    VIA VIDEOCONFERENCE
10           BEFORE THE HONORABLE KEVIN GROSS
             UNITED STATES BANKRUPTCY JUDGE
11
   APPEARANCES:
12
   VIA VIDEOCONFERNECE:     Justice Morawetz
13
   For the Debtors:         Derrick Tay, Esquire
14                          Jennifer Stam, Esquire
                            Ogilvy, Renault, LLP
15
   For Ernst & Young as     Ms. Cher *(ph)* Hamilton, Esquire
16 the Monitor:             Joseph Pasquariello, Esquire
                            Goodmans, LLP
17
   For Former Nortel        Mark Ziegler, Esquire
18 Employees:               Koskie, Minsky

19 IN PERSON:

20 For the Debtors:         Ann C. Cordo, Esquire
                            Derek C. Abbott, Esquire
21                          Morris, Nichols, Arsht & Tunnell, LLP

22                          James L. Bromley, Esquire
                            Jeremy Lacks, Esquire
23                          Sanjeet Malik, Esquire
                            Cleary, Gottlieb, Steen & Hamilton,
24                          LLP

25

2

| | | |
|---|---|---|
| 1 | For SNMP: | Carl Neff, Esquire |
| | | Ciardi, Ciardi & Astin |
| 2 | | |
| | For The Committee: | Fred Hodara, Esquire |
| 3 | | Ryan Jacobs, Esquire |
| | | (unknown) |
| 4 | | Akin, Gump, Strauss, Hauer & Feld, |
| | | LLP |
| 5 | | |
| | | Christopher Samis, Esquire |
| 6 | | Richards, Layton & Finger |
| 7 | For Verizon | Darryl Laddin, Esquire |
| | Communications, Inc.: | Arnall, Golden, Gregory, LLP |
| 8 | | |
| | | Kathy Miller, Esquire |
| 9 | | Smith, Katzenstein & Furlow, LLP |
| 10 | For Avaya: | Evelyn Meltzer, Esquire |
| | | Pepper Hamilton, LLP |
| 11 | | |
| | | Mark Bane, Esquire |
| 12 | | Ropes & Gray, LLP |
| 13 | For Emerson: | Duane D. Werb, Esquire |
| | | (unknown) |
| 14 | | Werb & Sullivan |
| 15 | For AT&T: | Amanda M. Winfree, Esquire |
| | | Ashby & Geddes, P.A. |
| 16 | | |
| | | David Rosenweig, Esquire |
| 17 | | Fulbright & Jaworski, LLP |
| 18 | For the U.K. | Jaime Luton, Esquire |
| | Administrators: | Young, Conaway, Stargatt & Taylor, |
| 19 | | LLP |
| 20 | | Michael Luskin, Esquire |
| | | Hughes, Hubbard & Reed, LLP |
| 21 | | |
| 22 | For the Office of the | Richard L. Schepacarter, Esquire |
| | United States Trustee: | United States Department of Justice |
| 23 | | |
| 24 | For Anixter: | Ayesha Chacko, Esquire |
| | | Campbell & Levine, LLC |
| 25 | | |

| | |
|---|---|
| | Vicente Matias Murrell, Esquire |
| | Pension Benefit Guaranty Corporation |
| For Freescale | William Hazeltine, Esquire |
| Semiconductor & Intoto | Elihu E. Allinson, III, Esquire |
| Motorola, Inc.: | Sullivan, Hazeltine, Allison, LLC |
| For Enterprise | Kevin G. Collins, Esquire |
| Networks Holdings BV, | Bifferato |
| ENH: | |

VIA TELEPHONE:

| | |
|---|---|
| For the Debtors: | Craig Brod, Esquire |
| | Cleary, Gottlieb, Steen & Hamilton |
| For Ciena Capital: | Alice Burke, Esquire |
| | Latham & Watkins |
| For Monarch Alternative | Robert Burns, Esquire |
| Capital: | Monarch Alternative Capital, LP |
| For Oracle: | Amish Doshi, Esquire |
| | Day, Pitney, LLP |
| For Flextronics: | James V. Drew, Esquire |
| | Steven J. Reisman, Esquire |
| | Curtis, Mallet-Prevost, Colt, Mosle, LLP |
| For MatlinPatterson | Jennifer Feldsher, Esquire |
| Global Advisors: | Bracewell & Guiliani |
| For Sanmina: | David Fidler, Esquire |
| | Klee, Tuchin, Bogdanoff & Stern, LLP |
| For Interested Party, | Jan M. Geht, Esquire |
| Department of Justice: | U.S. Department of Justice |
| For Tricadia: | Stephan Gresanti |
| | Tricadia Capital |
| For Ernest & Young: | Lisa Kraidin, Esquire |
| | Allen & Overy, LLP |
| For Bondholders Group: | Thomas Kreller, Esquire |
| | Milbank, Tweed, Hadley & McCloy |

4

1  For Keith Weiner,          Jeffrey B. Rose, Esquire
   et al.:                     Tishler & Wald, LTD
2

3  For Anixter:                Jon Vigano, Esquire
                               Schiff, Harden, LLP
4

   For in Propria Persona      Jacob Zand
5  Jacob Zand:                 Jacob Zand

6  For Telmar:                 Erin Zavalkoff, Esquire
                               Vedder Price
7

   Court Recorder:             Jennifer Pasierb
8

   Transcription Service:      Perfect Pages Transcription, Inc.
9                              18 Tuckerton Road
                               Shamong, NJ 08088
10                             www.perfecttranscripts.com
                               (609) 654-8880
11

   Proceedings recorded by electronic sound recording;
12 transcript produced by transcription service.

13

14

15

16

17

18

19

20

21

22

23

24

25

5

INDEX

|  | Direct | Cross | Re-Direct | Re-Cross | Further Redirect |
|---|---|---|---|---|---|

Witnesses For Debtors:

George Riedel
(By proffer)
(Mr. Bromley)                 107

Michael Murray
(By proffer)
(By Mr. Bromley)             117

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| Verizon 1 | Written e-mail exchange | 37 | |
| B | Request for shortening time | 81 | |

6

1        (Call to order of the Court.)

2            THE COURT:  Good morning, everyone.  Thank you and

3    please be seated.  Mr. Abbott, good morning.

4            MR. ABBOTT:  Good morning, Your Honor.

5            THE COURT:  It's a busy day.

6            MR. ABBOTT:  It is, Your Honor.  Derek Abbott here

7    on behalf of the Debtors.  Your Honor, we've got a lot of

8    things scheduled.  I first want to say how appreciative the

9    Debtors and their constituents are for Your Honor making

10   yourself available today.  And there was a lot of high jinks

11   getting the scheduling coordinated well, bet --

12           THE COURT:  I certainly understand, Mr. Abbott.

13           MR. ABBOTT:  We appreciate it very much, and I

14   didn't want that to go unsaid.

15           THE COURT:  I'd much rather be here.

16           MR. ABBOTT:  It doesn't say much about your

17   alternative, Your Honor.

18           THE COURT:  Oh, that's right.

19           MR. ABBOTT:  Your Honor, just to be clear, we

20   submitted a Second Amended Agenda that I believe the Court's

21   received a copy of.

22           THE COURT:  I did, yes.  And I had an opportunity --

23   I was reading it as you were waiting for me.

24           MR. ABBOTT:  Your Honor, the first several matters

25   have obviously either been adjourned or orders entered, which

1  leads us this morning to both the discussions about the

2  Verizon objection that Your Honor scheduled at the

3  teleconference on Friday afternoon at the beginning of the

4  auction.

5         THE COURT:  Yes.

6         MR. ABBOTT:  In addition, Your Honor, last night as

7  a result of how things turned out as a result of the auction

8  and the filing of the IRS claim, we did file, Your Honor, last

9  night an objection to an IRS claim and they've asked for some

10 lender relief today --

11        THE COURT:  Yes.

12        MR. ABBOTT:  -- on an obviously much expedited basis

13 that Mr. Bromley will address after the Verizon matters, if

14 that's acceptable to the Court.

15        THE COURT:  Perfectly fine.

16        MR. ABBOTT:  I understand then, Your Honor, that at

17 1 o'clock you're going to take up the Chapter 15 matters, and

18 then at 1:30 we will be -- or as close there to as possible,

19 beginning the joint hearing, whether by TV or phone --

20        THE COURT:  If there's trouble in Canada, so I don't

21 know that we'll have the video, but I assume that the parties

22 would still like to go forward --

23        MR. ABBOTT:  Very much so.

24        THE COURT:  -- even if it's only audio, I'm sure.

25        MR. ABBOTT:  Okay.  Well, Your Honor, with that

1  behind us, I'll just cede the podium to Mr. Bromley.  Well, I

2  guess, Mr. Bromley will start and then we'll hear from Mr.

3  Laddin and --

4          THE COURT:  Yes.

5          MR. ABBOTT:  -- then we'll get into the IRS matters.

6          THE COURT:  Yes.  Thank you.

7          MR. ABBOTT:  Thank you, Your Honor.

8          THE COURT:  Yes, sir.  And I really would like to

9  focus it first on the prematurity issue.

10          MR. BROMLEY:  Good morning, Your Honor.

11          THE COURT:  Good morning, Mr. Bromley.

12          MR. BROMLEY:  James Bromley of Cleary, Gottlieb, on

13  behalf of Nortel Networks, Incorporated and its affiliated

14  U.S. Debtors.  I would like to echo Mr. Abbott's thanks for

15  the Court's willingness to adapt so quickly to a very fluid

16  situation.

17          THE COURT:  You bet.

18          MR. BROMLEY:  I will explain a little bit before we

19  start why we're here on Wednesday rather than Tuesday, and how

20  the events of the last few days unfolded.

21      We had anticipated that the evidence with respect to what

22  happened over the weekend and the auction will come on during

23  the joint hearing portion, and so what I'll say will be echoed

24  in the proffer, if necessary, testimony of Mr. Riedel and Mr.

25  Murray who I think you're getting to know quite well.

1          THE COURT:  Yes.

2          MR. BROMLEY:  If I could, Your Honor, also give a

3   couple of framework statements to begin with.  We're here now,

4   in September, we filed in January.  We made our first

5   announcement as to asset dispositions on June 19th, when the

6   announcement was made that a stalking-horse transaction had

7   been entered into with Nokia Siemens Networks for Nortel's

8   CDMA and LTE business.  And as Your Honor is aware, we had a

9   very successful auction in July, and we were able to increase

10  the purchase price for those assets by $480 million.

11         THE COURT:  Yes.

12         MR. BROMLEY:  And the successful bidder is Ericsson.

13  That was a great start to the sale process.  Your Honor will

14  recall, however, that in June, on June 19th, when we announced

15  that transaction, we also announced that Nortel was entering

16  into a process for the orderly disposition of its business

17  units, generally speaking, and that we would be coming to you

18  through the course of the next several months with a number of

19  sales.  And the next one that came up was, indeed, the one

20  that we're here today to consider, the Enterprise Solutions

21  Business.  We anticipate there will be others coming down the

22  road in not too short order.  And indeed, Your Honor, I think

23  -- I wanted to give you a heads up, there will be a relatively

24  small sale that we will be seeking to have expedited

25  consideration of the sale procedures for the omnibus hearing

1   on the 30th.

2           THE COURT:  Okay.

3           MR. BROMLEY:  We anticipate filing those procedures,

4   and it is a small one, more like the Velocity transaction that

5   we did early on in the case.  We anticipate filing the Sale

6   Procedures Motion in both Courts on Friday.

7       Also, Your Honor, in connection with CDMA transaction,

8   there was one thing that was left open, which was there needs

9   to be an Escrow Agreement approved for the deposit of the

10  funds.  We anticipate that the sale will close within the next

11  30 days.  That's certainly the plan, and there's been a lot of

12  work done in regard to that.  But we do need to come to the

13  Court and to the Court in Canada for approval of the Escrow

14  Agreement and something that we're referring to as the side

15  letter between the various estates as to the ultimate

16  disposition of the proceeds.

17          THE COURT:  Yes.

18          MR. BROMLEY:  We have, as you know, the Interim

19  Funding and Settlement Agreement that had been approved at the

20  end of June.  And we -- the parties are in active discussion

21  about the process that will be employed for the disposition

22  and allocation of proceeds, and so the Escrow Agreement and

23  side letter, that we'll be discussing, will be in anticipation

24  of that as well.  Basically a place holder until we have the

25  process in place just to make sure those funds go into a

1    secure place and everyone has their rights reserved, which is

2    the intention.

3         In addition, Your Honor, the -- and I should note that

4    the Nortel companies have been through a bit of internal

5    reorganization as well.  We've had -- the CEO has resigned in

6    light of the transactions in place and the situation that was

7    presented.  And there has been a real focus that has been

8    placed on the creation of a transition format for the

9    companies to move into the future.  Each of the transactions

10   that we're entering into anticipates what's known as a

11   Transition Services Agreement, and for some period of time, up

12   to two years, indeed, Nortel will need to provide transitions

13   services to its Purchasers of the various assets.  And it is

14   likely in the next several months that we will be coming to

15   you and to Justice Morawetz for relief with respect to the

16   structure of the transitions part of the business, such as

17   retention programs and things like that.  So it's all part of

18   the down sizing.  We are in active and constant communication

19   with our constituents and their financial advisors, and we

20   believe that everyone is up to speed on that.  And it is

21   certainly our anticipation that whatever we file, will be

22   filed after full consultation has been made and hopefully

23   agreement on everything, which has been the hallmark of this

24   case so far.

25        So that's just a bit of background.  I thought since we

12

1    hadn't been before you in a while, you might want to get a

2    sense of where things are heading.

3         THE COURT:  I appreciate it.

4         MR. BROMLEY:  And I do think it's important that we,

5    again, note that we've been extraordinarily grateful for the

6    cooperation and accommodations that the Courts have provided

7    us.  It's really been a Godsend.

8         If I could go back to the matter at hand, which is the

9    Enterprise transaction before we get into the Verizon

10   objection.  There are really two things this morning.  We have

11   the objection filed by Verizon Communications and certain of

12   its affiliates, as well as the Debtors' expedited request for

13   relief with respect to the Internal Revenue Service.  Both of

14   them relate in very important ways to the transaction that is

15   up for approval this afternoon.  And while the Verizon

16   situation certainly has been previewed with Your Honor, the

17   Internal Revenue Service situation, I think is new to you, so

18   --

19        THE COURT:  And I think a surprise to you.

20        MR. BROMLEY:  Well, I don't think letters from the

21   IRS are ever welcomed.

22        THE COURT:  No.

23        MR. BROMLEY:  But I think it's fair to say, it was a

24   bit of a surprise when we got the proof of claim.  So we'll

25   deal first with the Verizon situation and then after that,

1   we'll go to the Internal Revenue Service.  But before we even

2   get to Verizon, let me just describe to you, very briefly,

3   what happened over the weekend.

4        THE COURT:  Yes.

5        MR. BROMLEY:  So, Your Honor, the auction was

6   scheduled to start on Friday morning, September 11th at 9:30

7   a.m.  And at that time, the Debtors had two qualified bids and

8   two qualified bidders.  So they were Avaya, Incorporated, the

9   stalking-horse bidder, and now the winning bidder that's been

10  designated after the auction and an entity known as Enterprise

11  Networks Holdings, a joint venture between a Siemens of AG of

12  Germany and the Gores Group, a U.S. based private equity fund.

13  And that led to a very vigorous and lengthy auction.

14      One of the characteristics of the Enterprise transaction,

15  which is very different, I think, and important to note,

16  different from the CDMA transaction is that this is truly a

17  worldwide transaction.  The CDMA transaction was kind of in a

18  sweet spot if you will, Your Honor.  It was a North American,

19  Canadian, U.S. driven transaction.  There were certainly

20  elements of it that related to the Nortel business outside of

21  North America, but it was really a North American transaction.

22  This transaction is a worldwide transaction.  There are two

23  Asset Purchase Agreements.  Indeed, they're actually not

24  called Asset Purchase Agreements for an important reason,

25  they're Asset Sale and Share Sale Agreements.

14

1          THE COURT:  Yes.

2          MR. BROMLEY:  And there's one with the EMEA Debtors,

3   the European, Middle East and African Debtors that are under

4   joint administration in London.  Also parties are the Israeli

5   entities, which are in proceedings in Israel, as well as the

6   French entity, which is under secondary proceedings in Paris,

7   or actually Versailles.  So it is a truly international

8   transaction, and the EMEA transaction is entirely contingent

9   on this and vice versa, so they all hang together.  They rise

10  or fall as one, and that had made the negotiation of this

11  transaction a very complex and lengthy endeavor.  Indeed, I

12  think we're in our seventh month of negotiations, more or

13  less, with respect to this.  And, again, it's part and parcel

14  of the thing that we've said from the beginning, which is that

15  Nortel is an integrated business around the world and trying

16  to sell business units means disentangling decades of

17  interrelationships so that the Enterprise business can be sold

18  separate from the CDMA business, separate from the other

19  businesses.  And that has created lots of challenges on the

20  legal side, as well as the operational side.  So there's been

21  a lot of heavy work that's been done by the buyer and the

22  sellers and the Creditors, in particular, to come up to speed

23  to understand this that has led us to this day.

24      So on Friday we started our auction and we didn't finish

25  it until 2:30 a.m. on Monday morning.  The results were quite

1    successful from the Debtors' perspective.  We increased the

2    total value that was to be paid from $475 million to $915

3    million.  The 915 comprised of $900 million in cash and

4    another 15 million to fund employment retention, which is very

5    important in order to keep the businesses stabilized between

6    sale approval and closing.  So I think the Debtors and their

7    constituents are very happy with the way that the auction

8    process has worked in our first two sales and, frankly, has

9    seen vindication of the decisions to hold the companies

10   together and sell them as worldwide businesses.

11       So what happened between Friday and Monday was an awful

12   lot of negotiation, much negotiation on documents, which was a

13   little different than the CDMA situation.  CDMA, every round

14   was basically about money.  Who had more of it and who was

15   willing to pay more.  In this situation, we had to start off

16   the auction by actually delaying it because of the Internal

17   Revenue Service's claim.  And we really didn't get down to

18   business until late in the evening on Friday as we sat down

19   with both bidders working to both explain the IRS situation,

20   the potential ramifications to the transactions, and to draft

21   solutions to allow the auction to go forward.  So it was a bit

22   of touch and go there for awhile, but we were very much

23   grateful for everyone to have put the effort in to understand

24   these difficult issues and work through them.  And then we

25   went through several rounds.  I think on Friday we went to

16

1   about 6:00 a.m. and then we broke, came back at around noon.

2   We went from noon until about 1:00 a.m. or 1:30 a.m., came

3   back, again, at 7:00 or 8:00 a.m. on Sunday and went straight

4   through again until about 2:30 when the auction ended.  And

5   then pretty much since the auction ended, we've been in

6   nonstop drafting mode to make sure that all of the changes

7   that had been agreed to and discussed over the weekend were

8   properly documented.  So we finally did sign the --exchanged

9   the signature pages for the Amended Agreements yesterday

10  around 5:00 or 6 o'clock, and so that is the reason for our

11  delay.  We did have the Agreements still moving around, not

12  any major substantive issues, but given the size of them and

13  their complexity, it really did take some time to get to where

14  we are.  So that's, by means of background, Your Honor, sort

15  of an explanation of why we needed to move things from

16  yesterday to today.

17          THE COURT:  Understood.

18          MR. BROMLEY:  And also to give you some sense of

19  where we are right now.  In terms of the Sale Motion, we

20  did -- and the Verizon objection, in particular -- and we did

21  have a hearing back in August about the procedures and the

22  bidding procedures, and not only the bidding procedures, but

23  the procedures for the assumption and assignment of executory

24  contracts.

25      And I think it's worthwhile to stop there for a moment

17

1   because it does bear a bit of reflection.  In most of these

2   363 sales, that all of us here in the United States deal with,

3   we hear the word contract or lease and we simply stop and say,

4   okay, 365, let's think about it.  Our contracts are much more

5   complicated than that, unfortunately.  And so our Agreements

6   that we've entered into with Avaya, and would have entered

7   into with the other bidder, have a number of different

8   categories of contracts and they relate.

9        There are customer contracts and there are supplier

10  contracts.  There are contracts for the purchase of goods and

11  services.  There are contracts for the purchase of goods.

12  There are contracts for the purchase of services.  There are

13  contracts in the United States that are subject to Section

14  365.  There are contracts in Canada which are not.  There are

15  contracts in every other corner of the world which are not

16  subject to Section 365.  There are some contracts in the

17  United States that were entered into after the petition date,

18  some contracts that were entered into before the petition

19  date.  There are probably about 25,000 contracts that Avaya

20  needed to review.  And in all honesty, Your Honor, those are

21  contracts all around the world that fit into all of those

22  categories and probably some more.  So the question then

23  became, when we were putting together the procedures, would it

24  be possible to hold off signing any of these Agreements until

25  every single contract had been reviewed?  And the answer

1    simply was, no.  We would have run out of time.  We would have

2    run out of money.  We would have run out of purchasers.  We

3    would have lost an immense amount of value.  And that was

4    driven, not just by the sheer number, but also by the

5    different characteristics of the contracts.  It would be

6    fundamentally unfair, and I know that's not necessarily a word

7    that always comes up in courts.  I remember once being told by

8    a clerk at the Second Circuit when I was a young associate,

9    that this is not a court of justice, it's a court of law.

10            THE COURT:  Well, this is a court of equity.  Of

11   course, which gives me a little bit of an edge on fairness, I

12   suppose.

13            MR. BROMLEY:  Yes.  I was appealing a Bankruptcy

14   Court Order there, and I didn't get -- I mentioned equity,

15   that didn't come into play either --

16            THE COURT:  No.

17            MR. BROMLEY:  -- on the 38th floor.

18            THE COURT:  I seem to recall law professors didn't

19   like it very much when you answered that way either.

20            MR. BROMLEY:  But nevertheless, we're in a situation

21   where we have all of these contracts around the world, and the

22   U.S. procedures are, we think, different than they are around

23   the world.  And it would have been inappropriate, in our

24   judgment, and when I say our judgment, I say the judgment of

25   the Nortel entities around the world and the Creditor

1    constituencies, to have said everyone needs to stand still and

2    wait until the U.S. contracts are identified and categorized,

3    particularly because there's no need to do that right now as

4    of the sale hearing.

5        What we have is a period between today and closing that's

6    going to be several months.  We certainly want it to be as

7    short as possible.  And it is our hope that by the middle of

8    November, we're on the verge of closing this transaction, so

9    maybe it's just two months, and that is everyone's goal.  But

10   nevertheless, it's not tomorrow.  And what we've done is built

11   a process that provides counterparties in the United States to

12   contracts that are subject to Section 365 with a procedure

13   that guarantees them all of the rights and remedies that they

14   would have with respect to a 365 Motion, whether to assume or

15   to reject.  And that set of procedures, we think, is fair and

16   appropriate and has been used in many other cases.  Indeed,

17   the -- I have been personally involved in the Lehman Brothers,

18   GM and Chrysler cases.  In every one of those, they had

19   procedures post-sale hearing for the assumption and assignment

20   of contracts.  There's nothing in the Code that says that we

21   must assume and assign and make our decisions to assume and

22   assign at the time that the 363 sale is to be approved.  And,

23   indeed, that is what was up for consideration when the bidding

24   procedures were considered.  And notwithstanding a wide notice

25   and service on all counterparties, we didn't have a single

1    objection, including from Verizon, to those procedures.

2    Verizon, I think, purported to reserve its rights and said it

3    would object here, and we said we would oppose it, but

4    nevertheless, it was not objected to then.  And since that

5    time, over a month ago, the Debtors have expended millions of

6    dollars and Avaya has expended millions of dollars in deciding

7    which contracts are on the appropriate lists, which contracts

8    fit through filters, which contracts should be assumed and

9    assigned, which contracts should be transferred in every

10    jurisdiction around the world, not just the United States.

11        So, Your Honor, I think it's first and foremost, if this

12    was a problem that needed absolute and total attention and

13    would be a blocking -- turn out to be a block to the entire

14    transaction, the time to have raised that was at the

15    procedures hearing when they were approved.  And I would note,

16    the procedures were approved and not appealed by anyone,

17    including Verizon.

18        I was once before a district court judge here in Delaware

19    who, after the fifth or sixth bankruptcy lawyer stood up and

20    said, I want to reserve my rights, that judge said, what is it

21    about you bankruptcy lawyers?  You're always reserving your

22    rights.  I don't know what that means.  You either have them

23    or you don't.  And if you use them -- and if you have them and

24    you don't use them, you lose them.  And I would suggest, Your

25    Honor, that's where we are today.  What we have is a process

1   that was put in place a month ago, over a month ago, that

2   described in great detail how these contracts were going to be

3   dealt with.  And they were put in place for a very specific

4   reason, which was to accommodate an incredibly complex

5   transaction that has cost millions and millions of dollars to

6   bring to this Court and the Court in Toronto.  Without those

7   procedures being complied with and brought forward, we put at

8   risk a very, very positive transaction result.  We have almost

9   doubled the price with respect to the Enterprise deal.  We

10  have, ourselves, on the verge of putting all of our customers,

11  nearly all of our customers, I would say pretty much all of

12  them who don't have financial disputes with the Purchaser, in

13  safe hands.  And we're not talking about a lot of different

14  safe hands in this business.  If you look at the major players

15  in this business, you're talking about Avaya, Nortel, Cisco,

16  Siemens, and a few others that are not particularly large in

17  the marketplace, and we've had all of those players other than

18  Cisco here.  And then when we say here, we should also think

19  about it, Your Honor.  We're here in Bankruptcy Court.  We're

20  in Bankruptcy Court because Nortel was not going to be able to

21  make a go of it.  Not just with respect to the Enterprise

22  Business, but generally.  And so we've told you at the opening

23  of this case in the first-day hearings, we told you in

24  connection with CDMA deal, both at the procedures hearing and

25  at the sale hearing, and we've told you at the procedures

22

1   hearing for the Enterprise transaction, that Nortel simply did

2   not have and does not have the financial resources to compete

3   in these fiercely competitive businesses.  And, indeed, the

4   Enterprise Solutions Business is a fiercely competitive

5   business, and that is important to keep in mind when we talk

6   about prejudice and the ability to do things and the ability

7   to avoid bad results.

8        So, Your Honor, what we're talking about with respect to

9   this transaction is a great success, a buyer who is one of the

10  two or three premiere players in this field, absolutely

11  qualified with the financial wherewithal to take care of all

12  our customers.  We think that we have acquitted ourselves

13  quite well as Debtors with our Creditor constituencies in

14  finding the best result for our customers, for our employees,

15  for our Creditors.  And there aren't many other options.  We

16  either sell this business to one of the bidders or we don't.

