**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

**NOTICE OF FILING OF TWENTY-SECOND REPORT OF THE
MONITOR OF THE CANADIAN NORTEL COMPANIES
<u>IN THE CANADIAN PROCEEDINGS</u>**

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

**PLEASE TAKE NOTICE** that on October 6, 2009, Ernst & Young Inc., the Monitor and foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation, in proceedings under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List), by its undersigned counsel, filed, in the above-captioned cases, a copy of the Twenty-Second Report of the Monitor (the "**Twenty-Second Report**"), dated September 25, 2009.  A copy of the Twenty-Second Report is annexed hereto as <u>Exhibit A</u>.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Twenty-Second Report is also available on the Monitor's website, www.ey.com/ca/nortel or upon request to the Monitor's counsel.

Dated: Wilmington, Delaware
      October 6, 2009

ALLEN & OVERY LLP

Ken Coleman
Lisa Kraidin
1221 Avenue of the Americas
New York, New York  10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
ken.coleman@allenovery.com
lisa.kraidin@allenovery.com

-and-

BUCHANAN INGERSOLL & ROONEY

By: <u>/s/ Mary F. Caloway</u>
Mary F. Caloway (No. 3059)
Peter J. Duhig (No. 4024)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
Telephone (302) 552-4200
Facsimile (302) 552-4295
mary.caloway@bipc.com

Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian Nortel
Group

# **EXHIBIT A**

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS**
**LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL**
**NETWORKS INTERNATIONAL CORPORATION AND NORTEL**
**NETWORKS TECHNOLOGY CORPORATION**

**TWENTY-SECOND REPORT OF THE MONITOR**
**DATED SEPTEMBER 25, 2009**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date") Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") (collectively the "Applicants") filed for and obtained protection under the Companies' Creditors Arrangement Act ("CCAA"), pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"). Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceeding. The stay of proceedings was extended to October 30, 2009 by this Honourable Court in its Order dated July 30, 2009.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the U.S. Court on January 14, 2009. As required by U.S. law, an official unsecured creditors committee (the "UCC") was established in January, 2009. In addition, an

ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as those in the U.S. (the "Bondholder Group").

3.     Nortel Networks (CALA) Inc. ("NCI") (together with NNI and certain of its subsidiaries which filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

4.     Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court") on January 14, 2009.  The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "U.K. Administrators").

5.     On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders").  The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel (the "Joint Israeli Administrators") and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

6.     Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court.

**PURPOSE**

7.   The purpose of this twenty-second report of the Monitor (the "Twenty-Second Report") is to provide this Honourable Court with an update with respect to the following matters:

   a)  approval of a vesting order for the sale of certain fixed assets located at Nortel's head office in Etobicoke, Ontario;

   b)  approval of the execution of a lease termination agreement and new lease agreement between NNL and the landlord at Nortel's head office, including approval of an undertaking by NNL to not repudiate the new lease;

   c)  status of the Compensation Claims (as defined below) process;

   d)  interim results of the employee hardship program;

   e)  activities arising from various representative counsel orders including notices and receipt of opt-out letters; and

   f)  update on other proceedings.

**TERMS OF REFERENCE**

8.   In preparing this Twenty-Second Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel.  EYI has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Twenty-Second Report.

9.   Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

10. Capitalized terms not defined in this Twenty-Second Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report or previous reports of the Monitor.

**GENERAL BACKGROUND**

11. Nortel is a technology company that designs, develops and deploys communication products, systems and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

12. Effective July 1, 2009, Nortel has conducted its global business through five reportable business unit segments, Carrier Networks ("CN"), Carrier VoIP and Application Solutions ("CVAS"), Enterprise Solutions ("ES"), Metro Ethernet Networks ("MEN") and LG Nortel Co. Ltd. ("LGN"). The revenues and assets of each of the business units, except for LGN, are distributed among the multiple Nortel legal entities and joint ventures around the world.

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

**HEAD OFFICE PREMISES**

14. Nortel's global head office is currently located in an eleven storey, 161,000 square foot building located at 195 The West Mall, Etobicoke, Ontario (the "West Mall"). West Mall is leased pursuant to an Indenture of Lease (the "Former Lease") dated December 20, 2005, between NNL and PD Kanco Holdings Ltd. as agent for Kanco-195 The West Mall Ltd. (the "Former Landlord"). Total annual operating costs (inclusive of base rent, additional rent and facility management costs) are approximately CDN$6 million.

15. NNL has reviewed its head office real estate requirements as part of its cost cutting initiatives after giving consideration to the diminishing requirement for space driven by the anticipated transfer of employees to purchasers on projected business unit sales, attrition and additional anticipated staff reductions as part of its overall restructuring plan.

16. In order to significantly reduce its real estate costs, NNL, with the assistance of its real estate agent, engaged both the Former Landlord and canvassed the local real estate market regarding suitable alternative space that may be available and the price range for such alternative space.

17. As a result of these efforts, suitable space was located within a building owned by Kanco-Airways Ltd.  (the "New Landlord"), an affiliate of the Former Landlord, at 5945 Airport Road, Mississauga, Ontario (the "Airport Centre").

18. On August 20, 2009, NNL and the Former Landlord entered into a letter agreement outlining the terms and conditions by which they would terminate the Former Lease effective November 30, 2009, and enter into a new lease effective December 1, 2009.  On September 14, 2009, NNL, the Former Landlord and the New Landlord entered into a Lease Termination and New Lease Agreement (the "Lease Termination Agreement").  A copy of the Agreement is attached as Appendix "A" hereto.

19. Significant terms and conditions of the Lease Termination Agreement include:

    a) The Former Lease will be terminated effective November 30, 2009;

    b) The Former Landlord will release any and all claims it may have against NNL with respect to the Former Lease, including, without limitation, the right to file any claim in any insolvency or CCAA proceedings undertaken by NNL or any of its direct or indirect subsidiaries or affiliates;

    c) NNL shall have use of and access to certain areas of West Mall, as identified in the Lease Termination Agreement, for the purposes of monitoring,

maintaining, repairing, replacing and removing the carrier circuits located therein until March 1, 2010, at no cost to Nortel; and

d) NNL will leave certain assets (consisting primarily of office furniture) as listed in the Lease Termination Agreement (the "Office Assets") at the West Mall and the Former Landlord will purchase the Office Assets from NNL for CDN$497,000. These funds will be paid into escrow pursuant to the terms of an escrow agreement (the "Lease Escrow Agreement") between NNL and Bloom Lanys Professional Corporation dated September 14, 2009, and will be used to pay the last month's rent deposit under the New Lease, with the balance being applied towards the monthly rent payable under the New Lease until these monies are exhausted.

20. The Monitor arranged for Danbury Sales Inc., an appraisal and liquidation firm, to provide an appraisal of the Assets being sold to the Former Landlord. Based on the appraisal, the selling price of CDN$497,000 represents fair market value for the Office Assets.

21. In addition to the above significant terms and conditions, the Former Landlord requires that a vesting order be issued in respect of the sale of the Office Assets.

22. The new lease for Nortel's head office, which is to be effective December 1, 2009, until May 30, 2011, is for Suites 290 and 360 of the Airport Centre comprising two floors totalling approximately 36,000 square feet (the "New Lease"). A copy of the New Lease is attached as Schedule "D" to the Lease Termination Agreement. These premises are fully furnished and wired. The premises will house those corporate employees as well as outside professionals required to complete the administration of the insolvency proceedings. Total annual operating costs (inclusive of base rent, additional rent and facility management costs) are estimated to be approximately CDN$1.2 million.

23. The significant terms and conditions contained in the New Lease include:

a) NNL will have three options to renew the New Lease for a period of six months on the same terms and conditions subject to NNL notifying the New Landlord in writing of its intent to renew three months in advance;

b) NNL will have the option to terminate the New Lease in respect of either of the two floors without penalty thereby reducing the square footage pursuant to the New Lease at any time on five months written notice to the New Landlord; and

c) As outlined above, a portion of the monies related to the sale of the Office Assets and held pursuant to the Lease Escrow Agreement will be paid to the New Landlord as a last month's rent deposit with the balance of the funds being applied towards the monthly rent instalments beginning December 1, 2009, until the funds are exhausted.

24. In addition to the above significant terms and conditions, the New Landlord will not provide a subordination and non-disturbance agreement from any party to a prior lien and requires that NNL undertake not to exercise its right under the Initial Order to repudiate the New Lease. The New Landlord has requested an order confirming such undertaking.

25. Nortel's real estate agent has advised that, after considering the short initial term, renewal options, included furnishings and ability to return square footage to the New Landlord during the term, the rental rate under the New Lease reflects market rent for comparable real estate in the local market.

26. The primary benefits to NNL of terminating the Former Lease and entering into the New Lease include:

a) Significant cash savings with respect to real estate operating costs of approximately CDN$10 million over a potential two year period through rationalization of unoccupied floor space and the improvement of rent terms;

b) Elimination of a potentially significant claim in the CCAA proceedings of NNL; and

c) Providing flexibility to allow NNL to efficiently and effectively manage a portion of its real estate costs as it completes its restructuring.

**COMPENSATION CLAIMS PROCESS**

27.   On July 30, 2009, this Honourable Court approved an order establishing a claim process and a claims bar date of September 30, 2009 (the "Claim Procedure Order").

28.   The Claims Procedure Order excluded from that process "claims of (A) any current or former employee of any of the Applicants, for amounts owing to him or her in his or her capacity as a current or former employee of any of the Applicants, including without limitation claims on account of wages, salaries, any other form of compensation (whether sales-based, incentive-based, deferred, retention-based, share-based, or otherwise), severance or termination pay, employee benefits (including, but not limited to, medical and similar benefits, disability benefits, relocation or mobility benefits, and benefits under employee assistance programs), pension and retirement benefits, vacation pay, and employee expenses, (B) any current or former employee of any of the Applicants arising from the administration, management or oversight of any of the pension plans or employee benefit plans administered or sponsored by the Applicants or their subsidiaries, and (C) any Director for compensation for acting as a Director, including without limitation fees, deferred share-based compensation, benefits and Director expenses" (collectively "Compensation Claims").

29.   This exclusion was made to allow sufficient time to establish a process taking into account the significant number of current and former employees and the complexity of Compensation Claims. The Monitor previously indicated it would report to this Honourable Court on the status of the Compensation Claims process by September 30, 2009.

30.   There are many considerations to be taken into account in the design of the Compensation Claims procedure.  These considerations include:

   a)  rolling bar dates may be required;

   b)  certain claims may require actuarial determination; and

   c)  certain claims may relate to the Health and Welfare Trust, which is an integral component of the benefits package that the Applicants provide to their Canadian employees.

31.   The Applicants, Monitor and their respective legal counsel have been working collaboratively to:

   a)   establish the primary categories of claims to be captured in a Compensation Claims process;

   b)  assess how information required to calculate such claims can be compiled efficiently and effectively with regard to information available from the Applicants and their third party service providers;

   c)   identify possible methodologies for computing claims; and

   d)  consider alternative procedures for claim notification and processing.

32.   The Applicants have shared an overview of the proposed process for Compensation Claims with court-appointed representative counsel and counsel for the CAW-Canada.  However, due the complexity and types of claims, the Applicants and Monitor anticipate it may be necessary to obtain court approval of the process in stages.

33.   The Monitor believes the Compensation Claim process is complex and may benefit from being developed in stages.  By proceeding in this manner this Honourable Court and all stakeholders will have an opportunity to be apprised of the

methodology to be used for determining Compensation Claims prior to extensive and costly work being undertaken to value such claims.

34.    The timing of these phases is dependent upon progress made in determining appropriate methodologies.  The Monitor is satisfied that the Applicants are working towards developing a Compensation Claims process that is cost effective, timely and manageable and provides for the appropriate involvement of court-appointed representative counsel and their financial and actuarial advisors and CAW-Canada.

35.    The Monitor will report further on the status of the Compensation Claims procedure as it develops.

**EMPLOYEE HARDSHIP PAYMENT APPLICATION PROCESS**

36.    In response to concerns regarding employees experiencing extreme hardship, this Honourable Court issued an order dated July 30, 2009 (the "Employee Hardship Order") establishing an amount of CDN$750,000 (maximum of CDN$12,100 per claimant) to be available to satisfy claims of former employees meeting certain hardship criteria and establishing a hardship payment application process.

37.    In accordance with the Employee Hardship Order, the Monitor posted on its website a copy of the Employee Hardship Order (including a French translation), the Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications and Application For Hardship Payments. The Nortel Retirees and Former Employees Protection Committee (the "NRPC") also posted notice of the process and a link to the Koskie Minsky LLP website which provides copies of the Eligibility Requirements and the Application for Hardship Payments in both English and French.

*Processing of Applications*

38. As of the date of this Twenty-Second Report, the Monitor has received nineteen applications for hardship payments. The initial determination of approval or rejection of applications has been in a timely manner.

39. The informal review committee (the "Review Committee") contemplated in the Employee Hardship Order has been established and has met on several occasions by telephone to review the process, preliminary results and to formally address appeals.

40. Six hardship claims totalling CDN$37,630 have been accepted to date. The payments range from CDN$1,080 to CDN$12,100 with certain payments being made in instalments.  As of the date of this Twenty-Second Report, a total of CDN$23,831 has been paid to the hardship claimants.

41. Twelve hardship claim applications have not been approved for one or more of the following reasons:

   a) Applicant was not resident in Canada;

   b) Existence of family income (including but not limited to spousal income, receipt of pension income, receipt of employment income, receipt of employment insurance payments); or

   c) Medical costs which did not meet the criteria outlined in the eligibility requirements (in light of available income) or day to day expenses which were not in and of themselves considered significant financial hardship.

42. One application, recently received, remains in the initial determination stage of Hardship Applications.

43. Those applicants whose hardship claims are rejected in whole or in part are advised they may contact the Monitor either to appeal or to advise of any changes in their circumstances.

44. As of the date of this Twenty-Second Report two appeals have been received by the Monitor for hardship applications which originally had been approved for less than the maximum amount. Each applicant was offered the opportunity to be heard by the Committee, however, neither attended the arranged telephone conference. Instead, additional information was provided by each applicant to support their appeal and/or changed circumstances. Upon reconsideration of the two applications, the Committee accepted an aggregate additional amount of CND$13,794 included in the amount of total accepted claims to date.

45. The Monitor is continuing to administer the hardship payment application process and report to the relevant representative counsel with respect to the process. The Monitor will report back to this Honourable Court by the deadline for filing Employee Hardship Claims of November 30, 2009, with respect to the processing and administration of any further hardship applications.

**NOTICES RESPECTING THE APPOINTMENT OF REPRESENTATIVE COUNSEL AND RELATED OPT-OUTS**

46. On May 27, 2009, this Honourable Court made an Order (the "Former Employees Order") appointing Koskie Minsky LLP as representative counsel for all Former Employees (as defined in the Former Employees Order) with the exception of those employees who are members of the National Automobile, Aerospace, Transportation and General Workers Union of Canada ("CAW-Canada") and already are represented by Lewis Gottheil (counsel to the CAW-Canada).

47. On July 30, 2009, this Honourable Court made an Order (the "LTD Order") appointing Koskie Minsky LLP as representative counsel for all disabled employees (the "LTD Beneficiaries"), with the exception of those employees whose disability income benefits arise out of a collective agreement with the CAW-Canada.

48. On July 22, 2009, this Honourable Court made an Order (the "Continuing Employees Order" and, with the Former Employees Order and the LTD Order, the "Rep Orders") appointing Nelligan O'Brien Payne LLP and Shibley Righton LLP as

representative co-counsel for Canadian non-unionized employees of Nortel whose employment ultimately continues with a purchaser of a Nortel business unit with Nortel (the "Continuing Employees").

49. In accordance with each of the Rep Orders, any individual not wishing to be bound by the applicable order (and all other related orders) was given the opportunity to opt-out of being represented by the applicable representative counsel. The opt-out procedure for Former Employees and LTD Beneficiaries required those individuals to notify the Monitor by providing a duly completed opt-out letter 30 days from the publication of notice/mailing of notice of the applicable order. Continuing Employees were required to notify the Monitor by September 18, 2009, of their intent to opt-out.

50. Pursuant to the requirements of the Rep Orders, the Monitor performed the following activities:

   a) Published notice of the Former Employees Order in the August 19, 2009, edition of the *Globe and Mail (National Edition), La Presse, Ottawa Citizen, and Calgary Herald.* As well, the Monitor also placed notices in *The Montreal Gazette, London Free Press, Halifax Chronicle Herald and Belleville Intelligence* at the request of Koskie Minsky LLP and as agreed to by the Company and the Monitor;

   b) Sent notice by electronic transmission, in the prescribed form to all Continuing Employees on August 6, 2009;

   c) Sent 382 packages, in the prescribed form, by regular mail to the LTD Beneficiaries on August 26, 2009; and

   d) The Monitor posted a copy of each of the Rep Orders and the related opt-out letters on its website.

51. All of the Rep Orders provide for ongoing notice and rolling opt-out bar dates for employees whose status changes subsequent to the publication, mailing or sending

of the notices outlined above.  Accordingly, the Monitor has provided the Applicants with packages, consisting of a copy of the applicable Rep Order and opt-out letter, to provide to employees whose representation changes as a result of a change in that employee's status.

52.   The bar dates for the receipt of opt-out letters from Former Employees and Continuing Employees was established to be September 18, 2009.  As of September 18, 2009, the Monitor had received only one opt-out letter from a Former Employee and one opt-out letter from a Continuing Employee.

53.   As noted in the First Report of the Monitor, a toll free hotline number was established to permit creditors and interested parties in Canada and the U.S. to contact the Monitor to obtain additional information concerning the CCAA proceedings.  To date, the Monitor has received numerous inquiries from Former Employees, Continuing Employees and LTD Beneficiaries requesting copies of Representative Counsel Orders, opt-out letters and queries regarding specific benefit and compensation matters, among other issues. The Monitor continues to respond to these inquires in a timely manner.

