# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- X

                                   :

*In re*                                  :      Chapter 11

                                   :

Nortel Networks Inc., *et al.*,[1]          :      Case No. 09-10138 (KG)

                                   :

                   Debtors.           :      Jointly Administered

                                   :

                                   :      **Hearing date:** October 15, 2009 at 2:00 PM (ET) (proposed)

                                   :      **Objections due:** October 14, 2009 at 4:00 PM (ET) (proposed)

------------------------------------------------------- X

## DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING DEBTORS' ENTRY INTO THE STALKING HORSE ASSET SALE AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES AND BID PROTECTIONS, (C) APPROVING THE NOTICE PROCEDURES AND THE ASSUMPTION AND ASSIGNMENT PROCEDURES, (D) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL AND (E) SETTING A DATE FOR THE SALE HEARING, AND (II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF DEBTORS' METRO ETHERNET NETWORKS BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of

orders pursuant to sections 105, 107(b)(1), 363 and 365 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 6004, 6006, 9014 and 9018 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 9018-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

District of Delaware (the "Local Rules") (i) (a) authorizing the Debtors' entry into that certain

asset sale agreement dated as of October 7, 2009 among NNI, Nortel Networks Limited

("NNL"), Nortel Networks Corporation ("NNC") and certain other entities identified therein as

sellers (the "Sellers") and Ciena Corporation as purchaser ("Ciena" or the "Stalking Horse

Purchaser") for the sale of certain assets of the Sellers' Metro Ethernet Networks business (the

"MEN Business") as described therein (the "Purchased Assets") as a "stalking-horse" sale

agreement (as appended hereto as Exhibit A, the "Stalking Horse Agreement"), (b) authorizing

and approving the bidding procedures (as appended as Exhibit 1 to the Bidding Procedures Order

(as defined herein), the "Bidding Procedures") and the Bid Protections (as defined below),

including granting administrative expense status to the Bid Protections payable by the Debtors to

the Stalking Horse Purchaser, (c) approving the form and manner of sale notice (the "Notice

Procedures") and the procedures as set forth herein for the assumption and assignment of the

Assumed and Assigned Contracts (as defined below, and together with the Purchased Assets and

such other assets and contracts as described in the Stalking Horse Agreement, the "Assets"), (d)

authorizing the Debtors to file certain documents under seal and (e) setting the time, date and

place for a hearing (the "Sale Hearing") to consider the sale of the Assets and the assumption and

assignment of the Assumed and Assigned Contracts (the "Sale"), (ii) authorizing and approving

(a) the sale of the Assets, free and clear of all liens, claims, and encumbrances, pursuant to

section 363 of the Bankruptcy Code, except as set forth in the Stalking Horse Agreement and (b)

the assumption and assignment of the Assumed and Assigned Contracts pursuant to section 365

of the Bankruptcy Code; and (iii) granting them such other and further relief as the Court deems

just and proper.  In support of this Motion, the Debtors rely on the declaration of George Riedel

(the "Riedel Declaration"), attached hereto as Exhibit B.  In further support of this Motion, the

Debtors respectfully represent as follows:

**Jurisdiction**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 107(b)(1), 363

and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9014 and 9018 of the Bankruptcy

Rules, and Rules 6004-1 and 9018-1 of the Local Rules.

**Background**

**A.      Introduction**

1.      On January 14, 2009 (the "Petition Date"), the Debtors other than NN CALA (as

defined below) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On January 15, 2009, this Court entered an order of joint administration pursuant

to Rule 1015(b) of the Bankruptcy Rules that provided for the joint administration of these cases

and for consolidation for procedural purposes only [D.I. 36].

4.      Also on the Petition Date, the Debtors' ultimate corporate parent NNC, NNI's

direct corporate parent NNL (together with NNC and their affiliates, including the Debtors,

"Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an

application with the Ontario Superior Court of Justice (the "Canadian Court") under the

Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors continue to manage

their properties and operate their businesses under the supervision of the Canadian Court.  Ernst

& Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign

representative for the Canadian Debtors (the "Monitor"), has filed petitions in this Court for

recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the

Bankruptcy Code.  On January 14, 2009, the Canadian Court entered an order recognizing these

chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA.  On February

27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main

proceedings under chapter 15 of the Bankruptcy Code.  In addition, at 8 p.m. (London time) on

January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European

affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of

individuals from Ernst & Young LLC (collectively, the "Joint Administrators").  On May 28,

2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the

"French Court") (Docket No. 2009P00492) ordered the commencement of secondary

proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation

proceedings during which NNSA continued to operate as a going concern for an initial period of

three months, which period was subsequently extended.  On October 1, 2009, pursuant to a

motion filed by the Joint Administrators, the French Court approved an order to: (i) suspend the

liquidation operations relating to the sale of the assets and/or businesses of NNSA for a

renewable period of two months; (ii) authorize the continuation of the business of NNSA so long

---

[3]    The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

as the liquidation operations are suspended; and (iii) maintain the powers of the French

Administrator and Liquidator during the suspension period, except with respect to the sale of

assets and/or businesses of NNSA.  In accordance with the European Union's Council

Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the

"English Proceedings") remain the main proceedings in respect of NNSA.  On June 8, 2009,

Nortel Networks UK Limited filed petitions in this Court for recognition of the English

Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.  On June 26,

2009, the Court entered an order recognizing the English Proceedings as foreign main

proceedings under chapter 15 of the Bankruptcy Code.

     5.      On January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel

(Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court,

pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of

proceedings.  On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D.

Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law (the

"Joint Israeli Administrators").

     6.      On January 26, 2009, the Office of the United States Trustee for the District of

Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the

"Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad

hoc group of bondholders holding claims against certain of the Debtors and certain of the

Canadian Debtors also has been organized (the "Bondholder Group").  No trustee or examiner

has been appointed in the Debtors' cases.

     7.      On July 14, 2009, Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor with

NNI and its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of

the Bankruptcy Code.  On July 17, the Court entered orders approving the joint administration

and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for

procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in

the Debtors' chapter 11 cases [D.I. 1099].

**B.      Debtors' Corporate Structure and Business**

8.      A description of the Debtors' corporate structure and business and the events

leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First

Day Motions and Applications [D.I. 3].

9.      On June 19, 2009, the Debtors filed a motion seeking approval of the sale of

assets associated with their 2G/3G mobility networking solutions based on Code Division

Multiple Access ("CDMA") and 4G broadband wireless technologies including Long Term

Evolution ("LTE") to Nokia Siemens Networks B.V., subject to the receipt of higher and better

offers at auction [D.I. 931].  On July 28, 2009, the Court entered an order approving the sale of

the CDMA and LTE assets to Telefonaktiebolaget LM Ericsson (publ) as the successful bidder at

auction [D.I. 1205].  The Debtors are currently working to satisfy all closing conditions

necessary to close the sale.

10.      On July 20, 2009, the Debtors filed a motion seeking approval of the sale of assets

associated with their Enterprise Solutions business to Avaya Inc., subject to the receipt of higher

and better offers [D.I. 1131].  On September 16, 2009, the Court entered an order approving the

sale to Avaya Inc. as the successful bidder at auction [D.I. 1514].  The Debtors are currently

working to close the sale later this year (subject to certain closing conditions).

11.      On September 21, 2009, the Debtors filed a motion seeking approval of

procedures to govern the sale of their Next Generation Service Packet Core Network

Components [D.I. 1525].  On September 30, 2009, the Court entered an order approving certain

procedures related to the sale, and scheduling a hearing to consider the sale on October 28, 2009 [D.I. 1584].

12.      On September 30, 2009, the Debtors filed a motion seeking approval of procedures to govern the sale of assets associated with their GSM/GSM-R business [D.I. 1587]. On October 1, 2009, this Court entered an order setting October 15, 2009 as the date for a hearing to consider the sale procedures [D.I. 1595].

13.      In addition, the Debtors previously sold certain non-core assets related to their enterprise "Layer 4-7" business to Radware Ltd.  The sale, which was approved by this Court on March 26, 2009 [D.I. 539] and by the Canadian Court on March 30, 2009, closed on March 31, 2009.

**C.      The Metro Ethernet Networks Business**

14.      Nortel's MEN Business includes optical networking, carrier Ethernet switching and multiservice switching products, delivering carrier-grade Ethernet transport capabilities for higher performance and lower cost for emerging video-intensive applications.

15.      The MEN Business's optical networking portfolio includes the 40G Adaptive Optical Engine technology, which can quadruple network capacity while being deployable over any fiber, allowing service providers to reduce engineering and equipment expense and upgrade quickly and cost-effectively from 10G to 40G.  The MEN Business also is in the process of developing the industry's first optical technology that can deliver both 40G and 100G network capacity, enabling four times the network throughput immediately, while providing the foundation to simply and affordably increase capacity tenfold as required.

16.      Nortel's principal competitors in the global optical market are large communications companies such as Alcatel-Lucent, Huawei Technologies Co., Ltd., Nokia Siemens Networks B.V., Fujitsu Limited, Ericsson and Cisco Systems, Inc., as well as others that

address specific niches within this market, such as Ciena, ADVA AG Optical Networking,

Meiningen, Tellabs, Inc. and Infinera Corporation.

17.    As set forth in the Riedel Declaration, the environment in which Nortel operates is highly competitive, the competition for market share is fierce, and the cost of rapid technological development is steep.  Furthermore, the scale requirements to compete in this industry are substantial.  Due to the global economic downturn, Nortel is experiencing significant pressure on its businesses and facing competing demands on its cash resources, globally as well as on a regional basis, as customers across all businesses suspend, delay and reduce capital expenditures. The extreme volatility in the financial, foreign exchange and credit markets globally and the uncertainty created by the ongoing creditor protection proceedings has compounded the situation.  On June 19, 2009, Nortel announced that it had determined that the sale of its businesses is the best path for Nortel to maximize value.  As a result, Nortel has commenced a process for the orderly disposition of its businesses and dispositions of two major business units – the CDMA/LTE business and the Enterprise Solutions business – have been approved by this Court and the Canadian Court.

18.    Even before filing for creditor protection, it had become clear that in order to reduce operating costs during a time of decreased customer spending and global economic uncertainty, Nortel would need to consider strategic divestiture as a way to conserve liquidity and consolidate its position with respect to its remaining businesses.  Accordingly, Nortel had begun the process of marketing the Assets for sale before the decision was made to file for creditor protection.

