**Exhibit B**

**Declaration of George Riedel**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------X
: 
: Chapter 11
*In re* :
: Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,[1] :
: Joint ly Administered
                Debtors. :
: 
---------------------------------------------------------------X

**DECLARATION OF GEORGE RIEDEL IN SUPPORT OF DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING DEBTORS' ENTRY INTO THE STALKING HORSE ASSET SALE AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES AND BID PROTECTIONS, (C) APPROVING THE NOTICE PROCEDURES AND THE ASSUMPTION AND ASSIGNMENT PROCEDURES, (D) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL AND (E) SETTING A DATE FOR THE SALE HEARING, AND (II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF DEBTORS' METRO ETHERNET NETWORKS BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS**

I, George Riedel, declare under penalty of perjury as follows:

1. I am Chief Strategy Officer of Nortel Networks Corporation ("NNC") and Nortel Networks Limited ("NNL"), direct corporate parent of Nortel Networks, Inc. ("NNI" and, together with the other above-captioned debtors, the "Debtors" or the "U.S. Debtors"). I have held these positions since February 2006.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

2.      I submit this declaration in support of the Debtors' motion (the "Sale Motion")[2] for orders (i) (a) authorizing the Debtors' entry into that certain asset sale agreement dated as of October 7, 2009 among NNI, NNL, NNC and certain other Sellers and Ciena Corporation as purchaser ("Ciena" or the "Stalking Horse Purchaser") for the sale of certain assets of the Sellers' MEN Business as described therein (the "Purchased Assets") as a "stalking-horse" sale agreement (as appended to the Sale Motion as Exhibit A, the "Stalking Horse Agreement"), (b) authorizing and approving the Bidding Procedures and the Bid Protections, including granting administrative expense status to the Bid Protections payable by the Debtors to the Stalking Horse Purchaser, (c) approving the Notice Procedures and the Assumption and Assignment Procedures, (d) authorizing the Debtors to file certain documents under seal and (e) setting the time, date and place for the Sale Hearing, (ii) authorizing and approving (a) the sale of the Assets, free and clear of all liens, claims, and encumbrances, pursuant to section 363 of the Bankruptcy Code, except as set forth in the Stalking Horse Agreement and (b) the assumption and assignment of the Assumed and Assigned Contracts pursuant to section 365 of the Bankruptcy Code; and (iii) granting them such other and further relief as the Court deems just and proper.

3.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals or learned from my review of relevant documents or upon my opinion based on my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this declaration.

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Sale Motion.

4.        I have participated in or was informed of Nortel's exploration of opportunities to sell the Assets that have since resulted in the negotiations and execution of the Stalking Horse Agreement among NNI, NNL, NNC and certain of their affiliates, as Sellers and Ciena as the Stalking Horse Purchaser, dated as of October 7, 2009, and the EMEA Agreement dated as of the same date.

5.        Nortel's MEN Business includes optical networking, carrier Ethernet switching and multiservice switching products, delivering carrier-grade Ethernet transport capabilities for higher performance and lower cost for emerging video-intensive applications.

6.        The MEN Business's optical networking portfolio includes the 40G Adaptive Optical Engine technology, which can quadruple network capacity while being deployable over any fiber, allowing service providers to reduce engineering and equipment expense and upgrade quickly and cost-effectively from 10G to 40G.  The MEN Business also is in the process of developing the industry's first optical technology that can deliver both 40G and 100G network capacity, enabling four times the network throughput immediately, while providing the foundation to simply and affordably increase capacity tenfold as required.

7.        Nortel's principal competitors in the global optical market are large communications companies such as Alcatel-Lucent, Huawei Technologies Co., Ltd., Nokia Siemens Networks B.V., Fujitsu Limited, Ericsson and Cisco Systems, Inc., as well as others that address specific niches within this market, such as Ciena, ADVA AG Optical Networking, Meiningen, Tellabs, Inc. and Infinera Corporation.

8.        The environment in which Nortel operates is highly competitive, the competition for market share is fierce, and the cost of rapid technological development is steep.  Furthermore, the scale requirements to compete in this industry are substantial.  Due to the global economic

downturn, Nortel is experiencing significant pressure on its businesses and facing competing demands on its cash resources, globally as well as on a regional basis, as customers across all businesses suspend, delay and reduce capital expenditures. The extreme volatility in the financial, foreign exchange and credit markets globally and the uncertainty created by the ongoing creditor protection proceedings has compounded the situation. On June 19, 2009, Nortel announced that it had determined that the sale of its businesses is best path for Nortel to maximize value.

