## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X
                              :

*In re*                                   :    Chapter 11
                              :

Nortel Networks Inc., *et al.*,[1]        :    Case No. 09-10138 (KG)
                              :

                  Debtors.     :    Jointly Administered
                              :

                              :    **Hearing date: October 28, 2009 2:00 PM (ET)**
                              :    **Objections due: October 21, 2009 4:00 PM (ET)**

---------------------------------------------------------X

## DEBTORS' MOTION FOR ENTRY OF AN
## ORDER AUTHORIZING PAYMENT OF PREPETITION TERMINATION
## BENEFITS TO CERTAIN ADDITIONAL FOREIGN EMPLOYEES

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of

an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a) and

363(b) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing the Debtors, in

their sole discretion, to pay termination benefits to certain additional foreign employees; and

granting them such other and further relief as the Court deems just and proper. In support of this

Motion, the Debtors rely on the Declarations of Sally El Shalakany (the "El Shalakany

Declaration"), attached hereto as Exhibit B, and Mehdi Ben Slama (the "Ben Slama

Declaration"), attached hereto as Exhibit C. In further support of this Motion, the Debtors

respectfully represent as follows:

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

**Jurisdiction**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code.

**Background**

**A.      Introduction**

3.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.  Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

foreign main proceedings under chapter 15 of the Bankruptcy Code.  On January 14, 2009, the

Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign

proceeding under section 18.6 of the CCAA.  On February 27, 2009, this Court entered an order

recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the

Bankruptcy Code.  On January 14, 2009, the High Court of Justice in England placed nineteen of

Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the

control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators").  On

May 28, 2009, at the request of the Administrators, the Commercial Court of Versailles, France

(Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of

Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA

will continue to operate as a going concern until November 28, 2009.  In accordance with the

European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the

English law proceedings remain the main proceedings in respect of NNSA.  On June 8, 2009,

Nortel Networks UK Limited ("NNUK") filed petitions in this Court for recognition of the

English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.  On

June 26, 2009, the Court entered an order recognizing the English Proceedings as foreign main

proceedings under chapter 15 of the Bankruptcy Code.

6.    On January 15, 2009, this Court entered an order of joint administration pursuant

to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that

---

[3]    The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

7.      On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

8.      On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor together with NNI and certain of its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, the Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA of certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

**B.      Debtors' Corporate Structure and Business**

9.      A description of the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").[4]

**C.      The Enterprise Solutions Business Transaction**

10.      On September 16, 2009, the Court entered an Order approving the sale of the Debtors' Enterprise Solutions business to Avaya Inc. (the "Purchaser") as the successful bidder

---

[4]      Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

4

at auction (the "Enterprise Transaction").  As part of the asset share and sale agreement signed

by the Debtors and the Purchaser (the "Enterprise Agreement"), the Purchaser has agreed to

accept the transfer of a number of Nortel's employees to the Purchaser on a worldwide basis,

with the specific employees to be transferred to be determined prior to closing the Enterprise

Transaction.

## Relief Requested

11.     By this Motion, the Debtors seek an order authorizing but not directing the

Debtors to pay as when due, in their sole discretion and in the ordinary course of business, the

Foreign Termination Expenses (as defined below).

## Facts Relevant to the Motion

12.     On August 25, 2009, the Debtors filed a motion requesting authority to pay up to

$2 million in foreign termination expenses for employees serving the NNI branch office located

in Dubai, United Arab Emirates (the "Dubai Foreign Terminations Motion").  As part of the

Dubai Foreign Terminations Motion, the Debtors reserved the right to return to the Court to seek

similar relief with regard to future terminations in other countries as necessary.  The Court

granted the Dubai Foreign Terminations Motion on September 15, 2009.  As the Debtors

continue to evaluate their needs in light of the pursuit of various transactions, the Debtors have

come to a more definitive understanding as to the need to terminate the employment of

individuals in additional foreign branch offices.

13.     In the ordinary course of its business, NNI maintains a branch office primarily

dedicated to sales and distribution for the Enterprise Solutions business in Cairo, Egypt (the

"Cairo Office").  A total of seven (7) employees currently work in the Cairo Office.

Additionally, NNI maintains a branch office primarily dedicated to sales and distribution for the

Debtors' Carrier VoIP and Application Solutions ("CVAS") business, which is part of the

Debtors' Carrier business, in Tunis, Tunisia (the "Tunis Office," and together with the Cairo

Office, the "Foreign Offices").  A total of three (3) employees currently work in the Tunis

Office.

