**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------X
               :

*In re*                           :      Chapter 11
               :

Nortel Networks Inc., *et al.*,[1]     :      Case No. 09-10138 (KG)
               :

             Debtors.    :      Jointly Administered
               :

               :      **Hearing date: October 13, 2009 at 10:00 AM (ET)**
               :      **Objections due: October 13, 2009 at 9:00 AM (ET)**
               :

---------------------------------------------------------X

## DEBTORS' MOTION FOR AN ORDER APPROVING STIPULATION WITH THE PENSION BENEFIT GUARANTY CORPORATION

Nortel Networks Inc. ("NNI"), and its affiliated Debtors and Debtors in possession

(collectively, the "Debtors"), hereby move this Court (the "Motion"), pursuant to section 105(a)

of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of an Order substantially

in the form attached hereto as Exhibit A, approving a Stipulation (the "PBGC Stipulation") with

the Pension Benefit Guaranty Corporation ("PBGC"), in the form attached hereto as Exhibit B,

pursuant to which the PBGC has agreed to waive claims and potential claims against certain NNI

wholly owned, non-debtor subsidiaries, the shares of which are to be sold as part of the sale of

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. f/k/a Alteon WebSystems, Inc. (9769), Nortel Altsystems International, Inc. f/k/a Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

the Debtors' Enterprise Solutions Business, in exchange for certain consideration from NNI.  In

support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are section 105(a) of the

Bankruptcy Code and Rule 9019 of the Bankruptcy Rules.

## BACKGROUND

**A.      Introduction**

3.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

Debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario

Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement

Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian

Proceedings").  The Canadian Debtors continue to manage their properties and operate their

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

businesses under the supervision of the Canadian Court.  Ernst & Young Inc., as court-appointed

Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the

"Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as

foreign main proceedings under chapter 15 of the Bankruptcy Code.  On January 14, 2009, the

Canadian Court entered an Order recognizing these chapter 11 proceedings as a foreign

proceeding under section 18.6 of the CCAA.  On February 27, 2009, this Court entered an Order

recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the

Bankruptcy Code.  In addition, on January 14, 2009, the High Court of Justice in England placed

nineteen of Nortel's European affiliates into administration under the control of individuals from

Ernst & Young LLC (collectively, the "Joint Administrator").

6.    On January 15, 2009, this Court entered an Order of Joint Administration

pursuant to Rule 1015(b) of the Bankruptcy Rules that provided for the joint administration of

these cases and for consolidation for procedural purposes only.

7.    On January 26, 2009, the Office of the United States Trustee (the "U.S. Trustee")

appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section

1102(a)(1) of the Bankruptcy Code (D.I.s 141, 142).  No trustee or examiner has been appointed

in the Debtors' cases.

8.    By Order dated August 4, 2009, the Court set the general bar date for filing claims

at September 30, 2009.

### B.    The Proposed Sale of the Enterprise Solutions Business

9.    By Order entered September 16, 2009, (the "Sale Order"), the Court approved the

sale of Nortel's Enterprise Solutions Business to Avaya, Inc. ("Avaya"), pursuant to the

Amended and Restated Asset and Share Sale Agreement between and among various Nortel

entities and Avaya, dated September 14, 2009 (the "ASSA").  The sale of the Enterprise

Solutions Business (the "Enterprise Sale") includes the sale of 100% of the shares of two wholly

owned non-debtor subsidiaries of NNI, Nortel Government Solutions Inc. (together with its own

subsidiaries, collectively "NGS"), and DiamondWare Ltd. ("DiamondWare" and together with

NGS, the "Non-Debtor Subsidiaries").  Avaya has agreed to pay a purchase price of in excess of

$900 million, subject to adjustments.

### C.     Background of Issues Giving Rise to the PBGC Stipulation

10.     NNI sponsors the Nortel Networks Retirement Income Plan (the "Pension Plan"),

a defined benefit pension plan which is intended to be qualified under Section 401(a) of the

Internal Revenue Code of 1986 (as amended, the "IRC"), and covered by Title IV of the

Employee Retirement Income Security Act of 1974, as amended ("ERISA").  The Pension Plan

was terminated under section 4042(c) of ERISA, effective July 17, 2009, pursuant to an

agreement between the PBGC and the Retirement Plan Committee of the Pension Plan.  The

agreement also appointed the PBGC trustee of the Pension Plan under Section 4042(c) of

ERISA.

