## Exhibit A

**ASSET SALE AGREEMENT**[1]

BY AND AMONG

**NORTEL NETWORKS CORPORATION**

**NORTEL NETWORKS LIMITED**

**NORTEL NETWORKS INC.**

AND

**THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS**

AND

**[PURCHASER]**

**DATED AS OF [●], 2009**

---

[1]  **THIS DRAFT REMAINS SUBJECT TO FURTHER MODIFICATIONS BY THE SELLERS IN CONSULTATION WITH THEIR VARIOUS STAKEHOLDERS.**

# TABLE OF CONTENTS

Page

**ARTICLE I INTERPRETATION** ............................................................................................ **3**

Section 1.1.            Definitions............................................................................. 3

Section 1.2.            Interpretation........................................................................ 28

1.2.1.            Gender and Number........................................................... 28

1.2.2.            Certain Phrases and Calculation of Time........................ 28

1.2.3.            Headings, etc....................................................................... 28

1.2.4.            Currency............................................................................... 28

1.2.5.            Statutory References........................................................... 29

**ARTICLE II PURCHASE AND SALE OF ASSETS**............................................................ **29**

Section 2.1.            Purchase and Sale. ............................................................ 29

2.1.1.            Assets. .................................................................................. 29

2.1.2.            Excluded Assets. ................................................................ 30

2.1.3.            Assumed Liabilities. .......................................................... 32

2.1.4.            Excluded Liabilities. .......................................................... 34

2.1.5.            Assumption and Assignment of 365 Contracts............... 34

2.1.6.            Assignment of Non-365 Contracts.................................... 35

2.1.7.            Cure Costs; Adequate Assurance; Efforts...................... 35

2.1.8.            Local Sale Agreements. ..................................................... 35

2.1.9.            EMEA Asset Sale Agreement; NNSA Irrevocable
Offer..................................................................................... 35

2.1.10.            Non-Assignable Assets. ..................................................... 36

Section 2.2.            Purchase Price. ................................................................... 36

2.2.1.            Purchase Price..................................................................... 36

2.2.2.            Estimated Purchase Price.................................................. 37

2.2.3.            Purchase Price Adjustment. .............................................. 38

2.2.4.            Good Faith Deposit............................................................ 41

Section 2.3.            Closing. ............................................................................... 41

2.3.1.            Closing Date........................................................................ 41

2.3.2.            Closing Actions and Deliveries. ...................................... 42

Section 2.4.            Designated Purchaser(s)................................................... 43

i

# TABLE OF CONTENTS

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ..... 44**

Section 3.1.    Organization and Corporate Power................................................ 44

Section 3.2.    Authorization; Binding Effect; No Breach. ................................. 44

Section 3.3.    Financing....................................................................................... 45

Section 3.4.    Adequate Assurance of Future Performance. ............................. 46

Section 3.5.    Purchaser's Acknowledgments; Exclusivity of
Representations and Warranties.................................................... 47

Section 3.6.    Brokers........................................................................................ 48

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS ............ 48**

Section 4.1.    Organization and Corporate Power................................................ 49

Section 4.2.    Authorization; Binding Effect; No Breach. ................................. 49

Section 4.3.    Title to Tangible Assets. .............................................................. 50

Section 4.4.    Material Contracts......................................................................... 50

Section 4.5.    Intellectual Property...................................................................... 50

Section 4.6.    Litigation...................................................................................... 52

Section 4.7.    Financial Statements. .................................................................... 52

Section 4.8.    Compliance with Laws; Consents. ............................................... 52

Section 4.9.    Environmental Matters. ................................................................ 53

Section 4.10.    Labor and Employee Benefits Matters. ....................................... 53

Section 4.11.    Brokers......................................................................................... 54

Section 4.12.    Representations and Warranties by the Other Sellers.................. 54

4.12.1.    Organization and Corporate Power.............................................. 54

4.12.2.    Authorization; Binding Effect; No Breach. ................................. 54

**ARTICLE V COVENANTS AND OTHER AGREEMENTS............................................. 55**

Section 5.1.    U.S. Bankruptcy Actions. ............................................................. 55

Section 5.2.    Canadian Bankruptcy Actions. ..................................................... 55

Section 5.3.    Consultation; Notification............................................................. 56

Section 5.4.    Pre-Closing Cooperation............................................................... 57

Section 5.5.    Antitrust and Other Regulatory Approvals. .................................. 57

Section 5.6.    Pre-Closing Access to Information................................................ 60

# TABLE OF CONTENTS

| | | |
|---|---|---|
| Section 5.7. | Public Announcements. | 61 |
| Section 5.8. | Further Actions. | 61 |
| Section 5.9. | Conduct of Business. | 61 |
| Section 5.10. | Transaction Expenses. | 63 |
| Section 5.11. | Confidentiality. | 63 |
| Section 5.12. | Certain Payments or Instruments Received from Third Parties. | 63 |
| Section 5.13. | Non-Assignable Contracts. | 64 |
| Section 5.14. | Bundled Contracts. | 64 |
| Section 5.15. | Post-Closing Assistance for Litigation. | 65 |
| Section 5.16. | Delivery of Assets. | 66 |
| Section 5.17. | Termination of Overhead and Shared Services. | 66 |
| Section 5.18. | Financing. | 66 |
| Section 5.19. | Insurance Matters. | 67 |
| Section 5.20. | Guarantees and Other Credit Support of the Business. | 68 |
| Section 5.21. | Use of Trademarks. | 68 |
| Section 5.22. | Sellers' Accessible Information. | 68 |
| Section 5.23. | Maintenance of Books and Records. | 69 |
| Section 5.24. | Additional Bankruptcy Proceedings; Adverse International Injunctions. | 70 |
| Section 5.25. | Finalization of Schedules to Transition Services Agreement; Disputes. | 71 |
| **ARTICLE VI TAX MATTERS** | | **74** |
| Section 6.1. | Transfer Taxes. | 74 |
| Section 6.2. | Withholding Taxes. | 75 |
| Section 6.3. | Tax Characterization of Payments Under This Agreement. | 75 |
| Section 6.4. | Apportionment of Taxes. | 75 |
| Section 6.5. | Tax Disclosure. | 76 |
| Section 6.6. | Records. | 76 |
| Section 6.7. | Tax Returns. | 78 |
| Section 6.8. | Allocation of Purchase Price. | 79 |

iii

# TABLE OF CONTENTS

**ARTICLE VII EMPLOYMENT MATTERS** ......................................................... **79**

    Section 7.1.    Employment Obligations ............................................... 79

        7.1.1.    Employment Terms.......................................................79

        7.1.2.    Employee Benefits. ......................................................81

    Section 7.2.    Excluded Employee Liabilities. .................................. 83

    Section 7.3.    Other Employee Covenants. ...................................... 84

    Section 7.4.    Canadian Pension Plans. ............................................ 85

**ARTICLE VIII CONDITIONS TO THE CLOSING** ................................................ **85**

    Section 8.1.    Conditions to Each Party's Obligation. ..................... 85

    Section 8.2.    Conditions to Sellers' Obligation............................... 86

    Section 8.3.    Conditions to Purchaser's Obligation. ....................... 86

**ARTICLE IX TERMINATION** .................................................................................. **87**

    Section 9.1.    Termination.................................................................. 87

    Section 9.2.    Effects of Termination. .............................................. 88

**ARTICLE X MISCELLANEOUS** ............................................................................. **89**

    Section 10.1.    No Survival of Representations and Warranties or Covenants........................................................................ 89

    Section 10.2.    Remedies...................................................................... 89

    Section 10.3.    No Third Party Beneficiaries. ..................................... 89

    Section 10.4.    Consent to Amendments; Waivers............................... 90

    Section 10.5.    Successors and Assigns............................................... 90

    Section 10.6.    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial....................................................................... 90

    Section 10.7.    Notices. ....................................................................... 92

    Section 10.8.    Exhibits; Sellers Disclosure Schedule. ...................... 93

    Section 10.9.    Counterparts................................................................ 94

    Section 10.10.    No Presumption. ......................................................... 94

    Section 10.11.    Severability. ................................................................ 94

    Section 10.12.    Headings ..................................................................... 94

    Section 10.13.    Entire Agreement........................................................ 95

## TABLE OF CONTENTS

Section 10.14.        Availability of Equitable Relief; Sole Remedy. ......................... 95

Section 10.15.        Bulk Sales Laws......................................................................... 95

Section 10.16.        Main Sellers as Representatives of Other Sellers. ..................... 95

Section 10.17.        Execution by Other Sellers. ....................................................... 96

Section 10.18.        Obligations of the Sellers........................................................... 96

# TABLE OF CONTENTS

## EXHIBITS[2]

Exhibit A – Other Sellers

Exhibit B – EMEA Sellers

Exhibit C – Canadian Debtors; U.S. Debtors; EMEA Debtors; Non-Debtor Sellers

Exhibit D – EMEA Asset Sale Agreement

Exhibit E – Contract Manufacturing Inventory Agreements Term Sheet

Exhibit F – Intellectual Property License Agreement

Exhibit G – Knowledge of the Purchaser

Exhibit H – Loaned Employee Agreement

Exhibit I – Antitrust Approvals – Relevant Antitrust Jurisdictions/Authorities

Exhibit J – Subcontract Agreement

Exhibit K – Trademark License Agreement

Exhibit L – Transition Services Agreement

[Exhibit M – Purchaser Supply Agreement/Term Sheet]

[Exhibit N – Seller Supply Agreement/Term Sheet]

Exhibit O – Adjusted Net Working Capital Statement

Exhibit 2.1.8 – Forms of Local Sale Agreements

Exhibit 5.1 – Form of U.S. Sale Order

Exhibit 5.2 – Form of Canadian Approval and Vesting Order

Exhibit 5.9 – Purchaser's Representatives for Interim Covenants Consents

---

[2] Note to Purchaser: List of exhibits to be finalized when a list of ancillary agreements has been agreed upon.

# ASSET SALE AGREEMENT[3]

This Asset Sale Agreement is dated as of [●], 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the Affiliates (as defined below) of the Main Sellers listed in Exhibit A hereto (the "**Other Sellers**"[4] and, together with the Main Sellers, the "**Sellers**") and [●], a [●] organized under the laws of [●] (the "**Purchaser**").

## W I T N E S S E T H:

WHEREAS, the Sellers and the Affiliates of the Main Sellers listed in Exhibit B hereto (the "**EMEA Sellers**"), and Nortel Network S.A., a corporation incorporated under the laws of France ("**NNSA**") beneficially own and operate the Business (as defined below);

WHEREAS, on January 14, 2009 (the "**Petition Date**"), NNC, NNL and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases and was extended by further order of the Canadian Court on

---

[3]  Note to Purchaser:  The sale of the business will be structured as follows:

1)   all the US and Canadian assets of the Isis business will be sold to the Purchaser as an asset sale governed by this Agreement;

2)   the assets of the Isis business owned by the EMEA entities, whether in administration or not (except the assets of the Isis business owned by NNSA) will be sold to the Purchaser as a sale governed by a separate EMEA Asset Sale Agreement attached as an exhibit hereto and to be entered into by the EMEA Sellers (and the Joint Administrators of those EMEA Sellers that are in administration)—for the avoidance of doubt, this will include the Russian entity;

3)   the assets of the Isis business owned by NNSA will be transferred to the Purchaser as an asset sale following the approval by the French Court of an irrevocable offer made by the Purchaser to purchase the NNSA Assets—such irrevocable offer will be attached as an exhibit to the EMEA Asset Sale Agreement;

4)   the assets of the Isis business owned by any seller that is not included in the above categories (e.g., Asian and South American entities, but excluding the assets held by the Brazilian, Colombian and Venezuelan entities, which will not be sold) will be transferred to the Purchaser as an asset sale governed by this Agreement.

[4]  Note to Purchaser: The "**Other Sellers**" are all those direct and indirect subsidiaries of the Main Sellers (other than those that will sell their Isis assets pursuant to the EMEA Asset Sale Agreement) that own assets belonging to the Isis business. The Other Sellers include both (a) entities that have filed for bankruptcy protection in the US or Canada and (b) entities that are not subject to bankruptcy or administration proceedings.

February 10, 2009, April 28, 2009 and July 30, 2009, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit C hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the entities listed under the heading "EMEA Debtors" in part 3 of Exhibit C hereto (the "**EMEA Debtors**") on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "**EMEA Cases**") and the English Court appointed Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes and Alan Bloom serve as joint administrators) (the "**Joint Administrators**") under the Insolvency Act;

WHEREAS, on May 28, 2009, liquidation proceedings with temporary continuation of the business have been commenced in France with respect to NNSA pursuant to the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings and articles L. 640-1 *seq.* of the French Code of commerce, and the Commercial Court of Versailles, France (the "**French Court**") appointed Cosme Rogeau as liquidator and Franck Michel as judicial administrator (together, the "**French Administrators**");

WHEREAS, the Other Sellers listed in part 4 of Exhibit C hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, simultaneously with the execution of this Agreement, the EMEA Sellers, the Joint Administrators, and the Purchaser are entering into a separate agreement in the form set forth in Exhibit D hereto (the "**EMEA Asset Sale Agreement**") providing for the sale to the Purchaser (and/or the EMEA Designated Purchasers (as defined therein)) of the assets of the Business held by such EMEA Sellers;

WHEREAS, Schedule [●] to the EMEA Asset Sale Agreement contains the terms of an irrevocable offer (the "**NNSA Irrevocable Offer**") by the Purchaser to purchase the NNSA Assets (as defined below), which will be submitted for approval to the French Court;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers and/or the EMEA Designated Purchasers, if any) of the Assets, the EMEA Assets (as defined below) and the NNSA Assets(as defined below), the license of Intellectual Property under the Intellectual Property License Agreement [and the Trademark License Agreement] ([each] as defined below), and the assumption by the Purchaser and the Designated Purchasers and/or the EMEA Designated Purchasers, as applicable, of the Assumed Liabilities, the EMEA Assumed Liabilities and the NNSA Assumed Liabilities (each as defined below) are being made at arms' length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates; and

WHEREAS, in addition, at the Closing, the Purchaser, certain Sellers (or Affiliates of the Sellers) and certain EMEA Sellers will enter into the following ancillary agreements (together, the "**Ancillary Agreements**"):  [(i) the Local Sale Agreements, (ii) the Intellectual Property License Agreement, (iii) the Transition Services Agreement, (iv) the Trademark License Agreement, (v) the Loaned Employee Agreement, [and] (vii) the Subcontract Agreement, [(vii) the Purchaser Supply Agreement, and (viii) the Seller Supply Agreement,] (each as defined below) and will use their reasonable efforts to enter into (ix) the Contract Manufacturing Inventory Agreements, and (x) any distribution agreements to be determined].[5]

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

# ARTICLE I

## INTERPRETATION

Section 1.1.    <u>Definitions</u>.

Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accounting Arbitrator**" has the meaning set forth in Section 2.2.3.1(c).

"**Accrued Vacation Amount**" means, at any given time, the amount of compensation with respect to the accrued and unused vacation days that is due and owing to the Specified Transferred Employees from their respective employer, to be calculated in accordance with the Calculation Principles.[6]

---

[5]    <u>Note to Purchaser</u>:  Scope and list of ancillary agreements to be discussed.

[6]    <u>Note to Purchaser</u>:  The Sellers will be responsible for the compensation payable to the Transferred Employees with respect to their unused and accrued vacation days as of the Closing Date.  Where appropriate under applicable

[Footnote continued on next page]

"**Action**" means any litigation, action, suit, charge, binding arbitration or other legal, administrative, regulatory or judicial proceeding.

"**Additional Bankruptcy Proceeding**" has the meaning set forth in Section 5.24(a).

"**Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(c).

"**Adjusted Net Working Capital Statement**" means the statement of certain specified asset and liability accounts and certain accounting principles, methodologies and policies used in the determination of such accounts, consistent with the Calculation Principles, in the form provided in Exhibit **[O]** hereto.

"**Adverse International Injunction**" has the meaning set forth in Section 5.24(a).

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; provided, that neither any EMEA Debtor or Subsidiary of an EMEA Debtor (other than those Subsidiaries that are Sellers hereunder) nor NNSA shall be deemed an Affiliate of any Seller.

"**Aggregate Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Aggregate EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Aggregate EMEA Upward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Alternative Transaction**" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation or other similar transaction, of all or substantially all of the Business, or all or substantially all of (i) the Assets, (ii) the EMEA Assets, and (iii) the NNSA Assets ((i), (ii) and (iii) considered together as a whole), in a transaction or a series of transactions with one or more Persons other than the Purchaser and/or its Affiliates; provided, however, that an "Alternative Transaction" shall not include: (i) the retention of the Business by all or part of the Sellers (or their successor entities

---

[Footnote continued from previous page]
Law, the Sellers will pay such amounts directly to the relevant Employees (see Section 7.1.2(c)). Where a direct payment to the Employees is not appropriate, the Sellers will pay the relevant amounts to the Purchaser through this Purchase Price adjustment mechanism for the Accrued Vacation Amount.

emerging from the Bankruptcy Proceedings) under a standalone plan of reorganization or plan of arrangement approved by a Bankruptcy Court, or (ii) the sale, transfer or other disposition, directly or indirectly, of any portion of the Business or the Assets or the EMEA Assets or the NNSA Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Antitrust Approvals**" means the HSR Approval, the EC Merger Regulation Approval and any other decision, in whatever form (including a declaration of lack of jurisdiction or a mere filing or notification, if the Closing can take place, pursuant to the applicable Antitrust Law, without a decision or the expiry of any waiting period), by any Government Entity under the Laws of any of the jurisdictions listed in Exhibit **[I]** or the expiry of the applicable waiting period, as applicable, under the Antitrust Laws of any of the jurisdictions listed in Exhibit **[I]**,[7] authorizing or not objecting to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer), which includes any decision or consent by any such Government Entity setting forth conditions or obligations on the Purchaser or any of its Affiliates if such conditions have been or, pursuant to Section 5.5(e) or Clause 10.10 of the EMEA Asset Sale Agreement are required, to be accepted by the Purchaser.

"**Antitrust Laws**" means the HSR Act, the EC Merger Regulation, and any competition, merger control and antitrust Law of the European Union, any applicable European Union member states and EFTA states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"**Arbitration Trigger Date**" has the meaning set forth in Section 5.25(h).

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Contracts**" means all Seller Contracts except Non-Assigned Contracts.

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Australian Long Service Leave Amount**" means, at any given time, in respect of Transferred Employees in Australia, the amount specified in Section 7.1.2(c)(vi) of the Sellers

---

[7]  Note to Purchaser:  It is currently expected that the Mandatory Antitrust Approvals will include clearance from the EU Commission under the EC Merger Regulation and expiration under the HSR Act.  Purchaser to provide list of additional Mandatory Antitrust Approvals to be negotiated prior to signing.

Disclosure Schedule in respect of the long service leave, to be calculated in accordance with the Calculation Principles.

"**Balance Sheet Date**" has the meaning set forth in Section 4.7.

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court, the French Court or any other court before which Bankruptcy Proceedings are filed.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act, Book VI of the French Code of commerce (*Code de commerce*) and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration, liquidation or similar judicial proceedings concerning any of the Sellers, the EMEA Sellers or NNSA from time to time.

"**Bundled Contract**" has the meaning set forth in Section 5.14.

"**Business**" means the GSM and GSM-R infrastructure and solutions business of the Sellers, the EMEA Sellers and NNSA consisting of:

(a)    developing and/or causing to develop the Products;

(b)    causing the manufacture and testing of the Products;

(c)    selling and supplying the Products and the warranties thereon; and

(d)    selling and supplying of the Services;

all as conducted by the Sellers, the EMEA Sellers and NNSA as at the Closing Date, but excludes:

(i)    any financial, information technology, legal, marketing, human resource operations, real estate or other "corporate" or related services supporting or utilized by such activities, unless such functions are exclusively dedicated to the support of the activities described in (a), (b), (c) and (d), in which event such functions are included;

(ii)    the Excluded Products and Services; and

(iii)    Overhead and Shared Services (other than Transferred Overhead and Shared Services).

6

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, (iii) London, England, United Kingdom, and (iv) Paris, France.

"**Business Information**" means all books, records, files, ledgers, documentation, sales literature or similar information in the possession or under control of the Sellers and that, in each case, is used exclusively in connection with the Business, including information, policies and procedures, Owned Equipment manuals and materials and procurement documentation exclusively used in the Business, but excluding any Employee Records.

"**Business Registered IP**" has the meaning set forth in Section 4.5(b).

"**Calculation Principles**" means the Nortel Accounting Principles, to the extent applicable to the determination of the Inventory Value, the CIP Receivables Amount, the Warranty Provision Amount, the Indian and Pakistan Gratuity Payment Amount, the Australian Long Service Leave Amount, the Accrued Vacation Amount, the Adjusted Net Working Capital, and the Prepaid Expenses Amount, and the other accounting principles, methodologies and policies for the determination of the Inventory Value, the CIP Receivables Amount, the Warranty Provision Amount, the Indian and Pakistan Gratuity Payment Amount, the Australian Long Service Leave Amount, the Accrued Vacation Amount, the Adjusted Net Working Capital, and the Prepaid Expenses Amount, as set forth in Section 1.1(a) of the Sellers Disclosure Schedule and in the Adjusted Net Working Capital Statement.

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.

"**Canadian Court**" means the Ontario Superior Court of Justice.

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Sales Process Order**" means that certain order (GSM/GSM-R Bidding Procedures Order), which was entered on October [15], 2009 by the Canadian Court.

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**CIP Receivables**" means, as of a given date, amounts classified in construction-in-process accounts determined in accordance with the Calculation Principles.

"**CIP Receivables Amount**" means, as of any given date, the amount of CIP Receivables of the Business determined in accordance with the Calculation Principles.

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 2.3.1.

"**Closing Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing CIP Receivables Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Date**" has the meaning set forth in Section 2.3.1.

"**Closing Employee Adjustment Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Inventory Value**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Prepaid Expenses Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Statement**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Warranty Provision Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Person has entered into with any union or collective bargaining agent with respect to terms and conditions of employment of such Person's employees.

"**Confidentiality Agreement**" means the confidentiality agreement between [Purchaser] and the other parties listed therein dated [●], 2009.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by any Government Entity or other Third Party.

"**Contract**" means any binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.

"**Contract Manufacturing Inventory Agreements**" means the agreements between the Purchaser and/or any Designated Purchasers, the relevant Sellers, and the contract manufacturers of the Business listed in Section 1.1(b) of the Sellers Disclosure Schedule that the

8

relevant Parties will use their reasonable efforts to execute on or before the Closing in the form that shall be negotiated in good faith on the basis of the term sheet attached hereto as Exhibit **[E]**.[8]

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, or as trustee or executor, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract, credit arrangement or otherwise.

"**Covered Assets and Persons**" means the Business (excluding the EMEA Business) and the assets (including the Assets), tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of, the Business (excluding the EMEA Business).

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cure Cost**" means (i) any amounts required by Section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under a 365 Contract and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract, and (ii) with respect to any Non-365 Contract (other than Contracts of a Canadian Debtor that are assignable to the Purchaser without the consent of the counterparty), any amounts required to cure any defaults and to pay any actual pecuniary losses under such Seller Contract in respect of the period prior to the Closing Date.

"**Debt Commitment Letters**" has the meaning set forth in Section 3.3.

"**Debt Financing**" has the meaning set forth in Section 3.3.

"**Designated Purchaser**" has the meaning set forth in Section 2.4.

"**Disagreement Notice**" has the meaning set forth in Section 2.2.3.1(b).

"**Distribution Agent**" means [●], as distribution agent for the Sellers and the EMEA Sellers.

"**Downward Adjustment**" means [●].[9]

---

[8]  <u>Note to Purchaser</u>:  Parties to discuss approach to contract manufacturers.

"**EC Merger Regulation**" means Council Regulation (EC) No 139/2004 of January 20, 2004 on the control of concentrations between undertakings, as amended.

"**EC Merger Regulation Approval**" means (i) that the Purchaser shall have received notification from the European Commission that the transactions contemplated in this Agreement are compatible with the common market or there has been a deemed declaration in respect of the transactions contemplated in this Agreement under Article 10(6) of the EC Merger Regulation or (ii) where the transactions contemplated in this Agreement have been referred to an EU or EFTA Member State under Article 4(4) or Article 9 of the EC Merger Regulation, confirmation shall have been received by the Purchaser that the transactions contemplated in this Agreement have been approved or have been approved subject to such conditions, obligations, modifications or undertakings as shall be accepted by the Parties in accordance with the relevant legislation of that EU or EFTA Member State and with Section 5.5.

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**EFTA**" means the European Free Trade Association.

"**EMEA Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Assumed Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Business**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Debtors**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Designated Purchaser**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Downward Adjustment**" has the meaning attributed to the term "Downward Adjustment" in Clause 3.2.2 of the EMEA Asset Sale Agreement.

---

[Footnote continued from previous page]

[9]  Note to Purchaser:  Method for calculating this amount to be discussed.

