**EXHIBIT A**

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### MOTION RECORD
Metro Ethernet Networks Business Bidding Procedures
(returnable October 15, 2009)

October 9, 2009

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario  M5J 2Z4

Derrick Tay LSUC#: 21152A
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

Mario Forte  LSUC#: 27293F
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

# INDEX

`

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

## INDEX

| TAB | DOCUMENT | PAGE |
|-----|----------|------|
| 1. | Notice of Motion returnable October 15, 2009 | 1 |
| 2. | Affidavit of George Riedel sworn October 9, 2009 | 27 |
| 3. | Draft Order | 44 |

TAB 1

Court File No.  09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

### NOTICE OF MOTION
### (returnable October 15, 2009)

Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") will make a motion to Justice Morawetz of the Commercial List court on **Thursday, October 15, 2009 at 2:00 p.m. at 393 University Avenue, Toronto, Ontario.**

PROPOSED METHOD OF HEARING: The motion is to be heard:

☐ in writing under subrule 37.12.1(1) because it is on consent or unopposed or made without notice;

☐ in writing as an opposed motion under subrule 37.12.1(4);

☒ orally.

THE MOTION IS FOR AN ORDER:

(a)     Abridging the time for service of the Notice of Motion and Motion Record in respect of this motion and dispensing with further service thereof;

2

- 2 -

(b)     Approving the bidding procedures (the "Bidding Procedures") described in the affidavit of George Riedel sworn October 9, 2009 (the "Riedel Affidavit") and the twenty-fourth report (the "Twenty-Fourth Report") of Ernst & Young Inc., in its capacity as monitor (the "Monitor") to be filed separately, subject to the approval of the Bidding Procedures by the United States Bankruptcy Court for the District of Delaware in the Chapter 11 Proceedings of the Chapter 11 Debtors and authorizing the Applicants to conduct the sale process contemplated therein;

(c)     Approving the asset sale agreement dated as of October 7, 2009 (the "Sale Agreement") among NNC, NNL and Nortel Networks Inc. ("NNI") and certain of their affiliates, as vendors, certain other entities defined as Sellers in the Sale Agreement (collectively, the "Sellers") and Ciena Corporation, as purchaser ("Ciena or the "Purchaser") in the form attached as an appendix to the Twenty-Fourth Report and approving and accepting the Sale Agreement for the purposes of conducting the "stalking horse" bidding process in accordance with the Bidding Procedures including, without limitation the Break-Up Fee and the Expense Reimbursement (as both terms are defined in the Sale Agreement);

(d)     Approving the letter of intent dated as of October 1, 2009 (the "Montreal LOI") entered into between NNL and BREOF/Belmont Ban G.P. Limited, general partner of BREOF/Belmont Ban L.P. in respect of certain premises located at 2351 Alfred-Nobel Blvd., Saint-Laurent, Quebec and authorizing and directing NNL to comply with its obligations and covenants thereunder;

(e)     Sealing of the confidential appendices to the Twenty-Fourth containing the schedules and exhibits to the Sale Agreement as well as an unredacted copy of the Montreal LOI pending further Order of this Court; and

(f)     Such further and other relief as counsel may request and this Honourable Court deem just.

3

- 3 -

THE GROUNDS FOR THE MOTION ARE:

**BACKGROUND**

(a)     On January 14, 2009 (the "Filing Date"), this Honourable Court made an Initial Order granting the CCAA stay of proceedings against the Applicants and appointing Ernst & Young Inc. as Monitor in the CCAA proceedings;

(b)     Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including Nortel Networks Inc. ("NNI"), made voluntary filings under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases in the U.S. as "foreign proceedings" in Canada and giving effect to the automatic stay under the Code in Canada;

(c)     Additionally, on January 15, 2009, Nortel Networks UK Limited and certain subsidiaries of the Nortel group incorporated in the Europe, Middle East and Africa region ("EMEA") each obtained an administration order from the English High Court of Justice under the Insolvency Act 1986;

(d)     References to "Nortel" herein shall be to the global enterprise as a whole;

**THE MEN BUSINESS**

(e)     Nortel's Metro Ethernet Networks business (the "MEN Business") includes optical networking, carrier Ethernet switching and multiservice switching products, delivering carrier-grade Ethernet transport capabilities for higher performance and lower cost for emerging video-intensive applications;

(f)     Prior to the CCAA proceedings it was clear that Nortel would need to consider strategic divestiture as a way to conserve liquidity and consolidate its position with respect to its remaining businesses and accordingly, Nortel began the process of marketing the Assets for sale before the decision was made to commence proceedings under the CCAA;

4

- 4 -

**PREVIOUS MARKETING EFFORTS**

(g) Nortel first announced its intention to explore and commenced a process for the divestiture of the MEN Business in September 2008;

(h) After the commencement of the proceedings, the Applicants reinitiated their efforts to divest the MEN Business;

(i) As a result, thirteen (13) parties were given access to the electronic data room and management presentations conducted with seven (7) of the parties;

**THE SALE AGREEMENT**

(j) After extensive negotiations the parties have now agreed on the terms of the Sale Agreement as well as the terms of an EMEA Sale Agreement for the transfer of assets by certain of the EMEA entities, which agreements are subject to higher or better offers;

(k) The terms and conditions of the Sale Agreement, and the agreements to be entered into in connection with the closing of the transactions contemplated in the Sale Agreement are described in further detail in the Riedel Affidavit and the Twenty-Fourth Report and provides for, among other things, a purchase price of US$390 million plus 10,000,000 common shares of Ciena Corporation;

(l) It is anticipated that, Nortel, with the assistance of the Monitor, will conduct an expedited sale process and follow the Bidding Procedures with a view to the ultimate conduct of an auction amongst the Qualified Bidders (as defined below);

(m) An agreed upon set of Bidding Procedures have been developed, which provide for a process through which an interested party may become a "Qualified Bidder";

(n) Bids from Qualified Bidders must be submitted no later than 4:00 p.m. (ET) on November 9, 2009. The auction is scheduled to take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York City at 9:30 a.m. (ET) on November 13, 2009;

- 5 -

(o)     The proposed auction sale process for the MEN Business, based on the Sale Agreement as a stalking horse bid, is the best way to preserve the business as a going concern and maximize the value and preserve jobs for the Applicants' employees;

**MONTREAL LETTER OF INTENT**

(p)     The Applicants currently lease space at a facility near Montreal located at 2351 Alfred-Nobel Blvd., Saint-Laurent, Quebec (the "Building") pursuant to a lease dated as of June 27, 2007 (the "Lease"). These premise are used by the Applicants in the conduct of the MEN Business;

(q)     Pursuant to the Lease, NNL leases the 3rd and 4th floors of the Building (the "Montreal Premises") and the lease term is currently set to expire on June 30, 2012;

(r)     Due to employee and business reductions both before and since the filing, the portion of the Montreal Premises that are being used by the Applicants in connection with the MEN Business do not require the full space.

(s)     The Purchaser has also advised that it is only interested in leasing the 3rd floor of the Montreal Premises provided the MEN Business is consolidated onto such 3rd floor space;

(t)     In connection with the Sale Agreement and in order to facilitate the transaction, NNL and the landlord for the Lease entered into discussions to discuss the terms on which the Purchaser would lease or occupy the Montreal Premises for a period of time post closing;

(u)     NNL and the landlord agreed to the terms of a letter of intent dated as of October 1, 2009 (the "Montreal LOI") which provides for, among other things, the following:

       (i)     an extension of the term of the Montreal Lease for the 3rd floor premises to June 30, 2014; and a reduction of the term of the 4th floor premises for a period of nine (9) months from the date of the Montreal LOI;

- 6 -

    (ii)    an agreement that NNL may assign the Montreal Lease to the Purchaser or such other listed purchasers or any other purchasers of the MEN Business provided that certain financial tests are met; and

    (iii)    an agreement that NNL will not repudiate the Montreal Lease (as amended by the Montreal LOI);

(v)    A redacted copy of the Montreal LOI will be attached to the Twenty-Fourth Report which will further describe in detail the provisions of the Montreal LOI;

(w)    The Montreal LOI and the amendments to the Montreal Lease therein are fair and reasonable in the circumstances, and provide for flexibility to the Purchaser or any other listed purchaser to decline the assumption of the Montreal Lease upon payment of the Montreal Surrender Penalty (as defined in the Montreal LOI);

(x)    The confidential appendices to the Twenty-Fourth Report contain sensitive, competitive and, in some instances, personal information and the redactions from the Montreal LOI contain a list of parties to which the Montreal Premises landlord agrees to consent and which, if disclosed, may have other implications in the sale process generally;

(y)    The sealing of these confidential appendices and unredacted Montreal LOI are appropriate in the circumstances;

**MISCELLANEOUS**

(z)    The provisions of the CCAA; and

(aa)    Such further and other grounds as counsel may advise and this Honourable Court permit.

THE FOLLOWING DOCUMENTARY EVIDENCE will be used at the hearing of the motion:

(a)    The Riedel Affidavit;

(b)    The Twenty-Fourth Report, filed separately; and

- 7 -

(c)    Such further and other relief as counsel may request and this Honourable Court deem
just.

October 9, 2009

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4  CANADA

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930
Lawyers for the Applicants

TO:       Attached Service List

*8*

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

### SERVICE LIST

TO:    **OGILVY RENAULT LLP**
Royal Bank Plaza, South Tower
200 Bay Street, Suite 3800
Toronto, Ontario M5J 2Z4

Derrick Tay
Mario Forte
Jennifer Stam

Email:    dtay@ogilvyrenault.com
mforte@ogilvyrenault.com
jstam@ogilvyrenault.com

Tel:    416.216.4000
Fax:    416.216.3930

Lawyers for the Applicants

*9*

- 2 -

TO: **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, ON  M5K 1J7

Murray McDonald
Brent Beekenkamp

Email:  nortel.monitor@ca.ey.com

Tel:    416.943.3016
Fax:    416.943.3300

AND TO: **GOODMANS LLP**
250 Yonge Street
Suite 2400
Toronto, ON  M5B 2M6

Jay Carfagnini
Joseph Pasquariello
Gail Rubenstein
Chris Armstrong

Email:  jcarfagnini@goodmans.ca
        jpasquariello@goodmans.ca
        grubenstein@goodmans.ca
        carmstrong@goodmans.ca

Tel:    416.597.4107
Fax:    416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND TO: **OSLER HOSKIN AND HARCOURT LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, ON  M5X 1B8

Lyndon Barnes
Rupert Chartrand
Edward Sellers
Adam Hirsh

Email:  lbarnes@osler.com
        rchartrand@osler.com
        esellers@osler.com
        ahirsh@osler.com

Tel:    416.362.2111
Fax:    416.862.6666

Lawyers for the Boards of Directors of
Nortel Networks Corporation and Nortel
Networks Limited

AND TO: **FASKEN MARTINEAU DUMOULIN LLP**
66 Wellington Street West
Toronto Dominion Bank Tower
P.O. Box 20, Suite 4200
Toronto, ON  M5K 1N6

Donald E. Milner
Aubrey Kauffman
Edmond Lamek
Jon Levin

Email:  dmilner@fasken.com
        akauffman@fasken.com
        elamek@fasken.com
        jlevin@fasken.com

