# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

## NOTICE OF FILING OF TWENTY-THIRD REPORT OF THE MONITOR OF THE CANADIAN NORTEL COMPANIES <ins>IN THE CANADIAN PROCEEDINGS</ins>

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

**PLEASE TAKE NOTICE** that on October 14, 2009, Ernst & Young Inc., the Monitor and foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation, in proceedings under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List), by its undersigned counsel, filed, in the above-captioned cases, a copy of the Twenty-Third Report of the Monitor (the **"Twenty-Third Report"**), dated October 8, 2009.  A copy of the Twenty-Third Report is annexed hereto as Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Twenty-Third Report is also available on the Monitor's website, www.ey.com/ca/nortel or upon request to the Monitor's counsel.

Dated: Wilmington, Delaware
October 14, 2009

ALLEN & OVERY LLP

Ken Coleman
Lisa Kraidin
1221 Avenue of the Americas
New York, New York  10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
ken.coleman@allenovery.com
lisa.kraidin@allenovery.com

-and-

BUCHANAN INGERSOLL & ROONEY

By: /s/ Mary F. Caloway
Mary F. Caloway (No. 3059)
Peter J. Duhig (No. 4024)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
Telephone (302) 552-4200
Facsimile (302) 552-4295
mary.caloway@bipc.com

Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian Nortel
Group

**EXHIBIT A**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE COMPANIES' CREDITORS**
**ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION (the**
**"Applicants")**

**TWENTY-THIRD REPORT OF THE MONITOR**
**DATED OCTOBER 8, 2009**

**INTRODUCTION**

1.      On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceeding. The stay of proceedings was extended to October 30, 2009, by this Honourable Court in its Order dated July 30, 2009.

2.      Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings") . As required by U.S. law,

an official unsecured creditors committee (the "Committee") was established in January, 2009.  In addition, an ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as those in the U.S. (the "Bondholder Group").

3.      Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

4.      Nortel Networks UK Limited and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court on January 14, 2009.  The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators (the "UK Administrators") of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed.

5.      On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together, "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders").  The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

6.      Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court (the "French Court").

**PURPOSE**

7.  The purpose of this twenty-third Report of the Monitor ("Twenty-Third Report") is to provide support for the Applicants' motion with respect to approval to conduct a sale process (the "Sale Process") to market certain assets (the "Assets") associated with Nortel's GSM / GSM-R business (the "GSM Business").

**TERMS OF REFERENCE**

8.  In preparing this Twenty-Third Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Twenty-Third Report.

9.  Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

10. Capitalized terms not defined in this Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Sale Procedures (as defined below) or previous Reports of the Monitor.

**GENERAL BACKGROUND**

11. Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

- 3 -

**THE GSM BUSINESS**

12.     The GSM Business is a sub-unit of Nortel's wider Carrier Networks' ("CN") wireless business. Following a joint hearing on July 28, 2009, Orders were issued by this Honourable Court and the U.S. Court approving a sale of substantially all of Nortel's assets related to the CDMA and LTE-access portions of the CN business to Telefonaktiebolaget L M Ericsson (publ); however, the Assets were not included in that sale.

13.     Global System for Mobile communications ("GSM") is the only mobile technology providing truly global wireless coverage with more than 2.6 billion users worldwide. Nortel has worked with operators worldwide to implement high-performance wireless networks using GSM standards. Nortel's GSM Business solutions includes the following: GSM network access products that offer a wide range of solutions to provide nationwide coverage and significantly increase the access to networks, and hence the subscriber base; voice core solutions that focus on network optimization for cost efficiencies and better voice quality; and packet core solutions that offer network optimization for higher capacity to support data needs. Also based on the GSM technology is GSM for Railways ("GSM-R"), which provides a secure wireless communications system for railways operators.

14.     Nortel's GSM products are installed and supported in more than 100 GSM public operators around the globe, including 7 of the top 10 global GSM operators as well as 14 GSM-R operators. Nortel is a leader in the GSM-R market segment with an approximate 60% share of global railway track kilometres awarded to date.

15.     The GSM Business had 2008 revenues of approximately $1.36 billion representing approximately 13% of Nortel's 2008 revenues. 2008 revenues were split geographically 41%, 37% and 22% in the Americas, EMEA and Asia respectively.

16.     GSM operations are conducted principally from Nortel's facilities in Richardson, Texas, Paris, France and China. Approximately 850 employees (the "Employees") are presently employed in connection with GSM activity. Approximately 330 third party contract

- 4 -

employees are presently engaged through out-sourcing arrangements in connection with the GSM operations. The GSM Business employs approximately 9 people in Canada.

17. As with other Nortel technologies, the underlying intellectual property associated with the GSM Business is owned by NNL and is subject to various inter-company licensing agreements. Nortel has made considerable R&D investments in its GSM product offerings.

