**<u>EXHIBIT A</u>**

Court File No. 09-CL-7950

### ONTARIO
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE COMPANIES' CREDITORS
### ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF
### COMPROMISE OR ARRANGEMENT OF
### NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
### NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
### CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION (the
### "Applicants")

### SUPPLEMENTAL TWENTY-THIRD REPORT OF THE MONITOR
### DATED OCTOBER 13, 2009

## INTRODUCTION

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries, "Nortel" or the "Company"), Nortel Networks
    Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks
    International Corporation and Nortel Networks Global Corporation (collectively, the
    "Applicants") filed for and obtained protection under the *Companies' Creditors*
    *Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated
    January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc.
    ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA
    proceeding. The stay of proceedings was extended to October 30, 2009, by this
    Honourable Court in its Order dated July 30, 2009.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed
    voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the
    "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S.

Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009. In addition, an ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as those in the U.S. (the "Bondholder Group").

3. Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

4. Nortel Networks UK Limited and certain of its subsidiaries located in Europe, the Middle East and Africa (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators (the "UK Administrators") of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed.

5. On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together, "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

6. Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court (the "French Court").

**PURPOSE**

7.    The purpose of this supplemental twenty-third report of the Monitor ("Supplemental Twenty-Third Report") is to provide this Honourable Court with the form of asset sale agreement to be provided to potential buyers in connection with the sale of certain assets (the "Assets") associated with Nortel's GSM / GSM-R business (the "GSM Business").

**TERMS OF REFERENCE**

8.    In preparing this Supplemental Twenty-Third Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel.  EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Supplemental Twenty-Third Report.

9.    Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

10.    Capitalized terms not defined in this Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Sale Procedures (as defined below), the Twenty-Third Report of the Monitor dated October 8, 2009 (the "Twenty-Third Report"), or previous Reports of the Monitor.

**GENERAL BACKGROUND**

11.    Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

**THE PURCHASE AGREEMENT**

12.     The Twenty-Third Report provides information with respect to the Applicants' motion for approval to conduct a sale process (the "Sale Process") to market the Assets. This Supplemental Twenty-Third Report should be read in conjunction with the Twenty-Third Report of the Monitor.

13.     As set out in the Twenty-Third Report, the Sale Process contemplates that the Assets will be marketed pursuant to specific Sale Procedures to be approved by this Honourable Court and the U.S. Court. The Sale Procedures contemplate that the Sellers will provide Qualified Bidders with materials and information in respect of the Assets including a form of purchase agreement (the "Purchase Agreement") and related agreements and schedules that are acceptable to the Sellers.

14.     The Sale Procedures provide that a bid will only be considered a Qualified Bid if, among other things, it: i) states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Purchase Agreement, or upon alternative terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholders Committee and the Monitor, are no less favourable than the terms and conditions of the Purchase Agreement; and ii) includes duly authorized and executed purchase agreements, as well as copies of such materials marked to show those amendments and ancillary modifications to the Purchase Agreement and ancillary agreements and the proposed orders to approve the Sale by the U.S. Court, this Honourable Court and any other applicable court(s) whose approval may be required, proposed by the Qualified Bidder.

15.     The draft Purchase Agreement is attached as Appendix "A" hereto. The Monitor notes that the draft Purchase Agreement is subject to modifications or amendments by the Company, in consultation with the Monitor, the UCC and the Bondholder Group and that any such changes to the draft Purchase Agreement will be made available to all potential bidders and Qualified Bidders on a timely basis.

- 4 -

16.    The Purchase Agreement contemplates that the divestiture of the Assets will be structured as follows:

- the transfer of the Owned Inventory, CIP Receivables, Owned Equipment, Assigned Contracts, Prepaid Expenses, and Business Information (each as defined in the Purchase Agreement) used in the GSM Business at Closing;

- an assignment of certain Nortel owned patents, trademarks and other intellectual property used exclusively in the GSM Business;

- a global non-exclusive license within the appropriate field of use of Nortel owned intellectual property used in the GSM Business but not assigned to the purchaser;

- an assignment of certain contracts that relate exclusively to the GSM Business; and

- a mechanism permitting a purchaser to make offers of employment to employees of the Sellers engaged in the GSM Business.

17.    The Purchase Agreement contemplates that the assets of the GSM Business other than those owned by the EMEA entities, NNSA and certain Brazilian, Columbian and Venezuelan Nortel entities will be sold pursuant to the final form of the Purchase Agreement. Assets owned by the EMEA entities will be sold pursuant to a separate EMEA asset sale agreement. Assets owned by NNSA will be sold following French Court approval of an irrevocable offer to be made by the purchaser to purchase the NNSA Assets. The assets of the Brazilian, Columbian and Venezuelan entities will not be sold.

18.    It is contemplated that in connection with the Purchase Agreement, the purchaser and the relevant Nortel parties will also enter into a transition services agreement and an intellectual property license agreement, among other ancillary agreements.

All of which is respectfully submitted this 13th day of October, 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

APPENDIX "A"

Draft Purchase Agreement

[Attached.]

# ASSET SALE AGREEMENT[1]

## BY AND AMONG

## NORTEL NETWORKS CORPORATION

## NORTEL NETWORKS LIMITED

## NORTEL NETWORKS INC.

### AND

## THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

### AND

## [PURCHASER]

### DATED AS OF [●], 2009

---

[1]   THIS DRAFT REMAINS SUBJECT TO FURTHER MODIFICATIONS BY THE
SELLERS IN CONSULTATION WITH THEIR VARIOUS STAKEHOLDERS.

1

## TABLE OF CONTENTS

Page

ARTICLE I INTERPRETATION ...................................................................................... 3

Section 1.1.        Definitions.......................................................................... 3

Section 1.2.        Interpretation...................................................................... 28

1.2.1.        Gender and Number............................................................ 28

1.2.2.        Certain Phrases and Calculation of Time........................... 28

1.2.3.        Headings, etc....................................................................... 28

1.2.4.        Currency............................................................................. 28

1.2.5.        Statutory References. ......................................................... 29

ARTICLE II PURCHASE AND SALE OF ASSETS............................................... 29

Section 2.1.        Purchase and Sale. ............................................................. 29

2.1.1.        Assets. ................................................................................ 29

2.1.2.        Excluded Assets. ................................................................ 30

2.1.3.        Assumed Liabilities. .......................................................... 32

2.1.4.        Excluded Liabilities. .......................................................... 34

2.1.5.        Assumption and Assignment of 365 Contracts.............................. 34

2.1.6.        Assignment of Non-365 Contracts..................................... 35

2.1.7.        Cure Costs; Adequate Assurance; Efforts........................... 35

2.1.8.        Local Sale Agreements. ...................................................... 35

2.1.9.        EMEA Asset Sale Agreement; NNSA Irrevocable
              Offer.................................................................................... 35

2.1.10.       Non-Assignable Assets. ..................................................... 36

Section 2.2.        Purchase Price. .................................................................. 36

2.2.1.        Purchase Price..................................................................... 36

2.2.2.        Estimated Purchase Price.................................................... 37

2.2.3.        Purchase Price Adjustment. ................................................ 38

2.2.4.        Good Faith Deposit............................................................. 41

Section 2.3.        Closing. .............................................................................. 41

2.3.1.        Closing Date........................................................................ 41

2.3.2.        Closing Actions and Deliveries. ......................................... 42

Section 2.4.        Designated Purchaser(s)..................................................... 43

i

# TABLE OF CONTENTS

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ..... 44**

| | | |
|---|---|---|
| Section 3.1. | Organization and Corporate Power | 44 |
| Section 3.2. | Authorization; Binding Effect; No Breach. | 44 |
| Section 3.3. | Financing | 45 |
| Section 3.4. | Adequate Assurance of Future Performance. | 46 |
| Section 3.5. | Purchaser's Acknowledgments; Exclusivity of Representations and Warranties | 47 |
| Section 3.6. | Brokers. | 48 |

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS ........... 48**

| | | |
|---|---|---|
| Section 4.1. | Organization and Corporate Power | 49 |
| Section 4.2. | Authorization; Binding Effect; No Breach. | 49 |
| Section 4.3. | Title to Tangible Assets. | 50 |
| Section 4.4. | Material Contracts. | 50 |
| Section 4.5. | Intellectual Property | 50 |
| Section 4.6. | Litigation | 52 |
| Section 4.7. | Financial Statements. | 52 |
| Section 4.8. | Compliance with Laws; Consents | 52 |
| Section 4.9. | Environmental Matters | 53 |
| Section 4.10. | Labor and Employee Benefits Matters. | 53 |
| Section 4.11. | Brokers. | 54 |
| Section 4.12. | Representations and Warranties by the Other Sellers | 54 |
| 4.12.1. | Organization and Corporate Power | 54 |
| 4.12.2. | Authorization; Binding Effect; No Breach. | 54 |

**ARTICLE V COVENANTS AND OTHER AGREEMENTS ............................................. 55**

| | | |
|---|---|---|
| Section 5.1. | U.S. Bankruptcy Actions. | 55 |
| Section 5.2. | Canadian Bankruptcy Actions. | 55 |
| Section 5.3. | Consultation; Notification | 56 |
| Section 5.4. | Pre-Closing Cooperation | 57 |
| Section 5.5. | Antitrust and Other Regulatory Approvals. | 57 |
| Section 5.6. | Pre-Closing Access to Information | 60 |

ii

### TABLE OF CONTENTS

| Section 5.7. | Public Announcements. | 61 |
| Section 5.8. | Further Actions. | 61 |
| Section 5.9. | Conduct of Business. | 61 |
| Section 5.10. | Transaction Expenses. | 63 |
| Section 5.11. | Confidentiality. | 63 |
| Section 5.12. | Certain Payments or Instruments Received from Third Parties. | 63 |
| Section 5.13. | Non-Assignable Contracts. | 64 |
| Section 5.14. | Bundled Contracts. | 64 |
| Section 5.15. | Post-Closing Assistance for Litigation. | 65 |
| Section 5.16. | Delivery of Assets. | 66 |
| Section 5.17. | Termination of Overhead and Shared Services. | 66 |
| Section 5.18. | Financing. | 66 |
| Section 5.19. | Insurance Matters. | 67 |
| Section 5.20. | Guarantees and Other Credit Support of the Business | 68 |
| Section 5.21. | Use of Trademarks. | 68 |
| Section 5.22. | Sellers' Accessible Information. | 68 |
| Section 5.23. | Maintenance of Books and Records. | 69 |
| Section 5.24. | Additional Bankruptcy Proceedings; Adverse International Injunctions. | 70 |
| Section 5.25. | Finalization of Schedules to Transition Services Agreement; Disputes. | 71 |
| **ARTICLE VI TAX MATTERS** | | **74** |
| Section 6.1. | Transfer Taxes. | 74 |
| Section 6.2. | Withholding Taxes. | 75 |
| Section 6.3. | Tax Characterization of Payments Under This Agreement. | 75 |
| Section 6.4. | Apportionment of Taxes. | 75 |
| Section 6.5. | Tax Disclosure. | 76 |
| Section 6.6. | Records. | 76 |
| Section 6.7. | Tax Returns. | 78 |
| Section 6.8. | Allocation of Purchase Price. | 79 |

