**EXHIBIT A**

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")

TWENTY-FOURTH REPORT OF THE MONITOR
DATED OCTOBER 13, 2009

## INTRODUCTION

1.  On January 14, 2009 (the "Filing Date") Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited
    ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks
    International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC")
    (collectively the "Applicants") filed for and obtained protection under the *Companies'
    Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court
    dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc.
    ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA

- 2 -

proceeding. The stay of proceedings was extended to October 30, 2009, by this Honourable Court in its Order dated July 30, 2009.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009. As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009. In addition, an ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as those in the U.S. (the "Bondholder Group").

3.  Nortel Networks (CALA) Inc. ("NCI") (together with NNI and certain of its subsidiaries filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

4.  Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in Europe, the Middle East and Africa (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court") on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "U.K. Administrators").

5.  On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together, "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel (the "Joint Israeli Administrators") and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

- 3 -

6.    Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court.

**PURPOSE**

7.    The purpose of this twenty-fourth Report of the Monitor ("Twenty-Fourth Report") is to provide this Honourable Court with information regarding the Applicants' motion seeking approval of:

- an asset sale agreement dated October 7, 2009 (the "Ciena Agreement") amongst NNC, NNL and NNI (the "Main Sellers") and certain of their affiliates (the "Other Sellers" and, with the Main Sellers, the "Sellers"), and Ciena Corporation ("Ciena" or the "Purchaser") in respect of the sale of substantially all of the Metro Ethernet Networks business (the "MEN Business") as a "stalking horse" agreement;

- a sealing order in respect of the exhibits and sellers disclosure schedules (the "Sellers Disclosure Schedules") to the Ciena Agreement for the reasons set out below;

- the Bidding Procedures (as defined below);

- the terms and conditions of the Break-Up Fee and Expense Reimbursement (as defined below); and

- a letter of intent (the "Montreal LOI") between NNL and Breof/Belmont Ban G.P. Limited (the "Montreal Landlord"), with respect to the amendment of the current lease agreement in respect of certain property located in St. Laurent,

- 4 -

Quebec (the "Montreal Premises"), which property is currently utilized in connection with the MEN Business; and

to provide the Monitor's support thereof.


## TERMS OF REFERENCE

8.  In preparing this Twenty-Fourth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. EYI has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Report.

9.  Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

10. Capitalized terms not defined in this Twenty-Fourth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor, the Bidding Procedures or the Ciena Agreement.


## GENERAL BACKGROUND

11. Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

12. As at June 30, 2009, Nortel conducts its global business through four reportable business unit segments, Carrier Networks ("CN"), Enterprise Solutions ("ES"), Metro Ethernet Networks ("MEN") and LG Nortel Co. Ltd. ("LGN"). The revenue and assets of each of

- 5 -

the business units, except for LGN, is distributed among the multiple Nortel legal entities and joint ventures around the world.

13.    The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

### THE METRO ETHERNET NETWORKS BUSINESS

*Background*

14.    The MEN Business is not operated through a dedicated legal entity or stand-alone division. Generally, Nortel has one legal entity in each country in which it operates and sales of all Nortel products in that country are made through the single legal entity. A more detailed description of this structure is set out in the Pre-Filing Report.

15.    The Ciena Agreement specifically defines the MEN Business as the optical networking solutions and carrier ethernet switching segments of Nortel's overall "Metro Ethernet Networks" business unit. The MEN Business excludes the "Carrier Data" and "Ethernet Fibre Access" segments of the Company's overall Metro Ethernet Networks business unit. The optical networking segment is the predominant part of the Metro Ethernet Networks business unit. The sale of the MEN Business pursuant to the Ciena Agreement also excludes Nortel's Passport portfolio of products.

16.    The MEN Business delivers and services communications infrastructure and solutions for the transport of voice, video and data signals for the "Metropolitan" and "Long-Haul" communications markets using innovative optical networking capabilities. The MEN Business' solutions are designed to deliver carrier-grade ethernet transport capabilities for higher performance and lower cost communication for emerging video-intensive applications.

- 6 -

17.  Principal competitors to the MEN Business include Cisco Systems, Inc., Nokia Siemens
     Networks B.V., Alcatel-Lucent, Huawei Technologies Co., Ltd., Fujitsu Limited and
     Ericsson as well as other companies that compete in certain niches within this market
     including Ciena, ADVA AG Optical Networking, Meiningen, Tellabs, Inc. and Infinera
     Corporation.

18.  The MEN Business operates globally in approximately 44 countries. It has an installed
     base with over 400,000 network elements. Fiscal 2008 revenues were $1.3 billion
     representing approximately 13% of Nortel's 2008 revenues.

19.  The MEN Business had revenues in Canada in fiscal 2008 of approximately $213 million
     representing approximately 31% of Nortel's 2008 Canadian revenue.

20.  In addition, the Applicants have an interest in the intellectual property upon which the
     products of the MEN Business are based. Generally speaking, the owner of the intellectual
     property in the Nortel group, which in most cases is NNL, licenses the intellectual property
     in question to various other Nortel legal entities around the world, in some cases on an
     exclusive basis and in other cases, on a non-exclusive basis. These Nortel entities in turn
     license the intellectual property related to the MEN Business to customers in their
     respective geographic regions.

21.  The MEN Business currently employs the equivalent of approximately 2,330 full time
     employees. This includes individuals directly involved in the MEN Business as well as
     individuals in other Nortel functional areas and corporate departments that are dedicated to
     the MEN Business. Of the 2,330 employees dedicated to the MEN Business,
     approximately 1,450 are located in Canada. (The majority of the Canadian employees
     perform research and development activities and as a result, the majority of the global
     MEN Business's research and development expenditures are incurred by the Applicants.)
     The majority of the remaining employees are located in the United States, the U.K., and
     China, with the balance located in other countries. Generally, these individuals are
     employed by the Nortel legal entity established in the country in which they work.

- 7 -

22.    The environment in which the MEN Business operates is highly competitive. To effectively compete in the industry, parties must continue to make significant investments in research and development as well as in building sales and marketing infrastructures. The scale requirements to effectively compete in the industry are substantial. Given Nortel's limited available financial resources, management determined in 2008 that the value of the Business would best be maximized through a sale to a buyer who can leverage its own existing customer relationships and the acquired customer relationships, as well as continue to make the necessary investments in technology. As a result, in late 2008, Nortel began to explore the potential sale of the MEN Business.

*Initial Sale Process*

23.    In the fall of 2008, prior to commencing insolvency proceedings, as discussed in the Affidavit of George Riedel dated October 9, 2009, Nortel, with the assistance of its financial advisors, approached a total of approximately fifty financial investors and strategic buyers likely to be interested in and able to acquire the MEN Business. An information memorandum was provided to the twenty-one parties that executed confidentiality agreements. Management presentations were conducted with those parties that submitted expressions of interest and that Nortel deemed able to consummate a transaction for the MEN Business. Five parties were given access to an electronic data room containing confidential due diligence materials. Ultimately, these five parties submitted non-binding proposals and Nortel commenced serious discussions with three of those parties. However, as a result of the commencement of the insolvency proceedings on January 14, 2009, the sale process was subsequently put on hold.

*Post-filing Sale Process*

24.    In March, 2009, Nortel recommenced efforts to market the MEN Business. With the assistance of Lazard Frères & Co., the Company approached all of the parties that had previously indicated interest in acquiring the MEN Business and that the Company determined had the ability to consummate a transaction as well as five additional parties. As a result of those efforts, thirteen parties expressed interest in purchasing the MEN

- 8 -

Business, executed confidentiality agreements and were provided with a confidential information memorandum. All thirteen parties were provided access to confidential information relating to the MEN Business via an electronic data room.

25.    Seven parties participated in management presentations commencing March 16, 2009. In addition, the Company received and responded to numerous information requests from these parties.

26.    Three parties submitted proposals to acquire the MEN Business and the Company proceeded to engage in extensive negotiations with these three parties in parallel. These negotiations culminated with Nortel entering into the Ciena Agreement as described below.

27.    The Monitor has had extensive involvement in the post-filing sale process including attending and participating in the management presentations and negotiations with prospective buyers described above, performing its own review of materials submitted by prospective purchasers (including the Ciena Agreement) and providing input to the Company with respect to these matters.

**THE CIENA AGREEMENT**

28.    On October 7, 2009, the Sellers entered into the Ciena Agreement with the Purchaser. Concurrently, certain of the EMEA Debtors, NN Israel and certain affiliates of the EMEA Debtors (collectively, the "EMEA Sellers") entered into a separate Asset Sale Agreement (the "EMEA ASA") with Ciena dated October 7, 2009. Collectively, the Ciena Agreement and EMEA ASA outline the terms of the Sellers' and the EMEA Sellers' sale of the assets and certain associated liabilities of the MEN Business to Ciena. The Ciena Agreement (without Exhibits or Schedules) is attached as Appendix "A" hereto. A copy of the exhibits and schedules to the Ciena Agreement are attached as confidential Appendix "B" hereto. As these exhibits and schedules contain sensitive competitive information as well

- 9 -

as personal information with respect to employees, the Monitor requests that confidential Appendix "B" to this Twenty-Fourth Report be sealed by this Honourable Court.

29. Ciena is a publicly-traded company listed on NASDAQ and based in Linthicum, Maryland. Ciena provides communications networking equipment, software, and services that support the transport, switching, aggregation, and management of voice, video, and data traffic. Its optical service delivery and carrier ethernet service delivery products are used, individually or as part of an integrated solution, in networks operated by communications service providers, cable operators, governments, and enterprises worldwide.

30. A summary of the key provisions of the Ciena Agreement is provided in the paragraphs that follow. Reference should be made directly to the Ciena Agreement, a copy of which is attached as Appendix "A" hereto, for a complete understanding of the terms governing the transaction.

*Assets*

31. The assets of the Sellers relating to the MEN Business being sold are as follows (collectively, the "Purchased Assets"):

- the Owned Inventory as of the Closing Date;

- the Owned Equipment as of the Closing Date;

- the Assigned Contracts in force as of the Closing Date;

- the Business Information existing as of the Closing Date (subject to certain exceptions);

- the Transferred Intellectual Property as of the Closing Date, subject to license rights granted prior to the Closing Date, together with all claims against Third Parties for infringement, misappropriation or other violation of law with respect to the Transferred Intellectual Property;

- 10 -

- all rights as of the Closing Date under all warranties, representations and guarantees made by suppliers, manufacturers, and contractors to the extent related to the Purchased Assets described above;

- certain consents of Government Entities and pending applications therefor;

- the Employee Records with respect to Employees whose employment transfers to the Purchaser by operation of law;

- any Tax records required by law to be transferred; and

- the contracts in progress accounts receivable.

32. The Purchased Assets to be acquired by the Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable (including intercompany receivables but excluding contracts in progress accounts receivable), bank account balances and petty cash of the Sellers, certain rights and refunds (including Tax refunds) relating to the pre-Closing period, security deposits provided by the Sellers to their contractual counterparties, any rights under any contracts (other than the Assigned Contracts), shares of any Person, and any assets owned by certain joint ventures of the Sellers.

*Purchase Price*

33. The Purchase Price is $390 million cash (the "Base Cash Purchase Price"), as adjusted in the manner described below, plus 10 million shares of common stock of the Purchaser[1] (the "Shares"), plus the Purchaser's obligation to pay, perform and discharge the Assumed Liabilities and the EMEA Assumed Liabilities. On the Closing Date, the Purchaser will, subject to certain mechanics set out in the Ciena Agreement, deliver to the Distribution Agent share certificates representing the Shares and pay to the Distribution Agent the Base Cash Purchase Price, less the Escrow Amount and as adjusted by the Estimated

---

[1] The Monitor understands that the closing price of Ciena's common stock on NASDAQ on October 7, 2009 was $13.44 per share implying an approximate market value for the Shares as of the date of the Ciena Agreement of approximately $134 million.

- 11 -

Adjustment Amount, which is calculated as the Estimated Closing Date Net Working Capital Transferred less $167 million.

- If the Estimated Adjustment Amount is a positive number, then the Cash Purchase Price is calculated as the Base Cash Purchase Price, minus the Escrow Amount (as described below), plus the Estimated Adjustment Amount.

- If the Estimated Adjustment Amount is a negative number, then the Cash Purchase Price is calculated as the Base Cash Purchase Price, minus the Escrow Amount, minus the absolute value of the Estimated Adjustment Amount.

34. The amount of the Cash Purchase Price paid at Closing may also be subject to certain purchase price adjustments contemplated in the Real Estate Terms and Conditions appended to the Ciena Agreement (as described below).

35. The Monitor notes that the Ciena Agreement does not provide for any adjustment of the Purchase Price or the number of Shares as a result of fluctuations in the stock price prior to closing and that the Sellers will be subject to certain resale restrictions in respect of the Shares.

36. After the Closing, the Cash Purchase Price will be further adjusted based on differences between the estimated and final amounts of the Closing Date Net Working Capital Transferred (as described below).

37. At Closing, if the Sellers and the Purchaser have been unable to obtain the consent of the Montreal Landlord to an assignment of the Montreal Lease (as defined below) as contemplated by the Montreal LOI or a new lease for the third floor portion of the Montreal Premises pursuant to terms and conditions similar to those contained in the Montreal LOI, the Purchase Price shall be reduced by $5,000,000 (the "Montreal Premises Relocation Fee"). The Montreal Premises Relocation Fee shall be held in escrow and released to the Purchaser at such time as the Purchaser has vacated the Montreal Premises and removed all of the Purchased Assets therefrom. As noted below in the description of

- 12 -

the Montreal LOI, the Montreal Landlord has, subject to certain terms and conditions, consented to the assignment of the Montreal Lease to Ciena.

