or the EMEA Assets, including under the International Convention on Contracts for the Sale of Goods (Geneva Convention)) and any other applicable sale of goods Laws), the Assumed Liabilities, the EMEA Assumed Liabilities or any Affiliate of any such Person or the accuracy or completeness of any information regarding any of the foregoing that the Sellers, the EMEA Sellers or any other Person furnished or made available to the Purchaser and its representatives (including any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials);

(iii)    except for the representations and warranties expressly set forth in this Agreement and the other Transaction Documents, and subject to the terms of the Bankruptcy Consents, the Purchaser or any Designated Purchaser takes the Assets on an "as is" and "where is" basis;

(iv)    the enforceability of this Agreement against the Sellers is subject to receipt of the Bankruptcy Consents; and

(v)    notwithstanding anything to the contrary contained herein, the Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person.

(c)    Except for the representations and warranties expressly set forth in this Agreement and the other Transaction Documents, THE PURCHASER ACKNOWLEDGES THAT THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OF NONINFRINGEMENT OF THIRD PARTY INTELLECTUAL PROPERTY RIGHTS, OR REGARDING THE SCOPE, VALIDITY OR ENFORCEABILITY OF ANY TRANSFERRED INTELLECTUAL PROPERTY OR LICENSED INTELLECTUAL PROPERTY RIGHTS.

SECTION 3.6.  **Brokers.**  Except for fees and commissions or other similar payments that will be paid or otherwise settled or provided for by the Purchaser, no broker, finder, agent or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates for which the Sellers are or will become liable, and the Purchaser shall indemnify and hold harmless the Sellers from any claims with respect to any such fees and commissions.

SECTION 3.7.  **Representations and Warranties Relating to the Shares.**

(a)    As of July 31, 2009, the authorized capital stock of the Purchaser consists of 290,000,000 shares of common stock, of which 91,522,101 shares are issued and outstanding and 20,000,000 shares of preferred stock, of which no shares are issued and outstanding.  As of July 31, 2009, except for 5,851,695 shares issuable under outstanding stock options, 4,188,276 restricted stock units outstanding, 3,504,311 shares reserved for issuance under stock purchase plans and 20,647,130 shares reserved for issuance in connection with convertible notes, there are no options, warrants or other agreements obligating the Purchaser to issue or sell any shares of capital stock of, or other equity

interests in the Purchaser. Except as disclosed in the SEC Filings, there are no outstanding obligations of the Purchaser to repurchase, redeem or otherwise acquire any shares of its capital stock. All of the issued and outstanding shares of capital stock of the Purchaser have been duly authorized and validly issued in accordance with applicable Laws and are fully paid and non-assessable and not subject to preemptive rights.

(b)　　The issued and outstanding shares of common stock of the Purchaser are listed for trading solely on the NASDAQ Stock Market, and no order ceasing or suspending trading in any securities of the Purchaser has been issued and, to the Knowledge of the Purchaser, no proceedings for such purpose are threatened or pending.

(c)　　All of the Shares will be, when issued, duly authorized, validly issued, fully paid and non-assessable, free and clear of all Liens and not subject to any preemptive rights or restrictions on transfer (other than restrictions arising under U.S. securities Laws or the securities Laws of any state of the United States or any other jurisdiction).

(d)　　The Purchaser does not have a shareholder rights plan or "poison pill" or similar plan.

(e)　　The Purchaser is a "well-known seasoned issuer" (as defined in Rule 405 under the Securities Act), including not being an "ineligible issuer" (as defined in Rule 405 under the Securities Act). The Purchaser is eligible to file an automatic shelf registration statement.

(f)　　The Purchaser is not a "reporting issuer" as such term is defined in the Securities Act (Ontario) or the equivalent under securities legislation in any other province or territory of Canada and to the Knowledge of the Purchaser, after giving effect to the issue of the Shares, residents of Canada do not own directly or indirectly more than ten percent (10%) of the outstanding shares of Common Stock of the Purchaser and do not represent in number more than ten percent (10%) of the total number of owners directly or indirectly of the outstanding shares of Common Stock of the Purchaser.

(g)　　The Purchaser has timely filed all reports, schedules, forms, statements and other documents required to be filed by it with the Securities and Exchange Commission (the "**SEC**") during the period since November 1, 2008 through and including the date hereof (such reports, schedules, forms, statements and other documents together with any documents furnished during such period by the Purchaser to the SEC on a voluntary basis on Current Reports on Form 8-K but excluding any exhibits required to be filed with any of the foregoing in accordance with Item 601 of Regulation S-K, the "**SEC Filings**"). As of its filing date, each SEC Filing (i) complied in all material respects with the applicable requirements of the Exchange Act, and (ii) did not, at the time they were filed, contain any untrue statements of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading. As of the date hereof, there are no outstanding or unresolved comments from the staff of the SEC with respect to any of the SEC Filings. Each of the financial statements (including the related notes) of the Purchaser included or incorporated by reference in the SEC Filings were prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be

indicated in the notes thereto or, in the case of unaudited statements, as permitted by Form 10-Q of the SEC and the requirements of Regulation S-X under the Securities Act) and each fairly presents, in all material respects, the consolidated financial position of the Purchaser and its consolidated Subsidiaries as of the respective dates thereof and their consolidated results of operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal and recurring year-end audit adjustments and the absence of footnotes). To the extent required, each SEC Filing filed with the SEC by the Purchaser during the twelve (12) month period prior to the date hereof, was accompanied by the certifications required to be filed or submitted by the Purchaser's chief executive officer and chief financial officer pursuant to the Sarbanes-Oxley Act of 2002.

(h) The Purchaser maintains a system of internal control over financial reporting (within the meaning of Rules 13a-15(f) and 15d-15(f) of the Exchange Act) designed to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except (a) for disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably apparent on its face from the Sellers Disclosure Schedule that such disclosure is applicable, (b) as expressly contemplated by this Agreement or (c) other than with respect to Section 4.7, to the extent relating to the Excluded Assets or the Excluded Liabilities, each of the Main Sellers jointly and severally represents and warrants to the Purchaser as set forth in this Article IV:

### SECTION 4.1. Organization and Corporate Power.

(a) Each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is organized. Subject to entry of the U.S. Bidding Procedures Order and the U.S. Sale Order in the case of the U.S. Debtors and the Canadian Sales Process Order and Canadian Approval and Vesting Order in the case of the Canadian Debtors and receipt of such other Consents from the U.S. Bankruptcy Court and the Canadian Court in connection with the transactions contemplated hereby and by the other Transaction Documents (collectively, the "**Bankruptcy Consents**"), each of the Sellers has the requisite corporate or other organizational power and authority necessary to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and to consummate the transactions contemplated thereby.

(b) Each of the Sellers is duly qualified or licensed to do business and to own or lease and operate its properties and assets, including the Assets, as applicable in each jurisdiction in which the nature of its properties or the character of its business relating to the Business (excluding the EMEA Business) requires it to so qualify or be licensed, except to the extent that the failure to be so qualified would not have, or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

60

**SECTION 4.2. Authorization; Binding Effect; No Breach.**

(a)     Subject to the Bankruptcy Consents, the execution, delivery and performance of this Agreement and such other Transaction Documents by each Seller and the consummation by such Seller of the transactions contemplated herein and therein have been duly and validly authorized by all corporate or other organizational action by such Seller. This Agreement has been duly and validly executed and delivered by each Seller and each other Transaction Document required to be executed and delivered by a Seller at the Closing will be duly and validly executed and delivered by such Seller at the Closing. Subject to the Bankruptcy Consents, and assuming the due authorization, execution and delivery by the Purchaser, this Agreement and the other Transaction Documents constitute, with respect to each Seller that is party thereto, a legal, valid and binding obligation of such Seller enforceable against it in accordance with its terms.

(b)     The execution, delivery and performance by each Seller of the Transaction Documents to which such Seller is, or on the Closing Date will be, a party and the consummation of the transactions contemplated thereby do not and will not conflict with or result in a breach of the terms, conditions or provisions of, result in a loss of benefits or constitute a default under, result in a violation of, result in the creation or imposition of any Lien upon any of the Assets, cause any acceleration of or give any Person the right to accelerate any obligation of such Seller under, or require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration, filing or notice to any Person pursuant to (i) the articles, charter, by-laws or other governing documents of any Seller, (ii) any agreement, indenture, or other instrument to which any Seller is a party or to which any of its assets is subject or (iii) any Laws to which any of the Sellers or any of the Assets are subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**SECTION 4.3. Title to Tangible Assets; Sufficiency of Assets.**

(a)     Except for Permitted Encumbrances, the Owned Inventory and the Owned Equipment is owned beneficially by one or more of the Sellers, free and clear of all Liens, and those Sellers have good and marketable title thereto.

(b)     All tangible assets included in the Assets are in satisfactory operating condition for the uses to which they are being put, subject to ordinary wear and tear and ordinary maintenance requirements, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)     Assuming the assignment or novation of all Seller Contracts and all Non-Assignable Contracts to the Purchaser or a Designated Purchaser, the Assets, the EMEA Assets and the rights of, or to be acquired by, the Purchaser and/or the Designated Purchasers under this Agreement and the EMEA Asset Sale Agreement, together with the rights to be provided to the Purchaser and/or the Designated Purchasers under the other Transaction Documents, considered together, include such material assets and material rights (other than Inbound License Agreements and Patent Cross Licenses set forth on Section 4.3(c)(i) of the Sellers Disclosure Schedule) as are necessary and sufficient to

61

conduct the Business substantially in the manner conducted as of the date hereof other than (x) those assets and rights that are used to provide the Overhead and Shared Services and are not otherwise used in the Business and (y) those assets and rights disclosed on Section 4.3(c)(ii) of the Sellers Disclosure Schedule. For the avoidance of doubt, any effects arising from or out of the failure of the Purchaser to hire all of the Employees will not, or be deemed to, constitute a breach of this Section 4.3(c).

### SECTION 4.4. Material Contracts.

(a)    Section 4.4(a) of the Sellers Disclosure Schedule sets forth, as of the date hereof:

(i)    in respect of any customer of the Business which, in the most recent completed fiscal year of the Main Sellers resulted in, or is reasonably expected by the Main Sellers in 2009 to result in, the payment to or receipt by the Business of more than $10,000,000 per annum from such customer taken on an aggregate basis, a true and complete list of every written contract with such customer (other than purchase orders issued thereunder) that relates to the Business and to which a Seller is a party; and

(ii)    in respect of any supplier of the Business which, in the most recent completed fiscal year of the Main Sellers resulted in, or is reasonably expected by the Main Sellers in 2009 to result in, the payment by the Business of more than $10,000,000 per annum to such supplier, taken on an aggregate basis, a true and complete list of every written contract with such supplier (other than purchase orders issued thereunder) that relates to the Business and to which a Seller is a Party.

