the Parties may mutually agree, the Sellers and the Purchaser shall use commercially reasonable efforts to enter into one or more Subcontract Agreements between the Sellers and the Purchaser or the applicable Designated Purchaser with respect to such Bundled Contracts on such terms as are reasonably satisfactory to each of them; provided that (x) nothing in this Section 5.15 shall require the Sellers to renew any Bundled Contract once it has expired, (y) the Sellers shall have the right, any time after the date that is one (1) year after the Closing Date, to exercise any right to terminate any Bundled Contract, and (z) the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liabilities in order to comply with its obligations under this sentence.

### SECTION 5.16. Post-Closing Assistance for Litigation.

(a)    After the Closing, the Purchaser shall, upon the request of the Sellers and at the Sellers' cost (including reimbursement of reasonable out of pocket expenses of the Purchaser and the Designated Purchasers and payment of a reasonable *per diem* to the Purchaser or a Designated Purchaser which *per diem* shall be based on the total compensation of the affected Transferred Employees at the time), require the Transferred Employees to make themselves reasonably available at reasonable times and cooperate in all reasonable respects with the Sellers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action (whether disclosed or not disclosed in the Sellers Disclosure Schedule) filed or claimed against the Sellers or any of their Affiliates or any of the respective agents, directors, officers and employees of the Sellers and their Affiliates, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, however, that the obligations of the Purchaser hereunder shall only extend to the Transferred Employees who remain employed by the Purchaser or a Designated Purchaser as of the date of the Sellers' request and shall not apply to former employees no longer employed by the Purchaser or a Designated Purchaser as of such date and shall not require the Purchaser or a Designated Purchaser to continue the employment of any such employee.

(b)    After the Closing, the Sellers shall, upon the request of the Purchaser, and at the Purchaser's cost (including reimbursement of reasonable out of pocket expenses of the Sellers and payment of a reasonable *per diem* to the Sellers which *per diem* shall be based on the total compensation of the affected employees at the time), require their employees that were not Transferred Employees to make themselves reasonably available and cooperate in all reasonable respects with the Purchaser and the Designated Purchasers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action filed or claimed against the Purchaser, any of the Designated Purchasers, any of their Affiliates or any of the respective agents, directors, officers and employees of any of the foregoing, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, that the obligations of the Sellers or their Affiliates under this Section 5.16(b) shall only extend to the employees of such Sellers or Sellers' Affiliates as of the date of the Purchaser's request and shall not apply to former employees no longer employed by such Sellers or Sellers' Affiliates as of such date and shall not require such Sellers or Sellers' Affiliates to continue the employment of any such employee.

**SECTION 5.17. Tangible Asset Removal.** Except as otherwise set forth in the Real Estate Terms and Conditions and the Real Estate Agreements, the Purchaser shall, and shall cause the relevant Designated Purchasers to remove all tangible Assets from all premises owned or leased by the Sellers or their Affiliates that are not being leased, subleased or licensed to the Purchaser or any Designated Purchaser in accordance with the Real Estate Terms and Conditions within sixty (60) days after the Closing Date; provided, however, that in the event that the Sellers notify the Purchaser in writing that the Sellers desire, or are required, to vacate earlier, (i) the Sellers shall have the right by written notice to the Purchaser to require the Purchaser to remove all tangible Assets from all premises owned or leased by the Sellers or their Affiliates prior to the date that is thirty (30) days after the Closing Date or (ii) the Sellers may remove and store all tangible Assets at the Sellers' sole cost and expense until the date that is sixty (60) days after the Closing Date. The Sellers shall cooperate with such efforts, including by providing access to such facilities during normal business hours or where necessary to minimize disruption to the Business and to the other businesses of the Sellers, to provide reasonable access during non-working hours for the purpose of facilitating such removal.

**SECTION 5.18. Termination of Overhead and Shared Services and Intercompany Licensing Arrangements.**

(a)     The Purchaser acknowledges and agrees that, except as otherwise expressly provided in the Transition Services Agreement, effective as of the Closing Date (i) all Overhead and Shared Services provided to the Business (excluding the EMEA Business and except the Transferred Overhead and Shared Services) shall cease and (ii) the Sellers or their Affiliates shall have no further obligation to provide any Overhead and Shared Services to the Business (excluding the EMEA Business).

(b)     The Sellers shall, on or before Closing, provide the Purchaser with reasonable evidence confirming that Nortel Networks S.A. has agreed:

(i)     not to assert its Intellectual Property and exclusive license rights, if any, in a manner that could restrict or conflict with the ability of the Purchaser or its successors, assigns, licensees, sub-licensees or customers to operate in the field of the Business and its natural evolutions; and

(ii)     to the fullest extent permitted under French Law, to relinquish, waive and terminate all its Intellectual Property and license rights (including any enforcement rights) to the extent (but only to the extent) that they relate to the Intellectual Property that is sold or licensed to the Purchaser in connection with the sale of the Business.

(c)     The Sellers (other than NNL) shall, on or before Closing, provide the Purchaser with Appropriate License Termination agreements (as defined in the IFSA) executed by each of them and shall use commercially reasonable efforts to obtain and provide the Purchaser with Appropriate License Termination agreements from each of their Affiliates who are not Sellers.

**SECTION 5.19. Financing.** Notwithstanding anything to the contrary set forth herein, the Purchaser acknowledges and agrees that (i) its obligations to consummate the

94

transactions contemplated by this Agreement are not conditioned or contingent in any way upon receipt of any financing and the failure to consummate the transactions contemplated herein as a result of the failure to obtain financing shall constitute a breach of this Agreement by the Purchaser (including its obligations pursuant to Section 2.3).

### SECTION 5.20. Insurance Matters.

      (a)     The Purchaser acknowledges and agrees that coverage of the assets, tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of, the Business (excluding the EMEA Business) (collectively, the "**Covered Assets and Persons**") under all current or previous insurance policies of the Sellers and their Affiliates, including, without limitation, all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, contaminated products and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing (the "**Seller Insurance Policies**") shall cease as of the Closing Date and the Covered Assets and Persons will be deleted in all respects as insured (or additional insured, as the case may be) under all Seller Insurance Policies. Except as expressly provided herein, the Sellers shall retain any rights to, including any right to any proceeds received in respect of, any claim pending as of the date hereof or made after the date hereof under any Seller Insurance Policy, even if such claims relates to the capital assets or properties of the Business (excluding the EMEA Business).

      (b)     If after the Closing Date the Purchaser or the Sellers (or any of their respective Affiliates) reasonably require any information regarding claim data or other information pertaining to a claim or an occurrence reasonably likely to give rise to a claim (including any pre-Closing claims under the Seller Insurance Policies that are to be covered under the retrospective component of the new insurance policy) in order to give notice to or make filings with insurance carriers or claims adjustors or administrators or to adjust, administer or otherwise manage a claim, then the Sellers or the Purchaser, as the case may be, shall cause such information to be supplied to the other (or their designee), to the extent such information is in their possession and control or can be reasonably obtained by the Sellers or the Purchaser (or their respective Affiliates), as applicable, promptly upon a written request therefore. If the Purchaser desires access to, and utilization of, claims data or information maintained by an insurance company or other Third Party in respect of any claim (including any pre-Closing claims under any Seller Insurance Policies that are covered under the retrospective component of the new insurance policies), the Purchaser shall be exclusively responsible for acquiring from such insurance company or Third Party, at the Purchaser's sole cost and expense, the rights necessary to permit them to obtain access to and utilization of such claims data or information. If any Third Party requires the consent of the Sellers or any of their Affiliates to the disclosure of such information, such consent shall not be unreasonably withheld.

      (c)     Prior to Closing, the Sellers shall maintain the Seller Insurance Policies, or in the event any such policies are cancelled or otherwise terminated, shall obtain other substantially comparable insurance policies that have the same coverage limits and

deductibles or self-retention amounts.  In respect of insurance claims relating to the Owned Equipment (excluding for the purposes of this Section 5.20(c), any fixtures and improvements forming part of the Carling Property) or the premises subject to a Real Estate Agreement (except for the Carling Property) occurring prior to Closing, the following provisions shall apply:

    (i)     The Sellers shall make and diligently pursue any applicable insurance claims related to damage or destruction to any Owned Equipment wherever located.

    (ii)    If and to the extent that any Owned Equipment, wherever located, is destroyed or damaged prior to Closing, and is not replaced or repaired or restored to its condition prior to such damage or destruction, then at Closing, the Sellers shall pay to the Purchaser the amount of any net insurance proceeds received (or which would have been received had the Sellers maintained the Seller Insurance Policies) in respect of such Owned Equipment that have not been applied to repair, replacement or restoration, as applicable, and assign any such claim and the rights to receive the proceeds of any such claim that has not yet been finally adjusted.  In the event that insurance proceeds would have been available but for the Sellers' failure to maintain the Seller Insurance Policies, or due to the rights of any superior lender, then in such event, the Purchase Price shall be reduced by an amount equal to the cost of repair, or, if destroyed or damaged beyond repair, by an amount equal to the cost of replacing the Owned Equipment so damaged or destroyed with equipment of comparable age and condition.

    (iii)    Except in respect of the Carling Property, if and to the extent that any leasehold improvements at any premises subject to a Real Estate Agreement are destroyed or damaged prior to Closing, then to the extent of the receipt of insurance proceeds relating to such damage or destruction by the Sellers or which would have been received had the Sellers complied with the Seller Insurance Policies, or tenant's insurance requirements under the applicable Lease, as applicable (but excluding any proceeds related to business interruption insurance or related to any part of any premises in the applicable building not forming part of the premises subject to a Real Estate Agreement) the Sellers shall be responsible to the extent required under the terms of the applicable Lease, to utilize such insurance proceeds received to restore the applicable improvements and leasehold improvements in accordance with the provisions of the applicable Lease.  To the extent that any Real Property which is the subject of a Real Estate Agreement is destroyed or damaged after Closing, the applicable terms of the applicable Real Estate Agreement shall apply; and to the extent that the subject Real Estate Agreement provides that it is the responsibility of the landlord to repair or restore any destruction or damage to real or personal property, the Sellers shall make and diligently pursue any applicable claims against the landlord related to such damage or destruction.

    (d)    If and to the extent that the Carling Property is destroyed or damaged prior to Closing and the Purchaser does not elect to terminate this Agreement pursuant to

96

Section 10.1(f), hereof, then to the extent of the Sellers' receipt of insurance proceeds relating to such damage or destruction or which would have been received had the Seller maintained the Seller Insurance Policies, (but excluding any proceeds related to business interruption insurance), and subject to the rights of any superior landlord or mortgagee in respect of the Carling Property, the Sellers shall be responsible to the extent required under the terms of the Carling Property Lease Agreements (as if such Lease Agreements were in effect prior to Closing and as if the landlord were required to restore tenant improvements in the same manner as other improvements) to restore the applicable improvements and fixtures to a condition substantially comparable to the condition prior to such damage or destruction. In the event that (i) insurance proceeds are not immediately available to the Sellers on Closing for purposes of the repair and restoration of the Carling Property (including any fixtures and tenant improvements forming a part thereof); or (ii) insurance proceeds would have been available but for the Sellers' failure to maintain the Seller Insurance Policies, or due to the rights of any superior landlord or mortgagee, the Purchaser may withhold from the Purchase Price due on Closing and pay into the Escrow Account an amount equivalent to the aggregate cost of repairing such damage and restoring the Carling Property (including any fixtures and improvements forming a part thereof) to a condition substantially comparable to the condition prior to such damage or destruction (such cost to be determined by an independent and qualified architect or engineer mutually acceptable to the Sellers and Purchaser, each acting reasonably). The provisions of Article II.C of the Real Estate Terms and Conditions shall apply mutatis mutandis in respect of these escrow amounts and the completion of the repair and restoration works. To the extent that the Carling Property is destroyed or damaged after Closing, the terms of the Carling Property Lease Agreements shall apply.

### SECTION 5.21. Sellers Deposits, Guarantees and Other Credit Support of the Business.

(a)     Following the Closing, the Purchaser shall, or shall cause the applicable Designated Purchaser to, cooperate with the Sellers to procure the return and/or release by the applicable counterparty, as soon as reasonably practicable, of any lease security deposits given by the Sellers under any Leases that are Assigned Contracts or any deposits, bonds or other security posted in connection with Assigned Contracts and that are set forth in Section 5.21(a) of the Sellers Disclosure Schedule (which such Section of the Sellers Disclosure Schedule may be updated by the Sellers upon notice to the Purchaser up until three (3) Business Days prior to the Closing Date) (the "**Security Deposits**"), including where required by the applicable counterparty, offering to post such Security Deposits on terms and conditions no less favorable than offered to such Seller by such counterparty. Except as required by the immediately preceding sentence, the Purchaser shall in no event be required to provide any replacement financial security or any financial security or other deposits with respect to any premises leased pursuant to any lease or sublease arrangement with any Seller, all of which shall be the sole responsibility of the Seller.

(b)     The Purchaser shall, or shall cause the applicable Designated Purchaser to, hold the Sellers and their Affiliates harmless from and against any and all Losses suffered by the Sellers and their Affiliates resulting from, or relating to, the failure of the Purchaser or the applicable Designated Purchaser, as the case may be, to procure the return and/or release of the Security Deposits to the relevant Seller in accordance with Section

5.21(a); provided, however, that (i) the Purchaser shall have no liability to the Sellers and their Affiliates pursuant to this Section 5.21(b) unless the Sellers and their Affiliates assign to the Purchaser all of the Sellers' and their Affiliates' right, title and interest in the unreturned Security Deposits and (ii) the Purchaser's liability to the Sellers and their Affiliates shall be limited, in each case, to the amount of such Security Deposits.

