(iii)   if the U.S. Bidding Procedures Order and the Canadian Sales Process Order are not entered by the respective courts by October 19, 2009 in the case of any termination pursuant to this clause (iii) by the Purchaser or October 30, 2009 in the case of any termination pursuant to this clause (iii) by the Main Sellers, provided however, that the Main Sellers shall only have the right to terminate pursuant to this Section 10.1(b)(iii) if they are not otherwise in breach of Section 5.1 or Section 5.2;

(iv)   if the U.S. Sale Order and Canadian Approval and Vesting Order are not entered into by December 17, 2009;

(v)   upon the entry of an order by the Bankruptcy Court authorizing an Alternative Transaction;

(vi)   if the EMEA Asset Sale Agreement is terminated in accordance with its terms;

(vii)   if a Government Entity in the U.S., Canada or the United Kingdom issues a ruling or Final Order prohibiting the transactions contemplated hereby; or

(viii)   if the Auction is not completed by December 11, 2009;

(c)   by the Purchaser in the event that the Sellers fail to consummate the Closing in breach of Section 2.3, within ten (10) Business Days of a written demand by the Purchaser to consummate the Closing;

(d)   by the Purchaser if any of the Sellers withdraw or seek authority to withdraw the Canadian Approval and Vesting Order Motion or the U.S. Bidding Procedures and Sale Motion, or publicly announce any stand-alone plan of reorganization or plan of arrangement in respect of the Business or liquidation or winding up of all or substantially all of the Assets or the EMEA Assets or any of the Sellers or the EMEA Sellers (or support any such plan filed by any other Person);

(e)   by the Main Sellers upon the entry of an order by the Bankruptcy Court authorizing a Sponsored Reorganization Plan; or

(f)   by the Purchaser if premises in Lab 10 of the Carling Property to be leased to the Purchaser in accordance with the Carling Property Lease Agreements is destroyed or substantially damaged,

provided, however, that the right to terminate this Agreement pursuant to Section 10.1(b)(i), Section 10.1(b)(ii), Section 10.1(b)(iii), Section 10.1(b)(iv), Section 10.1(b)(vi) and Section 10.1(b)(viii) shall not be available to any Party whose breach hereof has been the principal cause of, or has directly resulted in, the event or condition purportedly giving rise to a right to terminate this Agreement under such clauses; and further provided however, that a Party shall not be permitted to terminate under Section 10.1(b)(ii) if such Party is then itself in material breach of this Agreement.

**SECTION 10.2.** **Termination Payments.**

(a)    In the event that this Agreement is terminated by either Primary Party pursuant to Section 10.1(b)(v) or by the Purchaser pursuant to Section 10.1(b)(ii), Section 10.1(c) or Section 10.1(d) or by the Main Sellers pursuant to Section 10.1(b)(iii), Section 10.1(b)(iv), Section 10.1(b)(viii) or Section 10.1(e) or in the event that the EMEA Asset Sale Agreement is terminated by the Purchaser pursuant to clause 15.4.4 or clause 15.4.5 of the EMEA Asset Sale Agreement, then the Sellers shall pay to the Purchaser in immediately available funds, within two (2) Business Days following such termination, a cash fee equal to $10,696,000 (the "**Break-Up Fee**"). Additionally, if this Agreement is terminated by either Party pursuant to Section 10.1 (other than Section 10.1(a) or by Sellers pursuant to Section 10.1(b)(ii) or pursuant to Section 10.1(b)(vi) to the extent that no EMEA Expense Reimbursement (as defined in the EMEA Asset Sale Agreement) is payable under the EMEA Asset Sale Agreement), the Sellers shall pay to the Purchaser an amount in cash equal to the total amount of all reasonable and documented fees, costs and expenses incurred by the Purchaser in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all filing and notification fees, and all fees and expenses of the Purchaser and its Affiliates in an amount not to exceed $3,565,333 (the "**Expense Reimbursement**"). The Sellers acknowledge and agree that the Expense Reimbursement is a reasonable amount given the size and complexity of the transactions contemplated by this Agreement. The Expense Reimbursement shall be paid by wire transfer or other means acceptable to the Purchaser not later than two (2) Business Days following the receipt by the Main Sellers of a written notice from the Purchaser describing the fees and expenses which constitute the Expense Reimbursement in reasonable detail (the "**Expense Reimbursement Notice**").

(b)    Notwithstanding anything to the contrary in this Agreement, the payment of any fees payable pursuant to Section 10.2(a) shall be the sole and exclusive remedy of the Purchaser, whether at Law or in equity, under this Agreement in the event this Agreement is terminated in accordance with Article X and the Purchaser is paid such fees.

(c)    The Sellers' obligation to pay the Expense Reimbursement and the Break-Up Fee pursuant to this Section 10.2 shall survive termination of this Agreement and shall, to the extent owed by the U.S. Debtors, constitute an administrative expense of the U.S. Debtors under Section 503(b) of the U.S. Bankruptcy Code.

(d)    Notwithstanding anything to the contrary herein, the Sellers' obligation to pay the Break-Up Fee and Expense Reimbursement pursuant to this Section 10.2 is expressly subject to entry of the U.S. Bidding Procedures Order and the Canadian Sales Process Order.

**SECTION 10.3.** **Effects of Termination.** If this Agreement is terminated pursuant to Section 10.1:

(a)    all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of (i) Section 5.7 (Public Announcements), (ii) Section 5.10 (Transaction Expenses), (iii) Section 5.11 (Confidentiality), (iv) Section 7.4(b)(ii) (Other Employee

Covenants), (v) Section 10.1 (Termination) (vi) Section 10.2 (Termination Payments), (vii) Section 10.3 (Effects of Termination) and (vii) Article XI (Miscellaneous); provided, that neither the termination or anything in this Section 10.3 shall relieve any Party hereto from liability for any breach of this Agreement occurring before the termination hereof and thereof;

      (b)     except as required by applicable Law, the Purchaser shall return to the Sellers or destroy all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; and

      (c)     the provisions of the Confidentiality Agreement will continue in full force and effect.

## ARTICLE XI
## MISCELLANEOUS

### SECTION 11.1.  Survival of Representations and Warranties or Covenants.

      (a)     No representations or warranties, covenants or agreements of the Sellers or the Other Sellers in this Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which shall survive until satisfied in accordance with their terms.  For the avoidance of doubt, the covenants of the Sellers in Section 5.26, Article VI and Article VIII shall survive until fully discharged.

      (b)     No representations or warranties, covenants or agreements of the Purchaser in this Agreement shall survive beyond the Closing Date, except the representations and warranties, covenants and agreements of the Purchaser set forth in Section 3.1, Section 3.2, Section 3.5, Section 3.7 and Section 5.27 shall survive beyond the Closing Date, as shall any covenants and agreements set forth in Article VI and Article VIII and covenants and agreements of the Purchaser that by their terms are to be satisfied after the Closing Date, which shall survive until satisfied in accordance with their terms.

