## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS INC., et al., [1] | ) | Case No. 09-10138 (KG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | Re: Docket No. 1627 |
| | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO DEBTORS' MOTION FOR ORDERS (I)(A)
AUTHORIZING DEBTORS' ENTRY INTO THE STALKING HORSE
ASSET SALE AGREEMENT, (B) AUTHORIZING AND APPROVING THE
BIDDING PROCEDURES AND BID PROTECTIONS, (C) APPROVING
THE NOTICE PROCEDURES AND THE ASSUMPTION AND
ASSIGNMENT PROCEDURES, (D) AUTHORIZING THE FILING OF
CERTAIN DOCUMENTS UNDER SEAL AND (E) SETTING A DATE FOR
THE SALE HEARING, AND  (II) AUTHORIZING AND APPROVING (A)
THE SALE OF CERTAIN ASSETS OF DEBTORS' METRO
ETHERNET NETWORKS BUSINESS FREE AND CLEAR OF ALL
LIENS, CLAIMS AND ENCUMBRANCES AND (B) THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS**

The Official Committee of Unsecured Creditors (the "Committee") of Nortel Networks

Inc., et al. (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this

objection (the "Objection") to certain portions of the relief requested in the Debtors' Motion for

Orders (I)(A) Authorizing Debtors' Entry into the Stalking Horse Asset Sale Agreement, (B)

Authorizing and Approving the Bidding Procedures and Bid Protections, (C) Approving the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

Notice Procedures and the Assumption and Assignment Procedures, (D) Authorizing the Filing

of Certain Documents Under Seal, and (E) Setting a Date for the Sale Hearing, and (II)

Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Metro Ethernet Networks

Business Free and Clear of All Liens, Claims and Encumbrances and (B) the Assumption and

Assignment of Certain Executory Contracts (the "Motion"),[2] as more particularly described

below.  In support of its Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      Although the Committee generally supports the Debtors' efforts to sell their metro

ethernet networks business assets (the "Assets") pursuant to the proposed stalking horse sale

agreement, subject to an auction process, the Committee believes that elements of the proposed

agreement and bidding procedures are contrary to the bankruptcy goal of maximizing proceeds

of the Debtors' estates.  The offensive provisions must be remedied before this Court can

approve those documents and allow the sales process to move forward.

2.      Aspects of the proposed bidding procedures and stalking horse agreement serve

to, among other things, stifle rather than encourage active bidding at auction.  Critically, the

Debtors propose to exempt the stalking horse from the generally applicable requirement that the

runner up at the auction serve as an alternate purchaser.  Such an exemption could deprive the

Debtors of the security of a back-up purchaser in the event that the sale to the prevailing bidder

does not close, and creates an uneven playing field that could dissuade other bidders from

bidding at auction.  The Debtors also propose to guarantee only the stalking horse copies of all

qualified overbids on the same day that they are designated as such, but in no event later than 48

hours prior to the commencement of the Auction, which will chill competitive bidding by,

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion or the Bidding Procedures, as applicable.

RLF1-3446533-1

among other things, giving the stalking horse superior access to information and more time to prepare counter-bids prior to the commencement of the auction. Equally unfair, and chilling bidding still more, the Debtors propose to require only over-bidders -- not the stalking horse -- to provide significant good faith deposits with their bids. All of these requirements create an uneven playing field and will retard active participation in an auction for one of the Debtors' most valuable assets. Such discrimination will result in a process that is not ideally designed to maximize the value of the sale assets for the benefit of the Debtors' creditors. The playing field needs to be reset.

