UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                      .   Case No. 09-10138(KG)
                            .
                            .
NORTEL NETWORKS, INC.,      .   824 North Market Street
et al.,                     .   Wilmington, DE  19801
                            .
                            .
        Debtors.            .   October 13, 2009
. . . . . . . . . . . . . .  .   10:02 a.m.


TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Morris, Nichols, Arsht & Tunnell
                          By:  DEREK C. ABBOTT, ESQ.
                               ANN C. CORDO, ESQ.
                          1201 North Market Street, 18th Floor
                          P.O. Box 1347
                          Wilmington, DE  19899

                          Cleary, Gottlieb, Steen & Hamilton
                          By:  JAMES L. BROMLEY, ESQ.
                          One Liberty Plaza
                          New York, NY 10006


Audio Operator:           Jennifer Pasierb


Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

For the Committee:        Richards, Layton & Finger, P.A.
                          By:  CHRISTOPHER M. SAMIS, ESQ.
                          One Rodney Square
                          920 N. King Street
                          P.O. Box 551
                          Wilmington, DE  19899

For Avaya:                Ropes & Gray
                          By:  MARK BANE, ESQ.
                          1211 Avenue of the Americas
                          New York, NY  10036-8704

For the United States:    United States Department of Justice
                          By:  JAN M. GEHT, ESQ.
                          P.O. Box 227
                          Washington, D.C. 20044

TELEPHONIC APPEARANCES:

For the Debtors:          Cleary, Gottlieb, Steen & Hamilton
                          By:  IRA LINDSAY, ESQ.
                               DEBORAH M. BUELL
                          One Liberty Plaza
                          New York, NY 10006

                          PETER LOOK

In Pro Per/Pro Se:        Mathew M. Barnett

For Ernst & Young:        Allen & Overy, LLP
                          By:  AMELIE BAUDOT, ESQ.
                          1221 Avenue of the Americas
                          New York, NY 10020

For Monarch               Monarch Alternative Capital, L.P.
Alternative Capital,      By:  ROBERT BURNS
LP:

For CitiGroup:            CitiGroup
                          By:  ERIC GELLER

For Tricidia Capital:     Tricidia Capital
                          By:  STEPHEN GRISANTI

For D.E. Shaw:            D.E. Shaw
                          By:  SARAH JOHNSON

TELEPHONIC APPEARANCES (Cont'd.):

For Morgan Stanley:        Morgan Stanley
                           By:  JIM C. MARTIN

For Barclays Capital,      Barclays Capital, Inc.
Inc.:                      By:  OLIVIA MAURO, ESQ.

For Flextronics            Curtis, Mallet-Prevost, Colt
Telecom Systems Ltd.:       & Mosle, LLP
                           By:  STEVEN J. REISMAN, ESQ.
                           101 Park Avenue
                           New York, NY  10178-0061

For King Street            King Street Capital Management, LLC
Capital Management: By:  MITCHELL SOCKETT

For Halcyon Asset          Halcyon Asset Management
Management:                By:  TODD L. SOLOMON

For In Pro Per:            JACOB ZAND

For PBGC:                  Pension Benefit Guaranty Corporation
                           By:  VINCENT MURRELL

4

1            THE CLERK:  Please rise.

2            THE COURT:  Good morning, everyone.  Thank you and

3 please be seated.  Mr. Abbott, good morning.

4            MR. ABBOTT:  Good morning, Your Honor.  Derek Abbott

5 here on behalf of the debtors with happily what should be a

6 much abbreviated hearing than what it otherwise might have

7 been, Your Honor.

8            THE COURT:  It was good news.

9            MR. ABBOTT:  It was, Your Honor.  I wanted to just

10 run through -- the first three items, Your Honor, on the agenda

11 have been continued.  That leaves the main events, the IRS

12 matter and the PBGC matter that we filed.  Your Honor, I

13 thought perhaps in advance I might handle one housekeeping

14 matter.  At the last hearing we had discussed with Your Honor

15 an additional order regarding annotation of U.S. currency

16 amounts for professionals paid otherwise.

17            THE COURT:  Yes.

18            MR. ABBOTT:  Your Honor, we settled an order.  We ran

19 it by the Committee and got their approval.  No significant

20 comments.  I believe it was submitted on Friday to Your Honor.

