**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: <br><br> NORTEL NETWORKS INC., <u>et al</u>., <br><br> Debtors. | Chapter 11 <br><br> Case No. 09-10138 (KG) <br><br> (Jointly Administered) <br><br> **RE:  Docket No. 1525** |

**OBJECTION BY OSS NOKALVA, INC., TO DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING AND APPROVING SALE PROCEDURES, (B) AUTHORIZING AND APPROVING NOTICE PROCEDURES, AND (C) SETTING A DATE FOR SALE HEARING, AND (II) AUTHORIZING AND APPROVING SALE OF DEBTORS' NEXT GENERATION SERVING PACKET CORE NETWORK COMPONENTS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBERANCES**

OSS Nokalva, Inc., the successor in interest to Open Systems Solutions, Inc. ("**OSS**"), by and through its undersigned counsel, by way of objection to Debtors' Motion for Orders (I)(A) Authorizing and Approving Sale Procedures, (B) Authorizing and Approving Notice Procedures, and (C) Setting a Date for Sale Hearing, and (II) Authorizing and Approving Sale of Debtors' Next Generation Serving Packet Core Network Components Free and Clear of All Liens, Claims and Encumbrances [Docket No. 1525] (the "**Motion**"), respectfully states and represents:

**PRELIMINARY STATEMENT**

1.      OSS is a party with Debtor Nortel Networks Inc. ("**NNI**" or "**Debtor**") to a certain "Nortel Networks/OSS Corporate-Wide Software License Agreements" (the "**OSS Agreements**")[1]. Pursuant to the OSS Agreements, OSS non-exclusively licenses to NNI OSS software, including, without limitation, source code generated by NNI through use of certain of

---

[1] Capitalized terms have the meaning ascribed to them in the Motion or OSS Agreement, unless the meaning is otherwise clear from the context of their usage.

the OSS software (collectively, the "**OSS Software**") and such license and the OSS Agreements cannot be assigned without OSS' consent.

2. Whether by design or inadvertence, nothing in the Motion, Sale Procedures, or proposed Transaction Agreement remotely identifies OSS, the OSS Agreement or the OSS Software as integral parts of the sale of the Assets to a yet-unknown purchaser. OSS submits, however, the OSS Software is an integral part of the NNI Assets being proposed for sale. Indeed, annexed as Exhibit "B" is an e-mail "thread" in which Debtor admits it will not renew OSS' Annual Maintenance Renewal for ASN.1 Tools because the buyer of the Next Generation Packet Core business will have to sign a new agreement with OSS.

3. Despite that fact, OSS has received no notice, formal or otherwise, that NNI intends to assume and assign the OSS Agreement to a purchaser of the Assets. Moreover, OSS submits that, in addition to the de facto and unlawful assignment of the OSS agreement without OSS' consent, the OSS Software may be embedded in the Assets and cannot be used by a purchaser without infringement of OSS' software licenses.

4. OSS does not consent to the assignment of the OSS Agreement or transfer of the OSS Software to any purchaser, consents required by the OSS Agreement and applicable non-bankruptcy law. OSS expressly reserves all rights to take appropriate legal action against persons or entities infringing, or aiding and abetting the infringement of, the OSS Software.

5. Accordingly, OSS respectfully requests that the Court deny approval of the proposed Transaction Agreement and sale of the Assets, as presently proposed.

## BACKGROUND

**A.    The Sale of Next Generation Packet Core Network Components**

6. For the past several months, NNI has slowly been selling off various units or divisions of its business. On at least one prior occasion, NNI's sale of assets included an express assumption and assignment of intellectual property licenses. The Motion does <u>not</u> purport to include an assumption and assignment of licenses.

7. Currently, NNI is attempting to sell additional pieces of its business, including Next Generation Packet Core network components that are the subject of the Motion.

8. Under the terms of the Motion, NNI has not yet found a purchaser for the Assets it proposes to sell, but has included in its Transaction Agreement, attached as Exhibit F to the Motion, a description of the sale process in which it wishes to engage with any prospective purchaser or highest bidder of the Assets. Both the Motion and the Transaction Agreement suggest strongly, <u>albeit</u> obliquely, that the OSS Software is an integral component of the Assets.

9. As set forth in the Motion, the Assets for sale consist primarily of "intellectual property and related tangible assets, associated with the design, development, commercialization, customization and support of the following network components: (a) a Next Generation Serving GPRS Support Node on Advance Telecomputing Architecture ("**ATCA**"); (b) a Next Generation Gateway GPRS Support Node on ATCA; (c) a Mobility Manager Element on ATCA; (d) an AGW Serving Gateway on ATCA; (e) an AGW Packet Data Gateway on ATCA; and (f) a Network Element Manager associated with each of the aforementioned components." (Motion, ¶ 11).

