## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

## NOTICE OF FILING OF TWENTY-FIFTH REPORT OF THE MONITOR OF THE CANADIAN NORTEL COMPANIES <u>IN THE CANADIAN PROCEEDINGS</u>

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

**PLEASE TAKE NOTICE** that on October 23, 2009, Ernst & Young Inc., the Monitor and foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation, in proceedings under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List), by its undersigned counsel, filed, in the above-captioned cases, a copy of the Twenty-Fifth Report of the Monitor (the **"Twenty-Fifth Report"**), dated October 22, 2009.  A copy of the Twenty-Fifth Report is annexed hereto as Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Twenty-Fifth Report is also available on the Monitor's website, www.ey.com/ca/nortel or upon request to the Monitor's counsel.

Dated: Wilmington, Delaware
      October 23, 2009

ALLEN & OVERY LLP

Ken Coleman
Lisa Kraidin
1221 Avenue of the Americas
New York, New York  10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
ken.coleman@allenovery.com
lisa.kraidin@allenovery.com

-and-

BUCHANAN INGERSOLL & ROONEY

By: /s/ Mary F. Caloway
Mary F. Caloway (No. 3059)
Peter J. Duhig (No. 4024)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
Telephone (302) 552-4200
Facsimile (302) 552-4295
mary.caloway@bipc.com

Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian Nortel
Group

## EXHIBIT A

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")

TWENTY-FIFTH REPORT OF THE MONITOR
DATED OCTOBER 22, 2009

**INTRODUCTION**

1. On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceeding. The stay of proceedings was extended to October 30, 2009, by this Honourable Court in its Order dated July 30, 2009.

2. Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in

the U.S. Court on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official unsecured creditors committee (the "Unsecured Creditors' Committee") was established in January, 2009. In addition, an ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as those in the U.S. (the "the Ad Hoc Bondholders'").

3.  Nortel Networks (CALA) Inc. ("NCI") (together with NNI and certain of its subsidiaries filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009. On August 14, 2009, the NN CALA Chapter 11 filing was recognized pursuant to Section 18.6 of the CCAA.

4.  Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court") on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Joint Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "U.K. Administrators"). On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

5.  On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a

stay against NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

6.  Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (the "French Court").

**PURPOSE**

7.  The purpose of this twenty-fifth report of the Monitor (the "Twenty-Fifth Report") is to report on the following matters:

    a)  consolidated cash position and liquidity as at October 3, 2009;

    b)  actual receipts and disbursements from July 12, 2009 to October 3, 2009;

    c)  cash flow forecast for the period from October 4, 2009 to December 31, 2009;

    d)  current status of the Group Supplier Protocol Agreement ("GSPA");

    e)  update on the CCAA claims process;

    f)  status of foreign proceedings;

    g)  the Applicants' progress on restructuring; and

    h)  the Applicants' request for an extension of the stay of proceedings to December 18, 2009.

**TERMS OF REFERENCE**

8.  In preparing this Twenty-Fifth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. EYI has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Twenty-Fifth Report.

9.  Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

10. Capitalized terms not defined in this Twenty-Fifth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report or previous Reports of the Monitor.

**GENERAL BACKGROUND**

11. Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

12. Since June 30, 2009, Nortel has conducted its global business through five reportable business unit segments, Carrier Networks ("CN"), Enterprise Solutions ("ES"), Metro Ethernet Networks ("MEN"), Carrier Voice Application Solutions ("CVAS") and LG Nortel Co. Ltd. ("LGN"). The revenue and assets of each of the business units, except for LGN, is distributed among the multiple Nortel legal entities and joint ventures around the world.

4

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**CONSOLIDATED CASH POSITION AND LIQUIDITY AS AT OCTOBER 3, 2009**

14. At October 3, 2009, Nortel's consolidated gross cash balance of approximately $2.9 billion was held globally in various Nortel entities and joint ventures. The following is an overview of Nortel's consolidated cash position as at October 3, 2009:

| Region | Gross Cash | Restricted | JV's and Other Items (see below) | Available Cash |
|---|---|---|---|---|
| NNL | 202 | (32) | - | 170 |
| Other Canada | 39 | (27) | - | 12 |
| | | | | |
| NNI | 752 | (59) | - | 693 |
| NNI - Reserve MMF (ST/LT) | 18 | - | (18) | - |
| NGS | 56 | - | (56) | - |
| Other US | 3 | - | - | 3 |
| **North America** | 1,070 | (118) | (74) | 878 |
| | | | | |
| NN UK Limited | 372 | (26) | - | 346 |
| Other EMEA Filed Entities | 402 | (11) | - | 391 |
| JV - Netas | 61 | - | (61) | - |
| EMEA non-filed entities | 8 | - | - | 8 |
| **UK/Europe** | 843 | (37) | (61) | 745 |
| | | | | |
| Greater China | 186 | (6) | - | 180 |
| Other ASIA PAC (excl JVs) | 238 | (1) | - | 237 |
| LG Nortel | 310 | - | (310) | - |
| Other JVs | 78 | - | (78) | - |
| **ASIA** | 812 | (7) | (388) | 417 |
| | | | | |
| NCI | 76 | - | - | 76 |
| CALA non-filed entities | 63 | - | - | 63 |
| **Cala** | 139 | - | - | 139 |
| | | | | |
| **Total Treasury Cash** | 2,864 | (162) | (523) | 2,179 |

