**EXHIBIT D**

# MASTER CONSULTING AGREEMENT

This MASTER CONSULTING AGREEMENT NO. 22066, including Exhibit A, (Agreement), is dated October 15, 2009 (Effective Date). The parties are Nortel Networks Limited ("NNL") a corporation incorporated under the laws of Canada and having an office at 3500 Carling Avenue, Ottawa, Ontario K2H 8E9; Nortel Networks Inc. ("NNI"); Nortel Networks UK Limited (in administration), a company incorporated in England ("NNUK"), acting by its joint administrators A. R. Bloom, S. J. Harris, A. M. Hudson and C. J. W. Hill of Ernst & Young LLP (collectively, the "UK Joint Administrators"); Nortel Networks (Ireland) Limited (in administration), a company incorporated in the Republic of Ireland ("NN Ireland"), acting by its joint administrators A. R. Bloom and D. Hughes of Ernst & Young LLP (collectively, the "Ireland Joint Administrators" and together with the UK Joint Administrators, the "Joint Administrators"); and Global IP Law Group, LLC, an Illinois limited liability company with offices at 233 South Wacker Drive, Suite 8400, Chicago, IL 60606 ("Consultant").

1. **Definitions**
   a) *Acceptance* means that Nortel agrees that Services (including Deliverables) have been completed in accordance with the requirements of the related P.O. or Statement of Work.
   b) *Affiliate* means one or more of the following: (i) a Joint Venture or (ii) an entity of which Nortel Networks Corporation controls directly or indirectly between 20% and 50% of the voting stock, shares or voting power.
   c) *Change Order* will have the meaning set out in Section 3 of this Agreement.
   d) *Confidential Information* means information disclosed by Nortel to the Consultant that is designated at the time of disclosure as confidential (or like designation), is disclosed in circumstances of confidence, or would be understood by Nortel, exercising reasonable business judgment, to be confidential. Confidential Information shall include, without limitation, the pricing and terms and conditions of this Agreement that are not made public by Nortel.
   e) *Deliverables* means all work (including, but not limited to, any work for hire created and/or performed by Consultant or any employee, agent, contractor or subcontractor of Consultant that performs Services) delivered to Nortel hereunder, except to the extent any such work is Consultant Property pursuant to Section 6(b).
   f) EU means European Union.
   g) *EU Workers* will have the meaning set out in Section 11 (b).
   h) *Intellectual Property Rights* means without limitation, all copyrights and rights to create derivative works and all rights in patents, trademarks, trade secrets, mask works and any other intellectual property rights.
   i) *Joint Venture* means a business enterprise with a limited scope and duration between Nortel and a third party.
   j) *Monitor* means Ernst & Young Inc. as monitor in the creditor protection proceedings involving Nortel Networks Corporation, NNL and certain of their Canadian Subsidiaries under the Companies' Creditors Arrangement Act (Canada).
   k) *Nortel Networks Corporation* means the operating company that is the parent of NNL.
   l) *Nortel* means NNL, NNI, NNUK and NN Ireland and all Subsidiaries and Affiliates.
   m) *NNSA* means Nortel Networks SA, an entity duly formed under the laws of France having its head office at Parc d'Activites de Magny-Chateaufort, Chateaufort Cedex 9, France, 78928 and an operating French Subsidiary of Nortel Networks Corporation.
   n) *Payment Period* will have the meaning set out in Section 17 (a) of this Agreement.
   o) *Purchase Order or P.O.* means an order issued under this Agreement by Nortel or a purchasing Affiliate for the purchase of Services or Deliverables that contains all of the basic information (e.g., statement of work or work package, dates, locations, quantity) required by Consultant to perform the Services or Deliverables ordered.
   p) *Services* means the services to be provided by Consultant in fulfilling its obligations hereunder.
   q) *Statement of Work (SOW)* means a specific set of Services to be performed by the Consultant including any related planning, management and internal resources required by the Consultant to perform such Services.
   r) *Subsidiary* means an entity other than Nortel that is controlled directly or indirectly Nortel Networks Corporation by over fifty percent (50%) or more of the voting stock, shares or voting power of such entity.
   s) *Consultant Property* will have the meaning set out in Section 6 (b) of this Agreement.
   t) *Tax* means foreign, federal, state, provincial and local (i.e., sales, use, excise, value-added, stamp, goods and services, etc.) taxes with respect to Nortel's purchases under this Agreement, but excluding withholding taxes.
   u) *Worker* means Consultant's employees, agents and subcontractors and the agents and employees of subcontractors that perform Services.

