UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                            .    Chapter 11
                                  .
Nortel Networks Inc., *et al.*,   .    Case No. 09-10138(KG)
                                  .    (Jointly Administered)
                                  .
                                  .    October 28, 2009
                                  .    2:00 p.m.
            Debtors.              .    (Wilmington)
                                  .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY COURT JUDGE

<u>APPEARANCES:</u>

For the Debtors:          Derek C. Abbott, Esq.
                          Morris, Nichols, Arsht & Tunnell, LLP

                          James L. Bromley, Esq.
                          Clearly, Gottlieb, Steen
                          & Hamilton, LLP

For the US Trustee:       Patrick Tinker, Esq.
                          Office of the United States Trustee

For Hitachi, Ltd.:        Jordan A. Wishnew, Esq.
                          Morrison & Foerster, LLP

For Motorola Inc.:        Elihu E. Allinson, Esq.


<u>VIA TELEPHONE:</u>

For Oracle USA, Inc.:     Amish R. Doshi, Esq.
                          Day Pitney, LLP

For the Lead Plaintiff:   Michael S. Etkin, Esq.
                          Lowenstein Sandler, PC

2

Audio Operator:            Jennifer Pasierb

Transcriptionist:          Jennifer Ryan Enslen
                           43 Bay Boulevard
                           Newark, De 19702
                           (302)836-1905

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1            THE CLERK: Please rise.

2            THE COURT: Good afternoon, everyone.  Please be

3    seated.  Thank you.

4            MR. ABBOTT: Good afternoon, Your Honor.

5            THE COURT: Good afternoon, Mr. Abbott, how are you?

6            MR. ABBOTT: I'm good, Your Honor.  Derek Abbott

7    here on behalf of the Debtors.  Your Honor, we have, although

8    a number of pages in the agenda, I think what should be

9    relatively short.  Mr. Bromley will address the sale matters

10   and the motion to seal in connection with that.  Your Honor,

11   I thought that I would start with the special counsel

12   retention.

13           THE COURT: Yes.

14           MR. ABBOTT: And Your Honor, I first have to admit a

15   little bit of *mea culpa* here.  We have been in discussions

16   with the US Trustee shortly after, since shortly after this

17   was filed to resolve what is I think going to be something

18   that we can continue to resolve, we just haven't had the time

19   the do it.  And we neglected to note their informal comments

20   on the agenda, which we should have.  And we're obviously

21   continuing to work with them, Your Honor.  The issue is this.

22   Special Counsel is essentially a temporary legal staffing

23   company.  They are providing to the Debtors attorneys who are

24   working under the supervision of Cleary attorneys, Your

25   Honor, to help with the review and production necessary to

1    meet the various regulatory hurdles that these Debtors must

2    meet in order to accomplish all these sales.  The issue that

3    Mr. Tinker has raised is a concern to make sure that we've

4    got some mechanism in place to deal with making sure that

5    none of these contract attorneys have, or are working on

6    matters adverse to Nortel.  And we've talked about trying to

7    implement some sort of very short form procedure where they

8    would sign some sort of a certification that would say really

9    two things.  One, We're not adverse to Nortel in anything

10   else we're doing, and if we become adverse to Nortel in

11   anything else we're doing, we'll disclose it and then, you

12   know, the ultimate resolution to that would probably be that

13   they couldn't continue to work on this matter.  We haven't,

14   Your Honor, had a chance to work out the specifics exactly of

15   how that would happen, and whether those would be filed in

16   some sort of supplemental declaration as a stack by special

17   counsel, or just kept on file with some sort of additional

18   declaration by special counsel to the extent that they got

19   them, or along those lines.  We'd like to continue to work

20   that out with the US Trustee's Office.  Once we do that,

21   submit an order approving the special counsel retention by

22   certificate.  Failing our ability to do that, Your Honor,

23   we'd ask to come back at the next omnibus hearing.  So I

24   guess what I'm asking you to do is to grant the application,

25   subject to working that out in the order with Mr. Tinker, a

1   consensual order.  And if not, we'd be back in front of Your

2   Honor at the next hearing.

3           THE COURT: Mr. Tinker any wish to be heard on this?

4           MR. TINKER: No, Your Honor.

5           THE COURT: All right.  That is acceptable to me,

6   and I'm sure that you'll be able to work out that language.

7   To the extent you can't we can even do it by telephone

8   conference if timing is of, you know, some essence.  So

9   please continue to work on it, and we'll get it done.

10          MR. ABBOTT: We'll do so, Your Honor.  Thanks very

11  much.  And I'll now cede the podium to Mr. Bromley who will

12  deal with the sale matters.

13          THE COURT: All right.  Thank you, Mr. Abbott.  Mr.

14  Bromley, good afternoon.

15          MR. BROMLEY: Good afternoon, Your Honor.  James

16  Bromley, Cleary Gottlieb on behalf of the Debtors.  It's a

17  pleasure to be before you again.

18          THE COURT: Good to see you.

19          MR. BROMLEY: By my measurements, Your Honor, I

20  think we are now here on the 4th sale - -

21          THE COURT: Yes.

22          MR. BROMLEY: - - approval hearing.  This is

23  relating to a relatively small business that we've been

24  describing as Project Seville.

25          THE COURT: Right.

1          MR. BROMLEY: We have not had a joint hearing on

2     this particular sale, and I am informed by my colleagues in

3     Canada that there was a hearing this morning and Justice

4     Morawetz has approved the sale subject to your approval.

5          THE COURT: Yes.  And he advised me of that.

6          MR. BROMLEY: Oh good.  Well, if I could, Your

7     Honor, there are two things that I'd like to start off with.

8     One is, we did file an emergency motion to seal.

9          THE COURT: Yes.

10          MR. BROMLEY: There is certain information contained

11     in the schedules which are competitively sensitive.  In

12     particular, descriptions relating to the Debtors' business

13     and it's intellectual property, and customers which we would

14     rather not be in the public domain.  We did not file this at

15     the time that we filed the motion, but we are aware Your

16     Honor that you would like to see the schedules, and we do

17     believe there is a basis on which to ask for this relief.  So

18     as a predicate to the motion going forward, we would like to

19     have the schedules and the information therein sealed.

