# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
:
In re:                         : **Chapter 11**
:
**NORTEL NETWORKS, INC.**, *et al.*,     : **Case No. 09-10138 (KG)**
: **(Jointly Administered)**
             **Debtors.**     : Hearing Date: November 19, 2009 at 2:00 p.m.
: Objection Deadline: November 6, 2009 at 4:00 p.m.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x Related Docket No. 1627

## AT&T'S LIMITED OBJECTION TO DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING DEBTORS' ENTRY INTO THE STALKING HORSE ASSET SALE AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES AND BID PROTECTIONS, (C) APPROVING THE NOTICE PROCEDURES AND THE ASSUMPTION AND ASSIGNMENT PROCEDURES, (D) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL AND (E) SETTING A DATE FOR THE SALE HEARING, AND (II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF DEBTORS' METRO ETHERNET NETWORKS BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND (B) THE ASSUMPTION AND ASSIGNMENT OF <u>CERTAIN EXECUTORY CONTRACTS</u>

AT&T Services, Inc., on its own behalf and as agent on behalf of AT&T Corp. and its subsidiaries and affiliates (collectively, "<u>AT&T</u>"), hereby files this limited objection (the "<u>Objection</u>") to the Debtors' Motion for Orders (I)(A) Authorizing Debtors' Entry into the Stalking Horse Asset Sale Agreement (the "<u>APA</u>"), (B) Authorizing and Approving the Bidding Procedures and Bid Protections, (C) Approving the Notice Procedures and the Assumption and Assignment Procedures, (D) Authorizing the Filing of Certain Documents Under Seal, and (E) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Metro Ethernet Networks Business Free and Clear of all Liens, Claims and Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts, dated October 7, 2009 (the "<u>Sale Motion</u>") and in support thereof states as follows:

## BACKGROUND

A.    *The AT&T Contracts*

1.      AT&T and the Debtors are parties to several contracts whereby AT&T purchases Nortel equipment for use in AT&T's telecommunications network and also purchases Nortel equipment for resale to AT&T's customers for use in connection with AT&T's telecommunication services (collectively, the "AT&T Contracts"). The AT&T Contracts include Master Agreement, No. 980332 (the "Master Agreement") and several supplemental agreements, attachments, modules, orders and other similar agreements entered into under the master agreements (the "Supplemental Agreements"). The Master Agreement and the related Supplemental Agreements are considered one integrated contract pursuant to their terms.

2.      Under the AT&T Contracts, the Debtors indemnify AT&T against, among other things, any damages or losses caused by the products, or as a result of claims for copyright infringement made by third parties against AT&T (collectively, the "Indemnification Provisions"). The Indemnification Provisions are essential to the AT&T Contracts because by using and/or reselling Nortel equipment to AT&T customers, AT&T, among other things, may expose itself to liability should a claim be asserted against AT&T on account of the Nortel equipment. In addition, under the AT&T Contracts, Nortel provides warranties for the Nortel equipment and is required to send technicians to service and upgrade Nortel products in addition to providing services related to the warranties on such products (collectively, the "Warranty Provisions" and, together with the Indemnification Provisions, the "Indemnification/Warranty Provisions").[1] The Warranty Provisions are also essential to the AT&T Contracts because AT&T needs Nortel to provide these services for the Nortel equipment.

---

[1] Although the APA appears to provide that the Purchaser is assuming some of these provisions in their entirety, such as "obligations under any warranty liabilities, including with respect to Known Product Defects," AT&T objects to the extent that the proposed assignment does not include all the obligations under the AT&T Contracts or that the assumed "warranty" provision excludes any warranty or similar obligation under the AT&T Contracts.

3.    In addition to the Indemnification/Warranty Provisions, there are other relevant provisions that are important to consider in the context of assuming and assigning the AT&T Contracts.  For example, AT&T earns credits for the Nortel equipment that AT&T purchases under the AT&T Contracts.  These credits can be used to, among other things, train AT&T employees to provide certain services on the Nortel equipment.  The value of these credits is substantial both in terms of monetary amount and necessary training.  AT&T continuously earns credits and presently has earned credits totaling approximately $248,134.73.

