**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------X
                  :
                  :    Chapter 11
*In re*               :
                  :    Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*, [1]    :
                  :    Jointly Administered
          Debtors.    :
                  :    **Hearing date: December 2, 2009 at 11:00 a.m. (ET)**
                  :    **Objections due: December 1, 2009 at 12:00 p.m. (ET)**
                  :
------------------------------------------------------X

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105 AND 363 AND FED. R.**
**BANKR. P. 9019 FOR ENTRY OF AN ORDER (I) AUTHORIZING**
**AND APPROVING THE FLEXTRONICS SETTLEMENT AND**
**RELEASE AGREEMENT, (II) AUTHORIZING AND APPROVING THE**
**RELATED SIDE AGREEMENT AND (III) GRANTING RELATED RELIEF**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of

an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a) and

363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing and approving a

settlement and release agreement (the "Settlement and Release Agreement"), attached hereto as

Exhibit B, by and among (a) Flextronics Corporation ("FC"), Flextronics Telecom Systems Ltd.

("FTS") and certain affiliates of FC and FTS that are signatories thereto, on behalf of themselves

and their respective affiliates (collectively, "Flextronics"), (b) the Canadian Debtors (as defined

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

below), (c) the Debtors, (d) Nortel Networks B.V., Nortel Networks (Ireland) Limited, Nortel

Networks Hispania, S.A., and Nortel Networks UK Ltd. ("NNUK") (each an EMEA Debtor (as

defined below), and collectively, the "EMEA Entities"), and (e) the joint administrators acting on

behalf of the EMEA Entities (the "EMEA Entities' Joint Administrators") (Flextronics, the

Canadian Debtors, the Debtors, the EMEA Entities and the EMEA Entities' Joint Administrators

are collectively referred to herein as the "Parties"); (ii) authorizing and approving the related side

agreement (the "Side Agreement," and together with the Settlement Agreement, the

"Agreements"), attached hereto as Exhibit C, by and among (a) the Canadian Debtors, (b) the

Debtors, (c) the EMEA Entities, and (d) the EMEA Entities' Joint Administrators; and (iii)

granting them such other and further relief as the Court deems just and proper.  In support of this

Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 363(b)

of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules.

## Background

**A.      Introduction**

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA

(defined below), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On January 15, 2009, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Bankruptcy Rules that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

6.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent NNL, and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7.      Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.  On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA.  On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.      On January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[3]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators").  On

May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles,

France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary

proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation

proceedings during which NNSA continued to operate as a going concern for an initial period of

three months, which period was subsequently extended.  On October 1, 2009, pursuant to a

motion filed by the Joint Administrators, the French Court approved an order to:  (i) suspend the

liquidation operations relating to the sale of the assets and/or businesses of NNSA for a

renewable period of two months; (ii) authorize the continuation of the business of NNSA so long

as the liquidation operations are suspended; and (iii) maintain the powers of the French

Administrator and Liquidator during the suspension period, except with respect to the sale of

assets and/or businesses of NNSA.  In accordance with the European Union's Council

Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the

"English Proceedings") remain the main proceedings in respect of NNSA.  On June 8, 2009,

NNUK filed petitions in this Court for recognition of the English Proceedings as foreign main

proceedings under chapter 15 of the Bankruptcy Code.  On June 26, 2009, this Court entered an

order recognizing the English Proceedings as foreign main proceedings under chapter 15 of the

Bankruptcy Code.

   9.  On January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel

(Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court,

pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of

proceedings.  On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D.

Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law (the "Joint Israeli Administrators").

10.     On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

11.     On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor with NNI and its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

**B.     Debtors' Corporate Structure and Business**

12.     A description of the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").[4]

**Relief Requested**

13.     By this Motion, the Debtors seek an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules, (i) authorizing and approving the terms and conditions of the Settlement and Release Agreement, (ii) authorizing and

---

[4]     Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

approving the terms and conditions of the Side Agreement and (iii) granting them such other and

further relief as the Court deems just and proper.  The Committee and the Bondholder Group

have consented to the relief requested herein.

