**EXHIBIT C**

**Execution Version**

# SIDE AGREEMENT

This Side Agreement (the "Agreement") is dated as of November 20, 2009 (the "Effective Date"), among Nortel Networks Limited ("NNL") and its Canadian affiliates that have filed under the Companies' Creditors Arrangement Act (the "Canadian Entities"), (ii) Nortel Networks Inc. ("NNI") and its US debtor affiliates (the "US Entities") and (iii) the companies listed on Schedule A hereto (collectively the "EMEA Entities" and together with the Canadian Entities and the US Entities, the "Parties"), which in the case of the EMEA Entities are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan Robert Bloom serve as joint administrators) (collectively, the "Joint Administrators") who act as agents, for the EMEA Entities without any personal liability whatsoever.

## W I T N E S S E T H:

WHEREAS, the Canadian Entities, the US Entities and the EMEA Entities have entered into that certain Settlement and Release Agreement with Flextronics Corporation ("FC"), Flextronics Telecom Systems Ltd ("FTS") and certain of their affiliates, on behalf of themselves and their respective affiliates (collectively, "Flextronics"), for which the "Effective Date" shall be the first day after the Approval Orders (as defined therein) become final (the "Settlement and Release Agreement") attached hereto as Exhibit 1;

WHEREAS, solely for the purpose of facilitating the payments due to Flextronics under the Settlement and Release Agreement, and subject to the potential reallocation of the total liabilities due to Flextronics under the Settlement and Release Agreement among the Parties, the Parties have agreed to make the payments described in Schedule B hereto (the "Payment Obligations"); and

WHEREAS, the Parties expressly acknowledge and agree that the Payment Obligations do not necessarily reflect the appropriate allocation of liability for the Payment Obligations among the Parties and, as such, the Parties wish to settle the procedures for determining such liability and, if necessary, ultimately reallocating the Payment Obligations and the value of certain other claims compromised by certain of the Parties in connection with the Settlement and Release Agreement.

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree as follows:

**Execution Version**

ARTICLE I

INTERPRETATION

SECTION 1.1.  <u>Definitions</u>.

(a)     To the extent capitalized words used herein (including in the recitals hereof) are not defined in this Agreement, those words shall have the meanings given to them (i) in the Settlement and Release Agreement.

(b)     The following capitalized terms shall have the meanings set forth below:

(i)     "<u>Allocation Rules</u>" means the rules (expressed as percentages or otherwise) to be used to allocate the proceeds of the Relevant Sales (as defined herein) among the various Parties, as such rules shall be agreed upon among the relevant Parties, and pursuant to Section 12.d and 12.g of the IFSA or shall be otherwise determined in accordance with the binding procedures to be set forth in the Interim Sales Protocol pursuant to Section 12.c and 12.g of the IFSA.

(ii)     "<u>IFSA</u>" means the Interim Funding and Settlement Agreement dated June 9, 2009, to which each of the Canadian Entities, the US Entities and the EMEA Entities are a party.

(iii)     "<u>Interim Sales Protocol</u>" has the meaning ascribed to it in Section 12.c of the IFSA.

(iv)     "<u>Party</u>" means (w) each of the Canadian Entities, (x) each of the US Entities, (y) each of the EMEA Entities and (z) the Joint Administrators, as agents of the EMEA Entities and without any personal liability whatsoever.

SECTION 1.2.  <u>Interpretation</u>.

1.2.1.  <u>Gender and Number</u>.  Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2.  <u>Certain Phrases and Calculation of Time</u>.  In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Section and Schedule references are to the Sections and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding".  If the last day of any such period is not a business day, such period will end on the next business day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date

**Execution Version**

which is the reference date in calculating such period is excluded from the calculation.  If the last day of any such period is not a business day, such period will end on the next business day.

1.2.3.  <u>Headings, etc</u>.  The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

ARTICLE II

COVENANTS

SECTION 2.1.  <u>Efforts to Complete the Settlement and Release Agreement</u>.

