## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| In re: | : **Chapter 11** |
| | : |
| **NORTEL NETWORKS, INC.,** *et al.,* | : **Case No. 09-10138 (KG)** |
| | : **(Jointly Administered)** |
| **Debtors.** | : Hearing Date: December 2, 2009 |
| | : Objection Deadline: November 25, 2009 |
| | : Related Docket No. 1587 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### AT&T'S LIMITED OBJECTION TO DEBTORS'
### MOTION FOR ORDERS (I)(A) AUTHORIZING AND
### APPROVING THE BIDDING PROCEDURES, (B) APPROVING
### THE NOTICE PROCEDURES, AND (C) SETTING A DATE FOR
### THE SALE HEARING, AND (II) AUTHORIZING AND APPROVING
### THE SALE OF CERTAIN ASSETS OF DEBTORS' GSM/GSM-R BUSINESS

AT&T Services, Inc. ("AT&T Services"), on its own behalf and as agent on behalf of AT&T Mobility LLC and its subsidiaries and affiliates (collectively, "AT&T"), hereby files this limited objection (the "Objection") to the Debtors' Motion for Orders (I)(A) Authorizing and Approving the Bidding Procedures, (B) Approving the Notice Procedures, and (C) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving the Sale of Certain Assets of Debtors' GSM/GSM-R Business, dated September 30, 2009 (the "Sale Motion") and in support thereof states as follows:

### BACKGROUND

*A.*     *The AT&T Contracts*

1.     AT&T and the Debtors are parties to several contracts whereby AT&T purchases Nortel equipment and services for use in AT&T's telecommunications network, among other things (collectively, the "AT&T Contracts"). The AT&T Contracts include certain master agreements, (the "Master Agreement(s)") and several supplemental agreements, attachments, modules, orders and other similar agreements entered into under the master agreements (the

"Supplemental Agreements"). Specifically, the Debtors and AT&T are parties to, among others, the following Master Agreement - "Master Sales Agreement", between Nortel Networks, Inc. ("Nortel") and Cingular Wireless, LLC ("Cingular")[1], dated November 1, 2001, as amended, and/or supplemented, and including all agreements, work statements or similar documents issued thereunder or pursuant to (the "MSA") – including, but not limited to the following Supplemental Agreements:

- GSM Supplement, between Nortel and Cingular, dated December 15, 2005 (the "GSM Supplement");

- "Equipment and Services Supplement", No. cing 6770, between AT&T Mobility and Nortel as amended, and/or supplemented, and including all agreements, work statements or similar documents issued thereunder or pursuant to (the "ESS");

- UMTS Supplement F, between Cingular and Nortel as amended, and/or supplemented, and including all agreements, work statements or similar documents issued thereunder or pursuant to;

- Letter Agreement and related Memorandum of Agreement – e3 BSC, between Cingular and Nortel, as amended, and/or supplemented, and including all agreements, work statements or similar documents issued thereunder or pursuant to;

- Letter Agreement, dated April 20, 2006. between Cingular and Nortel, as amended, and/or supplemented, and including all agreements, work statements or similar documents issued thereunder or pursuant to;

---

[1] Cingular changed its name to AT&T Mobility LLC ("AT&T Mobility").

- Letter Agreement, dated December 18, 2006, between Cingular and Nortel, as amended, and/or supplemented, and including all agreements, work statements or similar documents issued thereunder or pursuant to;

- Letter Agreement, dated September 19, 2007, between Cingular and Nortel, as amended, and/or supplemented, and including all agreements, work statements or similar documents issued thereunder or pursuant to;

- Letter Agreement, dated December 30, 2008, between Cingular and Nortel, as amended, and/or supplemented, and including all agreements, work statements or similar documents issued thereunder or pursuant to;

- Information Exchange Agreement, dated November 6, 2006, between Cingular and Nortel, as amended, and/or supplemented, and including all agreements, work statements or similar documents issued thereunder or pursuant to;

- Information Exchange Agreement, dated September 7, 2007 between Cingular and Nortel, as amended, and/or supplemented, and including all agreements, work statements or similar documents issued thereunder or pursuant to; and

- Non-Disclosure – Reciprocal, No. 20090410.042.C, dated April 28, 2009, between Nortel and AT&T Services, as amended, and/or supplemented, and including all agreements, work statements or similar documents issued thereunder or pursuant to.

