31

Court File No. 09-CL-7950

**_ONTARIO_**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE _COMPANIES' CREDITORS ARRANGEMENT ACT_,
R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE _COMPANIES' CREDITORS ARRANGEMENT ACT_,
R.S.C. 1985, c. C-36, AS AMENDED**

**SUPPLEMENTARY SERVICE LIST OF
PROVINCIAL TAX AUTHORITIES**

TO:      **OGILVY RENAULT LLP**
         Royal Bank Plaza, South Tower
         200 Bay Street, Suite 3800
         Toronto, Ontario M5J 2Z4

         Derrick Tay
         Mario Forte
         Jennifer Stam

         Email:     dtay@ogilvyrenault.com
                    mforte@ogilvyrenault.com
                    jstam@ogilvyrenault.com

         Tel:       416.216.4000
         Fax:       416.216.3930

         Lawyers for the Applicants

*32*

**BY EMAIL:**

**ALBERTA**

AND
TO:
**ALBERTA MINISTRY OF FINANCE**
The Tax and Revenue Administration
9811-109 Street
Edmonton, Alberta  T5K 2L5

Sue Jamieson, Assistant Deputy Minister

Email: sue.jamieson@gov.ab.ca
Tel:    780.427.9403
Fax:    780.427.0348

**MANITOBA**

AND
TO:
**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF MANITOBA AS
REPRESENTED BY THE MINISTER OF
FINANCE**

450 Broadway
Winnipeg, Manitoba  R3C 0V8

Barry Draward

E-mail: barry.draward@gov.mb.ca
Tel:    204.945.3758
Fax:    204.948.2360

33

**NEW BRUNSWICK**

AND
TO:
**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF NEW BRUNSWICK AS
REPRESENTED BY THE MINISTER OF
FINANCE**

Centennial Building
Room: 371, Floor: 3
P. O. Box 6000
Fredericton, New Brunswick
E3B 5H1

Lynn Noel

Email:  lynn.noel@gnb.ca
Tel:      506.457.3550
Fax:     506.444.4920

**NEWFOUNDLAND**

AND
TO:
**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF NEWFOUNDLAND AS
REPRESENTED BY THE MINISTER OF
FINANCE**

Department of Finance
3rd Floor, East Block, Confederation Complex
P.O. Box 8700, St. John's, Newfoundland
A1B 4J6

Keith Rees

Email:  krees@gov.nl.ca
Tel:      709.729.6297
Fax:     709.729.2856

.34

## NOVA SCOTIA

AND
TO:
**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF NOVA SCOTIA AS
REPRESENTED BY THE MINISTER OF
FINANCE**

P.O. Box 187
1723 Hollis St.
Halifax, Nova Scotia  B3J 2N3

Doug Moodie

Email:   moodiedj@gov.ns.ca
Tel:      902.424.5720
Fax:     902.424.6635

## ONTARIO

AND
TO:
**ONTARIO MINISTRY OF FINANCE**
Legal Services Branch
6th Floor
33 King Street West
Oshawa, Ontario
L1H 8H5

Kevin O'Hara

Email:   kevin.ohara@ontario.ca
Tel:      905.433.6934
Fax:     905.436.4510

35

**PRINCE EDWARD ISLAND**

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF PRINCE EDWARD
ISLAND AS REPRESENTED BY THE
PROVINCIAL TREASURY**

Shaw Building, 1st Floor
95 Rochford Street
PO Box 2000
Charlottetown, PE  C1A 7N8

Mary Hennessey

Email:  mihennessey@gov.pe.ca
Tel:     902.368.4070
Fax:     902.368.6164

**SASKATCHEWAN**

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF SASKATCHEWAN AS
REPRESENTED BY THE MINISTER OF
FINANCE**

2350 Albert Street
Regina, Saskatchewan  S4P 4A6

Margaret Johannsson, Assistant Deputy Minister

Email:  Margaret.johannsson@gov.sk.ca
Tel:     306.787.6685
Fax:     306.787.0241

36

**FEDERAL**

AND
TO:

**CANADA REVENUE AGENCY**
c/o Department of Justice
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario  M5X 1K6

Diane Winters

Email: diane.winters@justice.gc.ca
Tel:    416.973.3172
Fax:    416.973.0810

37

**BY FAX:**

**BRITISH COLUMBIA**

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF THE PROVINCE OF BRITISH COLUMBIA, AS REPRESENTED BY THE MINISTER OF FINANCE, REVENUE DIVISION**

3rd Floor, 1802 Douglas Street
Victoria, British Columbia  V8T 4K6

Michael Ford

Fax:    250.356.0065

**QUEBEC**

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF THE PROVINCE OF QUEBEC AS REPRESENTED BY THE MINISTER OF FINANCE**

**Ministère des Finances**
12, rue Saint-Louis
Québec (Québec) G1R 5L3

Tel:    418.528.9323
Fax:    418.646.1631

DOCSTOR: 1731595\3

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**NOTICE OF MOTION**
**(returnable December 2, 2009)**

Ogilvy Renault LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

38

**TAB 2**

39

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF GEORGE RIEDEL**
**(sworn October 9, 2009)**

I, George Riedel, of the city of Boston in the State of Massachusetts, MAKE OATH
AND SAY:

1.      I am the Chief Strategy Officer of Nortel Networks Corporation ("NNC") and Nortel
Networks Limited ("NNL") and have held those positions since February, 2006. As such, I have
personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where I do
not possess personal knowledge, I have stated the source of my information and, in all such
cases, believe it to be true.

2.      I swear this Affidavit in support of the motion to approve, among other things, the
bidding procedures and a "stalking horse" asset sale agreement dated as of October 7, 2009 (the
"Sale Agreement") among NNC, NNL and Nortel Networks Inc. ("NNI") and certain of their
affiliates, as vendors, certain other entities defined therein as Sellers (collectively, the "Sellers")
and Ciena Corporation, as purchaser ("Ciena" or the "Purchaser"), in respect of the sale of
certain of the Sellers' assets relating to the MEN Business (as such phrase is defined and
described in further detail below) (the "Assets"). A copy of the Sale Agreement (without exhibits
or schedules) is attached as an appendix to the twenty-fourth report (the "Twenty-Fourth
Report") of the Monitor (as defined below) to be filed in connection with this motion.