17  We don't operate it.  We don't have a choice here, Your Honor.

18  Nortel has announced it's selling its assets.  It's not going

19  to remain in business to service contracts, not when those

20  contracts and the business are money losing propositions for

21  Nortel.  It is great that they are money making opportunities

22  for others, but to delay this sale diminishes that money

23  making opportunity for others and, therefore, decreases the

24  amount of money that we would be able to obtain for our

25  various constituencies.  And it also creates a great deal of

1  uncertainty for our other customers, for the vast majority of

2  customers that are perfectly happy, indeed, excited about a

3  transaction with Avaya.

4      So when we sit here, Your Honor, we're looking at a

5  number of things.  It is not easy for Nortel to stand up here

6  and have a public argument with one of its biggest customers.

7  Nortel has had a long and successful relationship with

8  Verizon, all different parts of Verizon.  When we did the CDMA

9  transaction, I think it was noted that a substantial portion

10 of Verizon's Wireless Network is built on Nortel CDMA

11 equipment.  And so every time there's a commercial on TV that

12 says, can you hear me now, by that guy in the Verizon coat

13 with the helicopters behind him, the answer is you can hear me

14 now because of Nortel, because of decades of cooperation and

15 work between Nortel and Verizon.  But it's also important now

16 to take a step back and look at what we're talking about here.

17 The CDMA transaction was about networks.  It was about

18 transmitting outside of buildings, communications.

19     My father-in-law worked for the phone company when it was

20 the phone company.  And one of the things that he found most

21 surprising after the breakup of AT&T was that the world

22 divided between the street and the wall of the house.  It used

23 to be that the phone company was responsible for everything

24 from the street to your ear, but it's not that anymore.  It's

25 you're responsible for the things inside your building and

24

1    others are responsible for the things outside your building.

2    What we're talking about here, Your Honor, is a business

3    that's about inside the building.  The Enterprise Solutions

4    Business is a business that sells telephones systems.  There's

5    lots of very complicated words for it, but it sells telephone

6    systems and voice mail systems and video conferencing systems.

7    Yes, it is broadly within the idea of communications, but it

8    is not part of the backbone of the national communication

9    grid.  It is not part of a monopoly or a near monopoly that

10   delivers communication services.  It is the hardware, the

11   piece of equipment, the telephone that you pick up.  And I

12   think that's important to keep in mind when we talk about

13   things like national security, public health and safety.  I

14   think it's really dangerous to throw around those terms

15   because they get people upset and I think unnecessarily so.

16      The Enterprise Solutions Business operates in a sphere

17   where there's incredible competition with very powerful

18   players.  That's why Nortel has to get out of it.  It has to

19   get out of this business because there are too many

20   competitors out there who can come in on a moments notice and

21   take away its customers.  Who can come in and say, I have

22   better, newer, more sophisticated stuff, and I can rip and

23   replace, which is the term that's used, on a moments notice.

24      I think it's also important to note, Your Honor, that

25   there's not a single insinuation that this isn't very robust

1   equipment.  I don't know about you, but my phone tends to work

2   pretty well.  I've had a Nortel Networks phone on my desk for

3   20 years.  The three button sticks a little bit, and

4   occasionally the voice mail light doesn't light, but for the

5   past 20 years, people have found me and have found me pretty

6   quickly.  And our phone system hasn't failed and we don't

7   expect to.  But even if it did, I think we can call Cisco or

8   Avaya or Siemens, and they'd be at our front door pretty quick

9   with a contract and a smile on their face and a team of people

10  who can come in and rip and replace all of our equipment very

11  quickly.  Now, granted I'm a law firm partner, and I'm not

12  operating a 911 system or a national security desk, but I

13  think it's the same thing, Your Honor.  We're not talking

14  about anything here that implicates a statutory or regulatory

15  regime that would prevent the Debtors from exercising their

16  business judgment.  And the Debtors haven't even exercised it

17  yet.

18          THE COURT:  That's my -- that's the question I was

19  about to ask.

20          MR. BROMLEY:  We haven't told Verizon that we're

21  going to reject anything.  We haven't told them we're going to

22  assume anything.  All we've done is told them that our

23  Purchaser, Avaya, has indicated that they do not want us to

24  assume and assign that contract to them.  That decision is

25  subject to a revision.  If Avaya came to us and said, we'd be

1    happy to assume it and assign it, I think the Debtors would

2    have to look at it and see if that entails a price on the

3    Debtors' side, but we would certainly consider it.  And if we

4    gave the rejection notice tomorrow, the closing would not

5    occur until the end of November in any event, and Verizon

6    would have plenty of time.  Plenty of time to put in some

7    backup and to make sure that its customers were taken care of.

8    If we told them that tomorrow, they would have more time then

9    Section 365 requires.  And they would have the ability to come

10   in here to Court to argue that what they're purporting is a

11   national security or public health and safety issue, indeed,

12   actually is, but we haven't gotten there yet.  Indeed, that

13   cuts both ways in my mind in terms of the Verizon argument.

14       They've known since the end of July that Avaya was the

15   potential Purchaser here.  And like I said, Your Honor,

16   there's only a few parties in this area who could potentially

17   acquire this business.  And they've known since the middle of

18   August, when we told them that the other Purchaser was --

19   potential Purchaser was Gore Siemens.  Verizon has had,

20   therefore, at least a month to figure out what it might do in

21   the event that these contracts might be rejected.  They've

22   also had a month to talk internally about what kind of

23   transaction they might be willing to enter into with Avaya

24   and, indeed, I understand that business level conversations

25   have taken place with Avaya.  But right now, we don't have a

27

1  ripe dispute with respect to the assumption and assignment or

2  the rejection.  And I think that, if for no other reason, for

3  that reason alone, justifies moving this out, not just moving

4  it out, but actually saying it's not appropriate here.  It has

5  nothing to do with the sale hearing.  And if and when a Motion

6  to Reject or Assume and Assign is made, Verizon will have its

7  rights at that point in time to press its case.

8     Now, the other thing Verizon says is, well, if we wait,

9  we lose our chance because, in effect, the decision as to the

10 Enterprise Business is being made today.  And if the answer is

11 that Avaya can buy it, then -- and Avaya says, I'm only going

12 to buy it if I don't have to take the Verizon contracts as

13 written, then I'd lose my chance to object.  And so Verizon

14 says that I need to hear it.  I need to argue it today.

15    We have not been provided a single citation that says

16 that a 363 sale should be tied together with a 365 rejection

17 standard, which I think is telling because these things happen

18 all the time.  I've never been involved in 363 sale that

19 didn't have a component that was a 365 section assumption and

20 assignment or rejection element.  But even if it did, even if

21 there were case law that said that, I really fail to

22 understand how these contracts, even assuming every fact that

23 Verizon purports to make in its pleadings, could ever rise to

24 the level of the contracts that are provided with special

25 status either under the Bankruptcy Code or in the case law.

1    But the _Mirant_ case is an interesting case that talks about

2    energy transmission, and it was a Motion to Reject a contract

3    for the purchase of energy.  It affected the national energy

4    grid and it was decided around the time, if you recall, Your

5    Honor, that certain fellows in Enron had been accused of

6    manipulating the energy trading market in the United States.

7    And there were rolling brownouts in California.  There were

8    large swatches of the United States that were really in danger

9    of losing their electrical supply.  In that situation there

10   was a -- two statutory regimes.  There's a Federal Commission

11   that looks at the pricing of electricity, and there's a

12   Federal Power Act that deals with the production of and sale

13   of electricity.  There's an established and recognized

14   national interest in making sure that power flows throughout

15   the United States and it is not interrupted.  I carry a

16   flashlight in my briefcase now because I had to walk down 45

17   floors when the blackout occurred a few years ago in New York.

18   And, you know, the fragility of the electrical grid is clear.

19   I think judicial notice can be taken of that if you did not

20   have a Federal Power Act and the Federal Electrical Regulatory

21   Commission.  But nevertheless, _Mirant_ says that there might be

22   a heightened standard, that we have a statutory regime and we

23   have a regulatory body.  And the rejection was entirely driven

24   by the pricing in that contract, so not only was that contract

25   related to a federal regulatory regime, but FERC has the

29

1    ability, indeed, the responsibility to deal with pricing.  And

2    so to reject a contract for energy transmission implicates a

3    federal -- for pricing purposes, implicates a Federal

4    Commission that's charged with regulating the pricing of

5    electricity.  So we had a statutory regime and a regulatory

6    regime in <u>Mirant</u>.

7        There is a case that is also cited from 1974, <u>Lewis and</u>

8    <u>Brown</u> (sic), I think it was, about manhole covers and steam

9    pipes.  That case, even in the Bankruptcy Act, recognized that

10   the Debtors have pretty much unfettered discretion to reject

11   contracts.  That was a situation where the Debtor had

12   liquidated all of its assets, it had nothing but a pot of

13   cash, and it wanted to distribute those funds.  And in an

14   excess of caution, at the last minute, before it shut out the

15   lights and walked out the door, somebody said we should do

16   something about the manhole covers in Philadelphia.  There was

17   no sale that was transferring the manhole covers to the

18   second-best manhole cover company in the world.  There was

19   nothing that said that the steam company that was implicated

20   by those manhole covers had refused to cut an economic deal

21   with the second-best manhole cover company in the world.  It

22   simply said, we're shutting out the lights and walking away.

23   Should we do something about the manholes that might explode?

24   It seems to me that that's a different situation.  Not only is

25   it a different situation, it's a situation that came up when

1   Richard Nixon was President under a statue that no longer is

2   in effect.  But nevertheless, I think it still argues in our

3   favor.

4        The other cases that have been cited by Verizon also

5   relate to highly regulated industries.  The abandonment of

6   underground storage facilities, the Midlantic case relates

7   directly to environmental concerns, and they are -- the Boron

8   (ph) Chemical case relates to the sale of three properties,

9   not as part of a sale transaction, but it also relates

10  entirely to environmental contamination.  We're not talking

11  about environmental contamination or collective bargaining

12  agreements or any other contract that has ever been recognized

13  as having a special status under the Bankruptcy Code.  We're

14  talking about contracts for the sale of phone systems and the

15  support of those systems.  We're talking about something that

16  is part and parcel of daily life.  If Otis elevator went out

17  of business and it couldn't support the elevators in the CIA

18  building, I don't think they would need to remain in business

19  to make those elevators go up and down.  I don't think

20  Chrysler would have been prevented from selling its assets if

21  it could no longer warranty the ambulances that it built.  I

22  don't think that General Electric would be forced to sell

23  florescent bulbs to light up the National Security

24  Administration.  Just because something is sold into a

25  business or a private sector or a public sector where

1   something important goes on, doesn't mean that national

2   security or public health and safety is implicated.  Indeed,

3   as I mentioned earlier, I think it's irresponsible to say so.

4        What we're talking about, at the end of the day, is an

5   economic issue.  And this is where the case law actually is

6   very supportive of the Debtors.  It's very clear that over the

7   course of many years, under the Bankruptcy Code and the

8   Bankruptcy Act, counterparties to contracts have come into

9   court and said, it's not fair that the Bankruptcy Code allows

10  people to not comply with their contracts.  That costs me

11  something.  I don't like it.  I don't know how many

12  conversations I've had on the telephone with Creditor clients

13  apologizing for the U.S. Bankruptcy Code.  But that's what the

14  law provides.  The economic impact on the counterparty is

15  irrelevant.  Economic impact on a counterparty that was one of

16  the wealthiest companies in America is irrelevant.  There's

17  nothing here that is special about the national security or

18  public health and safety.  You have some of the biggest and

19  most powerful companies in the world that are using these

20  phone systems.  No one has shown up and said, it's a problem

21  for us, because they know they can pick up the phone and call

22  Avaya or Cisco or Siemens and somebody would be over and

23  replace it pretty darn quickly and happily.

24       So what we're talking about is a concern here that

25  Verizon has at base, which is that if there's a rejection, and

32

1   a rejection has not been decided, but if there is a rejection

2   that there will be damages created and they will have claim

3   against a bankrupt company for those damages.  Now, maybe that

4   claim could be magnified, depending on how quickly things have

5   to happen, but I also think that claim can be mitigated, if

6   not eliminated, if they simply would sit down at the table

7   with Avaya and come to a resolution.  But if we're sitting

8   here today talking about a transaction that spans every

9   continent in the world and has more than doubled the potential

10  consideration to these estates and say, what should we do?

11  Should we stop it because Verizon says we should stop it?

12  Should we stop it because Verizon says wait a second, it hurts

13  me or may hurt me?  It could hurt me.  I think the answer to

14  that has to be, no.  I don't think there's a single case that

15  justifies it.  I don't think there's a single case that says

16  anything that we provide to Verizon implicates national health

17  -- a national security, health, public safety or anything of

18  the like.  And we haven't even done anything yet.

19      So, Your Honor, I think from the Debtors' perspective,

20  again, it's unfortunate that we're here with a customer and a

21  client that we've had for so many years having to have a

22  public dispute.  But we have to defend this transaction and

23  defend it around the world because without it, there will be a

24  massive loss of value and all for naught.  As Verizon, if

25  anyone knows exactly what to do in this situation --  they are

1   a hard-nosed company.  They provide great service.  They

2   provide great products, and they've been doing that for years

3   largely because of what we've provided them.  And we don't

4   want them to stand here today and try to hold up the sale

5   transaction at the last minute.

6       And so it is reluctantly that we come before you to say

7   that you should reject their objection.  You should allow the

8   sale hearing to go forward.  The sale to be approved

9   notwithstanding their objection.  And that to the extent that

10  they have disputes with respect to an assumption or

11  assignment, that we can deal with that when the proper time

12  comes.  Thank you, Your Honor.

13          THE COURT:  Thank you, Mr. Bromley.  Mr. Laddin,

14  good morning.

15          MR. LADDIN:  Good morning, Your Honor.  Your Honor,

16  I'm here with Kathy Miller on behalf of the affiliates of

17  Verizon Communications, Inc.  I've got a number of points that

18  I want to make today, but let me start with a few observations

19  that really are basic ones because there have been several

20  things that have been said, either here today or in pleadings,

21  that are simply patently untrue.

22      And let me start with the first, which is that Verizon is

23  somehow trying to extract better commercial terms from Avaya.

24  The Debtors said that in their pleading that they filed last

25  night, and that's simply is baseless and unsubstantiated.  I

34

do not understand how the Debtors could suggest that.  All

that Verizon has ever asked for, all they've ever asked for is

the assumption of their existing contracts and nothing more,

nada.  Not a single change in the terms.  When Mr. Bromley

referred to the CDMA transaction, that's what Verizon asked

for in the CDMA transaction, an assumption of the existing

Agreement.  And that's what Ericsson, as the winning bidder in

that transaction, agreed to do.  They assumed the contract on

the existing -- excuse me, on the existing terms.  I do not

understand how -- somehow the request to have the contracts

assumed on their existing terms could be concocted into

something else.  And, frankly, it casts a jaundice eye on the

remainder of the Debtors' arguments here.

THE COURT:  So really what you're seeking, as

opposed to an objection to the sale, is a Motion to Compel

Assumption of your contract.

MR. LADDIN:  What we're saying here today, Your

Honor, is that the sale itself should be conditioned upon the

requirement that the contracts be assumed, which gets to this

second notion that Verizon simply wants the transaction to

fail.  This isn't about Verizon.  It's not about money.

Verizon hasn't sought a single penny here.  It's about Verizon

trying to protect its customers, which include major critical

governmental and public sector entities and functions.

And so what we've said all along is simply condition the

1  sale upon the requirement that the Verizon contracts be

2  assumed, and that doesn't mean that the sale has to be denied.

3  Noticeably absent from the Debtors' pleading last night and

4  from Mr. Bromley's presentation was the fact that the second

5  bidder, Enterprise Networks Holdings, had, in fact, notified

6  the Debtors who in turn notified Verizon, that they would

7  assume the Verizon contracts.  So this isn't about whether the

8  transaction will fail around the world.  And in addition to

9  that, there was only essentially one thing holding up Avaya's

10 assumption of the contracts, if you believe what they

11 communicated to the Debtors and what the Debtors communicated

12 to Verizon, which is that Avaya wanted to change the terms of

13 the contracts and didn't want to assume some liability in

14 connection with the patent infringement action.  So, again,

15 this isn't about whether the transaction should fail.  It's

16 about whether it should be conditioned upon the assumption of

17 the Verizon contract or about whether the second bidder should

18 be the successful bidder here.

19     The third point I wanted to make at the outset here

20 that's relevant is one of the key bases for the Debtors not

21 wanting to go forward on the Verizon objection today, and to

22 defer this issue until a later point in time is their

23 continued allegation, through last night, that 90 days was

24 more than ample time for Verizon to transition its customers

25 and avoid any imagined threat to the public welfare, in their

1    terms.  That has now changed to 60 days.  And, of course,

2    essentially what Mr. Bromley was doing and what the Debtor was

3    doing in its reply brief last night was testifying.  We heard

4    lots of testimony from Mr. Bromley about what Verizon could

5    do.  What types of services the Debtors provided and how

6    suddenly, suddenly, the Debtors' products and services are

7    simply fungible and indistinguishable from any other supplier,

8    that we're just talking about a basic phone.  And we all know

9    phones work, so there's not going to be a problem here.  That

10   allegation, again, that factual allegation that needs

11   evidence, is baseless.

12       And it really is hard to believe these total fungible

13   assets just went for $900 million.  It ignores the proprietary

14   nature of what the Debtors sell.  It ignores that this estate

15   is laden with patents that govern every aspect of the

16   equipment and the software that they provide.  It ignores

17   completely how embedded in the networks of the end-user

18   customers the Debtors' products, software and services are.

19   It ignores the fact that those networks are not easily

20   accessible.  And that's particularly true in the case of

21   sensitive governmental functions, including military functions

22   and national security.  And, again, it is a totally disputed

23   key fact, and yet it forms the basis for their argument here

24   today.  And unless the Court assumes that what they're

25   contending is true, which the Court can't do, then the Court

37

1    has to deal with this issue in connection with the sale

2    hearing after taking evidence from both parties.

3         THE COURT:  Well, let's assume for a moment that

4    Avaya decided that it was going to purchase just the name and

5    was going to reject all of the contracts, the service

6    contracts.  Could this Court force Verizon to continue to

7    service those contracts?

8         MR. LADDIN:  Could this Court force Verizon to

9    service --

10         THE COURT:  I'm sorry, not Verizon, forgive me --

11    the Debtors to continue to service those contracts under those

12    circumstances?

13         MR. LADDIN:  The answer to that -- that's not the

14    situation, first of all, that we have in front of the Court.

15    The Court isn't faced with a situation where there is no other

16    alternative, that's number one.  And number two, as I'll get

17    into the case law in a minute, the Court does have the

18    authority and should condition a rejection on conditions that

19    would protect the public safety, health and public interest.

20         Let me address the procedural issue briefly that Mr.

21    Bromley referred to.  Mr. Bromley said that there was no

22    objection filed to the Procedures Motion.  Well, that is not

23    accurate.  The record will reflect that Verizon did file an

24    objection to the procedures.  And the record will also reflect

25    that Verizon put on the record a resolution that modified

1  those procedures as to Verizon, and the deal was

2  straightforward.  As we explained to the Court at that time,

3  both in the written pleading and orally, Verizon had the

4  concern then, that it has expressed now.  That it couldn't be

5  notified at some late date that its contracts were going to be

6  rejected and, therefore, we put on the record that Avaya

7  would, in fact, let Verizon know by at least 10 calendar days

8  prior to Verizon's deadline to object to the sale, what

9  contracts were being designated for assumption or rejection.

10 It didn't leave it open for Avaya to later change that

11 designation from assumption to rejection.  And I have a

12 written e-mail exchange, which we read into the Court record

13 but -- which I think, in light of the comments today, I think

14 would be helpful to hand up to the Court.

15           THE COURT:  Yes.

16           MR. LADDIN:  May I approach?

17           THE COURT:  Certainly, you may.  Thank you.

18      (Counsel approaches.)

19           THE COURT:  Thank you, Mr. Laddin.

20           MR. LADDIN:  And just for record purposes, I'll just

21 mark this as Verizon Exhibit 1, if that's --

22           THE COURT:  That's fine.

23           MR. LADDIN:  Your Honor, Verizon Exhibit 1 is the

24 e-mail exchange that we just discussed.  And it reflects the

25 agreement as read into the record, word for word, at the

39

1    procedures hearing on August 4th.  The last page, which is --
2    it says page 3 of 4, item number one.  It says, "Avaya will
3    let Verizon know by at least 10 calendar days prior to
4    Verizon's deadline to object to the Enterprise Sale Motion
5    what Verizon contracts it is designating for assumption or
6    rejection, including by sending such notices to me by e-mail."
7    That's quite clear.  We also agreed, and this is reflected in
8    paragraph 2, which is on the first page of the e-mail, "That
9    the order approving the bidding procedures would not be res
10   judicata or collateral estoppel to any objection or defense
11   that could be raised at the sale hearing."  And that is quite
12   clear.  Avaya, did, in fact, provide notice that it was not
13   designating the Verizon contracts for assumption and
14   assignment.  And Nortel, under its agreement with Verizon that
15   was part of the Order, gave notice to Verizon in a letter from
16   Mr. Bromley to me.  So we're not in a situation at all where
17   Nortel or Avaya can stand up here and say either we don't know
18   what Avaya's going to do or somehow Nortel's procedures apply
19   and somehow bar the assertion of this objection today.  That's
20   just not the case.  And even if one didn't know what Avaya
21   would do, so long as Avaya reserved the right to reject, that
22   calls into question, again, whether the sale should be
23   approved without the condition that the Verizon contracts be
24   approved -- be assumed.
25        So procedurally then this morning, we obviously

40

1    recognized that on the hearing on Friday, the Court decided

2    not to allow any depositions to go forward prior to the sale

3    hearing today with respect to the issue of whether the sale,

4    if it involves, at all, the rejection of the Verizon

5    contracts, would impact the public safety, security and

6    necessity.  Obviously, there is a clear factual dispute on

7    that.  And we understand, as the Court decided on Friday, that

8    the Court was not going to actually take evidence on that

9    subject today and hear only argument.  And that the Court then

10   would decide, after hearing argument, whether the Court would

11   simply adjourn the sale hearing so that the parties could take

12   expedited discovery and hold an evidentiary hearing, which

13   given the fact that they're not going to close immediately --

14          THE COURT:  Right.

15          MR. LADDIN:  -- would not seem to be prejudicial in

16   any way.  So the question for the Court today obviously,

17   therefore, is whether the Court can approve a sale without

18   considering the impact of that sale on public safety, security

19   and necessity.  And the answer to that question simply is, no.

20   It is necessary to consider those issues.

21       And just so that our statements are clear on the record

22   and again, I understand that this is a factual issue and the

23   Court ultimately is the trier of fact and will make this

24   determination, but contrary to Mr. Bromley's conjecture,

25   Verizon does not have the internal ability or other existing

41

1    contracts with any supplier under which it can continue to

2    obtain all of the products and related repair, maintenance,

3    software and support services provided by the Debtors or those

4    that would be compatible with those provided by the Debtors.

5    It would take significant lead time, a year or more, depending

6    upon the various sensitive Government and commercial end users

7    to make alternate arrangements.  Whether the Debtors like it

8    or not -- and one of the comments that Mr. Bromley made in

9    that regard was quite interesting.  Verizon's a really big

10   company and they're able to provide these great services and

11   then he went on to say something that was quite apt, because

12   of what the Debtors provide to Verizon.  And that's what I'm

13   telling Your Honor exactly what Mr. Bromley said, because of

14   what the Debtors provide to Verizon.  And --

15         THE COURT:  Now, we're not talking about all of the

16   Verizon contracts though, are we?  We're talking about

17   specifically those in which services are being provided to

18   sensitive Government agencies.

19         MR. LADDIN:  It would be sensitive Government

20   agencies, as well as certain large customers.  So it's not

21   every single end user that would be impacted.

22         THE COURT:  Well, large customers don't involve

23   national security, correct?

24         MR. LADDIN:  Large customers -- you've got one set

25   of governmental functions, okay.  And then you've got public

42

1   sector operations as well, and certain of the public sector

2   operations, with respect to some types of equipment, sure,

3   that may be able to be transitioned in a shorter period of

4   time, but with respect to critical governmental functions and

5   with respect to certain of the other public sector functions,

6   that's not the case, and we'd be prepared to provide testimony

7   on that.

8        Your Honor, we've obviously filed our brief.  I'm sure

9   Your Honor has read that, but I'll touch briefly on the case

10  law because we believe it is now well established that

11  significant threats to public safety or security can't trump

12  provisions of the Bankruptcy Code and permit courts to place

13  conditions upon or even deny relief that would otherwise be

14  ordered under the Code.  And that concept has arisen in

15  various contexts.  And the authority comes from the highest

16  level, regardless of the particular factual circumstances,

17  the fact remains it comes from the highest levels.

18       The Supreme Court addressed the issue in the <u>Midlantic</u>

19  decision that we cited and said, "Congress has expressly

20  provided that the efforts of the Trustee to marshal and

21  distribute the assets of the estate must yield to the

22  governmental interest in public health and safety."  And we

23  heard on Friday, gee, well, that's only if there's a statute

24  involved.  But there's nothing about that principle set forth

25  by the Supreme Court that requires that the public health or

43

1   safety at issue, either be set forth in a statute or be

2   described to be environmental or something else.  And, in

3   fact, the decision that the Supreme Court cited, which was

4   the, In re: Lewis Jones case, specifically addressed the

5   public health and safety concerns where there was no statute

6   involved.  The Bankruptcy Court there expressly found that

7   there was no statute governing what the court should do.  And

8   it went on to say there, "Even absent the violation of a state

9   or federal act, the public interest must be protected by the

10  Bankruptcy Court."  And it in turn cited another Supreme Court

11  decision addressing courts of equity, which obviously was

12  discussed at the outset of this hearing.  And it is

13  particularly courts of equity that have the ability and the

14  requirement that they place conditions on things in order to

15  protect the public interest.

16       Now, there are a number of areas where relief has been

17  conditioned or denied.  And by the way, I'm -- the In re:

18  Lewis Jones case, Your Honor, was a BCD site, I don't know

19  whether Your Honor actually has that.  I have an extra copy of

20  the decision, if you'd like me to hand it up.

21            THE COURT:  I would like that.  Thank you.

22       (Counsel complies.)

23            THE COURT:  Thank you.  Certainly, Mr. Laddin.

24  Thanks, again.  Yes.

25            MR. LADDIN:  In the context of -- I know Your Honor

44

1    is looking at the case, the --

2            THE COURT:  I can read it as you're talking.

3            MR. LADDIN:  All right.  The abandonment power is

4    one of those powers that is seemingly quite broad.  It is as

5    broad as the Debtors contend their right to sell assets is

6    under Section 363.  554(a), the abandonment power, says, "The

7    Trustee can abandon any property of the estate that is

8    burdensome to the estate or that is of inconsequential value

9    and benefit to the estate."