**UPDATE ON FOREIGN PROCEEDINGS**

*Chapter 11*

54.   The following is a summary of the material court orders that have been issued and the financial information that has been filed in the U.S. Chapter 11 proceedings since the last update provided in the Monitor's Sixteenth Report.

   a)   On July 28, 2009, the U.S. Debtors obtained an order approving the sale by the U.S. Debtors of certain CDMA and LTE assets of the Carrier business to Telefonaktiebolaget LM Ericsson (Publ) as the successful bidder at an auction held on July 24, 2009;

   b)   On July 29, 2009, the U.S. Debtors filed the Initial Monthly Operating Report for NN (CALA) Inc.;

c) On August 4, 2009, the U.S. Debtors obtained an order establishing September 30, 2009 as the general bar date for certain claims in the Chapter 11 cases;

d) On August 17, 2009, the U.S. Debtors filed the Debtor-in-Possession Monthly Operating Report for the period May 31, 2009 through June 30, 2009;

e) On August 18, 2009, the U.S. Debtors obtained an order approving the U.S. Debtors' entry into a new lease with Prudential Insurance Co. of America for the premises occupied by the U.S. Debtors in Santa Clara, California;

f) On August 31, 2009, the U.S. Debtors filed the Debtor-in-Possession Monthly Operating Report for the period of July 1, 2009, through August 1, 2009;

g) On August 31, 2009, the U.S. Debtors obtained an order authorizing the U.S. Debtors to take actions necessary to effectuate a trusteeship agreement with the Pension Benefit Guarantee Corporation concerning the termination of NNI's defined benefit pension plan;

h) On September 11, 2009, the U.S. Debtors filed the Schedules of Assets and Liabilities and the Statement of Financial Affairs for NN (CALA) Inc.; and

i) On September 15, 2009, the U.S. Debtors obtained orders:

    (i.) Extending the period during which the U.S. Debtors have the exclusive right to file a plan or plans of reorganization through February 1, 2010, and extending the period during which the U.S. Debtors have the exclusive right to solicit acceptances thereof through April 2, 2010;

    (ii.) Authorizing the U.S. Debtors to pay termination expenses for certain foreign employees in NNI's sales office in Dubai, United Arab Emirates;

    (iii.) On September 16, 2009, the U.S. Debtors obtained an order approving the sale by the U.S. Debtors of the Enterprise

Solutions Business to Avaya Inc. as the successful bidder at an auction held from September 11, 2009, through September 14, 2009, based on bidding procedures approved by the U.S. Court on August 4, 2009; and

(iv.)   On September 15, 2009, the U.S. Debtors filed an objection to a claim filed by the Internal Revenue Service ("IRS") on August 20, 2009, as well as a motion seeking certain discovery from the IRS.   On September 16, 2009, the U.S. Debtors obtained an order requiring the IRS to serve upon the U.S. Debtors responses and documents responsive to the U.S. Debtors' expedited discovery request.

*Chapter 15*

55.   The following is a summary of the filings in the Chapter 15 proceedings since the last update provided in the Monitor's Sixteenth Report.

56.   The Monitor has continued to file with the U.S. Bankruptcy Court and serve on required parties notices of each of its reports to this Honourable Court.

57.   The U.S. Bankruptcy Court recognized and enforced the following orders of this Honourable Court on August 31, 2009: (i) the Order expanding the role and authority of the Monitor; (ii) the Approval and Vesting Order for the sale of Nortel's CDMA and LTE business; (iii) the Bidding Procedures Order in connection with the sale of the Enterprise Solutions business; and (iv) the Claims Procedure Order.

58.   On August 5, 2009, the plaintiffs in Domenikos v. Roth, No. 05 Civ. 2080 (LAK), an action against NNC, John Andrew Roth, Clarence Chandran, and Frank Dunn currently pending in the U.S. District Court for the Southern District of New York, filed a motion in the U.S. Bankruptcy Court seeking to lift the stay in order to allow them to proceed with the litigation.   The plaintiffs specifically sought to have the stay, granted by this Honourable Court in the Initial Order and recognized by the U.S. Bankruptcy Court in its Recognition Order dated February 27, 2009, lifted as to

John Andrew Roth, Clarence Chandran, and Frank Dunn, three former directors and officers of NNC.  The Monitor filed an objection to the motion and a hearing was scheduled for September 16, 2009.  At the hearing, the U.S. Bankruptcy Court denied the Plaintiffs' motion without prejudice to their right to renew their motion before the U.S. Bankruptcy Court in 120 days.  This ruling coincides with the order of this Honourable Court confirming the application of the stay to the individual defendants in the In Re Nortel Networks Corp. "ERISA" Litigation, MDL Docket No. 3:03 (the "ERISA Litigation") currently pending in the United States District Court, Middle District of Tennessee, Nashville Division.  Notice of this Honourable Court's Order in the ERISA Litigation was filed with the U.S. Bankruptcy Court on September 10, 2009.

## MONITOR'S RECOMMENDATIONS

59. The Monitor is of the view the New Lease provides a significant cost saving opportunity for the Applicants and that the terms of the New Lease, including the non-repudiation clause, are acceptable in the circumstances.

60. The Monitor is also of the view that the purchase price payable for the Office Assets is reasonable in the circumstances.

61.   It is the Monitor's recommendation that an Order be issued:

   a) Providing a vesting order for the sale of the Office Assets to the Former Landlord upon the filing of a certificate with the Court by the Monitor confirming waiver of all conditions of sale; and

   b) Approving the Lease Termination Agreement, including the New Lease attached as Schedule "D" thereto and confirming  NNL's undertaking not to repudiate the New Lease.

All of which is respectfully submitted this 25th day of September, 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

## LEASE TERMINATION AND NEW LEASE AGREEMENT

THIS LEASE TERMINATION AND NEW LEASE AGREEMENT ("**Agreement**") is made this 14th day of September, 2009,

**AMONG:**

### NORTEL NETWORKS LIMITED
("**Nortel**")

OF THE FIRST PART

**AND:**

### PD KANCO HOLDINGS LTD.,
**As agent for Kanco-195 The West Mall Ltd.**
("**Landlord**")

OF THE SECOND PART

**AND:**

### KANCO-AIRWAYS LTD.
("**New Landlord**")

OF THE THIRD PART

**WHEREAS**:

A.    By an Indenture of Lease made as of the 20th day of December, 2005 between Nortel and Landlord (the "**Lease**"), Nortel leased the Premises from the Landlord on the terms and conditions set out in the Lease;

B.    On January 14, 2009, Nortel and affiliated corporations filed an application for protection under the *Companies' Creditors Arrangement Act* (the "**CCAA**") and were granted certain initial creditor protection pursuant to an order issued by the Ontario Superior Court of Justice on the same date, which also appointed Ernst & Young Inc. as "**Monitor**" in connection with the affairs of Nortel and others, which Initial Order was extended by further order on July 30, 2009, and may amended, extended, restated or replaced from time to time (collectively, the "**Initial Order**");

C.    By a letter agreement between Nortel and the Landlord dated August 20, 2009 (the "**Letter Agreement**"), the parties agreed to terminate the Lease as of November 30, 2009 (the "**Termination Date**"), and to enter into a new lease in respect of the "New Space" (the "**New Lease**") as of and from December 1, 2009 (the "**New Lease Commencement Date**"), on and subject to the terms and conditions set out in the Letter Agreement;

D.    The said conditions in the Letter Agreement have been satisfied, and the parties wish to confirm the terms and conditions pertaining to the termination of the Lease and the

surrender of the Premises to Nortel as of the Termination Date, and the entering into of the New Lease as of and from the New Lease Commencement Date.


**NOW THEREFORE**, in consideration of the sum of Five ($5.00) Dollars and other good and valuable consideration paid by each of the parties to each of the others, the receipt and sufficiency of which is hereby respectively acknowledged, the parties agree as follows:


## ARTICLE 1- INTERPRETATION


1.1    **Definitions and Recitals** - In this Agreement any capitalized term not otherwise defined herein shall have the meaning ascribed thereto in the Lease. The recitals at the beginning of this Agreement are true and are to be read as forming an integral part of this Agreement.

1.2    **Effect of Headings, etc. -**The division of this Agreement into articles and sections and the insertion of headings and marginal notes are for convenience of reference only and shall not affect the construction or interpretation of this Agreement**.**

1.3    **Contra Proferentum-**The parties acknowledge and agree that both parties have participated in the drafting of this Agreement, and that any rule of law providing that ambiguities shall be construed against the drafting party shall not be applicable to the interpretation of this Agreement**.**

1.4    **Partial Invalidity-** If any term, covenant or condition of this Agreement, or the application thereof to any person or circumstance, is held or rendered illegal, invalid, or unenforceable it shall:

(a)    be considered separate and severable from this Agreement and the remaining provisions of this Agreement shall remain in force and bind the parties as though the illegal or unenforceable provision had never been included in this Agreement; and

(b)    continue to be applicable to and enforceable to the fullest extent permitted by law against any person and circumstances other than those as to which it has been rendered invalid, unenforceable or illegal.

1.5    **Extended Meanings -**The words "hereof", "herein", "hereunder" and similar expressions used in any section or subsection of this Agreement relate to the whole of this Agreement and not to that section or subsection only, unless the context indicates otherwise.  The use of the neuter singular pronoun to refer to any party is deemed a proper reference even though such party is an individual, a partnership, an association, a corporation or a group of two or more individuals, partnerships, associations or corporations.  The necessary grammatical changes required to make the provisions of this Agreement apply in the

plural sense and to either corporations, associations, partnerships or individuals, males or females, shall in all instances be assumed as though in each case fully expressed.

1.6     **Governing Law -**This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein and shall be treated in all respects as an Ontario contract. For legal proceedings in respect of matters arising under this Agreement, the parties hereby irrevocably submit themselves to the non-exclusive jurisdiction of the Ontario Superior Court of Justice.

1.7     **Currency -**All amounts payable hereunder are in lawful currency of Canada.

1.8     **Entire Agreement -**This Agreement and the schedules referred to herein constitute the entire agreement between the parties hereto and supersedes all prior agreements, representations, warranties, statements, promises, information, arrangements and understandings, whether oral or written, express or implied, with respect to the subject matter hereof.   The parties hereto further acknowledge and agree that, in entering into this Agreement and in delivering the schedules, documents and instruments to be delivered in connection with this Agreement, they have not in any way relied, and will not in any way rely, upon any oral or written agreements, representations, warranties, statements, promises, information, arrangements or understandings, express or implied, not specifically set forth in this Agreement or in such schedules, documents or instruments. Any party hereto which is entitled to the benefits of this Agreement may, and has the right to, waive any term or condition hereof at any time on or prior to the Closing Time; provided, however, that such waiver shall be evidenced by written instrument duly executed on behalf of such party. No modification or amendment to this Agreement may be made unless agreed to by the parties hereto in writing.

## ARTICLE 2- AUTHORITY OF PARTIES

2.1     Each of Landlord and New Landlord covenants with Nortel that it has the full right, power and authority to enter into this Agreement and to observe and perform its obligations set out herein. Nortel covenants with each of Landlord and New Landlord that, subject to the provisions of Section 2.2 hereof, it has the full right, power and authority to enter into this Agreement and to observe and perform its obligations set out herein.

2.2     Nortel's ability to enter into, and to perform its obligations under, this Agreement and the New Lease are conditional upon receiving consent from the Monitor (**"Monitor Consent"**) and an order from the Ontario Superior Court of Justice approving the transactions contemplated in this Agreement ("**Approval and Vesting Order**"). Nortel shall apply for and make commercially reasonable efforts to obtain and deliver such Monitor Consent on or before 6:00 pm on September 15, 2009, and shall make best efforts to obtain the Approval and Vesting Order approving Nortel's entering into the transactions contemplated herein and containing language satisfactory to Landlord,

4

acting reasonably, that Nortel will not repudiate the New Lease, on or before September 30, 2009.

2.3    The parties agree to execute and deliver this Agreement and the New Lease to confirm their respective agreement on the terms and conditions set out herein and therein, but this Agreement and the New Lease shall, notwithstanding such execution, be held in escrow pending receipt of the Monitor Consent and Approval and Vesting Order.    In the event that Monitor Consent is not obtained and delivered to the Landlord by September 15, 2009, or the Approval and Vesting Order vesting the Included FF&E in the name of Landlord as of the New Lease Commencement Date, and containing such non-repudiation language, is not obtained by September 30, 2009, and failing other agreement between the parties extending or revising such conditions, this Agreement, the New Lease and all obligations of Nortel hereunder and thereunder shall be null and void. In the event that the Approval and Vesting Order is obtained containing the aforesaid provisions, it will be delivered to the Landlord as soon as possible following issuance by the Ontario Superior Court of Justice, and upon such delivery, this Agreement and the New Lease shall be released from escrow and be binding upon the parties.


## ARTICLE 3- SURRENDER AND TERMINATION OF LEASE


3.1    Subject to the provisions of Subsection 3.4 hereof, as of and from the Termination Date, Nortel assigns, releases and surrenders to Landlord all of Nortel's right, title, interest and benefit in, to and from the Lease and the Premises, to the intent that the unexpired residue of the Term created by the Lease, and all other estate and interest of Nortel in the Premises under the Lease, shall be merged and extinguished in the reversion of the Premises, and the Lease shall be cancelled, terminated and nullified.

3.2    Nortel will comply with its obligations under the Lease to and including the Termination Date. Subject to availability of access to, completion of preparatory work, and move and migration scheduling of personnel and equipment to the New Premises, Nortel will make all commercially reasonable efforts to return vacant possession of the Premises in a clean condition as of the Termination Date, provided that any residual occupancy in the Premises after the Termination Date will be to complete decommissioning of equipment, removal of Excluded FF&E and final clean-up of the Premises ("**Final Clean-up**"). Nortel will not have any liability for the payment of any rents, charges or fees in respect of Final Clean-up in the Premises after the Termination Date, other than for any damages caused by Nortel to the Premises in connection with such Final Clean-up activities. In no event shall the Final Clean-up period extend beyond December 7, 2009.

3.3    Subject to the provisions of Subsection 3.4 hereof, Landlord hereby accepts the assignment, release and surrender to it by Nortel of Nortel's interest in the Lease and to the Premises, to the intent that the term created by the Lease and all other interest of Nortel under the Lease are terminated, and all covenants, undertakings, and obligations of Nortel under the Lease and in respect of the Premises, are cancelled, terminated, nullified, extinguished and released as of the Termination Date.

3.4    Notwithstanding the provisions of Subsections 3.1, 3.2 and 3.3 hereof, Nortel and its agents, representatives and contractors, shall have the continued use of and access to that part of the Premises identified in Schedule "A" attached hereto ("**Telecom Cabinets**") in the same manner as has been the case during the currency of the Lease for the purpose of monitoring, maintaining, repairing, replacing and removing the carrier circuits located in the Telecom Cabinets until March 1, 2010 at no cost, rent, fee or liability to Nortel (the "**POP Access License**"). Nortel shall remove the contents of the Telecom Cabinets on or before March 1, 2010, and may, on 15 days written notice to Landlord, earlier terminate the POP Access License.

**Formatted:** Bullets and Numbering

## ARTICLE 4- FURNITURE, FIXTURES AND EQUIPMENT

4.1    Nortel shall remove from the Premises on or about the Termination Date the items of furniture, fixtures and equipment listed on Schedule "B" hereto (and together with the telecom equipment listed in Schedule "A", the "**Excluded FF&E**"). Nortel shall leave in the Premises and convey to Landlord as of and from the Termination Date the items of furniture, fixtures and equipment listed on Schedule "C" hereto (the "**Included FF&E**"). Landlord shall, on the Termination Date, pay to Bloom Lanys Professional Corporation (as "**Escrow Agent**", or such other escrow agent approved by the parties, each acting reasonably in determining the replacement escrow agent), the sum of Four Hundred and Ninety-Seven Thousand dollars ($497,000.00), representing the value of the Included FF&E agreed to between the parties (the "**FF&E Payment**"), with the GST and any applicable PST (if applicable) thereon to be paid to Nortel for remittance by Nortel to the applicable authorities in conjunction with its reporting requirements. The Escrow Agent shall receive the FF&E Payment and invest same in an interest bearing trust account, and shall be authorized and directed by the parties, pursuant to an escrow release letter to be approved by the parties, acting reasonably, to pay to the New Landlord for the benefit of Nortel from the escrow funds and interest earned thereon (the "**Escrow Funds**") the last month's security deposit under the New Lease on the commencement date of the New Lease, and the base and additional rents first accruing due under the New Lease until such time as the Escrow Funds are exhausted.

4.2    The Included FF&E is conveyed by Nortel and accepted by Landlord in "as-is, where is" condition without representation or warranty by Nortel of any kind, other than that the conveyance of the Included FF&E has been approved by the Monitor, and will be freed and cleared of encumbrances by virtue of the Approval and Vesting Order to be obtained by Nortel and delivered to Landlord pursuant to Section 2.2 hereof.

## ARTICLE 5-NEW LEASE

6

5.1 New Landlord joins in these presents to confirm that, in consideration of the covenants and agreements contained in this Agreement, it is entering into the New Lease with Nortel in the form attached hereto as Schedule "D", and that an amount corresponding to the FF&E Payment shall be credited to Nortel in a manner satisfactory to Nortel as a security deposit in respect of the last month's rent under the New Lease, and the first base rent and additional rent due and payable by Nortel under the New Lease.

5.2 Nortel agrees not to exercise its right under the Initial Order to repudiate the New Lease, except as may be permitted under the provisions of the New Lease, and to make commercially reasonable efforts to have the Approval and Vesting Order provide for such agreement not to repudiate the New Lease, save as aforesaid.

## ARTICLE 6- RELEASES

6.1 Subject to completion of performance of all of Nortel's obligations under this Agreement, Landlord hereby remises, releases and forever discharges Nortel, effective as of and from the Termination Date, of and from all manner of actions, causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, liens, claims, costs, and demands whatsoever which against Nortel, Landlord ever had, now has or hereafter can, shall or may have for or by reason of any action, cause, matter or thing whatsoever existing up to the present time and particularly, without limiting the generality of the foregoing, of and from all claims and demands of every nature and kind whatsoever in any way related to or arising from the Lease or the use and occupation of the Premises including, without limitation, the filing of any claim in any insolvency or CCAA proceedings undertaken by Nortel or any of its direct or indirect subsidiaries or affiliates.

6.2 Upon completion of performance of all of Landlord's obligations under this Agreement, Nortel hereby remises, releases and forever discharges Landlord of and from all manner of actions, causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, liens, claims, costs, and demands whatsoever which against Landlord, Nortel ever had, now has or hereafter can, shall or may have for or by reason of any action, cause, matter or thing whatsoever existing up to the present time and particularly, without limiting the generality of the foregoing, of and from all claims and demands of every nature and kind whatsoever in any way related to or arising from the Lease or the use and occupation of the Premises.

## ARTICLE 7- NOTICE

7.1    All notices, demands, requests, instructions and other communications to be given or made under this Agreement shall be in writing and given by: (i) messenger or a recognized overnight delivery service; (ii) registered or certified mail, return receipt requested and postage prepaid; or (iii) facsimile or other confirmed electronic transmission, as follows:

If to Landlord:
c/o Tran globe Property Management Services
5925 Airport Road, Suite 700
Mississauga, Ontario L4V 1W1
Attention: Daniel Drimmer
Fax #: 905-293-9428  e-mail  ddrimmer@gotransglobe.com

With a copy to:
Barbara Lanys
BLOOM  LANYS
Professional Corporation
Suite 200- 2171 Avenue Road
Toronto, Ontario M5M 4B4
Fax# 416-485-6054  e-mail barb@bloom-lanys.com

If to Nortel:
Nortel Networks
2221 Lakeside Blvd.
MS 991-01-A10
Richardson, TX 75082
Attn. Real Estate Dept
Ph 972-685-8887; FAX 972-684-3868

With a copy to:
D. John Naccarato
Ogilvy Renault, LLP
1500-45 O'Connor Street
Ottawa, Ontario K1P 1A4
Fax # (613) 230-5459 e-mail jnaccarato@ogilvyrenault.com

or to such other person or address as may be designated by written notice from any party to the others.  Any notice is deemed to have been given and received: (i) if sent by messenger or overnight delivery service, then on the date of receipt; (ii) if sent by mail, then three (3) calendar days after mailing; or (iii) if sent by confirmed facsimile or other electronic transmission during normal business hours, then on the date of transmission or if sent by facsimile transmission outside of normal business hours, then on the following business day.