**D.    Previous Efforts to Market and Sell the MEN Business**

19.    Nortel first announced its intention to explore a divestiture of the MEN Business in September 2008.  With a strong customer base and industry-leading technology breakthroughs

8

such as 40G/100G optical networking, the MEN Business was considered a premium asset with a highly differentiated offering, making it attractive to potential purchasers.

20.     In connection with this initial effort, Nortel, in consultation with its financial advisors, approached approximately fifty parties likely to be interested and able to acquire the MEN Business, including a mix of financial investors and strategic buyers.  An information memorandum was provided to the twenty-one parties who had executed confidentiality agreements.  Of those parties who subsequently submitted expressions of interest, Nortel conducted management presentations with the entities it deemed able to consummate a transaction for the MEN Business, and ultimately gave five companies access to an electronic data room containing confidential diligence materials regarding the MEN Business.

21.     As of the Petition Date, Nortel was in serious discussions with three potential bidders, including Ciena.  The commencement of creditor protection proceedings forced Nortel to put its plans to divest the MEN Business on hold in order to evaluate the future of the company as a whole.

**E.     Post-Petition Efforts to Divest the MEN Business**

22.     Since the Petition Date, the Debtors have reinitiated their efforts to divest the MEN Business, re-canvassing many of the entities originally contacted in connection with the previous sale, plus five additional parties.  As a result of these efforts, thirteen parties expressed interest in purchasing the assets, executed confidentiality agreements and were provided confidential information memoranda.  All thirteen were given access to the electronic data room, and management presentations were conducted with seven entities.

<u>**Relief Requested**</u>

23.     By this Motion, the Debtors seek orders:  (i)(a) authorizing the Debtors to enter into the Stalking Horse Agreement and take other such steps as are necessary to consummate the

Sale, (b) authorizing and approving the Bidding Procedures and Bid Protections, (c) approving

the Notice Procedures and the Assumption and Assignment Procedures (as defined below), (d)

authorizing the Debtors to file certain documents under seal and (e) setting the time, date, and

place of the Sale Hearing (such order, substantially in the form attached hereto as Exhibit C, the

"Bidding Procedures Order"); (ii) authorizing and approving (a) the sale of the Assets, free and

clear of all liens, claims and encumbrances, and (b) the assumption and assignment of the

Assumed and Assigned Contracts (such order, substantially in the form attached hereto as

Exhibit D, the "Sale Order"); and (iii) granting them such other and further relief as the Court

deems just and proper.

**F.      The Stalking Horse Agreement**[4]

24.      After extensive arm's-length, good faith negotiations among the Sellers and the

EMEA Sellers (as defined below) and the Stalking Horse Purchaser and their respective advisors,

the Sellers and the EMEA Sellers have agreed, among other things, to convey the Assets and the

EMEA Assets (as defined in the Stalking Horse Agreement) and assign the Assumed and

Assigned Contracts to the Stalking Horse Purchaser in accordance with the terms and conditions

of the Stalking Horse Agreement, subject to the approval of the Sale in the various jurisdictions

in which the Sellers are subject to creditor protection proceedings.  The Sellers, the EMEA

Sellers and the Stalking Horse Purchaser have entered into two separate purchase agreements for

the sale of the Assets and the EMEA Assets:  (a) the Stalking Horse Agreement relating to the

sale and purchase of the Assets among the Sellers and the Stalking Horse Purchaser, and (b) an

asset sale agreement relating to the sale and purchase of the EMEA Assets among certain of the

---

[4]      Capitalized terms used but not defined herein have the meanings ascribed to them in the Stalking Horse Agreement.  To the extent that there are inconsistencies between the summary description of the Stalking Horse Agreement contained herein and the terms and conditions of the Stalking Horse Agreement, the terms and conditions of the Stalking Horse Agreement control.

EMEA Debtors and their affiliates (the "EMEA Sellers"), the Joint Administrators, the Joint

Israeli Administrators, and the Stalking Horse Purchaser, dated October 7, 2009 (the "EMEA

Agreement").  The Debtors have determined that the Stalking Horse Agreement and the EMEA

Agreement represent the best opportunity for the Debtors to maximize the value of their assets

relating to the MEN Business and serve as a basis for conducting an auction to seek higher

and/or better offers.  The Stalking Horse Agreement contemplates the sale of the Assets, subject

to higher and/or better bids, on the following material terms:[5]

- Purchase Price.  At the Closing, the Stalking Horse Purchaser will pay to the Sellers and the EMEA Sellers, through their Distribution Agent, an estimated purchase price of $390 million in cash plus 10,000,000 shares of Ciena common stock (the "Shares"), subject to certain escrows and net working capital adjustments, among other adjustments.  The Purchase Price may also be reduced if the assets of any EMEA Seller under the EMEA Agreement are excluded in certain circumstances, or if certain provisions of the Transition Services Agreement (as described below) are not met by the Closing Date.

- Certain Fees.  In certain circumstances the Sellers and the EMEA Sellers may be required to pay to the Stalking Horse Purchaser a Break-Up Fee and an Expense Reimbursement.  See section H for more details on these obligations.

- Assets.  The Assets to be acquired by the Stalking Horse Purchaser include, among other things, certain (i) inventory and supplies, (ii) equipment, (iii) contracts, (iv) business information, (v) intellectual property (including claims against third parties for past, present or future infringement), (vi) rights under warranties, representations and guarantees by suppliers, manufacturers and contractors related to the Assets, (vii) governmental consents, (viii) employee records, (ix) tax records required by law to be transferred, and (x) account receivables related to contracts in progress.  The assets to be acquired by the Stalking Horse Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable (excluding receivables related to contracts in progress), bank account balances and petty cash, certain assets and rights (for example, the right to tax refunds, credits, or similar benefits, and rights under certain contracts (other than Assigned Contracts)) relating to the pre-closing period, and security deposits.

- Assigned Contracts.  The Sellers agree to assign certain Seller Contracts, including supplier and customer contracts, to the Stalking Horse Purchaser, and to cooperate

---

[5] The Debtors are not parties to the EMEA Agreement, and therefore this Motion does not discuss the terms and conditions of the EMEA Agreement.

with the Stalking Horse Purchaser to assist in the transition of Bundled Contracts to the Stalking Horse Purchaser as they relate to the Business. The Stalking Horse Purchaser and the Sellers agree to share certain of the Cure Costs associated with such assignments and transition.

- <u>Assumed Liabilities</u>. The liabilities to be assumed by the Stalking Horse Purchaser include, among others, (i) liabilities arising after the Closing Date to the extent related to the operation of the MEN Business by the Stalking Horse Purchaser following the Closing, (ii) liabilities arising from the performance of Assigned Contracts after the Closing Date, (iii) certain liabilities relating to transferred intellectual property, (iv) certain tax liabilities, (v) certain warranty liabilities and (vi) certain liabilities related to employees and employee benefit plans and under employment laws.

- <u>Sale Free and Clear</u>. The Assets to be transferred by the Sellers will be transferred free and clear of all liens, claims and encumbrances, other than those expressly assumed by the Stalking Horse Purchaser or otherwise expressly permitted under the Stalking Horse Agreement.

- <u>Ancillary Agreements</u>. Pursuant to the Stalking Horse Agreement, at or prior to the Closing, certain Sellers, certain EMEA Sellers and the Stalking Horse Purchaser will enter into, among others, the following ancillary agreements:

  - <u>Transition Services Agreement</u>. At the Closing, NNL, NNC, NNI, NNUK, Nortel Networks (Ireland) Limited, certain of their affiliates and the Stalking Horse Purchaser will enter into one or more agreement under which NNL, NNC, NNI, NNUK, Nortel Networks (Ireland) Limited and their affiliates will agree to provide to the Stalking Horse Purchaser and its affiliates certain information technology, business transition and related services, commencing at the Closing and continuing for a period not to exceed two (2) years.

  - <u>Intellectual Property License Agreement</u>. At the Closing, NNL and the Stalking Horse Purchaser will enter into an intellectual property license agreement (the "<u>IPLA</u>") pursuant to which (i) NNL will grant to the Stalking Horse Purchaser and its affiliates a non-exclusive license to certain intellectual property necessary for the commercialization of the products and the provision of services, as well as an exclusive license to certain of the intellectual property to commercialize products and provide services within an exclusive field of use, and (ii) NNL and its affiliates will receive a license back to all intellectual property included in the Assets for use in their other businesses. The IPLA will remain in force for so long as any intellectual property rights licensed thereunder continue to exist.

  - <u>Trademark License Agreement</u>. At the Closing, NNL and the Stalking Horse Purchaser will enter into a license agreement allowing the Stalking Horse Purchaser and its affiliates to use "Nortel" trademarks and logo in its sales of the Products for a limited period after the Closing.

  - <u>Loaned Employee Agreement</u>. At the Closing, Nortel and the Stalking Horse

12

Purchaser will enter into an agreement under which certain employees of Nortel and its affiliates will be seconded to the Stalking Horse Purchaser to perform services for the Stalking Horse Purchaser for a 90-day period beginning on the Closing Date. Nortel will continue to pay all employment costs in respect of the Loaned Employees that relate to the period of the Loaned Employee Agreement, and the Stalking Horse Purchaser will provide for the payment of, or if not paid pursuant to the pre-funding mechanism in the Loaned Employee Agreement, promptly reimburse Nortel for, all such employment costs.

▪ Carling Property Lease Agreements. At the Closing, Nortel Networks Technology Corporation ("NNTC") and the Stalking Horse Purchaser (or an affiliate) will enter into lease agreements pursuant to which NNTC, as landlord, will lease to the Stalking Horse Purchaser (or an affiliate) the whole of the Lab 10 building and certain parts of the Lab 2 building of the Nortel Carling Campus located at 3500 Carling Avenue, Ottawa, Ontario, Canada. Additionally, at the Closing, the parties (or their relevant affiliates) will enter into non-disturbance agreements with NNI, who is an existing mortgagee of the Nortel Carling Campus.