9. Even before filing for creditor protection, it had become clear that in order to reduce operating costs during a time of decreased customer spending and global economic uncertainty, Nortel would need to consider strategic divestiture as a way to conserve liquidity and consolidate its position with respect to its remaining businesses. Accordingly, Nortel had begun the process of marketing the Assets for sale before the decision was made to file for creditor protection.

10. Nortel first announced its intention to explore a divestiture of the MEN Business in September 2008. With a strong customer base and industry-leading technology breakthroughs such as 40G/100G optical networking, the MEN Business was considered a premium asset with a highly differentiated offering, making it attractive to potential purchasers.

11. In connection with this initial effort, Nortel, in consultation with its financial advisors, approached approximately fifty parties likely to be interested and able to acquire the MEN Business, including a mix of financial investors and strategic buyers. An information memorandum was provided to the twenty-one parties who had executed confidentiality agreements. Of those parties who subsequently submitted expressions of interest, Nortel conducted management presentations with the entities it deemed able to consummate a

transaction for the MEN Business, and ultimately gave five companies access to an electronic data room containing confidential diligence materials regarding the MEN Business.

12.     As of the Petition Date, Nortel was in serious discussions with three potential bidders, including Ciena.  The commencement of creditor protection proceedings forced Nortel to put its plans to divest the MEN Business on hold in order to evaluate the future of the company as a whole.

13.     Since the Petition Date, the Debtors have reinitiated their efforts to divest the MEN Business, re-canvassing many of the entities originally contacted in connection with the previous sale, plus five additional parties.  As a result of these efforts, thirteen parties expressed interest in purchasing the assets, executed confidentiality agreements and were provided confidential information memoranda.  All thirteen were given access to the electronic data room, and management presentations were conducted with seven entities.

14.     I believe, based on the Debtors' prior exploration of potential transactions involving the MEN Business and after re-canvassing the marketplace since the commencement of these chapter 11 cases, that that the proposed transaction with the Stalking Horse Purchaser represents the highest and best proposal available for the MEN Business, subject to the receipt of a better bid through the auction process contemplated in the Sale Motion.

15.     The potential purchase price that could be realized through a sale of the Assets is likely to decline over time if the Assets remain unsold.  While it is clear that the Assets have significant value, the full value of the Assets may not be realized if a sale is not consummated quickly.

16.     The Stalking Horse Agreement requires an expeditious sale process and provides the Stalking Horse Purchaser the right to terminate the Stalking Horse Agreement if certain

milestones in the sale process are not timely met.  For example, if the Court does not approve the Bidding Procedures Order by October 19, 2009, the Stalking Horse Purchaser may terminate the Stalking Horse Agreement.  For these reasons, the expeditious sale of the Assets is critical to the maximization of the value of the Debtors' assets and, in turn, to a recovery for the Debtors' estates.

17.	As part of the Sale Motion, the Debtors seek authority to file certain notices identifying their Customer Contracts under seal.  A significant aspect of the value of the MEN Business is the established relationships the Debtors maintain with hundreds of customers with whom they have entered into the contracts at issue in the Sale Motion, in addition to other contracts related to the MEN Business but not at issue in the Sale Motion.  These Customer Contracts are of critical value not only to any prospective purchaser of the Customer Contracts but also to the Debtors' other businesses.

18.	If a list of counterparties to the Debtors' Customer Contracts were to be made publicly available, I believe that the value of the Assets would decline further, and as a result, the Stalking Horse Purchaser may become less likely to consummate the transaction.

19.	In addition, publicizing such a list would disclose confidential proprietary information enabling competitors of the Debtors to solicit such customers for the sale of competing products and services, which would be detrimental to the preservation of the value of the Debtors' estates.

20.	Accordingly, I believe the best interests of the Debtors and their creditors require that the sale of the Assets and contracts be completed as expeditiously as possible, and that the Court approve procedures by which the sale can be carried out without publicly divulging the names of the counterparties to the Customer Contracts.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: October 7, 2009
New York, NY

_____
George Riedel

HANNA MURNANE
Notary Public, State of New York
No. 41-4729327
Qualified in Queens County
Commission Expires March 30, 2010

10/7/2009