14.    As part of their ongoing restructuring efforts, the Debtors have concluded that

they must now terminate the employment of a small number of employees in the Cairo Office

and in the Tunis Office because their positions have become economically redundant (the "Near-

Term Terminations").  These Near-Term Terminations are necessary to ensure the efficient use

of the Debtors' limited resources.  The Near-Term Terminations are expected to occur by the end

of October 2009.[5]

15.    In addition, the Debtors anticipate that in the coming months, upon determining

with greater certainty which (if any) of the employees from the Cairo Office will be transferred

to the Purchaser as part of the Enterprise Transaction and which (if any) of the employees in the

Tunis Office will be transferred as part of any transaction involving the CVAS business, the

Debtors will have to undertake additional terminations (the "Long-Term Terminations") in the

Foreign Offices.  The Debtors believe that it is important to continue to operate the Foreign

Offices in the interim because many of the employees in the Foreign Offices are integral to the

remaining businesses that the Debtors are currently in the process of selling.  In order to

maximize the value of those businesses in possible transactions, it is necessary for the Debtors to

provide the Purchaser in the Enterprise Transaction and any potential purchasers in a transaction

involving the CVAS business or any other business with the option to transfer the Foreign

Offices' employees as part of those transactions.

---

[5]    The Debtors reserve the right to return to the Court to seek similar relief with regard to future terminations in other countries, as necessary.

16.     In order to carry out both the Near-Term and Long-Term Terminations, the Debtors will incur certain termination costs imposed by domestic law in Egypt and Tunisia (the "Foreign Termination Expenses").  As described in greater detail below, these Foreign Termination Expenses are calculated largely by reference to the length of the employees' tenure with the Debtors, most of which will have occurred prepetition.  If the Foreign Termination Expenses are not paid, the Debtors will likely be unable to continue to operate the Foreign Offices, as courts and other entities in Egypt and Tunisia are unlikely to respect the automatic stay imposed by U.S. law, leaving the Debtors liable for the Foreign Termination Expenses while incurring additional costs for litigation.

17.     As described in the El Shalakany Declaration, under Egyptian law, before an employer may terminate an individual's employment because of economic redundancy reasons, the employer must submit a request to an Egyptian governmental committee for approval of the termination.  Additionally, the employer must make a severance payment equivalent to one month of the employee's wages for each of the first five years of the employee's service.  For each year of employment exceeding five years, severance payments must amount to one and a half months of the terminated employee's wages.  Employers also must provide payments for unused vacation days and other payments and termination benefits promised in the employee's employment agreement.  Since convening the Egyptian governmental committee and obtaining its approval can be time consuming, employers and employees typically reach consensual agreements by which employees resign in exchange for severance payments that usually amount to two months' wages for each year of the employee's service.

18.     As described in the Ben Slama Declaration, under Tunisian Law, before an employer terminates an individual's employment because of economic redundancy reasons, the

employer typically seeks to negotiate a mutually-agreed severance payment with the terminated employee. Severance amounts discussed in such negotiation typically occupy a range wherein the employee's end-of-service indemnity (the <u>EOS Indemnity</u>) under the Tunisian Labour Code serves as the minimum floor for negotiation. The EOS Indemnity is equivalent to one day of the employee's wages for each month of the employee's service, up to a maximum of three (3) months' wages (subject to a higher EOS Indemnity provided by a specific collective agreement).[6] If such negotiation is unsuccessful, the employer must notify the Tunisian Labour Inspectorate, which inquires as to the economic basis for the termination and attempts to facilitate a mutual agreement between the parties. If an agreement cannot be reached, the matter is then referred to the Commission for Control of Dismissals (the "<u>Commission</u>") for approval of the termination. The Commission will either accept the termination and recommend payment of termination benefits or propose alternative solutions. If the Commission accepts the termination as justified, it will recommend the payment of termination benefits based on the circumstances of the parties and based on the amounts discussed in the mutual negotiation. The Commission typically recommends payment of an amount that reasonably exceeds the minimum EOS Indemnity. The Commission will also take into account payments for unused vacation days as well as any other payments promised in the employee's agreement upon termination. If either party refuses to abide by the Commission's recommendation, the matter is referred to the Tunisian courts for litigation over the proper amount of termination benefits to be paid.[7]

---

[6]     The Tunis Office is covered by the Tunisian Collective Agreement applicable to Electricity and Electronic sectors approved by the Ministerial Order of 15 September 1999. According to this Collective Agreement, the end-of-service indemnity is calculated on the basis of one day of the employee's wages for each month of the employee's service, up to a maximum of six (6) months' wages.

[7]     If the Commission determines that the termination is not legitimate, or if the employer fails to avail itself of the process described herein, there is a possibility that a court could impose unfair dismissal costs on the employer. Under the Tunisian Labour Code, unfair dismissal costs vary between one and two months of the employee's wages for each year of the employee's service, up to a maximum of three (3) years' wages.