11.     On September 29, the PBGC filed four proofs of claim against each of the

Debtors, bearing claim identification numbers 4735-4738 (collectively the "PBGC Claims").  As

set forth in these proofs of claim, the PBGC contends that NNI and the other Debtors, as

members of NNI's "controlled group," as that term is defined in Section 4001(a)(14) of ERISA

("collectively, NNI's Controlled Group"), are jointly and severally liable for (i) the unfunded

benefit liabilities of the Pension Plan,  (ii) contributions necessary to satisfy the minimum

funding standards of the Pension Plan, (iii) insurance premiums, interest and penalties with

4

respect to the Pension Plan, and (iv) the shortfall and waiver amortization charges. [3]

12.     The Non-Debtor Subsidiaries are also members of NNI's Controlled Group.  In that capacity, they are potentially liable for the full amount of the PBGC Claims allowed by the Court.  Additionally, the Non-Debtor Subsidiaries could be subject to the filing of a statutory lien in favor of the PBGC under Section 4068 of ERISA with respect to the unfunded benefit liability of the Pension Plan.

13.     The ASSA requires the Debtors to transfer the assets and shares to Avaya free and clear of any and all liens and claims.  Accordingly, in order to satisfy this requirement, the Debtors must resolve any and all claims the PBGC might assert against the Non-Debtor Subsidiaries, and any and all liens the PBGC might assert against the stock in the Non-Debtor Subsidiaries.

14.     In addition, the ASSA includes a provision expressly conditioning Avaya's obligation to close on the Enterprise Sale on the PBGC's waiver of its claims and potential claims against Avaya and against the Non-Debtor Subsidiaries, and the release of any lien or potential lien arising under IRC § 430 or Section 4068 of ERISA with respect to the Pension Plan.

### D.     The IRS Closing Condition

15.     The Internal Revenue Service (the "IRS") also filed proofs of claim against NNI. Its current proof of claim is for an amount exceeding $3 billion (the "IRS Claim").  Under Treasury Regulations, as members of a consolidated tax filing group with NNI, the Non-Debtor Subsidiaries are potentially jointly and severally liable for any tax liability incurred by NNI or any other member of the tax filing group.  In order to eliminate the risk that it would be taking on

---

[3]     By Order dated September 24, 2009, this Court approved a Stipulation Regarding Filing Claims By Pension Benefit Guaranty Corporation, whereby each proof of claim filed by the PBGC in this case shall be deemed filed not

potentially massive tax liabilities if it purchased the stock in the Non-Debtor Subsidiaries as part

of the Enterprise Sale, Avaya inserted into the ASSA a closing condition requiring that by

October 15, either the IRS Claim is fully resolved to its reasonable satisfaction, or, in the

alternative, NNI elects to file Chapter 11 petitions for the Non-Debtor Subsidiaries.

### E.     PBGC Stipulation

16.     In order to satisfy the requirements of the ASSA, NNI and the PBGC have agreed

to the terms of the PBGC Stipulation, whereby the PBGC will release and waive against the

Non-Debtor Subsidiaries any claim, lien, interest or obligation for joint or several liability, the

right to assert any such claim, lien, interest or obligation, and the right to assess or impose any

such liability, arising before or after the date of the Stipulation, under Title IV of ERISA or

under Sections 430 and 412 of the IRC, with respect to the Pension Plan.  In addition, in the

PBGC Stipulation, the PBGC acknowledges that the shares in the Non-Debtor Subsidiaries being

sold to Avaya are "Transferred Property" under the terms of the Sale Order, and thus can be

conveyed to Avaya free and clear of any claims by the PBGC against any of the Debtors,

whether or not asserted in the PBGC Claims.  Both the PBGC Stipulation, and the IRS

Stipulation (as defined below) have been reviewed and approved by Avaya as satisfying the

Debtors' obligations under the ASSA relating to the delivery of the shares of the Non-Debtor

Subsidiaries free and clear of the liens, claims, and interests of the PBGC and the IRS.

17.     In exchange for these waivers and releases, NNI has agreed to grant the PBGC a

lien (the "PBGC Lien") on the proceeds of the Enterprise Sale that are allocated to the sale of the

shares of the Non-Debtor Subsidiaries (the "Share Sale Proceeds"). The PBGC Lien is to be in

an amount equal to the amount of the statutory lien imposed by Section 4068 of ERISA with

---

only in this case but also in each of the 16 Debtors' Chapter 11 cases.

respect to the liability of NNI and any member of NNI's Controlled Group to the PBGC as a

result of the termination of the Pension Plan, and in no event shall be less than 30% of the Share

Sale Proceeds.[4]

18.    NNI has also agreed that if the Share Sale Proceeds exceed the combined amount

of the PBGC Lien, and a subordinate IRS Lien being granted pursuant to a Stipulation between

NNI and the IRS, as described below, the excess shall be divided equally between the PBGC and

NNI.  By its express terms, the PBGC Stipulation has no effect on the parties' respective rights

with respect to the PBGC Claims, such that notwithstanding the Stipulation, the Debtors remain

free to assert any and all objections to such Claims (and the PBGC is free to assert any defenses

or counterclaims).