"**EMEA Owned Inventory**" means (i) Inventory owned and paid for by any EMEA Seller that is held or used exclusively in connection with the Business, including any Inventory which is owned by the EMEA Sellers but remains in the possession or control of a contract manufacturer or another Third Party and (ii) the other Inventory listed in Section 1.1(c) of Sellers Disclosure Schedule.

"**EMEA Sellers**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Upward Adjustment**" has the meaning attributed to the term "Upward Adjustment" in Clause 3.2.1 of the EMEA Asset Sale Agreement.

"**EMEA Warranty Obligations**" means the warranty obligations relating to Products and Services assumed by Purchaser and/or a Designated Purchaser pursuant to Clauses 2.3.2 and 2.3.5 of the EMEA Asset Sale Agreement.

"**Employee**" means any employee of the Sellers engaged in the Business (excluding the EMEA Business), as listed in Section 4.10(b) of the Sellers Disclosure Schedule.

"**Employee Adjustment Amount**" means, at any given time, the sum of (i) the Accrued Vacation Amount, (ii) the Indian and Pakistan Gratuity Payment Amount and (iii) the Australian Long Service Leave Amount.

"**Employee Information**" has the meaning set forth in Section 4.10(b).

"**Employee Records**" means books, records, files, or other documentation, whether in electronic or other form, with respect to Employees.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferred Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day immediately following the Closing Date.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environmental Law**" means any applicable Law relating to or regulating (i) the management, Release or remediation of Hazardous Materials; (ii) the exposure of persons to Hazardous Materials; (iii) occupational health and safety; or (iv) pollution or protection of the environment or natural resources, including the United States Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act and the Toxic Substances Control Act, all as amended, and any requirements of a Government Entity promulgated pursuant to these applicable laws or any analogous foreign, state, provincial or local laws.

"**Environmental Permit**" means any Consent required under any Environmental Law for the Business (excluding the EMEA Business) as currently conducted.

"**Equipment**" means tangible property, including all trade fixtures and fixtures, furniture, furnishings, fittings, equipment, apparatus, appliances and other articles of personal

11

property which are owned by the Sellers and held or used exclusively in connection with the Business, provided, however that "Equipment" shall not include any Inventory, items of tangible property personally assigned to Employees who are not (a) Transferred Employees as of the Employee Transfer Date or (b) Visa Employees, or any Intellectual Property.

"**Equity Commitment Letters**" has the meaning set forth in Section 3.3.

"**Equity Financing**" has the meaning set forth in Section 3.3.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Agent**" means [●]

"**Estimated Aggregate Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Aggregate EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Aggregate EMEA Upward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated CIP Receivables Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Code Schedule**" has the meaning attributed to that term in the Transition Services Agreement.

"**Estimated Employee Adjustment Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Inventory Value**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Prepaid Expenses Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Warranty Provision Amount**" has the meaning set forth in Section 2.2.2(a).

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.2.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded Products and Services**" means (a) all products and services provided by businesses or business segments of any Seller other than the Products, and including (b) the following products and all associated development and PLM resources:  Evolved Packet Core (including the Access Gateway, MME, and next-generation GPRS support nodes), LTE radio access products and services, WiMAX products and services, XACore Hardware and platform software and associated peripherals (LPP, MS/ENET, SPM, DTC, MTM, DRAM IWSPM), ERS8600, Passport (MSS), associated Software (PCR) and associated OAM MultiService Data Manager(MDM).

"**Executory Contract**" means an "executory contract" for the purposes of the U.S. Bankruptcy Code.

"**Extra Services**" has the meaning set forth in Section 5.25(b).

"**Final Purchase Price**" has the meaning set forth in Section 2.2.3.1(a).

"**Financial Statements**" has the meaning set forth in Section 4.7.

"**Financing**" has the meaning set forth in Section 3.3.

"**Financing Commitments**" has the meaning set forth in Section 3.3.

"**Financing Termination Event**" has the meaning set forth in Section 5.18(a).

"**French Administrators**" has the meaning set forth in the preamble to this Agreement.

"**French Court**" has the meaning set forth in the recitals to this Agreement.

"**GAAP**" means the United States generally accepted accounting principles.

"**General Scope of Included Services**" has the meaning set forth in Section 5.25(a).

"**Good Faith Deposit**" has the meaning set forth in Section 2.2.4.

"**Government Entity**" means any U.S., Canadian, UK, French, supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**GST**" means goods and services tax payable under Part IX of the Excise Tax Act (Canada).

"**Hazardous Materials**" means any chemical, material, waste or substance defined by or regulated under any Environmental Law as a hazardous waste, hazardous material,

13

hazardous substance, extremely hazardous waste, restricted hazardous waste, pollutant, contaminant, toxic substance or toxic waste, including without limitation petroleum, petroleum products, asbestos, lead or polychlorinated biphenyls.

"**Headcount Forecast**" has the meaning attributed to that term in the Transition Services Agreement.

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means that the Purchaser shall have received (i) notification from the responsible Minister under the Investment Canada Act that he/she is satisfied or is deemed to be satisfied that the transactions contemplated in this Agreement that are subject to the provisions of the Investment Canada Act are likely to be of net benefit to Canada and (ii) any other approvals, clearances or authorizations required under the Investment Canada Act to effect the Closing as contemplated by this Agreement.

"**Inactive Employees**" means Employees (other than Employees whose employment transfers to Purchaser or a Designated Purchaser by operation of Law) who have accepted Purchaser or Designated Purchaser's offer of employment as provided in Section 7.1.1 and are on a Seller-approved leave of absence as of the Employee Transfer Date and are expected to return to work and actually return to work in the time permitted for such leave under applicable Law and, for any leave that is not covered under applicable Law, are expected to return to work and actually return to work within twelve (12) months following the Closing Date.

"**Inbound License Agreements**" has the meaning set forth in Section 4.5(f)

"**Included Services**" has the meaning set forth in Section 5.25(a).

"**Indebtedness**" of any Person means at any date, without duplication, all obligations of such Person to the extent incurred for the Business (i) for indebtedness for borrowed money (including any unpaid principal, premium and accrued and unpaid interest or fees), (ii) for indebtedness evidenced by bonds, debentures, notes or similar instruments, (iii) in respect of leases that are capitalized in accordance with GAAP under which such Person is the lessee, (iv) in respect of letters of credit issued for the account of such Person (to the extent drawn), (v) in respect of guarantees of the obligations of other Persons of the type referred to in clauses (i) through (iv) above and (vi) any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayment or default under any of the Indebtedness referred to in items (i) and (ii) above.

"**Independent Auditor**" means [●] or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation that is (i) jointly selected by the Primary Parties, or (ii) in case they cannot agree on any such firm, by [●] at the request of the first Primary Party to move.

"**Indian and Pakistan Gratuity Payment Amount**" means, at any given time, in respect of Transferred Employees located in India and Pakistan, the amount specified on Section 7.1.2(c)(vi) of the Sellers Disclosure Schedule in respect of gratuity payments, to be calculated in accordance with the Calculation Principles.

"**Insolvency Act**" has the meaning set forth in the recitals to this Agreement.

"**Intellectual Property**" means all intellectual and industrial property rights and any and all forms of protection having equivalent or similar effect anywhere in the world as recognized under the Laws of all countries and jurisdictions, whether registered or unregistered and including applications for the registration or grant of any such rights, including rights in or to any of the following: (a) Trademarks; (b) Patents; (c) works of authorship; (d) mask works; (e) trade secrets, know-how and confidential technical or business information; (f) Software; (g) databases and (h) industrial designs.

"**Intellectual Property License Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit **[F]**.

"**Inventory**" means any inventories of raw materials, manufactured and purchased parts, works in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise.

"**Inventory Value**" means, as of any given date, the book value of the Owned Inventory and the EMEA Owned Inventory, net of applicable provisions, that would be required to be reflected on a balance sheet of the Business as of such date prepared consistent with the Calculation Principles.

"**Investment Canada Act**" means the Investment Canada Act, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Joint Administrators**" has the meaning set forth in the recitals to this Agreement.

"**KEIP**" means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in the District of Delaware in part on March 5, 2009 and in part on March 20, 2009, and approved by the Canadian Court in part on March 6, 2009 and in part on March 20, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**KERP**" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware on March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

15

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase means, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(d) of the Sellers Disclosure Schedule, and, with reference to the Purchaser, the actual knowledge of those Persons listed on Exhibit **[G]**.

"**KPD Provision**" means the provision for "Known Product Defects" to be recognized and measured by the Business pursuant to the Calculation Principles with respect to defects (other than defects covered by the Non-KPD Warranty Provision) of Products and/or Services that have been sold by the Sellers and the EMEA Sellers.

"**Law**" means any U.S., Canadian, UK, French, foreign, supranational, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, judicial or administrative order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**LGN Joint Venture**" means LG-Nortel Co. Ltd., which was established in November 2005 as a joint venture between NNL and LG Electronics Inc. for the purpose of jointly developing and marketing certain telecommunications equipment and network solutions.

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchasers under the Intellectual Property License Agreement [and the Trademark License Agreement].

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, prior claim, lease or conditional sale arrangement.

"**Loaned Employee Agreement**" means the agreement between [●], on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or before the Closing attached hereto as Exhibit **[H]**.[10]

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Losses**" means all losses, damages, Liabilities, deficiencies, interest, awards, judgments, fines, penalties and reasonable and documented out-of-pocket costs and expenses

---

[10]    Note to Purchaser:  Pursuant to this agreement, Nortel may supply to the Purchaser the services of those Employees on a visa (other than Employees who transfer to Purchaser or Designated Purchaser by operation of law) that the Purchaser cannot hire immediately upon the Closing.

(including reasonable attorneys' fees and disbursements and the costs of litigation, including reasonable amount paid in investigation, defense or settlement of an Action).

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Mandatory Antitrust Filings**" means all notifications and filings which the Purchaser and/or the Sellers and/or the EMEA Sellers and/or NNSA or any of them, in respect of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer), is required under the Laws of any jurisdiction to deliver, prior to Closing, to any Government Entity having jurisdiction over mergers and/or similar transactions under any Antitrust Laws applying to any of the parties or to the transactions contemplated by the Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer).

"**Material Adverse Effect**" means any event, change, circumstance, occurrence or effect that has or would reasonably be expected to have a material adverse effect on the business, operations, assets, results of operations or financial condition of the Business to be transferred hereunder, under the EMEA Asset Sale Agreement and under the NNSA Irrevocable Offer, taken as a whole, but in each case shall not include the effect of events, changes, circumstances, occurrences or effects relating to (a) the industries and markets in which the Business operates, (b) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, acts of God, war, terrorism or hostilities, (c) changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (d) compliance with this Agreement, including any effect on the Business resulting from failure to take any action to which the Purchaser refused consent under this Agreement, (e) the transactions contemplated hereby or any announcement hereof or the identity of the Purchaser, (f) the attrition of customers or employees or other deterioration of the Business prior to the Closing Date, (g) the pendency of the Bankruptcy Proceedings and any action approved by, or motion made before, the Bankruptcy Courts, or (h) matters known to or reasonably foreseeable by the Purchaser, taking into account the financial condition, business and operations of the Sellers and the fact that the Sellers are involved in the Bankruptcy Proceedings; it being understood that the failure of the Business to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect; provided, that, with respect to clauses (a) and (b), any such event, change, circumstance, occurrence or effect shall be included to the extent that such events, changes, circumstances, occurrences or effects have a materially disproportionate effect on the Business as compared to other industry participants.

"**Material Contracts**" has the meaning set forth in Section 4.4.

"**Minimum Terms and Conditions of Employment**" has the meaning set forth in Section 7.1.1.

"**Monetary Cost**" has the meaning attributed to that term in the Transition Services Agreement.

"**Monetary Cost Floor and Cap**" has the meaning set forth in Section 5.25(c).

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**New York Courts**" has the meaning set forth in Section 10.6(b)

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNSA**" has the meaning set forth in the recitals to this Agreement.

"**NNSA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**NNSA Assumed Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**NNSA Irrevocable Offer**" has the meaning set forth in the preamble to this Agreement.

"**NNTC**" means Nortel Networks Technology Corporation.

"**NN Turkey**" means Nortel Networks Netas Telekomunikasyon A.S., a joint stock corporation formed under the laws of Turkey.

"**NNUK**" means Nortel Networks UK Limited.

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.13(a).

"**Non-Assigned Contract**" means a Non-Assignable Contract as to which all applicable Consents to assignment have not been granted prior to the Closing Date.

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

"**Non-KPD Warranty Provision**" means the provision to be recognized and measured by the Business pursuant to the Calculation Principles for potential claims by customers under the Warranty Obligations and the EMEA Warranty Obligations.

"**Non-Solicitation Period**" means the twenty-four (24) month period immediately following the Closing Date.

"**Non-365 Contracts**" has the meaning set forth in Section 2.1.6.

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Financial Statements, as set forth in Section 1.1(e) of the Sellers Disclosure Schedule.

"**Open Source Software**" means Software that is made available under a license agreement that (i) conditions use, modification or distribution of any Software program, or any Software integrated with or derived from such Software program, or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software) or (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software.

"**Ordinary Course**" means the ordinary course of the Business (excluding the EMEA Business) consistent with recent past practice since the filing of the Bankruptcy Proceedings, as such practice may be modified from time to time to the extent necessary to reflect the Bankruptcy Proceedings and as such practice may be modified from time to time to reflect the separation of the Business from the other businesses of the Sellers in a manner consistent with the terms hereof, the EMEA Asset Sale Agreement and the NNSA Irrevocable Offer.

"**Overhead and Shared Services**" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services or provided to both (i) the Business and (ii) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software or other Intellectual Property necessary for or used in connection therewith.

"**Owned Equipment**" means (i) Equipment owned by any of the Sellers that is held or used exclusively in connection with the Business, and (ii) the other Equipment listed in Section 1.1(f) of the Sellers Disclosure Schedule, excluding, in each case, any Owned Inventory and any Intellectual Property.

"**Owned Inventory**" means (i) Inventory owned and paid for by any of the Sellers that is held or used exclusively in connection with the Business, including any such Inventory which is owned by the Sellers but remains in the possession or control of a contract manufacturer or another Third Party, and (ii) the other Inventory listed in Section 1.1(g) of the Sellers Disclosure Schedule.

"**Partial Allocation**" has the meaning set forth in Section 6.8(a).

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patents**" means all national and multinational statutory invention registrations, invention disclosures, patents, utility models, patent applications, provisional patent applications, including all reissues, divisions, continuations, continuations-in-part, extensions and re-examinations thereof.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or for Taxes the validity of which are being contested in good faith by appropriate proceedings other than Liens that may be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP; (iii) Liens arising hereunder or under any Assigned Contracts (after giving effect to the assignment hereunder); (iv) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (v) any other Liens set forth in Section 1.1(h) of the Sellers Disclosure Schedule; and (vi) present or future zoning, entitlement, building and land use regulations, customary covenants, defects of title, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair in any material respect the use or value of the related assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Post-Closing Taxable Period**" means any Taxable period beginning after the Closing Date.

"**Pre-Closing Segregation Costs**" has the meaning set forth in Section 5.25(g).

"**Pre-Closing Segregation Projects**" has the meaning set forth in Section 5.25(g).

"**Pre-Closing Taxable Period**" means any Taxable period ending on or prior to the Closing Date.

"**Prepaid Expenses**" means the prepaid expenses specifically identified as relating to the Business as indicated in the Adjusted Net Working Capital Statement.[11]

---

[11]    Note to Purchaser:  Treatment of these prepaid expenses to be discussed.  This draft anticipates that these Prepaid Expenses would be included in the Working Capital Adjustment, but Sellers' intent is to manage such Prepaid Expenses down to zero pre-Closing.

"**Prepaid Expenses Amount**" means, as of any given date, the amounts classified as Prepaid Expenses of the Business, determined in a manner consistent with the Calculation Principles.

"**Primary Party**" means (i) each of the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Produce Volume Forecast**" has the meaning attributed to that term in the Transition Services Agreement.

"**Products**" means the prior, if currently supported, and current versions of all products set forth in Section 1.1(i) of the Sellers Disclosure Schedule.

"**Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Authorized Agents**" has the meaning set forth in Section 10.6(c).

"**Purchaser Authorized Canadian Agent**" has the meaning set forth in Section 10.6(c).

"**Purchaser Authorized U.S. Agent**" has the meaning set forth in Section 10.6(c).

"**Purchaser Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan, termination or retirement indemnity plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, early or ill health retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferred Employees pursuant to this Agreement.

["**Purchaser Supply Agreement**" means the agreement between the Purchaser and/or any Designated Purchasers, on the one hand, and the relevant Sellers, on the other hand,

to be executed on or before the Closing [in the form] [on the basis of the term sheet] attached hereto as Exhibit **[M]**.]¹²

"**Qualified Expenditures**" has the meaning set forth in Section 6.6(b).

"**Real Estate Lease**" means any Seller Contract that is a lease, sublease, license or other agreements for occupancy of real estate.

"**Records Custodian**" means Deloitte & Touche LLP or in case such firm is unable to carry out its duties for whatever reason, such other auditing firm of international reputation that is acceptable to each of the Purchaser and the Sellers, each acting reasonably.

"**Regulatory Approvals**" means the (i) Antitrust Approvals, (ii), if required to effect the Closing, the ICA Approval, and (iii) [●].¹³

"**Release**" when used in conjunction with Hazardous Materials, means any spilling, leaking, pumping, emitting, emptying, pouring, discharging, depositing, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers or other receptacles containing Hazardous Materials) into the environment.

"**Removed Assets**" has the meaning set forth in Section 5.24(a).

"**Removed Liabilities**" has the meaning set forth in Section 5.24(b).

"**Respective Affiliates**" has the meaning set forth in Section 10.16(c).

"**Restricted Seller**" has the meaning set forth in Section 5.24(b).

"**Restricted Technical Records**" means the Livelink database or any other similar database containing only all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2007 and subsequent taxation years.

"**Scope Guidelines**" has the meaning set forth in Section 5.25(a).

"**Securities Disclosure Documents**" has the meaning set forth in the first sentence of ARTICLE IV.

"**Seller**" has the meaning set forth in the recitals to this Ageement.

---

¹²    Note to Purchaser:  If applicable and required, this agreement may govern the supply by the Purchaser and/or any Designated Purchasers to the relevant Sellers of certain required products and services.

¹³    Note to Purchaser:  Definition to be completed with any key governmental consents required in connection with the transaction whether relevant to the Sellers or the EMEA Sellers.

"**Seller Authorized Agents**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized Canadian Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized U.S. Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Consents**" has the meaning set forth in Section 2.1.1(i).

"**Seller Contracts**" means those Contracts of a Seller that relate exclusively to the Business (including Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business, but excluding any other licenses of Intellectual Property).

"**Seller Employee Plan**" means (i) any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan, termination or retirement indemnity plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, early or ill health retirement plan,  retirement savings plan, post retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates (other than the EMEA Sellers or NNSA) with respect to Employees, and (ii) any other employee benefit plan with respect to which the Purchaser or any of its Affiliates could have any Liability as a result of the Sellers or any of their Subsidiaries or Affiliates (other than the EMEA Sellers or NNSA) maintaining such plan prior to the Closing Date.

"**Seller Insurance Policies**" means all current or previous insurance policies of the Sellers and their Affiliates, including all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, contaminated products insurance policies and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing.

["**Seller Supply Agreement**" means the agreement between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, that

such parties will use their reasonable best efforts to negotiate and execute on or prior to the Closing [in the form] [on the basis of the term sheet] attached hereto as Exhibit **[N]**.][14]

"**Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Sellers' Trademarks**" has the meaning set forth in Section 5.21.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Services**" means the GSM network implementation services, the GSM network managed services and the GSM network support services directly associated with the Business provided by the Sellers, the EMEA Sellers and NNSA as of the Closing Date.

"**Software**" means any and all (i) computer programs, whether in source code or object code, and (ii) computerized databases and compilations.

"**Specified Employee Liabilities**" has the meaning set forth in Section 2.1.3(j).

"**Specified Transferred Employees**" has the meaning set forth in Section 7.1.2(c)(ii).

"**Sponsors**" has the meaning set forth in Section 3.3.

"**Straddle Period**" has the meaning set forth in Section 6.4(b).

"**Subcontract Agreement**" means one or more agreements between the relevant Seller(s), on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, that such parties will use their reasonable best efforts to negotiate and execute on or prior to the Closing in the form attached hereto as Exhibit **[J]**.[15]

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity,

---

[14]     Note to Purchaser:  This agreement may govern the supply by the relevant Sellers to the Purchaser and/or any Designated Purchasers of certain products and services on which the Business is dependent as at the Closing Date.

[15]     Note to Purchaser:  Pursuant to this Subcontract Agreement, for a period not to exceed [60] days from the Closing Date, (i) the relevant Sellers would provide or cause to be provided to the Purchaser or a Designated Purchaser, to the extent permitted under applicable Law and the relevant contract, the benefits of any Bundled Contracts specified in Section 5.14 of the Sellers Disclosure Schedule to the extent they relate to the Business, and (ii) the Purchaser or such Designated Purchaser would assume, directly or indirectly, the Liabilities of, and perform as subcontractor the obligations of, the relevant Seller under any such Bundled Contracts to the extent they relate to the Business.

including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, gross receipts, sales, use, *ad valorem*, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto, and (b) any obligation to pay Taxes of a Third Party, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian, U.K, French or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

"**Tax Credit Purchaser**" has the meaning set forth in Section 6.6(b).

"**Tax Returns**" means all returns, reports (including elections, declarations, disclosures, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes, including any amendments thereto.

"**Third Party**" means any Person that is neither a Party nor an Affiliate of a Party.

"**Third Party Beneficiaries**" has the meaning set forth in Section 10.3.

"**Third Party Provisions**" has the meaning set forth in Section 10.3.

"**365 Contracts**" has the meaning set forth in Section 2.1.5(a).

"**Trademarks**" means, together with the goodwill associated therewith, all trademarks, service marks, trade dress, logos, distinguishing guises and indicia, trade names, corporate names, business names, domain names, whether or not registered, including all common law rights, and registrations, applications for registration and renewals thereof, including without limitation, all marks registered in the trademark offices of any nation throughout the world, and all rights therein provided by multinational treaties or conventions.

"**Trademark License Agreement**" means the trademark license agreement between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be entered into on or before the Closing in the form attached hereto as Exhibit **[K]**.

"**Transaction Documents**" means this Agreement, the EMEA Asset Sale Agreement, the NNSA Irrevocable Offer, the Ancillary Agreements and all other ancillary agreements to be entered into, or documentation delivered by, any Party and/or any Designated Purchaser pursuant to this Agreement or any Local Sale Agreement.

25

"**Transfer Tax Returns**" has the meaning set forth in Section 6.7(a).

"**Transfer Taxes**" means all goods and services, sales, excise, use, transfer, gross receipts, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees and notarial fees), together with interest, penalties and additional amounts imposed with respect thereto.

"**Transferred Employee**" means (i) Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1 and (ii) those Employees whose employment transfers by operation of Law.

"**Transferred Employee Plan**" means any Seller Employee Plan that is transferred (or the Liabilities of which are transferred) to the Purchaser or Designated Purchaser by operation of Law.

"**Transferred Intellectual Property**" means (i) the Transferred Patents, (ii) the Trademarks set forth in Section 1.1(j) of the Sellers Disclosure Schedule, and (iii) any Intellectual Property (other than Patents and Trademarks) owned solely by any of the Sellers that is used exclusively in connection with the Business as of the date hereof.

"**Transferred Overhead and Shared Services**" means Overhead and Shared Services to be provided to or in support of the Business post-Closing by Transferred Employees as set forth in Section 1.1(k) of the Sellers Disclosure Schedule.

"**Transferred Patents**" means the Patents listed in Section 1.1(l) of the Sellers Disclosure Schedule.

"**Transition Services Agreement**" means an agreement between relevant Sellers and/or the relevant EMEA Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or prior to the Closing Date, in the form attached hereto as Exhibit **[L]**, except that the Schedules to such agreement shall be agreed between the Parties in accordance with Section 5.25 hereof.

"**Transition Tax Returns**" has the meaning set forth in Section 6.7(a).

"**TSA Arbitrator**" has the meaning set forth in Section 5.25(h).

"**TSA EMEA Sellers**" means NNUK and Nortel Networks (Ireland) Limited.

"**TSA Sellers**" means the Main Sellers and those entities listed on Exhibit A attached to the form Transition Services Agreement attached hereto as Exhibit **[L]**.

"**Uni-Nortel**" means Uni-Nortel Communication Technologies (Hellas), S.A., a company organized under the laws of Greece, which was established in July 2005 as a joint venture between Nortel Networks International Finance & Holding, B.V. and UniSystems, S.A.

for the purposes of marketing and selling certain telecommunications equipment and systems in Greece and the Republic of Cyprus.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**U.S. Bidding Procedures Order**" means that certain [*insert title of the order*], which was entered on [●] by the U.S. Bankruptcy Court.