Tel:    416.868.3538
Fax:    416.364.7813

Lawyers for Export Development Canada

- 3 -

10

<table>
<tr>
<td>AND<br>TO:</td>
<td><strong>EXPORT DEVELOPMENT CANADA</strong><br>151 O'Connor Street<br>Ottawa, ON K1A 1K3<br><br>Jennifer Sullivan<br><br>Email:  jsullivan@edc.ca<br><br>Tel:    613.597.8651<br>Fax:   613.598.3113</td>
<td>AND<br>TO:</td>
<td><strong>THORNTON GROUT FINNIGAN LLP</strong><br>3200-100 Wellington Street West<br>Toronto-Dominion Centre, Canadian Pacific<br>Tower<br>Toronto, ON M5K 1K7<br><br>Robert I. Thornton<br>Michael Barrack<br>Rachelle Moncur<br>Leanne M. Williams<br><br>Email:  rthornton@tgf.ca<br>          mbarrack@tgf.ca<br>          rmoncur@tgf.ca<br>          lwilliams@tgf.ca<br><br>Tel:    416.304.1616<br>Fax:   416.304.1313<br><br>Lawyers for Flextronics Telecom Systems Ltd.</td>
</tr>
<tr>
<td>AND<br>TO:</td>
<td><strong>McINNES COOPER</strong><br>Purdy's Wharf Tower II<br>1300 – 1969 Upper Water Street<br>Halifax, NS B3J 2V1<br><br>John Stringer, Q.C.<br>Stephen Kingston<br><br>Email:  john.stringer@mcinnescooper.com<br>          stephen.kingston@mcinnescooper.com<br><br>Tel:    902.425.6500<br>Fax:   902.425.6350<br><br>Lawyers for Convergys EMEA Limited</td>
<td>AND<br>TO:</td>
<td><strong>MILLER THOMSON LLP</strong><br>Scotia Plaza<br>40 King Street West, Suite 5800<br>P.O. Box 1011<br>Toronto, ON M5H 3S1<br><br>Jeffrey Carhart<br>Margaret Sims<br><br>Email:  jcarhart@millerthomson.com<br>          msims@millerthomson.com<br><br>Tel:    416.595.8615/8577<br>Fax:   416.595.8695<br><br>Lawyers for Toronto-Dominion Bank</td>
</tr>
<tr>
<td>AND<br>TO:</td>
<td><strong>CAW-CANADA</strong><br>Legal Department<br>205 Placer Court<br>Toronto, ON M2H 3H9<br><br>Barry E. Wadsworth<br>Lewis Gottheil<br><br>Email:  barry.wadsworth@caw.ca<br>          lewis.gottheil@caw.ca<br><br>Tel.:   416.495.3776<br>Fax:   416.495.3786<br><br>Lawyers for all active and retired Nortel<br>employees represented by the CAW-Canada</td>
<td>AND<br>TO:</td>
<td><strong>BOUGHTON LAW CORPORATION</strong><br>Suite 700<br>595 Burrard Street<br>Vancouver, BC V7X 1S8<br><br>R. Hoops Harrison<br><br>Email:  hharrison@boughton.ca<br><br>Tel:    604.687.6789<br>Fax:   604.683.5317<br><br>Lawyers for Tonko Realty Advisors (BC) Ltd.</td>
</tr>
</table>

- 4 -

AND
TO: **BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, ON  M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email:  mmacnaughton@blgcanada.com
Tel:    416. 367.6646
Fax:    416. 682.2837

Email:  rjaipargas@blgcanada.com
Tel:    416.367.6266
Fax:    416.361.7067

Email:  srappos@blgcanada.com
Tel:    416.367.6033
Fax:    416.361.7306

Lawyers for Bell Canada

AND
TO:  **LANG MICHNER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

Leslie A. Wittlin
John Contini
Aaron Rousseau

Email:  lwittlin@langmichener.ca
Tel:    416.307.4087
Fax:    416.304.3855

Email   jcontini@langmichener.ca
Tel:    416.307.4148
Fax:    416.304.3767

Email   arousseau@langmichener.ca
Tel:    416.307.4081
Fax:    416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND
TO:  **SISKINDS LLP**
680 Waterloo Street
London, ON  N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein

Email:  ray.leach@siskinds.com
        dimitri.lascaris@siskinds.com
        monique.radlein@siskinds.com

Tel:    519.672.2121
Fax:    519.672.6065

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare

AND
TO:  **BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON  M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson

Email:  zychk@bennettjones.com
Tel:    416.777.5738
Fax:    416.863.1716

Email:  orzyr@bennettjones.com
Tel:    416.777.5737
Fax:    416.863.1716

Email:  finlaysong@bennettjones.com
Tel:    416.777.5762
Fax:    416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

| | | | |
|---|---|---|---|
| **AND TO:** | **KOSKIE MINSKY**<br>20 Queen Street West<br>Suite 900<br>Toronto, ON  M5H 3R3 | **AND TO:** | **MILLER THOMSON LLP**<br>Scotia Plaza<br>40 King Street West, Suite 5800<br>P.O. Box 1011<br>Toronto, ON  M5H 3S1 |

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon

Email:   mzigler@kmlaw.ca
Tel:      416.595.2090
Fax:     416.204.2877

Email:   sphilpott@kmlaw.ca
Tel:      416.595.2104
Fax:     416.204.2882

Email:   dyiokaris@kmlaw.ca
Tel:      416.595.2130
Fax:     416.204.2810

Email:   amckinnon@kmlaw.ca
Tel:      416.595.2150
Fax:     416.204.2874

Lawyers for the Former Employees of Nortel

Jeffrey Carhart
Margaret Sims
James Klotz

Email:   jcarhart@millerthomson.com
Tel:      416.595.8615
Fax:     416.595.8695

Email:   msims@millerthomson.com
Tel:      416.595.8577
Fax:     416.595.8695

Email:   jmklotz@millerthomson.com
Tel:      416.595.4373
Fax:     416.595.8695

Lawyers for LG Electronics Inc.

| | | | |
|---|---|---|---|
| **AND TO:** | **MILLER THOMSON LLP**<br>Scotia Plaza<br>40 King Street West, Suite 5800<br>P.O. Box 1011<br>Toronto, ON  M5H 3S1 | **AND TO:** | **LG ELECTRONICS INC.**<br>11/F, LG Twin Towers (West)<br>20 Yeouido-dong, Yeongdeungpo-gu<br>Seoul 150-721, Korea |

Jeffrey Carhart
Margaret Sims

Email:   jcarhart@millerthomson.com
Tel:      416.595.8615
Fax:     416.595.8695

Email   msims@millerthomson.com
Tel:      416.595.8577
Fax:     416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.

Joseph Kim

Email:   joseph.kim@lge.com

Tel:      +82.2.3777.3171
Fax:     +82.2.3777.5345

13

- 6 -

AND TO: **CHAITONS LLP**
185 Sheppard Avenue West
Toronto, ON  M2N 1M9

Harvey G. Chaiton

Email:   harvey@chaitons.com

Tel:     416.218.1129
Fax:     416.218.1849

Lawyers for IBM Canada Limited

AND TO: **FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, ON  M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder

Email:   Shayne.kukulowicz@fmc-law.com
         Alex.macfarlane@fmc-law.com
         Michael.wunder@fmc-law.com

Tel:     416.863.4511
Fax:     416.863.4592

Canadian Lawyers for the Official Committee of
Unsecured Creditors

AND TO: **PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, ON  M5H 3E5

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:   ken.rosenberg@paliareroland.com
Tel:     416.646.4304
Fax:     416.646.4301

Email:   max.starnino@paliareroland.com
Tel:     416.646.7431
Fax:     416.646.4301

Email:   lily.harmer@paliareroland.com
Tel:     416.646.4326
Fax:     416.646.4301

Email:   tina.lie@paliareroland.com
Tel:     416.646.4332
Fax:     416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

AND TO: **GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

E. Patrick Shea

Email:   patrick.shea@gowlings.com

Tel:     416.369.7399
Fax:     416.862.7661

Lawyers for Westcon Group

| | |
|---|---|
| AND TO: | **MINDEN GROSS LLP**<br>145 King Street West, Suite 2200<br>Toronto, ON  M5H 4G2<br><br>Raymond M. Slattery<br>David T. Ullmann<br><br>Email:  rslattery@mindengross.com<br>        dullmann@mindengross.com<br>Tel:    416.369.4149<br>Fax:    416.864.9223<br><br>Lawyers for Verizon Communications Inc. | AND TO: | **AIRD & BERLIS**<br>Brookfield Place<br>181 Bay Street, Suite 1800<br>Toronto, ON  M5J 2T9<br><br>Harry Fogul<br>Peter K. Czegledy<br><br>Email:  hfogul@airdberlis.com<br>Tel:    416.865.7773<br>Fax:    416.863.1515<br><br>Email:  pczegledy@airdberlis.com<br>Tel:    416.865.7749<br>Fax:    416.863.1515<br><br>Lawyers for Microsoft Corporation |

AND TO:  **MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, ON  M5H 4G2

Raymond M. Slattery
David T. Ullmann

Email:  rslattery@mindengross.com
        dullmann@mindengross.com
Tel:    416.369.4149
Fax:    416.864.9223

Lawyers for Verizon Communications Inc.

AND TO:  **AIRD & BERLIS**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Harry Fogul
Peter K. Czegledy

Email:  hfogul@airdberlis.com
Tel:    416.865.7773
Fax:    416.863.1515

Email:  pczegledy@airdberlis.com
Tel:    416.865.7749
Fax:    416.863.1515

Lawyers for Microsoft Corporation

AND TO:  **GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:  jwigley@gardiner-roberts.com
Tel:    416.865.6655
Fax:    416.865.6636

Email:  vdare@gardiner-roberts.com
Tel:    416.865.6641
Fax:    416.865.6636

Lawyers for Andrew, LLC

AND TO:  **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:    416.865.7726
Fax:    416.863.1515

Email:  iaversa@airdberlis.com
Tel:    416.865.3082
Fax:    416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND TO:  **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email:  renglish@airdberlis.com
        smitra@airdberlis.com

Tel:    416.863.1500
Fax:    416.863.1515

Lawyers for Tata Consultancy Services Limited
and Tata America International Corporation

AND TO:  **ALEXANDER HOLBURN BEAUDIN & LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia  V7Y 1B8

Sharon M. Urquhart

Email:  surquhart@ahbl.ca
Tel:    604.484.1757
Fax:    604.484.1957

Lawyers for Algo Communication Products Ltd.