18. Nortel, as a result of its ongoing restructuring, believes that it is in its best interest to divest the Assets in a relatively expedient manner in order to maximize the value of the Assets and reduce the continuing cost related to the support and development of the GSM Business.

**THE SALE PROCESS**

19. The Assets have been the subject of a sale process for approximately six months. From April through June, 2009, Nortel, with the assistance of its investment banker, Lazard Frères & Co., contacted over 50 buyers who it thought might be interested in acquiring the GSM Business. Following this, Nortel entered into a non-disclosure agreement ("NDA") with 26 parties. These 26 parties were provided with a Confidential Information Memorandum and asked to provide non-binding expressions of interest for the GSM Business. Eleven of these parties submitted expressions of interest for all of a portion of the GSM Business. After evaluating these expressions of interest, Nortel with the assistance of Lazard, engaged in further discussions with certain of these parties. These parties were provided access to an electronic data room ("EDR") and invited to attend presentations conducted by management of the GSM Business.

20. As a result of these discussions with the potential bidders, Nortel understands that certain bidders are interested in acquiring the global GSM Business while others are interested in particular geographic pieces. Nortel has conducted its own analysis around the possibility of splitting the GSM Business into two geographic pieces. As a result of this analysis, Nortel has concluded that such a split is possible but that there would be

significant practical complexities associated with such a split which could only be resolved by soliciting the cooperation of the parties buying the respective pieces. Accordingly, it is Nortel's view that it would prefer to sell all or substantially all of the Assets to a single buyer. However, Nortel will entertain joint bids for all or substantially all of the Assets from a team of two or more bidders bidding together provided that those bidders are able to resolve between themselves the issues associated with splitting the GSM Business and that they do not exclude any material portion of the Assets.

21.     As of the current date, discussions with the potential bidders are ongoing. At the same time, the GSM Business is experiencing significant pressure from existing and potential customers to provide a definitive timeline for the transfer of the GSM Business to a third party. It is management's view that any significant delays in the sale of the GSM Business could result in a material reduction in value to a buyer which will result in a lower transaction value. As a result, Nortel has determined that it should conduct an expedited, court-approved Sale Process for the global GSM Business as a means of completing a definitive transaction in as timely a manner as possible. Accordingly, the Applicants are seeking approval of certain sale procedures (the "Sale Procedures"), a copy of which is attached as Appendix "A" hereto

- Assets to Be Sold. The Sellers will entertain bids to convey all or substantially all of the Assets to a single bidder or joint bids for all or substantially all of the Assets from a team of two or more bidders bidding jointly (each such bid, a "Joint Bid"). The Sellers do not intend to entertain bids that seek to exclude a material portion of the Assets in any significant jurisdiction.

- Participation Requirements. Unless otherwise ordered by both the U.S. Court and this Honourable Court, for cause shown, or as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), each person who wishes to participate in the Sale Process (a "Potential Bidder") will be required to execute a confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of the Assets. Potential Bidders will also be required to provide

sufficient financial information that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination of the Potential Bidder's financial and other capabilities to consummate the transaction. A Potential Bidder who delivers a confidentiality agreement, provides evidence of financial capacity, and delivers a preliminary non-binding proposal in a form and substance satisfactory to the Sellers, and who the Sellers determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is likely to submit a bid that will constitute a Qualified Bid (as defined below) will be deemed a "Qualified Bidder."

• <u>Due Diligence</u>. The Sellers will provide Qualified Bidders with materials and information in respect of the Assets, access to an electronic data room, and a form of purchase agreement[1] and related agreements and schedules (the "Purchase Agreement") that is acceptable to the Sellers. Due diligence access may include management presentations and such other matters as may be reasonably requested by a Qualified Bidder and as to which the Sellers, in their reasonable business judgment, may agree. The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise.

• <u>Bid Deadline</u>. A Qualified Bidder who desires to make a bid will deliver written copies of its bid to the Notice Parties so as to be received not later than November

---

[1] The U.S. Debtors are required to file the form of purchase agreement with the U.S. Court by Friday, October 9, 2009. In order to afford Canadian creditors the opportunity to receive a copy of the form of purchase agreement, the Monitor intends to also file a copy of same with this Honourable Court, and serve it on the service list in these proceedings, by way of supplementary report on or about Friday October 9, 2009.

5, 2009, at 12:00 p.m. (ET) (the "Bid Deadline") by the Sellers. The Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders of such extension.