## TABLE OF CONTENTS

**ARTICLE VII EMPLOYMENT MATTERS** ................................................................................. 79

    Section 7.1.        Employment Obligations ..................................... 79

          7.1.1.        Employment Terms........................................... 79

          7.1.2.        Employee Benefits............................................ 81

    Section 7.2.        Excluded Employee Liabilities. ........................... 83

    Section 7.3.        Other Employee Covenants. ................................ 84

    Section 7.4.        Canadian Pension Plans. .................................... 85

**ARTICLE VIII CONDITIONS TO THE CLOSING** ..................................................... 85

    Section 8.1.        Conditions to Each Party's Obligation. ................. 85

    Section 8.2.        Conditions to Sellers' Obligation......................... 86

    Section 8.3.        Conditions to Purchaser's Obligation. ................... 86

**ARTICLE IX TERMINATION** ................................................................................. 87

    Section 9.1.        Termination...................................................... 87

    Section 9.2.        Effects of Termination. ...................................... 88

**ARTICLE X MISCELLANEOUS** ............................................................................. 89

    Section 10.1.       No Survival of Representations and Warranties or Covenants........................................................ 89

    Section 10.2.       Remedies......................................................... 89

    Section 10.3.       No Third Party Beneficiaries. .............................. 89

    Section 10.4.       Consent to Amendments; Waivers......................... 90

    Section 10.5.       Successors and Assigns...................................... 90

    Section 10.6.       Governing Law; Submission to Jurisdiction; Waiver of Jury Trial......................................................... 90

    Section 10.7.       Notices. .......................................................... 92

    Section 10.8.       Exhibits; Sellers Disclosure Schedule. .................. 93

    Section 10.9.       Counterparts..................................................... 94

    Section 10.10.      No Presumption. ............................................... 94

    Section 10.11.      Severability. .................................................... 94

    Section 10.12.      Headings ......................................................... 94

    Section 10.13.      Entire Agreement. ............................................. 95

# TABLE OF CONTENTS

Section 10.14.        Availability of Equitable Relief; Sole Remedy. ........................... 95

Section 10.15.        Bulk Sales Laws.................................................................. 95

Section 10.16.        Main Sellers as Representatives of Other Sellers. ....................... 95

Section 10.17.        Execution by Other Sellers. ....................................................... 96

Section 10.18.        Obligations of the Sellers........................................................... 96

# TABLE OF CONTENTS

## EXHIBITS[2]

Exhibit A – Other Sellers

Exhibit B – EMEA Sellers

Exhibit C – Canadian Debtors; U.S. Debtors; EMEA Debtors; Non-Debtor Sellers

Exhibit D – EMEA Asset Sale Agreement

Exhibit E – Contract Manufacturing Inventory Agreements Term Sheet

Exhibit F – Intellectual Property License Agreement

Exhibit G – Knowledge of the Purchaser

Exhibit H – Loaned Employee Agreement

Exhibit I – Antitrust Approvals – Relevant Antitrust Jurisdictions/Authorities

Exhibit J – Subcontract Agreement

Exhibit K – Trademark License Agreement

Exhibit L – Transition Services Agreement

[Exhibit M – Purchaser Supply Agreement/Term Sheet]

[Exhibit N – Seller Supply Agreement/Term Sheet]

Exhibit O – Adjusted Net Working Capital Statement

Exhibit 2.1.8 – Forms of Local Sale Agreements

Exhibit 5.1 – Form of U.S. Sale Order

Exhibit 5.2 – Form of Canadian Approval and Vesting Order

Exhibit 5.9 – Purchaser's Representatives for Interim Covenants Consents

---

[2]  Note to Purchaser: List of exhibits to be finalized when a list of ancillary agreements has been agreed upon.

## ASSET SALE AGREEMENT[3]

This Asset Sale Agreement is dated as of [●], 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the Affiliates (as defined below) of the Main Sellers listed in Exhibit A hereto (the "**Other Sellers**"[4] and, together with the Main Sellers, the "**Sellers**") and [●], a [●] organized under the laws of [●] (the "**Purchaser**").

### W I T N E S S E T H:

WHEREAS, the Sellers and the Affiliates of the Main Sellers listed in Exhibit B hereto (the "**EMEA Sellers**"), and Nortel Network S.A., a corporation incorporated under the laws of France ("**NNSA**") beneficially own and operate the Business (as defined below);

WHEREAS, on January 14, 2009 (the "**Petition Date**"), NNC, NNL and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases and was extended by further order of the Canadian Court on

---

[3]  Note to Purchaser: The sale of the business will be structured as follows:

  1)  all the US and Canadian assets of the Isis business will be sold to the Purchaser as an asset sale governed by this Agreement;

  2)  the assets of the Isis business owned by the EMEA entities, whether in administration or not (except the assets of the Isis business owned by NNSA) will be sold to the Purchaser as a sale governed by a separate EMEA Asset Sale Agreement attached as an exhibit hereto and to be entered into by the EMEA Sellers (and the Joint Administrators of those EMEA Sellers that are in administration)—for the avoidance of doubt, this will include the Russian entity;

  3)  the assets of the Isis business owned by NNSA will be transferred to the Purchaser as an asset sale following the approval by the French Court of an irrevocable offer made by the Purchaser to purchase the NNSA Assets—such irrevocable offer will be attached as an exhibit to the EMEA Asset Sale Agreement;

  4)  the assets of the Isis business owned by any seller that is not included in the above categories (e.g., Asian and South American entities, but excluding the assets held by the Brazilian, Colombian and Venezuelan entities, which will not be sold) will be transferred to the Purchaser as an asset sale governed by this Agreement.

[4]  Note to Purchaser: The "**Other Sellers**" are all those direct and indirect subsidiaries of the Main Sellers (other than those that will sell their Isis assets pursuant to the EMEA Asset Sale Agreement) that own assets belonging to the Isis business. The Other Sellers include both (a) entities that have filed for bankruptcy protection in the US or Canada and (b) entities that are not subject to bankruptcy or administration proceedings.

1

February 10, 2009, April 28, 2009 and July 30, 2009, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit C hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the entities listed under the heading "EMEA Debtors" in part 3 of Exhibit C hereto (the "**EMEA Debtors**") on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "**EMEA Cases**") and the English Court appointed Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes and Alan Bloom serve as joint administrators) (the "**Joint Administrators**") under the Insolvency Act;

WHEREAS, on May 28, 2009, liquidation proceedings with temporary continuation of the business have been commenced in France with respect to NNSA pursuant to the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings and articles L. 640-1 *seq.* of the French Code of commerce, and the Commercial Court of Versailles, France (the "**French Court**") appointed Cosme Rogeau as liquidator and Franck Michel as judicial administrator (together, the "**French Administrators**");

WHEREAS, the Other Sellers listed in part 4 of Exhibit C hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, simultaneously with the execution of this Agreement, the EMEA Sellers, the Joint Administrators, and the Purchaser are entering into a separate agreement in the form set forth in Exhibit D hereto (the "**EMEA Asset Sale Agreement**") providing for the sale to the Purchaser (and/or the EMEA Designated Purchasers (as defined therein)) of the assets of the Business held by such EMEA Sellers;

WHEREAS, Schedule [●] to the EMEA Asset Sale Agreement contains the terms of an irrevocable offer (the "**NNSA Irrevocable Offer**") by the Purchaser to purchase the NNSA Assets (as defined below), which will be submitted for approval to the French Court;

2

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers and/or the EMEA Designated Purchasers, if any) of the Assets, the EMEA Assets (as defined below) and the NNSA Assets (as defined below), the license of Intellectual Property under the Intellectual Property License Agreement [and the Trademark License Agreement] ([each] as defined below), and the assumption by the Purchaser and the Designated Purchasers and/or the EMEA Designated Purchasers, as applicable, of the Assumed Liabilities, the EMEA Assumed Liabilities and the NNSA Assumed Liabilities (each as defined below) are being made at arms' length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates; and

WHEREAS, in addition, at the Closing, the Purchaser, certain Sellers (or Affiliates of the Sellers) and certain EMEA Sellers will enter into the following ancillary agreements (together, the "**Ancillary Agreements**"):  [(i) the Local Sale Agreements, (ii) the Intellectual Property License Agreement, (iii) the Transition Services Agreement, (iv) the Trademark License Agreement, (v) the Loaned Employee Agreement, [and] (vii) the Subcontract Agreement, [(vii) the Purchaser Supply Agreement, and (viii) the Seller Supply Agreement,] (each as defined below) and will use their reasonable efforts to enter into (ix) the Contract Manufacturing Inventory Agreements, and (x) any distribution agreements to be determined].[5]

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I

### INTERPRETATION

Section 1.1.  Definitions.

Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accounting Arbitrator**" has the meaning set forth in Section 2.2.3.1(c).

"**Accrued Vacation Amount**" means, at any given time, the amount of compensation with respect to the accrued and unused vacation days that is due and owing to the Specified Transferred Employees from their respective employer, to be calculated in accordance with the Calculation Principles.[6]

---

[5]  Note to Purchaser:  Scope and list of ancillary agreements to be discussed.

[6]  Note to Purchaser:  The Sellers will be responsible for the compensation payable to the Transferred Employees with respect to their unused and accrued vacation days as of the Closing Date.  Where appropriate under applicable

[Footnote continued on next page]

"**Action**" means any litigation, action, suit, charge, binding arbitration or other legal, administrative, regulatory or judicial proceeding.

"**Additional Bankruptcy Proceeding**" has the meaning set forth in Section 5.24(a).

"**Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(c).

"**Adjusted Net Working Capital Statement**" means the statement of certain specified asset and liability accounts and certain accounting principles, methodologies and policies used in the determination of such accounts, consistent with the Calculation Principles, in the form provided in Exhibit [O] hereto.

"**Adverse International Injunction**" has the meaning set forth in Section 5.24(a).

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; <u>provided</u>, that neither any EMEA Debtor or Subsidiary of an EMEA Debtor (other than those Subsidiaries that are Sellers hereunder) nor NNSA shall be deemed an Affiliate of any Seller.