38.    Each of the Main Sellers, the EMEA Sellers (or an authorized representative thereof) and the Purchaser will enter into the Escrow Agreement with the Escrow Agent on or prior to Closing pursuant to which the following escrow amounts (collectively, the "Escrow Amount") will be set up at Closing with funds provided by the Purchaser (which funds form part of the Base Cash Purchase Price):

- the Working Capital Escrow Amount of $5 million to secure any amounts that may be owed to the Purchaser as a post-Closing Working Capital adjustment;

- the Carling Property Escrow Amount of $33.5 million to secure the termination fee, if any, payable by the Sellers to the Purchaser in respect of the Sellers' early termination of the Carling Property Lease Agreement; this escrow is subject to a step down of $8.375 million in each of years 7 to 10 after Closing in the event the Carling Property Lease Agreement has not been terminated;

- the Transition Services Financial Performance Escrow Amount of $15 million to be released to the Sellers pending delivery of materially all of the financial data required by the Purchaser to satisfy its SEC quarterly financial reporting requirements for the first two financial close processes after the Closing (less claims made by the Purchaser under this escrow); thereafter, and upon resolution of all disputes between the Parties regarding the Purchaser's rights to amounts under this escrow, any remaining amounts under this escrow shall be released to the Sellers. If the first monthly financial close after the Closing is a quarterly close, the Purchaser may elect to apply this escrow to the second and third quarterly close processes only that occur after Closing;

- the Transition Services General Service Level Escrow Amount of $15 million to secure the performance of the Transition Services at agreed upon service levels for a two year period after Closing. Half of this amount ($7.5 million) shall be released twelve months after the Closing (less claims by the Purchaser

- 13 -

under this escrow), provided $3 million has not already been paid-out to the Purchaser under this escrow and all disputes brought by the Sellers contesting Purchaser's right to a claim under this escrow have been resolved (or if still ongoing, would amount to less than $3 million). Following the second anniversary of the Closing (or the date on which the last remaining period under the Transition Services Agreement expires or terminates, if such date is earlier) remaining amounts under this escrow shall be released to the Sellers (less claims by the Purchaser under this escrow); thereafter, and upon resolution of all disputes between the parties regarding Purchaser's rights to amounts under this escrow, any remaining amounts under this escrow shall be released to Sellers;

o   The Purchaser may claim under the Transition Services Financial Performance Escrow in addition to the Transition Services General Service Level Escrow, unless (and only to the extent that) a failure giving rise to a claim under the Transition Services General Service Level Escrow had no material impact on the transition services other than with respect to the Purchaser's ability to meet its financial reporting obligations;

o   The entire $30 million amount (representing the sum of the Transition Services Financial Performance Escrow Amount and the Transition Services General Service Level Escrow Amount) stands as security for any claims made by the Purchaser which are outstanding at the time of a scheduled release, but only to the extent of the amount of the claim outstanding. Accordingly, if the Purchaser has an outstanding claim against the Sellers (not relating to the two aforementioned escrows) and a portion of the funds in the transition services escrow are due for release, the funds representing the claim would continue to be held back until the claim is resolved.

- 14 -

- the Tax Escrow Amount, the EMEA Tax Escrow Amount and the Italian Tax Escrow Amount of $10 million (which amount may be adjusted pursuant to the terms of the Ciena Agreement), $2.5 million and $5 million (which amount may be adjusted pursuant to the terms of the Ciena Agreement), respectively, to secure certain claims that might be made against the Purchaser by certain tax authorities in respect of Taxes that are Excluded Liabilities; and

- an additional amount to secure the Sellers' obligations with respect to Cure Costs, the terms of which are set forth in the Sellers Disclosure Schedule.

*Post-Closing Purchase Price Working Capital Adjustment*

39.   Within 90 days of Closing, the Purchaser shall deliver to the Main Sellers and the EMEA Sellers a Closing Statement of the Closing Date Net Working Capital Transferred, which is calculated as the Closing Inventory Amount, plus Closing CIP Accounts Receivable Amount, minus Closing Warranty Provision, minus Closing KPD Provision, minus Closing Net Deferred Revenues, minus Closing Other Accrued and Contractual Liabilities, minus Closing Accrued Vacation and Service Award Amount, minus Closing Retirement Obligation Amount, minus Excess ARD Employees Amount. The Main Sellers shall have 30 days from the date of receipt of such Closing Statement to notify the Purchaser of a disagreement with the Closing Statement. The Purchaser and the Main Sellers shall use commercially reasonable efforts to resolve any disagreements for a period of 30 days thereafter, after which a mutually agreed Accounting Arbitrator will be appointed to resolve any remaining disagreements.

40.   The Base Cash Purchase Price will be adjusted by the Adjustment Amount, which is calculated by deducting the Estimated Closing Date Net Working Capital Transferred from the Closing Date Net Working Capital Transferred.

- If the Adjustment Amount is positive, then the Purchaser will pay to the Distribution Agent such amount (with interest from the Closing Date to the date of payment at the Prime Rate) and the Escrow Agent shall pay to the

- 15 -

Distribution Agent the full Working Capital Escrow Amount (with interest from the Closing Date to the date of payment at the Prime Rate), and

• If the Adjustment Amount is negative, then the Escrow Agent will pay to the Purchaser the lesser of the absolute value of the Adjustment Amount (with interest from the Closing Date to the date of payment at the Prime Rate) and the Working Capital Escrow Amount. In addition, if the absolute value of the Adjustment Amount exceeds the Working Capital Escrow Amount, then the Distribution Agent will pay to the Purchaser an amount equal to that by which the absolute value of the Adjustment Amount (with interest from the Closing Date to the date of payment at the Prime Rate) exceeds the Working Capital Escrow Amount. Any portion of the Working Capital Escrow Amount remaining after payment of the Adjustment Amount will be returned to the Distribution Agent.

*Assumed Liabilities*

41.    The Purchaser will assume the following liabilities:

• all liabilities of the MEN Business arising after the Closing Date to the extent related to the operation of the MEN Business by the Purchaser following Closing including (i) all liabilities with respect to the ownership and operation of the Purchased Assets; (ii) all liabilities related to actions or claims brought against the MEN Business; and (iii) all liabilities under any product liability laws or similar laws concerning defective products manufactured or sold by the MEN Business;

• all liabilities arising from or in connection with the performance (or breach) of the Assigned Contracts after the Closing Date and all liabilities with respect to Cure Costs payable by the Purchaser pursuant to the Ciena Agreement, obligations to buy back from relevant resellers the products sold to resellers under Seller Contracts that are Assigned Contracts, obligations under any warranty liabilities including Known Product Defects relating to the Products

- 16 -

and Services supplied under any Assigned Contract or any Bundled Contract which is subcontracted to the Purchaser, and all liabilities accrued in the financial statements of the MEN Business as Other Accrued and Contractual Liabilities to the extent reflected in the calculation of Net Working Capital Transferred;

- all liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property which the Sellers may have granted or committed to third parties including standard setting bodies, that are listed in the Sellers Disclosure Schedule;

- all liabilities for, or related to any obligation for, any Tax that the Purchaser bears pursuant to the Ciena Agreement;

- except to the extent otherwise set forth in the Ciena Agreement, all liabilities related to any of the following: (i) the Purchaser's employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees after Closing; (ii) the Purchaser's failure make an offer of employment to any employee that violates applicable law; and (iii) the failure of the Purchaser to satisfy its obligations with respect to the Employees, including the Transferred Employees as set out in the Ciena Agreement;

- all liabilities that arise under any Purchaser Employee Plan;

- any obligation to provide continuation coverage pursuant to COBRA or any similar law under any Purchaser Employee Plan that is a "group health plan" (as defined in section 5000(b)(1) of the Code) to Transferred Employees and/or their qualified beneficiaries who have a qualifying event on or after such Transferred Employees' Effective Hire Date;

- all liabilities related to the Transferred Employees as set forth in the Sellers Disclosure Schedule; and

- 17 -

- all liabilities related to Transferred Employees expressly assumed by the Purchaser as set out in the Ciena Agreement.

*Employees*

42.    The Purchaser has committed to offer employment to no less than 2,000 employees of the MEN Business, including all EMEA employees and all employees whose employment transfers by operation of law.  For employees employed in Canada or the United States, the Purchaser's employment offers shall provide terms and conditions that will consist of: i) either the same wage and target bonus or a substantially comparable overall compensation package; ii) employment reasonably close to the employee's current location; and iii) employee benefits that are substantially comparable in the aggregate to the Sellers' benefits or the Purchaser's benefits for similarly situated employees.  For employees in countries outside of Canada and the United States but excluding EMEA, and where the number of employees in such country is 10 or more, the Purchaser will make employment offers on terms and conditions that are no less favourable in the aggregate than current employment terms and conditions, subject to certain adjustments to conform to the Purchaser's standard employment policies where legally possible, provided that, following the Employee Transfer Date, the Purchaser shall be entitled to make changes to such terms and conditions that are generally applicable and broadly based across the Purchaser's employee population in the particular country.  Other than as required by applicable Law, the Purchaser will not be required to offer any defined benefit pension plans or take into account any defined pension benefits, post-retirement health and welfare benefits, severance or employee retention plans such as KEIP or KERP, or equity compensation when determining whether employee benefits are no less favourable in the aggregate.  For employees outside of Canada and the United States but excluding EMEA, and where the number of employees is less than 10, the Purchaser will make employment offers on terms and conditions that are reasonably competitive with those received by similarly situated employees in the local market.   Employees whose employment transfers automatically by operation of Law to the Purchaser will have terms and conditions of employment governed by such applicable Laws, but, at a minimum, shall receive terms and conditions of employment that are no less favourable than those

- 18 -

received by the employees described above (not including those employed in Canada or the United States), based on the number of the Sellers' employees in the country where such Employees are employed, provided that Employees located in the Province of Quebec shall be treated as if they were Employees employed in Canada or the United States.

43. Prior to Closing, the Sellers will take all action permitted under applicable Law legally necessary to cause the termination of employment (effective prior to Closing) of those Employees that will not be offered employment with the Purchaser and whose employment would have transferred by operation of law.

44. With respect to any Employees who do not accept or who reject an offer of employment from the Purchaser, the Purchaser shall reimburse the Sellers for payments made by them in an aggregate amount up to $2 million in respect of pay in lieu of notice (including WARN Act notice) and/or severance liability relating to such Employees, provided that any such payments shall have been made by the Sellers as required by applicable law, certain Seller Employee Plans or pursuant to a Contract in effect as of the date of the Ciena Agreement, and a copy of which will be delivered to the Purchaser at the time such liability is incurred.

*Assignment of Contracts*

45. The Purchaser will assume certain customer contracts associated with the MEN Business. The Purchaser may also assume selected supplier contracts, real estate leases and certain other contracts identified by the Purchaser within certain prescribed time periods.

*Cure Costs*

46. To the extent that the transactions contemplated by the Ciena Agreement give rise to a liability for any Cure Cost or Customer Cure Cost, as defined in the Sellers Disclosure Schedule, the payment of such Cure Costs by the Purchaser and Sellers, as applicable, shall be made in accordance with the terms set out in the Sellers Disclosure Schedule. The Sellers Disclosure Schedule also sets out certain circumstances in relation to the payment

- 19 -

of certain Cure Costs in respect of which the Purchaser may terminate the Ciena Agreement. In the event of such termination, the Purchaser shall be entitled to a termination payment of $21,392,000.

### *Additional Adverse Bankruptcy Proceedings*

47.    Prior to Closing, if any Seller (a "Restricted Seller") that is a Non-Debtor Seller commences insolvency proceedings or any law or order comes into effect preventing the Seller from assigning the assets in its jurisdiction (the "Restricted Assets") to the Purchaser, then the Parties shall use their commercially reasonable efforts to cause the transfer of the Restricted Seller's interest in the Restricted Assets to the Purchaser provided that, if such transfer is prevented due to any law or order, then the Sellers and the Purchaser shall be relieved of their obligations to sell and purchase, respectively, the Restricted Assets and the Purchaser shall be relieved from its obligation to assume any Assumed Liabilities in respect thereof, or to make offers of employment or employ any Employee who is employed by any Restricted Seller or who devotes more than 50% of his or her working time to the business of any such Restricted Seller. The Purchase Price shall be reduced by an amount equal to the 2008 revenues of the Restricted Seller (as set out in the Sellers Disclosure Schedule) multiplied by 0.4088, provided that if the 2008 revenues for all Restricted Sellers exceeds $120 million, then the Purchase Price shall be reduced by an amount equal to the 2008 revenues of the Restricted Seller(s) multiplied by 0.5314.

### *Exclusion of Sellers*

48.    The Sellers Disclosure Schedule sets out the manner in which the Purchaser may elect to exclude from the transaction any one Seller (and such Seller's assets and liabilities) from the Ciena Agreement.

### *Sale Free and Clear*

49.    The Purchased Assets to be transferred by the Sellers will be transferred free and clear of all liens, claims and interests, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the Ciena Agreement.

- 20 -

*Representations and Warranties or Covenants*

50.    The Ciena Agreement contains a number of representations, warranties and covenants by the Main Sellers or the Sellers, as applicable, with respect to various matters including title to assets, sufficiency of assets, preparation of financial statements, status of real property, environmental matters, compliance with laws, taxes, employee matters, undisclosed liabilities and status of litigation.  In addition, the Ciena Agreement includes a number of covenants with respect to matters including pre-Closing cooperation and access to information, preparation and filings regarding antitrust and other Regulatory Approvals, preparation and delivery of certain financial statements of the MEN Business, pre-Closing conduct of the Business, post-Closing assistance and maintenance of books and records, post-Closing arrangements with respect to certain non-assignable and/or Bundled Contracts, post-Closing assistance for litigation, negotiation and completion of Ancillary Agreements, and insurance and real estate matters including the sub-lease of certain real property to the Purchaser.

*Survival of Representations and Warranties or Covenants*

51.    No representations or warranties, covenants, or agreements of the Sellers contained in the Ciena Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms shall survive until satisfied in accordance with their terms.

*Termination Rights*

52.    The Ciena Agreement may be terminated prior to Closing in a number of instances including:

- by mutual consent of the Purchaser and the Main Sellers;

- by either the Purchaser or the Main Sellers:

    o    if the Closing does not take place by April 30, 2010;

- 21 -

    o   in the event of a material breach by the other Primary Party of the Ciena Agreement, which breach would result in a failure of certain of the conditions to Closing which is not cured within a specified period of time;

    o   if the U.S. Bidding Procedures Order and the Canadian Sales Process Order have not been entered by October 19, 2009, in the case of termination by the Purchaser, or October 30, 2009 in the case of termination by the Main Sellers;

    o   if the U.S. Sale Order and the Canadian Approval and Vesting Order are not entered into by December 17, 2009;

    o   if this Honourable Court or the U.S. Court approves an Alternative Transaction;

    o   if the EMEA ASA is terminated in accordance with its terms;

    o   an antitrust law or order is issued in the U.S., Canada or the United Kingdom prohibiting the transaction; or

    o   if the Auction is not completed by December 11, 2009.

- by the Purchaser if the Sellers fail to consummate the Closing in breach of the Ciena Agreement within 10 Business Days of a demand by the Purchaser to do so;

- by the Purchaser if any of the Sellers withdraw or seek authority to withdraw the Canadian Approval and Vesting Order Motion or the U.S. Bidding Procedures and Sale Motion, or publicly announce any stand-alone plan of reorganization or plan of arrangement in respect of the MEN Business or liquidation or winding-up of all or substantially all of the Purchased Assets or the EMEA Assets or any of the Sellers or the EMEA Sellers (or support any such plan filed by any other Person);

- 22 -

- by the Main Sellers upon the entry of an order by the U.S. Court or this Honourable Court authorizing a Sponsored Reorganization Plan; or

- by the Purchaser if Lab 10 of the Carling Property is destroyed or substantially damaged.