(b)    Section 4.4(b) of the Sellers Disclosure Schedule sets forth, as of the date hereof, a true and complete list of every Seller Contract, in each case other than purchase orders and invoices (which shall be deemed to be a part of the Seller Contract under which such purchase order or invoice is issued) that:

(i)    in respect of the Business, is (x) a non-competition agreement or other agreement which otherwise materially restricts the Seller party thereto from engaging in any business activity anywhere in the world or (y) an exclusive distribution agreement (whether such agreement is exclusive by geography, product type or otherwise);

(ii)    creates a material joint venture or partnership in respect of the Business or which otherwise involves the sharing of profits, losses, costs or liabilities in respect of the Business with any other Person;

(iii)    is a research and development Contract that, in respect of the Business, involves consideration or expenditures, in the most recent completed fiscal year of the Main Sellers (or is reasonably expected by the Main Sellers under the terms of such Contract in 2009 to be) in excess of $2,000,000 or

requiring such expenditures of more than $2,000,000 in the aggregate after the date hereof;

(iv)    is a distribution or reseller Contract that, in respect of the Business, involves the sale or distribution of Products, in the most recent completed fiscal year of the Main Sellers that is (or is reasonably expected by the Main Sellers under the terms of such Contract in 2009 to be) valued at more than $10,000,000;

(v)    is a distribution or reseller Contract that, in respect of the Business, contains any express inventory repurchase requirement (whether contingent or otherwise);

(vi)    is a Contract between the Business and the Sellers or any of their Affiliates (other than agreements related to Overhead and Shared Services or agreements which will be terminated prior to or at Closing);

(vii)    relates to Indebtedness (including personal property leases) in excess of $1,000,000 to be assumed by the Purchaser or a Designated Purchaser;

(viii)    has a "take or pay" or "requirements" provisions committing the Seller party thereto to purchase, in respect of the Business, goods or services in excess of $10,000,000 in 2009 or any calendar year thereafter;

(ix)    contains any material obligation secured by a Lien on any material Asset (other than a Permitted Encumbrance or any encumbrance that will be released prior to or at Closing); or

(x)    involves capital expenditures in respect of the Business in excess of $2,000,000 after the date hereof.

The Customer Contracts and the Seller Contracts set forth in Section 4.4(a) and Section 4.4(c), together with such Seller Contracts exclusive to the Business as are entered into, pursuant to Section 5.9, after the date hereof that would have been required to be set forth in Section 4.4(a) and Section 4.4(b) of the Sellers Disclosure Schedule had they been in effect as of the date hereof, are collectively referred to in this Agreement as the "**Material Contracts**".

(c)    The Seller Contracts listed on Section 1.1(i) of the Sellers Disclosure Schedule together with the Bundled Contracts listed in Section 5.15 of the Sellers Disclosure Schedule include all of the customer and supplier Contracts of the Sellers that in the most recent completed fiscal year of the Main Sellers resulted in, or is reasonably expected by the Main Sellers under its terms in 2009 to result in, the payment or receipt by the Business of more than $2,000,000 per annum in the aggregate.

(d)    Other than with respect to Bundled Contracts, the Sellers have made available to the Purchaser or its representatives pursuant to the clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated April 15, 2009 and the second clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated May 8, 2009, copies of all of the

Material Contracts in the Sellers' possession which the Purchaser has requested (as such copies exist in the Sellers' contract database(s)) and the Sellers have no specific Knowledge that the copies provided are incomplete in any material respect. With respect to Bundled Contracts, the Sellers have made available to the Purchaser copies of such Bundled Contracts to the extent that they relate to the Business which the Purchaser has requested (as such copies exist in the Sellers' contract database(s)) and the Sellers have no specific Knowledge that the copies provided are incomplete in any material respect. Each Material Contract is in full force and effect and is a legal, valid and binding obligation of each Seller party thereto and enforceable against the Seller party thereto, and to the Knowledge of the Sellers, the other parties thereto, in accordance with its terms and conditions, in each case except as such enforceability may be limited by bankruptcy, insolvency or other similar Laws affecting the enforcement of creditors' rights generally (and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law).

(e)     To the Knowledge of the Sellers, neither any Seller nor any other party thereto, is in material violation, breach of or default under a Material Contract, and no event has occurred that with notice or lapse of time, or both, would constitute a material violation, breach of or default under a Material Contract by any Seller, or to the Sellers' Knowledge, any other party thereto. Except as disclosed in Section 4.4(a) or Section 4.4(b) of the Sellers Disclosure Schedule, the Sellers (or any Affiliate of the Sellers other than the EMEA Sellers) have not been notified in writing that any of them is in breach or default under any Material Contract, nor have the Sellers or any of their respective Affiliates (other than the EMEA Sellers) been notified in writing of such other party's intention to terminate any Seller Contract.

### SECTION 4.5. Intellectual Property.

(a)     The Transferred Intellectual Property, the Intellectual Property transferred by the EMEA Asset Sale Agreement (the "**EMEA Intellectual Property**"), the Licensed Intellectual Property and the Intellectual Property licensed to the Sellers and/or their Affiliates (other than any joint venture between any Seller or EMEA Seller or their Affiliates and any Third Party, whether or not such joint venture is controlled by the Sellers, the EMEA Sellers or their Affiliates), including the EMEA Sellers, under the Inbound License Agreements and the Patent Cross Licenses include all the material Intellectual Property owned or controlled by any of the Sellers or EMEA Sellers or their respective Affiliates (other than any joint venture between any Seller or EMEA Seller or their Affiliates and any Third Party, whether or not such joint venture is controlled by the Sellers, the EMEA Sellers or their Affiliates) that covers or is used in connection with the conduct and operation of the Business, except any Intellectual Property included in Overhead and Shared Services. No Seller or EMEA Seller licenses or uses any Intellectual Property that is owned or licensed by any joint venture between any Seller or EMEA Seller and any Third Party and that is material to the Business other than any Intellectual Property that will be licensed to Purchaser at the Closing pursuant to the Intellectual Property License Agreement. For the purposes of this Section 4.5, "**controlled**" has the meaning set forth in the Intellectual Property License Agreement.

(b)     An accurate, true and complete list of all the Transferred Intellectual Property registered in the name of the Sellers is set forth in Section 4.5(b) of the Sellers

Disclosure Schedule. To the Knowledge of the Sellers, the EMEA Sellers do not have any Patents or Trademarks or other Intellectual Property registered in their names that are included in either Transferred Intellectual Property or Licensed Intellectual Property.

(c)     The list identified in Section 4.5(b) of the Sellers Disclosure Schedule will include: (1) for each issued Patent and Patent application, the Patent number or application serial number for each jurisdiction in which such Patent is filed, and date issued and filed; (2) for each registered Trademark, the application serial number or registration number, by country, province and state; (3) for any Domain Names, the registration date and name of registry; and (4) for each copyright registration or application, the number and date of such registration or application by country, province and state.

(d)     To the Knowledge of the Sellers, the Transferred Intellectual Property and EMEA Intellectual Property that is material to the Business is subsisting and in full force and effect. The foregoing will not be construed as a warranty that any Patent or Trademark will issue or be registered based on any application.

(e)     The Transferred Intellectual Property and EMEA Intellectual Property are not subject to any Liens other than Permitted Encumbrances. The Sellers own all right, title, and interest in and to each item of Transferred Intellectual Property and the EMEA Sellers own all right, title, and interest in and to each item of EMEA Intellectual Property. To the Knowledge of the Sellers, none of the Transferred Intellectual Property or EMEA Intellectual Property is subject to any outstanding order, judgment or stipulation restricting the use, transfer or exploitation thereof by the Sellers and their Affiliates in any material respect.

(f)     To the Knowledge of the Sellers, the Sellers and their Affiliates and the EMEA Sellers hold sufficient rights in the Licensed Intellectual Property to grant the licenses of the Licensed Intellectual Property contemplated to be granted by the Sellers and their Affiliates and the EMEA Sellers in the Intellectual Property License Agreement.

(g)     The Sellers have no Knowledge that any Third Party infringes upon, misappropriates or violates the Transferred Intellectual Property.

(h)     To the Knowledge of the Sellers, except as set forth in Section 4.5(h) of the Sellers Disclosure Schedule, no Seller or EMEA Seller has received any written assertions since January 1, 2007 that (i) any Seller's or its Affiliates' (including any EMEA Seller or its Affiliates) operations of the Business, including such Seller's or its Affiliates' (including any EMEA Seller or its Affiliates) use, performance, licensing, copying, distribution, sale, offer for sale, lease, manufacture, having made, importation, or any other exploitation of the Products sold by the Business or of the Services rendered by the Business infringes, misappropriates or violates in any material respect any Intellectual Property right or moral right of any Third Party; or (ii) the use or exploitation of any of Transferred Intellectual Property or EMEA Intellectual Property infringes or violates in any material respect any Intellectual Property of or was misappropriated from a Third Party.

(i)     To the Knowledge of the Sellers, as of the date hereof, there has been no assertion or claim made in writing to the Sellers or their Affiliates or the EMEA Sellers

or their Affiliates since January 1, 2007 asserting invalidity, misuse or unenforceability of any Transferred Intellectual Property or EMEA Intellectual Property or challenging the Sellers' or their Affiliates' (including any EMEA Seller or its Affiliates) right to use, right to transfer, or ownership of any Transferred Intellectual Property or EMEA Intellectual Property; in each case, excluding any such assertions or claims that would not reasonably be expected to result in any invalidity, unenforceability, loss or other material impairment of any rights or interest in the subject Intellectual Property.

(j)

(i)    To the Knowledge of the Sellers, Section 4.5(j)(i) of the Sellers Disclosure Schedule sets forth a complete and accurate list of all Patent Cross Licenses, indicating for each Patent Cross License, the title and the parties thereto, except to the extent a Patent Cross License prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to reasonably obtain, in which case such Patent Cross License has been omitted from Section 4.5(j)(i) of the Sellers Disclosure Schedule (an **"Omitted Patent Cross License"**). No royalties or other amounts are due or payable by or on behalf of Nortel under any such Omitted Patent Cross Licenses, nor will any such royalties or other amounts be due or payable by Purchaser under any Omitted Cross License in connection with entering into this Agreement.

(ii)    To the Knowledge of the Sellers, Section 4.5(j)(ii) of the Sellers Disclosure Schedule sets forth a complete and accurate list of all material Contracts (other than Patent Cross Licenses) granting to the Sellers or any of their Affiliates or the EMEA Sellers or their Affiliates any license under or to any Intellectual Property owned by a Third Party that is, as of the date hereof, incorporated in or used in connection with the design, development, testing, manufacturing, sale, distribution, support or servicing of any Products or the provision of Services (collectively, the **"Inbound License Agreements"**), indicating for each Inbound License Agreement whether such Contract is included in the definition of "Seller Contracts" hereunder, and the title and the parties thereto.

(iii)    To the Knowledge of the Sellers, Section 4.5(j)(iii) of the Sellers Disclosure Schedule sets forth a complete and accurate list of all Contracts in effect (other than (x) Patent Cross Licenses, (y) non-exclusive object code licenses granted to end users or other purchasers of Products or non-exclusive licenses granted by the Sellers or their Affiliates or the EMEA Sellers to customers, distributors or suppliers in connection with the manufacture or sale of products or Services and (z) any non-exclusive license granted to any purchaser of any subsidiary or assets of a business unit of the Sellers, the EMEA Sellers or their respective Affiliates the sale of which was consummated prior to January 1, 2007) under which the Sellers or their Affiliates or the EMEA Sellers or their Affiliates grant a license to a Third Party under Transferred Intellectual Property (collectively, the **"Outbound License Agreements"**), indicating the title and the parties thereto.