     **SECTION 5.22.  Use of Sellers' Trademarks.**  Except as expressly provided in the Trademark License Agreement, as of the Closing Date, the Purchaser shall not have the right to use the name "Nortel" or any Trademarks owned by the Sellers or any of their Affiliates or any other mark employing the word "Nortel" or any part or variation of any of the foregoing or any confusingly similar Trademarks to any of the foregoing (collectively, the **"Sellers' Trademarks"**).

     **SECTION 5.23.  Accessible Information.**  After the Closing, the Purchaser shall have the right to reasonably request from the Main Sellers copies of all books, records, files, documentation and sales literature (other than Tax records and Employee Records, except as provided in Sections 5.6(d) and 7.4(d)) in the possession or under control of the Sellers and held or used in the Business (other than records to the extent prohibited by applicable Law), to which the Purchaser in good faith determines it needs access for *bona fide* business or legal purposes. The Sellers shall use commercially reasonable efforts to, or cause their Respective Affiliates to use commercially reasonable efforts to, provide such copies to the Purchaser (at the Purchaser's expense) as soon as reasonably practicable; provided, that the Sellers shall be allowed to redact any such requested document in order to delete any information and data relating to business segments of any such Seller and its Respective Affiliates not included in the Business; provided, further, that nothing herein shall require the Sellers to (i) disclose any information to the Purchaser if such information disclosure would jeopardize any attorney-client or legal privilege or (ii) contravene any applicable Law, fiduciary duty or agreement (including any confidentiality agreement to which the Sellers or any of their Affiliates is a party); it being understood, that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement).

     **SECTION 5.24.  Maintenance of Books and Records.**  After the Closing, each Primary Party shall, and shall cause its Affiliates to, preserve, until at least the third (3rd) anniversary of the Closing Date (or, in the case of Tax records (including VAT records), such later date as may be required by Law), all pre-Closing Date records to the extent relating to the Business possessed or to be possessed by such Person. After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable request from any Primary Party or its representatives, the other Primary Party shall, and/or shall cause the Person holding such records to, (a) provide to the requesting Primary Party or its representatives reasonable access to such records during normal business hours and (b) permit the requesting Primary Party or its representatives to make copies of such records, in each case at no cost to the requesting Primary Party or its representatives (other than for reasonable out-of-pocket expenses). In addition, in the event that the financial statements of the Business are audited for any period prior to the Closing Date, upon execution of a customary access letter if required, the requesting Primary Party and its representatives (including their outside accountants) shall be granted access to all relevant documents and information in connection with the requesting Primary Party completing the audit of its accounts for the 2009 fiscal year; provided, however,

that nothing herein shall require the non-requesting Primary Party to disclose any information to the requesting Primary Party if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement (it being understood that the non-requesting Primary Party shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the requesting Primary Party to occur without so jeopardizing privilege or contravening such Law, duty or agreement). Such records may be sought under this Section 5.24 for any reasonable purpose, including to the extent reasonably required in connection with accounting, litigation, federal securities disclosure or other similar needs of the requesting Primary Party (other than claims between the Primary Parties or any of their respective Subsidiaries under this Agreement or any Ancillary Agreement). Notwithstanding the foregoing, any and all such records may be destroyed by the non-requesting Primary Party if the non-requesting Primary Party sends to the requesting Primary Party written notice of its intent to destroy such records, specifying in reasonable detail the contents of the records to be destroyed; (i) such records may then be destroyed after the 60th day following such notice unless the requesting Primary Party notify the destroying party that the requesting Primary Party desire to obtain possession of such records, in which event the non-requesting Primary Party shall transfer or cause to be transferred the records to the requesting Primary Party and the requesting Primary Party shall pay all reasonable expenses of the non-requesting Primary Party in connection therewith, and (ii) neither Primary Party shall be required to provide the other Party access to, or copies of any of its Tax records.

   **SECTION 5.25.  Certain Ancillary Agreements.**  The Primary Parties shall use their commercially reasonable efforts to:

   (a)     promptly negotiate in good faith with the relevant contract manufacturers and finalize the terms of the Contract Manufacturing Inventory Agreements based on the term sheet attached hereto as Exhibit 1.1;

   (b)     promptly negotiate in good faith with the LGN Joint Venture with respect to the LGN/Korea Distribution Agreement;

   (c)     promptly negotiate in good faith with NETAS with respect to the NETAS Distribution Agreement;

   (d)     negotiate in good faith with the relevant counterparties with respect to the Mutual Development Agreement, the Seller Supply Agreement, the NGS Distribution Agreement and the EFA Development Agreement;

   (e)     negotiate in good faith with respect to any Subcontract Agreement;

   (f)     on or before the Closing and subject to the completion prior to Closing of the negotiation of each such agreement to the mutual satisfaction of each party thereto, enter into the Contract Manufacturing Inventory Agreements, the LGN/Korea Distribution Agreement and the NETAS Distribution Agreement, the Mutual Development Agreement, the Seller Supply Agreement, the NGS Distribution Agreement and the EFA Development Agreement, each as negotiated and finalized pursuant to this Section 5.25; and

Notwithstanding the foregoing, the Primary Parties shall have no obligation to enter into any of the agreements described in this Section 5.25 unless each of them are satisfied, in their sole and absolute discretion with the terms thereof and it shall not be a breach of this Agreement to fail to enter into such agreements before, on or after the Closing Date; provided however, that the Parties acknowledge that the failure to enter into any such Agreement shall not be deemed a failure of any condition precedent to any Party's obligations hereunder.  In the event that the Purchaser is unable prior to the Closing to negotiate terms and conditions for the Seller Supply Agreement that are satisfactory to it in its sole discretion, the Purchaser may by written notice to the Sellers given by January 18, 2010 elect to require that the Sellers purchase such amount of the components and other products intended to be supplied under the Seller Supply Agreement and such components and other products shall be transferred to the Purchaser as part of the Owned Inventory hereunder.

**SECTION 5.26.  Additional Financial Statements.**  The Sellers shall use commercially reasonable efforts to cause KPMG (as their independent accountants) to complete the audit of the combined carve-out (A) balance sheets for the Business at December 31, 2007 and 2008, (B) related statements of earnings and cash flows of the Business for the fiscal years ended December 31, 2007 and 2008, and (C) balance sheet for the Business at September 30, 2009, and (D) the related statements of earnings and cash flows of the Business for the nine (9) month period ending on September 30, 2009 and (E) only if the Closing Date is February 12, 2010 or later, a balance sheet for the Business at December 31, 2009 and related statements of earnings and cash flows of the Business for the fiscal year ended December 31, 2009 (any such balance sheets and statements of earnings and cash flows, collectively, the "**Audited Financial Statements**") and to deliver to the Purchaser as promptly as practicable, and in any event within three (3) Business Days of receipt thereof the Audited Financial Statements.  The Sellers shall use commercially reasonable efforts to prepare and furnish the Purchaser with any other financial and other pertinent information regarding the Business as may be reasonably requested by the Purchaser, including all financial statements (including, to the extent required, unaudited combined carve-out financial statements of the Business as of the end of and for the nine (9) month period ended September 30, 2008, the "**Unaudited September 30, 2008 Financial Statements**") and financial data, in each case of the type required by Regulation S-X and Regulation S-K under the Securities Act or in order for the Purchaser to comply with its financial reporting obligations as established by the SEC under the Exchange Act.  The Sellers shall provide the Purchaser and its representatives with such cooperation and information as they shall reasonably request in connection with the Purchaser's compliance with its obligations under Section 8.1(a) hereof, or in order for the Purchaser to comply with its obligations as established by the SEC under the Securities Act and the Exchange Act.

**SECTION 5.27.  Securities Compliance.**  The Purchaser shall notify NASDAQ of the listing of the Shares as required by the NASDAQ listing rules prior to the Closing Date.

**SECTION 5.28.  Transition Services.**  Section 5.28 of the Sellers Disclosure Schedule addresses certain matters related to the Transition Services Agreement and the services to be performed by certain Affiliates of the Sellers for the Purchaser.  The Parties agree that the terms and conditions set forth in Section 5.28 of the Sellers Disclosure Schedule are incorporated by reference herein and form a part of this Agreement.

**SECTION 5.29. <u>Standstill Period</u>.**

(a)    From the date of this Agreement until the entry of the U.S. Bidding Procedures Order, and from the date of the conclusion of the Auction until the Closing Date or termination of this Agreement, neither any Seller nor any Affiliate of any Seller shall, directly or indirectly through any of its authorized representatives, (i) solicit, initiate or encourage or engage in discussions or negotiations with respect to any proposal or offer from any Person (other than the Purchaser or its Affiliates) relating to in each case any acquisition, divestiture, recapitalization, business combination or reorganization of or involving all or a substantial part of the business and operations of the Business (a **"Competing Transaction"**), (ii) furnish any information with respect to, or participate in, or assist, any effort or attempt by any Person to do or seek a Competing Transaction, (iii) execute any letter of intent or agreement providing for a Competing Transaction, or (iv) seek or support Bankruptcy Court approval of a motion or Order inconsistent with the transactions contemplated herein, <u>provided</u>, <u>however</u>, that nothing contained herein shall prohibit the Sellers from providing any Person with the bidding procedures for the sale of the Business and related documents, answering questions about the bidding procedures for the sale of the Business, announcing the execution of this Agreement or the Auction or selecting an Alternate Bid (as such term is defined in the U.S. Bidding Procedures Order) at Auction and obtaining approval of such Alternate Bid as an alternate bid; and <u>provided</u> that nothing herein shall limit the Sellers' ability to negotiate, file, seek approval of or consummate a Sponsored Reorganization Plan prior to the completion of the Auction.

(b)    Notwithstanding the foregoing, the Sellers may provide continued access to written due diligence materials about the Business in an electronic data room (including written responses to requests for information made after the date hereof), to only such Person or Persons that (i) have access to such electronic data room as of the date hereof, and (ii) have satisfied the requirements of paragraph (a) of the "Participation Requirements" of the U.S. Bidding Procedures Order within ten (10) Business Days from the date hereof, it being understood that, during such ten (10) Business Day period, the Sellers will be allowed to (x) request such Persons to enter into amendments to their existing confidentiality agreements in order to render them compliant with the requirements of the bidding procedures for the sale of the Business, (y) discuss and negotiate such amendments with those Persons, and (z) execute such amendments, and each such action shall not constitute a breach of this Section 5.29, <u>provided</u>, <u>however</u>, that the Sellers must provide the Purchaser at least equivalent access to all such written due diligence materials.

(c)    Without prejudice to any other methods or actions that may result in the cure of any breach of this Section 5.29, the Parties acknowledge and agree that in the event that any officer or other employee of any Seller acting alone (without the assistance of outside advisors) in violation of a corporate policy approved by the board of directors of NNC takes an action that constitutes a breach of Section 5.29(a)(i) but does not constitute a breach of any other clause of this Section 5.29, such breach shall be deemed cured in the event such action ceases and one or more of the Sellers notifies the counterparty or counterparties to the potential Competing Transaction in writing that the Sellers will not undertake such Competing Transaction, in each case no later than the fifth (5th) day after the Sellers become aware of such breach (for such purposes excluding the knowledge of the employee or officer whose action constitutes such breach), <u>provided</u> that such action that

constituted the breach did not involve substantive negotiations regarding the terms of such Competing Transaction.

**SECTION 5.30.  Hazardous Materials at the Carling Property.**

(a)    The Sellers acknowledge that the Purchaser and any Designated Purchaser did not cause or contribute to, and shall not be liable or responsible for, any currently or formerly existing Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property prior to or at the Closing Date.

(b)    The Sellers that own and lease the Carling Property and the Purchaser agree that the relevant Sellers and the Purchaser or a Designated Purchaser shall include in the Carling Property Lease Agreements: (i) an acknowledgement that the Purchaser or a Designated Purchaser did not cause or contribute to, and shall not be liable or responsible for, the currently or formerly existing Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property prior to or at the commencement of the Carling Property Lease Agreements; (ii) an indemnity by the relevant Sellers in favor of the Purchaser and any Designated Purchaser for (A) any Liabilities, including any Order, arising (directly or indirectly) out of or relating to any currently or formerly existing Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property prior to or at the commencement of the Carling Property Lease Agreements and (B) if and to the extent caused by Sellers, any Liabilities, including any Order, arising (directly or indirectly) out of or relating to any Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property; and (iii) an indemnity by the Purchaser or Designated Purchaser, as the case may be, in favor of the Sellers  for, if and to the extent caused by the Purchaser or Designated Purchaser, as the case may be, any Liabilities, if and to the extent caused by the Purchaser or Designated Purchaser, as the case may be, including any Order, arising (directly or indirectly) out of or relating to any Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property after the commencement of the Carling Property Lease Agreements.

**SECTION 5.31.  Montreal Premises and Other Real Estate.**  Before, on and after the Closing Date, the Parties shall take such actions as are contemplated by, and comply with, the Real Estate Terms and Conditions which shall be incorporated herein by reference.  Without limiting the foregoing, at the Closing, the Purchaser and/or a Designated Purchaser and each applicable Seller shall enter into an Occupancy Agreement with respect to each Critical Location (identified in the Real Estate Terms and Conditions) and shall enter into a license agreement with respect to each Short-Term Licensed Property location which the Purchaser shall be licensed to occupy following the Closing Date, in each case on the terms and conditions specified in the Real Estate Terms and Conditions.