    SECTION 11.2.  Remedies.  No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement or the documents referred to in this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege. To the maximum extent permitted by applicable Law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

    SECTION 11.3.  Third-Party Beneficiaries.  The acknowledgements, rights, undertakings, representations or warranties contained in this Agreement and expressed to be for the benefit of the EMEA Sellers, the Joint Administrators or the Joint Israeli Administrators

(including the provisions of Section 2.2, Section 3.7, Section 5.4(c), Section 5.27, Section 5.33, Section 6.8, Section 6.9, Section 5.28 of the Sellers Disclosure Schedule (other than subsection (k)) and Article VIII) (collectively, the "**Third Party Provisions**") shall inure to, are expressly intended to be for the benefit of, and shall be enforceable by, each of the EMEA Sellers, the Joint Administrators or the Joint Israeli Administrators (and their applicable successors or representatives) (the "**Third Party Beneficiaries**"), as applicable, and shall be binding on the Purchaser and its successors and assigns. In the event that any Party or any of its successors or assigns (a) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity in such consolidation or merger, or (b) transfers all or a majority of its properties and assets to any Person, then, and in each such case, proper provision shall be made so that the successors and assigns of such Party, assumes the obligations thereof contained in the Third Party Provisions or otherwise in this Agreement. Except as provided in this Section 11.3, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

      **SECTION 11.4.  Consent to Amendments; Waivers.**  No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement and the Ancillary Documents shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.  Notwithstanding the foregoing provisions of this Section 11.4, (a) no Third Party Beneficiary shall be deemed to have waived any Third Party Provision unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver and (b) no Third Party Provision shall be amended, altered or qualified except by an instrument in writing signed by all the parties hereto and the Third Party Beneficiaries affected by such amendment, alteration or qualification.

      **SECTION 11.5.  Successors and Assigns.**  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned (whether directly or indirectly) by any Party without the prior written consent of the other Party, which consent may be withheld in such party's sole discretion, except for (i) direct assignment by any Seller to an Affiliate (provided that the applicable Seller remains liable jointly and severally with its assignee Affiliate for the assigned obligations), (ii) direct assignment by the Purchaser to a Designated Purchaser (provided that the Purchaser remains liable jointly and severally with its assignee Designated Purchaser for the assigned obligations), (iii) direct assignment by a U.S. Debtor to a succeeding entity following such U.S. Debtor's emergence from Chapter 11, and (iv) direct assignment by any of the Canadian Debtors pursuant to any plan of arrangement approved by the Canadian Court, which will not require the consent of the Purchaser.

      **SECTION 11.6.  Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

        (a)  Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be

governed exclusively by the Laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

(b)     To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases or the Canadian Court, if brought prior to the termination of the CCAA Cases and (b) in the United States District Court for the Southern District of New York or, if that court lacks subject matter jurisdiction, the Supreme Court of the State of New York, County of New York (collectively, the "**New York Courts**") or the *Superior Court of Justice* for the Province of Ontario ("**Ontario Court**"), if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases, and shall not be brought in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the U.S. Bankruptcy Court, the Canadian Court, the New York Courts and the Ontario Court, as applicable, pursuant to the preceding clauses (i)(a) and (b) for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any such court or any claim that any such action brought in such court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 11.7 or any other manner as may be permitted by Law should be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment and in any other manner provided by applicable Law.

(c)     Section 11.6(b) shall not limit the jurisdiction of (i) the Accounting Arbitrator set forth in Section 2.2.4.1(b) with respect to all disputes hereunder which the Parties have agreed to be arbitrated by the Accounting Arbitrator, or (ii) the TSA Arbitrator set forth in Section 5.28(m)(i) of Section 5.28 of the Sellers Disclosure Schedule with respect to all disputes thereunder which the Parties have agreed to be arbitrated by the TSA Arbitrator, although claims described in the foregoing may be asserted in the courts referred to in Section 11.6(b) for purposes of enforcing the jurisdiction and judgments of the Accounting Arbitrator and the TSA Arbitrator.

(d)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE ANCILLARY

AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.6.

**SECTION 11.7. Notices.** All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 11.7.

If to the **Purchaser** to:

> **Ciena Corporation**
> 1201 Winterson Road
> Linthicum, Maryland 21090
> Attention: David Rothenstein,
>        Senior Vice President and General Counsel
> Facsimile: +1-410-865-8001

With copies (that shall not constitute notice) to:

> **Latham & Watkins LLP**
> 555 Eleventh Street, NW
> Suite 1000
> Washington, DC 20004
> Attention: David S. Dantzic
>        Joseph A. Simei
> Facsimile: +1-202-637-2201

> and

> **Stikeman Elliott LLP**
> 5300 Commerce Court West
> 199 Bay Street
> Toronto, Ontario  M5L 1B9
> Attention: Brian M. Pukier
> Facsimile: +1-416-947-0866

If to the **Main Sellers** or the **Sellers**, to:

> **Nortel Networks Corporation**
> 195 The West Mall
> Mailstop: T0505009
> Toronto, Ontario M9C 5K1
> Attention: Anna Ventresca
>        General Counsel – Corporate and Corporate Secretary

Facsimile: +1-905-863-7739

and

**Nortel Networks Limited**
195 The West Mall
Mailstop: T0505009
Toronto, Ontario M9C 5K1
Attention: Anna Ventresca
        General Counsel – Corporate and Corporate Secretary
Facsimile: +1-905-863-7739

and

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee 37228
Attention: Lynn C. Egan
        Assistant Secretary
Facsimile: +1-615-432-4067

With copies (that shall not constitute notice) to:

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee 37228
Attention: Robert Fishman
        Senior Counsel
Facsimile: +1-347-427-3815 & +1-615-432-4067

and

**Cleary Gottlieb Steen & Hamilton LLP**
One Liberty Plaza
New York, NY 10006
Attention: Daniel S. Sternberg
Facsimile: +1-212-225-3999

and

**Ogilvy Renault LLP**
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Attention: Michael J. Lang

Facsimile: +1-416-216-3930

and

**Baker, Donelson, Bearman, Caldwell & Berkowitz, PC**
211 Commerce Street
Nashville, Tennessee 37201
Attention: Robert J. Looney
Facsimile: +1-615-744-5647

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

**SECTION 11.8. Exhibits; Sellers Disclosure Schedule.**

(a)    The Sellers Disclosure Schedule and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)    For purposes of the representations and warranties of the Sellers contained in this Agreement, disclosure in any Section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances with respect to all representations or warranties by the Sellers calling for disclosure of such information, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably apparent from the Sellers Disclosure Schedule that such disclosure is applicable. The inclusion of any information in any Section of the Sellers Disclosure Schedule or other document delivered by the Sellers pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

**SECTION 11.9. Counterparts.** The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopier or electronic mail attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

**SECTION 11.10. No Presumption.** The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

140

**SECTION 11.11.  Severability.**  If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

**SECTION 11.12. Entire Agreement.**

(a)  This Agreement, the EMEA Asset Sale Agreement, the Ancillary Agreements and the Confidentiality Agreement set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the Ancillary Agreements and the Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated.  In the event of any irreconcilable conflict between this Agreement and any of the Ancillary Agreements or the Confidentiality Agreement, the provisions of this Agreement shall prevail, regardless of the fact that certain Ancillary Agreements, such as the Local Sale Agreement, may be subject to different governing Laws (unless the Ancillary Agreement expressly provides otherwise).