3.      Additional aspects of the bidding procedures also infringe upon the Debtors' ability to acquit their fiduciary duties through the sale process. For instance, the bidding procedures currently require the Debtors to obtain consent from the stalking horse to postpone certain key deadlines and to waive key qualified bid requirements, including, among others, the requirement that a bid must (i) provide written evidence of a firm financing commitment, (ii) be submitted by the bid deadline, and (iii) fully disclose the identity of each entity bidding on the sale assets, which consent the stalking horse has no incentive to grant. Prohibiting the Debtors from considering an otherwise qualified overbid for failure to meet a technical requirement, such as being submitted several hours past the bid deadline, prohibits them from doing everything that may be necessary to maximize the value received through the auction. Moreover, the stalking horse's sale agreement specifically provides it with an unrestricted right to assert damages claims against the Debtors in the event of just such a technical breach of any of the bidding procedures requirements. Bidding procedures designed to hamstring the Debtors in this fashion, and tilt the auction in the stalking horse's favor, must not be approved.

4.      The Debtors also should not be permitted to provide the stalking horse with a break-up fee and expense reimbursement in the absence of the closing of an alternative

RLF1-3446533-1

transaction that actually generates value for the Debtors' estates.  See ASA § 10.2 (allowing

break-up fees for failure to timely obtain certain court orders, failure to timely consummate

closing, or the breach of representations and warranties).  Consistent with binding precedent in

this Circuit, such payments must only be provided to the stalking horse if the payments can be

offset by a corresponding benefit to the estate, such as the closing of an alternative transaction.

Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527

(3d Cir. 1999).  Because the payment of the break-up fee and expense reimbursement proposed

in the Motion and stalking horse agreement do not meet this standard, they cannot be approved.

5.      Finally, prior to closing the sale of the Assets, the parties to the stalking horse

agreement contemplate that the Debtors will enter into a transition services agreement for

provision of transition services, primarily by the U.S. Debtors, to the successful purchaser.

Before moving forward with this transaction, the parties must ensure that the risks and rewards

assigned to the U.S. Debtors providing those transition services are proportionate.

## BACKGROUND

6.      On January 14, 2009 (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief in the United States Bankruptcy Court for the District of Delaware (the

"Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  On

January 15, 2009, the Court entered an order jointly administering these chapter 11 cases

pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.[3]

7.      On January 14, 2009, the Debtors' ultimate corporate parent, Nortel Networks

Corporation, together with Nortel Networks Limited and certain of their Canadian affiliates

---

[3] On July 14, 2009, Nortel Networks (CALA) Inc. ("NN CALA"), an affiliate of the Debtors, filed a
voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, the Court entered orders
approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter
11 cases for procedural proposes, and applying to NN CALA certain previously entered orders in the Debtors'
chapter 11 cases.

4

commenced a proceeding before the Ontario Superior Court of Justice (the "Canadian Court")

for a plan of compromise or arrangement under the Canadian Companies' Creditors

Arrangement Act.  The Canadian Debtors continue to operate their businesses and manage their

properties under the supervision of the Canadian Court.

8.      On January 14, 2009, the High Court of Justice in England placed nineteen of the

Debtors' European affiliates into administration under the control of individuals from Ernst &

Young LLC.

9.      Since the Petition Date, the Debtors continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

10.     On January 22, 2009, pursuant to section 1102 of the Bankruptcy Code, the

United States Trustee for the District of Delaware appointed the Committee.[4]

11.     On October 7, 2009, the Sellers and the Purchaser executed an asset sale

agreement (the "ASA "), pursuant to which the Purchaser agreed to purchase the Assets (the

"Sale").  The Sellers propose to sell the Assets to the Purchaser for cash consideration of $390

million, subject to certain purchase price adjustments, plus 10 million shares of common stock of

the Purchaser.

12.     Pursuant to the Motion, the Debtors seek, among other things, the entry of an

order (i) establishing bidding procedures (the "Bidding Procedures") to govern the sale of the

Assets, and (ii) approving (a) a break-up fee of approximately $10,696,000 (the "Break-Up

Fee"), and (b) an expense reimbursement of up to a maximum of $3,565,333 (the "Expense

---

[4] The Committee currently consists of the following five entities: Airvana, Inc.; Flextronics Corporation
(Chairperson); Law Debenture Trust Company of New York, as indenture trustee; Pension Benefit Guaranty Corp.;
and The Bank of New York Mellon, as indenture trustee.