21 I don't know if Your Honor's had a chance to see it, but I

22 thought I might just hand that up if --

23            THE COURT:  I did sign it.

24            MR. ABBOTT:  Oh, you did.  Okay.

25            THE COURT:  I've signed it.  It probably just has not

1 hit the docket because of yesterday's holiday.

2          MR. ABBOTT:  Fair enough, Your Honor.  Okay, so we're

3 in good shape.  I will then cede the podium, Your Honor, to Mr.

4 Bromley.  He'll address the IRS resolution.

5          THE COURT:  Thank you.  And thank you for attending

6 to that, Mr. Abbott --

7          MR. ABBOTT:  Thank you, Your Honor.  Sure.

8          THE COURT:  -- and Ms. Cordo.  I appreciate it.  Mr.

9 Bromley, good morning.

10          MR. BROMLEY:  Good morning, Your Honor.  Good

11 morning, Your Honor.  James Bromley of Cleary Gottlieb on

12 behalf of Nortel Networks, Inc. --

13          THE COURT:  Yes.

14          MR. BROMLEY:  -- and its other debtors.  I would like

15 to pick up on Mr. Abbott's comments that we are -- we're very

16 happy to be here on a more abbreviated calendar.

17          THE COURT:  I stopped studying the Tax Code.

18          MR. BROMLEY:  I have to say it is a wondrous thing.

19          THE COURT:  Yes, it is.

20          MR. BROMLEY:  Your Honor, if I could just give you a

21 little bit of background for context and then tell you what we

22 did last week?

23          THE COURT:  Yes.

24          MR. BROMLEY:  As you know, Your Honor, we have been

25 very lucky in being able to have held two very successful

1 auctions for major pieces of the business of Nortel, and we

2 will be before you on Thursday with two additional sale

3 procedures for hopefully additional successful auctions.  But

4 the last one that we have had approved, which was in early

5 September, was the sale of the enterprise solutions business to

6 Avaya, Inc.

7          THE COURT:  Yes.

8          MR. BROMLEY:  And as we mentioned at the sale hearing

9 to approve that, Your Honor, we did have a somewhat eleventh

10 hour issue that came up with respect to a claim that was filed

11 by the Internal Revenue Service.  And so that had thrown a bit

12 of a monkeywrench into the auction, and we needed to amend the

13 agreement that was entered into with Avaya, and indeed our

14 other bidder at the time had also demanded that we amend their

15 agreement as we were going through the auction to take into

16 account what is known on a colloquial basis as dash six

17 liability.

18          There is a -- there's a provision of the Internal

19 Revenue Code and regulations related to the Internal Revenue

20 Code that would create joint and several -- or several

21 liability I think is actually the phrase with respect to

22 entities within a corporate group.  And the entities within the

23 Nortel consolidated tax group would all find themselves liable

24 for the taxes of each other, so to speak.

25          The problem that we had is that typically this is not

7

1 an issue in Chapter 11, because assets can be transferred free

2 and clear of this sort of dash six liability but for very

3 particular reasons.  There were two entities -- really four

4 companies but two entities, one Nortel Government Solutions,

5 which had two subsidiaries, and the other DiamondWare Limited,

6 that were being sold to Avaya in a stock sale rather than in an

7 asset sale.

8         And so it became clear -- and this is -- became clear

9 that we needed to address this dash six liability, because the

10 purchasers reasonably were concerned about having the potential

11 for substantial liability following the stock.  And so we had a

12 deadline that was put into our contract which required the

13 debtors to make an election, and that election had to be made

14 no later than Friday of this week, and that election would be

15 to either continue as a stock sale selling the stock of NGS and

16 DiamondWare or commencing Chapter 11 proceedings for those four

17 entities and turning the transaction into asset sales for those

18 two entities.

19         And so we didn't have much time, and we did file an

20 objection to the IRS claim, and it was really just an objection

21 to the IRS claim not some of the other issues in the background

22 that deal with its transfer pricing tax issues.  But what we --

23 this was really focused on trying to isolate the dash six

24 liability and to drive to a solution to allow this transaction

25 to close.

**J&J COURT TRANSCRIBERS, INC.**

8

1          And we moved on multiple paths at the same time.  We

2 did work to prepare these companies to file for Chapter 11.  We

3 did agree to commence a mediation, and we also moved down the

4 litigation path at the same time with the expectation that

5 today's hearing would be a contested hearing on the substance

6 of the IRS's claim.