10. The transfer of OSS' Software would appear to be a central component of any proposed sale by NNI, including this one.

11. Paragraph 14 of the Motion provides in pertinent part:

In particular, as set forth in more detail below, NNL proposes to transfer its interests in certain non-patent intellectual property included in the Assets and

grant a non-exclusive license to patent intellectual property included in the Assets, and NNI (together with NNL, the "Sellers") proposes to transfer equipment and other tangible assets included in the Assets to the purchaser pursuant to the Agreement.  The Sellers also contemplate entering into certain ancillary agreements with the purchaser, in particular an Intellectual Property License Agreement and a Transition Services Agreement. . . .

12. In addition, Section 4.5 of the proposed Transaction Agreement also provides in relevant part:

(d) To the knowledge of the Sellers, NNL has the right and power to grant the licenses to be granted to the Purchaser pursuant to Article III of the Intellectual Property License Agreement.

13. A copy of the proposed Intellectual Property License Agreement was not attached to any of the documents electronically filed with the Court; consequently, its terms remain undisclosed and whether it is intended to apply to the OSS Software remains unknown.

14. However, from these sections, it clearly appears that the sale contemplates and requires a transfer of OSS' Software as an integral part of the Next Generation Packet Core network components.

### B. OSS' Agreement with NNI

15. NNI and OSS entered into the OSS Agreement as of the 25th day of June, 1999. Pursuant to the OSS Agreement, NNI was granted a non-exclusive license to use the OSS Software. A copy of the OSS Agreement is annexed as Exhibit "A".

16. The OSS Software includes software tools, libraries and code that Nortel uses to develop certain products, which products Nortel sells to end users. Nortel has used many copies of the OSS Software since the inception of the OSS Agreement.

17. The OSS Software is OSS' main asset. Substantially all of OSS' business consists of licensing the OSS Software to entities and receiving fees for such licenses.

18. NNI's proposed transfer of the OSS Software to a third party for valuable consideration to NNI would deprive OSS of its license fees and risk, potentially, such third party having the continued use of the OSS Software without having to pay fees to OSS.

19. In addition, OSS has concerns if the OSS Software were to be provided to a competitor of OSS. Presently, it is impossible to know if the ultimate purchaser of the Assets is a competitor of OSS or, arguably, may hold interests adverse to those of OSS.

20. Furthermore, there is a distinct risk that the OSS Software may be transferred to a third party, with which OSS might not agree to contract for various business reasons. Those reasons include, without limitation, such party's use of the OSS Software in a manner that could adversely affect OSS' ownership and intellectual property rights or to a third party located in a foreign jurisdiction that won't enforce OCC's ownership rights with respect to the software. For example, if the transferee were to distribute certain source code provided as part of the software, which distribution is prohibited by the OSS Agreement, this would seriously affect OSS' business. OSS would have to proceed with costly and time consuming litigation to prevent further damage to its rights.

21. The OSS Agreement also authorizes NNI to use OSS' trademarks in connection with marketing and distributing of the OSS Software or those NNI products that incorporate any of the OSS Software. A transfer of that right to a third party purchaser - - not approved by OSS - - greatly impairs the value and usefulness of the OSS trademarks.

22. Pursuant to Section 12.4 of the OSS Agreement, NNI's duties and rights under the OSS Agreement with respect to the OSS Software "may not be sold, assigned, sublicensed or otherwise transferred by NNI, in whole or in part, without the prior written consent of OSS."

23. In addition, pursuant to Sections 10.1 and 10.2 of the OSS Agreement, any source code provided by OSS, and source code produced by the use of the OSS Software, are confidential information of OSS and cannot be disclosed by NNI to third parties. Thus, absent OSS' consent, OSS is greatly concerned that NNI may breach this provision of the OSS Agreement in its negotiations with any potential purchaser. NNI may already have breached this provision.

24. In addition, pursuant to Paragraph 14 of the Motion and Section 4.5(d) of the Transaction Agreement, NNI seeks to both transfer rights to a proposed buyer <u>and</u> to retain certain license privileges and benefits as though no assignment had been made. That is unacceptable to OSS because two parties would have a license to the software though a license fee would only be paid by one party.

## **LEGAL BASIS FOR OBJECTION**

25. Pursuant to 11 U.S.C. § 365(a) and (f) of the Bankruptcy Code, the trustee, subject to the court's approval, may assume or assign any executory contract or unexpired lease of the debtor. The license for the OSS Software, which NNI in fact proposes to assume and assign, is an executory contract excluded from the reach of § 365(a) and (f) by the exception in 11 U.S.C. § 365(c)(1). Under § 365(c) (1),

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if-
>
> (1)  (a) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
>    (b) such party does not consent to such assumption or assignment . . .