15. As at October 3, 2009, North America had cash available for operations and post-filing inter-company settlements of approximately $878 million compared to a gross cash position of approximately $1.1 billion. Of this amount, approximately $182 million is held by Canadian entities and approximately $696 million is held by U.S. entities.

16. None of the Applicants' Restricted Cash and Unavailable Cash is readily available to them. Restricted Cash relates primarily to: (i) $15 million of cash collateral posted by Nortel with respect to non-EDC performance bonds and letter of credit facilities, (ii) $7 million cash collateral posted with EDC for post filing performance bonding, (iii) $8 million related to cash collateral required to issue EDC performance bonds in exotic foreign currencies, (iv) $10 million held in an escrow account related to the settlement of the Global Class Action, (v) $6 million held in relation to benefits paid through the Health and Welfare Trust (the "H&WT"), (vi) $2 million held in escrow in respect of a certain real estate lease, and (vii) $11 million held in the D&O Trust as described in the Pre-Filing Report.

17. NNI's Restricted Cash relates primarily to: (i) a good faith deposit of $37 million by Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") in respect of the sale of the CDMA and LTE Access assets (described later in this Report) (ii) proceeds of $18 million from the sale of the Layer 4-7 Business being held in escrow by JP Morgan until an agreement is reached regarding allocation of these proceeds to various Nortel legal entities, including NNL, (iii) $1 million held in escrow to the benefit of utilities providers in accordance with the First Day Order, (iv) $3 million of cash collateral posted by Nortel with respect to non-EDC performance bonds and letter of credit facilities. NNI's Unavailable Cash as at October 3, 2009 includes $18 million related to the Money Market Reserve Primary Fund (the "MMF"). Since filing, $47 million has been recovered from the MMF.

18. Nortel Government Solutions ("NGS"), a U.S. non-debtor entity, had cash of approximately $56 million for use in its own operations and for settlement of inter-company transactions. It is anticipated that the shares of NGS will be transferred to Avaya Inc. in connection with the closing of the sale of Nortel's ES business.

19. The U.K. Administrators had cash available for operations and post–filing inter-company settlements for NNUK and the other EMEA Debtors, of approximately $737 million. The EMEA non-filed entities had available cash of approximately $8 million which is expected to be used primarily to fund their in-country operations and inter-company settlements.

20. NETAS, a joint venture in which Nortel owns a 53% interest, has approximately $61 million of cash of which $32 million represents Nortel's proportionate share. Nortel believes these funds will continue to be used to fund NETAS's operations. Repatriation of any of these funds requires approval of the joint venture partners.

21. Nortel entities in the APAC region have approximately $417 million of cash available for operations and inter-company settlements. As a result of the regulatory regime in the People's Republic of China, the funds in Greater China of approximately $180 million are generally only available to fund operations within China and inter-company settlements. LGN and other Nortel Asian joint ventures hold approximately $388 million of cash of which approximately $203 million represents Nortel's proportionate share. Repatriation of any of these funds requires approval of the respective joint venture partners.

22. As at October 3, 2009, NCI's available cash position was $76 million. The CALA non-filed entities have approximately $63 million of cash generally available to fund their in-country operations and inter-company settlements.

ACTUAL RECEIPTS AND DISBURSEMENTS FROM JULY 12, 2009 TO
OCTOBER 3, 2009

23. The Applicants' actual consolidated net cash outflow for the period from July 12 to
October 3, 2009, was $26.9 million.  A summary of the actual receipts and
disbursements as compared to the forecast filed with the Sixteenth Report is attached
at Appendix "A".

24. Actual net cash outflow was less than forecast by $13.7 million.  Significant items
contributing to the variance were as follows:

   a) a positive variance of $17.2 million with respect to the collection of accounts
   receivable primarily as a result of the following:

      i.  a positive timing variance of $8.3 million relating to amounts forecast
      to be received in Q4 2009 that were actually received in Q3 2009; and

      ii. a positive permanent variance of $8.8 million relating to higher than
      expected collections from contract manufacturers;

   b) a positive permanent variance of $2.0 million with respect to other receipts as
   a result of the release of $2.0 million relating to the RBC letter of credit
   facility not originally reflected in the forecast;

   c) a negative timing variance relating to net inter-company receipts and
   disbursements of approximately $8.9 million primarily as a result of:

      i.  a $4.5 million negative timing variance with NNI;

      ii. an $11.1 million negative timing variance with the EMEA region; and

      iii. a $6.7 million positive timing variance primarily related to a $4.0
      million funding receipt from Nortel Networks Taiwan Sales and $1.6
      million and $1.8 million research and development and service