2. **Parties Authorized to Participate Under this Agreement**
   a) Nortel may notify Consultant in writing that a particular Subsidiary or Affiliate named in the notice may purchase under this Agreement. Unless otherwise agreed in writing by Consultant and Nortel, this Agreement will apply to all purchases of Services or Deliverables from Consultant by the named Subsidiaries and Affiliates, as if each were Nortel and a signatory to this Agreement, whether or not an applicable Purchase Order expressly references this Agreement.

b) Each P.O. issued by Nortel (and accepted by Consultant in accordance with Section 3) will create contractual rights and obligations under this Agreement solely between Nortel, as applicable, and Consultant. Notwithstanding the preceding, Nortel and the Subsidiaries will be considered third party beneficiaries to any Purchase Order and /or Release issued and accepted, in accordance with Section 3, between any Affiliate and Consultant.

c) Notwithstanding that a P.O. for a Service or Deliverable does not refer to this Agreement, any such P.O.s issued by Nortel for Services or Deliverables during the Term will be deemed to have been issued pursuant to this Agreement.

3. **Purchase Orders** – To make a purchase under this Agreement, Nortel must issue a P.O. The Consultant shall forward a written acceptance of the P.O. within five (5) working days of receipt thereof; failure to provide written acceptance shall be deemed acceptance by the Consultant.

   a) **Change Orders** – The parties may make changes in the Services or Deliverables by mutual written agreement (Change Order). If Consultant makes changes without a Change Order, Consultant shall not invoice Nortel and Nortel will have no obligation to pay Consultant for the changed Services or Deliverables.

   b) **Suspension Clause** – Nortel shall be entitled to request Consultant to suspend performance of the Services by giving written notice to the Consultant. In such event all time periods for performance of each party's respective obligations under this Agreement shall be extended by a period equal to the period of such suspension. In no event shall Consultant be entitled to any additional payment for such suspension.

4. **Term** – This Agreement will be in effect for 1 year from the Effective Date unless earlier terminated by Nortel for its convenience by giving thirty (30) Days written notice to Consultant. Nortel or the applicable purchasing Subsidiary or Affiliate may terminate all or part of a P.O. by 10 days' written notice to Consultant. If applicable, Nortel will pay for Services and Deliverables provided they have achieved Acceptance prior to termination. In the case of Nortel's terminating, when Consultant receives the termination notice, Consultant will stop performing the cancelled Services and deliver all Deliverables to Nortel "as is," and Nortel shall pay a pro rata portion of the fees due for the work performed in accordance with this Agreement up to the date of termination. However, if requested in writing by Nortel, Consultant will finish incomplete Services after termination.

   a) The termination right in this Section 4 is in addition to, and not in lieu of, any other rights of the terminating party at law, in equity or under this Agreement.

   b) **Breach** – Nortel may terminate this Agreement immediately for any material breach by Consultant.

   c) **Debt Proceedings and Dissolution** – Consultant is obliged to immediately give written notice to Nortel of any one of (i) through (viii) below. If Consultant:
      i) files a petition in bankruptcy filed by or for itself, or
      ii) makes an assignment for the benefit of creditors; or,
      iii) makes a general settlement of debts or debt reorganization, or
      iv) is dissolved or ceases doing business; or
      v) has a substantial part of its assets seized; or
      vi) has a substantial part of its assets seized; or
      vii) goes into receivership or insolvency proceedings; or
      viii) assigns the Agreement or any part thereof in violation of Section 21 e) (Assignment).

   d) Nortel may give notice of termination for breach to Consultant if any one of the following occurs: Section 4(c) sub-parts (i) or (iii) and there has been no resolution after 20 days have passed since service of process; or, Section 4(c) sub-parts (ii), (iv), (v), (vi), (vii), or (viii).

5. **Consultant Governance**
   a) **Reporting** – At Nortel's request and at Consultant's expense, Consultant will provide the following reports
      i) Consultant Personnel reports identifying all Consultant personnel in the U.S. who have performed at least 1500 hours of service under the primary direction and control of Nortel. Consultant will provide Nortel with the information required by the U.S. Internal Revenue Code to determine the non-discrimination requirements for retirement and welfare plans on agreed upon dates and in an agreed upon format.
      ii) Audit compliance reports documenting the adequacy of Consultant's process controls to provide Nortel with accurate and timely information (e.g., SAS 70 Type II).
      iii) Audited Financial Statements or equivalent report.
      iv) Minority/Women Business Enterprise and/or Disabled Veteran Business Enterprise (MWBE/DVBE) data documenting the reporting company, certifying agency, ethnic/gender code, company name, address and contact and quarterly totals of employees by work category, provided, however, that reports falling within this Section 5(a)(iv) shall not be requested for any employees based in the United Kingdom.
      v) Operational reporting as agreed to by the parties to support managing of the business.