20          THE COURT: Does anyone object?  I've had an

21     opportunity to review them and I can see that clearly they

22     are confidential and sensitive documents with proprietary

23     information that is of a, of significance.  And I am pleased

24     to grant the motion.

25          MR. BROMLEY: Thank you very much, Your Honor.  And

1    I should note just for the record, the information obviously

2    has been shared with our Creditors Committee, our Bondholders

3    Committee, the monitor, and all of those in our group of

4    constituents.  A bit of a happy band that we take along to

5    all of our sales.

6              THE COURT: Yes.  I'm pleased to just sign the order

7    that I have that was submitted earlier today.

8              MR. BROMLEY: Great.  Thank you very much, Your

9    Honor.  Your Honor, I, rather than go into a lot of detail as

10   an overview, I think it might be worthwhile, given the

11   situation that we have here, to just give a couple of high

12   level points.  Describe the objections that we've received,

13   and then go directly to the proffer that we have in order to

14   support the relief.

15             THE COURT: Yes.  I think that would be enough.

16             MR. BROMLEY: So Your Honor, what we're talking

17   about here is a business.  It's a relatively small business.

18   It's known within the Nortel Enterprise as the Next

19   Generation Packet Core Network Components Business.  In its

20   broadest sense it's part of the carrier business.  And as you

21   know, Your Honor, the carrier business in its broadest sense

22   is subject to the sale transaction with Ericsson that we had

23   approved in July.  Now the differences, obviously our counter

24   party in that transaction, Ericsson, is not interested in

25   acquiring this business, and therefore the Debtors have been

1    engaged in an exercise attempting to sell them.  So the, and

2    we set this up as a naked auction.  We did not have a

3    stalking horse bidder.  And what we have before you today,

4    Your Honor, is approval of a transaction with Hitachi.

5         THE COURT: Yes.

6         MR. BROMLEY: To purchase these assets for a total

7    purchase price of $10 million.  The, there are a number of

8    objections that we have received, and we believe that we have

9    resolved nearly all of them.  I think all but one.  And after

10   I go through Mr. DeAlmeida's proffer, I'll describe how we've

11   resolved those objections.  There is one objection, however,

12   Your Honor, that we have not resolved.  That was received

13   yesterday.  And we believe, first, that it's untimely, but

14   also that there are other issues relating to it.  We, so

15   we're happy to address that, and we'll do that as well after

16   I go through the proffer.  I have conferred with the Official

17   Committee, and they don't have any objection to the proffer.

18   And I'm not sure that, I don't believe anyone else does.  But

19   unless someone has an objection to proceeding by proffer,

20   that's what we would propose to do.

21        THE COURT: Does anyone have any objection?  All

22   right.  I think that's proper.  Thank you, Mr. Bromley.

23        MR. BROMLEY: Thank you, Your Honor.  In the court

24   today, Your Honor, is Mr. Hyacinth DeAlmeida, who's a, the

25   leader of Corporate Business Development for Nortel Networks

1   Incorporated, the lead Debtor in these cases.  He is present

2   in the courtroom and available to testify with respect to the

3   motion to approve the sale of the Next Generation Packet Core

4   Network Components.  He is the leader of the Corporate

5   Business Development of NNI, and has held that position for

6   approximately 10 years.  And in that position, his

7   responsibilities include oversight of smaller mergers and

8   acquisitions as well as the management of venture capital

9   investments, partnerships, and startups with minority equity

10  investments.  He's been closely involved with the Debtors'

11  efforts to sell its businesses, and he has also acted most

12  recently as a leader in respect of the CDMA and LTE sale to

13  Ericsson.  If called to testify, he would testify that he

14  oversaw the sale process for this business, including the

15  negotiation of the terms of the sale with the interested

16  party, Hitachi, and the selection of Hitachi as the

17  successful bidder.  He would testify that the assets being

18  sold consist of certain non-patent intellectual property and

19  related tangible assets associated with the, with network

20  components that are designed to provide data network

21  connectivity for 2G GPRS, 3G UMTS, and 4G LTE wireless

22  networks.  And to increase network bandwidth for multimedia

23  content and applications over wireless networks.  This

24  technology facilitates the receipt of wireless data by radio

25  towers by connecting the base station to the internet.  And

1    in particular these network components include a next

2    generation GPRS support node on advanced tele-commuting,

3    tele-computing architecture, ATCA for short, next generation

4    gateway GPRS support node on ATCA, mobility manager element

5    on ATCA, and an AGW serving gateway on ATCA, and an AGW

6    packet gateway on ATCA.  As well as a network element manager

7    associated with each of the aforementioned components.  In

8    short, Your Honor, these are some of the intermediary

9    components between your cell phone and the internet.

10             THE COURT: Okay.

11             MR. BROMLEY: He would further testify that the

12    underlying intellectual property associated with this

13    business is owned by Nortel Networks Limited, the Debtors'

14    Canadian affiliate, and that Nortel Networks Incorporated

15    owns the fixed assets associated with the business.  That

16    this business has been associated, historically, with

17    Nortel's carrier wireless business, and offers service

18    providers that supply mobile voice data, multi-media

19    communication services and enterprises using cellular

20    telephones, personal digital assistants, lap tops, soft

21    clients, and other wireless, computing, and communications

22    devices.  The major cell phone companies are the typical

23    consumers of these products.  He would testify that the Next

24    Generation Packet Core Network Components are being developed

25    from technology based on Nortel's Legacy Packet Core

1    Solutions, and that the goal was for the readiness for

2    commercial deployment of these assets in mid 2010.  So in

3    other words, these assets are not yet commercially deployed.