B.    *The Sale Motion and Assignment Notices*

4.    On October 7, 2009, the Debtors filed the Sale Motion.  Pursuant to the Sale Motion, the Debtors propose to sell certain assets related to the Debtors' Metro Ethernet Networks Business (the "MEN Business") to Ciena Corporation (the "Purchaser") for approximately $390 million in cash plus 10,000,000 shares in the Purchaser subject to higher and better offers (the "Sale").  On October 15, 2009, the Court entered an order (the "Order") approving bidding procedures, setting the sale hearing for November 19, 2009 (the "Sale Hearing") and establishing the deadlines for parties to object to the Sale.

5.    In the Sale Motion, the Debtors seek to assume and assign certain executory contracts to the Purchaser pursuant to Section 365 of the Bankruptcy Code (the "Assigned Contracts").  However, the Purchaser is not assuming all liabilities under the Assigned Contracts, but rather, is only assuming the "Assumed Liabilities," which includes, among other things, "liabilities arising after the Closing Date to the extent related to the operation of the MEN Business by the Stalking Horse Purchaser following the Closing…[and] liabilities arising from the performance of Assigned Contracts after the Closing Date…."  Sale Motion at p. 12.  Thus, the APA provides that the Purchaser shall assume and become responsible for, "all Liabilities

arising from or in connection with the performance of the Assigned Contracts (or breach thereof) after the Closing Date...." APA at §2.1.3.

6.      Consistent with the Sale Motion and the APA, the proposed order approving the Sale Motion (the "Proposed Order") provides that "[u]pon the Closing, the Purchaser shall be deemed to have assumed only the Assumed Liabilities." Proposed Order at p. 16. Although the Purchaser is not assuming all the liabilities arising from the executory contracts, the Proposed Order provides that, "[u]pon the entry of this Order ... no other amounts will be owed by the Debtors, their estates or the Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assumed and Assigned Contracts..." Id. at p. 14-15.

7.      Pursuant to the two Notices of Debtors' Request for Authority to Assume and Assign Certain Contracts, both dated October 19, 2009 (the "Assignment Notices"), the Debtors are seeking to assume and assign to the Purchaser certain AT&T Contracts and assert that no amounts are owed to cure such contracts. The AT&T Contracts listed in the Assignment Notices do not include all of the AT&T Contracts related to Nortel's MEN Business. In addition, the Debtors have listed several Supplemental Agreements, but have failed to include the Master Agreement or the other Supplemental Agreements entered into under the Master Agreement.

8.      Specifically, the Debtors listed the following Supplemental Agreements that relate to and are integrated with the Master Agreement: (i) Affiliate Module (Optical) Agreement No. 06046944[2], (ii) Affiliate Module Agreement No. 06046687 to Supplemental Agreement No. 01019547, (iii) Optical Module Agreement with Amendment #1 and Appendix #1-9, Agreement No. 03032497[3], (iv) Agreement #20071110.A.001 Optical Planner and License Agreement

---

[2] The list above contains certain additional information identifying the contracts.
[3] This agreement has two additional amendments. Nortel must assume these and all amendments to the agreements that Nortel seeks to assume and assign to the Purchaser.

Software, (v) Subordinate Agreement #04036069 for MPS1000 Product & Services Agreement with Amendments #1-2, (vi) DWDM/CWDM Agreement #01019547 Amendment #11, and (vii) LOA 20090828.OME for products credits for Ultravailable Network Services Agreement. Despite including these Supplemental Agreements in the Assignment Notices, the Debtors failed to list the Master Agreement.

9.    The Debtors have also failed to include the following Supplemental Agreements, together with the amendments and supplements to such agreements: (i) OME Product Family Agreement No. 20080605.036.C, and (ii) Agreement No. 051041050 – Software. The Debtors also failed to include the Multi-Commitment and Purchase Agreement, No. 20080912.028.C and Amendment No. 1 to the agreement (collectively, the "MCAP Agreement"). These agreements are also considered one integrated contract with the Master Agreement.