**Facts Relevant to this Motion**

A.      **The Relationship Between Nortel and Flextronics**

14.     In 2006, Nortel completed the transition to an outsourcing model whereby it

transferred substantially all of its hardware manufacturing and related activities, including certain

product integration, testing, repair operations, supply chain management, third party logistics and

design assets.  As part of this plan, in 2004 NNL entered into an asset purchase agreement with

FTS for the sale of the bulk of Nortel's remaining manufacturing facilities and related inventory.

15.     Since 2004, Nortel and Flextronics have engaged in a complex, wide-ranging

contract manufacturing relationship whereby Flextronics, pursuant to specifications supplied by

Nortel, purchases materials and components, assembles those materials and components into

higher-level components and finished goods, and stores and delivers such finished components

and goods to Nortel based on Nortel's forecasts and demands.

16.     Flextronics is by far Nortel's largest supplier.  As the Debtors informed this Court

at the January 15, 2009 first day hearing in the chapter 11 proceedings, as of the Petition Date,

Flextronics was responsible for the supply of approximately 70% of Nortel's hardware products.

See Hearing Tr. 17:22-25, Jan. 15, 2009, the relevant portions of which are attached hereto as

Exhibit D.  In addition, Flextronics provides a significant portion of the logistics and repair

services required in connection with those products.  Indeed, as the Debtors explained to the

Court, Flextronics is, in many respects, "the critical vendor" of Nortel.  Id. at 18:6.

17.     The contract manufacturing relationship between Flextronics and Nortel is governed by a number of agreements entered into by various Flextronics and Nortel entities.  On September 30, 2003, NNL and Solectron Corporation ("Solectron") entered into the Master Contract Manufacturing Services Agreement (including any ancillary agreements incorporated by reference thereunder, including without limitation certain VSHAs (as defined below) and purchase orders, and as amended by an amending agreement dated June 8, 2009, the "SLR MCMSA").  Subsequently, Flextronics acquired Solectron in 2007.  Additionally, on June 29, 2004, in connection with FTS' purchase of the bulk of Nortel's manufacturing facilities, NNL and FTS entered into the Amended and Restated Master Contract Manufacturing Services Agreement (including any ancillary agreements incorporated by reference thereunder, including without limitation certain VSHAs (as defined below) and purchase orders as amended from time to time by the following agreements:  (i) the first amending agreements, dated November 1, 2004; the second amending agreement, dated May 8, 2006; (iii) a memorandum of understanding, dated October 13. 2006; and (iv) a third amending agreement, dated March 31, 2008, the "Flextronics MCMSA," and collectively with the SLR MCMSA, the "MCMSAs").

18.     Under the MCMSAs, NNL and certain of its subsidiaries, including NNI, also have entered into "Virtual Systems House Agreements" (the "VSHAs") with Flextronics.  The VSHAs authorize the Nortel entity party to the VSHA to issue purchase orders to Flextronics and outline the responsibilities of the VSHA parties with respect to individual Flextronics manufacturing sites and particular Nortel products.  For example, each VSHA may contain terms and conditions unique to each Flextronics manufacturing site, such as a list of products manufactured at the site, support teams and the specific reporting requirements for the site. Additionally, each Nortel entity and Flextronics entity that enters into a VSHA becomes a party

to the MCMSA with regard to the products covered by the VSHA and the VSHAs are
incorporated by reference into the relevant MCMSA.

**B.      The Amending Agreement**

19.      Just prior to the Petition Date, in anticipation of the filing and in recognition of
the extreme importance of Flextronics' continued performance during the chapter 11, CCAA and
EMEA proceedings, Nortel entered into negotiations with Flextronics to ensure ongoing supply
during the postpetition period.  On January 13, 2009, NNL, FTS and FC entered into an
amending agreement (the "Amending Agreement") that amends various Flextronics agreements,
including the MCMSAs.