Subject to the requirements of any applicable law, each of the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other and Flextronics in good faith in order to do, all things necessary, proper or advisable under applicable law to perform their obligations under the Settlement and Release Agreement as soon as practicable in accordance with the provisions thereof and cause the fulfillment at the earliest practicable date of all of the conditions to Flextronics' obligations thereunder.

SECTION 2.2.  <u>Segregated Account</u>.

On or prior to the Effective Date of the Settlement and Release Agreement, (i) NNI shall establish a segregated account (the "<u>Segregated Account</u>") solely for the purpose of holding the Payment Obligations (including any "Adjustment Amount", as such term is defined in Schedule B to the Settlement and Release Agreement) until such amounts are distributed in accordance with Schedule B hereto, (ii) ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉, and (iii) ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ into the Segregated Account (where (ii) and (iii) collectively constitute the "<u>Segregated Funds</u>").  NNI shall hold the Segregated Funds for the benefit of the Parties and solely for the purpose of satisfying the Payment Obligations set forth in Schedule B hereto. Without limiting the foregoing, the Parties shall deposit into the Segregated Account the Adjustment Amount, if any, in accordance with Schedule B hereto, which deposited amounts shall constitute additional Segregated Funds.

SECTION 2.3.  <u>Payment to Flextronics</u>.

The initial allocation of the Payment Obligations set forth in Schedule B hereto has been agreed to by the Parties solely as a means to fund the payments due to Flextronics under the Settlement and Release Agreement.  Such allocation does not reflect an agreement of the Parties as to the appropriate allocation of liability with respect to the Payment Obligations or the claims being compromised by certain of the Parties in connection with the Settlement and Release Agreement, and such allocation of liability shall be determined in accordance with Section 2.4 hereof.

3

**Execution Version**

SECTION 2.4.   <u>Allocation of Settlement Cost</u>.

(a)      *Allocation of Settlement Cost among the Regional Entities*.  The ultimate allocation of the Settlement Cost (as defined on Schedule C hereto) incurred by the Parties in each of the following three groups: (i) the Canadian Entities collectively, (ii) the US Entities collectively and (iii) the EMEA Entities collectively (each of (i), (ii) and (iii), a "<u>Regional Entity</u>" and together, the "<u>Regional Entities</u>") in connection with the Settlement and Release Agreement shall be allocated among the Regional Entities according to the weighted average of proceeds allocated to such Regional Entity (the "<u>Weighted Average</u>") from the sales of the Enterprise, Optical, CVAS and GSM businesses (the "<u>Relevant Sales</u>") in accordance with the Allocation Rules governing the Relevant Sales (each an "<u>Allocation Decision</u>"); <u>provided</u> that the Parties may agree to modify, with the consent of the official committee of unsecured creditors of Nortel Networks Inc., *et al.* (the "<u>Committee</u>"), the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "<u>Bondholder Group</u>") and Ernst & Young Inc. as "Monitor" in connection with the CCAA Proceedings (the "<u>Monitor</u>"), the sales included among the Relevant Sales.