The above-listed Supplemental Agreements incorporate the MSA. The Master Agreements and the related Supplemental Agreements are considered one integrated contract pursuant to their terms.

2.      Under the AT&T Contracts, the Debtors indemnify AT&T against, among other things, any damages or losses caused by the products, or as a result of claims for copyright

infringement made by third parties against AT&T (collectively, the "Indemnification Provisions"). The Indemnification Provisions are essential to the AT&T Contracts because by using and/or reselling Nortel equipment to AT&T customers, AT&T, among other things, may expose itself to liability should a claim be asserted against AT&T on account of the Nortel equipment. In addition, under the AT&T Contracts, Nortel provides warranties for the Nortel equipment and is required to send technicians to service and upgrade Nortel products in addition to providing services related to the warranties on such products (collectively, the "Warranty Provisions" and, together with the Indemnification Provisions, the "Indemnification/Warranty Provisions"). The Warranty Provisions are also essential to the AT&T Contracts because AT&T needs Nortel to provide these services for the Nortel equipment.

3.     In addition to the Indemnification/Warranty Provisions, there are other relevant provisions that are important to consider in the context of assuming and assigning the AT&T Contracts. For example, under the Master Sales Agreement, AT&T earns certain product credits that can be applied to future purchases of Nortel equipment, including but not limited to the purchase of Nortel equipment. In addition, the Debtors are required to provide AT&T with training to be accrued at a rate equal to five thousand, five hundred fifty dollars ($5,550) for every one million dollars ($1 Million) AT&T spends for Nortel equipment. The value of these credits is substantial both in terms of monetary amount and necessary training. AT&T continuously earns credits and presently holds approximately $12 million in accrued credits.

B.     *The Sale Motion*

4.     On September 30, 2009, the Debtors filed the Sale Motion. Pursuant to the Sale Motion, the Debtors propose to sell certain assets related to the Debtors' Global System for Mobile communications (the "GSM/GSM-R Business") to the successful bidder (the

"Purchaser") established an auction for the GSM/GSM-R Business (the "Sale").  On October 9, 2009, the Debtors filed a proposed Asset Sale Agreement for the sale of substantially all of the assets of the GSM/GSM-R Business (the "APA").  On October 15, 2009, the Court entered an order approving bidding procedures, setting the sale hearing and establishing the deadlines for parties to object to the Sale.

5.      Pursuant to the APA, the Debtors are seeking to assume and assign executory contracts which have not yet been identified as part of the Sale.  With regard to executory contracts, the Debtors are proposing the Purchaser assume, "all Liabilities of the Sellers arising from or in connection with the performance of the Assigned Contracts (or breach thereof), whether occurring before or after the Closing Date, including (i) any Cure Costs payable pursuant to Section 2.1.7 (to the extent applicable), (ii) any obligation under any Assigned Contract to buy back from the relevant resellers the Products sold by the Business to such resellers under such Assigned Contract, and (iii) any obligations under any warranty or indemnification liabilities relating to Products and/or Services which have been supplied under any Assigned Contract."  APA at §2.1.3.

## OBJECTION

6.      AT&T files this objection to the extent that the final executed APA provides that AT&T's rights under the Indemnification/Warranty Provisions along with all of the other contractual provisions are not assumed by the Purchaser.[2]  The proposed APA in its current form appears to provide for the assumption and assignment of all of the obligations under the AT&T Contracts, including, but not limited to, Nortel's obligations under the Indemnification/Warranty Provisions.  However, AT&T objects to the extent that the Debtors revise the APA to limit the

---

[2] AT&T's objection also extends to a final executed APA that limits or negatively impacts in any manner AT&T's rights to the accrued and continuously earned credits, described in paragraph 3, for the reasons stated above.

assumption and assignment of the aforementioned obligations or if the proposed APA is interpreted in such a manner to include only a partial assumption and assignment of those obligations.