40.

- 2 -

References to "Nortel" herein are references to the global enterprise of NNC, NNL, NNI and their respective affiliates as a whole. In connection with entering into the Sale Agreement, certain Nortel entities in EMEA (defined below), as vendors (the "EMEA Sellers") and the Purchaser, as purchaser, entered into an asset sale agreement relating to the sale and purchase dated as of October 7, 2009 (the "EMEA Agreement" and together with the Sale Agreement, the "Purchase Agreements") in respect of the sale of certain of the assets of the EMEA Sellers relating to the MEN Business.

3.      All dollar references are US$ unless otherwise indicated.

**BACKGROUND**

4.      On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court and Ernst & Young Inc. was appointed as monitor (the "Monitor") in the CCAA proceedings.

5.      Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "Chapter 11 Debtors"), made voluntary filings in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

6.      Additionally, on January 15, 2009, Nortel Networks UK Limited ("NNUK") and certain subsidiaries of the Nortel group incorporated in Europe, the Middle East or Africa ("EMEA") each obtained an administration order for the appointment of administrators from the English High Court of Justice under the Insolvency Act 1986.

7.      On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

41

8.      On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months which period was subsequently extended. On October 1, 2009, the French Court approved an order to (i) suspend the liquidation operation relating to the sale of the assets and/or business of NNSA for a renewal period of two months; and (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French administrator and liquidator during that period except with respect to the sale of assets and/or businesses of NNSA. In accordance with the European Union's Counsel Regulation, the English law proceedings remain the main proceedings in respect of NNSA.

9.      On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

10.     On July 14, 2009, Nortel Networks (CALA) Inc. made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

11.     Further details regarding the background to these proceedings are set out in the affidavit of John Doolittle sworn January 14, 2009 (the "Initial Order Affidavit") previously filed in these proceedings and are therefore not repeated herein.

12.     The Applicants have previously obtained various relief related to the sale of certain other of their assets including:

     (a)      The sale of Nortel's Layer 4-7 Application Delivery Business, which sale closed on April 1, 2009;

     (b)      The sale of NNL's real property known as the "Westwinds Facility" in Alberta, which sale closed on June 16, 2009;

- 4 -

(c)     A sale process for the divestiture of NNL's interest in its joint venture with LG Electronics Inc., which process is still underway;

(d)     Bidding procedures and a stalking horse agreement entered into with Nokia Siemens Networks B.V. for the sale of certain of Nortel's CDMA and LTE related assets, which was subject to higher and better offers and which ultimately led to the approval of a sale agreement for the sale of such assets to Telefonaktiebolaget LM Ericsson (publ);

(e)     Bidding procedures and a stalking horse agreement entered into with Avaya Inc. ("Avaya") for the sale of Nortel's Enterprise Solutions business, which was subject to higher and better offers and subsequently led to the approval of an amended and restated sale agreement for the sale of that business to Avaya; and

(f)     A sales process order for the sale of Nortel's LTE packet core assets which process is underway.

13.     The Applicants have also brought a motion currently scheduled to be heard on the return date of this motion for the approval of a sale process for its GSM and GSM-R business.

**THE TRANSACTION**

14.     Capitalized terms used in this section of my Affidavit not otherwise defined herein shall have the meanings given to them in the Sale Agreement.

*The MEN Business*

15.     Nortel's Metro Ethernet Networks business (the "MEN Business") includes optical networking, carrier Ethernet switching and multiservice switching products, delivering carrier-grade Ethernet transport capabilities for higher performance and lower cost for emerging video-intensive applications.

16.     The MEN Business's optical networking portfolio includes the 40G Adaptive Optical Engine technology, which can quadruple network capacity while being deployable over any fiber, allowing service providers to reduce engineering and equipment expense and upgrade

43

- 5 -

quickly and cost-effectively from 10G to 40G. The MEN Business also is in the process of developing the industry's first optical technology that can deliver both 40G and 100G network capacity, enabling four times the network throughput immediately, while providing the foundation to simply and affordably increase capacity tenfold as required.

17.     Nortel's principal competitors in the global optical market are large communications companies such as Alcatel-Lucent, Huawei Technologies Co., Ltd., Nokia Siemens Networks B.V., Fujitsu Limited, Ericsson and Cisco Systems, Inc., as well as others that address specific niches within this market, such as Ciena, ADVA AG Optical Networking, Meiningen, Tellabs, Inc. and Infinera Corporation.

18.     The environment in which Nortel operates is highly competitive, the competition for market share is fierce, and the cost of rapid technological development is steep. Furthermore, the scale requirements to compete in this industry are substantial. Due to the global economic downturn, Nortel is experiencing significant pressure on its businesses and facing competing demands on its cash resources, globally as well as on a regional basis, as customers across all businesses suspend, delay and reduce capital expenditures. The extreme volatility in the financial, foreign exchange and credit markets globally and the uncertainty created by the ongoing creditor protection proceedings has compounded the situation.

19.     Even before the commencement of the CCAA proceedings, it had become clear that in order to reduce operating costs during a time of decreased customer spending and global economic uncertainty, Nortel would need to consider strategic divestiture as a way to conserve liquidity and consolidate its position with respect to its remaining businesses. Accordingly, Nortel had begun the process of marketing the Assets for sale before the decision was made to commence proceedings under the CCAA.

*Previous Marketing Efforts*

20.     Nortel first announced its intention to explore a divestiture of the MEN Business in September 2008. With a strong customer base and industry-leading technology breakthroughs such as 40G/100G optical networking, the MEN Business was considered a premium asset with a highly differentiated offering, making it attractive to potential purchasers.