10           THE COURT:  Yes.

11           MR. LADDIN:  Quite broad.  Yet it is clear from the

12   case law that the risk of imminent and identifiable harm to

13   the public will prevent the bankruptcy Trustee from exercising

14   that abandonment authority.  Similarly, this has been dealt

15   with in the context of rejection of contracts, the Mirant

16   case.  The Fifth Circuit said, "When the proposed rejection

17   poses a threat to the national public interest, the Bankruptcy

18   Court should apply a more heightened and rigorous standard for

19   review and approval of that rejection."  And Mirant involved

20   the, as Mr. Bromley indicated, the attempt to reject a

21   contract for the purchase of electricity, and the court said,

22   "The courts in that context, where the public interest is at

23   issue, have to balance the equities, carefully scrutinize the

24   impact of rejection upon the public interest and ensure the

25   rejection does not cause any disruption in the supply of

1   public services at issue."  Now, while that case was a

2   supplier of electricity, that's no different today from the

3   essential nature of the voice and data communication systems

4   at issue here that are so embedded and integral to the

5   functioning of the systems that the end users here have,

6   including the governmental and major business customers.  I

7   also should note in that case that on remand to the district

8   court, the Rejection Motion was scrutinized under the higher

9   standard and it was, in fact, denied.  The issue has also come

10  up in the 363 sale context in the Boron Chemical case.  The

11  fact is, that case is there and the court will refuse to

12  approve the closing of a sale that would have been at the

13  expense of the general public interest.  Again, that was an

14  environmental statute, but there's no difference.  The

15  question is whether the public safety and security is at

16  issue.  And the court said in that case, and I quote,

17  "Congress did not intend that the objectives of the Bankruptcy

18  Code are to be accomplished at the expense of the general

19  public welfare."  So there's ample authority, ample direction

20  that the public safety, security and necessity have to be

21  considered and are relevant when a Debtor seeks to exercise

22  powers granted to it under the Bankruptcy Code.

23          THE COURT:  Well, clearly you're not arguing that

24  only Nortel can service -- provide the service that the

25  Government requires.  You're not suggesting that Avaya can't;

46

1    is that right?  And I think that the fact that you are

2    requesting -- or that your objection is premised upon

3    conditioning the assumption and assignment to Avaya indicates

4    what your position is on that question.

5         MR. LADDIN:  Provided that the contracts are

6    assumed, but sitting here today, we don't know whether Avaya

7    can or can't.  That issue is one that was going to be delved

8    into in the event that the Debtors were going to put somebody

9    up from Avaya to say, gee, Avaya's going to go ahead and

10   service the contracts.  The fact remains today, under these

11   facts, there is no contract with Avaya.  There's no

12   assumption.  There's no contract with Avaya that Verizon has

13   under which Verizon can obtain the same services, so that is a

14   factual question that would have to be delved into.

15        THE COURT:  Well, if Avaya -- I guess my point is,

16   based upon your objection, if Avaya were assuming -- if Avaya

17   were -- if the contract, your contracts were being assigned to

18   Avaya, you would not be in Court today.

19        MR. LADDIN:  On this issue that is correct.

20        THE COURT:  Okay.

21        MR. LADDIN:  Yes.

22        THE COURT:  So it really becomes, to some extent, a

23   matter of price; doesn't it?

24        MR. LADDIN:  It's not a matter of price, no.  It's

25   not at all a matter of price because in that circumstance --

47

1    THE COURT:  Well, I shouldn't say price, damages I
2  should say.

3    MR. LADDIN:  No.  It's not a matter of damages
4  because there is no -- if there's an assumption of the
5  contract, there is a commitment to fill the terms of that
6  contract on the terms of that contract.  If there is not an
7  assumption of that contract, there is no such commitment.  And
8  while Avaya may have made statements to the press that it
9  intends to fulfill that contract, it sure hasn't told Verizon
10  that.  And there's an easy way to show and one way to show that
11  it intends to fulfill that contract and that's to assume.
12  Without the assumption, there's a factual issue.  And if you
13  get to balancing the equities here, at the end of the day in
14  light of the serious consequences that would result --

15    THE COURT:  I don't think you want to go to balancing
16  of the equities because to balance the equities means a
17  tremendous harm to these Debtors and their estate.

18    MR. LADDIN:  Again, I don't think that's correct,
19  Your Honor.  With all due respect, I don't believe that's
20  correct.  The second bidder, and I haven't heard anyone stand
21  up to dispute, the second bidder said, and I -- for that
22  matter, I'll hand it up to Your Honor.  The second bidder said
23  they would assume.

24    THE COURT:  So you would like to, in effect, replace
25  the Debtors' business judgment with that of Avaya's as to who

48

1    should be the successful Purchaser?

2            MR. LADDIN:  Your Honor, we don't care.  My client

3    does not care whether it's Avaya who assumes the contracts or

4    it is the second bidder who assumes the contracts.

5            THE COURT:  Well, that then is the whole point that

6    I've been trying to establish.

7            MR. LADDIN:  Okay.

8            THE COURT:  That you don't care.  Because there are

9    multiple entities that can service your contracts.

10           MR. LADDIN:  No.  That's not -- in the context of an

11   assumption, Your Honor, but what we have here is not an

12   assumption.  And that is the key --

13           THE COURT:  Not yet.

14           MR. LADDIN:  We've been told that there will be a

15   rejection, and you're being asked to approve a sale in that

16   context, which could be approving a rejection.  Very different.

17   And --

18           THE COURT:  Well, then it goes to the conditions

19   because I could condition the rejection upon a lengthier period

20   of time that might be required.  I'd love to hear from Cisco or

21   other entities, other providers, how long it would take them to

22   step into your shoes -- I'm sorry, to step into the shoes of

23   Verizon with respect to your contracts.  Wouldn't that be a

24   critical issue to resolve?  Maybe they could do it in 60 days

25   or 90 days or 30 days for all we know.

1      MR. LADDIN:  Absolutely, Your Honor.  That is a

2   factual question.  And the problem is here, you've got a sale

3   that the Debtors now want to close within 60 days.

4      THE COURT:  I've got a sale, but I don't have a

5   rejection.

6      MR. LADDIN:  You've got a clear statement that is not

7   disputed, that Avaya intends to reject.  And if that's the case

8   and, again, they didn't have -- they had to let Verizon know

9   under the agreement, then the Court would be without power to

10  fashion relief if Your Honor hears this later, okay.  They

11  close their sale and Your Honor says, you know what, Verizon

12  was right.  It's going to take a year, oops.  There's nothing

13  Your Honor can do at that point because the sale will close

14  earlier.  So the sale closes.  There's no assumption.  The

15  Debtors got no ability to service the contract.  That's the

16  dilemma here, Your Honor.  That's why we've got a significant

17  problem, and it doesn't need to exist.  This is a simple matter

18  for Avaya to choose to take an assumption and, again, it's a

19  simple matter with respect to the other bidder.  And I would,

20  if that's all right with the Court, like to also hand up this

21  e-mail exchange.

22      MR. BROMLEY:  Your Honor, I can probably short

23  circuit the need for this.  There is no alternative bidder.

24  Gore Siemens has walked away.  There is nothing that we can do

25  to bring them back to the table unless they choose to come back

1    to the table.  They took off from their bid during the course

2    of the auction, the willingness to standby as an alternate

3    bidder.

4              THE COURT:  Okay.

5              MR. BROMLEY:  So that's now gone.

6              THE COURT:  I assume that this e-mail is no longer --

7    or I should ask, does it remain confidential, as is stated in

8    the e-mail?

9              MR. LADDIN:  I will defer to Mr. Bromley.

10             THE COURT:  That's -- I'm sorry.  I was really asking

11   Mr. Bromley and I -- well, why don't we treat it as

12   confidential, subject to further review.

13             MR. LADDIN:  And it, of course, confirms what I was

14   telling the Court it said in the first -- I guess, the second

15   paragraph.

16        The bottom line, Your Honor, is we're asking for limited

17   relief here, and the Debtors' basis for disputing the right to

18   the limited relief is a lot of factual allegations that are

19   disputed.  We ask that the Court hear this matter and take

20   evidence on it in conjunction with the sale hearing, and not

21   set up a process where Verizon -- where any relief granted by

22   the Court would be foreclosed by an Order that the Court

23   enters.

24        Your Honor, there are two additional matters that I did

25   just need to briefly mention that are --

51

1          THE COURT:  Yes.

2          MR. LADDIN:  -- unrelated.  One is a reservation of

3    setoff rights, which we put in the pleading.  I did not hear

4    back from Mr. Bromley on the setoff rights.  We had filed in

5    our papers, and have been in discussions with the Debtors for

6    some time, about effectuation of the setoff rights in

7    connection with CDMA sale.  We specifically agreed to a

8    sentence in the Order that reserved those rights, in fact,

9    reserved those rights.  It said, "Nothing in this Order shall

10   be deemed a waive, release or extinguish any valid claim with

11   respect to the setoff that Verizon may have against the

12   Debtors."  I'll ask Mr. Bromley now, I'm assuming that you

13   would be fine with adding a similar provision in this Order.

14         MR. BROMLEY:  I'm not prepared to make that

15   commitment right now, Your Honor.

16         THE COURT:  All right.

17         MR. LADDIN:  I'm not sure why that's the case.  But

18   in any event, we believe that nothing about this Sale Order can

19   affect or should affect the setoff rights, and we would ask the

20   Court to insert the -- essentially the same paragraph, which is

21   one sentence in the Order relating to setoff rights.

22         THE COURT:  I'll ask you to raise that issue at the

23   afternoon hearing.

24         MR. LADDIN:  Oh, that's fine, Your Honor.  And --

25         MR. BROMLEY:  Your Honor, the only reason I'm not

52

1   willing to consider it is I've not heard about it until just

2   this moment, so --

3           THE COURT:  Okay.

4           MR. BROMLEY:  -- if I can get some language on a

5   piece paper, I'd be happy to take a look at it.

6           THE COURT:  All right.  Thank you, Mr. Bromley.

7           MR. LADDIN:  Your Honor, I have nothing further.

8   Thank you.

9           THE COURT:  All right.  Thank you, Mr. Laddin.

10          MR. BROMLEY:  Your Honor, counsel for Avaya would

11  like to speak.

12          THE COURT:  Certainly.  Good morning.

13          MR. BANE:  Good morning, Your Honor.  Mark Bane,

14  Ropes & Gray, on behalf of Avaya, the successful bidder at the

15  auction.  I was taught when I was very young that when you're

16  in an argument and your opponent says, it's not the money it's

17  the principle, it's the money.  And based on everything that

18  we've just heard, it's imminent and clear that it's just the

19  money.  Every counterparty to a contract with a Debtor is

20  disturbed when the Debtor does not want to assume the contract.

21  Every counterparty to a contract with a Debtor who hears that

22  there may be someone who might assume and assign the contract

23  who decides not to, would prefer that the contract be assumed

24  and assigned.  Mr. Laddin has just noted on the record, that

25  there have been discussions between Avaya and Verizon.  I'm not

53

1   going to get into any detail of it, but I'm just taking Mr.

2   Laddin's words.

3       Avaya is purchasing this business in order to do business.

4   It's purchasing this business in order to have customers.

5   That's why it's buying these assets.  That's why it's paying so

6   much money for these assets.

7       There is a contract currently on the table.  Mr. Laddin

8   says that he cannot understand why economics are being alleged

9   as a motivation for Verizon.  They're prepared to go ahead with

10  the contract if it's assumed but, obviously, if the contract is

11  rejected, that means there may be different economic terms in a

12  new contract between Verizon and Avaya.  It's all about money.

13  Avaya has no reason not to want to do business with Verizon.

14  In fact, it does business with Verizon.  It would love to

15  continue to do business with Verizon.  The only question is how

16  much the terms of the deal are going to address.  What are

17  going to be the terms, etcetera.  And that is a common

18  phenomena with regard to every single contract that a Debtor

19  has to decide whether to assume or reject or a 363 Purchaser

20  has to decide whether to have rejected or to have assumed and

21  assigned.  And that is the only issue here before Your Honor.

22  There has been no allegation being made by Mr. Laddin that

23  Avaya has no interest in servicing the contract, merely that it

24  may be on different terms.  That's not national security.

25  That's economics.  And, therefore -- you know, Mr. Bromley went

54

through the distinctions between the cases that are cited in
Verizon's papers.  Obviously, we support those distinctions.
We believe that none of them, at all, are applicable here.  The
Midlantic case certainly was talking about a completely
different set of facts.  It was talking about a set of facts in
which property was being abandoned and the abandonment itself
was going to violate the law.  Here, the rejection is not going
to -- even if there is a rejection, it will not be violating
the law.  It will not be creating public security.  Whether or
not a new contract could be negotiated between these parties,
that might have consequences, that's a business decision.  The
Mirant case is cited as also reflecting a rejection situation
in which there was a threat.  There it was going to be rejected
in toto, with no opportunity for there to be an assignee who
would take over on different economic terms.  Here, there is a
counterparty who is more than eager to continue a relationship.

All of the distinctions between the cases, and I can go
through all of them, but it would be merely burdening the
record.  There is nothing here but dollars and cents.  Verizon
is trying to influence in negotiations what it would have to
undertake if the contract is rejected with a new counterparty
and that is not an issue that should be raised in the context
of a 363 sale.  It is not even an issue that has any legitimacy
in the context of a 365 rejection sale.  That's the economic
consequences of the Bankruptcy Code.  And there is nothing at

1    all that implicates national security, public health, etcetera.

2         THE COURT:  Thank you, sir.

3         MR. BANE:  Thank you, Your Honor.

4         THE COURT:  Thank you.  Mr. Hodara, why don't we hear

5    from the Committee?

6         MR. HODARA:  Absolutely.  Thank you, Your Honor.

7         THE COURT:  Thank you.

8         MR. HODARA:  Fred Hodara, Akin, Gump, Strauss, Hauer

9    & Feld, for the Official Committee of Unsecured Creditors.

10        THE COURT:  Yes, sir.

11        MR. HODARA:  Your Honor, I'll make this statement

12   very short.  I think that in a series of cogent and well

13   formulated arguments that Mr. Bromley has made to the Court

14   over the course of this case, today's argument was the most

15   thorough, most cogent and well stated argument that I have

16   heard and had the pleasure of hearing to date.  We subscribe to

17   all of the points that Mr. Bromley and the Debtors have made.

18   And we note, in particular, that this was a very successful

19   auction.  Thankfully once again, and conducted pursuant to the

20   specifics dictates of the bid procedures to the letter of those

21   procedures.  And we think that that point alone is dispositive

22   of this matter.

23        THE COURT:  Thank you, Mr. Hodara.  And I do think

24   that's significant.  Mr. -- yes.  Someone else --

25        MR. KRELLER:  Your Honor, this is Tom Kreller from

1    Milbank, Tweed, appearing on behalf of the Ad Hoc Bondholder

2    Committee.  May I be heard?

3              THE COURT:  You may.

4              MR. KRELLER:  Your Honor, I'll try to be brief.  I

5    certainly fully concur with Mr. Hodara with respect to his

6    comments on Mr. Bromley's (indiscernible) in an argument I'll

7    try not to duplicate.  I would say, Your Honor, that there's a

8    -- as much as Mr. Laddin would have you believe that this is

9    kind of routine or (indiscernible) this is a (indiscernible)

10   indeed.  I've gotten scores of these types of (indiscernible)

11   in various sizes and (indiscernible) and frankly, there's many

12   (indiscernible).  I've never seen a court look for a buyer to

13   take a contract that it didn't want.  Frankly, I've never even

14   seen a counterparty make such a request in this kind of a

15   context.  And as Mr. Bromley suggested, I don't think there's

16   any case law in point for which the Court -- your request is

17   being made.

18        Maybe even more remarkable than that is the suggestion

19   that the estate should take an inferior bid solely to protect

20   Verizon's economic interest.  You know, Verizon would have

21   argued that the public safety and welfare are implicated here

22   by virtue of relationships, contractual arrangements that

23   Verizon has with third party governmental agencies or other

24   (indiscernible).  That may, in fact, be the case.  If you

25   decide that is the case that's a function of Verizon's

1  relationships, not Nortel relationships.  And to the extent the

2  public interest or safety and welfare are implicated, it's a

3  function of the contract that Verizon has entered into to

4  provide services to its customers, not a function of anything

5  that the Debtors have (indiscernible).  All the Debtors did was

6  enter into private contracts with Verizon.  What Verizon does

7  from there is their business and their risk.  It's not the

8  Debtors' business or the Debtors' risk.  It's certainly not the

9  (indiscernible) risk.

10          THE COURT:  All right.  Thank you, sir.

11          MR. KRELLER:  (Indiscernible) even if you put the

12  sale aside, this is simply a risk that Verizon bears.  Put the

13  bankruptcy case aside, there's a risk that Nortel simply

14  breaches these contracts, even out of bankruptcy, and Verizon

15  needs to be in a position to deal with that as a matter of

16  their own business.  And that's really what distinguishes this

17  case from a case like Midlantic and the Boron Chemical case.

18  There the Debtor who held contaminated property and who had a

19  direct connection to the public interest being asserted

20  (indiscernible) here, this really all runs through Verizon,

21  including the (indiscernible) stipulation that Nortel or

22  (indiscernible).

23      Your Honor, lastly the issue is really it's only a

24  economic issue.  And I think that becomes very clear from

25  Verizon's own pleadings.  That Verizon asserts that the only

58

reason that Avaya is not taking these contracts, and I have no
reason to believe or not believe the statement, but they've
argued that the only reason Avaya is not willing to take these
contracts is due to the existence of what Verizon itself calls,
a highly contingent indemnification liability that would run
with the contract.  And essentially what Verizon's argument is,
is that's such a highly contingent liability and their
pleadings did a pretty good job of downplaying that potential
liability, so at least reading that pleading, that doesn't
sound like a -- necessarily even in the (indiscernible)
economic issue can one support the (indiscernible) on Avaya and
say, look you should just take it.  It's not -- the liability
isn't much.  You shouldn't be worried about it.  You should be
forced to take it.  Well, Your Honor, it's kind of a classic
negotiation.  If you turn to Avaya, it would be -- it certainly
would help if you can turn around to Verizon and say, if it's
so small, you should just keep it.  And that's really, Your
Honor, what this appears to be about is a -- what Verizon
itself characterizes as a highly contingent indemnification
liability and who bears that risk as between Verizon and
whoever else it might be.  And they want to force it on Avaya.
That's not a negotiation that the estate or this Court need be
in the middle of.  And it's certainly not a negotiation that
should put at risk what otherwise is a very successful
transaction the Debtors have arrived to.

59

1      I guess, final point, Your Honor, and this -- to echo Mr.

2  Hodara.  The integrity of the sale procedure, not only for this

3  transaction, but (indiscernible) behavior is of utmost

4  importance.  We've already seen, Your Honor, and with kudos to

5  the Debtors for having achieved what they have achieved.  We've

6  seen two very successful highly robust auctions.  Part of the

7  reason those auctions have been as successful as they are is

8  because the Debtor has been able to negotiate and implement a

9  comprehensive set of sale procedures that have permitted the

10 auction to occur the way it has and as successfully as it has.

11 And as part of the sale procedures, the assumption and

12 assignment process was (indiscernible).  And as Mr. Bromley

13 indicated, it was very clear in the procedures and it was

14 essentially the 365 components were bifurcated.

15      To the extent that Verizon is attempting to end run around

16 the sale procedures, and there's some -- and there's certainly

17 some indication that's what this is, that should not be

18 condoned.  We're going to have some other auctions ahead of us.

19 The integrity of the sale procedures in these cases is

20 paramount to any further auctions we may have.  And to the

21 extent that this is an attack on the future of (indiscernible)

22 or otherwise, it shouldn't be permitted.  It puts at risk,

23 future transactions that we -- the procedures on the

24 (indiscernible) that we can rely on.  That's all I have, Your

25 Honor.  Thank you.

1        THE COURT:  Thank you.

2        MR. LUSKIN:  Your Honor, Michael Luskin from Hughes,

3   Hubbard & Reed in New York, for the U.K. Administrators.

4        THE COURT:  Yes.

5        MR. LUSKIN:  I do have local counsel here, Jaime

6   Luton from Young, Conaway, to introduce me, but I thought I'd

7   just save some time.

8        THE COURT:  This is fine.

9        MR. LUSKIN:  If that's all right?

10       THE COURT:  You bet.

11       MR. LUSKIN:  We certainly support the sale, and we

12  urge the Court to overrule Verizon's objection.  There has

13  been, as Your Honor has heard, a tremendous amount of time and

14  effort put into this sale process and, of course, the preceding

15  sale process.  This one's going on for over seven months.  My

16  clients have taken a very active part in this.  This is, you

17  heard, is a worldwide transaction and includes, among its

18  components, a very complicated Agreement, the EMEA Agreement,

19  that the U.K. Administrators have approved.

20       Clearly it's impossible for all 25,000 contracts to be

21  dealt with.  Clearly it's impossible for all of the purely U.S.

22  contracts subject to 365 to be dealt with on this short time

23  line we've all been working on.  The procedures that were

24  approved on notice, with full participation, objection and

25  resolution by Verizon, are procedures that we've all relied on.

1   It's hard to imagine that Verizon could claim that it's

2   prejudiced by those procedures.  I don't understand them -- to

3   claim that they're prejudiced by those procedures.  They

4   participated and actually negotiated an exception for

5   themselves, which has been complied with.  There are no

6   surprises here.  I think really what this comes down to today

7   is a dispute over the resolution of a contingent unliquidated

8   pre-petition rejection damages claim, or as more eloquently put

9   by Avaya's lawyer, it's about the money.  And I think that

10  under the circumstances, the Code has provisions for dealing

11  with these pre-petition rejection claims.  Those are the

12  provisions that should be followed here.  That's not a surprise

13  to Verizon nor is it unfair to Verizon.  And for all of those

14  reasons, we urge the Court to overrule the objection.

15          THE COURT:  Thank you very much, Mr. Luskin.

16          MR. BROMLEY:  Your Honor, I'll try to be brief.  As I

17  listened to Mr. Laddin's argument, something struck me that I

18  hadn't focused on before.  I think it was embedded in all of

19  the arguments, but it really is embedded in the case law, the

20  case law that Mr. Laddin cites.  The Midlantic case, you know,

21  it's a Supreme Court case, all right.  And I grew up in the

22  middle of New Jersey and I remember the Midlantic Banks that I

23  used to --

24          THE COURT:  I do, too.

25          MR. BROMLEY:  -- ride past.  I don't know who owns

62

1   them now, but it's very interesting because when you get to the

2   very end of it, there's kind of a robust argument.  Justice

3   Rehnquist doesn't really like the decision.  But there's a

4   paragraph, and this is what I hated when I was in law school

5   when we were told to find the holding of a case.  The, you

6   know, the case books we had in law school, they always took the

7   holding out, right.

8         THE COURT:  Yes.

9         MR. BROMLEY:  And then when I started practicing and

10  you'd read the cases and you'd see these nice little paragraphs

11  at the end, you know, so it says, "Accordingly, without

12  reaching the question whether certain state laws imposing

13  conditions on abandonment may be so onerous as to interfere

14  with bankruptcy adjudication itself, we hold that a Trustee may

15  not abandon property in contravention of a state statute or

16  regulation that is reasonably designed to protect the public

17  health or safety from identified hazards."  I don't mean to say

18  that decisions that are rendered by courts other than the

19  Supreme Court are not crafted with the utmost care, but when

20  you're parsing the language of the Supreme Court decision, I

21  think you have to pay very careful attention to each word.  So

22  there's the holding.  It's the sentence that says, we hold, and

23  it says what we hold, and it's the Supreme Court of the United

24  States.  First word, abandonment.  What does abandonment mean?

25  It means leaving something with no one to take care of it and

63

1   no way to have anyone take care of it so that it falls on the

2   public's responsibility to take care of it.  And that was what

3   this was about.  The <u>Midlantic</u> case was about environmental

4   issues and the abandonment of property that were contaminated

5   with environmental things, but it was about abandonment under

6   Section 554.  There's nothing being abandoned here.  The Nortel

7   Enterprise Solutions business is being sold.  All of our

8   technology and IP and know-how and service providers and the

9   guys that go out in the field and fix things are being sold or

10  licensed to Avaya.  So the solution to Verizon's problem is

11  going to be owned by Mr. Bane's client.

12      Now, Mr. Bane made it very clear that they're happy to

13  service them.  So when you are trying to take the case law,

14  which says abandonment, which means no choice and no one to

15  take care of it, as compared to sale, that equals one other

16  word in my mind, which is choice.  It is Verizon's choice not

17  to do business with Avaya.  It is Verizon's choice not to do

18  business with the company that will own all of the know-how and

19  ability to service every one of its customers.  It is Verizon's

20  choice to do so because nothing is being abandon.  It's being

21  sold.  It's not going away.  It's not disappearing.  And oddly

22  enough, the alternative that Mr. Laddin puts forward really is

23  the one that could lead to abandonment.  We don't have a backup

24  bidder.  The auction process went on long and hard and the

25  strategic decisions made during the auction process by our

64

1  bidders included ENH taking off the table, their willingness to

2  be the alternate bidder.  So when they walked out of our

3  offices at 3 o'clock in the morning on Monday morning and shook

4  hands and said, congratulations, they walked out of there

5  without a single worry that we could impose on them the

6  requirement to close this transaction.

7       So Verizon has a choice.  It can do business with Avaya,

8  who's going to own this business and can support everyone of

9  their customers and has stood up and told you that they want to

10 support those customers.  And Mr. Laddin said that the

11 statements that I had made about this all being about money

12 were patently untrue.  We're not making statements.  We're

13 asking that the Court draw inferences.  Inferences from actions

14 and inferences from statements to the Court, both orally and

15 written.  And the only reasonable inference that's possible is

16 that this is about money.

17      So Verizon has a choice.  It can litigate.  It can try to

18 win here today.  It can try to hold things up.  It can get on

19 the phone with Cisco and say, help me out and tell me what

20 you're going to charge me to rip and replace everything.  Tell

21 me if you can support it or it can get on the phone with Avaya

22 and say, let's cut a deal.  A deal with the Purchaser of

23 everything that we're selling, the people that will hold the

24 key to their problem.

25      So when you read more carefully, and further on it says,

65

1  formulating conditions that will adequately protect the

2  public's health and safety.  And Mr. Laddin uses those words,

3  but he then moves over into public interest.  And then he says

4  a lot about evidence.  But Your Honor, you've been overseeing

5  this case since January, I think you have plenty of evidence

6  that's before you to let you make a decision that the things

7  that Mr. Laddin has asserted are not reasonable.  But I don't

8  think you need to get to the evidence and I don't think we need

9  to delay things and I don't think we need to have depositions.