## ARTICLE 8 -SUCCESSORS AND ASSIGNS

8

8.1    This Agreement shall enure to the benefit of and be binding upon the parties and their respective executors, trustees, successors and assigns.


## ARTICLE 9 –MISCELLANEOUS

9.1    The parties shall do all further acts and things, provide such further assurances, and execute all further documents reasonably requested by another party or required in the circumstances to effect the provisions and intent of this Agreement.  This Agreement may be executed by facsimile or other electronic transmission and in counterpart (each such counterpart constituting one and the same instrument) and the reproduction of signatures by way of facsimile or electronic transmission will be treated as though such reproduction were executed originals. It is the express intent of the parties that this Agreement be treated for all purposes as a contract under seal and that time be of the essence hereof.


**IN WITNESS WHEREOF** the parties hereto have caused this Agreement to be executed by the respective proper signing officers or signatories duly authorized in that behalf.


**NORTEL NETWORKS LIMITED**

Per: _____
Name: _____
Title: _____

I/We have authority to bind the Corporation.


**PD KANCO HOLDINGS LTD.,**
**As agent for Kanco-195 The West Mall Ltd.**          **KANCO-AIRWAYS LTD.**


Per: _____          Per: _____
Name: Daniel Drimmer                                        Name: Daniel Drimmer
Title: President                                                    Title: President
I/We have authority to bind the Corporation.          I/We have authority to bind the Corporation.

9

_____

The Undersigned GE Canada Real Estate Financing Holding Company hereby confirms notice of
and consent to the termination of the Lease in accordance with the terms of this Agreement.

**GE Canada Real Estate Financing Holding Company**


Per: _____
Name: _____
Title: _____

I/We have authority to bind the Corporation.

Schedule "A"
POP Telecom Cabinets



# WM IT equipment exclusions

**Nortel to retain (remove & ship elsewhere)**

- All Cooper B-Line cabinets in the MER & their contents
- All (6) Panduit Ethernet cross connection matrices in the MER
- All Nortel hubs, switches & Contivity equipment in the IT closets (all floors)
- All LAN/MAN/WAN & Voice equipment spares within the MER, the IT closets and 7th floor stock room.
- All computers (with monitors), multimedia and telephone switches and equipment.

**Nortel to leave behind**

- All (4) Panduit FMS cabinets & contents (excluding fibre patch cords) in the MER
- All PDUs and RPDUs in the MER
- All HVAC equipment in the MER
- BIX panels on the wall of the MER
- 3 desks within the MER

# WM IT access needed after the people move until the remaining circuits are migrated

**Nortel to retain (remove & ship elsewhere)**

- Cabinets C05 – C09 in the MER, their contents and fibre connections

**Nortel to leave behind**

- Two Panduit FMS cabinets & contents used for the carrier & also the cross connect to the equipment (FMS C & FMS D)
- C10 – power / rectifier unit
- PDUs and RPDUs in the MER
- HVAC equipment in the MER

- **NOTE:   Carrier entries into the building which will also need to be maintained:**
  - **Bell access in the small room near security.**
  - **Allstream & Hydro One Telecom access in the small room off the shipping area**
  - **Allstream access into the wall of the MER near the PDUs**

Schedule "B"
Excluded FF&E

**Exclusions List**                                                ver 4.0

| Item | Quantity | Location | Comments |
|---|---|---|---|
| 4 High Filing Cabinets | 135 | in non-standard workspaces | Cabinets are not in common areas |
| 2 high storage cabinets | 4 | from 4th floor | Taking 4 to new site, will be 26 left |
| Height Adjustable Worksurface | 2 | 6B1-08, 4G8-06 | Ergonomic desk( Kathy Wesselman and Blair Gibbs) |
| Misc chairs (not Mirra or Aerons) | 3 | 10D1-08, 6B1-08, 6A1-02 | 1 from brampton, 1 from Ottawa, 1 From Matheson |
| | | various enclaves, to be replaced with round tables in stge | Not part of WM furniture purchase, moved from Matheson |
| Rectangular Enclave/Meeting Tables | 14 | | |
| Ambi Chair | 4 | 1D8-13, 10F10-06 | Not part of WM furniture purchase |
| Aeron Side Chair | 7 | 1D8-13, Wellness Centre | Not part of WM furniture purchase |
| Aeron chairs | 16 | Multimedia Studio | |
| Lunch Room Stools | 18 | 11D8-15 | Not part of WM furniture purchase |
| Lunch Room Small Round Tables | 6 | 11D8-15 | Not part of WM furniture purchase |
| Vault | 1 | 5F8-16 | Legal Dept. - moved from Brampton |
| Fire Proof Cabinets | 19 | 5F8-16 | Legal Dept. - moved from Brampton |
| Shelving | 12 | 7G9-09, 7G8-18, 7F8-18 | Required for specialty rooms at new site and TCF |
| Desks (not systems furniture) | 6 | 1L4-07 | need for S&R and Desktop Room |
| Miscellaneous workstation accessories (plastic in/out trays) | N/A | 7F8-18 | |
| Shipping & Receiving content/ furniture | | 1L4-07 | |
| Telepresence Room- all contents | | 7F2-16 | |
| Multi Media Studio - all contents | | 1C10-07, 1F9-07, 1D10-13, 1D9-14 | |
| Customer Meeting Room/Sales Lab all contents and equipment, podium | | 2J2-03,2K3-03, 2N7-08 | |
| All Lab contents (including Lab tables) | | 10F10-06 | |
| All Artwork, statues, podiums | | throughout the building | Includes Receivers and TV's  on 4th and 3rd flrs |
| Bell Expressvu Satellite Dish | 8 | 7F8-18 | |
| Keyboard Trays | 45 | 7F8-18 | |
| Keyboard Tray additional mounting bracket | 40 | 7F8-18 | in inventory |
| Workstation Whiteboard Dividers (Stands) | 3 | 7F8-18 | in inventory |
| Whiteboard (Wall Mount) 58 X 44 | 2 | 7F8-18 | |
| Waste Baskets (Silver) | 4 | 7F8-18 | |
| Waste Baskets (Recycle Blue) | 13 | 7F8-18 | |
| Waste Baskets (Waste Black) | 21 | 7F8-18 | |
| Nortel Mugs (Box) | 1 | 7F8-18 | |
| Mail Sort Station (Print/Copy Room) | 6 | misc floors from print copy rooms | in inventory |
| Office Whiteboards (Wall Mount) 48 X 36 | 3 | 7F8-18 | in inventory |
| Microwaves | 6 | 7F8-18 | |
| Coat Hangers | 1 | 7F8-18 | |
| Lamp | 1 | 7E2-01 | |
| All print/copy/fax equipment | Various | throughout building | |
| HP4000  Printer - Serial # USEA015748     Asset # AC011847 | 1 | 7E2-01 | |
| Switchboard | 1 | 1L2-09 | |
| Black Computer Bags | 13 Boxes | 1L2-09 | In Projector bags labeled |
| WhiteBoard Markers | Various | 11G2-10 | |
| Tools - Miscellaneous | N/A | 11G2-10 | In Projector bags labeled |
| Projector (7) | 1 | 11G2-10 | In Projector bags labeled |
| Projector (9) | 1 | 11G2-10 | In Projector bags labeled |
| Projector (10) | 1 | 11G2-10 | In Projector bags labeled |
| Projector (11) | 1 | 11G2-10 | In Projector bags labeled |
| Projector (12) | 1 | 11G2-10 | in box from King Street |

14

| | | | |
|---|---|---|---|
| Projector - KWEST | 1 | 11G2-10 | In AV Room |
| Projector - MATHE | 1 | 11G2-10 | In AV Room |
| Projector - MATHE | 1 | 11G2-10 | In AV Room |
| Projector - MATHE | 1 | 11G2-10 | In AV Room |
| Projector - MATHE | 1 | 11G2-10 | In AV Room |
| Projector - MATHE | 1 | 11G2-10 | In AV Room |
| Projector - MATHE | 1 | 11G2-10 | In AV Room |
| Projector - MATHE | 1 | 11G2-10 | in inventory |
| Panasonic Flat Screen TV | 1 | 11G2-10 | in inventory |
| LG Flat Screen TV | 1 | 11G2-10 | Originally from KWEST |
| KWEST - Flat Screen | 1 | 11G2-10 | Originally from BRAM |
| Sony 36" Trinitron TV | 1 | 11J6-02 | Originally from MATHE |
| MATHE - Flat Screen TV | 2 | 11J6-02 | in inventory |
| Wall Mount Screens | 5 | 11G2-10 | in inventory |
| Easels | 9 | 11G2-10 | in inventory |
| Whiteboard Erasers | | 11G2-10 | Box |
| Misc. Ports, Cables & Remotes | Various | 11G2-10 | Bottle |
| Windex (Whiteboard Cleaner) | 1 | 11G2-10 | |
| Overhead Projector | 1 | 11G2-10 | |
| Overhead Projector Bulbs | 4 | 11G2-10 | Grey Bin |
| Computer Cables | Various | 11G2-10 | Grey Bin |
| AV Cables | Various | 11G2-10 | Grey Bin |
| A/C Extention Cords | Various | 11G2-10 | |
| Yahama Mixer Board | 1 | 11G2-10 | |
| Mixer Board | 1 | 11G2-10 | |
| Ice Maker | 1 | 11D8-15 | |
| Refrigerators | 2 or 3 | | |
| Catering Smallwares | Various | 3J8-02 | Lighthouse Room |
| Polycom System (Video Conferencing) | 1 | 3J2-11 | |
| All personal computing equipment, desktops, laptops, unix workstations, monitors | | throughout building | |
| All phones and polycom units | | throughout building | |
| Building maintenance tools and equipment owned by contracted maintenance providers | | | |
| All leased equipment and supplier owned equipment | | throughout building | |
| Security Cameras, security radios and DVR | 10 cameras | throughout building | |
| All Nortel and Contractor Security Badges | | | |
| Environment Health and Safety equipment and supplies | Various | | |
| All goods, chattels, equipment, furniture owned by employees or contractors | | | |
| Nortel employees personal property | | | |
| Nortel intellectual property | | | |
| | | | |
| | | | |
| | | | |
| See Additional IT excluded list | | | |

| WEST MALL ESTIMATED FURNITURE INVENTORY | | | | | | | | | | ver 4.0 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Floors** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | |
| Workstations (2 peds, 1 overhead)--chairs not included | | 66 | | 64 | 56 | 82 | 80 | 106 | 81 | 95 | 1 | 631 |
| Enclosed Offices | | 5 | | 18 | 18 | 15 | 7 | 8 | 11 | 7 | | 89 |
| | | | | | | | | | | | | |
| **Filling & Storage Cabinets** | | | | | | | | | | | | |
| 2 high cabinets | 2 | 22 | | 31 | 49 | 27 | 29 | 36 | 34 | 34 | 3 | 267 |
| 4 high cabinets with overhead cabinets | | 7 | | 6 | 12 | 12 | 12 | 11 | 11 | 11 | | 82 |
| 2 high storage cabinets | | 3 | | 2 | 4 | 3 | 4 | 4 | 3 | 3 | | 26 |
| 2 Door storage cabinet | | | | 1 | | | 0 | 1 | 7 | 1 | | 10 |
| 5 high cabinets | | | | | | | | | 5 | | | 5 |
| **Lunch Room** | | | | | | | | | | | | |
| Tables | | | | | | | | | | | 19 | 19 |
| Chairs | | | | 6 | | | | | | | 71 | 77 |
| **Chairs** | | | | | | | | | | | | |
| Mirra | 18 | 116 | | 128 | 112 | 136 | 125 | 146 | 131 | 140 | 2 | 1054 |
| Aerons | | 21 | | | | | | | | | | 21 |
| Stackable Conference Chairs | | | | | | | | | | | 136 | 136 |
| Guest Chairs (from enclaves & Enclosed offices) | | 13 | | 46 | 40 | 32 | 32 | 32 | 27 | 34 | | 256 |
| Oasis stools | 1 | 7 | | 6 | 7 | 7 | 7 | 7 | 7 | 7 | | 56 |
| **Conference Tables** | | | | | | | | | | | | |
| Round enclave tables | | 0 | | 3 | 1 | 1 | 2 | 0 | | 2 | 13 | 22 |
| 11th fl meeting room tables | | | | 2 | | | | | | | 63 | 65 |
| Medium conference room tables | 1 | 2 | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | 17 |
| Large conference room tables | | 1 | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | 8 |
| Department meeting room tables | | | | 2 | | | | | 1 | | | 3 |
| Customer Presentation Table | | 1 | | | | | | | | | | 1 |
| **Misc** | | | | | | | | | | | | |
| Coat Closets | | 1 | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | 15 |
| Shelving | 5 | 6 | | 1 | 7 | | 15 | | 7 | 7 | 10 | 58 |
| Meeting Room Credenza | | 7 | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | 21 |
| Bookcases | | | | 1 | 9 | | | | | 4 | | 14 |
| Desks | | | | | | | 5 | | | | 1 | 6 |
| Podiums | | | | | | | | | | | 2 | 2 |
| Small round lounge tables | | | | | | | | | | | 4 | 4 |
| Lounge Chairs (Cloth) | | 2 | | | | | | | | | 16 | 18 |
| Lounge Chairs (leather) | 8 | 4 | | | | | | | | | | 12 |
| Glass tables | 2 | 1 | | | | | | | | | | 3 |
| tables | | | | | 4 | | 6 | | | | | 10 |
| **Whiteboards** | | | | | | | | | | | | |
| Free Standing Whiteboards | | 27 | | 21 | 18 | 33 | 30 | 36 | 31 | 38 | | 234 |
| Conference Room wall mounted whiteboards | 1 | 3 | | 4 | 3 | 3 | 3 | 3 | 3 | 3 | | 26 |
| Enclave/office whiteboards | | 6 | | 17 | 18 | 17 | 12 | 12 | 12 | 9 | | 103 |
| 11th floor Wall mounted whiteboards | | | | | | | | | | | 8 | 8 |
| | | | | | | | | | | | | |
| **Executive Floor Furniture** | | | | | | | | | | | | |
| Executive Enclosed Offices | | | 12 | | | | | | | | | 12 |
| Workstations (2 peds, 1 overhead)--chairs not included | | | 13 | | | | | | | | | 13 |
| Reception Desk (built in) | | | 1 | | | | | | | | | 1 |

15

Schedule "C"
Included FF&E

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Mirra Chairs | | | 20 | | | | | | | 20 |
| Aeron Chairs | | | 71 | | | | | | | 71 |
| small round tables (in guest drop-ins at reception area) | | | 2 | | | | | | | 2 |
| Leather chairs (guest ) | | | 4 | | | | | | | 4 |
| credenza | | | 9 | | | | | | | 9 |
| Glass tables | | | 1 | | | | | | | 1 |
| 2 door filing cabinet | | | 1 | | | | | | | 1 |
| lunch room Chairs | | | 8 | | | | | | | 8 |
| lunch room tables | | | 2 | | | | | | | 2 |
| lunch room stools | | | 4 | | | | | | | 4 |
| Office guest/side chairs | | | 42 | | | | | | | 42 |
| White leather chairs | | | 20 | | | | | | | 20 |
| Glass tables-rectangular | | | 5 | | | | | | | 5 |
| small round glass tables | | | 2 | | | | | | | 2 |
| 11th fl meeting room tables | | | 1 | | | | | | | 1 |
| Wall mounted whiteboards | | | 5 | | | | | | | 5 |
| conference tables | | | 5 | | | | | | | 5 |
| Board room table | | | 1 | | | | | | | 1 |
| 2 high cabinets | | | 6 | | | | | | | 6 |
| 3 high cabinets | | | 12 | | | | | | | 12 |
| 4 high cabinets | | | 4 | | | | | | | 4 |
| 4 high cabinets with overhead cabinets | | | 0 | | | | | | | 4 |
| Shelving | | | 2 | | | | | | | 2 |

## Nortel Real Estate Storage Inventory

ver 4.0

| Description | QTY | Location | Comments |
|---|---|---|---|
| Herman Miller Workstation Panel - (Fabric Brown 42 X 20) | 1 | 7F8-18 | |
| Herman Miller Workstation Panel - (Fabric Beige 42 X 18) | 1 | 7F8-18 | |
| Herman Miller Workstation Panel - (Fabric Beige 48 X 18) | 5 | 7F8-18 | |
| Herman Miller Workstation Panel - (Fabric Green 42 X 16) | 2 | 7F8-18 | |
| Herman Miller Workstation Panel - (Fabric Green 24 X 16) | 2 | 7F8-18 | |
| Herman Miller Workstation Panel - (Metal Beige 48 X 24) | 1 | 7F8-18 | |
| Herman Miller Workstation Light Fixture | 1 | 7F8-18 | |
| Herman Miller Overhead bins Sets | 2 | 7F8-18 | |
| Herman Miller Workstation Frames (Black 62 X 48) | 4 | 7F8-18 | |
| Light Fixture (Starbucks) | 3 | 7F8-18 | |
| Red carpet tiles (for Broadcast Studio) | 6 | 7F8-18 | |
| Eaton Powerware connectUPS-X cards | 3 | 7F8-18 | |
| Quantum Water Filters (replacement cartridges for Oasis) | 18 | 7F8-18 | |
| Quantum 1000 - tap fixture | 2 | 7F8-18 | |
| Chairs - Office Grey on Castors | 4 | 7F8-18 | |
| Chairs - Office Green side chairs | 3 | 7F8-18 | |
| Chair Castors | 5 | 7F8-18 | |
| Chairs - Office Grey on Castors (Damaged back support) | 2 | 7F8-18 | |
| Herman Miller Overhead bins Set (Wood finish sliding door) | 1 | 7F8-18 | |
| Herman Miller Workstation Partitions (Clear attach to side tables) | 2 | 7F8-18 | |
| Desk Top Beige (66 X22) | 1 | 7F8-18 | |
| Counter Top Beige (90 X 20) | 1 | 7F8-18 | |
| Desk Top Wood (72 X29) | 2 | 7F8-18 | |
| Wood Pieces (40 X 23) | 2 | 7F8-18 | |
| Silver Desk Handles | 14 | 7F8-18 | |
| Marble Plaque Stand | 1 | 1L4-07 | |
| Interface  - Timberlane Carpet Tiles | 70 | 1L2-09 | |
| 16 X 24 Piasentina Tiles | 153 | 1L2-09 | 408 sq.ft. |
| 6 X 19.5 Is1a Kristal Latte | 12 | 1L2-09 | 10 sq.ft. (White used in Oasis) |
| 12 X 12 Tinte Unite White Matte | 4 | 1L2-09 | 4 sq.ft |
| 4 X 4 Tinte Unite White. Pol. | 9 | 1L2-09 | |
| Johnsonite Tightlock Wall Base | 1 | 1L2-09 | Partial Roll |
| Schlage Latch/Strike Lock | 1 | 1L2-09 | |
| Glynn Johnson Door Closure Arm | 2 | 1L2-09 | |
| Carpet Tiles | 12 Boxes | Penthouse | |
| Light Fixtures Flourescent (20 X 60) | 68 | Penthouse | |
| Ceiling Tiles (20 X 60 X 3/4") | 14 Boxes | Penthouse | |
| Xenon Architectural Lighting Strips (Opal) 12ft | 3 | Penthouse | |
| Baseboard Moulding (30ft) | 1 | Penthouse | |
| CMG/CM Communication Cable (Grey) | 3 Boxes | Penthouse | Anixter 317--23-1801-FR |
| Mohawk 5eLAN Communications Cable (White) | 1 Box | Penthouse | 4PR 24AWG UL |
| Armstrong Humiguard (24 X 24  X 1") | 1 Box | Penthouse | Fibreglass |
| Painter - Plastic Sheet Roll | 1 Box | Penthouse | |
| Rodgers Wallcovers 60-300 | 1 Roll | Penthouse | |
| RippleWallcover (white) used in Main Lobby | 1 Roll | Penthouse | |
| Beige Wallcover (2 partial rolls) | 2 Rolls | Penthouse | |
| Remotes - Misc. | N/A | N/A | N/A |
| Network Cables | | N/A | N/A |
| All Wall/ceiling mounted projectors/plasma screen TVs to remain | | | |

18

Schedule "D"
New Lease
[see attached]

**AIRWAY CENTRE**             **Schedule D**

THIS INDENTURE made (in quadruplicate) as of the date set forth in Schedule "A" attached hereto.