▪ Real Estate Terms and Conditions. At the Closing, the Sellers and the Stalking Horse Purchaser will finalize the general terms to which the parties agree, which will govern the applicable leases, subleases or license agreements in respect of certain real property which the Sellers will lease, sublease, assign or license to the Stalking Horse Purchaser (or an affiliate) from and after Closing.

▪ Contract Manufacturing Inventory Agreement. At the Closing, certain of the Sellers and the Stalking Horse Purchaser (or its affiliates) will enter into 3-way agreements with certain contract manufacturers of the MEN Business, pursuant to which the Sellers and the Stalking Horse Purchaser (or its affiliates, as applicable) will allocate certain inventory buy back obligations as between themselves.

• Restrictions on Solicitation of Competing Bids. As set forth in section 5.29 of the Stalking Horse Agreement and subject to the terms and limitations therein, the Stalking Horse Agreement prohibits the Sellers from soliciting competing transactions or seeking relief inconsistent with the Stalking Horse Agreement from the date of execution of the Stalking Horse Agreement until the entry of the Bidding Procedures Order, and from the date of the conclusion of the Auction until the Closing Date or termination of the Stalking Horse Agreement.

• Closing Conditions: In addition to certain other customary closing conditions, including conditions relating to bankruptcy court approvals, the obligation of the Stalking Horse Purchaser to close the sale is subject to the satisfaction of the following conditions: (i) the Stalking Horse Purchaser's submission of notification of listing of the Shares to NASDAQ at least fifteen (15) days prior to the Closing Date without subsequent notification of objection from NASDAQ, (ii) the Sellers' delivery to the Stalking Horse Purchaser of certain of its Financial Statements pursuant to the Stalking Horse Agreement at least five (5) days prior to the Closing Date, and (iii) the

performance in all material respects of all material covenants, obligations and agreements required to be performed by the Sellers on or before the Closing.

- <u>Ongoing Covenants and Restrictions</u>:  In addition to certain other customary post-closing obligations such as information-sharing and redirection of customers and payments, the Sellers have agreed to cooperate with the Stalking Horse Purchaser for an agreed period after Closing in relation to arrangements regarding (i) Bundled Contracts, (ii) Assets which were not transferred at Closing due to bankruptcy proceedings commenced in other jurisdictions following execution of the Stalking Horse Agreement and (iii) Contracts for which required consents were not obtained prior to Closing.

- <u>Post-Closing Access to Books and Records</u>.  For three (3) years after the Closing (or such longer period as may be required under applicable law in the case of tax records), NNC, NNL, NNI and the Stalking Horse Purchaser (each, a "<u>Primary Party</u>") must preserve pre-closing records to the extent related to the MEN Business. After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable request from any Primary Party, the other Primary Party shall, and/or shall cause the person holding such records to provide to the requesting Primary Party or its representatives reasonable access to such records during normal business hours and permit the requesting Primary Party or its representatives to make copies of such records, in each case at no cost to the requesting Primary Party or its representatives (other than for reasonable out-of-pocket expenses).  The Stalking Horse Agreement contains further provisions related to tax and audit-related financial records and information.

- <u>Status of Payments</u>.  The portion of the Bid Protections to be paid or borne by the Debtors shall constitute administrative expenses under section 503(b) of the Bankruptcy Code.

## G.    The Bidding Procedures

25.    In order to ensure that the Sellers receive the maximum value for the Assets, the Stalking Horse Agreement is subject to higher or better offers, and, as such, the Stalking Horse Agreement will serve as the "stalking-horse" bid for the Assets.  The Assets may be sold in a single sale to a single purchaser or in parts to several purchasers.

26.    The key provisions of the Bidding Procedures to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities as set forth in the Stalking Horse Agreement are as follows:

a.  <u>Bid Deadline</u>.  A Qualified Bidder that desires to make a bid will deliver written copies of its

bid to the following parties (collectively, the "Notice Parties"):  (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Anna Ventresca, Esq., (905) 863-2564, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905) 863-1984; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (v) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vi) financial advisor to the Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (vii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; (viii) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; and (ix) the Administrators: Ernst & Young LLP, Attn: Stephen Harris, 1 More Place, London SE1 2AF, United Kingdom, Facsimile +44 20 7951 9002; and (x) counsel to the Administrators: Herbert Smith LLP, Attn: Stephen Gale, Exchange House, Primrose Street, London, EC2A 2HS, Facsimile: +44 20 7098 4878; so as to be received not later than **November 9, 2009 at 4:00 p.m. (ET)** by the Sellers (as may be extended as set out below, the "Bid Deadline").  The Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so; provided, however, that for any such extension beyond five (5) Business Days, the Sellers shall have obtained the prior written consent of the Stalking Horse Purchaser, the Committee, the Bondholder Group and the Monitor, in their respective sole discretion.  If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders (including the Stalking Horse Purchaser) and the parties listed above of such extension.

b.  Provisions Governing Qualifications of Bidders.  Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court and accepted by the Administrators, for cause shown, or as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), in order to participate in the Bidding Process, prior to the Bid Deadline (as defined below), each person other than the Stalking Horse Purchaser who wishes to participate in the Bidding Process (a "Potential Bidder") must deliver to the Notice Parties at the addresses noted above:

(i)  an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in substantially the same form as the confidentiality agreement executed by the Stalking Horse Purchaser and otherwise in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of the Assets.  In the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement agreeing that such agreement shall be deemed to be amended so as to be in substantially the same

form as the confidentiality agreement executed by the Stalking Horse Purchaser and that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets;

(ii)    current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Sale; and

(iii)    a preliminary (non-binding) written proposal regarding:  (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the Sale (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Sale, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Stalking Horse Agreement and the EMEA Agreement.

A Potential Bidder that delivers the documents described above, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Sale, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.  At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence as provided in the following paragraph with respect to the Assets.

c.    Provisions Governing Qualified Bids.  A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph, and complies with all of the following (a "Qualified Bid"):

(i)       it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Stalking Horse Agreement and the EMEA Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure (including, without limitation, an offer conditioned upon confirmation of a plan of reorganization proposed by the U.S. Debtors either individually or in collaboration with such Qualified Bidder), or upon alternative terms and conditions that the Sellers reasonably determine, after consultation with the Committee, the Bondholders Committee and the Monitor, are no less favourable than the terms and conditions of the Stalking Horse Agreement and the EMEA Agreement;

(ii)      it includes a letter stating that the bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), provided that if such bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, March 1, 2010, and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(iii)     it includes duly authorized and executed Stalking Horse Agreement and the EMEA Agreement, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, including, to the extent required by the terms and conditions of such bid, Local Sale Agreements, the Real Estate Agreements, the Intellectual Property License Agreement, the Transition Services Agreement, the Trademark License Agreement, the Loaned Employee Agreement the Subcontract Agreement, the Contract Manufacturing Inventory Agreements, the Carling Property Lease Agreements, the Patent Assignments, the Trademark Assignments, the Flextronics Back-to-Back Supply Agreement (if required) (each as defined in the Stalking Horse Agreement), the other ancillary agreements, including other back-to-back supply agreements, as described in the Stalking Horse Agreement and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Stalking Horse Agreement and the EMEA Agreement ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the bidder;

(iv)      it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(v)       it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

(vi)    it fully discloses the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(vii)    it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Stalking Horse Agreement and EMEA Agreement, plus (i) the amount of the Aggregate Break-Up Fee and Aggregate Expense Reimbursement (as defined below), plus (ii) U.S.$5,000,000.

(viii)    it includes an acknowledgment and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Stalking Horse Agreement and EMEA Agreement (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs, and identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(ix)    it includes an acknowledgement and representation that the bidder:  (A) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (D) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(x)    it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(xi)    it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to 5% of the Purchase Price to be dealt with as provided for in the "Good Faith Deposit" section of the Bidding Procedures;

(xii)    it (a) contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment and associated with the employment of all employees who will become employees of the Qualified Bidder, and (b) identifies any pension liabilities and assets related to any employees currently covered under the Nortel

Retirement Income Plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(xiii)   it includes evidence of the Potential Bidder's ability to comply with section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(xiv)   it contains other information reasonably requested by the Sellers; and

(xv)   it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified in the Bidding Procedures and deem such bids to be Qualified Bids, <u>provided</u> that the Sellers, in evaluating such bids, may not waive substantial compliance with any items in paragraphs (d), (e), (f), (i)(D), (j) and (o) without the consent of the Stalking Horse Purchaser, the Committee, the Bondholder Group and the Monitor  provided that, with respect to (e), such consent not to be unreasonably withheld in connection with any bid that would (1) otherwise fully satisfy the requirements of a Qualified Bid but for a de minimis failure to comply with those criteria; and (2) such non compliance is cured within 24 hours of the Bid Deadline.  The Sellers shall deliver copies of any bids deemed to be Qualified Bids to the Stalking Horse Purchaser in accordance with section 5.3(f) of the Stalking Horse Agreement.  Notwithstanding the foregoing, the Stalking Horse Purchaser will be deemed a Qualified Bidder, and the Stalking Horse Agreement and EMEA Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

The Sellers shall notify the Stalking Horse Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Stalking Horse Purchaser, whether such Qualified Bidder's bid constitutes a Qualified Bid) promptly after, and in any event on the same day as the notification to any Qualified Bidder that their bid constitutes a Qualified Bid; provided such notification shall not be given later than two (2) Business Days following the expiration of the Bid Deadline.

d.   <u>Evaluation of Competing Bids</u>.  A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder, including any assumed pension liabilities) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Sale, the proposed revisions to the relevant Sale documents, the effect of the Sale on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Sale (including any regulatory approvals required to close the Sale), the assets included or excluded from the bid, the

estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

e. <u>No Qualified Bids</u>.  If the Sellers do not receive any Qualified Bids other than the Stalking Horse Agreement and the EMEA Agreement received from the Stalking Horse Purchaser, the Auction shall be cancelled and the U.S. Debtors shall report the same to the Bankruptcy Court, the Canadian Debtors shall report the same to the Canadian Court and the Monitor and subject to requiring and obtaining approvals of the Bankruptcy Court, the Canadian Court or any other applicable court and satisfaction of the conditions set forth in the Stalking Horse Agreement and the EMEA Agreement, the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Stalking Horse Agreement and the EMEA Agreement.  In addition, if no Qualified Bid is received, the U.S. Debtors reserve the right to request that the Bankruptcy Court advance the date of the Sale Hearing and provide notice of such new date to those parties in interest entitled to notice thereof and the Canadian Debtors reserve the right to file a motion with the Canadian Court seeking advancement of the date for approval of the sale of the Canadian Debtors' rights, title and interests in and to the Assets to the Stalking Horse Purchaser.  In addition, if approval of any other applicable court is required, the Sellers will as soon as practicable file an appropriate pleading with such court(s) seeking approval of the Sale.

f. <u>Auction Process</u>.  If the Sellers receive one or more Qualified Bids in addition to the Stalking Horse Agreement and EMEA Agreement, the Sellers will conduct an auction (the "<u>Auction</u>") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at **9:30 a.m. (ET) on Friday, November 13, 2009**, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction. The commencement of the Auction may be cancelled or adjourned without the prior written consent of the Stalking Horse Purchaser, subject to the terms of the Stalking Horse Agreement and the EMEA Agreement.  The Auction shall run in accordance with the following procedures:

(i)     Only the Sellers, the Stalking Horse Purchaser, the Committee, the Bondholder Group, the Monitor and the Administrator (and the advisors to each of the foregoing), any creditor of the U.S. Debtors and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Stalking Horse Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(ii)    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(iii)   At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the

Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date.  At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Stalking Horse Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction.