19.     The Debtors estimate that they will owe, at most, approximately $829,501 in Foreign Termination Expenses to carry out the Near-Term and Long-Term Terminations.  This estimate is based on a worst-case scenario in which no employees are transferred to the purchasers as part of the Enterprise Transaction and/or any sale of the other remaining businesses, because the number of employees that will be transferred ultimately in connection with such sales is unknown at this time.  The Debtors have not to date sold assets relating to their CVAS business, nor has it been determined how many (if any) of the employees from the Cairo Office will be transferred to the Purchaser as part of the Enterprise Transaction, and therefore the extent of the Long-Term Terminations remains uncertain at this time.  Moreover, this estimate represents a worst-case scenario because the estimate is based on a calculation of the maximum amount that the employees would be entitled to, and the Debtors may have the ability to negotiate with certain of the employees to pay lesser amounts in Foreign Termination Expenses.  For these reasons, the Debtors anticipate that the actual cost of the Long-Term Terminations could be significantly lower than the estimate presented in this Motion.

20.     Under well-established Third Circuit precedent, termination benefits can only be accorded administrative priority status if they were actually earned by employees postpetition.  Typically, this has meant that while lump sum fixed or salary-based payments provided in lieu of advance notice of termination is an administrative expense, payments for severance and unused vacation accrued prepetition, such as where the amount of severance owed is linked to the length of employment, constitute prepetition claims.  See, e.g., In re Hechinger Inv. Co. of Delaware, 298 F.3d 219, 226-27 (3d Cir. 2002); In re Roth American, Inc., 975 F.2d 949, 957-58 (3d Cir. 1992).  As a result, the automatic stay currently prevents the Debtors from paying most of the

Foreign Termination Expenses since they are tied to the employees' prepetition service, and therefore earned by the employees prepetition.

21.     However, as described in the El Shalakany and Ben Slama Declarations, it is unlikely that courts and other entities in Egypt and Tunisia would respect the jurisdiction of this Court and the automatic stay imposed by U.S. law.  As a result, if the Debtors were to attempt to enforce the automatic stay in Egyptian and Tunisian courts, such an attempt would likely be unsuccessful, leaving the Debtors liable for the Foreign Termination Expenses while incurring additional costs for litigation and damages.  This added expense would needlessly drain the assets of the Debtors' estates, to the detriment of both the Debtors and their creditors, and could result in the closure of the Foreign Offices.  As noted, it is important to continue to operate the Foreign Offices as the Debtors pursue transactions involving the Enterprise Solutions and CVAS businesses, as the Foreign Offices employ individuals who may be critical to those businesses. Therefore, the Debtors seek by this Motion authority to pay as when due, in their sole discretion and in the ordinary course of business, the Foreign Termination Expenses.

**Basis for Relief**

22.     The Debtors submit that the relief requested is reasonable and necessary under the circumstances and justified by applicable law.  Section 363(b)(1) of the Bankruptcy Code provides that, after notice and a hearing, the trustee "may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  The Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a)

of the Bankruptcy Code, courts may permit pre-plan payments of prepetition obligations when essential to the continued operation and reorganization of the debtor's business. Specifically, this Court may use its power under section 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").

23.     The "doctrine of necessity" or the "necessity of payment" rule originated in railway cases and was first articulated by the United States Supreme Court in Miltenberger v. Logansport, C. & S. W. R. Co., 106 U.S. 286 (1882). The Third Circuit recognized the "necessity of payment" doctrine in In re Lehigh & New England Railway Co., 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit has held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. See In re Just for Feet, Inc., 242 B.R. 821, 824-26 (D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).[8]

24.     Today, the rationale for the necessity of payment rule – the rehabilitation of a debtor in reorganization cases – is "the paramount policy and goal of Chapter 11." In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); see also Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation" is appropriate); In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991)

---

[8]     Additionally, the Bankruptcy Code contemplates prepetition payments in some circumstances. Section 549(a), which deals with postpetition transfers, provides that "the trustee may avoid a transfer of property of the estate . . . that occurs after the commencement of the case . . . that is not authorized . . . by the court." 11 U.S.C. § 549(a). Thus, by necessary implication, a bankruptcy court may authorize limited postpetition payments to satisfy prepetition obligations. See In re Isis Foods, Inc., 37 B.R. 334, 336 n.3 (W.D. Mo. 1984) (noting that "proposed transfers [to pay prepetition claims may] be presented in advance to a bankruptcy court for its approval and would thereafter be insulated from attack" under section 549(a); see also 11 U.S.C. § 363(b)(1) (allowing the trustee, after notice and hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate").

("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately").