19.    The PBGC Stipulation was entered into in conjunction with the Stipulation agreed

to by NNI and the Department of Justice on behalf of the IRS (the "IRS Stipulation"), whereby

the IRS has agreed to waive and release any claim for tax liability against the Non-Debtor

Subsidiaries, and in exchange will receive an agreed minimum claim in respect of corporate

alternative minimum tax, interest, and penalties for NNI's 2005 taxable year, and a junior lien,

subordinate to the PBGC Lien, on the Share Sale Proceeds.  Apart from the foregoing, the IRS

Stipulation maintains the status quo and expressly reserves the rights of both the IRS and the

Debtors with respect to U.S. federal tax claims and related issues.  Given that in the absence of

the PBGC Stipulation, the PBGC could move to assert and perfect a statutory lien against the

Non-Debtor Subsidiaries in the same amount as the PBGC Lien, the subordination provision in

---

[4]    Under Section 4068 of ERISA, the statutory lien is limited to 30% of the collective net worth of all of the liable parties.

the IRS Stipulation merely replicates the superior rights the PBGC already has pursuant to the statute.

20.     In light of the closing conditions in the ASSA, the PBGC Stipulation and the IRS Stipulation are each mutually contingent on Court approval of the other.  The PBGC Stipulation provides that it shall terminate immediately and have no further force or effect if this Court fails to approve both the PBGC Stipulation and the IRS Stipulation on or before October 13, 2009. The IRS Stipulation has a similar provision.

## RELIEF REQUESTED AND BASIS FOR RELIEF

21.     By this Motion, the Debtors seek an Order, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, approving the PBGC Stipulation, and granting such other and further relief as the Court deems just and proper.

22.     Section 105(a) of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

23.      Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  Under this authority, the Third Circuit has emphasized that "[c]ompromises are favored in bankruptcy."  Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)).  In addition, the District of Delaware has recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the Bankruptcy Court.  See In re Coram Healthcare Corp., 315 B.R. 321, 330 (Bankr. D. Del. 2004).

24.     Before approving a settlement under Bankruptcy Rule 9019, a court must

determine whether "the compromise is fair, reasonable, and in the interest of the estate." In re

Key3Media Group, Inc., 336 B.R. 87, 92 (Bankr. D. Del. 2005); In re Marvel Entm't Group, 222

B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997));

see also In re Nutritional Sourcing Corp., 398 B.R. 816, 833 (Bankr. D. Del. 2008).  Basic to the

process of evaluating proposed settlements is "the need to compare the terms of the compromise

with the likely rewards of litigation." Protective Comm. for Independent Stockholders of TMT

Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968).  The court's obligation is to

"canvass the issues and see whether the settlement falls below the lowest point in a range of

reasonableness." Travelers Cas. & Sur. Co. v. Future Claimants Representative, No. 07-2785,

2008 WL 821088, at *5 (D.N.J. Mar. 25, 2008) (citing In re Jasmine, Ltd., 258 B.R. 119 (D.N.J.

2000)); Coram, 315 B.R. at 330; Official Unsecured Creditors' Comm. of Pa. Truck Lines v. Pa.

Truck Lines, Inc., 150 B.R. 595, 598 (E.D. Pa. 1992).  The court need not be convinced that the

settlement is the best possible compromise in order to approve it.  Coram, 315 B.R. at 330.

25.     Applying these principles to the instant matter, the Debtors submit that the PBGC

Stipulation is clearly in the best interests of the Debtors, their estates and their creditors and

should be approved.  Under the PBGC Stipulation, the Debtors are granting the PBGC a limited

lien on the Share Sale Proceeds, as described above (*supra* at ¶¶ 16-18), in an amount that is no

greater than the amount of the statutory lien to which the PBGC would otherwise be entitled.