"**U.S. Debtor Contract**" means any Seller Contract to which a U.S. Debtor is a party.

"**U.S. Debtors**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Sale Order**" means the sale order of the U.S. Bankruptcy Court, substantially in the form attached hereto as Exhibit 5.1, approving the sale of the Assets to the Purchaser (or a Designated Purchaser) and the assignment by the U.S. Debtors to, and assumption thereof by, the Purchaser (or a Designated Purchaser) of the 365 Contracts and the Assumed Liabilities pursuant to Sections 105, 363 and 365 of the U.S. Bankruptcy Code.

"**Visa Employees**" means Employees (other than Employees whose employment transfers by operation of Law) who are identified as having a visa or permit in Section 4.10(b) of the Sellers Disclosure Schedule and whose employment with Purchaser or a Designated Purchaser cannot commence or continue on the Employee Transfer Date solely due to Purchaser or Designated Purchaser's inability to obtain the required visa or permit with respect to such Employee's employment on the Employee Transfer Date.[16]

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1989, as amended, or any similar Law.

"**Warranty Obligations**" means the warranty obligations relating to Products and Services assumed by the Purchaser and/or a Designated Purchaser pursuant to Section 2.1.3(b) and Section 2.1.3(f).

"**Warranty Provision Amount**" means the sum of (i) the KPD Provision and (ii) the Non-KPD Warranty Provision.

---

[16]    Note to Purchaser:  There is an expectation that between signing and closing Purchaser will use commercially reasonable efforts to obtain visas or permits that are required for Purchaser to employ these employees.  If unsuccessful, Purchaser's efforts are expected to continue while the employee is employed pursuant to the Loaned Employee Agreement.

"**Wholly-Owned Subsidiary**" means any Subsidiary all of the capital stock or capital which is held directly or indirectly by the Purchaser, except for any capital stock which is held by a director of such Subsidiary as required by applicable Laws.

Section 1.2.    Interpretation.

1.2.1.  Gender and Number.

Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2.  Certain Phrases and Calculation of Time.

In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding", and (iv) in determining whether an asset is "exclusively" used in connection with the Business, incidental, *de minimis* or casual uses outside the Business shall not be considered.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

The reference to any "list" set forth in the Sellers Disclosure Schedule shall mean a list that is complete and accurate, taking into account that disclosure in one section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed an adequate response and disclosure of such facts and circumstances with respect to any other representations or warranties by Seller calling for disclosure of such information whether or not such disclosure is specifically associated with it or purports to respond to one or more of such other representations or warranties if it is reasonably apparent on the face of the Sellers Disclosure Schedule that such disclosure is applicable.

1.2.3.  Headings, etc.

The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

1.2.4.  Currency.

28

All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency.  All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency.  All payments required under this Agreement shall be paid in United States currency in immediately available funds, unless otherwise specifically indicated herein.  Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the Wall Street Journal (Eastern Edition) for the day in question.

1.2.5.  Statutory References.

Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

Section 2.1.    Purchase and Sale.

2.1.1.  Assets.

Subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, purchase or be assigned and assume from the relevant Sellers, and each Seller shall sell, transfer or assign to the Purchaser or the relevant Designated Purchasers (subject to the provisions of Section 5.24), whatever right, title and interest in and to the assets exclusively used or held for use by such Seller in the conduct of the Business, to the extent existing as of the Closing Date, excluding the Excluded Assets but including the following assets (such assets, the "**Assets**") (x) in the case of Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens and Claims (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code, (y) in the case of Assets that are transferred or assigned by the Canadian Debtors, free and clear of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to the Canadian Approval and Vesting Order, when granted, and (z) in the case of Assets that are transferred or assigned by the Non-Debtor Sellers, free and clear of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates):

(a)    the Owned Inventory as of the Closing Date;

(b)    the CIP Receivables as of the Closing Date;

(c)    the Owned Equipment as of the Closing Date;

(d)    the Assigned Contracts in force as of the Closing Date;

(e)      the Prepaid Expenses as of the Closing Date;

(f)      the Business Information existing as of the Closing Date, subject to Section 2.1.2(h);

(g)      the Transferred Intellectual Property as of the Closing Date, subject to any and all licenses granted prior to the Closing Date under such Intellectual Property, together with all claims against Third Parties for infringement, misappropriation or other violation of any Law with respect to any of the Transferred Intellectual Property;

(h)      all rights as of the Closing under all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Assets; and

(i)      to the extent assignable under applicable Law, all Consents of Government Entities used by the Sellers exclusively pertaining to the Business (the "**Seller Consents**").

2.1.2.  Excluded Assets.

Notwithstanding anything in this Section 2.1 or elsewhere in this Agreement or in any of the Transaction Documents to the contrary, nothing herein shall be deemed to sell, transfer, assign or convey (or require Sellers to do any of the foregoing as to) the following assets to the Purchaser or any Designated Purchaser, and the Sellers shall retain all of their respective rights, title and interests in and to, and the Purchaser and the Designated Purchasers shall have no rights with respect to, the rights, title and interests of the Sellers in and to any of (x) the respective assets of Sellers (other than the Assets), and (y) the following assets (collectively, the "**Excluded Assets**"):

(a)      cash and cash equivalents, accounts receivable (including intercompany receivables but excluding CIP Receivables),[17] bank account balances and all petty cash of the Sellers;

(b)      any refunds due from, or payments due on, claims with the insurers of any of the Sellers in respect of losses arising prior to the Closing Date;

(c)      all rights to Tax refunds, credits or similar benefits relating to the Assets or the Business allocable to a Pre-Closing Taxable Period or to the portion of a Straddle Period ending on and including the Closing Date;

---

[17]      Note to Purchaser:  Bidders are invited to make an offer to purchase all account receivables. To the extent that account receivables are not sold to the Purchaser, provisions should be included that the Purchaser will provide all assistance requested in connection with the collection of receivables.

(d)      all claims, causes of action and rights of Sellers or any Subsidiary thereof to the extent relating to any Excluded Liabilities or to any Liabilities for which Sellers are responsible under this Agreement (including rights of set-off, rights to refunds and rights of recoupment from or against any Third Party);

(e)      any security deposits made by or on behalf the Sellers (including those relating to Assigned Contracts);

(f)      any rights of the Sellers under any Non-Assigned Contract;

(g)      the minute books, stock ledgers and Tax records of the Sellers;

(h)      (i) any books, records, files, documentation or sales literature other than the Business Information (subject to clause (iii) below of this subsection and the last paragraph of this Section 2.1.2), (ii) the Employee Records, and (iii) such portion of the Business Information that the Sellers are required by Law (including Laws relating to privilege or privacy) or by any agreement with a Third Party to retain and/or not to disclose (provided that copies of such information shall be provided to the Purchaser at the Purchaser's cost and to the extent permitted by applicable Law or such agreement);

(i)      except for (i) the Transferred Intellectual Property and the rights described in Section 2.1.1(g) above, and (ii) Intellectual Property to the extent rights are granted thereto pursuant to the Intellectual Property License Agreement[, the Trademark License Agreement] or any other Transaction Documents, any rights to (A) any Intellectual Property of any of the Sellers (including Sellers' names) or any Affiliates of any of the Sellers or (B) Intellectual Property owned by a Third Party or jointly with any Third Party, except to the extent licensed under an Assigned Contract;

(j)      all rights of the Sellers under this Agreement and the Transaction Documents;

(k)      all of the rights and claims of the U.S. Debtors available to the U.S. Debtors under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code, and any related claims and actions arising under such Sections by operation of Law or otherwise, including any and all proceeds of the foregoing;

(l)      all records prepared in connection with the sale of the Assets and the EMEA Assets to the Purchaser and the Designated Purchasers;

(m)      all stock or other equity interests in any Person;

(n)      any assets set forth on Section 2.1.2(n) of the Sellers Disclosure Schedule;

(o)      any freehold or leasehold interest in any real estate;

(p)      any assets deemed to be Removed Assets pursuant to Section 5.24 or otherwise under this Agreement;

31

(q)     any business asset, product or service run, owned, managed and/or provided by NN Turkey, the LGN Joint Venture, Uni-Nortel and any other joint venture (or similar arrangement) of the Sellers and the EMEA Sellers unless expressly included in this Agreement; and

(r)     any and all other assets and rights of the Sellers not specifically included in Section 2.1.1.

In addition to the above, the Sellers shall have the right to retain, following the Closing, copies of any book, record, literature, list and any other written or recorded information constituting Business Information to which the Sellers in good faith determine they are reasonably likely to need access for *bona fide* business or legal purposes.

2.1.3.   Assumed Liabilities.

On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, assume and become responsible for, and duly and properly perform, discharge and pay and indemnify the Sellers against, when due, the following Liabilities (the "**Assumed Liabilities**"):

(a)     all Liabilities of the Sellers arising on or after the Closing Date to the extent related to the conduct, operation or ownership of the Business after the Closing Date, including (i) all such Liabilities with respect to the ownership, exploitation and operation of the Assets, (ii) all such Liabilities related to Actions or claims brought against the Business, (iii) all such Liabilities under any Environmental Laws, (iv) all such Liabilities under any products liability Laws or similar Laws concerning defective products, and (v) all such Liabilities under any applicable Laws in relation to telecommunications;

(b)     all Liabilities of the Sellers arising from or in connection with the performance of the Assigned Contracts (or breach thereof), whether occurring before or after the Closing Date, including (i) any Cure Costs payable pursuant to Section 2.1.7 (to the extent applicable), (ii) any obligation under any Assigned Contract to buy back from the relevant resellers the Products sold by the Business to such resellers under such Assigned Contract, and (iii) any obligations under any warranty or indemnification liabilities relating to Products and/or Services which have been supplied under any Assigned Contract;

(c)     all Liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property which the Sellers may have granted or committed to Third Parties, including Liabilities resulting from any assurances, declarations and undertakings made to standard setting bodies;

(d)     all Liabilities for, or related to any obligation for, any Tax that the Purchaser or any Designated Purchaser bears under ARTICLE VI (including for the avoidance of doubt, Transfer Taxes imposed in connection with this Agreement and the transactions contemplated hereunder or in connection with the execution of any other Transaction Documents);

(e)    all Liabilities relating to executory supply purchase orders entered into by the Business in the normal course with any Person who is a supplier of the Business as of the date hereof (or a replacement supplier for any such supplier) and under which Products and/or Services have not been delivered or supplied as of the Closing Date;

(f)    all obligations of the Sellers under any warranty Liabilities relating to Products and Services which have been supplied prior to the Closing under any Bundled Contract subcontracted to the Purchaser or any Designated Purchaser under any Subcontract Agreement or the benefit and burden of which has otherwise been transferred in accordance with Section 5.14(b);

(g)    except to the extent otherwise expressly set forth in ARTICLE VII, all Liabilities related to or arising from any of the following: (i) the Purchaser's or any Designated Purchasers' (or any of their Affiliates') employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees arising on or after the Closing Date; (ii) the Purchaser's or relevant Designated Purchasers' (or any of their Affiliates') offer of employment or notice of continued employment, as applicable, to any Employee pursuant to the terms of Section 7.1 (including any violation of Law in connection therewith); and (iii) the failure of the Purchaser or any Designated Purchasers or their Affiliates to satisfy their obligations with respect to the Employees, including the Transferred Employees, as set out in ARTICLE VII;

(h)    all Liabilities that relate to or arise from or in connection with any Purchaser Employee Plan;

(i)    any obligation to provide continuation coverage pursuant to COBRA or any similar Law under any Purchaser Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to Transferred Employees and/or their qualified beneficiaries with respect to a qualifying event that occurs on or after such Transferred Employees' Effective Hire Date;

(j)    all Liabilities related to the Transferred Employees set forth on Section 2.1.3(j) of the Sellers Disclosure Schedule (the "**Specified Employee Liabilities**");[18]

(k)    all Liabilities related to Transferred Employees expressly assumed by Purchaser or a Designated Purchaser as set out in ARTICLE VII;

(l)    Liabilities related to obligation to repurchase Business-related Inventory under contract manufacturing agreements, as specified in the Contract Manufacturing Inventory Agreements;

---

[18]    This Section of the Sellers Disclosure Schedule will identify the liabilities for obligations regarding long service leave and sick leave for employees in Australia, gratuity payments for employees in India and Pakistan and accrued unused vacation of Specified Transferred Employees.

(m)    all Liabilities reflected in the computation of Adjusted Net Working Capital; and

(n)    all other Liabilities listed in Section 2.1.3(n) of the Sellers Disclosure Schedule.

2.1.4.  Excluded Liabilities.

Except as provided in Section 2.1.3 or in any other provision in this Agreement or in any Ancillary Agreement, at the Closing, neither the Purchaser nor any Designated Purchasers shall assume any Liabilities of the Sellers or their Affiliates (collectively the "**Excluded Liabilities**").  Without limiting the foregoing, Excluded Liabilities include:

(a)    all Indebtedness of the Sellers and their Affiliates;

(b)    all Liabilities arising out of the Contracts that are not Assigned Contracts;

(c)    all accounts payable and trade payables of the Sellers, including intercompany payables but excluding any Liabilities described under Section 2.1.3(e);

(d)    all fees or commissions of any brokers, funds or investment banks in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates;

(e)    all Liabilities deemed to be Removed Liabilities pursuant to Section 5.24 or otherwise under this Agreement;

(f)    all Excluded Employee Liabilities; and

(g)    all Liabilities of NN Turkey, the LGN Joint Venture, Uni-Nortel.

2.1.5.  Assumption and Assignment of 365 Contracts.

(a)    At Closing, the U.S. Debtors will assume and assign to the Purchaser or a Designated Purchaser, all U.S. Debtor Contracts (other than Real Estate Leases) that are Executory Contracts, and were entered into prior to the Petition Date (the "**365 Contracts**"). Section 2.1.5(a) of the Sellers Disclosure Schedule sets forth a list of all 365 Contracts.

(b)    Prior to the Closing Date, the Sellers shall be entitled to update and/or supplement Section 2.1.5(a) of the Sellers Disclosure Schedule.

(c)    The U.S. Debtors shall seek the approval of the U.S. Bankruptcy Court to permit the assumption and assignment of all the 365 Contracts in accordance with Section 5.1.

2.1.6.  <u>Assignment of Non-365 Contracts</u>.

At Closing, the Sellers that are not U.S. Debtors will assign to the Purchaser or a Designated Purchaser all Seller Contracts other than U.S. Debtor Contracts, Real Estate Lease or Non-Assignable Contracts (the "**Non-365 Contracts**").

2.1.7.  <u>Cure Costs; Adequate Assurance; Efforts</u>

(a)     To the extent that assumption and assignment of any 365 Contract or assignment of Non-365 Contract entail the payment of any Cure Cost, the Purchaser shall directly pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order and such payment shall not entitle the Purchaser to any adjustment to the Purchase Price.

(b)     Prior to the hearing before the U.S. Bankruptcy Court to assume the 365 Contracts, the Purchaser shall provide adequate assurance of its and the relevant Designated Purchasers' future performance under each 365 Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code and to the extent required by the U.S. Sale Order.

(c)     The Parties shall, and shall cause the Other Sellers and the Designated Purchasers, as applicable, to, use reasonable best efforts to obtain all Consents required to permit the assignment to the Purchaser (or, if specified by the Purchaser, a Designated Purchaser) of the Contracts that have been entered into with customers in force as of the Closing Date; <u>provided</u>, <u>however</u>, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in seeking such Consents and <u>provided</u> <u>further</u> that the failure to obtain any or all of such Consents shall not in itself entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby, or under the EMEA Asset Sale Agreement or entitle the Purchaser to any adjustment to the Purchase Price.

2.1.8.  <u>Local Sale Agreements</u>.

Subject to the terms and conditions hereof, if reasonably requested in writing by the Purchaser to effect the Closing on the terms hereof, the relevant Sellers shall, and the Purchaser shall, and shall cause the relevant Designated Purchasers to, enter into such agreements or instruments, including bills of sale and/or assignment and assumption agreements (the "**Local Sale Agreements**"), providing for (i) the sale, transfer, assignment or other conveyance to the Purchaser and relevant Designated Purchasers, in accordance with the requirements of applicable local Law, of any Assets located in the countries listed in Section 2.1.8 of the Sellers Disclosure Schedule, and (ii) the assumption by the Designated Purchasers of any Assumed Liability that the Purchaser intends to allocate to them.  The agreed forms of certain of such Local Sale Agreements, subject to modification required by applicable Law, are attached to this Agreement as Exhibit 2.1.8.  In the event of a conflict between this Agreement and the Local Sale Agreement, this Agreement shall prevail.

2.1.9.  <u>EMEA Asset Sale Agreement; NNSA Irrevocable Offer</u>.

None of the EMEA Sellers, NNSA, the Joint Administrators, or the French

Administrators shall assume, or be deemed to assume, any Liability whatsoever under this Agreement and nothing in this Agreement (except to the extent expressly incorporated into the EMEA Asset Sale Agreement or the NNSA Irrevocable Offer) shall apply to, or govern, the sale, assignment, transfer, retention or assumption of assets, rights, properties or Liabilities of, or by, NNSA, the French Administrators, any EMEA Sellers or the Joint Administrators in any manner whatsoever.  The only assets, rights, properties and Liabilities of NNSA or the French Administrators that are being sold, assigned or transferred to, and assumed by, the Purchaser or the Designated Purchaser(s), and the terms and conditions thereof, and representations with respect thereto, are solely as expressly set forth in the NNSA Irrevocable Offer.  The only assets, rights, properties and Liabilities of the EMEA Sellers or Joint Administrators that are being sold, assigned or transferred to, and assumed by, the Purchaser or the EMEA Designated Purchasers, and the terms and conditions thereof, and representations with respect thereto, are solely as expressly set forth in the EMEA Asset Sale Agreement.  Neither the Purchaser nor any Designated Purchaser shall be entitled to make any claim under this Agreement, or assert any right hereunder, against any Person other than the Sellers.

2.1.10. <u>Non-Assignable Assets</u>.

Notwithstanding anything in this Agreement to the contrary, if a Consent of a Third Party (including a Government Entity) has not been obtained on or prior to Closing, then, unless such Consent is subsequently obtained, this Agreement shall not constitute an agreement to sell, transfer, lease or sublease or assign, directly or indirectly, any Asset or any obligation or benefit arising thereunder if an attempted direct or indirect sale, transfer, lease, sublease or assignment thereof, without such Consent, would constitute a breach, default, violation or other contravention of the rights of such Third Party or would be ineffective with respect to any party to a Contract concerning such Asset.  For greater certainty, failure to obtain any such Consent shall not entitle the Purchaser to terminate or rescind this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment of the Purchase Price.

Section 2.2.    <u>Purchase Price</u>.

2.2.1. <u>Purchase Price</u>.

Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the sale, transfer and assignment of the Assets pursuant to the terms hereof, of the EMEA Assets pursuant to the EMEA Asset Sale Agreement and of the NNSA Assets under the NNSA Irrevocable Offer, and of the rights granted by certain Sellers and the EMEA Sellers under the Intellectual Property License Agreement [and the Trademark License Agreement], the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers, shall (x) assume and become obligated to pay, duly and properly perform and discharge and indemnify, when due, the Assumed Liabilities and the EMEA Assumed Liabilities and (y) pay to the Distribution Agent an amount of cash (the "**Purchase Price**") equal to [●] dollars ($ [●]) to be adjusted pursuant to this Agreement and Clause 3.2 of the EMEA Asset Sale Agreement.

2.2.2.   <u>Estimated Purchase Price</u>.

(a)    For purposes of determining the amount of cash to be paid as the Estimated Purchase Price by the Purchaser to the Sellers and the EMEA Sellers at the Closing pursuant to Section 2.3.2(b), at least three (3) Business Days prior to the Closing Date, the Main Sellers and the EMEA Sellers shall deliver to the Purchaser a statement prepared in good faith in accordance with the Calculation Principles (in all cases without double-counting of Cure Costs) and the terms hereof setting forth:

(i)    the estimated amount of the Inventory Value as of the Closing Date (the "**Estimated Inventory Value**"),

(ii)    the estimated amount of the CIP Receivables Amount as of the Closing Date (the "**Estimated CIP Receivables Amount**"),

(iii)    the estimated amount of the Prepaid Expenses Amount as of the Closing Date (the "**Estimated Prepaid Expenses Amount**"),

(iv)    the estimated amount of the Warranty Provision Amount as of the Closing Date (the "**Estimated Warranty Provision Amount**"),

(v)    the estimated amount of the Employee Adjustment Amount as of the Closing Date (the "**Estimated Employee Adjustment Amount**"),

(vi)    the estimated amount of the Adjusted Net Working Capital (the "**Estimated Adjusted Net Working Capital**"),

(vii)    the estimated amount of the aggregate of all EMEA Upward Adjustments (the "**Estimated Aggregate EMEA Upward Adjustment**"),

(viii)    the estimated amount of the aggregate of all EMEA Downward Adjustments (the "**Estimated Aggregate EMEA Downward Adjustment**"),

(ix)    the estimated amount of the aggregate of all Downward Adjustments (the "**Estimated Aggregate Downward Adjustment**"), and

(x)    the Estimated Purchase Price.

(b)    As used in this Agreement, "**Estimated Purchase Price**" means an amount equal to:

(i)    the Purchase Price; <u>plus</u>

(ii)    the difference, which may be positive or negative, equal to the Estimated Adjusted Net Working Capital <u>minus</u> $[●][19]; <u>plus</u>

      (iii)    the Estimated Aggregate EMEA Upward Adjustment; <u>minus</u>

      (iv)    the Estimated Aggregate EMEA Downward Adjustment; <u>minus</u>

      (v)    the Estimated Aggregate Downward Adjustment (if any); <u>minus</u>

      (vi)    the Estimated Employee Adjustment Amount (if any).

(c)    As used in this Agreement and shown in the attached Adjusted Net Working Capital Statement in Exhibit **[O]**, the "**Adjusted Net Working Capital**" means an amount equal to:

      (i)    the Inventory Value; <u>plus</u>

      (ii)    the CIP Receivables Amount; <u>plus</u>

      (iii)    the Prepaid Expenses Amount; <u>minus</u>

      (iv)    the Warranty Provision Amount.

    2.2.3.    <u>Purchase Price Adjustment</u>.

      2.2.3.1    <u>Closing Statement; Dispute Resolution</u>.

(a)    As promptly as practicable after the Closing (and in any event within thirty (30) days after the Closing), the Purchaser shall deliver to the Main Sellers and the EMEA Sellers a written statement (the "**Closing Statement**"), which shall be prepared in accordance with the Calculation Principles and the terms hereof and contain the Purchaser's final calculation of:

      (i)    the Inventory Value as of the Closing (the "**Closing Inventory Value**");

      (ii)    the CIP Receivables Amount as of the Closing (the "**Closing CIP Receivables Amount**");

      (iii)    the Prepaid Expenses Amount as of the Closing (the "**Closing Prepaid Expenses Amount**");

      (iv)    the Warranty Provision Amount as of the Closing (the "**Closing Warranty Provision Amount**");

---

[19]    <u>Note to Purchaser</u>:  Normalized working capital to be provided.

(v)     the Adjusted Net Working Capital as of the Closing (the "**Closing Adjusted Net Working Capital**");

(vi)     the Employee Adjustment Amount as of the Closing Date (the "**Closing Employee Adjustment Amount**");

(vii)     the aggregate of all EMEA Upward Adjustments (the "**Aggregate EMEA Upward Adjustment**");

(viii)     the aggregate of all EMEA Downward Adjustments (the "**Aggregate EMEA Downward Adjustment**");

(ix)     the aggregate of all Downward Adjustments (the "**Aggregate Downward Adjustment**");

(x)     the final Purchase Price adjusted as provided in this Section and based on the foregoing (the "**Final Purchase Price**"), which shall be equal to:

(A)     the Purchase Price; plus

(B)     the difference, which may be positive or negative, equal to the Closing Adjusted Net Working Capital minus $[●]; plus

(C)     the Aggregate EMEA Upward Adjustment; minus

(D)     the Aggregate EMEA Downward Adjustment; minus

(E)     the Aggregate Downward Adjustment (if any); minus

(F)     the Closing Employee Adjustment Amount (if any).