AND TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Maurice Fleming

Email:    mfleming@millerthomson.com
Tel:       416.595.8686
Fax:       416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

AND TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:    bdarlington@davis.ca
Tel:       416.365.3529
Fax:       416.369.5210

Email:    jdavissydor@davis.ca
Tel:       416.941.5397
Fax:       416.365.7886

Lawyers for Brookfield LePage Johnson Controls
Facility Management Services

AND TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:    andrew.kent@mcmillan.ca
Tel:       416.865.7160
Fax:       416.865.7048

Email:    hilary.clarke@mcmillan.ca
Tel:       416.865.7286
Fax:       416.865.7048

Email:    tushara.weerasooriya@mcmillan.ca
Tel:       416.865.7262
Fax:       416.865.7048

Lawyers for Royal Bank of Canada

AND TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:    sgraff@airdberlis.com
Tel:       416.865.7726
Fax:       416.863.1515

Email:    iaversa@airdberlis.com
Tel:       416.865.3082
Fax:       416.863.1515

Lawyers for Perot Systems Corporation

| | |
|---|---|
| AND TO: | **McMILLAN LLP** |

AND
TO:    **McMILLAN LLP**
       Brookfield Place, Suite 4400
       181 Bay Street
       Toronto, Ontario  M5J 2T3

       Lawrence J. Crozier
       Adam C. Maerov

       Email:    lawrence.crozier@mcmillan.ca
       Tel:      416.865.7178
       Fax:      416.865.7048

       Email:    adam.maerov@mcmillan.ca
       Tel:      416.865.7285
       Fax:      416.865.7048

       Lawyers for Citibank

AND
TO:    **BLANEY McMURTRY LLP**
       Barristers and Solicitors
       1500 – 2 Queen Street East
       Toronto, Ontario  M5C 3G5

       Domenico Magisano

       Email:    dmagisano@blaney.com
       Tel:      416.593.2996
       Fax:      416.593.5437

       Lawyers for Expertech Network Installation Inc.

AND
TO:    **LANG MICHENER LLP**
       Brookfield Place
       Suite 2500, 181 Bay Street
       P.O. Box 747
       Toronto, Ontario  M5J 2T7

       Leslie Wittlin
       Aaron Rousseau

       Email:    lwittlin@langmichener.ca
       Tel:      416.307.4087
       Fax:      416.365.1719

       Email:    arousseau@langmichener.ca
       Tel:      416.307.4081
       Fax:      416.365.1719

       Lawyers for Right Management Inc.

AND
TO:    **CASSELS BROCK & BLACKWELL LLP**
       40 King Street West,
       Suite 2100
       Toronto, Ontario  M5H 3C2

       Deborah S. Grieve

       Email:    dgrieve@casselsbrock.com
       Tel:      416.860.5219
       Fax:      416.350.6923

       Lawyers for Alvarion Ltd.

AND
TO:    **GARDINER ROBERTS LLP**
       Suite 3100, Scotia Plaza
       40 King Street West
       Toronto, ON  M5H 3Y2

       Jonathan Wigley
       Vern W. DaRe

       Email:    jwigley@gardiner-roberts.com
       Tel:      416.865.6655
       Fax:      416.865.6636

       Email:    vdare@gardiner-roberts.com
       Tel:      416.865.6641
       Fax:      416.865.6636

       Lawyers for Amphenol Corporation

AND
TO:    **AIRD & BERLIS LLP**
       Barristers & Solicitors
       Brookfield Place, P.O. Box 754
       181 Bay Street, Suite 1800
       Toronto, Ontario  M5J 2T9

       Sanjeev P.R. Mitra
       Sandra A. Vitorovich

       Email:    smitra@airdberlis.com
                 svitorovich@airdberlis.com

       Tel:      416.863.1500
       Fax:      416.863.1515

       Lawyers for Enbridge Gas Distribution Inc.

- 10 -

17

AND TO: **NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Ainslie Benedict
Steven Levitt
Christopher Rootham

Email:  janice.payne@nelligan.ca
ainslie.benedict@nelligan.ca
steven.levitt@nelligan.ca
christopher.rootham@nelligan.ca

Tel:   613.231.8245
Fax:   613.788.3655

Lawyers for the Steering Committee of Recently
Severed Canadian Nortel Employees

AND TO: **CALEYWRAY**
Labour/Employment Lawyers
1600-65 Queen Street West
Toronto, Ontario  M5H 2M5

Gail E. Misra

Email:  misrag@caleywray.com

Tel:   416.775.4680
Fax:   416.366.3293

Lawyers for the Communication, Energy and
Paperworkers Union of Canada

AND TO: **COLBY, MONET DEMERS, DELAGE &**
**CREVIER LLP**
Tour McGill College
1501 McGill College Avenue
Suite 2900
Montreal, Quebec  H3A 3M8

David J. Dropsy

Email:  ddropsy@colby-monet.com
Tel:   514.284.3663
Fax:   514.284.1961

Lawyers for GFI INC., a division of Thomas &
Betts Manufacturing Inc.

AND TO: **CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, Ontario  M5H 3C2

E. Bruce Leonard
Harvey Garman
Michael Casey

Email:  bleonard@casselsbrock.com
hgarman@casselsbrock.com
mcasey@casselsbrock.com

Tel:   416.860.6455
Fax:   416.640.3054

Lawyers for the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

AND TO: **MCFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, Ontario  K2P 0A2

Paul K. Lepsoe

Email:  pklepsoe@mcfarlanelaw.com

Tel:   613.233.2679
Fax:   613.233.3774

Lawyers for Iron Mountain Canada Corporation
and Iron Mountain Information Management, Inc.

AND TO: **SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec  H9S 2A5

Dan Goldstein
Marco Gaggino

Email:  dgoldstein@schneidergaggino.com
mgaggino@schneidergaggino.com

Tel:   514.631.8787
Fax:   514.631.0220

Lawyers for the Teamsters Quebec Local 1999

- 11 -

18

| AND<br>TO: | **NELLIGAN O'BRIEN PAYNE LLP**<br>Barristers and Solicitors<br>50 O'Connor Street<br>Suite 1500<br>Ottawa, Ontario  K1P 6L2 | AND<br>TO: | **BAKER & McKENZIE LLP**<br>Brookfield Place, P.O. Box 874<br>181 Bay Street, Suite 2100<br>Toronto, Ontario  M5J 2T3 |

AND
TO:
**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email:   janice.payne@nelligan.ca
         steven.levitt@nelligan.ca
         christopher.rootham@nelligan.ca

Tel:     613.231.8245
Fax:     613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA
as at January 14, 2009

AND
TO:
**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Chris Besant
Lydia Salvi

Email:   chris.besant@bakernet.com

Tel:     416.865.2318
Fax:     416.863.6275

Email:   lydia.salvi@bakernet.com

Tel:     416.865.6944
Fax:     416.863.6275

Lawyers for Jabil Circuit Inc.

AND
TO:
**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario  M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:   ryanbellr@bennettjones.com
         laugesenm@bennettjones.com

Tel:     416.863.1200
Fax:     416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

AND
TO:
**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email:   theintzm@mccarthy.ca
Tel:     416.601.7627
Fax:     416.868.0673

Email:   jsirivar@mccarthy.ca
Tel:     416.601.7750
Fax:     416.868.0673

Lawyers for Frank Andrew Dunn

AND
TO:
**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, Ontario  M5H 4G2

Timothy R. Dunn

Email:   tdunn@mindengross.com
Tel:     416.369.4335
Fax:     416.864.9223

Lawyers for 2748355 Canada Inc.

AND
TO:
**EURODATA**
2574 Sheffield Road
Ottawa, Ontario  K1B 3V7

Nanci Shore

Email:   nanci@eurodata.ca
Tel:     613.745.0921
Fax:     613.745.1172

*19*

- 12 -

AND TO:    **BALDWIN LAW PROFESSIONAL**
           **CORPORATION**
           54 Victoria Avenue
           Belleville, Ontario K8N 5J2

           Ian W. Brady

           Email:   lbrady@baldwinlaw.ca
           Tel:     613.771.9991
           Fax:     613.771.9998

           Lawyers for Sydney Street Properties Corp.


AND TO:    **AIRD & BERLIS LLP**
           Barristers & Solicitors
           Brookfield Place, P.O. Box 754
           181 Bay Street, Suite 1800
           Toronto, ON  M5J 2T9

           Steven L. Graff
           Ian E. Aversa

           Email:   sgraff@airdberlis.com
           Tel:     416.865.7726
           Fax:     416.863.1515

           Email:   iaversa@airdberlis.com
           Tel:     416.865.3082
           Fax:     416.863.1515

           Lawyers for Huawei Technologies Co. Ltd.


AND TO:    **SHIBLEY RIGHTON LLP**
           Barristers and Solicitors
           250 University Avenue, Suite 700
           Toronto, Ontario M5H 3E5

           Arthur O. Jacques
           Thomas McRae

           Email:   arthur.jacques@shibleyrighton.com
           Tel:     416.214.5213
           Fax:     416.214.5413

           Email :  thomas.mcrae@shibleyrighton.com
           Tel :    416.214.5206
           Fax :    416.214.5400

           Co-Counsel for the Steering Committee of
           Nortel Canadian Continuing Employees – Post
           CCAA as at January 14, 2009


AND TO:    **AETL TESTING, INC.**
           130 Chaparral Court, Suite 250
           Anaheim, California 92808

           Cynthia R. Maher

           Email:   cynthia.maher@ntscorp.com
           Tel:     714.998.4351
           Fax:     714.998.7142

           Lawyers for AETL Testing, Inc.


AND TO:    **SHIBLEY RIGHTON LLP**
           Barristers and Solicitors
           250 University Avenue, Suite 700
           Toronto, Ontario M5H 3E5

           Arthur O. Jacques
           Thomas McRae

           Email:   arthur.jacques@shibleyrighton.com
           Tel:     416.214.5213
           Fax:     416.214.5413

           Email :  thomas.mcrae@shibleyrighton.com
           Tel :    416.214.5206
           Fax :    416.214.5400

           Lawyers for The Recently Severed Canadian
           Nortel Employees Committee


AND TO:    **LAVERY, DE BILLY, LLP**
           Barristers & Solicitors
           Suite 2400, 600 de la Gauchetière West
           Montreal, Quebec H3B 4L8

           Jean-Yves Simard

           Email :  jysimard@lavery.ca
           Tel :    514.871.1522
           Fax :    514.871.8977

           Lawyers for Texas Landlords to Nortel Networks
           Inc.

20

| | | | |
|---|---|---|---|
| AND TO: | **NATIONAL TECHNICAL SYSTEMS**<br>130 Chaparral Ct., Suite 250<br>Anaheim, California, U.S.A.<br>92808 | AND TO: | **GOWLING LAFLEUR HENDERSON LLP**<br>Suite 1600, First Canadian Place<br>100 King Street West<br>Toronto, ON  M5X 1G5 |

**NATIONAL TECHNICAL SYSTEMS**

Cynthia Maher

Email:  cynthia.maher@ntscorp.com
Tel:  714.998.4351

**GOWLING LAFLEUR HENDERSON LLP**

David F.W. Cohen

Email:  david.cohen@gowlings.com

Tel:  416.369.6667
Fax:  416.862.7661

Lawyers for General Electric Canada Equipment Finance G.P. and GE Capital Canada Leasing Services Inc.