- Qualified Bid. A bid, including a Joint Bid, will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous provision and complies with all of the following (a "Qualified Bid"):

  o it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Purchase Agreement, including, without limitation, with respect to certainty and timing of closing, or upon alternative terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholders Committee and the Monitor, are no less favorable than the terms and conditions of the Purchase Agreement;

  o it includes a letter stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below);

  o it includes duly authorized and executed purchase agreements, including an offer for the GSM Assets of NNSA in France (the "French Offer"), which includes the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, including any ancillary agreements as described in the Purchase Agreement with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and ancillary modifications to the Purchase Agreement (the "Marked Agreement"), the French Offer (the "Marked French Offer"), and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve

- 8 -

the Sale by the U.S. Court, this Honourable Court and any other applicable court(s) whose approval may be required, proposed by the Qualified Bidder;

o   it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction;

o   it is not conditioned on (i) the outcome of unperformed due diligence by the Qualified Bidder (and includes an acknowledgement and representation that the Qualified Bidder has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer); (ii) obtaining financing and (iii) in the case of a Joint Bid, the resolution of any Interdependencies among the various Assets or entry of a cooperation agreement or similar agreement among the various participants in the Joint Bid;

o   it fully discloses the identity of each entity that will be bidding for the Assets;

o   it includes an acknowledgment and representation that the Qualified Bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreement (or identifies with particularity which of such contracts and leases the Qualified Bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the Qualified Bidder wishes to assume), contains full details of the Qualified Bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

- 9 -

   o   it includes an acknowledgement and representation that the Qualified
Bidder:  (i) has relied solely upon its own independent review,
investigation and/or inspection of any documents and/or the Assets in
making its bid; (ii) did not rely upon any written or oral statements,
representations, promises, warranties or guaranties whatsoever, whether
express or implied (by operation of law or otherwise), regarding the Assets
or the completeness of any information provided in connection therewith or
the Auction, except as expressly stated in the Marked Agreement, the
Marked French Offer or the Marked Ancillary Agreements; and (iii) is not
entitled to any expense reimbursement or break-up fee in connection with
its bid;

   o   it includes evidence, in form and substance reasonably satisfactory to
Sellers, of authorization and approval from the Qualified Bidder's board of
directors (or comparable governing body) with respect to the bid;

   o   it is accompanied by a good faith deposit ("Good Faith Deposit") in a form
acceptable to the Sellers in an amount equal to US$10 million;

   o   it (a) contains full details of the proposed number of employees of the
Sellers (apportioned by jurisdiction(s)) who will become employees of the
Qualified Bidder (save in jurisdictions where employees transfer by
operation of law) and any proposed measures associated with the continued
employment and associated with the employment of all employees who
will become employees of the Qualified Bidder, and (b) identifies any
pension liabilities and assets related to any employees currently covered
under any Nortel registered pension or retirement income plan who will
become employees of the Qualified Bidder that the Qualified Bidder
intends to assume or purchase;

   o   it includes evidence of the Qualified Bidder's ability to comply with
Section 365 of the U.S. Bankruptcy Code (to the extent applicable),
including providing adequate assurance of such Qualified Bidder's ability

- 10 -

to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Qualified Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

- o   it contains other information reasonably requested by the Sellers; and

- o   it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified in the Sale Procedures and deem such bids to be Qualified Bids. The Sellers shall notify any Qualified Bidders in writing as to whether or not their bid constitutes a Qualified Bid promptly following the expiration of the Bid Deadline.

- • <u>Evaluation of Competing Bids</u>. A Qualified Bid will be evaluated based upon several factors including, without limitation, items such as the Purchase Price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the transaction, any assets excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor. Following their review of the Qualified Bids

- 11 -

and in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, the Sellers reserve the right, in their sole discretion, to reject all Qualified Bids and/or withdraw from sale, in whole or in part, any Assets.

- <u>No Qualified Bids</u>. If the Sellers do not receive any Qualified Bids, the Sellers reserve the right, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, to (i) extend the deadlines set forth in the Sale Procedures without further notice, and (ii) withdraw from sale, in whole or in part, any Assets at any time and to make subsequent attempts to market the same.

- <u>Auction</u>.   If the Sellers receive two or more Qualified Bids, the Sellers will conduct an auction (the "Auction") of the Assets at 9:30 a.m. on November 9, 2009. The Auction shall run in accordance with the following procedures:

  - o   Only the Qualified Bidders that have timely submitted Qualified Bids, the Sellers, the Committee, the Bondholder Group, the Monitor and the UK Administrators (and the advisors to each of the foregoing), and any creditor of the North American Debtors shall attend the Auction in person, and only such Qualified Bidders will be entitled to make any subsequent bids at the Auction;

  - o   Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

  - o   At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction, provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date. At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid which the Sellers believe, in their reasonable business

- 12 -

judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to all Qualified Bidders that have timely submitted Qualified Bids and have informed the Sellers of their intent to attend the Auction;

o   All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction, provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person;

o   The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Sale Procedures, the Bankruptcy Code, or any order of the U.S Court, this Honourable Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction; and

o   Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better

- 13 -

offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least U.S.$3 million over the Starting Bid or the Leading Bid, as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction, and provided, further that the Sellers in determining the net value of any incremental bid to the estate shall not be limited to evaluating the incremental dollar value of such bid and may consider other factors as set out above, including, without limitation, factors affecting speed and certainty of obtaining regulatory approvals required to close the transaction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids, the Sellers will, at each round of bidding, give effect to any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