"**Aggregate Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Aggregate EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Aggregate EMEA Upward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Alternative Transaction**" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation or other similar transaction, of all or substantially all of the Business, or all or substantially all of (i) the Assets, (ii) the EMEA Assets, and (iii) the NNSA Assets ((i), (ii) and (iii) considered together as a whole), in a transaction or a series of transactions with one or more Persons other than the Purchaser and/or its Affiliates; <u>provided</u>, <u>however</u>, that an "Alternative Transaction" shall not include: (i) the retention of the Business by all or part of the Sellers (or their successor entities

---

[Footnote continued from previous page]

Law, the Sellers will pay such amounts directly to the relevant Employees (see Section 7.1.2(c)). Where a direct payment to the Employees is not appropriate, the Sellers will pay the relevant amounts to the Purchaser through this Purchase Price adjustment mechanism for the Accrued Vacation Amount.

emerging from the Bankruptcy Proceedings) under a standalone plan of reorganization or plan of arrangement approved by a Bankruptcy Court, or (ii) the sale, transfer or other disposition, directly or indirectly, of any portion of the Business or the Assets or the EMEA Assets or the NNSA Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Antitrust Approvals**" means the HSR Approval, the EC Merger Regulation Approval and any other decision, in whatever form (including a declaration of lack of jurisdiction or a mere filing or notification, if the Closing can take place, pursuant to the applicable Antitrust Law, without a decision or the expiry of any waiting period), by any Government Entity under the Laws of any of the jurisdictions listed in Exhibit [I] or the expiry of the applicable waiting period, as applicable, under the Antitrust Laws of any of the jurisdictions listed in Exhibit [I],[7] authorizing or not objecting to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer), which includes any decision or consent by any such Government Entity setting forth conditions or obligations on the Purchaser or any of its Affiliates if such conditions have been or, pursuant to Section 5.5(e) or Clause 10.10 of the EMEA Asset Sale Agreement are required, to be accepted by the Purchaser.

"**Antitrust Laws**" means the HSR Act, the EC Merger Regulation, and any competition, merger control and antitrust Law of the European Union, any applicable European Union member states and EFTA states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"**Arbitration Trigger Date**" has the meaning set forth in Section 5.25(h).

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Contracts**" means all Seller Contracts except Non-Assigned Contracts.

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Australian Long Service Leave Amount**" means, at any given time, in respect of Transferred Employees in Australia, the amount specified in Section 7.1.2(c)(vi) of the Sellers

---

[7]   Note to Purchaser:  It is currently expected that the Mandatory Antitrust Approvals will include clearance from the EU Commission under the EC Merger Regulation and expiration under the HSR Act.  Purchaser to provide list of additional Mandatory Antitrust Approvals to be negotiated prior to signing.

Disclosure Schedule in respect of the long service leave, to be calculated in accordance with the Calculation Principles.

"**Balance Sheet Date**" has the meaning set forth in Section 4.7.

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court, the French Court or any other court before which Bankruptcy Proceedings are filed.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act, Book VI of the French Code of commerce (*Code de commerce*) and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration, liquidation or similar judicial proceedings concerning any of the Sellers, the EMEA Sellers or NNSA from time to time.

"**Bundled Contract**" has the meaning set forth in Section 5.14.

"**Business**" means the GSM and GSM-R infrastructure and solutions business of the Sellers, the EMEA Sellers and NNSA consisting of:

      (a)     developing and/or causing to develop the Products;

      (b)     causing the manufacture and testing of the Products;

      (c)     selling and supplying the Products and the warranties thereon; and

      (d)     selling and supplying of the Services;

all as conducted by the Sellers, the EMEA Sellers and NNSA as at the Closing Date, but excludes:

      (i)     any financial, information technology, legal, marketing, human resource operations, real estate or other "corporate" or related services supporting or utilized by such activities, unless such functions are exclusively dedicated to the support of the activities described in (a), (b), (c) and (d), in which event such functions are included;

      (ii)    the Excluded Products and Services; and

      (iii)   Overhead and Shared Services (other than Transferred Overhead and Shared Services).

6

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, (iii) London, England, United Kingdom, and (iv) Paris, France.

"**Business Information**" means all books, records, files, ledgers, documentation, sales literature or similar information in the possession or under control of the Sellers and that, in each case, is used exclusively in connection with the Business, including information, policies and procedures, Owned Equipment manuals and materials and procurement documentation exclusively used in the Business, but excluding any Employee Records.

"**Business Registered IP**" has the meaning set forth in Section 4.5(b).

"**Calculation Principles**" means the Nortel Accounting Principles, to the extent applicable to the determination of the Inventory Value, the CIP Receivables Amount, the Warranty Provision Amount, the Indian and Pakistan Gratuity Payment Amount, the Australian Long Service Leave Amount, the Accrued Vacation Amount, the Adjusted Net Working Capital, and the Prepaid Expenses Amount, and the other accounting principles, methodologies and policies for the determination of the Inventory Value, the CIP Receivables Amount, the Warranty Provision Amount, the Indian and Pakistan Gratuity Payment Amount, the Australian Long Service Leave Amount, the Accrued Vacation Amount, the Adjusted Net Working Capital, and the Prepaid Expenses Amount, as set forth in Section 1.1(a) of the Sellers Disclosure Schedule and in the Adjusted Net Working Capital Statement.

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.

"**Canadian Court**" means the Ontario Superior Court of Justice.

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Sales Process Order**" means that certain order (GSM/GSM-R Bidding Procedures Order), which was entered on October [15], 2009 by the Canadian Court.

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**CIP Receivables**" means, as of a given date, amounts classified in construction-in-process accounts determined in accordance with the Calculation Principles.

"**CIP Receivables Amount**" means, as of any given date, the amount of CIP Receivables of the Business determined in accordance with the Calculation Principles.

7

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 2.3.1.

"**Closing Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing CIP Receivables Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Date**" has the meaning set forth in Section 2.3.1.

"**Closing Employee Adjustment Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Inventory Value**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Prepaid Expenses Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Statement**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Warranty Provision Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Person has entered into with any union or collective bargaining agent with respect to terms and conditions of employment of such Person's employees.

"**Confidentiality Agreement**" means the confidentiality agreement between [Purchaser] and the other parties listed therein dated [•], 2009.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by any Government Entity or other Third Party.

"**Contract**" means any binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.

"**Contract Manufacturing Inventory Agreements**" means the agreements between the Purchaser and/or any Designated Purchasers, the relevant Sellers, and the contract manufacturers of the Business listed in Section 1.1(b) of the Sellers Disclosure Schedule that the

8

relevant Parties will use their reasonable efforts to execute on or before the Closing in the form that shall be negotiated in good faith on the basis of the term sheet attached hereto as Exhibit [E].[8]

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, or as trustee or executor, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract, credit arrangement or otherwise.

"**Covered Assets and Persons**" means the Business (excluding the EMEA Business) and the assets (including the Assets), tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of, the Business (excluding the EMEA Business).

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cure Cost**" means (i) any amounts required by Section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under a 365 Contract and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract, and (ii) with respect to any Non-365 Contract (other than Contracts of a Canadian Debtor that are assignable to the Purchaser without the consent of the counterparty), any amounts required to cure any defaults and to pay any actual pecuniary losses under such Seller Contract in respect of the period prior to the Closing Date.

"**Debt Commitment Letters**" has the meaning set forth in Section 3.3.

"**Debt Financing**" has the meaning set forth in Section 3.3.

"**Designated Purchaser**" has the meaning set forth in Section 2.4.

"**Disagreement Notice**" has the meaning set forth in Section 2.2.3.1(b).

"**Distribution Agent**" means [●], as distribution agent for the Sellers and the EMEA Sellers.

"**Downward Adjustment**" means [●].[9]

---

[8]    Note to Purchaser:  Parties to discuss approach to contract manufacturers.

9

"**EC Merger Regulation**" means Council Regulation (EC) No 139/2004 of January 20, 2004 on the control of concentrations between undertakings, as amended.

"**EC Merger Regulation Approval**" means (i) that the Purchaser shall have received notification from the European Commission that the transactions contemplated in this Agreement are compatible with the common market or there has been a deemed declaration in respect of the transactions contemplated in this Agreement under Article 10(6) of the EC Merger Regulation or (ii) where the transactions contemplated in this Agreement have been referred to an EU or EFTA Member State under Article 4(4) or Article 9 of the EC Merger Regulation, confirmation shall have been received by the Purchaser that the transactions contemplated in this Agreement have been approved or have been approved subject to such conditions, obligations, modifications or undertakings as shall be accepted by the Parties in accordance with the relevant legislation of that EU or EFTA Member State and with Section 5.5.

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**EFTA**" means the European Free Trade Association.

"**EMEA Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Assumed Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Business**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Debtors**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Designated Purchaser**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Downward Adjustment**" has the meaning attributed to the term "Downward Adjustment" in Clause 3.2.2 of the EMEA Asset Sale Agreement.

---

[Footnote continued from previous page]

[9]    Note to Purchaser:  Method for calculating this amount to be discussed.

"**EMEA Owned Inventory**" means (i) Inventory owned and paid for by any EMEA Seller that is held or used exclusively in connection with the Business, including any Inventory which is owned by the EMEA Sellers but remains in the possession or control of a contract manufacturer or another Third Party and (ii) the other Inventory listed in Section 1.1(c) of Sellers Disclosure Schedule.

"**EMEA Sellers**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Upward Adjustment**" has the meaning attributed to the term "Upward Adjustment" in Clause 3.2.1 of the EMEA Asset Sale Agreement.

"**EMEA Warranty Obligations**" means the warranty obligations relating to Products and Services assumed by Purchaser and/or a Designated Purchaser pursuant to Clauses 2.3.2 and 2.3.5 of the EMEA Asset Sale Agreement.

"**Employee**" means any employee of the Sellers engaged in the Business (excluding the EMEA Business), as listed in Section 4.10(b) of the Sellers Disclosure Schedule.

"**Employee Adjustment Amount**" means, at any given time, the sum of (i) the Accrued Vacation Amount, (ii) the Indian and Pakistan Gratuity Payment Amount and (iii) the Australian Long Service Leave Amount.

"**Employee Information**" has the meaning set forth in Section 4.10(b).

"**Employee Records**" means books, records, files, or other documentation, whether in electronic or other form, with respect to Employees.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferred Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day immediately following the Closing Date.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environmental Law**" means any applicable Law relating to or regulating (i) the management, Release or remediation of Hazardous Materials; (ii) the exposure of persons to Hazardous Materials; (iii) occupational health and safety; or (iv) pollution or protection of the environment or natural resources, including the United States Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act and the Toxic Substances Control Act, all as amended, and any requirements of a Government Entity promulgated pursuant to these applicable laws or any analogous foreign, state, provincial or local laws.

"**Environmental Permit**" means any Consent required under any Environmental Law for the Business (excluding the EMEA Business) as currently conducted.