*Break-Up Fee*

53. The Sellers shall pay to the Purchaser an aggregate Break-Up Fee of $16,044,000 (2/3 to be paid by the Main Sellers and 1/3 by the EMEA Sellers) if the Ciena Agreement is terminated:

- by either the Purchaser or the Main Sellers as a result of the approval by this Honourable Court or the U.S. Court of an Alternative Transaction;

- by the Purchaser:

  o as a result of a material breach by the Sellers of the Sellers' representations, warranties, agreements, or covenants that would result in the failure of certain conditions to Closing and that is not cured by the Sellers within a specified period of time;

  o if the Sellers fail to consummate the Closing in breach of the Ciena Agreement within 10 Business Days of a demand by the Purchaser to do so; or

  o if any of the Sellers withdraw or seek authority to withdraw the Canadian Approval and Vesting Order Motion or the U.S. Bidding Procedures and Sale Motion, or publicly announce any stand-alone plan of reorganization or plan of arrangement in respect of the MEN Business or liquidation or winding-up of all or substantially all of the Purchased Assets or the EMEA Assets or any of the Sellers or the EMEA Sellers (or support any such plan filed by any other Person);

- 23 -

- by the Main Sellers if:

  o the U.S. Bidding Procedures Order and the Canadian Sales Process Order are not entered by the respective courts by October 30, 2009;

  o the U.S. Sale Order and Canadian Approval and Vesting Order are not entered into by December 17, 2009;

  o the Auction is not completed by December 11, 2009;

  o the U.S. Court or this Honourable Court enters an order authorizing a Sponsored Reorganization Plan; or

  o the EMEA ASA is terminated in certain circumstances.

*Expense Reimbursement*

54. The Sellers shall reimburse the Purchaser for all reasonable and documented fees, costs and expenses incurred in connection with the transaction to a maximum of $5,348,000 (2/3 to be paid by the Main Sellers and 1/3 by the EMEA Sellers) if the Ciena Agreement is terminated pursuant to its termination provisions except where such termination is: i) by mutual consent; or ii) as a result of a material breach by the Purchaser of the Ciena Agreement or the EMEA ASA which breach would result in a failure to satisfy certain conditions to Closing and which are not cured within a specified period of time.

*Limitation of Liability*

55. Termination of the Ciena Agreement and payment of the Break-Up Fee and Expense Reimbursement, if payable, are the sole and exclusive remedies of the Purchaser against the Sellers for termination of the Ciena Agreement.

*Ancillary Agreements*

56. On or before Closing, the Purchaser and the relevant Sellers and EMEA Sellers will enter into the following ancillary agreements, forms of which have been agreed:

- 24 -

- Intellectual Property License Agreement - an intellectual property license agreement between NNL and the Purchaser pursuant to which i) NNL and its affiliates will grant to the Purchaser a non-exclusive license and an exclusive license (within an exclusive field of use) to, among other things, make, use, distribute, sell, develop and service certain retained intellectual property assets; and ii) NNL and its affiliates will receive a license back to all intellectual property included for use in Nortel's other businesses.

- Trademark License Agreement – an agreement between NNL and the Purchaser permitting the Purchaser and its affiliates to, among other things, use the "Nortel" trademark and logo and certain other Nortel marks in its sales of the Products and Services for a transitional period of 18 months after Closing.

- Transition Services Agreement – an agreement between NNL, NNC, NNI, NNUK, NN Ireland, certain Other Sellers, the U.K. Administrators and the Purchaser pursuant to which the Sellers and their affiliates will agree to provide certain information technology, business transition and related services to the Purchaser for up to 24 months post-Closing. The final form of the Transition Services Agreement will set forth the fees to be paid by the Purchaser to the Sellers for these services as well as certain other terms that will regulate the provision of services thereunder. The agreed form of Transition Services Agreement sets out the general scope of transition services to be provided and the parties have agreed to negotiate in good faith to refine the description of the transitional services to be provided in accordance with the terms and guidelines set forth in the Sellers Disclosure Schedule. The parties have agreed to an arbitration procedure to resolve any disputes regarding, among other things, the services to be provided or the amount to be billed for such services. Pursuant to the Ciena Agreement, the Purchaser and the TSA Sellers or the TSA Arbitrator (as defined in the Sellers Disclosure Schedules), shall determine, among other things, whether the information technology systems and business processes to be used in the performance of TSA services for the Purchaser are First Day

- 25 -

Ready. If First Day Ready is not achieved prior to April 30, 2010, then, as long as the conditions to Closing have otherwise been satisfied or waived, the Closing shall occur on such date (subject to the penalty discussed below)Effective March 22, 2010, if First Day Ready has not been achieved, then the Sellers shall incur a penalty of $2 million per weekday to a maximum penalty of $60 million until First Day Ready is achieved (which amount shall be deducted from the Cash Purchase Price). Failure to achieve First Day Ready shall not fall within the scope of the Purchaser's closing condition pertaining to no breach of covenants until after April 30, 2010.

- <u>Loaned Employee Agreement</u> – an agreement between the relevant Sellers and the Purchaser pursuant to which certain employees of the Sellers that cannot be transferred to the Purchaser at Closing will be seconded to the Purchaser for a period of, in certain cases, up to 90 days. The Loaned Employees will remain on the payroll of the applicable Seller and will continue to participate in the Seller's pension and benefit plans. The Purchaser shall reimburse the Sellers for the cost of retaining the Loaned Employees, subject to certain exceptions.

The Purchaser and the relevant Sellers and EMEA Sellers will also enter into, among other things, the following ancillary agreements:

- <u>Real Estate Agreements</u> - agreements between the relevant Sellers and the Purchaser with respect to the post-Closing direct lease, sublease or occupancy by the Purchaser of certain owned and leased properties of the Sellers on the following terms:

  o    Lab 10 and Lab 2 Lease Agreements – NNTC and the Purchaser shall enter into leases for Lab 10 (for a 10 year term) and a portion of Lab 2 (for an initial term of 2.5 years, renewable for an additional 7.5 years) of the Carling Property under terms negotiated between the parties. This Lab 10 lease shall be subject to a termination right by NNTC exercisable at any time, to be effective no earlier than 5 years from the Closing Date. Any

- 26 -

termination by NNTC prior to the end of the lease shall obligate the Sellers to pay a termination fee as described above. The Sellers and the Purchaser shall each contribute to any demising costs of the Lab 2 space.

o   Montreal Premises Lease – The Sellers have entered into an LOI with the Montreal Landlord to restructure the existing lease for the Montreal Premises to meet the preferred space requirements of the Purchaser under the same rental terms as the existing lease or, if unsuccessful, to obtain the consent of the Montreal Landlord to the sublease of such premises. The Sellers and the Purchaser shall each contribute to any demising costs associated with the Montreal Premises. As noted previously, should the Sellers be unable to secure the consent of the Montreal Landlord to the restructured lease arrangement, or obtain its consent to the sublease, the Purchase Price payable at Closing shall be reduced by $5 million, and such amount shall be held in escrow and released to the Purchaser following the date on which it has vacated the Montreal Premises and removed all Assets therefrom  In the event that the Purchaser elects not to accept an assignment of the lease for the Montreal Premises, the Purchaser shall pay to NNL, or to the Montreal Landlord if directed by NNL, the negotiated early termination penalty due to the Montreal Landlord of Cdn$2,931,000.

o   Subleases and Occupancy Agreements: The Real Estate Terms and Conditions appended to the Ciena Agreement sets forth the terms whereby the Sellers and the Purchaser shall enter into subleases or occupancy agreements with respect to leased premises of the Sellers designated by the Purchaser for subletting. The size and configuration of subleased premises will be reasonably agreed by the Sellers and the Purchaser prior to Closing by reference to certain specified factors. Alternatively, if certain specific conditions are met, the Purchaser shall have the right to negotiate with the landlord a direct lease of the space. The Sellers' obligation under any subleases entered into with the Purchaser shall be

- 27 -

subject to the Sellers' right to reject the related lease.  If the Sellers reject such lease prior to Closing, the Sellers shall, at their expense, remove and store any Purchased Assets until Closing.  If the rejection of the lease is effective on or after Closing, the Purchaser shall vacate the subleased premises upon notice from the Sellers.  If the Sellers are required to obtain Consents from landlords in order to permit the occupancy of any Critical Locations (as described in the Real Estate Terms and Conditions), are unable to obtain such Consents on or prior to Closing and are unable to relocate the Purchaser to equivalent premises in accordance with the Real Estate Terms and Conditions, then the Purchaser is entitled to a credit on Closing against the Cash Purchase Price in the amount of $100,000 per affected occupancy.

In addition, the Main Sellers and the Purchaser will use their commercially reasonable efforts to negotiate between themselves and, when applicable, with the relevant third parties, the following ancillary agreements, among others, in good faith:

- LGN/Korea Distribution Agreement -- an agreement between LGN and the Purchaser with respect to the sale of certain products by the MEN Business to LGN for resale in South Korea.

- NETAS Distribution Agreement – an agreement between NETAS and the Purchaser with respect to the sale of certain products by the MEN Business to NETAS for resale in Turkey.

- NGS Distribution Agreement -- an agreement between Nortel Government Services ("NGS") and the Purchaser with respect to the sale of certain products by the MEN Business to NGS.

- Mutual Development Agreement - an agreement between the Sellers and the Purchaser with respect to the ongoing development by either party of new features for certain of the products used by either party.

- 28 -

- <u>EFA Development Agreement</u> - an agreement between LGN and the Purchaser with respect to development services for Ethernet Fiber Access products to be provided by the Purchaser to LGN.

- <u>Contract Manufacturing Inventory Agreements</u> – agreements between the Purchaser, the Sellers and certain Contract Manufacturers of the Sellers to sell Contract Manufacturer Inventories related to the Business to the Purchaser after Closing.

- <u>Flextronics Back-to-Back Supply Agreement</u> – an agreement between the Sellers and the Purchaser, which may be executed if the Purchaser has not executed a new supply agreement with Flextronics prior to Closing, for the provision of products by Flextronics to the Purchaser after Closing on the same terms and conditions as the existing contract between the Sellers and Flextronics.

- <u>Seller Supply Agreement</u> – an agreement between the Sellers or the purchaser of the Sellers' Enterprise Solutions business and the Purchaser for the supply of certain components of the Products to the Purchaser. If the parties are unable to agree to the terms of the Seller Supply Agreement, then, until January 18, 2010, the Purchaser is entitled to require that the Sellers purchase the components intended to be supplied to the Purchaser under the Seller Supply Agreement, and such components shall be transferred to the Purchaser as part of the Owned Inventory under the Ciena Agreement.

*Closing*

57. Closing shall occur on the date which is the later of: i) February 1, 2010; ii) the date that is the earlier of: a) 10 Business Days after the date that First Day Ready is achieved and b) April 30, 2010; and iii) 5 Business Days after the date upon which all Closing conditions have been satisfied or waived.

- 29 -

*Closing Conditions*

58.    The obligation of the Purchaser to close the sale is subject to satisfaction of the following
conditions, among others:

- the U.S. Bidding Procedures Order and the Canadian Sales Process Order shall
have been entered and shall not have been stayed and such orders shall have
become Final Orders;

- the receipt of all antitrust and other regulatory approvals in a number of
jurisdictions including approval in Canada pursuant to the *Investment Canada
Act*;

- no law or order of any Court or other Governmental Entity in Canada, the U.S.
or the United Kingdom, prohibiting the consummation of any of the
transactions contemplated by the Ciena Agreement or the EMEA ASA;

- the U.S. Sale Order and the Canadian Approval and Vesting Order shall have
been entered and shall not have been stayed and such orders shall have become
Final Orders;

- the satisfaction of conditions to closing under the EMEA ASA and the
simultaneous consummation of the transaction governed by the EMEA ASA;

- the Sellers' representations and warranties being true and correct, except as
would not reasonably be expected to result in a Material Adverse Effect;

- the Sellers' material pre-Closing covenants, obligations and agreements
pursuant to the Ciena Agreement shall not have been breached in any material
respect;

- the performance by the Sellers of: i) all pre-Closing covenants relating to the
delivery of certain Audited Financial Statements and Unaudited September 30,

- 30 -

2008 Financial Statements; and ii) all Closing deliveries (subject to certain exceptions); and

- Lab 10 of the Carling Property shall not have been destroyed or substantially damaged;

*Standstill Period*

59.    From the date of the Ciena Agreement to the entry of the U.S. Bidding Procedures Order and from the conclusion of the Auction to Closing or termination of the Ciena Agreement, the Sellers and their affiliates are prohibited from soliciting, initiating, encouraging or engaging in any discussions or negotiations with any party, or taking any other action with respect to a proposal or offer relating to the acquisition, divestiture, recapitalization, business combination or reorganization of all or a substantial part of the MEN Business, with the exception of the selection of an Alternate Bid at Auction or seeking approval of such Alternate Bid.  Notwithstanding the foregoing, from the date of the Ciena Agreement to the entry of the U.S. Bidding Procedures Order, the Sellers may continue to provide written due diligence materials in an electronic data room to parties that already have access to the electronic data room and have satisfied the Participation Requirements as set out in the U.S. Bidding Procedures Order.

**BIDDING PROCEDURES AND AUCTION PROCESS**

60.    Given that certain of the U.S. Debtors are parties to the Ciena Agreement and given the desire to maximize value for the benefit of stakeholders in relation to the assets which are the subject of the Ciena Agreement, Nortel has determined and has agreed with Ciena that the Ciena Agreement is subject to higher or better offers being obtained pursuant to a sale process under section 363 of the Code and that the Ciena Agreement shall serve as a "stalking horse" bid pursuant to that process.  The Purchased Assets may be sold in a single sale to a single purchaser or in parts to several purchasers.

- 31 -

61.  The U.S. Debtors have filed a bidding procedures motion with the U.S. Court. A copy of the proposed bidding procedures is attached as Appendix "C" (the "Bidding Procedures").

62.  It is a covenant of the Ciena Agreement that the Sellers that are U.S. Debtors shall have filed the U.S. Bidding Procedures and Sale Motion with the U.S. Court within 2 Business days after signing of the Ciena Agreement. This motion was filed with the U.S. Court on October 7, 2009. It is also a condition of the Ciena Agreement that the Sellers that are Canadian Debtors shall have filed the Canadian Sales Process Order Motion with this Honourable Court within 5 days after the signing of the Ciena Agreement. This motion was filed with this Honourable Court on October 9, 2009.

63.  Pursuant to the Ciena Agreement, the Sellers who are U.S. Debtors shall use their reasonable best efforts to cause the U.S. Court to schedule a hearing to consider the U.S Bidding Procedures and Sale Motion and to enter the U.S. Bidding Procedures Order within two Business Days of the hearing to approve the Bidding Procedures.

64.  The Monitor understands that the Applicants and the U.S. Debtors will seek approval of the Bidding Procedures at a videoconference joint hearing between this Honourable Court and the U.S. Court scheduled for October 15, 2009, conducted pursuant to the Cross-Border Insolvency Protocol previously approved by both Courts.

65.  The Bidding Procedures provide that all bids must be received by the Sellers not later than 4:00 p.m. (Eastern Time) on November 9, 2009 and that the Sellers will conduct an auction of the Purchased Assets on November 13, 2009 at 9:30 a.m. (the "Auction").

66.  Pursuant to the Ciena Agreement, the Sellers who are U.S. Debtors shall request the U.S. Court to schedule a Sale Hearing on the fourth Business Day following the conclusion of the Auction and shall use their reasonable best efforts to cause the Sale Hearing to be heard on that date or the earliest date thereafter permitted by the U.S. Court's schedule. In no event later than three Business Days following completion of the Auction, the Canadian Debtors shall file a motion for the Canadian Approval and Vesting Order with this Honourable Court.