(iv)    To the Knowledge of the Sellers, there is no outstanding dispute or disagreement with respect to (1) any Inbound License Agreement, (2) any Outbound License Agreement or (3) any Patent Cross License, in each case, that materially affects any of the Intellectual Property rights granted to the Purchaser herein. To the Knowledge of the Sellers, the Sellers have made available to Purchaser or its counsel true and complete copies of each Inbound License Agreement, Outbound License Agreement and Patent Cross License (excluding Omitted Patent Cross Licenses).

(k)    To the Knowledge of the Sellers, Section 4.5(k) of the Sellers Disclosure Schedule sets forth a true and complete list of any Open Source Software incorporated into any of the Products and describes (i) the specific Open Source Software used, (ii) the specific Open Source Software version, (iii) the licensor(s) of the specific Open Source Software, and (iv) the Products or portions thereof into which such Open Source Software is incorporated.

(l)    To the Knowledge of the Sellers, the conduct of the Business, including the design, development, testing, manufacturing, sale, distribution, support or servicing of any Products or the use or exploitation of any Transferred Intellectual Property, EMEA Intellectual Property or Licensed Intellectual Property or the provision of any Services by any Seller or its Affiliates or the EMEA Sellers or their Affiliates in connection with any of the foregoing, does not infringe upon, misappropriate or otherwise violate in any material respect any Intellectual Property of any Third Party.

(m)    Notwithstanding any provision herein to the contrary, this Section 4.5 consists of the sole representation and warranty in this Agreement regarding non-infringement, non-violation and non-misappropriation of Intellectual Property.

**SECTION 4.6.  Litigation.** As of the date hereof, except for the Bankruptcy Proceedings and except as set forth in Section 4.6 of the Sellers Disclosure Schedule, there is no Action pending or, to the Knowledge of the Sellers, threatened before any Government Entity or arbitration tribunal against any Seller involving the Business (excluding the EMEA Business) or the Assets or that seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or that has had, or otherwise would reasonably be expected to have a Material Adverse Effect. To the Knowledge of the Sellers, except for the Bankruptcy Proceedings, there is no outstanding Order to which the Sellers are subject in respect of the Business (excluding the EMEA Business) or the Assets, nor are any of the Sellers in default with respect to any such Order.

**SECTION 4.7.  Financial Statements.** Section 4.7 of the Sellers Disclosure Schedule sets forth the unaudited combined (i) balance sheet of the Business as of December 31, 2008 (the "**Balance Sheet Date**") and December 31, 2007, (ii) statements of earnings and cash flows of the Business for each of the fiscal years ended December 31, 2008 and December 31, 2007, (iii) balance sheet of the Business as of June 30, 2009 and (iv) statements of earnings and cash flows of the Business for the six (6) months ended June 30, 2009 (collectively, the "**Financial Statements**"). The Financial Statements were prepared in accordance with GAAP (subject to normal year-end adjustments, the effect of which are not material in nature, and except for the omission of certain footnotes and other presentation items required by GAAP with

respect to audited financial statements) using the Nortel Accounting Principles, and fairly present in all material respects the combined financial position, results of operations and cash flows of the Business as of the date thereof and for the periods covered thereby.

### SECTION 4.8.  Compliance with Laws; Consents.

(a)     Except as set forth in Section 4.8 of the Sellers Disclosure Schedule, no Seller is in violation of any Law applicable to the operation of the Business or the Assets, except for such violations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and none of the Sellers has received any written notice or written claims from any Government Entity within the twelve (12) months preceding the date hereof relating to any material non-compliance of the Business or the Assets with any applicable Law nor are there, to the Knowledge of the Sellers, any such notice or claims threatened or pending, except where such notices or claims would not, individually or in the aggregate, materially hinder, delay or impair the performance by the Sellers of any of their obligations under the Transaction Documents.

(b)     (i) All of the Consents of Government Entities necessary for, or otherwise material to, the conduct of the Business (excluding the EMEA Business) as conducted on the date hereof, have been duly obtained and are in full force and effect and (ii) the relevant Sellers are in compliance with the terms of each of such Consents, in each case except for such violations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. None of the Sellers has received any notice or written claims from any Government Entity relating to any material non-compliance of the Business (excluding the EMEA Business) or the Assets with such Consents nor are there, to the Knowledge of the Sellers, any such notice or claims threatened or pending, except where such claims would not, individually or in the aggregate, materially hinder, delay or impair the performance by the Sellers of any of their obligations under the Transaction Documents.

### SECTION 4.9.  Real Property.

(a)     Section 4.9(a)(i) of the Sellers Disclosure Schedule lists, as of the date hereof, all real property which is owned by the Sellers in respect of which a real property lease or license between the applicable Seller and the Purchaser or one or more Designated Purchasers shall be entered into on Closing on terms set forth in the Real Estate Terms and Conditions  (collectively, the **"Owned Real Property"**). Section 4.9(a)(ii) of the Sellers Disclosure Schedule lists, as of the date hereof, all leases, subleases, space licenses or other occupancy agreements (collectively, **"Leases"**) of real property (the **"Leased Real Property"**) to be assigned to the Purchaser or one or more Designated Purchasers on Closing on the terms set forth in the Real Estate Terms and Conditions.  Section 4.9(a)(iii) of the Sellers Disclosure Schedule lists, as of the date hereof, those Leases in respect of which an Occupancy Agreement is to be entered into on Closing on the terms set forth in the Real Estate Terms and Conditions (collectively, the **"6 Month Locations"**).  Section 4.9(a)(iv) of the Sellers Disclosure Schedule lists, as of the date hereof, those Leases in respect of which a short-term license is to be entered into on Closing on the terms set forth in the Real Estate Terms and Conditions (collectively, the **"Short-Term Licensed Property"** and together with the Owned Real Property, the Leased Real Property and the 6 Month Locations, the **"Real Property"**).  Section 4.9(a)(v) of the Sellers Disclosure

68

Schedule lists, as of the date hereof, those locations where any Owned Assets used in carrying the Business are located. The Sellers have provided true, complete and correct copies of the Leases with respect to the Real Property to the Purchaser, including any amendments thereto. There are no written or oral subleases, licenses, concessions, occupancy agreements or other contractual obligations granting to any other Person the right of use or occupancy of any part of the Real Property which is occupied for purposes of the Business, or which will be occupied for purposes of the Business on or after Closing in accordance with the segregation, consolidation and demising plans contemplated by the Real Estate Terms and Conditions, save and except with respect to such rights retained by the Sellers or granted to the purchasers of other Nortel business segments which are co-located at such premises, the effect of which would not have a material adverse effect on the lease, license or occupancy by the Purchaser or any Designated Purchaser of such part of the Real Property to be occupied for the purposes of the Business.

(b)     The Sellers have received all Consents that are necessary in connection with the Sellers' occupancy, ownership or leasing of the Real Property, and the present use of the Real Property by the Sellers does not violate the Consents applicable thereto, except where the (A) failure to receive or (B) violation of a Consent would not have a Material Adverse Effect.

(c)     Except to the extent that any Cure Cost is payable with respect to any Lease with respect to a breach of such Lease prior to the Petition Date, and except for the Bankruptcy Proceedings, (i) no Seller is in material breach or default of its obligations under any Lease, (ii) no condition exists that with notice or lapse of time or both would constitute a material default by any Seller under any Lease and (iii) to the Knowledge of the Sellers, no other party to any Lease is in breach or default thereunder, except in each case, as would not, individually or in the aggregate, reasonably be expected to result in the termination of such Lease or otherwise have a Material Adverse Effect.

(d)     The Sellers have not received written notice of any threatened (i) condemnation, eminent domain, expropriation or similar proceeding affecting the Real Property, (ii) proceeding to change the zoning classification of any portion of the Real Property or (iii) imposition of any special assessments for public betterments affecting the Real Property, which in each of clauses (i), (ii) and (iii) would materially and adversely impact the use of the Real Property for the purposes for which it is being used as of the date hereof.

**SECTION 4.10.  Labor and Employee Benefits Matters.**

(a)     Section 4.10(a)(i) of the Sellers Disclosure Schedule contains an accurate and complete list, by country, of (i) all material Seller Employee Plans and (ii) all employment agreements or other commitments for employment or engagement by the Sellers or their Affiliates with respect to Employees that deviate in any material respect from the standard form offer letter for the applicable jurisdiction or provide for retention, severance or change in control payments or benefits to the Employees, excluding in each case Seller Employee Plans. The Sellers have provided the Purchaser with a true and complete copy of the plan document or summary plan description of each material Seller Employee Plan or, if such plan document or summary plan description does not exist, an

accurate written summary of such Seller Employee Plan. The Sellers have provided the Purchaser or its Affiliate with a true and complete copy of the standard form (or where such individual agreement is materially different from the standard form, the individual written agreement) of such employment, retention, change in control or severance agreements between the Sellers (or any Affiliate of Sellers (excluding EMEA Sellers)) and any Employee.

(b)    The information contained in Section 4.10(b) of the Sellers Disclosure Schedule in respect of the Employees (the "**Employee Information**") is accurate in all material respects as of the date hereof, and sets forth with respect to each Employee (except where that is not permissible under applicable data privacy Laws): (i) unique identifier, (ii) service date, (iii) job title/position, (iv) annual base salary and annual incentive plan target amount, (v) work location, (vi) visa type, if any and expiry date, (vii) the applicable Collective Labor Agreement, works council or other applicable labor organization, if any, (viii) leave status, reason for the leave, the start date of the leave and expected return date, (ix) vacation accrual rate, (x) status as full-time or part-time, (xi) home country of residence, (xii) Job Complexity Indicator, (xiii) country of payroll, (xiv) sales indicator, (xv) Exempt/Non-Exempt status (U.S. only), (xvi) payment currency, (xvii) department/function, to the extent applicable, (xviii) work schedule and (xix) whether such Employee has any individual written agreement that provides for length of notice or severance payment required to terminate his or her employment in excess of that required by applicable Law or pursuant to a Seller Employee Plan disclosed in Section 4.10(a)(i) of the Sellers Disclosure Schedule as a result of which there could be a payment to such employee in excess of $50,000 in addition to such payment required by applicable Law or such Seller Employee Plan.

(c)    Except as set forth in Section 4.10(c) of the Sellers Disclosure Schedule, there has not been for a period of twelve (12) consecutive months prior to the date hereof, nor is there existent or, to the Sellers' Knowledge, has there been threatened, any strike, material grievance, slowdown, lockout, picketing or work stoppage against the Sellers by or on behalf of the Employees.

(d)    Section 4.10(d) of the Sellers Disclosure Schedule identifies and lists all of the Collective Labor Agreements and works councils or similar labor organizations in effect with respect to the Employees and in the case of Collective Labor Agreements that have expired, whether notice to bargain has been given and the status of the bargaining process. For a period of twelve (12) consecutive months prior to the date hereof, no petition has been filed or proceedings instituted by a union, works council, collective bargaining agent, employee or group of employees with any Government Entity seeking recognition of a collective bargaining agent with respect to any Employees, and, to the Sellers' Knowledge, no such organizational effort is currently being made or has been threatened by or on behalf of any union, works council, employee, group of employees or collective bargaining agent to organize any Employees. The Sellers have provided the Purchaser with a true and complete copy of each Collective Labor Agreement listed in Section 4.10(d) of the Sellers Disclosure Schedule.