**SECTION 5.32.  Right to Exclude.**

(a)    At any time prior to the date of the Auction, the Purchaser may elect, by written notice to the Main Sellers, but without any effect on the Purchase Price or the Purchaser's obligation to offer employment to at least the numbers of Employees set out in Section 7.1.1, to designate as Excluded Assets all of the assets, interests and rights of any

Other Seller other than any Other Seller with respect to which it has previously made an election under Section 2.2.3 if it is the case that, absent such election, by consummating the transactions contemplated hereby, the Purchaser or a Designated Purchaser would be reasonably likely to succeed to Liabilities of such Other Seller that are not Assumed Liabilities hereunder, or Liabilities of such Other Seller would be reasonably likely to be transferred to, or assumed by, the Purchaser or a Designated Purchaser, whether by operation of Law or otherwise (including, without limitation, any Liability for Taxes) (any such Other Seller so designated by the Purchaser, an "**Excluded Other Seller**".  For the avoidance of doubt, if the Purchaser makes an election under this Section 5.32 with respect to any Excluded Other Seller, the provisions of Section 2.2.3 shall not apply to such Excluded Other Seller.  Upon designation of any Excluded Other Seller, the assets, interests and rights of such Excluded Other Seller shall be Excluded Assets and any Liabilities of such Excluded Other Seller or otherwise relating to such Excluded Assets shall be Excluded Liabilities, and such Excluded Other Seller shall not be a Party to this Agreement, shall not be an Other Seller, and shall have no rights or obligations hereunder, provided that each Excluded Other Seller shall remain bound by the provisions of Article XI.  In addition to the foregoing, following the designation of an Excluded Other Seller by the Purchaser, no sublease and no license or other arrangement pursuant to the Real Estate Terms and Conditions shall be required to be entered into with respect to any premises related to such Excluded Other Seller's operations prior to the date of the Purchaser's election.  For the avoidance of doubt, the designation of assets, interests or rights in any country as Excluded Assets shall not in any way prevent the Purchaser or any of its Affiliates from engaging in the Business (defined as if such assets, interests or rights were not Excluded Assets) in such country either before or after the Closing.  If a TSA Seller becomes an Excluded Other Seller pursuant to this Section 5.32, such entity shall not be required to be a party to the Transition Services Agreement.  For the avoidance of doubt, the failure of any TSA Seller to become party to the Transition Services Agreement shall not in any way diminish the obligations of the remaining TSA Sellers to provide, or to cause one or more of the Providers to provide, all Services (as defined in the Transition Services Agreement).  Notwithstanding anything herein to the contrary, the Parties agree that neither the Included Services nor the Extra Services shall include any service currently provided by an Excluded Seller unless such service can reasonably be provided by the TSA Sellers without materially changing or burdening the operations of the TSA Sellers.

(b)      The Main Sellers agree that, as of the Closing, (i) neither any Seller nor any Seller's Affiliate will be a party to any Contract with any Excluded Seller that will restrict the Purchaser or a Designated Purchaser, in any material respect, from engaging after the Closing·in any business activity relating to the Business in the country where such Excluded Seller is located or organized; and (ii) the Sellers and their Affiliates will cease to supply Products or Services or provide other assistance to an Excluded Seller with respect to the Business (except to the extent required in order to allow such Excluded Seller to continue to perform any obligations under (x) a contract with one of its customers existing as of the date hereof, or (y) a contract with one of its customers entered into after the date hereof but before Closing that was entered into in the Ordinary Course, in each case which such Excluded Seller is required by such contract to perform until the earliest of (A) the expiration of such contract (without giving effect to any extension of the term thereof other than at the option of the counterparty thereto), (B) the earliest date on which such Excluded

103

Seller has the right to terminate such contract without penalty or (C) the date on which such contract is terminated by the counterparty thereto; provided that the Purchaser and its Affiliates shall be under no obligation to make Products or Services (or any other products or services) available to the Sellers or their Affiliates or provide other assistance in connection therewith) and the Purchaser and its Affiliates will have no obligation to supply Products or Services (or any other products or services) or provide other assistance to the Excluded Sellers; provided that, notwithstanding clauses (i) and (ii) above, the Purchaser or a Designated Purchaser will, if requested to do so, perform any Subcontract Agreement that it enters into pursuant to Section 5.15(c) at the request of an Excluded Seller and the Sellers may be a conduit through which the Purchaser supplies Products or Services to an Excluded Seller.

SECTION 5.33.  **Purchaser Management Presentation.**  On or before October 31, 2009, the Chief Financial Officer, General Counsel and Vice President of Business Development of the Purchaser will deliver a management presentation with respect to the Purchaser and its business to a reasonable number of representatives of the Sellers, the EMEA Sellers, the Joint Administrators, the Monitor and their financial advisors and such other Persons as the Sellers may notify the Purchaser for the sole purpose of permitting them to form an independent view of the value of the Shares.  Each participant in such management presentation shall be required to execute a customary nondisclosure agreement with respect to all non-public information presented at such presentation.  The scope of such management presentation will be agreed in advance between the Purchaser, the Sellers and the EMEA Sellers, each acting reasonably.

SECTION 5.34.  **Patent Assignments.**  Prior to the Closing Date, the Purchaser shall notify the Sellers in writing of any defects in title affecting any of the transferred Patents and the Sellers shall take, as soon as reasonably practicable thereafter, all reasonable steps necessary to ensure that NNL is the assignee on record in the relevant government registry or patent office, as applicable, for all transferred Patents and to correct all material defects in title affecting any of the transferred Patents that are still in force in the relevant jurisdiction.

SECTION 5.35.  **India.**  Section 5.35 of the Sellers Disclosure Schedule addresses certain matters related to the transfer of assets that are used by Nortel Networks Singapore Pte. Limited, Nortel Networks India International Inc. and Nortel Networks (India) Private Limited in the Business in India.  The Parties agree that the terms and conditions set forth in Section 5.35 of the Sellers Disclosure Schedule are incorporated by reference herein and form a part of this Agreement.

### ARTICLE VI
### TAX MATTERS

SECTION 6.1.  **Transfer Taxes.**

(a)       The Parties agree that the Purchase Price is exclusive of any Transfer Taxes.  The Purchaser shall (on behalf of itself and the Designated Purchasers) promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that are properly imposed upon or payable or collectible or incurred in connection with the purchase by the Purchaser (or a Designated Purchaser) of the Assets under this Agreement and in connection

with the other Transaction Documents including, for greater certainty, any stamp, documentary, recording, filing and similar Taxes that may be imposed upon or payable or collectible or incurred in connection with the execution of this Agreement and any other Transaction Documents; provided that if any such Taxes are required to be collected, remitted, or paid by the Sellers or any Subsidiary of the Sellers or any agent thereof (as requested by the Sellers or any Subsidiary of the Sellers), they shall be paid by the Purchaser to the Sellers or any Subsidiary of the Sellers or any such agent, as applicable, at the Closing, as applicable, or thereafter as requested of or by the Sellers. For greater certainty, the Purchaser shall remain liable in respect of any Transfer Taxes for which it is liable under the terms hereof regardless of the date that the Assets purchased under this Agreement are removed by the Purchaser or its agents from the premises of the Sellers or any of the Sellers' suppliers. Upon request from a Seller, the Purchaser shall provide to such Seller an original receipt (or other such evidence as shall be reasonably satisfactory to such Seller) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1(a).

(b)    If the Purchaser or any Designated Purchaser wishes to claim or elect any exemption relating to, or a reduced rate of, Transfer Taxes, in connection with this Agreement or the other Transaction Documents (other than the EMEA Asset Sale Agreement, with respect to which Transfer Taxes are separately addressed therein), the Purchaser or any Designated Purchaser, as the case may be, acting reasonably and in good faith, shall be solely responsible for determining that such exemption, reduction or election (a "**Transfer Tax Reduction Determination**") applies. In such case, the Purchaser or the Designated Purchaser, as the case may be, shall provide the Sellers prior to Closing with its permit number, GST or other similar registration numbers and/or any appropriate certificate of exemption, election and/or other document or evidence to support the claimed entitlement to such exemption by the Purchaser or such Designated Purchaser, as the case may be, it being understood that Purchaser shall remain responsible for any Transfer Taxes whether or not shown due on such Tax Return and shall indemnify and hold harmless the Sellers and their respective officers and directors from any Losses arising out of or resulting from the Transfer Tax Reduction Determination, including without limitation, any Tax, interest, penalty or sanction. The Sellers shall, if applicable, agree to make a joint election under Section 167 of the Excise Tax Act (Canada) and other similar Canadian provincial sales tax elections. If the Purchaser or any Designated Purchaser pays any Transfer Taxes pursuant to this Section 6.1 and a Seller thereafter becomes entitled to a refund for, or a reduction in Liability for, Transfer Taxes payable by such Seller in respect of such Transfer Taxes paid by the Purchaser or a Designated Purchaser, then such Seller shall promptly reimburse the Purchaser or Designated Purchaser for an amount equal to such refund or reduction (including any interest paid in connection with such refund or reduction and net of reasonable out of pocket expenses incurred in obtaining such refund or reduction).

(c)    Each of the Sellers shall cooperate with the Purchaser and its Affiliates in complying with the reporting requirements relating to any Transfer Taxes under applicable Law with respect to this Agreement and the Transaction Documents, and shall make reasonable efforts to cooperate to the extent necessary to obtain any exemption from, or any reduction in amount or rate of, Transfer Taxes sought by Purchaser or any Designated Purchaser. For the avoidance of doubt, such cooperation shall include any applicable Seller using reasonable efforts to obtain and/or furnish to the Purchaser or any Designated

Purchaser any applicable information that is reasonably requested by Purchaser or any Designated Purchaser in connection with its efforts to obtain any exemption or reduction in amount or rate of Transfer Taxes, including through the provision of invoices, receipts or other documentation requested by Purchaser or any Designated Purchaser to document the payment of or establish the entitlement to a recovery or refund of, such Transfer Taxes or the eligibility of the transactions to qualify as a "transfer of a going concern" under applicable Law. Each Seller that is required by Law to collect VAT in connection with this Agreement and the Transaction Documents shall, prior to and on the Closing Date, be registered for VAT purposes in any jurisdiction applicable to such Seller.

(d)     Each Tax Return with respect to Transfer Taxes (a "**Transfer Tax Return**") imposed upon or payable or collectible or incurred in connection with the purchase by the Purchaser (or a Designated Purchaser) of the Assets under this Agreement shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to applicable Law. Any Transfer Tax Returns prepared by the Sellers pursuant to this Section 6.1(d) shall be made available to the Purchaser at least five (5) Business Days before such Tax Returns are due to be filed. The Purchaser shall be entitled to review and comment on any Transfer Tax Return prepared by the Sellers prior to making any payment in respect thereof, and the Sellers shall incorporate any reasonable comments received from Purchaser at least three (3) Business Days before such Tax Returns are due to be filed, it being understood that the Purchaser shall remain responsible for any Transfer Taxes whether or not shown due on such Tax Return. Subject to Section 6.1(a), the Purchaser shall pay to the Sellers the amount of any Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.1(d) at least one (1) Business Day before such Transfer Tax becomes due and payable.

(e)     With respect to any provision of this Article VI that by its terms applies to another Transaction Document, such provision shall not apply to the other Transaction Document to the extent that such other Transaction Document contains a contrary provision or contains a provision that is inconsistent with the relevant provision of this Article VI. A reference to a Transaction Document in this Article VI shall not include the EMEA Asset Sale Agreement or the schedules thereto.

**SECTION 6.2. Withholding Taxes.** Subject to Section 2.4, the Purchasers and Designated Purchasers shall be entitled to deduct and withhold from the Purchase Price and other payments made under this Agreement and the Transaction Documents (other than the Transition Services Agreement, with respect to which withholding Taxes are separately addressed therein) such amounts as the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold under the Code or under any provision of state, local or foreign Tax Law, with respect to the making of such payment. To the extent such amounts are so withheld by the Purchaser or a Designated Purchaser, as the case may be, such withheld amounts shall be treated for all purposes of this Agreement and the Transaction Documents as having been paid to the relevant Seller in respect of whom such deduction and withholding was made by such Purchaser or Designated Purchaser. If any of the Parties learns of any obligation to deduct and withhold from the Purchase Price and other payments made under this Agreement or the Transaction Documents (other than the Transition Services Agreement, with respect to which withholding Taxes are separately addressed therein) on or prior to the Closing Date, then (i) in the case of a Seller, such Seller shall promptly provide reasonable notice of such obligation to the Purchaser,

and (ii) in the case of the Purchaser, the Purchaser shall promptly provide reasonable notice of such obligation to the Sellers. The Parties shall cooperate in good faith to minimize the amounts that the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold. In connection therewith, the Parties shall cooperate to obtain any applicable forms, certificates, or other documentation or information that is reasonably requested by a Party to obtain any exemption from, or reduced rate of, withholding on any payments made pursuant to this Agreement and the other Transaction Documents.