(b)  For the sake of clarity, the provisions of the EMEA Asset Sale Agreement have been drafted separately from the provisions in the body of this Agreement to reflect differing market practices in the countries of jurisdiction of the EMEA Sellers.  Unless the context specifically requires, the provisions contained in the body of this Agreement and the provisions of the EMEA Asset Sale Agreement shall be interpreted independently and without reference to each other.

**SECTION 11.13.  Availability of Equitable Relief.**  Each Party agrees that irreparable damage would occur in the event that any of the provisions of this Agreement that it is required to perform were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, subject to the limitations set forth in this Section 11.13 and Section 10.2(a), each Party shall be entitled to equitable relief to prevent or remedy breaches of this Agreement prior to the Closing, and for any breach of Section 8.1 following the Closing, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches.  Each Party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedy.  Each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of the provisions of this Agreement.  For avoidance of doubt, under no circumstances shall the Sellers be liable for punitive damages or indirect, special, incidental, or consequential damages arising out of or in connection with this Agreement or the transactions contemplated hereby or

141

any breach or alleged breach of any of the terms hereof, including damages alleged as a result of tortious conduct.

SECTION 11.14.  **Bulk Sales Laws.**  Each Party waives compliance by the other Party with any applicable bulk sales Law.

SECTION 11.15.  **Main Sellers as Representatives of Other Sellers.**

(a)    For all purposes of this Agreement:

(i)    each Other Seller listed in Section 11.15(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNC as its representative;

(ii)    each Other Seller listed in Section 11.15(a)(ii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNL as its representative; and

(iii)    each Other Seller listed in Section 11.15(a)(iii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNI as its representative.

(b)    Pursuant to Section 11.15(a), each of NNC, NNL and NNI shall expressly have the power to, in the name and on behalf of each of its Respective Affiliates (as defined below), (i) make all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

(c)    For the purposes of this Agreement, "**Respective Affiliates**" means: (i) with respect to NNC, each Other Seller listed in Section 11.15(a)(i) of the Sellers Disclosure Schedule; (ii) with respect to NNL, each Other Seller listed in Section 11.15(a)(ii) of the Sellers Disclosure Schedule, and (iii) with respect to NNI, all the other U.S. Debtors and each Other Seller listed in Section 11.15(a)(iii) of the Sellers Disclosure Schedule.

(d)    Each Respective Affiliate shall indemnify the Main Seller that acts as representative of such Respective Affiliate pursuant to this Section for, and hold it harmless against, any loss, liability or expense, including reasonable attorneys' fees, incurred by such Main Seller without gross negligence, bad faith or willful misconduct, for serving in the capacity of representative of such Respective Affiliate hereunder.

SECTION 11.16.  **Obligations of Sellers.**  When references are made in this Agreement to certain Sellers causing Other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain Other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor -- other than NNC - and a Non-Debtor Seller).

SECTION 11.17.  **Execution by Other Sellers.**  The Purchaser hereby acknowledges that the Other Sellers are not executing this Agreement as of the date hereof. This Agreement shall be binding on all parties that have executed this Agreement from the time of

142

such execution, regardless of whether all Sellers have done so. Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall cause each Other Seller to execute a counterpart to this Agreement as promptly as practicable but in no event later than the day that is sixty (60) days after the date hereof, agreeing to be bound as a Seller under this Agreement and authorizing NNC, NNL or NNI, as applicable, to act as its representative under Section 11.15.

**[Remainder of this page intentionally left blank. Signature page follows.]**

**IN WITNESS WHEREOF**, the Parties have duly executed this Asset Sale Agreement as of the date first written above.

CIENA CORPORATION

Per:

Gary B. Smith
President and Chief Executive Officer

**NORTEL NETWORKS CORPORATION**

Per: _____
Paviter Binning
Executive Vice-President, Chief
Financial Officer and Chief Restructuring
Officer

Per: _____
John M. Doolittle
Senior Vice-President, Finance and
Corporate Services


**NORTEL NETWORKS LIMITED**

Per: _____
Paviter Binning
Executive Vice-President, Chief
Financial Officer and Chief Restructuring
Officer

Per: _____
John M. Doolittle
Senior Vice-President, Finance and
Corporate Services


**NORTEL NETWORKS INC.**

Per: _____
John M. Doolittle
Vice-President

APPENDIX "B"

CIENA AGREEMENT EXHIBITS AND SCHEDULES

[CONFIDENTIAL]

**APPENDIX "C"**

**BIDDING PROCEDURES**

**[ATTACHED]**

Schedule "A"

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities as set forth in the Agreements (as defined below) with respect to the Purchaser, or, as set forth in the relevant sale agreement with respect to a Successful Bidder (as defined below). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreements (as defined below).

On [●], 2009, Nortel Networks Inc. and certain of its U.S. subsidiaries that are debtors and debtors-in-possession (collectively, the "U.S. Debtors") as well as Nortel Networks Limited and certain other affiliates of the U.S. Debtors that have commenced proceedings under the Canadian Companies' Creditors Arrangement Act (the "Canadian Debtors"), and certain non-debtor affiliates of the U.S. Debtors and the Canadian Debtors (together with the U.S. Debtors and the Canadian Debtors, the "North American Sellers") executed that certain Asset Sale Agreement (the "North American Agreement") with [●] (together with any of its designees, the "Purchaser").

On [●], 2009, certain affiliates of the North American Sellers (the "EMEA Sellers" and together with the North American Sellers, the "Sellers"), certain of which are under the control of Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP, in their capacities as the joint administrators of certain EMEA Sellers' companies incorporated in the Europe, Middle East and Africa region appointed by the English High Court of Justice in connection with the proceedings (the "UK Proceedings") under the Insolvency Act 1986 (such individuals collectively, the "Administrators"), and the Administrators executed that certain Asset Sale Agreement Relating to the Sale and Purchase of the EMEA Assets with the Purchaser (the "EMEA Agreement" and together with the North American Agreement, the "Agreements").

The Sellers have determined that: (A) the transactions contemplated by the Agreements and the ancillary agreements discussed therein with respect to the Purchaser, or, as set forth in the relevant sale agreement and ancillary agreements with respect to a Successful Bidder (collectively, the "Transaction") should be subject to competitive bidding as set forth herein; (B) the transfer of the U.S. Debtors' rights, title and interests in and to the Assets (as defined below) should be subject to approval by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"); (C) the transfer of the rights, title and interests of the Canadian Debtors (as such term is defined in the North American Agreement) in and to the Assets should be subject to approval by the Ontario Superior Court of Justice (the "Canadian Court"); and (D) the Transaction shall be submitted for approval by such other applicable court(s) as the Sellers, in consultation with the Committee (as defined below), the Bondholder Group (as defined below) and the Monitor (as defined below), may determine are necessary or appropriate and subject to such other closing conditions as are set forth in the Agreements.