Reimbursement")[5].  The Break-Up Fee and Expense Reimbursement may be payable upon

certain ASA termination events that do not include the consummation of a Sale with an

alternative purchaser.

13.    The Purchaser's offer to purchase the Assets will be subject to higher and better

offers, if any, received during an auction (the "Auction") to be conducted in accordance with the

Bidding Procedures.  The Bidding Procedures also require, among other things, that (i) Qualified

Bidders other than the Purchaser include good faith deposits of five percent of the proposed

purchase price with their bids (e.g., a $25 million deposit on a $500 million bid), (ii) the Debtors'

obtain Purchaser consent for any waiver of certain technical violations of the Bidding

Procedures, (iii) an overbidder's deposit become nonrefundable if its bid is approved as the

Successful Bid at the Sale Hearing, (iv) each Qualified Bid, other than the Purchaser's, include a

letter stating that the bidder's offer is irrevocable until the Alternate Bid Expiration Date, if such

bidder is selected as the Alternate Bidder, and (iv) the Purchaser, in contrast to other Qualified

Bidders, shall receive copies of each Qualified Bid, at least 48 hours prior to the Auction.

## THE COMMITTEE'S OBJECTION

### I.    The Proposed Bidding Procedures Will Impermissibly Chill Bidding.

14.    The purpose of bidding procedures is to facilitate the fair sale of a debtor's assets

through a process that will maximize the value of such assets for the benefit of the debtor's

creditors.  See In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997); In re Reading

Broadcasting, Inc., 386 B.R. 562, 575 (Bankr. E.D. Pa. 2008) (noting that the purpose of a

bankruptcy sale is to obtain the highest and best price for the estate and thus for its creditors); In

---

[5] Under the EMEA Asset Sale Agreement, the EMEA Sellers are liable for an additional break-up fee of $5,348,000 and expense reimbursement up to a maximum of $1,782,667.  Therefore, under the ASA and the EMEA Agreements, the Purchaser would be entitled to an aggregate break-up fee in the amount of $16,044,000 and expense reimbursement in the amount of up to $5,348,000.

6

re E-Z Serve Convenience Stores, Inc., 289 B.R. 45 (Bankr. M.D.N.C. 2003) (denying approval

of a sale on the grounds that the auction procedures were "patently unfair and inequitable"); In re

Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders

is to facilitate an open and fair public sale designed to maximize value for the estate."). Courts

have consistently held that mechanisms that will have a chilling effect on the bidding process

should not be approved. See In re President Casinos, Inc., 314 B.R. 784, 786 (Bankr. E.D. Mo.

2004) (permitting debtor to conduct sale of assets, but declining to approve bidding procedures

that could have hampered the bidding process); see also In re APP Plus, Inc., 223 B.R. 870

(Bankr. E.D.N.Y. 1998) (rejecting a proposed topping fee because it found that the stalking horse

bidder was adequately protected by a break-up fee).

15.     The Bidding Procedures proposed by the Debtors will not facilitate a fair sale of

the Assets, will chill bidding, and must be modified in order to ensure such a fair sale. Among

other necessary modifications discussed further below, the following changes must be made to

avoid an inappropriate chilling effect on bidding: (i) requiring the Purchaser to act as the

Alternate Bidder if its bid is deemed the second-highest and best, and (ii) eliminating the

requirement that the Sellers deliver a copy of each Qualified Bid to the Purchaser at least 48

hours prior to the commencement of the Auction. Absent these modifications, the Committee

believes that approval of the Bidding Procedures will discourage competing bids, diminishing

the likelihood of (a) a competitive Auction and (b) increased unsecured creditor recoveries

resulting from the Sale.