7          Last week, on Wednesday, we did have a mediation in

8 our offices.  A mediation that was chaired by Judge Gibbons,

9 the former Chief Judge of the Third Circuit --

10          THE COURT:  Yes.

11          MR. BROMLEY:  -- who very graciously gave us an

12 entire day and late into the evening and was instrumental in

13 helping us come to a resolution.  That mediation was attended

14 by the IRS, the debtors, the Creditors' Committee's advisors,

15 the advisors the the Ad Hoc Bondholder Committee, advisors to

16 Avaya, the purchaser, as well as representatives of and

17 advisors to the PBGC.

18          Now, the PBGC is a little bit of a -- an add on to

19 this, because the IRS and the PBGC issues relate to each other,

20 and I'll describe that, because we do have two things before

21 you today --

22          THE COURT:  Yes.

23          MR. BROMLEY:  -- one relating to the IRS and the

24 second relating to the PBGC.

25          So we were able to commence our mediation last week,

**J&J COURT TRANSCRIBERS, INC.**

1   and through the course of the day there was a lot of back and

2   forth and discussions as one might expect, and Judge Gibbons

3   took us each to the woodshed separately and helped us

4   understand the issues that we face, and by the end of the day

5   we were able to come to a resolution.  And so -- and really, it

6   was a resolution both of the issues relating to the dash six

7   liability for the IRS, but also issues relating to the PBGC.

8           And, if I could, I'll step back for a moment and try

9   to describe the contract issues that we faced and how we tried

10  to solve them, because ultimately what we are doing here is

11  trying to -- to solve a problem that is driven by our contract,

12  and it is our happy task to tell you that we have been able to

13  do that.

14          First with respect to the dash six liability, Section

15  10.2 -- I'm sorry -- 10.20 -- ten point two 0 -- of the ASSA is

16  -- with Avaya deals with the election, whether or not we will

17  file NGS or DiamondWare into Chapter 11 and the transfer of the

18  stock -- the shares of these entities free and clear of dash

19  six liability.  And so we have entered into two agreements with

20  the IRS, and I should say we, the debtors, have entered into

21  two.  The IRS, thus far, has only entered into one, but we'll

22  deliver the second at the time of the closing, and I'll explain

23  that.

24          So with respect to the IRS, we have agreed that the

25  IRS will waive dash six liability with respect to NGS and

1  DiamondWare for the years -- the tax years 2005 and following.

2  Now, why is that important?  Well, NGS only joined the

3  consolidated group in 2005, and so its liability would only

4  move from 2005 to the present.  And so the years prior to 2005

5  as it relates to NGS are irrelevant, and DiamondWare joined the

6  consolidated tax group in 2008.  So that helped in the context

7  of our mediation to focus the time line a little more closely.

8  It was not a 2001 to present.  It was really 2005 to present,

9  and that helped us narrow the numbers.

10        So the IRS has agreed that it will waive the dash six

11  liability with respect to NGS and DiamondWare for the tax years

12  2005 and following.  And there are specific statements in the

13  draft orders that the stock will transfer free and clear of

14  liens and claims with respect to the dash six liability.  That

15  is, in particular, contained in Paragraph 2 of the stipulation.

16  That is Exhibit A to the order.

17        THE COURT:  Yes.

18        MR. BROMLEY:  And the way this is going to occur,

19  Your Honor, is at the closing there will be something

20  delivered, which is known as a closing agreement.  A closing

21  agreement is a term of art that exists in the tax world and the

22  form of the closing agreement has been negotiated, and it has

23  been attached to the pleadings, and it will be delivered by the

24  IRS at closing in the form attached as Exhibit A.  And the

25  closing -- that is the closing at the -- of the transaction

1  with Avaya.  So the IRS has agreed to do that and will do that

2  at the closing.

3        So the -- and that formulation, Your Honor, is

4  acceptable to Avaya.  They, as I mentioned, were part of the

5  negotiations and the mediation, and so that will satisfy the

6  conditions of Section 10.20, ten point twenty, of the ASSA.