26. The Third Circuit adheres to the definition under Countryman of an executory contact as a contract in which "the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." See In re Access Beyond Tech., Inc., 237 B.R. 32, 43 (Bankr. D. Del. 1999) (quoting Countryman, Executory Contracts in Bankruptcy; Part I, 57 Minn. L. Rev. 439, 460 (1973)) (citing Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989)).

27. This Court has also held that intellectual property licenses, including copyright licenses, are executory contracts within the meaning of 11 U.S.C. § 365(c) under the Countryman definition. See In re Valley Media, Inc., 279 B.R. 105, 135 (Bankr. D. Del. 2002) (copyright license found to be executory contract); In re Golden Books Family Entm't Inc., 269 B.R. 311, 349 (Bankr. D. Del. 2001) ("courts generally have found intellectual property license to be 'executory' within the meaning of section 365(c) because each party to the license had the material duty of "refraining from suing the other for infringement of any of the [intellectual property] covered by the license")(terms in brackets included in original); Access Beyond Tech., 237 B.R. at 43-44 (patent license agreement found to be executory contract). Accordingly, the OSS Agreement for the licensing of OSS Software is an executory contract because it provides for the licensing of OSS' intellectual property to NNI.

28. In accordance with the exception outlined in § 365(c)(1)(a), there is applicable non-bankruptcy law that prohibits the assumption and assignment of non-exclusive intellectual property licenses, like the OSS Agreement. Under the Copyright Act, 17 U.S.C. § 201(d), the owner of a copyright may transfer, by a license or otherwise, in whole or in part, any of the exclusive rights that inure to the benefit of the copyright holder as defined in 17 U.S.C. § 106.

Those rights under § 106 include the right to make copies of the copyrighted work, prepare derivative works based on the copyrighted work, and distribute copies of the copyrighted work to the public for sale. Thus, any exercise of these exclusive rights, or any transfers of these rights pursuant to a non-exclusive license, may only be accomplished with the consent of the copyright holder.

29.  The Copyright Act recognizes a distinction between exclusive licenses, which transfer all rights of the copyright owner to the extent of the license to the licensee, and non-exclusive licenses, where all rights remain with the licensor. See In re Patient Educ. Media, Inc., 210 B.R. 237, 240 (Bankr. S.D.N.Y. 1997) (holding that photographer had granted debtor a nonexclusive license in his copyrighted work, and thus, debtor could not transfer license to purchaser of substantially all of its assets without photographer's consent. Id. at 243). The owner of an exclusive license receives the rights of exclusive ownership of the copyright and may act without the consent of the copyright owner. See Golden Books, 269 B.R. at 319 (Bankr. D. Del. 2001) (holding that copyright law provides a distinction between treatment of exclusive and non-exclusive licenses to copyright material and that copyright law would not prevent assumption and assignment of work held pursuant to an exclusive license).

30.  However, the holder of a non-exclusive license does not possess all of the rights of exclusive ownership of the copyright, and thus, may not take any action with respect to the copyright, including assignment of its license, without the consent of the copyright owner. See Valley Media, 279 B.R. at 135 ("A non-exclusive license of rights by a copyright owner to another party is not assignable by that party without the permission of the copyright holder under federal copyright law since the license represents only a personal and not a property interest in the copyright); Patient Educ. Media, 210 B.R. at 240 ("non-exclusive license is personal to the

transferee . . . and the licensee cannot assign it to a third party without the consent of the copyright owner").

31. Notably, the OSS Agreement between OSS and NNI expressly provides in § 12.4 that "the OSS Software and OSS Generated Source Code may not be sold, assigned, sublicensed or otherwise transferred by Nortel Networks, in whole or in part, without the prior consent of OSS".

32. Here, the OSS Agreement with NNI clearly sets forth in the "LICENSE" section, specifically paragraphs 4.1 -4.2, that "[s]ubject to the payment of fees . . . OSS grants Nortel Networks a non-exclusive, worldwide right" to perform various actions outlined in the OSS Agreement with respect to its use of the OSS Software.  (See OSS Agreement at 7).  Thus, there can be no dispute that all NNI possesses is a non-exclusive license for the use of the OSS Software.

33. Accordingly, because applicable non-bankruptcy law, here the Copyright Act, prohibits NNI from transferring its non-exclusive license in the OSS Software without the consent of OSS, and such consent is denied, NNI may not assume and assign its non-exclusive license with OSS as part of this bankruptcy proceeding.  See In re Sunterra Corp., 361 F.3d 257, 260, 271 (4th Cir. 2004) (debtor not permitted to assume non-exclusive software license under § 365(c)); Patient Educ. Media, 210 B.R. at 243 (relying on case law concerning non-assignability under bankruptcy and federal law of non-exclusive patent licenses to hold that non-exclusive copyright license could not be assigned pursuant to § 365(c) without copyright owner's consent); Access Beyond Tech., 237 B.R. at 47 (non-exclusive patent cross-license agreement cannot be assigned pursuant to § 365(c)); Cf. Golden Books, 269 B.R. at 314 (determination as to whether

copyright license is assignable under § 365(c) turns on whether license is exclusive or non-exclusive).