8

charegeback reimbursements from GDNT and Nortel Networks Singapore, respectively;

d) a positive permanent variance of $22.4 million as inventory disbursements were lower than projected due to shifts in product sourcing and reductions in the purchase volumes for certain product lines;

e) a negative timing variance of $15.8 million relating to non-inventory purchases including an $11.3 million payment representing 50% of the stalking horse break fee and expense reimbursement paid to Nokia Siemens Networks B.V. related to the CDMA and LTE Access asset sale transaction. This payment is forecast to be refunded to the Applicants in November 2009 from the proceeds of the sale of the CDMA and LTE Access assets to Ericsson; and

f) a negative timing variance of $2.5 million relating to restructuring costs as certain professional fees were settled earlier than forecast.

25. In addition, Available Cash was greater than forecast by approximately $7.5 million as a result of the appreciation of the Canadian dollar as against the U.S. dollar.

26. Unavailable Cash decreased by approximately $0.9 million primarily as a result of a release of $1.0 million to Available Cash from the unutilized portion of the RBC letter of credit facility not included in the forecast.

27. Restricted Cash increased by $1.6 million primarily as a result of the following:

a) $1.0 million decrease in the utilized portion of the RBC letter of credit facility;

b) $2.0 million increase as a result of earlier funding provided to Sun Life with respect to benefits paid through the H&WT; and

c) the appreciation of the Canadian dollar as against the U.S. dollar.

9

**CASH FLOW FORECAST FOR THE PERIOD OCTOBER 4, 2009 TO DECEMBER 31, 2009**

28. Nortel, with the assistance of the Monitor, has prepared an updated 14-week cash flow forecast for the period October 4 to December 31, 2009 (respectively, the "October 4 Forecast" and the "Forecast Period"). A copy of the October 4 Forecast is attached as Appendix "B".

29. At October 3, 2009, the Applicants have Available Cash balances of approximately $182 million, excluding Restricted Cash and Unavailable Cash of approximately $59 million.

30. The October 4 Forecast indicates the Applicants will have total receipts of $400 million and total disbursements of $524 million resulting in a net cash outflow of $124 million.

31. During the Forecast Period, it is assumed NNL does not make any additional draws on the NNI Loan beyond the $75 million drawn prior to February 1, 2009 and no additional cost recovery occurs as the Applicants and the U.S. Debtors are currently discussing the level of cost reimbursement applicable. Negotiations for Q4 2009 funding are discussed in more detail in paragraphs 33 to 35.

32. The significant assumptions used in preparing the October 4 Forecast include the following:

    a) the Ericsson sale transaction (described later in this Report) is assumed to close on November 30, 2009. The impact of the divestiture of the CDMA and LTE Access assets has been included in the October 4 Forecast. For purposes of the October 4 Forecast, no other potential business unit divestitures are assumed to close within the Forecast Period;

10

b) payroll and accounts payable disbursements for the CDMA and LTE Access assets continue to be administered by the Applicants for the duration of the forecast period subsequent to the closing of the Ericsson sale transaction. During the transition period, Ericsson is assumed to pre-fund the Company for these expenses resulting in no material working capital impact;

c) upon closing of the Ericsson sale transaction, the Applicants will be reimbursed $11.3 million from the sale proceeds for the stalking horse break fee and expense reimbursement paid to Nokia Siemens Networks B.V. The balance of the sale proceeds are assumed to be placed in escrow and are not reflected in the October 4 Forecast;

d) accounts receivable collections have been estimated by the Applicants' collection group based on revenue forecasts and historic customer collection experience;

e) all disbursements are made assuming suppliers' pre-filing amounts are stayed and post-filing amounts are paid on significantly reduced credit terms as a result of the CCAA proceedings;

f) non-inventory purchases includes payment of an estimated amount related to Directors and Officers' run-off insurance;

g) inter-company trade accounts for post-filing transactions continue to settle on a cash basis between the Applicants, U.S. Debtors, EMEA Debtors and the other Nortel entities. Inter-company pre-filing loans between the Applicants and all other Nortel filed and non-filed entities are stayed;

h) payroll includes payment of estimated Q3 2009 AIP;

11

i)   severance payments are stayed during the Forecast Period[1];

j)   pension funding continues for both current and special service payments based upon existing requirements with respect to the registered defined benefit and defined contribution plans.   Funding for non-registered pension or other retirement plans is stayed;

k)   funding continues in the ordinary course for the H&WT; and

l)   all interest payments relating to the Company's pre-filing indebtedness are stayed.   Interest with respect to the post filing NNI Loan continues to accrue; however, no interest payment is scheduled during the Forecast Period.