    b) **Audit Rights** – Upon 72 hours notice, Nortel may audit the books, records or any documents (hardcopy or electronic versions) of the Consultant relating to the delivery of Services or Deliverables under this Agreement.
        i) **Use of third Party to conduct Audit** – Within Nortel's sole discretion, it may use a third party or Nortel's employees to conduct any applicable audit.
        ii) **Audit Rights Confidential Information** – Notwithstanding the above, Nortel will not be entitled to any Confidential Information or proprietary information of Consultant not directly related to the Services or Deliverables.
    c) **Consultant Cooperation** – To facilitate the audit, if required, the Consultant will ensure that Nortel has access to its facilities and personnel as required to facilitate the audit. Consultant will inform Nortel visiting representatives in advance about Consultant's facility safety and security rules. Following an audit by Nortel, Consultant will participate in any exit conference conducted by Nortel.
    d) **Expenses** – Unless otherwise provided in this Agreement, each party will bear its own expenses relating to any audit under this Section. If Consultant is found materially non-compliant to terms or requirements of this Agreement, Consultant will reimburse Nortel for any overcharges and reasonable audit expenses within 10 days of completion of the audit.

6. **Grant of Rights**
    a) Nortel will own all Deliverables, including Intellectual Property Rights in the Deliverables.
    b) Where Deliverables are composed of newly developed property in which Consultant's pre-existing property (Consultant Property) is embodied, Consultant will grant to Nortel a non-exclusive, royalty-free license to utilize Consultant Property, but only as embodied in the Deliverables or derivatives of the Deliverables. The license will include the right to use copy, and sublicense Consultant Property. In all other respects this Agreement will not affect Consultant's prior ownership or rights in Consultant Property. Unless stated otherwise in a P.O. or the Agreement, Consultant's tools (whether software or hardware) that may be used in providing Services will remain the property of Consultant and will not be considered to be Deliverables. Furthermore, any modifications to Consultant's tools made by Consultant will also remain the property of Consultant, provided that the modifications (i) are made during Consultant's own time (i.e. not in the course of providing the Services), (ii) are not included in the Services being purchased, and (iii) do not incorporate Nortel's property.
    c) Consultant represents that it has all rights necessary, including rights from third parties, to provide the license described in Section 6 b) above.
    d) Consultant represents and warrants that (i) it has the right to convey title to the Deliverables and the related Intellectual Property Rights, and (ii) the creators of the Deliverables, including Workers, have assigned in writing all of their intellectual property rights of any kind or description in the Deliverables to Consultant or Nortel and, in addition, have waived their moral rights.
    e) **Limited License Grant** – With respect to any Nortel Confidential Information (including proprietary information and intellectual property) provided by Nortel to Consultant under this Agreement, Nortel grants to Consultant the non-exclusive and non-transferable right to utilize such Nortel Confidential Information (including Intellectual Property Rights in such information) solely for the purposes of performing the Services for Nortel.

7. **Warranties on Services, Deliverables and Materials**
    a) **Services** – Consultant warrants that the Services have been and will be performed in a professional and workmanlike manner in accordance with generally accepted industry standards and will conform to the P.O. and this Agreement. If Consultant breaches the described warranty, at Nortel's request Consultant will re-perform the applicable Services with in forty eight (48) hours so that the Services conform to the warranty.
    b) **Deliverables** – Consultant warrants that Deliverables (i) will be free from defects in material and workmanship in accordance with the applicable standards and the SOW, (ii) do not infringe upon any third party intellectual property rights, and (iii) will be protected by applicable legal privilege and any analogous privileges that protect confidentiality of information, to the fullest extent provided by law. Consultant further warrants that Consultant shall take any measures within Consultant's power to ensure that the Deliverables remain protected by such applicable privileges.
    c) **Warranty Period** – The warranties set out in this Section 7 will apply to corrected Work for the remainder of the warranty period or 6 months from the date of such repairs/replace, whichever is later.

8. **Confidential Information** – The Consultant will hold the Confidential Information in confidence and not disclose it to anyone except the Consultant's employees or for any purpose other than this Agreement. However, the Consultant may disclose the Confidential Information to third parties (e.g., Subsidiaries, Affiliates and auditors) as strictly necessary for the purposes of this Agreement.
    a) **Exceptions** – Confidential Information is not protected if and only to the extent that (i) a recipient can demonstrate through written documentation that it was already known to be free from any obligation of confidentiality; (ii) it

CONFIDENTIAL INFORMATION        Page 3 of 15

3

[New York #2117489 v8]

becomes known or generally available to the public (other than by act of the recipient) after its disclosure; (iii) it is disclosed or made available in writing to the recipient by a third party having a bona fide right to do so and without similar confidentiality obligations; (iv) it is independently developed by recipient as demonstrated by its business records; or (v) it is required to be disclosed by subpoena or other process of law. The recipient will notify Nortel promptly of a subpoena or other process of law requiring disclosure so that Nortel may seek a protective order or other remedy to ensure that the Confidential Information that is so disclosed is accorded confidential treatment.

   b) **Release of Information** – The Consultant may not (i) advertise, make public statements or publish information concerning this Agreement, a P.O. or the relationship between Nortel and Consultant, or (ii) use the name or trademark of Nortel with respect to any advertising, promotion, publicity, or representation that Consultant may make in connection with Consultant's business, services, or product lines, unless the Consultant has given Nortel notice pursuant to Section 20 of its intention to carry out an activity covered by (i) or (ii) above and has obtained Nortel's prior written consent to carrying out such activity.