4    He would testify that there are no customer contracts

5    currently associated with these assets, and at the present

6    time they do not provide revenue to Nortel.  And that the

7    development of these assets have continuing cash requirements

8    of approximately $1 million a month associated with ongoing

9    research and development efforts, and related infrastructure

10   requirements.  That the R&D activity related to these assets

11   is conducted principally out of Nortel's offices in

12   Richardson, Texas, and approximately 40 employees of NNI and

13   95 third party contract employees work in connection with the

14   development of these assets.  He would testify that the

15   business environment in which the sellers operate is highly

16   competitive.  The competition for market share is fierce and

17   the cost of technical development in this area is steep.  Mr.

18   DeAlmeida would also further state that the success of this

19   business is dependent on substantial investments in R&D and

20   on building strong sales in marketing infrastructure.

21   Efforts that Nortel, at this time, does not have the

22   financial wherewithal to commit to.  And as a result, it is

23   his view that selling the assets now is the best way of

24   maximizing their value.  Mr. DeAlmeida would also testify

25   that Nortel has, over the last several months, explored the

1    interest of 3rd parties in acquiring the assets.  That

2    discussions with potential purchasers and expressions of

3    interest from this process have provided Nortel's management

4    with a view of the market for the assets, as well as their

5    value in the market.  He would testify that since the

6    commencement of these proceedings, Nortel has engaged in

7    discussions with various parties.  That it's, that Nortel and

8    its financial advisor have engaged in a robust marketing

9    effort, pursuant to which they contacted potential bidders

10   for the assets.  And that despite the sale to Ericsson of the

11   CDMA and LTE assets, that comprise a majority of the carrier

12   business, no bidder or purchaser interested in a larger

13   transaction, including Ericsson, or the stalking horse in

14   that transaction, Nokia Siemens Networks, indicated an

15   interest in acquiring these assets.  Nortel approached

16   approximately 9 parties that it had identified as likely to

17   be interested and able to acquire the assets.  Including 2

18   financial investors and 7 strategic buyers.  An information

19   memorandum was provided to those who executed confidentiality

20   agreements.  Management presentations were conducted for

21   those who so requested.  And an expression of interest was

22   required before access was provided to due diligence

23   materials in an electronic data room.  Furthermore, since the

24   motion was filed, Nortel has approached approximately 26

25   additional parties that it believes could be interested in

1   acquiring the assets.  Mr. DeAlmeida would testify that

2   between the time of the bidding procedures hearing, on

3   September 30th, and the bid deadline, only one entity,

4   Hitachi, approached the Debtors and their advisors requesting

5   to become a qualified bidder.  Hitachi submitted materials to

6   become a qualified bidder on October 9th, and on October 12th,

7   after consultation with the Committee, the bondholder group,

8   the administrators, in the United Kingdom the monitor, and

9   it's advisors, Nortel declared Hitachi to be a qualified

10  bidder.  Mr. DeAlmeida would testify that he's familiar with

11  the sale procedures approved both by this Court and by Mr.

12  Justice Morawetz in Ontario.  He would testify that Hitachi

13  submitted a bid for consideration.  The purchase price of

14  that bid was $10 million and a mark up of marked up version

15  of the transaction agreement was also prepared.  He would

16  testify that the qualified bid was valued in consultation

17  with Nortel's advisors, the Committee, the bondholder group,

18  the monitor, and the administrators based on a number of

19  factors, including the purchase price and the net value,

20  including assumed liabilities and other obligations to be

21  assumed by the bidder.  The proposed revisions to the

22  relevant transaction documents, other factors affecting the

23  speed, and certainty, and value of the transaction, as well

24  as the timing and likelihood of consummation of the

25  transaction.  Mr. DeAlmeida would testify that to his belief

1   and the Debtors' conclusion, business judgement conclusion is

2   that the successful bid from Hitachi constitutes the highest

3   and best offer received for these assets.  And maximizes the

4   value to the Debtors' estates.  He would testify that the

5   bidding process and all discussions with the bidder were at

6   arms' length, and the negotiation process was vigorous.  And

7   that in his view there was no evidence that the sale price

8   was controlled by any agreement among potential bidders.  He

9   would state that Hitachi is not an insider of Nortel, and nor

10  were any members of the Hitachi negotiation team insiders of

11  Nortel.  And he would also testify that he is not aware of

12  any unnamed parties that are a party to the successful bid or

13  to the transaction agreement between the sellers and Hitachi.

14  Mr. DeAlmeida would testify that he's familiar with the

15  transaction agreement.  He would testify that the terms of

16  the final transaction agreement are substantially the same as

17  those involved in the transaction agreement that were filed

18  with the Court on September 21st with a number of differences.

19  First, the purchase price of $10 million is the gross

20  purchase price.  Regardless of any applicable tax that is

21  required to be deducted or withheld.  With the exception of a

22  Japanese withholding tax, which could reduce the purchase

23  price by up to $140 thousand.  In respect of employee

24  matters, Nortel reserved the right to terminate the employee,

25  the employment, I'm sorry, of any employee to whom Hitachi

1    does not extend an offer, or who rejects offers of employment

2    from Hitachi.  And in respect of closing conditions, there's

3    a certain closing condition that was added in respect of

4    something that is known as ITAR, which is the International

5    Trading and Arms Regulations.  Which as a result of Nortel's

6    business, notice must be given to the US Government.  Nortel

7    was also given the right to extend the drop dead date under

8    the transaction documents from December 31 of 2009 to January

9    31st of 2010, if the closing has not taken place solely due to

10    a lack of approval under what are known as the CFIUS, c-f-i-

11    u-s, rules and regulations relating to national security.  He

12    would testify that to his belief, the approval and

13    consummation of the transaction agreement would be in the

14    best interest of the Debtors and their creditors.  And that

15    by selling the assets other than in a manner contemplated by

16    the transaction agreement he believes would yield

17    substantially less value to the Debtors' estates.  Mr.