10.    In addition, the Debtors list "Agreement 04034025.S.001" and "Services Work Statement #04034025 with Amendments #1-3 and Attachments 1-2" both of which do not relate to the MEN Business. The Debtors also list the "Dev Services Agreement for Optical Purchase and License Agreement SW #20080605.029.C" which was a contract the parties were negotiating but never signed because the parties decided to cancel the project related to the agreement. Finally, the Debtors list the "Maintenance Agreement" with AT&T Corp. However, this agreement has expired, and therefore, cannot be assumed and assigned.

## OBJECTION

11.    AT&T objects to the assumption and assignment of the agreements listed in paragraph 10 since such agreements have either expired, were never signed or do not relate to the MEN Business.

12.    AT&T also objects to the extent that its rights under the Indemnification/Warranty Provisions along with all of the other contractual provisions are not

assumed by the Purchaser.[4]   In particular, the APA could be read to preclude AT&T from

asserting a claim for indemnity against the Purchaser if such claim relates to events that occurred

prior to the Closing Date (even if the claim was not asserted against AT&T until after the

Closing Date).  As discussed below, this is not permissible under Section 365, and the AT&T

Contracts must be assumed and assigned in their entirety without limiting AT&T's rights under

any of the contractual provisions, including the Indemnification/Warranty Provisions.   In

addition, AT&T must be provided with adequate assurance of future performance that its

bargained for rights will be protected.

13.    AT&T also objects to the extent that the Debtors are attempting to pick and

choose certain Supplemental Agreements without assuming the corresponding Master

Agreement together with all Supplemental Agreements entered thereunder with respect to the

MEN Business.  The Master Agreement and the related Supplemental Agreements constitute

single integrated agreements which must be assumed and assigned in their entirety.

A.    *The Purchaser Must Be Responsible under all Indemnification/Warranty Provisions*

14.    It is black letter law that a debtor assumes a contract under Section 365 of the

Bankruptcy Code *cum onere*—with all of its benefits and burdens.   NLRB v. Bildisco &

Bildisco, 465 U.S. 513, 531 (1984); In re Fleming Cos., Inc., 499 F.3d 300, 308 (3d Cir. 2007).

As stated by the Third Circuit,

> Section 365(f) requires a debtor to assume a contract subject to the benefits and
> burdens thereunder ... 'The [debtor] ... may not blow hot and cold.  If he accepts
> the benefits he must adopt the burdens.  He cannot accept one and reject the
> other'... The *cum onere* rule 'prevents the [bankruptcy] estate from avoiding
> obligations that are an integral part of an assumed agreement.'

Fleming, 499 F.3d at 308 (citations omitted).  Similarly, a debtor seeking to assign a contract

under Section 365 must also assign the contract in whole with all the benefits and burdens.  Id. at

---

[4] This includes the credits AT&T has earned under the AT&T Contracts.  AT&T is still earning these credits and the
APA should not preclude AT&T from continuing to earn credits and use the credits that have been earned.

308 ("'an assignment is intended to change only who performs an obligation, not the obligation

to be performed'") (citing Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d

44, 60 (3d Cir. 2001); see also In re Morande Enters., Inc., 335 B.R. 188, 192 (Bankr. M.D. Fla.

2005) ("The Debtor cannot assume and assign the contract in part, under either § 365 or the

Florida Dealer Law, but must do so in whole, including the Location Provision"); In re Cajun

Elec. Power Co-Op., Inc., 230 B.R. 693, 710 (Bankr. M.D. La. 1999) ("The rule that an

executory contract must be assumed or assigned in toto has been recognized on several occasions

by the Fifth Circuit... an executory contract must be assumed or assigned in its entirety....").