20.      Pursuant to the Amending Agreement, Flextronics agreed to continue to supply
products to Nortel.  In exchange, NNL agreed to purchase certain Flextronics inventory in the
total amount of $120 million payable in four installments between January 14, 2009 and July 1,
2009.[5]  Additionally, NNL agreed to submit purchase orders on a quarterly basis for certain other
inventory and to pay on a weekly basis for goods supplied during the immediately previous
week, and NNL and Flextronics agreed to treatment of certain existing plans of record for
transfers of operations.

21.      On January 14, 2009, in its Initial Order in the Canadian Proceedings, the
Canadian Court approved the Amending Agreement and authorized and directed NNL to comply
with its obligations thereunder.  Initial Order at ¶ 48.

22.      NNI has reimbursed NNL for certain inventory purchased from Flextronics under
the Amending Agreement pursuant to an ordinary course intercompany allocation of the cost of
such inventory.  Nortel allocates the cost of inventory purchases among the four Nortel entities

---

[5]       The payment schedule under the Amending Agreement was as follows: (i) $25 million on January 14,
2009; (ii) $50 million on January 20, 2009; (iii) $25 million on April 1, 2009; and (iv) $20 million on July 1, 2009.

that serve as transaction control centers ("TCCs"),[6] which are used to coordinate Nortel's global purchasing and supply chain.  Under this system, Nortel determines the product line for which inventory will be used.  Then, the cost of the inventory is allocated between Nortel entities based on the historical mix of purchases by product line that each TCC made in 2008.  As a result of this purchasing system, costs related to the provision of goods and services are settled in the ordinary course through intercompany receivables and payables between the Nortel entities that serve as TCCs.

**C.    The May Settlement**

23.    Subsequent to the commencement of the CCAA, EMEA and chapter 11 proceedings, certain disputes emerged between Nortel and Flextronics regarding the proper interpretation of the Amending Agreement and certain other matters.  Again recognizing the extreme importance of Flextronics' continued performance during Nortel's bankruptcy proceedings, Nortel engaged Flextronics in negotiations in order to maintain the relationship and resolve the disputes concerning the Amending Agreement.

24.    On May 22, 2009, Flextronics and NNL resolved the disputes existing between them regarding the proper interpretation of the Amending Agreement.  This resolution was memorialized in a settlement agreement (the "May Settlement Agreement") and a side letter to that agreement (the "May Side Letter," and with the May Settlement Agreement, the "May Settlement").  The May Settlement resolved certain issues related to Nortel's obligations to purchase inventory; the termination of the SLR MCMSA; the inclusion of certain inventory on Nortel's quarterly E&O purchase orders; and certain other disputes between the parties.

---

[6]    The four TCCs are NNL, NNI, NNUK and NNSA.

25.     In accordance with past and present practice, a portion of the total amount owed by NNL under the May Settlement was allocated to NNI for NNI's share of costs related to the May Settlement.  The May Settlement was approved by this Court on June 11, 2009 [D.I. 895] and by the Canadian Court on June 16, 2009.

**D.     The Flextronics Objections and Proofs of Claim**

26.     On June 19, 2009, Nortel filed a motion for the authorization and approval of the sale of its CDMA and LTE businesses [D.I. 931] (the "<u>CDMA Sale Motion</u>").  Flextronics filed a limited objection and reservation of rights to the CDMA Sale Motion on June 26, 2009 [D.I. 969] and a further objection to the CDMA Sale Motion on July 22, 2009 [D.I. 1151] (collectively, the "<u>CDMA Objection</u>").  In particular, Flextronics objected to the treatment of the MCMSAs in connection with the CDMA divestiture and demanded Nortel "cure" $16 million in outstanding prepetition accounts receivable owed by Nortel to Flextronics relating to the CDMA and LTE businesses.  Nortel, Flextronics and the purchaser of the CDMA and LTE assets consensually resolved the CDMA Objection and Flextronics withdrew the CDMA Objection on July 27, 2009 [D.I. 1183].  On July 29, 2009, this Court entered an order approving the CDMA Sale Motion [D.I. 1205].