(b)      *Determination of the US Avoidance Claim.*  The "<u>US Avoidance Claim</u>" shall consist of the value attributable to the claims released by the US Entities in the Settlement and Release Agreement under Chapter 5 of the Bankruptcy Code, which value each of the Parties shall negotiate in good faith to agree to through a representative designated by each of the Regional Entities (such representatives, collectively, the "<u>Representatives</u>"), with the consent of the Committee, the Bondholder Group and the Monitor, or if such agreement cannot be reached prior to the Allocation Decision for the first Relevant Sale, shall be promptly submitted to mediation among the Parties (through their Representatives) by a mediator appointed jointly by the United States Bankruptcy Court for the District of Delaware and the Ontario Superior Court of Justice (Commercial List) (collectively, the "<u>Courts</u>") following notice and a joint hearing. The costs of such mediation shall be shared equally among the Regional Entities participating in the mediation.  In the event that the mediation has not resulted in an agreement between the Parties (through their Representatives), with the consent of the Committee, the Bondholder Group and the Monitor (a "<u>Mediation Agreement</u>"), within 180 calendar days of the appointment of the mediator (unless the Representatives of the Parties, with the consent of the Committee, the Bondholder Group and the Monitor, agree to extend that period) the determination of the amount of the US Avoidance Claim shall be finally resolved by binding arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce ("<u>ICC Arbitration Rules</u>"). The arbitration shall be conducted in the English language in New York, New York, USA, by one disinterested arbitrator appointed in accordance with the ICC Arbitration Rules, who shall be a US trained lawyer experienced in United States bankruptcy matters.  The Parties agree that the decision of the arbitrator will be final and binding.  The EMEA Entities have the right to be a full participant to any mediation and/or arbitration proceeding, but in the event that the EMEA Entities elect not to participate in any mediation and/or arbitration proceeding they will not be obligated to do so and will not have any liability for any costs of such mediation and/or arbitration proceeding if they do not participate.  For the avoidance of doubt, (i) whether or not the EMEA Entities participate in the mediation, they shall be bound by any Mediation Agreement and (ii) whether or not the EMEA Entities participate in the arbitration, they shall be bound by any award rendered by the arbitrator and expressly waive any right to submit the US Avoidance Claim to any forum other than the arbitral forum specified herein.  The US Entities

agree that (x) any agreement by the US Entities (through their Representative) to the selection of a mediator and/or arbitrator in connection with the determination of the US Avoidance Claim and (y) any papers submitted in the mediation and/or arbitration by the US Entities shall be subject to the approval of the Committee.  Further, if the Committee is not the designated Representative for the US Entities in connection with the negotiation and/or any necessary mediation or arbitration proceeding, the US Entities agree to directly involve the Committee in any discussions and negotiations that the US Entities (through their Representative) have with the other Regional Entities (through their Representatives) in connection with the determination of the US Avoidance Claim.  Judgment on the award rendered by the arbitrator may be entered only in the state or federal courts sitting in the State of New York, which shall have exclusive jurisdiction to confirm or vacate the award.  For the avoidance of doubt, the provisions of this Section 2.4(b) shall not limit the jurisdiction of the Courts as provided in Section 3.7(b) of this Agreement.  The Parties covenant that they shall not disclose the information contained in Schedule C, including, but not limited to the Settlement Cost Cap and the Avoidance Claims Cap, to any mediator or arbitrator and the Parties agree that the mediator and/or arbitrator shall not consider any such information in determining the amount of the US Avoidance Claim.  The Parties further agree to use their reasonable best efforts to ensure that the information contained in Schedule C, including, but not limited to the Settlement Cost Cap and the Avoidance Claims Cap, is not disclosed by any administrators of the arbitration proceeding provided for in this section 2.4(b).

(c)     *Escrow of True-up Amounts.*  The Parties agree that at the time of disbursement of proceeds to the Regional Entities for a Relevant Sale, the Gross True-up Amount (as defined below) for each Regional Entity shall be transferred to an alternative escrow (the "True-up Escrow") established by the Parties, with the consent of the Committee, the Bondholder Group and the Monitor, for the purpose of holding funds to be used for the reallocation of the Settlement Cost among the Regional Entities under this Agreement.  Following an Allocation Decision for a Relevant Sale, but prior to the disbursement of funds to the Parties from the proceeds escrow for a Relevant Sale, a "Gross True-up Amount" for each Regional Entity shall be calculated and the Parties shall direct the escrow agent for the relevant proceeds escrow to deposit into the True-up Escrow the Gross True-up Amounts, where such Gross True-up Amounts shall equal (i) the Settlement Cost multiplied by such Regional Entity's Weighted Average for all Relevant Sales for which an Allocation Decision has been made, less (ii) the sum of (w) such Regional Entity's share of the Released Accounts Payable (as defined in Schedule B hereto), (x) any Adjustment Amount (as defined in Schedule B hereto), (y) in respect of the US Entities only, the Interim Avoidance Cap as defined on Schedule C hereto.  For the avoidance of doubt, if at any time prior to the termination of this Agreement, the amount that a Regional Entity has deposited into the True-up Escrow exceeds the aggregate Gross True-up Amount for such Regional Entity (any such amount, a "True-up Surplus") the Parties agree that any such True-up Surplus shall remain in the True-up Escrow on behalf of such Regional Entity until such time as the US Avoidance Claim is settled, and after which time, at the request of such Regional Entity, a new Gross True-up Amount will be calculated and the Parties will direct the escrow agent for the True-up Escrow to release from the True-up Escrow and pay to such Regional Entity any such True-up Surplus.  The Parties expressly agree to direct the escrow agent for the True-up Escrow to hold and distribute proceeds from the Relevant Sales according to this paragraph.