7.     AT&T also objects to the extent that the Debtors are attempting to pick and choose certain AT&T Contracts without assuming the corresponding agreements entered thereunder with respect to the GSM/GSL Business. The Master Agreements and the related Supplemental Agreements constitute single integrated agreements which must be assumed and assigned in their entirety.[3]

A.     *The Purchaser Must Be Responsible under all Indemnification/Warranty Provisions*

8.     It is black letter law that a debtor assumes a contract under Section 365 of the Bankruptcy Code *cum onere*—with all of its benefits and burdens.  NLRB v. Bildisco & Bildisco, 465 U.S. 513, 531 (1984); In re Fleming Cos., Inc., 499 F.3d 300, 308 (3d Cir. 2007). As stated by the Third Circuit,

> Section 365(f) requires a debtor to assume a contract subject to the benefits and burdens thereunder ... 'The [debtor] ... may not blow hot and cold. If he accepts the benefits he must adopt the burdens. He cannot accept one and reject the other'... The *cum onere* rule 'prevents the [bankruptcy] estate from avoiding obligations that are an integral part of an assumed agreement.'

Fleming, 499 F.3d at 308 (citations omitted).  Similarly, a debtor seeking to assign a contract under Section 365 must also assign the contract in whole with all the benefits and burdens.  Id. at 308 ("'an assignment is intended to change only who performs an obligation, not the obligation to be performed'") (citing Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 60 (3d Cir. 2001); see also In re Morande Enters., Inc., 335 B.R. 188, 192 (Bankr. M.D. Fla. 2005) ("The Debtor cannot assume and assign the contract in part, under either § 365 or the

---

[3] AT&T previously filed objections to Nortel's sale of its Enterprise Business to Avaya, Inc. and its MEN Business to Ciena, Inc. based on Nortel's attempt to effect a partial assumption and assignment to the respective purchasers (the "AT&T Objections"). See Docket Nos. 1848 & 1432.

Florida Dealer Law, but must do so in whole, including the Location Provision"); In re Cajun Elec. Power Co-Op., Inc., 230 B.R. 693, 710 (Bankr. M.D. La. 1999) ("The rule that an executory contract must be assumed or assigned in toto has been recognized on several occasions by the Fifth Circuit... an executory contract must be assumed or assigned in its entirety....").

9.      Among the reasons that a contract must be assigned in its entirety under Section 365 is that the debtor will be relieved of its obligations under the contract pursuant to Section 365(k). Therefore, the assignee must assume all the obligations so that the counterparty's rights are protected. The Third Circuit addressed the issue of whether a party can make a partial assignment under Section 365 in American Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76 (3d Cir. 1999). In American Flint, the debtor objected to proofs of claim filed under collective bargaining agreements that had been assumed and assigned to the purchaser of the debtor's assets. The bankruptcy court found that the debtor was relieved of liability under Section 365(k), and therefore, the claims could not be asserted against the debtor. The Third Circuit reversed, holding that an assignment under Section 365 did not take place because the contracts at issue were not assigned with all of the benefits and burdens:

> In the bankruptcy context, however, Code § 365(k) changes the common law rule by effecting a novation by operation of law whether or not the obligee consents to the substitution.... But consistent with the basic concept of a contract's assignment, under which every contractual assignee takes the entire bundle of rights and obligations under the contract, such a forced novation is dependent on just such a total undertaking by the assignee. Code § 365(k) (emphasis added) provides: Assignment by the trustee to an entity *of a contract* or lease assumed under this section relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment.

> Where Congress uses legal terms that have "accumulated settled meaning" under common law, it must be presumed (unless of course the statute dictates otherwise) that Congress meant to employ that established meaning.... Hence we construe the terms in Code § 365(k) to incorporate the general common law of assignments. In particular, we will follow the dominant consensus of common law jurisdictions, rather than the law of any particular jurisdiction....

> That dominant consensus conforms to the clear meaning of the language involved: that an assignment of a contract as such involves a commitment by the assignee to perform all obligations under the contract, as well as to acquire all rights created by the contract.

Id. at 80-81 (finding the debtor was still liable because the contract was not assigned in its entirety); cf. In re Allegheny Health, 383 F.3d 169 (3d Cir. 2004) (union could not assert post-closing indemnification claim against buyer of assets because such assets were not assumed by the buyer and *union failed to object to the sale*). Thus, a debtor cannot assign a contract under Section 365 unless the assignee assumes all the obligations.