44

- 6 -

21.   In connection with this initial effort, Nortel, in consultation with its financial advisors, approached approximately fifty (50) parties likely to be interested and able to acquire the MEN Business, including a mix of financial investors and strategic buyers.   An information memorandum was provided to the twenty-one (21) parties who had executed confidentiality agreements.   Of those parties who subsequently submitted expressions of interest, Nortel conducted management presentations with the entities it deemed able to consummate a transaction for the MEN Business, and ultimately gave five (5) companies access to an electronic data room containing confidential diligence materials regarding the MEN Business.

22.   As of the Filing Date, Nortel was in serious discussions with three (3) potential bidders, including Ciena.   The commencement of CCAA proceedings forced Nortel to put its plans to divest the MEN Business on hold in order to evaluate the future of the company as a whole.

23.   After the commencement of the proceedings, the Applicants reinitiated their efforts to divest the MEN Business, re-canvassing many of the entities originally contacted in connection with the previous sale, plus five (5) additional parties.   As a result of these efforts, thirteen (13) parties expressed interest in purchasing the assets, executed confidentiality agreements and were provided confidential information memoranda.   All thirteen (13) were given access to the electronic data room, and management presentations were conducted with seven (7) entities.

24.   I am aware that the Twenty-Fourth Report will also include information regarding Nortel's sale efforts in this regard.

*The Sale Agreement*

25.   After extensive arms'-length, good faith negotiations among the Sellers, the EMEA Sellers and the Purchaser and their respective advisors, the Sellers and the EMEA Sellers have agreed, among other things, to convey the Assets to the Purchaser or certain other purchasers designated by the Purchaser all in accordance with the terms and conditions of the Purchase Agreements, subject to the approval of the transaction in a number of the jurisdictions in which the Sellers and EMEA Sellers are subject to insolvency proceedings.

26.   The Sale Agreement contemplates the sale of the Assets, subject to higher and/or better bids, on the following material terms:

45

- 7 -

(a)    *Purchase Price.*  At the Closing, the Purchaser will pay to the Sellers and the EMEA Sellers, through their Distribution Agent, an estimated purchase price of US$390 million in cash plus 10,000,000 shares of Ciena common stock (the "Shares"), subject to certain escrows and net working capital adjustments, among other adjustments.  The Purchase Price may also be reduced if the assets of any EMEA Seller under the EMEA Agreement are excluded in certain circumstances, or if certain provisions of the Transition Services Agreement (as described below) are not met by the Closing Date.

(b)    *Certain Fees.*  In certain circumstances the Sellers and the EMEA Sellers may be required to pay to the Purchaser a Break-Up Fee and an Expense Reimbursement, which is discussed in further detail below.

(c)    *Assets.*  The Assets to be acquired by the Purchaser include, among other things, certain (i) inventory and supplies, (ii) equipment, (iii) contracts, (iv) business information, (v) intellectual property (including claims against third parties for past, present or future infringement), (vi) rights under warranties, representations and guarantees by suppliers, manufacturers and contractors related to the Assets, (vii) governmental consents, (viii) employee records, (ix) tax records required by law to be transferred, and (x) account receivables related to contracts in progress. The assets to be acquired by the Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable (excluding receivables related to contracts in progress), bank account balances and petty cash, certain assets and rights (for example, the right to tax refunds, credits, or similar benefits, and rights under certain contracts (other than Assigned Contracts)) relating to the pre-closing period, and security deposits.

(d)    *Assigned Contracts.*  The Sellers agree to assign certain Seller Contracts, including supplier and customer contracts, to the Purchaser, and to cooperate with the Purchaser to assist in the transition of Bundled Contracts to the Purchaser as they relate to the Business.  The Purchaser and the Sellers agree under certain conditions to share certain of the Cure Costs associated with such assignments and transition.

46.

- 8 -

(e) *Assumed Liabilities.* The liabilities to be assumed by the Purchaser include, among others, (i) liabilities arising after the Closing Date to the extent related to the operation of the MEN Business by the Purchaser following the Closing, (ii) liabilities arising from the performance of Assigned Contracts after the Closing Date, (iii) certain liabilities relating to transferred intellectual property, (iv) certain tax liabilities, (v) certain warranty liabilities and (vi) certain liabilities related to employees and employee benefit plans and under employment laws.

(f) *Sale Free and Clear.* The Assets to be transferred by the Sellers will be transferred free and clear of all liens, claims and encumbrances, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the Sale Agreement.

(g) *Ancillary Agreements.* Pursuant to the Sale Agreement, at Closing, certain Sellers, certain EMEA Sellers and the Purchaser will enter into, among others, the following ancillary agreements:

   (i) *Transition Services Agreement.* At the Closing, NNL, NNC, NNI, NNUK, Nortel Networks (Ireland) Limited, certain of their affiliates and the Purchaser will enter into one or more agreements under which NNL, NNC, NNI, NNUK, Nortel Networks (Ireland) Limited and their affiliates will agree to provide to the Purchaser and its affiliates certain information technology, business transition and related services, commencing at the Closing and continuing for a period not to exceed two (2) years.

   (ii) *Intellectual Property License Agreement.* At the Closing, NNL and the Purchaser will enter into an intellectual property license agreement (the "IPLA") pursuant to which (i) NNL will grant to the Purchaser and its affiliates a non-exclusive license to certain intellectual property necessary for the commercialization of the products and the provision of services, as well as an exclusive license to certain of the intellectual property to commercialize products and provide services within an exclusive field of use, and (ii) NNL and its affiliates will receive a license back to all

47.

- 9 -

intellectual property included in the Assets for use in their other businesses. The IPLA will remain in force for so long as any intellectual property rights licensed thereunder continue to exist.

(iii) *Trademark License Agreement.* At the Closing, NNL and the Purchaser will enter into a license agreement allowing the Purchaser and its affiliates to use "Nortel" trademarks and logo in its sales of the Products for a limited period after the Closing.