10 Because if you read further what the Supreme Court said, we

11 hold that a Trustee may not abandon, again, the word abandon,

12 property in contravention of a state statute or regulation.  So

13 we're sitting here today, there's no case law that says

14 anything about that.  No, I'm sorry, Mr. Laddin.  The Supreme

15 Court of the United States says that you may not abandon

16 property in contravention of a state statute or regulation, all

17 right.  It doesn't say that that 1974 case about exploding

18 manhole covers gives a blanket exception.

19      THE COURT:  Now, if I'm not mistaken, that case also

20 involved a statute.

21      MR. BROMLEY:  It did.  It involved a statute and it

22 also involved abandonment.

23      THE COURT:  Yes.

24      MR. BROMLEY:  And while it's in the descent, it's a

25 great quote because I think it applies here.  Justice Rehnquist

1    said, "Moreover, I do not believe that the isolated decision of

2    a single Bankruptcy Court rises to the level of established law

3    that we can fairly assume Congress intended to incorporate."

4    And that's his discussion of Lewis Jones.  It's in descent, I

5    know that, but I agree.

6            THE COURT:  And it hurts my feelings.

7            MR. BROMLEY:  So then it says, not just a state

8    statute or regulation, but it says something else.  It says, a

9    state statute or regulation that is reasonably designed to

10   protect the public health and -- or safety.  Again, public

11   health or safety from identified hazards, okay.  So we're not

12   just talking about we need a statute, we need a regulation.

13   It's got to be reasonably designed.  It's got to protect public

14   health and safety and from identified hazards in a case where

15   something is being abandoned and there's no choice at all.  And

16   the choice in these situations, it's not a choice for a

17   sophisticated commercial player.  It's a foregone conclusion

18   that abandonment is going to require that the public FISK *(ph)*

19   pick up the solution.  That's what abandonment's about.  No one

20   takes responsibility for it, and when no one takes

21   responsibility for it, we take responsibility for it.  That's

22   not appropriate.  That's public policy.  That's public

23   interest.

24       What we're talking about here is a decision by one of the

25   wealthiest company's in the world to not deal with the people

1   who are buying our business.  And if they don't want to do

2   that, that's up to them.  And if they don't want to do it and

3   claim they've been damaged, I'm going to argue, when they file

4   that claim, it's their own damn fault.  Excuse me, Your Honor.

5            THE COURT:  Of course.

6            MR. BROMLEY:  And I fully recognize my FIOS system's

7   going to be cut off today.

8            THE COURT:  I'm more worried about the IRS to tell

9   you the truth.

10           MR. BROMLEY:  It's not a good day, Your Honor, for

11  that.  So, Your Honor, I feel that this is just --  this is

12  really something that needs to get taken care of and taken care

13  of today.  There's nothing in the law or in the facts or the

14  circumstances of this case that justifies Verizon making the

15  point that they're trying to make today.  And the idea that

16  somehow they reserve their rights through e-mail traffic is

17  just really beyond belief.

18       If they wanted to stand here today and make evidentiary

19  submissions, they should have told us before Thursday of last

20  week, all right.  If they thought that their objection was

21  going to depend on evidentiary submissions, they had an

22  obligation to tell us that before this.  They cannot walk away

23  from a procedures hearing on the 4th of August and come to us

24  on the 10th of September and say, oh, by the way, I'm putting

25  on testimony and evidence on Tuesday on the issue of public

68

1   health and safety and national security.  If they wanted to do

2   that before today's hearing, they needed to tell us that well

3   in advance.  So the idea that somehow the reservation of rights

4   that was read into the record or somehow is included in the

5   e-mail traffic forecloses anyone here from arguing that, then

6   that's just a complete sandbag maneuver by Verizon, and we just

7   simply do not agree with it.

8       And on that basis, Your Honor, we think they should be --

9   the relief should be denied.  Thank you.

10              THE COURT:  Yes, Mr. Bromley.

11              MR. LADDIN:  Your Honor, if I may, I'll be very

12  brief.

13              THE COURT:  All right.

14              MR. LADDIN:  Your Honor, I really find it difficult

15  to believe I could have been more clear then we were on the

16  fourth.  Mr. Bromley's a sophisticated counsel, we said we were

17  going to object to the sale. We explained the public safety

18  issues.  It is really hard for me to stand up here or sit there

19  and believe that Mr. Bromley thought, gee, well, they're not --

20  they won't really object to the sale.  It's just simply not

21  believable.

22      With respect to the statute issue, in fact, in the --

23  excuse me, the Lewis Jones case --

24              THE COURT:  Yes.

25              MR. LADDIN:  -- did not rely on the statute.  The

69

1   court addressed the question of whether a statute actually

2   covered the situation.  It actually expressly found that no

3   statute applied, so that is contrary to what Debtors' counsel

4   has told you, but when you read the case, you will see that is

5   crystal clear in the case.

6       With respect to what they're trying to do here, and they

7   say it's not abandonment, it's rejection to contract.  A simple

8   way to solve the problem, assume the contract.  They want to

9   contend that they're going to, you know, just come to us and

10  we'll supply the services.  There's an easy way to prove that.

11  There's an easy way to show it, assume the contract.  Without

12  that, their statements are just that, they're statements with

13  absolutely no evidentiary support or foundation.

14      Your Honor, we believe it is appropriate for the Court and

15  that the Court should, either condition the sale on the

16  assumption of the Verizon contract or take evidence, so that

17  Your Honor can make a decision about all of the disputed facts

18  that have been alleged today on both sides.  Thank you, Your

19  Honor.

20          THE COURT:  Thank you, Mr. Laddin.  Well, a couple of

21  things.  First of all, I certainly will take evidence at the

22  appropriate time.  The appropriate time being when a Section

23  365 Motion for Assumption or Rejection is brought before me.  I

24  think that Mr. Laddin and -- I'm sorry, that Verizon would have

25  a more persuasive case where the fact to be that only Verizon

70

1    -- I'm sorry, I keep doing it, I'm -- that only the Debtors,

2    Nortel or Avaya, could service these contracts.  Then there

3    would be, perhaps, and I would take evidence on the issue as to

4    whether or not there was a national security, public safety

5    issue.  But the fact is, as I've heard today, there are

6    multiple providers who can provide service.  Now, there may be

7    certain conditions that the Court has to impose in order to

8    enable those alternative providers to provide service to

9    Verizon and its customers, but the fact is this isn't only

10   Nortel or Avaya, and I'm convinced of that.  And I'm also,

11   therefore, convinced that, to a large extent, it is an economic

12   issue as opposed to a public safety issue.

13       The procedures for the sale have been followed.  I

14   recognize that Verizon reserved its rights to raise an

15   objection in the nature that it did here today, but I don't

16   think that that objection to the procedures is well taken.  And

17   as I said, this is not foreclosing an evidentiary hearing at a

18   later date if necessary.  And one of the key issues, I think,

19   would be at that hearing, how long it's going to take for

20   another provider to step in and assume the obligations, not the

21   legal obligations, but to assume the kind of service that

22   Nortel has been providing, that will be a key issue.  And that

23   will, I think, at that point, make it clear to everyone that

24   there is a damages issue, and, again, an economic issue.

25       So for all of those reasons, I am going to overrule

1  Verizon's objection to the sale going forward.  The sale is

2  going forward on the terms that the Court previously approved,

3  and we will conduct that hearing this afternoon.  Mr. Laddin.

4         MR. LADDIN:  Your Honor, with respect to this Motion

5  to Reject, again, the question -- I understand what Your Honor

6  has ruled.  The question, with respect to hearing on a Motion

7  to Reject, it seems to me that that needs to get set.  If Your

8  Honor wants to deal with this issue in the context of a hearing

9  on a Motion to Reject, it needs to get set for a hearing before

10 the Court prior to the close of the sale.  And so --

11        THE COURT:  I don't have a problem with that.  And

12 I'm sure that the Debtors will not have a problem with that.

13 It is going to take some time to close.  And, Mr. Bromley, have

14 I volunteered something for you that you disagree with?

15        MR. BROMLEY:  No, Your Honor.  I mean, I think that

16 what we're planning on doing is going back, after we get the

17 sale approved, and dealing with all the contract issues.  I

18 mean, I think what Mr. Laddin's doing right now, is making a

19 sua sponte Motion for -- to compel the Debtors to assume or

20 reject the contracts.

21        THE COURT:  Yes.

22        MR. BROMLEY:  And if he wants -- I'm happy to do that

23 on very shortened notice.  If we could do that at the -- on a

24 telephone call in a day or so, we have a few other things that

25 we need to try to get done today.

1          THE COURT:  Clearly.

2          MR. BROMLEY:  And I'm happy to try to work out a

3    schedule with Mr. Laddin on that front, including a schedule

4    with respect to depositions and the like.

5          THE COURT:  All right.  Why don't the parties discuss

6    that issue, how much time you're going to need to complete any

7    discovery, and I would certainly provide you an early date.

8          MR. LADDIN:  Okay.  Thank you, Your Honor.  We'll

9    speak with Mr. Bromley and, obviously, if we can't work things

10   out, we'll ask the Court for a conference.

11         THE COURT:  Of course.  That will be fine.

12         MR. LADDIN:  Thank you, Your Honor.

13         THE COURT:  All right.  That concludes this matter.

14   And I guess we now have the issue relating to the Internal

15   Revenue Service.  Did you want to proceed with that now or

16   later?

17         MR. BROMLEY:  Well, we're happy to proceed with that

18   now.  I'm not sure if counsel for the Internal Revenue Service

19   is on the phone.

20         MR. GEHT:  Good afternoon, Your Honor.  John Geht,

21   Department of Justice, Tax Division, for the Internal Revenue

22   Service.  I am on the phone.

23         THE COURT:  Good afternoon.  And I think that what

24   we're dealing with at the moment is a Motion for Expedited

25   Discovery and to schedule a scheduling conference.

1        MR. BROMLEY:  That's --

2        THE COURT:  And I'm sure Mr. Bromley has a little

3   more, maybe has a little more background, although, I think I'm

4   pretty much up to speed on what brings us to this point.

5        MR. BROMLEY:  Yes, Your Honor.  Thank you for the

6   time.  The Debtors have made a request for expedited relief

7   with respect to an objection that they have filed to a Proof of

8   Claim that has been filed by the Internal Revenue Service.  We

9   recognize it is somewhat out of the normal course that you

10  would find an expedited request to resolve a claim at this

11  stage of these proceedings.  And it is no normal or typical

12  claim that we're dealing with.

13       The Internal Revenue Service, Your Honor, obviously is a

14  very large organization and has a statutory obligation to do

15  certain things, and it filed a Proof of Claim in these

16  proceedings on August 20th.  That was not the first Proof of

17  Claim that had been filed by the IRS.  Indeed, there have been,

18  I think, two earlier Proofs of Claim that were for relatively

19  small amounts of money, but the claim that was filed, and

20  that's claim number 1935, which was filed on/or about August

21  20th, really came as quite a surprise to the Debtors.  This was

22  a claim that asserts an unsecured priority claim in the amount

23  of $2.9 billion and an unsecured non-priority claim in the

24  amount of $49 million.  And it's asserted against Nortel

25  Networks, Incorporated and its subsidiaries.  There's also some

74

1    unassessed unliquidating contingent claims that are thrown into

2    the Proof of Claim as well, but really what we're talking about

3    is a $3 billion claim that has been filed on August 20th.   And

4    so in my experience, the taxing authorities often file large

5    claims and they work their way through the claims

6    reconciliation process and they are the subject of negotiation

7    and reduction usually.   And I do understand as well, Your

8    Honor, that the typical way that folks operate, not just

9    Government entities, but most Creditors, is that you file the

10   highest claim that you think you might have because you don't

11   want to be foreclosed from amending your claim upward after the

12   bar date.   It's much easier to go down the chutes then to climb

13   the ladders after the bar date.   And I respect that, Your

14   Honor, and certainly sympathize with the IRS in that regard.

15       And so it is with some, you know, degree of reluctance that

16   we bring this request for expedited relief because the claim

17   does throw a monkey wrench of sorts into the situation.   And,

18   indeed, the auction that we had over the weekend was materially

19   delayed and extended as a result of the introduction of this

20   claim into the circumstances of the auction.

21       The transaction that we're approving -- trying to approve

22   today, Your Honor, is a transaction which provides for the sale

23   of assets in multiple jurisdictions as you're aware, but it

24   also provides for the sale of the stock of two Non-Debtor

25   entities in the United States.   One is Nortel Government

75

1   Solutions, Incorporated and the other is DiamondWare,

2   Incorporated.  DiamondWare is a relatively small intellectual

3   property type startup entity, and Nortel Government Solutions

4   is a entity that's created and maintained separately from the

5   rest of Nortel in order to service U.S. federal contracts.  And

6   so what's the problem with that?

7        Well, in the tax world when you -- when a claim is filed

8   against the main reporting company, in this case, NNI, there is

9   arguably created as well, certain related liabilities that are

10  referred to in the lingo as dash 6 liabilities.  Liabilities

11  that provide for several liability on entities within the tax

12  group, the filing group.  And both NGS and DiamondWare find

13  themselves, unfortunately, within that world.  We had -- and we

14  had a problem in the sense that outside of bankruptcy, the

15  entities within a corporate group arguably have this several

16  liability.  That is not an issue once they file for bankruptcy

17  because the asset sale process under Section 363 allows the

18  assets to be transferred free and clear and the proceeds to

19  apply to whatever claims might exist, including claims of the

20  Internal Revenue Service.  The problem that we're facing here

21  is that we've kept two companies out of bankruptcy.  We've kept

22  them out bankruptcy intentionally for different reasons, but

23  they're good and valid reasons.  Valid reasons that we've

24  discussed with our constituencies over the course of the case

25  and really formed an important element of the transactions that

76

1   we were negotiating with Avaya and the other bidders.  We

2   simply think it would be improper and incorrect from a value

3   perspective to have to file these companies for bankruptcy.

4   But, as you might imagine, the Purchasers are not willing to

5   simply buy a company that carries with it substantial liability

6   for Nortel's past tax sins, if there are any.  And so the

7   negotiations of the contracts over the weekend really centered

8   in large part around crafting fairly complex language that

9   would allow us to deal with this.  And let me describe how

10  we're going to deal with it.

11       One, we have a relatively narrow period of time within

12  which to try to resolve the IRS claim.  And that comes to a

13  sunset in the first -- second week of October, the 14th and 15th

14  are dates by which we have to make certain decisions, and those

15  decisions would include filing those entities for Chapter 11.

16  If we file those entities for Chapter 11, there are certain

17  price adjustment mechanics that have been built in and

18  negotiated, and they were price adjustment mechanics which

19  parties insisted upon, so on this I think we're on all fours in

20  terms of whether or not it was Avaya, the winning bidder, or

21  our now out of the picture competing bidder.

22            THE COURT:  Yes.

23            MR. BROMLEY:  Both of them required this.  And so we

24  have a relatively quick decision time frame here, which means

25  that we need to try to have some sort of resolution of the IRS

1  claim, if at all possible, by the 13th of October, which is an

2  omnibus hearing date.  And we recognize that our request for a

3  hearing on the objection to the IRS claim on the 13th is

4  seeking shortened notice by a couple of days.  But in all

5  honesty, Your Honor, we were just not ready to make -- we were

6  already within the 30-day window by the time we had the

7  conversations over the weekend, and we do believe we moved as

8  promptly as possible to seek that date.

9      In addition, we would like expedited discovery, and that's

10  really the key issue, with respect to the basis for the claim.

11  Proofs of Claim are always inscrutable documents in many ways,

12  Your Honor, but none more than an IRS Proof of Claim which says

13  3 billion on the front and 5 times 600 million on the back.  It

14  doesn't provide a lot of information to have a negotiation with

15  a counterparty as to whether or not the claim is good or bad or

16  indifferent.  And, indeed, as we mentioned in our papers, the

17  thing that hits Nortel the hardest is that Nortel has lost a

18  lot of money over the years, and the one thing that we were not

19  thinking that we had a substantial risk of was a cash tax

20  obligation.  And so to have, at a very late hour, in connection

21  with a material transaction, a Proof of Claim which indicates

22  the potential for $3 billion cash tax obligation, it threw us

23  for a loop if you will.

24      When we first heard about this in the second -- in the

25  third week of August, Nortel and its counsel, my partners at

78

1   Cleary in the tax group, tried to reach out for the IRS in

2   various ways to find out the basis of the claim.  I would note,

3   that the claim, when filed, did get a fair amount of press in

4   Canada, in Ireland, in the United States on Debtwire and the

5   bond trade.  The bond prices were affected by the filing of the

6   Proof of Claim, so we really wanted to understand it very

7   quickly.  And we made a number of contacts at a number of

8   different levels within the IRS, and we were just unable to get

9   any concrete information as to the backup.  I think it's our

10   understanding, based on previous interaction with the Service,

11   that there would be a set of work papers that exists backing up

12   the calculations and that should be relatively easy to

13   identify.  And that there should be one or two analysts or

14   agents who are assigned to creating that Proof of Claim and

15   monitoring the work that -- the backup that went into that

16   claim.  And so we do believe, from an expedited discovery

17   perspective -- well, timing is never -- short timing is never

18   particularly attractive, we do think that in this circumstance,

19   it's relatively targeted that we're going to be able to find

20   out very quickly the right people to depose and the relatively

21   narrow package of information that should back up this claim.

22       So in that regard, Your Honor, we do think that while

23   we've recognized that we're asking for extraordinary relief in

24   terms of timing, we don't think that this is a, you know,

25   cannon blast broadside type of discovery.  We're trying to

1    figure out things very strategically to the degree possible.

2    Not only do we think that the work papers with respect to the

3    Proof of Claim should exist and be easily copied and delivered,

4    you know, our keen, most keen interest is on a couple of years.

5    The way this works is that if -- you're only tagged with group

6    liability, so to speak, to the extent it exists when you enter

7    the group.

8            THE COURT:  Okay.

9            MR. BROMLEY:  So NGS, Nortel Government Solutions,

10   joined the group in 2005 and DiamondWare joined it in 2008, so

11   we have, I think, a relatively narrow band from a timing

12   perspective as well.  So it is our sincere hope and expectation

13   that the discovery requests are not overly burdensome for the

14   Government.

15       Of course, Your Honor, we're asking -- we recognize we're

16   asking for a very quick resolution as well of the claim itself,

17   but really it all depends on getting the documentation first.

18   It's very hard for us to say, based on the sketchy information

19   provided, that we'll be able to bring on a full-blown objection

20   on the 13th, but we do believe it's important that we have that

21   date set because if the information we receive allows us to

22   move forward that quickly, we do want to do so.  And, again, we

23   have in the contract now, a requirement to make a decision as

24   to whether or not to file NGS by the end of that second week in

25   October.  And I think it's important to recognize why that

80

1    would be the case.

2        Well, if we do have to file those entities, what we'd be

3    doing is coming back to you, Your Honor, to ask for

4    Supplemental Orders to join in those Debtors, new Debtors --

5            THE COURT:  Right.

6            MR. BROMLEY:  -- if they are Debtors, into any relief

7    that you grant today.  So it's -- that's the framework of the

8    situation we're dealing with.  Nortel really has no basis on

9    which to understand, from its records, the basis for this tax

10   claim.  We don't think it comports with the reported tax

11   returns that have been filed.  Indeed, we think on a worldwide

12   basis, it wouldn't' be justified in terms of it having such a

13   tax obligation.  And to the degree that there's a way that we

14   can resolve this with the IRS short of filing this, but we did

15   try to do that.

16       We had -- we were able to actually get through to a number

17   of people at the end of last week with the IRS and we suggested

18   a number of possible resolutions.  And we recognize that we

19   were asking for those resolutions on a very short time line,

20   especially when dealing with an organization like the IRS, and

21   not one that has a lot of areas of responsibility in reporting

22   lines that need to come together to make that sort of decision.

23   But we were rebuffed in our offers last week.  And it was --

24   really we didn't find out, you know, we were hopeful and

25   hopeful and hopeful up until Thursday, and we did have two

81

1  phone calls on Thursday where it became crystal clear that

2  there was no way the IRS could have an answer for us by the

3  time the auction commenced.  And we did fully disclose the

4  issues and the potential impact on the auction to the Service

5  but, again, they were unable to respond quickly enough.

6      So it is our hope that, one, we get the information that

7  we need on a very short time line, that we have an objection

8  hearing scheduled for the 13th.  And at the same time, we

9  remain fully available to engage with the Service to try to

10  resolve the issue, which we feel is an important issue for the

11  value of this transaction.  We do not want to have to come back

12  and say, well, Your Honor, we've had to file these entities and

13  the value that we might obtain is going to be less than 915,

14  but that was really an absolute requirement from both

15  Purchasers or potential Purchasers I should say.  So we really

16  had no choice.  I would also say that the difficulty of

17  explaining these issues to folks over the weekend and trying to

18  negotiate them in real time, you know, really did add to the

19  time line that we found ourselves facing over the weekend.

20      So that, Your Honor, is the basis -- sort of the

21  background of facts and the basis for our request.  We

22  certainly hope -- we have not been able to completely preview

23  this with the Department of Justice.  We did give them a heads

24  up it was coming, so we don't know whether they will simply

25  consent or object, but that is the Debtors' position, Your

1  Honor.

2  THE COURT:  Thank you, Mr. Bromley.  Is it Mr. Geht?

3  MR. GEHT:  Yes, Your Honor.

4  THE COURT:  Mr. Geht, you may proceed.

5  MR. GEHT:  Thank you.  Let me start off with we will

6  not consent.  We will object.  I hope that doesn't come as a

7  surprise to anyone in the courtroom.

8  Let me start by pointing out that really what's at stake -

9  - the -- immediately what's at stake is two (indiscernible) two

10  Non-Debtor companies.  I think Mr. Bromley noted that what

11  they're asking is extremely -- well, is not normal to put it

12  mildly.  Filing those two companies for Chapter 11 is the

13  normal procedure and it would be a very orderly and quick

14  process, and no one needs to resolve the $3 billion claim.  So

15  our preference would obviously be for those two companies to

16  simply be filed for bankruptcy and we would (indiscernible) as

17  far as the claim is concerned.

18  With respect to the claim, I recognize that it was filed

19  fairly late in the game, but we did have our date at the end of

20  this month, so the Service had to file something.  To give the

21  Court some idea -- I think it's been covered in some press, the

22  claim is really related to the transfer prior to this agreement

23  between the Service and Nortel.  The transfer prior to this

24  agreement, as the parties have been trying to resolve, I'm

25  told, for over the last -- over nine years.  They're

1  complicated issues involving not just the U.S. taxing

2  authorities, but also foreign authorities, including Canada.

3  So the suggestion that this Court can, in one month, resolve

4  what's taken parties nine years to try to resolve, I think is

5  unrealistic.  That said, what I was hearing from Mr. Bromley is

6  a two-fold concern.  There's the issue of does the Service

7  actually have a basis for filing a $3 billion claim or is this

8  a (indiscernible) have a valid $3 billion claim.  If --

9  certainly if the document request that was attached, I don't

10  know if Your Honor has it before you --

11           THE COURT:  Yes.

12           MR. GEHT:  -- Exhibit B to the notice of Debtors in a

13  (indiscernible) of (indiscernible) for shortening the time

14  because the documents request it's actually in -- Your Honor,

15  if you could turn to page 6 of Exhibit B?

16           THE COURT:  Yes, sir.  I've got it.

17           MR. GEHT:  Okay.  It requests full IRS internal

18  memorandum, reports, records of discussions and other

19  communications, spreadsheets, work visas, that kind of

20  information and other documents that relate to the taxable year

21  of 1998 to 2008.  That's ten years worth of documents within

22  the possession of the Internal Revenue Service.  I did a quick

23  calculation by looking at my calendar, we have ten days to

24  respond to this document request.  I understand Mr. Bromley's

25  other point that there is a more narrow document request that

84

1    goes to the question of whether or not the Service has a basis

2    for filing a $3 billion claim, but this Court finding that the

3    Internal Revenue Service has a basis for filing a claim isn't

4    going to (indiscernible) buyers in this auction.  The buyers

5    need assurances that the two Non-Debtor entities don't have to

6    (indiscernible) relief for a $3 billion tax judgment.  That

7    requires, as I mentioned, and I think as Mr. Bromley indicated,

8    the actual finding on the merits of whether or not the Service

9    has a valid claim.  And, again, Your Honor, this is -- if I may

10   just explain the -- if the Court wishes, I can explain when the

11   (indiscernible) as a general matter involves.

12          THE COURT:  All right.

13          MR. GEHT:  If you have a -- and this is not

14   particular to Nortel, we could use corporation X, which has

15   subsidiaries in different jurisdictions, and by that I mean

16   foreign jurisdiction.  You could have wholly-owned subsidiaries

17   in low-tax jurisdictions, those that have a low income tax rate

18   and high-tax jurisdictions, those that have high income tax.

19   On a consolidated basis, if a company wanted to lower its

20   income tax liability in a high-tax rate jurisdiction and by all

21   accounts, people generally consider the United States to be a

22   high tax-rate jurisdiction, the company can do one of several

23   things.

24       One thing it can do is it can sell product from a high-tax

25   jurisdiction, such as the U.S., to a low-tax jurisdiction at a

85

1  low price, thereby lowering their revenue, thereby lowering

2  their capital income.  Other ways you could do this is by

3  having a subsidiary in the high-tax jurisdiction

4  (indiscernible) be overcharged by a subsidiary in the low-tax

5  jurisdiction because that would increase the cost of goods sold

6  for the U.S. company, thereby lowering taxable income.  And

7  what happens is then the Service comes in and tries to audit

8  whether or not the prices that were being charged by one

9  subsidiary in one country to another subsidiary in another

10 country an actual arms-length transaction sales price.  As I

11 mentioned, this has been going on for about nine years, the

12 (indiscernible) going back and forth (indiscernible) involved,

13 I believe, I'm not sure if there are other countries involved

14 because it does affect tax liabilities, not just of a

15 subsidiary that is (indiscernible) it in a high-tax

16 jurisdiction in the United States, but also in a potentially

17 low-tax jurisdiction.  I'm not sure whether or not it is

18 realistic, and actually, I think it's quite unrealistic to

19 believe that discovery and the question of, I believe there are

20 nine years on the Proof of Claim, nine years worth of Transfer

21 Pricing Agreements between the various subsidiaries of Nortel

22 can be resolved in one month.

23      And so what we would suggest is the Court deny the

24 Debtors' Motion.  And I realize that would force the Debtors to

25 effectively be presented with a (indiscernible) companies, the

1  two companies at issue in the (indiscernible) sale to Chapter

2  11.  If they wish to proceed with a formal objection to the IRS

3  claim of 3 billion and have this Court adjudicate the merits of

4  that objection.  Well, I always say we're amenable to it, but

5  we generally recognize we have no choice in the matter.  I

6  would simply say that litigating the merits of this claim would

7  take months not days.  I'm not sure if you want to have some

8  questions for me.