In pursuance of the Short Form of Leases Act

B E T W E E N:

**KANCO-AIRWAYS LTD.**

(herein called the "Landlord")

OF THE FIRST PART

- and -

**NORTEL NETWORKS LIMITED**

(herein called the "Tenant")

OF THE SECOND PART

WITNESSETH that in consideration of the rents, covenants and agreements hereinafter reserved and contained, the Landlord and the Tenant covenant and agree as follows:

1.     **LANDS, BUILDINGS AND PREMISES**

The Landlord is the owner of the lands and premises legally described in Schedule "A" hereto (the "Lands") on which a building known as 5945 and 5955 Airport Road (the "Building") is erected. The Lands and Building form part of a complex of multiple occupancy office buildings known as the "Airway Centre" (herein called the "Complex"). The Landlord has agreed to lease to the Tenant, and the Tenant has agreed to lease from the Landlord, part of the Building comprised of the premises described in Schedule "A" attached hereto (herein referred to as the "Premises") and outlined on the floor plan attached hereto as Schedule "B".

2.     **TERM**

TO HAVE AND TO HOLD the Premises for and during the term (hereinafter called the "Term") as set forth on Schedule "A" attached hereto.

3.     **RENTAL**

The Tenant covenants and agrees to pay to the Landlord during the Term, without deduction, abatement or set-off, a Net Rent and Additional Rent as set out in Schedule "A" of this Lease.  If the Term commences on any day other than the first or ends on any other day than the last day of the month, Net Rent for the fractions of a month at the commencement and at the end of the Term shall be adjusted pro-rata on a daily basis.

RENTABLE AREA

For any purpose of this Lease, the total area, by outside measurements and in accordance with current BOMA standards, of the Premises shall be treated as the area set forth on Schedule "A" (the "Rentable Area").    In the event that a certificate is prepared which sets out a greater square footage for the Premises, neither the Net Rent nor the Tenant's Proportionate Share shall be adjusted for any area greater than as set out in Schedule "A" herein.

DEPOSIT

The Landlord acknowledges receipt of the sum as set forth on Schedule "A" attached hereto.

SECURITY DEPOSIT

Intentionally Deleted.

4. **DEFINITIONS**

In this Lease the following terms shall have the following meaning ascribed to them:

(a)    "Total Maintenance Costs" means, subject to the provisions of this Lease, the total amount of all costs, expenses or amounts incurred, whether by the Landlord or others on behalf of the Landlord, in connection with the complete maintenance, operation, management and repair of any part of:

i)    the Premises and the Building, of which the Premises form a part;

ii)    the Common Inside Areas and Common Outside Areas and Facilities (as hereinafter defined); and

iii)    other items, components and improvements used or enjoyed by the Tenant in common with others including without limiting the generality of the foregoing all fixtures, fittings, lights, boilers, pipes, plant machinery, elevators, elevator shafts, heating, ventilating and air-conditioning equipment, lobbies, entrances, stairs, passages, washrooms, walls, fences, gutters, drains, walkways, driveways, parking areas, ramps, shipping and receiving areas, flower beds, lawns and other areas situated within the limits of the lands described in Schedule "A" attached hereto;

which shall include, without limiting the generality of the foregoing and without limiting the generality of the interpretation of the foregoing and without duplication, the cost of all repairs and replacements required for such operation and maintenance; maintenance to the foundation, columns, structural elements of sub-floors, bearing walls and roof (including the roof membrane or weather covering) of the Building shall be included as part of Total Maintenance Costs, excluding major repairs (if any) that are required as a result of structural failure due to defective design or construction; all costs in respect of any heating, ventilating and air-conditioning equipment, all expenditures made by the Landlord in an effort to promote energy conservation as set out in section 5(v) of this Lease, the costs of operating and maintaining elevators; the cost of providing hot and cold water; capital tax; depreciation or amortization of any maintenance costs or major repairs which have not been charged fully in the year in which they are incurred, and interest on the undepreciated or unamortized balance of such costs, at an annual rate equal to two percent (2%) above the prime rate; the cost of electricity and public utilities including lighting not otherwise charged to tenants; the cost of snow, ice and refuse clearance and removal; parking lot maintenance, repairs and striping, landscape maintenance and window cleaning; the cost of insuring the Building of which the Premises form a part for the full cost of reinstatement against loss or damage on an "all risks" basis (including flood and earthquake for full replacement cost with no deduction for depreciation), boiler and machinery insurance, public liability insurance and loss of rental income insurance, and such other risks usually insured against by prudent owners of similar buildings in similar areas having regard to the location, age, nature and character of the Building, in such amounts and with such deductibles as are usually carried; accounting costs incurred in connection with the preparation of statements and opinions for the tenants and the reasonable cost of collecting payments of all amounts payable by tenants; professional and consulting fees and disbursements incurred in connection with the maintenance, repair, replacement, operation, administration, supervision and management of the Building; the cost of providing janitor and security service and security devices for the Premises and the Building such as are in keeping with maintaining the standard of a first-class office building; the cost of all rental

DOCSOTT: 751987\6

equipment and building supplies used by the Landlord for all such operation and maintenance or any other purpose; including, without limitation, all leasing fees and expenses incurred for the energy management equipment and systems and for security equipment and systems; amounts paid on service contracts; the amount of all salaries, wages and benefits paid to or on behalf of persons engaged in cleaning, supervision, maintenance, operating, management and repair, but excluding salaries of Landlord's head office personnel; any business taxes which may be imposed on the Landlord by reason of its operation of the Building or parts thereof; any management fees or charges of managing agents, or the Landlord's charges in lieu thereof if the Landlord undertakes management of the Building (which charges shall be an amount per year equal to five percent (5%) of the gross income, including all Net Rent, Additional Rent and parking and storage rent of the Building).

Total Maintenance Costs shall not include interest or fines for late payment by Landlord of Realty Taxes, nor interest on the Landlord's debt or Capital retirement of debt or amounts directly chargeable to capital account, nor shall they include costs for structural repairs to the Building and/or the Premises, or amounts directly chargeable to other tenants, ground rent, or costs for losses that are or should have been insured against in accordance with the provisions of this Lease, except as otherwise expressly provided herein.

In calculating Total Maintenance Costs, if less than one hundred (100%) percent of the Building is occupied by tenants (including the Tenant), then the actual amount of such Total Maintenance Costs shall be allocated to the tenants occupying the Building (including the Tenant) throughout the entire period for which Total Maintenance Costs is being calculated and the Tenant's Proportionte Share of such Total Maintenance Costs may be equitably and reasonably adjusted by the Landlord to achieve such allocation.

With respect to any such costs, expenses or amounts incurred on other parts of the Complex, the Landlord shall have the right from time to time to reasonably allocate and reallocate such costs, expenses and amounts among the Building and any other buildings from time to time erected on other parts of the Complex, and the amounts so allocated to the Building shall constitute part of the Total Maintenance Costs.

Total Maintenance Costs shall be adjusted annually within thirty (30) days of receipt by the Tenant of the Landlord's final statement of Total Maintenance Costs for the year (or if applicable, broken portion thereof), which the Landlord shall deliver to the Tenant within one hundred and eighty (180) days of the date of expiration of the calendar year. Any balance remaining unpaid or any excess paid shall, notwithstanding any termination (if applicable), be adjusted between the Landlord and the Tenant. For greater clarity, the Landlord shall provide an annual audited statement of Operating Costs prepared by an independent accounting firm. Failure to provide the audited statement within the above timeframe does not negate the parties obligation to readjust Additional Rent charges. Any claim for readjustment of Additional Rent must be made within six months of the delivery of the final operating statement to the Tenant.

(b)    "Proportionate Share" means the fraction which has as its numerator the Rentable Area of the Premises and has as its denominator the Total Rentable Area of the Building whether rented or not, subject only to the adjustments which follow. The Total Rentable Area of the Building shall be calculated as if the Building were entirely occupied by tenants renting whole floors, and shall be the total of the Rentable Area of all premises leased or set aside from time to time by the Landlord for leasing in the Building, and shall include the areas of all corridors, lobbies and other areas from time to time set aside by the Landlord for common use on all floors of the Building (excluding those common areas at the ground level of the Building, such as entrance lobbies and other areas from time to time designated by the Landlord). The calculation of the Total Rentable Area of the Building whether rented or not shall be determined upon completion of the Building and shall be adjusted from time to time to give effect to any structural or functional change affecting same. The calculation of the Rentable Area of the Premises shall be adjusted from time to time to give effect to any change therein during the Term. Provided that if any tenant, pursuant to its lease or otherwise with the Landlord's consent performs at its own cost any service or aspect of these items, the

DOCSOTT: 751987\6

4

cost of which would normally constitute a part of Total Maintenance Costs, then the Landlord shall alter the above fraction for such services or aspects as may be necessary to provide equitable distribution of Total Maintenance Costs among the tenants provided with the said services.

(c)    "Rentable Area" in accordance with current BOMA standards.

(d)    "Common Outside Areas and Facilities" means the walls, fences, gutters, drains, parking areas, shipping and receiving areas, driveways, walkways, flower beds, lawns and other areas situated within the limits of the Lands described in Schedule "A" attached hereto, ramps and other common outside areas in or about the said Building or Complex as may from time to time be designated by the Landlord for the use of or benefit of customers while visiting said Building or for the purpose of ingress to or egress from the demised Premises, including without limiting the generality of the foregoing, driveways, walkways, parking facilities and landscaping outside the limits of the Lands described in Schedule "A" attached hereto, but which are facilities servicing the Building and shared with owners and occupants of the lands and premises within the Complex.  With respect to parking areas, the Tenant, its employees, invitees and licensees shall not be entitled to the exclusive use of any parking space or spaces, but shall share and use the same reasonably in common with other tenants of the said Complex, their employees, invitees and licensees.

Notwithstanding the foregoing, the Landlord shall have the right (but shall not be obligated) during the Term of the Lease, to designate parts of the parking areas for the exclusive use of the Tenant, its employees, invitees or licensees or for the exclusive use of any other tenant or tenants of the Complex, their employees, invitees or licensees.

(e)    "Common Insides Areas" means the elevators, elevator shafts, stairs, passages and washrooms, lobbies, corridors and entrances used in common by the tenants at ground level and all other levels of the Building from time to time.

5.    **TENANT'S COVENANTS**

The TENANT COVENANTS with the Landlord:

(a)    To pay rent.

(b)    And to pay:

i)    for all costs, including engineering services, incurred or paid by the Landlord for the alterations or modifications to either the Premises or the Building necessitated by either the installation of Tenant's Improvements or the erection of any installations, modifications, alterations, additions or partitions made or caused to be made by the Tenant pursuant to the provisions of sub-paragraph(s) of this paragraph 5 including, without limitations, the removal, modification, and re-installation and redesign of the mechanical and electrical systems of the Building, together with any affected ceiling, wall or floor areas of the Premises or the Building made on or after Commencement Date;

ii)    all charges for telephone, electrical current and all other utilities supplied to or used in connection with the Premises, and the total cost of any replacement of electric bulbs, tubes, starters and ballasts in the Premises. If there are no separate meters for measuring the consumption of such utilities, the Tenant shall pay to the Landlord, in advance by monthly instalments as Additional Rent, such amount as may be reasonably estimated by the Landlord from time to time as the cost of such utilities for the Premises;

iii)    costs incurred as a result of the Tenant using the premises during periods other than 7:00 a.m. to 6:00 p.m. Monday to Friday, excluding public or statutory holidays, which at the discretion of the Landlord may be charged to the Tenant alone and not shared as part of the Operating Costs of the

5

Building, but which the Tenant shall pay to the Landlord, in addition to all other charges payable under this Lease, and which when received from the Tenant will be credited to Total Maintenance Costs.  In the event that the use of the Premises by the Tenant results in additional consistent twenty-four (24) hours, seven (7) days a week cooling requirements dedicated for the Tenant's specific use (i.e. data room), it shall be the Tenant's responsibility to ensure that the cooling units dedicated to the Tenant's existing use within the Premises are adequately maintained, serviced and are covered by a maintenance contract administered directly by the Tenant even though such dedicated equipment may form part of base building infrastructure.  Any additional costs associated with cooling the Premises beyond Normal Business Hours for all or part of the Premises shall be billed directly to the Tenant, (and not to any other tenants) and paid with the balance of Additional Rent based on the Tenant's usage per square foot.  For clarity, the Tenant shall only be billed for excess cooling charges applicable to the Premises.

(c)      And to pay to the Landlord as Additional Rent the Tenant's Proportionate Share of Total Maintenance Costs, within fifteen (15) days following receipt by the Tenant of written notice of the amount of such Tenant's Proportionate Share of Total Maintenance Costs for such year, notwithstanding that the year in question or the Term may have ended.

Any amounts payable by the Tenant to the Landlord pursuant to the provisions of this sub-paragraph (c) of this paragraph 5 shall be determined by the Landlord following the end of the calendar year for which such amounts are payable.  If only part of the final calendar year is included within the Term any such amounts payable for such period shall be pro-rated accordingly and shall be paid on the date the Term ends.  Any balance remaining unpaid or any excess paid shall, notwithstanding such termination, be adjusted between the Landlord and the Tenant within a reasonable period thereafter.

The Landlord shall be entitled at any time in any year, upon at least ten (10) days' notice to the Tenant, to require the Tenant to pay to the Landlord monthly, on the date for payment of monthly rental instalments, as Additional Rent, an amount equal to one-twelfth (1/12th) of the amount estimated by the Landlord to be the amount of the Tenant's Proportionate Share of Total Maintenance Costs for such year.  The Landlord shall be entitled subsequently during such year upon at least ten (10) days' notice to the Tenant, to revise its estimate of the amount of the Tenant's Proportionate Share of Total Maintenance Costs and the said monthly instalments shall be revised accordingly.  All amounts received under this provision in any year on account of the estimated amount of the Tenant's Proportionate Share of Total Maintenance Costs shall be applied in reduction of the actual amounts of the Tenant's Proportionate Share of Total Maintenance Costs for such year.  If the amount received is less than the actual Tenant's Proportionate Share of Total Maintenance Costs for such year, the Tenant shall pay any deficiency to the Landlord as Additional Rent within ten (10) days following receipt by the Tenant of notice of the amount of such deficiency.  If the amount received is greater than the actual Tenant's Proportionate Share of Total Maintenance Costs, the Landlord shall either refund the excess to the Tenant as soon as possible after the end of the year in respect of which such payments were made or at the Landlord's option shall apply such excess against any amount owing or becoming due to the Landlord by the Tenant.

JANITOR SERVICES

(d)      And that the Tenant shall bear the cost of janitor services for the Premises, including without limitation, all sweeping and cleaning of carpeting, floors, windows, blinds and furniture.  Such janitor services shall be performed for or supplied to the Tenant by employees of or contractors designated by the Landlord and the cost thereof shall be borne by the Tenant and is included in Total Maintenance Costs.  The Landlord shall not be responsible for any act of omission or commission on the part of the employees or contractors or any other person employed to perform or supply such janitor services, provided the janitorial services are separately bonded and insured for amounts consistent with industry standards for buildings similar to the buildings in the

5

Complex, and with financially secure bonding companies licensed to carry on business in Canada.

### BUSINESS TAX AND SCHOOL TAX

(e)    And to pay business and other governmental taxes, charges, rates, duties and assessments levied in respect of the Tenant's occupancy of the Premises or in respect of the personal property or business of the Tenant on the Premises as and when the same become due and also if the Tenant or any assignee or subtenant of the Tenant shall elect to have the Premises or any part thereof assessed for separate school taxes, the Tenant shall pay to the Landlord, as soon as the amount of the separate school taxes is ascertained, any amounts by which the separate school taxes exceed the amount which would have been payable for school taxes had such election not been made.

### REPAIR

(f)    And to repair, maintain and keep the Premises in good and substantial repair as a prudent tenant would do, normal wear and tear, damage by fire, lightening, tempest, explosion, acts of God or the Queen's enemies, structural defects and weaknesses, impact of aircraft, riots, and insurrection only excepted; and that the Landlord may enter and view the state of repair, and that the Tenant will repair in accordance with notice in writing, save for the exception to its obligations to repair mentioned above in this sub-paragraph (f); and that the Tenant will leave the Premises in good repair, save for the exception to its obligations to repair mentioned above in this sub-paragraph (f); provided that if the Tenant neglects to so maintain or to make such repairs promptly after notice, the Landlord may, at its option, do such maintenance or make such repairs at the expense of the Tenant, and in any and every such case the Tenant covenants with the Landlord to pay to the Landlord forthwith as Additional Rent all sums which the Landlord may have expended in doing such maintenance and making such repairs together with the Landlord's reasonable supervisory fees, charged at an hourly rate, as charged by landlord's in matters of this nature in the Greater Toronto Area; provided further that the doing of such maintenance or the making of any repairs by the Landlord shall not relieve the Tenant from the obligation to maintain and repair as set out herein.

### REPAIR WHERE TENANT AT FAULT

(g)    That if the Building, including the Premises, the elevators, boilers, engines, pipes and other apparatus (or any of them) used for the purpose of heating, ventilating or air-conditioning the Building, operating the elevators, or if the water pipes, drainage pipes, electrical lighting or other equipment of the Building or the roof or outside walls of the Building get out or repair or become damaged or destroyed through the negligence, carelessness or misuse of the Tenant, its servants, agents, employees or anyone permitted by it to be in the Building, or through it or them in any way stopping up or injuring the heating apparatus, elevators, water pipes, drainage pipes or other equipment of part of the Building, the expense of all necessary repairs, replacements or alterations shall be borne by the Tenant who shall pay the same to the Landlord forthwith on demand together with the Landlord's reasonable supervisory fee, charged at an hourly rate, as charged by landlord's in matters of this nature in the Greater Toronto Area.