(iv)    All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(v)    The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(vi)    Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below).  Each incremental bid at the Auction shall provide net value to the estate of at least U.S.$5,000,000 over the Starting Bid or the Leading Bid (as defined below), as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction.  After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid").  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.  Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Stalking Horse Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to

the Stalking Horse Purchaser under the Stalking Horse Agreement and the EMEA Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

g.  Selection Of Successful Bid.  Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid and evaluate each Qualified Bid as set forth in the section titled "Evaluation of Competing Bids" herein, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and (c) communicate to the Stalking Horse Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any.  The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by the Canadian Court and any required approvals of any other applicable court(s) and approval and execution by the Administrators of the relevant purchase agreement with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

h.  Closing with Alternative Backup Bidders.  If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder").  The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is necessary or appropriate, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval is required.  Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court.  The Alternate Bid shall remain open until the earlier of (a) December 15, 2009 or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date").  All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.  Notwithstanding the foregoing, under no circumstance will the Stalking Horse Purchaser be deemed the Alternate Bidder.

**H.      The Bid Protections**

27.      The Stalking Horse Purchaser and its advisors have expended, and likely will

continue to expend, considerable time, energy and resources pursuing the purchase of the Assets

and the assumption and assignment of the Assumed and Assigned Contracts, and have engaged

in extended, good faith negotiations.  The Stalking Horse Agreement is the culmination of these

efforts.

28.      In recognition of this expenditure of time, energy, and resources, the Sellers have

agreed that if the Stalking Horse Purchaser is not the Successful Bidder, the Sellers and the

EMEA Sellers will, to the extent due under section 10.2 of the Stalking Horse Agreement and

section 15.5 of the EMEA Agreement, pay the Stalking Horse Purchaser:  (i) an aggregate fee of

sixteen million forty-four thousand dollars and 00/100 ($16,044,000), which is equal to

approximately three percent (3%) of the aggregate Purchase Price,[6] prior to any closing

adjustments, as set forth in section 2.2.1 of the Stalking Horse Agreement (the "Aggregate

Break-Up Fee," and to the extent payable by the Sellers, the "Break-Up Fee") and (ii) an amount

in cash equal to the total amount of all reasonable and documented fees, costs and expenses

incurred by the Stalking Horse Purchaser in connection with the preparation, performance and

execution of the Stalking Horse Agreement and EMEA Agreement and the transactions

contemplated thereby, including all filing and notification fees and all fees and expenses of the

Stalking Horse Purchaser's representatives, in an amount not to exceed five million three

hundred forty-eight thousand dollars and 00/100 ($5,348,000), which is equal to approximately

one percent (1%) of the aggregate Purchase Price, prior to any closing adjustments (the

---

[6]      For purposes of calculating the amount of the Bid Protections, the Shares are valued based on the 10-day
weighted average trading price for the 10 days prior to the date on which the Stalking Horse Agreement is executed.

"Aggregate Expense Reimbursement," and to the extent payable by the Sellers, the "Expense Reimbursement" and, together with the Break-Up Fee, to the extent payable by the Sellers, the "Bid Protections"), which shall be payable as provided for pursuant to the terms of the Stalking Horse Agreement.  Under the Stalking Horse Agreement, two-thirds of the aggregate Bid Protections will be payable by the Sellers, including the Debtors that are Sellers, and the remaining one-third will be payable by the EMEA Sellers.

29.    Specifically, section 10.2 of the Stalking Horse Agreement provides for payment of the Break-Up Fee upon termination of the Stalking Horse Agreement in the following instances:  (a) if either the Sellers or the Stalking Horse Purchaser terminate the Stalking Horse Agreement upon the entry of an order by this Court and the Canadian Court approving an Alternate Transaction; (b) if the Sellers terminate the Stalking Horse Agreement because: (i) the U.S. Bidding Procedures Order and the Canadian Sales Process Order have not been entered by October 30, 2009, (ii) the Auction has not been completed by December 11, 2009, (iii) the U.S. Sale Order and Canadian Approval and Vesting Order have not been entered by December 17, 2009, (iv) upon the entry of an order by this Court or another Bankruptcy Court authorizing a Sponsored Reorganization Plan or (v) if the EMEA Agreement is terminated pursuant to the terms therein which require payment of the EMEA Break-Up Fee; (c) if the Stalking Horse Purchaser terminates the Stalking Horse Agreement: (i) because the Sellers have withdrawn or sought to withdraw the Canadian Approval and Vesting Order Motion or the U.S. Bidding Procedures and Sale Motion, or publicly announce any stand-alone plan of reorganization in respect of the MEN Business or plan of arrangement or plan of liquidation or winding up of all or substantially all of the Assets or the EMEA Assets or any of the Main Sellers or the EMEA Sellers, (ii) in the event of a material breach by the Sellers of the Sellers' representations,

24

warranties, agreements or covenants set forth in the Stalking Horse Agreement, which breach

would result in a failure to satisfy the conditions to Closing set forth in sections 9.1(a), 9.2(a),

9.2(b), 9.3(a) or 9.3(b) thereof, as applicable, and, in each case, which, if capable of being cured,

is not cured within thirty (30) days from receipt of a written notice from the Stalking Horse

Purchaser; provided, however, that the right to terminate the Stalking Horse Agreement pursuant

to section 10.1(b)(ii) thereof shall not be available to the Stalking Horse Purchaser where the

Stalking Horse Purchaser is then itself in material breach of the Stalking Horse Agreement or a

breach of the Stalking Horse Agreement by the Stalking Horse Purchaser has been the principal

cause of, or has directly resulted in, the event or condition giving rise to a right to terminate the

Stalking Horse Agreement pursuant to such clause, or (iii) in the event the Sellers fail to

consummate the Closing in material breach of section 2.3 of the Stalking Horse Agreement,

within ten (10) Business Days of written demand by the Stalking Horse Purchaser to

consummate the Closing.  The Expense Reimbursement is payable upon termination of the

Stalking Horse Agreement pursuant to any of the grounds listed in section 10.1 of the Stalking

Horse Agreement (other than termination pursuant to section 10.1(a) or by Sellers pursuant to

section 10.1(b)(ii) or pursuant to section 10.1(b)(vi) to the extent that no EMEA Expense

Reimbursement (as defined in the EMEA Agreement) is payable under the EMEA Agreement).

The timing of the Debtors' obligation to pay the Break-Up Fee and Expense Reimbursement is

set forth in section 10.2 of the Stalking Horse Agreement.[7]

30.    The Sellers have further agreed that their obligation to pay the Break-Up Fee and

Expense Reimbursement pursuant to section 10.2 of the Stalking Horse Agreement shall survive

---

[7]    The Sellers intend to seek approval of any and all fees payable as a result of a termination of the Stalking
Horse Agreement pursuant to section 2.1.7(c) (as provided in Section 2.1.7 of the Sellers Disclosure Schedule) at the
Sale Hearing.

termination of the Stalking Horse Agreement, shall, to the extent owed by the Debtors, constitute an administrative expense claim under section 503(b) of the Bankruptcy Code and shall be payable within two (2) business days under the terms and conditions of the Stalking Horse Agreement and the Bidding Procedures Order, notwithstanding section 507(a) of the Bankruptcy Code.

31.     The Break-Up Fee and/or the Expense Reimbursement, if payable, will be the sole and exclusive remedy of the Stalking Horse Purchaser in the event that the Closing (as defined in the Stalking Horse Agreement) has not occurred or does not occur for any reason whatsoever; provided that if the Closing occurs, the Break-Up Fee and/or the Expense Reimbursement will not be payable and will not be the sole and exclusive remedy of the Stalking Horse Purchaser.

32.     In no event shall the Sellers be responsible or liable for any losses or liabilities under the Stalking Horse Agreement that are consequential, in the nature of lost profits, diminution in the value of property, special or punitive, or otherwise not actual damages.

**I.      The Notice Procedures**

33.     The Debtors propose to give notice immediately after the entry of the Bidding Procedures Order (or as soon thereafter as reasonably practicable) of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing by sending a notice (the "Sale Notice"), substantially in the form attached hereto as Exhibit E by first-class mail, postage prepaid, upon (i) all entities reasonably known to have expressed an interest in a transaction with respect to the Assets during the past nine (9) months, (ii) all entities reasonably known to have asserted any claim, lien interest or encumbrance against the Debtors' right, title and interest in the Assets, (iii) the attorneys general for all states in which Purchased Assets owned by the Debtors are located, all federal and state taxing authorities, including (without limitation) the Securities and Exchange Commission, the

Environmental Protection Agency, state environmental protection agencies, the Internal Revenue

Service, and the Department of Labor and similar state labor or employment agencies, (iv) all

counterparties to the Assumed and Assigned Contracts, (v) all known or potential creditors of the

Debtors and (vi) the general service list established in these chapter 11 cases pursuant to

Bankruptcy Rule 2002 and Local Rule 2002-1.