25.     Since payment of the Foreign Termination Expenses is essential to the Debtors' restructuring and cost savings efforts in Egypt and Tunisia, and because the Foreign Offices must remain open as the Debtors pursue transactions involving the Enterprise and CVAS businesses, the Debtors have met the standard for authorizing payment of prepetition obligations under section 105(a).  Such restructuring and cost-saving measures play a key role in the Debtors' ability to continue to operate and maximize value of the Debtors' estates.  It is not uncommon for foreign entities and courts to assert that they are not subject to the jurisdiction of a United States bankruptcy court and, as such, not subject to the automatic stay provisions of 11 U.S.C. section 362.  Although the Debtors vigorously dispute such contentions, if the Debtors proceeded with their planned terminations without paying the Foreign Termination Expenses, the automatic stay would likely not protect them under Egyptian or Tunisian law.  As a result, attempting to enforce the automatic stay would merely impose additional litigation expenses on the Debtors, while failing to shield the Debtors from paying the Foreign Termination Expenses.

26.     Such added litigation expense would needlessly drain the assets of the Debtors'

estates.  During this difficult period, the Debtors have limited resources, and therefore must

eliminate the positions of certain employees.  Since the purpose of these terminations is to

preserve the limited assets of the Debtors' estates, and because the Debtors need to continue

operating the Foreign Offices in order to maximize those assets, increasing the expenses

associated with these terminations clearly runs contrary to the interests of the Debtors, their

estates and their creditors.

27.     Bankruptcy courts routinely grant authorization for chapter 11 debtors to pay

claims owing to foreign entities against which the automatic stay cannot be readily enforced in

the United States and as to which it would be unduly time-consuming and expensive to seek to

enforce an order of the bankruptcy court in the creditor's home country.  See, e.g., In re Nortel

Networks Inc., Case No. 09-10138 (KG) (Bankr. D. Del. Jan. 16, 2009); In re Delta Air Lines,

Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005); In re Northwest Airlines

Corp., Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sept. 15, 2005); In re US Airways Group,

Inc., Case No. 02-83983 (SSM) (Bankr. E.D. Va. Aug. 12, 2002); In re WorldCom, Inc., Case

No. 02-13533 (AJG) (Bankr. S.D.N.Y. July 22, 2002 and Aug. 13, 2002); In re Global Crossing

Ltd., Case Nos. 02-40187 through 02-40241 (REG) (Bankr. S.D.N.Y. Jan. 28, 2002); In re Kmart

Corp., Case No. 02-02474 (SPS) (Bankr. N.D. Ill. Jan. 25, 2002); In re Enron Corp., Case No.

01-16034 (AJG) (Bankr. S.D.N.Y. Dec. 4, 2001).

28.     The Debtors submit that, to the best of their knowledge, section 503(c)(2) of the

Bankruptcy Code, which places restrictions on "severance payment[s]" to "insider[s]," 11 U.S.C.

§ 503(c)(2), does not apply here because none of the employees receiving payments for Foreign

Termination Expenses is an insider, as such term is defined by the Bankruptcy Code.

29.      Nothing contained herein is intended or should be construed as:  (i) an admission as to the validity of any claim against the Debtors; (ii) an admission that any claims that might arise upon the termination of the employment of an employee, including without limitation claims relating to severance, notice pay and repatriation expenses, are entitled to payment as an administrative expense; (iii) a waiver of the Debtors' rights to dispute any claim on any grounds or assert any counterclaims or affirmative defenses; (iv) a promise to pay any claim; (v) an implication or admission that any particular claim would constitute Foreign Termination Expenses; or (vi) a request to assume any executory contract or unexpired lease, pursuant to section 365 of the Bankruptcy Code.

### Request for Waiver of Stay

30.      The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." As set forth above, the immediate payment of the Foreign Termination Expenses is essential to protect the value of the Debtors' estates.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the ten-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

### Notice

31.      Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to the (i) Office of the United States Trustee for the District of Delaware; (ii) the Committee; and (iii) the Bondholder Group; and (iv) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

**No Prior Request**

32.     No prior request for the relief sought herein has been made to this or any other

court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and

the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other

and further relief as it deems just and proper.

Dated:  October 8, 2009          CLEARY GOTTLIEB STEEN & HAMILTON LLP
      Wilmington, Delaware

                       James L. Bromley
                       Lisa M. Schweitzer
                       One Liberty Plaza
                       New York, New York 10006
                       Telephone:  (212) 225-2000
                       Facsimile:  (212) 225-3999

                      - and -

                       MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                       */s Ann C. Cordo*
                       Derek C. Abbott (No. 3376)
                       Eric D. Schwartz (No. 3134)
                       Ann C. Cordo (No. 4817)
                       Andrew R. Remming (No. 5120)
                       1201 North Market Street
                       P.O. Box 1347
                       Wilmington, Delaware 19801
                       Telephone:  (302) 658-9200
                       Facsimile: (302) 658-3989

                       *Counsel for the Debtors and Debtors in Possession*

3165088.1