26.     Moreover, the PBGC Stipulation expressly reserves, and is without prejudice to,

the parties' rights with respect to the PBGC Claims, including the Debtors' rights to interpose

whatever objections to the PBGC Claims they deem appropriate.  The PBGC Lien simply

mirrors the amount of the lien the PBGC could assert against NNI or any other member of NNI's

Controlled Group under Section 4068 of ERISA, including the Non-Debtor Subsidiaries, except

that the PBGC is waiving any claim or lien in such amount or any other amount against the Non-

Debtor Subsidiaries with respect to the Pension Plan .

27.     In consideration for acknowledging and granting the PBGC a lien to which the

PBGC would otherwise be entitled under ERISA, and agreeing to split with the PBGC any

excess Share Sale Proceeds remaining after the PBGC Lien and the IRS Lien are accounted for --

an amount that may turn out to be $0 -- the Debtors are receiving a *substantial* benefit -- the

release and waiver of any claims or liens against the Non-Debtor Subsidiaries with respect to the

Pension Plan, and the acknowledgement that the shares in the Non-Debtor Subsidiaries being

sold to Avaya can be conveyed free and clear of any claims by the PBGC against any of the

Debtors, whether or not asserted in the PBGC Claims.

28.     These provisions, together with the release and waiver contained in the IRS

Stipulation, permit the $900 million Enterprise Sale to go forward.  In the absence of the PBGC

Stipulation, the only way the Debtors could satisfy the closing conditions in the ASSA would be

to file Chapter 11 petitions for the Non-Debtor Subsidiaries.  Such filings would be costly for the

estates, not only in the fees and expenses required to file the petitions and related documents, to

compile the ongoing reports and schedules during the course of the Chapter 11 proceeding, and

to address any issues raised in such proceedings, but also in the potential consequences that such

filings could engender because NGS is a government vendor.  As such, if the Non-Debtor

Subsidiaries filed for Chapter 11, NGS would be required to transfer existing government

contracts and leases to Avaya, a process that in itself would be costly and would result in a

reduction in the $900 million purchase price for the Enterprise Sale for each contract that could

not be transferred.   In addition, pursuant to the ASSA, if NGS is not able to transfer existing

customer contracts representing at least 65% of revenues during the twelve months prior to the closing date, Avaya has no obligation to close the transaction.

29.    Moreover, the PBGC Stipulation and the IRS Stipulation are mutually dependent, so if the Court rejects either, the other will terminate.

30.    In short, the PBGC Stipulation benefits and is in the best interests of the Debtors, their estates, and their creditors.[5]  It provides substantial consideration that would be unavailable in the absence of the Stipulation.  There would have been no upside for the Debtors, their estates, and their creditors, and a significant downside, had NNI not agreed to the PBGC Stipulation. Together with the IRS Stipulation, the PBGC Stipulation is important to the closing of a $900 million transaction, and for that reason alone, should be approved by this Court.

## NOTICE

31.    Notice of this Motion has been given to the (i) Office of the United States Trustee for the District of Delaware; (ii) counsel for the Committee; (iii) counsel for the Bondholders; (iv) counsel for Avaya; (v) counsel for the IRS; (vi) the Attorney General of the United States; (vii) the United States Attorney for the District of Delaware; (viii) counsel for the PBGC; and (ix) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

## NO PRIOR REQUEST

32.    No prior request for the relief sought herein has been made to this or any other Court.

---

[5]    The Committee and the ad hoc Bondholders' Group (the "Bondholders' Group") have each reviewed the PBGC Stipulation, as well as the IRS Stipulation, and have informed the Debtors that they support this Motion and the Debtors' request for approval of the IRS Stipulation.

11

WHEREFORE, the Debtors respectfully request that this Court (i) grant this

Motion and the relief requested herein; (ii) enter the proposed Order attached hereto; and

(iii) grant such other and further relief as it deems just and proper.


Dated:  October 8, 2009
         Wilmington, Delaware

                             CLEARY GOTTLIEB STEEN & HAMILTON LLP
                             Deborah M. Buell
                             James L. Bromley
                             One Liberty Plaza
                             New York, New York 10006
                             Telephone:  (212) 225-2000
                             Facsimile:  (212) 225-3999

                                - and -

                             MORRIS, NICHOLS, ARSHT & TUNNELL LLP


                             */s Ann C. Cordo*
                             Derek C. Abbott (No. 3376)
                             Eric D. Schwartz (No. 3134)
                             Ann C. Cordo (No. 4817)
                             Andrew R. Remming (No. 5120)
                             1201 North Market Street
                             P.O. Box 1347
                             Wilmington, Delaware 19801
                             Telephone:  (302) 658-9200
                             Facsimile: (302) 658-3989

                             *Counsel for the Debtors*
                             *and Debtors in Possession*

3165479.1