(b)     If the Main Sellers and/or the EMEA Sellers disagree with the determination of the Closing Statement, the Main Sellers and/or the EMEA Sellers shall notify the Purchaser of such disagreement within thirty (30) days after delivery of the Closing Statement (such notice, the "**Disagreement Notice**").  The Disagreement Notice shall set forth, in reasonable detail, any disagreement with, and any requested adjustment to, the Closing Statement.  If the Main Sellers and/or the EMEA Sellers fail to deliver the Disagreement Notice by the end of such thirty- (30-) day period, the Main Sellers and the EMEA Sellers shall be deemed to have accepted as final the Closing Statement delivered by the Purchaser.  Matters included in the calculations in the Closing Statement to which the Main Sellers and the EMEA Sellers do not object in the Disagreement Notice shall be deemed accepted by the Main Sellers and the EMEA Sellers and shall not be subject to further dispute or review.  Throughout the periods during which the Closing Statement is being prepared and any disputes that may arise under this Section 2.2.3 are being resolved, the Purchaser shall, promptly upon request, provide the Main Sellers, the EMEA Sellers and their respective accountants access to the books, records and personnel of the Business and all documents, schedules and workpapers used by the Purchaser in the preparation of the Closing Statement or that are otherwise reasonably necessary for the Main Sellers, the EMEA Sellers and their respective accountants to review the Closing

Statement (other than any such documents, schedules and workpapers that are subject to attorney-client privilege; it being understood, however, that Purchaser and the Designated Purchasers shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the Main Sellers and the EMEA Sellers or their respective representatives to occur without so jeopardizing privilege).  The Main Sellers, the EMEA Sellers and the Purchaser shall negotiate in good faith to resolve any disagreement with respect to the Closing Statement, and any resolution agreed to in writing by the Main Sellers, the EMEA Sellers and the Purchaser shall be final and binding upon the Parties.

(c)    If the Main Sellers, the EMEA Sellers and the Purchaser are unable to resolve any disagreement as contemplated by Section 2.2.3.1(b) within **[●] ([●])** days after delivery of a Disagreement Notice by the Main Sellers and/or the EMEA Sellers, the Independent Auditor shall serve as arbitrator (the "**Accounting Arbitrator**") to resolve such disagreement.  The Primary Parties and NNUK shall instruct the Accounting Arbitrator to consider only those items and amounts set forth in the Closing Statement as to which the Main Sellers, the EMEA Sellers and the Purchaser have not resolved their disagreement and to conduct such hearing as it considers necessary to resolve such disagreement.  The Main Sellers, the EMEA Sellers and the Purchaser shall use their reasonable best efforts to cause the Accounting Arbitrator to deliver to the Primary Parties and NNUK, as promptly as practicable (and in no event later than **[●] ([●])** days after his or her appointment), a written report setting forth the resolution of any such disagreement determined in accordance with the terms of this Agreement.  Such report and the Closing Statement, as adjusted thereby, shall be final and binding upon the Sellers, the EMEA Sellers and the Purchaser.  In the event the Accounting Arbitrator concludes that the Purchaser was correct as to a majority (by dollar amount) of the disputed items, then the Sellers and the EMEA Sellers shall share the Accounting Arbitrator's fees, costs and expenses. In the event the Accounting Arbitrator concludes that the Main Sellers and EMEA Sellers were correct as to a majority (by dollar amount) of the disputed items, then the Purchaser shall pay the Accounting Arbitrator's fees, costs and expenses.

2.2.3.2    Calculation and Payment of the Purchase Price Adjustment.

(a)    If the Final Purchase Price, as finally determined in accordance with this Section 2.2.3, is less than the Estimated Purchase Price, then the Main Sellers, acting on behalf and as agent of the Other Sellers and the EMEA Sellers shall pay to the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, the excess of the Estimated Purchase Price over the Final Purchase Price.

(b)    If the Final Purchase Price, as finally determined in accordance with this Section 2.2.3, exceeds the Estimated Purchase Price, the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, shall pay to the Distribution Agent the amount by which the Final Purchase Price exceeds the Estimated Purchase Price.

(c)    Any payment to be made under this Section 2.2.3.2 shall include interest thereon calculated from the Closing Date to the date of payment at a rate per annum of three (3)%.  Such interest shall accrue from day to day.

(d)    All amounts payable under this Section 2.2.3.2 to any Party shall be paid in cash by wire transfer of immediately available funds to the bank account(s) designated in writing by the Main Sellers in case of payment to the Distribution Agent or by the Purchaser in case of payment to the Purchaser within five (5) Business Days of the final determination of the Closing Statement in accordance with Section 2.2.3.1.

2.2.4.   Good Faith Deposit.

(a)    The Purchaser has delivered to the Escrow Agent an amount in United States dollars equal to US$10,000,000 (the "**Good Faith Deposit**") in the form of [●][20] to serve as earnest money under this Agreement.

(b)    The Good Faith Deposit shall:

(i)    be applied to the Estimated Purchase Price to be paid by the Purchaser pursuant to Section 2.3.2(b) and therefore be paid by the Escrow Agent to the Distribution Agent (as agent of the Sellers and the EMEA Sellers) pursuant to Section 2.3.2(c) at Closing; or

(ii)    become property of the Sellers and the EMEA Sellers:

(1)    in the event that this Agreement is terminated for any reason after the granting of the U.S. Sale Order and the Canadian Approval and Vesting Order; and/or

(2)    in the event that this Agreement is terminated by the Main Sellers pursuant to Section 9.1(c)(i) [or Section 9.1(d)]; and/or

(3)    in the event that this Agreement is terminated by any Primary Party pursuant to Section 9.1(b)(iii) or Section 9.1(b)(iv); or

(iii)    be promptly returned to the Purchaser otherwise.

Section 2.3.    Closing.

2.3.1.   Closing Date.

The completion of the purchase and sale of the Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall occur simultaneously with the closing of the transaction contemplated by the EMEA Asset Sale Agreement, and shall take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in [●], [●], commencing at 12:00 p.m. local time on

---

[20]   Note to Purchaser:  To be completed based on the form agreed by the Parties.

the date upon which all of the conditions set forth under ARTICLE VIII (other than conditions to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions) have been satisfied or, if permissible, waived by the Main Sellers and/or the Purchaser (as applicable), or on such other place, date and time as shall be mutually agreed upon in writing by the Purchaser, the Main Sellers, the EMEA Sellers and NNSA (the day on which the Closing takes place being the "**Closing Date**").

Legal title, equitable title and risk of Loss with respect to the Assets will transfer to the Purchaser or the relevant Designated Purchaser, and the Assumed Liabilities will be assumed by the Purchaser and the relevant Designated Purchasers, at the Closing.

2.3.2.  Closing Actions and Deliveries.

At the Closing:

(a)  the Sellers and the Purchaser shall, and the Purchaser shall cause the Designated Purchasers to, enter into (i) the Ancillary Agreements to which it is contemplated that they will be parties, to the extent such agreements have not yet been entered into and subject to Section 5.24 and Section 5.25 and (ii) instruments of assignment and assumption effecting the transfer of the Assets and the Transferred Intellectual Property from the Sellers to the Purchaser or the Designated Purchaser(s), as applicable;

(b)  the Purchaser shall deliver:

(i)  to the Distribution Agent, an amount equal to the Estimated Purchase Price, less the Good Faith Deposit, by wire transfer in immediately available funds to an account or accounts designated at least two (2) Business Days prior to the Closing Date by the Main Sellers in a written notice to the Purchaser; and

(ii)  to the Main Sellers, a duly executed certificate of an executive officer of the Purchaser certifying the fulfillment of the conditions set forth in Section 8.2.

(c)  NNL, NNI and NNUK shall cause the Escrow Agent to deliver to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) all amounts of cash held by the Escrow Agent by wire transfer in immediately available funds to an account or accounts designated at least two Business Days prior to the Closing Date by the Distribution Agent in a written notice to NNL, NNI and NNUK.

(d)  NNI shall deliver or cause to be delivered:

(i)  an updated Section 4.10(b) of the Sellers Disclosure Schedule (if applicable) with respect to those Employees who have accepted Purchaser's or the Designated Purchaser's offer of employment pursuant to Section 7.1.1 or whose employment will transfer to the Purchaser or Designated Purchaser by operation of Law, dated as of a date no earlier than three (3) days prior to the Closing;

42

(ii)     a duly executed certificate of non-foreign status in accordance with Section 1445 of the Code and applicable Treasury Regulations; and

(iii)     a duly executed certificate of an executive officer of NNI certifying the fulfillment of the conditions set forth in Section 8.3.

(e)     each Party shall deliver, or cause to be delivered, to the other any other documents reasonably requested by such other Party in order to effect, or evidence the consummation of, the transactions contemplated herein.

Section 2.4.    Designated Purchaser(s).

The Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.4, one or more Wholly-Owned Subsidiaries to (i) purchase specified Assets (including specified Assigned Contracts), (ii) assume specified Assumed Liabilities, and/or (iii) employ Transferred Employees on and after the Closing Date (any Subsidiary of the Purchaser that shall be properly designated by the Purchaser in accordance with this clause, a "**Designated Purchaser**"); it being understood and agreed, however, that any such right of the Purchaser to designate a Designated Purchaser is conditioned upon (x) such Designated Purchaser being able to perform the applicable covenants under Section 2.1.7 and ARTICLE VII and demonstrate satisfaction of the applicable requirements of Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance, with respect to the 365 Contracts and (y) any such designation not creating any Liability (including any Liability relating to Taxes) for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the relevant Assets, assumed the relevant Specified Employee Liabilities and/or employed the relevant Transferred Employees. No such designation shall relieve the Purchaser of any of its obligations hereunder.  Any breach hereof by a Designated Purchaser shall be deemed a breach by Purchaser.  The Purchaser and each Designated Purchaser shall be jointly and severally liable for any obligations delegated or assigned to or assumed by any of them hereunder.

The above designation shall be made by the Purchaser by way of a written notice to be delivered to the Sellers as soon as reasonably practicable after the date hereof and in no event later than the earlier of thirty (30) days after the date hereof and fifteen (15) Business Days before Closing, which written notice shall contain appropriate information about the Designated Purchaser(s) (including legal name, jurisdiction of incorporation and actual and (if there is any intention to change such residence on or prior to Closing) proposed jurisdiction of Tax residence of such Designated Purchaser(s) and shall indicate which Assets, Assumed Liabilities and Transferred Employees the Purchaser intends such Designated Purchaser(s) to purchase, assume and/or employ, as applicable, hereunder and include a signed counterpart to this Agreement in a form acceptable to the Main Sellers, agreeing to be bound by the terms of this Agreement as Designated Purchaser(s) and authorizing the Purchaser to act as such Designated Purchaser(s)' agent for all purposes hereunder.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Sellers as follows:

Section 3.1.    <u>Organization and Corporate Power</u>.

(a)    The Purchaser is a **[●]** duly organized, validly existing and in good standing under the Laws of **[●]**.  Each Designated Purchaser other than the Purchaser is a **[●]** duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is organized.  Each of the Purchaser and the Designated Purchasers has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and (ii) to own, lease and operate its assets and to carry on its business as it is now being conducted.

(b)    Each of Purchaser and the Designated Purchasers is duly qualified or licensed to own or lease and operate its properties and assets (including the Assets), and is in good standing, in each jurisdiction in which its ownership of assets or operation of business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not materially hinder, delay or impair the Purchaser's or any such Designated Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is or will become a party.

Section 3.2.    <u>Authorization; Binding Effect; No Breach</u>.

(a)    The execution, delivery and performance of each Transaction Document to which the Purchaser or any of the Designated Purchasers is a party have been duly authorized by the Purchaser and the relevant Designated Purchasers, as applicable.  This Agreement has been duly executed and delivered by the Purchaser, and the other Transaction Documents to which the Purchaser or any Designated Purchaser is, or on the Closing Date will become, a party have been or will be duly executed and delivered by the Purchaser and each Designated Purchaser party thereto.  Assuming due authorization, execution and delivery by the relevant Sellers, each Transaction Document to which the Purchaser or any Designated Purchaser is a party constitutes, or upon execution thereof will constitute, a valid and binding obligation of the Purchaser or such Designated Purchaser, as applicable, enforceable against such Person in accordance with its respective terms.

(b)    The execution, delivery and performance by each of the Purchaser and the Designated Purchasers of the Transaction Documents to which the Purchaser or such Designated Purchaser is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, or require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or

44

notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the Purchaser or the relevant Designated Purchaser, (ii) any material Contract or other document to which the Purchaser or the relevant Designated Purchaser is a party or to which any of its assets is subject or (iii) any Laws to which the Purchaser, the relevant Designated Purchaser, or any of their assets is subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that have not materially hindered, delayed or impaired, and would not reasonably be expected to, individually or in the aggregate, materially hinder, delay or impair, the performance by the Purchaser or the Designated Purchasers of any of their obligations under the Transaction Documents.

Section 3.3.    Financing.

The Purchaser has, as of the date hereof, and will have as of the Closing (i) sufficient funds available for purposes of funding the transactions contemplated herein and paying any other amount due hereunder or in respect hereof and (ii) the resources and capabilities (financial or otherwise) to perform its obligations hereunder.  The Purchaser has not, as of the date hereof, and will not have as of the Closing, incurred any obligation, commitment, restriction or liability of any kind, which would materially impair or adversely affect such resources and capabilities.  Notwithstanding anything to the contrary herein, the Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person.

(a)    [The Purchaser has delivered to the Main Sellers and the Joint Administrators correct and complete copies of: (i) executed equity commitment letters of even date herewith and addressed to Purchaser and NNC (with consent rights in respect of any amendment thereto, exercisable by NNC in its sole discretion) (such equity commitment letters, the "**Equity Commitment Letters**"), pursuant to which [●](the "**Sponsors**") have committed, subject solely to the terms and conditions thereof, to invest an aggregate amount of $[●] in equity financing in Purchaser for purposes of funding the transactions contemplated herein, under the EMEA Asset Sale Agreement and under the NNSA Irrevocable Offer and paying any other amount due hereunder or in respect hereof including in respect of any breach hereof by Purchaser (the "**Equity Financing**") and (ii) executed debt commitment letters dated [●], 2009 and related term sheet (such debt commitment letters, the "**Debt Commitment Letters**" and, together with the Equity Commitment Letters, the "**Financing Commitments**"), pursuant to which certain lenders have committed, subject solely to the terms and conditions thereof, to provide Purchaser with an aggregate amount of $[●] in debt financing (the "**Debt Financing**" and, together with the Equity Financing, the "**Financing**") for purposes of funding the transactions contemplated herein, under the EMEA Asset Sale Agreement and under the NNSA Irrevocable Offer and paying any other amount due hereunder or in respect hereof.

(b)    As of the date hereof, the Financing Commitments in the form so delivered are valid and in full force and effect.  The Financing Commitments have not been and prior to the Closing, shall not be, withdrawn, terminated, assigned or otherwise amended or modified in any respect without the express written consent of the Main Sellers.  No event has occurred that, with or without notice, lapse of time or both, would constitute a default or breach on the part of the Purchaser or the Sponsors or, to the Knowledge of the Purchaser, of the lenders under any term or condition in the Financing Commitments.  The Financing Commitments,

together with a separate fee letter, constitute, as of the date hereof, the entire and complete agreements between the parties thereto with respect to the financing contemplated thereby, and, except as set forth, described or provided for therein, (i) there are no conditions precedent to the respective obligations of the Sponsors and lenders to provide the Financing, and (ii) there are no contractual contingencies or other provisions under any agreement (including any side letters) or any understanding or commitment relating to the transactions contemplated by this Agreement to which the Purchaser, the Sponsors or any of their respective Affiliates is a party that would permit any of the Sponsors or lenders to reduce the total amount of the Financing or impose any additional condition precedent to the availability of the Financing. As of the date hereof, the Purchaser has no reason to believe that any of the conditions to the Financing will not be satisfied on a timely basis. The Purchaser has fully paid any and all commitment fees, if any, or other fees required by the Financing Commitments to be paid as of the date hereof. Subject to its terms and conditions, the aggregate proceeds of the Financing, when funded in accordance with the Financing Commitments, will, together with unrestricted cash on hand available to the Purchaser from its Affiliates, provide financing sufficient to pay the Purchase Price, all other amounts to be paid or repaid by the Purchaser under this Agreement, the EMEA Asset Sale Agreement and the NNSA Irrevocable Offer (whether payable on or after the Closing or in the event of termination of this Agreement), and all of the Purchaser's and its Affiliates' fees and expenses associated with the transactions contemplated in this Agreement, the EMEA Asset Sale Agreement and the NNSA Irrevocable Offer. The Purchaser acknowledges and agrees that receipt of the aggregate (or any) proceeds of the Financing by the Purchaser is not a condition precedent to the Purchaser's obligation to consummate the transactions contemplated hereby.] [21]

Section 3.4.    Adequate Assurance of Future Performance.

To the extent required by any Bankruptcy Laws or other Laws, the Purchaser will be able to provide, at Closing or on such earlier date as is designated by the U.S. Bankruptcy Court, adequate assurance of its and/or the relevant Designated Purchasers' future performance under each 365 Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any 365 Contract. The Purchaser acknowledges and agrees that, if it becomes necessary to provide a 365 Contract counterparty with additional assurances to satisfy the Purchaser's or a Designated Purchaser's obligations under Section 2.1.5, the Purchaser shall, and shall cause the relevant Designated Purchasers to, perform all actions and bear all such costs and expenses as may be necessary or advisable in connection with their obligations under Section 2.1.5 without recourse to any Seller. Failure to perform all such actions and bear all such costs and expenses shall result in the relevant 365 Contract being deemed to be a Non-Assigned Contract at Closing, unless otherwise agreed in writing by the Seller that is a party thereto.

---

[21]    Note to Purchaser:  These provisions will only apply to private equity fund or similar acquiror needing specific debt financing.

Section 3.5.    Purchaser's Acknowledgments; Exclusivity of Representations and Warranties.

(a)    The Purchaser is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement and the Transaction Documents.  In consultation with experienced counsel and advisors of its choice, the Purchaser has conducted its own independent review and analysis of the Business, the Assets, the EMEA Assets, the NNSA Assets, the Assumed Liabilities, the EMEA Assumed Liabilities, the NNSA Assumed Liabilities and the rights and obligations it is acquiring and assuming under this Agreement and the other Transaction Documents.  The Purchaser acknowledges that it and its representatives have been permitted such access to the books and records, facilities, equipment, contracts and other properties and assets of the Business as it required to complete its review, and that it and its representatives have had an opportunity to meet with the officers and other employees of the Sellers, the EMEA Sellers, NNSA and the Business to discuss the Business.

(b)    The Purchaser acknowledges and agrees that:

(i)    except for the representations and warranties expressly set forth herein, in the EMEA Asset Sale Agreement, in the NNSA Irrevocable Offer or in any Ancillary Agreement, the Purchaser has not relied on any representation or warranty from the Sellers, the EMEA Sellers, or NNSA, or any Affiliate of any such Person or any employee, officer, director, accountant, financial, legal or other representative of the Sellers or the EMEA Sellers, or NNSA in determining whether to enter into this Agreement;

(ii)    except for the representations and warranties expressly set forth in ARTICLE IV, the EMEA Asset Sale Agreement, the NNSA Irrevocable Offer or in any Ancillary Agreement, none of the Sellers, or the EMEA Sellers, or NNSA, or any employee, officer, director, accountant, financial, legal or other representative of the Sellers, or the EMEA Sellers**,** or NNSA, or any Affiliate of any such Person has made any representation or warranty, express or implied, as to the Business (or the value or future thereof), the Assets, the EMEA Assets or the NNSA Assets (including any implied representation or warranty as to the condition, merchantability, suitability or fitness for a particular purpose of any of the Assets, the EMEA Assets or the NNSA Assets, including under the International Convention on Contracts for the Sale of Goods (Geneva Convention) and any other applicable sale of goods Laws), the Assumed Liabilities, the EMEA Assumed Liabilities, or the NNSA Assumed Liabilities, or any Affiliate of any such Person or the accuracy or completeness of any information regarding any of the foregoing that the Sellers, the EMEA Sellers, NNSA or any other Person furnished or made available to the Purchaser and its representatives (including any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials);

(iii)    none of the Seller, the EMEA Seller, NNSA or any other Person shall have or be subject to any liability to the Purchaser, any Designated Purchaser or any other Person resulting from the distribution to the Purchaser or any Designated Purchaser,

or the Purchaser's or any Designated Purchaser's use, of the information referred to in Section 3.5(b)(ii);

      (iv)    subject to the terms of the Bankruptcy Consents, the Purchaser or any Designated Purchaser takes the Assets on an "as is" and "where is" basis;

      (v)    the enforceability of this Agreement against the Sellers is subject to receipt of the Bankruptcy Consents; and

      (vi)    notwithstanding anything to the contrary contained herein, the Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person.

      (c)    Without limiting the generality of the foregoing, PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED HEREIN, THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT OF THIRD PARTY INTELLECTUAL PROPERTY RIGHTS, OR REGARDING THE SCOPE, VALIDITY OR ENFORCEABILITY OF ANY TRANSFERRED INTELLECTUAL PROPERTY OR LICENSED INTELLECTUAL PROPERTY RIGHTS.

      Section 3.6.   Brokers.

      Except for fees and commissions that will be paid by the Purchaser, no broker, finder or investment banker is entitled to any brokerage, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

      Except (a) as set forth in the Sellers Disclosure Schedule, (b) as set forth in the registration statements, prospectuses, reports, schedules, forms and other filings (including any exhibits and documents incorporated by reference and any amendments thereto) filed by the Sellers with the U.S. Securities and Exchange Commission or the Canadian securities regulatory authorities (collectively, the "**Securities Disclosure Documents**") (but excluding any forward-looking disclosures in Securities Disclosure Documents made under the heading "Risk Factors") and/or in any filings made in the Bankruptcy Proceedings, in each case publicly filed between January 1, 2007 and the date hereof, (c) as expressly contemplated by this Agreement or (d) to the extent relating to the Excluded Assets or the Excluded Liabilities, each of the Main Sellers jointly and severally represents and warrants to the Purchaser as set forth in this ARTICLE IV:

Section 4.1.    <u>Organization and Corporate Power</u>.

(a)    Each Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized.  Subject to entry of the U.S. Sale Order in the case of the U.S. Debtors and the Canadian Sales Process Order and the Canadian Approval and Vesting Order in the case of the Canadian Debtors and receipt of other Consents from the U.S. Bankruptcy Court and the Canadian Court in connection with the transactions contemplated hereby and in the other Transaction Documents (collectively, the "**Bankruptcy Consents**"), each of the Sellers has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and (ii) own, lease and operate its assets, including the Assets, as applicable, and to carry on the Business (excluding the EMEA Business) as it is now being conducted.

(b)    Each of the Sellers is duly qualified or licensed to do business and to own, lease and operate its assets, including the Assets, and to carry on the Business (excluding the EMEA Business) as it is currently being conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not have, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.2.    <u>Authorization; Binding Effect; No Breach</u>.

(a)    Subject to the receipt of the Bankruptcy Consents (i) the execution, delivery and performance by each Main Seller of the Transaction Documents to which such Main Seller is, or at the Closing will be, a party have been duly authorized by such Main Seller and (ii) the execution, delivery and performance by each Other Seller of the Transaction Documents to which such Seller will be a party will have been duly authorized by such Other Seller by the time such Other Seller executes this Agreement.  Subject to receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser and the Designated Purchasers parties thereto, the Transaction Documents to which any Seller is or will be a party, will constitute, a legal, valid and binding obligation of such Seller, enforceable against it in accordance with its terms, subject to (in the case of Non-Debtor Sellers) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b)    Subject to receipt of the Bankruptcy Consents and the Regulatory Approvals, the execution, delivery and performance by each Seller of the Transaction Documents to which such Seller is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, result in the creation or imposition of any Lien upon any of the Assets, or (subject to the receipt of Consents in connection with the Assigned Contracts and any other Consents expressly provided for herein) require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the relevant Sellers, (ii) any Material Contract to which the relevant Seller is a party or to which any of its or their assets are

subject, (iii) any order of any Government Entity applicable to any Seller or by which any of their respective properties or Assets are bound or (iv) any Laws to which any of the Sellers, or any of the Assets are subject, except, in the case of (ii), (iii) and (iv) above, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 4.3.    Title to Tangible Assets.

Except for Permitted Encumbrances, the Owned Inventory and the Owned Equipment is owned beneficially by one or more of the Sellers, free and clear of all Liens, and such Sellers have good and marketable title thereto.

Section 4.4.    Material Contracts.

Section 4.4 of the Sellers Disclosure Schedule sets forth, as of the date hereof, a list of every Seller Contract but excluding all licenses of Intellectual Property, all of which are addressed in Section 4.5 below, other than purchase orders and invoices and any third-party or intercompany agreements related to Overhead and Shared Services, that:

(i)    in the most recent fiscal year of the Main Sellers resulted in, or is reasonably expected by its terms in the future to result in, (A) the payment of more than $25,000,000 per annum in the aggregate or (B) the receipt by the Business (excluding the EMEA Business) of more than $25,000,000 per annum in the aggregate, except any contracts referred to in any other subsection;

(ii)    materially restricts the Business (excluding the EMEA Business) from engaging in any business activity anywhere in the world;

(iii)    is a material joint venture, partnership or alliance Contract;

(iv)    is a research and development Contract involving consideration or expenditures in excess of $25,000,000 per annum; or

(v)    is a sale or distribution Contract involving the sale or distribution of Products valued at more than $25,000,000 per year,

(all the above, collectively, the "**Material Contracts**").

Section 4.5.    Intellectual Property.