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:  bdarlington@davis.ca
Tel:  416.365.3529
Fax:  416.369.5210

Email:  jdavissydor@davis.ca
Tel:  416.941.5397
Fax:  416.365.7886

Lawyers for Computershare Trust Company of Canada

**DAVIES WARD PHILLIPS & VINEBERG LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:  rschwill@dwpv.com
Tel:  416.863.0900
Fax:  416.863.0871

Email:  mgottlieb@dwpv.com
Tel:  416.863.0900
Fax:  416.863.0871

Lawyers for Nortel Networks UK Limited (In Administration)

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

E-mail:  tosullivan@counsel-toronto.com
Tel:  416.598.1744
Fax:  416.598.3730

Email:  slaubman@counsel-toronto.com
Tel:  416.598.1744
Fax:  416.598.3730

Lawyers for William A. Owens

**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Lydia Salvi

Email:  lydia.salvi@bakernet.com

Tel:  416.865.6944
Fax:  416.863.6275

Lawyers for Wipro Limited

21

- 14 -

AND TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Lawyers for the Current and Former Employees of
Nortel Networks Inc. who are or were Participants
in the Long-Term Investment Plan Sponsored by
Nortel Networks Inc.

AND TO:
**TORYS LLP**
79 Wellington Street West, Suite 3000
Box 270, TD Centre
Toronto, Ontario  M5K 1N2

Scott Bomhof

Email:   sbomhof@torys.com
Tel:      416.865.7370
Fax:     416.865.7380

Lawyers for Nokia Siemens Networks B.V.

AND TO:
**McCARTHY TETRAULT LLP**
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, Ontario  M5K 1E6

Heather Meredith

Email:   hmeredith@mccarthy.ca
Tel:      416.601.8342
Fax:     416.868.0673

Lawyers for Hitachi Communications
Technologies, Ltd.

AND TO:
**DEPARTMENT OF JUSTICE**
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario  M5X 1K6

Diane Winters

Email:   dwinters@justice.gc.ca
Tel:      416.973.3172
Fax:     416.973.0810

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Pamela Huff
Milly Chow
Hugh DesBrisay
Craig Thorburn

Email:  pamela.huff@blakes.com
Tel:    416.863.2958
Fax:    416.863.2653

Email:  milly.chow@blakes.com
Tel:    416.863.2594
Fax:    416.863.2653

Email:  hugh.desbrisay@blakes.com
Tel:    416.863.2426
Fax:    416.863.2653

Email:  craig.thorburn@blakes.com
Tel:    416.863.2965
Fax:    416.863.2653

Lawyers for MatlinPatterson Global Advisers LLC,
MatlinPatterson Global Opportunities Partners III
L.P. and MatlinPatterson Opportunities Partners
(Cayman) III L.P.

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Susan M. Grundy
Marc Flynn

Email:  susan.grundy@blakes.com
Tel:    416.863.2572
Fax:    416.863.2653

Email:  marc.flynn@blakes.com
Tel:    416.863.2685
Fax:    416.863.2653

Lawyers for Telefonaktiebolaget L M Ericsson
(publ)

AND
TO:

**LANG MICHENER LLP**
Brookfield Place
181 Bay Street, Suite 2500
Toronto, Ontario, M5J 2T7

Sheryl E. Seigel

Email:  sseigel@langmichener.ca
Tel:    416.307.4063
Fax:    416.365.1719

Lawyers for The Bank of New York Mellon

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Kevin P. McElcheran
Ryan Stabile

Email:  kmcelcheran@mccarthy.ca
Tel:    416.601.7730
Fax:    416.868.0673

Email:  rstabile@mccarthy.ca
Tel:    416.601.8335
Fax:    416.868.0673

Lawyers for Avaya Inc.

23

- 16 -

| | |
|---|---|
| AND TO: | **SACK GOLDBLATT MITCHELL LLP** |

AND TO:

**SACK GOLDBLATT MITCHELL LLP**
20 Dundas Street West
Suite 1100
Toronto, Ontario  M5G 2G8

James McDonald
Darrell Brown

Email:  jmcdonald@sgmlaw.com
Tel:     416.979.6425
Fax:     416.591.7333

Email:  dbrown@sgmlaw.com
Tel:     416.979.4050
Fax:     416.591.7333

Lawyers for Edmund Fitzgerald

AND TO:

**FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, Ontario  M5J 2Z9

Jeffrey K. Spiegelman

Email:  jspiegelman@foglers.com
Tel:     416.864.9700
Fax:     416.941.8852

Lawyers for Belden (Canada) Inc.

**COURTESY COPIES:**

AND
TO:    **LEWIS AND ROCA**
       40 North Central Avenue
       Phoenix, Arizona
       USA 85004-4429

       Scott K. Brown

       Email:   sbrown@lrlaw.com

       Tel:    602.262.5321
       Fax:    602.734.3866

       Lawyers for The Prudential Insurance
       Company of America

AND
TO:    **CURTIS, MALLET-PREVOST, COLT &**
       **MOSLE LLP**
       101 Park Avenue
       New York, New York 10178-0061

       Steven J. Reisman
       James V. Drew

       E-mail:  sreisman@curtis.com
                jdrew@curtis.com

       Tel:    212.696.6000
       Fax:    212-697-1559

       Lawyers for Flextronics International

AND
TO:    **AKIN GUMP STRAUSS HAUER &**
       **FELD LLP**
       One Bryant Park
       New York, NY 10036

       Fred S. Hodara
       Ryan C. Jacobs

       Email:   fhodara@akingump.com
                rjacobs@akingump.com

       Tel:    212.872.1000
       Fax:    212.872.1002

       U.S. Lawyers for the Official Committee of
       Unsecured Creditors

AND
TO:    **MILBANK, TWEED, HADLEY**
       **McCLOY LLP**
       1 Chase Manhattan Plaza
       New York, NY 10005

       Dennis F. Dunne
       Andrew M. Leblanc
       Albert A. Pisa

       Email:   DDunne@milbank.com
       Tel:    212.530.5770
       Fax:    212.530.5219

       Email:   ALeblanc@milbank.com
       Tel:    212.835.7574
       Fax:    212.530.5219

       Email:   APisa@milbank.com
       Tel:    212.530.5319
       Fax:    212.530.5219

       U.S. Lawyers for The Informal Nortel
       Noteholder Group

- 18 -

25

AND
TO:

**VEDDER PRICE P.C.**
1633 Broadway, 47th Floor
New York, New York 10019

Michael L. Schein

Email:   mschein@vedderprice.com

Tel:     212.407.6920
Fax:     212.407.7799

U.S. Lawyers for Telmar Network Technology,
Inc. and Precision Communication Services, Inc.

AND
TO:

**MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta  T2P 4H2

Andrew Robertson
Caylee M. Rieger

Email :   andrew.robertson@macleoddixon.com
          caylee.rieger@macleoddixon.com

Tel :    403.267.8222
Fax :    403.264.5973

Agent for Nelligan O'Brien Payne LLP, lawyers
for the Steering Committee of Recently Severed
Canadian Nortel Employees and lawyers for the
Steering Committee of Nortel Canadian
Continuing Employees – Post CCAA as at
January 14, 2009

AND
TO:

**BRYAN CAVE LLP**
161 North Clark Street, Suite 4300
Chicago, Illinois  60601

Eric S. Prezant

Email:   eric.prezant@bryancave.com
Tel:     312.602.5033
Fax:     312.602.5050

U.S. Lawyers for Tellabs, Inc.

26

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Applicants

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

Proceeding commenced at Toronto

NOTICE OF MOTION
(returnable October 15, 2009)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4
CANADA

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

**TAB 2**

*27*

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF GEORGE RIEDEL**
**(sworn October 9, 2009)**

I, George Riedel, of the city of Boston in the State of Massachusetts, MAKE OATH AND SAY:

1.    I am the Chief Strategy Officer of Nortel Networks Corporation ("NNC") and Nortel Networks Limited ("NNL") and have held those positions since February, 2006. As such, I have personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where I do not possess personal knowledge, I have stated the source of my information and, in all such cases, believe it to be true.

2.    I swear this Affidavit in support of the motion to approve, among other things, the bidding procedures and a "stalking horse" asset sale agreement dated as of October 7, 2009 (the "Sale Agreement") among NNC, NNL and Nortel Networks Inc. ("NNI") and certain of their affiliates, as vendors, certain other entities defined therein as Sellers (collectively, the "Sellers") and Ciena Corporation, as purchaser ("Ciena" or the "Purchaser"), in respect of the sale of certain of the Sellers' assets relating to the MEN Business (as such phrase is defined and described in further detail below) (the "Assets"). A copy of the Sale Agreement (without exhibits or schedules) is attached as an appendix to the twenty-fourth report (the "Twenty-Fourth Report") of the Monitor (as defined below) to be filed in connection with this motion.

- 2 -

References to "Nortel" herein are references to the global enterprise of NNC, NNL, NNI and their respective affiliates as a whole. In connection with entering into the Sale Agreement, certain Nortel entities in EMEA (defined below), as vendors (the "EMEA Sellers") and the Purchaser, as purchaser, entered into an asset sale agreement relating to the sale and purchase dated as of October 7, 2009 (the "EMEA Agreement" and together with the Sale Agreement, the "Purchase Agreements") in respect of the sale of certain of the assets of the EMEA Sellers relating to the MEN Business.

3.      All dollar references are US$ unless otherwise indicated.

**BACKGROUND**

4.      On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court and Ernst & Young Inc. was appointed as monitor (the "Monitor") in the CCAA proceedings.

5.      Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "Chapter 11 Debtors"), made voluntary filings in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

6.      Additionally, on January 15, 2009, Nortel Networks UK Limited ("NNUK") and certain subsidiaries of the Nortel group incorporated in Europe, the Middle East or Africa ("EMEA") each obtained an administration order for the appointment of administrators from the English High Court of Justice under the Insolvency Act 1986.

7.      On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

- 3 -

8.    On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months which period was subsequently extended. On October 1, 2009, the French Court approved an order to (i) suspend the liquidation operation relating to the sale of the assets and/or business of NNSA for a renewal period of two months; and (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French administrator and liquidator during that period except with respect to the sale of assets and/or businesses of NNSA. In accordance with the European Union's Counsel Regulation, the English law proceedings remain the main proceedings in respect of NNSA.

9.    On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

10.    On July 14, 2009, Nortel Networks (CALA) Inc. made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

11.    Further details regarding the background to these proceedings are set out in the affidavit of John Doolittle sworn January 14, 2009 (the "Initial Order Affidavit") previously filed in these proceedings and are therefore not repeated herein.

12.    The Applicants have previously obtained various relief related to the sale of certain other of their assets including:

   (a)    The sale of Nortel's Layer 4-7 Application Delivery Business, which sale closed on April 1, 2009;

   (b)    The sale of NNL's real property known as the "Westwinds Facility" in Alberta, which sale closed on June 16, 2009;

- 4 -

(c)     A sale process for the divestiture of NNL's interest in its joint venture with LG
        Electronics Inc., which process is still underway;

(d)     Bidding procedures and a stalking horse agreement entered into with Nokia
        Siemens Networks B.V. for the sale of certain of Nortel's CDMA and LTE
        related assets, which was subject to higher and better offers and which ultimately
        led to the approval of a sale agreement for the sale of such assets to
        Telefonaktiebolaget LM Ericsson (publ);

(e)     Bidding procedures and a stalking horse agreement entered into with Avaya Inc.
        ("Avaya") for the sale of Nortel's Enterprise Solutions business, which was
        subject to higher and better offers and subsequently led to the approval of an
        amended and restated sale agreement for the sale of that business to Avaya; and

(f)     A sales process order for the sale of Nortel's LTE packet core assets which
        process is underway.