- Successful Bid. To the extent that the Sellers select a Successful Bid in accordance with the "Evaluation of Competing Bids" provision of the Sale Procedures, the Sellers shall communicate to the Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder, if any, and the details of the Successful Bid and Alternate Bid, if any. The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the U.S. Court and this Honourable Court, which approval will include authorization to sell the Assets of the U.S. Debtors and the Applicants free and clear of all liens, claims and encumbrances. The Alternate Bid shall remain open until 45 days from the conclusion of the Auction (the "Alternate Bid Expiration

- 14 -

Date"). The Monitor understands that joint hearing to approve the sale of the Assets (the "Sale Hearing") has currently been scheduled before the U.S. Court and this Honourable Court for November 19, 2009, at 2:00 p.m. (ET), which hearing may be adjourned, rescheduled or cancelled at the Sellers' discretion.

- Good Faith Deposits. The Good Faith Deposit of any Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within seven days thereafter. The Good Faith Deposit of the Successful Bidder will be applied in accordance with the terms of the Successful Bid. The Good Faith Deposit of any Qualified Bidder not selected as either the Successful Bidder or the Alternate Bidder shall be returned to such bidders within five (5) business days of the selection of the Successful Bidder and the Alternate Bidder.

- Reservation of Rights. The Sellers reserve the right in their discretion, after consultation with the Committee, the Bondholder Group and the Monitor, to (i) impose additional terms and conditions and otherwise modify the Sale Procedures at any time; (ii) withdraw from sale any Assets at any time and make subsequent attempts to market the same; and (iii) reject any or all bids.

- NNSA. In addition to the delivery of its bid to the Notice Parties, a Qualified Bidder that desires to make a bid will deliver written copies of its bid to the French administrator of NNSA, the liquidator of NNSA and their respective counsel. The Successful Bidder will be expected to file with the French Court in accordance with applicable French laws shortly after the conclusion of the Auction and prior to the U.S. Sale Hearing an offer for the acquisition of the Assets and GSM Business owned by or pertaining to NNSA (the "French Offer"). The French Court will determine in due course the deadline for the filing of the French Offer with the French Court.

- 15 -

**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

22.    The Monitor is of the view that the Sale Process described above is designed to provide a commercially reasonable approach for Nortel to attempt to market and maximize value for its GSM Business.  The Monitor has been involved in the activities undertaken to date to market the GSM Business and will be involved in the Sale Process.  Accordingly, the Monitor recommends that the Applicants' motion for approval of the Sale Procedures be approved by this Honourable Court.

All of which is respectfully submitted this 8th day of October, 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

- 16 -

**APPENDIX "A"**

**Sale Procedures**

[Attached.]

- 17 -

BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities (the "Sale") pertaining to the global GSM/GSM-R business of Nortel (as defined below).

On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and certain of NNC's other Canadian affiliates (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein as "Nortel"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, the "Canadian Proceedings" and "CCAA"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor").

On the Filing Date and on July 14, 2009 (with respect to Nortel Networks (CALA) Inc.), Nortel Networks Inc. ("NNI") and certain of NNI's United States affiliates (collectively, the "US Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (respectively, the "US Proceedings" and the "Bankruptcy Code").

On the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa region (respectively, "EMEA Debtors" and "EMEA") commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the Bankruptcy Court, the "Courts"), and the UK Court appointed individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Administrators").

NNL, NNI and NNUK and certain of their affiliates (together, the "Sellers") have determined that: (A) the potential sale of the Assets (as defined below) contemplated by the Sale Motion (as defined below) should be subject to a competitive sale process as set forth herein and the supplement to these Bidding Procedures attached hereto as Schedule 1; (B) the eventual transfer of the U.S. Debtors' rights, title and interests in and to the Assets will be subject to approval by the Bankruptcy Court; (C) the eventual transfer of the rights, title and interests of the Canadian Debtors in and to the Assets will be subject to approval by the Canadian Court; and (D) the eventual transfer of the rights, title and interests of NNSA in and to the Assets will be subject to approval by the French Court (as defined in Schedule 1).

On September 30, 2009, the U.S. Debtors filed a Motion for Orders (I)(A) Authorizing and Approving the Bidding Procedures, (B) Approving the Notice Procedures, (C) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving the Sale of Certain Assets of Debtors' GSM/GSM-R Business (the "Sale Motion").

On [October 15], 2009 the Bankruptcy Court entered an Order approving, among other things, the Bidding Procedures set forth herein (the "Bidding Procedures Order").

On [October 6], 2009 the Canadian Debtors filed a motion with the Canadian Court seeking an order for approval of the Bidding Procedures set forth herein (the "Canadian Sales Process Order").