"**Equipment**" means tangible property, including all trade fixtures and fixtures, furniture, furnishings, fittings, equipment, apparatus, appliances and other articles of personal

11

property which are owned by the Sellers and held or used exclusively in connection with the Business, provided, however that "Equipment" shall not include any Inventory, items of tangible property personally assigned to Employees who are not (a) Transferred Employees as of the Employee Transfer Date or (b) Visa Employees, or any Intellectual Property.

"**Equity Commitment Letters**" has the meaning set forth in Section 3.3.

"**Equity Financing**" has the meaning set forth in Section 3.3.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Agent**" means [●]

"**Estimated Aggregate Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Aggregate EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Aggregate EMEA Upward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated CIP Receivables Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Code Schedule**" has the meaning attributed to that term in the Transition Services Agreement.

"**Estimated Employee Adjustment Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Inventory Value**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Prepaid Expenses Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Warranty Provision Amount**" has the meaning set forth in Section 2.2.2(a).

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.2.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

12

"**Excluded Products and Services**" means (a) all products and services provided by businesses or business segments of any Seller other than the Products, and including (b) the following products and all associated development and PLM resources: Evolved Packet Core (including the Access Gateway, MME, and next-generation GPRS support nodes), LTE radio access products and services, WiMAX products and services, XACore Hardware and platform software and associated peripherals (LPP, MS/ENET, SPM, DTC, MTM, DRAM IWSPM), ERS8600, Passport (MSS), associated Software (PCR) and associated OAM MultiService Data Manager(MDM).

"**Executory Contract**" means an "executory contract" for the purposes of the U.S. Bankruptcy Code.

"**Extra Services**" has the meaning set forth in Section 5.25(b).

"**Final Purchase Price**" has the meaning set forth in Section 2.2.3.1(a).

"**Financial Statements**" has the meaning set forth in Section 4.7.

"**Financing**" has the meaning set forth in Section 3.3.

"**Financing Commitments**" has the meaning set forth in Section 3.3.

"**Financing Termination Event**" has the meaning set forth in Section 5.18(a).

"**French Administrators**" has the meaning set forth in the preamble to this Agreement.

"**French Court**" has the meaning set forth in the recitals to this Agreement.

"**GAAP**" means the United States generally accepted accounting principles.

"**General Scope of Included Services**" has the meaning set forth in Section 5.25(a).

"**Good Faith Deposit**" has the meaning set forth in Section 2.2.4.

"**Government Entity**" means any U.S., Canadian, UK, French, supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**GST**" means goods and services tax payable under Part IX of the Excise Tax Act (Canada).

"**Hazardous Materials**" means any chemical, material, waste or substance defined by or regulated under any Environmental Law as a hazardous waste, hazardous material,

13

hazardous substance, extremely hazardous waste, restricted hazardous waste, pollutant, contaminant, toxic substance or toxic waste, including without limitation petroleum, petroleum products, asbestos, lead or polychlorinated biphenyls.

"**Headcount Forecast**" has the meaning attributed to that term in the Transition Services Agreement.

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means that the Purchaser shall have received (i) notification from the responsible Minister under the Investment Canada Act that he/she is satisfied or is deemed to be satisfied that the transactions contemplated in this Agreement that are subject to the provisions of the Investment Canada Act are likely to be of net benefit to Canada and (ii) any other approvals, clearances or authorizations required under the Investment Canada Act to effect the Closing as contemplated by this Agreement.

"**Inactive Employees**" means Employees (other than Employees whose employment transfers to Purchaser or a Designated Purchaser by operation of Law) who have accepted Purchaser or Designated Purchaser's offer of employment as provided in Section 7.1.1 and are on a Seller-approved leave of absence as of the Employee Transfer Date and are expected to return to work and actually return to work in the time permitted for such leave under applicable Law and, for any leave that is not covered under applicable Law, are expected to return to work and actually return to work within twelve (12) months following the Closing Date.

"**Inbound License Agreements**" has the meaning set forth in Section 4.5(f)

"**Included Services**" has the meaning set forth in Section 5.25(a).

"**Indebtedness**" of any Person means at any date, without duplication, all obligations of such Person to the extent incurred for the Business (i) for indebtedness for borrowed money (including any unpaid principal, premium and accrued and unpaid interest or fees), (ii) for indebtedness evidenced by bonds, debentures, notes or similar instruments, (iii) in respect of leases that are capitalized in accordance with GAAP under which such Person is the lessee, (iv) in respect of letters of credit issued for the account of such Person (to the extent drawn), (v) in respect of guarantees of the obligations of other Persons of the type referred to in clauses (i) through (iv) above and (vi) any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayment or default under any of the Indebtedness referred to in items (i) and (ii) above.

"**Independent Auditor**" means [●] or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation that is (i) jointly selected by the Primary Parties, or (ii) in case they cannot agree on any such firm, by [●] at the request of the first Primary Party to move.

"**Indian and Pakistan Gratuity Payment Amount**" means, at any given time, in respect of Transferred Employees located in India and Pakistan, the amount specified on Section 7.1.2(c)(vi) of the Sellers Disclosure Schedule in respect of gratuity payments, to be calculated in accordance with the Calculation Principles.

"**Insolvency Act**" has the meaning set forth in the recitals to this Agreement.

"**Intellectual Property**" means all intellectual and industrial property rights and any and all forms of protection having equivalent or similar effect anywhere in the world as recognized under the Laws of all countries and jurisdictions, whether registered or unregistered and including applications for the registration or grant of any such rights, including rights in or to any of the following: (a) Trademarks; (b) Patents; (c) works of authorship; (d) mask works; (e) trade secrets, know-how and confidential technical or business information; (f) Software; (g) databases and (h) industrial designs.

"**Intellectual Property License Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit [F].

"**Inventory**" means any inventories of raw materials, manufactured and purchased parts, works in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise.

"**Inventory Value**" means, as of any given date, the book value of the Owned Inventory and the EMEA Owned Inventory, net of applicable provisions, that would be required to be reflected on a balance sheet of the Business as of such date prepared consistent with the Calculation Principles.

"**Investment Canada Act**" means the Investment Canada Act, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Joint Administrators**" has the meaning set forth in the recitals to this Agreement.

"**KEIP**" means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in the District of Delaware in part on March 5, 2009 and in part on March 20, 2009, and approved by the Canadian Court in part on March 6, 2009 and in part on March 20, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**KERP**" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware on March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

15

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase means, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(d) of the Sellers Disclosure Schedule, and, with reference to the Purchaser, the actual knowledge of those Persons listed on Exhibit **[G]**.

"**KPD Provision**" means the provision for "Known Product Defects" to be recognized and measured by the Business pursuant to the Calculation Principles with respect to defects (other than defects covered by the Non-KPD Warranty Provision) of Products and/or Services that have been sold by the Sellers and the EMEA Sellers.

"**Law**" means any U.S., Canadian, UK, French, foreign, supranational, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, judicial or administrative order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**LGN Joint Venture**" means LG-Nortel Co. Ltd., which was established in November 2005 as a joint venture between NNL and LG Electronics Inc. for the purpose of jointly developing and marketing certain telecommunications equipment and network solutions.

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchasers under the Intellectual Property License Agreement [and the Trademark License Agreement].

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, prior claim, lease or conditional sale arrangement.

"**Loaned Employee Agreement**" means the agreement between [●], on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or before the Closing attached hereto as Exhibit **[H]**.[10]

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Losses**" means all losses, damages, Liabilities, deficiencies, interest, awards, judgments, fines, penalties and reasonable and documented out-of-pocket costs and expenses

---

[10]    Note to Purchaser:  Pursuant to this agreement, Nortel may supply to the Purchaser the services of those Employees on a visa (other than Employees who transfer to Purchaser or Designated Purchaser by operation of law) that the Purchaser cannot hire immediately upon the Closing.

16

(including reasonable attorneys' fees and disbursements and the costs of litigation, including reasonable amount paid in investigation, defense or settlement of an Action).

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Mandatory Antitrust Filings**" means all notifications and filings which the Purchaser and/or the Sellers and/or the EMEA Sellers and/or NNSA or any of them, in respect of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer), is required under the Laws of any jurisdiction to deliver, prior to Closing, to any Government Entity having jurisdiction over mergers and/or similar transactions under any Antitrust Laws applying to any of the parties or to the transactions contemplated by the Agreement (and/or by the EMEA Asset Sale Agreement and/or by the NNSA Irrevocable Offer).

"**Material Adverse Effect**" means any event, change, circumstance, occurrence or effect that has or would reasonably be expected to have a material adverse effect on the business, operations, assets, results of operations or financial condition of the Business to be transferred hereunder, under the EMEA Asset Sale Agreement and under the NNSA Irrevocable Offer, taken as a whole, but in each case shall not include the effect of events, changes, circumstances, occurrences or effects relating to (a) the industries and markets in which the Business operates, (b) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, acts of God, war, terrorism or hostilities, (c) changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (d) compliance with this Agreement, including any effect on the Business resulting from failure to take any action to which the Purchaser refused consent under this Agreement, (e) the transactions contemplated hereby or any announcement hereof or the identity of the Purchaser, (f) the attrition of customers or employees or other deterioration of the Business prior to the Closing Date, (g) the pendency of the Bankruptcy Proceedings and any action approved by, or motion made before, the Bankruptcy Courts, or (h) matters known to or reasonably foreseeable by the Purchaser, taking into account the financial condition, business and operations of the Sellers and the fact that the Sellers are involved in the Bankruptcy Proceedings; it being understood that the failure of the Business to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect; provided, that, with respect to clauses (a) and (b), any such event, change, circumstance, occurrence or effect shall be included to the extent that such events, changes, circumstances, occurrences or effects have a materially disproportionate effect on the Business as compared to other industry participants.

"**Material Contracts**" has the meaning set forth in Section 4.4.

"**Minimum Terms and Conditions of Employment**" has the meaning set forth in Section 7.1.1.

"**Monetary Cost**" has the meaning attributed to that term in the Transition Services Agreement.

"**Monetary Cost Floor and Cap**" has the meaning set forth in Section 5.25(c).

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**New York Courts**" has the meaning set forth in Section 10.6(b)

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNSA**" has the meaning set forth in the recitals to this Agreement.

"**NNSA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**NNSA Assumed Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**NNSA Irrevocable Offer**" has the meaning set forth in the preamble to this Agreement.

"**NNTC**" means Nortel Networks Technology Corporation.

"**NN Turkey**" means Nortel Networks Netas Telekomunikasyon A.S., a joint stock corporation formed under the laws of Turkey.

"**NNUK**" means Nortel Networks UK Limited.

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.13(a).

"**Non-Assigned Contract**" means a Non-Assignable Contract as to which all applicable Consents to assignment have not been granted prior to the Closing Date.