- 32 -

67. The Monitor recognizes the expeditious nature of the proposed sale process. However, given the extensive process conducted to date and that there are likely to be a limited number of parties interested in acquiring the MEN Business, the Monitor is supportive of the proposed sale process. In addition, Nortel has consulted with, among others, the Committee and the Bondholder Group regarding the Bidding Procedures and believes that these parties are supportive of the timing of this sale process.

68. As described in the relevant motion materials filed with the U.S. Court, the key provisions of the Bidding Procedures are outlined in the paragraphs that follow.

### *Bid Deadline*

69. A Qualified Bidder (as defined below) that desires to make a bid will deliver written copies of its bid to: the Sellers, counsel and financial advisors to the Sellers, counsel and financial advisors to the Committee, counsel to the Bondholders' Committee, the Monitor, the U.K. Administrators and counsel to the U.K. Administrators (collectively, the "Notice Parties"); so as to be received not later than 4:00 p.m. (Eastern Time) on November 9, 2009 (the "Bid Deadline").

### *Provisions Governing Qualifications of Bidders*

70. Unless otherwise ordered by the U.S. Court and this Honourable Court and accepted by the U.K. Administrators, for cause shown, or as otherwise determined by the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, in order to participate in the bidding process, each person (a "Potential Bidder"), other than Ciena, must deliver (unless previously delivered) to the Notice Parties:

    a)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers and on terms that are substantially similar to those contained in the confidentiality agreement executed by Ciena;

    b)    financial information that will allow the Sellers and their financial advisors, in consultation with the Committee, the Bondholders' Committee and the

- 33 -

Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate a purchase of the Purchased Assets; and

c)  a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including liabilities to assumed by the Potential Bidder); (ii) any Purchased Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder, and any proposed measures associated with their continued employment; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Ciena Agreement.

71.  A Potential Bidder that satisfies the above requirements, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgement, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the transaction, will be deemed a "Qualified Bidder". The determination as to whether a Potential Bidder meets the requirements of a Qualified Bidder will be made as promptly as practicable and the Sellers will so notify the Potential Bidder. The Sellers will immediately allow Qualified Bidders to begin to conduct due diligence with respect to the Purchased Assets as provided in the Bidding Procedures.

- 34 -

*Provisions Governing Qualified Bids*

72.   A bid submitted pursuant to the Bidding Procedures will be considered a Qualified Bid
only if the bid is submitted by a Qualified Bidder and complies with all of the following
(a "Qualified Bid"):

    a)   the Qualified Bidder offers to purchase the Purchased Assets upon the terms
and conditions substantially as set forth in the Ciena Agreement, or pursuant to
alternate terms and conditions that the Sellers determine, after consultation with
the Committee, the Bondholder Group and the Monitor, are no less favourable
than the terms and conditions of the Ciena Agreement;

    b)   the Qualified Bidder's offer is irrevocable until the selection of the Successful
Bidder (as defined below) and, if applicable, the Alternate Bidder (as defined
below), provided that if such bidder is selected as the Successful Bidder or the
Alternative Bidder, its offer shall remain irrevocable until the earlier of (i)
closing of the sale to the Successful Bidder or the Alternate Bidder, and (ii) (x)
with respect to the Successful Bidder only, March 1, 2010 and (y) with respect
to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined
below);

    c)   it includes a duly authorized and executed sale agreement, including the
purchase price for the Purchased Assets expressed in U.S. Dollars (the
"Purchase Price"), together with all exhibits and schedules thereto including to
the extent required by such bid, all applicable ancillary agreements as well as
copies of such materials marked to show those amendments and modifications
to the Ciena Agreement, the EMEA ASA and related ancillary agreements and
proposed orders to approve the sale by the U.S. Court, this Honourable Court
and any other applicable court(s) whose approval may be required, as  proposed
by the Qualified Bidder;

    d)   it includes written evidence of a firm, irrevocable commitment for financing, or
other evidence of ability to consummate the proposed transaction;

- 35 -

e)     it is not conditioned on (i) the outcome of unperformed due diligence by the
       bidder and/or (ii) obtaining financing;

f)     it fully discloses the identity of each entity that will be bidding for the
       Purchased Assets or otherwise sponsoring or participating in connection with
       such bid, and the complete terms of any such participation;

g)     it has a value to the Sellers, in the Sellers' reasonable business judgment, after
       consultation with their financial advisors, the Committee, the Bondholder
       Group and the Monitor that either individually or, when evaluated in
       conjunction with any other Qualified Bid for the Purchased Assets, is greater
       than or equal to the sum of the value offered under the Ciena Agreement plus
       (i) the amount of the Break-Up Fee and Expense Reimbursement plus (ii) $5
       million;

h)     it includes an acknowledgement and representation with respect to the
       executory contracts and unexpired leases which the Qualified Bidder proposes
       to assume or not assume, the Qualified Bidder's proposal for the treatment of
       related Cure Costs and any executory contract or unexpired lease the
       assumption and assignment of which is a condition to Closing;

i)     it includes an acknowledgement and representation that the Qualified Bidder:
       (i) has had an opportunity to conduct and all required due diligence regarding
       the Purchased Assets prior to making its offer; ii) has relied solely upon its own
       independent review, investigation and/or inspection of any documents and/or
       the Purchased Assets; (iii) has not relied upon any written or oral statements,
       representations, promises, warranties or guaranties whatsoever, except as
       expressly stated in its bid; and (iv) is not entitled to any expense reimbursement
       or break-up fee in connection with its bid;

j)     it includes evidence of authorization and approval from the Qualified Bidder's
       board of directors (or comparable governing body);

- 36 -

k)    it is accompanied by a good faith deposit in an amount equal to 5% of the
      Purchase Price;

l)    it contains full details of the proposed number of employees of the Sellers
      (apportioned by jurisdiction) who will become employees of the Qualified
      Bidder and any proposed measures associated with their continued employment
      and identifies any pension liabilities and assets related to any employees
      currently covered under the Nortel Retirement Income Plan who will become
      employees of the Qualified Bidder that the Qualified Bidder intends to assume
      or purchase;

m)    it includes evidence of the Qualified Bidder's ability to comply with Section
      365 of the Code (to the extent applicable), including providing adequate
      assurance of such Qualified Bidder's ability to perform in the future the
      contracts and leases proposed to be assigned or subleased to the Potential
      Bidder;

n)    it contains other information reasonably requested by the Sellers; and

o)    it is received by the Bid Deadline.

73.    The Sellers will determine, in their reasonable business judgment, after consultation with
the Committee, the Bondholder Group and the Monitor, whether to deem bids for the
Purchased Assets that do not conform to one or more of the requirements specified in the
Bidding Procedures to be Qualified Bids provided that the Sellers may not waive
substantial compliance with any items in paragraphs d), e), f), i)(iv), j) and o) above
without the consent of Ciena, the Committee, the Bondholder Group and the Monitor, and
such consent shall not be unreasonably withheld in connection with any bid that (i) would
otherwise fully satisfy the requirements of a Qualified Bid hereunder but for a de
minimums failure to comply with those criteria; and (ii) such noncompliance is cured
within 24 hours of the Bid Deadline.

- 37 -

74. The Sellers shall deliver copies of any bids deemed to be Qualified Bids to Ciena on the day that such bid is determined to be a Qualified Bid and in no event later than 48 hours prior to the commencement of the Auction. The Sellers shall promptly notify Ciena and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids and in no event later than two Business Days following the expiration of the Bid Deadline.

75. Notwithstanding the foregoing, Ciena will be deemed a Qualified Bidder, and the Ciena Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the sale.

76. A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such transaction, the proposed revisions to the relevant transaction documents, the effect of the transaction on the value of the ongoing businesses of Sellers, other factors affecting the speed, certainty and value of the transaction, the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

77. If the Sellers do not receive any Qualified Bids other than the Ciena Agreement, the Auction shall be cancelled and the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Ciena Agreement subject to obtaining any relevant court approvals.

*Auction Process*

78. If the Sellers receive one or more Qualified Bids in addition to the Ciena Agreement, the Sellers will conduct the Auction of the Purchased Assets, upon notice to all Qualified Bidders who have submitted Qualified Bids, on November 13, 2009, which Auction may

- 38 -

be cancelled or adjourned without the prior consent of Ciena, subject to the terms of the
Ciena Agreement and the Bidding Procedures.

79.   The Auction shall run in accordance with the following procedures:

- only the Sellers, the Purchaser, the Committee, the Bondholder Group, the
  Monitor and the U.K. Administrators (and the advisors to each of the
  foregoing), any creditor of the U.S. Debtors or the Applicants and any other
  Qualified Bidder that has timely submitted a Qualified Bid, shall attend the
  Auction in person, and only the Purchaser and such other Qualified Bidders
  will be entitled to make any subsequent bids at the Auction;

- each Qualified Bidder shall be required to confirm that it has not engaged in
  any collusion with respect to the bidding or the sale;

- at least one business day prior to the Auction, each Qualified Bidder who has
  timely submitted a Qualified Bid must inform the Sellers whether it intends to
  attend the Auction;

- at least one business day prior to the Auction, the Sellers will provide copies of
  the Qualified Bid or combination of Qualified Bids which the Sellers believe,
  in their reasonable business judgment, after consultation with the Committee,
  the Bondholder Group and the Monitor, is the highest or otherwise best offer
  (the "Starting Bid") to the Purchaser and all other Qualified Bidders;

- all Qualified Bidders who have timely submitted Qualified Bids will be entitled
  to be present for all Subsequent Bids (as explained below) at the Auction with
  the understanding that the true identity of each Qualified Bidder at the Auction
  will be fully disclosed to all other Qualified Bidders at the Auction and that all
  material terms of each Subsequent Bid will be fully disclosed to all other
  bidders throughout the entire Auction;

- 39 -

- the Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction provided that such rules are (i) not inconsistent with the Bidding Procedures, the Code, or any order of the U.S. Court, this Honourable Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction;

- bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that in the determination of the Sellers, in consultation with their advisers, the Committee, the Bondholder Group and the Monitor, improves upon the Starting Bid or previous Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least $5 million, or such amount to be determined by the Sellers, in consultation with the UCC, the Bondholder Group and the Monitor, over the Starting Bid or the Leading Bid. After each round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

*Selection of Successful Bid*

80.    Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, will (a) review each Qualified Bid and evaluate each Qualified Bid on the basis of a number of financial and other factors, (b) identify the highest or otherwise best offer or offers for the Purchased Assets received at the Auction (the "Successful Bid" and the bidder making such bid, the "Successful Bidder"), and (c) communicate to Ciena and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the

- 40 -

Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid shall be final and subject to approval by the U.S. Court and this Honourable Court.

81.    The Sellers will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon approval of such Successful Bid by the U.S. Court at the Sale Hearing, this Honourable Court and any required approvals of any other applicable court(s) and execution by the U.K. Administrators of the relevant Successful Bid transaction documents (or, under certain circumstances described herein, the Alternate Bidder).

*Closing with Alternative Bidders*

82.    If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid," and such bidder, the "Alternate Bidder"). Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a sale to the Alternate Bidder subject to the terms of the Alternate Bid. If a Qualified Bid other than the Ciena Agreement is selected as the Alternate Bid, then the Alternate Bid shall remain open until the earlier of (a) December 15, 2009 or (b) the consummation of the sale to the Successful Bidder (the "Alternate Bid Expiration Date").

83.    Notwithstanding the foregoing, under no circumstance will the Purchaser be deemed the Alternate Bidder.

- 41 -

*Court Approval*

84.    The Bidding Procedures are being submitted to this Honourable Court and to the U.S.
Court for approval and the Ciena Agreement is being submitted for approval as the
stalking horse bid pursuant to those Bidding Procedures.  The final sale and assignment of
the Purchased Assets will also be submitted to this Honourable Court and to the U.S. Court
for approval.  With respect to those assets owned by the EMEA Debtors, the U.K.
Administrators have the power and authority to sell the assets without seeking a separate
order from the U.K. Court.

*Reservation of Rights*

85.    The Bidding Procedures are subject to the rights of the Sellers, in consultation with the
Committee, the Bondholder Group and the Monitor, to: a) after each round of bidding at
the Auction, determine which Qualified Bid is the highest or best offer; b) reject, at any
time, any bid that: is inadequate or insufficient; not in conformity with the requirements of
the Code, the Bidding Procedures, any orders of this Honourable Court or any other
applicable orders; contrary to the best interests of the Sellers, their estates and
stakeholders; or contrary to the statutory duties or legal obligations of the U.K.
Administrators; and c) modify the Bidding Procedures or impose at, or prior to the
Auction, additional customary terms and conditions on the sale of the Purchased Assets.

86.    The Sellers may not, without prior written consent of the Committee, the Bondholder
Group, the Monitor and the Purchaser adjourn the Auction for more than three Business
Days or subject to the availability of the U.S. Court and this Honourable Court, adjourn the
Sale Hearing for more than three Business Days if the Auction has concluded.


**ALLOCATION OF PROCEEDS OF SALE AMONGST NORTEL ENTITIES AND THE
SIDE AGREEMENT**

87.    As previously indicated, the MEN Business is not operated through a dedicated legal entity
or stand-alone division.  The Applicants have an interest in intellectual property of the

- 42 -

MEN Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from a sale agreement amongst the various Nortel entities in the various jurisdictions is complex.

88.    As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties to the IFSA agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation.

89.    As of the current date, no agreement has been reached regarding the allocation of any sales proceeds and the terms of a protocol with respect to the resolution of disputes in connection with the allocation of sale proceeds are still under discussion.

90.    In the interim, the Applicants, the U.S. Debtors and the EMEA Sellers have engaged in discussions with respect to a draft side agreement (the "Side Agreement") which will, amongst other things, implement, certain elements of the framework set forth in the IFSA and set out certain agreements between the Nortel parties with respect to a process to allocate the Break-Up Fee, Expense Reimbursement and termination fee as amongst the

- 43 -

Applicants, the U.S. Debtors and the EMEA Sellers, and a process to appoint the Distribution Agent and the selling agent to hold and deal with the Shares. The Monitor expects that the Applicants will bring a further motion before this Honourable Court for approval of the Side Agreement once the same has been finalized. The Monitor will provide a supplementary report in respect of the Side Agreement in advance of such motion.

## THE MONTREAL PREMISES LOI

91. NNL currently leases the Montreal Premises pursuant to a lease dated as of June 27, 2007 and amended as of October 8, 2008 (the "Montreal Lease"). The Montreal Premises comprise the 3rd and 4th floors of a building located at 2351 Alfred-Nobel Blvd, Saint-Laurent, Quebec. The Montreal Lease is currently set to expire on June 30, 2012. A significant portion of the Montreal Premises is used in the operation of the MEN Business. As a result of employee and business reductions, the MEN Business does not currently need the full space available on both the 3rd and 4th floors. The Purchaser has advised the Company that it wishes to consolidate the MEN Business operations onto the 3rd floor and lease only the 3rd floor portion of the Montreal Premises.