(e)    There are no Transferred Employee Plans and, except as set forth in Section 4.10(e) of the Sellers Disclosure Schedule, there are no Seller Employee Plans that

70

are multiemployer plans within the meaning of Section 3(37) of ERISA, and none of the Sellers or any of their ERISA Affiliates has, within the past six (6) years, ever maintained, contributed to or participated in, any such multiemployer plans.

   (f) None of the Sellers or any of their Affiliates (excluding the EMEA Sellers) have, with respect to the Business, any Liability to provide retiree welfare benefits to any Person for any reason, except as may be required by COBRA, a Seller Employee Plan listed in Section 4.10(a)(i) of the Sellers Disclosure Schedule or applicable Law.

  **SECTION 4.11.  Brokers.**  Except for fees and commissions or other similar payments that will be paid or otherwise settled or provided for by the Sellers, no broker, finder, agent or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates for which the Purchaser is or will become liable, and the Sellers shall indemnify and hold harmless the Purchaser from any claims with respect to any such fees and commissions.

  **SECTION 4.12.  Taxes.**  Except as set forth in the corresponding sections of the Sellers Disclosure Schedules, if any, or with respect to any Taxes, Liens and Claims of the Sellers that will be discharged on the Closing Date as provided for in the U.S. Sales Order and the Canadian Approval and Vesting Orders;

   (a) There are no Liens for Taxes on any Asset (other than Permitted Encumbrances).

   (b) The Sellers have timely filed with the appropriate Tax Authorities all material Tax Returns required to be filed with respect to the Assets and the Business (excluding the EMEA Business) and all such Tax Returns are true, correct and complete in all material respects.  All material Taxes due and payable with respect to the Assets and the Business (excluding the EMEA Business) have been timely paid.

   (c) No deficiency for any material amount of Taxes has been claimed, proposed or assessed by any Tax Authority against any Seller and there is no pending audit, examination or other proceeding involving any Seller in respect of any material amount of Taxes, (i), in the case of each Seller not listed on Section 4.12(c)(i) of the Sellers Disclosure Schedule, relating to any Asset or the Business (excluding the EMEA Business) and (ii) in the case of each Seller listed on Section 4.12(c)(ii) of the Sellers Disclosure Schedule, relating to each such Seller.

   (d) No Seller has entered into an agreement or waiver or been requested to enter into an agreement or waiver extending any statute of limitations relating to the assessment, payment or collection of material Taxes relating to any Asset or the Business (excluding the EMEA Business).

   (e) None of the Assets located within the United States or which is owned by a U.S. Debtor (i) is property required to be treated as being owned by another person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of

71

1986, (ii) constitutes "tax-exempt use property" within the meaning of Section 168(h)(1) of the Code and (iii) is "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code.

(f)     The Sellers have, in accordance with applicable Law, invoiced, collected, withheld, reported and remitted to the appropriate Government Entity (within the time prescribed) all material: (i) Transfer Taxes which are due and payable or collectible by the Sellers; (ii) withholding, payroll or employment taxes, and other deductions at source as required by applicable Law; and (iii) all non-resident withholding Taxes as required by applicable Law.

(g)     Any Seller that is selling any Asset that constitutes "taxable Canadian property" as defined under the Income Tax Act (Canada) is not a non-resident of Canada within the meaning of the Income Tax Act (Canada).

(h)     No Seller that is not a "United States person," as such term is defined in Section 7701(a)(30) of the Code, is transferring pursuant to this Agreement any "United States real property interest," as such term is defined in Section 897(c)(1) of the Code.

**SECTION 4.13.  Environmental Matters.**  Except as disclosed in the Sellers Disclosure Schedule, if any:

(a)     The Business (excluding the EMEA Business) is and since January 1, 2005, has been in material compliance with, all applicable Environmental Laws and all material licenses, permits and approvals issued under Environmental Laws.

(b)     All material licenses, permits and approvals required under Environmental Laws required to own or operate the Business (excluding the EMEA Business) have been obtained, and remain in full force and effect.

(c)     None of the Sellers has received any written request for information, or been notified in writing that it is a potentially responsible party, under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("**CERCLA**"), or any similar state, local or foreign laws that relates in any respect to the Business (excluding the EMEA Business) or any facility used by the Business (excluding the EMEA Business) as of the date hereof.

(d)     There are no writs, injunctions, decrees, orders or judgments to which any of the Sellers is a party that are outstanding, and there are no material actions, suits, claims, orders, proceedings or investigations to which any of the Sellers is a party that are pending or, to the Knowledge of the Sellers, threatened, relating to the compliance of the Sellers with, or the liability of the Sellers under, any Environmental Laws in connection with the Business (excluding the EMEA Business) or any facility used by the Business (excluding the EMEA Business) as of the date hereof.

(e)     None of the real property currently owned, leased or operated by the Sellers in respect of the Business (excluding the EMEA Business), is listed or, to the Knowledge of the Sellers, proposed for listing on the "National Priorities List" under

CERCLA, or on the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the United States Environmental Protection Agency, as updated through the Closing Date, or any similar state or foreign list of sites requiring investigation or cleanup.

(f)    To the Knowledge of the Sellers, there has heretofore been no material Release of any Hazardous Material in connection with the Business (excluding the EMEA Business) or the operations of the Business (excluding the EMEA Business).

(g)    The Sellers have made available to, or provided the Purchaser with, true and correct copies of all material environmental assessment reports (including Phase I or Phase II reports) and any other material environmental studies in the possession of the Sellers relating to the Business (excluding the EMEA Business) or its operations.

SECTION 4.14. **Undisclosed Liabilities.** There are no Assumed Liabilities or EMEA Assumed Liabilities of a type that would be required to be included on a balance sheet of the Business prepared in accordance with GAAP (or reflected in the notes thereto) except Liabilities that (i) in the aggregate are adequately provided for in the Financial Statements; (ii) have been incurred in the Ordinary Course since the date of the last balance sheet included in the Financial Statements; (iii) have been incurred in connection with this Agreement or the transactions contemplated hereby; or (iv) which (not including Liabilities referred to in clauses (i) through (iii) above) would not have a Material Adverse Effect.

SECTION 4.15. **Reliance On Exemption From Registration Under Section 4(2) of the Securities Act.**

(a)    The Distribution Agent is receiving the Shares in its capacity as agent for the Sellers and the EMEA Sellers, and does not exercise independent voting or investment power over the Shares. The Shares are being acquired by the Sellers and the EMEA Sellers for investment only and not with a view to distribution, except as contemplated by this Agreement. The Sellers and the EMEA Sellers have been advised and understand that the issuance of the Shares to the Distribution Agent has not been registered under the Securities Act or under the "blue sky" or similar Laws of any jurisdiction and that the Shares may be resold only in a transaction registered under the Securities Act and in accordance with such "blue sky" or similar Laws as may be applicable, or, subject to the terms and conditions of this Agreement, if an exemption from registration is available. The Sellers and the EMEA Sellers have been advised and understand that the Purchaser, in issuing the Shares, is relying upon, among other things, the representations and warranties of the Sellers herein in concluding that such issuance is not a "public offering" and is exempt from the registration requirements of the Securities Act.

(b)    Each of the Sellers and the EMEA Sellers is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D under the Securities Act and is able to bear the risk of its investment in the Shares. Each of the Sellers and the EMEA Sellers have such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of acquiring the Shares.

73

(c)    Each of the Sellers and the EMEA Sellers understand that no United States federal or state agency has passed on or made any recommendation or endorsement of the Shares or the fairness or suitability of an investment in the Shares nor have such authorities passed upon or endorsed the merits thereof.

(d)    Each of the Sellers and the EMEA Sellers understand that the Shares are restricted securities and must be held until an exemption from registration under the Securities Act is available and all of the requirements of such exemption have been met or unless and until the resale of such Shares is registered under the Securities Act or subject to the terms and conditions of this Agreement and the applicable U.S. securities Laws, an exemption from registration is available.

(e)    The Sellers and the EMEA Sellers have been furnished with all materials relating to the business, finances and operations of the Purchaser and its subsidiaries and materials relating to the offer and transfer of the Shares which have been requested by them. The Sellers and the EMEA Sellers and their advisors, if any, have been afforded the opportunity to ask such questions of the Purchaser as they deem appropriate for purposes of the investment contemplated hereby. Each of the Sellers and the EMEA Sellers understands that beneficial ownership of the Shares involves a high degree of risk and that each may lose its entire investment in the Shares and that each can afford to do so without material adverse consequences to its financial condition. In choosing to acquire beneficial ownership over any Shares, none of the Sellers or the EMEA Sellers is relying on any information provided by the Purchaser and its subsidiaries, except to the extent provided herein.

(f)    The Sellers, the EMEA Sellers and their respective "Ultimate Parent Entities" (including all entities under the control of such Ultimate Parent Entities) within the meaning of the HSR Act are acquiring, and will hold, the Shares "solely for the purposes of investment" within the meaning of Section 18a(c)(9) of the HSR Act. As of the Closing, neither the Sellers and the EMEA Sellers nor their respective "Ultimate Parent Entities" (including all entities under the control of such Ultimate Parent Entities) within the meaning of the HSR Act, shall hold more than ten million (10,000,000) shares of Common Stock.

### SECTION 4.16.  Representations and Warranties by the Other Sellers.

Except as set forth in the Sellers Disclosure Schedule, each Other Seller severally but not jointly will, as of the date such Other Seller will execute this Agreement pursuant to Section 11.17, represent and warrant to the Purchaser as follows:

#### 4.16.1.    Organization and Corporate Power.

(a)    Such Other Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized. Subject to the receipt of the Bankruptcy Consents, at the time it executes this Agreement, such Other Seller will have the requisite corporate or other organizational power and authority necessary to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or, at the Closing Date, will become a party.

74

(b)     Such Other Seller is qualified to do business and to own, lease or operate its properties and assets, including the Assets, as applicable in each jurisdiction in which the nature of its properties or the character of its business relating to the Business (excluding the EMEA Business) requires it to so qualify, except to the extent that the failure to be so qualified would not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

### 4.16.2.    Authorization; Binding Effect; No Breach.

(a)     Subject to the Bankruptcy Consents, the execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller will be a party will have been duly and validly authorized by all corporate or other organizational action by such Other Seller.  Subject to the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser, the Transaction Documents to which such Other Seller will be a party will constitute a legal, valid and binding obligation of such Other Seller, enforceable against it in accordance with its terms, except to the extent that such enforceability may be limited by applicable principles of equity regarding the availability of remedies (whether in proceeding at law or in equity).