SECTION 6.3. **Tax Characterization of Payments Under This Agreement.** The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than any interest payments) as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

SECTION 6.4. **Apportionment of Taxes.**

(a)     Except as otherwise provided in this Article VI, (i) the Main Sellers shall and shall cause the Other Sellers, as the case may be, to bear all Taxes of any kind relating to the Assets or the conduct or operation of the Business (excluding the EMEA Business), in each case, for all Tax periods or portions thereof ending on or before the Closing Date and (ii) the Purchaser shall and shall cause the Designated Purchasers to bear all Taxes of any kind relating to the Assets or the conduct or operation of the Business (excluding the EMEA Business) for all Tax periods or portions thereof beginning after the Closing Date. The Sellers shall pay, when due, all Taxes apportioned to the Sellers under this Section 6.4(a) that could result in a liability of a Purchaser or Designated Purchaser as a successor or transferee or a Lien on any of the Assets in the hands of the Purchaser or Designated Purchaser. For purposes of the preceding sentence, a Tax shall be considered due when required to be paid after assessment (it being understood that Sellers shall have the right to pursue any action for reconsideration or appeal that under applicable law tolls the time for the payment of the disputed Tax and prevents the Tax Authority from availing itself of its collection remedies); provided that no Tax shall be considered due for purposes of this subsection to the extent payment thereof is excused under applicable Bankruptcy Law.

(b)

(i)     For purposes of this Agreement, any Taxes for a "**Straddle Period**" (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of the period beginning after the Closing Date, respectively. The amount of any Taxes based on or measured by income or receipts of the Business (excluding the EMEA Business) shall be allocated between the Pre-Closing Taxable Period and the Post-Closing Taxable Period on a closing-of-the-books basis. The amount of other Taxes shall be allocated between portions of a Straddle Period in the following manner: (a) in the case of a Tax imposed in respect of property (excluding, for the avoidance of doubt, any income Tax) and that applies rateably to a Straddle Period, the amount

107

of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (b) in the case of sales, value-added and similar transaction-based Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be allocated to the portion of the Straddle Period in which the relevant transaction occurred.

   (ii) In the case where the parties do not file their own separate Tax Return for any Straddle Period under applicable Law, the party legally obligated to file any Tax Return for a Straddle Period (the "**Filing Party**") shall timely and accurately prepare and file such Tax Return and timely pay all Taxes due and payable on such Tax Return. Promptly upon the filing of any Tax Return for a Straddle Period, the party filing such Tax Return shall provide a copy of such Tax Return to the Purchaser or Sellers, as the case may be, of the Assets to which such Tax Return relates, (the "**Non-Filing Party**") along with a calculation of the allocation of the Taxes shown to be due on such Tax Return between the Filing Party and the Non-Filing Party pursuant to this Section 6.4(b). Within ten (10) Business Days of the receipt of such Tax Return, the Non-Filing party shall, unless it timely objects to the calculation of the apportioned Tax based upon the principles set forth in this Section 6.4(b), pay to the Filing Party the amount shown in the calculation to be due by the Non-Filing Party. If the Non-Filing Party objects to the calculation of the apportioned Tax as prepared by the Filing Party in writing within ten (10) Business Days of the receipt of such Tax Return, the Filing Party and the Non-Filing Party shall negotiate in good faith a resolution of the calculation and the Non-Filing Party shall promptly pay to the Filing Party the amount of the apportioned Tax as finally resolved. If after five (5) Business Days of negotiation, the Parties cannot agree upon the apportioned Tax amount, they shall promptly submit the matter to the Accounting Arbitrator for final resolution as promptly as practical and the Accounting Arbitrator's decision shall be final and binding upon the Parties as to the amount of any disputed apportioned Tax, and the Non-Filing Party shall promptly pay to the Filing Party the amount of the disputed apportioned Tax as determined by the Accounting Arbitrator. The costs of the Accounting Arbitrator shall be borne by the Party whose position is less correct in the judgment of the Accounting Arbitrator.

   (c) Prior to, on and after the Closing Date, each of the Sellers shall reasonably cooperate with the Purchaser and its Affiliates (i) to obtain any applicable forms, certificates, or other information and (ii) to comply with clearance procedures established under applicable Law in the jurisdictions in which the Assets are being transferred hereunder to establish, quantify, reduce or eliminate the extent to which the Purchaser or any Designated Purchaser could be liable for any Taxes of the Sellers that are Excluded Liabilities, including by reason of a Lien being filed on the Assets or as a result of such Purchaser or Designated Purchaser having liability as a transferee or successor under applicable Law; provided that such cooperation shall not include a liquidation or restructuring of a Seller or any business of a Seller, and provided further that such cooperation would not: (i) in the Sellers' opinion, acting reasonably and in good faith, result

in the imposition on the Sellers of any director's or officer's liability or Tax liability (other than any amount necessary to pay any Taxes of the Sellers that are Excluded Liabilities that Sellers are required to pay (as being due) under Section 6.4(a) at the time such cooperation is provided and any interest, penalties and additions to Tax thereon) that is not fully and promptly reimbursed by the Purchaser and its Affiliates; or (ii) cause any of the Sellers to bear any other out-of-pocket cost or expense that is not fully and promptly reimbursed by the Purchaser and its Affiliates; and provided further that such cooperation would not violate applicable Law, including Bankruptcy Laws as applied to the relevant Seller(s) and any order or other legal obligation of a Seller arising out of the Bankruptcy Proceedings. For the avoidance of doubt, such cooperation shall include taking actions necessary to comply with Tax clearance procedures established under applicable Law in Argentina and Hong Kong.

### SECTION 6.5.  Tax Records.

(a)     Notwithstanding the provisions of Section 5.6(a), Section 5.23 and Section 5.24, but subject to the provisions of Section 5.6(e) (i) after the date of the Auction, the Purchaser and the Designated Purchasers, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to Taxes with respect to the Assets, Assumed Liabilities or the Business (excluding the EMEA Business) for all periods prior to and including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party reasonably needs access to the records in the possession of a second party relating to the Assets, Assumed Liabilities or the Business (excluding the EMEA Business) for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or any other investigative demand by any Tax Authority or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow Representatives of the other party access to such records during regular business hours and the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be necessary or convenient. The obligation to cooperate pursuant to this Section 6.5(a) shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

(b)     On or prior to Closing, the Sellers shall cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for ten (10) years in accordance with an escrow agreement between the Purchaser, the Sellers and the Records Custodian, in form satisfactory to the Purchaser and the Main Sellers. The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by Tax advisors of any purchaser ("**Tax Credit Purchaser**") of the scientific research and experimental development tax credits of the Sellers under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser. The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or Nortel Networks Technology Corporation ("**NNTC**") as qualified expenditures on scientific research and

experimental development for purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**").

(c)    The Purchaser shall use reasonable efforts to make available to the relevant Taxing Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Taxing Authority of the characterization of expenditures by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser.

(d)    The Purchaser shall have no obligation to provide any access under this provision unless the Seller (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

**SECTION 6.6. <u>Cooperation</u>.**

(a)    The Sellers and the Purchaser shall reasonably cooperate with each other in connection with the conduct of any Tax audit, investigation, dispute, or appeal relating to any Pre-Closing Taxable Period.

(b)    Notwithstanding the provisions of Section 5.6, but subject to the provisions of Section 5.6(e) and, solely with respect to the subject matter addressed therein, subject to Section 6.5(a), from and after the date hereof through the Closing Date, (i) the Sellers shall reasonably cooperate with the Purchaser and its Affiliates to develop and provide such information as is reasonably requested and reasonably necessary to permit the Purchaser and its Affiliates to identify and timely comply with their respective obligations under applicable Tax Laws arising out of this Agreement and the other Transaction Documents and (ii) the Sellers shall reasonably cooperate with the Purchaser and its Affiliates to structure and carry out the transactions between the Sellers, on the one hand, and the Purchaser and its Affiliates, on the other hand, contemplated by this Agreement and the other Transaction Documents in a tax-efficient manner (including, without limitation, to limit withholding Taxes and irrecoverable VAT with respect to the transactions contemplated by this Agreement and the Transaction Documents); <u>provided</u> that any such cooperation to be provided in (i) and (ii) above would not include a liquidation or restructuring of a Seller or any business of a Seller, would not result in the imposition on any Seller of any additional Tax Liability or cause any Seller to bear any additional out-of-pocket cost or expense, in each case which is not fully and promptly reimbursed by the Purchaser and its Affiliates and such cooperation would not violate applicable law, including Bankruptcy Laws as applicable to the relevant Seller(s) and any order or other legal obligation of a Seller arising out of the Bankruptcy Proceedings

**SECTION 6.7. <u>North American Tax Escrow</u>.**

(a)    In the event that any Tax Authority shall (A) make any claim against any Purchaser, Designated Purchaser, or any of their Affiliates (a "**Purchaser Party**") for any Taxes that are Excluded Liabilities of any Seller or (B) have in its favor a Lien on any of the Assets arising out of the non-payment of any Taxes that are Excluded Liabilities of a Seller (any Taxes described in (A) and (B) above hereby are referred to collectively as "**Excluded Taxes**"), such Purchaser Party shall be entitled to recover all Losses arising out of or in connection with such Excluded Taxes promptly (in accordance with the following provisions) by obtaining cash from the Tax Escrow Amount in an amount equal to the aggregate amount of such Losses, provided that (i) the aggregate amount to be recovered under this Section 6.7 in respect of such Losses shall not exceed the Tax Escrow Amount (plus any accrued interest on the Tax Escrow Amount); and (ii) the only Losses recoverable under this Section 6.7 shall be Losses incurred by a Purchaser Party after the earlier of the date on which a Tax Authority has made a claim described in (A) above or registered or imposed a Lien described in (B) above, as applicable.

(b)    If a claim for Losses under Section 6.7(a) (a "**Tax Claim**") is to be made by a Purchaser Party, the Purchaser shall give written notice (a "**Claim Notice**") on behalf of such Purchaser Party to the Main Sellers promptly after such Purchaser Party becomes aware that a Tax Authority has made a claim against it for any Excluded Taxes or that such Taxes have given rise to a Lien described in clause (B) of subsection (a) above, as applicable, stating, with reasonable specificity, the basis for the Tax Claim, and including a copy of all relevant documents received from the relevant Tax Authority. In the event that any Purchaser Party is entitled to recover the amount of any such Losses from the Tax Escrow Amount, the Purchaser and the Main Sellers shall issue joint written instructions to the Escrow Agent authorizing distribution of the amount of such Losses to such Purchaser Party and such Purchaser Party shall be responsible for paying over to the relevant Tax Authority the amount of Excluded Taxes distributed to it from the Tax Escrow Amount to the extent it has not already done so at the time of the distribution of such amount from such fund and shall provide Sellers with such written evidence as is reasonably requested in writing to confirm that payment to the relevant Tax Authority has been duly made.

(c)    Upon delivery by the Sellers to the Purchaser prior to Closing of a certificate or other documentation issued by the Hong Kong Inland Revenue Department reasonably satisfactory in form and content to the Purchaser confirming that Nortel Networks (Asia) Limited has no outstanding Tax Liabilities, the Tax Escrow Amount payable on Closing to the Escrow Agent shall be reduced by $5,000,000.

(d)    Upon delivery by the Sellers to the Purchaser after Closing of a certificate or other documentation issued by the Hong Kong Inland Revenue Department reasonably satisfactory in form and content to the Purchaser confirming that Nortel Networks (Asia) Limited has no outstanding tax liabilities, and provided that a Purchaser Party has not served a valid Claim Notice to the Main Sellers before that time in respect of a Tax Claim relating to Excluded Taxes of Nortel Networks (Asia) Limited, the Purchaser and the Main Sellers shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, $5,000,000 out of the Tax Escrow Amount (or such lesser amount remaining therein at that time).

(e)     On the date that is the first Business Day after the third anniversary of the Closing Date, the Purchaser and the Main Sellers shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, any remaining portion of the Tax Escrow Amount (including any accrued interest thereon) in excess of an amount equal to the aggregate of all Tax Claims which have been asserted prior to such date evidenced by one or more Claim Notices and which remain pending and unresolved on such date. Thereafter, as soon as reasonably practicable after the final resolution of any such Tax Claims, the Purchaser and the Main Sellers shall issue joint written instructions to the Escrow Agent to release to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, any remaining portion of the Tax Escrow Amount (including any accrued interest thereon).

(f)     In the event that a Claim Notice is served, the Purchaser shall take such steps as are commercially reasonable to mitigate or otherwise defend the assessment(s) made by the relevant Tax Authority. In the event that a payment is made to a Purchaser Party pursuant to this Section 6.7, and subsequently a Purchaser Party becomes entitled to and receives a refund of Excluded Taxes (in whole or in part), then the Purchaser shall, or shall cause the relevant Purchaser Party to, promptly pay to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, an amount equal to such refund (including any interest paid in connection with such refund), net of reasonable out-of-pocket expenses incurred by the Purchaser Party in obtaining such refund, unless (i) such refund is received prior to the third anniversary of the Closing Date or (ii) at the time the refund is received, the Tax Escrow Amount is less than the sum of the Tax Claims that are evidenced by one or more Claim Notices and which remain pending and unresolved on such date, then, in each case, the Purchaser Party shall pay the net amount of such refund to the Escrow Agent to be added to the Tax Escrow Amount.

(g)     Notwithstanding anything to the contrary in this Agreement (including, without limitation, the provisions of Section 11.1 of this Agreement as applied to provisions other than those contained in this Article VI), recourse to the Tax Escrow Amount under this Section 6.7 shall be the sole and exclusive remedy available to the Purchaser and any Designated Purchaser following the Closing in respect of any liability for Taxes that are Excluded Liabilities of a Seller or any liability for Taxes that give rise to any Lien on any Assets.