On [●], 2009, the U.S. Debtors filed a Motion for Orders (I)(A) Authorizing Debtors' Entry into the Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D) Approving

1

the Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Metro Ethernet Networks Business Free and Clear of All Liens, Claims and Encumbrances, (B) The Assumption and Assignment of Certain Contracts and (C) the Assumption and Sublease of Certain Leases (the "Sale Motion").

On [●], 2009, the Bankruptcy Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Bidding Procedures Order").

On [●], 2009, the Canadian Debtors filed a motion with the Canadian Court seeking an order for approval of (I) execution and delivery of the North American Agreement by the Canadian Debtors, (II) payment of the Break-Up Fee and Expense Reimbursement in the circumstances provided for in the North American Agreement, and (III) a process for the Sale of the Canadian Debtors' rights, title and interests in and to the Assets (as defined below).

On [●], 2009, the Canadian Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Canadian Sales Process Order").

### Bidding Process

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's and the Canadian Court's and, if required, such other applicable courts' approval thereof (collectively, the "Bidding Process"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., et al. (jointly administered under Case No. 09-10138) involving the U.S. Debtors (the "Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor"), the Administrators in connection with the UK Proceedings, and their respective advisors throughout the Bidding Process. In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, the Canadian Court and the Bankruptcy Court will have jurisdiction to hear and resolve such dispute. [1]

---

[1] For the avoidance of doubt, this Bidding Process shall not govern any disagreements among the Sellers.

6\

### Assets To Be Sold

The Sellers are offering for sale, in one or more transactions, certain of the Sellers' assets pertaining to the business segment described in the Agreements (to the extent that such assets are not subsequently excluded from the sale in accordance with the terms of the Agreements) with respect to the Purchaser, or, as set forth in the relevant sale or restructuring agreement with respect to a Successful Bidder, and related schedules and in an information memorandum made available by the Sellers to the Purchaser and other potential bidders, which will also be made available to other potential bidders that have executed a confidentiality agreement with the Sellers (the "Assets").

### "As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except, with respect to the Purchaser, to the extent set forth in the Agreements or, with respect to a Successful Bidder (as defined below), to the extent set forth in the relevant sale agreement of such Successful Bidder. In addition, in the case of the EMEA Sellers, the sale of whatever rights, title and interests that such EMEA Seller may have (if any) in and to the Assets will be without any representations or warranties (except as may be set forth in the EMEA Agreement).

### Free Of Any And All Claims And Interests

All of the rights, title and interests of the U.S. Debtors and the Canadian Debtors in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests") to the extent permitted by sections 363 and 365 of the Bankruptcy Code and other applicable law, such Claims and Interests to attach to the net proceeds of the sale of such Assets (without prejudice to any claims or causes of action regarding the priority, validity or enforceability thereof), except, with respect to the Purchaser, to the extent otherwise set forth in the North American Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant sale agreement of such Successful Bidder with the U.S. Debtors and the Canadian Debtors.

### Publication Notice

Within three (3) Business Days, or as soon thereafter as reasonably practicable after the entry of orders by the Bankruptcy Court and the Canadian Court approving these Bidding Procedures, the Sellers shall publish notice of these Bidding Procedures, the time and place of the Auction (as defined below), if required, the time and place of the Sale Hearing (as defined below), and the objection deadline for the Sale Hearing in The Financial Times (National Edition), The Wall Street Journal (National Edition) and The Globe & Mail (National Edition).

3

52

### Participation Requirements

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court and accepted by the Administrators, for cause shown, or as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), in order to participate in the Bidding Process, prior to the Bid Deadline (as defined below), each person other than the Purchaser who wishes to participate in the Bidding Process (a "Potential Bidder") must deliver to the Notice Parties (as defined below) at the addresses provided below:

(a)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in substantially the same form as the confidentiality agreement executed by the Purchaser and otherwise in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of the Assets.  In the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement agreeing that such agreement shall be deemed to be amended so as to be in substantially the same form as the confidentiality agreement executed by the Purchaser and that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets;

(b)    current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transaction; and

(c)    a preliminary (non-binding) written proposal regarding:  (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Agreements.

4

A Potential Bidder that delivers the documents described above, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence as provided in the following paragraph with respect to the Assets.

## Due Diligence

The Sellers may in their reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a confidentiality agreement with the Sellers such due diligence access to materials and information relating to the Assets as the Sellers deem appropriate after consultation with the Committee, the Bondholder Group and the Monitor. Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their reasonable business judgment, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. No additional due diligence for any party other than a Qualified Bidder who has submitted a Qualified Bid will continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. In any event, the Purchaser shall be provided prompt access to all material due diligence materials, management presentations, on-site inspections and other information provided to Qualified Bidders that were not previously made available to the Purchaser. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Agreements or any other definitive sale agreement with any Successful Bidder executed and delivered by Sellers.

## Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel

64

Networks Inc., c/o Nortel Networks Limited, Attn: Anna Ventresca, Esq., (905) 863-2564, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905) 863-1984; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (v) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vi) financial advisor to the Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (vii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; (viii) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; and (ix) the Administrators: Ernst & Young LLP, Attn: Stephen Harris, 1 More Place, London SE1 2AF, United Kingdom, Facsimile +44 20 7951 9002; and (x) counsel to the Administrators: Herbert Smith LLP, Attn: Stephen Gale, Exchange House, Primrose Street, London, EC2A 2HS, Facsimile: +44 20 7098 4878; so as to be received not later than November 9, 2009 at 4:00 p.m. (ET) by the Sellers (as may be extended as set out below, the "Bid Deadline"). The Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so; provided, however, that for any such extension beyond five (5) Business Days, the Sellers shall have obtained the prior written consent of the Purchaser, the Committee, the Bondholder Group and the Monitor, in their respective sole discretion. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders (including the Purchaser) and the parties listed above of such extension.

### Qualified Bid

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(a)   it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Agreements, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure (including without limitation, an offer conditioned upon confirmation of a plan of reorganization proposed by the U.S. Debtors either individually or in collaboration with such Qualified Bidder), or upon alternative terms and conditions that the Sellers reasonably determine, after consultation with the Committee, the Bondholders Committee and the Monitor, are no less favourable than the terms and conditions of the Agreements;

(b)   it includes a letter stating that the bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined

below), provided that if such bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, March 1, 2010, and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)    it includes duly authorized and executed Agreements, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, including, to the extent required by the terms and conditions of such bid, Local Sale Agreements, the Real Estate Agreements, the Intellectual Property License Agreement, the Transition Services Agreement, the Trademark License Agreement, the Loaned Employee Agreement the Subcontract Agreement, the Contract Manufacturing Inventory Agreements, the Carling Property Lease Agreements, the Patent Assignments, the Trademark Assignments, the Flextronics Back-to-Back Supply Agreement (if required) (each as defined in the Agreement), the other ancillary agreements, including other back-to-back supply agreements, as described in the Agreements and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Agreements ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the bidder;

(d)    it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(e)    it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

(f)    it fully discloses the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(g)    it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Agreements, plus (i) the amount of the Break-Up Fee and Expense Reimbursement (as defined below), plus (ii) U.S.$5,000,000.