**A.      Requiring All Qualified Bidders Other than the Purchaser
to Keep Bids Open as Alternate Bid Creates an Unfair Advantage.**

16.     While the Bidding Procedures require that the bid of the runner up at the Auction

or "Alternate Bidder" remain open and irrevocable until the earlier of December 15, 2009 and

the consummation of the Sale to the Successful Bidder, the ASA and the Bidding Procedures

7

specifically exempt the Purchaser from the obligation to close such a transaction as an Alternate

Bidder. See ASA § 5.1(g); Bidding Procedures at 13. Accordingly, in the event that a party

other than the Purchaser is the Successful Bidder and the Purchaser is the runner up, there will

not be an Alternate Bidder. The Debtors would thus lack the security of a back up purchaser,

and would be in a weakened negotiating position in any final closing negotiations with the

Successful Bidder following the Auction. Moreover, the Purchaser's exemption creates an

uneven playing field on which the Purchaser can bid knowing that it will never be constrained to

close a purchase of the Assets if it is not the Successful Bidder at the Auction. The exemption

thus creates a significant tactical advantage in favor of the Purchaser at Auction that could

dissuade other potential bidders from participating. Bidding Procedures implementing such a

systemic advantage for the Purchaser should not be approved.

### B.    The Requirement that Qualified Bids Be Given Only to the Purchaser Prior to the Auction Gives the Purchaser an Unfair Advantage.

17.    The proposed Bidding Procedures and the ASA also inappropriately require the

Sellers to provide the Purchaser with all Qualified Bids on the same day that they are designated

as such, but in no event later than 48 hours prior to the commencement of the Auction. See

Bidding Procedures at 9, ASA § 5.3(f). Other bidders are not guaranteed such advance

notification. This requirement will chill the competitive bidding process in at least two ways.

First, it provides the Purchaser with an unfair advantage over other Qualified Bidders prior to the

Auction because the Purchaser will have more information about competing Qualified Bids, and

more time to prepare counter-offers than any of the other Qualified Bidders. Second, the

requirement may prevent the Purchaser's industry competitors from submitting bids to the extent

that their bids contain information of a proprietary or confidential nature that these competitors

would not want shared with the Purchaser in advance of an Auction. Even more importantly,

this requirement impairs the Debtors' ability to review Qualified Bids and consult with the

8

Committee in order to seek to refine or improve the terms of such bids prior to the Auction, which has been a critical component in the success of previous Nortel auctions. For the foregoing reasons, the Committee submits that this requirement should be removed from the Bidding Procedures and the ASA.

## II.    The Break-Up Fee Should Only Be Payable Upon Closing of a Competing Transaction.

18.    The proponent of a break-up fee bears a very heavy burden, which the Debtors cannot satisfy here. Applying the standard for payment of administrative expenses, Courts only allow payment of break-up fees when the requesting party can show that the fees were actually necessary to preserve the value of the estate. See In re O'Brien Envtl. Energy, Inc., 181 F.3d at 535. Courts have recognized that break-up fees may yield large profits to the recipient at the expense of unpaid unsecured creditors. See In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995). Indeed, as "any money that a bidder receives through a bidding incentive comes out of the pockets of the creditors of the estate . . . there should be a direct relationship between the reimbursement an unsuccessful buyer receives and the benefit to the estate from the unsuccessful buyer's bid." Id. Unless the Debtors consummate a sale of the Assets at a higher price than the stalking horse bid, the stalking horse bid will not have provided a benefit to the Debtors' estates. Conversely, the only circumstance where the Break-Up Fee could be paid in this case would be upon the closing of a competing transaction that provides a demonstrable benefit to the Debtors' estates and creditors.

19.    Despite such requirement, the ASA currently provides for the payment of the Break-Up Fee to the Purchaser and permits the Purchaser to terminate the ASA in a number of circumstances that have nothing to do with the closing of an alternate transaction. Specifically, the ASA calls for a Break-Up Fee to be paid in the following inappropriate circumstances:

9

(i) entry of an order by the Court and the Canadian Court approving a transaction for the Assets with a Successful Bidder other than the Purchaser, regardless of whether such transaction closes, see ASA §§ 10.1(b)(v) and 10.2(a);

(ii)     (a) orders approving the Bidding Procedures not having been entered by the Court and the Canadian Court by October 19, 2009, in the case of termination by the Purchaser, or October 30, 2009, in the case of termination by the Main Sellers, See ASA §§ 10.1(b)(iii) and 10.2(a);