7        I should also note, Your Honor, that there is a

8  statement in the stipulation, Paragraph 5, regarding the scope

9  of the IRS release, a provision that was added at the request

10 of Avaya, which does state that without limiting the scope of

11 Paragraph 2, which deals with the dash six waiver, that the IRS

12 acknowledges that the NGS shares and the DiamondWare  shares

13 shall constitute in all regards, quote, transferred property,

14 which is a defined term --

15        THE COURT:  Right.

16        MR. BROMLEY:  -- as defined and referenced in the

17 sale order and shall be conveyed to Avaya, Inc. free and clear

18 of any and all claims of the IRS against NNI or any of the

19 other Nortel entities including, without limitation, the claim

20 described in the IRS claims -- described in the proofs of claim

21 filed by the IRS dated as of February 13, 2009, May 22, 2009,

22 and August 20, 2009 bearing the respective claim identification

23 numbers 250, 1226 and 1935, defined collectively as the IRS

24 claim, and also free and clear of the IRS agreed claim.

25        So the IRS agreed claim, Your Honor, is an amount of

1  $9.8 million that was part of the negotiations and represents

2  the corporate alternative minimum tax for NNI's taxable year on

3  December 31, 2005 through NNI's taxable year ending December

4  31, 2008.  It's not less than one -- than 8 million plus 1.8

5  million for interest and penalties.  So it's not less than 9.8

6  million.

7           It's important to note, Your Honor, that all rights

8  and -- both to object to and prosecute the IRS claim under any

9  theory or basis are preserved both for the IRS and for the

10 debtors.  So there's no compromise of the underlying issues

11 with respect to the claim, although there is an agreement that

12 the minimum claim would be 9.8 million, and that I think needs

13 to be balanced against the certainty that we now have with

14 respect to closing and the very large size of the IRS claim.

15 It was filed at 3 billion.

16          And so we believe that this is a very fair and

17 reasonable resolution of the issues as they relate to this

18 situation.  It avoids the need for needing to file NGS and

19 DiamondWare.  It satisfies the conditions for the ASSA.  It is

20 I think appropriate and acceptable to the debtors there,

21 creditor constituencies, and to the IRS.

22          It is, as well, conditional and related to the PBGC

23 stipulation, which I'll mention in a moment.  But if I could

24 pause there, Your Honor, if you have any questions, I'd be

25 happy to answer with respect to the IRS, also happy to hear

1  from anyone else who has any issues with respect to the IRS

2  agreements.

3            THE COURT:  Thank you, Mr. Bromley.  I don't know.

4  Does anyone else wish to be heard?

5                      (No verbal response)

6            THE COURT:  I don't have any questions.  It appears,

7  to me, so obvious that it is a wise and helpful resolution and

8  clearly in the best interests of the debtor's estates, and I'm

9  very pleased to grant the motion and to enter the order.

10           MR. BROMLEY:  Thank you, Your Honor.

11           THE COURT:  And I will be recommending to the Federal

12 Judicial Conference that they provide us with a course on tax

13 issues for bankruptcy judges, because we need some help.

14           MR. BROMLEY:  It is --

15           THE COURT:  But the parties -- the parties were very

16 helpful, I must say, in helping me to understand the issues.

17           MR. BROMLEY:  I think that course should be open to

18 the bankruptcy practitioners as well --

19           THE COURT:  I hear you.

20           MR. BROMLEY:  -- Your Honor.

21           THE COURT:  I know that Ms. Buell is on the

22 telephone, and maybe she should teach the course.

23           MR. BROMLEY:  The -- if I can refer now, Your Honor,

24 to the PBGC?

25           THE COURT:  Yes.  Yes.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BROMLEY:  Just so I can close the circle on that,

2  I think --

3          THE COURT:  You bet.

4          MR. BROMLEY:  -- one benefit to this process was that

5  we were able to also resolve a closing condition to the Avaya

6  transaction a bit earlier than we had I think originally

7  anticipated, which is the -- the situation, as it relates to

8  the PBGC, Your Honor, is one that has been apparent to the

9  debtors and the purchasers, Avaya and our other competing

10  bidders at the time, for quite a while, which is that the

11  defined benefit plan that the debtors have maintained in the

12  United States is in the process of being terminated, and the

13  PBGC has filed proofs of claim.

14          We are obviously not stipulating to amounts of the

15  proofs of claim, but they are substantial, in the hundreds of

16  millions of dollars, and we anticipated all along that we

17  woujld need to have a negotiation with the PBGC in order to

18  make sure that the assets of these non-debtor entities as well

19  as their shares would be able to be transferred to Avaya free

20  and clear of any liens, claims, encumbrances, or the like.