34.     In addition, under trademark law, the registration of a trademark provides the registrant with the exclusive right to use the mark, see 15 U.S.C. § 1057(b) and § 1115, and any person who uses a trademark without the consent of the trademark registrant can be subject to civil suit for infringement.  See 15 U.S.C. § 1114.

35.     Trademark law similarly provides that the registrant of a trademark may assign the mark, but such assignment must be by consent or "by instrument in writing duly executed." See 15 U.S.C. § 1060.

36.     In § 4.8 of the OSS Agreement, OSS also agrees to permit NNI to use its trademarks in connection with marketing and distribution of NNI products provided, however, that NNI properly identifies OSS as the owner of such trademarks and complies with the instructions of OSS regarding the use of the marks.

37.     The courts that have addressed the assumption and assignment of licenses to use trademarks have relied upon cases in the copyright and patent areas to similarly hold that the exception under § 365(c)(1) applies with equal force to prohibit the assignment of trademark licensing agreements. See In re: Wellington Vision, Inc., 364 B.R. 129, 136 (S.D. Fla. 2007) (precluding assignment of franchise agreement that provided for right to use trademarks as a license under the Trademark (Lanham) Act and § 365(c) and noting that "a clause against unreasonable withholding of consent is not equivalent to a clause expressly allowing assignment without consent."); In re N.C.P. Marketing Group, Inc., 337 B.R. 230, 237-238 (D. Nev. 2005) (holding that "Because . . . under applicable trademark law, trademarks are personal and non-

assignable without the consent of the licensor, the [owners'] trademark would be unassuamble as part of the bankruptcy estate of NCP without the [owners'] consent.")

38.  Moreover, for § 365(c)(1) to be applicable, not only must non-bankruptcy law prohibit the transfer of the property, but the non-debtor party must withhold its consent.  As previously noted, OSS refuses to consent to the assignment of its non-exclusive license with NNI under the present terms of the asset sale.  OSS may withhold consent to such assignment, not only under the applicable law discussed above, but pursuant to section 12.4 of the OSS Agreement which provides that "the OSS Software and OSS Generated Source Code may not be sold, assigned, sublicensed or otherwise transferred by Nortel Networks, in whole or in part, without the prior written consent of OSS."

39.  Although NNI has requested that this Court approve the sale of certain assets of the Debtor, including the Debtor's non-exclusive licenses to certain patent intellectual property which encompasses the OSS Software, pursuant to § 365(a) and (f) of the Bankruptcy Code, such assignments or transfers cannot take place where the exceptions to § 365(a) and (f), under § 365(c), are applicable.  Thus, under the OSS Agreement, relevant bankruptcy law, and applicable non-bankruptcy law, the Debtor should not be permitted to transfer its non-exclusive license with OSS without the consent of OSS.

40.  In addition, when Debtors' sold its CDMA and LTE Business, OSS filed a similar objection to the transfer of Debtors' non-exclusive license to OSS' Software without its consent. In response to that objection, this Court approved in the final sale order:

41.  Nothing in this Order provides for the assumption and assignment of any contract or license with OSS Noklava, Inc., successor to Open System Solutions, Inc. ("OSS") pursuant to section 365 of the Bankruptcy Code. To the extent that the Purchaser elects to have the

Debtors assign to the Purchaser any contract with OSS relating to the Assets, in whole or in part, the Debtors and Purchaser will do so in accordance with the terms of such contract or license, which terms include, *inter alia*, the written consent of OSS.

42. For the foregoing reasons, similar language is appropriate in any sale order issued with respect to the sale of the Next Generation Packet Core network components by NNI. This notice would serve to protect OSS' interest in its intellectual property, to uphold the terms of the OSS Agreement, and to put potential purchasers on notice of the infringement of the OSS Software.

## **CONCLUSION**

For each of the reasons set forth above, OSS respectfully requests entry of an order denying the sale of the Assets to any purchaser under the terms of the proposed Transaction Agreement.

Dated: October 20, 2009  
       Wilmington, Delaware

**POLSINELLI SHUGHART PC**

By: */s/ Christopher A. Ward*

Christopher A. Ward (No. 3877)  
Justin K. Edelson (No. 5002)  
222 Delaware Avenue, Suite 1101  
Wilmington, Delaware 19801  
Telephone: (302) 252-0920  
Facsimile: (302) 252-0921

-and-

Robert E. Nies, Esq.  
**WOLFF & SAMSON PC**  
The Offices at Crystal Lake  
One Boland Drive  
West Orange, New Jersey 07052  
Phone: (973) 325-1500  
Facsimile: (973) 325-1501

*Counsel for OSS Nokalva, Inc.*