33. The Applicants continue to incur significant R&D and corporate costs on behalf of all Nortel entities around the world.   These expenses are incurred by the Applicants in order to preserve the enterprise value of Nortel's businesses and coordinate the global restructuring for the benefit of all stakeholders.   The interim funding and settlement agreement ("IFSA") approved by this Honourable Court on June 29, 2009, provided cost reimbursement from NNI to NNL for the period January 14, 2009 to September 30, 2009.

34. Negotiations between NNL and the U.S. Debtors for reimbursement of a portion of these costs for Q4 2009 are on-going.   In addition, the Applicants, the U.S. Debtors, EMEA Debtors and other Nortel entities are commencing discussions in order to address NNL liquidity needs for periods subsequent to December 31, 2009.

35. Based on an analysis conducted by the Monitor, it appears NNL has enough cash resources to fund operations through the Forecast Period and allow for the Applicants to complete the necessary negotiations with respect to funding.   The Applicants' anticipate bringing a motion with respect to a funding agreement that (i) reimburses

---

[1] As of the date of this Report there has been no decision received by the Applicants from the Ontario Court of Appeal in respect of the appeals brought regarding payment of severance pay.

the Applicants for certain costs incurred in Q4 2009 and (ii) addresses the Applicants liquidity needs for periods subsequent to December 31, 2009 prior to the expiry of the Forecast Period. The Monitor is of the view the Applicants must obtain recovery of costs incurred for the benefit of other Nortel entities for the period from and after September 30, 2009 (being the final date that funding under the IFSA related to) in order to have the necessary cash balances to fund their operations in January, 2010 and beyond.

**CURRENT STATUS OF GSPA**

36.  Since the Filing Date, Nortel entities have continued to purchase goods and services from one another on a basis consistent with the operation of the business prior to these proceedings. Post-filing transactions between the U.S. Debtors and the Applicants are pursuant to court orders entered in the Canadian Proceedings (e.g. the Initial Order) and the Chapter 11 Proceedings and/or in accordance with the Code (together, the "Trading Orders"). Trade between the EMEA Debtors and the Applicants is pursuant to the GSPA. The GSPA has continued to be extended by the parties, substantially in the same form as the initial GSPA.

37.  The purpose of the Trading Orders and GSPA is to ensure goods and services purchased after the Filing Date are paid in full without any set off, deduction, withholding, counter-claim or payment netting with respect to amounts owed as between the Nortel parties prior to the Filing Date. In addition, the Trading Orders and GSPA set out the requirement for the Applicants to secure any unpaid amount owing for post-filing purchases to the U.S. Debtors or EMEA Debtors by way of a charge on the assets of the Applicants (the "Inter-Company Charge").

38.  The Applicants have previously sought and obtained approval of the first to eighth extension to the GPSA.

13

39. The Applicants are seeking this Honourable Court's approval of the ninth and tenth extensions of the GSPA. The tenth extension of the GSPA expires on November 9, 2009. The Monitor supports approval of the ninth and tenth extensions of the GSPA.

**CLAIMS PROCESS UPDATE**

40. On July 30, 2009, this Honourable Court issued an order outlining the procedures for creditors to file claims against the Applicants (the "Claims Procedure Order"). The Claims Procedure Order established a claims bar date of September 30, 2009 by which creditors were to file Claims, as defined in the Claims Procedure Order, with the Monitor. The Sixteenth Report outlined the significant provisions of the Claims Procedure Order.

41. The initial call for claims excluded, among other claims, those claims in the following categories:

    a) Claims by directors and officers of the Applicants for indemnification and/or contribution arising from such Director or Officer's service to any Applicant;

    b) Employee compensation claims; and

    c) Inter-company claims (other than with Joint Ventures)[2].

---

[2] The Claims Procedure Order was subsequently amended to clarify that inter-company claims against the Directors and Officers were also excluded.

14

42. The following is a summary of claims received by the Monitor as of the Claims Bar Date:

**Nortel - CCAA Applicants**
**Claims filed as at September 30, 2009**
**CDN$ (000's)**

| | Claims Filed | |
|---|---|---|
| | # | Value |
| Nortel Networks Corporation | 246 | 8,441,749 |
| Nortel Networks Global Corporation | 50 | 3,145,052 |
| Nortel Networks International Corporation | 48 | 3,144,299 |
| Nortel Networks Limited | 439 | 9,940,282 |
| Nortel Networks Technology Corporation | 138 | 3,193,236 |

43. The number and value of filed claims include:

   a) the same claim filed against more than one of the Applicants (i.e. duplicate claims); and

   b) claims filed as "placeholder" claims with nominal claim amounts or amounts subject to further adjustment.

44. Since the Claims Bar Date, the Monitor has received 13 additional claims totalling Cdn$1.4 million.

45. It is the intention of the Monitor and the Company to come back to this Honourable Court in the near term seeking an order or orders authorizing a claims resolution process and a cross border claims protocol in respect of cross border claims.