9. **Personal Data Protection**
   a) Personal Data shall mean data, which relates to or is capable of identifying any employee of Nortel or any other third party, which Consultant receives from Nortel.
   b) Consultant shall comply with their obligations under all applicable data protection and privacy laws relating to Personal Data and without prejudice to the fore-going shall:
      i) hold Personal Data in confidence and restrict the disclosure of Personal Data to such of its employees, agents, advisors or other third parties as is necessary for the purposes of complying with its obligations pursuant to this Agreement;
      ii) not use Personal Data save for the purposes of complying with its obligations in this Agreement;
      iii) comply with Nortel's reasonable instructions regarding the handling of Personal Data and return Personal Data to the Consultant or destroy such Personal Data if this Agreement is terminated in accordance with Nortel's instructions;
      iv) not transfer Personal Data to another country unless satisfied that such transfer is lawful in accordance with applicable data protection and privacy laws;
      v) take security measures necessary to safeguard Personal Data against unauthorized, unlawful or accidental access, loss, destruction, damage, disclosure, transfer, or other improper use;
      vi) provide Nortel with reasonable assistance in (i) complying with requests from the person about whom the Personal Data relates so far as such Personal Data is in Consultant's possession or control; (ii) investigating any breach or alleged breach of applicable privacy or data protection laws relating to such Personal Data; and (iii) responding to and complying with any request or demand made by any court or governmental authority responsible for enforcing privacy or data protection laws; and
      vii) ensure that if any Personal Data is passed to any third party or other person, such third party or person shall sign up to equivalent provisions relating to the protection of such Personal Data as are contained in this Section 10.

10. **Insurance**
    a) During the Term Consultant will carry the following types of insurance coverage and liability limits:
       i) *Comprehensive automobile insurance* for all hired and non-owned vehicles, covering at minimum, bodily injury and property damage, with a minimum liability limit of $ 1,000,000 U.S. dollars for each occurrence;
       ii) *Comprehensive general liability insurance* policy that provides coverage on an occurrence basis that (a) includes third party liability coverage, protecting Nortel and its Subsidiaries and Affiliates from property damage or personal injury caused by Consultant, (b) has a minimum combined single limit of $ 2,000,000 U.S. dollars, (c) provides worldwide coverage, and (d) indicates on its face that it is primary insurance;
       iii) *Employer's liability insurance* with a minimum liability limit of $ 1,000,000 U.S. dollars including coverage for injury and occupational disease; and
       iv) *Workers' compensation*, with the statutory requirement for coverage. (In the United States, Consultant must carry statutory workers' compensation coverage whether or not state law allows Consultant to elect not to carry coverage).
    b) **Additional Insured** – Consultant will name Nortel as an additional insured on its Consultant's comprehensive general liability policy.
    c) **Certification** – Upon Nortel's request, Consultant will furnish Nortel with a certificate of insurance and evidence of the required, paid-up coverage and will furnish an updated certificate of insurance within ten (10) business days after any renewal of such coverage. The insurance policy will be in addition to Consultant's indemnity under this Agreement.
    d) **Termination of Coverage** – Nortel may terminate Consultant's performance of Services, if any of the required insurance coverage terminates.

e) **Notice of Changes in Coverage** – Consultant cannot cancel or change a policy without at least thirty days advance written notice to Nortel and Consultant will ensure that Consultant's insurers cannot cancel or change a policy without at least thirty (30) days advance written notice to Nortel.

f) **Changes Required by Nortel** – Nortel may request Consultant to increase its coverage, if Nortel reasonably believes that the preceding coverage is inadequate and Consultant will comply.