18    DeAlmeida would also testify that he's generally familiar

19    with the ancillary agreements that have been entered into by

20    Nortel and Hitachi in connection with the successful bid, and

21    that the US Trustee, the Creditors Committee, the bondholders

22    group, the monitor, and the administrators and their

23    respective advisors have all had access to those ancillary

24    agreements.  And that is the sum and substance of Mr.

25    DeAlmeida's proffer.

1          THE COURT: All right.

2          MR. BROMLEY: And he's available for cross

3    examination if anybody wishes to do so.

4          THE COURT: Does anyone wish to cross examine Mr.

5    DeAlmeida?  All right.  Hearing no one, that proffer is

6    admitted.

7          MR. BROMLEY: Thank you very much, Your Honor.  Your

8    Honor if I could turn to the objections.  There are, like I

9    said, a number.  We have five that have been filed.  Four

10   timely, one untimely.  With respect to the four timely

11   objections, I think we have worked through by adding language

12   into the order, in paragraphs 24 and 25, that satisfies each

13   of the objectors.  First objector is an entity known as OSS

14   Nokalva, n-o-k-a-l-v-a, Incorporated.  The objection was with

15   respect to the potential that the transaction would, if

16   consummated, amount to a de facto transfer of non-exclusive

17   licenses to a buyer without the consent of OSS.  We have

18   added language in paragraph 25 which we believe resolves that

19   objection.

20         THE COURT: Okay.

21         MR. BROMLEY: Your Honor, in, the next one was filed

22   by Oracle USA, Incorporated.  The, there's also additional

23   language that's been added in paragraph 24.  And that is an

24   objection as well that goes to the assumption or assignment

25   of contracts.  We are not attempting to assume and assign the

1    contracts of Oracle, and we've made that language clear as

2    well in paragraph 24.  SN - -

3            MR. DOSHI (Telephonic): If I may be heard, Your

4    Honor.

5            THE COURT: Yes.  Are you on for Oracle?

6            MR. DOSHI (Telephonic): Yes I am, Your Honor.  For

7    the record Amish Doshi with Day Pitney on behalf of Oracle

8    USA, Inc.  The representation made by counsel is accurate.  I

9    just wanted to note that literally at the start of this

10   hearing there was certain minor revisions to the language

11   which I believe was agreed to.  So to the extent that an

12   order is going to be submitted at the end of the hearing, I

13   think the change that was just discussed literally I believe

14   at 2 o'clock today, needs to be incorporated, so we would

15   like one final review of the order before it's submitted.

16   But I believe we are resolved, yes.  Based on the language.

17           THE COURT: All right.  Thank you, Mr. Doshi.  Mr.

18   Abbott, yes.

19           MR. ABBOTT: Your Honor, Derek Abbott.  Sorry to

20   interrupt.  There was an email exchange among one of Mr.

21   Doshi's colleagues and some of the Cleary lawyers, as well as

22   my office, Your Honor.  And we just had to move a phrase in

23   paragraph 24.  And I'd rather not, Your Honor, get into the

24   business of circulating another order, but what I would

25   propose is that when we hand up the order, assuming Your

1   Honor approves it, I will simply talk through, on the record,

2   that change so it's clear to Mr. Doshi and his colleagues

3   that the change, I think requested by his colleague, was made

4   to the order, Your Honor.  We have that draft being sent over

5   by courier now.

6           THE COURT: Excellent.  All right.

7           MR. ABBOTT: Thank you, Your Honor.

8           THE COURT: Thank you, Mr. Abbott.

9           MR. DOSHI (Telephonic): That's perfectly fine.

10  Thank you, Your Honor.

11          THE COURT: Good.  Thank you, Mr. Doshi.

12          MR. BROMLEY: Your Honor, the next objection is from

13  SNMP Research International.

14          THE COURT: Yes.

15          MR. BROMLEY: It is a substantially similar

16  objection, and it is, we believe as well, solved by the new

17  language that we've added to paragraph 24.  That is the same

18  as it relates to Motorola Inc.  Although Motorola has also

19  asked for a statement on the record that Motorola's objection

20  has been addressed and settled through the revised sale

21  order, but is not being overruled or considered on the

22  merits.

23          THE COURT: Okay.

24          MR. BROMLEY: That is a different type of

25  reservation of rights, but I think we're comfortable making

1    that representation.  And as long as they are happy with

2    paragraph 24, which is what they've told us is the case.

3            THE COURT: Thank you.

4            MR. ALLINSON: Good afternoon, Your Honor.  Elihu

5    Allinson on behalf of Motorola Inc.  I appreciate counsel's

6    representation on the record.  I am confirming right now that

7    paragraph 24 states what my client expected it to state, and

8    if you don't hear from me by the end of the hearing, then our

9    objection has been resolved by the language in paragraph 24.