15.    Among the reasons that a contract must be assigned in its entirety under Section

365 is that the debtor will be relieved of its obligations under the contract pursuant to Section

365(k).  Therefore, the assignee must assume all the obligations so that the counterparty's rights

are protected.   The Third Circuit addressed the issue of whether a party can make a partial

assignment under Section 365 in American Flint Glass Workers Union v. Anchor Resolution

Corp., 197 F.3d 76 (3d Cir. 1999).  In American Flint, the debtor objected to proofs of claim

filed under collective bargaining agreements that had been assumed and assigned to the

purchaser of the debtor's assets.  The bankruptcy court found that the debtor was relieved of

liability under Section 365(k), and therefore, the claims could not be asserted against the debtor.

The Third Circuit reversed, holding that an assignment under Section 365 did not take place

because the contracts at issue were not assigned with all of the benefits and burdens:

> In the bankruptcy context, however, Code § 365(k) changes the common law rule
> by effecting a novation by operation of law whether or not the obligee consents to
> the substitution.... But consistent with the basic concept of a contract's
> assignment, under which every contractual assignee takes the entire bundle of
> rights and obligations under the contract, such a forced novation is dependent on
> just such a total undertaking by the assignee. Code § 365(k) (emphasis added)
> provides: Assignment by the trustee to an entity *of a contract* or lease assumed
> under this section relieves the trustee and the estate from any liability for any
> breach of such contract or lease occurring after such assignment.

Where Congress uses legal terms that have "accumulated settled meaning" under common law, it must be presumed (unless of course the statute dictates otherwise) that Congress meant to employ that established meaning.... Hence we construe the terms in Code § 365(k) to incorporate the general common law of assignments. In particular, we will follow the dominant consensus of common law jurisdictions, rather than the law of any particular jurisdiction....

That dominant consensus conforms to the clear meaning of the language involved: that an assignment of a contract as such involves a commitment by the assignee to perform all obligations under the contract, as well as to acquire all rights created by the contract.

Id. at 80-81 (finding the debtor was still liable because the contract was not assigned in its entirety); cf. In re Allegheny Health, 383 F.3d 169 (3d Cir. 2004) (union could not assert post-closing indemnification claim against buyer of assets because such assets were not assumed by the buyer and *union failed to object to the sale*). Thus, a debtor cannot assign a contract under Section 365 unless the assignee assumes all the obligations.

16. In this case, the Debtors are seeking to assume and assign the contracts under Section 365 and are seeking to be relieved of all liability after such assignment. However, the Purchaser is not taking the Assigned Contracts with all benefits and burdens, but rather, is seeking to limit its liabilities to the "Assumed Liabilities," i.e., liabilities related to post-closing performance. As the Third Circuit has made clear, this is not permissible under Section 365 of the Bankruptcy Code. In an analogous case, In re 1945 Route 23 Assocs., Inc., 2008 WL 2386296 (Bankr. D. N.J. 2008), the assignee of a lease argued that it was not responsible for pre-closing costs because, similar to the APA in this case, the assignee was only responsible for post-closing costs under the asset purchase agreement. The court rejected the argument, reasoning:

The court is similarly not persuaded by Autobacs's construction of the pertinent provisions of the APA. Autobacs concedes that the Tozzo lease is an Assumed Agreement but then contends that the 2007 Corrected Cost Statement is not an Assumed Liability because much of the amount due under that cost statement accrued prior to the sale closing date (May 2, 2007). It contends that under the APA's definition of Assumed Liabilities, the obligation must both arise and relate to a period after the closing date. Further, it concludes that the following sentence in the definition clearly expresses Autobacs's intent not to assume liabilities like

those contained in the 2007 Corrected Cost Statement: "For avoidance of doubt, Assumed Liabilities excludes any Liability attributable to any act, occurrence or omission which occurred prior to Closing except as expressly assumed hereunder." Autobacs concludes from this that because it did not expressly assume the obligation to pay the cost statement, the obligation is expressly excluded. The flaw in Autobacs's argument is that under the APA Autobacs expressly assumed the Tozzo lease, and thereby expressly assumed all of its provisions, including the obligation to satisfy the payment of the 2007 Corrected Cost Statement. When R & S, and subsequently Autobacs, assumed the Tozzo lease, they assumed it in its entirety, accepting the burdens as well as the benefits. See In re Fleming Cos., Inc., 499 F.3d 300, 308 (3d Cir. 2007). Unquestionably then, the assumed obligation to pay the Corrected 2007 Cost Statement arises and relates to the period after the closing date because that is when the obligation came due.