27.     On July 20, 2009, Nortel filed a motion for the authorization and approval of the sale of its Enterprise Solutions business [D.I. 1131] (the "<u>US Enterprise Sale Motion</u>").  Flextronics filed limited objections and reservations of rights to the US Enterprise Sale Motion on July 30, 2009 [D.I. 1237] and September 4, 2009 [D.I. 1435] (collectively, the "<u>Enterprise Objection</u>").  The Enterprise Objection was resolved pursuant to certain representations and terms set forth in (i) paragraph 28 of an order entered by this Court on September 16, 2009 approving the US Enterprise Sale Motion [D.I. 1514] (the "<u>US Enterprise Sale Order</u>") and (ii) paragraph 11 of an order entered by the Canadian Court on September 17, 2009 approving the

sale of the Enterprise Solutions business (the "Canadian Enterprise Sale Order," together with the US Enterprise Sale Order, the "Enterprise Sale Orders").

28.    Nortel currently is in the process of divesting its assets through various pending and future sales of businesses or product lines or any other assets or shares of Nortel (each, a "Business") to one or more third parties (a "Purchaser") (any such sale, whether by asset sale, merger, operation of law or otherwise, a "Divestiture"). Flextronics is a supplier to several of the Businesses, including without limitation the Enterprise Solutions, MEN (Optical), CVAS, Passport and GSM Businesses. Due to the size of the Debtors' supply relationship with Flextronics, the Debtors expect it is likely that potential Purchasers will want to continue a supply relationship with Flextronics in connection with a Divestiture.

29.    On September 30, 2009, Flextronics filed 13 individual §503(b)(9) Claim Request Forms against NNI, Nortel Altsystems, Inc. ("Nortel Altsystems") and NN CALA pursuant to §503(b)(9) of the Bankruptcy Code, asserting that such Debtors owe Flextronics not less than $24,795,601 on account of §503(b)(9) claims (the "§503(b)(9) Claims"). Also on September 30, 2009, Flextronics filed 18 individual proofs of claim against NNI, Nortel Networks Capital Corporation, Inc., Nortel Altsystems, Nortel Networks International Inc. and NN CALA, asserting that such Debtors owe Flextronics no less than $608,200,466, plus certain contingent and/or unliquidated amounts, on account of prepetition claims (the "US Proofs of Claim").[7] Lastly, again on September 30, 2009, Flextronics filed a number of proofs of claim against the Canadian Debtors asserting prepetition amounts owed by the Canadian Debtors to Flextronics (the "Canadian Proofs of Claim," and together with the §503(b)(9) Claims, the US Proofs of

---

[7]    The proof of claim asserted by FTS against Nortel Altsystems Inc., one of the 18 US Proofs of Claim, was never received by Epiq Bankruptcy Solutions, LLC, the Claims, Noticing and Balloting Agent in these chapter 11 proceedings. Cleary Gottlieb Steen & Hamilton LLP, counsel to the Debtors, was served with courtesy copies of all 18 US Proofs of Claim, including that asserted by FTS against Nortel Altsystems Inc.

Claims, any claims that have been or could be filed or otherwise asserted against the EMEA

Entities (the "<u>EMEA Proofs of Claim</u>") and any claims that have been or could be filed or

otherwise asserted in any other proceeding of a Nortel entity or otherwise in any other

proceeding of a Nortel entity, the "<u>Flextronics Proofs</u>").