(d)    *Payment Obligations Adjustment.*  After the Allocation Decision is made for the final Relevant Sale and the Regional Entities have deposited the final Gross True-up Amounts into the True-up Escrow in accordance with Section 2.4(c) above, the Parties shall direct the escrow agent for the True-up Escrow to disburse the funds contained in the True-up Escrow to any Regional Entity that has a negative Gross True-up Amount based on the final Weighted Average for each Regional Entity (as calculated for purposes of determining the final Gross True-up Amount), in the amount of such negative Gross True-up Amount (such disbursement, the "Payment Obligations Adjustment").  In connection with the foregoing, each Regional Entity agrees that the True-up Escrow is being used for administrative convenience and, in the event that sufficient sale proceeds are not received by a Regional Entity to satisfy its obligation to deposit funds into the True-up Escrow, such Regional Entity shall be liable for any portion of the Settlement Cost that such Regional Entity is determined to owe any other Regional Entity at the time that the Payment Obligations Adjustment becomes due, which liability shall not be capped by such Regional Entity's portion of the Gross True-up Amount on deposit in the True-up Escrow at such time.  Each of the Regional Entities shall be separately responsible for apportioning liability for the Settlement Cost among the Parties and their affiliates within such Regional Entity.

## ARTICLE III

## MISCELLANEOUS

SECTION 3.1.  Exclusion of Liability and Acknowledgments re Joint Administrators.

(a)    The Parties agree that the Joint Administrators are entering into this Agreement as agents for the EMEA Entities to which they are appointed and the Parties acknowledge that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(b)    The Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Entities of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) for the purposes of Section 3.1.

(c)    Notwithstanding anything in Section 3.6, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm or partners, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of the EMEA Entities and their remaining as current joint administrators thereof under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English courts.

(d)      For the purposes of the acknowledgements or agreements to, or exclusions of, liability in favor of the Joint Administrators in this Agreement, references to the Joint Administrators where the context so permits shall mean and include any additional or successor administrator of the EMEA Entities and their respective firms or future firms, employees, agents, members, partners and personal representatives.

SECTION 3.2.  <u>Remedies</u>.  No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 3.3.  <u>Third-Party Beneficiaries</u>.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to the Parties, nor shall any provision give any third persons any right of subrogation or action against any party to this Agreement; <u>provided</u>, <u>however</u>, that the Committee (as a statutory committee appointed in the US Bankruptcy Cases) shall be a third party beneficiary of Sections 2.1, 2.2, 2.3, 2.4, 3.5, 3.13 and 3.14 of this Agreement entitled to enforce and take advantage of the benefits of those sections of this Agreement to NNI only to their fullest extent as if it were a signatory hereto.