10.     In this case, the Debtors cannot enter into an APA that in any way limits the Purchaser's liability under the assumed contracts particularly since Section 365(k) relieves the estate of liability upon assignment. As the Third Circuit has made clear, this is not permissible under Section 365 of the Bankruptcy Code. In an analogous case, In re 1945 Route 23 Assocs., Inc., 2008 WL 2386296 (Bankr. D. N.J. 2008), the assignee of a lease argued that it was not responsible for pre-closing costs because, similar to the APA in this case, the assignee was only responsible for post-closing costs under the asset purchase agreement. The court rejected the argument, reasoning:

> The court is similarly not persuaded by Autobacs's construction of the pertinent provisions of the APA. Autobacs concedes that the Tozzo lease is an Assumed Agreement but then contends that the 2007 Corrected Cost Statement is not an Assumed Liability because much of the amount due under that cost statement accrued prior to the sale closing date (May 2, 2007). It contends that under the APA's definition of Assumed Liabilities, the obligation must both arise and relate to a period after the closing date. Further, it concludes that the following sentence in the definition clearly expresses Autobacs's intent not to assume liabilities like those contained in the 2007 Corrected Cost Statement: "For avoidance of doubt, Assumed Liabilities excludes any Liability attributable to any act, occurrence or omission which occurred prior to Closing except as expressly assumed hereunder." Autobacs concludes from this that because it did not expressly assume the obligation to pay the cost statement, the obligation is expressly excluded. The flaw in Autobacs's argument is that under the APA Autobacs

expressly assumed the Tozzo lease, and thereby expressly assumed all of its provisions, including the obligation to satisfy the payment of the 2007 Corrected Cost Statement. When R & S, and subsequently Autobacs, assumed the Tozzo lease, they assumed it in its entirety, accepting the burdens as well as the benefits. See In re Fleming Cos., Inc., 499 F.3d 300, 308 (3d Cir. 2007). Unquestionably then, the assumed obligation to pay the Corrected 2007 Cost Statement arises and relates to the period after the closing date because that is when the obligation came due.

Id., 2008 WL 2386296 at *7.

11.    Here, under the AT&T Contracts, AT&T has the right to assert claims for indemnity if claims are asserted against AT&T on account of Nortel products as well as warranty and service claims related to the Nortel equipment.  Pursuant to Section 365 of the Bankruptcy Code, the Purchaser takes the assignment subject to those rights.  The Debtors cannot enter into an APA with a purchaser which would bar AT&T from asserting its bargained for rights, including indemnity rights, against such purchaser if a claim based on pre-closing conduct is asserted against AT&T.  This is not permissible and, accordingly, the Sale should not be approved unless the Purchaser also agrees to fully assume the Indemnification/Warranty Provisions contained in the AT&T Contracts.

B.    *There Is no Adequate Assurance of Future Performance*

12.    Absent assumption of the Indemnification/Warranty Provisions in the contracts, the Debtors must also provide adequate assurance of future performance under the AT&T Contracts.

13.    To effectuate an assignment under the Bankruptcy Code, the Debtors must demonstrate adequate assurance of future performance.   Adequate assurance of future performance is an element of the assumption and assignment process which must be met in addition to the curing of any defaults under an executory contract.  11 U.S.C. § 365(f)(2).  Even in the absence of a default under the contract, adequate assurance of future performance must be

afforded before the trustee can assign an executory contract.  See In re E-Z Serve Convenience Stores, Inc., 289 B.R. 45, 52 (Bankr. M.D.N.C. 2003) (refusing to excise a right of first refusal from a lease agreement reasoning that, among other things, absent such provision the non-debtor party "will not receive the full benefit of its bargain and the Trustee cannot give adequate assurance of future performance").  Although not defined in the Bankruptcy Code, the phrase "adequate assurance of future performance," adopted from Section 2-609(1) of the Uniform Commercial Code, is intended to be given a "practical, pragmatic construction based upon the facts and circumstances of each case." Cinicola v. Scharffenberger, 248 F.3d 110, 120 (3d Cir. Pa. 2001) (citations omitted).