(iv) *Loaned Employee Agreement.* At the Closing, Nortel and the Purchaser will enter into an agreement under which certain employees of Nortel and its affiliates will be seconded to the Purchaser to perform services for the Purchaser for a 90-day period beginning on the Closing Date. Nortel will continue to pay all employment costs in respect of the Loaned Employees that relate to the period of the Loaned Employee Agreement, and the Purchaser will provide for the payment of, or if not paid pursuant to the pre-funding mechanism in the Loaned Employee Agreement, promptly reimburse Nortel for, all such employment costs.

(v) *Carling Property Lease Agreements.* At the Closing, Nortel Networks Technology Corporation ("NNTC") and the Purchaser (or an affiliate) will enter into lease agreements pursuant to which NNTC, as landlord, will lease to the Purchaser (or an affiliate) the whole of the Lab 10 building and certain parts of the Lab 2 building of the Carling Property located at 3500 Carling Avenue, Ottawa, Ontario, Canada. Additionally, at the Closing, the parties (or their relevant affiliates) will enter into non-disturbance agreements with NNI, which is an existing mortgagee of the Carling Property.

(vi) *Real Estate Terms and Conditions.* At the Closing, the Sellers and the Purchaser will finalize the general terms to which the parties agree, which will govern the applicable leases, subleases or license agreements in respect of certain real property which the Sellers will lease, sublease, assign or license to the Purchaser (or an affiliate) from and after Closing.

- 10 -

    (vii)    *Contract Manufacturing Inventory Agreement.* At the Closing, certain of the Sellers and the Purchaser (or its affiliates) will enter into 3-way agreements with certain contract manufacturers of the MEN Business, pursuant to which the Sellers and the Purchaser (or its affiliates, as applicable) will allocate certain inventory buy back obligations as between themselves.

(h)    *Restrictions on Solicitation of Competing Bids.* As set forth in section 5.29 of the Sale Agreement and subject to the terms and limitations therein, the Sale Agreement prohibits the Sellers from soliciting competing transactions or seeking relief inconsistent with the Sale Agreement from the date of execution of the Sale Agreement until the entry of the U.S. Bidding Procedures Order, and from the date of the conclusion of the Auction until the Closing Date or termination of the Sale Agreement.

(i)    *Closing Conditions*: In addition to certain other customary closing conditions, including conditions relating to bankruptcy court approvals, the obligation of the Purchaser to close the sale is subject to the satisfaction of the following conditions: (i) the Sellers' delivery to the Purchaser of its Audited Financial Statements and the Unaudited September 30, 2008 Financial Statements pursuant to the Sale Agreement at least five (5) days prior to the Closing Date, and (ii) the performance in all material respects of all material covenants, obligations and agreements required to be performed by the Sellers on or before the Closing.

(j)    *Ongoing Covenants and Restrictions*: In addition to certain other customary post-closing obligations such as information-sharing and redirection of customers and payments, the Sellers have agreed to cooperate with the Purchaser for an agreed period after Closing in relation to arrangements regarding (i) Bundled Contracts, (ii) Assets which were not transferred at Closing due to bankruptcy proceedings commenced in other jurisdictions following execution of the Sale Agreement and (iii) Contracts for which required consents were not obtained prior to Closing.

(k)    *Post-Closing Access to Books and Records.* For three (3) years after the Closing (or such longer period as may be required under applicable law in the case of tax

49.

records), NNC, NNL, NNI and the Purchaser (each, a "Primary Party") must preserve pre-closing records to the extent related to the MEN Business. After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable request from any Primary Party, the other Primary Party shall, and/or shall cause the person holding such records to provide to the requesting Primary Party or its representatives reasonable access to such records during normal business hours and permit the requesting Primary Party or its representatives to make copies of such records, in each case at no cost to the requesting Primary Party or its representatives (other than for reasonable out-of-pocket expenses). The Sale Agreement contains further provisions related to tax and audit-related financial records and information.

*Employees*

27.    As part of the Sale Agreement, the Purchaser has agreed to make offers to at least 2,000 Nortel employees associated with the MEN Business. The Sale Agreement provides that the Purchaser shall be entitled to make offers of employment to such employees after the granting of the U.S. Sale Order and the Canadian Approval and Vesting Order.

*Break Up Fee and Expense Reimbursement*

28.    The Purchaser and its advisors have expended, and expect to continue to expend, considerable time, energy, and resources pursuing the purchase of the Assets and have engaged in extended good faith negotiations. The Purchase Agreements are the culmination of these efforts.

29.    In recognition of this expenditure of time, energy, and resources, the Sellers and the EMEA Sellers have agreed that if the Purchaser is not the Successful Bidder, the Sellers and the EMEA Sellers will, to the extent due under section 10.2 of the Sale Agreement and section 15.5 of the EMEA Agreement, pay the Purchaser: (i) an aggregate fee of sixteen million forty-four thousand dollars and 00/100 (US$16,044,000), which is equal to approximately three percent

50.

- 12 -

(3%) of the aggregate Purchase Price,[1] prior to any closing adjustments, as set forth in section 2.2.1 of the Sale Agreement (the "Break-Up Fee") and (ii) an amount in cash equal to the total amount of all reasonable and documented fees, costs and expenses incurred by the Purchaser in connection with the preparation, performance and execution of the Sale Agreement and EMEA Agreement and the transactions contemplated thereby, including all filing and notification fees and all fees and expenses of the Purchaser's representatives, in an amount not to exceed five million three hundred forty-eight thousand dollars and 00/100 (US$5,348,000), which is equal to approximately one percent (1%) of the aggregate Purchase Price, prior to any closing adjustments (the "Expense Reimbursement" and, together with the Break-Up Fee, to the extent payable by the Sellers, the "Bid Protections"), which shall be payable as provided for pursuant to the terms of the Sale Agreement.  Under the Sale Agreement, two-thirds of the aggregate Bid Protections will be payable by the Sellers, including the Debtors that are Sellers, and the remaining one-third will be payable by the EMEA Sellers under the EMEA Agreement.