9       THE COURT:  Well, I think I have more questions for

10  Mr. Bromley, frankly, because I'm wondering about, for example,

11  the discovery requests and their being, you know, tailored.

12  For example, I'm assuming -- and this, Mr. Geht, I'm assuming

13  you have collected a file of documents upon which you based

14  your claim.

15       MR. GEHT:  Your Honor, I assume that the Internal

16  Revenue Service can support the claim itself.  The Department

17  of Justice was just recently brought into this matter --

18       THE COURT:  I see.

19       MR. GEHT:  I presume that it's  -- given the fact

20  that it's not a 3 billion, zero, zero, zero, zero, zero, that

21  there are (indiscernible) that make up the total, yes.

22       THE COURT:  Okay.

23       MR. GEHT:  But once, again, I'm not -- and this goes

24  to the distinction being drawn by Mr. Bromley between the basis

25  for the claim versus the validity of the claim.  I'm not sure

1   if we can -- I can present, I believe, it was my exchange that

2   (indiscernible) probably (indiscernible) with the Internal

3   Revenue Service who prepared the form, I can certainly produce

4   them by the hearing in October 13th, and Your Honor can satisfy

5   (indiscernible) basis for filing a Proof of Claim, but finding

6   that we had a basis will not resolve the underlying problem,

7   namely the potential liabilities.

8          THE COURT:  All right.  Mr. Bromley.

9          MR. BROMLEY:  Well, Your Honor, I think it's

10  important to maybe back up a little bit.  This is the first

11  time we've had actual confirmation from a representative of the

12  U.S. Government that the Proof of Claim is actually related to

13  the transfer pricing dispute, okay.  And I'm glad it's now on

14  the record because that's about 100 percent more information

15  than we had last week.

16         THE COURT:  Despite conversations with people from

17  the IRS?

18         MR. BROMLEY:  That's correct.  There are an myriad of

19  departments.  There's the collections group, the counsel group,

20  the big and small, the business, the large business, the

21  competent authority group, competent authority being the one

22  that deals with transfer pricing.  At times, Your Honor, we did

23  feel quite frustrated over the process, and there were a fair

24  number of people who were out on vacation, which is

25  understandable, but we were unable to get any clear and

definitive statement.

Now, that having been said, we have a little bit more clarity, but I think it's important to do exactly what Mr. Geht did, right. Which is to go to the document request, all right. And Mr. Geht, I think, intentionally said, you should read something on page 6.

THE COURT:  Yes.

MR. BROMLEY:  Okay.  And something on page 6, what he read starts with number 2.  I think it's a clear inference that there's a number 1 and it would be good to look at number 1 instead of number 2.

Number 1, says all documents in the possession, custody or control of the IRS that the IRS relied on in preparing the IRS Proof of Claim, but only to the extent such documents are relevant to the amounts shown as owing on the IRS Proof of Claim in respect of taxable years 2005 through 2007.  And then it asks for, including but not limited to IRS internal memos and spreadsheets and work papers and the like.  It is a much more narrowly tailored request, and I don't really think it's much to ask.  I mean, it's a -- I was kind of stunned at the cavalier way that Mr. Geht's said, well, we should file these companies for bankruptcy.  You know, the fact that these companies might have to file for bankruptcy is an important issue in these cases.  It's important for the value that can be realized for our Creditors and it's important for those

1   businesses themselves.  And the IRS should not be able to sit

2   here and throw in a completely unsupported two-page document in

3   the middle of a summer vacation and then say, I don't have to

4   explain it.  It may be that once they explain it, we may not be

5   able to litigate it with any particular clarity by the 13th of

6   October, but to sit here and say that maybe in a month I'll be

7   able to get in front of you, Your Honor, and prove that I had

8   any justification to file this Proof of Claim is just

9   preposterous.  The IRS should be able to and should be required

10  to put its proof on the table because there's substantial value

11  in these estates that could be compromised by their failure to

12  do so.  It maybe that we are not able to litigate this to

13  conclusion, but we will not know that until they tell us what

14  the claim is about and how those numbers were calculated.

15          THE COURT:  Right.

16          MR. BROMLEY:  So the idea that we should simply say,

17  we're not going to get around to it, file your companies and

18  we'll just deal with it in the ordinary course is just

19  ridiculous.

20      The other thing, Your Honor, is that we're sitting here

21  today with a transaction that might be able to be restructured

22  in some way or accommodated if we knew any of the information,

23  right.  If we knew that the $3 billion is structured and put

24  together in a particular way, the Debtors and Avaya could sit

25  down and try to craft a solution to a problem, but you can't

1   craft a solution to a problem unless the problem is explained.

2   And so what we're looking for is expedited discovery, first and

3   foremost, expedited discovery that can be provided.  If the

4   Government did not have at their fingertips the support for

5   this $3 billion claim, they have violated their own internal

6   procedures and they should be sanctioned for that.  The IRS has

7   very clear procedures that says they cannot file a Proof of

8   Claim in a bankruptcy case unless they are able to support it.

9   And it doesn't say that they're able to support it in their own

10  good time.  They should have to support it when it's needed to

11  be supported.

12      So what we're talking about here is a very key issue here.

13  And so I really have a hard time understanding how we can sit

14  here and say we should just file these cases, get on with our

15  lives, take whatever hit we're going to take and then at some

16  point down the road, the IRS will tell us what their claim is

17  about.  If the IRS tells us what their claim is based on and

18  they tell us that after this deal is closed and we've taken a

19  purchase price hit, I don't think we're going to have much

20  redress against the IRS, but we will have lost material value

21  as a result of it.  And they shouldn't be allowed to do that to

22  us.  We told them for a period of two weeks prior to the

23  auction commencing that we needed an answer, we needed a

24  conversation and it wasn't until Thursday afternoon that we got

25  two distinct messages that the proposals we had made were

91

1    non-starters.  It's just not fair.  They have filed a Proof of

2    Claim.  They have submitted themselves to your jurisdiction,

3    Your Honor, and they should be required to put proof on the

4    table that we can analyze and at least have a conversation

5    about.  Who knows, maybe this all will be able to be resolved

6    now that we know that it is directly related to transfer

7    pricing, that would help those conversations as well.

8          So I really don't think that we're talking about much

9    here, Your Honor.  I think we should schedule a hearing date

10   for the 13th, and we should require them to produce their

11   documents in no less than two weeks.  We understand it's not

12   going to be every single document, but there's got to be a file

13   somewhere that somebody has that adds up to these numbers.  And

14   I think Mr. Geht is absolutely right, there's got to be backup

15   because, you know, there's dollars and cents.

16             THE COURT:  Absolutely.

17             MR. BROMLEY:  I'd like to know, you know, that.  And

18   I'd also, if I may -- obviously, there's also been a $15

19   million claim filed.  You know, that was -- there was a $15

20   million claim filed and $171,000 claim, both of them have been

21   overruled by this $3 billion claim.  And both of the claims

22   that were filed for less money, had more backup.

23             THE COURT:  Thank you.

24             MR. BROMLEY:  Thank you, Your Honor.

25             THE COURT:  Well --

1          MR. GEHT:  Your Honor, may I just --

2          THE COURT:  Yes, Mr. Geht.

3          MR. GEHT:  First thing is the Proof of Claim that was

4    filed is what is required to be filed by the Bankruptcy Rules.

5    It was deemed allowed until it is objected to.  We do not have

6    any obligation to file anything until it is objected to.  So to

7    the extent that we're being accused of not following unwritten

8    rules, I'd register my objection.  And I simply -- I understand

9    the point that Mr. Bromley was making and I think I

10   acknowledged when I drew your attention to number 2, that

11   number 1 was the more limited one, but the problem is we're

12   attorneys, both Mr. Bromley and I.  I have to defend that the

13   Government requested is one and two.  I have to defend an

14   objection that does not simply question the basis for the claim

15   of whether or not the Service has a single file that adds up to

16   $3 billion.  I have to defend an actual objection to the merits

17   of the $3 billion claim.  If Mr. Bromley wants to limit his

18   objection or withdraw the objection and file another one simply

19   to the basis for our claim, it's an entirely different

20   discussion.  That's all I have.

21         THE COURT:  Well, I do think that the Debtors, under

22   these circumstances, are entitled to expedited discovery.  If

23   this matter has been going on for nine years, then the Internal

24   Revenue Service should certainly not be at any disadvantage in

25   producing documents.  They have filed a Proof of Claim for $3

93

1  billion.  I'm assuming they didn't pull information out of the

2  air, but there are documents upon which they relied, and I am

3  going to grant the Motion for the production by, I believe, it

4  was September 30th.  And we will hold a status conference on

5  September 30th as well.  I don't know whether you want to come

6  to Court, Mr. Bromley, or do it by telephone.  I have --

7          MR. BROMLEY:  Let's do it (indiscernible).

8          THE COURT:  I have a matter scheduled for the 4

9  o'clock time which may or may not proceed.  I'd like to do it

10  at 4:00 with the understanding it may not actually -- I may not

11  hear from you until 5:00, but --

12          MR. BROMLEY:  September 30th is fine, Your Honor.

13          THE COURT:  Yes.

14          MR. BROMLEY:  It's an omnibus date.  We intend to be

15  here in person in any event.

16          THE COURT:  All right.  I think it's appropriate.

17  I'm also going to order that the Internal Revenue Service

18  identify representatives with the most knowledge of the matter

19  to whom the Debtors may speak about these issues, so that there

20  isn't a problem with chasing down -- I understand through you,

21  Mr. Geht, but since you are now, you know, you've noted your

22  appearance here, but I do want, at least, the IRS sort of

23  organize itself so that there can be meaningful discussion with

24  the Debtors.  As far as the hearing on the 13th, I have a

25  number of other matters, but I am going to attempt to move

94

1    those.  I think I can, so that I can allow us to proceed on

2    October 13th with a hearing.  I think everyone will know better

3    on the 30th of September what that hearing might entail and how

4    realistic it is and whether it's necessary, but at least you'll

5    be on the schedule.

6              MR. BROMLEY:  Thank you, Your Honor.

7              MR. GEHT:  Your Honor, this is Jan Geht.  It's my

8    understanding that the Court, therefore, has ordered us to

9    comply not just with document request number 1, but also

10   document request number 2, which seeks 10 years worth of

11   documents --

12             THE COURT:  To the extent --

13             MR. GEHT:  -- to be produced in ten days.

14             THE COURT:  You know, I assume that there are people

15   who are in charge of this claim who have documents available to

16   them.  I don't think they have to be, you know, photocopied and

17   shipped, but at least they can be made available to the

18   Debtors.  But I'm expecting that the attorneys will speak with

19   one another, and I know from my own dealings with him, how

20   reasonable Mr. Bromley is.  Whether his tax partners are

21   equally reasonable, we don't know, but if you run into

22   problems, you'll call me.  And I prefer to deal with discovery

23   issues, at least, in the first -- at the first moment somewhat

24   informally with a telephone conference and usually we can work

25   things out if there is an issue.  But yes, I am ordering

1  discovery with respect to both requests.

2          MR. GEHT:  Thank you, Your Honor.

3          THE COURT:  Anything further, counsel?

4      (No verbal response.)

5          THE COURT:  Well, you'll be back sooner than you

6  thought you would anyway, but we will reconvene with this

7  matter at 1:30.  Again, I don't know if it's going to be by

8  video or audio, but --

9          MR. ABBOTT:  Your Honor, I did receive an e-mail that

10  apparently the video has been fixed.

11          THE COURT:  Oh, good.

12          MR. ABBOTT:  So that hopefully we will be by video.

13          THE COURT:  All right.  I'll be sure and shave.  And

14  with that, we'll stand in recess, counsel.  Thank you.

15          UNIDENTIFIED SPEAKER:  Thank you.

16      (Recess from 12:39 p.m. to 1:47 p.m.)

17          THE CLERK:  Please rise.

18          THE COURT:  Good afternoon, everyone.  Please be

19  seated.  Thank you so much.  Mr. Justice Morawetz, good

20  afternoon, sir.

21          UNIDENTIFIED SPEAKER:  Good afternoon.

22          JUSTICE MORAWETZ:  Good afternoon, Judge.

23          THE COURT:  I think that --

24          JUSTICE MORAWETZ:  If I may just do the usual

25  introduction, Judge Gross.  That the Toronto counsel are all

1   present, and in accordance with the Cross-Border Protocol

2   Guidelines we have had a discussion regarding the procedure to

3   be followed this afternoon.  It will be similar to the

4   procedure followed on previous Motions of this type where the

5   --

6            MR. DOSHI:  Your Honor --

7            JUSTICE MORAWETZ:  -- present argument --

8            MR. DOSHI:  -- if I may interrupt on the phone here?

9            JUSTICE MORAWETZ:  -- to be heard in the --

10           MR. DOSHI:  We're having a little trouble hearing.

11           UNIDENTIFIED SPEAKER:  Yes.  So am I, Your Honor.

12           THE COURT:  Oh, Mr. Justice Morawetz, apparently

13  there's difficulty hearing your comments.

14           JUSTICE MORAWETZ:  Is that any better?

15           MR. DOSHI:  No.  It's still the same.

16           THE COURT:  But I see you do --

17           JUSTICE MORAWETZ:  I think we're bringing in another

18  one.  Is that any better?

19           THE COURT:  It's better at this end.  Is it better on

20  the telephone?

21           MR. DOSHI:  I can hear the Judge fine, but not

22  counsel.

23           THE COURT:  Counsel, oh.  That was when they were

24  with me.  Well, I guess we'll do them --

25           JUSTICE MORAWETZ:  Well, given that counsel haven't

1   said anything yet, we're okay.

2          THE COURT:  That's right.

3          JUSTICE MORAWETZ:  Let me just start from the

4   beginning then.  That the hearing clearly is being held in

5   accordance with the Cross-Border Protocol, then it'll turn to

6   that protocol.  Judge Gross and I have discussed the procedure

7   and process to be followed this afternoon, similar to previous

8   motions of this type.  Argument will commence in the Delaware

9   Court followed by submissions in this Court.  There will then

10  be a brief recess followed by any endorsements or judgments

11  this afternoon.  So subject to your comments, Judge Gross,

12  it'll be over to you and you can proceed, obviously with the

13  hearing before you.

14         THE COURT:  Thank you.  And just -- we are prepared

15  to proceed, of course.  I would just like to note for the

16  record, that at a hearing this morning, we addressed the

17  objection of Verizon and that objection was overruled, and we

18  will now be in a position to proceed with the Motion for Sale.

19  Mr. Bromley.

20         MR. BROMLEY:  Good afternoon, Your Honor.  Good

21  afternoon, Mr. Justice Morawetz.  It's a pleasure to be before

22  you both again.  And we'd like to, once again, thank you both

23  for accommodating this somewhat shifting requests that have

24  come from the Nortel side of the aisle.

25         I would like to start out with a bit of background.  I did

1    provide some of this, as well, this morning in connection with

2    the Verizon objection, but if I could, it would explain why

3    we're here on Wednesday instead of Tuesday.

4              THE COURT:  Yes.

5              MR. BROMLEY:  And also explain a bit how we came to

6    the results that we were seeking approval for today.  The

7    Courts will recall that on August 4th, 2009, we were last here

8    in connection with the approval of bidding procedures for the

9    Enterprise Business Solutions business, Nortel's worldwide

10   business that deals with and sells products and services

11   related to communications, voice mail, phone, teleconferencing

12   and the like.  This is one of the major business units of the

13   Nortel worldwide business, and there are some distinctions

14   between this transaction and the CDMA transaction, which the

15   Courts considered and approved in July.  In particular, the

16   CDMA transaction was a transaction that was largely North

17   American.  There were certain elements of it that reached

18   outside of North America, but it was a transaction that was

19   primarily centered on the businesses of Nortel in the United

20   States and Canada.  And in many respects, we proceeded with

21   that transaction much as many cross-border transactions have

22   occurred in the past.  And so to a certain extent, while

23   cross-border transactions are not the norm, we did follow the

24   typical rules and procedures and came to a result, which I

25   think is in accord with the great working relationship the U.S.

1   and Canadian systems have.

2       This transaction provides a bit more difficulty because

3   what we're doing here is entering into a transaction which

4   requires the transfer of this business in multiple

5   jurisdictions around the world.  And, indeed, the transaction

6   that we're seeking approval for here today, both in Toronto and

7   Wilmington, is a transaction that is interdependent with the

8   transaction that has been entered into between the joint

9   administrators for the EMEA Debtors for the sale of the

10  Enterprise Business in Europe, the Middle East and Africa.  We

11  also are selling elements of the business as they exist in

12  Latin America and Asia.  So this is the first worldwide

13  transaction in a true sense.  And so what we're looking for

14  here today is approval of a transaction that will effect Nortel

15  employees all around the world, and benefit Creditors in every

16  jurisdiction in which Nortel operates.

17      The transaction has been a difficult one in many respects

18  because of the complications that the business presents.  And

19  we've had a number of months of negotiations.  These

20  negotiations started first with discussions prior to the

21  commencement of these proceedings as Mr. Riedel had testified

22  to at the bidding procedures hearing.  And they started in

23  earnest with Avaya in the March time frame, and here we are in

24  September looking for approval.  And I'm very happy to be able

25  to report that the transaction, which took so long to bring to

1  these two Courts, has been brought to you with a substantial

2  increase in the value of that -- the Debtors have been able to

3  achieve through this auction process.

4      The stalking-horse transaction with Avaya provided for

5  consideration of $475 million that would be allocated amongst

6  the various jurisdictions.  And as the result of an auction,

7  which I'll describe in a moment, the total consideration

8  flowing is now at $915 million, 900 million in cash and $15

9  million to establish an employee retention program, which is

10  very important to maintain the business in its current state

11  through the closing.  That purchase price was accomplished as

12  the result of a very diligent marketing effort that took place,

13  both before and after the August 4th bidding procedures

14  hearing.  The period of time after the August 4th hearing was

15  comprised of intense efforts to engage with Avaya to continue

16  the work towards what needed to be accomplished with that

17  transaction.  And I would say that we were very, very pleased

18  with the diligence and efforts that Avaya employed in that

19  post-signing period.

20      But at the same time, in order to make sure that we had a

21  robust auction, the companies M&A deal team and our bankers

22  went out and worked very hard to create an effective auction

23  dynamic.  And by last week, we had an auction.  An auction

24  process that had yielded a qualified bidder in the form of a

25  group called Enterprise Networks Holdings, a joint venture

1   between the Gores Group, a U.S. private equity firm and Siemens

2   AG of Germany, as well as Avaya, so we had two qualified

3   bidders.  And we started this auction on Friday morning,

4   September 11th.  The auction concluded at about 2:30 a.m. on

5   Monday, September 14th, and with a final bid being put on the

6   table by Avaya, and the Gores Siemens group, ENH, withdrawing

7   from the auction as a result of that bid.  Through the course

8   of that auction, a number of things took place, a very

9   substantial negotiation of the documents between each round of

10  bidding was essential.  So while many auctions are simply a

11  matter of dollars and cents, this was a matter of negotiation,

12  as well as dollars and cents.  And that was driven in part by

13  an issue that was raised by the Internal Revenue Service here

14  in the United States, which I'll mention in a moment.  In

15  addition, during the course of that bidding, ENH, the other

16  qualified bidder, did take the lead as the rounds went through.

17  I think they took the lead twice.  And during the course of

18  that bidding, ENH did remove from their bid the provision that

19  said that they would be a backup bidder or an alternate bidder.

20      And so as we stand here today, unlike the CDMA

21  transaction, where we had a bidder standing behind the winning

22  bidder ready to take over the transaction if it failed within a

23  certain period of time, we do not have that here.  ENH has

24  withdrawn from the field, so to speak, in light of the Avaya

25  bid.  And so right now we have a winning bidder and an executed

1   agreement, set of agreements, but we do not have a backup

2   bidder.  And that is not uncommon in these auction situations,

3   but indeed, it should be noted because the -- it is a situation

4   that is different than we were facing in the CDMA transaction.

5       It would be worthwhile, I think, for a moment to just

6   pause and explain to both Courts why the transaction -- the

7   auction took a little bit longer than expected as a result of

8   this claim filed by the IRS.  And in particular, Mr. Justice

9   Morawetz, I wanted to explain to you because it has -- I've

10  already had the opportunity to explain it this morning to Judge

11  Gross.

12      There was a claim filed by the Internal Revenue Service

13  here in the United States on August 20th, and that claim has

14  required a readjustment of sorts of the transaction.  And we

15  heard on Thursday of last week on the 10th of September from

16  the IRS that they were unwilling or unable at that time to

17  engage in negotiations to allow the transaction to proceed as

18  we had hoped.  And so Friday the 11th, we did engage in

19  negotiations and discussions with both bidders about the IRS

20  claim and it did change the landscape somewhat.  In particular,

21  there has been added to the winning bid and had been added to

22  the bids of ENH when they were making bids over the weekend, a

23  new provision, which deals in particular with two entities here

24  in the United States, Nortel Government Solutions and

25  DiamondWare, Incorporated.  These are two wholly-owned

1  subsidiaries of Nortel Networks, Incorporated, the lead U.S.

2  Debtor.  Both of these entities are Non-Debtors at the time --

3  at this time, sorry.  They are not Chapter 11 Debtors.  And the

4  transaction that we have stuck with Avaya requires that Nortel

5  Networks, Incorporated deliver the stock of each of these

6  entities at the closing.  The filing of the claim by the IRS

7  and the potential for the assertion of several liability with

8  respect to these entities, DiamondWare and NGS, has meant that

9  we have negotiated into the winning bid a provision that allows

10 Nortel Networks, Incorporated to commence Chapter 11

11 proceedings for each of these entities if it becomes necessary

12 in order to close this transaction.  It is certainly our hope

13 that this will not have to occur, and we have asked for certain

14 expedited relief this morning from Judge Gross, which has been

15 granted and I'll describe in a moment.

16     But in the event that we need to file these two entities,

17 there's the possibility of a purchase price adjustment.  That

18 purchase price adjustment would depend on the level of assets

19 that would be delivered by these two entities, and there's a

20 mathematical formula in the Agreement.  I should note, that

21 both this Agreement and the Draft Agreements that we had

22 received from ENH, provided for the same type of purchase price

23 adjustment, so we're not talking about there being any

24 fundamental difference between the winning bid and any of the

25 competing bids that were made, both of them required the same

1  thing.  Both Purchasers were unable to or unwilling to I should

2  say, bear the risks that there could several liability that

3  would follow the stock of these two entities.

4  So in recognition of the difficulty that that situation

5  presents, we also agreed, in the context of the Agreement that

6  we signed with Avaya, to commence a proceeding against the

7  Internal Revenue Service, an objection to the claim that has

8  been filed by the Internal Revenue Service.  We filed those

9  papers last night, and we asked Judge Gross to enter an Order

10  directing that a hearing be held on the objection on October

11  13th, and that expedited discovery from the IRS be required by

12  September 30th.  So as we are presently scheduled -- and Judge

13  Gross was kind enough to grant that relief over the objection

14  of the IRS.  So based on that schedule, we will be conducting

15  expedited discovery with the IRS to understand the basis for

16  its claim.  And we anticipate that once we understand the basis

17  of the claim, which right now, Nortel does not, that we will be

18  able to engage in more complete discussions with the IRS about

19  the resolution of that claim, if possible, as well as with

20  Avaya in terms of the potential liabilities that might be

21  associated with it.  Right now, unfortunately, as we described

22  to Judge Gross this morning, we're simply unable to size the

23  liability.  And right now, Nortel simply does not understand

24  it.  It is our hope that once the IRS complies with Judge

25  Gross's Order to produce information that we will have a better

1    sense of the scope and basis of that claim.  Needless to say,

2    it came at a difficult time, and we thank very much our

3    constituents and both of our bidders for giving us the time to

4    resolve that issue.

5         Needless to say, even though I've said that before, having

6    conversations about difficult tax issues add a lot of hours to

7    a day.  And so our auction did begin on the morning of

8    September 11th, and did not end until the morning of September

9    14th, in large part as we spent a lot of time discussing these

10   tax issues, but also as we worked on negotiating the documents

11   in successive bidding rounds.  But at the end of the day, I

12   think we're here to actually recognize a very substantial

13   achievement.

14        We were able, in the CDMA transaction, to increase the

15   purchase price by $480 million to $1.13 billion.  And here

16   we've been able to increase the purchase price from 475 million

17   to 915 million, with 15 of that for employee retention.  These

18   are very substantial increases in the purchase price, and we

19   believe ample evidence of the robust nature of the auction

20   process.  And, indeed, conclusive evidence of the position that

21   we've taken from the very beginning that these estates need to

22   be operated and sold as a whole in order to maximize value for

23   everyone around the world.

24        So that is the background of how we got to where we are.

25   We had a robust sale process that lasted for months prior to

1   the signing.  We had a robust auction process after the

2   approval of the bidding procedures, and we had a very lengthy

3   auction, itself, that has been quite successful.  And so it is

4   with a great deal of pleasure that we are here before both

5   Courts in Wilmington and Toronto to seek approval of this

6   transaction.  And that, by way of background, Your Honor, is

7   where I think I might pause for a moment, and then talk about a

8   little bit of housekeeping from the U.S. side of the fence.

9       We have a number of other objections in addition to

10  Verizon.  We believe that they have all been resolved.  There

11  are a couple of points that we have offered corrective language

12  or reservations of rights-type language, which we're happy to

13  go through.  But I would think, Your Honor, it might make sense

14  to put on the evidence necessary that would allow us to provide

15  the basis for you to enter the Order here in the United States.

16  And I would note, Mr. Justice Morawetz, it also is essentially

17  consistent with the evidence that's been provided in the

18  Affidavit of Mr. Riedel, submitted in the Motion record by Mr.

19  Tay, as well as the Monitor's Report issued by Ms. Hamilton.

20          THE COURT:  I think that's a fine way to proceed, Mr.

21  Bromley, with the evidence now.

22          MR. BROMLEY:  And, Your Honor, I should note that

23  before we started, I did ask, before you came on the bench, I

24  asked folks in the audience here whether there were any

25  objections to proceeding by proffer.  And I did speak to Mr.

107

1    Laddin, as I thought, given our prior exchange this morning, he

2    might have a concern, and I didn't hear anyone interested in

3    cross-examining the witnesses.  So unless anyone is interested

4    in doing that, I would propose to proceed by proffer.

5            THE COURT:  I think that's appropriate.  Please do.

6            MR. BROMLEY:  And, Your Honor, to try and be a little

7    more economical, I would also ask that the Court incorporate

8    the evidentiary record that we placed on the record on the 4th

9    of August because a good portion of Mr. Riedel's proffer and

10   Mr. Murray's proffer actually go over the grounds that we

11   established on the 4th, which was accepted without objection.

12           THE COURT:  All right.  Does anyone object to the

13   incorporation of the record from the August 4th hearing?