### GLASS, LOCKS AND TRIMMINGS

(h)    That all glass, locks and trimming of the doors and windows in or upon the Premises and in or upon the interior or exterior walls or doors abutting or forming part of the Premises shall be kept whole or whenever broken due to negligence on the part of the Tenant, its employees or invitees, shall be immediately replaced or repaired under the direction and to the reasonable satisfaction of the Landlord and that such replacements and/or repairs shall be paid for by the Tenant.  Provided that all repairs to or replacements of any locks or windows shall only be done by a person specified  or approved by the Landlord, subject to the foregoing provisions with respect to payment for such repairs or replacement.

DOCSOTT: 751987\6

ASSIGNING OR SUBLETTING

(i)      That the Tenant will not, except as hereinafter permitted or as set out in Schedule "A", assign this Lease or sublet or franchise, license, or otherwise part with or share possession of the Premises, or any part thereof, without consent and which consent shall not be unreasonably withheld or delayed, provided nevertheless:

(1)      that the Landlord consents to the assignment, subletting, franchising, licensing, or parting with or sharing possession of the Premises as the case may be and in accordance with this Lease, the Tenant shall pay forthwith upon receipt to the Landlord any amount the Tenant receives from an assignee or sublessee or franchisee or licensee or other person with whom it shares or parts with possession of the Premises, as the case may be, as consideration for granting such assignment, sublet, franchise, license, or sharing of this Lease and the Premises, as the case may be, whether such payments are periodic or lump sum payments, or any additional amount that the Tenant receives from its sub-tenant, licensee, assignee, franchisee, or other persons with whom the Tenant shares possession of the Premises or parts with the premises or any part thereof, over the monthly Net Rent and Additional Rent hereby reserved; it being the express intention of the Landlord and the Tenant that any valuable consideration received by the Tenant upon any assignment, subletting, parting with or sharing possession of the Premises or any part thereof, or licensing, or franchising, as the case may be, in excess of the said monthly Net Rent and Additional Rent herein reserved shall be for the account of the Landlord and shall forthwith upon receipt by the Tenant be payable to the Landlord as Additional Rent, in addition to all other rent due to the Landlord hereunder and the Landlord shall have all rights of recovery with respect to same as the Landlord has for Net Rent and Additional Rent.

(2)      that the Landlord shall be entitled to withhold consent arbitrarily if the Landlord exercises the right hereinafter set out in clause (3) of this sub paragraph (i);

(3)      that if the Tenant requests the Landlord's consent to an assignment of this Lease or to a subletting, franchising, licensing, parting with or sharing possession of the whole or any part of the Premises to or with any person, firm or corporation, the Tenant shall submit to the Landlord the name of the proposed assignee, subtenant, franchisee, licensee or other person and such information as to the nature of its business and its financial responsibility and standing as the Landlord may reasonably require.  Upon the receipt of such request and information from the Tenant the Landlord shall have the right, exercisable in writing within fourteen (14) days after such receipt, to cancel and terminate this Lease if the request is to assign this Lease or to sublet, franchise, license or otherwise part with or share possession of all the Premises or, if the request is to assign, sublet, franchise, license or otherwise part with or share possession of a portion of the Premises only, to cancel and terminate this Lease with respect to such portion, in each case as of the date set forth in Landlord's notice of exercise of such right, which shall be neither less than sixty (60) nor more than one hundred and twenty (120) days following the service of such notice.  If the Landlord shall exercise such right the Tenant shall surrender possession of the entire Premises or the portion which is the subject of the right, as the case may be, on the date set forth in such notice in accordance with the provision of this Lease relating to surrender of the Premises at the expiration of the Term.  If this Lease shall be cancelled as to a portion of the Premises only, the Net Rent payable by the Tenant under this Lease as well as the Tenant's Proportionate Share shall be abated proportionately.  If the Landlord shall not exercise the right to cancel this Lease as above provided after the receipt of the Tenant's written request, the Landlord's consent to such request shall not be unreasonably withheld.  In no event shall any assignment, subletting,

DOCSOTT: 751987\6

franchising, licensing or otherwise parting with or sharing possession to which the Landlord may have consented or for which the Landlord's consent is not required, release or relieve the Tenant from its obligations fully to perform all the terms, covenants, and conditions of this Lease on its part to be performed.

(4)     all reasonable costs of the Landlord in respect of any such assignment or sublease or other similar dealing with this Lease or the Premises shall be forthwith paid upon demand as Additional Rent by the Tenant or its assignee, subtenant, franchisee or licensee, such reasonable costs of the Landlord shall include a Four Hundred Dollar ($400.00) administration fee, and the Landlord's solicitors reasonable legal fees;

(5)     the Tenant shall not advertise or allow the Premises or a portion thereof to be advertised as being available for assignment, sublease or otherwise without the prior written approval of the Landlord as to the form and content of such advertisement, which approval shall not be unreasonably withheld, provided that no such advertising shall contain any reference to the rental rate of the Premises.

(6)     notwithstanding anything in this Lease, the Landlord may arbitrarily withhold its consent to any assigning or subletting to an existing tenant or subtenant of the Building.

(7)     any proposed assignee, subtenant, franchisee, licensee or other person or corporation sharing or taking possession of the Premises shall execute an agreement with the Landlord in writing in a form acceptable to the Landlord to perform and be bound by all of the Tenant's obligations and covenants set out in the Lease;

(8)     no consent of the Landlord hereunder shall be effective unless given in writing by the Landlord, and no such consent shall be presumed from any act or omission of the Landlord and in particular by the acceptance by the Landlord of payment of any amount payable hereunder by any party other than the Tenant.  No consent by the Landlord shall constitute a waiver of the requirement to obtain the Landlord's consent to any subsequent or other assigning, subletting, franchising, licensing or parting with possession of the Premises.  No consent of the Landlord shall relieve the Tenant from any of its covenants under this Lease for the balance of the Term.

(9)     The foregoing restrictions on assigning and subletting shall apply to any mortgaging, charging or otherwise dealing with the Lease or the Premises for the purpose of securing any obligation of the Tenant, other than those contained or provided for in the Initial Order or any subsequent or other order of the Ontario Superior Court of Justice in respect of the CCAA proceedings governing the affairs of the Tenant.

RULES AND REGULATIONS

(j)     That the Tenant and its employees and all persons visiting or doing business with them on the Premises shall be bound by and will observe and perform the Rules and Regulations annexed hereto as Schedule "D" and any further and other Rules and Regulations of general application to the Building and/or its use made hereafter by the Landlord of which notice in writing shall be given to the Tenant and all such Rules and Regulations shall be deemed to be incorporated and form part of this Lease.  All Rules and Regulations shall be adopted by the Landlord acting reasonably and shall not be applied by the Landlord in an arbitrary or capricious manner.

USE OF PREMISES AND INSURANCE

(k)     That the Premises shall be used only for the purpose as set forth on Schedule "A" attached hereto and the Tenant will not carry on or permit to be carried on

9

therein any other trade or business and that the Tenant will not do or omit or permit to be done or omitted upon the Premises anything which shall cause the rate of insurance upon the Building to be increased or any insurance policy on the Building to be cancelled and if the Tenant shall be in breach of these provisions, the Tenant shall not only be responsible for all consequences flowing therefrom and shall indemnify the Landlord in respect thereof, but;

(i)      if the rate of insurance on the Building should be increased by reason of the use made of the Premises or by reason of anything done or omitted or permitted to be done or omitted by the Tenant, or by anyone permitted by the Tenant to be upon the Premises, the Tenant will pay to the Landlord on demand the amount of such increase which amount shall be recoverable as rent; and

(ii)     if the insurance policy upon the Building should be cancelled by the insurer by reason of the use or occupation of the Premises or any part thereof by the Tenant or by an assignee or subtenant of the Tenant or by anyone permitted by the Tenant to be upon the Premises the Landlord may at its option, determine the Term forthwith by leaving upon the Premises notice in writing of its intention so determining the Term and thereupon rent and any other payments for which the Tenant is liable under this Lease shall be apportioned and paid in full to the date of such determination and the Tenant shall immediately deliver up possession of the Premises to the Landlord and the Landlord may re-enter and take possession of the same.

Provided that subject to the provisions of the next above paragraph hereof, if the amount of any insurance premium payable by the Landlord in respect of the said Building in any calendar year shall exceed the amount of said insurance premium payable in the first calendar year of the Term hereby demised due to the fault of the Tenant, the Tenant shall pay its proportionate share of such increase forthwith upon its becoming due and payable.  If the Tenant fails to pay its proportionate share of such increase promptly, the Landlord may pay the same and such amount paid by the Landlord shall constitute rent in arrears under this Lease.

(iii)    The Tenant shall have access to the Premises, twenty-four (24) hours a day, seven (7) days a week.

OBSERVANCE OF LAW

(l)      In its use and occupation of the Premises, not to violate any and to comply with every law, by-law, ordinance, order, rule, regulation or requirement of any federal, provincial, or municipal government or any department, commission, board or officer thereof and with any application, regulation or order of the Canadian Underwriters Association, or anybody having a similar function, or of any liability or fire insurance company by which the Landlord or Tenant may from time to time be insured.

ASHES, REFUSE, ETC.

(m)     That the Tenant shall not use any outside garbage or other containers, nor allow any ashes, refuse, garbage or other loose or objectionable material to accumulate in or about the Premises and will at all times keep the Premises in a clean and wholesome condition.  The Tenant further covenants that the Tenant will not upon the termination of the Term leave upon the said Premises any rubbish or waste material and will leave the said Premises in a clean and tidy condition.

WASTE AND NUISANCE

(n)      Not to make or suffer any waste or cause or allow to be caused any damage, disfiguration or injury to the Premises or the fixtures and equipment thereof or permit or suffer any overloading of the floors thereof; and not to use or permit to be

9

used any part of the Premises for any dangerous, noxious or offensive trade, business or other activity, and not to cause or maintain any nuisance in, at or on the Premises.

ENTRY BY LANDLORD

(o)    Subject to the provisions of Schedule "A", to permit the Landlord or its agents to enter upon the Premises at any reasonable time, upon prior written notice to the Tenant, (except in the case of an emergency and from time to time for the purpose of inspecting and of making repairs, alterations, or improvements to the Premises, to the Building and the Tenant shall not be entitled to compensation for any inconvenience, nuisance or discomfort occasioned thereby; provided that the foregoing shall be done in such a manner as to interfere as little as is reasonable with the Tenant's business.

INDEMNITY

(p)    To indemnify and save harmless the Landlord against and from any and all claims arising from bodily injury or damage to tangible property by or on behalf of any person or persons, firm or firms, corporation or corporations to the extent arising from or out of the negligence of the Tenant or any assignee, subtenant, agent, contractor, servant, employee or licensee of the Tenant and against and from all costs, counsel fees, expenses and liabilities incurred in connection with any such claims or any actions or proceeding brought thereon.

FLOOR PLAN

(q)    That the Tenant acknowledges and agrees that the floor plan annexed hereto as Schedule "B" and whereon the Premises are identified is provided for ready reference only, and that in the event of any discrepancy between the Premises as referred to in the provisions of this Lease and the Premises as identified in the Schedule "B", the provisions of this Lease shall govern.

EXHIBITING PREMISES

(r)    Subject to the reasonable prior notice and compliance with the Tenant's security and confidentiality requirements, to permit the Landlord or its agents to exhibit the Premises to prospective tenants during Normal Business Hours of the last three (3) months of the Term.

ALTERATIONS

(s)    That the Tenant will not, without prior written consent of the Landlord, make or erect in or to the Premises any installations, alterations, additional partitions, repairs or improvements, or do anything which might affect the proper operation of the electrical, lighting, heating, ventilating, air-conditioning, sprinkler, fire protection or other systems; the Tenant's request for such consent shall be in writing and accompanied by an adequate description of the contemplated work, and where appropriate, working drawings and specifications therefor, the Landlord's out of pocket costs of having its architects, engineers or others examine such drawings and specifications shall be payable by the Tenant upon demand as Additional Rent; the Landlord may require that any or all work to be done hereunder be done by the Landlord's contractors or workmen or by contractors or workmen engaged by the Tenant but first approved by the Landlord, and all work shall be subject to inspection by and the reasonable supervision of the Landlord and shall be performed in accordance with all laws and any reasonable conditions (including a reasonable supervision fee of the Landlord to be paid by the Tenant) imposed by the Landlord and completed in a good and workmanlike manner and with reasonable diligence in accordance with the approvals given by the Landlord; any connection of apparatus to the Building, systems shall be deemed to be an alteration within the meaning of this paragraph; the Tenant shall, at its own cost and before commencement of any work, obtain all necessary building and other permits and keep same in force and the Tenant shall promptly pay all charges incurred by it for any work, labour, materials or services and shall forthwith discharge any liens resulting therefrom; if the Tenant fails to so discharge any liens, the Landlord may (but shall be under no obligation to) pay into court the amount required, or otherwise obtain a

DOCSOTT: 751987\6

discharge of the lien in the name of the Tenant and any amount so paid together with all costs incurred in respect of such discharge shall be payable by the Tenant to the Landlord forthwith upon demand plus interest on all such amounts at the rate hereafter set out in this Lease; the Tenant shall not create any mortgage, conditional sale agreement, or other encumbrance in respect of its leasehold improvements or trade fixtures nor shall the Tenant lease the same from any third party; notwithstanding anything herein contained, the Landlord may require that the Tenant, upon expiration of the Term, shall, at the Tenant's sole expense, restore the Premises to the condition that they were in prior to such alterations or additions, reasonable wear and tear excepted.

SIGNS

(t)    That except as otherwise permitted in this Lease, the Tenant will not paint, display, inscribe or affix any sign, picture, advertisement, notice, lettering or direction on any part of the outside or inside of the Building or Complex or on the Premises provided that at the request of the Tenant, the Landlord will cause a sign showing the name of the Tenant to be placed at the doors of the Premises leading to the public corridors and on the directory board on the ground floor of the Building; the colour, size, style, character and material of such signs shall be such as the Landlord shall determine and the cost of such signs shall be paid by the Landlord as set forth on Schedule "A" attached hereto.

NAME OF BUILDING

(u)    Not to refer to the Building or Complex by any name other than that designated from time to time by the Landlord nor use the name of the Building or Complex for any purpose other than that of the business address of the Tenant.

ENERGY CONSERVATION

(v)    To co-operate with the Landlord in conserving energy of all types in the Building and in the Complex including complying with all reasonable requests and demands of the Landlord made with a view to energy conservation; any reasonable expenditures made by the Landlord in an effort to promote energy conservation shall be added to Total Maintenance Costs in the year such expenditures are incurred or if such expenditures have not been charged fully in the year in which they are incurred, depreciation or amortization of such costs plus interest on the undepreciated or unamortized balance of such expenditures, at an annual rate equal to two percent (2%) above the prime rate shall be added.

CERTIFICATES

(w)    That each of the Landlord and the Tenant as the case may be  will at any time and from time to time, at no cost to other , and upon not less than five (5) days' prior notice, execute and deliver to the other or such other parties as designated by the requesting party, a statement in writing certifying that this Lease is unmodified and in full force and effect (or if modified stating the modifications and that the Lease is in full force and effect as modified), the amount of annual rental then being paid hereunder, the dates to which the same, by instalments or otherwise, and other charges hereunder have been paid, whether or not there is any existing default on the part of the Landlord of which Tenant has notice, and any other information reasonably required.

TENANT INSURANCE AND LANDLORD INSURANCE

(x)    The Tenant shall, at its expense, maintain in force during the Term and any renewal thereof:

i)    comprehensive general liability insurance against claims for personal injury, death or property damage arising out of all operations of the Tenant (including Tenant's legal liability, personal liability, property damage and contractual liability to cover all indemnities and repair obligations) with respect to the business carried on in and from the Premises, in amounts required by the Landlord and any mortgagee of the Building or any part

12

thereof from time to time but in no event less than FIVE MILLION DOLLARS ($5,000,000.00) per occurrence;

ii)     all risks direct damage insurance, covering all chattels and fixtures and all leasehold improvements, installations, additions and partitions made by the Tenant, the Landlord or existing in the Premises at the Tenant's expense, in an amount equal to the full replacement value thereof; and

iii)    such other forms, amounts and coverage of insurance as may be reasonably required by the Landlord and any mortgagee from time to time. All such insurance shall be with insurers and upon such terms and conditions as the Landlord reasonably approves, and copies of the certificate of insurance and renewal thereof shall be delivered to the Landlord; all such policies shall, with respect to 5.(x) i) above, include the Landlord, the Management Company and any mortgagees as additional insureds with respect only to liability arising from the operations of Tenant, and with respect to 5.(x) ii) above shall name the Landlord, the Management Company and any mortgagees as loss payees as their interests may appear, and shall contain a cross-liability clause protecting the Landlord in respect of claims by the Tenant as if the Landlord were separately insured; the Tenant shall make commercially reasonable efforts to include in all such policies a provision prohibiting the insurer from altering or cancelling the coverage without first giving the Landlord thirty (30) days' prior written notice thereof; if the Tenant fails to take out and maintain in force such insurance, the Landlord may do so and pay the premiums and the Tenant shall pay to the Landlord the amount of such premiums forthwith upon demand.  If both the Landlord and the Tenant have claims to be indemnified under any such insurance, the indemnity shall be applied first to the settlement of the Landlord's claim and the balance, if any, to the settlement of the Tenant's claim.

y)      The Landlord shall obtain and keep in force during the Term of this Lease a policy of Comprehensive General Liability Insurance in an amount of not less than Five Million Dollars ($5,000,000.00) per occurrence for bodily injury and property damage combined and shall insure Landlord with Tenant as additional insured against liability arising out of the use and occupancy or maintenance of the Building.

z)      The Landlord shall obtain and keep in force during the Term of this Lease a policy or policies of property insurance covering loss or damage to the Building and improvements, but not the Tenant's personal property, fixtures, equipment, or tenant improvements, in the amount of the full replacement cost thereof, as the same may exist from time to time, providing protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, plate glass, and other such perils as Landlord deems advisable or may be required by a lender having a lien on the Building.

aa)     Each policy required to be obtained by the parties hereunder shall (i) be issued by insurers whose policies are valid in the jurisdiction in which the Building is located (ii) with respect to property insurance, contain a provision that the insurer waives its rights to subrogation as described in paragraph below; and (iii) contain an undertaking by the insurer to endeavour to notify the additional insured or loss payees in writing not less than thirty (30) days prior to any cancellation thereof.  Each party agrees to deliver to the other upon request, certificates from the insurance company evidencing the existence of such insurance.  Each party shall cause replacement certificates to be delivered to the other party at the other party's request upon the expiration of any such policy or policies.

bb)     The Tenant and Landlord each hereby release and relieve the other and waive their entire right of recovery against the other, for the direct or consequential loss or damage arising out of or incident to the perils

covered by proper property insurance maintained by such party, or required to be maintained by such party under this Lease, whether due to negligence of the Landlord or the Tenant, or their agents, employees, contractors and/or invitees. If necessary all property insurance policies required under this Lease shall be endorsed to so provide.

cc)     Neither party shall be liable for special, indirect, incidental or consequential damages except in the case of bodily injury or death or property damage for which the Landlord or the Tenant is found liable.