34.     In addition, within three (3) business days of entry of the Bidding Procedures

Order and the Canadian Bidding Procedures Order (as defined below), or as soon thereafter as

reasonably practicable, the Sellers shall publish notice of the Bidding Procedures, the time and

place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the

Sale Hearing in The Wall Street Journal (National Edition), The Globe & Mail (National

Edition) and The Financial Times (International Edition), substantially in the form attached

hereto as Exhibit G (the "Publication Notice").

35.     The Debtors propose to give notice of the Sale to the counterparties under all

Assumed and Assigned Contracts (the "Counterparties") in accordance with section J below.

**J.      The Assumption and Assignment Procedures**

36.     To facilitate and effect the sale of the Assets, the Debtors seek authorization to

assume certain pre-petition executory contracts of the Debtors related to the Assets as further

discussed below (the "Assumed and Assigned Contracts"), and to assign such executory

contracts to the Stalking Horse Purchaser or the Successful Bidder.

37.     Included in the Assumed and Assigned Contracts designated for assumption and

assignment to the Stalking Horse Purchaser or other Successful Bidder are contracts between the

27

Debtors and their customers (the "Customer Contracts").[8] The identity of the counterparties to

the Customer Contracts (the "Customer Counterparties") constitutes an integral component of

the Assumed and Assigned Contracts' value. Access to the list of Customer Counterparties

absent appropriate confidentiality restrictions would entail releasing valuable confidential

information of critical value not only to any prospective purchaser of the Assets but also to the

Debtors' other businesses, many of which share overlapping customer lists. Thus, publicly

releasing the names of the Customer Counterparties would have an immediate detrimental

impact on the value of the Assets as well as other aspects of the Debtors' business.

38.     In light of the foregoing and the need to coordinate the sale of the Assets, the

Debtors submit the following procedures (the "Assumption and Assignment Procedures") for the

Court's approval:

### Purchasers' Designation

39.     On or before the date of the Bidding Procedures Order hearing, the Sellers will

provide to the Stalking Horse Purchaser a list or lists of all contracts of the Debtors related to the

MEN Business entered into prior to the Petition Date that the Sellers have identified as executory

pursuant to section 365 of the Bankruptcy Code (the "Designated Contracts"). On or before the

date that is three days before the Auction, as further described in section 2.1.5 of the Stalking

Horse Agreement, the Stalking Horse Purchaser will provide to the Sellers a list of those

Designated Contracts that the Stalking Horse Purchaser elects to have assumed and assigned to

the Stalking Horse Purchaser at Closing pursuant to section 365. Under the Stalking Horse

Agreement, the Stalking Horse Purchaser has the right to remove certain contracts from the list

---

[8]     While Debtors have made an effort to limit the list of Assumed and Assigned Contracts to include only those contracts to which they are parties, in the event that Debtors later determine that they are not in fact a party to an agreement included on the list of Assumed and Assigned Contracts, the Debtors reserve the right to remove such contract from the list and from the relief requested herein for the Assumed and Assigned Contracts.

of Assumed and Assigned Contracts at any time prior to January 15, 2010.  In the event that the

Stalking Horse Purchaser exercises this option, the Debtors will provide the relevant

Counterparty written notice that their contract(s) are no longer designated as an Assumed and

Assigned Contract.  For the avoidance of doubt, only those executory contracts that remain

designated as Assumed and Assigned Contracts as of the Closing will constitute Assumed and

Assigned Contracts and will be assumed by the Debtors and assigned to the Stalking Horse

Purchaser under the Sale Order.

### Notices

40.     The Debtors shall serve an individual notice substantially in the form attached

hereto as Exhibit F (the "Assumption and Assignment Notice") by first class mail on each

Counterparty under each Designated Contract (and its attorney, if known) at the last known

address available to the Debtors no later than October 21, 2009.  Each Assumption and

Assignment Notice shall set forth the following information:  (i) the name and address of the

Counterparty, (ii) notice of the proposed effective date of the assignment (subject to the Debtors'

and Stalking Horse Purchaser's right to withdraw such request for assumption and assignment of

the Designated Contracts prior to the Closing), (iii) identification of the Designated Contract, (iv)

the amount, if any, determined by the Debtors to be necessary to be paid to cure any existing

default in accordance with sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "Cure

Amount") and (v) a description of the Stalking Horse Purchaser and a statement as to the

Stalking Horse Purchaser's ability to perform the Debtors' obligations under the Designated

Contracts.

41.     For Assumed and Assigned Contracts other than Customer Contracts (if any), the

Debtors shall file with the Court a master notice of assignment of contracts (a "Master

Assumption Notice") that sets forth:  (i) the name and address of each Counterparty, (ii) notice of

the proposed effective date of the assignment (subject to the Debtors' and Stalking Horse Purchaser's right to withdraw such request for assumption and assignment of the Designated Contracts prior to the Closing), (iii) identification of the Designated Contract, and (iv) the Cure Amount, if any.

42.     For Customer Contracts, the Debtors shall file under seal with the Court a separate Master Assumption Notice as well as an affidavit confirming that an Assumption and Assignment Notice has been sent to each Counterparty, and shall serve copies to (a) counsel to the Stalking Horse Purchaser, (b) the U.S. Trustee, (c) counsel to the Monitor, (d) counsel to the Committee, and (e) counsel to the Bondholder Group.

43.     Master Assumption Notices for Assumed and Assigned Contracts must be filed no later than three (3) Business Days prior to the Sale Hearing.

44.     Within five (5) business days following the Closing Date, the Debtors shall file with the Court the final list of Assumed and Assigned Contracts. Those portions of the list that include Customer Contracts shall be filed under seal.

### *Cure Amounts*

45.     To the extent necessary to consummate the Sale, the Cure Amounts shall be paid promptly by the Stalking Horse Purchaser and the Debtors in accordance with the Stalking Horse Agreement, but in no event later than the later of (a) twenty (20) days following the resolution of the Cure Amounts in accordance with these procedures and (b) ten (10) days following the Closing Date.

46.     Any Counterparty will be deemed to have received adequate assurance of future performance as required by section 365 of the Bankruptcy Code if the Debtors, after payment of any Cure Amounts, would no longer have any payment or delivery obligations under the relevant

Assumed and Assigned Contract.

### *Counterparty Objection Procedures*

47.     To the extent that any Counterparty wishes to object to any matter pertaining to the proposed assumption and assignment of the Assumed and Assigned Contracts, including without limitation to the proposed Cure Amount and the adequate assurance of future performance by the Stalking Horse Purchaser under the applicable Assumed and Assigned Contract, then such Counterparty must file a written objection with the Court so that such objection is received by the applicable objection deadline (as further discussed below).

### *Requests for Adequate Assurance*

48.     Any Counterparty to an Assumed and Assigned Contract that wishes to obtain adequate assurance information regarding bidders other than the Stalking Horse Purchaser that will or may participate at the Auction, and to which the Debtors may ultimately elect, at the conclusion of the Auction, to assume and assign the Assumed and Assigned Contracts, must provide written notice (a "Request for Adequate Assurance") to counsel to the Debtors by mail, facsimile or hand delivery at Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Fax:  (212) 225-3999 (Attention:  Lisa M. Schweitzer) so as to be received on or before the General Objection Deadline (as defined below).  All Requests for Adequate Assurance must include an email address and/or facsimile number to which a response to such request will be sent.

49.     If a Counterparty timely submits a Request for Adequate Assurance, the Debtors shall supply such Counterparty with any non-confidential information reasonably related to adequate assurance with respect to such other bidders by email or facsimile delivery by November 12, 2009.  If a bidder other than the Stalking Horse Purchaser is the Successful Bidder

at the end of the Auction, the Debtors shall immediately notify all Counterparties that filed a Request for Adequate Assurance of the name of the Successful Bidder and the Alternate Bidder, if any.

50.    If the Stalking Horse Purchaser is not the Successful Bidder at the Auction and if a Counterparty does not timely submit a Request for Adequate Assurance and does not timely object to adequate assurance of future performance by bidders other than the Stalking Horse Purchaser on or before the General Objection Deadline, the Court may enter an order forever barring such Counterparty from objecting to adequate assurance of future performance.  Any party that has submitted a Request for Adequate Assurance shall have until **November 17, 2009 at 4 p.m. (ET)** (the "Supplemental Objection Deadline") to file an objection to adequate assurance of future performance by any Successful Bidder or Alternate Bidder that is not the Stalking Horse Purchaser.

### *Service of Objections*

51.    All objections by Counterparties to Assumed and Assigned Contracts other than those filed pursuant to the above procedures regarding Requests for Adequate Assurance must be filed by the General Objection Deadline.  Any objection filed with respect to Assumed and Assigned Contracts will be addressed at the Sale Hearing unless adjourned or withdrawn.

52.    All Counterparty objections must be served in accordance with the General Objection Procedures (as defined below) and must specify the grounds for such objection, including stating the Counterparty's alleged Cure Amount (including, on a transaction by transaction basis, calculations and detail of specific charges and dates, and any other amounts receivable or payable supporting such alleged Cure Amount) if the Counterparty disagrees with the Debtors' proposed Cure Amount and any other defaults or termination events the

Counterparty alleges must be cured to effect assignment of the Assumed and Assigned Contract.

53.    To the extent that any Counterparty does not timely serve an objection as set forth above, such Counterparty will be (i) deemed to have consented to such Cure Amounts, if any, and to the assumption and assignment of the applicable Assumed and Assigned Contract; (ii) bound to such corresponding Cure Amount, if any; (iii) deemed to have agreed that the Stalking Horse Purchaser or any Successful Bidder has provided adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(1)(C); (iv) deemed to have agreed that all defaults under the Assumed and Assigned Contracts arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Stalking Horse Purchaser or any Successful Bidder or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the Assumed and Assigned Contract shall remain in full force and effect for the benefit of the Stalking Horse Purchaser or any Successful Bidder and the Counterparty in accordance with its terms; (v) deemed to have waived any right to terminate the Assumed and Assigned Contract or designate an early termination date under the applicable Assumed and Assigned Contract as a result of any default that occurred and/or was continuing prior to the assignment date; and (vi) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Assumed and Assigned Contract.