(a)    The Transferred Intellectual Property and the Licensed Intellectual Property include all the material Intellectual Property exclusively owned by any of the Sellers that, as of the date hereof, is used in connection with the conduct and operation of the Business, except with respect to any Intellectual Property included in Overhead and Shared Services.

(b)    A list of all the Transferred Intellectual Property registered in the name of the Sellers is set forth in Section 4.5(b) of the Sellers Disclosure Schedule (such listed Intellectual Property, the "**Business Registered IP**").  To the Knowledge of the Sellers, the

Business Registered IP is subsisting and in full force and effect, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The foregoing will not be construed as a warranty that any Patent or Trademark will issue or be registered based on any application.

(c)     To the Knowledge of the Sellers, the Transferred Intellectual Property is not subject to any Liens other than Permitted Encumbrances and licenses entered into prior to Closing.

(d)     To the Knowledge of the Sellers, except where such assertions would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, Section 4.5(d) of the Sellers Disclosure Schedule references all written assertions received by the Sellers during the two (2) years prior to the date hereof alleging that: (i) a Seller's operations of the Business (excluding the EMEA Business), including such Seller's use, performance, licensing, copying, distribution, sale, offer for sale, lease, manufacture, having made, importation, or any other exploitation of the Products sold by the Business (excluding the EMEA Business) or of the Services rendered by the Business (excluding the EMEA Business) infringes, misappropriates or violates any Intellectual Property right of any Third Party; or (ii) the use or exploitation of any of the Transferred Intellectual Property infringes or violates any Intellectual Property of or was misappropriated from a Third Party.

(e)     To the Knowledge of the Sellers, as of the date hereof, there has been no assertion or claim made in writing to Sellers during the two (2) years prior to the date hereof asserting invalidity, misuse or unenforceability of any Transferred Intellectual Property or challenging the Sellers' right to use, right to transfer, or ownership of the Transferred Intellectual Property, in each case, excluding any such assertions or claims that would not reasonably be expected to result in any invalidity, unenforceability, loss or other material impairment of any rights or interest in the subject Intellectual Property.

(f)     To the Knowledge of the Sellers, Section 4.5(f) of the Sellers Disclosure Schedule sets forth a list of all material Contracts granting to the Sellers or any of their Affiliates any license under or to any Intellectual Property owned by a Third Party  (other than any such Contract that also grants a license to such Third Party under patents or patent applications owned by or licensed to the Sellers or their Affiliates) that is, as of the date hereof, incorporated in or used in connection with the design, development, testing, manufacturing, sale, distribution, support or servicing of any Products or the provision of Services (collectively, the "**Inbound License Agreements**"), indicating for each Inbound License Agreement, the title and the parties thereto, except to the extent an Inbound License Agreement prohibits disclosure of its existence without consent of the relevant Third Party, in which case such agreement has been omitted from Section 4.5(f) of the Sellers Disclosure Schedule.

(g)     To the Knowledge of the Sellers, Section 4.5(g) of the Sellers Disclosure Schedule sets forth a list of any Open Source Software incorporated into any of the Products and, whenever possible, describes (i) the specific Open Source Software used; (ii) the specific Open Source Software version; (iii) the vendor of the specific Open Source Software; and (iv) the Products or portions thereof into which such Open Source Software is incorporated.

(h)     Notwithstanding any provision herein to the contrary, this Section 4.5 consists of the sole representation and warranty in this Agreement regarding non-infringement, non-violation and non-misappropriation of Intellectual Property.

Section 4.6.     Litigation.

As of the date hereof, except for the Bankruptcy Proceedings, there is no Action pending or, to the Knowledge of the Sellers, threatened before any Government Entity against, involving or affecting the Business (excluding the EMEA Business) or the Assets, that would be reasonably expected to result in, individually or in the aggregate, a Material Adverse Effect.

Section 4.7.     Financial Statements.

Section 4.7 of the Sellers Disclosure Schedule sets forth the unaudited management statements of certain assets and liabilities of the Business as of December 31, 2008 (the "**Balance Sheet Date**") and the related unaudited management statements of income of the Business for the one- (1-) year period ended on the Balance Sheet Date (together, the "**Financial Statements**"). Except as set forth in the Financial Statements, such Financial Statements were prepared based on the financial books and records maintained by the Sellers and their Affiliates for the Business on the basis of the Nortel Accounting Principles and represent Sellers' good faith estimate of the selected balance sheet accounts and income statements set forth therein for the Business, in each case as of the dates and for the periods presented therein. The Financial Statements (a) have not been prepared in accordance with GAAP, (b) include estimated costs that do not necessarily represent the costs that were actually allocated to the Business for the relevant periods (or that the Business will incur after the Closing), (c) include assets that have not been tested for impairment or otherwise adjusted for fair value, (d) reflect the estimated historical operation of the Business (including the Overhead and Shared Services and the Excluded Assets) for the periods specified therein and (e) do not represent the balance sheet accounts or the income statements that would have occurred if the Business (excluding the EMEA Business) had been operated by the Sellers as a "stand alone" entity.

Section 4.8.     Compliance with Laws; Consents.

(a)     To the Knowledge of the Sellers, no Seller is in violation of any applicable Law in connection with the Business (excluding the EMEA Business), in each case except for such violations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. None of the Sellers has received any written notice or written claims from any Government Entity within the twelve (12) months preceding the date hereof relating to any material non-compliance of the Business (excluding the EMEA Business) or the Assets with any applicable Law nor are there, based on the Knowledge of the Sellers, any such notice or claims threatened or pending, except where such claims would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     To the Knowledge of the Sellers: (i) all the Consents of Government Entities necessary for, or otherwise material to, the conduct of the Business as conducted by the Seller on the date hereof, have been duly obtained and are in full force and effect and (ii) the relevant Sellers are in compliance with the terms of each of such Consents, in each case except

for such violations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  None of the Sellers has received any written notice or written claims from any Government Entity relating to any material non-compliance of the Business (excluding the EMEA Business) or the Assets with such Consents nor are there, based on the Knowledge of the Sellers, any such notice or claims threatened or pending, except where such claims would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.9.    Environmental Matters.

(a)    To the Knowledge of the Sellers, the Business (excluding the EMEA Business) is in compliance with Environmental Laws and has obtained and is in compliance with all Environmental Permits, except where failure to comply with Environmental Laws, or to obtain or comply with Environmental Permits, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Notwithstanding anything in this ARTICLE IV to the contrary, none of the representations and warranties in this ARTICLE IV other than this Section 4.9 shall relate to environmental matters.

Section 4.10.    Labor and Employee Benefits Matters.

(a)    Section 4.10(a) of the Sellers Disclosure Schedule contains a list of all material Seller Employee Plans.  The Sellers have provided the Purchaser with a true and complete copy of the plan document or summary plan description of each material Seller Employee Plan or, if such plan document or summary plan description does not exist, an accurate written summary of such material Seller Employee Plan.

(b)    The information contained in Section 4.10(b) of the Sellers Disclosure Schedule in respect of the Employees (the "**Employee Information**") is accurate in all material respects as of the date hereof, and sets forth with respect to each Employee (except where that is not permissible under applicable data privacy Laws): (i) unique identifier, (ii) service date, (iii) position, (iv) annual base salary and annual target incentive, (v) work location, (vi) visa type, if any, (vii) vacation accrual rate, (viii) status as full-time or part-time, (ix) telecommuter arrangement, if any, and (x) status as an Inactive Employee and expected date of return to work, if known.

(c)    There has not been for a period of twelve (12) consecutive months prior to the date hereof, nor is there existent or, to the Sellers' Knowledge, has been threatened in writing, any strike, slowdown, lockout, picketing or work stoppage against the Sellers by or on behalf of the Employees.

(d)    There are no Collective Labor Agreements in effect with respect to the Employees.  For a period of twelve (12) consecutive months prior to the date hereof, no petition has been filed or proceedings instituted by a union, collective bargaining agent, employee or group of employees with any Government Entity seeking recognition of a collective bargaining agent with respect to any Employees, no voluntary recognition has been given by the Sellers or any Affiliate, and, to the Sellers' Knowledge, no such organizational effort is currently being

made or has been threatened in writing by or on behalf of any union, employee, group of employees or collective bargaining agent to organize any Employees.

(e)    There are no Transferred Employee Plans.

Section 4.11.   Brokers.

Except for fees and commissions that will be paid or otherwise settled or provided for by the Sellers, no broker, finder or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates.

Section 4.12.   Representations and Warranties by the Other Sellers.

Except (a) as set forth in the Sellers Disclosure Schedule, (b) as set forth in the Securities Disclosure Documents (but excluding any forward-looking disclosures in Securities Disclosure Documents made under the heading "Risk Factors") and/or in any filings made in the Bankruptcy Proceedings on or prior to the Closing, in each case publicly filed between January 1, 2007 and the date hereof, (c) as expressly contemplated by this Agreement or (d) to the extent relating to the Excluded Assets or the Excluded Liabilities, each Other Seller will, as of the Closing Date, severally but not jointly represent and warrant to the Purchaser as follows:

4.12.1. Organization and Corporate Power.

(a)    Such Other Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized.  Subject to the receipt of the Bankruptcy Consents, such Other Seller has the requisite corporate power and authority to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is a party.

(b)    Such Other Seller is duly qualified or licensed to do business and to own, lease and operate its assets, including the Assets, and to carry on the Business as it is currently conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not have, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.12.2. Authorization; Binding Effect; No Breach.

(a)    Subject to the receipt of the Bankruptcy Consents, the execution, delivery and performance by such Other Seller of each Transaction Document to which such Other Seller is a party has been duly authorized by such Other Seller.  This Agreement has been duly executed and delivered by such Other Seller, and the other Transaction Documents to which such Other Seller is a party have been duly executed and delivered by such Other Seller party thereto. Subject to the receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser, each Transaction Document to which such Other Seller is a party constitute, a legal, valid and binding obligation of such Other Seller, enforceable against it in accordance with its terms, subject to (in the case of Non-Debtor Sellers) applicable bankruptcy,

insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b)     The execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller is a party do not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, result in the creation or imposition of any Lien upon any of the Assets owned by such Other Seller, or (subject to the receipt of Consents in connection with the Assigned Contracts and other Consents expressly provided for herein) require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of such Other Seller, (ii) any Material Contract to which such Other Seller is a party or to which any of the Assets or the Business (excluding the EMEA Business) is subject or (iii) any Laws to which such Other Seller, or any of the Assets owned by such Other Seller, is subject, except, in the case of (ii) and (iii), for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

## ARTICLE V

## COVENANTS AND OTHER AGREEMENTS

Section 5.1.    <u>U.S. Bankruptcy Actions</u>.

On the timetables and subject to the terms set forth below, the U.S. Debtors shall (i) file with the U.S. Bankruptcy Court one or more motions and proposed orders as set forth below, (ii) notify, as required by the U.S. Bankruptcy Code and the U.S. Bankruptcy Rules, all parties entitled to notice of such motions and orders, as modified by orders in respect of notice which may be issued at any time and from time to time by the U.S. Bankruptcy Court, and such additional parties as the Purchaser may reasonably request, and (iii) subject to the provisions of this Agreement, including the provisions of Section 9.1, and the U.S. Bidding Procedures Order use their reasonable best efforts to obtain U.S. Bankruptcy Court approval of such orders.

The U.S. Sale Order shall be substantially in the form of Exhibit 5.1 hereto (with such changes thereto as the Purchaser and the Sellers both shall approve, such approval not to be unreasonably withheld, conditioned or delayed).

Section 5.2.    <u>Canadian Bankruptcy Actions</u>.

As promptly as practicable, but in no event later than the date on which the U.S. Sale Order is granted, and subject to their rights and obligations set forth in the Canadian Sales Process Order, the Canadian Debtors shall file with the Canadian Court one or more motions (the "**Canadian Approval and Vesting Order Motion**") seeking an order substantially in the form set forth in Exhibit 5.2 with such changes thereto as the Purchaser and the Sellers both shall

approve, such approval not to be unreasonably withheld, conditioned or delayed) (such order as approved, the "**Canadian Approval and Vesting Order**") of the Canadian Court approving this Agreement and the transactions contemplated herein.

Section 5.3.    Consultation; Notification.

(a)    The Purchaser and the U.S. Debtors shall cooperate with filing and obtaining entry of the U.S. Sale Order, and the U.S. Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, notices, statements schedules, applications, reports and other material papers to be filed by the U.S. Debtors in connection with such motions and relief requested therein.

(b)    The Purchaser and the Canadian Debtors shall cooperate with filing and prosecuting the Canadian Approval and Vesting Order Motion, and obtaining entry of the Canadian Approval and Vesting Order, and the Canadian Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, notices, statements schedules, applications, reports (other than the draft Monitor's report) and other material papers to be filed by the Canadian Debtors in connection with such motions and relief requested therein.

(c)    If the U.S. Sale Order or any other order of the U.S. Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the U.S. Debtors agree to, and to cause their Affiliates to, take all reasonable steps, and use their reasonable efforts, to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to take all reasonably steps, and use its reasonable efforts, to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing contained in this Section shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the U.S. Sale Order shall have been entered and shall not have been stayed, modified, revised or amended, in which event the Purchaser and the relevant Designated Purchasers shall be able to assert the benefits of Section 363(m) of the U.S. Bankruptcy Code and, as a consequence of which, such appeal shall become moot.

(d)    If the Canadian Approval and Vesting Order or any other order of the Canadian Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the Canadian Debtors agree to, and to cause their Affiliates to, take all reasonable steps, and use their reasonable efforts, to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to take all reasonable steps, and use its reasonable efforts, to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing in this Section shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the Canadian Approval and Vesting Order shall have been entered and shall not have been stayed, modified, revised or amended.

Section 5.4.    <u>Pre-Closing Cooperation</u>.

(a)    Prior to the Closing, upon the terms and subject to the conditions of this Agreement, each of the Parties shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement as soon as practicable and cause the fulfillment at the earliest practicable date of all of the conditions to the other Parties' obligations to consummate the transactions contemplated by this Agreement, including: (i) the preparation and filing of all forms, registrations and notices required to be filed to consummate the Closing and the taking of such actions as are necessary to obtain any requisite Consent; <u>provided</u>, that the Sellers shall not be obligated to make any payment or deliver anything of value to any Third Party (other than filing and application fees to Government Entities all of which shall be paid or reimbursed by the Purchaser) to obtain any Consent and provided further that Sellers' obligations under this Section 5.4 with respect to Assigned Contracts which are real property leases shall be subject to an obligation of Purchaser to provide adequate assurances required by the relevant landlords and/or the Bankruptcy Court, including credit enhancement, (ii) taking all reasonable actions to defend all lawsuits and other proceedings by or before any Government Entity challenging this Agreement or the consummation of the Closing, and (iii) using reasonable endeavors to cause to be lifted or rescinded any injunction, decree, ruling, order or other action of any Government Entity adversely affecting the ability of the Parties to consummate the Closing.

(b)    Each Primary Party shall promptly notify the other Primary Party of the occurrence, to such Party's Knowledge, of any event or condition, or the existence, to such Party's Knowledge, of any fact, that would reasonably be expected to result in any of the conditions set forth in ARTICLE VIII not being satisfied.

Section 5.5.    <u>Antitrust and Other Regulatory Approvals</u>.

(a)    In furtherance and not in limitation of the provisions of Section 5.4, each of the Parties agrees to (i) each of the Parties agrees to prepare and file as promptly as practicable, and in any event by no later than ten (10) Business Days from the date of this Agreement, an appropriate Notification and Report Form pursuant to the HSR Act; (ii) the Purchaser agrees to prepare and file as promptly as practicable, and in any event by no later than ten (10) Business Days from the date of this Agreement, a complete draft Form CO filing under the EC Merger Regulation and to cooperate with the European Commission case team to file the final Form CO filing as promptly as possible thereafter; and (iii) each Party, as applicable, agrees to prepare and file as promptly as practicable, and in any event by no later than ten (10) Business Days from the date of this Agreement, the Mandatory Antitrust Filings (with the exception of the filings required in (i) and (ii) above) and all other necessary documents, registrations, statements, petitions, filings and applications for other Regulatory Approvals and any other Consent of any

other Government Entities either required or that the Primary Parties mutually agree are advisable to satisfy the condition set forth in Section 8.1(a) as expeditiously as possible.[22]

(b)      If a Party or any of its Affiliates receives a request for information or documentary material from any Government Entity with respect to this Agreement or any of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer), then such Party shall endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request.

(c)      The Parties shall keep each other apprised of the status of matters relating to the completion of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer) and work cooperatively in connection with obtaining the Regulatory Approvals of each applicable Government Entity, including:

(i)      cooperating with each other in connection with the Mandatory Antitrust Filings, the Regulatory Approvals, and any other filings required under the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer) including the Investment Canada Act (if applicable)[23], and each Antitrust Approval, and liaising with each other in relation to each step of the procedure before the relevant Government Entities and as to the contents of all communications with such Government Entities. In particular, to the extent permitted by Law or Government Entity, no Party will make any notification or other submission in relation to the transactions contemplated hereunder without first providing the other Parties with a copy of such notification or submission in draft form and giving such other party a reasonable opportunity to discuss its content before it is filed with the relevant Government Entities, and such first Party shall consider and take account of all reasonable comments timely made by the other Parties in this respect;

(ii)      furnishing to the other Primary Parties all information within its possession that is required for the Mandatory Antitrust Filings, obtaining the Antitrust Approvals, and any application or other filing to be made by the other Party pursuant to the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction, including the Investment Canada Act (if applicable), in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer); provided, however, that (a) no such

---

[22]      Note to Purchaser:  Language to be adjusted to encompass possible national filings

[23]      Note to Purchaser:  This list should be completed with any other identified approval required in connection with the transaction

58

information shall be required to be provided by a Party if it determines, acting reasonably, that, such information is material and competitively sensitive or that the provision of such information could reasonably be expected to have a material adverse effect upon it if the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer) were not completed or that the provision of such information would jeopardize any attorney-client or other legal privilege (it being understood, however, that the parties shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the other parties to occur without so jeopardizing privilege), and (b) in any such case the Purchaser and the Main Sellers shall cooperate with a view to establishing a mutually satisfactory procedure for providing such information directly to the Government Entity requiring or requesting such information, and the relevant Main Seller or the Purchaser or the relevant Designated Purchaser required to provide such information shall provide it directly to such Government Entity requiring or requesting such information;

(iii)    promptly notifying each other of any communications from or with any Government Entity with respect to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer) and ensuring to the extent permitted by Law or Government Entity that each of the Primary Parties is entitled to attend any meetings with or other appearances before any Government Entity with respect to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer);

(iv)    consulting and cooperating with one another in connection with all analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Party hereto in connection with proceedings under or relating to the Mandatory Antitrust Filings, the Antitrust Approvals, the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer); and

(v)    without prejudice to any rights of the Parties hereunder, consulting and cooperating in all respects with the other in defending all lawsuits and other proceedings by or before any Government Entity challenging this Agreement or the consummation of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer).

(d)    In addition the Purchaser shall, and shall cause each of the Designated Purchasers to, use its best efforts to satisfy (or cause the satisfaction of) the conditions precedent to the Purchaser's obligations hereunder as set forth in Section 8.1(a) and to take, or cause to be taken, all other actions and to do, or cause to be done, all other things necessary, proper or advisable under all applicable Laws to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer), including using its best efforts to make all required filings and obtain all Regulatory Approvals and any other Consent of a Government Entity required to be obtained in order for the Parties to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer).

(e)    The obligations of the Purchaser pursuant to Section 5.5(d)shall include an obligation to commit, and cause the Designated Purchasers to commit, to any and all undertakings, divestitures, licenses or hold separate or similar arrangements with respect to their respective assets and/or the Assets and/or the EMEA Assets and/or to any and all arrangements for the conduct of any business and/or termination of any and all existing relationships and contractual rights and obligations as a condition to obtaining any and all Regulatory Approvals and other Consents from any Government Entity necessary to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer), including without limitation an obligation to take any and all actions necessary in order to ensure the receipt of the necessary Consents, the obtaining of all Regulatory Approvals, or the termination, waiver or expiration of the necessary waiting periods, under the Investment Canada Act (if applicable), the HSR Act, the EC Merger Regulation or any other applicable Antitrust Laws or investment or similar Law without any reduction of the consideration paid to the Sellers and the EMEA Sellers.  In addition, subject to the terms and conditions herein provided, the Purchaser shall not, and shall cause the Designated Purchasers not to, take or cause to be taken any action which would reasonably be expected to prevent or materially delay the consummation of the transactions contemplated by this Agreement (and/or the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer).

(f)    For the avoidance of doubt, the covenants under this Section 5.5 shall not apply to any action, effort, filing, Consent, proceedings, or other activity or matter relating to the Bankruptcy Courts, the Bankruptcy Proceedings and/or the Bankruptcy Consents.

Section 5.6.    Pre-Closing Access to Information.

(a)    Prior to the Closing, the Main Sellers shall, and shall cause their Subsidiaries (other than the EMEA Debtors or NNSA) to, (i) give the Purchaser and its authorized representatives, upon reasonable advance notice and during regular business hours, reasonable access to all books, records, personnel, officers and other facilities and properties of the Business (other than the EMEA Business), (ii) permit the Purchaser and its representatives to make such copies and inspections thereof, upon reasonable advance notice and during regular business hours, as the Purchaser may reasonably request and (iii) furnish the Purchaser with such unaudited financial and operating data and other information with respect to the Business as is regularly prepared in the Ordinary Course that the Purchaser may from time to time reasonably request; provided, however, that (A) any such access shall be conducted at Purchaser's expense, in accordance with Law (including any applicable Antitrust Law and Bankruptcy Law), at a reasonable time, under the supervision of the Sellers' personnel and in such a manner as to maintain confidentiality and not to interfere with the normal operations of the businesses of the Sellers and their Affiliates, (B) the Sellers will not be required to provide to the Purchaser access to or copies of any Employee Records, and (C) the Sellers will not be required to provide to the Purchaser access to or copies of any Tax records except as otherwise provided herein.

(b)    Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof, the Sellers shall not have any obligation to make available to the Purchaser or its representatives, or provide the Purchaser or its representatives with, (i) any Tax Return filed by the Sellers or any of their Affiliates or predecessors, or any related material, or (ii) more generally, any information if

making such information available would (A) jeopardize any attorney-client or other legal privilege or (B) potentially cause the Sellers to be found in contravention of any applicable Law or contravene any fiduciary duty or agreement (including any confidentiality agreement to which the Sellers or any of their Affiliates are a party), it being understood that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

Section 5.7.    Public Announcements.

Subject to (a) the provisions of Section 7.3(a) with respect to communications and announcements to the Employees and the employees of the Purchaser and the Designated Purchasers and (b) each Party's disclosure obligations imposed by Law (including any obligations under any Bankruptcy Laws), during the period from the date hereof until the Closing Date, the Purchaser and the Main Sellers shall, and shall cause their respective Affiliates to, (i) cooperate with the other Primary Party in the development and distribution of all news releases, other public information disclosures and announcements, including announcements and notices to customers, suppliers and Employees, with respect to this Agreement, or any of the transactions contemplated by this Agreement and the other Transaction Documents and (ii) not issue any such announcement or statement prior to consultation with, and the approval of, the other Primary Parties (such approval not to be unreasonably withheld or delayed); provided that approval shall not be required where the disclosing Primary Party determines, based on advice of counsel and after consultation with the other Primary Parties, that such disclosure is required by Law.

Section 5.8.    Further Actions.

From and after the Closing Date, each of the Parties shall execute and deliver such documents and other papers and take such further actions as may reasonably be required to carry out the provisions of this Agreement and give effect to the transactions contemplated herein, including the execution and delivery of such assignments, deeds and other documents as may be necessary to transfer any Assets as provided in this Agreement; provided that, subject to Section 5.5, neither the Purchaser nor the Sellers shall be obligated to make any payment or deliver anything of value to any Third Party (other than filing and application fees to Government Entities) in order to obtain any Consent to the transfer of Assets or the assumption of Assumed Liabilities.

Section 5.9.    Conduct of Business.