13.    The Applicants have also brought a motion currently scheduled to be heard on the return
date of this motion for the approval of a sale process for its GSM and GSM-R business.

**THE TRANSACTION**

14.    Capitalized terms used in this section of my Affidavit not otherwise defined herein shall
have the meanings given to them in the Sale Agreement.

*The MEN Business*

15.    Nortel's Metro Ethernet Networks business (the "MEN Business") includes optical
networking, carrier Ethernet switching and multiservice switching products, delivering carrier-
grade Ethernet transport capabilities for higher performance and lower cost for emerging video-
intensive applications.

16.    The MEN Business's optical networking portfolio includes the 40G Adaptive Optical
Engine technology, which can quadruple network capacity while being deployable over any
fiber, allowing service providers to reduce engineering and equipment expense and upgrade

quickly and cost-effectively from 10G to 40G. The MEN Business also is in the process of developing the industry's first optical technology that can deliver both 40G and 100G network capacity, enabling four times the network throughput immediately, while providing the foundation to simply and affordably increase capacity tenfold as required.

17.     Nortel's principal competitors in the global optical market are large communications companies such as Alcatel-Lucent, Huawei Technologies Co., Ltd., Nokia Siemens Networks B.V., Fujitsu Limited, Ericsson and Cisco Systems, Inc., as well as others that address specific niches within this market, such as Ciena, ADVA AG Optical Networking, Meiningen, Tellabs, Inc. and Infinera Corporation.

18.     The environment in which Nortel operates is highly competitive, the competition for market share is fierce, and the cost of rapid technological development is steep. Furthermore, the scale requirements to compete in this industry are substantial. Due to the global economic downturn, Nortel is experiencing significant pressure on its businesses and facing competing demands on its cash resources, globally as well as on a regional basis, as customers across all businesses suspend, delay and reduce capital expenditures. The extreme volatility in the financial, foreign exchange and credit markets globally and the uncertainty created by the ongoing creditor protection proceedings has compounded the situation.

19.     Even before the commencement of the CCAA proceedings, it had become clear that in order to reduce operating costs during a time of decreased customer spending and global economic uncertainty, Nortel would need to consider strategic divestiture as a way to conserve liquidity and consolidate its position with respect to its remaining businesses. Accordingly, Nortel had begun the process of marketing the Assets for sale before the decision was made to commence proceedings under the CCAA.

*Previous Marketing Efforts*

20.     Nortel first announced its intention to explore a divestiture of the MEN Business in September 2008. With a strong customer base and industry-leading technology breakthroughs such as 40G/100G optical networking, the MEN Business was considered a premium asset with a highly differentiated offering, making it attractive to potential purchasers.

- 6 -

21.     In connection with this initial effort, Nortel, in consultation with its financial advisors, approached approximately fifty (50) parties likely to be interested and able to acquire the MEN Business, including a mix of financial investors and strategic buyers.     An information memorandum was provided to the twenty-one (21) parties who had executed confidentiality agreements.     Of those parties who subsequently submitted expressions of interest, Nortel conducted management presentations with the entities it deemed able to consummate a transaction for the MEN Business, and ultimately gave five (5) companies access to an electronic data room containing confidential diligence materials regarding the MEN Business.

22.     As of the Filing Date, Nortel was in serious discussions with three (3) potential bidders, including Ciena.  The commencement of CCAA proceedings forced Nortel to put its plans to divest the MEN Business on hold in order to evaluate the future of the company as a whole.

23.     After the commencement of the proceedings, the Applicants reinitiated their efforts to divest the MEN Business, re-canvassing many of the entities originally contacted in connection with the previous sale, plus five (5) additional parties.  As a result of these efforts, thirteen (13) parties expressed interest in purchasing the assets, executed confidentiality agreements and were provided confidential information memoranda.     All thirteen (13) were given access to the electronic data room, and management presentations were conducted with seven (7) entities.

24.     I am aware that the Twenty-Fourth Report will also include information regarding Nortel's sale efforts in this regard.

*The Sale Agreement*

25.     After extensive arms'-length, good faith negotiations among the Sellers, the EMEA Sellers and the Purchaser and their respective advisors, the Sellers and the EMEA Sellers have agreed, among other things, to convey the Assets to the Purchaser or certain other purchasers designated by the Purchaser all in accordance with the terms and conditions of the Purchase Agreements, subject to the approval of the transaction in a number of the jurisdictions in which the Sellers and EMEA Sellers are subject to insolvency proceedings.

26.     The Sale Agreement contemplates the sale of the Assets, subject to higher and/or better bids, on the following material terms:

- 7 -

(a)     *Purchase Price.*  At the Closing, the Purchaser will pay to the Sellers and the EMEA Sellers, through their Distribution Agent, an estimated purchase price of US$390 million in cash plus 10,000,000 shares of Ciena common stock (the "Shares"), subject to certain escrows and net working capital adjustments, among other adjustments. The Purchase Price may also be reduced if the assets of any EMEA Seller under the EMEA Agreement are excluded in certain circumstances, or if certain provisions of the Transition Services Agreement (as described below) are not met by the Closing Date.

(b)     *Certain Fees.*  In certain circumstances the Sellers and the EMEA Sellers may be required to pay to the Purchaser a Break-Up Fee and an Expense Reimbursement, which is discussed in further detail below.

(c)     *Assets.*  The Assets to be acquired by the Purchaser include, among other things, certain (i) inventory and supplies, (ii) equipment, (iii) contracts, (iv) business information, (v) intellectual property (including claims against third parties for past, present or future infringement), (vi) rights under warranties, representations and guarantees by suppliers, manufacturers and contractors related to the Assets, (vii) governmental consents, (viii) employee records, (ix) tax records required by law to be transferred, and (x) account receivables related to contracts in progress. The assets to be acquired by the Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable (excluding receivables related to contracts in progress), bank account balances and petty cash, certain assets and rights (for example, the right to tax refunds, credits, or similar benefits, and rights under certain contracts (other than Assigned Contracts)) relating to the pre-closing period, and security deposits.

(d)     *Assigned Contracts.*   The Sellers agree to assign certain Seller Contracts, including supplier and customer contracts, to the Purchaser, and to cooperate with the Purchaser to assist in the transition of Bundled Contracts to the Purchaser as they relate to the Business. The Purchaser and the Sellers agree under certain conditions to share certain of the Cure Costs associated with such assignments and transition.

- 8 -

(e) *Assumed Liabilities.* The liabilities to be assumed by the Purchaser include, among others, (i) liabilities arising after the Closing Date to the extent related to the operation of the MEN Business by the Purchaser following the Closing, (ii) liabilities arising from the performance of Assigned Contracts after the Closing Date, (iii) certain liabilities relating to transferred intellectual property, (iv) certain tax liabilities, (v) certain warranty liabilities and (vi) certain liabilities related to employees and employee benefit plans and under employment laws.

(f) *Sale Free and Clear.* The Assets to be transferred by the Sellers will be transferred free and clear of all liens, claims and encumbrances, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the Sale Agreement.

(g) *Ancillary Agreements.* Pursuant to the Sale Agreement, at Closing, certain Sellers, certain EMEA Sellers and the Purchaser will enter into, among others, the following ancillary agreements:

    (i) *Transition Services Agreement.* At the Closing, NNL, NNC, NNI, NNUK, Nortel Networks (Ireland) Limited, certain of their affiliates and the Purchaser will enter into one or more agreements under which NNL, NNC, NNI, NNUK, Nortel Networks (Ireland) Limited and their affiliates will agree to provide to the Purchaser and its affiliates certain information technology, business transition and related services, commencing at the Closing and continuing for a period not to exceed two (2) years.

    (ii) *Intellectual Property License Agreement.* At the Closing, NNL and the Purchaser will enter into an intellectual property license agreement (the "IPLA") pursuant to which (i) NNL will grant to the Purchaser and its affiliates a non-exclusive license to certain intellectual property necessary for the commercialization of the products and the provision of services, as well as an exclusive license to certain of the intellectual property to commercialize products and provide services within an exclusive field of use, and (ii) NNL and its affiliates will receive a license back to all

-9-

intellectual property included in the Assets for use in their other businesses. The IPLA will remain in force for so long as any intellectual property rights licensed thereunder continue to exist.

(iii)    *Trademark License Agreement.* At the Closing, NNL and the Purchaser will enter into a license agreement allowing the Purchaser and its affiliates to use "Nortel" trademarks and logo in its sales of the Products for a limited period after the Closing.

(iv)    *Loaned Employee Agreement.* At the Closing, Nortel and the Purchaser will enter into an agreement under which certain employees of Nortel and its affiliates will be seconded to the Purchaser to perform services for the Purchaser for a 90-day period beginning on the Closing Date. Nortel will continue to pay all employment costs in respect of the Loaned Employees that relate to the period of the Loaned Employee Agreement, and the Purchaser will provide for the payment of, or if not paid pursuant to the pre-funding mechanism in the Loaned Employee Agreement, promptly reimburse Nortel for, all such employment costs.

(v)    *Carling Property Lease Agreements.* At the Closing, Nortel Networks Technology Corporation ("NNTC") and the Purchaser (or an affiliate) will enter into lease agreements pursuant to which NNTC, as landlord, will lease to the Purchaser (or an affiliate) the whole of the Lab 10 building and certain parts of the Lab 2 building of the Carling Property located at 3500 Carling Avenue, Ottawa, Ontario, Canada. Additionally, at the Closing, the parties (or their relevant affiliates) will enter into non-disturbance agreements with NNI, which is an existing mortgagee of the Carling Property.

(vi)    *Real Estate Terms and Conditions.* At the Closing, the Sellers and the Purchaser will finalize the general terms to which the parties agree, which will govern the applicable leases, subleases or license agreements in respect of certain real property which the Sellers will lease, sublease, assign or license to the Purchaser (or an affiliate) from and after Closing.

36

- 10 -

    (vii)    *Contract Manufacturing Inventory Agreement.* At the Closing, certain of the Sellers and the Purchaser (or its affiliates) will enter into 3-way agreements with certain contract manufacturers of the MEN Business, pursuant to which the Sellers and the Purchaser (or its affiliates, as applicable) will allocate certain inventory buy back obligations as between themselves.

(h)    *Restrictions on Solicitation of Competing Bids.* As set forth in section 5.29 of the Sale Agreement and subject to the terms and limitations therein, the Sale Agreement prohibits the Sellers from soliciting competing transactions or seeking relief inconsistent with the Sale Agreement from the date of execution of the Sale Agreement until the entry of the U.S. Bidding Procedures Order, and from the date of the conclusion of the Auction until the Closing Date or termination of the Sale Agreement.

(i)    *Closing Conditions*: In addition to certain other customary closing conditions, including conditions relating to bankruptcy court approvals, the obligation of the Purchaser to close the sale is subject to the satisfaction of the following conditions: (i) the Sellers' delivery to the Purchaser of its Audited Financial Statements and the Unaudited September 30, 2008 Financial Statements pursuant to the Sale Agreement at least five (5) days prior to the Closing Date, and (ii) the performance in all material respects of all material covenants, obligations and agreements required to be performed by the Sellers on or before the Closing.