Bidding Process

The Bidding Procedures set forth herein describe, among other things, the Assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's, the Canadian Court's and the French Court's and, if required, such other applicable courts' approval thereof (collectively, the "Bidding Process"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., *et al*. (Case No. 09-10138) involving the U.S. Debtors (the "Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the CCAA, the Administrators in connection with the UK Proceedings, and their respective advisors throughout the Bidding Process. In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, the Bankruptcy Court and the Canadian Court will have jurisdiction to hear and resolve such dispute.[1]

Assets To Be Sold

The Sellers are offering for sale certain of the Sellers' assets pertaining to the GSM/GSM-R business unit of Nortel (collectively, the "Transaction"), or, as set forth in the relevant sale agreements with respect to a Successful Bidder (as defined below), and related schedules and in an information memorandum made available by the Sellers to potential bidders that have executed a confidentiality agreement with the Sellers (the "Assets"). The Sellers will entertain bids to convey all or substantially all of the Assets to a single bidder or joint bids for all or substantially all of the Assets from a team of two or more bidders bidding jointly (each such bid, a "Joint Bid").

---

[1] For the avoidance of doubt, this Bidding Process shall not govern any disagreements among the Sellers.

2

<u>Joint Bids</u>

The Sellers recognize that certain Potential Bidders may desire to acquire only a portion of the Assets. The Sellers do **NOT** intend to entertain bids that seek to exclude a material portion of the Assets in any significant jurisdiction.[2] As mentioned above, the Sellers will entertain a Joint Bid for all or substantially all of the Assets from a team of two or more bidders bidding jointly. PLEASE NOTE, HOWEVER, THAT A POTENTIAL OR QUALIFIED BIDDER MAY CONTACT ANOTHER POTENTIAL OR QUALIFIED BIDDER IN CONNECTION WITH A JOINT BID ONLY UPON THE PRIOR WRITTEN CONSENT OF NNL, NNI AND NNUK, WHICH CONSENT SHALL BE GRANTED AFTER CONSULTATION WITH THE COMMITTEE, THE BONDHOLDER GROUP AND THE MONITOR. Any unauthorized contacts between one or more Potential Bidders or Qualified Bidders are hereby strictly prohibited and may result in disqualification from participation in the Bidding Process and any Auction that may occur.

Upon consummation of the Sale, the participants in a Joint Bid may decide to divide the Assets amongst themselves and operate each portion of the Assets on a stand-alone basis. In order to operate such stand-alone businesses, the ultimate buyers of the Assets may need to resolve certain interdependencies among the various Assets (the "<u>Interdependencies</u>"), including, without limitation, certain issues relating to the use of intellectual property or the provision of transition services by and between joint bidders. Please note that the Sellers do not intend to, and shall not, undertake any obligation to resolve any Interdependencies among the various Assets.

<u>"As Is, Where Is"</u>

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates. In addition, in the case of the EMEA Sellers (as defined below), the sale of whatever rights, title and interests that such EMEA Seller may have (if any) in and to the Assets will be on an "as-is" basis and will be without any representations or warranties. For the purposes of these Bidding Procedures, "<u>EMEA Seller</u>" means any Seller that is an EMEA Debtor or a wholly-owned subsidiary of an EMEA Debtor.

<u>Free Of Any And All Claims And Interests</u>

All of the rights, title and interests of the U.S. Debtors and the Canadian Debtors in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "<u>Claims and Interests</u>") as permitted by sections 105 (a), 363 and 365 of the Bankruptcy Code and the CCAA, such Claims and Interests to attach to the net proceeds of the sale of such Assets (without prejudice to any claims or causes of action regarding the priority, validity or enforceability thereof).

---

[2]    Without prejudice to the generality of this sentence, please note that the Sellers shall <u>NOT</u> entertain bids that exclude all or substantially all of the Assets that are located outside North America or vice versa.

### Publication Notice

As soon as reasonably practicable after entry of the Bidding Procedures Order and the Canadian Bidding Procedures Order, but in any event no more than five (5) days after the entry of such orders, the Sellers shall publish notice of these Bidding Procedures, the time and place of the Auction (as defined below), if required, the time and place of the Sale Hearing (as defined below), and the objection deadline for the Sale Hearing in The Wall Street Journal (National Edition), The Globe & Mail (National Edition) and The Financial Times (International Edition) (such publication notice, the "Sale Notice").