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

"**Non-KPD Warranty Provision**" means the provision to be recognized and measured by the Business pursuant to the Calculation Principles for potential claims by customers under the Warranty Obligations and the EMEA Warranty Obligations.

"**Non-Solicitation Period**" means the twenty-four (24) month period immediately following the Closing Date.

"**Non-365 Contracts**" has the meaning set forth in Section 2.1.6.

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Financial Statements, as set forth in Section 1.1(e) of the Sellers Disclosure Schedule.

"**Open Source Software**" means Software that is made available under a license agreement that (i) conditions use, modification or distribution of any Software program, or any Software integrated with or derived from such Software program, or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software) or (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software.

"**Ordinary Course**" means the ordinary course of the Business (excluding the EMEA Business) consistent with recent past practice since the filing of the Bankruptcy Proceedings, as such practice may be modified from time to time to the extent necessary to reflect the Bankruptcy Proceedings and as such practice may be modified from time to time to reflect the separation of the Business from the other businesses of the Sellers in a manner consistent with the terms hereof, the EMEA Asset Sale Agreement and the NNSA Irrevocable Offer.

"**Overhead and Shared Services**" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services or provided to both (i) the Business and (ii) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software or other Intellectual Property necessary for or used in connection therewith.

"**Owned Equipment**" means (i) Equipment owned by any of the Sellers that is held or used exclusively in connection with the Business, and (ii) the other Equipment listed in Section 1.1(f) of the Sellers Disclosure Schedule, excluding, in each case, any Owned Inventory and any Intellectual Property.

"**Owned Inventory**" means (i) Inventory owned and paid for by any of the Sellers that is held or used exclusively in connection with the Business, including any such Inventory which is owned by the Sellers but remains in the possession or control of a contract manufacturer or another Third Party, and (ii) the other Inventory listed in Section 1.1(g) of the Sellers Disclosure Schedule.

"**Partial Allocation**" has the meaning set forth in Section 6.8(a).

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patents**" means all national and multinational statutory invention registrations, invention disclosures, patents, utility models, patent applications, provisional patent applications, including all reissues, divisions, continuations, continuations-in-part, extensions and re-examinations thereof.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or for Taxes the validity of which are being contested in good faith by appropriate proceedings other than Liens that may be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP; (iii) Liens arising hereunder or under any Assigned Contracts (after giving effect to the assignment hereunder); (iv) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (v) any other Liens set forth in Section 1.1(h) of the Sellers Disclosure Schedule; and (vi) present or future zoning, entitlement, building and land use regulations, customary covenants, defects of title, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair in any material respect the use or value of the related assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Post-Closing Taxable Period**" means any Taxable period beginning after the Closing Date.

"**Pre-Closing Segregation Costs**" has the meaning set forth in Section 5.25(g).

"**Pre-Closing Segregation Projects**" has the meaning set forth in Section 5.25(g).

"**Pre-Closing Taxable Period**" means any Taxable period ending on or prior to the Closing Date.

"**Prepaid Expenses**" means the prepaid expenses specifically identified as relating to the Business as indicated in the Adjusted Net Working Capital Statement.[11]

---

[11]    Note to Purchaser:  Treatment of these prepaid expenses to be discussed.  This draft anticipates that these Prepaid Expenses would be included in the Working Capital Adjustment, but Sellers' intent is to manage such Prepaid Expenses down to zero pre-Closing.

"**Prepaid Expenses Amount**" means, as of any given date, the amounts classified as Prepaid Expenses of the Business, determined in a manner consistent with the Calculation Principles.

"**Primary Party**" means (i) each of the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Produce Volume Forecast**" has the meaning attributed to that term in the Transition Services Agreement.

"**Products**" means the prior, if currently supported, and current versions of all products set forth in Section 1.1(i) of the Sellers Disclosure Schedule.

"**Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Authorized Agents**" has the meaning set forth in Section 10.6(c).

"**Purchaser Authorized Canadian Agent**" has the meaning set forth in Section 10.6(c).

"**Purchaser Authorized U.S. Agent**" has the meaning set forth in Section 10.6(c).

"**Purchaser Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan, termination or retirement indemnity plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, early or ill health retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferred Employees pursuant to this Agreement.

["**Purchaser Supply Agreement**" means the agreement between the Purchaser and/or any Designated Purchasers, on the one hand, and the relevant Sellers, on the other hand,

21

to be executed on or before the Closing [in the form] [on the basis of the term sheet] attached hereto as Exhibit [M].][12]

"**Qualified Expenditures**" has the meaning set forth in Section 6.6(b).

"**Real Estate Lease**" means any Seller Contract that is a lease, sublease, license or other agreements for occupancy of real estate.

"**Records Custodian**" means Deloitte & Touche LLP or in case such firm is unable to carry out its duties for whatever reason, such other auditing firm of international reputation that is acceptable to each of the Purchaser and the Sellers, each acting reasonably.

"**Regulatory Approvals**" means the (i) Antitrust Approvals, (ii), if required to effect the Closing, the ICA Approval, and (iii) [●].[13]

"**Release**" when used in conjunction with Hazardous Materials, means any spilling, leaking, pumping, emitting, emptying, pouring, discharging, depositing, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers or other receptacles containing Hazardous Materials) into the environment.

"**Removed Assets**" has the meaning set forth in Section 5.24(a).

"**Removed Liabilities**" has the meaning set forth in Section 5.24(b).

"**Respective Affiliates**" has the meaning set forth in Section 10.16(c).

"**Restricted Seller**" has the meaning set forth in Section 5.24(b).

"**Restricted Technical Records**" means the Livelink database or any other similar database containing only all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2007 and subsequent taxation years.

"**Scope Guidelines**" has the meaning set forth in Section 5.25(a).

"**Securities Disclosure Documents**" has the meaning set forth in the first sentence of ARTICLE IV.

"**Seller**" has the meaning set forth in the recitals to this Agreement.

---

[12]    Note to Purchaser:  If applicable and required, this agreement may govern the supply by the Purchaser and/or any Designated Purchasers to the relevant Sellers of certain required products and services.

[13]    Note to Purchaser:  Definition to be completed with any key governmental consents required in connection with the transaction whether relevant to the Sellers or the EMEA Sellers.

"**Seller Authorized Agents**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized Canadian Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized U.S. Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Consents**" has the meaning set forth in Section 2.1.1(i).

"**Seller Contracts**" means those Contracts of a Seller that relate exclusively to the Business (including Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business, but excluding any other licenses of Intellectual Property).

"**Seller Employee Plan**" means (i) any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan, termination or retirement indemnity plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, early or ill health retirement plan, retirement savings plan, post retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates (other than the EMEA Sellers or NNSA) with respect to Employees, and (ii) any other employee benefit plan with respect to which the Purchaser or any of its Affiliates could have any Liability as a result of the Sellers or any of their Subsidiaries or Affiliates (other than the EMEA Sellers or NNSA) maintaining such plan prior to the Closing Date.

"**Seller Insurance Policies**" means all current or previous insurance policies of the Sellers and their Affiliates, including all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, contaminated products insurance policies and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing.

["**Seller Supply Agreement**" means the agreement between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, that

such parties will use their reasonable best efforts to negotiate and execute on or prior to the Closing [in the form] [on the basis of the term sheet] attached hereto as Exhibit **[N]**.][14]

"**Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Sellers' Trademarks**" has the meaning set forth in Section 5.21.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Services**" means the GSM network implementation services, the GSM network managed services and the GSM network support services directly associated with the Business provided by the Sellers, the EMEA Sellers and NNSA as of the Closing Date.

"**Software**" means any and all (i) computer programs, whether in source code or object code, and (ii) computerized databases and compilations.

"**Specified Employee Liabilities**" has the meaning set forth in Section 2.1.3(j).

"**Specified Transferred Employees**" has the meaning set forth in Section 7.1.2(c)(ii).

"**Sponsors**" has the meaning set forth in Section 3.3.

"**Straddle Period**" has the meaning set forth in Section 6.4(b).

"**Subcontract Agreement**" means one or more agreements between the relevant Seller(s), on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, that such parties will use their reasonable best efforts to negotiate and execute on or prior to the Closing in the form attached hereto as Exhibit **[J]**.[15]

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity,

---

[14]     Note to Purchaser:  This agreement may govern the supply by the relevant Sellers to the Purchaser and/or any Designated Purchasers of certain products and services on which the Business is dependent as at the Closing Date.

[15]     Note to Purchaser:  Pursuant to this Subcontract Agreement, for a period not to exceed [60] days from the Closing Date, (i) the relevant Sellers would provide or cause to be provided to the Purchaser or a Designated Purchaser, to the extent permitted under applicable Law and the relevant contract, the benefits of any Bundled Contracts specified in Section 5.14 of the Sellers Disclosure Schedule to the extent they relate to the Business, and (ii) the Purchaser or such Designated Purchaser would assume, directly or indirectly, the Liabilities of, and perform as subcontractor the obligations of, the relevant Seller under any such Bundled Contracts to the extent they relate to the Business.

including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, gross receipts, sales, use, *ad valorem*, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto, and (b) any obligation to pay Taxes of a Third Party, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian, U.K, French or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

"**Tax Credit Purchaser**" has the meaning set forth in Section 6.6(b).

"**Tax Returns**" means all returns, reports (including elections, declarations, disclosures, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes, including any amendments thereto.

"**Third Party**" means any Person that is neither a Party nor an Affiliate of a Party.

"**Third Party Beneficiaries**" has the meaning set forth in Section 10.3.

"**Third Party Provisions**" has the meaning set forth in Section 10.3.

"**365 Contracts**" has the meaning set forth in Section 2.1.5(a).

"**Trademarks**" means, together with the goodwill associated therewith, all trademarks, service marks, trade dress, logos, distinguishing guises and indicia, trade names, corporate names, business names, domain names, whether or not registered, including all common law rights, and registrations, applications for registration and renewals thereof, including without limitation, all marks registered in the trademark offices of any nation throughout the world, and all rights therein provided by multinational treaties or conventions.

"**Trademark License Agreement**" means the trademark license agreement between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be entered into on or before the Closing in the form attached hereto as Exhibit [K].

"**Transaction Documents**" means this Agreement, the EMEA Asset Sale Agreement, the NNSA Irrevocable Offer, the Ancillary Agreements and all other ancillary agreements to be entered into, or documentation delivered by, any Party and/or any Designated Purchaser pursuant to this Agreement or any Local Sale Agreement.

25

"**Transfer Tax Returns**" has the meaning set forth in Section 6.7(a).

"**Transfer Taxes**" means all goods and services, sales, excise, use, transfer, gross receipts, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees and notarial fees), together with interest, penalties and additional amounts imposed with respect thereto.

"**Transferred Employee**" means (i) Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1 and (ii) those Employees whose employment transfers by operation of Law.