92. Accordingly, concurrent with its negotiations with the Purchaser, NNL entered into discussions with the Montreal Landlord with respect to an amendment to the Montreal Lease that would permit the Purchaser to receive an assignment of the restructured lease, but be responsible for the lease obligations pertaining to the 3rd floor premises only and therefore, facilitate the transaction contemplated by the Ciena Agreement. As a result of those negotiations, NNL and the Montreal Landlord entered into the Montreal LOI dated as of October 1, 2009. A redacted copy of the Montreal LOI is attached at Appendix "D". An unredacted copy of the Montreal LOI is attached as confidential Appendix "E". As the unredacted version contains sensitive information with respect to the identity of certain potential purchasers of the MEN Business, the Monitor requests that Appendix "E" to this

- 44 -

Twenty-Fourth Report be sealed by this Honourable Court.  A summary of the key terms of the Montreal LOI is as follows:

- the term of the Montreal Lease for the 3rd floor premises shall be extended to June 30, 2014, while the term of the 4th floor premises shall be amended to be 9 months from the date the Montreal LOI is approved by this Honourable Court;

- NNL agrees to consolidate the MEN Business onto the 3rd floor premises within 90 days of the Closing Date, the costs of such consolidation to be shared with the purchaser;

- the Montreal Landlord agrees that it will grant its consent to the assignment of the entire Montreal Lease to a purchaser of the MEN Business provided that such purchaser is Ciena, certain other specified entities or another purchaser who meets certain financial criteria;

- if the Montreal Lease is not assigned to a purchaser by May 31, 2010, the consent to the assignment shall expire, NNL shall pay a penalty of CDN$500,000 plus applicable taxes and the term of the Montreal Lease in respect of the 3rd floor premises shall revert to June 30, 2012;

- in the event that the Montreal Lease is assigned to a purchaser: a) Nortel shall remain liable for all obligations under the Montreal Lease for the period ending on June 30, 2012; and b) the 4th floor premises shall be subleased from the purchaser to NNL for the remainder of the amended term for the 4th floor premises, and the purchaser shall not be liable for, and its use and occupancy of the 3rd floor premises shall not be affected by, any default by NNL in respect of the 4th floor premises, NNL dealing directly with the Montreal Landlord in respect of the 4th floor premises (the effect being that the purchaser is effectively leasing and responsible only for the 3rd floor premises);

- 45 -

- in the event that the ultimate purchaser of the MEN Business does not wish to take an assignment of the Montreal Lease, NNL shall have a right to surrender the 3rd floor premises on or about June 30, 2010 upon payment to the Montreal Landlord of a surrender penalty of CDN$2,931,000;

- the Montreal Landlord may, on 90 days notice to NNL, require that half or all of the 4th floor premises be surrendered to the Montreal Landlord in which case NNL's consolidation of the MEN Business operations onto the 3rd floor premises may be accelerated;

- the Montreal LOI is conditional upon, among other things, approval of this Honourable Court on or before October 19, 2009; and

- notwithstanding any provisions in the Initial Order, NNL shall not have the right to repudiate the Montreal Lease, and any amounts payable to the Montreal Landlord pursuant to the Montreal LOI shall not be claims affected or compromised under any proposed plan of arrangement pursuant to the CCAA.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

93.    The Monitor has reviewed Nortel's efforts to divest the MEN Business and is of the view that the Applicants are acting in good faith to maximize value. The Monitor recommends approval of the Ciena Agreement as a "stalking horse" bid and approval of the Bidding Procedures as described above. In so doing, the Monitor considers the potential payment of the Break Fee and Expense Reimbursement to Ciena as reasonable in the circumstances.

94.    The Monitor has also reviewed the terms of the Montreal LOI and is of the view that the amendments to the Montreal Lease are necessary to facilitate the completion of a transaction with respect to the MEN Business and that the Montreal LOI is therefore reasonable in the circumstances. Accordingly, the Monitor recommends approval of the Montreal LOI.

- 46 -

95. For the reasons described in Paragraphs 28 and 92, the Monitor recommends that confidential Appendix "B" and confidential Appendix "E" to this Twenty-Fourth Report be sealed by this Honourable Court.

All of which is respectfully submitted this 13th day of October, 2009.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:

Murray A. McDonald
President

**APPENDIX "A"**

**CIENA AGREEMENT**

**[ATTACHED]**

ASSET SALE AGREEMENT

BY AND AMONG

NORTEL NETWORKS CORPORATION

NORTEL NETWORKS LIMITED

NORTEL NETWORKS INC.

AND

THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

AND

CIENA CORPORATION

DATED AS OF OCTOBER 7, 2009

# TABLE OF CONTENTS

Page

**ARTICLE I INTERPRETATION** .................................................................. **3**
SECTION 1.1. DEFINITIONS. ...................................................................... 3
SECTION 1.2. INTERPRETATION. ............................................................ 32
**ARTICLE II PURCHASE AND SALE OF ASSETS** ................................ **34**
SECTION 2.1. PURCHASE AND SALE. ..................................................... 34
SECTION 2.2. PURCHASE PRICE. ............................................................ 44
SECTION 2.3. CLOSING. ............................................................................ 52
SECTION 2.4. DESIGNATED PURCHASER(S). ....................................... 55
**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** ..... **55**
SECTION 3.1. ORGANIZATION AND CORPORATE POWER. ................ 56
SECTION 3.2. AUTHORIZATION; BINDING EFFECT; NO BREACH. ..... 56
SECTION 3.3. AVAILABILITY OF FUNDS. ............................................. 57
SECTION 3.4. ADEQUATE ASSURANCE OF FUTURE PERFORMANCE. ..... 57
SECTION 3.5. PURCHASER'S ACKNOWLEDGMENTS; EXCLUSIVITY OF
    REPRESENTATIONS AND WARRANTIES. .................................. 57
SECTION 3.6. BROKERS. ........................................................................... 58
SECTION 3.7. REPRESENTATIONS AND WARRANTIES RELATING TO THE
    SHARES. ............................................................................................ 58
**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS** ........... **60**
SECTION 4.1. ORGANIZATION AND CORPORATE POWER. ................ 60
SECTION 4.2. AUTHORIZATION; BINDING EFFECT; NO BREACH. ..... 61
SECTION 4.3. TITLE TO TANGIBLE ASSETS; SUFFICIENCY OF ASSETS ..... 61
SECTION 4.4. MATERIAL CONTRACTS. ................................................. 62
SECTION 4.5. INTELLECTUAL PROPERTY ........................................... 64
SECTION 4.6. LITIGATION. ....................................................................... 67
SECTION 4.7. FINANCIAL STATEMENTS. .............................................. 67
SECTION 4.8. COMPLIANCE WITH LAWS; CONSENTS. ....................... 68
SECTION 4.9. REAL PROPERTY. .............................................................. 68
SECTION 4.10. LABOR AND EMPLOYEE BENEFITS MATTERS. ......... 69
SECTION 4.11. BROKERS. ......................................................................... 71
SECTION 4.12. TAXES ................................................................................ 71
SECTION 4.13. ENVIRONMENTAL MATTERS. ...................................... 72
SECTION 4.14. UNDISCLOSED LIABILITIES. ........................................ 73
SECTION 4.15. RELIANCE ON EXEMPTION FROM REGISTRATION UNDER
    SECTION 4(2) OF THE SECURITIES ACT. .................................... 73
SECTION 4.16. REPRESENTATIONS AND WARRANTIES BY THE OTHER
    SELLERS. .......................................................................................... 74
**ARTICLE V COVENANTS AND OTHER AGREEMENTS** ................... **75**
SECTION 5.1. U.S. BANKRUPTCY ACTIONS. ......................................... 75
SECTION 5.2. CANADIAN BANKRUPTCY ACTIONS. ............................ 77

i

**TABLE OF CONTENTS**

Page

SECTION 5.3. CONSULTATION; NOTIFICATION; COOPERATION;
    SOLICITATION. ................................................................. 77
SECTION 5.4. PRE-CLOSING COOPERATION. ................................................ 79
SECTION 5.5. ANTITRUST AND OTHER REGULATORY APPROVALS. ...................... 80
SECTION 5.6. PRE-CLOSING ACCESS TO INFORMATION. .............................. 83
SECTION 5.7. PUBLIC ANNOUNCEMENTS. ................................................ 85
SECTION 5.8. FURTHER ACTIONS. ........................................................ 85
SECTION 5.9. CONDUCT OF BUSINESS. ................................................... 85
SECTION 5.10. TRANSACTION EXPENSES. ................................................ 88
SECTION 5.11. CONFIDENTIALITY. ........................................................ 88
SECTION 5.12. DISCLOSURE SCHEDULES AND CERTAIN INFORMATION. .............. 90
SECTION 5.13. CERTAIN PAYMENTS OR INSTRUMENTS RECEIVED FROM
    THIRD PARTIES. ............................................................. 90
SECTION 5.14. NON-ASSIGNABLE CONTRACTS. ........................................ 91
SECTION 5.15. BUNDLED CONTRACTS. ................................................... 91
SECTION 5.16. POST-CLOSING ASSISTANCE FOR LITIGATION. ....................... 93
SECTION 5.17. TANGIBLE ASSET REMOVAL. ............................................. 94
SECTION 5.18. TERMINATION OF OVERHEAD AND SHARED SERVICES AND
    INTERCOMPANY LICENSING ARRANGEMENTS. ............................... 94
SECTION 5.19. FINANCING. ................................................................ 94
SECTION 5.20. INSURANCE MATTERS. .................................................... 95
SECTION 5.21. SELLERS DEPOSITS, GUARANTEES AND OTHER CREDIT
    SUPPORT OF THE BUSINESS. .............................................. 97
SECTION 5.22. USE OF SELLERS' TRADEMARKS. ....................................... 98
SECTION 5.23. ACCESSIBLE INFORMATION. ............................................. 98
SECTION 5.24. MAINTENANCE OF BOOKS AND RECORDS. ............................ 98
SECTION 5.25. CERTAIN ANCILLARY AGREEMENTS. .................................... 99
SECTION 5.26. ADDITIONAL FINANCIAL STATEMENTS. ............................... 100
SECTION 5.27. SECURITIES COMPLIANCE. .............................................. 100
SECTION 5.28. TRANSITION SERVICES. .................................................. 100
SECTION 5.29. STANDSTILL PERIOD. ..................................................... 101
SECTION 5.30. HAZARDOUS MATERIALS AT THE CARLING PROPERTY. .............. 102
SECTION 5.31. MONTREAL PREMISES AND OTHER REAL ESTATE. .................... 102
SECTION 5.32. RIGHT TO EXCLUDE. ...................................................... 102
SECTION 5.33. PURCHASER MANAGEMENT PRESENTATION. .......................... 104
SECTION 5.34. PATENT ASSIGNMENTS. .................................................. 104
SECTION 5.35. INDIA. ...................................................................... 104

**ARTICLE VI TAX MATTERS** ................................................................. **104**
SECTION 6.1. TRANSFER TAXES. .......................................................... 104
SECTION 6.2. WITHHOLDING TAXES. ..................................................... 106
SECTION 6.3. TAX CHARACTERIZATION OF PAYMENTS UNDER THIS
    AGREEMENT. ................................................................. 107
SECTION 6.4. APPORTIONMENT OF TAXES. ............................................. 107

ii

## TABLE OF CONTENTS

Page

SECTION 6.5. TAX RECORDS. .................................................................... 109
SECTION 6.6. COOPERATION. ................................................................... 110
SECTION 6.7. NORTH AMERICAN TAX ESCROW. ..................................... 111
SECTION 6.8. EMEA TAX ESCROW. ........................................................... 112
SECTION 6.9. ITALIAN TAX ESCROW. ....................................................... 114
**ARTICLE VII EMPLOYMENT MATTERS** ............................................... **116**
SECTION 7.1. EMPLOYMENT OBLIGATIONS WITH RESPECT TO NON-UNION
            EMPLOYEES. ....................................................................... 116
SECTION 7.2. EMPLOYMENT OBLIGATIONS WITH RESPECT TO UNION
            EMPLOYEES. ....................................................................... 121
SECTION 7.3. EXCLUDED EMPLOYEE LIABILITIES. ................................... 122
SECTION 7.4. OTHER EMPLOYEE COVENANTS. ....................................... 123
SECTION 7.5. CANADIAN PENSION PLANS. .............................................. 125
SECTION 7.6. SOLE BENEFIT OF SELLERS AND PURCHASER. .................... 126
**ARTICLE VIII REGISTRATION AND SALE OF SHARES** .......................... **126**
SECTION 8.1. SHELF REGISTRATION. ....................................................... 126
SECTION 8.2. INDEMNIFICATION. ........................................................... 128
SECTION 8.3. TRADING LIMITATION. ....................................................... 130
**ARTICLE IX CONDITIONS TO THE CLOSING** ...................................... **130**
SECTION 9.1. CONDITIONS TO EACH PARTY'S OBLIGATION. .................... 130
SECTION 9.2. CONDITIONS TO SELLERS' OBLIGATION. ............................ 131
SECTION 9.3. CONDITIONS TO PURCHASER'S OBLIGATION. ..................... 131
**ARTICLE X TERMINATION** .................................................................. **132**
SECTION 10.1. TERMINATION. ................................................................. 132
SECTION 10.2. TERMINATION PAYMENTS. ............................................... 134
SECTION 10.3. EFFECTS OF TERMINATION. ............................................. 134
**ARTICLE XI MISCELLANEOUS** ............................................................ **135**
SECTION 11.1. SURVIVAL OF REPRESENTATIONS AND WARRANTIES OR
            COVENANTS. ..................................................................... 135
SECTION 11.2. REMEDIES. ...................................................................... 135
SECTION 11.3. THIRD-PARTY BENEFICIARIES. .......................................... 135
SECTION 11.4. CONSENT TO AMENDMENTS; WAIVERS. ........................... 136
SECTION 11.5. SUCCESSORS AND ASSIGNS. ............................................. 136
SECTION 11.6. GOVERNING LAW; SUBMISSION TO JURISDICTION; WAIVER
            OF JURY TRIAL. ................................................................. 136
SECTION 11.7. NOTICES. ......................................................................... 138
SECTION 11.8. EXHIBITS; SELLERS DISCLOSURE SCHEDULE. .................... 140
SECTION 11.9. COUNTERPARTS. ............................................................. 140
SECTION 11.10. NO PRESUMPTION. ......................................................... 140
SECTION 11.11. SEVERABILITY. ............................................................... 141
SECTION 11.12. ENTIRE AGREEMENT. ..................................................... 141

iii

**TABLE OF CONTENTS**

Page

SECTION 11.13. AVAILABILITY OF EQUITABLE RELIEF. ........................................... 141
SECTION 11.14. BULK SALES LAWS. ........................................................................ 142
SECTION 11.15. MAIN SELLERS AS REPRESENTATIVES OF OTHER SELLERS........ 142
SECTION 11.16. OBLIGATIONS OF SELLERS. ............................................................ 142
SECTION 11.17. EXECUTION BY OTHER SELLERS...................................................... 142

**EXHIBITS**

Exhibit A – Other Sellers

Exhibit B – EMEA Sellers

Exhibit C – Canadian Debtors; U.S. Debtors; Israeli Company; Non-Debtor Sellers; EMEA Debtors