(b)     The execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller will be a party will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, result in the creation or imposition of any Lien upon any of the Assets, or (subject to the receipt of Consents in connection with the Assigned Contracts and other Consents expressly provided for herein) require any Consent of any Person (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration, filing or notice to any Person pursuant to (i) the articles, charter, by-laws or other governing documents of such Other Seller, (ii) any Material Contract to which the such Other Seller is a party or to which any of its assets is subject, (iii) any Laws to which such Other Seller, or any of the Assets owned by such Other Seller is subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

### ARTICLE V
### COVENANTS AND OTHER AGREEMENTS

**SECTION 5.1.  U.S. Bankruptcy Actions.**  On the timetables and subject to the terms set forth below, the Sellers who are U.S. Debtors shall (i) file with the U.S. Bankruptcy Court one or more motions and proposed orders as set forth below, (ii) notify, as required by the U.S. Bankruptcy Code, the U.S. Bankruptcy Rules, and any order of the U.S. Bankruptcy Court, all parties entitled to notice of such motions and orders, as modified by orders in respect of notice which may be issued at any time and from time to time by the U.S. Bankruptcy Court, and such additional parties as the Purchaser may reasonably request, and (iii) subject to the provisions of this Agreement, including the provisions of Section 10.1, and the U.S. Bidding Procedures Order, if entered, use commercially reasonable efforts to obtain U.S. Bankruptcy Court approval of such orders.

(a)     As promptly as practicable, but in no event later than the second (2nd) Business Day after the date hereof, the U.S. Debtors shall file with the U.S. Bankruptcy Court a motion (the "**U.S. Bidding Procedures and Sale Motion**") and two (2) proposed orders substantially in the forms set forth in Exhibit 5.1(a) (as attached as exhibits to the U.S. Bidding Procedures and Sale Motion and as may be modified pursuant to Section 5.1(c) and Section 5.1(d), the "**U.S. Bidding Procedures Order**" and the "**U.S. Sale Order**") seeking approval by the U.S. Bankruptcy Court of, respectively, (i) as for the U.S. Bidding Procedures Order, a process for the sale of the Business, the provision of the Solicitation Period as set forth in Section 5.3(f) and the provision of the Break-Up Fee and Expense Reimbursement as set forth in Section 10.2, and (ii) as for the U.S. Sale Order, pursuant to Sections 105, 363 and 365 of the U.S. Bankruptcy Code, the sale of the Assets to the Purchaser or a Designated Purchaser and the assumption by the U.S. Debtors and assignment to the Purchaser or a Designated Purchaser of the Assumed and Assigned Contracts.

(b)     The Sellers who are U.S. Debtors shall use their reasonable best efforts to cause the U.S. Bankruptcy Court to (i) schedule a hearing to consider the U.S. Bidding Procedures and Sale Motion and (ii) enter the U.S. Bidding Procedures Order within two (2) Business Days of the hearing referred to in clause (i) of this sentence.

(c)     The U.S. Bidding Procedures Order and the bidding procedures approved therein shall not be materially amended by the Sellers without the prior approval of the Purchaser in its reasonable discretion; provided, however, it shall not be deemed unreasonable for the Purchaser to withhold its consent to any change to the U.S. Bidding Procedures Order that conflict with any express provisions of this Agreement, including without limitation Section 5.1(g) below.

(d)     Material failure to adhere to the U.S. Bidding Procedures Order by the Sellers from and after the entry thereof shall constitute a breach of this Agreement and entitle the Purchaser to all rights and remedies set forth herein with respect to such breach, subject to the Sellers' cure right set out in Section 10.1(b)(ii).

(e)     The U.S. Sale Order shall contain the provisions (it being understood that certain of such provisions must constitute findings of fact or conclusions of Law to be made by the U.S. Bankruptcy Court as part of the U.S. Sale Order) set forth in the form of Exhibit 5.1(a) attached hereto, without modification thereto unless the Purchaser expressly consents in writing to such modification in its reasonable discretion.

(f)     The Sellers shall request that the U.S. Bankruptcy Court schedule, subject to the availability of the U.S. Bankruptcy Court, a U.S. Sale Hearing on the fourth (4th) Business Day following the conclusion of the Auction and shall use their reasonable best efforts to cause the U.S. Bidding Procedures and Sale Motion to be heard on that date or the earliest date thereafter permitted by the Bankruptcy Court's schedule.

(g)     Notwithstanding anything to the contrary herein or in the U.S. Bidding Procedures Order, under no circumstances (i) will the Purchaser be required to remain obligated under this Agreement (as amended, at the Auction or otherwise) as the Alternate Bidder (as such term is defined in the U.S. Bidding Procedures Order) if any

76

Alternative Transaction is selected by the Sellers at the Auction or (ii) will the Purchaser be required to pay any deposit as a condition of participating in the Auction or otherwise.

**SECTION 5.2.  Canadian Bankruptcy Actions.**

**5.2.1. Canadian Sales Process Order.**

(a)      Within five (5) days of execution of this Agreement, the Canadian Debtors shall serve on the CCAA Service List and file with the Canadian Court a motion (the "**Canadian Sales Process Order Motion**") in form and substance acceptable to the Sellers and the Purchaser, each acting reasonably, seeking an order approving the execution, delivery and performance of this Agreement, including payment of the Break-Up Fee and Expense Reimbursement and a process for the sale of the Business.  The Canadian Sales Process Order Motion, as served and filed, shall include a copy of the order in the form set forth in Exhibit 5.2.1 with such amendments as the Canadian Debtors and the Purchaser may agree (the "**Canadian Sales Process Order**").  Any amendment to the form of the Canadian Sales Process Order, after the Canadian Sales Process Order Motion has been served, shall be subject to the prior written approval of the Purchaser in its reasonable discretion.

(b)      The Canadian Debtors shall use their reasonable best efforts to cause the Canadian Court to (i) schedule and hear the Canadian Sales Process Order Motion within seven (7) days of filing the Canadian Sales Process Order Motion, and (ii) the Canadian Debtors shall enter the issued order forthwith after its issuance.

**5.2.2. Canadian Approval and Vesting Order.**  As promptly as practicable, but in no event later than three (3) Business Days following completion of the Auction (although, <u>provided</u> that service shall take place at least one (1) Business Day prior to the Canadian Approval and Vesting Order Motion unless consented to by the Purchaser), the Canadian Debtors shall serve on the CCAA Service List with such reasonable additions as are requested by the Purchaser and file with the Canadian Court a motion (the "**Canadian Approval and Vesting Order Motion**") in form and substance acceptable to the Sellers and the Purchaser, each acting reasonably, seeking an order approving this Agreement and the transactions contemplated herein.  The Canadian Approval and Vesting Order Motion, as served and filed, shall include a copy of the order in the form set forth in Exhibit 5.2.2 with such amendments as the Canadian Debtors and the Purchaser may agree (the "**Canadian Approval and Vesting Order**").  Any amendment to the form of the Canadian Approval and Vesting Order, after the Canadian Approval and Vesting Order Motion has been served, shall be subject to the prior written approval of the Purchaser.

**SECTION 5.3.  Consultation; Notification; Cooperation; Solicitation.**

(a)      The Purchaser and the U.S. Debtors shall cooperate with filing and prosecuting the U.S. Bidding Procedures and Sale Motion, a draft of which shall be delivered by the Sellers to the Purchaser no later than one (1) day after the date hereof, and obtaining entry of the U.S. Bidding Procedures Order and the U.S. Sale Order, and the U.S. Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, responses to objections, notices,

statements, schedules, applications, reports and other material papers to be filed by the U.S. Debtors in connection with such motions and relief requested therein and any challenges thereto.

        (b)     The Purchaser and the Canadian Debtors shall cooperate with filing and prosecuting the Canadian Sales Process Order Motion and the Canadian Approval and Vesting Order Motion, and obtaining issuance and entry of the Canadian Sales Process Order and the Canadian Approval and Vesting Order, and the Canadian Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all of the Canadian Debtors' proposed pleadings, motions, responses to objections, notices, statements schedules, applications, reports and other material papers to be filed by the Canadian Debtors in connection with such motions and relief requested therein and any challenges thereto.

        (c)     If the U.S. Sale Order or any other order of the U.S. Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the U.S. Debtors agree to, and to cause their Subsidiaries to, use their reasonable best efforts, to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing contained in this Section shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the U.S. Sale Order shall have been entered and shall not have been stayed, modified, revised or amended, in which event the Purchaser and the relevant Designated Purchasers shall be able to assert the benefits of Section 363(m) of the U.S. Bankruptcy Code and, as a consequence of which, such appeal shall become moot.

        (d)     If the Canadian Approval and Vesting Order or any other order of the Canadian Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the Canadian Debtors agree to, and to cause their Affiliates (other than the EMEA Sellers and their respective Subsidiaries) to, take all commercially reasonable steps, and use their reasonable best efforts to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing in this Section shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the Canadian Approval and Vesting Order shall have been entered and shall not have been stayed, modified, revised or amended.

        (e)     Prior to Closing, the Sellers shall, from time to time, at the request of the Purchaser, request such further Order or Orders from the Canadian Court or the U.S. Bankruptcy Court as the Sellers and the Purchaser both agree, each acting reasonably, are required in order to give effect to this Agreement and the transactions contemplated hereby. The terms of such requested Orders shall be satisfactory to the Sellers and the Purchaser, each acting reasonably. Upon any such request each of the Purchaser and the Sellers, acting

reasonably, shall cooperate with each other, as necessary or as may be reasonably requested, in order to obtain such further Order or Orders.

(f)     From the date of the later of (i) the entry of the U.S. Bidding Procedures Order or (ii) the entry of the Canadian Sales Process Order, until the conclusion of the Auction (the "**Solicitation Period**"), the Sellers are permitted to cause their authorized representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to the Purchaser and its Affiliates, agents and authorized representatives) in connection with any Competing Transaction. In addition, during such Solicitation Period, the Sellers shall have the right to respond to any inquiries or offers to purchase all or any part of the Business and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable Law, including supplying information relating to the Business and Assets to prospective buyers. The Sellers shall contemporaneously, or as soon as possible thereafter, provide the Purchaser with any information concerning the Business or Assets provided to any prospective purchasers not previously provided to the Purchaser. The Main Sellers shall provide the Purchaser with a copy of any Qualified Bid received by the Sellers on the day that the determination is made that such bid is a Qualified Bid but in no event later than 48 hours prior to the commencement of the Auction and otherwise in accordance with the U.S. Bidding Procedures Order. In the event that the time at which the final Qualified Bid to be delivered is less than 48 hours from the scheduled time for commencement of the Auction, either the Sellers or the Purchaser, may, by written notice, require that the scheduled commencement date and time of the Auction be delayed until such time the Purchaser has had possession of the Qualified Bids for 48 hours prior to commencement of the Auction. Nothing herein shall limit the Sellers' ability to consummate a Sponsored Reorganization Plan.