**SECTION 6.8.  EMEA Tax Escrow.**

(a)     In the event that any Tax Authority shall make any claim against Purchaser or any EMEA Designated Purchaser or any of their Affiliates (an "**EMEA Purchaser Party**") for (A) any Taxes that are EMEA Excluded Liabilities of any EMEA Seller or (B) any Succession Tax Liabilities or (C) any Succession Tax Lien (any Taxes described in (A) and (B) and (C) above are hereby are referred to collectively as "**EMEA Excluded Taxes**"), such EMEA Purchaser Party shall be entitled to recover all Losses arising out of or in connection with such EMEA Excluded Taxes promptly (in accordance with the following provisions) by obtaining cash from the EMEA Tax Escrow Amount in an amount equal to the aggregate amount of such Losses, provided that: (i) the aggregate amount to be recovered under this Section 6.8 in respect of such Losses shall not exceed the EMEA Tax Escrow Amount (plus any accrued interest on the EMEA Tax Escrow

112

Amount); (ii) the only Losses recoverable under this Section 6.8 shall be Losses incurred by an EMEA Purchaser Party after a Tax Authority has made a claim described in (A), (B) or (C) above, as applicable; and (iii) no claim shall be allowed by any EMEA Purchaser Party in respect of Italian Excluded Taxes other than pursuant to Section 6.9 below.

(b)    If a claim for Losses under subsection (a) (an "**EMEA Tax Claim**") is to be made by an EMEA Purchaser Party, the Purchaser shall give written notice (an "**EMEA Tax Claim Notice**") on behalf of such EMEA Purchaser Party to the Joint Administrators promptly after such EMEA Purchaser Party becomes aware that a Tax Authority has made a claim against it for any EMEA Excluded Taxes or that such Taxes have given rise to any Succession Tax Lien for which recovery is sought under this Section 6.8, stating, with reasonable specificity, the basis for the EMEA Tax Claim and the amount of EMEA Excluded Taxes claimed, and including a copy of all relevant documents received from the relevant Tax Authority.  In the event that any EMEA Purchaser Party is entitled to recover the amount of any such Losses from the EMEA Tax Escrow Amount, the Purchaser and the Joint Administrators  shall issue joint written instructions to the Escrow Agent authorizing distribution of the amount of such Loss to such EMEA Purchaser Party and such EMEA Purchaser Party shall be responsible for paying over to the relevant Tax Authority the amount of such EMEA Excluded Taxes distributed to it from the EMEA Tax Escrow Amount to the extent it has not already done so at the time of the distribution of such amount from such fund, and shall provide the Joint Administrators with such written evidence as is reasonably requested in writing to confirm that payment to the relevant Tax Authority has been duly made.

(c)    On the date that is the first Business Day after the third anniversary of the Closing Date, the Purchaser and the Joint Administrators shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, any remaining portion of the EMEA Tax Escrow Amount (including any accrued interest thereon) in excess of an amount equal to the aggregate of all EMEA Tax Claims which have been asserted prior to such date evidenced by one or more EMEA Tax Claim Notices and which remain pending and unresolved on such date.  Thereafter, as soon as reasonably practicable after the final resolution of all such EMEA Tax Claim(s), the Purchaser and the Joint Administrators shall issue joint written instructions to the Escrow Agent to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, the remaining portion of the EMEA Tax Escrow Amount (including any accrued interest thereon).

(d)    In the event that an EMEA Claim Notice is served, the Purchaser shall take such steps as are commercially reasonable to mitigate or otherwise defend the assessment(s) made by the relevant Tax Authority.  In the event that a payment is made to an EMEA Purchaser Party pursuant to this Section 6.8, and subsequently an EMEA Purchaser Party or any Affiliate becomes entitled to and receives a refund of amounts in respect of EMEA Excluded Taxes, then the Purchaser shall or shall procure that the relevant EMEA Purchaser Party shall promptly pay to Distribution Agent, on behalf of the Sellers and EMEA Sellers, an amount equal to such refund (including any interest paid in connection with such refund), net of reasonable out-of-pocket expenses incurred by the EMEA Purchaser Party in obtaining such refund, unless (i) such refund is received prior to the third anniversary of the Closing Date or (ii) at the time the refund is received,  the

113

EMEA Tax Escrow Amount is less than the sum of the EMEA Tax Claims that are evidenced by one or more EMEA Tax Claim Notices and which remain pending and unresolved on such date, then, in each case, the Purchaser Party shall pay the net amount of such refund to the Escrow Agent to be added to the EMEA Tax Escrow Amount.

**SECTION 6.9. Italian Tax Escrow.**

(a)  In the event that any Tax Authority in Italy shall make any claim against the Purchaser or any EMEA Designated Purchaser or any of their Affiliates (an "**Italian Purchaser Party**") for (A) any Taxes that are EMEA Excluded Liabilities of any EMEA Seller or (B) any Succession Tax Liabilities or (C) any Succession Tax Lien (any such Taxes are hereby are referred as "**Italian Excluded Taxes**"), such Italian Purchaser Party shall be entitled to recover all Losses arising out of or in connection with such Italian Excluded Taxes promptly (in accordance with the following provisions) by obtaining cash from the Italian Tax Escrow Amount in an amount equal to the aggregate amount of such Losses, provided that: (i) the aggregate amount to be recovered under this Section 6.9 in respect of such Losses shall not exceed the Italian Tax Escrow Amount (plus any accrued interest on the Italian Tax Escrow Amount); and (ii) the only Losses recoverable under this Section 6.9 shall be Losses incurred by an Italian Purchaser Party after a Tax Authority in Italy has made a claim.

(b)  If a claim for Losses under subsection (a) (an "**Italian Tax Claim**") is to be made by an Italian Purchaser Party, the Purchaser shall give written notice (an "**Italian Tax Claim Notice**") on behalf of such Italian Purchaser Party to the Joint Administrators promptly after such Italian Purchaser Party becomes aware that a Tax Authority in Italy has made a claim against it for Italian Excluded Taxes  or that such Taxes have given rise to any Succession Tax Lien for which recovery is sought under this Section 6.9, stating, with reasonable specificity, the basis for the Italian Tax Claim and the amount of Italian Excluded Taxes claimed, and including a copy of all relevant documents received from the relevant Tax Authority.  In the event that any Italian Purchaser Party is entitled to recover the amount of any such Losses from the Italian Tax Escrow Amount, the Purchaser and the Joint Administrators  shall issue joint written instructions to the Escrow Agent authorizing distribution of the amount of such Loss to such Italian Purchaser Party and such Italian Purchaser Party shall be responsible for paying over to the relevant Tax Authority the amount of such Italian Excluded Taxes distributed to it from the Italian Tax Escrow Amount to the extent it has not already done so at the time of the distribution of such amount from such fund, and shall provide the Joint Administrators with such written evidence as is reasonably requested in writing to confirm that payment to the relevant Tax Authority has been duly made.

(c)  On the date that is the first Business Day after the third anniversary of the Closing Date, the Purchaser and the Joint Administrators shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, any remaining portion of the Italian Tax Escrow Amount (including any accrued interest thereon) in excess of an amount equal to the aggregate of all Italian Tax Claims which have been asserted prior to such date evidenced by one or more Italian Tax Claim Notices and which remain pending and unresolved on such date.  Thereafter, as soon as reasonably practicable after the final resolution of all such Italian Tax Claim(s), the

114

Purchaser and the Joint Administrators shall issue joint written instructions to the Escrow Agent to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, the remaining portion of the Italian Tax Escrow Amount (including any accrued interest thereon).

(d)    In the event that an Italian Claim Notice is served, the Purchaser shall take such steps as are commercially reasonable to mitigate or otherwise defend the assessment(s) made by the relevant Tax Authority.  In the event that a payment is made to an Italian Purchaser Party pursuant to this Section 6.9, and subsequently an Italian Purchaser Party or any Affiliate becomes entitled to and receives a refund of amounts in respect of Italian Excluded Taxes, then the Purchaser shall or shall procure that the relevant Italian Purchaser Party shall promptly pay to Distribution Agent, on behalf of the Sellers and EMEA Sellers, an amount equal to such refund (including any interest paid in connection with such refund), net of reasonable out-of-pocket expenses incurred by the Italian Purchaser Party in obtaining such refund, unless (i) such refund is received prior to the third anniversary of the Closing Date (other than where, prior to such refund being received, the provisions at Section 6.9(f) have applied) or (ii) at the time the refund is received,  the Italian Tax Escrow Amount is less than the sum of the Italian Tax Claims that are evidenced by one or more Italian Tax Claim Notices and which remain pending and unresolved on such date, then, in each case, the Purchaser Party shall pay the net amount of such refund to the Escrow Agent to be added to the Italian Tax Escrow Amount.

(e)    Upon delivery by Nortel Italy to the Purchaser prior to Closing of a certificate, ruling or other documentation issued by the Tax Authorities in Italy (including but not limited to a response to the Interpellation addressed to the regional department of the Revenue Office of Lombardy as submitted by Nortel Italy on 4 August 2009) reasonably satisfactory in form and content to the Purchaser (acting in good faith), and, if such certificate, ruling or other documentation does not address Succession Tax Liens,  such other written evidence as is reasonably satisfactory in form and content to the Purchaser (acting in good faith) addressing Succession Tax Liens, together confirming either:

(i)    that Nortel Italy does not have any liabilities for Tax that could become Succession Tax Liabilities or Succession Tax Liens; or

(ii)    that it is not possible (whether as a result of Bankruptcy Proceedings or otherwise) for liabilities for Tax of Nortel Italy to become Succession Tax Liabilities or Succession Tax Liens,

then the Italian Escrow Amount payable on Closing to the Escrow Agent shall be reduced to nil.

(f)    Upon delivery by Nortel Italy to the Purchaser after Closing of a certificate, ruling or other documentation issued by the Tax Authorities in Italy (including but not limited to a response to the Interpellation addressed to the regional department of the Revenue Office of Lombardy as submitted by Nortel Italy on 4 August 2009) reasonably satisfactory in form and content to the Purchaser (acting in good faith) and, if such certificate, ruling or other documentation does not address Succession Tax Liens,  such

other written evidence as is reasonably satisfactory in form and content to the Purchaser (acting in good faith) addressing Succession Tax Liens, together confirming either:

        (i)     that Nortel Italy does not have any liabilities for Tax that could become Succession Tax Liabilities or Succession Tax Liens; or

        (ii)    that it is not possible (whether as a result of Bankruptcy Proceedings or otherwise) for liabilities for Tax of Nortel Italy to become Succession Tax Liabilities or Succession Tax Liens,

then the Purchaser and Joint Administrators shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, any remaining portion of the Italian Tax Escrow Amount (including any accrued interest thereon) in excess of an amount equal to the aggregate of all Italian Tax Claims which have been asserted prior to such date evidenced by one or more Italian Tax Claim Notices and which remain pending and unresolved on such date, provided that as soon as reasonably practicable after the final resolution of each such Italian Tax Claim, the Purchaser and the Joint Administrators shall issue joint written instructions to the Escrow Agent to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, the remaining portion of the Italian Tax Escrow Amount referable to that Italian Tax Claim (including any accrued interest thereon).

## ARTICLE VII
## EMPLOYMENT MATTERS

### SECTION 7.1. Employment Obligations with Respect to Non-Union Employees.

        Except for the provisions of Section 7.1.1(a) and the first three (3) sentences of Section 7.1.2(b)(ii)(B), the provisions of this Section 7.1 shall apply only with respect to Non-Union Employees. Subject to the clarificatory wording in 7.1.1(a) and the provisions relating to the Closing Accrued Vacation and Service Award Amount, the Excess ARD Employees Amount and the Closing Retirement Obligation Amount, the provisions of this Agreement shall not apply to EMEA Employees.

#### 7.1.1. Employment Terms.

        (a)     Within thirty (30) days following the completion of the Auction, the Purchaser shall notify the Sellers of the identity of the Employees on Section 4.10(b) of the Sellers Disclosure Schedule by unique identifier (the "**Identified Employees**") to whom the Purchaser or a Designated Purchaser intends to provide a written offer of employment or notice of continued employment in accordance with applicable Law (each an "**Offer**" and collectively, the "**Offers**"); provided that, promptly after the date hereof, the relevant Sellers have permitted the Purchaser with access to such information as the Purchaser reasonably requires in accordance with Section 5.6(d) and Section 7.4(c) in order to make such identifications (except as prohibited by Law). As soon as reasonably practicable following the latest of the granting of the U.S. Sale Order and the Canadian Approval and Vesting Order, but in any event no later than the time required to provide the Offer Consideration Period described below, the Purchaser shall, or shall cause a Designated Purchaser to,

116

extend a minimum of Two Thousand (2,000) Offers, which number shall include all EMEA Transferring Employees, whose employment shall be governed by the EMEA Asset Sale Agreement (for the avoidance of doubt, no Offers will be required to be made to ARD Transferring Employees whose contracts of employment will transfer to the Purchaser by operation of Law, but the number of EMEA Transferring Employees will be included within the minimum number set forth above, and the terms of Offers made to Non-ARD Transferring Employees will be governed by the EMEA Asset Sale Agreement), plus a sufficient number of Employees equal to, in total, such minimum number, with employment of such Employee who is not an EMEA Employee to take effect as of the Effective Hire Date, as defined below. Such Offers to Employees (who are not EMEA Employees) shall be contingent (i) in the discretion of the Purchaser, on each such Employee passing a background check and, if such Employee is located in the United States, drug screening, in all cases, to the extent permitted and consistent with applicable Law and except with respect to Union Employees, and (ii) in the case of Inactive Employees, upon their return to active status (other than Employees set forth on Section 7.1.1(a) of the Sellers Disclosure Schedule whose employment transfers automatically by operation of Law to the Purchaser or a Designated Purchaser) with the Purchaser or one of its Affiliates within two (2) years following the date of the commencement of the leave or such longer period as provided under applicable Law. The Offers shall be made prior to the Closing in compliance with Section 7.1.1 and shall provide each such Employee with a consideration period prior to the Closing that is no less than two (2) weeks with respect to Employees located in Japan and with respect to Employees located in other countries, one week, or such longer period as required by applicable Law (the "**Offer Consideration Period**"). The Sellers shall have the right to review any form Offer with respect to a particular jurisdiction (and any Offer that deviates in any material respect from the form Offer with respect to the relevant country) made pursuant to Section 7.1.1 prior to it being sent to any Employee. As soon as reasonably practicable following the Sellers' receipt from the Purchaser of the notice containing the Identified Employees (as required pursuant to the first sentence of this Section 7.1.1(a)) but in all events prior to Closing, the Sellers shall take any and all action permitted under applicable Law legally necessary to cause the termination of employment, effective prior to the Closing, of each Employee set forth on Section 4.10(b) who is not an Identified Employee but only to the extent such employment would otherwise transfer to the Purchaser or a Designated Purchaser by operation of Law.