(h)     it includes an acknowledgment and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Agreements (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)     it includes an acknowledgement and representation that the bidder:  (A) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (D) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)     it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(k)     it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to 5% of the Purchase Price to be dealt with as provided for under "Good Faith Deposit" herein;

(l)     it (a) contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment and associated with the employment of all employees who will become employees of the Qualified Bidder, and (b) identifies any pension liabilities and assets related to any employees currently covered under the Nortel Retirement Income Plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m)     it includes evidence of the Potential Bidder's ability to comply with section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned

or subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)    it contains other information reasonably requested by the Sellers; and

(o)    it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids, provided that the Sellers, in evaluating such bids, may not waive substantial compliance with any items in paragraphs (d), (e), (f), (i)(D), (j) and (o) without the consent of the Purchaser, the Committee, the Bondholder Group and the Monitor provided that, with respect to (e), such consent not to be unreasonably withheld in connection with any bid that would (1) otherwise fully satisfy the requirements of a Qualified Bid but for a de minimis failure to comply with those criteria; and (2) such non compliance is cured within 24 hours of the Bid Deadline. The Sellers shall deliver copies of any bids deemed to be Qualified Bids to the Purchaser in accordance with Section 5.3(f) of the North American Agreement.    Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Agreements will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

The Sellers shall notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Purchaser, whether such Qualified Bidder's bid constitutes a Qualified Bid) promptly after, and in any event on the same day as the notification to any Qualified Bidder that their bid constitutes a Qualified Bid; provided such notification shall not be given later than two (2) Business Days following the expiration of the Bid Deadline.

### Aggregate Bids

The Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided, that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

### Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder, including any assumed pension liabilities) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Transaction (including any regulatory approvals required to close the Transaction), the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by

the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

## No Qualified Bids

If the Sellers do not receive any Qualified Bids other than the Agreements received from the Purchaser, the Auction shall be cancelled and the U.S. Debtors shall report the same to the Bankruptcy Court, the Canadian Debtors shall report the same to the Canadian Court and the Monitor and subject to requiring and obtaining approvals of the Bankruptcy Court, the Canadian Court or any other applicable court and satisfaction of the conditions set forth in the Agreements, the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Agreements. In addition, if no Qualified Bid is received, the U.S. Debtors reserve the right to request that the Bankruptcy Court advance the date of the Sale Hearing (as defined below) and provide notice of such new date to those parties in interest entitled to notice thereof and the Canadian Debtors reserve the right to file a motion with the Canadian Court seeking advancement of the date for approval of the sale of the Canadian Debtors' rights, title and interests in and to the Assets to the Purchaser. In addition, if approval of any other applicable court is required, the Sellers will as soon as practicable file an appropriate pleading with such court(s) seeking approval of the Transaction.

## Break-Up Fee and Expense Reimbursement

Recognizing the value and benefits that the Purchaser has provided to the U.S. Debtors and the other Sellers by entering into the Agreements, as well as the Purchaser's expenditure of time, energy and resources, the Sellers have agreed that if the Purchaser is not the Successful Bidder, the Sellers will, in the circumstances as set forth in the Agreements and Bidding Procedures Order, pay to the Purchaser (i) a break-up fee of $[●] (the "Break-Up Fee"), and (ii) reimburse the Purchaser for certain expenses as set forth in the Agreements and Bidding Procedures Order up to $[●] (the "Expense Reimbursement").

## Auction

If the Sellers receive one or more Qualified Bids in addition to the Agreements, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at **9:30 a.m. (ET) on Friday, November 13, 2009,** at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction. The commencement of the Auction may be cancelled or adjourned without the prior written consent of the Purchaser, subject to the terms of the Agreements. The Auction shall run in accordance with the following procedures:

(a)     Only the Sellers, the Purchaser, the Committee, the Bondholder Group, the Monitor and the Administrator (and the advisors to each of the foregoing), any

10

creditor of the U.S. Debtors or the Canadian Debtors and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(c)    At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date. At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction.

(d)    All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(e)    The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(f)    Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a

11



higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least U.S.$5,000,000 over the Starting Bid or the Leading Bid (as defined below), as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the Agreements as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

### Selection Of Successful Bid

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid and evaluate each Qualified Bid as set forth in the section titled "Evaluation of Competing Bids" herein, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by the Canadian Court and any required approvals of any other applicable court(s) and approval and execution by the Administrators of the relevant purchase agreement with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

### Sale Hearing

The sale hearing to authorize certain of the Sellers to enter into agreements with respect to the Successful Bid (the "Sale Hearing") will be held, in respect of those Sellers that are U.S. Debtors, before the Honourable Judge Kevin Gross (or any substitute therefor) in the United

States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as Thursday, November 19, 2009 at 1:00 p.m. (ET), and, in respect of those Sellers that are Canadian Debtors, before the Honourable Mr. Justice Geoffrey B. Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto, Ontario, and in any other applicable court(s) whose approval is required, as soon as practicable following the date of the Sale Hearing (or, with respect to the Canadian Court, in a joint hearing with the Bankruptcy Court at the Sale Hearing). The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing. If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Sellers shall proceed as set forth in the "No Qualified Bids" section above. If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is necessary or appropriate, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval is required. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court. The Alternate Bid shall remain open until the earlier of (a) December 15, 2009 or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date"). All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

Notwithstanding the foregoing, under no circumstance will the Purchaser be deemed the Alternate Bidder.

### Good Faith Deposits

The Good Faith Deposit of any Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within five (5) Business Days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within five (5) Business Days of the date of the selection of the Successful Bidder and the Alternate Bidder. The Good Faith Deposit of the Successful Bidder will be applied in accordance with the terms of the Successful Bid, and will

62

become nonrefundable upon the approval by the Bankruptcy Court and the Canadian Court of the Sale to the Successful Bidder.

## Reservation Of Rights

The Sellers, after consultation with their advisors, the Committee, the Bondholder Group and the Monitor, and their respective advisors, (a) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof; (b) may reject, at any time, any bid (other than the Purchaser's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, any orders of the Canadian Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor; or (iv) contrary to the statutory duties or legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers and (c) except as otherwise specifically set forth herein, with respect to instances in which the consent of the Committee, the Bondholder Group and the Monitor is required, may modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets.

Other than as specifically provided for herein, the Sellers may not, without prior written consent of the Committee, the Bondholder Group the Monitor and the Purchaser in their respective sole discretion (i) adjourn the Auction for more than three (3) Business Days, or (ii) subject to the availability of the Bankruptcy Court and the Canadian Court, adjourn the Sale Hearing for more than three (3) Business Days if the Auction has concluded.

Each of the foregoing actions shall be made by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, and their respective advisors. For the purposes of these Bidding Procedures and all matters relating to them, the Administrators are acting only as agents for and on behalf of the EMEA Sellers that are controlled by the Administrators pursuant to the UK Proceedings and without personal liability. Notwithstanding the foregoing, the Sellers may not, without the prior written consent of the Purchaser, impair or modify the Sellers' obligation to give effect to the Break-Up Fee and the Expense Reimbursement payable to the Purchaser under the Agreements by crediting those amounts to the Purchaser's Qualified Bid and any Subsequent Bid by the Purchaser. For the avoidance of doubt, nothing herein shall be construed to impair or amend the Purchaser's rights and obligations under the Agreements.