(b) the Auction not having been completed by December 11, 2009, See ASA §§ 10.1(b)(viii) and 10.2(a); or

(c) the U.S. Sale Order and Canadian Approval and Vesting Order not having been entered by December 17, 2009, See ASA §§ 10.1(b)(iv) and 10.2(a); or

(iii) a breach by the Sellers of any of the covenants, representations or warranties under the ASA such that they are unable to satisfy the closing conditions, even if, for example, the reason for such inability to satisfy the closing conditions occurs without fault or omission of the Sellers. See ASA §§ 10.1(b) and 10.2(a).

20.     The Bidding Procedures thus provide that the Debtors are obligated to pay the Purchaser an aggregate of $16,044,000 in break-up fees (a $10,696,000 Break-Up Fee payable under the ASA and a $5,348,000 break-up fee payable under the EMEA Asset Sale Agreement) in circumstances in which the Debtors may not receive any proceeds from the closing of another sale. See Bidding Procedures at 10. If no Alternative Transaction closes, or the Break-Up Fee becomes payable by reason of a condition other than the consummation of an Alternative Transaction, then the Break-Up Fee would have provided no benefit to the Debtors' estates. There simply is no justification for the payment of a break-up fee if, for instance, the Sale does not occur because of a breach of a representation and warranty or the failure of the parties to obtain a necessary governmental approval. The Break-Up Fee must only be payable from and upon consummation of an Alternative Transaction because only at such time will the benefit of the Break-Up Fee to the Debtors' estates be received. Accordingly, the Committee requests that this Court allow the payment of the Break-Up Fee solely upon the **closing** of a competing transaction.

RLF1-3446533-1

III.   **The Bidding Procedures and the ASA Require Additional Critical Modifications.**

21.   In addition to the offensive provisions discussed above, it is critical that the following additional provisions of the ASA and Bidding Procedures be modified or clarified as a condition to this Court's approval of the ASA and Bidding Procedures:[6]

- **Purchaser Has Veto over Waivability of Key Qualified Bid Requirements**. The Purchaser should not hold veto power over the waiver of key Qualified Bid requirements or the adjournment of certain auction-related dates. Core Bidding Procedure requirements, including that a Qualified Bid (i) contain a written financing commitment, (ii) fully disclose the identity of each entity bidding on the Assets, (iii) not provide for any expense reimbursement or break-up fee, and (iv) be received by the bid deadline, can only be waived with the Purchaser's consent, and in its sole discretion. See Bidding Procedures at 9.[7] Similarly, if the Debtors seek to extend the Bid Deadline, the Auction, and/or Sale Hearing date for more than several days, in consultation with their stakeholders, the Debtors must obtain the Purchaser's prior written consent. See Bidding Procedures at 6 and 14. The Purchaser has no incentive whatsoever to waive any of these requirements or deadlines. Rather, it is in the Purchaser's self interest to enforce all requirements and deadlines rigidly in order to eliminate other potential bidders who may bid against the Purchaser, and either win the auction or drive up the Purchaser's ultimate price. Allowing the Purchaser such unfettered control over the Auction process is completely inconsistent with the Debtors' duty to maximize value for the Debtors' estates. See In re Martin, 91 F.3d 389, 394 (3d Cir. 1996) ("[I]t is the trustee's duty to … the creditor to realize from the estate all that is possible for distribution among the creditors." (citing 4 Collier on Bankruptcy ¶ 704.01 (15th ed. 1993)). Indeed, the Debtors' flexibility in waiving or enforcing provisions of the Bidding Procedures has been critical to the success of their past auctions.

- **The Stalking Horse is Not Required to Make a Deposit**. While the Bidding Procedures require that all Qualified Bids be accompanied by a Good Faith Deposit of 5% of the Purchase Price, neither the ASA nor the Bidding Procedures require the Purchaser to provide any deposit whatsoever. A deposit (i) provides the Sellers with critical assurance that the Purchaser has "skin in the game" to move to the closing of the Sale, and (ii) provides the Debtors with direct access to a source of recovery from the Purchaser in the event that the Purchaser breaches the ASA. Requiring Qualified Bidders, but not the Purchaser, to provide deposits

---

[6] The Committee reserves the right to raise any and all appropriate objections to the Sale at the Sale Hearing, including, without limitation, the Debtors' failure to modify the ASA to address the Committee's concerns.