21          The fact that the IRS filed their proof of claim and

22  we needed to resolve the dash six liability meant that we also

23  needed to resolve the PBGC issues.  And referring to the ASSA

24  with Avaya, there's a closing condition in Section 8.3(d), and

25  it's a condition to the performance of the obligations of the

1 purchaser, and that section references the PBGC, their right to

2 assert liens and claims against the assets of the non-debtor

3 entities.

4         And what we needed to do, Your Honor, was to

5 recognize that both the IRS and the PBGC had very specific

6 issues as they related to the claim -- to the assets and the

7 proceeds that relate to these two entities.  And so what we

8 have is a stipulation that's attached to the motion as an

9 exhibit.

10         THE COURT:  Yes.

11         MR. BROMLEY:  This is a 9019 motion to approve the

12 stipulation of the PBGC, and that resolution with the PBGC is

13 -- is one that is conditional on the IRS settlement being

14 approved, and the IRS settlement, in turn, is conditioned on

15 the PBGC order being approved.  And it's interesting if you

16 look at the way Congress has decided to provide the benefits

17 and protections to both agencies.  They've done so a little

18 differently.  The PBGC gets a lien when it terminates the plan,

19 and that lien is measured according to a statutory methodology,

20 and that lien -- that's a lien.  Now, the IRS obviously has a

21 tax claim, and it's given a priority with respect to certain

22 elements of its tax claim but not a lien.

23         And so what we have here are the IRS and the PBGC

24 both having competing claims against the proceeds of the Avaya

25 transaction that would relate to these entities.  And we have

1 defined in both of these orders those proceeds to be the

2 Sheriff Sale proceeds.

3          THE COURT:  Yes.

4          MR. BROMLEY:  And so the IRS and the PBGC will take

5 with respect to those Sheriff Sale proceeds in a particular

6 order that both of these resolutions incorporate.  The first

7 party taking will be the PBGC to the extent of their lien.

8 There is no agreement in any of these documents as to the

9 dollar amount of that lien, and the termination of that is

10 something that will take place in the next several months.

11 But, nevertheless, it is something that we need to address.

12 And it may be large.  It may be small.  We'll -- we may have to

13 be before you to help us figure out how large or small it is.

14          And if there is anything left over after the PBGC's

15 lien, the IRS would take to the extent of its claim, which is

16 entitled to priority under (a)(8).  Now that claim as well we

17 have fully reserved our rights.  We don't know if that claim

18 will be large or small or zero at this point.

19          But in the event that there is a claim for the IRS

20 that follows the lien of the PBGC, it would be satisfied in

21 that order.  If the PBGC lien is satisfied and then the IRS

22 claim is satisfied out of the proceeds, after that the PBGC

23 would have an unsecured deficiency claim, and that unsecured

24 deficiency claim would share in the proceeds that are left over

25 on a 50/50 basis with NNI, the corporate owner of the stock of

1  NGS and DiamondWare.

2          And so that is the priority that has been agreed to,

3  and it's incorporated, as I said, Your Honor, into both of

4  these documents.  All rights as to what those amounts may be

5  are reserved.  The debtors are clearly going to object to the

6  claim at this point.  We'll try to work it out, but we reserve

7  our rights to do so at an appropriate time.

8          The IRS arrangement adjourns without date our

9  objection to the IRS claim.  We will, if necessary, have to

10  come back and resolve that, but again, hopefully, our

11  cooperative venture last week will help us resolve that dollar

12  amount in a cooperative manner as well.

13          But what we've been able to do, Your Honor, here is

14  out of lemons make some lemonade.  I think we've been able to

15  resolve both the IRS claim in the sense of the dash six

16  liability only.  It doesn't resolve it as to anything else, but

17  it does allow us to not have to file these two entities. It

18  satisfies those conditions as it relates to the Avaya

19  transaction and allows those sales -- the sale of the shares to

20  take place in a manner satisfactory to Avaya.

21          By the same token, Your Honor, we've been able to

22  also satisfy the closing condition with respect to the liens

23  and claims of the PBGC, and, therefore, on the basis of the way

24  the two fit together, we think it's been a successful week.

25          And so on that, Your Honor, I would stop for a moment

1  on the PBGC and see if anyone has any questions or concerns on

2  that, and then now that I've described how they fit together,

3  happy to address any issues on that basis as well.