**STATUS OF FOREIGN PROCEEDINGS**

*Chapter 11*

46. The following is a summary of the court orders that have been issued and the financial information that has been filed in the U.S. Chapter 11 Proceedings since the last update provided in the Twenty-Second Report:

15

a) On September 28, 2009, the U.S. Debtors filed the Debtor-in-Possession Monthly Operating Report for the period August 2, 2009 through August 29, 2009.

b) On September 30, 2009, the U.S. Debtors obtained an order approving the bidding and sale procedures for the sale by the U.S. Debtors of certain Next Generation Packet Core network components.

c) On October 13, 2009, the U.S. Debtors obtained orders:

   i. approving a stipulation between NNI and the PBGC waiving and releasing PBGC's claims against certain assets of the ES business in exchange for a lien on certain proceeds of the ES sale; and

   ii. approving a stipulation between NNI and the IRS pursuant to which the IRS waived its claims against certain assets of the Enterprise Solutions business in exchange for NNI's acknowledgement of a claim in favor of the IRS for not less than $9.8 million and a lien against certain proceeds of the ES sale for such amount.

d) On October 15, 2009, the U.S. Debtors obtained an order approving the bidding and sale procedures relating to certain assets of Nortel's GSM/GSM-R business.

e) On October 16, 2009, the U.S. Debtors obtained an order approving the bidding and sale procedures relating to certain assets of Nortel's Metro Ethernet Networks business and certain termination fee protections for Ciena Corporation, the stalking horse bidder.

*Chapter 15*

47. Since the Twenty-Second Report, no orders have been sought or obtained in the Chapter 15 proceedings.

48. The Monitor has continued to file with the U.S. Court and serve on required parties notices of each of its reports to this Honourable Court.

49. On September 29, 2009, the Monitor filed and served notice of the Next Generation Packet Core Sale Procedures Order and the related endorsement of this Honourable Court, on required parties. Notice of the Amended and Restated Claims Procedure Order of this Honourable Court was also filed in the U.S. Bankruptcy Court and served on required parties on October 9, 2009.

*France*

50. NNSA is subject to secondary insolvency proceedings and is under the direction of the NNSA Liquidator and NNSA Administrator.

51. On October 1, 2009, the French Court approved an order to (i) suspend the liquidation operation relating to the sale of the assets and/or business of NNSA for a renewal period of two months; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the NNSA Administrator and NNSA Liquidator during that period except with respect to the sale of assets and/or business of NNSA. In accordance with the European Union's Counsel Regulation, the English law proceedings remain the main proceedings in respect of NNSA.

52. The French Court established a claims bar date for foreign creditors to file claims against NNSA of October 12, 2009. The Applicants have prepared and filed their claims in the French proceeding.

53. NNSA is a party to the ninth and tenth extensions of the GSPA.

*Israel*

54.  The Israeli court established a claims bar date of July 26, 2009 for filing of claims against Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communication Holdings (1997) Limited. The Applicants have prepared and filed their claims in these proceedings.

## PROGRESS ON RESTRUCTURING

*CDMA Business and LTE Access Assets Sale*

55.  As discussed in the Seventeenth Report of the Monitor, NNC, NNL and certain of NNL's subsidiaries, including NNI, entered into an asset sale agreement dated July 24, 2009 with Ericsson for the sale of substantially all of its CDMA and LTE Access assets for $1.13 billion plus certain assumed liabilities.

56.  The sale transaction was approved by this Honourable Court and the U.S. Court on July 28, 2009.

57.  The sale transaction is expected to close prior to the end of 2009.

*Enterprise Solutions Sale*

58.  As discussed in the Twentieth Report, NNC, NNL and certain of NNL's subsidiaries, including NNI, entered into an amended and restated asset and share sale agreement dated September 14, 2009 with Avaya Inc. ("Avaya") in respect of the sale of the ES business for $900 million plus certain assumed liabilities.

59.  The sale transaction was approved by this Honourable Court and the U.S. Court on September 16, 2009.

60.  The sale transaction is expected to close late in the fourth quarter of 2009.

*GSM / GSM-R Business Sale*

61. As discussed in the Twenty-Third Report, NNC, NNL and certain of NNL's subsidiaries, including NNI, have commenced a sale process to market certain assets associated with Nortel's GSM / GSM-R business.

62. The Bidding Procedures as described in the Twenty-Third Report were approved by this Honourable Court and the U.S. Court on October 15, 2009.

63. The Bidding Procedures provided for all bids to be received by the Sellers not later than November 5, 2009 and for the Sellers to conduct an auction of the assets on November 9, 2009 to determine the successful purchaser.