11. **Workers**
    a) **Removal of Workers** – Nortel shall have the right, without additional cost and at any time to request Consultant to remove one of its employees from the supply of Services to Nortel for any reason. Consultant shall immediately remove such employee from the supply of Services upon receiving such request from Nortel. Nortel shall not be responsible for payment for Services supplied by the Consultant employee after the date of such request for removal. Any such request by Nortel for removal of any Consultant employee shall not be considered to be a request for termination of any employment or other relationship between the employee and the Consultant. Any decision to terminate such employment or other relationship shall be made solely by Consultant. Consultant shall indemnify and hold Nortel free and harmless from all employment liabilities arising out of the request by Nortel for removal and/or Consultant's termination of any employment or other relationship with any Consultant Employee.
    b) **Special Terms and Conditions relating to the Transfer Regulations**
        i) In this section the following definition applies – *Transfer Regulations* means (a) Acquired Rights Directive 2001/23/EC ("ARD") or any provisions of national law giving effect to such Directive, (including the Transfer of Undertakings (Protection of Employment) Regulations 2006 as amended); or (b) the laws of a country waiting for admittance to the EU that is conforming its laws to the laws of the European Union (EU), including the ARD, or (c) the laws of a country that is not a member of the EU, and that is not awaiting membership, whose laws are analogous to or have a similar effect to the provisions of the ARD (e.g., laws with substantially the same provisions as the ARD).
        ii) Consultant acknowledges and agrees that Nortel does not require the Consultant to assign any employee of the Consultant wholly or mainly to the provision of the Services.
        iii) The Consultant agrees to arrange its staff, in relation to the provision of the Services in such a way that no individual is at any time wholly or mainly assigned to the provision of the Services and consequently that no contract of employment of any individual will transfer from the Consultant (or any sub-contractor of the Consultant) to Nortel, or to any new Consultant by virtue of the Transfer Regulations, on the cessation or partial cessation of the provision of the Services by the Consultant, or otherwise.
        iv) Notwithstanding the above clause, if the employment of any individual is transferred from the Consultant to Nortel or to any new Consultant by virtue of the Transfer Regulations or any person asserts that his employment has so transferred, then Nortel or such new Consultant may terminate the employment of any such person within 30 business days of becoming aware of such transfer or alleged transfer (where permitted by applicable law). Whether or not Nortel or such new Consultant terminates any contract of employment in such circumstances, the Consultant will indemnify Nortel and each new Consultant against all losses, fines, penalties, awards, liabilities, costs, damages and expenses (including reasonable legal expenses on an indemnity basis) which Nortel and/or any such new Consultant may suffer or incur and which arise in connection with, or relate to the employment of such a person and/or the termination of their contract of employment.

12. **Indemnities**
    a) In this section the following definitions apply:
        i) *Liabilities* means all fines, penalties, losses, costs, injuries, liabilities, settlements and expenses (including reasonable attorneys' fees) arising out of any claims, proceedings, suits or actions brought by a third person. Liabilities shall be considered direct damages.
        ii) *Indemnitees* means, in respect of Nortel, the affiliates, contractors, distributors and customers of Nortel, its employees, and the Monitor and its employees. Indemnitees means, in respect of Consultant, its employees.
    b) Each party shall defend and indemnify the other party, including in the case of Nortel its Indemnitees, from any Liabilities resulting from injury or death of a person or damage or loss of property resulting from the negligence or willful misconduct of the indemnifying party, or any person acting on its behalf, and the Consultant acknowledges that the liabilities of Nortel shall be several.
    c) Consultant shall defend and indemnify Nortel and its Indemnitees from any Liabilities (i) caused by Services or Deliverables, including strict liability and negligence per se; or (ii) resulting from Consultant's breach of this Agreement; or (iii) resulting from an allegation that the sale, use or delivery of any Service or Deliverable, or the exercise of any rights granted hereunder, infringes any intellectual property right of any third person (*Infringement Claim*).
    d) A party seeking indemnification hereunder shall provide adequate notice of the Liability, and shall provide, at the indemnifying party's request and expense, reasonably available information, assistance and cooperation. At its expense,

the indemnifying party will defend against or settle Liabilities and will have control of the settlement or defense of Liabilities, provided that any such settlement includes a full, final and unconditional release of the indemnified party and each of its Indemnitees from all such Liabilities. However, the indemnified party or any Indemnitee may, at its choosing, participate in the defense or settlement at its expense.

e) In addition to the above, if aware of an Infringement Claim, Consultant may (and in the case of a judgment, order or injunction that restricts the exercise of any rights granted herein, shall) in good faith, at its option and expense, (i) obtain the right for Nortel and its Indemnitees to exercise their rights in accordance with this Agreement; or (ii) substitute a non-infringing Service or Deliverable with equivalent functional capabilities; or (iii) modify the Service or Deliverable, while retaining equivalent functional capabilities, so that it no longer infringes. The workaround provided under this section will result in no additional charges or fees to Nortel or its Indemnitees.

f) Consultant will not be responsible for defense and indemnification to the extent the Infringement Claim Liability results solely from (i) the Service or Deliverable being modified by Nortel (other than as approved or specified by Consultant); or (ii) the Service or Deliverable being used in combination with equipment or software not (a) contemplated by the documentation, (b) provided by Consultant, or (c) approved or specified by Consultant (other than equipment or software that would reasonably be expected to be used in combination with the Service or Deliverable).

13. **Subcontracts** – Consultant shall not subcontract Services and/or Deliverables set out in a P.O. or this Agreement.