10           THE COURT: Okay, Mr. Allinson.  Thank you for that.

11           MR. BROMLEY: Thank you, Your Honor.

12           THE COURT: Yes, Mr. Bromley.

13           MR. BROMLEY: The next objection, Your Honor, is the

14   one that we received yesterday.  And this is an objection

15   that has been filed by certain lead plaintiffs in a putative

16   class action that is pending in the United States District

17   Court for the Southern District of New York.  It is a class

18   action captioned David Lucescu, l-u-c-e-s-c-u, individually

19   on behalf of all other similarly situated versus Mike

20   Zafirovski, z-a-f-i-r-o-v-s-k-i.  Mr. Zafirovski is the

21   former CEO of Nortel, and - -

22           THE COURT: Yes.

23           MR. BROMLEY:  - - there are additional defendants

24   in that action as well.  Your Honor, there's a couple of

25   things I'd like to note on this.  The objection is

1    essentially about the retention of documents.

2        THE COURT: Correct.

3        MR. BROMLEY: And there are a couple of things that

4    strike me about the objection.  One is I think this is really

5    a request for affirmative relief masked as an objection.

6    There's, there is a specific provision in this contract,

7    §5.16, that talks about the documents relating to this

8    business that's being sold.  And it specifically says that

9    those materials will be retained for a period of three years

10   from closing.  We believe that is commercially appropriate,

11   prudent, and all that is required under the circumstances.

12   But it's important to note, Your Honor, this business is

13   being sold for $10 million.  We've sold other businesses for

14   a lot more money.  And while we understand the concerns that

15   the lead plaintiffs in this putative class action have

16   raised, everything that we've done to date is completely

17   consistent with maintaining the books and records of the

18   company.  We have not brought any requests before you to

19   abandon any books and records, and if we did that, we would

20   do it on notice.  We also have three things that are playing

21   against this action.  First of all, it was commenced post-

22   petition.  Which is a little strange.  We don't usually see

23   putative class actions against Debtor companies and their

24   officers and directors filed after the petition date.  And it

25   is stayed in three ways.  First, discovery with respect to

1    this proceeding is stayed by Federal statute.  The Private

2    Securities Litigation Reform Act of 1995 says that you cannot

3    have affirmative discovery with respect to class actions of

4    this type regardless of whether or not you're in Chapter 11

5    until such time as the dispositive motions on the merits have

6    been disposed of.  And that was a very conscious policy

7    decision made by Congress in respect of what was perceived to

8    be overreaching in securities class actions.  So by statute

9    this discovery here is already stayed.  Second, the automatic

10   stay does stay this with respect to the Debtors.  And third,

11   Your Honor, with respect to the officers and directors.  The

12   officers and directors who are being sued in this class

13   action are Canadian officers and directors.  And there

14   already is a stay in the Canadian proceedings.  One

15   difference between the US Bankruptcy process and the Canadian

16   Bankruptcy process is that it is very common in the first day

17   stay order in Canada to have the stay extended to officers

18   and directors.  And indeed in Canada the bar date that was

19   set for September 30th requires, under Canadian law, that any

20   claims that may lie against the officers and directors, the

21   Canadian officers and directors have to be filed - - these

22   are third party claims, not insider claims.  But for claims

23   such as this, they would have to be filed in the Canadian

24   court.  By September 30th.  Since this only came in last

25   night, I've not been able to go and check whether or not

1    there already are claims filed.  But that I would suggest

2    that if there are claims against these individuals who are

3    Canadian officers and directors, in light of the Canadian

4    stay, they should be addressed through the Canadian process.

5    In addition, Your Honor, in the Chapter 15 that has been

6    filed with respect to the Canadian Debtors here, there is a

7    stay in place with respect to proceeding against these

8    individuals.  So in substance what we have is no evidence

9    whatsoever that we were trying to get rid of any of our books

10   and records.  Indeed we have an affirmative obligation to

11   come to you and ask for permission to do so, and we have not

12   done so.  We have a document in front of you on a very small

13   transaction which affirmatively states we will keep all the

14   documents and records for three years.  And then we have a

15   class action which is tied down, stapled, and taped, and not

16   able to move in the Southern District of New York.  So we

17   think it's a little misplaced.  Perhaps it's a marker that's

18   being put down for the future.  But if there is a request

19   for, you know, a general retention of documents, we think

20   that should be made in a different format.  And so on that

21   basis, Your Honor, we do believe that this objection is

22   inapplicable and inappropriate and should be overruled.

23            THE COURT: Thank you, Mr. Bromley.

24            MR. BROMLEY: Thank you.

25            THE COURT: Mr. Etkin, are you on the telephone?

1             MR. ETKIN (Telephonic): I am, Your Honor.

2             THE COURT: Would you like to be heard on your

3      objection?

4             MR. ETKIN (Telephonic): Yes I would, Your Honor.

5      And in the first instance, this is our first appearance in

6      connection with this Chapter 11 proceeding, and we have yet

7      to retain, as is obvious from the timing of the filing of the

8      pleading, we have yet to retain local counsel or move to be

9      admitted *pro hac* in this proceeding, although we have

10     appeared on a discrete matter in the Chapter 15 proceeding

11     before Your Honor previously.  So I'd be remiss if I didn't

12     point that out, and indicate that we will deal with those

13     issues post haste.  But I must ask the Court for permission

14     to address the Court today in the absence of a, of an order

15     from Your Honor regarding our *pro hac* admission in the

16     Chapter 11 case.

17            THE COURT: Sure, Mr. Etkin.  I'll be pleased to

18     hear from you.