Id., 2008 WL 2386296 at *7.

17.    Here, under the AT&T Contracts, AT&T has the right to assert claims for indemnity if claims are asserted against AT&T on account of Nortel products as well as warranty and service claims related to the Nortel equipment. Pursuant to Section 365 of the Bankruptcy Code, the Purchaser takes the assignment subject to those rights. As it currently stands, the APA would appear to bar AT&T from asserting its bargained for rights, including indemnity rights, against the Purchaser if a claim based on pre-closing conduct is asserted against AT&T. This is not permissible and, accordingly, the sale should not be approved unless the Purchaser also agrees to fully assume the Indemnification/Warranty Provisions contained in the AT&T Contracts.

B.    _There Is no Adequate Assurance of Future Performance_

18.    Absent assumption of the Indemnification/Warranty Provisions in the contracts, the Debtors have also failed to provide adequate assurance of future performance under the AT&T Contracts.

19.    To effectuate an assignment under the Bankruptcy Code, the Debtors must demonstrate adequate assurance of future performance. Adequate assurance of future performance is an element of the assumption and assignment process which must be met in

addition to the curing of any defaults under an executory contract. 11 U.S.C. § 365(f)(2). Even in the absence of a default under the contract, adequate assurance of future performance must be afforded before the trustee can assign an executory contract. See In re E-Z Serve Convenience Stores, Inc., 289 B.R. 45, 52 (Bankr. M.D.N.C. 2003) (refusing to excise a right of first refusal from a lease agreement reasoning that, among other things, absent such provision the non-debtor party "will not receive the full benefit of its bargain and the Trustee cannot give adequate assurance of future performance"). Although not defined in the Bankruptcy Code, the phrase "adequate assurance of future performance," adopted from Section 2-609(1) of the Uniform Commercial Code, is intended to be given a "practical, pragmatic construction based upon the facts and circumstances of each case." Cinicola v. Scharffenberger, 248 F.3d 110, 120 (3d Cir. Pa. 2001) (citations omitted).

20.     As discussed, Section 365(k) of the Bankruptcy Code relieves the trustee and the estate from any liability under a contract occurring after assignment. In re Washington Capital Aviation & Leasing, 156 B.R. 167, 175 & n.3 (Bankr. E.D. Va. 1993) (Section 365(k) alters the common law rule that the original obligor remains ultimately liable after assignment until discharged by performance, consent or otherwise.); see also In re Rickel Home Centers, Inc., 209 F.3d 291, 299 (3d Cir. 2000) (in the context of shopping center leases, the court held that adequate assurance is "necessary to protect the rights of the non-debtor party to the contract or lease, because assignment relieves the trustee and the estate from liability arising from a post-assignment breach"), cert. denied, 531 U.S. 873 (2000).

21.     Here, AT&T's indemnity claims based on events that occurred prior to the Closing Date could arise months or years after the Closing. Assuming arguendo, that these claims are considered pre-closing claims, the APA would appear to prevent AT&T from asserting the claims against the Debtors for a variety of reasons. This would leave AT&T

without its bargained for rights, resulting in the failure to provide adequate assurance of future performance. In short, the Debtors must provide adequate assurance that AT&T's bargained for rights will be protected, which means that the contracts, including the Indemnification/Warranty Provisions, must be assumed in their entirety in a seamless fashion.