**E.      The Terms of the Settlement and Release Agreement**

   30.  In light of the several pending and potential Divestitures, the significance, size

and complexity of the supply relationship with Flextronics, and Nortel's experience in prior

Divestitures since its commencement of creditor protection proceedings, Nortel and Flextronics

have determined that it is in their mutual best interests to enter into an agreement that provides a

mechanic for the transfer of the supply relationship to interested parties, resolves the settlement

and payment of certain claims held by Nortel and Flextronics that would need to be resolved in

connection with such Divestitures, and resolves other claims held by each of the Parties in order

to fully settle prepetition claims held by the Parties and certain other claims related to open

accounts receivable and payable by Flextronics and Nortel.  Moreover, while Nortel does not

admit the validity of (i) any objection Flextronics has asserted to date in these chapter 11

proceedings and the Canadian Proceedings, or that it could assert with respect to any pending or

future Divestiture, including without limitation to the treatment of the MCMSAs in connection

with any such Divestiture, or (ii) any claim asserted in the Flextronics Proofs, Nortel believes it

is in the best interests of Nortel and its creditors to avoid the expense, delay and uncertainty

associated with any possible litigation relating to such potential sale-related objections, the

Flextronics Proofs, and the other matters addressed in the Settlement and Release Agreement.

To this end, the Parties have reached agreement to (i) ensure Flextronics' cooperation with

regard to pending and future Divestitures, (ii) ensure the provision by Flextronics of a supply

contract with the Purchaser in connection with any future Divestiture on the terms described in

the Settlement and Release Agreement, (iii) satisfy the resolution of the Enterprise Objection,

(iv) fully and finally resolve the Flextronics Proofs, including certain post-petition ordinary

course contractual claims, and all of the Parties' respective claims arising prior to the Petition

Date, except as otherwise expressly stated in the Settlement and Release Agreement and

(v) provide for the Parties' performance of their postpetition obligations under the MCMSAs in

accordance with the Settlement and Release Agreement.  The agreement is the result of lengthy

and vigorous negotiations between Nortel and Flextronics, including extensive discussions with

the Committee, the Bondholder Group and the Monitor.

31.    The agreements between Nortel and Flextronics have been memorialized in a

Settlement and Release Agreement dated November 20, 2009.  The main terms of the Settlement

and Release Agreement include:[8]

- a payment by Nortel in the amounts set forth in paragraph 1 of Schedule B to the Settlement and Release Agreement  (such payment together with the Adjustment Amount (as defined below), the "Payment Obligation"), to be made in two equal installments —10 days after the Effective Date (as defined in the Settlement and Release Agreement), and on or before May 31, 2010 — in consideration for Flextronics' obligations under the Settlement and Release Agreement, and the full and final settlement of (i) the Flextronics Proofs, including certain post-petition ordinary course contractual claims, and (ii) all of the Parties' respective claims arising prior to the Petition Date, except as otherwise expressly stated in the Settlement and Release Agreement.  The Settlement and Release Agreement provides that NNI shall pay the Payment Obligation to Flextronics on behalf of Nortel.  The allocation within Nortel for the Payment Obligation is provided for under a Side Agreement (described below).

- the resolution of additional disputed accounts receivable (listed on Schedule J to the Settlement and Release Agreement) owed by Flextronics to Nortel.  In the event the

---

[8]    This overview is intended as a summary of the terms of the Settlement and Release Agreement.  If any conflict arises between this overview and the Settlement and Release Agreement, the terms of the Settlement and Release Agreement shall control.  Capitalized terms used in this overview but not described herein have the meaning ascribed to them in the Settlement and Release Agreement.

disputed invoices are determined to be invalid, Nortel shall not be entitled to setoff those amounts against amounts it otherwise would owe Flextronics, and accordingly would be required to pay to Flextronics such amounts (the "<u>Adjustment Amount</u>").

- the Payment Obligation (including the Adjustment Amount) shall constitute an administrative expense claim pursuant to section 503(b) of the Bankruptcy Code against NNI in its chapter 11 proceeding.

- Flextronics and Nortel agree that, except as may be specifically provided under the Settlement and Release Agreement, their postpetition accounts receivable and payable, including without limitation certain accounts receivable identified in Schedule C to the Settlement and Release Agreement (the "<u>Post-Petition Ordinary Contractual Claims</u>"), will be resolved and paid in the ordinary course of business.