SECTION 3.4.  <u>Accession by Nortel Networks, S.A.</u>  Nortel Networks S.A. may, within 30 days of the Effective Date of the Settlement and Release Agreement, by notice in writing to the Parties hereto, accede to the Settlement and Release Agreement.  In the event it does so, and on the same date, Nortel Networks S.A. shall accede to this Agreement as an EMEA Entity on the same terms and conditions as an EMEA Entity (such accession conditioned, if applicable, on French court approval), and the Parties shall forthwith on receipt of such notice enter into an appropriate form of accession agreement with Nortel Networks S.A. The Parties agree that the provisions of this Section 3.4 are for the benefit of Nortel Networks S.A. and may be enforced by Nortel Networks S.A.

SECTION 3.5.<u>Consent to Amendments; Waivers</u>.  No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.  This Agreement, or any provision hereof, may be waived or amended, on no less than 5 days' notice, only by means of a writing signed by all Parties, and approved by the Committee, Bondholder Group and the Monitor, which amendments, if material in the judgment of the Parties, must be approved by each of the Courts that initially approved this Agreement.

SECTION 3.6.  <u>Successors</u>.  Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors.

SECTION 3.7.  <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)    The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; provided, however, that Section 3.1 shall be governed exclusively by English law.

(b)    To the fullest extent permitted by applicable law, and except as provided for in Section 2.4(b), each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Bankruptcy Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Protocol adopted by such courts, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be brought in the U.S. Bankruptcy Court and the Canadian Court, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law; provided, however, that any claim, action or proceeding set forth in Section 3.1 shall be brought exclusively in the English courts.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY.  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 3.7.

SECTION 3.8.  Notices.  All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 3.8.

**If to the US Entities:**

c/o Nortel Networks Inc.
Attention:  Anna Ventresca
        Chief Legal Officer
Address: 2221 Lakeside Boulevard
        Richardson, Texas 75082
        U.S.A.
Facsimile No.: (905) 863-8386

**With a copy to:**

Cleary Gottlieb Steen & Hamilton LLP
Attention: Lisa M. Schweitzer, Esq.
Address: One Liberty Plaza
        New York, New York 10006
        U.S.A.
Facsimile No.:  (212) 225-3999

**If to the Canadian Entities (prior to December 1, 2009):**

c/o Nortel Networks Limited
Attention: Anna Ventresca
        Chief Legal Officer
Address: 195 The West Mall
Mailstop: T0503006
        Toronto, Ontario,
        Canada M9C 5K1
Facsimile No.: (905) 863-7386

**With a copy to:**

Ogilvy Renault LLP
Attention: Ian Ness, Esq.
Address: Suite 3800
        Royal Bank Plaza, South Tower
        200 Bay Street, P.O. Box 84
        Toronto, Ontario M5J 2Z4
        Canada
Facsimile No.: (416) 216-3930

**If to the Canadian Entities (after December 1, 2009):**

c/o Nortel Networks Limited
Attention: Anna Ventresca
        Chief Legal Officer
Address:   5945 Airport Road, Suite 360
        Mississauga, Ontario
        L4V 1R9
Facsimile No.: (905) 863-7386

**If to the EMEA Entities:**

c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
        London SE1 2AF
        United Kingdom
Facsimile No.: +44 (0) 20 7951 1345

**With a copy to:**

Herbert Smith LLP
Attention: Alan Montgomery and Ben Ward, Esq.
Address: Exchange House
        Primrose Street
        London EC2A 2HS
        United Kingdom
Facsimile No.: +44 (0) 20 7098 4878

**If to the Committee:**

Akin Gump Strauss Hauer & Feld LLP
Attention:  Fred S. Hodara, Esq. and David H. Botter, Esq.
Address:   One Bryant Park

**If to the Bondholder Group:**

Milbank, Tweed, Hadley & McCloy
Attention:  Gina Ciraldo, Esq. and David Clayton, Esq.
Address:   One Chase Manhattan Plaza

New York, New York 10036                     New York, New York, 10006
Facsimile:  (212) 872-1002                     Facsimile:  (212) 822-5537