14.      As discussed, Section 365(k) of the Bankruptcy Code relieves the trustee and the estate from any liability under a contract occurring after assignment.  In re Washington Capital Aviation & Leasing, 156 B.R. 167, 175 & n.3 (Bankr. E.D. Va. 1993) (Section 365(k) alters the common law rule that the original obligor remains ultimately liable after assignment until discharged by performance, consent or otherwise.); see also In re Rickel Home Centers, Inc., 209 F.3d 291, 299 (3d Cir. 2000) (in the context of shopping center leases, the court held that adequate assurance is "necessary to protect the rights of the non-debtor party to the contract or lease, because assignment relieves the trustee and the estate from liability arising from a post-assignment breach"), cert. denied, 531 U.S. 873 (2000).

15.      Here, AT&T's indemnity claims based on events that occurred prior to the Sale could arise months or years after the Sale.  If the APA prevents AT&T from asserting these claims against the Debtors, AT&T would be left without its bargained for rights, resulting in the failure to provide adequate assurance of future performance.  In short, the Debtors must provide adequate assurance that AT&T's bargained for rights will be protected, which means that the

contracts, including the Indemnification/Warranty Provisions, must be assumed in their entirety in a seamless fashion.

C.    *The Master Agreements and the Related Supplemental*
      *Agreements Must Be Assumed in Their Entirety*

16.    The Debtors cannot assume and assign certain Supplemental Agreements without assuming and assigning the Master Agreements and all underlying Supplemental Agreements related to the GSM/GSM-R Business since the agreements constitute a single integrated transaction.[4]

17.    Where several separate "contracts" are in substance one agreement, Section 365 of the Bankruptcy Code similarly does not allow a debtor to "cherry pick" the "contracts," accepting certain ones, while rejecting others. In re Atl. Computer Sys., Inc., 173 B.R. 844, 849 (S.D.N.Y. 1994); see also In re Kopel, 232 B.R. 57, 65, n.4 (Bankr. E.D.N.Y. 1999) ("Where several documents are construed as one contract, the debtor must assume or reject them together"). The debtor must assume the entire package of contracts that comprise the overall agreement. Bankruptcy Courts frequently have found that several contracts form one indivisible, integrated agreement and have refused to allow the debtor to split up the transaction by assuming the beneficial contracts and rejecting others under Section 365. See, e.g., In re Cole Bros., 137 B.R. 647, 651 (Bankr. W.D. Mich. 1992); Braniff, Inc. v. GPA Group PLC (In re Braniff), 118 B.R. 819, 844 (Bankr. M.D. Fla. 1989); In re T & H Diner, Inc., 108 B.R. 448, 454 (Bankr. D.N.J. 1989); In re Ritchey, 84 B.R. 474, 476 (Bankr. N.D. Ohio 1988); Bistrian v. Easthampton

---

[4] AT&T reserves its rights to further object to the extent that the Debtors and the Purchaser seek to "un-bundle" the AT&T Contracts as detailed in Section 5.14 of the APA. Under that section, the Debtors and the Purchaser will use "reasonable efforts" to un-bundle certain contracts and enter into arrangements with counter-parties to a contract by continuing under the existing contract or entering into a new contract. APA at §5.14(a). Section 5.14(b) also allows the Debtors to subcontract portions of the Bundled Contracts to the Purchaser under certain conditions and subject to certain requirements.    AT&T reserves its right to object with regard to the un-bundling of its contracts or with regard to other issues that may arise when the Debtors make their determination regarding the treatment of the AT&T Contracts.

Sand & Gravel Co., Inc. (In re Easthampton Sand & Gravel Co.), 25 B.R. 193, 199 (Bankr.
E.D.N.Y. 1982).

18.    In determining whether *several* separate contracts in substance form one
integrated agreement that must be assumed as a package under Section 365, the Bankruptcy
Courts look to the underlying state law, the contract itself, and the intent of the parties.  In re
Philip Servs. (Del.), Inc., 284 B.R. 541, 546 (Bankr. D. Del. 2002) ("Under general contract law,
the parties' intentions determine whether two separately executed documents are in reality one
agreement").  In determining whether the agreements constitute one integrated agreement, state
courts usually consider the following:

> Ultimately, the question is one of the intent of the parties, and the courts, in
> making this determination, consider all of the facts and circumstances
> surrounding the making of the agreements, including:  (1) the nature and purpose
> of the various agreements, including whether they are contained in one instrument
> or multiple instruments and whether, if the latter, they were executed at the same
> time or at different times, and whether the initially executed agreement
> contemplated the later agreements; (2) whether the same consideration was paid
> for each of the promises contained in the agreements or whether the consideration
> for the various agreements was separate and distinct; and (3) whether the parties'
> obligations under the various agreements are interrelated or independent.