30.     I believe, based on my discussions with the Monitor, that the Twenty-Fourth Report will be providing more detail as to the circumstances in which the Bid Protections are payable.

31.     The Sellers have further agreed that their obligation to pay the Break-Up Fee and Expense Reimbursement shall survive termination of the Purchase Agreements.

*The Sale and Bid Process*

32.     In connection with having entered into the Purchase Agreements and subject to approvals by the U.S. Court and this Honourable Court, Nortel will conduct an auction process for the sale of the Assets to ensure that the Sellers receive the maximum value for the Assets and the Sellers and the Purchaser have agreed that the Sale Agreement is subject to higher or better offers.  It is anticipated that if the US Bidding Procedures Order and the Canadian Sales Process Orders are granted, Nortel will conduct an expedited sale process and follow the Bidding Procedures (as defined below) with a view to the ultimate conduct of an auction.

---

[1]     For purposes of calculating the amount of the Bid Protections, the Shares are valued based on the 10-day weighted average trading price for the 10 days prior to the date on which the Stalking Horse Agreement was executed.

51.

- 13 -

33.    An agreed upon set of bidding procedures (the "Bidding Procedures") have been developed, which provide for a process through which an interested party may become a "Qualified Bidder". Bids from Qualified Bidders must be submitted no later than 4:00 p.m. (ET) on November 9, 2009. The auction is scheduled to take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York City at 9:30 a.m. (ET) on November 13, 2009.

34.    I am aware that the Twenty-Fourth Report will attach and outline the proposed sale process and the Bidding Procedures in more detail. I have reviewed the Bidding Procedures and believe them to be fair in the circumstances.

*Montreal Letter of Intent*

35.    The Applicants currently lease space at a facility near Montreal located at 2351 Alfred-Nobel Blvd., Saint-Laurent, Quebec (the "Building") pursuant to a lease dated as of June 27, 2007 (as amended, the "Montreal Lease"). Pursuant to the Montreal Lease, NNL leases the 3rd and 4th floors of the Building (the "Montreal Premises") and the lease term is currently set to expire on June 30, 2012. These premises are used by the Applicants in the conduct of the MEN Business.

36.    Although the Montreal Lease currently provides the for the lease of the entire 3rd and 4th floors of the Building, due to employee and business reductions both before and since the filing, the portion of the Montreal Premises that are being used by the Applicants in connection with the MEN Business do not require the full space. Further, the Purchaser has advised that it is only interested in leasing the 3rd floor of the Montreal Premises provided the MEN Business is consolidated onto such 3rd floor space.

37.    In connection the Sale Agreement and in order to facilitate the transaction, NNL entered into discussions with the landlord for the Montreal Lease in order to discuss the terms on which the Purchaser would lease or occupy the Montreal Premises for a period of time post closing. As a result of those negotiations, NNL and the landlord agreed to the terms of a letter of intent dated as of October 1, 2009 (the "Montreal LOI"), which provide, among other things, the following:

(a)    an extension of the term of the Montreal Lease for the 3rd floor premises to June 30, 2014; and a reduction of the term of the 4th floor premises for a period of nine (9) months from the date of the Montreal LOI;

- 14 -

    (b)    an agreement that NNL may assign the Montreal Lease to the Purchaser or such other listed purchasers or any other purchasers of the MEN Business provided that certain financial tests are met;

    (c)    a provision that upon the assignment of the Montreal Lease, the 4th floor premises shall be subleased from the Purchaser or such other listed purchaser to NNL for the remainder of the term for the 4th floor premises, but that any default by Nortel under such sublease shall not affect the rights of occupancy of the Purchaser or other listed purchaser in respect of the 3rd floor premises so long as the Purchaser or other listed purchasers performs its obligations under the Montreal Lease, as amended by the Montreal LOI;

    (d)    agreement that in the event that the sale of the MEN Business is not closed by May 31, 2010, the consent to assignment set out in the Montreal LOI shall expire, the term of the Montreal Lease shall revert to June 30, 2012, and NNL shall pay a penalty of CDN$500,000 plus applicable taxes; and

    (e)    agreement that NNL will not repudiate the Montreal Lease (as amended by the Montreal LOI).

A redacted copy of the Montreal LOI will be attached to the Twenty-Fourth Report.

38.    The Montreal LOI also provides that on 90 days notice to NNL, the landlord may require that half or all of the 4th floor premises be surrendered to the landlord in which case NNL's required consolidation of the MEN Business operations onto the 3rd floor premises may be accelerated.

39.    In addition to the foregoing, the Montreal LOI provides that, in the event that the Purchaser or other listed purchaser gives notice, or is deemed to have given notice that it does not wish to take an assignment of the Montreal Lease, NNL shall have a right to surrender the 3rd floor premises on June 30, 2010 and, in that event, NNL shall be obligated to pay a surrender penalty of CDN$2,931,000 ("Montreal Surrender Penalty") to the landlord. Under the terms of the Sale Agreement, the Montreal Lease, as amended by the Montreal LOI will either be assigned pursuant to the Sale Agreement by NNL to the Purchaser, or the Purchaser shall be

53

- 15 -

obliged to pay the Montreal Surrender Penalty pursuant to Section 2.3.2(e)(v) of the Sale Agreement.

40. The Montreal LOI is conditional upon, among other things, approval of this Court on or before October 19, 2009.

41. The Montreal LOI was entered into as a result of extensive negotiations with the landlord of the Montreal Premises and to accommodate the terms of the Sale Agreement. I believe that the Montreal LOI and the amendments to the Montreal Lease therein are fair and reasonable in the circumstances, and provide for flexibility to the Purchaser or any other listed purchaser to decline the assumption of the Montreal Lease upon payment of the Montreal Surrender Penalty.