14       (No verbal response.)

15           THE COURT:  Hearing no one, it is -- that is

16   incorporated herein.

17           MR. BROMLEY:  Thank you, Your Honor.  Let me start

18   with the proffer of Mr. George Riedel.  Your Honor, Mr. Riedel

19   is present in the courtroom and if called would be available to

20   testify to the following:  Mr. Riedel is the chief strategy

21   officer of Nortel Networks Corporation and Nortel Networks

22   Limited.  He's also employed by Nortel Networks Incorporated.

23   He has testified, both direct and through proffer, on several

24   occasions before Your Honor in connection with the bidding

25   procedures in this transaction, as well as the CDMA

1  transaction, both at the bidding procedures and at the sale

2  hearing.

3      It's the testimony of Mr. Riedel that took place at the

4  bidding procedures hearing went through, and I'll just give you

5  the highlights very briefly, his background, his

6  qualifications, both as a chief strategy officer at Nortel and

7  his educational background.  He also provided testimony with

8  respect to the Enterprise Solutions Business, the type of

9  assets that constitute the business, the general structure of

10  Nortel's other businesses, the type of products it provides the

11  environment in which it operates, including the highly

12  competitive nature of that environment.  He also testified in

13  the past with respect to the requirement that this business has

14  for substantial investments in research and development, and

15  the needs to make those investments in order to remain

16  competitive and the inability of Nortel, in its current state,

17  to make those commitments.

18      He also testified with respect to the pre-auction

19  solicitation of bids that the selling of the Enterprise

20  Solutions Business was discussed first in the end of 2008

21  internally, and that in connection with those efforts, Nortel

22  had approach eight parties, including one financial investor

23  and seven strategic buyers.  He also testified that prior to

24  the filing, Nortel had received six expressions of interest and

25  that three of the interested parties participated in management

1  presentations and due diligence sessions, which resulted in the

2  receipt of two non-binding proposals.

3      He would testify that after the commencement of the

4  Creditor protection proceedings, that Nortel's exploration of

5  the sale of the Enterprise Business halted for a while and was

6  restarted approximately in the March time frame.  And that

7  following that, substantial efforts were recommenced and prior

8  to the execution of the stalking-horse bid with Avaya, that 11

9  entities signed Non-Disclosure Agreements and were granted

10  access to diligence materials that 3 bidders actually

11  (indiscernible) becoming the stalking-horse bidder.  And that

12  Avaya signed the stalking-horse bid on July 20, 2009.  And

13  you'll recall, Your Honor, that the bidding procedures were

14  approved by both you and Justice Morawetz on August 4th.

15          THE COURT:  Yes.

16          MR. BROMLEY:  Now, we'll get to where we're -- let's

17  -- or catches us up.  If called to testify today, Your Honor,

18  Mr. Riedel would testify that after the bidding procedures

19  hearing on August 4th, two additional parties signed

20  Confidentiality Agreements and conducted due diligence on the

21  business assets.  Mr. Riedel would testify that between the

22  time of the August 4 hearing and the bid deadline, two entities

23  other than Avaya approached the Debtors and their advisors

24  requesting to become qualified bidders.  And that one, ENH,

25  submitted materials and on the 4th of September that ENH was --

110

1   I'm sorry, that they submitted those materials on September 4th

2   and that on September 7th, after consulting with the Monitor

3   and the Committee the Bondholder Group, the Administrators,

4   Nortel and its advisors, Nortel and its advisors declared ENH

5   to be a qualified bidder.  The other interested party at that

6   point in time withdrew from the process.

7       If called to testify, Mr. Riedel would testify that he's

8   familiar with the bidding procedures approved by this Court and

9   the Ontario Superior Court of Justice to govern the auction

10  process, and that the auction process was conducted in

11  accordance with the bidding procedures.  He would testify that

12  two bidders, including Avaya, submitted bids for the

13  consideration on or before the deadline of September 4, 2009.

14  We had the Avaya stalking-horse bid and a bid from ENH on

15  September 4.  That ENH's bid on September 4 had a purchase

16  price of $300 million in cash and a note in the principal

17  amount of 100 million.  And that after consulting with the

18  Committee, the Bondholder Group, the Monitor and the

19  Administrators, Nortel and its advisors declared that ENH's bid

20  was a qualified bid and notified Avaya shortly thereafter.  Mr.

21  Riedel would also testify that on September 10th, 2009, one day

22  prior to the auction, in accordance with the auction

23  procedures, that Nortel and its advisors, after consulting with

24  the constituents and the Administrators, declared Avaya's bid

25  to be the starting bid and communicated this to both bidders,

111

1   and that as required, Avaya was given a copy of ENH's qualified

2   bid prior to the auction.

3        Mr. Riedel would also testify, if called, that he was

4   present at the auction throughout all of it and that he is

5   generally familiar with the events that transpired there.  He

6   would testify that the auction took place at the offices of

7   Cleary, Gottlieb, in New York on September 11th beginning at

8   approximately 8:30 a.m. -- 9:30 a.m., I'm sorry, on September

9   11th, and continuing through the early morning hours of

10  September 14, until the selection of Avaya as the successful

11  bidder.  Mr. Riedel would further testify that Avaya's

12  stalking-horse bid was selected as the starting bid and made

13  available to the other qualified bidders, at least one business

14  day prior to the auction.  And that after the auction was open

15  with the starting bid, written bids were submitted for five

16  additional rounds and a new leading bid was selected at the end

17  of each round of bidding, and the other qualified bidder was

18  made aware of the terms of the new leading bid.  Mr. Riedel

19  would testify, if asked, that throughout the course of the

20  auction, that Nortel and its advisors consulted with the

21  Creditors' Committee, the Bondholder's Group, the Monitor and

22  the Administrators throughout the day and night of each of the

23  three days of the auction.  And that there were certain

24  amendments made to the bidding procedures during the course of

25  the auction and each of those amendments, including the

1  increase of incremental cash bids from 5 million to 25 million,

2  were discussed with our constituents prior to implementation

3  and disclosed to the two bidders on the record, which was kept

4  by a court reporter as required by Delaware law.

5      Mr. Riedel would indicate -- would testify, if called,

6  that after the -- that the first round of bidding included an

7  increase by ENH of its bid to 400 million in cash a note of 200

8  million, and this led through several successive rounds until

9  round 6, which was the final round, where Avaya submitted a bid

10  with a purchase price of 915 million in cash, 900 payable to

11  the sellers and 15 million payable to employees at closing

12  under an Employee Retention Plan.

13      With respect to the Employee Retention Plan, Mr. Riedel

14  would testify that this is intended to be a global plan.  That

15  it is essential that the employees, who are key to running the

16  Enterprise Solutions Business, be incentivized to remain

17  through closing and that it is an important element of

18  maintaining the value of the business prior to closing.  It is

19  important to note that Avaya's bid, the winning bid, was

20  conditioned on the sellers committing that they would not

21  accept a bid from any bidder after that point in time that

22  included consideration other than, A, cash, B, cash funding for

23  employee retention and, C, in the case of Avaya, a credit for

24  the break-up fee and expense reimbursement.

25      He would also testify, if called, that prior to the

113

1    announcement of this bid as the leading bid, ENH withdrew from

2    the auction.  At that point in time, the leading bid was

3    accepted, and I should note, we were on our way to accept it at

4    the time.  And Avaya's bid was announced and on the record as

5    the successful bid when the auction adjourned pending signing

6    of final documents.  Mr. Riedel would also note that after the

7    implementation of certain changes as a result of the

8    negotiations over the weekend that the documents were -- the

9    signature pages to the documents were finally exchanged

10   yesterday in the afternoon.

11       Mr. Riedel would also testify, if called, that in addition

12   to the higher purchase price, the bidders accepted the Debtors'

13   changes to the ASSA that were favorable to the Debtors and

14   proposed additional changes to the deal that had taken account

15   of a number of issues that had recently arisen, including the

16   tax claim filed by the IRS.  The main changes, Your Honor, in

17   addition to the provisions relating to the IRS claim, Mr.

18   Riedel would testify, is an increase in the reverse termination

19   fee from 100 million to 200 million if the Agreement is

20   terminated by the Purchaser if regulatory approvals have not

21   been obtained.

22       Also, Your Honor, as I mentioned earlier, that Mr. Riedel

23   would testify that the Debtors will have the option to file NGS

24   or DiamondWare into Chapter 11 and transfer their assets rather

25   than transferring shares of NGS or DiamondWare, subject to a

1  purchase price adjustment mechanic.  There's been a material

2  improvement in the remedies of the sellers in the event that

3  the Purchasers breach and there have been certain increases in

4  the assumed liabilities.

5  There are other changes, Your Honor, we believe materially

6  beneficial to the Debtors, both in the United States and

7  Canada, as well is in EMEA.  The document is a very long

8  document and we would -- we have available black lines, but

9  those are the substantial changes that have occurred.

10  Mr. Riedel would testify that each qualified bid at each

11  round was valued in consultation with Nortel's advisors, the

12  Committee, the Bondholder Group, the Monitor and the

13  Administrators based upon a number of factors, including the

14  purchase price and the net value, including assumed liabilities

15  and other obligations to be performed or assumed by the bidder,

16  the proposed revisions to the relevant transaction documents,

17  of which there were many, other factors effecting speed,

18  certainty and value of the transaction, including any

19  regulatory approvals required to close the transaction, and the

20  likelihood and timing of consummating such a transaction, each

21  is determined by the sellers.  Mr. Riedel would testify that on

22  many other factors the bids were not materially different by

23  the end of the auction.  And he would also testify that at the

24  end of each round of bidding, effect was given to the break-up

25  fee and expense reimbursement that would be payable to Avaya

115

1    under the Stalking-Horse Agreement.

2        With respect to the winning bid, Mr. Riedel would testify

3    that it is his belief and the Debtors' conclusion that the

4    successful bid from Avaya constitutes the highest and best

5    offer received for the Enterprise Business Solutions assets and

6    maximizes the value to the Debtors' estates.  He would also

7    testify that the auction process and all discussions with

8    bidders prior to the auction were at arms length, and that the

9    negotiation and auction process was vigorous, and that all

10   parties were represented by competent advisors.  Mr. Riedel

11   would further testify that he is unaware of any evidence that

12   the sale price was controlled by an agreement among potential

13   bidders at the auction, and that Avaya is not an insider of

14   Nortel, nor are any members of the Avaya team insiders of

15   Nortel.

16       Mr. Riedel would also testify that he is not aware of any

17   unnamed parties that might be a party to the successful bid and

18   he has not heard that from anyone from Avaya.  Mr. Riedel would

19   also testify that he's familiar generally with the amended and

20   restated Asset Sale and Share Sale Agreement entered into with

21   Avaya as the result of the submission of the winning bid at the

22   auction.  He would testify that the terms of the successful

23   ASSA, other than those changes that I've mentioned, are

24   essentially the same as those involved in the Stalking-Horse

25   Agreement.  He would also testify that to his -- in his belief

1  that the approval and consummation of the ASSA between the

2  sellers and Avaya would be in the best interest of the Debtors

3  and their Creditors.  He would testify, also, that in his

4  opinion that Avaya has the wherewithal, both from a financial

5  and operational perspective, to perform under the executory

6  contracts and leases that will be assumed and assigned, as well

7  as those contracts that will be taken outside of the United

8  States.

9      Mr. Riedel would also testify that it is his view that the

10 synergies between Nortel and Avaya will make for a smooth

11 transition for customers and suppliers and employees, and that

12 overall the transaction with Avaya successfully will put -- if

13 successfully completed will put the Enterprise Solutions

14 Business into safe hands.

15     Mr. Riedel would also testify that he is generally

16 familiar with certain Ancillary Agreements that have also been

17 entered into with -- in connection with the successful bid, and

18 that while some of them have not been available, generally they

19 have been made available to the Official Committee, the Ad Hoc

20 Bondholders Group, the U.K. Administrators and their respective

21 advisors, and an offer of making them available to the U.S.

22 Trustee has been made as well.  And that would be the sum and

23 substance of Mr. Riedel's testimony if called to testify.

24         THE COURT:  All right.  Thank you, Mr. Bromley.  Does

25 anyone at this point wish to cross-examine?

1      (No verbal response.)

2          THE COURT:  Hearing no one, that proffer is certainly

3   admitted into evidence.

4          MR. BROMLEY:  Thank you very much, Your Honor.  The

5   next proffer, Your Honor, is that of Michael Murray.  Mr.

6   Murray, who've you seen, again, in the past on numerous

7   occasions, is a managing director at Lazard, the financial

8   advisor to the Debtors and the chief banker who's been involved

9   in running the auction process and the sale process for the

10  Enterprise Solutions Business.  Again, we made a proffer that

11  was accepted into evidence on August 4th --

12         THE COURT:  Yes.

13         MR. BROMLEY:  -- generally speaking about Mr.

14  Murray's background, his experience in the M&A world, his

15  particular experience in the technology space.  He also

16  testified, at that time, with respect to contacting potential

17  buyers for the Enterprise Business, and that of 15 that were

18  contacted, 11 signed Non-Disclosure Agreements, and then 3

19  bidders emerged as potential stalking-horse bidders, who

20  submitted definitive proposals to acquire the business.  He

21  would also testify -- he also did testify that, aside from

22  those contacted, in his view, there are no other obvious

23  entities that could be potentially interested parties.  And

24  that based on his experience in the industry, all potential

25  counterparties were approached about their interest in the

1    assets.

2        Mr. Murray would testify, if called, that he's familiar

3    both with the terms and conditions of the stalking-horse ASSA

4    between Nortel and Avaya, as well as the recently revised ASSA.

5    And that he has been involved in the process of negotiating the

6    Stalking-Horse Agreement, as well as the amendments to the

7    Stalking-Horse Agreement.  He would testify that the process

8    prior to signing took place for over a period of approximately

9    four months, and that meetings with representatives of the

10   bidders took place on numerous occasions throughout that period

11   of time.  And that his major involvement in negotiations was on

12   matters of price and terms.  And that these negotiations

13   continued throughout the auction period until Avaya was

14   selected as the successful bidder on September 14, 2009.

15       Mr. Murray would testify that throughout the process,

16   Avaya was represented by qualified counsel and financial

17   advisors.  That the discussions were vigorous and contentious

18   at time and that, in his view, no facts or circumstances arose

19   during the course of negotiations that led him to believe that

20   the transaction, as memorialized in the successful bid, was

21   anything other than an arms-length transaction.  He would

22   testify, as well, if called, that in his opinion the net value

23   offered to the Debtors' estates from the transaction with Avaya

24   constitutes fair and reasonable value for the assets being

25   sold.  And that while in certain respects, the asset may

119

1   constitute a wasting assets in terms of negative cash flows,

2   that this was not conducted on a fire-sale basis, but rather in

3   a full and vigorous auction context.

4       Mr. Murray would testify that he was present at the

5   auction and throughout the auction, and is generally familiar

6   with the events that transpired.  He would testify that

7   throughout the auction he served as an advisor to the sellers,

8   and assisted them in determining whether each bid received

9   should be considered a qualified bid.  That he also helped to

10  value each bid received and consulted with the other advisors,

11  the Monitor, the Committee of Unsecured Creditors, the Ad Hoc

12  Bondholder Group and their respective advisors throughout the

13  long weekend.  He would further testify that the final bid from

14  Avaya was selected as the successful bid because it represented

15  the highest and best offer received for the assets, and that

16  that was a view shared by all of the constituents present on

17  behalf of Nortel and the U.K. Advisors.  He would also testify

18  that it is his belief that the approval of the sale of the

19  assets pursuant to the ASSA between the sellers and Avaya is in

20  the best interest of the Debtors and their Creditors.

21          THE COURT:  Thank you, Mr. Bromley.  Anyone wish to

22  cross-examine Mr. Murray?

23      (No verbal response.)

24          THE COURT:  All right.  That proffer is admitted.

25          MR. BROMLEY:  Thank you, Your Honor.  If I could just

1  briefly run through the legal standards, which we've heard

2  before, but we need to go through again.

3      This is a sale, Your Honor, we're seeking approval for

4  under Section 363(b) of the Bankruptcy Code, which provides the

5  Debtor, after notice in a hearing, may use, sell or lease,

6  other than in the ordinary course of business, property of the

7  estate.  And the standard that is applied by virtually every

8  court that has looked at a proposed sale under Section 363 is

9  that such a sale is appropriate if a court finds that the

10 transaction represents a reasonable business judgment.  And in

11 the Third Circuit, the controlling case on this point is the

12 Abbotts Dairies case from 1986.  And that the sound business

13 reason test requires a Trustee or Debtor-in-Possession to

14 establish four elements.

15     First, the sound business reason, as under line L in the

16 Second Circuit, is the sale necessary to preserve the value of

17 the assets for the estate, its Creditors or interest holders?

18 And, indeed, Your Honor, based on the process that we have gone

19 through here, we believe that this sale is, indeed, the only

20 way to preserve the assets, the value of the Enterprise

21 Solutions Business.  We do not believe that there's anyway to

22 recognize any value near this by selling this other than as a

23 going concern, and a going concern on a worldwide basis.  Also

24 that the Debtors believe that the proposed transaction presents

25 the best opportunity to maximize value.  We think that the

1   evidence is (indiscernible) that this standard is met.  And

2   that the Debtors believe that the benefit to the Creditors

3   would be adversely affected without an immediate sale and that

4   the value of the assets diminish over time if not sold.  And we

5   believe that it is also extraordinarily clear that that

6   standard is met.  Without this sale, the Enterprise Business

7   would not have sufficient funding to continue to operate in the

8   hands of Nortel.

9        It's also required that accurate and reasonable notice be

10  given to interested parties, and we have submitted to the Court

11  and filed uncontested Certificates of Service.  A sale notice

12  had been served on all interested parties as set forth in that

13  Certificate of Service, and the notice of sale was published in

14  the Wall Street Journal, the Globe and Mail and the Financial

15  Times on August 7, 2009.

16       There needs to be evidence that the price paid is

17  adequate, fair and reasonable. Under the circumstances, we

18  believe, Your Honor, after four months of negotiations, six

19  weeks of marketing and a 54-hour auction, that there could be

20  no better evidence that the winning bid was, indeed, the

21  highest and best bid.  And that the winning bid was selected

22  only after consultation with the various constituencies and

23  their advisors.

24       It's also required, Your Honor, that evidence of good

25  faith be provided, that there is no lucrative insider deal that

1   is anywhere lurking.  And under Abbotts Dairies, we must show

2   that good faith means purchasing in good faith and for value.

3   And the testimony of both witnesses is clear, that Avaya was

4   aggressively and very competently represented throughout the

5   process.  The negotiations were in good faith.  The competing

6   bidder was there and helped move the process along, and that

7   there is simply no evidence of anything other than good faith.

8        Also, Your Honor, the evidence shows that the Purchaser is

9   not an insider.  That there is no collusion of which the

10  Debtors are aware, and that all parties conducted themselves

11  throughout with integrity.

12       Under Section 363(m), the sale is binding if the assets

13  are purchased in good faith.  And we believe that the good

14  faith standards under Abbotts Dairies have been met and met in

15  a very convincing fashion.  That the good-faith finding that's

16  required under Section 363(m) can be made and made with

17  confidence.  In addition, Your Honor, Section 363(m) says that

18  the Trustee may avoid a sale if the sale was controlled by an

19  agreement among the potential bidders.  We believe, Your Honor,

20  that the evidence is clear as well that there's no evidence of

21  bad faith or collusion among the bidders.  We believe, Your

22  Honor, that the Section 363(f) standards have been met.  That

23  the assets may transfer free and clear and that there is ample

24  evidence that at least one of the requirements under 363(f) as

25  required by In re: Elliot have been met for each Creditor that

1   asserts an interest in the assets being sold and with respect

2   to any potential disputes that may exist.  All parties have

3   been noticed and there are no objections based on any 363(f)

4   grounds.

5       Your Honor, you also authorized the creation of a process

6   under Section 365 for the assumption and assignment of

7   contracts.  We did talk a fair amount about that this morning

8   in connection with Verizon.  We're not looking for 365 relief

9   here today.  We are looking for relief with respect to 363 and

10  the rights of parties, as particularly, as set forth in the

11  Amended Order for those who have filed some objections, have

12  been reserved.  We believe that the Agreement takes proper

13  account of the information for customer contracts and the like,

14  and otherwise, that all requirements under Section 363 have

15  been satisfied.  So, Your Honor, on that basis we believe that

16  there's ample authority for you to make the findings necessary

17  under Section 363 that we proposed in the Sale Order.

18          THE COURT:  Thank you, Mr. Bromley.

19          MR. BROMLEY:  We also have several objections.  And

20  maybe it's worthwhile at this point to try to run through them

21  as quickly as possible.

22          THE COURT:  Yes.

23          MR. BROMLEY:  We had a number of objections, Your

24  Honor, and I think we're -- aside from one who we have not

25  heard back from, we believe everything has been resolved with

1  respect to this hearing and with the inclusion of certain

2  language in the Order.

3       First, there was an objection filed from Telstra

4  Corporation.  That objection was withdrawn this morning, and I

5  don't know if counsel can tell us who's in the room or on the

6  phone?

7            THE COURT:  No.

8            MR. BROMLEY:  Okay.  There was an objection filed by

9  SNMP Research International.  We have added certain language in

10 paragraph 27 of the Order, which reserves rights and we believe

11 is satisfactory to SNMP.  And it might be worthwhile at this

12 point to go through a number of them because the language that

13 we've added addresses, we think, the objections to quite a few.

14           THE COURT:  Okay.

15           MR. BROMLEY:  So in addition to SNMP Research

16 International there's also an objection from Freescale

17 Semiconductor, Intoto, LLC, Motorola, Inc., Macro 4, Inc.,

18 Anixter, Inc., AT&T Corporation, Oracle Corporation --

19           MR. DOSHI:  Your Honor, at an appropriate point, I

20 would like to be heard.  This is Amish Doshi with Day, Pitney,

21 on behalf of Oracle USA.

22           MR. BROMLEY:  They were the ones we hadn't heard back

23 from.

24           THE COURT:  All right.  Mr. Doshi, you'll have an

25 opportunity after we've gone through those objections which

1    have been resolved.

2         MR. DOSHI:  Thank you, Your Honor.

3         MR. BROMLEY:  Your Honor, if I could just describe

4    the resolution proposed in the new paragraph 27 for all of

5    those parties?  And I would note, that there are certain other

6    -- in the case of AT&T, two other statements that we've been

7    requested to make on the record.  So I'll focus first, if I

8    may, on paragraph 27 --

9         THE COURT:  Okay.

10        MR. BROMLEY:  -- and then go back to AT&T separately

11   with those other two points.  And I would like to hear, as

12   well, if this is satisfactory to Oracle because we had not

13   heard prior to the commencement of the hearing.

14     Essentially, Your Honor, paragraph 27 is a reservation of

15   rights regarding certain contracts.  And it says, that nothing

16   in the Order authorizes or provides for the assumption,

17   assignment or rejection in whole or part of any objecting party

18   agreement.  And an objecting party agreement is defined, and

19   I'll get to that in a -- obviously, it's an agreement with an

20   objecting party, and objecting party is defined as well.  So

21   objecting party means, Motorola, Inc., Macro 4, Inc., Freescale

22   Semiconductor, Inc., Intoto, LLC, Oracle USA, Inc., AT&T Corp.,

23   Anixter, Inc., Telstra Corporation Limited, SNMP Research

24   International, Inc., and the DiamondWare former shareholders,

25   who are listed in their objection as Mr. Keith Weiner, Rudy

1  Matthau *(ph)*, Wendell Allen Neff, Charles Roe *(ph)*, Neil

2  Shacked *(ph)*, Fred Scott, Jack Goatsmit *(ph)*, Dwayne Roberts,

3  William Widner *(ph)* and Price *(ph)* Pascal *(ph)*.  Now, what is

4  -- what rights are reserved?

5      Rights are reserved, including without limitation, the

6  right to seek, oppose or support, any assumption or rejection

7  of any objecting party agreement, adequate assurance of future

8  performance, any proposed cure amount, the assumption by the

9  Purchaser of obligations and liabilities under any objecting

10  party agreement by virtue of the assumption and assignment of

11  the objecting party agreement under Section 365, including

12  contingent unmatured, unliquidated claims and whether such

13  claims arose or arise pre or post-closing, and adequate

14  assurance for payment of such contingent unmatured or

15  unliquidated claims.

16      I should note, Your Honor, that among the objecting

17  parties, we did add right before we started, Verizon

18  Communications and its affiliates --

19          THE COURT:  All right.

20          MR. BROMLEY:  -- so that will be added in the final

21  form.  So essentially, Your Honor, what this is is a

22  reservation of rights in the event that there is a motion under

23  Section 365 to assume, assign or reject the contracts with

24  these parties.  And it is set out in very specific detail and

25  we're happy to provide that.  The, I think, with respect to all

1  of those, that paragraph, which we're happy to share with

2  folks, and I believe we already have, we believe resolves the

3  objections of everyone I've listed.  Again, with two

4  exceptions.  AT&T has two other statements that we need to put

5  on the record, and Oracle, we had not heard from prior to the

6  commencement of the hearing today.

7            THE COURT:  All right.  Thank you.  Does anyone wish

8  to be heard regarding the resolution of the objections and, in

9  particular, of course, counsel for Oracle, Mr. Doshi?  Why

10 don't we hear you first, Mr. Doshi.

11           MR. DOSHI:  Yes, Thank you very much, Your Honor.

12 For the record, Amish Doshi with Day, Pitney, on behalf of

13 Oracle USA.  First, I'd like to thank the Court for allowing me

14 to be heard telephonically and I would also like to apologize

15 to the Canadian Court.  I referred to the Judge in the Canadian

16 proceeding as counsel when I couldn't hear earlier.  I

17 apologize.  I thought Debtors' counsel was speaking.

18           THE COURT:  Okay.  That's now understood.

19           MR. DOSHI:  Thank you very much.

20           JUSTICE MORAWETZ:  Clearly understood.

21           MR. DOSHI:  With respect to Oracle, Your Honor, there

22 were two issues relating to the reservations of rights we had

23 filed.  The language that's included in the new paragraph 27

24 resolves most of the reservation of rights, the one portion of

25 it.  There is a second portion of our reservation of rights,

1  which I do not believe is addressed and I was under the

2  understanding there was going to be a representation on the

3  record on that issue, but I'll address it now.