SALES TAX

(dd)    Notwithstanding any other provisions of this Lease to the contrary, the Tenant shall pay to the Landlord an amount equal to any and all goods and services taxes, sales taxes, value added taxes, or any other taxes imposed on the Landlord with respect to Net Rent, Additional Rent or any other amounts payable by the Tenant to the Landlord under this Lease whether characterized as a goods and services tax, sales tax, value added tax, or otherwise (and shall hereinafter be referred to as "Sales Taxes"). It is the intention of the parties that the Landlord shall be fully reimbursed by the Tenant with respect to any and all Sales Taxes payable by the Landlord. The amount of such Sales Taxes so payable by the Tenant shall be calculated by the Landlord in accordance with the applicable legislation and shall be paid to the Landlord at the same time as the amounts to which such Sales Taxes apply are payable to the Landlord under the terms of this Lease or upon demand at such other time or times as the Landlord from time to time determines. Notwithstanding any other provision in this Lease to the contrary, the amount payable by the Tenant under this paragraph shall be deemed not to be Net Rent or Additional Rent, but the Landlord shall have all of the same remedies for and rights of recovery of such amount as it has for recovery of rent under this Lease.

SMOKING

(ee)    Not to permit or allow its servants, agents, employees, invitees, licensees, guests or anyone for whom the Tenant is in law responsible to smoke cigarettes, cigars, pipes or any other tobacco product in or about the Common Outside Areas and Facilities or the Common Inside Areas.

6.   **TAXES**

(a)     In this Lease:

i)      "Municipal Taxes" includes all taxes, rates, duties, levies and assessments whatsoever whether municipal, parliamentary or otherwise, charged upon the Lands described in Schedule "A" hereto annexed or upon any buildings, erections or installation thereon annexed or upon any buildings, erection or installation thereon on therein, including underground parking garage, or charged upon the Landlord on account thereof, including Municipal Taxes or local improvements or similar charges, and school taxes (whether for public or separate schools) but does not include business taxes that may hereafter be levied upon or in respect of the Tenant's business at the Premises whether or not the same are collectible by the Landlord or a charge on said Lands. Where parking, shipping and receiving, landscaped and other common areas forming part of the Lands described in Schedule "A" hereto are assessed separately from the Premises and other leasehold space on the said Lands, "Municipal Taxes" shall also include taxes in the year in question levied or charged upon or attributable to the assessed value of the same and any business taxes or tax in lieu thereof now or hereafter levied upon the Landlord in respect of such parking, shipping and receiving, landscaped or other common areas. With respect to any such Municipal Taxes and similar taxes on lands adjoining the Lands described in Schedule "A", the Landlord shall have the right from time to time to reasonably allocate and reallocate same among the Building and all such adjoining lands, and the

DOCSOTT: 751987\6

amount so allocated to the Building and the Lands described in Schedule "A" shall constitute Municipal Taxes.

ii)     "Year" shall mean the calendar year.

(b)     The Tenant covenants to pay the Tenant's Proportionate Share of Municipal Taxes, if any, during each Year of the Term to the Landlord as Additional Rent within ten (10) days following receipt by the Tenant of written notice of the amount owing notwithstanding that the Year in question or the Term of this Lease may have ended.  If in any Year after initial determination of the Tenant's Proportionate Share of Municipal Taxes for that Year by the Landlord, such amount is increased by reason of the issue of supplemental assessment notices or tax or both, or other variation in the basis upon which the Tenant's Proportionate Share of Municipal Taxes is calculated, the Landlord shall, as often as necessary, recalculate the Tenant's Proportionate Share of Municipal Taxes for that Year and if the amount of the Tenant's Proportionate Share of Municipal Taxes for that Year is more than originally calculated, the Tenant covenants to pay such excess (together with the original calculated amount of the Tenant's Proportionate Share of Municipal Taxes for that Year if not already paid) as Additional Rent as aforesaid.

(c)     The Landlord shall be entitled in any year, upon at least ten (10) days notice to the Tenant to require the Tenant to pay monthly, during the twelve (12) months of each Year, on the date for payment of monthly rental instalments and in addition thereto, as Additional Rent, an amount equal to one-twelfth (1/12th) of the amount estimated by the Landlord to be the amount of the Tenant's Proportionate Share of Municipal Taxes for such Year.  The Landlord shall be entitled subsequently during the year upon at least ten (10) days' notice to the Tenant to revise its estimate of the amount of the Tenant's Proportionate Share of Municipal Taxes and the said monthly payment accordingly.  All amounts received under this provision in any Year on account of the estimated amount of the Tenant's Proportionate Share of Municipal Taxes shall be applied in reduction of the actual amount of the Tenant's Proportionate Share of Municipal Taxes for such Year.  If the said amounts received are less than the actual amount of the Tenant's Proportionate Share of Municipal Taxes, the Tenant shall pay the deficiency to the Landlord as Additional Rent within ten (10) days following receipt by the Tenant of notice of the amount of the deficiency.  If the said amounts received are greater than the actual amount of the Tenant's Proportionate Share of Municipal Taxes, the Landlord shall refund the excess to the Tenant within a reasonable time after the end of the year in respect of which the payments were made.

(d)     If the Term shall commence, end or be determined on any day other than the first or last day of a Year, the Tenant shall be liable only for a portion of the amount of the Tenant's Proportionate Share of Municipal Taxes for such Year, determined on a per diem basis by dividing the amount of the Tenant's Proportionate Share of Municipal Taxes for such Year by 365 and multiplying the quotient so obtained by the number of days in the Term falling in the Year in question.  If however, during the Year in question, more than one assessed value or more than one mill rate shall have been attributed to the Premises, the Year shall be divided into periods in each of which one assessed value and one mill rate are applicable, and the Landlord shall determine the portion of the amount of the Tenant's Proportionate Share of Municipal Taxes for such Year to be attributed to each such period which shall be a fraction (in the ratio that the number of days in the period bears to the number of days in the Year) of the amount of the Tenant's Proportionate Share of Municipal Taxes which would have occurred had this Lease and the assessed value and mill rate for the period been in effect for the entire Year.  Where a period falls entirely within the Term of this Lease, the portion of the amount of the Tenant's Proportionate Share of Municipal Taxes so attributed thereto shall be borne entirely by the Tenant; where a period falls partly within and partly outside the Term of the Lease, the portion of the Tenant's Proportionate Share of Municipal Taxes so attributed thereto shall be apportioned between the Landlord and the Tenant on a per diem basis; where a period falls entirely outside the Term, the portion of the amount of the Tenant's proportionate Share of Municipal Taxes so attributed thereto shall be borne entirely by the Landlord; where a period falls partly within and partly outside the Term of the Lease, the portion of the Tenant's

DOCSOTT: 751987\6

15

Proportionate Share of Municipal Taxes so attributed thereto shall be apportioned between the Landlord and the Tenant on a per diem basis.

(e)    Intentionally deleted

(f)    With respect to any Municipal Taxes and any similar taxes on other parts of the Building and the Lands, the Landlord shall have the right from time to time to reasonably allocate and reallocate such Municipal Taxes and any portion or portions of the Lands remaining vacant or not built upon, and the amounts so allocated to the Building shall constitute Municipal Taxes.

(g)    Notwithstanding the foregoing;

(i)    If the Tenant or assignee, sublessee, franchisee, licensee, or other occupant of the Premises elects or causes the Premises to be assessed for separate school taxes, the Tenant shall pay to the Landlord forthwith upon demand the amount, if any, by which Municipal Taxes have been increased on account of the foregoing;

(ii)    If the Tenant or assignee, sublessee, franchisee, licensee, or other occupant of the Premises installs or has installed on its behalf leasehold improvements, fixtures or equipment that cause the Premises to be assessed or taxed at a higher rate or amount than other premises in the Building, the Tenant shall pay to the Landlord forthwith upon demand the amount, if any by which Municipal Taxes have been increased on account of the foregoing;

(iii)    If the Premises are separately assessed, the Landlord may calculate the Tenant's Proportionate Share of Municipal Taxes based on such separate assessment together with the Tenant's Proportionate Share of Municipal Taxes on all Common Inside Areas and Common Outside Areas and Facilities if the Landlord deems it more appropriate to do so.

7.    **RECOVERY OF ADJUSTMENTS**

The Landlord shall have (in addition to any other right or remedy) the same rights and remedies in the event of default by the Tenant in payment of any amount payable by it pursuant to paragraph 6, or any other provision of this Lease, as the Landlord would have in the case of default in payment of rent.

8.    **QUIET ENJOYMENT**

The Landlord covenants that it has the right to make this Lease for the Term aforesaid and that if Tenant shall pay the rent and perform all of the covenants, terms, conditions and agreements of this Lease to be performed by Tenant, the Tenant shall, during the Term hereby created, freely, peaceably and quietly occupy and enjoy the full possession of the Premises without molestation or hindrance by the Landlord or any party claiming through or under Landlord, subject to the provisions of this Lease.

9.    **LIENS**

The Tenant will not suffer or permit during the Term any construction or other liens for work, labour, services or materials ordered by it or for the cost of which it may be in any way obligated to attach to the Premises,  the Building or the Lands upon which the Building is situated and that whenever and so often as any such liens shall attach or claims therefor be filed the Tenant shall within fifteen (15) days after the Tenant has notice of the claim for lien obtain the discharge thereof by payment or by giving security or in such other manner as is or may be required or permitted by law.

DOCSOTT: 751987\6

10.    **LANDLORD'S COVENANTS**

The Landlord further covenants with the Tenant:

TAXES

(a)    To pay, subject to the provisions of paragraph 6 hereof, all municipal property taxes (including local improvement rates), rates, duties and assessments that may be charged, levied, rated or assessed against the Premises.  The Tenant shall not be responsible for any interest or fines for late payment.

LIGHTING, HEATING, VENTILATING AND AIR-CONDITIONING

(b)    To provide lighting to the Premises and the Building of which the Premises form a part including the Common Inside Areas and the Common Outside Areas and Facilities and to provide heating, ventilating and air-conditioning to the Premises to an extent sufficient to maintain therein a reasonable temperature at all times during Normal Business Hours, which are defined as between 7:00 a.m. and 6:00 p.m., Monday through Friday, excluding public or statutory holidays, except during the making of repairs but should the Landlord make default in providing such services, it shall not be liable for any other or greater damages than the monies (if any) expended by the Tenant in providing such services for the Premises and in no event shall the Landlord be liable for indirect or consequential damages or personal discomfort or illness suffered by the Tenant, its servants, agents or employees or any other persons using the Premises arising out of any default of the Landlord in providing lighting, heating, ventilating and/or air-conditioning of the Premises except to the extent caused by the wilful misconduct or negligence of the Landlord or those for whom the Landlord is responsible.

CARETAKING

(c)    To maintain and keep clean all public areas in the Building, but, except as to the obligations to cause such maintenance and cleaning to be done, the Landlord shall not be responsible for any act of omission or commission or for any negligence on the part of the person or persons employed to perform such work, provided they are independently bonded.

ACCESS

(d)    To permit the Tenant and the employees of the Tenant and all persons lawfully requiring communication with them to have the use at reasonable times in common with others of the main entrance of the Building and the stairways and corridors leading to the Premises; provided that, subject to the rights of access and use of the Tenant under the provisions of Schedule "A",  the Landlord may maintain reasonable security measures in the Building to prevent unauthorized persons entering the Premises and the Building after Normal Business Hours which are defined as between 7:00 a.m. and 6:00 p.m. Monday through Friday, excluding public or statutory holidays.

WASHROOMS

(e)    To permit the Tenant and the employees of the Tenant in common with others entitled thereto to use the washrooms in the Building.

ELEVATORS

(f)    To furnish, during Normal Business Hours, as hereinbefore defined, except when repairs are being made, elevator service and to permit the Tenant and the Tenant's employees and invitees to have free use of such

DOCSOTT: 751987\6

elevator service in common with others entitled thereto, but the Tenant and such employees and all other persons using such service shall do so at their sole risk and under no circumstances shall the Landlord be held responsible for any damage or injury happening to any person while using the elevator or occasioned to any person while using the elevator or any of its appurtenances except to the extent caused by the wilful misconduct or negligence of the Landlord or those for whom the Landlord is responsible; the use of such elevator and all deliveries to the Premises shall be in the manner and at the times designated from time to time by the Landlord.

INSURANCE

(g)     To insure the Property in accordance with Section 5 hereof.

(h)     To indemnify and save harmless the Tenant against and from any and all claims arising from bodily injury or damage to tangible property by or on behalf of any person or persons, firm or firms, corporation or corporations to the extent arising from or out of the negligence of the Landlord or any assignee, agent, contractor, servant, employee or licensee of the Landlord and against and from all costs, counsel fees, expenses and liabilities incurred in connection with any such claims or any actions or proceeding brought thereon.

## 11.     COMMON AREAS - EXPANSION AND ALTERATION

(a)     Notwithstanding anything in this Lease contained, the Landlord shall have the right, subject to the provisions of Schedule "A", to enter into the Premises and to bring workmen and materials thereon to make such additions, alterations, improvements, installations and repairs, and the Landlord may from time to time decide, in respect of the Building, the Complex, the Lands and the lands adjoining same, the Common Inside Areas, the Common Outside Areas and Facilities, or any part thereof, including the walkways, parking areas, shipping and receiving areas, driveways, and any other improvements thereto or erections thereon (except to the Premises), including the right to change the size, shape and location thereof, erect buildings thereon or sell or lease part or parts thereof.   The Landlord may cause such reasonable obstructions and interference with the use and enjoyment of the Building, the Complex, the Lands, Common Inside Areas or Common Outside Areas and Facilities as may be necessary for the purposes aforesaid and may interrupt or suspend the supply of electricity, water or other utilities or services when necessary and until the additions, alterations, improvements, installations or repairs have been completed, and there shall be no abatement in rent nor shall the Landlord be liable by reason thereof provided the Landlord's actions are not negligent, and provided all such work is done as expeditiously as reasonably possible.   The Landlord shall have the right to use, install, maintain and repair pipes, wires, ducts, shafts or other installations in, under or through the Premises for or in connection with the supply of any services to the Premises or any other premises in the Building, the Complex or on the Lands and the lands adjoining same.

Without limiting the generality of the foregoing, the Landlord hereby reserves the right at any time and from time to time to make changes or revisions in its plans for the said Lands, the Building, the Complex, the Common Inside Areas or the Common Outside Areas and Facilities, as aforesaid, and particularly the right to construct other buildings and improvements on the Lands.   The Landlord shall have the right to specify the date on which any such changes become part of the said Lands, the Building, the Complex, the Common Inside Areas and Facilities, as the case may be, for all purposes.

DOCSOTT: 751987\6

(b)     The Landlord shall have the right to issue Rules and Regulations from time to time respecting the use of the Common Inside Areas and Common Outside Areas and Facilities including without limiting the generality of the foregoing Rules and Regulations designating the means by which merchandise may be moved to and from the storage or loading areas and all such Rules and Regulations shall be binding upon the Tenant.

(c)     The manner in which the Common Outside Areas and Facilities and the Common Inside Areas are maintained and the expenditures incurred in connection therewith shall be at the reasonable sole discretion of the Landlord.

## 12.     FIXTURES

The Tenant may remove its fixtures; provided that all installations, alterations, additions, partitions and fixtures other than trade or tenant's fixtures in or upon the premises, whether placed there by the Tenant or the Landlord shall become the Landlord's property without compensation therefor to the Tenant and shall not be removed from the Premises at any time either during or after the Term; and provided further that if the Landlord so directs by written notice to the Tenant, the Tenant shall upon the termination of the Term, at the expense of the Tenant, promptly remove any or all of the installations, alterations, additions, partitions and fixtures placed in the Premises after the Commencement Date by or at the request of the Tenant and the Tenant shall make good any damage caused by such removal or the Landlord may make good such damage and the Tenant shall pay the cost thereof on demand which shall be recoverable as rent, reasonable wear and tear excepted.

## 13.     INJURY TO PREMISES AND BUILDING

If during the Term, the Premises or the Building shall be damaged or destroyed by fire, lightning, tempest, explosion, Acts of God or the Queen's enemies, structural defects or weaknesses, impact of aircraft, riots or insurrection or other casualty then the following provisions shall have effect:

(a)     If the Premises or other parts of the Building shall be so badly injured as to render the Premises unfit for the Tenant's use and occupancy and shall be incapable, with reasonable diligence, of being repaired within one hundred and eighty (180) days from the happening of such injury then either the Landlord or the Tenant may declare the Term to be forthwith terminated and the Tenant shall immediately surrender the Premises to the Landlord and shall pay Net Rent and Additional Rent only to the time of such injury, and the Landlord may re-enter and repossess the Premises discharged of this Lease and may remove all persons therefrom.

(b)     If the Premises or other parts of the Building shall be capable, within reasonable diligence, of being repaired and rendered fit for the Tenant's use and occupancy within one hundred and eighty (180) days from the happening of such injury as aforesaid then the Landlord shall diligently undertake all necessary repairs, and;

i)      if the damage is such as to render the Premises wholly unfit for occupancy during the process of such repairs, the rent thereby reserved shall not run or accrue after such injury or while the process of repair is going on and the rent shall recommence immediately after such repairs have been completed;

ii)     if the damage is so slight that the Premises are partially fit for occupancy and use for the purpose of the Tenant's business, until such damage has been repaired the Net Rent and Additional Rent hereby reserved shall abate only in proportion to the extent that possession and enjoyment are interfered with and until such possession and enjoyment are fully restored.

DOCSOTT: 751987\6

(c)  The certificate of the Landlord's Architect as to whether any such injury can or cannot be repaired within a period of one hundred and eighty (180) days from the happening of any such injury shall be final and binding upon the parties hereto as to the facts so certified.

(d)  Irrespective of whether the Premises or any portion thereof are injured as aforesaid, in the event that twenty-five percent (25%) or more, as determined by the Landlord's Architect, of the Building is injured by any cause whatsoever, and if such area cannot be rebuilt or made fit for the purposes of the tenants thereof within 180 days from the happening of such injury, the Landlord may at its option terminate this Lease by giving to the Tenant, within thirty (30) days after such injury, notice of termination requiring vacant possession of the Premises sixty (60) days after delivery of the notice of termination and thereupon rent and any other payment for which the Tenant is liable under this Lease shall be apportioned and paid to the date on which vacant possession is given and the Tenant shall deliver up possession of the Premises to the Landlord in accordance with such notice of termination.

(e)  If there is damage or destruction to the Premises or the Building and if this Lease is not terminated pursuant hereto, the Landlord, in performing its repairs as required hereby, shall not be obligated to repair or rebuild in accordance with the plans or specifications for the Premises or the Building as they existed prior to such damage or destruction; rather, the Landlord may repair or rebuild in accordance with any plans and specifications chosen by the Landlord and approved by the Tenant acting reasonably, and provided that the Tenant's use of and access to the Premises and the general overall quality of the Building are not materially or detrimentally affected by any difference in plans or specifications of the Premises or the Building.

## 14.  DAMAGE TO PROPERTY

The Landlord shall not be liable nor responsible in any way for any loss or damage or injury to any property belonging to the Tenant or to employees of the Tenant or to any other person while such property is in or upon the Premises, in the Building or at the Complex unless such loss, damage or injury shall have been caused by the negligence of the Landlord or of its employees, servants or agents; but notwithstanding the foregoing, in no event shall the Landlord be liable for indirect or consequential damage or for any damage to any such property caused by the Building or from the water, steam or drainage pipes or plumbing works of the Building or from any other place or quarter or for any damage caused by or attributable to the conditions or arrangement of any electric or other wiring or for any damage caused by anything done or omitted by any other tenant.