### *Reservation of Rights*

54.    The Debtors' assumption and assignment of the Assumed and Assigned Contracts is subject to Court approval and consummation of the sale of the Assets to the Stalking Horse Purchaser or other Successful Bidder.  The Debtors shall be deemed to have assumed each of the

Assumed and Assigned Contracts as of the date of and effective only upon the Closing Date of the Stalking Horse Agreement or a similar agreement entered into between the Sellers and any Successful Bidder.  Absent such closing, the Assumed and Assigned Contracts shall be deemed neither assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.

55.     The Stalking Horse Purchaser shall have no rights in and to a particular Assumed and Assigned Contract until such time as the particular Assumed and Assigned Contract is assumed and assigned in accordance with the procedures set forth herein.

56.     In the event that the Stalking Horse Purchaser is not the Successful Bidder at the Auction, the Debtors reserve the right to modify the Assumption and Assignment Procedures, subject to approval of the Court.

57.     Regardless of whether any objection with respect to adequate assurance has been received from a Counterparty, prior to the entry of the Sale Order, the Stalking Horse Purchaser or any bidder other than the Stalking Horse Purchaser that is the Successful Bidder at the Auction shall provide such adequate assurance of its future performance under the Assumed and Assigned Contracts for the benefit of the parties thereto (other than the Debtors) as reasonably necessary to satisfy section 365(f)(2)(B) of the Bankruptcy Code.  Except as set forth in the Stalking Horse Agreement, the Stalking Horse Purchaser has not agreed to pay, shall not be required to assume, and shall have no liability or obligation with respect to, any liability or obligation, direct or indirect, absolute or contingent, of the Debtors, including any liabilities or obligations associated with the Assumed and Assigned Contracts arising on or before Closing under the Stalking Horse Agreement.

58.     The same Assumption and Assignment Procedures will be used for each of the

Assumed and Assigned Contracts.  Bankruptcy Rule 6006(e) allows for the sale of multiple

contracts in one motion upon authorization of the Court.  The Debtors therefore request that the

Court grant authorization to seek approval of the assumption and assignment of the Assumed and

Assigned Contracts through this Motion and the notice and procedures set forth in the

Assumption and Assignment Procedures (which are consistent with the use of an omnibus

motion pursuant to Bankruptcy Rule 6006(f)(6)).

59.    To facilitate the assumption and assignment of the Assumed and Assigned

Contracts, the Debtors further request that the Court find the anti-assignment provisions of the

Assumed and Assigned Contracts, if any, to be unenforceable under section 365(f) of the

Bankruptcy Code.[9]

**K.    Request to Set a Date for the Sale Hearing**

60.    The Debtors intend to present the Successful Bid and the Alternate Bid, if any, for

approval by the Court pursuant to the provisions of sections 105, 363 and 365 of the Bankruptcy

Code at the Sale Hearing to be scheduled by the Court and currently proposed as **November 19,**

**2009 at 1:00 p.m. (ET)**.  The Debtors shall be deemed to have accepted a bid only when the

Court has approved the bid at the Sale Hearing.  The Debtors propose that upon the failure to

consummate a sale of the Assets after the Sale Hearing because of the occurrence of a breach or

default under the terms of the Successful Bid, the next highest or otherwise best Alternate Bid, if

any, as disclosed at the Sale Hearing, shall be deemed the Successful Bid without need for

---

[9]    Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ."  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

further order of the Court, and the parties shall be authorized to consummate the transaction

contemplated by the Alternate Bid.

**L.       Objections**

61.      All objections to the sale of the Assets, the assumption and assignment of the

Assumed and Assigned Contracts, or any relief requested in the Motion other than the relief

granted by this Court in the Bidding Procedures Order must be:  (a) in writing; (b) signed by

counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the

Local Rules; (d) filed with the Clerk of the Bankruptcy Court, 824 Market Street, Wilmington,

Delaware 19801 by no later than **4 p.m. (ET) on November 6, 2009**  (the "General Objection

Deadline"), or other applicable deadline as indicated in this Motion; and (e) served in accordance

with the Local Rules so as to be received on or before the relevant objection deadline by the

following (collectively, the "Objection Notice Parties"):  (a) counsel to the Debtors:  Cleary

Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Fax:  (212)

225-3999 (Attention:  James L. Bromley and Lisa M. Schweitzer) and Morris, Nichols, Arsht &

Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801, Fax:  (302) 658-3989

(Attention:  Derek C. Abbott); (b) counsel to the Stalking Horse Purchaser:  Latham & Watkins

LLP, 233 South Wacker Drive, Suite 5800, Chicago, Illinois 60606, Fax: (312) 993-9767

(Attention: Douglas Bacon, Joseph Simei and Alice Burke), (c) counsel to the Committee:  Akin

Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Fax:  (212)

872-1002 (Attention:  Fred Hodara, Stephen Kuhn and Kenneth Davis) and Richards, Layton &

Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801

(Attention:  Christopher M. Samis), (d) counsel to the Bondholder Group:  Milbank, Tweed,

Hadley & McCloy, One Chase Manhattan Plaza, New York, New York 10006, Fax:  (212) 822-

5735 (Attention:  Roland Hlawaty) and (e) the Office of the United States Trustee, 844 King

Street, Suite 2207, Wilmington, Delaware 19801, Fax: (302) 573-6497 (Attention: Patrick

Tinker) (these procedures collectively referred to as the "General Objection Procedures").

62.     Each objection shall state the legal and factual basis of such objection and may be

orally supplemented at the relevant hearing.

63.     If the Stalking Horse Purchaser is not the Successful Bidder at the Auction,

objections to issues arising from and in connection with the Auction and/or the Debtors'

selection of a Successful Bid made by a Successful Bidder other than the Stalking Horse

Purchaser must be filed by the Supplemental Objection Deadline in accordance with the General

Objection Procedures.

64.     Only those objections made in compliance with the General Objection Procedures

will be considered by the Court at the relevant hearing.  The failure of any objecting person or

entity to file its objections by the relevant objection deadline and in accordance with the General

Objection Procedures will be a bar to the assertion, at the Sale Hearing or thereafter, of any

objection (including to the sale of the Assets and assumption and assignment of the Assumed and

Assigned Contracts free and clear of liens, claims and encumbrances), and shall be deemed to be

"consent" for purposes of Bankruptcy Code section 363(f).

**M.     Sale Free and Clear of All Liens, Claims and Interests**

65.     The Debtors have agreed to sell and transfer the Debtors' right, title and interest

in the Assets, free and clear of any and all interests pursuant to section 363 of the Bankruptcy

Code to the maximum extent allowed by section 363 of the Bankruptcy Code (other than with

respect to Assumed Liabilities and Permitted Encumbrances[10] and liens created by or through the

---

[10]     For purposes of this Motion, "Permitted Encumbrances" shall have the same meaning as set forth in the Stalking Horse Agreement, but excluding clauses (i) through (iv) of such definition.

Stalking Horse Purchaser with respect to the Transferred Intellectual Property (as defined in the Stalking Horse Agreement)), including (without limitation) (i) any and all liens, including any lien (statutory or otherwise), mortgage, pledge, security interest, hypothecation, deed of trust, deemed trust, option, right of use, right of first offer or first refusal, servitude, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, charge, prior claim, lease, conditional sale arrangement, or other similar restriction of any kind, but not including any prior intellectual property license granted by any of the Sellers (collectively, including "Liens" as defined in the Stalking Horse Agreement, the "Liens"), (ii) any and all debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured, known or unknown or determined or undeterminable, including any tax liability (other than Assumed Liabilities and the Permitted Encumbrances) (collectively, the "Liabilities" and together with the Liens, the "Interests"), with such Interests to attach to the sale proceeds in the same validity, extent and priority as immediately prior to the Sale, subject to any rights, claims and defenses of the Debtors and other parties in interest, and (iii) any and all claims as defined in 11 U.S.C. § 101(5), (collectively, the "Claims"), in each case other than Assumed Liabilities, the Permitted Encumbrances and liens created by or through the Stalking Horse Purchaser with respect to the Transferred Intellectual Property.

66.    The Debtors seek a finding by the Court that upon the Closing, and except as otherwise expressly provided in the Stalking Horse Agreement, the Stalking Horse Purchaser shall not be liable for any Claims against, and Interests and obligations of, the Debtors or any of the Debtors' predecessors or affiliates.  The Debtors further seek a finding by the Court that as of the Closing, subject to the provisions of this Order, the Stalking Horse Purchaser shall succeed to

the entirety of the Debtors' rights and obligations in the Assumed and Assigned Contracts first arising and attributable to the time period occurring on or after the Closing and shall have all rights thereunder.

67.     The Debtors further request that (i) all defaults (monetary and non-monetary) under the Assumed and Assigned Contracts through the Closing shall be deemed cured, (ii) no other amounts will be owed by the Debtors, their estates or the Stalking Horse Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period prior to Closing, (iii) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or the Stalking Horse Purchaser that any additional amounts are due or defaults exist under the Assumed and Assigned Contracts that arose or accrued, or relate to or are attributable to the period prior to the Closing.

**N.      Assumption and Assignment of the Assumed and Assigned Contracts**

68.     Pursuant to section 365(f) of the Bankruptcy Code, the Debtors seek authorization and approval to assume and assign the Assumed and Assigned Contracts to the Stalking Horse Purchaser notwithstanding any provision to the contrary in the Assumed and Assigned Contracts, or in applicable non-bankruptcy law, that prohibits, restricts, or conditions the assignment.

69.     Upon assumption of the Assumed and Assigned Contracts by the Debtors and assignment to the Stalking Horse Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of the Sale Order.

**O.      Canadian Proceedings**

70.     The Sellers subject to the CCAA proceedings are seeking approval from the Canadian Court of the bidding procedures (the "Canadian Bidding Procedures Order"), which request shall be considered at a joint hearing with this Court.  The final sale of the Assets also

will be submitted for approval by the Canadian Court.  The Debtors may seek recognition of the

Orders of this Court approving the sale from the Canadian Court.

**Basis for Relief**

**A.      Sale of the Assets Is a Product of the Debtors' Reasonable Business Judgment**

71.      Section 363(b)(1) of the Bankruptcy Code provides:  "[t]he Trustee, after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part:  "The Court may

issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of this title."