The Sellers covenant that, subject to any limitation imposed as a result of being subject to the Bankruptcy Proceedings and except as (i) the Purchaser may approve otherwise in writing as set forth below (such approval not to be unreasonably withheld or delayed), (ii) set forth in Section 5.9 of the Sellers Disclosure Schedule, (iii) otherwise expressly contemplated or permitted by this Agreement or another Transaction Document, (iv) required by Law (including any applicable Bankruptcy Law) or by any order of a Bankruptcy Court, or (v) relates solely to Excluded Assets or Excluded Liabilities, the Sellers shall (A) conduct the Business (excluding

the EMEA Business) and maintain the level of operations and maintenance expenses at an adequate level, all in the Ordinary Course and (B) abstain from any of the following actions:

(a)     sell, lease or otherwise dispose of a material portion of the Assets, in any single transaction or series of related transactions, other than in the Ordinary Course, or enter into any exclusive agreement that would restrict the Business or the Assets after the Closing in any material respect;

(b)     incur any Lien on any Assets, other than (i) in the Ordinary Course, (ii) Liens that will be discharged at or prior to Closing and (iii) Permitted Encumbrances;

(c)     grant any license or sublicense of any rights under or with respect to any Transferred Intellectual Property other than (i) licenses or sublicenses granted in the Ordinary Course, (ii) licenses as would be permitted by the grant back license rights set forth in Section 2.06 of the Intellectual Property License Agreement (after the Intellectual Property License Agreement becomes effective), or (iii) licenses or sublicenses granted pursuant to source code escrow arrangements listed in Section 5.9(c) of the Sellers Disclosure Schedule;

(d)     materially increase the rate of cash compensation or other fringe, incentive, equity incentive, pension, welfare or other employee benefits payable to the Employees, other than increases in the Ordinary Course or as required by applicable Law, Contracts or Seller Employee Plans in effect as of the date hereof  (including pursuant to the KEIP or KERP, or any annual incentive plan), or as otherwise approved by the Bankruptcy Court from time to time, or increases that apply to substantially all similarly situated employees (including the Employees) of the Sellers or the applicable Affiliates of the Sellers;

(e)     enter into any Collective Labor Agreement applicable to Employees, except as required by applicable Law;

(f)     voluntarily terminate, waive any right under, or materially amend (by materially increasing the obligations of the Sellers under a supply Contract, materially reducing the obligations of a customer under a customer Contract of the Sellers, or materially modifying the standard warranty terms or return policy for Products or Services under a Material Contract so as to materially increase the Liabilities of the Sellers thereunder) any Material Contract that is a customer or a supply Seller Contract (unless such Contract has become a Non-Assigned Contract) other than in the Ordinary Course;

(g)     waive, release, assign, settle or compromise any material claim, litigation or arbitration relating to the Business to the extent that such waiver, release, assignment, settlement or compromise imposes any binding obligation, whether contingent or realized, on the Business that will bind the Purchaser and/or the Designated Purchasers after the Closing Date and is materially adverse to the Business;

(h)     enter into any Contract other than in the Ordinary Course that would be a Material Contract; or

(i)     authorize, or commit or agree to take, any of the foregoing actions.  If a Seller desires to take any action in this Section 5.9 requiring Purchaser's consent, the Main

Sellers may, prior to any such action being taken, request the Purchaser's consent via an electronic mail or facsimile sent to the individual(s) at the addresses listed on Exhibit 5.9. The Purchaser shall respond to such notice in writing by 11:59 p.m. (New York time) on the second Business Day after the day of delivery of such email or facsimile. The failure of the Purchaser to respond within such two (2) Business Days shall not be deemed to be consent to such action.

Section 5.10.  Transaction Expenses.

Except as otherwise provided in this Agreement, the EMEA Asset Sale Agreement, the NNSA Irrevocable Offer or the Ancillary Agreements, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

Section 5.11.  Confidentiality.

The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of any of the Transaction Documents (i) to any court or to any liquidator or to any Tax Authority or Government Entity, (ii) in connection with any auction process approved by the Bankruptcy Court and to show appropriate figures in their administration records, accounts and returns or (iii) in connection with acquiring, merging or otherwise combining with, or being acquired by, or selling all or part of their assets to, any Person (whether in a single transaction or a series of related transactions and whether structured as an acquisition of assets, securities or otherwise).

Section 5.12.  Certain Payments or Instruments Received from Third Parties.

To the extent that, after the Closing Date, (a) the Purchaser and/or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document or relates primarily to any business or business segment of the Sellers other than the Business, the Purchaser shall, and shall cause the Designated Purchasers to, until the date that is one-hundred and eighty (180) days after the Closing Date (and thereafter only upon request of any Seller) promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment that is for the account of the Purchaser, any of the Designated Purchasers according to the terms of any Transaction Document or relates exclusively to the Business, the Sellers shall, and shall cause the other Sellers to, until the date that is one-hundred and eighty (180) days after the Closing Date (and thereafter only upon request of the Purchaser or any Designated Purchaser) promptly deliver such amount or instrument to the Purchaser or the relevant Designated Purchaser, as applicable. All amounts due and payable under this Section 5.12 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use its reasonable best efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

63

Section 5.13.   Non-Assignable Contracts.

(a)     To the extent that any Seller Contract or any Seller Consent is not capable of being assigned under Section 365 of the U.S. Bankruptcy Code (or, if inapplicable, pursuant to other applicable Laws or the terms of such Contract or Consent) to the Purchaser or a Designated Purchaser at the Closing without the Consent of the issuer thereof or the other party thereto or any Third Party (including a Government Entity) (collectively, the "**Non-Assignable Contracts**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless and until any such Consent is obtained, including any Consents obtained following Closing; provided, however, that the Sellers will use their reasonable efforts to cooperate with the Purchaser in any reasonable arrangement to provide the Purchaser the same interest, benefits and rights under any such Non-Assignable Contracts as the applicable Seller had immediately prior to the Closing, including using their reasonable best efforts to enter into one or more mutually agreed reasonable Subcontract Agreements.  As between the Sellers and the Purchaser (or the relevant Designated Purchaser), such Non-Assignable Contracts shall be deemed to be assigned and the Purchaser (or the relevant Designated Purchaser) shall perform all obligations and covenants thereunder.  Notwithstanding the foregoing sentences, (w) nothing in this Section 5.13 shall require any Seller to renew, modify or amend any Non-Assignable Contract once it has expired, (x) any efforts required of the Sellers pursuant to this paragraph shall be strictly on an interim basis and in no event required after ninety (90) days from the Closing Date, and (y) the Sellers shall have the right, any time after the ninety- (90-) day anniversary of the Closing Date, to exercise any right to terminate any Non-Assignable Contract. The Purchaser or the Designated Purchaser, as applicable, shall reimburse the relevant Seller and indemnify and hold each Seller harmless from and against all Liabilities, incurred or asserted, as a result of any actions taken pursuant to this Section 5.13.  The Parties acknowledge that the fact that any Contract constitutes a Non-Assignable Contract shall not (i) constitute a breach of any covenant hereunder, (ii) entitle Purchaser to terminate this Agreement or (iii) result in any reduction of the Purchase Price payable hereunder.  Any Non-Assignable Contract assigned pursuant to the terms of this Section 5.13 shall, when assigned, constitute an Assigned Contract hereunder from and after such date.

(b)     For the purposes of this Agreement (including Section 5.13(a) and all representations and warranties of the Sellers contained herein), the relevant Sellers shall be deemed to have obtained all required Consents in respect of the assignment of any 365 Contract if, and to the extent that, pursuant to the U.S. Sale Order, the Sellers are authorized to assume and assign to the Designated Purchasers such Seller Contract pursuant to Section 365 of the U.S. Bankruptcy Code and any applicable Cure Cost has been satisfied as provided in Section 2.1.7.

Section 5.14.   Bundled Contracts.

(a)     Each of the Purchaser and the Sellers shall, and the Purchaser shall, and shall cause any relevant Designated Purchaser, as applicable, to use its reasonable efforts to, at least fifteen (15) Business Days prior to the Closing Date, enter into arrangements with the counterparty to each Contract of a Seller that involves the sale or provision of Products and/or Services to a customer and the sale or provision of other products and/or services of the Sellers or their Affiliates and is listed in Section 5.14 of the Sellers Disclosure Schedule (a "**Bundled Contract**"), to amend such Bundled Contract so as to delete all obligations and Liabilities

therefrom as they relate to the Products and the Services and enter into a new Contract (effective as of, and conditioned upon the occurrence of, the Closing) with the applicable customer and which only relates to Products and Services, in which event such new Contract shall be deemed to be a Seller Contract; provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in obtaining such arrangements and the failure to enter into such arrangements with respect to any Bundled Contract shall not entitle the Purchaser to terminate or rescind this Agreement, not to complete the transactions contemplated hereby or reduce the Purchase Price payable hereunder.

(b)    For those Bundled Contracts for which the arrangements mentioned in Section 5.14(a) could not be entered into fifteen (15) Business Days prior to the Closing Date, the Sellers shall either: (i) use their reasonable efforts to facilitate the entry by the Purchaser or the relevant Designated Purchaser and the other party to each such Bundled Contract into a new Contract that only relates to Products and/or Services or (ii) use their reasonable best efforts to cooperate with the Purchaser in any commercially reasonable arrangement to provide the Purchaser or Designated Purchaser, as applicable, the same interest, benefits and rights under any such Bundled Contract only to the extent relating to Products and/or Services as the applicable Seller had immediately prior to the Closing, including using its reasonable efforts to enter into one or more mutually agreed commercially reasonable Subcontract Agreements with respect to such Bundled Contracts; provided that (A) nothing in this Section 5.14 shall require the Sellers to renew any Bundled Contract once it has expired, (B) the Sellers shall have the right, any time after the date that is ninety (90) days after the Closing Date, to exercise any right to terminate any Bundled Contract, and (C) the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in order to comply with its obligations under this sentence.

Section 5.15.    Post-Closing Assistance for Litigation.

(a)    After the Closing, the Purchaser shall, upon the request of the Sellers, and at no cost to the Sellers (other than reimbursement of out of pocket expenses), require the Transferred Employees to make themselves and make any necessary documents reasonably available at reasonable times and cooperate in all reasonable respects with the Sellers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action (whether disclosed or not disclosed in the Sellers Disclosure Schedule) filed or claimed against the Sellers or any of their Affiliates or any of the respective agents, directors, officers and employees of the Sellers and their Affiliates, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date.

(b)    After the Closing, the Sellers shall, upon the request of the Purchaser, and at no cost to the Purchaser or any Designated Purchaser (other than reimbursement of reasonable out of pocket expenses), require their employees that were not Transferred Employees to make themselves reasonably available at reasonable times and cooperate in all reasonable respects with the Purchaser and the Designated Purchasers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action filed or claimed against the Purchaser, any of the Designated Purchasers, any of their Affiliates or any of the respective agents, directors, officers and employees of any of the foregoing, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided,

however, that the obligations of the Sellers or their Affiliates hereunder shall only extend to the employees of such Sellers or Sellers' Affiliates as of the date of Purchaser's request, shall not apply to former employees of such Sellers or Seller's Affiliates whose employment has been terminated prior to such date, shall not require Sellers or Seller's Affiliates to continue the employment of any such employee and shall be subject to the rights of the Sellers to maintain any attorney or solicitor privilege.

Section 5.16.  Delivery of Assets.

(a)     The Purchaser shall, and shall cause the relevant Designated Purchasers to, within thirty (30) days after the Closing Date, relocate all tangible Assets and Purchaser's activities from all premises owned or leased by the Sellers or their Affiliates after the Closing other than those premises to be occupied by the Purchaser or any Designated Purchasers after the Closing Date pursuant to the provisions of an Ancillary Agreement.

(b)     As promptly as reasonably practicable, and in no event more than thirty (30) days, after the Closing Date, the Sellers shall deliver to the Purchaser in such manner and on such media as the Purchaser may reasonably request copies of correspondence, notices, filings, prosecution files, dockets, certifications and other documents relating to the filing, prosecution, issuance, renewal and enforcement of the Business Registered IP, provided that all items to be delivered hereunder shall be delivered solely by remote telecommunication to the extent the Purchaser may so request.  Without limiting the generality of the foregoing, within thirty (30) days of Closing, the Sellers shall and shall cause their Affiliates to, instruct their current attorneys and agents to deliver to the Purchaser, or attorneys designated by Purchaser, any and all records in the possession of such attorneys and agents relating to the prosecution of any applications, registrations and renewals of any Business Registered IP.

Section 5.17.  Termination of Overhead and Shared Services.

The Purchaser acknowledges and agrees that, except as otherwise expressly provided in the Transition Services Agreement, effective as of the Closing Date (i) all Overhead and Shared Services provided to the Business (except the Transferred Overhead and Shared Services) shall cease and (ii) the Sellers or their Affiliates shall have no further obligation to provide any Overhead and Shared Services to the Business.

Section 5.18.  Financing.

(a)     [The Purchaser shall obtain the Financing on the terms and conditions described in the Financing Commitments, and shall: (i) enter into definitive agreements with respect to the Financing on substantially the terms and conditions contemplated by the Financing Commitments; (ii) to the extent within its control, fully satisfy on a timely basis all conditions applicable in such definitive agreements to such Person obtaining the Financing set forth therein; and (iii) consummate the Financing contemplated by the Financing Commitments at Closing.  In the event any portion of the Financing expires or is terminated or otherwise becomes unavailable on the terms and conditions contemplated in the Financing Commitments (any such occurrence, a "**Financing Termination Event**"), the Purchaser shall promptly (and in any event within two (2) Business Days) notify the Sellers of such unavailability and the reasons therefor, shall

enforce its rights under the Financing Commitments and use its best efforts to arrange to obtain alternative financing from alternative sources as promptly as practicable following the occurrence of such event.  In such event, the Purchaser shall promptly notify the Sellers when it obtains alternative financing.  The Purchaser shall keep the Sellers informed on a reasonably prompt basis, and in reasonable detail of the status of the Financing.  The Purchaser shall provide notice to the Sellers promptly upon receiving the Financing and shall furnish correct and complete copies of the definitive agreements with respect thereto to the Sellers promptly upon their execution, to the extent executed prior to the Closing and subject to any confidentiality undertakings with respect to fees.

(b)    The Sellers shall use their reasonable best efforts to provide, and cause their Affiliates to provide, the Purchaser and the Designated Purchasers with such cooperation and assistance in connection with the arrangement of the Debt Financing as may be reasonably requested by the Purchaser upon reasonable advance notice to the Sellers, including (i) participating in meetings, presentations and due diligence sessions required in connection with the Debt Financing, (ii) assisting with the preparation of materials for bank information memoranda and similar documents required in connection with the Debt Financing, and (iii) furnishing the Purchaser and its financing sources on a confidential basis with certain financial statements, financial books and records; provided that (A) such requested cooperation does not unreasonably interfere with the ongoing operations of the Sellers or their Affiliates and (B) none of the Sellers or their Affiliates shall be required to pay any commitment or other similar fee or incur any other liability in connection with the Debt Financing.][24]

(c)    Notwithstanding anything to the contrary set forth herein, the Purchaser acknowledges and agrees that (i) its obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon receipt of [the Financing or] any financing from any other Person, and (ii) failure to consummate the transactions contemplated herein as a result of the failure to obtain financing shall constitute a breach of this Agreement by the Purchaser (including its obligations pursuant to Section 2.3).

Section 5.19.    Insurance Matters.

(a)    The Purchaser acknowledges and agrees that coverage of the Covered Assets and Persons under the Seller Insurance Policies shall cease as of the Closing Date and the Covered Assets and Persons will be deleted in all respects as insured (or additional insured, as the case may be) under all Seller Insurance Policies.  Notwithstanding anything herein to the contrary, the Sellers shall retain any rights to, including any right to any proceeds received in respect of, any claim pending as of the date hereof or made after the date hereof under any Seller Insurance Policy, even if such claims relates to the capital assets or properties of the Business.

---

[24]    Note to Purchaser:  These provisions will only apply to private equity fund or similar acquiror needing specific debt financing.

(b)    If after the Closing Date the Purchaser or the Sellers (or any of their respective Affiliates) reasonably require any information regarding claim data or other information pertaining to a claim or an occurrence reasonably likely to give rise to a claim (including any pre-Closing claims under the Seller Insurance Policies that are to be covered under the retrospective component of the new insurance policy) in order to give notice to or make filings with insurance carriers or claims adjustors or administrators or to adjust, administer or otherwise manage a claim, then the Sellers or the Purchaser, as the case may be, shall cause such information to be supplied to the other (or their designee), to the extent such information is in their possession and control or can be reasonably obtained by the Sellers or the Purchaser (or their respective Affiliates), as applicable, promptly upon a written request therefore.  If the Purchaser desires access to, and utilization of, claims data or information maintained by an insurance company or other Third Party in respect of any claim (including any pre-Closing claims under any Seller Insurance Policies that are covered under the retrospective component of the new insurance policies), the Purchaser shall be exclusively responsible for acquiring from such insurance company or Third Party, at the Purchaser's sole cost and expense, the rights necessary to permit them to obtain access to and utilization of such claims data or information. If any Third Party requires the consent of the Sellers or any of their Affiliates to the disclosure of such information, such consent shall not be unreasonably withheld.

Section 5.20.   Guarantees and Other Credit Support of the Business.

Following the Closing, the Purchaser shall, or shall cause the applicable Designated Purchasers to:

(i)    procure the return and/or release by the applicable counterparty, as soon as reasonably practicable but in no event later than thirty (30) days after the Closing Date, of any continuing obligation of any Seller or any Affiliate thereof with respect to any Assigned Contract or any Contract, asset or obligation of the Business (including any guarantee or credit support provided by, or any letter of credit, performance bond or surety posted by, any Seller or any of its Affiliates); and

(ii)    indemnify and hold harmless the Sellers and their Affiliates from and against any Loss resulting from any failure of the Purchaser or Designated Purchasers to comply with the obligations set forth in this Section 5.20.

Section 5.21.   Use of Trademarks.

[Except as expressly provided in the Trademark License Agreement,] as of the Closing Date, neither the Purchaser nor any Designated Purchaser shall have the right to use the name "Nortel" or any other Trademarks owned by the Sellers or any of their Affiliates or any other Trademark employing the word "Nortel" or any part or variation of the foregoing or any confusingly similar Trademarks to any of the foregoing (collectively, the "**Sellers' Trademarks**") and the Purchaser shall, or shall cause any Designated Purchaser to, promptly adopt new Trademarks related thereto that are not confusingly similar to the Sellers' Trademarks.

Section 5.22.   Sellers' Accessible Information.

Within the first ninety (90) days after the Closing, the Purchaser shall have the

68

right to reasonably request from the Main Sellers copies of all books, records, files, documentation and sales literature in the possession or under control of the Sellers and held or used in the Business (other than Tax Records or Employee Records), to which the Purchaser in good faith determines it needs access for *bona fide* business or legal purposes.  The Sellers shall, or cause their Respective Affiliates to, provide such copies to the Purchaser (at the Purchaser's expense) as soon as reasonably practicable, provided that the Sellers shall be allowed to (i) redact any such requested document in order to delete any information and data relating to business segments of any such Seller and its Respective Affiliates not included in the Business, and (ii) impose other reasonable restrictions and limitations to the disclosure of such documents as any Seller may impose for disclosure of information relating to itself and its Respective Affiliates; provided further, that nothing herein shall require the Sellers to disclose any information to the Purchaser if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement, it being understood that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

Section 5.23.    Maintenance of Books and Records.

After the Closing, the Purchaser shall, and shall cause the Designated Purchasers to, preserve, until at least the seventh (7th) anniversary of the Closing Date (or such longer period as may be required by applicable Law), all pre-Closing Date records to the extent relating to the Business possessed or to be possessed by such Person.  After the Closing Date and up until at least the seventh (7th) anniversary of the Closing Date (or such longer period as may be required by applicable Law), upon any reasonable request from the Sellers or their representatives, the Purchaser shall, and/or shall cause the Person holding such records to, (a) provide to the Sellers or their representatives reasonable access to such records during normal business hours and (b) permit the Sellers or their representatives to make copies of such records, in each case at no cost to the Sellers or their representatives (other than for reasonable out-of-pocket expenses).  In addition, in the event that the financial statements of the Business are audited for any period prior to the Closing Date, upon execution of a customary access letter if required, the Sellers and their representatives (including their outside accountants) shall be granted access to all relevant work papers, schedules, memoranda and other documents prepared by the Business or their representatives (including outside accountants) in connection with the Sellers' completing the audit of their accounts for the 2009 fiscal year; provided, however, that nothing herein shall require the Purchaser to disclose any information to the Sellers if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement (it being understood that the Purchaser shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Sellers to occur without so jeopardizing privilege or contravening such Law, duty or agreement) or require the Purchaser to disclose any income Tax Return or any combined or consolidated Tax Return filed by the Purchaser.  Such records may be sought under this Section 5.23 for any reasonable purpose, including to the extent reasonably required in connection with accounting, litigation, federal securities disclosure or other similar needs of the Sellers (other than claims between the Sellers and the Purchaser or any of their respective Subsidiaries under this Agreement or any Ancillary Agreement).  Notwithstanding the foregoing, (i) any and all such records may be destroyed by the Purchaser if the Purchaser sends to the Sellers written

notice of its intent to destroy such records, specifying in reasonable detail the contents of the records to be destroyed; such records may then be destroyed after the sixtieth (60th) day following such notice unless the Sellers notify the destroying party that the Sellers desire to obtain possession of such records, in which event the Purchaser shall transfer or cause to be transferred the records to the Sellers and the Sellers shall pay all reasonable expenses of the Purchaser in connection therewith and (ii) the Purchaser shall not be required to provide the Sellers access to, or copies of, any Tax records.

Section 5.24.    Additional Bankruptcy Proceedings; Adverse International Injunctions.

(a)    If at any time prior to the Closing Date, (i) any Seller that is a Non-Debtor Seller as of the date hereof shall have commenced Bankruptcy Proceedings (an "**Additional Bankruptcy Proceeding**") or (ii) there shall be in effect any Law, material order, injunction, decree or judgment of any court or other Government Entity in India prohibiting in such jurisdiction the consummation of the transactions contemplated hereby (such Law, material order, injunction, decree or judgment, an "**Adverse International Injunction**"), then (A) the Main Sellers shall reasonably promptly notify the Purchaser of the commencement of such Additional Bankruptcy Proceeding or of the issuance of such an Adverse International Injunction, as applicable, and, to the extent the Main Sellers are aware of the same, identify the Assets that are subject to such Additional Bankruptcy Proceeding or Adverse International Injunction (the "**Removed Assets**"), (B) the Parties shall, in respect of the Removed Assets, use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to assign all of Sellers' right, title and interest in the Removed Assets to Purchaser or a Designated Purchaser, as applicable, as contemplated hereby on the Closing Date, notwithstanding the Additional Bankruptcy Proceeding or Adverse International Injunction, as applicable.

(b)    If, ten (10) Business Days prior to the Closing Date, it has become apparent to the Parties that such Additional Bankruptcy Proceeding or Adverse International Injunction will prevent a Seller (the "**Restricted Seller**") from assigning the Removed Assets to the Purchaser or a Designated Purchaser, as applicable, as of the Closing Date, then, as of the Closing Date, such Removed Assets shall automatically be deemed Excluded Assets hereunder, the Restricted Seller shall be excused from delivering the Removed Assets and, without prejudice to all other obligations of the Purchaser and the other Sellers hereunder, Purchaser shall be relieved from its rights and obligations to acquire such Removed Assets or assume any Assumed Liabilities in respect thereof (the "**Removed Liabilities**") and the Purchase Price shall be reduced by an amount equivalent to the Downward Adjustment.

(c)    For a period of one-hundred eighty (180) days following the Closing, the Sellers and the Purchaser shall, in respect of the Removed Assets, continue to use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to assign the Removed Assets of the relevant Restricted Seller to Purchaser or a Designated Purchaser, as promptly as reasonably practicable within such period.  To the extent the Removed Assets are assigned to Purchaser or a Designated Purchaser, as applicable,

70

Purchaser or a Designated Purchaser shall assume the related Removed Liabilities, then as of the transfer date (i) the Removed Assets and the Removed Liabilities shall be deemed respectively Assets and Assumed Liabilities hereunder and (ii) Purchaser shall pay to the Distribution Agent by wire transfer to the account designated by the Main Sellers pursuant to Section 2.2.3.2(d) an amount in cash equal to the Downward Adjustment.

Section 5.25.    Finalization of Schedules to Transition Services Agreement; Disputes.

(a)    The Parties acknowledge that Schedule 1 attached to the form of Transition Services Agreement contained in Exhibit **[L]** (the "**General Scope of Included Services**") reflects the general scope of certain services to be provided pursuant to the Transition Services Agreement by the TSA Sellers and TSA EMEA Sellers (and may reflect greater detail as to some of such services), but is not sufficiently refined to define all such services in operational detail.  Accordingly, the Parties agree that, from and after the execution of this Agreement, they will negotiate in good faith to refine the description of the services included within the General Scope of Included Services so as to provide sufficient operational detail (as mutually agreed or as determined by arbitration in accordance with clause (d), the "**Included Services**").  The Parties agree that Included Services will be finally determined by such negotiation or by arbitration in accordance with this Section 5.25, provided that the Included Services will be consistent with, and will omit any services not reasonably within the service description categories contained in, the General Scope of Included Services.  The Parties further agree that any such negotiation or arbitration will be subject to the following general limitations and conditions (the "**Scope Guidelines**"):  (i) the Included Services will not include any portion of any service (A) related to the provision of space or real estate or (B) not provided internally by the applicable Seller or the applicable EMEA Seller (or any Affiliate of any of them) or provided or procured by the applicable Seller or the applicable EMEA Seller (or any Affiliate of any of them) from a third party on the date hereof (the Sellers hereby represent to the Purchaser that no such internal services have heretofore been discontinued with the intent of avoiding the provision thereof pursuant to this Section), (ii) the Included Services will not include any service the provision of which, in the Seller's reasonable opinion, would violate or would risk violating any Law, (iii) if and to the extent that employees of a Seller or an EMEA Seller or a Subsidiary of a Seller or an EMEA Seller or Provider are Transferred Employees under this Agreement or Transferring Employees under the EMEA Asset Sale Agreement, then the Included Services will exclude human tasks formerly undertaken by such Transferred Employees or Transferring Employees (but equipment, licenses and other resources not transferred shall, in accordance with the terms of the Transition Services Agreement, continue to be made available as necessary to perform such tasks under the Transition Services Agreement as contemplated by this Section 5.25), (iv) the Included Services will not include any service, the provision of which would require the applicable Seller or the applicable EMEA Seller to incrementally employ or otherwise engage any additional employees or contractors to assist in the provision of such service, (v) without the applicable Seller's or the applicable EMEA Seller's consent, the Included Services will not include any service that is reasonably available from a Third Party on commercially reasonable terms without any material degradation or interruption in the performance of such service and (vi) the Included Services will be limited to those reasonably necessary to carry on the Business after the Closing in a manner materially consistent with the operation of the Business at the Closing Date.