(j)    *Ongoing Covenants and Restrictions*: In addition to certain other customary post-closing obligations such as information-sharing and redirection of customers and payments, the Sellers have agreed to cooperate with the Purchaser for an agreed period after Closing in relation to arrangements regarding (i) Bundled Contracts, (ii) Assets which were not transferred at Closing due to bankruptcy proceedings commenced in other jurisdictions following execution of the Sale Agreement and (iii) Contracts for which required consents were not obtained prior to Closing.

(k)    *Post-Closing Access to Books and Records.* For three (3) years after the Closing (or such longer period as may be required under applicable law in the case of tax

- 11 -

records), NNC, NNL, NNI and the Purchaser (each, a "Primary Party") must preserve pre-closing records to the extent related to the MEN Business. After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable request from any Primary Party, the other Primary Party shall, and/or shall cause the person holding such records to provide to the requesting Primary Party or its representatives reasonable access to such records during normal business hours and permit the requesting Primary Party or its representatives to make copies of such records, in each case at no cost to the requesting Primary Party or its representatives (other than for reasonable out-of-pocket expenses). The Sale Agreement contains further provisions related to tax and audit-related financial records and information.

*Employees*

27.    As part of the Sale Agreement, the Purchaser has agreed to make offers to at least 2,000 Nortel employees associated with the MEN Business. The Sale Agreement provides that the Purchaser shall be entitled to make offers of employment to such employees after the granting of the U.S. Sale Order and the Canadian Approval and Vesting Order.

*Break Up Fee and Expense Reimbursement*

28.    The Purchaser and its advisors have expended, and expect to continue to expend, considerable time, energy, and resources pursuing the purchase of the Assets and have engaged in extended good faith negotiations. The Purchase Agreements are the culmination of these efforts.

29.    In recognition of this expenditure of time, energy, and resources, the Sellers and the EMEA Sellers have agreed that if the Purchaser is not the Successful Bidder, the Sellers and the EMEA Sellers will, to the extent due under section 10.2 of the Sale Agreement and section 15.5 of the EMEA Agreement, pay the Purchaser: (i) an aggregate fee of sixteen million forty-four thousand dollars and 00/100 (US$16,044,000), which is equal to approximately three percent

- 12 -

(3%) of the aggregate Purchase Price,[1] prior to any closing adjustments, as set forth in section 2.2.1 of the Sale Agreement (the "Break-Up Fee") and (ii) an amount in cash equal to the total amount of all reasonable and documented fees, costs and expenses incurred by the Purchaser in connection with the preparation, performance and execution of the Sale Agreement and EMEA Agreement and the transactions contemplated thereby, including all filing and notification fees and all fees and expenses of the Purchaser's representatives, in an amount not to exceed five million three hundred forty-eight thousand dollars and 00/100 (US$5,348,000), which is equal to approximately one percent (1%) of the aggregate Purchase Price, prior to any closing adjustments (the "Expense Reimbursement" and, together with the Break-Up Fee, to the extent payable by the Sellers, the "Bid Protections"), which shall be payable as provided for pursuant to the terms of the Sale Agreement. Under the Sale Agreement, two-thirds of the aggregate Bid Protections will be payable by the Sellers, including the Debtors that are Sellers, and the remaining one-third will be payable by the EMEA Sellers under the EMEA Agreement.

30.     I believe, based on my discussions with the Monitor, that the Twenty-Fourth Report will be providing more detail as to the circumstances in which the Bid Protections are payable.

31.     The Sellers have further agreed that their obligation to pay the Break-Up Fee and Expense Reimbursement shall survive termination of the Purchase Agreements.

*The Sale and Bid Process*

32.     In connection with having entered into the Purchase Agreements and subject to approvals by the U.S. Court and this Honourable Court, Nortel will conduct an auction process for the sale of the Assets to ensure that the Sellers receive the maximum value for the Assets and the Sellers and the Purchaser have agreed that the Sale Agreement is subject to higher or better offers. It is anticipated that if the US Bidding Procedures Order and the Canadian Sales Process Orders are granted, Nortel will conduct an expedited sale process and follow the Bidding Procedures (as defined below) with a view to the ultimate conduct of an auction.

---

[1]     For purposes of calculating the amount of the Bid Protections, the Shares are valued based on the 10-day weighted average trading price for the 10 days prior to the date on which the Stalking Horse Agreement was executed.

- 13 -

33.    An agreed upon set of bidding procedures (the "Bidding Procedures") have been developed, which provide for a process through which an interested party may become a "Qualified Bidder". Bids from Qualified Bidders must be submitted no later than **4:00 p.m. (ET) on November 9, 2009.** The auction is scheduled to take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York City at **9:30 a.m. (ET) on November 13, 2009.**

34.    I am aware that the Twenty-Fourth Report will attach and outline the proposed sale process and the Bidding Procedures in more detail. I have reviewed the Bidding Procedures and believe them to be fair in the circumstances.

*Montreal Letter of Intent*

35.    The Applicants currently lease space at a facility near Montreal located at 2351 Alfred-Nobel Blvd., Saint-Laurent, Quebec (the "Building") pursuant to a lease dated as of June 27, 2007 (as amended, the "Montreal Lease"). Pursuant to the Montreal Lease, NNL leases the 3rd and 4th floors of the Building (the "Montreal Premises") and the lease term is currently set to expire on June 30, 2012. These premises are used by the Applicants in the conduct of the MEN Business.

36.    Although the Montreal Lease currently provides the for the lease of the entire 3rd and 4th floors of the Building, due to employee and business reductions both before and since the filing, the portion of the Montreal Premises that are being used by the Applicants in connection with the MEN Business do not require the full space. Further, the Purchaser has advised that it is only interested in leasing the 3rd floor of the Montreal Premises provided the MEN Business is consolidated onto such 3rd floor space.

37.    In connection the Sale Agreement and in order to facilitate the transaction, NNL entered into discussions with the landlord for the Montreal Lease in order to discuss the terms on which the Purchaser would lease or occupy the Montreal Premises for a period of time post closing. As a result of those negotiations, NNL and the landlord agreed to the terms of a letter of intent dated as of October 1, 2009 (the "Montreal LOI"), which provide, among other things, the following:

    (a)    an extension of the term of the Montreal Lease for the 3rd floor premises to June 30, 2014; and a reduction of the term of the 4th floor premises for a period of nine (9) months from the date of the Montreal LOI;

- 14 -

(b)     an agreement that NNL may assign the Montreal Lease to the Purchaser or such other listed purchasers or any other purchasers of the MEN Business provided that certain financial tests are met;

(c)     a provision that upon the assignment of the Montreal Lease, the 4th floor premises shall be subleased from the Purchaser or such other listed purchaser to NNL for the remainder of the term for the 4th floor premises, but that any default by Nortel under such sublease shall not affect the rights of occupancy of the Purchaser or other listed purchaser in respect of the 3rd floor premises so long as the Purchaser or other listed purchasers performs its obligations under the Montreal Lease, as amended by the Montreal LOI;

(d)     agreement that in the event that the sale of the MEN Business is not closed by May 31, 2010, the consent to assignment set out in the Montreal LOI shall expire, the term of the Montreal Lease shall revert to June 30, 2012, and NNL shall pay a penalty of CDN$500,000 plus applicable taxes; and

(e)     agreement that NNL will not repudiate the Montreal Lease (as amended by the Montreal LOI).

A redacted copy of the Montreal LOI will be attached to the Twenty-Fourth Report.

38.     The Montreal LOI also provides that on 90 days notice to NNL, the landlord may require that half or all of the 4th floor premises be surrendered to the landlord in which case NNL's required consolidation of the MEN Business operations onto the 3rd floor premises may be accelerated.

39.     In addition to the foregoing, the Montreal LOI provides that, in the event that the Purchaser or other listed purchaser gives notice, or is deemed to have given notice that it does not wish to take an assignment of the Montreal Lease, NNL shall have a right to surrender the 3rd floor premises on June 30, 2010 and, in that event, NNL shall be obligated to pay a surrender penalty of CDN$2,931,000 ("Montreal Surrender Penalty") to the landlord. Under the terms of the Sale Agreement, the Montreal Lease, as amended by the Montreal LOI will either be assigned pursuant to the Sale Agreement by NNL to the Purchaser, or the Purchaser shall be

- 15 -

obliged to pay the Montreal Surrender Penalty pursuant to Section 2.3.2(e)(v) of the Sale Agreement.

40.     The Montreal LOI is conditional upon, among other things, approval of this Court on or before October 19, 2009.

41.     The Montreal LOI was entered into as a result of extensive negotiations with the landlord of the Montreal Premises and to accommodate the terms of the Sale Agreement. I believe that the Montreal LOI and the amendments to the Montreal Lease therein are fair and reasonable in the circumstances, and provide for flexibility to the Purchaser or any other listed purchaser to decline the assumption of the Montreal Lease upon payment of the Montreal Surrender Penalty.

*Sealing*

42.     I am aware that the Monitor has or will be filing confidential appendices to the Twenty-Fourth Report which contain the disclosure schedules and exhibits to the Sale Agreement as well as an unredacted copy of the Montreal LOI. The disclosure schedules and exhibits contain sensitive competitive and, in some instances, personal information. The redactions from the Montreal LOI contain a list of parties to which the Montreal Premises landlord agrees to consent and which, if disclosed, may have other implications in the sale process generally.

43.     I believe sealing this confidential appendices are appropriate in the circumstances.

**CONCLUSION**

44.     I believe that the Sale Agreement is the product of a vigorous, comprehensive and fair process. The proposed auction sale process for the MEN Business, based on the Sale Agreement as a stalking horse bid, is the best way to preserve the business as a going concern and to maximize value and preserve jobs for the Applicants' employees.

45.     Based on the Applicants' previous consideration of potential transactions involving the MEN Business and after re-canvassing the marketplace since the commencement of these proceedings, I believe that the proposed transaction with the Purchaser represents the highest and best proposal available for the MEN Business, subject to the receipt of a better bid through the auction process contemplated in this motion.

42

- 16 -

46.    The Sale Agreement requires an expeditious sale process and provides the Purchaser the right to terminate the Sale Agreement if certain milestones in the sale process are not timely met. For these reasons, the expeditious sale of the Assets is critical to the maximization of the value of the Applicants' assets and, in turn, to a recovery for the Applicants' estates.

47.    Further, the Montreal LOI will facilitate the MEN Business transaction with the Purchaser and is fair and reasonable in the circumstances.

SWORN BEFORE ME at the City of Boston, in the State of Massachusetts on this 9th day of October, 2009.