### Participation Requirements

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court and accepted by the Administrators, for cause shown or, as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), prior to the Bid Deadline (as defined below), in order to participate in the Bidding Process, each bidder (each such bidder, a "Potential Bidder") must deliver to the Notice Parties (as defined below) at the addresses provided below:

(a)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of the Assets (in the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets and waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transaction it may enter into, to the Notice Parties (as defined below));

(b)    current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements and latest unaudited financial statements of the equity holders or sponsors of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transaction; and

(c)    a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any portion of the assets expected to be excluded; (iii) the structure (including, without limitation, in the case of each potential Joint Bid, the structure of such Joint Bid) and financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and

4

any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Potential Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Purchase Agreements, where for the purposes of these Bidding Procedures, "Purchase Agreements" means the sale agreements and other ancillary agreements provided by the Sellers to each Potential Bidder for the proposed Sale. The Sellers shall provide such Purchase Agreements in consultation with the Committee, the Bondholder Group and the Monitor.

A Potential Bidder, or in the case of a Joint Bid, all of the Potential Bidders participating in such Joint Bid, which shall be collectively considered a single bidder, that delivers the documents described above, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction will be deemed a "Qualified Bidder". For the avoidance of any doubt, in the case of a proposed Joint Bid, the Potential Bidders participating in such Joint Bid shall together constitute a single Qualified Bidder.

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder either by itself or, in the case of a proposed Joint Bid, in conjunction with other bidders participating in such Joint Bid, is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence as provided in the following paragraph with respect to the Assets.

Due Diligence

The Sellers may in their reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a confidentiality agreement (as described above) with the Sellers such due diligence access to materials and information relating to the Assets as the Sellers deem appropriate after consultation with the Committee, the Bondholder Group and the Monitor. Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on site inspections, and other matters which a Qualified Bidder or other person seeking to become a Qualified Bidder may reasonably request and as to which the Sellers, in their reasonable business judgment, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such parties. The Sellers may, in their discretion, coordinate diligence efforts such that multiple parties have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.

Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders and any other person seeking to become a Qualified Bidder that has executed a confidentiality agreement with the Sellers. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the definitive sale agreements with any Successful Bidder executed and delivered by Sellers.

Bid Deadline

A Qualified Bidder that desires to make a bid must deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Anna Ventresca, General Counsel, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905) 863-2075; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (v) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vi) financial advisor to the Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (vii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; (viii) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; (ix) the Administrators: Ernst & Young LLP, Attn: Stephen Harris, 1 More Place, London SE1 2AF, United Kingdom, Facsimile +44 20 7951 9002; and (x) counsel to the Administrators: Herbert Smith LLP, Attn: Stephen Gale, Exchange House, Primrose Street, London, EC2A 2HS, Facsimile: +44 20 7098 4878; so as to be received not later than November 5, 2009 at 12:00 pm (Eastern) by the Sellers (the "Bid Deadline"). The Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders and the other Notice Parties of such extension.

Qualified Bid

A bid, including a Joint Bid, will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(a)    it states that the applicable Qualified Bidder offers to purchase all or substantially all of the Assets upon the terms and conditions substantially as set forth in the Purchase Agreements, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure (including, without limitation, an offer conditioned upon confirmation of a plan of reorganization proposed by the U.S. Debtors either individually or in collaboration with such Qualified Bidder) or upon alternative terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholders Committee and the Monitor, are no less favorable than the terms and conditions of the Purchase Agreements;

(b)    it includes a letter stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), provided that if such Qualified Bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, 180 days from the entry of the Sale Order, and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)    it includes duly authorized and executed purchase agreements, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, including the French Offer (as such term is defined in Schedule 1 attached hereto) and, to the extent required by the terms and conditions of such bid, any ancillary agreements as described in the Purchase Agreements with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and ancillary modifications to the Purchase Agreements ("Marked Agreements"), the French Offer (the "Marked French Offer") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the Qualified Bidder;

(d)    it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements, the Marked French Offer and the Marked Ancillary Agreements;

(e)    it is not conditioned on (i) the outcome of unperformed due diligence by the Qualified Bidder (and includes an acknowledgement and representation that the

7

Qualified Bidder has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer); (ii) obtaining financing and (iii) in the case of a Joint Bid, the resolution of any Interdependencies among the various Assets or entry of a cooperation agreement or similar agreement among the various participants in the Joint Bid;

(f)　　it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(g)　　it includes an acknowledgment and representation that the Qualified Bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreements (or identifies with particularity which of such contracts and leases of the US and Canada Debtors that the Qualified Bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases of the US and Canada Debtors that the Qualified Bidder wishes to assume), contains full details of the Qualified Bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(h)　　it includes an acknowledgement and representation that the Qualified Bidder: (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements, the Marked French Offer or the Marked Ancillary Agreements; and (iii) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(i)　　it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements, the Marked French Offer and Marked Ancillary Agreements;

(j)　　it is accompanied by a good faith deposit ("Good Faith Deposit") in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to US$10 million to be dealt with as provided for under "Good Faith Deposit" herein;

(k)　　it (a) contains full details of the proposed number of employees of the Sellers, including, without limitation, NNSA (apportioned by jurisdiction(s)) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment and associated with the employment of all employees who will become

8

employees of the Qualified Bidder, and (b) identifies any pension liabilities and assets related to any employees currently covered under any Nortel registered pension or retirement income plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(l)     it includes evidence of the Qualified Bidder's ability to comply with Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Qualified Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(m)     it contains other information reasonably requested by the Sellers; and

(n)     it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids.