"**Transferred Employee Plan**" means any Seller Employee Plan that is transferred (or the Liabilities of which are transferred) to the Purchaser or Designated Purchaser by operation of Law.

"**Transferred Intellectual Property**" means (i) the Transferred Patents, (ii) the Trademarks set forth in Section 1.1(j) of the Sellers Disclosure Schedule, and (iii) any Intellectual Property (other than Patents and Trademarks) owned solely by any of the Sellers that is used exclusively in connection with the Business as of the date hereof.

"**Transferred Overhead and Shared Services**" means Overhead and Shared Services to be provided to or in support of the Business post-Closing by Transferred Employees as set forth in Section 1.1(k) of the Sellers Disclosure Schedule.

"**Transferred Patents**" means the Patents listed in Section 1.1(l) of the Sellers Disclosure Schedule.

"**Transition Services Agreement**" means an agreement between relevant Sellers and/or the relevant EMEA Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or prior to the Closing Date, in the form attached hereto as Exhibit [L], except that the Schedules to such agreement shall be agreed between the Parties in accordance with Section 5.25 hereof.

"**Transition Tax Returns**" has the meaning set forth in Section 6.7(a).

"**TSA Arbitrator**" has the meaning set forth in Section 5.25(h).

"**TSA EMEA Sellers**" means NNUK and Nortel Networks (Ireland) Limited.

"**TSA Sellers**" means the Main Sellers and those entities listed on Exhibit A attached to the form Transition Services Agreement attached hereto as Exhibit [L].

"**Uni-Nortel**" means Uni-Nortel Communication Technologies (Hellas), S.A., a company organized under the laws of Greece, which was established in July 2005 as a joint venture between Nortel Networks International Finance & Holding, B.V. and UniSystems, S.A.

26

for the purposes of marketing and selling certain telecommunications equipment and systems in Greece and the Republic of Cyprus.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**U.S. Bidding Procedures Order**" means that certain [*insert title of the order*], which was entered on [●] by the U.S. Bankruptcy Court.

"**U.S. Debtor Contract**" means any Seller Contract to which a U.S. Debtor is a party.

"**U.S. Debtors**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Sale Order**" means the sale order of the U.S. Bankruptcy Court, substantially in the form attached hereto as Exhibit 5.1, approving the sale of the Assets to the Purchaser (or a Designated Purchaser) and the assignment by the U.S. Debtors to, and assumption thereof by, the Purchaser (or a Designated Purchaser) of the 365 Contracts and the Assumed Liabilities pursuant to Sections 105, 363 and 365 of the U.S. Bankruptcy Code.

"**Visa Employees**" means Employees (other than Employees whose employment transfers by operation of Law) who are identified as having a visa or permit in Section 4.10(b) of the Sellers Disclosure Schedule and whose employment with Purchaser or a Designated Purchaser cannot commence or continue on the Employee Transfer Date solely due to Purchaser or Designated Purchaser's inability to obtain the required visa or permit with respect to such Employee's employment on the Employee Transfer Date.[16]

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1989, as amended, or any similar Law.

"**Warranty Obligations**" means the warranty obligations relating to Products and Services assumed by the Purchaser and/or a Designated Purchaser pursuant to Section 2.1.3(b) and Section 2.1.3(f).

"**Warranty Provision Amount**" means the sum of (i) the KPD Provision and (ii) the Non-KPD Warranty Provision.

---

[16]    Note to Purchaser: There is an expectation that between signing and closing Purchaser will use commercially reasonable efforts to obtain visas or permits that are required for Purchaser to employ these employees. If unsuccessful, Purchaser's efforts are expected to continue while the employee is employed pursuant to the Loaned Employee Agreement.

"**Wholly-Owned Subsidiary**" means any Subsidiary all of the capital stock or capital which is held directly or indirectly by the Purchaser, except for any capital stock which is held by a director of such Subsidiary as required by applicable Laws.

Section 1.2.    Interpretation.

1.2.1.  Gender and Number.

Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2.  Certain Phrases and Calculation of Time.

In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding", and (iv) in determining whether an asset is "exclusively" used in connection with the Business, incidental, *de minimis* or casual uses outside the Business shall not be considered. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

The reference to any "list" set forth in the Sellers Disclosure Schedule shall mean a list that is complete and accurate, taking into account that disclosure in one section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed an adequate response and disclosure of such facts and circumstances with respect to any other representations or warranties by Seller calling for disclosure of such information whether or not such disclosure is specifically associated with it or purports to respond to one or more of such other representations or warranties if it is reasonably apparent on the face of the Sellers Disclosure Schedule that such disclosure is applicable.

1.2.3.  Headings, etc.

The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

1.2.4.  Currency.

All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency. All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency. All payments required under this Agreement shall be paid in United States currency in immediately available funds, unless otherwise specifically indicated herein. Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the Wall Street Journal (Eastern Edition) for the day in question.

1.2.5. Statutory References.

Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

**ARTICLE II**

**PURCHASE AND SALE OF ASSETS**

Section 2.1.   Purchase and Sale.

2.1.1. Assets.

Subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, purchase or be assigned and assume from the relevant Sellers, and each Seller shall sell, transfer or assign to the Purchaser or the relevant Designated Purchasers (subject to the provisions of Section 5.24), whatever right, title and interest in and to the assets exclusively used or held for use by such Seller in the conduct of the Business, to the extent existing as of the Closing Date, excluding the Excluded Assets but including the following assets (such assets, the "**Assets**") (x) in the case of Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens and Claims (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code, (y) in the case of Assets that are transferred or assigned by the Canadian Debtors, free and clear of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to the Canadian Approval and Vesting Order, when granted, and (z) in the case of Assets that are transferred or assigned by the Non-Debtor Sellers, free and clear of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates):

(a)    the Owned Inventory as of the Closing Date;

(b)    the CIP Receivables as of the Closing Date;

(c)    the Owned Equipment as of the Closing Date;

(d)    the Assigned Contracts in force as of the Closing Date;

29

(e)    the Prepaid Expenses as of the Closing Date;

(f)    the Business Information existing as of the Closing Date, subject to Section 2.1.2(h);

(g)    the Transferred Intellectual Property as of the Closing Date, subject to any and all licenses granted prior to the Closing Date under such Intellectual Property, together with all claims against Third Parties for infringement, misappropriation or other violation of any Law with respect to any of the Transferred Intellectual Property;

(h)    all rights as of the Closing under all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Assets; and

(i)    to the extent assignable under applicable Law, all Consents of Government Entities used by the Sellers exclusively pertaining to the Business (the "**Seller Consents**").

2.1.2.  Excluded Assets.

Notwithstanding anything in this Section 2.1 or elsewhere in this Agreement or in any of the Transaction Documents to the contrary, nothing herein shall be deemed to sell, transfer, assign or convey (or require Sellers to do any of the foregoing as to) the following assets to the Purchaser or any Designated Purchaser, and the Sellers shall retain all of their respective rights, title and interests in and to, and the Purchaser and the Designated Purchasers shall have no rights with respect to, the rights, title and interests of the Sellers in and to any of (x) the respective assets of Sellers (other than the Assets), and (y) the following assets (collectively, the "**Excluded Assets**"):

(a)    cash and cash equivalents, accounts receivable (including intercompany receivables but excluding CIP Receivables),[17] bank account balances and all petty cash of the Sellers;

(b)    any refunds due from, or payments due on, claims with the insurers of any of the Sellers in respect of losses arising prior to the Closing Date;

(c)    all rights to Tax refunds, credits or similar benefits relating to the Assets or the Business allocable to a Pre-Closing Taxable Period or to the portion of a Straddle Period ending on and including the Closing Date;

---

[17]    Note to Purchaser:  Bidders are invited to make an offer to purchase all account receivables. To the extent that account receivables are not sold to the Purchaser, provisions should be included that the Purchaser will provide all assistance requested in connection with the collection of receivables.

30

(d)     all claims, causes of action and rights of Sellers or any Subsidiary thereof to the extent relating to any Excluded Liabilities or to any Liabilities for which Sellers are responsible under this Agreement (including rights of set-off, rights to refunds and rights of recoupment from or against any Third Party);

(e)     any security deposits made by or on behalf the Sellers (including those relating to Assigned Contracts);

(f)     any rights of the Sellers under any Non-Assigned Contract;

(g)     the minute books, stock ledgers and Tax records of the Sellers;

(h)     (i) any books, records, files, documentation or sales literature other than the Business Information (subject to clause (iii) below of this subsection and the last paragraph of this Section 2.1.2), (ii) the Employee Records, and (iii) such portion of the Business Information that the Sellers are required by Law (including Laws relating to privilege or privacy) or by any agreement with a Third Party to retain and/or not to disclose (provided that copies of such information shall be provided to the Purchaser at the Purchaser's cost and to the extent permitted by applicable Law or such agreement);

(i)     except for (i) the Transferred Intellectual Property and the rights described in Section 2.1.1(g) above, and (ii) Intellectual Property to the extent rights are granted thereto pursuant to the Intellectual Property License Agreement[, the Trademark License Agreement] or any other Transaction Documents, any rights to (A) any Intellectual Property of any of the Sellers (including Sellers' names) or any Affiliates of any of the Sellers or (B) Intellectual Property owned by a Third Party or jointly with any Third Party, except to the extent licensed under an Assigned Contract;

(j)     all rights of the Sellers under this Agreement and the Transaction Documents;

(k)     all of the rights and claims of the U.S. Debtors available to the U.S. Debtors under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code, and any related claims and actions arising under such Sections by operation of Law or otherwise, including any and all proceeds of the foregoing;

(l)     all records prepared in connection with the sale of the Assets and the EMEA Assets to the Purchaser and the Designated Purchasers;

(m)     all stock or other equity interests in any Person;

(n)     any assets set forth on Section 2.1.2(n) of the Sellers Disclosure Schedule;

(o)     any freehold or leasehold interest in any real estate;

(p)     any assets deemed to be Removed Assets pursuant to Section 5.24 or otherwise under this Agreement;

31

(q)     any business asset, product or service run, owned, managed and/or provided by NN Turkey, the LGN Joint Venture, Uni-Nortel and any other joint venture (or similar arrangement) of the Sellers and the EMEA Sellers unless expressly included in this Agreement; and

(r)     any and all other assets and rights of the Sellers not specifically included in Section 2.1.1.

In addition to the above, the Sellers shall have the right to retain, following the Closing, copies of any book, record, literature, list and any other written or recorded information constituting Business Information to which the Sellers in good faith determine they are reasonably likely to need access for *bona fide* business or legal purposes.