Exhibit D – Intentionally Omitted

Exhibit E – EMEA Asset Sale Agreement

Exhibit F – Intellectual Property License Agreement

Exhibit G – Knowledge of the Purchaser

Exhibit H – Intentionally Omitted

Exhibit I – Loaned Employee Agreement

Exhibit J – Intentionally Omitted

Exhibit K – Intentionally Omitted

Exhibit L-1 – Lab 10 Lease Agreement

Exhibit L-2 – Carling Property Non-Disturbance Agreements

Exhibit M – Intentionally Omitted

Exhibit N – Intentionally Omitted

Exhibit O – Intentionally Omitted

Exhibit P – Trademark License Agreement

Exhibit Q – Transition Services Agreement

Exhibit R – Intentionally Omitted

Exhibit S – Intentionally Omitted

Exhibit T – Intentionally Omitted

Exhibit U – Intentionally Omitted

Exhibit V – Form of Assignment of Patent Rights

Exhibit W – Form of Assignment of Trademark Rights

Exhibit X – Restricted Seller Revenue

Exhibit Y – Real Estate Terms and Conditions

Exhibit Z – Flextronics Back-to-Back Supply Agreement Term Sheet

Exhibit 1.1 – Contract Manufacturing Inventory Agreements (Term Sheet)

Exhibit 2.1.1 – Sellers and Purchaser

Exhibit 5.1(a) – Forms of U.S. Bidding Procedures Order and U.S. Sale Order

Exhibit 5.2.1 – Form of Canadian Sales Process Order

Exhibit 5.2.2 – Form of Canadian Approval and Vesting Order

Exhibit 5.9 – Purchaser's Representatives for Interim Covenants Consents

Exhibit 5.12 – Purchaser's Representatives for Sellers Disclosure Schedule and Certain Information Updates

## SELLERS DISCLOSURE SCHEDULE

Section 1.1(a) -- Contract Manufacturers

Section 1.1(b) -- Persons Having Knowledge

Section 1.1(d) -- Nortel Accounting Principles

Section 1.1(e) -- Owned Equipment

Section 1.1(g) -- Permitted Encumbrances

Section 1.1(h) -- Products

Section 1.1(i) -- Seller Contracts

Section 1.1(j) -- Services

Section 1.1(k) -- Patents

Section 1.1(l) -- Trademarks

Section 1.1(m) -- Seconded Employees

Section 2.1.1(g) -- Seller Consents

Section 2.1.2(n) -- Excluded Assets

Section 2.1.3(c) -- Assumed Intellectual Property Liabilities

Section 2.1.3(i) -- Assumed Specified Employee Liabilities

Section 2.1.4(n) -- Other Excluded Liabilities

Section 2.1.5(a) -- 365 Vendor Contracts

Section 2.1.5(b) -- 365 Customer Contracts

Section 2.1.6(a) -- Other Vendor Contracts

Section 2.1.6(b) -- Non-Assignable Contracts with Suppliers

Section 2.1.6(c) -- Designated Other Customer Contracts

Section 2.1.6(d) -- Designated Non-Assignable Customer Contracts

Section 2.1.7(a) -- Cure Costs

Section 2.1.7(b) -- Payment of Cure Costs

Section 2.1.7(c) -- Customer Contract Cure Costs

Section 2.2.3(d) -- Manner for Exclusion of Sellers

Section 2.2.7(a) -- Allocations for Shares

Section 4.3(c)(i) -- Inbound License Agreements and Patent Cross Licenses

Section 4.3(c)(ii) -- Other Assets and Rights

Section 4.4(a) -- Material Customer and Supplier Contracts

Section 4.4(b) -- Material Seller Contracts

Section 4.5(b) – Transferred Intellectual Property

Section 4.5(h) – Infringement

Section 4.5(j)(i) – Patent Cross Licenses

Section 4.5(j)(ii) – Inbound License Agreements

Section 4.5(j)(iii) – Outbound License Agreements

Section 4.5(k) – Open Source Software

Section 4.6 – Litigation

Section 4.7 – Financial Statements

Section 4.8 – Compliance with Laws

Section 4.9(a)(i) – Owned Real Property

Section 4.9(a)(ii) – Leased Real Property

Section 4.9(a)(iii) – 6-Month Locations

Section 4.9(a)(iv) – Short-Term Licensed Property

Section 4.9(a)(v) – Locations where Owned Assets Located

Section 4.10(a)(i) – Seller Employee Plans

Section 4.10(b) – Employee Information

Section 4.10(c) – Strike, Material Grievance, Work Stoppage

Section 4.10(d) – Collective Labor Agreements

Section 4.10(e) – Multiemployer Plans

Section 4.12(c) –Deficiency for Material Amount of Taxes

Section 5.9 – Conduct of Business in the Ordinary Course Exceptions

Section 5.15 – Bundled Contracts

Section 5.21(a) – Security Deposits

Section 5.28 – Covenants in respect of Transition Services

Section 5.35 - India

Section 7.1.1(a) – Employees Transferring by Operation of Law

Section 7.1.1(c) – Countries with Ten or More Employees

Section 7.1.2(b)(ii)(B) – Accrued Amounts Owing to Specified Transferred Employees

Section 7.1.2(b)(iv) – Pakistan Gratuity and Australia Long Service Leave and Sick Leave

Section 11.15(a)(i) – Appointment of NNC as Representative

Section 11.15(a)(ii) – Appointment of NNL as Representative

Section 11.15(a)(iii) – Appointment of NNI as Representative

2

## ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of October 7, 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the affiliates of the Main Sellers listed in Exhibit A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**") and Ciena Corporation, a corporation organized under the laws of Delaware (the "**Purchaser**").

**WHEREAS** the Sellers and the affiliates of the Main Sellers listed in Exhibit B hereto (the "**EMEA Sellers**") beneficially own and operate, respectively, the Business (as defined below);

**WHEREAS**, on the Petition Date (as defined herein), NNC, NNL and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases and has been extended by further order of the Canadian Court from time to time, most recently on July 30, 2009, as the same may be amended and restated from time to time by the Canadian Court.

**WHEREAS**, NNI and the Other Sellers listed in part 2 of Exhibit C hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

**WHEREAS**, the EMEA Debtors (as defined below) on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "**EMEA Cases**") and the English Court appointed Alan Bloom, Stephen Harris, Christopher Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants and Alan Bloom serve as joint administrators) (the "**Joint Administrators**") under the Insolvency Act;

**WHEREAS**, the entity listed under the heading "Israeli Company" in part 3 of Exhibit C hereto (the "**Israeli Company**") on January 18, 2009 filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto (collectively, the "**Israeli Companies Law**") for a stay of proceedings, and the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") on January 19, 2009, as joint administrators of the Israeli Company under the Israeli Companies Law;

**WHEREAS,** on May 28, 2009, the Commercial Court of Versailles, France ordered the commencement of secondary proceedings and the appointment of a French administrator in respect of Nortel Networks S.A.;

**WHEREAS,** on July 14, 2009, Nortel Networks (CALA) Inc. commenced a case under Chapter 11 of the U.S. Bankruptcy Code by filing a voluntary petition for relief in the U.S. Bankruptcy Court for the District of Delaware;

**WHEREAS,** the Other Sellers listed in part 4 of Exhibit C hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

**WHEREAS,** the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers upon the terms and conditions set forth hereinafter;

**WHEREAS,** simultaneously with the execution of this Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser are entering into a separate agreement in the form set forth in Exhibit E hereto (the "**EMEA Asset Sale Agreement**") providing for the sale to the Purchaser (or the EMEA Designated Purchasers (as defined therein)) of the EMEA Assets (as defined below);

**WHEREAS,** the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers, if any) of the Assets and the EMEA Assets, the license of Intellectual Property rights under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates and each Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisitions by the Purchaser and the Designated Purchasers of the Assets and the EMEA Assets, the license of Intellectual Property rights under the Intellectual Property License Agreement and the Trademark License Agreement and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities, as set forth hereunder and in the EMEA Asset Sale Agreement; and

**WHEREAS,** in addition, at the Closing, the Purchaser, certain Sellers (or affiliates of the Sellers) and certain EMEA Sellers will enter into the following ancillary agreements (together, the "**Ancillary Agreements**") (i) the Local Sale Agreements, (ii) the Real Estate Agreements, (iii) the Intellectual Property License Agreement, (iv) the Transition Services Agreement, (v) the Trademark License Agreement, (vi) the Loaned Employee Agreement; (vii) the Subcontract Agreement, (viii) the Contract Manufacturing Inventory Agreements, (ix) the Carling Property Lease Agreements, (x) the Patent Assignments, (xi) the Trademark Assignments, (xii) if requested by the Purchaser in accordance with the terms hereof, the Flextronics Back-to-Back Supply Agreement and (xiii) such other back-to-back supply

2

agreements as are requested by the Purchaser in accordance with the terms hereof, and, subject to the negotiation prior to Closing of each such agreement to the mutual satisfaction of each party thereto, in their sole and absolute discretion, will enter into the Mutual Development Agreement, the Seller Supply Agreement, the NETAS Distribution Agreement, the NGS Distribution Agreement, the EFA Development Agreement, and the LGN/Korea Distribution Agreement (each as defined below).

    **NOW, THEREFORE,** in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

# ARTICLE I
## INTERPRETATION

    **SECTION 1.1. Definitions.** Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

    **"2008 Revenues"** has the meaning set forth in Section 2.2.3(b).

    **"365 Contracts"** has the meaning set forth in Section 2.1.5(b).

    **"365 Customer Contract List"** has the meaning set forth in Section 2.1.5(b).

    **"365 Customer Contracts"** has the meaning set forth in Section 2.1.5(b).

    **"365 Vendor Contract List"** has the meaning set forth in Section 2.1.5(a).

    **"365 Vendor Contracts"** has the meaning set forth in Section 2.1.5(a).

    **"6 Month Location"** has the meaning set forth in Section 4.9(a).

    **"Accounting Arbitrator"** has the meaning set forth in Section 2.2.4.1(b).

    **"Action"** means any litigation, action, audit, hearing, investigation, suit (whether civil, criminal, administrative or investigative), charge, binding arbitration, Tax audit or other legal, administrative or judicial proceeding.

    **"Additional Adverse Bankruptcy Proceeding"** has the meaning set forth in Section 2.2.3(a).

    **"Additional Premises Lease Agreement"** means the lease agreement between NNTC on the one hand and the Purchaser or Designated Purchaser on the other hand in respect of the leasing of those parts of the Lab 2 Building of the Carling Property as more particularly defined in the Real Estate Terms and Conditions.

    **"Additional Statements"** has the meaning set forth in Section 8.1(a)(i).

    **"Adjustment Amount"** has the meaning set forth in Section 2.2.4.2(a).

3

"**Adverse International Injunction**" has the meaning set forth in Section 2.2.3(a).

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; provided, however, that no EMEA Seller or Subsidiary of an EMEA Seller shall be deemed an Affiliate of any Seller.

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 11.4.

"**Alternative Arrangements**" has the meaning set forth in Section 5.15(b).

"**Alternative Transaction**" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangement or other similar transaction, of all or a substantial portion of the Business, or all or a substantial portion of the Assets and the EMEA Assets, in each case, in a transaction or a series of transactions with a Successful Bidder (as such term has been defined in Exhibit 5.1(a), which may include multiple bidders whose bids are combined) other than the Purchaser and/or its Affiliates; provided, however, that an "Alternative Transaction" shall not include: (i) the retention of the Business or all or any portion of the Assets and the EMEA Assets, by all or part of the Sellers and/or the EMEA Sellers (or their successor entities emerging from the Bankruptcy Proceedings) pursuant to a stand-alone plan of reorganization or plan of arrangement approved by any Bankruptcy Court, or (ii) the sale, transfer or other disposition, directly or indirectly, of any portion of the Assets or the EMEA Assets (other than as a going concern) in connection with the closure, liquidation or winding-up of any of the Sellers.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Antitrust Approvals**" means the HSR Approval and the Competition Act Approval.

"**Antitrust Laws**" means the Competition Act, the HSR Act, the EC Merger Regulation, and any competition, merger control and anti-trust Law of the European Union, any applicable European Union member states and EFTA states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement).

"**ARD Transferring Employee**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**Assets**" has the meaning set forth in Section 2.1.1.

4

"**Assigned Contracts**" means all Seller Contracts except: (i) the Excluded 365 Contracts, (ii) the Excluded Other Vendor Contracts, (iii) the Excluded Non-Assignable Supply Contracts, (iv) the Non-Assigned Contracts and (v) leases, subleases, licenses and other occupancy agreements in respect of any Real Property, unless an assignment of such contract is contemplated by the Real Estate Terms and Conditions.

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(b).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Auction**" has the meaning set forth in the U.S. Bidding Procedures and Sale Motion.

"**Audited Financial Statements**" has the meaning set forth in Section 5.26.

"**Balance Sheet Date**" has the meaning set forth in Section 4.7.

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court and any other court before which Bankruptcy Proceedings are held.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings concerning any of the Sellers or the EMEA Sellers that are held from time to time.

"**Base Cash Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Break-Up Fee**" has the meaning set forth in Section 10.2(a).

"**Bundled Contract**" has the meaning set forth in Section 5.15(a).

"**Business**" means the optical networking solutions and carrier ethernet switching segments of NNC's "Metro Ethernet Networks" business through which the Sellers and the EMEA Sellers, individually, jointly or in collaboration with, or pursuant to Contracts with, Third Parties: (a) design, develop and cause the manufacture, assembly and testing of the Products; (b) market, sell, distribute and supply the Products; and (c) provide the Services, all as conducted as at the date of this Agreement, but excludes:

> (i)    any financial, information technology, legal, marketing, human resource operations (including supply management and technical and product support), real estate or other "corporate" or related functions supporting or utilized by such activities, unless such functions are exclusively dedicated

to the support of the activities described in (a) through (c), in which event such functions are included;

(ii)    Overhead and Shared Services (other than Transferred Overhead and Shared Services); and

(iii)    any products and/or services provided by businesses or business segments of any of the Sellers or the EMEA Sellers, other than those specified in (a) through (c) above.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, and (iii) London, England, United Kingdom.

"**Business Information**" means, as of the Closing Date, all books, records, files, research and development log books, ledgers, documentation, sales literature or similar documents in the possession or under control of the Sellers and to the extent that such information relates to the Business, including policies and procedures, Owned Equipment manuals and materials and procurement documentation; provided, that, to the extent any of the foregoing is also used in any business or business segment of any Seller other than the Business, then such portion of the Business Information as used in such business or business segment of any Seller other than the Business shall be segregated and shall not form part of Business Information, provided further that, where such segregation shall be impracticable, Business Information shall be limited to copies of the foregoing. Business Information shall not include any Employee Records or Tax records.

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.2.

"**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List).

"**Canadian DB Replacement Plan**" has the meaning set forth in Section 7.5.3.

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Non-Union DC Replacement Plan**" has the meaning set forth in Section 7.5.1.

"**Canadian Sales Process Order**" has the meaning set forth in Section 5.2.1(a).