**SECTION 5.4.  Pre-Closing Cooperation.**

(a)     Prior to the Closing, upon the terms and subject to the conditions of this Agreement, each of the Parties shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement as soon as practicable, including (i) the preparation and filing of all forms, registrations and notices required to be filed to consummate the Closing and the taking of such actions as are necessary to obtain any requisite Consent, provided that the Sellers shall not be obligated to make any payment or deliver anything of value to any Third Party (other than filing and application fees to Government Entities, all of which shall be paid or reimbursed by the Purchaser) in order to obtain any Consent; (ii) taking reasonable actions to defend any Actions filed against such Party by or before any Government Entity challenging this Agreement or the consummation of the Closing (or to cooperate with the other Party in the case of any such Action filed against such other Party); and (iii) using reasonable efforts to cause to be lifted or rescinded any injunction, decree, ruling, order or other action of any Government Entity adversely affecting the ability of the Parties to consummate the Closing; provided, that such reasonable efforts described in clauses (ii) and (iii) above shall not require either Party to take, or agree to take any action, that would reasonably be expected to materially and adversely impact the Business or any other business of such Party.

79

(b)     Each Primary Party shall promptly notify the other Primary Party of the occurrence, to such party's knowledge, of any event or condition, or the existence, to such party's knowledge, of any fact, that would reasonably be expected to result in any of the conditions set forth in Article IX not being satisfied.

(c)     The Purchaser hereby covenants and agrees until the Closing Date or the earlier termination of this Agreement in accordance with Article X:

(i)     to reserve for issuance the Shares in connection with the transactions contemplated by this Agreement;

(ii)    not to pay any dividend or make any cash distribution on or in respect of its outstanding common stock, other than normal and customary cash dividends, consistent with past practice; and

(iii)   that except with respect to any matter expressly contemplated by this Agreement, it will not acquire or agree to acquire by amalgamating, merging or consolidating with, purchasing a substantial equity interest in or a substantial portion of the assets of or otherwise, any business or Person which acquisition or other transaction would reasonably be expected to prevent or materially delay the transactions contemplated by this Agreement; provided, however, notwithstanding anything to the contrary herein, nothing in this clause (iii) shall prevent or otherwise restrict the Purchaser from being acquired or agreeing to be acquired (whether by merger, consolidation, tender offer or otherwise) by any other Person.

**SECTION 5.5.   Antitrust and Other Regulatory Approvals.**

(a)     In furtherance and not in limitation of the provisions of Section 5.4, each of the Parties agrees (so far as it is legally bound to do so) to prepare and file as promptly as practicable, or cause their ultimate parent entities (as that term is defined in the HSR Act) to prepare and file as promptly as practicable, and in any event by no later than ten (10) Business Days from the date of this Agreement (or on such other subsequent day as the Parties mutually agree (or the earlier date required by the applicable Antitrust Laws)): (i) a request for an advance ruling certificate pursuant to Section 102 of the Competition Act, and if deemed advisable by the Purchaser, acting reasonably, a pre-merger notification filing under the Competition Act; (ii) an appropriate filing of a Notification and Report Form pursuant to the HSR Act; and (iii) all other necessary documents, registrations, statements, petitions, filings and applications for ICA Approval and any other Consent of any other Government Entities required to satisfy the condition set forth in Section 9.1(a).

(b)     If a Party or any of its Affiliates receives a request for information or documentary material from any Government Entity with respect to this Agreement or any of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), then such Party shall endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request.

(c)    The Parties shall keep each other apprised of the status of matters relating to the completion of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and work cooperatively in connection with obtaining the requisite Regulatory Approvals of each applicable Government Entity, including:

(i)    cooperating with each other in connection with filings required under the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and each Antitrust Approval, and liaising with each other in relation to each step of the procedure before the relevant Government Entities and as to the contents of all communications with such Government Entities. In particular, and except for any filings made pursuant to the Investment Canada Act, no Party will make any notification or other filing with or to any Government Entity in relation to the transactions contemplated hereunder without first providing the other Party or its outside counsel on an outside counsel only basis with a copy of such notification in draft form (except with respect to any documents relating to Item 4(c) of the notification form required by the HSR Act) and giving such other party or its outside counsel a reasonable opportunity to discuss its content before it is filed with the relevant Government Entities, and such first Party shall consider and take account of all reasonable comments timely made by the other Party or its outside counsel in this respect. For the avoidance of doubt, draft filings, materials or information provided under this section or under any other provision of this Agreement to the other Party's counsel on an outside counsel only basis shall only be given to outside counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient without the advance written consent of the Party providing such draft filing or materials;

(ii)    furnishing to the other party or its outside counsel in a timely fashion all information within its possession that is required for any application or other filing to be made by the other party pursuant to the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement); provided, however, that no such information shall be required to be provided by a Party if it determines, acting reasonably, that the provision of such information would jeopardize any attorney-client or other legal privilege (it being understood, however, that the Parties shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the other Party or its outside counsel to occur without so jeopardizing the privilege);

(iii)    promptly notifying each other of any communications from or with any Government Entity with respect to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and ensuring that each of the parties or its outside counsel (as determined by the Purchaser in its reasonable discretion in the case of meetings or appearances related to ICA Approval), where acceptable to the Government Entity, is represented at any meetings with or other appearances before any Government Entity with respect to

the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement); and

(iv)  consulting and cooperating with one another and the other Party's outside counsel in connection with all analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with proceedings under or relating to the Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement).

(d)  In addition, and subject to Section 5.5(e), the Purchaser shall, and shall cause each of the Designated Purchasers to, use its reasonable efforts to satisfy (or cause the satisfaction of) the conditions precedent to the Purchaser's obligations hereunder as set forth in Section 9.1(a) to the extent the same is within its control and to take, or cause to be taken, all other actions and to do, or cause to be done, all other things necessary, proper or advisable under all applicable Laws to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), including using its reasonable efforts to obtain all Regulatory Approvals, and any other Consent of a Government Entity required to be obtained in order for the Parties to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement).

(e)  The obligations of the Purchaser pursuant to Section 5.5(d) shall include committing, and causing the Designated Purchasers to commit, to any and all undertakings, divestitures, licenses or hold separate or similar arrangements with respect to their respective assets and/or the Assets and/or the EMEA Assets and/or to any and all arrangements for the conduct of any business and/or to any termination of any and all existing relationships and contractual rights and obligations as a condition to obtaining any and all Consents from any Government Entity necessary to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), including taking, and causing the Designated Purchasers to take, any and all Consents from any Government Entity necessary to consummate the transactions contemplated hereby, including taking any and all actions necessary in order to ensure the receipt of the necessary Consents and Regulatory Approvals; provided, however, that nothing in this Agreement or the EMEA Asset Sale Agreement shall require or be construed to require the Purchaser, any Designated Purchaser, any EMEA Designated Purchaser or any of their respective Subsidiaries to commit to any undertaking, divestiture, license or hold separate or similar arrangement or conduct of business arrangement or to terminate any relationships, rights or obligations or to do any other act, to the extent such commitment, termination or action would be reasonably likely to be materially adverse to the Business or the Purchaser, or financial condition or prospects of the Business or the Purchaser.

(f)  For the avoidance of doubt, the covenants under this Section 5.5 shall not apply to any action, effort, filing, Consent, proceedings, or other activity or matter relating to the Bankruptcy Courts, the Bankruptcy Proceedings and/or the Bankruptcy Consents, and the ICA Approval.

**SECTION 5.6. Pre-Closing Access to Information.**

(a)    Prior to the Closing, the Sellers shall, and shall cause their Subsidiaries (other than the EMEA Sellers) to, (i) give the Purchaser and its authorized representatives, upon reasonable advance notice and during regular business hours, reasonable access to all books, records, personnel, officers and other facilities and properties of the Business (excluding the EMEA Business), (ii) permit the Purchaser to make such copies and inspections thereof, upon reasonable advance notice and during regular business hours, as the Purchaser may reasonably request, (iii) grant the Purchaser and its representatives reasonable access to each of the facilities of the Business where Assets are located for purposes of completing an updated inventory of the fixed assets of the Business for purposes of completing an appraisal of the value thereof, and (iv) cause the officers of the Sellers to (A) after each month-end promptly (and in any event within thirty (30) days thereafter) furnish the Purchaser with copies of the Sellers' standard Business review of orders and revenue as is regularly prepared in the Ordinary Course, and (B) after each quarter-end promptly (and in any event within thirty (30) days thereafter) furnish the Purchaser with an unaudited quarter-end balance sheet for the Business as of the end of such quarter, and unaudited combined statements of earnings and cash flows of the Business for the three (3) month period then ended; provided, however, that (1) any such access shall be conducted at the Purchaser's expense, in accordance with Law (including any applicable Antitrust Laws and Bankruptcy Laws), at a reasonable time, under the supervision of the Sellers' personnel and in such a manner as to maintain confidentiality and not to unreasonably interfere with the normal operations of the businesses of the Sellers and their Affiliates, and (2) the Sellers will not be required to provide to the Purchaser access to or copies of any Tax records except as otherwise provided herein.

(b)    In order to facilitate the Purchaser's entry into new supply arrangements effective as of the Closing, the Sellers shall make available to the Purchaser unredacted copies of all Contracts with suppliers of the Business, or in the case of any Non-Exclusive Supply Contracts, unredacted copies of any portion thereof that are applicable to the Business (other than pricing/cost information or other competitively sensitive information the sharing of which Sellers or their representatives reasonably determine may violate applicable Law), promptly following the date hereof (or in the event that any such Contract is subject to confidentiality restrictions promptly following the receipt of any required consent which the Sellers will cooperate with the Purchaser to obtain as promptly as practicable). So long as the Purchaser is the winning bidder in the Auction, the Sellers shall provide such information not provided in accordance with the preceding sentence upon the later of the entry of the U.S. Sale Order, the receipt of the HSR Approval and the receipt of the Competition Act Approval. Any such disclosures shall be made to any employees or representatives of the Purchaser who are designated by the Purchaser, who reasonably require access to such information for any reasonable business purpose related to the acquisition of the Business by the Purchasers and who have executed the applicable "Clean Room Agreements," provided, however, that employees of the Purchaser shall not have access to such information unless they are not involved in making decisions regarding pricing or the other material competitive terms offered to any customer of a competing business to the Business, and if the transaction does not close, agree not to be employed in such a role for an agreed-upon minimum period of time.

(c)    In connection with the procedures set forth in Section 5.15 with respect to the Bundled Contracts, the Sellers will provide unredacted copies of any portion of any Bundled Contracts that relates to the Business (other than pricing information and other competitive sensitive information the sharing of which the Sellers or their representatives reasonably determine may violate applicable Law) promptly following the date hereof, and so long as the Purchaser is the winning bidder in the Auction, will provide such information upon the later of the entry of the U.S. Sale Order, the receipt of the HSR Approval and the receipt of the Competition Act Approval. Any such disclosures shall be made to any employees or representatives of the Purchaser who are designated by the Purchaser, who reasonably require access to such information for any reasonable business purpose related to the acquisition of the Business by the Purchasers and who have executed the applicable "Clean Room Agreements," <u>provided</u>, <u>however</u>, that employees of the Purchaser shall not have access to such information unless they are not involved in making decisions regarding pricing or the other material competitive terms offered to any customer of a competing business to the Business, and if the transaction does not close, agree not to be employed in such a role for an agreed-upon minimum period of time.