(b)    For Employees employed in Canada and the United States, the Offers shall be in accordance with applicable Law and provide terms and conditions of employment as of such Employee's Effective Hire Date that will consist of (i) either the same annual base salary (whether on a salary, wage or hourly rate basis) and annual incentive plan target amount for such Employee as set out in the Employee Information or a substantially comparable overall compensation package (taking into account any equity-based compensation that may be offered by Purchaser or its Affiliates to such Employee) to such annual base salary and annual incentive plan target amount set out in the Employee Information, (ii) a location of employment reasonably close to such Employee's current location as set out in the Employee Information,  and (iii) employee benefits that are substantially comparable in the aggregate to (A) employee benefits received by such Employee from the Sellers as of the date hereof or (B) employee benefits provided by the Purchaser (or any of its Affiliates) to its similarly situated employees.

117

(c)      For all Employees set forth in Section 4.10(b) of the Sellers Disclosure Schedule (other than Employees in Canada and the United States) in any country set forth on Section 7.1.1(c) of the Seller Disclosure Schedule where the number of Employees in such country is ten (10) or more, the Purchaser's Offer to Employees in such country shall be in accordance with applicable Law and on terms and conditions not less favorable in the aggregate than those terms and conditions received by the Employees as of the date hereof as disclosed in Section 4.10(a) and Section 4.10(b) of the Sellers Disclosure Schedule, subject to certain adjustments to conform to the Purchaser's (or its Affiliates') standard employment policies where legally possible; provided, that, following the Employee Transfer Date, nothing shall prohibit the Purchaser or any Designated Purchaser from making changes to such terms and conditions of employment that are generally applicable and broadly based across the Purchaser's or Designated Purchaser's employee population in the particular country; provided, further that in no event other than as required by applicable Law, shall the Purchaser or a Designated Purchaser be required to (i) provide defined benefit pension plans, or (ii) take into account defined benefit pension benefits, post retirement health and welfare benefits, severance or retention, the KEIP or KERP, equity compensation, non-qualified deferred compensation plans, non-qualified retirement plans or retirement allowance plans of the Sellers or any of their Affiliates when determining whether terms and conditions of employment are no less favorable in the aggregate.

(d)      For Employees other than Employees referred to in Section 7.1.1(b) or Section 7.1.1(c), the Purchaser's Offer to such Employee shall be in accordance with applicable Law and on such terms and conditions of employment reasonably competitive with those received by similarly situated employees in the local market.

(e)      Employees whose employment transfers automatically by operation of Law to the Purchaser or a Designated Purchaser will have their terms and conditions of employment governed by such applicable Laws, but at a minimum shall receive terms and conditions of employment that are no less favorable than those employees in Section 7.1.1(c) or Section 7.1.1(d), as applicable, based on the number of the Sellers' Employees in the country where such Employees are employed, except with respect to Employees located in the Province of Quebec, Canada, as indicated in the Employee Information, who shall be treated in accordance with 7.1.1(b).

(f)      Any Employee who accepts an Offer and commences employment with the Purchaser or a Designated Purchaser pursuant to this Agreement, and any Employees whose employment transfers by operation of Law, shall each be deemed to be a Transferred Employee for all purposes of this Agreement.  Inactive Employees shall remain employed by the relevant Seller until their release in the Ordinary Course to return to active status with the Purchaser or one of its Affiliates within two (2) years following the date of the commencement of the leave or such longer period as provided under applicable Law. Visa Employees and Seconded Employees shall remain employed by the relevant Seller under the terms and conditions of the Loaned Employee Agreement.  The Purchaser or a Designated Purchaser shall use commercially reasonable efforts beginning immediately after the date of the Auction  to obtain, prior to the Closing Date, and beyond if necessary, at Purchaser's cost, such visas or permits as are required for Purchaser or a Designated Purchaser to employ any Visa Employee who accepts an Offer effective as of the Effective Hire Date.  The Purchaser or Designated Purchaser shall use commercially reasonable

118

efforts beginning promptly following the notification to Sellers of the Identified Employees (as provided for in Section 7.1.1(a)) to resolve, as soon as reasonably practicable following such notification, at the Purchaser's cost, any impediments to Purchaser's or Designated Purchaser's employment of Employees in countries set forth in Section 1.1(m) of the Sellers Disclosure Schedule.

(g)     The Effective Hire Date for Employees is (i) the Employee Transfer Date for those Employees other than Inactive Employees, Seconded Employees and Visa Employees, (ii) 12:01 a.m. on the first Business Day following the release to return to active employment from leave for all Inactive Employees and (iii) the date specified in the Loaned Employee Agreement with respect to Visa Employees and Seconded Employees, as applicable. As of the Effective Hire Date and, except as otherwise provided herein, for a period of not less than twelve (12) months after the Closing Date, the employment of Non-Union Employees shall be, at a minimum, on the terms and conditions set forth in Section 7.1.

(h)     With respect to all Employees (other than EMEA Employees and Union Employees) to whom the Purchaser extends an Offer pursuant to Section 7.1.1 but who do not accept or who reject such an Offer (each, a "**Rejecting Employee**"), the Purchaser shall reimburse the Sellers for payments made by Sellers in an aggregate amount up to $2,000,000 in respect of pay in lieu of notice (including WARN Act notice) and/or severance liability relating to such Rejecting Employees (the "**Rejecting Employees Liability Limit**"); provided that any such payments shall have been made by the Sellers as required by applicable Law or the Seller Employee Plans listed in Section 4.10(a)(i) of the Sellers Disclosure Schedule or pursuant to a Contract in effect as of the date hereof, and a copy of which will be delivered to the Purchaser at the time such liability is incurred. Notwithstanding anything to the contrary in this Agreement, the Sellers shall retain, and neither the Purchaser nor any of its Affiliates shall assume any Liability whatsoever related to or arising from the Rejecting Employees in respect of pay in lieu of notice (including WARN Act notice) and/or severance liability, including without limitations, any Liability relating to or arising from Claims with respect to a change in the terms of employment made with respect to any Rejecting Employee in the Province of Quebec) to the extent such Liabilities exceed the Rejecting Employees Liability Limit.

### 7.1.2.  Employee Benefits.

(a)     The Purchaser or a Designated Purchaser shall, and shall cause its relevant Affiliates to, recognize the service date of each Transferred Employee as set out in the Employee Information for all purposes other than benefit accrual under any defined benefit pension plan, and except as would result in a duplication of benefits.

(b)     Without limiting the generality of the foregoing, the Purchaser shall, or shall cause its relevant Affiliates to, provide the following benefits to Transferred Employees:

(i)     For the period beginning on the Closing Date and ending on the date that is twelve (12) months from the Closing Date, the Purchaser shall, or shall cause its relevant Affiliates to, provide Transferred Employees with

119

severance payments and severance benefits that are substantially similar to the severance payments and severance benefits provided to similarly situated employees of the Purchaser or the Designated Purchaser.

(ii)

(A)    The Sellers shall pay the amount of compensation with respect to the accrued and unused vacation hours that is due and owing to the Transferred Employees (other than Transferred Employees whose accrued and unused vacation is specified in Section 7.1.2(b)(ii)(B) of the Sellers Disclosure Schedule (the **"Specified Transferred Employees"**)), up to their Effective Hire Date, to such Transferred Employees by the date required under applicable Law. The Purchaser will, and will cause the relevant Designated Purchasers to, make commercially reasonable efforts to accommodate time off requests of such Transferred Employees until such time as they accrue sufficient paid time off under the Purchaser Employee Plans to address their vacation plans.

(B)    Section 7.1.2(b)(ii)(B) of the Sellers Disclosure Schedule sets forth the amount of accrued and unused vacation hours that are due and owing to the Specified Transferred Employees as of the date hereof and updated by the Sellers as of the Closing Date. The Purchaser shall, or shall cause its relevant Affiliates to, grant each Specified Transferred Employee paid time off in an amount equal to such accrued unused vacation hours for such Specified Transferred Employee as set forth in Section 7.1.2(b)(ii)(B) of the Sellers Disclosure Schedule. If such Specified Transferred Employee terminates employment with the Purchaser or an Affiliate of the Purchaser prior to receiving such paid time off, as described above, the Purchaser shall pay such Specified Transferred Employee an amount equal to any such unused paid time off upon such employment termination. Under the vacation policy of the Purchaser or an Affiliate of the Purchaser, the vacation accrual rate of each Transferred Employee on and after the Effective Hire Date shall be equal to either, in the sole discretion of the Purchaser or its Affiliate, the Transferred Employee's vacation accrual rate (i) as reflected in the Employee Information or (ii) under the vacation policy of the Purchaser or its relevant Affiliate applicable to similarly situated employees after taking into account such Transferred Employee's service, if applicable, as provided in Section 7.1.2(a). For the avoidance of doubt, such vacation accrual rate applicable to Specified Transferred Employees shall not be decreased by the Purchaser or its Affiliates as a result of the obligation in this Section 7.1.2(b)(ii)(B) that the Purchaser or its Affiliates grant such Employees accrued and unused vacation hours due and owing as of the Closing Date.

(iii)

(A)    With respect to each Transferred Employee (and his or her eligible dependents, as applicable) in Canada and the United States, the Purchaser or the relevant Purchaser's Affiliates shall (x) waive any eligibility periods, evidence of insurability or pre-existing condition limitations and (y) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such

120

employee, including with respect to his or her dependents, under comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Effective Hire Date occurs, provided that such employee provides documentation of such expenses paid or incurred to the Purchaser or its Affiliates, and in each case to the extent waived or honored under the Seller Employee Plans in which such Transferred Employee participated immediately prior to the Closing and to the extent doing so will not result in the duplication of benefits.

(B)    With respect to each Transferred Employee (and his or her eligible dependents, as applicable) in all countries other than those described in Section 7.1.2(b)(iii)(A), the Purchaser or the relevant Purchaser's Affiliates shall use commercially reasonable efforts to cause the Purchaser Employee Plans to (x) waive any eligibility periods, evidence of insurability or pre-existing condition limitations and (y) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employee, including with respect to his or her dependents, under comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Effective Hire Date occurs, provided that such employee provides documentation of such expenses paid or incurred to the Purchaser or its Affiliates, and in each case to the extent waived or honored under the Seller Employee Plans in which such Transferred Employee participated immediately prior to the Closing and to the extent doing so will not result in the duplication of benefits.

(iv)    The Purchaser or Designated Purchaser shall provide each Transferred Employee employed in:

(A)    Australia, with the benefit of the amount set forth in Section 7.1.2(b)(iv) of the Sellers Disclosure Schedule of long service leave and sick leave, at such time, if any; and

(B)    Pakistan, with the gratuity payment as set forth on Section 7.1.2(b)(iv) of the Sellers Disclosure Schedule provided under applicable Law in Pakistan at such time, if any,

as payment of such amount is due and owing to each such Transferred Employee under applicable Law, taking into account in the calculation of such total payment due, the service of such Transferred Employee as set forth in the Employee Information together with such Transferred Employee's service with the Purchaser on and after the Closing Date. Section 7.1.2(b)(iv) of the Sellers Disclosure Schedule shall be updated no later than ten (10) Business Days prior to the Closing Date to reflect additions or deletions of Identified Employees or other status changes that are not prohibited under Section 5.9.

SECTION 7.2. Employment Obligations with Respect to Union Employees. The provisions of this Section 7.2 shall apply to Union Employees. As of the Closing Date the Purchaser or its relevant Affiliate will be bound by the terms and obligations of the Collective Labor Agreements specified in the Employee Information with respect to the employment of the relevant Union Employees who are Transferred Employees as a successor, assign or purchaser of the relevant Seller. With respect to all Union Employees who are not Identified Employees, the

Purchaser shall reimburse the Sellers for payments made by Sellers in respect of severance liability pursuant to the Collective Labor Agreement or as required by applicable Law relating to such Union Employees; provided, that, the Sellers agree to use commercially reasonable efforts to mitigate the Liabilities associated with the termination of such Union Employees by providing, upon notice from the Purchaser identifying any Union Employee who will not be an Identified Employee, working notice to such Union Employees and, in the case of Union Employees located in the province of Quebec, written notice, and the Minister of Employment and Social Solidarity in the case of a mass or group termination in all material respects in accordance with applicable Law.