14

APPENDIX "D"

REDACTED MONTREAL LOI

[ATTACHED]

October 1, 2009

VIA EMAIL

**BREOF/BELMONT BAN G.P. LIMITED**
**general partner of BREOF/BELMONT BAN L.P.,**
c/o Brookfield Real Estate Opportunity Fund,
BCE Place, Suite 300,
181 Bay Street, P.O. Box 762,
Toronto ON M5J 2T3 Canada.

Attention: Seamus Foran and David Kemper

Re:     **Letter of Intent ("LOI") regarding the amendment and reconfirmation of Nortel Networks Limited ("Nortel" or "Tenant") lease of 3rd and 4th floor premises at 2351 Alfred-Nobel Blvd., Saint-Laurent, Quebec-Lease Agreement dated June 27, 2007, amended October 8, 2008 (the "Lease") between the Tenant and BREOF/BELMONT BAN L.P. ("Landlord")**

Dear Seamus and David:

This is further to the various communications between Tenant and the Landlord over the past months regarding the amending and reconfirmation of the Lease. We have received approval to proceed with the below outlined proposal. We would appreciate your confirmation of acceptance of the terms and conditions set out below by 5:00 pm on October 1, 2009 so that we may conclude our arrangements with the "stalking horse" purchaser or any other entity that will ultimately purchase the MEN Business (the "Purchaser") of the Metro Ether Net division ("MEN Business") in contemplation of the provisions of this accepted proposal.

The Lease is to be amended as per the following:

**BAN 1 North 3rd Floor Premises**

1.     Rentable Area- based on BOMA 1996 calculation, 54,118 sq. ft. (the "3rd Floor Premises").

2.     Term- as existing, ending June 30, 2012 unless extended as required resulting from the assignment of the Lease as contemplated below.

3.     Term Extension- (i) one 2 year requirement to extend in accordance with Section 9; and, (ii) provided the Lease has been assigned (and thus extended until June 30, 2014), one 5 year option to extend from July 1, 2014 to June 30, 2019, at market rate, such option to be governed by the terms and conditions of Section 11.1 of the Lease, *mutatis mutandis*. There shall be no other extension or renewal option.

Page 1 of 6

4.   Rent- Gross rent as per Lease ($26.41 psf, plus 1.5% annual steps).

5.   Consolidation Work- In the event the Landlord has provided the Tenant notice pursuant to Section 14, the Tenant shall consolidate the MEN Business onto the 3rd floor within 90 days of the Tenant receiving the said notice, at Tenant's cost. In the event no such notice per Section 14 is given, the Tenant shall also consolidate the MEN Business onto the 3rd floor, not later than 90 days after the closing of MEN Business divestiture, at Tenant's cost.

6.   Generator Capacity- Tenant shall reduce the requirement for currently dedicated electrical and cooling capacity supported by generator to a maximum of 45 KW draw on the generator (the "New Maximum Draw"), which New Maximum Draw will be dedicated to 3rd floor MEN Business use during the term of Lease, as amended and extended. The New Maximum Draw replaces any other obligation of the Landlord to provide electrical and cooling capacity supported by the generator under Section 6.4 (b) and (c) of the Lease.

7.   The Landlord shall have the right to relocate the cubicle housing Tenant's service provider currently operating from the shipping/receiving area at Landlord's cost, provided the relocated space is on the ground floor of 2351 Boulevard Alfred-Nobel and is within reasonable proximity of the shipping/receiving area. For certainty, such relocation of the cubicle does not affect Tenant's access to and rights in respect of the shipping/receiving area.

8.   Landlord 3rd floor bridge right- The Landlord shall have the right at any time in the future to allow common access by another tenant to 3rd floor bridge by extending the demising walls on both sides of the 3rd floor lobby, all changes at Landlord's cost.

9.   Landlord Consent- Subject to and in accordance with the following terms and conditions, Landlord agrees to grant its consent to the assignment of the entire Lease, by the Tenant, to the Purchaser, upon closing of the MEN Business divestiture to the Purchaser, provided the Purchaser is ████████████████████

(the "Listed Purchasers") (or such other successful purchaser of the MEN Business following the Court approved auction process and sale order hearing, provided the other successful purchaser meets all of the following financial criteria on a pro-forma basis using post transaction figures (the "Financial Test"): (i) it has minimum revenues of 1 Billion dollars annually; (ii) it has a minimum of 300 Million dollars in shareholders equity net worth, based on GAAP book value; (iii) its debts do not exceed 30% of the total of its assets based on GAAP book value; and (iv) its debt service coverage ratio calculated as EBITDA/debt service costs must be equal to 2 or greater). Purchasers that meet the Financial Test shall hereinafter be referred to as the "Financially Qualified Purchasers". Upon such assignment, the term of the Lease, as pertains to the 3rd floor Premises, shall automatically be extended by an additional 2 years beyond the current Lease expiration date to June 30, 2014, while all other provisions remain as outlined above including the rent per square foot which will be stepped annually during each of the extended 2 year period by 1.5% from the previous annual rent per square foot under the Lease. It is understood and agreed that if the Tenant asks the Landlord to grant its consent to an assignment of the Lease to a purchaser other than the Listed Purchasers or the Financially Qualified Purchasers, and the Landlord denies its consent, then, provided

the Tenant has exercised its early surrender right as contemplated at Section 10 below, the Landlord shall not have the right to enter into a lease with such entity or an entity affiliated thereto with respect to the Premises so surrendered, for a period of one (1) year following the 3rd Floor Premises Early Surrender Date. It is further agreed that:

9.1    In the event that the sale of the MEN Business is not completed or that the Lease is not assigned (and thus not extended) as afore-mentioned by May 31, 2010, this pre-agreed assignment right (but not the Lease, as amended) shall expire and; (i) the Tenant shall pay a penalty (the "Non-Extension Penalty") of $500,000.00 plus applicable taxes to the Landlord at such time, in which event the Lease expiry date of the term of the 3rd Floor Premises shall remain at June 30, 2012; and (ii) the Tenant shall no longer be permitted to assign the Lease or sublease the 3rd Floor Premises to any party in the future or sublease the premises leased thereunder (except that the Tenant may bona fide sublease the 3rd Floor Premises, in whole or in part, to an arm's length entity other than the Purchaser, a Listed Purchaser or a Financially Qualified Purchaser, after having obtained the prior written consent of the Landlord, the whole in accordance with and subject to the terms and conditions set out in Section 5.7 of the Lease, provided also that the subleased space is empty space that the Tenant will no longer use after the sublease taking effect, and provided the subtenant's activities conducted in the subleased space are not the same or substantially the same as the MEN Business.)