[7] Moreover, to the extent that a bid improperly is conditioned on the outcome of unperformed due diligence or obtaining financing, the bidder may cure any de minimis non-conformity within 24 hours of the Bid Deadline, subject to the Purchaser's consent, which may not be unreasonably withheld.

RLF1-3446533-1

will create unfair discrimination, chill bidding, and compromise the Debtors' ability to maximize value for the benefit of the Debtors' estates and creditors.

- **Successful Bidder's Deposit Not Refundable for Any Reason**. The Bidding Procedures provide that the deposit of a Successful Bidder will become nonrefundable upon court approval of its bid. See Bidding Procedures at 13-14. While this provision appears creditor-friendly, it is not advisable. The Bidding Procedures should allow that the Successful Bidder's deposit be refundable in certain circumstances. The current Bidding Procedures would prevent potential bidders from making bids that would allow the refund of deposits under appropriate circumstances, such as when a sale fails to close through no fault of the Successful Bidder. Preventing bidders from proposing a deposit that is refundable in such circumstances will chill bidding and is inconsistent with the Debtors' duty to maximize value for the benefit of their estates. It is all the more offensive considering that the Purchaser is not required to provide any deposit in the first place.

- **ASA Covenant Regarding Breach of Bidding Procedures**. The ASA provides that failure to comply with the Bidding Procedures Order constitutes a breach of the agreement, giving the Purchaser a right to assert a damages claim. See ASA §§ 5.1(d) and 11.13. This only underscores the importance of the objections summarized above. If, for example, the Debtors accept a bid that is several hours late, and therefore in breach of the technical requirements of the Bidding Procedures, the Purchaser could bring a claim for damages against the Debtors if the Purchaser ultimately wins the Auction following a successful bidding war with the late bidder. The Debtors must be able to waive immaterial, technical violations when doing so will further their fiduciary duty to maximize the value of the Assets for the benefit of their creditors.

## IV.    Transition Services Agreement Services Providers Must Be Proportionally Compensated for Liabilities that they Assume.

22.     Pursuant to the ASA, the Debtors will enter into a transition services agreement (the "TSA"), which will provide for transition services to the successful purchaser of the Assets, but may also create liabilities for the U.S. Debtors that are disproportionate to the benefits the U.S. Debtors would ultimately receive from the Sale. Because of potential liabilities arising under the proposed TSA, the benefits of the transaction may not outweigh the potential costs for the U.S. Debtors. As the allocation of the proceeds of the Sale have yet to be determined, the parties should ensure that the risks and rewards to the U.S. Debtors, of providing transition

services, are proportionate and the U.S. Debtors are not overly burdened, while the other Nortel

Debtors only reap the benefit of the transaction.

## **CONCLUSION**

23.    For all of the foregoing reasons, the Committee respectfully requests that the

Court (i) deny approval of the Bidding Procedures absent the modifications thereof as outlined

herein, (ii) deny approval of the ASA absent the modification thereof as outlined herein, and

(iii) grant such other and further relief as this Court deems just, proper and equitable.

Dated: October 14, 2009
     New York, New York

Respectfully submitted,

By: _____
    Mark D. Collins (No. 2981)
    Christopher M. Samis (No. 4909)
    Richards, Layton & Finger, P.A.
    One Rodney Square
    920 North King Street
    Wilmington, DE  19801
    Tel.:  (302) 651-7700

    and

    Fred S. Hodara (*pro hac vice*)
    David H. Botter (*pro hac vice*)
    Akin Gump Strauss Hauer & Feld LLP
    One Bryant Park
    New York, NY  10036
    Tel.:  (212) 872-1000

    Co-counsel to the Committee

RLF1-3446533-1