4          THE COURT:  Thank you, Mr. Bromley.  Does anyone else

5  wish to be heard?  I welcome Mr. Bane on behalf of Avaya, and

6  he looks to be sitting rather comfortably and contentedly back

7  there.  So unless anyone wishes to be hear, I again say that

8  your hard work has really I think borne fruit for the benefits

9  of this estate -- of the debtors' estates, I should say, and,

10  certainly, the Rule 9019 requirements are -- they're clearly

11  met.  It's a fair and reasonable settlement well within the

12  range of fairness.

13          As you know, it only has to be at the lower end of

14  that range, but I -- without indicating at what end of the

15  range it is, it clearly is -- it's solubly within the range,

16  and it's in the best interests of the debtors' estates, and I'm

17  pleased to grant the motion and enter both orders.

18          MR. BROMLEY:  Thank you very much, Your Honor, and I

19  would like to --

20          THE COURT:  It was an impressive amount of work, and

21  I want to thank also -- I see -- I acknowledged Mr. Bane, but

22  Mr. Geht is in the courtroom as well, and I know that it was a

23  rocky path, but I see from his smile that he is at least also

24  satisfied with where we are today.

25          MR. GEHT:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Thank you, Mr. Geht.

2          MR. BROMLEY:  The debtors would very much like to

3   thank the efforts of everyone involved.

4          THE COURT:  Yes.

5          MR. BROMLEY:  I think it's -- it is very gratifying

6   to be able to say that the -- both agencies of the government

7   worked very hard to help us through this.  I think the -- you

8   know, the speed with which this had to move is not the typical

9   speed with which some things move through different government

10  agencies.  We do appreciate that, and we recognize that there

11  are reasons for that, and I think on that basis, we really do

12  think that the IRS and the PBGC should be complimented on being

13  able to react as quickly as they have.  And, certainly, our

14  creditor constituencies again were at the table the entire

15  time, and having everyone there, including Mr. Bane, made last

16  Wednesday a very fruitful exercise.

17         THE COURT:  Absolutely, and I'm grateful to -- I am

18  grateful for all of you as the person who would've been

19  presiding over this hearing today.  I don't know if anyone is

20  on the phone from the PBGC, but I would like to, as you

21  suggested, Mr. Bromley, also acknowledge their effort and

22  cooperation here in arriving at a successful, I don't know

23  whether to call it interim but at least successful resolution

24  of the emergent issues.

25         MR. BROMLEY:  Thank you, Your Honor.  I have the two

**J&J COURT TRANSCRIBERS, INC.**

1  orders --

2          MR. MURRELL:  Your Honor, Vincent Murrell on behalf

3  of the Pension Benefit Guaranty Corporation.

4          THE COURT:  Oh, there you are.  Good morning.

5          MR. MURRELL:  Good morning, Your Honor.  Your Honor,

6  thank you very much, and we also thank the debtor for their

7  professionalism, Mr. Bromley and the rest of the team for their

8  professionalism with which they handled this, and it could've

9  been -- it could've turned out much differently, but especially

10 given the time restraints, but all I can say is yes, it was

11 well done from out standpoint.

12         THE COURT:  Thank you very much.  All right.

13         MR. BROMLEY:  May I approach, Your Honor?

14         THE COURT:  Mr. Bromley, you may.  Thank you.  Well

15 done.  Well done to everyone, and I am signing the orders.

16                         (Pause)

17         THE COURT:  Anything further?

18         MR. BROMLEY:  No, Your Honor.  We'll be back on

19 Thursday with Mr. Reidel (phonetic), Mr. Murray --

20         THE COURT:  Yes.

21         MR. BROMLEY:  -- Flextronics, Verizon, the whole

22 gang.

23         THE COURT:  I will look forward to seeing you,

24 everyone, and thank you very much and a good day to you, and

25 we'll stand in recess.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BROMLEY:  Thank you very much, Your Honor.

2          THE COURT:  Thank you.

3          ALL:  Thank you, Your Honor.

4                    * * * * *

5          **C E R T I F I C A T I O N**

6 _____I, PATRICIA C. REPKO, court approved transcriber,

7 certify that the foregoing is a correct transcript from the

8 official electronic sound recording of the proceedings in the

9 above-entitled matter, and to the best of my ability.

10

11 /s/ Patricia C. Repko          DATE:  October 15, 2009
12 PATRICIA C. REPKO
13 J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**