64. It is currently anticipated Nortel will ultimately seek a final Sales Order from the U.S. Court and an Approval and Vesting Order from this Honourable Court on or about November 19, 2009 by way of a video conference joint hearing pursuant to the Cross-Border Insolvency Protocol approved by both this Honourable Court and the U.S. Court. A detailed report with respect to the outcome of the bidding process, auction and these motions will be filed separately.

*Metro Ethernet Network Business Sale*

65. As discussed in the Twenty-Fourth Report, NNC, NNL and certain of NNL's subsidiaries, including NNI, entered into a "stalking horse" asset sale agreement dated October 7, 2009 with Ciena Corporation ("Ciena") for the sale of substantially all of its Metro Ethernet Networks business for $390 million in cash, 10 million shares of common stock of Ciena and the assumption of certain assumed liabilities.

66. The Bidding Procedures as described in the Twenty-Fourth Report with certain modifications as agreed to between Nortel and Ciena were approved by this Honourable Court and the U.S. Court on October 15, 2009.

19

67. The Bidding Procedures provide for all bids to be received not later than November 9, 2009 and for an auction to be conducted on November 13, 2009 to determine the successful purchaser.

68. It is anticipated Nortel will ultimately seek a final Sales Order from the U.S. Court and an Approval and Vesting Order from this Honourable Court on or about November 19, 2009 by way of a video conference joint hearing pursuant to the Cross-Border Insolvency Protocol approved by both the Canadian Court and the U.S. Court. A detailed report with respect to the outcome of the bidding process, auction and these motions will be filed separately.

*Next Generation Packet Core Business Sale*

69. As discussed in the Twenty-First Report, NNC, NNL and certain of NNL's subsidiaries, including NNI, have commenced a sale process to market certain assets associated with Nortel's Next Generation Packet Core business.

70. The Bidding Procedures as described in the Twenty-First Report were approved by this Honourable Court and the U.S. Court on September 29, 2009.

71. The deadline for bids in respect of the Next Generation Packet Core business was October 16, 2009. In accordance with the Bidding Procedures, Nortel is consulting with the Monitor, the Unsecured Creditors' Committee and the Ad Hoc Bondholders' Group regarding the next steps to be taken in connection with this sale process. The Monitor will provide a further update to this Honourable Court as these matters develop.

*Other Businesses*

72. Nortel continues to advance discussions with various interested parties with respect to the sale of its other businesses while at the same time exploring other options in the event it cannot maximize value through sales.

73. On October 16, 2009, the Chairman of LGN, a Nortel employee, resigned both from his position as Chairman of LGN and in respect of his employment with Nortel. Accordingly, NNL has engaged a retired Nortel employee and former senior executive at LGN, to assist the Applicants in their efforts to maximize value from its interest in LGN and maintain senior representation for Nortel at the joint venture. Details of the terms of his employment and compensation package are attached as Confidential Appendix "C" hereto.    As Confidential Appendix "C" contains confidential and sensitive personal information, the Monitor requests that it be sealed by this Honourable Court.

*Residual Patents and Intellectual Property*

74. In conjunction with the sales processes related to the various operating businesses, Nortel conducted a patent review and assignment exercise to determine those patents that should be assigned to the buyers of the individual business units as part of the sale of those businesses.

75. As a general standard, those patents predominantly used by a certain business unit were or will be assigned to the buyers of such business unit.

76. Upon completion of this review, Nortel determined there are approximately 3,400 residual patent families that have not been assigned to with the buyers of individual business units. The final number of residual patents is subject to change as the sale of certain business units is still pending.

77. Nortel, in consultation with the Monitor, the Unsecured Creditors' Committee, the Ad Hoc Bondholders' Group and the U.K. Administrators, determined that it should engage a consulting firm with expertise in patents and intellectual property to provide an analysis of the portfolio and advice with respect to maximizing value from this portfolio.

78. After reviewing proposals and presentations from selected consulting firms, Global IP Law Group, LLC ("Global IP") was selected and Nortel has entered into an agreement with Global IP, dated October 15, 2009.

79. Under this agreement, Global IP has been jointly engaged by NNL, NNI, NNUK, and Nortel Networks (Ireland) Limited (in administration) ("NN Ireland"). NNSA may accede to the agreement by written notice at a later date. NNI's participation is subject to and contingent upon the entry of a final order of the U.S. Court approving NNI's retention of Global IP.

80. NNL shall make all payments to Global IP due under the agreement and NNI, NNUK and NN Ireland shall reimburse NNL for their share of any such payments.

81. Nortel expects to receive a preliminary report from Global IP by the end of 2009 upon completion of the phase one work as outlined in the agreement.

82. Nortel, in consultation with the Monitor, the Unsecured Creditors' Committee, the Ad Hoc Bondholders' Group and the U.K. Administrators, will then assess the various options and determine next steps to be taken at that time.