14. **Prices and Payments** – The prices and currency for the Services and Deliverables are set out in Exhibit A.
   a) Nortel will pay Consultant as set forth in the Revised Response to Request for Proposal (attached). All out-of-pocket expenses of the Consultant in excess of the estimates contained in the Revised Response to Request for Proposal must be pre-approved by Nortel in writing before being incurred. Consultant will invoice monthly for its pre-approved out-of-pocket expenses. If requested by Nortel, Consultant must provide back up receipts for expenses. Consultant will invoice Nortel at the address set forth in the applicable P.O. Undisputed invoices will be paid on the first scheduled payment day following the 30th day from date of invoice (Payment Period).
   b) If Nortel notifies Consultant that it disputes only part of an invoice, Consultant will issue a credit invoice to Nortel in full for the original invoice amount and reissue any disputed invoice as 2 invoices, the first invoice for the undisputed amount and the second invoice for the disputed amount, both of which reissued invoices must be dated as of the original invoice date for the original Payment Period to apply. Regardless of the reissue, the undisputed amount will continue to be due within the original Payment Period. If the reissued invoice is delivered to Nortel with less than 10 business days remaining before the end of the Payment Period, the undisputed amounts payable will be due 10 business days from the date of receipt of the reissued invoice; provided, the invoice date on the reissued invoice is the same as the date of Consultant's original invoice.
   c) Set Off – Without prejudice to Nortel's other rights and remedies, Nortel may deduct from any sums due to the Consultant under this Agreement an amount equivalent to any sums due from the Consultant to Nortel (whether such sums are due to Nortel under this Agreement or under any other agreement between the Consultant and Nortel).
   d) NNL, NNI, NNUK and NN Ireland hereby agree that NNL shall make all payments to Consultant that are due under this Agreement, and NNI, NNUK and NN Ireland shall reimburse NNL for their share of any such costs, which share will be agreed separately among NNL, NNI, NNUK and NN Ireland. Notwithstanding that the Consultant's fees shall be paid to the Consultant by NNL as described in the preceding sentence, it is expressly understood that the Consultant's duties and obligations under this Agreement are owed to all parties hereunder.

15. **Taxes** – If any governmental authority imposes a Tax for which Nortel is responsible under this Agreement, Nortel will pay the Tax if Consultant includes the Tax as a separate line item on the invoice where permitted by law. If the Tax is not included as a separate line item, the amount of the Tax will be deemed to have been included in the price for the Products purchased, and paid in full when Nortel pays the applicable invoice.
   a) Consultant will timely remit all Taxes to the proper authorities.
   b) If Nortel provides Consultant with a Tax exemption certificate, Consultant will not invoice for the Taxes exempted. Consultant will reimburse Nortel to the extent Taxes paid by Nortel are recovered by Consultant from the taxing or government authority. If Taxes may only be refunded to Nortel, Consultant shall help Nortel obtain the refund.
   c) Nortel will not be responsible for any other taxes, including without limitation, taxes imposed upon Consultant's net income or gross receipts.
   d) If Nortel is required by law to withhold any tax with respect to a payment to Consultant, Nortel will (i) withhold the appropriate amount from the payment, (ii) pay the withheld amount to the applicable authority, (iii) pay Consultant the remaining amount in accordance with this Agreement, and (iv) provide Consultant with evidence of payment of such withholding tax.
   e) If Consultant provides Nortel with documentation sufficient to permit Nortel to reduce or eliminate the deduction for withholding tax as may be permitted by law and Nortel reduces the deduction in reliance on such documentation, Consultant will indemnify and hold Nortel harmless from and against any and all assessments for such taxes, including

all interest, penalties and late charges and the reasonable cost of professional fees incurred by Nortel to settle the matter with the relevant tax authorities.

16. **Materials and Confidential Information Furnished by Nortel** - Nortel will own all materials and/or equipment it provides to Consultant under the Agreement. Nortel will provide the materials and/or equipment on an "as is" basis only without any warranty or condition.
    a) **Title** - Title in all materials and/or equipment provided by Nortel to the Consultant under this Agreement shall remain with Nortel at all times. While in the Consultants possession and control the Consultant shall be liable for the loss or damage to materials and/or equipment caused by the Consultant. Damage or loss shall be valued at either i) the manufacturing cost if manufactured by Nortel, or ii) the replacement cost (if purchased from a third party).
    b) **Audit** - Consultant and Nortel representatives shall jointly perform a physical inventory audit in order to determine any loss or damage to the materials and/or equipment provided by Nortel to the Consultant under this Agreement.
    c) **Return of Material** - On Nortel's request, completion of Services, or termination of the Agreement the Consultant shall return the materials and/or equipment supplied by Nortel at the Consultants risk and expense in the same condition in which they were furnished to Consultant, reasonable wear and tear excepted.