19            MR. ETKIN (Telephonic): And also I'm, we do

20     apologize for the obvious tardiness of the filing, but it is

21     a discrete issue that does not involve any objection to the

22     sale itself.  And I think Mr. Bromley aptly set forth the

23     various prohibitions that exist with respect to affirmative

24     discovery in the class action at this moment.  And that's

25     precisely why we're concerned.  And I mean, we understand

1    that absent further orders of this Court, both with respect

2    to the Chapter 15 proceeding and perhaps this proceeding, as

3    well as further movement in the actual class action, which is

4    stayed even as to the non-Debtors by virtue of the

5    recognition order entered by Your Honor in the Chapter 15

6    proceeding, we cannot conduct discovery.  We are not in a

7    position to know what is or what may be relevant in terms of

8    the documents that are part and parcel of the assets being

9    transferred.  We understand the Debtors' obligations going

10    forward with respect to having to come to this Court on

11    notice with an opportunity to be heard to abandon books and

12    records.  You know, our concern is with, in the context of

13    the continuing disposition of assets of this Debtor that

14    books and records are being transferred to third parties

15    without the, potentially, the ability of any party in

16    interest, and the lead plaintiffs in particular in connection

17    with this objection, can access those documents down the

18    road.  For example, you know, within that three year period,

19    the parties could agree to, the Debtor could agree, if

20    approached by the purchaser, to, that certain documents could

21    be abandoned or destroyed because they've now passed to the

22    purchaser.  And the purchaser can do with them what they

23    will, so long as they deal with the Debtor directly on it.

24    And we're just concerned, without having the ability to

25    conduct discovery, without having the ability to know what is

1    or is not relevant to anything with respect to the documents

2    that are the subject of this sale, to access them at a point

3    down the road when we're in a position to access them.  So

4    our concern, as pointed out in our objection, is not to seek

5    any affirmative relief from the Court at this point.  We

6    understand that with respect to the automatic stay and the

7    recognition order that we have to come before this Court for

8    relief to conduct discovery or gain access to these

9    documents.  But to make sure that they, that they're there

10   when and if the time comes that we're entitled to access to

11   the documents.  So we would just be concerned that to the

12   extent there's any attempt to abandon, or destroy, or make

13   unavailable any of the records that are being transferred,

14   that there be some requirement to come before this Court and

15   not just notice the Debtor of the purchaser's intention, but

16   to come before this Court and request that it be permitted to

17   destroy within that, destroy or make unavailable those

18   documents within that three year period.  And give parties in

19   interest, such as my constituents, an opportunity to be heard

20   in that respect.

21          THE COURT: All right.  Thank you, Mr. Etkin.  Mr.

22   Bromley, will the Debtor be maintaining a set of the

23   documents that it is turning over, if you will, to Hitachi in

24   the sale?

25          MR. BROMLEY: Well I think that there is - -

1          THE COURT: It is curious to me, because we've had

2    sales in excess of what? $2 billion thus far, and we haven't

3    had this issue.

4          MR. BROMLEY: I think we have to - -

5          MR. ETKIN (Telephonic): I guess, Your Honor, that

6    that's, you know, that's an issue that we're going to have to

7    address differently because we obviously didn't appear at

8    that time.  And certainly in terms of the Ericsson sale, I

9    don't think there was a lead plaintiff appointment until the

10   end of July by the District Court.

11         THE COURT: Okay.

12         MR. ETKIN (Telephonic): If Your Honor recalls,

13   there was limited stay relief provided to allow the parties

14   to move forward with lead plaintiff motion practice so that

15   the District Court could appoint a lead plaintiff and there

16   could be some acknowledged leadership in the class action.

17         THE COURT: All right.

18         MR. BROMLEY: Your Honor - -

19         MR. ETKIN (Telephonic): Sorry for interrupting.

20         THE COURT: That's quite all right.

21         MR. BROMLEY: There's a, I think there's a question

22   that I have, frankly, for plaintiff's counsel.  This is, as I

23   understand it, a relatively garden variety securities class

24   action about disclosure of certain material or non-material

25   information or an omission.  And the, they even say in their

1   pleadings that this relates to Nortel Networks Corporation,

2   which is the Canadian publicly traded entity.  And what we're

3   talking about here is selling assets relating to a very

4   specific piece of highly technical equipment and product that

5   is even hard to describe in summary fashion.  And it's only

6   worth $10 million in connection with asset sales that have

7   already exceeded 2 billion.  I find it very hard to believe

8   that there's anything that could relate to the Next

9   Generation Packet Core Business that has anything to do with

10  the asserted acts or omissions that the lead plaintiffs are

11  referring to.  That, at first level is one question.  Second

12  is, we will not be abandoning any records without coming to

13  the Court, and telling the Court, and - - well, not telling,

14  but asking permission to do so.  Excuse me, Your Honor.

15          THE COURT: Yes.

16          MR. BROMLEY: I think there's - - it's always good

17  to look at the agreement, Your Honor.  And there are two

18  things that are worthwhile.  First, the, what are we selling?

19  Okay.  One of the things that we're selling is business

20  information.  And that is a defined term.  And business

21  information says, Books, records, files, ledgers, marketing

22  plans, sales literature or similar documents in the

23  possession and control of the sellers, and to the extent such

24  information exclusively relates to the business.  Business

25  Information, the defined term, shall be limited to copies of

1    the foregoing.  So we'll be providing copies of the business

2    information.  Now sellers is admittedly a term that's broader

3    than simply the Debtors.  And so to the degree that we're

4    providing copies of the business information to the seller,

5    and the Debtors are maintaining the originals, we will not be

6    abandoning those without the permission of the Court.  What's

7    not before Your Honor is that there's certain of the business

8    information that exists in the hands of the Canadian Debtors.

9    And the, it's simply not, we're not before, we don't have

10   that issue in front of Your Honor.  And in terms of what are

11   the requirements of abandoning property in Canada, including

12   records, I'm just not sure.  But I can tell you that

13   certainly from the Debtors, the US Debtors' perspective, we

14   will be keeping the originals of what we have, and we will

15   not be abandoning them without Court permission.  Then Your

16   Honor, with respect to §5.16 - -

17          THE COURT: Yes.

18          MR. BROMLEY: That is the maintenance of books and

19   records.  And after the closing the purchaser shall cause the

20   designated purchaser, if there is one, to preserve, at least

21   until the greater of the third anniversary of the closing

22   date or otherwise provided in the purchaser's applicable

23   document retention policy, so therefore a minimum of three

24   years, all pre-closing date records to the extent relating to

25   the business possessed or to be possessed by such person.