C.    *The Master Agreements and the Related Supplemental*
      *Agreements Must Be Assumed in Their Entirety*

22.    The Debtors cannot assume and assign certain Supplemental Agreements without assuming and assigning the Master Agreement and all underlying Supplemental Agreements related to the MEN Business since the agreements constitute a single integrated transaction.[5]

23.    Where several separate "contracts" are in substance one agreement, Section 365 of the Bankruptcy Code similarly does not allow a debtor to "cherry pick" the "contracts," accepting certain ones, while rejecting others. In re Atl. Computer Sys., Inc., 173 B.R. 844, 849 (S.D.N.Y. 1994); see also In re Kopel, 232 B.R. 57, 65, n.4 (Bankr. E.D.N.Y. 1999) ("Where several documents are construed as one contract, the debtor must assume or reject them together"). The debtor must assume the entire package of contracts that comprise the overall agreement. Bankruptcy Courts frequently have found that several contracts form one indivisible, integrated agreement and have refused to allow the debtor to split up the transaction by assuming the beneficial contracts and rejecting others under Section 365. See, e.g., In re Cole Bros., 137 B.R. 647, 651 (Bankr. W.D. Mich. 1992); Braniff, Inc. v. GPA Group PLC (In re Braniff), 118

---

[5] AT&T reserves its rights to further object to the extent that the Debtors and the Purchaser seek to "un-bundle" the AT&T Contracts as detailed in Section 5.15 of the APA. Under that section, the Debtors and the Purchaser will seek to un-bundle certain contracts and enter into "Alternate Arrangements" by continuing under the existing contract or entering into a new contract. APA at §5.15(b). Section 5.15(c) & (d) also allows the Debtors to subcontract portions of the Bundled Contracts to the Purchaser under certain conditions and subject to certain requirements. The Master Agreement and certain Supplemental Agreements govern the MEN Business as well as other business lines with Nortel. As discussed above, certain Supplemental Agreements incorporate the Master Agreement and must be assumed and assigned in their entirety. Thus, to effectuate assumption and assignment of the AT&T Contracts that relate to other business units, the Debtors and the Purchaser may need to attempt to "un-bundle" these contracts. At this point, AT&T does not know whether any proposed "un-bundling" of the AT&T Contracts will negatively impact its rights under the contracts. Accordingly, AT&T reserves its right to object with regard to the un-bundling of its contracts or with regard to other issues that may arise when the Debtors make their determination regarding the treatment of the AT&T Contracts.

B.R. 819, 844 (Bankr. M.D. Fla. 1989); In re T & H Diner, Inc., 108 B.R. 448, 454 (Bankr.

D.N.J. 1989); In re Ritchey, 84 B.R. 474, 476 (Bankr. N.D. Ohio 1988); Bistrian v. Easthampton

Sand & Gravel Co., Inc. (In re Easthampton Sand & Gravel Co.), 25 B.R. 193, 199 (Bankr.

E.D.N.Y. 1982).

24.     In determining whether *several* separate contracts in substance form one

integrated agreement that must be assumed as a package under Section 365, the Bankruptcy

Courts look to the underlying state law, the contract itself, and the intent of the parties.  In re

Philip Servs. (Del.), Inc., 284 B.R. 541, 546 (Bankr. D. Del. 2002) ("Under general contract law,

the parties' intentions determine whether two separately executed documents are in reality one

agreement").  In determining whether the agreements constitute one integrated agreement, state

courts usually consider the following:

> Ultimately, the question is one of the intent of the parties, and the courts, in
> making this determination, consider all of the facts and circumstances
> surrounding the making of the agreements, including: (1) the nature and purpose
> of the various agreements, including whether they are contained in one instrument
> or multiple instruments and whether, if the latter, they were executed at the same
> time or at different times, and whether the initially executed agreement
> contemplated the later agreements; (2) whether the same consideration was paid
> for each of the promises contained in the agreements or whether the consideration
> for the various agreements was separate and distinct; and (3) whether the parties'
> obligations under the various agreements are interrelated or independent.