- Flextronics agrees to cooperate with Nortel and Purchasers in pending and future Divestitures, including by:

  o Flextronics agrees not to assert any rights to adequate protection or similar rights related to the transfer of equipment owned by Nortel in connection with the sale of Nortel's Enterprise Solutions Business as authorized by this Court and the Canadian Court on September 16 and 17, 2009, and to effect the orderly transfer of the equipment in Flextronics' possession owned by Nortel and proposed to be transferred to the Purchaser of the Enterprise Solutions Business.

  o in connection with any proposed future Divestiture,

    ▪ Flextronics agrees that at the request of Nortel in connection with such Divestiture, it will conduct good faith negotiations with a proposed Purchaser for the purpose of entering into a direct agreement by and among Flextronics, such Purchaser and any of such Purchaser's designated Affiliates for the supply of products and services related to the applicable Business being acquired on market competitive terms and conditions.

    ▪ Without limiting the foregoing obligation, if by the time periods set forth in the Settlement and Release Agreement, such direct agreement has not been reached, Flextronics will, at the request of Nortel, enter into and execute a new supply agreement with the Purchaser that contains terms and conditions identical (aside from nonmaterial conforming changes) to the terms and conditions (including, but not limited to, payment and pricing terms) existing under the MCMSAs, as such terms and conditions relate to the Business subject to such

14

Divestiture, as of January 12, 2009 (subject to certain terms as described in the Settlement and Release Agreement).

- ▪ Nortel and Flextronics agree to conduct good faith negotiations with the Purchaser regarding a three-way inventory purchase agreement in connection with such Divestiture and to limit Nortel's liability for certain unconsumed portions of forecasts, as further described in the Settlement and Release Agreement.

- ▪ Nortel and Flextronics further agree that Nortel will not place purchase orders for a Business following the closing of a Divestiture, except in an administrative role for a Purchaser.

- o Flextronics agrees not to file any formal or informal objection or take any other action in opposition to or with the intention of frustrating any Divestiture, or to seek from Nortel or the Purchaser any remedy, payment or any modification of the MCMSAs as a result of any such Divestiture, including without limitation any claim or demand for adequate assurances, changes in payment terms, deposits or any other credit protection, cure costs, or any request or demand for the termination, assumption, rejection or repudiation of the MCMSAs or any part thereof.  Flextronics further agrees that it shall not assert any claim or seek any payment or other remedy from a Purchaser in compensation for any right or claim released, waived or compromised by Flextronics pursuant to the Settlement and Release Agreement.

- o The Settlement and Release Agreement provides further mechanics and terms to facilitate Divestitures.

- • Flextronics and Nortel further agree that (absent a material breach by the other Party) the Parties shall not seek to reject, repudiate or otherwise cancel or terminate the Flextronics MCMSA pursuant to the processes applicable in the Proceedings except upon 210 days notice to the other Party (or such shorter period as the Parties may agree), during which period the Parties shall continue to perform their obligations under the Flextronics MCMSA in the ordinary course of business.

- • Flextronics and Nortel agree to not exercise their respective rights to deliver a notice for termination for convenience under the Flextronics MCMSA for the period through December 31, 2010, and to enter into certain agreements related to the continuation of specific manufacturing agreements following the termination of the SLR MCMSA.

- • Nortel and Flextronics each are releasing claims against each other for prepetition amounts and as described and qualified in sections 6 and 7 of the Settlement and Release Agreement.  The releases include a release by the Debtors of claims arising

15

under chapter 5 of the Bankruptcy Code, subject to certain conditions set forth in the Settlement and Release Agreement.