**If to the Monitor:**                               **With a copy to:**
Murray A. McDonald                          Goodmans L.L.P.
Ernst & Young Inc.                             Attention:  Joseph Pasquariello
Ernst & Young Tower                         Facsimilie: (416) 979-1239
Address: 222 Bay Street, P. O. Box 251
            Toronto, ON M5K 1J7             If prior to December 22, 2009:
            Canada
Facsimile:  (416) 943-3300                   Address:   250 Yonge Street
                                                              Suite 2400
                                                              Toronto, ON M5B 2M6
                                                              Canada

                                                  If after December 22, 2009:

                                                  Address:   Bay Adelaide Centre
                                                              333 Bay Street, Suite 3400
                                                              Toronto, ON M5H 2S7

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

SECTION 3.9.  Counterparts.  The Parties may execute this Agreement in three or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

SECTION 3.10.  Severability.  If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner, and approved by the Committee, the Bondholder Group and the Monitor, in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 3.11.  Termination.  This Agreement will automatically terminate upon the final distribution of any amounts owed by or to the Parties pursuant to Section 2.4 hereof.

SECTION 3.12.  Obligations of the Parties.  The liability of any Regional Entity shall be several (and not joint) with respect to the other Regional Entities, but the Parties included within a Regional Entity shall be jointly liable for all obligations of such Regional Entity.

SECTION 3.13.    Effectiveness.

(a)    No provision of this Agreement (other than as set forth in Section 3.13(d)) shall be effective until each of the US Court and the Canadian Court approves the entirety of this Agreement and all of the provisions hereof (the "Court Approval Condition").

(b)    All provisions of this Agreement shall be effective as of the date of the satisfaction of the Court Approval Condition.

(c)    Each Party hereto shall:

(i)    use commercially reasonable efforts to satisfy the Court Approval Condition as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

(ii)    keep all other Parties reasonably apprised of the progress of the satisfaction of the Court Approval Condition and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

(iii)    use commercially reasonable efforts to allow any other Party, which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Court Approval Condition.

(d)    Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 3.1 through 3.12 and Section 3.13(b), (c) and (d).

SECTION 3.14.    Limitations of Remedies.  Each of the Parties agrees that this Agreement may be pled as a defense to any claim or action in any court of competent jurisdiction.  In connection with the foregoing, the Parties agree that monetary damages would not be sufficient to remedy any breach by a party of this Agreement and that the non-breaching party would be entitled to equitable relief, including, without limitation, temporary injunctive relief preventing (or allowing, as the case may be) the unilateral termination of performance and specific performance in respect of any breach of the Agreement.

SECTION 3.15.    Reservation of Rights.  The Parties expressly agree that the allocation of the Payment Obligations pursuant to Schedule B hereto shall not be binding on the Parties in determining the ultimate allocation of the Settlement Cost of the Parties.  Further, the Parties hereby agree that, except as otherwise provided herein, nothing in this Agreement shall or be deemed to determine, ratify, or adopt, or have any impact whatsoever on, the allocation or

distribution of proceeds from any Divestiture (as defined in the Settlement and Release Agreement).

**[Remainder of this page intentionally left blank.  Signature pages follow.]**

IN WITNESS WHEREOF, each Party, by its respective duly-authorized representative identified below, acknowledges and agrees to the terms and conditions of this Agreement.