WILLISTON ON CONTRACTS, ASSUMPTION OR REJECTION OF CONTRACTS CONSISTING OF MORE
THAN ONE AGREEMENT § 78:29, § 78:29 (2009).  Thus, in analyzing the parties' intentions,
courts will look to the terms of the agreement.  For example in In re Beatriz Ready Mix, Inc.,
2009 WL 255890 (Bankr. D.P.R. 2009) the court stated:

> Each document also states the parties intended that the three documents be
> considered complimentary and interrelated agreements, or components of the one
> single transaction, that is, the sale of the business
>
> *        *        *
>
> We find the words used in the tie-in clauses in all three documents are clear. The
> contractual language expressing the parties' intent is not murky, or obscure. These
> expressions undoubtedly state the parties intended that the three documents

complement each other, depicting the components of one single business transaction.

*   *   *

Hence, we find the preponderance of the credible and admissible evidence here shows the tie-in clauses in the three documents demonstrate the parties' true and unequivocal intent once they reached a meeting of the minds. These tie-in clauses clearly show the three contracts express the true intent of the parties: that is, the documents are but components of a single, interdependent, unified business transaction, and that the parties never intended us to consider the documents as three individual, separate, self-standing and severable contracts.

Id. at *4. Thus, where the terms of the contracts unambiguously demonstrate that the parties intend the contracts to be integrated into a single contract, the courts will find that the agreements should be treated as one contract. For example, where the parties' relationship is governed by a master agreement and subsequent agreements entered into under the master agreement and the parties intend such agreements to be integrated into a single agreement, courts will find the master agreement and subsequent agreements constitute a single integrated contract that must be assumed and assigned in its entirety. See, e.g., In re Atl. Computer Sys.., 173 B.R. 844, 849 (S.D.N.Y. 1994), (court reversed bankruptcy court decision allowing Debtors to assume a Master Lease Agreement for computer equipment but not the subsequent leases entered into contemporaneously with the equipment schedules); see also In re Aneco Electrical Construction, 2005 WL 3750364 at *4 (M.D. Fla. 2005) ("the Court finds that the Subcontract Agreement entered by the Debtor and Turner on November 25, 2002, constitutes a single, indivisible contract for electrical work at the Dulles International Airport, and that the subsequent Work Orders did not effect a severance of the contract into two separate and independent 'subcontracts'").

19.     In this case, the parties' intentions are readily apparent through reference to the AT&T Contracts, which provide for the Supplemental Agreements referenced above to be

integrated into the Master Agreement.  For example, the ESS provides that "[t]his ESS and the MSA and the GSM Supplement shall constitute the entire agreement between the parties with respect to the subject matter contained herein...."  ESS at §11.  The intention of the parties is clear – the Supplemental Agreements are integrated into the corresponding Master Agreements, and as a result, the agreements with respect to the GSM/GSM-R Business constitute a single integrated contract that must be assumed and assigned *cum onere*.

## CONCLUSION

WHEREFORE, for the reasons stated above, AT&T objects to the relief requested in the Sale Motion to the extent cited above and respectfully requests that it be denied, and that the Court grant such other and further relief as deemed just and proper.

Dated: November 25, 2009

**ASHBY & GEDDES**

William P. Bowden (#2553)
500 Delaware Avenue
Wilmington, Delaware 19899
Telephone:  (302) 654-1888
Facsimile:  (302) 654-2067

--and--

**FULBRIGHT & JAWORSKI L.L.P.**

David A. Rosenzweig
Mark C. Haut
666 Fifth Avenue
New York, New York 10103
Tel:  (212) 318-3000
Fax:  (212) 318-3400

Co-Counsel for AT&T

{00357335;v1}75891930.5                         - 14 -