*Sealing*

42. I am aware that the Monitor has or will be filing confidential appendices to the Twenty-Fourth Report which contain the disclosure schedules and exhibits to the Sale Agreement as well as an unredacted copy of the Montreal LOI. The disclosure schedules and exhibits contain sensitive competitive and, in some instances, personal information. The redactions from the Montreal LOI contain a list of parties to which the Montreal Premises landlord agrees to consent and which, if disclosed, may have other implications in the sale process generally.

43. I believe sealing this confidential appendices are appropriate in the circumstances.

**CONCLUSION**

44. I believe that the Sale Agreement is the product of a vigorous, comprehensive and fair process. The proposed auction sale process for the MEN Business, based on the Sale Agreement as a stalking horse bid, is the best way to preserve the business as a going concern and to maximize value and preserve jobs for the Applicants' employees.

45. Based on the Applicants' previous consideration of potential transactions involving the MEN Business and after re-canvassing the marketplace since the commencement of these proceedings, I believe that the proposed transaction with the Purchaser represents the highest and best proposal available for the MEN Business, subject to the receipt of a better bid through the auction process contemplated in this motion.

54

- 16 -

46.    The Sale Agreement requires an expeditious sale process and provides the Purchaser the right to terminate the Sale Agreement if certain milestones in the sale process are not timely met. For these reasons, the expeditious sale of the Assets is critical to the maximization of the value of the Applicants' assets and, in turn, to a recovery for the Applicants' estates.

47.    Further, the Montreal LOI will facilitate the MEN Business transaction with the Purchaser and is fair and reasonable in the circumstances.

SWORN BEFORE ME at the City of Boston, in the State of Massachusetts on this 9th day of October, 2009.

_____
Commissioner for Taking Affidavits or Notary Public

RITA LOFFA
MY COMMISSION, EX:
11/09/2012

_____
George Riedel

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**AFFIDAVIT OF GEORGE RIEDEL**
(sworn October 9, 2009)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

**TAB 3**

56

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION (the "Applicants")**

**TWENTY-FOURTH REPORT OF THE MONITOR**
**DATED OCTOBER 13, 2009**

**INTRODUCTION**

1.    On January 14, 2009 (the "Filing Date") Nortel Networks Corporation ("NNC" and
      collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited
      ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks
      International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC")
      (collectively the "Applicants") filed for and obtained protection under the *Companies'*
      *Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court
      dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc.
      ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA

57

- 2 -

proceeding. The stay of proceedings was extended to October 30, 2009, by this Honourable Court in its Order dated July 30, 2009.

2.    Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009. As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009. In addition, an ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as those in the U.S. (the "Bondholder Group").

3.    Nortel Networks (CALA) Inc. ("NCI") (together with NNI and certain of its subsidiaries filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

4.    Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in Europe, the Middle East and Africa (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court") on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "U.K. Administrators").

5.    On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together, "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel (the "Joint Israeli Administrators") and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

*58*

- 3 -

6.    Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court.

**PURPOSE**

7.    The purpose of this twenty-fourth Report of the Monitor ("Twenty-Fourth Report") is to provide this Honourable Court with information regarding the Applicants' motion seeking approval of:

- an asset sale agreement dated October 7, 2009 (the "Ciena Agreement") amongst NNC, NNL and NNI (the "Main Sellers") and certain of their affiliates (the "Other Sellers" and, with the Main Sellers, the "Sellers"), and Ciena Corporation ("Ciena" or the "Purchaser") in respect of the sale of substantially all of the Metro Ethernet Networks business (the "MEN Business") as a "stalking horse" agreement;

- a sealing order in respect of the exhibits and sellers disclosure schedules (the "Sellers Disclosure Schedules") to the Ciena Agreement for the reasons set out below;

- the Bidding Procedures (as defined below);

- the terms and conditions of the Break-Up Fee and Expense Reimbursement (as defined below); and

- a letter of intent (the "Montreal LOI") between NNL and Breof/Belmont Ban G.P. Limited (the "Montreal Landlord"), with respect to the amendment of the current lease agreement in respect of certain property located in St. Laurent,

59.

- 4 -

Quebec (the "Montreal Premises"), which property is currently utilized in connection with the MEN Business; and

to provide the Monitor's support thereof.


## TERMS OF REFERENCE

8.    In preparing this Twenty-Fourth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. EYI has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Report.

9.    Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

10.   Capitalized terms not defined in this Twenty-Fourth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor, the Bidding Procedures or the Ciena Agreement.


## GENERAL BACKGROUND

11.   Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

12.   As at June 30, 2009, Nortel conducts its global business through four reportable business unit segments, Carrier Networks ("CN"), Enterprise Solutions ("ES"), Metro Ethernet Networks ("MEN") and LG Nortel Co. Ltd. ("LGN"). The revenue and assets of each of

60.

- 5 -

the business units, except for LGN, is distributed among the multiple Nortel legal entities and joint ventures around the world.

13.     The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

## THE METRO ETHERNET NETWORKS BUSINESS

### *Background*

14.     The MEN Business is not operated through a dedicated legal entity or stand-alone division. Generally, Nortel has one legal entity in each country in which it operates and sales of all Nortel products in that country are made through the single legal entity. A more detailed description of this structure is set out in the Pre-Filing Report.

15.     The Ciena Agreement specifically defines the MEN Business as the optical networking solutions and carrier ethernet switching segments of Nortel's overall "Metro Ethernet Networks" business unit. The MEN Business excludes the "Carrier Data" and "Ethernet Fibre Access" segments of the Company's overall Metro Ethernet Networks business unit. The optical networking segment is the predominant part of the Metro Ethernet Networks business unit. The sale of the MEN Business pursuant to the Ciena Agreement also excludes Nortel's Passport portfolio of products.

16.     The MEN Business delivers and services communications infrastructure and solutions for the transport of voice, video and data signals for the "Metropolitan" and "Long-Haul" communications markets using innovative optical networking capabilities. The MEN Business' solutions are designed to deliver carrier-grade ethernet transport capabilities for higher performance and lower cost communication for emerging video-intensive applications.