4      In terms of the first part of the resolution, which was

5  reservations of rights with respect to any assumption,

6  assignment or rejection, the language addresses all

7  reservations of rights for all parties.  An additional issue

8  that we had and which has been not, I believe, resolved, unless

9  I can get confirmation from the Purchasers' counsel, as well as

10 Debtors' counsel, relates to the Transition Services Agreement.

11 Just by way of background, Your Honor, the Assets and Share and

12 Sale Purchase Agreement also provides that the Debtors and the

13 Purchasers are going to enter into a certain Ancillary

14 Agreements included within that is something called a

15 Transition Services Agreement.  Now, that Transition Services

16 Agreement has not been filed with the Court, and we have not

17 been provided with a copy of it.  So the issue there is that

18 after the sale transaction, if it's approved, Debtor and the

19 Purchaser are going to enter into some transition services

20 where it appears and, again, since I've not seen it, I have to

21 go by just what the Transition Services Agreement in generally

22 would provide.  It would appear that the Debtors may be

23 proposing that the Purchaser and Debtors may use certain

24 services, which would include intellectual property licenses

25 during the transitional period.  And if I -- I believe that

129

1    could be as much as 12 months.  So our objection relates to any

2    sort of transitional use by any third party, including the

3    Purchaser, Avaya of Oracle's licensed software.  The underlying

4    agreements here are between Oracle and the Debtors, not Avaya.

5    So if there's any contemplated use by any third party, not just

6    the Purchaser or any unauthorized party, that is the one issue

7    that I believe is not addressed in the resolution that was

8    proposed.  And Oracle does not consent to any such use of

9    either transitional or otherwise by any party other than the

10   Debtors or the authorized Debtor parties.

11        And we had received some language from Debtors' counsel

12   and I thought they were going to clarify that there is going to

13   be new transitional use or access of the Oracle software by any

14   party other than that.  If that is confirmed that no -- either

15   the Purchaser or none of the unauthorized third parties are

16   going to have access or use of the Oracle software, even on a

17   transitional basis, and the Transition Services Agreement does

18   not apply to the Oracle Agreements, then I think we're fine.

19   If not, I would reserve my right on that issue and to further

20   argue if necessary.

21            THE COURT:  Mr. Bane -- Mr. Bromley, I'm sorry.  Yes,

22   Mr. Bane.

23            MR. BANE:  Thank you.  Once again, Mark Bane, Ropes &

24   Gray, on behalf of the Purchaser.  As counsel to Oracle

25   indicated, we had indicated, we thought, earlier to Oracle's

1  counsel that the Purchaser will not intend during the interim

2  period under the TSA to violate any of the limitations in the

3  current agreements between Oracle and the Debtors and,

4  therefore, to the extent that there is any unauthorized use

5  intended, it would only be undertaken after full consent by

6  Oracle.

7       THE COURT:  Thank you, Mr. Bane.  Mr. Doshi, is that

8  satisfactory to you?

9       MR. DOSHI:  I just -- I don't want to get caught up

10  in words.  As long as the intent of the parties is that there's

11  no third party or Purchaser that can have access or use to

12  Oracle software, then that's fine.  And if there's going to be

13  any third party use, Oracle consent is going to be required and

14  -- which at that point, they don't have.  I don't want to

15  quibble about words, but if that is the intent, and then with

16  that representation, then it's fine.  But if we're going to be

17  getting caught up in words of access, and use and things, which

18  is what the intent is, that there's going to be no use by a

19  third party, then that's acceptable, Your Honor.

20       MR. BANE:  Your Honor, I can't make that

21  representation.  What I could make the representation is that

22  whatever the contracts are between Oracle and Nortel, will be

23  adhered to.  To the extent that there is authorization that is

24  allowed under those contracts, we're not making any commitments

25  beyond what the contracts already provide.  So to the extent

1  that there is any intent, and I have no idea what the intent is

2  at this point, one way or the other, we are making the

3  commitment to Oracle that to the extent that we'd be using any

4  software or otherwise in which Oracle has a restriction under

5  their Agreements, we will not violate those restrictions

6  without prior permission of Oracle.

7         MR. DOSHI:  Okay.  And I can represent that those --

8  the agreements, underlying agreements do not authorize Avaya or

9  a third party to have use without Oracle's consent.  So if the

10 underlying agreements are going to be adhered to by all parties

11 and there's going to be no transitional use, then I think that

12 is acceptable.

13        THE COURT:  Very well.  Thank you, Mr. Doshi.

14        MR. DOSHI:  Thank you.

15        MR. BROMLEY:  I think Mr. Rosenweig might be best to

16 put the statements on that AT&T would request.

17        THE COURT:  All right.  Mr. Rosenweig, good

18 afternoon.

19        MR. ROSENWEIG:  Good afternoon, Your Honor.  Good

20 afternoon, Justice Morawetz.  David Rosenweig representing

21 AT&T.  Our objection was resolved in the language that was

22 inserted in the Order.  There was just two other points we

23 wanted to have on the record.

24     Our objection dealt with these so-called contingent, so to

25 speak, unknown claims for indemnities, warranties and the sort.

1  That's been resolved for now.  Our position's in the papers

2  that we filed, but that's for another day at this stage.

3      What the parties have agreed, in addition to the changes

4  in the Order, is that if an AT&T contract is going to be

5  assumed, that within 15 business days of the later of either

6  the entry of the Court Order that's before the Court today or

7  the applicable contract designation date, which is a defined

8  term in the ASSA, the Nortel Debtors and Avaya will notify AT&T

9  with respect to the Debtors and Avaya's position on this issue

10  that we have raised regarding the so-called contingent type

11  claims.

12      In addition, we hope this doesn't come to pass, but like

13  Verizon we're a customer, and if we have the situation where a

14  contract is going to be rejected, we may have the same or

15  similar types of issues as Verizon had, so we're reserving our

16  rights on that point.  And the parties have agreed that we have

17  the same rights with respect to an objection on the issue that

18  was discussed this morning.

19          MR. BROMLEY:  Those clarifications are acceptable to

20  the Debtors, Your Honor.

21          THE COURT:  All right.  Very well and thank you.  Mr.

22  Laddin.

23          MR. LADDIN:  Your Honor, I'll be very brief.  I'll

24  simply confirm that Mr. Bromley's correct that the affiliates

25  of Verizon Communications, Inc., are being added in as a

1    defined party and as an objecting party in paragraph 27.

2         THE COURT:  Okay.

3         MR. LADDIN:  And then secondly, with respect to the

4    setoff issue that we discussed this morning, the Debtors have

5    added in a paragraph 30 consistent with the language that we

6    discussed this morning.

7         THE COURT:  All right.  Thank you, Mr. Laddin.

8         MR. LADDIN:  Thank you.

9         THE COURT:  One more.

10        MR. BROMLEY:  That is correct, Your Honor.  I just

11   needed to read the language from this morning.

12        THE COURT:  Oh, okay.

13        MR. BROMLEY:  But it is exactly the same as we

14   inserted into the CDMA Order.  So, Your Honor, that, I believe,

15   resolves everything up until Flextronics.  It wouldn't be a

16   proper sale hearing unless we had an objection from

17   Flextronics, and I'm happy to say that we've resolved it.  We

18   have added a paragraph 28 to the Revised Order and I'll

19   summarize it rather than reading it.  But in substance, Your

20   Honor, the following representations are being made and certain

21   terms inserted.

22        First, a representation that the ASSA, which is the

23   Agreement, and related agreements do not involve a

24   back-to-back arrangement with the Purchaser by which the

25   Debtors would continue to place orders under the Master

1    Agreements as a conduit between Flextronics and the Purchaser.

2    And they agreed the Operative Agreements for Flextronics are

3    abbreviated as MCMSA's, there are two, the Amended and the

4    Restated Master Contract Manufacturing Services Agreement,

5    dated as of June 29, 2004 between Nortel Networks Limited, the

6    Canadian entity and Flextronics Telecom Systems Limited, also a

7    Canadian entity.  And, B, the Master Contract Manufacturing

8    Services Agreement, dated as of September 30, 2003 and between

9    Nortel Networks Limited and Flextronics Corporation, formally

10   known as Solectron Corporation, and related Ancillary

11   Agreements.  So, one, this transaction does not involve a

12   back-to-back arrangement relating to Flextronics.  The CDMA did

13   and others may, but this one does not.  And certainly any

14   objections that Flextronics may have in the future for future

15   sales will be fully reserved.

16       Number two, the MCMSA's and any of the Debtors'

17   contractual rights, whatever they may be, are not assigned to

18   the Purchaser in connection with the Agreement, and nothing in

19   the Agreement or the Order is to be construed to be an

20   assumption of either of those Agreements by the Debtors, which

21   we don't -- the Debtors are not party to those Agreements so

22   they wouldn't be subject to assumption anyway.

23       Number three, upon the closing of the transaction, the

24   Debtors shall cease placing forecasts or purchase orders under

25   the MCMSA's for products related solely to the Enterprise

1   Solutions Business provided that in the event Avaya and

2   Flextronics enter into their own contractual arrangements, that

3   the Debtors are not going to be prohibited from providing

4   administrative services to the Purchaser, including placing

5   forecasts or orders under that new Agreement.

6       Number four, the Debtors, the Purchaser and Flextronics

7   are going to promptly begin good-faith negotiations regarding

8   what is known as a Three-Way Inventory Purchase Agreement as

9   contemplated in the term sheet attached as Exhibit E to the

10  Agreement.  That the Purchaser and Flextronics will promptly

11  begin good-faith negotiations regarding an agreement which

12  shall apply to any purchase orders that Flextronics -- that are

13  issued to Flextronics by the Purchaser in connection with the

14  Enterprise Solutions Business.

15      And finally, this is a fairly long paragraph, so I'll just

16  describe it in general terms.  There are certain equipment that

17  Flextronics -- that is on the property and premises owned by

18  Flextronics, which Nortel owns.  And a piece of equipment that

19  is a Nortel piece of equipment on the floor of a Flextronics

20  facility, for better or for worse, neither party has a complete

21  and total list of what is where.  And there was a reservation

22  of rights with respect to the equipment, wherever it and

23  whatever it may be, with respect to adequate protection,

24  meaning that in the event that Nortel is seeking to transfer a

25  piece of equipment that it owns on a Flextronics facility -- at

1  a Flextronics facility, it may be that Flextronics would have

2  an argument relating to that piece of equipment that it cannot

3  be transferred unless adequate protection is paid.

4  Complicating this analysis is that we don't have a list of the

5  equipment or where it is or what it does.  Other than that,

6  we're fine.  But what we've done is put in place a process

7  whereby both Nortel and Flextronics will identify which

8  equipment is at issue, and Nortel will provide Flextronics with

9  a notice in the event that any of the equipment that gets on

10  the official list is seeking to be transferred.  And in the

11  event that anything on that list, Flextronics believes

12  implicates an adequate protection issue, we'll be back before

13  you, Your Honor.

14          THE COURT:  All right.

15          MR. BROMLEY:  Okay.  And then there are dates related

16  to that, but that's the sum and substance of what we're trying

17  to do.

18          THE COURT:  Very well.

19          MR. BROMLEY:  So that is the Flextronics resolution.

20  And I believe counsel for Flextronics is either here or on the

21  phone.

22          THE COURT:  Counsel for Flextronics?

23          MR. DREW:  Yes, Your Honor.  James Drew from Curtis,

24  Mallet.

25          THE COURT:  Yes.

1       MR. DREW:  Thank you for allowing me to appear

2  telephonically.

3       THE COURT:  Certainly.

4       MR. DREW:  That's an accurate description by Mr.

5  Bromley.  I would just note that there isn't official provision

6  in there requiring it's resolved by (indiscernible) to the

7  language.  And I would officially note that we are requesting

8  that the Canadian Court add parallel language indicating

9  (indiscernible).

10       THE COURT:  All right.

11       MR. DREW:  I believe that's been agreed.

12       THE COURT:  That has been agreed.  Okay.

13       MR. DREW:  With Canadian counsel for Nortel as well.

14       THE COURT:  All right.  It is acceptable to me and,

15  obviously, subject to Justice Morawetz's like acceptance.

16       JUSTICE MORAWETZ:  Thank you.  But we did hear the

17  comments loud and clear.

18       THE COURT:  Good.  Mr. Bromley.

19       MR. BROMLEY:  Thank you, Your Honor.  There was an

20  objection -- the next objection was an objection filed by a

21  number of individuals whose names I've read out earlier.  They

22  are former equity holders of DiamondWare.

23       THE COURT:  Right.

24       MR. BROMLEY:  And we already talked about DiamondWare

25  in connection with the IRS claim.  We did file a response to

1   the DiamondWare objection, but subsequent to their response, we

2   understand that the former equity holders of DiamondWare have

3   agreed in principal with certain proposals made by Avaya, and

4   that they reserve their rights with respect to contracts as

5   they exist between Nortel, DiamondWare and themselves.  And

6   that they have agreed in principle to negotiate in good faith

7   with Avaya regarding certain earn-out provisions of the Stock

8   Purchase Agreement, but it's my understanding that that

9   objection was withdrawn based on the understandings between the

10  individuals and Avaya.

11          THE COURT:  Mr. Rose.

12          MR. ROSE:  Yes, Your Honor.  Jeffrey Rose on behalf

13  of those 10 individuals that were previously named.  And that

14  is correct, our objection is withdrawn subject to a

15  (indiscernible) statement on the record.

16          THE COURT:  Thank you.

17          MR. BROMLEY:  The next objection, Your Honor, is one

18  that had been filed by the PBGC, and that is resolved by a new

19  paragraph 29 added to the Order.  This is a paragraph that is,

20  in sum and substance, almost exactly the same as the

21  reservation of rights that appeared in the CDMA Order.  In

22  particular, it says that the Order applies only to assets owned

23  by the Debtors, including all of the Debtors' equity interests

24  in the Nortel Government Solutions entity and DiamondWare

25  Limited.  That basically we're not seeking to transfer

1    Non-Debtor property free and clear of the PBGC's interest or

2    anyone else's.  And so that language has been provided to

3    counsel to the PBGC, who I believe is here in Court.

4              THE COURT:  Good afternoon.

5              MR. MURRELL:  Good morning, Your Honor -- rather good

6    afternoon, Your Honor.  And good afternoon, Justice Morawetz.

7    Vicente Matias Murrell on behalf of the Pension Benefit

8    Guaranty Corporation.

9              THE COURT:  Yes.

10             MR. MURRELL:  Your Honor, we are satisfied with the

11   language that preserves our rights against Non-Debtor assets.

12             THE COURT:  Thank you.  Thank you for appearing.

13             MR. MURRELL:  Thank you, Your Honor.

14             MR. ALLINSON:  Good afternoon, Your Honor.

15             THE COURT:  Mr. Allinson, good afternoon.

16             MR. ALLINSON:  Elihu Allinson on behalf of Motorola,

17   Inc.  Good afternoon, Mr. Justice Morawetz.  Going back for a

18   moment to paragraph 27, my client had filed an objection, which

19   has largely been resolved by the language that's in paragraph

20   27, however, at the last minute, a few of our edits fell

21   through the cracks.  And we have discussed those with the

22   Debtors and I believe they've discussed them with the

23   Purchaser, and I believe everyone's on board.  And what I'd

24   like to do is read those into the record.

25             THE COURT:  All right.

1          MR. ALLINSON:  Beginning with the second sentence in

2     paragraph 27, after the introductory clause, "Nothing herein or

3     in the Agreement shall affect the rights of any party regarding

4     an objecting party Agreement."  We would insert the clause,

5     comma, all of which such rights of the objecting parties are

6     hereby preserved, and a comma.  And then at the end of

7     subsection A, "Any assumption or rejection of any objecting

8     party Agreement on any legal or factual basis."  Then at the

9     beginning of sub-part C, "Before any proposed cure amount,"

10    inserting the words, the estimation or assertion of.  And then

11    in subsection D, about the fifth word in, the assumption by the

12    Purchaser of all obligations and liabilities.  Continuing on,

13    of the objecting party Agreement under Section 365 and other

14    applicable law, including contingent (indiscernible).  Those

15    would be our requests for additional language that would

16    resolve our objection at Docket 1316 with regard to the Sale

17    Motion.  The objection would remain extant as to issues

18    relating to the assumption and assignment of executory

19    contracts.  Thank you.

20          THE COURT:  Let's give the Debtor an opportunity to

21    consider those comments.

22          MR. BROMLEY:  They are all fine with the Debtors,

23    Your Honor.

24          THE COURT:  All right.  Then they are accepted.

25    Thank you.

1          MR. BROMLEY:  I think the tombstone of every

2     bankruptcy lawyer will say, he reserved his rights.

3          THE COURT:  Yes.  And lost.

4          MR. BROMLEY:  Well, you never know.  There might be a

5     higher court of appeal --

6          THE COURT:  That's right.

7          MR. BROMLEY:  -- for some of us.  Not many.

8          MR. DOSHI:  Your Honor?

9          THE COURT:  Yes.

10         MR. DOSHI:  (Indiscernible) this is Amish Doshi with

11    Day, Pitney, on behalf of Oracle USA, Inc.  In the recitation I

12    just -- I'm not sure if this was intentional or not, but the

13    language in paragraph 27 only talks about assumption, it

14    doesn't talk about assumption and/or assignment.  I believe

15    assignment was left out in the sub-paragraphs A, B and C.  It

16    is included in the preamble in the start of paragraph 27, but

17    it doesn't include assignment issues in A, B and C, so I would

18    just request that addition as well, Your Honor.

19         MR. BROMLEY:  That's fine, Your Honor.

20         THE COURT:  Yes.  It's done, Mr. Doshi.  Thank you.

21         MR. DOSHI:  Thank you, Your Honor.

22         MR. BROMLEY:  The last thing, Your Honor, is not an

23    objection, but rather a clarification.  With respect to the

24    procedures that have been put in place, we've been focusing

25    almost entirely on -- or up to this point contracts and there

1    are leases involved as well, leases of real property.  As we've

2    been reviewing the procedures we have with Avaya, there is one

3    particular issue, which is that under the procedures we've put

4    in place for leases, we had to provide notice of assumption and

5    assignment or assumption and -- I'm sorry, assumption and

6    assignment or assumption and sublease, and that had to be

7    served within 50 days from the signing date.  At this point,

8    the Debtors have not been able to make determinations with

9    respect to the leases, there's just been too much going on.

10   And, therefore, with respect to leases, Your Honor, at this

11   point, the Debtors will be moving by separate motion, but we

12   will do it within the time frame required under the Code.

13            THE COURT:  All right.  Very well.

14            MR. BROMLEY:  It's a very limited number of leases

15   that we're talking about.

16            THE COURT:  Okay.

17            MR. BROMLEY:  And with that, Your Honor, I believe

18   all of the objections have been resolved.

19            THE COURT:  Someone is -- come forward, please.  Mr.

20   Neff.  Mr. Collins, I'm sorry.  Good afternoon.

21            MR. COLLINS:  Good afternoon.  I apologize.  I'm not

22   up here for a formal objection that was filed, but my

23   co-counsel has asked that I put something -- a clarification on

24   the record from what was stated earlier today.

25            THE COURT:  And you're here representing who, Mr.

1    Collins?

2           MR. COLLINS:  I'm with the Bifferato, and I'm here

3    for Enterprise Networks Holdings, BV --

4           THE COURT:  Okay.

5           MR. COLLINS:  -- ENH, the --

6           THE COURT:  Right.

7           MR. COLLINS:  -- unsuccessful bidder at auction.  And

8    the clarification is as follows:  Although we were not willing

9    to be the alternate bidder at the auction, we did not, in fact,

10   walk away from table either.  We were merely outbid.  And if

11   the deal with Avaya were not to go forward for any reason, we

12   would be happy for Nortel to come back to us.  Furthermore, as

13   part of our bid, we were willing to take the Verizon contracts.

14   And I realize this was discussed earlier today.  I apologize

15   that I'm coming a little bit late on this, but I thought it was

16   important to get this on the record.

17          THE COURT:  All right, Mr. Collins.  Yes, Mr.

18   Bromley.

19          MR. BROMLEY:  Can I just ask for a clarification?

20   Excuse me.  The Order, the Form of Order that went around had a

21   very specific provision in it relating to alternate bidder.

22          THE COURT:  Right.

23          MR. BROMLEY:  And I need to know whether ENH is now

24   saying that their view is that they are the alternate bidder

25   and are bound to perform if necessary.  So the answer is, yes

144

1   or no?

2           MR. COLLINS:  No.

3           MR. BROMLEY:  So I'm really kind of confused.  What

4   is ENH saying?

5           MR. COLLINS:  They're not saying that they're the

6   alternate bidder.  And I -- as I said, you know, we are not

7   willing to be the alternate bidder.  They just -- it was my

8   understanding that it was said earlier that we just merely

9   walked away from the table and that was not the case.  It's my

10  understanding that we were outbid.  I, myself, was not at the

11  auction, but just wanted to make it clear that if for some

12  reason the deal were not to go through with Avaya, that we just

13  wanted to get on the record that we would be happy for them to

14  come back to us.

15          THE COURT:  Well, I don't think that there was any --

16  I don't think the Debtors intended anything negative by the

17  statement that they walked away from the table, as much as just

18  that they -- I mean, I can also recall a statement to the

19  effect that ENH congratulated the winning bidder and simply

20  stopped -- they all stopped bidding at the auction.  Is that

21  correct, Mr. Bromley?  No negative -- nothing negative should

22  be read from your comments.

23          MR. BROMLEY:  No.  Not at all, Your Honor.

24          THE COURT:  All right.

25          MR. BROMLEY:  I think ENH did a fabulous job at the

145

1    auction and we're glad they attended.  I just wanted to be

2    clear because there was a --

3                THE COURT:  You bet.

4                MR. BROMLEY:  -- a very certain, you know, set of

5    legal ramifications if they want to be the backup bidder, that

6    would be great.  And the answer to that is, no.

7                THE COURT:  The answer is, no.

8                MR. COLLINS:  That's correct.

9                THE COURT:  All right.  Thank you, Mr. --

10               MR. COLLINS:  Thank you.

11               THE COURT:  Thank you, Mr. Collins.  So I think

12   you're resting at this point having resolved all objections.

13   Let me just make certain, is there anyone else in the courtroom

14   who has an objection that has not been addressed?

15      (No verbal response.)

16               THE COURT:  And no one rises, so you've --

17               MR. BROMLEY:  I would pass the podium --

18               THE COURT:  -- covered them all.

19               MR. BROMLEY:  -- to Mr. Tay.

20               THE COURT:  All right.  Thank you.

21               JUSTICE MORAWETZ:  Thank you, Judge Gross.  Thank

22   you, Mr. Bromley.  And Mr. Tay, I assume you're ready to

23   proceed.

24               MR. TAY:  Yes, I am, Your Honor.  Good afternoon,

25   Justice Morawetz, Judge Gross and guests.  And, again, thank

1   you very much accommodating us on this schedule.

2       Everything happens in real time and unfortunately we've

3   given everyone as much time as we could.  For you, Mr. Justice

4   Morawetz, just as by way of preview of what's to come, I don't

5   believe there are any objections in Canada.  There will be a

6   few parties, I think, who might want to make a few statements,

7   but there should be no objections.  The language that was

8   resolved that you heard about with respect to Flextronics, that

9   language, after being Canadianized a little bit because there

10  was some U.S. concepts that didn't apply in Canada, has been

11  agreed to with counsel for Flextronics and will part of the

12  Order and I'll hand it up to you when I get to the Order.

13      As you heard Mr. Bromley say this auction lasted

14  approximately 50 hours or thereabouts.  We all lost count after

15  a little while, but to put this is granular terms, the benefit

16  to the estate of the increase in price was approximately $8

17  million an hour, which by my reckoning should be just about

18  enough to cover the cumulative hourly rates of the

19  professionals involved.  And Mr. Bromley did a wonderful --

20          UNIDENTIFIED SPEAKER:  That's subject to your

21  assessment.

22          MR. TAY:  Mr. Bromley did a wonderful job in

23  summarizing the auction, but he made one omission, and by that

24  omission he did himself a great disservice.  Because I can tell

25  you, having witnessed it first hand, that Mr. Bromley's

1  tireless efforts, he went throughout this whole period without

2  any sleep, and just went from room to room dealing with issue

3  after issue and resolving matters in the most practical way

4  possible.  And I think it was -- the success of this auction

5  was due in large part to his personal tireless efforts, and I

6  think it's appropriate that that be recognized and be stated on

7  the record.

8      I should also note that despite his exhaustive efforts, he

9  managed to pause each evening at exactly the right time so that

10  he could pose majestically in front of a Cleary, Gottlieb

11  window and afford us all that life changing experience of

12  watching the sun slowly setting behind him.  So we all

13  appreciated that effort.

14      I think this is a good news story, not just for Creditors,

15  Your Honor, because it's clear that what we set out to do that

16  the process that was approved by both these Courts was designed

17  to get the highest and best bid.  And by any definition, I

18  think we succeeded in that objective.  But it's not, as I said,

19  just a good news story for the Creditors because of the

20  increase recoveries, but it's also important for the employees

21  who now can look forward to employment going forward.  To the

22  customers who no longer have to operate under a cloud of

23  uncertainty knowing that now the business will be passing into

24  safe hands.  And for the potential customers who may have held

25  back dealing with this company because of the uncertainty.  And

1  this deal, I think, resolves all of that and I think will be of

2  benefit to everybody involved.

3      I won't belabor Your Honor with the various legal

4  standards that we have to meet in Canada.  As you know we

5  talked about the various tests in connection with the CDMA

6  sale.  And I think all the standards and all the questions that

7  were asked in that case would be answered resoundingly

8  positively in this (indiscernible) situation.  That this is, in

9  fact, a deal that should be approved by the Court.  Because

10  it's a worldwide sale, we will also be requiring approvals of

11  the courts in some other jurisdiction in addition to the U.S.,

12  primarily Israel and France.  And so this is an important

13  beginning, and hopefully what is done in these Courts, will be

14  followed by those courts so that we can, in fact, give effect

15  to this truly worldwide sale.

16      I am in Your Honor's hands as to whether you want me to

17  deal with the Order now or to wait until you've had a chance to

18  confer with Judge Gross and then deal with the Order after.

19          JUSTICE MORAWETZ:  I think we'll deal with it now.

20          MR. TAY:  Okay.  I'll hand up the Order.

21      (Counsel complies.)

22          MR. TAY:  And there are a few minor hand-written

23  changes in the form of the Order itself, which by way of

24  clarification, and I don't believe are controversial and that's

25  been agreed to by the various parties in this courtroom.  And

149

1    the other thing that you have, that I've handed up, is the

2    rider that deals with the Flextronics situation that was

3    discussed earlier.  And if that would be acceptable to you, if

4    you should decide to grant this Order, that if you could

5    initial that and we'll prepare a Order subsequently that will

6    incorporate that language into the Final Order.

7          JUSTICE MORAWETZ:  Ms. Maharves (ph), is this

8    language acceptable?

9          MS. MAHARVES:  Yes, Your Honor.  It's acceptable.

10          MR. TAY:  And finally just to address the point,

11   which has always been near and dear to our hearts, the proceeds

12   to the sale will, again, go into a big black hole until we

13   resolve the issue of the allocation, and there is no resolution

14   as yet as to the agreement as to allocation, but the parties

15   are working hard on it and hopefully sometime in the near

16   future, we'll be able to come back with better news in that

17   regard and seek approval of both these Courts in that matter.