## 15.  IMPOSSIBILITY OF PERFORMANCE

Intentionally Deleted.

## 16.  DEFAULT OF TENANT

It is hereby expressly agreed, that if and whenever the rent hereby reserved, or any part thereof, shall not be paid on the day appointed for payment thereof, and if such default continues and is not remedied by the Tenant within ten (10) days of written notice from the Landlord, or in case the Term shall be taken in execution or attachment for any cause whatsoever, then and in each such case, it shall be lawful for the Landlord at any time thereafter to re-enter the Premises or any part thereof in the name of the whole and the same to have again, re-possess and enjoy as of its former estate, anything herein contained to the contrary notwithstanding.

If the Tenant shall fail to comply with any of its covenants hereunder, except the covenant to pay rent (including without limitation Additional Rent), the Landlord may

DOCSOTT: 751987\6

give to the Tenant notice in writing stating the default with reasonable sufficient particulars and requiring it to be remedied, and if such default is not remedied by the Tenant within fifteen (15) days after the receipt of such notice, or such longer period as may be reasonably necessary to remedy such default provided the Tenant is acting diligently in prosecuting such remedial activity, then at the option of the Landlord, the Term may be terminated, and the Landlord may in accordance with legal requirements applicable thereto forthwith re-enter upon the Premises or any part thereof in the name of the whole and re-possess and enjoy the same as of its former estate, anything contained in any statute or law to the contrary notwithstanding.

17.    **BANKRUPTCY**

Except for the current proceeding commenced January 14, 2009 under the CCAA order, wherein Nortel was granted certain initial creditor protection pursuant to an order issued by the Ontario Superior Court of Justice on the same date, if the Premises shall be used by any person other than the Tenant or for any purpose other than that as set out herein or in the annexed Rules and Regulations, without the written consent of the Landlord, or in case the Term or any of the goods and chattels of the Tenant shall be at any time seized in execution or attachment by any creditor of the Tenant or the Tenant shall make any assignment for the benefit of creditors or become bankrupt or insolvent or take the benefit of any Act now or hereafter in force for bankrupt or insolvent debtors or (if the Tenant is a company) an order shall be made for the winding-up of the Tenant, then in any such case, unless a trustee in bankruptcy confirms this Lease pursuant to the *Bankruptcy & Insolvency Act*, this Lease shall, at the option of the Landlord cease and determine and the Term shall immediately be determined and the next ensuing three (3) months rent shall immediately become due and payable and the Landlord may re-enter and take possession of the Premises as though the Tenant or other occupant or occupants of the Premises was or were holding over after the expiration of the Term without any right whatever, but the Tenant shall continue to be liable to the Landlord for the rent hereby reserved for the balance of the Term.

18.    **WAIVER OF EXEMPTIONS**

The Tenant hereby covenants and agrees with the Landlord that in consideration of the Premises and of the leasing and letting by the Landlord to the said Tenant of the Lands and the Premises mentioned above for the Term hereby created (and it is upon that express understanding that these presents are entered into) notwithstanding anything contained in the *Commercial Tenancies Act* or in any other statute which may hereafter be passed to take the place of the said Act or the amendment of same, none of the goods or chattels of the said Tenant at any time during the continuance of the Term hereby created on the demised Premises, shall be exempt from levy by distress for rent in arrears by the Tenant as provided for by any section or sections of the said Act or any amendment or amendments thereto, and that upon any claim being made for such exemption by the Tenant or on distress being made by the Landlord, this covenant and agreement may be pleaded as an estoppel against the Tenant in any action brought to test the right to the levying upon any such goods as are named as exempted in said section or sections or amendments or amendments thereto, said Tenant waiving as the Tenant hereby does, every benefit that could or might have accrued to the Tenant under and by virtue of the said section or sections of the said Act or any amendment of amendments thereto but for this covenant.

19.    **RIGHT OF RE-ENTRY**

The Tenant further covenants and agrees that upon the Landlord becoming entitled to re-enter upon the Premises under any of the provisions of this Lease, the Landlord in addition to all other rights, shall have the right to enter the Premises as the agent of the Tenant in accordance with applicable legal requirements, without being liable for any prosecution therefore, and to re-let the Premises as the agent of the Tenant, to take possession of any furniture or other property on the Premises and to sell the same at public or private sale with or without notice and to apply the proceeds of such sale and any rent derived from re-letting the Premises upon account of the rent hereby reserved, and the Tenant shall be liable to the Landlord for the deficiency, if any.

DOCSOTT: 751987\6

20.    **RIGHT OF TERMINATION**

The Tenant further covenants and agrees that, subject to the provisions of Section 17 hereof, upon the Landlord becoming entitled to re-enter upon the Premises under any of the provisions of this Lease, the Landlord, in addition to all other rights, shall have the right to terminate forthwith this Lease and the Term by leaving upon the Premises notice in writing of its intention so to do, and thereupon Net Rent and Additional Rent and any other payments for which the Tenant is liable under this Lease shall be computed, apportioned and paid in full to the date of such termination of this Lease, and the Tenant shall immediately deliver up possession of the Premises to the Landlord, and the Landlord may re-enter and take possession of the same.  Any such re-entry and any such termination shall be without prejudice to the Landlord's right to sue for damages and pursue its other remedies at law and hereunder.

21.    **NON-WAIVER**

Any condoning, waiving, excusing or overlooking by the Landlord of any default, breach or non-observance by the Tenant at any time or times of or in respect of any covenant, proviso or condition herein contained shall not operate as a waiver of the Landlord's rights hereunder in respect of any subsequent default, breach or non-observance, nor so as to defeat or affect in any way the rights of such party herein in respect of any such subsequent default or breach.

22.    **WAIVER**

Intentionally Deleted.

23.    **CHATTELS**

In the case of removal by the Tenant of the goods and chattels of the Tenant from the Premises the Landlord may follow the same for thirty (30) days in the same manner as is provided for in the Commercial Tenancies Act, R.S.O. 1990, c. L7.

24.    **LANDLORD MAY PERFORM COVENANTS**

If the Tenant shall fail to perform any of the covenants or obligations of the Tenant under or in respect of this Lease, the Landlord, subject as hereinafter provided, may from time to time, in its discretion, perform or cause to be performed any of such covenants or obligations, or any part thereof, and for such purpose may do such things as may be requisite, including without limiting the foregoing, entering upon the Premises and doing such things upon or in respect of the Premises or any part thereof as the Landlord may consider requisite or necessary or making, on behalf of the Tenant, any payment which the Tenant is obligated to make under the provisions of this Lease (including all expenses incurred and expenditures made by or on behalf of the Landlord under this paragraph any other amounts owing by the Tenant to the Landlord under the provisions of this Lease, other than rent) shall, unless otherwise provided in this Lease, be forthwith paid by the Tenant to the Landlord upon receipt of written notice requesting same and if not so paid shall bear interest at the same rate as referred to in paragraph 3 of this Lease, from the date the same were incurred, made or due (particulars as to which shall be given by the Landlord to the Tenant) and all amounts owing to the Landlord and referred to by this paragraph shall be deemed to be Additional Rent and recoverable by the Landlord in the same manner as if they were rent in arrears and with like powers of distress.  Provided that, except in cases of emergency, the Landlord before exercising its rights under this clause to perform any obligation or covenant of the Tenant shall give to the Tenant fifteen (15) days notice of the default which the Landlord intends to remedy and if the Tenant within said period forthwith remedies or takes such action as may be necessary to commence to remedy said default and thereafter pursues and completes same with all reasonable diligence the Landlord shall not proceed under this clause and the matter shall be deemed not to be a default.

DOCSOTT: 751987\6

25.    **OVERHOLDING**

　　　　If without any further written agreement the Tenant shall continue to occupy the Premises and pay rent after the expiration of the Term, the Tenant shall be a monthly tenant at a monthly rental equal to one hundred and fifty percent (150%) of the annual rental payable in respect of the last year of the Term and otherwise on the terms and conditions herein set out, except as to length of tenancy.  It is further understood and agreed by the Tenant that the maximum overholding period shall be ninety (90) days.

26.    **NO COLLATERAL AGREEMENTS**

　　　　It is understood and agreed that this Lease contains the entire agreement and understanding made between the parties hereto, and that there is no representation, warranty, collateral agreement or condition, expressed or implied, affecting this lease or supported hereby other than such as may be expressly contained in or implied from the provisions hereof and that this Lease may not be modified except as herein expressly provided or except by subsequent agreement in writing of equal formality hereto executed by the Landlord and the Tenant.

27.    **ARBITRATION**

　　　　intentionally deleted

28.    **SUBORDINATION**

　　　　This Lease is subject and subordinate to all ground or underlying leases, if any, and to all mortgages (including any deed of trust and mortgage security bonds and all indentures supplemental thereto) (the "Prior Liens") which may now or hereafter (provided a non-disturbance agreement is obtained in connection with any lien entered into hereafter) affect either the freehold Lands on which the Building is situated or such leases and the parcel or parcels of leasehold land constituted thereby, as the case may be, and to all renewals, modifications, consolidations, replacements and extensions thereof.  The Tenant agrees to execute promptly any certificate in confirmation of such subordination as the Landlord may request and hereby constitutes the Landlord, the agent or attorney in fact of the Tenant for the purpose of executing any such certificate and of making application at any time and from time to time to register postponements of this Lease in favour of any such mortgage in order to give effect to the provisions of this paragraph 28.

29.    **REGISTRATION**

　　　　The Tenant shall be permitted to register notice of this Lease on title to the Lands in a form approved by the Landlord, acting reasonably.  The Tenant agrees to remove any notice filed by it upon vacating or termination of the lease at its sole cost and expense.

30.    **NOTICE**

　　　　Any notice or request herein provided for or given hereunder if given by the Landlord to the Tenant shall be sufficiently given if mailed at a time of no actual or reasonably anticipated disruption in regular postal service, by prepaid registered post addressed to the Tenant at the Premises or if delivered in a sealed envelope addressed to the Tenant at the Premises and any notice or request herein provided for or given hereunder if given by the Tenant to the Landlord shall be sufficiently given if mailed or delivered as aforesaid addressed to Kanco-Airways Ltd., c/o TransGlobe Property Management Services, 5925 Airport Road, Mississauga, Ontario, L4V 1W1, fax number: 905-629-7750.

Notice to the Tenant shall be given if delivered in accordance herewith or the terms herein, if given to the Tenant at the following address:

DOCSOTT: 751987\6

| | |
|---|---|
| Nortel Networks: | With a copy to: |
| 2221 Lakeside Blvd. | D. John Naccarato |
| MS 991-01-A10 | Ogilvy Renault, LLP |
| Richardson, TX 75082 | 1500-45 O'Connor Street |
| Attn. Real Estate Dept | Ottawa, Ontario K1P 1A4 |
| Ph 972-685-8887 | Fax # (613) 230-5459 |
| FAX 972-684-3868 | e-mail jnaccarato@ogilvyrenault.com |

With a further copy to

Ernst & Young Inc.
Ernst & Young Tower
222 Bay Street
PO Box 251
Toronto, Ontario
M5K 1J7
Attention: Tom Ayres
FAX   1-416-943-3300
email: tom.c.ayres@ca.ey.com

Any notice or request shall be conclusively deemed to have been given if mailed as aforesaid on the third (3rd) business day next following the day on which it was so mailed, and if delivered at the time of delivery.  Either party may at any time give notice in writing to the other of any change of address of the party giving such notice and from and after the giving of such notice the address therein specified shall be deemed to be the address of such party for the purpose of giving such notices or requests thereafter.

31.    **CAPTIONS**

The captions appearing in this Lease have been inserted as a matter of convenience and for reference only and in no way define, limit or enlarge the scope of meaning of this Lease or any of its provisions.

32.    **EFFECT OF LEASE**

This indenture and everything herein contained shall extend to and bind and may be taken advantage of by the respective heirs, executors, administrators, successors, and assigns, as the case may be, of each and every one of the parties hereto, subject to the granting of consent by the Landlord as provided in paragraph 5 (i) to any assignment or sub-lease, and where the Tenant consists of more than one person or is a female or a corporation, the provisions hereof shall be read with all grammatical changes thereby rendered necessary and all covenants on the part of the Tenant shall be deemed joint and several.

33.    **ASSIGNMENT BY LANDLORD**

If the Landlord sells the Building or leases the entire Building under one Lease, or so sells or leases the Lands on which the Building is located or any part thereof, or assigns this Lease, and to the extent that the purchaser, lessee or assignee is responsible for compliance with the covenants and obligations of the Landlord hereunder, the Landlord without further written agreement shall be discharged and relieved of liability under the said covenants and obligations.

34.    **ADDITIONAL RENTALS**

All amounts that are or shall become payable by the Tenant to the Landlord pursuant to this Lease and whether hereinbefore expressed to be payable as Additional Rent or otherwise than as rent shall be and it is hereby agreed that they and each of them shall be payable as Additional Rent as set forth on Schedule "A" attached hereto.

DOCSOTT: 751987\6

35. **PARKING**

The Landlord agrees to provide the Tenant with parking in accordance with the terms set out in Schedule "A".

Parking charges are for the use of the said parking spaces only and the Landlord shall not be responsible for any theft, loss or damage to the Tenant's vehicles whatsoever on the surface parking stalls, or for any injury to the Tenant or others in the surface parking areas.

The use by the Tenant and the Tenant's agents, employees, invites, licensees and others doing business with the Tenant, of any unreserved surface parking spaces located on the Common Outside Areas and Facilities shall not at any time exceed or be disproportionate to the Tenant's Proportionate Share of the Total Rentable Area of the Building, without the prior written approval of the Landlord, which approval may be arbitrarily withheld.

The Landlord shall have the right to establish reasonable Rules and Regulations governing the use of the parking spaces from time to time and the Tenant hereby agrees to observe and abide by all such Rules and Regulations.

36. **RELOCATION**

Intentionally Deleted.

37. **NET LEASE**

The Tenant acknowledges that it is intended and agreed that this Lease is a completely carefree Net Lease for the Landlord and that the Landlord is not responsible during the Term or any renewals thereof for any costs, charges, expenses or outlays of any nature relating to the Premises, the Building the Common Inside Areas and Common Outside Areas and Facilities,  or the contents thereof, or otherwise except as specifically set forth in this Lease, and that the Tenant will pay all charges, taxes, impositions, costs and expenses of every kind relative to the Premises, and the Tenant covenants with the Landlord accordingly.

38. **SCHEDULES**

Schedules "A", "B", "C" and "D" annexed hereto form part of this Lease. In the event of any conflict between Schedule "A"" hereto and the body of this Lease or any other schedule hereto, then all provisions of Schedule "A" shall govern, and in the event that the subject matter of any provisions of Schedule "A" deal with matters also dealt with in the body of this Lease or any other schedule hereto, the provisions of Schedule "A" shall supersede and govern.

39. **TIME OF ESSENCE**

Time shall be of the essence of this Lease.

40. **LAW**

This Lease shall be governed by and construed in accordance with the laws of the Province of Ontario.

41. **PLANNING ACT**

This Lease is subject to compliance with the provisions of the Planning Act of Ontario, (RSO 1990, C.T13) as amended from time to time.

42. **OPTION TO RENEW**

The Tenant's option to renew this Lease is set forth on Schedule "A" attached hereto.

43.   **LANDLORD'S WORK**

The Landlord's Work is set forth on Schedule "C" attached hereto.

44.   **OVERDUE PAYMENTS**

In the event that any payments required to be made by the Tenant to the Landlord hereunder are not paid when due, then interest at the rate of the prime commercial lending rate of the Royal Bank of Canada plus three and one-half (3 ½%)percent per annum, calculated monthly, and not in advance, from the date when such overdue amounts were due to the date when such overdue amounts are paid shall be payable by the Tenant to the Landlord, and such interest shall be collected as Additional Rent with the next installment of rent thereafter falling due hereunder, or at the time the overdue amounts are paid, whichever is the earlier, but nothing herein contained shall be deemed to suspend or delay the payment of any amount of money or charge at the time the same becomes due and payable hereunder or limit any other remedy of the Landlord.

45.   **PRE-AUTHORIZED DEBIT PLAN**

Intentionally Deleted.

46.   **FORCE MAJEURE**

Except as herein otherwise expressly provided, if and whenever and to the extent that the Landlord shall be prevented delayed or restricted in the fulfillment of any obligations hereunder in respect of the supply or provision of any service or utility, the making of any repair, the doing of any work or any other thing by reason of strikes or work stoppages or being unable to obtain any material, service, utility or labour required to fulfill such obligation (except where such inability is for financial reasons) or by reason of any statute, law or regulation of or inability to obtain any permission from any governmental authority having lawful jurisdiction preventing, delaying or restricting such fulfillment (except a building permit or occupancy permit in respect of the Leased Premises), or by reason of other unavoidable occurrence, the time for fulfillment of such obligation shall be extended during the period in which such circumstance operates to prevent, delay or restrict the fulfillment thereof and the Tenant shall not be entitled to compensation for any inconvenience, nuisance or discomfort thereby occasioned.  This provision shall be deemed to operate in the reciprocal for the benefit of the Tenant save for the payment of monies owing under this Lease.

47.   **ENVIRONMENTAL LAWS**

For the purpose of this Lease "Environmental Laws" shall mean all applicable federal, provincial, municipal or local laws, statutes, regulations, by-laws and orders, directives and decisions rendered by any ministry, department or administrative or regulatory agency.

(a)   The Tenant represents and warrants that it has inspected the Premises and is satisfied with its condition.

(b)   The Tenant will carry on business upon and with respect to the Premises in compliance with all permits, licenses, registrations and approvals necessary to carry on its business, including, without limitation, all applicable environmental permits, licenses, consents, approvals, orders and authorizations as required under applicable Environmental Laws.

(c)   The business which the Tenant intends to conduct upon and with respect to the Premises is not in breach of any applicable covenant, restriction or Environmental Laws currently in force.

(d)   If the Tenant receives any notice, citation, summons or order or learns of any complaint which has been filed with respect to the business carried on by the Tenant on

the Premises concerning any alleged violation of any Environmental Laws or with respect to alleged failure to have any environmental permits or approvals required in connection with the conduct of its business, or any alleged violation with respect to compliance with the terms or conditions of any environmental permits or approvals in connection with the conduct of its business, the Tenant shall forthwith notify the Landlord thereof in writing.

(e)    On the termination of this Lease for any reason the Tenant will surrender the Premises to the Landlord in the condition in which they are required by this Lease to be kept by the Tenant and as closely as is reasonably possible to their condition at the Lease Commencement Date, reasonable wear and tear excepted and damage by fire and casualty excepted, all at the Tenant's expense.

(f)    The Tenant shall indemnify and hold the Landlord harmless from and against any claims, demands, liabilities, losses, damages and expenses suffered by the Landlord arising out of or in connection with any and all environmental liabilities relating to the activities of the Tenant upon or with respect to the Premises.

(g)    The Tenant acknowledges and agrees that the Landlord may cause periodic environmental inspections of the Premises to ensure that the Tenant is complying with the environmental requirements of all governmental authorities having jurisdiction and the cost of said environmental inspections incurred by the Landlord shall be paid for by the Tenant upon demand if it is established that the Tenant is in default of its environmental obligations under this Lease.