72.      Virtually all courts have held that approval of a proposed sale of assets of a debtor

under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to

the confirmation of a plan of reorganization is appropriate if a court finds that the transaction

represents a reasonable business judgment on the part of the trustee or debtor-in-possession.  See

In re Abbotts Dairies of Pa., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124

B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be

considered by a court in determining whether there is a sound business purpose for an asset sale:

"the proportionate value of the asset to the estate as a whole; the amount of elapsed time since

the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the

amount of proceeds to be obtained from the sale versus appraised values of the property; and

whether the asset is decreasing or increasing in value"); In re Stroud Ford, Inc., 164 B.R. 730,

732 (Bankr. M.D. Pa 1993); Titusville Country Club v. Pennbank (In re Titusville Country

Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Industrial Valley Refrigeration & Air

Conditioning Supplies Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); In re Lionel Corp., 722 F.2d

1063 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re

40

Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82

B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a

section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is

a good business reason for completing the sale and the transaction is in good faith").

73.     The "sound business reason" test requires a trustee or debtor-in-possession to

establish four elements:  (1) that a sound business purpose justifies the sale of assets outside the

ordinary course of business; (2) that accurate and reasonable notice has been provided to

interested persons; (3) that the trustee or the debtor-in-possession has obtained a fair and

reasonable price; and (4) good faith.  In re Titusville Country Club, 128 B.R. at 399; In re

Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R.

at 335-36; see also Stephens Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.[11]

74.     Additionally, prior to and after enactment of the Bankruptcy Code, courts have

permitted a proposed sale of all or substantially all assets of a trustee outside the ordinary course

of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or

interest holders.  See In re Abbotts Dairies of Pa., Inc., 788 F.2d at 143; In re Lionel Corp., 722

F.2d at 1063 (passim).

75.     The proposed procedures for the sale of the Debtors' Assets meet the "sound

business reason" test.  First, sound business purposes justify the sale.  The Debtors believe that a

prompt sale of the Assets conducted pursuant to the Bidding Procedures presents the best

opportunity to realize the maximum value of the Assets for distribution to the Debtors' estates

---

[11]     Lionel's "sound business purpose test" replaces an older rule that held that sales of substantially all of a
debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i.e. when
the assets to be sold were "wasting" or perishable.  Lionel, 722 F.2d at 1071.

and their creditors.  The Debtors further believe that the benefit to their creditors will be adversely affected absent an immediate sale.  See In re Lionel Corp., 722 F.2d at 1071 (of factors for court to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").

76.     The proposed procedures for the sale of the Assets also meet the other factors of the "sound business reason" test.  As part of this Motion, the Debtors have sought to establish procedures for notice to creditors and other prospective bidders.  Under the circumstances of this case, the Debtors submit that the notice period proposed satisfies the requirements of the Bankruptcy Rules, see Bankruptcy Rule 2002, and provides sufficient time for parties in interest to submit objections to the proposed sale and for bidders to formulate and submit competing proposals.

77.     Finally, the proposed procedures for the sale of the Assets, which require the Debtors to consult with the Committee, Bondholder Group and the Monitor throughout the process, satisfy the good faith requirement of Abbotts Dairies.  The Debtors submit that the results of the Auction will be the product of good faith, arm's-length negotiations with respect to the price and other terms of the sale of the Assets between the Debtors and highest and best bidder at the conclusion of the Auction.

78.     As set forth above, the Debtors have demonstrated compelling and sound business justifications for authorizing the sale of the Assets, entry into the Stalking Horse Agreement as a "stalking horse" sale agreement and the payment of the Bid Protections under the circumstances, timing, and procedures set forth herein and in the Bidding Procedures.  The Sale of the Assets pursuant to the Bidding Procedures will afford the Debtors' estates an opportunity to maximize the recoveries to creditors.  Accordingly, the Debtors request that the Court approve the proposed

procedures for the Sale of the Assets to the highest or otherwise best bidder at the Auction and approve the Sale presented to the Court at the Sale Hearing and authorize the Debtors to take such other steps as are necessary to consummate the Sale.

**B.    The Bidding Procedures Are Appropriate Under the Circumstances**

79.    A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business.  11 U.S.C. § 363.  Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case.  <u>See, e.g.</u>, <u>Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)</u>, 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); <u>In re Integrated Res.</u>, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting <u>Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.)</u>, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

80.    The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate.  The Debtors submit that the opportunity for competitive bidding embodied in the Bidding Procedures will generate the highest or otherwise best offer for the Assets and therefore is designed to maximize the value of the Assets.

81.    The Debtors believe that a prompt sale process is the best way to maximize the value of the Debtors' Assets for the benefit of their estates, creditors and other stakeholders.  Accordingly, the Debtors have concluded that:  (a) a prompt sale of the Assets is the best way to maximize value for these estates, and (b) the proposed Bidding Procedures described herein are

43

fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale

of the Assets.

### C.    Provision for Bid Protections in the Form of a Break-Up Fee and Expense Reimbursement Has Become a Recognized and Necessary Practice

82.    The Debtors have formulated a bidding process that the Debtors believe will

induce prospective competing bidders to expend the time, energy and resources necessary to

submit a bid, and which the Debtors believe is fair and reasonable and will provide a benefit to

the Debtors' estates and creditors.  The Bidding Procedures and, in particular, the proposed

Break-Up Fee and Expense Reimbursement, are reasonable and supported by applicable case

law.

83.    The use of bid protections such as these has become an established practice in

chapter 11 asset sales involving the sale of significant assets because such bid protections enable

a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair,

while providing the debtor with the potential of obtaining an enhanced recovery through an

auction process.  Historically, bankruptcy courts have approved bidding incentives (including bid

protections) solely by reference to the "business judgment rule," which proscribes judicial

second-guessing of the actions of a corporation's board of directors taken in good faith and in the

exercise of honest judgment.  See, e.g., In re 995 Fifth Ave. Assocs., 96 B.R. 24, 28 (Bankr.

S.D.N.Y. 1992) (holding that bidding incentives may "be legitimately necessary to convince a

'white knight' to enter the bidding by providing some form of compensation for the risks it is

undertaking") (citation omitted); In re Marrose Corp., Nos. 89 B 12171-12179 (CB), 1992 WL

33848, at *5 (Bankr. S.D.N.Y. 1992) ("[bidding incentives] are meant to compensate the

potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable

offers"); see also In re Integrated Res., 147 B.R. 650, 657-58 (S.D.N.Y. 1992).

84.     The Third Circuit Court of Appeals has clarified the standard for determining the appropriateness of bidding incentives in the bankruptcy context.  In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F. 3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives such as the Break-Up Fee must provide benefit to a debtor's estate.  Id. at 533.

85.     The O'Brien opinion identified at least two instances in which bidding incentives may provide benefit to the estate.  First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  Id. at 537.  Second, where the availability of bidding incentives induced a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  Id.

86.     The bid protections proposed by the Debtors are consistent with the "business judgment rule" and satisfy the Third Circuit's "administrative expense" standard.  At the inception of the marketing process, potential purchasers will be provided with the Stalking Horse Agreement and will be afforded an opportunity to submit their own adaptation of that agreement, marked to show changes necessary to consummate a sale which must be acceptable to the Debtors.  Under the "administrative expense" standard enunciated in O'Brien, as well as the "sound business judgment" standard followed in other jurisdictions, the bid protections proposed by the Debtors, including the Break-Up Fee and the Expense Reimbursement, should be

approved as fair and reasonable.  The proposed bid protections are reasonable and generally

consistent with the range of bidding protections typically approved by bankruptcy courts in this

district.  See, e.g., In re Rouge Indus., Inc., Case No. 03-13272 (Bankr. D. Del. Dec. 3, 2003); In

re Ameriserve Food Distrib., Inc., Case No. 00-00358 (Bankr. D. Del. Jan 31, 2000) (court

approved break up fee of 3.6% or $4 million in connection with a $110 million sale of assets); In

re Fruit of the Loom, Inc., Case No. 99-04497 (Bankr. D. Del. Dec. 29, 1999) (court approved

break-up fee of 3.0%, or $25 million in connection with a $835 million sale of business); In re

Worldwide Direct, Inc., Case No. 99-108 (Bankr. D. Del. Feb. 26, 1999) (approving break-up fee

of 3.1% of the proposed purchase price); In re Montgomery Ward Holding Corp., et al., Case No.

97-1409 (Bankr. D. Del. June 15, 1998) (court approved break-up fee of 2.7% or $3 million in

connection with $100 million sale of real estate); In re Medlab, Inc., Case No. 97-1893 (Bankr.

D. Del. Apr. 28, 1999) (court approved break-up fee of 3.12% or $250,000 in connection with $8

million sale transaction).  The Bid Protections also are consistent with bid protections previously

approved by the Court in the Debtors' cases.  See Order Pursuant to Bankruptcy Code Sections

105, 363 and 365 (A) Authorizing Debtors' Entry into the Asset Sale Agreement, (B)

Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up

Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E) Authorizing the

Filing of Certain Documents Under Seal, and (G) Setting a Date for the Sale Hearing [D.I. 1012]

(approving a break-up fee of 3% and expense reimbursement up to $3,000,000 in connection

with the sale of the CDMA and LTE Assets), and Order Pursuant to Bankruptcy Code Sections

105, 363 and 365 (A) Authorizing Debtors' Entry into the Asset Sale and Share Agreement, (B)

Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up

Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E) Approving the

Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under

Seal, and (G) Setting a Date for the Sale Hearing [D.I. 1278] (approving a break-up fee of

approximately 3% and expense reimbursement up to $9,500,000 in connection with the sale of

the Enterprise Business).

87.    Therefore, the Debtors' payment of the portion of the Bid Protections payable by

the Debtors under the conditions set forth in this Motion is (a) an actual and necessary cost of

preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code,

(b) of substantial benefit to the Debtors' estates and creditors and all parties in interest herein, (c)

reasonable and appropriate and (d) necessary to ensure that the Stalking Horse Purchaser will

continue to pursue the proposed Stalking Horse Agreement to undertake the sale of the Assets,

and therefore constitute administrative expenses with priority pursuant to Bankruptcy Code

sections 503(b).

**D.    The Stalking Horse Purchaser Should be Granted the Protection of Bankruptcy
Code Section 363(m)**

88.    As will be set forth in further detail at the Sale Hearing, the Debtors also maintain

that the Stalking Horse Purchaser is entitled to the protections afforded by Bankruptcy Code

section 363(m).