(b)    If, between the time of execution of this Agreement and Closing, Purchaser identifies services not reasonably within the service description categories contained in the General Scope of Included Services which are reasonably advisable in order to assist with the orderly transition of the Business to Purchaser and which are consistent with the Scope Guidelines, then the Parties agree that such additional services will be provided under the Transition Services Agreement, and the Parties will negotiate in good faith and use reasonable efforts expeditiously to refine such additional services in operational detail (failing which, such specification will be determined by arbitration in accordance with this Section 5.25).  Further, if, between the time of execution of this Agreement and Closing, Purchaser identifies services which are reasonably necessary to carry on the Business which are not described in the General Scope of Services and which are not consistent with the Scope Guidelines, other than services related to the provision of space or real estate, but which can reasonably be provided by the applicable Seller (but not an EMEA Seller) without violating any Law, hiring new employees or materially changing or burdening the operations of such Seller, then the Parties agree that such additional services will be provided under the Transition Services Agreement, and the Parties will negotiate in good faith and use reasonable efforts expeditiously to define such additional services in operational detail (failing which, such specification will be determined by arbitration in accordance with this Section 5.25; any services identified by Purchaser under this Section 5.25(b) are herein referred to as "**Extra Services**").

(c)    Prior to the Closing, the Parties will negotiate in good faith to quantify and stipulate the Monetary Cost of each Included Service; provided that the aggregate Monetary Cost of the Services, assuming the product flow contemplated by the Product Volume Forecast and headcount contemplated by the Headcount Forecast, (x) will not be less than 90% of the aggregate estimated cost of all Services reflected in the Estimated Cost Schedule, and (y) shall not exceed 110% of the applicable aggregate cost for such Services reflected in the Estimated Cost Schedule (together, the "**Monetary Cost Floor and Cap**").

(d)    The determination of the Monetary Cost of any Extra Services identified by Purchaser will be determined in manner analogous to the determination of Monetary Cost of Included Services, except that the Monetary Cost of such Extra Services will be determined without regard to the Monetary Cost Floor and Cap.

(e)    Until the Monetary Cost of any Included Service or Extra Service has been agreed by the Parties or determined by arbitration in accordance with this Section 5.25, the Monetary Cost of such Service will be the Monetary Cost thereof, as reasonably determined by the applicable Sellers.  Upon final determination of the Monetary Cost, the Parties will promptly reconcile any prior payments made by Purchaser that were based on the Sellers' estimate of Monetary Cost (with the applicable Seller paying to Purchaser any amount by which such prior payments exceeded the Monetary Cost as finally determined, or with the Purchaser paying to the applicable Seller any amount by which such prior payments were less than the Monetary Cost as finally determined).

(f)    It is the expectation of the Parties that the Included Services, any Extra Services and the Monetary Costs thereof will be specified in operational detail, either by mutual agreement or by arbitration, prior to the Closing.  However, notwithstanding anything to the contrary in this Agreement, finalization and mutual approval of the Included Services, the Extra

Services and the Monetary Costs thereof shall not be a condition to, or delay, the Closing, or permit any Party to rescind or terminate this Agreement.  In the event that the Included Services, any Extra Services and the Monetary Costs thereof have not been finalized and mutually approved by the Closing Date, then the following will apply: (i) at Closing, the applicable parties will execute and deliver the Transition Services Agreement in the form of Exhibit **[L]**, (ii) the Parties will continue to use good faith efforts after the Closing to finalize the Included Services and any Extra Services (subject to, and in accordance with, the terms of this Section 5.25), (iii) pending such finalization, the Sellers will (a) subject to Section 5.25(e) provide such Included Services (subject to the Scope Guidelines), and any Extra Services as are not in dispute and (b) act in good faith and use reasonable efforts, with the cooperation of Purchaser, to provide such other services, subject to the Scope Guidelines, as may be reasonably requested by Purchaser on an interim basis to support the Business in a manner materially consistent with the operation of the Business as at the Closing Date (any such services provided to be in accordance with the pricing and other provisions of this Section 5.25 and the Transition Services Agreement).

(g)      The Parties acknowledge that for purposes of providing the Included Services and Extra Services from and after the Closing, certain Segregation Projects will need to be undertaken and substantially completed between the date of this Agreement and the Closing Date (the "**Pre-Closing Segregation Projects**").  The Parties agree that, from and after the execution of this Agreement, they will promptly negotiate in good faith to identify the exact scope of the Pre-Closing Segregation Projects reasonably necessary, and the Sellers will cause such Pre-Closing Segregation Projects to be undertaken.  The Parties will cooperate as to prioritizing necessary segregation services and assisting with an orderly transition at Closing.  At Closing, Purchaser will pay to the Sellers, in addition to all other amounts then required to be paid by Purchaser under this Agreement, the Monetary Cost incurred by the Sellers and their affiliates in providing such Pre-Closing Segregation Projects (the "**Pre-Closing Segregation Costs**").  Any disagreement among the Parties as to the Pre-Closing Segregation Costs will be resolved by arbitration in accordance with this Section 5.25.

(h)      Prior to the [forty-fifth 45th] day following the execution of this Agreement (the "**Arbitration Trigger Date**"), the Parties will negotiate and agree to a mutually satisfactory principal of an information technology consultancy firm who is impartial and independent of Purchaser and Sellers, has appropriate expertise in implementing transition services arrangements ancillary to M&A transactions, and that involve sophisticated enterprise resource planning systems that are similar in scope and complexity to the systems required by the Transition Services Agreement (the "**TSA Arbitrator**"), provided that if the Parties cannot agree as to the identity of the TSA Arbitrator by the Arbitration Trigger Date, the TSA Arbitrator shall be selected by the Independent Auditor (after having taken all appropriate steps to establish necessary ethical walls) prior to [sixty (60) days following the execution of this Agreement.  If the TSA Arbitrator has been appointed but is unable to fulfil his/her responsibilities, an alternative TSA Arbitrator shall be appointed by the Parties in accordance with the foregoing requirements, or if the Parties have not mutually agreed on the appointment within three (3) days of the request to do so by one of the Parties, the TSA Arbitrator shall be appointed by the Independent Auditor.  All enquiries made by the TSA Arbitrator and all information and data provided to the TSA Arbitrator shall be delivered and shared forthwith with all other Parties.

(i)     At any time after the Arbitration Trigger Date, any affected Party may submit any disagreements relating to the Included Services or the Extra Services, or the Monetary Costs thereof to the TSA Arbitrator for binding resolution.  The TSA Arbitrator shall finally determine all disputes under this Section 5.25 submitted to it as promptly as practicable, but, in any event, the later of the one hundred twentieth (120th) day after the date of this Agreement or the fifteenth (15th) day prior to the Closing Date; provided that failure by the TSA Arbitrator to make such a determination within such time period shall not be a basis for any Party to challenge such determination.  In making its determination the TSA Arbitrator shall meet jointly with both the applicable TSA Sellers, the applicable TSA EMEA Sellers and Purchaser (provided that, if a Party has been given reasonable opportunity to attend such meeting(s) and does not attend, the TSA Arbitrator shall be able to determine the disagreement without meeting such Party) and permit each Party to provide such data or other information as such Party believes is relevant to the TSA Arbitrator's determination.  The TSA Arbitrator shall be entitled to make such other inquires or require that either Party provide any information or data which exist and are in a Party's or its agents' possession as s/he deems necessary in order to make his/her determination.

(j)     Any arbitration under this Section 5.25 may be initiated by written notice delivered by a Party to the applicable counterparty.  The fees and expenses of the TSA Arbitrator shall be paid fifty percent (50%) by the Purchaser and fifty percent (50%) by the applicable TSA Sellers and the applicable TSA EMEA Sellers.  The decision of the TSA Arbitrator shall be in writing, shall be final and conclusive on the Parties, and counterpart copies thereof shall be delivered to all of the Parties.  The Parties acknowledge and agree that the decision of the TSA Arbitrator shall be final and binding and may be enforced by any court of competent jurisdiction.

(k)     Solely, for purposes of this Section 5.25, the term "Parties" shall also include the TSA EMEA Sellers.

## ARTICLE VI

## TAX MATTERS

Section 6.1.    Transfer Taxes.

(a)     The Parties agree that the Purchase Price is exclusive of any Transfer Taxes.  The Purchaser shall (on behalf of itself and the Designated Purchasers) promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the execution of any other Transaction Document; provided, that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller or any Subsidiary, Affiliate, representative or agent thereof, such Transfer Taxes shall be paid by the Purchaser to such Seller, Subsidiary, Affiliate or agent, as applicable, at the Closing or thereafter, as requested of or by the applicable Seller.  For the avoidance of doubt, Purchaser shall remain liable in respect of any Transfer Taxes regardless of the date that the Assets are removed from the premises of a Seller or any Seller's supplier.  All other Closing expenses will be paid by the Party incurring such expenses.  Upon request from a Seller, the Purchaser shall provide to such

Seller an original receipt (or such other evidence as shall be reasonably satisfactory to such Seller) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1(a).

(b)    If the Purchaser or any Designated Purchaser wishes to claim any exemption relating to, or a reduced rate of, or make an election with the effect of reducing, Transfer Taxes, in connection with this Agreement or the transactions contemplated herein, or in connection with the execution of any other Transaction Document, the Purchaser or any Designated Purchaser, as the case may be, shall be solely responsible for ensuring that such exemption or election applies and, in that regard, shall provide the Sellers prior to Closing with its permit number, GST, VAT or other similar registration numbers and/or any appropriate certificate of exemption, election and/or other document or evidence to support the claimed entitlement to such exemption or reduction by the Purchaser or such Designated Purchaser, as the case may be.  All Parties shall make reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduction.

Section 6.2.    Withholding Taxes.

If the Purchaser or any Designated Purchaser is required for any reason to deduct or withhold from the Purchase Price for any Tax imposed by a Tax Authority, and if the applicable Seller is unable to recover such Tax from such Tax Authority, such payment of the Purchase Price shall be increased to an amount which, after taking into account such deduction or withholding, will result in payment to the applicable Seller of the full amount such Seller would have received from the Purchaser or such Designated Purchaser had no such deduction or withholding been made.  The Purchaser shall or shall cause such Designated Purchaser to promptly furnish the Sellers with such evidence as may be required by the applicable Tax Authorities to establish that any such Tax has been paid, and shall indemnify and hold harmless the Sellers on an after-Tax basis from any liability for penalties or interest due to the payor's failure to timely withhold and remit amounts in respect of Taxes to the applicable Tax Authority.

Section 6.3.    Tax Characterization of Payments Under This Agreement.

The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than payment of the Estimated Purchase Price and any interest payments) as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

Section 6.4.    Apportionment of Taxes.

(a)    Except as otherwise provided in this ARTICLE VI, (i) the Sellers shall and shall cause the Other Sellers, as the case may be, to bear all Taxes of any kind relating to the Assets or the conduct or operation of the Business (excluding the EMEA Business) for all Tax periods or portions thereof ending on or before the Closing Date and (ii) the Purchaser shall and shall cause the Designated Purchasers to bear all Taxes relating to the Assets or the conduct or operation of the Business (excluding the EMEA Business) for all Tax periods or portions thereof beginning after the Closing Date.

(b)    For purposes of this Agreement, any Taxes for a "**Straddle Period**" (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of the period beginning after the Closing Date, respectively.  The amount of Taxes shall be allocated between portions of a Straddle Period in the following manner: (i) in the case of a Tax imposed in respect of property (excluding, for the avoidance of doubt, any income Tax) and that applies ratably to a Straddle Period, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of sales, value-added and similar transaction-based Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be allocated to the portion of the Straddle Period in which the relevant transaction occurred.

Section 6.5.    <u>Tax Disclosure</u>.

Notwithstanding anything to the contrary in this Agreement, except as reasonably necessary to comply with applicable securities laws and regulations, any party may (i) consult any Tax adviser regarding the U.S. federal income Tax treatment or Tax structure of the transactions contemplated by this Agreement, and (ii) disclose to any and all persons, without limitation of any kind, the U.S. federal income Tax treatment and Tax structure of the transactions contemplated hereunder and all materials of any kind (including opinions or other Tax analyses) that are provided to the taxpayer relating to such Tax treatment and Tax structure (but without disclosure of identifying information or any non-public commercial or financial information); provided, however, that clause (ii) of this paragraph shall not apply until the date of the public announcement of the execution of this Agreement and performance of the transactions contemplated hereunder. For this purpose, "Tax structure" is limited to any facts relevant to the U.S. federal income Tax treatment of the transactions contemplated hereunder.

Section 6.6.    <u>Records</u>.

(a)    Notwithstanding the provisions of Section 5.22 or Section 5.23, but subject to the provisions of Section 5.6, (i) after the Closing Date, the Purchaser and the Designated Purchasers, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets, the Assumed Liabilities, or the Business for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Assets, the Assumed Liabilities or the Business for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow representatives of the other party access to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be necessary or convenient.  The

obligation to cooperate pursuant to this Section 6.6 shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

(b)     At any time within the ten (10) years immediately following the Closing, the Sellers may cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for a term ending no later than ten (10) years after the Closing Date in accordance with an escrow agreement between the Purchaser (or the relevant Designated Purchaser, as applicable), the Sellers and the Records Custodian, in form satisfactory to the Purchaser (or the relevant Designated Purchaser) and the Main Sellers.  The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by Tax advisors of any purchaser ("**Tax Credit Purchaser**") relating to the scientific research and experimental development tax credits of the Sellers under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser (or the relevant Designated Purchaser), acting reasonably.  The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or NNTC as qualified expenditures on scientific research and experimental development for purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**").

(c)     The Purchaser shall use reasonable efforts to make available to the relevant Tax Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Tax Authority of the characterization of expenditures by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser.

(d)     The Purchaser shall have no obligation to provide any access under this provision unless the Seller (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

(e)     At the request of the Purchaser, the Sellers shall provide reasonable access to records and employees of the Sellers to assist the Purchaser in claiming any future scientific research and experimental development Tax credits for Qualified Expenditures.

(f)     The Sellers shall have no obligation to provide any access under this provision unless the Purchaser pays all of the Sellers' reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to employees of the Sellers (based on the total compensation of the employee at the time access is provided).

Section 6.7.    Tax Returns.

(a)    The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets or the Business (excluding the EMEA Business), for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("**Transfer Tax Returns**") described below in Section 6.7(b)). Such Tax Returns shall be true, correct and complete in all material respects. Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) Sellers as and when required by Law.

(b)    Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated herein or in respect of the execution of any Ancillary Agreement shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws.  Any Transfer Tax Returns prepared by the Sellers pursuant to this Section 6.7(b) shall be made available to the Purchaser at least five (5) Business Days before such Tax Returns are due to be filed.  The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.7(b) at least one (1) Business Day before such Transfer Tax becomes due and payable.

(c)    The Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets or the Business for all Straddle Periods.  Such Tax Returns shall be true, correct and complete in all material respects.  All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Purchaser as and when required by Law.

(d)    The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.7(b)) prepared by the Purchaser for any Straddle Period before any such Tax Return is filed.  The Purchaser shall submit a draft of any such Tax Return to the Sellers at least thirty (30) days before the date such Tax Return is required to be filed with the relevant Tax Authority.  The Sellers shall have ten (10) days after the date of receipt thereof to submit to the Purchaser, in writing, the Sellers' written comments with respect to such Tax Return.  The Purchaser shall file such Tax Return in accordance with the Sellers' reasonable comments.

(e)    Notwithstanding any contrary provision in this ARTICLE VI, each Seller shall pay to the Purchaser the amount of its liability for Taxes shown to be due on any Tax Return for a Straddle Period at least three (3) Business Days prior to the due date thereof, giving effect to valid extensions; provided, however, that (i) if such Seller and the Purchaser are unable to agree as to the amount of such liability prior to such due date, such Seller shall pay to the Purchaser such amount as it in good faith believes that it owes.

78

Section 6.8.    Allocation of Purchase Price.

(a)    The Parties and the EMEA Sellers shall (i) allocate to the tangible Assets and tangible EMEA Assets a portion of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities) equal to the net book value of such tangible Assets as of the Closing Date, and (ii) allocate to the intangible Assets and intangible EMEA Assets the balance of the Purchase Price.

(b)    To the extent necessary to file Transfer Tax Returns, the Sellers shall reasonably and in good faith determine an allocation of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities) among the Assets in accordance with the principles of Section 1060 of the Code and the Treasury Regulations promulgated thereunder and other applicable Tax Laws, which allocation shall be subject to the principles of Section 6.8(a) (such allocation, a "**Partial Allocation**"); provided, however, that if a different Partial Allocation is required by a Government Entity (including as a result of the Bankruptcy Proceedings), then the Partial Allocation shall be modified as necessary to be consistent with the required allocation but in all cases shall be subject to the principles of Section 6.8(a).  The Parties agree (i) to be bound by the final Partial Allocation (as modified to be consistent with the allocation required by a Government Entity, as described above) and (ii) to act in accordance with the allocations contained in such final Partial Allocation for all purposes relating to Transfer Taxes, including the preparation, filing and audit of any Transfer Tax Returns.  For the purposes of this Section 6.8(b), the terms "Parties" shall include the EMEA Sellers to the extent any negotiation or agreement required hereunder concern Transfer Tax Returns.

## ARTICLE VII

## EMPLOYMENT MATTERS

Section 7.1.    Employment Obligations

7.1.1.    Employment Terms.

Promptly following the granting of the later of the U.S. Sale Order and the Canadian Approval and Vesting Order, the Purchaser shall, or shall cause a Designated Purchaser to, extend a written offer of employment to the Employees employed by the Sellers as of such employment offer date (other than Employees whose employment transfers automatically by operation of Law to the Purchaser or a Designated Purchaser) and such offer of employment shall be in the form, manner and timeframe, which provides no less than a two week Employee consideration period, agreed by the Primary Parties and in compliance with applicable Law with such employment to take effect under the terms stated herein as of the Effective Hire Date, as defined below.  Such offers shall be for employment on terms and conditions in compliance with applicable Law and substantially the same, in the aggregate, excluding, except as otherwise provided expressly herein or required by applicable Law, the KEIP, the KERP, or any equity compensation arrangements, as the Employee's terms and conditions of employment in effect immediately prior to the Closing and, without limiting the generality of the foregoing, shall include (i) an annual base salary and annual target incentive opportunity for each such

Employee at least equal to the annual base salary and annual target incentive opportunity for such Employee as set out in the Employee Information, (ii) employment in a reasonably comparable position as set out for the Employee in the Employee Information, (iii) a work location within reasonable proximity to such Employee's current work location as set out in the Employee Information and (iv) other terms and conditions of employment as set forth in this Section 7.1 as applicable (collectively, "**Minimum Terms and Conditions of Employment**").

Purchaser or Designated Purchaser shall provide Seller with information that Seller reasonably requests to verify that such offers of employment are in compliance with this Section 7.1.1 and regarding Employees' acceptances and rejections of such offers of employment.  The Sellers shall provide the Purchaser with such additional information as the Purchaser may reasonably require in order to comply with its obligations under this ARTICLE VII.  Employees whose employment transfers automatically by operation of Law to the Purchaser or Designated Purchaser will continue to be employed on Minimum Terms and Conditions of Employment as of the applicable Effective Hire Date.  For purposes of this Agreement, to the extent certain terms and conditions of employment are required to be maintained under applicable Law or Seller Employee Plans in order to avoid Sellers' incurring severance or other employment termination benefits or Liability under the WARN Act with respect to Employees, such terms and conditions shall be deemed to be required by applicable Law, and to the extent required by applicable Law for purposes of this Section 7.1, such employment offers and subsequent employment shall include such terms and conditions.  Employees' employment with Purchaser or a Designated Purchaser on and after the Effective Hire Date shall not be conditioned upon such employees satisfactorily completing a background investigation, drug test or other employment screening processes and shall not include a probationary period; provided, however, that the Purchaser or Designated Purchaser may require Employees to provide evidence that they are legally permitted to be employed by the Purchaser or a Designated Purchaser, as required by applicable Law.

Any Employee who accepts such offer of employment and commences employment with the Purchaser or a Designated Purchaser, and any Employee whose employment transfers by operation of Law, shall be deemed to be a Transferred Employee for all purposes of this Agreement.  Inactive Employees shall remain employed by the relevant Seller until the first (1st) Business Day immediately following the date the Inactive Employee is released to return to active employment in accordance with Sellers' leave policies.  The Purchaser or a Designated Purchaser shall use reasonable best efforts from the date hereof until the Closing Date to obtain, at its cost, such visas or permits as are required for it to employ Visa Employees. Visa Employees shall remain employed by the relevant Seller following the Closing Date under the terms and conditions of the Loaned Employee Agreement.  The Effective Hire Date for Employees is (a) the Employee Transfer Date for those Employees other than Inactive Employees and Visa Employees, (b) 12:01 a.m. on the first Business Day following the release to return to active employment from leave for all Inactive Employees and (c) the date specified, in the Loaned Employee Agreement with respect to Visa Employees. As of the Effective Hire Date and, except as otherwise provided herein, for a period of not less than twelve (12) months after the Closing Date, the employment of Transferred Employees shall be on the terms and conditions set forth in Section 7.1, including any applicable schedules thereto, or on terms and conditions that are substantially the same in the aggregate as in effect immediately prior to the

Closing Date, but excluding, except as otherwise provided herein or required by applicable Law, the KEIP, the KERP and any equity compensation arrangements.

7.1.2.          Employee Benefits.

(a)          The Purchaser or a Designated Purchaser shall, and shall cause its relevant Affiliates to, recognize the service date of each Transferred Employee as set out in the Employee Information for all purposes, including membership, vesting, benefit accrual and entitlement to benefits under the relevant Purchaser Employee Plans, but not for purposes of benefit accrual under any Purchaser Employee Plan that is a defined benefit pension plan, except as otherwise provided herein, or to the extent that such crediting would result in duplication of benefits.

(b)          After the date hereof, the Sellers and the Purchaser shall cooperate promptly and in good faith in preparing the transition of the Transferred Employees, as applicable, from coverage under the Seller Employee Plans to coverage under the Purchaser Employee Plans effective as of the Transferred Employee's Effective Hire Date.

(c)          Without limiting the generality of the foregoing, the Purchaser shall, or shall cause its relevant Affiliates to, provide the following benefits to Transferred Employees:

(i)          For the period beginning on the Closing Date and ending on the date that is twelve (12) months from the Closing Date, the Purchaser shall, or shall cause its relevant Affiliates to, provide Transferred Employees with at least the severance payments and benefits to which the Transferred Employee would have been entitled under the applicable severance plan, policy or agreement of the relevant Seller or its Affiliates covering the Transferred Employee immediately prior to the Effective Hire Date.

(ii)          The Sellers shall pay the amount of compensation with respect to the accrued and unused vacation days that is due and owing to the Transferred Employees (other than those Transferred Employees specified in Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule (the "**Specified Transferred Employees**"))[25], up to their Effective Hire Date, to such Transferred Employees by the date required under applicable Law. The Purchaser will, and shall cause the relevant Designated Purchasers to, make reasonable best efforts to accommodate requests for unpaid time off of such Transferred Employees until such time as they accrue sufficient paid time off under the Purchaser Employee Plans to address their vacation plans.

(iii)          Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule sets forth the amount of accrued and unused vacation days that are due and owing to the Specified Transferred Employees as of the date hereof and updated by Sellers as of the Closing Date.  The Purchaser shall, or shall cause its relevant Affiliates to, grant each such

---

[25]          Note to Purchaser:  These are the employees in countries where payment of vacation upon employment termination with the Sellers is not appropriate (e.g., China).

Transferred Employee paid time off in an amount equal to such accrued unused vacation days for such Transferred Employee as set forth in Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule.  If such Transferred Employee terminates employment with the Purchaser or an Affiliate of Purchaser prior to receiving such paid time off, as described above, the Purchaser shall pay such Transferred Employee an amount equal to any such unused paid time off upon such employment termination.