_____
Commissioner for Taking Affidavits or Notary Public

Rita Loffa
My Commission, Ex:
11/09/2012

_____
George Riedel

43

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**AFFIDAVIT OF GEORGE RIEDEL**
(sworn October 9, 2009)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

DOCSTOR: 1786110\3

**TAB 3**

44

Court File No.: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| THE HONOURABLE MR. | ) | THURSDAY, THE 15TH |
|---|---|---|
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF OCTOBER, 2009 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**ORDER**
(Metro Ethernet Networks Business Bidding Procedures Order)

**THIS MOTION,** made by Nortel Networks Corporation ("NNC"), Nortel Networks
Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global
Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for
the relief set out in the Applicants' notice of motion dated October 9, 2009 was heard this day at
393 University Avenue, Toronto, Ontario.



- 2 -

ON READING the affidavit of George Riedel sworn October 9, 2009 (the "Riedel Affidavit") and the twenty-fourth report of Ernst & Young Inc. dated October ●, 2009 (the "Twenty-Fourth Report") in its capacity as monitor (the "Monitor") and on hearing submissions of counsel for the Applicants, the Monitor and those other parties present, no one appearing for any other person on the service list, although served as appears from the Affidavit of Service of Katie Legree sworn October 9, 2009, filed.

1.      THIS COURT ORDERS that the time for the service of the Notice of Motion, the Twenty-Fourth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      THIS COURT ORDERS that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Riedel Affidavit.

3.      THIS COURT ORDERS that the bidding procedures (the "Bidding Procedures") described in the Riedel Affidavit, the Twenty-Fourth Report and attached as Schedule "A" hereto are hereby approved and, subject to approval of the Bidding Procedures substantially in the same form by the United States Bankruptcy Court for the District of Delaware in the Chapter 11 Proceedings of the Chapter 11 Debtors, the Applicants shall be authorized to conduct the sale process and auction (the "Stalking Horse Process") contemplated therein.

4.      THIS COURT ORDERS that the asset sale agreement dated as of October 7, 2009 (the "Stalking Horse Agreement") among NNC, NNL, Nortel Networks Inc. (collectively the "Main Sellers") and the affiliates of the Main Sellers identified in the Sale Agreement as Other Sellers, as sellers and Ciena Corporation, as purchaser (the "Purchaser") attached as Appendix ● to the Twenty-Fourth Report be and is hereby approved and the execution, delivery and performance of

- 3 -

the Stalking Horse Agreement is hereby approved and accepted for the purposes of conducting the Stalking Horse Process including, without limitation payment of the Break-Up Fee and the Expense Reimbursement by NNC and NNL in accordance with the terms specified in the Stalking Horse Agreement.

5.    **THIS COURT ORDERS** that in connection with the Stalking Horse Process and pursuant to clause 7(3)(c) of the Canada *Personal Information Protection and Electronic Documents Act*, the Applicants shall disclose personal information of identifiable individuals to prospective purchasers or bidders for the assets to be sold pursuant to the Stalking Horse Process and to their advisors, but only to the extent desirable or required to negotiate and attempt to complete one or more sales of the Business (each, a "Sale"). Each prospective purchaser or bidder to whom such personal information is disclosed shall maintain and protect the privacy of such information and limit the use of such information to its evaluation of the Sale, and if it does not complete a Sale, shall return all such information to the Applicants, or in the alternative destroy all such information. The purchaser of any assets associated with the Business shall be entitled to continue to use the personal information provided to it, and related to the Business, in a manner which is in all material respects identical to the prior use of such information by the Applicants, and shall return all other personal information to the Applicants, or ensure that all other personal information is destroyed.

6.    **THIS COURT ORDERS** that the letter of intent dated as of October 1, 2009 entered into between NNL and BREOF/Belmont Ban G.P. Limited, general partner of BREOF/Belmont Ban L.P. in respect of certain premises located at 2351 Alfred-Nobel Blvd., Saint-Laurent, Quebec and attached as Appendix ● to the Twenty-Fourth Report be and is hereby approved and NNL is hereby authorized and directed to comply with its obligations and covenants thereunder.



- 4 -

7.    **THIS COURT ORDERS** that the confidential appendices to the Twenty-Fourth Report be and are hereby sealed pending further order of this Court.

8.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

9.    **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

48

## Schedule "A" – Bidding Procedures

**Attached.**

Schedule "A"

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "<u>Bidding Procedures</u>") to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities as set forth in the Agreements (as defined below) with respect to the Purchaser, or, as set forth in the relevant sale agreement with respect to a Successful Bidder (as defined below). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreements (as defined below).

On [●], 2009, Nortel Networks Inc. and certain of its U.S. subsidiaries that are debtors and debtors-in-possession (collectively, the "<u>U.S. Debtors</u>") as well as Nortel Networks Limited and certain other affiliates of the U.S. Debtors that have commenced proceedings under the Canadian Companies' Creditors Arrangement Act (the "<u>Canadian Debtors</u>"), and certain non-debtor affiliates of the U.S. Debtors and the Canadian Debtors (together with the U.S. Debtors and the Canadian Debtors, the "<u>North American Sellers</u>") executed that certain Asset Sale Agreement (the "<u>North American Agreement</u>") with [●] (together with any of its designees, the "<u>Purchaser</u>").

On [●], 2009, certain affiliates of the North American Sellers (the "<u>EMEA Sellers</u>" and together with the North American Sellers, the "<u>Sellers</u>"), certain of which are under the control of Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP, in their capacities as the joint administrators of certain EMEA Sellers' companies incorporated in the Europe, Middle East and Africa region appointed by the English High Court of Justice in connection with the proceedings (the "<u>UK Proceedings</u>") under the Insolvency Act 1986 (such individuals collectively, the "<u>Administrators</u>"), and the Administrators executed that certain Asset Sale Agreement Relating to the Sale and Purchase of the EMEA Assets with the Purchaser (the "<u>EMEA Agreement</u>" and together with the North American Agreement, the "<u>Agreements</u>").

The Sellers have determined that: (A) the transactions contemplated by the Agreements and the ancillary agreements discussed therein with respect to the Purchaser, or, as set forth in the relevant sale agreement and ancillary agreements with respect to a Successful Bidder (collectively, the "<u>Transaction</u>") should be subject to competitive bidding as set forth herein; (B) the transfer of the U.S. Debtors' rights, title and interests in and to the Assets (as defined below) should be subject to approval by the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "<u>Bankruptcy Code</u>"); (C) the transfer of the rights, title and interests of the Canadian Debtors (as such term is defined in the North American Agreement) in and to the Assets should be subject to approval by the Ontario Superior Court of Justice (the "<u>Canadian Court</u>"); and (D) the Transaction shall be submitted for approval by such other applicable court(s) as the Sellers, in consultation with the Committee (as defined below), the Bondholder Group (as defined below) and the Monitor (as defined below), may determine are necessary or appropriate and subject to such other closing conditions as are set forth in the Agreements.

On [●], 2009, the U.S. Debtors filed a Motion for Orders (I)(A) Authorizing Debtors' Entry into the Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D) Approving

1



the Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Metro Ethernet Networks Business Free and Clear of All Liens, Claims and Encumbrances, (B) The Assumption and Assignment of Certain Contracts and (C) the Assumption and Sublease of Certain Leases (the "Sale Motion").

On [●], 2009, the Bankruptcy Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Bidding Procedures Order").

On [●], 2009, the Canadian Debtors filed a motion with the Canadian Court seeking an order for approval of (I) execution and delivery of the North American Agreement by the Canadian Debtors, (II) payment of the Break-Up Fee and Expense Reimbursement in the circumstances provided for in the North American Agreement, and (III) a process for the Sale of the Canadian Debtors' rights, title and interests in and to the Assets (as defined below).

On [●], 2009, the Canadian Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Canadian Sales Process Order").

## Bidding Process

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's and the Canadian Court's and, if required, such other applicable courts' approval thereof (collectively, the "Bidding Process"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., et al. (jointly administered under Case No. 09-10138) involving the U.S. Debtors (the "Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor"), the Administrators in connection with the UK Proceedings, and their respective advisors throughout the Bidding Process. In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, the Canadian Court and the Bankruptcy Court will have jurisdiction to hear and resolve such dispute. [1]

---

[1] For the avoidance of doubt, this Bidding Process shall not govern any disagreements among the Sellers.

6\

### Assets To Be Sold

The Sellers are offering for sale, in one or more transactions, certain of the Sellers' assets pertaining to the business segment described in the Agreements (to the extent that such assets are not subsequently excluded from the sale in accordance with the terms of the Agreements) with respect to the Purchaser, or, as set forth in the relevant sale or restructuring agreement with respect to a Successful Bidder, and related schedules and in an information memorandum made available by the Sellers to the Purchaser and other potential bidders, which will also be made available to other potential bidders that have executed a confidentiality agreement with the Sellers (the "Assets").

### "As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except, with respect to the Purchaser, to the extent set forth in the Agreements or, with respect to a Successful Bidder (as defined below), to the extent set forth in the relevant sale agreement of such Successful Bidder. In addition, in the case of the EMEA Sellers, the sale of whatever rights, title and interests that such EMEA Seller may have (if any) in and to the Assets will be without any representations or warranties (except as may be set forth in the EMEA Agreement).

### Free Of Any And All Claims And Interests

All of the rights, title and interests of the U.S. Debtors and the Canadian Debtors in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests") to the extent permitted by sections 363 and 365 of the Bankruptcy Code and other applicable law, such Claims and Interests to attach to the net proceeds of the sale of such Assets (without prejudice to any claims or causes of action regarding the priority, validity or enforceability thereof), except, with respect to the Purchaser, to the extent otherwise set forth in the North American Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant sale agreement of such Successful Bidder with the U.S. Debtors and the Canadian Debtors.

### Publication Notice

Within three (3) Business Days, or as soon thereafter as reasonably practicable after the entry of orders by the Bankruptcy Court and the Canadian Court approving these Bidding Procedures, the Sellers shall publish notice of these Bidding Procedures, the time and place of the Auction (as defined below), if required, the time and place of the Sale Hearing (as defined below), and the objection deadline for the Sale Hearing in The Financial Times (National Edition), The Wall Street Journal (National Edition) and The Globe & Mail (National Edition).

## Participation Requirements

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court and accepted by the Administrators, for cause shown, or as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), in order to participate in the Bidding Process, prior to the Bid Deadline (as defined below), each person other than the Purchaser who wishes to participate in the Bidding Process (a "Potential Bidder") must deliver to the Notice Parties (as defined below) at the addresses provided below:

(a)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in substantially the same form as the confidentiality agreement executed by the Purchaser and otherwise in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of the Assets.  In the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement agreeing that such agreement shall be deemed to be amended so as to be in substantially the same form as the confidentiality agreement executed by the Purchaser and that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets;

(b)    current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transaction; and

(c)    a preliminary (non-binding) written proposal regarding:  (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Agreements.

4

A Potential Bidder that delivers the documents described above, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence as provided in the following paragraph with respect to the Assets.

## Due Diligence

The Sellers may in their reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a confidentiality agreement with the Sellers such due diligence access to materials and information relating to the Assets as the Sellers deem appropriate after consultation with the Committee, the Bondholder Group and the Monitor. Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their reasonable business judgment, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. No additional due diligence for any party other than a Qualified Bidder who has submitted a Qualified Bid will continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. In any event, the Purchaser shall be provided prompt access to all material due diligence materials, management presentations, on-site inspections and other information provided to Qualified Bidders that were not previously made available to the Purchaser. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Agreements or any other definitive sale agreement with any Successful Bidder executed and delivered by Sellers.

## Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel



Networks Inc., c/o Nortel Networks Limited, Attn: Anna Ventresca, Esq., (905) 863-2564, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905) 863-1984; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (v) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vi) financial advisor to the Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (vii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; (viii) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; and (ix) the Administrators: Ernst & Young LLP, Attn: Stephen Harris, 1 More Place, London SE1 2AF, United Kingdom, Facsimile +44 20 7951 9002; and (x) counsel to the Administrators: Herbert Smith LLP, Attn: Stephen Gale, Exchange House, Primrose Street, London, EC2A 2HS, Facsimile: +44 20 7098 4878; so as to be received not later than November 9, 2009 at 4:00 p.m. (ET) by the Sellers (as may be extended as set out below, the "Bid Deadline"). The Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so; provided, however, that for any such extension beyond five (5) Business Days, the Sellers shall have obtained the prior written consent of the Purchaser, the Committee, the Bondholder Group and the Monitor, in their respective sole discretion. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders (including the Purchaser) and the parties listed above of such extension.

### Qualified Bid

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(a)    it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Agreements, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure (including without limitation, an offer conditioned upon confirmation of a plan of reorganization proposed by the U.S. Debtors either individually or in collaboration with such Qualified Bidder), or upon alternative terms and conditions that the Sellers reasonably determine, after consultation with the Committee, the Bondholders Committee and the Monitor, are no less favourable than the terms and conditions of the Agreements;

(b)    it includes a letter stating that the bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined

6

below), provided that if such bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, March 1, 2010, and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)     it includes duly authorized and executed Agreements, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, including, to the extent required by the terms and conditions of such bid, Local Sale Agreements, the Real Estate Agreements, the Intellectual Property License Agreement, the Transition Services Agreement, the Trademark License Agreement, the Loaned Employee Agreement the Subcontract Agreement, the Contract Manufacturing Inventory Agreements, the Carling Property Lease Agreements, the Patent Assignments, the Trademark Assignments, the Flextronics Back-to-Back Supply Agreement (if required) (each as defined in the Agreement), the other ancillary agreements, including other back-to-back supply agreements, as described in the Agreements and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Agreements ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the bidder;

(d)     it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(e)     it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

(f)     it fully discloses the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(g)     it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Agreements, plus (i) the amount of the Break-Up Fee and Expense Reimbursement (as defined below), plus (ii) U.S.$5,000,000.

7

(h)     it includes an acknowledgment and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Agreements (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)     it includes an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (D) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)     it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(k)     it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to 5% of the Purchase Price to be dealt with as provided for under "Good Faith Deposit" herein;

(l)     it (a) contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment and associated with the employment of all employees who will become employees of the Qualified Bidder, and (b) identifies any pension liabilities and assets related to any employees currently covered under the Nortel Retirement Income Plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m)     it includes evidence of the Potential Bidder's ability to comply with section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned

8

or subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)    it contains other information reasonably requested by the Sellers; and

(o)    it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids, provided that the Sellers, in evaluating such bids, may not waive substantial compliance with any items in paragraphs (d), (e), (f), (i)(D), (j) and (o) without the consent of the Purchaser, the Committee, the Bondholder Group and the Monitor provided that, with respect to (e), such consent not to be unreasonably withheld in connection with any bid that would (1) otherwise fully satisfy the requirements of a Qualified Bid but for a de minimis failure to comply with those criteria; and (2) such non compliance is cured within 24 hours of the Bid Deadline. The Sellers shall deliver copies of any bids deemed to be Qualified Bids to the Purchaser in accordance with Section 5.3(f) of the North American Agreement.   Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Agreements will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

The Sellers shall notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Purchaser, whether such Qualified Bidder's bid constitutes a Qualified Bid) promptly after, and in any event on the same day as the notification to any Qualified Bidder that their bid constitutes a Qualified Bid; provided such notification shall not be given later than two (2) Business Days following the expiration of the Bid Deadline.

### Aggregate Bids

The Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided, that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

### Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder, including any assumed pension liabilities) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Transaction (including any regulatory approvals required to close the Transaction), the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by



the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

### No Qualified Bids

If the Sellers do not receive any Qualified Bids other than the Agreements received from the Purchaser, the Auction shall be cancelled and the U.S. Debtors shall report the same to the Bankruptcy Court, the Canadian Debtors shall report the same to the Canadian Court and the Monitor and subject to requiring and obtaining approvals of the Bankruptcy Court, the Canadian Court or any other applicable court and satisfaction of the conditions set forth in the Agreements, the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Agreements. In addition, if no Qualified Bid is received, the U.S. Debtors reserve the right to request that the Bankruptcy Court advance the date of the Sale Hearing (as defined below) and provide notice of such new date to those parties in interest entitled to notice thereof and the Canadian Debtors reserve the right to file a motion with the Canadian Court seeking advancement of the date for approval of the sale of the Canadian Debtors' rights, title and interests in and to the Assets to the Purchaser. In addition, if approval of any other applicable court is required, the Sellers will as soon as practicable file an appropriate pleading with such court(s) seeking approval of the Transaction.

### Break-Up Fee and Expense Reimbursement

Recognizing the value and benefits that the Purchaser has provided to the U.S. Debtors and the other Sellers by entering into the Agreements, as well as the Purchaser's expenditure of time, energy and resources, the Sellers have agreed that if the Purchaser is not the Successful Bidder, the Sellers will, in the circumstances as set forth in the Agreements and Bidding Procedures Order, pay to the Purchaser (i) a break-up fee of $[●] (the "Break-Up Fee"), and (ii) reimburse the Purchaser for certain expenses as set forth in the Agreements and Bidding Procedures Order up to $[●] (the "Expense Reimbursement").

### Auction

If the Sellers receive one or more Qualified Bids in addition to the Agreements, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at **9:30 a.m. (ET) on Friday, November 13, 2009,** at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction. The commencement of the Auction may be cancelled or adjourned without the prior written consent of the Purchaser, subject to the terms of the Agreements. The Auction shall run in accordance with the following procedures:

(a)    Only the Sellers, the Purchaser, the Committee, the Bondholder Group, the Monitor and the Administrator (and the advisors to each of the foregoing), any

creditor of the U.S. Debtors or the Canadian Debtors and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)   Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(c)   At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date. At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction.

(d)   All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(e)   The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(f)   Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a

11



higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least U.S.$5,000,000 over the Starting Bid or the Leading Bid (as defined below), as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the Agreements as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

### Selection Of Successful Bid

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid and evaluate each Qualified Bid as set forth in the section titled "Evaluation of Competing Bids" herein, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by the Canadian Court and any required approvals of any other applicable court(s) and approval and execution by the Administrators of the relevant purchase agreement with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

### Sale Hearing

The sale hearing to authorize certain of the Sellers to enter into agreements with respect to the Successful Bid (the "Sale Hearing") will be held, in respect of those Sellers that are U.S. Debtors, before the Honourable Judge Kevin Gross (or any substitute therefor) in the United

States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as Thursday, November 19, 2009 at 1:00 p.m. (ET), and, in respect of those Sellers that are Canadian Debtors, before the Honourable Mr. Justice Geoffrey B. Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto, Ontario, and in any other applicable court(s) whose approval is required, as soon as practicable following the date of the Sale Hearing (or, with respect to the Canadian Court, in a joint hearing with the Bankruptcy Court at the Sale Hearing). The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing. If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Sellers shall proceed as set forth in the "No Qualified Bids" section above. If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "<u>Alternate Bid</u>" and, such bidder, the "<u>Alternate Bidder</u>"). The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is necessary or appropriate, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval is required. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court. The Alternate Bid shall remain open until the earlier of (a) December 15, 2009 or (b) the consummation of the Sale to the Successful Bidder (the "<u>Alternate Bid Expiration Date</u>"). All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

Notwithstanding the foregoing, under no circumstance will the Purchaser be deemed the Alternate Bidder.

### Good Faith Deposits

The Good Faith Deposit of any Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within five (5) Business Days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within five (5) Business Days of the date of the selection of the Successful Bidder and the Alternate Bidder. The Good Faith Deposit of the Successful Bidder will be applied in accordance with the terms of the Successful Bid, and will

62

become nonrefundable upon the approval by the Bankruptcy Court and the Canadian Court of the Sale to the Successful Bidder.

## Reservation Of Rights

The Sellers, after consultation with their advisors, the Committee, the Bondholder Group and the Monitor, and their respective advisors, (a) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof; (b) may reject, at any time, any bid (other than the Purchaser's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, any orders of the Canadian Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor; or (iv) contrary to the statutory duties or legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers and (c) except as otherwise specifically set forth herein, with respect to instances in which the consent of the Committee, the Bondholder Group and the Monitor is required, may modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets.

Other than as specifically provided for herein, the Sellers may not, without prior written consent of the Committee, the Bondholder Group the Monitor and the Purchaser in their respective sole discretion (i) adjourn the Auction for more than three (3) Business Days, or (ii) subject to the availability of the Bankruptcy Court and the Canadian Court, adjourn the Sale Hearing for more than three (3) Business Days if the Auction has concluded.

Each of the foregoing actions shall be made by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, and their respective advisors. For the purposes of these Bidding Procedures and all matters relating to them, the Administrators are acting only as agents for and on behalf of the EMEA Sellers that are controlled by the Administrators pursuant to the UK Proceedings and without personal liability. Notwithstanding the foregoing, the Sellers may not, without the prior written consent of the Purchaser, impair or modify the Sellers' obligation to give effect to the Break-Up Fee and the Expense Reimbursement payable to the Purchaser under the Agreements by crediting those amounts to the Purchaser's Qualified Bid and any Subsequent Bid by the Purchaser. For the avoidance of doubt, nothing herein shall be construed to impair or amend the Purchaser's rights and obligations under the Agreements.

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

| | |
|---|---|
| | *ONTARIO*<br>SUPERIOR COURT OF JUSTICE<br>(COMMERCIAL LIST)<br><br>Proceeding commenced at Toronto |
| | **ORDER**<br>(Metro Ethernet Networks Bidding Procedures<br>Order) |
| | **OGILVY RENAULT LLP**<br>Suite 3800<br>Royal Bank Plaza, South Tower<br>200 Bay Street<br>P.O. Box 84<br>Toronto, Ontario  M5J 2Z4, Canada<br><br>**Derrick Tay LSUC#: 21152A**<br>Tel: (416) 216-4832<br>Email: dtay@ogilvyrenault.com<br><br>**Mario Forte  LSUC#: 27293F**<br>Tel: (416) 216-4870<br>Email: mforte@ogilvyrenault.com<br><br>**Jennifer Stam LSUC #46735J**<br>Tel: (416) 216-2327<br>Email: jstam@ogilvyrenault.com<br>Fax: (416) 216-3930<br>Lawyers for the Applicants |

DOCSTOR: 16878554

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS
CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

Proceeding commenced at Toronto

**MOTION RECORD**
Metro Ethernet Networks Business Bidding
Procedures
(returnable October 15, 2009)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario M5J 2Z4
CANADA

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 1787063\1