The Sellers shall notify any Qualified Bidders in writing as to whether or not their bid constitutes a Qualified Bid promptly following the expiration of the Bid Deadline.

## Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Transaction (including any regulatory approvals required to close the Transaction), any assets excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction(s)) to be offered post-closing employment by the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment of all employees who will become the employees of the Qualified Bidder, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor. Following their review of the Qualified Bids and in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, the Sellers reserve the right, in their sole discretion, to reject all Qualified Bids and/or withdraw from sale, in whole or in part, any Assets.

<u>No Qualified Bids</u>

If the Sellers do not receive any Qualified Bids, the Sellers reserve the right, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, to (i) extend the deadlines set forth in the Bidding Procedures without further notice, and (ii) withdraw from sale, in whole or in part, any Assets at any time and to make subsequent attempts to market the same.

<u>Auction</u>

If the Sellers receive two or more Qualified Bids, the Sellers will conduct an auction (the "<u>Auction</u>") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at 9:30 a.m. on November 9, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned without the prior written consent of any Qualified Bidder. Copies of all Qualified Bids shall be delivered to the Committee, the Bondholder Group, the Monitor and the Administrators at such time that such bid is deemed a Qualified Bid but no later than one (1) Business Day prior to the Auction. The Auction shall run in accordance with the following procedures:

(a)     Only the Qualified Bidders that have timely submitted Qualified Bids, the Sellers, the Committee, the Bondholder Group, the Monitor and the Administrators (and the advisors to each of the foregoing), and any creditor of the North American Debtors shall attend the Auction in person (and the advisors to such Qualified Bidder), and only such Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)     Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(c)     At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction, <u>provided</u> that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date. At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "<u>Starting Bid</u>") to <u>all</u> Qualified Bidders that have timely submitted Qualified Bids and have informed the Sellers of their intent to attend the Auction.

(d)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each

10

Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction, provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(e)    The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(f)    Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least US $3 million over the Starting Bid or the Leading Bid, as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction, and provided, further that the Sellers in determining the net value of any incremental bid to the estate shall not be limited to evaluating the incremental dollar value of such bid and may consider other factors as identified in the "Selection of Successful Bid" section of these Bidding Procedures, including, without limitation, factors affecting speed and certainty of obtaining regulatory approvals required to close the Transaction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids, the Sellers will, at each round of bidding, give effect to any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

<u>Selection Of Successful Bid</u>

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid that is either the Leading Bid or submitted subsequent to and as an improvement to the submission of the Leading Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including, among other things, the proposed revisions to the transaction documents,

the effect of the Sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), the counterparties to such transactions, the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, other factors affecting the speed, certainty and value of the Sale (including any regulatory approvals required to close the Transaction), any assets excluded from the bid, the estimated number of in-scope employees of the Sellers to be offered post-closing employment by the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor; (b) identify the highest or otherwise best offer for the Assets received in accordance with the Bidding Procedures (such bid, the "Successful Bid" and the Qualified Bidder making such bid, collectively, the "Successful Bidder"); and (c) communicate to the Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any.  The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by the Canadian Court and any required approvals of any other applicable court(s) with such Successful Bidder and approval and execution by the Administrators of the relevant Successful Bid transaction documents with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

<u>Sale Hearing</u>

The sale hearing to authorize certain of the Sellers to enter into agreements with respect to the Successful Bid (the "<u>Sale Hearing</u>") will be held, in respect of those Sellers that are U.S. Debtors, before the Honorable Judge Kevin Gross (or any substitute therefor) in the United States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as November 19, 2009 at 2 p.m. (Eastern), and, in respect of those Sellers that are Canadian Debtors, before the Honourable Mr. Justice Geoffrey B. Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto, Ontario, on a date to be scheduled by the court and currently proposed as November 19, 2009 at 2 p.m. (Eastern), and in any other applicable court(s) whose approval is required, as soon as practicable following the date of the Sale Hearing (or, with respect to the Canadian Court, in a joint hearing with the Bankruptcy Court at the Sale Hearing).  The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing.  If the

Sellers do not receive any Qualified Bids, the Sellers shall proceed as set forth in the "No Qualified Bids" section above. If the Sellers receive one or more Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is legally required, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval is legally required. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court. The Alternate Bid shall remain open until 45 days from the conclusion of the Auction (the "Alternate Bid Expiration Date"). All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

### Good Faith Deposits

The Good Faith Deposit of any Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within seven (7) days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within five (5) Business Days of the date of the selection of the Successful Bidder and the Alternate Bidder. The Good Faith Deposit of the Successful Bidder will be applied in accordance with the terms of the Successful Bid.

### Reservation Of Rights

The Sellers, after consultation with their advisors, the Committee, the Bondholder Group and the Monitor, and their respective advisors, (a) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof; (b) may reject, at any time, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, any orders of the Canadian Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, or (iv) contrary to the statutory duties or legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers; (c) may impose additional terms and conditions and otherwise modify the Sale Procedures at any time; (d) withdraw from sale any Assets at any time and make subsequent attempts to market the same; and (e) reject all bids.

13

For the purposes of these Bidding Procedures and all matters relating to them, the Administrators are acting only as agents for and on behalf of the EMEA Sellers that are controlled by the Administrators pursuant to the UK Proceedings and without personal liability.

SCHEDULE 1
BIDDING PROCEDURES – FRENCH SUPPLEMENT

This document (the "French Supplement") supplements the Bidding Procedures to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities pertaining to the global GSM/GSM-R business of Nortel.

Capitalized terms used but not defined herein have the meanings ascribed to them in the Bidding Procedures.

On May 28, 2009, at the request of the UK Administrator of NNSA and in accordance with Council Regulation (EC) No 1346/2000 of 29 May 2000 on insolvency proceedings (the "EC Regulation"), the Commercial Court of Versailles, France, (the "French Court") ordered the commencement of secondary proceedings (the "Secondary Proceedings") in respect of NNSA. In accordance with the EC Regulation and applicable French laws, the Secondary Proceedings consist of liquidation proceedings during which NNSA continued to operate as a going concern for an initial three-month period and, in accordance with a judgment of the French Court of August 20, 2009, will continue to operate as a going concern for another three-month period, provided that this second three-month period has been further extended as a result of the suspension of the liquidation process under the Secondary Proceedings in accordance with a judgment of the French Court of October 1, 2009 rendered at the request of the U.K. Administrator. In accordance with the EC Regulation, the U.K. administration proceedings remain the main proceedings in respect of NNSA. However, a French administrator (the "French Administrator") has been appointed and is in charge of the day-to-day affairs and continuing business of NNSA and a French liquidator (the "French Liquidator") has also been appointed and is in charge of the sale process of the business of NNSA. The French Administrator and the French Liquidator will remain in place during the suspension of the Secondary Proceedings.

Publication Notice

The publication of the Sale Notice in The Wall Street Journal (National Edition), The Globe and Mail (National Edition) and The Financial Times (International Edition) contemplated by the "Publication Notice" section of the Bidding Procedures will be supplemented by the concurrent publication in each such newspapers of this French Supplement. In addition, the French Administrator and the French Liquidator will publish in Les Echos a French translation of the Sale Notice and of this French Supplement as soon as reasonably practicable after entry of orders by the Bankruptcy Court and the Canadian Court approving the Bidding Procedures, but in any event no more than fifteen (15) days after the entry of such orders.

### Bid Deadline

In addition to the delivery of its bid to the Notice Parties, a Qualified Bidder that desires to make a bid will deliver written copies of its bid to (i) the French administrator: Me. Franck Michel, AJAssociés, 10 allée Pierrede Coubertin 78000 Versailles, France , Facsimile: +33 1 39 50 87 52; (ii) the French Liquidator: Me Cosme Rogeau, 26 avenue Hoche 78000 Versailles, France, Facsimile: +33 1 39 49 44 63; and (iii) counsel to the French Administrator and the French Liquidator: Foucaud, Tchekhoff, Pochet et Associés, Attn: Antoine Tchekhoff and Edouard Fabre, 1bis avenue Foch 75116 Paris, France, Facsimile: +33 1 45 00 08 19.

Notwithstanding the Bid Deadline applicable to the making of bids in accordance with the Bidding Procedures, the Successful Bidder will be expected to file with the French Court in accordance with applicable French laws shortly after the conclusion of the Auction and prior to the U.S. Sale Hearing an offer for the acquisition of NNSA's GSM/GSM-R assets and business (the "French Offer"). The Purchase Agreements among the Sellers and the Successful Bidder shall contain a commitment from the Successful Bidder(s) to that effect.

The French Court will determine in due course the deadline for the filing of the French Offer with the French Court. The French Administrator and the French Liquidator will announce such deadline by way of a publication in Les Echos in French and in The Financial Times (International Edition) in English. Such publications will supplement the announcement published by the French Administrator in French in Les Echos on September 4, 2009, and in English in the Financial Times on September 3, 2009.

### Reservation Of Rights

The "Reservation of Rights" section of the Bidding Procedures is incorporated herein by reference.

For the purposes of this French Supplement and all matters relating to them, the French Administrator and the French Liquidator are acting solely as agents for and on behalf of NNSA and without personal liability.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**TWENTY-THIRD REPORT OF THE MONITOR**
**DATED OCTOBER 8, 2009**

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada M5B 2M6

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5768340