2.1.3.    Assumed Liabilities.

On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, assume and become responsible for, and duly and properly perform, discharge and pay and indemnify the Sellers against, when due, the following Liabilities (the "**Assumed Liabilities**"):

(a)     all Liabilities of the Sellers arising on or after the Closing Date to the extent related to the conduct, operation or ownership of the Business after the Closing Date, including (i) all such Liabilities with respect to the ownership, exploitation and operation of the Assets, (ii) all such Liabilities related to Actions or claims brought against the Business, (iii) all such Liabilities under any Environmental Laws, (iv) all such Liabilities under any products liability Laws or similar Laws concerning defective products, and (v) all such Liabilities under any applicable Laws in relation to telecommunications;

(b)     all Liabilities of the Sellers arising from or in connection with the performance of the Assigned Contracts (or breach thereof), whether occurring before or after the Closing Date, including (i) any Cure Costs payable pursuant to Section 2.1.7 (to the extent applicable), (ii) any obligation under any Assigned Contract to buy back from the relevant resellers the Products sold by the Business to such resellers under such Assigned Contract, and (iii) any obligations under any warranty or indemnification liabilities relating to Products and/or Services which have been supplied under any Assigned Contract;

(c)     all Liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property which the Sellers may have granted or committed to Third Parties, including Liabilities resulting from any assurances, declarations and undertakings made to standard setting bodies;

(d)     all Liabilities for, or related to any obligation for, any Tax that the Purchaser or any Designated Purchaser bears under ARTICLE VI (including for the avoidance of doubt, Transfer Taxes imposed in connection with this Agreement and the transactions contemplated hereunder or in connection with the execution of any other Transaction Documents);

32

(e)      all Liabilities relating to executory supply purchase orders entered into by the Business in the normal course with any Person who is a supplier of the Business as of the date hereof (or a replacement supplier for any such supplier) and under which Products and/or Services have not been delivered or supplied as of the Closing Date;

(f)      all obligations of the Sellers under any warranty Liabilities relating to Products and Services which have been supplied prior to the Closing under any Bundled Contract subcontracted to the Purchaser or any Designated Purchaser under any Subcontract Agreement or the benefit and burden of which has otherwise been transferred in accordance with . Section 5.14(b);

(g)      except to the extent otherwise expressly set forth in ARTICLE VII, all Liabilities related to or arising from any of the following: (i) the Purchaser's or any Designated Purchasers' (or any of their Affiliates') employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees arising on or after the Closing Date; (ii) the Purchaser's or relevant Designated Purchasers' (or any of their Affiliates') offer of employment or notice of continued employment, as applicable, to any Employee pursuant to the terms of Section 7.1 (including any violation of Law in connection therewith); and (iii) the failure of the Purchaser or any Designated Purchasers or their Affiliates to satisfy their obligations with respect to the Employees, including the Transferred Employees, as set out in ARTICLE VII;

(h)      all Liabilities that relate to or arise from or in connection with any Purchaser Employee Plan;

(i)      any obligation to provide continuation coverage pursuant to COBRA or any similar Law under any Purchaser Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to Transferred Employees and/or their qualified beneficiaries with respect to a qualifying event that occurs on or after such Transferred Employees' Effective Hire Date;

(j)      all Liabilities related to the Transferred Employees set forth on Section 2.1.3(j) of the Sellers Disclosure Schedule (the "**Specified Employee Liabilities**");[18]

(k)      all Liabilities related to Transferred Employees expressly assumed by Purchaser or a Designated Purchaser as set out in ARTICLE VII;

(l)      Liabilities related to obligation to repurchase Business-related Inventory under contract manufacturing agreements, as specified in the Contract Manufacturing Inventory Agreements;

---

[18]      This Section of the Sellers Disclosure Schedule will identify the liabilities for obligations regarding long service leave and sick leave for employees in Australia, gratuity payments for employees in India and Pakistan and accrued unused vacation of Specified Transferred Employees.

33

(m)    all Liabilities reflected in the computation of Adjusted Net Working Capital; and

(n)    all other Liabilities listed in Section 2.1.3(n) of the Sellers Disclosure Schedule.

2.1.4.  Excluded Liabilities.

Except as provided in Section 2.1.3 or in any other provision in this Agreement or in any Ancillary Agreement, at the Closing, neither the Purchaser nor any Designated Purchasers shall assume any Liabilities of the Sellers or their Affiliates (collectively the "**Excluded Liabilities**").  Without limiting the foregoing, Excluded Liabilities include:

(a)    all Indebtedness of the Sellers and their Affiliates;

(b)    all Liabilities arising out of the Contracts that are not Assigned Contracts;

(c)    all accounts payable and trade payables of the Sellers, including intercompany payables but excluding any Liabilities described under Section 2.1.3(e);

(d)    all fees or commissions of any brokers, funds or investment banks in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates;

(e)    all Liabilities deemed to be Removed Liabilities pursuant to Section 5.24 or otherwise under this Agreement;

(f)    all Excluded Employee Liabilities; and

(g)    all Liabilities of NN Turkey, the LGN Joint Venture, Uni-Nortel.

2.1.5.  Assumption and Assignment of 365 Contracts.

(a)    At Closing, the U.S. Debtors will assume and assign to the Purchaser or a Designated Purchaser, all U.S. Debtor Contracts (other than Real Estate Leases) that are Executory Contracts, and were entered into prior to the Petition Date (the "**365 Contracts**"). Section 2.1.5(a) of the Sellers Disclosure Schedule sets forth a list of all 365 Contracts.

(b)    Prior to the Closing Date, the Sellers shall be entitled to update and/or supplement Section 2.1.5(a) of the Sellers Disclosure Schedule.

(c)    The U.S. Debtors shall seek the approval of the U.S. Bankruptcy Court to permit the assumption and assignment of all the 365 Contracts in accordance with Section 5.1.

2.1.6.  Assignment of Non-365 Contracts.

At Closing, the Sellers that are not U.S. Debtors will assign to the Purchaser or a Designated Purchaser all Seller Contracts other than U.S. Debtor Contracts, Real Estate Lease or Non-Assignable Contracts (the "**Non-365 Contracts**").

2.1.7.  Cure Costs; Adequate Assurance; Efforts

(a)    To the extent that assumption and assignment of any 365 Contract or assignment of Non-365 Contract entail the payment of any Cure Cost, the Purchaser shall directly pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order and such payment shall not entitle the Purchaser to any adjustment to the Purchase Price.

(b)    Prior to the hearing before the U.S. Bankruptcy Court to assume the 365 Contracts, the Purchaser shall provide adequate assurance of its and the relevant Designated Purchasers' future performance under each 365 Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code and to the extent required by the U.S. Sale Order.

(c)    The Parties shall, and shall cause the Other Sellers and the Designated Purchasers, as applicable, to, use reasonable best efforts to obtain all Consents required to permit the assignment to the Purchaser (or, if specified by the Purchaser, a Designated Purchaser) of the Contracts that have been entered into with customers in force as of the Closing Date; provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in seeking such Consents and provided further that the failure to obtain any or all of such Consents shall not in itself entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby, or under the EMEA Asset Sale Agreement or entitle the Purchaser to any adjustment to the Purchase Price.

2.1.8.  Local Sale Agreements.

Subject to the terms and conditions hereof, if reasonably requested in writing by the Purchaser to effect the Closing on the terms hereof, the relevant Sellers shall, and the Purchaser shall, and shall cause the relevant Designated Purchasers to, enter into such agreements or instruments, including bills of sale and/or assignment and assumption agreements (the "Local Sale Agreements"), providing for (i) the sale, transfer, assignment or other conveyance to the Purchaser and relevant Designated Purchasers, in accordance with the requirements of applicable local Law, of any Assets located in the countries listed in Section 2.1.8 of the Sellers Disclosure Schedule, and (ii) the assumption by the Designated Purchasers of any Assumed Liability that the Purchaser intends to allocate to them. The agreed forms of certain of such Local Sale Agreements, subject to modification required by applicable Law, are attached to this Agreement as Exhibit 2.1.8. In the event of a conflict between this Agreement and the Local Sale Agreement, this Agreement shall prevail.

2.1.9.  EMEA Asset Sale Agreement; NNSA Irrevocable Offer.

None of the EMEA Sellers, NNSA, the Joint Administrators, or the French

Administrators shall assume, or be deemed to assume, any Liability whatsoever under this Agreement and nothing in this Agreement (except to the extent expressly incorporated into the EMEA Asset Sale Agreement or the NNSA Irrevocable Offer) shall apply to, or govern, the sale, assignment, transfer, retention or assumption of assets, rights, properties or Liabilities of, or by, NNSA, the French Administrators, any EMEA Sellers or the Joint Administrators in any manner whatsoever. The only assets, rights, properties and Liabilities of NNSA or the French Administrators that are being sold, assigned or transferred to, and assumed by, the Purchaser or the Designated Purchaser(s), and the terms and conditions thereof, and representations with respect thereto, are solely as expressly set forth in the NNSA Irrevocable Offer. The only assets, rights, properties and Liabilities of the EMEA Sellers or Joint Administrators that are being sold, assigned or transferred to, and assumed by, the Purchaser or the EMEA Designated Purchasers, and the terms and conditions thereof, and representations with respect thereto, are solely as expressly set forth in the EMEA Asset Sale Agreement. Neither the Purchaser nor any Designated Purchaser shall be entitled to make any claim under this Agreement, or assert any right hereunder, against any Person other than the Sellers.

2.1.10. Non-Assignable Assets.

Notwithstanding anything in this Agreement to the contrary, if a Consent of a Third Party (including a Government Entity) has not been obtained on or prior to Closing, then, unless such Consent is subsequently obtained, this Agreement shall not constitute an agreement to sell, transfer, lease or sublease or assign, directly or indirectly, any Asset or any obligation or benefit arising thereunder if an attempted direct or indirect sale, transfer, lease, sublease or assignment thereof, without such Consent, would constitute a breach, default, violation or other contravention of the rights of such Third Party or would be ineffective with respect to any party to a Contract concerning such Asset. For greater certainty, failure to obtain any such Consent shall not entitle the Purchaser to terminate or rescind this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment of the Purchase Price.

Section 2.2.    Purchase Price.

2.2.1.  Purchase Price.

Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the sale, transfer and assignment of the Assets pursuant to the terms hereof, of the EMEA Assets pursuant to the EMEA Asset Sale Agreement and of the NNSA Assets under the NNSA Irrevocable Offer, and of the rights granted by certain Sellers and the EMEA Sellers under the Intellectual Property License Agreement [and the Trademark License Agreement], the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers, shall (x) assume and become obligated to pay, duly and properly perform and discharge and indemnify, when due, the Assumed Liabilities and the EMEA Assumed Liabilities and (y) pay to the Distribution Agent an amount of cash (the "**Purchase Price**") equal to [●] dollars ($ [●]) to be adjusted pursuant to this Agreement and Clause 3.2 of the EMEA Asset Sale Agreement.

2.2.2.  Estimated Purchase Price.

(a)      For purposes of determining the amount of cash to be paid as the Estimated Purchase Price by the Purchaser to the Sellers and the EMEA Sellers at the Closing pursuant to Section 2.3.2(b), at least three (3) Business Days prior to the Closing Date, the Main Sellers and the EMEA Sellers shall deliver to the Purchaser a statement prepared in good faith in accordance with the Calculation Principles (in all cases without double-counting of Cure Costs) and the terms hereof setting forth:

(i)      the estimated amount of the Inventory Value as of the Closing Date (the "**Estimated Inventory Value**"),

(ii)      the estimated amount of the CIP Receivables Amount as of the Closing Date (the "**Estimated CIP Receivables Amount**"),

(iii)      the estimated amount of the Prepaid Expenses Amount as of the Closing Date (the "**Estimated Prepaid Expenses Amount**"),

(iv)      the estimated amount of the Warranty Provision Amount as of the Closing Date (the "**Estimated Warranty Provision Amount**"),

(v)      the estimated amount of the Employee Adjustment Amount as of the Closing Date (the "**Estimated Employee Adjustment Amount**"),

(vi)      the estimated amount of the Adjusted Net Working Capital (the "**Estimated Adjusted Net Working Capital**"),

(vii)      the estimated amount of the aggregate of all EMEA Upward Adjustments (the "**Estimated Aggregate EMEA Upward Adjustment**"),

(viii)      the estimated amount of the aggregate of all EMEA Downward Adjustments (the "**Estimated Aggregate EMEA Downward Adjustment**"),

(ix)      the estimated amount of the aggregate of all Downward Adjustments (the "**Estimated Aggregate Downward Adjustment**"), and

(x)      the Estimated Purchase Price.

(b)      As used in this Agreement, "**Estimated Purchase Price**" means an amount equal to:

(i)      the Purchase Price; plus

37

(ii)    the difference, which may be positive or negative, equal to the Estimated Adjusted Net Working Capital minus $[●][19]; plus

(iii)    the Estimated Aggregate EMEA Upward Adjustment; minus

(iv)    the Estimated Aggregate EMEA Downward Adjustment; minus

(v)    the Estimated Aggregate Downward Adjustment (if any); minus

(vi)    the Estimated Employee Adjustment Amount (if any).

(c)    As used in this Agreement and shown in the attached Adjusted Net Working Capital Statement in Exhibit [O], the "**Adjusted Net Working Capital**" means an amount equal to:

(i)    the Inventory Value; plus

(ii)    the CIP Receivables Amount; plus

(iii)    the Prepaid Expenses Amount; minus

(iv)    the Warranty Provision Amount.

2.2.3.    Purchase Price Adjustment.

2.2.3.1    Closing Statement; Dispute Resolution.

(a)    As promptly as practicable after the Closing (and in any event within thirty (30) days after the Closing), the Purchaser shall deliver to the Main Sellers and the EMEA Sellers a written statement (the "**Closing Statement**"), which shall be prepared in accordance with the Calculation Principles and the terms hereof and contain the Purchaser's final calculation of:

(i)    the Inventory Value as of the Closing (the "**Closing Inventory Value**");

(ii)    the CIP Receivables Amount as of the Closing (the "**Closing CIP Receivables Amount**");

(iii)    the Prepaid Expenses Amount as of the Closing (the "**Closing Prepaid Expenses Amount**");

(iv)    the Warranty Provision Amount as of the Closing (the "**Closing Warranty Provision Amount**");

---

[19]    Note to Purchaser: Normalized working capital to be provided.

38

(v)    the Adjusted Net Working Capital as of the Closing (the "**Closing Adjusted Net Working Capital**");

(vi)    the Employee Adjustment Amount as of the Closing Date (the "**Closing Employee Adjustment Amount**");

(vii)    the aggregate of all EMEA Upward Adjustments (the "**Aggregate EMEA Upward Adjustment**");

(viii)    the aggregate of all EMEA Downward Adjustments (the "**Aggregate EMEA Downward Adjustment**");

(ix)    the aggregate of all Downward Adjustments (the "**Aggregate Downward Adjustment**");

(x)    the final Purchase Price adjusted as provided in this Section and based on the foregoing (the "**Final Purchase Price**"), which shall be equal to:

(A)    the Purchase Price; plus

(B)    the difference, which may be positive or negative, equal to the Closing Adjusted Net Working Capital minus $[●]; plus

(C)    the Aggregate EMEA Upward Adjustment; minus

(D)    the Aggregate EMEA Downward Adjustment; minus

(E)    the Aggregate Downward Adjustment (if any); minus

(F)    the Closing Employee Adjustment Amount (if any).

(b)    If the Main Sellers and/or the EMEA Sellers disagree with the determination of the Closing Statement, the Main Sellers and/or the EMEA Sellers shall notify the Purchaser of such disagreement within thirty (30) days after delivery of the Closing Statement (such notice, the "**Disagreement Notice**"). The Disagreement Notice shall set forth, in reasonable detail, any disagreement with, and any requested adjustment to, the Closing Statement. If the Main Sellers and/or the EMEA Sellers fail to deliver the Disagreement Notice by the end of such thirty- (30-) day period, the Main Sellers and the EMEA Sellers shall be deemed to have accepted as final the Closing Statement delivered by the Purchaser. Matters included in the calculations in the Closing Statement to which the Main Sellers and the EMEA Sellers do not object in the Disagreement Notice shall be deemed accepted by the Main Sellers and the EMEA Sellers and shall not be subject to further dispute or review. Throughout the periods during which the Closing Statement is being prepared and any disputes that may arise under this Section 2.2.3 are being resolved, the Purchaser shall, promptly upon request, provide the Main Sellers, the EMEA Sellers and their respective accountants access to the books, records and personnel of the Business and all documents, schedules and workpapers used by the Purchaser in the preparation of the Closing Statement or that are otherwise reasonably necessary for the Main Sellers, the EMEA Sellers and their respective accountants to review the Closing

Statement (other than any such documents, schedules and workpapers that are subject to attorney-client privilege; it being understood, however, that Purchaser and the Designated Purchasers shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the Main Sellers and the EMEA Sellers or their respective representatives to occur without so jeopardizing privilege). The Main Sellers, the EMEA Sellers and the Purchaser shall negotiate in good faith to resolve any disagreement with respect to the Closing Statement, and any resolution agreed to in writing by the Main Sellers, the EMEA Sellers and the Purchaser shall be final and binding upon the Parties.

(c)     If the Main Sellers, the EMEA Sellers and the Purchaser are unable to resolve any disagreement as contemplated by Section 2.2.3.1(b) within [●] ([●]) days after delivery of a Disagreement Notice by the Main Sellers and/or the EMEA Sellers, the Independent Auditor shall serve as arbitrator (the "**Accounting Arbitrator**") to resolve such disagreement. The Primary Parties and NNUK shall instruct the Accounting Arbitrator to consider only those items and amounts set forth in the Closing Statement as to which the Main Sellers, the EMEA Sellers and the Purchaser have not resolved their disagreement and to conduct such hearing as it considers necessary to resolve such disagreement. The Main Sellers, the EMEA Sellers and the Purchaser shall use their reasonable best efforts to cause the Accounting Arbitrator to deliver to the Primary Parties and NNUK, as promptly as practicable (and in no event later than [●] ([●]) days after his or her appointment), a written report setting forth the resolution of any such disagreement determined in accordance with the terms of this Agreement. Such report and the Closing Statement, as adjusted thereby, shall be final and binding upon the Sellers, the EMEA Sellers and the Purchaser. In the event the Accounting Arbitrator concludes that the Purchaser was correct as to a majority (by dollar amount) of the disputed items, then the Sellers and the EMEA Sellers shall share the Accounting Arbitrator's fees, costs and expenses. In the event the Accounting Arbitrator concludes that the Main Sellers and EMEA Sellers were correct as to a majority (by dollar amount) of the disputed items, then the Purchaser shall pay the Accounting Arbitrator's fees, costs and expenses.

2.2.3.2     Calculation and Payment of the Purchase Price Adjustment.

(a)     If the Final Purchase Price, as finally determined in accordance with this Section 2.2.3, is less than the Estimated Purchase Price, then the Main Sellers, acting on behalf and as agent of the Other Sellers and the EMEA Sellers shall pay to the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, the excess of the Estimated Purchase Price over the Final Purchase Price.

(b)     If the Final Purchase Price, as finally determined in accordance with this Section 2.2.3, exceeds the Estimated Purchase Price, the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, shall pay to the Distribution Agent the amount by which the Final Purchase Price exceeds the Estimated Purchase Price.

(c)     Any payment to be made under this Section 2.2.3.2 shall include interest thereon calculated from the Closing Date to the date of payment at a rate per annum of three (3)%. Such interest shall accrue from day to day.

40

(d)    All amounts payable under this Section 2.2.3.2 to any Party shall be paid in cash by wire transfer of immediately available funds to the bank account(s) designated in writing by the Main Sellers in case of payment to the Distribution Agent or by the Purchaser in case of payment to the Purchaser within five (5) Business Days of the final determination of the Closing Statement in accordance with Section 2.2.3.1.

2.2.4.  Good Faith Deposit.

(a)    The Purchaser has delivered to the Escrow Agent an amount in United States dollars equal to US$10,000,000 (the "**Good Faith Deposit**") in the form of [●][20] to serve as earnest money under this Agreement.

(b)    The Good Faith Deposit shall:

(i)    be applied to the Estimated Purchase Price to be paid by the Purchaser pursuant to Section 2.3.2(b) and therefore be paid by the Escrow Agent to the Distribution Agent (as agent of the Sellers and the EMEA Sellers) pursuant to Section 2.3.2(c) at Closing; or

(ii)    become property of the Sellers and the EMEA Sellers:

(1)    in the event that this Agreement is terminated for any reason after the granting of the U.S. Sale Order and the Canadian Approval and Vesting Order; and/or

(2)    in the event that this Agreement is terminated by the Main Sellers pursuant to Section 9.1(c)(i) [or Section 9.1(d)]; and/or

(3)    in the event that this Agreement is terminated by any Primary Party pursuant to Section 9.1(b)(iii) or Section 9.1(b)(iv); or

(iii)    be promptly returned to the Purchaser otherwise.

Section 2.3.    Closing.

2.3.1.  Closing Date.

The completion of the purchase and sale of the Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall occur simultaneously with the closing of the transaction contemplated by the EMEA Asset Sale Agreement, and shall take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in [●], [●], commencing at 12:00 p.m. local time on

---

[20]    Note to Purchaser:  To be completed based on the form agreed by the Parties.