"**Canadian Sales Process Order Motion**" has the meaning set forth in Section 5.2.1(a).

"**Canadian Sellers**" means each of the Sellers that are organized under the laws of Canada (or any province of Canada).

6

"**Canadian Union DC Replacement Plan**" has the meaning set forth in Section 7.5.4.

"**Canadian Union Retiree**" means any individual who was employed by any of the Sellers or any of their Affiliates in Canada in respect of the Business and whose terms and conditions of employment were governed by a Collective Labor Agreement.

"**Carling Property**" means the "Premises" as defined in the Carling Property Lease Agreements.

"**Carling Property Escrow Amount**" means, pursuant to the Carling Property Lease Agreements, an initial amount in immediately available funds equal to $33,500,000 which amount shall secure exclusively the break-fee, if any, payable by the Sellers to the Purchaser in respect of the early termination of the Carling Property Lease Agreements by the Sellers in the exercise of the Sellers' early termination rights thereunder.

"**Carling Property Lease Agreements**" means, collectively, the Lab 10 Lease Agreement and the Additional Premises Lease Agreement, and non-disturbance agreements from any existing mortgagees registered on title to the Carling Property in the form attached as Exhibit L-2 hereto, each of the foregoing agreements to be entered into and delivered on or before Closing by each of the parties to such agreements substantially in the forms aforesaid.

"**Cash Purchase Price**" has the meaning set forth in Section 2.2.1.

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Service List**" means the Canadian Debtors' service list as posted on the Monitor's website (www.ey.com/ca/nortel) as the same may be updated from time to time in the context of the CCAA Cases.

"**CERCLA**" has the meaning set forth in Section 4.13(c).

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**CIP Accounts Receivable**" means all uninvoiced accounts receivable relating to the Business with respect to Contracts in progress, but only to the extent that such accounts receivable have not been invoiced because of milestones, deliverables or other commitments arising pursuant to such Contracts which have not yet been satisfied or fulfilled and excluding all EMEA CIP Accounts Receivable.

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**Claim Notice**" has the meaning set forth in Section 6.7(b).

"**Closing**" has the meaning set forth in Section 2.3.1.

7

"**Closing Accrued Vacation and Service Award Amount**" means, as of the Closing Date, (i) the amount of compensation with respect to the accrued and unused vacation with respect to each Specified Transferred Employee and each EMEA Transferring Employee (including all Taxes required to be withheld on behalf of the applicable Specified Transferred Employee and EMEA Transferring Employee by his or her respective employer) calculated by taking, with respect to each such employee (A) an amount equal to the number (not less than zero) of such employee's accrued and unused vacation hours as of the Closing Date multiplied by such employee's hourly rate of pay (with such hourly rate of pay derived by dividing such employee's annual base salary by the number of standard work hours per year for such employee), (ii) in respect of Transferred Employees located in Pakistan, the amounts specified in Section 7.1.2(b)(iv) of the Sellers Disclosure Schedule in respect of gratuity payments multiplied by the applicable percentage as set forth in the Nortel Accounting Principles, and (iii) in respect of Transferred Employees in Australia with five (5) years or more of service as an employee of Sellers, the EMEA Sellers or their respective Affiliates as of the Closing Date, the amounts specified in Section 7.1.2(b)(iv) of the Sellers Disclosure Schedules in respect of long service leave multiplied by the applicable percentage as set forth in the Nortel Accounting Principles, plus, without duplication, the aggregate amount of employer Taxes required to be paid in connection with all such amounts.

"**Closing CIP Accounts Receivable Amount**" means, as of the Closing Date, the amount accrued for CIP Accounts Receivable and EMEA CIP Accounts Receivable as of the Closing Date in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

"**Closing Date**" has the meaning set forth in Section 2.3.1.

"**Closing Date Net Working Capital Transferred**" has the meaning set forth in Section 2.2.4.1(a).

"**Closing Inventory Amount**" means, as of the Closing Date, the book value of the Owned Inventory and the EMEA Owned Inventory, net of applicable provisions, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

"**Closing KPD Provision**" means, as of the Closing Date, the provision for Known Product Defects accrued by the Business in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

"**Closing Net Deferred Revenues**" means, as of the Closing Date, (x) deferred revenues for services to be performed or products to be provided by the Business after the Closing Date but for which an account receivable has been recorded prior to the Closing Date <u>minus</u> (y) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

8

"**Closing Other Accrued and Contractual Liabilities**" means, as of the Closing Date, (i) such current Assumed Liabilities and current EMEA Assumed Liabilities of a type accrued on the Business' historic Financial Statements under the heading "Other Accrued and Contractual Liabilities" (including "Accrued Known Project Losses", "Accrued Liquidated Damages", "Accrued Marketing Program Liabilities", "Accrued Product Credits" (including, for the avoidance of doubt, all credits for EMEA Products or EMEA Services to be assumed by the Purchaser pursuant to Section 2.4.2(B)(4) of the EMEA Asset Sale Agreement) and "Accrued Training Credits", but excluding "COS Accruals" and "Representative Fees"), that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

"**Closing Retirement Obligation Amount**" means, as of the Closing Date, the amount of the actual unfunded obligations accrued in any period preceding the Closing Date that will be assumed by the Purchaser, a Designated Purchaser or an EMEA Designated Purchaser at Closing (if any) whether pursuant to this Agreement or by operation of Law under a plan providing retirement or retiree welfare benefits of any Seller or EMEA Seller, and under any plan providing jubilee benefits (anniversary bonuses) of Nortel GmbH, in all cases determined in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP), and using reasonable actuarial assumptions consistent with the assumptions most recently used for determining unfunded obligations for the applicable plan prior to the date hereof. For purposes of this definition, an unfunded obligation shall be deemed to be under (A) with respect to any Seller or EMEA Seller, a plan providing retirement or retiree welfare benefits to the extent it is required to be accounted for under FAS 87 (paragraphs 11, 72 and 73) or FAS 106 (paragraphs 16 and 85), as applicable, and (B) with respect to Nortel GmbH, a plan providing jubilee benefits (anniversary bonuses) to the extent it is required to be accounted for under FAS 112. Notwithstanding the foregoing, an unfunded obligation shall not be taken into account to the extent that it is a Liability in respect of which there is, and to the extent of, a separate Purchase Price adjustment that is expressly provided for, if any, under this Agreement or the EMEA Asset Sale Agreement.

"**Closing Statement**" has the meaning set forth in Section 2.2.4.1(a).

"**Closing Warranty Provision**" means, as of the Closing Date, the provision for potential claims by customers under the Warranty Obligations to be recognized and measured by the Business in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Person has entered into with any union or collective bargaining agent with respect to terms and conditions of employment of such Person's employees.

9

**"Commissioner"** means the Commissioner of Competition appointed under the Competition Act or any person duly authorized to exercise the powers and perform the duties of the Commissioner of Competition.

**"Common Stock"** has the meaning set forth in Section 2.2.1.

**"Competing Transaction"** has the meaning set forth in Section 5.29(a).

**"Competition Act"** means the Competition Act (Canada), as amended, and the regulations promulgated in connection therewith.

**"Competition Act Approval"** means that: (a) the Commissioner shall have issued an advance ruling certificate pursuant to Section 102 of the Competition Act in respect of the transactions contemplated by this Agreement; or (b)(i) the applicable waiting period has expired, been terminated pursuant to Section 123 of the Competition Act or compliance with Part IX of the Competition Act has been waived pursuant to Section 113(c) of the Competition Act, and (ii) the Commissioner or his/her authorized representative shall have advised the Purchaser in writing that the Commissioner does not intend to make an application under Section 92 of the Competition Act with respect to the transactions contemplated by this Agreement, and neither the Commissioner nor any of his/her authorized representatives shall have rescinded or amended such advice.

**"Confidentiality Agreement"** means collectively, the confidentiality agreement between the Purchaser, NNC and its subsidiaries and the Joint Administrators dated March 27, 2009, the clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated April 15, 2009, the second clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated May 8, 2009, and the third clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated June 19, 2009.

**"Consent"** means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by, or notice to (including the expiry of any related notice or waiting period), any Government Entity or other Third Party.

**"Contract"** means any written binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.

**"Contract Manufacturing Inventory Agreements"** means the agreements between the Purchaser and/or any Designated Purchasers, on the one hand, the relevant Sellers, on the other hand, and the contract manufacturers of the Business listed in Section 1.1(a) of the Sellers Disclosure Schedule that the relevant Parties will use commercially reasonable efforts to execute on or before the Closing in the form that shall be negotiated in good faith pursuant to Section 5.25 and the term sheet attached as Exhibit 1.1.

**"Control"**, including, with its correlative meanings, **"Controlled by"** and **"under common Control with"**, means, in connection with a given Person, the possession, directly or indirectly, of the power to either (i) elect more than fifty percent (50%) of the directors of such

10

Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract or otherwise.

"**Covered Assets and Persons**" has the meaning set forth in Section 5.20(a).

"**Cure Cost**" has the meaning set forth in Section 2.1.7(b) of the Sellers Disclosure Schedule.

"**Customer Contract**" means any Seller Contract pursuant to which a Seller provides Products and/or Services to the counterparty.

"**Customer Contract Cure Cost**" has the meaning set forth in Section 2.1.7(c) of the Sellers Disclosure Schedule.

"**Daily Trading Limit**" as of any date shall mean the lesser of (i) 10% of the average reported daily trading volume of the shares of Common Stock on NASDAQ for the 20 consecutive trading days immediately preceding such date and (ii) 10% of the reported daily trading volume of the shares of Common Stock for the trading date immediately preceding such date.

"**Deficit Amount**" has the meaning set forth in Section 2.2.4.2(b)(ii).

"**Demand Note**" has the meaning set forth in Section 2.2.7(b).

"**Designated Non-Assignable Contracts**" has the meaning set forth in Section 2.1.6(d).

"**Designated Non-Assignable Customer Contracts**" has the meaning set forth in Section 2.1.6(d).

"**Designated Non-Assignable Supply Contracts**" has the meaning set forth in Section 2.1.6(b).

"**Designated Other Customer Contracts**" has the meaning set forth in Section 2.1.6(c).

"**Designated Other Vendor Contracts**" has the meaning set forth in Section 2.1.6(a).

"**Designated Purchaser**" has the meaning set forth in Section 2.4.

"**Determination Date**" has the meaning set forth in Section 2.2.4.1(b).

"**Distribution Agent**" means the Person that will act as distribution agent for the Sellers and the EMEA Sellers hereunder, to be notified by the Main Sellers to the Purchaser and the Escrow Agent by and not later than January 25, 2010.

"**Domain Name**" means an alphanumeric name that identifies a specific computer or website on the Internet, and all rights in and to such domain name, including any registrations therefor with a domain name registrar.

"**E&O Inventory**" has the meaning set forth in Section 5.9(a).

"**EC Merger Regulation**" means Council Regulation (EC) No. 139/2004 of January 20, 2004 on the control of concentrations between undertakings, as amended.

"**EFA Development Agreement**" means the agreement between the Purchaser and LG Nortel Co. Ltd. for development services related to ethernet fiber access (EFA),to be provided by the Purchaser to LG Nortel Co. Ltd., such agreement to be effective on Closing, that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**Effective Period**" has the meaning set forth in Section 8.1(a).

"**EMEA Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Assumed Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Business**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA CIP Accounts Receivable**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Debtors**" means those entities listed under the heading "EMEA Debtors" in part 5 of Exhibit C hereto.

"**EMEA Designated Purchaser**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Employee**" means an employee of any of the EMEA Sellers engaged in the EMEA Business.

"**EMEA Excluded Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Excluded Taxes**" has the meaning set forth in Section 6.8(a).

"**EMEA Intellectual Property**" has the meaning set forth in Section 4.5(a).

"**EMEA Owned Inventory**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Purchaser Party**" has the meaning set forth in Section 6.8(a).

"**EMEA Sellers**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Tax Claim**" has the meaning set forth in Section 6.8(b).

"**EMEA Tax Claim Notice**" has the meaning set forth in Section 6.8(b).

"**EMEA Tax Escrow Amount**" means $2,500,000, which amount shall secure the EMEA Sellers' obligations under Section 6.8.

"**EMEA Transferring Employee**" has the meaning ascribed to the term "Transferring Employee" in the EMEA Asset Sale Agreement.

"**Employee**" means an employee of any of the Sellers or their Affiliates (excluding the EMEA Sellers) engaged in the Business (excluding the EMEA Business), in each instance as listed in Section 4.10(b) of the Sellers Disclosure Schedule.

"**Employee Data**" has the meaning set forth in Section 7.4(b).

"**Employee Information**" has the meaning set forth in Section 4.10(b).

"**Employee Records**" means books, records, files, or other documentation with respect to Employees.

"**Employee Transfer Date**" means with respect to each jurisdiction where Employees, other than Inactive Employees, Visa Employees and Seconded Employees, will become Transferred Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction immediately following the Closing.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environment**" means soil, land, surface or subsurface strata, waters (including navigable ocean, stream, pond, reservoirs, drainage, basins, wetland, ground and drinking), sediments, ambient air (including indoor), noise, plant life, animal life and all other environmental media or natural resources.

"**Environmental Laws**" means any applicable Laws relating to pollution or protection of the Environment, human health and safety, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, transfer, storage, disposal, distribution, importing, labeling, testing, processing, discharge, release, control, or other action or failure to act involving cleanup of any Hazardous

Materials, including without limitation and by way of example only the following laws as in effect now and as of the Closing Date: (i) Clean Air Act (42 USC 7401, et seq.); (ii) Clean Water Act (33 USC 1251, et seq.); (iii) Resource Conservation and Recovery Act (42 USC 6901, et seq.); (iv) Comprehensive Environmental Response, Compensation and Liability Act (41 USC 9601, et seq.); (iv) Toxic Substances Control Act (15 USC 2601, et seq.).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Agent**" has the meaning ascribed to such term in the Escrow Agreement.

"**Escrow Amount**" means the portion of the Cash Purchase Price to be paid to the Escrow Agent on the Closing Date in accordance with Section 2.3.2(b) and, subject to adjustment in accordance with Section 2.1.7(b) of the Sellers Disclosure Schedule, such amount will consist of (i) the Working Capital Escrow Amount, (ii) the Carling Property Escrow Amount, (iii) the Tax Escrow Amount, (iv) the EMEA Tax Escrow Amount and (v) the Italian Tax Escrow Amount.

"**Escrow Agreement**" means a "joint instruction" Escrow Agreement to be entered into on or prior to Closing with respect to the deposit, investment and disbursement of the Escrow Amount and the Transition Services Escrow Amount and requiring that any amounts to be distributed thereunder shall require the written instruction of one or more the Main Sellers and the Purchaser which shall be given in accordance with this Agreement or the applicable Transaction Document to which any portion of the Escrow Amount and the Transition Services Escrow Amount relates and otherwise on terms and conditions reasonably satisfactory to each of the Purchaser, the Sellers, the EMEA Sellers and the Escrow Agent.

"**Estimated Adjustment Amount**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Closing Date Net Working Capital Transferred**" has the meaning set forth in Section 2.2.2(a).

"**Excess ARD Employees Amount**" has the meaning ascribed to such term in the EMEA Asset Sale Agreement.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded 365 Contract**" has the meaning set forth in Section 2.1.5(d).

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.3.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded Non-Assignable Supply Contracts**" has the meaning set forth in 2.1.6(b).

"**Excluded Other Seller**" has the meaning set forth in Section 5.32(a).

"**Excluded Other Vendor Contracts**" has the meaning set forth in Section 2.1.6(a).

"**Excluded Taxes**" has the meaning set forth in Section 6.7(a).

"**Executory Contract**" means an 'executory contract' for the purposes of Section 365 of the U.S. Bankruptcy Code.

"**Expense Reimbursement**" has the meaning set forth in Section 10.2(a).

"**Expense Reimbursement Notice**" has the meaning set forth in Section 10.2(a).

"**Extra Services**" has the meaning set forth in Section 5.28 of the Sellers Disclosure Schedule.

"**Filing Party**" has the meaning set forth in Section 6.4(b)(ii).

"**Final Order**" means an order of any Bankruptcy Court, any court of competent jurisdiction or other Government Entity (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 or Federal Rule of Civil Procedure 60 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

"**Financial Statements**" has the meaning set forth in Section 4.7.

"**Flextronics Back-to-Back Supply Agreement**" means the agreement between the relevant Sellers and the Purchaser and/or any Designated Purchasers which may be executed, if required, on or before Closing on the terms set forth in the Flextronics Back-to-Back Supply Agreement Term Sheet attached as Exhibit Z hereto and such other terms as the Main Sellers and the Purchaser may reasonably agree.

"**GAAP**" means United States generally accepted accounting principles, consistently applied.

"**Government Entity**" means any U.S., Canadian, United Kingdom, foreign, domestic, supra-national, multi-national, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, bureau, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

15

"**GST**" means goods and services tax payable under Part IX of the Excise Tax Act (Canada).

"**Hazardous Materials**" means (a) petroleum, petroleum products, asbestos in any form that is friable or polychlorinated biphenyls and (b) any chemical, waste, material, pollutant, contaminant or other substance, whether solid, liquid or gaseous, the presence of which is regulated by any Government Entity or which requires investigation or remediation under any Environmental Laws.

"**Handling of Hazardous Materials**" means the production, use, generation, Release, storage, treatment, formulation, processing, labeling, distribution, introduction into commerce, registration, transportation, reclamation, recycling, disposal, discharge, or other handling or disposition of Hazardous Materials.

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any rules and regulations promulgated in connection therewith.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means that: (i) if required pursuant to Part IV of the Investment Canada Act, the Purchaser shall have received confirmation in writing from the responsible Minister under the Investment Canada Act that he/she is satisfied or is deemed to be satisfied that the transactions contemplated in this Agreement that are subject to the provisions of the Investment Canada Act are likely to be of net benefit to Canada, on terms and conditions satisfactory to the Purchaser, acting reasonably; and (ii) the responsible Minister shall not have issued a notice to the Purchaser pursuant to Section 25.2(1) of the Investment Canada Act or an order pursuant to Section 25.3(1) of the Investment Canada Act. If either a notice pursuant to Section 25.2(1) or an order pursuant to Section 25.3(1) has been issued, the Purchaser shall also have received (a) confirmation in writing from the responsible Minister either that no order will be made under Section 25.3(1) or that no further action will be taken or (b) a copy of an order under Section 25.4(1)(b) authorizing the transaction, provided that order is on terms and conditions satisfactory to the Purchaser, acting reasonably.

"**Inactive Employees**" means Employees (other than Employees whose employment transfers to the Purchaser or a Designated Purchaser by operation of Law) who have accepted the Purchaser's or Designated Purchaser's offer of employment as provided in Section 7.1.1 and are on any Seller's approved leave of absence as of the Employee Transfer Date.

"**Identified Employees**" has the meaning set forth in Section 7.1.1(a).

"**IFSA**" means the Interim Funding and Settlement Agreement dated June 9, 2009 among NNL, NNL, the Joint Administrators and the other parties thereto.

"**Inbound License Agreements**" has the meaning set forth in Section 4.5(j)(ii).

"**Included Services**" has the meaning set forth in Section 5.28 of the Sellers Disclosure Schedule.

16

"**Increase Amount**" has the meaning set forth in Section 2.2.4.2(b)(i).

"**Indebtedness**" of any Person at any date means (a) indebtedness for borrowed money, (b) indebtedness evidenced by bonds, debentures, notes or similar instruments, (c) leases that are capitalized in accordance with GAAP under which such Person is the lessee, (d) reimbursement obligations of such Person with respect to letters of credit or performance bonds that are drawn prior to Closing, (e) obligations in respect of the deferred purchase price of property or services (other than current trade payables incurred on a basis consistent with past practices), (f) obligations (under conditional sale or other title retention agreements, (g) obligations (including without limitation, breakage costs) under interest rate cap agreements, interest rate swap agreements, foreign currency exchange contracts or other hedging contracts and (h) any guarantee of the obligations of another Person with respect to any of the foregoing.

"**Independent Auditor**" means Deloitte & Touche LLP or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation that is (i) jointly selected by the Primary Parties, or (ii) in case the Primary Parties cannot agree on any such firm, selected by Deloitte & Touche LLP at the request of the first Primary Party to move.

"**Indemnitee**" has the meaning set forth in Section 8.2(b).

"**Indemnitor**" has the meaning set forth in Section 8.2(b).

"**Insolvency Act**" has the meaning set forth in the recitals to this Agreement.

"**Intellectual Property**" means any and all intellectual property, whether protected or arising under the laws of the United States, Canada or any other jurisdiction, including all intellectual property rights in respect of any of the following: (a) Trademarks; (b) Patents; (c) copyrights and works of authorship (including any registrations therefor or applications for registration); (d) mask works; (e) trade secrets, know-how and confidential technical or business information; (f) industrial design or similar rights; and (g) any Software and technology.

"**Intellectual Property License Agreement**" means the agreement to be entered into between NNL, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit F.

"**Investment Canada Act**" means the Investment Canada Act, as amended, and the regulations promulgated in connection therewith.

"**Israeli Companies Law**" has the meaning set forth in the recitals to this Agreement.

"**Israeli Company**" has the meaning set forth in the recitals to this Agreement.

"**Italian Excluded Taxes**" has the meaning set forth in Section 6.9(a).

"**Italian Purchaser Party**" has the meaning set forth in Section 6.9(a).

"**Italian Tax Claim**" has the meaning set forth in Section 6.9(b).

"**Italian Tax Claim Notice**" has the meaning set forth in Section 6.9(b).

"**Italian Tax Escrow Amount**" means $5,000,000, as such amount is adjusted in accordance with Section 6.9, which amount shall secure Nortel Italy's obligations under Section 6.9.

"**Joint Administrators**" has the meaning set forth in the recitals to this Agreement.

"**Joint Israeli Administrators**" has the meaning set forth in the recitals to this Agreement.

"**KEIP**" shall mean the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in the District of Delaware on March 5, 2009, and approved by the Canadian Court on March 6, 2009 and March 20, 2009, with such further amendments and/or supplements as may be approved by the Canadian Court and/or the U.S. Bankruptcy Court from time to time.

"**KERP**" shall mean the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware on March 5, 2009, and approved by the Canadian Court on March 6, 2009, with such further amendments and/or supplements as may be approved by the Canadian Court and/or U.S. Bankruptcy Court from time to time.

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase shall mean, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(b) of the Sellers Disclosure Schedule, and, with reference to the Purchaser, the actual knowledge of those Persons listed on Exhibit G.

"**Known Product Defects**" means those defects of Products and/or Services that have been sold by the Business and which are known by the Sellers as of the Closing Date.

"**Lab 10 Lease Agreement**" means the lease agreement between NNTC on the one hand and the Purchaser or Designated Purchaser on the other hand in respect of the leasing of the whole of the Lab 10 Building as more particularly defined in the Lab 10 Lease Agreement to be entered into on or before Closing in the form attached hereto as Exhibit L-1.

"**Law**" means any U.S., Canadian, United Kingdom, foreign, domestic, supra-national federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**Leased Real Property**" has the meaning set forth in Section 4.9(a).

"**Leases**" has the meaning set forth in Section 4.9(a).

18

"**LGN Joint Venture**" means LG-Nortel Co. Ltd., which was established in November 2005 as a joint venture between NNL and LG Electronics Inc. for the purpose of jointly developing and marketing certain telecommunications equipment and network solutions.

"**LGN/Korea Distribution Agreement**" means the agreement to be entered into between the Purchaser and/or one or more Designated Purchasers designated by it and the LGN Joint Venture that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, absolute or contingent, asserted or unasserted, liquidated or unliquidated, matured or unmatured, known or unknown or determined or undeterminable, including those arising under any Law or Action and those arising under any contract, agreement, arrangement, commitment or undertaking or otherwise, including any Tax liability.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchasers under the Intellectual Property License Agreement and the Trademark License Agreement.

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge or security interest, hypothecation, deed of trust, deemed trust, option, right of use, right of first offer or first refusal, servitude, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, charge, prior claim, lease, conditional sale arrangement or other similar restriction of any kind, but does not include any prior Intellectual Property license granted by any of the Sellers.

"**Loaned Employee Agreement**" means the agreement between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or before the Closing attached hereto as Exhibit I.

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Losses**" means all losses, damages and reasonable and documented out-of-pocket costs and expenses.

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Material Adverse Effect**" means any event, change or circumstance that, individually or in the aggregate, has had, or would reasonably be expected to have a material adverse effect on the assets, liabilities, operations, results of operations or condition (financial or otherwise) of the Business to be transferred hereunder and under the EMEA Asset Sale Agreement, taken as a whole, but in each case shall not include the effect of events, changes and circumstances to the extent arising from (a) changes in the industries and markets in which the Business operates, except to the extent such changes disproportionately affect the Business, (b) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, acts of God, war, terrorism or hostilities, (c) changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (d) compliance with this Agreement, including any effect on the Business resulting from failure to take any action to

19

which the Purchaser refused consent under this Agreement, (e) the transactions contemplated hereby or any announcement hereof or the identity of the Purchaser, (f) the attrition of customers or employees prior to the Closing Date, (g) the pendency of the Bankruptcy Proceedings and any action approved by the Bankruptcy Courts, or (h) the failure of the Business to achieve internal or external financial forecasts or projections, by itself; provided, however, that in the case of clauses (f) and (h), the reason for the customer attrition or the failure of the Business to achieve internal or external financial forecasts or projections shall not be excluded as a result of such clauses.

"**Material Contracts**" has the meaning set forth in Section 4.4(b).

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**Montreal Landlord**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Montreal Lease Termination Penalty**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Montreal Premises**" means that portion of the third and fourth floors of the North Tower of the building municipally known as 2351 Alfred Nobel Blvd., St. Laurent, Quebec that is used by the Business as of the date hereof or any alternate or additional premises in such building if contemplated by the Montreal Premises Restructured Lease or Montreal Premises Sublease, as the case may be.

"**Montreal Premises Amended Lease**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Montreal Premises Lease**" means that certain lease dated June 27, 2007 in respect of the Montreal Premises by and between BREOF/Belmont Ban L.P., acting through its general partner BREOF/Belmont Ban G.P. Limited, as landlord, and NNL, as tenant, as amended by a first lease amending agreement dated October 8, 2008.

"**Montreal Premises Restructured Lease**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Montreal Premises Sublease**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Montreal Premises Sublease Consent**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Mutual Development Agreement**" means the agreement between the Purchaser and/or any Designated Purchasers, on the one hand, and the relevant Sellers, on the other hand, relating to the development (i) by the Purchaser and/or any Designated Purchasers of new features of certain of products used by the Sellers and/or (ii) by the relevant Sellers of new features of certain of the Products that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

20

"**NETAS**" means Nortel Networks NETAS Telekomunikasyon A.S., a company incorporated in Turkey and having its principal place of business at Alemdag Caddesi, Umraniye 34768, Istanbul, Turkey.

"**NETAS Distribution Agreement**" means the agreement between the Purchaser and/or one or more Designated Purchasers and NETAS relating to the sale of Products by the Purchaser to NETAS for resale in Turkey that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

"**Net Working Capital Transferred**" has the meaning set forth in Section 2.2.4.1(a).

"**New York Courts**" has the meaning set forth in Section 11.6(b).

"**NGS**" means Nortel Government Solutions Incorporated, a corporation organized under the laws of Delaware with offices at 12730 Fair Lakes Circle, Fairfax, Virginia.

"**NGS Distribution Agreement**" means the agreement between the Purchaser and/or one or more Designated Purchasers and NGS relating to the sale of Products by the Purchaser to NGS that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNTC**" has the meaning set forth in Section 6.5(b).

"**Non-ARD Transferring Employee**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.14(a).

"**Non-Assigned Contracts**" means the Non-Assignable Contracts, to the extent all applicable Consents to assignment thereof to the Purchaser or a Designated Purchaser have not been granted prior to the Closing Date, provided that if such Consents are granted within one (1) year after the Closing Date, such Non-Assignable Contracts will cease to be Non-Assignable Contracts as of the effective date of such Consents, and shall then be assigned by the relevant Seller to the Purchaser or a Designated Purchaser in accordance with this Agreement.

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

"**Non-Exclusive Supply Contract**" means any supply Contract to which any Seller is a party that relates to the Business and also relates to one or more other businesses of the Sellers.

"**Non-Filing Party**" has the meaning set forth in Section 6.4(b)(ii).

21

"**Non-Solicitation Period**" means the twenty-four (24) month period immediately following the Closing Date.

"**Non-Stock Recipient Sellers**" means each of the Sellers and EMEA Sellers other than the Stock Recipient Sellers.

"**Non-Union Employee**" means an Employee whose terms and conditions of employment are not governed by a Collective Labor Agreement.

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Financial Statements, as set forth in Section 1.1(d) of the Sellers Disclosure Schedule.

"**Nortel Italy**" means Nortel Networks SpA (in administration).

"**Nortel Plan**" has the meaning set forth in Section 7.5.1.

"**Occupancy Agreement**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Offer**" has the meaning set forth in Section 7.1.1(a).

"**Offer Consideration Period**" has the meaning set forth in Section 7.1.1(a).

"**Omitted Patent Cross License**" has the meaning set forth in Section 4.5(j)(i).

"**Ontario Court**" has the meaning set forth in Section 11.6(b).

"**Open Source Software**" means Software that is made available under a license agreement that: (i) conditions use, modification or distribution of any Software program, or any Software integrated with or derived from such Software program, or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software); or (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software.

"**Order**" means any award, writ, injunction, judgment, order or decree entered into, issued, made or rendered by any Government Entity.

"**Ordinary Course**" means the ordinary course of the Business (excluding the EMEA Business) through the date hereof consistent with past practice since the filing of the Bankruptcy Proceedings, as such practice may be modified from time to time to the extent necessary to reflect the Bankruptcy Proceedings.

"**Other Seller Contracts**" means Seller Contracts other than 365 Contracts.

"**Other Sellers**" has the meaning set forth in the preamble to this Agreement.

22