(d)    Promptly following the date hereof, the Sellers will provide to Purchaser a correct and complete list of table values from the Sellers' SAP HR system for the following fields: (i) job, (ii) organization/HR Department, and (iii) location. Within twenty (20) days following the date hereof, the Sellers will provide to the Purchaser a set of test files from the Sellers' SAP HR system, which shall include actual employee data (including at least one person per country), but excluding in such data any information revealing the identity of any Employees (including names, addresses, tax identification numbers and any other information that would allow the Purchaser to individually identify any Employee). Such test files shall be in the same format as the format that will be subsequently provided to the Purchaser by the Sellers when actual payroll data is transferred from the Sellers to the Purchaser. Within three (3) Business Days following the completion of the Auction, the Sellers will provide the following additional information with respect to each of the Employees whose information was provided in Section 4.10(b) of the Sellers Disclosure Schedule: (i) full name, (ii) work e-mail address, (iii) work telephone number, (iv) specific recurring allowances paid to employees (if applicable), (v) supervisor and (vi) pay schedule. Within three (3) Business Days following the notification from Purchaser to Sellers of any Identified Employee pursuant to Section 7.1.1, the Sellers will provide Purchaser with the Identified Employee's home address. Additionally, <u>provided</u> that Purchaser provides Seller with proof that an Identified Employee has consented to its release and, if applicable, transfer across boundaries, the Sellers will provide the Purchaser with the following additional information with respect to such Identified Employees as soon as practicable following the receipt by Seller of such proof: (ix) tax identification number, (x) date of birth, and (xi) gender. In addition, upon Purchaser's reasonable request, the Sellers will promptly provide Purchaser with aggregate census data with respect to gender and age (using five-year bands) of the Identified Employees' employee population (without individually identifying any Identified Employee).

(e)    Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof, the Sellers shall not have any obligation to make available to the Purchaser or its

representatives, or provide the Purchaser or its representatives with, (i) any Tax Return filed by the Sellers or any of their Affiliates or predecessors or (ii) any other information, if in each case under subsection (i) and (ii), making such information available would (A) jeopardize any attorney-client or other legal privilege or (B) potentially cause the Sellers to be found in contravention of any applicable Law or contravene any fiduciary duty or agreement (including any confidentiality agreement with a Third Party to which the Sellers or any of their Affiliates are a party) between Sellers and a Third Party, it being understood that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

(f)        Promptly following the date of the U.S. Sale Order, the Sellers agree to provide the Purchaser with access to such documentation, records and databases to the extent reasonably required to review and assess the Sellers' use of Open Source Software incorporated into any of the Products or Services.

**SECTION 5.7.  Public Announcements.**  The initial press release relating to this Agreement shall be a joint press release, the text of which shall be agreed to by the Purchaser and the Sellers acting reasonably.  Unless otherwise required by applicable Law or by obligations of the Parties or their Affiliates pursuant to any listing agreement with or rules of any securities exchange, the Parties hereto shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other Party and shall not issue any such release or make any such statement without the prior written consent of the other Party (such consent not to be unreasonably withheld or delayed).

**SECTION 5.8.  Further Actions.**  From and after the Closing Date, each of the Parties shall execute and deliver such documents and other papers and take such further actions as may reasonably be required to carry out the provisions of this Agreement and the other Transaction Documents to which they are a party and give effect to the transactions contemplated herein and therein, including the execution and delivery of such assignments, deeds and other documents as may be necessary to transfer any Assets as provided in this Agreement, including the assignment of any Assigned Contract; provided, that subject to Section 5.5, the Sellers shall not be obligated to make any payment or deliver anything of value to any Third Party (other than filing and application fees to Government Entities, all of which shall be paid or reimbursed by the party required to pay such fees under the Agreement) in order to obtain any Consent to the transfer of Assets or the assumption of Assumed Liabilities.

**SECTION 5.9.  Conduct of Business.**    The Sellers covenant that, subject to any limitation imposed as a result of being subject to the Bankruptcy Proceedings and except as (i) the Purchaser may approve otherwise in writing as set forth below (such approval not to be unreasonably withheld or delayed), (ii) set forth in Section 5.9 of the Sellers Disclosure Schedule, (iii) otherwise contemplated or permitted by this Agreement or another Transaction Document, (iv) required by Law (including any applicable Bankruptcy Laws or by any order of a Bankruptcy Court), or (v) relates solely to Excluded Assets or Excluded Liabilities, the Sellers shall and shall cause their Affiliates to (A) conduct the Business and maintain the Owned Equipment in the Ordinary Course, (B) use efforts that are commercially reasonable in the context of the Bankruptcy Proceedings and taking into account employee attrition to continue

85

operating the Business (excluding the EMEA Business) as a going concern, and to maintain the business organizations of the Business (excluding the EMEA Business) intact and (C) abstain from any of the following actions:

   (a) sell or otherwise dispose of material Assets, other than sales of inventory (including, without limitation, inventory that has been designated as "excess" or "obsolete" ("**E&O Inventory**")) on a basis consistent with past practice;

   (b) incur any Lien on any Assets, other than Liens that will be discharged at or prior to Closing and Permitted Encumbrances;

   (c) (i) grant any license or sublicense of any rights under or with respect to any Transferred Intellectual Property other than licenses to suppliers, resellers and customers in the Ordinary Course and licenses or sublicenses granted in accordance with the Intellectual Property License Agreement (if such agreement were in effect as of the date hereof), or (ii) enter into any exclusive license agreement that would restrict the Business or the Assets after the Closing in any material respect or which is in conflict with the provisions of this Agreement or that would be in conflict with the Intellectual Property License Agreement if it were in effect as of the date hereof;

   (d) increase the rate of cash compensation or other fringe, incentive, equity incentive, pension, welfare or other employee benefits payable to the Employees, other than normal periodic increases consistent with past practice or as required by applicable Law, Contracts or Seller Employee Plans in effect as of the date hereof, or pursuant to the KEIP or KERP (<u>provided</u> that the Sellers provide the Purchaser with notice of amendments, modifications, supplements or replacements to the KEIP as may be approved by the Canadian Court or to the KERP as may be approved by the Canadian Court or the U.S. Bankruptcy Court), or increases to welfare benefits that apply to substantially all similarly situated employees (including the Employees) of the Sellers or the applicable Affiliates of the Sellers, or (ii) except as otherwise expressly permitted under Section 5.9, enter into, or increase the benefits or any payments under, any employment, deferred compensation, severance or other similar agreement or arrangement with any Employee;

   (e) voluntarily terminate or waive any material right under, or materially amend any Material Contract or any Bundled Contract material to the Business (other than as necessary to effect the unbundling of any Bundled Contract required with respect to any other business or business segment of the Sellers), unless such Contract has become an Excluded Other Vendor Contract, an Excluded 365 Vendor Contract or a Non-Assigned Contract;

   (f) waive, release, assign, settle or compromise any material claim, litigation or arbitration relating to the Business to the extent that such waiver, release, assignment, settlement or compromise imposes any binding obligation, whether contingent or realized, on the Business that will bind the Designated Purchasers after the Closing Date and is materially adverse to the Business;

   (g) fail to make any budgeted capital expenditures with respect to the Business (excluding the EMEA Business) or make any unbudgeted capital expenditure with

respect to the Business (excluding the EMEA Business) in excess of $100,000 individually or $250,000 in the aggregate;

(h)     enter into any Material Contract for or relating to the Business that cannot be assigned to the Purchaser;

(i)     fail to maintain tangible property which, individually or in the aggregate, is material to the Business and which is included in the Assets, consistent with past practice since the filing of the Bankruptcy Proceedings;

(j)     enter into, or agree to enter into, any sale-leaseback transactions with respect to the Business;

(k)     take any action, other than actions that an employer in bankruptcy would take, to cause any employee of the Sellers who would otherwise be an Employee as of the Closing not to be such an employee (other than termination for cause or termination of Employees who failed to receive an offer of employment from the Purchaser or a Designated Purchaser pursuant to this Agreement provided the Sellers make a reasonable effort to provide notice to the Purchaser prior to such employment termination);

(l)     fail to maintain the material Consents with respect to the Business (excluding the EMEA Business);

(m)     on or before the Closing Date, make or rescind any material election in relation to Taxes that would materially and adversely impact the Purchaser after the Closing;

(n)     grant any lease, sublease, license, sublicense or other occupancy rights under or with respect to any portion of Real Property used in the Business (except with respect to such rights granted to the purchasers of other Nortel business segments which are co-located at such premises and the effect of which would not have a material adverse effect on the lease, license or occupancy by the Purchaser or any Designated Purchaser of such Real Property) or terminate or surrender or agree to release any Lease, in whole or in part, which is identified in the Real Estate Terms and Conditions except in accordance with the Real Estate Terms and Conditions;

(o)     construct, or permit to be constructed any capital improvements or major alterations at any portion of the Real Property used for the Business (excluding the EMEA Business, except with respect to any capital improvements or major alterations at any portion of the Real Property required in connection with the purchase by purchasers of other Nortel business segments), or as otherwise contemplated in the Real Estate Terms and Conditions;

(p)     enter into any Collective Labor Agreement affecting Transferred Employees except as required by applicable Law; or

87

(q)     enter into any Contract not to compete in any line of business or geographic area that would reasonably be expected to bind the Purchaser or any of its Affiliates after the Closing in any material respect;

(r)     enter into any Contract granting an indemnity in respect of intellectual property infringement or misappropriation other than in the Ordinary Course that would bind the Purchaser or any of its Affiliates after the Closing in any material respect, except for those Contracts that will not be, or that the Purchaser may elect not to have, assigned to the Purchaser hereunder; or

(s)     authorize, or commit or agree to take, any of the foregoing actions.

If a Seller desires to take any action described in this Section 5.9, the Main Sellers may, prior to any such action being taken, request the Purchaser's consent via an electronic mail or facsimile sent to the individual(s) at the addresses listed on Exhibit 5.9. The Purchaser shall respond to such notice in writing by 11:59 p.m. (New York time) on the second Business Day after the day of delivery of such electronic mail or facsimile. The failure of the Purchaser to respond within such two (2) Business Days shall not be deemed to be consent to such action.

The Purchaser acknowledges and agrees that: (i) prior to the Closing Date, the Sellers shall exercise, consistent with the terms and conditions of this Agreement, control and supervision of the Business (excluding the EMEA Business) and the EMEA Sellers shall exercise, consistent with the terms and conditions of the EMEA Asset Sale Agreement, the EMEA Business and (ii) notwithstanding anything to the contrary set forth in this Agreement, no consent of the Purchaser shall be required with respect to any matter set forth in Section 5.9 or elsewhere in this Agreement to the extent the requirement of such consent would, upon advice of the Purchaser's counsel, violate any Law.

        **SECTION 5.10.  Transaction Expenses.**  Except as otherwise provided in this Agreement or the Ancillary Agreements, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

        **SECTION 5.11.  Confidentiality.**

        (a)     The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement to any court or to any liquidator or in connection with any auction process with respect to the Business or the Assets approved by the Bankruptcy Court and show appropriate figures in their administration records, accounts and returns; provided, that after the completion of the transactions contemplated herein, the Purchaser's confidentiality obligations under this Section 5.11 and the confidentiality agreement between the Purchaser, NNC and its subsidiaries and Alan Bloom dated March 27, 2009, with respect to information and data relating to the Business and/or the Assets shall terminate. For greater certainty, the Purchaser's confidentiality obligations under the

88

third clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated June 19, 2009, shall not terminate after the completion of the transactions contemplated herein.

(b)    Subject to the requirements of the Bankruptcy Laws or as may be imposed by the Bankruptcy Court or as otherwise required by applicable Law, from and after the Closing: (i) the Sellers shall, and shall cause their Affiliates to, hold in confidence all confidential information (including trade secrets, customer lists, marketing plans and pricing information) of the Sellers relating to the Business or the Assets; (ii) in the event that the Sellers or an Affiliate thereof shall be legally compelled to disclose any such information, the Sellers shall provide the Purchaser with prompt written notice of such requirement so that the Purchaser may seek a protective order or other remedy; and (iii) in the event that such protective order or other remedy is not obtained, the Sellers or their Affiliates shall furnish only such information as is legally required to be provided.

(c)    It is acknowledged by the Purchaser and the Sellers that in the course of attempting to sell the Assets, one or more of the Sellers has entered into several confidentiality agreements with Third Parties in respect of information relating to the Assets and has disclosed such information to certain of those Third Parties.

(d)    Each Seller shall assign to the Purchaser, at or prior to, and with effect from and after the Closing, all of its rights under any such confidentiality agreement made by such Seller with any Third Party but only as such confidentiality agreements relate to the Assets and the Business and only to the extent that such agreements permit such assignments without the consent of any Third Party.  To the extent such agreements do not permit any assignment without the consent of any Third Party, at the Purchaser's request and the Purchaser's expense, provided that the Sellers receive an indemnity from the Purchaser in form and substance satisfactory to the Sellers, to the extent permitted by applicable Laws and the terms of such confidentiality agreements, shall appoint the Purchaser as such Sellers' representative and agent in respect of confidential information relating to the Business and Assets under such confidentiality agreements and any amounts recovered or expenses incurred in enforcing those confidentiality agreements in respect of the Sellers shall accrue to the benefit of or be for the account of the Purchaser.

(e)    Notwithstanding anything to the contrary contained in this Section 5.11, nothing contained in this Agreement shall be construed as precluding, prohibiting, restricting or otherwise limiting the ability of the Sellers, the Sellers' Affiliates or their respective representatives to: (i) make permitted disclosures under Section 5.7 or as otherwise permitted under this Agreement; (ii) make any disclosures that are required by applicable Law; (iii) use or disclose information that is not exclusive to the Business to the extent necessary to operate the other business segments of the Sellers or their Affiliates or otherwise engage in any manner in any business activities unrelated to the Business; (iv) perform any retained Contracts, whether or not exclusively related to the Business; or (v) make customary disclosures, subject to customary confidentiality agreements, regarding information that is not exclusive to the Business and is primarily related to other business segments of the Sellers in connection with acquiring, merging or otherwise combining with, or being acquired by, or selling all or part of their assets to, any Person (whether in a single transaction or a series of related transactions or whether structured as an acquisition of

89

assets, securities or otherwise).  Notwithstanding anything to the contrary contained in this Section 5.11, nothing contained in this Agreement shall be construed as precluding, prohibiting, restricting or otherwise limiting the ability of the Purchaser, the Purchaser's Affiliates or their respective representatives to: (i) make permitted disclosures under Section 5.7 or as otherwise permitted under this Agreement or (ii) make any disclosures that are required by applicable Law.

**SECTION 5.12.  Disclosure Schedules and Certain Information.**

(a)      The Sellers shall submit to the Purchaser via electronic mail or facsimile sent to the individual(s) at the addresses listed in Exhibit 5.12, every two (2) weeks, written updates to Section 4.10(b) of the Sellers Disclosure Schedule with respect to additions, deletions or other status changes of Employees or, after finalization of the Identified Employees, only with respect to Identified Employees.  The Sellers shall submit to the Purchaser at least three (3) Business Days prior to the Closing Date, written updates to the Sellers Disclosure Schedules in respect of Article IV disclosing any events or developments that occurred or any information learned between the date of this Agreement and the Closing Date that reflect any matters hereafter arising which, if existing, occurring or known to the Sellers at the date hereof, would have been required to be set forth or described in the Sellers Disclosure Schedule in relation to Article IV.

(b)      The Sellers shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to the Sellers, upon obtaining knowledge of the occurrence or nonoccurrence of any event that, individually or in the aggregate, would make the timely satisfaction of the conditions set forth in Article IX impossible or unlikely.

(c)      The delivery of any update or notice pursuant to this Section 5.12 shall not cure any breach of any representation or warranty requiring disclosure of such matter or otherwise limit or affect the remedies available hereunder to any party receiving such notice.

**SECTION 5.13.  Certain Payments or Instruments Received from Third Parties.**
To the extent that, after the Closing Date, (a) the Purchaser or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of this Agreement or relates primarily to any business or business segment of the Sellers other than the Business, the Purchaser shall, and shall cause the Designated Purchasers to promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment that is for the account of the Purchaser or any of the Designated Purchasers according to the terms of this Agreement or relates primarily to the Business, the Main Sellers shall, and shall cause the Other Sellers to promptly deliver such amount or instrument to the Purchaser or the relevant Designated Purchasers.  All amounts due and payable under this Section 5.13 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party.  Notwithstanding the foregoing, each Party hereby undertakes to use reasonable best efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

**SECTION 5.14.  Non-Assignable Contracts.**

   (a) To the extent that any Seller Contract or any Seller Consent is not capable of being assigned under Section 365 of the U.S. Bankruptcy Code (or, if inapplicable, pursuant to other applicable Laws or the terms of such Contract or Consent) to the Purchaser or a Designated Purchaser at the Closing without the Consent of the issuer thereof or the other party thereto or any Third Party (including a Government Entity) (collectively, the "**Non-Assignable Contracts**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless any such Consent is obtained.

   (b) For the purposes of this Agreement (including Section 5.14(a) and all representations and warranties of the Sellers contained herein), the relevant Sellers shall be deemed to have obtained all required Consents in respect of the assignment of any 365 Vendor Contract and 365 Customer Contract if, and to the extent that, pursuant to the U.S. Sale Order, the Sellers are authorized to assume and assign to the Purchaser or Designated Purchasers such Seller Contract pursuant to Section 365 of the U.S. Bankruptcy Code and any applicable Cure Cost has been, or will be, satisfied as provided in Section 2.1.7.  In furtherance thereof, the U.S. Bidding Procedures Order shall contain procedures, in form and substance acceptable to the Purchaser, for obtaining U.S. Bankruptcy Court approval that all 365 Contracts other than the Non-Assignable Contracts can and shall be assigned to the Purchaser on the Closing Date.

**SECTION 5.15.  Bundled Contracts.**

   (a) Section 5.15 of the Sellers Disclosure Schedule lists each Contract that the Sellers or their Affiliates have entered into prior to the date hereof providing for the sale or provision of Products and/or Services and the sale or provision of other products and services of the Sellers or their Affiliates (each, a "**Bundled Contract**").

   (b) During the period from the date hereof until the Auction, the Sellers and their Affiliates shall cooperate (consistent with applicable Laws and any confidentiality restrictions requiring consent of Third Parties) with the Purchaser in developing a strategy with respect to transitioning each customer of the Business that is party to a Bundled Contract by, among other things, making available those employees who are responsible for managing the customer relationship with each such customer, by providing unredacted copies of all Contracts to which any Seller is a party (or in the case of Bundled Contracts, the portions of such Bundled Contracts as are applicable to the Business) with each of the top 40 customers of the Business by revenue for the year ended December 31, 2008 (other than pricing information and other competitive sensitive information the sharing of which Sellers or their representatives reasonably determine may violate applicable Law) and such other information as the Purchaser may reasonably request, which disclosures shall be subject to the Confidentiality Agreement.  On or before the date that is five (5) Business Days after the date of the Auction, the Purchaser shall notify the Sellers of those counterparties to Bundled Contracts with which the Purchaser elects to attempt to negotiate alternative arrangements (effective as of and conditioned upon the Closing) ("**Alternative Arrangements**") directly with such counterparty to such Bundled Contract, including without limitation, such counterparty's purchase or sale of items under an existing Contract between such counterparty and the Purchaser or the entry into a new contract covering the

Products and Services. Promptly following the later of (x) the entry of the U.S. Sale Order and (y) the receipt of HSR Approval and Competition Act Approval, the Sellers and their Affiliates shall (i) provide such competitive sensitive information as was redacted pursuant to the first sentence of this subsection (b) in such a manner, and subject to, Section 5.6(c) so as not to violate any applicable Law and (ii) cooperate with the Purchaser with respect to the negotiation of any such Alternative Arrangements, including without limitation, by making introductions to customers with whom the Purchaser does not have an existing customer relationship, by, subject to applicable Law, participating in telephone calls and meetings with such customers and by providing such forecast and other information as is necessary to assist the Purchaser negotiate such Alternative Arrangements. The Purchaser agrees that any Alternative Arrangements it reaches with counterparties shall, effective as of the occurrence of the Closing, expressly release each Seller that is a party to the affected Bundled Contract from any obligations and Liabilities under such Bundled Contract from and after the Closing Date as they relate to the Products and Services sold or provided after the Closing Date.

       (c)      With respect to those Bundled Contracts other than those which the Purchaser has elected to negotiate Alternative Arrangements, promptly following the later of (i) the entry of the U.S. Sale Order and (ii) the receipt of HSR Approval and Competition Act Approval, the Purchaser and the Sellers shall cooperate to jointly contact each party thereto including without limitation, by making such contacts (by phone or in person) as may be reasonably requested by Purchaser and by sending a joint letter, in form and substance satisfactory to each of Sellers and Purchaser notifying the counterparty to each such Bundled Contract of the transactions and requesting the counterparty to agree to amend such Bundled Contract from and after the Closing Date so as to delete all obligations and Liabilities therefrom as they relate to the Products and the Services and enter into a new Contract (effective as of, and conditioned upon the occurrence of, the Closing) with the applicable customer and which only relates to Products and Services, in which event such new Contract shall be deemed to be a Seller Contract, provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liabilities in obtaining such arrangements, and the failure to enter into such arrangements shall not entitle the Purchaser to terminate this Agreement, fail to complete the transactions contemplated hereby or reduce the Purchase Price payable hereunder (except as otherwise provided in Section 2.2.1); provided, further, that without the express written consent of Purchaser, Sellers shall not agree to amend the material terms of any Bundled Contract as a condition of such counterparty agreeing to amend the Bundled Contract in the manner set forth in this subsection (c) and if so requested, Sellers shall notify Purchaser and, unless Purchaser consents to such amendment, Sellers shall not enter into a new Contract with such customer as set forth in this subsection (c) but shall instead enter into a Subcontract Agreement with respect to such Bundled Contract as provided in subsection (d) below. Each of the Sellers and the Purchaser shall notify the other Party if any customer has contacted such Party with regard to the matters set forth in this Section 5.15 and shall keep such other Party reasonably informed regarding the content of any discussions with the customer.

       (d)      For those Bundled Contracts for which the arrangements mentioned in Section 5.15 (a) – (c) have not been entered into by January 25, 2010 or such later date as