**SECTION 7.3. <u>Excluded Employee Liabilities</u>.** For purposes of clarity, the Sellers shall retain, and neither the Purchaser nor any of the Designated Purchasers or Purchaser Employee Plans shall assume, any of the following Liabilities of the Sellers or Seller Employee Plans (the "**Excluded Employee Liabilities**"):

(a)      Liabilities related to the Seller Employee Plans or any employee plans or arrangements related to former employees of the Business (excluding the EMEA Business), including the Sellers' or any of their Affiliates' (excluding the EMEA Sellers) or Seller Employee Plans' obligations to make payments or provide benefit accrued under any Seller Employee Plan, except with respect to the Specified Employee Liabilities or as specified in the Loaned Employee Agreement;

(b)      Any obligation to provide continuation coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to the Employees and/or their qualified beneficiaries with respect to a COBRA qualifying event that occurs prior to such Employees' Effective Hire Date including, for avoidance of doubt, an Employee's termination of employment from the Sellers or their Affiliates;

(c)      Liabilities related to the stock or other equity interests in the Seller or any of its Affiliates;

(d)      Except with respect to the Assumed Liabilities and as provided for in Article VII, Liabilities relating to (i) any Employee's or a former employee's employment or termination of employment with any of the Sellers or their Affiliates, including any severance or similar obligations that may arise as a result of the transfer of an Employee's employment to the Purchaser or one of its Affiliates or as a result of the Employee's refusal of the Purchaser's Offer and any Liabilities that relate to the Inactive Employees', Visa Employees' and Seconded Employees' employment or termination of employment with any of the Sellers or their Affiliates, except as otherwise provided in the Loaned Employee Agreement, (ii) an applicant with respect to potential employment with any of the Sellers or their Affiliates, (iii) the purported class action filed in Ontario Superior Court of Justice under Court file number 08-CV41878CP, (iv) any Action arising on or prior to the Closing filed by any Person in connection with any Employee's employment or the termination thereof with the Sellers, or (v) any Action arising prior to, on or after the Closing relating to or filed by any of the Employees set forth in Section 4.10(b) who are not Identified Employees in connection with any such Employee's employment or termination of employment with the Sellers; and

122

(e)     Any Liabilities with respect to Canadian Union Retirees.

**SECTION 7.4.  Other Employee Covenants.**

(a)     After the date hereof, and subject to each Party's disclosure obligations imposed by Law or by Government Entities and each Party's obligations hereunder, the Purchaser shall not, and shall procure that the Designated Purchasers and any of the Purchaser's Affiliates shall not, issue any announcement or communication to their respective employees or the Employees, prior to consultation with, and the approval of, the Main Sellers (not to be unreasonably withheld or delayed) with respect to this Agreement or any of the transactions contemplated hereby.  If requested, the non-requesting Party shall cooperate with the requesting Party in respect of the development and distribution of any announcement and communication to the employees of the Sellers, including Employees, with respect to this Agreement or any of the transactions contemplated hereby.

(b)     The Purchaser undertakes to keep the Employee Data and any additional information provided to the Purchaser by the Sellers with respect to individually identifiable Employees (collectively, "**Employee Data**") in confidence and agrees that, until the relevant Employee Transfer Date with respect to those Employees who become Transferred Employees, and at all times with respect to those Employees who do not become Transferred Employees:

(i)     the Purchaser shall, and shall cause the Designated Purchasers to, restrict the disclosure of the Employee Data only to such of its employees, agents and advisors as is reasonably necessary for the purposes of complying with its obligations pursuant to this Agreement;

(ii)     the Employee Data shall not be used except for the purposes of complying with the obligations of the Purchaser and the Designated Purchasers pursuant to this Agreement and shall be returned to the Sellers or destroyed, at the Sellers' election, if this Agreement is terminated; and

(iii)     the Purchaser shall, and shall cause the Designated Purchasers to, comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

(c)     The Purchaser and the Sellers shall cooperate with each other to provide for an orderly transition of the Transferred Employees from the Sellers to the Purchaser or the Designated Purchasers, as applicable (including the providing of any information by the Sellers to the Purchaser as may be reasonably requested by Purchaser for purposes of complying with its obligations pursuant to Article VII), subject to Section 5.6(d), and to minimize the disruption to the respective businesses of the Parties resulting from the transactions contemplated hereby.

(d)     Within sixty (60) days following the relevant Effective Hire Date, except to the extent prohibited by applicable data privacy Laws and subject to consent by such employee to be obtained by the Purchaser or Designated Purchaser in his or her Offer (including any consent, if required, to transfer Employee Records across geographical

123

boundaries), or as otherwise required by Law, the Sellers shall provide the Purchaser or the Designated Purchaser with the Employee Records (or a copy thereof) of Transferred Employees other than those Employee Records that constitute Assets pursuant to Section 2.1.1(h) hereof. Further, after the Effective Hire Date, the Purchaser may request in writing an individual Employee Record in relation to a reasonably contemplated employment termination by the Purchaser and, except to the extent prohibited by applicable data privacy Laws and subject to consent by such employee to be obtained by the Purchaser or Designated Purchaser in his or her Offer (including any consent, if required, to transfer Employee Records across geographical boundaries), the Seller shall provide such individual Employee Record within two (2) Business Days. With respect to such Employee Records provided by the Sellers to the Purchaser or Designated Purchasers, in the event that the Sellers reasonably need access to such records for purposes of complying with a subpoena or in connection with any pending or threatened Action, the Purchaser or Designated Purchaser will allow the Sellers reasonable access to such records for the sole purpose of obtaining information for use as aforesaid and will permit the Sellers to make copies thereof as may be necessary or convenient.

(e)    During the Non-Solicitation Period the Sellers shall not, without the advance written consent of the Purchaser, either directly or indirectly solicit for employment or hire any Transferred Employee unless the employment of such employee is involuntarily terminated by the Purchaser or Designated Purchaser prior to such action by the Sellers; provided, however, that nothing in this Section 7.4(e) shall prevent the Sellers from (i) conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such Transferred Employees, or (ii) hiring such Transferred Employees identified through such generalized employment searches.

(f)    During the Non-Solicitation Period, the Purchaser and the Designated Purchasers shall not, without the Sellers' advance written consent, either directly or indirectly solicit for employment (i) any of the employees of the Sellers who are not Employees, unless the employment of such employee is involuntarily terminated by the Sellers prior to such action by the Purchaser or the Designated Purchasers, (ii) any Employees who have rejected their Offer or objected to their transfer of employment to the Purchaser or Designated Purchasers pursuant to this Agreement, or (iii) any Employees to whom the Purchaser or any Designated Purchaser have not made an Offer; provided, however, that nothing in this Section 7.4(f) shall prevent the Purchaser or the Designated Purchasers from (A) conducting generalized employment searches, including placing *bona fide* public advertisements, that are not specifically targeted at such employees or former employees of the Sellers, or (B) hiring such employees or former employees identified through such generalized employment searches; provided, further, that, with respect to any Employee described in clauses (ii) and (iii) above who becomes employed with the Purchaser or a Designated Purchaser (other than by operation of Law) during the ninety-day period following the Closing Date, the Purchaser and the Designated Purchasers shall be required to reimburse the Sellers, if applicable, for any pay in lieu of notice (including WARN Act notice) and/or severance payments to the extent paid by the Sellers to such Employee.

(g)     Neither the Sellers nor any of their Affiliates shall enforce against any Transferred Employee any, non-compete, non-solicit or similar contractual obligations, or otherwise assert, with respect to any such Transferred Employee or the Purchaser or any of its Affiliates, claims that would otherwise prohibit or restrict such Transferred Employee's employment with the Purchaser or any of its Affiliates in the Business.

### SECTION 7.5.  Canadian Pension Plans.

7.5.1. Non-Union Defined Benefit.  As of the relevant Effective Hire Date, each Non-Union Employee who has any entitlement to defined benefits under the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (the "Nortel Plan"), whether such Non-Union Employee was accruing such benefits as of such Effective Hire Date or whether accrual had ceased prior to such date, shall cease to participate actively in such Seller Employee Plan. The Purchaser shall cause all such Non-Union Employees who become Transferred Employees to participate in a defined contribution registered pension plan (the "Canadian Non-Union DC Replacement Plan") to be established by the relevant Designated Purchaser effective as of the day after the Closing Date.  The Purchaser shall cause the Canadian Non-Union DC Replacement Plan to recognize the prior service of such Transferred Employees with the Seller for the purposes of eligibility to participate, vesting and entitlement to benefits.  The Canadian Non-Union DC Replacement Plan shall contain an employer contribution formula of at least 1% of the salary of such Transferred Employees, subject to any applicable Tax Law.  The Designated Purchaser shall maintain the Canadian Non-Union DC Replacement Plan in respect of such Transferred Employees (A) for at least five (5) years after the Closing Date or their respective employment termination dates with the Designated Purchaser or (B) until the wind-up of the Nortel Plan, whichever is earlier, without any adverse amendment. For greater certainty, there shall be no transfer of assets or liabilities from the Nortel Plan to the Canadian Non-Union DC Replacement Plan or any other Purchaser Employee Plan in respect of defined benefit accruals.

7.5.2. Non-Union Defined Contribution.  As of the relevant Effective Hire Date, each Non-Union Employee who participates only in the defined contribution component of the Nortel Plan shall cease to participate actively in, and accrue benefits under, such Seller Employee Plan.  The Purchaser shall cause all such Non-Union Employees to participate in the Canadian Non-Union DC Replacement Plan beginning as of the relevant Effective Hire Date. The Purchaser shall cause the Canadian Non-Union DC Replacement Plan to recognize the prior service of such Transferred Employees with the Seller for the purposes of eligibility to participate, vesting and entitlement to benefits.  The Canadian Non-Union DC Replacement Plan shall contain an employer contribution formula of at least 1% of the salary of such Transferred Employees, subject to any applicable Tax Law.

7.5.3. Union Defined Benefit.  As of the relevant Effective Hire Date, each Union Employee who was accruing defined benefits under the Nortel Networks Negotiated Pension Plan shall cease to participate actively in, and accrue benefits under, such Seller Employee Plan.  The Purchaser shall cause all such Union Employees who become Transferred Employees to participate in a defined benefit registered pension plan (the "Canadian DB Replacement Plan") to be established by the relevant Designated Purchaser effective as of the day after the Closing Date and which shall contain a benefit formula which is no less favorable than the formula in the Nortel Networks Negotiated Pension Plan and which shall otherwise

125

comply with the applicable Collective Labor Agreement. The Purchaser shall cause the Canadian DB Replacement Plan to recognize the prior service of such Transferred Employees with the Seller for the purposes of eligibility to participate, vesting and entitlement to benefits, but not for the purpose of benefit accrual. For greater certainty, there shall be no transfer of assets or liabilities from the Nortel Networks Negotiated Pension Plan to the Canadian DB Replacement Plan or any other Purchaser Employee Plan.

       7.5.4.**Union Defined Contribution.** As of the relevant Effective Hire Date, each Union Employee who participates in the defined contribution component of the Nortel Networks Negotiated Pension Plan shall cease to participate actively in, and accrue benefits under, such plan. The Purchaser shall cause all such Union Employees who become Transferred Employees to participate in a defined contribution registered pension plan (the "**Canadian Union DC Replacement Plan**") to be established by the Purchaser effective as of the day after the Closing Date and which shall comply with the applicable Collective Labor Agreement. The Purchaser shall cause the Canadian Union DC Replacement Plan to recognize the prior service of such Transferred Employees with the Seller for the purposes of eligibility to participate, vesting and entitlement to benefits.

       **SECTION 7.6. Sole Benefit of Sellers and Purchaser.** The terms and provisions of this Article VII are for the sole benefit of the Parties. Nothing contained herein, express or implied (i) shall be construed to establish, amend, or modify any Seller Employee Plan, any Purchaser Employee Plan, or any other benefit plan, program, agreement or arrangement, (ii) shall alter or limit the ability of the Purchaser, the Sellers, or any of their respective Affiliates to amend, modify or terminate any Seller Employee Plan, any Purchaser Employee Plan (other than as provided in Section 7.5), or any other benefit or employment plan, program, agreement or arrangement after the Closing Date, (iii) is intended to confer or shall confer upon any current or former employee any right to employment or continued employment, or constitute or create an employment agreement with any Transferred Employee, or (iv) is intended to confer or shall confer upon any individual or any legal representative of any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees and including collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement.

**ARTICLE VIII**
**REGISTRATION AND SALE OF SHARES**

**SECTION 8.1. Shelf Registration.**

       (a)     Provided that the Sellers have complied with their obligations to deliver the information, including the Audited Financial Statements and Unaudited September 30, 2008 Financial Statements, as may be required by and within the time periods specified in Section 5.26, on or prior to the later of (x) the 30th calendar day following the Closing and (y) sixty (60) days following the receipt of such information and financial statements from the Sellers as are required by the rules and regulations promulgated under the Securities Act in connection with the filing and effectiveness of the Shelf Registration Statement referred to below, the Purchaser shall prepare and file an automatic shelf registration statement on Form S-3 (or other applicable form) (together with any amendments or supplements thereto, the "**Shelf Registration Statement**"), to permit the

126

immediate resale of the Shares under the Securities Act by the Sellers and shall use its commercially reasonable efforts to cause the Shelf Registration Statement to remain continuously effective until the later of (i) one year after the Closing and (ii) when the Shares are no longer subject to the volume limitations set forth in Rule 144(e) of the Securities Act (such period, the "**Effective Period**"); provided that the Purchaser may by written notice to the Distribution Agent immediately suspend the use of the Shelf Registration Statement for:

(i)    any period starting on the date on which additional financial statements for the Business with respect to any interim period that begins after the date of the latest period covered by the Audited Financial Statements but ends prior to the Closing Date and that are not then included in the Shelf Registration Statement and any financial statements for the corresponding period of the preceding fiscal year that, in each case, are required by the rules and regulations promulgated under the Securities Act to be included or incorporated by reference in the Shelf Registration Statement (the "**Additional Statements**") and ending three (3) Business Days after the date on which the Sellers have provided such Additional Statements to the Purchaser. The Purchaser shall provide the Main Sellers and their representatives reasonable access to the records and employees of the Business to the extent relevant for the preparation and delivery of any Additional Statements and shall cause the employees of the Business to provide the Main Sellers with such cooperation as they shall reasonably request in connection with their preparation and delivery of any Additional Statements;

(ii)    any period starting on the date that the Purchaser's board of directors (or a committee thereof) concludes that any previously issued financial statements included in, or incorporated by reference into, such Shelf Registration Statement should no longer be relied upon because of an error in such financial statements as addressed in Accounting Principles Board Opinion No. 20, as may be modified, supplemented or succeeded, and ending on the date on which the Purchaser takes corrective action necessary to permit sales under the Shelf Registration Statement to resume; and

(iii)    a period not to exceed twenty (20) consecutive days in any one instance and for a period not to exceed forty-five (45) days in any six (6) month period, without regard to any period of suspension pursuant to the immediately preceding clauses, at any time that the Purchaser becomes engaged in a material business activity or negotiation or any other event has occurred or is anticipated, which activity, negotiation or event is not disclosed in that prospectus and that the Purchaser's board of directors (or a committee thereof) reasonably believes after consultation with counsel should be disclosed therein under applicable Law and determines in good faith that such disclosure would be premature or would adversely affect the Purchaser or its business or prospects; provided, however, that the Purchaser may not suspend the use of the Shelf Registration Statement pursuant to this clause (iii) during the sixty (60) consecutive trading day period commencing on the effective date of the Shelf Registration Statement.

127

The Purchaser will use its reasonable best efforts to ensure that the use of the Shelf Registration Statement may be resumed immediately following any such period of suspension (including by taking such corrective actions as referred to in clause (ii) above).

(b)     At its expense, the Purchaser will use reasonable best efforts during the Effective Period to:

(i)     prepare and file with the SEC such amendments and supplements to the Shelf Registration Statement and the prospectus used in connection therewith as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of the Shares covered by the Shelf Registration Statement;

(ii)     furnish such number of prospectuses and any amendments or supplements thereto, as the Distribution Agent, the Sellers or the EMEA Sellers from time to time may reasonably request;

(iii)     promptly amend the Shelf Registration Statement onto a form the Purchaser is then eligible to use or file a new registration statement on such form and to keep such registration statement effective in accordance with the requirements otherwise applicable under this Agreement if the Purchaser ceases to be a WKSI;

(iv)     make and keep adequate current public information with respect to the Purchaser available in accordance with Rule 144 under the Securities Act; and

(v)     file with the SEC in a timely manner all reports and other documents required of the Purchaser under the Securities Act and the Exchange Act.

**SECTION 8.2.   Indemnification.**

(a)     As a condition to any Seller's or EMEA Seller's inclusion in the Shelf Registration Statement as a selling shareholder, such Seller or EMEA Seller shall, severally and not jointly, indemnify the Purchaser, each person, if any, who controls the Purchaser within the meaning of the Securities Act or the Exchange Act, and each officer or director of the Purchaser, against all losses, claims, damages or liabilities (including any loss, damage, claim or liability under the Securities Act, the Exchange Act, state securities laws or otherwise) arising out of or based upon any untrue statement or alleged untrue statement of any material fact contained in the Shelf Registration Statement, any preliminary prospectus or final prospectus contained therein, or any amendment or supplement thereof, or arising out of or based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading and each agrees, severally and not jointly, to reimburse the Purchaser and each such officer, director and controlling person for any legal or other expenses reasonably incurred by them in connection with investigating or defending such loss, claim, damage, liability or action, provided, however, that any Seller or EMEA Seller shall only be liable hereunder in any such case if and only to the extent that any such loss, claim, damage, liability arises out of or

is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in the Shelf Registration Statement, preliminary prospectus or final prospectus, or any such amendment or supplement, in reliance upon and in conformity with information pertaining to such Seller or EMEA Seller, as such, as furnished in writing to the Purchaser by or on behalf of the Sellers or the EMEA Sellers, respectively, specifically for use in the preparation thereof, provided, further, however, that the liability of each of the Sellers and the EMEA Sellers hereunder shall not in any event exceed the net proceeds received by such Seller or EMEA Seller from the sale of Shares covered by the Shelf Registration Statement. The Purchaser will indemnify and hold harmless each of the Sellers and the EMEA Sellers selling Shares registered on the Shelf Registration Statement and each other person, if any, who controls any of them within the meaning of the Securities Act or Exchange Act, and each officer, director or agent of any of them, against any losses, claims, damages or liabilities (including any loss, damage, claim or liability under the Securities Act, the Exchange Act or state securities Laws) or otherwise to the extent such losses, claims, damages or liabilities arise out of or based upon any untrue statement or alleged untrue statement of any material fact contained in the Shelf Registration Statement, any preliminary prospectus or final prospectus contained therein, or any amendment or supplement thereof, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading and the Purchaser will reimburse each such Seller and EMEA Seller and each such officer, director, agent and controlling person for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action, provided, however, that the Purchaser will not be liable hereunder in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in the Shelf Registration Statement, preliminary prospectus or final prospectus or any such amendment or supplement, in reliance upon and in conformity with information pertaining to any of the Sellers or the EMEA Sellers, as such, as furnished in writing to the Purchaser by or on behalf of any of them specifically for use in the preparation thereof. The Purchaser shall bear all costs and expenses associated with the registration of the Shares as specified in this Section 8.1 and the preparation and filing of the Shelf Registration Statement, the Purchaser's outside counsel, NASDAQ and blue sky registration and filing fees and transfer agents' and registrars' fees and legal fees and disbursements of counsel to the Sellers or the EMEA Sellers.

(b)     If the indemnification provided for in Section 8.2(a) is unavailable to a Person intended to be indemnified under Section 8.2(a) (an "**Indemnitee**") in respect of any losses, damages, claims or liabilities referred to herein, then, as a condition to any Seller's or EMEA Seller's inclusion in the Shelf Registration Statement as a selling shareholder, the Person who was to provide the indemnity under Section 8.2(a) (an "**Indemnitor**"), in lieu of indemnifying such Indemnitee hereunder, shall contribute to the amount paid or payable by such Indemnitee as a result of such losses, damages, claims or liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnitor and the Indemnitee and the Persons acting on behalf of or controlling the Indemnitor or the Indemnitee in connection with the statements or omissions or violations which resulted in such losses, damages, claims or liabilities, as well as any other relevant equitable considerations. If the indemnification described in Section 8.2(a) is unavailable to an

Indemnitee, the relative fault of the Indemnitor and the Indemnitee and Persons acting on behalf of or controlling the Indemnitor or the Indemnitee shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Indemnitor or the Indemnitee or the Persons acting on behalf of or controlling the Indemnitor or the Indemnitee and their relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Indemnitor shall not be required to contribute pursuant to this Section 8.2(b) if there has been a settlement of any proceeding affected without its written consent. No claim against the assets of the Sellers or the EMEA Sellers shall be created by this Section 8.2(b), except as and to the extent permitted by applicable Law. Notwithstanding the foregoing, no Seller or EMEA Seller shall be required to make a contribution in excess of the net amount received by such Seller or EMEA Seller from the sale of the Shares in the offering giving rise to such liability.

SECTION 8.3.  **Trading Limitation.**  The Sellers and EMEA Sellers agree that for any given day, the aggregate amount of Shares sold for the account of the Sellers and the EMEA Sellers collectively, whether pursuant to the Shelf Registration Statement or otherwise, shall not exceed the Daily Trading Limit.

## ARTICLE IX
## CONDITIONS TO THE CLOSING

SECTION 9.1.  **Conditions to Each Party's Obligation.**  The Parties' obligation to effect, and, as to the Purchaser, to cause the relevant Designated Purchasers to effect, the Closing is subject to the satisfaction or the express written waiver of the Primary Parties, at or prior to the Closing, of the following conditions:

(a)    *Regulatory Approvals.*  All Regulatory Approvals shall have been obtained.

(b)    *No Injunctions or Restraints.*  There shall not be in effect any Law or Order of any court or other Government Entity in the U.S., Canada or the United Kingdom (in respect of the transactions contemplated under the EMEA Asset Sale Agreement) prohibiting the consummation of the transactions contemplated hereby and there shall not be any proceeding pending by any Government Entity in the U.S., Canada or the United Kingdom seeking such prohibition.

(c)    *Bidding Procedures Order and Canadian Sales Process Order.*  The U.S. Bidding Procedures Order and the Canadian Sales Process Order shall have been entered and shall not have been stayed as of the Closing Date and such orders shall have become Final Orders.

(d)    *U.S. Sale Order and Canadian Approval and Vesting Order.*  The U.S. Sale Order and the Canadian Approval and Vesting Order shall have been entered and shall not have been stayed and (x) such orders shall have become Final Orders, (y) following Closing any such appeal of either such Order shall become moot under applicable Law or (z) any ruling or order by the court in respect of the issue on appeal could not reasonably be

130

expected to have a material adverse effect on the Purchaser or the Business taken as a whole.

(e)    *Satisfaction of Conditions under EMEA Asset Sale Agreement.* The conditions to Closing of the EMEA Asset Sale Agreement set out in clauses 15.1, 15.2 and 15.3 thereof (other than the condition regarding the satisfaction of the conditions hereunder) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement.

(f)    *Consummation of Closing under EMEA Asset Sale Agreement.* The transaction contemplated by the EMEA Asset Sale Agreement shall be completed simultaneously with the Closing hereunder.

**SECTION 9.2.    Conditions to Sellers' Obligation.** The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Main Sellers), at or prior to the Closing, of each of the following conditions:

(a)    *No breach of Representations and Warranties.* Each of the representations and warranties set forth in Article III, disregarding all materiality and material adverse effect qualifications contained therein, shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that has not had or would not reasonably be expected to have individually or in the aggregate (i) a material adverse effect on the Purchaser's ability to consummate the transactions contemplated hereby or (ii) a material adverse effect on the assets, liabilities, results of operations or condition (financial or otherwise) of the Purchaser and its subsidiaries taken as a whole.

(b)    *No breach of Covenants.* The material covenants, obligations and agreements contained in this Agreement to be complied with by the Purchaser on or before the Closing shall not have been breached in any material respect.

(c)    *Notification of NASDAQ for Listing.* The Purchaser has submitted a notification of listing of the Shares to NASDAQ, such listing to be effective as of the Closing Date, subject to the filing of required documentation, notice of issuance and/or other usual requirements at least fifteen (15) days prior to the Closing Date and has not received any notification of objection from NASDAQ with respect to such listing.

(d)    *Purchaser's Deliveries.* Each of the deliveries required to be made by the Purchaser pursuant to Sections 2.3.2(b), and 2.3.2(e) shall have been so delivered.

**SECTION 9.3.    Conditions to Purchaser's Obligation.** The Purchaser's obligation to effect, and to cause the relevant Designated Purchasers to effect, the Closing shall be subject to the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a)    *No breach of Representations and Warranties.* Each of the representations and warranties set forth in Article IV, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (i) as if

restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except in each case for any failure to be true and correct that has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)   *No breach of Covenants.* The material covenants, obligations and agreements contained in this Agreement to be complied with by the Sellers on or before the Closing shall not have been breached in any material respect, <u>provided</u> that a failure by the Sellers to achieve First Day Ready (as defined in Section 5.28 of the Sellers Disclosure Schedule) on or before April 30, 2010 shall not fall within the scope of this condition.

(c)   *Sellers' Deliveries.* Each of the deliveries required to be made by the Sellers pursuant to Section 2.3.2(f) shall have been so delivered except if such deliverable is a Non-Assigned Contract in respect of which a Consent is outstanding.

(d)   *Financial Statements.* The Sellers shall have delivered to the Purchaser at least five (5) days prior to the Closing Date, the Audited Financial Statements and Unaudited September 30, 2008 Financial Statements as required by and pursuant to Section 5.26 hereof and the Audited Financial Statements and Unaudited September 30, 2008 Financial Statements shall be consistent in all material respects with the Financial Statements for such periods that are included in the Financial Statements (other than to the extent such differences arise from the differences between the carve-out accounting guidelines promulgated by the SEC and the principals used to allocate corporate overhead used by the Sellers in preparing the Financial Statements).

(e)   *Carling Property.* The premises in Lab 10 of the Carling Property to be leased to the Purchaser in accordance with the Carling Property Lease Agreements shall not have been destroyed or substantially damaged.

## ARTICLE X
## TERMINATION

**SECTION 10.1.  <u>Termination</u>.** This Agreement may be terminated at any time prior to the Closing:

(a)   by mutual written consent of the Primary Parties;

(b)   by either Primary Party, upon written notice to the other:

(i)   if the Closing does not take place on or before April 30, 2010.

(ii)   in the event of a material breach by such other Primary Party of such other Primary Party's representations, warranties, agreements or covenants set forth in this Agreement, which breach (x) would result in a failure of the conditions to Closing set forth in Section 9.1(a), Section 9.2(a), Section 9.2(b), Section 9.3(a) or Section 9.3(b), as applicable, and (y) is not cured within 30 days from receipt of a written notice from the non-breaching Primary Party;

132