9.2    If the Lease is assigned: (a) Nortel shall remain solidarily liable for all obligations under the Lease, as amended, that are incumbent upon the Tenant, as provided by Section 5.7 (d) of the Lease, but only for the period ending on June 30, 2012; and (b) the 4th Floor Premises shall, effective automatically upon the assignment of the Lease to the Purchaser, be subleased to Nortel by Purchaser for the 4th Floor Premises Term and upon the other terms and conditions set out below pertaining to the 4th Floor Premises (mutatis mutandis, to take into consideration the fact that Nortel would sublease the 4th Floor Premises as opposed to leasing them directly from the Landlord), it being understood and agreed, however, that the rent payable by Nortel for the 4th Floor Premises shall be payable directly to the Landlord and that the rights and obligations of the Purchaser under the sublease may only be asserted by or against the Landlord, as if the Landlord were the sublandlord pursuant to the sublease. It is understood and agreed that the Landlord shall have no recourse against the Purchaser or with respect to the 3rd Floor Premises should Nortel be in default of its obligations regarding the 4th Floor Premises (except that this shall not prevent the Landlord from enforcing all of its default remedies under the Lease with respect to the 4th floor against the subtenant, Nortel). Landlord and Tenant undertake to copy the Purchaser on any notice with respect to the sublease or the the premises subleased thereunder. . Subject to and in accordance with the terms and conditions set out herein, the Landlord agrees to grant its consent to such sublease.

9.3    When reference is made in this LOI to Listed Purchasers or Financially Qualified Purchasers, this will include any of their affiliates or subsidiaries (or, in the case of One Equity Partners, its investment fund), provided that the Lease may only be assigned to such an affiliate or subsidiary (or, in the case of One Equity Partners, its investment fund) on the condition that the named Listed Purchaser or the Financially Qualified Purchaser in question provides to the Landlord either: (i) a fully enforceable corporate guarantee of the affiliate's (or subsidiary's)

Page 3 of 6

obligations, as tenant, under the Lease, as amended, such guarantee to be in a form mutually acceptable to the Landlord and the Purchaser, each acting reasonably; or (ii) a pre-paid cash security deposit of 1 Million dollars plus applicable taxes (such deposit to be held by the Landlord as security for the Tenant's obligations under the Lease, as amended, and applied against the last rents due under the Lease, as amended, or, in the event of a default, against the outstanding amount and any other amount due to the Landlord in connection with the default, all interest being for the benefit of the Landlord). Moreover, if the Financial Test is not met by the purchasing entity and the purchasing entity is not one of the Listed Purchasers, another entity that does meet the Financial Test and is invested in or affiliated with the purchasing entity could provide a fully enforceable corporate guarantee and in such event the Financial Test would be applied against the guaranteeing entity.

9.4    The Tenant shall be allowed to request that a new purchaser be approved by Landlord to become a Listed Purchaser provided that the new purchaser being proposed by the Tenant meets all of the following criteria: (i) it is a private equity firm with at least two years of business operations and a track record of investing in businesses of similar size to the MEN Business; and (ii) it is not related directly or indirectly in any way to any existing Listed Purchaser; and (iii) it does not meet the Financial Test to qualify as a Financially Qualified Purchaser. In the event that *all the criteria set out in this Section 9.4 are met, then: (a) the Landlord shall act reasonably in evaluating such request to approve such party as a Listed Purchaser;* and (b) if the Landlord grants its consent to such request, such entity shall become a Listed Purchaser but the provisions of paragraph 9.3 above will not apply for that newly appointed Listed Purchaser, who instead shall provide a pre-paid cash security deposit of 2 Million dollars plus applicable taxes (such deposit to be held by the Landlord as security for the Tenant's obligations under the Lease, as amended, *and applied against the last rents due under the Lease, as amended,* or, in the event of a default, against the outstanding amount and any other amount due to the Landlord in connection with the default, all interest being for the benefit of the Landlord).

10.    3rd Floor Premises Early Surrender Right – Tenant shall have a one time right to surrender the 3rd Floor Premises effective on June 30, 2010 (the "3rd Floor Premises Early Surrender Date"), and thus reduce the term of the Lease as regards the 3rd Floor Premises to that it ends on the 3rd Floor Premises Early Surrender Date, in the event that the Purchaser does not wish to receive an assignment of the Lease as outlined above. Should the Tenant wish to exercise this early surrender right, Tenant must provide written notice to the Landlord within 5 business days of the sale order hearing to approve the sale of the MEN Business (*such sale order hearing date being estimated to be prior to* November 30, 2009). The early surrender penalty shall be $2,931,000.00 plus applicable taxes (such penalty amount being inclusive of the Non-Extension Penalty and applicable taxes under Section 9 above), and shall be due and payable to the Landlord, by the Tenant, upon the closing of the MEN Business divestiture, but in no event later than May 31, 2010. At the option of the Landlord, to be notified in writing to the Tenant at least 120 days in advance (but not before the date on which a written notice is given by Tenant to the Landlord that it wishes to exercise this early surrender right), the 3rd Floor Premises Early Surrender Date shall be May 31, 2010. If it exercises this surrender right, the Tenant undertakes to vacate the 3rd Floor Premises no later than on the 3rd Floor Premises

Early Surrender Date, and agrees that it shall not overhold and that, in any event, there shall be no tacit renewal of the Lease, notwithstanding any provision of the Lease or at law to the contrary. This early surrender right and the present clause shall supersede any right of the Tenant to terminate the Lease in accordance with the CCAA Initial Order, as amended from time to time.

## BAN 1 North 4th Floor Premises

11. Rentable Area- based on current calculation, 46,954 sq. ft. (the "4th Floor Premises")

12. Term- 9 months, commencing on the Condition Date (as defined at Section 24) (the "4th Floor Premises Term"), with no extension or renewal options. The Tenant may not terminate the Lease as pertains to the 4th Floor Premises on any earlier date, notwithstanding any right of the Tenant pursuant to the CCAA Initial order, as amended from time.

13. Rent- Gross rent per square foot as per existing Lease ($26.41 psf plus 1.5% annual steps).

14. Landlord Take-back options- Landlord can require that approximately half or all of 4th Floor Premises be surrendered to Landlord at any time but on 90 days written notice to Tenant, and at such time as the Tenant shall vacate and surrender the space, the Tenant's rights and obligations with respect to the space so vacated and surrendered shall cease, regarding the unelapsed portion of the 4th Floor Premises Term.  Landlord shall be *required to request a minimum of approximately half the premises in the first notice and the balance of the 4th Floor Premises in the second notice. If Landlord calls for space and Tenant needs to temporarily house employees, Landlord shall offer to the Tenant to lease other vacant space, to the extent it is available, in the Complex, on a temporary basis* for up to a maximum of 3 months. Tenant to pay for such relocation space on same gross rate per square foot as applies to 4th Floor Premises. Any moving and set-up costs in relocated space to be borne entirely by Tenant.

15. Demising Costs-If Landlord calls for space per paragraph 14 above, Landlord to pay demising costs on 4th Floor if necessary, with *time of construction to be determined by Landlord, but such activity to be done in a manner to minimize to the extent reasonably possible any disruption of use and occupancy of 4th Floor by Tenant.*

16. Furniture — The Tenant acknowledges that all furniture in the 4th Floor Premises belongs to the Landlord and shall remain on the 4th Floor when vacant possession is provided other than the office furniture in the president's office which will be moved to the 3rd Floor Premises by the Tenant, at it sole cost and expense.

## General Provisions

17. The Tenant's rights and the Landlord's corresponding obligations pursuant to Section 5.17 (Signs) are hereby deleted, and the following provisions of the Lease are hereby deleted: 6.10 (Use of Cafeteria, Fitness Centre and Bank/Teller Machine Outlet), 11.3 (Continuing Right of Expansion), 11.5 (Exclusivity), 11.9 (South Tower ROFR).

18. Landlord shall be responsible to only pay Nortel $81,000 plus applicable taxes of the tenant allowance under the October 8, 2008 amending agreement, such amount being payable *within 10 business days of this LOI being fully executed and all conditions*

fulfilled. The balance of the tenant allowance shall no longer be owing, as of and from the date the Landlord pays the afore-mentioned $81,000 plus applicable taxes to Nortel.

19. Landlord shall not be responsible to pay any leasing commissions in relation to the Lease, *these presents or any other documents in relation to these presents. Tenant shall pay all such commissions, if any, at the complete exoneration of the Landlord, and the Tenant hereby undertakes to indemnify, defend and hold the Landlord harmless from any request for such commissions.*

20. The parties agree that, except as required by the Tenant in connection with the CCAA proceedings under which it is operating and to receive the requisite approvals for the terms and conditions of this LOI, neither party shall disclose the terms or existence of this LOI to any third party prior to documentation becoming binding without the prior written consent of the other party, provided that each party shall be entitled to make disclosure to the extent required by law or any regulation, rule or policy of any regulatory body, in which case the disclosing party shall notify the other prior to making such disclosure. *Tenant acknowledges that Landlord will disclose this LOI to its lender, GE Capital.*

21. The parties agree to act diligently and in good faith to complete any other documents deemed necessary to formalize and reflect the above noted terms, if required as expeditiously as possible, it being understood and agreed that this LOI shall be fully binding as *further set out in Section 22 below and not be conditional upon the* said documents being executed.

22. The parties agree that, subject to the Court approval set out below at Section 24 and to the Landlord's condition set out at Section 25, the terms and conditions set out herein are intended to create legally binding obligations upon the parties, provided this *LOI is fully executed, conditions waived, Court approved and fully binding (and Landlord's legal counsel shall be satisfied that this LOI is binding and the Lease, as amended herein, can no longer be repudiated), no later than October 19, 2009, after which date any obligation of the Landlord and Tenant under this LOI shall be null and void and Landlord and Tenant shall automatically be released by the other of any obligation in relation thereto, but the Lease shall continue, unamended.*

23. This LOI shall be governed by and construed in accordance with the laws of the Province of Québec. The parties hereto have declared to have requested that the present document be drawn up in the English language. Les parties aux présents déclarent avoir exigé que le présent document soit rédigé en langue anglaise. All references herein are to Canadian dollars. *Time is of the essence in this LOI.*

24. This LOI is conditional upon the Tenant receiving all necessary Court approvals to this LOI by October 19, 2009 (the "**Court Condition Date**"); Tenant shall make its best efforts to obtain such Court approval as expeditiously as possible. *To avoid any doubt, this LOI shall automatically be deemed null and void if this condition is not fulfilled by the specified date.*

25. This LOI is conditional upon the Landlord receiving, no later than two (2) business days following the Court Condition Date, an unqualified estoppel certificate signed by the Tenant, in the same form as the estoppel that was signed by the Tenant on June 26, 2007, subject to the modifications required to take account of the changes in the Lease that have taken place in October 2008 and the terms and conditions of this LOI. Such estoppel

certificate shall, namely, certify that the Landlord and the Tenant have fulfilled all of their respective obligations as at such date (except for the fact that the Tenant is currently operating under CCAA proceedings). The condition set out at this Section 25 is for the sole benefit of the Landlord, who is the only party that may claim the benefit of such condition, or waive it.

26. Within two (2) business days following its receipt of the Tenant's estoppel in accordance with Section 25, the Landlord shall execute and deliver a certificate of similar content to the Tenant or any Person (as defined in the Lease) as may be directed by the Tenant.

27. This LOI may be executed in several counterparts, each of which when so executed shall be deemed to be an original and such counterparts shall constitute one and the same instrument. This LOI shall be considered properly executed by any party if executed, scanned and transmitted by e-mail to the other party's attorney, i.e.: (a) in the case of documents transmitted to the Tenant: Nortel Networks, Real Estate Lease Administration at the following e-mail address: mccollom@nortel.com, with a copy to Nortel Networks Legal department at the following e-mail address: chelm@nortel.com, and (b) in the case of documents transmitted to the Landlord: David Kemper, at the following e-mail address: dkemper@belmontequity.com, the parties agreeing that executed originals will follow, to complete their files only.

28. This LOI shall, once all the conditions have been satisfied, be deemed to be a fully binding amendment of the Lease, shall be read in conjunction with the Lease, and shall form a part thereof. Except as modified pursuant to the terms of this present agreement, the Lease remains in full force and effect and unamended.

29. It is understood and agreed that once the Court shall have approved this LOI: (i) the Tenant shall not have the right to repudiate the Lease, as amended, or surrender any premises leased thereunder, other than as contemplated herein, notwithstanding any provision to the contrary in the CCAA Initial Order, as amended from time to time; and (ii) payment of the rent and of any other amounts payable to the Landlord pursuant to this LOI shall not be claims affected or compromised under any proposed arrangement of the Tenant pursuant to the CCAA.

*Please indicate your agreement with the foregoing terms and conditions by returning an executed copy of this LOI within two (2) business days following your receipt of this LOI, signed by the Tenant, to the attention of Allan Lane, Asset Manager, Americas, email address alane@nortel.com*

*(In the event this LOI is executed by the Landlord first, it shall be open for acceptance by the Tenant within two (2) business days following the receipt, by the Tenant, of this LOI, signed by the Landlord, and the Tenant shall indicate its agreement of the foregoing terms and conditions by returning an executed copy of this LOI within the said delay to David Kemper, email address dkemper@belmontequity.com)*

NORTEL NETWORKS LIMITED

Per : *Allan Lane   October 7th, 2009, 2:30 PM*

Allan Lane, Asset Manager, Americas
I have authority to bind the corporation

ACCEPTED AND AGREED THIS 8th DAY OF OCTOBER, 2009

BREOF/Belmont BAN L.P., acting through its
general partner, BREOF/Belmont BAN G.P.
Limited

Per:
Name:  Authorized signing officer

Per: *Seamus Finn*
*Authorized Signing Officer*

*Page 8 of 6*

## APPENDIX "E"

## MONTREAL LOI

## [CONFIDENTIAL]

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

---

TWENTY-FOURTH REPORT OF THE MONITOR
DATED OCTOBER 13, 2009

---

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada  M5B 2M6

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5768340