*Head Office Premises*

83. As discussed in the Twenty-Second Report, on September 14, 2009 NNL entered into a Lease Termination Agreement with Kanco-195 The West Mall Ltd. (the "Former Landlord") to terminate their lease at Nortel's global headquarters at 195 The West Mall, Toronto, Ontario and entered into a New Lease Agreement with Kanco-Airways Ltd., an affiliate of the Former Landlord, at 5945 Airport Road, Mississauga, Ontario (the "Airport Centre").

84. Planning and preparations for the move to the Airport Centre are in progress and the move is expected to be completed on schedule by the end of November, 2009. The

22

relocation is expected to result in significant cash savings with respect to real estate operating costs of approximately CDN$10 million over a two year period.

## REQUEST FOR AN EXTENSION TO THE STAY OF PROCEEDINGS

85.  Pursuant to the Order of this Honourable Court dated July 30, 2009, the stay extension granted expires on October 30, 2009. The Applicants are seeking a 49 day extension of the Stay Period until and including December 18, 2009.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

86.  The Monitor has assisted and continues to assist the Applicants in their efforts to review operations and assess a range of restructuring alternatives in consultation with their legal and financial advisors. The Monitor believes the Applicants are working diligently and in good faith and continue to progress towards the development of a Plan.

87.  The Monitor supports the Applicants' request to have the ninth and tenth extensions to the GSPA approved by this Honourable Court.

88.  For the reasons outlined in Paragraph 73, the Monitor recommends that Confidential Appendix "C" to this Twenty-Fifth Report be sealed by this Honourable Court.

89.  Based upon the key assumptions used in preparation of the Applicants' October 4 Forecast, it is the Monitor's view the Applicants will have sufficient cash resources available during the Forecast Period to:

   a)  allow the Applicants to complete the necessary negotiations with respect to funding for the period from and after September 30, 2009 in order to have the necessary cash resources to fund their operations in January, 2010 and beyond;

   b)  permit them to make further progress in their efforts to complete and close the sales of the Ericsson Transaction and the Avaya Transaction; and

c) pursue the sale of its other businesses or develop alternative restructuring strategies as appropriate, including the filing of a Plan.

90. For the reasons outlined in this report, the Monitor supports the Applicants' request for an extension of the stay to December 18, 2009.

All of which is respectfully submitted this 22nd day of October, 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

24

# APPENDIX A

APPENDIX A

**Nortel Networks - Oct 4, 2009**
**CCAA Applicants**
**Forecast Cash Flow Variances**
USD (Millions)

| | Forecast | Actual | Variance |
|---|---|---|---|
| Start of period | 12-Jul-09 | 12-Jul-09 | 12-Jul-09 |
| End of period | 03-Oct-09 | 03-Oct-09 | 03-Oct-09 |

## Receipts & Disbursements

| | | | |
|---|---|---|---|
| **Receipts** | | | |
| Collection of Accounts Receivable | 134.9 | 152.1 | 17.2 |
| Other Receipts | 5.0 | 7.0 | 2.0 |
| Intercompany Receipts | 91.8 | 68.6 | (23.2) |
| Intercompany Receipts - Interim Funding Arrangement | 94.2 | 94.2 | - |
| NNI/NNI Restructuring Loan Advances | - | - | - |
| **Total Receipts** | 325.9 | 321.9 | (4.0) |
| | | | |
| **Disbursements** | | | |
| Payroll (Gross) | 118.1 | 118.2 | (0.1) |
| Benefits | 22.9 | 23.3 | (0.4) |
| Pension | 5.8 | 6.0 | (0.2) |
| Inventory Purchases | 53.3 | 30.9 | 22.4 |
| Non-Inventory Purchases | 85.2 | 101.0 | (15.8) |
| Intercompany Disbursements | 67.1 | 52.8 | 14.3 |
| Intercompany Disbursements - Interim Funding Arrangement | - | - | - |
| Restructuring Costs | 14.1 | 16.6 | (2.5) |
| NNI/NNI Restructuring Loan Repayments | - | - | - |
| **Total Disbursements** | 366.5 | 348.8 | 17.7 |
| | | | |
| **Net Cash Flow** | (40.6) | (26.9) | 13.7 |
| FX Impact | - | 7.5 | 7.5 |
| | | | |
| **Opening Available Cash Balance** | 201.6 | 201.6 | (0.0) |
| | | | |
| **Closing Available Cash Balance** | 161.0 | 182.2 | 21.2 |
| | | | |
| Unavailable Cash | 1.0 | 0.1 | (0.9) |
| **Total Cash** | 162.0 | 182.3 | 20.3 |
| | | | |
| Restricted Cash | 57.1 | 58.7 | 1.6 |
| **Total Cash + Restricted Cash** | 219.1 | 241.0 | 21.9 |

# APPENDIX B

APPENDIX B

**Nortel Networks — Oct 4, 2009**
**CCAA Applicants**
**Forecast Cash Flow**
**(US $ millions)** — Summary of Receipts & Disbursements

| | | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | | |
| Collection of Accounts Receivable | 4.9 | 6.9 | 4.1 | 23.1 | 6.7 | 5.2 | 5.8 | 16.0 | 5.1 | 4.8 | 5.1 | 4.7 | 22.8 | 117.2 |
| Other Receipts | | | | | | | | | | | | | 7.9 | 13.1 |
| Payroll / Accounts Payable reimbursement from Buyers | 6.9 | 7.9 | 15.8 | 21.2 | 13.0 | 22.3 | 16.3 | 4.1 | 2.4 | 6.9 | 2.8 | 2.6 | 5.9 | 23.6 |
| Intercompany Receipts | 54.4 | | | | | | | 22.4 | 13.0 | 7.0 | 11.4 | 33.3 | | 240.4 |
| Intercompany Receipts - Interim Funding Arrangement | | | | | | | | | | | | | | |
| **Total Receipts** | 58.8 | 14.7 | 19.7 | 44.2 | 19.7 | 27.5 | 22.2 | 42.5 | 16.5 | 18.7 | 17.9 | 19.9 | 43.2 | 460.3 |
| | | | | | | | | | | | | | | |
| **Disbursements** | | | | | | | | | | | | | | |
| Payroll (Gross) | 17.5 | 0.2 | 17.8 | 0.0 | 16.0 | 5.5 | 20.3 | 5.5 | 0.0 | 8.6 | 7.4 | 7.8 | 4.2 | 116.5 |
| Benefits | 1.1 | 0.6 | 1.8 | 3.4 | 1.8 | 0.6 | 1.0 | 0.6 | 3.3 | 1.5 | 0.6 | 1.5 | 3.6 | 21.4 |
| Pension | | | 2.1 | | | | | 2.1 | | | | | 2.1 | 6.2 |
| Inventory Purchases | 2.2 | 2.2 | 2.2 | 2.2 | 2.1 | 2.2 | 2.0 | 2.2 | 5.4 | 0.2 | 0.1 | 0.1 | 0.4 | 18.4 |
| Non-Inventory Purchases | 10.5 | 10.4 | 10.4 | 11.6 | 9.1 | 8.0 | 8.0 | 9.1 | 1.4 | 33.6 | 7.4 | 7.4 | 8.3 | 124.8 |
| Payroll / Accounts Payable payments on behalf of Buyers | | | | | | | | | | 5.5 | 5.5 | 5.5 | 4.1 | 22.2 |
| Intercompany Disbursements | 13.2 | 6.4 | 13.2 | 24.7 | 13.2 | 7.2 | 17.4 | 22.2 | 5.1 | 10.1 | 7.2 | 12.4 | 33.2 | 188.6 |
| Intercompany Disbursements - Interim Funding Arrangement | | | | | | | | | | | | | | |
| Restructuring Costs | 1.1 | 1.3 | 1.1 | 1.1 | 1.1 | 1.1 | 1.3 | 1.1 | 1.1 | 1.1 | 1.1 | 1.2 | 1.1 | 14.0 |
| **Total Disbursements** | 45.6 | 21.1 | 48.4 | 43.1 | 43.1 | 24.6 | 50.1 | 43.8 | 12.3 | 60.4 | 27.8 | 35.7 | 55.0 | 524.2 |
| | | | | | | | | | | | | | | |
| **Net Cash Flow** | 13.2 | (6.4) | (28.7) | 1.2 | (22.4) | 2.9 | (28.0) | (1.4) | 6.7 | (42.6) | (9.7) | (15.8) | (7.9) | (123.9) |
| Opening Available Cash Balance | 182.2 | 195.4 | 189.0 | 160.4 | 161.5 | 139.1 | 142.0 | 114.1 | 112.7 | 119.3 | 76.8 | 67.0 | 50.9 | 182.2 |
| **Closing Available Cash Balance** | 195.4 | 189.0 | 160.4 | 161.5 | 139.1 | 142.0 | 114.1 | 112.7 | 119.3 | 76.8 | 67.0 | 50.8 | 43.1 | 58.4 |
| | | | | | | | | | | | | | | |
| Unavailable Cash | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| **Total Cash** | 195.5 | 189.1 | 160.5 | 161.6 | 139.2 | 142.1 | 114.2 | 112.8 | 119.4 | 76.8 | 67.7 | 50.9 | 43.1 | 58.4 |
| | | | | | | | | | | | | | | |
| Restricted Cash | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 |
| **Total Cash + Restricted Cash** | 254.2 | 247.8 | 219.1 | 220.3 | 197.9 | 200.8 | 172.9 | 171.4 | 178.1 | 135.5 | 126.4 | 109.6 | 101.8 | 117.1 |

# APPENDIX C

# [CONFIDENTIAL]

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**TWENTY-FIFTH REPORT OF THE MONITOR**
**DATED OCTOBER 22, 2009**

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada M5B 2M6

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5768340