17. **LIMITATION OF LIABILITY** - EXCEPT FOR CLAIMS ARISING FROM (A) EITHER PARTY'S INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT, (B) EITHER PARTY'S BREACH OF THE SECTION 8 (CONFIDENTIALITY), OR (C) LIABILITIES RESULTING FROM A PARTY'S INTENTIONAL ACTS, GROSS NEGLIGENCE OR WILFUL MISCONDUCT, NEITHER PARTY WILL BE LIABLE FOR ANY INDIRECT OR CONSEQUENTIAL DAMAGES OR FOR ANY LOSS OF REVENUES, LOSS OF PROFITS OR LOSS OF GOODWILL, EVEN IF THE PARTY OR ITS AUTHORIZED REPRESENTATIVE HAS BEEN ADVISED OF THE POSSIBILITY OF THE TYPE OF DAMAGES AND NOTWITHSTANDING ANY FAILURE OF THE ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

18. **Drug Testing and Background Checks** – Unless drug and alcohol testing or background checks are prohibited by law in the location at which Services will be performed under this Agreement, upon Nortel's request Consultant must only assign employees to perform the Services at that location who have undergone (a) a drug and alcohol test and (b) a background check. The drug and alcohol test and background checks will be conducted in accordance with then current industry standards. The background check will include, but not be limited to, Consultant's (a) verification of educational history and identity and a criminal record check and a motor vehicle report. Consultant shall, upon Nortel's request, provide Nortel with a written certification that Consultant has conducted any required drug and alcohol test and background check and any written information produced or obtained by Consultant during such drug and alcohol test and background check as permitted by applicable law. Upon request by Nortel, Consultant will provide Nortel with information about Consultant's procedure for conducting drug and alcohol testing and background checks. The parties agree that the provisions of this Section 18 shall not apply to any employees based in the United Kingdom.

19. **Laws, Rules and Regulations** – Consultant and its Services and Deliverables will conform to all laws and governmental orders and regulations in effect at the time of performance of Service or the delivery of the Deliverables in effect in any country in which Consultant performs Services.

20. **Notices** – Legal notices may be given by certified mail or courier to the addresses below. Notice is effective on the earlier of 5 days from being deposited for delivery or the date on the mail or courier receipt.

| | |
|---|---|
| Nortel Networks Limited<br>195 The West Mall<br>Mailstop: T0503006<br>Toronto, Ontario, Canada M9C 5K1<br>Attention: Anna Ventresca | With copies (that shall not constitute notice) to:<br>Ernst & Young Inc.<br>Ernst & Young Tower<br>222 Bay Street, P.O. Box 251<br>Toronto, Ontario M5K 1J7<br>Canada<br>Attention: Steve Schaus<br><br>- and -<br><br>Ogilvy Renault LLP<br>Suite 3800, Royal Bank Plaza, South Tower<br>200 Bay Street, P.O. Box 84<br>Toronto, Ontario M5J 2Z4<br>Canada<br>Attention: Michael J. Lang |
| Nortel Networks Inc.<br>220 Athens Way<br>Nashville, Tennessee 37228<br>Attention: Lynn Egan | With a copy (that shall not constitute notice) to:<br>Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, NY 10006<br>Attention: James L. Bromley |

The Joint Administrators
Nortel Networks UK Limited (in administration)
1 More London Place
London
SE1 2AF
UK

The Joint Administrators
Nortel Networks (Ireland) Limited (in administration)
1 More London Place
London
SE1 2AF
UK

Global IP Law Group, LLC
233 South Wacker Drive
Suite 8400
Chicago, IL 60606
USA
Attn: Steven Steger

21. **Bankruptcy Court Approval** – As promptly as possible after execution of this Agreement, NNI will file an appropriate motion with the United States Bankruptcy Court for the District of Delaware (the "Court") seeking Court approval for the retention of Consultant and the provision of Services and Deliverables as contemplated hereunder. NNI's obligations and duties under this Agreement shall be subject to and contingent upon the entry of a final order of the Court approving Nortel's retention of Consultant.

22. **Accession by NNSA** – Within no later than 30 days after receipt of the Court approval provided for under Section 21, it is expressly agreed that NNSA may accede to this Agreement by written notice confirming such accession sent on behalf of NNSA to each of NNL, NNI, NNUK and NN Ireland. Upon receipt, NNL will send a copy of such notice to the Consultant.

23. **General**
    a) **Survival** – The following Sections will survive the expiration or termination of the Agreement: Grant of Rights, Section 6; Warranties, Section 7; Confidentiality, Section 8; Indemnities, Section 12; Limitation of Liability, Section 17 and General, Section 23.
    b) **Severability** – If any provision of this Agreement is determined to be legally unenforceable or invalid, the remaining provisions will continue in effect. The parties will substitute a provision that most closely approximates the economic effect and intent of the invalid provision.
    c) **Waiver** – Unless waived and agreed in writing by the parties, no action or inaction by a party under this Agreement will constitute a waiver of a party's (a) rights or obligations under this Agreement, or (b) breach of this Agreement.
    d) **Governing Law**-Unless otherwise expressly agreed herein, the laws of the – Province of Ontario and the federal laws applicable therein, except for conflict of laws rules, will govern this Agreement, apart from Section 23(k) (*Personal Liability*), which shall be governed under English law.
    e) **Assignment and Control** – Neither Nortel nor Consultant will assign or transfer this Agreement, or its rights or obligations, without the prior written consent of the other. Consent will not be unreasonably withheld or delayed. Within 2 business days of Consultant's initial receipt of a written term sheet from a third party that could result in (i) a change of control of Consultant, or (ii) acquisition of a minority interest in Consultant by a competitor of Nortel, Consultant shall give Nortel written notice. The notice shall not be required to contain specifics of the term sheet and shall be considered Consultant Confidential Information.
    f) **Independent Contractor** - Under this Agreement Consultant is an independent contractor. This Agreement does not create a joint venture, partnership, principal-agent or employment relationship between Consultant and Nortel.
    g) **Business Ethics** – Consultant represents that as a company it substantially complies with Nortel's business conduct guidelines as they may be revised from time to time, and which guidelines Consultant may access at Nortel's web page.
    h) **English** – This Agreement has been drafted in the English language at the mutual request of the parties hereto. Les présentes ont été rédigées dans la langue anglaise à la demande mutuelle des parties aux présentes.
    i) **Counterparts** – This Agreement may be executed and delivered in one or more counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Facsimiles of executed signature pages are acceptable and shall be deemed to be originals.
    j) **Entire Agreement** – This Agreement supersedes all prior written, oral or electronic agreements and understandings between the parties concerning the subject matter herein, including without limitation any terms and conditions of any Consultant standard acknowledgement form, proposal or quotation. This Agreement may not be modified or any right of a party waived, except by means of an amendment which expressly references this Agreement and is duly executed by each of the parties.
    k) **Personal Liability** – The Consultant acknowledges that the Joint Administrators act as agents of NNUK and NN Ireland without personal liability.

IN WITNESS WHEREOF, the Parties have signed this Agreement by their duly authorized representatives, to be effective as of the Effective Date, although actually signed by the parties on the dates shown below their respective signatures.

GLOBAL IP LAW GROUP, LLC

By: _____
Print name: STEVEN STEGER
Title: MANAGING PARTNER
Date: Oct. 15, 2009

[New York #2117489 v8]

NORTEL NETWORKS LIMITED

By: _____
Print name: _J. Doolittle_
Title _Sr VP Finance_
Date: _Oct 15/09_

By: _____
Print name: _Mark Taylor_
Title _PST Leader_
Date: _Oct 15, 2009_


NORTEL NETWORKS INC.

By: _____
Print name: _J. Doolittle_
Title _V.P._
Date: _Oct 15/09_


NORTEL NETWORKS UK LIMITED
(in administration) by _____
as Joint Administrator
(acting as agent and without personal liability)

Print name: _____
Title _____
Date: _____


NORTEL NETWORKS (IRELAND) LIMITED
(in administration) by _____
as Joint Administrator
(acting as agent and without personal liability)

Print name: _____
Title _____
Date: _____

NORTEL NETWORKS LIMITED

By:_____
Print name:_____
Title_____
Date:_____

By:_____
Print name:_____
Title_____
Date:_____

NORTEL NETWORKS INC.

By:_____
Print name:_____
Title_____
Date:_____

NORTEL NETWORKS UK LIMITED
(in administration) by _____
as Joint Administrator
(acting as agent and without personal liability)

Print name: *[signature]*
Title *[signature]*
Date: 17 October 2009

NORTEL NETWORKS (IRELAND) LIMITED
(in administration) by _____
as Joint Administrator
(acting as agent and without personal liability)

Print name:_____
Title_____
Date:_____

[New York #2117489 v8]

NORTEL NETWORKS LIMITED

By:_____
Print name:_____
Title_____
Date:_____

By:_____
Print name:_____
Title_____
Date:_____


NORTEL NETWORKS INC.

By:_____
Print name:_____
Title_____
Date:_____


NORTEL NETWORKS UK LIMITED
(in administration) by _____
as Joint Administrator
(acting as agent and without personal liability)

Print name:_____
Title_____
Date:_____


NORTEL NETWORKS (IRELAND) LIMITED
(in administration) by  DAVID HUGHES
as Joint Administrator
(acting as agent and without personal liability)

Print name: DAVID HUGHES
Title  Joint Administrator
Date:  15.10.09

[New York #2117489 v8]