1    So, and then the, it says, after the closing date and up

2    until at least the third anniversary of the closing date upon

3    any reasonable advance notice, and during regular business

4    hours, the purchaser shall cause the person holding the

5    records to allow the seller to have access to that.  So, what

6    that means, Your Honor, is one, we are only selling them

7    copies of things.  And to the extent that those copies turn

8    out to be the only things that we actually had for some

9    reason, they have to allow us to see them and have copies of

10   them for up to three years.  You know, given where we stand

11   in terms of this transaction in light of everything else, the

12   type of product that's being sold, the cause of action that's

13   being asserted, I really don't think there's anything more

14   that's necessary.  The, you know, and I do think that what

15   we're trying to do here is to shoehorn this request for

16   affirmative relief into an objection.  If there's a general

17   concern that in the sale processes that are ongoing that

18   there is a risk that records on either side of the border

19   might be lost to the detriment of the plaintiffs in this

20   case, then I think they have the right and indeed the

21   obligation to make a request for affirmative relief for that.

22   I would point out for them that in order for that relief to

23   be comprehensive, they would have to ask not only Your Honor

24   but also Mr. Justice Morawetz.

25            THE COURT: Right.

1           MR. BROMLEY: It's been no secret from the very

2      beginning of these cases, and indeed it's imbedded in their

3      complaint, that the officers and directors of the publicly

4      traded company were located in Canada.  There's - - so to the

5      degree that there's a concern about the - - at least in my

6      experience - - the types of books and records that would go

7      to a securities class action are the types of books and

8      records that are at headquarters, which are in Toronto.  Not

9      the types of books and records that would be supporting the

10     development of this very technical type of equipment in

11     Richardson, Texas.  So I think that there's ample protection

12     in this document, and in the law in the United States under

13     abandonment for protection here today.  And if there is a

14     need for additional comfort, that the lead plaintiffs believe

15     their entitled to, I would suggest that they make the request

16     separately, rather than trying to get in the way of this.

17          THE COURT: Let me just say, I have to agree,

18     really, here with Mr. Bromley.  It seems to me that the type

19     of information with which the lead plaintiffs are concerned

20     is not the type of information that is involved in this

21     transaction.  The documents will remain in the hands of the

22     Debtors for a number of years yet.  And I am reluctant to do

23     anything, not just because maybe it wouldn't hurt, but it

24     really, I think we have to have evidence of the necessity for

25     the relief being sought.  And I just don't hear it here.  So

1    I'm going to overrule the objection.

2          MR. DOSHI (Telephonic): Your Honor, may - - I

3    understand the Court's ruling.

4          THE COURT: Yes.

5          MR. DOSHI (Telephonic): And given Mr. Bromley's

6    representations on the record, I understand.  Your Honor

7    asked a question a few minutes ago, before Mr. Bromley spoke

8    for a bit as to whether the Debtor was retaining copies of

9    the documents relating to this business, and I thought I

10   heard in the middle of everything that the Debtors were

11   retaining the originals, and - -

12         THE COURT: Yes.

13         MR. DOSHI (Telephonic):  - - providing copies to

14   the purchaser.  And that the Debtors remain subject to the

15   jurisdiction of this Court with respect of, to abandonment of

16   records.  So I understand that.  I just, I do resent, to some

17   extent, the statement that we're trying to get in the way of

18   the transaction.  We are not.  And we, specifically in our

19   objection, indicated that we have no objection to the sale

20   itself.  While it appears at first blush that there may, at

21   the end of the day, not be or be, or there may be minimal

22   relevance of these documents to the allegations in the class

23   action, the class action, obviously, has not gotten off the

24   ground yet.  I just don't know the answer to that question.

25   And all I want to make sure that I put on the record is that

1  the concerns that we've raised are legitimate concerns, and

2  are not in any way an attempt to back door into affirmative

3  relief.  If we want affirmative relief, I don't think it's as

4  easy as Mr. Bromley pointed out, since we have stays to deal

5  with both with respect to the District Court and the Court in

6  the CCAA proceeding, as well as this Court.  So we would have

7  to overcome that hurdle in the first instance.  It's not just

8  that we can go in and serve document preservation subpoenas.

9  But you know, we'll do what we need to do.  But I understand

10 Your Honor's ruling, and given what Mr. Bromley stated on the

11 record, I think it's fair to say that these books and records

12 will remain available from the Debtor.

13         THE COURT: Yes.  All right.  Thank you, Mr. Etkin.

14         MR. ETKIN (Telephonic): Thank you, Your Honor.

15         THE COURT: Now have we covered all the objections?

16 Do any of the objectors wish to be heard further?  All right.

17 I am satisfied on this record, in particular the proffer of

18 Mr. DeAlmeida, and the documents having been presented that

19 - - and also the fact that a number of constituencies if not

20 in support of the motion, or not in support of the sale, are

21 at least certainly not opposed to it.  And there are a number

22 of constituencies which are reviewing all of these sales, and

23 the Court takes great comfort from that fact.  That there are

24 able counsel and able parties reviewing the Debtors' actions.

25 That this sale is, indeed, in the best interests of the

1    Debtors' estate.  That the procedures, having been followed,

2    were designed to achieve a highest and best price, that the

3    transaction proceeded at arm's length, that there was no

4    collusion, there was no insider involved in the transaction,

5    and that the price being achieved here is fair and

6    reasonable, and again in the best interest of the Debtors'

7    estates.  And I am pleased to approve the sale, and also to

8    grant the request for a good faith finding pursuant to

9    §363(m).  Clearly, as I've said and found, the transaction

10   was at arm's length and there was no collusion.  And it

11   involves no insiders.  So with that, I will be pleased to

12   enter an order.

13            MR. ABBOTT: Your Honor, may I approach?

14            THE COURT: Yes.  And I believe you were going to

15   read some language.

16            MR. ABBOTT: Just a handful of - -

17            THE COURT: Yes.

18            MR. ABBOTT:  - - comments.

19            THE COURT: And there are - - thank you, Mr. Abbott.

20   There are people on the telephone, and it would be helpful.

21            MR. ABBOTT: Your Honor, there have been a number of

22   what I would characterize as minor changes to reflect Hitachi

23   as the buyer, etcetera.

24            THE COURT: Yes.

25            MR. ABBOTT: The big changes, Your Honor, are at

1   paragraphs 23, 24, and 25.  Your Honor, the change at

2   paragraph 23 just talks about where the proceeds go.  24 is

3   the one that we had to change, Your Honor, to make Mr. Doshi

4   happy.  And I can tell the Court the minor change.  This

5   black line, unfortunately shows everything that was added.

6           THE COURT: Yes.

7           MR. ABBOTT: But it's in the first sentence of

8   paragraph 24, Your Honor.

9           THE COURT: Yeah.  And I think you can address, Mr.

10  Abbott, just the precise language that addresses the

11  objections.

12          MR. ABBOTT: Will do, Your Honor.  The first

13  sentence has at the end of it now, a reference to a

14  particular Motorola contract.

15          THE COURT: Okay, yes.

16          MR. ABBOTT: That reference in the earlier draft

17  that Mr. Doshi had seen was in the middle of the sentence,

18  and I guess Oracle's counsel felt that that muddied the

19  sentence and the meaning of the sentence a little bit, so we

20  just added that sort of, included without limitation, that

21  particular contract that Motorola wanted in here at the end,

22  rather than in the middle of the sentence.  Motorola, I'm

23  told, is comfortable with this change, so long as we make

24  clear, which I'm doing now, Your Honor, that that reference

25  to a particular Motorola contract is included among the

1  agreements that are defined as objecting party agreements.

2  So that's the only change, just moving that phrase to the end

3  of the sentence rather than in the middle.  Other than that,

4  Your Honor, paragraphs 24 and 25 are, as Mr. Bromley

5  indicated, to resolve the relevant objections, Your Honor.

6          THE COURT: Okay.  And in particular paragraph 25

7  addresses the Open System Solutions objection?

8          MR. ABBOTT: Yes, Your Honor.

9          THE COURT: Is there anyone who would like to have

10  any precise language, at least there be a confirmation on the

11  record that certain language appears in here?  All right.  I

12  hear no one.

13          MR. ABBOTT: Thank you, Your Honor.  I have handed

14  up, Your Honor, a clean copy of the order as well as the

15  attached agreement.

16          THE COURT: Excellent.

17          MR. ABBOTT: Thank you, Your Honor.

18          THE COURT: Now the attached agreement does not have

19  the schedules and that sort of thing.  So this may be filed

20  on the record.  Is that correct?  You don't have any issue?

21          MR. ABBOTT: It is a clean copy without the

22  disclosure schedules that were filed - -

23          THE COURT: Excellent.

24          MR. ABBOTT:  - - under seal, Your Honor.

25          THE COURT: All right.

1          MR. ABBOTT: Thank you.

2          THE COURT: Very well.  All right, then I am pleased

3   to sign the order.

4          MR. ABBOTT: Thank you, Your Honor.  All right.  Mr.

5   Bromley.

6          MR. BROMLEY: Thank you, Your Honor.  Just wanted to

7   mention.  I think the next scheduled hearing we have in this

8   matter is the 19th of November.

9          THE COURT: Yes.

10          MR. BROMLEY: And we anticipate being before you

11   with yet another sale transaction.  The auction of the Metro

12   Ethernet business is scheduled to take place on Friday the

13   13th.

14          THE COURT: Oh.

15          MR. BROMLEY: And we'll be before you on the 19th,

16   hopefully with a very successful result.

17          THE COURT: I hope so.  You've certainly done well.

18   And keep them coming, I suppose, is how I feel about it.  And

19   if there's nothing else, I certainly wish the good people at

20   Hitachi success with their purchase.  Did someone else wish

21   to be heard?

22          MR. WISHNEW: Your Honor, Jordan Wishnew, Morrison &

23   Foerster for Hitachi.

24          THE COURT: Yes.

25          MR. WISHNEW: I just wanted to thank Your Honor for

1   everything.  We echo all, everything that Mr. Bromley has

2   represented to the Court, and we appreciate Your Honor's

3   attention to this matter.

4           THE COURT: My pleasure.  Thank you very much.

5           MR. WISHNEW: Thank you.

6           THE COURT: All right, counsel, we will stand in

7   recess, and everyone can go home and watch the Phillies beat

8   the New York Yankees.  And with that we'll stand in recess.

9           UNIDENTIFIED SPEAKER: Is that on the record?

10          UNIDENTIFIED SPEAKER (Telephonic): Is that on the

11   record, Your Honor?

12          THE COURT: Yes it is.

13      (Whereupon at 2:54 p.m. the hearing in this matter was

14   concluded for this date.)

15

16

17

18          I, Jennifer Ryan Enslen, approved transcriber for

19   the United States Courts, certify that the foregoing is a

20   correct transcript from the electronic sound recording of the

21   proceedings in the above entitled matter.

22

23    _/s/Jennifer Ryan Enslen_                  November 3, 2009
      Jennifer Ryan Enslen
24    43 Bay Boulevard
      Newark, DE 19702
25    (302)836-1905