WILLISTON ON CONTRACTS, ASSUMPTION OR REJECTION OF CONTRACTS CONSISTING OF MORE

THAN ONE AGREEMENT § 78:29, § 78:29 (2009).[6]  Thus, in analyzing the parties' intentions,

courts will look to the terms of the agreement.  For example in In re Beatriz Ready Mix, Inc.,

2009 WL 255890 (Bankr. D.P.R. 2009) the court stated:

> Each document also states the parties intended that the three documents be
> considered complimentary and interrelated agreements, or components of the one
> single transaction, that is, the sale of the business

---

[6] In this case, the law governing the contracts at issue encompass several states and, in certain circumstances,
depends on the location of the AT&T affiliates' principal places of business.  As discussed above, courts generally
consider the same factors and principles in connection with this analysis.

\*        \*        \*

We find the words used in the tie-in clauses in all three documents are clear. The contractual language expressing the parties' intent is not murky, or obscure. These expressions undoubtedly state the parties intended that the three documents complement each other, depicting the components of one single business transaction.

\*        \*        \*

Hence, we find the preponderance of the credible and admissible evidence here shows the tie-in clauses in the three documents demonstrate the parties' true and unequivocal intent once they reached a meeting of the minds. These tie-in clauses clearly show the three contracts express the true intent of the parties: that is, the documents are but components of a single, interdependent, unified business transaction, and that the parties never intended us to consider the documents as three individual, separate, self-standing and severable contracts.

Id. at \*4.  Thus, where the terms of the contracts unambigously demonstrate that the parties intend the contracts to be integrated into a single contract, the courts will find that the agreements should be treated as one contract.  For example, where the parties' relationship is governed by a master agreement and subsequent agreements entered into under the master agreement and the parties intend such agreements to be integrated into a single agreement, courts will find the Master Agreement and subsequent agreements constitute a single integrated contract that must be assumed and assigned in its entirety.  See, e.g., In re Atl. Computer Sys.., 173 B.R. 844, 849 (S.D.N.Y. 1994), (court reversed bankruptcy court decision allowing Debtors to assume a Master Lease Agreement for computer equipment but not the subsequent leases entered into contemporaneously with the equipment schedules); see also In re Aneco Electrical Construction, 2005 WL 3750364 at \*4 (M.D. Fla. 2005) ("the Court finds that the Subcontract Agreement entered by the Debtor and Turner on November 25, 2002, constitutes a single, indivisible contract for electrical work at the Dulles International Airport, and that the subsequent Work Orders did not effect a severance of the contract into two separate and independent 'subcontracts'").

25.    In this case, the parties' intentions are readily apparent through reference to the AT&T Contracts, which provide for the Supplemental Agreements referenced above to be integrated into the Master Agreement.  For example, Agreement No. 20080605.036C, which is a Supplemental Agreement provides that "[t]his Agreement is pursuant to and hereby incorporates by reference the terms and conditions of General Agreement No. 980332 ("General Agreement")."  The agreement also provides that "[t]he terms and conditions contained in this Agreement including all exhibits, appendices and subordinate documents attached to or referenced in this Agreement when this Agreement is executed by both Parties, and any Orders placed pursuant hereto together with the General Agreement, will constitute the entire integrated Agreement between Nortel and AT&T with regard to the subject matter hereof."  Similar provisions are contained in the other AT&T Contracts.  The intention of the parties is clear – the Supplemental Agreements referenced above are integrated into the Master Agreement, and as a result, the agreements with respect to the MEN Business constitute a single integrated contract that must be assumed and assigned *cum onere*.

## CONCLUSION

WHEREFORE, for the reasons stated above, AT&T objects to the relief requested in the

Sale Motion to the extent cited above and respectfully requests that it be denied, and that the

Court grant such other and further relief as deemed just and proper.

Dated: November 6, 2009

**ASHBY & GEDDES**

By: _AMWinfree_

William P. Bowden (#2553)
Amanda M. Winfree  (#4615)
500 Delaware Avenue
Wilmington, Delaware 19899
Telephone:  (302) 654-1888
Facsimile: (302) 654-2067

--and--

**FULBRIGHT & JAWORSKI L.L.P.**

David A. Rosenzweig
Mark C. Haut
666 Fifth Avenue
New York, New York 10103
Tel:  (212) 318-3000
Fax:  (212) 318-3400

*Co-Counsel for AT&T*