F.    **The Side Agreement**

32.    The Debtors, the Canadian Debtors and the EMEA Entities concluded it was in their best interests to further the Settlement and Release Agreement through the entry into a Side Agreement to govern allocation of responsibility for the Payment Obligation and the settlement of certain avoidance actions under the Settlement and Release Agreement.  Following lengthy negotiations, including extensive negotiations with the Committee, the Bondholder Group, the Monitor and the EMEA Entities' Joint Administrators, on or about November 20, 2009, the Debtors, the Canadian Debtors, the EMEA Entities and the EMEA Entities' Joint Administrators (collectively, the "Side Agreement Parties") entered into the Side Agreement governing the initial funding of the Payment Obligation under the Settlement and Release Agreement and ultimate allocation of the Settlement Cost (as defined in the Side Agreement) amongst them.[9] The Side Agreement provides for the initial funding of the Payment Obligation among the estates, the establishment of a segregated account by NNI to hold the funds pending payment, and a methodology for the ultimate allocation of the Settlement Cost incurred by the Side Agreement Parties in each of the following three groups:  (i) the Canadian Debtors, (ii) the Debtors and (iii) the EMEA Entities (each of (i), (ii) and (iii), a "Regional Entity") according to the weighted average of proceeds allocated to such Regional Entity from the sales of the Enterprise, MEN (Optical), CVAS and GSM businesses.

33.    The Canadian Debtors will also seek approval of the Settlement and Release Agreement and the Side Agreement by the Canadian Court.

---

[9]    This overview is intended as a summary of the terms of the Side Agreement.  If any conflict arises between this overview and the Side Agreement, the terms of the Side Agreement shall control.  Capitalized terms used in this overview but not described herein have the meaning ascribed to them in the Side Agreement.

**Basis for Relief**

34.     The approval of the Agreements requested herein is authorized by sections 105

and 363 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules.  Section 105(a) of the

Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or

appropriate to carry out the provisions of this title."  11 U.S.C. § 105.

35.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease the

property of the estate outside of the ordinary course of business after notice and a hearing.  11

U.S.C. § 363.  Section 363 applies when a settlement agreement involves the disposition of the

estate's assets in such a way that it ventures beyond an ordinary course transaction.  Myers v.

Martin (In re Martin), 91 F.3d 389, 394-95 (3d Cir. 1996).

36.     The use or transfer of estate property under this provision must be supported by a

sound business purpose.  Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),

722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459, 2002 WL

32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward

Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re

Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991); Travelers Cas. & Sur. Co. v.

Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008).

A court determining whether a sound business purpose justifies the transaction "should consider

all salient factors pertaining to the proceeding and, accordingly, act to further the diverse

interests of the debtor, creditors and equity holders, alike."  In re Montgomery Ward Holding

Corp., 242 B.R. at 153-54 & n.1 (quoting In re Lionel Corp., 722 F.2d at 1071).  In addition, a

Debtor must show that the transaction has been proposed in good faith, that adequate and

reasonable notice has been provided and that it is receiving fair and reasonable value in

exchange.  <u>See</u> <u>In re Decora Industries, Inc.</u>, 2002 WL 32332749, at *2; <u>In re Delaware &</u>

<u>Hudson Ry. Co.</u>, 124 B.R. at 176.  Courts have distinguished the application of Section 363 to

settlements as opposed to property sales, finding that the settlement of pre-petition claims

requires less scrutiny than asset sales because settlements must be approved quickly and are

often an important first step in formulating a plan.  <u>Official Unsecured Creditors' Comm. of</u>

<u>Pennsylvania Truck Lines v. Pennsylvania Truck Lines, Inc. (In re Pennsylvania Truck Lines)</u>,

150 B.R. 595, 599 (E.D. Pa., 1992) (quoting <u>In re Grant Broadcasting of Phila., Inc.</u>, 71 B.R.

390, 398 (Bankr. E.D. Pa. 1987) and <u>In re Neshaminy Office Bldg. Assocs.</u>, 62 B.R. 798, 805

(E.D. Pa. 1986)).

37.     Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee

and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R.

Bankr. P. 9019.  Under this authority, the Third Circuit has emphasized that "[c]ompromises are

favored in bankruptcy."  <u>In re Martin</u>, 91 F.3d at 393 (quoting <u>Collier on Bankruptcy</u> ¶

9019.03[1] (15th ed. 1993)).  In addition, the District of Delaware has recognized that the

approval of a proposed compromise and settlement is committed to the sound discretion of the

bankruptcy court.  <u>See</u> <u>In re Coram Healthcare Corp.</u>, 315 B.R. 321, 329 (Bankr. D. Del. 2004).

38.     Before approving a settlement under Bankruptcy Rule 9019, a court must

determine whether "the compromise is fair, reasonable, and in the interest of the estate."  <u>In re</u>

<u>Marvel Entm't Group, Inc.</u>, 222 B.R. 243, 249 (D. Del. 1998) (quoting <u>In re Louise's, Inc.</u>, 211

B.R. 798, 801 (D. Del. 1997)).  Basic to the process of evaluating proposed settlements is "the

need to compare the terms of the compromise with the likely rewards of litigation."  <u>Protective</u>

<u>Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 424-25

(1968).  The court's obligation is to "canvass the issues and see whether the settlement falls

below the lowest point in a range of reasonableness." Travelers, 2008 WL 821088, at *5 (citing

Matter of Jasmine, Ltd., 258 B.R. 119 (D.N.J. 2000)). The court need not be convinced that the

settlement is the best possible compromise in order to approve it. In re Coram Healthcare Corp.,

315 B.R. at 330.

39.     The Third Circuit has set out four criteria for a bankruptcy court to consider when

evaluating a settlement proposal (the "Martin Factors"): "(1) the probability of success in

litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved,

and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest

of the creditors." In re Martin, 91 F.3d at 393 (citing In re Neshaminy Office Bldg. Assocs., 62

B.R. at 803).

40.     The Debtors respectfully submit that the Settlement and Release Agreement and

Side Agreement meet each of the requirements under section 363 of the Bankruptcy Code and

Bankruptcy Rule 9019. As required by section 363, the Agreements are proposed as a good faith

means to reach agreement and to resolve claims and actual and potential disputes between the

Parties regarding (i) the Enterprise Objection, (ii) Flextronics' cooperation with regard to

pending and future Divestitures, (iii) the provision by Flextronics of a supply contract with the

Purchaser in connection with any future Divestiture on the terms described in the Settlement and

Release Agreement, (iv) the Flextronics Proofs, including certain post-petition ordinary course

contractual claims, and all of the Parties' respective claims arising prior to the Petition Date,

except as otherwise expressly stated in the Settlement and Release Agreement and (v) the

Parties' performance of their postpetition obligations under the MCMSAs.

41.     The Debtors will benefit from the Settlement and Release Agreement through

their ability to further Divestitures, and the avoidance of the time, cost and expense of resolution

of the other claims between them and Flextronics whether on a consensual basis or through litigation.  The Side Agreement provides for a fair and efficient method for allocating the costs of settlement among the Nortel estates.  The Agreements are within sound business judgment and further the interests of the Debtors and the Debtors' stakeholders.

42.     Accordingly, the Debtors submit that the Agreements are in the best interest of the Debtors' estates, creditors and other stakeholders and should, therefore, be approved by the Court.

### Notice

43.     Notice of the Motion has been given via hand delivery or overnight mail to the (i) U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) counsel to Flextronics; and (v) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

### No Prior Request

44.     No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  November 24, 2009  
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (No. 5125)  
Lisa M. Schweitzer (No. 1033)  
One Liberty Plaza  
New York, New York 10006  
Telephone:  (212) 225-2000  
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s Ann C. Cordo*  
Derek C. Abbott (No. 3376)  
Eric D. Schwartz (No. 3134)  
Ann C. Cordo (No. 4817)  
Andrew R. Remming (No. 5120)  
1201 North Market Street  
P.O. Box 1347  
Wilmington, Delaware 19801  
Telephone:  (302) 658-9200  
Facsimile: (302) 658-3989

*Counsel for the Debtors*  
*and Debtors in Possession*