**NORTEL NETWORKS CORPORATION**

By: _____

Name: _Anna Ventresca_

Title: _General Counsel-Corporate_
_and Corporate Secretary_

Dated:   November 20, 2009

By: _____

Name: _John Doolittle_

Title: _SVP, Finance & Corporate_
_Services_

Dated:   November 20, 2009


**NORTEL NETWORKS LIMITED**

By: _____

Name: _Anna Ventresca_

Title: _General Counsel-Corporate_
_and Corporate Secretary_

Dated:   November 20, 2009

By: _____

Name: _John Doolittle_

Title: _SVP, Finance & Corporate_
_Services_

Dated:   November 20, 2009


**NORTEL NETWORKS INC.**

By: _____

Name: _Anna Ventresca_

Title: _Chief Legal Officer_

Dated: November 20, 2009


**NORTEL NETWORKS CAPITAL
CORPORATION**

By: _____

Name: _John Doolittle_

Title: _President_

Dated:   November 20, 2009


**NORTEL ALTSYSTEMS INC.**

By: _____

Name: _John Doolittle_

Title: _President_

Dated:   November 20, 2009

**SONOMA SYSTEMS**

By: _____

Name: _____ John Doolittle _____

Title: __ Pres . & Treasurer __

Dated:   November 20, 2009

**OTERA CORPORATION**

By: _____

Name: _____ John Doolittle _____

Title: _____ President _____

Dated:   November 20, 2009

**CORETEK, INC**

By: _____

Name: _____ John Doolittle _____

Title: _____ President _____

Dated:   November 20, 2009

**NORTEL NETWORKS**
**APPLICATIONS MANAGEMENT**
**SOLUTIONS INC.**

By: _____

Name: _____ John Doolittle _____

Title: _____ President _____

Dated:   November 20, 2009

**NORTEL NETWORKS OPTICAL**
**COMPONENTS INC.**

By: _____

Name: _____ John Doolittle . _____

Title: _____ President _____

Dated:   November 20, 2009

**NORTEL NETWORKS HPOCS INC.**

By: _____

Name: _____ John Doolittle _____

Title: _____ President _____

Dated:   November 20, 2009

**ARCHITEL SYSTEMS (U.S.)
CORPORATION**

By: _____

Name: _____ John Doolittle _____

Title: _____ President _____

Dated:   November 20, 2009

**NORTEL NETWORKS
INTERNATIONAL INC.**

By: _____

Name: _____ John Doolittle _____

Title: _____ President _____

Dated:   November 20, 2009

**NORTHERN TELECOM
INTERNATIONAL INC.**

By: _____

Name: _____ John Doolittle _____

Title: _____ President _____

Dated:   November 20, 2009

**NORTEL NETWORKS CABLE
SOLUTIONS INC.**

By: _____

Name: _____ John Doolittle _____

Title: _____ V-P _____

Dated:   November 20, 2009

**NORTEL NETWORKS (CALA) INC.**

By: _____

Name: _____ John Doolittle _____

Title: _____ Treasurer _____

Dated:   November 20, 2009

By: _____

Name: _____ Peter Look _____

Title: _____ President _____

Dated:   November 20, 2009

**NORTEL ALTSYSTEMS**
**INTERNATIONAL INC.**

By: _____

Name: _____John Doolittle_____

Title: _____President_____

Dated:    November 20 2009

**XROS, INC.**

By: _____

Name: _____John Doolittle_____

Title: _____President_____

Dated:    November 20 2009

Signed by CHRISTOPHER J.W.HILL as
joint administrator on behalf of the Joint
Administrators and the EMEA Entities
(except Nortel Networks (Ireland) Limited)
without personal liability and solely for the
purpose of obtaining the benefit of the
provisions of this Agreement expressed to be
conferred on or given to the Joint
Administrators

By _____

Name:  CHRISTOPHER HILL

Title:  JOINT ADMINISTRATOR

Signed by David Hughes as joint
administrator on behalf of the Joint
Administrators and Nortel Networks
(Ireland) Limited without personal liability
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to the
Joint Administrators

By _____

Name: ___DAVID   HUGHES___

Title: ___JOINT   ADMINISTRATOR___

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS UK LIMITED (IN**
**ADMINISTRATION) by**
**CHRISTOPHER J.W. HILL** as Joint
Administrator (acting as agent and without
personal liability whatsoever) in the
presence of:

)
)
)
)

**CHRISTOPHER J.W. HILL**

Witness: _____ (signature) _____

Name: JAN CORDELL
Address: 1 HORE LONDON PLACE
LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS (IRELAND) LIMITED**
**(IN ADMINISTRATION)**
by **DAVID HUGHES** as Joint
Administrator (acting as agent and without
personal liability whatsoever) in the
presence of:

)
)
)
)

**DAVID HUGHES**

Witness: *Eimear Ni Ghriofa*

Name: EIMEAR NI GHRIOFA
Address: C/O ERNST & YOUNG, HARCOURT CENTRE, HARCOURT STREET, DUBLIN 2.

SIGNED for and on behalf of NORTEL )
NETWORKS BV (IN )      **CHRISTOPHER J.W. HILL**
ADMINISTRATION) )
by CHRISTOPHER J.W. HILL as Joint )
Administrator (acting as agent and without
personal liability whatsoever) in the
presence of:

Witness: _____

Name: JAN CORDELL
Address: 1 MORE LONDON PLACE
LONDON SE1 2AF

)
**SIGNED** for and on behalf of **NORTEL**   )    **CHRISTOPHER J.W. HILL**
**NETWORKS HISPANIA, S.A.**   )
by **CHRISTOPHER J.W. HILL** as Joint   )
Administrator (acting as agent and without
personal liability whatsoever) in the
presence of:

Witness: _____

Name: _____ JAN CORDELL _____
Address: __ 1 MORE LONDON PLACE __
              LONDON  SE1  2AF

## Exhibit 1

Settlement and Release Agreement

**Schedule A – EMEA Entities**

Nortel Networks UK Limited (in administration)

Nortel Networks (Ireland) Limited (in administration)

Nortel Networks B.V. (in administration)

Nortel Networks Hispania SA (in administration)

If Nortel Networks S.A. accedes to this Agreement pursuant to Section 3.4, it shall be considered an EMEA Entity.

## Schedule B – The Payment Obligations

1.      Initial Payment to Flextronics

NNI shall, on behalf of all of the Parties and following the receipt of payment of █████ ████████ from the EMEA Entities as Segregated Funds as contemplated in Section 2.2 of this Agreement (the "EMEA Payment"), pay Flextronics from the Segregated Account ████████████████ within 10 days after the Effective Date of the Settlement and Release Agreement.


2.      Final Payment to Flextronics

NNI shall, on behalf of all of the Parties and following the receipt of the EMEA Payment, pay Flextronics from the Segregated Account ████████████████ on or before May 31, 2010.


3.      Payment to NNL

NNI shall, on behalf of all of the Parties and following the receipt of the EMEA Payment, pay NNL from the Segregated Account ████████████████ within 10 days after the Effective Date of the Settlement and Release Agreement.

4.      Released Accounts Payable

Immediately following the payment described in item 3 above, the "Released Accounts Payable" for the Regional Entities shall equal █████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ █████████████████████████████

5.      Adjustment Amount

(a)     Promptly, but in no case more than 5 days, following the determination of the Adjustment Amount (or any portion thereof) in accordance with Schedule B to the Settlement and Release Agreement, each Regional Entity shall pay to NNI for deposit into the Segregated Account the actual amount of the Adjustment Amount attributable to each Regional Entity (which shall be determined according to the Nortel legal entities listed for the accounts payable agreed not to be valid obligations in accordance with Schedule B to the Settlement and Release Agreement).

(b)     NNI shall, on behalf of all of the Parties and following the receipt of the payments from the Canadian Entities and EMEA Entities required in 4(a) above, pay to Flextronics the Adjustment Amount from the Segregated Account in accordance with Schedule B to the Settlement and Release Agreement.

**Schedule C – Settlement Cost**

Confidential.  Filed under seal pursuant to the Order Authorizing the Debtors to File Under Seal Certain Portions of (I) the Settlement and Release Agreement and (II) the Side Agreement, Attached as Exhibits to the Debtors' Motion Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 for Entry of an Order (I) Authorizing and Approving the Flextronics Settlement and Release Agreement, (II) Authorizing and Approving the Related Side Agreement and (III) Granting Related Relief [D.I. _____].  Copies of Schedule C will be provided to the United States Trustee and the Court.