61.

- 6 -

17.  Principal competitors to the MEN Business include Cisco Systems, Inc., Nokia Siemens
     Networks B.V., Alcatel-Lucent, Huawei Technologies Co., Ltd., Fujitsu Limited and
     Ericsson as well as other companies that compete in certain niches within this market
     including Ciena, ADVA AG Optical Networking, Meiningen, Tellabs, Inc. and Infinera
     Corporation.

18.  The MEN Business operates globally in approximately 44 countries. It has an installed
     base with over 400,000 network elements. Fiscal 2008 revenues were $1.3 billion
     representing approximately 13% of Nortel's 2008 revenues.

19.  The MEN Business had revenues in Canada in fiscal 2008 of approximately $213 million
     representing approximately 31% of Nortel's 2008 Canadian revenue.

20.  In addition, the Applicants have an interest in the intellectual property upon which the
     products of the MEN Business are based. Generally speaking, the owner of the intellectual
     property in the Nortel group, which in most cases is NNL, licenses the intellectual property
     in question to various other Nortel legal entities around the world, in some cases on an
     exclusive basis and in other cases, on a non-exclusive basis. These Nortel entities in turn
     license the intellectual property related to the MEN Business to customers in their
     respective geographic regions.

21.  The MEN Business currently employs the equivalent of approximately 2,330 full time
     employees. This includes individuals directly involved in the MEN Business as well as
     individuals in other Nortel functional areas and corporate departments that are dedicated to
     the MEN Business. Of the 2,330 employees dedicated to the MEN Business,
     approximately 1,450 are located in Canada. (The majority of the Canadian employees
     perform research and development activities and as a result, the majority of the global
     MEN Business's research and development expenditures are incurred by the Applicants.)
     The majority of the remaining employees are located in the United States, the U.K., and
     China, with the balance located in other countries. Generally, these individuals are
     employed by the Nortel legal entity established in the country in which they work.

6 2

- 7 -

22.   The environment in which the MEN Business operates is highly competitive.  To
effectively compete in the industry, parties must continue to make significant investments
in research and development as well as in building sales and marketing infrastructures.
The scale requirements to effectively compete in the industry are substantial.  Given
Nortel's limited available financial resources, management determined in 2008 that the
value of the Business would best be maximized through a sale to a buyer who can leverage
its own existing customer relationships and the acquired customer relationships, as well as
continue to make the necessary investments in technology.  As a result, in late 2008,
Nortel began to explore the potential sale of the MEN Business.

*Initial Sale Process*

23.   In the fall of 2008, prior to commencing insolvency proceedings, as discussed in the
Affidavit of George Riedel dated October 9, 2009, Nortel, with the assistance of its
financial advisors, approached a total of approximately fifty financial investors and
strategic buyers likely to be interested in and able to acquire the MEN Business.  An
information memorandum was provided to the twenty-one parties that executed
confidentiality agreements.  Management presentations were conducted with those parties
that submitted expressions of interest and that Nortel deemed able to consummate a
transaction for the MEN Business.  Five parties were given access to an electronic data
room containing confidential due diligence materials.  Ultimately, these five parties
submitted non-binding proposals and Nortel commenced serious discussions with three of
those parties.  However, as a result of the commencement of the insolvency proceedings
on January 14, 2009, the sale process was subsequently put on hold.

*Post-filing Sale Process*

24.   In March, 2009, Nortel recommenced efforts to market the MEN Business.  With the
assistance of Lazard Frères & Co., the Company approached all of the parties that had
previously indicated interest in acquiring the MEN Business and that the Company
determined had the ability to consummate a transaction as well as five additional parties.
As a result of those efforts, thirteen parties expressed interest in purchasing the MEN

63

- 8 -

Business, executed confidentiality agreements and were provided with a confidential information memorandum. All thirteen parties were provided access to confidential information relating to the MEN Business via an electronic data room.

25.    Seven parties participated in management presentations commencing March 16, 2009. In addition, the Company received and responded to numerous information requests from these parties.

26.    Three parties submitted proposals to acquire the MEN Business and the Company proceeded to engage in extensive negotiations with these three parties in parallel. These negotiations culminated with Nortel entering into the Ciena Agreement as described below.

27.    The Monitor has had extensive involvement in the post-filing sale process including attending and participating in the management presentations and negotiations with prospective buyers described above, performing its own review of materials submitted by prospective purchasers (including the Ciena Agreement) and providing input to the Company with respect to these matters.

**THE CIENA AGREEMENT**

28.    On October 7, 2009, the Sellers entered into the Ciena Agreement with the Purchaser. Concurrently, certain of the EMEA Debtors, NN Israel and certain affiliates of the EMEA Debtors (collectively, the "EMEA Sellers") entered into a separate Asset Sale Agreement (the "EMEA ASA") with Ciena dated October 7, 2009. Collectively, the Ciena Agreement and EMEA ASA outline the terms of the Sellers' and the EMEA Sellers' sale of the assets and certain associated liabilities of the MEN Business to Ciena. The Ciena Agreement (without Exhibits or Schedules) is attached as Appendix "A" hereto. A copy of the exhibits and schedules to the Ciena Agreement are attached as confidential Appendix "B" hereto. As these exhibits and schedules contain sensitive competitive information as well

64

- 9 -

as personal information with respect to employees, the Monitor requests that confidential Appendix "B" to this Twenty-Fourth Report be sealed by this Honourable Court.

29. Ciena is a publicly-traded company listed on NASDAQ and based in Linthicum, Maryland. Ciena provides communications networking equipment, software, and services that support the transport, switching, aggregation, and management of voice, video, and data traffic. Its optical service delivery and carrier ethernet service delivery products are used, individually or as part of an integrated solution, in networks operated by communications service providers, cable operators, governments, and enterprises worldwide.

30. A summary of the key provisions of the Ciena Agreement is provided in the paragraphs that follow. Reference should be made directly to the Ciena Agreement, a copy of which is attached as Appendix "A" hereto, for a complete understanding of the terms governing the transaction.

*Assets*

31. The assets of the Sellers relating to the MEN Business being sold are as follows (collectively, the "Purchased Assets"):

- the Owned Inventory as of the Closing Date;

- the Owned Equipment as of the Closing Date;

- the Assigned Contracts in force as of the Closing Date;

- the Business Information existing as of the Closing Date (subject to certain exceptions);

- the Transferred Intellectual Property as of the Closing Date, subject to license rights granted prior to the Closing Date, together with all claims against Third Parties for infringement, misappropriation or other violation of law with respect to the Transferred Intellectual Property;

65.

- 10 -

- all rights as of the Closing Date under all warranties, representations and guarantees made by suppliers, manufacturers, and contractors to the extent related to the Purchased Assets described above;

- certain consents of Government Entities and pending applications therefor;

- the Employee Records with respect to Employees whose employment transfers to the Purchaser by operation of law;

- any Tax records required by law to be transferred; and

- the contracts in progress accounts receivable.

32.    The Purchased Assets to be acquired by the Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable (including intercompany receivables but excluding contracts in progress accounts receivable), bank account balances and petty cash of the Sellers, certain rights and refunds (including Tax refunds) relating to the pre-Closing period, security deposits provided by the Sellers to their contractual counterparties, any rights under any contracts (other than the Assigned Contracts), shares of any Person, and any assets owned by certain joint ventures of the Sellers.

*Purchase Price*

33.    The Purchase Price is $390 million cash (the "Base Cash Purchase Price"), as adjusted in the manner described below, plus 10 million shares of common stock of the Purchaser[1] (the "Shares"), plus the Purchaser's obligation to pay, perform and discharge the Assumed Liabilities and the EMEA Assumed Liabilities. On the Closing Date, the Purchaser will, subject to certain mechanics set out in the Ciena Agreement, deliver to the Distribution Agent share certificates representing the Shares and pay to the Distribution Agent the Base Cash Purchase Price, less the Escrow Amount and as adjusted by the Estimated

---

[1] The Monitor understands that the closing price of Ciena's common stock on NASDAQ on October 7, 2009 was $13.44 per share implying an approximate market value for the Shares as of the date of the Ciena Agreement of approximately $134 million.

66.

- 11 -

Adjustment Amount, which is calculated as the Estimated Closing Date Net Working
Capital Transferred less $167 million.

- If the Estimated Adjustment Amount is a positive number, then the Cash Purchase
  Price is calculated as the Base Cash Purchase Price, minus the Escrow Amount
  (as described below), plus the Estimated Adjustment Amount.

- If the Estimated Adjustment Amount is a negative number, then the Cash
  Purchase Price is calculated as the Base Cash Purchase Price, minus the Escrow
  Amount, minus the absolute value of the Estimated Adjustment Amount.

34.   The amount of the Cash Purchase Price paid at Closing may also be subject to certain
      purchase price adjustments contemplated in the Real Estate Terms and Conditions
      appended to the Ciena Agreement (as described below).

35.   The Monitor notes that the Ciena Agreement does not provide for any adjustment of the
      Purchase Price or the number of Shares as a result of fluctuations in the stock price prior to
      closing and that the Sellers will be subject to certain resale restrictions in respect of the
      Shares.

36.   After the Closing, the Cash Purchase Price will be further adjusted based on differences
      between the estimated and final amounts of the Closing Date Net Working Capital
      Transferred (as described below).

37.   At Closing, if the Sellers and the Purchaser have been unable to obtain the consent of the
      Montreal Landlord to an assignment of the Montreal Lease (as defined below) as
      contemplated by the Montreal LOI or a new lease for the third floor portion of the
      Montreal Premises pursuant to terms and conditions similar to those contained in the
      Montreal LOI, the Purchase Price shall be reduced by $5,000,000 (the "Montreal Premises
      Relocation Fee"). The Montreal Premises Relocation Fee shall be held in escrow and
      released to the Purchaser at such time as the Purchaser has vacated the Montreal Premises
      and removed all of the Purchased Assets therefrom. As noted below in the description of

67

- 12 -

the Montreal LOI, the Montreal Landlord has, subject to certain terms and conditions, consented to the assignment of the Montreal Lease to Ciena.

38.    Each of the Main Sellers, the EMEA Sellers (or an authorized representative thereof) and the Purchaser will enter into the Escrow Agreement with the Escrow Agent on or prior to Closing pursuant to which the following escrow amounts (collectively, the "Escrow Amount") will be set up at Closing with funds provided by the Purchaser (which funds form part of the Base Cash Purchase Price):

- the Working Capital Escrow Amount of $5 million to secure any amounts that may be owed to the Purchaser as a post-Closing Working Capital adjustment;

- the Carling Property Escrow Amount of $33.5 million to secure the termination fee, if any, payable by the Sellers to the Purchaser in respect of the Sellers' early termination of the Carling Property Lease Agreement; this escrow is subject to a step down of $8.375 million in each of years 7 to 10 after Closing in the event the Carling Property Lease Agreement has not been terminated;

- the Transition Services Financial Performance Escrow Amount of $15 million to be released to the Sellers pending delivery of materially all of the financial data required by the Purchaser to satisfy its SEC quarterly financial reporting requirements for the first two financial close processes after the Closing (less claims made by the Purchaser under this escrow); thereafter, and upon resolution of all disputes between the Parties regarding the Purchaser's rights to amounts under this escrow, any remaining amounts under this escrow shall be released to the Sellers. If the first monthly financial close after the Closing is a quarterly close, the Purchaser may elect to apply this escrow to the second and third quarterly close processes only that occur after Closing;

- the Transition Services General Service Level Escrow Amount of $15 million to secure the performance of the Transition Services at agreed upon service levels for a two year period after Closing. Half of this amount ($7.5 million) shall be released twelve months after the Closing (less claims by the Purchaser