18   So I will -- unless you have any questions, I will leave the

19   floor to others who may have comments.

20          JUSTICE MORAWETZ:  I understand that you do wish to

21   have Appendix D to the Twentieth Report sealed.

22          MR. TAY:  Sealed?  Yes.  I was going to leave that to

23   the Monitor's counsel.

24          JUSTICE MORAWETZ:  (Indiscernible).

25          MR. TAY:  But, yes.  The answer is yes.

1    JUSTICE MORAWETZ:  Fine.  Thank you, Mr. Tay.  Mr.

2    Pasquariello.

3    MR. PASQUARIELLO:  Good afternoon, Justice Morawetz,

4    Judge Gross.  Joe Pasquariello for Ernst & Young, Inc., in its

5    capacity as Court appointed Monitor.  With me this afternoon

6    from Ernst & Young is Mr. Murray McDonald and Ms. Cher (ph)

7    Hamilton seated at the back of the courtroom, Your Honor.

8    Your Honor, you should have before you the Twentieth

9    Report of the Monitor where the Monitor has indicated its

10   approval and support of the Applicants Motions today.  Do you

11   have that?

12   JUSTICE MORAWETZ:  Yes, I do.  And I also have the

13   two Monitor appendages.

14   MR. PASQUARIELLO:  As detailed in that Monitor's

15   Report, Your Honor, the Monitor was involved in the sale

16   process and was consulted in deeming qualified bidders under

17   the bidding procedures and participating in conference calls

18   with perspective buyers, in reviewing materials submitted by

19   those perspective buyers and, furthermore, the Monitor was

20   consulted in the selection of the starting bid for the auction.

21   The Monitor attended the multi day, multi round auction, which

22   Mr. Tay has eloquently described.  And certain of those

23   specifics of those auction -- of that auction is outlined in

24   the Monitor's Twentieth Report.  The Monitor was further

25   consulted, Your Honor, during the auction and selecting of

151

1    (indiscernible) bids in agreeing to increasing the threshold

2    amounts during the auction, and ultimately in the selection of

3    the Avaya sixth-round bid as the successful bid.

4         That successful bid is, of course, the basis of the

5    Agreement, which is before the Courts today.  Your Honor has

6    already noted that Appendix A has the Agreement, Appendix B is

7    a black line to the Stalking-Horse Agreement.  I'm sorry,

8    that's Appendix B is the Agreement, C is the black line and D

9    are the schedules which contain confidential information and

10   sensitive employee information, which the Monitor is requesting

11   be sealed and be kept out of the public domain.

12        Your Honor, the Monitor's Report also details in paragraph

13   30, various differences between the ultimate Sale Agreement and

14   that of the stalking-horse bid.  I'm not going to go through

15   those.  Those have been dealt with in the U.S. proceedings and

16   been explained, but needless to say that there have been

17   significant improvements that have been made from the

18   perspective of Nortel and its stakeholders and, of course, the

19   dramatic increase in purchase price being the most obvious one.

20        Your Honor, the Monitor has been kept apprised, was

21   consulted and participated in the sales process in the auction

22   which gave rise to the Agreement before the Courts today.  The

23   Monitor is satisfied that the Avaya Agreement represents the

24   best transaction for the sale of the Enterprise Solution

25   Business and, therefore, the Monitor recommends that this

1    Honorable Court approve the Applicant's Motion, subject to any

2    questions Your Honor may have.  Those are my solutions.

3            JUSTICE MORAWETZ:  Just one, and it's to both you and

4    Mr. Tay.  I think it's very clear the Monitor's requesting a

5    sealing.  I assume that Nortel's also requesting --

6            MR. PASQUARIELLO:  Yes, Your Honor.

7            JUSTICE MORAWETZ:  -- it sealed.

8            MR. PASQUARIELLO:  Absolutely.

9            JUSTICE MORAWETZ:  Okay.  Thank you.

10           MR. PASQUARIELLO:  Thank you.

11           JUSTICE MORAWETZ:  Who would like to go next?  Are

12   there any other parties --

13           MR. TAY:  I'm sorry, Your Honor.  Ms. Stam has

14   informed me that the sealing part was accidently left out of

15   the Order, so we'll have to include it.

16           JUSTICE MORAWETZ:  Mr. McFarlane.

17           MR. MCFARLANE:  Your Honor, I'll reserve my rights

18   about that.  First of all, I don't think I -- I don't normally

19   (indiscernible) much of --

20           JUSTICE MORAWETZ:  You have to come forward.

21   Certainly nobody can see you in the back (indiscernible).

22           MR. MCFARLANE:  It's a small point, but just there's

23   a -- we had an exchange of e-mail discussion on the definition

24   of sellers as that appears in the preamble of your Order.  And

25   this is rectified in the U.S. and I think Judge Gross has the

1    language, but there's been changes made to the definition of

2    sellers and I think there may be a further change in your Order

3    just because it's been expanded to include EMEA sellers and it

4    includes other sellers, but there is a concern that other

5    sellers, there should be a (indiscernible) for those other

6    sellers that are not participating under the Amended or

7    Restated Asset Sale and Share Agreement.  And that's currently

8    being addressed by Cleary in the hearing in Delaware, but I

9    just wanted to make sure that Your Honor was aware there was a

10   --

11            JUSTICE MORAWETZ:  I've been aware of it.

12            MR. MCFARLANE:  -- pending change.

13            JUSTICE MORAWETZ:  Then it's subject, obviously, to

14   the disposition of the two Motions, I think, that I'll rely on

15   counsel to ensure that it's consistent with the -- with what's

16   being drafted in Delaware.

17            MR. MCFARLANE:  Thank you.

18            JUSTICE MORAWETZ:  Mr. Ziegler.

19            MR. ZIEGLER:  Yes.  Your Honor and Judge Gross, good

20   afternoon.  I represent the former employees of Nortel in

21   Canada.  And my clients support the transaction in principle.

22   That is not the difficulty.  Our concern is, perhaps, the

23   (indiscernible) is between what Mr. Tay described as real-time

24   litigation and what I'll call no-time litigation.  Frankly,

25   these materials were served on my clients, even though we're

1    Court appointed, around 11 o'clock last night, probably the

2    same with all the other Creditors.  And all I would ask is that

3    Your Honor issue some directive so that there can be better

4    notice given to my clients, at least on matters pertaining to

5    employment pension and benefit issues, so that we're not put in

6    this position.  Now, Mr. Armstrong was good enough to give me

7    some information this -- early this afternoon, but my clients

8    have not had the opportunity -- I've not had the opportunity to

9    consult with my clients to work through all the elements of the

10   document.  If we have this directive from Your Honor, and

11   perhaps a 48 hour comeback on pension and benefit matters,

12   we're satisfied with the Order.

13          JUSTICE MORAWETZ:  Mr. (Indiscernible).

14          UNIDENTIFIED SPEAKER:  Your Honor, Judge Gross, I

15   represent the Superintendent and Financial Services in its

16   capacity as Administrator in the Pension Benefit Guaranty Fund

17   of Ontario.  The Superintendent also supports the transaction.

18   It recognizes everybody's worked very hard towards this

19   transaction; however, we do support Mr. Ziegler's request for a

20   short comeback clause, at least for his clients.  We recognize

21   that, as a practical matter, everybody's not on the same

22   footing in terms of participating in the transaction and going

23   forward from a cost perspective.  I don't think it necessarily

24   sends the right message to require people to actively engage in

25   every step of every transaction.  There should be a presumption

1  that people will be given an opportunity to review the

2  materials when they become more widely available.

3       JUSTICE MORAWETZ:  The difficulty, and I'll put this

4  back to both you and to Mr. Ziegler, is that this is a Motion

5  to approve a sale.  The anser to that, generally, either it is

6  or it is not, and with a 48-hour comeback, I don't hear that

7  your Superintendent nor the former employees are objecting to

8  this particular sale.

9       UNIDENTIFIED SPEAKER:  Your Honor --

10      JUSTICE MORAWETZ:  I don't think it's part of today's

11 endorsements whatever's my (indiscernible) to give directives

12 your (indiscernible) to up (indiscernible) I think that counsel

13 are well aware of the service obligations.  Obviously, you've

14 got some very difficult issues, on-going issues that I would

15 prefer that that matter be resolved in communications take it

16 up with the Monitor, with Nortel to try to ensure that the most

17 or adequate services is provided.  There's no benefit when

18 materials are served at 11:00 p.m. the night before.  It's

19 stretching beyond what could be considered reasonable, but

20 there are certain circumstances, and this may be one of them,

21 what appears to be a very positive outcome.

22      UNIDENTIFIED SPEAKER:  And, Your Honor, we don't

23 question that.  And I certainly don't want to seem to be

24 critical of the Monitor or any of the parties who worked very

25 hard on this, as Mr. Tay pointed out, towards the transaction.

1    And it's from the Superintendent's perspective, we don't take

2    any issue.  We've had adequate information and we don't seek

3    the comeback clause for ourself.  We're simply sensitive to Mr.

4    Ziegler's clients' positions.

5          JUSTICE MORAWETZ:  Your points for both are noted

6    and, as I said, I'll leave it for the parties to try to work

7    out those issues in the future.

8          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

9          JUSTICE MORAWETZ:  Mr. McCullty.

10          MR. MCCULLTY:  Your Honor, Judge Gross, I'm rising

11    for only to deal with this matter.  I don't know that maybe

12    this -- it may be appropriate for me to deal with it later on,

13    but I just wanted to make it clear to the Court that the

14    comeback clause in the Vesting Order is not going to be

15    acceptable to the Purchaser.  It's our perspective that, as

16    acting for the Purchaser, we're looking for a Vesting Order

17    that you were saying earlier, the approval is either approved

18    or not approved.  And I don't think I need to say anything more

19    about it than that.

20          JUSTICE MORAWETZ:  I think I've already addressed it.

21    Mr. Tay.

22          MR. TAY:  I think it's important just to address the

23    issue.  I think everyone knows from the way we've conducted

24    ourselves from the beginning of these proceedings that we will

25    give people as much time as is possible.  The reality is in

1  this fact situation, when you have an auction that lasted this

2  long, and you can imagine the reason we couldn't have the

3  hearing yesterday, apart from the scheduling issues, was that

4  this -- there just wasn't enough time to finalize the documents

5  and to put it out.  We can assure this Court that we put the

6  documents out, and I'm sure the Monitor will assure the Court

7  similarly, that no one tried to delay the putting of any

8  documents.  That's the way we've conducted ourselves and that's

9  the way we undertake that we will always conduct ourselves in

10 these proceedings.

11      JUSTICE MORAWETZ:  Yes.  I think it's also noteworthy

12 that if you were watching the internet on Tuesday morning, you

13 had a pretty good idea of what was happening.  It may have even

14 been Monday morning (indiscernible).

15      MR. TAY:  Monday morning, yes.

16      JUSTICE MORAWETZ:  Anybody else wish to make

17 comments?

18    (No verbal response.)

19      JUSTICE MORAWETZ:  Thank you.  Well, Judge Gross, I

20 think now might be an appropriate time to recess for 10 or 15

21 minutes or so?

22      THE COURT:  I agree.  Thank you.  We will stand in

23 recess.

24      JUSTICE MORAWETZ:  Thank you.

25      THE COURT:  Mr. Bromley, does anyone have a more

1    recent Form of Order at this point --

2         MR. TAY:  Forgive me (indiscernible) so we can --

3         THE COURT:  -- that I might take back with me?

4      (No verbal response.)

5         THE COURT:  I'm sure there will be some other

6    changes, but -- all right.  All right, thank you.  Thank you

7    very much, sir.

8      (Recess from 3:24 p.m. to 3:41 p.m.)

9         THE COURT:  Justice Morawetz, shall I --

10         JUSTICE MORAWETZ:  Judge Gross, we're -- yes, please.

11    Judge Gross, everybody is here and ready to go and as

12    discussed, you'll deliver your reasons first.

13         THE COURT:  Thank you, sir.  Well, we are here today

14    on the Motion for Approval of the Sale of Certain Assets of an

15    equity interest in the Debtors of its Enterprise Solutions

16    Business.  The Court has conducted a hearing wherein evidence

17    was submitted by way of proffer and the incorporation of

18    evidence from a prior hearing in this case held on August 4th,

19    2009 in which the Court approved bidding procedures for the

20    sale of these assets.  The Court is satisfied, first of all,

21    that the jurisdiction is obviously appropriate.  That the

22    statutory predicates for the relief sought have been met and,

23    in particular, Section 363 of the Bankruptcy Code.  That notice

24    was proper and adequate for purposes of the Motion.  The

25    parties have had a reasonable opportunity to object and be

159

1    heard and, in fact, all of the objections with the exception of

2    the Verizon objection have been resolved.  And the Verizon

3    objection was, earlier today, overruled in connection with the

4    sale hearing.

5        The record shows that the seller has very extensively

6    marketed the Nortel Enterprise Solutions Business and the

7    assets related to that business.  That the process created by

8    the bidding procedures provided potential bidders with a full

9    and fair opportunity to submit bids and to participate in the

10   auction.  And that at the auction, Avaya, Inc. was selected as

11   the successful bidder based upon the Debtors' determination

12   that the Avaya bid constituted the highest and best offer for

13   the property.  The transaction is being undertaken by the

14   Debtors and Purchaser in good faith and at arms length, without

15   collusion and in good faith, specifically within the meaning of

16   Section 363(m) of the Bankruptcy Code, and as such, Avaya, Inc.

17   is entitled to the protection of Section 363(m) of the

18   Bankruptcy Code.

19       Again, Avaya and its affiliates and their respective

20   representatives have proceeded in good faith and without

21   collusion and are, therefore, entitled to those benefits.

22       The Court is fully satisfied that the proposed sale is in

23   the best interest of the Debtors and that the Debtors have, in

24   fact, presented evidence supporting such finding.  In addition,

25   the Debtors have demonstrated both good, sufficient and sound

160

1  business purposes and justifications and compelling

2  circumstances for the transaction, which is outside of the

3  ordinary course, pursuant to Section 363(b) of the Code.

4      The conveyance of the property at issue will be legal,

5  valid and effective and free and clear of liens and other

6  encumbrances.

7      The Court notes that the auction achieved a consideration,

8  the consideration being $915 million, which is far beyond that

9  which was originally bid by Avaya, Inc.  And clearly, the

10  auction itself justifies the Court's findings and the

11  conclusion that the sale is in the best interests of the

12  Debtors' estates and, in fact, that the Debtors' business

13  judgment has been satisfied and proven to be appropriate.

14      So for the reasons set forth in the Proposed Order, I make

15  the findings in the Order and will approve the sale on the

16  terms set forth in the Order.  And I thank counsel and

17  congratulate you for an extremely well-conducted auction, and I

18  certainly recognize the hard work.  And I congratulate Avaya,

19  Inc. for its purchase and wish them well.  Justice Morawetz.

20          JUSTICE MORAWETZ:  Thank you, Judge Gross.  Madam

21  reporter, are you ready?

22      (No verbal response.)

23          JUSTICE MORAWETZ:  Okay.  The following endorsement

24  is in connection with the Motion being brought today.  Nortel

25  Networks Corporation, Nortel Networks Limited, Nortel Networks

161

1    Technology Corporation, Nortel Networks International

2    Corporation, Nortel Networks Global Corporation, collectively

3    the Applicants, bring this Motion for an Order approving and

4    authorizing the execution of the Amended and Restated Asset and

5    Share Sale Agreement, dated as of September 14, 2009 defined as

6    the Final Sale Agreement, among Avaya, Inc., the buyer, and

7    NNL, NNC, NNI, and certain of their affiliates as vendors,

8    collectively the sellers, in the form attached as Appendix B to

9    the Twentieth Report of Ernst & Young in its capacity as

10   Monitor in the CCAA proceedings.  The Applicants also request,

11   among other things, a Vesting Order and a declaration that all

12   sales proceeds are to be held in a escrow account pursuant to

13   an Escrow Agreement in accordance with Section 12(g) of the

14   Interim Funding and Settlement Agreement entered into on June

15   9, 2009.

16        Finally, the Applicants also seek an Order sealing the

17   confidential Appendix D to Twentieth Report pending further

18   Order of this Court.

19        This joint hearing is being conducted by way of

20   videoconference.  His Honor, Judge Gross, is presiding over the

21   hearing in the U.S. Court.  This joint hearing is being

22   conducted in accordance with the provisions of the Cross-Border

23   Protocol, which has previously been approved by both the U.S.

24   Court and this Court.

25        The Applicants have filed two Affidavits in support of the

162

1    Motion.  The first is that of Mr. George Riedel, sworn

2    September 15, 2009.  Mr. Riedel is the chief strategy officer

3    of NNC and NL.  Mr. Riedel also swore an Affidavit on July 30

4    in support of the Motion to approve the bidding procedures.

5        The Monitor has also filed its Twentieth Report with

6    respect to this Motion.  The Monitor recommends that the

7    requested relief be granted.  No party is opposed to the

8    requested relief.

9        On August 4, 2009, this Court granted an Order approving

10   the bidding procedures for a sale process for certain of the

11   sellers Enterprise Solution Business and the shares of Nortel

12   Government Solutions Incorporated and DiamondWare Limited.  The

13   procedures were attached to the Order.  The Court also approved

14   the Stalking-Horse Agreement, dated as of July 20, 2009 among

15   the Purchaser and the sellers, and accepted the Agreement for

16   the purposes of conducting the stalking-horse bidding process

17   in accordance with the bidding procedures, including the

18   break-up fee and expense reimbursement as both terms are

19   defined in the Stalking-Horse Agreement.  The Order of this

20   Court was granted immediately after His Honor, Judge Gross,

21   United States Bankruptcy Court for the District of Delaware,

22   approved the bidding procedures in the Chapter 11 proceedings.

23   The bidding procedures contemplated a bid deadline of 4:00 p.m.

24   on September 4, 2009.  By the bid deadline, two bids were

25   acknowledged as qualified bids as contemplated by the bidding

163

1    procedures.  In addition to Avaya, a qualified bid was received

2    from Enterprise Network Holdings BV, defined as ENH.

3        In the period up to September 4, 2009, the Monitor reports

4    that it was kept apprised of all activities conducted between

5    Nortel and the potential buyers.  In addition, the Monitor

6    participated in conference calls and meetings with the

7    potential buyers.  The Monitor further reports that it

8    conducted its own independent review and analysis of the

9    material submitted by the potential buyers.

10       On September 4, 2009, in accordance with the bidding

11   procedures, a copy of the ENH bid was provided to Avaya.  After

12   consultation with the Monitor and representatives of the UCC,

13   the Bondholder Group and the U.K. Administrators, the sellers

14   determined that the highest or otherwise best offer was

15   submitted by Avaya, and accordingly, on September 10, 2009, ENH

16   and Avaya were informed that the Avaya bid had been selected as

17   the starting bid pursuant to the bidding procedures.

18       The auction was held in New York from September 11th

19   through to 14, 2009.  Pursuant to the bidding procedures, the

20   auction went through several rounds of bidding.  The sellers

21   finally determined that the Avaya bid submitted in the sixth

22   round should be declared the successful bid.  The Monitor

23   reports that these determinations were made in accordance with

24   consultations with the Monitor and representatives of the UCC,

25   the Bondholder Group and the U.K. Administrators.  The Monitor

164

1   reports that the terms and conditions of the successful bid are

2   substantially the same as the Avaya Final Agreement described

3   in the Eighteenth Report -- sorry, as is the Avaya Agreement

4   described in the Eighteenth Report, with the significant

5   differences being described at paragraph 30 of the Monitor's

6   Twentieth Report.  The most significant difference being that

7   the purchase price has been increased from U.S., 475 million to

8   U.S., 900 million, plus 15 million to be paid to employees at

9   closing under an employee retention program.

10        The assets to be transferred by the Applicants and the

11  U.S. Debtors, pursuant to the successful bid, are going to be

12  transferred free and clear of all liens of any kind

13  (indiscernible) permitted liens and those expressly assumed by

14  Avaya, pursuant to the Final Sale Agreement.  The Monitor also

15  reports it's subject to Court approval and regulatory

16  approvals.  Closing is anticipated to occur in December 2009.

17        The Monitor is of the view that the task of allocating

18  sale proceeds stemming from the successful bid amongst the

19  various Nortel entities and the various jurisdictions is

20  complex.  Further, as set out in Fifteenth Report, the

21  Applicants, the U.S. Debtors, and certain of the EMEA Debtors,

22  through the U.K. Administrators, entered into an Interim

23  Funding and Settlement Agreement.  The IFSA, which was approved

24  by the Court on June 29, 2009.  Pursuant to the IFSA, each of

25  the Applicants, the U.S. Debtors, and EMEA Debtors agree that

1  the execution of definitive documentation with the Purchaser of

2  any material of Nortel assets was not conditional upon reaching

3  agreement regarding the allocation of the sale proceeds or

4  binding procedures for the allocation of the sale proceeds.

5       The monitor reports that the parties agreed to negotiate

6  in good faith in an attempt to reach an agreement on a protocol

7  for resolving disputes concerning the allocation of sale

8  proceeds, but as of the current date, no agreement has been

9  reached regarding the allocation of any sale proceeds.

10  Accordingly, the Debtor has determined that the proceeds are to

11  be deposited in an escrow account.  The issue of allocation of

12  sale proceeds will be addressed at a later date.

13       In his Affidavit, Mr. Riedel concludes that the sale

14  process was conducted by Nortel with consultation from its

15  financial advisor, the Monitor, and several of its significant

16  stakeholders in accordance with the bidding procedures, and

17  that the auction resulted in a significantly increased purchase

18  price, as well as favorable changes reflected in the Final

19  Sales Agreement.  He is of the view that the proposed

20  transaction, as set out in the Final Sale Agreement, is the

21  best offer available for the assets.

22       The Monitor concluded that the companies efforts to market

23  the business were comprehensive and conducted in accordance

24  with the bidding procedures, and is further of the view that

25  the Section 363-type auction process provided a mechanism to

166

1  fully determine the market value of the business.  The Monitor

2  is satisfied that the purchase price constitutes fair

3  consideration for such assets and as a result, the Monitor is

4  of the view that the Final Sale Agreement represents the best

5  transaction for the sale of the business.  The Monitor,

6  therefore, recommends that the Court approve the Applicants

7  Motion.

8      A number of objections have been considered by the U.S.

9  Court and they have been either resolved or overruled.  I'm

10  satisfied that no useful purpose would be served by adding

11  additional comment on this issue.

12      Turning now to whether it is appropriate to approve the

13  transaction, I refer back to my endorsement on the approval of

14  the Bidding Procedures Motion in connection with the CDMA

15  business and the Motion to approval the sale of assets to

16  Ericsson.  At that time, I indicated that counsel to the

17  Applicants had emphasized that Nortel would aim to satisfy the

18  elements established by the Court for approval as set out in

19  the decision of the Court of Appeal in Royal Bank and Soundair,

20  which in turn accepts certain standards set out by this Court

21  in Crown Trust and Rosenberg.  Although Soundair and Crown

22  Trust, tests were established for the sale of an -- of sale of

23  assets by a Receiver, the principals have been considered to be

24  appropriate for the sale of assets as part of a court's

25  supervised sales process in a CCAA proceeding, and for

1    authority see Tiger Brand Knitting Company.

2        The duties of the Court in reviewing a proposed sale of

3    assets are as follows:  One, it should consider whether

4    sufficient effort has been made to obtain the best price and

5    that the Debtor has not acted improvidently.  Two, it should

6    consider the interests of parties.  Three, it should consider

7    the efficacy and integrity of the process by which the offers

8    had been obtained.  And, four, it should consider whether there

9    has been unfairness in the working out of the process.  I am

10   satisfied that the unchallenged record clearly establishes that

11   the sale process has been conducted in accordance with the

12   bidding procedure and with the principal set out in both

13   Soundair and Crown Trust.

14       All parties are of the view that the purchase price

15   represents fair considerations for the assets included in the

16   Final Sale Agreement.  I accept the submissions.  The

17   consideration provided by Avaya, pursuant to the Final Sale

18   Agreement, in my view, constitutes reasonably equivalent value

19   and fair consideration for the assets.  In my view, it is

20   appropriate to approve the Sale Agreement as between the seller

21   and Purchaser.  I am also satisfied that it is appropriate to

22   grant the relief relating to the Vesting Order and the

23   Declaration relating to Section 12(g) of the Interim Funding

24   and Settlement Agreement, entered into on June 9, 2009.

25       The Applicants and the Monitor also requested an Order

1    sealing confidential Appendix D to the Twentieth Report of the

2    Monitor pending further Order.  In considering this request, I

3    refer to the decision of the Supreme Court of Canada in <u>Sierra</u>

4    <u>Club of Canada v. Minister of Finance</u>, which addresses the

5    issue of a Sealing Order.  The Supreme Court of Canada held

6    that such Order should only be granted when, one, an Order is

7    needed to prevent serious risk to an important interest because

8    reasonable alternative measures will not prevent the risk.

9    Two, the salutary effects of the Order outweigh its downside

10   effects, including the effects on the right to free expression,

11   which includes public interest in open and accessible court

12   proceedings.

13       I have reviewed the confidential Appendix D to the

14   Twentieth Report.  I am satisfied that the Appendix contains

15   sensitive commercial information, the release of which could be

16   prejudicial to the stakeholders.  I am satisfied that the

17   request for a Sealing Order is appropriate and it is so

18   granted.  An Order shall be issued in the form presented as

19   amended to give effect to the forgoing reasons.  And I do echo

20   Judge Gross's sentiments and thank you to all counsel for

21   preparing matters in the comprehensive way in such a short time

22   frame.

23       At the conclusion of these proceedings today, I would like

24   to see (indiscernible) counsel who are still interested in

25   chambers to discuss scheduling matters on a going-forward

1  basis.

2      Judge Gross, that completes my endorsement on this matter.

3  And we are prepared to terminate and adjourn today's

4  proceedings subject to any comments that you may have.

5          THE COURT:  No.  I think I have no further comments,

6  Justice Morawetz.  I will await delivery of a Final Form of

7  Order and will sign it at that time.

8          JUSTICE MORAWETZ:  Thank you, counsel.  Thank you,

9  Judge --

10          THE COURT:  Thank you.

11          JUSTICE MORAWETZ:  -- Gross.

12          THE COURT:  Thank you, Justice Morawetz.  And good

13  day to you.  We'll stand in recess.  Good day, counsel.

14      (Court adjourned at 4:00 p.m.)

15                          CERTIFICATE

16          I certify that the foregoing is a correct transcript

17  from the electronic sound recording of the proceedings in the

18  above-entitled matter.

19

20   _/s/April J. Foga_____          September 28, 2009
     April J. Foga, CET, CCR, CRCR

21

22

23

24

25