48.    **CONSENTS, APPROVALS, DETERMINATIONS**

Any consent, permission or approval of either party required or requested under this Lease shall not be unreasonably withheld or delayed.  Adequate reasons in writing shall be given if consent is refused.  Any provision in this Lease which requires a calculation, allocation or determination by the Landlord shall be made by the Landlord acting in a commercially reasonable manner.  The Landlord shall act reasonably and as a prudent owner in exercising all rights and so as not to interfere more than reasonably necessary under the circumstances with the Tenant's use and enjoyment of the Premises.

49.    **COUNTERPARTS**

This Lease may be executed in counterparts and by facsimile or electronic transmission, and when each party has executed and delivered a counterpart, each such counterpart shall be deemed to be an original and all such counterparts when taken together shall constitute one and the same indenture.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

DOCSOTT: 751987\6

IN WITNESS WHEREOF the Landlord and the Tenant have executed these presents.

SIGNED, SEALED AND DELIVERED
      in the presence of:

**KANCO-AIRWAYS LTD.**
                      (the "Landlord")

Per: _____
Name:        Daniel Drimmer
Title:         President

I have authority to bind the Corporation

**NORTEL NETWORKS LIMITED**
                      (the "Tenant")

Per: _____
Name:
Title:

Per:_____
Name:
Title

I/We have the authority to bind the Corporation

DOCSOTT: 751987\6

28

**SCHEDULE "A"**

| | | |
|---|---|---|
| 1. | Date: | September 14, 2009 |
| 2. | Tenant: | Nortel Networks Limited |
| 3. | Lands: | That certain parcel or tract of land and premises situate, lying and being in the City of Mississauga, in the Regional Municipality of Peel, being composed of those parts of Lot 5, Concession 7, East of Hurontario Street, in the said City, designated as Parts 5, 6, 9, 10, 11 and 12 on plan of survey in the Land Registry Office for the Registry Division of Peel (No. 43) as Plan 43R-7479. |
| 5. | Building: | 5945 Airport Road, Mississauga, Ontario |
| 6. | Premises: | Second (2nd) Floor, Suite 290 and Third (3rd) Floor, Suite 360 |
| 7. | Term: | One (1) and one half (1.5) years commencing on the first day of December, 2009 and ending on the last day of May 31, 2011. |
| 8. | Net Rent: | During the period, commencing on the first day of December, 2009 to and including the last day of May, 2011, the annual Net Rent of Three Hundred and Twenty Three Thousand, Two Hundred and Twenty Six Dollars ($323,226.00) payable in equal monthly installments of Twenty Six Thousand, Nine Hundred and Thirty Five Dollars and Fifty Cents ($26,935.50), in advance, on the first day of each month calculated on the basis of Nine Dollars ($9.00) per square foot per annum of the Rentable Area. |
| 9. | Rentable Area: | Approximately 35,914 square feet of rentable area, comprising of 12,655 square feet located on the 2nd floor, being Suite 290 and 23,259 square feet located on the 3rd floor, being Suite 360. |
| 10. | | Deposit:    The Landlord shall receive the amount of $73,809.00 (inclusive of GST and parking charges) from the Escrow Funds contemplated in Section 20 of this Schedule A to be applied towards the last month's rent of the Term or the last month of any renewal term exercised thereof. |
| 11. | Security Deposit: | Not Applicable. |
| 12. | Use: | Office use only. |
| 13. | Sign: | The Landlord, at its own expense, shall install building standard signage with the Tenant's name in the directory board located in the lobby of the Building and near the entrance door to the Premises. |
| 14. | Additional Rent: | The Tenant shall pay, as Additional Rent, its proportionate share of Municipal Taxes and Total Maintenance Costs with respect to the Premises, which may be estimated by the Landlord subject to final year-end adjustments.  The Landlord estimates |

28

Municipal Taxes and Total Maintenance Costs to be $12.33 per square foot, per annum for the year 2009.

Total Maintenance Costs shall not include:

- Cost of Landlord's head office personnel (salary, wages only of on-site personnel);
- Cost of structural repairs to the Building including the Premises (including foundation, concrete floors, structural frame and roof system);
- amounts directly chargeable to other tenants;
- ground rent (if any), amortization and interest or any capital retirement of debt affecting the property;
- any loss or damage to the Building or any personal injury for which the Landlord was obligated to be insured under the Lease;
- any cost or expense which is normally treated in accordance with generally accepted accounting principles as being of a capital nature;
- capital taxes;
- all fines, suits, claims, demands, costs, charges and expenses for which Landlord is liable by reason of the negligent or wilful act or omission of Landlord or those for whom it is in law responsible;
- all work to the Complex or Land made necessary by Landlord's non-compliance with governing codes, etc. relating to the construction of the Complex, but excluding any alterations required as a result of changes to the law;
- cost of repairing latent structural defects in the Building and structural changes to the parking structures; and
- With respect to Municipal Taxes, any interest or fines for late payment.

15.    Conditions of Complex, Building and Premises and
Leasehold Improvements:        The Landlord covenants and warrants that the Building and base Building systems serving the Premises (including without limitation, the structural, electrical, mechanical, plumbing, life safety and fire suppression (including ground and second floor sprinklers), elevator, and HVAC systems) together with all works to be undertaken by the Landlord pursuant to Section 21 herein shall, on or before the Commencement Date, be in good working condition, comply with building code requirements and all applicable laws and be of sufficient capacity to service the Building, including the Premises, for their intended uses. In addition, the Landlord represents and warrants, to the best of its knowledge, that (i) it is not aware of any structural or major repairs required to be effected to the Complex, Building, including the Premises and the parking areas; (ii) it has not received any notice of non-compliance with laws, etc. in respect of the Complex, Building or Land which has not been remedied; (iii) the Land complies with all

DOCSOTT: 751987\6

applicable laws; (iv) the Building and equipment therein do not contain formaldehyde foam insulation, asbestos, polychlorinated biphenyls or excess quantities of radon gas, and the Premises and the Buildings are free from environmental contamination. Prior to occupancy as set out in Section 6 herein, Landlord, at its expense, shall leave the Premises in a clean and vacuumed condition; and (v) it has obtained all third party consents necessary to the its entering to this Lease.

| | | |
|---|---|---|
| 16. | Utilities: | Included in Additional Rent. |

17. Parking:

The Tenant shall have the right during the Term and any renewal thereof to occupy up to 240 unreserved surface parking spaces at a rate of $25.00 per month, per stall, plus P.S.T. and G.S.T.

Such cost shall be subject to increase from time to time throughout the Term and any renewal thereof upon thirty (30) days written notice to the Tenant.

For each parking space requested by the Tenant, a transponder shall be provided with a refundable deposit of $30.00 for each transponder. With the return of a transponder the deposit shall be returned to the Tenant.

18. Option to Renew:

The Landlord hereby grants the Tenant three (3) options to renew the Lease for six (6) months each on the same terms and conditions, (save as to any free rent periods, further renewals, or landlord's work) subject to Tenant notifying the Landlord in writing of its intent to renew three (3) months in advance.

19. Right to Surrender:

The Landlord shall, at anytime during the Term or any renewal thereof, upon the Tenant providing five (5) months written notice to the Landlord, grant the Tenant the right to return either floor to the Landlord without penalty thereby reducing the square footage as described in Section 9 herein.

The Tenant agrees that it shall readjust with the Landlord any amounts that may be payable to the Landlord, for any Additional Rent charges which may arise with respect to the floor being surrendered up to and including the respective termination date, upon completion by the Landlord of the applicable year(s) final realty tax and operating statements. The Tenant shall, upon vacating, leave the respective floor in a clean, vacant, broom-swept condition.

The Tenant agrees and acknowledges it shall not be entitled to repudiate this Lease.

20. Special Provisions:

a)    The Tenant has a credit in the amount of Four Hundred and Ninety-Seven Thousand Dollars ($497,000.00), which shall be applied (i) to the last month's rent Deposit contemplated in Section 10 of this Schedule "A",  and (ii) with the balance to be applied towards Net Rent and Additional Rent commencing December 1, 2009 until exhausted, which shall be paid from the funds held by the Escrow

Agent pursuant to the Lease Termination Agreement dated September 8, 2009 in respect of the 195 The West Mall lease. The Landlord acknowledges and confirms that payment of the said sum of Four Hundred and Ninety-Seven Thousand Dollars ($497,000.00) to the Escrow Agent is deemed for all purposes to be a credit against all Rent payable by the Tenant under this Lease.

b) The Tenant shall make commercially reasonable efforts to include in the Approval and Vesting Order approving Tenant's entry into this Lease of language satisfactory to the Landlord, acting reasonably, that the Tenant will not repudiate this Lease.  The Landlord and Tenant agree that this Lease and the Lease Termination and New Lease Agreement being entered into contemporaneously with this Lease is conditional upon the Approval and Vesting Order containing such non-repudiation language satisfactory to the Landlord, acting reasonably.

c)      The Tenant shall be provided occupancy free of Net Rent and Additional Rent upon execution contemporaneously of this Lease and a termination agreement of its existing lease, in order to prepare the space and make it ready for its business use.

21.  Landlord's Work:              See Schedule "C".

22.  Publicity:                        The Landlord shall not in any advertising, sales promotion materials, press releases or any other publicity matters use the name "NORTEL," "Northern Telecom," "Nortel Technology Limited," or the name of any Nortel company, any variation thereof or language from which the connection of said names may be implied, unless the Tenant in its sole discretion, grants Landlord prior written permission to do so.

23.  Confidentiality:               The Landlord recognizes that Tenant may have confidential or proprietary information in the Leased Premises and that Landlord, its agents, and employees may have access to such information while in the Leased Premises.  Landlord, on behalf of itself and its agents and employees agrees not to utilize or disclose such confidential or proprietary information except to the extent disclosure is required by law.

24.   Environment:                 The Landlord shall be responsible, at its expense, for the cost of clean up or any other remedial measures for any contamination to the Land or Building existing prior to the commencement of the Lease or caused at any time by any person other than Tenant.  Landlord shall save harmless and indemnify Tenant for any such costs, fines, etc.  Landlord to the best of its knowledge and belief warrants it is not aware of any such contamination.

Tenant shall not be responsible for: (i) compliance with any laws relating to the use, generation, storage, discharge or disposal of any hazardous or toxic substances or wastes of any petroleum products or

by-products by and parties other than Tenant, its employees or agents; (ii) remediation of any environmental contamination except to the extent such contamination results from the negligent acts or wilful misconduct of Tenant, its employees or agents; (iii) with respect to loss or damage to the Premises, the Building or the Land, any loss, damage or diminution in the value of the Premises, the Building or the Land resulting from the use, generation, storage, discharge or disposal of any hazardous or toxic substances or wastes of any petroleum products or by-products by Tenant, its employees or agents which is in excess of the fair market value of the Premises, the Building or the Land (provided that this limitation does not affect Tenant's liability under the Lease, if any, for clean-up costs or for damages arising from bodily injury); or (iv) clean-up or remediation of the Premises, the Building or the Land in excess of the requirements mandated by any governmental agency or court of competent jurisdiction.

25. Remedies (Tenant):    The Landlord shall act reasonably and as a prudent owner in exercising all rights and so as not to interfere more than is reasonably necessary under the circumstances with Tenant's use and enjoyment of the Premises.

DOCSOTT: 751987\6

**SCHEDULE "B"**

**FLOOR PLAN OF PREMISES**



DOCSOTT: 751987\6

## SCHEDULE "B"

## FLOOR PLAN OF PREMISES



**SCHEDULE "C"**

**LANDLORD'S WORK**

The Landlord shall maintain the Building and Land in a good state of repair, and in compliance with applicable laws, regulations, ordinances and codes.

The Landlord shall provide to code the Tenant with Building standard wood double doors entrance with one glass sidelight to the Premises. The Landlord will do the painting and cleaning in private offices and patch and repair as needed. Landlord will replace any work stations missing from the Premises depicted on the attached furniture layout plan on or before the Commencement Date, and all work stations to be wired, cabled and energized. Landlord to supply cot for health station.  Otherwise the Tenant shall take possession of the Premises in an "as is", "where is" condition including all furnishings and equipment existing as outlined below. Tenant shall take reasonable care not to damage the included furniture, but will not be responsible to maintain, repair or replace any items of included furniture, and not be liable for any damage to or loss of any items of included furniture. Nortel will leave in place the included furniture at the end of the Term. The parties acknowledge that Tenant will be bringing onto the Premises items of Tenant furniture and equipment which will remain Tenant's property,  be maintained, repaired and replaced by Tenant at its own cost, and be removed by Tenant at the end of the Term.

**Furniture included below "as is":**

**Suite 290 –**
Sixty-three (63) workstations with pedestals and one (1) blue cubicle chair for each workstation.

Eighteen (18) private offices including one (1) U-shaped office desk, one (1) black office desk chair and two (2) blue guest chairs for each office.  Office #2R27 and #2R38 in addition to the furniture described herein includes one (1) round table with two (2) blue guest chairs.

Sixteen (16) six (6) foot bookcases

Fifteen (15) whiteboards

Fifteen (15) corkboards

| | |
|---|---|
| Large Conference Room (2R51) – 10 tables, 29 chairs, 2 whiteboards | |
| Small Conference Room (2R57) – 1 conference table, 1 small table, 17 chairs, 5 whiteboards and 1 projection screen | |
| Kitchen (2R49) – 1 fridge, 4 microwaves, 1 dishwasher, 2 tables | |
| First Aid Room (2R56) – 1 table, 1 chair, 1 bookcase | |
| Riser Room (2R48) – 2 racks | |

**Suite 360 –**

One Hundred and Thirty-Three (133) workstations with pedestals and one (1) blue cubicle chair for each workstation.

Twenty-Three (23) private offices including one (1) U-shaped office desk, one (1) black office desk chair and two (2) blue guest chairs for each office.  Office #3R05 in addition to the furniture described herein includes one (1) round table with two (2) blue guest chairs.

Twenty-Three (23) six (6) foot bookcases

Twenty-Two (22) whiteboards

Twenty-Three (23) corkboards

| |
|---|
| Large Presentation Room (3R09) – 7 tables, 31 chairs, 3 whiteboards |
| Conference Room (3R10) – 6 tables, 30 chairs, 2 whiteboards |
| Kitchen (3R141) – 2 fridges, 2 microwaves, 1 dishwasher, 4 tables, 11 chairs |
| Coffee Station (3R10A) – 1 bar fridge, 1 dishwasher, 1 microwave |
| Server Room – 2 racks, 1 table, 1 chair, 3 wire storage racks |

DOCSOTT: 751987\6

**SCHEDULE "D"**

**RULES AND REGULATIONS**

1.    **INGRESS AND EGRESS**

The sidewalks, entrances, elevators, stairways, corridors and fire escapes of the Building and the Complex shall not be obstructed by the Tenant or used for any purpose other than for ingress and egress to and from the Premises.  The Tenant shall not place or allow to be placed in the hallways, corridors or stairways any waste paper, dust, garbage, refuse or anything else whatsoever that would obstruct them or tend to make them appear unclean or untidy.  Nothing shall be thrown by the Tenant or its employees out the windows or doors or down the passages or sky lights of the Building or the Complex.

2.    **HEAVY EQUIPMENT**

Business machines, filing cabinets, heavy merchandise, or other articles liable to overload, injure or destroy any part of the Building or the Complex shall not be taken into it without the written consent of the Landlord and the Landlord shall in all cases retain the right to prescribe the weight and proper position of all such articles and the times and routines for moving them into or out of the Building or the Complex the cost of repairing any damage done to the Building or the Complex by the moving or keeping of any such articles on the Premises shall be paid by the Tenant.

3.    **OTHER TENANTS**

The Tenant and its employees shall not in any way interfere with or annoy other occupants of the Building or the Complex or those having business with them.

4.    **NOTICE OF DEFECTS**

The Tenant shall give the Landlord or its agent prompt written notice of any accident to or any defect in the plumbing, heating, ventilating and air-conditioning, mechanical or electrical apparatus or any other part of the Building which has come to the attention of the Tenant.

5.    **VEHICLES AND ANIMALS**

No bicycles or other vehicles and no dog or other animal or bird shall be brought into or kept in the Building, or the Complex.

6.    **SUPPLIES**

Furniture, effects and supplies shall not be taken into or removed from the Premises except at such time and in such manner as may be previously approved by the Landlord.

7.    **NOISE**

The Tenant will not make or permit any improper noise in the Building and will not place any radio or television antenna on the roof or in any part of the inside or outside of the Building or the Complex other than the inside of the Premises; and will not operate or permit to be operated any musical or sound producing instrument or device inside or outside the Premises which may be heard outside the Premises; and will not operate any electrical device from which may emanate waves which may interfere or impair radio or television broadcasting or reception from or in the Building, the Complex or elsewhere.

8.    **SLEEPING QUARTERS**

No one shall use the Premises for sleeping quarters.

DOCSOTT: 751987\6

9.    **SECURITY**

The Landlord shall have the right to (a) require all persons entering and leaving the Building or the Complex at hours other than Normal Business Hours, which are defined as between 7:00 a.m. and 6:00 p.m. Monday through Friday, as the Landlord may reasonably determine to identify themselves to a watchman by registration or otherwise and to establish their right to enter or leave and (b) to exclude or expel any peddler or beggar at any time from the Premises, the Building or the Complex.

10.    **WASHROOMS**

The Tenant and its employees shall use such water closets, other water apparatus and washroom facilities in the Building as shall be from time to time designated by the Landlord for use in connection with the Premises.  The water closets and other water apparatus shall not be used for any purpose other than those for which they are constructed and no sweepings, rubbish, rags, ashes or other substances shall be thrown therein.  Any damage resulting by misuse shall be borne by the Tenant or those for whom in law it is responsible.  The Tenant shall not let water run unless in actual use.

11.    **WINDOW COVERINGS**

Vertical blinds for all exterior windows, uniformly standard as specified and arranged for by the Landlord at the Landlord's expense.

12.    **LOCKS**

The Tenant shall not place any additional lock upon any door of the Building or the Complex.

13.    **COOKING**

The Tenant shall not permit any cooking in the Premises without the written consent of the Landlord.

14.    **PARKING**

The Tenant and its employees, invitees, visitors, and others doing business with it at the Premises shall not block the driveways or parking stalls in the parking lot of the Building or of the Complex by parking their vehicles in such a manner that such vehicles restrict the free flow of traffic or prevent other vehicles from entering designated parking stalls or in a manner in which one vehicle is using or hindering the use of more than one parking stall.  There shall be no overnight parking whatsoever without the prior written approval of the Landlord.  Any vehicles violating these rules with respect to parking will be ticketed and/or towed away by the Landlord at the expense of the Tenant.

The Tenant will at the commencement of the Term and from time to time during the term of this Lease at the Landlord's request, provide the Landlord with a list of all employees of the Tenant together with the make, model, year and current licence number of such employee's vehicle or vehicles.

DOCSOTT: 751987\6

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al*.

Court File No:  09-CL-7950

---

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**TWENTY-SECOND REPORT OF THE MONITOR**
**DATED SEPTEMBER 25, 2009**

---

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada  M5B 2M6

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5764832