89.    Specifically, Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b)
> or (c) of this section of a sale or lease of property does not affect the validity of a
> sale or lease under such authorization to an entity that purchased or leased such
> property in good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).

90.    While the Bankruptcy Code does not define "good faith," the Third Circuit in In

re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) has held that:

47

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); see generally Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.), Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); see also In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)); In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

91.     As the Debtors will demonstrate at the Sale Hearing, over the last weeks and months, the Debtors have spent a considerable amount of time and resources negotiating the Stalking Horse Agreement at arm's length, with give and take on both sides.  Under the circumstances, this Court should find that the Stalking Horse Purchaser is entitled to all of the protections of Bankruptcy Code section 363(m).

**E.     The Stalking Horse Agreement is Not the Subject of Collusive Bidding Under Bankruptcy Code Section 363(n)**

92.     As set forth above, the Debtors have been negotiating with the Stalking Horse Purchaser at arm's length and in good faith regarding the sale of the Assets.  Moreover, the Debtors do not believe that any such sale will be the result of collusion or other bad faith between bidders or that the sale price under the Stalking Horse Agreement has been or will be controlled by an agreement between potential or actual bidders within the meaning of Bankruptcy Code section 363(n).

48

93.     As will be set forth in further detail at the Sale Hearing, the Stalking Horse Agreement with the Stalking Horse Purchaser has been negotiated, proposed, and entered into by the Debtors and the Stalking Horse Purchaser without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors nor the Stalking Horse Purchaser have engaged in any conduct that would cause or permit the Stalking Horse Agreement to be avoided under Bankruptcy Code section 363(n).

**E.     Privacy Ombudsman**

94.     Under section 363(b)(1) of the Bankruptcy Code, if the sale of a consumer customer list containing personal information relating to individual persons is inconsistent with the Debtors consumer privacy policy, section 332 governs the appointment of a consumer privacy ombudsman.  11 U.S.C. § 363(b)(1).  Here, none of the Debtors' customers that are subject to the sale of the Assets are individuals, and the Debtors do not have a consumer privacy policy, so section 363(b)(1) does not apply, and a consumer privacy ombudsman is not required.

**F.     Sale of the Assets Should Be Free and Clear of Liens, Claims and Interests**

95.     Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to sell and transfer the Debtors' right, interest and title in the Assets to the Stalking Horse Purchaser or Successful Bidder free and clear of all Claims and Interests, except as set forth in the Stalking Horse Agreement, with such Claims and Interests to attach to the proceeds of the sale of the Assets, subject to any rights and defenses of the Debtors and other parties in interest with respect thereto.  Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)      such entity consents;

(3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)      such interest is in bona fide dispute; or

(5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the requirements is met).

96.      With respect to each creditor asserting an Interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied.  Those holders of Claims and Interests who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2). Those holders of Claims and Interests who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f).

97.      A sale free and clear of Claims and Interests is necessary to maximize the value of the Assets.  The Stalking Horse Purchaser would not have entered into the Stalking Horse Agreement and would not consummate the Sale if the sale of the Assets to the Stalking Horse Purchaser were not free and clear of all Claims and Interests (as defined herein), or if the Stalking Horse Purchaser would, or in the future could, be liable for any of such Interest.  A sale of the Assets other than one free and clear of all Claims and Interests would yield substantially less value for the Debtors' estates, with less certainty than the proposed Sale.  Therefore, the Sale contemplated by the Stalking Horse Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.  A sale free and clear of Claims and

Interests is particularly appropriate under the circumstances because any lien or claim in, to or against the Debtors' right, interest and title in the Assets that exists immediately prior to the closing of any sales will attach to the sale proceeds allocated to the Debtors with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in interest.  The Debtors submit that holders of Claims and Interests, if any, will be adequately protected by the availability of the proceeds of the sale to satisfy their Claims and Interests.

**G.    Notice of the Proposed Sale Is Reasonable Under the Circumstances**

98.    The Debtors submit that the Sale Notice as set forth above, along with the Publication Notice in <u>The Wall Street Journal</u> (National Edition) and <u>The Globe & Mail</u> (National Edition), and <u>The Financial Times</u> (International Edition) is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Auction (if necessary) and the Sale Hearing.

**H.    The Assumption and Assignment of the Assumed and Assigned Contracts Should Be Authorized**

99.    Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an executory contract of a debtor.  This subsection provides:

> (b) (1)    If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -
>
> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party

other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).  Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part,

that:

The trustee may assign an executory contract or unexpired lease of the debtor only if --

(A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

100.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

101.    Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

52

102.    To the extent any defaults exist under any Assumed and Assigned Contracts, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment.  If necessary, the Debtors will submit facts prior to or at the Sale Hearing to show the financial credibility of the Stalking Horse Purchaser or Successful Bidder and willingness and ability to perform under the Assumed and Assigned Contracts.  The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Purchaser to provide adequate assurance of future performance under the Assumed and Assigned Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

103.    In addition, the Debtors submit that it is an exercise of their sound business judgment to assume and assign the Assumed and Assigned Contracts to the Stalking Horse Purchaser in connection with the consummation of the Sale, and the assumption, assignment and sale of Assumed and Assigned Contracts is in the best interests of the Debtors, their estates, their creditors and all parties in interest.  The Assumed and Assigned Contracts being assigned to the Stalking Horse Purchaser are an integral part of the Assets being purchased by the Stalking Horse Purchaser, and accordingly, such assumption, assignment and sale of Assumed and Assigned Contracts are reasonable and enhance the value of the Debtors' estates.  The Court should therefore authorize the Debtors to assume and assign the Assumed and Assigned Contracts as set forth herein.

**I.      Information Regarding the Debtors' Customers Is Confidential Commercial Information and Should Be Filed Under Seal**

104.    The Debtors propose to file the lists of Customer Contracts to be assumed and assigned under seal and to serve individualized notices of the assignment to the relevant Counterparties.

105.    The relief requested by the Debtors is squarely authorized under the Bankruptcy

Code.  Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to

issue orders to protect a party's confidential, commercial or proprietary information:

> On request of a party in interest, the bankruptcy court shall . . .
> protect an entity with respect to a trade secret or confidential
> research, development, or commercial information. . . .

11 U.S.C. § 107(b).

106.    Furthermore, Bankruptcy Rule 9018 defines the procedure by which a party may

move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court
> may make any order which justice requires . . . to protect the estate
> or any entity in respect of a trade secret or other confidential
> research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018.

107.    This Court has defined "commercial information" in the context of section 107(b)

as follows:

> Commercial information is information which would result in 'an
> unfair advantage to competitors by providing them information as
> to the commercial operations of the debtor.'

In re Alterra Healthcare Corp., 353 B.R. 66, 75-76 (Bankr. D. Del. 2006) (citing In re Orion

Pictures Corp., 21 F.3d 24, 27-28 (2d Cir. 1994)).  This Court has also explained that section

107(b)'s exception to usual public disclosure mandated by section 107(a) is "intended to avoid

'affording an unfair advantage to competitors by providing them information as to the

commercial operations of the debtor.'"  In re MUMA Services Inc., 279 B.R. 478, 484 (Bankr.

D. Del. 2002) (citing In re Itel Corp., 17 B.R. 942, 944 (B.A.P. 9th Cir. 1982)).

108.    Since information related to the Customer Contracts is "commercial information"

within the ambit of section 107, the Court should enter an order permitting the Debtors to file

under seal all confidential information related to the Customer Contracts.

109.    The identities of Customer Counterparties constitute confidential commercial

information because they represent a significant aspect of the value of the MEN Business and the

Assets.  Access to the list of Customer Counterparties absent appropriate confidentiality

restrictions would entail releasing confidential information of critical value not only to any

prospective purchaser of the Customer Contracts but also to the Debtors' other businesses.

Therefore, it is critical to the preservation of the value of the Debtors' estate that the Court allow

for this confidential information to be filed under seal.

110.    As such, the Debtors respectfully submit that the Court should permit the Debtors

to file their certificate of service listing the names and addresses of such parties under seal.

**J.      Waiver of Bankruptcy Rule 6006(f)(6) with Respect to the Assumed and Assigned Contracts**

111.    Bankruptcy Rule 6006(f)(6) requires that an omnibus motion to reject, assume

or assign multiple executory contracts or unexpired leases "be limited to no more than 100

executory contracts or unexpired leases."  With regards to the Assumed and Assigned

Contracts, the Debtors request that the Court waive the provision in Bankruptcy Rule

6006(f)(6) limiting the number of executory contracts and unexpired leases that may be

incorporated into one omnibus motion.  Rule 6006(f)(6) seeks "to help the other parties to the

contracts locate their information in the midst of the omnibus motion."  10 Collier on

Bankruptcy ¶ 6006.05 (15th ed. 1999).  Because the Debtors propose to send an individual

notice to each Counterparty, the purpose of the rule will be satisfied without needlessly filing

multiple motions with the Court.

**K.      Waiver of Automatic Ten-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)**

112.    Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all

orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for ten days after entry of the order.  Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for ten days after entry of the order.  The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

113.    Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, commentators agree that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure.  See generally 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  Id.

114.    Pursuant to the Stalking Horse Agreement, and because of the potentially diminishing value of the Assets, the Debtors must close this sale promptly after all closing conditions have been met or waived.  Thus, waiver of any applicable stays is appropriate in this circumstance.

## Notice

115.    Notice of the Motion has been given via first-class mail, facsimile, electronic transmission, hand delivery or overnight mail to (i) counsel to the Stalking Horse Purchaser; (ii) the Office of the U.S. Trustee; (iii) the Monitor; (iv) counsel to the Committee; (v) counsel to the Bondholder Group; and (vi) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  The Debtors submit that under the circumstances no other or further

notice is necessary.

## No Prior Request

116.    No prior request for the relief sought herein has been made to this or any other

court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and

the relief requested herein; (ii) enter the proposed orders attached hereto; and (iii) grant such

other and further relief as it deems just and proper.

Dated:  October 7, 2009              CLEARY GOTTLIEB STEEN & HAMILTON LLP
Wilmington, Delaware

James L. Bromley (No. 5125)
Lisa M. Schweitzer (No. 1033)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors and Debtors in Possession*