(iv)    Under the vacation policy of the Purchaser or an Affiliate of the Purchaser, the vacation accrual rate of each Transferred Employee on and after the Effective Hire Date shall be the greater of such Transferred Employee's vacation accrual rate (i) as reflected in the Employee Information, or (ii) under the vacation policy of the Purchaser or the Designated Purchaser following the crediting of such Transferred Employee with service as provided in Section 7.1.2(a).  For the avoidance of doubt, such vacation accrual rate applicable to Specified Transferred Employees shall not be decreased by Purchaser or an Affiliate of Purchaser as a result of the obligation in Section 7.1.2(c)(iii) that Purchaser or its Affiliates grant such Employees accrued and unused vacation days due and owing as set forth in Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule.

(v)    Each Transferred Employee (and their eligible dependents, as applicable), shall be eligible, effective as of the relevant Effective Hire Date, to participate in and accrue benefits under the Purchaser Employee Plans that the Purchaser (or, as applicable, a Designated Purchaser) extends to similarly situated employees of the Purchaser (or the applicable Designated Purchaser). With respect to each Transferred Employee (and their eligible dependents, as applicable), the Purchaser or the relevant Purchaser's Affiliates shall cause such plans to (i) waive any eligibility periods, evidence of insurability or pre-existing condition limitations to the extent such limitations no longer apply to such Transferred Employees under the corresponding Seller Employee Plan and (ii) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employees, including with respect to their dependents, under comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Effective Hire Date occurs, provided that such employee provides an explanation of benefits or similar documentation of such expenses paid or incurred to the Purchaser or its Affiliates.

(vi)    The Purchaser or Designated Purchaser shall provide each Transferred Employee employed in:

(A)    India, with India Gratuity (Government of India's Payment of Gratuity) as set forth in Section 7.1.2(c)(vi) of the Sellers Disclosure Schedule, at such time, if any;

(B)    Australia, with the benefit of the amount set forth in Section 7.1.2(c)(vi) of the Sellers Disclosure Schedule of long service leave and sick leave, at such time, if any; and

(C) Pakistan, with the gratuity payment as set forth on Section 7.1.2(c)(vi) of the Sellers Disclosure Schedule provided under applicable Law in Pakistan at such time, if any,

as payment of such amount is due and owing to each such Transferred Employee under applicable Law, taking into account in the calculation of such total payment due at such time the service of such Transferred Employee as set forth in the Employee Information together with such Transferred Employee's service with the Purchaser on and after the Closing Date.  Section 7.1.2(c)(vi) of the Sellers Disclosure Schedule shall be updated no later than three (3) Business Days prior to the Closing Date with respect to those Employees who have accepted Purchaser's or the Designated Purchaser's offer of employment pursuant to Section 7.1.1 or whose employment will transfer to the Purchaser or Designated Purchaser by operation of Law.

(d)    The Sellers shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Employees other than Transferred Employees regardless of the date of such termination provided that the Purchaser or Designated Purchaser, as applicable, has satisfied its obligations as set out in this ARTICLE VII.  Purchaser shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Transferred Employees that occur after the Closing Date.

(e)    Neither Section 7.1.1 nor this Section 7.1.2 restricts the right of the Purchaser to terminate the employment of any Transferred Employee after the Closing or, except as expressly provided in Section 7.1.1 or this Section 7.1.2, to modify the terms and conditions of employment applicable to any Transferred Employee after the Closing.

Section 7.2.    Excluded Employee Liabilities.

For purposes of clarity, the Sellers shall retain, and neither the Purchaser nor any of the Designated Purchasers or Purchaser Employee Plans shall assume at the Closing, any of the following Liabilities of the Sellers, their Affiliates or Seller Employee Plans (the "**Excluded Employee Liabilities**"):

(a)    the Sellers' or any of their Affiliates' obligations to contribute to, make payments with respect to or provide benefits under any Seller Employee Plan except (i) with respect to the Specified Employee Liabilities and (ii) as provided in the Loaned Employee Agreement;

(b)    any Liability with respect to the KERP, the KEIP, or any other retention plan, program or arrangement that provides benefits to any Transferred Employee;

(c)    any obligation to provide continuation coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to the Transferred Employees and/or their qualified beneficiaries with respect to a COBRA qualifying event that occurs prior to such Employees' Effective Hire Date; and

(d)    liabilities resulting from any Action (i) by any Employee relating to his/her employment or termination of employment with any of the Sellers, or (ii) by an applicant

83

with respect to potential employment with any of the Sellers in the Business (excluding the EMEA Business).

Section 7.3.    <u>Other Employee Covenants</u>.

(a)    After the date hereof, and subject to each Party's disclosure obligations imposed by Law or by Government Entities and each Party's obligations hereunder, neither the Purchaser, the Sellers nor any of their respective Affiliates shall issue any announcement or communication to their respective employees or the Employees, prior to consultation with, and the approval of, the other Party (not to be unreasonably withheld or delayed) with respect to this Agreement or any of the transactions contemplated hereby.  If requested, the Purchaser shall reasonably cooperate with the Sellers in respect of the development and distribution of any announcement and communication to the employees of the Sellers, including Employees, with respect to this Agreement or any of the transactions contemplated hereby.

(b)    The Purchaser undertakes to keep the Employee Information in confidence and that until the relevant Employee Transfer Date with respect to those Employees who become Transferred Employees and at all times with respect to those Employees who do not become Transferred Employees:

(i)    the Purchaser shall, and shall cause the Designated Purchasers to, restrict the disclosure of the Employee Information only to such of its employees, agents and advisors as is necessary for the purposes of complying with its obligations pursuant to this Agreement;

(ii)    the Employee Information shall not be disclosed to any other Person (including, for the avoidance of doubt, any other employee of the Purchaser or any Designated Purchaser or other Affiliate of the Purchaser) without the consent of the Main Sellers, such consent not to be unreasonably withheld;

(iii)    the Employee Information shall not be used except for the purposes of complying with the obligations of the Purchaser and the Designated Purchasers pursuant to this Agreement and shall be returned to the Sellers or destroyed, at the Sellers' election, if this Agreement is terminated; and

(iv)    the Purchaser shall, and shall cause the Designated Purchasers to, comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

(c)    The Purchaser and the Sellers shall cooperate with each other to provide for an orderly transition of the Transferred Employees from the Sellers to the Purchaser or the Designated Purchasers, as applicable, and to minimize the disruption to the respective businesses of the Parties resulting from the transactions contemplated hereby.

(d)    During the Non-Solicitation Period, the Sellers shall not, without the advance written consent of Purchaser, either directly or indirectly solicit for employment or hire any Transferred Employee unless the employment of such Transferred Employee is involuntarily terminated by the Purchaser or Designated prior to such action by the Sellers; <u>provided</u>, <u>however</u>,

that nothing in this Section 7.3(d) shall prevent the Sellers from (i) conducting generalized employment searches, including placing *bona fide* public advertisements, that are not specifically targeted at such Transferred Employees or (ii) hiring such Transferred Employees identified through such employment searches.

(e)    During the Non-Solicitation Period, Purchaser and the Designated Purchasers shall not, without the Seller's advance written consent or as expressly permitted by this Agreement, either directly or indirectly solicit for employment or hire (i) any of the employees of the Sellers, unless the employment of such employee is involuntarily terminated by the Sellers prior to such action by the Purchaser or the Designated Purchasers, or (ii) any Employees who have rejected the employment offer of Purchaser or Designated Purchasers or objected to their transfer of employment to Purchaser or Designated Purchasers pursuant to this Agreement; provided, however, that nothing in this Section 7.3(e) shall prevent the Purchaser or the Designated Purchasers from (x) conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such employees or former employees of the Sellers or (y) hiring such employees or former employees of the Sellers identified through such employment searches.

Section 7.4.    Canadian Pension Plans.

As of the Closing Date, the Purchaser or the Designated Purchaser, as applicable, shall establish or otherwise provide a registered pension plan for Transferred Employees employed in Canada and maintain such plan for a period of at least five (5) years following the Closing Date and each such Transferred Employee's participation shall commence on such Transferred Employee's Effective Hire Date.

## ARTICLE VIII

## CONDITIONS TO THE CLOSING

Section 8.1.    Conditions to Each Party's Obligation.

The Parties' obligation to effect, and, as to the Purchaser, to cause the relevant Designated Purchasers to effect, the Closing is subject to the satisfaction or the express written waiver of the Primary Parties, at or prior to the Closing, of the following conditions:

(a)    *Regulatory Approvals*.  All Regulatory Approvals shall have been obtained.

(b)    *No Injunctions or Restraints*.  There shall be in effect no Law, or material order, injunction, decree or judgment of any court or other Government Entity in the U.S., Canada, the United Kingdom (in respect of the transactions contemplated under the EMEA Asset Sale Agreement) or France (in respect of the transactions contemplated under the NNSA Irrevocable Offer) prohibiting the consummation of any of the transactions contemplated thereby.

(c)    *U.S. Sale Order and Canadian Approval and Vesting Order*.  The U.S. Sale Order and the Canadian Approval and Vesting Order shall have been entered and shall not

have been stayed as of the Closing Date and shall not be subject to appeal, stay, reversal or modification as of the Closing Date (provided, that, this condition shall be deemed satisfied even if the U.S. Sale Order has been appealed, so long as (i) the applicable appeal period has expired, (ii) the effectiveness of the U.S. Sale Order has not been stayed by the U.S. Bankruptcy Court pending appeal, and (iii) in the reasonable good faith judgment of the U.S. Debtors after consultation with their counsel and taking into account Section 363(m) of the U.S. Bankruptcy Code, the reversal or modification of U.S. Sale Order as a result of any then pending appeal would not have a Material Adverse Effect).

(d)     *Satisfaction of Conditions under EMEA Asset Sale Agreement*.  The conditions to Closing (as that term is defined in the EMEA Asset Sale Agreement) set out in Clause 15.1 of the EMEA Asset Sale Agreement (other than the conditions set out in Clauses 15.1.1, 15.1.2 and 15.1.3 thereof) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement (provided that a Party may not assert the failure of this condition to be satisfied in the event that such failure is the result of, or has been caused by, a breach by such Party or its Affiliates of the EMEA Asset Sale Agreement).

(e)     *Consummation of Closing under EMEA Asset Sale Agreement*.  The transaction contemplated by the EMEA Asset Sale Agreement shall be completed contemporaneously with the Closing hereunder (provided that a Party may not assert the failure of this condition to be satisfied in the event that such failure is the result of, or has been caused by, a breach by such Party or its Affiliates of the EMEA Asset Sale Agreement).

Section 8.2.     Conditions to Sellers' Obligation.

The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Main Sellers), at or prior to the Closing, of each of the following conditions:

(a)     *No Breach of Representations and Warranties*.  Each of the representations and warranties set forth in ARTICLE III, disregarding all materiality and material adverse effect qualifications contained therein, shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually or together with other such failures, has not had, and would not reasonably be expected to have, a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement.

(b)     *No Breach of Covenants*.  The material covenants, obligations and agreements contained in this Agreement to be performed by the Purchaser or the Designated Purchasers on or before the Closing shall not have been breached in any material respect.

Section 8.3.     Conditions to Purchaser's Obligation.

The Purchaser's obligation to effect, and to cause the relevant Designated Purchasers to effect, the Closing shall be subject to the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a)    *No Breach of Representations and Warranties.*  Each of the representations and warranties set forth in ARTICLE IV, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that has not had, and would not reasonably be expected to have, a Material Adverse Effect.

(b)    *No Breach of Covenants.*  The material covenants, obligations and agreements contained in this Agreement to be performed by the Sellers on or before the Closing shall not have been breached in any material respect.

## ARTICLE IX

## TERMINATION

Section 9.1.    <u>Termination</u>.

This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of the Primary Parties;

(b)    by either the Main Sellers or the Purchaser, upon written notice to the other:

(i)    if the U.S. Sale Order and the Canadian Approval and Vesting Order are not entered within thirty (30) days after the Auction (as defined in the U.S. Bidding Procedures Order);

(ii)    upon the entry of an order by the U.S. Bankruptcy Court and the Canadian Court approving an Alternative Transaction;

(iii)    if the EMEA Asset Sale Agreement is terminated in accordance with its terms;

(iv)    if the NNSA Irrevocable Offer is terminated in accordance with its terms;

(v)    upon the sale, transfer or other disposition, directly or indirectly, of any material portion of the Business or the Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers;

(vi)    if any Antitrust Law is enacted in the U.S., Canada, in the United Kingdom or in France or by the European Union, or any Court or other Government Entity in the U.S., Canada, the United Kingdom, France or any European Union Entity issues a final order, injunction, decree, ruling or judgment base on Antitrust Laws, in each case permanently restraining, enjoining or otherwise prohibiting the consummation

87

of the transactions contemplated by this Agreement, the EMEA Asset Sale Agreement or NNSA Irrevocable Offer; or

(vii)    if the Closing does not take place within one-hundred and eighty (180) days from the date of the U.S. Sale Order.

(c)    (i) by the Main Sellers in the event of a material breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement, the EMEA Asset Sale Agreement or the NNSA Irrevocable Offer, which breach would result in a failure to satisfy the conditions to Closing set forth in Sections 8.1(a), 8.1(e), 8.2(a), or 8.2(b) or (ii) by the Purchaser in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Sections 8.3(a) or 8.3(b), as applicable, and, in each case in respect of (i) and (ii) above, which, if capable of being cured, is not cured within forty-five (45) days from receipt of a written notice from the non-breaching Party; or

(d)    [by the Main Sellers, upon written notice to the Purchaser, upon the occurrence of a Financing Termination Event;][26]

provided, however, that (x) the right to terminate this Agreement pursuant to Section 9.1(b)(i), Section 9.1(b)(iii), Section 9.1(b)(iv), Section 9.1(b)(vii), [and] Section 9.1(c) [and Section 9.1(d)] shall not be available to any Party whose breach hereof has been the cause of, or has resulted in, the event or condition purportedly giving rise to a right to terminate this Agreement under such clauses and (y) the right to terminate this Agreement pursuant to Section 9.1(b)(vii) shall not be available to Purchaser if the condition to Closing set forth in Section 8.1(a) has not yet been satisfied.

Section 9.2.    Effects of Termination.

If this Agreement is terminated pursuant to Section 9.1:

(a)    all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of (i) Section 2.2.4 (Good Faith Deposit), (ii) Section 5.7 (Public Announcements), (iii) Section 5.10 (Transaction Expenses), (iv) Section 5.11 (Confidentiality), (v) Section 7.3(b)(iii) (Other Employee Covenants), (vi) Section 9.1 (Termination), (vii) Section 9.2 (Effects of Termination) and (viii) ARTICLE X (Miscellaneous); provided, that neither the termination of this Agreement nor anything in this Section 9.2 shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof and thereof;

---

[26]    Note to Purchaser:  These provisions will only apply to private equity fund or similar acquiror needing specific debt financing.

(b)      except as required by applicable Law, the Purchaser shall promptly return to the Sellers or destroy all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; and

(c)      the provisions of the Confidentiality Agreement shall continue in full force and effect.

## ARTICLE X

## MISCELLANEOUS

Section 10.1.   <u>No Survival of Representations and Warranties or Covenants</u>.

Except for the representations set forth in Section 3.5, no representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants set forth in Article VI and covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

Section 10.2.   <u>Remedies</u>.

No failure to exercise nor any delay in exercising, on the part of any Party, any right or remedy under this Agreement or the documents referred to in this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise thereof or the exercise of any other right or remedy.  To the maximum extent permitted by applicable Law: (i) no waiver that may be given by a Party hereto shall be applicable except in the specific instance for which it is given; and (ii) no notice to or demand on one Party shall be deemed to be a waiver of any right of the party giving such notice or demand to take further action without notice or demand.  The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by Law.

Section 10.3.   <u>No Third Party Beneficiaries</u>.

The acknowledgements, rights, undertakings, representations or warranties contained in this Agreement and expressed to be for the benefit of the EMEA Sellers or the Joint Administrators (including the provisions of Section 2.2, Section 5.25 and Section 6.8) (collectively, the "**Third Party Provisions**") shall inure to, are expressly intended to be for the benefit of, and shall be enforceable by, each of the EMEA Sellers and the Joint Administrators (and their applicable successors or representatives) (the "**Third Party Beneficiaries**"), as applicable, and shall be binding on the Purchaser and its successors and assigns. In the event that any Party or any of its successors or assigns (a) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity in such consolidation or merger, or (b) transfers all or a majority of its properties and assets to any Person, then, and in each such case, proper provision shall be made so that the successors and assigns of such Party, assumes the obligations thereof contained in the Third Party Provisions or otherwise in this Agreement.  Except as provided in this Section 10.3, this Agreement is for the sole benefit of the

89

Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.4.    <u>Consent to Amendments; Waivers</u>.

No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.  This Agreement and the Ancillary Agreements shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.

Section 10.5.    <u>Successors and Assigns</u>.

Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Main Sellers in case of an assignment by Purchaser or Purchaser in case of an assignment by any Seller, which consent may be withheld in such party's sole discretion, except for the following assignment which shall not require consent (i) assignment to an Affiliate of a Party (provided (A) that such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Parties and (B) any such assignment by Purchaser complies with Section 2.4 if applicable), (ii) assignment by a U.S. Debtor to a succeeding entity following such U.S. Debtor's emergence from Chapter 11, and (iii) assignment by any of the Canadian Debtors pursuant to any plan of arrangement approved by the Canadian Court, which will not require the consent of the Purchaser.

Section 10.6.    <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)    Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of any other jurisdiction.

(b)    To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, <u>provided</u> that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors or the Canadian Debtors may, in accordance with the Cross-Border Protocol, move the U.S. Bankruptcy Court or the Canadian Court, as case may be, to hold a joint hearing of the U.S. Bankruptcy Court and the Canadian

Court to determine the appropriate jurisdiction for such claim, action or proceeding, and (b) in the Federal Courts in the Southern District of New York and the state courts of the State of New York, county of Manhattan (collectively, the "**New York Courts**") and the Canadian Court, if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases, and shall not be brought, in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the U.S. Bankruptcy Court, the Canadian Court, and the New York Courts, as applicable, pursuant to the preceding clauses (a) and (b) for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such Action brought in any such court or any claim that any such Action brought in such court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such Action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)     The Purchaser hereby appoints (i) [●], [●], as its authorized agent (the "**Purchaser Authorized U.S. Agent**") upon whom process and any other documents may be served in the Chapter 11 Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the U.S. Bankruptcy Court or in the New York Courts by any other party hereto and (ii) [●], [●], as its authorized agent (the "**Purchaser Authorized Canadian Agent**" and together with the Purchaser Authorized U.S. Agent, the "**Purchaser Authorized Agents**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable. The Purchaser further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointments in full force and effect as aforesaid.  Service of process upon the applicable Purchaser Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Purchaser shall be deemed, in every respect, effective service of process upon the Purchaser in relation to such jurisdiction.

(d)     Each Seller hereby appoints (i) NNI as its authorized agent (the "**Seller Authorized U.S. Agent**") upon whom process and any other documents may be served in the Chapter 11 Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the U.S. Bankruptcy Court or in the New York Courts by any other party hereto, and (ii) NNL as its authorized agent (the "**Seller Authorized Canadian Agent**" and together with the Seller Authorized U.S. Agent, the "**Seller Authorized Agents**")) upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable. Each such Seller further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointment in full force and effect as aforesaid.

91

Service of process upon the applicable Seller Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Main Sellers shall be deemed, in every respect, effective service of process upon every such Seller.

(e)    Section 10.6(b) shall not limit the jurisdiction of (i) the Accounting Arbitrator set forth in Section 2.2.3.1(c) or (ii) any of the arbitrators set forth in Section 5.25, although claims may be asserted in the courts referred to in Section 10.6(b) for purposes of enforcing the jurisdiction and judgments of the Accounting Arbitrator or arbitrator(s), as applicable.

(f)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

Section 10.7.   Notices.

All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Purchaser to:

[●]

With copies (that shall not constitute notice) to:

[●]

If to the Main Sellers or the Sellers, to:

[NNC]
[●]
Attention: [●]
Facsimile: [●]

[NNL]
[●]
Attention: [●]
Facsimile: [●]

[NNI]
[●]
Attention: [●]
Facsimile: [●]

With copies (that shall not constitute notice) to:

[●]

and

Cleary Gottlieb Steen & Hamilton LLP
12, rue de Tilsitt
75008 Paris
France
Attention: Jean-Marie Ambrosi
Facsimile: +33 1 40 74 68 00

and

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention: Michael J. Lang
Facsimile: + 1-416-216-3930

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the second calendar day after deposit with a reputable overnight courier service, as applicable.

Section 10.8.   Exhibits; Sellers Disclosure Schedule.

(a)    The Sellers Disclosure Schedule and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)    For purposes of the representations and warranties of the Sellers contained in this Agreement, disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances with respect to all representations or warranties by the Sellers calling for

disclosure of such information, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably apparent from the Sellers Disclosure Schedule that such disclosure is applicable.  The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

Section 10.9.   Counterparts.

The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

Section 10.10. No Presumption.

The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations.  Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby.  The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

Section 10.11. Severability.

If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

Section 10.12. Headings.

The headings used in this Agreement are for the purpose of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.

Section 10.13. <u>Entire Agreement</u>.

(a)    This Agreement, the other Transaction Documents and the Confidentiality Agreement set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the other Transaction Documents and the Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated.  In the event of any irreconcilable conflict between this Agreement and any of the other Transaction Documents or the Confidentiality Agreement, the provisions of this Agreement shall prevail, regardless of the fact that certain other Transaction Documents, such as the Local Sale Agreement, may be subject to different governing Laws.

(b)    For the sake of clarity, the provisions of the EMEA Asset Sale Agreement and the NNSA Irrevocable Offer have been drafted separately from the provisions in the body of this Agreement to reflect differing market practices in the countries of jurisdiction of the EMEA Sellers and NNSA.  Unless the context specifically requires, the provisions contained in the body of this Agreement and the provisions of the EMEA Asset Sale Agreement and the NNSA Irrevocable Offer shall be interpreted independently and without reference to each other.

Section 10.14. <u>Availability of Equitable Relief; Sole Remedy</u>.

The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, subject to the limitations set forth in this Section 10.14, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches.  Each Party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedy.  Each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of the provisions of this Agreement.  Equitable remedies shall constitute the sole remedy of the Purchaser under or in respect of this Agreement.  Without limiting the preceding sentence, it is acknowledged and agreed that under no circumstances shall any Party be liable for punitive damages or indirect, special, incidental, or consequential damages arising out of or in connection with this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof, including damages alleged as a result of tortious conduct.

Section 10.15. <u>Bulk Sales Laws</u>.

Subject to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, each Party waives compliance by the other Party with any applicable bulk sales Law.

Section 10.16. <u>Main Sellers as Representatives of Other Sellers</u>.

(a)    For all purposes of this Agreement:

95

(i)    each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNC as its representative;

(ii)    each Other Seller listed in Section 10.16(a)(ii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNL as its representative; and

(iii)    each Other Seller listed in Section 10.16(a)(iii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNI as its representative.

(b)    Pursuant to Section 10.16(a), each of NNC, NNL and NNI shall expressly have the power to, in the name and on behalf of each of its Respective Affiliates (as defined below), (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

(c)    For the purposes of this Agreement, "**Respective Affiliates**" means: (i) with respect to NNC, each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule; (ii) with respect to NNL, each Other Seller listed in Section 10.16(a)(ii) of the Sellers Disclosure Schedule, and (iii) with respect to NNI, all the other U.S. Debtors and each Other Seller listed in Section 10.16(a)(iii) of the Sellers Disclosure Schedule.

(d)    Each Respective Affiliate shall indemnify the Main Seller that acts as representative of such Respective Affiliate for, and hold it harmless against, any loss, liability or expense, including reasonable attorneys' fees, incurred by such Main Seller without gross negligence, bad faith or willful misconduct, for serving in the capacity of representative of such Respective Affiliate hereunder.

Section 10.17. <u>Execution by Other Sellers</u>.

The Purchaser hereby acknowledges that the Other Sellers are not executing this Agreement as of the date hereof.  This Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers have done so.  Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall cause each Other Seller to execute a counterpart to this Agreement no later than the day prior to the Closing Date, agreeing to be bound as a Seller under this Agreement and authorizing NNC, NNL or NNI, as applicable, to act as its representative under Section 10.16 hereof.

Section 10.18. <u>Obligations of the Sellers</u>.

When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor – other than NNC – and a Non-Debtor Seller).

**[Remainder of this page intentionally left blank.  Signature page follows.]**

IN WITNESS WHEREOF, the Parties have duly executed this Asset Sale Agreement as of the date first written above.

[PURCHASER]

By:_____
    Name:
    Title:

Nortel Networks Corporation

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Nortel Networks Limited

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Nortel Networks Inc.

By:_____
    Name:
    Title: